## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NUMBER ONE,
401 W. 15th Street
Suite 850
Austin, Texas 78701,
                    *Plaintiff*,

v.

ALBERTO GONZALES,
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530,
                    *Defendant*.

Civil Action No. 1:06CV01384
The Hon. Paul L. Friedman

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION BY TEXAS STATE CONFERENCE OF NAACP AND AUSTIN BRANCH OF THE NAACP TO INTERVENE AS DEFENDANTS

TABLE OF CONTENTS

Table of Contents .................................................................................................. i

Table of Authorities ............................................................................................. ii

Introduction ......................................................................................................... 1

Background .......................................................................................................... 2

Argument ............................................................................................................. 3

I.    Applicants Lack Standing to Intervene. ...................................................... 5

      A.    Nonresidents of the District Cannot Show Injury-in-Fact From the
            District's Attempt to Bail Out of §5 Preclearance. ............................. 7

      B.    Applicants Cannot Show Causation Because No Injury to Them or Their
            Members Is Fairly Traceable to Actions of the District. .................... 12

      C.    Applicants Cannot Show That Any Cognizable Injury to Them or Their
            Members Would Be Redressed by a Judgment Against the District. ................ 13

II.   Applicants Are Not So Situated That the Disposition of This Case May Impair or
      Impede Their Interests. ............................................................................. 14

III.  Applicants Cannot Show That Their Interests Are Not Adequately Represented by
      the Attorney General. ................................................................................ 15

IV.   Applicants Should Be Denied Permissive Intervention Because Their Duplicative
      Participation Would Cause Undue Delay and Prejudice. ............................ 19

Conclusion ......................................................................................................... 20

Certificate of Service ......................................................................................... 21

TABLE OF AUTHORITIES

CASES

*ACLU v. Reno,*
    217 F.3d 162 (3d Cir. 2000) ........................................................................................10

*Allen v. Wright,*
    468 U.S. 737, 104 S.Ct. 3315 (1984) ....................................................................12, 13

*Athens Lumber Co. v. Fed. Election Comm'n,*
    690 F.2d 1364 (11th Cir. 1982) ...........................................................................12, 15

*Briscoe v. Bell,*
    432 U.S. 404, 97 S.Ct. 2428 (1977) ...........................................................................8

*Blake v. Pallan,*
    554 F.2d 947 (9th Cir. 1977) ....................................................................................18

*City of Boerne v. Flores,*
    521 U.S. 507, 117 S.Ct. 2157 (1997) ........................................................................8

*City of Cleveland v. NRC,*
    17 F.3d 1515 (D.C. Cir. 1994) ..................................................................4, 5, 10, 11

*City of Rome v. United States,*
    446 U.S. 156, 100 S.Ct. 1548 (1980) ........................................................................8

*Diamond v. Charles,*
    476 U.S. 54, 106 S.Ct. 1697 (1986) ........................................................................11

*Dimond v. District of Columbia,*
    792 F.2d 179 (D.C. Cir. 1986) ................................................................................17

*Envtl. Def. Fund, Inc. v. Higginson,*
    631 F.2d 738 (D.C. Cir. 1979) ....................................................................16, 17, 18

*Fund for Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003) ......................................................................... *passim*

*Georgia v. Ashcroft,*
    539 U.S. 461, 123 S.Ct. 2498 (2003) ....................................................................7, 8

*Humane Soc'y of United States v. Clark,*
    109 F.R.D. 518 (D.D.C. 1985) ................................................................................16

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333, 97 S.Ct. 2434 (1977)................................................................5

*In re Vitamins Antitrust Class Action*,
  215 F.3d 26 (D.C. Cir. 2000) ........................................................................4

*Ind. Democratic Party v. Rokita*,
  No. 1:05-CV-0634-SEB-VSS, 2006 U.S. Dist. LEXIS 20321
  (S.D. Ind. April 14, 2006) ...........................................................................15

*Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*,
  378 F.3d 774 (8th Cir. 2004) ...................................................................16, 18

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S.Ct. 2130 (1992).......................................................6, 7, 12, 13

*Massachusetts Sch. of Law at Andover, Inc. v. United States*,
  118 F.3d 776 (D.C. Cir. 1997) .......................................................................19

*Nuesse v. Camp*,
  385 F.2d 694 (D.C. Cir. 1967) .......................................................................16

*Reno v. Bossier Parish Sch. Bd.*,
  528 U.S. 320, 120 S.Ct. 866 (2000)...................................................................8

*Rio Grande Pipeline Co. v. FERC*,
  178 F.3d 533 (D.C. Cir. 1999) ....................................................................4, 11

*Roeder v. Islamic Rep. of Iran*,
  333 F.3d 228 (D.C. Cir. 2003) .....................................................................4, 6

*SEC v. Prudential Sec. Inc.*,
  136 F.3d 153 (D.C. Cir. 1998) ........................................................................4

*Smuck v. Hobson*,
  408 F.2d 175 (D.C. Cir. 1969) .......................................................................18

*Snyder v. FCC*,
  No. 04-1022, 2004 U.S. App. LEXIS 11272 (D.C. Cir. June 7, 2004) ............................4

*Sweet Home Chapter of Cmtys. for Great Or. v. Lujan*,
  No. 91-1468, 1991 U.S. Dist. LEXIS 17449 (D.D.C. Dec. 10, 1991)............................16

*Trbovich v. United Mine Workers*,
  404 U.S. 528, 92 S.Ct. 630 (1972)...................................................................16

*United States v. Hays*,
    515 U.S. 737, 115 S.Ct. 2431 (1995)...............................................................6, 7, 11, 12

*United States v. Philip Morris USA Inc.*,
    No. 99-2496 (GK), 2005 U.S. Dist. LEXIS 16196 (D.D.C. July 25, 2005).......................4

*United States v. United States Coin & Currency*,
    401 U.S. 715, 91 S.Ct. 1041 (1971)...............................................................................10

**STATUTES & RULES**

42 U.S.C. §1973*b*......................................................................................................................2, 8

42 U.S.C. §1973*c*...........................................................................................................................2

FED. R. CIV. P. 24(a)..................................................................................................................4, 6

FED. R. CIV. P. 24(a)(2)...................................................................................................... *passim*

FED. R. CIV. P. 24(b)................................................................................................................5, 19

FED. R. CIV. P. 24(b)(2)................................................................................................................5

**MISCELLANEOUS**

Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal
Defense and Educational Fund, Inc., Reauthorization of the Voting Rights Act: Policy
Perspectives and Views from the Field, United States Senate Judiciary Subcommittee
on the Constitution, June 21, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/
VRA_ Adegbile_Senate_Testimony.pdf .......................................................................9

Response of Theodore Shaw, Director-Counsel, NAACP Legal Defense and Educational
Fund, Inc. to Written Questions from Senator John Cornyn, June 9, 2006, *available at*
http://www.naacpldf.org/content/pdf/vra/Ted Shaw_Response_to_Questions_on_VRA
from_Senate_Judiciary_Committee.pdf .......................................................................9

### INTRODUCTION

The plaintiff, a small utility district in Texas that does not register voters and that has no history of discrimination in voting, seeks an escape from the burdensome requirement that it submit any proposed change affecting voting—no matter how tiny or tangential—for preliminary clearance by the United States Attorney General.   The district has always complied with the Voting Rights Act and the Constitution, and does not challenge one jot of the substantive provisions of the Voting Rights Act that guarantee full access to the ballot box and the political process for every one of its citizens.   Instead, the district merely seeks to demonstrate that its longtime commitment to ensuring full voting rights for all its citizens is precisely what entitles this local political subdivision to relief from the preclearance requirement.   The district's residents, who participate in the open and fair elections for the district's board members, have the right to sound local government that is free to make local decisions without the undue interference of the federal government.

Two organizations now move to intervene to oppose the district's effort to terminate its preclearance obligations.   Those organizations claim no members residing in the district and assert no particularized injury to any of their members, only a generalized interest in stopping the district from getting the remedy it seeks.

The motion should be denied.   Applicants have no cognizable stake in the outcome of this proceeding between the district and the Attorney General.   They have no standing because they represent no one in the district who has suffered or is about to suffer an injury-in-fact. They are not so situated that anything in this action, as a practical consequence, will impair or impede any cognizable interests they possess.   The Attorney General—a governmental entity obliged to act in the public interest—is presumed to adequately represent any actual interest applicants might have, and applicants provide nothing to overcome that presumption.   Further,

permitting the duplicative and cumulative participation applicants propose would unnecessarily complicate these proceedings, resulting in undue delay and prejudice that makes permissive intervention improper.

## BACKGROUND

Northwest Austin Municipal Utility District Number One, the plaintiff in this action, seeks a declaratory judgment relieving it from the burden of subjecting changes affecting voting in the district to preclearance by the Attorney General under §5 of the Voting Rights Act, 42 U.S.C. §1973*c*. The district, which has never engaged in discrimination in any form, believes that it is entitled to "bail out" of the §5 preclearance requirement because it satisfies the requirements for a declaratory judgment under §4 of the Act. 42 U.S.C. §1973*b*. In the alternative, the district believes that if §4 does not entitle it to bail out of §5's preclearance requirement, then the continued application of §5 against the district is unconstitutional.

Texas became covered by §5 as of September 23, 1975, when the United States Attorney General determined that: (a) election materials in Texas had been offered only in English; (b) more than 5% of Texas's voting age population was Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972 presidential election. The district does now and always has supported full and open voting rights for all its residents. The district did not exist when Texas became covered by §5; it was formed in 1987. Nevertheless, the district is a covered political subdivision that must presently submit any proposed voting changes for §5 preclearance.

The §5 preclearance process is costly and burdensome. To comply with §5, before any "change in practices or procedures affecting voting"—even the most minute of changes—the district must submit such changes to the Attorney General for approval. In addition to the cost

2

of the submission itself, most proposed changes are presumptively delayed by at least 60 days awaiting the Attorney General's approval.

In July 2006, Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions nor take into account that discriminatory conditions may now exist in jurisdictions that are not covered by §5. While Congress was considering that reenactment, proponents of reauthorizing §5 repeatedly stressed that the availability of bail-out for jurisdictions that could demonstrate a history of compliance with the Voting Rights Act is intended to minimize the burdens on constitutionally compliant political subdivisions and that this escape clause made §5 a congruent and proportional remedy for the evils Congress sought to address.

Now that the district has sought to avail itself of that remedy, however, applicants Texas State Conference of NAACP Branches and Austin Branch of the NAACP have moved to intervene, expressing determined opposition to the district's effort to terminate its §5 obligations. Applicants claim to have voter members in Texas, including in the Austin area, but do not claim to have members residing in the district. NAACP Mem. 4. Thus, rather than asserting particularized injury affecting any of their members, applicants assert a generalized "interest in the continued enforcement of Section 5." NAACP Mem. 1. The Attorney General, in his answer to the district's complaint, has indicated that he will vigorously defend that interest. Because applicants lack standing and cannot satisfy other requirements for intervention, the district opposes the motion.

ARGUMENT

The applicant organizations, which do not claim to have any members who are residents of the district and which cannot state a legally cognizable stake in the outcome of this action, cannot satisfy the requirements for intervention as of right or permissive intervention. There is

3

no indication that the Attorney General is inadequate to defend the constitutionality of §5. At most, applicants have articulated interests in influencing the Court's determination of the case that could be fully served by applicants' participation as *amici curiae*. The district would have no objection to applicants' participating through *amici* filings, but it opposes applicants' attempt to participate at the same level as the parties to this action because applicants lack standing and cannot meet remaining elements of the intervention inquiry.

The D.C. Circuit has made clear that "because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties." *City of Cleveland v. NRC*, 17 F.3d 1515, 1517 (D.C. Cir. 1994); *accord Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 538 (D.C. Cir. 1999).[1] Contrary to applicants' suggestion, *Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003), did not relax this requirement for those seeking to intervene on the side of a defendant; rather, *Roeder* confirms that an applicant cannot satisfy rule 24(a) without establishing standing. *Id.* at 233 ("[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement.").

Additionally, a motion to intervene as of right under rule 24(a)(2) requires the Court to consider four factors:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair

---

[1] *In re Vitamins Antitrust Class Action*, 215 F.3d 26 (D.C. Cir. 2000), expressed "uncertainty over whether standing is necessary for permissive intervention." *Id.* at 31. But other decisions by the court of appeals and this Court suggest that it is. *See, e.g.*, Snyder v. FCC, No. 04-1022, 2004 U.S. App. LEXIS 11272, at *1-*3 (D.C. Cir. June 7, 2004) (unpublished) ("[A]lthough the court has allowed interested parties to intervene where the party expected to press the public interest does not appeal, intervenors themselves are required to have standing."); *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 n.7 (D.C. Cir. 1998) (affirming a denial of permissive intervention when the applicants' "intervention would have no effect because they have no standing to enforce the consent decree"); *United States v. Philip Morris USA Inc.*, No. 99-2496 (GK), 2005 U.S. Dist. LEXIS 16196, at *27 (D.D.C. July 25, 2005) (unpublished) (granting permissive intervention after finding, *inter alia*, that applicants had standing).

4

or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties."

*Fund for Animals*, 322 F.3d at 731. The requirement that an intervenor demonstrate "'an interest relating to the property or transaction which is the subject of the action' . . . impliedly refers not to any interest the applicant can put forward, but only to a legally protectable one." *City of Cleveland*, 17 F.3d at 1517. Permissive intervention under rule 24(b)(2) requires the applicant to establish, in addition to timeliness, that the "applicant's claim or defense and the main action have a question of law or fact in common" and requires the Court to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." FED. R. CIV. P. 24(b).

Applicants' motion to intervene should be denied because they lack standing, they have no legally cognizable interests that would be impaired as a practical consequence of this action, and they have made no showing that the Attorney General is inadequate to represent their asserted interest in defending §5. Moreover, permitting a multiplicity of parties who seek to inject duplicative and extraneous matters into this case would necessarily unduly prejudice the parties and delay judicial resolution of their respective rights.

## I.  APPLICANTS LACK STANDING TO INTERVENE.

Applicants fail to cross the constitutional threshold of standing required of intervenors in this Court. To establish associational standing, an organization must show that: (1) its members would otherwise have standing to litigate in their own right, (2) the interests that the organization seeks to protect are germane to its purpose, and (3) neither the claim nor relief requested require participation of individual members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441 (1977). Applicants cannot satisfy that standard because their

individual members—who, according to applicants, all reside outside the district—would not have standing to intervene in their own right.

"To establish standing under Article III, a prospective intervenor—like any party—must show: (1) injury-in-fact, (2) causation, and (3) redressability." *Fund for Animals*, 322 F.3d at 732-33; *accord, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992). And those elements are merely "the irreducible constitutional minimum." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. Rule 24(a)(2)'s requirement that an applicant demonstrate a legally protectable interest is effectively subsumed in the standing inquiry. *Fund for Animals*, 322 F.3d at 735; *see also Roeder*, 333 F.3d at 233.

Applicants cannot establish that any of their members has standing to intervene in this action involving a single municipal utility district because they do not assert, let alone show, that they have any members who reside in the district. Applicants assert only that they have members "throughout the State of Texas," including "in the Austin area" surrounding the district. NAACP Mem. 4. But the Supreme Court has explained that, to establish standing in a case allegedly affecting voting rights, individuals must—at a minimum—live in the district that is the primary focus of the suit, at least absent specific evidence showing particularized harm. *See United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 2436 (1995) ("[W]here a plaintiff does not live in [a racially gerrymandered] district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference.").[2] That Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental

---

[2] As discussed more fully in the district's oppositions to the Louis and Diaz applicants motions for intervention, even residents of the district cannot establish standing to intervene in this bail-out proceeding absent some showing of injury-in-fact.

conduct as sufficient for standing to invoke the federal judicial power." *Id.* at 743, 115 S.Ct. at 2435.

**A.      Nonresidents of the District Cannot Show Injury-in-Fact From the District's Attempt to Bail Out of §5 Preclearance.**

Injury-in-fact consists of "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.*; *accord Lujan*, 504 U.S. at 560-61, 112 S.Ct. at 2130.   Applicants, which claim to represent only voters outside the district, do not and cannot allege any concrete injury particularized to those nonresidents of the district arising from the district's attempt to bail out of §5 preclearance. Nor could they show any actual or imminent injury to those nonresidents that could arise if the district establishes that it is entitled to exemption from §5.

Whether the district is allowed to bail out of §5 has no bearing on anyone outside the district.   Indeed, even within the district, the effect of exemption from §5 would not be to deprive anyone of substantive voting rights.   No relief the district seeks could exempt the district from complying with the substantive provisions of the Voting Rights Act designed to fully implement the protection of voting rights enshrined in the Constitution, *see Georgia v. Ashcroft*, 539 U.S. 461, 477-78, 123 S.Ct. 2498, 2510 (2003) (noting that "Section 5 of the Voting Rights Act has a limited substantive goal: to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," and that §2 requires substantive protections of voting rights not reached by the §5 preclearance inquiry (internal quotation marks omitted)), nor does the district challenge the Act's protection of substantive voting rights.   Neither preclearance nor exemption from preclearance insulates a political subdivision from an action

under §2 to enforce substantive voting rights.   *See id*; *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 335-36, 120 S.Ct. 866, 875-76 (2000).

　　　For the Court to determine that the district is entitled to bail out under §4, it will need to be satisfied that the district affirmatively proved at least a ten-year history of compliance with the Voting Rights Act and the Constitution.   42 U.S.C. §1973*b*; *see Briscoe v. Bell*, 432 U.S. 404, 411, 97 S.Ct. 2428, 2432 (1977).   For the Court to grant the district the remedy of exemption from §5 on the alternative rationale that it is unconstitutional to apply the preclearance requirement to the district, the Court will need to determine that §5 is not a congruent and proportional exercise of Congress's power to enforce constitutional voting rights when it sweeps in the district, an entity with no history of discrimination, and provides no escape clause.   *See City of Boerne v. Flores*, 521 U.S. 507, 533, 117 S.Ct. 2157, 2170 (1997) (noting that *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548 (1980), upheld the 1975 reenactment of §5 as constitutional because "[t]he [preclearance] requirement was placed only on jurisdictions with a history of intentional racial discrimination in voting"); *Briscoe*, 432 U.S. at 411, 97 S.Ct. at 2432 ("Congress was well aware . . . that the simple formula of § 4(b) might bring within its sweep governmental units not guilty of any unlawful discriminatory voting practices.   It afforded such jurisdictions immediately available protection in the form of an action to terminate coverage under § 4(a) of the Act."); *cf. City of Rome*, 446 U.S. at 177, 100 S.Ct. at 1562 ("Congress could rationally have concluded that, because electoral changes *by jurisdictions with a demonstrable history of intentional racial discrimination in voting* create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." (emphasis added, footnote omitted)).

Indeed, proponents of the 2006 reenactment of §5—including counsel for the Louis applicants, testifying before Congress as representatives of the NAACP Legal Defense Fund— repeatedly emphasized that "the existing bailout and bail-in provisions—Sections 4(a) and 3(c) of the act—operate in tandem with the Section 5 Coverage formula to ensure that the scope of Section 5 is appropriately contracted or expanded."    Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal Defense and Educational Fund, Inc., Reauthorization of the Voting Rights Act: Policy Perspectives and Views from the Field, United States Senate Judiciary Subcommittee on the Constitution, June 21, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/VRA_Adegbile_Senate_Testimony.pdf, at 15-17.    For example, Theodore Shaw explained that "Section 5 coverage is not fixed under the existing statute but rather contains a way out . . . .    Under the bailout provision in Section 4(a), jurisdictions that can establish a clean record of compliance with the VRA and statutory principles of equality in voting can bailout from the preclearance obligations."    Response of Theodore Shaw, Director-Counsel, NAACP Legal Defense and Educational Fund, Inc. to Written Questions from Senator John Cornyn, June 9, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/Ted_Shaw_Response_to_Questions_on_VRA_from_Senate_Judiciary_Committee.pdf, at 2 n.6; *see generally also id.* at 2-11.

In their memorandum in support of intervention, applicants have not identified a legally protectable interest particularly affecting their Texas members—all of whom reside outside of the district.    Rather, applicants merely assert a generalized concern that a judgment in the district's favor would affect enforcement of §5 outside the district if that judgment is based on the rationale that §5 is facially unconstitutional.    For several reasons, that asserted concern fails to rise to the level of an injury-in-fact.

9

In attempting to assert an injury-in-fact, applicants assert that injury outside the district would follow if the Court grants the district the remedy of exemption under the rationale that §5 is facially unconstitutional.    But that assertion confuses a remedy with the *reasoning* the Court may employ to arrive at that remedy.    Any judgment in this case would be binding only as between the district and the Attorney General.    That is, the remedy that the district seeks—exemption from §5—will, if granted, apply only to the district, regardless of the reasoning behind the Court's judgment.    Neither applicants nor their members have a legally protectable interest in this Court's application of particular reasoning in fixing the legal rights of the original parties before it.

Applicants appear to be claiming that the potential harm to their members would arise from a failure to enforce §5 against jurisdictions outside the district if the district is exempted on the ground that §5 is facially unconstitutional.    To the extent applicants thus assert an interest in the continued enforcement of an unconstitutional law, they have not stated a legally cognizable interest.    No one has a legitimate interest in the continued enforcement of a facially unconstitutional law nor suffers cognizable injury when such a law is not enforced.    *See United States v. United States Coin & Currency*, 401 U.S. 715, 728, 91 S.Ct. 1041 (1971) (Brennan, J., concurring); *ACLU v. Reno*, 217 F.3d 162, 180-81 (3d Cir. 2000) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law."). Further, applicants' asserted interest in how success by the district might affect enforcement of §5 in relation to entities not before the Court is analogous to the interest asserted by prospective intervenors that was rejected in *City of Cleveland*.    That applicant, a nuclear power plant operator, sought to intervene in a dispute between the Nuclear Regulatory Commission and two nuclear power plants over whether the commission could suspend antitrust conditions.    The

applicant, which had no relationship with the petitioners, feared that an adverse decision could lead one of its competitors to seek a similar suspension of antitrust conditions. That concern was "'unduly remote' and 'too "academic" to cloak it with standing.'" *City of Cleveland*, 17 F.3d at 1518. So is applicants' asserted concern about how the Court will resolve the constitutional issue should that issue be reached.

"Article III requires more than a desire to vindicate value interests." *Diamond v. Charles*, 476 U.S. 54, 66-67, 106 S.Ct. 1697, 1706 (1986) (holding that the plaintiff physician's "expression of a desire that the Illinois Abortion Law as written be obeyed" was merely an "abstract concern," insufficient to confer standing). To the extent applicants seek to influence the Court's determination of whether §5 is constitutional or not, they have articulated an *amicus* interest, not an intervenor's interest. *See Rio Grande*, 178 F.3d at 539 ("On the record here, there is no doubt that Longhorn is not a proper intervenor. It appears that Longhorn is really seeking to appear as an amicus."); *City of Cleveland*, 17 F.3d at 1518 (denying the motion for intervention but permitting the applicant to participate as *amicus curiae*); *see also Diamond*, 476 U.S. at 78, 106 S.Ct. at 1711. The district has no objection to applicants' participating as *amici*. "[A]n entity lacking Article III standing can do no more than that." *Rio Grande*, 178 F.3d at 539.

Applicants simply cannot show actual or imminent invasion of a legally protectable interest as to either their individual members or the organizations themselves. Vague concerns that a judgment in favor of the district might lead to nonenforcement of §5 elsewhere, which might in turn lead to an increase in violations of §2 or the Fifteenth Amendment in other jurisdictions, are at least one step removed from the "generalized grievance," *Hays*, 515 U.S. at 743, 115 S.Ct. at 2435, that the Supreme Court has repeatedly held is insufficient to support

standing.   Thus, the injuries that applicants attempt to allege are not actual or imminent but conjectural and hypothetical.  *See id.*   It is pure conjecture that a district court judgment in favor of the district, even on the reasoning that §5 is facially unconstitutional, would lead to nonenforcement of §5 elsewhere.   And it is further conjecture that, even if §5's preclearance requirement is not enforced, such an outcome would result in—imminently—§2 or constitutional injury that would not have occurred but for a lack of §5 preclearance.   Applicants' further assertion that they may be injured as organizations by "a substantial drain on their limited resources" because they might, at some indeterminate future time, choose to expend resources challenging §2 violations that might arise and that might have some speculative causal connection to a judgment in this case, NAACP Mem. 12, "stretche[s]" the imminence requirement "beyond its purpose."   *Lujan*, 504 U.S. at 564 n.2, 112 S.Ct. at 2138 n.2 (noting that the concept of imminence "has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control."); *see also Athens Lumber Co. v. Fed. Election Comm'n*, 690 F.2d 1364, 1366 (11th Cir. 1982) ("The interest claimed by IAM is the danger that unions will be financially overwhelmed in federal elections. Although this claim represents a genuine concern, it fails to constitute an 'interest' sufficient to support intervention of right.").

> **B.    Applicants Cannot Show Causation Because No Injury to Them or Their Members Is Fairly Traceable to Actions of the District.**

To satisfy the causation element of the standing inquiry, applicants must show not just that some cognizable injury exists but also that it is "fairly traceable" to conduct of the district. *E.g.*, *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324 (1984).   If the district's

successful exemption from §5 could in and of itself cause injury to anyone (which it cannot), that "injury" could affect only residents of the district.

The injuries that applicants hypothesize *might* occur outside of the district—where all of applicants' members reside—would be §2 violations perpetrated by *other entities*. Those third parties—other political subdivisions—are not before the Court nor, obviously, are they subject to any control by the small utility district that is the subject of this action.

### C.     Applicants Cannot Show That Any Cognizable Injury to Them or Their Members Would Be Redressed by a Judgment Against the District.

A party asserting standing must demonstrate, in addition to an actual injury caused by the opposing litigant, that the relief it seeks is likely to redress that injury. *E.g., Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136. And "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.*

The decision that applicants desire—that the district cannot claim exemption from §5— can have no binding consequence that affects the likelihood that voters in other jurisdictions will avoid §2 violations by those jurisdictions, regardless of the reasoning by which the Court reaches its decision. *Cf. Lujan*, 504 U.S. at 568, 112 S.Ct. at 2140 (challenging a "generalized level of Government action" presents "obvious difficulties insofar as proof of causation or redressability is concerned"); *Allen*, 468 U.S. at 759-60, 104 S.Ct. at 3329 ("[S]uits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . are rarely if ever appropriate for federal-court adjudication."). At bottom, applicants assert merely an interest in avoiding the creation of *precedent* that they do not prefer. Such an interest is the equivalent of seeking an impermissible advisory opinion. *Cf. Lujan*, 504 U.S. at 570 n.5, 112 S.Ct. at 2142 n.5 (rejecting Justice Stevens's argument, in dissent, that the possibility of a nonbinding but persuasive

precedent from the Supreme Court was sufficient to establish redressability because standing is determined at the commencement of suit and " since it is not likely that an agency would feel compelled to accede to the legal view of a district court expressed in a case to which it was not a party; redressability clearly did not exist").   Again, if applicants want to influence precedent this Court might establish, they can do so as *amici*.   But they cannot do so as intervenors when no judgment the Court could enter will redress any actual harm to them or their members.

## II.    APPLICANTS ARE NOT SO SITUATED THAT THE DISPOSITION OF THIS CASE MAY IMPAIR OR IMPEDE THEIR INTERESTS.

In addition to lacking standing, applicants cannot demonstrate that the disposition of this case may impair or impede their ability to protect their interests, as rule 24(a)(2) also requires. The inquiry for this element of intervention as of right focuses on the "practical consequences" that denying intervention would have for the prospective intervenor.   *Fund for Animals*, 322 F.3d at 735.

Applicants identify no practical consequences that they will suffer, only an interest in avoiding the speculative consequences that might flow from precedent with which they disagree. As noted above, that type of concern is the interest of an *amicus curiae*, not the type of interest that must be asserted by an intervenor as of right, which must show that its rights are directly affected by the litigation.   Because applicants can present their views just as well by participating as *amici*, denying intervention would have no practical effect on applicants' ability to communicate their views to the Court.

Moreover, the only practical consequence of the change to the status quo that applicants oppose is that the district would be relieved of the burden of seeking preclearance.   Because this action does not seek to, and cannot, relieve the district from complying with §2 or the dictates of the Constitution, it cannot affect the substantive voting rights of voters within the district, let

alone affect those rights for members of the applicant organizations, all of whom reside outside the district.   For voters outside the district, a decision either that the district is entitled to bailout or that enforcement of §5 is unconstitutional as applied, by itself, plainly has no direct practical effect outside the district.   Even a determination based on the broader rationale that §5 is facially unconstitutional would be binding only as between the Attorney General and the district and have no direct practical consequence on enforcement of §5 outside the district, much less the practical consequence of impairing substantive voting rights in other jurisdictions.

Ultimately, applicants urge the Court to adopt a limitless principle under which virtually anyone would be entitled to intervene in any lawsuit and participate fully as a party as long as that individual or organization asserts that the reasoning a trial court might employ might affect that person or group's asserted interests.   For example, under applicants' theory, virtually anyone could intervene in any Title VII case because any disposition could conceivably affect anyone's employment rights in the sense of contributing to a body of precedent.   When a court permits full participation by parties who are not yet "truly aggrieved" it will be "repeatedly required to respond to vague hypotheticals and speculation rather than concrete and actual harms."   *Ind. Democratic Party v. Rokita*, No. 1:05-CV-0634-SEB-VSS, 2006 U.S. Dist. LEXIS 20321, at *129 n.75 (S.D. Ind. April 14, 2006) (unpublished).   Intervention is not appropriate for applicants who assert only an attenuated and generalized interest in the effect of a case's outcome on speculative future transactions.   *See, e.g.*, *Athens Lumber*, 690 F.2d at 1366.

### III.   APPLICANTS CANNOT SHOW THAT THEIR INTERESTS ARE NOT ADEQUATELY REPRESENTED BY THE ATTORNEY GENERAL.

In addition to establishing that they have a cognizable stake in the litigation sufficient to show standing and that the disposition may impair or impede their interests, intervenors under rule 24(a)(2) must show that their interests are not adequately represented by anyone who is

already a party to the action.   FED. R. CIV. P. 24(a)(2); *Fund for Animals*, 322 F.3d at 735.
Appellants do not and cannot show that the Attorney General is inadequate to defend their
claimed interest in the facial constitutionality of §5.

Although the burden of establishing inadequate representation has been described as
"minimal," *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10
(1972), "the fact that the government is a party makes it more difficult for movants for
intervention in this Circuit to meet that minimal burden."   *Sweet Home Chapter of Cmtys. for
Great Or. v. Lujan*, No. 91-1468, 1991 U.S. Dist. LEXIS 17449, at *7 (D.D.C. Dec. 10, 1991)
(unpublished); *see Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979);
*Humane Soc'y of United States v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985); *cf. Nuesse v. Camp*,
385 F.2d 694, 702-04 (D.C. Cir. 1967) (state banking commissioner was permitted to intervene
when his more general interest in the competitive equality of state and national banks was not
adequately represented by a single state bank).   That is because a governmental entity, under
the principle of *parens patriae*, "is presumed to represent the interests of all its citizens."
*Higginson*, 631 F.2d at 740; *accord Sweet Home Chapter*, 1991 U.S. Dist. LEXIS 17449, at *6
("Certainly federal agencies are parts of a government body, and as such, are charged with
enforcing the public interest. The parens patriae doctrine would thus seem to apply equally well
to government agencies as to states.").

Indeed, the office of the Attorney General—which already adequately represents
applicants' interests in this case—is the very government agency that applicants argue is best
situated to protect their members' substantive voting rights through the preclearance process.
*Cf. Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, 378 F.3d 774, 780-81 (8th Cir. 2004)
(denying intervention by a group of voters when "the state directly represented the Bollen

Group's asserted interest by seeking to proceed with the election pursued by its citizens under state law and by specifically adopting the positions advanced by the Bollen Group"). Any finding that the Attorney General is inadequate to represent applicants' interests would thus be inconsistent with the very disposition applicants seek for this case.

The Attorney General is presumed adequate to represent applicants' asserted interest in defending the enforceability of §5, and applicants make no real attempt to overcome that presumption. The Attorney General's answer to the district's complaint makes clear that the department is committed to vigorously defending §5's constitutionality and enforcing §5 against the district. Applicants cannot just assume a conflict without showing an actual divergence of their interests from those of the Attorney General. To overcome the presumption of adequacy, they must show that they have some particularized interest that "cannot be subsumed within the shared interest of the citizens" represented by the Attorney General. *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986); *see Higginson*, 631 F.2d at 740 (holding that, although applicants may have had more direct economic interest than did the state, they could not overcome the presumption of adequate representation when "there appear[ed] to be no possible divergence between their position and the state's position on the primary issue").

"[P]artial congruence of interests" may "not guarantee the adequacy of representation." *Fund for Animals*, 322 F.3d at 737. But there is complete congruence in this case. Applicants' interests and the Attorney General's do not merely, as applicants suggest, "in some senses overlap." NAACP Mem. 18. Comparing the Attorney General's answer with applicants' motion papers and proposed answer demonstrates no divergence in the objective each hopes to achieve and the defenses each proposes to raise. In particular, applicants and the Attorney General all propose to defend the constitutionality of §5, and applicants offer no

17

explanation of any argument or defense that they intend to raise but have reason to believe that the Attorney General will not. *Cf. Blake v. Pallan*, 554 F.2d 947, 954-55 (9th Cir. 1977) (considering whether the interests of an original party would lead it to make all of the prospective intervenor's arguments). Unlike, for example, a suit challenging an agency regulation that may have myriad aspects and may affect particular entities in particular ways, creating opportunities for divergence, *see Fund for Animals*, 322 F.3d at 736-37, the issue in which applicants express an interest is a simple binary proposition: whether §5 is facially constitutional. The Attorney General and applicants are in total agreement that the simple answer to that question is yes.[3] Inadequacy has not been shown when, as in this case, prospective intervenors' arguments "would be merely cumulative." *Higginson*, 631 F.3d at 740.

Applicants identify no pressures or other considerations that would detract from the Attorney General's ability to vigorously press the position on which they are in total agreement. And nothing has yet occurred that might indicate inadequacy of representation, for example, the Attorney General's deciding to drop a meritorious defense or not to appeal an adverse ruling. *See, e.g.*, *Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969).[4] There is simply no indication that the Attorney General will compromise the full and vigorous defense of §5 by any act or failure to act. And, in any event, "[i]t is not sufficient that the party seeking intervention merely disagrees with the litigation strategy or objectives of the party representing its interests." *Little Rock Sch. Dist.*, 378 F.3d at 780. Applicants do not even propose a different litigation strategy, merely "a different perspective." NAACP Mem. 17. Applicants can share that perspective as

---

[3] Even beyond the constitutional issue, applicants and the Attorney General are in complete agreement. For example, applicants expressly adopt the Attorney General's defense that the district is not a "political subdivision" for purposes of a bail-out action. NAACP Mem. 3 n.1.

[4] A motion to intervene may still be timely following a new development, like failure to appeal an adverse judgment, that, for the first time, demonstrates inadequacy. *Smuck*, 408 F.2d at 181-82.

*amici*; they do not need to participate with all the rights, privileges, and obligations of intervening parties to adequately submit their views.

IV.  **APPLICANTS SHOULD BE DENIED PERMISSIVE INTERVENTION BECAUSE THEIR DUPLICATIVE PARTICIPATION WOULD CAUSE UNDUE DELAY AND PREJUDICE.**

Even if applicants had standing and established that their "claim or defense and the main action have a question of law or fact in common," FED. R. CIV. P. 24(b), the Court should deny permissive intervention because it "will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*  Applicants essentially propose to duplicate the efforts of the Attorney General to defend the constitutionality of §5 and suggest that their expertise will permit them to provide information and arguments to the Court that are either cumulative or extraneous. For example, applicants suggest that they intend to delve into "the history of discrimination in Texas."  NAACP Mem. 21.  But the only relevant history is the history of discrimination— more precisely, the utter lack thereof—in the district.   And nothing indicates that the Attorney General lacks the competence or resources to fully investigate the history of voting in a tiny jurisdiction that has existed for less than three decades.

The inefficiencies inherent in duplicative and cumulative effort are precisely the type of danger that the undue delay and prejudice standard is designed to avert.   The standard "presumably captures all the possible drawbacks of piling on parties."  *Massachusetts Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 782 (D.C. Cir. 1997).   When parties multiply unnecessarily through permissive intervention, "the concomitant issue proliferation and confusion will result in delay as parties and court expend resources trying to overcome the centrifugal forces springing from intervention, and prejudice will take the form not only of the extra cost but also of an increased risk of error."   *Id.*

Applicants have no cognizable stake in the outcome of this litigation, are adequately represented by the Attorney General, and can readily communicate their perspective on the issues before the Court as *amici*.   There is no justification for the delay in adjudicating the respective rights of the district and the Attorney General—the only entities with legally protectable interests in this case—by permitting applicants to participate as intervenors with the full panoply of litigation rights that status entails.

### CONCLUSION

For these reasons, the Court should deny applicants' motion to intervene.

DATED:    October 30, 2006                    Respectfully submitted:


/s/ Erik S. Jaffe
Erik S. Jaffe
D.C. Bar No. 440112
ERIK S. JAFFE, P.C.
5101 34th Street N.W.
Washington, D.C .20008
[Tel.] (202) 237-8165
[Fax  (202) 237-8166

Gregory S. Coleman
(admitted *pro hac vice*)
Christian J. Ward
(admitted *pro hac vice*)
PROJECT ON FAIR REPRESENTATION
8911 Capital of Texas Hwy., Ste. 1350
Austin, Texas  78759
[Tel.] (512) 349-1930
[Fax] (512) 527-0798


*Attorneys for Plaintiff*
*Northwest Austin Municipal*
*Utility District No. One*

CERTIFICATE OF SERVICE

I hereby certify that I served true copies of Plaintiff's Memorandum of Points and Authorities in Opposition to Motion by Texas State Conference of NAACP and Austin Branch of the NAACP and the proposed Order denying the motion upon counsel for the parties and for applicants to intervene by United States First Class postage-paid mail and by e-mail to the parties indicated below on October 30, 2006.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.   20530

*Counsel for Defendant*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Applicants Texas State
Conference of NAACP and Austin Branch of
the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Applicants Texas State Conference of
NAACP and Austin Branch of the NAACP*

Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland   21215

*Counsel for Applicants Texas State Conference of
NAACP and Austin Branch of the NAACP*

21

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
    EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas    78205

*Counsel for Applicants David and Lisa Diaz*

Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York 10013

*Counsel for Applicants Rodney and Nicole
Louis*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C. 20003

*Counsel for Applicants David and Lisa Diaz*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
    FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.    20005

*Counsel for Applicants Rodney and Nicole Louis*

/s/ Christian J. Ward
Christian J. Ward