## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NUMBER ONE,
401 W. 15th Street
Suite 850
Austin, Texas 78701,
                                *Plaintiff*,

v.

ALBERTO GONZALES,
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530,
                                *Defendant*,

Civil Action No. 1:06CV01384
The Hon. Paul L. Friedman

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION BY DAVID AND LISA DIAZ TO INTERVENE AS DEFENDANTS

TABLE OF CONTENTS

Table of Contents ............................................................................................................... i

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 2

Argument .......................................................................................................................... 4

I.      The Diazes Are Not Aggrieved Parties and Lack Standing to Intervene. ......................... 6

        A.      The Diazes Cannot Show Injury-in-Fact From the District's Attempt to Bail Out of §5 Preclearance. .................................................................. 7

        B.      The Diazes Cannot Show Causation Because No Injury Is Fairly Traceable to Actions of the District ................................................................ 10

        C.      The Diazes Cannot Show That Any Cognizable Injury Would Be Redressed by a Judgment Against the District. ................................................ 11

II.     The Diazes Are Not So Situated That the Disposition of This Case May Impair or Impede Their Interests. ................................................................. 12

III.    The Diazes Cannot Show That the Attorney General Will Not Adequately Represent Their Interests. ................................................................. 13

IV.     The Diazes Should Be Denied Permissive Intervention Because Their Duplicative Participation Would Cause Undue Delay and Prejudice. ................................................. 16

Conclusion ...................................................................................................................... 17

Certificate of Service ...................................................................................................... 19

TABLE OF AUTHORITIES

CASES

*Allen v. Wright*,
    468 U.S. 737, 104 S.Ct. 3315 (1984) .......................................................................10, 11

*Briscoe v. Bell*,
    432 U.S. 404, 97 S.Ct. 2428 (1977) ...........................................................................9, 10

*Blake v. Pallan*,
    554 F.2d 947 (9th Cir. 1977) .........................................................................................15

*City of Boerne v. Flores*,
    521 U.S. 507, 117 S.Ct. 2157 (1997) ..............................................................................9

*City of Cleveland v. NRC*,
    17 F.3d 1515 (D.C. Cir. 1994) ............................................................................5, 6, 13

*City of Rome v. United States*,
    446 U.S. 156, 100 S.Ct. 1548 (1980) .............................................................................10

*Diamond v. Charles*,
    476 U.S. 54, 106 S.Ct. 1697 (1986) ..........................................................................8, 13

*Dimond v. District of Columbia*,
    792 F.2d 179 (D.C. Cir. 1986) .......................................................................................15

*Envtl. Def. Fund, Inc. v. Higginson*,
    631 F.2d 738 (D.C. Cir. 1979) .............................................................................13, 14, 15

*Fund for Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ............................................................................. *passim*

*Georgia v. Ashcroft*,
    539 U.S. 461, 123 S.Ct. 2498 (2003) ...................................................................8, 9, 11

*Humane Soc'y of United States v. Clark*,
    109 F.R.D. 518 (D.D.C. 1985) .......................................................................................13

*In re Vitamins Antitrust Class Action*,
    215 F.3d 26 (D.C. Cir. 2000) ...........................................................................................5

*Ind. Democratic Party v. Rokita*,
    No. 1:05-CV-0634-SEB-VSS, 2006 U.S. Dist. LEXIS 20321
    (S.D. Ind. April 14, 2006) ..............................................................................................17

*Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*,
    378 F.3d 774 (8th Cir. 2004) .................................................................14, 16

*LULAC v. Perry*, __U.S.__,
    126 S.Ct. 2594 (2006).......................................................................14, 15

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555, 112 S.Ct. 2130 (1992)...........................................................7, 11

*Massachusetts Sch. of Law at Andover, Inc. v. United States*,
    118 F.3d 776 (D.C. Cir. 1997) ...................................................................17

*Nuesse v. Camp*,
    385 F.2d 694 (D.C. Cir. 1967) ...................................................................13

*Reno v. Bossier Parish Sch. Bd.*,
    528 U.S. 320, 120 S.Ct. 866 (2000)..................................................9, 10, 11, 12

*Rio Grande Pipeline Co. v. FERC*,
    178 F.3d 533 (D.C. Cir. 1999) ...................................................................5, 13

*Roeder v. Islamic Rep. of Iran*,
    333 F.3d 228 (D.C. Cir. 2003) ...................................................................5, 7

*SEC v. Prudential Sec. Inc.*,
    136 F.3d 153 (D.C. Cir. 1998) ...................................................................5

*Smuck v. Hobson*,
    408 F.2d 175 (D.C. Cir. 1969) ...................................................................16

*Snyder v. FCC*,
    No. 04-1022, 2004 U.S. App. LEXIS 11272 (D.C. Cir. June 7, 2004) ............................5

*Sweet Home Chapter of Cmtys. for Great Or. v. Lujan*,
    No. 91-1468, 1991 U.S. Dist. LEXIS 17449 (D.D.C. Dec. 10, 1991)........................13, 14

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205, 93 S.Ct. 364 (1972)...............................................................6, 8

*Trbovich v. United Mine Workers*,
    404 U.S. 528, 92 S.Ct. 630 (1972).................................................................13

*United States v. Hays*,
    515 U.S. 737, 115 S.Ct. 2431 (1995)..............................................................7

*United States v. Philip Morris USA Inc.*,
    No. 99-2496 (GK), 2005 U.S. Dist. LEXIS 16196 (D.D.C. July 25, 2005) ......................5

**STATUTES & RULES**

42 U.S.C. §1973*b* ...............................................................................................................2, 7, 9

42 U.S.C. 1973*b* (a)(4) ...............................................................................................................6

42 U.S.C. §1973*c* ...............................................................................................................2

FED. R. CIV. P. 24(a)(1) ...............................................................................................................5, 12

FED. R. CIV. P. 24(a)(2) ...............................................................................................................5, 7, 12, 13

FED. R. CIV. P. 24(b) ...............................................................................................................6, 16

FED. R. CIV. P. 24(b)(2) ...............................................................................................................6

**MISCELLANEOUS**

Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal
Defense and Educational Fund, Inc., Reauthorization of the Voting Rights Act: Policy
Perspectives and Views from the Field, United States Senate Judiciary Subcommittee
on the Constitution, June 21, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/
VRA_ Adegbile_Senate_Testimony.pdf .......................................................................................3

Response of Theodore Shaw, Director-Counsel, NAACP Legal Defense and Educational
Fund, Inc. to Written Questions from Senator John Cornyn, June 9, 2006, *available at*
http://www.naacpldf.org/content/pdf/vra/Ted Shaw_Response_to_Questions_on_VRA
from_Senate_Judiciary_Committee.pdf .......................................................................................3, 4

**INTRODUCTION**

The plaintiff, a small utility district in Texas that does not register voters and that has no history of discrimination in voting, seeks an escape from the burdensome requirement that it submit any proposed change affecting voting—no matter how tiny or tangential—for preliminary clearance by the United States Attorney General.   The district has always complied with the Voting Rights Act and the Constitution, and does not challenge one jot of the substantive provisions of the Voting Rights Act that guarantee full access to the ballot box and the political process for every one of its citizens.   Instead, the district merely seeks to demonstrate that its longtime commitment to ensuring full voting rights for all its citizens is precisely what entitles this local political subdivision to relief from the preclearance requirement.   The district's residents, who participate in the open and fair elections for the district's board members, have the right to sound local government that is free to make local decisions without the undue interference of the federal government.

Two residents of the district now move to intervene to oppose the district's effort to terminate its preclearance obligations.   Those residents, however, allege no cognizable injury to their substantive voting rights, only a generalized interest in stopping the district from getting the remedy it seeks.

The motion should be denied.   Applicants are not "aggrieved parties" and have no standing because do not allege that they have suffered or are about to suffer an injury-in-fact affecting their substantive voting rights.   They are not so situated that anything in this action, as a practical consequence, will impair or impede any cognizable interests they possess.   The Attorney General—a governmental entity obliged to act in the public interest—is presumed to adequately represent any actual interest applicants might have, and applicants provide nothing to

1

overcome that presumption.    Further, permitting the duplicative and cumulative participation applicants propose would unnecessarily complicate these proceedings, resulting in undue delay and prejudice that makes permissive intervention improper.

## BACKGROUND

Northwest Austin Municipal Utility District Number One, the plaintiff in this action, seeks a declaratory judgment relieving it from the burden of subjecting changes affecting voting in the district to preclearance by the Attorney General under §5 of the Voting Rights Act, 42 U.S.C. §1973*c*.    The district, which has never engaged in discrimination in any form, believes that it is entitled to "bail out" of the §5 preclearance requirement because it satisfies the requirements for a declaratory judgment under §4 of the Act.    42 U.S.C. §1973*b*.    In the alternative, the district believes that if §4 does not entitle it to bail out of §5's preclearance requirement, then the continued application of §5 against the district is unconstitutional.

Texas became covered by §5 as of September 23, 1975, when the United States Attorney General determined that: (a) election materials in Texas had been offered only in English; (b) more than 5% of Texas's voting age population was Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972 presidential election.    The district does now and always has supported full and open voting rights for all its residents.    The district did not exist when Texas became covered by §5; it was formed in 1987.    Nevertheless, the district is a covered political subdivision that must presently submit any proposed voting changes for §5 preclearance.

The §5 preclearance process is costly and burdensome.    To comply with §5, before any "change in practices or procedures affecting voting"—even the most minute of changes—the district must submit such changes to the Attorney General for approval.    In addition to the cost

2

of the submission itself, most proposed changes are presumptively delayed by at least 60 days awaiting the Attorney General's approval.

In July 2006, Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions nor take into account that discriminatory conditions may now exist in jurisdictions that are not covered by §5. While Congress was considering that reenactment, proponents of reauthorizing §5 repeatedly stressed that the availability of bail-out for jurisdictions that could demonstrate a history of compliance with the Voting Rights Act is intended to minimize the burdens on constitutionally compliant political subdivisions and that this escape clause made §5 a congruent and proportional remedy for the evils Congress sought to address.

For example, counsel for another couple who seek to intervene in this case, testifying before Congress as representatives of the NAACP Legal Defense Fund—repeatedly emphasized that "the existing bailout and bail-in provisions—Sections 4(a) and 3(c) of the act—operate in tandem with the Section 5 Coverage formula to ensure that the scope of Section 5 is appropriately contracted or expanded."   Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal Defense and Educational Fund, Inc., Reauthorization of the Voting Rights Act: Policy Perspectives and Views from the Field, United States Senate Judiciary Subcommittee on the Constitution, June 21, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/VRA_Adegbile_Senate_Testimony.pdf, at 15-17. Theodore Shaw explained that "Section 5 coverage is not fixed under the existing statute but rather contains a way out . . . .   Under the bailout provision in Section 4(a), jurisdictions that can establish a clean record of compliance with the VRA and statutory principles of equality in voting can bailout from the preclearance obligations."   Response of Theodore Shaw, Director-

Counsel, NAACP Legal Defense and Educational Fund, Inc. to Written Questions from Senator John Cornyn, June 9, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/Ted Shaw_Response_to_Questions_on_VRA_from_Senate_Judiciary_Committee.pdf, at 2 n.6; *see generally also id.* at 2-11.

Now that the district has sought to avail itself of the bail-out remedy, however, David and Lisa Diaz, Latino residents of the district, have moved to intervene, expressing determined opposition to the district's effort to terminate its §5 obligations.   The Diazes do not allege that they have ever been the victims of discriminatory practices by the district that would affect either the district's right to bail out under the statute or, more generally, their substantive voting rights; nor do they articulate a concrete danger that those rights will be impaired if the district succeeds in terminating §5 coverage.   Rather, they profess merely a generalized interest in the district's remaining covered under §5 as an end in itself.   Moreover, the Diazes' counsel mischaracterize this case as seeking "declaratory relief that will remove the protections of the Voting Rights Act from voters in Plaintiff's elections."   Diaz Mem. 1.   The district seeks no such thing as removal of substantive protections of the Voting Rights Act; this action seeks only relief from the burdensome preclearance requirement.

The Attorney General, in his answer to the district's complaint, has indicated that he will vigorously defend against the district's bail-out request and its alternative constitutional challenge.   Because the Diazes lack standing and cannot satisfy other requirements for intervention, the district opposes their motion to intervene.

## ARGUMENT

The Diazes, who do not claim any actual or imminent injury to their substantive voting rights, are not "aggrieved parties" under the Voting Rights Act, have no cognizable stake in the

outcome of this action, and thus cannot satisfy the requirements for intervention as of right or permissive intervention. There is no indication that the Attorney General is inadequate to defend the application of §5. At most, the Diazes have articulated interests in influencing the Court's determination of the case that could be fully served by their participation as *amici curiae*. The district would have no objection to the Diazes' participating through an *amici* filing, but it opposes their attempt to participate at the same level as the parties to this action because they lack standing and cannot meet remaining elements of the intervention inquiry.

To intervene, the Diazes must satisfy the requirements of Article III standing. *City of Cleveland v. NRC*, 17 F.3d 1515, 1517 (D.C. Cir. 1994) ("[B]ecause a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties."); *accord Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 538 (D.C. Cir. 1999).[1] The D.C. Circuit has been resolute in insisting that rule 24 intervenors meet that requirement. *See Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).

Additionally, a motion to intervene as of right under rule 24(a)(1) requires the applicant to show that "a statute of the United States confers an unconditional right to intervene." FED. R. CIV. P. 24(a)(1). A motion to intervene under rule 24(a)(2) requires the Court to consider four factors:

---

[1] *In re Vitamins Antitrust Class Action*, 215 F.3d 26 (D.C. Cir. 2000), expressed "uncertainty over whether standing is necessary for permissive intervention." *Id.* at 31. But other decisions by the court of appeals and this Court suggest that it is. *See, e.g.*, Snyder v. FCC, No. 04-1022, 2004 U.S. App. LEXIS 11272, at *1-*3 (D.C. Cir. June 7, 2004) (unpublished) ("[A]lthough the court has allowed interested parties to intervene where the party expected to press the public interest does not appeal, intervenors themselves are required to have standing."); *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 n.7 (D.C. Cir. 1998) (affirming a denial of permissive intervention when the applicants' "intervention would have no effect because they have no standing to enforce the consent decree"); *United States v. Philip Morris USA Inc.*, No. 99-2496 (GK), 2005 U.S. Dist. LEXIS 16196, at *27 (D.D.C. July 25, 2005) (unpublished) (granting permissive intervention after finding, *inter alia*, that applicants had standing).

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties."

*Fund for Animals*, 322 F.3d at 731. The requirement that an intervenor demonstrate "'an interest relating to the property or transaction which is the subject of the action' . . . impliedly refers not to any interest the applicant can put forward, but only to a legally protectable one." *City of Cleveland*, 17 F.3d at 1517. Permissive intervention under rule 24(b)(2) requires the applicant to establish, in addition to timeliness, that the "applicant's claim or defense and the main action have a question of law or fact in common" and requires the Court to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." FED. R. CIV. P. 24(b).

The Diazes' motion to intervene should be denied because they lack standing as "aggrieved parties," they have no legally cognizable interests that would be impaired as a practical consequence of this action, and they have made no showing that the Attorney General is inadequate to represent their asserted interest in defending §5. Moreover, permitting a multiplicity of parties who seek to inject duplicative and extraneous matters into this case would necessarily unduly prejudice the parties and delay judicial resolution of their respective rights.

## I.    THE DIAZES ARE NOT AGGRIEVED PARTIES AND LACK STANDING TO INTERVENE.

To intervene under any subsection of rule 24, the Diazes must establish standing. The Diazes do not even acknowledge the standing requirement, let alone attempt to satisfy it. And they cannot do so. The Diazes' primary asserted basis for intervention is a statutory provision: "Any aggrieved party may as of right intervene at any stage in such [a §4] action." 42 U.S.C. 1973*b*(a)(4). An "aggrieved party" is a party with standing. *See Trafficante v. Metro. Life Ins.*

*Co.*, 409 U.S. 205, 209 93 S.Ct. 364, 366-67 (1972) (concluding that the words "person claiming to be aggrieved" in the Civil Rights Act of 1968 "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution'"). The Diazes are not aggrieved parties and thus lack standing to intervene.

"To establish standing under Article III, a prospective intervenor—like any party—must show: (1) injury-in-fact, (2) causation, and (3) redressability." *Fund for Animals*, 322 F.3d at 732-33; *accord, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992). And those elements are merely "the irreducible constitutional minimum." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. Rule 24(a)(2)'s requirement that an applicant demonstrate a legally protectable interest is effectively subsumed in the standing inquiry. *See Fund for Animals*, 322 F.3d at 735; *see also Roeder*, 333 F.3d at 233.

Further, to establish standing in a case allegedly affecting voting rights, individuals must show that they have suffered particularized, "special harms" from alleged discrimination. *United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 2436 (1995). "[A] generalized grievance against allegedly illegal governmental conduct" is not "sufficient for standing to invoke the federal judicial power." *Id.* at 743, 115 S.Ct. at 2435.

A.     **The Diazes Cannot Show Injury-in-Fact From the District's Attempt to Bail Out of §5 Preclearance.**

Injury-in-fact consists of "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 743, 115 S.Ct. at 2435; *accord Lujan*, 504 U.S. at 560-61, 112 S.Ct. at 2130. The Diazes do not allege such an injury.

The elements of the bail-out procedure are set out in §4 itself, 42 U.S.C. 1973*b*, and the Diazes do not allege that they specifically possess any information relevant to the analysis of

whether the district meets the bail-out criteria.   More generally, they do not allege that they have been subject to or are in imminent fear of any discriminatory practice.   *Cf. Trafficante*, 409 U.S. at 209-10, 93 S.Ct. at 367 (finding standing to exist when "[i]ndividual injury or injury in fact to petitioners, the ingredient found missing in *Sierra Club v. Morton*, 405 U.S. 727, is alleged here").   They assert no concrete and particularized injury, actual or imminent.   Instead, they merely make the conclusory assertion that they "have a strong and legally cognizable interest in this action" because they "are Latino registered voters who seek to preserve the protections of the Voting Rights Act where they live and vote."   Diaz Mem. 4.

"Article III requires more than a desire to vindicate value interests."   *Diamond v. Charles*, 476 U.S. 54, 66-67, 106 S.Ct. 1697, 1706 (1986) (holding that the plaintiff physician's "expression of a desire that the Illinois Abortion Law as written be obeyed" was merely an "abstract concern," insufficient to confer standing).   Section 5 coverage is not itself a substantive voting right.   Substantive voting rights are those rights that directly implicate voters' participation in the political and electoral processes, and those rights are enshrined for all voters in the Constitution and in §2 of the Voting Rights Act, which is not challenged here.   *See Georgia v. Ashcroft*, 539 U.S. 461, 477-78, 123 S.Ct. 2498, 2510 (2003) (noting that "Section 5 of the Voting Rights Act has a limited substantive goal: to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," and that §2 requires substantive protections of voting rights not reached by the §5 preclearance inquiry (internal quotation marks omitted)).

Indeed, if there were a substantive right to live under local governmental units that are covered by §5—and thus required to seek permission from the federal government before

implementing any local voting change—the vast majority of our nation's citizens would be suffering infringement of that right. Most American voters, even many in localities with recent histories of voting discrimination, do not live in areas covered by §5.

All local political subdivisions are required to comply with the Constitution and §2. And no relief the district seeks could exempt the district from complying with the substantive provisions of the Voting Rights Act that are designed to fully implement the protection of voting rights enshrined in the Constitution, nor does the district challenge the Act's protection of substantive voting rights. The assertion that "this case seeks declaratory relief that will remove the protections of the Voting Rights Act from voters in Plaintiff's elections," Diaz Mem. 1, is simply wrong. Neither preclearance nor exemption from preclearance insulates a political subdivision from an action under §2 to enforce substantive voting rights. *See Georgia*, 539 U.S. at 477-78, 123 S.Ct. at 2510; *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 335-36, 120 S.Ct. 866, 875-76 (2000).

Indeed, the district always has been and remains committed to full implementation of substantive voting protections for all its citizens. For the Court to determine that the district is entitled to bail out under §4, it will need to be satisfied that the district affirmatively proved at least a ten-year history of compliance with the Voting Rights Act and the Constitution. 42 U.S.C. §1973*b*; *see Briscoe v. Bell*, 432 U.S. 404, 411, 97 S.Ct. 2428, 2432 (1977). For the Court to grant the district the remedy of exemption from §5 on the alternative rationale that it is unconstitutional to apply the preclearance requirement to the district, the Court will need to determine that §5 is not a congruent and proportional exercise of Congress's power to enforce constitutional voting rights when it sweeps in the district, an entity with no history of discrimination, and provides no escape clause. *See City of Boerne v. Flores*, 521 U.S. 507, 533,

9

117 S.Ct. 2157, 2170 (1997) (noting that *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548 (1980), upheld the 1975 reenactment of §5 as constitutional because "[t]he [preclearance] requirement was placed only on jurisdictions with a history of intentional racial discrimination in voting"); *Briscoe*, 432 U.S. at 411, 97 S.Ct. at 2432 ("Congress was well aware . . . that the simple formula of § 4(b) might bring within its sweep governmental units not guilty of any unlawful discriminatory voting practices.  It afforded such jurisdictions immediately available protection in the form of an action to terminate coverage under § 4(a) of the Act."); *cf. City of Rome*, 446 U.S. at 177, 100 S.Ct. at 1562 ("Congress could rationally have concluded that, because electoral changes *by jurisdictions with a demonstrable history of intentional racial discrimination in voting* create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." (emphasis added, footnote omitted)).

In other words, any judgment terminating the district's coverage under §5 necessarily involves examination of the district's recent history and a judicial determination that it demonstrates compliance with §2.  The Diazes are thus unlikely to suffer any imminent injury to substantive voting rights at the hands of the district if its §5 coverage is terminated, and they have made no allegation of a concrete or particularized harm that would throw into doubt the district's entitlement to termination of §5 coverage.

### B.    The Diazes Cannot Show Causation Because No Injury Is Fairly Traceable to Actions of the District.

To satisfy the causation element of the standing inquiry, the Diazes must show not just that some cognizable injury exists but also that it is "fairly traceable" to conduct of the district. *E.g.*, *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324 (1984).  The Diazes allege no injury-in-fact at all, so none is traceable to actions of the district.

Moreover, any conceivable future injury-in-fact—which, at this time, would be groundless conjecture and hypothesis—would not be caused by the district's terminating §5 coverage but by separate, future conduct that would continue to be prohibited by §2 and the Constitution. Later, substantive violations of voting rights, if any, will always be subject to challenge under §2, regardless whether they receive preclearance before implementation. *See Georgia*, 539 U.S. at 477-78, 123 S.Ct. at 2510 (2003); *Bossier Parish Sch. Bd.*, 528 U.S. at 335-36, 120 S.Ct. 866, 875-76 (2000).

## C.    The Diazes Cannot Show That Any Cognizable Injury Would Be Redressed by a Judgment Against the District.

Someone asserting standing must demonstrate, in addition to an actual injury caused by the opposing litigant, that the relief sought is likely to redress that injury. *E.g., Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136. And "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* The Diazes cannot establish that any cognizable injury would be redressed by a judgment against the district.

Challenging a "generalized level of Government action" presents "obvious difficulties insofar as proof of causation or redressability is concerned." *Lujan*, 504 U.S. at 568, 112 S.Ct. at 2140; *accord Allen*, 468 U.S. at 759-60, 104 S.Ct. at 3329 ("[S]uits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . are rarely if ever appropriate for federal-court adjudication."). The only "injury" that the Diazes suggest would be directly remedied by denying the district exemption from §5 coverage is to the asserted "right" to live in a jurisdiction covered by §5. *See* Diaz Mem. 5. As discussed above, living in a covered jurisdiction cannot be a federally protected substantive voting right because, if it is, then most Americans live in areas where that right is violated. As further discussed above, speculative future injuries of

11

actual substantive voting rights are not redressable by continued §5 coverage but by the continued—and here unchallenged—protections of §2 and the Fifteenth Amendment. *See Bossier Parish Sch. Bd.*, 528 U.S. at 335-36, 120 S.Ct. at 875-76 (2000) (explaining that existing practices that violate substantive voting rights "cannot be stopped in advance under the extraordinary burden-shifting procedures of § 5, but must be attacked through the normal means of a § 2 action").

## II.    THE DIAZES ARE NOT SO SITUATED THAT THE DISPOSITION OF THIS CASE MAY IMPAIR OR IMPEDE THEIR INTERESTS.

In addition to lacking standing, which is required for intervention of any type and for the Diazes to be "aggrieved part[ies]" entitled to rule 24(a)(1) intervention, the Diazes cannot demonstrate that the disposition of this case may impair or impede their ability to protect their interests, as rule 24(a)(2) further requires.   The inquiry for this element of intervention as of right focuses on the "practical consequences" that denying intervention would have for the prospective intervenor.   *Fund for Animals*, 322 F.3d at 735.

As discussed above, the Diazes have no legally protectable interest in preserving the district's §5 coverage because that coverage, in and of itself, has no direct effect on preservation of the Diazes' substantive voting rights.   The only practical consequence of a judgment in the district's favor is relief for the district from the burdensome preclearance process; the district must still maintain full compliance with §2 and the Constitution, and it is firmly committed to doing so.   Should any violations of substantive voting rights arise in the future, they can be challenged under §2, just as they must be now.   *See Bossier Parish Sch. Bd.*, 528 U.S. at 335 - 36, 120 S.Ct. 866, 875-76 (2000).

The Diazes' stated desire to influence the Court's decision in this action is not an intervenor's interest, but merely the type of interest that can be served by participation as *amici*

*curiae*.   *See Rio Grande*, 178 F.3d at 539 ("On the record here, there is no doubt that Longhorn is not a proper intervenor.    It appears that Longhorn is really seeking to appear as an amicus."); *City of Cleveland*, 17 F.3d at 1518 (denying the motion for intervention but permitting the applicant to participate as *amicus curiae*); *see also Diamond*, 476 U.S. at 78, 106 S.Ct. at 1711. Because the Diazes can present any unique perspective or material information in their possession just as well by participating as *amici*, denying intervention would have no practical effect on their ability to communicate their views to the Court.    The district has no objection to the Diazes' participating as *amici*.    One "lacking Article III standing can do no more than that." *Rio Grande*, 178 F.3d at 539.

### III.    THE DIAZES CANNOT SHOW THAT THE ATTORNEY GENERAL WILL NOT ADEQUATELY REPRESENT THEIR INTERESTS.

In addition to establishing that they have a cognizable stake in the litigation sufficient to show standing and that the disposition may impair or impede their interests, intervenors under rule 24(a)(2) must show that their interests are not adequately represented by anyone who is already a party to the action.    FED. R. CIV. P. 24(a)(2); *Fund for Animals*, 322 F.3d at 735.    The Diazes do not and cannot show that the Attorney General is inadequate to defend their claimed interest in keeping the district covered by §5.

Although the burden of establishing inadequate representation has been described as "minimal," *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10 (1972), "the fact that the government is a party makes it more difficult for movants for intervention in this Circuit to meet that minimal burden."    *Sweet Home Chapter of Cmtys. for Great Or. v. Lujan*, No. 91-1468, 1991 U.S. Dist. LEXIS 17449, at *7 (D.D.C. Dec. 10, 1991) (unpublished); *see Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979); *Humane Soc'y of United States v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985); *cf. Nuesse v. Camp*,

13

385 F.2d 694, 702-04 (D.C. Cir. 1967) (state banking commissioner was permitted to intervene when his more general interest in the competitive equality of state and national banks was not adequately represented by a single state bank).   That is because a governmental entity, under the principle of *parens patriae*, "is presumed to represent the interests of all its citizens." *Higginson*, 631 F.2d at 740; *accord Sweet Home Chapter*, 1991 U.S. Dist. LEXIS 17449, at *6 ("Certainly federal agencies are parts of a government body, and as such, are charged with enforcing the public interest.   The parens patriae doctrine would thus seem to apply equally well to government agencies as to states.").

Indeed, the office of the Attorney General—which already adequately represents the Diazes' interests in this case—is the very government agency that the Diazes argue is best situated to protect their substantive voting rights through the preclearance process.   *Cf. Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, 378 F.3d 774, 780-81 (8th Cir. 2004) (denying intervention by a group of voters when "the state directly represented the Bollen Group's asserted interest by seeking to proceed with the election pursued by its citizens under state law and by specifically adopting the positions advanced by the Bollen Group").   Ironically, the Diazes' only attempt to show potential adversity between their interests as Latino voters in the district and those of the Attorney General references the Attorney General's effort to defend a redistricting plan that he had precleared.   Diaz Mem. 6 (citing *LULAC v. Perry*, __U.S.__, 126 S.Ct. 2594 (2006)).   But any finding that the Attorney General is inadequate to represent the Diazes' interests would be inconsistent with the very disposition they seek for this case.

The Attorney General is presumed adequate to represent the Diazes' asserted interest in defending the enforceability of §5, and the Diazes show nothing sufficient to overcome that presumption.   They rely primarily on the conclusory assertion that "the United States may not"

vigorously defend the Voting Rights Act.   Diaz Mem. 6.[2]   But the Attorney General's answer to the district's complaint makes clear that the department is committed to vigorously defending §5's constitutionality and enforcing §5 against the district.   The Diazes cannot just assume a conflict without showing an actual divergence of their interests from those of the Attorney General.   To overcome the presumption of adequacy, they must show that they have some particularized interest that "cannot be subsumed within the shared interest of the citizens" represented by the Attorney General.   *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986); *see Higginson*, 631 F.2d at 740 (holding that, although applicants may have had more direct economic interest than did the state, they could not overcome the presumption of adequate representation when "there appear[ed] to be no possible divergence between their position and the state's position on the primary issue").

"[P]artial congruence of interests" may "not guarantee the adequacy of representation." *Fund for Animals*, 322 F.3d at 737.   But there is complete congruence in this case.   Comparing the Attorney General's answer with the Diazes' motion papers and proposed answer demonstrates no divergence in the objective each hopes to achieve and the defenses each proposes to raise.   *Cf. Blake v. Pallan*, 554 F.2d 947, 954-55 (9th Cir. 1977) (considering whether the interests of an original party would lead it to make all of the prospective intervenor's arguments).   Inadequacy has not been shown when, as in this case, prospective intervenors' arguments "would be merely cumulative."   *Higginson*, 631 F.2d at 740.

Unlike in *Perry*, the issue in this case is not a complex determination regarding something as multifaceted as the possibility of vote dilution caused by a statewide redistricting plan.   *See Perry*, 126 S.Ct. at 2614-23 (analyzing the many factors involved in determining

---

[2]   The Diazes again ignore the significant distinction between the district's limited request to terminate its preclearance obligations and a global challenge to the Voting Rights Act, which the district does not make or desire.

whether a redistricting plan violates §2 and concluding, contrary to the Attorney General's preclearance analysis, that part of the plan did so). In this case, the Diazes and the Attorney General share a simple, concrete goal: preventing the district from terminating its §5 coverage under any possible rationale. And "[i]t is not sufficient that the party seeking intervention merely disagrees with the litigation strategy or objectives of the party representing its interests." *Little Rock Sch. Dist.*, 378 F.3d at 780.

Nothing has yet occurred that might indicate inadequacy of representation, for example, the Attorney General's deciding to drop a meritorious defense or not to appeal an adverse ruling. *See, e.g.*, *Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969).[3]  There is simply no indication that the Attorney General will compromise the full and vigorous defense of §5 by any act or failure to act. The Diazes can share any unique perspective they have as *amici*; to adequately submit their views they do not need to participate with all the rights, privileges, and obligations of intervening parties.

## IV.    THE DIAZES SHOULD BE DENIED PERMISSIVE INTERVENTION BECAUSE THEIR DUPLICATIVE PARTICIPATION WOULD CAUSE UNDUE DELAY AND PREJUDICE.

Even if the Diazes had standing and established that their "claim or defense and the main action have a question of law or fact in common," FED. R. CIV. P. 24(b), the Court should deny permissive intervention because it "will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* The Diazes essentially propose to duplicate the efforts of the Attorney General to defend the application of §5 and suggest that they seek to provide information and arguments to the Court that are either cumulative or extraneous. For example, the Diazes suggest that they seek to address "racially polarized voting patterns and the history

---

[3] A motion to intervene may still be timely following a new development, like failure to appeal an adverse judgment, that, for the first time, demonstrates inadequacy. *Smuck*, 408 F.2d at 181-82.

across Texas of discrimination against Latinos." Diaz Mem. 3. But the only issues material to this case relate to conditions within the district, not "across Texas." And the Diazes do not allege any racial polarization or discrimination against Latinos within the district.

The inefficiencies inherent in duplicative and cumulative effort are precisely the type of danger that the undue delay and prejudice standard is designed to avert. The standard "presumably captures all the possible drawbacks of piling on parties." *Massachusetts Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 782 (D.C. Cir. 1997). When parties multiply unnecessarily through permissive intervention, "the concomitant issue proliferation and confusion will result in delay as parties and court expend resources trying to overcome the centrifugal forces springing from intervention, and prejudice will take the form not only of the extra cost but also of an increased risk of error." *Id.* When a court permits full participation by parties who "only marginally satisfy the standing requirements" and are not yet "truly aggrieved" it will be "repeatedly required to respond to vague hypotheticals and speculation rather than concrete and actual harms." *Ind. Democratic Party v. Rokita*, No. 1:05-CV-0634-SEB-VSS, 2006 U.S. Dist. LEXIS 20321, at *129 n.75 (S.D. Ind. April 14, 2006) (unpublished).

The Diazes give no indication of how their participation as intervenors could avoid the delay and inefficiency inherent with a multiplicity of parties. They again rely solely on a conclusory assertion: "intervention will not create delay or prejudice to the parties." Diaz Mem. 8. If the Diazes are serious about communicating their views while avoiding delay and prejudice, they can do that effectively as *amici*, not as intervenors.

### CONCLUSION

For these reasons, the Court should deny the Diazes' motion to intervene.

DATED:   October 30, 2006          Respectfully submitted:


/s/ Erik S. Jaffe
Erik S. Jaffe
D.C. Bar No. 440112
ERIK S. JAFFE, P.C.
5101 34th Street N.W.
Washington, D.C .20008
[Tel.] (202) 237-8165
[Fax]  (202) 237-8166

Gregory S. Coleman
(admitted *pro hac vice*)
Christian J. Ward
(admitted *pro hac vice*)
PROJECT ON FAIR REPRESENTATION
8911 Capital of Texas Hwy., Ste. 1350
Austin, Texas  78759
[Tel.] (512) 349-1930
[Fax] (512) 527-0798

*Attorneys for Plaintiff*
*Northwest Austin Municipal*
*Utility District No. One*

CERTIFICATE OF SERVICE

I hereby certify that I served true copies of Plaintiff's Memorandum of Points and Authorities in Opposition to Motion by David and Lisa Diaz and the proposed Order denying the motion upon counsel for the parties and for applicants to intervene by United States First Class postage-paid mail and by e-mail to the parties indicated below on October 30, 2006.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.   20530

*Counsel for Defendant*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
      UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Applicants Texas State
Conference of NAACP and Austin Branch of
the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
      DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Applicants Texas State Conference of
NAACP and Austin Branch of the NAACP*

Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
      ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland   21215

*Counsel for Applicants Texas State Conference of
NAACP and Austin Branch of the NAACP*

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
   EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas   78205

*Counsel for Applicants David and Lisa Diaz*
Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
   EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York 10013

*Counsel for Applicants Rodney and Nicole
Louis*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C. 20003

*Counsel for Applicants David and Lisa Diaz*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
   FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.   20005

*Counsel for Applicants Rodney and Nicole Louis*

/s/ Christian J. Ward
Christian J. Ward