**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE,<br>401 W. 15th Street<br>Suite 850<br>Austin, TX 78701<br><br>　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>ALBERTO GONZALES,<br>ATTORNEY GENERAL OF THE UNITED STATES,<br>950 Pennsylvania Ave., NW<br>Washington, DC 20530<br><br>　　　　　　　　Defendant,<br><br>TEXAS STATE CONFERENCE OF NAACP BRANCHES,<br>1107 East 11th Street<br>Austin, TX 78701,<br><br>　　　　　　　　and<br><br>AUSTIN BRANCH OF THE NAACP,<br>1704 East 12th Street<br>Austin, TX  78702,<br><br>Applicants to Intervene, | Civil Action No. 1:06-CV-01384<br><br>Three Judge Court<br>(PLF, DST, EGS) |

**REPLY MEMORANDUM IN SUPPORT OF MOTION BY
APPLICANTS TEXAS STATE CONFERENCE OF THE NAACP BRANCHES AND
<u>AUSTIN BRANCH OF THE NAACP TO INTERVENE AS DEFENDANTS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT ................................................................................................................................2

I.      Applicants are Entitled to Intervention of Right ...........................................................2

        A.      Applicants Have Standing to Intervene as Defendants ......................................3

              1.      An Adverse Ruling on Facial Constitutionality Would Injure Applicants and their Members ................................................................3

              2.      Redressability Exists Where Remedy Sought by Plaintiff Would Cause Applicant-Defendants to Suffer an Injury-in-Fact .....................8

        B.      Applicants Motion is Timely ...............................................................................9

        C.      Disposition of this Case will Impair Applicants' Interests ...............................9

II.     In the Alternative, This Court Should Grant Permissive Intervention under Rule 24(b)(2) ........................................................................................................................10

# TABLE OF AUTHORITIES[♦]

## FEDERAL CASES

*Bennett. v. Spear*, 520 U.S. 154 (1997) ................................................................................... 4

*Briscoe v. Bell*, 432 U.S. 404 (1977) ........................................................................................ 7

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..................................................................... 3

*City of Port Arthur, Tex. v. United States*, 517 F. Supp. 987 (D.D.C. 1981) ......................... 7

*City of Rome v. United States*, 466 U.S. 156 (1980) .............................................................. 7

*E.E.O.C. v. Nat'l Children's Center, Inc.*, 146 F.3d 1042 (D.C. Cir. 1998) ........................... 11

\**Fund for Animals, Inc. v. Norton*, 322 F.3d 728-732-33 (D.C. Cir. 2003) .................. 2, 4, 5, 9

\**Georgia v. Ashcroft*, 539 U.S. 461 (2003) ............................................................................. 6

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................................... 5

\**In re Vitamins Antitrust Class Action*, 215 F.3d 26 (D.C. Cir. 2000) ................................. 11

*Lopez v. Monterey County*, 525 U.S. 266 (1999) ................................................................... 7

\**Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471 (11th Cir. 1993) .................... 8, 12

*Military Toxics Project v. EPA*, 146 F.3d 948 (D.C. Cir. 1998) ......................................... 6, 8

\**Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*, 205 F.R.D. 1 (D.D.C. 2000) ......... 11, 12

*San Juan Cty., UT v. U.S.*, 420 F.3d 1197 (10th Cir. 2005) ................................................. 11

*Shaw v. Hunt*, 154 F.3d 161 (4th Cir. 1998) ......................................................................... 11

*Textile Workers Union of America, CIO v. Allendale Co.*, 226 F.2d 765 (D.C. Cir. 1955) ... 11

*United States v. Bd. of School Comm'rs of City of Indianapolis, Ind.*, 466 F.2d 573 (7th Cir. 1972) ................................................................................................................................. 4

---

[♦] Pursuant to Local Rule 7(a), counsel has placed asterisks in the margin to the left of those authorities on which Applicants chiefly rely.

## RULES

Fed. R. Civ. P. 24 ................................................................................................ 1, 2, 3, 10, 12

## STATUTES

40 Fed. Reg. 43746 (September 23, 1975)................................................................................ 7

42 U.S.C. § 1971 ...................................................................................................................... 7

42 U.S.C. § 1973 .............................................................................................................. *passim*

## LEGISLATIVE MATERIALS

Pub. L. 109-246, 120 Stat. 577, § 1 (July 27, 2006) ................................................................. 7

S. Rep. No. 109-295 (2006) ..................................................................................................... 7

## MISCELLANEOUS

THE FUTURE OF THE VOTING RIGHTS ACT xiii (David L. Epstein *et al*. eds., 2006) ........................ 4

# INTRODUCTION

In their Memorandum in Support of Applicants' Motion to Intervene as Defendants, Applicants Texas State Conference of the NAACP Branches ("Texas State Conference") and the Austin Branch of the NAACP ("Austin Branch") (collectively "Applicants") demonstrated that they are entitled to intervene as a matter of right under Rule 24(a) of the Federal Rules of Civil Procedure, and, in the alternative, under Rule 24(b) of the Federal Rules. In its response, Plaintiff, the Northwest Austin Municipal Utility District No. 1 ("District"), contends that Applicants have no stake in the outcome of this proceeding between the District and the United States. Applicants file this reply chiefly to explain the following critical points:

*First,* the Plaintiff's decision to seek a declaratory judgment declaring Section 5 of the Voting Rights Act *facially* unconstitutional provides Applicants with the potential for injury-in-fact sufficient for Article III standing. If Section 5 is declared unconstitutional on its face, it will be unenforceable anywhere in Texas, and Applicants and their members will then be deprived of the vital protection that Section 5 affords them against potentially discriminatory voting changes. Further, because Plaintiff's coverage under the VRA is dependent on Texas' coverage, any ruling that it would be unconstitutional to apply Section 5 to Plaintiff would very likely depend on a ruling that it is unconstitutional to apply Section 5 to Texas as a whole. In either event, Applicants' members throughout Texas, who depend on the protections of Section 5, would be injured by its invalidation. This injury-in-fact is a sufficient interest to warrant intervention of right under Federal Rule 24(a).

*Second,* even if this Court denies intervention as of right under Rule 24(a), Applicants should be entitled to intervene permissively under Rule 24(b). Contrary to Plaintiff's assertions, the D.C. Circuit does not require Applicants to have Article III standing to intervene under Rule

1

24(b). Thus, although Applicants believe they have standing sufficient to allow intervention under Rule 24(a), they may intervene permissively under Rule 24(b) if this Court determines otherwise. Further, the Defendant Attorney General freely embraces permissive intervention, sees no peril of duplication, and further acknowledges that several intervention orders have recently been granted in Section 5 cases both *as of right* and permissively.

## ARGUMENT

I. **Applicants are Entitled to Intervention of Right**

Applicants and Plaintiff agree on the basic framework for determining whether a party is entitled to intervene as of right. First, in addition to establishing its qualification for intervention under Rule 24(a)(2), a party seeking to intervene must satisfy the basic standing requirements of Article III of the Constitution. *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003). Once the applicant has shown Article III standing, this Court must consider four factors: (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties." *Id.* at 731 (quoting *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1074 (D.C. Cir. 1998) (internal citations omitted)). Instead of acknowledging the harm that would fall on Applicants and their members if this Court granted Plaintiff's proposed remedy, Plaintiff's Memorandum distorts the nature of the remedy sought in an attempt to preclude Applicants from meeting the standards for intervention.

    A.    **Applicants Have Standing to Intervene as Defendants**

        1.    **An Adverse Ruling on Facial Constitutionality Would Injure Applicants and their Members**

On August 4, 2006, Plaintiff filed suit seeking two alternate forms of relief. First, Plaintiff seeks to bail out of Section 5 coverage pursuant to Section 4 of the VRA. Complaint ¶ 18. Second, in the event that "the district is not eligible to bail out of Section 5 coverage," Plaintiff seeks a declaratory judgment in which Section 5 is "struck down as unconstitutional, either on its face, or as applied to the district." Complaint at ¶¶ 19, 23; *see also id.* at page 8 ("**PRAYER FOR RELIEF** Plaintiff requests the Court to declare that . . . [Section] 5 of the Act is an unconstitutional overextension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment. . . .") (capitalization and bolded font in the original; spacing altered).

The second form of relief sought by Plaintiff — a declaratory judgment that Section 5 is unconstitutional on its face — clearly threatens an injury to Applicants that is sufficient to meet the intervention standards under Rules 24(a) and 24(b). Any such ruling of facial unconstitutionally—especially if rendered or affirmed by the United States Supreme Court— would reach beyond the Plaintiff District and would prevent the United States from enforcing Section 5 anywhere in the State of Texas. *See e.g., City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) ("When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question."). Plaintiff, having voluntarily sought a ruling that Section 5 is facially unconstitutional, has plainly opened the door to Applicants' intervention because a facial invalidation of the VRA would harm both Applicants and their members. *See* Declaration of Gary Bledsoe in Support of

3

Applicants' Motion to Intervene as Defendants (Ex. C to Memorandum in Support of Applicants' Motion to Intervene as Defendants) (hereinafter "Bledsoe Decl."); Declaration of Nelson Linder in Support of Applicants' Motion to Intervene as Defendants (Ex. D to Memorandum in Support of Applicants' Motion to Intervene as Defendants) (hereinafter "Linder Decl."). These harms rise to the level required for Article III standing. *See Bennett. v. Spear*, 520 U.S. 154, 168 (1997); *see also United States v. Bd. of School Comm'rs of City of Indianapolis, Ind.*, 466 F.2d 573, 577 (7th Cir. 1972) ("The requirements for intervention, moreover, should generally be more liberal than those for standing to bring suit.").

    a. **Invalidating Section 5 on its Face Would Cause Injury-in-Fact to Applicants as Organizations**

  Despite Plaintiff's assertions to the contrary, Applicants and their members "would suffer concrete injury if the court were to [find Section 5 facially unconstitutional]." *Fund For Animals,* 322 F.3d at 733. For example, Applicants would be forced to devote significant additional resources (financial and otherwise) to monitoring and preventing voting changes throughout the District and the State of Texas. This would require additional investigations, research, and lawsuits to block the implementation of retrogressive changes now protected by Section 5. *See* Bledsoe Decl. at ¶¶ 9-10 ("If Section 5 were eliminated, the Texas State Conference would have to divert more of its resources to preventing voting discrimination. The Texas State Conference and its units would need to more closely monitor voting changes of all jurisdictions in the area, and it would require the Texas State Conference and its units to challenge objectionable voting changes on a case-by-case basis, including filing lawsuits."); *see also* Linder Decl. at ¶ 9. The burden of filing lawsuits and proving claims under Section 2 of the VRA—which the NAACP would be forced to do absent Section 5—would impose substantial monetary costs and would be exceedingly time-consuming. *See, e.g.*, The Future of the Voting

4

Rights Act xiii (David L. Epstein, et al. eds., 2006) ("[S]ection 2 operates through the ordinary legal system, rather than the unusual preclearance review process . . . Section 2 is therefore more costly, more time consuming, and substantively more difficult for those challenging a voting practice than is section 5"). This type of harm is just the type of "concrete and imminent injury" that courts have held sufficient to confer Article III standing on a party. *See, e.g. Fund for Animals*, 322 F.3d at 734; *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982) (upholding a reversal of the District Court's dismissal for lack of standing and noting that the "concrete and demonstrable injury to the organization's activities -- with the consequent drain on the organization's resources -- constitutes more than simply a setback to the organization's abstract social interests").

      **b.  Invalidating Section 5 on its Face Would Cause Injury-in-Fact to Applicants' Members**

Not only would a finding of facial unconstitutionality harm Applicants themselves, but such a finding would also harm Applicants' members. First, the NAACP's members have a particular interest in this litigation because the Plaintiff has challenged the constitutionality of Section 5 on its face. *See* Complaint ¶ 23; *id. at* page 8. As such, the remedy Plaintiff seeks threatens a statutory protection currently enjoyed by all of Applicants' members. Bledsoe Decl. ¶ 10; Linder Decl. ¶ 10. Each of Applicants' members is protected by the fact that Texas is covered by the preclearance provisions of Section 5. "If Section 5 were invalidated, as plaintiff requests, the [Applicants'] members could not longer rely on the Section 5 process, including the Justice Department's review of preclearance submissions, to ensure that Texas and its political subdivisions are not implementing changes with the purpose or effect of abridging the right to vote on the basis of race." Bledsoe Decl. ¶ 10. Absent these protections, Applicants' members would have to "much more closely monitor all voting changes in local jurisdictions, investigate

5

the effect of such changes on African-American voters and, if necessary, sue to block the implementation of such changes, a process that requires dedication of enormous resources of time and money -- resources that may well be beyond the reach of many of [Applicants'] members, as well as [Applicants] as a whole." Linder Decl. ¶ 10. *See, e.g., Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (holding that an association had standing to intervene as defendant on behalf of its members because the members "would suffer concrete injury if the court grants the relief the petitioners seek; they would therefore have standing to intervene in their own right").

Plaintiff suggests that a ruling in this case that Section 5 is unconstitutional would be of no moment to Applicants, because such a ruling would bind only itself and the Attorney General, and would not affect any other entity's obligation to comply with Section 5. That argument is wide of the mark. If the courts, including the United States Supreme Court on appeal from this Court, were to rule that Section 5 is unconstitutional on its face, the Attorney General would hardly consider that ruling applicable only to Plaintiff and continue to enforce Section 5 against other jurisdictions in Texas. To the contrary, a final ruling by the courts that Section 5 is unconstitutional *on its face* would plainly mean the end of enforcement of Section 5 throughout Texas; and equally plainly, that is the result that Plaintiff desires and has sought by requesting that Section 5 be invalidated on its face. Thus, Applicants' members in the State of Texas have standing to preserve the current protections guaranteed by Section 5. *See, e.g.*, *Georgia v. Ashcroft*, 539 U.S. 461, 477 (2003) (affirming the district court's grant of intervention in Section 5 case to African-American voters who resided *outside* the district at issue).

Plaintiff also overlooks the fact that it is covered by Section 5 because it is a political subunit of the State of Texas, which is covered as a whole by Section 5, not because it

independently has been deemed covered by Section 5. The State of Texas *as a whole* became covered by Section 5 in September of 1975 "when the United States Attorney General determined that: (a) election materials in Texas has been offered only in English; (b) more than 5% of Texas's voting age population was Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972 presidential election." Complaint ¶ 8. *See also Briscoe v. Bell*, 432 U.S. 404, 409 (1977) (rejecting on jurisdictional grounds petitioners claims that the Attorney General wrongfully determined that Texas was covered by the 1975 Amendments to the VRA); 40 Fed. Reg. 43746 (September 23, 1975) (providing that the *entire State* of Texas was to be covered by the preclearance provisions of Section 5). Because Congress chose to cover Texas in its entirety, any attempt by the District to sever this relationship between the State and its political subunits would be contrary to Congress's intent. *See, e.g. Lopez v. Monterey County*, 525 U.S. 266, 279-280 (1999) (noting the importance of the relationship between a covered state and its political subunits); *City of Rome v. United States*, 466 U.S. 156, 168-169 (1980) (same); *City of Port Arthur, Tex. v. United States*, 517 F. Supp. 987, 1010 (D.D.C. 1981) (same).

Indeed, Plaintiff's Complaint alleges (contrary to Congress's determinations) that current conditions in Texas no longer warrant application of Section 5. See Complaint ¶ 10 (alleging that "[t]he conditions that caused Texas to be covered by §5 have long been remedied"). It appears, then, that Plaintiff intends to argue that it is unconstitutional to apply Section 5 to Texas (and, derivatively, to any of its political subunits, including the District). Any ruling by the courts that it would be unconstitutional to apply Section 5 to Texas (and, therefore, to its political subunits such as Plaintiff) would clearly cause injury to Applicants' members throughout Texas.

7

Congress considered Texas's coverage during the 2006 reauthorization and amendments and rejected proposals to change the coverage formula. *See* Pub. L. 109-246, 120 Stat. 577, § 1 (July 27, 2006), codified at 42 U.S.C. §§ 1971 & 1973; S. Rep. No. 109-295, at 33 (2006) (considering a proposal "to update the coverage formula"). Indeed, the Senate Judiciary Report accompanying bill reauthorizing and amending the VRA contained at least thirty-one pages of examples of a continuing need to bring Texas within the scope of Section 5. S. Rep. No. 109-295, at 333-353 (2006). Specifically, the Report noted that "Texas is the state with the largest number of Section 2 suits resolved on behalf of minority plaintiffs since 1982," and that "[s]ince 1982, Texas has had the second highest number of Section 5 objections interposed by the DOJ, including at least 107 objections, *10 of which were for statewide voting changes.*" *Id.* at 334, 336 (emphasis added).

Given that Section 5 covers Texas as a whole, and that the Plaintiff seeks a declaratory judgment deeming Section 5 facially unconstitutional, Applicants' members have a cognizable interest in preserving the protections they are guaranteed by Section 5. If permitted to intervene, Applicants and their members are uniquely situated to demonstrate both the history of discrimination in Texas and the ways in which Section 5 has prevented further discrimination in the Utility District and throughout the State. Applicants and their members are plainly among the intended beneficiaries of the relevant statutory provision.

    **2.    Redressability Exists Where Remedy Sought by Plaintiff Would Cause Applicant-Defendants to Suffer an Injury-in-Fact**

A prospective intervenor-defendant may satisfy Article III requirements regardless of whether it has already suffered an injury, so long as it demonstrates that the remedy sought by the plaintiff, if adopted, would cause the intervenor to suffer an injury-in-fact. *See Military Toxics Project*, 146 F.3d at 954; *Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471, 1480

(11th Cir. 1993) ("The interveners sought to vindicate important personal interests in maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered. As such, they alleged a tangible actual or prospective injury. . . ."). Here, one of the remedies sought by the Plaintiff -- a declaration that Section 5 is unconstitutional -- would, as discussed above, cause an injury-in-fact to Applicants and their members. That there has been no current harm caused to the Applicants by the Plaintiff is simply immaterial where Applicants seek to intervene as Defendants. *Fund for Animals*, 322 F.3d at 733 (noting that proposed intervener-defendants "would suffer concrete injury if the court were to grant the relief the plaintiffs seek" and remanding to the district court with instructions to grant the motion to intervene as of right).

### B. Applicants Motion is Timely

Plaintiff has not disputed the timeliness of Applicants' Motion to Intervene. As such, Applicants believe that its motion to intervene is timely for the reasons stated in its earlier Memorandum in Support of its Motion to Intervene.

### C. Disposition of this Case will Impair Applicants' Interests

As explained in our opening brief, a ruling that Section 5 is unconstitutional would deprive Applicants' members of the crucial protections that Section 5 affords minority voters against potentially discriminatory voting changes. Applicants' members would be deprived of this protection if the Court were to rule that Section 5 is unconstitutional on its face, or that Section 5 cannot be constitutionally applied to Plaintiff because conditions in Texas no longer justify application of Section 5.

As explained above, were this Court to find Section 5 facially unconstitutional, it is highly unlikely that the Attorney General would enforce on other jurisdictions a law that has

been declared facially unconstitutional by this Court. If the Attorney General attempted to enforce Section 5 after an adverse ruling in this lawsuit, the jurisdiction threatened with enforcement could petition this very district court, as it must under 42 U.S.C. § 1973b(a)(1), for a declaration of unconstitutionality. The VRA's jurisdictional provisions effectively preclude the Attorney General trying to get a contrary ruling from another District Court or another Circuit before seeking review from the United States Supreme Court. 42 U.S.C. 1973b(a)(5). Further, if on a likely review of this Court's decision, the United States Supreme Court were to rule that the Voting Rights Act is facially unconstitutional, it is inconceivable to believe that the Attorney General will be bound only as to the Plaintiff. A finding of facial unconstitutionality clearly would have District-wide, Texas-wide and nationwide effect.

## II.     In the Alternative, This Court Should Grant Permissive Intervention under Rule 24(b)(2)

Even if this Court were to find that Applicants are not entitled to intervention as a matter of right, this Court should nonetheless exercise its discretion to grant intervention under Federal Rule 24(b)(2). As the Attorney General has noted in essentially consenting to permissive intervention, "[t]his Court has 'routinely allowed intervention' to those similarly situated movants in declaratory judgment actions brought under the Voting Rights Act by covered jurisdictions against the Attorney General as the statutory defendant." Def. Response at 7 (internal citation omitted). In support of this statement, the Attorney General has cited to *twenty-five cases* between 1973 and 2002 in which applicants were permitted to intervene in Section 5 cases.

Plaintiff essentially makes two arguments against allowing applicants to permissively intervene. First, the District suggests that Applicants do not have standing to participate in this action and, under D.C. Circuit precedent, standing is necessary for permissive intervention. Pl.

10

Mem. at 4. But as Plaintiff correctly notes in a footnote, the D.C. Circuit has expressed "uncertainty over whether standing is necessary for permissive intervention." *In re Vitamins Antitrust Class Action*, 215 F.3d 26 (D.C. Cir. 2000). In spite of this "uncertainty," a large number of cases from this circuit, as well as cases from other circuits, indicate that standing is not a requirement for permissive intervention. *See, e.g. E.E.O.C. v. Nat'l Children's Center, Inc.*, 146 F.3d 1042, 1045-46 (D.C. Cir. 1998) (expressing a "willingness to adopt flexible interpretations" to Rule 24(b)); *Textile Workers Union of America, CIO v. Allendale Co.*, 226 F.2d 765, 768 (D.C. Cir. 1955) ("[F]ailure to come within the precise bounds of Rule 24's provisions does not necessarily bar intervention if there is a sound reason to allow it."); *San Juan Cty., UT v. U.S.*, 420 F.3d 1197 (10th Cir. 2005) ("[W]e also conclude that a party seeking to intervene permissively need not first establish its standing."); *Shaw v. Hunt*, 154 F.3d 161, 165 (4th Cir. 1998) ("Key to our analysis is the Supreme Court's ruling that a party who lacks standing can nonetheless take part in a case as a permissive intervener.") (citing *S.E.C. v. United States Realty & Improvement Co.*, 310 U.S. 434, 459 (1940); *Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*, 205 F.R.D. 1 (D.D.C. 2000) (granting permissive intervention under Rule 24(b) while denying intervention as of right for lack of standing).

Plaintiff's second argument against permissive intervention is simply that Applicants "propose to duplicate the efforts of the Attorney General" and present "cumulative or extraneous" information and arguments. Pl. Mem. at 19-20.[1] Plaintiff fails to recognize, however, the extensive experience and factual knowledge Applicants possess with regards to voting rights and racial discrimination in Texas. Applicants have played a central role in the

---

[1] It is unclear to Applicants how Plaintiff expects Applicants to both "duplicate the efforts of the Attorney General" and also provide "extraneous" arguments to the Court. Pl. Mem. at 19.

passage of, and numerous amendments to, the VRA, have participated in countless lawsuits brought under the Act, and have worked diligently to remedy and protect against discrimination in Texas and around the country. The NAACP and its members have a unique perspective on factual and legal issues related to this litigation. This perspective must not be lost simply because of the Attorney General's presence as a Defendant in this suit.[2]

      Finally, in the event that this Court decides that intervention of right is not appropriate, permissive intervention is the only sufficient alternative. Contrary to Plaintiff's assertions that Applicants can simply participate as *amicus curiae*, amicus participation in this case would be simply inadequate. *See, e.g.*, *Meek*, 985 F.2d at 1478 (noting the appropriateness of intervention where applicant's goal in intervening was to protect a distinct interest). As discussed above, Plaintiff chose to bring the issue of state-wide discrimination into this suit. Applicants have a far-ranging and unique perspective on, and interest in protecting against, voting discrimination in Texas. Limiting Applicants participation in this case to *amicus curiae* status would not sufficiently grant Applicants to protect their interests before this Court.

---

[2] Nor is it uncommon for multiple parties to intervene in a single lawsuit. Though Applicants do not believe it necessary, any concerns regarding duplicative participation can easily be remedied because "[a] court may place conditions on permissive interventions in order to minimize the delay and prejudice to the existing parties." *Nationwide Mut. Ins. Co.*, 205 F.R.D. at 7 (citing *J.B. Stringfellow, Jr. v. Concerned Neighbors in Action*, 480 U.S. 370, 382 n.1 (1987) (Brennan, J., concurring). Applicants believe, however, that their perspective, expertise, and the uniqueness of the harm that will fall upon Applicants and their members suffice to allow for intervention without any restrictions.

**CONCLUSION**

For the reasons stated herein, this Court should grant Applicants' motion to intervene as a matter of right under Fed. R. Civ. P. 24(a)(2); in the alternative, this Court should permit Applicants to intervene under Fed. R. Civ. P. 24(b)(2).

DATED: November 6, 2006

Respectfully submitted,

Intervenor-Applicants Texas State Conference of NAACP Branches and Austin Branch of the NAACP

By their Attorneys,

*/s/ Seth P. Waxman*

| | |
|---|---|
| Seth P. Waxman (D.C. Bar No. 257337) | Jon M. Greenbaum (D.C. Bar No. 489887) |
| John A. Payton (D.C. Bar No. 282699) | Benjamin J. Blustein (D.C. Bar No. 418930) |
| Paul R.Q. Wolfson (D.C. Bar No. 414759) | Jonah H Goldman (D.C. Bar No. 497507) |
| Ariel B. Waldman (D.C. Bar No. 474429) | LAWYERS' COMMITTEE FOR CIVIL |
| Daniel A. Zibel (D.C. Bar No. 491377) | RIGHTS UNDER LAW |
| WILMER CUTLER PICKERING HALE and DORR LLP | 1401 New York Avenue, NW, Suite 400 |
| 1875 Pennsylvania Ave. N.W. | Washington, D.C. 20005 |
| Washington, D.C. 20006 | Telephone: 202-662-8600 |
| Telephone: (202) 663-6000 | Facsimile: 202-628-2858 |
| Facsimile: (202) 663-6363 | |

Dennis C. Hayes (Indiana Bar No. 7601-49)
(motion to be admitted *pro hac vice* to be filed)
General Counsel
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT
OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
Facsimile: (410) 358-9350

**CERTIFICATE OF SERVICE**

  I, Daniel A. Zibel, hereby certify that on this 6th day of November, 2006, a copy of the foregoing *Reply Memorandum in Support of Motion by Applicants Texas State Conference of the NAACP Branches and Austin Branch of the NAACP to Intervene as Defendants* was filed e-mailed to the Clerk of the Court at dcd_cmecf@dcd.uscourts.gov. The electronic filing prompts service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.

  I also hereby certify that on this 6th day of November, 2006, I caused to be served a copy of the foregoing *Reply Memorandum in Support of Motion by Applicants Texas State Conference of the NAACP Branches and Austin Branch of the NAACP to Intervene as Defendants* through e-mail (where an e-mail address was known) and first class mail, postage pre-paid, to the following:

Ferdose al-Taie
Ferdose.al-Taie@weil.com
Weil, Gotshal & Manges LLP
1300 I Street, NW
Washington, DC 20005

Gregory S. Coleman, Esq.
greg.coleman@weil.com
Christian T. Ward, Esq.
chris.ward@weil.com
Weil, Gotshal & Manges LLP
8911 Capital of Texas Highway
Suite 1350
Austin, TX 78759

Erik Scott Jaffe
jaffe@esjpc.com
ERIK S. JAFFE, P.C.
5101 34th Street, NW
Washington, DC 20008-2015

*Counsel for Plaintiff*

Wan J. Kim
John K. Tanner
H. Christopher Coates
Thomas Christian Herren, Jr.
chris.herren@usdoj.gov
Sarah E. Harrington
sarah.Harrington@usdoj.gov
Christy A. McCormick
christy.mccormick@usdoj.gov
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 7254-NWB
Washington, DC 20530

*Counsel for Defendant*

Nina Perales, Esq.
nperales@maldef.org
MALDEF
110 Broadway, Suite 300
San Antonio, Texas 78205

Joseph E. Sandler
sandler@sandlerreiff.com
Sandler, Reiff & Young, P.C.
50 E Street, SE, Suite 300
Washington, DC 20003

*Counsel for Applicants David and Lisa Diaz*

14

| | |
|---|---|
| Elliot M. Mincberg<br>emincberg@pfaw.org<br>David J. Becker<br>dbecker@pfaw.org<br>People For the American Way Foundation<br>2000 M Street NW, Suite 400<br>Washington, DC 20036<br><br>*Counsel for Applicants People for the American Way* | Kristen M. Clarke, Esq.<br>kclarke@naacpldf.org<br>NAACP Legal Defense & Education Fund<br>1444 Eye Street NW, 10th Floor<br>Washington DC 20005<br><br>Norman Jay Chachkin<br>nchachkin@naacpldf.org<br>Debo P. Adegbile, Esq.<br>dadegbile@naacpldf.org<br>NAACP Legal Defense & Educational Fund, Inc.<br>99 Hudson Street, 16th Floor<br>New York, NY 10013<br><br>*Counsel for Applicants Rodney and Nicole Louis* |

                                                       */s/ Daniel A. Zibel*
                                                         Daniel A. Zibel