# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NUMBER ONE,
401 W. 15th Street
Suite 850
Austin, Texas 78701,

                *Plaintiff*,

v.

ALBERTO GONZALES,
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530,
               *Defendant*.

Civil Action No. 1:06-CV-01384
(DST, PLF, EGS)

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION BY PEOPLE FOR THE AMERICAN WAY TO INTERVENE AS DEFENDANTS

TABLE OF CONTENTS

Table of Contents ........................................................................................................ i

Table of Authorities .................................................................................................. ii

Introduction .............................................................................................................. 1

Background ................................................................................................................ 2

Argument ................................................................................................................... 4

I.       PFAW Lacks Standing to Intervene. .......................................................... 6

         A.       PFAW Cannot Show Injury-in-Fact to Any of Its Alleged Members From
                  the District's Attempt to Bail Out of §5 Preclearance. ......................... 7

         B.       PFAW Cannot Show Causation Because No Injury Is Fairly Traceable to
                  Actions of the District. ....................................................................... 11

         C.       PFAW Cannot Show That Any Cognizable Injury Would Be Redressed by
                  a Judgment Against the District. ........................................................ 11

II.      PFAW and Its Members Are Not So Situated That the Disposition of This Case
         May Impair or Impede Their Interests. ..................................................... 12

III.     PFAW Cannot Show That the Attorney General or Other Intervenors Will Not
         Adequately Represent Its Interests ............................................................ 14

IV.      PFAW Should Be Denied Permissive Intervention Because Its Duplicative
         Participation Would Cause Undue Delay and Prejudice. .............................. 17

V.       At a Minimum, the Court Should Attempt to Minimize Inherent Delay and
         Prejudice by Requiring Any Intervenors-Defendants to Consolidate Their Efforts. ........ 18

Conclusion .............................................................................................................. 19

Certificate of Service ............................................................................................. 20

## TABLE OF AUTHORITIES

### CASES

*Allen v. Wright*,
    468 U.S. 737, 104 S.Ct. 3315 (1984) ..........................................................................11, 12

*Briscoe v. Bell*,
    432 U.S. 404, 97 S.Ct. 2428 (1977) ....................................................................................10

*Blake v. Pallan*,
    554 F.2d 947 (9th Cir. 1977) .............................................................................................16

*City of Boerne v. Flores*,
    521 U.S. 507, 117 S.Ct. 2157 (1997) ..................................................................................10

*City of Cleveland v. NRC*,
    17 F.3d 1515 (D.C. Cir. 1994) ...........................................................................4, 5, 13, 18

*City of Rome v. United States*,
    446 U.S. 156, 100 S.Ct. 1548 (1980) ..................................................................................10

*Diamond v. Charles*,
    476 U.S. 54, 106 S.Ct. 1697 (1986) .................................................................................8, 13

*Dimond v. District of Columbia*,
    792 F.2d 179 (D.C. Cir. 1986) ............................................................................................15

*Envtl. Def. Fund, Inc. v. Higginson*,
    631 F.2d 738 (D.C. Cir. 1979) .......................................................................................14, 16

*Fund for Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ..................................................................................... passim

*Georgia v. Ashcroft*,
    539 U.S. 461, 123 S.Ct. 2498 (2003) .............................................................................8, 9, 11

*Humane Soc'y of United States v. Clark*,
    109 F.R.D. 518 (D.D.C. 1985) ...........................................................................................14

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333, 97 S.Ct. 2434 (1977) ......................................................................................6

*In re Vitamins Antitrust Class Action*,
    215 F.3d 26 (D.C. Cir. 2000) ................................................................................................4

*Indep. Democratic Party v. Rokita,*
No. 1:05-CV-0634-SEB-VSS, 2006 U.S. Dist. LEXIS 20321
(S.D. Ind. April 14, 2006) ................................................................................18

*Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.,*
378 F.3d 774 (8th Cir. 2004) ......................................................................15, 16

*Lujan v. Defenders of Wildlife,*
504 U.S. 555, 112 S.Ct. 2130 (1992) ...................................................6, 7, 11, 12

*Massachusetts Sch. of Law at Andover, Inc. v. United States,*
118 F.3d 776 (D.C. Cir. 1997) ....................................................................17, 18

*Nuesse v. Camp,*
385 F.2d 694 (D.C. Cir. 1967) ...........................................................................14

*Reno v. Bossier Parish Sch. Bd.,*
528 U.S. 320, 120 S.Ct. 866 (2000) ...................................................9, 11, 12, 13

*Rio Grande Pipeline Co. v. FERC,*
178 F.3d 533 (D.C. Cir. 1999) ........................................................................4, 13

*Roeder v. Islamic Rep. of Iran,*
333 F.3d 228 (D.C. Cir. 2003) ..........................................................................5, 6

*SEC v. Prudential Sec. Inc.,*
136 F.3d 153 (D.C. Cir. 1998) .............................................................................4

*Smuck v. Hobson,*
408 F.2d 175 (D.C. Cir. 1969) ...........................................................................16

*Snyder v. FCC,*
No. 04-1022, 2004 U.S. App. LEXIS 11272 (D.C. Cir. June 7, 2004) ...............4

*Sweet Home Chapter of Cmtys. for Great Or. v. Lujan,*
No. 91-1468, 1991 U.S. Dist. LEXIS 17449 (D.D.C. Dec. 10, 1991) ...............14

*Trafficante v. Metro. Life Ins. Co.,*
409 U.S. 205, 93 S.Ct. 364 (1972) .......................................................................6

*Trbovich v. United Mine Workers,*
404 U.S. 528, 92 S.Ct. 630 (1972) .....................................................................14

*United States v. Hays,*
515 U.S. 737, 115 S.Ct. 2431 (1995) ...................................................................7

*United States v. Philip Morris USA Inc.*,
  No. 99-2496 (GK), 2005 U.S. Dist. LEXIS 16196 (D.D.C. July 25, 2005) .......................4

## STATUTES & RULES

42 U.S.C. §1973*b* .............................................................................................................2, 7, 10

42 U.S.C. 1973*b*(a)(4) ...................................................................................................................6

42 U.S.C. §1973*c* ...........................................................................................................................2

FED. R. CIV. P. 24(a)(1) .................................................................................................5, 6, 14, 17

## OTHER

Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal
Defense and Educational Fund, Inc., Reauthorization of the Voting Rights Act: Policy
Perspectives and Views from the Field, United States Senate Judiciary Subcommittee
on the Constitution, June 21, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/
VRA_ Adegbile_Senate_Testimony.pdf .......................................................................................9

*Renewal of the Voting Rights Act of 1965*, http://www.pfaw.org/pfaw/general/ default.asp
x?oid =20834 (last visited November 4, 2006).......................................................................3, 8

Response of Theodore Shaw, Director-Counsel, NAACP Legal Defense and Educational
Fund, Inc. to Written Questions from Senator John Cornyn, June 9, 2006, *available at*
http://www.naacpldf.org/content/pdf/vra/Ted Shaw_Response_to_Questions_on_VRA
from_Senate_Judiciary_Committee.pdf .......................................................................................9

**INTRODUCTION**

The plaintiff, a small utility district in Texas that does not register voters and that has no history of discrimination in voting, seeks to bail out from the burdensome requirement that it submit any proposed change affecting voting—no matter how tiny or tangential—for preliminary clearance by the United States Attorney General.  The district has always complied with the Voting Rights Act and the Constitution, and does not challenge one jot of the substantive provisions of the Voting Rights Act that guarantee full access to the ballot box and the political process for every one of its citizens.  Instead, the district merely seeks to demonstrate that its longtime commitment to ensuring full voting rights for all its citizens is precisely what entitles this local political subdivision to relief from the preclearance requirement.  The district's residents, who participate in the open and fair elections for the district's board members, have the right to sound local government that is free to make local decisions without the undue interference of the federal government.

People For the American Way (PFAW) has filed what is now one of seven motions by organizations or individuals to intervene as defendants opposing the district's effort to terminate its preclearance obligations, three of which have already been granted.  PFAW claims to have members residing in the district, but it does not specify the number of member residents or provide names of any individuals.   Moreover, PFAW asserts no particularized injury to any of its members, only a generalized interest in stopping the district from getting the remedy it seeks.

The motion should be denied.  PFAW has no cognizable stake in the outcome of this proceeding between the district and the Attorney General.  It has no standing because it identifies no one in the district who has suffered or is about to suffer an injury-in-fact.  PFAW is not so situated that anything in this action, as a practical consequence, will impair or impede any cognizable interests it possesses.  The Attorney General—a governmental entity obliged to

1

act in the public interest—is presumed to adequately represent any actual interest PFAW might have, and PFAW provides nothing to overcome that presumption.    Further, permitting the duplicative and cumulative participation that PFAW and other applicants propose would unnecessarily complicate these proceedings, resulting in undue delay and prejudice that makes permissive intervention improper.

## BACKGROUND

Northwest Austin Municipal Utility District Number One, the plaintiff in this action, seeks a declaratory judgment relieving it from the burden of subjecting changes affecting voting in the district to preclearance by the Attorney General under §5 of the Voting Rights Act, 42 U.S.C. §1973c.    The district, which has never engaged in discrimination in any form, believes that it is entitled to bail out of the §5 preclearance requirement because it satisfies the requirements for a declaratory judgment under §4 of the Act.    42 U.S.C. §1973b.    In the alternative, the district believes that if §4 does not entitle it to bail out of §5's preclearance requirement, then the continued application of §5 against the district is unconstitutional.

Texas became covered by §5 as of September 23, 1975, when the United States Attorney General determined that: (a) election materials in Texas had been offered only in English; (b) more than 5% of Texas's voting age population was Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972 presidential election.    The district does now and always has supported full and open voting rights for all its residents.    The district did not exist when Texas became covered by §5; it was formed in 1987.    Nevertheless, the district is a covered political subdivision that must presently submit any proposed voting changes for §5 preclearance.

The §5 preclearance process is costly and burdensome.    To comply with §5, before any "change in practices or procedures affecting voting"—even the most minute of changes—the

district must submit such changes to the Attorney General for approval.    In addition to the cost of the submission itself, most proposed changes are presumptively delayed by at least 60 days awaiting the Attorney General's approval.

In July 2006, Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions nor take into account that discriminatory conditions may now exist in jurisdictions that are not covered by §5. While Congress was considering that reenactment, proponents of reauthorizing §5 repeatedly stressed that the availability of bail-out for jurisdictions that could demonstrate a history of compliance with the Voting Rights Act is intended to minimize the burdens on constitutionally compliant political subdivisions and that this escape clause made §5 a congruent and proportional remedy for the evils Congress sought to address.

Indeed, PFAW itself publicly acknowledges that "[c]urrent legal doctrine requires that statutes such as Section 5 that are race conscious be 'narrowly tailored' to address the harms they are designed to cure," and that "Section 5 is directed at jurisdictions with a *history* of discriminating against minority voters."    *Renewal of the Voting Rights Act of 1965*, http://www.pfaw.org/pfaw/general/default.aspx?oid=20834 (last visited November 4, 2006) (emphasis added).   But now that the district, which has no history of discrimination, seeks to avail itself of the bail-out remedy, PFAW and several other applicants have moved to intervene, expressing determined opposition to the district's effort to terminate its §5 obligations.   PFAW claims to have members "several of whom are Spanish-surnamed voters who reside within the Northwest Austin Municipal Utility District Number One," PFAW Mot. 1, but it does not identify a single resident member by name.   Nor does PFAW allege that any of its unnamed members has suffered or is in imminent danger of suffering any concrete injury from any discriminatory voting practice.   Instead rather than asserting particularized injury affecting any

3

of its members, PFAW asserts a generalized interest "in the continued enforcement of Section 5 of the Voting Rights Act . . . in Texas in general, and in [the district] specifically."   PFAW Mot. 1-2.   The Attorney General, in his answer to the district's complaint, has indicated that he will vigorously defend that interest.   Because PFAW lacks standing and cannot satisfy other requirements for intervention, the district opposes the motion.

A<small>RGUMENT</small>

PFAW, which does not specifically identify any members who are residents of the district and which cannot state a legally cognizable stake in the outcome of this action, cannot satisfy the requirements for intervention as of right or permissive intervention.   There is no indication that the Attorney General is inadequate to defend the application and constitutionality of §5.   At most, PFAW has articulated interests in influencing the Court's determination of the case that could be fully served by its participation as an *amicus curiae*.   The district would have no objection to PFAW's participating through an *amicus* filing, but it opposes PFAW's attempt to participate at the same level as the parties to this action because it lacks standing and cannot meet remaining elements of the intervention inquiry.

The D.C. Circuit has made clear that "because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties."   *City of Cleveland v. NRC*, 17 F.3d 1515, 1517 (D.C. Cir. 1994); *accord Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 538 (D.C. Cir. 1999).[1]   The D.C. Circuit has been resolute

---

[1]   *In re Vitamins Antitrust Class Action*, 215 F.3d 26 (D.C. Cir. 2000), expressed "uncertainty over whether standing is necessary for permissive intervention."   *Id.* at 31.   But other decisions by the court of appeals and this Court suggest that it is.   *See, e.g.*, *Snyder v. FCC*, No. 04-1022, 2004 U.S. App. LEXIS 11272, at *1-*3 (D.C. Cir. June 7, 2004) (unpublished) ("[A]lthough the court has allowed interested parties to intervene where the party expected to press the public interest does not appeal, intervenors themselves are required to have standing."); *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 n.7 (D.C. Cir. 1998) (affirming a denial of permissive intervention when the applicants' "intervention would have no effect because they have no standing to enforce the consent decree"); *United States v.*

4

in insisting that standing be established.    *See Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 233

(D.C. Cir. 2003).

Additionally, a motion to intervene as of right under rule 24(a)(1) requires the applicant

to show that "a statute of the United States confers an unconditional right to intervene."    FED. R.

CIV. P. 24(a)(1).    A motion to intervene under rule 24(a)(2) requires the Court to consider four

factors:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to
> the property or transaction which is the subject of the action"; (3) whether "the
> applicant is so situated that the disposition of the action may as a practical matter impair
> or impede the applicant's ability to protect that interest"; and (4) whether "the
> applicant's interest is adequately represented by existing parties."

*Fund for Animals*, 322 F.3d at 731.    The requirement that an intervenor demonstrate "'an

interest relating to the property or transaction which is the subject of the action' . . . impliedly

refers not to any interest the applicant can put forward, but only to a legally protectable one."

*City of Cleveland*, 17 F.3d at 1517.    Permissive intervention under rule 24(b)(2) requires the

applicant to establish, in addition to timeliness, that the "applicant's claim or defense and the

main action have a question of law or fact in common" and requires the Court to "consider

whether the intervention will unduly delay or prejudice the adjudication of the rights of the

original parties."    FED. R. CIV. P. 24(b).

PFAW's motion to intervene should be denied because PFAW lacks standing, it has no

legally cognizable interests that would be impaired as a practical consequence of this action, and

it has made no showing that the Attorney General is inadequate to represent its asserted interest

in defending §5.    Moreover, permitting a multiplicity of parties—each of whom seeks to

duplicate the Attorney General's efforts, inject extraneous matters irrelevant to the issues in this

---

*Philip Morris USA Inc.*, No. 99-2496 (GK), 2005 U.S. Dist. LEXIS 16196, at *27 (D.D.C. July 25, 2005)
(unpublished) (granting permissive intervention after finding, *inter alia*, that applicants had standing).

case, or both—would necessarily unduly prejudice the parties and delay judicial resolution of their respective rights.

## I.  PFAW LACKS STANDING TO INTERVENE.

PFAW does not even acknowledge its burden to show standing, let alone attempt to meet it.  To establish associational standing, an organization must show that: (1) its members would otherwise have standing to litigate in their own right, (2) the interests that the organization seeks to protect are germane to its purpose, and (3) neither the claim nor relief requested require participation of individual members.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441 (1977).  PFAW cannot satisfy that standard because, although it claims unidentified members residing in the district, it makes no showing that those members—if they exist—would have standing in their own right.

PFAW's primary purported basis for intervention is the assertion that its unnamed resident members have an unconditional right to intervene under a statutory provision: "Any aggrieved party may as of right intervene at any stage in such [a §4] action."  42 U.S.C. 1973*b*(a)(4).  An "aggrieved party" is a party with standing.  *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 93 S.Ct. 364, 366-67 (1972) (concluding that the words "person claiming to be aggrieved" in the Civil Rights Act of 1968 "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution'").  PFAW alleges nothing to indicate that it has any members with standing as "aggrieved parties."

"To establish standing under Article III, a prospective intervenor—like any party—must show: (1) injury-in-fact, (2) causation, and (3) redressability."  *Fund for Animals*, 322 F.3d at 732-33; *accord, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992).  And those elements are merely "the irreducible constitutional minimum."  *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136.  Rule 24(a)(2)'s requirement that an applicant demonstrate a

legally protectable interest is effectively subsumed in the standing inquiry.  *Fund for Animals*, 322 F.3d at 735; *see also Roeder*, 333 F.3d at 233.

A.    **PFAW Cannot Show Injury-in-Fact to Any of Its Alleged Members From the District's Attempt to Bail Out of §5 Preclearance.**

As an initial matter, PFAW's naked assertion that it has minority-group members in the district, which provides no specific names of individuals or even an approximate number, is insufficient to support PFAW's claim to have individual members with standing to invoke federal jurisdiction.    *Cf. Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, 2136 (noting that the elements of standing are "not mere pleading requirements" and, thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation"); *cf. also United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 2436 (1995) ("[W]here a plaintiff does not live in [a racially gerrymandered] district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference.").    In any event, PFAW alleges nothing to suggest that any of its unnamed members have suffered or are about to suffer an injury-in-fact.    Injury-in-fact consists of "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."    *Id*. at 743, 115 S.Ct. at 2435; *accord Lujan*, 504 U.S. at 560-61, 112 S.Ct. at 2130.

The elements of the bail-out procedure are set out in §4 itself, 42 U.S.C. 1973*b*, and PFAW does not allege that its members specifically possess any information relevant to the analysis of whether the district meets the bail-out criteria.    More generally, PFAW does not allege that any of its members have been subject to or are in imminent fear of any discriminatory practice.    *Cf. Trafficante*, 409 U.S. at 209-10, 93 S.Ct. at 367 (finding standing to exist when

7

"[i]ndividual injury or injury in fact to petitioners, the ingredient found missing in *Sierra Club v. Morton*, 405 U.S. 727, is alleged here").   PFAW asserts no concrete and particularized injury, actual or imminent.   PFAW asserts that "[a]ny effort to affect the ability to participate in the electoral process . . . will unquestionably impede PFAW's members' interests as voters." PFAW Mem. 3.   But PFAW does not—and cannot—identify any specific threat to its members' ability to participate in the district's electoral process.

"Article III requires more than a desire to vindicate value interests."   *Diamond v. Charles*, 476 U.S. 54, 66-67, 106 S.Ct. 1697, 1706 (1986) (holding that the plaintiff physician's "expression of a desire that the Illinois Abortion Law as written be obeyed" was merely an "abstract concern," insufficient to confer standing).   Section 5 coverage is not itself a substantive voting right.   Substantive voting rights are those rights that directly implicate voters' participation in the political and electoral processes, and those rights are enshrined for all voters in the Constitution and in §2 of the Voting Rights Act.   *See Georgia v. Ashcroft*, 539 U.S. 461, 477-78, 123 S.Ct. 2498, 2510 (2003) (noting that "Section 5 of the Voting Rights Act has a limited substantive goal: 'to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise'," and that §2 requires substantive protections of voting rights not reached by the §5 preclearance inquiry (internal quotation marks omitted)).

Indeed, if there were a substantive right to live under local governmental units that are covered by §5—and thus required to seek permission from the federal government before implementing any local voting change—the vast majority of our nation's citizens would be suffering infringement of that right.   *Cf. Renewal of the Voting Rights Act of 1965*, http://www.pfaw.org/pfaw/general/default.aspx?oid=20834 (last visited November 4, 2006) (acknowledging that, for §5 to survive constitutional challenge, it must, at a minimum, be

8

"narrowly tailored" to address harms in areas with a history of voting discrimination).   Most American voters, even many in localities with recent histories of voting discrimination, do not live in areas covered by §5.

All local political subdivisions are required to comply with the Constitution and §2. And no relief the district seeks could exempt the district from complying with the substantive provisions of the Voting Rights Act that are designed to fully implement the protection of voting rights enshrined in the Constitution.   The assertion that the remedy the district seeks "would immediately jeopardize PFAW's members' voting rights," PFAW Mot. 2, is simply wrong. Neither preclearance nor exemption from preclearance insulates a political subdivision from an action to enforce substantive voting rights.   *See Georgia*, 539 U.S. at 477-78, 123 S.Ct. at 2510; *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 335-36, 120 S.Ct. 866, 875-76 (2000).

Proponents of the 2006 reenactment of §5 repeatedly emphasized that "the existing bailout and bail-in provisions—Sections 4(a) and 3(c) of the act—operate in tandem with the Section 5 Coverage formula to ensure that the scope of Section 5 is appropriately contracted or expanded."   Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal Defense and Educational Fund, Inc., Reauthorization of the Voting Rights Act: Policy Perspectives and Views from the Field, United States Senate Judiciary Subcommittee on the Constitution, June 21, 2006, *available at* http://www.naacpldf.org/content/pdf/vra/VRA _Adegbile_Senate_Testimony.pdf, at 15-17.   For example, Theodore Shaw explained that "Section 5 coverage is not fixed under the existing statute but rather contains a way out . . . . Under the bailout provision in Section 4(a), jurisdictions that can establish a clean record of compliance with the VRA and statutory principles of equality in voting can bailout from the preclearance obligations."   Response of Theodore Shaw, Director-Counsel, NAACP Legal Defense and Educational Fund, Inc. to Written Questions from Senator John Cornyn, June 9,

2006, *available at* http://www.naacpldf.org/content/pdf/vra/Ted_Shaw_Response_to_Questions_on_VRA_from_Senate_Judiciary_Committee.pdf, at 2 n.6; *see generally also id.* at 2-11.

The district always has been and remains committed to full implementation of substantive voting protections for all its citizens. For the Court to determine that the district is entitled to bail out under §4, it will need to be satisfied that the district affirmatively proved at least a ten-year history of compliance with the Voting Rights Act and the Constitution. 42 U.S.C. §1973*b*; *see Briscoe v. Bell*, 432 U.S. 404, 411, 97 S.Ct. 2428, 2432 (1977). For the Court to grant the district the remedy of exemption from §5 on the alternative rationale that it is unconstitutional to apply the preclearance requirement to the district, the Court will need to determine that §5 is not a congruent and proportional exercise of Congress's power to enforce constitutional voting rights when it sweeps in the district, an entity with no history of discrimination, and provides no escape clause. *See City of Boerne v. Flores*, 521 U.S. 507, 533, 117 S.Ct. 2157, 2170 (1997) (noting that *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548 (1980), upheld the 1975 reenactment of §5 as constitutional because "[t]he [preclearance] requirement was placed only on jurisdictions with a history of intentional racial discrimination in voting"); *Briscoe*, 432 U.S. at 411, 97 S.Ct. at 2432 ("Congress was well aware . . . that the simple formula of § 4(b) might bring within its sweep governmental units not guilty of any unlawful discriminatory voting practices. It afforded such jurisdictions immediately available protection in the form of an action to terminate coverage under § 4(a) of the Act."); *cf. City of Rome*, 446 U.S. at 177, 100 S.Ct. at 1562 ("Congress could rationally have concluded that, because electoral changes *by jurisdictions with a demonstrable history of intentional racial discrimination in voting* create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." (emphasis added, footnote omitted)).

In other words, any judgment terminating the district's coverage under §5 necessarily involves examination of the district's recent history and a judicial determination that it demonstrates compliance with §2.   PFAW's members are thus unlikely to suffer any imminent injury to substantive voting rights at the hands of the district if its §5 coverage is terminated, and PFAW has made no allegation of a concrete or particularized harm that would throw into doubt the district's entitlement to termination of §5 coverage.

**B.     PFAW Cannot Show Causation Because No Injury Is Fairly Traceable to Actions of the District.**

To satisfy the causation element of the standing inquiry, PFAW must show not just that some cognizable injury exists but also that it is "fairly traceable" to conduct of the district. *E.g.*, *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324 (1984).   PFAW alleges no injury-in-fact at all, so none is traceable to actions of the district.

Moreover, any conceivable future injury-in-fact—which, at this time, would be groundless conjecture and hypothesis—would not be caused by the district's terminating §5 coverage but by separate, future conduct that would continue to be prohibited by §2 and the Constitution.   Later, substantive violations of voting rights, if any, will always be subject to challenge under §2, regardless whether they receive preclearance before implementation.   *See Georgia*, 539 U.S. at 477-78, 123 S.Ct. at 2510 (2003); *Bossier Parish Sch. Bd.*, 528 U.S. at 335-36, 120 S.Ct. 866, 875-76 (2000).

**C.     PFAW Cannot Show That Any Cognizable Injury Would Be Redressed by a Judgment Against the District.**

Someone asserting standing must demonstrate, in addition to an actual injury caused by the opposing litigant, that the relief sought is likely to redress that injury.   *E.g., Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136.   And "it must be 'likely,' as opposed to merely 'speculative,' that the

injury will be 'redressed by a favorable decision.'" *Id.* PFAW cannot establish that any cognizable injury would be redressed by a judgment against the district.

Challenging a "generalized level of Government action" presents "obvious difficulties insofar as proof of causation or redressability is concerned." *Lujan*, 504 U.S. at 568, 112 S.Ct. at 2140; *accord Allen*, 468 U.S. at 759-60, 104 S.Ct. at 3329 ("[S]uits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . are rarely if ever appropriate for federal-court adjudication."). The only "injury" that PFAW suggests would be directly remedied by denying the district exemption from §5 coverage is to the asserted "right" to live in a jurisdiction covered by §5. *See* PFAW Mem. 5. As discussed above, living in a covered jurisdiction cannot be a federally protected substantive voting right because, if it is, then most Americans live in areas where that right is violated. As further discussed above, speculative future injuries of actual substantive voting rights are not redressable by continued §5 coverage but by the continued—and here unchallenged—protections of §2 and the Fifteenth Amendment. *See Bossier Parish Sch. Bd.*, 528 U.S. at 335-36, 120 S.Ct. at 875-76 (2000) (explaining that existing practices that violate substantive voting rights "cannot be stopped in advance under the extraordinary burden-shifting procedures of § 5, but must be attacked through the normal means of a § 2 action").

## II.    PFAW AND ITS MEMBERS ARE NOT SO SITUATED THAT THE DISPOSITION OF THIS CASE MAY IMPAIR OR IMPEDE THEIR INTERESTS.

In addition to lacking standing, which is required for intervention of any type and for PFAW's members to be "aggrieved part[ies]" entitled to rule 24(a)(1) intervention, the PFAW cannot demonstrate that the disposition of this case may impair or impede its or its members' ability to protect their interests, as rule 24(a)(2) further requires. The inquiry for this element of

intervention as of right focuses on the "practical consequences" that denying intervention would have for the prospective intervenor.    *Fund for Animals*, 322 F.3d at 735.

As discussed above, PFAW and its members—even if PFAW actually has members in the district—have no legally protectable interest in preserving the district's §5 coverage because that coverage, in and of itself, has no direct effect on preservation of substantive voting rights. The only practical consequence of a judgment in the district's favor is relief for the district from the burdensome preclearance process; the district must still maintain full compliance with §2 and the Constitution, and it is firmly committed to doing so.    Should any violations of substantive voting rights arise in the future, they can be challenged under §2, just as they must be now.    *See Bossier Parish Sch. Bd.*, 528 U.S. at 335-36, 120 S.Ct. 866, 875-76 (2000).

PFAW's stated desire to influence the Court's decision in this action is not an intervenor's interest, but merely the type of interest that can be served by participation as an *amicus curiae*.    *See Rio Grande*, 178 F.3d at 539 ("On the record here, there is no doubt that Longhorn is not a proper intervenor.    It appears that Longhorn is really seeking to appear as an amicus."); *City of Cleveland*, 17 F.3d at 1518 (denying the motion for intervention but permitting the applicant to participate as *amicus curiae*); *see also Diamond*, 476 U.S. at 78, 106 S.Ct. at 1711.    Because PFAW can present any unique perspective or material information in its members' possession just as well by participating as an *amicus*, denying intervention would have no practical effect on its ability to communicate its views to the Court.    The district has no objection to PFAW participating as an *amicus*.    One "lacking Article III standing can do no more than that."    *Rio Grande*, 178 F.3d at 539.

### III.     PFAW CANNOT SHOW THAT THE ATTORNEY GENERAL OR OTHER INTERVENORS WILL NOT ADEQUATELY REPRESENT ITS INTERESTS.

In addition to establishing that they have a cognizable stake in the litigation sufficient to show standing and that the disposition may impair or impede their interests, intervenors under rule 24(a)(2) must show that their interests are not adequately represented by anyone who is already a party to the action.   FED. R. CIV. P. 24(a)(2); *Fund for Animals*, 322 F.3d at 735. PFAW does not and cannot show that the Attorney General is inadequate to defend its claimed interest in keeping the district covered by §5.

Although the burden of establishing inadequate representation has been described as "minimal," *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10 (1972), "the fact that the government is a party makes it more difficult for movants for intervention in this Circuit to meet that minimal burden."   *Sweet Home Chapter of Cmtys. for Great Or. v. Lujan*, No. 91-1468, 1991 U.S. Dist. LEXIS 17449, at *7 (D.D.C. Dec. 10, 1991) (unpublished); *see Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979); *Humane Soc'y of United States v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985); *cf. Nuesse v. Camp*, 385 F.2d 694, 702-04 (D.C. Cir. 1967) (state banking commissioner was permitted to intervene when his more general interest in the competitive equality of state and national banks was not adequately represented by a single state bank).   That is because a governmental entity, under the principle of *parens patriae*, "is presumed to represent the interests of all its citizens." *Higginson*, 631 F.2d at 740; *accord Sweet Home Chapter*, 1991 U.S. Dist. LEXIS 17449, at *6 ("Certainly federal agencies are parts of a government body, and as such, are charged with enforcing the public interest.   The parens patriae doctrine would thus seem to apply equally well to government agencies as to states.").

Indeed, the office of the Attorney General—which already adequately represents PFAW's interests in this case—is the very government agency that PFAW argues is best situated to protect its members' substantive voting rights through the preclearance process.   *Cf. Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, 378 F.3d 774, 780-81 (8th Cir. 2004) (denying intervention by a group of voters when "the state directly represented the Bollen Group's asserted interest by seeking to proceed with the election pursued by its citizens under state law and by specifically adopting the positions advanced by the Bollen Group").   There is more than a little irony in PFAW's assertion that it needs to intervene because the Attorney General cannot adequately defend the very procedure that the statute charges the Attorney General with enforcing.   Any finding that the Attorney General is inadequate to represent PFAW's members' interests would be inconsistent with the very disposition PFAW seeks for this case.

The Attorney General is presumed adequate to represent PFAW's asserted interest in defending the enforceability of §5, and PFAW shows nothing sufficient to overcome that presumption.   It relies primarily on the conclusory assertion that "the government's interests and minority voters' interests may diverge to some degree."   PFAW Mem. 7.   But the Attorney General's answer to the district's complaint makes clear that the department is committed to vigorously defending §5's constitutionality and enforcing §5 against the district. PFAW cannot just assume a conflict without showing an actual divergence of its members' interests from those of the Attorney General.   To overcome the presumption of adequacy, PFAW must show that it and its members have some particularized interest that "cannot be subsumed within the shared interest of the citizens" represented by the Attorney General. *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986); *compare* PFAW Mem. 7 (asserting that, "[w]hile the government may have a generalized interest in defending the constitutionality of a statute enacted by Congress, PFAW and its members have highly specific

interest [*sic*] in protecting their voting rights and Section 5 of the VRA"), *with Higginson*, 631 F.2d at 740 (holding that, although applicants may have had more direct economic interest than did the state, they could not overcome the presumption of adequate representation when "there appear[ed] to be no possible divergence between their position and the state's position on the primary issue").

"[P]artial congruence of interests" may "not guarantee the adequacy of representation." *Fund for Animals*, 322 F.3d at 737.    But there is complete congruence in this case.    Comparing the Attorney General's answer with PFAW's motion papers and proposed answer demonstrates no divergence in the objective each hopes to achieve and the defenses each proposes to raise. *Cf. Blake v. Pallan*, 554 F.2d 947, 954-55 (9th Cir. 1977) (considering whether the interests of an original party would lead it to make all of the prospective intervenor's arguments).    Inadequacy has not been shown when, as in this case, prospective intervenors' arguments "would be merely cumulative."    *Higginson*, 631 F.2d at 740.    In this case, PFAW and the Attorney General share a simple, concrete goal: preventing the district from terminating its §5 coverage under any possible rationale.    And "[i]t is not sufficient that the party seeking intervention merely disagrees with the litigation strategy or objectives of the party representing its interests."    *Little Rock Sch. Dist.*, 378 F.3d at 780.

Nothing has yet occurred that might indicate inadequacy of representation, for example, the Attorney General's deciding to drop a meritorious defense or not to appeal an adverse ruling. *See, e.g.*, *Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969).[2]    There is simply no indication that the Attorney General will compromise the full and vigorous defense of §5 by any act or failure to act.    PFAW can share any unique perspective it has as an *amicus*; to adequately

---

[2] A motion to intervene may still be timely following a new development, like failure to appeal an adverse judgment, that, for the first time, demonstrates inadequacy.    *Smuck*, 408 F.2d at 181-82.

submit its views PFAW does not need to participate with all the rights, privileges, and obligations of an intervening party.

In addition, this Court has already granted motions to intervene by five residents of the district and two organizations—Texas State Conference of NAACP and Austin Branch of the NAACP—all of whom profess interests identical to those Lesane professes. Even if PFAW could show that its interests were not adequately represented by the Attorney General, they are more than adequately represented by those intervenors who have already been made parties to this litigation. Clearly, a needless multiplicity of parties asserting indistinguishable interests is the very problem that the inadequacy requirement is intended to avoid.

## IV.  PFAW SHOULD BE DENIED PERMISSIVE INTERVENTION BECAUSE ITS DUPLICATIVE PARTICIPATION WOULD CAUSE UNDUE DELAY AND PREJUDICE.

Even if PFAW had standing and established that its "claim or defense and the main action have a question of law or fact in common," FED. R. CIV. P. 24(b), the Court should deny permissive intervention because it "will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* PFAW essentially proposes to duplicate the efforts of the Attorney General to defend the application of §5 and suggests that it seeks to provide information and arguments to the Court that are either cumulative or extraneous. For example, PFAW suggests that it seeks to address "racially polarized voting patterns and the history across Texas of discrimination against minorities." PFAW Mem. 3. But the only issues material to this case relate to conditions within the district, not "across Texas."[3] And PFAW does not allege any racial polarization or discrimination against minorities within the district.

The inefficiencies inherent in duplicative and cumulative effort are precisely the type of danger that the undue delay and prejudice standard is designed to avert. The standard

---

[3] Moreover, PFAW's proposed presentation is expressly cumulative and duplicative of that suggested by the Diaz applicants for intervention, at least partially. *See* Diaz Mem. 3 (suggesting that the Diazes seek to address "racially polarized voting patterns and the history across Texas of discrimination against Latinos").

"presumably captures all the possible drawbacks of piling on parties." *Massachusetts Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 782 (D.C. Cir. 1997). When parties multiply unnecessarily through permissive intervention, "the concomitant issue proliferation and confusion will result in delay as parties and court expend resources trying to overcome the centrifugal forces springing from intervention, and prejudice will take the form not only of the extra cost but also of an increased risk of error." *Id.* When a court permits full participation by parties who "only marginally satisfy the standing requirements" and are not yet "truly aggrieved" it will be "repeatedly required to respond to vague hypotheticals and speculation rather than concrete and actual harms." *Indep. Democratic Party v. Rokita*, No. 1:05-CV-0634-SEB-VSS, 2006 U.S. Dist. LEXIS 20321, at *129 n.75 (S.D. Ind. April 14, 2006) (unpublished).

PFAW gives no indication of how its participation as an intervenor could avoid the delay and inefficiency inherent with a multiplicity of parties. Because intervenors participate with a full panoply of litigation rights akin to those enjoyed by the original parties to a suit, *City of Cleveland*, 17 F.3d at 1517, PFAW's avowed intent to abide by the schedule established for the parties and avoid duplicative effort cannot negate the dangers of inefficiency and delay. If nothing else, a multiplicity of parties necessarily complicates the logistics of setting schedules and administering proceedings. If PFAW is serious about communicating its views while avoiding delay and prejudice, it can do that effectively as an *amicus*, not an intervenor.

## V. AT A MINIMUM, THE COURT SHOULD ATTEMPT TO MINIMIZE INHERENT DELAY AND PREJUDICE BY REQUIRING ALL INTERVENORS-DEFENDANTS TO CONSOLIDATE THEIR EFFORTS.

PFAW's motion to intervene as a defendant is one of at least seven such motions filed in this case so far. Two entities and five individuals have already been granted intervention, at least four motions remain pending before the Court, and counsel for the district has been advised that additional motions to intervene may soon be filed. This mushrooming of parties clearly

prejudices the district, a small public entity with limited resources, and unavoidably generates delay and complexity in administering this litigation. *See Massachusetts Sch. of Law*, 118 F.3d 776 at 782. The Court, particularly if it is inclined to permit these applicant to also intervene as a defendant, should, at the very least, order all intervenors-defendants to consolidate their efforts so as to minimize delay, prejudice, and complexity.

Specifically, the Court should require those intervenors to appoint or have appointed a single counsel as the liaison to the Court and the original parties and to consolidate discovery, motion practice, and briefing and, whenever possible, to coordinate their activities and filings with those of the Attorney General. Requiring multiple intervenors to establish a unitary point of communication and conduct a unified effort would at least relieve the district, the Attorney General, and the Court of some of the burden of coordinating the conduct of this litigation with a legion of counsel and responding to numerous redundant filings and discovery requests, reducing the drain on scarce litigation and judicial resources.

## CONCLUSION

For these reasons, the Court should deny PFAW's motion to intervene and, at a minimum, require all intervenors-defendants to consolidate their litigation efforts.

DATED:   November 13, 2006                Respectfully submitted:

                                          /s/ Gregory S. Coleman
                                          Gregory S. Coleman
                                          (admitted *pro hac vice*)
                                          Christian J. Ward
                                          (admitted *pro hac vice*)
                                          PROJECT ON FAIR REPRESENTATION
                                          8911 Capital of Texas Hwy., Ste. 1350
                                          Austin, Texas  78759
                                          [Tel.] (512) 349-1930
                                          [Fax] (512) 527-0798

                                          /s/ Erik S. Jaffe
                                          Erik S. Jaffe

D.C. Bar No. 440112
ERIK S. JAFFE, P.C.
5101 34th Street N.W.
Washington, D.C .20008
[Tel.] (202) 237-8165
[Fax]  (202) 237-8166

*Attorneys for Plaintiff*
*Northwest Austin Municipal*
*Utility District No. One*

CERTIFICATE OF SERVICE

I hereby certify that I served true copies of Plaintiff's Memorandum of Points and Authorities in Opposition to Motion by People for the American Way and the proposed Order denying the motion upon counsel for the parties and for applicants to intervene by United States First Class postage-paid mail and by e-mail to the parties indicated below on November 13, 2006.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.    20530

*Counsel for Defendant*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Intervenors-Defendants Texas
State Conference of NAACP and Austin
Branch of the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Intervenors-Defendants Texas State
Conference of NAACP and Austin Branch of the
NAACP*

Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland    21215

*Counsel for Intervenors-Defendants Texas State
Conference of NAACP and Austin Branch of the
NAACP*

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
    EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas    78205

*Counsel for Intervenors-Defendants Lisa and Gabriel Diaz*

Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York    10013

*Counsel for Intervenors-Defendants Rodney and Nicole Louis*

Elliott M. Mincberg
emincberg@pfaw.org
David J. Becker
People for the American Way Foundation
2000 M Street NW, Suite 400
Washington, D.C.    20036

*Counsel for Applicant People for the American Way*

J. Gerald Hebert
jghebert@comcast.net
5019 Waple Lane
Alexandria, Virginia    22304

*Counsel for Applicant Travis County*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C.    20003

*Counsel for Intervenors-Defendants Lisa and Gabriel Diaz*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
    FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.    20005

*Counsel for Intervenors-Defendants Rodney and Nicole Louis*

Max Renea Hicks
rhicks@renea-hicks.com
1250 Norwood Tower
114 West 7th Street
Austin, Texas    78701

*Counsel for Applicant Travis County*

Laughlin McDonald
Neil Bradley
courtfilings@aclu-nca.org
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, Georgia    30303

*Counsel for Applicant Nathaniel Lesane*

Lisa Graybill
Legal Director
courtfilings@aclu-nca.org
ACLU FOUNDATION OF TEXAS
1210 Rosewood Ave.
Austin, Texas    78702

*Counsel for Applicant Nathaniel Lesane*

Art Spitzer
artspitzer@aol.com
courtfilings@aclu-nca.org
Legal Director
ACLU OF THE NATIONAL CAPITAL AREA
1400 20th Street N.W., Suite 119
Washington, D.C.    20036

*Counsel for Applicant Nathaniel Lesane*

Jose Garza
jgarza@trla.org
Judith A. Sanders-Castro
George Korbel
Texas RioGrande Legal Aid, Inc.
1111 N. Main Street
San Antonio, Texas    78212

*Counsel for Applicants Angie Garcia,
Jovita Casarez and Ofelia Zapata*

Alpha Hernandez
ahernandez@trla.org
Eloy Padilla
epadilla@trla.org
Texas RioGrande Legal Aid, Inc.
309 Cantu Street
Del Rio, Texas    78212

*Counsel for Applicants Angie Garcia,
Jovita Casarez and Ofelia Zapata*

Michael T. Kilpatrick
mkirkpatrick@citizen.org
Brian Wolfman
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC    20009

*Counsel for Applicants Angie Garcia,
Jovita Casarez and Ofelia Zapata*

/s/ Christian J. Ward
Christian J. Ward