IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL § <br> UTILITY DISTRICT NUMBER ONE, § <br> § <br> *Plaintiff*, § <br> § <br> vs. § <br> § <br> ALBERTO GONZALES, Attorney § <br> General of the United States, § <br> § <br> *Defendant*, § <br> § <br> TRAVIS COUNTY, TEXAS § <br> 314 W. 11th Street § <br> Austin, Texas 78701 § <br> § <br> *Defendant-Intervenor*. § | Civil Action No. <br> 1:06cv1384 <br> Three-judge court (PLF, DST, EGS) |

**TRAVIS COUNTY'S MOTION FOR SUMMARY JUDGMENT,
WITH ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES**

Travis County, Texas ("Travis County" or "County"), a defendant-intervenor herein, moves for summary judgment in the above-referenced case, in which the Northwest Austin Municipal Utility District No. 1 ("Austin MUD" or "District") seeks a declaratory judgment, asserting a statutory claim under Section 4 of the Voting Rights Act of 1965, as amended ("the Act"), and an alternative challenge to the constitutional validity of Section 5 of the Act.

**I.    The County requests summary judgment and adopts by reference the private Defendant-Intervenors' Motion for Summary Judgment.**

Travis County moves for entry of summary judgment against the District and entry of a declaratory judgment that:

- the Austin MUD is not authorized to seek exemption from Section 5 of the Act, 42 U.S.C. § 1973c, by invoking the bailout provisions of Section 4 of the Act, 42 U.S.C. § 1973b(a), because it is not a

        "political subdivision" within the meaning of Section 14 of the Act, 42 U.S.C. § 1973*l*(c)(2); and

- Section 5 of the Act, 42 U.S.C. § 1973c, is an appropriate exercise of Congress's legislative power under Section 5 of the Fourteenth Amendment to the United States Constitution and Section 2 of the Fifteenth Amendment to the United States Constitution.

The County adopts by reference the Motion for Summary Judgment, including exhibits, and the Memorandum of Points and Authorities in Support of Motion for Summary Judgment to be filed today by Defendant-Intervenors Texas State Conference of NAACP Branches and thirteen other private defendant-intervenors.[1]  Further, the County is one of the fifteen defendant-intervenors submitting the Joint Statement of Material Facts As To Which There Is No Genuine Issue Pursuant to Local Rules 7(h) and 56.1, which also is being filed today.

## II. Travis County's unique vantage point provides insight into additional reasons for granting summary judgment.

### A. The scope of governmental authority for Travis County is substantially broader than for the Austin MUD, particularly regarding election administration.

As a governmental unit with sole voter registration responsibilities in Travis County and, consequently, the authority to determine whether to seek judicial bailout from Section 5 coverage, the County is uniquely positioned in this case.  The County, therefore, offers this additional support for entry of summary judgment against the District for which the County is contractually engaged to conduct elections.

Nearly a million people live in Travis County.  Expert Report of R. Robinson (showing Travis County's 2000 population as 812,280) [*Exh. 3 to Texas NAACP Motion*].  The County is the political subdivision responsible for voter registration with

---

[1] The summary judgment motion and legal memorandum are termed here the "Texas NAACP Motion."

regard to those County residents who are eligible to vote. Deposition of Travis County Clerk D. DeBeauvoir ("DeBeauvoir Depo."), at 44-45 (voter registrar is Travis County Tax Assessor-Collector) [*exhibit to Texas NAACP Motion*]; TEX. ELEC. CODE § 12.001.

The Austin MUD is a small, special-purpose governmental unit located toward the northern edge of the County. The District, which had a population of only twelve people in 1990, shortly after its creation, still has a comparatively small population; its residents make up less than 1% of the County's overall population. *See* Expert Report of R. Robinson. It also is substantially less racially and ethnically diverse than the County as a whole. *Id*.[2]

The District's powers and duties are generally described in Chapter 54 of the Texas Water Code.[3] For example, it is subject to continuing supervision by the state's chief environmental agency, the Texas Commission on Environmental Quality. TEX. WATER CODE § 54.024.[4]

Special-purpose local districts such as the Austin MUD have tightly circumscribed powers under Texas law. First, the state constitutional grant of authority for the creation and existence of such districts specifies a limit on their powers that the

---

[2] For example, the District's Anglo population in 2000 was 80.1% of its total population, as compared to the County's Anglo population, which was 56.4% of the total County population. The District did have a comparatively higher percentage of those identifying themselves as Asian (11.6%) in the 2000 decennial census than did the County as a whole (4.5%).

[3] Some municipal utility districts in the state are created by special legislation, which may contain directives and restrictions different from those in the Water Code's Chapter 54. *See, e.g., Save Our Springs Alliance, Inc. v. Lazy Nine MUD*, 198 S.W.3d 300, 313 (Tex.App.—Texarkana 2006, rev. denied); *see generally* D. Brooks, *County and Special District Law*, 36A TEX. PRACTICE § 46.6, at 123-124 (2nd ed. 2002) (hereinafter, "Brooks *Special District Law*"). The Austin MUD was not created this way. Municipal utility districts have been identified as the most popular form of special-purpose district created under the Texas Constitution's Conservation Amendment, TEX. CONST. art. 16, § 59. *See* Brooks *Special District Law* § 46.71, at 228-29.

[4] The state supervision, however, does not make the District part of state government. *Cf. Monsanto Co. v. Cornerstones MUD*, 865 S.W.2d 937, 940-941 (Tex. 1993) (holding that MUD was a political subdivision, not the "state," for purposes of statutory exemption from limitations).

legislature cannot expand. *Deason v. Orange County Water Control & Improvement District No. 1*, 151 Tex. 29, 244 S.W.2d 981, 984 (1952) (addressing scope of the Texas Constitution's Conservation Amendment). Second, even legislative grants of powers to these entities are read restrictively. *Tri-City Fresh Water Supply District No. 2 of Harris County v. Mann*, 142 Tex. 280, 142 S.W.2d 945, 948 (1940) (explaining that local water conservation districts only have powers that are clearly granted by the legislature and necessarily implied to effectuate the express powers and describing such districts as "low down in the scale or grade of corporate existence").

**B.   The County conducts elections for over a hundred governmental units within its territory and must display a special sensitivity to minority voting concerns across the spectrum.**

The County is authorized to conduct elections and provide election services for the many separate units of local government within its territory, even when the County itself is not a party to the election. DeBeauvoir Depo. at 15. The impetus for the County to provide such election services dramatically increased in early 2006 with implementation of the Help America Vote Act of 2002, 42 U.S.C. §§ 15301-15545 ("HAVA"). DeBeauvoir Depo. at 24-26. Now, the County provides election services and conducts elections for all of the 107 separate units of local government within the County. *Id.*, at 7, 44. Beginning in 2004, the Austin MUD chose to be among those local units of government for which the County conducts elections. *Id.* at 35, 51.

But, the County's conduct of elections for these local governmental sub-units does not give it control over every detail of the election process. For example, some of the smaller jurisdictions recruit their own polling place workers, while asking the County to provide their training. *Id.* at 36. Issues of poll worker sensitivity to those turning out

4

to vote is a particular, concrete concern in the conduct of elections, particularly with regard to voters who are unable to read, write, or speak English. Indeed, the County has to grapple regularly with how to handle potential shortcomings in that sphere of electoral administration. *Id.* at 73-75 (giving examples of County Clerk's concern with problems of poll workers' sensitivity to minority voting concerns). This situation means that, unlike the Austin MUD, which the summary judgment evidence indicates displays a resolute indifference to minority voting matters, the County has to be acutely aware of how to address the special issues that arise from the state's historical shortcomings in furthering minority voting opportunities.

    **C.**    **Section 5 is more beneficial than burdensome for government conduct of local elections.**

In contrast to the comparatively narrow duties, obligations, and interests of the Austin MUD, Travis County has to take into account a wide array of election-related responsibilities, especially with regard to voter registration activities and the conduct of elections. The County has had to exercise these election-related responsibilities over a much lengthier time span than the District's existence.

Particularly pertinent is the County's experience with Section 5 of the Voting Rights Act since it became applicable to Texas in 1975. The current County Clerk has served during most of that era – for the last twenty years – and been responsible for a nearly a hundred preclearance submissions to the Department of Justice. DeBeauvoir Depo. at 21. Yet, her conclusion after these many years is that, with the County's development of settled administrative routines and familiarization with the rules governing Section 5, the process has become relatively quick and easy. *Id*. at 12.

Thus, the County sees the Section 5 preclearance process through a very different lens than the District – one polished by experience, not theory. While there is some administrative burden associated with Section 5 compliance, it is minor and not disruptive to the County's business. On the other side of the scale, the County actually receives benefits from the Section 5 preclearance process. The continued existence of the Act's preclearance requirements carries with it valuable educational and deterrent effects that aid Travis County and its lead election officials – the County Clerk and the County Tax Assessor-Collector – in administering their many election-related duties, not just for themselves, but also for the more than one hundred jurisdictions whose elections the County handles and for the voters themselves.

To take only one example, the interface between poll workers and voters, particularly minority voters, is probably the most personal interaction between local government officials and the electorate in the democratic process. Yet, as the Travis County Clerk has explained, the process of selecting those poll workers who fan out across the County on election day is highly idiosyncratic, varying from precinct to precinct and electoral unit to electoral unit. Training is an essential component in making the system work in a way that results in an atmosphere of sensitivity and concern for voters rather than an environment of hostility and indifference. The existence of the anti-discrimination principles underlying Section 5 and of the watchful presence of the Department of Justice in the background are beneficial tools, aiding the County in its efforts to train poll workers and others involved in the election process in a way that furthers the principles of openness and fairness to minority voters.

Thus, for the County, the modest administrative costs that come with being subject to Section 5's preclearance requirements are far outweighed by the benefits that come from such coverage. The day may come when the balance shifts, and Section 5's burdens on conducting local elections outweigh the benefits, but it isn't here yet. The preclearance requirement, the substantive standards that must be surmounted in order to satisfy it, and the threat of disruption if the Section 5 rules are not meticulously observed all play a continuing, valuable role in helping to ensure that minority voters in the County are afforded full and equal access to the electoral system for every governmental entity in the area.

The District's invocation of the Section 4 bailout option for itself alone also is troubling to the County. As a purely legal matter, it is a usurpation of the County's statutory authority. Among the 107 local governmental units in Travis County, only the County registers voters. That is a major responsibility, but it also affords a unique perspective that those in the Austin MUD's shoes do not have. The hurdles that attend encouraging registration, especially among minority voters, cannot be cleared without a community-wide knowledge and years of practical experience and trial-and-error efforts. Those governmental units that have never had to grapple with these problems cannot have any concrete understanding of what it would mean to lose the pressure for openness that comes with Section 5's existence.

There is another practical problem that would come from allowing individual sub-units to bailout, independently of the unit responsible for voter registration. If there were

such an effort by a sub-unit and it failed, the County would be stymied for the next ten years from seeking a bailout of its own. *See* 42 U.S.C. § 1973b(a)(1)(B).[5]

As a practical matter, the preclearance requirements have the salutary effect of ensuring that local election officials regularly consider the racial or ethnic implications of their election decisions. The retrogression standard is well known and comparatively simple to understand and apply. Having such a bright line test eases the administration of elections and helps ensure that they are conducted in a manner that is free of discrimination on the basis of race or membership in a language minority group.

These kinds of practical concerns, and the real-world events that still attend the role of government vis-à-vis minority voting, gave rise to the original Voting Rights Act and underpinned its 2006 renewal. Theory gave way to reality. Travis County's intimate experience with the reality of elections and the participation of minority voters also is based in reality – a voting and electoral reality that the Austin MUD, with its limited exposure and limited duties, has not been in a position to experience. That very well may explain why Travis County thinks Section 5 of the Voting Rights Act is well worth keeping, and the Austin MUD does not.

---

[5] Special-purpose districts such as the Austin MUD also raise a unique bailout problem unique. Certainly, during its early years, the Austin MUD was hardly a real public governmental entity at all. After three years in existence, it still only had twelve residents. This is a typical evolution, and it led Texas courts to describe such entities, especially during their early years, as "often organized primarily for private purposes." *Brazos River Conservation and Reclamation District v. McCraw*, 126 Tex. 505, 91 S.W.2d 665, 670 (1936). A government mature enough to have voter registration responsibilities, as the County has here, will most likely have a sufficiently long history to enable courts to make informed judgments about the *bona fides* of the proof of whether the government satisfies the bailout requirements. Those like the District here, though, are less likely to have as robust a history of governmental experiences and, consequently, proof of the elements required for bailout would be far less indicative of how the government *as government* behaved over time with respect to minority voting interests.

**CONCLUSION**

For the foregoing reasons, as well as those in the Texas NAACP Motion, Travis County urges the Court to grant this motion for summary judgment.

Respectfully submitted,

_/s/ Renea Hicks_____
Max Renea Hicks
Attorney at Law

104 West 6th Street
Suite 504
Austin, Texas 78701
(512) 480-8231
fax: (512) 480-9105
e-mail: rhicks@renea-hicks.com

_/s/ J. Gerald Hebert_____
J. GERALD HEBERT
Attorney at Law
5019 Waple Lane
Alexandria, VA 22304
(703) 567-5873 (O)
(703) 567-5876 (fax)
DC Bar No. 447676
e-mail: jghebert@comcast.net

ATTORNEYS FOR TRAVIS COUNTY

CERTIFICATE OF SERVICE

    I hereby certify that on this 15th day of May, 2007, a copy of the foregoing pleading was e-mailed to the Clerk of the Court at dcd_cmecf@dcd.uscourts.gov.  The electronic filing constitutes service of the filing to all counsel of record in this case who have obtained CM/ECF passwords, including the following attorneys for the plaintiff:

Gregory S. Coleman
Christian T. Ward
Project on Fair Representation
221 West 6th Street, Suite 750
Austin, Texas  78701
 gcoleman@yetterwarden.com
cward@yetterwarden.com


                                                  _/s/ Renea Hicks_____
                                                  Max Renea Hicks