IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

NORTHWEST AUSTIN MUNICIPAL             )
UTILITY DISTRICT NUMBER ONE,           )
                                       )
             Plaintiff,                )
                                       )
        v.                             )     Civil Action No. 1:06-cv-1384
                                       )
ALBERTO R. GONZALES,                   )     Three-judge court
Attorney General of the United States, )     (PLF, DST, EGS)
*et al.*,                              )
                                       )
             Defendants.               )
———————————————————————

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**PAGE**

I.   **Background** ........................................................................................ 1

II.  **Plaintiff Is Not Eligible To Seek Bailout Under Section 4(a)** ...................... 3

    A.   *Plaintiff Is Not The Type Of Jurisdiction Section 4(a) Allows To Seek Bailout* ................................................................................ 3

    B.   *Substantive Bailout Standard* ................................................... 6

III. **The 2006 Reauthorization Of Section 5 Of The Voting Rights Act Was A Valid Exercise Of Congress's Authority To Enforce The Protections Of The Fourteenth And Fifteenth Amendments** ........................................ 7

    A.   *Analytical Framework* ............................................................. 9

    B.   *Section 5 Protects Citizens' Right To Vote Free Of Discrimination On The Bases Of Race And National Origin* ........................... 11

    C.   *The Evidentiary Record Supporting The 2006 Reauthorization Of Section 5 Demonstrates The Continued Need For Section 5* ............... 12

        1.   *Evidence Of Ongoing Discrimination In Voting Justified Previous Reauthorizations* ................................................. 13

            a.   *Evidentiary Sources Congress Relied On In 1965, 1970, 1975, And 1982* ........................................... 13

            b.   *Patterns Of Voting Discrimination Congress Identified In 1965, 1970, 1975, And 1982* ....................... 14

        2.   *Evidence Of Ongoing Discrimination In Voting Justified The 2006 Reauthorization* ........................................... 18

            a.   *In 2006, Congress Found Evidence Of Voting Discrimination In The Same Evidentiary Sources That Previous Congresses Relied Upon* ................................................... 19

                i.   *Section 5 Enforcement Since 1982* ................... 20

                    (a)   *Section 5 Objections* ........................... 20

**TABLE OF CONTENTS (continued):**                                          **PAGE**

*(1) Rate And Types Of Objections* ....................... 20

*(2) Findings Of Discriminatory Intent* ................ 22

*(3) Preventing Back-Sliding* ................................ 28

(b)     *More Information Requests & Submission Withdrawals* ............................................... 31

(c)     *Section 5 Injunctive Actions* ................................ 32

ii.     *Federal Observer Coverage Since 1982* ......................... 34

iii.    *Rate Of Section 2 Litigation* .............................. 36

b.      *In 2006, Congress Found Ample Evidence That The Same Types And Patterns Of Voting Discrimination That Supported Enactment And Reauthorization Of Section 5 In The Past Continue Today* ................................................ 38

i.      *Evidence Of Vote Suppression* ......................... 38

ii.     *Evidence Of Vote Dilution* .............................. 40

(a)     *Employment Of Dilutive Techniques* .................. 40

(b)     *Widespread Racial Bloc Voting* .......................... 44

3.      *The Evidence Before Congress Demonstrates That Section 5 Is An Effective Remedy And That The Need For A Preclearance Mechanism Continues Today* ................................................ 47

a.      *Section 5 Effectively Deters Covered Jurisdictions From Adopting Retrogressive Or Otherwise Discriminatory Voting Changes* ........................................... 47

b.      *Section 2 Alone Is Inadequate* ..................... 49

4.      *Evidence Of Similar Discrimination Against Language Minorities* ................................................ 51

**TABLE OF CONTENTS (continued):**                                    **PAGE**

D.      *The Evidence Before Congress Demonstrates That Section 5 Remains A Congruent And Proportional Means Of Enforcing And Protecting The Voting Rights Of Racial And Language Minority Citizens* ................................. 53

      1.      *The Supreme Court Has Repeatedly Held That Section 5's Preclearance Mechanism Is A Valid Means Of Enforcing Citizens' Right To Vote Free Of Discrimination* .................................................... 54

      2.      *In Recent Years, The Supreme Court Has Held Out Section 5 As The Model Of Congruent And Proportional Legislation* ................... 55

      3.      *In Protecting Minority Citizens From Discrimination In Voting, Congress Is Justified In Employing A Prophylactic Remedy* ........................................................................................... 57

      4.      *The Limitations Built Into Section 5 Secure Its Congruence And Proportionality* ....................................................................... 59

          a.      *Coverage Formula* ........................................................ 59

          b.      *Bailout Provisions* ....................................................... 61

          c.      *Expiration Date* ........................................................... 63

          d.      *Low Cost Of Compliance* ............................................. 64

**CONCLUSION** ................................................................................. 67

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

**CASES**:                                                                                          **PAGE**

*Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) ..................................... 12

*Attorney Gen. of N.Y.* v. *Soto-Lopez*, 476 U.S. 898 (1986) ........................................ 12

*Beer* v. *United States*, 415 U.S. 130 (1976) ........................................................ 17, 58

*Blodgett* v. *Holden*, 275 U.S. 142 (1927) ........................................................... 7

*Board of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001) .................................. 9, 10, 55

*Bone Shirt* v. *Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) ..................................... 46

*Briscoe* v. *Bell*, 432 U.S. 404 (1977) .................................................................. passim

*Buskey* v. *Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983) ........................................ 46

*Campos* v. *City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ..................................... 46

*Chisom* v. *Roemer*, 501 U.S. 380 (1991) ....................................................... 42

*Citizens For a Better Gretna* v. *City of Gretna*, 834 F.2d 496 (5th Cir. 1987) ......................... 46

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) .................................................. passim

*City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432 (1985) ........................... 12

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) ........................................... 12

*City of Rome* v. *United States*, 446 U.S. 156 (1980) .......................................... passim

*City of Rome* v. *United States*, 472 F. Supp. 221 (D.D.C. 1979),
    aff'd, 446 U.S. 156 (1980) .................................................................. 5

*Clark* v. *Calhoun County*, 88 F.3d 1393 (5th Cir. 1996) .................................. 46

*Clark* v. *Jeter*, 486 U.S. 456 (1988) ................................................................ 12

*Clark* v. *Marengo County*, 623 F. Supp. 33 (S.D. Ala. 1985) ................................. 46

*Clark* v. *Roemer*, 777 F. Supp. 445 (M.D. La. 1990) .................................. 46

**CASES (continued):**                                                                    **PAGE**

*Cofield* v. *City of LaGrange*, 969 F. Supp. 749 (N.D. Ga. 1997) ................................ 46

*Colleton County Council* v. *McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002) ........................... 46

*Collins* v. *City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989) ........................................ 46

*Columbia Broad. Sys., Inc.* v. *Democratic Nat'l Comm.*, 412 U.S. 94 (1973) ........................... 7

*County Council of Sumter County* v. *United States*, 555 F. Supp. 694 (D.D.C. 1983) .............. 54

*DeGrandy* v. *Wetherell*, 794 F. Supp. 1076 (N.D. Fla. 1992),
    aff'd in part and rev'd in part on other grounds *sub nom.*
    *Johnson* v. *DeGrandy*, 512 U.S. 997 (1994) ................................................... 45

*Dillard* v. *Baldwin County Bd. of Educ.*, 686 F. Supp. 1459 (M.D. Ala. 1988) ........................ 46

*Dillard* v. *Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986) ................................... 44, 46

*Dillard* v. *Town of North Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989) .................................... 40

*Dougherty County Bd. of Educ.* v. *White*, 439 U.S. 32 (1978) ........................................ 3

*Dunn* v. *Blumstein*, 405 U.S. 330 (1972) ............................................................ 11, 12

*East Jefferson Coal. for Leadership & Dev.* v. *Jefferson Parish*,
    926 F.2d 487 (5th Cir. 1991) ............................................................... 46

*Ewing* v. *Monroe County*, 740 F. Supp. 417 (N.D. Miss. 1990) .................................... 46

*Foster* v. *Love*, 522 U.S. 67 (1997) ................................................................ 8

*Gaston County* v. *United States*, 288 F. Supp. 678 (D.D.C. 1968) ................................... 3

*Georgia* v. *United States*, 411 U.S. 526 (1973) ..................................................... 8, 54

*Giles* v. *Ashcroft*, 193 F. Supp. 2d 258 (D.D.C. 2002) .............................................. 54

*Gunn* v. *Chickasaw County*, 705 F. Supp. 315 (N.D. Miss. 1989) ................................... 46

*Harper* v. *Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ................................... 11

*Harris* v. *Siegelman*, 695 F. Supp. 517 (M.D. Ala. 1988) ........................................... 44

**CASES (continued):**                                                             **PAGE**

*Hines* v. *Mayor & Town Council of Ahoskie*, 998 F.2d 1266 (4th Cir. 1993) ............. 46

*Houston* v. *Lafayette County*, 20 F. Supp. 2d 996 (N.D. Miss. 1998) ..................... 46

*Jackson* v. *Edgefield County*, 650 F. Supp. 1176 (D.S.C. 1986) ........................... 46

*Jones* v. *City of Lubbock*, 727 F.2d 364 (5th Cir. 1984) ................................. 46

*Jordan* v. *City of Greenwood*, 599 F. Supp. 397 (N.D. Miss. 1984) ..................... 46

*Jordan* v. *Winter*, 604 F. Supp. 807 (N.D. Miss. 1984) ................................... 46

*Katzenbach* v. *Morgan*, 384 U.S. 641 (1966) ...................................... 10, 56

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000) .................................. 9

*Kramer* v. *Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969) ......................... 11

*Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-62 (D.D.C.) ............. 30

*LULAC* v. *North East Indep. Sch. Dist.*, 903 F. Supp. 1071 (W.D. Tex. 1995) ......... 46

*LULAC* v. *Perry*, 126 S. Ct. 2594 (2006) ................................... 41, 45, 55

*Lopez* v. *Monterey County*, 525 U.S. 266 (1999) ............................... passim

*Major* v. *Treen*, 574 F. Supp. 325 (E.D. La. 1983) ..................................... 46

*Martin* v. *Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987) ................................. 46

*McCain* v. *Lybrand*, 465 U.S. 236 (1984) .............................................. 2

*McDaniels* v. *Mehfoud*, 702 F. Supp. 588 (E.D. Va. 1988) ............................. 46

*Mississippi State Chapter, Operation PUSH* v. *Allain*,
    674 F. Supp. 1245 (N.D. Miss. 1987) ............................................. 43

*Neal* v. *Coleburn*, 689 F. Supp. 1426 (E.D. Va. 1988) ................................. 46

*Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721 (2003) ..................... passim

*Oregon* v. *Mitchell*, 400 U.S. 112 (1970) ............................................ 12

**CASES (continued):**                                                              **PAGE**

*Oyama* v. *California*, 332 U.S. 633 (1948) ............................................................. 12

*Perkins* v. *Matthews*, 400 U.S. 379 (1971) ............................................................. 2

*Political Civil Voters Org.* v. *City of Terrell*, 565 F. Supp. 338 (N.D. Tex. 1983) ................... 46

*Reaves* v. *United States Dep't of Justice*, 355 F. Supp. 2d 510 (D.D.C. 2005) ........................ 54

*Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) ............................................ 2, 12

*Rostker* v. *Goldberg*, 453 U.S. 57 (1981) ................................................................ 7

*Sierra* v. *El Paso Indep. Sch. Dist.*, 591 F. Supp. 802 (W.D. Tex. 1984) ................................. 46

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ........................................... passim

*St. Bernard Citizens For Better Gov't* v. *St. Bernard Parish Sch. Bd.*, No. 02-2209,
     2002 WL 2022589 (E.D. La. Aug. 26, 2002) ....................................................... 46

*Teague* v. *Attala County*, 92 F.3d 283 (5th Cir. 1996) ................................................. 46

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) .......................................................... passim

*U.S. Term Limits* v. *Thornton*, 514 U.S. 779 (1995) .................................................... 8

*Texas* v. *United States*, 523 U.S. 296 (1998) .......................................................... 3

*United States* v. *Charleston County*, 316 F. Supp. 2d 268 (D.S.C. 2003) ................................ 29

*United States* v. *Charleston County*, 365 F.3d 341 (4th Cir. 2004) ..................................... 46

*United States* v. *Long County*, No. 06-04 (S.D. Ga.) .................................................. 40

*United States* v. *Lopez*, 514 U.S. 549 (1995) ......................................................... 9

*United States* v. *Morrison*, 529 U.S. 598 (2000) .................................................... 7, 9

*United States* v. *Sheffield Bd. of Comm'rs*, 435 U.S. 110 (1978) ...................................... 3

*United States* v. *Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978),
     aff'd, 439 U.S. 1105 (1979) .................................................................... 38

*Washington* v. *Davis*, 426 U.S. 229 (1976) ........................................................... 12

**CASES (continued):**                                                                                          **PAGE**

*Westwego Citizens For Better Gov't* v. *City of Westwego,*
    946 F.2d 1109 (5th Cir. 1991) ........................................................................ 46

*Williams* v. *City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990) ............................... 46

*Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886) .................................................................. 12

*Young* v. *Fordice*, 520 U.S. 273 (1997) ...................................................................... 43


**STATUTES:**

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act
    Reauthorization and Amendments Act of 2006,
    Pub. L. 109-246, 120 Stat. 577 ............................................................. 1, 8, 36

Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq* ........................................................ 7
    42 U.S.C. 1973a(c) ........................................................................................... 61
    42 U.S.C. 1973aa-1a ........................................................................................... 4
    42 U.S.C. 1973b(a) ......................................................................................... 1, 2
    42 U.S.C. 1973b(f)(3) ...................................................................................... 2, 4
    42 U.S.C. 1973b(f)(4) ........................................................................................... 4
    42 U.S.C. 1973c ............................................................................................. 3, 32
    42 U.S.C. 1973f ..................................................................................................... 4
    42 U.S.C. 1973j(f) ............................................................................................... 32
    42 U.S.C. 1973l(c)(2) ........................................................................................... 4
    42 U.S.C. 1973l(c)(3) ........................................................................................... 2

Pub. L. No. 85-315, § 161, 71 Stat. 638 ...................................................................... 14

Pub. L. No. 86-449, § 1, 74 Stat. 86 ............................................................................ 14

Pub. L. No. 88-352, 78 Stat. 241 ................................................................................. 14

Pub. L. No. 89-110, § 4(a), 79 Stat. 438 ....................................................................... 5

Pub. L. No. 94-73, §§ 201-208, 89 Stat. 400-402 ......................................................... 2

Pub. L. No. 97-205, § 2(b)(2), 96 Stat. 131 .................................................................. 5

Pub. L. No. 102-344, 106 Stat. 92 ............................................................................... 19

**LEGISLATIVE HISTORY:** **PAGE**

152 Cong. Rec. at S7976 (daily ed. July 20, 2006) (statement of Sen. Feingold) ...................... 65

H.R. Rep. No. 397, 91st Cong., 1st Sess. (1969) ................................................. 13, 15

H.R. Rep. No. 196, 94th Cong., 1st Sess. (1975) ................................................ passim

H.R. Rep. No. 227, 97th Cong., 1st Sess. (1981) ............................................... passim

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) ............................................. passim

S. Rep. No. 162, 89th Cong., 1st Sess. (1965) .................................................. 14, 15

S. Rep. No. 295, 94th Cong., 1st Sess. (1975) ................................................. passim

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ................................................. passim

S. Rep. No. 523, 109th Cong., 2d Sess. (2006) ................................................. 18, 53

*An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues
    Relating to Reauthorization:  Hearing Before the Senate Comm. on the Judiciary*,
    109th Cong., 2d Sess. (2006) ................................................................. passim

*Appendix to Voting Rights Act:  Evidence of Continued Need:  Hearing Before the House
    Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) ......................................... passim

*Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization:
    Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess.
    (2006) ................................................................................................. 30

*Modern Enforcement of the Voting Rights Act:  Hearing Before the Senate Comm. on the
    Judiciary*, 109th Cong., 2d Sess. (2006) ..................................................... passim

*Reauthorization of the Voting Rights Act's Temporary Provisions:  Policy Perspectives and
Views From the Field:  Hearing Before the Senate Comm. on the Judiciary*,
    109th Cong., 2d Sess. (2006) .................................................... 30, 51, 63, 64, 65

*The Continuing Need for Section 203's Provisions for Limited English Proficient Voters:
    Hearing Before the Senate Comm. on the Judiciary*,
    109th Cong., 2d Sess. (2006) ....................................................................... 31, 32

*The Continuing Need for Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the
    Judiciary*, 109th Cong., 2d Sess. (2006) .......................................................... 21, 39

**LEGISLATIVE HISTORY (continued):**                                                    **PAGE**

*To Examine the Impact and Effectiveness of the Voting Rights Act:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) .................................................... 2, 50, 51

*Understanding the Benefits and Costs of Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the Judiciary Comm.*, 109th Cong., 2d Sess. (2006) .......................................... 64, 65

*Voting Rights Act:  An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) ...................................................... 39, 45, 62, 63

*Voting Rights Act:  Evidence of Continued Need:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) ......................................... passim

*Voting Rights Act:  The Continuing Need for Section 5:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) .......................................... passim

*Voting Rights Act:  Section 203 – Bilingual Election Requirements (Part I):  Hearing Before the House Comm. on the Judiciary Comm.*, 109th Cong., 1st Sess. (2005) ... 39, 52

*Voting Rights Act:  Section 5 of the Act – History, Scope, & Purpose:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) ............................... passim

*Voting Rights Act:  Section 5 of the Act – Preclearance Standards:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) ....................................... 47

**MISCELLANEOUS**

40 Fed. Reg. 43 ....................................................................................................... 3

40 Fed. Reg. 746 ..................................................................................................... 3

McCrary, Seaman, & Valelly, *The End of Preclearance As We Know It: How the Supreme Court Transformed Section 5 of the Voting Rights Act*, 11 Mich. J. Race & Law 275, 297 (2006) ...................................................................................................... 27

Plaintiff Northwest Austin Municipal Utility District Number One ("Plaintiff") filed this action on August 4, 2006, just eight days after the President signed into law an act extending the temporary provisions of the Voting Rights Act. See Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577.

Plaintiff's first claim seeks to "bailout" under Section 4(a) of the Voting Rights Act, 42 U.S.C. 1973b(a), from coverage under the preclearance provisions of Section 5 of the Act, 42 U.S.C. 1973c. First Amended Complaint ¶ 1 (Docket #83). Plaintiff's second claim alternatively asserts that if it cannot bailout, then the preclearance requirements of Section 5 are unconstitutional. *Ibid.*

As set forth below, Defendant Alberto R. Gonzales, Attorney General of the United States, is entitled to summary judgment on both of Plaintiff's claims, because Plaintiff is not a "political subdivision" eligible to bail out separately under Section 4(a), and because the 2006 reauthorization of Section 5 remains a congruent and proportional exercise of Congress's authority under the Fourteenth and Fifteenth Amendments.

## I.     Background

Congress enacted the Voting Rights Act in 1965 to "rid the country of racial discrimination in voting." *South Carolina* v. *Katzenbach*, 383 U.S. 301, 315 (1966). The Act contained several special provisions that were limited both in time and in geographic coverage.

The best known temporary provision, Section 5, requires covered jurisdictions to receive a "preclearance" determination, from either the Attorney General of the United States or the United States District Court for the District of Columbia, that proposed changes in voting practices and procedures are not discriminatory before those changes can be implemented. The preclearance

- 2 -

mechanism is designed "to shift the advantage of time and inertia from the perpetrators of the evil to its victim, by freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory." *Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471, 477 (1997) (internal quotations and citations omitted).  Originally enacted as part of the 1965 Act, Congress extended Section 5 and certain other of the Act's temporary provisions in 1970, 1975, 1982 and, most recently, on July 27, 2006.

"Section 5 was enacted in large part because of the acknowledged and anticipated inability of the Justice Department – given limited resources – to investigate independently all changes with respect to voting enacted by States and subdivisions covered by the Act." *Perkins* v. *Matthews*, 400 U.S. 379, 391 n.10 (1971).  "For that reason, § 5 places the burden on the affected polities to submit all changes for prior approval."  *Ibid.*  Section 5 also places the burden on the covered jurisdictions of "demonstrating that the changes are not motivated by a discriminatory purpose and will not have an adverse impact on minority voters." *McCain* v. *Lybrand*, 465 U.S. 236, 247 (1984).[1]

In 1975, Congress amended the coverage formula for the temporary provisions of the Act to include jurisdictions with a demonstrated history of discrimination against language minority voters.  Act of Aug. 6, 1975, Pub. L. No. 94-73, §§ 201-208, 89 Stat. 400-402.[2]  Under this

---

[1] At present, Section 5 applies to nine states in their entirety and individual political subdivisions in seven other states.  See Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. Pt. 51, App.  The Appendix has not been updated yet to reflect the 14 jurisdictions in Virginia that have bailed out under Section 4(a).

[2] This change is reflected in the coverage formula set forth in the third sentence of Section 4(b) of the Act, 42 U.S.C. 1973b(b), as well as in Section 4(f)(3), 42 U.S.C. 1973b(f)(3), and Section 14(c)(3), 42 U.S.C. 1973l(c)(3).

- 3 -

formula, the entire State of Texas became covered by the temporary provisions of the Act.  40

Fed. Reg. 43,746 (Sept. 23, 1975).   Thus, Texas and all of its political subunits must receive

preclearance under Section 5 for all changes affecting voting enacted or implemented after

November 1, 1972.  42 U.S.C. 1973c.  See *Texas* v. *United States*, 523 U.S. 296, 298-299 (1998);

*United States* v. *Sheffield Bd. of Comm'rs*, 435 U.S. 110, 118 (1978) ("§ 5 * * * applies to all

entities having power over any aspect of the electoral process within designated jurisdictions, not

only to counties or to whatever units of state government perform the function of registering

voters"); *Dougherty County Bd. of Ed.* v. *White*, 439 U.S. 32, 43-47 (1978).  Hence, as Plaintiff

concedes, it is required, like all other political subunits in Texas, to comply with Section 5.  First

Amended Complaint ¶ 10.

**II.      Plaintiff Is Not Eligible to Seek Bailout Under Section 4(a)**

> *A.  Plaintiff Is Not The Type Of Jurisdiction Section 4(a) Allows To Seek Bailout*

Since its original enactment, Section 4(a) has always provided a "bailout" mechanism

whereby an eligible State or political subdivision covered by the temporary provisions of the Act

may be exempted from this coverage by obtaining a declaratory judgment from this Court that it

meets all the statutory criteria for a bailout.  A jurisdiction seeking to bail out bears the burden of

proof on each element of the Section 4(a) bailout standard.[3]

A declaratory judgment granting bailout under Section 4(a) to a covered jurisdiction in

Texas would exempt it from the preclearance requirement of Section 5, 42 U.S.C. 1973c, the

---

[3] *South Carolina* v. *Katzenbach*, 383 U.S. 301, 331 (1966); *Gaston County* v. *United States*, 288 F. Supp. 678, 688 n.20 (D.D.C. 1968) (three-judge court) ("The placing of the burden in a § 4(a) Voting Rights Act case could not be more emphatic – it lies squarely on the certified subdivision.").

- 4 -

suspension of tests and devices under Section 4(a)(1), 42 U.S.C. 1973b(a)(1), the requirement to provide election materials in Spanish as well as English under Section 4(f)(4), 42 U.S.C. 1973b(f)(4), and the potential for the assignment of federal observers to monitor elections under Section 8, 42 U.S.C. 1973f.[4]

Not every political subunit may seek to bail out of the temporary provisions. Under the current bailout standard set forth in Section 4(a)(1), 42 U.S.C. 1973b(a)(1), only three types of jurisdictions may seek a bailout: (1) "any State with respect to which the [coverage] determinations have been made"; (2) "any political subdivision of such State * * * though such determinations were not made with respect to such subdivision as a separate unit"; and (3) "any political subdivision with respect to which such determinations have been made as a separate unit." Under the Act, a "political subdivision" includes "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." 42 U.S.C. 1973*l*(c)(2).

Because Plaintiff does not fall within any of the three categories set forth in Section 4(a)(1), it is not eligible to seek a bailout and its bailout claim must fail. Plaintiff is not a "State." Nor is Plaintiff a "political subdivision" as to which separate published determinations of coverage have been made. Nor, finally, is Plaintiff a "political subdivision" of a fully covered State within the meaning of the Act, because it is neither a county nor a county-equivalent that registers voters.

_____

[4] Even upon a successful bailout under Section 4(a), however, a Texas jurisdiction would remain subject to the language minority requirements of Section 203 of the Act, 42 U.S.C. 1973aa-1a, and the Texas Election Code, Chapter 272.

- 5 -

The text of the statute and the history of the bailout standard confirm that this Plaintiff is not entitled to seek a bailout under any of the three categories. Between 1965 and 1984, only two types of jurisdictions were entitled to seek a bailout: (1) "any State with respect to which the [coverage] determinations have been made" and (2) "any political subdivision with respect to which such determinations have been made as a separate unit." See Voting Rights Act of 1965, Pub. L. No. 89-110, § 4(a), 79 Stat. 438 (1965). Under that standard, only those jurisdictions with a published coverage determination in the Federal Register could seek to bail out; smaller entities within those jurisdictions could not. In 1979, the City of Rome, Georgia, filed an action seeking, *inter alia*, to bail out. Both this Court and the Supreme Court rejected the City's argument that it could seek bailout on its own. Instead, the City had to rely on Georgia to seek a bailout on behalf of the State as a whole because the City was covered under Section 4 by virtue of a determination made with respect to the State of Georgia as a whole. *City of Rome* v. *United States*, 472 F. Supp. 221, 229-232 (D.D.C. 1979) (three-judge court), aff'd, 446 U.S. 156, 162-169 (1980).

In 1982, following *City of Rome*, Congress amended the bailout standard to significantly expand who could seek to bail out under Section 4(a). Congress added a third category of eligible jurisdictions, namely, "any political subdivision of such State * * * though such determinations were not made with respect to such subdivision as a separate unit." See Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, § 2(b)(2), 96 Stat. 131. This change allowed counties within fully covered states to seek to bail out independently for the first time.[5] Congress deliberately decided not to allow subjurisdictions smaller than counties to seek to bail out because

_____

[5] H.R. Rep. No. 227, 97th Cong., 1st Sess. 32-33 (1981) (*1981 House Report*); S. Rep. No. 417, 97th Cong., 2d Sess. 44, 45, 57 (1982) (*1982 Senate Report*). The 1982 amendment to the bailout provisions took effect in August 1984.

- 6 -

of the burden it would place on the Attorney General and this Court to handle such bailout cases.[6]

Hence, in the case of a State such as Texas that is covered as a whole, only the State itself and its 254 counties (each of which supervise voter registration for elections) may seek to bail out of Section 5 coverage.[7] Thus, this Plaintiff may be relieved of its obligations under Section 5 only if either the State of Texas or Travis County successfully seeks to bail out.

B. *Substantive Bailout Standard*

The current substantive bailout standard is set forth in Section 4(a)(1) to 4(a)(6), 4(a)(9), and 4(d) of the Voting Rights Act, as amended by Public Law 109-246 (2006).   A detailed description of the standard for bailout appears in the H.R. Rep. No. 227, 97th Cong., 1st Sess. 33, 39-45 (1981) (*1981 House Report*), and S. Rep. No. 417, 97th Cong., 2d Sess. 43-61 (1982) (*1982 Senate Report*).  The Plaintiff must present "compelling evidence" to "carry the burden of proving that it * * * ha[s] met each of the bailout criteria * * * during the 10 years preceding the filing of the declaratory judgment action and during the pendency of such suit."  *1982 Senate Report* 56, 69 (1982).

Because Plaintiff does not meet the threshold requirement of being a jurisdiction that is eligible to seek bailout, this Court need not reach the issue of whether the remaining bailout criteria are met.

---

[6] *1981 House Report* 39, 41; *1982 Senate Report* 57, n.192, 69.

[7] Texas Election Code 12.001, 13.002

- 7 -

III.    **The 2006 Reauthorization Of Section 5 Of The Voting Rights Act Was A Valid Exercise Of Congress's Authority To Enforce The Protections Of The Fourteenth And Fifteenth Amendments**

Plaintiff claims, in the alternative, that if it cannot bail out of coverage under Section 5, the statute is unconstitutional.  A constitutional challenge to an act of Congress is not to be treated lightly, and Plaintiff bears a heavy burden in convincing this Court to exercise "the gravest and most delicate duty that [any] Court is called upon to perform."  *Blodgett* v. *Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.).  Federal courts accord "great weight to the decisions of Congress," *Columbia Broad. Sys., Inc.* v. *Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973), and the Supreme Court has held that "[d]ue respect for the decisions of a coordinate branch of Government demands that [a court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds," *United States* v. *Morrison*, 529 U.S. 598, 607 (2000).  As the Supreme Court has noted, "Congress is a coequal branch of government whose Members take the same oath [judges] do to uphold the Constitution of the United States."  *Rostker* v. *Goldberg*, 453 U.S. 57, 64 (1981).  Moreover, "[t]he customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality."  *Ibid.*; see H.R. Rep. No. 478, 109th Cong., 2d Sess. 54-56, 90 (2006) (*2006 House Report*).  Here, Plaintiff cannot meet its burden because Section 5 remains a valid exercise of Congress's authority under the Constitution.

Congress enacted the Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq.*, in order "to banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts of our country for nearly a century."  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 308 (1966).  Congress acted well within its authority under the Fourteenth and Fifteenth Amendments

- 8 -

in enacting Section 5;[8] indeed, the Supreme Court has upheld the constitutionality of the Act on

four separate occasions.  See  *Lopez* v. *Monterey County*, 525 U.S. 266, 282-285 (1999); *City of*

*Rome* v. *United States*, 446 U.S. 156, 177-178 (1980); *Georgia* v. *United States*, 411 U.S. 526,

535 (1973); *South Carolina*, 383 U.S. at 337.  As originally written, certain provisions of the

Voting Rights Act, including Section 5, automatically expire after a period of time unless

Congress reauthorizes those provisions.  Congress has reauthorized and amended the Act,

including Section 5, a number of times, most recently in 2006.  Fannie Lou Hamer, Rosa Parks,

and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L.

109-246, 120 Stat. 577 (2006 Amendments Act).

    Congress found in 2006 (1) that Section 5 has been effective at preventing and remedying

some voting discrimination, and (2) that covered jurisdictions continue to discriminate in voting

against minority citizens.  2006 Amendments Act, Pub. L. No. 109-246, § 2(b)(1), 120 Stat. 577

("Significant progress has been made in eliminating first generation barriers experienced by

minority voters * * *.  This progress is the direct result of the Voting Rights Act of 1965."); §

2(b)(2), 120 Stat. 578 ("vestiges of discrimination in voting continue to exist"); *id.* at § 2(b)(7)

("Despite the progress made by minorities under the Voting Rights Act of 1965, the evidence

before Congress reveals that 40 years has not been a sufficient amount of time to eliminate the

vestiges of discrimination following nearly 100 years of disregard.").  Taken together, these

findings, and the underlying evidence, establish that Section 5 remains a congruent and

_____

    [8] Moreover, to the extent the Voting Rights Act applies to the administration of federal elections by state and local entities, Congress has plenary authority to override state regulations pursuant to the Elections Clause of the Constitution, Art. I, § 4, cl. 1.  *Foster* v. *Love*, 522 U.S. 67, 69 (1997); *U.S. Term Limits* v. *Thornton*, 514 U.S. 779, 832-833 (1995).

- 9 -

proportional means of enforcing the Constitution's prohibition on race and national origin

discrimination in voting.  Congress's 2006 extension of the Voting Rights Act is, therefore, a

valid exercise of its authority under the Fourteenth and Fifteenth Amendments.[9]

   A.    *Analytical Framework*

   The Civil War Amendments are affirmative grants of legislative power, see *Kimel* v.

*Florida Bd. of Regents*, 528 U.S. 62, 80 (2000), that give Congress the "authority both to remedy

and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of

conduct, including that which is not itself forbidden by the Amendment's text," *Nevada Dep't of

Human Res.* v. *Hibbs*, 538 U.S. 721, 727 (2003) (quoting *Board of Trs. of the Univ. of Ala.* v.

*Garrett*, 531 U.S. 356, 365 (2001)).  This authority "is a 'broad power indeed,'" *Tennessee* v.

*Lane*, 541 U.S. 509, 518 (2004), empowering Congress not only to remedy past violations of

constitutional rights, but also to enact "prophylactic legislation that proscribes facially

constitutional conduct, in order to prevent and deter unconstitutional conduct," *Hibbs*, 538 U.S. at

727-728.  Congress also may prohibit "practices that are discriminatory in effect, if not in intent,

to carry out the basic objectives" of the Amendments.  *Lane*, 541 U.S. at 520.  Moreover, "[i]t is

for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure

---

   [9] In its amended complaint, Plaintiff attempts to cast its constitutional challenge as an "as-applied" challenge to Section 5 rather than a facial challenge.  But where an entity challenges the constitutionality of a federal statute on the ground that the enactment of such statute was outside the scope of Congress's enumerated powers, courts must examine the validity of such statute on its face.  See *Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721 (2003); *United States* v. *Morrison*, 529 U.S. 598 (2000); *City of Boerne* v. *Flores*, 521 U.S. 507 (1997); *United States* v. *Lopez*, 514 U.S. 549 (1995).  To the extent, then, that Plaintiff challenges Congress's authority to enact and extend Section 5, its claim to be asserting an as-applied challenge is misplaced.  To the extent Plaintiff may present an appropriate as-applied challenge in its summary judgment motion, the United States will respond to such argument in an opposition to Plaintiff's motion.

- 10 -

the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much

deference." *City of Boerne* v. *Flores*, 521 U.S. 507, 536 (1997) (quoting *Katzenbach* v. *Morgan*,

384 U.S. 641, 651 (1966)) (second alteration in original).

The Supreme Court upheld Section 5 both when it was originally enacted to cover

jurisdictions with a demonstrated history of discrimination against racial minorities, and after it

was extended to cover jurisdictions, such as Texas, with demonstrated histories of discrimination

against language minorities. *South Carolina*, 383 U.S. at 327-337; *Briscoe* v. *Bell*, 432 U.S. 404,

414-415 (1977); *City of Rome*, 446 U.S. at 173-183; *Lopez* v. *Monterey County*, 525 U.S. 266,

283-285 (1999). Congress chose to cover only the most egregious violators of minority citizens'

voting rights, and the Supreme Court upheld Congress's decision to target jurisdictions in which

it "infer[red] a significant danger of the evil" of voting discrimination. *South Carolina*, 383 U.S.

at 329.

In recent years, the Supreme Court has instructed that, in assessing whether Congress has

enacted valid prophylactic legislation pursuant to its authority under Section 5 of the Fourteenth

Amendment or, by extension, Section 2 of the Fifteenth Amendment,[10] courts should determine

the following: (1) what constitutional rights Congress intends to protect through the legislation in

question; (2) whether the history of violations of those constitutional rights is sufficient to justify

---

[10] The Supreme Court has repeatedly stated that the Fourteenth Amendment's enforcement clause is "virtually identical" to that of the Fifteenth Amendment. *E.g.*, *Board of Trs. of Univ. of Alabama* v. *Garrett*, 531 U.S. 356, 373 n.8 (2001); compare Amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article"), with Amend. XV, § 2 ("The Congress shall have power to enforce this article by appropriate legislation"). Moreover, the Court has "always treated the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive." *Lopez*, 525 U.S. at 294 n.6.

- 11 -

prophylactic legislation in the area; and (3) whether, in light of the importance of the rights and the history of violations, Congress's chosen legislative remedy is a congruent and proportional means of enforcing those rights. *E.g.*, *Lane*, 541 U.S. at 522, 529-530.[11]

Accordingly, to uphold the 2006 reauthorization of Section 5, this Court should inquire whether the ongoing record of discrimination in voting is sufficient to justify the reauthorization. See *City of Rome*, 446 U.S. at 180-182 (reviewing "Congress' judgment that the 1975 extension was warranted"). Although Congress found that the Voting Rights Act has helped to combat voting discrimination over the last several decades, Congress also found that covered jurisdictions – *in spite of* 40 years of Section 5 coverage – continue to discriminate against minorities in voting. That well-grounded finding justifies Congress's reauthorization of Section 5.

    B.    *Section 5 Protects Citizens' Right To Vote Free Of Discrimination On The Bases Of Race And National Origin*

As the Supreme Court has recognized, Section 5 is intended to rid this country of discrimination in voting against minority citizens. *South Carolina*, 383 U.S. at 308; *Briscoe*, 432 U.S. at 405-406. A citizen's right to vote free of discrimination is indispensable. The Supreme Court has repeatedly held that the right to vote is "fundamental" and is "preservative of all rights." *Harper* v. *Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966).[12] Because the right

---

[11] Although, in upholding Section 5 in *South Carolina* and in *City of Rome*, the Supreme Court did not describe its analysis in these terms, the Court has made clear the "*Boerne* test" is intended to describe the analysis undertaken in those earlier cases. See *Boerne*, 521 U.S. at 530-536; *Hibbs*, 538 U.S. at 726-740.

[12] See also *Dunn* v. *Blumstein*, 405 U.S. 330, 336 (1972) ("In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Kramer* v. *Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969) ("Any unjustified discrimination in determining who may

(continued...)

- 12 -

to vote is so fundamental, where a State "grants the right to vote to some citizens and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Dunn* v. *Blumstein*, 405 U.S. 330, 337 (1972) (internal quotation marks omitted).

Moreover, governmental restrictions on the basis of race or national origin are subject to strict scrutiny. See, *e.g.*, *Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-482 (1997) (race); *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (national origin).[13] The Supreme Court has stated that, "[a]bove all else, the framers of the Civil War Amendments intended to deny States the power to discriminate against persons on account of their race." *Oregon* v. *Mitchell*, 400 U.S. 112, 126 (1970) (Douglas, J., plurality).

C.    *The Evidentiary Record Supporting The 2006 Reauthorization Of Section 5 Demonstrates The Continued Need For Section 5*

In upholding Section 5 as originally enacted, the Supreme Court instructed that the "constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects." *South Carolina*, 383 U.S. at 308. Thus, this Court must assess the continuing validity of Section 5's preclearance mechanism in light of the record of voting rights violations Congress amassed in support of the 2006 reauthorization. This Court

---

[12](...continued)
participate in political affairs or in the selection of public officials undermines the legitimacy of representative government."); *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886) (noting that voting "is regarded as a fundamental political right, because preservative of all rights").

[13] See also *City of Mobile* v. *Bolden*, 446 U.S. 55, 62 (1980) (race); *Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (race); *Washington* v. *Davis*, 426 U.S. 229, 238-248 (1976) (race); *Attorney Gen. of N.Y.* v. *Soto-Lopez*, 476 U.S. 898, 906 n.6 (1986) (national origin); *Oyama* v. *California*, 332 U.S. 633, 640 (1948) (national origin).

- 13 -

should judge the recent record against the backdrop of the evidentiary records that Congress relied on in the enactment and previous reauthorizations of Section 5 – records the Supreme Court in *South Carolina* and *City of Rome* found more than adequate to justify the exercise of Congress's prophylactic powers.

As shown in the following pages, a comparison of the recent record with its predecessors demonstrates that Congress looked in 2006 to the same evidentiary sources relied on by previous Congresses and found to be adequate by the Supreme Court. And, relying on those sources, Congress found in 2006 that the same types and patterns of discriminatory behavior found by previous Congresses continues today.

<blockquote>
1.     *Evidence Of Ongoing Discrimination In Voting Justified Previous Reauthorizations*

  a.     *Evidentiary Sources Congress Relied On In 1965, 1970, 1975, And 1982*
</blockquote>

In enacting and reauthorizing Section 5 over the years, Congress has repeatedly examined the state of voting rights in covered jurisdictions, and has repeatedly concluded that jurisdictions covered by Section 5 have engaged in a pattern of suppressing and diluting the voting strength of minority citizens. In so concluding, Congress relied on various types of evidence. First, Congress relied on the number and types of Section 5 objections interposed by the Attorney General. See, *e.g.*, *1982 Senate Report* 10-12; *1981 House Report* 11-13; H.R. Rep. No. 196, 94th Cong., 1st Sess. 9-10 (1975) (*1975 House Report*); S. Rep. No. 295, 94th Cong., 1st Sess. 16-18 (1975) (*1975 Senate Report*); H.R. Rep. No. 397, 91st Cong., 1st Sess. 6-8 (1969) (*1969 House Report*). Second, Congress relied on the extent to which the Justice Department deployed observers to monitor elections in covered jurisdictions. *1981 House Report* 20-21; *1975 House*

- 14 -

*Report* 12; *1975 Senate Report* 20-21; *1969 House Report* 6.  Third, Congress examined the inadequacies of other legislative remedies available to victims of voting discrimination.  S. Rep. No. 162, 89th Cong., 1st Sess. 5-9 (1965) (*1965 Senate Report*); H.R. Rep. No. 439, 89th Cong., 1st Sess., Part 3, at 8-11 (1965) (*1965 House Report*).[14]  Fourth, Congress relied on direct evidence of discrimination:  anecdotal evidence and evidence from litigation demonstrating that racial and language minority citizens faced discrimination in voting in covered jurisdictions.  See, *e.g.*, *1981 House Report* 17-18, 26-28; *1975 House Report* 16-24; *1975 Senate Report* 25-31; *1965 Senate Report* 3-5, 9-12; *1965 House Report* 11-13.  Finally, Congress found that registration rates of racial and language minority citizens lagged behind those of white citizens, and continued to do so in some covered jurisdictions long after Section 5 went into effect.  See, *e.g.*, *1981 House Report* 7-8; *1975 House Report* 7; *1975 Senate Report* 13-15.

> b.    *Patterns Of Voting Discrimination Congress Identified In 1965, 1970, 1975, And 1982*

Relying on these sources of evidence, Congress concluded in 1965 that covered jurisdictions had engaged in a pattern of suppressing participation of minority voters through discrimination, intimidation, misinformation, and outright exclusion.  In the century between passage of the Fifteenth Amendment and the Voting Rights Act, southern States displayed "ingenuity and dedication" in their determination to "circumvent the guarantees of the 15th amendment" by preventing black citizens from voting, employing a variety of discriminatory devices including grandfather clauses, white primaries, discriminatory procedural hurdles, and

---

[14] Pre-VRA legislative attempts to address discrimination in voting include the Civil Rights Act of 1957, Pub. L. No. 85-315, § 161, 71 Stat. 638; the Civil Rights Act of 1960, Pub. L. No. 86-449, § 1, 74 Stat. 86; and Title I of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241.

- 15 -

discriminatory challenges and purges, to name a few. *1965 House Report* 8-11; *1965 Senate Report* 5. Those States also employed discriminatory tests such as literacy tests, oral constitutional "understanding" and "interpretation" tests, citizenship tests, and tests of good moral character, *1965 House Report* 12; *1965 Senate Report* 4, 9-12, and restricted the times and locations of registration sites so as to prevent minority citizens from registering, *1975 House Report* 11.

In upholding the original Section 5 in *South Carolina*, the Supreme Court found that the history of voting discrimination identified by Congress justified the remedy of Section 5. That history included the former Confederate States' use of vast and varied methods and devices that "were specifically designed to prevent Negroes from voting." 383 U.S. at 310-312 (collecting cases). The Court noted that, in the years preceding the enactment of the Voting Rights Act, courts found a "widespread 'pattern or practice'" of "[d]iscriminatory administration of voting qualifications" throughout the Southern States. *Id.* at 312-313. Based on the behavior of these States, the Supreme Court found that "Congress felt itself confronted by an insidious and pervasive evil [that] had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.* at 309.

When Congress considered reauthorizing Section 5 in 1970, and again in 1975, it concluded that covered jurisdictions continued to employ discriminatory devices and to engage in other discriminatory behavior in order to suppress the participation of minority voters. *1969 House Report* 6-8; *1975 House Report* 16-17. And, when Congress again reauthorized Section 5 in 1982, it continued to find concerted efforts by covered jurisdictions to suppress the participation of minority voters. Congress found that a pattern of intimidation and harassment

- 16 -

accompanied the use of discriminatory voting practices. *1982 Senate Report* 14; *1981 House Report* 6, 15. Such behavior included positioning white citizens with guns outside of registration sites, criminally prosecuting black citizens for helping to register other black citizens, and prematurely calling in the mortgage of a black citizen running for local office. *1981 House Report* at 15. With respect to language minority citizens' attempting to vote, Congress found that they, too, suffered from physical, economic, and political harassment and intimidation. *1975 House Report* 18.

Congress also found that, as registration and participation rates among minority voters improved through enforcement of the Voting Rights Act, covered jurisdictions shifted their focus from preventing participation to diluting the voting strength of minority voters. Congress noted that the "right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot," *1981 House Report* 17, and found that, "covered jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices to dilute minority voting strength," *1982 Senate Report* 10. These devices include racial gerrymandering, use of at-large elections, annexation, shifts from elective to appointive offices, majority vote run-off requirements, numbered posts, staggered terms, and full slate voting requirements. *1981 House Report* 17-19; *1975 Senate Report* 16-19.

In reviewing the Act as amended in 1975, the Supreme Court again relied on Congress's conclusion, based on extensive hearings, that "there was 'overwhelming evidence' showing 'the ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise affect the voting rights of language minorities.'" *Briscoe*, 432 U.S. at 405-406. The Supreme Court noted that "[c]oncern was particularly expressed over the plight of

- 17 -

Mexican-American citizens in Texas, a State that had not been covered by the 1965 Act," but was

newly covered under the 1975 amendments to the Act.  *Id.* at 406.

Although the Court acknowledged that black voter registration rates had dramatically

improved by 1975, it also recognized that "a bleaker side of the picture yet exist[ed]."  *City of

Rome*, 446 U.S. at 180.  Relying on the evidence Congress amassed that widespread

discrimination in voting continued in covered jurisdictions, the Court concluded that Congress

was justified in extending the life of Section 5 to protect the "limited and fragile success"

achieved to date.  *Id.* at 181.  See also *Beer* v. *United States*, 415 U.S. 130, 140-141 (1976)

(noting that, in extending the life of Section 5, Congress "desired to prevent States from

'undo(ing) or defeat(ing) the rights recently won'" by minority voters and "to insure that (the

gains thus far achieved in minority political participation) shall not be destroyed through new

(discriminatory) procedures and techniques"); *Briscoe*, 432 U.S. at 414-415 ("[T]here can be no

question that in attacking the pervasive evils and tenacious defenders of voting discrimination,

Congress acted within its 'power to enforce' the Fourteenth and Fifteenth Amendments 'by

appropriate legislation.'").

In *City of Rome*, the Supreme Court placed the 1975 reauthorization into this historical

context:

> It must not be forgotten that in 1965, *95 years* after ratification of the Fifteenth
> Amendment extended the right to vote to all citizens regardless of race or color,
> Congress found that racial discrimination in voting was an insidious and pervasive
> evil which had been perpetuated in certain parts of our country through
> unremitting and ingenious defiance of the Constitution.  In adopting the Voting
> Rights Act, Congress sought to remedy this century of obstruction by shifting the
> advantage of time and inertia from the perpetrators of the evil to its victims.

446 U.S. at 181-182 (internal citations omitted).  "When viewed in this light," the Court held,

- 18 -

Congress's conclusion that reauthorization of the Act was "necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable." *Id.* at 182. In reviewing the Act as amended in 1982, the Supreme Court in *Lopez* again upheld the validity of Section 5, noting that, although "the Voting Rights Act, by its nature, intrudes on state sovereignty[, t]he Fifteenth Amendment permits this intrusion." 525 U.S. at 284-285.

2.    *Evidence of Ongoing Discrimination In Voting Justified The 2006 Reauthorization*

The voluminous record supporting the 2006 reauthorization reveals three important facts: (1) in 2006, Congress relied on the same types and sources of evidence it had relied on in previous reauthorizations; (2) Congress concluded that, despite some progress, covered jurisdictions continue to discriminate against racial and language minority voters through concerted efforts to suppress the participation of such voters and to dilute their voting strength; and (3) Congress concluded that Section 5 works and must continue to work to stamp out discrimination in voting.

Congress held extensive hearings to study the effect and operation of the Voting Rights Act over the last 40 years. The House of Representatives held ten oversight hearings and two legislative hearings to examine both "the effectiveness of the temporary provisions of the VRA over the last 25 years" and the effect reauthorization of those provisions would have "on continuing the progress that minority groups have made in the last forty years and on protecting racial and language minority voters over the next 25 years." *2006 House Report* 5. The House heard from 46 witnesses and assembled over 12,000 pages of testimony and documentary evidence. *Ibid.*; *id.* at 11. The Senate, too, held ten hearings featuring testimony from 40 witnesses, and gathered thousands of pages of evidence. S. Rep. No. 523, 109th Cong., 2d Sess. 2

- 19 -

(2006) (*2006 Senate Report*).

Although Congress recognized that "[s]ubstantial progress has been made over the last 40 years," Congress also learned that "[d]iscrimination today is more subtle than the visible methods used in 1965" and continues to result in "a diminishing of the minority community's ability to fully participate in the electoral process and to elect their preferred candidates of choice." *2006 House Report* 6. In the end, Congress found that the evidence before it "resembles the evidence before Congress in 1965 and the evidence that was present again [when Congress reauthorized Section 5] in 1970, 1975, 1982, and 1992,"[15] and amounts to "abundant evidentiary support for reauthorization of VRA's temporary provisions." *Ibid.* In 1965, Congress concluded that the evidence demonstrated that covered jurisdictions were engaging in a pervasive pattern of constitutional violations. In 2006, Congress concluded that the continued existence of the same types of evidence in the same jurisdictions demonstrated the continued need for Section 5.[16]

> a.    *In 2006, Congress Found Evidence of Voting Discrimination In The Same Evidentiary Sources That Previous Congresses Relied Upon*

In amassing evidence of continued patterns of voting discrimination against minority citizens, Congress relied on a variety of types of evidence and evidentiary sources. As the Supreme Court averred in *South Carolina*, "[i]n identifying past evils," for which Section 5

---

[15] In 1992, Congress modified and extended the language assistance provisions of the Act. See Pub. L. No. 102-344, 106 Stat. 92.

[16] *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 28 (2006) (testimony of Theodore M. Shaw) ("[T]he progress that we have made in this country, which is tremendous, did not happen serendipitously. It happened only as a consequence of the Voting Rights Act. I think we all recognize that. We have acknowledged it, and I think it is so important not to kill the goose that laid the golden egg.").

- 20 -

legislation is appropriate, "Congress obviously may avail itself of information from any probative source." 383 U.S. at 330. Significantly, the primary sources on which Congress relied mirror the primary sources on which previous Congresses relied in enacting and reauthorizing Section 5 – the same sources the Supreme Court found to be reliable in cases such as *South Carolina* and *City of Rome*.

<em>i.</em>      <em>Section 5 Enforcement Since 1982</em>

<em>(a)</em>      <em>Section 5 Objections</em>

*(1) Rate And Types Of Objections*: In approving the 1975 reauthorization of Section 5, Congress relied heavily on the number of objections interposed by the Attorney General to voting changes submitted by covered jurisdictions as a means of gauging the continued need for Section 5. See *City of Rome*, 446 U.S. at 181-182. In upholding Section 5, the Supreme Court credited Congress's conclusion that "[t]he recent objections entered by the Attorney General * * * clearly bespeak the continuing need for this preclearance mechanism." *Ibid.*

In 2006, Congress again relied on the volume and substance of Section 5 objections. Since the 1982 amendments to the Act went into effect, the Attorney General has interposed more than 700 objections to voting changes submitted under Section 5.[17] *2006 House Report* 21-22; *id.* at 36. Although the annual rate of objections from 1965-1982 was slightly higher than the rate from 1982 to the present, *Appendix to Voting Rights Act: Evidence of Continued Need: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 172 (2006) (*H. Appx.*), the rate

---

[17] A list of the Attorney General's objection letters and copies of some of them are at http://www.usdoj.gov/crt/voting/sec_5/obj_activ.htm. See also *Voting Rights Act: Section 5 of the Act – History, Scope, & Purpose: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 105-224 (2005) (*History, Scope, & Purpose*) (list of all objection letters issued through 2005); *id.* at 225-2595 (objection letters issued from 1980 through mid-2003).

- 21 -

in several southern states actually *increased* in the post-1982 time period.  For example, in

Louisiana, a State covered since 1965, the rate of objections per year increased after 1982.  *Voting*

*Rights Act:  Evidence of Continued Need:  Hearing Before the House Comm. on the Judiciary*,

109th Cong., 2d Sess. 60 (2006) (*Evidence of Continued Need*) (statement of Wade Henderson);

*H. Appx.* 259.[18]  In Mississippi, another State covered since 1965, approximately two-thirds of the

Section 5 objections were interposed after 1982.  *Evidence of Continued Need* 54 (statement of

Henderson); *H. Appx.* 259; *2006 House Report* 37.[19]  And, although Texas has been covered by

Section 5 only since 1975, that State has sustained more objections than any other State in the

country since 1965.  *Voting Rights Act:  Section 5 of the Act – History, Scope, & Purpose:*

*Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 86 (2005) (*History,*

*Scope, & Purpose*) (testimony of Nina Perales).[20]

     Over the years, the Justice Department has interposed objections to a wide variety of

voting changes, including annexations, education requirements, election dates, polling locations,

majority vote requirements, statewide and local redistricting, staggered terms, and numbered

posts.  *H. Appx.* 402-404; see also *id.* at 335; see also *History, Scope, & Purpose* 1696-2595

(copies of objection letters sent from 1988 through mid-2003).[21]  In Louisiana, "since 1965, not

one single Louisiana State House of Representatives redistricting plan as initially submitted to the

---

[18] See also http://www.usdoj.gov/crt/voting/sec_5/la_obj2.htm.

[19] See also http://www.usdoj.gov/crt/voting/sec_5/ms_obj2.htm.

[20] See also http://www.usdoj.gov/crt/voting/sec_5/tx_obj2.htm.

[21] Congress also learned that Section 5 objections "aid small as well as large scale elections, shielding as few as 208 and as many as 215,406 voters with a single objection."  *The Continuing Need for Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 58 (2006) (testimony of Anita Earls).

- 22 -

Justice Department for review, has been precleared." *To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 16 (2005) (*To Examine the Impact and Effectiveness of the Voting Rights Act*) (testimony of Marc Morial). In Georgia, the 92 objections interposed between 1982 and 2004 covered a varied set of election changes and included many that "had been illegally implemented for years, or even decades, without Section 5 preclearance." *Evidence of Continued Need* 62 (statement of Henderson). In Texas, the Attorney General has objected to redistricting plans at all levels of government, changes in local voting procedures, and changes related to the system of representation. *Id.* at 63-64 (statement of Henderson). In South Carolina, the "objected-to discriminatory practices have covered a wide variety of changes that affected nearly every aspect of black citizens' participation in South Carolina's electoral processes, including redistricting, annexations, voter assistance, changing county boundaries, eliminating offices, reducing the number of seats on a public body, majority vote requirements, changing to at-large elections, changing from nonpartisan to partisan elections and limiting the ability of African-American citizens to run for office." *Id.* at 65-66 (statement of Henderson); see also *H. Appx.* 335 (noting that, in Louisiana, objections have been interposed to voting changes "at every level of government, including the state legislature, the state court system, the state board of education, parish councils, school boards, police juries, city councils, and boards of aldermen").

(2) *Findings Of Discriminatory Intent*: Congress also learned that the Attorney General interposed some objections because he or she found that a jurisdiction acted with a discriminatory purpose. For example, the Attorney General objected to the post-2000 census redistricting plan of the City of Albany, Georgia, because there was evidence that the plan "was animated by

- 23 -

purposeful discrimination to limit the opportunities of minorities." *Voting Rights Act: The Continuing Need for Section 5: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 80 (2005) (*The Continuing Need for Section 5*) (testimony of Laughlin McDonald); *2006 House Report* 37; Letter from J. Michael Wiggins to Al Grieshaber, Jr. (Sept. 23, 2002), in *History, Scope, & Purpose* 845-848. Moreover, in the early 1990s, the Attorney General refused to preclear a redistricting plan for Selma, Alabama, because the plan "exhibited a purpose to prevent African Americans from electing candidates of their choice by fragmenting the black voting population." *Evidence of Continued Need* 54 (statement of Henderson); see also Letter from John R. Dunne to John E. Pilcher (July 21, 1992), in *History, Scope, & Purpose* 397-399. And in 1993, the Attorney General objected to a school board election change in Monterey County, California, because the change "was motivated, at least in part, by a discriminatory animus." *H. Appx.* 351 (describing testimony of Robert Rubin); Letter from Ralph F. Boyd, Jr. to William D. Barr (Mar. 29, 2002), available at http://www.usdoj.gov/crt/voting/sec_5/ltr/ l_040102.htm. See also *2006 House Report* 23 ("Section 5 has been instrumental in preventing covered jurisdictions from intentionally reenacting and enforcing changes to which the Department of Justice had previously objected.").

        In one stark example, Congress heard testimony about the Attorney General's objection to Mississippi's 1991 statewide redistricting plan. The Attorney General interposed an objection after concluding that the proposed plan was "calculated not to provide black voters in the Delta with the equal opportunity for representation required by the Voting Rights Act" and noting that legislative debate about the proposed plan and alternatives was "characterized by overt racial appeals." Letter from John R. Dunne to Hon. Hainon A. Miller (July 2, 1991), in *History, Scope,*

- 24 -

*& Purpose* 1410-1413.  Congress heard testimony that, when state legislators defeated an

alternative plan that would have increased the number of black majority districts, some of them

referred to the alternative plan as the "black plan" when speaking on the floor, and as the "n_____

plan" privately.  *Modern Enforcement of the Voting Rights Act:  Hearing Before the Senate*

*Comm. on the Judiciary*, 109th Cong., 2d Sess. 22 (2006) (testimony of Robert B. McDuff)

(*Modern Enforcement of the Voting Rights Act*).

      In many instances, the Attorney General found that a jurisdiction enacted a voting change

with the specific intent to limit minority voting strength.  For instance, in 2001, the Attorney

General interposed an objection to a Mississippi town's cancellation of an election because the

evidence demonstrated that the cancellation was calculated to retrogress minority voting strength.

Letter from Ralph F. Boyd, Jr. to J. Lane Greenlee (Dec. 11, 2001) (re:  Kilmichael, MS), in

*History, Scope, & Purpose* 1616-1619.  The Department of Justice found evidence that no black

citizen had ever been elected mayor of the town and that only one black person had ever served

on the Board of Aldermen, although black citizens had recently become a majority of the town's

population.  Moreover, the town opted to cancel the election – with no notice to the community –

*after* the incumbent all-white town governance learned that the minority community had a chance

to win the mayoral election and four out of the five aldermen seats.  *Ibid.*; see also *Modern*

*Enforcement of the Voting Rights Act* 22.

      To take another example, in 2000, the Attorney General objected to a redistricting plan for

the Board of Education in Webster County, Georgia, after finding that the redistricting was

undertaken to "intentionally decreas[e] the opportunity of minority voters to participate in the

electoral process."  Letter from Bill Lann Lee to James M. Skipper, Jr. (Jan. 11, 2000), in *History,*

- 25 -

*Scope, & Purpose* 830-838.  The redistricting was initiated by a state legislative act after voters elected a majority black school board for the first time.  In another example, the Attorney General interposed an objection in 1998 to a redistricting plan for the City of Grenada, Mississippi, because the Attorney General found "a purpose to maintain and strengthen white control of a City on the verge of becoming majority black."  Letter from Bill Lann Lee to T.H. Freeland IV (Aug. 17, 1998), in *History, Scope, & Purpose* 1606-1612.[22]

Nor were the Attorney General's findings of intentional discrimination limited to the redistricting context.  Less than a year ago (and after the President signed the reauthorization

---

[22] For other examples of objections interposed because the Attorney General found an intent to limit or retrogress minority voting strength, see, *e.g.*, Letter from R. Alexander Acosta to David A. Creed (Apr. 25, 2005) (re:  Town of Delhi, LA), available at http://www.usdoj.gov/ crt/voting/ sec_5/ltr/l_042505.htm; Letter from R. Alexander Acosta to Hon. Phillip A. LeMoine (June 4, 2004) (re:  City of Ville Platte, LA), available at http://www.usdoj.gov/crt/voting/sec_5/ ltr/l_060404.html; Letter from Ralph F. Boyd, Jr. to William D. Sleeper (Apr. 29, 2002) (re: Pittsylvania County, VA), in *History, Scope, & Purpose* 2588-2591; Letter from Loretta King to Guy Kenner Ellis, Jr. (Nov. 17, 1995) (re:  City of Greenville, MS), in History, Scope, & Purpose  1516-1521; Letter from Deval L. Patrick to Sandra Murphy Shelson (Feb. 6, 1995) (re: State of Mississippi), in *History, Scope, & Purpose* 1570-1571; Letter from Deval L. Patrick to James R. Lewis (Oct. 11, 1994) (re:  City of LaGrange, GA), in *History, Scope, & Purpose* 798-800; Letter from James P. Turner to Nicholas H. Cobbs (Jan. 3, 1994) (re:  Hale County, AL), in *History, Scope, & Purpose* 412-414; Letter from James P. Turner to Philip Henry Pitts (Mar. 15, 1993) (re:  City of Selma, AL), in *History, Scope, & Purpose* 402-405; Letter from James P. Turner to Hon. Gregory N. Marcantel (Mar. 8, 1993) (re:  City of Jennings, LA), in *History, Scope, & Purpose* 1034-1036; Letter from John R. Dunne to James E. Nelson (March 30, 1992) (re:  Monahans-Wickett-Pyote Independent School District in Ward County, TX), in *History, Scope, & Purpose* 2352-2354; Letter from John R. Dunne to Hon. Jimmy Evans (Mar. 27, 1992) (re:  State of Alabama), in *History, Scope, & Purpose* 385-387; Letter from John R. Dunne to Tommy M. McWilliams (Oct. 25, 1991) (re:  Sunflower County, MS), in *History, Scope, & Purpose* 1468-1470; Letter from John R. Dunne to John B. Farese (Sept. 9, 1991) (re:  Benton County, MS), in *History, Scope, & Purpose* 1435-1437; Letter from John R. Dunne to Hubbard T. Saunders, IV (Aug. 23, 1991) (re:  Amite County, MS), in *History, Scope, & Purpose* 1428-1430; Letter from James P. Turner to John P. Fox (Feb. 27, 1990) (re:  Chickasaw County, MS), in *History, Scope, & Purpose* 1388-1390; Letter from James P. Turner to Garry C. Mercer (Mar. 10, 1986) (Re:  Wilson County, NC), in *History, Scope, & Purpose* 1730-1732.

- 26 -

bill), the Attorney General objected to Randolph County, Georgia's proposed reassignment of the African-American chair of the Board of Education out of his incumbent district because the county failed to demonstrate that the transfer was not motivated by discriminatory purpose. Letter from Wan J. Kim to Tommy Coleman (Sep. 12, 2006), available at http://www.usdoj.gov/crt/ voting/sec_5/ltr/l_091206.html.  In another example, the Attorney General interposed an objection in 1987 to a change in the method of election for the board of commissioners of Bladen County, North Carolina, finding that "the board undertook extraordinary measures to adopt an election plan [that] minimizes minority voting strength" in order to "maintain white political control to the maximum extent possible."  Letter from William Bradford Reynolds to W. Leslie Johnson, Jr. (Nov. 2, 1987), in *History, Scope, & Purpose* 1760-1763.

In its amended complaint, Plaintiff derides the requirement that covered jurisdictions submit changes in polling locations for preclearance.  First Amended Complaint ¶ 12.  But a review of the Attorney General's objection letters reveals why such a requirement is important. In 1992, the Attorney General interposed an objection to the relocation of a polling place in Johnson County, Georgia, from the county courthouse to the American Legion.  Letter from John R. Dunne to Charlotte Beall (Oct. 28, 1992), in *History, Scope, & Purpose* 726-728.  In reviewing the submission, the Justice Department obtained evidence that:  "[T]he American Legion in Johnson County has a wide-spread reputation as an all-white club with a history of refusing membership to black applicants.  Moreover, the American Legion hall, itself, is used for functions to which only whites are welcome to attend."  This information led to the unsurprising conclusion that "the atmosphere at the American Legion is considered hostile and intimidating to potential

- 27 -

black voters, and it appears that locating a polling place there has the effect of discouraging black voters from turning out to vote."

In two other examples – both in Texas – the Attorney General interposed objections to polling place changes.  In one case, the proposed change was found to be "designed, in part, to thwart recent black political participation."  Letter from Deval L. Patrick to James P. Finstrom (Apr. 18, 1994) (re:  Marion County, TX), in *History, Scope, & Purpose* 2427-2429.  In the second, the Attorney General concluded that the proposed change was "calculated to discourage turnout among minority voters and, accordingly, to undermine the electoral opportunities created by" a new election system put in place in response to a Section 2 suit, Letter from John R. Dunne to Don Graf (Mar. 19, 1991) (re:  Lubbock County, TX), in *History, Scope, & Purpose* 2300-2303.  And in a very recent example, also out of Texas, the Attorney General objected to a community college district's proposal to eliminate 86% of its polling places because the assignment of voters to the new sites was "remarkably uneven."  Letter from Wan J. Kim to Renee Smith Byas (May 5, 2006) (re:  North Harris Montgomery Community College District), available at http://www.usdoj.gov/crt/voting/sec_5/ltr/ l_050506.htm; see also *Modern Enforcement of the Voting Rights* 83-84 (testimony of McDuff).  Under the proposed change, communities populated primarily by minority voters had disproportionately fewer polling places than communities without significant minority populations; the site with the smallest proportion of minority voters served only 6,500 voters total while the site with the largest proportion of minority voters served more than 67,000 voters.

Indeed, one recent study of Attorney General objections found a "consistent increase over time of objections based on the purpose prong of Section 5."  McCrary, Seaman, & Valelly, *The*

- 28 -

*End of Preclearance As We Know It: How the Supreme Court Transformed Section 5 of the*

*Voting Rights Act*, 11 Mich. J. Race & Law 275, 297 (2006). The study found that, in the 1990s,

43% of all objections interposed by the Attorney General were on the basis of intent alone and

another 31% were based on a combination of intent and effect. *Ibid.*

      *(3) Preventing Back-Sliding*: Even where the Attorney General made no explicit finding

of discriminatory purpose, Congress heard evidence that Section 5 has prevented hundreds of

voting changes since 1982 that would have eroded the progress minority voters have made since

1965. In Texas, for example, Latinos reached one-third of the State's total population by 2001.

The state legislative redistricting board proposed a redistricting plan for the State House of

Representatives that would have minimized Latino voting strength by eliminating four existing

majority-Latino districts, while adding only one such district. The Attorney General interposed

an objection to the proposed plan, and Latino voters in Texas accordingly maintained four

majority districts and the opportunity to elect representatives of their choice. *To Examine the*

*Impact and Effectiveness of the Voting Rights Act* 19 (testimony of Ann Marie Tallman); Letter

from Ralph F. Boyd, Jr. to Hon. Geoffrey Connor (Nov. 16, 2001), in *History, Scope, & Purpose*

2518-2523.

      A similar situation arose in Arizona in 2002, where the state legislature "pared down

Latino majority districts so they no longer provided the opportunity to elect Latino candidates of

choice" until the Attorney General objected to the House and Senate redistricting plans. *History,*

*Scope, & Purpose* 87 (testimony of Perales); Letter from Ralph F. Boyd, Jr. to Lisa T. Hauser &

José de Jesús Rivera (May 20, 2002), in *History, Scope, & Purpose* 496-501. Similarly, the

Attorney General objected in 2002 to Florida's statewide House redistricting plan because the

- 29 -

proposed plan would have made it "impossible" for Hispanic voters in a covered county to elect their candidate of choice. Letter from Ralph F. Boyd, Jr. to Hon. John M. McKay (July 1, 2002), in *History, Scope, & Purpose* 524-529.

Moreover, in many instances a covered jurisdiction adopted an election change knowing that the change would diminish the ability of minority voters to elect their candidate of choice. A recent example took place in Charleston County, South Carolina. On the heels of a federal court decision finding that the at-large method of electing members of the county council violated Section 2 of the Voting Rights Act, *United States* v. *Charleston County*, 316 F. Supp. 2d 268 (D.S.C. 2003), the County proposed changing its school board elections from partisan to non-partisan, essentially converting to the at-large majority-vote system found to violate Section 2. The Attorney General interposed an objection, concluding that it "would significantly impair the present ability of minority voters to elect candidates of choice to the school board and to participate fully in the political process." Letter from R. Alexander Acosta to Havird Jones, Jr. (Feb. 26, 2004), available at http://www.usdoj.gov/crt/voting/sec_5/ltr/l_022604.html; see also *Evidence of Continued Need* 25 (statement of Nadine Strossen); *2006 House Report* 39. The Attorney General found that the retrogressive nature of the change was well known among both black and white citizens in the County.

The Attorney General has also objected to proposed changes where a jurisdiction attempts to implement a voting change that perpetuates past discrimination. In 1993, for example, the Attorney General objected to a proposed change to the candidacy requirements for election to the School Board in Randolph County, Georgia, initiated by a state legislative act. See Letter from James P. Turner to Jesse Bowles III (June 28, 1993), in *History, Scope, & Purpose* 1727-1729.

- 30 -

The proposed change would have required that school board members possess a high school diploma or GED.  Census data demonstrated that 65% of black residents age 25 or older did not possess a high school diploma or GED, compared to only 36% of the relevant white population.  Thus, the Attorney General found that the proposed change would have a "pronounced disparate impact" on black voters in the county; indeed, a number of black voters' candidates of choice from previous elections would have been barred from serving on the Board.  Again, the Attorney General noted that the disparate impact of the proposed change was "well-known" before its adoption.

In some instances, a covered jurisdiction has admitted that it sought to diminish the electoral opportunities for minority voters.  The State of Louisiana, for example, sought preclearance from this Court for its 2001 State House of Representatives redistricting plan.  The United States opposed preclearance based on the undisputed evidence that, in drawing the new plan, Louisiana had intentionally eliminated a majority black district in Orleans Parish to advantage white voters in another part of the Parish.  *Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-62 (D.D.C.) (three-judge).  The State, in fact, admitted that its intent was to diminish black electoral opportunity in order to increase the electoral opportunity of white voters.  Defs.' Mot. for Summ. J. at 34-40, *Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-62 (D.D.C. Jan. 17, 2003); see also *Reauthorization of the Voting Rights Act's Temporary Provisions:  Policy Perspectives and Views From the Field:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 43-44 (2006) (*Policy Perspectives and Views From the Field*) (statement of Debo P. Adegbile).  The case ultimately settled when the State withdrew its proposed plan and submitted an alternative plan to the Attorney General for preclearance.  See *An*

- 31 -

*Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2nd Sess. 152-153 (2006) (*Introduction to the Expiring Provisions*) (statement of Theodore M. Shaw).

>    (b)    *More Information Requests & Submission Withdrawals*

Congress concluded that "[e]fforts to discriminate over the past 25 years were not just demonstrated by objection letters issued under Section 5 but were also reflected by an administrative mechanism known as a 'more information request.'"  *2006 House Report* 40.  In some such cases, the Department's request for more information causes the jurisdiction to alter its proposed change after concluding "that the change would be objected to as violating the Act if it were not withdrawn."  *Ibid.*; *id.* at 330; *History, Scope, & Purpose* 93 (testimony of Perales).  Congress found that the covered jurisdictions' responses to requests from the Department for more information "are often illustrative of a jurisdiction's motives."  *2006 House Report* 40.

Testimony revealed that requests for more information "affected more than 800 additional voting changes that were submitted for preclearance, compelling the jurisdictions to either alter the proposal or withdraw it from consideration altogether."  *2006 House Report* 40-41.  Indeed, since 1982, more than 205 voting changes have been withdrawn in response to such information requests.  *Id.* at 41.

Congress also considered a recent study of the efficacy of more information requests (MIRs) at deterring discriminatory voting practices.  The study found that "MIRs increased the DOJ's impact in Section 5 enforcement by 51 percent between 1982 and July 2005."  *The Continuing Need for Section 203's Provisions for Limited English Proficient Voters:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 219 (2006).  The study

- 32 -

concluded that the effect of MIRs is "significantly greater in the recent period of 1999 to 2005 where MIRs deterred 605 percent more changes than did formal objections." *Id.* at 221. Moreover, the study found that the "largest impact of MIRs was in Texas." *Id.* at 220.

(c)       *Section 5 Injunctive Actions*

Congress also considered the recent history of judicial actions seeking injunctive relief under Section 5. The Voting Rights Act permits both the Justice Department and private citizens to bring Section 5 actions for injunctive relief to compel covered jurisdictions to submit voting changes for preclearance. 42 U.S.C. 1973c, 1973j(f). Congress learned that, since 1982, more than 100 such cases have been brought. *Evidence of Continued Need* 13 (testimony of Bill Lann Lee); *H. Appx.* 124-125; see also *History, Scope, & Purpose* 2840-2841, 2849-2850 (United States participation in Section 5 enforcement actions). Texas claims more such cases than any other covered State, with 29 of the 105 Section 5 enforcement actions brought in 9 States between 1982 and 2004. *H. Appx.* 250. Following Texas is Alabama with 22 suits, Georgia with 17, and Mississippi with 15. *Ibid.*

Witnesses also testified that the existence of Section 5 enforcement actions often signifies that the defendant jurisdiction is resistant to complying with the Act, refusing to submit covered changes for preclearance. *Evidence of Continued Need* 87 (testimony of Joe Rogers). As Congress noted, "[p]erhaps the most egregious example of non-compliance" with Section 5 occurred in South Dakota. *2006 House Report* 42. In the mid-1970s, two South Dakota counties were newly covered under Section 5. At that time, former South Dakota Attorney General William Janklow described the preclearance requirement as "a facial absurdity" and advised the covered counties not to comply with the law, stating, "I see no need to proceed with undue speed

- 33 -

to subject our State laws to a 'one-man veto' by the United States Attorney General." *Ibid.*

Between 1976 and 2002, the covered counties enacted or implemented over 600 voting changes

but submitted fewer than 10 for preclearance. *H. Appx.* 172-173; *2006 House Report* 42. It was

not until members of local Indian tribes brought a Section 5 enforcement action that the covered

counties agreed to comply with the law by submitting their election changes for preclearance.

*2006 House Report* 42.

     In addition, Congress heard other examples of defiant noncompliance with Section 5.

Such examples involve covered jurisdictions from California, *2006 House Report* 42, to Texas, *H.*

*Appx.* 351, to Louisiana, *2006 House Report* 53, to South Carolina, *ibid.* In addition, Congress

was "made aware that unofficial changes to voting practices are routinely made by local elections

officials" without preclearance, and that "[l]ocal election officials and poll workers often make

arbitrary decisions in polling locations that effectively change voting procedures." *Id.* at 43.[23]

* * * * *

     Thus, the full picture of the ongoing effectiveness of Section 5 reveals that, since 1982:

> the District Court of the District of Columbia and the Justice Department together
> have declined to preclear over 1,100 voting changes contained in more than 650
> section 5 submissions since 1982. In addition, as a result of the correspondence
> between the Justice Department and jurisdictions after submission, jurisdictions
> have withdrawn 200 submissions.

*Evidence of Continued Need* 13 (testimony of Lee). Texas again claimed the largest combined

total, with 168 objections, submission withdrawals, and Section 5 judgments favorable to

minorities from 1982 to 2004. *H. Appx.* 273. Mississippi had the second highest number, with a

---

    [23] For a discussion of Section 5's demonstrated deterrent effect, see *infra* at Section
III.C.3.a.

- 34 -

combined total of 155, followed by Louisiana with 129, and Georgia with 123. *Ibid.* This level

of Section 5 activity tracks the rate the Supreme Court found in *City of Rome* to be more than

sufficient to justify the reauthorization of Section 5 in 1975. See 446 U.S. at 181; *1975 House

Report* 10-11; *1975 Senate Report* 15-19.

ii.     *Federal Observer Coverage Since 1982*

Congress also learned that "[y]et another indicator of actual or potential vote

discrimination is an event known as an 'observer coverage,' whereby the Attorney General sends

federal observers on Election Day to a locale because racial tensions are high and efforts to

discriminate may occur." *H. Appx.* 124. In the period between 1965 and 1982, the Justice

Department sent observers to monitor a total of 520 elections. *Id.* at 4. Since 1982, the Justice

Department has sent several thousand observers to monitor elections in more than 600

jurisdictions. *Evidence of Continued Need* 13 (testimony of Lee); *H. Appx.* 4. In each year

between 1984 and 2000, the Justice Department sent out between 300 and 600 individual

observers. *Evidence of Continued Need* 13 (testimony of Lee). In 2004 alone, the federal

government dispatched nearly 2000 election monitors to over 100 jurisdictions. See *Modern

Enforcement of the Voting Rights Act* 9 (testimony of Assistant Attorney General Wan J. Kim).

The Department of Justice has sent observers to cover 250 separate elections in Mississippi alone

since 1982, accounting for approximately 40% of the monitor coverage in that time. *H. Appx.* 4;

*Evidence of Continued Need* 80 (statement of Henderson). Alabama had observers for 67

elections since 1982, and Georgia had observers for 57 elections in that time. *Evidence of

Continued Need* 80 (statement of Henderson). In many covered States, the rate of observer

coverage since 1982 has met or exceeded the rate of observer coverage between 1965 and 1982.

- 35 -

*Ibid.* For example, 62% of the elections in which South Carolina had monitors occurred after 1982, *id.* at 78, 66% of the elections in which Georgia had monitors occurred after 1982, *id.* at 79, and 100% of the elections in which North Carolina had monitors occurred after 1982, *id.* at 80.

Witnesses stressed that federal observers help to prevent discrimination because they can enter and remain in polling places. *H. Appx.* 301 (testimony of Anita Earls). Congress also heard examples of the types of problems reported by observers, including failure to provide minority language ballots in jurisdictions required to do so, harassment of voters, instances in which minority voters were required to provide identification when white voters were not, and outright discriminatory statements made by poll workers. *H. Appx.* 64. Congress concluded that "observers have played a critical role in law enforcement efforts to protect minority citizens." *2006 House Report* 44.

Furthermore, evidence before Congress demonstrates that observers are often sent to covered jurisdictions precisely because minority voters have faced discrimination in such jurisdictions in recent elections. For example, in 1990 the Attorney General sent observers to Pike County, Georgia for a special election because the originally scheduled election was enjoined after the city held an illegal after-hours voter registration session open to white voters only. *H. Appx.* 3533. In 1993, the Attorney General sent monitors to Humphreys County, Mississippi after finding that polling place officials had harassed black voters and denied illiterate black voters assistance from a person of their choice. *H. Appx.* 3578. In 1996, the Attorney General sent observers to Galveston County and Jefferson County, Texas, because minority

- 36 -

voters had been harassed by white poll watchers at previous elections. *H. Appx.* 3642-3643.[24]

The anecdotal and statistical information regarding election observers demonstrates that elections

in predominantly minority areas of covered jurisdictions continue to suffer racial tensions.

### iii.     Rate Of Section 2 Litigation

Although Congress did not focus extensively on the history of enforcement of Section 2 of

the Voting Rights Act, it did note the importance of reauthorizing Section 5 as a means of

protecting the gains minority voters have won through Section 2 litigation. *2006 House Report*

53.  "In identifying past evils," for which Section 5 legislation is appropriate, "Congress

obviously may avail itself of information from any probative source." *South Carolina*, 383 U.S.

at 330.  Successful Section 2 cases are just such a probative source.  See 2006 Amendments Act,

Pub. L. No. 109-246, § 2(b)(4)(C), 120 Stat. 577-578 ("Evidence of continued discrimination

includes * * * the continued filing of section 2 cases that originated in covered jurisdictions."); *id.*

at § 2(b)(8), 120 Stat. 578 ("Present day discrimination experienced by racial and language

minority voters is contained in evidence, including * * * the section 2 litigation filed to prevent

dilutive techniques from adversely affecting minority voters.").

Congress learned of a study that compiled a non-comprehensive list including both

reported and unreported Section 2 cases with outcomes favorable to minority voters in the eight

---

[24] See also *H. Appx.* 3532 (1996 Johnson County, GA); *id.* at 3534 (1994 Taliaferro
County, GA); *id.* at 3536 (1999 Twiggs County, GA); *id.* at 3551 (1994 East Carroll County,
LA); *id.* at 3569 (1995 Carroll County, MS); *id.* at 3576 (1993 Holmes County, MS); *id.* at 3583
(1993 Leflore County, MS); *id.* at 3586 (1999 Monroe County, MS); *id.* at 3589 (1995 Noxubee
County, MS); *id.* at 3591 (1993 Quitman County, MS); *id.* at 3592 (1993 Scott County, MS);
*id.* at 3593 (1993 Sunflower County, MS); *id.* at 3596 (1993 & 1995 Tallahatchie County, MS);
*id.* at 3598 (1995 Tunica County, MS); *id.* at 3601 (1992 & 1995 Wilkinson County, MS); *id.* at
3622 (1996 Chester County, SC); *id.* at 3623 (1996 Williamsburg, SC); *id.* at 3641 (1984 Dallas
County, TX); *id.* at 3643 (2004 Waller County, TX).

- 37 -

southern states fully covered by Section 5, plus North Carolina. *H. Appx.* 126. The study

identified 653 such successful cases, affecting 825 different county-level voting practices. *Ibid.*;

cf. *History, Scope, & Purpose* 2835-2839, 2846, 2848 (Section 2 cases in which United States has

participated). Texas claimed the largest number, with 206 Section 2 cases with outcomes

favorable to minority voters, affecting 197 jurisdictions and 274 county-level voting practices.

*Id.* at 251. Alabama followed with 192 such cases affecting 275 practices. *Ibid.*

  Analysis of reported Section 2 cases reveals widespread judicial findings of serious voting

discrimination by whites against minorities. *H. Appx.* 208. Congress heard testimony that the use

of at-large elections schemes as a mechanism to dilute minority votes lasted well into the 1980s

and 1990s. *The Continuing Need for Section 5* 11 (statement of McDonald). Multiple witnesses

testified about examples of Section 2 cases in which courts found unlawful discrimination against

minority voters throughout covered jurisdictions. See, *e.g.*, *H. Appx.* 340 (South Dakota);

*Evidence of Continued Need* 4-5 (South Carolina); *History, Scope, & Purpose* 78 (Texas, North

Carolina, Alabama); *Evidence of Continued Need* 14 (North Carolina); *H. Appx.* 251, 283-287

(maps and table showing number of number of county-level voting practices altered as a result of

Section 2 litigation in, *e.g.*, Alabama (275), Texas (274), Georgia (76), Mississippi (74), and

North Carolina (56)). Congress also heard that considering only Section 2 cases with final

judgments underestimates the extent of ongoing voting discrimination because it excludes cases

that may have had favorable settlements. *Introduction to the Expiring Provisions* 159 (statement

of Shaw).

- 38 -

b.    *In 2006, Congress Found Ample Evidence That The Same Types And Patterns Of Voting Discrimination That Supported Enactment And Reauthorization Of Section 5 In The Past Continue Today*

The evidence before Congress reveals continuing patterns of discrimination in voting against racial and language minorities in covered jurisdictions.  The examples encompass numerous covered jurisdictions, minority populations, aspects of our voting system, and methods of discrimination.

i.    *Evidence Of Vote Suppression*

The record before Congress is replete with examples of intimidation, harassment, and misinformation leveled against minority voters in covered jurisdictions.  For example, voting officials in Waller County, Texas, went to great lengths over the last several decades to prevent students at the historically black Prairie View A&M University from voting.  In the 1970s, a federal court held that students of the school were entitled to vote in local elections.  In 2004, when two students from Prairie View A&M decided to run for local office, the white district attorney threatened the predominantly black student body with felony prosecution for illegal voting if they voted.  *H. Appx.* 185; *United States* v. *Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), aff'd, 439 U.S. 1105 (1979).  The district attorney relented after the campus NAACP chapter and several students brought suit.  A month before the election, however, county election officials drastically reduced the availability of early voting at the polling place near campus, without submitting the change for preclearance.  *H. Appx.* 185.  The county officials abandoned the change only after the campus NAACP chapter filed a Section 5 enforcement action.  *Ibid.*

Congress also learned that minority voters continue to face overt discrimination and harassment at their polling places.  Testimony recounted examples in which Asian American

- 39 -

voters were told at polling places, "[i]f you can't speak English, you shouldn't be voting." *H. Appx.* 350. A Latina voter in Arizona was told in 2000 "to go back to Mexico and learn English" and was prevented from voting when she told a poll worker that she did not speak English. *H. Appx.* 3980. Such tactics affect all minority populations, including African American, Asian American, Native American, Arab American, and Latino communities.[25]

The record includes many examples of efforts to keep minority voters from the polls, including by threatening minority voters with arrest if they attempted to vote. In 2004, at some voting precincts in Maricopa County, Arizona, trucks with megaphones warned Latino voters that they would be deported if they had wrongfully registered to vote. *H. Appx.* 3979; cf. *1981 House Report* 15 (in 1981, Congress found a pattern of white citizens with guns taking up positions outside of polling places to intimidate minority voters). Also in 2004, in Charleston County, South Carolina, letters falsely stating they were from the NAACP warned voters that they could be arrested when they attempted to vote if they had outstanding parking tickets or overdue child support payments. *H. Appx.* 3619-3620; cf. *1981 House Report* 15 (in 1981, Congress found a pattern of prosecuting minority citizens for helping other minority citizens to register). And in two Georgia counties, "there were efforts to wrongfully challenge Latino voters *en masse* in the

---

[25] See, *e.g.*, *Voting Rights Act: An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 12 (2005) (testimony of Jose Garza) (Latino); *The Continuing Need for Section 5* 8 (statement of McDonald) (Native American); *Voting Rights Act: Section 203 – Bilingual Election Requirements (Part I): Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 18 (2005) (testimony of Margaret Fung) (Asian American); *H. Appx.* 140 (Arab American); *H. Appx.* 138 (African American).

- 40 -

2004 election cycle." *Evidence of Continued Need* 93 (statement of Rogers).[26]

Moreover, witnesses testified about campaigns to disseminate misinformation regarding elections to minority voters in order to prevent them from voting effectively. In Louisiana in 2002, for example, fliers were distributed in African American neighborhoods advertising the wrong date for a key runoff election for a United States Senate seat. *H. Appx.* 3548.

Covered jurisdictions have also attempted to prevent minority voters' candidates of choice from becoming candidates at all. In one example, a district court found that an Alabama town intentionally discriminated on the basis of race, in violation of Section 2 of the Act, by refusing to provide candidate forms to black candidates while providing them to white candidates. *Dillard* v. *Town of North Johns*, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989).[27]

ii.    *Evidence Of Vote Dilution*

(a)    *Employment Of Dilutive Techniques*

Congress heard multiple examples of jurisdictions implementing discriminatory voting practices to dilute the voting strength of minority citizens. Cf. *Briscoe*, 432 U.S. at 405-406 (dilution techniques used against language minority voters). A few examples include:

Discriminatory annexations and deannexations; pairing Black incumbents in redistricting plans; refusing to draw majority minority districts; refusing to hold elections following a section 5 objection; packing Native American and African-

---

[26] The United States filed an action under Section 2 of the Voting Rights Act against one of those counties, alleging that the county imposed different procedures for Hispanic voters whose citizenship was challenged with no basis than for non-Hispanic voters challenged on other bases. See *United States* v. *Long County*, No. 06-04 (S.D. Ga.). The suit was resolved through entry of a consent decree.

[27] In *South Carolina* v. *Katzenbach*, the Supreme Court relied on previous federal court findings of voting discrimination in covered jurisdictions in upholding Section 5. 383 U.S. at 329.

- 41 -

American voters to dilute their influence; and discriminatory voter identification requirement.

*Evidence of Continued Need* 20 (testimony of Strossen).  Other examples include "racial

gerrymandering, at-large (as distinct from district) election systems, anti-single-shot rules,

staggered terms, the majority run-off requirement, [and] annexing predominantly white suburbs

while excluding minority areas."  *H. Appx.* 123.

Indeed, just last year, the Supreme Court found that the State of Texas – home to Plaintiff

– adopted a congressional districting plan in 2003, part of which bore "the mark of intentional

discrimination that could give rise to an equal protection violation" by purposefully diluting the

voting strength of a cohesive minority community.  *LULAC* v. *Perry*, 126 S. Ct. 2594, 2622

(2006).  Although the Court's decision did not call into question the Attorney General's decision

to preclear the districting plan, the Court found that, in creating one district, Texas divided a

cohesive Latino community precisely *because* that community had become "more politically

active," with greater "Spanish-surnamed registration," and was "poised to elect their candidate of

choice."  *Id.* at 2621-2622.  As the Court explained, the State's intentional splitting of that

cohesive minority population "undermined the progress of a racial group that has been subject to

significant voting-related discrimination and that was becoming increasingly politically active

and cohesive."  *Ibid.*

In investigating the breadth and depth of voting discrimination today, Congress found that

minority voters throughout covered jurisdictions continue to face official obstacles.  For example,

in recent years, "a federal court determined that South Dakota discriminated against Native-

American voters by packing them into a single district to remove their ability to elect a second

representative of their choice to the state legislature."  *The Continuing Need for Section 5* 8

- 42 -

(statement of McDonald).  And in 1982, the Justice Department objected to a Louisiana state house redistricting plan that reduced the number of majority black districts in Orleans Parish from 11 to 7, even though the proportion of black residents in the Parish had increased from 45% to 55% since the previous redistricting.  *Evidence of Continued Need* 58-59 (statement of Henderson).  In the 9th Ward of Orleans, moreover, the proposed plan contained only one majority black district out of five districts total, although the population of the ward was 61% black.  *Ibid.*

Similarly, through the 1980s and early 1990s, five of the seven justices on the Louisiana Supreme Court were elected from single-member districts.  The remaining two justices were elected at large from a majority white district comprising Orleans Parish and three surrounding parishes, although the population of Orleans Parish alone was sufficient to create a district equal in size to the other districts in the State.  Orleans was the only majority black parish in the district, and the three surrounding parishes were over 75% white.  Until that election system was abandoned in the early 1990s in response to a Section 2 suit, not a single black person was elected to the Supreme Court of Louisiana.  See *Chisom* v. *Roemer*, 501 U.S. 380, 384-386 (1991).

Another example involved Mississippi's dual registration system, under which citizens were required to register separately for state and federal elections.  The dual system was a relic of the State's 1890 constitutional convention adopted "for the purpose of disfranchising blacks."  *H. Appx.* 176.  In 1987, a federal court found that the system violated Section 2 of the Voting Rights Act because it was "adopted for a discriminatory purpose and had a discriminatory effect, accounting, in part, for the 25 percentage-point difference in the registration rates of blacks and whites."  *Ibid.*; *Evidence of Continued Need* 87-88 (testimony of Rogers); *Mississippi State*

- 43 -

*Chapter, Operation PUSH* v. *Allain*, 674 F. Supp. 1245, 1263-1268 (N.D. Miss. 1987).  In the

early 1990s, after passage of the federal National Voter Registration Act, Mississippi reinstituted

a dual registration system and refused to submit the change for preclearance.  *H. Appx.* 176,367-

368.  Private citizens filed a Section 5 enforcement action, and ultimately a unanimous Supreme

Court held that the State had to submit that change for preclearance.  *Id.* at 368; see also *Young* v.

*Fordice*, 520 U.S. 273 (1997).  When the State finally submitted the change, the Department of

Justice objected, "finding that the state's new dual system was racially discriminatory both in

purpose and effect."  *H. Appx.* 368; Letter from Isabelle Katz Pinzler to Sandra M. Shelson (Sept.

22, 1997), in *History, Scope, & Purpose* 1599-1605.  When the state legislature passed a bill to

restore a unitary registration system, the Governor vetoed the bill, leading to further private

litigation.  *H. Appx.* 368.  It was not until 1998 – 16 years after Section 5's previous

reauthorization and more than a decade after a federal court struck down the first dual registration

system – that Mississippi's new dual registration system was abolished by federal court order.

*Ibid.*

        Even where many years have elapsed since the adoption of an intentionally discriminatory

election system, courts have found that the maintenance of such systems perpetuates the intended

discrimination.  In *Dillard* v. *Crenshaw County*, for example, a district court in Alabama enjoined

the continued use of an at-large election scheme adopted in the 1960s "with the specific intent of

discriminating against black persons."  640 F. Supp. 1347, 1360 (M.D. Ala. 1986).  Alabama

employed numbered place laws that had been enacted "with the specific intent of making at-large

election systems more effective and efficient instruments for keeping black voters from electing

black candidates."  *Ibid.*  The court found that these laws were "still having their intended racist

- 44 -

impact" into the mid-1980s. *Ibid.* Similarly, Alabama adopted state election laws early in the

first half of the twentieth century with the intent of preventing black citizens from voting,

including a state policy of poll workers' harassing and intimidating black voters. *Harris* v.

*Siegelman*, 695 F. Supp. 517, 525 (M.D. Ala. 1988). Another district court found that Alabama

continued to enforce those policies well into the 1980s. *Ibid.* That court explained the

significance of modern-day implementation of intentionally discriminatory election schemes:

> Black voters do not view an instance of discrimination as an isolated instance but
> as part of a pattern and practice, as part of a history of discriminatory treatment.
> Therefore, even isolated recent instances of discrimination would quickly ripple
> through the black community and frighten away black voters. In the black
> community, as the perpetrators of discrimination well know, a little discrimination
> or a little harassment or intimidation can go a long way.

*Ibid.*

### (b)    *Widespread Racial Bloc Voting*

Congress also heard extensive testimony regarding the high degree of racially polarized

voting throughout jurisdictions covered by Section 5 and that racial bloc voting is "a necessary

precondition for vote dilution to occur." *H. Appx.* 126. Racially polarized voting takes place in

both partisan and nonpartisan elections, *id.* at 355-356 (describing testimony of Rep. Melvin

Watt), and at every level of government, *id.* at 210 (statement of Engstrom). In some States

covered by Section 5, such as Mississippi, Louisiana, and South Carolina – which have large

African American populations – African American voters have yet to elect a single African

American to an at-large statewide office, *2006 House Report* 33, despite several serious attempts.

Congress found that racially polarized voting ranked as "the clearest and strongest evidence of the

continued resistance within covered jurisdictions to fully accept minority citizens and their

preferred candidates into the electoral process." *2006 House Report* 34. Moreover, Congress

- 45 -

noted that "the degree of racially polarized voting in the South is increasing, not decreasing," and that it "shapes electoral competitions" in jurisdictions covered by Section 5. *Ibid.*

The testimony supports these conclusions. Congress heard that the existence of racial polarization among voters has not abated in the years since the Voting Rights Act was enacted. *Voting Rights Act: An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 84 (2005) (statement of Armand Derfner) (*An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act*). The prevalence of racial bloc voting has been documented in numerous judicial decisions throughout covered jurisdictions. See generally *H. Appx.* 404-409.

For example, just last year, the Supreme Court noted the lower court's finding of racially polarized voting "throughout the State" of Texas. *LULAC*, 126 S. Ct. at 2615. In another case, a federal district court in Florida found that "racially polarized voting exists throughout Florida." *DeGrandy* v. *Wetherell*, 794 F. Supp. 1076 (N.D. Fla. 1992), aff'd in part and rev'd in part on other grounds *sub nom. Johnson* v. *DeGrandy*, 512 U.S. 997 (1994). In South Carolina, a three-judge panel recently held that "[v]oting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections." *Colleton County Council* v. *McConnell*, 201 F. Supp. 2d 618, 641 (D.S.C. 2002). And in South Dakota, a federal court concluded only a few years ago that "substantial evidence, both statistical and lay, demonstrates that voting in South Dakota is racially polarized among whites and Indians" in some districts. *Bone Shirt* v. *Hazeltine*, 336 F. Supp. 2d 976, 1036 (D.S.D. 2004).

- 46 -

In addition to these and other examples,[28] Congress heard voluminous testimony about trends in racial bloc voting.  Witnesses testified that racially polarized voting not only exists between black and white voters, but encompasses Latino voters, Asian American voters, and Native American voters as well.  See, *e.g.*, *The Continuing Need for Section 5* 50 (testimony of Richard Engstrom); *H. Appx.* 213-214 (describing testimony of Joaquin Avila); *Evidence of Continued Need* 96 (testimony of Rogers); *id.* at 27-28 (statement of Strossen); *2006 House Report* at 34.

---

[28] See also *United States* v. *Charleston County*, 365 F.3d 341, 343 (4th Cir. 2004); *Teague* v. *Attala County*, 92 F.3d 283, 291 (5th Cir. 1996); *Clark* v. *Calhoun County*, 88 F.3d 1393, 1397 (5th Cir. 1996); *Hines* v. *Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1269 (4th Cir. 1993); *Westwego Citizens For Better Gov't* v. *City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991); *East Jefferson Coal. for Leadership & Dev.* v. *Jefferson Parish*, 926 F.2d 487, 493 (5th Cir. 1991); *Collins* v. *City of Norfolk*, 883 F.2d 1232, 1237 & n.6 (4th Cir. 1989); *Campos* v. *City of Baytown*, 840 F.2d 1240, 1249 (5th Cir. 1988); *Citizens For a Better Gretna* v. *City of Gretna*, 834 F.2d 496, 499, 504 (5th Cir. 1987); *Jones* v. *City of Lubbock*, 727 F.2d 364, 380 (5th Cir. 1984); *St. Bernard Citizens For Better Gov't* v. *St. Bernard Parish Sch. Bd.*, No. 02-2209, 2002 WL 2022589, at *9 (E.D. La. Aug. 26, 2002); *Houston* v. *Lafayette County*, 20 F. Supp. 2d 996, 1002 (N.D. Miss. 1998); *Cofield* v. *City of LaGrange*, 969 F. Supp. 749, 776 (N.D. Ga. 1997); *LULAC* v. *North East Indep. Sch. Dist.*, 903 F. Supp. 1071, 1081 (W.D. Tex. 1995); *Clark* v. *Roemer*, 777 F. Supp. 445, 456 (M.D. La. 1990); *Ewing* v. *Monroe County*, 740 F. Supp. 417, 421-424 (N.D. Miss. 1990); *Williams* v. *City of Dallas*, 734 F. Supp. 1317, 1388-1400 (N.D. Tex. 1990); *Gunn* v. *Chickasaw County*, 705 F. Supp. 315, 320 (N.D. Miss. 1989); *McDaniels* v. *Mehfoud*, 702 F. Supp. 588, 594 (E.D. Va. 1988); *Neal* v. *Coleburn*, 689 F. Supp. 1426, 1431 (E.D. Va. 1988); *Dillard* v. *Baldwin County Bd. of Educ.*, 686 F. Supp. 1459, 1464 (M.D. Ala. 1988); *Martin* v. *Allain*, 658 F. Supp. 1183, 1202 (S.D. Miss. 1987); *Jackson* v. *Edgefield County*, 650 F. Supp. 1176, 1198 (D.S.C. 1986); *Dillard* v. *Crenshaw County*, 640 F. Supp. 1347, 1353 (M.D. Ala. 1986); *Clark* v. *Marengo County*, 623 F. Supp. 33, 37 (S.D. Ala. 1985); *Jordan* v. *Winter*, 604 F. Supp. 807, 812-813 (N.D. Miss. 1984); *Jordan* v. *City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984); *Sierra* v. *El Paso Indep. Sch. Dist.*, 591 F. Supp. 802, 807 (W.D. Tex. 1984); *Major* v. *Treen*, 574 F. Supp. 325, 351-352 (E.D. La. 1983); *Buskey* v. *Oliver*, 565 F. Supp. 1473, 1482 (M.D. Ala. 1983); *Political Civil Voters Org.* v. *City of Terrell*, 565 F. Supp. 338, 348-349 (N.D. Tex. 1983).

- 47 -

> 3.    *The Evidence Before Congress Demonstrates That Section 5 Is An Effective Remedy*

Section 5 also deters covered jurisdictions from implementing retrogressive changes, and helps minority voters complement the remedies available through Section 2.

> a.    *Section 5 Effectively Deters Covered Jurisdictions From Adopting Retrogressive Or Otherwise Discriminatory Voting Changes*

The full measure of Section 5's effectiveness must take into account the strong deterrence provided by the statute.  Congress heard substantial testimony that Section 5 has a vital, yet unquantifiable, deterrent effect with respect to retrogressive election changes.[29]  For example, one witness testified that "one of the most astonishing things about section 5 preclearance [is] its ability to nudge public officials to act in a positive way and to be more inclusive as they go about reaching a consensus in that decision-making process."  *Voting Rights Act:  Section 5 of the Act – Preclearance Standards:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 44-45 (2005) (testimony of Jerome Gray).

Although witnesses agreed that it is impossible to quantify the deterrent effect of Section 5,[30] Congress heard some specific examples.  In Alaska, for instance, the State's post-1990 redistricting plans for its state house and senate were found to violate Section 5 because they reduced the voting strength of Alaska Natives.  After the 2000 census, Alaska officials "took specific measures to ensure that it did not reduce Alaska Native voting strength in districts where

---

[29]  See also *Evidence of Continued Need* at 88 (statement of Rogers); *H. Appx.* 127; *The Continuing Need for Section 5* 81 (testimony of Engstrom); *History, Scope, & Purpose* 84 (statement of Earls); *Modern Enforcement of the Voting Rights Act* 8 (testimony of Assistant Attorney General Kim).

[30] *An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act* 98 (testimony of Derfner).

- 48 -

Alaska Natives had a reasonable opportunity to elect candidates of their choice." *Evidence of Continued Need* 92 (statement of Rogers).

Similarly, in a 2002 redistricting in Fredericksburg, Virginia, the City Council was preparing to dismantle the only majority African-American district in the city until the City Attorney simply "warned" the Council that such an action would violate Section 5. *Evidence of Continued Need* 92 (statement of Rogers); *H. Appx.* 362-363 (describing testimony of Kent Willis). In Alabama's 2001 redistricting, Section 5's non-retrogression standard "was at the top of the list of the legislative guidelines for redistricting." *H. Appx.* 303 (describing testimony of James Blacksher). And in Georgia's 2005 congressional redistricting, the State adopted resolutions recognizing its need to comply with Section 5 and drew a new plan that maintained the black voting age population in the two majority black districts in the State as well as in the two other districts that had elected black members of Congress. *H. Appx.* 417.

Congress also found that enforcement of Section 5 has done much to provide minority citizens with a fair opportunity to elect their candidates of choice. Evidence presented to Congress demonstrated that the limited success minority candidates for political office have enjoyed to date is due in large part to the operation of the Voting Rights Act. *H. Appx.* 365-366; cf. *City of Rome*, 446 U.S. at 181.[31]

Congress heard that in Mississippi, no black candidate was elected to Congress for the first 85 years of the 20th century, and that the "only reason" a black citizen was finally elected to

---

[31] A former Assistant Attorney General for the Civil Rights Division testified that the Voting Rights Act "has been instrumental in giving minority communities fair and responsive representation they would not otherwise have." *Evidence of Continued Need* 26 (testimony of Lee).

- 49 -

Congress "was because of the enforcement of Section 5 of the Voting Rights Act by the Justice

Department and litigation under" Section 2. *H. Appx.* 365-366. Without majority minority

districts, drawn as a result of Sections 5 and 2, many of the gains in the number of elected

minority officials would not have been realized. See *H. Appx.* 365.

### b. Section 2 Alone Is Inadequate

Congress also heard extensive testimony that Section 2 alone is an inadequate remedy to

address discrimination in voting. Although Section 2 and Section 5 "are meant to work hand in

hand," *History, Scope, & Purpose* 92 (testimony of Perales), the two provisions are not

redundant, and neither is sufficient in and of itself. In upholding the enactment of Section 5, the

Supreme Court relied explicitly on the fact that other legislative remedies had proved inadequate

at protecting the voting rights of racial and language minority citizens. See *South Carolina*, 383

U.S. at 309. Similarly, the identified short-comings of Section 2 support the continued need for

Section 5's preclearance device. Because Section 2 cases are expensive and burdensome to

litigate, the existence of some successful Section 2 cases suggests that other discrimination is not

being redressed by Section 2 suits.

Witnesses identified three major shortcomings of Section 2 litigation that are not present

in the Section 5 preclearance system. First, Section 2 is purely an after-the-fact remedy, available

only to challenge voting practices and procedures that are already in place. Cf. *South Carolina*,

383 U.S. at 314 (case-by-case litigation ineffective); *City of Rome*, 446 U.S. at 174 (same). One

witness testified that most Section 2 actions take two to five years to make their way through the

court system, during which time the challenged practice remains in place no matter how

discriminatory it is. *History, Scope, & Purpose* 97 (testimony of Perales). If, during that time, a

- 50 -

candidate is elected under what turns out to be an illegal voting scheme, that person nevertheless will enjoy the "big advantage" that comes with incumbency.  *To Examine the Impact and Effectiveness of the Voting Rights Act* 13 (testimony of Jack Kemp); *History, Scope, & Purpose* 97 (testimony of Rogers); *id.* at 92 (testimony of Perales).   In some cases, a Section 2 plaintiff must allow an illegal voting practice to be in effect for several election cycles before the plaintiff can gather enough evidence to demonstrate the practice's discriminatory effect.  *History, Scope, & Purpose* 92 (testimony of Perales).  To contrast, under Section 5, discriminatory voting practices are forestalled through a system that takes at most several months.  See *id.* at 101 (testimony of Perales).

        Second, Section 2 places a heavy financial burden on minority voters challenging illegal election practices and schemes.  See *History, Scope, & Purpose* 97 (testimony of Perales); *id.* at 92 (testimony of Perales).  Section 5, on the other hand, takes the financial burden off of minority voters while placing the comparatively small financial burden associated with preclearance onto covered jurisdictions.  See *History, Scope, & Purpose* 79 (testimony of Earls).  This shifting of financial burden is especially important "in local communities and particularly in rural areas, where minority voters are finally having a voice on school boards, county commissions, city councils, water districts and the like."  *History, Scope, & Purpose* 84 (statement of Earls).  In such areas, voters generally "do not have access to the means to bring litigation under Section 2 of the Act, yet they are often the most vulnerable to discriminatory practices."  *Ibid.*  Moreover, Congress heard testimony that covered jurisdictions reap a financial benefit as well.  The General Counsel of North Carolina's Board of Elections testified that complying with Section 5's preclearance scheme is much less burdensome in terms of "costs, time, and labor" for covered

- 51 -

jurisdictions than defending against Section 2 claims. *Policy Perspectives and Views From the Field* 120 (statement of Donald M. Wright).

Finally, Section 2 leaves the burden of proof on minority plaintiffs with respect to demonstrating discriminatory effect, while Section 5 places the burden on jurisdictions to demonstrate that a proposed change will not have a discriminatory effect and was not animated by a discriminatory purpose. *History, Scope, & Purpose* 83 (statement of Earls); *Evidence of Continued Need* 97 (testimony of Rogers). Jurisdictions are in a much better position than individual citizens to amass information about any potentially discriminatory effects of voting procedures or systems, without incurring undue expense.

### 4.    Evidence Of Similar Discrimination Against Language Minorities

In addition, recognizing that some jurisdictions are covered under Section 5 by virtue of their language minority populations, Congress examined the problem of discrimination in voting against citizens whose primary language is other than English. Congress concluded that "Latinos, Asian Americans, Alaska Natives, and Native Americans continue to suffer from discrimination in voting." *2006 House Report* 45. Congress heard testimony that many of the same sorts of discriminatory activities that have occurred throughout the South to prevent black citizens from voting also "occurred in Texas, but w[ere] targeted to the Mexican-American community." *An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act* 12 (testimony of Garza).

Congress heard that, "[c]urrently, 4.3 million voting age citizens are limited English proficient." *To Examine the Impact and Effectiveness of the Voting Rights Act* 20 (testimony of Ann Marie Tallman). Although the Voting Rights Act requires some jurisdictions to provide

- 52 -

ballots and election information in minority languages, Congress heard that many jurisdictions fail to satisfy these obligations.  One witness testified that "[m]any Florida jurisdictions have repeatedly ignored the language assistance needs of their constituents and [have] disenfranchised language minorities."  *Evidence of Continued Need* 68-69 (statement of Henderson).  Similar testimony was presented with respect to Texas, *H. Appx.* 309, California, *id.* at 348, Alaska, *id.* at 1313, Arizona, *id.* at 1379, and New York, *id.* at 4090.  As a result of these failures, Congress learned that "there remains an enormous gap in political participation" between language minority citizens and citizens whose primary language is English.  *Evidence of Continued Need* 13-14 (testimony of Lee).[32]

Moreover, although disparities in registration rates between black and white citizens have largely declined through enforcement of the Voting Rights Act, Congress found that disparities remain in registration and participation rates of language minority citizens.  *2006 House Report* 29; see also *2006 Senate Report* 11.  In 1996, only 29% of Latino voters in Texas cast ballots, compared to 52.7% of white voters.  Indeed, turnout among Latino citizens in Texas actually decreased slightly between 1980 and 1996.  And in 2004, only 41.5% of Latino citizens in Texas

---

[32] Congress also heard evidence that the problems faced by language minorities have become more diverse and widespread over time, as new immigrant populations become citizens of this country and establish cohesive communities.  Thus, for instance, Congress heard a report of poll workers in New York assigning a Chinese-speaking interpreter to a Korean voter.  *H. Appx.* 4097.  But several witnesses testified that enforcement of the Voting Rights Act has led to a marked increase in participation rates for these newer immigrant populations.  In Harris County, Texas, for example, voter turnout among Vietnamese citizens doubled, and the first Vietnamese candidate in history was elected as the result of a settlement between the county and the Department of Justice.  *To Examine the Impact and Effectiveness of the Voting Rights Act* 7 (statement of Kemp); *Voting Rights Act:  Section 203 – Bilingual Election Requirements (Part I):  Hearing Before the House Comm. on the Judiciary Comm.*, 109th Cong., 1st Sess. 12 (2005) (statement of Bradley Schlozman).

- 53 -

were registered to vote, compared to 61.5% of white citizens. *Ibid.* The situation in Florida, which contains five covered counties, is similar: in 2004, only 38.2% of Latino citizens in Florida were registered to vote, compared to 64.8% of white citizens; and among registered voters, only 34 percent of Latinos cast a vote in the 2004 election, compared to 58.6 percent of whites. *Id.* at 30.

     D.     *The Evidence Before Congress Demonstrates That Section 5 Remains A Congruent And Proportional Means Of Enforcing And Protecting The Voting Rights Of Racial And Language Minority Citizens*

     Ample evidence supports Congress's conclusion in 2006 that "extending the VRA's temporary provisions is necessary to protect racial and language minority citizens located in covered jurisdictions from discrimination." *2006 House Report* 56. As the Supreme Court has made clear, where, as here, Congress seeks to protect rights subject to heightened constitutional protection, Congress has greater leeway in crafting its remedies and has an easier time establishing the need for such legislation. See *South Carolina*, 383 U.S. at 324 ("Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."); *Hibbs*, 538 U.S. at 736 (holding that it is "easier for Congress to show a pattern of state constitutional violations" when Congress seeks to protect rights subject to heightened constitutional protection). Nevertheless, Congress carefully amassed extensive evidence that the problem of discrimination in voting remains widespread and pervasive in jurisdictions covered by Section 5. As detailed *supra*, Congress relied on the same types of evidence as in previous reauthorizations of Section 5, and found a comparable level of discrimination.

- 54 -

1.    *The Supreme Court Has Repeatedly Held That Section 5's Preclearance Mechanism Is A Valid Means Of Enforcing Citizens' Right To Vote Free Of Discrimination*

The Supreme Court has held on multiple occasions that Congress acted pursuant to its legitimate authority under the Civil War Amendments when it enacted and repeatedly reauthorized Section 5's preclearance mechanism. *South Carolina*, 383 U.S. 301; *City of Rome*, 446 U.S. 156; *Georgia* v. *United States*, 411 U.S. 526, 535 (1973); *Lopez* v. *Monterey County*, 525 U.S. 266, 282-285 (1999).[33]  In *South Carolina*, the Court held that the statute was a valid means of enforcing citizens' right to vote free of discrimination in spite of the fact that the remedies in the Voting Rights Act are "stringent," and "inventive."  383 U.S. at 315, 327, 337.  In upholding the Act as a valid exercise of Congress's authority, the Court relied on the fact that Section 5 applies only to those jurisdictions Congress found to be the most egregious perpetrators of discrimination in voting.  *Id.* at 329-331.  The Court also found that the statute is neither over- nor underinclusive because it incorporates – in Section 3(c) of the Act – methods for initiating coverage of jurisdictions that were not originally covered but have engaged in discriminatory behavior.  *Id.* at 331.  The Court further recognized the importance of the bailout provision in Section 4 of the Act, which protects against overbreadth by providing "for termination of special statutory coverage at the behest of States and political subdivisions in which the danger of substantial voting discrimination has not materialized" in recent years.  *South Carolina*, 383 U.S.

---

[33] This Court also upheld the 1982 extension of Section 5 in *County Council of Sumter County* v. *United States*, 555 F. Supp. 694, 707 (D.D.C. 1983) (three-judge court).  And, only four years ago, this Court characterized a plaintiff's challenge to the constitutionality of Section 5 as "frivolous in light of overwhelming Supreme Court precedent."  *Giles* v. *Ashcroft*, 193 F. Supp. 2d 258 (D.D.C. 2002); see also *Reaves* v. *United States Dep't of Justice*, 355 F. Supp. 2d 510, 516 (D.D.C. 2005) (three-judge court) (holding that Section 5 validly abrogates States' sovereign immunity).

- 55 -

at 331.  Thus, the Court in *South Carolina* upheld Section 5 as a legitimate exercise of Congress's authority under the Civil War Amendments to combat the "pervasive evil" of discrimination in voting.

In *City of Rome* and *Lopez*, the Court reiterated its holding.  In those decisions, the Court specifically found that the statute's goal of preventing voting changes that have a discriminatory effect is a valid means of targeting intentional discrimination.  *City of Rome*, 446 U.S. at 177-178; *Lopez*, 525 U.S. at 283-284.

2.    *In Recent Years, The Supreme Court Has Held Out Section 5 As The Model Of Congruent And Proportional Legislation*

The validity of the Voting Rights Act – and of Section 5 in particular – is now deeply embedded in our constitutional jurisprudence.  In recent cases examining Congress's authority under the Fourteenth Amendment, the Supreme Court has applied the congruence and proportionality test articulated in *City of Boerne* v. *Flores*, 521 U.S. 507, 526 (1997).  In those very cases, the Court has held out the Voting Rights Act as the gold standard of congruence and proportionality.  See, *e.g.*, *Lane*, 541 U.S. at 519 n.4; *Hibbs*, 538 U.S. at 737-738; *Board of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 373 (2001); *Boerne*, 521 U.S. at 526.  And for good reason:  the combination of the importance of the rights at stake, the extent of the record of constitutional violations, and the limits inherent in the Act make Section 5 a model of legitimate legislation.[34]

Section 5 operates at the intersection of a citizen's most fundamental right and a

---

[34] Indeed, just last term, four justices expressed their view that compliance with Section 5 is a compelling state interest.  *LULAC*, 126 S. Ct. at 2642 n.12 (2006) (Stevens & Breyer, JJ., concurring in part and dissenting in part); *id.* at 2648 n.2 (Souter, J., concurring in part and dissenting in part); *id.* at 2667(Scalia, J., dissenting).

- 56 -

government's most suspect classifications.  As the Supreme Court said in *South Carolina*,

"Congress may use any rational means to effectuate the constitutional prohibition of racial

discrimination in voting."  383 U.S. at 324.  And, in upholding the 1975 amendments to the

Voting Rights Act, the Supreme Court in *City of Rome* reiterated that, "[c]orrectly viewed, § 5 [of

the Fourteenth Amendment] is a positive grant of legislative power authorizing Congress to

exercise its discretion in determining whether and what legislation is needed to secure the

guarantees of the Fourteenth Amendment."  446 U.S. at 176 (quoting *Katzenbach* v. *Morgan*, 384

U.S. 641, 651 (1966)).  In recent years, the Supreme Court has confirmed that Congress is entitled

to greater leeway in enacting measures to protect or enforce rights subject to heightened

constitutional protection.  See *Hibbs*, 538 U.S. at 736 (holding that it is "easier for Congress to

show a pattern of state constitutional violations" when Congress targets discrimination on the

basis of a suspect classification); see also *Lane*, 541 U.S. at 528-529.

     Furthermore, the Supreme Court has made clear that, where Congress has tried and failed

to cure a constitutional problem through legislative means, Congress is justified in enacting a

more stringent remedy, including strong prophylactic measures.  The Voting Rights Act

exemplifies Congress's authority to take such action.  In *City of Boerne*, for example, the

Supreme Court contrasted the validity of the Voting Rights Act with the over-reaching of the

Religious Freedom Restoration Act, emphasizing that various characteristics of the Voting Rights

Act itself and the history of voting discrimination in covered jurisdictions justified the Act's

"unprecedented remedies."  521 U.S. at 526-533.  Specifically, the Court recognized the

"ineffectiveness of the existing voting rights law, * * * and the slow, costly character of case-by-

case litigation," as well as "the widespread and persisting deprivation of constitutional rights

- 57 -

resulting from this country's history of racial discrimination." *Id.* at 526. Similarly, in *Hibbs*, the

Supreme Court upheld the family leave provisions of the Family and Medical Leave Act (FMLA)

after finding that Congress had tried unsuccessfully to address the problem of gender

discrimination in the provision of family leave through Title VII of the Civil Rights Act of 1964

and the Pregnancy Discrimination Act. 538 U.S. at 737. The *Hibbs* Court analogized enactment

of the FMLA to the enactment of the Voting Rights Act, finding that, in both situations, Congress

"confronted a difficult and intractable proble[m] * * * where previous legislative attempts had

failed." *Ibid.* (internal citations omitted). "Such problems," the Court held, "may justify added

prophylactic measures in response." *Ibid.*

And yet, the Court has also repeatedly credited Congress with embedding limitations in

the Voting Rights Act, and in Section 5 in particular. As the Court noted in *Boerne*, Section 5 is a

targeted remedy because it is "confined to those regions of the country where voting

discrimination had been most flagrant," and "affect[s] a discrete class of state laws, *i.e.*, state

voting laws." 521 U.S. at 532. Significantly, the Court in *Boerne* recognized the importance of

the Act's "bailout" mechanism in ensuring the statute's congruence and proportionality. *Id.* at

532.

> 3.    *In Protecting Minority Citizens From Discrimination In Voting, Congress
>        Is Justified In Employing A Prophylactic Remedy*

In upholding a previous reauthorization of Section 5, the Supreme Court recognized that

continued enforcement of Section 5 was "necessary to preserve the 'limited and fragile'

achievements of the Act and to promote further amelioration of voting discrimination." *City of

Rome*, 446 U.S. at 182. The Court credited Congress's determination in 1975 that "it is largely

Section 5 [that] has contributed to the gains thus far achieved in minority political participation,

- 58 -

and it is likewise Sect[i]on 5 [that] serves to insure that progress not be destroyed through new procedures and techniques." *Id.* at 181 (citing *1975 Senate Report* 15-19); see also *Beer*, 425 U.S. at 140-141.

Significantly, in 2006 Congress *again* concluded that Section 5 prevents discrimination in voting against minority citizens. Congress found, based on the evidence, that the progress racial and language minority voters have made in the last 40 years has been precisely *because of* enforcement of the Voting Rights Act. See *2006 House Report* 21.[35]

Moreover, as discussed in Section III.C.3.b, *supra*, Congress specifically found in 2006 that Section 2 of the Act – and, by implication, the Constitution itself – was an insufficient remedy to prevent and deter voting discrimination. Although Section 2 is a valuable tool, it is a piecemeal remedy, targeting one practice or electoral system at a time and only retrospectively, after a discriminatory voting practice is in place and causing irreparable damage. As the Supreme Court found in *South Carolina*, "case-by-case litigation" has proved "inadequate to combat widespread and persistent discrimination in voting because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits." 383 U.S. at 328. In addition, such litigation often proved ineffective as jurisdictions "merely switched to [new] discriminatory devices not covered by the federal decree" or "defied and evaded court orders." *Id.* at 314. Indeed, some covered jurisdictions are covered precisely

---

[35] Congress heard testimony that Section 5, "in fact, ha[s] prevented and remedied much discrimination" and "continue[s] to do so to this day." *Evidence of Continued Need* 13 (testimony of Lee). Another witness stated that, "[m]uch progress has been made in minority voting rights and office holding in recent times, but it has been made in large measure *because of* the existence of Section 5 and the other provisions of the Voting Rights Act." *Id.* at 33 (statement of Strossen); see also *H. Appx.* 310; *id.* at 365.

- 59 -

because they engaged in such "systematic resistence to the Fifteenth Amendment." *Id.* at 328.

Just as Congress and the Supreme Court found that litigation to correct voting discrimination was

"exceedingly slow" 40 years ago, *id.* at 314, so, too, Congress found the same to be true today,

*History, Scope, & Purpose* 101 (testimony of Earls).

> 4.    The Limitations Built Into Section 5 Secure Its Congruence And Proportionality

Congress is a national legislature and, especially when exercising its prophylactic and

remedial power under the Fourteenth and Fifteenth Amendments, necessarily responds to and

addresses broad "pattern[s]" of unconstitutional conduct by government officials in the

substantive areas in which they operate.  *Lane*, 541 U.S. at 526; *Boerne*, 521 U.S. at 531, 534.

And yet, unique among modern legislation enacted pursuant to authority under the Civil War

Amendments, Section 5 coverage is limited in important ways:  (1) Section 5 covers only those

jurisdictions with the worst records of unconstitutionally disenfranchising racial and language

minority citizens; (2) covered jurisdictions are able to "bail out" of coverage; (3) Section 5

contains a built-in expiration date; and (4) compliance with Section 5 is not unduly burdensome.

These limitations ensure Section 5's congruence and proportionality.

> a.    Coverage Formula

Congress specifically limited Section 5's coverage to target *only* those jurisdictions with

the worst records of unconstitutionally disenfranchising racial and language minority citizens.

The Supreme Court upheld Section 5's original coverage formula in *South Carolina*, 383 U.S. at

328-333, and upheld the statute as amended in 1975 in *City of Rome*, 446 U.S. at 173-178, 180-

182.  Moreover, in *Briscoe*, 432 U.S. at 410, 414-415, the Court found that Congress's decision to

prohibit challenges to the coverage formula as amended in 1975 – the formula that extended

- 60 -

Section 5 to Texas, among other jurisdictions – was, "like the preclearance requirement of

[Section] 5," an "uncommon" but valid exercise of its authority under the Fourteenth and

Fifteenth Amendments.  Congress determined which jurisdictions should be subject to Section 5

by studying "reliable evidence of actual voting discrimination" in the covered jurisdictions.

*South Carolina*, 383 U.S. at 329.  "No more was required to justify the application to these areas

of Congress' express powers under the Fifteenth Amendment."  *Ibid.*

      As recently as 1999, the Supreme Court reaffirmed Congress's constitutional authority to

designate jurisdictions for coverage under Section 5.  *Lopez*, 525 U.S. at 283-284.  Congress was

justified in continuing to rely on the coverage determinations made between 1965 and 1975 after

finding, based on massive amounts of reliable evidence, that discrimination in voting against

racial and language minority citizens *continues* to abound in the jurisdictions covered by Section

5.  Congress also understood that, without Section 5, covered jurisdictions would backslide in

their protection of the voting rights of minority citizens.  See *Modern Enforcement of the Voting

Rights Act* 8 (testimony of Assistant Attorney General Kim).

      Congress also found that Section 5 has prevented the implementation of countless voting

changes that would have discriminated against racial and language minority voters in covered

jurisdictions.  These findings, taken together, indicate that covered jurisdictions remain the worst

offenders in the realm of voting discrimination – and would be even worse absent Section 5.

Congress was, therefore, justified in continuing to apply Section 5's preclearance mechanism to

those jurisdictions found by the Supreme Court to have the worst historical records of "pervasive

voting discrimination."  *City of Rome,* 446 U.S. at 182.  Congress also understood that, if covered

jurisdictions ceased to be covered by Section 5, the result would be backsliding in the voting

- 61 -

rights of minority citizens in covered jurisdictions, resulting in the loss of much of the progress

that has been made.  See *Modern Enforcement of the Voting Rights Act* 8 (testimony of Assistant

Attorney General Kim).

Moreover, even setting aside the Section 5 process, nationwide evidence reveals more

voting discrimination in covered jurisdictions than in non-covered jurisdictions.  Congress

examined a study of reported Section 2 suits filed throughout the country between 1982 and 2005,

conducted by the University of Michigan Voting Rights Initiative.  *H. Appx.* 125-126; *id.* at 202-

203.  The study revealed that 57% of the 117 cases with outcomes favorable to minority voters

were filed in jurisdictions covered by Section 5, although those jurisdictions comprised less than

one-quarter of the nation's population in 2000.  *Id.* at 125-126, 203.  Thus, covered jurisdictions

were subject to more than twice their proportional share of plaintiffs' successful Section 2 suits,

notwithstanding close monitoring of those jurisdictions through Section 5.

Finally, in enacting and amending Section 5, Congress has taken careful measures to

ensure that Section 5's coverage would be neither underinclusive nor overinclusive.  Section 3(c)

of the Voting Rights Act, 42 U.S.C. 1973a(c) permits the Attorney General or any "aggrieved

person" to ask a federal court to determine that a jurisdiction not covered by Section 5 be subject

to the same preclearance requirement upon a showing of sufficient violations of the Fourteenth

and Fifteenth Amendments.  This provision ensures that Section 5's preclearance prophylaxis will

extend to appropriate jurisdictions.  And, as detailed *infra*, Section 4(a) of the Act permits

qualifying jurisdictions to seek termination of their coverage in certain circumstances.

b.      *Bailout Provisions*

The bailout provision in Section 4 of the Act permits a qualified jurisdiction to terminate

- 62 -

Section 5 coverage if it has eliminated discrimination in voting within its boundaries.  See *South Carolina*, 383 U.S. at 331; *Briscoe*, 432 U.S. at 411; *City of Boerne*, 521 U.S. at 533.  As Congress heard in testimony relating to the 2006 reauthorization, the bailout provisions "are just the right stuff" because the criteria required to earn a bailout "go exactly to the issues that Congress was concerned about when it enacted the Voting Rights Act in the first place."  *An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act* 104 (testimony of Gerald Hebert).  Indeed, by focusing on the record of covered jurisdictions over the previous ten years, the bailout provision focuses on whether a jurisdiction has engaged in any *recent* behavior rather than focusing on the behavior that brought a jurisdiction under the auspices of Section 5 in the first place.  When Congress reauthorized Section 5 for 25 years in 1982, it liberalized the bailout process in order to counteract the length of the extension, expecting that most, if not all, jurisdictions would bail out of Section 5 coverage before the next reauthorization in 2006.  See *1982 Senate Report* 60 ("The maximum period for Section 5 coverage was set at 25 years because a shorter period would defeat the design of the bailout provisions.  The 'cap' will be relevant only for those recalcitrant jurisdictions which have not bailed out by then.  The Committee expects that most jurisdictions, and hopes that all of them, will have demonstrated compliance and will have utilized the new bailout procedures earlier.").

     Congress heard testimony that it is neither difficult nor expensive for eligible jurisdictions successfully to bail out of Section 5 coverage.  Indeed, Congress learned that "[m]ost of the factors to be demonstrated are easily proven for jurisdictions that do not discriminate in their voting practices."  *An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act* 90 (statement of Hebert).  Nor is the financial burden of seeking a bailout

- 63 -

onerous; Congress learned that the average cost to a jurisdiction seeking to bail out is approximately $5,000 to cover legal expenses.  *Ibid.*; see also *Policy Perspectives and Views From the Field* 265-266 (letter from County Attorney for Augusta County, VA).  It is worth noting, moreover, that every bailout request filed since the amended bailout standard went into effect in 1984 (prior to the instant case) has been met with acquiescence by the Department of Justice.  See generally *History, Scope, & Purpose* 2599-2835; *id.* at 2854 (bailout cases).

c.       *Expiration Date*

In addition, Section 5 has always had, and continues to have, a built-in expiration date. That Congress has extended its life on four separate occasions demonstrates that the temporal limit works, ensuring that Section 5 remains in effect only as long as necessary for securing the voting rights of minority citizens in this country.  Had Congress, in reexamining the state of voting rights in the last few years, determined that minority citizens in covered jurisdictions now enjoy the right to vote and a fair opportunity to elect the candidates of their choice free of discrimination, on par with non-covered jurisdictions, Congress would not have reauthorized Section 5.  Instead, Congress concluded that "the temporary provisions of the VRA are still needed." *2006 House Report* 6.  That conclusion was rational and is entitled to deference.  *South Carolina*, 383 U.S. at 324.

Moreover, Congress understood that extending Section 5 for an additional 25 years would permit Congress to rely on data from two more decennial redistricting rounds in evaluating whether to further extend the Act in 2032.  *Introduction to the Expiring Provisions* 167 (statement of Shaw).  By extending Section 5 for another 25 years, Congress also allowed enough time for jurisdictions that are able to overcome their history of discrimination to bail out of coverage under

- 64 -

Section 5.  After determining that there remains in 2006 a vital need for Section 5, it was

reasonable for Congress to extend the provision for a period of time long enough to allow

Congress to collect sufficient information to make a careful determination in 2032 about whether

the need for Section 5 continues.

### d.    Low Cost Of Compliance

Finally, the evidence presented to Congress demonstrates that compliance with Section 5

is not unduly burdensome.  Congress heard that the administrative process of preclearance

through the Attorney General is "swift," *Understanding the Benefits and Costs of Section 5 Pre-*

*clearance:  Hearing Before the Senate Comm. on the Judiciary Comm.*, 109th Cong., 2d Sess. 10

(2006) (*Understanding the Benefits and Costs of Section 5 Pre-clearance*), requires less work

"than the paperwork associated with other state or federal regulations," *id.* at 81, and "is probably

the most streamlined administrative process known to the federal government," *id.* at 182; see

also *Policy Perspectives and Views From the Field* 12 (statement of Wright) ("[T]he way

preclearance is administered by the Department of Justice is very efficient.").  Indeed, in this

case, expert witness Terry L. Musika determined that Plaintiff's average annual expenditure on

complying with Section 5's preclearance requirements is only $223.  Musika Report 10-11.

Moreover, the Department of Justice has taken a number of steps to make the

administrative preclearance process as easy as possible for covered jurisdictions.  The Department

considers submissions on an expedited basis when requested by jurisdictions facing emergency

situations, often rendering early decisions to assist in such circumstances.  The Department also

seeks to accommodate jurisdictions that wish to submit information by overnight mail, by fax,

and by email, and most recently by a completely web-based submission process.

- 65 -

The General Counsel of the North Carolina Board of Elections testified that the preclearance process is not a burden on the average covered jurisdiction, and that he "never had any difficulty getting expedited pre-clearance or any reasonable cooperation from the U.S. Department of Justice." *Policy Perspectives and Views From the Field* 11-12 (statement of Wright). He further testified that, in his "national meetings with other election administrators," he had "never heard a complaint" about the Department's handling of "the day-to-day submissions." *Ibid.*; see also *History, Scope, & Purpose* 79 (testimony of Earls).

Another voting rights attorney, who has prepared Section 5 submissions, testified that the administrative burden "is not great." *Understanding the Benefits and Costs of Section 5 Pre-clearance* 10 (statement of Derfner). He testified that the work that goes into preparing a submission is "typically a tiny reflection of the work, thought, planning, and effort that had to go into making the change to begin with." *Ibid.*; *id.* at 81. The General Counsel of the North Carolina State Board of Elections agreed, stating "I will be honest with you, if push comes to shove, I could probably knock out a pre-clearance on a routine matter in a half an hour." *Policy Perspectives and Views From the Field* 12.

Given these limits on Section 5, the evidence of discrimination in voting against racial and language minority citizens is more than sufficient to justify Congress's decision to reauthorize Section 5. As one Senator stated in support of the 2006 reauthorization, "[t]he Voting Rights Act was drafted to rid the country of racial discrimination – not simply to reduce racial discrimination in voting to what some view as a tolerable level." 152 Cong. Rec. at S7976 (daily ed. July 20, 2006) (statement of Sen. Feingold). Although the Act has proven effective, Congress heard more than sufficient evidence that its time has not yet passed. The 2006 reauthorization of Section 5 is

- 66 -

a congruent and proportional exercise of Congress's authority under the Fourteenth and Fifteenth

Amendments to protect the right of all citizens to vote freely and fairly.

- 67 -

## CONCLUSION

This Court should grant summary judgment in favor of Defendant on both of Plaintiff's

claims, because Plaintiff is not a "political subdivision" eligible to bail out separately under

Section 4(a), and because Section 5 is constitutional.

                                        Respectfully submitted,

JEFFREY A. TAYLOR                       WAN J. KIM
United States Attorney                  Assistant Attorney General
                                        Civil Rights Division

                                        ASHEESH AGARWAL
                                        Deputy Assistant Attorney General
                                        Civil Rights Division

                                        JOHN K. TANNER (D.C. Bar No. 318873)
                                        Chief, Voting Section

                                        ___/s/ T. Christian Herren, Jr._____
                                        H. CHRISTOPHER COATES
                                        Principal Deputy Chief
                                        T. CHRISTIAN HERREN, JR.
                                        chris.herren@usdoj.gov
                                        RICHARD DELLHEIM
                                        richard.dellheim@usdoj.gov
                                        SARAH E. HARRINGTON
                                        sarah.harrington@usdoj.gov
                                        CHRISTY A. McCORMICK
                                        christy.mccormick@usdoj.gov
                                        Attorneys
                                        Civil Rights Division
                                        United States Department of Justice
                                        Room 7254 - NWB
                                        950 Pennsylvania Ave., N.W.
                                        Washington, DC 20530
                                        Phone: (800) 253-3931
                                        Fax:    (202) 307-3961

Date:  May 15, 2007