## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:06-cv-1384 ) (PLF, DST, EGS) |
| ALBERTO GONZALES, Attorney General of the United States *et al.* | ) ) ) |
| Defendants. | ) ) |

## DEFENDANT'S STATEMENT OF UNCONTESTED MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, Defendant Attorney General of the United States submits the following statement of material facts as to which the United States contends there is no genuine issue.

<u>The Plaintiff is Subject to Section 5</u>

1.     The Plaintiff Northwest Austin Municipal Utility District Number One ("The Plaintiff") is a municipal utility district, which is a governmental entity organized under the constitution and laws of the State of Texas.  *See* Amended Complaint at ¶ 2;  Tex. Const. Art. XVI, § 59; Tex. Water Code § 54.011; Reilly Dep. at 17:14 to 17:25.

2.     Municipal utility districts such as the Plaintiff operate under Chapters 49 and 54 of the Texas Water Code, and Title 30, Texas Admin. Code, Chapter 293.  *See* Collins Dep. at 53:19-25 to 54:1-14.

3.     Municipal utility districts such as the Plaintiff have significant governmental powers under Texas law, including powers to build and operate public works,

issue bonds, and levy and collect taxes.  *See* Tex. Water Code §§ 54.012, 54.201, 54.203, 54.501, 54.601, 49.066.

4.  The Plaintiff conducts elections for its district directors under the Texas Election Code.  *See* Amended Complaint at ¶ 6, Answer to Amended Complaint at ¶ 6; Tex. Water Code § 49.101.

5.  The State of Texas became covered as a whole by the temporary provisions of the Voting Rights Act, based on a coverage determination made by the Attorney General and the Director of the Census dated September 18, 1975, and published in the Federal Register on September 23, 1975.  *See* 40 Fed. Reg. 43746.

6.  The State of Texas and all of its political subunits, such as the Plaintiff, must receive preclearance under Section 5 of the Voting Rights Act for all changes affecting voting enacted or implemented after November 1, 1972.  *See* Amended Complaint at ¶ 10, Answer to Amended Complaint at ¶ 10; 28 C.F.R. Part 51, Appendix.

7.  The Plaintiff is located entirely within the boundaries of Travis County, Texas. *See* Amended Complaint at ¶ 6; Answer to Amended Complaint at ¶ 6;  Reilly Dep. at 91:3 to 91:7.

8.  The Plaintiff is located entirely within the boundaries of the City of Austin, Texas.  See Reilly Dep. at 91:3 to 91:7.

The Plaintiff's Creation and Election History

9.  On April 18, 1986, based on a petition from a developer, the Texas Water Commission initially created the Plaintiff district, to encompass 671.65 acres.

The Texas Water Commission appointed the first set of five temporary directors for the Plaintiff. *See* Herren Declaration, Government Exhibit 1; Tex. Water Code §§ 54.014, 54.021, 54.022.

10. The original five directors appointed for start-up districts such as the Plaintiff tend to be suggested by and acquainted with the developer, and the developer not infrequently conveys an interest in land to a prospective director in order to qualify them to serve as a director. *See* Collins Dep. at 39:25 to 41:03, 48:04 to 49:13; 136:02 to 138:10; Zimmerman Dep. at 51:20 to 52:01.

11. On June 27, 1986, the City of Austin initiated litigation challenging the Texas Water Commission's creation of the Plaintiff district. *See* Herren Declaration, Government Exhibit 25; Tex. Water Code § 54.023.

12. On December 13, 1986, Plaintiff held an election to (1) confirm the creation of the district, (2) elect directors, and (3) vote on bond and maintenance tax issues. A total of two ballots were cast in this election, with two votes cast for each of five directors, who were running at large without opposition. Two votes were also cast in favor of creation of the Plaintiff, in favor of the bond issue, and in favor of the maintenance tax. *See* Collins Dep. at 166:03-166:13 & Ex. 35; Herren Declaration, Government Exhibit 9; Tex. Water § Code 49.102.

13. The litigation with the City of Austin was resolved in a written agreement dated December 9, 1987, in which the City consented to the creation of the Plaintiff. *See* Collins Dep. at 39:01 to 39:24. That agreement defines the specific division

of responsibilities between the City and the Plaintiff and has been amended several times. *See* Herren Declaration, Government Exhibit 26.

14. On January 7, 1988, pursuant to that agreement, the land encompassing the Plaintiff was annexed by the City of Austin into its municipal boundaries. *See* Zimmerman Dep., at 112:22 to 113:14; Herren Declaration, Government Exhibit 27.

15. On March 8, 1988, counsel for the Plaintiff transmitted to the Texas Water Commission the resignations of the original set of directors for the Plaintiff, who had been elected in the December 13, 1986 election. The first set of directors for the Plaintiff were affiliated with the original developer of the district, who had declared bankruptcy in the interim. *See* Collins Dep. at 166:19 to 167:18, Ex. 36.

16. On March 16, 1988, at the request of the developer, the Texas Water Commission created anew the Plaintiff district, which now encompassed 707.19 acres. The Texas Water Commission appointed a different set of five temporary directors, who were affiliated with the new developer for the Plaintiff. *See* Collins Dep. at 167:14 to 167:18, Herren Declaration, Government Exhibit 2.

17. On May 7, 1988, the Plaintiff held a confirmation, director, bond and maintenance tax election. There was one ballot cast in this election in favor of confirming the district, in favor of the bond issue, and in favor of the maintenance tax. The ballot also cast one vote for each of five directors, who ran at-large and unopposed. *See* Herren Declaration, Government Exhibit 10; Zimmerman Dep. at 27:05 to 27:14; Tex. Water Code § 49.102.

18.   On May 5, 1990, the Plaintiff held a director election.  There were four votes cast in this election for each of five directors, who ran at-large and unopposed.  *See* Herren Declaration, Government Exhibit 11.

19.   The Plaintiff thereafter established staggered terms for its five directors, with two directors elected in the 1992 election and every four years thereafter, and three directors elected at the 1994 election, and every four years thereafter.  *See* Herren Declaration, Government Exhibit 11; Reilly Dep. at 89:21 to 90:07.

20.   On May 2, 1992, the Plaintiff held a director election.  There were two votes cast for each of two directors running unopposed for two numbered places.  *See* Herren Declaration, Government Exhibit 12.

21.   On May 7, 1994, the Plaintiff held a director election.  There were two votes cast for each of three directors running unopposed for three numbered places.  *See* Herren Declaration, Government Exhibit 14.

22.   In the 1992 and 1994 elections, the Plaintiff implemented numbered posts in its director elections, and did not seek preclearance for that voting change.  The Plaintiff apparently did not utilize numbered posts in its elections after 1994.  *See* Herren Declaration, Government Exhibit 13, 15.

23.   The Plaintiff cancelled its May 4, 1996 directors' election pursuant to a new state law allowing for such cancellations when all candidates are unopposed, as the two candidates were in this election.  *See* Herren Declaration, Government Exhibit 16, Tex. Elec. Code § 2.051 to 2.054 (enacted in 1995).

24.    The Plaintiff cancelled its May 2, 1998 directors' election pursuant to state law because the three candidates were unopposed.  *See* Herren Declaration, Government Exhibit 17.

25.    The Plaintiff cancelled its May 6, 2000 directors' election pursuant to state law because the two candidates were unopposed.  *See* Herren Declaration, Government Exhibit 18.

26.    On May 4, 2002, the Plaintiff held a director election.  There were a total of 253 ballots cast, with 824 total votes spread among six candidates, running at large for three positions.  *See* Herren Declaration, Government Exhibit 19, 20.

27.    The 2002 election was the first in the history of the Plaintiff that was contested, involving more candidates running for election than there were open positions.  *See* Collins Dep. at 41:11 to 41:15, 139:19 to 139:23; Zimmerman Dep. at 51:03 to 51:10.

28.    On May 7, 2004, the Plaintiff entered into a joint election agreement for Travis County to conduct its May 15, 2004 election.  *See* DeBeauvoir Dep. Ex 6.

29.    The Travis County clerk has contracted to conduct the elections for virtually all the subjurisdictions in the county, numbering at least 107 jurisdictions.  The Plaintiff was one of the last governmental units that conduct elections in Travis County to enter into a joint election agreement, as a standard contract for the County to conduct the Plaintiff's elections.  Such agreements allow entities holding elections on the same dates to use common polling places, common early voting procedures, common ballots, common poll officials, etc.  *See* DeBeauvoir

Dep. at 6:16 to 8:10, 13:13 to 13:20, 44:15 to 44:18, 71:22 to 72:06; Zimmerman

Dep. at 57:23 to 58:05; 62:16 to 62:22; Tex. Elec. Code §§ 271.001-271.014.

30.    The May 15, 2004 election was the first election held under the joint election

agreement with Travis County, and was conducted in Travis County's Election

Precinct 333 at the Canyon Creek Elementary School, located within the

boundaries of the Plaintiff.  *See* DeBeauvoir Dep., Ex. 6; Herren Declaration,

Government Exhibit 8.

31.    In Plaintiff's May 15, 2004, director election, there were a total of 439 ballots

cast, with 695 total votes distributed among three candidates running at large for

two director positions.  As of the May 15, 2004 election, there were a total of

2,276 registered voters in the Plaintiff.  *See* Herren Declaration, Government

Exhibit 21.

32.    On or about March 28, 2006, the Plaintiff entered into an election services

agreement with Travis County for the county to conduct the Plaintiff's elections

until at least 2011, with the agreement renewable automatically for two additional

three year terms, until 2017.  *See* DeBeauvoir Dep. Ex. 10; Reilly Dep. at 44:22 to

45:19.

33.    On April 18, 2006, the Plaintiff entered into a joint election agreement for Travis

County to conduct its May 13, 2006 election.  *See* DeBeauvoir Dep. Ex. 5.

34.    The May 13, 2006 election was the second election held under a joint election

agreement with Travis County.  The Plaintiff's election was conducted in Travis

County's Election Precincts 333 and 343 at the Canyon Creek Elementary School,

located within the boundaries of the Plaintiff. *See* DeBeauvoir Dep. Ex. 5; Herren Declaration, Government Exhibit 31.

35. The Attorney General's records do not reflect any evidence that either of the two 2006 election agreements between Travis County and the Plaintiff was submitted for review under Section 5 of the Voting Rights Act by either Travis County or the Plaintiff. *See* Herren Declaration at ¶ 55.

36. In Plaintiff's May 13, 2006 director election, there were a total of 495 ballots cast, with 883 votes distributed among five candidates running at large for three director positions. As of the May 13, 2006 election, there were a total of 3,129 registered voters in the Plaintiff. See Herren Declaration, Government Exhibit 22.

37. As of May 10, 2007, Travis County reports that the Plaintiff includes 3,175 total registered voters, including 2,548 registered voters in Precinct 333, and 627 registered voters in Precinct 343. *See* Herren Declaration, Ex. 24.

38. From 1988 until 2002, the Plaintiff held elections at locations separate from other elections held on the same date. The Plaintiff also utilized procedures for absentee, early, and election voting that were separate from those procedures utilized by other elections conducted on the same date. *See*, e.g., Herren Declaration, Government Exhibit 7.

39. Prior to the May 2004 election, the Plaintiff held elections in private homes, using separate polling places from the other elections held that day. As a consequence, voters in the Plaintiff district had to travel to a county voting precinct to vote for

municipal and other elections, and travel to a private residence to vote for director elections for the Plaintiff.  *See*, e.g. Zimmerman Dep. at at 94:07 to 96:20, Herren Declaration, Government Exhibit 7, 8 (describing prior practice).

40.  For example, in the May 1994 election, voters living in the Plaintiff district had to travel to the county's Precinct 219 to vote in other local elections (8455 Spicewood Springs Road), and to a private residence to vote in the Plaintiff's elections (11709 Boulder Lane).  This was a distance of 5.5 miles.  *See* Herren Declaration, Government Exhibit 3, 15, 28, 32.

41.  Travis County first used the Canyon Creek Elementary School (located within the boundaries of the Plaintiff) as a polling place for its elections in the November 1998 general election as Election Precinct 219.  *See* Herren Declaration, Government Exhibit 29.  Travis County changed the designation of the Canyon Creek Elementary School to Precinct 333 in 2001.  *See* Herren Declaration, Government Exhibit 30.

42.  However, the Plaintiff did not begin using the Canyon Creek Elementary School as a polling place until the May 2004 election.  *See* Herren Declaration, Government Exhibit 8.

43.  As a consequence, in the intervening May 2002 election, voters living in the Plaintiff district had to travel to two polling places to vote in both local elections and in the Plaintiff's elections on election day.  These voters had to travel to the Canyon Creek Elementary School (10210 Ember Glen Drive) to vote in other local elections, and to a private residence (10741 Chestnut Ridge Road) to vote in

the Plaintiff's election.  These two polling places are 0.4 miles apart.  Voters

living in the Plaintiff had to go to yet a third polling place in order to vote in

school elections.  *See* Zimmerman Dep. at 94:07 to 96:20; Herren Declaration,

Government Exhibit 7, 20, 30, 33.

Development in the Plaintiff

44.    At the time the Plaintiff was created in 1988, the land comprising the district was

undeveloped.  *See* Zimmerman Dep. at 27:05 to 29:01.

45.    Municipal utility districts such as the plaintiff are created for the purpose of

aiding the developer of the land to build out water, wastewater and drainage

utility infrastructure to allow for residential development of the land.  These

districts provide a legal structure for issuance of bonds to cover the costs of

building such utilities, with the bonds repaid over time through the assessment of

real estate taxes.  *See* Collins Dep. at 17:19 to 19:05, Reilly Dep. at 102:15 to

102:18, 110:05 to 110:12, Zimmerman Dep. at 28:10 to 28:14; Ferguson Dep. at

20:14 to 20:19.

46.    The Plaintiff has no employees.  All of the Plaintiff's work is done by contractors,

including the use of outside counsel for legal work.  *See* Zimmerman Dep. at

34:24 to 35:05;  Collins Dep. at 61:11 to 61:13.

47.    Of the 709.7 acres presently within the Plaintiff, approximately 565 acres are

developable, of which 562 have been developed already, with the remaining 3

developable acres under contract for a commercial use.  As of April 1, 2006, the

Plaintiff included 1,298 platted single family lots (with 1,280 completed homes, 12 homes under construction, 6 vacant single family lots), two apartment complexes containing 848 units, one 20,000 square foot office building, and a Chevron Service Center.  *See* Herren Declaration, Government Exhibit 23; Collins Dep. at 33:12 to 33:20.

48.    As of February 2007, testimony from Plaintiff's directors and counsel indicated that all utility work for which the Plaintiff is responsible is completed, and that almost all of the homes under construction in the Plaintiff are now close to completion.  *See* Ferguson Dep. at 60:17 to 62:02; Zimmerman Dep. at 125:01 to 125:04; Reilly Dep. at 130:18 to 131:16.

49.    The Plaintiff has issued all of the bonds it intends to issue, and has not reached the bond limit authorized in its 1988 election.  *See* Zimmerman Dep. at 117:10 to 117:18; Reilly Dep. at 80:23 to 81:07.

50.    The Plaintiff district includes the residential neighborhood known as "Canyon Creek."   *See* Collins Dep. 31:13 to 31:15; Ferguson Dep. at 26:13 to 26:21.

Census data

51.    The demographer for the City of Austin has estimated that under the 1990 Census, the Plaintiff had a total population of 12 persons, of whom all were white. *See* Expert Report of Ryan Robinson.

52.    The demographer for the City of Austin has estimated that under the 2000 Census, the Plaintiff had a total population of 3,586 persons, of whom 2,872

(80.1%) were white, 54 (1.5%) were black, 197 were Hispanic (5.5%), 416 were

Asian (11.6%), and 47 (1.3%) were "other."  *See* Expert Report of Ryan

Robinson.

<u>The Plaintiff's Current Method of Election</u>

53.　　State law provides that all elections for the Plaintiff are conducted in accordance

　　　　with the Texas Election Code, except as otherwise provided in the Texas Water

　　　　Code.  *See* Tex. Water Code § 49.101, Tex. Elec. Code § 1.002;  Amended

　　　　Complaint at ¶ 6; Answer to Amended Complaint at ¶ 6.

54.　　State law required that the initial set of directors to the Plaintiff was to be

　　　　appointed by the Texas Water Commission.  State law likewise required that the

　　　　temporary directors be confirmed by election at the same time the district is

　　　　confirmed in its initial election in 1986 and 1988.  *See* Tex. Water Code § 54.022;

　　　　Tex. Water Code § 49.102.  Plaintiff has, as required by state law, held its bond

　　　　and its operation and maintenance tax authorizing elections in 1986 and 1988.

　　　　*See* Tex. Water Code §§ 49.106, 49.107.

55.　　As required by state law, the Plaintiff is governed by a board of five directors.

　　　　*See* Tex. Water Code § 54.101.

56.　　As required by state law, to be qualified to serve as a director of the Plaintiff, a

　　　　person shall be at least 18 years old, a resident citizen of the State of Texas, and

　　　　either own land subject to taxation in the district or be a qualified voter within the

district.  *See* Tex. Water Code § 54.102; Reilly Dep. at 87:12 to 87:17, 98:20 to 99:11.

57.    Directors of the board of the Plaintiff are elected, as required by state law.  *See*, e.g., Tex. Water Code § 49.103(b).

58.    Directors of the board of the Plaintiff serve four-year terms, as required by state law.  *See* Tex. Water Code § 49.103(a); Reilly Dep. at 89:25 to 90:2.

59.    Directors of the Plaintiff serve staggered terms, as required by state law.  The Plaintiff has three directors elected in one even-numbered year, and two directors elected in the next even numbered year.  *See* Tex. Water Code § 49.102(h); Reilly Dep. at 89:18 to 90:06.

60.    As required by state law, the Plaintiff holds an election on a uniform election date, at the same time as a number of other local elections.  Elections are held on the second Saturday in May of each even-numbered year to elect the appropriate number of directors.  *See* Tex. Water Code § 49.103(b), Tex. Elec. Code § 41.001(a)(1); Tex. Elec. Code § 41.0053; Reilly Dep. at 104:07 to 104:21.

61.    Elections for directors of the Plaintiff are conducted at-large throughout the entire territory of the Plaintiff.  Plaintiff does not presently utilize subdistricts for election of its directors, and thus does not have to engage in redistricting. *See* Reilly Dep. at 88:20 to 89:01.

62.    The Plaintiff's directors are not presently elected by numbered posts or numbered places.  *See* Reilly Dep. at 89:07 to 89:12.  Hence, voters in director elections for

the Plaintiff presently can "single-shot" vote for candidates for director positions, *i.e.*, they can cast one vote, for each position, or less than all positions, that are up for election.  *See*, e.g., Herren Declaration, Government Exhibit 20 ("Vote for none, one, two or three.").

63.    There are no primary elections for director positions for the Plaintiff, only a single general election, as required by state law.  *See* Tex. Elec. Code § 144.001, 144.002; Reilly Dep. at 89:13 to 89:17.

64.    As required by state law, candidates for the Plaintiff's director positions do not run according to affiliation with a political party, but instead run as independents in non-partisan elections, as required by state law.   *See* Tex. Elec. Code §§ 1.005(9), 144.001, 144.002; Reilly Dep. at 89:10 to 89:12.

65.    To be elected as a director of the Plaintiff, a candidate must receive more votes than any other candidate for the office, as required by state law.  In other words, elections for the Plaintiff are conducted by plurality-vote, so that the persons with the highest numbers of votes for each position are elected, irrespective of whether or not the candidate receives a majority of the votes cast.  Thus, there is no majority-vote requirement and the Plaintiff does not hold runoff elections for director positions, absent a tie vote.  *See* Tex. Elec. Code §§ 2.001, 2.002; Reilly Dep. at 89:2 to 89:6, 90:08 to 90:10.

66.    Candidates for the Plaintiff's director positions qualify to run for office by filing an application with the secretary of the governing body, as required by state law.  *See* Tex. Elec. Code § 144.003, 144.004; Reilly Dep. at 87:18 to 88:04.

-14-

67. Where the Plaintiff certifies that its candidates for office are unopposed by the qualifying deadline for the election in question, it may cancel the election under state law. *See* Tex. Elec. Code § 2.051 to 2.054.

68. As required by state law, vacancies in director positions on the board of the Plaintiff are filled by appointment by the remaining members of the board of directors of the Plaintiff, not by special election. *See* Tex. Water Code §§ 49.105, 54.103; Reilly Dep. at 88:05 to 88:19; Collins Dep. at 140:14 to 140:24.

69. The polling hours for the Plaintiff's elections (7 a.m. to 7 p.m.) are fixed by state law. *See* Tex. Elec. Code § 41.031.

70. The determination of who is a qualified voter and eligible to vote in Plaintiff's elections is defined by state law. *See* Tex. Elec. Code §§ 11.001 to 11.002.

<u>The Plaintiff's Submissions Under Section 5</u>

71. On November 26, 1986, the Attorney General received the Plaintiff's first submission under Section 5 of the Voting Rights Act. In that submission, the Plaintiff sought preclearance under § 5 for its creation; for the procedures for conducting its December 13, 1986, confirmation, directors, bond, and maintenance tax election; for bilingual election procedures; for its implementation schedule; and for the establishment of a polling place. The Attorney General notified the Plaintiff that he interposed no objection to the submitted voting changes on January 26, 1987. *See* Herren Declaration, Government Exhibit 1 (USDOJ File 1986-1537).

72.     On April 11, 1988, the Attorney General received the Plaintiff's second submission under Section 5 of the Voting Rights Act.  In that submission, the Plaintiff sought preclearance for its re-creation; for the procedures for conducting its May 7, 1988, confirmation, directors, bond, and maintenance tax election; for the establishment of a polling place, for bilingual election procedures; and for the use of paper ballots.  The Attorney General notified the Plaintiff that he interposed no objection to the submitted voting changes on June 10, 1988.  *See* Herren Declaration, Government Exhibit 2  (USDOJ File 1988-1404).

73.     On April 10, 1990, the Attorney General received the Plaintiff's third submission under Section 5 of the Voting Rights Act.  In that submission, the Plaintiff sought preclearance for changes in its polling place and absentee voting location.  The Attorney General notified the Plaintiff that he interposed no objection on June 11, 1990.  *See* Herren Declaration, Government Exhibit 3  (USDOJ File 1990-1423).

74.     On April 5, 1996, the Attorney General received the Plaintiff's fourth submission under Section 5 of the Voting Rights Act.  In that submission, the Plaintiff sought preclearance for a change in its polling place.  The Attorney General notified the Plaintiff that she interposed no objection on June 3, 1996.  *See* Herren Declaration, Government Exhibit 4  (USDOJ File 1996-1732).

75.     On June 10, 1996, the Attorney General received its fifth submission from the Plaintiff under Section 5 the Voting Rights Act.  In that submission, the Plaintiff sought preclearance for its general election notice procedures and for the cancellation of its general election.  The Attorney General notified the Plaintiff

that she interposed no objection on August 1, 1996.  *See* Herren Declaration, Government Exhibit 5 (USDOJ File 1996-2595).

76.  On March 27, 1998, the Attorney General received the Plaintiff's sixth submission under Section 5 the Voting Rights Act.  In that submission, the Plaintiff sought preclearance for an annexation into the Plaintiff (of approximately 2.486 acres) and for a polling place change.  The Attorney General notified the Plaintiff that she interposed no objection on May 19, 1998.  *See* Herren Declaration, Government Exhibit 6 (USDOJ File 1998-1264).

77.  On March 27, 2002, the Attorney General received the Plaintiff's seventh submission under Section 5 of the Voting Rights Act.   In that submission, the Plaintiff sought preclearance for a polling place change.  The Attorney General notified the Plaintiff that he interposed no objection on May 24, 2002.  *See* Herren Declaration, Government Exhibit 7 (USDOJ File 2002-1980).

78.  On February 27, 2004, the Attorney General received the Plaintiff's eighth submission under Section 5 of the Voting Rights Act.  In that submission, the Plaintiff sought preclearance for joint election procedures with Travis County, Texas, including use of the county's election day polling place, and the use of the county's early voting locations, hours and voting method.  The Attorney General notified the Plaintiff that he interposed no objection on April 8, 2004.  *See* Herren Declaration, Government Exhibit 8 (USDOJ File 2004-0946).

Changes Submitted by Travis County and the City of Austin

79.     Travis County and the City of Austin have a made a number of changes in joint election procedures that have affected elections for the Plaintiff, and have submitted those changes to the Attorney General for preclearance under Section 5; the Attorney General has interposed no objection to those changes.

80.     Travis County split the election precinct in which the Plaintiff sits (Precinct 333) into two precincts in 2005.  The County left Precinct 333 at the Canyon Creek Elementary School, and created new Precinct 343 at Cantebrea Crossing, 8021 RR 621 N.  Part of the Plaintiff district is included in both Precinct 333 and 343. The County submitted this change to the Attorney General under Section 5, and he interposed no objection.  *See* DeBeauvoir Dep., Ex. 1.

81.     For the May 2006 election, the City of Austin consolidated the two election precincts that encompass the Plaintiff (Precinct 333 and 343) into one polling place at the Canyon Creek Elementary School.  The City submitted this change to the Attorney General for review under Section 5, and he interposed no objection. *See* Herren Declaration, Government Exhibit 31.

82.     Travis County submitted the joint election agreement with the Plaintiff for the May 2004 election as well as several early voting location changes for that election to the Attorney General for review under Section 5, and he interposed no objection.  *See* DeBeauvoir Dep. Ex. 2, 3, 4.

83.     Travis County submitted several changes in early voting locations for the May 13, 2006, joint election to the Attorney General for review under Section 5, and he interposed no objection.  *See* DeBeauvoir Dep. Ex . 7, 8.

The Plaintiff Is Not Significantly Burdened by Section 5

84. The last submission the Plaintiff made under Section 5 to the Attorney General seeking preclearance of voting changes was on February 26, 2004, in connection with its 2004 directors' election, and has made no submissions in the more than three years since. *See* Herren Declaration at ¶ 51.

85. The Plaintiff made no submission under Section 5 to the Attorney General seeking preclearance of voting changes in connection with its most recent May 2006 election, or in connection with its next election, scheduled for May 10, 2008. *See* Herren Declaration at ¶ 52; Tex. Water Code § 49.103(b), Tex. Elec. Code § 41.001(a)(1).

86. As of May 15, 2007, the Plaintiff has no submissions under Section 5 pending before the Attorney General seeking preclearance of any voting changes. *See* Herren Declaration at ¶ 53.

87. The Plaintiff has not identified any voting changes that it presently desires or plans to implement. *See* Amended Complaint at ¶ 12. Two of Plaintiff's directors, who testified as Rule 30(b)(6) witnesses for the Plaintiff, stated that aside from a polling place change in 2004, there really have been no voting changes in the Plaintiff, nor are any voting changes anticipated in the future. *See* Zimmerman Dep. at 69:13 to 69:16, 144:21 to 145:09; Ferguson Dep. at 69:23 to 70:02.

88.    The Plaintiff has not identified any voting changes that Section 5 has prevented it from adopting.  The Plaintiff has admitted that "it is presently unaware of any particular instance in which the District has explicitly considered and then refrained from making a change with respect to voting because of the preclearance requirements of Section 5".  *See* Government Exhibit 34.  Two of Plaintiff's directors, testified under Rule 30(b)(6), and stated that they could not recall such a situation.  *See* Zimmerman Dep. at 76:08 to 76:23;  Ferguson Dep. at 70:15 to 70:19.

89.    The Attorney General's records  do not reflect any evidence that Section 5 has prevented Plaintiff from implementing any proposed voting changes.  See Herren Declaration at ¶ 54.

90.    As described above, most features of the Plaintiff's election system are determined by state law, and are not discretionary, and thus there are relatively few types of voting changes that the Plaintiff has discretion under state law to implement on its own.

91.    Under the joint election agreements between the Plaintiff and Travis County, it appears that many changes in election procedures affecting joint elections with the Plaintiff likely will be submitted for preclearance under Section 5 by the County.

92.    The Plaintiff has held only eight elections in its history.  Plaintiff has not held any types of elections other than director elections since 1988, and there is no present indication that it will have need to do so in the future.  *See* Tex. Water Code

49.106, 49.107.

93.     The Plaintiff has made only eight Section 5 submissions in its history.

94.     There have been no discussions of annexation by the board of the Plaintiff since 2002, and there is no present foreseeable need to annex.  *See* Zimmerman Dep. 97:09 to 97:16.

95.     There is only one public building in the Plaintiff, Canyon Creek Elementary School, and that building is currently used as the polling place for the Plaintiff. *See* Zimmerman Dep. at 94:08 to 94:09, 119:01 to 119:05.

96.     The Plaintiff's witnesses testified that they were pleased with Travis County's conduct of its elections under the joint election agreements in 2004 and 2006 and that they expect that Travis County will administer the Plaintiff's May 2008 election, and will keep the polling place at the school.  *See* Reilly Dep. 43:13 to 44:05; Ferguson, Dep. at 44:17 to 45:01, 49:14 to 50:13, 69:23 to 70:10; Zimmerman Dep. at 69:06 to 69:12; 100:22 to 101:04.

97.     The previous attorney for the Plaintiff, who made seven of the Plaintiff's eight submissions to the Attorney General of voting changes under Section 5, testified that preparation of such submissions "don't take very long."  *See* Collins Dep. 25:01 to 25:14.

98.     Expert witness Terry L. Musika produced a chart for this case showing that Plaintiff has spent an average of $30,056 on legal fees annually during the period from 1989 to 2005, out of an average total annual expenditure by Plaintiff of

$548,338. *See* Report of Terry Musika at Ex. E.

99.    Mr. Musika further estimated that Plaintiff's average annualized estimated cost of making preclearance submissions of voting changes under Section 5 was $223. *See* Report of Terry Musika, at 10-11.

100.    The Plaintiff will eventually be dissolved, once its debts are paid off at the end of bond payment cycle or are assumed by the City of Austin. *See* Zimmerman Dep., at 116:16 to 117:09, 124:17 to 124:25; Ferguson Dep., Part 2, at 57:22 to 58:02

### Section 5 Process

101.    The Attorney General endeavors to make the administrative review process for Section 5 submissions as efficient, convenient and reasonable as possible for jurisdictions covered by its requirements. *See* Herren Declaration at ¶ 39.

102.    The Attorney General has long-standing published procedures that describe many aspects of the Section 5 review process. *See* 28 C.F.R. Part 51. These procedures were first promulgated in 1971. *See* 36 Fed. Reg. 18186 (Sept. 10, 1971). *See* Herren Declaration at ¶ 40.

103.    The Attorney General also provides a website that discusses the Section 5 process (http://www.usdoj.gov/crt/voting/). *See* Herren Declaration at ¶ 41.

104.    Section 5 itself allows submissions to be made by the "chief legal officer" or "other appropriate official" of a jurisdiction. 42 U.S.C. 1973c.

105.    The Attorney General's procedures likewise provide that submissions can be made by the "chief legal officer," "other appropriate official of the submitting

authority," or "any other authorized person on behalf of the submitting authority." 28 C.F.R. 51.23.

106.    Hence, neither Section 5 nor the Attorney General's Procedures require that submissions for preclearance be made by attorneys.  Many of the submissions received by the Attorney General under Section 5 are in fact neither prepared nor submitted by attorneys.  Moreover, based on the Attorney General's experience in administering the Section 5 process, the vast majority of submissions do not require an attorney in order to prepare the submission.  *See* Herren Declaration at ¶ 44.

107.    The Attorney General provides a toll-free telephone number that submitting officials can call to speak with Department of Justice staff members, who are available to walk persons through what needs to be done to make a submission under Section 5.  *See* Herren Declaration at ¶ 45.

108.    The Attorney General has a long-established procedure, dating from 1971, for jurisdictions to request expedited consideration of voting changes.  *See* 28 C.F.R. 51.34, 36 Fed. Reg. 18186 (September 10, 1971).  The Attorney General makes every effort to accommodate covered states and local jurisdictions that experience emergencies prior to elections for which expedited consideration of submissions of voting changes is required.  Situations calling for expedited consideration can include events such as fires or natural disasters that affect which polling places can be used in an election, or pre-election litigation that threatens to stop the conduct of an election.  The Attorney General not infrequently makes emergency

preclearance decisions within 24 hours on submissions in such situations.  *See* Herren Declaration at ¶ 46.

109.   The Attorney General has long accepted submissions from jurisdictions via overnight delivery.  The Plaintiff availed itself of this option in a 1996 submission, which it sent by overnight delivery to the Attorney General (USDOJ File 1996-1732).   *See* Herren Declaration at ¶ 47, Government Exhibit 4.

110.   For some years, the Department has provided a means for jurisdictions to make submissions for preclearance via facsimile.   The Plaintiff availed itself of this option in a 2002 submission, which it faxed to the Attorney General (USDOJ File 2002-1980).  *See* Herren Declaration at ¶ 48, Government Exhibit 7.

111.    For some time, the Attorney General has also provided jurisdictions a means to submit additional information on pending Section 5 submissions through sending attachments to an email address.   *See* Herren Declaration at ¶ 49.

112.   Recently, the Attorney General has expanded his internet website to allow jurisdictions to make Section 5 submissions by means of an entirely internet-based format (http://wd.usdoj.gov/crt/voting/sec_5/evs/).  *See* Herren Declaration at ¶ 50.

Jurisdictions Eligible to File Bailout Actions

113.   Prior to the 1982 amendments to Section 4(a) of the Voting Rights Act, that went into effect in 1984, there were approximately 91 jurisdictions that were eligible to file actions under Section 4(a) seeking to bail out of the temporary provisions of

the Voting Rights Act.  The jurisdictions eligible to file such actions were those that had individual determinations published in the Federal Register that they were covered by the temporary provisions of the Voting Rights Act.  *See* 46 Fed. Reg. 870-01 (Jan. 5, 1981).  *See* Herren Declaration at ¶ 56.

114.   The 1982 amendments to Section 4(a) of the Voting Rights Act, that went into effect in August 1984, broadened the number of jurisdictions that could file actions seeking to bail out under Section 4(a) to at least 896 jurisdictions.  These jurisdictions break down as follows -- there are 9 states covered as a whole by Section 5; there are at least 821 counties, parishes and independent cities that supervise voter registration within those 9 states; and there are 66 jurisdictions that are separately covered by Section 5 in 7 other states.  *See* 28 C.F.R. Part 51 Appendix (listing jurisdictions).  *See* Herren Declaration at ¶ 57.

115.   To date, 14 of these 896 jurisdictions have successfully bailed out under Section 4(a) since 1984, with the agreement of the Attorney General.  All of these 14 jurisdictions were counties and independent cities in Virginia (the counties of Augusta, Botetourt, Essex, Frederick, Greene, Pulaski, Roanoke, Rockingham, Shenandoah, and Warren and the independent cities of Fairfax, Harrisonburg, Salem and Winchester).  *See* Herren Declaration at ¶ 58.

116.   If the opportunity to seek bailout under Section 4(a) was extended to the smallest political subjurisdictions that conduct elections in every covered state and covered county, like the Plaintiff, then well more than 10,000 jurisdictions in those covered States and counties could file bailout actions in this Court.  *See*

Herren Declaration at ¶ 59.

The Plaintiff Does Not Meet the Threshold Requirement to Bail Out

117.    The Plaintiff is not a State.

118.    The Plaintiff is not a county or parish.

119.    The Plaintiff's name does not appear on a list of jurisdictions with separate

coverage determinations under the temporary provisions of the Voting Rights Act.

*See* 28 C.F.R. Part 51, Appendix.

120.    In the State of Texas, registration for voting is conducted under the supervision of

the State's 254 counties.  A county official is designated by state law as the voter

registrar for each county in Texas, usually the tax-assessor collector.  *See* Tex.

Elec. Code §§ 12.001, 12.031, 13.002, 13.071, 13.072, 13.073, 13.101.

121.    Texas uses a unitary voter registration system under which a citizen may register

to vote once, in order to be able to vote in elections for state, county, and

municipal offices, as well as for special district offices, such as the Plaintiff.  *See*

Tex. Elec. Code § 11.001.

122.    The Plaintiff uses Travis County's voter registration list for its elections,

including the county's determinations of which registered voters reside in the

Plaintiff.  *See* Reilly Dep. at 71:08 to 71:20; Collins Dep. at 66:04 to 67:08,

104:10 to 104:15, 147:17 to 150:16; DeBeauvoir Dep. at 66:04 to 66:16.

123.    In Travis County, the voter registrar for all elections, including those of the

Plaintiff, is a county official, the Travis County tax assessor-collector.  *See*

DeBeauvoir Dep. at 44:19 to 45:17; Tex. Elec. Code § 12.001.

124.    Registration for voting is not conducted under the supervision of the Plaintiff.

*See* Reilly Dep. at 67:01 to 67:05; Collins Dep. at 66:04 to 67:08, 125:02 to

125:07.

Respectfully submitted,

JEFFREY A. TAYLOR                    WAN J. KIM
United States Attorney               Assistant Attorney General
                                     Civil Rights Division

                                     ASHEESH AGARWAL
                                     Deputy Assistant Attorney General
                                     Civil Rights Division

                                     JOHN K. TANNER (D.C. Bar No. 318873)
                                     Chief, Voting Section

                                       /s/  T. Christian Herren Jr
                                     _____
                                     H. CHRISTOPHER COATES
                                     Principal Deputy Chief
                                     T. CHRISTIAN HERREN JR
                                     chris.herren@usdoj.gov
                                     RICHARD DELLHEIM
                                     richard.dellheim@usdoj.gov
                                     SARAH E. HARRINGTON
                                     sarah.harrington@usdoj.gov
                                     CHRISTY A. McCORMICK
                                     christy.mccormick@usdoj.gov
                                     Attorneys
                                     Civil Rights Division
                                     United States Department of Justice
                                     Room 7254 - NWB
                                     950 Pennsylvania Ave., N.W.
                                     Washington, DC 20530
                                     Phone: (800) 253-3931
                                     Fax:    (202) 307-3961

Date:  May 15, 2007