## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NUMBER ONE,
401 W. 15th Street
Suite 850
Austin, Texas 78701,

*Plaintiff*,

v.

ALBERTO GONZALES,
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530,

*Defendant*.

Civil Action No. 1:06-CV-01384
(DST, PLF, EGS)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities ...................................................................................................... iii

    Cases ........................................................................................................................ iii

    Statutes and Regulations ........................................................................................ vi

    Miscellaneous ........................................................................................................ vii

Introduction ................................................................................................................... 1

Summary of the Argument ........................................................................................... 2

Statement of Facts ......................................................................................................... 5

Argument ...................................................................................................................... 11

I.      The District Is Entitled to Bail Out of §5 Preclearance. .................................... 11

     A.    The District Is a Political Subdivision Eligible to Pursue Bailout Under §4(a). .................................................................................................. 11

          1.    The Plain Language of the Bailout Provision Establishes the District's Eligibility. ........................................................................... 12

               a.    The District Is a Political Subdivision of the State of Texas. ....... 13

               b.    The Supreme Court Has Determined That Political Subunits in Covered States Are "Political Subdivisions" Under §4(a) Even When They Do Not Meet the Definition in §14(c)(2). ........ 14

               c.    Congress Abrogated *City of Rome* But Not *Sheffield* and *Dougherty County*. ....................................................................... 18

               d.    In Any Event, the Only Potentially Relevant Legislative History Confirms the District's Eligibility for Bailout. ............... 20

                    i.    The Legislative History Accompanying the 2006 Reenactment Would Confirm the District's Eligibility to Seek Bailout. ............................................... 21

                    ii.    Congress Did Not Intend for Bailout to Be Rarely Used or Practically Unworkable. ...................................... 22

          2.    Section 4(a) Must Be Interpreted to Provide the District Access to Bailout to Avoid Grave Constitutional Concerns. .................................. 24

    B.  The District Meets the Statutory Requirements for a Declaration That
        It Is Entitled to Bail Out............................................................................ 28

II.  Congress's Failure to Fashion §5 As a Congruent and Proportional Remedy for
     Demonstrated Constitutional Violations Has Resulted in the Unconstitutional
     Application of §5 to the District. ..................................................................... 36

    A.  The 2006 Reauthorization of §5 Cannot Be Constitutionally Applied to
        the District If It Is Not Congruent and Proportional to Voting Problems
        in Today's America............................................................................................ 37

    B.  The 2006 Reauthorization of §5 Is Not a Congruent and Proportional
        Remedy That Can Be Applied to the District. ....................................... 43

        1.  To Be Applied to the District as Appropriate Legislation, §5 Must
            Be Congruent and Proportional to the Right to Be Free of Purposeful
            Discrimination in Voting. ......................................................... 44

        2.  In the 2006 Reauthorization, Congress Had No Sufficient Evidence
            and Made No Sufficient Findings Identifying a Relevant History
            or Pattern of Discrimination..................................................... 46

        3.  Section 5 Is Not Congruent and Proportional to the Rights It Purports
            to Enforce or the Record Adduced by Congress....................................... 52

            a.  The New Enactment of §5 Is Not Geographically Targeted to
                Areas with Problems................................................................. 54

            b.  Section 5 Cuts Too Broad a Swath. ............................................. 56

            c.  Section 5 Lacks Meaningful Limitations in Time and Scope....... 57

Conclusion ......................................................................................................... 59

Certificate of Service ............................................................................................. 61

# TABLE OF AUTHORITIES

**CASES**

*Allen v. State Bd. of Elections*,
  393 U.S. 544, 89 S.Ct. 817 (1969)..............................................................49, 56

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986) ...........................................11

*Beer v. United States*,
  425 U.S. 130, 96 S.Ct. 1357 (1976).................................................................38

*Bennett v. Brown County Water Improvement Dist. No. 1*,
  272 S.W.2d 498 (Tex. 1954).............................................................................14

*Bd. of Trs. of the Univ. of Ala. v. Garrett*,
  531 U.S. 356, 121 S.Ct. 955 (2001).................................................... *passim*

*Branson Sch. Dist. RE-82 v. Romer*,
  161 F.3d 619 (10th Cir. 1998) ..........................................................................13

*Celotex Corp. v. Catrett*, ............................................................................11
  477 U.S. 317, 324,  106 S.Ct. 2548, 2553 (1986)

*City of Boerne v. Flores*,
  521 U.S. 507, 117 S.Ct. 2157 (1997)................................................... *passim*

*City of Mobile, Ala. v. Bolden*,
  446 U.S. 55, 100 S.Ct.1490 (1980)..................................................................45

*City of Rome v. United States*,
  446 U.S. 156, 100 S.Ct. 1548 (1980)................................................... *passim*

*City of Rome, Ga. v. United States*,
  472 F.Supp. 221 (D.D.C. 1979) ......................................................................17

*Connor v. Waller*,
   421 U.S. 656, 95 S.Ct. 2003 (1975) (*per curiam*) ......................................... 43

*Czekalski v. Peters*, ......................................................................................11
  475 F.3d 360, 363 (D.C. Cir. 2007)

*Doughterty County, Ga., Bd. of Educ. v. White*,
  439 U.S. 32, 99 S.Ct. 368 (1978).........................................................14, 16, 17

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568, 108 S.Ct. 1392 (1988)................................................................. 25

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
   527 U.S. 627, 119 S.Ct. 2199 (1999).........................................41, 42, 54, 57

*Georgia v. United States*,
   411 U.S. 526, 93 S.Ct. 1702 (1973)...............................................19, 53

*Guinn v. United States*,
   238 U.S. 347, 35 S.Ct. 926 (1915)...................................................45

*Holcomb v. Powell*, .........................................................................11
   433 F.3d 889, 895 (D.C. Cir. 2006)

*Holder v. Hall*,
   512 U.S. 874, 922, 114 S.Ct. 2581 (1994).........................................45

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398, 54 S.Ct. 231 (1934)...................................................39

*Hooper v. Cal.*,
   155 U.S. 648, 15 S.Ct. 207 (1895)...................................................24

*Johnson v. De Grandy*, ....................................................................49
   512 U.S. 997, 1014 n.11, 114 S.Ct. 2647 n.11 (1994)

*Kimel v. Fla. Bd. of Regents*,
   528 U.S. 62, 120 S.Ct. 631 (2000)...............................................41, 57

*Landgraf v. USI Film Prods.*,
   511 U.S. 244, 114 S.Ct. 1483 (1994).................................................20

*Lamie v. United States Tr.*,
   540 U.S. 526, 124 S.Ct. 1023 (2004).................................................20

*League of United Latin Am. Citizens v. Perry*,
   _ U.S. __, 126 S.Ct. 2594 (2006) ...................................................49

*Lopez v. Monterey County*,
   525 U.S. 266, 119 S.Ct. 693 (1999)........................................... *passim*

*McMillan v. Nw. Harris County Mun. Util. Dist. No. 24*,
   988 S.W.2d 337 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)..............14

iv

*Miller v. Johnson,*
    515 U.S. 900, 115 S.Ct. 2475 (1995)........................................................ *passim*

*McCain v. Lybrand,*
    465 U.S. 236, 104 S.Ct. 1037 (1984)............................................................40

*Monsanto Co. v. Cornerstones Mun. Util. Dist.,*
    865 S.W.2d 937 (Tex. 1993)........................................................................14

*Myers v. Anderson,*
    238 U.S. 368, 35 S.Ct. 932 (1915)...............................................................45

*Nev. Dep't of Human Res. v. Hibbs,*
    538 U.S. 721, 123 S.Ct. 1972 (2003)......................................................41, 42

*N.L.R.B. v. Amax Coal Co.*
    453 U.S. 322, 101 S.Ct. 2789 (1981)...........................................................19

*Oregon v. Mitchell,*
    400 U.S. 112, 91 S.Ct. 260 (1970)...............................................................41

*Pierce v. Underwood,*
    487 U.S. 552, 108 S.Ct. 2541 (1988)...........................................................18

*Reno v. Bossier Parish Sch. Bd.,* (*Bossier Parish I*)
    520 U.S. 471, 117 S.Ct. 1491 (1997)......................................................19, 53

*Reno v. Bossier Parish Sch. Bd.,* (*Bossier Parish II*)
    528 U.S. 320, 120 S.C. 866 (2000)........................................................45, 53

*Rogers v. Lodge,*
    458 U.S. 613, 102 S.Ct. 3272 (1982)......................................................46, 49

*Shaw v. Reno*
    509 U.S. 630, 113 S.Ct. 2816 (1993)......................................................46, 49

*South Carolina v. Katzenbach,*
    383 U.S. 301, 86 S.Ct. 803 (1966)......................................................... *passim*

*State of Ariz. v. Reno,*
    887 F.Supp. 318, (D.D.C. 1995).................................................................19

*Tennessee v. Lane,*
    541 U.S. 509, 124 S.Ct. 1978 (2004).....................................................41, 46

*United States ex rel. Atty Gen.  v. Del. & Hudson Co.,*
    213 U.S. 366, 29 S.Ct. 527 (1909).........................................................................24

*United States v. Bd. of Comm'rs of Sheffield, Ala.,*
    435 U.S. 110, 98 S.Ct. 965 (1978)............................................................. *passim*

*United States v. Georgia,*
    546 U.S. 151, 126 S.Ct. 877 (2006)............................................... 41, 42, 59

*United States v. Morrison,*
    529 U.S. 598, 120 S.Ct. 1740 (2000)...........................................41, 46, 49

*United States v. Uvalde Consol. Indep. Sch. Dist.,*
    625 F.2d 547 (5th Cir. 1980) ..................................................................15, 17

*W. Va. Univ. Hosps., Inc. v. Casey,*
    499 U.S. 83, 111 S.Ct. 1138 (1991)........................................................20

*Whitcomb v. Chavis,*
    403 U.S. 124, 91 S.Ct. 1858 (1971).......................................................45

*White v. Regester,*
    412 U.S. 755, 93 S.Ct. 2332 (1973).......................................................46

*Williams v. Taylor,*
    529 U.S. 420, 120 S.Ct. 1479 (2000)...............................................13, 19

*Wilson v. New,*
    243 U.S. 332, 37 S.Ct. 298 (1917)..........................................................39

## STATUTES AND REGULATIONS

42 U.S.C. §1973............................................................................................59

42 U.S.C. §1973*aa* (2007) .........................................................................55

42 U.S.C. §1973*a* (a)-(c) (1979) ................................................................15

42 U.S.C. §1973*b*(a) ....................................................................................1

42 U.S.C. §1973*b*(a)(1) (2006)..................................................12, 18, 30

42 U.S.C. §1973*b*(a)(1)(D) (2006) .............................................................22

42 U.S.C. §1973*b*(a)(8) (1970) ..................................................................54

42 U.S.C. §1973*b*(b) (1970) ...........................................................................................15, 54

42 U.S.C. §1973*b*(c) (1970)...............................................................................................30

42 U.S.C. §1973*l*(c)(2) (2006) ...........................................................................................15

42 U.S.C. §1973(f)(3) (2006) ...............................................................................................29

FED. R. CIV. P. 56(c) ............................................................................................................11

FED. R. CIV. P. 56(e) ............................................................................................................11


**MISCELLANEOUS**

28 C.F.R. §51.14 (2006) .......................................................................................................10

152 CONG. REC. H5180 (daily ed. July 13, 2006) ............................................................. 56

BLACK'S LAW DICTIONARY 1159 (6th ed. 1991) ..............................................................13

BLACK'S LAW DICTIONARY 535 (2d Pocket ed. 2001) ....................................................13

H.R. REP. NO. 94-196 (1975).............................................................................................38

H.R. REP. NO. 91-397 (1969).............................................................................................38

H.R. REP. NO. 109-478 (2006)..................................................................................... *passim*

Partial List of Determinations, 40 Fed. Reg. 43750 (Sep. 23, 1975)...............................13

S. REP. NO. 109-295 (2006) ....................................................................................47, 48, 51

TEX. CONST. art. XVI, §59(a)(b) ...................................................................................13, 27

TEX. WATER CODE §54.001, *et. seq* ..................................................................................23

TEX. WATER CODE §54.011 ...............................................................................................14

TEX. WATER CODE §54.012 ...............................................................................................27

TEX. WATER CODE §54.013(a).............................................................................................27

TEX. WATER CODE §54.016(f) .............................................................................................8

TEX. WATER CODE §54.0161 ................................................................................27

TEX. WATER CODE §54.024 .................................................................................6

TEX. WATER CODE §54.5161 ...............................................................................27

TEX. WATER CODE §54.239 ..................................................................................6

VA. CODE §15.2-1500(A) ....................................................................................23

James F. Blumstein, *Federalism and Civil Rights: Complementary and Competing*
    *Paradigms*, 47 VAND. L. REV. 1251 (1994)................................................53

Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?*,
    81 DENV. U. L. REV. 225 (2003) ...............................................................49, 55

Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the*
    *Voting Rights Act After* Tennessee v. Lane, 66 OHIO ST. L.J. 177 (2005) ........................50

Samuel Issacharoff, *Is Section 5 of the Voting Rights Act a Victim of Its Own Success?,*
    104 COLUM. L. REV. 1710 (2004) ......................................................47

Samuel Issacharoff, *Polarized Voting and the Political Process: The Transformation of*
    *Voting Rights Jurisprudence*, 90 MICH. L. REV. 1833, 1833-34 (1992) .......................47

Voting Rights Act Amendments of 1982,
    PUB. L. NO. 97-205 ..........................................................................40

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King
    Voting Rights Act Reauthorization and Amendments
    Act of 2006, PUB. L. NO. 109-246 ................................................44, 47, 48, 56

Travis County Profile,
    http://www.txcip.org/tac/census/profile.php?FIPS=48453................................22

Special Districts in Travis County,
    http://www.txcip.org/tac/census/sd.php?FIPS=48453....................................22

School Districts in Travis County,
    http://www.txcip.org/tac/census/school.php?FIPS=48453..............................22

Pub. L. No. 94-73.............................................................................54

Plaintiff Northwest Austin Municipal Utility District No. 1 moves for summary judgment that it is entitled to a declaratory judgment under 42 U.S.C. §1973*b*(a) terminating its preclearance obligations under §5 of the Voting Rights Act or, in the alternative, that the continued application of §5 to the district is unconstitutional.

## INTRODUCTION

Either through the statutory bailout mechanism or through a declaration that §5 of the Voting Rights Act can no longer be constitutionally enforced against it, Northwest Austin Municipal Utility District No. 1 seeks to exclude itself from the continuing requirement of obtaining §5 federal preclearance. Throughout its two decades of existence, the district has held elections in compliance with the Voting Rights Act. When it needed to, the district has sought and received preclearance from the Attorney General—who has never interposed an objection to any election change made by the district. The district has never been subjected to federal election examiners, has never had a judgment entered against it on any election matter, and has never had any voting or election lawsuit filed against it. In its entire history, not a single individual has ever complained about or questioned any voting or election procedure used by the district on federal voting rights grounds. In their depositions, not one of the intervenors identified a single complaint about the district's elections or the way they are conducted.

The time has come for the district to be released from the intrusive federal mandate of preclearance. Never having discriminated in its elections and never having had a single voting-rights-related complaint in its entire existence, there is no conceivable rationale to force the district to continue to wear the badge of shame that is preclearance. Either the district is entitled to bailout of §5, or its continued enforcement is unconstitutional.

## SUMMARY OF THE ARGUMENT

The preclearance provision of §5 of the Voting Rights Act is perhaps the most federally invasive law in existence. Preclearance does not merely create a standard of conduct in an area in which the Constitution permits Congress to act, nor does it even stop short at commandeering state and local officials to enforce federal dictates. It reaches into the heart of state and local government in covered jurisdictions and changes the very nature of lawmaking by injecting into the process a federal shadow executive with veto power over any change involving voting and elections, and by the decree of Congress no covered local law or enactment is valid until the Attorney General of the United States (or by judicial bypass, this Court) has approved of it. The concept of a federal veto over state enactments was expressly rejected in the Constitutional Convention of 1787 as contrary to the scheme of federalism that the founders established, and any congressional arrogation of that authority, even in part, must be closely scrutinized and plainly justified as necessary to enforce the Fourteenth and Fifteenth Amendments.

Undoubtedly in part because of the intrusiveness of preclearance, Congress enacted a bailout mechanism that, since 1982, has expressly permitted political subdivisions of covered states that were not specifically designated as covered by the Attorney General to terminate preclearance obligations if they could meet certain statutory requirements. Notwithstanding the fact that the district is quite obviously a "political subdivision" of Texas, a covered state, that has never been separately designated for coverage, the Attorney General has adopted a cramped interpretation of §4(a) that would limit bailout eligibility to counties in covered states that have not been separately designated as covered. But that limitation is not consistent with the statutory text, is contrary to the Supreme Court's interpretation of the term, and, if accepted, would turn the bailout mechanism into more of a cruel hoax than a genuine promise of relief for covered political subdivisions that have lived up to their preclearance obligations.

Interpreting the statute, as the Attorney General urges, to preclude the district from invoking the bailout because only counties (and perhaps independent cities) count as political subdivisions under the statute would raise at least two grave constitutional concerns.  First, unlike Virginia, most states have numerous forms of political subdivisions that may geographically exist within a county, but are not subdivisions of the county itself.  One need look no further than Travis County itself, which has over a hundred political subdivisions within its geographic boundaries, including municipal utility districts, water districts, hospital districts, school districts, community college districts, cities, and other kinds of governmental entities recognized by the state.  Under the Attorney General's interpretation of §4(a), bailout is essentially an empty promise outside Virginia because no county would rationally choose, even if it physically could, to collect the vast amounts of data that would be required to make a bailout submission on behalf of dozens of (and in many cases more than a hundred) political subdivisions over which it has no supervisory authority.  Under the Attorney General's interpretation, bailout becomes a Virginia-only proposition, consistent with the history of bailout, but inconsistent with any fair treatment among the states, and there is no hope of geographically tailoring §5 into a congruent and proportional remedy.

Worse, the Attorney General's countertextual interpretation would unconstitutionally put counties into a supervisory or authoritarian role over other political subdivisions (like the district) that, while existing geographically within the county, exist entirely outside the counties' chain of command.  In essence, adoption of the Attorney General's nonsensical interpretation would redefine the roles and chain of authority within state government for purposes of the bailout statute, putting one form of state government (the county) over another form of state

government (the municipal utility district) in a way that unconstitutionally alters the form of state government.

Moreover, even if the bailout provision permits the district to pursue termination of preclearance obligations, continued application of §5 to the district would be unconstitutional in any event. When the Supreme Court upheld the early preclearance enactments against constitutional challenge, it did so mindful of §5's extraordinary intrusiveness and after determining that Congress had made specific findings linking the preclearance remedy, the proposed coverage area, and the temporal scope to the specific conduct that §5 was intended to prevent. In particular, Congress found that enacting the substantive provisions of the Voting Rights Act was insufficient because states and political subdivisions were defeating the legislation by making changes during the course of litigation, staying one step ahead of the courts. Only by prophylactically requiring preclearance could Congress prevent jurisdictions from eviscerating the core protections of the Voting Rights Act. In short, the remedy chosen, albeit intrusive, was congruent and proportional to the constitutional threat that Congress faced in 1965.

But when Congress reenacted §5 in 2006, it made no attempt whatsoever to justify its reauthorization on the same grounds and with the same kinds of findings on which it had originally supported §5. Although Congress made numerous anecdotal findings about alleged problems in voting, Congress could not justify reenactment of §5's preclearance remedy merely by reciting evidence that §2 is still needed. There is no evidence anywhere in the congressional record and no finding by Congress, that any covered state or political subdivision is or would be likely to engage in the same kind of gamesmanship that Congress found to be prevalent two generations ago. Similarly, Congress neither attempted to make nor could have made any

4

findings justifying the reimposition of §5 on previously covered jurisdictions by comparison to noncovered states or by comparing covered and noncovered jurisdictions in partially covered states.

Nor can the coverage formula be justified by reference to historical events more than 30 years in the past.  Texas, for example, is a covered jurisidiction solely because of the lack of Spanish-language election materials and less than 50% voter turnout in the 1972 presidential election, nearly 35 years prior to the reenactment of preclearance in 2006.  Those facts remain the only reason the district is covered, even though Spanish-language materials have been available in elections ever since Texas has been a covered jurisdiction.  By whatever standard, Congress cannot justify the significant intrusion into state and local sovereignty that §5 works in the absence of any showing that it is needed to resolve a looming constitutional crisis or even an articulable federal interest, or in reliance on an ancient justification that has not been true for more than 30 years.

### STATEMENT OF FACTS

Northwest Austin Municipal Utility District No. 1 is located in northwest Austin, Texas. Municipal utility districts are created under state law, pursuant to chapter 54 of the Texas Water Code, in part for the purpose of assisting in the development of an area through the creation of a governmental entity with bonding and taxing authority to fund infrastructure construction and other core improvements.  Created in the late 1980s in connection with the development of a residential subdivision now known as Canyon Creek, the district sits wholly within the geographical boundaries of both the City of Austin and Travis County.  The creation of the district and the establishment of the original polling location were submitted to and precleared by the Attorney General.  Nov. 25, 1986 Preclearance Submission & Response, Ex. 2.

The district is a political subdivision of the State of Texas and performs certain governmental functions including the maintenance of a local park and the assessment of ad valorem taxes to service bond indebtedness. The district is subject to direct supervision by the state through the Texas Commission on Environmental Quality (TCEQ) (formerly known as the Texas Natural Resources and Conservation Commission), TEX. WATER CODE §54.024, and certain decisions of the district can be appealed directly to the commission. TEX. WATER CODE §54.239. Although the district is geographically located within Austin and Travis County, it is independent of both. Neither the city nor the county exercises any supervisory authority over the district. *See* Deposition of Dana DeBeauvoir, Ex. 14 at 17:13-18:1.

The district is governed by a board consisting of five individuals who serve staggered four-year terms. District elections are held every two years, with two director positions on the ballot in one election and three the following election. District elections are nonpartisan. In each election, candidates for director positions do not run head-to-head for a particular place, but voters are instructed to vote for two or three candidates, depending on the number of director positions up for election. The candidates with the highest number of votes are elected to the board.

Early in Canyon Creek's development, the only locations available to be used as polling places for the district's elections were private residences. During the 1990s, Sharlene Collins, the district's then counsel, sought approval to hold the district's elections at one of the builder's model homes, but this request was denied. Deposition of Sharlene Collins, Ex. 13 at 144:6-19. Ms. Collins also testified that after Canyon Creek Elementary School opened in the neighborhood, she sought permission to hold the district's elections at the elementary school, and this request was also denied. Deposition of Sharlene Collins, Ex. 12 at 33: 2-11.

For nearly 20 years, the district has complied with the preclearance requirements of §5, seeking and obtaining preclearance approval from the Attorney General when, from time to time, the district changed its election practices and procedures. From its creation until 2002, the district's polling location was occasionally moved, and each move was submitted for preclearance. Mar. 21, 1988 Preclearance Submission, Ex. 3; Mar. 6, 1990 Preclearance Submission, Ex. 4; Apr. 4, 1996 Preclearance Submission, Ex. 5; Mar. 28, 1998 Preclearance Submission, Ex. 6; Mar. 27, 2002 Preclearance Submission, Ex. 7. When the 1996 election was uncontested, the district cancelled the election in accordance with state law and obtained preclearance of the cancellation of the election. June 6, 1996 Preclearance Submission, Ex. 5. The district annexed a small, commercial tract of land in 1997. Although the lot was uninhabited and zoned so that it could not be inhabited (and, therefore, the annexation could not realistically effect a change in voter make-up of the district), that change was also submitted to the Attorney General for preclearance before the next election. Mar. 26, 1998 Preclearance Submission, Ex. 6.

2002 brought a significant change to the district. Until then, the directors had largely been individuals generally affiliated with the developers, and the district performed its statutory duties without significant fanfare or notice. Prior to 2002, the district's elections were largely uncontested and without any significant campaign issue. The 2002 election was different. In 2002, a handful of residents decided to run for the district's board because they had become convinced that the district's contract entered into at its creation with the city of Austin contained a provision that violated state law and resulted in district homeowners paying too much in ad valorem taxes. The contract authorized both the city of Austin and the district to charge their full ad valorem tax rates to homeowners in the district. That double taxation was contrary to a state

law that required the city to allocate ad valorem taxes so that the total amount collected by the city and the district combined was no more than the city's full tax rate (*i.e.*, so that district homeowners paid no more in total ad valorem taxes than other city residents). TEX. WATER CODE §54.016(f). These district residents, including current board president Bill Ferguson, board member and former board president Don Zimmerman, and former board member Alan Weiss, made the so-called double taxation issue a campaign issue and ran against the board incumbents in 2002. The challengers won with overwhelming popular support, including many, if not most, of the individual intervenors who voted.

Like previous district elections, the 2002 election was held at a private residence, that of Mr. and Mrs. Stueber, approximately a quarter mile from the elementary school where some of the other local elections were held. Before the election, then candidate Don Zimmerman inquired whether it would be possible to hold the election at the elementary school with most of the other local elections to make voting more convenient for local residents and thereby improve voter turnout.[1] He was told no. See Deposition of Don Zimmerman, Ex. 35 at 50:6-19. On the day of the election, Zimmerman spent much of the day at the elementary school encouraging residents to vote in the district's election and directing them to the district's polling place. *Id.* at 95:1-5. Indeed, some of the individual intervenors had personal recollections of Zimmerman encouraging their participation in the district's election and directing them to the polling location.

Sometime after the election, Zimmerman again inquired whether it would be possible to hold the district election at a public location, like the elementary school, to make voting in the

---

[1] Round Rock Independent School District, which by state law also held its election that day, had its polling location elsewhere, so that a resident of Canyon Creek had to go to three different locations in order to vote in all of the local elections that day.

district's elections more convenient and to encourage greater participation in the district's elections. During the course of counsel's inquiries into that possibility, the district learned not only that it was now possible to hold the district's elections at the elementary school, but that the district could contract with the county to put the district's election on the larger county ballot and to delegate to the county the task of conducting the district's election. Deposition of Kerrie Jo Qualtrough, Ex. 28 at 57:17-59:9, 65:9-66:8. The district concluded that this arrangement would benefit voters because it would allow district voters to go to a single, public, convenient location to cast their ballots in all local elections at the same time.

The contractual arrangement also permitted the district to tie into the county's substantial election apparatus, including minority and language-minority election officials and workers for the various individual precincts. Prior to the 2004 election, a bilingual member of the district's counsel's office would be on call throughout election day, and the local residents serving as the election officials could call (or allow voters to call) to receive any language assistance that might be needed. Deposition of Sharlene Collins, Ex. 13 at 157:11-158:7 The contract delegating the conduct of the district's election to the county permitted the district to use the county's more sophisticated minority outreach and language-minority assistance programs, including the county's systematized practice of ensuring at least one minority or language-minority election official in each of the county's many precincts plus a hotline for further Spanish-language assistance. Deposition of Dana DeBeauvior, Ex. 14 at 58:15-18, 67:6-17.

The district contracted with the county to conduct its 2004 election. *See* February 26, 2004 Preclearance Letter & Exhibit, Ex. 9. Because the polling place relocation and the new method of conducting the election were changes to the district's election practices, the changes were submitted to the Department of Justice for preclearance and were approved by the Attorney

General. The contract was renewed in 2006, and the county also conducted the district's 2006 election. The renewal of the contract with the county in 2006 was not precleared because the renewal did not constitute a change by the district. *See* 28 C.F.R. §51.14 (2006) (confirming that recurrent voting practices do not have to be repeatedly precleared). Any general changes that affected the broader election were submitted for preclearance by the county on behalf of itself, the district, and the other political subdivisions with which it contracts. *See* Deposition of Dana DeBeauvoir, Ex. 14 at 33:16-34:3; Travis County April 4, 2003 Preclearance Submission, Ex. 8.

Throughout the past 20 years, the Attorney General has never interposed an objection to any of the district's several preclearance submissions. Affidavit of Frank Reilly, Ex. 1. No election-related lawsuit has ever been filed against the district, so it should go without saying that no court has ever entered a judgment against the district on any election-related matter. *Id.* Indeed, in its entire history, not a single individual has ever complained about or questioned any voting or election procedure used by the district. And notwithstanding the several individual intervenors that various advocacy groups have personally recruited and convinced to oppose the district's lawsuit, not one of the intervenors during their depositions identified a single complaint about the district's elections or the way they are conducted.[2]

---

[2] Deposition of Jose Gabriel Diaz, Ex. 16 at 27:4-6; 27:22-28; 24:22-25:14; Deposition of Nathaniel Lesane, Ex. 24 at 13:24-14:22; 18:21-19-4; Deposition of David Diaz, Ex. 15 at 12:12-15; 14:2-18; 15:1-8; Deposition of Lisa Diaz, Ex. 17 at 16:17-17:6; Deposition of Rodney Louis, Ex. 26 at 25:16-27:7; Deposition of Nicole Louis, Ex. 25 at 16:1-17; Deposition of Winthrop Graham, Ex. 21 at 9:1-11; Deposition of Yvonne Graham, Ex. 22 at 17:18-18:2; Deposition of Jamal Richardson, Ex. 30 at 11:14-12:8; Deposition of Wendy Richardson, Ex. 31 at 12:4-13; 18:13-22; Deposition of Marisa Williams, Ex. 33 at 8:22-9:19; Deposition of Gary Bledsoe, Ex. 10 at 18:15-19:7; 21:15-22; Deposition of Angela Garcia, Ex. 20 at 8:6-11; Deposition of Ofelia Zapata, Ex. 34 at 6:22-7:1; Deposition of Tanya House, Ex. 23 at 20:11-20; Deposition of Jovita Casares, Ex. 11 at 7:10-13.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits or declarations show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Only those facts "that might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); *accord Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). When the Court considers a motion for summary judgment, it must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). But a nonmoving party's opposition must be supported by competent evidence setting forth specific facts to show that there is a genuine issue for trial; it cannot consist of mere unsupported allegations or denials. *See* FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).

ARGUMENT

I.     **THE DISTRICT IS ENTITLED TO BAIL OUT OF §5 PRECLEARANCE.**

    A.     **The District Is a Political Subdivision Eligible to Pursue Bailout Under §4(a).**

As an initial matter, because the Attorney General and intervenors, including Travis County, have suggested that the district is not eligible to seek bailout under the VRA, this Court should determine as a matter of law that the VRA's plain language authorizes the district to bring this action. This Court is not bound by the Attorney General's interpretation of the VRA. *Miller v. Johnson*, 515 U.S. 900, 923, 115 S.Ct. 2475, 2491 (1995) ("[W]e think it inappropriate for a court engaged in constitutional scrutiny to accord deference to the Justice Department's

11

interpretation of the Act."); *see also* Part I.A.2 *infra* (discussing the serious constitutional implications of the Attorney General's interpretation of §4(a) of the VRA).

Simply put, under the current version of §4, any political subdivision that is obligated to comply with §5 preclearance is also eligible to seek bailout. That interpretation is compelled by the plain language of the statute—which is reinforced by Supreme Court precedent—and is necessary to avoid constitutional infirmity.

### 1.     The Plain Language of the Bailout Provision Establishes the District's Eligibility.

Section 4(a) of the VRA authorizes three categories of jurisdictions to bail out from the §5 preclearance requirements: (1) "any State" that is covered under the coverage formula listed in §4(b); (2) "any political subdivision" of a covered state, even though the subdivision's coverage under the §5 preclearance requirements was not determined separately from that of the state of which it is a subdivision; and (3) "any political subdivision" that has separately been determined to qualify for the preclearance requirements.[3]

Although the district did not exist until the late 1980s, it is covered by §5 because, on September 23, 1975, the United States Attorney General determined that §5 covered the State of Texas when (1) election materials in Texas had been offered only in English; (2) more than 5% of Texas's voting age population was Spanish speaking; and (3) less than 50% of Texas's voting age population voted in the 1972 presidential election. *See* Voting Rights Act Amendments of

---

[3] Section 4(a) provides, "no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device *in any State with respect to which the determinations have been made under the first two sentences of subsection (b) of this section or in any political subdivision of such State (as such subdivision existed on the date such determinations were made with respect to such State), though such determinations were not made with respect to such subdivision as a separate unit, or in any political subdivision with respect to which such determinations have been made as a separate uni*t, unless the United States District Court for the District of Columbia issues a declaratory judgment under this section." 42 U.S.C. §1973*b*(a)(1) (2006) (emphasis added).

1975: Partial List of Determinations, 40 Fed. Reg. 43750 Sept. 23, 1975. The district plainly falls within the second category: it is a political subdivision covered because it is within the covered State of Texas.

### a.     The District Is a Political Subdivision of the State of Texas.

Because there is no indication that Congress intended to give the term "political subdivision" a specialized meaning for purposes of §4(a), that term carries its ordinary, contemporary, or common meaning. *See Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 1488 (2000) ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.") (internal quotation marks omitted); *Lopez v. Monterey County*, 525 U.S. 266, 278-79, 19 S.Ct. 693, 701 (1999) (turning to dictionary definitions to interpret "administer" as used in §5). Unsurprisingly, the ordinary meaning of "political subdivision" easily encompasses governmental units like the district, which is "[a] division of a state that exists primarily to discharge some function of local government." BLACK'S LAW DICTIONARY 535 (2d Pocket ed. 2001); *accord, e.g.*, *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998) (recognizing that a school district was a "political subdivision" of a state); BLACK'S LAW DICTIONARY 1159 (6th ed. 1991) (defining "political subdivision" as "[a] division of the state made by proper authorities thereof, acting within their constitutional powers, for purposes of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public").

The necessary conclusion that a municipal utility district fits squarely within the ordinary meaning of "political subdivision" is confirmed by state law. Texas's municipal utility districts are political subdivisions under Texas law. They are created under the authority of the Texas Constitution. *See* TEX. CONST. art. XVI, §59(a), (b) (authorizing creation of conservation and

reclamation districts as necessary to conserve and develop State natural resources); *see also* TEX. WATER CODE §54.011 (authorizing creation of MUDs). And Texas law expressly recognizes those districts as political subdivisions of the state. *Bennett v. Brown County Water Improvement Dist. No. 1*, 272 S.W.2d 498, 500 (Tex. 1954) (holding that entities created under Article XVI, §59 of the Texas Constitution are political subdivisions of the State with governmental authority and their own areas of autonomy); *McMillan v. Nw. Harris County Mun. Util. Dist. No. 24*, 988 S.W.2d 337, 340 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("MUD 24 is a political subdivision of the State of Texas . . ."); *see Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 n.2 (Tex. 1993) (assuming that a MUD is a political subdivision of the State of Texas).

The Supreme Court has suggested that state law—at least when it comports with the common-sense understanding that substate units of government are political subdivisions of a state—is determinative. In holding that a local school board that neither registered voters nor conducted elections was nevertheless a "political subdivision" of Georgia and thus required to comply with the VRA, *Dougherty County, Georgia, Board of Education v. White*, 439 U.S. 32, 99 S.Ct. 368 (1978), noted that "the Board is a political subdivision under state law." *Id.* at 43 & n.13, 99 S.Ct. at 375 & n.13 (citing Georgia law sources).

> **b.      The Supreme Court Has Determined That Political Subunits in Covered States Are "Political Subdivisions" Under §4(a) Even When They Do Not Meet the Definition in §14(c)(2).**

*Dougherty County* followed *United States v. Board of Commissioners of Sheffield*, 435 U.S. 110, 98 S.Ct. 965 (1978), in which the Supreme Court definitively rejected the argument on which the Attorney General's position appears to rely, *i.e.*, that "political subdivision"—as used throughout the VRA—comprises only those entities listed in §14(c)(2) of the Act. *Id.* at 128-31, 98 S.Ct. at 977-79. Section 14(c)(2) provides that "[t]he term 'political subdivision' shall mean

any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." *Id.* at 141-42, 98 S.Ct. at 948, 42 U.S.C. §1973*l*(c)(2) (2006). But, *Sheffield* explains, "Congress' *exclusive* objective in §14(c)(2) was to limit the jurisdictions which may be separately designated for coverage under §4(b)." 435 U.S. at 131 n.18, 98 S.Ct. at 979 n.18 (emphasis added).

Accordingly, §14(c)(2)'s definition limits "political subdivision" only as the term is used in §4(b), the coverage formula, 42 U.S.C. §1973*b*(b), and not as it is used in §5 or in §4(a), which contains the bailout provision. *Sheffield*, 435 U.S. at 120-22, 98 S.Ct. at 973-74 (stating that "§4(a) imposes a duty on *every entity* in the covered jurisdictions having power over the electoral process, *whether or not the entity registers voters*" and rejecting the "conclusion that §5 should apply only to counties and to the political units that conduct voter registration" (emphasis added)); *see also United States v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 554-55 (5th Cir. 1980) ("[T]he Supreme Court has held that [§14(c)(2)'s] definition limits the meaning of the phrase 'State or political subdivision' only when it appears in certain parts of the Act, and that it does not confine the phrase as used elsewhere in the Act."). "The usage 'in a political subdivision,' which occurs in §4(a) and in many other sections of the Act, *see*, *e.g.*, 42 U.S.C. §§1973*a*(a)-(c) (1970 ed., Supp. V), would be nonsensical if 'political subdivision' denoted only specific functional units of state government." *Sheffield¸* 435 U.S. at 129 n.15, 98 S.Ct. at 978 n.15. Accordingly, as used outside the context of limiting the types of substate geographical areas that may be separately designated for coverage, "political subdivision" must include state political subunits that—like the City of Sheffield and the district—do not register voters. *Cf. id.* at 129, n.16, 98 S.Ct. at 978 n.16 (noting that "[u]nder §14(c)(2)'s terms, counties are 'political

subdivisions' whether or not they register voters.")  *Sheffield*'s limitation of §14(c)(2)'s application was ncecessary if the Act was to have Congress's intended effect of eradicating devices limiting access to voting at whatever level of government they may be erected.  *See id.* at 120-21, 98 S.Ct. at 973-74 (noting that "[t]he congressional objectives plainly required that §4(a) apply throughout each designated jurisdiction" and that "[i]f it did not have this scope, the covered States . . . could have easily circumvented §4(a) by, *e.g.*, discontinuing the use of literacy tests to determine who may register but requiring that all citizens pass literacy tests at the polling places before voting"); *id.* at 122, 98 S.Ct. at 974 ("The terms of the Act and decisions of this Court clearly indicate that §5 was not intended to apply only to voting changes occurring within the registration process.").

Noting the "fundamental point that local political units that do not conduct registration may conduct or control state and national elections," *id.* at 125 n.13, 98 S.Ct. at 976 n.13, the *Sheffield* majority specifically rejected Justice Stevens's dissenting view that Sheffield was "not a 'political subdivision'" because §14(c)(2)'s definition applied and Sheffield "is not a county or a parish, and it does not conduct registration for voting."  *Id.* at 141-42, 98 S.Ct. at 984 (Stevens, J., dissenting).  *Dougherty County* recognized that "Section 5 applies to all changes affecting voting made by 'political subdivision[s]' of States designated for coverage pursuant to §4 of the Act,"  439 U.S. at 43, 99 S.Ct. at 375 (alteration in original), and held that the appellant school board's contention that it was not a political subdivision because §14(c)(2) applied and because the board did not register voters was "squarely foreclosed by" *Sheffield*.  *Id.* at 44, 99 S.Ct. at 375.  Despite the fact that the school board did not register voters—and, indeed, did not even conduct elections—it was a political subdivision under the Act for purposes outside the coverage limitation imposed by §14(c)(2).  *Id.*  *Sheffield*, *Dougherty County*, and common sense foreclose

16

any argument that the district, which is (1) obviously a political subunit of Texas and (2) a political subdivision for purposes of §4(a) suspension of tests and devices and §5 preclearance, is not also a political subdivision for purposes of §4(a)'s bailout provision.

Importantly, *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548 (1980), does not alter that conclusion. *City of Rome* held that Rome, Georgia was ineligible to initiate bailout. *Id.* at 167, 100 S.Ct. at 1556. But Rome was not ineligible because it did not register voters; rather, it was ineligible because, under the 1975 version of §4(a), the only political subdivisions eligible to bail out independently were those covered under §4(b) as separate units. *Id.* Indeed, Rome previously had conducted voter registration—as permitted by Georgia law at the time, *see Sheffield*, 435 U.S. at 143, 98 S.Ct. at 985 (Stevens, J., dissenting)—and had voluntarily transferred voter registration to the county. *City of Rome, Ga. v. United States*, 472 F.Supp. 221, 224 (D.D.C. 1979). Neither the Supreme Court nor this Court, in answering Rome's assertion that it was eligible to pursue bailout, remotely suggested that Rome could bail out only if it resumed the function of voter registration. *See generally City of Rome*, 446 U.S. at 156, 100 S.Ct. at 1548; *City of Rome*, Ga., 472 F.Supp. at 221. The Supreme Court rejected Rome's argument that *Sheffield* made Rome, which was covered only because Georgia was covered, eligible to pursue bailout even though it did not meet the definition of entities that could be separately covered, *City of Rome*, 446 U.S. at 168, 100 S.Ct. at 1557, but did not overrule *Sheffield*'s cabining of the §14(c)(2) definition to the coverage context. *See Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d at 556 (holding, in light of *Sheffield*, *Dougherty County*, and *City of Rome* "that a school board is a political subdivision for section 2 purposes" although it did not fall within §14(c)(2)'s definition because it did not register voters); *accord City of Rome*, 446 U.S. at 190-93, 100 S.Ct. at 1568-70 (Stevens, J., concurring) (noting that from "the Court's

decision in *Sheffield* that all political units in a covered State are to be treated for §5 purposes as though they were 'political subdivisions' of that State, it follows that they should also be treated as such for purposes of §4(a)'s bailout provisions" and concurring that Congress could constitutionally preclude political subdivisions in covered states from bailing out independently from their states).

**c.  Congress Abrogated *City of Rome* But Not *Sheffield* and *Dougherty County*.**

In 1982 Congress legislatively abrogated the relevant holding of *City of Rome* by amending §4(a) to add political subdivisions in covered states to the category of entities that can independently pursue bailout, even if the subdivision was not covered as a separate unit. The 2006 VRA retains that addition.[4] But neither the 1982 nor the 2006 reauthorizations made any change affecting *Sheffield*'s and *Dougherty County*'s conclusions that the §14(c)(2) definition of "political subdivision" does not "impose any limitations on the reach of the [VRA] outside the designation process," *Sheffield*, 435 U.S. at 129 n.16, 98 S.Ct. at 978, n.16, and thus that "political subdivision" as used in §4(a) must encompass any subunits of a state that would ordinarily be encompassed by the term. "Quite obviously, reenacting precisely the same language would be a strange way to make a change." *Pierce v. Underwood*, 487 U.S. 552, 567, 108 S.Ct. 2541, 2551 (1988).

---

[4] Section 4(a) now provides, "no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device *in any State with respect to which the determinations have been made under the first two sentences of subsection (b)* of this section *or in any political subdivision of such State (as such subdivision existed on the date such determinations were made with respect to such State), though such determinations were not made with respect to such subdivision as a separate unit, or in any political subdivision with respect to which such determinations have been made as a separate unit*, unless the United States District Court for the District of Columbia issues a declaratory judgment under this section." 42 U.S.C. §1973*b*(a)(1)(emphasis added).

18

When Congress amends a statute, it is presumed to be mindful of prior judicial interpretations of that statute. *See Williams,* 529 U.S. at 434, 120 S.Ct. at 1489 ("When the words of the [Supreme] Court are used in a later statute governing the same subject matter, it is respectful of Congress and of the Court's own processes to give the words the same meaning in the absence of specific direction to the contrary."); *N.L.R.B. v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 2794 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."). Indeed, the Supreme Court has specifically found that Congress's failure to change particulars of the VRA indicates congressional acquiescence in Supreme Court interpretations of the Act. *E.g.,* *Georgia v. United States*, 411 U.S. 526, 533, 93 S.Ct. 1702, 1707 (1973) (concluding that Congress's failure to make substantive changes to §5 despite ample opportunity to do so indicated Congress's agreement with the Court's broad interpretation of that section). That presumption applies in the face of contrary legislative history. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471*,* 483-84, 117 S.Ct. 1491, 1500 (2000) (*Bossier Parish I*) ("Given our longstanding interpretation of §5, . . . we believe Congress has made it sufficiently clear that a violation of §2 is not grounds in and of itself for denying preclearance under §5. That there may be some suggestion to the contrary in the Senate Report to the 1982 Voting Rights Act amendments . . . does not change our view.").

As the Supreme Court explained: "We doubt that Congress would depart from the settled interpretation of §5 and impose a demonstrably greater burden on the jurisdictions covered by §5 . . . by dropping a footnote in a Senate Report instead of amending the statute itself." *Id.* at 484, 117 S.Ct. at 1500. This Court agrees. *State of Ariz. v. Reno*, 887 F.Supp. 318, 321-22 (D.D.C.

1995) (noting that a "single footnote in the Senate Report is not sufficient to demonstrate that Congress intended to require a covered jurisdiction to prove that its proposed change does not violate section 2 in order to receive section 5 preclearance").

> **d.     In Any Event, the Only Potentially Relevant Legislative History Confirms the District's Eligibility for Bailout.**

The Attorney General has indicated that his interpretation of §4(a) hinges primarily on a footnote like the ones disregarded by the Supreme Court in *Bossier Parish I* and by this Court in *Arizona v. Reno*.  Aside from the insufficiency of such scanty evidence of legislative intent, that argument fails because (1) it is unnecessary and inappropriate to consider legislative history when the enacted language of the statute, especially as informed by Supreme Court interpretations, is clear; and (2) the only potentially relevant legislative history declares Congress's intent that bailout be a widely available, frequently used remedy and an incentive for progress in jurisdictions within the preclearance coverage formula.

The best evidence of congressional purpose is the statutory text adopted by both Houses of Congress and signed by the President.  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 1146-47 (1991)*, superseded by statute on other grounds as recognized in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251, 114 S.Ct. 1483, 1490 (1994).  Where statutory text is unambiguous, it cannot be expanded or contracted by the statements of individual legislators or committees made during the course of the enactment process.  *W. Va. Univ. Hosps., Inc.*, 499 U.S. at 98-99, 111 S.Ct. at 1146-47.  "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Lamie v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030 (2004).  As discussed above, the plain language of §4(a) unambiguously permits the district to seek bailout, especially in light of *Sheffield* and *Dougherty County*, which eliminate the only

20

possible source of ambiguity in the text.  And *City of Rome* confirmed that the only limitation on the ability of political subdivisions, as the term is ordinarily understood, to pursue bailout was the restrictive language of the old version of §4(a), which Congress subsequently expanded to include political subdivisions within a covered state.

<blockquote>
i.    **The Legislative History Accompanying the 2006 Reenactment Would Confirm the District's Eligibility to Seek Bailout.**
</blockquote>

If any legislative history is at all material to construing the present version of §4(a), it is that accompanying the 2006 enactment.  *See Sheffield*, 435 U.S. at 135 n.25, 98 S.Ct. at 981 n.25 (rejecting the dissent's contention that the legislative histories of the 1970 and 1975 VRA's were unreliable guides as to what Congress intended when it drafted §5 in 1965 and noting that "[i]t cannot be gainsaid that we are construing, not the 1965 enactment of §5, but a 1975 reenactment."); *see also City of Rome*, 446 U.S. at 173, 180-82, 100 S.Ct. at 1559, 1563-64 (looking to the legislative history of 1975 reauthorization of the VRA).  The legislative history accompanying the 2006 reenactment evinces a clear intent to allow any jurisdiction falling under preclearance coverage to seek bailout from those requirements.

For example, the House Report states, "covered status has been and continues to be within the control of the jurisdiction such that those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so."  H.R. Rep. No. 109-478, at 25 (2006).  Similarly, the Committee "reiterate[d] that termination of covered status has been and continues to be within the reach of compliant covered jurisdictions," and expressed "hope[] that more covered States and political subdivisions will take advantage of the [bailout] process."  *Id.* at 58.  The committee stressed again: "Bailout, available through Section 4(a), while for the most part has gone unused until recently, has proven to be achievable to those jurisdictions that can demonstrate an end to their discriminatory histories."  *Id.* at 61.  These statements reflect

Congress's intent to grant all jurisdictions that are subject to the preclearance requirements the ability to bail out of those requirements by complying with the statutory conditions for bailout.

### ii. Congress Did Not Intend for Bailout to Be Rarely Used or Practically Unworkable.

The legislative history from the 2006 reenactment also confirms that Congress did not intend for bailout to be a rarely used or practically unworkable process, which would necessarily result if §4(a) were interpreted, as the Attorney General argues, to allow independent bailout only by political subdivisions that register voters. *See id*. at 58, 61. To bail out, the statute requires a covered jurisdiction to establish that during the last ten years it has fully complied with the remedial provisions of §5, including timely submission of any and all voting-related changes for preclearance. 42 U.S.C. §1973*b*(a)(1)(D) (2006). In most covered states, including Texas, counties register voters. And in most states, application of the bailout requirements at a county level would make the bailout procedures practically unworkable and in effect unachievable, frustrating Congress's purpose.

A county seeking bailout must establish that every city, town, school district, or other entity within its boundaries has met the statutory conditions for bailout. For example, Travis County's territory includes all or part of approximately 107 geographically smaller governmental units. Deposition of Dana DeBeauvoir, Ex. 14 at 7:14-17; *see also* Travis County Profile, http://www.txcip.org/tac/census/profile.php?FIPS=48453 (last visited May 13, 2007); Special Districts in Travis County, http://www.txcip.org/tac/census/sd.php?FIPS=48453 (last visited May 13, 2007); School Districts in Travis County, http://www.txcip.org/ tac/census/school.php?FIPS=48453 (last visited May 13, 2007). If none of these smaller governmental entities could bail out until the county itself bailed out, the only way bailout would ever be achieved would be if Travis County were to research the activities of each and every one

of these entities for the prior ten years. That monumental task would be further complicated by the fact that in most states, including Texas, counties have no authority to compel entities like MUDs to comply with the preclearance requirements or even to share information with the county about its past compliance. *See generally* TEX. WATER CODE Ch. 54 (providing that MUDs operate under the authority of the State of Texas, and that counties have no binding control over the creation or operation of MUDs); Deposition of Dana DeBeauvoir, Ex. 14 at 23:5-24:4 (testifying that Travis County would not necessarily know about voting changes or preclearance submissions by other entities within its territory). As a result, it would be practically impossible for most counties to establish that every entity within the county meets the statutory conditions for bailout.[5] And bailout, accordingly, would seldom, if ever, occur in states like Texas, which is not what Congress intended. *See, e.g.*, H.R. REP. No. 109-478, at 58, 61.

By contrast, interpreting §4(a) to allow governmental units to bail out independently would make bailout feasible. Bailout for political subdivisions like the district would be possible without undue burden because the subdivisions themselves, and not the counties in which they

---

[5] According to the Department of Justice, only fourteen political subdivisions (ten counties and four cities that register voters) have bailed out from preclearance coverage since the 1982 Amendments. U.S. Department of Justice Civil Rights Division, Voting Section Home Page, Section 5 Covered Jurisdictions (available at http://www.usdoj.gov/crt/voting/sec_5/covered.htm#note1). It is telling that *all* of these political subdivisions are located in Virginia. Unlike most states, Virginia uniquely structures its local government so that counties and independent cities do not contain large numbers of smaller governmental units. *See* VA. CODE §15.2-1500(A) ("Every locality shall provide for all the governmental functions of the locality, including, without limitation, the organization of all departments, offices, boards, commissions and agencies of government, and the organizational structure thereof, which are necessary and the employment of the officers and other employees needed to carry out the functions of government."); *see also, e.g.*, Commission on Local Government, Commonwealth of Virginia, *Operating Expenditures of Virginia's Counties and Cities FY 2005, available at* http://www.dhcd.virginia.gov/CommissiononLocalGovernment/PDFs/oe2005.pdf (delineating the numerous public services for which Virginia counties and independent cities are directly responsible). The fact that *only* Virginia counties have successfully achieved bailout illustrates the practical impossibility of bailing out for the majority of covered counties under the interpretation of §4(a) advanced by the DOJ. Section 4(a) should be interpreted to comport with Congress's clear intent to make bailout not a Virginia-only remedy, but a procedure that is "within the reach" of *all* compliant covered jurisdictions. *See* H.R. REP. No. 109-478, at 58.

sit, would control and have access to the required records.  And once the various subdivisions within a county bailed out, the county could also pursue its own bailout action without incurring the expense of independently researching the compliance of *every* political unit located within the county.  Instead, the county could make the requisite showing that the entities within the county were in compliance by relying on evidence production and findings from the previous bailout proceedings.

The legislative history accompanying the 2006 reenactment demonstrates that Congress did not intend for bailout to be a hollow promise.  But interpreting §4(a) to prevent jurisdictions such as the district from independently seeking bailout makes that procedure prohibitively expensive and practically impossible.  Consequently, §4(a) should be interpreted as allowing political subdivisions like the district to independently bailout, which comports with and gives effect to congressional intent by making bailout a viable option for compliant covered jurisdictions.

### 2.    Section 4(a) Must Be Interpreted to Provide the District Access to Bailout to Avoid Grave Constitutional Concerns.

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."  *United States ex rel. Atty. Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 536 (1909); *see also Hooper v. Cal.*, 155 U.S. 648, 657, 15 S.Ct. 207, 211 (1895) ("The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality."); *see Miller*, 515 U.S. at 926-27, 115 S.Ct. at 2493-94 (finding it unnecessary to reach serious constitutional questions posed by an Attorney General interpretation of §5 when the VRA should not be interpreted in the manner urged by the Attorney General).  This approach not only reflects the prudential concern that constitutional issues not be

needlessly confronted, but also recognizes that Congress is bound by and swears an oath to uphold the Constitution. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397 (1988). As discussed above, the most natural interpretation of §4(a)—especially in light of the Supreme Court's interpretation of "political subdivision" as used outside the context of §14(c)(2)—makes the bailout mechanism available to all political subdivisions within covered states, regardless whether the subdivisions register voters. Because the natural interpretation of §4(a) is also the only interpretation that minimizes constitutional concerns, that interpretation—which entitles the district to pursue bailout—must be adopted.

Specifically, interpreting §4(a) to provide the district with access to bailout minimizes the likelihood that §5 is an illegitimate use of Congress's power to remedy Fifteenth Amendment violations. Congress has the power to enforce the Fifteenth Amendment by creating appropriate prophylactic remedies. *See South Carolina v. Katzenbach*, 383 U.S. 301, 327, 86 S.Ct. 803, 818 (1966); *see also City of Boerne v. Flores*, 521 U.S. 507, 518, 117 S.Ct. 2157, 2163 (1997). But "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520, 117 S.Ct. at 2164.[6] If jurisdictions with genuinely clean records are subject to the preclearance requirements yet are ineligible to bailout, Congress exceeded its enforcement powers under the Fifteenth Amendment when it reenacted the preclearance requirements.

---

[6] Even though *City of Boerne* dealt with the Fourteenth Amendment, the congruent and proportional standard applies to the Fifteenth Amendment. *See Bd. of Trus. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 n.8, 121 S.Ct. 955, 967 n.8 (2001); *City of Boerne*, 521 U.S. at 518, 117 S.Ct. at 2163 (referring to the Fourteenth and Fifteenth Amendments as "parallel power[s]"); *see also Lopez*, 525 U.S. at 294 n.6, 119 S.Ct. at 709 n.6 (1999) (Thomas, J., dissenting) ("Although *City of Boerne* involved the Fourteenth Amendment enforcement power, we have always treated the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive.").

As discussed further below, the 2006 reauthorization of a largely unmodified preclearance prophylactic was not a congruent and proportional exercise of Congress's Fifteenth Amendment enforcement power.  But even if the 2006 reauthorization of §5 could be considered legitimate as a general matter, the concern relating to the remedy's incongruence is magnified exponentially if §4(a) is distorted beyond its plain meaning to preclude jurisdictions like the district from even attempting to demonstrate that preclearance coverage should not extend to them.   In other words, if bailout were restricted to only counties, parishes, and other governmental units that register voters—providing no recourse for the remaining thousands of municipalities and special-purpose districts otherwise qualified to escape the preclearance requirement—reauthorized §5 would be an unconstitutionally overbroad remedy.

As long as the bailout option is available to all covered jurisdictions, the concern that preclearance is not congruent and proportional is somewhat diminished if jurisdictions with genuinely clean records that fall under the overbroad coverage formula can bail out of preclearance.  *See City of Boerne*, 521 U.S. at 533, 117 S.Ct. at 2170; *Katzenbach*, 383 U.S. at 331, 86 S.Ct. at 820.   But if the many covered jurisdictions that lie within a county's geographical boundaries cannot bailout, then the overinclusive coverage formula indefinitely traps many jurisdictions, like the district, that have absolutely no record of discrimination under the preclearance obligations.  Therefore, interpreting §4(a) to prevent these political subdivisions from bailing out intensifies the already significant problem of congressional authority to enact preclearance legislation.  To avoid this grave constitutional question, the Court should interpret §4(a) to allow *all covered political subdivisions*, including the district, to bail out.

Moreover, under the Attorney General's interpretation, §4(a) would interfere with and reorder state government by granting a Texas county political control over jurisdictions that are

not under its authority according to state law. The district was created under the authority of the Texas Constitution. *See* TEX. CONST. art. XVI, §59(a), (b) (authorizing creation of conservation and reclamation districts as necessary to conserve and develop State natural resources). And the district operates exclusively under the supervision of the State of Texas. TEX. WATER CODE §54.012 (providing that a MUD is subject to the continuing right of supervision of the state, exercised through a state commission). Alhough the district is geographically located within Travis County, it is emphatically *not* a subunit of the county. *See id.* at §54.013(a) (noting that a single MUD can be located in multiple counties). Under Texas law, Texas counties never have binding authority over the creation or the operation of MUDs. *See id.* at §54.0161 (allowing counties to make only *nonbinding* recommendations to the commission regarding the creation of MUDs and then only for MUDs that are not located entirely within a city); *see id.* at §54.5161 (permitting counties to make only nonbinding recommendations to the state commission regarding the approval of MUD bond projects). Indeed, because the MUD at issue in this case is located entirely within the City of Austin, Travis County never had even a nonbinding say in the district's creation. *Id.* at §54.0161.

Under the interpretation of §4(a) advanced by the Attorney General, the VRA would substantially interfere with and reorder state government by politically interposing Travis County between the district and the State of Texas, which is the district's only supervisory authority under state law. The Attorney General's flawed view of §4(a) would grant Travis County the discretion to determine when the district may terminate its preclearance obligations; that is, the district's ability to bail out would be contingent on the county's decision about whether to initiate a bailout action on behalf of the county as a whole. And Travis County would retain this discretion even if all the entities located within its geographical bounds had satisfied the

conditions for bailout. Travis County, accordingly, could deny for any reason whatever—or no reason at all—the district the opportunity to terminate its preclearance obligations, simply by refusing to initiate the bailout proceeding.

That extraordinary invasion of the state's sovereign authority to organize its own government would only exacerbate the congruence and proportionality problems already presented by §5. But Congress did not enact that kind of senseless and unconstitutional restructuring of state government. Congress could and did achieve a more effective preclearance and bailout scheme without reordering state government by simply instructing the Department of Justice to evaluate whether bailout applications submitted by political subdivisions like the district entitle them to bail out.

The version of §4(a) in place when *City of Rome* was decided did not present this particular constitutional problem. Under that statutory scheme, the bailout provision granted the state control over whether governmental entities within a state could terminate their coverage obligations incurred only because those entities were within a covered state. *City of Rome*, 446 U.S. at 167, 100 S.Ct. at 1556. That arrangement did not interpose one political subdivision in a covered state between the state and other political subdivisions that otherwise answer only to the state.

### B.     The District Meets the Statutory Requirements for a Declaration That It Is Entitled to Bail Out.

Not only is the district entitled to pursue bailout, but the summary judgment evidence establishes that there are no genuine issues of material fact precluding summary judgment that the district is entitled to a bailout declaration. Bailout is appropriately granted when conditions listed in seven subsections of §4(a)(1) are satisfied:

A declaratory judgment under this section shall issue only if such court determines that during the ten years preceding the filing of the action, and during the pendency of such action—

(A) no such test or device has been used within such State or political subdivision for the purpose or with the effect of denying or abridging the right to vote on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2) of this section;

(B) no final judgment of any court of the United States, other than the denial of declaratory judgment under this section, has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) that denials or abridgements of the right to vote in contravention of the guarantees of subsection (f)(2) of this section have occurred anywhere in the territory of such State or subdivision and no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds; and no declaratory judgment under this section shall be entered during the pendency of an action commenced before the filing of an action under this section and alleging such denials or abridgments of the right to vote;

(C) no Federal examiners or observers under [this Act] have been assigned to such State or political subdivision;

(D) such State or political subdivision and all governmental units within its territory have complied with [section 5] of this [Act] section 1973c of this title, including compliance with the requirement that no change covered by section 1973c of this title has been enforced without preclearance under section 1973c of this title, and have repealed all changes covered by section 1973c of this title to which the Attorney General has successfully objected or as to which the United States District Court for the District of Columbia has denied a declaratory judgment;

(E) the Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under section 1973c of this title, with respect to any submission by or on behalf of the plaintiff or any governmental unit within its territory under section 1973c of

this title, and no such submissions or declaratory judgment actions are pending; and

(F) such State or political subdivision and all governmental units within its territory—(i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process; (ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under [this Act]; and (iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process.

42 U.S.C. §1973*b*(a)(1).

In short, a political subdivision like the district is entitled to a bailout declaration when certain objective conditions—designed to indicate compliance with §5 and perhaps useful as a proxy for a generalized commitment to voting rights for all citizens—are satisfied for a ten-year period.  The relevant historical period for this suit, which was filed on August 4, 2006, began on August 4, 1996.[7]  The district satisfies all the §4(a)(2) conditions for that period.

The district has never used a "test or device" at all, let alone one with a discriminatory purpose or effect.  Affidavit of Frank Reilly, Ex. 1.  It cannot be disputed that the district has never used any "test or device" as a prerequisite for voting or registration for voting.  The district has never used a literacy test, education or knowledge requirement, good moral character requirement, or voucher requirement.  *Id.*; *see* 42 U.S.C. §1973*b*(c).  Nor has the district ever conducted English-only elections.   Affidavit of Frank Reilly, Ex. 1; *see* 42 U.S.C. §1973(f)(3)

---

[7] Although only the time period since August 1996 is relevant, the district has been in full compliance with the §4(a)(1)(A-F) factors since its inception in 1986.  By assertions in this brief to the effect that the district has "always" been in compliance or "never" been out of compliance the district does not in any way waive any objections to evidence or argument pertaining to conditions prior to August 1996, the start of the statutorily relevant period.

(2006). The district has always provided election materials in Spanish as well as English. Affidavit of Frank Reilly, Ex. 1; Spanish-Language Election Materials, Ex. 36; *see also*, *e.g.*, Feb. 26, 2004 Preclearance Submission, Ex. 9; Deposition of Sharlene Collins, Ex. 12 at 99:7-20, Ex. 13 at 157:11-158:7.

No final judgment of any court of the United States has determined that denials or abridgements of the rights to vote on account of race or color have occurred anywhere in the territory of the district or that denials or abridgements of the right to vote in contravention of the guarantees of subsection (f)(2) have occurred anywhere in the district and no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds; and no action is pending that was commenced before the filing of this action and alleging such denials or abridgments of the right to vote. Affidavit of Frank Reilly, Ex. 1. Indeed, no lawsuit has ever been filed against the district alleging such denials or abridgments. *Id.* And no federal examiners under the VRA have ever been assigned to the district. *Id.*

The district has fully complied with §5 during the statutorily relevant time period, including compliance with the requirement that no change covered by §5 has been enforced without preclearance.

In March 1998, the district submitted a preclearance request for approval of two changes potentially affecting voting and the subsequent elections to be held under those changes. The changes submitted for preclearance were (1) moving the district's polling place one-half mile from one private residence within the district to another because the previous location became unavailable and (2) the district's annexation of an uninhabited acre of land used for commercial

purposes.  Mar. 26, 1998 Preclearance Submission, Ex. 6.  Those changes were precleared in a May 19, 1998 letter from the Department of Justice.  May 19, 1998 Resp. Letter, Ex. 6.

In March 2002, the district submitted a preclearance request for approval to move its polling place from the private-residence location that was precleared in 1998 to another private residence within the district, one-quarter mile away from the prior polling place.  Mar. 27, 2002 Preclearance Submission, Ex. 7.  The new polling place was precleared in a May 24, 2002 response from the Department.  *Id.*

In February 2004, the district sought preclearance to move its polling place from the private residence that was precleared in 2002 to the neighborhood public elementary school.  Feb. 26, 2004 Preclearance Submission, Ex. 9.  That submission also requested preclearance for additional changes connected with the district's decision to hold its elections jointly with Travis County, including different and more numerous locations for early voting and the use of electronic ballots in place of paper ballots.  *Id.*  Those changes were precleared in an April 8, 2004 letter from the Department.  2004 Resp. Letter, Ex. 9.

No objections have been interposed and no declaratory judgment has been denied under §5 with respect to any submission by the district.  Affidavit of Frank Reilly, Ex. 1.  No such submissions or declaratory judgment actions are pending.  *Id.*  No other governmental units are within the district's territory.  *Id.*

Finally, the district has made constructive efforts to encourage full access to the electoral process for all its residents.  The district has never used any voting procedures or methods of election that inhibited or diluted equal access to the electoral process.  Similarly, there is no indication that any intimidation or harassment of persons exercising rights protected under the VRA in the district's electoral process has ever occurred.  Indeed, every single one of the 11

minority-group residents of the district who have intervened as defendants in this action testified that they have no knowledge of any problems relating to the electoral process in the district, or any complaint other than a philosophical objection to this bailout action.  Deposition of Jose Gabriel Diaz, Ex. 16 at 27:4-6; 27:22-28; 24:22-25:14; Deposition of Nathaniel Lesane, Ex. 24 at 13:24-14:22; 18:21-19-4; Deposition of David Diaz, Ex. 15 at 12:12-15; 14:2-18; 15:1-8; Deposition of Lisa Diaz, Ex. 17 at 16:17-17:6; Deposition of Rodney Louis, Ex. 26 at 25:16-27:7; Deposition of Nicole Louis, Ex. 25 at 16:1-17;  Deposition of Winthrop Graham, Ex. 21 at 9:1-11; Deposition of Yvonne Graham, Ex. 22 at 17:18-18:2; Deposition of Jamal Richardson, Ex. 30 at 11:14-12:8; Deposition of Wendy Richardson, Ex. 31 at 12:4-13; 18:13-22;  Deposition of Marisa Williams, Ex. 33 at 8:22-9:19.

Nor have any non-resident intervenors identified any such problems.  Deposition of Gary Bledsoe, Ex. 10 at 18:15-19:7; 21:15-22; Deposition of Angela Garcia, Ex. 20 at 8:6-11; Deposition of Ofelia Zapata, Ex. 34 at 6:22-7:1; Deposition of Tanya House, Ex. 23 at 20:11-20; Deposition of Jovita Casares, Ex. 11 at 7:10-13.  Although the district has no history of problems relating to its electoral process, it has taken constructive steps to ensure that electoral access is preserved and expanded.

The most significant specific effort to expand voter access and participation was the district's relocating its polling place from a residential garage to a nearby public school and the district's concomitant contract to have Travis County run its elections in conjunction with the county's elections.  *See* Feb. 26, 2004 Preclearance Submission, Ex. 9.  That change took effect, after preclearance, for the 2004 elections, and the polling place for the district's biennial elections remains at the Canyon Creek Elementary School.  *See id.*

Although there is no indication that the district's former practice of holding elections at a residence—a location that was precleared by the Attorney General—resulted in denial of anyone's access to the electoral process, moving the elections to the neighborhood public school could not help but make voting more convenient for residents.  In addition to obvious advantages like the school's greater visibility and a public nature more befitting a public function like voting, the school is where the district's residents cast their ballots for the other elections—state, county, and city—held on the same day as the district's elections.  By contracting to participate in the joint election conducted by Travis County, the district thus provided its voters a time-saving "one-stop shopping" solution to voting in the district's elections.  Previously, a voter who wanted to vote in the other state and local elections on Election Day would have to make a second trip to a separate location to participate in the district's elections.  (Indeed, to vote in school district elections, a voter would have to make three trips.  *See* Deposition of Don Zimmerman, Ex. 35 at 77:20-78:3.

Additionally, through its contract with Travis County, the district provides voters additional services and convenience that the district—which has no employees or offices—acting alone could not provide.  For example, the district previously provided language assistance to Spanish-speaking voters by ensuring that a Spanish speaking legal assistant or law librarian was available by telephone at all times on Election Day.  Deposition of Sharlene Collins*, Ex. 13 at 157:11-158:7 (testimony by the district's former attorney that she ensured that a Spanish-speaking staff member was available by telephone to provide voter assistance).  The district's decision to have Travis County administer its elections improved access to Spanish-language voter assistance by ensuring there would be at least one Spanish-speaking poll worker onsite at

the polling place as well as a hotline to a call center that could provide additional Spanish-language assistance.  Deposition of Dana DeBeauvior, Ex. 14 at 58:15-18, 67:6-17.

Moreover, the district's participation in the joint election ballot gives district residents the option of casting their ballots at any of numerous early-voting sites maintained at locations throughout Travis County during the weeks preceding Election Day.  *Id.* at 74: 14-19; Feb. 26, 2004 Preclearance Letter, Ex. 9 at 4, Ex. B to letter.  For example, in the 2004 election, early voting was held every day, including Sundays, from April 28 through May 11, at 26 locations, with the polls open 11 or 12 hours each day (except Sundays, when voting was from noon to 6:00 p.m.).  Feb. 26, 2004 Preclearance Letter, Ex. 9 at Ex. B to letter.  Previously, early voting for the district's elections was held at only a single location—the same private residence used as an Election Day polling place—on weekdays only and only between the hours of 11:00 a.m. and 7:00 p.m. on those days.  Feb. 26, 2004 Preclearance Letter, Ex. 9 at 4.  The ability to vote at a date, time, and place that may be even more convenient for an individual voter than voting at Canyon Creek Elementary on Election Day obviously expands access to the district's electoral process.  Indeed, Travis County Clerk Dana DeBeauvoir  characterized the county's early voting program as "the perfect example" of "affirmative efforts to reach out to Latino and African-American voters," emphasizing that the early voting locations are "equitably distributed and put in commercial areas."  Deposition of Dana DeBeauvoir, Ex. 14 at 75:11-12, 14-19.

The district does not specifically keep records of or have ready access to data regarding voter registration or participation by race.  However, Travis County's demographic expert estimates that the African American population of the district increased from 0% in 1990 to 1.5% in 2000, the most recent year for which census data is available, and that the district's Hispanic population increased from 0% to 5.5% in the same time period.  Exs. 1 and 2 to Deposition of

Ryan Robinson, Ex. 32.  Along with the upward trend in the district's minority population, there is an overall trend of increased participation in the district's elections.  In 1996, the election was cancelled when there were no more candidates than there were seats available.  See June 6, 1996 Preclearance Submission, Ex. 5.  From no election in 1996, participation increased in 2002 so that at least 284 ballots were cast.  Official Canvass Reports, Ex. 37.  After the elections were moved to the school and combined with Travis County's, participation continued to increase so that 695 ballots were cast in 2004 and 883 were cast in 2006.  Id.

## II. CONGRESS'S FAILURE TO FASHION §5 AS A CONGRUENT AND PROPORTIONAL REMEDY FOR DEMONSTRATED CONSTITUTIONAL VIOLATIONS HAS RESULTED IN THE UNCONSTITUTIONAL APPLICATION OF §5 TO THE DISTRICT.

If the Court determines that the district is not entitled to bail out—either because the district is not eligible to pursue bailout or because the district does not satisfy the bailout criteria—the district requests a ruling that it is unconstitutional to apply §5 to it.  As discussed above, if §4(a) must be interpreted to preclude the district from seeking bailout and to put the decision whether to seek bailout on behalf of the district in the hands of Travis County, then §5 is not a congruent and proportional exercise of Congress's enforcement power and is constitutionally infirm for the additional reason that it impermissibly interferes with the structure of state government.  But even if the district is eligible to seek bailout under §4(a), the 2006 reauthorization of §5 lacks the congruence and proportionality required for it be an appropriate constitutional application of Congress's enforcement power.

Section 5 is perhaps the most intrusive abdication of core federalism principles anywhere in federal law.  Going far beyond other federal enactments that have been challenged from time to time on federalism grounds, most of which involve either the establishment of a federal standard of conduct or Congress's right to limit the states' sovereign immunity, §5 radically alters the lines of responsibility in state government and injects a federal overseer into the very

heart of state and local government.  This case does not question Congress's authority to enact and enforce substantive restrictions to prevent discrimination in voting and elections, nor does it challenge Congress's ability to waive the states' Eleventh Amendment immunity and subject states and their political subdivisions to federal judicial authority to enforce those core substantive enactments.

But that is not what §5 does.  What makes §5 so uniquely intrusive is the fact that it essentially puts all covered states and political subdivisions into a form of federal receivership for all election-related subjects.  In covered areas, no state or local enactment regarding elections is valid or enforceable until the federal government has had its separate opportunity to consider and approve or object to the enactment.  Under §5, Congress has in effect appointed a federal executive officer, the U.S. Attorney General, to oversee all state and local election-related enactments in covered areas and has given that officer a special federal veto power over all election- and voting-related changes.

In no other area has Congress so directly injected the federal government into the lawmaking process at the state and local level, by imposing a federal shadow executive with veto authority over state and local legislative enactments in the election arena.

A.      **The 2006 Reauthorization of §5 Cannot Be Constitutionally Applied to the District If It Is Not Congruent and Proportional to Voting Problems in Today's America.**

The original enactment of §5 was an extraordinary response to an extraordinary problem. In *South Carolina v. Katzenbach*, the Supreme Court upheld the constitutionality of that 1965 enactment of §5 against a serious challenge.  *Katzenbach* recognized that the new preclearance provision—which, unlike any federal enactment before or since, overrode the traditional prerogatives of state legislatures and local governments by imposing federal veto power over new local laws—could, in understatement, be characterized as "an uncommon exercise of

congressional power." 383 U.S. at 334, 86 S.Ct. at 822.[8] But "exceptional conditions can justify legislative measures not otherwise appropriate." *Id.*

Exceptional conditions existed in 1965. Specifically, as documented in the legislative record, "Congress knew that some of the States covered by §4(b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *Id.* at 335, 86 S.Ct. at 822. In particular, "discriminatory application of voting tests" was then "the principal method used to bar Negroes from the polls." *Id.* at 311-12, 86 S.Ct. at 810. The Court described examples of those Jim Crow-era tests and devices in some detail. *Id.* at 312-13 & nn.11-13, 86 S.Ct. at 810 & nn.11-13 (describing discriminatory application of "literacy and understanding tests," subjective and abusive application of a "good-morals requirement," and impossible requirements that African Americans "obtain vouchers from registered voters . . . in areas where almost no Negroes [were] on the rolls").

The VRA as a whole was directed at eradicating such barriers to voting. *See id.* at 314-15, 86 S.Ct. at 811-12. In particular, the original enactment of "Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer v. United States*, 425 U.S. 130, 140, 96 S.Ct. 1357, 1363 (1976) (quoting H.R. Rep. No. 94-196, pp. 57-58) (1975). That is, "Section 5 was directed at preventing a particular set of invidious practices that had the effect of 'undo[ing] or defeat[ing] the rights recently won by nonwhite voters.'" *Miller,* 515 U.S. at 925, 115 S.Ct. at 2493 (quoting H.R. Rep. No. 91-397, p. 8 (1969)) (alterations in original). "[T]he federalism costs exacted by §5 preclearance could be justified" only by "those

---

[8] Indeed, in some instances, §5 imposes a federal veto power over even state laws enacted by noncovered states. *See Lopez* 525 U.S. at 280, 119 S.Ct. at 701-02.

extraordinary circumstances" identified in *Katzenbach*. *Id.*; *see also Katzenbach*, 383 U.S. at 334, 86 S.Ct. at 822 (noting that the "exceptional conditions" justified "legislative measures not otherwise appropriate")

Under those "unique circumstances," *Katzenbach*, 383 U.S. at 335, 86 S.Ct. at 822, that existed in 1965, the original enactment of §5 as a provision with a five-year lifespan was an appropriate exercise of Congress's remedial power. *Id.* In so holding, *Katzenbach* analogized voting conditions in 1965 to the national emergencies in *Home Building & Loan Ass'n v. Blaisdell* and *Wilson v. New*. *Id.* at 334–35, 86 S.Ct. at 822 (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231 (1934), and *Wilson v. New*, 243 U.S. 332, 37 S.Ct. 298 (1917)). In *Wilson*, a labor dispute threatened to stop "all movement in interstate commerce." *Wilson*, 243 U.S. at 350, 37 S.Ct. at 303. Not only would the public have suffered imminent "infinite injury," *id.* at 348, 37 S.Ct. at 301, but this would have brought "ruin to the vast interests concerned in the movement of interstate commerce." *Id.* at 350, 37 S.Ct. at 303. Additionally, the *Blaisdell* Court used the emergency of the Great Depression as a basis for upholding Minnesota's mortgage relief laws. *Blaisdell*, 290 U.S. at 416, 54 S.Ct. at 232. Like those cases, *Katzenbach*'s holding was premised on an "emergency," which afforded "a reason for the exertion of a living power already enjoyed." *Blaisdell*, 290 U.S. at 426, 54 S.Ct. at 235 (quoting *Wilson*, 243 U.S. at 348).

The Supreme Court's next occasion to consider the constitutionality of §5 was 1980's *City of Rome*, coming after the seven-year extension of the provision in 1975 and before the 25-year extension in 1982. In *City of Rome*, the Court declined to overrule its holding in *Katzenbach* that the original enactment if §5 was constitutional, reiterating the extraordinary circumstances that *Katzenbach* found essential to that determination. 446 U.S. at 174-78, 100

S.Ct. at 1560-62. *City of Rome* further upheld the modest seven-year extension of §5—enacted a scant ten years after the original Act—in light of congressional findings that progress thus far had been "limited and fragile." *Id.* at 180-81, 1563-64.

In 1982, seventeen years after its original enactment, Congress reauthorized §5—originally viewed as a temporary emergency measure—for another quarter century. Voting Rights Act Amendments of 1982, Pub. L. No. 97-205. During §5's third incarnation, the constitutionality of continuing preclearance was never seriously challenged, although the Supreme Court in two decisions briefly touched on the issue. *McCain v. Lybrand*, 465 U.S. 236, 104 S.Ct. 1037 (1984), noted that, when enacting the 1982 Act, Congress identified evidence of a history of significant noncompliance with §5 up to that time. *Id.* at 248-49, 104 S.Ct. at 1045. *Lopez v. Monterey County* did not specifically address the constitutionality of the 1982 reauthorization of the VRA. Relying on *Katzenbach*'s holding that the original enactment of the VRA was a constitutional federal intrusion into state sovereignty, the Court rejected California's particular argument that it was unconstitutional to apply §5 to require preclearance of a change administered by a covered county in compliance with the law of an uncovered state. *Lopez*, 525 U.S. at 283-84, 119 S.Ct. at 703.

Since its cases upholding the 1965 and 1975 enactments of §5, the Supreme Court has elaborated on the test for determining whether a congressional act is an appropriate exercise of Congress's remedial powers under the Civil War Amendments. In *City of Boerne*, 521 U.S. at 520, 117 S.Ct. at 2164, the Court explained that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" in order for Congress to use its remedial enforcement powers under those amendments.[9] In

---

[9] Although *City of Boerne* concerned the Fourteenth Amendment, the congruent-and-proportional standard applies to the Fifteenth Amendment. *See Garrett*, 531 U.S. at 373 n.8, 121 S.Ct. at 967 n.8; *City of Boerne*, 521 U.S. at

a line of cases following *City of Boerne*, the Court has further articulated that standard: *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 119 S.Ct. 2199 (1999); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631 (2000); *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740 (2000); *Garrett,* 531 U.S. at 356, 121 S.Ct. at 955; *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972 (2003); *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978 (2004); *United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877 (2006).

The *City of Boerne* line of cases built on the longstanding recognition that, "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell*, 400 U.S. 112, 128, 91 S.Ct. 260, 266 (1970) (opinion by Black, J.). When purporting to enforce the Civil Rights Amendments, Congress cannot rewrite their substantive scope. *See City of Boerne*, 521 U.S. at 519, 117 S.Ct. at 2164 ("Congress does not enforce a constitutional right by changing what the right is."). "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Hibbs*, 538 U.S. at 727-28, 123 S.Ct. at 1977. But the distinction between "purportedly prophylactic legislation" and "substantive redefinition of the . . . right at issue," *Kimel*, 528 U.S. at 81, 120 S.Ct. at 644, "exists and it must be observed." *City of Boerne*, 521 U.S. at 520, 117 S.Ct. at 2164.

For prophylactic legislation to be a valid exercise of Congress's enforcement power, Congress must "identify conduct transgressing the . . . substantive provisions" of the relevant

---

518, 117 S.Ct. at 2163 (referring to the Fourteenth and Fifteenth Amendments as "parallel power[s]"); *see also Lopez,* 525 U.S. at 294 n.6, 119 S.Ct. at 709 n.6 ("Although *City of Boerne* involved the Fourteenth Amendment enforcement power, we have always treated the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive."). Indeed, *City of Boerne* explicitly drew on *Katzenbach*'s analysis of Congress's "remedial" powers under §5 of the Fifteenth Amendment. *City of Boerne*, 521 U.S. at 519, 117 S.Ct. at 2164 ("Congress' power under § 5, however, extends only to 'enforc [ing]' the provisions of the Fourteenth Amendment. The Court has described this power as 'remedial,' *South Carolina* v. *Katzenbach*, *supra*, at 326, 86 S.Ct., at 817-818." (alteration in original)).

amendments and "tailor its legislative scheme to remedying or preventing such conduct." *Fla. Prepaid*, 527 U.S. at 639, 119 S.Ct. at 2207. To satisfy that standard, Congress must develop a "legislative record" that demonstrates a "history and pattern" of unconstitutional state conduct. *Garrett*, 531 U.S. at 368; 121 S.Ct. at 965; *accord Hibbs*, 538 U.S. at 729, 123 S.Ct. at 1978; *Fla. Prepaid*, 527 U.S. at 640, 119 S.Ct. at 2207. And, considered in light of that record, the purported prophylactic must not be "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532, 117 S.Ct. at 2170; *accord Garrett*, 531 U.S. at 372-73, 121 S.Ct. at 966-67.

The Supreme Court's recent decisions in *Hibbs* and *Lane* continue to apply the rule that prophylactic legislation must be supported with a legislative record reflecting a history and pattern of unconstitutional state conduct. In *Hibbs*, considering the validity of the Family and Medical Leave Act, the Court "inquire[d] whether Congress had evidence of a pattern" of sex discrimination in the workplace by states. 538 U.S. at 729, 123 S.Ct. at 1978. A thorough review of that legislative record demonstrated that it was "weighty enough to justify the enactment of prophylactic [Enforcement Clause] legislation." *Id.* at 735, 123 S.Ct. at 1981. Similarly, *Lane* upheld a portion of the Americans with Disabilities Act as a valid prophylactic protecting the right of access to courts when the record regarding discrimination in the provision of public services "far exceed[ed] the record in *Hibbs*." 541 U.S. at 529, 124 S. Ct. at 1992.

In *United States v. Georgia*, the Court distinguished between Congress's undisputable power to remedy "*actual* violations of" the substantive provisions of the Civil War Amendments and "the scope of Congress's 'prophylactic' enforcement powers." 546 U.S. at __, 126 S.Ct. at 881. Section 5 preclearance is, by definition, a prophylactic measure, putatively directed at

avoiding enforcement of unconstitutional voting changes before anyone's constitutional rights are actually violated. *City of Boerne* identified as paradigmatic *Katzenbach*'s analysis of whether the 1965 enactment of §5 was appropriately congruent and proportional legislation in light of the extensive record of discriminatory gamesmanship in certain parts of the country adduced by the 1965 Congress. *City of Boerne*, 521 U.S. at 525-26, 117 S.Ct. at 2166-67. In considering whether the 2006 reenactment of §5 can be constitutionally applied to the district, this Court must apply the same paradigm, as developed in *City of Boerne* and its progeny.

    **B.**    **The 2006 Reauthorization of §5 Is Not a Congruent and Proportional Remedy That Can Be Applied to the District.**

To say that §5 prohibits some conduct that does not violate the Constitution is a vast understatement. The essence of §5 is that it prohibits numerous governmental entities from enacting laws or practices relating to voting without receiving prior federal approval. *See, e.g.*, *Connor v. Waller*, 421 U.S. 656, 656, 95 S.Ct. 2003, 2003 (1975) (*per curiam*) (noting that local enactments subject to §5 "are not now and will not be effective as laws until and unless cleared pursuant to §5"). Because all but a vanishingly small fraction of such changes are found not to abridge the constitutional right to vote, the great bulk of activity forbidden by §5 is constitutionally benign. That fact, especially when coupled with the unparalleled federalism costs exacted by the preclearance regime, set a high evidentiary hurdle for a Congress needing to show that a 1965 remedy was congruent and proportional to the facts on the ground in 2006. Congress did not clear that hurdle, particularly if its broad, intrusive prophylactic provides no escape for a jurisdiction like the district, which did not exist until decades after the 1965 emergency was declared and has never even been accused of erecting discriminatory barriers to voting.

The Supreme Court has articulated a three-step process for determining whether a particular congressional enactment is a congruent and proportional exercise of Congress's remedial power under the Civil War Amendments.  First, a court must "identify with some precision the scope of the constitutional right at issue."  *Garrett*, 531 U.S. at 365, 121 S.Ct. at 958.  Second, it must ask "whether Congress identified a history and pattern" of unconstitutional deprivations of the relevant right.  *Id.* at 368, 121 S.Ct. at 964.  Such a pattern must represent a "widespread and persisting deprivation of constitutional rights."  *City of Boerne*, 521 U.S. at 526, 117 S.Ct. at 2167.  Third, a court must determine whether the statutory remedy is congruent and proportional to the constitutional rights that are being enforced.  *Garrett*, 531 U.S. at 372, 121 S.Ct. at 966.

> **1.    To Be Applied to the District as Appropriate Legislation, §5 Must Be Congruent and Proportional to the Right to Be Free of Purposeful Discrimination in Voting.**

In applying the first step in the congruence and proportionality analysis, a court must identify the "metes and bounds of the constitutional right in question," *id.* at 368, 121 S.Ct. at 964, with "some precision."  *Id.* at 365, 121 S.Ct. at 963.  Congress's stated purpose in the 2006 VRA is "to ensure that the right of all citizens to vote, including the right to register to vote and cast meaningful votes, is preserved and protected as guaranteed by the Constitution."  Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, §2, 120 Stat. 577.  The constitutional guarantee is stated in §1 of the Fifteenth Amendment: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  Thus, the 2006 VRA as a whole aims at protecting the right to vote from denial or abridgment by state actors on account of racial minority status.

More precisely, the Fifteenth Amendment guarantee is a guarantee against "*purposefully* discriminatory denial or abridgment by government of the freedom to vote." *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 65, 100 S.Ct. 1490, 1498 (1980) (plurality opinion) (emphasis added); *accord Myers v. Anderson*, 238 U.S. 368, 379, 35 S.Ct. 932, 935 (1915); *Guinn v. United States*, 238 U.S. 347, 363-65, 35 S.Ct. 926, 930-31 (1915); *see Garrett*, 531 U.S. at 365, 121 S.Ct. at 963 ("[I]t is the responsibility of this Court, not Congress, to define the substance of constitutional guarantees.").[10]  Thus, the Fifteenth Amendment prohibits measures implemented with the intent and effect of denying racial minorities access to the ballot. *Holder v. Hall*, 512 U.S. 874, 922, 114 S.Ct. 2581, 2607 (1994) (Thomas, J., concurring) (listing examples of voting measures designed to deny ballot access).

To the extent §5 is also directed at enforcing the Fourteenth Amendment's Equal Protection Clause, that constitutional guarantee is also one against purposeful discrimination.  A plaintiff challenging an election scheme under the Fourteenth Amendment "must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination,'" *Mobile*, 446 U.S. at 66, 100 S.Ct. at 1499 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872 (1971) (alterations in original)).  That is, apportionment schemes that have the effect of diluting minority voting strength "violate the Fourteenth

---

[10] In fact, however, Congress appears to have attempted to redefine part of the substantive rights at issue.  Prior to the 2006 reauthorization, the Supreme Court held preclearance could only be denied for vote dilution when it was retrogressive, even if the Department of Justice believed it to be motivated by a discriminatory intent. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 335–36, 120 S.Ct. at 866, 875-76 (2000) (*Bossier Parish II*).  In the 2006 reauthorization, Congress attempts to override *Bossier Parish II* "by clarifying that any voting change motivated by any discriminatory purpose is prohibited under Section 5."  H.R. REP. NO. 109-478, at 68 (2006).  But the Supreme Court has expressly noted that extending §5 preclearance to cover non-retrogressive discrimination would "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts . . . perhaps to the extent of raising concerns about § 5's constitutionality." *Bossier Parish II*, 528 U.S. at 336, 120 S.Ct. at 876 (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)).

Amendment when they are adopted with a discriminatory purpose." *Shaw v. Reno*, 509 U.S. 630, 641, 113 S.Ct. 2816, 2823 (1993); *see also, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 616-617, 102 S.Ct. 3272, 3274-3275 (1982); *White v. Register*, 412 U.S. 755, 765-766, 93 S.Ct. 2332, 2339-2340 (1973).

As relevant to this case, for the 2006 §5 to be constitutionally applied to the district it must be shown that the preclearance requirement is a congruent and proportional prophylactic to protect racial minorities from denial or abridgment of the right to vote by governmental entities similarly situated to the district. *See Lane*, 541 U.S. at 531, 124 S.Ct. at 1993 (upholding the validity of remedial legislation "as it applies to the class of cases" at issue); *Morrison*, 529 U.S. at 598, 626, 120 S.Ct. at 1740, 1759 (invalidating the Violence Against Women Act's civil-remedy provision in part because it "applie[d] uniformly throughout the [n]ation," including to states with no history of discriminating against victims of gender-motivated violence). Section 5 cannot be constitutionally applied to the district if the record adduced by Congress fails to demonstrate a sufficient nexus between a regime that burdens thousands of local entities with a requirement that they seek federal permission for every minute change affecting voting, nearly all of which are found to be benign, and the prevention of purposeful abridgment of the right to vote in such jurisdictions.

> **2.      In the 2006 Reauthorization, Congress Had No Sufficient Evidence and Made No Sufficient Findings Identifying a Relevant History or Pattern of Discrimination.**

In reenacting §5 in 2006, Congress made no sufficient findings of "extraordinary circumstances," *Miller*, 515 U.S. at 926, 115 S.Ct. at 2493, like those that justified the original enactment of the VRA in 1965. *See Katzenbach*, 383 U.S. at 334, 86 S.Ct. at 822 ("exceptional conditions" justified "legislative measures not otherwise appropriate"). When Congress originally created §5 preclearance, it found (1) that racial discrimination in voting was "an

*insidious and pervasive evil* which had been perpetuated in certain parts of our country through *unremitting and ingenious defiance* of the Constitution," and (2) previous congressional measures had been "unsuccessful remedies."  *Katzenbach*, 383 U.S. at 309, 86 S.Ct. at 808 (emphasis added).  Congress could not permissibly enact the same remedy 41 years later with no showing that such extraordinary conditions persist in modern times.  *See Garrett*, 531 U.S. at 369 n.6, 121 S.Ct. at 965 n.6 (invalidating the ADA when the congressional record, although including evidence of historical measures like compulsory sterilization of the disabled, contained "no indication that any State had persisted in requiring such harsh measures as of 1990 when the ADA was adopted")*; City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169 (requiring that the congressional record demonstrate "modern instances" of unconstitutional state action).

In 2006, Congress had no evidence that the type of gamesmanship described in *Katzenbach* was still rampant in those jurisdictions covered by the hoary §4(b) coverage formula.  To the contrary, Congress found that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters."  Pub. L. No. 109-246, 120 Stat. 577, §2(b)(1); *see also* H.R. REP. NO. 109-478, at 12 (2006); Samuel Issacharoff, *Is Section 5 of the Voting Rights Act a Victim of Its Own Success?*, 104 COLUM. L. REV. 1710, 1730 (2004).  "Gone are the poll taxes, the literacy tests, and the other overt barriers to voter registration."  Samuel Issacharoff, *Polarized Voting and the Political Process: The Transformation of Voting Rights Jurisprudence*, 90 MICH. L. REV. 1833, 1833-34 (1992). In fact, there are numerous examples of congressional findings that *negate* the existence of extraordinary circumstances like those existing in 1965:

- "[I]n seven of the covered States, African-Americans are registered at a rate higher than the national average."  S. REP. NO. 109-295, at 8 (2006).

- "[I]n Texas, 68.4 percent of African-Americans were registered to vote in 2004 compared to 61.5 percent of white citizens." H.R. REP. NO. 109-478, at 12.

- "[I]n California, Georgia, Mississippi, North Carolina, and Texas, black registration *and turnout* in the 2004 election (the most recent Presidential election) was higher than that for whites." S. REP. NO. 109-295, at 8 (emphasis added).

- There have been "significant increases in the number of African-Americans serving in elected offices": [a]s of 2000, more than 9,000 African-Americans have been elected to office, an increase from the 1,469 officials who held office in 1970." H.R. REP. NO. 109-478, at 18.

- "[T]he number of African-American elected officials serving in the original six States covered by the temporary provisions of the Voting Rights Act (Louisiana, Mississippi, South Carolina, Virginia, Georgia, and Alabama) increased by approximately *1000 percent* since 1965." *Id.* (emphasis added).

After making these findings, Congress reauthorized §5—not on the basis of extraordinary circumstances, but, purportedly, because "vestiges of discrimination in voting" were maintained through "second generation barriers." Pub. L. No. 109-246, 120 Stat. 577, §2(b)(2). "Second generation barriers" are a far cry from the "century of systematic resistance to the Fifteenth Amendment" that initially justified §5 preclearance. *Katzenbach*, 383 U.S. at 328, 86 S.Ct. at 818. Specifically, in reauthorizing §5 in 2006, Congress pointed to (1) racially polarized voting, (2) DOJ preclearance statistics, and (3) anecdotal evidence. 120 Stat. 577, §§3–4; *see also* H.R. REP. NO. 109-478, at 21–24, 34–35. However, none of these justifications comes close to finding the extraordinary circumstances necessary to justify the prior restraint prophylactic of §5 preclearance.

In stark contrast to the strong evidence of a systematic pattern of discriminatory applications of tests and other barriers to ballot access identified by Congress in 1965, in 2006 Congress instead identified racially polarized voting as "the clearest and strongest evidence" it had "of the continued resistence [*sic*] within covered jurisdictions to fully accept minority citizens and their preferred candidates into the electoral process." *Id.* at 34. Such evidence does

not support the §5 preclearance remedy for at least two reasons.  First, there is no link between the possible existence of racially polarized voting and the pattern of gamesmanship and avoidance that Congress found to justify §5 in 1965.  At best, it might justify some other substantive restriction in the VRA, but not preclearance.  In any event, racially polarized voting is not state action.  *See Rogers*, 458 U.S. at 647 n.30, 102 S.Ct. at 3291 n.30 (Stevens, J., dissenting)  Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?*, 81 DENV. U. L. REV. 225, 261 (2003).  State action, however, is the only appropriate target for Congress's enforcement powers under the Civil War Amendments, *see, e.g.*, *Morrison*, 529 U.S. at 625–26, 120 S.Ct. at 1758-59, and the relevant constitutional right at issue is the right of citizens to be free of such state action. Further, the existence of racially polarized voting is drastically different from the plethora of procedural barriers that were used to deny the ability to vote before 1965.  *See Katzenbach*, 383 U.S. at 311–12, 86 S.Ct. at 810.  Nor is racially polarized voting identical to retrogressive vote-dilution.  Purposeful *dilution of voting power*, which nullifies minority voters' ability "to elect the candidate of their choice," is unconstitutional.  *Shaw*, 509 U.S. at 640–41, 113 S.Ct. at 2816, 2823 (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 569; 89 S.Ct. 817, 833 (1969)).  But there is no constitutional guarantee of a particular *outcome* in a nondiscriminatory electoral process.  *See League of United Latin Am. Citizens v. Perry*, __ U.S. __, 126 S.Ct. 2594, 2615 (2006) ("We have said that 'the ultimate right of §2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11, 114 S.Ct. 2647, 2658 n.11 (1994))).  Rather, for there to be a constitutional violation, there must be a "voting-procedures change[ ]" diluting minority voting power.  *Miller*, 515 U.S. at 926, 115 S.Ct. at 2493.  The existence of racially polarized voting, though, is not a voting-

procedures change and is patently not unconstitutional.  Thus, this finding does not support Congress's 2006 reauthorization of §5 preclearance because it does not address a constitutional violation.

Next, Congress's reliance on Department of Justice preclearance statistics is misplaced. Congress recognized that (1) "the Department of Justice reported that roughly between 4,000 and 6,000 submissions have been received annually from jurisdictions covered by the VRA," and (2) "more Section 5 objections were lodged between 1982 and 2004 than were interposed between 1965 and 1982."  H.R. REP. No. 109-478, at 21, 36.  But reliance on these statistics is a "poor prox[y] for intentionally discriminatory state action in voting, for a number of reasons."  Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After* Tennessee v. Lane, 66 OHIO ST. L.J. 177, 190 (2005).  The number of submissions only proves that "states and local jurisdictions covered by Section Five have been endeavoring to make a large number of changes in voting practices and procedures and submitting those changes to DOJ for approval."  *Id.*  The number of complaints, though, fails to account for the significant increase in the number of submissions over time.  Rather, objections as a percentage of submissions have drastically decreased in the past forty-two years: "Objection rates exceeded 4% of total submissions in the first five years of the Voting Rights Act.  They fell precipitously to 1.31% in the next five-year period and have been falling steadily ever since, down to 0.05% from 0.23% in the last three five-year periods."  *Id.*  Therefore, there is "very little in the DOJ evidence that Congress could use to support a case for a renewed Section Five."  *Id.*  In short, the raw number of objections in recent years is no evidence of a "widespread and persisting deprivation," *City of Boerne*, 521 U.S. at 526, 117 S.Ct. at 2167, when the *proportion* of those objections to *all* submissions is a minute fraction of a percent.  The numbers are in fact

conclusive evidence that there is no gamesmanship prevalent in covered jurisdictions today of the type that justified the 1965 §5 remedy.

Additionally, Congress relied on anecdotal evidence of unconstitutional discrimination and retrogression. *See* H.R. REP. NO. 109-478, at 22–23, 36–40. "Most of the record adduced in the House and Senate Judiciary Committees is devoted to first-person accounts of alleged discrimination." S. REP. NO. 109-295, at 11. Of course, Congress can "cull a number of examples of grossly outrageous purposeful discrimination," but even this anecdotal evidence demonstrates that §5 preclearance is simultaneously over- and under-inclusive. Pitts, *supra*, at 255. It is over-inclusive because these anecdotes do not implicate most of the covered jurisdictions. Of the 893 covered counties, only 139 are directly implicated in the anecdotes, and in Texas, only 22 of the 254 covered counties are implicated. S. REP. NO. 109-295, at 19. (additional views of Sen. Coburn and Sen. Cornyn). Preclearance is also under-inclusive as at least 45 non-covered counties were implicated by these anecdotes. *Id.* at 23. Additionally, besides proving that §5 is both over- and under-inclusive, these anecdotes come nowhere close to showing extraordinary circumstances or a "systematic resistance to the Fifteenth Amendment." *Katzenbach*, 383 U.S. at 328, 86 S.Ct. at 818. Indeed, Congress never found in 2006 that "case-by-case litigation" was inadequate for remedying what little unconstitutional voting discrimination it could still point to. *Cf. id.* at 328, 86 S.Ct. at 818 ("Congress had found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits."). Nor did Congress find that any evidence, anecdotal or otherwise, of any jurisdiction, covered or not, engaged in systematic undermining of voting rights by staying one step ahead of the courts, as was true in 1965.

Beyond failing to adduce evidence of widespread and persistent discriminatory gamesmanship in general, Congress also failed to adduce evidence that small, local governmental units like the district are a significant source of any problems, much less the kind of specific problems that might justify a reenactment of §5.  *Cf. Garrett*, 531 U.S. at 369-70, 121 S.Ct. at 965-966 (finding that, although Congress had identified evidence of widespread private discrimination against the disabled, it had no such evidence of widespread discrimination by state employers, the particular actors targeted by the remedial provision in question).  Although Congress produced a record of 12,000 pages, it hardly made any findings relating to jurisdictions smaller than counties, except to note a few anecdotes related to cities or school boards.  H.R. REP. NO. 109-478, at 25.  Nevertheless, the House Committee on the Judiciary concluded that the scanty evidence it did receive in this regard was sufficient to "highlight[] the necessity of Section 5 objections to protect minority voters from actions undertaken by local governments."  H.R. REP. NO. 109-478, at 37.  The Committee, however, included counties within its definition of "local governments."  *See id.*  So even that conclusory statement provides no basis for imposing §5's preclearance burdens on the numerous smaller-than-county political subdivisions in covered states.

### 3.    Section 5 Is Not Congruent and Proportional to the Rights It Purports to Enforce or the Record Adduced by Congress.

As reauthorized in 2006, §5 is not congruent for at least the reasons that it sweeps in a disproportionate amount of constitutional activity and numerous jurisdictions, like the district, with no demonstrated history of discriminatory voting practices.  And §5 is not proportional for at least the reason that it imposes an unparalleled strain on our federal structure that cannot be justified by any present-day emergency.

"From a federalism perspective, the preclearance mechanism is surely stiff medicine." James F. Blumstein, *Federalism and Civil Rights: Complementary and Competing Paradigms*, 47 VAND. L. REV. 1251, 1263 (1994). From its beginning, the Supreme Court has recognized that the historically unique §5 preclearance requirement imposes "substantial 'federalism costs.'" *Lopez,* 525 U.S at 282, 119 S.Ct. at 703 (quoting *Miller*, 515 U.S. at 926; 115 S.Ct. at 2493); *see also Reno v. Bossier Parish Sch. Bd. (Bossier Parish II),* 528 U.S. 320, 336, 120 S.Ct. at 866, 876 (2000); *Bossier Parish I*, 520 U.S. at 480, 117 S.Ct. at 1498; *Katzenbach*, 383 U.S. at 334, 86 S.Ct. at 821.[11] The reauthorized 2006 version of §5 preclearance—which directly injects the federal Executive Branch into the law- and policymaking processes of countless local governmental units—could not be a proportional response to any but the most acute conditions. *City of Rome* recognized that Congress can displace state policies because "the Fifteenth Amendment supersedes contrary exertions of state power." 446 U.S. at 178, 180 (quoting *Katzenbach*, 383 U.S. at 325, 86 S.Ct. at 817). There have been no sufficient findings of relevant present-day widespread exertions of state power contrary to the guarantee of the Fifteenth Amendment. Congress's record for the 2006 enactment comes nowhere close to demonstrating that such conditions exist today or are likely to persist for another 25 years and thus cannot justify the severe federal intrusion inherent in §5.

---

[11] Individual Justices, with diverse constitutional philosophies, have recognized the serious federalism concerns too. *E.g.*, *Lopez*, 525 U.S. at 294, 119 S.Ct. at 708 (Thomas, J., dissenting) ("The section's interference with state sovereignty is quite drastic—covered States and political subdivisions may not give effect to their policy choices affecting voting without first obtaining the Federal Government's approval."); *City of Rome*, 446 U.S. at 209, 100 S.Ct. at 1574 (Rehnquist, J., dissenting) ("[R]equiring localities to submit to preclearance is a significant intrusion on local autonomy."); *Sheffield*, 435 U.S. at 141, 98 S.Ct. at 984 (Stevens, J., dissenting) (describing §5's encroachment on state sovereignty as being "significant and undeniable"); *Georgia*, 411 U.S. at 545, 93 S.Ct. at 1703 (Powell, J., dissenting) ("It is indeed a serious intrusion, incompatible with the basic structure of our system, for federal authorities to compel a State to submit its legislation for advance review.").

### a. The New Enactment of §5 Is Not Geographically Targeted to Areas with Problems.

The current incarnation of §5 imposes its unique federal intrusion on countless jurisdictions that, like the district, have no demonstrated history of racially discriminatory governmental action denying or abridging the right to vote, let alone recent history of such conduct. That fact is hardly surprising given that Congress reenacted the formula in §4(b)— which triggers coverage for §5—unchanged from its enactment in 1975. *Compare* 42 U.S.C. §1973*b*(b) *with* Pub. L. No. 94-73, §202. And the failure to enact an updated coverage formula with any hope of tailoring the geographical scope of current §5 to the contours of any present-day problem that might exist compels a conclusion that the 2006 enactment of §5 is not congruent and proportional. *See City of Boerne*, 521 U.S. at 532-33, 117 S.Ct. at 2170 (noting that the 1965 provisions upheld as an appropriate exercise of the enforcement power were "confined to those regions of the country where voting discrimination had been most flagrant"); *see also Fla. Prepaid*, 527 U.S. at 647, 119 S. Ct. at 2210 (noting that in passing the Patent Act, which was found not to be a valid exercise of the enforcement power, "Congress did nothing to limit the coverage of the Act" by "providing for suits only against States with questionable remedies or a high incidence of infringement.")

Section 5's coverage under the 2006 enactment bears no rational geographical relationship to whatever unconstitutional voting-related conduct may exist today because it is based on a proxy formula using data inputs that date back at least 35 years to 1972. 42 U.S.C. §1973*b*(b). Notably, the 2006 enactment of §§4 and 5, premised on data that is already 35 years old, will endure for 25 years. 42 U.S.C. §1973*b*(a)(8). As applied to the district, that means that by 2031 the district will continue to be burdened by requirements based on 60-year-old facts that contain nothing specific to the district, which did not even exist until two decades ago. Such

temporally disconnected evidence cannot be used to draw legitimate territorial boundaries to a remedy to be applied today and far into the future. *See Garrett*, 531 U.S. at 369 n.6, 121 S.Ct. at 965 n.6; *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169.

The §4(b) coverage formula uses two proxies to determine whether a jurisdiction has engaged in voting discrimination: (1) use of literacy tests or other devices that prohibited voting, and (2) voting registration and turnout rates. *Id.* Both proxies are out of date and cannot indicate which jurisdictions have recently engaged in unconstitutional transgressions. *See Garrett*, 531 U.S. at 365, 121 S.Ct. at 963. Literacy tests and other devices preventing ballot access have not been used for decades. Indeed, they are permanently banned. 42 U.S.C. §1973*aa* (2007). The use of such devices so far back in time offers nothing helpful to discerning where unconstitutional voting discrimination has occurred recently.

Voting registration and turnout rates are conceivably useful as proxies, but the 2006 enactment still uses presidential election data from 1964, 1968, and 1972. Had Congress attempted to implement the possibly better proxy of using recent 2000 and 2004 presidential election data, the contours of its remedy would have looked drastically different, particularly if the formula were applied to localized conditions rather than painting states with a broad brush. *Cf.* Pitt, *supra*, at 280 (proposing that §5 could be made more congruent and proportional "by adopting a two-tier level of coverage," avoiding "'automatic' coverage" of potentially innocent localities but acknowledging that even that coverage formula could fail the congruence and proportionality test). For example, if coverage were based on voter registration and turnout under 50 percent at the county level during the most recent presidential elections, at least 351 currently covered counties would no longer be covered (including nearly half of all Texas

counties—118 out of 254).  152 CONG. REC. H5180 (daily ed. July 13, 2006) (statement of Rep. Norwood).

Congress made no serious effort to determine if proxies based on 1972 data bear any relation to conditions existing across the United States in 2006.  Certainly Congress made no meaningful comparison between previously covered jurisdictions and noncovered ones.  Pub. L. No. 109-246, §2(b)(5), 120 Stat. 577 (Congressional findings limited to generalized, conclusory statements regarding "the continued need for Federal oversight in jurisdictions covered by the Voting Rights Act of 1965 since 1982").  Thus there is no basis to conclude that those jurisdictions—like the district—that are singled out for special federal treatment are any worse with regard to the constitutional rights at issue than those that are not.  There is simply no reason to believe that statistics about voter registration and participation up to 1972 can be applied to identify pockets of voting discrimination persisting into the twenty-first century or to exclude anywhere near all those jurisdictions in which such discrimination is not entrenched.  They certainly are not a sufficient proxy on which to apply §5 to the district.

### b.    Section 5 Cuts Too Broad a Swath.

Section 5 covers a vast amount of clearly constitutional government activity in two distinct senses.  First, the essence of §5 is that it compels state and local governmental units to invite an arm of the national government—in all but the rarest cases, the Executive Branch—into their legislative processes.  It is certainly not unconstitutional for a state legislature to pass a bill into law or a local authority like the district's board to pass resolutions in a process that bypasses the federal government.  *Cf. Allen*, 393 U.S. 544, 596, 89 S.Ct. at 847 (Black, J., dissenting) (noting that "[p]roposals to give judges a part in enacting or vetoing legislation before it passed were made and rejected in the Constitutional Convention").  Second, out of the tens of thousands of changes submitted for preclearance, the percentage actually found to present even arguable

constitutional problems, and thus draw objection from the Department of Justice, is minute. Hasen, *supra*, at 191-92 (noting that objections were "down to 0.05% from 0.23% in the last three five-year periods" up to 2005). And even most of those objections probably do not signify the *purposeful* discrimination that is required for a constitutional violation.

Section 5 cannot satisfy the congruence and proportionality standard when it touches so much activity that is not related to the constitutional guarantee against purposeful voter discrimination. *See Kimel*, 528 U.S. at 86, 120 S.Ct. at 647 (noting that the Age Discrimination in Employment Act failed to satisfy the standard because it "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable" constitutional standard); *Fla. Prepaid*, 527 U.S. at 646, 119 S.Ct. at 2210 (noting that, in the Patent Act, Congress "did nothing to limit the coverage . . . to cases involving arguable constitutional violations"). Like the Religious Freedom Restoration Act found to be invalid in *City of Boerne*, §5, as reenacted in 2006, is not "designed to identify and counteract state laws likely to be unconstitutional." *City of Boerne*, 521 U.S. at 534, 117 S.Ct. at 2171.

### c.    Section 5 Lacks Meaningful Limitations in Time and Scope.

Section 5 is not only over broad but too intrusively deep. As illustrated by its application to the small, limited-purpose district in this lawsuit, §5 unnecessarily projects the national government's reach too far down, right to the neighborhood level. As with RFRA, "[s]weeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *Id.* at 532, 117 S.Ct. at 2170 (noting that RFRA's restrictions applied to every local agency and official).

Congress also apparently regards §5 as unlimited in time. Although the 2006 reenactment purports to set a termination date in 25 years, that termination is and would remain

illusory if the 2006 enactment could be upheld.  It is already the second 25-year extension, and the fourth extension overall.  In the aggregate, the original five-year response to the 1965 emergency has been extended by an additional 62 years.  While Congress was unable to adduce an adequate record of an endless emergency persisting to the present day, there is no end in sight to the dictates of §5, exacerbating the inappropriateness of that legislation.  *See id.* at 533, 117 S.Ct. at 2170 (noting that the incarnation of §5 last upheld in *City of Rome* "lapsed in seven years").

Moreover, if a jurisdiction like the district cannot terminate application of §5 to it through bailout, then bailout is an empty promise that cannot "reduce the possibility of overbreadth." *Id.* (indicating that the fact that the bailout "provision permitted a covered jurisdiction to avoid preclearance requirements under certain conditions" was important to finding §5 constitutionally valid).   If §5's perpetual renewals based on stale evidence continue to go unexamined and if jurisdictions like the district remain unable to escape preclearance in any achievable way, §5, like RFRA, effectively "has no termination date or termination mechanism," *id.* at 532, 117 S.Ct. at 2170, and is not congruent and proportional.

There is simply no evidence that local governmental entities in covered jurisdictions today are engaging in the kind of gamesmanship that drove passage of the original §5 in 1965. That practice by local authorities of staying "one step ahead" in contriving barriers to registration and ballot access is what made the preemptive §5 congruent and proportional in 1965.  *See Katzenbach*, 383 U.S. at 333-34, 86 S.Ct. at 821 ("The record shows that in most of the States covered by the Act, including South Carolina, various tests and devices have been instituted with the purpose of disenfranchising Negroes, have been framed in such a way as to facilitate this aim, and have been administered in a discriminatory fashion for many years.")  Absent those

exigent circumstances—which Congress found existed forty years ago, but did not and could not have found to exist today—the only congruent and proportional response to such denials or abridgments of the right to vote as may still occur is §2 of the VRA.  Section 5, by its very nature, is a purely prospective and prophylactic measure.  By comparison, §2 enforces the Fifteenth Amendment by remedying such *actual* constitutional violations as may occur.  42 U.S.C. §1973; *cf. United States v. Georgia*, 546 U.S. at __, 126 S.Ct. at 881 (distinguishing between Congress's clear power to remedy actual violations of the Constitution and the necessity for congruence and proportionality when Congress imposes a broad prophylactic measure).

## CONCLUSION

For these reasons, the Court should grant summary judgment that the district is entitled to bail out from §5 coverage under §4(a) or, in the alternative, that §5 is unconstitutional as applied to the district.

DATED:  May 15, 2007                    Respectfully submitted:

/s/ Gregory S. Coleman
Gregory S. Coleman
(admitted *pro hac vice*)
Christian J. Ward
(admitted *pro hac vice*)
PROJECT ON FAIR REPRESENTATION
YETTER & WARDEN, L.L.P.
221 West 6th Street, Suite 750
Austin, Texas  78701
[Tel.] (512) 533-0150
[Fax]  (512) 533-0120

/s/ Erik S. Jaffe
Erik S. Jaffe
D.C. Bar No. 440112
ERIK S. JAFFE, P.C.
5101 34th Street N.W.
Washington, D.C .20008
[Tel.] (202) 237-8165
[Fax]  (202) 237-8166

*Attorneys for Plaintiff*
*Northwest Austin Municipal*
*Utility District No. One*

CERTIFICATE OF SERVICE

I hereby certify that I served Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment upon counsel for the parties indicated below through the Court's electronic case filing system on May 15, 2007.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

*Counsel for Defendant*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Intervenors-Defendants Texas
State Conference of NAACP and Austin
Branch of the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Intervenors-Defendants Texas State
Conference of NAACP and Austin Branch of the
NAACP*

Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland  21215

*Counsel for Intervenors-Defendants Texas State
Conference of NAACP and Austin Branch of the
NAACP*

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
    EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas  78205

*Counsel for Intervenors-Defendants Lisa
Diaz, Gabriel Diaz, and David Diaz*

Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York  10013

*Counsel for Intervenors-Defendants Rodney
and Nicole Louis for Applicants by Winthrop
Graham, Yvonne Graham, Wendy
Richardson, Jamal Richardson, and Marisa
Richardson*

David J. Becker
dbecker@pfaw.org
People for the American Way Foundation
2000 M Street NW, Suite 400
Washington, D.C.  20036

*Counsel for Intervenor-Defendant People
for the American Way*

J. Gerald Hebert
jghebert@comcast.net
5019 Waple Lane
Alexandria, Virginia  22304

*Counsel for Intervenor-Defendant Travis
County*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C.  20003

*Counsel for Intervenors-Defendants Lisa Diaz,
Gabriel Diaz, and David Diaz*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
    FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.  20005

*Counsel for Intervenors-Defendants Rodney and
Nicole Louis and for Applicants by Winthrop
Graham, Yvonne Graham, Wendy Richardson,
Jamal Richardson, and Marisa Richardson*

Max Renea Hicks
rhicks@renea-hicks.com
1250 Norwood Tower
114 West 7th Street
Austin, Texas  78701

*Counsel for Intervenor-Defendant Travis County*

Laughlin McDonald
Neil Bradley
courtfilings@aclu-nca.org
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, Georgia  30303

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Lisa Graybill
Legal Director
courtfilings@aclu-nca.org
ACLU FOUNDATION OF TEXAS
1210 Rosewood Ave.
Austin, Texas 78702

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Art Spitzer
artspitzer@aol.com
courtfilings@aclu-nca.org
Legal Director
ACLU OF THE NATIONAL CAPITAL AREA
1400 20th Street N.W., Suite 119
Washington, D.C. 20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jose Garza
jgarza@trla.org
Judith A. Sanders-Castro
George Korbel
Texas RioGrande Legal Aid, Inc.
1111 N. Main Street
San Antonio, Texas 78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Alpha Hernandez
ahernandez@trla.org
Eloy Padilla
epadilla@trla.org
Texas RioGrande Legal Aid, Inc.
309 Cantu Street
Del Rio, Texas 78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael T. Kilpatrick
mkirkpatrick@citizen.org
Brian Wolfman
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, N.W., Suite 350
Washington, D.C. 20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

*Counsel for Intervenor-Defendant Nathaniel Lesane*

/s/ Christian J. Ward
Christian J. Ward

NW MUD – MSJ Attachments

| Exhibit No. | | Description |
|---|---|---|
| 1 | | Affidavit of Frank Reilly |
| 2 | 11/25/86 | Preclearance letter and response |
| 3 | 3/21/88 | Preclearance letter and response |
| 4 | 3/6/90 | Preclearance letter and response |
| 5 | 6/6/96 | Preclearance letter and response |
| 6 | 3/26/98 | Preclearance letter and response |
| 7 | 3/27/02 | Preclearance letter and response |
| 8 | 4/4/03 | Preclearance letter and response |
| 9 | 2/26/04 | Preclearance letter and response |
| 10 | 02-26-07 | Gary Bledsoe |
| 11 | 03-01-07 | Jovita Casares |
| 12 | 02-22-07 | Sharlene Collins |
| 13 | 03-02-07 | Sharlene Collins |
| 14 | 02-26-07 | Dana DeBeauvoir |
| 15 | 02-28-07 | David Diaz |
| 16 | 02-22-07 | Jose Gabriel Diaz |
| 17 | 02-28-07 | Lisa Diaz |
| 18 | 02-20-07 | William Ferguson |
| 19 | 02-28-07 | William Ferguson |
| 20 | 02-28-07 | Angela Garcia |
| 21 | 04-25-07 | Winthrop Graham |
| 22 | 04-25-07 | Yvonne Graham |
| 23 | 03-01-07 | Tanya House |
| 24 | 02-26-07 | Nathaniel Lesane |
| 25 | 03-01-07 | Nicole Louis |
| 26 | 03-01-07 | Rodney Louis |
| 27 | 04-09-07 | Terry Musika |
| 28 | 02-26-07 | Kerri Jo Qualtrough |
| 29 | 02-23-07 | Frank Reilly |
| 30 | 04-26-07 | Jamal Richardson |
| 31 | 04-26-07 | Wendy Richardson |
| 32 | 04-04-07 | Ryan Robinson |
| 33 | 04-26-07 | Marisa Williams |
| 34 | 02-28-07 | Ofelia Zapata |
| 35 | 02-21-07 | Donald Zimmerman |
| 36 | | Spanish Language Materials |
| 37 | | Canvass Reports |