IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN                )
MUNICIPAL UTILITY DISTRICT      )
NUMBER ONE,                     )
401 W. 15th Street              )       CIVIL ACTION NO.
Suite 850                       )
Austin, Texas 78701             )       1:06-CV-01384
            Plaintiff,          )       (DST,PLF,EGS)
                                )
v.                              )
                                )
ALBERTO GONZALES,               )
ATTORNEY GENERAL OF THE         )
UNITED STATES,                  )
U.S. Department of Justice      )
950 Pennsylvania Avenue NW      )
Washington, D.C. 20530          )


* * * * * * * * * * * * * * *
ORAL DEPOSITION OF
GARY BLEDSOE
Monday, February 26, 2007
* * * * * * * * * * * * * * *

ORAL DEPOSITION OF GARY BLEDSOE, produced as a

witness at the instance of the Plaintiff and duly

sworn, was taken in the above-styled and numbered cause

on the 26th day of February, 2007, from 4:56 p.m. to

5:58 p.m., before RANDALL N. FINCH, Certified Shorthand

Reporter in and for the State of Texas, reported by

computerized stenotype machine at the offices of Weil,

Gotshal & Manges, LLP, 8911 Capital of Texas Highway,

Suite 1350, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

**Page 2**

APPEARANCES

FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NO. ONE:

Mr. Gregory S. Coleman
-and-
Mr. Christian J. Ward
WEIL, GOTSHAL & MANGES, LLP
8911 Capital of Texas Highway
Building One, Suite 1350
Austin, Texas 78759 (512) 349-1937
(512) 527-0698 Fax

FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
FUND (MALDEF):

Ms. Nina Perales
-and-
Mr. Diego Bernal
Attorney at Law
110 Broadway, Suite 300
San Antonio, Texas 78205 (210) 224-5476
(210) 224-5382 Fax

FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
DIVISION:
Mr. Chris Herren
-and-
Ms. Christy A. McCormick
950 Pennsylvania Avenue, N.W., Room 7246
Washington, D.C. 20530 (202) 305-0609
(202) 327-3961 Fax

FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:

Mr. Benjamin Blustein
Staff Attorney, Voting Rights Project
1401 New York Avenue, NW, Suite 1400
Washington, D.C. 20005 (202) 662-8320
(202) 628-2858 Fax

**Page 3**

FOR THE LEWIS INTERVENORS:
Mr. Samuel Spital
HOLLAND & KNIGHT, LLP
195 Broadway, 24th Floor
New York, New York 10007-3189 (212) 513-3454
(212) 385-9010 Fax

**Page 4**

GARY BLEDSOE,
having been first duly sworn, testified as follows:
                    EXAMINATION
BY MR. COLEMAN:
    Q.  Mr. Bledsoe, good afternoon.
    A.  Good afternoon, Mr. Coleman.  How are you
today?
    Q.  I'm well, thanks.  Thanks for coming over.
    A.  Thank you.
    Q.  Did you bring any documents today in response
to deposition notice that you received?
    A.  No.  I -- looking at that, it appeared that
any documents that we would have had that was
responsive to that would have already been turned over,
I guess, the disclosures or what have you.  I think the
transcripts from the hearings we've had is one thing
that really kind of stands out and there -- I guess
there have been a lot of documents probably in the
public domain, like, you know, decisions of the Supreme
Court or what have you.
    Q.  All right.  You're here on behalf of two
organizations today?
    A.  Yes, the NAACP State Conference of Texas and
the Austin branch of the NAACP.
    Q.  And are those entities affiliated?

**Page 5**

    A.  Yes, we're all units or affiliated with the
national organization in Baltimore, Maryland.
    Q.  Can you tell me how the Texas State Conference
and Austin branch are related?
    A.  The Texas State Conference is essentially in
oversight relationship to the Austin branch.  There are
70 some odd branches in the State of Texas, and the
state conference has oversight responsibility over
those, making sure they adhere with national rules and
things of that nature.
    Q.  Is the -- is the Texas entity, then, different
in nature -- in nature than the other local branches?
You say it has oversight responsibility.  Does it -- is
that its primary function?
    A.  No, it also has civil rights responsibility as
well.  It primarily handles matters on the state level
that -- matters of importance to individuals of the
African-American community or minority -- ethnic and
racial minorities in the state, but it also has the
other function of helping to train and guide local
units.
        The local units have that same civil
rights function in their own communities, but in terms
of state issues, those are driven by the state
organization, and local issues before your city

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

419a3e49-c742-4515-bf32-c97afc0ec34c

Page 6

1   council, et cetera, are driven by the local
2   organization.
3       Q. Would a person living in Austin -- you
4   could -- a person living in Austin could be a member of
5   the Austin branch? Is that correct?
6       A. That's correct, uh-huh. That's correct.
7       Q. Would that person also be a member of the
8   Texas State Conference?
9       A. Well, the membership of the state conference
10  is not the same. Everyone who is a member in Texas is
11  a member of the state conference.
12      Q. And would that be -- could I, for instance --
13  without joining a branch, could I join the Texas State
14  Conference, or is it through the branches?
15      A. Well, the -- you can join the national
16  organization without joining the local. But any member
17  of the local would be a member of the state conference.
18  But, of course, in terms of voting power and things of
19  that nature, you wouldn't have that. You would just be
20  a member of the NAACP in Texas.
21      Q. I'm not sure I quite understood that. So let
22  me -- let me clarify it for myself at least. Could
23  I -- it would be easy enough for me to fill out an
24  application to join the Austin branch. Right?
25      A. That's correct.

Page 7

1       Q. And through that I would belong to the Texas
2   State Conference.
3       A. That's correct.
4       Q. But I could not fill out an application, join
5   the state conference by itself.
6       A. I think the theoretical possibility exists.
7   It's really never happened.
8       Q. I see. Okay. How many members do you have in
9   the Austin area -- that -- I'm sorry, the Austin branch
10  have in the Austin area?
11      A. I think it's -- the -- the actual stated
12  number -- I guess one of the things that -- the numbers
13  can be a little bit skewed now because under the new
14  leadership of the NAACP we've gone into e-memberships,
15  and e-memberships aren't as easy to assess as the old
16  traditional memberships that you fill out by hand or
17  what have you.
18          So my guess -- my last recollection, five
19  or 600 of the regular members. I don't know how many
20  e-members you would add on to that, but there's been a
21  major rush on e-members, I think over a hundred
22  thousand e-members nationwide, and I don't know exactly
23  what the number would be from this area.
24      Q. How many of those members live inside the
25  district boundaries?

Page 8

1       A. I can't say that -- that any specifically live
2   there. I don't know about the e-members. And I don't
3   know if any of the members have actually gone there to
4   look for homes or what have you. But from what I know,
5   I can't tell you that there is a specific person who is
6   a member as we sit that is actually a -- a member of
7   the organization, but I can't say to the contrary,
8   because of the e-memberships. But I would say that
9   clearly, our membership would have had some contact
10  with the -- with the MUD just by nature of its
11  existence here.
12      Q. In saying that you can't say that any
13  particular member actually lives inside the district,
14  have you or somebody associated with the entity taken a
15  look to see if there's somebody in the district who is
16  a member of the NAACP?
17      A. Well, the -- I think that at one point we did
18  look at a -- at a list or what have you early on before
19  we were involved in the lawsuit. I think I asked the
20  local branch to look in to see, and I don't know that
21  we had the right configurations or boundaries to -- to
22  know at that point. So I think some effort was
23  undertaken at some point.
24      Q. Okay. And that effort, as far as you can
25  tell, showed that there weren't any members inside the

Page 9

1   district --
2       A. We couldn't -- we couldn't locate one that was
3   specifically in that -- but I don't know if we had the
4   right configurations at that point.
5       Q. Your statement that -- that members of the
6   NAACP have had -- I forget the word you used, but
7   interaction or connection with the district, do you
8   recall that statement?
9       A. Well, yes, what I mentioned is quite
10  naturally, with it being a MUD in Travis County,
11  members would have had some interest, whether members
12  would be looking for -- looking to buy a home or simply
13  just traveling from one area to -- to another, or even
14  if they live in adjoining areas near -- near a school.
15  I mean, obviously, with -- with commerce being what it
16  is and traffic moving as regularly as it does, clearly
17  NAACP members are going to have involvement. And
18  besides that, you've got the other issues relating to
19  elections and things of that nature that necessarily
20  involve minorities in this county.
21      Q. When you offer that explanation, is any of it
22  based on a review of the records of the NAACP or are
23  you speaking generally as an expectation that -- that
24  there would have been this type of association or
25  connection?

3  (Pages 6 to 9)

Page 10

1    A.  Okay. It's not based on a review. I haven't
2  looked at records to see if there were specific
3  complaints made against the Northwest Austin MUD.
4  The -- you know, what I'm more familiar with is, you
5  know, the -- the -- the voters in the area seem not to
6  be too enamored with, you know, African-American
7  candidates that usually win going away. They've had a
8  very hard time there within that MUD. The voters seem
9  to be hostile to -- to African-American candidates.
10  And so that's something that obviously looms very large
11  on the horizon to me.
12    Q.  Do you know of any person who does not live in
13  the MUD who attends school in the MUD?
14    A.  I haven't specifically looked to see. I don't
15  know if I do or if I don't. I -- I'd have to -- I
16  would have to go look. I have friends that live in
17  that area of Austin. I don't know that the kids go to
18  that MUD or not.
19    Q.  Do you have any information about people who
20  don't live in the district but who vote inside district
21  boundaries?
22    A.  No, I've never looked at -- analyzed the
23  voting pattern of people who don't live within the
24  district.
25    Q.  You mentioned a moment ago that -- that it is

Page 11

1  a matter of concern to you that candidates -- trying to
2  remember what you said -- that African-American
3  candidates have not done well in the district?
4    A.  Well, let me just give you a couple of
5  examples of what I'm --
6    Q.  No, no. I don't --
7    A.  Okay.
8    Q.  I'm not looking for an example.
9    A.  Sure.
10    Q.  I just want to clarify what it was that you
11  said.
12    A.  I'd have to get the court reporter to read
13  that back, because best I recall, I was -- basically
14  said that African-American candidates who have done
15  very well overall in the -- the districts or the area
16  that they were running in did not do well in that
17  district.
18    Q.  And is this based on any sort of research that
19  you've done or is it simply a -- kind of look-see at --
20  general look-see at area -- at the area?
21    A.  Looked at it on the Internet.
22    Q.  Okay. Have you done any evaluation in terms
23  of like research or analysis that would suggest that
24  your concern is anything other than partisan politics?
25  That particular part of Travis County is one of the few

Page 12

1  areas in Travis County that pretty consistently votes
2  Republican.
3    A.  Well, actually, yes, I have. Danny Thomas,
4  who was running for city council in 2003, was the
5  overwhelming favorite of the African-American
6  community. And city council races are non-partisan
7  races and Thomas was a -- former policeman; he was
8  retiring from the police department to become a city
9  council person. So he was very conservative, the kind
10  of thing that you think that might appeal to
11  conservative voters. Yet, Mr. Benedict defeated him, I
12  think about two to one, if I recall correctly. And so
13  there were no partisan overtones in that race. It was
14  clearly race, I believe.
15    Q.  You're suggesting that there are no partisan
16  overtones in city council elections?
17    A.  What I am saying is I think you had an
18  African-American police officer who was running for an
19  office, and in Texas you don't declare an affiliation
20  to a political party when you run for a city council
21  seat.
22    Q.  What year was that?
23    A.  It's 2003, if I recall correctly.
24    Q.  Do you know where the polling places were for
25  those elections?

Page 13

1    A.  Well, I know some. I mean, I don't know
2  which -- which -- what you're saying there. Obviously,
3  I'm familiar with polling places in Travis County, but
4  you're asking me about a specific polling place. I --
5  I've -- I can't tell you now. But, you know, I was
6  always one who monitored and looked at city elections,
7  even that particular election.
8    Q.  And that was not a -- a district election?
9    A.  No, no, it's a city-wide election. You see,
10  in Austin there's a gentleman's agreement where you
11  have one Latino and one African-American so that --
12  basically, so you don't have single-member districts.
13  After the Reynolds versus Sims opinion came down from
14  the Supreme Court, the city decided we would have one
15  black seat and one brown seat. That's something we
16  fought and lost in the courts. But Danny Thomas was
17  running for what's known as place six, the
18  African-American seat. So that's even more significant
19  or ominous, when he's running for something under a
20  gentleman's agreement and he's turned down two to one.
21    Q.  I'm not sure I understand what you're saying.
22  A gentleman's agreement, is this something that you
23  think voters know about?
24    A.  It was part of the litigation involving
25  single-member districts for the Austin City Council.

4  (Pages 10 to 13)

Page 14

1  It's something that's been written about very much.
2  It's -- extensive media coverage of the gentleman's
3  agreement. And the gentleman's agreement is, again,
4  something that was seen by city fathers as a way of --
5  of actually having a more acceptable minority to
6  represent the interests of the minority community and
7  having that done by an at-large election as opposed to
8  a single-member district election.
9     Q.  Objection; nonresponsive.
10          My question was is that something you
11  think voters know about?
12    A.  I think if it's widely held in the media and I
13  think if it's reported in the media and it's been all
14  over television, it's in the public annals of the
15  opinions that have been written about the single-member
16  district litigation, I would hope voters know about it.
17  And I think in Travis County you have a pretty
18  intelligent group of voters, so I would think they do.
19    Q.  So if -- if I were to move inside the City of
20  Austin and go down to vote for city council and I see
21  some names on the ballot, how do I know who I'm
22  supposed to vote for?
23    A.  Well, I guess it depends on the individual and
24  the area of the city that you live in. But, you know,
25  when you have a person who is not a member of a

Page 15

1  minority group running for one of those seats, that's
2  something the media always writes about, because that
3  is an issue. And that's something that the minority
4  community is very concerned about and they make that an
5  issue.
6          So I think it's hard for individuals not
7  to know who the preferred person is from the minority
8  community and hard for them not to know that that's a
9  seat that's covered by the gentleman's agreement,
10  because there's always so much rancor about it when
11  that happens. And there have been challenges from the
12  left and from the right to minorities in those seats
13  and it upsets the minority community when they see a
14  challenge.
15    Q.  I'll represent the district, you know -- are
16  you aware that district elections are held in
17  even-numbered years?
18    A.  I hadn't made particular note of that. That's
19  the same year, I guess, as gubernatorial and
20  presidential elections. It makes sense because I
21  knew -- I think that Travis County was handling those,
22  so, yeah.
23    Q.  So this instance that you're talking about,
24  you -- you understand the district didn't even have an
25  election that year.

Page 16

1    A.  Well, I'm not -- I'm not concerned about
2  whether they had an election or not.
3    Q.  I was just asking a question. You understand
4  that there was no district election that year.
5    A.  If you're saying that. I haven't looked to
6  see if there was an election in 2003, so I can't tell
7  you that there was. I just don't have independent
8  knowledge of whether there was or was not.
9    Q.  And you understand the district has no
10  connection to City of Austin elections at all. Right?
11    A.  I'm not sure what you mean by the term
12  connection, but --
13    Q.  The city -- the district doesn't administer
14  city elections.
15    A.  I -- I don't know who the city contracts with
16  out here to handle city elections. I don't know
17  whether they contract with -- with the MUD or not. I
18  don't have any independent knowledge of -- of who
19  represents the city out in this area when city
20  elections are held.
21    Q.  Well, knowing, as you do, the -- the city
22  conducts its own elections?
23    A.  But -- but, you know, just like any entity.
24  Sometimes the city will get involved with the school
25  district or some other entity and contract with them.

Page 17

1  You know, you -- you handle it in these precincts or
2  those precincts. So without me having personal
3  knowledge of it, I don't know. I know the city is
4  responsible for its own elections but that does not
5  mean that the MUD did not have a part -- a role in
6  carrying out the election process.
7    Q.  Fair point. Would it be safe to say that you
8  have no personal knowledge or organizational knowledge
9  that the district has administered the city's
10  elections?
11    A.  I would agree. That's a fair statement.
12    Q.  Would it be fair to say that you have no
13  personal knowledge or organizational knowledge that the
14  district has been involved in qualifying candidates and
15  providing polling places and providing staff to run
16  city elections or -- or anything like that? Would that
17  be safe to say?
18    A.  I don't have any personal knowledge of that,
19  but some of it, I think, it's logical to believe they
20  would have had some input.
21    Q.  Why would it -- why would it be logical to
22  assume that?
23    A.  Well, if this is a MUD and, you know,
24  they're -- this is their area, I think that clearly I
25  would guess the city and the county probably would

5  (Pages 14 to 17)

419a3e49-c742-4515-bf32-c97afc0ec34c

Page 18

1  defer or make contact to try to use individuals out
2  here to the extent that they could, because I know when
3  I go in and vote in -- in primary elections, I usually
4  see the same people in my precinct where I vote that I
5  see when I vote in city elections.
6      So, I mean, it just seems logical that
7  the people know the process; they know the election
8  law, and so you go to those folks and you -- you defer.
9  So -- I mean, but I don't have personal knowledge of
10 that. It just seems logical from having been involved
11 in the political process myself.
12     Q. Let me clarify. Are you saying that there are
13 people who live in the district who are involved in
14 city or district or are you saying that the district
15 itself would be somehow involved in a city election?
16     A. I don't think those are mutually exclusive. I
17 think they could be -- it could be either way. I mean,
18 it -- and you would have to look at, you know, how you
19 do that. Whether you pick up the telephone and the
20 county clerk calls up someone with the MUD and says,
21 "Look, we need to have elections. Do you have some
22 folks that you can recommend to run the election?"
23 But, I mean, I'm -- obviously, there's some overlap
24 with that.
25     Q. You're saying obviously there could be some

Page 19

1  overlap with that.
2      A. You're right. That's -- that's -- that's --
3      Q. You don't --
4      A. That's better put than what I said, yeah.
5      Q. You don't have any personal or organizational
6  knowledge that --
7      A. That is true.
8      Q. -- that has ever happened, do you?
9      A. That is true.
10     Q. Have you personally or has your organization
11 gathered information about elections that the district
12 has conducted in the past several years?
13     A. No. I don't believe we've actually gone out
14 to collect information.
15     Q. So sitting here today as the representative of
16 these two organizations, you can't share with me any
17 information about the way district has conducted its
18 elections at any time, can you?
19     A. We haven't investigated how the district has
20 carried out its elections.
21     Q. So you have no information relating to the
22 district's elections. Is that safe to say?
23     A. No information relating to its elections...
24 I'm not sure that that's true. I don't think they've
25 ever had African-Americans elected or things of that --

Page 20

1  that nature. But in terms of -- you would have to
2  really specify exactly what you mean there. I can't
3  tell you the race of the individuals who have been the
4  election judges or who have been the clerks to assist
5  the election judges. No, I can't tell you that. I
6  can't tell you that there have been instances when
7  minority voters have tried to vote and they have been
8  turned away. I can't tell you that.
9      Q. And that would be true at any time, say,
10 during the 1990s or 2000s. For any given election,
11 that would be true. Right?
12     A. We haven't conducted a specific investigation
13 in relation to voting irregularities just for that
14 particular MUD.
15     Q. And because you lack any information about the
16 district's elections, you personally and as
17 representative of the two organizations you represent
18 don't have any complaint about the district's
19 elections. Is that true?
20     A. Well, I'm not sure what you mean by not having
21 any complaint about the district's elections.
22     Q. You --
23     A. We've never filed a complaint about the
24 district's elections, so I can't say that we do. I
25 mean, obviously, I would have loved to have seen more

Page 21

1  diversity on the people who represent the -- the board
2  or members of the board, and so I can't say that I
3  have -- I mean, that I appreciate the results.
4      Q. Does your -- do the organizations you
5  represent collect complaints made by individuals about
6  elections or things that happened when they went to the
7  polling place or what have you?
8      A. Absolutely, we do. You know, we've done that
9  in the past. I know that -- I guess one of the
10 problems relating to this -- this MUD is that there are
11 so few minorities that actually live within the MUD.
12 But that's one thing we've actively done over the past
13 seven or eight years, is collect information relating
14 to voting irregularities.
15     Q. To your knowledge, no individual has ever made
16 a complaint to your organization about the way the
17 district's elections have been executed or performed.
18 Is that fair to say?
19     A. It's -- it's -- it's fair to say that I'm not
20 familiar with any complaint that has been filed by any
21 citizen relating to how the Northwest Austin MUD,
22 Travis County, handles its elections.
23     Q. If such a complaint had been filed, you would
24 be likely to be aware of it and -- whether in a general
25 sense or in preparation for this deposition, is it not

6  (Pages 18 to 21)

FREDERICKS-CARROLL REPORTING

419a3e49-c742-4515-bf32-c97afc0ec34c

## Page 22

1  fair to say?
2    A.  There would be a possibility that -- that I
3  would be.  It's possible that it could have occurred
4  without me being aware of it.  A lot of it depends on
5  time and logistics, at one point the -- at what point
6  the complaint was lodged.  So that's not totally true.
7    Q.  Is it likely that you would know whether one
8  had been filed or not?
9    A.  I try to be very familiar with -- with what
10  takes place, and I know that -- but we have, you know,
11  lawyers that do -- agree to do pro bono work for us and
12  the local organization has the same.  So it is -- it is
13  possible.  But I try to stay aware, but like anyone,
14  I'm not aware of 100 percent of the things that take
15  place.  Or every complaint.  I'm not aware of every
16  complaint that we have received.
17    Q.  But if you had received one, it's likely that
18  you would have known, even though there's some chance
19  that you -- it might have escaped you?
20    A.  I think there would be a -- a -- a reasonable
21  chance that -- that I would know.
22    Q.  Given that the NAACP, as far as we can tell,
23  has no members in the district and that the NAACP is
24  not in possession of any information suggesting
25  problems with the district's elections, is it fair to

## Page 23

1  say that the NAACP's intervention in this case is
2  directed primarily at its philosophical position that
3  preclearance is a -- is a good thing?
4    A.  I wouldn't -- I wouldn't say that, no.
5  Because I think there was such an incredible record
6  that was created before to justify the original
7  creation.  And as you know, we were very actively
8  involved in getting the Voting Rights Act reauthorized
9  this -- this past year.  And in that regard we are very
10  concerned about all of the political subdivisions
11  within this state.
12       Because, you know, a MUD has a lot of
13  authority.  And when you look at a MUD that seems to be
14  out of lockstep, even with the white voters in the
15  city, then you have to take notice that there is a
16  potential problem with this -- with this MUD, that MUDs
17  can creates pools; they can create parks; they may
18  become large enough to hire employees.  You know, they
19  could do something like come up with a rule that they
20  don't provide utilities for anyone that has a home less
21  than 10,000 square feet.  And so what does that do?
22  That's going to price out or eliminate minorities from
23  being able to come and live in the neighborhood.
24       So we take this very seriously.  And I
25  think if they're not required to respond to the Voting

## Page 24

1  Rights Act, it's going to lend itself to the kinds of
2  things that were -- were intended to be avoided by the
3  passage of the act.
4    Q.  Those potentialities that you talk about, you
5  don't have any information that would suggest any of
6  those have ever happened or that they're likely to
7  happen.  That's -- that is a concern or -- but it's a
8  speculative concern, isn't it?
9    A.  Not speculative.  No, it's -- it's not.  When
10  you look at the voting pattern and they're so much out
11  of step, I think that's -- becomes a -- a real concern.
12  Maybe not the specific examples, but there could be
13  other similar examples.  You know, years --
14    Q.  Other than the loss of this one gentleman in a
15  city election in 2003, what evidence do you have that
16  suggests that voting patterns in the district are out
17  of step with anything?
18    A.  Well, it was -- I mention the -- I mention the
19  Biscoe race.  That's another example.
20    Q.  The Biscoe race is...
21    A.  The county judge race.  Against Commissioner
22  Hontz.
23    Q.  And so your information is based on what you
24  believe to be the returns from two races?
25    A.  No, that's all that I'm recalling at this

## Page 25

1  point.  I think those things are -- are -- help
2  illustrate the point that I'm trying to -- that I'm
3  trying to make in that there is a -- there's a problem
4  in the -- in the MUD in regards to interests of
5  importance to African-Americans.
6    Q.  Your conclusion that there's a "problem" in
7  the MUD is based on your view of two races that -- the
8  returns from two races in the district?
9    A.  Again, let me repeat what I -- what I said.
10  Those are the two that I'm recalling at this point.
11    Q.  And that's based on your eyeball view of
12  returns in those races and not on any mathematical or
13  statistical analysis of those returns.  Is that
14  correct?
15    A.  I haven't analyzed the returns, but the -- the
16  numbers were striking.
17    Q.  The answer to my question is that's correct,
18  you've not performed any sort of mathematical analysis?
19    A.  I said I hadn't -- I hadn't analyzed the
20  returns, but the numbers are striking.  I don't think
21  you need to.  Sometimes a number is just so striking,
22  you know, and you get into statistical analyses and
23  standard deviations from what the norm would be or what
24  you would expect in the district with voting patterns.
25  But when you have it flipped and candidate is losing

7  (Pages 22 to 25)

Page 26

1  two to one who were winning everywhere else, I think
2  that -- that speaks significantly to me.
3      Q.  Do you know the partisan makeup of the
4  district or the district's voters?
5      A.  I haven't bothered to be overly concerned
6  about the partisan nature because I think that in some
7  issues, like the gentleman's agreement, the partisan
8  nature isn't a problem.  It is not an issue.  So I
9  don't think the partisan nature is -- is overriding at
10  all.
11          I mean, I think you clearly have a county
12  that's a Democratic county, yes, that's true.  But in
13  terms of the gentleman's agreement, I think that you
14  have members of both parties that understand that place
15  six is an African-American seat and they share that
16  belief.
17      Q.  So with respect to that one -- the city
18  council race, it's based on your concern that the
19  district didn't follow the gentleman's agreement?
20      A.  Yes.  And that -- and that -- that has
21  enormous implications under the Voting Rights Act.
22  Because you could elect someone who is not the
23  preferred person for that community if they were to --
24  and it would require us to go and file a Section 2
25  lawsuit, to go and all of a sudden to try to get

Page 27

1  African-American representation again, if what occurred
2  in -- in this MUD takes hold and takes -- and -- and
3  becomes the -- the -- the will of the majority of
4  voters in the city.
5      Q.  Are you saying that this MUD is the only place
6  that had that type of a voting pattern in that -- in
7  that particular election?
8      A.  I'm saying it stands out.  I mean, Thomas won
9  overwhelmingly.  I don't remember exactly; he probably
10  got 70 percent of the vote.  And he just won going
11  away.  It was not a close race.
12      Q.  Are you saying --
13      A.  And Biscoe won handily.
14      Q.  Are you saying that this district is the only
15  place in the county that had this type of voting
16  pattern?
17      A.  I'm not saying it's the only place in the
18  county that had this type voting pattern.  But anywhere
19  where that type voting pattern exists is a potential
20  problem.  When you -- when you have racially polarized
21  voting, that's an issue.  And I can't tell you that
22  Travis County has only one county where there's
23  racially -- one -- one or one district or precinct
24  where there is racially polarized voting.  I wish I
25  could sit here and tell you that, but I can't tell you

Page 28

1  that.
2      Q.  Going back a few minutes, based on a couple of
3  elections, you have -- you have concluded that there is
4  polarized voting in this area where the district
5  exists.
6      A.  Yes.
7      Q.  Okay.  But you have possession of no
8  information that the district doesn't perform its
9  elections in a satisfactory way under the Voting Rights
10  Act.  Is that safe to say?
11      A.  I -- no, I -- I don't want to say that.  I
12  don't think I'm at liberty to say --
13      Q.  I'm not asking you to conclude --
14      A.  -- to say -- to say that, but --
15      Q.  I'm say -- asking if you -- are you currently
16  in possession of any information that says that they
17  didn't?  So I'm not asking you to agree with me that
18  they did, because I know you can't do that.  I'm saying
19  do you have any information right now that they didn't?
20  Because you don't have a member in the district and you
21  don't -- you don't have complaints by anyone.
22      A.  Yeah.  Well, again, I don't know for a fact we
23  don't have a member.  Even the e-members could be
24  members and could be in the district, so I can't -- I
25  can't say that.  And in terms of the Voting Rights Act,

Page 29

1  that's -- that's a completely different animal than to
2  say whether or not we've received a complaint.  You
3  know, I can speak more so about us receiving a
4  complaint, you know.
5          But, I mean, I have a great deal of
6  concern that the -- that the -- that the management
7  there at the MUD would actually decide to go and attack
8  this law and try to have it invalidated.  So I think
9  that clearly shows that they're out of lockstep with
10  the minority community and are a potential problem or
11  danger to the minority community.  Because that's
12  really kind of a frightening thing, to bring this whole
13  nation down to its knees based on a lawsuit from --
14  from this MUD.
15          So I think that they clearly -- things
16  that have been said in the depositions so far and --
17  and their leadership in bringing this lawsuit lets me
18  know that I should be righteously concerned about that
19  MUD.
20      Q.  Do you understand the term bailout?
21      A.  Yes.
22      Q.  Tell me what bailout means.
23      A.  Well, it depends.  I mean, it depends if I'm a
24  savings and loan, it's got one meaning.
25      Q.  All right.

8  (Pages 26 to 29)

Page 30

1    A.  You know.  So --
2    Q.  Under --
3    A.  -- it depends on the context that you're
4  talking about.  But I think what you're saying is if a
5  covered jurisdiction is able to meet certain criteria,
6  then it can bail out and not be covered by the
7  provisions in the Voting Rights Act and doesn't -- they
8  don't have to go through the preclearance steps.
9    Q.  Do you believe that that provision is
10  philosophically wrong?
11    A.  That the bailout provision is philosophically
12  wrong?  I don't want to question the wisdom of -- of
13  Congress.  Obviously, they debated the issue quite a
14  bit and I'm sure that there was a reason or basis for
15  them to include that.  But, you know, it's one thing
16  when you're on the floor of the House or the Senate
17  debating an issue in Washington, D.C.  It's another
18  thing when you're right here at home and you see things
19  close and up personal.
20    All I can say is that when one is
21  eligible for a bailout, it should be only in the most
22  limited circumstances where there is no risk or there
23  is no history.  But I think when you look at here, when
24  you look at the voting patterns in the district and
25  when you look at the -- the -- the -- the bringing of

Page 31

1  this lawsuit -- in the bringing of the lawsuit, it was
2  authorized not just to -- not just to bail out, but to
3  invalidate -- invalidate Section 5.  So I think that --
4    Q.  So, let's -- let's -- let's --
5    A.  -- evinces -- evinces a real bias in my mind.
6    Q.  So let me ask you about -- you understand that
7  there's two parts to the lawsuit; one is bailout, one
8  is the Constitution --
9    A.  I thought that's what I just said, but, yeah.
10    Q.  Okay.  I agree.  I think you did.  Do you know
11  the specific statutory requirements for bailout?
12    A.  I haven't looked at those recently.  But I do
13  know that there are various things that the -- that the
14  district should try to do where any political
15  subdivision -- one of those things is to -- to be
16  aggressive, to basic -- to use a bad term, to basically
17  use affirmative action and to try to get out there and
18  do outreach to minority voters and try to do all that
19  it can to comply with the statutory requirements.
20  And -- and -- and I think it's absolutely clear that
21  that hasn't happened.
22    Q.  You don't have one bit of information whether
23  it has or hasn't; isn't that true?
24    A.  No, I think if that's the true requirement, I
25  think if the minority community had been contacted,

Page 32

1  that I would absolutely know about it.
2    Q.  So you -- your conclusion about that is based
3  on the fact that you and your organization you
4  represent hasn't been contacted.  Is that safe to say?
5    A.  Yes, nor are we aware or familiar with it.  I
6  think that in terms of -- of getting out the minority
7  vote or educating the minority community about voting,
8  that our organization is the leader in this community
9  in terms of African-Americans.  So I think we would
10  know.
11    Q.  Do you do work with the county in that
12  relation?
13    A.  Work with the county in that relation?
14    Q.  In terms of the affirmative action steps that
15  you believe are required.
16    A.  I have had meetings with the county clerk,
17  Dana DeBeauvoir, and let her know my concerns.  I think
18  we disagree on the election machines because I think
19  that there should be a paper trail.  I don't agree with
20  just the electronic voting machines.  So I have visited
21  with her about those issues.
22    Q.  Other than the paper trail, do you believe
23  that the county makes appropriate steps to involve the
24  minority community and others?
25    A.  I think the county is -- is unique in that

Page 33

1  regard.  I can see the county has diverse clerks that
2  they use.  I think that they have done things to try to
3  make sure that -- whether it's the -- the wording in
4  the ballots and things of that nature.  So I think the
5  current leadership in the county has -- has done -- has
6  done a lot in -- in terms of outreach.
7    Q.  And you say the -- in the way the county
8  conducts elections.  Other than the paper trail, you
9  were relatively satisfied with the way the county
10  conducts its elections?
11    A.  Well, let me give you an example.  I mean, if
12  I go to HEB or if I go to the county courthouse and I
13  vote early, and I've done both, you've got a diverse
14  group that is there.  You know -- you know, you've got
15  African-American and Latino, you have people who can
16  speak different languages.  So I think that's
17  significant that the -- that the county -- that the
18  county does that.  But things still occur within the
19  county.  The county's not perfect.
20    I'm not really here to absolve the county
21  of any responsibilities at this point, but I will say
22  that the kind of affirmative action that they have done
23  is the kind of affirmative action that I would have
24  wanted to see the -- to see the -- the MUD have.
25  Because, for example, Dana DeBeauvoir called me, she

9  (Pages 30 to 33)

**Page 34**

1 wanted to meet with me and visit with me about concerns
2 of the minority community in regards to voting. So I
3 went over and I met with her. I mean, MUD could have
4 done that. They didn't do that.
5   Q. But the MUD has done that, Mr. Bledsoe. Don't
6 you remember?
7   A. I must have missed it on my message pad. I
8 haven't seen it.
9   Q. But you understand that the district has
10 contracted with the county to run elections.
11   A. Mm-hmm.
12   Q. And that the county has -- that's a yes.
13 Right?
14   A. I think I said that earlier, that the district
15 had contracted with the county.
16   Q. And that -- that those mechanisms that the
17 county uses that you approve of are now being used to
18 further the district's own elections.
19   A. Well, let me say this: The county has been
20 aggressive and the county has done the things that I've
21 mentioned. I think that's good and that's clear. You
22 know, a contract can be cancelled tomorrow. So you
23 can't say because Travis County has done something I
24 can say that the MUD never did that.
25       I think at the time -- at the point in

**Page 35**

1 time when I was contacted by Ms. DeBeauvoir, I don't
2 think that they actually handled the elections in the
3 MUD. So in terms of being contacted by anyone
4 representing the MUD or on behalf of the MUD, that's
5 never happened.
6   Q. If this lawsuit were simply the bailout aspect
7 and it were clear that the district satisfied the
8 statutory requirements, you would still intervene to
9 oppose it, wouldn't you?
10   A. Because I think there's a great risk that
11 exists when you look at the voting patterns. I -- I
12 think it's one of the reasons why we have a voting
13 rights act, that you don't wait for -- you know, it's
14 just like a -- it's like a murder. You want to have
15 crime prevention out there. And when we have seen the
16 kinds of things that we've seen in this area, I think
17 there's great reason to be concerned. When you have
18 racially polarized voting taking place I think there's
19 reason to be on alert and to be concerned. So we
20 absolutely would still oppose it.
21   Q. Do you know of a single county, city, utility
22 district, fire district, water district or school
23 district in the state that you would support a bailout
24 action for?
25   A. I hadn't really thought about that. If -- if

**Page 36**

1 I might have considered one, it's probably the one the
2 state decided to abolish, Wilma Hutchins, an
3 African-American school district. But they decided to
4 abolish that one. But I can't really think of one
5 right offhand.
6       Not that we've looked at it, but, you
7 know, you have to look at the whole state and voting
8 patterns and what -- if you -- if you -- the issue
9 should be this: The issue should be if you release
10 them from jurisdiction. If you say they're no longer
11 covered, what is the potential harm to the minority
12 community as a result of the people that are being left
13 in control or who are likely to take over and become
14 the persons in control? And so clearly, with most
15 areas we would have a problem.
16       I mean, things could even change in
17 Travis County tomorrow. Dana DeBeauvoir may not be the
18 clerk for a while. And like I say, she didn't give me
19 all the relief that we wanted, because I thought that
20 the polling -- I thought that they were using the wrong
21 kinds of -- of machines for the voting. She disagreed
22 with me. So I met with her, but she didn't acquiesce
23 to my concerns.
24       So you have to be concerned and look at
25 the history and look at each area individually. And

**Page 37**

1 I'm looking at this area and the fact that there has
2 been no outreach, the fact that they have the kind of
3 voting patterns that they do. The -- you know, that --
4 that clearly -- and that they decided to challenge a
5 lawsuit in the way that they did. You look at all
6 those things and I think there is clearly -- clearly
7 reason to be concerned about that MUD.
8   Q. Let me ask you about -- you have drawn certain
9 conclusions about outreach. Do you have any personal
10 knowledge yourself or your organization about whether
11 they have or haven't, other than the fact that you
12 assert that you -- you have -- yourself have not been
13 contacted by this district?
14   A. When I say myself, I'm speaking for the
15 organization.
16   Q. The organization.
17   A. And so I've got personal knowledge that to my
18 knowledge, that we've never been contacted by the MUD.
19 Now, the MUD may go find some letter in File 13 and say
20 that they sent it. I don't know that for a fact. But
21 I do know that -- that as far as I know and as far as
22 the local branch of the state conference knows, we've
23 never been contacted by the MUD.
24   Q. So when you talk about lack of outreach, what
25 you're really saying is that the NAACP has not been

10 (Pages 34 to 37)

Page 38

1  contacted. That's the only knowledge that you have or
2  that your organization has about whatever the district
3  has or has not done.
4      A. Well --
5      Q. That's your only knowledge, isn't it,
6  Mr. Bledsoe?
7      A. Well, I don't know if I would agree with that.
8  Because I think if they had been contacted, with the
9  leadership that we have in the minority community on
10 the issue of voting, that we would know about it. So
11 clearly, I think it just has not happened.
12     Q. All right. You are concluding from the fact
13 that you have not been contacted and from you have no
14 knowledge of others being contacted, that is the basis
15 for your conclusion?
16     A. Well, in other words, if -- if a -- if a -- if
17 a city leader is --
18     Q. No, I understand what you're saying. I just
19 want to say is that the basis. I am just trying to get
20 at what the basis is.
21     A. Okay. I can't think, if there have been a
22 desire to have outreach to get concerns of the minority
23 community on the issues of voting, that if any person
24 of significance or any organization of significance had
25 been contacted, that we would be aware of it.

Page 39

1      Q. And that's the basis for your conclusion about
2  outreach. Right?
3      A. Along with the fact that we personally were
4  not contacted. The organizations.
5      Q. You ever been to Las Cruces, Mr. Bledsoe?
6      A. Quite a few times.
7      Q. Are you aware of voting patterns in Las
8  Cruces?
9      A. No, I just like to go there and eat at
10 Navarro's Bakery, so I go there to -- when I'm on I-10,
11 I pull off and go to Navarro's.
12     Q. Where is Navarro's?
13     A. It's about five minutes off the highway. It's
14 a great bakery.
15     Q. You don't know if there's polarized voting in
16 Las Cruces?
17     A. I've never studied Las Cruces. I don't know.
18 I've got two friends that live there, but I don't know
19 anything about the voting.
20     Q. How about Boston?
21     A. You said Boston?
22     Q. Have you been to Boston?
23     A. Massachusetts?
24     Q. Yes.
25     A. Yes.

Page 40

1      Q. Are you familiar with the level of racially
2  polarized voting in Boston?
3      A. I don't think I have independent knowledge of
4  that. It's kind of an interesting situation in Boston.
5      Q. How so?
6      A. Well, you do have an African-American governor
7  now, but you do have some of the most caustic politics
8  along racial lines that one has seen in this -- in this
9  state. The city elections there with Flan and others
10 were really very hostile because of the desegregation
11 and busing issues and all that that kind of engulfed
12 the whole city. So I can remember my first few times
13 there how we -- I had to walk through South Boston a
14 couple of times and I walked pretty lightly.
15     Q. Would you compare the caustic nature of racial
16 politics in Boston to what might have existed in parts
17 of Texas a couple of decades ago?
18     A. I don't know if I've got enough knowledge
19 about the -- in Boston, but I do know that there were
20 little riots and things of that nature, that it was
21 really very -- a very serious matter up there. So --
22 so -- but I don't think it's -- it's comparable in --
23 in the sense that Massachusetts appears to be a divided
24 state where you have strong feelings on both sides of
25 the issues of importance to the African-American

Page 41

1  community, and that's why, I guess, Deval Patrick is
2  mayor -- I mean is -- is governor right now. But you
3  have a large number on the other side as well.
4      In Texas, I think it -- we are always
5  fighting an uphill struggle or battle, because, you
6  know, our battle just wasn't a strong battle. We
7  didn't have -- you know, it's -- it's an ironic thing.
8  If you look at the, oh, Fifth Circuit opinions back in
9  the '40s and '50s and '60s, George will tell you this,
10 that you had the -- kind of the Republican wing of the
11 court that were the big friends of the minority
12 community, that were helping us. I know we fought our
13 deseg and voting rights cases, that's who it was. And
14 they were very much in the minority in Texas and you
15 couldn't get any traction.
16     So we have never had the situation where
17 our issues were broad-based because now it appears that
18 the Democratic party has embraced a number of
19 the issues in the other minority party in Texas. So
20 it's a little bit different from when your views might
21 be shared by a large majority of people.
22     Q. You don't believe there's broad-based support
23 for all aspects of the Voting Rights Act in Texas these
24 days?
25     A. I would venture to say that if you put it up

11 (Pages 38 to 41)

**Page 42**

1  to a popular vote, it very well would probably not
2  pass.  It would be like the Bill of Rights, I think.
3  It no doubt would not pass.  You look at the elections
4  around the state and there's just so much racially
5  polarized voting that still continues on local
6  elections.
7          You know, we just had a big problem up in
8  Palestine, Anderson County.  And you look around and,
9  you know, where there's hate crimes in Wharton County,
10  white citizens supporting a black sheriff candidate
11  having their home burned or -- you know, I mean, it is
12  just -- it's all around the state.  I can start citing
13  enumerable examples here now.
14          So there's still -- people still are not
15  comfortable with the minority vote and there's still a
16  lot of antagonism towards the African-American vote.
17  So that's one of the reasons why we wanted to make sure
18  that the Voting Rights Act was reauthorized.
19          I know when Senator Cornyn, who I had had
20  a personal relationship with, had come out and said
21  there was no need for Section 5, we -- all these great
22  things, but we had actually done hearings and all that,
23  so we took a great deal of information up to him and
24  said, "Look at this.  And we want you to look at this
25  before you make your ultimate decision."

**Page 43**

1      Q.  And did you feel like he listened to you?
2      A.  Well, he -- he voted the right way ultimately,
3  so that part was good.
4      Q.  So is that -- is that a yes, then?  You felt
5  like you had his ear?
6      A.  I think he listened to us.  I think John
7  Cornyn listened to us.
8          MR. COLEMAN:  Off the record for a couple
9  of minutes.
10          (Recess from 5:55 to 5:58 p.m.)
11          MR. COLEMAN:  Pass the witness.
12          MS. PERALES:  I have no questions.
13          MR. HERREN:  No questions.
14          MR. KORBEL:  No questions.
15          MR. COLEMAN:  All right.  Done and off
16  the record.
17          (Deposition concluded at 5:58 p.m.)

**Page 44**

1              CHANGES AND CORRECTIONS
2  WITNESS NAME: GARY BLEDSOE    DATE: _____
3  Reason Codes: (1) to clarify the record; (2) to
   conform to the facts; (3) to correct a transcription
4  error; (4) other (please explain).
5  PAGE LINE  CHANGE              REASON CODE

**Page 45**

1  PAGE LINE  CHANGE              REASON CODE
9          _____
          GARY BLEDSOE
12  THE STATE OF _____)
                       )
13  COUNTY OF _____)
14    Before me, _____, on this day personally
    appeared GARY BLEDSOE, known to me (or proved to me
15  under oath or through
16  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
18  expressed.
19    Given under my hand and seal of office this
    _____ day of March 2007.
21    _____
22    NOTARY PUBLIC IN AND FOR
      THE STATE OF _____

12 (Pages 42 to 45)

Page 46

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
    NORTHWEST AUSTIN          )
3   MUNICIPAL UTILITY DISTRICT )
    NUMBER ONE,              )
4   401 W. 15th Street       )    CIVIL ACTION NO.
    Suite 850                )
5   Austin, Texas 78701      )    1:06-CV-01384
              Plaintiff,     )    (DST,PLF,EGS)
6   v.                       )
                             )
7   ALBERTO GONZALES,        )
    ATTORNEY GENERAL OF THE  )
8   UNITED STATES,           )
    U.S. Department of Justice )
9   950 Pennsylvania Avenue NW )
    Washington, D.C. 20530   )
10
11         REPORTER'S CERTIFICATION
           DEPOSITION OF GARY BLEDSOE
           Monday, February 26, 2007
12
13         I, RANDALL N. FINCH, Certified Shorthand
14   Reporter in and for the State of Texas, hereby certify
15   to the following:
16         That the witness, GARY BLEDSOE, was duly sworn
17   by the officer and that the transcript of the oral
18   deposition is a true record of the testimony given by
19   the witness;
20         That the deposition transcript was submitted
21   on March 1, 2007 to the witness or to the attorney for
22   the witness for examination, signature and return to me
23   by _____, 2007.
24         That the amount of time used by each party at
25   the deposition is as follows:

Page 47

1         Mr. Gregory S. Coleman - 33 minutes
2         Ms. Nina Perales - 0 minutes
3         Mr. Samuel Spital - 0 minutes
4         Mr. George Korbel - 0 minutes
5         That pursuant to information given to the
6   deposition officer at the time said testimony was
7   taken, the following includes counsel for all parties
8   of record:
9         Mr. Gregory S. Coleman, attorney for Plaintiff
10        Ms. Nina Perales, attorney for MALDEF
11        Mr. George Korbel, attorney for Texas Rio
12   Grande Legal Aid, Inc.
13        Mr. Chris Herren, attorney for USDJ
14        Mr. Benjamin Blustein, attorney for Lawyers'
15   Committee for Civil Rights Under Law
16        I further certify that I am neither counsel
17   for, related to, nor employed by any of the parties or
18   attorneys in the action in which this proceeding was
19   taken, and further that I am not financially or
20   otherwise interested in the outcome of the action.
21        Certified to by me this 1st day of March, 2007.
22   _____
           RANDALL N. FINCH, Texas CSR #504
23        Expiration date: 12/31/2008
           Fredericks-Carroll Reporting
24        Firm Registration No. 82
           7800 Shoal Creek Blvd., Suite 200-W
25        Austin, Texas 78757 (512) 477-9911

13  (Pages 46 to 47)