

# AcuScribe
### COURT REPORTERS
*When accuracy means everything.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL )
UTILITY DISTRICT NUMBER ONE )
)
)
VS. ) CIVIL ACTION NO.:
) 1:06-CV-01384
) (PLF, DST, EGS)
ALBERTO GONZALES, IN HIS )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**SHARLENE N. COLLINS**

FEBRUARY 22, 2007

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONDENSED TRANSCRIPT AND KEYWORD INDEX

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701

512-499-0277
800-497-0277
512-499-0298 (fax)
www.acuscribe.com

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL    *
UTILITY DISTRICT NUMBER ONE   *
                              *
        Plaintiff              *
                              *
VS.                * Civil Action No.
                   * 1:06-CV-01384
ALBERTO GONZALES, in his   *  (PLF, DST, EGS)
official capacity as          *
Attorney General of the       *
United States                 *
                              *
        Defendant              *


*********************************************
               ORAL DEPOSITION OF
              SHARLENE N. COLLINS
              FEBRUARY 22, 2007
                  VOLUME 1
*********************************************
```

## Page 2

(1)        ORAL DEPOSITION OF SHARLENE N. COLLINS,
(2) VOLUME 1, produced as a witness at the instance of the
(3) Defendant-Intervenors Texas State Conference of NAACP
(4) Branches and Austin Branch of the NAACP, and duly
(5) sworn, was taken in the above-styled and numbered cause
(6) on the 22nd day of February, 2007, from 12:08 p.m. to
(7) 3:30 p.m., before MARSHA EVANS, Certified Shorthand
(8) Reporter in and for the State of Texas, reported by
(9) machine shorthand, at the offices of Armbrust & Brown,
(10) LLP, 100 Congress Avenue, Suite 1300, Austin, Texas,
(11) pursuant to the Federal Rules of Civil Procedure and
(12) the provisions stated on the record or attached hereto.

## Page 3

APPEARANCES

FOR THE PLAINTIFF:
    MR. GREGORY S. COLEMAN
    WEIL, GOTSHAL & MANGES, LLP
    8911 Capital of Texas Highway
    Building One, Suite 1350
    Austin, Texas 78759
    512-349-1937

FOR THE DEFENDANT ALBERTO GONZALES, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
    MR. CHRIS HERREN
    MS. CHRISTY A. MCCORMICK
    U.S. DEPARTMENT OF JUSTICE
    CIVIL RIGHTS DIVISION
    950 Pennsylvania Avenue, NW
    Room 7254 NWB
    Washington, DC 20530
    202-514-1416

FOR THE INTERVENOR TRAVIS COUNTY:
    MR. MAX RENEA HICKS
    ATTORNEY AT LAW
    101 West 6th Street, Suite 504
    Austin, Texas 78701
    512-480-8231

FOR THE INTERVENORS LISA AND GABRIEL DIAZ:
    MS. NINA PERALES
    MR. CARLOS BECERRA
    MALDEF
    110 Broadway, Suite 300
    San Antonio, Texas 78205
    210-224-5476

## Page 4

APPEARANCES (CONT'D)

FOR THE DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND AUSTIN BRANCH OF THE NAACP:
    MR. BENJAMIN BLUSTEIN
    LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
    1401 New York Avenue, NW, Suite 400
    Washington, DC 20005-2124
    202-662-8600

    --and--

    MR. ARIEL B. WALDMAN
    WILMERHALE
    1875 Pennsylvania Avenue, NW
    Washington, DC 20006
    202-663-6063

FOR THE DEFENDANT-INTERVENOR ANGIE GARCIA:
    MR. GEORGE J. KORBEL
    MR. JOSE GARZA
    TEXAS RIOGRANDE LEGAL AID, INC.
    1111 North Main Avenue
    San Antonio, Texas 78212
    210-212-3700

FOR THE WITNESS:
    MR. J. BRUCE SCRAFFORD
    ARMBRUST & BROWN, LLP
    100 Congress Avenue, Suite 1300
    Austin, Texas 78701-2744
    512-435-2360

ALSO PRESENT:

    Markell Pool

## Page 5

REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE

## Page 6

INDEX
                                                PAGE
Appearances..........................................  3
Stipulations.........................................  5

SHARLENE N. COLLINS
    Examination by Mr. Waldman.......................  8

Changes and Corrections.............................. 109
Signature............................................ 110
Reporter's Certificate............................... 111

EXHIBITS

NO. DESCRIPTION                        PAGE/LINE REFERENCED

11............................................... 44/18
    Submission Under Section 5, Voting Rights
    Act

12............................................... 67/24
    Submission Under Section 5, Voting Rights
    Act

13............................................... 68/14
    Letter from Joseph D. Rich to Sharlene N.
    Collins, Esq., dated May 24, 2002

14............................................... 104/18
    Submission Under Section 5, Voting Rights
    Act

**Page 7**

EXHIBITS (cont'd)

NO. DESCRIPTION                PAGE/LINE REFERENCED

15............................................ 106/20
   Submission Under Section 5, Voting Rights Act

**Page 8**

(1) MR. SCRAFFORD: Ladies and gentlemen, my
(2) name is Bruce Scrafford. I am Sharlene's law partner.
(3) I'm going to mostly be sitting here as a potted plant.
(4) Sharlene was formerly counsel for Northwest Austin MUD
(5) Number One. I understand Northwest Austin MUD Number
(6) One has counsel here, Mr. Coleman, and to the extent
(7) there are attorney/client privileges to be asserted by
(8) the client they will be done by Mr. Coleman. I'm not
(9) going to stop her from answering questions assuming
(10) again that the MUD's counsel will decide when to assert
(11) and waive the privilege.
(12)     My main objective is to make sure we get
(13) her out of here by 3:30 and hopefully stick to factual
(14) matters as opposed to trying to get on-the-spot legal
(15) advice from Ms. Collins. Thank you.
(16)     SHARLENE N. COLLINS,
(17) having been first duly sworn, testified as follows:
(18)     EXAMINATION
(19) QUESTIONS BY MR. WALDMAN:
(20) Q. Good afternoon, Ms. Collins. Please state
(21) your name and spell it for the court reporter.
(22) A. It's Sharlene Collins.
(23) Q. If you could spell your name for the court
(24) reporter.
(25) A. S-h-a-r-l-e-n-e C-o-l-l-i-n-s.

**Page 9**

(1) Q. Okay. My name is Ariel Waldman. I'm an
(2) attorney representing the Texas State Conference NAACP
(3) and the Austin Branch of the NAACP. I'll be asking you
(4) some questions. With me are colleagues, and they
(5) represent various other defendants in the case and
(6) Intervenors. They may also take the opportunity to ask
(7) questions this afternoon. In fact, several additional
(8) colleagues have just joined us. I'm just going to
(9) pause a second.
(10)     (Discussion off the record)
(11) Q. (By Mr. Waldman) Ms. Collins, have you been
(12) deposed before?
(13) A. I have.
(14) Q. In what case or cases?
(15) A. I'm not sure that I recall. I was an expert
(16) witness in a case dealing with utility districts, but I
(17) couldn't tell you now what it was. It never went to
(18) trial. And I was deposed in another case where
(19) malpractice by our firm was alleged. That was 15 years
(20) ago maybe.
(21) Q. Other than the utility case and the
(22) malpractice case have you had your deposition taken in
(23) any other cases?
(24) A. Not that I recall.
(25) Q. What was the issue, if you remember, in the

**Page 10**

(1) utility case?
(2) A. I really don't.
(3) Q. Do you remember what issue you were retained
(4) to provide expert testimony on at a general level, if
(5) you can remember?
(6) A. I believe it had to do with reimbursable costs
(7) for developers from utility districts.
(8) Q. The malpractice case, do you recall what the
(9) issue was, what the dispute was in the matter?
(10) A. It had to do with a disclosure matter alleging
(11) that one of my partners had some knowledge that
(12) affected whether bonds should have been issued or not.
(13) Q. Were you a fact witness in the case?
(14) A. Yes.
(15) Q. What was the result, if you remember?
(16) A. We won.
(17) Q. Have you ever testified at trial?
(18) A. Yes.
(19) Q. How many times?
(20) A. Once.
(21) Q. What was the case?
(22) A. The same case, on the malpractice.
(23) Q. I know you're an experienced attorney, but I'm
(24) just going to run through some preliminary instructions
(25) for the sake of completeness, okay?

**Page 11**

(1) A. Okay.
(2) Q. Please let me know if you don't hear or
(3) understand a question. If you answer I will assume
(4) that you heard and understood the question, all right?
(5) A. You can make that assumption.
(6) Q. Please let me finish my question before you
(7) give your answer, and I will wait until you're finished
(8) answering until I ask another question, okay?
(9) A. All right.
(10) Q. Tell me if you don't know or can't remember
(11) the information that the question seeks, and if you
(12) answer I'll assume that you know and remember the
(13) information that the question seeks. Is that fair?
(14) A. All right.
(15) Q. Please answer in a way that the court reporter
(16) can record in the transcript, so you need to answer
(17) verbally. Please don't nod or shake your head or say
(18) uh-huh. Do you understand?
(19) A. Yes.
(20) Q. And if you need to take a break at any point,
(21) just let us know. Also, if you realize that an answer
(22) that you gave earlier in the deposition is inaccurate
(23) or in any way incomplete, just say so and please just
(24) let me know that you want to correct or supplement a
(25) previous answer. Do you understand?

**Page 12**

(1) A. Yes.
(2) Q. Is there any reason why you can't give full
(3) and complete testimony here today?
(4) A. Not to my knowledge.
(5) Q. What did you do to prepare to testify here
(6) today?
(7) A. Mr. Scrafford and I briefly spoke with
(8) Mr. Coleman yesterday.
(9) Q. And for about how long?
(10) A. Ten minutes.
(11) Q. Was that a telephone conversation?
(12) A. That's correct.
(13) Q. Did you review any documents in preparation
(14) for your testimony today?
(15) A. No.
(16) Q. Were you shown any documents by Mr. Coleman or
(17) your counsel --
(18) A. No.
(19) Q. -- to refresh your recollection?
(20) A. No.
(21) Q. Other than the ten-minute phone conversation
(22) you mentioned, did you do anything else to prepare to
(23) testify today?
(24) A. No.
(25) Q. Did you speak to any people on the current

### Page 13

(1) board for the Northwest Austin Municipal Utility
(2) District Number One, who I will refer to throughout as
(3) the district?
(4) A. No.
(5) Q. Did you speak to any of the former district
(6) board members?
(7) A. No.
(8) Q. Did anyone search your files that you know of
(9) in preparation for this deposition?
(10) A. No, because I have no files.
(11) Q. And is that the case both with respect to
(12) paper and with respect to electronic files --
(13) A. That's correct.
(14) Q. -- regarding this case?
(15) A. I don't think I had e-mail -- I may have had
(16) e-mail. No, there are no e-mail files.
(17) Q. Ms. Collins, where do you live?
(18) A. In Austin.
(19) Q. What's your home address?
(20) A. It's 1400 Yaupon Valley Road, Austin, Texas.
(21) Q. How long have you lived at that address?
(22) A. 20 years.
(23) Q. Is your home address within the bounds of the
(24) district borders?
(25) A. No.

### Page 14

(1) Q. Can you describe your educational background
(2) for us? When did you graduate from high school?
(3) A. I graduated from high school in 1971.
(4) Q. What high school?
(5) A. Castleberry High School in Fort Worth.
(6) Q. Where did you attend college?
(7) A. At the University of Texas here in Austin.
(8) Q. And law school?
(9) A. University of Texas here in Austin.
(10) Q. Other than your bachelor's and law degrees, do
(11) you have any additional educational degrees?
(12) A. No.
(13) Q. Where are you currently employed?
(14) A. I am a partner with Armbrust & Brown.
(15) Q. How long have you been a partner at Armbrust &
(16) Brown?
(17) A. Since 1985. We merged and then we demerged.
(18) The core group has been together for roughly 20 years.
(19) Q. Can you walk me through that a little bit when
(20) you say you merged and then demerged?
(21) A. Yes. In 1984 we formed Armbrust & Brown. In
(22) 1990 we merged with a Dallas firm, Strasburger & Price.
(23) In 1997 we elected to reform Armbrust & Brown, and I
(24) have practiced there since then.
(25) Q. Do you recall what caused the initial merger

### Page 15

(1) in 1990?
(2) A. In the late '80s the theory was that big firms
(3) were what you needed to be a part of to have a
(4) successful practice, and we were being courted by a
(5) number of large firms, and it's kind of like getting
(6) married. It's sort of hard to remember exactly why you
(7) did it at the time.
(8) Q. Fair enough. In 1997 when you unmarried, what
(9) led to the demerger? Do you recall?
(10) A. It was a different culture, and we preferred a
(11) small firm instead.
(12) Q. With respect to bills provided by your firm,
(13) can we assume that the billing at each step of the
(14) firm's name evolution would have been reflecting that
(15) applicable firm name?
(16) A. Yes.
(17) Q. I asked that because we're -- as we're going
(18) through some of the old bills and trying to piece
(19) together who was where with respect to the district.
(20) A. Let me correct one thing. When we first left
(21) Strasburger & Price we had an attorney by the name of
(22) Gary Davis with us. So the name of the firm briefly
(23) was Armbrust, Brown & Davis. Mr. Davis then went to
(24) Clark Thomas, and we went back to Armbrust & Brown.
(25) Q. And what time period would that be, roughly?

### Page 16

(1) A. Maybe 2000. I really don't recall.
(2) Q. Prior to becoming a partner at Armbrust &
(3) Brown where were you working?
(4) A. I was with Brown Maroney, a local Austin firm.
(5) Q. Was there a corporate relationship between
(6) Armbrust & Brown and Brown Maroney or the names?
(7) A. Those are two different Browns.
(8) Q. How long were you at Brown & Maroney?
(9) A. One year.
(10) Q. What was your title at Brown & Maroney?
(11) A. Associate.
(12) Q. And prior to Brown & Maroney where did you
(13) practice?
(14) A. I was a senior assistant -- assistant city
(15) attorney with the City of Austin for five years.
(16) Q. And prior to working for the city?
(17) A. I worked with Legal Aid temporarily for
(18) about -- it was a four or five-month internship.
(19) Q. What's your current practice with the firm?
(20) A. My practice is basically land development with
(21) an emphasis on water and wastewater utilities and
(22) representing municipal utility districts.
(23) Q. What sorts of work do you do when you
(24) represent municipal utility districts?
(25) A. I act as their general counsel. Utility

### Page 17

(1) districts are somewhat like small cities, so there are
(2) board of director meetings, open records issues, open
(3) meetings, taxes, elections, contracts, those sorts of
(4) things.
(5) Q. Just to get a snapshot, currently about how
(6) many municipal utility districts would you say you are
(7) representing?
(8) A. Personally I handle probably 25, maybe 30.
(9) Q. And would you estimate that that number would
(10) hold true going backwards in your career?
(11) A. No. We have more now than we did in the past.
(12) Q. From, say, 1988 to 2000 what was -- at any
(13) given time what would you estimate the highest number
(14) of separate municipal utility districts that you were
(15) representing?
(16) A. I don't think I could tell you.
(17) Q. Was it typically more than ten?
(18) A. Yes.
(19) Q. In your experience typically what's the
(20) purpose for the creation of a Municipal Utility
(21) District?
(22) A. The purpose is to provide water, wastewater
(23) and drainage facilities to areas that previously did
(24) not have those services.
(25) Q. And what is the business interest for those

### Page 18

(1) funding the property?
(2) A. The business interest --
(3) Q. In regard --
(4) A. -- is to be able to develop the land and sell
(5) the lots for a profit hopefully.
(6) Q. Can you describe -- is there a bond process
(7) typically involved with the origination of a Municipal
(8) Utility District?
(9) A. There is a bond process. It is not involved
(10) in the origination of a district.
(11) Q. Connected to the initial financing of the
(12) district?
(13) A. It is not connected to the initial financing.
(14) That's done by the developer.
(15) Q. The next round of financing, typically does
(16) that involve a bond after the initial developer
(17) financing?
(18) A. Yes.
(19) Q. Can you describe how that process works?
(20) A. When a district is created the developer is
(21) required to finance and construct the water, wastewater
(22) and drainage facilities for the development. At such
(23) time as there is adequate assessed value within the
(24) boundaries of the district, then bonds begin to be
(25) issued to pay back the developer. It's kind of like

(Pages 13 to 18)

19

(1) having a house loan. You got to have enough income to
(2) pay back the debt over time, and that's through a tax
(3) rate. So you watch -- the financial adviser for the
(4) district determines how many bonds can be sold and paid
(5) back at a reasonable tax rate.
(6)   Q.  Of the municipal utility districts for which
(7) you participated in the -- I will call it early stage
(8) bond financing, have most of them dissolved by now or
(9) most of them still in existence? Would you be able to
(10) say?
(11)   A.  Most are still in existence.
(12)   Q.  Is there a typical life for municipal utility
(13) districts in Texas in your experience?
(14)   A.  No. Some have been around a long time. Some
(15) cities are more aggressive about annexing and
(16) dissolving districts. So it varies widely.
(17)   Q.  Does Austin from what you observed have a
(18) particular tendency with respect to being more or less
(19) aggressive in the annexation of districts?
(20)   A.  The city had one spurt of aggressive
(21) annexation and dissolution. That was in 1997.
(22)   Q.  Do you recall what drove that spurt?
(23)   A.  Probably Kirk Watson, who was then the mayor
(24) of Austin.
(25)   Q.  During your career you came to do work for the

20

(1) district. Am I correct?
(2)   A.  That's correct.
(3)   Q.  When did you begin working for the district,
(4) doing legal work for the district?
(5)   A.  I handled the creation of the district for the
(6) developer back in the 1980s, and after the district was
(7) created I was hired as their general counsel.
(8)   Q.  And was that -- when you were hired as their
(9) general counsel was that an outside general counsel
(10) role?
(11)   A.  That's correct.
(12)   Q.  Let me start at the beginning of your time
(13) working for the district. Initially what compensation
(14) arrangement did you have with the district?
(15)   A.  We had an engagement letter with the district,
(16) which we typically do. The general counsel work is
(17) done on an hourly basis at our normal rates at that
(18) time. On bond issues, we did that on a percentage of
(19) the bond issue to be paid if and when the bonds were
(20) sold.
(21)   Q.  Was there any other work other than the bond
(22) issues that you did for the district that was performed
(23) on an other than typical hourly basis?
(24)   A.  Not that I recall.
(25)   Q.  Can you describe the nature of the bond work

21

(1) that you were doing for the district at the time it was
(2) created?
(3)   A.  When you do a bond issue with the district an
(4) application has to be made to what then was the Water
(5) Commission, now known as the Texas Commission on
(6) Environmental Quality. That application has to be
(7) prepared by an engineer with the help of the attorney.
(8) It is filed, processed through the commission, and then
(9) an order of the commission is published and provided to
(10) the district, and the district can then sell its bonds.
(11) My work was mainly through processing
(12) through the commission and then assisting bond counsel
(13) because my firm does not act and has never acted as a
(14) bond counsel. You have to write an opinion that the
(15) securities are exempt for federal tax purposes, and we
(16) don't hold ourselves out as experts doing that.
(17)   Q.  Other than the bond work at the beginning
(18) stage of the district's existence, what type of legal
(19) services were you performing for the district?
(20)   A.  As I mentioned, a district is a lot like a
(21) little city. There are board meetings that are held.
(22) There are agendas that must be put together, must be
(23) posted in accordance with the open meetings
(24) requirements. The board meetings are held. You go
(25) down the agenda, and there are various agenda items,

22

(1) and there is one expert or another that explains to the
(2) board why that's on the agenda, what it's about, what
(3) you're asking them to do and why. There are elections
(4) that are held every two years, so there is work, you
(5) know, involved in calling the election, holding the
(6) election if it's contested, canvassing the voting
(7) rights submissions. There are taxes that are typically
(8) set every September, and with the help of the financial
(9) adviser those have to be posted for hearings, orders
(10) entered, working with the tax office to get that to
(11) them. Most of the actions taken by boards are, you
(12) know, maybe there is a resolution that's done that we
(13) have to draft or an order adopting something. Those
(14) are the typical types of work that I would do. There
(15) are contracts that are entered into with various
(16) parties. We will negotiate the contracts on behalf of
(17) the district. That's sort of a thumbnail sketch of it.
(18)   Q.  As far as you know during, say, the period
(19) 1986 through the end of 2001, to the extent the
(20) district had work other than bond counsel, legal work
(21) done, were you the person performing those legal
(22) services?
(23)   A.  Yes. I don't recall that there were any
(24) occasions of litigation when we had any kind of outside
(25) counsel, but I can't tell you for certain.

23

(1)   Q.  Within your range of general counsel work I
(2) heard you say board meetings, agendas, election work,
(3) tax work, contract work, and each of those having some
(4) subcategories. Within that range of work that you did,
(5) what -- if you had to approximate a guess as to what
(6) percentage of it related to elections, what would you
(7) say?
(8)   A.  5 percent.
(9)   Q.  And when you were describing the elections
(10) work you did, you mentioned there is holding, calling,
(11) and Voting Rights Act submissions work. Were there any
(12) other categories of election-related work that you
(13) performed?
(14)   A.  That's basically it.
(15)   Q.  Did you also do work with respect to
(16) canvassing?
(17)   A.  Well, the elections are canvassed by the board
(18) of directors. There is an order canvassing that we
(19) prepared and board's required to meet so many days
(20) after the election. That's changed recently. But at
(21) that time I think it was between three and eight days
(22) after the election, so there would be a board meeting
(23) set and held. The results of the election would be
(24) reviewed by the board, and then they would enter the
(25) order canvassing which would basically say what the

24

(1) propositions or if it were directors being elected who
(2) won.
(3)   Q.  Elections I think you said were about --
(4) election-related legal work was about 5 percent of your
(5) time for the district. If you had to sort of break it
(6) down, of that category of election work do you have a
(7) sense about how much consisted of Voting Rights Act
(8) submissions?
(9)   A.  On this particular district, no.
(10)   Q.  Did you play a general counsel role for other
(11) municipal utility districts in the range of time you
(12) were doing -- giving general counsel services for the
(13) MUD in -- here I guess we are talking about roughly
(14) 1986 through middle of 2002?
(15)   A.  Yes.
(16)   Q.  Typically for those districts would you say
(17) the percentage is broke down similarly such that
(18) elections work was about 5 percent or in that range of
(19) your total work?
(20)   A.  That would be typical. As with any client you
(21) may have some issue that comes up on an election that
(22) is unusual. That just happens.
(23)   Q.  But over a range of time that sounds like a
(24) fair number to you?
(25)   A.  I think that's probably correct.

(Pages 19 to 24)

### Page 25

(1) Q. And for your typical work representing Texas
(2) municipal utility districts, of the roughly 5 percent
(3) that goes towards election-related legal work, about
(4) what -- about what percentage of that elections work
(5) would you say is typically Voting Rights Act
(6) submissions work?
(7) A. I don't know that I could say typically
(8) because it depends on how many changes are required
(9) under a particular submission. If it's purely moving
(10) from one polling place to another, that's pretty
(11) simple. If there have been annexations plus polling
(12) places plus change of equipment, it can be more
(13) involved, and I don't know that there's anything that
(14) is typical. They don't take very long.
(15) Q. Of all your work for municipal utility
(16) districts in Texas, what would you say the very high
(17) end has been if you had to calculate the amount of work
(18) done on Voting Rights Act submissions as a percentage
(19) of the elections work done for the particular district?
(20) What would you say the absolute high end would be?
(21) A. I don't know.
(22) Q. Does 20 percent --
(23) A. I don't know that I -- I can't answer your
(24) question in percentages because that's something that I
(25) just don't know how many hours I spend or -- it's

### Page 26

(1) easier to tell you how many hours typically I would
(2) spend on that, but as a percentage of all the election
(3) activities I have no idea.
(4) Q. For a typical Voting Rights Act submission
(5) related to moving of a polling place how many hours
(6) would you typically spend on such a submission?
(7) A. Probably two hours.
(8) Q. And for annexation-related work?
(9) A. Depends on how many annexations, if we can
(10) find the files easily, if there is something unusual
(11) about it.
(12) Q. What's the range?
(13) A. One that includes annexations probably ends up
(14) being more, from three to six hours' worth of work.
(15) Q. How did you come to start doing work for the
(16) district? How did that relationship begin?
(17) A. As I stated previously, I was hired by the
(18) developer to work on the creation of the district.
(19) Q. And do you recall how you were -- how you came
(20) to be first hired by the developer?
(21) A. That would have been in probably 1984. We
(22) were hired by a local home builder, Nash Phillips
(23) Copus, to pursue the creation of District Number One
(24) and District Number Two, and I think there was a
(25) District Number Three in the original submittals.

### Page 27

(1) David Armbrust, one of my partners, and I handled the
(2) submittal to the City of Austin requesting consent to
(3) the creation of the three districts.
(4) Q. You mentioned earlier that one of your roles
(5) as outside general counsel was to attend the board
(6) meetings of the district; is that correct?
(7) A. That's correct.
(8) Q. And we have been looking through some of the
(9) old district minutes meetings. It looks like you were
(10) at most or maybe all of the board meetings during the
(11) time that you were doing work for the district between
(12) roughly 1986 to the middle of 2002. Is that a correct
(13) impression?
(14) A. That's probably correct.
(15) Q. Do you still do legal work for the district?
(16) A. No, I don't.
(17) Q. When did you stop doing legal work for the
(18) district?
(19) A. Probably 2002, but I really don't remember
(20) exactly.
(21) Q. Do you remember why your relationship as
(22) outside general counsel ended with the district?
(23) A. Yes.
(24) Q. Why was that?
(25) A. The new board of directors had a different

### Page 28

(1) idea of how they wanted to -- I won't say control the
(2) district, but a different policy, and we didn't
(3) particularly see eye to eye.
(4) Q. What policy -- well, let me back up a step.
(5) When you say we, who are you referring to?
(6) A. I'm sorry.
(7) Q. You said earlier, I think, "We didn't
(8) particularly see eye to eye." I just want to
(9) understand who the we in that situation is.
(10) A. There were three new board members at that
(11) time.
(12) Q. And who were they?
(13) A. Mr. Zimmerman, a fellow by the name of Weiss,
(14) and I really don't remember the third fellow's name.
(15) Q. Mr. Ferguson?
(16) A. Yes, you're right. That is Mr. Ferguson.
(17) Q. What policy disagreements did you have with
(18) the new board members in 2002?
(19) A. It was probably more personality than anything
(20) else. However, they were very upset about being an
(21) in-district city -- in-city district. Excuse me.
(22) Q. Excuse me. Can you explain what being an
(23) in-city district meant in terms of its significance in
(24) that context?
(25) A. Most utility districts are created in the

### Page 29

(1) extraterritorial jurisdiction of a city or outside any
(2) city jurisdiction, just in the county. The City of
(3) Austin desired to have these districts created within
(4) the corporate limits of the City of Austin. So they
(5) had two tax rates, both a city tax rate and a MUD tax
(6) rate. And the MUD tax rate was kept artificially low
(7) because of the double tax that was levied.
(8) Q. And did I hear right the new board members
(9) were upset because the district was being categorized
(10) as an in-city entity?
(11) A. It was an in-city district.
(12) Q. And the significance of that I take it was
(13) that they were subject to a higher tax rate than they
(14) would have been if they were -- if the district was not
(15) deemed an in-city entity.
(16) A. I suppose that's a question for argument
(17) because had that district been outside the boundaries
(18) of the City of Austin the district tax would have been
(19) substantially higher, more comparable to what other
(20) districts' tax rates are in the county.
(21) Q. I want to ask you about the personality
(22) tension you mentioned, but first I want to try to
(23) understand. You mentioned there was a policy
(24) difference, and I want to try to get at what the policy
(25) disagreement was between you and the new board members

### Page 30

(1) if there was one.
(2) A. I think the attitude was generally that they
(3) felt like they were being mistreated as a community
(4) being an in-city district.
(5) Q. Did you feel they were being mistreated?
(6) A. I don't know about mistreated, but I tried to
(7) explain to them that their MUD tax was substantially
(8) lower than comparable MUD taxes because they were in
(9) the city, so they got the services of the MUD and they
(10) got City of Austin services for a total tax rate that
(11) was equal to what some other people get MUD services
(12) for.
(13) Q. In 2002 were you representing the developer in
(14) matters other than related to the district?
(15) A. I don't recall that I did much work for John
(16) Simmons and Fred Eppright. Seems like I dealt with
(17) them on some city matters on something, but they had
(18) different lawyers that represented them.
(19) Q. Just so I understand, when you say Simmons and
(20) Right --
(21) A. Eppright.
(22) Q. Are those people connected to the Nash
(23) Phillips Copus entity?
(24) A. No.
(25) Q. So who -- If you can walk us through. My

**Page 31**

(1) understanding is that the original developer was --
(2) I'll call them NPC, Nash Phillips Copus.
(3) A. Correct.
(4) Q. Until when did their development work with
(5) respect to the district end?
(6) A. Nash Phillips Copus declared bankruptcy in
(7) 1987, and the property was put into -- it wasn't the
(8) Resolution Trust Corporation at first. I can't recall
(9) if it was FDIC, but there was another federal entity
(10) that took property first, and then the RTC was formed.
(11) They took property. This particular property was
(12) purchased, I believe, by a Fort Worth bank.
(13) Q. When you say property, you mean the land of
(14) the district?
(15) A. Canyon Creek. Right. Then that property was
(16) sold at some point to a limited partnership, I think,
(17) made up of John Simmons and Fred Eppright and Perry
(18) Blanton.
(19) Q. And is that limited partnership as far as you
(20) know still the developing entity for the district
(21) today?
(22) A. I don't believe Mr. Blanton is involved
(23) anymore. I don't really know if Fred Eppright and John
(24) Simmons are still involved.
(25) Q. What are the personality tensions you

**Page 32**

(1) mentioned earlier between you and the new board members
(2) as of 2002? Was there any particular event or clash
(3) that you recall?
(4) A. Not any particular event, no.
(5) Q. Did you resign your work as outside general
(6) counsel -- let me ask this another way. Were you --
(7) A. Was I fired?
(8) Q. Were you fired?
(9) A. It was sort of mutual. I came to a board
(10) meeting with my resignation in hand and they voted to
(11) terminate me, so we just sort of said good-bye
(12) mutually.
(13) Q. Other than your personality tensions and the
(14) clash relating to the tax status, were there any other
(15) factors that drove your separation?
(16) A. No. It just wasn't a relationship that was
(17) very pleasant on either side probably.
(18) Q. Do you recall discussion with the new board
(19) members with respect to the location of polling places
(20) of the district?
(21) A. I recall visiting with Mr. Zimmerman when he
(22) was a candidate about why the election was being held
(23) at a private residence.
(24) Q. Why was the election being held at a private
(25) residence?

**Page 33**

(1) A. In the beginning of the district there were no
(2) other buildings other than private residences. The
(3) elementary school was constructed sometime in the '90s,
(4) and at one point we called them to inquire about
(5) whether we could have our election there, and they
(6) really weren't very interested in it, not because they
(7) weren't nice people, but schools are very careful now
(8) about who they let on campus, and because we were not
(9) Travis County they really were not very receptive to
(10) having people coming and going where their children
(11) were.
(12) Q. Were there any other nonprivate buildings in
(13) the district other than Canyon Creek Elementary School
(14) during your time working for the MUD?
(15) A. There was the convenience store at the corner.
(16) I believe there was a religious organization that was
(17) building a small office building up toward Boulder
(18) Lane. And later there were apartments that had amenity
(19) center type areas. But it was primarily single-family
(20) dwellings in that district at that time.
(21) Q. Do you recall roughly when the convenience
(22) store came to be?
(23) A. No.
(24) Q. Do you recall roughly when the -- well, you
(25) mentioned a religious institution. Do you remember

**Page 34**

(1) what type of religious institution it was?
(2) A. No. It was an office building. It wasn't a
(3) church. But it was some religious organization, like a
(4) headquarters type of thing, as I recall.
(5) Q. Do you remember when that came in the
(6) district?
(7) A. No.
(8) Q. The apartment building with amenities you
(9) mentioned, do you remember roughly when that came in
(10) the district?
(11) A. Probably close to 2000.
(12) Q. The conversations you mentioned earlier with
(13) the folks at the school, about when did they occur?
(14) A. Probably sometime between 1998 and 2002. I
(15) can't be more specific than that.
(16) Q. Prior to 1997 do you recall any conversations
(17) with anyone at the school about the possibility of
(18) using their facility for a polling place?
(19) A. I'm not sure I understand your question
(20) related to your prior question.
(21) Q. I just want to make sure. You mentioned the
(22) range of times, approximately, for when the
(23) conversation with the school might have been, 1998 to
(24) 2002. I just want to make sure. Do you recall any --
(25) you do not recall any earlier conversations with folks

**Page 35**

(1) at the school about the possibility of the district
(2) using Canyon Creek as --
(3) A. Prior to 1998?
(4) Q. -- as a polling place? Prior to 1998, yes.
(5) A. Not that I recall.
(6) Q. Do you recall who you spoke with at the
(7) school?
(8) A. No.
(9) Q. Do you recall whether it was one person or
(10) more people?
(11) A. I don't recall.
(12) Q. Do you recall whether it was a man or a woman?
(13) A. No.
(14) Q. Do you recall if it was an administrator
(15) versus a teacher?
(16) A. I believe it was someone in administration.
(17) Q. Do you recall if it was an in-person meeting
(18) or a phone conversation?
(19) A. It was a phone conversation.
(20) Q. Do you recall roughly how long the phone
(21) conversation took place?
(22) A. Sometime between 1998 and 2002.
(23) Q. No, I'm sorry. In terms of number -- the
(24) length of the conversation.
(25) A. No, I don't.

**Page 36**

(1) Q. Would you say it was -- do you recall it being
(2) a short versus long conversation?
(3) A. I believe it was short.
(4) Q. Other than the single conversation with
(5) someone at the school, did you make any efforts during
(6) your time as outside general counsel to identify a
(7) nonprivate resident's home space where the district
(8) could have a polling place?
(9) A. No.
(10) Q. Why not?
(11) A. My client didn't ask me to.
(12) Q. In your range of experiences working with
(13) election issues for municipality -- municipal utility
(14) districts, does the location of the polling place
(15) affect voter turnout?
(16) A. Not particularly, no.
(17) Q. It's your sense -- it's your sense that there
(18) is no difference in voter turnout between a polling
(19) place located at someone's house versus, say, a school
(20) or a church?
(21) A. In my experience with utility districts the
(22) location of a polling place has very little to do with
(23) the voter turnout.
(24) Q. In your time working for the district did you
(25) or anyone at the district take affirmative steps to

## Page 37

(1) increase voter turnout in district elections?
(2)   A. No.
(3)   Q. In your time working at the district did
(4) anyone at the district express to you an interest in
(5) increasing voter turnout for district elections?
(6)   A. Repeat that. I want to make sure I understand
(7) your question.
(8)   Q. Absolutely. In your time doing outside
(9) general counsel work for the district did anyone on the
(10) district board express to you an interest in taking
(11) steps to increase voter turnout for district elections?
(12)   A. Not that I recall.
(13)   Q. You mentioned earlier that there were three
(14) MUDs, municipal utility districts, in the initial 1986
(15) submission by the district to the Department of
(16) Justice; is that correct?
(17)   A. No.
(18)   Q. Is it the case that the developer who
(19) developed the MUD -- who developed the district
(20) originally was working on three separate municipal
(21) utility districts, MUD 1, MUD 2, and MUD 3?
(22)   A. Yes.
(23)   Q. If you know, what happened to MUDs 2 and 3?
(24)   A. As I recall, the boundaries of the development
(25) did not change, and I couldn't tell you right now how

## Page 38

(1) many acres there were. Approximately 1600, 1800,
(2) somewhere in that range. When the land planners and
(3) the developer looked at how they wanted to develop the
(4) property, they decided to go forward with three
(5) districts, carving up that 1800 acres or however much
(6) it was into three districts. For whatever reason, the
(7) city did not want three districts. They finally agreed
(8) to two districts but made up of the same acreage. In
(9) the mid '90s the endangered species, black-capped
(10) vireos, karst features, whatever else was endangered in
(11) Northwest Travis County became more prevalent, and a
(12) substantial portion of District Number Two became
(13) conservancy-type land. And there was an agreement with
(14) the City of Austin and the developer to go ahead and
(15) dissolve that district. It really wasn't feasible
(16) because a lot of the land was going to stay natural.
(17)   Q. And with respect to MUD 3 do you recall --
(18)   A. MUD 3 never came about. It never got created.
(19)   Q. Do you recall why?
(20)   A. As I previously said, the city wanted to have
(21) two MUDs instead of three MUDs.
(22)   Q. So that was the reason it didn't go forward?
(23) It was -- there was an agreement to go forward with
(24) just the two MUDs?
(25)   A. Correct.

## Page 39

(1)   Q. I think I saw in looking at the original
(2) submissions to the Department of Justice that the City
(3) of Austin was opposed to the initial creation of MUD 1,
(4) the district. Do you recall, was it the objection that
(5) the city had this proposed three-district divide? Was
(6) it something else?
(7)   A. It's a long, complicated story. Whenever you
(8) want to create a district you have to go to the city in
(9) whose ETJ it's located. The City of Austin was not in
(10) favor of the creation of these districts at that time.
(11) The developer went through the process of requesting
(12) consent to creation. When that was denied, they then
(13) went through the second process, which is asking the
(14) city to serve the property on mutually agreeable terms,
(15) and there was a time frame for that. That time frame
(16) passed without a mutually agreeable contract being
(17) approved by all parties. The developer then went to
(18) the Texas Water Commission over the objection of the
(19) city and asked that the state go ahead and create the
(20) districts understanding that the city was opposed to
(21) it. There was a contested hearing at the commission.
(22) The districts were in fact approved, and at some point
(23) the developer and the city reached an agreement and
(24) consented to the districts. It was a settlement.
(25)   Q. Do you recall the process by which the

## Page 40

(1) original board members of the district were -- came to
(2) be on the board?
(3)   A. Yes. The process is statutory. The Texas
(4) Water Code provides that the landowner will suggest
(5) five individuals to serve as the initial board of
(6) directors, and those five directors have to be
(7) qualified to do so.
(8)   Q. What are the required qualifications?
(9)   A. They must either own property within the
(10) boundaries of the district or they must reside in the
(11) district, and they must be Texas residents and at least
(12) 18 years of age.
(13)   Q. And after the landowner -- I take it in this
(14) case the landowner was NPC, Nash Phillips Copus.
(15)   A. Nash -- yes, but Nash Phillips Copus went into
(16) bankruptcy in the middle of the whole process at the
(17) commission.
(18)   Q. After the landowner suggested the initial set
(19) of temporary directors, what was the process by which
(20) the first permanent set of directors were chosen?
(21)   A. Again, according to the Texas Water Code,
(22) after a district has been created by the commission the
(23) board organizes, meets, and calls an election for the
(24) confirmation of the district. At that election you
(25) have a proposition to confirm the creation of the

## Page 41

(1) district, and you have the five initial directors on
(2) the ballot for election to the permanent position. And
(3) that was done in accordance with the Texas Water Code.
(4)   Q. I was looking through the minutes reflecting
(5) the votes for the board. It looks like the elections
(6) were typically not competitive. That is, the number of
(7) board slots was greater or equal to the number of
(8) candidates. Am I --
(9)   A. That's correct. You call that an uncontested
(10) election.
(11)   Q. Was that the case throughout your time working
(12) with the district, that the elections were uncontested
(13) for election to the board?
(14)   A. I don't recall any contested elections until
(15) 2002.
(16)   Q. It looks from going through the minutes as if
(17) a number of elections were canceled for the board. Can
(18) you explain the process by which elections would be
(19) canceled for board membership?
(20)   A. Pursuant to state law if the number of
(21) candidates equals the number of positions open, it is
(22) then deemed to be uncontested and the election is
(23) canceled.
(24)   Q. And am I recalling correct that that state law
(25) came into effect in roughly 1995?

## Page 42

(1)   A. I don't recall the year.
(2)   Q. Was there a period of time after 1986 when the
(3) state law that prevents the cancellation of elections
(4) was not in effect?
(5)   A. I think that's correct.
(6)   Q. During that time after the MUD came into
(7) existence prior to the effective date of state law
(8) we're talking about, were there a number of elections
(9) that went forward but were uncontested?
(10)   A. There probably were, just based on the years
(11) you are describing, yes.
(12)   Q. Prior to the effective date of the state law
(13) were there any district elections canceled?
(14)   A. Would you restate your question?
(15)   Q. Absolutely. The state law permitting
(16) cancellations in the event of an uncontested election
(17) came into effect at some point -- I believe it was
(18) 1995. But whatever the date was, my question is, prior
(19) to that effective date were there elections for
(20) district board membership that were canceled?
(21)   A. No. That would have been illegal.
(22)       MR. COLEMAN: Ms. Collins, I don't know
(23) if at any point you would like to take a break.
(24)       THE WITNESS: Let's trudge on.
(25)   Q. (By Mr. Waldman) Now is certainly fine. Just

**43**

(1) let us know.
(2) A. No, that's fine. I had a five-hour meeting
(3) last night so I have been sitting a lot for the last
(4) two days. But that's okay.
(5) THE WITNESS: Do you need a break?
(6) MR. SCRAFFORD: No, I'm fine.
(7) MR. WALDMAN: We should ask counsel.
(8) (Discussion off the record)
(9) Q. (By Mr. Waldman) Do you recall the original
(10) November 1986 time period when the submissions on
(11) behalf of the district went to the Department of
(12) Justice, do you recall there were two people of voting
(13) age living in the district?
(14) A. That's probably correct.
(15) Q. Do you recall who those two people were?
(16) A. No.
(17) Q. Do you recall their race?
(18) A. I don't believe I ever met them.
(19) Q. Do you recall knowing their race at the time
(20) from some source other than having personally met them?
(21) A. No.
(22) Q. Do you recall at the time of the November '86
(23) submission there was one black family residing within
(24) the boundaries of the district?
(25) A. No.

**44**

(1) Q. Do you recall if any African-Americans played
(2) a role in the formation of the district?
(3) A. In the formation of the district?
(4) Q. Yes. And here by formation I'm referring to
(5) the entire scope of activities from initial petition to
(6) the Water Commission, submission to the Department of
(7) Justice, and initial creation of a temporary board,
(8) anything within that range of activity.
(9) A. The individuals with Nash Phillips Copus that
(10) I dealt with were probably all white males.
(11) MR. WALDMAN: Now I am going to introduce
(12) an exhibit. I'm going to ask the court reporter to
(13) mark this document.
(14) (Exhibit 11 marked)
(15) MR. COLEMAN: May I briefly take a --
(16) MR. WALDMAN: Yeah, we got copies.
(17) MR. HICKS: What's the number?
(18) MS. POOL: It will be 11.
(19) Q. (By Mr. Waldman) Ms. Collins, do you
(20) recognize this document?
(21) A. It appears to be one of our submissions to the
(22) Department of Justice for this district.
(23) Q. And is this the November 25, 1986 submission
(24) to the department?
(25) A. It is. And it would be the initial one

**45**

(1) because it says the district proposes to hold a
(2) confirmation election.
(3) Q. And this was the initial submission under
(4) Section 5 of the Voting Rights Act; is that correct?
(5) A. That's correct.
(6) Q. Can I ask you to turn to the second page?
(7) A. Okay.
(8) Q. At the top do you see where it says there's --
(9) "There are two (2) people of voting age residing in the
(10) district. There is one black family residing in the
(11) district and zero families with Spanish surnames"?
(12) A. I see that.
(13) Q. Does this refresh your recollection at all
(14) with respect to whether there was an African-American
(15) family residing in the district in November 1986?
(16) MR. COLEMAN: Refresh or inform?
(17) THE WITNESS: It --
(18) Q. (By Mr. Waldman) Well, start with refresh.
(19) A. It does not refresh my memory. If we said it,
(20) it must have been.
(21) Q. Sitting here today perhaps having your memory
(22) informed by this document, do you have any reason to
(23) doubt that there was, in fact, an African-American
(24) family in the district in November '86?
(25) A. No. We wouldn't put it in there if it wasn't

**46**

(1) true.
(2) Q. Ms. Collins, you can put that document to the
(3) side for now. Do you know today what precincts the
(4) district lies in? By precinct I mean precinct number.
(5) A. No.
(6) Q. Do you know if the district is in Precinct
(7) No. 333 --
(8) A. No.
(9) Q. -- by chance? I take it you also don't know
(10) if the district also has some portion of it in
(11) Precinct 343.
(12) A. No.
(13) Q. During the time that you worked for the
(14) district do you recall what precinct the district was
(15) in?
(16) A. The district elections were held separately.
(17) Therefore, there was no need to know what precinct they
(18) were in for purposes of other elections. So I had no
(19) reason to seek out knowledge of which precinct, and I
(20) assume you're talking about Travis County voting
(21) precincts.
(22) Q. Yes. Do you recall there being any change in
(23) the precincts in which the district was in during your
(24) time working with the district?
(25) A. I have no idea.

**47**

(1) Q. I think you mentioned earlier there were some
(2) basic statutory requirements for the initial board of
(3) directors. I take it the initial slate of directors
(4) met the statutory requirements. Is that correct?
(5) A. Yes.
(6) Q. Other than the statutory requirements, were
(7) there any other reasons that that particular slate of
(8) directors were chosen? And here specifically I'm
(9) curious about relationship between the then developer
(10) and the individuals appointed to the board.
(11) A. I don't even remember who the original board
(12) of directors were.
(13) Q. If I can ask you to take back out the document
(14) marked Exhibit 11.
(15) A. Okay.
(16) Q. And flip to Exhibit B. The third page of
(17) Exhibit B doesn't have a page number or a Bates number.
(18) The first words at the top are "generally circulated in
(19) Travis County," several pages after the map.
(20) A. Okay. I'm there.
(21) Q. If you go to numbered paragraph 4 you see
(22) where it states the affidavits of five (5) proposed
(23) temporary directors of the proposed district have been
(24) received, and it continues "they are as follows"?
(25) A. Yes.

**48**

(1) Q. Do you recall who Theodore R. Hendricks was?
(2) A. I vaguely remember him. I can't tell you what
(3) he did for a living.
(4) Q. Do you remember if he had any relationship
(5) with the then developer?
(6) A. I'm sure he did because you didn't just pick
(7) up strangers off the street and ask them to be your
(8) directors.
(9) Q. And the answer -- to save us time would the
(10) answer be the same with respect to the four other
(11) individuals listed, James Hillyer, Homer Reed, Robert
(12) James Iverman, and Timothy Emile Jamail?
(13) A. Homer Reed was a former assistant city manager
(14) for the City of Austin, and I believe he had gone into
(15) doing development work privately. He was not an
(16) employee of NPC. And Emile Jamail was a local
(17) developer around here in the '70s and '80s and I'm sure
(18) was an acquaintance of the developer. Mr. Hillyer and
(19) Mr. Iverson I have no recollection of.
(20) Q. Generally do you recall how this particular
(21) slate of directors was chosen by the developer?
(22) A. I cannot tell you the thought process on who
(23) they determined to request to do this for them.
(24) Q. In your experience with municipal utility
(25) districts, typically how is the initial slate of

(Pages 43 to 48)

### Page 49

(1) proposed temporary directors chosen by the district?
(2) A. They're not picked by the district because the
(3) district doesn't exist.
(4) Q. Excuse me. By the developer seeking to create
(5) the district.
(6) A. The developer looks to find five individuals
(7) that they know and are comfortable with that are not
(8) family, don't work for them, and look for people who
(9) are interested in serving on a board of directors and
(10) perhaps learning something. And I think probably every
(11) developer has a different -- slightly different
(12) criteria on determining who they would like to see work
(13) with them on their board of directors.
(14) Q. During your time working for the district was
(15) there -- were there ever any African-American officers
(16) of the district?
(17) A. Not that I recall.
(18) Q. Were there ever -- were there ever any
(19) African-American members of the district?
(20) A. Do you mean residents in the district?
(21) Q. I mean any person affiliated with the district
(22) who was not a board officer. I'm not asking about
(23) residents, but in any administrative or other capacity.
(24) A. The developer -- and I'm not -- not NPC, but
(25) John Simmons, Fred Eppright, and Perry Blanton, their

### Page 50

(1) chief administrative assistant, Rosalyn Peterson, was
(2) the main liaison with the district, and she is in fact
(3) African-American.
(4) Q. Can you say again what her last name was?
(5) A. Peterson.
(6) Q. Other than Ms. Peterson, was there anyone else
(7) that you can think of in this category?
(8) A. No one that I can recall.
(9) Q. Since you stopped working for the district in
(10) 2002 have you been aware of any African-American board
(11) members for the district?
(12) A. No.
(13) Q. During your time doing work for the district
(14) were there any Latino or Hispanic board members of the
(15) district?
(16) A. Not that I recall.
(17) Q. And since the time in 2002 when you stopped
(18) doing work for the district are you aware of any Latino
(19) or Hispanic board of directors that have -- individuals
(20) who have joined the district board?
(21) A. No.
(22) Q. During your time working for the board --
(23) scratch that. To your knowledge has there ever been a
(24) candidate for board officer who is an African-American?
(25) A. No.

### Page 51

(1) Q. Has there ever been a candidate for board
(2) officer who has been Latino or Hispanic?
(3) A. Not to my knowledge.
(4) Q. To your knowledge has the district ever made
(5) any affirmative effort to seek out an African-American
(6) resident of the district for the purpose of encouraging
(7) them to run for the district board?
(8) A. Not that I'm aware of.
(9) Q. Has the district ever made any affirmative
(10) effort to seek out a Latino or Hispanic resident of the
(11) district for the purpose of encouraging that person or
(12) persons to run for the board?
(13) A. Not that I'm aware of.
(14) Q. Has the district ever made any affirmative
(15) efforts to seek out an Asian-American resident of the
(16) district for the purpose of encouraging them to run for
(17) the board?
(18) A. Not that I'm aware of.
(19) MR. COLEMAN: Did you ask her if she was
(20) aware whether there have been Asian-American candidates
(21) for the board?
(22) MR. WALDMAN: I have not asked that yet.
(23) Q. (By Mr. Waldman) Do you recall any discussion
(24) about or consideration of making affirmative efforts to
(25) recruit any minority candidates to run for board

### Page 52

(1) office?
(2) A. Not that I recall.
(3) Q. Were there ever any Asian-American candidates
(4) for board office?
(5) A. Not that I'm aware of.
(6) Q. You mentioned earlier that you attended most
(7) or all of the district board meetings from the time the
(8) board was -- from the time the district was created up
(9) until you stopped doing work sometime in 2002 for the
(10) board. In your experience how frequently would the
(11) district board typically meet?
(12) A. Once a month.
(13) Q. And would -- was there a particular period of
(14) the month when the board meeting would occur by any
(15) sort of rule? Was it ad hoc? How was it set?
(16) A. The board had a standing meeting date, which
(17) is typical of all my districts. You pick, say, the
(18) third Thursday of the month, and you try to meet on the
(19) third Thursday of the month so everybody can put it on
(20) their calendar for a year.
(21) Q. And typically would the meetings actually
(22) occur every month?
(23) A. Yes. I'm sure there were probably a few
(24) occasions where we couldn't get a quorum.
(25) Q. And on those occasions what would happen?

### Page 53

(1) A. Either the meeting would be moved to another
(2) date where we could get a quorum or we would skip the
(3) meeting.
(4) Q. How frequently do you recall meetings being
(5) skipped?
(6) A. I think that was very infrequent.
(7) Q. If a meeting was scheduled and then skipped,
(8) would the decision to skip be reflected in the minutes
(9) of the subsequent district board meeting?
(10) A. Not necessarily, no.
(11) Q. Did each board meeting that did occur produce
(12) a set of minutes?
(13) A. Yes. That's a statutory requirement.
(14) MR. WALDMAN: Let's go ahead and take a
(15) five-minute break if that's okay with the witness and
(16) counsel.
(17) MR. SCRAFFORD: Okay.
(18) (Recess from 1:31 to 1:43)
(19) Q. (By Mr. Waldman) Do you recall, Ms. Collins,
(20) are there state regulations that govern the way that
(21) the district conducts itself? And here I mean with
(22) respect --
(23) A. Can you define --
(24) Q. -- with respect to board governance.
(25) A. Yes.

### Page 54

(1) Q. What are the -- what are the applicable rules
(2) that derive from the state regulations? I don't mean
(3) to ask for the legal treatise, but just what were
(4) the -- what were the rules that -- the key rules that
(5) governed from the state when you were representing the
(6) district?
(7) A. Well, the main rules that deal with utility
(8) districts are -- and let's just -- there's lots of
(9) different types of districts. For MUDs, Chapter 49 and
(10) Chapter 54 of the Texas Water Code, as well as would be
(11) 30 Texas Administrative Code, Chapter 293, which deals
(12) with water districts. Those are the two main sets of
(13) requirements about how districts conduct their
(14) business.
(15) Q. In addition to this applicable state
(16) regulations, were there district-generated regulations
(17) that govern the way the district board governed the
(18) district?
(19) A. There are sometimes. A district, for example,
(20) is required to have an investment policy which sets
(21) forth how it invests its funds. They will frequently
(22) have a code of ethics, and that may be in the same set
(23) of policies.
(24) Q. Do you recall if our particular district --
(25) the district had investment policy?

(Pages 49 to 54)

Page 55

(1) A. I believe so, yes. And I say that simply
(2) because all of my districts have one, and I think in
(3) 2002 that was already a requirement that you have an
(4) investment policy.
(5) MR. WALDMAN: Counsel, do you know if the
(6) investment policy has been produced?
(7) MR. COLEMAN: I don't know. We've
(8) produced all the minutes.
(9) MR. HERREN: I believe they're attached.
(10) Q. (By Mr. Waldman) Ms. Collins, do you recall
(11) if the district had a code of ethics?
(12) A. I believe that it did, yes.
(13) MR. WALDMAN: Same question for counsel.
(14) MR. COLEMAN: Same answer.
(15) MR. WALDMAN: Do we know if counsel was
(16) able -- if we received a code of ethics from the
(17) district?
(18) MR. HERREN: I believe they were in by a
(19) yearly basis. I think they were in the minutes.
(20) MR. COLEMAN: They're always attached. I
(21) haven't personally verified, but you have them.
(22) Q. (By Mr. Waldman) Ms. Collins, what were the
(23) rules for the decisions of the board? That is, what
(24) was required for the board to do something? Majority
(25) rule? Something else?

Page 56

(1) A. The Texas Water Code states that it takes an
(2) affirmative vote of a majority of the members of the
(3) board. For example, a MUD has five board members. It
(4) takes three for affirmative action. Even if you only
(5) have three in attendance, it still takes three to act.
(6) Q. In your time working with MUD 1, the district,
(7) were there nonunanimous decisions by the board?
(8) A. I don't recall.
(9) Q. So sitting here today, would -- is it your
(10) sense that most or all of the decisions made by the
(11) board during your time from '86 to middle of '02 were
(12) unanimous?
(13) MR. COLEMAN: Objection, misstates the
(14) testimony.
(15) Q. (By Mr. Waldman) You can answer the question.
(16) A. I don't recall. I anticipate -- most of our
(17) districts reach consensus on most topics because
(18) they're uncontroversial.
(19) Q. In the vernacular of the district we've seen
(20) in some of the documentation references to special
(21) meetings versus regular meetings. Is that distinction
(22) meaningful to you? Here I'm referring to meetings of
(23) the district board.
(24) A. The board regular meetings were the ones that
(25) were generally on the regular meeting date. As I said,

Page 57

(1) for example, the third Thursday of the month. In the
(2) event there was a special activity or a need, for
(3) example, to have the board approve an award of contract
(4) so that construction could begin on a subdivision, you
(5) might ask the board if they would be willing to have a
(6) special meeting in between the regular meetings to go
(7) ahead and get that contract approved so that
(8) construction could begin. Or if you had, say,
(9) canvassing an election, you might have a special
(10) meeting to canvass your election because of the
(11) deadlines to get that done.
(12) Q. Is the term special meeting, is it a term of
(13) art? Does it come from a statute or a rule or is it
(14) something that the board used more informally just to
(15) refer to the nonregular meetings?
(16) A. It's a term that the attorney general's office
(17) uses frequently. For example, if you have activities
(18) to do with bonds that take place on meetings that are
(19) not the regular meeting of the board, then you have to
(20) have an affirmation from absent board members later
(21) that they were informed of that special meeting. So
(22) it's not just something that we came up with. It's --
(23) and I can't tell you if it came from the attorney
(24) general's office to begin with, but it's an important
(25) distinction to them.

Page 58

(1) Q. During your time working for the board, would
(2) the board periodically go into executive session?
(3) A. Yes.
(4) Q. About how frequently would that occur?
(5) A. Rarely.
(6) Q. Was there any typical reason for the board to
(7) call executive session?
(8) A. There are very limited reasons why a district
(9) can go into an executive session, and those are set out
(10) in the Open Meetings Act. If there was a discussion
(11) about the purchase of property, for example, what to
(12) offer on a condemnation, the board might want to
(13) discuss that in executive session just so that they
(14) could talk about it privately before an amount was
(15) offered. If there was contemplated or pending
(16) litigation, you could go into executive session. If
(17) there were personnel matters, you could go into
(18) executive session. I don't think these came up very
(19) often.
(20) Q. Do you recall if the board ever went into
(21) executive session to discuss a possible Section 5
(22) submission?
(23) A. Very unlikely.
(24) Q. So sitting here today you can't recall?
(25) A. No.

Page 59

(1) Q. Do you recall the board going into executive
(2) session to discuss prospective litigation?
(3) A. You mean in any of the 16 years? I just don't
(4) remember.
(5) Q. Where were the board meetings held during your
(6) time working for the board?
(7) A. It changed from time to time. In the
(8) beginning they met at the developer's office, as I
(9) recall. I don't believe they met in our offices. For
(10) a long time they met at the offices of Simmons &
(11) Eppright. Then in later years one of the builders
(12) allowed us to use the model home in the district, not
(13) too far from the elementary school.
(14) Q. What were the years in which the district
(15) permitted you to use the model home?
(16) A. I don't recall.
(17) Q. If you recall approximately.
(18) A. The meetings were still being held there when
(19) I resigned. I believe we had been meeting in that
(20) model home or another one maybe three years total.
(21) Q. Did the district ever consider using model
(22) homes as a poll place?
(23) A. Yes.
(24) Q. And what decision was made?
(25) A. The owner of the model home had no interest in

Page 60

(1) having people tromping in and out for an election and
(2) declined to let us do it.
(3) (Cell phone ringing)
(4) MR. WALDMAN: That's embarrassing.
(5) Excuse me.
(6) Q. (By Mr. Waldman) When did the owner of the
(7) model home express a disinterest in permitting polling
(8) places at the model home?
(9) A. I think the topic came up maybe with the 2000
(10) election and then again in the 2002.
(11) Q. Did you or someone at the district approach
(12) the owner of the model home about the possibility of
(13) putting a poll place there?
(14) A. My recollection is that it was Mr. Blanton or
(15) Ms. Peterson who talked to Standard Pacific. I think
(16) it was Standard Pacific that owned that house.
(17) Q. Did you ever talk to anybody at Standard
(18) Pacific about the prospect of placing a poll site at
(19) the model home?
(20) A. No.
(21) Q. It looks like from going through the minutes
(22) that a lot of the board meetings occurred at 7:30 in
(23) the morning. Is that your recollection?
(24) A. Yes.
(25) Q. Why was that?

(Pages 55 to 60)

## Page 61

(1) A. That was what was convenient to the board of
(2) directors.
(3) Q. Do you recall whose idea it was to begin the
(4) meetings at that hour?
(5) A. No.
(6) Q. Do you recall any consideration being given as
(7) to whether the hour of the day in which board meetings
(8) took place would increase or decrease the number of
(9) members of the public who attended the board meetings?
(10) A. No.
(11) Q. In the 1988 through 2002 time frame did the
(12) district have any employees?
(13) A. No.
(14) Q. Same time frame, did the district have any
(15) nonelected positions?
(16) A. Please define position.
(17) Q. Other than the board member and counsel, who
(18) was doing work for the district in that period?
(19) A. The district employed a number of consultants
(20) that worked with it. Are you interested in types or
(21) names?
(22) Q. If you recall both, types and names.
(23) A. The district employed an engineer. That was
(24) Ken Schroeder with Schroeder Engineering Company. The
(25) district had a financial adviser. That was Cheryl

## Page 62

(1) Allen with Southwest Securities. And her -- she
(2) changed companies a couple of times, but I think she
(3) was the individual throughout. The district had a
(4) general manager or bookkeeper, and that was Kay
(5) Markette with Severn Trent. There may have been some
(6) other consultants, but they're not coming to mind right
(7) now besides me.
(8) Q. What was the role of the general manager?
(9) A. To be the bookkeeper, basically. The City of
(10) Austin actually maintained the water, wastewater, and
(11) most of the drainage facilities rather than the
(12) district. So it was more administrative than hands-on
(13) running of the utility system.
(14) Q. Was Kay Markette the district's general
(15) manager during the entire period that you were doing
(16) work with the district?
(17) A. I'm pretty sure she was not, but I couldn't
(18) tell you who was before her. There are registration
(19) forms in those files that I'm sure you have copies of,
(20) and that would tell you.
(21) Q. It looks like from going through the Section 5
(22) submissions that population estimates in the
(23) submissions would be based on the estimates provided to
(24) the board or to counsel by the district's general
(25) manager. Do you recall how the district manager would

## Page 63

(1) go about generating the population estimates?
(2)     MR. COLEMAN: Objection, foundation.
(3) Q. (By Mr. Waldman) You can answer.
(4) A. I don't really know. I think on Hispanic that
(5) they tended to go by the customer list or the resident
(6) list and truly looked at Spanish surnames rather than
(7) knowing anything more specific about whether someone is
(8) truly Hispanic or not. As to black families, I think
(9) that it was based on just, you know, who they knew and
(10) what they saw in district dealing with the district.
(11) If they had documentary information, I'm not aware of
(12) it.
(13) Q. When you were preparing the Section 5
(14) submissions, other than the estimates of the general
(15) manager, did you take any additional steps to verify
(16) the accuracy of the population estimates?
(17) A. No.
(18) Q. Same question with respect to the estimates on
(19) number of African-Americans in the district.
(20) A. No.
(21) Q. Same question with respect to the number of
(22) Latino or Spanish surnames.
(23) A. None. None.
(24) Q. When you prepared the Section 5 submissions
(25) for the district, in what form did the estimates of the

## Page 64

(1) general manager with respect to population come to you?
(2) That is, was it written? Was it oral? Was it both?
(3) A. I believe it varied from time to time. It
(4) might be a phone call one time, and it might be an
(5) e-mail another or something in another form of variety
(6) another time.
(7) Q. If you took notes of a phone call with respect
(8) to population estimates that later went into Section 5
(9) submission, would those notes be reflected in the board
(10) minutes or attached to the board minutes?
(11) A. If it did not happen at a board meeting, it
(12) would not be reflected in the minutes, no.
(13) Q. If you took the types of notes I was just
(14) describing, would those notes be reflected in the
(15) board's publicly available records?
(16) A. If they are in the files I suppose they are.
(17) If I had a call from Ms. Markette and she told me there
(18) were approximately 25 African-American families and
(19) 50 Hispanic families, I probably would have written it
(20) on something like this and it went in the trash after
(21) that.
(22) Q. And I guess same question with respect to
(23) e-mails that Ms. Markette or any of the general
(24) managers would have sent on population estimates. To
(25) the extent you kept such e-mails, would --

## Page 65

(1)     MR. SCRAFFORD: I just want to make --
(2) for the record, when you said "like this" you were
(3) referring to a piece of scratch paper.
(4)     THE WITNESS: A legal pad. Yeah, scratch
(5) paper. As far as e-mails, I know that they were
(6) deleted, and that was two computers ago, and I doubt
(7) that those could be retrieved.
(8) Q. (By Mr. Waldman) During your time doing
(9) outside general counsel work for the district, did your
(10) firm have in place document retention policies?
(11) A. The district has a document retention policy
(12) because all districts are required to have that, and
(13) there should be written documentation of that in the
(14) district's files. I don't have a copy of it.
(15) Q. During the time that you worked for the
(16) district, did your law firm have document retention
(17) policies?
(18) A. Formal? I don't think so.
(19)     MR. SCRAFFORD: If there are, we don't
(20) know.
(21)     THE WITNESS: I don't -- I don't believe
(22) so. Our policy is we keep everything until we have no
(23) space, and then you start culling through just like any
(24) other law firm.
(25) Q. (By Mr. Waldman) Do you recall the race of

## Page 66

(1) the general -- general manager of the district?
(2) Ms. Markette did you say it was?
(3) A. Yes. She's Caucasian.
(4) Q. During your time working for the district, who
(5) was responsible for registering voters of the district?
(6) A. Registration of voters is a matter of county
(7) practice, not the district.
(8) Q. Is that to say Travis County during the time
(9) period you were working for the district was
(10) responsible for voter registration?
(11) A. Yes, if it's in Travis County.
(12) Q. Did the district ever, to your knowledge, have
(13) any role in registering voters?
(14) A. Not to my knowledge.
(15) Q. Did the district maintain any records on the
(16) race of persons who voted in district elections?
(17) A. Not that I'm aware of.
(18) Q. Did the district maintain any records on the
(19) ethnicity of persons who voted in the district
(20) elections?
(21) A. Not that I'm aware of.
(22) Q. As far as you know, since the district was
(23) created has Travis County continually conducted voter
(24) registration for all district elections?
(25) A. My understanding of state law is that the

(Pages 61 to 66)

Page 67

(1) county is the voter registrar for all elections. I
(2) don't know what else to tell you.
(3)     Q.  Do you have any reason to doubt that Travis
(4) County has been the sole registrant of voters for
(5) district elections --
(6)     A.  No.
(7)     Q.  -- In the times since the district's creation?
(8)     A.  No.
(9)     Q.  When the district was considering a change in
(10) voting, what was the process?
(11)    A.  The only changes that were -- came about
(12) really were annexations and polling places. The
(13) polling place, because there was not a public building
(14) that we found available, would be determined by who was
(15) nice enough to be our election judges, and it would be
(16) held at their home.
(17)         (Discussion off the record)
(18)         MR. WALDMAN: I'm asking the court
(19) reporter to mark this document as Exhibit 12. I've
(20) given a copy to counsel.
(21)         (Exhibit 12 marked)
(22)    Q.  (By Mr. Waldman) The court reporter,
(23) Ms. Collins, has shown you a document marked
(24) Exhibit 12. Ms. Collins, do you recognize this
(25) document?

Page 68

(1)     A.  Yes. It is a preclearance submission that we
(2) did for the 2002 director election.
(3)     Q.  And what change in voting were you seeking to
(4) preclear in this submission?
(5)     A.  Change of a polling place.
(6)     Q.  And if you recall, was the request to change
(7) approved by the Department of Justice?
(8)     A.  I don't think I've ever had one that wasn't
(9) approved, so I'm going to say yes, but I don't --
(10) without seeing the letter from the Department of
(11) Justice I don't absolutely for sure.
(12)         (Exhibit 13 marked)
(13)         MR. WALDMAN: I'm asking the court
(14) reporter to mark this document Exhibit 13. It's an
(15) unBates stamped document dated May 24, 2002. For the
(16) record, a copy has been handed to counsel.
(17)         THE WITNESS: It looks like the district
(18) got approved.
(19)    Q.  (By Mr. Waldman) Ms. Collins, is the document
(20) at Exhibit 13 a letter from the voting section to you
(21) approving the requested poll change sought in the
(22) March 27, 2002 Section 5 submission?
(23)    A.  Yes, it is.
(24)    Q.  If I can ask you to flip back to Exhibit 12.
(25)    A.  Okay.

Page 69

(1)     Q.  The second page of the letter, which I think
(2) is the third page of the document.
(3)     A.  Okay.
(4)     Q.  The upper right-hand corner do you see the
(5) list of prior -- six prior submissions to the
(6) Department of Justice?
(7)     A.  I do.
(8)     Q.  Do you recall that each of the six prior
(9) submissions were approved by the department?
(10)    A.  Again, I don't think I've ever had one that
(11) was not approved, so I -- my supposition is that all of
(12) these were approved.
(13)    Q.  During your time doing legal work for the
(14) district, other than the March 27, 2002 submission and
(15) the six proposed changes in the voting rules identified
(16) in the upper right-hand corner of page 2 of the
(17) March 27, 2002 letter, did the district submit any
(18) additional Section 5 preclearance documents?
(19)    A.  I don't have any recollection of any others.
(20)    Q.  Typically when you worked with a district on
(21) preclearance submissions, what was the extent of the
(22) board's involvement in the preclearance submission?
(23)    A.  Normally we would put an item on the agenda
(24) and just get the board to approve having the attorney
(25) make the necessary submission.

Page 70

(1)     Q.  And on average do you recall about how much
(2) review the board members would give to the proposed
(3) submissions?
(4)     A.  I don't think I ever had one of the board
(5) members take a look at the submission.
(6)     Q.  So it's your recollection that with respect to
(7) the March 27th, 2002 submission and the six prior
(8) Section 5 submissions, the board members never reviewed
(9) the draft preclearance submissions?
(10)    A.  I think that's correct. Now, I will add that
(11) in the event that we had one done before a board
(12) meeting to call the election, we might have put it in
(13) the packet. I'm not going to tell you that's never
(14) happened.
(15)    Q.  Starting after the initial temporary slate of
(16) directors when there was a permanent slate going
(17) forward for the district, what were the eligibility
(18) requirements for becoming a board member?
(19)    A.  The same ones that I mentioned before. You
(20) had to either own property within the boundaries of the
(21) district or live in the district, plus you had to be at
(22) least 18 years old and a resident of Texas.
(23)    Q.  Are there any candidate filing fees to run for
(24) district board member?
(25)    A.  No.

Page 71

(1)     Q.  What was the process by which a candidate for
(2) membership on the board would file their candidacy?
(3)     A.  The process for filing an application is set
(4) forth in the Texas Election Code. There is a standard
(5) filing application that the Texas Secretary of State's
(6) office generates. That can be downloaded off a
(7) computer. We have copies available when we have
(8) elections for our districts. If someone calls in and
(9) says, "I'd like to run for the board of X district," we
(10) send them an application. Plus there's three different
(11) publications about do's and don'ts of campaign finance
(12) and all the things that you got to do when you try to
(13) get on the ballot to run for office.
(14)    Q.  And after the would-be candidates submits
(15) their paperwork, where do those -- where do the written
(16) documents of the candidacy get housed by the district?
(17)    A.  In the district office, which is my office for
(18) the districts that I represent.
(19)    Q.  Do the candidacy documents for the district
(20) for the years in which you worked for the district
(21) currently reside in your law firm's storage facilities
(22) or records?
(23)    A.  No.
(24)    Q.  Where are those documents?
(25)    A.  I turned them all over to the new attorney for

Page 72

(1) the district.
(2)     Q.  And who is that?
(3)     A.  I knew you were going to ask me that. I don't
(4) remember his name. It's not Mr. Coleman.
(5)     Q.  When did you turn those documents over to him?
(6)     A.  I would say summer of '02, fall of '02.
(7)     Q.  Do you recall if that was an individual named
(8) Frank Reilly?
(9)     A.  Frank?
(10)    Q.  Reilly.
(11)    A.  It was.
(12)    Q.  Do you recall the district having homeowner
(13) organizations?
(14)    A.  The district does not have a homeowner
(15) organization. That's not provided for by the Texas
(16) Water Code.
(17)    Q.  Do you recall homeowner organizations to which
(18) property owners who owned property in the district
(19) belonged?
(20)    A.  There was and I assume still is a Canyon Creek
(21) homeowners association that was set up as a part of the
(22) declarations on subdivisions at the time of development
(23) of the different subdivisions in the district.
(24)    Q.  Canyon Creek, is that -- that's a neighborhood
(25) name for a particular part of the district; is that

**Page 73**

(1) correct?
(2) A. In a planned development, frequently a
(3) developer will have a set of master declarations and
(4) there will be -- there will be an overall homeowners
(5) association or there may be individual homeowner
(6) associations for different subdivisions, and that's
(7) purely a matter of how the developer wants to do it.
(8) Q. Was there -- there is now an elementary school
(9) called Canyon Creek Elementary. Am I correct?
(10) A. Yes.
(11) Q. Do you know the name of the school district
(12) that governs Canyon Creek Elementary?
(13) A. My understanding -- my recollection it's Round
(14) Rock ISD.
(15) Q. Can you repeat that?
(16) A. It's the Round Rock ISD.
(17) Q. Round Rock ISD. During your time of working
(18) for the district, who were -- who was or were the
(19) leaders of the Canyon Creek homeowners association?
(20) A. I have no idea.
(21) Q. Do you recall whether the district board ever
(22) attempted to reach out -- let me pause. Other than the
(23) Canyon Creek homeowner association, were there any
(24) other homeowner associations you recall to which
(25) property owners of property in the district belonged?

**Page 74**

(1) A. Not that I knew of.
(2) Q. Do you recall whether the district board ever
(3) attempted to reach out to the Canyon Creek homeowner
(4) association to include minorities on the district
(5) board?
(6) A. Not to my knowledge.
(7) Q. Do you recall whether the district ever
(8) considered reaching out to the homeowners association
(9) to identify any minorities as possible candidates for
(10) the district board?
(11) A. There were no discussions in my presence that
(12) I recall.
(13) Q. Do the districts specifically notify the
(14) Canyon Creek homeowners association about district
(15) board meetings? That is, beyond the standard postings
(16) that are required by state law.
(17) A. I don't remember.
(18) Q. Do you remember any effort made by the
(19) district board to make African-American residents of
(20) the district aware of the time and location of district
(21) board meetings?
(22) A. Other than the statutory requirements, no.
(23) Q. And what statutory requirements are you
(24) referring to here?
(25) A. The open meetings requirements. The notice of

**Page 75**

(1) board meetings are posted at the Travis County
(2) Courthouse, they're posted here at our office, and I
(3) believe they were on a bulletin board at the pool in
(4) Canyon Creek. There was a glass bulletin board, and I
(5) think we had a key, and our runner would go out there
(6) and tack up the notice on the bulletin board.
(7) Q. I think I'm -- I think I'm hearing you right
(8) that -- I take it there are no state requirements that
(9) would require the district to reach out specifically to
(10) African-American groups. Is that correct?
(11) A. I'm not aware of any.
(12) Q. And other than the district's efforts to
(13) comply with the applicable state regulations, just to
(14) make sure I understand, you're not aware of any efforts
(15) by the district to reach out specifically to
(16) African-Americans in the district to make them aware of
(17) board meetings; is that correct?
(18) A. I am not aware of any special activities
(19) undertaken by the board to target African-Americans
(20) vis-a-vis coming to board meetings.
(21) Q. Same question with respect to Latino or
(22) Hispanic residents of the district.
(23) A. Same answer.
(24) Q. Same question with respect to Asian-American
(25) residents of the district.

**Page 76**

(1) A. Same answer.
(2) Q. Why weren't such efforts made?
(3) A. I couldn't tell you.
(4) Q. Do you recall thinking about the possibility
(5) of reach-out efforts by the board to a minority?
(6) A. Did I think about it?
(7) Q. (Moving head up and down)
(8) A. Not that I recall.
(9) Q. Was there a pool in the district, a public
(10) community pool during your time there?
(11) A. To my knowledge it was not a public community
(12) pool. There was a pool that belonged to the homeowners
(13) association.
(14) Q. When did the homeowners association pool get
(15) built?
(16) A. I don't know.
(17) Q. About when?
(18) A. I believe it was early on in the development,
(19) probably with the first few sections, first few
(20) subdivisions.
(21) Q. And what are the applicable regulations that
(22) govern the homeowners' operation of the pool?
(23) A. I don't know. I wasn't involved in that.
(24) Q. Based on your experience, are there
(25) typically -- in a situation where there is a homeowners

**Page 77**

(1) association that operates a pool within the boundaries
(2) of a Municipal Utility District, are there regulatory
(3) requirements on the district that are imposed as a
(4) result of a pool? That is, filings, legal compliance,
(5) anything of that sort.
(6) A. Repeat that again. I'm sorry. That made no
(7) sense to me. I'm sorry.
(8) Q. I understood you describing the fact that
(9) there was a homeowners association operated pool --
(10) A. Yes.
(11) Q. -- within the district starting shortly
(12) after -- sometime after, I should say, the district
(13) came into existence; is that correct?
(14) A. That's correct.
(15) Q. As a result of the pool, did the district have
(16) to satisfy any regulatory or legal requirements
(17) specifically because of the pool?
(18) A. No. The pool didn't belong to them.
(19) Q. So far as you know, has any African-American
(20) resident of the district ever attended a board meeting?
(21) A. Seems like there was one gentleman that did
(22) for a short -- you know, three or four meetings.
(23) Q. Do you recall the name of the gentleman?
(24) A. No.
(25) Q. Do you recall his age, approximately?

**Page 78**

(1) A. No. It wasn't someone very young or very old,
(2) but short of that I really couldn't tell you.
(3) Q. Do you recall the approximate time frame in
(4) which he attended the meetings?
(5) A. It was at the model home.
(6) Q. Do you recall approximately how many meetings
(7) he attended, like you said, over the course of three or
(8) four months?
(9) A. I think that's about what it was, three or
(10) four meetings.
(11) Q. Do you recall if he participated in any way at
(12) the meetings?
(13) A. I think he asked a couple of questions. He
(14) was just interested in what the district was about.
(15) Q. Do you recall what his questions concerned?
(16) A. Not really, no.
(17) Q. Other than this single individual over the
(18) three or four-month period that we just talked about,
(19) do you recall any African-American residents attending
(20) board meetings?
(21) A. No.
(22) Q. Do you recall any Latino or Hispanic district
(23) residents attending the board meeting?
(24) A. No.
(25) Q. Did you view this lack of minority attendance

(Pages 73 to 78)

**Page 79**

(1) at board meetings as a problem when you worked for the
(2) board?
(3) A. No one attended the board meetings, so no, I
(4) didn't.
(5) Q. With the exception of the -- I mean, with the
(6) exception of the single African male --
(7) African-American male, can you think of any other
(8) minorities -- minority residents of the district during
(9) your time working for the district who attended a board
(10) meeting?
(11) A. No.
(12) Q. So other than -- am I right to say that other
(13) than that single example, all individuals who attended
(14) the board meeting were Caucasian so far as you recall?
(15) A. As far as I recall.
(16) Q. And you don't recall thinking that that racial
(17) makeup of board attendance was a problem?
(18) A. No, because we normally had maybe one resident
(19) a year who would show up, so it may have been that half
(20) of them were black because it was that one black guy
(21) and the other guy was white. I mean, we really had
(22) nobody come to these meetings to speak of. I don't
(23) know if I can convey that to you, but it was the board
(24) and the consultants and almost nobody else ever.
(25) Q. Did the board view that as a good thing, that

**Page 80**

(1) no one came to the meetings?
(2) A. I think you'd have to ask the board.
(3) Q. Did you have any understanding or impression
(4) as to why residents didn't attend the board meetings?
(5) A. Because they're deadly dull.
(6) Q. Did any residents ever express that opinion to
(7) you?
(8) A. I did have one. He said, yeah, this isn't
(9) worth coming to.
(10) Q. Did the board members ever express any
(11) interest in increasing attendance or participation by
(12) district residents?
(13) A. When we had three resident members on the
(14) board there was some interest in trying to get more
(15) people involved in the aspects of the park area and
(16) what might be done to do more in the parks, but I don't
(17) recall that there was a whole lot of activity. And it
(18) pretty much was shuttled over to the homeowners
(19) association because they were in a better position to
(20) make recommendations on things like that.
(21) Q. Did the board members ever express an interest
(22) in decreasing or limiting the amount of resident
(23) attendance or participation at the meeting?
(24) A. No.
(25) Q. Did the district ever, through the board

**Page 81**

(1) members or counsel or any other representative, have
(2) communications with the Austin branch of the NAACP?
(3) A. Did the board members?
(4) Q. Board members or counsel or the board as a
(5) body.
(6) A. Not to my knowledge.
(7) Q. Did the district ever have any communications
(8) with any African-American oriented community
(9) organizations in the Austin area about any issue?
(10) A. Not to my knowledge.
(11) Q. And I take it since they didn't communicate,
(12) to your knowledge, about any issue, they did not, in
(13) turn, communicate about voting issues specifically with
(14) any minority community organizations in the Austin
(15) area?
(16) A. I think that would be correct, yes.
(17) Q. Was there ever a discussion that you were
(18) aware of of any matters relating to the district's
(19) operation with respect to an African-American resident
(20) of the district?
(21) A. I'm sorry. Say that again.
(22) Q. Do you recall any discussions or consideration
(23) of any issue relating to an African-American resident
(24) of the district?
(25) A. Not that I recall.

**Page 82**

(1) Q. Do you recall any discussions or
(2) considerations related -- by the district related to
(3) any issue having to do with a Latino or Hispanic
(4) resident of the district?
(5) A. No.
(6) Q. Same question with respect to Asian-Americans.
(7) MR. COLEMAN: Can I ask for
(8) clarification? Are you talking about discussions about
(9) that person's race or discussions about like a wild hog
(10) digging up a yard of a person of a minority race?
(11) MR. WALDMAN: Talking about any -- any
(12) issue relating to a person in this category, whether
(13) it's race or a wild hog running in the yard or any
(14) other matter relating to this kind of thing.
(15) MR. COLEMAN: If you know.
(16) THE WITNESS: I don't recall discussions
(17) about anyone based on their race one way or the other.
(18) Q. (By Mr. Waldman) Do you recall the district
(19) making any affirmative efforts to try and eliminate
(20) harassment of minorities in voting in the district?
(21) MR. COLEMAN: Objection, foundation.
(22) There's no evidence of any harassing in the district at
(23) any time in its history.
(24) THE WITNESS: There was nothing that I
(25) was aware of, and I was never aware of any harassment

**Page 83**

(1) of anyone, so there would not be any reason to take
(2) action.
(3) Q. (By Mr. Waldman) Same question with respect
(4) to intimidation of voters in the district.
(5) MR. COLEMAN: Same objection.
(6) THE WITNESS: I'm not aware of any.
(7) Q. (By Mr. Waldman) We talked earlier about how
(8) districts use private residences for polling places.
(9) Do you recall that discussion?
(10) A. Yes.
(11) Q. How was the particular private residence
(12) selected to be the location of a polling place?
(13) A. It was not based so much on location of the
(14) polling place, but finding a couple who were willing to
(15) be election judges. Normally retired people would be
(16) more willing to do that than people who have employment
(17) outside the home.
(18) Q. And so typically would the individuals who
(19) owned the private residence serve as the election
(20) judges for the given election?
(21) A. That's correct.
(22) Q. And then typically who would count the ballots
(23) in district elections at private residences?
(24) A. Pursuant to the Texas Election Code the
(25) election judge and the helpers count the ballots in

**Page 84**

(1) accordance with the statutory requirements. Whenever
(2) we would have elections and still have elections there
(3) are -- they're called election worker handbooks, and
(4) they tell you how you're supposed to do this stuff, and
(5) that's -- you know, we would train them on how they
(6) need to do that after the polls closed and so forth.
(7) Q. You referenced helpers. How was it that
(8) people came to be helpers for a given election?
(9) A. Normally it would be the election judge and
(10) the assistant election judge. In this district, as
(11) you've already mentioned, most of the elections were
(12) uncontested, so it wasn't as if we had a rush of voters
(13) that required, you know, assistant election judges.
(14) Two people could handle it.
(15) Q. Do you recall there ever being -- I will call
(16) them helpers for elections that took place in the
(17) district?
(18) A. No.
(19) Q. Did you ever count ballots in district
(20) elections?
(21) A. No.
(22) Q. Did anyone working at your direction ever
(23) count ballots in district elections?
(24) A. No.
(25) Q. Do you recall anyone other than the owners of

(Pages 79 to 84)

Page 85

(1) the given private residence counting ballots for a
(2) particular election?
(3) A. No.
(4) Q. Are there any churches in the district today?
(5) A. I don't know.
(6) Q. Do you know if there are any synagogues?
(7) A. I don't know.
(8) Q. Do you know if there are any mosques?
(9) A. I don't know.
(10) Q. What public buildings are in the district
(11) today that you're aware of?
(12) A. The elementary school.
(13) Q. Any others?
(14) A. Not that I'm aware of.
(15) Q. I take it there was never any effort made to
(16) encourage a public building or some nonresidential home
(17) structure to be available for district elections.
(18) A. I think I've already told you about my
(19) discussion with the elementary school people. That's
(20) the only effort we made because that was the only
(21) public building in the district.
(22) Q. Did anyone on the board ever suggest keeping
(23) the elections at a private home?
(24) A. Repeat that, please.
(25) Q. Did anyone on the board ever express an

Page 86

(1) interest to you in keeping elections at a private home
(2) versus some other option?
(3) A. Not that I recall.
(4) Q. Does the district have a high rate of -- let
(5) me back up. Are there residents in the district that
(6) you're aware of who are not homeowners?
(7) A. I have no idea.
(8) Q. During your time working for the district were
(9) you aware of any non-homeowner residents?
(10) A. I didn't know whether people owned or didn't
(11) own.
(12) Q. Were there any restrictive covenants in the
(13) district that limited residents to only homeowners or
(14) only people with some ownership interest in a property?
(15) A. I'm not aware of any.
(16) Q. What's -- what are the rules typically in
(17) Texas municipal utility districts with respect to
(18) ownership requirements for in-district residents?
(19) A. There are none.
(20) Q. So there's typically not a rule that one be a
(21) homeowner to live in a newly formed --
(22) A. I think that would be illegal.
(23) Q. When did you first become familiar with
(24) Section 5 of the Voting Rights Act?
(25) A. College maybe.

Page 87

(1) Q. When did you first work on a Section 5 matter
(2) as a practicing attorney?
(3) A. City of Austin.
(4) Q. When was that?
(5) A. When? I'm not sure. I was fairly new. That
(6) was one of those things that they gave to the grunt
(7) attorney as the young ones. Probably '79 or '80.
(8) Q. What's your understanding of Section 5? How
(9) does it work?
(10) A. We're not going to do any treatises here.
(11)     MR. SCRAFFORD: Just give him a brief
(12) answer. How are we doing?
(13)     THE WITNESS: We got 50 minutes. Okay.
(14) My understanding of what Section 5 is, it's a part of
(15) the -- what I suppose was the -- originally the 1965
(16) Voting Rights Act, and it is an attempt to make sure
(17) that certain states do not discriminate against voters
(18) based on race, color, or creed. And it requires that
(19) when a political subdivision makes any kind of change
(20) that affects voting, that a description of that change
(21) in a format set forth in the federal rules is put
(22) together just like whichever one -- your No. 11 here,
(23) and that is submitted for preclearance. It is done
(24) 60 days in advance of an election so that the
(25) Department of Justice division up there can take a look

Page 88

(1) at whatever it is the political subdivision is planning
(2) to do as a change and has an opportunity to object to
(3) that change.
(4) Q. (By Mr. Waldman) Is there any requirement
(5) that a political subdivision use an attorney to prepare
(6) a Section 5 preclearance document?
(7) A. I don't know that there's a requirement. My
(8) clients wouldn't touch it themselves because it's a
(9) little complicated.
(10) Q. Do you typically advise clients that they need
(11) to -- the best practice would be to use an attorney for
(12) Section 5 preclearance?
(13) A. For all of the political subdivisions that I
(14) work with, I've, number one, never had another
(15) consultant be willing to do it other than me, so it's
(16) just a matter of routine that the district's attorney
(17) handles the preclearance submissions.
(18) Q. I take it there is no reason -- there's no
(19) requirement that a layperson couldn't handle the
(20) Section 5 submissions. Is that correct?
(21)     MR. SCRAFFORD: Objection. I think that
(22) was compound. You mean reason or requirement?
(23) Q. (By Mr. Waldman) Requirement.
(24) A. I don't remember anything in the federal rules
(25) that require it to be signed by an attorney.

Page 89

(1) Q. Did anybody at the Department of Justice ever
(2) advise you that an attorney had to be involved in the
(3) preparation of the preclearance documents?
(4) A. No.
(5) Q. Are you aware of any instance in which anyone
(6) at the Department of Justice advised anyone on the
(7) district board of such a requirement?
(8) A. No.
(9) Q. Going through the preclearance submissions it
(10) looks like for the years prior to 1996 an officer of
(11) the board would sign the preclearance submission and
(12) reference your name and that '96 through 2002 you would
(13) provide the signature on the preclearance letter. Was
(14) there a particular reason for that change in practice?
(15) A. I don't think so.
(16) Q. Other than the seven voting changes we talked
(17) about -- we talked about earlier and the March '02
(18) submission, did the district ever consider making any
(19) other changes in rules that affect voting?
(20)     MR. COLEMAN: Objection. I think the
(21) document shows there were seven submissions, not seven
(22) changes.
(23)     THE WITNESS: Okay. There were changes
(24) due to annexation, and there were changes due to the
(25) new law that allowed you to cancel an uncontested

Page 90

(1) election. So I guess you could say that the board by
(2) deciding to cancel an uncontested election initiated a
(3) change that would require the Department of Justice to
(4) be notified. And as I recall, we got notice from the
(5) Texas Secretary of State that even though it was a
(6) state law on this uncontested elections, that they were
(7) making all of us file a submission on that. And we did
(8) it after the fact, and I think that's why the date in
(9) that one is in June rather than earlier, because we all
(10) went, uh-oh, we didn't know we needed to do that so we,
(11) you know, submitted it after the fact.
(12) Q. (By Mr. Waldman) Other than the changes
(13) proposed in that -- as you mentioned in every instance
(14) approved by the Department of Justice, did the district
(15) consider making any additional changes that would
(16) affect voting?
(17) A. Not that I'm aware of.
(18) Q. I take it, then, it's also the case that the
(19) district never considered and then declined to make a
(20) change with respect to voting as a result of concern
(21) about the preclearance process.
(22) A. Would you repeat that, please?
(23)     MR. WALDMAN: Could you read the question
(24) back, please?
(25)     (Requested portion was read)

(Pages 85 to 90)

## Page 91

(1) THE WITNESS: I'm not aware of any.
(2) Q. (By Mr. Waldman) Are you aware of any
(3) instance in which the district submitted a Section 5
(4) preclearance application and subsequently received a
(5) request from DOJ for additional information with
(6) respect to the preclearance submission?
(7) A. It's possible, yes.
(8) Q. Do you recall any sitting here today?
(9) A. It was not uncommon and it's still not
(10) uncommon for us to get a call from the voting rights
(11) section saying, "You reference an order that's going to
(12) be approved by the board calling the election. Has
(13) that been approved now and can we get a copy of it?"
(14) Those sorts of follow-ups.
(15) Q. Other than that type of follow-up, do you
(16) recall any category or specific instance of requests
(17) for additional information by DOJ after the district
(18) submitted a Section 5 preclearance?
(19) A. Not that I recall.
(20) Q. Has the district ever been sued in a case that
(21) involved an issue of race or discrimination on the
(22) basis of race?
(23) A. Not that I'm aware of.
(24) Q. Same question with respect to ethnicity.
(25) A. No.

## Page 92

(1) Q. Same question with respect to membership in a
(2) language minority group.
(3) A. Not that I'm aware of.
(4) Q. Has the district ever been recipient of an
(5) EEOC complaint?
(6) A. Not to my knowledge.
(7) Q. Has the district ever had a claim for
(8) employment discrimination of any kind filed against it?
(9) A. Not to my knowledge.
(10) Q. Has the district ever received a complaint or
(11) been involved in litigation relating to housing
(12) discrimination?
(13) A. Not that I'm aware of.
(14) Q. Same question with respect to voting
(15) discrimination.
(16) A. Not that I'm aware of.
(17) Q. We talked earlier about the ways in which your
(18) work for the district broke down. We talked about how
(19) election-related work was something like 5 percent and
(20) then some subcomponent of that work related to
(21) preclearance submissions. I want to ask you a similar
(22) set of questions about the district's legal burdens, if
(23) you can estimate.
(24) The district is subject to both federal
(25) and state legal mandates; is that correct?

## Page 93

(1) A. Yes.
(2) Q. And if you had to estimate the amount of
(3) resources required to comply with federal versus state,
(4) how would you break it down for the district? By
(5) effort here I'm referring to preparation of
(6) submissions, time spent discussing, work by counsel,
(7) all the things that go into resources.
(8) A. It is overwhelmingly state related.
(9) Q. With respect to the federal mandates, could
(10) you describe what federal mandates the district deals
(11) with?
(12) A. Now, are you limiting this to this particular
(13) district?
(14) Q. I am.
(15) A. Okay. I'm not aware of any other than the
(16) Department of Justice submissions, which doesn't mean
(17) there isn't some, but nothing is coming to mind right
(18) now.
(19) Q. And when you say the Department of Justice
(20) submissions you mean with respect to voting
(21) preclearance?
(22) A. Yes.
(23) Q. With respect to a typical Texas municipal
(24) utility district, how would you characterize the
(25) breakdown, federal, state?

## Page 94

(1) A. It's still overwhelmingly state. The reason I
(2) ask is because there are certain water quality
(3) requirements by the federal government that involve
(4) districts, and there are some compliance issues that
(5) come up that are not only state, but federal and
(6) federally mandated.
(7) Q. Do you recall at a rough level how much the
(8) district spent on legal fees for outside counsel per
(9) year?
(10) A. No.
(11) Q. And, again, I'm not asking for a dollar
(12) amount, but just a --
(13) A. No. I have no idea.
(14) Q. Do you recall during your time working for the
(15) district was most -- were most of the legal expenses
(16) from the district to your firm, to other firms? How
(17) did that work?
(18) A. Most of the legal fees paid were to either my
(19) firm for general counsel work, to my firm for working
(20) on bond issues, or to the bond counsel's firm, which is
(21) McCall, Parkhurst & Horton.
(22) Q. And of the fees charged by your firm to the
(23) district, is it fair to say less than 5 percent related
(24) to preclearance submissions?
(25) A. I would say that's fair to say, yes.

## Page 95

(1) Q. Is it fair to say less than 3 percent?
(2) A. I'm not going to go further down than that. I
(3) don't know.
(4) Q. If we wanted to try and quantify that, the
(5) information provided in the bills from your firm to the
(6) district would be one piece of information for us to
(7) look at. Is there anything else that would allow us to
(8) make that relative comparison?
(9) A. No.
(10) MR. WALDMAN: Can we take a two-minute
(11) break?
(12) MR. COLEMAN: Sure.
(13) (Recess from 2:55 to 3:06)
(14) Q. (By Mr. Waldman) Ms. Collins, can I ask you
(15) to get back from the court reporter a document marked
(16) Exhibit 11?
(17) A. It's right here.
(18) Q. If you can flip to the Exhibit C portion of
(19) the document, which we don't have Bates numbers but
(20) it's towards the back.
(21) A. Okay.
(22) Q. The lower right Exhibit C, and then the forth
(23) page of Exhibit C it has a list of what's labeled
(24) nonconstruction costs. Do you see that page?
(25) A. I do.

## Page 96

(1) Q. Do you see the first line item is labeled
(2) legal and market attorney fees?
(3) A. I do.
(4) Q. That the amount is $1,029,000?
(5) A. Yes.
(6) Q. This document is part of the 1986 preclearance
(7) submission to the Department of Justice; is that
(8) correct?
(9) A. So it appears.
(10) Q. Do you recall if the 1986 Section 5
(11) preclearance submission was reflected in the category
(12) labeled as legal and market attorney fees?
(13) A. Are you asking if the amounts charged to do
(14) the submission work was reflected in this?
(15) Q. I'm not asking if -- if the charge was a
(16) million plus. I'm asking --
(17) A. I understand that.
(18) Q. -- if the total spent or budgeted for the
(19) Section 5 preclearance would have been a part of the
(20) million 29 figure.
(21) A. No.
(22) Q. And for future preclearance submissions where
(23) there's -- for preclearance submissions after 1986
(24) where there was a category labeled legal and market
(25) attorneys' fees, did those typically exclude Section 5

(Pages 91 to 96)

## Page 97

(1) preclearance submission costs?
(2) A. I don't think you understand what that is
(3) about. Do you want me to explain?
(4) Q. Yeah. What -- what did that category entail?
(5) A. Okay. When -- when a district is created
(6) there is an estimate of bonds that will be issued over
(7) the life of the district in order to buy the
(8) facilities, water, wastewater and drainage. As I
(9) mentioned before, you issue debt from time to time,
(10) maybe a $3 million issue, a $5 million issue. The bond
(11) counsel and the general counsel charge a percentage of
(12) each bond issue. In this case I believe it was
(13) 3 percent. It may have been a sliding scale. I really
(14) don't remember. But roughly 3 percent. The total
(15) amount of bonds that the voters have approved was
(16) $34 million. So say you issue 5 million in bonds.
(17) Then there would be a 3 percent fee for bond counsel
(18) and general counsel. In that case it would be
(19) $150,000. That $150,000 would come out of that number.
(20) This does not have anything to do with general counsel
(21) costs at all.
(22) Q. Thank you.
(23) A. Sure.
(24) Q. Did the district have a legal expense category
(25) known as special legal expenses?

## Page 98

(1) A. I don't remember.
(2) Q. I want to go back to something we talked about
(3) earlier. On the question of the rules governing
(4) which -- who could live in the district, were there any
(5) restrictive covenants in the district that limited
(6) single family -- that restricted the properties in the
(7) district from being used for single-family homes?
(8) A. I have never seen the restrictive covenants to
(9) my recollection for Canyon Creek.
(10) Q. I think you may have answered it. Let me ask
(11) the question better. Were there any -- any covenants
(12) that restricted use of -- use of property in the
(13) district to single-family homes in the district?
(14) A. I have not reviewed any of the restrictive
(15) covenants for the Canyon Creek subdivisions. I would
(16) anticipate that, yes, some of those would have been
(17) restricted to single family so that you didn't have a
(18) Wal-Mart next to your house. Just a guess.
(19) Q. During your time working on the board, were
(20) there board members who did not reside in the district?
(21) A. Yes.
(22) Q. Were there board members who did not reside in
(23) Travis County?
(24) A. I don't think so.
(25) Q. I take it, then, that there are no board

## Page 99

(1) members who lived outside the state.
(2) A. No.
(3) Q. What were the state law rules governing the
(4) district's provision of bilingual ballots, that is,
(5) English and Spanish, during your time working for the
(6) board?
(7) A. My recollection is that state law required
(8) that everything that we did that had to do with the
(9) election was done in Spanish and English. The orders,
(10) the ballots, everything was Spanish and English.
(11) Agendas that had anything to do with elections, we
(12) would do those in Spanish and English. We would have a
(13) supplemental agenda so that we didn't have to translate
(14) everything into Spanish.
(15) Q. Was it your understanding that the bilingual
(16) election materials requirement from state law had
(17) applied to the district since the time the district
(18) came into being?
(19) A. I think we did it in Spanish and English from
(20) the beginning, yes, if that's your --
(21) Q. No, sorry.
(22) A. Maybe that's not your question.
(23) Q. My question isn't what did you do, but my
(24) question is, did the state law requirement that the
(25) ballots be provided in Spanish and English, did that

## Page 100

(1) apply during the entire existence of the district?
(2) A. I don't recall.
(3) Q. Is it your understanding that the state law
(4) requirement is that in any county in which 5 percent or
(5) more of the county inhabitants are persons of Spanish
(6) origin or descent the bilingual election materials
(7) requirement kicks in?
(8) A. I don't remember what the state law says. We
(9) always do it in Spanish and English. And that may be
(10) the reason that we do it in Spanish and English on all
(11) of them, but I couldn't quote you a code provision to
(12) that effect.
(13) Q. Do you remember ever -- do you remember the
(14) district ever printing ballots in English and Spanish
(15) because of a perceived federal regulatory requirement
(16) as separate from any applicable state rules?
(17) A. No.
(18) Q. Do you recall the district ever doing anything
(19) to attempt to go beyond the bare minimum of state law
(20) requirements in terms of the provision of bilingual
(21) election law materials -- excuse me -- bilingual
(22) election materials?
(23) A. Not that I recall.
(24) (Cell phone ringing)
(25) MR. COLEMAN: Do you want to turn that

## Page 101

(1) ringer off?
(2) Q. (By Mr. Waldman) I think you mentioned
(3) earlier that typically the owners of the private
(4) residence in which the poll site was located were the
(5) judges of the election. Am I remembering that right?
(6) A. Not typically. Always.
(7) Q. Always?
(8) A. We didn't ask somebody to use their house and
(9) not have them involved in it.
(10) Q. Were there other election officials appointed
(11) by the district other than the judges of a given
(12) election?
(13) A. Well, you have -- you have an early voting
(14) ballot board which is normally the same as the judges,
(15) but they wear two or three different hats through the
(16) process of -- under the Texas Election Code.
(17) Q. So just so I understand, the owners of the
(18) private residence would be responsible for
(19) administering the early -- early elections as well as
(20) the day of elections in their home?
(21) A. Yes.
(22) Q. And who typically would appoint the election
(23) judges? How did it work?
(24) A. The board of directors appoints the election
(25) officials for its election, and that's typical under

## Page 102

(1) the election code, that the governing body determines
(2) who the election officials are going to be.
(3) Q. In terms of the way it worked as a practical
(4) matter, would the board reach out to individual owners
(5) of private residences or would homeowners come to the
(6) board and volunteer?
(7) A. Nobody ever volunteered. Normally we would
(8) try to find a couple that was retired that had time and
(9) willingness to do this and cajole them into
(10) volunteering because it is, as you know, a substantial
(11) amount of time for a couple of weeks.
(12) Q. Have any African-Americans ever served as a
(13) poll worker in the district?
(14) A. I would say yes, based upon your Exhibit 11.
(15) Q. Explain that.
(16) A. In it it says there are two people residing of
(17) voting age within the district. One is a black family.
(18) If no one else lived in the district, those were our
(19) judges.
(20) Q. Other than your inference from this document,
(21) do you have any basis for thinking that an
(22) African-American ever served as a poll worker in the
(23) district?
(24) A. The more I thought about it, I think that it
(25) was Rosalyn Peterson who lived out there, and she is an

(Pages 97 to 102)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

```
                                              103
(1)  African-American and has an African-American husband.
(2)     Q.  So you believe that Rosalyn Peterson is the --
(3)  is the person referenced in Exhibit 11 --
(4)     A.  I think so.
(5)     Q.  -- the African-American in 1986?
(6)     A.  Again, it's been a long time and you-all are
(7)  trying to jog my memory. I'm not --
(8)     Q.  I appreciate that.
(9)     A.  But I think she and her husband lived out
(10) there.
(11)    Q.  Other than Rosalyn Peterson, is there anyone
(12) that you believe -- are there any African-Americans you
(13) believe to have ever worked as a poll worker in the
(14) district?
(15)    A.  Not that I'm aware of.
(16)    Q.  Do you have any reason to believe Rosalyn
(17) Peterson served as a poll worker at any point after
(18) 1986 in the district?
(19)    A.  I won't say I had or had not. If she still
(20) lived there she probably did, but I don't remember, you
(21) know, and I think it was Rosalyn that lived out there.
(22) And if she still lived out there in '88 and '90, '92,
(23) she may very well have been the election judge.
(24)    Q.  If it's the case that in 1988 Section 5
(25) preclearance submission in the district lists zero
```

```
                                              104
(1)  African-American residents, would you then think it was
(2)  the case that Rosalyn Peterson did not after the 1986
(3)  period serve as a poll worker in the district?
(4)     A.  That would make sense.
(5)     Q.  Have any Latino or Hispanic Americans ever
(6)  worked as a poll worker at a place -- polling place in
(7)  the district?
(8)     A.  I don't know. I'm not sure I ever saw any of
(9)  the judges other than the Stuebers in 2002.
(10)    Q.  What are the qualifications to be eligible to
(11) vote in district elections?
(12)    A.  The same as for anywhere else in the State of
(13) Texas. You must reside within the boundaries of that
(14) political subdivision, and you must be registered to
(15) vote in your county at least 30 days in advance.
(16)           (Exhibit 14 marked)
(17)           MR. WALDMAN: I'm asking the court
(18) reporter to mark this document Exhibit 14. A copy has
(19) been handed to counsel.
(20)    Q.  (By Mr. Waldman) Ms. Collins, do you
(21) recognize this document?
(22)    A.  It is a submission that we did in April of
(23) 1996 for the district.
(24)    Q.  Can I ask you to look at page 3 of the letter?
(25)    A.  Okay.
```

```
                                              105
(1)     Q.  The first full paragraph, the third sentence,
(2)  you see where it says, "As stated above, by error the
(3)  annexation was not submitted for review prior to the
(4)  1990 director election"?
(5)     A.  I do.
(6)     Q.  Do you recall how it was that sentence came to
(7)  be in the submission?
(8)     A.  Well, I expect that it was an admission that
(9)  we fouled up and didn't preclear the annexation when we
(10) were supposed to. This seemed kind of out of place.
(11)    Q.  When you prepared Section 5 preclearances, did
(12) you typically start from scratch? Did you have a
(13) boilerplate document from previous submissions? How
(14) did it work?
(15)    A.  The latter.
(16)    Q.  Is it possible this is simply left over?
(17)    A.  Could be. It makes no sense.
(18)    Q.  If there was -- If there was a note -- and
(19) I'll represent to you that there is. If there was a
(20) later note in which this was -- reflecting your
(21) description to the DOJ of this particular sentence as a
(22) typo, would the explanation likely be that that
(23) sentence was left over from a boilerplate document?
(24)    A.  Yes, because it's not reflected anywhere else
(25) in the submission.
```

```
                                              106
(1)     Q.  Earlier you mentioned there is an annexation
(2)  that the district did, in fact, go forward with. I
(3)  believe that was in 1997; is that correct?
(4)     A.  I don't know.
(5)     Q.  But there was -- there is a particular
(6)  annexation that you worked on that you sought
(7)  preclearance for. Do you recall that?
(8)     A.  I don't recall which property it was. It may
(9)  have been something that was in District Number 2 that
(10) was annexed into One before Number Two was dissolved.
(11)          MR. COLEMAN: Counsel, there are only a
(12) few more minutes left. So I don't know if this -- if
(13) the conclusion of this line of questioning might be a
(14) good place to pause.
(15)          MR. WALDMAN: That's perfect. I just --
(16) I have, you know, south of four minutes' worth of
(17) questions on this.
(18)          (Exhibit 15 marked)
(19)          MR. WALDMAN: I'm asking the court
(20) reporter to mark this document Exhibit 15. A copy has
(21) been handed to counsel.
(22)    Q.  (By Mr. Waldman) Ms. Collins, do you
(23) recognize this document?
(24)    A.  It is a 1998 submission that we did on behalf
(25) of the district.
```

```
                                              107
(1)     Q.  Can I ask you to turn to page 3 in the upper
(2)  right-hand corner under annexation and review, the one
(3)  paragraph?
(4)     A.  Okay.
(5)     Q.  Reviewing this paragraph, do you recall what
(6)  was -- what was being annexed and why?
(7)     A.  I do.
(8)     Q.  Can you tell us?
(9)     A.  This is the convenience store right there at
(10) Boulder and 620, I think. These guys wanted utility
(11) service, and when they bought the land I think they
(12) just assumed that City of Austin service was available,
(13) and surprise, there was no service. And the board
(14) said, "Yeah, we'll -- we'll give you service, but we
(15) want you annexed so that we have your tax base in our
(16) district." And that's how it was -- it was a fellow
(17) with a Chinese name, but he had his property annexed
(18) in.
(19)    Q.  So would you expect that the reference to the
(20) land is used for commercial purpose is a reference to
(21) the operations of the convenience store?
(22)    A.  Yes.
(23)    Q.  Were there any efforts made by the board to
(24) encourage African-Americans to be involved in the
(25) convenience store?
```

```
                                              108
(1)     A.  I'm -- excuse me. I'm not sure I -- what do
(2)  you mean to be involved in the -- to buy it?
(3)     Q.  To work at the convenience store, to live near
(4)  the convenience store, to be in any way affiliated with
(5)  the convenience store.
(6)     A.  No.
(7)     Q.  Same question with respect to Latino and
(8)  Hispanic Americans.
(9)     A.  No.
(10)    Q.  Same question with respect to Asian-Americans
(11) setting aside the individual of Chinese ethnicity you
(12) mentioned earlier.
(13)    A.  No. It had nothing to do with race. It had
(14) to do with utility service.
(15)          MR. WALDMAN: I have no further questions
(16) and we're a minute before the promised end time, so I
(17) propose we wrap it up and at the next session my
(18) colleagues take the lead.
(19)          MS. PERALES: Yes, we'll continue the
(20) deposition.
(21)          MR. COLEMAN: Let's -- we'll talk about
(22) scheduling.
(23)          (DEPOSITION RECESSED)
```

(Pages 103 to 108)

## Page 109

CHANGES AND CORRECTIONS
WITNESS NAME: SHARLENE N. COLLINS
DATE: FEBRUARY 22, 2007
VOLUME 1

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE  LINE  CHANGE                              REASON CODE

## Page 110

SIGNATURE

I, SHARLENE N. COLLINS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page.

_____
SHARLENE N. COLLINS

STATE OF _____
COUNTY OF _____

Before me, _____, on this day personally appears SHARLENE N. COLLINS, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2007.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

## Page 111

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL *
UTILITY DISTRICT NUMBER ONE *
            Plaintiff *
VS.                    * Civil Action No.
                       * 1:06-CV-01384
ALBERTO GONZALES, in his * (PLF, DST, EGS)
official capacity as   *
Attorney General of the *
United States          *
            Defendant *

REPORTER'S CERTIFICATION
DEPOSITION OF SHARLENE N. COLLINS
FEBRUARY 22, 2007
VOLUME 1

I, MARSHA EVANS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, SHARLENE N. COLLINS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature, and return to ACUSCRIBE COURT REPORTERS by _____.

That the amount of time used by each party at the deposition is as follows:
    Mr. Ariel B. Waldman - 2 hours, 58 minutes.

I further certify that I am neither counsel for, related nor employed by any of the parties or

## Page 112

attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me on _____.

MARSHA EVANS, TEXAS CSR 5100
Expiration Date: 12/31/07
Firm Registration No. 241
114 West 7th Street, Suite 750
Austin, Texas 78701
512-499-0277

(Pages 109 to 112)

ACUSCRIBE COURT REPORTERS
(800) 497-0277