

# AcuScribe
### COURT REPORTERS
*When accuracy means everything.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL )
UTILITY DISTRICT NUMBER ONE )
)
)
VS. ) CIVIL ACTION NO.:
) 1:06-CV-01384
) (PLF, DST, EGS)
ALBERTO GONZALES, IN HIS )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**SHARLENE N. COLLINS**

MARCH 2, 2007

VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONDENSED TRANSCRIPT AND KEYWORD INDEX

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701

512-499-0277
800-497-0277
512-499-0298 (fax)
www.acuscribe.com

Page 113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL *
UTILITY DISTRICT NUMBER ONE *
　　　　　　　　　　　　　　　*
　　　　Plaintiff　　　　　　*
　　　　　　　　　　　　　　　*
VS.　　　　　　　　　　　　　* Civil Action No.
　　　　　　　　　　　　　　　* 1:06-CV-01384
ALBERTO GONZALES, in his　　 * (PLF, DST, EGS)
official capacity as　　　　 *
Attorney General of the　　　*
United States　　　　　　　　 *
　　　　　　　　　　　　　　　*
　　　　Defendant　　　　　　 *

**********************************************
ORAL DEPOSITION OF
SHARLENE N. COLLINS
MARCH 2, 2007
VOLUME 2
**********************************************

Page 114

ORAL DEPOSITION OF SHARLENE N. COLLINS, VOLUME 2, produced as a witness at the instance of the Defendant-Intervenors Texas State Conference of NAACP Branches and Austin Branch of the NAACP, and duly sworn, was taken in the above-styled and numbered cause on the 2nd day of March, 2007, from 2:42 p.m. to 4:22 p.m., before MARSHA EVANS, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Armbrust & Brown, LLP, 100 Congress Avenue, Suite 1300, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 115

APPEARANCES

FOR THE PLAINTIFF:
　MR. GREGORY S. COLEMAN
　MR. CHRISTIAN J. WARD
　WEIL, GOTSHAL & MANGES, LLP
　8911 Capital of Texas Highway
　Building One, Suite 1350
　Austin, Texas 78759
　512-349-1937

FOR THE DEFENDANT ALBERTO GONZALES, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
　MR. CHRIS HERREN
　U.S. DEPARTMENT OF JUSTICE
　CIVIL RIGHTS DIVISION
　950 Pennsylvania Avenue, NW
　Room 7254 NWB
　Washington, DC 20530
　202-514-1416

FOR THE INTERVENOR TRAVIS COUNTY:
　MR. MAX RENEA HICKS
　ATTORNEY AT LAW
　101 West 6th Street, Suite 504
　Austin, Texas 78701
　512-480-8231

FOR THE INTERVENORS LISA AND GABRIEL DIAZ:
　MS. NINA PERALES
　MR. LUIS FIGUEROA
　MALDEF
　110 Broadway, Suite 300
　San Antonio, Texas 78205
　210-224-5476

Page 116

APPEARANCES (CONT'D)

FOR THE DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF NAACP BRANCHES AND AUSTIN BRANCH OF THE NAACP:
　MR. BENJAMIN BLUSTEIN (Via Telephone)
　LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
　1401 New York Avenue, NW, Suite 400
　Washington, DC 20005-2124
　202-662-8600

　--and--

　MR. DANIEL A. ZIBEL (Via Telephone)
　WILMERHALE
　1875 Pennsylvania Avenue, NW
　Washington, DC 20006
　202-663-6063

FOR THE DEFENDANT-INTERVENOR ANGIE GARCIA:
　MR. GEORGE J. KORBEL (Via Telephone)
　TEXAS RIOGRANDE LEGAL AID, INC.
　1111 North Main Avenue
　San Antonio, Texas 78212
　210-212-3700

FOR THE DEFENDANT-INTERVENORS RODNEY AND NICOLE LOUIS:
　MR. SAM SPITAL (Via Telephone)
　HOLLAND & KNIGHT
　195 Broadway, 24th Floor
　New York, New York 10007
　212-513-3454

Page 117

REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE

Page 118

INDEX
　　　　　　　　　　　　　　　　　　　　PAGE
Appearances.................................. 115
Stipulations................................. 117

SHARLENE N. COLLINS
　Examination by Ms. Perales................. 123
　Examination by Mr. Herren.................. 162
　Examination by Mr. Hicks................... 175
　Examination by Mr. Korbel.................. 179

Changes and Corrections...................... 181
Signature.................................... 182
Reporter's Certificate....................... 183

EXHIBITS

NO.　DESCRIPTION　　　　　　PAGE/LINE REFERENCED

24........................................ 120/12
　Subpoena in a Civil Case
25......................................... 124/5
　Minutes of Meeting of Board of Directors of
　Northwest Austin Municipal Utility District
　Number One, April 11, 2000
26........................................ 130/20
　Submission Under Section 5, Voting Rights Act
27........................................ 132/19
　Submission Under Section 5, Voting Rights Act

### Page 119

**EXHIBITS (cont'd)**

| NO. | DESCRIPTION | PAGE/LINE REFERENCED |
|---|---|---|
| 28 | Minutes of Meeting of Board of Directors of Northwest Austin Municipal Utility District Number One, February 18, 1992 | 136/4 |
| 29 | Notice of Director Election | 142/20 |
| 30 | Resident List | 147/21 |
| 31 | Canyon Creek Property Owners | 151/15 |
| 32 | Register of Official Ballots | 152/15 |
| 33 | Register of Official Ballots | 153/18 |
| 34 | Letter from Denise L. Motal, Strasburger & Price, to Ms. Melinda Avey, Travis County Voter Registrar, dated May 21, 1992 | 164/9 |
| 35 | Correction Certificate for Order Canvassing the Returns and Declaring the Results of December 13, 1986 Confirmation and Director Election, Bond Election and Maintenance Tax Election | 166/2 |
| 36 | Letters of resignation of directors and affidavits for appointment as temporary director | 166/20 |
| 37 | Assignment and Assumption of Letter of Agreement | 170/2 |

### Page 120

(1) MS. PERALES: Ms. Collins is leaving the
(2) room now. She has refused to testify in this
(3) deposition, and I would like to mark as Exhibit 1 this
(4) subpoena.
(5) MR. COLEMAN: The subpoena also fails
(6) because it wasn't served on me, but --
(7) MS. PERALES: Well, it is being -- it is
(8) being served today.
(9) MR. COLEMAN: I would like to go off the
(10) record for a few minutes.
(11) MS. PERALES: Okay.
(12) (Exhibit 24 marked)
(13) (Recess from 2:42 to 2:46)
(14) MR. COLEMAN: I would like to just make
(15) one quick statement. Until I walked in here a few
(16) minutes ago I was unaware of the subpoena. I believe
(17) the subpoena is invalid. I also believe it was
(18) unnecessary, as Ms. Collins was agreeing to appear
(19) pursuant to the agreement that I made with WilmerHale
(20) earlier. I thought that there was an agreement made on
(21) the record when Ms. Collins testified last week. The
(22) record will reflect what it does. But I believe it's
(23) in the interest of all parties to proceed to complete
(24) this deposition today, so from our side of the table it
(25) is proceeding as the continuation of the last one. We

### Page 121

(1) think an agreement had been made on the record.
(2) Whatever that is is, but we need to get this done, so
(3) let's continue with the deposition.
(4) MS. PERALES: I'd like to respond that we
(5) did send the subpoena out of an excess of caution
(6) because there did appear to be some difficulty in
(7) arranging a time within the discovery schedule that
(8) Ms. Collins was available, and that is the reason that
(9) we did send the subpoena, was to make sure. Now, my
(10) understanding when I left the office this morning was
(11) that the subpoena had been served but we had not yet
(12) received the proof of service, and so I have contacted
(13) my office again to make sure that when that comes in
(14) that we PDF it and send it to all counsel. We would
(15) like to proceed with the deposition today and get it
(16) done with, and that's our position.
(17) MR. COLEMAN: One more point. It is our
(18) position that the scheduling difficulties are not of
(19) the plaintiff's making. This deposition which began
(20) last Thursday, there was time available on Friday,
(21) there was time available on Monday, there was time
(22) available on Tuesday to continue the deposition and
(23) that the request wasn't made until those times were
(24) fast becoming unavailable and that Wednesday and
(25) Thursday, the last days of the fact discovery deadline,

### Page 122

(1) had in fact already been filled up with deposition
(2) because of difficulties that I had in scheduling the
(3) witnesses of defense -- defendant and
(4) defendant-intervenors. We had agreed to allow this one
(5) deposition to take place outside the deadline for the
(6) fact -- for fact discovery. We had no contact from
(7) anybody on the defendant or defendant-intervenor's side
(8) relating to any uncertainty about the beginning or the
(9) continuation of the deposition, and we had no
(10) communication relating to any intention to issue a
(11) subpoena and certainly no communication, whether PDF or
(12) otherwise, of a subpoena that was going to be served or
(13) that had been served.
(14) MS. PERALES: I'd like to add for Diaz
(15) intervenors that we are not -- it's not our position
(16) that plaintiffs have been obstructionists in scheduling
(17) of depositions. We have appreciated plaintiff's
(18) willingness to work with all of the attorneys on the
(19) schedule. Although we have tried to arrange on several
(20) occasions a convenient time to continue Ms. Collins'
(21) deposition, that was not possible because of the
(22) schedule of various attorneys until today. Today's
(23) date and time and location were agreed upon earlier
(24) this week, I believe on Wednesday, and so we would like
(25) to move forward with the deposition.

### Page 123

(1) MR. COLEMAN: Please begin.
(2) SHARLENE N. COLLINS,
(3) having been previously duly sworn, continued testifying
(4) as follows:
(5) EXAMINATION
(6) QUESTIONS BY MS. PERALES:
(7) Q. Good afternoon, Ms. Collins. My name is Nina
(8) Perales. I am counsel for the Diaz
(9) defendant-intervenors in this case. You are an
(10) attorney, and so I will skip over reviewing once again
(11) the rules involving depositions. I do want to ask if
(12) you will agree with me that when I use the terms
(13) Hispanic or Latino that I mean the same thing, that the
(14) terms are interchangeable. Is that all right with you?
(15) A. That's fine.
(16) Q. And if I use the terms African-American and
(17) black interchangeably, will that be okay with you?
(18) A. Yes.
(19) Q. And will you understand that I use the terms
(20) Anglo and white interchangeably?
(21) A. Yes.
(22) Q. Thank you. I'd like to begin with just a
(23) couple of unrelated questions about the operations of
(24) the MUD.
(25) MS. PERALES: I would like to mark this

### Page 124

(1) document Exhibit 25, please.
(2) (Exhibit 25 marked)
(3) Q. (By Ms. Perales) Ms. Collins, I have handed
(4) you -- the court reporter has handed you what has been
(5) marked Exhibit No. 25, and I would ask you to turn to
(6) page 2, the first big paragraph where I believe there
(7) is a report about apartment buildings, but let me
(8) check, okay? All righty. About the fourth or fifth
(9) line down in that paragraph it states that Mr. Blanton
(10) stated the developer was under contract with the
(11) apartment builder for additional apartments and another
(12) section of single-family homes. It's in that third
(13) paragraph on the page. Do you see that?
(14) A. I do.
(15) Q. Can you tell me if any apartments were ever
(16) built within the boundaries of the MUD?
(17) A. I don't know.
(18) Q. Oh, and just as another matter of vocabulary,
(19) will you understand if I say the district or the MUD to
(20) mean the Northwest Austin Municipal Utility District
(21) Number One?
(22) A. Yes.
(23) Q. Thank you. And so it's your testimony that
(24) you don't recall whether any apartments were built
(25) within the boundaries of the MUD?

125

(1) A. I don't know.
(2) Q. Thank you. I believe you testified earlier
(3) that you attended most, if not all, of the MUD board
(4) meetings while you were counsel, and I wanted to ask
(5) you whether in your recollection the MUD ever made
(6) voter registration cards available at their meetings.
(7) A. Not that I recall.
(8) Q. Do you recall during your time as counsel for
(9) the MUD that the MUD had a newsletter?
(10) A. I do not believe that the district had a
(11) newsletter, no.
(12) Q. And do you recall during your time as counsel
(13) for the MUD whether the MUD hosted a Web site on the
(14) Internet?
(15) A. It did not.
(16) Q. Thank you. In the last -- in the earlier part
(17) of your --
(18) MS. PERALES: I'm sorry. Did somebody
(19) say something?
(20) Q. (By Ms. Perales) I remember earlier in your
(21) deposition we talked about Ms. Peterson, and I know it
(22) was stretching your memory a little bit to recall the
(23) early years around 1988 when the MUD was formed, 1986,
(24) 1988, but I wanted to ask you, do you recall whether
(25) Ms. Peterson lived within the boundaries of the MUD at

126

(1) any time early in its existence?
(2) A. I believe that she may have, yes.
(3) Q. Do you recall whether Ms. Peterson lived in
(4) some kind of trailer home or whether she lived in a
(5) fully constructed home that was out there?
(6) A. I don't believe I ever saw Ms. Peterson's
(7) home.
(8) Q. Did you have any other knowledge besides
(9) seeing the home whether it was a trailer home or not?
(10) A. I do not know.
(11) Q. Are you aware of any restrictive covenants
(12) that are associated with homes in the MUD?
(13) A. I do not think I have ever seen restrictive
(14) covenants on the subdivisions because I didn't do that
(15) sort of work for the district.
(16) Q. If there were restrictive covenants associated
(17) with homes in the MUD would they be found at the
(18) developer's offices? Is that where a restrictive
(19) covenant might lie or be?
(20) A. Well, under Texas law restrictive covenants to
(21) be effective have to be of record with the county
(22) clerk, so if you are looking for a set I would contact
(23) Dana DeBeauvoir's office.
(24) Q. Thank you.
(25) MR. HICKS: And make sure it doesn't have

127

(1) a social security number.
(2) MS. PERALES: Thank you, Mr. Hicks.
(3) Q. (By Ms. Perales) Let me ask you another MUD
(4) question which has come up a few times, and I think you
(5) may be the only person who can answer it. Is the MUD
(6) limited to annexing land that is contiguous to its
(7) boundaries?
(8) A. No, it's not.
(9) Q. And so it is possible under the law for a MUD
(10) to annex land that is not attached to it?
(11) A. That's correct.
(12) Q. Can you describe for me how you billed for
(13) your legal work to the MUD when you were working on the
(14) MUD's behalf?
(15) A. I billed for general counsel work on a time
(16) matter. The firm bills in series of six-minute
(17) increments. .1 is six minutes. For work regarding the
(18) issuance of bonds we worked with bond counsel on a
(19) percentage of the bond amount, and we were paid at the
(20) time the bonds closed.
(21) Q. Did you provide monthly bills to the MUD or
(22) were they on any other schedule?
(23) A. They were monthly other than for bond work.
(24) Q. How did you bill the MUD for the preparation
(25) of preclearance submissions, if you recall? Did you

128

(1) bill separately for that work or did you roll it into
(2) any other kind of work?
(3) A. It was billed on an hourly basis, and it
(4) appeared on our monthly invoice for all work that we
(5) did for the district other than bond work.
(6) Q. Okay. Thank you. Do you recall whether you
(7) used the same billing rate for the time spent on the
(8) preparation of MUD preclearance submissions as any
(9) other work related to the MUD, putting aside bonds?
(10) A. I would have, yes.
(11) Q. After the first preclearance submission that
(12) you prepared for the MUD which was related to the
(13) creation of the MUD, can you tell me if when preparing
(14) subsequent submissions you relied on sort of
(15) boilerplate language from earlier submissions?
(16) A. We used a general form, yes.
(17) Q. And with respect to, for example, background
(18) information about the MUD, would you also carry that
(19) language forward from submission to submission?
(20) A. It depends on the type of background
(21) information. If it was when the district was created,
(22) yes. If it had to do with information regarding
(23) populations, things like that, we would use information
(24) that we had gotten from the general manager at that
(25) time of submission.

129

(1) Q. How did you approach whether or not to put an
(2) attachment to the preclearance submission, in all
(3) submissions following the very first submission?
(4) A. Normally we would attach a copy of the order
(5) calling the election and probably the notice of the
(6) election. If a polling place were to change we would
(7) have a map that showed the location of the old polling
(8) place and the location of the new polling place, as
(9) well as an estimate of the distance between the two.
(10) Those are the typical attachments that I can recall.
(11) Q. Do you recall how much time on average it took
(12) you to prepare preclearance submissions excluding the
(13) very first submission that you submitted for the MUD?
(14) A. It's difficult for me to recall on this
(15) particular district, if that's what your question is.
(16) Q. Yes. And do you prepare preclearance
(17) submissions for other MUDs in your work as a lawyer?
(18) A. I have over the years, yes. At this point
(19) we're trying to have our younger lawyers spend the time
(20) doing that.
(21) Q. When you were preparing preclearance
(22) submissions for the MUD how did you know what format to
(23) follow?
(24) A. When we first started doing those submissions
(25) one of my partners, Sue Littlefield, who also does a

130

(1) number of MUD representations, and I put together
(2) something that we thought met the federal rules
(3) regarding submissions, and we used it and tried to
(4) update it as those rules would change from time to
(5) time.
(6) Q. So you in a sense created a model format for
(7) your preclearance submissions; is that right?
(8) A. That's my recollection. We may have looked at
(9) some that other people did. I don't really remember.
(10) Q. And did you review the federal regulations
(11) related to preclearance submissions when you were
(12) putting together your model submission or future
(13) submissions for the MUD?
(14) A. I believe we did, yes.
(15) MS. PERALES: I'd like to mark this
(16) document as Exhibit 26.
(17) (Exhibit 26 marked)
(18) Q. (By Ms. Perales) Ms. Collins, the court
(19) reporter is handing you what has been marked Deposition
(20) Exhibit 26. And that is -- do you recognize this as a
(21) preclearance submission prepared or sent by you dated
(22) March 26, 1998?
(23) A. I do.
(24) Q. And I'm just going to use this particular
(25) exhibit by way of example and ask you to turn to page 2

ACUSCRIBE COURT REPORTERS
(800) 497-0277

### 131

(1) of the submission. Below where you list prior
(2) submissions there is a paragraph that talks about the
(3) population of the district. Do you see that?
(4)   A. I do.
(5)   Q. And do you see the phrase where it says, "Less
(6) than 5 percent families with Spanish surnames, none of
(7) whom would be considered language minorities"?
(8)   A. I see that.
(9)   Q. Can you tell me what your understanding of the
(10) term language minorities is in this paragraph?
(11)  A. I'm not sure what the definition is used in
(12) the federal regs on that. I think that what we were
(13) getting toward was that other than Spanish and English,
(14) which were what our documents were done in, Spanish and
(15) English, there were no other languages, for example,
(16) Vietnamese, that would require an additional third
(17) language to be used on our documents.
(18)  Q. So when you say, "To the best of my knowledge
(19) there are less than 2.5 percent African-American
(20) families in the district and less than 5 percent
(21) families with Spanish surnames, none of whom would be
(22) considered language minorities," that phrase language
(23) minorities, then, excludes Spanish speakers?
(24)  A. I believe that's what we intended. Now, that
(25) may not be what the government intended, but we were

### 132

(1) trying to make clear that other than the way our
(2) documents were done, in English and in Spanish, there
(3) were no other languages that were a significant
(4) minority that we were aware of.
(5)   Q. Thank you. Do you recall for this particular
(6) submission, March 26, 1998, how you obtained the
(7) demographic information that led to the statement "less
(8) than 2.5 percent African-American families in the
(9) district and less than 5 percent families with Spanish
(10) surnames"?
(11)  A. I have no recollection on this one in
(12) particular, but it was my pattern on all to call the
(13) general manager who has more dealings with people in
(14) the district and rely upon them to give me an estimate.
(15)      MS. PERALES: I'd like to mark this
(16) Exhibit 27, please.
(17)      (Exhibit 27 marked)
(18)  Q. (By Ms. Perales) Ms. Collins, the court
(19) reporter has handed you what has been marked Exhibit 27
(20) for this deposition. Do you recognize it as the
(21) June 6, 1996 preclearance submission on behalf of the
(22) MUD?
(23)  A. I do.
(24)  Q. And you prepared this submission as well as
(25) the submission that we just looked at, Exhibit 26;

### 133

(1) isn't that right?
(2)   A. I believe that's correct. I don't think that
(3) I had anyone help me on this, but it is possible.
(4)   Q. Can you look on page 2 of this submission?
(5)   A. Yes.
(6)   Q. And if you can find for me that paragraph
(7) which talks about demographic information, do you see
(8) the sentence that says, "To the best of my knowledge
(9) there are less than 2.5 percent black families in the
(10) district and less than 5 percent families with Spanish
(11) surnames, none of whom would be considered language
(12) minorities"?
(13)  A. Yes, ma'am.
(14)  Q. Is that the same -- the 1998 submission has
(15) that same statement that you have in the 1996
(16) submission; isn't that right?
(17)  A. It does.
(18)  Q. Isn't it also true that all of the submissions
(19) that you did have that same sentence in them?
(20)  A. With the exact same numbers? I don't know.
(21)  Q. Okay. But if they did -- and I won't
(22) represent to you either way because I don't want to
(23) waste everyone's time by marking each one. Would it be
(24) your testimony that if you included that very same
(25) sentence each time in a preclearance submission it was

### 134

(1) because you had contacted the general manager and been
(2) given that information?
(3)   A. That was what we normally do, yes.
(4)   Q. And would you be testifying that if you made
(5) that statement in each of the preclearance submissions
(6) it was definitely because you got that information from
(7) the general manager?
(8)   A. What I'm saying is it was our pattern and
(9) practice to call the general manager on each one of
(10) these and ask them for population estimates and
(11) percentages of African-Americans and Hispanic. I have
(12) no recollection of calling on this particular one or
(13) the other one. That was our pattern of practice.
(14)  Q. Would you have thought it strange at the time
(15) if that demographic information with respect to
(16) African-Americans and Hispanics never changed during
(17) the time that you represented the MUD as represented to
(18) you by the general manager?
(19)  A. No.
(20)  Q. Do you have -- I understand that you've
(21) testified that it was your practice to call the general
(22) manager for the information regarding African-American
(23) families and Spanish surname persons. Did you have any
(24) other independent means of determining what was the
(25) percentage of African-Americans or Spanish surname

### 135

(1) persons in the MUD?
(2)   A. In some districts in which the district
(3) actually retails water and wastewater service, there is
(4) more information available. In this district the City
(5) of Austin provides retail service for water and
(6) wastewater. The amount of materials that the district
(7) receives is much less because of that. So there is not
(8) a customer list under which the general manager could
(9) sit there and count Spanish-type surnames, so it was
(10) more difficult I'm sure for her.
(11)  Q. And with respect to you, Ms. Collins, did you
(12) have any independent material or information by which
(13) to determine the demographic information about the
(14) district, Latino, African-American?
(15)  A. Not that I recall, no.
(16)  Q. Do you ever recall an occasion while you were
(17) counsel for a MUD -- for the MUD that a director for
(18) the MUD did not either own property or live in the MUD?
(19)  A. No.
(20)  Q. And was it always a requirement during the
(21) time that you were counsel for the MUD that a director
(22) either own property or live in the MUD?
(23)  A. Yes.
(24)      MS. PERALES: I'd like to mark this,
(25) please.

### 136

(1)      (Exhibit 28 marked)
(2)   Q. (By Ms. Perales) Ms. Collins, the court
(3) reporter has handed you what has been marked as
(4) Deposition Exhibit 28. I would ask you to turn to
(5) page 2. Hang on. Let me just find it. Yes. It's on
(6) page 1. Please turn to page 1. Below the list of
(7) directors that are present at the meeting, the third
(8) paragraph down which begins, "The next item to come
(9) before the board was to receive an update regarding the
(10) status of the appointment of a new director," do you
(11) see that paragraph?
(12)  A. I do.
(13)  Q. Do you see where it says Mr. Blanton stated
(14) that the developer and Team Bank were proceeding toward
(15) the conveyance of a lot which could be conveyed to a
(16) candidate for appointment?
(17)  A. Yes.
(18)  Q. Can you explain to me what was happening
(19) during this time with respect to filling the vacancy
(20) for a new director?
(21)  A. Yes. In the early years of a district -- let
(22) me start this way. At the time of creation of a
(23) district the land normally has no residents. The first
(24) set of directors qualify to serve by owning property
(25) within the district. It is the standard practice for

### Page 137

(1) the developer to convey a piece of property to each
(2) candidate for directorship. When someone would resign
(3) from a director position, then it would be necessary to
(4) convey to another person another piece of property so
(5) that they would qualify to serve.
(6) Q. All right. And just so the record is clear
(7) because I know the court reporter can't take down the
(8) hand motions, when you said candidate for directorship
(9) you made little quotation marks with your fingers; is
(10) that right?
(11) A. That's correct.
(12) Q. Now, this -- these meeting minutes are dated
(13) in 1992. I guess I need to understand from you since
(14) you were there, was the -- were there not homes in the
(15) subdivision in 1992?
(16) A. I don't recall.
(17) Q. Was it the case during the time of these
(18) meeting minutes that the developer would identify a
(19) candidate for appointment or election prior to
(20) conveying the land to that person?
(21) A. That would be correct.
(22) Q. And do you know how the developer identified
(23) persons to become directors either by appointment or by
(24) election?
(25) A. I think -- are you talking about this

### Page 138

(1) particular developer?
(2) Q. Yes. And with respect to this particular MUD
(3) and this particular developer.
(4) A. It would be acquaintances of Mr. Simmons or
(5) Mr. Blanton that would be willing to be on the board,
(6) who would express interest in serving, going to
(7) meetings once a month at least, and having some general
(8) knowledge of areas of land development or city
(9) government or something that made them interested in
(10) doing this.
(11) Q. Do you recall whether these directors who were
(12) property owners but not residents of the MUD were
(13) residents of Travis County?
(14) A. Mr. Storm is a resident of Travis County.
(15) Mr. Ventura is also or was a resident of Travis County.
(16) Mr. Collinsworth -- I'm not positive about this. He
(17) may very well have been a resident in Round Rock, so
(18) Williamson County. Mr. Cox, I don't remember who he
(19) was.
(20) Q. Is it correct, then, that Mr. Collinsworth,
(21) Storm -- Misters Collinsworth, Storm, and Ventura were
(22) not residents of the MUD on February 18, 1992?
(23) A. I believe that's correct.
(24) Q. And did there come a time when you were
(25) counsel for the MUD when directors were also residents

### Page 139

(1) of the MUD?
(2) A. Yes.
(3) Q. And can you give me an estimate of about what
(4) time that began to happen, that directors were not
(5) nonresident owners but were actually residents of the
(6) MUD?
(7) A. In the late '90s as I recall.
(8) Q. How did you as counsel for the MUD confirm
(9) that a director either lived in or owned property in
(10) the MUD?
(11) A. Frequently on the conveyances we would see the
(12) deed that conveyed property into the potential
(13) director. The residents -- normally you got to know
(14) who they were and where they lived in the district, and
(15) you just knew they lived in the district.
(16) Q. Did you see all the conveyances of property
(17) that were made for the MUD?
(18) A. I don't recall.
(19) Q. During your time as counsel for the MUD was
(20) there ever a contested election for director?
(21) A. Yes.
(22) Q. Do you recall what year that was?
(23) A. Probably 2002.
(24) Q. Is it correct to say that when a director ran
(25) as a candidate for a MUD, as contrasted with being

### Page 140

(1) appointed to the MUD board, but when a director ran as
(2) a candidate for a MUD during your time as counsel for
(3) the MUD it was largely because that person had been
(4) approached by the developer?
(5) A. I'm not sure there's a clear way to answer
(6) that. When the first set of directors were suggested
(7) by the developer and appointed by the Texas Water
(8) Commission, they then were required to run for
(9) election. And while it was uncontested, they applied
(10) to get -- each director applied to get on the ballot to
(11) run for election, so I don't think it would be true to
(12) say that the developer had anything in particular to do
(13) with it.
(14) Q. Okay. I understand. And did it come to pass
(15) that the original directors who were initially
(16) appointed and then ran for their seats resigned their
(17) positions or stopped serving on the board?
(18) A. From time to time, yes.
(19) Q. And then how would a new director candidate be
(20) found in that situation?
(21) A. The same way as the original ones. Usually
(22) the developer would find people they were acquainted
(23) with who expressed an interest in serving on the board
(24) of directors.
(25) Q. Now, in 2002, which is that contested election

### Page 141

(1) we talked about earlier, was it then the case that some
(2) of the candidates had been contacted by the developer
(3) and other candidates were sort of running
(4) independently, I suppose? How would you describe what
(5) happened in 2002?
(6) A. I don't exactly remember. I am not sure
(7) whether Mr. Storm and Mr. Ventura even ran for
(8) reelection that year. There was one resident who had
(9) been appointed to the board and then ran for election,
(10) and I believe he was opposed by another resident, but I
(11) have no independent memory as to whether the other two
(12) were opposed or unopposed.
(13) Q. So with respect to the resident who had been
(14) initially appointed and then put his name in to run for
(15) the board, when he was initially appointed was that
(16) through a relationship with the developer?
(17) A. I don't know.
(18) Q. Before 2002 did you ever suggest that the MUD
(19) have Travis County administer its elections?
(20) A. Not to my recollection.
(21) Q. And with respect to -- well, let me jump
(22) around a little bit and ask. At this point in time you
(23) still do legal work for other MUDs besides the MUD in
(24) this case; is that right?
(25) A. That's correct.

### Page 142

(1) Q. Are any of those MUDs in Travis County?
(2) A. They are.
(3) Q. And at this point is Travis County running
(4) those other MUDs' elections?
(5) A. Some of them, yes.
(6) Q. Prior to 2002 did you represent any MUDs that
(7) had their elections administered by Travis County?
(8) A. Without looking at my files I couldn't tell
(9) you that on all the districts that I represent, no.
(10) Q. Do you have any recollection whether in 2002
(11) some of your MUD clients had their elections run by
(12) Travis County and some of your MUD clients didn't?
(13) A. I would say that at that time most of the MUDs were
(14) handling their own elections.
(15)     MS. PERALES: I'd like to mark this
(16) Exhibit 29.
(17)     (Exhibit 29 marked)
(18) Q. (By Ms. Perales) Ms. Collins, you have been
(19) handed by the court reporter what has been marked
(20) Deposition Exhibit 29. I'm going to ask you to put --
(21) there it is. In the very last page of the exhibit do
(22) you see this as a letter from your legal assistant to
(23) the Austin American-Statesman?
(24) A. Yes.
(25) Q. And would it be correct, then, that you

(Pages 137 to 142)

**143**

(1) published the notice of election for the 1992 MUD
(2) election in the Austin American-Statesman?
(3)   A.  That's what it says.
(4)   Q.  Do you have any reason to believe it wasn't
(5) published?
(6)   A.  No.
(7)   Q.  And do you recall whether it was your practice
(8) for MUD elections besides 1992 to publish the notice of
(9) election in the Austin American-Statesman?
(10)   A.  It depends on the location of the district.
(11)   Q.  And with respect to this MUD only, do you
(12) recall that it was your practice to advertise MUD
(13) elections in the Austin American-Statesman?
(14)   A.  It probably was, yes.
(15)   Q.  When you were counsel for the MUD and
(16) administering their elections were you the person
(17) responsible for sending out absentee ballots?
(18)   A.  No.
(19)   Q.  Can you tell me who was responsible for
(20) sending out absentee ballots?
(21)   A.  The absentee clerk.
(22)   Q.  The early voting clerk?
(23)   A.  Yes.
(24)   Q.  Were you ever the early voting clerk for this
(25) particular MUD?

**144**

(1)   A.  No.
(2)   Q.  During your time as counsel for the MUD do you
(3) ever recall a model home being put inside the MUD
(4) anywhere, one or more model homes?
(5)   A.  Yes.
(6)   Q.  Was there ever any talk of making one of these
(7) model homes a polling place?
(8)   A.  Yes.
(9)   Q.  And can you tell me what came of that?
(10)   A.  It did not happen.
(11)   Q.  Was there opposition from the owner of the
(12) model home?
(13)   A.  Opposition may be too strong a word, but they
(14) liked -- I have found that the model home owners are
(15) very picky about the use of their model homes. They
(16) are for trying to sell homes to potential home buyers,
(17) and we did not have anyone who really wanted to have an
(18) election set up in their model home when they were
(19) trying to sell homes.
(20)   Q.  Okay. Do you ever recall during your time as
(21) counsel for the MUD that any voter mailed in an
(22) absentee ballot in one of the MUD elections?
(23)   A.  I don't remember.
(24)   Q.  I would like you to look at Exhibit 29 again,
(25) which I handed to you, and on the very first page it

**145**

(1) lists two people as the presiding judge and the
(2) alternate presiding judge, Jim Gauntt and Joan Gauntt.
(3) Do you see that on the first page?
(4)   A.  I do.
(5)   Q.  Do you remember Jim or Joan Gauntt?
(6)   A.  I believe I spoke with Mr. Gauntt on the phone
(7) a couple of times.
(8)   Q.  Do you know if Mr. Gauntt resided in the MUD?
(9)   A.  I believe he did, yes.
(10)   Q.  And do you recall whether he and his wife were
(11) the judges for the election because the election was at
(12) their house?
(13)   A.  That would have been typical, as I testified
(14) last week, yes.
(15)   Q.  Do you remember -- I know you testified
(16) earlier that you recall Rosalyn Peterson. I wanted to
(17) know if you recall Carrie Montoya.
(18)   A.  Yes.
(19)   Q.  Was she an employee of the developer?
(20)   A.  Yes, she was.
(21)   Q.  Do you recall ever having a conversation or
(22) exploring with Ms. Montoya whether she spoke Spanish?
(23)   A.  No.
(24)   Q.  When you were counsel for the MUD and
(25) administering their elections how would someone find a

**146**

(1) candidate application form or where would a candidate
(2) application form have been located?
(3)   A.  An application form can be obtained from our
(4) office, or it can be obtained from the Secretary of
(5) State's Web site. You can download it.
(6)   Q.  And that would be as of the date the Secretary
(7) of State made it available on the Web site; is that
(8) right?
(9)   A.  Yes.
(10)   Q.  Did candidates for MUD directorship frequently
(11) come to your office in person to fill out an
(12) application? Was that the way things were done?
(13)   A.  On this particular district?
(14)   Q.  For this particular district.
(15)   A.  Normally what would happen in the March time
(16) frame, when a director was up for reelection we would
(17) take the applications to the board meeting and say, "If
(18) you want to run again here is the packet of material."
(19) We do that as a courtesy to all of our existing board
(20) members.
(21)   Q.  And with respect to somebody who was going to
(22) run and the former board member was not going to run,
(23) so this would be a new candidate, somebody who wasn't
(24) already an incumbent, how would that person have
(25) typically completed the form? Would it have been at

**147**

(1) your office?
(2)   A.  Not necessarily. Frequently we will have
(3) people call and we have -- at that time of the year on
(4) those years we have elections we have a huge stack of
(5) packets of applications, campaign information, the dos
(6) and don'ts that the Secretary of State puts out. We
(7) will typically mail those to people who request them.
(8)   Q.  And then would they have to be returned to you
(9) following their completion?
(10)   A.  Yes. We are the district office.
(11)   Q.  And when you say that you would have a stack
(12) of applications, was this because you are representing
(13) a number of MUDs and so you would be processing the
(14) requests from all different MUDs' candidates?
(15)   A.  That's correct.
(16)        MS. PERALES: I would like to mark this
(17) as Exhibit 30, please.
(18)        (Exhibit 30 marked)
(19)   Q.  (By Ms. Perales) Ms. Collins, you have been
(20) handed by the court reporter what has been marked
(21) Exhibit 30 for this deposition. Can you tell me what
(22) this document is?
(23)   A.  It purports to be a list of Canyon Creek
(24) property owners.
(25)   Q.  And is it dated April 8, 1992?

**148**

(1)   A.  It is.
(2)   Q.  And does it have a fax tag across the top from
(3) The Blanton Company?
(4)   A.  It does.
(5)   Q.  All right. Do you have any reason to believe
(6) this is not the resident list from April 8, 1992?
(7)   A.  I have no reason not to believe it.
(8)   Q.  And does it say across the top "resident
(9) list"?
(10)   A.  In handwriting, yes.
(11)   Q.  Now, was it part of your work as counsel for
(12) the MUD and administratrix, I guess, of their elections
(13) that you would obtain a list of residents prior to the
(14) election? Was this the way that you knew or were able
(15) to run the election, by knowing who could vote and who
(16) couldn't vote?
(17)   A.  We get copies of the voter registrar list for
(18) our entities from the county. I don't recall whether
(19) there was a cross-reference, but because this district
(20) did not retail water and wastewater service there would
(21) not be a list of customers, and I really don't know the
(22) purpose of why the district -- I assume you got this
(23) from the district records. I don't know why it's in
(24) the district records.
(25)   Q.  So with respect to this document, document --

(Pages 143 to 148)

149

(1) Deposition Exhibit 30, this is not something that you
(2) would have used towards administering the election and
(3) figuring out who could vote and who couldn't vote?
(4) A. I would not have used it, no.
(5) Q. Might it have been used by the election judge
(6) on Election Day?
(7) A. I suppose it's possible, but you still use the
(8) list that comes from the voter registrar.
(9) Q. Okay. Have you ever had occasion to look at
(10) a -- to see a list like this resident list in your work
(11) as counsel for the MUD in any other capacity besides
(12) election administrator?
(13) A. I don't recall.
(14) Q. Okay. Now, tell me about this list from the
(15) county registrar. Is this something that you would
(16) obtain for this MUD prior to an election?
(17) A. Yes.
(18) Q. Okay. And would you contact the county and
(19) then ask them for the list of registered voters within
(20) the boundaries of this MUD?
(21) A. That's correct. Now, let me explain one
(22) thing. I think this may be where this list comes in.
(23) The county has difficulty coming up or did have
(24) difficulty coming up with less than a county precinct
(25) list. We would use customer lists to try to

150

(1) cross-reference in case there was a question as to
(2) whether someone really was a resident of the district.
(3) This list could possibly have been used for that.
(4) Q. By the election judge?
(5) A. By the election judge.
(6) Q. But mainly you would have obtained and handled
(7) and reviewed the registered voter list for the MUD that
(8) came from Travis County; is that right?
(9) A. My legal assistant would have done that.
(10) Q. Did you ever have occasion to see these lists
(11) of registered voters for the MUD?
(12) A. I didn't really have time to look at lists of
(13) registered voters, no.
(14) Q. But they would have passed through your
(15) office, then; is that right?
(16) A. Generally speaking, yes.
(17) Q. I'm going to hand you what has been previously
(18) marked Deposition Exhibit 5. And it doesn't have a
(19) little 5 on it, but I will ask you to go along with me
(20) on this, and I'm keeping my fingers crossed this is
(21) Deposition Exhibit 5. Do you see a -- do you see that
(22) this is also another resident list? It says Canyon
(23) Creek property owners in the top left-hand corner, and
(24) it's dated April 1, 1994.
(25) A. That's what it says.

151

(1) Q. Okay.
(2) (Discussion off the record)
(3) MS. PERALES: Let's go back on the
(4) record. I'd like to mark this document Exhibit No. 31.
(5) (Exhibit 31 marked)
(6) MR. KORBEL: Before we proceed, Nina,
(7) could you adjust that -- this is George Korbel. Could
(8) you adjust the phone a little bit? I'm having a hard
(9) time hearing Ms. Collins.
(10) MS. PERALES: Okay.
(11) MR. KORBEL: I'm sorry. I didn't want to
(12) bother.
(13) MS. PERALES: Okay. Here we go.
(14) Q. (By Ms. Perales) Ms. Collins, you have been
(15) handed what has been marked Deposition Exhibit 31, and
(16) I believe you said a moment ago when we thought it was
(17) a different exhibit number that this document says
(18) Canyon Creek property owners across the top and is
(19) dated April 1, 1994; is that right?
(20) A. That's correct.
(21) Q. And do you recall ever using -- you personally
(22) ever handling or reviewing this document in connection
(23) with elections for the MUD, this MUD?
(24) A. No.
(25) Q. But is it also possible, as with respect to

152

(1) Exhibit 30, that it may have been used at the polling
(2) place by the election judge to figure out whether
(3) people were proper voters of the MUD?
(4) A. It's possible.
(5) Q. Ms. Collins, do you recall whether the MUD
(6) ever had voter sign-in sheets for its Election Day?
(7) A. At the poll?
(8) Q. Yes, at the poll.
(9) A. I don't know.
(10) MS. PERALES: I'd like to mark this,
(11) please.
(12) (Exhibit 32 marked)
(13) Q. (By Ms. Perales) Ms. Collins, I'm handing
(14) you -- or the court reporter is handing you what has
(15) been marked Exhibit 32, and I wanted to ask you to
(16) identify this document if you could.
(17) A. It states it is the register of official
(18) ballots.
(19) Q. And do you see on there that two ballots were
(20) voted in this May 1992 election?
(21) A. I see that, yes.
(22) Q. And it's signed by James Gauntt; is that
(23) right?
(24) A. It is.
(25) Q. Is it possible that these two votes that were

153

(1) cast in this election were the ones cast by the
(2) election judge and his wife in this election?
(3) A. It's possible.
(4) Q. The election judge and his wife, they were
(5) both qualified voters; isn't that right? That's a
(6) prerequisite for serving as election judge?
(7) A. That's correct.
(8) Q. And they were there all day, weren't they, on
(9) this Election Day?
(10) A. They should have been.
(11) Q. Okay. Do you think that the two votes that
(12) were cast this day were cast by the election judge and
(13) his wife?
(14) A. I don't know.
(15) (Exhibit 33 marked)
(16) Q. (By Ms. Perales) Ms. Collins, the court
(17) reporter is handing you what has been marked Deposition
(18) Exhibit 33, and I'd like to ask you to identify the
(19) document.
(20) A. It is entitled Register of Official Ballots.
(21) Q. And does it show that two ballots were cast in
(22) the election of 7 May, 1994?
(23) A. It does.
(24) Q. Do you think that the two ballots cast in this
(25) election were cast by the two election judges presiding

154

(1) over the election?
(2) A. I don't know.
(3) Q. During the time that you were counsel for MUD
(4) was the developer, Perry Blanton, based in Travis
(5) County?
(6) A. He was.
(7) Q. And did you post meetings -- meeting notices
(8) for MUD meetings in the Travis County Courthouse during
(9) that time?
(10) A. Yes.
(11) Q. Would you post any other kind of notices
(12) related to the MUD at the Travis County Courthouse
(13) while you were counsel for the MUD?
(14) A. Repeat your question for me, please.
(15) Q. Did you post any other kinds of notices
(16) besides meeting notices for this MUD at the Travis
(17) County Courthouse?
(18) A. We may have, yes.
(19) Q. Would you have posted orders of election or
(20) notices of election at the Travis County Courthouse?
(21) A. I think that is a requirement of state law.
(22) Q. And so you would have done it, yes?
(23) A. Yes.
(24) Q. What was your understanding while you were
(25) counsel for the MUD of the obligation of the MUD to

(Pages 149 to 154)

**155**

(1) provide assistance to voters with limited English
(2) proficiency?
(3)   A. We have someone available on our staff in the
(4) office all day on Election Day that was a Spanish
(5) speaker.
(6)   Q. And backing up a little bit, can you tell me
(7) what your understanding was of the obligation of the
(8) MUD? What requirements or what was the MUD required to
(9) do with respect to assisting voters of limited English
(10) proficiency?
(11)   A. The district believed it had an obligation to
(12) have someone available at least by telephone that could
(13) help translate or speak with Spanish voters who would
(14) show up to make sure that they were able to vote.
(15)   Q. Did the MUD also believe it had to make
(16) ballots in Spanish?
(17)   A. It did, and it had ballots in Spanish, as well
(18) as English.
(19)   Q. Did the MUD also -- or did you understand that
(20) the MUD was required to translate other
(21) election-related materials, such as the notice of
(22) election?
(23)   A. I advised the district to have all of their
(24) election documents in Spanish and English.
(25)   Q. And why did you give them that advice?

**156**

(1)   A. Because we understood that under Texas law
(2) with a large Spanish speaking population that election
(3) materials needed to be in Spanish and in English.
(4)   Q. When you say a large Spanish speaking
(5) population, do you mean a large Spanish speaking
(6) population residing in the MUD?
(7)   A. No. In the State of Texas. It's not my
(8) understanding that individual political subdivisions
(9) within the State of Texas can make a determination not
(10) to do Spanish translations.
(11)   Q. Tell me about the availability of somebody in
(12) your office to translate. Did you have that
(13) arrangement in your office in 1986?
(14)   A. We would have, yes. My legal assistant was
(15) Hispanic.
(16)   Q. At that time?
(17)   A. Yes.
(18)   Q. And was she a Spanish speaker?
(19)   A. It was a he. And yes, he is a Spanish
(20) speaker.
(21)   Q. Is he still your legal assistant?
(22)   A. No. He's not with me now.
(23)   Q. And how would a voter in the MUD have been
(24) connected to your legal assistant for help voting if
(25) they needed help in Spanish?

**157**

(1)   A. The judges have the phone numbers to call.
(2) We -- back then I think we also had those very large
(3) portable phones that they could be contacted. We made
(4) it our practice to make our legal assistants get up
(5) very early in the morning and go to each polling place
(6) right about 7:00 as best they could and check on the
(7) judges and make sure they had everything, make sure
(8) they had our phone numbers, so that if they had an
(9) issue during the day, whether it was language related
(10) or running low on ballots or just confusion, that we
(11) had someone to assist them and the voters as necessary.
(12)   Q. And so you did this for the MUD at issue in
(13) this case as well as a number of other MUDs at the same
(14) time; is that correct?
(15)   A. That's correct.
(16)   Q. And did you also -- were you also assisting in
(17) the administration of elections on these days for
(18) political sub-units that were not MUDs?
(19)   A. We may have had an emergency services district
(20) that had an election, as well, but they would have been
(21) mainly one type of utility district or another.
(22)   Q. And what is the name of the legal assistant
(23) that you had in 1986 and 1988 who spoke Spanish, the
(24) man?
(25)   A. Fred Castro.

**158**

(1)   Q. Fred Castro. And then following his departure
(2) from working with you did you have another legal
(3) assistant who could speak Spanish?
(4)   A. We have always had legal assistants that can
(5) speak Spanish. Our librarian is Hispanic. We have
(6) always had someone that was available and was willing
(7) to work to do that.
(8)   Q. So if the person was a legal assistant or a
(9) librarian, that person would be tasked with going out
(10) and making sure everything was going to be okay at the
(11) polls that day, and that would also be the person who
(12) would do the interpretation?
(13)   A. If the person who spoke Spanish was not a
(14) legal assistant we didn't require them to go out to the
(15) polling places. We simply required them to be
(16) available by telephone.
(17)   Q. And about how many elections would you be
(18) covering in a typical year? Let's say in 1988.
(19)   A. I don't know that I can really tell you very
(20) well. We probably had somewhere between 10 and 15.
(21)   Q. Thank you. With respect to the translation of
(22) meeting agendas when the board would consider calling
(23) an election or canvassing election returns, is it
(24) correct that it was your practice to create a
(25) supplemental agenda with respect to those

**159**

(1) election-related duties and then have that supplemental
(2) agenda translated into Spanish?
(3)   A. That's correct.
(4)   Q. Do you know if the MUD -- I have already asked
(5) you that question. Never mind. Did you ever attend a
(6) MUD meeting at which a Spanish language interpreter was
(7) present?
(8)   A. Not that I recall.
(9)   Q. Do you recall who was responsible for
(10) translating ballots into Spanish when you were counsel
(11) for the MUD?
(12)   A. No, I don't.
(13)   Q. Did you do that in-house in your firm or with
(14) somebody else out of the firm?
(15)   A. With director elections at which there were no
(16) other items I believe we did that in-house based upon
(17) prior ones that had been done. For creation, bond
(18) elections, those types of complicated ballots, the bond
(19) counsel would use a professional translation service.
(20)   Q. Was it your practice to retain all of the
(21) Spanish language election materials that you had
(22) translated and subsequently used in these MUD
(23) elections?
(24)   A. Retain forever?
(25)   Q. No. Just to retain as part of the records of

**160**

(1) the MUD the translated ballot or the canvass
(2) information.
(3)   A. Under the Texas Election Code there are
(4) certain materials that are retained permanently and
(5) some that are not retained permanently. It is my
(6) practice to get my legal assistants to throw out stuff
(7) that they don't need to retain, which they don't always
(8) do because you will find things sitting in the file
(9) from three elections ago that should have been tossed
(10) by then. Things such as orders canvassing, those would
(11) be retained indefinitely.
(12)   Q. Okay. Thank you. So, for example, the
(13) ballots themselves could be discarded after two years;
(14) is that right?
(15)   A. That's my recollection, yes.
(16)   Q. Would it be correct to say that Mr. and
(17) Mrs. Gauntt, who we have been discussing earlier,
(18) received no special training to assist Spanish language
(19) voters?
(20)   A. I doubt that they did, but I could not tell
(21) you what my legal assistant would or would not have
(22) done. The legal assistants generally attend the
(23) Secretary of State's training that's held -- I don't
(24) know if it's yearly or every other year. But we send
(25) them to those training sessions, and a lot of what they

(Pages 155 to 160)

### Page 161

(1) know how to do I don't even know how to do because I
(2) don't go to those courses. We pay out of our own money
(3) to send them to make sure that we do the best job we
(4) can on that.
(5)   Q. Okay.
(6)       MR. COLEMAN: Your question was about the
(7) Gauntts or the paralegals?
(8)       MS. PERALES: I think both got answered
(9) there in the answer. We talked a little bit about the
(10) Gauntts and also about the legal assistants.
(11)       THE WITNESS: I rambled. I'm sorry.
(12)       MR. COLEMAN: I didn't know if your point
(13) was that the paralegals then transmitted to the Gauntts
(14) or helped them understand how to contact.
(15)       THE WITNESS: That was my point, yes. I
(16) didn't make it very clearly.
(17)   Q. (By Ms. Perales) My last question is whether
(18) you have ever personally witnessed discrimination
(19) against African-Americans in your time in Texas of any
(20) sort.
(21)   A. Yes.
(22)   Q. Can you describe for me one instance or the
(23) most recent instance that you can think of or any
(24) instance if it's hard to sort them in time?
(25)   A. I have to say as a credit to Austin it's been

### Page 162

(1) quite a while, but restaurants.
(2)   Q. You remember restaurants that wouldn't serve
(3) African-Americans?
(4)   A. Well, I'm fairly old. Yes.
(5)   Q. Can you tell me what city that was in?
(6)   A. Probably Fort Worth.
(7)   Q. Do you recall ever seeing restaurants that
(8) wouldn't serve Mexican Americans in Fort Worth?
(9)   A. I don't remember any that did.
(10)   Q. Okay. Do you remember seeing any other kind
(11) of discrimination against Mexican Americans here in
(12) Texas?
(13)   A. Certainly.
(14)   Q. Can you describe for me an instance?
(15)   A. More than specific instances, more attitudes
(16) of people, particularly as a child being conveyed that
(17) attitude, that white adults that you were around did
(18) not care to serve or to deal with either blacks or
(19) Hispanics.
(20)   Q. Okay. Those were the hard questions.
(21)       MS. PERALES: I pass the witness.
(22)       EXAMINATION
(23) QUESTIONS BY MR. HERREN:
(24)   Q. Ms. Collins, my name is Chris Herren. I'm an
(25) attorney with the Justice Department out of Washington.

### Page 163

(1) Thank you very much for your time.
(2)   A. Can we stop for a second?
(3)   Q. Sure.
(4)       (Discussion off the record)
(5)   Q. (By Mr. Herren) Again, I'm Chris Herren with
(6) the Justice Department out of Washington. Thank you
(7) very much for your time today.
(8)   A. Certainly.
(9)   Q. If I could look at the Exhibits 32 and 33.
(10) Thank you. This is just sort of a technical question
(11) that I didn't really understand. They are -- the
(12) register of official ballots from 1992 and 1994 for
(13) MUD, do you have those in front of you?
(14)   A. I do.
(15)   Q. You had testified earlier in your deposition
(16) last week that the MUD conducted its elections
(17) separately from Travis County during the time that you
(18) were counsel for the MUD; is that correct?
(19)   A. That's correct.
(20)   Q. What -- If you can tell me or if you can
(21) explain to me, what is the significance of having an
(22) election precinct number on here in Travis County?
(23) Both of them have an election precinct No. 219. Can
(24) you describe the significance of that, if you know?
(25)   A. I'll answer the best I can, but it's going to

### Page 164

(1) be pretty much a guess. I suspect that all of the
(2) boundaries of the district are included within one
(3) Travis County precinct, that precinct being 219. That
(4) does not mean that all of 219 -- let me start over.
(5) The boundaries of the MUD and the precinct are not
(6) necessarily coterminous, and I doubt that they are.
(7)       (Exhibit 34 marked)
(8)   Q. (By Mr. Herren) What you have been handed is
(9) marked as Exhibit 34. It's Bates stamped P 009978. Do
(10) you recognize this as being something that came from
(11) your firm to the Travis County voter registrar?
(12)   A. It appears that it is, yes.
(13)   Q. Was Denise Motal a legal assistant who worked
(14) with you?
(15)   A. Yes.
(16)   Q. Could you, after reviewing this, describe to
(17) me briefly what you believe this to be?
(18)   A. Well, what Ms. Motal is saying is that there
(19) were certain election materials that were contained
(20) within Envelope 4 from the election in 1992 and then
(21) lists a variety of districts, and I assume she must
(22) have sent election material from each one of these
(23) districts from its own Envelope 4.
(24)   Q. Did your firm serve as a conduit between the
(25) election judges and the county for some election

### Page 165

(1) materials for the MUD elections?
(2)   A. Yes.
(3)   Q. What materials did you serve as a conduit for?
(4)   A. After the election, after the polls would
(5) close and the election returns would have been
(6) determined, the election judges would drive all the
(7) ballot boxes and materials back down to our office that
(8) night, and we would then lock all the materials up in
(9) one of the offices, and then when the canvassing was
(10) done, the materials for canvassing would be presented
(11) to the board of directors.
(12)   Q. And then after the materials were canvassed by
(13) the boards of directors of the individual MUDs would
(14) you then transmit the returns to Travis County?
(15)   A. Apparently we do. Again, this gets into the
(16) logistics of an election that I don't get involved in
(17) myself very often.
(18)   Q. Okay. But these -- the districts, the
(19) individual MUDs, appear to have Travis County election
(20) precinct numbers aligned with that. For example,
(21) Northwest Austin MUD Number One has Precinct 219. And
(22) you testified essentially that you believe this to
(23) be -- this is the Travis County election precinct in
(24) which the MUD was at that time?
(25)   A. That's correct.

### Page 166

(1)   Q. Okay. Thank you.
(2)       (Exhibit 35 marked)
(3)   Q. (By Mr. Herren) Ms. Collins, do you recognize
(4) this as a document that originated from your firm to
(5) Mary Ann Hefner at the Texas Water Commission?
(6)   A. Yes, it is.
(7)   Q. And does this purport to transmit the results
(8) of the December 13, 1986 confirmation and director
(9) election, bond election and maintenance tax election
(10) for the Northwest Austin MUD Number One?
(11)   A. That's what it says, yes.
(12)   Q. This is one of the documents we had been
(13) looking for in this case and I will represent to you I
(14) copied out of the records of the TCEQ yesterday. Does
(15) this, in fact, indicate to you that the December 13,
(16) 1986 election was conducted and successfully passed?
(17)   A. Yes.
(18)       (Exhibit 36 marked)
(19)   Q. (By Mr. Herren) The document that's been
(20) marked as Exhibit 36, does this purport to be another
(21) letter from your firm to Karen Phillips of the Texas
(22) Water Commission?
(23)   A. Yes.
(24)   Q. And does this purport to convey resignation
(25) letters for the original directors of the MUD and the

(Pages 161 to 166)

**Page 167**

(1) requests for appointment as temporary directors the new
(2) directors for the MUD?
(3)   A. Yes, it does.
(4)   Q. I will represent to you that I -- this is a
(5) copy that I made out of TCEQ files yesterday, as well.
(6) Could you explain briefly why the original directors of
(7) the MUD that were appointed in 1986 would have resigned
(8) before the MUD was essentially re-created in 1988?
(9)   A. My recollection is that these folks were
(10) friends of the original developer, Nash Phillips Copus,
(11) and when they went into bankruptcy their friends
(12) decided that they really weren't interested in serving
(13) any longer.
(14)   Q. So would the new directors have been
(15) affiliated with Mr. Simmons, Mr. Eppright, Mr. Blanton,
(16) the new developers?
(17)   A. Yes. They were acquaintances of the successor
(18) developer, yes.
(19)   Q. Okay. During the time period between the
(20) original appointments in 1986 and original creation of
(21) the district in 1986 and its re-creation in 1988, do
(22) you remember much about what the MUD did during that
(23) period of time? I realize you testified there was
(24) litigation that was ongoing between City of Austin and
(25) Texas Water Commission about reviewing the creation of

**Page 168**

(1) the MUD, but do you recall whether the MUD did very
(2) much during that time period between '86 and '88?
(3)   A. I don't recall.
(4)   MR. COLEMAN: I was going to interpose an
(5) objection just to the characterization as creation and
(6) re-creation.
(7)   MR. HERREN: Okay. I'm happy to accept
(8) any creation designation that you want to put on it,
(9) but --
(10)   Q. (By Mr. Herren) I'm sorry. I missed your
(11) answer. Do you recall --
(12)   A. The answer is it's been too long ago. I don't
(13) remember.
(14)   Q. Okay. I believe you testified last week that
(15) the MUD director meetings were often held at the
(16) office -- offices of Simmons and Eppright. Would that
(17) have been CapTex Development?
(18)   A. Yes. I think they used that name.
(19)   Q. Okay. Did there come a time when MUD Number
(20) Two was dissolved -- Northwest Austin MUD Number Two
(21) was dissolved?
(22)   A. Yes.
(23)   Q. And was that related to the fact that a lot of
(24) the property that was in MUD Number Two was protected
(25) under the Endangered Species Act and it could not be

**Page 169**

(1) developed?
(2)   A. It became conservancy land. It was not
(3) prohibited from being developed, to my knowledge.
(4) However, by agreement it was set aside so that other
(5) land could be developed, therefore rendering MUD 2 with
(6) too little developable land to be feasible as an
(7) independent district.
(8)   Q. At the time that MUD Number Two was dissolved
(9) did there come to be an agreement essentially
(10) transferring the interest of MUD Number Two and that
(11) land to MUD Number One?
(12)   A. That's correct. The City of Austin insisted
(13) on that.
(14)   Q. Why did they insist on that?
(15)   A. Why does the City of Austin insist on
(16) anything? I think in the negotiations the city did not
(17) want the responsibility for the land. They wanted the
(18) other MUDs to have responsibility for keeping people
(19) out and controlling the wild pigs and whatever else was
(20) out there.
(21)   Q. Okay. Did the boundaries of MUD 1 change --
(22) did the boundaries of MUD 1 change when this land was
(23) conveyed from MUD 2 to MUD 1?
(24)   A. Without looking at the files I'm not positive,
(25) but I do believe some land was annexed into MUD 1 that

**Page 170**

(1) had been in MUD 2.
(2)   (Exhibit 37 marked)
(3)   Q. (By Mr. Herren) What I have shown you is a
(4) document that was produced by the MUD. It begins at
(5) P 002206. It is -- appeared in the minutes of the MUD
(6) I believe in 1996.
(7)   MR. COLEMAN: Is it Exhibit D? Is that
(8) exhibit in the minutes?
(9)   MR. HERREN: It's Exhibit D to the
(10) minutes.
(11)   Q. (By Mr. Herren) Does this refresh your
(12) recollection at all about what happened to the land
(13) that was transferred from MUD 2 to MUD 1?
(14)   A. Not really, because it doesn't -- simply
(15) owning -- if District Number One owns land, it doesn't
(16) necessarily mean that that land is within the
(17) boundaries of MUD 1. So merely by looking at this I
(18) couldn't tell you whether land was annexed into MUD 1.
(19) I don't believe that the conservation land was ever
(20) annexed into MUD 1.
(21)   Q. Do you recall whether this transfer of land
(22) was ever submitted to the Justice Department for
(23) preclearance?
(24)   A. If it was not an annexation I doubt that it
(25) would have been, no.

**Page 171**

(1)   Q. Okay. Thank you. Would you have any records
(2) in your possession that would clarify what may have
(3) happened to that land or would you have given all of
(4) those records to the new attorney for the MUD at the
(5) time you ceased working for the MUD?
(6)   A. I would have sent my records to Mr. Reilly.
(7)   Q. In terms of the -- what happened to MUD Number
(8) Two, was it just simply dissolved, to your
(9) recollection?
(10)   A. Yes. I think there may have been an
(11) application to the commission to dissolve it, but I
(12) don't remember exactly, no.
(13)   Q. When a MUD dissolves, what's the basic process
(14) for that happening?
(15)   A. Most utility districts are created and exist
(16) outside the boundaries of the municipality. The Local
(17) Government Code here in Texas states that when a
(18) city -- any kind of municipality annexes a Utility
(19) District it must annex the entire district and dissolve
(20) it. Because this -- these two districts were within
(21) the boundaries of the city already, there was not a
(22) mechanism for an automatic dissolution. So my guess is
(23) that we actually took this to the commission for
(24) dissolution, but I don't remember off the top of my
(25) head. I would have to consult the files.

**Page 172**

(1)   Q. So when you say the commission you mean what
(2) was then the Texas Water Commission and is now the
(3) Texas Commission on Environmental Quality?
(4)   A. Yes. It's had several names.
(5)   Q. But essentially the state commission would
(6) have to approve the dissolution of the MUD, to your
(7) recollection?
(8)   A. Yes.
(9)   Q. One of the things that I've read and I don't
(10) know if it's true is the Northwest Austin MUD Number
(11) One is unusual perhaps because it is an in-city MUD.
(12) Is that in fact true, that that is an unusual thing, to
(13) have an in-city MUD?
(14)   A. In Central Texas at least -- in Central Texas
(15) it is unusual to have an in-city MUD. I cannot speak
(16) for other areas of the state.
(17)   Q. Are you aware of any other in-city MUDs in
(18) Travis County, for example?
(19)   A. Yes.
(20)   Q. What MUDs would those be?
(21)   A. The one that I am familiar with is
(22) Presidential Glen MUD in Manor.
(23)   MR. HICKS: Would you say the name again?
(24) I just didn't catch it.
(25)   THE WITNESS: Presidential Glen MUD.

(Pages 167 to 172)

### Page 173

(1) Q. (By Mr. Herren) Are there any other in-city
(2) MUDs that you are aware of in the City of Austin?
(3) A. No.
(4) Q. Ms. Perales had asked you a question about a
(5) MUD annexing land. If a MUD annexes land, whether it's
(6) contiguous or not contiguous, the persons in the
(7) annexed area become subject to the tax rate that the
(8) MUD taxes; is that correct?
(9) A. That's correct.
(10) Q. And a MUD such as the Northwest Austin MUD
(11) Number One where the water facilities, utility
(12) facilities that it's responsible for have been
(13) transferred to the city, is a MUD such as the Northwest
(14) Austin MUD Number One in a position to offer any
(15) services to persons that it annexed?
(16) A. Drainage services, parks and recreation
(17) services, restrictive enforcement -- restrictive
(18) covenant enforcement. Those would be the main things
(19) the district would do, as well as potential for
(20) financing infrastructure for areas that are not perhaps
(21) developed at the time of annexation but then would be
(22) developed and provide utility infrastructure to those
(23) annexed areas.
(24) Q. Okay. But essentially in order to get water
(25) service in an area that was annexed that's subject to

### Page 174

(1) this -- the City of Austin's water service provision,
(2) would they have to -- would the persons in the annexed
(3) area have to apply to the City of Austin for that, that
(4) service?
(5) A. For retail service, yes.
(6) Q. And one question about the development stage
(7) of the MUD. You had indicated you represented the
(8) developer I believe in proceedings that led to creation
(9) of this MUD; is that right?
(10) A. That's correct.
(11) Q. Did you start out representing Nash Phillips
(12) Copus and then start representing Simmons Eppright or
(13) how did that work?
(14) A. My recollection is that Simmons and Eppright
(15) were not involved in the district until after it was
(16) created, and they were represented by their own
(17) attorneys.
(18) Q. So were you representing NPC throughout the
(19) creation process?
(20) A. Well, they lost the land to the RTC, so they
(21) sort of dropped out before the creation ever took
(22) place, and we worked with the lender.
(23) Q. Team Bank?
(24) A. Team Bank. It was very complicated how this
(25) land was handed over to -- between lenders and the RTC

### Page 175

(1) as I recall. But we were -- we were hired by Team Bank
(2) to complete the work on the creation of the district.
(3) Q. If you can just give me one moment.
(4) (Pausing)
(5) MR. HERREN: Ms. Collins, thank you very
(6) much. That's all the questions I have. Thank you.
(7) MR. HICKS: I'm just trying to get some
(8) clarity. Did we make that thing that had Exhibit D at
(9) the bottom an exhibit? Did we give it an exhibit
(10) number?
(11) MR. COLEMAN: 37.
(12) MR. HICKS: We did give it a number?
(13) Okay.
(14) EXAMINATION
(15) QUESTIONS BY MR. HICKS:
(16) Q. Ms. Collins, I'm Renea Hicks. I represent
(17) Travis County. I'm going to try to clarify a couple of
(18) things for a nonTexas MUD specialist or a nonMUD
(19) nonTexas specialist. The TCEQ route is not the only
(20) route for creation of a MUD; isn't that right?
(21) A. That's correct.
(22) Q. Can you just briefly describe what other route
(23) or routes there are in Texas law for creating a MUD?
(24) A. There are two possibilities for MUDs, and I'm
(25) going to assume that you mean municipal utility

### Page 176

(1) districts and not other types of districts.
(2) Q. That's a good assumption.
(3) A. The Texas Legislature by an individual act can
(4) also create a Municipal Utility District.
(5) Q. And that's happened in Travis County, correct?
(6) MR. COLEMAN: Mr. Hicks knows.
(7) THE WITNESS: Yes, it has.
(8) Q. (By Mr. Hicks) Lazy Nine MUD might be an
(9) example, correct?
(10) A. Yes, although I'm not very familiar with that
(11) other than by here --
(12) Q. By my loss in the case?
(13) A. I do not know that.
(14) MR. COLEMAN: Are you not familiar with
(15) that illegitimately created MUD?
(16) THE WITNESS: I believe it was upheld,
(17) was it not?
(18) MR. COLEMAN: I think it was.
(19) Q. (By Mr. Hicks) And do you have any reasonably
(20) educated sense of how many MUDs there are in Texas?
(21) More than a thousand?
(22) A. There are more than a thousand according to
(23) the commission itself, yes.
(24) Q. Can you come any closer than that in your
(25) understanding?

### Page 177

(1) A. I think the last number I saw was somewhere
(2) between 11- and 1200.
(3) Q. I want to go to the conveyance of the lots to
(4) the board members that weren't residents, not the
(5) details of it, but do you know, was the conveyance an
(6) arm's length transaction?
(7) A. Define that better for me.
(8) Q. Well, was it a fully bargained for -- to your
(9) knowledge, fully bargained for at fair market value
(10) transfer of interest?
(11) A. Not necessarily, no.
(12) Q. How would it happen?
(13) A. The developer would come up with pieces of
(14) property that were suitable for director lots, as we
(15) call them. They would be in areas that would not be
(16) immediately developed usually. The developer would
(17) determine a purchase price for those lots. The
(18) warranty deed would be drafted. There would be a note.
(19) The developer would determine what that purchase price
(20) was, and the note would be equal to the purchase price.
(21) So in a way, yes, it's arm's length in that it is an
(22) actual transaction. The land was not given to those
(23) people. They had the right to pay off the note if they
(24) wanted to and keep the land. But if they did not, they
(25) could simply give the land back to the developer in

### Page 178

(1) exchange for extinguishment of the note.
(2) Q. And that's what would happen when they would
(3) either resign or otherwise leave the board, correct?
(4) A. Generally speaking. Some of my districts
(5) would actually convey a platted developed lot to a
(6) director, and then the director at the time they got
(7) off the board could decide whether they want to pay off
(8) the note and keep the lot or give it back.
(9) Q. What about this MUD, though?
(10) A. This MUD I believe the directors were given
(11) the option to buy pieces of land that were really not
(12) developable, but I'm not sure.
(13) Q. How close is the MUD to the Travis
(14) County/Williamson County line?
(15) A. I don't --
(16) Q. Roughly.
(17) A. I don't know.
(18) MR. HICKS: I don't have any further
(19) questions.
(20) MR. COLEMAN: Are we done?
(21) MS. PERALES: Phone people?
(22) MR. KORBEL: This is George Korbel. I
(23) have a question.

Page 179

EXAMINATION
QUESTIONS BY MR. KORBEL:
Q. Ms. Collins?
A. Yes.
Q. Ms. Collins, this is George Korbel. I represent the intervenor -- defendant-intervenors Garcia. And all firms that I've ever been associated with as a lawyer charge a discounted fee for their better clients or clients that pay retainers. Is your firm like that?
A. No. However, we do have a slightly lower rate that we charge to our Utility District clients that we do not charge to our other clients.
Q. All right. What is that slightly lower rate?
A. In today's dollars?
Q. Well, let's start with today's dollars.
A. Okay. My billing rate for my nondistrict clients is $335 an hour. I charge most of my MUD clients, at least my older ones, $295 an hour.
Q. And would that generally -- those amounts -- well, how much did you charge back in -- when you were representing this MUD? Do you recall?
A. No.
MR. KORBEL: I've got no further questions. Thank you very much.

Page 180

THE WITNESS: You're welcome.
MS. PERALES: Is there anybody else on the phone?
MR. SPITAL: This is Sam. I don't have any questions. Thank you.
MR. BLUSTEIN: This is Ben. We don't have any questions. Thank you.
(DEPOSITION RECESSED)

Page 181

CHANGES AND CORRECTIONS
WITNESS NAME: SHARLENE N. COLLINS
DATE: MARCH 2, 2007
VOLUME 2
Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).
PAGE   LINE   CHANGE                    REASON CODE

Page 182

SIGNATURE

I, SHARLENE N. COLLINS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page.

_____
SHARLENE N. COLLINS

STATE OF _____
COUNTY OF _____

Before me, _____, on this day personally appears SHARLENE N. COLLINS, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2007.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

Page 183

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL
UTILITY DISTRICT NUMBER ONE
        Plaintiff
VS.                           Civil Action No.
                              1:06-CV-01384
ALBERTO GONZALES, in his      (PLF, DST, EGS)
official capacity as
Attorney General of the
United States
        Defendant

REPORTER'S CERTIFICATION
DEPOSITION OF SHARLENE N. COLLINS
MARCH 2, 2007
VOLUME 2

I, MARSHA EVANS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, SHARLENE N. COLLINS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature, and return to ACUSCRIBE COURT REPORTERS by _____

That the amount of time used by each party at the deposition is as follows:
    Ms. Nina Perales - 1 hour, 2 minutes
    Mr. Chris Herren - 23 minutes
    Mr. Max Renea Hicks - 5 minutes
    Mr. George Korbel - 2 minutes.

Page 184

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.
Certified to by me on _____.

MARSHA EVANS, TEXAS CSR 5100
Expiration Date: 12/31/07
Firm Registration No. 241
114 West 7th Street, Suite 750
Austin, Texas 78701
512-499-0277

(Pages 179 to 184)

**ACUSCRIBE COURT REPORTERS**
**(800) 497-0277**