Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN                )
MUNICIPAL UTILITY DISTRICT      )
NUMBER ONE,                     )
401 W. 15th Street              )        CIVIL ACTION NO.
Suite 850                       )
Austin, Texas 78701             )        1:06-CV-01384
              Plaintiff,        )        (DST,PLF,EGS)
                                )
v.                              )
                                )
ALBERTO GONZALES,               )
ATTORNEY GENERAL OF THE         )
UNITED STATES,                  )
U.S. Department of Justice      )
950 Pennsylvania Avenue NW      )
Washington, D.C. 20530          )


* * * * * * * * * * * * * * *
ORAL DEPOSITION OF
DANA DEBEAUVOIR
Monday, February 26, 2007
* * * * * * * * * * * * * * *

ORAL DEPOSITION OF DANA DEBEAUVOIR, produced as a

witness at the instance of the Plaintiff and duly

sworn, was taken in the above-styled and numbered cause

on the 26th day of February, 2007, from 9:26 a.m. to

11:35 a.m., before RANDALL N. FINCH, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine at the

offices of Weil, Gotshal & Manges, LLP, 8911 Capital of

Texas Highway, Suite 1350, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

Page 2

```
 1        APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
      Mr. Gregory S. Coleman
 4  WEIL, GOTSHAL & MANGES, LLP
      8911 Capital of Texas Highway
 5    Building One, Suite 1350
      Austin, Texas 78759 (512) 349-1937
 6                      (512) 527-0698 Fax
 7  FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
    FUND (MALDEF):
 8
      Ms. Nina Perales
 9    Attorney at Law
      110 Broadway, Suite 300
10    San Antonio, Texas 78205  (210) 224-5476
                         (210) 224-5382 Fax
11
12  FOR TEXAS RIO GRANDE LEGAL AID, INC.:
13    Mr. George Korbel
      Attorney at Law
      1111 N. Main Avenue
14    San Antonio, Texas 78212  (210) 212-3700
                         (210) 212-3772 Fax
15
    FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
16  DIVISION:
17    Mr. Chris Herren
      Attorney at Law
18    950 Pennsylvania Avenue, N.W., Room 7246
      Washington, D.C. 20530 (202) 305-0609
19                      (202) 327-3961 Fax
20  FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:
21    Mr. Benjamin Blustein
      Staff Attorney, Voting Rights Project
22    1401 New York Avenue, NW, Suite 1400
      Washington, D.C. 20005  (202) 662-8320
23                      (202) 628-2858 Fax
24
25
```

Page 3

```
 1    Mr. Daniel A. Zibel
      WILMER, CUTLER, PICKERING, HALE & DORR, LLP
 2    1875 Pennsylvania Ave., N.W.
      Washington, D.C. 80006 (202) 603-6053 663-6363 Fax
 3
 4  FOR THE LEWIS INTERVENORS:
 5    Mr. Samuel Spital
      HOLLAND & KNIGHT, LLP
 6    195 Broadway, 24th Floor
      New York, New York  10007-3189 (212) 513-3454
 7                      (212) 385-9010 Fax
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2  Appearances.......................  2
 3  Stipulations......................
 4
 5  DANA DeBEAUVOIR
 6    Examination by Mr. Coleman...............  6
 7    Further Examination by Ms. Perales....  57
 8    Further Examination by Mr. Spital......  76
 9    Further Examination by Mr. Korbel......  79
10    Further Examination by Mr. Herren......  83
11
12  Signature and Changes...........................  85
13  Reporter's Certificate..........................  87
14
15            EXHIBIT INDEX
16  PLAINTIFF'S EXHIBITS
17  1. Letter dated December 12, 2005 to David
       Escamilla from John Tanner with attachments....  19
18
    2. Letter dated May 5, 2004 to Chief, Voting
19     Section from Tamara Armstrong................  29
20  3. Letter dated May 13, 2004 to Chief, Voting
       Section from Tamara Armstrong................  33
21
    4. Letter dated July 9, 2004 to Tamara Armstrong,
22     Section from Joseph D. Rich..................  34
23  5. Agreement to Conduct Joint Elections for May 13,
       2006 Elections................................  36
24
    6. Letter dated May 10, 2004 to Kerrie Qualtrough
25     from John C. Hille, Jr.....................  39
```

Page 5

```
 1  PLAINTIFF'S EXHIBITS (Cont'd)
 2  7. Letter dated April 28, 2006 to Chief, Voting
       Section, from Julie Joe......................  40
 3
 4  8. Letter dated June 22, 2006 to Julie Joe from
       John Tanner...................................  43
 5  9. Fedex airbill from Julie Joe to U.S. Department
       of Justice...................................  43
 6
 7  10. Election Agreement Between Travis County and
        Northwest Austin Municipal Utility District 1..  49
 8  11. November 7, 2006 List of Bilingual Workers.....  54
 9
10
11
12
13
14
15
16      .
17
18
19
20
21
22
23
24
25
```

2  (Pages 2 to 5)

Page 6

1          DANA DEBEAUVOIR,
2 having been first duly sworn, testified as follows:
3          EXAMINATION
4 BY MR. COLEMAN:
5    Q.  Good morning.
6    A.  Good morning.
7    Q.  Greg Coleman.  Thank you for coming today.
8 May I assume you've had your deposition taken before?
9    A.  I have.
10    Q.  More times than --
11    A.  Not a lot, but occasionally.
12    Q.  Okay.  If you have any questions about how the
13 process works, you're free to ask counsel or me and
14 we'll make sure things are running.
15    A.  Thank you.
16    Q.  If you would, you've been designated to
17 testify for the county in this case.  Would you
18 basically describe for me your position with the county
19 and what your job duties entail?
20    A.  Yes.  I'm the countywide Travis County elected
21 clerk.  It is a four-year post.  I was just re-elected
22 at the November 2006 election and took office January 1
23 for a four-year term.  I'm starting my 21st year.
24          And county clerks in Texas do a variety
25 of jobs.  It's -- it varies from county to county.

Page 7

1 Basically, I'm the recorder.  I serve as the clerk of
2 the court for civil, criminal and probate, also for
3 commissioners' court, and I conduct elections, most
4 recently under contract with virtually all of the
5 jurisdictions in Travis County to do their elections
6 for them.
7    Q.  How many different governmental entities are
8 there inside the county, including municipal utility
9 districts, water districts --
10    A.  Mm-hmm.
11    Q.  -- school districts, cities, other --
12    A.  Mm-hmm.
13    Q.  -- types of entities?
14    A.  Let me answer your question this way:  I do
15 business with about a hundred and seven.  I think
16 that's everybody, but there might be a few others out
17 there.  So approximately a hundred and seven.
18    Q.  And of those hundred and seven, could you give
19 me a rough breakout of how many are city, town-type
20 entities, how many are school districts, how many are
21 utility districts?  Rough --
22    A.  Roughly.  There are approximately -- I hope I
23 have this right, approximately 38 cities, approximately
24 19 school districts.  Capital Metro.  ACC.
25          MR. HICKS:  You might say what ACC is.

Page 8

1          THE WITNESS:  Oh, I'm -- excuse me, the
2 Austin Community College.
3    Q.  (By Mr. Coleman)  Mm-hmm.
4    A.  And then the rest are what we would describe
5 as municipal utility districts, fire districts, just
6 other kinds of smaller entities.
7    Q.  Do fire districts have elections?
8    A.  Mm-hmm.
9          MR. HICKS:  Say yes or no.
10          THE WITNESS:  Yes, sir.
11    Q.  (By Mr. Coleman)  You've been asked to bring
12 some documents today and your counsel has a variety of
13 documents.  Have you had a chance to speak with your
14 counsel about those documents?
15    A.  We've gone over them, yes, sir.
16    Q.  Okay.
17          MR. COLEMAN:  Mr. Hicks, if I could ask
18 you to produce --
19          MR. HICKS:  Yes.
20          MR. COLEMAN:  -- the documents and --
21          MR. HICKS:  All right.  You want me to
22 kind of describe what -- the piles I'm giving you or
23 you want me to just slide them across the table to you?
24 You tell me.
25          MR. COLEMAN:  Maybe for the record why

Page 9

1 don't you give a very brief description.
2          MR. HICKS:  Okay.  I have what -- overall
3 what we tried to bring is every submission that Trav --
4 Section 5 submission that Travis County has done with
5 respect -- that involves something concerning the MUD
6 specifically.  It may be the -- the MUD piece may be a
7 teeny piece of the big submission, but we tried to
8 bring every one.  That includes the 2004 joint election
9 agreement with the MUD, the 2006 joint election
10 agreement with the MUD.
11          So I'll give you the 2006 pile, I'll call
12 it, that includes every submission, every no objection
13 letter and some of the attachments that came with it,
14 along with a copy of the actual agreement.  Same thing
15 for 2004.
16          We brought a 2005 submission that
17 embraces the 330 -- Precincts 333/343 split.  Because
18 some questions had come in from Ms. Perales, we brought
19 a list of the bilingual workers by precinct for the
20 November general election.
21          Then we also brought some material -- I
22 don't have extra copies of these.  These are
23 essentially advisories or kind of rah-rah statements, I
24 guess you could call it that -- from the county clerk
25 to election -- presiding judges, elections.  This is a

3  (Pages 6 to 9)

Page 10

1  two-page document; I do have an extra copy of that.
2  And some training materials and call center standard
3  operating procedures that are used by the clerk to give
4  instruction to people that are going to be at the polls
5  and at the call centers. I don't have extra copies of
6  these three documents.
7       MR. COLEMAN: Okay. Well, maybe we'll
8  look at them and if we decide we want to put them in
9  the record, we'll make some arrangement --
10      MR. HICKS: Right.
11      MR. COLEMAN: -- to copy them and inject
12  them later.
13      THE WITNESS: And then, Counselor, I can
14  give you copies of them.
15      MR. HICKS: Okay. And then for other
16  counsel to know, I have one extra copy of essentially
17  all those things except the things that I identified
18  that I don't have an extra copy of, and we can get
19  copies for y'all afterwards, too.
20      MR. COLEMAN: Okay.
21      THE WITNESS: Greg, can I interrupt you
22  for a second --
23      MR. COLEMAN: Of course.
24      THE WITNESS: -- just to grab a bottle of
25  water?

Page 11

1       MR. COLEMAN: Of course.
2       THE WITNESS: One second.
3       (Discussion off the record)
4    Q. (By Mr. Coleman) Ms. DeBeauvoir, let me ask
5  you about some of the Section 5 preclearance materials
6  that you produced. It appears from the first page of
7  the documents that these are submitted by the county
8  attorney. Can you briefly describe for me what your
9  office or what you personally might do in connection
10  with these submissions?
11    A. Mm-hmm. We serve as a coordinator between the
12  voter registration office and what the county attorney
13  is going to need to meet the preclearance requirements.
14  So in an administrative capacity I gather information
15  from the voter registrar, match it up with the -- not
16  only the -- the names -- or excuse me, the precinct
17  number, but also the name of the polling place, the
18  address. We put all of that together, identifying
19  which ones are brand-new, never been used before, which
20  ones represent changes and which ones are -- have been
21  in use from the last similar election. And we put all
22  that information together, send it to the county
23  attorney's office.
24       If they need additional information,
25  names of election judges, whether there's any other

Page 12

1  requirements that we need to meet concerning Americans
2  with Disabilities Act or Spanish language assistance,
3  we provide all of that to them, too.
4    Q. Do you personally or does somebody in your
5  office review drafts of preclearance submissions before
6  they're sent or do you mostly provide information to
7  the attorney's office?
8    A. I do -- I take the liberty of -- of having a
9  final review that my staff does, but it is so
10  administrative and so rote by now, it's a fairly quick
11  process.
12    Q. What is the purpose of that review? Are you
13  looking for factual errors? Are you looking -- are you
14  testing it for legal -- if you think it meets the legal
15  standards of Section 5? What -- what is it that --
16  that your office does when you look at it?
17    A. My role is to provide correct information and
18  explanations. Why did we move a particular polling
19  place from a school to a church or vice versa? We
20  provide those kinds of explanations. It could have
21  been something like the -- the building refused to
22  house us because of the date of the election. It could
23  be construction. It could be fire, rain. I mean,
24  there could be any number of reasons we provide the
25  explanation.

Page 13

1    Q. Okay. Have you been personally involved in
2  the contracts with these various other political
3  entities within the county for -- for the joint
4  elections?
5    A. Yes, many of them. Not all of them, but many
6  of them I'm -- I'm involved. I -- I helped write the
7  first drafts of the agreements and I go over any
8  changes. Because what my office -- or the philosophy
9  of my office is that we try to do an election the way
10  my client wants it, so sometimes I have to make
11  judgments about can I do this within resources? That's
12  my level of involvement.
13    Q. Were you personally involved in the contracts
14  that have been entered with the Northwest Austin MUD
15  No. 1?
16    A. It is a -- not specifically with MUD, but it
17  is a standard contract that I reviewed, so I'm
18  certainly aware of the provisions they would have been
19  operating under with me. But, no, I didn't know
20  anything specific about this MUD until this.
21    Q. Okay. When you say "this," you're talking
22  about the --
23    A. This -- yes, our conversation today.
24    Q. Okay. Let me follow up on that. Do you have
25  any personal experience with the MUD, the district,

4  (Pages 10 to 13)

Page 14

1   with respect to its elections generally before the
2   contract?
3       A.  Uh-uh.
4       Q.  No?
5       A.  Absolutely not before the contract, and -- and
6   very minimally since.
7       Q.  And when you say very minimally, can you tell
8   me what the extent of that would have been?
9       A.  I would have been overseeing my staff member
10  who would have been gathering information to make
11  the -- the processing of pulling all that information
12  together for commissioners' court for signing of -- of
13  the contracts.  So I would have been observing my staff
14  member, making sure she'd gone through the checklist,
15  do we have everybody covered?  Do we have all of our
16  signatures back in?  That sort of work.
17      Q.  Okay.  Outside or separate from the context of
18  these particular contracts that we have been speaking
19  generally about, do you understand -- or what can you
20  tell me about your understanding of the relationship
21  between the county and the district as a whole?
22      A.  Yes.  I'm -- I'm not quite sure how to answer
23  the question.  Let's try this:  I've -- I feel it's my
24  duty as the Travis County clerk to provide as much
25  support as I can to this particular MUD as well as all

Page 15

1   of my other clients.
2           I -- we -- we have budgetary arrangements
3   and con -- and -- and the physical logistics that have
4   to be worked out in order to conduct elections, and
5   those tasks vary from election to election.  The kinds
6   of differences that -- that would affect the MUD are
7   whether or not they would be joining onto a November
8   election, which is not very likely, or am I helping
9   them participate in a May or spring election, and then
10  is the county involved in that spring or is it a
11  stand-alone municipal kind of election.
12          Those are the -- the understandings I
13  have.  And -- and there are a couple of different ways
14  under the election code that we can structure those
15  arrangements.  I believe it's the -- I think the
16  election code is the 31 and I think 272.  I think I
17  have those correct.  Basically, they -- they are
18  provisions that allow, if the county is not a party to
19  the election, to still conduct the election and provide
20  for services including joint polling places.
21          If the county is involved in the
22  election, then the -- there are cost considerations for
23  the smaller jurisdictions where they basically get to
24  tag along for free.
25      Q.  Okay.

Page 16

1       A.  Does that help?
2       Q.  Yes, it does.  Most of what you've described
3   is -- or everything you've just described just now is
4   really election related.  Do you have an understanding
5   of, you know, outside these elections, what
6   relationship the county has with the district?
7       A.  No.  Afraid not.  With apologies to the MUD,
8   I'm not up on it.
9       Q.  Other than the joint elections, do you know of
10  services that the county provides to the district?
11      A.  I would think no.  And I'm -- I'm aware that
12  there are contractual arrangements with commissioners'
13  court, but I don't think I could speak to what they are
14  or how they work.
15      Q.  Are you saying that you believe that there
16  are -- that the district has other contracts with the
17  county?
18      A.  They may very well.  But it depends on if its
19  purposes are water supply, water treatment, is there a
20  go-between between commissioners' court and TCEQ?
21  Those kinds of relationships I'm vague about.
22      Q.  I just want to make sure I was clear.  Are you
23  saying that something like that might exist or are you
24  saying that you believe that something like that
25  actually does exist?

Page 17

1       A.  No, sir, I'm saying it might exist and that I
2   wouldn't be aware of those details.
3       Q.  And to make sure the record is clear, you're
4   not aware of any such relationship?
5       A.  Not specifically.
6       Q.  Are you generally aware that something like
7   that does exist or are you saying that in your
8   experience there are others where that might exist, but
9   you don't have any knowledge that there's a -- any
10  other relationship between the county and this
11  particular district?
12      A.  That's a good summation, yes.  Thank you.
13      Q.  And in discussing this relationship between
14  the county and the district, are you aware of any
15  subject matter area in which the county, through the
16  commissioners' court or otherwise, can say, "Let it be
17  done," and then the district is then legally obligated
18  or is subservient to the county and must do it?
19      A.  I don't think so.  I don't think I understand
20  any of that.
21      Q.  You don't understand the question or you don't
22  believe there's --
23      A.  I don't understand the relationship.  I don't
24  know if there is anything like that.
25      Q.  But you're not aware of anything like that?

5  (Pages 14 to 17)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 18

1    A.  No, sir.
2    Q.  With respect to the elections themselves, the
3  contracts between the county and the district, what are
4  we -- what are they called, an election services
5  contract?
6    A.  Yes.  Election services contract.
7    Q.  And is the reason for that because the county
8  is contractually providing a service to the district in
9  performing the election?
10    A.  Certain specific duties related to the
11  election, yes.
12    Q.  And while they are held jointly, the election
13  itself is the district's.  Correct?
14    A.  Ultimate responsibility, yes.
15    Q.  And certain tasks or responsibilities are
16  delegated from the district to the county for purposes
17  of conducting the election.
18    A.  Yes.
19    Q.  You have today produced some Section 5
20  preclearance submissions from 2004, 2005 and 2006.
21  These represent changes made by the county that may or
22  may not affect the district itself?  Do you know?
23    A.  I don't know.  I'm assuming that's a fair
24  statement.
25    Q.  Let's -- let's mark the 2005 one.  Do we want

Page 19

1  to continue with the same numbers or just start over?
2        MS. PERALES:  I think we should continue.
3        MR. COLEMAN:  Does anybody happen to
4  remember the last number?  Do you want to -- just to
5  pick like 30 and have a gap or do we --
6        MS. PERALES:  You can start with your
7  own, whatever is your preference.
8        MR. BLUSTEIN:  Want to use the letters or
9  use the --
10        MR. COLEMAN:  Yeah, I'm not a big fan of
11  letters.  I'll just call it PX-1 and we'll...
12        MR. HICKS:  What number are you using?
13        MR. COLEMAN:  We're going to say PX-1, if
14  that's all right.
15        (Plaintiff's Exhibit No. 1 marked)
16    Q.  (By Mr. Coleman) Ms. DeBeauvoir, we -- while
17  I was marking this, you've had an opportunity to -- to
18  visit a little bit with counsel.  I'm not going to ask
19  you the nature of that conversation, but is there
20  anything in any of your answers that you have given to
21  this point that you want to change or clarify?
22    A.  No, sir.  I'm correct so far.
23    Q.  Okay.  I'm going to hand you what has been
24  marked as Plaintiff's Exhibit No. 1.
25    A.  Okay.

Page 20

1    Q.  Can you identify that as a -- well, the first
2  page is what, a --
3    A.  Cover letter from my attorney, David
4  Escamilla, county attorney.  Let's see, to John Tanner
5  of the -- well, I'm sorry.  The -- I'm saying it the
6  reverse way.  John Tanner, the chief of the voting
7  rights section, has sent a cover letter to my attorney,
8  David Escamilla, county attorney.
9    Q.  Is that a letter approving a preclearance
10  submission?
11    A.  Let's see.  I have on my other glasses today.
12  "We received your submission.  Does not interpose any
13  objections."  It looks like it's a perfectly fine
14  acceptance.
15    Q.  Let me then ask you to turn to the pages that
16  follow.  Is that -- to your knowledge is that the
17  actual submission that is being approved?
18    A.  Mm-hmm.  Yes, this is what we did.  Yes, sir.
19  Looks like.
20    Q.  And there are a variety of changes in there.
21  I believe your counsel represented to me that one of
22  the changes that's there involves some precinct
23  boundaries that changed, including precincts 333 and
24  343.  Does that appear to be accurate to you?
25    A.  Yes, it does appear to be accurate.

Page 21

1    Q.  And that was precleared?
2    A.  Mm-hmm.  Yes, it was.
3        MR. HERREN:  Do you have the date of the
4  preclearance letter?
5    Q.  (By Mr. Coleman)  I'm sorry.  If we could,
6  could you tell the -- into the record the date of the
7  preclearance letter that you -- the second page?
8    A.  The second page.  The preclearance letter was
9  submitted October 10th, 2005.
10    Q.  And the date of the letter approving it?
11    A.  Acceptance letter was December 12th, 2005.
12    Q.  During your time as county clerk, can you
13  guesstimate for me the number of preclearance
14  submissions to the Department of Justice that you
15  have -- that have -- you have seen or gone through your
16  office?
17    A.  How many in 20 years?
18    Q.  (Nods head)
19    A.  Every election.  Let me think here for a
20  second.  Probably in the neighborhood of 70 to a
21  hundred.
22    Q.  Okay.  Is it fairly standard for the
23  Department of Justice to approve those?
24    A.  Fairly standard.
25    Q.  How many of the 70 to a hundred that you have

6  (Pages 18 to 21)

Page 22

1  seen, how many of those has the Department of Justice
2  interposed an objection on?
3      A.  None that I know of.
4      Q.  They sometimes call for some additional
5  information?
6      A.  Sometimes they do.
7      Q.  But to your knowledge they have never actually
8  objected to any?
9      A.  Never.
10     Q.  With respect to these contracts that -- that
11 the district has entered into with the county, those
12 contracts involve the actual performance of the
13 election, the going to the poll and the ballot,
14 taking -- the presentation of ballots and counting of
15 the ballots themselves.  Is that correct?
16     A.  Correct.
17     Q.  Would you agree with me that that is -- while
18 certainly a very important part of an election, is
19 not -- it is a limited number of responsibilities that
20 relate to the district's elections?  Would you agree
21 with me on that?
22     A.  I would agree with that.
23     Q.  Do you happen to know, for instance, what the
24 term of years for district board members is?
25     A.  No, I don't.

Page 23

1      Q.  In performing the county's election
2  responsibilities under these contracts, is it necessary
3  for the county to know that?
4      A.  I have not found it necessary to know that.
5      Q.  Based on your knowledge of preclearance
6  procedures and your experience over many, many years of
7  doing this, if the district decided to change some
8  aspects of the way it does its elections, those would
9  probably need to be precleared, would you say?
10     A.  Depending on what you're talking about, but I
11 would assume every -- any -- every change needs to be
12 precleared.
13     Q.  And you might or might not even know about
14 that at the county.
15     A.  Correct.
16     Q.  Would you at the county -- you have contracts
17 with many of these different entities within the
18 county.  If those entities in general make changes that
19 don't involve the county's contract with that entity,
20 those entities may or may not submit a preclearance
21 submission to the Department of Justice.  Would you --
22 first of all, unless it involves the things the county
23 is doing, would -- you agree you wouldn't necessarily
24 know whether that entity had made changes to its
25 election procedures?

Page 24

1      A.  I would not necessarily know.
2      Q.  And same question, would you know whether they
3  had or had not submitted for preclearance?
4      A.  No, I would not know.
5      Q.  Do you have a way in your office or elsewhere
6  in the county for -- for gathering that information?
7      A.  May I consult with counsel for a second?  Am I
8  allowed to do that?
9      Q.  No, but I'll allow you.
10     A.  That's sweet of you.  I could bore you with so
11 much information.  Trust me, this may be better for
12 you.
13         MR. HICKS:  She is trying to -- she is
14 basically asking me, "How much do I bore him with?"
15         MR. COLEMAN:  I'm taking your word for
16 that.
17         (Discussion off the record)
18         THE WITNESS:  Okay.  The distinction I'm
19 trying to make here is that before the implementation
20 of HAVA, which would have gone into effect January 1,
21 2006, and we worked prior to that to get ready for that
22 deadline, prior to that law passing I would have had
23 virtually no contact or relationship with any of the --
24 especially the smaller jurisdictions.  Since then, that
25 relationship has changed dramatically and is still

Page 25

1  forming.  We're still trying to figure out what's the
2  best way to gather everybody together and operate
3  efficient election.
4      Q.  (By Mr. Coleman)  And can you describe what
5  that requires and what changes are being made?  Again
6  briefly, if you can.
7      A.  Yes, I can.  What -- HAVA -- HAVA has three
8  sections to it and the main sections that apply to the
9  conduct of county elections have to do with providing
10 Americans with disabilities assistance at every single
11 polling place.  The only way in the marketplace right
12 now that you can make sure that anybody with a visual
13 or mobility impairment can vote a private and
14 independent ballot is through electronic voting.
15         Electronic voting is very expensive.  The
16 county purchased all of that equipment using county
17 taxpayer dollars.  So the -- the attitude that we took
18 was that equipment is -- is part of the agreement of
19 the entire county citizenship and that those smaller
20 entities need help in complying with HAVA, with the ADA
21 requirements especially, and that it's really not fair
22 to expect them to go off on their own, buy their own
23 equipment, manage the security of it and do all of the
24 details associated with complying with HAVA.  And that
25 would include many things, training components.  The

7  (Pages 22 to 25)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 26

1  ADA components are much broader than they used to be,
2  and then there's Spanish language components as well.
3     Q.  Okay. Good. So in connection with HAVA, the
4  county can have a somewhat more direct relationship
5  with these smaller entities in complying with those
6  particular requirements. Is that a basic summary?
7     A.  Yes. I volunteered services to all of those
8  jurisdictions to -- to help them. I am not required to
9  do so as the elected county clerk, but it was the right
10 thing to do.
11    Q.  In connection with, you know, my earlier
12 question, for instance, about the length of term of
13 office or something like that --
14    A.  Mm-hmm.
15    Q.  -- you wouldn't --
16    A.  You know, I -- my guess is, if I remember my
17 Civics 101, that those terms of office are three years.
18 But I do not know for sure.
19    Q.  Okay. And that -- HAVA wouldn't impact that
20 type of information, whether you have --
21    A.  No, it would not. So did I guess right? No?
22    Q.  We are -- we're all better educated now.
23    A.  It's a four-year term. Okay? Just like mine.
24    Q.  The county through its attorneys has asserted
25 in this lawsuit that the district is not eligible for

Page 27

1  what we call a bailout. Let me ask you a couple of
2  questions about that. And again, do you understand
3  what a bailout is?
4     A.  I do understand the provisions of the bailout
5  chapter and that they're pretty -- pretty heavy
6  requirements. But -- and that's about all I know about
7  the specifics.
8     Q.  Do you generally understand what the
9  requirements are or just that they're fairly strict?
10    A.  I think I could probably give you a little
11 more detail. They -- the understanding I have of it is
12 that a jurisdiction has to demonstrate that they've had
13 no errors of any kind for some period; I believe it's
14 10 years. They have to have had no complaints filed
15 against them and -- now I'm -- now I'm reaching the end
16 of what I really know specifically.
17    Q.  You understand that it's a voluntary decision
18 whether an entity seeks bailout or not?
19    A.  I think that, yes.
20    Q.  Do you have an opinion -- separate from
21 whether they may or may not choose to exercise it, do
22 you have an opinion -- if the county decided today to
23 seek a bailout, do you believe that the county would be
24 eligible for that?
25    MR. HICKS: I object to the question to

Page 28

1  the extent it calls for a legal conclusion from
2  Ms. DeBeauvoir, since she's not a lawyer, especially.
3     MR. COLEMAN: Since -- I'm sorry --
4     MR. HICKS: She's not a lawyer.
5     MR. COLEMAN: Okay.
6     Q.  (By Mr. Coleman) Do you -- do you know
7  whether the county itself has had lawsuits against it
8  during the past 10 years, election related?
9     A.  Yes, we have.
10    Q.  Can you describe those for me?
11    A.  Several different categories. We had election
12 contests where the candidates or the parties or the
13 issues took issue with the final tally. We've had one
14 lawsuit that was -- they were denied a temporary
15 injunction and then the lawsuit was continued for the
16 near future, that is from the NAACP that talks about
17 whether or not the electronic voting system that is ADA
18 compliant should have an additional paper trail
19 associated with it.
20    Gosh. I've been -- I've also been
21 involved in -- in election law being written by case
22 precedent. Like, for example, with Moore versus Muir
23 case, where residency became an issue. So we went
24 through that lawsuit. There are quite a few.
25    Q.  And the Moore v. Muir is within the past 10

Page 29

1  years?
2     A.  Right at 10 years. I think. Might be --
3  might be outside 10 years.
4     (Plaintiff's Exhibit No. 2 marked)
5     Q.  Ms. DeBeauvoir, I'm going to hand you what
6  I've marked as Plaintiff's Exhibit 2. Can you identify
7  that as a preclearance submission from the county dated
8  May 5th, 2004?
9     A.  Submission for the -- yes, it is. For the May
10 election. Okay. Mm-hmm. Mm-hmm.
11    Q.  Can you identify for me very basically what
12 changes were being asked to be precleared in that
13 document.
14    A.  We had a brand-new organization that was added
15 in this particular May election and that was the
16 hospital district. Village of Volente had gone through
17 a split and so there were some changes that had to be
18 clarified for that particular part of the election.
19 For -- for the AISD elections we would have had to
20 indicate which seats were up this time versus last
21 time. So that kind of change is -- I'm sure it's
22 spelled out in here. It would have clarified who would
23 be the authority making the changes, whether or not
24 they were based on redistricting or some other reason.
25    Q.  Is there anything in there that you see that

8  (Pages 26 to 29)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 30

1  is specific to the district?
2      A.  Well, I haven't -- okay.  I would have said
3  early voting locations.  Let's see.  Election of a
4  director for the Northwest Austin utility -- Municipal
5  Utility District No. 1 and the -- okay.  Counsel for
6  Volente.  So this would have been their -- their
7  direct -- board of directors election.
8      Q.  Okay.  And can you tell me what page that's
9  on?
10     A.  Page 2.
11     Q.  All right.  Is there anything else in that
12 preclearance that would be specific to the district?
13     A.  You mean besides the joint agreement that they
14 would enter into which would be cited here?  Okay,
15 that's what I meant.  Beside -- okay.  We --
16     Q.  Yes.
17     A.  The joint election agreement that we would
18 have entered into.
19     Q.  Right.  And there might be other things in
20 there that affect -- and by specific versus general,
21 what I mean is the county might make some changes that
22 essentially affect everybody all together at the same
23 time, and then there would be these types of provisions
24 that affect the district specifically.
25     A.  Yes.

Page 31

1      Q.  Okay.  Is there anything else that you see in
2  Plaintiff's Exhibit 2 that is specific to the district?
3         MR. HICKS:  Can I just ask a question
4  here?  To be sure, I suppose she would have to read
5  through it very carefully --
6         THE WITNESS:  Mm-hmm.
7         MR. HICKS:  -- to make sure.  Do you want
8  her to do that before she answers?
9         MR. COLEMAN:  Yeah, I'm not trying to
10 trick you in here.  I'm just trying to make a record.
11        MR. HICKS:  I know.  I know.
12        MR. COLEMAN:  So if you would like to
13 help her and make things faster, that would be -- I'm
14 more than --
15        MR. HICKS:  I don't know that I'm much
16 help.
17        THE WITNESS:  Well, the only thing I was
18 going to say would be the early -- early and mobile
19 voting program.  That's at the bottom of page 4.
20     Q.  (By Mr. Coleman)  Okay.
21     A.  We would have structured that specifically for
22 that election.
23     Q.  Okay.
24     A.  And what we try to do is provide, between our
25 early voting program, which we call permanent even

Page 32

1  though the law refers to them as temporary, and the
2  mobile voting program, we would have made sure our
3  clients had at least one visit in their territory, so
4  that would change depending on who was participating in
5  the election.  That's on page 4.
6      Q.  Now, is that one that would affect everybody
7  all together?
8      A.  It will -- as a general group, it would have,
9  but --
10     Q.  Okay.
11     A.  But they're -- they're mentioned specifically
12 for this.
13     Q.  Okay.
14     A.  Let me think.  I don't think of anything in
15 particular.  Uh-uh.  This is all standard stuff.  Oh, I
16 guess the only other thing, once again it's still
17 general to everybody, but I would have been designated
18 the -- by mail, early voting clerk, too.  So any mail
19 that the jurisdiction got for people who were trying to
20 vote, either under the provisions of over 65 or
21 disabled or out of the county, I would be specifically
22 handling those for the jurisdiction, too.  And that
23 would really be a part of the standard language for the
24 election services agreement.  I cannot think of
25 anything else or see anything else in here.

Page 33

1         (Plaintiff's Exhibit No. 3 marked)
2      Q.  Okay.  I'm going to hand you what I've marked
3  as Plaintiff's --
4      A.  Custodian.  I'm sorry.
5      Q.  Excuse me.
6      A.  I'm sorry.  Custodian.  Okay.  Sorry.
7      Q.  I'm going to hand you what's been marked as
8  Plaintiff's Exhibit 3.  This is another preclearance
9  letter dated May 13th, 2004?
10     A.  Mm-hmm.
11     Q.  So this is really just a week or so later.
12     A.  Mm-hmm.  And do you want me to identify what
13 would specifically apply to the MUD?
14     Q.  First, if you will confirm for me that that's
15 what that is.
16     A.  From us to -- yes, it is.  It's our submission
17 pursuant to Section 5, indeed.
18     Q.  And again, same question:  Anything that is
19 specific to the district versus generally affecting
20 everybody?
21     A.  I'm not sure this one has anything specific to
22 the district.  I don't -- I think they were pretty much
23 carried over from their last election, so there were no
24 changes.  I can read through this and tell you for
25 certain, but...  Let's see, the county and the MUD,

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 34

1  Village of Volente. We would have already covered all
2  of their changes in the previous submission, so I don't
3  think there's anything in here.
4      Q.  Okay.
5      A.  Did I leave out -- okay.
6          (Plaintiff's Exhibit No. 4 marked)
7      Q.  I am going to hand you what I marked as
8  Plaintiff's Exhibit 4. This appears to be a letter
9  from the Department of Justice dated July --
10     A.  9th, 2004.
11     Q.  A little further down in that letter it -- it
12 says that they received submissions, I believe it says
13 on May 10th and 14th. Would that be a reference to the
14 two --
15     A.  To these two documents on -- yes.
16     Q.  And --
17     A.  Uh-huh, to the doc -- to the exhibits PX --
18 Plaintiff's 2 and Plaintiff's 3.
19     Q.  And does Plaintiff's 4 interpose no objection
20 to those exhibits?
21     A.  In Plaintiff's 4 it says that the attorney
22 general does not interpose any objections.
23     Q.  Okay. The contract that the district entered
24 into with the county in 2004, do you happen to recall
25 how long that contract would last? Do you have any

Page 35

1  recollection of that?
2      A.  Oh, I --
3          MR. HICKS: Do you have a copy of the --
4          MR. COLEMAN: Yeah, I think I do.
5          MR. HICKS: -- exhibit that has the
6  contract?
7          THE WITNESS: Some of the jurisdictions
8  signed more long-term agreements with me and some only
9  signed a one-year. I'm not sure which category they
10 fall in.
11     Q.  (By Mr. Coleman) Do you -- was there a reason
12 some only signed a shorter one versus a longer one?
13     A.  I can speculate.
14         MR. HICKS: Don't.
15         THE WITNESS: Don't?
16         MR. HICKS: Objection; no speculation.
17         THE WITNESS: I don't know.
18     Q.  (By Mr. Coleman) That -- that didn't come
19 from your office. Or did it?
20     A.  No, that was their choice.
21     Q.  Their choice?
22     A.  The jurisdictions had a choice.
23     Q.  And is there a difference -- for instance,
24 if -- if a small city enters into a contract with the
25 county that is a multi-year contract, do you also have

Page 36

1  them sign a separate agreement at every election?
2      A.  Yes.
3      Q.  Is there a separate agreement?
4      A.  Yes.
5      Q.  Tell me why you do that.
6      A.  Well, because what we do is what I would refer
7  to as a checklist of the kinds of things that either --
8  either a political party or a jurisdiction might ask me
9  to specifically do for each election.
10         For example, they may want me to go out
11 and -- and find a partner for them to share in the cost
12 of an early voting location that would be
13 representative of the territory of the two contiguous
14 districts. So they would be asking me to -- say, "Can
15 you go out and find somebody next door to us? Maybe we
16 can share the cost for an early voting or mobile
17 polling place." They may ask me to -- they may say,
18 "We want to do our own recruiting of our polling place
19 people. We will agree to send them to your training
20 class, but we want to recruit them themselves." Or
21 they could have the choice where we would recruit folks
22 for them. They have options like that. And the
23 options vary from election to election.
24         (Plaintiff's Exhibit No. 5 marked)
25     Q.  I'm going to hand you what I've marked as

Page 37

1  Exhibit 5. This appears to be an agreement to conduct
2  joint elections for May 13th, 2006 elections.
3      A.  Mm-hmm.
4      Q.  Would this be a copy of the one for the
5  elections last year?
6      A.  It appears to me to be our standard agreement.
7  Mm-hmm. Mm-hmm. Yes.
8      Q.  And for these kinds of contracts, do you ask
9  these various cities, school districts, municipal
10 utility districts and others to essentially all sign on
11 to that one agreement?
12     A.  Yes, I ask everybody to -- and it -- under the
13 election code it gets even a little bit more
14 complicated than that because the signatures are really
15 all amongst the participating parties as well as the
16 county.
17     Q.  Okay. And do you -- can you confirm that
18 Northwest Austin MUD No. 1 signed on to that one?
19     A.  Let me see. Page -- a ways back. MUD.
20 Northwest MUD, yes. There it is.
21     Q.  Your counsel is now searching for the actual
22 signature.
23     A.  Okay.
24     Q.  But you would expect it to be back there.
25 Right?

10 (Pages 34 to 37)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 38

1    A.  I would expect a signature from them, yes.
2    Q.  Okay.  Can you very briefly describe for me
3  what the maps at the back are?  Is that part of the
4  agreement?  Are those exhibits to the agreement?
5    A.  They are.  They establish the boundary lines
6  so that I will know exactly whether a polling place is
7  within or without a, you know, particular jurisdiction
8  so that I can look at not only serving that individual
9  jurisdiction but also relationships to next-door
10  neighbors.
11    Q.  Okay.
12    A.  Those lines are not drawn by the county clerk.
13  Did you find it?
14    Q.  Can you just state for me what page that's on?
15    A.  It is page 12 and the signature is -- it is
16  from the Northwest Austin MUD No. 1. Mr. Zimmerman.
17    Q.  Okay.
18    MR. HICKS:  Page 12, just for
19  clarification of the record, isn't going to help you
20  much because all of the signature lines are on page 12.
21    MR. COLEMAN:  They're all -- okay.  Let
22  me just briefly ask, because these documents don't have
23  any Bates numbering, would -- I don't know if the
24  county would like to or if you would like us to, but
25  just get a service that would take these particular

Page 39

1  exhibits and strip them out on -- produce something
2  with Bates on it for future reference?
3    MR. HICKS:  I think that's a good idea.
4    MS. PERALES:  That would be great.
5    MR. COLEMAN:  Do you want to do it?
6  Would you like us to do it?
7    MR. HICKS:  I'll be happy for you to do
8  it.
9    MR. COLEMAN:  All right.
10    MS. PERALES:  And it would just continue
11  from the numbers we already have.  Right?
12    MR. COLEMAN:  Sure.
13    MR. HERREN:  Greg, do you have signed
14  copies of all the agreements for the 2004 to 2006?  Do
15  you have signed copies of all the agreements?
16    MR. COLEMAN:  I have agreement -- the
17  agreements that I think we entered, some of the
18  counties' preclearance submissions.  I don't have
19  copies of those other ones.
20    THE WITNESS:  (Cell phone rings) Let me
21  turn this off.  I apologize.  Whoever that was, poor
22  person, it was probably the emergency that's happening
23  back at the office.
24    (Plaintiff's Exhibit No. 6 marked)
25    THE WITNESS:  (Cell phone rings) This is

Page 40

1  Dana.
2    MR. HICKS:  May we go off the record for
3  a minute?
4    (Discussion off the record)
5    Q.  (By Mr. Coleman) Ms. DeBeauvoir, I'm going
6  to hand you what I've marked as Plaintiff's Exhibit 6.
7  This is a letter from Ms. Qualtrough -- or to
8  Ms. Qualtrough?
9    A.  To her from John Hille.
10    Q.  Okay.  And that encloses --
11    A.  Final executed original of the agreement to
12  conduct, yes.  Between Travis County, me and the MUD.
13  Mm-hmm.
14    Q.  Okay.
15    A.  Voted in commissioners' court.
16    Q.  And that would look to be a correct copy of --
17    A.  This -- this is standard.  Mm-hmm.
18    (Plaintiff's Exhibit No. 7 marked)
19    Q.  I'm also going to hand you what has been
20  marked as Exhibit 7.  Is this all one thing?  That
21  April 28th, 2006?
22    MR. HICKS:  Depends -- depends on what
23  you mean by all one thing.
24    MR. COLEMAN:  Are these all attachments?
25    MR. HICKS:  I suppose everything is all

Page 41

1  one thing, but --
2    MR. COLEMAN:  Are these all attachments
3  to that preclearance submission?
4    MR. HICKS:  No, things are interspersed.
5  There's the submission of April 28, and you'll see
6  right after that there's no objection letter.  Then
7  you'll see a supplemental submission of June 16th. So
8  it has three pieces -- three things in it, I think --
9  guess I'll assume.
10    Q.  (By Mr. Coleman) All right.  Ms. DeBeauvoir,
11  I'm going to hand you what I've marked as Exhibit 7.
12  It is a April 28th, 2006 submission to the Department
13  of Justice.
14    A.  April 28th, 2006, our submission regarding
15  voting and early voting for the May election.  May
16  2006, yes.
17    Q.  Is there anything in there that is specific to
18  the district?
19    A.  Mm-hmm.  Let's see if we can find it.
20  Northwest utility -- well, they're -- they're listed
21  specifically as a client.  All of the part -- those
22  participating in -- in entities.  Our changes are -- we
23  made some changes to the temporary branch early --
24  which would have been our permanent early voting
25  locations.  And looking here to see if it involved the

11  (Pages 38 to 41)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 42

1  MUD specifically, because that was an ACC thing. May
2  not have involved the MUD specifically. You know, I'm
3  not sure there is anything here specific to them.
4      Q.  Okay.
5          MR. COLEMAN: Renea, the next piece of it
6  is the supplemental from June?
7          MR. HICKS: June 16th.
8          MR. COLEMAN: Now, are these attachments
9  to that or --
10         MR. HICKS: That's my understanding.
11 It's what I was given.
12         MR. COLEMAN: So the whole -- the rest of
13 this is all attachments to June?
14         MR. HICKS: My understanding is there's
15 the April 28th submission without the attachments.
16         MR. COLEMAN: Okay.
17         MR. HICKS: The June 16th submission with
18 attachments, and the June 22nd, no objection letter.
19 That would have been in that pile, as I understand --
20         THE WITNESS: Would you pass me a
21 paperclip, please?
22         MR. COLEMAN: Of course.
23         THE WITNESS: Thank you. All right.
24         MR. COLEMAN: And at the end of that --
25         MR. HICKS: Which one?

Page 43

1          MR. COLEMAN: Tell you what, may I -- may
2  I see that?
3          THE WITNESS: Sure.
4          MR. COLEMAN: That's Exhibit 7.
5          MR. HICKS: What did you do, tear off two
6  pages -- the back two pages?
7          MR. COLEMAN: I removed the June 22nd
8  letter.
9          (Plaintiff's Exhibit Nos. 8 and 9 were
10             marked)
11     Q.  (By Mr. Coleman) I'm now going to hand you
12 Plaintiff's Exhibit 9.
13         MR. HICKS: Did you skip eight on
14 purpose?
15         MR. COLEMAN: I skipped eight because
16 it's the approval afterwards.
17     Q.  (By Mr. Coleman) Behind that Fedex label it
18 appears that there's a supplemental preclearance
19 submission dated June 16th, 2006?
20     A.  June 16th from county attorney to the civil
21 rights division, supplement to the submission for
22 May 13th, yes.
23     Q.  So that's supplemental information to
24 Plaintiff's Exhibit 7?
25     A.  Mm-hmm.

Page 44

1      Q.  Would that have been information requested by
2  the Department of Justice or just follow --
3      A.  I'm sorry, I don't know. It could have been
4  just a follow-up.
5      Q.  Okay. Now I'm going to hand you Plaintiff's
6  Exhibit 8, which is two pages. And this is a letter
7  from the Department of Justice approving these two
8  submissions.
9      A.  Okay.
10     Q.  Seven and nine.
11     A.  Letter of the first joint election, temporary
12 consolidation, attorney general received your
13 submission, does not interpose any objection. So it's
14 our approval letter.
15     Q.  All right. Thank you. Are there still some
16 political entities in Travis County that don't do joint
17 elections with the county?
18     A.  Not now. Not since HAVA was implemented.
19     Q.  Thinking back to before HAVA, at a time when
20 there were some --
21     A.  Mm-hmm.
22     Q.  -- did -- to conduct those elections, did
23 those entities have to come to the county to get lists
24 of registered voters?
25     A.  They would have gone directly to the voter

Page 45

1  registrar, which is the office of the tax
2  assessor/collector, and requested, according to a
3  description of their boundaries, what their polling
4  list was. My office would not have been involved in
5  that.
6      Q.  Would that have been a very complicated
7  procedure or was that a relatively easy thing for these
8  various fire districts, municipal utility districts,
9  school districts to --
10     A.  To obtain the list? Yes, it would be fairly
11 easy.
12     Q.  And at one time in the past, every election
13 there would have been literally dozens and dozens of
14 entities requesting that from the voter registrar?
15     A.  Voter registrar.
16     Q.  Yes?
17     A.  That's correct.
18     Q.  Going back to some questions I asked you
19 earlier about the relationship between the district and
20 the county, generally, other than these contracts
21 relating to the performance of elections, would it be
22 fair to say that the -- that the connection is really
23 one of geography rather than one of interdependent
24 governmental entities?
25         MR. HICKS: Objection to the extent it

12  (Pages 42 to 45)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 46

1  calls for a legal conclusion from her. And I believe
2  she's already answered she doesn't know anything beyond
3  the election aspect.
4      Q. (By Mr. Coleman) The district geographically
5  is inside the county. Is that correct?
6      A. Right at the county line, yes.
7      Q. And the district may or may not answer to the
8  county for any governmental function that it performs.
9      A. May or may not.
10     Q. You don't know?
11     A. I don't know.
12     Q. If you could assume for just a moment with me
13 that it doesn't answer to the county for any of its
14 governmental functions, then that relationship would be
15 simply one of geography. Is that correct? The
16 district exists geographically within the county but
17 doesn't -- it is not a sub --
18     A. An arm of county government? No, it is not.
19     Q. Is it -- would you say that the county is an
20 arm of state government?
21     A. Yes, it is.
22     Q. The county, though, is not an arm of a
23 different county. You know, for instance, let's say El
24 Paso County and Travis County, they exist
25 independently. Is that correct?

Page 47

1      A. Most definitely independent of each other.
2  All 254.
3      Q. Does the county receive federal funds for
4  programs?
5      A. Yes.
6      Q. Could you identify for me one program that you
7  are familiar with?
8      A. I'm aware of several grant programs, but the
9  one that I'm most familiar with is the federal funding
10 for the purchase of electronic voting equipment, which
11 would have come from the Department of Justice through
12 the Secretary of State.
13     Q. Are there strings attached to that money?
14     A. Yes.
15     Q. Could you describe any of those for me?
16     A. Subject to audit, I must maintain some
17 business standard in -- business standards for
18 inventory control and I have to keep certain documents
19 for certain retention periods of time. I'm also
20 required to account for if any of the other
21 jurisdictions contribute to the paying back of the
22 county bonds before we got federal funding for that,
23 then I report that to the federal government as well.
24 So there's a lot of budgetary information. That's --
25 that's pretty easy picture to pull together.

Page 48

1      Q. Did you -- I'm trying to remember what the
2  term is. Business standards?
3      A. Standards for inventory control.
4      Q. Okay. Do you -- does somebody certify that to
5  the federal government?
6      A. I don't think the auditors certify it. I
7  think what they look for is exceptions to proper
8  management, to best practices.
9      Q. Okay. We've been going about an hour. Do
10 you --
11     A. I'm good, thank you.
12     Q. Okay. If you will let me know if you need a
13 break.
14         Are there certifications that need to be
15 made to the federal government just to make sure that
16 everything is in line? Is that part of what the
17 auditors do?
18     A. Yes, that's correct.
19     Q. Do you hire the auditors?
20     A. It's the county auditor.
21     Q. Okay.
22     A. That comes in and verifies the number of
23 pieces of equipment and the different kinds and the
24 kinds of software that I have. I'm required to do -- I
25 shouldn't say required; the law hasn't passed yet but

Page 49

1  it's going to. I'm required to do certain tests that
2  prove that the hardware, firmware and software that I
3  possess are the legitimate ones.
4      Q. By legitimate, are you saying one that -- some
5  software or hardware that has surpassed some certain
6  standards of --
7      A. Mm-hmm.
8      Q. -- of the -- I was going to say excellence,
9  but they are accurate, some standards of accuracy?
10     A. It is more a standard of -- of accuracy. What
11 they're looking for is -- is Travis County and its
12 clients conducting their election on firmware and
13 software that has not been altered in any way, patched,
14 substituted. You have to use just the specific one
15 that's been certified by the state. And there's a
16 mechanism that's described by the National Institute of
17 Standards and Technology that's called hash code
18 testing that tells you yes or no, you've got the
19 legitimate application.
20     Q. Okay.
21         (Plaintiff's Exhibit No. 10 marked)
22         Ms. DeBeauvoir, I'm going to hand you
23 what I've marked as Plaintiff's Exhibit 10, which I
24 believe to be a copy of the election agreement between
25 Travis County and the district for 2006. Could you

13  (Pages 46 to 49)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 50

1  briefly look at that and --
2      A.  Mm-hmm.
3      Q.  -- see if that is what that purports to be?
4      A.  Yes.  This would be our standard election
5  agreement between Travis County and the clerks, the
6  election officer and the client in this case, Northwest
7  Austin Municipal Utility District No. 1.  And it's for
8  all kinds of services related to the conduct of the
9  election.
10     Q.  Okay.  Do you have any particular recollection
11 of the 2004 election?  Do you -- do you remember any
12 issues that may have come up in connection with the
13 2004 election?
14         MR. HICKS:  Objection; vague.
15         THE WITNESS:  In relation to the MUD?
16 Yeah.
17         MR. HICKS:  Yeah.  In relation --
18     Q.  (By Mr. Coleman) In connection with the MUD,
19 specifically.
20     A.  Or just any -- any -- no, no, nothing with the
21 MUD.  That I remember.
22     Q.  How about the 2006 election, anything in
23 connection with the MUD?  Problems, complaints,
24 anything like that?
25     A.  No, nothing like that.  No, nothing like that.

Page 51

1  They were -- I think they even paid their fees timely.
2  I think everything was fine.
3      Q.  Prior to the time that the district entered
4  into the 2004 contract with the county, did the county
5  collect, whether voluntarily or by requiring,
6  information from the district about its election?
7      A.  Did you say prior to 2004?
8      Q.  Prior to then.
9      A.  No.  It -- there was no organized program to
10 collect information.  And as a matter of fact, there
11 were often entities holding elections that I knew
12 nothing about.  I would get a telephone call into my
13 call center asking me about a particular jurisdiction's
14 election and I wouldn't even know they were having it.
15     Q.  Would you have, again prior to 2004, any way
16 of knowing whether elections conducted by the district
17 were in compliance with the Voting Rights Act or not?
18     A.  I would have no way of knowing.
19     Q.  Would you even know if the elections were
20 taking place?
21     A.  Maybe not.
22     Q.  I asked you before about this relationship
23 between Travis County and El Paso County.  They're
24 independent entities.  Right?
25     A.  Mm-hmm.

Page 52

1      Q.  In connection with these grants for electronic
2  balloting equipment from the federal government, there
3  are performance requirements for the county.  Right?
4      A.  Correct.
5      Q.  There are things that you need to certify to
6  the federal government.  Is that correct?
7      A.  Correct.  Let me just add that we certify it
8  through the Secretary of State and they send it on.
9      Q.  Okay.  That's a good clarification.  There's
10 a -- there's a chain of --
11     A.  Yes.
12     Q.  -- command, if you will.
13     A.  Yes.
14     Q.  Or chain of responsibility.
15     A.  Yes.
16     Q.  Would it make sense to you if Travis County
17 getting money from the federal government depended on
18 El Paso County deciding that Travis County's system
19 worked okay?
20         MR. HICKS:  Objection; vague.  What do
21 you mean would it make sense to her?
22         MR. COLEMAN:  I was asking in -- in a
23 general sense.
24         THE WITNESS:  There's no connection.
25 The -- each county is independent.  They make its own

Page 53

1  choice of equipment and then you are responsible
2  yourself for making sure that you follow the rules in
3  accordance with HAVA.
4      Q.  (By Mr. Coleman) So there's a -- there's a
5  matching -- or there should be a matching in your mind
6  between lines of responsibility being answerable to the
7  federal government.  You're responsible for your own
8  actions as a county?
9      A.  Yes.  I'm -- yes.  Sorry.  Was I too quick?
10         MR. HICKS:  Yeah.
11         THE WITNESS:  Sorry.  Sorry.
12         MR. COLEMAN:  Now, no whispering.
13         THE WITNESS:  Sorry.
14     Q.  (By Mr. Coleman) I think I may have covered
15 this, but under -- the contract between the district
16 and the county covers only certain aspects of the
17 district's elections.  Is that correct?
18     A.  Correct.
19     Q.  And there are other aspects that the district
20 remains directly responsible for.  Is that correct?
21     A.  Correct.
22     Q.  And ultimately, the district is still
23 responsible for all aspects of its elections.  It is --
24 it is delegated --
25     A.  Contractually I'm not sure I can answer that

14  (Pages 50 to 53)

Page 54

1  care -- as carefully as you want me to.
2      Q.  Well, let me -- let me make a --
3      A.  I feel like I'm obligated to them to do -- to
4  make sure that everything happens correctly.
5      Q.  Okay.  And that's what I'm looking for.
6  You're obligated under the contract to the district.
7      A.  Yes.
8      Q.  The district is ultimately responsible to the
9  state and federal government by statute for the
10 actions in its elections.
11     A.  Okay, I have not read that statute, but I'll
12 take that at face value.
13     Q.  But your obligations are only contractual.
14     A.  Correct.
15         MR. COLEMAN:  Can we take a short break?
16         THE WITNESS:  Mm-hmm.
17         (Recess from 10:41 to 10:55 a.m.)
18         (Plaintiff's Exhibit No. 11 marked)
19     Q.  (By Mr. Coleman) Ms. DeBeauvoir, I'm going to
20 hand you what I marked as Exhibit 11.  Can you tell me
21 what that is?
22     A.  This is a list of the people that have been
23 assigned to polling places and whether or not they are
24 Hispanic surnamed and speak Spanish or non-Hispanic
25 surnamed and speak Spanish.  We are required by state

Page 55

1  law to have at least one Spanish speaker per polling
2  place.
3      Q.  I'm going back to -- can you check in
4  precincts 333 and 343?
5      A.  Let's see, 333.  Heather Bryan.  That's right.
6  The -- the Anglo name is actually the Spanish speaker
7  and the Hispanics are -- names are actually not
8  bilingual.
9          MR. HICKS:  That's in 333.
10         THE WITNESS:  333.  And what was the
11 other one you asked?
12     Q.  (By Mr. Coleman) That's pretty common, isn't
13 it?
14     A.  It's a mix.  It's a mix.  You cannot make the
15 assumption in complying with the law that Hispanic
16 surnamed gets you bilingual support.
17     Q.  And whether through marriage or anything else,
18 there are many, many people with non-Hispanic surnames
19 who are bilingual or trilingual?
20     A.  Or trilingual.
21         MR. COLEMAN:  I'm sorry?
22         MR. KORBEL:  What was the exhibit number?
23         MR. COLEMAN:  That one is 11.
24         THE WITNESS:  Yes.
25         MR. HICKS:  Just -- Greg, just to make

Page 56

1  the record clear, can -- can we get her to clarify
2  the -- which election this was for so that we don't say
3  this is for every --
4          MR. COLEMAN:  Sure.
5      Q.  (By Mr. Coleman) Can --
6      A.  Counselor, this -- this was a worksheet that
7  was prepared for the November 7th, 2006 election.
8      Q.  Okay.  So that worksheet itself actually would
9  not have been used in the district -- any election that
10 involved the district?
11     A.  Well, they would have been on the list.  I
12 would have had to have a Spanish speaker at their --
13 whatever their designated polling site was, so they are
14 included in this list.
15     Q.  The district's election was in May of 2006.
16     A.  I'm sorry.  I get your distinction.  I don't
17 think I know the answer to that.
18     Q.  But it wouldn't have been this worksheet,
19 then?
20     A.  No, it would not.
21         MR. HICKS:  Greg, let me just add, I -- I
22 couldn't tell if y'all even wanted this from your
23 document production request.  I kind of did this
24 because Ms. Perales had asked me some questions about
25 Spanish speaking, so I just -- we just grabbed the most

Page 57

1  recent one to use.
2          MR. COLEMAN:  Okay.
3          MR. HICKS:  That's the reason we brought
4  that.
5          MR. COLEMAN:  Okay.  I -- I understood
6  that from your discussion.  I just wanted, since you've
7  given it to us, to go ahead and get it in the record.
8          I'm -- I'm going to pass the witness for
9  right now.  I know that there are others who wanted to
10 ask her some questions and our time is limited.
11         MS. PERALES:  Would you mind passing down
12 that last exhibit so I can look at it?  Thank you.
13         FURTHER EXAMINATION
14 BY MS. PERALES:
15     Q.  Good morning, Ms. DeBeauvoir.
16     A.  Good morning.  Buenos dias.
17     Q.  Buenos dias.  My name is Nina Perales and I
18 represent the Diaz intervenors for Latino voters who
19 live in the municipal utility district.  And I have
20 just a few questions for you this morning related to
21 your language minority assistance program that you have
22 in Travis County.
23     A.  Mm-hmm.
24     Q.  Can -- let's start off by having you explain
25 Plaintiff's Exhibit 11 to me because I'm not so good at

15  (Pages 54 to 57)

FREDERICKS-CARROLL REPORTING

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 58

1  understanding Travis County's election charts.
2      A.  Okay.
3          MR. HICKS:  Why don't we switch?  You can
4  have my copy to talk from and she --
5      Q.  (By Ms. Perales)  I will hand you now the
6  original.
7      A.  Okay.
8      Q.  And I'm going to follow along on the copy.
9  Can you just sort of run me through this chart, please?
10     A.  Certainly.  You're going to find on the
11 left-hand X axis all of the polling places that would
12 be participating in this particular election.  Then
13 what we do is we go through and we identify is that
14 particular polling place a five percent or above
15 Hispanic surname.  For practical purposes in Travis
16 County, I -- 173 of our polling places are -- are
17 officially designated Spanish-speaking, but we've got
18 218 -- I just do all 218.  It's just easier.
19     Q.  Mm-hmm.
20     A.  Okay.  So -- so where it says required, it
21 should be everybody and we just make it easy that way.
22 Then we start shopping around for bilingual workers.
23 And this chart represents an improvement that had
24 started the year before and the year before that where
25 we're really trying to get a handle on who is actually

Page 59

1  working in the polling place, and that is because state
2  law says that the election judge selects, recruits,
3  designates --
4      Q.  Mm-hmm.
5      A.  -- who the Spanish speaker is, and oftentimes
6  I don't find out if they have had a problem or -- or
7  what the name of the person is until the time sheets
8  come back in after the election.
9      Q.  Mm-hmm.
10     A.  So we're -- we're trying -- the last few
11 elections we've tried to gather this information in
12 advance.
13     Q.  All right.  Can you turn to page 8 of 14 for
14 me, where we see precinct 303?
15     A.  303.  Okay.  Pat Crow.
16     Q.  And in the second column there is an X for
17 required.  What does that mean for precinct 303?
18     A.  That as far as we know, it is a required
19 precinct.
20     Q.  Okay.  And --
21     A.  We consider everybody required.
22     Q.  And would that be the same for precinct 304?
23     A.  Yes, it would be considered a -- Spanish
24 designated assistance.
25     Q.  Now, what about precinct 306?

Page 60

1      A.  It may not qualify because there's not a
2  little -- a little X by there, but we would have done
3  the same work to get a Spanish speaker.
4      Q.  So an X on your exhibit here would mean that
5  you had looked up the numbers and found that it was
6  more than five percent Spanish surname?
7      A.  As best as we can determine.  It is not an
8  exact science, but, yes, the X means they're considered
9  the official Spanish language.
10     Q.  Mm-hmm.  And where do you get your data?
11 When -- when -- I'm looking now at the column number of
12 Spanish surnames and percent of Spanish surnames.  Can
13 you tell me where that information comes from?
14     A.  Yes.  I get it from the voter registrar and
15 the voter registrar gets it from census data blocks,
16 and they translate the census data blocks boundary
17 lines into precinct boundary lines.
18     Q.  So do you know if that is number of Spanish
19 surnames of total population, voting age, registered
20 voters?  Do you happen to know?
21     A.  Oh, let me think a second.  Which is it?  I
22 think it's registered voters.
23     Q.  So in fact, it might not be census data; it
24 might be the registered voter list for that precinct?
25     A.  Yes.  But I know that the way that the voter

Page 61

1  registrar builds it is from census blocks.
2      Q.  Okay.
3      A.  I get it from VR.
4      Q.  So the voter registrar may have several sets
5  of information?
6      A.  Yes.
7      Q.  And I -- and I -- and I won't press you more
8  on this because I know you're -- you're not a
9  demographer, are you?
10     A.  A what?
11     Q.  A demographer.
12     A.  A demographer?  No.  No.
13     Q.  And you don't have --
14     A.  An archivist.
15     Q.  That I'm sure.  And you don't have any sort of
16 professional knowledge regarding the rates at which
17 Spanish surnamed people are limited English proficient.
18 Is that right?
19     A.  No.  No.  No.
20     Q.  And you don't have any information regarding
21 the rate at which non-Spanish surnamed people are
22 limited English proficient, do you?
23     A.  No.
24     Q.  Okay.  Thank you.
25         Now, I'm looking again for precinct 303,

16  (Pages 58 to 61)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 62

1  which says the bilingual worker, one, is Pat Crow. Is
2  that right?
3      A.  That's correct.
4      Q.  And then for precinct 304, I see the bilingual
5  workers are -- well, beginning with Margarita Rodriguez
6  and then following with a number of others. Is that
7  right?
8      A.  That's correct. And the distinction here for
9  you is that in several if not many of our precincts I
10  have more than one --
11     Q.  Mm-hmm.
12     A.  -- Spanish speaker.
13     Q.  And let me ask you about that last column on
14  the chart, which says Spanish surnamed confirmed not
15  bilingual.
16     A.  Yes.
17     Q.  What does that mean?
18     A.  That means the person that the election judge
19  selected as being their likely Spanish speaker, when we
20  called them and talked to them we determined that even
21  though they had a Spanish surname they were in fact not
22  bilingual or not sufficiently bilingual to be able to
23  assist a voter.
24     Q.  And -- and it sounds like you're -- you're
25  careful, aren't you, to make sure that the people who

Page 63

1  give Spanish language assistance are in fact competent
2  to do that?
3      A.  I'm very careful to the point of making sure
4  they understand the terms specific to elections in
5  Spanish.
6      Q.  Thank you.
7          Prior to 2004, did you ever provide
8  translation services to the Northwest Austin Municipal
9  Utility District 1?
10     A.  No.
11     Q.  Did you ever work with the MUD to ensure that
12  they could find a poll worker or an election judge who
13  was competent to deliver assistance in Spanish to
14  voters?
15     A.  I would have upon request. I don't know if
16  they requested.
17     Q.  Do you have any specific recollection of ever
18  being asked by the MUD for that kind of help?
19     A.  No.
20     Q.  Do you recall if you've ever been asked by the
21  MUD prior to your agreement in 2004 to provide any kind
22  of backup phone language assistance to voters?
23     A.  Prior to 2004?
24     Q.  Yes.
25     A.  No.

Page 64

1          MR. HICKS: No, you don't recall or no,
2  you weren't asked?
3          THE WITNESS: No, I was not asked.
4      Q.  (By Ms. Perales) Thank you.
5      A.  Both.
6      Q.  For elections that you run for Travis County,
7  not for anybody else --
8      A.  Okay.
9      Q.  -- you make sure that election notices are
10  prepared in Spanish, don't you?
11     A.  Yes, I do.
12     Q.  And you make sure that ballots are prepared in
13  Spanish, don't you?
14     A.  Correct.
15     Q.  And do you make sure that informational signs
16  that hang inside and outside the polling place are
17  prepared in Spanish?
18     A.  That is correct.
19     Q.  And do you make sure that Spanish -- sample
20  ballots are prepared in Spanish?
21     A.  That's correct, too.
22     Q.  Moving away from the question of Spanish now,
23  can you tell me where for Travis County elections you
24  publish notices of election?
25     A.  It would be in the Austin American-Statesman.

Page 65

1  I believe it's called the general classified section,
2  they have a special notices part of that. In addition
3  to that I also do Spanish language publications in La
4  Prenza. That's Peggy Vasquez. I think I did El Mundo
5  for a while, too. And then I've done -- that's all I
6  recall for right now. I think I've done more, but I
7  don't recall exactly.
8      Q.  Would you consider the Austin
9  American-Statesman a newspaper of general
10  circulation --
11     A.  Yes.
12     Q.  -- in Travis County?
13     A.  Yes.
14     Q.  You mentioned earlier that poll workers are
15  selected by the election judge. Do you have a role in
16  recommending bilingual poll workers to the election
17  judge or is it -- is your role more of a cleanup where
18  you -- you're calling afterwards?
19     A.  Mm-hmm. Well, that's a very good question.
20  The answer to that is in flux, even as we speak.
21  The -- the role that I have taken in the past is to try
22  to be an activist. I have asked Senator Barrientos and
23  various other members of the community to help recruit
24  sources for getting Spanish workers. I have a
25  designated person on my staff that when we look for

17 (Pages 62 to 65)

Page 66

1  election judges and staffing, you know, we try to ask.
2  We have institutionalized that and added more structure
3  to it over the last few years.
4      Q.  And you've mentioned -- under your agreement
5  with the MUD, is it now Travis County's responsibility
6  to secure the list of registered voters that live
7  within the boundaries of the MUD so that only those
8  people get a MUD election ballot?
9      A.  That is part -- yes, a part of our formatting,
10  yes.
11      Q.  And let me just see if I'm clear about your
12  earlier testimony. Before 2004 and your agreement with
13  the MUD, it would have been the MUD's responsibility to
14  go to the voter -- to go to the registrar and get their
15  list of registered voters. Is that right?
16      A.  That is correct.
17      Q.  And to the best of your knowledge, they would
18  have had the ability then to review that list and see
19  how many Spanish surnamed registered voters they had in
20  the MUD. Is that right?
21      A.  That's correct.
22      Q.  I'm skipping around because some questions
23  were already asked.
24      A.  Okay.
25      Q.  Do you have a service in Travis County where

Page 67

1  someone can call from the polling place to some kind of
2  central headquarters to receive Spanish language
3  assistance in voting?
4      A.  Yes.
5      Q.  Can you describe that for me?
6      A.  We have a call center that is staffed up
7  according to what the demand we think is going to be
8  for the calls on election day. I have a hotline
9  telephone number that is given to the election judges
10  so that they can get through if the lines jam up with
11  people calling and basically asking where the polling
12  place is. Part of that hotline for judges is also "and
13  I need a Spanish speaker right away."
14          So in addition to at least one per
15  polling place, we also have a call center. And in that
16  call center I don't think we've ever had a minimum --
17  less than a minimum of four Spanish speakers.
18      Q.  And how long have you had this operation?
19      A.  The call center operation?
20      Q.  Yes, with the language assistance for
21  Spanish-speaking voters.
22      A.  Oh, forever. Since the beginning. Certainly
23  the last 10 years.
24      Q.  And so would it be correct to say, then, that
25  if a voter needed Spanish language assistance for

Page 68

1  voting and was in a polling place where that assistance
2  wasn't available for some reason, the election judge
3  could call the call center and connect a
4  Spanish-speaking election worker with the
5  Spanish-speaking voter to assist that person in casting
6  their ballot?
7      A.  That is correct.
8      Q.  Thank you.
9          Tell me, why do you use five percent
10  Spanish surname registered voters in a precinct as your
11  trigger for providing language assistance?
12      A.  State law.
13      Q.  And it's required by state law?
14      A.  Mm-hmm.
15      Q.  Do you know how long that's been true?
16      A.  Yeah, true. Voting Rights Act, I'm not sure
17  when the last update was.
18      Q.  In November 7, 2006, going back to Plaintiff's
19  Exhibit 11, it looks like you've got a Spanish-speaking
20  election worker in almost every precinct in Travis
21  County. Is that right?
22      A.  I believe -- yes, that is correct.
23      Q.  Do you have any plans for what to do about the
24  precincts where you didn't manage to get a
25  Spanish-speaking poll worker in there?

Page 69

1      A.  Yes.
2      Q.  Tell me what those plans are. So I won't put
3  you on my list.
4      A.  Well, we've -- we tried to institutionalize
5  this more. The -- the law creates this break that
6  makes it difficult for me to be proactive on the front
7  end instead of just figuring out afterwards how well I
8  did.
9      Q.  Mm-hmm.
10      A.  I've -- in fact, commissioners' court started
11  voting on it last Tuesday. I'm forming a -- a citizens
12  advisory panel of workers who would have access to
13  groups of people who are Spanish-speaking. For
14  example, Spanish classes at the University of Texas,
15  St. Edwards, Concordia, not so much -- a little bit
16  businesses, but not so much that because we find their
17  people are overloaded.
18      Q.  Mm-hmm.
19      A.  Schools, ACC, are my biggest draw. And then
20  community organizations, Buena Vista. Peggy Vasquez is
21  going to serve on the -- on the citizens group. By
22  having that group of people, it more formalizes the
23  structures we've had in place for quite a while.
24          For a while now I've used Margaret Gomez,
25  commissioner -- Precinct 4 Margaret Gomez and former

18  (Pages 66 to 69)

Page 70

1  Senator Gonzalo Barrientos to help me recruit Spanish
2  speakers. And then the -- the -- the person who does
3  all of my personnel recruitment had basically an extra
4  element added to their job a few years ago that really
5  tries to focus on it.
6          The last thing that we did is in -- when
7  we're in our training classes, part of what the
8  election judges when they go through training have to
9  fill out at the time they're in training is the name of
10 the person who is their designated Spanish-speaker or
11 tell me then do they need help recruiting somebody.
12    Q.  Tell me where you were born.
13    A.  Fort Worth, Texas.
14    Q.  Did you grow up in Fort Worth?
15    A.  Yes. Arlington and Fort Worth.
16    Q.  And where did you go to high school?
17    A.  Arlington High School.
18    Q.  When did you come down to Austin?
19    A.  Well, the first time I went to second and
20 third grade here, which would have been in
21 approximately 1962 and '63. And then I moved here
22 permanently in 1979 to attend the LBJ School of Public
23 Affairs. I left for a year around 1981 and have been
24 back continuously since '82.
25    Q.  And before you were the county clerk, where

Page 71

1  did you work?
2     A.  In Austin. Let's start with that. I worked
3  for the Austin Independent School District as a
4  substitute teacher every Friday when I was in graduate
5  school. Guaranteed job. Then when I got out of
6  school, I worked temporarily in the northwest to try to
7  see something else; I had only been in Texas. I didn't
8  know anything.
9          When I moved back here I took a job as
10 the director -- excuse me, the supervisor of exceptions
11 for the property tax division for the then tax
12 assessor/collector Bill Aleshire. I was rather quickly
13 promoted to be the director of that division.
14    Q.  So before you became county clerk, you did not
15 work in the county clerk's office. Is that right?
16    A.  No, I did not. Only one time had I
17 volunteered and that was for an election.
18    Q.  Were you a poll worker?
19    A.  I was one of the stub-tearer-offers for
20 paper -- for punch card ballot. Yes. And I had worked
21 in a polling place as well. Chad collector.
22    Q.  You mentioned earlier that you have about 107
23 jurisdictions that contract with you to administer
24 their elections. Can you tell me whether the MUD was
25 one of the earlier jurisdictions to get on to this

Page 72

1  bandwagon or one of the later jurisdictions?
2     A.  One of the later ones.
3     Q.  Would you say it was one of the latest
4  jurisdictions?
5     A.  I think we can say it was one of the latest,
6  yes.
7     Q.  My last questions for you are -- are -- are
8  with respect to -- to your experience as a Texan and
9  not necessarily as county clerk. But can you recall as
10 a Texan ever seeing discrimination against Hispanics in
11 Texas?
12    A.  Most definitely.
13    Q.  Can you describe that to me?
14    A.  Some that was very painful. When I was living
15 in Fort Worth at about fourth grade, in elementary
16 school the Spanish-speaking kids were forbidden from
17 speaking Spanish in school, and if they were overheard,
18 they were beaten.
19    Q.  Mm-hmm.
20    A.  The -- in my own family, which was very large,
21 white family, there was a kind of a pecking order. The
22 Civil Rights Act had opened the eyes of some folks to
23 black equality issues, but brown equality was last on
24 their list. Let me think what else. There were -- in
25 terms of my suburban high school experience, I'm not

Page 73

1  even sure there were -- there was one black member in
2  my high school. His name was Carl Pointer and he was
3  it. I don't recall any other brown students when I was
4  going to high school.
5     Q.  Okay.
6     A.  Maybe there were some.
7     Q.  Mm-hmm. Thank you.
8     A.  And then I -- I can get a little closer to my
9  experience more with elections if that's helpful to
10 you.
11    Q.  It would be. Thank you.
12    A.  Okay. Gosh, which stories to tell? It --
13 it's really about human nature. A -- it's -- it's an
14 us/them, an us -- you and then the other. And so if --
15 if -- if you're -- if you're comfortable with accepting
16 all kinds of people, then you don't have that dichotomy
17 of us and them. But a lot of people are -- if
18 they're -- if they look any different from you, if
19 they're Asian, if they're brown, if they're black, then
20 they are not as helpful to voters when they come in the
21 poll.
22          There's kind of a -- there's kind of a --
23 one of the things that I had to do when I very first
24 took over county clerk, the training of the election
25 judges, was get them away from this mentality of

19 (Pages 70 to 73)

Page 74

1  policing. They weren't there to stop people from
2  voting, they were there to assist them to help them do
3  that.
4      Q. Mm-hmm.
5      A. Those are some examples of some of the things
6  I've -- I've seen myself. I also believe that it's
7  important to reach out to all kinds of communities in
8  whatever way helps them. So it's -- it's almost like
9  when in Rome, do as the Romans do. So for the black
10  communities you've got the neighborhood associations
11  and the churches. For the Hispanic community, it's
12  just really important to speak Spanish and to be
13  present through Spanish language media. And I do PSA's
14  in Espanol for Movecion, for -- I've done them for
15  years. I -- I've studied Spanish in Mexico. I try
16  very hard. Mi Espanol es morqueantes. You know, it
17  could be better.
18          I -- I study up before I do a PSA or even
19  an announcement. I hire Marta Kotera, who is my
20  Spanish contractor, and I -- and I run things back and
21  forth to -- through her, not only for official notices
22  but for any kind of important press release, even, or
23  special instructions to voters. Marta and I will talk
24  about, now, this needs to be in vernacular Spanish. I
25  don't want it to be too overly formulist -- formal,

Page 75

1  getting confused with terms. Let's make it
2  understandable.
3      Q. Thank you.
4          Would it be fair, then, to say that
5  you've made affirmative efforts in training your poll
6  workers so that their treatment of all voters is
7  non-discriminatory?
8      A. Yes. And if I may add, increasingly
9  affirmative. I don't think we've still done enough.
10      Q. And would it also be fair to say that you've
11  done -- that you've made affirmative efforts to reach
12  out to Latino and African-American voters especially
13  since you've been county clerk?
14      A. Yes. The early voting program is the perfect
15  example. We put the -- that early voting program in --
16  you know, equitably distributed it and put it in
17  commercial areas. We did not put it in the back of a
18  constable's office or something like that. It's retail
19  approach.
20      Q. And the retail approach is so that you can
21  come across more voters. Is that right?
22      A. We go where the voters already are. We don't
23  expect them to come to us.
24      Q. And would you agree with me that if somebody
25  doesn't have other voters in their family, for example,

Page 76

1  if their parents never voted, that it might take
2  special efforts to get that person to become a voter?
3      A. Yes. And I really think that applies across
4  the board. The -- it's the socioeconomic factors that
5  really complicate that.
6      Q. And would you say that historically Hispanic
7  and African-American voters have had lower
8  participation rates --
9      A. Yes.
10      Q. -- than Anglos?
11      A. That's clear. Those statistics are all over
12  the place.
13      Q. One moment, please. (Brief pause)
14          MS. PERALES: Thank you very much. I
15  pass the witness.
16          FURTHER EXAMINATION
17  BY MR. SPITAL:
18      Q. Good morning, Ms. DeBeauvoir. My name is Sam
19  Spital. I represent the Lewis intervenors, who are
20  African-American voters who live in the MUD.
21      A. Okay.
22      Q. I just have a few questions. It won't take
23  long. My first question is about who supervises voter
24  registration. For vote --
25      A. Okay.

Page 77

1      Q. For eligible voters in the MUD, is it the
2  county or the MUD that supervises voter registration?
3      A. I -- I don't know. And here's why. I think
4  your answer is the voter registrar that supervises
5  registration in all of our districts, not necessarily
6  the MUD. I don't know of any obligation. So I have to
7  say I don't know, but I think you need to be looking at
8  voter registration.
9      Q. Okay. And the voter registrar is a county
10  official?
11      A. Yes.
12      Q. Okay. Thank you.
13          The other -- just a few other questions.
14  I wanted to ask you about the ballot requirements that
15  I think Mr. Coleman asked you about earlier.
16      A. Okay.
17      Q. I think, if I remember correctly, you
18  characterized the ballot requirements as heavy? Is
19  that --
20      A. For a bailout?
21      Q. Yeah. For a bailout.
22      A. It looked -- looked like you had to go through
23  a lot.
24      Q. And is that your assessment based on having
25  looked at the statute primarily?

20  (Pages 74 to 77)

Page 78

1    A.  Briefly.
2    Q.  Okay.  Briefly.  Are you familiar at all with
3  the way the Department of Justice has administered the
4  ballot statute?
5    A.  No.
6    Q.  So would it affect your assessment that ballot
7  requirements are heavy if you were to find out that the
8  Department of Justice has been willing to retroactively
9  preclear changes that had not been submitted in some
10  circumstances?
11    A.  I am so sorry.  You --
12    Q.  Oh, yeah, that was a very complex question.
13    A.  I'm sorry.
14    Q.  Sorry.  If you found out that when a
15  jurisdiction seeks to bail out, if it is found that the
16  jurisdiction had failed to submit certain changes
17  for --
18    A.  It made some -- right.
19    Q.  Exactly.
20    A.  Okay.
21    Q.  That the Department of Justice has been
22  willing to retroactively preclear those changes for
23  certain jurisdictions seeking to bail out --
24    A.  Oh.  Okay.
25    Q.  -- would that -- if that -- if that's true,

Page 79

1  would that affect your assessment about the fact that
2  the ballot requirements are heavy?
3    A.  I don't think I know enough to answer your
4  question.  I would say no, I don't think it would
5  affect my assessment.
6        MR. SPITAL:  All right.  Thank you.
7  That's all I have.
8        FURTHER EXAMINATION
9  BY MR. KORBEL:
10    Q.  I've just got a couple.  Maybe you don't know
11  this and maybe that's what your answer is, but in
12  Texas, counties do the registration, don't they?
13    A.  Correct.
14    Q.  All right.  And however, organizations
15  frequently have -- our postcard -- we have a postcard
16  application for voting.  Is that correct?
17    A.  Correct.
18    Q.  And -- and postcards, that's stamped postage
19  on it?
20    A.  I think so.
21    Q.  And so that all a person has to do is fill the
22  card out and mail it in.
23    A.  Correct.
24    Q.  And those cards are, at least for some
25  jurisdictions, like -- like MUDS or that hold

Page 80

1  elections, some of those actually have those postcards
2  available, don't they, and that --
3    A.  Oh, yes.
4    Q.  -- they usually pass those out?
5    A.  Yes, absolutely.  The voter registrar will
6  give stacks of cards to various activist groups.
7    Q.  Not all -- not all jurisdictions do that; most
8  jurisdictions do that?
9    A.  I -- that sounds like a fair guess.  I don't
10  really know.
11    Q.  Now, one of the big things that the county
12  does is redraw voting precincts.
13    A.  Mm-hmm.
14    Q.  Correct?  And the redrawing of voting
15  precincts has -- is very specifically set out in state
16  law, is it not?  As soon as it gets to be a certain
17  number of registered voters, you have to redraw the
18  voting precincts?
19    A.  That is correct.  And -- and there -- there is
20  a distinction between redrawing the line and what we
21  call realignment.
22    Q.  That's correct.
23    A.  And realignment is based on population.  And
24  that population just recently changed.
25    Q.  Mm-hmm.  And -- and it's all -- it also has to

Page 81

1  do with redistricting as a result of --
2    A.  Mm-hmm.
3    Q.  -- as a result of federal litigation, findings
4  that jurisdictions are unconstitutionally violating
5  the -- the law, either state law or federal law.
6    A.  Mm-hmm.
7    Q.  Correct?
8    A.  Correct.
9    Q.  And it also has to do with the state, when the
10  state redistricts.
11    A.  Correct.
12    Q.  And under state law, you can't have more
13  than -- you -- one voting precinct can't contain two
14  offices of -- of the same -- for example, you can't
15  have two different state representatives in one voting
16  precinct.
17    A.  Yes, you have to have boundary lines drawn a
18  certain way, yes.
19    Q.  Yes.  And that's what causes the -- and
20  that -- which creates the total number of voting
21  precincts we end up having to have because we can't
22  have more than one candidate -- more than one office in
23  a single voting precinct.
24    A.  Are you asking me if that's a complicating
25  factor --

21  (Pages 78 to 81)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 82

1    Q.  Yes.
2    A.  -- to add to the number of precincts?
3    Q.  Yes.
4    A.  Yes.
5    Q.  And that's all required by state law.  Is that
6  correct?
7    A.  Yes, it is.
8    Q.  Federal law has nothing to do with any of
9  those problems.
10    A.  I don't know, because we have been in a mix of
11  realignment and redistricting, and, of course, that
12  would be federal.
13    Q.  The redistricting is a result of federal court
14  orders?
15    A.  Mm-hmm.
16    Q.  Now, you were asked questions about the voter
17  registration lists.  Are you providing these voter
18  registration lists to the -- to the MUD?
19    A.  I coordinate it, yes.
20    Q.  Yes.  All right.  And you provide those voter
21  registration lists to a whole -- large number of
22  different people, don't you?
23    A.  Yes, I do.
24    Q.  Including political consultants, candidates,
25  marketers.

Page 83

1    A.  Mm-hmm.
2    Q.  Lot of different people request those lists.
3    A.  Right.
4    Q.  Do they not?
5    A.  Let's make the distinction between my role as
6  coordinator just for the polling places.  If you were
7  a -- a political consultant you would be dealing
8  directly with the voter registrar, your -- with them
9  and not with me.
10    Q.  I guess I'm talking in terms of the county.
11  County provides those for all --
12    A.  Okay.  The county does do that.
13    Q.  And you are aware of that.
14    A.  I am aware of it.
15         MR. KORBEL:  No further questions.
16         FURTHER EXAMINATION
17  BY MR. HERREN:
18    Q.  My name is Chris Herren.  I'm an attorney for
19  the Department of Justice in Washington.  I had just 1
20  believe one question for you.  You had testified
21  earlier about HAVA and I thought I heard you say that
22  the HAVA money came from the Department of Justice
23  through the Secretary of State.  Is that what you
24  testified to?
25    A.  I -- did I get that wrong?  I think that's

Page 84

1  right.
2    Q.  Doesn't the money in fact come from the U.S.
3  Election Assistance Commission through the Secretary of
4  State?
5    A.  Well, yeah, we do have a -- that -- that is a
6  fair distinction, yes.  I serve on the standards board
7  of the EAC and should have made that clearer.
8    Q.  So -- but the money actually comes from the
9  EAC.
10    A.  The EAC, yes.  They -- they channel it now.
11         MR. HERREN:  Thank you very much.  That's
12  all I have.
13         THE WITNESS:  Okay.  Correct.
14         MR. COLEMAN:  Okay.  I think we can wrap
15  this up.  Thank you, Ms. DeBeauvoir.  Thank you for
16  coming.
17         THE WITNESS:  You're quite welcome.
18  Thank you very much.
19         (Deposition concluded at 11:35 a.m.)
20
21
22
23
24
25

Page 85

1         CHANGES AND CORRECTIONS
2  WITNESS NAME: DANA DEBEAUVOIR   DATE: _____
3  Reason Codes:  (1) to clarify the record; (2) to
   conform to the facts; (3) to correct a transcription
4  error; (4) other (please explain).
5  PAGE LINE  CHANGE              REASON CODE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

22  (Pages 82 to 85)

7f45c3aa-ced9-4267-9bb1-458d7c48e724

Page 86

```
 1   PAGE LINE  CHANGE          REASON CODE
 2   _____
 3   _____
 4   _____
 5   _____
 6   _____
 7
 8
 9           _____
             DANA DEBEAUVOIR
10
11
12   THE STATE OF _____)
                          )
13   COUNTY OF _____)
14      Before me, _____, on this day personally
     appeared DANA DEBEAUVOIR, known to me (or proved to me
15   under oath or through
     _____
16   (description of identity card or other document)) to be
     the person whose name is subscribed to the foregoing
17   instrument and acknowledged to me that they executed
     the same for the purposes and consideration therein
18   expressed.
19      Given under my hand and seal of office this
     _____ day of March 2007.
20
21
            _____
22          NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
23
24
25
```

Page 87

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2
     NORTHWEST AUSTIN        )
 3   MUNICIPAL UTILITY DISTRICT )
     NUMBER ONE,             )
 4   401 W. 15th Street      )    CIVIL ACTION NO.
     Suite 850               )
 5   Austin, Texas 78701     )    1:06-CV-01384
          Plaintiff,  )    (DST,PLF,EGS)
 6   v.                      )
                             )
 7   ALBERTO GONZALES,       )
     ATTORNEY GENERAL OF THE )
 8   UNITED STATES,          )
     U.S. Department of Justice )
 9   950 Pennsylvania Avenue NW )
     Washington, D.C. 20530  )
10
            REPORTER'S CERTIFICATION
11        DEPOSITION OF DANA DEBEAUVOIR
             Monday, February 26, 2007
12
13      I, RANDALL N. FINCH, Certified Shorthand
14   Reporter in and for the State of Texas, hereby certify
15   to the following:
16      That the witness, DANA DEBEAUVOIR, was duly
17   sworn by the officer and that the transcript of the
18   oral deposition is a true record of the testimony given
19   by the witness;
20      That the deposition transcript was submitted
21   on March 1, 2007 to the witness or to the attorney for
22   the witness for examination, signature and return to me
23   by _____, 2007.
24      That the amount of time used by each party at
25   the deposition is as follows:
```

Page 88

```
 1      Mr. Gregory S. Coleman - 39 minutes
 2      Ms. Nina Perales - 12 minutes
 3      Mr. Samuel Spital - 4 minutes
 4      Mr. George Korbel - 2 minutes
 5      That pursuant to information given to the
 6   deposition officer at the time said testimony was
 7   taken, the following includes counsel for all parties
 8   of record:
 9      Mr. Gregory S. Coleman, attorney for Plaintiff
10      Ms. Nina Perales, attorney for MALDEF
11      Mr. George Korbel, attorney for Texas Rio
12   Grande Legal Aid, Inc.
13      Mr. Chris Herren, attorney for USDJ
14      Mr. Benjamin Blustein, attorney for Lawyers'
15   Committee for Civil Rights Under Law
16      I further certify that I am neither counsel
17   for, related to, nor employed by any of the parties or
18   attorneys in the action in which this proceeding was
19   taken, and further that I am not financially or
20   otherwise interested in the outcome of the action.
21      Certified to by me this 1st day of March, 2007.
22
            _____
23          RANDALL N. FINCH, Texas CSR #504
            Expiration date: 12/31/2008
            Fredericks-Carroll Reporting
24          Firm Registration No. 82
            7800 Shoal Creek Blvd., Suite 200-W
25          Austin, Texas 78757 (512) 477-9911
```

23   (Pages 86 to 88)