IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, 401 W. 15th Street Suite 850 Austin, Texas 78701     Plaintiff, v. ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITES STATES, U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, D.C. 20530 | CIVIL ACTION NO. 1:06-CV-01384 (DST,PLF,EGS) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION OF
JOSE GABRIEL DIAZ
Thursday, February 22, 2007
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF JOSE GABRIEL DIAZ, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 22nd day of February, 2007, from 4:29 p.m. to 5:10 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weil, Gotshal & Manges, LLP, 8911 Capital of Texas Highway, Suite 1350, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
1           APPEARANCES
2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
   DISTRICT NO. ONE:
3
     Mr. Gregory S. Coleman
4    WEIL, GOTSHAL & MANGES, LLP
     8911 Capital of Texas Highway
5    Building One, Suite 1350
     Austin, Texas 78759  (512) 349-1937
6              (512) 527-0698 Fax
7  FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
   FUND (MALDEF):
8
     Ms. Nina Perales
9       -and-
     Mr. Carlos Becerra
10   110 Broadway, Suite 300
     San Antonio, Texas 78205  (210) 224-5476
11             (210) 224-5382 Fax
12 FOR TEXAS RIO GRANDE LEGAL AID, INC.:
13   Mr. Jose Garza
     Attorney at Law
14   1111 N. Main Avenue
     San Antonio, Texas 78212  (210) 212-3700
15             (210) 212-3772 Fax
16 FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
   DIVISION:
17
     Mr. Chris Herren
18      -and-
     Ms. Christy A. McCormick
19   950 Pennsylvania Avenue, N.W., Room 7246
     Washington, D.C. 20530  (202) 305-0609
20             (202) 327-3961 Fax
21 FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:
22   Mr. Benjamin Blustein
     Staff Attorney, Voting Rights Project
23   1401 New York Avenue, NW, Suite 400
     WASHINGTON, D.C. 20005
24
25
```

Page 3

1         JOSE GABRIEL DIAZ,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. COLEMAN:
5     Q.  Good afternoon, Mr. Diaz.
6     A.  Good afternoon.
7     Q.  Thank you for coming today. I appreciate you
8  taking time from your afternoon to spend with us.
9  Have -- have you had your deposition taken before?
10    A.  Not for this case.
11    Q.  But other cases?
12    A.  I believe so.
13    Q.  Okay. All right. Well, I'm going to dispense
14 with the introductories, so why don't we just -- why
15 don't we get in -- you live inside the district?
16    A.  I do.
17    Q.  Where do you live?
18    A.  9400 Jenaro Court.
19    Q.  Okay. Where -- and where is that in the
20 district?
21    A.  Canyon Creek.
22    Q.  Okay. Okay. Do you own --
23    A.  I do.
24    Q.  -- a home there? How long have you lived
25 there?

Page 4

1     A.  Since approximately 2002, July.
2     Q.  Where did you live before that?
3     A.  Wells Branch.
4     Q.  Okay. What do you do for a living?
5     A.  I'm in telecom.
6     Q.  What -- what particular --
7     A.  Internet.
8     Q.  Internet? Who -- who are you with?
9     A.  With a company called Real Links.
10    Q.  Do you do phone and Internet or just -- I may
11 need a business card from you.
12    A.  Is it relevant?
13    Q.  And were you with them when you lived in Wells
14 Branch?
15    A.  No, I wasn't.
16    Q.  Was that a different job?
17    A.  Different company.
18    Q.  Different company. Okay. When did you live
19 in Wells Branch?
20    A.  Before that, about a year and a half.
21    Q.  All right. Before that?
22    A.  It was Kingsview Court, 11709. That's Travis.
23    Q.  Okay. And before that? Have you always --
24    A.  Back pretty far.
25    Q.  -- lived in the Austin area?

Page 5

1     A.  For about the past 10 years.
2     Q.  Where did you grow up?
3     A.  Brownsville, Texas.
4     Q.  Okay. Have you always lived in Texas?
5     A.  No.
6     Q.  After Brownsville -- why don't you just kind
7  of quickly walk me through where you have lived.
8     A.  I was born in Puebla, Puebla, Mexico. Lived
9  in Mexico City. England. Lazaro Cardenas, Michoacan.
10 Saltillo. Cuidad Juarez. El Paso. Brownsville. And
11 then Austin.
12    Q.  And then Austin?
13    A.  Mm-hmm.
14    Q.  Tell me about your community involvement.
15 What --
16    A.  I --
17    Q.  What do you do to be involved in the
18 community?
19    A.  I attend church regularly. Participate in
20 some of the committees, ministry committees.
21    Q.  Okay.
22    A.  That's pretty much it.
23    Q.  Have you been involved in homeowners
24 associations or utility districts, what have you?
25    A.  Well, I pay my dues for the homeowners

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

74db57ca-edad-4764-9601-55767a3691a3

Page 6

1  association.
2  Q. Do you go -- habitually go to the meetings?
3  A. Not habitually, no.
4  Q. Do you sometimes go to the meetings?
5  A. Not to any at Canyon Creek.
6  Q. You've never attended a homeowners meeting at
7  Canyon Creek?
8  A. I have attended a MUD meeting at Canyon Creek.
9  Q. How many MUD meetings have you attended at
10 Canyon Creek?
11 A. One.
12 Q. Do you recall when that was?
13 A. Approximately between November and December.
14 I think it's the last one.
15 Q. Why did you attend that MUD meeting?
16 A. To get more information about this case.
17 Q. Let me go back to Wells Branch. Did you
18 attend city meetings -- city council meetings or
19 homeowner meetings or things like that when you were
20 there?
21 A. Not that I can recall.
22 Q. Remind -- remind me again, what was before
23 Wells Branch?
24 A. Mexico City. In Austin?
25 Q. Yeah. The Kings --

Page 7

1  A. Kingsview Court.
2  Q. Okay. Did you attend any --
3  A. No HOA there.
4  Q. Or city council meetings or anything like
5  that?
6  A. No. I watched it regularly on TV, though. I
7  will tell you that. I like zoning meetings.
8  Q. They're fascinating, aren't they?
9  A. No, they are.
10 Q. Yeah. How about Brownsville?
11 A. No.
12 Q. Okay. Okay. When you went to the MUD meeting
13 in November-December, you said you had some questions
14 to ask about this lawsuit.
15 A. I did.
16 Q. Were you able to get some answers to -- to
17 those questions?
18 A. Some, mm-hmm.
19 Q. Okay. Is that after you intervened in the
20 lawsuit?
21 A. No, it was prior.
22 Q. Is it possible that meeting wasn't
23 November-December?
24 A. Possible. I really don't remember.
25 Q. Maybe last summer or early -- very early fall?

Page 8

1  A. Maybe early fall. I'm really not sure.
2  Q. Okay.
3  A. I didn't think...
4  Q. Do you personally know any of the members of
5  the MUD board?
6  A. Not personally.
7  Q. Have you -- and by that, I mean have you had
8  conversations with them outside of that meeting that
9  you attended?
10 A. No, I haven't.
11 Q. Haven't met them?
12 A. No.
13 Q. And never talked to any of them?
14 A. Maybe one of them in passing. I think one of
15 them lives a couple of blocks down.
16 Q. Okay.
17 A. I may have seen them at a dinner or something.
18 Q. Do you recall which one that is?
19 A. No. I don't know their names.
20 Q. You mentioned that when you went to the MUD
21 meeting you got answers to some of your questions.
22 A. Mm-hmm.
23 Q. Leads me to conclude not all of them. Tell me
24 a little bit about which questions you felt you got
25 answers to.

Page 9

1  A. Why this case was taking place at the MUD.
2  Q. You did get an answer to that question?
3  A. I -- based on what I heard, I think I
4  concluded -- I made my conclusions.
5  Q. Okay. What were those conclusions?
6  A. From what I heard, what I understood was that
7  this was being done as a favor to the -- to I believe
8  Greg Zimmerman, because he had helped so much with some
9  of the MUD issues.
10 Q. Greg Coleman, maybe? Okay. You don't recall?
11 A. Now that I see you, maybe. I'm not good with
12 names.
13 Q. Okay.
14 A. Don -- yeah, you're right. Don Zimmerman.
15 Right. Absolutely.
16 Q. Did -- were there any other questions you did
17 get answers to at that meeting?
18 A. No. That was the -- the question I was
19 looking for is the why, the -- Canyon Creek MUD was
20 involved in this.
21 Q. Okay. What questions did you feel you did not
22 get an answer to?
23 A. Whether this had been -- whether the community
24 knew about this or not.
25 Q. Any others that you felt you didn't get an

Page 10

1  answer to?
2  A. No. I just thought it was a little bit
3  evasive the way that it was respond -- I was supposed
4  to receive a call from Don Zimmerman, I believe, and I
5  never did. I gave him my phone number.
6  Q. How old -- how old of a man are you?
7  A. I am a 35-year-old man.
8  Q. Do you regularly vote?
9  A. No.
10 Q. Did you vote in the 2006 elections?
11 A. No, I did not.
12 Q. Did you vote in the 2004 elections?
13 A. No, I did not.
14 Q. Now, 2002, you moved into the MUD in the
15 summer?
16 A. Approximately. Or in July-August.
17 Q. So you would not have voted in the 2002 MUD
18 elections.
19 A. No. If they were prior to that, probably not.
20 Q. Do you have any recollection whether you did
21 or didn't?
22 A. No, I did not.
23 Q. Okay. Did you vote in the 2002 fall
24 elections?
25 A. No, I did not.

Page 11

1  Q. There are lots of reasons why people may or
2  may not vote in a particular election, so let me ask
3  you, with respect to the 2006 election, can you tell me
4  the reason why you didn't vote?
5  A. It was just personal reasons. I didn't think
6  there was a candidate worthy of my vote.
7  Q. And let me ask the same question for the 2004
8  election.
9  A. No issues that I think I could affect or were
10 important enough to vote for.
11 Q. And let me ask you the same for the 2002
12 elections.
13 A. Same thing.
14 Q. Okay. In each of those elections, you were --
15 you were aware that the election was taking place. Is
16 that correct?
17 A. Yes.
18 Q. And you could have chosen to vote.
19 A. I became a U.S. citizen I believe in 2000 --
20 between 2000 and 2003. I'm not really sure. I don't
21 remember exactly when, so...
22 Q. Well, congratulations.
23 A. Thank you.
24 Q. So assuming that I -- again -- so maybe the
25 answer on 2002 is different. I'm not --

Page 12

1  A. Possibly -- absolutely. It's a possibility.
2  Q. Do you recall whether --
3  A. I don't. It was -- I didn't bring -- I'm
4  sorry, I didn't think of that before. Just -- I don't
5  know the exact date and -- bad with names and bad with
6  dates.
7  Q. No apology needed. Just -- just you don't
8  recall whether you were eligible for the --
9  A. Yeah.
10 Q. -- 2002 election or not?
11 A. I don't.
12 Q. All right. With respect -- let me limit it,
13 then, with respect to 2004 and 2006. With respect to
14 those elections, both of them, you knew an election was
15 taking place.
16 A. Mm-hmm.
17 Q. Yes?
18 A. Yes. I'm sorry. Yes.
19 Q. I just want to make sure I get the answer on
20 the record. You knew where to go to vote if you had
21 wanted to -- if there had been a candidate or an issue
22 that you wanted to vote for.
23 A. Yes.
24 Q. Nothing prevented you from going to vote.
25 A. No.

Page 13

1  Q. Tell me a little bit about how you came to be
2  a defendant/intervenor in this lawsuit.
3  A. I -- there was a knock on my door and I was
4  informed that this lawsuit was going on in the MUD. So
5  I didn't have a lot of time. I talked with two people
6  for a few minutes, got their cards, and then I
7  researched the case and found out what was going on,
8  read up on it a little bit, understood what the issues
9  were.
10 Q. Who came to your door?
11 A. It was two people from MALDEF.
12 Q. And after speaking to these representatives
13 from MALDEF and doing some further research yourself,
14 you agreed with them to become a defendant/intervenor?
15 A. Yes.
16 Q. Let me ask you a couple of questions that -- I
17 represent the district in this lawsuit and litigation,
18 but I'm also sensitive to the fact, you know, that the
19 district is where you live.
20 A. Mm-hmm.
21 Q. All right? So in your discussions with the
22 representatives from MALDEF, and I don't -- I don't
23 want to know all the nature of your representations,
24 but I would like to know a little bit more about the
25 things that were said that ultimately convinced you

Page 14

1  to -- to join the lawsuit.
2  A. Okay.
3      MS. PERALES: Objection to the extent
4  that it calls for privileged communication while
5  Mr. Diaz was consulting with representatives of MALDEF
6  about his representation in this case.
7      MR. COLEMAN: That's -- that's a fair
8  objection, Counsel.
9  Q. (By Mr. Coleman) Let me -- let me try to
10 phrase it in a way... Without disclosing to me any of
11 the communications back and forth between you and your
12 lawyers, can you tell me a little bit about, in your
13 own mind, what were the things that led you to decide
14 to join the lawsuit?
15 A. It was based on what I read, not based on
16 discussions.
17 Q. Okay.
18 A. It was based on my evaluation of the -- of
19 that MUD meeting and the response that I received. And
20 based on what my view of what the MUD board should do.
21 Q. Okay.
22 A. And not do.
23 Q. Okay. So tell me specifically -- and you said
24 it's based on what you read and your feelings about
25 what the board should or shouldn't do. Can you -- can

Page 15

1  you articulate for me those things that you read or the
2  things that you believe the board should or should not
3  do?
4  A. This is something that was passed by the
5  Senate not too long ago with overwhelming success. I
6  feel it's based on what I read, something that needs to
7  be in place, and it's not something to be challenged by
8  people who are supposed to be representing a municipal
9  utility district. Supposed to take care of our parks.
10 That's what I thought the MUD did.
11 Q. Now, in referring to this, you're --
12 A. Mm-hmm.
13 Q. -- you're talking specifically about Section 5
14 of the Voting Rights Act?
15 A. I am.
16 Q. Okay.
17 A. Well, whatever section it is. Again, I'm bad
18 with numbers, bad with names.
19 Q. That's okay.
20 A. Section.
21 Q. Preclearance. Can we call it preclearance?
22 A. Yes.
23 Q. Is there a lot of regulation in your
24 employment?
25 A. I don't think that's relevant.

Page 16

1      MS. PERALES: You may answer.
2      THE WITNESS: Okay. There is, just like
3  in any other business, but...
4  Q. (By Mr. Coleman) Have you ever had
5  discussions or thoughts regarding some of that
6  regulation, that some of it seems innocuous and some of
7  it seems a hassle?
8  A. Agreed.
9  Q. Tell me about one that you think is a -- that
10 you've experienced in your job that's a hassle -- what
11 you think of a hassle.
12 A. I get around things reasonably well, so I
13 couldn't tell you one that keeps me up at night.
14 Q. Okay. Well, I'm not sure there are many that
15 keep any of us up at night, but -- but there are -- you
16 agree there are some that are a hassle?
17 A. Mm-hmm.
18 Q. Can you identify for me just one that you
19 think is a hassle?
20 A. Well, franchise tax.
21 Q. Okay. Are there -- do you work in an office
22 building?
23 A. I do.
24 Q. Are you aware of, like, various regulations
25 that govern how your space has to be constructed?

Page 17

1  A. I am.
2  Q. And your office -- your company tries to
3  follow all of those restrictions?
4  A. Mm-hmm. I think so.
5  Q. Do you agree that there's a difference between
6  building out your space in an office building and
7  compliance with -- with all existing laws and having to
8  prepare all -- your plans and basically submit them
9  ahead of time for preapproval?
10     MS. PERALES: Objection; lack of
11 foundation. I don't believe that the witness does any
12 of these tasks. I'm not sure if he can comment on --
13 or compare them.
14     MR. COLEMAN: I wasn't suggesting he does
15 them, only that he understands that there are
16 regulations in place that say, you know, hallways have
17 to be a certain width.
18     THE WITNESS: As an immigrant, I can tell
19 you that these regulations are what make this country
20 operate so well, so complete agreement with them most
21 of the time.
22 Q. (By Mr. Coleman) Okay.
23 A. I can't think of a single time that I wouldn't
24 be.
25 Q. And that's a good point. You can agree that

Page 18

1  these regulations are helpful to people. Right?
2  A. Mm-hmm. Especially Section 5 or 6.
3  Q. Okay. But it is -- it -- you agree it would
4  be an additional hassle to have to submit your plans,
5  your architectural plans ahead of time.
6  A. I agree.
7  Q. That is -- that's an additional hassle.
8  A. (Nods head) If I did that, I guess it -- if I
9  was getting paid for it, I don't know. I mean, it
10 depends. Right?
11 Q. But if you owned the company and you couldn't
12 build out your office space for two or three months
13 while you waited for that approval, it would be a --
14 A. I can see that.
15 Q. Even if, right, you agreed with all of the
16 regulations, you wanted to follow them, you wanted to
17 have full access, it would still be a hassle to get
18 approval ahead of time?
19     MS. PERALES: Objection. The
20 hypothetical is vague. I'll let the witness answer,
21 but I just want to go on the record as saying that you
22 may have lost me, at least, in -- in all of this.
23     THE WITNESS: Well, I don't think I would
24 break any fire codes or do anything that -- I think
25 there are regulations that need to stay in place. And

Page 19

1  the reason I'm in this is because I think this is one
2  of them. So we can move on to the next topic if you
3  would like and --
4  Q. (By Mr. Coleman) No, I --
5  A. My answer is that this is absolutely crucial
6  to the way this -- the political system operates.
7  Q. Okay. Object; nonresponsive.
8      I want -- I want to make sure my record
9  is clear. I thought you were agreeing that under my
10 complicated hypothetical, first, there's a difference
11 between obeying the regulations and having to get
12 approval ahead of time. You agree with that?
13     MS. PERALES: Objection; vague.
14     THE WITNESS: I guess I'm confused.
15 Q. (By Mr. Coleman) Well, let's -- let's just --
16 let's stay with one simple hypothetical. I'm building
17 out a hallway.
18 A. Okay.
19 Q. It needs to be five feet wide.
20 A. Mm-hmm.
21 Q. And let's say we agree that having a five-foot
22 wide hallway is a good thing.
23 A. Mm-hmm.
24 Q. There's a difference between building a
25 five-foot hallway and then having to submit your

Page 20

1  five-foot hallway for approval ahead of time.
2  A. I understand that.
3  Q. You agree. Right? There is a difference?
4  A. I agree that there's a difference.
5  Q. And would you also agree that there is an
6  additional level of intrusiveness or hassle associated
7  with having to submit that ahead of time versus simply
8  following the regulation?
9      MS. PERALES: Objection; vague.
10     THE WITNESS: I could...
11     MS. PERALES: You may answer.
12     THE WITNESS: I'll answer it. If that
13 five-foot hallway is going to hit a structural beam and
14 the building is going to collapse, I would rather
15 have -- go through the process and wait a little bit
16 longer to make sure the building doesn't collapse on
17 me. That would be my thought as to why the regulation
18 was there in the first place.
19 Q. (By Mr. Coleman) The regulation is there
20 so --
21 A. But --
22 Q. -- everybody can get through the hallway.
23 A. Mm-hmm.
24 Q. Right?
25 A. Again, I don't build structures, so if I hit

Page 21

1  one of these beams, what happens?
2  Q. Well, I think we're assuming -- let me --
3  assume with me there's no beam, they're simply checking
4  to make sure that your hallway is five feet wide.
5  A. Mm-hmm. But I'm assuming that there could be.
6  In -- in -- I know where you're going and I think --
7  Q. Okay.
8  A. -- I assume that there are certain pillars
9  that if taken away and given liberties, that
10 preclearance might affect it.
11 Q. I understand your objection with that, so I
12 want to go back.
13 A. Okay.
14 Q. And I'm going to ask you just to assume that
15 there aren't any obstructions.
16 A. I guess -- I can't assume that. I'm sorry.
17 Q. I am asking you to do that.
18 A. Okay.
19 Q. All right? So there's an additional hassle
20 and --
21 A. I don't believe it's a hassle. It's there for
22 a reason. So I -- maybe if we go back and -- it -- it
23 is time-consuming and it could cost time and money, but
24 if it's there, it's there for a reason. Am I happy
25 about it? Probably not. But do I agree that it's

Page 22

1  there for a reason? I think I do.
2  Q. All right. Let me ask you this way: You've
3  lived in El Paso.
4  A. Mm-hmm.
5  Q. Where did you live in El Paso?
6  A. I don't remember.
7  Q. On the east side, west side?
8  A. West side.
9  Q. West side. I'm -- I'm building two buildings.
10  A. Okay.
11  Q. One up on Mesa Drive and one in Las Cruces.
12  A. You know El Paso.
13  Q. I'm from El Paso.
14  A. Oh, okay.
15  Q. On Mesa Drive -- they're identical buildings.
16  Identical. On Mesa Drive I have to submit my plans for
17  preapproval and wait three or four months.
18  A. Mm-hmm.
19  Q. But in Las Cruces, I get to just build my
20  building. Now, wouldn't I -- wouldn't I think that
21  that was a little unfair or a hassle?
22       MS. PERALES: Objection; the witness is
23  being asked to describe how Mr. Coleman would feel on
24  this situation.
25  Q. (By Mr. Coleman) Would a reasonable person

Page 23

1  find that odd?
2       MS. PERALES: Objection; vague.
3  Q. (By Mr. Coleman) You can answer that.
4  A. I don't know, I'm not a builder. I'm sorry.
5  Q. Okay.
6  A. So... And you're asking me to be an expert at
7  building and I don't know buildings, so --
8  Q. No, I'm just asking you do you under -- I'm
9  just trying to probe whether you understand the
10  difference between a regulation that is good and that
11  everybody agrees is good and a regulation that says in
12  addition to following this, we want you to wait around
13  and go through some additional administrative work.
14       MS. PERALES: Objection to form. It's
15  not a question.
16  Q. (By Mr. Coleman) Since -- since you've been
17  in the district, you've been to one district meeting.
18  How did -- how did you come to attend that meeting?
19  A. I think one of my neighbors told me that there
20  was a meeting.
21  Q. Okay. Do you remember what neighbor that was?
22  A. Howard Seigel.
23  Q. And you decided to attend that meeting?
24  A. I did.
25  Q. Okay. And you attended it?

Page 24

1  A. I did.
2  Q. Did you sign in when you went in?
3  A. I did.
4  Q. Did you speak during that meeting?
5  A. I did.
6  Q. Were you recognized?
7  A. I was.
8  Q. Did you ever -- that's the -- that's the only
9  district meeting you've ever attended or wanted to
10  attend.
11  A. That I've ever attended. I think I want to
12  attend more now.
13  Q. You've never been -- you never had a meeting
14  you wanted to attend and were somehow --
15  A. No.
16  Q. -- kept from attending?
17  A. No.
18  Q. You -- because you have not voted in the
19  district, do you have any awareness of the district
20  voting procedures?
21  A. Vague, I would say. Some, enough to know...
22  Q. Tell me what you understand about the
23  procedures for voting in the district.
24  A. Couldn't tell you much. You go and you vote
25  and vote for a representative.

Page 25

1  Q. Do you know whether those procedures are fair?
2  A. I don't.
3  Q. You don't have any -- but you don't have any
4  complaints about --
5  A. I don't have anything that would lead me to
6  believe they're unfair.
7  Q. And based on your experience, you -- you don't
8  have anything that would lead you to believe that
9  there's anything illegal or wrong with the district's
10  voting procedures.
11  A. No.
12  Q. The district has never discriminated against
13  you on any basis, has it?
14  A. No.
15  Q. Let me -- let me go back. I -- we were -- I
16  was trying to talk about the difference between the
17  regulation parts of what -- of this Voting Rights Act
18  and the -- what I -- then the preclearance --
19  A. Mm-hmm.
20  Q. -- differences. Your disagreement with the
21  lawsuit has -- is primarily driven by your feeling that
22  the preclearance is a good thing. Is that correct?
23  A. One of them. That's one of the reasons.
24  Q. Okay. Tell -- tell me the others, if there
25  are others.

7 (Pages 22 to 25)

Page 26

1   A. I don't feel the MUD has the authority to be
2   involved in a case like this.
3   Q. That last reason, you disagree that the
4   district should or should not file a lawsuit like this.
5   A. I don't think the district should be involved
6   in a lawsuit like this.
7   Q. Okay. And you have expressed those feelings.
8   A. Yes.
9   Q. Just to go back and clarify, your belief that
10  preclearance is a good thing and should continue is
11  based not on concern that the district hasn't followed
12  the regulations, but that preclearance by itself is a
13  good thing.
14        MS. PERALES: Objection; calls for a
15  legal conclusion with respect to whether or not the
16  district has followed regulations.
17        THE WITNESS: I wouldn't know if they
18  have or not.
19  Q. (By Mr. Coleman) You don't -- you don't have
20  anything that leads you to think that they're -- that
21  they haven't.
22        MS. PERALES: Objection; lack of
23  foundation.
24  Q. (By Mr. Coleman) You're -- you're not
25  complaining that the district has not followed voting

Page 27

1   regulations. Right?
2         MS. PERALES: Objection; calls for a
3   legal conclusion.
4         MR. COLEMAN: I'm just asking if he's
5   factually complaining that the district has not
6   performed its elections in the right way.
7         THE WITNESS: I would rather not answer
8   that.
9         MS. PERALES: Subject to my objection,
10  I'll instruct the witness to go ahead and answer the
11  question.
12        THE WITNESS: I don't think the MUD had
13  the vote of the community to get involved in something
14  like this, therefore --
15        MR. COLEMAN: Objection; nonresponsive.
16        THE WITNESS: What does that mean?
17        MS. PERALES: Do you need to have the
18  question, the original question, read back to you
19  again? Would that be helpful?
20        THE WITNESS: Please.
21        (Requested portion was read)
22        THE WITNESS: Okay. It's a good thing.
23  I don't have any knowledge of the MUD not following
24  regulations. I couldn't say whether they have or not.
25  Q. (By Mr. Coleman) That's not your complaint.

Page 28

1   Right?
2   A. My complaint is the preclearance is good.
3   Q. I apologize. I think I have answers to these,
4   but I just want to make sure. You spoke to the
5   district's board members when you were in the meeting
6   that you attended.
7   A. I believe so.
8   Q. Outside that meeting, you've not had
9   conversations with any of them.
10  A. I have not.
11        MR. COLEMAN: I'm finished. I have no
12  further questions right now.
13        MS. PERALES: I have no questions of the
14  witness at this time.
15        MR. GARZA: I don't have any questions.
16        MR. BLUSTEIN: None.
17        (Deposition concluded at 5:10 p.m.)

Page 29

                CHANGES AND CORRECTIONS
WITNESS NAME: JOSE GABRIEL DIAZ   DATE: _____
Reason Codes: (1) to clarify the record; (2) to
conform to the facts; (3) to correct a transcription
error; (4) other (please explain).
PAGE   LINE   CHANGE              REASON CODE

[blank lines 6-25]

Page 30

```
1   PAGE  LINE  CHANGE            REASON CODE
2   _____
3   _____
4   _____
5   _____
6   _____
7   _____
8   
9   _____
    JOSE GABRIEL DIAZ
10
11
12  THE STATE OF _____ )
                           )
13  COUNTY OF _____ )
14     Before me, _____, on this day personally
    appeared JOSE GABRIEL DIAZ, known to me (or proved to
15  me under oath or through

16  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
18  expressed.
19     Given under my hand and seal of office this
    _____ day of March 2007.
20
21  _____
    NOTARY PUBLIC IN AND FOR
22  THE STATE OF _____
23
24
25
```

Page 31

```
1       IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2
    NORTHWEST AUSTIN          )
3   MUNICIPAL UTILITY DISTRICT )
    NUMBER ONE,               )
4   401 W. 15th Street        )   CIVIL ACTION NO.
    Suite 850                 )
5   Austin, Texas 78701       )   1:06-CV-01384
            Plaintiff,  )     (DST,PLF,EGS)
6   v.                        )
                              )
7   ALBERTO GONZALES,         )
    ATTORNEY GENERAL OF THE   )
8   UNITES STATES,            )
    U.S. Department of Justice )
9   950 Pennsylvania Avenue NW )
    Washington, D.C. 20530    )
10
          REPORTER'S CERTIFICATION
11        DEPOSITION OF JOSE GABRIEL DIAZ
             Thursday, February 22, 2007
12
13     I, RANDALL N. FINCH, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16     That the witness, JOSE GABRIEL DIAZ, was duly
17  sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given
19  by the witness;
20     That the deposition transcript was submitted
21  on February 26, 2007 to the witness or to the attorney
22  for the witness for examination, signature and return
23  to me by _____, 2007.
24     That the amount of time used by each party at
25  the deposition is as follows:
```

Page 32

```
1      Mr. Gregory S. Coleman - 37 minutes
2      Ms. Nina Perales - 0 minutes
3      That pursuant to information given to the
4   deposition officer at the time said testimony was
5   taken, the following includes counsel for all parties
6   of record:
7      Mr. Gregory S. Coleman, attorney for Plaintiff
8      Ms. Nina Perales and Mr. Carlos Becerra,
9   attorneys for MALDEF
10     Mr. Jose Garza, attorney for Texas Rio Grande
11  Legal Aid, Inc.
12     Mr. Chris Herren and Ms. Christy A. McCormick,
13  attorneys for U.S. Department of Justice
14     Mr. Benjamin Blustein, attorney for Lawyers'
15  Committee for Civil Rights Under Law
16     I further certify that I am neither counsel
17  for, related to, nor employed by any of the parties or
18  attorneys in the action in which this proceeding was
19  taken, and further that I am not financially or
20  otherwise interested in the outcome of the action.
21     Certified to by me this 26th day of February, 2007.
22
    _____
    RANDALL N. FINCH, Texas CSR #504
23  Expiration date: 12/31/2008
    Fredericks-Carroll Reporting
24  Firm Registration No. 82
    7800 Shoal Creek Blvd., Suite 200-W
25  Austin, Texas 78757 (512) 477-9911
```