

# AcuScribe
### COURT REPORTERS
When accuracy means everything.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL )
UTILITY DISTRICT NUMBER ONE )
)
)
VS.                         )   CIVIL ACTION NO.:
)   1:06-CV-01384
)   (PLF, DST, EGS)
ALBERTO GONZALES, IN HIS    )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**WILLIAM C. FERGUSON**

FEBRUARY 20, 2007

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONDENSED TRANSCRIPT AND KEYWORD INDEX

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701
512-499-0277
800-497-0277
512-499-0298 (fax)
www.acuscribe.com

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL *
UTILITY DISTRICT NUMBER ONE *
                              *
       Plaintiff              *
                              *
VS.                    * Civil Action No.
                       * 1:06-CV-01384
ALBERTO GONZALES, In his * (PLF, DST, EGS)
official capacity as          *
Attorney General of the       *
United States                 *
                              *
       Defendant              *

*********************************************
              ORAL DEPOSITION OF
              WILLIAM C. FERGUSON
              FEBRUARY 20, 2007
              VOLUME 1
*********************************************

## Page 2

    ORAL DEPOSITION OF WILLIAM C. FERGUSON,
VOLUME 1, produced as a witness at the instance of the
Defendant-Intervenors Texas State Conference of NAACP
Branches and Austin Branch of the NAACP, and duly
sworn, was taken in the above-styled and numbered cause
on the 20th day of February, 2007, from 9:35 a.m. to
11:59 a.m., before MARSHA EVANS, Certified Shorthand
Reporter in and for the State of Texas, reported by
machine shorthand, at the Embassy Suites Hotel,
300 South Congress Avenue, Austin, Texas, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 3

APPEARANCES

FOR THE PLAINTIFF:
    MR. GREGORY S. COLEMAN
    MR. CHRISTIAN J. WARD
    WEIL, GOTSHAL & MANGES, LLP
    8911 Capital of Texas Highway
    Building One, Suite 1350
    Austin, Texas 78759
    512-349-1937

FOR THE DEFENDANT ALBERTO GONZALES, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
    MR. CHRIS HERREN
    MS. CHRISTY A. MCCORMICK
    U.S. DEPARTMENT OF JUSTICE
    CIVIL RIGHTS DIVISION
    950 Pennsylvania Avenue, NW
    Room 7254 NWB
    Washington, DC 20530
    202-514-1416

FOR THE INTERVENOR TRAVIS COUNTY:
    MS. SHARON TALLEY
    ASSISTANT COUNTY ATTORNEY
    314 West 11th Street
    Granger Building, Suite 420
    Austin, Texas 78701
    512-854-9513

FOR THE INTERVENORS LISA AND GABRIEL DIAZ:
    MS. NINA PERALES
    MR. CARLOS BECERRA
    MALDEF
    110 Broadway, Suite 300
    San Antonio, Texas 78205
    210-224-5476

## Page 4

APPEARANCES (CONT'D)

FOR THE DEFENDANT-INTERVENORS RODNEY AND NICOLE LOUIS:
    MR. DEBO P. ADEGBILE
    NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
    99 Hudson Street, Suite 1600
    New York, New York 10013
    212-965-2249

FOR THE DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND AUSTIN BRANCH OF THE NAACP:
    MR. BENJAMIN BLUSTEIN
    LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
    1401 New York Avenue, NW, Suite 400
    Washington, DC 20005-2124
    202-662-8600

    --and--

    MR. PAUL R.W. WOLFSON
    WILMERHALE
    1875 Pennsylvania Avenue, NW
    Washington, DC 20006
    202-663-6390

ALSO PRESENT:
    Markell Pool

## Page 5

REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE

## Page 6

                INDEX
                                    PAGE

Appearances..................................  3
Stipulations.................................  5

WILLIAM C. FERGUSON
    Examination by Mr. Blustein..............  8

Changes and Corrections......................  92
Signature....................................  93
Reporter's Certificate.......................  94

                EXHIBITS

NO.  DESCRIPTION              PAGE/LINE REFERENCED

1............................................  12/10
    Notice of Deposition of Plaintiff Northwest
    Austin Municipal Utility District Number One

2............................................  22/3
    Plaintiff Northwest Austin Municipal Utility
    District No. 1's Answers to Private
    Defendant-Intervenor's Joint First Set of
    Interrogatories

3............................................  23/1
    Submission Under Section 5, Voting Rights
    Act

Page 7

EXHIBITS (cont'd)

NO. DESCRIPTION                    PAGE/LINE REFERENCED

4........................................... 42/20
   Election Agreement Between Travis County and
   Northwest Austin Municipal Utility District
   No. 1

5........................................... 59/23
   Resident List

Page 8

(1) WILLIAM C. FERGUSON,
(2) having been first duly sworn, testified as follows:
(3)        EXAMINATION
(4) QUESTIONS BY MR. BLUSTEIN:
(5)    Q. Good morning, Mr. Ferguson. My name is Ben
(6) Blustein. I'm an attorney with the Lawyers' Committee
(7) for Civil Rights in Washington, and I'll be taking your
(8) deposition here this morning. Can you please state
(9) your full name for the record?
(10)   A. William Chandler Ferguson.
(11)   Q. I represent the Texas State Conference of the
(12) NAACP, as well as the Austin Branch of the NAACP, and
(13) with me here this morning are colleagues of mine who
(14) represent various parties in this case. I'm going to
(15) start out asking you some questions, and the other
(16) folks in the room also have an opportunity to ask you
(17) questions.
(18)        Have you ever had your deposition taken
(19) before?
(20)   A. Yes.
(21)   Q. How many times?
(22)   A. I think two or three.
(23)   Q. And in what context was your deposition taken?
(24)   A. Two related to real estate matters and one
(25) related to a class action suit in which I was one of

Page 9

(1) the primary plaintiffs.
(2)    Q. Were any of those actions concerning your
(3) duties with the Municipal Utility District?
(4)    A. No, sir.
(5)    Q. Have you ever testified at a trial?
(6)    A. Yes.
(7)    Q. And which case was that?
(8)    A. Two of them. One of them was a real estate
(9) matter in Florida and then a class action suit in
(10) Dallas.
(11)   Q. What was the class action suit?
(12)   A. I was a lead with a group of plaintiffs who
(13) were suing the Federal Deposit Insurance Corporation
(14) over an employment-related matter out of the savings
(15) and loan crisis.
(16)   Q. I see. Let me go over some of the ground
(17) rules before we get started. I'll be asking you a
(18) series of questions. Both my questions and your
(19) responses will be taken down by the court reporter, as
(20) you're aware. Following the deposition you'll be
(21) provided with a written transcript which you'll have an
(22) opportunity to review.
(23)       If -- if you don't understand a question
(24) that I ask or think that it needs clarification, please
(25) tell me so, and I'll be happy to rephrase the question.

Page 10

(1) Is that fair?
(2)    A. Thank you.
(3)    Q. I'll try to wait until you finish your answer
(4) before I ask another question, and likewise if you
(5) could wait until I ask my question. It would be
(6) helpful to get a clean record if you were to answer
(7) yes-or-no questions with a yes or a no rather than
(8) saying huh-uh or uh-huh. And also the court
(9) reporter --
(10)   A. Understood.
(11)   Q. Okay. Thank you. And please let me know if
(12) you need to take a break for any reason, okay?
(13)       Is there any reason why you would be
(14) unable to give full and accurate testimony here today?
(15)   A. None that I'm aware of.
(16)   Q. You are giving a deposition today in two
(17) capacities. First, you're being deposed in your
(18) personal capacity as a witness who has personal
(19) information relevant to this lawsuit. And you've also
(20) been designated as a witness to testify on behalf of
(21) the Utility District on certain subjects. Is that your
(22) understanding?
(23)   A. If you define it as such.
(24)   Q. Is that your understanding of your role here
(25) today?

Page 11

(1)    A. Well, I just interpreted my -- that I was here
(2) because I was the president of the Utility District,
(3) not in a personal capacity.
(4)    Q. Okay. We have also noted your deposition in
(5) your personal capacity, so even if you haven't been
(6) designated to testify on behalf of the district on a
(7) given subject --
(8)    A. I will try to clarify if I'm answering whether
(9) it's in a personal capacity or if my answer pertains to
(10) my capacity as a member of the Utility District if
(11) there is some differentiation.
(12)   Q. Okay. Well, let's --
(13)       MR. BLUSTEIN: Let me ask your counsel at
(14) this point, what topics has Mr. Ferguson been
(15) designated to testify regarding?
(16)       MR. COLEMAN: We've reviewed with him the
(17) entire list that was sent around. He has more or less
(18) knowledge, and there are some about which he has no
(19) knowledge. But please feel free to ask him about
(20) anything on the list.
(21)       MR. BLUSTEIN: All right.
(22)   Q. (By Mr. Blustein) If you feel as if you're
(23) not able to give testimony on behalf of the district on
(24) a given subject or a given question that I ask you,
(25) will you tell me that?

Page 12

(1)    A. Yes, sir.
(2)    Q. Okay. And even if you're -- even if we
(3) establish that you're not able to give testimony on
(4) behalf of the district on that subject, I'll still ask
(5) you for your best personal recollection on that issue.
(6) Is that fair?
(7)    A. That's fair.
(8)    Q. Okay. Let me show you what's been marked
(9) as -- what will be marked, please, as Deposition
(10) Exhibit No. 1.
(11)       (Exhibit 1 marked)
(12)   Q. (By Mr. Blustein) For the record, this is the
(13) notice of deposition of Plaintiff, Northwest Austin
(14) Municipal Utility District Number One. Have you seen
(15) this document before?
(16)   A. Not that I recall. But I may have. Seems
(17) like I -- there are some questions at the end. Yes, I
(18) have seen this.
(19)   Q. Okay.
(20)   A. Deposition topics that I --
(21)   Q. That is -- is it your understanding that
(22) you'll be testifying as a corporate representative for
(23) the Utility District on these topics to the extent that
(24) you're able to?
(25)   A. Yes. If it's -- you know, if it's a personal

**Page 13**

(1) question, then I'll try to answer it in a personal
(2) capacity. As a Utility District I'll try to handle it
(3) that way.
(4)   Q. Okay. Let me ask you, what did you do to
(5) prepare for the deposition here today?
(6)   A. I read the questions or I went over the
(7) questions and that's all I've done.
(8)   Q. The questions being?
(9)   A. The questions that are attached to the -- or
(10) the topics. Deposition topics.
(11)   Q. Okay. And when did you review those?
(12)   A. Last week. Maybe three or four days ago.
(13)   Q. Did you review any other documents?
(14)   A. No, sir.
(15)   Q. Did you meet with your attorneys?
(16)   A. We've met several times, and we did meet last
(17) week.
(18)   Q. To discuss what -- to discuss this deposition?
(19)   A. More or less to -- not to prepare me in terms
(20) of my questions or how I would respond to questions but
(21) to let me know when I had to be here, what topics would
(22) be -- I would be asked. You know, those were presented
(23) by my counsel.
(24)   Q. Besides meeting with your attorney and
(25) reviewing the 30(b)(6) deposition notice, which is

**Page 14**

(1) Exhibit No. 1, did you do anything else to prepare for
(2) the deposition here today?
(3)   A. No, sir.
(4)   Q. Did you speak to anyone about the deposition
(5) other than your attorneys?
(6)   A. And my family and the people that I work with
(7) so that they would know where I was, no.
(8)   Q. The people that you work with, you mean people
(9) at the Utility District?
(10)   A. No. Just my employer.
(11)   Q. Did you speak with any other members of the
(12) board of the Utility District?
(13)   A. No. We have to be extremely careful about,
(14) you know, talking about Utility District matters
(15) outside of the Utility District meeting.
(16)   Q. You said that you didn't review any documents
(17) in preparation for the deposition.
(18)   A. No, sir.
(19)   Q. Did you collect any documents?
(20)   A. No, sir. I really didn't. Our attorney for
(21) the district retains all the documents, and I may have
(22) the agenda for the last three meetings and just to
(23) follow up and make sure that we've taken care of --
(24) taken care of everything that was on the agenda for the
(25) last few meetings because sometimes we have to table

**Page 15**

(1) some of the agenda items, but then I don't retain them.
(2)   Q. Who is the attorney for the district?
(3)   A. Frank Reilly.
(4)   Q. Are there any other attorneys who represent
(5) the district?
(6)   A. Greg Coleman represents the district in some
(7) other matters.
(8)   Q. Okay. Which matters does Mr. Coleman
(9) represent the district in?
(10)   A. In this particular matter that we're
(11) addressing today and then in one other matter in which
(12) we have a disagreement with the City of Austin on the
(13) way in which they've interpreted a state law.
(14)   Q. Okay. Is that the tax issue?
(15)   A. Yes.
(16)   Q. Okay. Other than this matter and the tax
(17) issue, does Mr. Reilly represent the district on all
(18) other matters?
(19)   A. I would say yes.
(20)   Q. Let me ask you some background questions if I
(21) could. Where do you currently live?
(22)   A. I live with the street address 10316 Canyon
(23) Vista Way, Austin, Texas, 78726. So I live in the
(24) district.
(25)   Q. And how long have you lived there?

**Page 16**

(1)   A. We've lived there since I think it was July
(2) 2001.
(3)   Q. Where did you live previously?
(4)   A. We lived on Metric Boulevard for a year in the
(5) City of Austin on the north side.
(6)   Q. Is that within the bounds of the district?
(7)   A. No.
(8)   Q. And did you grow up in Austin?
(9)   A. Grew up in Lynchburg, Virginia, moved to
(10) Atlanta, Miami, back to Atlanta, to Dallas, and then
(11) from Dallas to here.
(12)   Q. How long have you been in the Austin area?
(13)   A. Since I think it was July of 2000. It might
(14) have been August 2000.
(15)   Q. Can you tell me a little bit about your
(16) educational background? Where did you graduate from
(17) high school?
(18)   A. I graduated from EC Glass High School in
(19) Lynchburg, Virginia. I attended Hampden-Sydney
(20) College, got a bachelor's -- BA degree in economics and
(21) have just gotten additional education, professional
(22) education. I'm a real estate appraiser, have a brokers
(23) license. I have brokers license in several states.
(24) I'm a certified appraiser. And I'm currently employed
(25) in a large mortgage company in quality control.

**Page 17**

(1)   Q. What's the name of the mortgage company?
(2)   A. Countrywide.
(3)   Q. And what's your job title?
(4)   A. I think it's regional appraisal manager.
(5)   Q. And how long have you been working there?
(6)   A. Since May of last year.
(7)   Q. Where were you working previously?
(8)   A. I was self-employed for a number of years.
(9)   Q. In the same line of work?
(10)   A. Yes, sir. Or related, closely related.
(11)   Q. As a real estate appraiser?
(12)   A. Or in the real estate and mortgage industries.
(13)   Q. So you were living in the Austin area before
(14) you actually moved into the --
(15)   A. Yes, sir.
(16)   Q. -- bounds of the district?
(17)   A. Yes, sir.
(18)   Q. And why did you move into the district?
(19)   A. The homes there represented a pretty good
(20) value, I think, good schools, diverse neighborhood,
(21) easy to get to different places in the city, kind of
(22) scenic. We're adjacent to a canyon. There's lots of
(23) adjacent green space.
(24)   Q. You're a member of the board of the directors
(25) of the district, correct?

**Page 18**

(1)   A. Yes, sir.
(2)   Q. Okay. How long have you been a member of the
(3) board?
(4)   A. I was elected in I think it was 2002. And
(5) I've been reelected once.
(6)   Q. When was that reelection?
(7)   A. I'm not sure.
(8)   Q. Was that in 2006?
(9)   A. It was -- it was last year, but I don't
(10) remember -- I don't recall. I think it was May, but
(11) I'm not sure.
(12)   Q. And you're currently the president of the
(13) board?
(14)   A. I am.
(15)   Q. And how long have you held that position?
(16)   A. After the reelection the board met and elected
(17) officers, and I was elected at the meeting after the
(18) most recent election.
(19)   Q. So you've been president of the board --
(20)   A. Several months, but I'm not sure exactly how
(21) many months.
(22)   Q. You were elected in --
(23)   A. I was vice president prior to the preceding
(24) term.
(25)   Q. And when did you become vice president?

### Page 19

(1) A. After the -- I think it was 2002 when I was
(2) elected.
(3) Q. Have you held any other positions on the
(4) board?
(5) A. No, sir.
(6) Q. What compensation does a board member receive?
(7) A. They receive a hundred dollars for each
(8) meeting, and if there are additional time requirements
(9) of a significant nature the board can allow a per diem
(10) of up to a hundred dollars a day for additional work
(11) outside of the meetings.
(12) Q. When you first ran for the board in 2002, were
(13) you opposed by anyone?
(14) A. There was a slate, but I don't recall how many
(15) people were running. I remember three of us were
(16) elected in that election, Alan Weiss, Don Zimmerman and
(17) myself.
(18) Q. And when you ran for reelection last year were
(19) you opposed?
(20) A. Yes. As I recall, there were five candidates
(21) for three open spots.
(22) Q. Why did you become interested in serving on
(23) the board?
(24) A. The people in the community had been trying to
(25) address some issues within the community, and we

### Page 20

(1) decided or I think some of the people -- I decided for
(2) myself that the best way for me to get involved to try
(3) to solve some of the issues or address some of the
(4) problems for the community was by trying to seek a
(5) position on the Utility District.
(6) Q. And what specific issues are you referring to?
(7) A. Well, the primary issue that the community is
(8) concerned about is the tax issue that Greg is
(9) addressing, helping us address with the City of Austin.
(10) That was the primary driving issue.
(11) Q. And can you briefly describe what the
(12) concerns -- what your concerns are regarding the tax
(13) issue?
(14) A. We -- Texas and Florida and some other states
(15) have a law that allows a developer to create a Utility
(16) District in which he has the authority to -- the
(17) district has the authority to sell bonds to raise money
(18) to install water and wastewater systems with the bonds
(19) repaid over time by a real estate tax load. And in our
(20) particular community we pay for city taxes and we pay
(21) Utility District taxes, but as Greg helped us discover,
(22) there's a state law that says that if a city annexes a
(23) Utility District, then the city has to allocate the
(24) taxes so the people in that district charged no more --
(25) are charged no more than other city residents. And the

### Page 21

(1) city has refused to allocate their taxes consistent
(2) with that law, so Greg has petitioned to try to help us
(3) get that overturned.
(4) Q. And what's the status of that now?
(5) A. It was heard by the third district almost --
(6) in March it will be two years in appeal. Is that
(7) right?
(8) MR. COLEMAN: February.
(9) THE WITNESS: Okay. So it has been
(10) approximately two years since the appeal was heard, and
(11) we're waiting for a ruling.
(12) Q. (By Mr. Blustein) And that's the primary
(13) issue that drew you to be a member of the board?
(14) A. Yes.
(15) Q. Are you involved in any other community
(16) activities in the district?
(17) A. I'm a coach of a boys lacrosse team that's
(18) primarily, you know, guys that -- boys that live in the
(19) neighborhood. And that's really about it.
(20) Q. The other gentlemen that you mentioned,
(21) Mr. Weiss and Mr. Zimmerman, who ran with you in the
(22) 2002 election, did you know them previously?
(23) A. No, I did not.
(24) MR. BLUSTEIN: Will you mark this as
(25) Exhibit 2, please?

### Page 22

(1) (Exhibit 2 marked)
(2) Q. (By Mr. Blustein) Mr. Ferguson, I've shown
(3) you what's been marked as Exhibit No. 2, which is a
(4) copy of the district's responses to the first set of
(5) interrogatories that were jointly submitted by the
(6) private defendant-intervenors. Let me ask you to --
(7) have you seen this document before?
(8) A. Yes, I have.
(9) Q. Okay. If you'll turn to page 15. I'm sorry.
(10) Page -- yeah. You have two page 15's. The second page
(11) 15.
(12) A. Okay.
(13) Q. Where there's --
(14) MR. COLEMAN: The verification.
(15) THE WITNESS: Oh, I'm sorry. Got you.
(16) Q. (By Mr. Blustein) Okay. Is that your
(17) signature?
(18) A. Yes, sir, it is.
(19) Q. Okay. And did you review these responses to
(20) the interrogatories?
(21) A. Yes. I read them.
(22) Q. Okay. And you verified the accuracy of the
(23) responses?
(24) A. Yes, sir.
(25) MR. BLUSTEIN: Will you mark this

### Page 23

(1) Exhibit 3, please?
(2) (Exhibit 3 marked)
(3) Q. (By Mr. Blustein) I'll show you another
(4) document that's dated February 26, 2004. Have you seen
(5) this document before?
(6) A. If you'll give me just a minute.
(7) Q. Sure.
(8) A. I don't specifically recall examining this
(9) document.
(10) Q. If you'll -- if you'll look on the first page
(11) with me, it's on the letterhead of the law firm of
(12) Potts & Reilly.
(13) A. Yes.
(14) Q. And that's the attorney for the district?
(15) A. It is.
(16) Q. Okay. And if you'll read with me, it's a
(17) letter to the Department of Justice. The top up in the
(18) heading it says submission under Section 5 of the
(19) Voting Rights Act. You were on the board in February
(20) of 2004, were you not?
(21) A. I was.
(22) Q. Okay. And at that time the district entered
(23) into a joint election agreement with Travis County,
(24) Texas?
(25) A. That's correct.

### Page 24

(1) Q. Okay. And do you recall that the district
(2) submitted a submission to the Department of Justice
(3) regarding that agreement with Travis County?
(4) A. Yes, sir, that was my understanding.
(5) Q. Okay. Is it your understanding that this
(6) document is the submission?
(7) A. It certainly appears to be so.
(8) Q. Okay. Turning your attention to the first
(9) page of the document, where it says background and
(10) history, the heading there.
(11) A. Yes, sir.
(12) Q. Okay. If you'll read with me. And for the
(13) record, this is Bates number P 009609. The document
(14) reads, quote, the district is a Municipal Utility
(15) District and was created in March of 1988 by the Texas
(16) Water Commission under the provisions of Chapter 54 of
(17) the Texas Water Code. At that time the district
(18) provided water, sanitary sewer, and storm drainage
(19) services to the area within its boundaries. However,
(20) those services are now provided by the City of Austin,
(21) end quote.
(22) Let me ask you, when did the City of
(23) Austin assume responsibility for providing water and
(24) sanitary sewer and storm drainage services to the area
(25) within the district?

Page 25

(1) A. Well, this particular district -- some water
(2) districts have their own water treatment facilities.
(3) This particular district does not. It's a retail --
(4) all the members of the district are retail customers of
(5) the Austin water and sewer. So we all pay for water
(6) and sewer to the city. It's just that the Utility
(7) District installed the water and sewer lines and as
(8) part of their agreement with the city conveyed those
(9) lines to the city, and we've done that as they've been
(10) completed.
(11) Q. Okay. If you'll continue with me.
(12) A. Sure.
(13) Q. In that same paragraph under background and
(14) history it says, "The district's current functions
(15) include the payment of existing bonds and contracts and
(16) maintenance of the common areas within the district."
(17) Is that an accurate statement of the district's current
(18) functions and services?
(19) A. Yes, sir.
(20) Q. Are there any other services that the district
(21) provides?
(22) A. Well, I think part of the public services is
(23) we have a community park and we maintain the park, and
(24) we've got some walking trails. We maintain the walking
(25) trails. They're on MUD-owned land.

Page 26

(1) Q. What's the name of the park?
(2) A. Trailhead Park.
(3) Q. Are there any other functions that the
(4) district performs?
(5) A. Those are the primary functions. The
(6) maintenance of the park and the paying of the bonded
(7) indebtedness. We did examine -- we previously examined
(8) invoices related to the developer's claim of, you know,
(9) how much was spent and approved those invoices, but the
(10) district has been fully built out now. So this would
(11) be, you know, a pretty good summary of what their
(12) current responsibilities are.
(13) Q. Okay. If you'll read with me again on the
(14) next paragraph it says that the district boundaries are
(15) essentially the same as the boundaries of the Canyon
(16) Creek subdivision located in Northwest Travis County,
(17) Texas. Is that an accurate statement?
(18) A. Well, we -- the district owns some property
(19) adjacent to the community. As long as it's all
(20) considered together I would say that's a reasonable
(21) statement. Yes, sir.
(22) Q. Does the entirety of the district lie within
(23) Travis County?
(24) A. Yes, sir.
(25) Q. And what voting precinct or precincts is the

Page 27

(1) district currently situated in?
(2) A. That I'm not completely sure of because I
(3) think it's 333, but I'm not sure.
(4) Q. Is there just one precinct that the district
(5) is situated in?
(6) A. No. Actually, it's split, and it gets kind of
(7) confusing when we're holding elections as to which
(8) people -- when we moved the elections from Jack
(9) Stueber's garage to the school, some of the people that
(10) voted at the school are in different districts. So
(11) some of the people can vote on MUD issues and some
(12) can't. Travis County makes a determination of who is
(13) in the district and who is not.
(14) Q. How long has that been the case?
(15) A. Well, this petition was -- since -- I'm aware
(16) of since the 2004 election, and we moved it to the
(17) school. And prior the elections were held separately,
(18) so -- in Jack Stueber's garage. So everyone -- I mean,
(19) that was the only issue on the ballot in Jack Stueber's
(20) garage, was who was running for the MUD. And so then
(21) when we moved it to the school to increase
(22) participation, you know, there are other issues. We
(23) wanted everyone to be able to vote at one time so we
(24) get a pretty good turnout, so there are a lot of
(25) other -- there are other city, state, and sometimes

Page 28

(1) perhaps even national. I don't know when the election
(2) coincides with, but, you know, there are a number of
(3) items that come up on the agenda and the MUD is just --
(4) the MUD board election is just one of the elements on
(5) the ballot.
(6) Q. Tell me if I have this right. Some of the
(7) residents of the district vote in one precinct and some
(8) of the residents in the district vote in another
(9) precinct?
(10) A. I think there's some -- well, we hold -- we
(11) now hold the elections at Canyon Creek Elementary
(12) School, which is in the district, but some of the
(13) people that vote there may not live in Canyon Creek.
(14) I'm not exact -- I can't say that I've examined the
(15) boundaries, but in talking to people outside of the
(16) polling place, the appropriate distance from the front
(17) door, of course, I find that some people show up to
(18) vote and they're not in the Utility District so they're
(19) not allowed to vote there. So, you know, I don't know
(20) specifically -- you know, the county determines who is
(21) in closest proximity to the voting place to make it the
(22) most convenient, so some people are allowed -- that
(23) live in the district are allowed to vote on district
(24) matters and some of them are not at the polling place.
(25) Q. Has there been an annexation of the district

Page 29

(1) since you've been on the board?
(2) A. No.
(3) Q. Let me ask you some additional questions about
(4) the board of directors. Is it fair to say the board --
(5) the board members manage the affairs of the district?
(6) A. Yes.
(7) Q. And --
(8) A. Or their agents. Through their agents they
(9) manage the affairs.
(10) Q. And --
(11) A. And we have an accountant and an attorney,
(12) Frank Reilly, you know, our agents, but yes.
(13) Q. Who is the accountant?
(14) A. We just got the annual audit and we have
(15) switched accountants once and I can't recall
(16) specifically. I'm sure Greg could get you that
(17) information, but I don't specifically recall the name
(18) of the firm.
(19) Q. This is -- is there recent --
(20) A. Yes, sir. We have to get an annual audit,
(21) send it to the Texas Water Control Board, I think, for
(22) approval.
(23) Q. Was there a different accountant since you've
(24) been on the board?
(25) A. We switched accountants once. They made some

Page 30

(1) changes to state law that affected the Utility
(2) District, and one accountant wanted to charge us
(3) significantly more than we thought was appropriate and
(4) so we found someone else that we thought was equally
(5) capable that would do it at a lower fee, so we made a
(6) change.
(7) Q. Who was that previous accountant?
(8) A. Once again, I'm -- you know, I'm sure we could
(9) get that information for you, but I don't recall.
(10) Q. So in addition to the accountant and the
(11) attorney, are there any other agents of the district
(12) that the --
(13) A. We did have a district engineer who advised
(14) the district on expenses for water, sewer, wastewater
(15) lines, but since that's been built out we no longer
(16) interact. His name was Ken Schrader. We also have a
(17) management company that manages the park for us, takes
(18) reservations to use the fields, makes sure the grass is
(19) cut, the bills are paid, the trash is picked up, those
(20) sort of matters.
(21) Q. Any other --
(22) A. And that is called Real Manage. That contract
(23) is with Real Manage.
(24) Q. Are there any other agents of the district?
(25) A. Well, there are subagents. There are some

(Pages 25 to 30)

31

(1) companies that work for the agents, but those are the
(2) direct agents that I recall.
(3)   Q. Does the district have any employees?
(4)   A. No. This district does not have any
(5) employees.
(6)   Q. Is it fair to say that the board members also
(7) make policy for the district?
(8)   A. Within the constraints of the law. Well,
(9) consistent with the law we try to interpret, you know,
(10) what we can and can't do and what we should and
(11) shouldn't do, if that's making policy.
(12)   Q. And do the board members also handle
(13) administrative matters for the district?
(14)   A. In certain situations, yes, they would.
(15)   Q. What kind of situations?
(16)   A. We had a broken water line last week, and so
(17) the bathroom was shut off in the park and people
(18) continued to use it and so I -- instead of getting the
(19) management company down there I just worked directly
(20) with the plumber to go down there, and we dug it out
(21) and fixed it.
(22)   Q. How is it determined which board members will
(23) hold the positions of president and vice president?
(24)   A. Elections are typically held right after a
(25) change in a new election.

32

(1)   Q. Who votes in those elections -- in those
(2) elections?
(3)   A. The board members vote in open meeting, you
(4) know, with input from the community. If the community
(5) has any sort of say we always ask the members if they
(6) have any recommendations.
(7)   Q. What are the specific duties of the president
(8) of the board?
(9)   A. Primarily to conduct the meetings, which are
(10) monthly, and deal with any other matters that come
(11) before the board that may have to be taken up or
(12) approved outside of meetings, such as signing documents
(13) or other similar issues.
(14)   Q. Who has held the position of president since
(15) you've been on the board in 2002?
(16)   A. Don Zimmerman was elected president when I was
(17) elected -- when I was elected vice president, and then
(18) I was elected president as a result of the more recent
(19) election in which I was reelected.
(20)   Q. What dates did Mr. Zimmerman hold the position
(21) of president?
(22)   A. It would have been 2002 to 2006, I think it
(23) is, and then I would have -- you know, in the election
(24) last year I was.
(25)   Q. Who is the current vice president?

33

(1)   A. George Frederickson.
(2)   Q. If I could turn your attention once again
(3) to -- I believe it's the second deposition exhibit,
(4) which is the answers to interrogatories.
(5)   A. Yes, sir.
(6)   Q. And if you'll turn with me to page 11 of that
(7) document, which is the district's answer to
(8) Interrogatory No. 17.
(9)   A. Yes, sir.
(10)   Q. This identifies the members of the board of
(11) directors who have served on the board since the
(12) inception of the district, does it not?
(13)   A. I assume so. A lot of these people were there
(14) before I got there. The people that have served since
(15) I've been on the board are Ed Swarthout, Karen
(16) Temborius, Don Zimmerman, myself, George Frederickson
(17) and Alan Weiss, who does -- for some reason doesn't
(18) appear on the list.
(19)   Q. Do you know which individuals listed in the
(20) response to Interrogatory No. 17 have served as
(21) president of the district?
(22)   A. Besides Don Zimmerman, I would -- I would
(23) speculate if I said which of the other names was
(24) president when we were elected. I think it was Scott
(25) Storm, but I'm not sure. I'd have to go back and check

34

(1) my records. We don't -- those -- to the best of my
(2) knowledge the people that were on the board, to qualify
(3) for serving on the board you had to own property within
(4) the district, but they didn't really -- the people that
(5) were on the board that left when we were elected didn't
(6) necessarily live in the district. They just owned
(7) property in the district. The developer would convey
(8) an interest in the -- in some property so that they
(9) could -- they could serve.
(10)   Q. What are the eligibility requirements for
(11) serving on the board?
(12)   A. That you own property in the district. You
(13) don't have to live in the district. You just have to
(14) own property in the district. That's my understanding.
(15)   Q. Is that eligibility requirement pursuant to
(16) the state law?
(17)   A. I believe so, yes, sir.
(18)   Q. Are there any other requirements?
(19)   A. There are probably some requirements in terms
(20) of being truthful and honest and maybe even not being a
(21) felon, but specifically -- I'm not specifically aware
(22) of. One primary issue for most candidates is to own
(23) property in the district. Karen Temborius was on the
(24) board for a number of years and sold her house and then
(25) no longer had -- you know, owned property in the

35

(1) district so she had to resign.
(2)   Q. Are there any candidate filing fees?
(3)   A. I think there are, but they're nominal. I
(4) think I paid to file maybe $10.
(5)   Q. Do you recall what the process is whereby a
(6) candidate for membership on the board files for
(7) candidacy?
(8)   A. They contact the MUD attorney and the MUD
(9) attorney -- they don't have to, but the MUD attorney
(10) can give them the documents that they have to be filled
(11) out. They don't have to do that. And then they file
(12) with the election board to become a candidate. I don't
(13) know specifically. I think it's the MUD attorney who
(14) actually determines whether or not the candidates
(15) qualify to serve on the board by checking or verifying
(16) that they own property in the district or otherwise
(17) qualify in other ways. And that would be Frank or
(18) whoever came before Frank.
(19)   Q. And the written documents that a candidate
(20) prepares when the candidate declares a candidacy, do
(21) you know where they are filed?
(22)   A. No, sir, I don't.
(23)   Q. Does the district maintain a list of
(24) candidates who have filed to be a candidate for board
(25) membership?

36

(1)   A. I suspect they're in the records somewhere,
(2) but I don't retain anything like that.
(3)   Q. Currently who does retain the documents
(4) relating to the district's operations?
(5)   A. Frank Reilly.
(6)   Q. Are records relating to the district's
(7) operations maintained in any other location?
(8)   A. No, sir.
(9)   Q. And physically are those documents now housed
(10) in Mr. Reilly's offices?
(11)   A. I can't specifically say. I doubt that they
(12) are. I think they're retained somewhere off-site in a
(13) secure location.
(14)   Q. If I could turn your attention again to the
(15) answer to Interrogatory No. 17, which lists the members
(16) of the board of directors. Which of these individuals
(17) do you know personally?
(18)   A. Well, I've met them through serving on the --
(19) on the board. Don Zimmerman, George Frederickson. I
(20) know Allen Jensen, Karen Temborius, Edward Swarthout,
(21) and I don't know any of the others. I may have met
(22) Scott Storm at one meeting, but I can't really say that
(23) I know him. It was a handshake sort of a situation.
(24)   Q. Are any of the individuals that you just
(25) listed African-American?

(Pages 31 to 36)

### Page 37

(1) A. Not that I'm aware of.
(2) Q. Are any of the individuals you mentioned as
(3) knowing personally Hispanic?
(4) A. Not that I'm aware of.
(5) Q. Do you know if any African-American
(6) individuals have ever served on the board since its
(7) inception?
(8) A. Not that I'm aware of.
(9) Q. That same question with respect to any
(10) Hispanic or Latino individuals who have served on the
(11) board.
(12) A. No one who has told me that they're Hispanic
(13) or --
(14) Q. You indicated that the board meets monthly?
(15) A. Yes, sir.
(16) Q. And where does the board currently meet?
(17) A. We routinely meet at the Lutheran church on
(18) Route 620 in an upper room. We pay the church $25.
(19) They've got plenty of parking. They're very
(20) accommodating. So we generally meet in a second floor
(21) room at Peace Lutheran Church.
(22) Q. How long has the board been meeting there?
(23) A. When I was originally elected we were meeting
(24) in the model of one of the builders that -- the
(25) meetings were held in one of the model units of the

### Page 38

(1) builder in Canyon Creek. And then we moved it shortly
(2) thereafter. After I was elected we moved it to the
(3) Lutheran church, and we've been there ever since.
(4) However, there have been some situations in which we
(5) had to move, because the church wasn't available, to an
(6) alternative location. So I think Frank has listed as
(7) alternative locations his office. And I remember we
(8) were locked out of the church one time so we had to
(9) meet in front of the church in a seated area because
(10) the person that has the key to the church forgot it so
(11) we all met under the trees in front of the church on
(12) some benches.
(13) Q. Do you how -- do you know for how long the
(14) board was meeting in the model unit?
(15) A. No, sir, I don't.
(16) Q. How long do meetings typically last?
(17) A. Probably around two hours. That would be a
(18) typical meeting. We're trying to keep them down, but
(19) we want input from the community and we have a lot of
(20) people that show up and want to express their opinion.
(21) And since we can only -- really communicate about
(22) district matters at the meeting, we allow them some
(23) leeway and give them five, ten minutes to talk about
(24) their issues.
(25) Q. Currently how many people, approximately, from

### Page 39

(1) the community attend the board meetings?
(2) A. Generally I would say 12 to 15.
(3) Q. Has that number changed over time since you've
(4) been a member of the board?
(5) A. Depends on what issues are active in the
(6) community. Sometimes we'll have a significantly higher
(7) number and sometimes less. There have been meetings
(8) that we have held in which, you know, 70 people have
(9) showed up.
(10) Q. Are there any state regulations that you're
(11) aware of that govern or relate to the way that the MUD
(12) governs itself?
(13) A. There are, but I'm -- I am not specifically
(14) aware or familiar with those. Only our attorney, Frank
(15) Reilly, is very familiar with those and so he keeps us
(16) in check and tells us, like I said, what we can and
(17) can't do according to law. And I'm not familiar with
(18) the specific numbers. I know one issue came up
(19) recently in which one of the board members interpreted
(20) a continuing education requirement as applying to him
(21) since he handles financial matters, Ed Swarthout, and
(22) so he asked Frank Reilly if, in fact, he had to get
(23) this continuing education to serve in this capacity as
(24) treasurer for the district, and Frank said, "According
(25) to this law, no, you're exempt." So generally we look

### Page 40

(1) for Frank's counsel on all these matters.
(2) Q. You have not had occasion to refer to those --
(3) to any --
(4) A. No, sir, not specifically.
(5) Q. -- regulations of that nature? Are there any
(6) policies or procedures that have been generated by the
(7) district that govern the way that the district handles
(8) its affairs?
(9) A. Other than state law, no.
(10) Q. So the district, to your knowledge, doesn't
(11) have any written policy manual or procedures manual?
(12) A. Not that I'm aware of.
(13) Q. How were -- how are decisions of the board
(14) made? By a majority of the board?
(15) A. Yes. Majority vote, making sure we've got
(16) enough members there to vote on the various issues that
(17) come up.
(18) Q. While you have the Exhibit No. 2 in front of
(19) you, the answers to interrogatories, if you'd turn with
(20) me, please, to Page No. 12. This -- page 12 shows the
(21) district's answer to Interrogatory No. 18 which begins
(22) on the preceding page. And this interrogatory asks for
(23) the identity of each person who has been a candidate
(24) for election to the board of directors of the district.
(25) And the district's answer sets forth a list of

### Page 41

(1) individuals.
(2) Did you have any involvement in preparing
(3) this particular --
(4) A. No, sir, I did not.
(5) Q. What individuals on this list are you
(6) personally familiar with?
(7) A. Alan Weiss, myself, Allen Jensen, Don
(8) Zimmerman. I've met -- not met Oliver Ban
(9) specifically, but I have had conversations with him.
(10) Ed Swarthout serves on the board, Karen Temborius.
(11) Franklin Lassandro was one of the candidates at the
(12) most recent election. I have met with him. Russell
(13) Hill was one of the candidates at the most recent
(14) election and attends our meetings. Rob Ratcliff was
(15) elected in the most recent election and, of course,
(16) attends our meetings and serves, and then George
(17) Frederickson who serves as the vice president.
(18) Q. Are any of those individuals you just named
(19) African-American?
(20) A. Not that I'm aware of.
(21) Q. Are any of those individuals you just named
(22) Latino?
(23) A. Not that I'm aware of or that they've notified
(24) me that they are.
(25) Q. Are you aware of any candidates or membership

### Page 42

(1) on the board who are African-American since the
(2) district's inception?
(3) A. No, I am not.
(4) Q. Same question --
(5) A. That have, you know, told me that they were or
(6) same question with Latino, no. None that have told me
(7) that they were Latino.
(8) Q. Has anybody ever advised you that any
(9) African-American or Latino candidates have ever run for
(10) membership on the board?
(11) A. No.
(12) Q. Has there ever been an effort, to your
(13) knowledge, by the district to speak to any black or
(14) Latino residents of the district for the purpose of
(15) encouraging them to run for the board?
(16) A. Addressing them specifically, no. We address
(17) everyone in general.
(18) (Exhibit 4 marked)
(19) Q. (By Mr. Blustein) Okay. Mr. Ferguson, I'm
(20) showing you what's been marked as Exhibit No. 4. And
(21) for the record, this is a letter on the letterhead of
(22) the law firm of Potts & Reilly dated February 27, 2006,
(23) Bates numbers P 009708 through 9720. Have you seen
(24) this document before?
(25) A. No, sir.

43

(1) Q. If you'll look on the second page with me at
(2) Bates P 009709, the heading reads Election Agreement
(3) Between Travis County and Northwest Austin Municipal
(4) Utility District Number One. Are you -- are you
(5) familiar with an election agreement between that
(6) county --
(7) A. Yes, sir. I knew it existed, yes.
(8) Q. Okay. Does that --
(9) MR. COLEMAN: Make sure you let him
(10) finish the question.
(11) THE WITNESS: Oh, I'm sorry.
(12) MR. BLUSTEIN: Thank you.
(13) Q. (By Mr. Blustein) But you've not seen the
(14) agreement itself?
(15) A. This agreement specifically I can't say that I
(16) have seen it. I noticed that it was signed by the
(17) president of the district, and I know it was discussed
(18) and presented at a meeting, but I can't specifically
(19) say that I have read and examined everything in it.
(20) It's just that through a consensus the district
(21) approved this procedure that was suggested by Frank
(22) Reilly, our attorney, for agreeing with the county on
(23) how they would hold the elections. And they charge us
(24) for that. I forgot what the fee is, but --
(25) Q. Is it your understanding that the agreement

44

(1) with Travis County provides that the Travis County
(2) clerk will conduct the district's elections and that
(3) the district can use the county's election equipment?
(4) MR. COLEMAN: If you know. If you know.
(5) THE WITNESS: Okay. When I have voted in
(6) the county elections for the MUD we have used the
(7) county's equipment.
(8) Q. (By Mr. Blustein) The election agreement
(9) between the -- between the district and Travis County
(10) essentially is that the county will conduct --
(11) A. Yes.
(12) Q. -- the district's elections?
(13) A. That's right.
(14) Q. Okay.
(15) A. They're our agent when they conduct. That's
(16) right. They are our agent to conduct the election.
(17) Q. And the district entered this agreement with
(18) Travis County so that the county would provide these
(19) election services for the district in the future,
(20) correct?
(21) A. Well, it's a renewable agreement I'm assuming,
(22) but we have no reason to -- yes. There could be -- I
(23) assume that there could be changes in the future but,
(24) you know, the county is doing a good job as far as I
(25) know. We're very pleased with the elections that they

45

(1) hold on our behalf.
(2) Q. Pursuant to the agreement with Travis County
(3) there are still some election-related duties that the
(4) district is responsible for; is that correct?
(5) A. Could you be a little more specific?
(6) Q. Yeah. If you'll turn to page 2 of this
(7) exhibit, Exhibit No. 4, the Bates number is P 009710.
(8) And the last paragraph which is labeled C, capital C,
(9) if you'll read with me it says, quote, "The
(10) participating entity shall continue to perform those
(11) election duties listed in one through eight below and
(12) any other election duties that may not be delegated to
(13) another governmental entity," end quote. And then on
(14) the following page it lists the eight categories of
(15) duties. Do you see that?
(16) A. I do.
(17) Q. Is it your understanding that these are the
(18) responsibilities of the district?
(19) MR. COLEMAN: Are you asking what he
(20) understands or are you asking what the document says?
(21) THE WITNESS: Yeah. I'm a little stuck
(22) here. I'm not quite sure that I've --
(23) Q. (By Mr. Blustein) Okay. Let's look at the
(24) numbers one through eight on page 3 of the document,
(25) okay?

46

(1) A. Yes, sir.
(2) Q. All right. The first one is, quote,
(3) preparing, adopting, and publishing all required
(4) election orders, resolutions, notices and other
(5) documents. It goes on to describe some additional
(6) materials. That's one of the duties that the district
(7) is responsible for?
(8) A. In this particular agreement, right. It is
(9) asked of Travis County to help with it, yes.
(10) Q. Okay. Then the second item listed on page 3,
(11) it says, "Preparing federal Voting Rights Act election
(12) preclearance submissions to the Department of Justice,
(13) other than changes in a joint election conducted under
(14) this agreement that directly affect the county." Do
(15) you see that?
(16) A. Yes, I do.
(17) Q. Okay. Now, is it your understanding that
(18) pursuant to this agreement the district would not be
(19) responsible for preparing a preclearance submission to
(20) the Department of Justice for any voting changes that
(21) relate to a joint election where those changes directly
(22) affect Travis County?
(23) A. I'm not sure I understand the question
(24) specifically. However, if you're asking me why item 2
(25) is in that list, I will say that the district is

47

(1) concerned about conserving financial resources, and any
(2) responsibility of the district that we can try to ask
(3) someone to help us comply with, which doesn't cost
(4) us -- you know, I'm sure it's built into the fee that
(5) Travis County charges us, but specifically I think that
(6) the district recognizes that's one of its requirements.
(7) It is just asked in this specific document that Travis
(8) County share that responsibility with the district, but
(9) ultimately I think it's the district's responsibility.
(10) Q. It's your -- if I can summarize -- and tell me
(11) if I accurately summarize what you said. One of the
(12) consequences of this agreement with Travis County is
(13) that Travis County will file certain preclearance
(14) submissions with the -- with the Department of Justice
(15) rather than the district having to file those?
(16) A. It appears that the district has asked the
(17) county to do that, but ultimately I think it's the
(18) district's responsibility to make sure it gets done.
(19) Q. But it's the county that actually performs the
(20) work under the agreement in certain circumstances?
(21) A. Well, we have asked the county to agree to do
(22) that. I don't know that they've ever actually done
(23) that for us. That's been one of the -- it's something
(24) we have asked them to do, but I'm not sure they have
(25) ever done it.

48

(1) Q. Since the district entered into this agreement
(2) in 2006 with Travis County, have there been any voting
(3) changes, to your knowledge, that have prompted Travis
(4) County to submit a preclearance submission to the
(5) Department of Justice?
(6) A. No.
(7) Q. Are you certain that none -- that no such
(8) submissions have occurred or --
(9) A. I'm not aware of any.
(10) Q. You are not aware of any. Since the district
(11) entered into this agreement with Travis County in 2006,
(12) has the district itself submitted any preclearance
(13) submissions to the Department of Justice?
(14) A. Not that I'm aware of.
(15) Q. You said you were at a meeting when this
(16) agreement with Travis County was discussed?
(17) A. All items like this are discussed in open
(18) meetings before they are approved. However, generally
(19) we make a motion, the board approves the motion, and
(20) then it's actually acknowledged by the president, and
(21) then the president takes responsibility if he's
(22) acknowledging it to make sure that the other board
(23) members understand the general nature of all the
(24) components within it. And that's why I couldn't say
(25) that I had specifically seen it. However, I knew that

Page 49

(1) we had entered into an election agreement with Travis
(2) County.
(3)    Q. Did you vote in favor of entering into the
(4) election agreement with Travis County?
(5)    A. I don't specifically recall, but if you were
(6) asking me to speculate I'd say yes.
(7)    Q. And there was discussion on -- among the
(8) members of the board regarding entering into the
(9) agreement with Travis County, correct?
(10)   A. Generally on any issue that comes before the
(11) board there's some discussion, but I can't specifically
(12) recall what discussion was raised or issues concerned
(13) in entering this agreement.
(14)   Q. Well, let me ask you what factors went into
(15) the decision to enter into this agreement whereby
(16) Travis County would conduct elections for the district.
(17) Were there monetary considerations or time-saving
(18) considerations? Can you elaborate on that?
(19)   A. Both. If -- generally speaking, when we moved
(20) the elections from Jack Stueber's garage and asked the
(21) county to hold it -- hold elections at one time that
(22) suited the board it was because we wanted to make sure
(23) that as many members of the community could participate
(24) in the election process as possible, because before,
(25) you had to go find Jack Stueber's house. You had to go

Page 50

(1) make sure Jack and his wife were in the garage to take
(2) your vote. It was extremely cumbersome. And we wanted
(3) to make sure that we got as much participation in the
(4) community as possible. So we asked the county if they
(5) would be willing to hold the election on our behalf,
(6) and then we tried to push -- you know, like any other
(7) agreement, we tried to save money where we can. And so
(8) we tried to push as much responsibility Travis County
(9) would reasonably accept as possible. And I don't know
(10) to what -- I don't think there's anything the county
(11) hasn't done that didn't meet our expectations. Like I
(12) said, we've been very pleased with the county holding
(13) our elections on our behalf.
(14)   Q. Which elections has Travis County held on
(15) behalf of the district?
(16)   A. The -- there have been two elections. There
(17) were two members that came up in '04 for reelection.
(18) Both were reelected. And then '06. Now, there may
(19) have been some elections that they held before that,
(20) but I'm not familiar with those. Three memberships
(21) came up in '06, two in '04. Ed Swarthout and Karen
(22) Temborius were up in '04, and then myself and George
(23) Frederickson were up in '06.
(24)   Q. Let me turn your attention if I could to the
(25) February 26, 2004 letter from the law firm of Potts &

Page 51

(1) Reilly. You have it in front of you there? I think
(2) it's the 2004. I apologize for not knowing the number
(3) offhand. There you go. Is that No. 3?
(4)    A. It's Exhibit 3.
(5)    Q. Okay.
(6)       MS. PERALES: What's the tab number?
(7)       MR. BLUSTEIN: It's -- the tab is tab 95.
(8)    Q. (By Mr. Blustein) And let me turn your
(9) attention specifically to page 3 of that document. For
(10) the record, it will be Bates number P 009611. And
(11) turning your attention to the heading halfway down the
(12) page where it says Election Day Polling Place.
(13)   A. Yes, sir.
(14)   Q. Okay. Last sentence of that page -- on that
(15) page says, quote, furthermore, Travis County has the
(16) financial ability and economies of scale to use
(17) electronic ballots instead of paper ballots used by the
(18) district in the past, end quote. Was one of the
(19) factors that went into having Travis County conduct
(20) elections for the district the fact that Travis County
(21) could use electronic ballots in district elections?
(22)   A. It would appear to have been an argument that
(23) was made in this particular document, but I don't know
(24) that there were ever any voting irregularities that
(25) were observed or claimed when the district was using

Page 52

(1) paper ballots. I think that -- I'm not sure that I
(2) can -- it would appear to be the point was that it
(3) might be less expensive using electronic equipment than
(4) paper ballots, but --
(5)    Q. Prior to the agreement with Travis County the
(6) district used private homes as a polling place for
(7) district elections; is that correct?
(8)    A. I'm only familiar with the one that was held
(9) in Jack Stueber's garage. So I can't specifically say
(10) where the prior elections were other than when I was
(11) elected to the board the polling place was Jack
(12) Stueber's garage.
(13)   Q. Do you know why the district used private
(14) homes prior to the agreement with Travis County?
(15)   A. No, sir.
(16)   Q. Do you know if the district ever considered
(17) using public places as polling locations?
(18)   A. I do not know. This was prior to, you know,
(19) us moving in Jack Stueber's garage.
(20)   Q. When was the first election that was held at
(21) the Canyon Creek Elementary School precinct?
(22)   A. The -- to the best of my knowledge is the 2004
(23) election in which two board seats were up for election.
(24)   Q. So the 2004 and 2006 elections were held at
(25) Canyon Creek Elementary School?

Page 53

(1)    A. Yes, sir.
(2)    Q. Since the polling place was moved to Canyon
(3) Creek Elementary School in 2004, do you know if there
(4) has been an increase in the percentage of minority
(5) residents who have turned out to vote?
(6)    A. No, sir, I don't.
(7)    Q. Let's go back to the agreement with Travis
(8) County, if you would.
(9)       MR. COLEMAN: Which one?
(10)      MR. BLUSTEIN: That would be the --
(11)      MR. COLEMAN: 2004 or 2006?
(12)      MR. BLUSTEIN: 2006.
(13)      THE WITNESS: Exhibit 4.
(14)   Q. (By Mr. Blustein) Thank you. And if I could
(15) turn you to page 3 again, the list of eight duties.
(16) The third duty is, quote, preparing the text for the
(17) participating party -- participating entity's official
(18) ballot in English and Spanish, or other languages as
(19) required by law, end quote. Is that one of the
(20) district's current duties relating to elections?
(21)   A. I'm not -- I wouldn't say that -- I don't know
(22) enough about election law to know if that's one of the
(23) district's responsibilities. However, I will say that
(24) we want to make sure that everyone that's qualified can
(25) vote.

Page 54

(1)    Q. Who actually performs that duty, if you know?
(2)    A. Well, since we ask the county to do it as our
(3) agent, I'm assuming it's the person at the poll who
(4) would ask the person who showed up to present evidence
(5) that they're qualified to vote if they would prefer an
(6) English or Spanish ballot.
(7)    Q. The No. 4 relates to providing the election
(8) officer with a list of candidates or propositions.
(9) Is -- does somebody in the district perform that duty
(10) relating to elections?
(11)   A. Frank Reilly.
(12)   Q. Okay. Conducting the official canvass of the
(13) election, that's No. 5. Who performs that duty within
(14) the district?
(15)   A. I think in that particular case it was the --
(16) we asked Travis County to act as our agent in that
(17) capacity.
(18)   Q. No. 6 is administering the participating
(19) entity's duties under state and local campaign finance
(20) laws. Do you know what the duties of the district are
(21) under state and local campaign finance law?
(22)   A. No, sir.
(23)   Q. Is that something that Frank Reilly would have
(24) knowledge of?
(25)   A. I can't speak for Frank, but hopefully between

(Pages 49 to 54)

Page 55

(1) Frank and the Travis County election board, yeah, they
(2) would know that and take care of that for us as our
(3) agent.
(4) Q. Who serves as the custodian of the district's
(5) election records?
(6) A. Well, I would assume it's Travis County and
(7) any -- and to a certain extent Frank Reilly.
(8) Q. And No. 8 talks about the annual voting system
(9) report to the Secretary of State. Are you familiar
(10) with that report?
(11) A. No, sir, I'm not.
(12) Q. Does the district currently perform any
(13) functions relating to registering voters?
(14) A. No, sir.
(15) Q. Has the district ever performed that function,
(16) to your knowledge?
(17) A. Not since I've been a member of the board.
(18) Q. Prior to you becoming a member of the board,
(19) do you know if the district was responsible for
(20) registering voters?
(21) A. No, sir, I do not know.
(22) Q. Does the -- does the district possess any
(23) information regarding the total population of persons
(24) living in the district?
(25) A. No, sir.

Page 56

(1) Q. I take it the district does not possess any
(2) information regarding the racial and ethnic composition
(3) of the district's population.
(4) A. No, sir.
(5) Q. Are there any African-American residents of
(6) the district?
(7) A. You're asking me to speculate on how they
(8) would -- yes, there's an African-American family on my
(9) street.
(10) Q. You've lived in the district for over five
(11) years now, correct?
(12) A. Yes, sir.
(13) Q. Okay. And so you're -- you're personally
(14) aware of there being African-American residents in the
(15) district?
(16) A. Yes, sir.
(17) Q. How many African-American families are you
(18) aware of who live in the district?
(19) A. You know, I really have a relationship with
(20) the people that live on my street and I've met one
(21) other family, but, you know --
(22) Q. You've met one of the African-American
(23) families that live in the district?
(24) A. Yes.
(25) Q. What's the family's name?

Page 57

(1) A. I'm trying to remember because she has a
(2) different last name than he does. He is a Realtor.
(3) His kids are in high school, and I can't remember his
(4) oldest son's name. I'm bad with names, so would it be
(5) possible for me to come back later and tell you
(6) specifically who it is?
(7) Q. That's fine. That's fine. This is the family
(8) that lives on your street?
(9) A. Yes, sir.
(10) Q. Okay. Are you personally familiar with any of
(11) the other African-American families who live in the
(12) district?
(13) A. Not -- I don't have a relationship with them
(14) and their kids aren't on the lacrosse team, so -- there
(15) have been some that showed up at the MUD board meetings
(16) and I've, you know, met them that way, but, you know,
(17) outside of that relationship I don't have a -- sort of
(18) a personal relationship like I do with the family that
(19) lives on my street.
(20) Q. Are you personally familiar with any of the
(21) Latino residents of the district?
(22) A. No.
(23) Q. Do you have any knowledge of how many Latino
(24) families --
(25) A. Can I go back?

Page 58

(1) Q. Sure.
(2) A. How do you define Latino?
(3) Q. That's a good question.
(4) A. Yeah. Because it's sort of a self-certifying.
(5) My wife's father is Mexican, so I don't know if
(6) she's -- to some people she would consider herself
(7) Latino and to others she wouldn't, you know. I don't
(8) know.
(9) Q. Does the district maintain any information
(10) regarding the identity of the individual residents of
(11) the district?
(12) A. That would be to what class they consider
(13) themselves to fall within?
(14) Q. No, just -- well, that would be one.
(15) A. No. We maintain no records of that sort.
(16) Q. Is there -- putting aside the race or
(17) ethnicity of the residents, is there a list of -- that
(18) the district maintains of the district residents?
(19) A. No. The homeowners association has a list of
(20) residents, but the voter district does not.
(21) Q. What's the name of the homeowners association?
(22) A. Canyon Creek Homeowners Association.
(23) Q. Do you know who the president of that is?
(24) A. Jenny Jensen.
(25) Q. Do you know her personally?

Page 59

(1) A. Yes, sir.
(2) Q. And how long has she been the president?
(3) A. Allen Jensen is her husband, who served on the
(4) MUD board previously or was up for election of the MUD
(5) board because I saw his name listed, and she has
(6) been -- Allen was the president for a couple of years,
(7) and she has served I think for the last two years.
(8) Q. Are you a member of the homeowners
(9) association?
(10) A. As a member of -- yes. Everyone that lives in
(11) the community is. It's sort of a required membership
(12) that, you know, you pay to -- so yes. I'd say as a
(13) property owner I am.
(14) Q. Okay. Does the homeowners association have
(15) regular meetings?
(16) A. Yes. Had one last night.
(17) Q. Did you attend?
(18) A. I did not.
(19) Q. Have you attended meetings --
(20) A. Yes, I have.
(21)     (Exhibit 5 marked)
(22) Q. (By Mr. Blustein) Mr. Ferguson, I'm showing
(23) you what's been marked as Exhibit No. 5. Have you ever
(24) seen this document before? This is tab 116. For the
(25) record --

Page 60

(1) A. No, I have never seen this before.
(2) Q. For the record, the first page of the document
(3) is Bates No. P 009997. Do you know what this document
(4) is?
(5) A. It would appear to be a list of property
(6) owners' names dating April 8th, 1992. I'm assuming
(7) these are the names of the people that had some sort of
(8) property interest in the addresses listed here.
(9) Q. This was -- for the record, this is one of the
(10) documents that the -- that the district produced to us.
(11) Do you know what entity generated this particular
(12) document?
(13) A. It says it was faxed from the Blanton Company,
(14) but no, I don't. Outside of -- outside of that I do
(15) not know.
(16) Q. Do you know what the Blanton Company is?
(17) A. Blanton Company was one of the developers of
(18) the community. They -- it's my understanding that the
(19) Blanton Company or an interest in the company acquired
(20) a property interest in the community from the
(21) Resolution Trust Corporation, but the extent of their
(22) interest I'm not aware.
(23) Q. Are you aware of any current resident list for
(24) the Canyon Creek property owners that's maintained by
(25) any entity?

(Pages 55 to 60)

**61**

(1) A. The homeowners association has a directory
(2) that's not, you know, widely available, but there is a
(3) directory of people who are willing to allow, you know,
(4) the name -- their names and the names of their kids to
(5) be placed in the directory so that we can communicate
(6) with one another. However, there are some people that
(7) don't want their names in there because they're afraid
(8) the list will fall into someone else's hands that's
(9) trying to solicit for something and they don't want to
(10) be called or they don't want people to know their kids'
(11) names to try to become familiar with their kids. There
(12) are security reasons. So I don't think any
(13) comprehensive list even exists with the homeowner
(14) association in terms of something that's publicly
(15) available.
(16) Q. Can I turn you back to Exhibit No. 3, which is
(17) the February 26, 2004 submission from the firm of
(18) Potts & Reilly? All right. If you'll look on the
(19) second page of that document, the bottom paragraph.
(20) There's a discussion if you'll look at that for a
(21) moment regarding the district's population. Take a
(22) moment to read that, please. Have you read that?
(23) A. Yes, sir.
(24) Q. There's a reference in that paragraph to an
(25) estimate regarding percentage of African-American

**62**

(1) families within the district, an estimate having been
(2) made by the former general manager of the district. Do
(3) you see that at the --
(4) A. Yes, sir.
(5) Q. Do you know who that general manager is?
(6) A. No, sir, I do not know who the general manager
(7) was in 2002.
(8) MR. COLEMAN: Oh, I'm sorry.
(9) Q. (By Mr. Blustein) What are the qualifications
(10) to be eligible to vote in district elections?
(11) A. Whatever qualifications exist for a general
(12) election other than the fact that property owners --
(13) that it's people that live in the district that vote
(14) for the Utility District. So Travis County is trying
(15) to identify those people for us that live in the
(16) district that can vote in the MUD election, but it's
(17) just a registered voter, just -- when the MUD
(18) election -- that was another problem that when the MUD
(19) election was held in Jack Stueber's garage, I don't
(20) know what criteria Jack Stueber and -- you know, would
(21) have been used at that time for Jack Stueber to
(22) identify who's a qualified voter and who is not other
(23) than the county's general election list of who lived in
(24) the community based on their property address.
(25) Q. Does the district currently possess any

**63**

(1) information regarding the identity of individuals who
(2) are registered to vote in the district?
(3) A. No, sir.
(4) Q. Who is responsible for maintaining that
(5) information?
(6) A. I suspect that we rely on the county to
(7) maintain and manage that for us.
(8) Q. Does the district have any information
(9) regarding the identity of individuals who have voted in
(10) district elections in the past?
(11) A. No, sir.
(12) Q. Can you vote in district elections if you are
(13) a renter of property in the district as opposed to an
(14) owner of property?
(15) A. Interesting question. I'm not sure I have an
(16) answer for you.
(17) MR. BLUSTEIN: Why don't we take a
(18) five-minute break.
(19) (Recess from 10:56 to 11:08)
(20) Q. (By Mr. Blustein) Mr. Ferguson, let me ask
(21) you the converse of the question I left you with, which
(22) is, can an individual vote if the individual owns
(23) property in the district but doesn't actually live in
(24) the district?
(25) A. You know, that would be up to the Travis

**64**

(1) County. You can serve on the board. You have to own
(2) property in the district to serve on the board, but in
(3) terms of voting, I don't know who checks that. The
(4) biggest problem we faced as a board was trying to make
(5) sure that Travis County had appropriately identified
(6) who was in the Canyon Creek community so that we could
(7) try to eliminate any voting errors, you know, for them
(8) that might have been unforeseen when they were taking
(9) this responsibility on for us.
(10) Q. What steps did you take to try to identify
(11) residents?
(12) A. Frank, he would -- well, I remember -- recall
(13) when we were entering into the agreement there was a
(14) discussion about that, but specifically I wasn't -- I
(15) took no steps to do that.
(16) Q. Do you know if anybody did?
(17) A. I know it was discussed, but specifically -- I
(18) don't know specifically who addressed that with whom
(19) or -- but I do recall that being discussed at a meeting
(20) when we were discussing transferring the responsibility
(21) to Travis County.
(22) Q. Earlier this morning I asked you some
(23) questions about whether you knew if any Latinos had
(24) served on the board or had declared candidacy for the
(25) board, and you gave me answers to those questions. And

**65**

(1) what definition of Latino were you using when you gave
(2) a response to those questions?
(3) A. Well, it's my understanding that Hispanic and
(4) Latino -- I don't know if you can even use them -- that
(5) is somewhat of a self-certifying designation that you
(6) can't strictly use surnames to try to interpret how
(7) someone interprets their upbringing or the language
(8) that they spoke at home or the social aspect of their
(9) community. It's not something that you could readily
(10) visualize, so that's why -- you know, we had a Hispanic
(11) family on our street, but they spoke extremely good
(12) English. So unless you knew -- you know, heard them
(13) talking with their kids, then you wouldn't have known
(14) that they were a Hispanic family. So that's why it's
(15) difficult to try to casually observe and draw some sort
(16) of conclusion from casual observations.
(17) Q. But as I understand it, you were not aware of
(18) any Hispanic candidates for membership on the board?
(19) A. None that specifically told me or disclosed to
(20) me that they considered themselves Hispanic.
(21) Q. Likewise with respect to -- that would be with
(22) respect to both membership on the board as well as
(23) candidates for membership?
(24) A. Yes.
(25) Q. You're familiar, are you not, with something

**66**

(1) known as Section 5 of the Voting Rights Act?
(2) A. I'm not an attorney, but to a certain extent I
(3) have some information.
(4) Q. It's your understanding that Section 5 relates
(5) to a requirement that some jurisdictions must seek
(6) preclearance of voting changes from the federal
(7) government?
(8) A. Is Section 5 the --
(9) MR. COLEMAN: If you know.
(10) THE WITNESS: Well, specifically I don't
(11) know which section it is, but I understand that the
(12) district is subject to a preclearance issue.
(13) Q. (By Mr. Blustein) Okay. When did you first
(14) become aware that the district was covered by this
(15) preclearance requirement?
(16) A. When we tried to move the general election
(17) from Jack Stueber's garage to the school so that we
(18) would get better community turnout. It would be more
(19) convenient for everyone that was going to vote to vote
(20) so we would get better turnout.
(21) Q. This was in 2004?
(22) A. Yes.
(23) Q. And who advised you that the district was
(24) subject to the preclearance requirement?
(25) A. I think it was our attorney, Frank Reilly.

(Pages 61 to 66)

**Page 67**

(1) Q. Prior to that you weren't aware that the
(2) district was subject to the preclearance requirement?
(3) A. No, sir.
(4) Q. Does Mr. Reilly currently handle the
(5) submissions that the district makes to the Department
(6) of Justice under the preclearance requirements?
(7) A. As our attorney I assume that he either makes
(8) whatever appropriate contact or petitions that are
(9) required under law or his agent that he designates
(10) would do so.
(11) Q. Are you familiar with Ms. Sharlene Collins?
(12) A. I have met her, yes.
(13) Q. Has -- has she ever handled the submission of
(14) preclearance requests for the district?
(15) A. I have no knowledge. Sharlene Collins was the
(16) attorney for the district when I was elected to the
(17) board, and it was shortly after I was elected that we
(18) replaced her with Frank Reilly.
(19) Q. And why was she replaced with Frank Reilly?
(20) A. The board felt like it was going to be
(21) entering into some litigation against the city that
(22) might include some documents that she had been involved
(23) with, and so we wanted to eliminate any conflict of
(24) interest that might exist with her prior relationship
(25) with the developer.

**Page 68**

(1) Q. Is there a reason that the district has a
(2) lawyer make the preclearance submissions to the
(3) Department of Justice as opposed to having a board
(4) member perform that duty?
(5) A. Well, to the degree that we want to conform to
(6) the law we just -- it seemed appropriate to have our
(7) attorney who would be familiar with the law take care
(8) of that responsibility for us. I can't say that any
(9) board member is familiar enough with that law in order
(10) to attempt to comply with it and do so appropriately.
(11) I don't think that -- well.
(12) Q. Let me turn your attention again if I could to
(13) the February 26, 2004 submission from Potts & Reilly.
(14) Has the -- has the district, to your knowledge,
(15) submitted any preclearance requests to the Department
(16) of Justice since this 2004 request?
(17) A. Not to my knowledge.
(18) Q. And this 2004 submission was the only
(19) submission -- the only preclearance submission that the
(20) district has filed since you became a board member in
(21) 2002, correct?
(22) A. Yes, sir.
(23) Q. And if you'll turn on page 2 of the document,
(24) Bates number P 009610, it lists seven prior submissions
(25) that the district has made to the Department of Justice

**Page 69**

(1) since the district's inception. You see that there?
(2) A. Yes, sir.
(3) Q. Are you aware of any other submissions that
(4) the district has made to the Department of Justice
(5) seeking preclearance other than these listed on page 2?
(6) A. No, other than the one that we made in 2004,
(7) which, you know, isn't shown here.
(8) Q. Which is, in fact, the document --
(9) A. Right.
(10) Q. Okay. Did the district seek preclearance of
(11) the agreement with Travis County to conduct the
(12) district's elections in 2006?
(13) A. It was my understanding that you only have
(14) to -- that you have to petition the Justice Department
(15) when a change is made and since no change was made in
(16) 2006 that we were in compliance with the preclearance
(17) issue and that no petition had to be made.
(18) Q. Has the district ever made a change affecting
(19) voting for which the district did not submit a
(20) preclearance request?
(21) A. Not that I'm aware of and not since I've been
(22) on the board.
(23) Q. Has the district ever considered any voting
(24) changes other than the ones reflected in the February
(25) 2004 submission?

**Page 70**

(1) A. Right now we are pleased with the way Travis
(2) County is conducting the elections on our behalf.
(3) Q. Since you've been a member of the board in
(4) 2002 there has been no situation which the district has
(5) considered a voting change but not pursued it; is that
(6) correct?
(7) A. Other than the change that was made in the
(8) 2004 election, right. We've gone through two elections
(9) at the school, and we're currently pleased with the
(10) results.
(11) Q. Has the district ever decided not to pursue a
(12) change in elections because it did not want to submit a
(13) preclearance request to the Department of Justice?
(14) A. Would you repeat that?
(15) Q. Has there ever been a situation when the
(16) district was considering making a change in voting but
(17) decided not to because it did not want to submit a
(18) preclearance request to the Department of Justice?
(19) A. Not that I'm aware of.
(20) Q. Are you aware of any submissions that the
(21) district has made seeking preclearance which were
(22) denied by the Department of Justice?
(23) A. No.
(24) Q. Are you aware of any preclearance submissions
(25) that were submitted by the district in which the

**Page 71**

(1) Department of Justice sought additional information
(2) beyond what the district had submitted?
(3) A. Not personally.
(4) Q. Have you ever heard of that situation
(5) occurring?
(6) A. I don't recall hearing it, no.
(7) Q. Have you ever heard of any situations in which
(8) the district submitted a request for preclearance and
(9) the Department of Justice sought meetings or interviews
(10) with district officials?
(11) A. I'm not aware of that circumstance.
(12) Q. You indicated that the February 26, 2004
(13) submission was the only preclearance submission that
(14) has been submitted since you became a board member in
(15) 2002?
(16) A. Say that again, please. I want to make sure I
(17) got the dates correct.
(18) Q. Sure. Since you became a board member in 2002
(19) only one preclearance submission has been submitted by
(20) the district, and that is the --
(21) A. That's my understanding.
(22) Q. -- February 2004 submission. Who prepared
(23) this submission?
(24) A. Frank Reilly.
(25) Q. On page 5 it's signed by Kerrie Jo Qualtrough.

**Page 72**

(1) Do you see that?
(2) A. Yes, sir.
(3) Q. Is she an attorney in Mr. Reilly's office?
(4) A. That's my understanding, yes, sir.
(5) Q. And this submission consists of this five-page
(6) letter to the Department of Justice with some
(7) attachments?
(8) A. Yes, sir.
(9) Q. Did you review the February 26, 2004
(10) submission after Ms. Qualtrough prepared it?
(11) A. Not that I recall, no, sir.
(12) Q. Do you know if any of the members of the board
(13) of the district reviewed the submission after
(14) Ms. Qualtrough prepared it?
(15) A. Don Zimmerman appears to have reviewed it.
(16) Q. And why do you say that?
(17) A. Okay. I'm sorry.
(18) Q. Mister -- Mr. Zimmerman signed the actual
(19) agreement with Travis County, correct?
(20) A. That is correct. I'm sorry.
(21) Q. Do you know if any members of the board
(22) actually reviewed the letter that Ms Qualtrough had --
(23) A. No, sir, I do not know.
(24) Q. Do you know how much you were -- do you know
(25) how much the board was charged for -- by the firm of

(Pages 67 to 72)

**Page 73**

(1) Potts & Reilly for preparing the submission?
(2) A. Specifically, no, sir.
(3) Q. Do you know who would have that information?
(4) A. Potts & Reilly.
(5) Q. Do you know if you were charged by the hour or
(6) for the entire project?
(7) A. Our current agreement with Potts & Reilly --
(8) I'm not sure what the agreement was at that time --
(9) includes a base amount plus any additional item on an
(10) hourly basis. And I suspect this would have been
(11) included as an additional item, so I think it was
(12) charged on an hourly basis, but I'm not entirely sure.
(13) Q. Have you personally found the preclearance
(14) procedures to be burdensome?
(15) A. We were going to address questions personally
(16) and as president of the Utility District. And I'd say
(17) as a person, no.
(18) Q. And why is that?
(19) A. Because most people are unaware that this even
(20) exists. I mean, most voters. When we -- when this was
(21) discussed in the meetings, most of the people that
(22) showed up at the meetings to discuss other issues in
(23) the district were not generally aware of the
(24) preclearance requirement.
(25) Q. And you yourself have not been required to

**Page 74**

(1) perform any particular functions relating to the
(2) preclearance requirement, correct?
(3) A. As a person, no. But as the head of the
(4) Utility District I know that we're subject to the
(5) preclearance requirement.
(6) Q. And speaking on behalf of the district, has
(7) the district found the preclearance requirement to be
(8) burdensome?
(9) A. If I can speak for the district, yes.
(10) Q. And why has it been burdensome for the
(11) district?
(12) A. Because it costs the district time and money.
(13) Q. How much time specifically has it -- did the,
(14) for example --
(15) A. I don't think we've got a -- I'm sorry.
(16) Finish.
(17) Q. Well, how much time did the board members put
(18) into the -- reviewing the February 26, 2004 document
(19) prepared by Ms. Qualtrough?
(20) A. Specifically I can't comment on that because I
(21) only personally know that it was discussed at the
(22) meeting, but there would have been the time it was
(23) discussed at the meeting and then the additional
(24) expense of paying the attorney to file on our behalf to
(25) make sure we were in compliance with the law and then

**Page 75**

(1) the additional time of making sure that it was all
(2) taken care of so that our general election could be
(3) held legally in compliance with the law before the --
(4) and we could hold a valid election and enter into an
(5) agreement with the county.
(6) Q. How much time was spent at the meeting
(7) discussing the February 26, 2004 --
(8) A. I don't know.
(9) Q. -- requirement? Or letter, rather.
(10) A. I don't know.
(11) Q. Was the February 26, 2004 submission discussed
(12) at only one board meeting?
(13) A. That I don't know. You'd have to check the
(14) minutes to see.
(15) Q. Other than the time that you mentioned that
(16) the district put into the February 26, 2004 requirement
(17) and the money that was paid to the law firm to do the
(18) work, are there any other burdens that the February 26,
(19) 2004 submission caused the district?
(20) A. Well, there is the uncertainty of knowing
(21) whether or not the Justice -- how the Justice
(22) Department is going to respond to the petition and
(23) whether or not if the Justice -- if they turned down
(24) your request whether or not you're going to have enough
(25) time to change it or meet their requirements and, you

**Page 76**

(1) know, be prepared to hold a valid election on time.
(2) Q. Are there any other burdens?
(3) A. The expense burden of trying to pay someone to
(4) file the petition and comply with the law so that you
(5) can make sure that you're in compliance.
(6) Q. Any other burdens?
(7) A. Not any obvious ones that I'm thinking of
(8) right at this particular point in time.
(9) Q. Let me ask you about litigation brought by or
(10) against the district where the district was a party.
(11) Has -- other than the tax case that you mentioned
(12) earlier, has any litigation ever been brought by the
(13) district?
(14) A. By or against the district?
(15) Q. By the district.
(16) A. And that would be only in the time when I was
(17) serving on the board. That's the primary litigation
(18) that I'm familiar with, although we had been sued by
(19) other parties. Specifically, the developer has sued us
(20) for what he perceives as a delay in payment or
(21) reimbursement for his -- some of his expenses.
(22) Q. Was that suit filed since you've been on the
(23) board?
(24) A. Yes, sir.
(25) Q. And what is the status of that?

**Page 77**

(1) A. Frank Reilly is trying to work with the
(2) developer to meet -- Frank Reilly is dealing with it so
(3) I can't specifically say, but there are some contested
(4) reimbursements that the developer has not received that
(5) the developer thinks he's entitled to that the board is
(6) not necessarily sure the developer is entitled to.
(7) Q. Have any other suits been brought by the
(8) district since you've been on the board?
(9) A. Not that I'm aware of.
(10) Q. Are you aware of any suits brought either by
(11) or against the district prior to you becoming a board
(12) member?
(13) A. No, sir.
(14) Q. Has there ever been any litigation involving
(15) the district in which issues of race or ethnicity or
(16) membership in a language minority group were raised?
(17) A. No, sir.
(18) Q. Has anybody ever filed a claim of
(19) discrimination on the basis of race or ethnicity
(20) against the district?
(21) A. Not that I'm aware of.
(22) Q. Any EEOC complaints alleging employment
(23) discrimination?
(24) A. No, sir.
(25) Q. Or any complaint relating to housing

**Page 78**

(1) discrimination?
(2) A. Not that I'm aware of.
(3) Q. Any complaint relating to voting
(4) discrimination?
(5) A. Not that I'm aware of.
(6) Q. Are you familiar with the term bailout as that
(7) term is used in connection with the Voting Rights Act?
(8) A. In a legal sense, no. Only in the extent that
(9) I've seen it mentioned as a possible solution.
(10) Q. All right. Do you have any understanding as
(11) to whether the district is eligible for bailout?
(12) A. No, sir, I don't.
(13) Q. Has the -- has the district ever attempted to
(14) reach out to the homeowner organization that you
(15) mentioned to try to include African-American or
(16) Hispanic members on the district's board?
(17) A. I can only speak for the district and the
(18) district has not. And I'm unaware of any such program
(19) that the homeowners association would have been
(20) involved with since I was a member of the community.
(21) Q. Why has the district not reached out to the
(22) homeowners organization to try to include any
(23) African-American or Hispanic members on the district's
(24) board?
(25) A. We've had no people -- no one has filed to,

Page 79

(1) you know -- we've had no one file. You know, we
(2) haven't reached out to them. We haven't discouraged
(3) them. We haven't -- they're members of the community,
(4) and they can file just like any other member of the
(5) community can file. It's just that none have filed, to
(6) the best of my knowledge.
(7)   Q. Do you know if there are any African-American
(8) residents who are on the -- members of the -- let me
(9) withdraw that question. You said that everybody is a
(10) member of the homeowners group.
(11)   A. Right.
(12)   Q. Does the district specifically notify the
(13) homeowners group about board meetings?
(14)   A. We are legally required to post notice of our
(15) meetings, and we help to build a sign at the front of
(16) the community so that when you drive in the community
(17) it's prominently announced on the sign when our
(18) meetings are going to be, both the homeowners
(19) association meeting is going to be held and when the
(20) MUD board meeting is going to be held.
(21)   Q. Are those meetings ever jointly held?
(22)   A. Not that I'm -- not since I've been on the
(23) board.
(24)   Q. Has the -- has the district ever made an
(25) effort to notify African-American or Hispanic residents

Page 80

(1) in particular about the board meetings, to make them
(2) aware of the board meetings?
(3)   A. No, sir.
(4)   Q. Have any African-American residents, to your
(5) knowledge, ever attended a board meeting since you've
(6) been on the board?
(7)   A. Yes, sir.
(8)   Q. Do you know the names of the individuals who
(9) attended the board meetings?
(10)   A. No, I don't. I'm just judging -- I'm assuming
(11) that they would consider themselves African-American,
(12) but --
(13)   Q. Have any Latino residents ever attended a
(14) board meeting since you've been on the board?
(15)   A. Yes, sir. And they did identify themselves as
(16) considering themselves Hispanic or Latino.
(17)   Q. In what manner did they do so?
(18)   A. Specifically there were a couple of gentlemen
(19) that said they were members of the community that
(20) attended a meeting several months ago in which they
(21) wanted to ask why the district was involved in this
(22) lawsuit, but I didn't try to verify whether or not they
(23) were members of the community or not, and so it's sort
(24) of a self-certifying. They attend the meeting and want
(25) to discuss community issues. We don't really ask them

Page 81

(1) what address they live at, you know.
(2)   Q. Do you know who those individuals were?
(3)   A. We -- at each meeting we pass around a sign-up
(4) sheet so that different people can sign up, and Frank
(5) Reilly would maintain that list of visitors in his
(6) files, but I can't -- I can't specifically say that I'm
(7) familiar with them. I told you I have difficulty with
(8) names, and specifically by name I'm not familiar with
(9) those individuals.
(10)   Q. Had you ever met -- how many individuals were
(11) there?
(12)   A. There were two, two gentlemen at that
(13) particular meeting that I'm thinking of.
(14)   Q. Had you ever met those gentlemen before?
(15)   A. No, I had not.
(16)   Q. Do you know if, in fact, they were residents
(17) of the district?
(18)   A. No, I do not.
(19)   Q. And can you elaborate on what the gentlemen
(20) spoke about?
(21)   A. They -- they were concerned that the district
(22) was involved in any sort of litigation on this
(23) preclearance issue with the Voting Rights Act.
(24)   Q. Did they indicate that they belonged to any
(25) particular organization?

Page 82

(1)   A. They may have, but if they did I'm unaware of
(2) what particular organization that they would have said
(3) that they were a member of.
(4)   Q. And when did this occur?
(5)   A. This would have been within the last six
(6) months, I think.
(7)   Q. Has -- has the district ever made any outreach
(8) to either African-American or Hispanic community
(9) organizations in the Austin area in order to encourage
(10) African-American or Hispanic residents to vote or to
(11) run for election for district offices?
(12)   A. Not that I'm aware of.
(13)   Q. Has the district, to your knowledge, ever had
(14) any communications with the Austin branch of the NAACP
(15) regarding voting issues?
(16)   A. Not that I'm aware of.
(17)   Q. Regarding any issues?
(18)   A. No.
(19)   Q. Has the district, to your knowledge, ever had
(20) any communications with the Texas State Conference of
(21) the NAACP regarding any issues?
(22)   A. Not that I'm aware of.
(23)   Q. Have you since your -- since you became a
(24) member of the board in 2002 have you ever had occasion
(25) to discuss any matters relating to the district's

Page 83

(1) operations with any African-American residents of the
(2) district?
(3)   A. I can discuss matters outside of the meeting
(4) with members of the community. I just can't discuss
(5) them among other board members. So yes, there's a
(6) family that lives on my street and I keep my neighbors
(7) informed on, you know, what the status is of any --
(8) anything the district is working on when I pass them
(9) and, you know, see them at the mailbox. Or one
(10) particular gentleman is a Realtor, and he has helped me
(11) get comparable sales to contest my tax assessment and
(12) so, you know, we exchange pleasantries. But yes, so I
(13) have discussed district matters or the state of
(14) district matters with African-Americans.
(15)   Q. Has the district ever made any affirmative
(16) efforts to ensure that African-American and Latino
(17) residents have equal access to the election process in
(18) the district?
(19)   A. Affirmative efforts?
(20)        MR. COLEMAN: Are you speaking directed
(21) solely at African-American and Hispanic individuals and
(22) not at other -- everyone together?
(23)        MR. BLUSTEIN: Yes.
(24)        THE WITNESS: The district has never
(25) recognized a need to make an affirmative effort in that

Page 84

(1) manner. We treat everyone equally. We even typically
(2) place a sign on the front door of the place where we're
(3) holding a meeting so that if someone is handicapped and
(4) they can't get upstairs to the meeting, to call us on
(5) their cell phone and we'll come down and help them get
(6) upstairs to attend the meeting. We're trying to take
(7) every step we can to make -- make sure that everyone in
(8) the community can and will participate.
(9)   Q. (By Mr. Blustein) How does -- how does the
(10) district decide where to post notices of meetings?
(11)   A. Our attorney, Frank Reilly, advises us on what
(12) needs to be done to comply with the law, and we take
(13) the necessary steps to make sure that we're in
(14) compliance with the law. It's my understanding that
(15) the meetings -- when we have to make public notice in a
(16) public document that we do so in the most
(17) cost-effective and readily -- you know, the media
(18) that's easily -- most easily available to members of
(19) the community.
(20)        And then there is -- besides posting them
(21) on the front board of the community so that anybody
(22) that drives past they can read, knows when the meeting
(23) is going to be held and where it's going to be held, a
(24) paper copy of the agenda is posted, and it's typically
(25) available on a sign inside the entrance to the

(Pages 79 to 84)

85

(1) community so they'll know -- they can even find out
(2) what the -- what items are going to be discussed at the
(3) meeting.
(4)   Q.  The sign that you mentioned that's at the
(5) front of the community, is that a bulletin board?
(6)   A.  One of them is. The one that's in the median
(7) is somewhat of a bulletin board. It's got letters
(8) about 6 inches high, black letters. The other one is
(9) just a sign -- like a road sign in which notices are
(10) posted on it. I don't necessarily think you can call
(11) it a bulletin board, but people tape notices on the
(12) sign.
(13)   Q.  Does the -- does the district post notices of
(14) meetings at any grocery stores or drugstores in the
(15) area?
(16)   A.  Not that I'm aware of.
(17)   Q.  Does the district publicize notice of meetings
(18) in any newspapers?
(19)   A.  The district does post some notices in the
(20) Hill Country News because we found that to be the most
(21) cost-effective way of getting the information out
(22) readily to the community when a public notice is
(23) required in a periodical that's, you know, widely
(24) distributed in the community.
(25)   Q.  Are notices of meetings published in that

86

(1) publication?
(2)   A.  Typically, no.
(3)   Q.  Are notices of meetings published in any
(4) publications that you're aware of?
(5)   A.  No. Typically we're required to post notices
(6) pertaining to what our tax rate is going to be and --
(7) because the water district. And those are the types of
(8) notices that are posted in the periodicals. Our
(9) typical meeting minutes are not posted in that form.
(10)   Q.  Are notices of meetings sent out by e-mail?
(11)   A.  Yes.
(12)   Q.  Can you describe that?
(13)   A.  I think the requirement is a week before the
(14) meeting is to be held the agenda has to be posted, and
(15) so all the MUD board members receive a posting, and a
(16) posting also goes to someone in the community to place
(17) the agenda item on the community bulletin board
(18) newsletter, Canyon Creek -- I think it's
(19) canyoncreek.net. And then monthly before each meeting
(20) the board members request a copy of the draft minutes
(21) so that we can go over the minutes from the prior
(22) meeting and review them before we get in the meeting so
(23) that, you know, if any changes need to be made that we
(24) can note them before the meeting to bring them up when
(25) the meeting starts to save time.

87

(1)   Q.  So the -- so the e-mail regarding meetings is
(2) sent to the board members; is that correct?
(3)   A.  Yes. And it may include others, but I haven't
(4) checked.
(5)   Q.  Is a -- are any e-mails regarding meetings
(6) sent to a broad group of community residents, for
(7) example, on a Listserv?
(8)   A.  One of the members of the board, Don
(9) Zimmerman, broadcasts a significant amount of
(10) information pertaining to what the district is doing to
(11) a group of residents in which he's got their e-mail
(12) addresses, and I think he told me he had 400-and-some
(13) community member e-mail addresses. But in terms of
(14) board policy of regularly distributing that, it's
(15) public information. No one is taking any steps to try
(16) to -- I mean, to limit the disposition of the
(17) information. We do send it to a representative of the
(18) homeowners association to post it on the homeowners
(19) association Web site, but we don't verify that they
(20) have done so.
(21)   Q.  Do you know if the homeowners association has
(22) an e-mail Listserv?
(23)   A.  I do not know.
(24)   Q.  One of the documents that I saw mentioned an
(25) individual named -- I believe the first name is Remi,

88

(1) R-e-m-i. The last name is Bekdash, B-e-k-d-a-s-h. Do
(2) you know who that is?
(3)   A.  No, sir.
(4)   Q.  Are you familiar with the requirements of
(5) Texas law regarding providing bilingual election
(6) materials printed in English and in Spanish?
(7)   A.  No, I'm not familiar with it.
(8)   Q.  Are you familiar with whether the bilingual
(9) election materials requirement under state law applies
(10) to the district?
(11)   A.  Would you repeat that question?
(12)   Q.  Yeah. Are -- do you have any familiarity with
(13) whether state law requires that bilingual election
(14) materials printed in both English and Spanish must be
(15) provided by the district?
(16)   A.  I don't have specific knowledge of that.
(17)   Q.  Do you have general knowledge about that?
(18)   A.  I'm sure that we do whatever -- if it's the
(19) law we take steps to try to comply with it.
(20)   Q.  Do you know whether the district has made any
(21) efforts to go beyond what state law requires in
(22) connection with providing bilingual election materials?
(23)   A.  No, I do not have any knowledge.
(24)   Q.  Does the district have any election officials
(25) who are responsible for administering elections?

89

(1)   A.  That's a member of the MUD board, no. Only to
(2) the degree that it has delegated -- selected Travis
(3) County as an agent to conduct the elections. I'm
(4) assuming that there is a point of contact with its
(5) agent for that, but I don't have a name that I can give
(6) you.
(7)   Q.  Before the agreement with Travis County to
(8) have Travis County conduct joint elections with the
(9) district, were election officials named by the district
(10) to handle election-related activities, for example,
(11) people to be poll workers?
(12)   A.  I assume that Jack Stueber and his wife were
(13) given delegated authority to act as agents for the
(14) district, but I haven't reviewed that agreement so I
(15) can't specifically say.
(16)   Q.  Do you know how it came to pass that the
(17) Stuebins -- is it Stueber or Stuebin?
(18)   A.  Stueber.
(19)   Q.  That the Stuebers were -- had that
(20) responsibility?
(21)   A.  No, I do not. I can speculate, but it
(22) wouldn't be valuable, I don't think.
(23)   Q.  Do you know why elections were held in their
(24) garage?
(25)   A.  No.

90

(1)   Q.  Prior to the agreement with Travis County how
(2) was it determined who would be a polling place
(3) official, for example?
(4)   A.  I was unaware of the criteria. We changed it
(5) the first chance we got when I joined the board. In
(6) other words, I was elected to the board, and at the
(7) next election we changed it.
(8)   Q.  Do you know if any African-Americans have ever
(9) served as a poll worker or as a polling place judge or
(10) official at any polling places in the district since
(11) the district's creation?
(12)   A.  I don't know.
(13)   Q.  Same question with respect to any Latino
(14) individuals.
(15)   A.  I don't know.
(16)   Q.  Do you know whether the district has ever made
(17) any affirmative efforts to try to appoint an
(18) African-American or Latino individual as an election
(19) official or poller?
(20)   A.  I don't know.
(21)         MR. BLUSTEIN:  Can we go off the record
(22) for just a minute?
(23)         (Recess from 11:50 to 11:58)
(24)         MR. BLUSTEIN:  For the record, we're back
(25) on. It's 12:00. By agreement of the parties we have

**91**

(1) agreed that -- to break the deposition at this point
(2) and continue to a later date that's mutually agreeable
(3) to everybody. So we will continue the deposition of
(4) Mr. Ferguson both in his capacity as a fact witness and
(5) as a 30(b)(6) witness to a later date.
(6)           (DEPOSITION RECESSED)

**92**

(1)           CHANGES AND CORRECTIONS
(2) WITNESS NAME: WILLIAM C. FERGUSON
(3) DATE: FEBRUARY 20, 2007
(4)           VOLUME 1
(5) Reason Codes: (1) to clarify the record; (2) to conform
    to the facts; (3) to correct a transcription error; (4)
(6) other (please explain).
(7) PAGE  LINE  CHANGE                    REASON CODE

**93**

(1)           SIGNATURE
(3) I, WILLIAM C. FERGUSON, have read the foregoing
(4) deposition and hereby affix my signature that same is
(5) true and correct, except as noted on the previous page.
(8)           WILLIAM C. FERGUSON
(9) STATE OF _____
(10) COUNTY OF _____
(11) Before me, _____, on this day
(12) personally appears WILLIAM C. FERGUSON, known to me (or
(13) proved to me under oath or through
(14) _____) (description of identity card or
(15) other document) to be the person whose name is
(16) subscribed to the foregoing instrument and acknowledged
(17) to me that they executed the same for the purposes and
(18) consideration therein expressed.
(19) Given under my hand and seal of office this
(20) ____ day of _____, 2007.
(23)           _____
              NOTARY PUBLIC IN AND FOR
(24)          THE STATE OF _____

**94**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL *
UTILITY DISTRICT NUMBER ONE *
                            *
    Plaintiff               *
                            *
VS.                         * Civil Action No.
                            * 1:06-CV-01384
ALBERTO GONZALES, in his    * (PLF, DST, EGS)
official capacity as        *
Attorney General of the     *
United States               *
                            *
    Defendant               *

**************************************
        REPORTER'S CERTIFICATION
    DEPOSITION OF WILLIAM C. FERGUSON
           FEBRUARY 20, 2007
**************************************

I, MARSHA EVANS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, WILLIAM C. FERGUSON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature, and return to ACUSCRIBE COURT REPORTERS by _____.

That the amount of time used by each party at the deposition is as follows:
    Mr. Benjamin Blustein - 2 hours, 2 minutes.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was

**95**

taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me on _____.

_____
MARSHA EVANS, TEXAS CSR 5100
Expiration Date: 12/31/07
Firm Registration No. 241
114 West 7th Street, Suite 750
Austin, Texas 78701
512-499-0277

(Pages 91 to 95)