Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, 401 W. 15th Street Suite 850 Austin, Texas 78701       Plaintiff, | CIVIL ACTION NO. 1:06-CV-01384 (DST,PLF,EGS) |
| v. | |
| ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITED STATES, U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, D.C. 20530 | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION OF
WILLIAM FERGUSON
Wednesday, February 28, 2007
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF WILLIAM FERGUSON, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on the 28th day of February, 2007, from 12:10 p.m. to 1:30 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weil, Gotshal & Manges, LLP, 8911 Capital of Texas Highway, Suite 1350, Austin, Texas 78759, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
                    APPEARANCES
FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NO. ONE:

    Mr. Gregory S. Coleman
        -and-
    Mr. Christian J. Ward
    WEIL, GOTSHAL & MANGES, LLP
    8911 Capital of Texas Highway
    Building One, Suite 1350
    Austin, Texas 78759  (512) 349-1937
            (512) 527-0698 Fax
FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
FUND (MALDEF):

    Ms. Nina Perales
        -and-
    Mr. Diego M. Bernal
    110 Broadway, Suite 300
    San Antonio, Texas 78205  (210) 224-5476
            (210) 224-5382 Fax
FOR TEXAS RIO GRANDE LEGAL AID, INC.:
    Mr. George Korbel (By telephone)
    Attorney at Law
    1111 N. Main Avenue
    San Antonio, Texas 78212  (210) 212-3700
            (210) 212-3772 Fax
FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
DIVISION:

    Mr. Chris Herren
        -and-
    Ms. Christy A. McCormick
    950 Pennsylvania Avenue, N.W., Room 7246
    Washington, D.C. 20530  (202) 305-0609
            (202) 327-3961 Fax
FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:
    Mr. Benjamin Blustein (By telephone)
    Staff Attorney, Voting Rights Project
    1401 New York Avenue, NW, Suite 1400
    Washington, D.C. 20005  (202) 662-8320
            (202) 628-2858 Fax
```

Page 3

```
    Mr. Daniel A. Zibel (By telephone)
    WILMER, CUTLER, PICKERING, HALE & DORR, LLP
    1875 Pennsylvania Ave., N.W.
    Washington, D.C. 80006  (202) 603-6053
            (202) 663-6363 Fax
FOR INTERVENOR TRAVIS COUNTY:
    Mr. Max Renea Hicks
    Attorney at Law
    1250 Norwood Tower
    114 West 7th Street
    Austin, Texas 78701
FOR THE NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.:
    Mr. Debo P. Adegbile (By telephone)
    Attorney at Law
    99 Hudson Street, Suite 1600
    New York, New York 10013

            INDEX
Appearances.......................  2
Stipulations.....................

WILLIAM FERGUSON
    Examination by Ms. Perales..............  4
    Further examination by Mr. Hicks........ 31
    Further examination by Mr. Korbel....... 49
    Further examination by Mr. Herren....... 58

Signature and Changes...................... 66
Reporter's Certificate..................... 68

        EXHIBITS
DEPOSITION EXHIBITS
23. Document............................ 26
```

Page 4

WILLIAM FERGUSON,
having been first duly sworn, testified as follows:
        EXAMINATION
BY MS. PERALES:
    Q. Thank you, Mr. Ferguson, for coming in this afternoon. My name is Nina Perales and I represent the Diaz intervenors, who are some of the parties in this case. Do you understand that we are now continuing the deposition that you were giving on an earlier date in this case?
    A. Yes.
    Q. And you've been sworn in?
    A. Yes.
    Q. Is there any reason that you cannot give complete and truthful answers today?
    A. None that I can think of.
        MR. COLEMAN: Can you all hear okay?
        (ON TELEPHONE) No, we're not hearing -- I'm not hearing very well.
        THE WITNESS: We have repositioned the microphone.
        MS. PERALES: Can you hear me now?
        (ON TELEPHONE) Yes. I can.
    Q. (By Ms. Perales) All the same rules as before apply with respect to making your answers out loud, and

Page 5

I will strive mightily to let you complete your answers before I ask my next question, and I will ask that you let me complete my question before you make your answer. Is that all right?
    A. Yes, ma'am.
    Q. Now, in the deposition I might use the term Hispanic or Latino. Will you understand those terms to mean the same thing?
    A. Well, if you define them as such.
    Q. I would like to do so.
    A. Could you -- that's -- those are -- could you tell me what that means to you? Because I know there's a lot of confusion about what that really means.
    Q. Let me start by asking whether you have a definition of the term Hispanic.
    A. Well, generally, I think it's someone who considers himself Hispanic, that may use Spanish as a -- as a -- one of the primary languages in their home or maybe consider themselves socially or ethnically of a Hispanic race or a mixed Indian-Spanish race.
    Q. Mm-hmm. Would -- do you generally understand Hispanic people to be of Latin American descent?
    A. In that -- so that would include all of South America as well?
    Q. Yes.

Page 6

1  A. Okay. Yes. Okay.
2  Q. Okay. And I wanted to follow up on that
3  because I remember you talking about it earlier in your
4  deposition. Do you think that being Hispanic is solely
5  a matter of consideration or self-identification?
6  A. I think living in Texas that we meet a number
7  of people that are -- don't seem different from anyone
8  else but who may consider themselves Hispanic or
9  Latino, and that's why I -- I think it's difficult to
10 draw an obvious conclusion when meeting someone and I
11 think it's best that you rely on what they personally
12 consider themselves to be.
13     Sometimes it comes up in a conversation
14 if -- as you get to know someone and sometimes it
15 doesn't. But I don't think it's fair to just, you
16 know, see someone and derive some sort of opinion about
17 who they might consider themselves to be.
18 Q. Do you sometimes come across people that you
19 would know are Hispanic?
20 A. It's typically people who have identified
21 themselves as such, but sometimes I -- if I see someone
22 that speaks Spanish as a first language --
23 Q. Mm-hmm.
24 A. -- I just assume that they might -- may
25 consider themselves Hispanic.

Page 7

1  Q. But other than speaking Spanish in your
2  presence, you would not be able to make a determination
3  whether somebody was Hispanic?
4  A. Not really.
5  Q. Okay. Tell me about having been a plaintiff
6  in a class action lawsuit.
7  A. The one that I mentioned in the previous
8  deposition?
9  Q. Yes, with the FDIC.
10 A. A number of us were employed by a
11 quasi-governmental organization that was rolled into
12 the FDIC as a result of the thrift resolution plan.
13 Q. Mm-hmm.
14 A. And when we were rolled into the FDIC we had
15 been given by a previous quasi-governmental employer
16 some employment retention plans.
17 Q. Mm-hmm.
18 A. And when we were rolled into the FDIC, the
19 FDIC chose to ignore those retention plans because the
20 quasi-governmental organization technically had a
21 thrift charter. So the FDIC considered their takeover
22 of the organization as they would take over any other
23 thrift, and so they chose not to honor those retention
24 agreements. And so myself and a couple of other
25 primary plaintiffs sued the FDIC on behalf of a group

Page 8

1  of employees so that the FDIC would recognize and honor
2  that retention program.
3  Q. About how many people were in the class total?
4  A. Well, it started off as a class action suit
5  but later on, through the course, they identified the
6  plaintiffs. And I think there were around -- initially
7  there were a hundred and some in a couple of different
8  offices that chose to go their own direction, but
9  ultimately I think there were 65, maybe.
10 Q. Did it have -- the lawsuit have a satisfactory
11 resolution, in your opinion?
12 A. We persevered and we won and we got what we
13 thought was a fair and equitable resolution.
14 Q. Excellent. You mentioned earlier in your
15 deposition that you lived in Dallas. Can you tell me
16 for how many years you lived in Dallas?
17 A. I moved to Dallas in 1987 and moved here in
18 spring of 2000.
19 Q. Had you lived in Texas before Dallas?
20 A. No.
21 Q. So you can say that you've been a Texas
22 resident since 1987?
23 A. Yes, ma'am.
24 Q. And what year were you born?
25 A. 1955.

Page 9

1  Q. Had you ever attended any meetings of the
2  district before you decided to run for the board of
3  directors?
4  A. No.
5  Q. And I wanted to add right now that sometimes
6  I'll use the word district and sometimes I'll use the
7  word MUD.
8  A. Okay.
9  Q. Would it be okay with you --
10 A. Yes, ma'am.
11 Q. Okay. Thank you. And of course, by that
12 we'll mean the Northwest Austin Municipal Utility
13 District 1. Is that all right with you?
14 A. Yes, ma'am.
15 Q. Thank you. Before you decided to run for a
16 position on the MUD board, tell me who was the first
17 person that you spoke to about possibly running.
18 A. Don Zimmerman.
19 Q. And when you had that first conversation, was
20 it Mr. Zimmerman who suggested the idea of your running
21 for the board?
22 A. No, it was not. I had an idea that I wanted
23 to run for the board, and then Don was also running for
24 the board. So I spoke to him about, prior to the
25 election, what his intentions were, why he was running

Page 10

1  for the board, what he wanted to accomplish, those sort
2  of issues.
3      Q. Tell me how you came to the decision to run
4  for the board.
5      A. The neighborhood is faced with a dual taxation
6  issue in which we feel like we are unjustly charged
7  duplicative taxes.
8      Q. Mm-hmm.
9      A. And there have been a number of people in the
10 community that have tried to resolve this issue through
11 negotiations which had not worked. And so we were
12 trying to discover different ways that we could be a
13 little bit more effective, and one of the methods that
14 we thought might be appropriate would be to try to have
15 an influence on the direction of the utility district
16 by becoming a director or member of the board.
17     Q. And did you have those conversations with
18 Mr. Zimmerman?
19     A. I did.
20     Q. Did you have those same conversations with
21 anybody else?
22     A. No. Well, let me -- there was a gentleman who
23 was work -- trying to work with the city directly to
24 resolve this outside of the MUD district and I had
25 conversations -- I had conversations with him.

Page 11

1      Q. Mm-hmm.
2      A. But he wasn't a member of the MUD board, so...
3      Q. And what was his name?
4      A. And he was a member of the community -- I
5  don't recall his name.
6      Q. And --
7      A. He has since moved out of the community. It's
8  my understanding that he has since moved out of the
9  community.
10     Q. When you say there was a group of people
11 working on the double taxation issue, was it a
12 situation in which you would get together maybe at
13 somebody's house and talk about how to fix the
14 situation?
15     A. That may have been going on, but I wasn't
16 party to that. My conversations were with this
17 gentleman and what are you -- what are you working on.
18     Q. Mm-hmm.
19     A. And is there anything I can do to help. Sort
20 of inquiries on my part.
21     Q. And then you also had conversations with
22 Mr. Zimmerman?
23     A. Yes. Don -- I did not know Don, and he was
24 running for the MUD board, and that's why I wanted to
25 introduce myself to him, just to get an idea of why he

Page 12

1  was involved.
2      Q. Mm-hmm. How did you become aware of the
3  double taxation issue?
4      A. When we bought a house in the community it was
5  obvious that we were paying both taxes and that our tax
6  load for living in the community would be somewhat
7  higher than it would be for others living around us.
8  But it was a new home in a really nice school district.
9  We have a really nice community school, elementary
10 school in the community, and we had two boys in
11 elementary school, so that was a pretty important
12 consideration.
13     Q. Let me ask you a question about the bulletin
14 board near the pool that I've heard come up a few
15 times, because like you, I recently moved for schools
16 into one of these subdivisions with a pool.
17     A. Mm-hmm.
18     Q. And I know we have a bulletin board, too. I
19 wanted to ask if you have a little community room near
20 your pool where people can meet or have parties. Do
21 you have something like that?
22     A. Mostly when we have a meeting in the
23 community --
24     Q. Mm-hmm.
25     A. -- it doesn't really take place at the

Page 13

1  homeowners' association pool because there's not really
2  a well-organized place there. Typically, it takes
3  place in the open pavilion at Trailhead Park, which is
4  part of MUD property.
5          MR. COLEMAN: Hey, can y'all put
6  yourselves on mute? We're -- we're getting a lot of
7  noise coming back through the speaker here. So if
8  you're not speaking, just hit the mute button, if you
9  would. Sorry.
10     Q. (By Ms. Perales) That's okay. So I
11 understand there's a -- maybe an open pavilion at
12 Trailhead Park; is that right?
13     A. Yes, ma'am.
14     Q. And that doesn't have walls; it's kind of an
15 open air situation?
16     A. That's right.
17     Q. And, now, near the pool, is there any kind of
18 closed room where --
19     A. There --
20     Q. -- you might be able to put a table and
21 chairs?
22     A. There are two bathrooms. I haven't been in
23 the women's bathroom. There are a couple of small
24 rooms, but the rooms are really unfinished concrete
25 floors, painted cinder block walls, open ceilings, no

4 (Pages 10 to 13)

Page 14

1  heating and air-conditioning, and the rooms are really
2  used by the lifeguards and for towels and floats and
3  stuff that the kids leave at the pool, they just throw
4  them in this room. So it's not really --
5  Q. Mm-hmm.
6  A. -- large enough or well-suited enough, in my
7  opinion, for a meeting.
8  Q. And the subdivision doesn't have any other
9  little community room or community building where
10 people throw, you know, birthday parties or other
11 things like that?
12 A. No, we really don't. No.
13 Q. When you spoke to Mr. Zimmerman about the
14 possibility of running for the MUD board, did you ask
15 him sort of general questions about how he campaigned,
16 or did he give you any advice along those lines?
17 A. No, ma'am. It was just strictly about what
18 issues you hope to accomplish by -- if you're
19 successful and you, you know, get on the MUD board.
20 Q. So you spoke to him because he was a
21 candidate. Is that right?
22 A. Yes, ma'am.
23 Q. And then was there a time when you began to
24 speak to him about your thoughts of running as well?
25 A. Well, I had already formulated an opinion that

Page 15

1  I was -- wanted to run as well. And there were three
2  board seats that were opened.
3  Q. Mm-hmm.
4  A. So it was sort of like if I talk to Don, I
5  wouldn't be excluding myself. It wouldn't be him
6  versus me.
7  Q. Mm-hmm.
8  A. It could possibly be he, I and others that
9  were successful.
10 Q. At the time did you know whether there was
11 anybody else other than Mr. Zimmerman who was running
12 for the MUD board?
13 A. I knew there were other candidates that had
14 declared.
15 Q. Mm-hmm.
16 A. But did not know what their positions were.
17 Q. Did there come a time when you shared with
18 Mr. Zimmerman your idea that you would like to run?
19 A. I think when I first contacted him I told him
20 I was also interested in running and the reasons why I
21 was interested in running regarding the double taxation
22 issue and trying to resolve it, and asking him what his
23 reasons were for running.
24 Q. Did he offer you any advice about campaigning,
25 since I know he had been on the board for a while?

Page 16

1  A. Actually, Don and I came in at the same time.
2  He was elected, I was elected and a guy named Alan
3  Weiss were all elected at the same time. So there
4  were -- there were two homeowners that were on the
5  board at the time and then three other MUD directors
6  that obviously owned property in the district, but I do
7  not think they actually owned homes or lived in the
8  direct at the time.
9  Q. Was it a good thing in your opinion that the
10 board became more representative of the homeowners
11 after you got on it?
12 A. I was glad to see that there were residents
13 that were now the majority interest in the board as
14 opposed to --
15 Q. Mm-hmm.
16 A. -- nonresidents, yes.
17 Q. Either before or after you ran that first time
18 for the MUD board, did you ever encounter Mr. Zimmerman
19 in a -- in a social setting?
20 A. No, ma'am.
21 Q. After you decided to run for the board --
22 well, let me back up a little bit. I'm following up
23 because you had mentioned earlier in your deposition
24 that you weren't completely sure how you filed your
25 application for a place on the ballot. So I thought I

Page 17

1  would ask whether you recall how you got ahold of the
2  application for a place on the ballot for the MUD
3  election.
4  A. The instructions were for us to contact the
5  MUD attorney and find out -- well, what I did was I
6  contacted the MUD attorney --
7  Q. Mm-hmm.
8  A. -- through her associate. He gave me the
9  documents that needed to be filled out. I sat in their
10 lobby. Her name is Ms. Collins.
11 Q. Mm-hmm.
12 A. I went down and spoke with one of her
13 associates. He gave me the forms that needed to be
14 filled out. I sat down in their lobby and filled out
15 the forms. He notarized them. And that was how my
16 name was placed on the ballot.
17 Q. And how did you find out that you needed to
18 contact the attorney for the MUD?
19 A. I do not recall specifically how I learned
20 what the requirements were for running for the board.
21 Q. Is it possible that Mr. Zimmerman told you?
22 A. I don't think so. I think it was probably --
23 it could have been in the homeowners' association
24 newsletter.
25 Q. Mm-hmm.

Page 18

1    A.  But it wasn't as a result of the conversation
2  with Don that I recall specifically.
3    Q.  Does the MUD have a Web site?
4    A.  Yes. Excuse me. The homeowners have a MUD --
5  a Web site; the MUD does not. But the MUD posts
6  information on what's going on with the MUD on the
7  homeowners Web site.
8    Q.  Has --
9    A.  It's Canyoncreek.net.
10   Q.  Really? I thought there was a Web site for
11 the MUD.
12   A.  Specifically, no.
13   Q.  No? Okay.
14   A.  If anyone has sat -- set up a Web site for the
15 MUD, it was without our direct authorization or -- you
16 know, and we have no influence on what is posted there.
17   Q.  So with respect to the homeowner association
18 sponsored Web site, does the MUD from time to time
19 contact the homeowners' association and ask them to put
20 up certain information?
21   A.  Yes, ma'am.
22   Q.  Has the MUD ever posted election related
23 material on the homeowners' association Web site, like
24 application for a place on the ballot?
25   A.  I don't know. Typically, what's posted are

Page 19

1  minutes from our meetings, any notices. Specifically,
2  we've recently had some problems with vandalism at the
3  park. Notices about the vandalism and what has
4  happened and when, so that if anyone in the community
5  sees something going on at the park that shouldn't be
6  happening, they know what they're supposed to do, who
7  they're supposed to call, those sorts of situations.
8    Q.  And that would be the non-hog-caused
9  vandalism?
10   A.  Yes.
11   Q.  Okay. I really enjoyed reviewing that part of
12 the minutes. It really struck me about the feral hogs.
13 And especially about the bow shooting at night. I
14 wondered about that.
15   A.  A number of people in the community are very
16 concerned about any hunting on any land in the area of
17 any sort because they're concerned about what may
18 happen to their pets, their kids, you know, anything.
19 But they also understand that the hogs are omnivores
20 and will eat just about anything, so they're not to be
21 taken lightly, either.
22   Q.  When you made your first run for the board,
23 were there more candidates than there were seats open?
24   A.  Yes, ma'am.
25   Q.  I'm going to move now to the year in which you

Page 20

1  became board president. Prior to becoming board
2  president, did you have a conversation with
3  Mr. Zimmerman about essentially him passing the mantle
4  to you?
5    A.  No, ma'am. I did ask him if he was going to
6  run again, and he said no.
7    Q.  Mm-hmm. Did you inform him that you hoped
8  in -- after his departure to become board president, or
9  after that election?
10   A.  I think that I expressed to him that I would
11 be willing to serve as the president if the board would
12 be willing to elect me to that position.
13   Q.  It sounds like something of a thankless job,
14 after reading the minutes.
15   A.  Well, we do get an honorarium of a hundred
16 dollars a meeting and we do get the feeling that we're
17 trying to do something to help the community.
18   Q.  Mm-hmm.
19   A.  And the residents are pretty supportive. So,
20 you know, it's got its benefits as well.
21   Q.  Did Mr. Zimmerman, upon learning of your
22 openness to serve as president of the board, ask you to
23 carry through with any commitments that he had made as
24 president?
25   A.  I don't recall any.

Page 21

1    Q.  Okay. From whom did you first learn about the
2  possibility of the MUD filing the lawsuit that is this
3  case here?
4    A.  From -- can you --
5    Q.  From whom?
6    A.  -- repeat the question?
7    Q.  Yes. From whom -- well, with respect to the
8  lawsuit that -- that this deposition -- in which this
9  deposition is occurring, the Section 5 lawsuit, if you
10 will, from whom did you first learn about the
11 possibility of this lawsuit?
12   A.  I don't recall.
13   Q.  Do you recall, Mr. Ferguson, whether you first
14 heard about the possibility of this lawsuit from
15 Mr. Zimmerman?
16   A.  It's possible, but I don't specifically
17 recall.
18   Q.  Can you tell me when you first learned that
19 the MUD had an obligation to preclear election changes
20 under the Voting Rights Act?
21   A.  Can you repeat that question?
22   Q.  Can you recall when you first learned or when
23 you came to know that there was a requirement to
24 preclear changes under the Voting Rights Act in
25 elections?

Page 22

1  A. It was when the board decided to move the
2  election from Jack Stuber's garage to the elementary
3  school, where all of the other county elections or city
4  elections or whatever elections were being held. We
5  were informed that we were subject to that constraint.
6  Q. Do you understand why the board chose to --
7  well, let me ask you this: How long has the elementary
8  school been there?
9  A. I think the elementary school opened around
10  1989 or 1990, but I'm not sure.
11  Q. Mm-hmm. Do you know why the MUD chose not to
12  have its elections at the school prior to --
13  A. No, ma'am. I'm sorry, I interrupted you. No,
14  ma'am, I do not know.
15  Q. Okay. With respect to the joint election
16  agreement with Travis County, do you recall whether it
17  was Travis County that came to you or whether it was
18  you that came to Travis County or how that agreement
19  came to be?
20  A. As I recall, it was that we approached our MUD
21  attorney, Frank Riley, with the dilemma of how to
22  conduct an appropriate election so that we could get as
23  large a community turnout as possible. And I think
24  that it was the MUD attorney, Frank Riley, that
25  suggested that we contact the county and ask them to

Page 23

1  become involved in helping us with their required
2  elections.
3  Q. Do you think that since the elections have
4  been moved from a private home to the school that
5  turnout has improved for MUD elections?
6  A. We don't have any strict -- I haven't examined
7  any statistical information. But what we have done is
8  tried to make it available -- readily available and
9  easily available to everyone. And -- so that our
10  intent was that we would, you know, receive more
11  ballots, that more people would find it easier to -- to
12  vote.
13  Q. And do you think it's true that more ballots
14  have been cast in MUD elections since you moved the
15  poll?
16  A. I don't have any statistical information that
17  I've reviewed that --
18  Q. Mm-hmm.
19  A. -- that -- I can't really answer the question.
20  I don't know, statistically speaking.
21  Q. Your first run was in '02? Is that right? Or
22  earlier?
23  A. I think it was in '02.
24  Q. Do you recall as a candidate noticing whether
25  or not you got more votes after the poll was moved to

Page 24

1  the school?
2  A. No, ma'am.
3  Q. Okay. Putting aside the question of whether
4  you've looked at the statistics or anything like that,
5  because I don't want to pin you down to numbers if you
6  haven't seen them, but do you -- is it generally your
7  opinion that moving the poll to the school increased
8  access to voting in the MUD election?
9  A. That was our intent. And yes, I do think,
10  even though I don't have any statistical evidence to --
11  that -- because when we moved the election to the
12  school, that gave people -- that gave the candidates a
13  greater opportunity to sort of advertise. You know,
14  sort -- not that any strict advertising was done,
15  except by word of mouth --
16  Q. Mm-hmm.
17  A. -- but to let the other people know, you know,
18  on a more consistent basis when the elections would be
19  held --
20  Q. Mm-hmm.
21  A. -- so that, you know, we could try to get
22  better turnout.
23  Q. And you believe the effect has been positive.
24  Is that right?
25  A. We haven't received any complaints. And I

Page 25

1  think the results have been positive, but like I said,
2  I don't have any hard numbers that I've looked at.
3  Q. Mm-hmm. With respect to the preclearance
4  submission made by the MUD in 2004, which was
5  associated with the joint election agreement and moving
6  the poll, do you recall working on that submission at
7  all?
8  A. No. We -- our MUD attorney worked on that
9  for -- on our behalf.
10  Q. Mm-hmm.
11  A. Although I do recall it being discussed in
12  meetings --
13  Q. Mm-hmm.
14  A. -- I personally did not assist or help
15  formulate that agreement.
16  Q. Okay. Since you were elected to the MUD
17  board, has the board ever had a Spanish language
18  interpreter at any of its meetings?
19  A. Not that I recall. Although I -- I suspect
20  that a number of the people that attend the meetings
21  are relatively -- most of the people that speak Spanish
22  in the community are fluent in multiple languages.
23  Q. Mm-hmm.
24  A. So no one has ever specifically requested
25  Spanish translation of the MUD board meeting minutes

7 (Pages 22 to 25)

Page 26

1  that I'm aware of.
2    Q. Mm-hmm. And with respect to people who might
3  be at a MUD meeting, is there anybody that you can name
4  who's been -- let's say to more than two MUD meetings
5  in a row who is fluent in Spanish?
6    A. It's very difficult for me to say because
7  typically, all the meetings are conducted in English.
8    Q. Mm-hmm.
9    A. Although we do have people that reportedly,
10  you know, speak Spanish fluently, no one has ever
11  really asked them to demonstrate it, so it's hard for
12  me to say.
13    Q. Mm-hmm. Do you know -- can you name any
14  person who's been to more than two MUD meetings in a
15  row who might be fluent in Spanish?
16    A. I think Don Zimmerman considers himself
17  somewhat fluent in Spanish, although what he considers
18  fluent and what he actually is I would not know because
19  I've never had an idea to, you know.
20    Q. Mm-hmm. Okay. I would like to mark this,
21  please.
22        (Deposition Exhibit No. 23 marked)
23    Q. (By Ms. Perales) Mr. Ferguson, I'm handing
24  you what has been marked Deposition Exhibit 23. And I
25  only -- I have just the smallest of questions for you.

Page 27

1  I will wait for you to get out your glasses.
2    A. Thank you.
3    Q. Can you turn with me to page 5922. I want to
4  ask you about Item 8, "President Zimmerman announced
5  Item 8 on the agenda." That's the -- sort of near the
6  middle of the page. Do you see that?
7    A. Yes, ma'am.
8    Q. Do you see where the board carries the motion
9  to place a 100-dollar ad to announce the -- the
10  election in the Canyon Creek Reporter?
11    A. Yes, I see that.
12    Q. Can you tell me what is the Canyon Creek
13  Reporter?
14    A. There is no periodical that I'm familiar with
15  that's known as the Canyon Creek Reporter.
16    Q. Mm-hmm.
17    A. I think that's an error. There is a --
18  there -- there is a weekly newspaper that we've used in
19  the past that -- for public announcements, but there is
20  no periodical that I'm familiar with called the Canyon
21  Creek Reporter.
22    Q. Tell me about the -- the newsletter that you
23  do know about that you have used in the past. What's
24  that newsletter's name, do you remember?
25    A. We use a Canyon Creek homeowners' association

Page 28

1  sponsored periodical that goes out perhaps quarterly.
2    Q. Mm-hmm.
3    A. And we have made notice in that particular --
4  but I don't recall that it's called the Canyon Creek
5  Reporter.
6    Q. Mm-hmm. Okay.
7    A. And then we have also placed ads in -- it's a
8  periodical that I -- I don't subscribe to, but most of
9  the neighborhood gets, because I see it in their
10  driveways. And it's less expensive than the Austin
11  American-Statesman.
12        MR. COLEMAN: Hill Country News, I think.
13        THE WITNESS: Thank you. It's -- it's
14  called the Hill County News. Thank you.
15    Q. (By Ms. Perales) You're not a subscriber to
16  the Hill Country News. Is that right?
17    A. That is correct.
18    Q. Okay. Do you have any idea whether the
19  majority of Canyon Creek residents subscribe to the
20  Hill Country News?
21    A. Based on my casual observation, because of the
22  number of Hill Country News that are delivered and
23  they're delivered in the driveways, in the bottom of
24  the driveways, I would say the majority of people on my
25  street subscribe.

Page 29

1    Q. Mm-hmm. Okay.
2    A. And -- and the assumption was by the board
3  that it was a relatively widely distributed periodical
4  that was cost-effective and so that's why it was
5  chosen.
6    Q. Okay. Do you recall whether for this
7  election, which is 2004, the board had a hundred-dollar
8  budget for placing ads about the election?
9    A. I do not recall.
10    Q. Tell me what kind of publicity you undertook
11  with respect to the decision to file this lawsuit. Did
12  you place any ads in any newsletters or newspapers or
13  any announcements?
14    A. It was an agenda item, as I recall, for more
15  than one MUD meeting where it was discussed in open
16  meetings among the board members and any public members
17  that attended. But I don't specifically recall which
18  meetings those were in which it was discussed.
19    Q. Would it be correct to say that the MUD did
20  not undertake any -- to place any ads or announcements
21  in newsletters or newspapers to announce that the MUD
22  had chosen to undertake this lawsuit?
23    A. It was my understanding that we had a
24  required -- it was a requirement to post a notice, and
25  that a notice was posted. But I don't specifically

Page 30

1  recall when that notice was posted or in what
2  periodical. But I suspect it would appear in the
3  meetings of -- of one of our minutes.
4      Q. When you say notice, do you mean a no -- a
5  notice under the Open Meetings Act related to
6  discussion of the lawsuit or do you mean some other
7  kind of notice?
8      A. It was my understanding that a public notice
9  was required that -- that we were involved in this
10 action outside of the Open Meetings Act or agenda items
11 or other such requirements.
12     Q. And it is -- you -- strike that. And it's
13 your testimony that you don't recall whether a notice
14 was posted or where a notice was posted?
15     A. I recall specifically that we discussed where
16 the notice -- public -- the requirement to post a
17 notice.
18     Q. Mm-hmm.
19     A. But I don't specifically recall where it was
20 decided that the notice would be posted and when it
21 would be posted.
22     Q. Do you have any certain knowledge that a
23 notice was ever posted?
24     A. I did not ever read the notice or investigate
25 the notice. But Frank Riley, the MUD attorney, would

Page 31

1  have been responsible for posting the notice, selecting
2  the periodical and complying with the law. So --
3      Q. Mm-hmm.
4      A. -- we would have -- I would have trusted that
5  Frank fulfilled his responsibilities.
6      Q. Did you have -- ever have a conversation with
7  Mr. Riley in which he let you know that he had made
8  this posting?
9      A. I don't recall a specific conversation.
10         MS. PERALES: I believe I am done. And I
11 will pass the witness.
12         MR. HICKS: Everybody okay if Renea Hicks
13 goes next? Out there in Never Never Land?
14         MS. PERALES: You phone people -- you
15 phone people, Renea is going to go next.
16         MR. BLUSTEIN: Renea -- Renea, how long
17 are you going to be?
18         MR. HICKS: Not long.
19         MR. BLUSTEIN: Okay.
20            FURTHER EXAMINATION
21 BY MR. HICKS:
22     Q. Mr. Ferguson, I'm Renea Hicks. I represent
23 Travis County.
24     A. Yes, sir.
25     Q. You testified, I -- in the rough draft of the

Page 32

1  deposition that you -- your -- the first part of your
2  deposition that all -- everybody is a member of the
3  homeowners' association, everybody who lives in the
4  district? Is that right?
5      A. It's a -- a community in which membership in
6  the homeowners' association is mandatory. That's my
7  understanding.
8      Q. Through what mechanism is it man -- made
9  mandatory, to your knowledge?
10     A. That when you agree to buy a home in that
11 particular neighborhood, you agree to the rules and
12 regulations as established or updated by the
13 homeowners' association and that you agree to pay
14 whatever reasonable homeowners' association fees are
15 imposed annually.
16     Q. You are a member of the homeowners'
17 association. Right?
18     A. As a property owner, yes, I am.
19     Q. What -- there are a couple of apartments in --
20 inside the MUD's boundaries. Right?
21     A. Yes, sir.
22     Q. Are the people that rent apartments there
23 members of the homeowners' association?
24     A. No, sir. They're members of the -- of the MUD
25 utility district, but not of the homeowners.

Page 33

1      Q. Is there just one homeowners' association?
2      A. For Canyon Creek, yes, sir.
3      Q. For the Canyon Creek subdivision, there's a
4  homeowners' association. Right?
5      A. Yes, sir.
6      Q. And the Canyon Creek subdivision does not
7  cover all the territory inside the MUD's political
8  boundaries. Right?
9      A. No.
10     Q. Is there any -- are there any other
11 subdivisions that have homeowners' associations other
12 than the -- inside the MUD's boundaries other than
13 Canyon Creek?
14     A. None that I am aware of.
15     Q. Now, do you -- to your knowledge, does the
16 Canyon Creek homeowners' association have any
17 enforcement authority with respect to deed restrictions
18 for the Canyon Creek subdivision?
19     A. Yes, sir, they do.
20     Q. And what -- what is your understanding of
21 their authority? And I'm not asking for a legal
22 opinion; I'm just asking what your understanding is.
23     A. I've received some of their notices when I was
24 not in compliance with what they considered their --
25 their rules and regs. But it never proceeded to the

Page 34

1  point where I was -- I don't know what their legal
2  authority is. I don't know that their legal authority
3  has been tested.
4    Q. What did you do wrong?
5    A. I had a basketball goal in front of my house
6  that was more than eight feet from the garage door. It
7  was a portable basketball goal.
8    Q. Do you know whether it -- there are any deed
9  restrictions with respect to whether there could be
10 multifamily arrangements within houses in the
11 subdivision?
12   A. I missed part of that question. Can you
13 repeat --
14   Q. That's okay, I didn't ask it very well. Do
15 you know whether there are any deed restrictions that
16 address the question of single family residences in the
17 district and whether -- not in the district, sorry --
18 in the -- in the subdivision and whether those
19 restrictions limit residents to having only
20 single-family residences?
21   A. I -- I don't -- I don't know.
22   Q. And you don't know whether the homeowners'
23 association has ever sought to enforce such a provision
24 since you don't even know whether there is such a
25 provision. Right?

Page 35

1    A. I have no specific knowledge, that's correct.
2    Q. Do you know whether the homeowners'
3  association has ever asked the MUD board to enforce any
4  of the restrictions in the subdivision?
5    A. I -- I do not think they have. I don't -- I
6  can't -- cannot recall that they have ever asked the
7  MUD.
8    Q. Is Trailhead Park inside the MUD's political
9  boundaries?
10   A. Yes, sir.
11   Q. Are there any of what you call the common
12 areas that aren't inside the -- you testified that
13 there were some common areas in the district. Are any
14 of those common areas not inside the political
15 boundaries of the district?
16   A. Of the MUD district?
17   Q. Yes.
18   A. All those that I mentioned were. And if I
19 could specifically just tell you which --
20   Q. Sure.
21   A. -- ones that I'm familiar with. The
22 homeowners' association has a swimming pool, a tennis
23 court, a kids playground, a basketball court. And this
24 is all up near the pool. And then they have some
25 strips of land right off of the main road and then one

Page 36

1  strip of land at the end of Seabright that goes behind
2  some houses. And then they also own some strips of
3  land that run between the houses that -- they're
4  referred to as greenbelt areas.
5    Q. Do you know of any other so-called common
6  areas inside the district than the ones you've
7  mentioned?
8    A. No, sir.
9    Q. There was testimony, I believe it -- I don't
10 remember where it came from. There was some testimony
11 that there are three parcels of land that the MUD owns
12 that aren't inside the political boundaries. Are you
13 familiar with what those three parcels of land are?
14   A. Yes, sir.
15   Q. What are they?
16   A. They are currently subject to an agreement
17 with the City of Austin for the MUD to transfer those
18 to the city in response to an agreement that the
19 community members will receive some sort of discount --
20 sliding scale discount on their water -- monthly water
21 bills.
22   Q. And as I understand it at the time whichever
23 deposition that we had that raised that, that had not
24 been finalized, that agreement had not been finalized.
25 Do you know whether it has been now?

Page 37

1    A. The agreement hasn't been consummated, but we
2  have reached an agreement and the district is trying to
3  comply with the city's requirements. And we're fairly
4  close to achieving the situation in which the MUD will
5  deed these canyon lands to the city for their use.
6    Q. And who's doing the work for the MUD to comply
7  with the city's requirements?
8    A. Primarily Frank Riley, the attorney.
9    Q. And do you know what it is he's doing? At a
10 general level?
11   A. He participated in the negotiations with the
12 city on what would be required. And he is coordinating
13 those requirements to try to make sure everything that
14 was -- all the items that were identified as things
15 that needed to be done are accomplished.
16        That would include -- we had to get a
17 survey and a -- they're updating the title commitment
18 right now. We had to get a letter from the developer
19 in which he transferred his Section 10 permit rights
20 with the Army Corps of Engineers to the city, or that
21 they would agree to. And there are a lot of small
22 requirements like that that it's my understanding have
23 pretty much been met, and the only remaining
24 requirements, it's my understanding now, are that the
25 title commitment is updated and that we prepare a deed

Page 38

1  and convey the property, or our interest in those
2  properties, to the city.
3      Q.  Up till now -- up until now, has the city had
4  to -- I mean, I'm sorry, has the MUD had to pay
5  property taxes on that property?
6      A.  The MUD is a tax-exempt entity.
7      Q.  All right.  What obligations, as you
8  understand it, has the MUD had with respect to those
9  three parcels of land outside the district that we've
10 been discussing?
11     A.  Specifically none, because some of them are
12 not even -- they're not on a road.  The developer had
13 some requirements to comply with a permit that he
14 received and -- because there are some protected
15 habitat on these parcels.  But the MUD had no specific
16 requirements on these properties other than to assist
17 the developer if the developer called us up and said,
18 "It looks like some homeowners may be, you know, going
19 on the land and influencing our permit.  Could you
20 intervene and ask them to stop or to notify them of" --
21 you know, just -- try to help the developer in his --
22 enforce his agreements with the Army Corps of Engineers
23 to maintain this property's habitat.
24     Q.  Do you know if the MUD had an understanding
25 that it was its legal obligation to take those actions

Page 39

1  to tell the homeowners to stay off, or not?
2      A.  I -- I don't think anyone's ever considered it
3  their legal -- at the MUD has considered it a legal
4  obligation.
5      Q.  You undertook it voluntarily, to help?
6      A.  As -- as people within the -- as members of
7  the community, yes.
8      Q.  But that isn't your community.  Right?  These
9  three parcels of land?
10     A.  The three parcels of land are -- I'm not sure
11 I quite understand it.
12     Q.  Well, you've been using the term community and
13 this time you said community and I wasn't sure whether
14 it was community like everybody inside the district or
15 community meaning places we would go and use that are
16 in -- that are near the district.
17     A.  Well, I wouldn't consider these common areas
18 because they're fenced with three-stranded barbed wire
19 and they're -- they're prominently posted that, you
20 know, you cannot really go on the land.  I have never
21 walked on these three parcels at all.  I have viewed
22 them from the outside -- outside the fence.  But
23 because they're protected habitat, I don't know of
24 anyone in -- in the community that we can specifically
25 identify that has walked on these parcels.

Page 40

1      Q.  Where -- where are they and how far away are
2  they from the MUD's boundaries?
3      A.  The most prominent one is about three or
4  400 feet south of the southern exit -- entrance of
5  Boulder Lane and 620, across from the animal hospital
6  on 620 and right adjacent to an apartment complex.  The
7  city owns the right-of-way that goes into some -- of
8  their land back sort of on the north side of the
9  Schlumberger tract that's under agreement with
10 Concordia University.  You know, Concordia is going to
11 buy -- move the campus.  The city owns land all around
12 there.  The MUD has title to some land and I think it's
13 about -- I'm guessing about 60 acres in two parcels
14 that run from that city right-of-way all the way down
15 to the -- the right-of-way or approximately the
16 right-of-way of Schlumberger Road, which they're now
17 trying to rename Concordia University Way or something
18 like that.
19         Then there are two other noncontiguous
20 parcels, one of them that would be not on a roadway but
21 south of the new Wal-Mart that recently opened up.
22 It's sort of cater corner from The Home Depot.  It -- I
23 don't know if you travel out there or not.
24     Q.  I've been out there but I don't remember that
25 part of it.

Page 41

1      A.  And then there's another irregular-shaped
2  parcel that's down in the canyon that's primarily
3  surrounded by city property.
4      Q.  I'm a little confused now.  It sounded like
5  you described four parcels.
6      A.  Well, legally, two of the -- there are two
7  parcels but they're contiguous so they're thought of as
8  one.  And those are the ones on 620.
9      Q.  So total acreage for the -- for the three or
10 four, if you can -- count -- count it as four, parcels
11 would be how much, would you guess?  Estimated, not
12 guessed.
13     A.  As I recall, it's approximately -- and I
14 haven't seen the most recent survey.  I recall it's
15 about 190 some acres.
16     Q.  And who put up the barbed wire fence?
17     A.  The developer.
18         MR. COLEMAN:  For anyone who is wondering
19 about elections, Renea is getting free discovery for
20 Save Our Springs.
21         MR. HICKS:  I represent an environmental
22 group here.  I also sue them sometimes, but...
23         THE WITNESS:  Oh, okay.
24         MR. HICKS:  I'm not getting free
25 discovery.  They're about to go bankrupt, anyway.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d2689db2-9831-453c-ae5c-12e6cac27586

Page 42

1   Q. (By Mr. Hicks) I want to ask you a little bit
2 about -- you had mentioned in your testimony that --
3 earlier part of your deposition that if somebody was
4 mobility-impaired or somehow had a disability that kept
5 them from getting into your board meetings, you had
6 things set up so that they could call in a cell phone
7 number and y'all could set up a way to go out and bring
8 those people in?
9   A. Yes, sir.
10   Q. Do you recall that? What led to you setting
11 up that process?
12   A. As I recall, Frank Riley, our MUD attorney,
13 told us it was a requirement for open meetings that
14 everyone -- that you would make every -- an open
15 meeting available to everyone to attend, and it was
16 part of that requirement. And the fact that the
17 meetings are generally held on the second floor and
18 there's no elevator so there's a set of stairs that has
19 to be negotiated, and that some people would -- may be
20 unable to negotiate the stairs, and to just make sure
21 the meetings were open and available to everyone, that
22 we specifically noticed those people so that they would
23 have a method of joining the meeting.
24   Q. And do you know whether it was your
25 understanding that the requirement to make them open

Page 43

1 with respect to people with disabilities, the way you
2 were talking about, was a federal or a state law
3 requirement?
4   A. I don't recall.
5   Q. You testified in response to some questions
6 from Ms. Perales that you wanted -- one benefit of
7 moving the polling place from Stuber's -- Mr. Stuber's
8 home to the school was to "get a -- as large a
9 community turnout as possible." Do you recall that
10 testimony?
11   A. That sounds like something I would have said,
12 yes, sir.
13   Q. Why would you want that?
14   A. Well, want to have the community to have -- to
15 be active and have a vote in the issues that affect
16 them. And that we thought that was the best way for us
17 to have the community to have an opportunity to express
18 themselves by choosing which MUD directors, you know,
19 they wanted to have represent them.
20   Q. Why is that a benefit to the MUD?
21   A. Well, since the majority of the MUD is made up
22 of residents of Canyon -- the Canyon Creek community,
23 we think of their interests as being somewhat similar.
24   Q. Well, but why is it a benefit to the MUD? Why
25 is getting a large -- larger turnout for elections to

Page 44

1 the MUD board considered in your view to be a benefit
2 to the MUD itself?
3   A. Because the -- in my opinion, the MUD is
4 responsive to the community. And so the best way for
5 the -- for it to know what the community wants its
6 board to do is to make sure that the community has an
7 opportunity to elect board members that -- that they
8 think are appropriate and that they have the ability to
9 attend the meetings and express themselves or question
10 what's going on or -- that we get some guidance -- that
11 the MUD boards get some guidance from the community in
12 terms of what decisions it makes so it's not in some
13 sort of vacuum trying to interpret what the community
14 would like, that it -- that it has a -- some sort of
15 openness with the community so that we understand what
16 they want.
17   Q. So is it your view that the greater the civic
18 participation from the MUD's elections in terms of
19 voters, the better.
20   A. Yes, sir.
21   Q. You had mentioned also, I think in -- earlier
22 today that there were three board members when you were
23 coming on to the board that were not residents of the
24 district but owned property in the district. Do you
25 recall that?

Page 45

1   A. It's a requirement to serve on the district
2 that you own property in the district. And it was -- I
3 asked several individuals if those MUD board members,
4 where they lived. And someone said they don't live in
5 the district, they just own property in the district.
6   Q. Did you know what property they owned?
7   A. No, sir, I did not. I never legally tried to
8 investigate or question their ability to serve.
9   Q. And to your knowledge did anybody else on the
10 MUD board conduct such an investigation or inquiry?
11   A. I don't know of any.
12   Q. Is it your understanding that people that live
13 in the two apartment complexes in the MUD could not be
14 eligible to be members of the board?
15   A. Oh, no, they could.
16   Q. So you're saying --
17   A. Some even attend our meetings and speak up.
18   Q. But you own -- they don't own the property
19 there. Right?
20   A. They live in the district, so they could serve
21 on the board --
22   Q. Okay.
23   A. -- MUD board because they live in the
24 district.
25   Q. Okay.

Page 46

1  A. Wow, interesting question.
2  Q. Well, I mean, I think I have an understanding
3  of what I think it requires. It's just been there's a
4  lot of confusing testimony, to me, confusing on this,
5  and I just didn't understand whether it's your
6  understanding.
7  A. Well, I will say this, I'm not an attorney.
8  Q. I understand that.
9  A. And I don't think that question has ever been
10 asked. But I see where you're going with it. And
11 frankly, I'm not --
12 Q. It's not a trick question. I'm just trying to
13 understand.
14 A. Frank -- yeah, I don't -- you know, I am not
15 sure I really know, but it's a very interesting
16 question.
17 Q. To your knowledge, has the MUD board, either
18 directly or through one of its agents, ever asked the
19 county to try to accomplish a bailout for the MUD from
20 the Voting Rights Act preclearance requirements?
21 A. I am not sure that I'm current with all of the
22 details that --
23 Q. You mean like in the lawsuit?
24 A. In the lawsuit. Where we are with every
25 little detail. I knew a bailout was part of an option

Page 47

1  or a request, but I don't know where in the process it
2  is or -- so detail wise, I'm just -- I -- I don't
3  really have a response to --
4  Q. Independent -- independent of the lawsuit are
5  you aware of any such effort or request? Independent
6  of what might have happened with respect to the lawsuit
7  that Mr. Coleman's representing you in, are you aware
8  of any formal or informal board action requesting the
9  county to take steps to try to achieve a bailout from
10 the Voting Rights Act requirements with respect to the
11 MUD?
12 A. I'm -- I can say I'm not specifically familiar
13 with it.
14     MR. HICKS: I have no further questions.
15 Thank you, sir.
16     MR. COLEMAN: Hey, Dan, are you planning
17 to ask some questions?
18     MR. ADEGBILE: I -- I just need to
19 clarify something with -- with Mr. Coleman. I -- I --
20 I'm -- I don't actually have questions for Ferguson.
21     MR. COLEMAN: Okay. I know Mr. Herren
22 has a couple of questions. I had promised to get him
23 back to work by 1:30. I just want to make sure that we
24 can do that.
25     MR. ADEGBILE: Okay. Can -- Chris, with

Page 48

1  your indulgence, can I just ask this question, because
2  I actually have to run?
3      MR. HERREN: Sure.
4      MR. ADEGBILE: Mr. Coleman, the other day
5  during Mr. Zimmerman's deposition I requested the
6  production of certain documents relating to the comment
7  letter that he provided to the DOJ in connection with
8  Save Our Taxpayers. Have you undertaken to look for
9  those documents for us?
10     MR. COLEMAN: I'm -- I don't have the --
11 Mr. Zimmerman's deposition yet and -- or in front of
12 me. If you --
13     MR. ADEGBILE: I can help you. It's
14 essentially just two categories of documents.
15     MR. COLEMAN: Send me --
16     MR. ADEGBILE: One is the comment letter
17 itself and the other is any documents evidencing
18 payment to the -- to Mr. Riley's law firm, Potts &
19 Riley, in connection with the preparation of the
20 comment letter.
21     MR. COLEMAN: I'll -- I'll see --
22     MR. ADEGBILE: I just want to know if we
23 can work it out so I don't have to go to the trouble of
24 issuing subpoenas.
25     MR. COLEMAN: I -- I -- I think we can do

Page 49

1  that. I'll make contact this afternoon and see if we
2  can get that.
3      MR. ADEGBILE: Okay. And -- and my
4  colleagues can -- can follow up with you tomorrow in
5  DC.
6      MR. COLEMAN: Okay.
7      MR. ADEGBILE: Okay. Thanks very much.
8  Thank you, Chris.
9      MR. HERREN: Sure.
10     MR. ZIBEL: Greg, this is Dan. I -- we
11 have no questions.
12     MR. COLEMAN: Okay. Thank you, Dan.
13     MR. KORBEL: This is -- this is George.
14 I've got a couple of questions.
15     MR. HERREN: George -- if you want to go,
16 George, go ahead.
17         FURTHER EXAMINATION
18 BY MR. KORBEL:
19 Q. This is George Korbel. I represent the -- the
20 Garcia defendant intervenors. We have not met,
21 Mr. Zimmerman, but I am looking at the 2005-2006 MUD
22 approved budget. Are you generally familiar with that?
23 A. This is Mr. Ferguson. You're addressing me
24 with the question on the budget? Is that correct?
25 Q. Yes, mm-hmm.

Page 50

1   A. I am not specifically familiar with it and
2  don't have a copy of it in front of me.
3   Q. Yes. I have just got a couple of very general
4  questions. Maybe you could answer them for me. I am
5  looking down the line items and there's a line item for
6  capital expenditures?
7   A. Okay.
8   Q. And that's 40 -- $46,740. Is -- is that -- am
9  I assuming correctly that that is the payment of paying
10 off of the bonds?
11  A. If it's bond payments, it wouldn't be listed
12 as capital improvements.
13  Q. What would bond payments be listed as?
14  A. I -- I could not say without referring
15 directly to the document.
16  Q. Let me ask it this way, then. The total
17 revenue that the -- that the Northwest Austin MUD No. 1
18 shows is $157,793, and the largest budget item is for
19 capital expenditures, and that's for the $46,740.
20  A. Okay.
21  Q. And that is a one-time payment in October.
22 Does that help you?
23  A. Of 2006?
24  Q. 2005-2006.
25  A. The only major capital improvement -- the

Page 51

1  only -- the only major capital improvement that the MUD
2  has made to that degree is that we installed sunscreen
3  covers over the swing set and the playscape at
4  Trailhead Park. And I suspect that -- that that
5  capital expenditure is related to the cost associated
6  with -- with those two items.
7   Q. Where would I find out how much you are paying
8  off on the -- on the -- on the bonds?
9   A. We do an annual audit, and I suspect that the
10 best place to go to get that kind of information would
11 be to look at our annual audits.
12  Q. So the bond payments may not show up on the
13 budget, then?
14  A. They should. I just can't specifically say
15 what category that they're listed at without, you know,
16 scrutinizing or -- or examining it.
17  Q. I got you. You have -- the only other
18 question that I've got is what does a -- what does a
19 lot cost in -- in Canyon Creek?
20  A. We've never had an undeveloped lot that has
21 sold on the open market, so I really could not say.
22 All the lots were sold by the developer to home
23 builders and then the home builders built homes and
24 sold the properties in that manner. And when the home
25 builders bought the lots, they bought groups of lots

Page 52

1  under agreements that I am not aware -- I'm not
2  familiar with. So I couldn't specifically say what --
3  how -- a group of lots, what the developer would have
4  paid for a group of lots so that we could even get an
5  average out of that number.
6   Q. Well, let me ask it this way, then. On your
7  annual -- when you pay your taxes, on the assessed
8  valuation, doesn't it assess the valuation of a lot
9  separately from the -- from the improvement or from the
10 building that's on the lot?
11  A. Yes, sir.
12  Q. And do you recall generally how much the --
13 they assessed your lot for?
14  A. If I could guess and just in a general range,
15 I would say somewhere between 40 to $50,000.
16  Q. Okay. And it's my understanding that the --
17 that the current outstanding bond --
18    MR. COLEMAN: Hey, George, start the
19 question over again. The court reporter is having
20 trouble hearing.
21    MR. KORBEL: I'm sorry.
22  Q. (By Mr. Korbel) The current -- am I correct
23 in understanding that the current bond -- assessed
24 bond -- the current cost of paying off the bonds is
25 about $13 million. Is that correct?

Page 53

1   A. Without having that information in front of
2  me, I can't recall. I -- I do recall that the limit of
3  bonded indebtedness was something on the order of
4  22 million at one time and then we agreed with the city
5  to cap total bonds six to 12 months ago at a certain
6  amount, and where we stand with the amortization of
7  that bond debt I'm not aware of or familiar right at
8  this particular point in time.
9   Q. Do you know whether or not there is a penalty
10 for prepayment of those bonds?
11  A. We have asked our attorneys that same question
12 and our financial advisor that same question, and as I
13 recall, their response was some bonds do have a
14 prepayment penalty but -- while others do not.
15  Q. And how many lots are in the Canyon Creek
16 subdivision, if you know?
17  A. Single-family lots as defined are 1,296.
18  Q. And then how many apartment tracts are there?
19  A. Someone else has mentioned recently that there
20 are two apartment complexes in the district and I -- I
21 don't have any information that would, you know,
22 contest that. I -- specifically I don't know.
23  Q. Now my last question: Have you specifically
24 considered paying off those -- the current
25 indebtedness?

14 (Pages 50 to 53)

Page 54

1  A. We have refunded and refinanced some of that
2  bonded indebtedness.
3  Q. Mm-hmm.
4  A. To the degree that we could. In some
5  situations -- based on what our financial advisor tells
6  us the market is doing, where we might have some older
7  bonds at a higher rate. So where it's financially
8  feasible and attractive for the district to -- to set
9  up a different financing arrangement that's less costly
10 to the taxpayers, we have done so, but when we do so we
11 have to get approval from the city to refund or
12 refinance those bonds.
13 Q. The reason why I'm asking that question is
14 it's my understanding there are about 1500 lots in
15 the -- in the subdivision and the current bonded
16 indebtedness is about $13 million, more or less.
17 That's about $10,000, as I see it, per lot.
18 A. I thought it was higher than that. But I
19 don't have any specific information that would contest
20 your -- what you've asserted.
21 Q. And if -- if each one of the -- if each one of
22 these lots paid off the $10,000, first of all, it would
23 be less than that because you would have prepayment and
24 you wouldn't have the long-term interest, but if you
25 did that, you could wind up the -- the MUD and they

Page 55

1  wouldn't have to pay all of the overhead costs.
2  A. The administrative expense.
3  Q. The attorneys' fees and the -- and the
4  management fees and all that sort of expense.
5  A. If such an agreement could be reached, that
6  would be true. We -- we -- there would be no reason
7  for the MUD to exist, is --
8  Q. Yeah. Well, what I'm saying is if each one of
9  the lot holders, you know, paid in about five or
10 $6,000, that would do away with -- with any further
11 payments. Correct?
12 A. Well, whatever the amount would be, most of
13 the people that live in the district are working class
14 people and it's -- it would be unreasonable for me to
15 expect or anyone to expect that they would have an
16 additional 10 or $20,000 sitting around that they would
17 be willing to pay off their -- pay against their house.
18 So I -- you know, I -- it's --
19 Q. Well, my last question, then, is when you
20 purchased -- when you purchased your house, were you
21 aware of the assessments that were -- that were going
22 to have to be paid off to -- to cover the extension of
23 these services?
24 A. I was familiar with the amount of bonds that
25 were in place at the time that I purchased my home.

Page 56

1  However, what the homeowner or home buyer doesn't know
2  is how much -- how many more bonds are going to be
3  coming down the track that -- that they're going to be
4  asked to participate in.
5       There's always that -- now we know that
6  the bonded indebtedness has been capped and so if
7  someone bought today, they would know how much has to
8  be paid off. But when I bought my home it was in the
9  middle of the development and so there was no way of
10 specifically knowing or understanding how much cost was
11 going to be involved in developing out the community
12 and -- and to what extent the homeowner would be
13 responsible for a debt. It was just an uncertain
14 number.
15 Q. And I appreciate that. And I am sorry,
16 perhaps I'm not being clear on my question and I
17 apologize for that. The question I'm asking you is
18 were you aware that there were -- that there was bonded
19 indebtedness that you were going to have to pay off
20 when you purchased your lot?
21 A. I was. And before I bought my lot I was -- I
22 had communicated with an individual in the community
23 who was fighting this double taxation issue and it was
24 my understanding -- and there had been some information
25 that would -- that had been produced in the local

Page 57

1  newsletter that said that community members were in
2  negotiations with the city to do away with this debt.
3       So I thought when I bought in the
4  community that something was going to be done about
5  this double taxation issue. It was only later that I
6  found that there were -- that the -- that wasn't --
7  those negotiations would not be fruitful.
8  Q. All right. Now, if -- if you're successful
9  with your lawsuit, and I suspect that you will be, if
10 you're successful with your lawsuit, you will be in a
11 position, then, to wind up the MUD. Is that correct?
12 A. We don't know what options that we'll have --
13 that will be provided or that will be available if the
14 lawsuit is successful.
15 Q. Well, let's say the city assumes all of the
16 cost of the bonds. Then you would be in a position to
17 wind up the MUD. Is that correct?
18      MR. COLEMAN: George, we can talk about
19 it offline, but that's not actually relief that we've
20 sought in that other lawsuit.
21      MR. KORBEL: All right.
22 Q. (By Mr. Korbel) If -- if there were no -- if
23 there was no further bonded indebtedness that you had,
24 then you would be in a position to wind up the MUD. Is
25 that correct?

15 (Pages 54 to 57)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d2689db2-9831-453c-ae5c-12e6cac27586

Page 58

1  A. That would be an option, I'm -- I'm -- I'm
2  sure.
3  Q. All right.
4  A. We've often --
5     MR. KORBEL: No further questions.
6     THE WITNESS: Okay.
7     MR. KORBEL: Thank you.
8     FURTHER EXAMINATION
9  BY MR. HERREN:
10  Q. Mr. Ferguson, I'm Chris Herren. I'm an
11 attorney with the justice department out of Washington.
12 And I had just a few questions for you. When you ran
13 for the MUD board of directors in 2002, is that the
14 first time you had run for public office?
15  A. Yes, sir.
16  Q. And between the two campaigns in 2002 and
17 2006, is that the only time you have run for public
18 office?
19  A. Yes, sir.
20  Q. When you ran in 2002, how did you go about
21 campaigning?
22  A. I produced for the community newsletter a
23 brief profile of myself, who I was, why I was
24 interested in running, what I hoped to accomplish. And
25 it was produced for free in the local newsletter.

Page 59

1  Q. Did you go to -- door-to-door at all?
2  A. I did not.
3  Q. Did you appear at any homeowners' association
4 meetings?
5  A. I spoke to the neighbors that I was familiar
6 with to let them know I was running, but that was the
7 real limit of my outreach in terms of my campaign.
8  Q. On election day in 2002, did you do any type
9 of campaigning?
10  A. No, sir.
11  Q. Did you do anything to direct people from the
12 school to Mr. Stuber's garage, anything like that?
13  A. No, sir.
14  Q. Okay. And at the time that you ran, was it
15 your understanding that you were running in the entire
16 district at large?
17  A. The --
18  Q. The entire MUD?
19  A. Yes.
20  Q. Okay. You had mentioned that there were two
21 resident directors at the time that you ran. Do you
22 remember who those two were?
23  A. Karen Timborius and Ed Swarthout.
24  Q. Okay. And were they running that year? In
25 2002?

Page 60

1  A. They were not up for re-election in that
2 particular year.
3  Q. And so when the three who won in 2002,
4 Mr. Wiese, Mr. Zimmerman and yourself, were -- were
5 sworn in, there were five resident directors at that
6 point?
7  A. Yes, sir.
8  Q. Okay. You mentioned the Canyoncreek.net Web
9 site. Have you been onto that Web site?
10  A. In -- historically, yes. Recently, no.
11  Q. Okay.
12  A. It's not somewhere I visit regularly.
13  Q. Okay. Do you know whether or not you have to
14 have a password in order to access part of the Web
15 site?
16  A. I do not know.
17  Q. Okay. You had mentioned that there were 1296
18 lots in the development, Canyon Creek, and that --
19 within the MUD?
20  A. That's my understanding, yes, sir.
21  Q. Do you know how many of those are still
22 unbuilt at this point?
23  A. Within the district I don't think we have any
24 single-family lots that don't have some sort of
25 construction underway. I think Standard Pacific -- I'm

Page 61

1 speculating here. I think Standard Pacific may own
2 five or less, and those are in various stages of
3 construction for final sale to homeowners.
4  Q. What about Weekley?
5  A. It's my understanding that Weekley is out of
6 the community.
7  Q. Okay.
8  A. They have completed construction on all their
9 lots and they have no more lots in the district.
10  Q. Okay. When I had driven up the other day to
11 the MUD, on Boulder Lane there was a sign that said
12 model homes for Weekley and Standard, and had a sign.
13 I never did actually see them. Do you know if there
14 are still model homes?
15  A. It's my understanding based -- that Weekley
16 definitely does not have a model. They sold their
17 model. Standard had moved their model to the newest
18 area and the last time I drove by there I did not see a
19 sign in front and it looked like residents had moved
20 into that model as well. So I do not know if they've
21 got a model, but it does not appear that they have a
22 model -- they -- they no longer have a model in the
23 community.
24  Q. So you think there may be five that are under
25 construction or --

Page 62

1  A.  I'm estimating, but it would be fairly close
2  to that number within a reasonable degree up or down.
3  Q.  Okay.  What are the market prices of houses
4  in -- in the MUD right now, roughly?
5  A.  I would say probably -- and I'm speculating
6  here because I haven't done any research on this.  I'm
7  guessing anywhere from maybe 225 to 500.
8  Q.  Okay.  And what are the sizes, roughly, square
9  footage, would you guess, of the houses?
10  A.  Roughly, I would say from 2,000 to 4500 square
11  feet.
12  Q.  Okay.  In terms of the MUD's responsibility,
13  the MUD owns Trailhead Park?
14  A.  Yes.  But there's an agreement to convey the
15  MUD's interest in Trailhead Park to the city within
16  five years and I'm not sure where we are on the
17  timeline.
18  Q.  Okay.
19  A.  Specifically when the deadline is that we have
20  to convey that.
21  Q.  The MUD doesn't own Canyon Creek park, the
22  pool and all of that area.
23  A.  No, sir.
24  Q.  Does it?  That's --
25  A.  Homeowners.

Page 63

1  Q.  -- owned by the homeowners' association.
2  Okay.  And there are certain conservation lands that
3  Mr. Hicks was asking you about that the -- the MUD has
4  title to at this point?
5  A.  The MUD has an interest in those, but the --
6  their interest is restricted by some -- by the Corps of
7  Engineers permits and it's my understanding that they
8  can never be developed.
9  Q.  So these -- this land is land that -- there's
10  Endangered Species Act issues with it as well?  Is that
11  your understanding?
12  A.  That's my understanding, yes, sir.
13  Q.  And so this is land that can never, ever be
14  developed, basically?
15  A.  It's my understanding that the city may cross
16  it or put utilities on it, but that would be the only
17  type of development that could be accommodated to
18  preserve the habitat that's required under the permits.
19  Q.  And when you say cross it, you mean --
20  A.  Water lines, electric -- overhead utility
21  lines, phone lines.
22  Q.  But it could never be residentially developed,
23  in other words?
24  A.  That's my understanding.
25  Q.  Okay.  At this point people can't even walk on

Page 64

1  it, at least parts of it.
2  A.  That's right.
3  Q.  Okay.  How many hours a week would you
4  estimate that you spend preparing for MUD meetings
5  and -- and getting ready and actually attending MUD
6  meetings?
7  A.  Could I do it -- we meet monthly.
8  Q.  Sure.  Sure.  That's fine.
9  A.  Okay.  I would say I spend perhaps two hours a
10  month preparing for a meeting.
11  Q.  And then the meetings typically last how long?
12  A.  Two and a half to three hours, depending on
13  how many public members show up and what they want to
14  talk about.
15  Q.  Okay.
16  A.  That's our only time to really talk about
17  issues, so the meetings tend to go on a little longer
18  than we would like, but that's just the nature of it.
19  Q.  Okay.
20       MR. HERREN:  I don't think I have
21  anything else.  Thank you very much for coming out
22  today.  Anybody else have any questions?
23       (Deposition concluded at 1:30 p.m.)
24
25

Page 65

1       CHANGES AND CORRECTIONS
2  WITNESS NAME: WILLIAM FERGUSON    DATE: _____
3  Reason Codes:  (1) to clarify the record; (2) to
   conform to the facts; (3) to correct a transcription
4  error; (4) other (please explain).
5  PAGE  LINE  CHANGE                REASON CODE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 66

```
 1  PAGE  LINE  CHANGE          REASON CODE
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8
 9  _____
    WILLIAM FERGUSON
10
11
12  THE STATE OF _____)
                          )
13  COUNTY OF _____)
14     Before me, _____, on this day personally
    appeared WILLIAM FERGUSON, known to me (or proved to me
15  under oath or through
    _____
16  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
18  expressed.
19     Given under my hand and seal of office this
    _____ day of March 2007.
20
21  _____
    NOTARY PUBLIC IN AND FOR
22  THE STATE OF _____
23
24
25
```

Page 67

```
 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2
    NORTHWEST AUSTIN         )
 3  MUNICIPAL UTILITY DISTRICT )
    NUMBER ONE,              )
 4  401 W. 15th Street       )  CIVIL ACTION NO.
    Suite 850                )
 5  Austin, Texas 78701      )    1:06-CV-01384
           Plaintiff,  )        (DST,PLF,EGS)
 6  v.                       )
                             )
 7  ALBERTO GONZALES,        )
    ATTORNEY GENERAL OF THE  )
 8  UNITED STATES,           )
    U.S. Department of Justice )
 9  950 Pennsylvania Avenue NW )
    Washington, D.C. 20530   )
10
            REPORTER'S CERTIFICATION
11        DEPOSITION OF WILLIAM FERGUSON
            Wednesday, February 28, 2007
12
13     I, RANDALL N. FINCH, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16     That the witness, WILLIAM FERGUSON, was duly
17  sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given
19  by the witness;
20     That the deposition transcript was submitted
21  on March 3, 2007 to the witness or to the attorney for
22  the witness for examination, signature and return to me
23  by _____, 2007.
24     That the amount of time used by each party at
25  the deposition is as follows:
```

Page 68

```
 1     Mr. Chris Herren - 00 minutes
 2     Ms. Nina Perales - 27 minutes
 3     Mr. Max Renea Hicks - 0 minutes
 4     Mr. George Korbel - 0 minutes
 5     That pursuant to information given to the
 6  deposition officer at the time said testimony was
 7  taken, the following includes counsel for all parties
 8  of record:
 9     Mr. Gregory S. Coleman, attorney for Plaintiff
10     Ms. Nina Perales, attorney for MALDEF
11     Mr. George Korbel, attorney for Texas Rio
12  Grande Legal Aid, Inc.
13     Mr. Chris Herren and Ms. Christy A. McCormick,
14  attorneys for U.S. Department of Justice
15     Mr. Benjamin Blustein and Mr. Daniel A. Zibel,
16  attorneys for Lawyers' Committee for Civil Rights Under
17     Mr. Max Renea Hicks, attorney for Travis
18  County
19     Mr. Debo Adegbile, attorney for the NAACP
20  Legal Defense and Educational Fund, Inc.
21     I further certify that I am neither counsel
22  for, related to, nor employed by any of the parties or
23  attorneys in the action in which this proceeding was
24  taken, and further that I am not financially or
25  otherwise interested in the outcome of the action.
```

Page 69

```
 1  Certified to by me this 1st day of March, 2007.
 2
    _____
 3  RANDALL N. FINCH, Texas CSR #504
    Expiration date: 12/31/2008
    Fredericks-Carroll Reporting
 4  Firm Registration No. 82
    7800 Shoal Creek Blvd., Suite 200-W
 5  Austin, Texas 78757 (512) 477-9911
```