Page 1

```
         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN              )
MUNICIPAL UTILITY DISTRICT    )
NUMBER ONE,                   )
401 W. 15th Street            )     CIVIL ACTION NO.
Suite 850                     )
Austin, Texas 78701           )     1:06-CV-01384
         Plaintiff,           )     (DST,PLF,EGS)
                              )
v.                            )
                              )
ALBERTO GONZALES,             )
ATTORNEY GENERAL OF THE       )
UNITED STATES,                )
U.S. Department of Justice    )
950 Pennsylvania Avenue NW    )
Washington, D.C. 20530        )
```

* * * * * * * * * * * * * * *
ORAL DEPOSITION OF
WINTHROP GRAHAM
Wednesday, April 25, 2007
* * * * * * * * * * * * * * *

ORAL DEPOSITION OF WINTHROP GRAHAM, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 25th day of April, 2007, from 8:01 p.m. to 8:34 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Yetter & Warden, LLP, 221 W. 6th Street, Suite 750, Austin, Texas 78701 pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1              APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
    Mr. Christian Ward
 4  YETTER & WARDEN, LLP
    221 West Sixth Street, Suite 750
 5  Austin, Texas 78701  (512) 743-2642
 6  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
 7
    Mr. Chris Herren (By telephone)
 8  Attorney at Law
    950 Pennsylvania Avenue, N.W., Room 7246
 9  Washington, D.C. 20530  (202) 305-0609
              (202) 327-3961 Fax
10
    FOR LDF:
11
    Mr. Ryan Paul Haygood
12  Assistant Counsel
    99 Hudson Street, Suite 1600
13  New York, New York  10013  (212) 965-2235
              (212) 226-7592 Fax
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2  Appearances........................  2
 3  Stipulations......................
 4
 5  WINTHROP GRAHAM
 6    Examination by Mr. Ward.......................  4
 7    Further Examination by Mr. Haygood............ 19
 8    Further Examination by Mr. Ward............... 28
 9
10  Signature and Changes............................ 29
11  Reporter's Certificate........................... 31
12
13          EXHIBIT INDEX
14  DEPOSITION EXHIBITS
15  (No exhibits were marked during this deposition)
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              WINTHROP GRAHAM,
 2  having been first duly sworn, testified as follows:
 3              EXAMINATION
 4  BY MR. WARD:
 5     Q.  Okay.  Mr. Graham, thank you for coming here
 6  tonight.  I have introduced you to myself once.  I'm
 7  Chris Ward and I am here representing the Northwest
 8  Austin Municipal Utility District No. 1.
 9     A.  Okay.
10     Q.  Just for the record, during this deposition if
11  I refer to the district or the MUD, that's the district
12  I'm going to be referring to.
13     A.  Okay.
14     Q.  Do you understand that?  And you have given
15  the court reporter your full name.  Can you please
16  state your address on the record for me?
17     A.  It's 9700 Indigo Brush Drive, Austin, Texas
18  78726.
19     Q.  And is that address inside the district?
20     A.  Yes, it is.
21     Q.  Okay.  And how long have you lived there?
22     A.  Since 1997, I think.
23     Q.  And -- and where did you live before that?
24     A.  I lived in a subdivision called Wells Branch.
25     Q.  Okay.  And -- and that is not within the
```

Page 5

```
 1  district.  Is that correct?
 2     A.  That's -- that's a little bit closer to I-35.
 3     Q.  Okay.  And that -- that is in Austin, though.
 4     A.  It's in Austin.
 5     Q.  Correct?
 6     A.  Yeah.
 7     Q.  Okay.  Did you live anywhere else before you
 8  came to Austin?
 9     A.  I lived in Arizona for one year.  I went to
10  school there.  And before that I lived in Jamaica.
11     Q.  And what school did you attend in Arizona?
12     A.  Central Arizona.
13     Q.  And have you done anything to prepare for this
14  deposition today?
15     A.  Not -- no, not -- don't think there was
16  anything I needed to do, really.
17     Q.  Okay.  Did you review any documents?
18     A.  Just some -- no, not really, just documents
19  about the -- the case was resolved, I guess -- not
20  resolved, but I guess just a letter just saying they
21  might have come to an agreement, something like that.
22  I wasn't sure what it was.  But it was, you know, a
23  simple letter.
24     Q.  Okay.  Did you bring any documents with you to
25  the deposition?
```

2 (Pages 2 to 5)

Page 6

1   A.  No, I didn't.  What form of documents are you
2  talking about?
3   Q.  Well, in our -- our deposition notice we
4  requested that you bring any documents that you might
5  have reviewed in preparation or that might have
6  relevant information --
7   A.  Oh, okay.
8   Q.  -- to the case.  But -- but you don't have any
9  documents --
10   A.  No, I don't.
11   Q.  -- of that type.  Okay.  Would you say that
12  you are involved in your community?
13   A.  I'm involved in a lot of different ways, I
14  think.
15   Q.  Okay.  What are some of those ways?
16   A.  Owner of small business in the community.
17  Volunteer at the schools different ways.  Help give
18  advice to different, you know, groups.  So just
19  different things like that I'm involved.
20   Q.  And do you vote?
21   A.  I voted once since I lived in that district.
22   Q.  Okay.  When was that?
23   A.  Not a hundred percent sure, but I think
24  perhaps '99 or somewhere around there.  Or 2000.
25  Somewhere around that time.  I'm not a hundred percent

Page 7

1  sure about the time.
2   Q.  Okay.  Would you consider yourself to be an
3  active voter?
4   A.  Not necessarily.  Not at the moment.  Because
5  if I see a person -- see that can, you know, voice my
6  views or whatever, I think I would.
7   Q.  So -- so you vote when a candidate appeals to
8  you?
9   A.  Yes.  I vote when a candidate appeals.
10   Q.  But if -- if no one is sparking your interest,
11  then you don't necessarily feel the need to go and
12  vote?
13   A.  No.
14   Q.  Okay.  The election that you voted in in the
15  district in -- you said either '99 or 2000, was that
16  one of the elections for the district's board?
17   A.  Not hundred percent sure, to be honest with
18  you, if it was for the board or for the -- you know, it
19  was a lot of different things you could vote for.
20   Q.  Okay.  Do you remember if that was a -- a
21  local election or maybe a federal election?
22   A.  I think they had -- if I remember correctly, I
23  think they had both.  I think it was like a local --
24  you had the local you could vote for or something like
25  that, running for office, and then others.

Page 8

1   Q.  Okay.  Was it -- do you remember if it was the
2  presidential election of 2000?
3   A.  It could be.  I think it could be 2000.
4   Q.  Okay.  Was it in the fall or the spring?
5   A.  It was so long ago, I can't remember.  I don't
6  really remember, to be honest, exactly what time of
7  year it was.
8   Q.  Okay.  So do you remember, though, if the --
9  the MUD board elections were on that ballot?
10   A.  I -- I am not going to swear, but I think a
11  lot of different things was on the ballot.  There was a
12  lot of different things.  You had -- gave you choices
13  to vote for.  This represented this, this
14  represented -- I can't remember exactly all that was on
15  it, to be honest.
16   Q.  And did you experience any problems voting in
17  that election?
18   A.  Not really.  It was simple.
19   Q.  So have you -- do you have any information
20  about how the MUD itself conducts its elections for its
21  board?
22   A.  I don't know the details about that, to be
23  honest.  I do know they run for offices but I don't
24  know -- you know, I'm not into politics too much like
25  that, so I don't really know, to be honest, sir.

Page 9

1   Q.  Okay.  So is it fair to say that you're -- you
2  have no specific complaint about how the MUD's
3  elections have been run?
4   A.  How the election have been run?
5   Q.  Yes.
6   A.  No.  No, because I don't follow in that
7  detail.
8   Q.  Okay.  Okay.  So it's fair to say you don't
9  have a specific complaint about the MUD's elections.
10   A.  About the election itself, not really -- not
11  at the moment, no.
12   Q.  Okay.  Do you attend board meetings of the
13  MUD?
14   A.  No.
15   Q.  Okay.  Have you ever attended any?
16   A.  No.
17   Q.  Okay.  Do you attend meetings of the
18  homeowners association in Canyon Creek?
19   A.  Yeah, those I have attended.
20   Q.  Okay.  Do you attend those on a regular basis?
21   A.  I wouldn't say on a regular basis, but I have
22  attended.
23   Q.  Okay.  Do you get the Canyon Creek homeowners
24  association newsletter?
25   A.  Yes, I do.

3 (Pages 6 to 9)

Page 10

1   Q.  And do you read that newsletter?
2   A.  Most of the time.
3   Q.  Do you know any members of the MUD board?
4   A.  I don't know anyone personally or by name, no.
5   Q.  Okay.  If I may, let me ask you a few specific
6   names and -- and ask you to tell me if you're familiar
7   with any of these individuals.  Bill Ferguson?
8   A.  I'm not sure about the Bill, but I do hear the
9   name Ferguson.  I'm not sure if it's Bill, but I do
10  hear the name Ferguson before.
11  Q.  Okay.  And are you familiar with Don
12  Zimmerman?
13  A.  Yeah.
14  Q.  Okay.  How do you know Don Zimmerman?
15  A.  Just by the news.  I don't know him
16  personally, no.
17  Q.  Oh.
18  A.  No.
19  Q.  But you've heard of him?
20  A.  Just heard of him, yeah.
21  Q.  Okay.  Did you know that he was a member of
22  the MUD board?
23  A.  Well, I don't really follow what they're on,
24  but I do know his name goes around in the community
25  about different things, especially maybe the homeowners

Page 11

1   association or something like that.
2   Q.  Okay.  So he's -- you know him as -- is it
3   fair to say you know him as sort of an activist in the
4   community?
5   A.  I don't know if activist or something.  I just
6   know of him being, you know, some person they refer to
7   when there's read -- sent out in the newsletter or
8   something like that.  I don't know if activist or
9   anything, but I just know his name around.
10  Q.  Okay.  Are you familiar with George
11  Frederickson?
12  A.  No.
13  Q.  How about Ed Swarthout?
14  A.  No, that one I don't.
15  Q.  What about Alan Weiss?
16  A.  No, I don't think I'm familiar with him.
17  Q.  How about Karen Temborius?
18  A.  No.
19  Q.  Okay.  And those -- those are just people
20  who -- who are or who have been members of the MUD
21  board, so I was just asking about that for those
22  reasons.
23          Now, how did you come to be involved as
24  an intervenor in this lawsuit?
25  A.  That was because the Lewises told, you know,

Page 12

1   my -- myself and my wife that they were -- they were
2   trying to, you know, change something that would have a
3   right to vote.  And I think that's -- that was probably
4   important to us because we know -- you know, being a
5   minority in that community, I know the -- the -- you
6   know, the importance of having the right to vote or
7   stuff like that.
8   Q.  Okay.  So you heard about the lawsuit from
9   Mr. and Mrs. Lewis, who are --
10  A.  Well, I wouldn't say the lawsuit.  I think
11  it's them -- I don't know they mentioned the lawsuit.
12  They just mentioned they were trying to, you know,
13  change the rule of voting, right to vote.
14  Q.  Okay.  And did they, then, later ask you if
15  you were interested in intervening as a party in the
16  lawsuit?
17  A.  Yeah, they asked me what would I think about
18  it, if I would object to that, and I said yeah.
19  Q.  Okay.  You said -- you said, yes, you would be
20  willing to, not -- not that you object --
21  A.  I would be willing to -- no, I would be
22  willing to object for it being changed.
23  Q.  Okay.  Okay.  Without going into the content
24  of any discussions that you might have had with your
25  attorneys, what -- in your own words, what is your

Page 13

1   understanding of what this lawsuit is about?
2   A.  I don't follow particulars that closely, but I
3   think it has to do with changing the right of minority
4   to vote, maybe, or something along that line.  And I
5   think any changes, from personal experience, along that
6   line, I think they serve the purpose at the moment for
7   minorities.
8   Q.  Okay.  Do you understand that this lawsuit
9   involves part of what's called the Voting Rights Act?
10  A.  Yeah.  Oh, yeah.
11  Q.  Do you know what preclearance is?
12  A.  Not really in terms of that, no.
13  Q.  Okay.  Do you know what bailout is?
14  A.  I mean, I have a general understanding of what
15  bailout is, if that's what it means.
16  Q.  Okay.  Can you tell me what that understanding
17  is?
18  A.  Well, bailout means just when somebody -- some
19  way -- means of getting out of something.
20  Q.  Okay.  Do you understand that the part of the
21  Voting Rights Act that is involved in this lawsuit is
22  the provision that requires the MUD to go to the
23  Department of Justice or federal court to ask
24  permission before making any change affecting elections
25  or voting in the district?

4 (Pages 10 to 13)

Page 14

1    MR. HAYGOOD: I would object there. I
2 think that calls for a legal conclusion. But if you
3 can answer that, you can.
4    THE WITNESS: Well, repeat the question
5 again. That's a long question.
6    Q. (By Mr. Ward) I -- yeah, I'm not sure -- I'm
7 not sure that question was very clear. Let me -- let
8 me try to -- let me try to make that more clear.
9    Do you -- or are you aware that part of
10 the Voting Rights Act requires certain local
11 governments to go to either the Department of Justice
12 or federal court to get approval before they can make
13 any change affecting voting?
14    A. Well, from general knowledge I have -- I have
15 followed I do know certain things you have to go to
16 certain area -- avenues to get it changed.
17    Q. Okay. Are you aware that this provision
18 requiring a local government to go to the federal
19 government for approval applies only to certain parts
20 of the country?
21    A. I mean, I don't follow all -- I don't follow
22 the country, to be honest, because I'm not big in
23 politics. I do follow the general -- what I can around
24 my area.
25    Q. Okay.

Page 15

1    A. So I don't know -- I don't know about the
2 other part of the country, to be honest.
3    Q. Okay. Do you understand that the district is
4 not challenging the part of the Voting Rights Act --
5 well, let -- let me back up and start this over.
6    Do you understand that there are other
7 parts of the Voting Rights Act besides the part that we
8 just talked about that forbid a local government like
9 the MUD from discriminating in voting?
10    MR. HAYGOOD: Object to form. But you
11 can answer it.
12    Q. (By Mr. Ward) You can answer if you can.
13    A. Well, to me I think I would object to any
14 changes in terms of what affect minority votes right
15 now. I think it -- from what I know, my understanding,
16 it serve its purpose, from personal experience.
17 It's -- I think -- make it convenient in having a right
18 to vote. It's -- as it is now in our district, I think
19 it serves its purpose.
20    Q. Okay. Do you think if a place like the MUD
21 had its elections in a private homeowner's garage, that
22 that would be a convenient place for people to vote?
23    A. No, I wouldn't think so.
24    Q. Do you think that a public school nearby would
25 be more convenient?

Page 16

1    A. I think that would be more convenient.
2    Q. Okay. Do you think that if a district like
3 the MUD wants to make a change like moving a polling
4 place from a private garage to a nearby school, that
5 they should need to go through the federal government
6 for that?
7    A. My opinion, I think it depends on which school
8 they're moving into. I mean, I think it might be
9 convenient but it's also -- depends on the school it's
10 going to.
11    Q. Okay.
12    A. I think not all schools might be convenient
13 for everybody.
14    Q. Okay. Do you know where Canyon Creek
15 elementary school is?
16    A. Yeah.
17    Q. Okay. Would you consider that a convenient
18 place for you to vote?
19    A. At the moment it is, yeah.
20    Q. Okay. If a local government like the MUD can
21 show to a federal court that it has a history of no
22 voting discrimination, do you think that that
23 governmental unit should be able to get out of going to
24 the federal government before it makes changes?
25    MR. HAYGOOD: I object to that question.

Page 17

1 It calls for a legal conclusion, and Mr. Graham is
2 neither a lawyer nor a particular court. But if you
3 can answer it, you can.
4    THE WITNESS: I mean, just from opinion
5 point of view, I think it's -- it's good to have
6 because I think it don't get abused.
7    Q. (By Mr. Ward) So just to clarify, are you
8 saying you think that you should still have the --
9    A. I think you should explore another avenue
10 before to just change it, someone just change it out of
11 mind. I think the system that is set up now serve its
12 purpose where it doesn't get abused. There's steps in
13 place that people have to take in order to -- someone
14 just take out by themselves and change it.
15    Q. Okay. We talked earlier about the term
16 bailout. If -- if you'll allow me to tell you that in
17 the context that we're talking about, bailout means --
18 if I could do the -- bailout means a political unit
19 basically bailing out of this requirement that they go
20 to the federal government for approval of changes. In
21 other words, exemption from that --
22    A. Okay.
23    Q. -- requirement. Do you -- do you understand
24 that?
25    A. Yeah. Yeah.

5 (Pages 14 to 17)

## Page 18

1  Q. Okay. So is it fair to say that your main
2  interest in this lawsuit is a philosophical objection
3  to a district like the MUD getting a bailout?
4  A. I would say yeah, that I wouldn't want to see
5  them just having a way to easily bail out of it.
6  Q. You say easily bail out of it. What if it was
7  a strict standard, would that make a difference?
8  A. No, I think if -- if -- the way it is right
9  now, from what I understand, if you have to check with
10 different avenue before you can change it, I think that
11 serves a good purpose. Just from personal experience
12 of certain things I know happen. So I think it's --
13 you know, maybe the people that's there now, okay, but
14 what about the people who come to run it two, four
15 years from now, they don't have the same opinion. So I
16 think it serves its purpose right now.
17  Q. Okay. Do you think, generally speaking, that
18 purely local elections are more of a local concern than
19 a federal concern?
20  A. Sorry, you asked my opinion about that?
21  Q. Yes.
22  A. Repeat that. Repeat it.
23  Q. Do you think that purely local elections --
24  A. Mm-hmm.
25  Q. -- are more of a local concern than a federal

## Page 19

1  concern?
2  A. No. I would say no.
3  Q. Okay. Other than elections, are there other
4  areas of local government that you think the federal
5  government should be involved in?
6  A. I can't say -- well, I don't know everything
7  about the local government, so I can't say yes or no
8  what they need to be involved in. But I do know some
9  of the ones that they are, I think it's okay.
10      MR. WARD: Okay. I think that's all the
11 questions I have. So I will pass the witness.
12      MR. HAYGOOD: Could we just -- could we
13 go off the record for a quick second?
14      (Recess from 8:23 to 8:25 p.m.)
15      FURTHER EXAMINATION
16 BY MR. HAYGOOD:
17  Q. Mr. Graham, I just have a few clarifying
18 questions for you. You mentioned that you haven't
19 voted since 1999 or 2000, in part because there hasn't
20 been a candidate that has espoused your particular
21 views or the issues that are important to you. Are
22 there other reasons why you haven't voted since that
23 time?
24  A. I mean, there's -- there's other reasons why I
25 haven't. I mean, it's -- living in that community to

## Page 20

1  me have been sometimes difficult in terms of how people
2  treat us because of color. I mean, I have -- I have --
3  I had very embarrassing situation before, and I know
4  it's only color motivated. So...
5  Q. Can you speak specifically about some of those
6  experiences you've had where you've -- I guess you're
7  saying you experienced discrimination on account of
8  your color?
9  A. Yeah. Some of them range from because of the
10 vehicle I drive. Pulled me over several times because
11 I'm driving a Land Cruiser. And they will make up a
12 story as to why they stopped me. I was weaving or
13 something. I don't drink, I don't smoke. You know, so
14 just stuff like that. And after several times of that
15 happening I changed vehicles. That never happened
16 anymore.
17      In my own neighborhood four houses down
18 from me a cop came up in front of me pointing a light.
19 Didn't know it was a cop at first because wasn't
20 blinking any light or anything, just some bright light
21 shining in my face. And he's saying to me, "Hold your
22 hand up and back up towards me." I said, "Who are
23 you?" He said, "I'm officer. Hold your hand up and
24 back up to me." I said, "I can't, I have my son with
25 me." And he said, "Well, you better hold it and back

## Page 21

1  up to me." I said, "No, I'm not." Because I have my
2  little son there. I was teaching him to ride it, ride
3  a -- ride his bike.
4       So I stood there for a while and I
5  decided, okay, do I back up to this guy, leave my son
6  screaming, or do I stand here and try to hold him where
7  this guy might shoot me. And I just decided to stand
8  there. And kind of lucky for me the backup cop that
9  arrived happened to be a colored officer. And he said
10 to me, "Stay there. I'm coming." And at that moment
11 was when I realized that the other guy -- cop that came
12 after was a colored guy. And he said something about
13 somebody said the guy with a trench coat walking around
14 or something.
15      I said, "We have been on this street for
16 quite a while riding up and down with the bike. No one
17 had passed us." But I know it was just because I was
18 black and, you know, I had -- nobody really probably
19 know me too much in the community. And I probably was
20 the only one at the time, black person around there.
21      So just stuff like that that happened to
22 me all the time around the community. Just changed my
23 mind about who I vote for or why I vote.
24  Q. So are you -- you were saying that you had a
25 Land Cruiser that you drove in the district?

6 (Pages 18 to 21)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

427dfbe1-f0ce-44df-9914-e2d63fdee9e9

Page 22

1   A. Mm-hmm.
2   Q. And those are police in the district who would
3 pull you over?
4   A. They would pull me over constantly.
5   Q. How many times would you say you were pulled
6 over since --
7   A. At least four to five times with the same --
8 with the -- with the -- with that vehicle. And since
9 my wife drives that now, they don't -- for some reason
10 they don't get to pull her over. So I don't drive that
11 vehicle anymore. And ever since I've been driving a
12 Tahoe, I've never had that happen to me.
13  Q. And so you changed cars because you were being
14 harassed by the police in the --
15  A. I know they were being harassing because of
16 that.
17  Q. And when you were pulled over were you ever
18 given a citation?
19  A. Never. I have a spot clean record.
20  Q. Can you remember some of the reasons why the
21 police justified pulling you over?
22  A. The main reason that I think it was about two
23 or three times was saying that they saw me going
24 over -- back and forth over the white line. I said,
25 "Well, I'm not drinking. I don't drink, I don't -- I'm

Page 23

1 not -- I don't smoke."
2   Q. Can you approximate the number of the times
3 you were pulled over by police in the district?
4   A. It happened quite often. Quite often. I
5 would say no less than four to six times it happened.
6 I don't remember exactly, but I know it happened enough
7 to say, okay, maybe I don't need to be driving this
8 vehicle.
9   Q. And your belief is that you were pulled over
10 those four to six times because you are black.
11  A. Yeah. I know it's because I'm black. I know
12 at the time there was no other black person driving
13 that car in that area. I know -- you know, I'm -- have
14 small business around the area so I do know -- kind of
15 have an idea who drives around there.
16  Q. And the second incident you mentioned, did
17 that occur in front of your home?
18  A. Four houses down from my house.
19  Q. And there you were -- you were trying to teach
20 your son how to ride a bicycle?
21  A. Trying to teach him how to ride a bike.
22  Q. And how did that situation end?
23  A. How did it end?
24  Q. Mm-hmm.
25  A. Well, at first I said I was going to take

Page 24

1 legal action, and the black officer that showed up
2 later told me that it's kind of -- I guess he was
3 trying to explain to me that maybe it's the general
4 procedure of the -- of the -- of the officer. I said,
5 well, what about common sense, if you see me with a
6 little kid on a bike? Common sense should tell you
7 that I can't just back up and leave that kid, or unless
8 they think I'm kidnapping that kid or something like
9 that. And if I just stand there, common sense, you see
10 the kid crying, you know, approach me like you did.
11 But for me to want me to back up with my hand towards
12 you and leave my son there... Until today my son still
13 talk about it, so it leave a mark on him.
14  Q. How old was he at the time?
15  A. He was six at the time. Mm-hmm.
16  Q. So given those experiences, those very
17 unfortunate experiences with the police, why do you
18 stay in the -- in the MUD?
19  A. It's a good school district. We moved there
20 for that reason, for the school district. I mean, our
21 kids are getting a very good education. They're pretty
22 smart, so that's -- without that, we wouldn't live
23 there.
24  Q. I think my final question is have these
25 experiences influenced whether or not you vote in some

Page 25

1 elections?
2   A. It has. It has. Because I haven't seen a
3 candidate who I think would look out for my view or --
4 or look out for what -- you know, what I would say know
5 our interests or my interests. I mean, just owning a
6 business in the area and people walking in there and I
7 can't tell them I own it should give you a good
8 understanding of how the situation is. So...
9   Q. And have these influences -- have these
10 experiences influenced whether you participate in
11 things like the board or the homeowners association?
12  A. It has. It has. Because I haven't seen --
13 it's majority white. So it's -- it's kind of, you
14 know, affect how -- how you participate.
15  Q. Mm-hmm. And I --
16  A. I mean, I have people next door to me that's
17 very racist, so I do know how deep it goes. I have
18 them telling me to go back to East Austin, so I do
19 really know how deep it goes. That's why I think the
20 Voting Rights Act and things like that are essential.
21  Q. What does that mean, to go back to East
22 Austin?
23  A. East Austin is -- I guess that's the thing
24 where most black people in Austin live. I've never
25 been in East Austin, really, because I'm not really an

Page 26

1  Austinite. So, you know, I know of East Austin but I
2  never grew up there. I don't know much about it,
3  really, you know.
4     Q. So just to clarify, you have had your
5  next-door neighbor tell you to go to East Austin
6  instead of residing where you do --
7     A. Yeah.
8     Q. -- in the MUD?
9     A. Yeah, several times. Told me to go back to
10 East Austin.
11    Q. So you may have answered this question, and
12 this is my final question. Honestly this time. There
13 are those who would say that within the MUD -- within
14 the district there is no racial discrimination so
15 there's no need for things like the Voting Rights Act
16 or other race-conscious measures. And I ask you, sir,
17 what is your opinion of the idea that within the MUD
18 there is no racial discrimination?
19    A. No, within the MUD there's a lot of racial
20 discrimination. I see it every day. I own a business,
21 I interact with a lot of people, say the -- and I tell
22 you, like I said, when I -- I have -- we have our own
23 business and I have to pretend like it's someone else,
24 because they won't come back, customers. So there is a
25 lot of -- as I said, like pulling -- pulling me over.

Page 27

1  There's a lot of discrimination.
2     Q. So in addition to the other forms of
3  discrimination, you say that if people knew that your
4  store was owned by a black person, they wouldn't shop
5  there?
6     A. No, they don't come back. So as long as
7  white -- I told them that a guy -- the coach at the
8  university owned it; I'm the manager, I run that for
9  him. Because the first few times when we just opened,
10 for the first couple of years, we were wondering why
11 people don't come back. And you see them in the
12 community. And actually, it was a white guy that said
13 to me maybe you gotta kind of not say it's yours. A
14 white person told me. And after I tried that we
15 started pretending like we're just a manager. You
16 could see the difference.
17    Q. And business picked up --
18    A. Yeah.
19    Q. -- when the people in the MUD thought that it
20 was owned by a white person?
21    A. Owned by someone else.
22    Q. And just managed by you and your wife, who are
23 black.
24    A. Yeah.
25    Q. And what type of store is this?

Page 28

1     A. These are health food stores. Which at the
2  time we saw the need for it over there because there
3  was none out there.
4     Q. So this is a store that ordinarily people
5  would patronize?
6     A. Yeah. People already are health conscious and
7  they go -- I already knew that a lot of people go to
8  Whole Food and places to shop. So that was the reason
9  why we started out there.
10       MR. HAYGOOD: That's all I have.
11       MR. HERREN: This is Chris Herren. I
12 have no questions. Thank you.
13          FURTHER EXAMINATION
14 BY MR. WARD:
15    Q. If I can ask one question on recross.
16 Mr. Graham, do you understand that the MUD as a utility
17 district is not responsible for controlling the Austin
18 Police Department?
19    A. Yeah, but I know it -- this is not just about
20 the police department and why I have certain opinions
21 about certain things. This is just about people to any
22 community, not just the police.
23       MR. WARD: Okay. Thank you very much.
24 No further questions.
25       (Deposition concluded at 8:34 p.m.)

Page 29

1        CHANGES AND CORRECTIONS
2  WITNESS NAME: WINTHROP GRAHAM   DATE: _____
3  Reason Codes: (1) to clarify the record; (2) to
   conform to the facts; (3) to correct a transcription
4  error; (4) other (please explain).
5  PAGE  LINE  CHANGE                REASON CODE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 30

```
 1  PAGE  LINE  CHANGE              REASON CODE
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8
 9         _____
           WINTHROP GRAHAM
10
11
12  THE STATE OF _____)
                         )
13  COUNTY OF _____)
14    Before me, _____, on this day personally
    appeared WINTHROP GRAHAM, known to me (or proved to me
15  under oath or through
    _____
16  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
18  expressed.
19     Given under my hand and seal of office this
       _____ day of May 2007.
20
21     _____
       NOTARY PUBLIC IN AND FOR
22     THE STATE OF _____
23
24
25
```

Page 31

```
 1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
 2
    NORTHWEST AUSTIN          )
 3  MUNICIPAL UTILITY DISTRICT )
    NUMBER ONE,               )
 4  401 W. 15th Street        )   CIVIL ACTION NO.
    Suite 850                 )
 5  Austin, Texas 78701       )   1:06-CV-01384
          Plaintiff,   )   (DST,PLF,EGS)
 6  v.                        )
                              )
 7  ALBERTO GONZALES,         )
    ATTORNEY GENERAL OF THE   )
 8  UNITED STATES,            )
    U.S. Department of Justice )
 9  950 Pennsylvania Avenue NW )
    Washington, D.C. 20530    )
10
11         REPORTER'S CERTIFICATION
         DEPOSITION OF WINTHROP GRAHAM
12         Wednesday, April 25, 2007
13     I, RANDALL N. FINCH, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16     That the witness, WINTHROP GRAHAM, was duly
17  sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given
19  by the witness;
20     That the deposition transcript was submitted
21  on May 3, 2007 to the witness or to the attorney for
22  the witness for examination, signature and return to me
23  by _____, 2007.
24     That the amount of time used by each party at
25  the deposition is as follows:
```

Page 32

```
 1      Mr. Gregory S. Coleman - 27 minutes
 2      Mr. Ryan Paul Haygood - 10 minutes
 3       That pursuant to information given to the
 4  deposition officer at the time said testimony was
 5  taken, the following includes counsel for all parties
 6  of record:
 7      Mr. Christian Ward, attorney for Plaintiff
 8      Mr. Carlos Becerra, attorney for MALDEF
 9      Mr. Chris Herren and Ms. Christy A. McCormick,
10  attorneys for U.S. Department of Justice
11      Mr. Benjamin Blustein, attorney for Lawyers'
12  Committee for Civil Rights Under Law
13      Mr. Daniel A. Zibel, attorney for NAACP
14      Mr. Max Renea Hicks, attorney for Travis Cty.
15       I further certify that I am neither counsel
16  for, related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20     Certified to by me this 3rd day of May, 2007.
21     _____
       RANDALL N. FINCH, Texas CSR #504
22     Expiration date: 12/31/2008
       Fredericks-Carroll Reporting
23     Firm Registration No. 82
       7800 Shoal Creek Blvd., Suite 200-W
24     Austin, Texas 78757 (512) 477-9911
25
```

9 (Pages 30 to 32)