```
           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN           )
MUNICIPAL UTILITY DISTRICT )
NUMBER ONE,                )
401 W. 15th Street         )    CIVIL ACTION NO.
Suite 850                  )
Austin, Texas 78701        )    1:06-CV-01384
         Plaintiff,        )    (DST,PLF,EGS)
                           )
v.                         )
                           )
ALBERTO GONZALES,          )
ATTORNEY GENERAL OF THE    )
UNITED STATES,             )
U.S. Department of Justice )
950 Pennsylvania Avenue NW )
Washington, D.C. 20530     )


           * * * * * * * * * * * * * * *
                 ORAL DEPOSITION OF
                   YVONNE GRAHAM
              Wednesday, April 25, 2007
           * * * * * * * * * * * * * * *
```

ORAL DEPOSITION OF YVONNE GRAHAM, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 25th day of April, 2007, from 8:35 p.m. to 9:07 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Yetter & Warden, LLP, 221 W. 6th Street, Suite 750, Austin, Texas 78701 pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1            APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
      Mr. Christian Ward
 4    YETTER & WARDEN, LLP
      221 West Sixth Street, Suite 750
 5    Austin, Texas 78701  (512) 743-2642
 6  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
 7
      Mr. Chris Herren (By telephone)
 8    Attorney at Law
      950 Pennsylvania Avenue, N.W., Room 7246
 9    Washington, D.C. 20530 (202) 305-0609
                 (202) 327-3961 Fax
10
    FOR LDF:
11
      Mr. Ryan Paul Haygood
12    Assistant Counsel
      99 Hudson Street, Suite 1600
13    New York, New York  10013  (212) 965-2235
                 (212) 226-7592 Fax
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2  Appearances........................  2
 3  Stipulations......................
 4
 5  YVONNE GRAHAM
 6    Examination by Mr. Ward.......................  4
 7    Further Examination by Mr. Haygood............ 18
 8
 9  Signature and Changes............................ 21
10  Reporter's Certificate........................... 23
11
12           EXHIBIT INDEX
13  DEPOSITION EXHIBITS
14  (No exhibits were marked during this deposition)
15
```

Page 4

 1            YVONNE GRAHAM,
 2   having been first duly sworn, testified as follows:
 3                EXAMINATION
 4   BY MR. WARD:
 5      Q.  Mrs. Graham, thank you for coming tonight.  As
 6   I told you before, my name is Chris Ward and I
 7   represent the Northwest Austin Municipal Utility
 8   District No. 1, which I will refer to -- if I refer to
 9   the MUD or the district during this deposition, that's
10   the district I'll be referring to.
11          Will you please state for the record your
12   address.
13      A.  9700 Indigo Brush Drive, Austin, Texas 78726.
14      Q.  And is that address within the district?
15      A.  Yes.
16      Q.  And how long have you lived there?
17      A.  It's almost 13 years, I would say.  Twelve.
18   Twelve, 13 years.
19      Q.  And where did you live before that?
20      A.  We lived in Wells Branch.  And before that --
21   I am from Germany; I lived in Germany.
22      Q.  Okay.  So before you lived in the district you
23   lived in Austin for a while but not inside the
24   district.  Is that correct?
25      A.  I came here '91 and lived in Wells Branch

Page 5

 1   first, and then we moved to Canyon Creek.
 2      Q.  Okay.  Have you done anything to prepare for
 3   this deposition?
 4      A.  Well, of course, the complicated legal issue
 5   Ryan can address.  My point of view is I -- I heard
 6   from a friend that MUD is -- I say it in my words,
 7   trying to detach themselves from the Voting Right Act,
 8   basically.  No jurisdiction really can overlook what's
 9   really doing, and from my point of view, my first thing
10   was there's something to hide, other than maybe even
11   devious reasons or even selfish reasons.
12          You got to understand I'm from Germany.
13   So to me, like the safety switch is missing.  If you
14   can report to other groups or if you can have other
15   people say an opinion -- I mean, like two eyes more --
16   two pair of eyes see more than one pair.  Three more
17   than two.  And since the MUD is still a small group,
18   they kind of get isolated, maybe not on purpose, doing
19   decisions that to me may be not right.
20          So I think it's -- it's much safer you
21   have a big group overlooking things, other
22   jurisdictions making decision or intervene if something
23   doesn't sound right.  And, I mean, like history --
24   history tells us in decisions like that, always the
25   minority are the ones that get hurt.  And eventually

Page 6

1  might get corrected, but at what cost?  Always the
2  minority.
3       So when I heard that, I said, well, I
4  would like to get a little bit involved.  Not that I
5  know -- you know, I don't know the legal language;
6  that's not my field.  I learned English when I was
7  here, so I am just here to say my opinion.
8       Q.  Okay.  And some of these things that you have
9  talked about I want to get to a little bit more in a
10 minute.  I am just -- just going to ask one
11 housekeeping matter.  Did you bring any documents with
12 you to this deposition?
13      A.  My driver's license.
14      Q.  Okay.  Well, I don't -- I don't think we need
15 to put that into the record.  But --
16      A.  What documents?  I mean, specific?
17      Q.  In -- in the notice of deposition we just
18 requested that if you have any documents --
19      A.  No.  No.
20      Q.  -- relevant to the case --
21      A.  No.  Ryan can do that.  I don't have that.
22      Q.  Okay.  That's fine.  That's fine.  Would you
23 say that you are involved in your community?
24      A.  I know what's going on.  I don't say much
25 because in general -- we have four children, I'm a big

Page 7

1  part of the community because of that.  Me coming from
2  Germany, first thing, it's -- it's different, you know.
3  Even when you live in a really nice neighborhood.  When
4  I came to the U.S., the first time I felt that I'm
5  black.  I mean, I'm half-black, half-white, but, of
6  course, in the U.S., considered black.  Okay?  So there
7  are certain things that even happen in the neighborhood
8  I am -- I am aware of.  I see a lot of things; I don't
9  say a lot of things.
10      Q.  Do you vote?
11      A.  I haven't voted.  Voting or not voting, that's
12 not why I'm here.  I'm here because I care.  If I am
13 ready to vote or when I -- when I'm ready to vote, I
14 want to make sure it's fair.
15      Q.  Okay.  But you -- so have you not voted in any
16 elections?
17      A.  I have not voted.
18      Q.  Okay.  Is there a reason you have not voted?
19      A.  No.  More personal reasons, not -- no.
20      Q.  Okay.  Do you know what elections the MUD
21 holds?
22      A.  Well, the decision in the neighborhoods, the
23 decision in their districts.
24      Q.  Let me ask you:  Are -- are you aware that the
25 MUD is governed by a board of directors?

Page 8

1       A.  Yes.
2       Q.  And are you aware that elections are held for
3  the members of that board?
4       A.  Yes.  Yes, I know that.
5       Q.  Okay.  And do you -- but do you know anything
6  about how the MUD conducts those elections?
7       A.  Specific, no.
8       Q.  Okay.  Do you ever attend board meetings of
9  the MUD?
10      A.  Never.
11      Q.  Do you ever attend meetings of the Canyon
12 Creek homeowners association?
13      A.  Yes.
14      Q.  And do you get the Canyon Creek homeowners
15 association newsletter?
16      A.  Yes.
17      Q.  And do you read that newsletter?
18      A.  Yes.
19      Q.  Do you know any members of the MUD board?
20      A.  I know a lot of the families in Canyon Creek
21 but not specific members of the MUD board.
22      Q.  Okay.  Well, I -- if I may, I'll ask you the
23 names of some specific people who are either on the MUD
24 board or have been on the MUD board in the past and ask
25 if you're familiar with these people.  Maybe you are

Page 9

1  familiar with them but you just are not aware that
2  they're on the MUD board.  Is that okay?
3       A.  Yeah.  But I don't need to know members of the
4  MUD board.  I know they -- you know, they have been
5  elected, they're doing their job.  It's not that I am
6  here for the -- for the members of the MUD board.  I'm
7  here because you are trying to change the Voting Rights
8  Act.
9       Q.  Okay, I understand that.  But if I may ask
10 these questions.  I'll just ask you --
11      A.  Okay.
12      Q.  -- if you're familiar with any of these people
13 and --
14      A.  I'm really bad with names, but go ahead.
15      Q.  Yes.  Okay.  Are you familiar with Bill
16 Ferguson?
17      A.  No.
18      Q.  How about Don Zimmerman?
19      A.  I heard the name, but more because it's a
20 German name.  But not specific.
21      Q.  How about George Frederickson?
22      A.  No.
23      Q.  And are you familiar with Ed Swarthout?
24      A.  No.
25      Q.  How about Alan Weiss?

3 (Pages 6 to 9)

Page 10

1  A. No.
2  Q. How about Karen Temborius?
3  A. Sounds familiar. But I know -- okay.
4  Q. But -- but -- but you -- you're not
5  specifically familiar with her?
6  A. No.
7  Q. Okay. And you -- you talked a little bit
8  about -- I think how this lawsuit came to your
9  attention.
10  A. Mm-hmm.
11  Q. So I want to ask you some questions about
12  that. Did I understand you correctly to say that a
13  friend of yours told you about this lawsuit?
14  A. Yes.
15  Q. And were you -- did your friend ask you if you
16  were interested in becoming an intervenor in the
17  lawsuit?
18  A. Not right away. He said, "Well, there's a
19  lawsuit, you know, involving the MUD," and he said,
20  "They're trying to move away from the Voting Rights
21  Act." And so I was like, "Why?" You know? And then
22  he said, "Well, would you like to get a little bit
23  involved, say -- say" -- you know, and I said, "Yeah, I
24  will say my -- my opinion and -- but what's the reason,
25  you know, to move away from that?" Because to me

Page 11

1  that's like the safety switch is off.
2  Q. Okay. And what is your understanding of what
3  you are calling the safety switch? What -- how does
4  that work?
5  A. That no other jurisdiction, no other group can
6  overlook the decision of the MUD itself. They can make
7  decision and maybe even not on purpose make wrong
8  decision and it cannot be corrected without any damage.
9  So therefore I think it's much wiser to have the safety
10  on and have other jurisdictions overlooking what is
11  going on before the damage.
12  Q. And what jurisdiction do you feel that should
13  be? What -- what in your view is the jurisdiction that
14  should be overseeing what the MUD does?
15  A. Other groups, even other utility districts,
16  with how are they doing, just -- not only one group
17  makes the decision. Because I think there's a limited
18  few. There always will be a limited few. You need
19  opinions from other groups. It doesn't even have to
20  be -- it could be another organ -- other organization,
21  it doesn't necessarily have to be another utility
22  district. Just a wide variety.
23      So as wider is better. Because,
24  particular in our neighborhood, I mean, it's -- it's a
25  good neighborhood. It's kind of upscale

Page 12

1  neighborhood -- upscale neighborhood. And maybe you
2  lose the touch to the minorities because of that. I
3  mean, maybe other districts don't have that problem
4  because there are more minorities, but this I think is
5  the danger of isolating or separating different
6  ethnics, different neighborhoods, just different
7  districts.
8  Q. So just --
9  A. So all kind of groups have to be able to
10  overlook.
11  Q. Okay. Just -- just to make sure I -- I
12  understand what you're saying, you think it would be --
13  it's a good idea for other neighborhoods, other similar
14  districts to --
15  A. Not even similar districts, because if it's a
16  similar district, they might have the same issues and
17  cannot look at things they -- not related to that issue
18  but maybe have an impact.
19  Q. Okay. Are you aware that nothing in the
20  Voting Rights Act requires the district, the MUD that
21  we're talking about, to be overseen by other districts
22  or other --
23  A. Yeah, I am aware. That's why I'm saying it
24  was just an example.
25  Q. Okay. Are you aware that under the current

Page 13

1  Voting Rights Act, that it's -- the federal government
2  is the entity that the MUD has to get approval from for
3  voting changes?
4  A. It's perfect. It's a completely different
5  jurisdiction. It's perfect. As more as possible, I
6  think.
7  Q. Okay. Are you aware that only certain parts
8  of the country have to go through that process?
9  A. Well, I'm aware every part of the -- every
10  different state has different laws, their own laws. I
11  am aware of that. So I'm just speaking about this one
12  here. And it's not necessary to change if it's already
13  overlooked by other institutions or other
14  jurisdictions.
15  Q. Okay. So are you aware that the voting rights
16  we're -- we're talking about is a federal law?
17  A. It's -- yes, yes, yes.
18  Q. But are you aware that it only affects
19  certain --
20  A. Certain --
21  Q. -- areas?
22  A. Yes, I am aware of that.
23  Q. Okay. And do you understand that most of the
24  country is not covered by this part of the Voting
25  Rights Act?

4 (Pages 10 to 13)

Page 14

1  A.  Well, there's actually just -- no, I'm very
2  stubborn.  Prove to me even if it's most, it doesn't
3  have to be right.  Common sense tells me it's better
4  you overlook it, somebody overlook it.
5  Q.  So do you feel that it would be best if the
6  whole country was under this part where they have to go
7  to the federal government for approval?
8  A.  Well, it depends.  When you have maybe an area
9  where there is a complete mix, which is impossible in
10 the U.S., a complete mix, white, blacks, Hispanic, same
11 proportion, it may be not necessary.  Do you understand
12 what I'm saying?
13        MR. HAYGOOD:  Mm-hmm.
14        THE WITNESS:  It's just I think the
15 diversity makes it work better.  It does -- it wouldn't
16 work where am I because of the majority of white
17 people.  The majority of how people think.  I mean, I
18 can feel it.  I -- you know, I come from a country
19 where I was even more a minority than in the U.S. and I
20 did not feel there like I feel here.  Like I feel even
21 in the neighborhood.
22        A lot of people know -- know us now
23 because we are very long in the neighborhood.  We have
24 four kids in the neighborhood.  But I still have quite
25 some people, they look at me a certain way and I can

Page 15

1  feel, you know, "What is she doing here?"  I am in the
2  park with my kids, "Do you live here?"  You know, like,
3  yes, I live here, for a long time.  Probably longer
4  than you all.  You know, and I work hard for that.  And
5  I pay my taxes.  Okay?
6        So -- so therefore, I am here.  I think
7  there is still a lot going on that has to be solved and
8  I don't think it's helpful when this MUD would
9  separate.
10 Q.  (By Mr. Ward)  Do you understand that aside
11 from the part of the Voting Rights Act that is involved
12 in this lawsuit, other parts of the Voting Rights Act
13 cover the whole country, and I --
14 A.  So you only partially moved away from the
15 Voting Rights Act?  Is this --
16        MR. HAYGOOD:  Just let him ask that
17 question.
18        THE WITNESS:  Huh?
19        MR. WARD:  Yeah, let --
20        MR. HAYGOOD:  Let him ask the question.
21        MR. WARD:  Let me -- let me try --
22        THE WITNESS:  Okay.
23 Q.  (By Mr. Ward)  Let me try to -- let me -- if
24 I -- let me try to start that question over again.  Do
25 you understand that part of the Voting Rights Act

Page 16

1  permits any government in the country to be sued if
2  someone thinks there's voting discrimination?
3        MR. HAYGOOD:  It's -- I -- I object to
4  that question because I think it calls for a legal
5  conclusion and also because I don't think it's
6  relevant.  But you can answer it if you can.
7        THE WITNESS:  Yeah, and I probably could
8  not honor this question anyway.  It's just -- yeah.
9  Q.  (By Mr. Ward)  Okay.  I'm -- I'm not -- in
10 these questions I'm not really asking for your legal
11 conclusion.
12 A.  No, no.
13 Q.  But I'm -- but I'm -- I'm --
14 A.  Well --
15 Q.  -- wanting to give you the opportunity to tell
16 me what you understand so that we --
17 A.  Well, I understand everybody sues everybody
18 here.
19 Q.  Okay.  Do you understand that if the district
20 gets away from the part of the Voting Rights Act that
21 requires supervision by the federal government, that it
22 could still be sued if it violates someone's voting
23 rights?
24        MR. HAYGOOD:  I object to the form.  It's
25 a confusing question.  But you can answer it if you

Page 17

1  understand.
2        THE WITNESS:  A person, even in order to
3  sue, have to understand the system first.  If you are a
4  minority, most likely probably not to sue.  Because
5  there is discrimination, you probably don't -- it's not
6  easy to find a lawyer, you stand alone, you're probably
7  an outcast in the neighborhood.  That's what makes it
8  very difficult to live in a white neighborhood if you
9  as a minority try to sue.  You better as well move out.
10 Q.  (By Mr. Ward)  But do you understand that the
11 only part of the Voting Rights Act that the district is
12 questioning in this lawsuit is the part that requires
13 it to go to the federal government for approval for
14 voting changes?
15 A.  Yeah, but that is that safety switch that's
16 off, then.  The federal government can make that
17 decision.  That's what's the most important part to me.
18 Q.  And -- so is it fair to say that your interest
19 in this lawsuit is a philosophical interest in keeping
20 this safety switch?
21 A.  Well, making it fair.  The safety switch makes
22 it fair for people like us.
23 Q.  So you're not complaining, are you, about any
24 specific problem with voting in the district?
25 A.  No.  But if the safeguard would let down, then

5 (Pages 14 to 17)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 18

1  maybe I would complain, because things can change. And
2  that's why I am here, I'm trying to avoid that.
3      MR. WARD:  Okay.  I think that's all I
4  have.  I'll pass the witness.
5      MR. HAYGOOD:  Can we go off the record
6  for a few minutes?
7      MR. WARD:  Sure.
8      (Recess from 8:58 to 9:04 p.m.)
9          FURTHER EXAMINATION
10 BY MR. HAYGOOD:
11   Q.  Ms. Graham, earlier in your deposition you
12 mentioned that you see a lot of things but you don't
13 say a lot of things.  Can you elaborate on what you
14 meant when you said that?
15   A.  Well, it's -- specific in Canyon Creek, I -- I
16 feel the way people look at me, if they don't know me,
17 like misplaced.  I talk to them, they wouldn't even
18 know, but I can tell that they maybe try to figure out
19 what I do for a living.  You know, I am probably a
20 pastor's wife or I do drugs or when I come with my --
21 my children they think I was a teenage mom.  But I
22 wasn't, I got my kids actually really late.
23      I -- I can tell -- I can tell immediately
24 when I look in the person's eye if -- when I pass them
25 they turn around, without even looking at them, I know

Page 19

1  exactly who turns around and who doesn't turn around,
2  because I just sense it.  Maybe because I grew up in a
3  white country, being black.  I -- maybe that's where I
4  got the intuition for it.  Not only -- not that people
5  looked at me in Germany because I am maybe not as much
6  worse or maybe they more looked like more stunned that
7  they see a black person.  Not down on you, just more
8  amazed.  And maybe that's where I got that.
9      Does that make sense?  They like -- here
10 it feels like I don't belong there because I am lower
11 class.  In Germany it felt like, whoa, where this black
12 person come from?
13   Q.  And are you speaking specifically about your
14 experience in the MUD, in the district?
15   A.  In -- in the neighborhood.  I mean, there are
16 other neighborhoods, of course, where I don't feel that
17 misplaced because there -- there are more black people,
18 so then it's not that obvious.  But in Canyon Creek
19 it's pretty obvious that people, they don't know me,
20 they look at me like "Are you a visitor?"  Even at the
21 pool they -- "Do you live in this neighborhood or are
22 you just somebody visiting here and using the pool?"
23 You know?
24      So -- but I can tell as soon as the
25 conversation start or -- where this person is going.

Page 20

1  And I'm always nice to them, so they wouldn't even
2  realize that I notice.  And even the friends I have
3  in -- in Canyon Creek, we have a lot of friends we hang
4  out with, too.  They don't fit that stereotype people.
5  They either looked at me right away equal and we became
6  friends, but none of the people where I felt like
7  awkward talking to them.  But I sensed it.  This is
8  what I mean when I see a lot of things and -- and I
9  keep it in mind but not necessarily that the person
10 will notice.
11      MR. HAYGOOD:  That's all I have.
12      MR. HERREN:  This is Chris Herren.  I
13 don't have any questions.  Thank you.
14      THE WITNESS:  Thank you.
15      MR. WARD:  Then I think we're done.
16      (Deposition concluded at 9:07 p.m.)

Page 21

1          CHANGES AND CORRECTIONS
2  WITNESS NAME:  YVONNE GRAHAM   DATE: _____
3  Reason Codes:  (1) to clarify the record; (2) to
   conform to the facts; (3) to correct a transcription
4  error; (4) other (please explain).
5  PAGE  LINE  CHANGE                REASON CODE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

```
                                         Page 22
 1  PAGE  LINE  CHANGE            REASON CODE
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8
 9      _____
        YVONNE GRAHAM
10
11
12  THE STATE OF _____)
                          )
13  COUNTY OF _____)
14     Before me, _____, on this day personally
    appeared YVONNE GRAHAM, known to me (or proved to me
15  under oath or through
    _____
16  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
18  expressed.
19     Given under my hand and seal of office this
    _____ day of May 2007.
20
21      _____
        NOTARY PUBLIC IN AND FOR
22      THE STATE OF _____
23
24
25
```

```
                                         Page 23
 1      IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
 2
    NORTHWEST AUSTIN         )
 3  MUNICIPAL UTILITY DISTRICT )
    NUMBER ONE,              )
 4  401 W. 15th Street       )   CIVIL ACTION NO.
    Suite 850                )
 5  Austin, Texas 78701      )   1:06-CV-01384
         Plaintiff,   )   (DST,PLF,EGS)
 6  v.                       )
                             )
 7  ALBERTO GONZALES,        )
    ATTORNEY GENERAL OF THE  )
 8  UNITED STATES,           )
    U.S. Department of Justice )
 9  950 Pennsylvania Avenue NW )
    Washington, D.C. 20530   )
10
11         REPORTER'S CERTIFICATION
          DEPOSITION OF YVONNE GRAHAM
12         Wednesday, April 25, 2007
13      I, RANDALL N. FINCH, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16      That the witness, YVONNE GRAHAM, was duly
17  sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given
19  by the witness;
20      That the deposition transcript was submitted
21  on May 3, 2007 to the witness or to the attorney for
22  the witness for examination, signature and return to me
23  by _____, 2007.
24      That the amount of time used by each party at
25  the deposition is as follows:
```

```
                                         Page 24
 1      Mr. Gregory S. Coleman - 21 minutes
 2      Mr. Ryan Paul Haygood - 9 minutes
 3      That pursuant to information given to the
 4  deposition officer at the time said testimony was
 5  taken, the following includes counsel for all parties
 6  of record:
 7      Mr. Christian Ward, attorney for Plaintiff
 8      Mr. Carlos Becerra, attorney for MALDEF
 9      Mr. Chris Herren and Ms. Christy A. McCormick,
10  attorneys for U.S. Department of Justice
11      Mr. Benjamin Blustein, attorney for Lawyers'
12  Committee for Civil Rights Under Law
13      Mr. Daniel A. Zibel, attorney for NAACP
14      Mr. Max Renea Hicks, attorney for Travis Cty.
15      I further certify that I am neither counsel
16  for, related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20      Certified to by me this 3rd day of May, 2007.
21      _____
        RANDALL N. FINCH, Texas CSR #504
22      Expiration date: 12/31/2008
        Fredericks-Carroll Reporting
23      Firm Registration No. 82
        7800 Shoal Creek Blvd., Suite 200-W
24      Austin, Texas 78757 (512) 477-9911
25
```