```
                                                                    Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3   NORTHWEST AUSTIN MUNICIPAL

 4   UTILITY DISTRICT NUMBER ONE,

 5   401 W. 15th Street, Suite 850

 6   Austin, Texas 78701,              Civil Action No.

 7           Plaintiff                 1:06-CV-01384

 8       vs.

 9   ALBERTO GONZALES, ATTORNEY

10   GENERAL OF THE UNITED STATES,

11   U.S. Department of Justice

12   950 Pennsylvania Avenue, NW

13   Washington, DC 20530,

14       , Defendant

15   _____/

16           The deposition of TANYA CLAY HOUSE was held on Thursday,

17   March 1st, 2007, commencing at 2:00 p.m. at the Law Offices of Weil,

18   Gotshal, & Manges, LLP, 1300 Eye Street, N.W., Suite 900, Washington,

19   D.C., before Steven Poulakos, Notary Public.

20

21   REPORTED BY: Steven Poulakos
```

Page 2

```
 1   APPEARANCES:
 2
 3       On behalf of Plaintiff:
 4           GREGORY S. COLEMAN, ESQUIRE
 5           Weil, Gotshal & Manges, LLP
 6           8911 Capital of Texas Highway
 7           Building One, Suite 1350
 8           Austin, Texas 78759
 9           512-349-1937
10           greg.coleman@weil.com
11
12       People for the American Way:
13           DAVID J. BECKER, ESQUIRE
14           2000 M Street, N.W.
15           Suite 400
16           Washington, D.C. 20036
17           202-467-4999
18           dbecker@pfaw.org
19
20
21   (Appearances continued on next page.)
```

Page 3

```
 1   APPEARANCES continued:
 2
 3   BY TELEPHONIC COMMUNICATION:
 4
 5       On behalf of Defendant:
 6           RICHARD DELLHEIM, ESQUIRE
 7           Department of Justice
 8           950 Pennsylvania Avenue, N.W.
 9           Washington, D.C. 20530
10           richard.dellheim@usdoj.gov
11
12       On behalf of Louis intervenors:
13           DESIREE PIPKINS, PARALEGAL
14           LDF
15           1444 Eye Street, N.W.
16           10th Floor
17           Washington, D.C. 20005
18           202-682-1300
19
20
21
```

Page 4

```
 1   Whereupon,
 2               TANYA CLAY HOUSE,
 3   called as a witness, having been first duly sworn to
 4   tell the truth, the whole truth and nothing but the
 5   truth, was examined and testified as follows:
 6               EXAMINATION BY MR. COLEMAN:
 7       Q   Good afternoon. I'm Greg Coleman. I
 8   represent the district in this lawsuit.
 9               Would you state your name for the record?
10       A   Tanya Clay House.
11       Q   And you are affiliated with People for the
12   American Way?
13       A   Yes.
14       Q   Can you tell me your position with the
15   organization?
16       A   I'm the director of our public policy
17   department.
18       Q   And you've been designated to testify today
19   on behalf of People for the American Way?
20       A   Yes, I have.
21               MR. BECKER: I should state just for the
```

Page 5

```
 1   record the notice was sent to People for the American
 2   Way Foundation and not The People for the American Way
 3   who is the actual party for this. We'll of course
 4   still appear for the deposition.
 5               MR. COLEMAN: Thank you for overlooking
 6   that.
 7               BY MR. COLEMAN:
 8       Q   Can you tell me a little bit about your
 9   position and what your job duties are?
10       A   Well, as the director of the policy
11   department I am responsible for overseeing all of our
12   policy development organizationally, primarily on the
13   federal level, but somewhat in an institutional level,
14   and also I act as the chief lobbyist for our
15   organization on Capitol Hill and as a representative of
16   the organization on various levels programatically or
17   through our media as well.
18       Q   What aspects of your job duties made it so
19   that you drew the short stick so you came to testify
20   today.
21               What particularly qualified you to be the
```

Page 6

1  person to speak in this lawsuit?
2     A   To my understanding, it's that I am a
3  representative of the organization on various levels as
4  a director of our policy department.
5          So, therefore, I have institutional
6  knowledge of what it is that we do, and have served in
7  that capacity for a significant time. So it's to my
8  knowledge that that's the basis behind me being
9  selected and I think that -- yes, so that's it.
10    Q   Do section 5 issues account for any
11 significant amount of your time from day-to-day?
12    A   Well, again, as the policy director I
13 oversaw all of our advocacy work on the authorization
14 of the Voting Rights Act. Therefore, I was involved on
15 a day-to-day basis through this whole process for the
16 past three years.
17    Q   Let me ask you a couple of questions about
18 your membership. Are you a membership organization?
19    A   Yes, we are.
20    Q   What does it cost for an annual membership?
21    A   What does it cost?

Page 7

1     Q   Yes.
2     A   That I'm not certain what it costs for an
3  annual membership. It varies. So there are different
4  levels of membership in the organization.
5     Q   Would the levels of membership be like if
6  you're an individual it's this much, if you're a
7  company this much, or is it you're gold, silver level
8  member and different fees associated with the level of
9  membership?
10    A   That's not what I meant. I just meant that
11 there are -- I can't speak to the amounts of money that
12 various people give in order to -- that people donate
13 to the organization which constitutes often times a
14 qualification for membership.
15    Q   How many members do you have?
16    A   Approximately 1 million members and
17 activists.
18    Q   How many in Texas?
19    A   I don't know how many in the State of
20 Texas.
21    Q   Do you know how many in the Austin area?

Page 8

1     A   I do not know.
2     Q   Do you know how many in the district?
3     A   In the -- can you be explicit?
4     Q   By district I mean Northwest Austin
5  Municipal Utility District Number One?
6     A   Yes, I do.
7     Q   Okay.
8     A   Would you like for me to tell you how many.
9     Q   Do you know how many there are?
10    A   There are five members in the district.
11    Q   Can you explain to me why People for the
12 American Way has decided to intervene into this
13 lawsuit?
14    A   Well, People for the American Way
15 represents members and activists on as a civil rights
16 organization that believes fully in the protection of a
17 persons right to vote and to engage in the electoral
18 process, and we believe that it's fundamental to
19 protect those rights as they stand accordingly within
20 the Voting Rights Act.
21         We believe that it's incumbent upon us to

Page 9

1  protect those rights and, therefore, protect the
2  members within Texas and within the district to
3  maintain a protection afforded them under our
4  constitution.
5     Q   Are you familiar with the bailout
6  provisions of the Voting Rights Act?
7     A   I am.
8     Q   If the district were able to present
9  evidence to the court that it satisfied the statutory
10 requirements for bailout, would your organization
11 oppose that bailout aspect of the lawsuit?
12         MR. BECKER: I'm going to object. I think
13 that calls for a legal conclusion and for speculation.
14         If you think you can answer that, you can
15 try.
16         THE WITNESS: The answer that I would give
17 is that it's not for me to decide. I think it's -- the
18 burden is on the district to provide -- determine
19 whether or not they were eligible for bailout.
20         BY MR. COLEMAN:
21    Q   Right. And my question was not exactly

3 (Pages 6 to 9)

Page 10

1 that.
2     My question was: I'm not asking you to
3 opine whether the district is or is not, but simply if
4 we could demonstrate that we satisfied the statutory
5 requirements, would the organization oppose bailout
6 under those circumstances?
7     MR. BECKER: I'm going to renew my
8 objection on that -- on the same basis. I think also
9 it calls for some degree for the deponent to make some
10 assessment of litigation strategy. I think that's very
11 difficult for her to do.
12     If you think you can answer it, you can.
13     THE WITNESS: No. On the advice of counsel
14 I'm not able to answer that.
15     BY MR. COLEMAN:
16  Q    Let me clarify. If your counsel says I
17 object on privilege and I instruct you not to answer,
18 then you shouldn't answer; but ordinarily the lawyer
19 will make a series of objections for the record. It
20 may be for the judge to decide, but the witness then
21 still should answer the question.

Page 11

1     MR. BECKER: If you can.
2     THE WITNESS: If I can, which I can't.
3     BY MR. COLEMAN:
4  Q    Why can you not answer that question?
5  A    I don't feel that I have enough information
6 to answer that question.
7  Q    What information do you feel you're lacking
8 to answer that question?
9  A    I'm not part of the legal strategy within
10 our organization and I'm not part of the legal team
11 that is bringing this lawsuit.
12  Q    So as far as you know then -- if again, I'm
13 not asking you to conclude, but I'm just asking you to
14 assume with me and that's what the if means.
15     If we could show that we satisfied the
16 statutory requirements your position might still be to
17 oppose it?
18     MR. BECKER: I'm going to renew the same
19 objection again. I think that there is -- the deponent
20 here is not part of the litigation team. I think it's
21 very hard for her to assess whether all of the aspects

Page 12

1 of the bailout provisions have been satisfied, and to
2 the degree they've been 100 percent satisfied, of
3 course, it's the People for the American Way to abide
4 by the law however the Court might interpret that.
5     If you think you can answer that with
6 anymore than you've already answered it you can go
7 ahead and try, but if you can't, that's okay.
8     THE WITNESS: No, I can't.
9     BY MR. COLEMAN:
10  Q    Did you bring any documents today in
11 response to our deposition notice?
12  A    I didn't bring any documents.
13     MR. BECKER: I have some with me, one
14 document.
15     MR. COLEMAN: Would you mind producing
16 that?
17     MR. BECKER: I'd be happy to. Do you want
18 me to describe what this is for you or would you like
19 the witness to?
20     MR. COLEMAN: Why don't we have the witness
21 do that.

Page 13

1     (Whereupon, a document was marked as
2 Deposition Exhibit Number 15.)
3     BY MR. COLEMAN:
4  Q    I'm going to mark what is 15. I will hand
5 you what has been marked as Exhibit 15. Would you
6 describe for me that particular document?
7  A    Sure. This is a copy of the five members
8 that I spoke of earlier that have been identified as
9 having addresses within the municipal district.
10  Q    I see that the names, addresses, phone
11 numbers, and e-mails have been blacked out, and I will
12 assume that the reason for that is the organization's
13 position that it should not disclose the identity of
14 its members and the district; is that correct?
15     MR. BECKER: That's correct.
16     BY MR. COLEMAN:
17  Q    I would just ask the witness to answer the
18 question?
19  A    That is correct.
20  Q    Without disclosing the identity of these
21 individuals has the organization contacted these

Page 14

1  specific members with regard to this lawsuit?
2  A    I don't know whether or not -- by contact
3  do you mean just any type of contact? Let me ask you
4  that question.
5  Q    Have they been contacted by telephone?
6  A    I don't know whether or not that have been
7  contacted by telephone.
8       MR. BECKER: I'm also going to object on
9  the basis of attorney/client privilege.
10      MR. COLEMAN: I will be very careful not to
11 ask the substance of any particular communication, but
12 I don't believe privilege covers the fact of the
13 content.
14      BY MR. COLEMAN:
15 Q    In-person visits, do you know if they've
16 been visited in person?
17 A    I don't know.
18 Q    By e-mail?
19 A    I don't know.
20 Q    By some form of mail or other written
21 correspondence?

Page 15

1       MR. BECKER: For clarification. Are you
2  talking about specifically with regard to this lawsuit
3  as opposed to any other kind of communication?
4       MR. COLEMAN: Yes.
5       BY MR. COLEMAN:
6  Q    With that clarification, so not your
7  general mail to all of your members, but something that
8  says you live in this district, we're involved in this
9  lawsuit.
10 A    I don't know.
11 Q    Do you know whether you have as an
12 organization collected any information relating to the
13 district's history?
14      MR. BECKER: And you mean outside of the
15 context of that which would be covered under the work
16 product privilege or any attorney/client
17 communications, for clarification?
18      MR. COLEMAN: If by work product privilege
19 you mean it stays in your file and will never be used
20 in this lawsuit, then I guess I'm willing to exclude
21 that.

Page 16

1       MR. BECKER: Used as evidence in this
2  lawsuit?
3       MR. COLEMAN: As evidence.
4       MR. BECKER: If you know of any information
5  feel free to clarify after I'm done here.
6       If you know of any information that we've
7  accumulated that was not done in the context of
8  preparing for this litigation or so long as that will
9  not be used as evidence in the lawsuit you can go ahead
10 and answer, and Greg might have some kind of
11 clarification.
12      THE WITNESS: Can you repeat your question
13 for me?
14      BY MR. COLEMAN:
15 Q    In intervening in the lawsuit has the
16 organization collected information about the history of
17 the district to better understand what the district is
18 and --
19      MR. BECKER: I'm just going to briefly
20 object. I think that's slightly outside of the scope
21 of the list of things that you gave us, but I think you

Page 17

1  can go ahead and answer, if you know the answer.
2       THE WITNESS: To my knowledge, I don't know
3  whether or not the organization has collected
4  information regarding the history, and the history --
5  the history of the district.
6       BY MR. COLEMAN:
7  Q    Do you know whether the organization has
8  collected or is in possession of information regarding
9  the district's elections?
10 A    Let me ask you a clarifying question.
11 Elections meaning any general election or any state
12 election that the county or just the district has had?
13 Q    I'm speaking specifically regarding the
14 district's elections. Their elections for the board of
15 directors.
16 A    I don't know.
17 Q    Let me state it a different way.
18      Is it correct to say that you have no
19 knowledge of any such information in the possession of
20 the organization?
21 A    It's correct --

Page 18

1      MR. BECKER: One second. You mean outside
2  of that that may have already been produced to all of
3  the parties or been even produced to us by other
4  parties? You mean knowledge or information only we
5  have right now?
6      MR. COLEMAN: The witness is the
7  representative of the organization. So I'm trying to
8  get the witness' understanding speaking for the
9  organization.
10     THE WITNESS: Speaking -- I do not have any
11 additional knowledge as to information about the
12 district, and again, I state that as not a member of
13 the legal team. So that's not something that is within
14 my purview.
15     BY MR. COLEMAN:
16     Q    Sitting here today as a representative of
17 the organization, do you have any complaint about any
18 election that the district has held or the way that it
19 was held?
20     MR. BECKER: Any particular election you're
21 talking about?

Page 19

1      MR. COLEMAN: Any election.
2      THE WITNESS: I have a question.
3      MR. BECKER: Yes. For you or a question
4  for me?
5      THE WITNESS: A question for you.
6      MR. BECKER: We're going to go off the
7  record.
8      MR. COLEMAN: There's a question pending.
9      MR. BECKER: That's noted.
10     Do you think you can answer that without
11 discussing -- without talking to me first.
12     THE WITNESS: No.
13     MR. COLEMAN: Is it on attorney/client
14 privilege? I don't think it's a privileged question.
15     MR. BECKER: I don't know what's in her
16 mind because I haven't spoken to her. We will
17 absolutely note for the record there's a question
18 pending and we're going to confer briefly. I don't
19 think it's going to be a particularly important point
20 to make, but I have no problem with that.
21     MR. COLEMAN: We will briefly pause.

Page 20

1      MR. BECKER: Thanks. Excuse us just for a
2  second.
3      (Witness confers with counsel)
4      BY MR. COLEMAN:
5      Q    We're back on the record.
6      Would you like to have the question
7  repeated?
8      A    Sure.
9      (Whereupon the following portion of the
10 testimony was repeated by the Court Reporter:
11     "QUESTION: Sitting here today as a
12 representative of the organization, do you have any
13 complaint about any election that the district has held
14 or the way that it was held?")
15     THE WITNESS: Based upon my knowledge I
16 don't have any complaint about the current elections
17 within the district. I do acknowledge and recognize
18 that there are -- there is ongoing discovery pending;
19 however, I don't independently have any complaints
20 regarding the elections in the district.
21     MR. COLEMAN: Nicely done.

Page 21

1      BY MR. COLEMAN:
2      Q    Have you reviewed any of the deposition
3  transcripts?
4      A    I have not reviewed the deposition
5  transcripts.
6      MR. BECKER: I've got to tell you, I
7  haven't reviewed all of the deposition transcripts
8  either so.
9      BY MR. COLEMAN:
10     Q    I was just going to ask you, and we have
11 obviously deposed a number of individual intervenors,
12 and I just wanted to ask you if you understood that
13 whether any of them have objected to any aspect of the
14 elections that the district has had over the years?
15     A    Having not reviewed them, I don't know.
16     Q    Sitting here today without any current
17 knowledge of any complaint regarding elections that
18 have taken place, would it be safe to say that the
19 organization's involvement in this suit is based on the
20 claim that the district should be excluded from section
21 5 pre-clearance and not on a complaint about prior

Page 22

1  elections?
2      A   I think it's -- I think it's difficult for
3  me to answer that question. I'm not fully aware of the
4  continuing discovery that's going on to say that we
5  would -- our lawsuit would not still be based upon both
6  any prior acts within the district regarding their
7  elections or anything else. So I have a hard time
8  saying that that would necessarily be the conclusion.
9          MR. BECKER: I'm going to object briefly.
10  I think it's a little outside of the scope of the
11  notice to ask which part of the lawsuit we feel is most
12  important and which part we feel is less important.
13  And I don't know if that was the thrust of your
14  question, but that's how I kind of heard it.
15         MR. COLEMAN: Well, the organization
16  obviously without possessing any information about the
17  district or its elections elected to intervene in the
18  lawsuit. I believe I'm entitled to probe out the basis
19  for that.
20         BY MR. COLEMAN:
21     Q   So let me ask, if you know, is The People

Page 23

1  for THE American Ways' presence in the lawsuit,
2  presence in this lawsuit, directed primarily at the
3  fact that there's a constitutional challenge to
4  pre-clearance?
5          MR. BECKER: I don't know if you were done
6  with your question. Was that --
7          MR. COLEMAN: I'm done.
8          MR. BECKER: I apologize. I didn't mean to
9  interrupt there.
10         I'm going to object. I think that's
11  outside of the scope. I think it's also potentially
12  work product and attorney/client in determining what
13  the basis was for the legal decision to enter into this
14  lawsuit and any communications or work product that was
15  developed in that context. I also think it's largely
16  irrelevant.
17         To the degree you can answer without
18  disclosing any attorney/client or work product, you can
19  go ahead and try.
20         BY MR. COLEMAN:
21     Q   And don't disclose communications you had

Page 24

1  with your attorney. I just want to know your
2  understanding as a representative.
3      A   It's my understanding as a representative
4  that this lawsuit is not only contingent upon the
5  elections within the district but also the
6  constitutionality challenge that was been brought
7  against section 5. So we are representing our members
8  on both of those basis.
9      Q   You say contingent on the elections in the
10  district. Let me go back. As you sit here today, you
11  don't have any information about that? You cannot
12  state for me as a representative of the organization
13  any complaint about any election that the district has
14  ever held; is that true?
15     A   That's true.
16     Q   Do you have an understanding of who is
17  entitled to bailout of the pre-clearance provisions in
18  the section 5?
19     A   I do.
20     Q   Can you explain that for me?
21     A   Those who have are entitled to bailout in

Page 25

1  general terms is those who have met the burden of
2  showing that they have not had any complaints filed
3  against them I believe within the past ten years, have
4  also -- that have -- forgive me.
5          There's two other prongs to this that I'm
6  missing.
7      Q   Including complaints of lawsuits filed
8  against --
9      A   Right.
10         MR. BECKER: You only have to answer to the
11  degree you can remember.
12         THE WITNESS: I know that for the most part
13  it's -- there is a -- the district has to show that
14  they have not had any -- at least have not within the
15  past ten years a history of discrimination within their
16  elections, and some of those prongs include, as I
17  indicated, having cases filed against them or
18  complaints filed against them.
19         I honestly can't remember the other prongs
20  of it.
21         BY MR. COLEMAN:

Page 26

1    Q    Is one of the others that you have
2  pre-cleared changes for a period of years?
3    A    Yes.
4    Q    As you sit here today, do you have any
5  information that any of those prongs have not been
6  satisfied?
7    A    I don't have any information about that.
8    Q    Are you able to testify about the
9  district's contract with the county, Travis County?
10   A    No, I'm not.
11   Q    Are you able to testify regarding any of
12 the changes that the district has made over the past
13 ten years that it has pre-cleared with the Department
14 of Justice?
15   A    No, I'm not.
16   Q    Are you able to testify about whether any
17 Voting Rights lawsuits have been filed against the
18 district in the past ten years?
19   A    To my knowledge, I'm not able to testify
20 that there have been any.
21   Q    Did your organization offer materials or

Page 27

1  testify before Congress during the pre-authorization
2  process?
3    A    Yes, it did.
4    Q    Can you tell me what individual or
5  individuals would have testified?
6         MR. BECKER: You mean would have testified
7  or did testify?
8         MR. COLEMAN: Did testify, I'm sorry.
9         MR. BECKER: That's okay.
10        THE WITNESS: There's a number of places.
11 We provided --
12        MR. BECKER: I'm sorry. Did anyone from
13 PFAW testify before Congress?
14        THE WITNESS: I believe so, and to my
15 knowledge Ralph -- actually I think it might have been
16 both Elliott and Ralph, but I can't be certain about
17 whether how many times. There was a number of
18 hearings.
19        MR. BECKER: We can, if you like -- I
20 didn't mean to interrupt you.
21        THE WITNESS: At times different work

Page 28

1  products -- different testimony was provided. So if
2  that's available I'm sure we can provide that.
3         MR. COLEMAN: I suspect if it's part of the
4  public record I will get it anyways.
5         MR. BECKER: And if you like we can double
6  check and make sure we get an answer for you on that.
7         BY MR. COLEMAN:
8    Q    Could you summarize for me the general
9  nature of the testimony?
10        MR. BECKER: Just for the record I'll state
11 I don't think the witness stated she was sure that we
12 testified before Congress, but to the -- I think if you
13 remember us testifying, if you want to answer the
14 question.
15        BY MR. COLEMAN:
16   Q    I'm sorry, I thought you believed that you
17 had testified but couldn't remember exactly who or
18 when?
19   A    It's both. I can't -- there were -- the
20 reason that there is a bit of confusion is because at
21 the same time hearings were going on on similar voting

Page 29

1  rights issues and we testified at a variety of
2  hearings.
3         To whether or not it was specifying that
4  the time to the Voting Rights Act re-authorization, I'm
5  just not certain, and I'm not certain about whether or
6  not it was the president of our organization or if it
7  was our vice-president and legal director at the time.
8         MR. BECKER: We'll get it to you if we did.
9  We'll get you copies of any testimony or materials that
10 were submitted to Congress.
11        MR. COLEMAN: That's very kind of you.
12 Thank you.
13        BY MR. COLEMAN:
14   Q    Let me ask, and, again, just if you
15 remember, with respect to section 5, when it was being
16 presented to Congress, a number of organizations had
17 suggested re-authorization but with changes and some
18 were re-authorization without changes.
19        Do you happen to recall whether People for
20 the American Way took a position relating to that and
21 if so what the general nature of that position would

Page 30

1  have been?
2      MR. BECKER: Perhaps you can clarify a
3  particular type of change that you're talking about
4  rather than -- I know there were different positions
5  taken by different groups.
6      BY MR. COLEMAN:
7    Q   We can start by whether -- let me start at
8  the very basic.
9      Did your organization take a position on
10 whether section 5 should be re-enacted?
11   A   We did.
12   Q   And was that position?
13   A   That it should be.
14   Q   That it should be? I thought that might be
15 the case.
16     Do you recall whether in taking that
17 position People for the American Way affirmatively
18 suggested that it should be re-enacted without change
19 or that it should be re-enacted with change?
20     If it goes that way we can talked about
21 what that might have been, but on that distinction do

Page 31

1  you happen to recall what the position of the
2  organization was?
3    A   On that position I recall that we had a
4  number of discussions about whether section 5 should be
5  changed or not. We did not take any official position
6  as to any type of change that --
7      MR. BECKER: I just want to instruct the
8  witness, don't talk about discussions to the degree
9  they might have been attorney/client discussions; but
10 you're asking about the position of the organization
11 took.
12     MR. COLEMAN: Yes.
13     THE WITNESS: Yes. We did not -- I'm
14 trying to verify.
15     I do not believe we took any official
16 position as to any particular change that should be
17 made to section 5 other than having discussions within
18 internally.
19     BY MR. COLEMAN:
20   Q   And to clarify then, the People for the
21 American Way did not take a public position, for

Page 32

1  instance, whether the coverage trigger should be
2  updated to a more modern election cycle, whether it's
3  1996 or 2000 or something else? I don't want to try to
4  pin you down. Your recollection is that there was no
5  position on that?
6    A   To a more modern -- my recollection is that
7  at one point in time that was offered as an amendment
8  in some capacity, that there were some changes that
9  were requested by certain members of Congress. That
10 was one of those changes.
11     We took a position in opposition to that
12 amendment, and that's I believe, like I said, that was
13 one of the -- something that went -- that was moving
14 through the committee process and we took a position I
15 believe through as part of a coalition in opposition to
16 that.
17   Q   In context, some of the changes that were
18 proposed you did either by yourself or in coalition
19 with others oppose as an organization?
20   A   As an organization, yes.
21     MR. BECKER: I'm sorry. I just want to

Page 33

1  clarify. You're not talking about changes that were
2  ultimately adopted, you're talking about any changes
3  that were offered during the process?
4      MR. COLEMAN: Changes that were offered,
5  and I wasn't specifically speaking about a particular
6  whether it was an amendment or even just a suggestion.
7      BY MR. COLEMAN:
8    Q   But I think you have testified that you did
9  at least oppose a particular amendment. It sounds to
10 me like it was probably the Norwood Amendment?
11   A   Yes, and the reason I clarified the
12 amendment because there are also a lot of other
13 surrounding factors to generally our opposition to
14 amendments versus just the policy.
15     So I just wanted to clarify that that's
16 along -- one of the reasons why we opposed the Norwood
17 amendment along with there was -- I know we did oppose
18 that amendment and I believe that was the one that
19 referenced the change of the dates that you spoke
20 about.
21   Q   Do you happen to recall whether the

Page 34

1  opposition was on that particular point or was it on
2  some other aspect of the amendment, do you recall?
3      A    It was -- that was -- I know it was on that
4  point. I can't say that it wasn't necessarily on
5  additional points as well.
6      Q    Do you know of any state or political
7  subdivision that People for the American Way would
8  currently support a bailout for?
9          MR. BECKER: I'm going to object on the
10 basis of relevance and also on the basis that it's
11 outside the scope of the notice, but I'll let the
12 witness answer, if she knows.
13         THE WITNESS: I don't know of any state or
14 jurisdiction that would be -- your question was be
15 eligible for bailout?
16         BY MR. COLEMAN:
17     Q    That the organization --
18     A    Would support bailout, I can't speak to
19 that. It's not a -- no, I can't speak to that.
20     Q    Why can you not speak to that? I want to
21 make sure I understand.

Page 35

1      A    I'm not aware whether -- I'm not aware of
2  anything, of any jurisdiction or state that people for
3  would support that is currently eligible for a bailout.
4          MR. COLEMAN: I'm going pass the witness.
5  Richard, any questions?
6          MR. DELLHEIM: No, I have no questions.
7          MR. COLEMAN: They would say you did better
8  than me then.
9          MR. BECKER: I appreciate that.
10         MR. COLEMAN: You've been a lovely witness.
11 Thank you for coming.
12         MR. BECKER: Thank you everybody.
13             - - -
14     (Reading and signature not waived.)
15     (Whereupon, at 2:52 p.m., deposition was adjourned.)
16             - - -
17
18
19
20
21

Page 36

1          CERTIFICATE OF DEPONENT
2
3
4          I hereby certify that I have read and
5  examined the foregoing transcript, and the same is a
6  true and accurate record of the testimony given by me.
7
8          Any additions or corrections that I feel are
9  necessary, I will attach on a separate sheet of paper
10 to the original transcript.
11
12
13
14         _____
15              TANYA CLAY HOUSE
16
17
18
19
20
21

Page 37

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2          I, Steven Poulakos, registered Professional
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by me
7  stenographically and thereafter reduced to typewriting
8  under my supervision; and that I am neither counsel
9  for, related to, nor employed by any of the parties to
10 this case and have no interest, financial or otherwise,
11 in its outcome.
12         IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 6th day of March,
14 2007.
15
16         _____
17              STEVEN POULAKOS
18              Notary Public
19
20 My commission expires:
21 June 17, 2009

```
                              Page 38
 1              I N D E X
 2      Deposition of TANYA CLAY HOUSE
 3              March 1, 2007
 4
 5   EXAMINATION BY:                   Page
 6   Mr. Coleman  . . . . . . . . . . .  4
 7
 8   EXHIBIT No.                      Marked
 9   15       A List                    13
10
11
12
13
14
15
16
17
18
19
20
21
```