Page 1

1               IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3    NORTHWEST AUSTIN MUNICIPAL

4    UTILITY DISTRICT NUMBER ONE,

5    401 W. 15th Street, Suite 850

6    Austin, Texas 78701,                Civil Action No.

7               Plaintiff              1:06-CV-01384

8        vs.

9    ALBERTO GONZALES, ATTORNEY

10   GENERAL OF THE UNITED STATES,

11   U.S. Department of Justice

12   950 Pennsylvania Avenue, NW

13   Washington, DC 20530,

14              Defendant

15   _____/

16           The deposition of RODNEY LOUIS was held on Thursday,

17   March 1st, 2007, commencing at 9:00 a.m. at the Law Offices of Weil,

18   Gotshal, & Manges, LLP, 1300 Eye Street, N.W., Suite 900, Washington,

19   D.C., before Steven Poulakos, Notary Public.

20

21   REPORTED BY: Steven Poulakos

Rodney Louis - 03/01/07

Page 2

1   APPEARANCES:
2
3        On behalf of Plaintiff:
4             GREGORY S. COLEMAN, ESQUIRE
5             Weil, Gotshal & Manges, LLP
6             8911 Capital of Texas Highway
7             Building One, Suite 1350
8             Austin, Texas 78759
9             512-349-1937
10            greg.coleman@weil.com
11
12       On behalf of The Lewis':
13            SAMUEL SPITAL, ESQUIRE
14            Holland & Knight
15            195 Broadway
16            24th Floor
17            New York, New York 10007-3189
18            212-513-3454
19            samuel.spital@hklaw.com
20
21   (Appearances continued on next page.)

Page 3

1   APPEARANCES continued:
2
3        On behalf of Intervenors:
4             KRISTEN CLARKE, ESQUIRE
5             LDF
6             1444 Eye Street, N.W.
7             10th Floor
8             Washington, D.C. 20005
9             202-682-1300
10
11   BY TELEPHONIC COMMUNICATION:
12
13       On behalf of Defendant:
14            RICHARD DELLHEIM, ESQUIRE
15            Department of Justice
16            950 Pennsylvania Avenue, N.W.
17            Washington, D.C. 20530
18            richard.dellheim@usdoj.gov
19
20
21

Page 4

1   Whereupon,
2                    RODNEY LOUIS,
3   called as a witness, having been first duly sworn to
4   tell the truth, the whole truth and nothing but the
5   truth, was examined and testified as follows:
6            EXAMINATION BY MR. COLEMAN:
7        Q   Good morning, Mr. Lewis.  My name is Greg
8   Coleman.  I represent the Plaintiff in this lawsuit.
9            You live in the district, and by district I
10  mean Northwest, Austin, MUD number one?
11       A   Yes.
12       Q   How long have you lived there?
13       A   Since 1998.
14       Q   Can you tell us your address there?
15       A   10613 Brambelcrest Drive, Austin 78726.
16       Q   Where did you live before moving into the
17  district?
18       A   In California.
19       Q   Where in California?
20       A   San Jose, California.
21       Q   How long did you live in San Jose?

Page 5

1        A   About six years.
2        Q   Before that?
3        A   Prior to that two years in Colorado.
4        Q   Where in Colorado?
5        A   Springs Colorado, Springs.
6        Q   Before that?
7        A   Prior to that I was in school for four
8   years in Baton Rouge.
9        Q   Where did you grew up?
10       A   Area New Orleans area.
11       Q   Would you consider yourself to be involved
12  in the community?
13       A   Somewhat, yes.
14       Q   Can you tell for me -- tell me what your
15  involvement has been over the past several years?  What
16  kinds of things that you've been involved with?
17       A   In terms of the community, I was heavily
18  involved in our church community, participated in the
19  homeowners' association as well as the MUD.
20       Q   What church community are you active with?
21       A   Holy Cross Catholic Church.

2 (Pages 2 to 5)

**Page 6**

1    Q    Where are they?
2    A    That's in East Austin.
3    Q    You mentioned you've been active with the
4    homeowners' association?
5    A    Yes, in terms of the meetings.
6    Q    About how many meetings would you say that
7    you have attended?
8    A    Over the course of?
9    Q    The eight or nine years, or if you want
10   to --
11   A    About eight or nine of them.
12   Q    When you go do you typically go because
13   there's an issue on the agenda you're interested in or
14   just to keep yourself informed about what's going on
15   generally or some combination?
16   A    Most of the time just to keep abreast as to
17   what's going on.
18   Q    Have you ever served as an officer or a
19   director of the HOA or sought to serve as an officer or
20   director of homeowners' association?
21   A    No, sir.

**Page 7**

1    Q    Would that interest you?
2    A    No, not at this time.
3    Q    You mentioned also that you're active with
4    the district itself?
5    A    Yes.
6    Q    Can you tell me about your activities with
7    the district?
8    A    In terms of staying abreast on stuff that
9    the issues that was going on primarily and just keeping
10   in contact with members who are also involved,
11   neighbors.
12   Q    About how many district meetings have you
13   attended over the years?
14   A    Over the course of time, about three or
15   four.
16   Q    Can you give me an idea of when those
17   meetings might have been? Are they more recent
18   meetings or earlier in your time in the district?
19   A    Maybe a little over a year ago was the last
20   one I attended.
21   Q    Before that?

**Page 8**

1    A    Whatever -- I mean, when you say before
2    that.
3    Q    You attended one a little over a year ago?
4    A    Right. Prior to that maybe that month
5    prior or the two months prior.
6    Q    Then before that would it have been around
7    the same timeframe or did you attend any district
8    meetings back in the late nineties when you moved into
9    the district?
10   A    No. The district meetings weren't that --
11   very active at the time. So, no.
12   Q    And same question for say 2000 to 2002
13   timeframe, generally did you attend any district
14   meetings during that timeframe?
15   A    2000?
16   Q    To 2002 roughly.
17   A    I may have during that time, maybe one.
18   Q    An maybe it's easier to ask around when you
19   attended your first meeting?
20   A    The timing is such that what -- the best
21   way to describe it is we were having issues with our

**Page 9**

1    MUD and a lot of the discussions were taking place at
2    the homeowners' association and then the homeowners'
3    association decided to start taking some of those
4    discussions and bringing them to the MUD and that's
5    when the MUD became active in that area.
6    So my timing maybe somewhat off, but it was
7    around that time, and I don't know if it was 2000,
8    2003. I don't remember the exact time when it took
9    place.
10   Q    Do you remember what the issue or issues
11   were that were being discussed at the time?
12   A    Absolutely. The issues at the time was
13   this bond that our community has, and that was taken up
14   the majority of the time trying to figure out how we
15   can get rid of this bond or to get the City of Austin
16   to release us of that bond.
17   Q    When you say the bond, are you taking about
18   the double taxation issue?
19   A    Yes, that's what most people call it,
20   double taxation, yes.
21   Q    Would your attendance about some of these

3 (Pages 6 to 9)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 10

1  HOA meetings and also at the district meetings have
2  been in connection with discussions about what to do
3  about the double taxation issue, what some of the
4  remedies might be?
5      A    That was most of the meeting, about
6  100 percent of the meeting most of the time.
7      Q    Do you know if those meetings would have
8  been before or after the district filed the lawsuit
9  against the City of Austin over --
10     A    I attended meetings before that and after.
11 So whatever that timeframe it was before and after.
12     Q    You understood that the district eventually
13 did file a lawsuit?
14     A    Yes, sir.
15     Q    And just for disclosure purposes you know
16 that I represent the district in that lawsuit or I
17 don't know if you knew that or not?
18     A    You're face looked familiar.  Did you ever
19 attend one of our meetings?
20     Q    Not the HOA meetings.
21     A    No, I mean one of the district meetings.

Page 11

1      Q    Yes.
2      A    I may have been at that meeting when you
3  were there.
4      Q    Were there other issues around that time
5  that brought you to either to the district meetings or
6  was it primarily that issue?
7      A    It was that issue and the things that was
8  surrounding that issue.  I mean, we had issues with, I
9  want to say his name is Jack Stick, if that was the
10 representative.
11     Q    Yes.
12     A    They thought at one point he was making a
13 mockery of out of what we were doing when he presented
14 it to the state board to have us get it dissolved, made
15 claims that he presented it to the City of Austin, and
16 some people felt that it wasn't in good -- for lack of
17 a better word -- it wasn't go intentions and it was
18 somewhat of just a show and tell for the people who
19 voted for him.
20         So that was of interest to me and that was
21 one of the reasons we attended as well, but it was all

Page 12

1  surrounding this double taxation, if you will.
2      Q    You mentioned also that you attended a
3  couple of district meetings a little over a year ago
4  and a little bit before that.
5         Would that have also been in connection
6  with that issue or would that have been a different
7  issue?
8      A    Everyone that I've attended has been
9  centered around this double taxation.  One time we had
10 a meeting -- Austin had made an offer to us to give us
11 relief on monies for I think it was water or utilities,
12 some rebates, if you will, and something to that
13 effect; but it all have been around that double
14 taxation.
15     Q    So the one a year ago and some months
16 before that those were when those discussions where the
17 district would give the canyon lands to the city in an
18 exchange get a rebate on the water rates?
19     A    Right, exactly.
20     Q    Would one of those have been maybe that
21 larger town meeting type meeting that they had?  Did

Page 13

1  you have a large number of people come or would it have
2  been in a smaller district setting?
3      A    I was at a large one where the
4  representative came.  Is that the one you're talking
5  about when --
6      Q    I don't recall.
7      A    -- the representative was at one that was a
8  very large one?  I don't know if the MUD attorney was
9  there or not.  I don't recall if you guys were there,
10 but I know we had a very large one when Stick was there
11 and we -- I've also attended a smaller one after that
12 and I don't remember what the timing was of that, but I
13 was there.
14     Q    Do you also get involved in other nonprofit
15 type entities other than the church that you've
16 mentioned?  Are you active with any of those?
17     A    Not very.
18     Q    Do you consider yourself politically
19 active?  Do you active vote in --
20     A    I active vote in most elections.
21     Q    Do you campaign or do things for candidates

4 (Pages 10 to 13)

Page 14

1  or parties?
2     A    Yes.
3     Q    Without going into too much detail, can you
4  describe for me some of the things that you've done in
5  the past few years?
6     A    In terms of campaigning.
7     Q    Any and all. Why don't you start with
8  campaigning.
9     A    In the past I have allowed candidates to
10  put signs up. In the past I have gone out and handed
11  out flyers for candidates. And in the past I've even
12  given donations to campaigns.
13     Q    Just briefly, if you remember, who have you
14  handed flyers out for?
15     A    U.S. Representative William Jefferson out
16  of Louisiana.
17     Q    And you said yard signs as well?
18     A    I've put yard signs out for actually Stick,
19  Zimmerman at one point, and Mark Stroma.
20     Q    Now Stick and Stroma are both Texas House
21  50?

Page 15

1     A    Yes.
2     Q    Was Zimmerman for his MUD position or for
3  when he was running for that same --
4     A    Zimmerman I supported him when he ran for
5  MUD president and he ran for I think Jack Stick's
6  position, and at that point he was running against
7  Stroma, and I didn't support him.
8     Q    Did you have one of his signs up when he
9  was running for --
10     A    Yes. His sign was up for I think a couple
11  of hours. He called me and asked me can he put it up
12  and I told him yes because at the time I was doing a
13  lot of traveling and then I figured out who was on the
14  list of people who were running and Mark Stroma was
15  one. So at that time I removed his sign and put Mark's
16  up.
17     Q    Let me also talk about voting. You said
18  that you're an active voter?
19     A    Yes.
20     Q    Did you vote in the 2006 Congressional
21  elections?

Page 16

1     A    I did an absentee ballot because I was here
2  and I got it a couple of days after the election. So I
3  was not able to vote.
4     Q    It came late?
5     A    By the time I saw it it was after the
6  election, yes.
7     Q    Did you vote in the 2006 local spring
8  elections, county, city?
9     A    Yes. I think I did, yes.
10     Q    In that election did you also vote on the
11  MUD district board member elections that should have
12  been on that same ballot?
13     A    Then I did if it was on that. I don't
14  recall whether it was or not.
15     Q    Did you vote in the 2004 Presidential
16  election?
17     A    Yes.
18     Q    The 2004 local elections again in the
19  spring?
20     A    I believe I did, yes.
21     Q    In the 2006 local elections do you recall

Page 17

1  where you voted?
2     A    Where?
3     Q    Where.
4     A    At the Canyon Creek I believe Elementary
5  School. 2006 you said?
6     Q    2006.
7          The same question for 2004, the spring
8  elections, again which were in the district elections?
9     A    If my memory served me right, I voted in
10  two places; one at the Canyon Creek Elementary School
11  and the other place I believe at the gentleman's garage
12  for the MUD.
13     Q    Might that have been the 2002 elections?
14     A    Yes, it could have been.
15     Q    Just if it helps your memory, do you know
16  that the district has entered into a contract with the
17  county to perform its elections. So that as you saw in
18  the 2006 the MUD district ballot is on the larger
19  ballot?
20     A    Yes.
21     Q    If you'll allow me to represent that that

Page 18

1 occurred in the spring of 2004. So there would have
2 been two, 2006 and the 2004 elections that would have
3 happened that way?
4    A    Okay.
5    Q    With that, do you recall voting in the 2004
6 spring elections?
7    A    Yes.
8    Q    That would have also been at the Canyon
9 Creek elementary?
10    A    Yes, I believe so.
11    Q    And you also testified that you voted in
12 the 2002 spring elections?
13    A    I voted most elections. So I'm assuming,
14 yes.
15    Q    And you have a recollection that you voted
16 in more than one place?
17    A    Yes.
18    Q    You went to Mr. Stueber's garage?
19    A    I don't remember the gentleman's name, but
20 it was one of the residents' garage.
21    Q    You don't know the gentleman whose house it

Page 19

1 was?
2    A    No, sir.
3    Q    Do you recall in the 2000 elections whether
4 you would have voted in the district elections that
5 year?
6    A    Yes.
7    Q    Was that also in a private residence?
8    A    That's where I don't recall because I don't
9 recall if the school was up at the time, the Canyon
10 Creek Elementary School, and I don't know if I voted in
11 HEB parking lot. I can't recall exactly where I voted,
12 but I don't remember it being -- I think I voted only
13 once, if my memory served me right, in that garage.
14    Q    Do you remember what month in '98 you moved
15 in?
16    A    June, I think.
17    Q    So that would have been after the spring
18 elections of that year?
19    A    Okay. So that's probably why the location
20 is getting a little foggy.
21    Q    Was the elementary school open when you

Page 20

1 moved in?
2    A    No.
3    Q    It had not yet opened?
4    A    It had not yet opened.
5    Q    Do you recall when that elementary school
6 opened?
7    A    I don't know. Maybe the year or two after.
8 I don't know the exact time.
9    Q    But sometime in that '99/2000 timeframe?
10    A    Yes.
11    Q    You've mentioned that you know Don
12 Zimmerman who is on the board for the district?
13    A    Yes.
14    Q    Do you know any other members of the board?
15    A    No.
16    Q    Do you know Bill Fergusson?
17    A    I have seen him and heard his name and seen
18 his name in some of the reports, but I don't know him
19 personally.
20    Q    Never had a conversation with him?
21    A    Not that I can remember, no.

Page 21

1    Q    Same question with Alan Weiss?
2    A    That name also sounds familiar, but not
3 enough if I see him I'll know him.
4    Q    Ed Swarthhout?
5    A    No.
6    Q    Karen Temborius?
7    A    No.
8    Q    George Fredrickson?
9    A    No.
10    Q    How did you come to meet -- the only person
11 you know on the district board is Mr. Zimmerman?
12    A    That's correct.
13    Q    How did you come to meet Mr. Zimmerman?
14    A    I met him at one of our homeowners'
15 association meetings.
16    Q    Do you recall about when that might be?
17    A    A wild guess, maybe 2000/2001.
18    Q    And that would have been about this
19 taxation issue?
20    A    Yes.
21    Q    Did you have a conversation at that point

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 22

1  about it?

2      A    Well, he was pretty vocal about his

3  position and wanting to do everything he could to

4  eliminate that. So a lot of people supported and

5  shared his thoughts and his vision, if you will.

6          So I expressed to him that, you know,

7  whatever I can do to help in this effort to let me

8  know, and that's how that start.

9      Q    So on that issue you agree with the

10  position Mr. Zimmerman was espousing trying to get rid

11  of this double taxation?

12     A    Yes, on that issue.

13     Q    Do you have other conversations with

14  Mr. Zimmerman subsequent to the HOA meeting?

15     A    Regarding the double taxation?

16     Q    Regarding anything.

17     A    The only time I've ever talked to him was

18  regarding things that he was doing, and perhaps he

19  wanted to see if I can help him regarding the double

20  taxation.

21     Q    Did you have numerous conversations about

Page 23

1  that? Would you describe it more as a handful or a lot

2  of conversations over the years?

3      A    More of a light handful. He would tell me

4  what's going on. He would send me e-mails. We didn't

5  speak in person that much, but when we saw each other

6  we spoke either at a meeting, but that's it.

7          As a matter of fact, I don't remember

8  seeing him too much around the neighborhood, but when

9  we did see each other we spoke about it.

10     Q    I'm sorry. I wanted to clarify something.

11          When he ran for that house district he

12  asked for your support and you agreed to put up a sign?

13     A    He didn't ask for my support. He asked

14  would I be able to allow him to put a sign up in my

15  yard and I told him absolutely.

16          I was in meetings, and then when he

17  realized that he was running against Mark Stroma then I

18  obviously I changed my mind.

19     Q    Was the decision not necessarily that you

20  disagreed with Mr. Zimmerman, but that you preferred

21  Mr. Stroma as a candidate?

Page 24

1      A    That's right.

2      Q    Mr. Stroma, he's still the representative

3  there, right?

4      A    Yes.

5      Q    Is Mr. Stroma doing a good job, do you

6  think?

7      A    As far as I know.

8      Q    When the depo is over I'll tell you what he

9  did for us in the last legislative session.

10         Going back to what I believe was probably

11  that 2002 election, the election where you voted in two

12  different places?

13     A    Yes.

14     Q    One was in a garage. Was the other one at

15  the elementary school?

16     A    Yes, sir, in the trailer.

17     Q    I'm sorry, in a trailer?

18     A    Yes. The polls were in the trailer at the

19  school.

20     Q    At the school?

21     A    Yes.

Page 25

1      Q    Did you vote at the garage first and then

2  at the school or the school and then?

3      A    School then garage.

4      Q    Was it very far between the school and the

5  garage?

6      A    It was between the school and my home.

7      Q    You didn't have a problem voting in either

8  of those elections that year?

9      A    No.

10     Q    The next time around when everything was

11  combined at the school, did you find that more

12  convenient?

13     A    Yes. It was more convenient, yes.

14     Q    Did you consider that to be a good change?

15     A    That was a good change.

16     Q    In the time that you've lived in the

17  district, you've always been able to exercise your vote

18  when you've chosen to and wanted to; is that correct?

19     A    That's right.

20     Q    You've never had any problem voting or

21  exercising your vote to choose the candidates that you

Towson Reporting Company                GORE BROTHERS                Whitman Reporting-Rockville
410-828-4148                            410-837-3027                 301-279-7599

Rodney Louis - 03/01/07

Page 26

1    want; is that correct?

2        A    That's correct except the last absentee

3    ballots that I didn't get in time.

4        Q    And that was in the --

5        A    The last.

6        Q    2006 Congressional?

7        A    Yes.

8        Q    Do you recall who you submitted the request

9    for the absentee ballot to?

10        A    It was to -- I called the district and they

11    told me who to send it to, but I don't recall exactly

12    who it was; but they sent me the paperwork and I sent

13    it back to them, and I did receive the ballot, just

14    didn't get it in time.

15        Q    When you say you called the district, that

16    was the Congressional elections in the fall, right, the

17    county?

18        A    What do you call it?  The voting

19    commission.

20        Q    Voter registrar for the county or the

21    state?

Page 27

1        A    I don't recall exactly who it was.  I don't

2    recall exactly who I requested it, but again, I did get

3    it.  I got it a couple of days after.  I actually got

4    it a couple of days after.

5        Q    I just wanted to clarify.  When you say the

6    district, it's not the MUD?

7        A    No, absolutely not the MUD.  No, I'm sorry.

8        Q    Let me talk to you a little bit about your

9    involvement in this particular lawsuit.

10        A    Okay.

11        Q    Would you describe for me, just in your own

12    words, why you've joined this lawsuit as an intervenor?

13        A    I joined because it appears as if this is a

14    request to have the Voters Right Act, the guidelines

15    that's issued by the courts for the Voters Right Act,

16    to be I guess set aside to where the MUD is saying that

17    they, I guess, don't want to follow the guidelines or

18    feel as if it's not necessary, or whatever the feeling

19    is, to follow the guidelines as it relates to the

20    Voters Right Act, and I don't support that.

21        Q    Let me ask for some clarification on your

Page 28

1    feelings on that.

2        Do you understand what the term

3    pre-clearance means?

4        A    No.

5        Q    Do you know what section 5 is?

6        A    Of what?

7        Q    I'm sorry, section 5 of the Voting Rights

8    Act.

9        A    No.

10        Q    Let me come back to that.

11        Tell me a little bit about how you came to

12    be involved.  At some point in the process were you

13    contacted by individuals?

14        A    Yes.

15        Q    Did they call you on the telephone or come

16    to your home?

17        A    Phone.

18        Q    Do you know if the individuals you spoke to

19    were attorneys?

20        A    Yes.

21        Q    Were the attorneys for the -- were they

Page 29

1    individuals in the room?

2        A    Ms. Kristen, yes.

3        Q    How many conversations did you have?

4        MR. SPITAL:  Let me interrupt for a second.

5    I believe that you can answer Mr. Coleman's question,

6    but I just want to remind you the nature of any

7    communications you had with your attorneys are

8    confidential and privileged.

9        BY MR. COLEMAN:

10        Q    I want to respect that.  I'm not going to

11    ask you anything that was said between you and your

12    attorneys, but I just wanted to get some basic

13    information.

14        How many conversations would you say you

15    had prior to your decision to join the lawsuit?

16        A    Prior to my decision?

17        Q    Yes.

18        A    One.

19        Q    Were both you and your wife on that phone

20    call together?

21        A    Initially, no.

8 (Pages 26 to 29)

Rodney Louis - 03/01/07

Page 30

1    Q    But at some point during the conversation
2    did your wife join the call?
3    A    Subsequent calls.  And just for
4    clarification, my wife informed me.  So she was spoken
5    to first and as soon as I was informed.
6    Q    Okay.  Thank you for that clarification.
7         When you say she informed you, did she have
8    a conversation with the attorneys first?
9    A    Yes.
10    Q    Thank you for that clarification.
11         Let me go back to what we talked about a
12    few minutes ago of why you're in the lawsuit.
13         Is it your understanding that the district
14    intends to be exempted from all aspects of the Voting
15    Rights Act or just one particular aspect?
16         MR. SPITAL:  Objection, calls for a legal
17    conclusion.
18         BY MR. COLEMAN:
19    Q    I'm asking for just your understanding.  So
20    your attorney needs to make certain objections, but you
21    can still answer the question.

Page 31

1    A    It's my understanding that they want to do
2    it for all of the entire.
3    Q    Would it matter to you if that weren't the
4    case, that the district were seeking exemptions only
5    from one very narrow aspect of the Voting Rights Act?
6         MR. SPITAL:  Just to clarify.  Are you
7    asking Ms. Louis to assume that that's the case?
8         BY MR. COLEMAN:  Not necessarily.  I think
9    my question was:  Would it matter to him?
10         MR. SPITAL:  If that were the case?
11         MR. COLEMAN:  If that were the case.
12         THE WITNESS:  Repeat the question.
13         BY MR. COLEMAN:
14    Q    Would it matter to you if the district
15    rather than trying to get some broad exemption from all
16    aspects of the Voting Rights Act that they were simply
17    trying to get an exclusion from one narrow aspect of
18    it?
19    A    It wouldn't matter to me, and, I mean, it
20    would somewhat concerned me why they were trying to get
21    an exclusion because the Act is there for protection.

Page 32

1    So why would you want to, in other words, break down
2    that barrier?
3         If it's there for protection and you're
4    asking for exclusion then the protection potential may
5    not be there.  So I would have a concern as to why they
6    would want an exception.
7    Q    That's a fair concern.
8         The Voting Rights Act very broadly
9    prohibits -- it's your understanding that the Voting
10    Rights Act broadly prohibits any kind of discrimination
11    in the exercise of a person's Voting Rights?
12         MR. SPITAL:  Objection, calls for a legal
13    conclusion.
14         BY MR. COLEMAN:
15    Q    Is that generally your understanding of
16    what it does?
17    A    Yes.
18    Q    Do you also understand that there's a
19    provision that applies in some places says if you're
20    going to make any changes you have to send a letter to
21    the Department of Justice to get approval first?

Page 33

1         MR. SPITAL:  Same objection for the record.
2         BY MR. COLEMAN:
3    Q    Is that your understanding, or if you know?
4    A    That's my understanding.
5    Q    Do you know whether, for instance, when you
6    lived in San Jose whether the City of San Jose had to
7    do the same thing?
8    A    I don't know.
9    Q    How about Colorado Springs?
10    A    Do not know.
11    Q    Would it make a difference to you if there
12    was a provision of the statute that said very basically
13    if you, governmental entity, follow the Voting Rights
14    Act for a period of years and show that to us then
15    we'll allow you to remove yourself from what I'm
16    calling the pre-clearance provisions?
17         Do you know whether the statute has that
18    type of a provision in it or not?
19         MR. SPITAL:  Same objection.
20         THE WITNESS:  I do not know.
21         BY MR. COLEMAN:

9 (Pages 30 to 33)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 34

1    Q    If it did and if the district could make a
2  showing that it has lived up to its obligations under
3  the Voting Rights Act, would you be opposed to the
4  district seeking that type of an exclusion?
5        MR. SPITAL:  Before you answer, for
6  clarification, are you -- does your question assume
7  that the district is eligible to make such an
8  application?
9        MR. COLEMAN:  Yes.  I'm not asking him to
10 express an opinion whether it is or it isn't, just if
11 that were the case, would he oppose a request to seek
12 that type of an exclusion.
13       THE WITNESS:  I would still oppose.
14       BY MR. COLEMAN:
15    Q    Mr. Louis, we've talked about your
16 participation in various elections of the district and
17 the fact that you've always been able to exercise your
18 right to vote in district elections.
19       As you sit here today, I just want to
20 clarify, you're not complaining about the way that the
21 district has exercised its elections, but rather your

Page 35

1  participation in the lawsuit is an expression of
2  concern about the district's attempt to exclude itself
3  from what I've called these pre-clearance provisions?
4        Is that a fair statement?
5        MR. SPITAL:  Objection.  I think that
6  misstates Mr. Louis' previous testimony.
7        BY MR. COLEMAN:
8     Q    I'm really just trying to clarify.
9        As we've talked today, I haven't heard you
10 express any complaints or concerns about the elections
11 themselves that the district has had?
12    A    Well, as we talked about this, you
13 mentioned some time frames and you indicated that the
14 garage election was in 2002.
15    Q    Right.
16    A    If there was elections prior to that in
17 that garage I was unaware of that.  I did not know.  So
18 I didn't have information of that.  So I don't know
19 what -- you know, I don't know what I've missed.
20       I don't know what should have been exposed
21 to me that wasn't because I only -- the only reason why

Page 36

1  I was able to vote in that garage that day was because
2  Mr. Zimmerman was running for MUD president and he
3  instructed me on where to go and vote.
4        So had he not been there I would not have
5  been able to vote because I didn't know that that's
6  where the voting had taken place.
7     Q    Okay.  In 2000 then you did not vote in the
8  district elections?
9     A    For the MUD?  When you say district, are
10 you talking specifically for the MUD?
11    Q    Yes, for the MUD.
12    A    I do not think I did.  I think I only voted
13 in the garage I believe once and that's when I was
14 instructed by Mr. Zimmerman to go and do so.
15    Q    Other than the fact that you didn't -- I
16 think your testimony is that you didn't know about the
17 2000 election or you didn't receive information?
18    A    For the district?
19    Q    For the district.
20    A    That's right.  And I'm not saying I didn't
21 receive it.  I wasn't aware when I went to vote that

Page 37

1  that's where I needed to go.
2     Q    Were you an active reader of the
3  homeowners' newsletter.
4     A    I was reading my newsletters.
5     Q    Is it possible then that you did receive
6  some information about the 2000 election that would
7  have contained information about where to vote?
8     A    If it was in the newsletter that I
9  received, then, yes.
10    Q    As we sit here today then you may or may
11 not have had information in your possession about where
12 to vote for the 2000 election, we just don't know?
13    A    That's correct.
14    Q    Going back to the question I asked earlier,
15 just to clarify.  Your involvement in the lawsuit, it's
16 not about anything that happened in the 2000 or 2002
17 any of the MUD elections, it's more about your sense
18 the district should not seek to exclude itself from
19 what I'm calling the pre-clearance provisions?
20    A    That's correct.
21       MR. COLEMAN:  I'm going to pass the

Towson Reporting Company          GORE BROTHERS          Whitman Reporting-Rockville
410-828-4148                     410-837-3027                  301-279-7599

**Page 38**

1 witness. Any questions from DOJ?
2     MR. DELLHEIM: No questions. Thank you.
3     MR. SPITAL: We don't have any questions.
4     - - -
5     (Reading and signature not waived.)
6 (Whereupon, at 10:00 a.m., deposition was adjourned.)
7     - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21

**Page 39**

1     CERTIFICATE OF DEPONENT
2
3
4     I hereby certify that I have read and
5 examined the foregoing transcript, and the same is a
6 true and accurate record of the testimony given by me.
7
8     Any additions or corrections that I feel are
9 necessary, I will attach on a separate sheet of paper
10 to the original transcript.
11
12
13
14     _____
15     RODNEY LOUIS
16
17
18
19
20
21

**Page 40**

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2     I, Steven Poulakos, registered Professional
3 Reporter, the officer before whom the foregoing
4 proceedings were taken, do hereby certify that the
5 foregoing transcript is a true and correct record of
6 the proceedings; that said proceedings were taken by me
7 stenographically and thereafter reduced to typewriting
8 under my supervision; and that I am neither counsel
9 for, related to, nor employed by any of the parties to
10 this case and have no interest, financial or otherwise,
11 in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 6th day of March,
14 2007.
15
16     _____
17     STEVEN POULAKOS
18     Notary Public
19
20 My commission expires:
21 June 17, 2009

**Page 41**

1     I N D E X
2     Deposition of RODNEY LOUIS
3     March 1, 2007
4
5 EXAMINATION BY:     Page
6 Mr. Coleman . . . . . . . . . . . . . . . . 4
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

11 (Pages 38 to 41)

Towson Reporting Company
410-828-4148
GORE BROTHERS
410-837-3027
Whitman Reporting-Rockville
301-279-7599