IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, 401 W. 15th Street Suite 850 Austin, Texas 78701 Plaintiff, | ) ) ) ) ) ) ) | CIVIL ACTION NO. 1:06-CV-01384 (DST,PLF,EGS) |
| v. | ) ) | |
| ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITED STATES, U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, D.C. 20530 | ) ) ) ) ) ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION OF
TERRY L. MUSIKA
Monday, April 9, 2007
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF TERRY L. MUSIKA, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 9th day of April, 2007, from 10:16 a.m. to 11:29 a.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the law offices of Wilmer, Cutler, Pickering, Hale & Dorr, LLP, 1875 Pennsylvania Avenue, Washington, D.C., pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

```
 1        APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
       Mr. Gregory S. Coleman
 4     YETTER & WARDEN, LLP
       221 West Sixth Street, Suite 750
 5     Austin, Texas 78701  (512) 743-2642
            -and-
 6     Mr. Christian Ward
       WEIL, GOTSHAL & MANGES, LLP
 7     8911 Capital of Texas Highway
       Building One, Suite 1350
 8     Austin, Texas 78759  (512) 349-1937
                (512) 527-0698 Fax
 9
    FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
10  FUND (MALDEF):
11     Mr. Carlos Becerra (By telephone)
       Attorney at Law
12     110 Broadway, Suite 300
       San Antonio, Texas 78205  (210) 224-5476
13              (210) 224-5382 Fax
14  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
15
       Mr. Chris Herren (By telephone)
16          -and-
       Ms. Christy A. McCormick
17     950 Pennsylvania Avenue, N.W., Room 7246
       Washington, D.C. 20530  (202) 305-0609
18              (202) 327-3961 Fax
19  FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:
20     Mr. Benjamin Blustein
       Staff Attorney, Voting Rights Project
21     1401 New York Avenue, NW, Suite 1400
       Washington, D.C. 20005  (202) 662-8320
22              (202) 628-2858 Fax
23
24
25
```

## Page 3

```
 1        APPEARANCES (Cont'd)
 2  FOR INTERVENOR DEFENDANTS TEXAS STATE CONFERENCE OF
    NAACP AND AUSTIN BRANCH OF THE NAACP:
 3
       Mr. Daniel A. Zibel
 4          -and-
       Mr. Ariel B. Waldman
 5     WILMER, CUTLER, PICKERING, HALE & DORR, LLP
       1875 Pennsylvania Ave., N.W.
 6     Washington, D.C. 80006  (202) 603-6053
                (202) 663-6363 Fax
 7
    FOR INTERVENOR TRAVIS COUNTY:
 8
       Mr. Max Renea Hicks
 9     Attorney at Law
       101 W. Sixth Street
10     Austin, Texas 78701
```

## Page 4

```
 1              INDEX
 2  Appearances.............................  2
 3  Stipulations............................
 4
 5  TERRY L. MUSIKA
 6     Examination by Mr. Coleman...........  4
 7
 8  Signature and Changes...................  47
 9  Reporter's Certificate..................  49
10
11            EXHIBITS
12  DEPOSITION EXHIBITS
13  1. Expert Report of Terry L. Musika.....  12
```

## Page 5

```
 1            TERRY L. MUSIKA,
 2  having been first duly sworn, testified as follows:
 3               EXAMINATION
 4  BY MR. COLEMAN:
 5     Q.  Good morning, Mr. Musika.  My name is Greg
 6  Coleman and I represent the plaintiff in this lawsuit.
 7     A.  Good morning.
 8     Q.  Let me start.  Do you ever have a hamburger
 9  for lunch?
10     A.  Yes.
11     Q.  Is there -- is there a place close by where
12  you sometimes go to have hamburgers?
13     A.  No.
14     Q.  All right.
15         MR. BECERRA:  I'm sorry, Greg.
16         MR. COLEMAN:  Yeah?
17         MR. BECERRA:  There -- I'm sorry, Greg.
18  This is Carlos Becerra.  We have some interference on
19  the line and I was wondering if you could just repeat
20  the first question.  I'm sorry.
21         MR. COLEMAN:  I just asked if he ever has
22  hamburgers for lunch.
23         MR. BECERRA:  Oh, okay.
24         MR. COLEMAN:  I wouldn't want to
25  disappoint you by starting with something normal.
```

Page 6

1    Q. (By Mr. Coleman) Let's -- I'm going to ask
2  you just to assume that there's a place downstairs
3  called Joe's Restaurant. Okay?
4    A. Yes.
5    Q. And we -- and they have hamburgers that sell
6  for about seven dollars. So if we went down to Joe's
7  and enjoyed a hamburger for seven dollars, and then we
8  went back next week and they had raised the price to
9  $15, is it possible that you might choose something
10 else on the menu?
11   A. For what reason?
12   Q. Because seven dollars is fine, but 15 is just
13 too much for a good burger.
14   A. That's your hypothetical, that that is too
15 much?
16   Q. I'm just asking if it's possible that it might
17 be too much, or you might make that decision.
18   A. I suppose anything is possible, yes.
19   Q. Now, let me ask you to assume, too, that you
20 and I went down together and you didn't have cash on
21 you, so you might borrow the money from me for the
22 burger, just on the assumption that next time around
23 you would probably pay for our lunch and it would all
24 be equal. If you were off getting a car loan or a
25 house loan, would -- would you likely list the

Page 7

1  hamburger loan on a financial statement?
2    A. It would depend on the purpose of the
3  financial statement, the readers of the financial
4  statement, the representations that may have been made
5  on that -- or about that financial statement by an
6  independent certified public accountant. There are
7  various levels of -- of reporting depending on the
8  ultimate end user and what the end user is using the
9  financial disclosures for. So it's a more complex
10 question and can't be answered simply like that.
11   Q. Let's say it's a $10 lunch and you're buying a
12 $30,000 car, just a car loan. Would you be likely to
13 list that burger loan?
14   A. List the loan on a personal financial
15 statement?
16   Q. Right.
17   A. Again, it would depend on the purpose of the
18 financial statements, who the end users are. The issue
19 of materiality sometimes, which I think is inherent in
20 your question, is not a purely -- from an accounting
21 standpoint or a financial reporting standpoint, is not
22 a purely quantitative measure; it's a quantitative and
23 qualitative measure. And Generally Accepted Accounting
24 Principles points that out in their Statement of
25 Concepts II, which says that a -- an amount that's

Page 8

1  likely to influence a reader of the financial
2  statement, irrespective of its size, small or large,
3  might be deemed material and therefore included.
4    Q. Well, have you ever listed a lunch loan on a
5  financial statement?
6    A. I've never prepared anybody's personal
7  financial statement.
8    Q. I'm talking about your own.
9    A. In what context?
10   Q. Any sort of personal loan that you've ever
11 taken out that asks you to list assets and loans and
12 things like that. Have you ever listed something like
13 that?
14   A. And I'm sorry, the "like that" being what?
15   Q. A $10 lunch loan, borrowed $10 for lunch.
16   A. I don't have any memory of -- of that
17 particular circumstance presenting itself in a
18 financial statement that I may have compiled for a
19 borrowing purpose.
20   Q. And have you ever seen that on another
21 person's financial statements?
22   A. I don't remember seeing anybody's hamburger
23 loan on any personal financial statement, no.
24   Q. And that would be -- you had mentioned
25 materiality before. That would likely be because such

Page 9

1  thing would not be material to any substantial loan.
2    A. Without knowing the circumstances, I couldn't
3  tell you why it may or may not have been included.
4    Q. If I could represent to you that the hamburger
5  loan is less than .1 percent of the person's annual
6  expenditures, would it likely to -- would it likely be
7  nonmaterial?
8    A. No, for the reasons I've stated earlier in my
9  testimony.
10   Q. Which are that there are a lot of things that
11 would go into that type of consideration?
12   A. Not -- no, that's -- that is to some degree
13 not what I've said. What I have said is -- is that the
14 question of materiality with respect to disclosure in a
15 financial statement is not one of a strict quantitative
16 measurement only, it is a combination of quantitative
17 and qualitative. And if a transaction is
18 quantitatively, relatively speaking, very, very small,
19 but is significant for whatever reason to an end user's
20 use of the financial statements, then that might be
21 deemed material and included in the financial
22 statement.
23   Q. And would you agree that when we went down to
24 Joe's the second time and saw that the price was $15
25 instead of seven dollars for the hamburger and that

3 (Pages 6 to 9)

Page 10

1  somebody might make a decision that $15 is just too
2  much when the panini sandwich is so good, that that
3  particular decision about whether to spend seven or $15
4  really at the end of the day has nothing to do with
5  whether you would list it on your financial statement?
6  The materiality and other factors that are going into
7  it really have nothing to do with your decision of
8  whether you would purchase or not purchase that
9  hamburger; isn't that right?
10     A.  I'm sorry, I didn't follow that question.
11     Q.  Yeah.  You've spoken about a lot of factors on
12  whether you would list something on a financial
13  statement.  And you've even gone so far as to suggest
14  that somebody might list a very small amount, a loan,
15  small loan, on a financial statement, a loan for a
16  lunch, for instance, and that -- you said that there's
17  a lot of things that go into that.  But one of the
18  things that doesn't go into that is a personal decision
19  about whether to purchase the hamburger in the first
20  place, whether you think it's worth it or not.
21     A.  If I follow the hypothetical, if the question
22  is if someone makes a decision to purchase a good or a
23  service, they would not consider whether or not that
24  purchase decision would ultimately be disclosed in
25  their personal financial statement, then I would

Page 11

1  disagree with you.  I can --
2     Q.  That's not my question.
3     A.  Oh.  I'm sorry.
4     Q.  My question is the other way around, that you
5  would make a decision whether you wanted the hamburger
6  or not based on whether you think the hamburger is
7  worth the money, and that that ultimately has nothing
8  to do with the decision of whether it subsequently
9  would be listed on a financial statement or not.
10     A.  I think there are a number of issues in your
11  question.  I don't -- I would not agree that a person's
12  decision to purchase a hamburger would be based solely
13  on the -- the price offered at Joe's.  I would disagree
14  with that.  I would probably --
15     Q.  No, my --
16     A.  -- agree with your second part.
17     Q.  The first part is that there's -- there's some
18  price at which you decide it's just not worth it
19  anymore.  Other -- other than --
20     A.  I think that's, generally speaking, yes.  From
21  an economic standpoint there is a price at which a
22  buyer would consider it too expensive.  Yes.
23     Q.  You've testified in a lot of cases.  Have you
24  ever testified in a case about the bailout provisions
25  of the Voting Rights Act?

Page 12

1     A.  Not before this one.
2     Q.  Have you ever testified in a case testing the
3  constitutionality of federal authority over states
4  under various federalism concepts?
5     A.  No.
6     Q.  Are you a lawyer?
7     A.  No.
8     Q.  Are you trained as an expert in constitutional
9  law?
10     A.  No.
11     Q.  Are you conversant with the constitutional
12  standards for infringing on the sovereignty of state
13  and local political subdivisions?
14     A.  As a U.S. citizen, but not as a legal scholar
15  or someone trained in the law.
16     Q.  Are you familiar with the bailout provisions
17  of the Voting Rights Act?
18     A.  Yes.
19     Q.  What is your familiarity with those based on?
20     A.  A reading of the Voting Rights Act, reading of
21  Section 5, a reading of the various submissions that
22  have been prepared and submitted in connection with --
23  may I refer to it as the district, the -- the --
24     Q.  Of course.
25     A.  Okay.  The district that's at issue here, from

Page 13

1  Texas, their various submissions under Section 5.
2  Broadly studying and reading other discovery materials
3  that have been produced in connection with this case.
4     Q.  Your expert report does not mention the
5  bailout provisions of the Voting Rights Act.  Is that
6  correct?
7     A.  I would have to look at it.  I'm -- I would
8  have thought that it does, but I would have to look at
9  it.
10     Q.  Mr. Musika, I'm going to just mark this --
11     A.  Sure.
12     Q.  -- as Exhibit 1.
13         (Deposition Exhibit No. 1 marked)
14         Is that a copy of the expert report that
15  you produced in this case?
16     A.  Yes.
17     Q.  Minus attachments?
18     A.  Yes.  Yes.
19     Q.  Can you point?
20     A.  Yes.  I'm reading from page 4 of my expert
21  report under the caption background, and there in the
22  first sentence it says, "I am advised by counsel that
23  Section 5 of the VRA, Voting Rights Act, in covered
24  jurisdiction requires suspension of all new voting
25  regulations pending review by the federal authorities."

Page 14

1  And then it goes on to say, "Under Section 5, any
2  voting" -- I'm not going to read that whole paragraph,
3  but that whole paragraph lists and makes specific
4  reference to the requirements under Section 5. And
5  I'll continue to look; I think there is one other place
6  where I state that it is the intention -- it's my
7  understanding that the intention of the district at
8  issue here was to "bail out." (Brief pause)
9         I do not see the reference to the
10 district's desire to "bail out," but I do know from
11 memory that I reference a document, I would say the
12 complaint being one in which there's specific reference
13 in the complaint to that.
14    Q. Do you understand there's a difference between
15 the constitutional issue that's presented in this case
16 and the bailout issue?
17    A. As a layperson, yes.
18    Q. Can you explain to me that difference?
19    A. Cannot legal opinion by any means, but a
20 bailout would be, in my understanding, more of
21 compliance with the existing law and a -- a legal and
22 semi-regulatory procedure. Constitutional issues seem
23 to me to be a larger, more philosophical legal issue
24 with respect to the legislative intent and ultimate
25 application of Supreme Court decisions.

Page 15

1    Q. Do you know what any of the statutory
2  requirements for a bailout are?
3    A. Not by memory, no.
4    Q. Do you know whether there's a financial aspect
5  to any of them?
6    A. I don't.
7    Q. Do you know whether you -- the analysis that
8  you were asked to prepare has any relevance to a
9  court's analysis under the bailout statute?
10   A. Can I have that question again?
11   Q. Do you know whether the analysis -- analysis
12 that you were asked to prepare has any relevance
13 whatsoever to the bailout provisions in the Voting
14 Rights Act?
15   A. That would be a matter for the court to
16 decide.
17   Q. Do you know why you were asked to prepare this
18 analysis?
19   A. Yes, I so state in the report.
20   Q. And what is that purpose?
21   A. I was asked by counsel for the district to
22 review and evaluate the extent of financial burden of
23 compliance with Section 5 of the Voting Rights Act.
24 That's what I was asked to do.
25   Q. Okay. Do you know why that would be important

Page 16

1  to this case at all?
2    A. Well, that would be for the court to decide.
3    Q. Do you know whether it's important to the case
4  at all?
5         MR. BLUSTEIN: Object; calls for a legal
6  conclusion.
7         THE WITNESS: That would be for the court
8  to decide.
9    Q. (By Mr. Coleman) Do you have any
10 understanding that if the compliance cost that you look
11 at, the financial compliance cost, that if they
12 exceeded a certain level or didn't exceed a certain
13 level, that that would have any impact on a bailout
14 analysis?
15   A. I am offering no opinion on that.
16   Q. Same question as to the constitutional issue.
17 Is it your understanding or have you been told by
18 anyone that there is a financial threshold with respect
19 to the constitutional issue at all?
20        MR. BLUSTEIN: Same objection.
21        THE WITNESS: I have not been told that.
22   Q. (By Mr. Coleman) Is it your understanding
23 that there is or isn't?
24   A. Isn't or -- is or isn't --
25   Q. There may -- there may or may not be. I don't

Page 17

1  know. What is your understanding?
2    A. Can I get you just to finish the question to
3  make sure I'm answering the right question.
4    Q. Is it -- is it your understanding that there
5  is some sort of financial threshold that relates to the
6  constitutional issue in this case?
7         MR. BLUSTEIN: Same objection. You may
8  answer.
9         THE WITNESS: My answer would be the
10 same. That would be up to the -- up to the court to
11 determine if so and to what extent.
12   Q. (By Mr. Coleman) Would you agree that the
13 numbers that you've put forward are estimates and not
14 exact calculations?
15   A. That's a broad question. I would not agree
16 with it in its entirety.
17   Q. Doesn't your report say that they're
18 estimates?
19   A. Again, there are certain numbers that are
20 included in the report which are exact numbers taken
21 from exact representations made by the district over
22 its historical existence. There are other amounts due
23 to the limitations in disclosures made, for example, by
24 the district's law firm which involve some estimation.
25 So it's a combination of both.

Page 18

1    Q. The numbers that you use regarding compliance
2  with the individual Section 5 submissions are
3  themselves estimates, are they not?
4    A. Some are estimates, some are actual.
5    Q. Which ones are actual?
6    A. The amount of general fund operating
7  expenditures for the district over the course of its
8  18- to 20-year existence would be an example.
9    Q. My question was limited to the costs of
10 Section 5 preclearance compliance. Let's go ahead and
11 mark...
12         (Deposition Exhibit No. 2 marked)
13         I mean, this is Exhibit G.
14    A. Yes.
15    Q. If you would like to look at those.
16    A. And the pending question is?
17    Q. The -- to the extent that you represent that
18 these are the Section 5 expenditures for the various
19 provisions, these -- these are stated as estimates. Is
20 that right?
21    A. Ultimately they are estimates because they
22 involve a certain amount of combination of
23 representations that were made. There were factual
24 representations made under oath by certain counsel;
25 there were certain bills that were factual, exact

Page 19

1  amounts, both in terms of time as well as rate per
2  hour; those were actual factual datapoints. But
3  ultimately I had to combine the collective information,
4  both fact specific as well as narrative testimony, to
5  get to a final estimate, as you characterize it, and I
6  think appropriately so, yes.
7    Q. And this -- these numbers could all be off by
8  quite a bit.
9    A. I would disagree with that.
10    Q. Well, you estimated, for instance, a 1990
11 moving of a polling place at $340. That was based on
12 Ms. Collins' testimony that it would take about two
13 hours to do a submission for moving a polling place.
14    A. That's correct.
15    Q. All right. You also estimated $340 for the
16 original submission, which involved the creation of the
17 district itself, the creation of a polling place, and
18 the setting forth of bilingual election procedure and
19 other things. Why would you estimate that those would
20 be the same?
21    A. Again, for the reasons you've stated and are
22 listed therein, that the time that Ms. Collins
23 represented was required was somewhere in that two-hour
24 time estimate, more for annexation issue. I think --
25 there's a little bit more to that answer. I think that

Page 20

1  there --
2    Q. She was asked about annexation.
3         MR. BLUSTEIN: Wait. I -- I'm going to
4  object. He indicated he wanted to finish his answer.
5         THE WITNESS: I -- I do --
6    Q. (By Mr. Coleman) Please, go ahead.
7    A. Okay. I think that in its entirety, too, that
8  the amounts that are reflected on that exhibit are
9  conservative in that both testimony and the documents
10 would show that the subsequent submissions -- many of
11 the subsequent submissions with respect to change in
12 polling place were virtually boilerplate and were --
13 they used the earlier stats as well as the format
14 and -- from an earlier filing. So I didn't seek to try
15 and reduce that based on the, again, boilerplate nature
16 subsequent.
17         So while there may be some level of
18 minor -- very minor imprecision in her estimates, I
19 think in its -- in their entirety it is a very
20 conservative representation, as further supported by
21 some actual bills from another law firm later in time.
22    Q. I'll object as nonresponsive.
23         You indicated that she said two -- two
24 hours for a polling place and more time when it
25 involved annexation, but she wasn't asked about other

Page 21

1  types of things that would be included in that. So my
2  question was about the 1986 submission that involved
3  many things other than polling place, and yet you still
4  just estimated two hours. That could be off. Right?
5  Come on, now, that could be off.
6    A. Well, as I --
7    Q. Right? Just -- it's yes or no.
8         MR. BLUSTEIN: Let him -- let him answer
9  the question, please.
10         THE WITNESS: It's not yes or no
11 because --
12         MR. COLEMAN: Sure, it is.
13         THE WITNESS: -- her testimony --
14         MR. BLUSTEIN: We're going to object that
15 that is argumentative. Let -- let him --
16         MR. COLEMAN: Please do.
17         MR. BLUSTEIN: -- answer the question.
18         THE WITNESS: Her testimony is more than
19 simply a yes or no question. It goes on for a number
20 of pages with respect to the types of work that she did
21 and how much time was involved. So I -- I do not read
22 or understand her testimony to suggest that the time
23 that she spent on Section 5 was limited to specific
24 types of acts. I believe that her testimony and the
25 spirit of her testimony was to give a reasonable

6 (Pages 18 to 21)

Page 22

estimate of the time that was required by her and her law firm to comply with the Section 5 preclearance matter.

Q. (By Mr. Coleman) Well, she was asked -- you -- you have based it in part on boilerplate language that -- your -- your label for various language that was used over -- there's no indication that language existed before 1986.

A. For the district?

Q. Correct.

A. Well, again, I think my recollection of Ms. Collins' testimony and the law firm was that they represent more than simply this district. So certainly 1986 was my recollection of the -- the formation and initiation of the district at issue in this case, but other special taxing districts or special purpose districts which fell under Section 5 existed and -- and it's my understanding the law firm did represent other districts.

Q. But at the end of the day, that two hours is just a guess for 1986.

A. It's sworn testimony. I would not take it as a guess.

Q. She didn't testify about 1986 taking two hours.

Page 23

A. That's where I think --

Q. What are you basing it on? You say sworn testimony. Do you -- have you seen anywhere sworn testimony about Ms. Collins' 1986 Section 5 submission?

A. I -- I understand your point and I think that's the point of our disagreement.

Q. Objection; nonresponsive.

The question is have you seen testimony about the 1986 that would suggest it was two hours?

A. Yes.

Q. And where is that?

A. In her testimony.

Q. You opine that the amounts spent by the district in terms of preparing Section 5 submissions is not material. Is that a correct reading of your report from an accounting standpoint?

A. That is correct. As represented by their own independent certified public accountants and the district itself in presentation of its financial statements to the general public.

Q. Has it been represented to you or do you have any independent knowledge that accounting materiality, again, has any relevance to the bailout procedure?

A. That, again, would be a matter of legal determination by the court.

Page 24

Q. Has anybody ever told you that?

A. In connection with this case or any -- in any matter?

Q. Well, let's start with this case. Has anyone told you in connection with this case?

A. I don't recall anyone telling me that, no.

Q. Now, let's -- how about other matters in your general knowledge?

A. Yes, as -- as a former audit partner for an international -- two international accounting firms, issues of materiality --

Q. With respect to bailout?

MR. BLUSTEIN: I would just ask that you let him finish his answer before you ask another question.

MR. COLEMAN: Well, I -- his answer was nonresponsive. I --

THE WITNESS: Well --

MR. COLEMAN: He was going off in a different direction. So I want to ask about bailout and I thought we could move things along by helping channel him back into my question.

THE WITNESS: Not bailouts that I can remember. No, not bailout. I thought it was a broader question. Sorry.

Page 25

Q. (By Mr. Coleman) Same question with respect to the federalism issues presented in this case. Has anybody told you that accounting materiality has any relevance to the federalism issues in this case?

A. No, not one way or the other.

Q. And separate from your involvement in this case, has anybody told you or are you of the mind that accounting materiality has any kind of relevance to the federalism constitutional issues presented in the case?

A. Yes, as a -- as a layperson, again, and a financial person preparing financial statements which are used for a variety of reasons, I see relevance, yes.

Q. How?

A. Well, from a financial, not a legal standpoint. But from -- from a financial standpoint, the issue of cost versus benefit is a well-known accounting and economic concept. And to me there is a meaningful and important part of the decision process in terms of the intent of -- of the law and its ultimate compliance. And part of that ultimate decision -- again, this is a -- not a legal, but a financial standpoint. When I have prepared or audited agencies of the federal government, state governments, local governments, special taxing district financial

Page 26

1  statements, the cost that's associated with various
2  federal programs is an important disclosure and one in
3  which I would believe that Congress or other -- from a
4  legal standpoint in actually ruling on the law that the
5  amount of cost versus the benefit that is ultimately
6  derived from the law is a reasonable and applicable
7  concept that helps make up the ultimate determination
8  in both drafting and enforcing the law.
9      Q.  Did anything you say have anything to do with
10  the federalism issues that we've been talking about?
11          MR. BLUSTEIN:  Objection; calls for a
12  legal conclusion.
13          THE WITNESS:  Yes.
14          MR. COLEMAN:  Objection; nonresponsive to
15  both the original question and that.
16      Q.  (By Mr. Coleman) If Congress passed a law
17  that said you could go -- IRS agents can go to the
18  homes of random individuals and collect a fee of one
19  dollar, as long as it's a nonmaterial amount regarding
20  the particular household, and they had to put at least
21  80 percent of that into the federal treasury so
22  there's -- there's good benefit for the federal law,
23  notwithstanding the nonmateriality of -- in accounting
24  terms, would you say that's a -- that the -- or that
25  the accounting non-materiality would come into play in

Page 27

1  assessing the constitutionality of such a law?
2      A.  I'm sorry, I -- I didn't understand that
3  question.
4      Q.  IRS agent comes to your house, says there's a
5  federal law allows me to take a dollar from you.  And
6  you give him a dollar and you want to challenge the
7  constitutionality of -- of random assessments against
8  you.  Are you saying that the IRS could come and say,
9  well, it's -- it's nonmaterial amount?
10      A.  No.
11      Q.  You agree governmental entities make all kinds
12  of decisions about things that they may or may not want
13  to do with respect to voting rights, voting procedures,
14  maintenance of parks, those types of things?
15      A.  Make decisions regarding --
16      Q.  About --
17      A.  -- those that they may not want to do.  I
18  don't -- that --
19      Q.  May or may not want to -- let's say -- let's
20  say that in a public park there's a covering over a
21  pavilion and somebody says you should come in -- you
22  should replace that covering; it -- it has a couple of
23  leaks in it.  And somebody else says we -- it will last
24  a couple more years.  You may or may not -- that entity
25  might choose to replace it now, might choose to replace

Page 28

1  it later, might choose not to replace it at all.
2  Right?
3      A.  Yes.
4      Q.  And cost might be a factor that would be
5  considered in doing that.  Right?
6      A.  Yes.
7      Q.  And the cost of that cover on the pavilion may
8  or may not be material for the entity's reporting of
9  accounting or reporting requirements.  Correct?
10      A.  Yes.
11      Q.  And the same is true with respect to
12  elections, isn't it?  You could -- somebody could say,
13  "Move a polling place down the street," and another
14  person could say, "Why bother?  It's going to cost us
15  $500.  Why would we want to do that?"  And the entity
16  might choose or not choose to make that change and cost
17  might be a factor in doing that.  Right?
18      A.  I don't think that you're dealing with a
19  parallel situation, so, no, I would disagree.
20      Q.  And what is your disagreement based on?
21      A.  Your first hypothetical was a purely
22  discretionary decision as to whether or not to make the
23  repairs.  The second one, with respect to the Voting
24  Rights Act or switching the polling place, involves an
25  issue of legal compliance.

Page 29

1      Q.  No, not at all.  I'm asking you to assume that
2  you have one polling place that's a perfectly good
3  polling place and you have another polling place that's
4  a perfectly good polling place.
5      A.  Mm-hmm.
6      Q.  And somebody suggested moving it as a
7  discretionary decision and cost might come into it.
8      A.  And --
9      Q.  Why don't you -- why don't you assume it is in
10  fact a discretionary decision?
11      A.  But it's not.
12      Q.  Sure, it is.
13      A.  I -- my understanding -- again, not a legal
14  opinion, but my understanding is you can't make
15  arbitrary decisions what may -- which may ultimately
16  prove to be discriminatory with respect to the minority
17  voting members' right to participate in the electoral
18  process as well as elect their candidate.  So --
19      Q.  That's not what I asked you to assume, though.
20  What I asked you to assume is that you have one polling
21  place that fully complies with the Voting Rights Act
22  and somebody suggests moving it to a different place
23  that fully complies with the Voting Rights Act.
24      A.  Okay.
25      Q.  And in making that discretionary decision,

Page 30

1  cost might come into effect.
2     A. That I would agree with.
3     Q. And that would be true whether or not the cost
4  was material for accounting or reporting purposes.
5     A. No, I would disagree with that.
6     Q. What's the basis for that disagreement?
7     A. Your example highlights the essence of
8  materiality. And so if cost is an issue, if the
9  decision, the discretionary decision, is based on the
10 amount of cost, then by definition you have illustrated
11 that it is material.
12           It's important to -- in your
13 hypothetical, perhaps, the -- the residents of the
14 special taxing district who recognize that making a
15 decision which is basically the same, one acceptable
16 site for another, and that if costs come into play, as
17 you say, they're going to have to say, well, I'm going
18 to have my tax assessment or my property increase or my
19 tax assessment increase to cover this increased cost,
20 and therefore I want to know what that cost is. It is
21 material to me because it -- it drives my decision as
22 to what I may or may not do as a resident of this
23 district.
24    Q. The standard for materiality that you've just
25 stated is different from the standard of materiality

Page 31

1  that's used in reporting requirements, and you know
2  that.
3     A. No, I totally disagree. As I started this
4  morning I said that there's a dual standard, one which
5  is of a quantitative nature, and there is a second
6  consideration which is a qualitative nature. And the
7  qualitative nature is if -- if the reader of the
8  financial statement, that party who relies on the
9  financial statement, would consider the information
10 that is absent important to their decision to invest or
11 to move or whatever it happened to be, then that's
12 material. You cannot make a purely arbitrary
13 quantitative decision with respect to a financial
14 disclosure. It has to consider the circumstances and
15 the end user as well.
16    Q. So if the -- if the entity, the subdivision,
17 is considering both the pavilion covering and the
18 change in polling place and the change in polling place
19 is $200 and the pavilion covering is a thousand
20 dollars, you're saying that the pavilion covering,
21 which you already told me might not be material, would
22 not have to be reported, but the $200 relating to
23 polling place would be?
24    A. Again, you're trying to suggest that there's a
25 quantitative cutoff or a comparative cutoff and there's

Page 32

1  absolutely, positively not. The residents who benefit,
2  for example, from the covering could be a different
3  subset than the residents who benefit from or not
4  benefit from the polling place change.
5     Q. The --
6     A. So -- I need to finish -- is that you cannot
7  simply line up expenditures and put them in a hierarchy
8  of quantity and say I'm going to draw a line and all
9  these under some dollar amount are immaterial and all
10 those over are not. You -- you can disagree with me
11 about the -- the concept of -- the dual concept of
12 quantitative and qualitative, but there's where I think
13 you and I disagree about the definition of materiality.
14 You cannot simply compare expenditures on the basis
15 of -- or liabilities or assets on the basis of a
16 quantitative -- strictly a quantitative measure.
17    Q. Has this district ever listed Section 5
18 compliance as a material expenditure in connection with
19 its financial statements?
20    A. I could find no record where they've ever
21 listed or identified a Section 5 preclearance
22 expenditure as a separate identified disclosure or line
23 item on the financial statements.
24    Q. So if you're suggesting that -- are you then
25 suggesting that an entity that has never reported an

Page 33

1  expenditure in connection with Section 5 as material on
2  its statements, that if it looked at some issue and
3  decided that -- that -- a voting related issue and
4  decided it didn't want to, that it would likely list
5  that as material?
6     A. You lost me. Sorry.
7     Q. They -- they don't list as material expenses
8  for changes that they do make, but you're suggesting
9  that they might have to list as material changes that
10 they choose not to make?
11    A. I -- I -- I don't understand the question, I
12 think, but I'm going to say no, I'm not -- that's not
13 what I'm saying.
14    Q. Well, let me go back to the original
15 statement. If they're looking at a voting change, a
16 discretionary voting change that they might, for
17 instance, choose not to change a polling place --
18    A. Mm-hmm.
19    Q. All right? If they choose not to based in
20 part on cost, are you saying that they would or would
21 not have to list that decision not to spend money?
22    A. No, I'm not saying that.
23    Q. So with respect to this district, you wouldn't
24 expect, based on their past performance, any decision
25 relating to changes in voting procedures to show up on

Page 34

1  their accounting reports at all.
2     A. No, I disagree with that. There were seven
3  separate occurrence -- eight, I guess, two in one year.
4     Q. Any on here that you think should have been
5  included or that...
6     A. No, I'm not saying that they should have been
7  included. But you're making a determination that they
8  couldn't have been included. They're for some
9  reason -- and what I'm saying is I'm not making an
10 independent decision only; I've looked at the
11 historical record. There -- the district itself has
12 complied with its financial reporting responsibilities,
13 the independent certified public accountants who were
14 hired certified to it, the investment bankers who
15 support and -- and brokered the some $12 million in
16 debt, the law firms, independent law firms who signed
17 off as well as on the disclosures and the bond
18 instruments and the official statements which
19 accompanied that and went into Wall Street for the
20 investors, all of that is a body of historical
21 financial knowledge which looked at these expenditures,
22 these expenditures being the Section 5 preclearance
23 expenditures, and deemed them in their opinions not to
24 be material expenses over the course of that 20 years.
25    Q. And you don't have a problem with those

Page 35

1  decisions?
2     A. I accept them as -- as a body of sophisticated
3  and -- and legally compliant professionals who
4  conducted themselves in accordance with a set of
5  standards that exist regarding financial reporting.
6     Q. Do you know what jurisdictions are covered by
7  the preclearance requirements of the Voting Rights Act?
8     A. In the entire country?
9     Q. Yes.
10    A. Not by name, no.
11    Q. Do you know generally?
12    A. Generally I have an understanding, yes.
13    Q. Have you done any analysis of the interest
14 rates that governmental entities get on their bonds
15 across the country with respect to whether an entity is
16 covered or not covered by preclearance requirements?
17    A. No.
18    Q. And you don't express in your report any
19 conclusions about whether areas that are covered by
20 preclearance receive higher or lower interest rates on
21 their bonds based on whether they're covered by the
22 preclearance requirements. Is that a correct reading
23 of your report?
24    A. Not entirely, no.
25    Q. Tell -- correct me.

Page 36

1     A. Well, there is a section in my report which
2  deals with the impact of complying with a receipt of
3  federal funds and the burden and responsibility that it
4  placed on units of local government that do receive
5  federal funds. And as identified by their -- once
6  again, their independent certified public accountant,
7  civil rights is one of the necessary areas of
8  compliance. A failure to comply with the existing laws
9  and regulations that are enforced on a unit of local
10 government will result in a negative feature quality
11 and reflect poorly on the unit of local government's
12 position with respect to the floating of a bond.
13       I provide further independent support for
14 that position. I, myself, for the 35 years I've --
15 hold that professional opinion as well, but I provided
16 further independent support for that position. I have
17 not quantified, as you say, made a comparison of
18 districts that fall under the requirements of Section 5
19 versus those that don't to determine whether there is a
20 discernible difference in the interest rate.
21       There's so many other factors as well.
22 My opinion is -- is that, A, it is a negative factor if
23 an entity fails to comply with the requirements under
24 various federal programs and that it is a
25 responsibility of the entity to demonstrate compliance

Page 37

1  with those, and the use of a Section 5 preclearance is
2  an effective mechanism through which to demonstrate to
3  outside auditors as well as bond rating agencies as
4  well as investors that indeed the district has complied
5  at least with respect to the Voting Rights Act.
6     Q. You cite two January 3, 1996 opinion letters
7  in your report. There have been many opinion letters
8  since January of 1996. Did you happen to look at
9  those?
10    A. You're referring to the auditor opinion
11 letters?
12    Q. Yes.
13    A. Yes. Yes, there have been. I agree with your
14 premise, foundation of the question. Yes, I've looked
15 at some.
16    Q. And they don't include that same language that
17 you refer to, do they?
18    A. It would -- I don't have them all, but it
19 would depend, again, on two general conditions: One is
20 whether or not the scope of the auditor's opinion
21 required them to do, as indicated I think in the '93
22 opinion, a single audit which is intended to cover both
23 the financial -- pardon me, the financial aspects of
24 the financial statement as well as the compliance
25 aspects.

Page 38

That would be one condition that needs to be present. The second is actual receipt of federal funds wherein the requirement to comply has been established as a result of a relationship between the federal government and the local government.

Q. There's not any opinion letters after January 3rd, 1996 that contain that language, are there?

A. I don't know. I have not seen one. But I don't know. I haven't seen them all.

Q. You haven't seen one?

A. I have not seen one, that's correct.

Q. Did you happen to see whether at any time after 1996 the district has received federal funds that might subject it to federal requirements?

A. I would have to go back and look. I don't recall seeing, but that's just my memory. I would have to look at the financial statements to see.

Q. Isn't it true that in the 1996 opinion letter, the federal requirement that is set forth relates to civil rights statutes such as Title VII, the Age Discrimination Act, other things like that; the auditors in fact do not make any attempt to determine compliance with the Voting Rights Act itself?

A. I can't speak for the auditors' opinion on

Page 39

that matter. I don't know.

Q. You've not seen an audit that -- a financial audit of the nature that is presented in the opinion letters of January 3rd, 1996 that makes an independent determination with respect to compliance with the Voting Rights Act, have you?

A. As it relates to this district?

Q. This district. Let's start there.

A. No, I haven't been provided with access to their workpapers and their workpaper programs and their confirmation letters to -- outside and to any legal counsel that represents them. That's where the specific compliance elements would be contained. I didn't have access to that. So, no, I haven't seen it.

Q. Have you seen audits from other governmental districts like this?

A. Yes.

Q. And they don't contain any independent audit of compliance with the Voting Rights Act either, do they?

A. I don't know. I would have to go back and research. I -- I don't know.

Q. Sitting here today, you can't point me to any audit that you've ever seen that does an independent evaluation of compliance with the Voting Rights Act as

Page 40

opposed to other types of anti-discrimination laws?

A. I can't point to you from memory, but I can cite for you in my professional opinion the responsibility to establish compliance. If an entity is subject to the Section 5 preclearance, I -- I would give you my professional opinion that that is a requirement under a single audit effort by an independent certified public accountant to establish that.

Q. You're -- Mr. Musika, you're making that up. The federal requirements are quite specific in that the requirements referenced in the January 3rd, 1996 audit letter don't refer at all to the Voting Rights Act, do they?

MR. BLUSTEIN: Before you answer the question, I want to object to the argumentative nature of the characterization of the witness' testimony as making it up. You may answer the question.

THE WITNESS: Yes, I -- I -- I'm certainly not making it up. I'm citing for you what the audit responsibilities are of a -- under the General Accounting Office Yellow Book and -- and within the AICPA's state and local government audit guide as to what the requirements are. And with respect to the auditor -- or this district's auditors'

Page 41

representations, they -- they don't -- they do not make any specific representations as to a specific grant program or a specific law.

What I recall, and I'm paraphrasing -- we could look at the language -- but I think it says that they determine compliance with all applicable laws and regulations that are the subject or that are enforced against the district, and it specifically categorically states civil rights as being one. But it doesn't point to, per my recollection, a specific law as it relates to either the environment or the -- or civil rights or any other categorical reference that's made by the auditors.

Q. (By Mr. Coleman) Is it your professional opinion that all things -- all other things being equal, that a government -- political subdivision in Texas pays a higher interest rate than a political subdivision in Oklahoma or New Mexico?

A. No.

Q. Is it your professional opinion that political subdivisions in Virginia pay -- all other things being equal, pay different interest rates on their bonds than political subdivisions in Texas?

A. No.

Q. Do you know whether this district has ever

Page 42

1  submitted its preclearance letters either to or from
2  the Department of Justice to its auditors or to anybody
3  else connected with the bonding process?
4      A. I don't know.
5      Q. Do you know whether political subdivisions in
6  Oklahoma, Virginia, New Mexico, Arkansas or Louisiana
7  submit preclearance letters to or from the Department
8  of Justice to underwriters, bonding counsel or others
9  connected with the bonding process?
10     A. I don't know.
11     Q. (Brief pause) Are you aware that there are
12 jurisdictions in the United States who have bailed out
13 of the preclearance requirements?
14     A. I don't know the names of those entities. It
15 would seem to me within my general understanding that
16 that's a possibility.
17     Q. Do you know whether those entities pay higher
18 or lower interest rates than entities who are -- who
19 have remained subject to preclearance?
20     A. I don't.
21     Q. Do you know whether they pay higher or lower
22 interest rates in connection with political
23 subdivisions that have never been subject to
24 preclearance?
25     A. I don't.

Page 43

1      Q. Do you have an opinion about whether those --
2  entities that have bailed out would pay higher or lower
3  interest rates?
4      A. No.
5      Q. With respect to political subdivisions that
6  have successfully removed themselves from the
7  preclearance requirements of Section 5, do you have an
8  opinion about their bail -- their ability to seek
9  public financing in the market?
10     A. No.
11     Q. You don't know whether it's harder or easier
12 or the same for those entities to get public finance as
13 any other political subdivision?
14     A. Not something I have studied, no.
15     Q. And that -- and the answer would be the same
16 whether it's in comparison to sub -- political
17 subdivisions that remain covered by preclearance and
18 those that never were covered by preclearance; isn't
19 that right?
20     A. That is correct.
21     Q. Unless I have read your report mistakenly,
22 though, you seem to want to express an opinion about
23 this district.
24     A. I do. That's true.
25     Q. So what -- what is the basis for that?

Page 44

1      A. Basis for what?
2      Q. Suggesting that if this district removed
3  itself from the requirements of preclearance, that it
4  would be negative -- negatively impacted when you're
5  unwilling to express an opinion about any other
6  district.
7      A. Well, I don't think I express that opinion as
8  it relates to this district at all.
9      Q. You're not saying that this district will --
10 would be impacted in its interest rate regarding its
11 bonding based on whether it is successful in removing
12 itself from preclearance requirements. Right?
13     A. I -- I would have to have that question again.
14 I can state for you what -- restate for you what the
15 report says about the impact of preclearance and
16 interest rates. It's not what you have represented to
17 be so far, but I can restate it again for you if you
18 like.
19     Q. I think I don't need it restated. What I'm
20 trying to get is an understanding of what the basis for
21 your statement is.
22     A. The basis is -- is that if there is a
23 requirement, and I'm not making a determination whether
24 it's a good or bad requirement, but there is a
25 requirement that the taxing district comply with a

Page 45

1  particular law. Doesn't matter to me as an auditor or
2  as a CPA which law, but it is a requirement. And as a
3  part of the district's picture, financial picture, to
4  the investment community, they need to put on as good a
5  face as possible and demonstrate that they are -- that
6  they can pay their debts and that they comply with the
7  various laws, rules and regulations under which they
8  operate. A failure to do that will adversely,
9  negatively impact their bond rating.
10          That's an opinion I hold, that's an
11 opinion that others hold that I've cited in this -- in
12 my expert report. That's true of this district and
13 that's true of any other district. That's the scope
14 and basis of my opinion.
15     Q. You portray the lifting of the preclearance
16 requirement as solely a negative for a district, and
17 yet you -- you express no opinion about other political
18 subdivisions that have removed themselves from the
19 requirements of preclearance.
20     A. I -- I disagree with that statement. I wanted
21 to point out, too, I was just noticing here that this
22 exhibit which we've marked as Exhibit 1 is incomplete.
23 I -- I know -- I know you -- you cited properly that it
24 doesn't include the exhibits, but it's also -- no, I'm
25 sorry, I stand corrected. I found it. It's -- you're

12 (Pages 42 to 45)

Page 46

1 copied on both pages. Sorry. No, I disagree with your
2 characterization of my opinions.
3    Q. You disagree with my characterization that I
4 think you said it would be solely a negative?
5    A. What would be solely a negative?
6    Q. That -- exempting oneself from the
7 preclearance requirements.
8    A. I do not give that opinion.
9    Q. Is it your opinion that it could be a
10 positive?
11    A. What could be?
12    Q. Obtaining a judicial declaration that a
13 political subdivision has complied with the provisions
14 of the Voting Rights Act for an extended period of time
15 and that it's therefore no longer needful to be subject
16 to preclearance.
17    A. I -- I haven't expressed that opinion.
18    Q. Do you acknowledge that that might be the
19 case?
20    A. Your hypothetical establishes compliance, and
21 compliance I view as a positive factor that influences
22 the interest rate. So how they achieve compliance is
23 not a -- is not a matter that I've expressed an opinion
24 on. I've simply stated that given an existing legal
25 requirement, the entity needs to comply, and failure to

Page 47

1 comply will -- will adversely impact the interest rate,
2 and it is an effective and efficient means through
3 which to demonstrate compliance by participating in the
4 immaterial cost of a preclearance.
5    Q. You're not in possession of any information
6 that this district has ever failed to comply, are you?
7    A. I believe that they have complied, it's my
8 understanding, in my review of the record.
9        MR. COLEMAN: I'm going to pass the
10 witness.
11        MS. McCORMICK: No questions.
12        MR. COLEMAN: Renea?
13        MR. HICKS: Yes?
14        MR. COLEMAN: Questions?
15        MR. HICKS: No, I have none.
16        MR. COLEMAN: Carlos?
17        MR. BECERRA: No questions.
18        MR. COLEMAN: Chris?
19        MR. HERREN: No questions.
20        MR. COLEMAN: Any questions from anybody
21 else at all? Okay. Off the record.
22        (Deposition concluded at 11:29 a.m.)
23
24
25

Page 48

1    CHANGES AND CORRECTIONS
2 WITNESS NAME: TERRY L. MUSIKA    DATE: _____
3 Reason Codes: (1) to clarify the record; (2) to
  conform to the facts; (3) to correct a transcription
4 error; (4) other (please explain).
5 PAGE LINE  CHANGE                REASON CODE
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 49

1 PAGE LINE  CHANGE                REASON CODE
2 _____
3 _____
4 _____
5 _____
6 _____
7
8
9     _____
10    TERRY L. MUSIKA
11
12 THE STATE OF _____)
                        )
13 COUNTY OF _____)
14   Before me, _____, on this day personally
   appeared TERRY L. MUSIKA, known to me (or proved to me
15 under oath or through
16 (description of identity card or other document)) to be
   the person whose name is subscribed to the foregoing
17 instrument and acknowledged to me that they executed
   the same for the purposes and consideration therein
18 expressed.
19   Given under my hand and seal of office this
   _____ day of April 2007.
20
21
   _____
22 NOTARY PUBLIC IN AND FOR
   THE STATE OF _____
23
24
25

13 (Pages 46 to 49)

Page 50

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLUMBIA
 2
      NORTHWEST AUSTIN           )
 3    MUNICIPAL UTILITY DISTRICT )
      NUMBER ONE,                )
 4    401 W. 15th Street         )    CIVIL ACTION NO.
      Suite 850                  )
 5    Austin, Texas 78701        )    1:06-CV-01384
              Plaintiff,         )    (DST,PLF,EGS)
 6    v.                         )
                                 )
 7    ALBERTO GONZALES,          )
      ATTORNEY GENERAL OF THE    )
 8    UNITED STATES,             )
      U.S. Department of Justice )
 9    950 Pennsylvania Avenue NW )
      Washington, D.C. 20530     )
10
11           REPORTER'S CERTIFICATION
           DEPOSITION OF TERRY L. MUSIKA
12              Monday, April 9, 2007
13         I, RANDALL N. FINCH, Certified Shorthand
14    Reporter in and for the State of Texas, hereby certify
15    to the following:
16         That the witness, TERRY L. MUSIKA, was duly
17    sworn by the officer and that the transcript of the
18    oral deposition is a true record of the testimony given
19    by the witness;
20         That the deposition transcript was submitted
21    on April 20, 2007 to the witness or to the attorney for
22    the witness for examination, signature and return to me
23    by _____, 2007.
24         That the amount of time used by each party at
25    the deposition is as follows:
```

Page 51

```
 1         Mr. Gregory S. Coleman - 1 hour 3 minutes
 2         Mr. Carlos Becerra - 3 minutes
 3         That pursuant to information given to the
 4    deposition officer at the time said testimony was
 5    taken, the following includes counsel for all parties
 6    of record:
 7         Mr. Gregory S. Coleman, attorney for Plaintiff
 8         Mr. Carlos Becerra, attorney for MALDEF
 9         Mr. Chris Herren and Ms. Christy A. McCormick,
10    attorneys for U.S. Department of Justice
11         Mr. Benjamin Blustein, attorney for Lawyers'
12    Committee for Civil Rights Under Law
13         Mr. Daniel A. Zibel, attorney for NAACP
14         Mr. Max Renea Hicks, attorney for Travis Cty.
15         I further certify that I am neither counsel
16    for, related to, nor employed by any of the parties or
17    attorneys in the action in which this proceeding was
18    taken, and further that I am not financially or
19    otherwise interested in the outcome of the action.
20         Certified to by me this 17th day of April, 2007.
21         _____
           RANDALL N. FINCH, Texas CSR #504
22         Expiration date: 12/31/2008
           Fredericks-Carroll Reporting
23         Firm Registration No. 82
           7800 Shoal Creek Blvd., Suite 200-W
24         Austin, Texas 78757 (512) 477-9911
25
```