

# AcuScribe
### COURT REPORTERS
When accuracy means everything.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL )
UTILITY DISTRICT NUMBER ONE )
                            )
                            )
VS.                         )      CIVIL ACTION NO.:
                            )      1:06-CV-01384
                            )      (PLF, DST, EGS)
ALBERTO GONZALES, IN HIS    )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORAL DEPOSITION OF

**KERRIE JO QUALTROUGH**

### FEBRUARY 26, 2007

### VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### CONDENSED TRANSCRIPT AND KEYWORD INDEX

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701

512-499-0277
800-497-0277
512-499-0298 (fax)
www.acuscribe.com

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COLUMBIA

NORTHWEST AUSTIN MUNICIPAL §
UTILITY DISTRICT NUMBER ONE §
§
VS.                              §    Civil Action No.
                                 §    1:06-CV-01384
ALBERTO GONZALES, in his         §    (PLF, DST, EGS)
official capacity as             §
Attorney General of the          §
United States                    §

*******************************

ORAL DEPOSITION OF
KERRIE JO QUALTROUGH
FEBRUARY 26, 2007
VOLUME 1

*******************************

ORAL DEPOSITION OF KERRIE JO QUALTROUGH, produced at the instance of the Defendant-Intervenors, Texas State Conference of NAACP Branches and Austin Branch of the NAACP, in the above-styled and numbered cause on the 26th day of February, 2007, at 12:24 P.M., before Micheal A. Johnson, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the Texas Capital Bank Conference Room, 114 West 7th Street, Austin, Texas, pursuant to Notice of Oral Deposition, and in accordance with the Federal Rules of Civil Procedure.

**2**

(1)         A P P E A R A N C E S
(2)   ON BEHALF OF THE PLAINTIFF
      NORTHWEST AUSTIN MUNICIPAL
(3)   UTILITY DISTRICT NUMBER ONE:
(4)      Gregory S. Coleman
         Christian J. Ward
(5)      WEIL, GOTSHAL & MANGES, L.L.P.
         8911 Capital of Texas Highway
(6)      Building One, Suite 1350
         Austin, Texas 78759
(7)
(8)   ON BEHALF OF THE DEFENDANT
      ALBERTO GONZALES, IN HIS
(9)   OFFICIAL CAPACITY AS ATTORNEY
      GENERAL OF THE UNITED STATES:
(10)
(11)     Chris Herren
         U.S. DEPARTMENT OF JUSTICE
(12)     CIVIL RIGHTS DIVISION
         950 Pennsylvania Avenue, NW
(13)     Room 7254 NWB
         Washington, D.C. 20530
(14)
(15)  ON BEHALF OF THE INTERVENOR
      TRAVIS COUNTY:
(16)     Max Renea Hicks
         ATTORNEY AT LAW
(17)     101 West 6th Street, Suite 504
         Austin, Texas 78701
(18)
(19)  ON BEHALF OF THE INTERVENORS
      LISA AND GABRIEL DIAZ:
(20)
(21)     Nina Perales
         Diego M. Bernal
(22)     MALDEF
         110 Broadway, Suite 300
(23)     San Antonio, Texas 78205
(24)
(25)

**3**

(1)      A P P E A R A N C E S (Cont.)
(2)   ON BEHALF OF THE DEFENDANT-INTERVENORS
      RODNEY AND NICOLE LOUIS:
(3)
         Sam Spital
(4)      HOLLAND & KNIGHT, L.L.P.
         195 Broadway, 24th Floor
(5)      New York, New York 10007-3189
(6)
      ON BEHALF OF THE DEFENDANT-INTERVENORS
(7)   TEXAS STATE CONFERENCE OF NAACP BRANCHES
      AND AUSTIN BRANCH OF THE NAACP:
(8)
         Daniel A. Zibel
(9)      WILMER CUTLER PICKERING HALE & DORR, L.L.P.
         1875 Pennsylvania Avenue, NW
(10)     Washington, D.C. 20006
         Benjamin Blustein
(11)     LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
         1401 New York Avenue, NW, Suite 400
(12)     Washington, D.C. 20005-2124
(13)
(14)  ON BEHALF OF THE DEFENDANT-INTERVENORS
      ANGIE GARCIA, JOVITA CASAREZ AND OFELIA ZAPATA:
(15)
         George Korbel
(16)     TEXAS RIOGRANDE LEGAL AID, INC.
         1111 North Main Street
(17)     San Antonio, Texas 78212
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**4**

(1)               INDEX
(2)   KERRIE JO QUALTROUGH DEPOSITION      PAGE
(3)   EXAMINATION
      BY MR. ZIBEL ---------------------- 04
(4)   BY MS. PERALES -------------------- 68
      BY MR. HICKS ---------------------- 84
(5)   BY MR. KORBEL --------------------- 86
      BY MR. SPITAL --------------------- 87
(6)
(7)   Appearances ----------------------- 02
(8)   Corrections and Signature --------- 90
(9)   Reporter's Certificate ------------ 91
(10)
(11)
(12)          * * * * * * * *
(13)
(14)
(15)         INDEX OF EXHIBITS
(16)  KERRIE JO QUALTROUGH DEPOSITION
(17)  EXHIBIT      DESCRIPTION OF EXHIBIT    PAGE
(18)  NO. 21   2/19/04 Northwest Austin MUD No. 1 Board
               of Directors Minutes ------- 60
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**5**

(1)            P R O C E E D I N G S
(2)            KERRIE JO QUALTROUGH
(3)   having been first duly sworn, testified as follows:
(4)            EXAMINATION
(5)   BY MR. ZIBEL:
(6)      Q. Good afternoon, Ms. Qualtrough.
(7)      A. Hi.
(8)      Q. Could you please state your name and spell it
(9)   for the court reporter.
(10)     A. My name is Kerrie Jo Qualtrough. It's
(11)  K-e-r-r-i-e, capital J-o, capital Q-u-a-l-t-r-o-u-g-h.
(12)     Q. My name is Dan Zibel. I am an attorney
(13)  representing the Texas State Conference of the NAACP and
(14)  the Austin Branch of the NAACP. With me are my
(15)  colleagues representing various other defendants in the
(16)  case. They may also take the opportunity to ask you
(17)  some questions today.
(18)         Can you tell me, have you ever been deposed
(19)  before?
(20)     A. No, I have not.
(21)     Q. Have you ever testified at trial?
(22)     A. No.
(23)     Q. Have you ever taken a deposition before?
(24)     A. Yes.
(25)     Q. In what types of cases? Or sorry, how many

**6**

(1)   times do you --
(2)      A. I can't tell you how many times. I've
(3)   participated in quite a few through primarily contested
(4)   case hearings before the TCEQ, Texas Commission on
(5)   Environmental Quality.
(6)      Q. I will probably get back to those in a little
(7)   bit. But have you been the lead attorney taking these
(8)   depositions or --
(9)      A. Typically, no.
(10)     Q. Well, I'd like to just outline some preliminary
(11)  instructions. I know you've probably heard some of
(12)  these before, but just for the sake of completeness, I
(13)  just want to go through some of them.
(14)         Please let me know you don't hear or understand
(15)  a question. If you answer, I will assume that you've
(16)  heard and understood the question. Is that okay?
(17)     A. That's okay.
(18)     Q. And please let me finish my question before
(19)  giving your answer. I'll wait until you're finished
(20)  answering until I ask another question.
(21)     A. Okay.
(22)     Q. Also, tell me if you don't know or can't
(23)  remember the information sought by the question. If you
(24)  do answer, I will assume that you know and remember the
(25)  information sought. Is that okay?

ACUSCRIBE COURT REPORTERS
(800) 497-0277

**7**

(1)  A. Okay.
(2)  Q. And be sure to answer in a way that the
(3)  reporter can record in the transcript, so you'll need to
(4)  answer verbally, no nodding, shaking your head --
(5)  A. Okay.
(6)  Q. -- uh-huhs, things like that.
(7)  And if you need to take a break for any reason,
(8)  please just let us know.
(9)  And do you understand that you may request a
(10) chance to review the transcript that will be generated
(11) by the court reporter for the testimony today?
(12) A. Okay.
(13) Q. And also you should take the time to let me
(14) know if you realize that an answer you previously gave
(15) is inaccurate or incomplete. Just say that you want to
(16) correct or supplement a previous answer.
(17) Is there any reason why you cannot give full
(18) and complete testimony today?
(19) A. Other than I was an attorney representing the
(20) MUD at the time, so there may be an attorney-client
(21) privilege issue.
(22) Q. Okay. Now, are you represented by Mr. Coleman
(23) here today?
(24) A. I'm not represented. I know he's representing
(25) the MUD.

**8**

(1)  Q. So have you had any conversations here --
(2)  conversations with him to prepare for this deposition?
(3)  A. Yes, I have.
(4)  Q. And when were those conversations?
(5)  A. Today.
(6)  Q. Have you had other conversations with him?
(7)  A. He called me to tell me the MUD -- the depo
(8)  would be today, but we didn't get into the specifics.
(9)  Q. Can you tell me briefly what you discussed with
(10) Mr. Coleman about this case?
(11) A. We talked about the length of time me taking
(12) off to come to the deposition, that it had to do with
(13) the 2004 election for the MUD.
(14) Q. And did you have any other substantive
(15) conversations with Mr. Coleman other than what you just
(16) mentioned?
(17) A. Today, no.
(18) Q. Did you review any documents in preparation for
(19) this deposition today?
(20) A. No, I have not.
(21) Q. And were you provided with any documents at all
(22) to refresh your recollection?
(23) A. No.
(24) Q. So besides your conversation with Mr. Coleman,
(25) did you do anything else to prepare to testify today?

**9**

(1)  A. No.
(2)  Q. Tell me, what is your understanding of what
(3)  this case is that we're all here to talk about today?
(4)  MR. COLEMAN: Objection, calls for a legal
(5)  conclusion.
(6)  THE WITNESS: Do I answer --
(7)  MR. COLEMAN: You can answer that if you
(8)  can.
(9)  A. I don't know the specifics or the legal theory
(10) that the case was filed under. I haven't read the
(11) pleadings. I don't know what's being challenged.
(12) Q. (BY MR. ZIBEL) Okay. Can you tell me just
(13) generally what you know it's about -- know it to be
(14) about?
(15) A. The -- the MUD -- in 2004 the MUD moved its
(16) polling place from a garage to Travis County. And I
(17) think that's something that was filed to -- I believe
(18) it's for preclearance, something to do with that filing,
(19) I think, is being challenged.
(20) Q. Just a few background questions for you.
(21) Where do you live?
(22) A. Austin, Texas.
(23) Q. The street address?
(24) THE WITNESS: Do I have to give my street
(25) address?

**10**

(1)  A. I guess it's available. 11110 Santa Cruz.
(2)  Q. (BY MR. ZIBEL) And is that within the bounds
(3)  of the Northwest Austin Municipal Utility District
(4)  No. 1?
(5)  A. No, it is not.
(6)  Q. And just to be clear, I might refer to that
(7)  district as "the district" or "the MUD," just so you
(8)  know what we're talking about.
(9)  A. And when I refer to "the MUD," I was referring
(10) to that.
(11) Q. Okay. How long have you lived in Austin?
(12) A. Since 1992. And before that I lived here from
(13) '79 to '87.
(14) Q. Where did you grow up?
(15) A. Houston.
(16) Q. And when did you graduate from high school?
(17) A. 1979.
(18) Q. And where did you attend college?
(19) A. University of Texas at Austin.
(20) Q. And what year did you graduate?
(21) A. 1983.
(22) Q. And what was your major?
(23) A. Advertising.
(24) Q. And you are a lawyer, so where did -- I assume
(25) you attended law school. Where did you attend law

**11**

(1)  school?
(2)  A. South Texas College of Law.
(3)  Q. And when did you graduate?
(4)  A. 1990.
(5)  Q. Do you have any additional education or
(6)  degrees?
(7)  A. No, I do not.
(8)  Q. And where do you currently work?
(9)  A. I work for the Texas Commission on
(10) Environmental Quality.
(11) Q. And what is your job title there?
(12) A. Senior attorney for water quality.
(13) Q. How long have you been working there?
(14) A. I worked there from 1992 to 1996 and then I
(15) returned January 2005.
(16) Q. And in your role at the Texas -- is it the
(17) Texas Council on Environmental --
(18) A. Commission.
(19) Q. Commission on Environmental Quality, excuse me.
(20) Do you often do work with municipal utility districts?
(21) A. It -- well, my job primarily is water quality
(22) permits, wastewater permits, and sometimes MUDs will
(23) be the applicant for such a permit. So I will deal with
(24) them in that context, but not in the context of
(25) regulating municipal utility districts or any other type

**12**

(1)  of district. That's a utility matter, and I don't do
(2)  utilities.
(3)  Q. So just so I understand, most of what you do
(4)  relates to the -- the actual quality of the water?
(5)  A. Right, wastewater discharge permits.
(6)  Q. Are there certain regulations that the MUDs in
(7)  general have to comply with regarding water quality?
(8)  A. Yes, but MUDs -- it's any other applicant. It
(9)  may be a MUD, it may be a city, it may be an industry.
(10) They'll all have to comply with the same regulations
(11) for -- regarding water quality.
(12) Q. Now, prior to your current job with the Texas
(13) Commission on Environmental Quality, where did you work?
(14) A. Where?
(15) Q. Yes.
(16) A. Here in Austin.
(17) Q. For what organization or company?
(18) A. I'm sorry, I misunderstood your question.
(19) Q. For what organization or company? Who was your
(20) employer?
(21) A. When?
(22) Q. Before you began with the Texas Commission on
(23) Environmental Quality.
(24) A. Okay.
(25) Q. The most -- the first -- the most recent time.

(Pages 7 to 12)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

13

(1)  A. Potts & Reilly.
(2)  Q. And that's the law firm?
(3)  A. Yes, it is.
(4)  Q. And what was your title when you were there?
(5)  A. Associate, I believe.
(6)  Q. And how long did you work there for?
(7)  A. I worked there from '96 to 2004, December 2004.
(8)  Q. And why did you leave Potts & Reilly?
(9)  A. There was another opportunity at the Commission
(10) on Environmental Quality.
(11) Q. And before working at Potts & Reilly, where did
(12) you work?
(13) A. At that time it was the same agency, the
(14) Texas -- it's the Texas Commission on Environmental
(15) Quality, although then it had a different name. It was
(16) the Texas Natural Resource Conservation Commission.
(17) Q. Okay. And how long were you there the first --
(18) A. '92 to '96. When I started it was the Water
(19) Commission, so it's the same agency. It's had three
(20) names.
(21) Q. And what was your capacity working at the Texas
(22) Natural Resource Conservation Commission?
(23) A. I was a staff attorney. I did primarily water
(24) quality. I did some hazardous and industrial, solid
(25) waste.

14

(1)  Q. So is that the --
(2)  A. And water right -- I'm sorry -- water rights.
(3)  Q. So is that a -- would you refer to that as a
(4)  similar role as what you do now?
(5)  A. Similar. The subject matter is the same. When
(6)  I worked there from '92 to '96, I was a staff attorney
(7)  and now I'm management, a senior water quality attorney.
(8)  But all I do is focus on water quality issues.
(9)  Q. Now, during the years of 1992 to 1996, did you
(10) work in a way that you came into contact with municipal
(11) utility districts?
(12) A. Well, no. Well, let me -- let me explain. If
(13) they were an applicant, they had a water right or if
(14) they were coming in for a permit, water quality
(15) discharge permit, yes, I would. But my agency also
(16) regulates MUDs. There are certain type -- they create
(17) them and there's some regulation bonding, I think. And
(18) I didn't do that at the Commission. But if they were
(19) coming in for a wastewater permit, then I would have
(20) some involvement with the MUD.
(21) Q. Do you recall during that time if you had any
(22) contact or dealings with the Northwest Austin Municipal
(23) Utility District No. 1?
(24) A. I -- I do not believe so. There's another --
(25) there's another MUD out there and it may be Northwest

15

(1)  Travis County MUD 1 or 2 and they had a wastewater
(2)  issue. But I don't think it was MUD number -- Austin
(3)  MUD No. 1. I don't believe so.
(4)  Q. And prior to 1992, where did you work?
(5)  A. I worked for Harris County.
(6)  Q. And in what capacity?
(7)  A. Assistant county attorney.
(8)  Q. For how long were you there?
(9)  A. I was there a year.
(10) Q. And before that?
(11) A. I was a briefing attorney for Judge Bass on the
(12) First Court of Appeals in Houston.
(13) Q. And how long did you work for -- for Judge
(14) Bass?
(15) A. That was a one year.
(16) Q. A one year. And before that, does that take
(17) you back to --
(18) A. It should take me back to law school.
(19) Q. Doing some math here.
(20) Okay. So between your experiences at Potts &
(21) Reilly and your experience at the Texas Commission on
(22) Environmental Quality, is it fair to say that you have a
(23) lot of experience with municipal utility districts in
(24) Texas?
(25) A. It depends what you mean by a lot. I've had --

16

(1)  I've had some, but I know others who've had a lot more,
(2)  so that's tough to quantify.
(3)  Q. Okay. Can you tell me why, in your mind, is a
(4)  municipal utility district created?
(5)  A. It's my understanding that a -- a MUD is
(6)  typically created by a developer or another entity to --
(7)  to fund infrastructure for subdivisions where there's
(8)  typically no city or no other provider.
(9)  Q. Are MUDs ever dissolved?
(10) A. I -- yes, I believe so.
(11) Q. And do you have an understanding of what the
(12) circumstances would be where a MUD would be dissolved?
(13) A. I think if it's inactive or something like
(14) that.
(15) Q. Now, during part of your career, you
(16) represented the -- the district; is that correct?
(17) A. That's correct.
(18) Q. And how did you come to do legal work for the
(19) district?
(20) A. My boss, Frank Reilly, I believe, was -- that
(21) was his client. And as an associate in the firm, he
(22) would assign work for me to do.
(23) Q. And during your time at Potts & Reilly, did you
(24) work with any other municipal utility districts?
(25) A. Yes. Yes.

17

(1)  Q. Do you recall which ones?
(2)  A. Emerald Bay Municipal Utility District.
(3)  Q. And what type of work did do you for the
(4)  Emerald Bay Municipal Utility District?
(5)  A. Emerald Bay at that time provided sewer service
(6)  to its district and Southern Utilities had filed an
(7)  application to terminate service -- water service to the
(8)  district in some other areas outside the district. And
(9)  the district filed an application at TCEQ to get the
(10) water CCN, certificate of convenience and necessity, in
(11) order to serve Emerald Bay and two other subdivisions
(12) outside of that district. So we were trying to get
(13) water authority.
(14) Q. Okay. And is that the only -- the extent of
(15) the work you did for the Emerald Bay Municipal Utility
(16) District?
(17) A. Yes. It was all connected to the CCN.
(18) Q. Do you recall ever doing any work relating to
(19) voting for the Emerald Bay --
(20) A. No.
(21) Q. -- Municipal Utility District?
(22) A. Excuse me. No.
(23) Q. Now, at Potts & Reilly -- while you working at
(24) Potts & Reilly, how did you typically account for your
(25) time there?

18

(1)  A. How did I keep track of it?
(2)  Q. Yeah.
(3)  A. It was a computer program called Time Matters,
(4)  I think was the name. And you could pull up clients and
(5)  it would run a clock. You could click on -- somehow get
(6)  a clock started while you work. And if you changed
(7)  clients, you could stop the clock and go somewhere else,
(8)  do things like that.
(9)  Q. I know it all too well.
(10) So clients were typically billed by the amount
(11) of time that you spent working for clients?
(12) A. There may have been some clients that were like
(13) a lump sum. Instead of by the hour, they pay us to do a
(14) particular task for a lump sum. But I don't -- I can't
(15) recall. I can't give you an example of that.
(16) Q. Do you recall whether the billing arrangement
(17) for the municipal utility district was one of these lump
(18) sum arrangements?
(19) A. Not -- not my time. I kept track of my time by
(20) whatever increment was done.
(21) Q. Do you recall what your hourly billing rate was
(22) when you first started Potts & Reilly?
(23) A. I don't recall exactly. Because it was
(24) different for different clients, I think. I can't
(25) recall.

ACUSCRIBE COURT REPORTERS
(800) 497-0277

**19**

(1) Q. Do you know if it went up year by year during
(2) the time you were there?
(3) A. At some point it went up.
(4) Q. Do you recall when that was?
(5) A. No, I don't.
(6) Q. Do you know when typically during the year
(7) Potts & Reilly would have changed their billing fee
(8) schedule?
(9) A. It didn't happen every year. I mean, there
(10) wasn't a scheduled changing, you know, like every
(11) January changed. It was not -- it wasn't like that.
(12) Q. It wasn't something like that?
(13) A. No, not that I recall.
(14) Q. I'm going to show you what's been designated as
(15) Exhibit 16 on this case, which is, for the record, Bates
(16) No. P_006551 and 6552.
(17)        Do you recognize this document?
(18) A. I mean, it looks like a -- it doesn't --
(19)        MR. COLEMAN: Are you asking if she's seen
(20) this document before or if she recognizes like the
(21) general format of what it is?
(22) A. I recognize the general format, but I can't
(23) tell you if this is the exact. I can't remember.
(24) Q. (BY MR. ZIBEL) Okay. So that -- you would
(25) describe that as a fair representation of a Potts &

**20**

(1) Reilly bill?
(2) A. Yes.
(3) Q. And if we look at that bill, is that a bill for
(4) the work done for the Northwest Austin Municipal Utility
(5) District No. 1?
(6) A. It appears to be. That's the addressee.
(7) Q. Hold on one second.
(8)        If we look at the entry on -- the last entry on
(9) the first page, on the far left-hand corner, it has the
(10) letters KJQ.
(11) A. Uh-huh.
(12) Q. Fair to assume that's you?
(13) A. That's correct.
(14) Q. And then under the middle column, it says,
(15) "Office conference with Frank Reilly regarding
(16) conveyance of Trailhead Park and auditors."
(17)        And would that be a basic description of the
(18) amount of work that you did -- the type of work that you
(19) did for that entry?
(20) A. I -- I mean, that's what I discussed with
(21) Frank.
(22) Q. Okay. And then if we keep moving to the right,
(23) it indicates that you spent .5 hours at 30 minutes,
(24) approximately, on that task; is that right?
(25) A. Yes.

**21**

(1) Q. And then on the far right-hand side, it's a fee
(2) total which is $145 --
(3) A. Okay.
(4) Q. -- is that right?
(5)        So would it be fair to suggest that for that
(6) amount of work, your billing rate was $290 an hour?
(7) A. If that's what it comes out to be. I know -- I
(8) would assume that's how it calculates out.
(9) Q. Does that sound approximately with what your
(10) recollection is?
(11) A. Yeah. It's -- I mean, it was different -- my
(12) rate was different. It was 150 and then it went to 250
(13) and then I guess 290. But, I mean, it's -- let me see.
(14) Is it back here? I assume that's right.
(15) Q. Now, this is dated September 30th, 2004. Do
(16) you have any understanding of whether or not that rate
(17) would have been consistent with your billing rate in
(18) approximately March of 2004?
(19) A. I don't recall.
(20) Q. Do you recall whether this rate was consistent
(21) across clients or did different clients pay different
(22) rates?
(23) A. I don't recall. I just -- I can't remember.
(24) Q. Do you recall any instances where your hourly
(25) time was not billed through a client or written off?

**22**

(1) A. Yes, I know it happened.
(2) Q. Do you know whether or not there was any time
(3) written off that the MUD was supposed to pay for?
(4) A. I -- I don't recall.
(5) Q. Are you aware of whether or not the district
(6) paid any form of retainer to the firm?
(7) A. I don't know. That would have been worked out
(8) by Frank, I think.
(9) Q. Do you know how often bills were issued to the
(10) district?
(11) A. I believe monthly.
(12) Q. Was that a standard practice?
(13) A. Yes.
(14) Q. And did the bills like this one generally
(15) include a detailed description of the work performed?
(16) A. Yes.
(17) Q. Do you recall at all the terms "special
(18) billing" versus "general billing"?
(19) A. No.
(20) Q. During your time working for the district, do
(21) you know approximately how much money Potts & Reilly
(22) billed the district as far as legal work?
(23) A. No.
(24) Q. Let me ask it another way. Do you know what
(25) percentage of your time at Potts & Reilly was spent

**23**

(1) working on work for the district?
(2) A. It depends. When we were preparing for the --
(3) the election, a lot of my time was spent on work for the
(4) district. But it just -- it just varied.
(5) Q. And during the time you spent preparing for the
(6) election, are you referring to the period around the
(7) spring -- March to May of 2004?
(8) A. I believe it predated March because there
(9) was -- it may have gone into 2003, but I can't tell you
(10) for sure. Because there's a lot of deadlines that you
(11) have to meet.
(12)        MR. COLEMAN: Let's be clear about --
(13) you're asking about what election?
(14)        THE WITNESS: I'm assuming it was the 2004.
(15) Q. (BY MR. ZIBEL) Yeah, sorry.
(16) A. May 2004.
(17) Q. Yeah, I'm referring to the May 2004 election.
(18)        MR. COLEMAN: Do you recall whether Potts &
(19) Reilly represented the district for the May 2004
(20) election?
(21)        THE WITNESS: That's what I worked on, as I
(22) recall. And it would have predated March of 2004, my
(23) work on that election.
(24) Q. (BY MR. ZIBEL) We're going to circle back to
(25) that in a minute, but just to finish up some of the

**24**

(1) billing issues --
(2)        MR. ZIBEL: Greg, I guess this is really a
(3) question for you, but we have been through the
(4) production set and, you know, in our first review, we
(5) can't seem to find a lot of these bills. I don't know
(6) if they're in there. I'd ask you if you knew if they
(7) were produced or not?
(8)        MR. COLEMAN: We produced everything in the
(9) district's possession.
(10)        MR. ZIBEL: And that would include a search
(11) of Potts & Reilly's billing?
(12)        MR. COLEMAN: We went -- everything that
(13) was done that was delineated as district files, we went
(14) through and produced everything.
(15)        MR. ZIBEL: I guess -- I guess I'm just
(16) wondering if you know whether or not more bills exist
(17) than what we have?
(18)        MR. COLEMAN: I don't know. Why don't you
(19) ask your questions to the witness and we can talk about
(20) this later.
(21)        MR. ZIBEL: We can talk about this later.
(22) That's fine.
(23) Q. (BY MR. ZIBEL) Ms. Qualtrough, do you know at
(24) Potts & Reilly, was there an individual, in particular,
(25) responsible for billing or handling the bills?

(Pages 19 to 24)

25

(1)  A. Well, I generated -- I made these entries. And
(2)  then at the beginning of the month, they would pass out
(3)  these for us to check, you know, typos, that kind of
(4)  thing. And then I'd make my changes and then they'd
(5)  change them and mail them out.
(6)  Q. And who would pass them out?
(7)  A. I don't know if it was Marti Asher. She was --
(8)  she was a secretary there. It may have been Patti
(9)  Shannon or maybe -- it may have been Steve, who was the
(10) office -- I think he must have been the office manager
(11) at that time. But who physically gave it to me --
(12) Q. Who --
(13) A. Steve Gibbs, I think, was the office manager.
(14) Probably one of those three, maybe Debbie. She was a
(15) secretary there as well. I don't know because I
(16) can't recall who physically gave them to me.
(17) Q. Do you recall Debbie's last name?
(18) A. Rathcke.
(19) Q. And you said that you would review the bills
(20) and check it for things like typos and then return it?
(21) A. Uh-huh.
(22) Q. And would you return it to the same person who
(23) typically gave it to you?
(24) A. I may have put it in my outbox.
(25) Q. And who was responsible ultimately for sending

26

(1)  the bills to the clients?
(2)  A. Stuff the envelope and mailed it? Is that what
(3)  you're talking about?
(4)  Q. Yeah.
(5)  A. I would say was one of the office staff.
(6)  Q. Would the partner in charge of the matter
(7)  review the bills, to your knowledge?
(8)  A. I don't recall. Probably. When -- probably.
(9)  I don't recall.
(10) Q. And do you know if there was any kind of system
(11) for filing bills, if any of the bills were kept at any
(12) one central spot in the firm?
(13) A. In their -- in the client's file. I don't -- I
(14) don't know.
(15) Q. Now, prior to doing work for the MUD, did you
(16) have any experience with Section 5 of the Voting Rights
(17) Act?
(18) A. No.
(19) Q. Do you recall when you first learned about
(20) Section 5 of the Voting Rights Act?
(21) A. No. It would be sometime in connection with
(22) when we started preparing for the election, but I can't
(23) give you the date.
(24) Q. And by the election, do you mean the
(25) May 2004 --

27

(1)  A. Yes.
(2)  Q. -- election?
(3)  Do you recall the circumstances more broadly
(4)  about how you learned about Section 5?
(5)  MR. COLEMAN: I will instruct the witness
(6)  that if you can answer the question without disclosing
(7)  attorney-client privilege, you may do so, but
(8)  communications with the district or with other
(9)  attorneys -- specific communications with the district
(10) or with attorneys in Potts & Reilly made with the intent
(11) of obtaining legal services would be privileged.
(12) THE WITNESS: Do I talk about my legal
(13) research?
(14) MR. COLEMAN: Say that you did legal
(15) research without disclosing content.
(16) A. Okay. I did legal research.
(17) Q. (BY MR. ZIBEL) Do you recall if it was
(18) Mr. Reilly who first told you about the existence of
(19) Section 5?
(20) MR. COLEMAN: Same instruction.
(21) A. I -- I don't recall.
(22) Q. (BY MR. ZIBEL) Other than the work that you
(23) did for the MUD, have you done any other work related to
(24) Section 5 of the Voting Rights Act for any other
(25) entities?

28

(1)  A. No, I have not.
(2)  Q. Have you done any work for any clients relating
(3)  to Section 2 of the Voting Rights Act?
(4)  A. Other than the MUD?
(5)  Q. Other than the MUD.
(6)  A. No.
(7)  Q. Have you done work for the MUD with relation to
(8)  Section 2 of the Voting Rights Act?
(9)  A. I don't know. At this time, I can't tell you
(10) what is required by Section 2 of the Voting Rights Act.
(11) Q. Do you have an understanding of what Section 2
(12) of the Voting Rights Act is?
(13) A. No.
(14) Q. Have you done any work for any clients which in
(15) any way relate to the right to vote under any other
(16) statutory or constitutional provisions other than the
(17) MUD?
(18) A. Other than the MUD, no.
(19) Q. Now, you did legal work for the district in
(20) connection with the 2004 submissions to the Justice
(21) Department under Section 5 of the Voting Rights Act; is
(22) that right?
(23) A. Yes.
(24) Q. Are you aware of any memos or memoranda that
(25) were written by individuals at Potts & Reilly to the

29

(1)  board of directors concerning election costs? And by
(2)  board of directors, I mean board of directors of the
(3)  MUD.
(4)  A. Regarding election costs?
(5)  Q. Uh-huh.
(6)  MR. COLEMAN: Answer the question about the
(7)  existence of memos without disclosing content.
(8)  A. I don't recall.
(9)  MR. ZIBEL: Just go off for one moment.
(10) (Recess Taken From 12:56 p.m. To 12:57 p.m.)
(11) Q. (BY MR. ZIBEL) Going to show you what has been
(12) previously marked as Exhibit 17, which is, just for the
(13) record, Bates No. P_004815.
(14) Do you recognize this document?
(15) A. I don't recognize it, I assume I sent it, but
(16) it...
(17) Q. But you don't specifically recall sending this
(18) e-mail?
(19) A. No. I don't recall this situation.
(20) Q. Do you have any reason to believe that you did
(21) not send this e-mail?
(22) A. No. It looks authentic, I guess. I mean, that
(23) is what my -- I don't know if it's a signature.
(24) Whenever any e-mail I think went out had this name on
(25) it. So it looks authentic.

30

(1)  Q. Now, in the second line of the e-mail, we start
(2)  reading from the top, the text of the message says,
(3)  "When you get a chance, could you please look through
(4)  the e-mail files or correspondence files for the
(5)  NWAMUD for an e-mail or memo from Frank to the Board
(6)  regarding election costs."
(7)  A. Okay.
(8)  Q. Who is the Frank reference?
(9)  A. Frank Reilly.
(10) Q. And do you recall if you ever saw a copy of
(11) that memorandum?
(12) MR. COLEMAN: Objection, assumes.
(13) Q. (BY MR. ZIBEL) Do you know if that memorandum
(14) exists or existed at the time?
(15) A. It sounds like I know there's one out there.
(16) But do I recall seeing -- did they find it and give it
(17) to me? I don't recall. Wait a minute. This is after
(18) the election? What's the date? Yeah, this is after the
(19) election.
(20) Q. So do you believe you ever saw a copy of such a
(21) memorandum?
(22) A. I may have. I don't recall.
(23) Q. Do you know whether that memorandum was ever
(24) provided to the district?
(25) A. I mean, the e-mail assumes there's one out

(Pages 25 to 30)



31

(1) there, I'm looking for it. So -- but I don't know.
(2) MR. ZIBEL: Greg, again, this is something
(3) we can probably talk about offline, but this e-mail or
(4) memo is not in -- to our knowledge in the production,
(5) nor is it on the privilege log. So just request that it
(6) either be produced or be withheld as privileged.
(7) Q. (BY MR. ZIBEL) Ms. Qualtrough, do you still do
(8) any legal work for the district?
(9) A. No, I do not.
(10) Q. And when did you stop?
(11) A. I left Potts & Reilly December of '04, so I
(12) would have stopped at that point.
(13) Q. So since that time, you've done no additional
(14) legal work for the district?
(15) A. That's correct.
(16) Q. During your course of work for the district,
(17) did you ever attend any board meetings of the district?
(18) A. Yes, I did.
(19) Q. Do you recall how many you attended?
(20) A. Exact numbers? No, I do not.
(21) Q. Do you recall approximately?
(22) A. No, I can't tell you approximately because I
(23) attended a few meetings for Frank and I was
(24) attending all of them in his place and I can't give you
(25) the dates when that occurred, but it was monthly.

32

(1) Q. Over a period of how many months would you...
(2) A. I'd be guessing. I mean, because -- because
(3) I'm not sure when I started doing it on a monthly basis
(4) instead of Frank, so...
(5) I mean, it would be assuming -- I mean, I'd
(6) just be guessing if I tried to give you a number. But
(7) at some point, I was there on a monthly basis.
(8) Q. Would you say more or less than ten times,
(9) approximately ten times?
(10) A. It's approximation.
(11) Q. Okay. And during what period of time,
(12) approximately, were you attending board meetings?
(13) A. See, that's it. I can't remember when I
(14) started. I believe I was going there once a month up
(15) until I left Potts & Reilly. So I can't tell you when I
(16) started going there on a monthly basis. My guess is
(17) November, December of '05, if they had a meeting in --
(18) not '05 -- November or December of '04 was probably the
(19) last time I attended a monthly meeting. I don't know
(20) when I started doing that on a monthly basis.
(21) Q. Well, you said earlier you started at Potts &
(22) Reilly in 1996; is that correct?
(23) A. That's correct.
(24) Q. And do you recall roughly when you might have
(25) started attending meetings that was --

33

(1) A. Well, I'm not sure when they became a client of
(2) Potts & Reilly. I don't think they were a client for
(3) the whole time I was there.
(4) Q. Did anyone else -- did anyone else from Potts &
(5) Reilly ever attend meetings with you, board meetings?
(6) A. With me? Not that I recall. I believe I was
(7) the only person that attended.
(8) Q. Do you recall whether anyone else from Potts &
(9) Reilly ever attended any other board meetings that you
(10) were not at just by being referred?
(11) A. I believe so. Frank attended some. Marti
(12) Asher may have attended some.
(13) Q. Anyone else?
(14) A. Not that I can recall. Maybe Patti, but I -- I
(15) can't tell you if she ever did. Patti Shannon.
(16) Q. Patti.
(17) A. But I don't think she did. I don't think Patti
(18) ever went.
(19) Q. Do you know whether or not there are any state
(20) regulations that govern the way that the MUD governs
(21) itself?
(22) A. Governs itself?
(23) Q. Uh-huh.
(24) A. Yes.
(25) Q. Can you describe to me what those regulations

34

(1) are?
(2) A. Well, there are several -- I mean, there's
(3) state election laws, there's state statutes that
(4) would -- that dictate certain aspects of MUDs, the TCEQ
(5) has regulations regarding MUDs. I think the AG may have
(6) some authority over bonds and those kinds of things.
(7) Q. Can you describe for me some of the
(8) regulation -- the types of regulations that the TCEQ has
(9) that relate to MUDs?
(10) A. TCEQ issues certificates of convenience and
(11) necessity to MUDs. There's also some appeals, rate
(12) appeals to MUD -- of MUD rates that the TCEQ determines.
(13) TCEQ has dissolved and created MUDs. Any wastewater
(14) issues will be -- would apply to a MUD. Drinking water
(15) rules will apply to a MUD that provides potable source
(16) of water. There's quite -- quite a few.
(17) Q. You mentioned a certificate of convenience and
(18) necessity?
(19) A. That's correct.
(20) Q. Quickly describe what that is.
(21) A. It's -- through utility regulations they
(22) essentially allow a monopoly in certain situations and
(23) that certificate of convenience and necessity is issued
(24) by the State to a particular entity. It could be a MUD,
(25) some other type of district, an investor-owned utility,

35

(1) and that gives that entity the right to provide retail
(2) water or sewer service within the area encompassed by
(3) the CCN.
(4) Q. Do you recall whether this particular MUD had
(5) any written policies or procedures it had to follow,
(6) internal -- internal governments issues?
(7) A. I don't recall.
(8) Q. Do you recall how decisions of the board were
(9) made?
(10) A. By vote.
(11) Q. Is that right?
(12) A. (Nods Head.)
(13) Q. Was it a majority vote; do you recall? Or was
(14) there any form of unanimity required?
(15) A. Not that I recall. Can I qualify something?
(16) But they would probably need some bylaws or --
(17) If you're asking for those types of procedures, they
(18) would probably be required to have some sort of bylaws,
(19) if that's what you're referring to procedures.
(20) Q. And when you say "required," required by the
(21) state law?
(22) A. I believe so.
(23) Q. Do you remember ever seeing any -- copy of any
(24) bylaws?
(25) A. For this district? I may have.

36

(1) Q. Do you recall where the board meetings were
(2) held?
(3) A. The ones I attended were at a church. Peace --
(4) was it Peace Lutheran Church? It's out on 620.
(5) Q. Do you remember if they were ever held anywhere
(6) else?
(7) A. The official board meetings? Not that I
(8) recall.
(9) Q. Do you recall unofficial board meetings?
(10) A. We had to -- we put on the notice to comply
(11) with the Texas Open Meetings Act that some of them may
(12) go to Johnny Carino's for drinks afterwards. I don't
(13) recall if they ever did that, but we did have it on the
(14) notice.
(15) Q. Was there ever any discussion about moving
(16) where board meetings were held?
(17) A. Moving it?
(18) Q. Yes, to a different location.
(19) A. Not that I recall.
(20) Q. And at what time of day were the board meetings
(21) held?
(22) A. In the evenings, certain times. I think it was
(23) Thursday -- certain Thursday night, maybe. Third
(24) Thursday, something like that.
(25) Q. Do you recall how notice was given to MUD

(Pages 31 to 36)

37

residents about the agenda for a meeting?
**A. We had to post notice out in the district in two places, I believe. Again, that's under the Open Meetings Act would have that requirement.**
Q. Do you recall where the notice was posted?
**A. I believe there were three bulletin boards where the notice was posted.**
Q. Do you remember where they were?
**A. Two -- two -- they were on two roads going into the district and then a notice at the -- the commons area, the clubhouse pool is where -- is what I recall.**
Q. In your experience at these meetings, how many nonboard members would attend?
**A. Not many. It would depend upon the topic. It -- there wasn't many.**
Q. Do you recall any discussion about attempting to increase the attendance at board meetings?
**A. I can't -- let me think. There was one issue -- oh, we had some -- some kids from the district and their parents were there for a meeting. I don't -- I don't know why. I can't remember if it was a specific topic where they were there just to attend the meeting. And there was discussion with them about coming to more and, you know, that these are open for anybody to come. I remember that. They may have been Boy Scouts or**

38

**something, but they were trying -- they were talking about -- you know, encouraging people to come.**
Q. Do you remember if anyone proposed any affirmative steps that the board could take to encourage greater attendance at the meetings?
**A. Specific steps?**
Q. Yeah.
**A. I can't recall. I know it was -- it seems to me there was an issue with the president. I know he was trying to encourage more people. Again, he was talking to these people that came trying to increase the public -- or the district participation in the meetings and encourage people to come. But I don't recall specific steps.**
Q. When you say "these people," do you mean this group of kids?
**A. Yeah. And there was another time where some people showed up on a specific issue and I think -- I think he had encouraged them as well. He had talked about, you know, thanking them for coming, we're glad you're here, that kind of thing.**
Q. Do you recall what that issue was?
**A. No, I don't.**
Q. Were board meetings ever cancelled?
**A. Not that I recall.**

39

Q. Do you recall at any board meeting where you attended any African-American residents of the district attending?
**A. No. I can't -- I'm trying to think of those group of kids and their parents. I don't believe so.**
Q. Do you recall any Hispanic or Latino members residents of the district?
**A. I believe so. I believe in that group of kids, there was -- but I can't tell you for sure. I believe there was.**
Q. Are you aware of any efforts made by the district to encourage black or Hispanic residents specifically to attend board meetings?
**A. Specifically?**
Q. Yeah.
**A. No, I don't.**
Q. During the time you were involved with working for the district, do you remember if there were any African-American officers or members of the board of the district?
**A. I don't believe so.**
Q. Do you recall if there were any Hispanic or Latino board members?
**A. I don't know.**
Q. Do you recall if there were -- at any point in

40

time if there were any black African-American candidates for membership to the board of directors?
**A. There was -- at this election, I think there was one or two other candidates and I don't know their race.**
Q. Do you recall any efforts -- affirmative efforts made by the board to recruit African-American candidates to run for the board?
**A. I don't recall.**
Q. Do you recall at any point in time while you were working for the district if there were any Hispanic or Latino candidates for membership of the board?
**A. Can I clarify that, though?**
Q. Uh-huh.
**A. Because I know they were trying to encourage other people to run on that board, but I don't know what their race was.**
Q. Do you remember how they were trying to encourage?
**A. I think it was word of mouth.**
Q. So were they targeting specific individuals or --
**A. I -- I can't tell you. I don't recall. But I know they were trying to get more people and I just -- I don't know who they were trying to encourage.**

41

Q. And other than by word of mouth, do you know if any steps were taken to encourage?
**A. I don't -- I don't know.**
Q. Do you recall whether there were any specific affirmative steps taken by the district to recruit Hispanic or Latino members to run for the -- Hispanic or Latino individuals -- excuse me -- to run for the board?
**A. I don't recall.**
Q. Are you aware whether the MUD ever conducted voter registration?
**A. Conducted voter registration?**
Q. Uh-huh.
**A. I don't think they could. Isn't that the county? I mean, they can't -- the MUD can't register voters, can they? I mean, I don't think they can.**
Q. So do you believe that a resident of the MUD would register to vote through Travis County?
**A. Right. That's my understanding.**
Q. I want to focus now on what's been previously marked as Exhibit No. 3, which is -- begins with Bates No. P_009609 to 9634. You can just take a moment to look at it if you need to, if you want to.
Do you recognize this document?
**A. Yes.**
Q. Can you describe what it is?

42

**A. I believe this is what I had to submit to the Department of Justice having to do with the -- moving the election polling place.**
Q. Now, without obviously asking you to verify every word of the document, do you have any reason to believe that this is not a true and correct copy of what was filed with the Department?
**A. I have no reason to believe it's not true and correct.**
Q. If you could turn to page 5 of the document.
**A. Okay.**
Q. Is that your signature?
**A. Yes, it is.**
Q. I want to talk a little bit about the preparation of this document.
Did you prepare this document to be filed with the Department of Justice?
**A. Yes, I did.**
Q. Do you recall when you started preparing this document?
**A. I'm guessing it's going to be January of '04, maybe the end of '03. Hang on.**
Q. And who asked you to prepare this document?
**A. Frank had asked me to help out with this election. I don't know if he said do this document or**

**43**

(1) if this was just part of the whole process.
(2) Q. And Frank is Mr. Reilly. We can assume that
(3) from here on out?
(4) A. Yes.
(5) Q. Just to clarify what you said earlier, prior to
(6) your work on this election, have you done any other
(7) voting-related work --
(8) A. No.
(9) Q. -- for the district?
(10) A. No.
(11) Q. Or for any other entity?
(12) A. No.
(13) Q. Do you recall approximately how much time you
(14) spent preparing this submission?
(15) A. A lot. I can't give you hours.
(16) Q. Did anyone assist you in the preparation of
(17) this document?
(18) A. I may have had some legal research done by a
(19) law clerk, maybe, but I don't recall. Depends upon what
(20) you mean by assist. I mean, I did have secretarial
(21) help.
(22) Q. Did you discuss this document at all with
(23) Mr. Reilly?
(24)         MR. COLEMAN: Again, same instruction as
(25) before. I believe you can answer the question as asked

**44**

(1) without disclosing client confidences.
(2) A. I would assume I did. I can't recall sitting
(3) in his office and discussing it, but I would assume we
(4) talked about this.
(5) Q. (BY MR. ZIBEL) In the process of preparing the
(6) submission, do you recall looking at prior submissions
(7) that were submitted by the district?
(8) A. I probably -- yes, I think I did.
(9) Q. Do you remember which ones they were?
(10) A. Not specifically. Hold on. Let me look. Is
(11) it in here? Because I don't -- y'all want to go into
(12) some history here? Yeah, made seven prior submissions.
(13) I would -- I would have reviewed those.
(14) Q. Do you need to take a break at all?
(15) A. Huh-uh. I'm fine.
(16) Q. You said a moment ago that it took you -- I
(17) think the term you used was a lot of time to prepare
(18) this submission. I wonder if you could briefly describe
(19) to me what types of work you did.
(20)         MR. COLEMAN: Again, same instruction as
(21) before. You can discuss and disclose the general
(22) process without disclosing client confidences or
(23) specific communications.
(24) A. Okay. I would have reviewed the prior
(25) submissions. I would have reviewed the act itself, any

**45**

(1) CFR regulations that would have been adopted. I believe
(2) I had a couple of manuals, election manuals, where that
(3) would have been included in there.
(4) Q. (BY MR. ZIBEL) Do you recall spending time
(5) getting up to speed on Section 5, just generally --
(6) A. Do I --
(7) Q. -- generally speaking?
(8) A. Generally. Generally.
(9) Q. Do you remember what you did to do that?
(10) A. What I just --
(11) Q. How you educated yourself about --
(12) A. Well, you would start off with the statute,
(13) check the CFRs. I'd like to see what they had already
(14) filed to make sure I could correlate the two. There
(15) were some election manuals that I relied upon. I
(16) believe I called somebody in DOJ to get more information
(17) if I had a question.
(18) Q. Do you recall whether or not you read any case
(19) law about Section 5?
(20) A. I don't recall specifically, but it wouldn't
(21) surprise me if I had. But I don't recall.
(22) Q. Could you estimate how much of your time was
(23) spent educating yourself generally about the
(24) requirements of Section 5 versus preparing this
(25) particular submission?

**46**

(1) A. No. I mean, I can't -- like 50 percent was
(2) getting up to speed and then 50 percent on this? No, I
(3) can't divvy it up -- my time up like that. Also a lot
(4) of time -- I mean, I attached -- are you including the
(5) working out all the issues with the agreement --
(6) Q. Let's take that --
(7) A. -- of Travis County?
(8) Q. Let's take that out of the equation --
(9) A. Okay.
(10) Q. -- at the moment and just focus on the
(11) preparation of the submission, not the negotiations with
(12) Travis County.
(13) A. No, I can't tell you how much -- what percent
(14) of my time was learning the law, applying it and asking
(15) questions as far as drafting this, I can't divvy that
(16) up.
(17) Q. If we took the -- the actual agreement and
(18) making the decisions about -- let me start over.
(19)     If we take out the terms of the agreement with
(20) Travis County and any other work relating to the making
(21) the changes out of the question, do you recall
(22) approximately how much time you spent just on this
(23) submission?
(24) A. I'm not sure I understand your question. I
(25) mean, are you talking about just drafting a paper?

**47**

(1) Q. Right.
(2) A. Do you want how many hours I spent on that?
(3) Q. If you're able to.
(4) A. I'm not able to do that. Do you have the old
(5) billing records? I mean, I could look at those. But
(6) off the top of my head three years ago, I don't know.
(7) Q. Unfortunately, we don't.
(8) A. Okay.
(9)         MR. COLEMAN: Objection, sidebar.
(10) Q. (BY MR. ZIBEL) Do you recall how much time
(11) Mr. Reilly spent on the preparation of this document?
(12) And by this document, I mean only the submission aspect
(13) of it.
(14) A. No, I don't. As I recall, it's primarily -- I
(15) did most of the work on this. He may have reviewed it,
(16) but I don't recall specifically.
(17) Q. Do you remember if a draft was provided to the
(18) board of directors for the MUD?
(19) A. I don't recall. I primarily had contact with
(20) Don Zimmerman. I may or may not have given him a copy
(21) of that. I just don't recall for you.
(22) Q. So without telling me the substance of any
(23) comments he made on the draft, do you recall whether or
(24) not he made substantive comments about the draft?
(25) A. He may have. He may have made substantive

**48**

(1) comments.
(2) Q. But do you recall specifically what any of
(3) those were?
(4) A. I do not --
(5)         MR. COLEMAN: Do you recall that he made
(6) them?
(7)         THE WITNESS: Well, we just did -- I mean,
(8) there was so much, I can't recall specifically this
(9) document or if it was just the election in general.
(10) Because we -- you know, we would -- having to work out
(11) the details of the agreement, so...
(12) Q. (BY MR. ZIBEL) Absent your seeing a bill for
(13) this time period, is it impossible for you to determine
(14) how much time you spent working on this submission?
(15) A. Right now, three years later? Yeah, I can't
(16) tell you how much time I spent. But, you know, I
(17) think -- going back to -- well, I did have a
(18) conversation with Don Zimmerman about this.
(19) Q. Do you remember when that conversation took
(20) place?
(21) A. It would probably have been in February,
(22) January '04.
(23) Q. Do you remember if it was during a meeting of
(24) the board?
(25) A. I don't believe so.

(Pages 43 to 48)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

49

(1)    Q. Do you recall how long the conversation was you
(2) had with Mr. Zimmerman?
(3)    A. No.
(4)    Q. Do you remember if he had reviewed a draft of
(5) this at that time?
(6)    A. He -- he may have, but, I mean, it's -- I don't
(7) recall sending it to him, getting -- asking for his
(8) comments. I don't recall that, but...
(9)    Q. So was your conversation with Mr. Zimmerman
(10) less in terms of the specifics of this document and more
(11) in terms of the process?
(12)    A. The process?
(13)    Q. Of the Section 5 preclearance.
(14)    MR. COLEMAN: Again, without disclosing any
(15) client confidences.
(16)    A. I'm sorry, repeat the question again.
(17)    Q. (BY MR. ZIBEL) I guess I'm trying to ascertain
(18) if you don't -- you've said that you don't necessarily
(19) remember providing him a copy of the document and you
(20) don't necessarily remember whether or not he provided
(21) comments on it. I'm just trying to figure out --
(22)    A. I know. But there was a lot of back and forth.
(23) I don't know so much on this draft or we were talking
(24) about what I needed to put in here. I mean, that's my
(25) problem. I'm having a hard time recalling back then if

50

(1) he reviewed a draft of this or not, which I think is
(2) what your question was.
(3)    Q. Right.
(4)    A. And he may have. I just honestly can't tell
(5) you.
(6)    Q. Okay. One more thing and then we can move on.
(7)    Do you recall how -- approximately how long a
(8) conversation that was with Mr. Zimmerman related to
(9) specifically this submission?
(10)    A. I'd be guessing, but I would think 15, 20
(11) minutes. Because I would -- if -- it would have been
(12) while I was -- while he was at work.
(13)    Q. Okay.
(14)    A. So it wouldn't have been a long...
(15)    Q. Do you know whether the MUD is required to use
(16) an attorney to make its Section 5 submissions?
(17)    A. I don't know.
(18)    Q. And would you consider yourself to be a
(19) specialist in voting or election law?
(20)    A. No, I do not.
(21)    Q. If we look at page 2 of the document, see in
(22) the middle of the page that there are -- represented
(23) that the district has made seven prior submissions to
(24) the Justice Department?
(25)    A. Uh-huh.

51

(1)    Q. To your knowledge, other than the submissions
(2) here, have any other submissions been made, to the best
(3) of your knowledge?
(4)    A. The one for '04.
(5)    Q. This -- this one here?
(6)    A. Right. In addition to these --
(7)    Q. Plus the other seven and that's it; is that
(8) right?
(9)    A. I don't know. They just had an election
(10) here -- or is it coming up?
(11)    Q. But to your knowledge, this is -- this is it;
(12) is that right?
(13)    A. To my -- to my knowledge. I don't know. I
(14) can't recall when the MUD was created, so if there would
(15) have been -- but it looks like this is all of them to
(16) my -- when I filed this that I knew of.
(17)    Q. And in preparing this document, did you review
(18) any of these submissions --
(19)    MR. COLEMAN: Asked and answered.
(20)    Q. (BY MR. ZIBEL) -- these other seven?
(21)    MR. COLEMAN: Asked and answered.
(22)    Q. (BY MR. ZIBEL) Do you recall which of these
(23) submissions you reviewed specifically?
(24)    MR. COLEMAN: Asked and answered.
(25)    MR. ZIBEL: I'm going to ask the question

52

(1) again. I don't think that specific question has been
(2) asked.
(3)    MR. COLEMAN: Objection, sidebar.
(4)    Q. (BY MR. ZIBEL) If we continue down the page to
(5) the last two paragraphs, there's some paragraphs about
(6) demographic information.
(7)    A. Uh-huh.
(8)    Q. Do you see that?
(9)    A. Uh-huh.
(10)    Q. Do you recall how you obtained this
(11) information?
(12)    A. I believe I obtained it from the prior
(13) submission.
(14)    Q. Is that from the March 27th, 2002, submission?
(15)    A. I believe so.
(16)    Q. Did you independently verify this information
(17) at all?
(18)    MR. COLEMAN: Objection to the extent that
(19) it may require disclosure of attorney-client privileged
(20) information or work product information.
(21)    THE WITNESS: Do I answer?
(22)    MR. COLEMAN: Objection. I don't -- I
(23) don't know.
(24)    A. No, I didn't do an independent verification.
(25)    Q. (BY MR. ZIBEL) To your knowledge, does the MUD

53

(1) keep any kind of records -- excuse me -- regarding the
(2) demographic population of its residents?
(3)    A. Not to my knowledge.
(4)    Q. So according to this paragraph, it would
(5) suggest that you did, in fact, look at the March 7th,
(6) 2002, submission?
(7)    A. Uh-huh. Yes, I did.
(8)    Q. Do you recall if that was the only submission
(9) you looked at?
(10)    MR. COLEMAN: Objection, asked and
(11) answered.
(12)    MR. ZIBEL: I'm going to --
(13)    Q. (BY MR. ZIBEL) Yeah, you may answer the
(14) question.
(15)    A. I --
(16)    MR. COLEMAN: With relation to that
(17) particular question or all -- is the question is that
(18) the only one she looked at for that information or at
(19) all?
(20)    MR. ZIBEL: At all.
(21)    MR. COLEMAN: Same objection. You can
(22) answer.
(23)    THE WITNESS: I can answer? Okay.
(24)    A. I would have verified these statements. I
(25) would double -- I think I would have double-checked

54

(1) these -- or I may -- I -- I'm sorry, ask me again the
(2) question. Did I look at these other submissions?
(3)    Q. (BY MR. ZIBEL) Well, I guess there are two
(4) questions sort of --
(5)    A. Okay. Let's do them one at a time.
(6)    Q. The first question is whether or not you
(7) reviewed each of the seven submissions listed above in
(8) your overall preparation of this document?
(9)    A. I may have.
(10)    Q. Do you recall specifically if there were any
(11) specific ones you did or did not?
(12)    A. I don't recall specifically.
(13)    Q. Now, to the extent of the last paragraph, do
(14) you recall looking at this type of information in any of
(15) the above submissions?
(16)    A. I believe this came from the 2002 submission.
(17)    Q. Do you recall looking at any of the other
(18) submissions to try and obtain this type of demographic
(19) information?
(20)    A. I don't believe I did.
(21)    Q. And did you seek any other sources to determine
(22) this type of -- this demographic information?
(23)    MR. COLEMAN: Objection to the extent it
(24) may require disclosure of attorney-client privilege or
(25) attorney work product information.

(Pages 49 to 54)

ACUSCRIBE COURT REPORTERS
(800) 497-0277



**55**

(1) THE WITNESS: Well, now I'm not sure what
(2) to answer. I mean, I can --
(3) MR. COLEMAN: Did you speak to others about
(4) that information or did you --
(5) THE REPORTER: I can't hear you.
(6) MR. COLEMAN: Did she speak to others about
(7) that information?
(8) THE WITNESS: Yes, I did.
(9) MR. COLEMAN: You may disclose who --
(10) Q. (BY MR. ZIBEL) Do you recall who you spoke
(11) with?
(12) A. Don Zimmerman.
(13) Q. Just to clarify for the record, you spoke with
(14) Mr. Zimmerman about the demographic information listed
(15) in the last paragraph in paragraph 2 -- on page 2?
(16) A. I believe so.
(17) Q. And do you recall whether or not he was able to
(18) give you demographic information regarding the district?
(19) MR. COLEMAN: Contents of that -- any
(20) conversation with Mr. Zimmerman will be privileged
(21) information.
(22) Q. (BY MR. ZIBEL) Is it correct that, to your
(23) knowledge, there are no other -- this is -- let me start
(24) the question over.
(25) Because you relied on the 2002 submission, is

**56**

(1) it your belief that the information in two thousand --
(2) from the 2002 submission was the most recent demographic
(3) information available about the district?
(4) A. Yes. I was unaware of where else you could
(5) find that information.
(6) Q. And if you had had more recent demographic
(7) information at the time of this submission, would you
(8) have included it in this submission?
(9) A. I guess it would depend upon the source, but if
(10) it was an accurate source, yeah, I would have.
(11) Q. Would you have assumed that Mr. Zimmerman was
(12) a -- would have been a source of accurate information
(13) about the district if he had provided?
(14) A. You mean like specific percentages?
(15) Q. Uh-huh.
(16) A. No. I mean, he doesn't know the makeup of the
(17) district, the racial makeup.
(18) Q. Did you ever see a bill provided by Potts &
(19) Reilly for the preparation of the Section 5 submission?
(20) A. I would have reviewed one that would have been
(21) sent out.
(22) Q. Do you recall specifically reviewing a bill for
(23) these services?
(24) A. I reviewed one every month for every client
(25) before it was sent out.

**57**

(1) Q. So would there be any reason why an itemized
(2) bill would not have been sent to the district for the
(3) time period that included the preparation of this
(4) submission?
(5) A. Not to my knowledge.
(6) Q. Is it correct that this document was used to
(7) seek the Justice Department's preclearance of a joint
(8) election agreement, which is attached to the document?
(9) A. Yes, we requested preclearance.
(10) Q. And am I correct that the Department of Justice
(11) approved the request for preclearance?
(12) A. Yes, they did.
(13) Q. Do you recall discussing these changes -- and
(14) by these changes, I mean the changes covered in this
(15) submission -- with the board of directors prior -- prior
(16) to filing the submission?
(17) MR. COLEMAN: To the extent that that
(18) information was conveyed back and forth outside of an
(19) open meeting, don't disclose privileged or attorney work
(20) product information.
(21) A. I would have updated the board on this
(22) agreement with Travis County.
(23) MR. ZIBEL: I'm going to mark -- not sure
(24) what our next number is. I think it's 21. Any reason
(25) to think otherwise?

**58**

(1) (Deposition Exhibit No. 21 Marked.)
(2) MR. ZIBEL: Can we take a break for a
(3) moment?
(4) (Recess Taken From 1:43 p.m. To 1:54 p.m.)
(5) Q. (BY MR. ZIBEL) Actually going to skip for a
(6) moment, rather than coming to this meeting right now, to
(7) the actual joint election agreement that was entered
(8) into with Travis County --
(9) A. Okay.
(10) Q. -- which I believe is attached to the Section 5
(11) submission.
(12) Do you have that document in front of you?
(13) A. Yeah, it's attached.
(14) Q. Do you recall why, generally speaking, the
(15) board wanted to enter into the agreement with Travis
(16) County?
(17) A. Well, the -- this agreement was going to be
(18) very beneficial for the MUD and the voters, actually,
(19) because, as I recall, previous elections had been held
(20) in somebody's garage and they wanted to move that
(21) election to the -- the elementary school to make it more
(22) accessible. I mean, that's where the polling place was.
(23) So in doing the research and preparing for that
(24) election, we -- we came across Travis County was going
(25) to hold hospital district elections and there's a state

**59**

(1) law that allows joint elections. So by entering into
(2) the agreement to allow Travis County to hold the
(3) election for us, it opened up elections -- early voting
(4) elections on a -- I mean, it -- HEBs and Randalls across
(5) the county that any district member could go and vote
(6) in. So, I mean, it was much more convenient and it
(7) ended up saving the district quite a bit of money. So
(8) it worked out rather well, I think, entering into this
(9) agreement with Travis County.
(10) Q. When you say "saved the district quite a bit of
(11) money," could you elaborate on that at all?
(12) A. Well, if I was going to do the -- all the
(13) election work, meet all the deadlines in order to
(14) facilitate that for the county, I mean, they were going
(15) to bill at the attorney's hourly wage, which would be
(16) quite substantially higher than what Travis County ended
(17) up charging us.
(18) Q. Were there other ways that this would be
(19) financially beneficial to the district?
(20) A. Other ways?
(21) Q. Uh-huh. Yeah.
(22) A. As opposed to saving them money?
(23) Q. Other than the way you just described.
(24) A. There may be another benefit I'm not
(25) considering as far as financial.

**60**

(1) Q. You mentioned two reasons, I think, one being
(2) moving the polling place out of a person's home and the
(3) other being financial incentives; is that correct?
(4) A. Well, it's not only -- yeah. But not only
(5) moving it out, I mean, but allowing them to vote early
(6) voting across Travis County. That would be much more
(7) convenient for the voters than trying to keep it local
(8) in that district.
(9) Q. Were there any other reasons that came to mind
(10) at the time?
(11) A. I can't recall. I mean, those were the big
(12) ones. There may have been others.
(13) Q. Do you know why the district hadn't previously
(14) entered into such an agreement?
(15) A. No, I do not.
(16) Q. I want to look now at what we marked earlier as
(17) Exhibit No. 21, which is a copy of the February -- the
(18) minutes from the February 19th, 2004, meeting of the
(19) board.
(20) A. Okay. What date? 19th? Yeah.
(21) MS. PERALES: What's the Bates numbers?
(22) MR. ZIBEL: It's Bates No. P_006127 to
(23) P_006209.
(24) MS. PERALES: Thank you.
(25) Q. (BY MR. ZIBEL) Specifically, I want to turn --

(Pages 55 to 60)

61

(1) let me just ask two quick questions. Do you recall this
(2) meeting?
(3)   A. Specifically, no. I mean, no.
(4)   Q. You can see that your name does appear about
(5) halfway down the middle of the first page of the
(6) exhibit. Do you have any reason to think that that --
(7) you were not at this meeting?
(8)   A. No.
(9)   Q. Turn to page Bates No. P_006164, which is
(10) titled at the top of the page "Preliminary May 15, 2004,
(11) Election Issues." Sorry, there are a lot of pages.
(12)     Do you recognize this document?
(13)   A. It looks like an outline I would have prepared.
(14)   Q. When you say "prepared," you mean prepared for
(15) the meeting?
(16)   A. Yes.
(17)   Q. Do you recall if anyone directed you to prepare
(18) such a document?
(19)   A. I don't recall. I'm kind of big on outlines,
(20) so I may have done this for my own -- decided to present
(21) it at -- formalize it, I don't recall.
(22)   Q. If we turn to the second page of this outline,
(23) which is P_006165, I want to look at letter G at the top
(24) of the page where it's bold and says "Action."
(25)   A. Uh-huh.

62

(1)   Q. The second sentence there says, "This agreement
(2) appears to be the most cost effective method of voting
(3) for the district and provide optimum convenience for
(4) district voters."
(5)   A. Uh-huh.
(6)   Q. Is the reason you wrote that similar to the
(7) reasons you just described to me?
(8)   A. Yes.
(9)   Q. And you do -- you did write this?
(10)   A. Yes.
(11)   Q. You think?
(12)   A. I believe I did. Sounds like me.
(13)   Q. Do you recall whether that statement considered
(14) the cost that the district would face because it would
(15) have to submit this agreement to -- for preclearance to
(16) the Justice Department?
(17)   A. I didn't understand the question.
(18)   Q. Let me -- let me rephrase. Do you -- when you
(19) described entering into this agreement as the most cost
(20) effective method of voting for the district, did that
(21) statement take into consideration the fact that the
(22) district would have to preclear the change with the
(23) Department of Justice? Is that any clearer?
(24)   A. No. I -- because I -- let me answer it like
(25) I -- what I think you're asking. We would -- to move it

63

(1) out of the garage to the elementary school, we would
(2) have had to have gotten it precleared --
(3)   Q. Right.
(4)   A. -- anyway. So I want to say -- I mean, that
(5) was going to have to be done regardless of whether we
(6) entered into the joint agreement with Travis County.
(7)   Q. So the board was going to move the polling
(8) place regardless of this agreement?
(9)   A. I believe so. That was pretty clear.
(10)   Q. So Section 5 did not detract from the board
(11) wanting to move the polling place?
(12)   A. No, they didn't -- they didn't want to have the
(13) election in the garage because that would require a
(14) voter to go to two different places. They would have to
(15) go to the elementary school to vote and then go to a
(16) second place to vote for the -- I guess it -- what was
(17) this? They were electing board members. So they would
(18) have gone two different places, which would have made it
(19) less likely for your folks to turn out. So they figured
(20) they'd have a better voter turnout having it in the --
(21) in the elementary school where they would have to go
(22) vote for any other election.
(23)   Q. Do you recall at that meeting whether anyone
(24) suggested that such a change shouldn't be made because
(25) of the requirements of Section 5?

64

(1)   A. What change shouldn't be made?
(2)   Q. Moving the poll -- either moving the polling
(3) place or the joint agreement with Travis County.
(4)   A. I'm sorry, they were going to move -- move it
(5) to the elementary school regardless.
(6)   Q. My question is whether or not anyone suggested
(7) that such a change was not a good idea because they
(8) would have to preclear the change with the Justice
(9) Department?
(10)   A. I don't recall that was discussed at this
(11) meeting.
(12)   Q. Do you recall whether anyone consulted with the
(13) Austin Branch of the NAACP regarding this change?
(14)   A. Not to my knowledge.
(15)   Q. How about the State Conference of the NAACP?
(16)   A. Okay. What -- again, let me clarify. What
(17) change are you talking about, moving it from the garage
(18) to the elementary school?
(19)   Q. Yes.
(20)   A. I don't recall that was discussed. I think
(21) that decision may have been made before I got involved
(22) with them working on their case, but -- but I don't
(23) recall any conversations or have any knowledge that they
(24) contacted the NAACP.
(25)   Q. Do you recall any conversations with any civil

65

(1) rights organization?
(2)   A. Not that I recall.
(3)   Q. Can you briefly just describe the process by
(4) which the joint election agreement with Travis County
(5) came into effect?
(6)   A. The negotiating the agreement, is that what
(7) you're talking about?
(8)   Q. Yeah.
(9)   A. As I recall, they had the agreement -- they
(10) being Travis County, had the agreement. First, we had
(11) to determine whether they were even going to have an
(12) election. And I believe it was the hospital district
(13) election that caused Travis County to run an election on
(14) that May '04 date. With them having an election, then
(15) we could have a joint election with them. We had to --
(16) we had to provide a map of our district, which is -- as
(17) I recall, was almost exactly the same as the precinct,
(18) so it was fairly easy. There may have been one or two
(19) properties that were either in or out of the precinct or
(20) not in the district or vice versa. So we had to work
(21) out that process. Travis County had some -- some issues
(22) to deal with regarding the computer and -- you know, the
(23) early voting being able to access that ballot for that
(24) voter in that precinct. I believe it was the Travis
(25) County attorney -- assistant attorney that gave me the

66

(1) agreement. We may -- I think, you know, we read it and
(2) we did have maybe some minor changes to it. We would
(3) have had to provide -- I believe we had to provide a
(4) presiding officer. We had to give them that
(5) information. We had to get the dollar amount. The
(6) county had to determine how much they were going to
(7) charge us. So it was a rather detailed process coming
(8) up with the final agreement.
(9)   Q. Do you know what attorneys at Travis County you
(10) worked with?
(11)   A. I can't recall his name.
(12)   Q. But it was a male?
(13)   A. It was a male. I can't tell you. I'd
(14) recognize it if I saw it, but I can't tell you off the
(15) top of my head.
(16)   Q. Were most of your conversations telephone?
(17)   A. Yes. I never met him in person. I also had
(18) conversations with a couple of folks in the Travis
(19) County clerk's office to get the precinct straight and
(20) to get the costs and the procedures straightened out.
(21)   Q. Do you recall who that was?
(22)   A. No. The -- it was a male regarding the
(23) precinct and the maps and it was the head -- I believe
(24) it was the head of their voting when we were working out
(25) the agreement and the dollar amount. It was not the

(Pages 61 to 66)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

67

(1) clerk herself.
(2)     Q. Do you recall about -- approximately how much
(3) time you spent working on the terms of the agreement?
(4)     A. No, I don't recall.
(5)     Q. As compared to the amount of time you spent
(6) working on the Section 5 submission, do you have a sense
(7) of which took up more of your time?
(8)     A. No, I don't have a sense because at that point
(9) in time, I was primarily working on the board's election
(10) issues. At this time I was working part time -- yeah,
(11) 2004 I was part time. So during that first part of '04,
(12) my work was primarily on the MUD's election and getting
(13) that set up and straightened out.
(14)     Q. When you were part time, how many days a week
(15) did you work?
(16)     A. This is '04. I believe Monday through Friday.
(17)     Q. Was it just a reduced schedule during the week?
(18)     A. Yes.
(19)     Q. Do you recall approximately how many hours a
(20) day you were working?
(21)     A. No. See, I had some -- I have small children
(22) at this time, so it kind of -- I would work when I had
(23) daycare for them. So sometimes it was Monday through
(24) Friday, sometimes it was Monday, Wednesday, Friday, that
(25) kind of thing. But I was usually -- it was just a

68

(1) reduced schedule.
(2)     Q. But it wasn't a specified number of hours a
(3) week that you can remember?
(4)     A. No.
(5)     Q. Were you working at other -- other clients on
(6) other matters during this time?
(7)     A. I may have been, but it was primarily this
(8) election issue was the bulk of it.
(9)     Q. Just give me one minute because I want to try
(10) to wrap up so other people can ask questions and we can
(11) try to get out of here in a timely --
(12)         MR. ZIBEL: I have no further questions at
(13) this time. Pass the witness on to anyone else.
(14)         MS. PERALES: I just have a few.
(15)             EXAMINATION
(16) BY MS. PERALES:
(17)     Q. Good afternoon, Ms. Qualtrough. My name is
(18) Nina Perales. I represent the Diaz intervenors in this
(19) case. I seem to always start my depositions in this
(20) case by explaining that I might skip around because I
(21) don't want to repeat any of the questions. So you'll
(22) see me bouncing around my outline a little bit.
(23)         In 2004 for the election after the MUD entered
(24) into the agreement with Travis County, did you still
(25) continue to do some election work for the MUD?

69

(1)     A. It was very little. I know I had some
(2) communications with Travis County. Kind of an or -- it
(3) was kind of a coordinating because I think we had to
(4) have somebody at the clerk's office on election eve and,
(5) you know, working out the details who would attend that.
(6) And then there was getting the information from Travis
(7) County regarding voters and who won and numbers and
(8) stuff like that. But, primarily, the election duties
(9) were handled by Travis County.
(10)     Q. Do you remember preparing the ballot language
(11) for Travis County? Was that something that you did?
(12)     A. Yes, I believe so. Because I recall we had to
(13) get a translator.
(14)     Q. So you also went and got it translated?
(15)     A. Yes, we did.
(16)     Q. Do you also remember working with the MUD to
(17) publish the notice of election for the 2004 director
(18) election?
(19)     A. I don't recall that.
(20)     Q. Do you recall -- do you recall the MUD
(21) authorizing the expenditure of a hundred dollars to
(22) publish the notice of election in the Canyon Creek
(23) Reporter?
(24)     A. That's -- that's that local newsletter, I
(25) believe. I don't recall specific. I do know I did have

70

(1) to check at the local paper out there as well. There's
(2) a Hill Country something or another.
(3)     Q. Do you remember whether you placed an ad in
(4) that Hill Country paper?
(5)     A. I don't recall.
(6)     Q. Do you remember having a specific budget for
(7) how much the MUD was going to spend to do publication on
(8) the election?
(9)     A. No, I don't recall we had a budget for that. I
(10) think we -- I don't recall having to take bids or
(11) anything like that. I think it was -- I think it was --
(12) they wanted to go with that newsletter because it would
(13) be read by more of the people there. I may have called
(14) the Austin American-Statesman as well, but it would have
(15) gotten lost in that paper -- the notice would have
(16) gotten lost in that one. So -- but I don't recall the
(17) specifics. I mean, I'm just kind of trying to remember.
(18)     Q. Okay. Thank you. Let me ask you a couple of
(19) questions about the decision to move the poll to the
(20) school --
(21)     A. Uh-huh.
(22)     Q. -- in 2004.
(23)         Do you remember whether it was somebody at
(24) Potts & Reilly or maybe yourself that suggested moving
(25) the poll to the school?

71

(1)     A. No. I believe that came from Don Zimmerman and
(2) the board.
(3)     Q. Do you have any sense of why in 2004 the
(4) decision was made to move the poll to the school as
(5) opposed to any previous year?
(6)     A. No, I wasn't involved in any previous year, so
(7) I don't know what the decision-making process was on
(8) those other elections.
(9)     Q. Did you come to learn at all why the decision
(10) might have been made in 2004 as opposed to an earlier
(11) year?
(12)     A. Why it happened in 2004?
(13)     Q. Yeah. Did you come to understand at any point
(14) why 2004 was the year?
(15)     A. No. It would have been the board. I mean,
(16) they really wanted to increase the participation,
(17) because, I mean, it was in a garage. I mean, it -- you
(18) just don't get a whole lot of voter turnout. So maybe
(19) it was just one board or another, but, again, I don't
(20) know. I know that was a big priority.
(21)     Q. Do you remember who you first spoke to about
(22) moving the poll to the school? Do you recall --
(23)     A. Within my firm?
(24)     Q. No.
(25)     A. I contacted the school as part of that process.

72

(1)     Q. Can you tell me who told -- who told you to
(2) contact the school or who first told you that there was
(3) a desire to move the poll to the school?
(4)     A. I don't know if it was Frank or Don. But they
(5) gave -- Don would have given me the name of the school
(6) to contact.
(7)     Q. I want to refer you to the exhibit that was
(8) marked. And I don't know the number of it, but it's
(9) that rather large document that you have in front of you
(10) now.
(11)         MR. COLEMAN: 21.
(12)         MR. ZIBEL: 21.
(13)     A. The minutes?
(14)     Q. (BY MS. PERALES) Yes. And then there are some
(15) attachments behind the minutes. Do you have that in
(16) front of you now?
(17)     A. Uh-huh. Yes.
(18)     Q. Can you please turn to the page Bates
(19) numbered 6167.
(20)     A. Okay.
(21)     Q. Do you notice in -- by the way, I love outlines
(22) too. Do you notice in the paragraph 6(b)1 there seems
(23) to be an instruction in here from you to the board to
(24) review the draft application for preclearance and look,
(25) for example, about whether there are changes in the

(Pages 67 to 72)

73

(1) percentages regarding demographics. Do you see that?
(2) A. Uh-huh. Yeah.
(3) Q. Can you tell me what you were asking the board
(4) to do there?
(5) A. If they were -- if we could rely on those
(6) numbers. I probably asked them if they knew where it
(7) came from and if they knew of any reason to change them.
(8) I mean, that -- it's kind of a difficult issue since
(9) they don't have -- the board doesn't keep that
(10) information. So we had to rely on the previous filing.
(11) Q. If I can ask you to keep your finger there but
(12) flip forward -- well, no, we've already gone over that.
(13) I don't think I need to ask you. But only just to say
(14) in sort of a summing up way, it would be -- it would be
(15) correct to say that following this meeting and any
(16) subsequent conversations you might have had with board
(17) members about demographics, that the final submission
(18) that was sent to the Department of Justice re-presented
(19) demographic information from the 2002 submission; isn't
(20) that right?
(21) A. I believe so. If you're asking me did -- was
(22) the information in the 2004 submission the same as in
(23) 2002?
(24) Q. Yes.
(25) A. I believe it was. I don't recall making any

74

(1) changes to that. I wouldn't have a basis.
(2) Q. And that would be the demographic information,
(3) right?
(4) A. That's what I thought you were referring to.
(5) Q. Yes. I was just trying to keep it clean.
(6) A. Yeah. I mean, that's, yeah, limited to that.
(7) Q. So then would it be fair to say that you did
(8) not make an independent investigation of the
(9) demographics for the MUD set out in the preclearance
(10) letter?
(11) A. No, I did not.
(12) Q. Now, in the draft that is attached to this
(13) meeting from February of '04 on the page that's marked
(14) Bates 6201 on the third line up from the bottom where
(15) you're talking about demographics here --
(16) A. Uh-huh.
(17) Q. -- on the second line, do you see where it says
(18) less than 5 percent families with Spanish surnames?
(19) A. Uh-huh.
(20) Q. Do you know what the significance might be of
(21) that 5 percent number?
(22) A. Significance in what way?
(23) Q. I mean, is there anything significant about
(24) that 5 percent number being used to, say, less than 5
(25) percent? Would it have been important to you if it was more

75

(1) than 5 percent or 7 percent?
(2) MR. COLEMAN: Objection, calls for a legal
(3) conclusion.
(4) Q. (BY MS. PERALES) You may answer.
(5) A. I'm not sure I -- again, I'm not sure I
(6) understand the question.
(7) Q. Do you happen to know of any particular
(8) significance associated with a 5 percent Spanish surname
(9) population in the MUD?
(10) A. Other than that -- to the best of our
(11) knowledge, that's what was the representation. I
(12) mean --
(13) Q. Well, that -- to the best -- then let me --
(14) me summarize, then.
(15) To the best of your knowledge, there were less
(16) than 5 percent families with Spanish surnames living in
(17) the MUD in 2004; is that right?
(18) A. That's my understanding of the demographics
(19) that we -- that we had and the information we had.
(20) Q. And would it have been significant to you at
(21) all if the number had been higher than 5 percent?
(22) MR. COLEMAN: Objection, calls for a legal
(23) conclusion.
(24) Q. (BY MS. PERALES) You may answer.
(25) A. No. I don't know.

76

(1) Q. And following along on that sentence, do you
(2) see where it says, "None of whom would be considered
(3) language minorities"?
(4) A. Uh-huh. Yes.
(5) Q. Can you tell me what that phrase means,
(6) "language minority"?
(7) A. I believed it had to do with the bilingual ESL
(8) requirements.
(9) Q. So when you say, "None of whom would be
(10) considered language minorities," what does that mean?
(11) A. I think I just said that. I would assume
(12) having English as a second language. Without -- don't
(13) take that too specifically.
(14) Q. But that's the -- that your best
(15) understanding of what you wrote there, is that the
(16) language minority's reference means persons for whom
(17) English is a second language?
(18) A. I believe so. I think that was the context of
(19) that in that previous submission.
(20) Q. During your time as an attorney, have you
(21) performed legal services with respect to elections for
(22) any other governmental jurisdictions that have
(23) obligations to deliver language minority assistance in
(24) voting?
(25) MR. COLEMAN: Objection, asked and

77

(1) answered.
(2) Q. (BY MS. PERALES) You may answer.
(3) A. The MUD was the only election that I have
(4) worked on.
(5) Q. When you attend -- I'm sorry?
(6) A. And as I recall, the reason that we had to have
(7) the -- the ballot in Spanish was because as a county as
(8) a whole, we had to. I think that's why we had that
(9) translated.
(10) Q. When you say "that," you mean the ballot?
(11) A. The ballot. I -- I'm not aware of a specific
(12) instance in the MUD that required us to have the Spanish
(13) ballot, but that it was a countywide.
(14) Q. So you think of it as being associated with
(15) Travis County administering your election?
(16) A. No. I think we would have to have had it
(17) in Spanish regardless of whether Travis County
(18) administered the election or not.
(19) Q. By virtue of a requirement that was placed on
(20) Travis County; is that right?
(21) A. That's my recollection.
(22) Q. Did you ever happen to see in one of the MUD
(23) meetings that you attended that a Spanish language
(24) interpreter was made to make interpretations for
(25) people who didn't speak English?

78

(1) A. Not that I recall. I don't recall being asked.
(2) Q. Do you recall obtaining a Spanish language
(3) translation of the election notice for the 2004
(4) election?
(5) A. I don't recall. I know we had to get the
(6) ballot. I don't recall about the notice.
(7) Q. Were you aware during the time that you worked
(8) for the MUD that any of the directors did not live in
(9) the MUD?
(10) A. I wasn't aware of that.
(11) Q. Did you ever obtain from the Travis County
(12) voter registrar a list for the MUD of all their
(13) registered voters?
(14) A. They may have given us that. I know we got a
(15) lot of printouts from Travis County.
(16) Q. Do you recall about when that happened? Before
(17) the election, after the election?
(18) A. I know -- I know we got a lot of data after the
(19) election. I simply don't recall before --
(20) Q. Do you recall knowing during the time that you
(21) were preparing for the 2004 election that the Travis
(22) County registrar did have a list of the MUD's registered
(23) voters?
(24) A. I would assume they had to because of the
(25) precinct and they would have to key that precinct in so

(Pages 73 to 78)

**79**

(1) they would have -- and I think the district was
(2) primarily that entire precinct, so I forget the number,
(3) but -- so it was -- yeah, they would have simply because
(4) the precinct and the district coincided the districts
(5) they resided.
(6)    Q. You mentioned earlier that a number of MUD
(7) meetings were held at the Peace Lutheran Church. Do you
(8) remember that testimony?
(9)    A. Yes.
(10)    Q. Do you know if the Peace Lutheran Church is
(11) located within the boundaries of the MUD or outside the
(12) MUD?
(13)    A. I don't recall if -- the extent of the MUD
(14) boundaries, but I believe that church is in between
(15) those two streets that lead into that district in that
(16) subdivision. So I don't know if they -- there was some
(17) frontage property on 620 that was inside the district.
(18) I don't know specifically about the church.
(19)    Q. Did you notice based on the people that you saw
(20) in and around the Peace Lutheran Church whether it was a
(21) predominantly African-American church?
(22)    A. We had it in the evenings, so I wasn't ever
(23) there when they had a service. So I can't tell you.
(24)    Q. A little bit earlier you mentioned that you
(25) knew there were a number of candidates for the May 2004

**80**

(1) MUD election and I wanted to ask you if you ever met
(2) Mr. Oliver Ban?
(3)    A. I don't think I said there was a number. There
(4) may have been one or two. I don't recall meeting Oliver
(5) Ban, but I think he was one of the candidates.
(6)    Q. But you never met him?
(7)    A. Huh-uh. No.
(8)    Q. In 2004 how would somebody have made an
(9) application for a place on the ballot for the MUD
(10) director election?
(11)    A. The MUD was required to provide those
(12) applications if asked, so we had those available.
(13)    Q. Did you have them in your office at Potts &
(14) Reilly?
(15)    A. Yes.
(16)    Q. Do you recall if they were translated into
(17) Spanish?
(18)    A. I don't recall.
(19)    Q. How would people have learned where to find an
(20) application for a place on the ballot for the MUD
(21) election?
(22)    A. I recall we had to publish that.
(23)    Q. Do you know how people would have learned where
(24) to apply for an absentee ballot for the 2004 MUD
(25) election?

**81**

(1)    A. Didn't we specify that in the -- I believe it
(2) was in the joint agreement. Can I look through this?
(3)    Q. No. Do you -- do you have a specific
(4) recollection of how you informed the voters where
(5) they --
(6)    A. An absentee ballot?
(7)    Q. Uh-huh.
(8)    A. No, I don't specifically have a recollection.
(9) I know all the early voting was handled by Travis
(10) County. But as far as getting a mail -- like are you
(11) talking about a mail notice?
(12)    Q. Yes. I'm sorry, mailed out. I'm going to --
(13)    A. They may have had to contact our office.
(14)    Q. Hopefully, this will be the last time I refer
(15) you to Exhibit 21. I'm looking back again at your memo
(16) at Bates No. 6166. No, I'm sorry, 6167.
(17)    A. Is all that set out in this? I haven't read
(18) this in years. As I recall, I had a lot of these issues
(19) outlined what we needed to do. So some of the questions
(20) you may have will be in here.
(21)    Q. Okay. On page 6167 where it's paragraph 6(b)2,
(22) do you see the sentence that says, "All election
(23) documents issued for public notice and information MAY
(24) need to be translated into Spanish"? Do you see that?
(25)    A. Uh-huh.

**82**

(1)    Q. And do you see that "MAY" is in all capital
(2) letters?
(3)    A. Right.
(4)    Q. I was wondering -- can you tell me why you
(5) wrote that for the board?
(6)    A. I would assume there were some questions on
(7) what had to be translated and what did not, and I was
(8) emphasizing that.
(9)    Q. Do you recall doing some subsequent research
(10) about -- in order to confirm or answer these questions
(11) regarding translation?
(12)    A. I'm sure I did.
(13)    Q. Do you -- do you recall what may have come of
(14) that?
(15)    MR. COLEMAN: Again, without
(16) disclosing attorney work product or --
(17)    Q. (BY MS. PERALES) Not going to ask you -- I
(18) won't ask you for your communications. I'm just asking
(19) what may have come of that.
(20)    A. I would have done the research to figure out
(21) what would be required. If you want me to tell you
(22) specifics what I did three years after the fact, I
(23) just -- I can't tell you.
(24)    Q. I'll point you also to Bates page No. 6169,
(25) paragraph 8(c). Do you state there that in a similar

**83**

(1) vein, quote, Application may need to be translated to
(2) Spanish. We will conduct further research into this
(3) area, unquote.
(4)    A. Okay.
(5)    Q. Do you see that?
(6)    A. Yes, I do.
(7)    Q. And can you tell me why you wrote that to the
(8) board?
(9)    MR. COLEMAN: Same objection.
(10)    Q. (BY MS. PERALES) You may answer.
(11)    A. Same answer. There was a question of what we
(12) had to do. We had additional research to conduct.
(13)    Q. Do you have any specific recollection of
(14) obtaining a Spanish translation of the application for a
(15) place on the ballot?
(16)    A. No, I don't have a specific recollection. I
(17) mean, we had a translator, but whether it was limited to
(18) the ballot application, I -- I can't tell you.
(19)    MR. COLEMAN: Ms. Perales, we need to --
(20)    MS. PERALES: I'm on my last question,
(21) Mr. Coleman.
(22)    MR. COLEMAN: Thank you.
(23)    MS. PERALES: I'm pausing because I want to
(24) ask it right so I don't end up having to extricate
(25) myself.

**84**

(1)    Q. (BY MS. PERALES) Did Mr. Zimmerman, as the
(2) board president, routinely sign election-related
(3) documents such as notices of election?
(4)    A. He signed the agreement. He was my primary
(5) contact. There was a secretary as well. But I believe
(6) it was Mr. Zimmerman that signed most of the documents
(7) that we needed to have board approval or his signature
(8) on as the president.
(9)    Q. Would you know of any reason why, if
(10) Mr. Zimmerman was required to sign an election form,
(11) that he would either not sign it or add notations to his
(12) signature?
(13)    A. If he -- if he couldn't -- if he had to sign
(14) something but he didn't have personal knowledge, maybe?
(15)    Q. Uh-huh.
(16)    A. If there was something that he didn't, like I
(17) said, have personal knowledge, he may have notated that.
(18)    MS. PERALES: I pass the witness.
(19)    MR. HICKS: I have one little area just out
(20) of curiosity.
(21)    EXAMINATION
(22) BY MR. HICKS:
(23)    Q. I'm Renea Hicks, and I represent Travis County.
(24) Do you recall that there were three small parcels of
(25) land outside the political boundaries of the district?

(Pages 79 to 84)

85

(1) Let me represent to you that Mr. Reilly said there were
(2) the other day in his deposition.
(3)     A. Outside of the district?
(4)     Q. Outside of the -- yes, what I call the
(5) political --
(6)     A. But within the precinct?
(7)     Q. I don't know the answer to that.
(8)     A. There was -- I mean, I -- as I recall, for
(9) the -- when we were trying to set up the precinct, the
(10) boundaries of the district weren't exact with the
(11) boundaries of the precinct.
(12)     Q. This is covering a different set -- question --
(13) set of questions.
(14)     A. Okay. Go for it, then. Ask me again.
(15)     Q. Okay. Well, I think I -- well, I'll just ask
(16) it again.
(17)     A. Okay.
(18)     Q. Are you aware of whether there were three
(19) parcels of land that the district owned that were not
(20) inside the political boundaries of the district?
(21)     A. The absence of the district?
(22)     Q. Yes.
(23)     A. No, I'm not aware of that.
(24)         MR. HICKS: Okay. I have no further
(25) questions.

86

(1)         MR. KORBEL: I've got a couple
(2) clarifications of the witness.
(3)         THE WITNESS: Well, can I ask one quick --
(4) are you talking about, like, infrastructure? I mean --
(5)         MR. HICKS: Just to be informal about it,
(6) y'all have picked up three parcels of land, I think,
(7) from discussing with Mr. Herren that probably was when
(8) the Northwest Austin MUD No. 2 dissolved. Y'all somehow
(9) ended up with three parcels from that. I wanted to ask
(10) you a question about it. But if you don't remember --
(11)         THE WITNESS: I don't have knowledge of
(12) that.
(13)         EXAMINATION
(14) BY MR. KORBEL:
(15)     Q. George Korbel for the defending intervenor
(16) Garcia. You mentioned the term "HEB." Isn't it true
(17) that that's a grocery -- a grocery chain in Texas?
(18)     A. Right.
(19)     Q. And frequently absent -- they're used as
(20) locations for absentee voting, correct?
(21)     A. It's early voting in Texas. It's not only HEB.
(22) There's Randalls, Albertsons, other ones that they use
(23) across the county.
(24)     Q. And I want to make sure it's clear for the
(25) record, you said this experience in this election is

87

(1) the only experience you've had with elections before or
(2) after as a lawyer; is that correct?
(3)     A. That's correct.
(4)     Q. And would that be the same for the Voting
(5) Rights Act, correct?
(6)     A. That's correct.
(7)     Q. First experience you've had with the Voting
(8) Rights Act and the last experience?
(9)     A. That's correct.
(10)         MR. KORBEL: Thank you.
(11)         MR. SPITAL: I just have a couple
(12) questions.
(13)         EXAMINATION
(14) BY MR. SPITAL:
(15)     Q. Sam Spital for the Louis intervenors. And I
(16) appreciate your time, Ms. Qualtrough.
(17)         My first question is -- I think Dan asked you
(18) earlier with connection to the fact that the MUD moved
(19) its polling place from a private residence to a school,
(20) whether the MUD contacted any civil rights organization
(21) before doing that.
(22)     A. Uh-huh.
(23)     Q. And I wanted to ask you a similar question.
(24) If -- did the MUD contact any organization representing
(25) black voters in connection with the decision to enter

88

(1) into the agreement between the MUD and Travis County in
(2) 2004?
(3)     A. Did the MUD -- prior to --
(4)     Q. Uh-huh.
(5)     A. -- entering into the agreement with Travis
(6) County --
(7)     Q. Yes.
(8)     A. -- did the MUD contact any other --
(9)     Q. Any organizations representing black voters in
(10) any way.
(11)     A. Not to my knowledge.
(12)     Q. What about organizations representing Latino
(13) voters in any way?
(14)     A. Same question as before, not to my knowledge.
(15)     Q. Yes. And what about individual black voters,
(16) did the MUD make any sort of outreach to individual
(17) black voters before entering into the agreement?
(18)     A. Not to my knowledge.
(19)     Q. Same question for Latino voters?
(20)     A. Yes, not to my knowledge.
(21)     A. All right. And just one more question.
(22)         Would it be fair to say that because you didn't
(23) have any prior experience with the Voting Rights Act, it
(24) took you longer to create the submission in 2004 than if
(25) you had had prior experience with the Voting Rights Act?

89

(1)     A. To create the actual document? Maybe, maybe
(2) not. I mean, obviously, learning the area of the law
(3) prior -- prior to preparing that document, but it was
(4) the same -- I mean, the factual content drafting it
(5) would have taken the same amount of time, but the
(6) background preparation --
(7)     Q. And that's the version you wouldn't have had to
(8) have done if you had had prior exposure to --
(9)     A. I probably -- excuse me. I probably would have
(10) anyway because it's a good idea to re-read the statutes
(11) and the CFRs.
(12)     Q. Let me rephrase it one more time and see if
(13) this is any clearer. If you had done a second
(14) submission shortly after the submission that you had
(15) made, do you think it would have taken you shorter than
(16) it took you to make the submission, all the things being
(17) equal?
(18)     A. Somewhat.
(19)         MR. SPITAL: Thank you. I have nothing
(20) else.
(21)         MR. ZIBEL: Thank you for your time. I
(22) think we're done.
(23)         (Deposition Concluded At 2:40 p.m.)
(24)
(25)

90

(1)         CORRECTIONS AND SIGNATURE
(2) PAGE/LINE      CORRECTION      REASON FOR CHANGE
(3) _____
(4) _____
(5) _____
(6) _____
(7) _____
(8) _____
(9) _____
(10) _____
(11) _____
(12) _____
(13) _____
(14) _____
(15) I, KERRIE JO QUALTROUGH, have read the foregoing
deposition and hereby affix my signature that same is
true and correct except as noted herein.
(16)
(17)         _____
            KERRIE JO QUALTROUGH
(18)
(19) STATE OF _____ )
    COUNTY OF _____ )
(20)         Subscribed and sworn to before me by the said
    witness, KERRIE JO QUALTROUGH, on this the _____ day
(21) of _____, 2007.
(22)
(23)         _____
            NOTARY PUBLIC IN AND FOR
            THE STATE OF_____
(24)
(25) My Commission Expires: _____

ACUSCRIBE COURT REPORTERS
(800) 497-0277

91

```
(1)              C E R T I F I C A T E
(2)
(3)          I, Micheal A. Johnson, Certified Shorthand
(4)     Reporter in and for the State of Texas, certify that on
(5)     the 26th day of February, 2007, I reported the Oral
(6)     Deposition of KERRIE JO QUALTROUGH, after the witness
(7)     had first been duly cautioned and sworn to testify under
(8)     oath; said deposition was subsequently transcribed by me
(9)     and under my supervision and contains a full, true and
(10)    complete transcription of the proceedings had at said
(11)    time and place.
(12)         I further certify that I am neither counsel
(13)    for nor related to any party in this cause and am not
(14)    financially interested in its outcome.
(15)         GIVEN UNDER MY HAND AND SEAL of office on this
(16)    _____ day of _____, 2007.
(17)
(18)
(19)
(20)
(21)    _____
        Micheal A. Johnson, Texas CSR 5891
(22)    Expiration Date:  12/31/2008
        Firm Registration No. 241
(23)    114 West 7th Street, Suite 750
        Austin, Texas 78701
(24)    (512) 499-0277
(25)
```

(Page 91)

ACUSCRIBE COURT REPORTERS
(800) 497-0277