

# AcuScribe
## COURT REPORTERS
When accuracy means everything.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL )
UTILITY DISTRICT NUMBER ONE )
                             )
                             )
VS.                          )          CIVIL ACTION NO.:
                             )          1:06-CV-01384
                             )          (PLF, DST, EGS)
ALBERTO GONZALES, IN HIS     )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**FRANK REILLY**

FEBRUARY 23, 2007

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONDENSED TRANSCRIPT AND KEYWORD INDEX

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701

512-499-0277
800-497-0277
512-499-0298 (fax)
www.acuscribe.com

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL  *
UTILITY DISTRICT NUMBER ONE  *

    Plaintiff  *
            *
VS.  *   Civil Action No.
        *  1:06-CV-01384
ALBERTO GONZALES, in his  *   (PLF, DST, EGS)
official capacity as  *
Attorney General of the  *
United States  *

    Defendant  *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
FRANK MICHAEL REILLY
FEBRUARY 23, 2007

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**2**

(1)     ORAL DEPOSITION OF FRANK MICHAEL REILLY,
(2)  produced as a witness at the instance of the
(3)  Defendant-Intervenors Texas State Conference of NAACP
(4)  Branches and Austin Branch of the NAACP, and duly
(5)  sworn, was taken in the above-styled and numbered cause
(6)  on the 23rd day of February, 2007, from 12:08 p.m. to
(7)  3:24 p.m., before MARSHA EVANS, Certified Shorthand
(8)  Reporter in and for the State of Texas, reported by
(9)  machine shorthand, at 114 West 7th Street, Austin,
(10) Texas, pursuant to the Federal Rules of Civil Procedure
(11) and the provisions stated on the record or attached
(12) hereto.

**3**

(1)
(2)         APPEARANCES
(3)
(4)  FOR THE PLAINTIFF:
      MR. GREGORY S. COLEMAN
      MR. CHRISTIAN J. WARD
(5)    WEIL, GOTSHAL & MANGES, LLP
      8911 Capital of Texas Highway
(6)    Building One, Suite 1350
      Austin, Texas  78759
(7)    512-349-1937
(8)
      FOR THE DEFENDANT ALBERTO GONZALES, IN HIS OFFICIAL
(9)  CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:.
(10)   MR. CHRIS HERREN
      MS. CHRISTY A. McCORMICK
(11)  U.S. DEPARTMENT OF JUSTICE
      CIVIL RIGHTS DIVISION
(12)  950 Pennsylvania Avenue, NW
      Room 7254 NWB
(13)  Washington, DC  20530
      202-514-1416
(14)
(15)  FOR THE INTERVENOR TRAVIS COUNTY:
(16)   MR. MAX RENEA HICKS
      ATTORNEY AT LAW
(17)  101 West 6th Street, Suite 504
      Austin, Texas  78701
(18)  512-480-8231
(19)
      FOR THE INTERVENORS LISA AND GABRIEL DIAZ:
(20)
      MR. CARLOS BECERRA
(21)   MS. NINA PERALES
      MALDEF
(22)  110 Broadway, Suite 300
      San Antonio, Texas  78205
(23)  210-224-5476
(24)
(25)

**4**

(1)      APPEARANCES (CONT'D)
(2)
      FOR THE DEFENDANT-INTERVENORS RODNEY AND NICOLE LOUIS:
(3)
(4)    MS. DANIELLE C. GRAY
      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
(5)    Four Times Square
      New York, New York  10036-6522
      212-735-3000
(6)
(7)    FOR THE DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF
      NAACP BRANCHES AND AUSTIN BRANCH OF THE NAACP:
(8)
(9)    MR. BENJAMIN BLUSTEIN
      LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
(10)  1401 New York Avenue, NW, Suite 400
      Washington, DC  20005-2124
(11)  202-662-8600
(12)        --and--
(13)   MR. ARIEL B. WALDMAN
      WILMERHALE
(14)  1875 Pennsylvania Avenue, NW
      Washington, DC  20006
(15)  202-663-6063
(16)  FOR THE DEFENDANT-INTERVENOR ANGIE GARCIA:
(17)   MR. GEORGE J. KORBEL
      TEXAS RIOGRANDE LEGAL AID, INC.
(18)  1111 North Main Avenue
      San Antonio, Texas  78212
(19)  210-212-3700
(20)
      ALSO PRESENT:
(21)
      Markell Pool
(22)
(23)
(24)
(25)

**5**

(1)
(2)
(3)  REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
(4)
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**6**

(1)         INDEX
(2)                PAGE
(3)
(4)  Appearances...................................  3
(5)  Stipulations..................................  5
(6)
(7)  FRANK MICHAEL REILLY
(8)    Examination by Mr. Blustein.................  8
      Examination by Ms. Gray.....................  58
(9)    Examination by Ms. Perales..................  59
      Examination by Mr. Herren...................  77
(10)  Examination by Mr. Hicks....................  95
      Examination by Mr. Korbel...................  107
(11)  Further Examination by Mr. Herren....  129
      Further Examination by Mr. Hicks.....  131
(12)
(13)  Changes and Corrections..................  133
(14)  Signature.................................  134
(15)  Reporter's Certificate....................  135
(16)
(17)        EXHIBITS
(18)
(19)  NO. DESCRIPTION        PAGE/LINE REFERENCED
(20)
(21)  16..............................  25/17
      Potts & Reilly fees
(22)  17..............................  34/5
      E-mail from Kerrie J. Qualrough dated
(23)  July 2, 2004
(24)  18..............................  48/18
      Agreement to Conduct Joint Elections for
(25)  May 13, 2006 Elections

(Pages 1 to 6)

**7**

```
(1)           EXHIBITS (cont'd)
(2)
     NO. DESCRIPTION          PAGE/LINE REFERENCED
(3)
(4)  19............................ 50/20
        Motion for Leave to File and Brief for
(5)     Edward Blum, Visiting Fellow at the American
        Enterprise Institute, and Roger Clegg,
(6)     President of the Center for Equal
        Opportunity as Amicus Curiae in Opposition
(7)     to Appellants
(8)  20............................ 91/23
        E-mails dated February 23, 2006
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**8**

```
(1)            FRANK MICHAEL REILLY,
(2)   having been first duly sworn, testified as follows:
(3)                 EXAMINATION
(4)   QUESTIONS BY MR. BLUSTEIN:
(5)      Q.  Good afternoon, Mr. Reilly.  My name is Ben
(6)   Blustein.  I'm an attorney with the Lawyers' Committee
(7)   for Civil Rights Under Law in Washington, D.C., and I'm
(8)   one of the attorneys who's representing the NAACP
(9)   intervenors in the matter of Northwest Austin Municipal
(10)  Utility District Number One versus Attorney General
(11)  Gonzales.  And with me are a number of counsel for the
(12)  various parties in the case who some you may know, some
(13)  you just met a moment ago.
(14)        Let me -- I'll be asking some questions
(15)  here this afternoon, and then I'll turn it over to my
(16)  colleagues, and they may have some questions also for
(17)  you.
(18)     A.  Okay.
(19)     Q.  Let me -- I understand you're -- you're an
(20)  attorney, correct?
(21)     A.  That's correct.
(22)     Q.  Okay.  So I'll dispense with the preliminary
(23)  instructions.  But let me -- let me ask you, have you
(24)  ever had your deposition taken before?
(25)     A.  Yes.
```

**9**

```
(1)      Q.  How many times?
(2)      A.  Just once.
(3)      Q.  And what occasioned that deposition?
(4)      A.  It was related to some litigation between the
(5)   City of Granite Shoals, Texas and some residents who
(6)   have contested the city's annexation of those
(7)   residents.
(8)      Q.  Okay.
(9)          MR. KORBEL:  Excuse me.  Could you speak
(10)  up a little bit?  It's kind of noisy in here.
(11)         THE WITNESS:  Sure.  Yeah.
(12)     Q.  (By Mr. Blustein)  And when was that
(13)  deposition?
(14)     A.  November 2006.
(15)     Q.  Okay.  Did that relate to voting matters?
(16)     A.  I can't -- I don't believe there were any
(17)  voting matters that were directly involved in that
(18)  other than the fact that people if they were in the
(19)  city could vote in city elections versus outside the
(20)  city.
(21)     Q.  You have taken depositions in your career, I
(22)  suppose,
(23)     A.  I have.
(24)     Q.  And how frequently do you take depositions?
(25)     A.  I am not primarily a litigator so I have only
```

**10**

```
(1)   taken a handful of depositions.
(2)      Q.  Is there any reason why you would not be able
(3)   to give full and accurate and complete testimony here
(4)   today?
(5)      A.  No.
(6)      Q.  Mr. Reilly, what did you do to prepare for the
(7)   deposition?
(8)      A.  I visited with my attorneys and that's
(9)   primarily it.  Just visited with, went over a few
(10)  matters with them.
(11)     Q.  And which attorneys did you speak to?
(12)     A.  Mr. Coleman.
(13)     Q.  And how many times did you speak to him about
(14)  the deposition?
(15)     A.  Twice, I believe.
(16)     Q.  And when was that?
(17)     A.  This morning and yesterday.
(18)     Q.  Did you review any documents in preparation
(19)  for the deposition?
(20)     A.  I briefly reviewed the district's 2004
(21)  submission to the Department of Justice for
(22)  preclearance of the change in voting practices the
(23)  district went through to change to contractual system
(24)  with the county providing the services and change in
(25)  location to the school.
```

**11**

```
(1)      Q.  Did you review any other documents?
(2)      A.  That is it.  Other than I briefly reviewed the
(3)   contract between the district and the county.
(4)      Q.  What contract are you referring to?
(5)      A.  The current contract between the district and
(6)   the county for election services that we entered into
(7)   last year.
(8)      Q.  Did you speak with anybody other than
(9)   Mr. Coleman regarding the deposition?
(10)     A.  No.
(11)     Q.  Did you bring any documents with you to the
(12)  deposition?
(13)     A.  No, I did not.
(14)     Q.  Can I ask you what is your understanding of
(15)  what this case that has been brought by the district
(16)  against the attorney general is about?
(17)     A.  My understanding is that the district is
(18)  seeking relief to remove it from the purviews of
(19)  Section 5 of the Voting Rights Act.
(20)     Q.  And how did you become familiar with what the
(21)  case is about?
(22)     A.  Just through discussions that Mr. Coleman had
(23)  with me back in my presence and initially looking at
(24)  the pleadings filed by the district.  I don't believe
(25)  I've reviewed any of the other pleadings in this case.
```

**12**

```
(1)      Q.  The lawsuit has been discussed during board
(2)   business and you've attended those board meetings as
(3)   counsel for the board?
(4)      A.  I have.
(5)      Q.  Can you tell me what is your relationship with
(6)   the Northwest Austin Municipal Utility District Number
(7)   One, which I would appreciate if we could refer to as
(8)   either the MUD or the district?
(9)      A.  Sure.  I serve as the general counsel.
(10)     Q.  Okay.  And how long have you served in that
(11)  capacity?
(12)     A.  Since approximately June or July of 2002, I
(13)  believe.
(14)     Q.  And have you served continuously as general
(15)  counsel for the district since that time?
(16)     A.  I have.
(17)     Q.  You're not counsel of record, though, in this
(18)  litigation brought against the attorney general.
(19)     A.  No, I am not.
(20)     Q.  Did you become aware at some point that
(21)  defendant-intervenors in the case had served discovery
(22)  requests on the district?
(23)     A.  Yes.
(24)     Q.  Did you have occasion to review those
(25)  discovery requests?
```

(Pages 7 to 12)

13

(1)   A.  Some of them.
(2)   Q.  Were you aware that requests for production of
(3)  documents had been served by the defendant-intervenors
(4)  on the district?
(5)   A.  Yes.
(6)   Q.  And did you review a copy of those document
(7)  requests?
(8)   A.  I believe so.
(9)   Q.  Did either you or your law firm, Potts &
(10)  Reilly, make any efforts to search your files for
(11)  responsive documents?
(12)   A.  Mr. Coleman and his cocounsel had primarily
(13)  performed that. We opened up our files for them to
(14)  review to find things. From time to time they would
(15)  ask myself or my staff to assist in locating particular
(16)  documents. I was not directly involved in most of
(17)  that.
(18)   Q.  Okay. Are the -- what files does your firm
(19)  maintain relating to the district?
(20)   A.  We maintain the correspondence files, the --
(21)  all the minutes of the board meetings and the records,
(22)  the contracts of the district binding the district to
(23)  certain obligations, the bond covenants and agreements,
(24)  those sorts of -- those sorts of things.
(25)   Q.  Are there any files relating to -- relating to

14

(1)  the district that are not maintained in your office?
(2)   A.  There would, of course, be some files that are
(3)  all public record at the Texas Commission on
(4)  Environmental Quality, although I believe that all --
(5)  pretty much all those files we would also have copies
(6)  of that. Our general manager that we contract with --
(7)  Real Manage is the company -- would have some of the
(8)  financial files of the district that we might not have.
(9)   Q.  Other than that, though, the files of the
(10)  district are maintained at your law firm?
(11)   A.  That's correct.
(12)   Q.  Let me ask you a few background questions, if
(13)  I -- if I may.
(14)   A.  Sure.
(15)   Q.  Where do you live?
(16)   A.  I live in Granite Shoals, Texas.
(17)   Q.  What's your address?
(18)   A.  It's 2412 Belaire, spelled B-e-l-a-i-r-e, East
(19)  Lane, Granite Shoals, Texas.
(20)   Q.  Forgive my lack of geography. That's not
(21)  within the bounds of the district, is it?
(22)   A.  It is not.
(23)   Q.  How long have you been practicing law?
(24)   A.  Since May of 1990.
(25)   Q.  And where did you go to law school?

15

(1)   A.  University of Houston Law Center.
(2)   Q.  And when did you graduate?
(3)   A.  Also May of 1990.
(4)   Q.  Can you walk me through your legal career
(5)  since graduating from law school?
(6)   A.  You mean by that which firms have I been with
(7)  or --
(8)   Q.  Yeah.
(9)   A.  -- areas of practice or what would you like to
(10)  know?
(11)   Q.  Both. Which firms you worked with and what
(12)  areas of the law you concentrated your practice in.
(13)   A.  Upon graduation I started working for a firm
(14)  here in Austin by the name of Booth & Newsom, B-o-o-t-h
(15)  N-e-w-s-o-m. They merged a year or so later I believe
(16)  into another firm by the name of Davidson, Troilo,
(17)  T-r-o-i-l-o, & Booth. For approximately a year or so I
(18)  moved on to another firm. It was an Austin office of a
(19)  firm by the name of Godwin & Carlton. Approximately
(20)  another year or so after that, which would have been
(21)  1993, went to the firm which is the current firm that I
(22)  am in now, now known as Potts & Reilly.
(23)      You want me to go back and kind of walk
(24)  you through the nature of the type of work I've done?
(25)   Q.  Yes, if you would.

16

(1)   A.  I have always done a fair amount of
(2)  legislative practice before the Texas Legislature. In
(3)  addition to that, our firm and myself in particular
(4)  have done a fair amount of administrative law practiced
(5)  before state agencies, permitting license and decisions
(6)  and those sorts of matters. I have worked for water
(7)  districts and river authorities and those types of
(8)  governmental entities in just kind of a legal role or
(9)  that mode, also do some general nonprofit work. And
(10)  that's primarily it.
(11)   Q.  And what areas of law do you currently
(12)  practice?
(13)   A.  All of those areas.
(14)   Q.  Has your law practice in terms of the areas of
(15)  practice remained essentially consistent?
(16)   A.  Essentially, yes.
(17)   Q.  Did you found the firm of Potts & Reilly?
(18)   A.  The firm was -- I was an associate when the
(19)  firm was originally founded. It was called Brown &
(20)  Potts at the time. And a year or two after that I
(21)  became a partner.
(22)   Q.  How many attorneys currently are in the firm?
(23)   A.  I believe we have seven lawyers with the firm.
(24)   Q.  And what are the primary practice areas of the
(25)  firm?

17

(1)   A.  Those which I've outlined, as well as some
(2)  general litigation type practice, utility work, and
(3)  campaign finance ethics compliance. Pretty much what
(4)  we do.
(5)   Q.  Does your firm currently represent municipal
(6)  utility districts?
(7)   A.  We do.
(8)   Q.  And water districts?
(9)   A.  We do.
(10)   Q.  There was another entity you mentioned. River
(11)  authorities?
(12)   A.  We have in the past. I don't believe we are
(13)  representing any river authorities at the current time.
(14)   Q.  What's the difference between a Municipal
(15)  Utility District and a water district?
(16)   A.  I think water district is a broader term. A
(17)  Municipal Utility District is a type of a water
(18)  district. All of these districts, including the river
(19)  authority, are typically created under the auspices of
(20)  Article 16, Section 59 of the Texas Constitution. It
(21)  sets up a -- I'll call it phrase called conservation
(22)  and reclamation districts. And the legislature has
(23)  taken that and passed enabling legislation for
(24)  different types of districts and authorities, municipal
(25)  utility districts being one of those.

18

(1)   Q.  Who in your firm does work representing MUDs
(2)  or water districts?
(3)   A.  Myself, my partner, Susan Potts, and I suspect
(4)  pretty much all of us have worked for one of the MUDs
(5)  or water districts in the past doing something on one
(6)  of these files or another.
(7)   Q.  How long has your firm been engaged in that
(8)  type of work?
(9)   A.  Since the work began.
(10)   Q.  And you yourself have been engaged in
(11)  representation of MUDs and water districts since the
(12)  beginning of your career; is that right?
(13)   A.  That's correct.
(14)   Q.  How many MUDs does -- how many MUDs does your
(15)  firm currently represent?
(16)   A.  Currently I think just two on active files.
(17)   Q.  The MUD -- Northwest Austin MUD Number One?
(18)   A.  Being one of them.
(19)   Q.  And what's the other?
(20)   A.  The other one is Emerald Bay MUD.
(21)   Q.  Do you represent Emerald Bay, as well?
(22)   A.  My law partner represents Emerald Bay.
(23)   Q.  Is that --
(24)   A.  Ms. Potts.
(25)   Q.  -- Ms. Potts?



**19**

(1) A. Uh-huh.
(2) Q. What water districts does your firm currently
(3) represent?
(4) A. In addition to those two, Red Bluff Municipal
(5) Water Power District. I'm drawing a blank, but I'm
(6) sure there are a couple more out there.
(7) Q. In the past has your firm represented any
(8) other water districts or MUDs that you can recall?
(9) A. Yes, but I'm not able to recall which ones
(10) they were.
(11) Q. Approximately how many?
(12) A. Two or three, four.
(13) Q. So your firm has represented half a dozen or
(14) more MUDs or water districts over the course of the
(15) firm's life?
(16) A. I would -- I would guess so.
(17) Q. Which attorneys in your firm currently --
(18) withdraw that.
(19) Which attorneys in your firm have
(20) represented Northwest Austin MUD Number One?
(21) A. Of our current attorneys that are there I
(22) think really just myself. I don't know that I've asked
(23) anyone else to look at anything, but I can't promise
(24) that. Occasionally we'll ask a lawyer to look at a
(25) question or two or something like that.

**20**

(1) Q. We saw Ms. Qualtrough's name in connection
(2) with some of these documents. She formerly was
(3) associated with the firm?
(4) A. She was formerly an associate with the firm,
(5) and we had her do some work for us on the file.
(6) Q. Okay. How was it that you became general
(7) counsel to the Northwest Austin MUD Number One?
(8) A. I received a call from Don Zimmerman, and this
(9) was I think immediately after the 2002 election. I
(10) was awaiting the results from the election, if I recall
(11) correctly, and said that he had heard from a friend --
(12) and I don't recall which friend -- that I practiced in
(13) the area of water districts and general districts and
(14) that sort of thing, had some general questions about
(15) the process of the elections and so forth. Shortly
(16) thereafter he asked did I mind coming to their next
(17) board meeting and so I did. And I was hired sometime
(18) shortly after that. I don't recall the exact time of
(19) the nature of it.
(20) Q. Had you ever met Mr. Zimmerman prior to
(21) receiving that phone call?
(22) A. Not that I recall.
(23) Q. Had you met any of the other members of the
(24) board of the MUD prior to talking to Mr. Zimmerman?
(25) A. No.

**21**

(1) (Brief Interruption)
(2) Q. (By Mr. Blustein) How long have you known
(3) Greg Coleman?
(4) A. Gosh, I don't recall when we first met. Five
(5) or six years probably, just guessing.
(6) Q. Do you recall how you met?
(7) A. Just here in legal circles. I believe he was
(8) solicitor general for the attorney general when I first
(9) met him.
(10) Q. Have you done any legal work relating to the
(11) Voting Rights Act during your career?
(12) A. Worked on a submission or two for preclearance
(13) matters before the Justice Department relating to some
(14) water districts.
(15) Q. What was the first case that you handled in
(16) your career that related to the Voting Rights Act?
(17) A. You know, I think it was the creation of a new
(18) district, and honestly I can't recall which district it
(19) was, but it was a new water district that we assisted
(20) someone in getting past the legislature. It was either
(21) the creation of or maybe it was modification. I
(22) honestly don't recall. It was probably eight years ago
(23) or something. I slept a little bit since then.
(24) Q. Do you recall which district that was?
(25) A. I don't.

**22**

(1) Q. Was a Section 5 submission made to the Justice
(2) Department in connection with that work?
(3) A. Yes.
(4) Q. Have you handled any other Section 5
(5) submissions to the Department of Justice in your
(6) career?
(7) A. I believe that one plus the one at the
(8) district that Ms. Qualtrough primarily did the work on
(9) are the only two that I've done.
(10) Q. Any other Section 5 submissions that your firm
(11) has made on behalf of any clients?
(12) A. None that come to my mind.
(13) Q. You yourself handled the Section 5 submission
(14) that was made approximately eight years ago that was
(15) the first one that you -- I think you mentioned?
(16) A. Yes. And the reason I don't recall, it was a
(17) former law partner, which brown, it was one of his
(18) clients that he was asking me to do that. So I'm fuzzy
(19) on the details. It wasn't something I was involved in
(20) from start to finish.
(21) Q. Okay. Have you been involved in any cases
(22) relating to Section 2 of the Voting Rights Act during
(23) your career?
(24) A. Not to my knowledge. Although I say that.
(25) I'm not familiar with each of the individual sections

**23**

(1) of the act, so perhaps there is something, but I --
(2) Q. Have you handled any other matters during your
(3) career that related to the Voting Rights Act?
(4) A. No.
(5) Q. Have you ever participated in any seminars
(6) relating to the Voting Rights Act?
(7) A. Not that I can recall.
(8) Q. Have you ever been a speaker at any seminar
(9) relating to the Voting Rights Act?
(10) A. Not a seminar for the act, no.
(11) Q. Have you ever been on any panel discussions
(12) involving the topics relating to the Voting Rights Act?
(13) A. Not that I recall.
(14) Q. Have you ever participated in any continuing
(15) legal education courses relating to the Voting Rights
(16) Act?
(17) A. Not that I can recall.
(18) Q. Is your firm involved in any educational
(19) seminars relating to the Voting Rights Act?
(20) A. Not that I know of.
(21) Q. Are there any other lawyers in your firm
(22) currently or in the past who have performed work
(23) relating to the Voting Rights Act?
(24) A. I don't think so. Donna Davidson in our firm
(25) perhaps has done something in the past, but I don't

**24**

(1) think she's ever done anything with our firm with
(2) regard to the Voting Rights Act, but she might have
(3) with regard to a client or two.
(4) Q. Is there an attorney in your firm named Marc
(5) Levin?
(6) A. There is.
(7) Q. And how long has he been affiliated with the
(8) firm?
(9) A. Gosh, I -- approximately two years, I believe.
(10) Q. During his -- during his tenure with the firm
(11) has he been involved in any cases involving the Voting
(12) Rights Act?
(13) A. Not that I recall.
(14) Q. Let me ask about the type of work that your
(15) firm does for MUDs and for water districts. What kinds
(16) of legal services, generally speaking, does your firm
(17) provide for water districts and MUDs?
(18) A. Typically general counsel type services where
(19) we advise them on compliance with applicable laws and
(20) regulations and be sure that they're in compliance with
(21) those and occasionally doing specific things for them
(22) when they need them before the Texas Commission on
(23) Environmental Quality or even the legislature.
(24) Q. And what areas of law are touched upon in
(25) connection with those general counsel duties?

(Pages 19 to 24)

25

(1) A. As you can imagine, being general counsel it's
(2) a little of everything. It's contract law. It's
(3) environmental law. It's special district law that
(4) relates to how the districts are created and operated.
(5) It is general governmental law with regard to
(6) investments and depository agreements and that sort of
(7) thing. Pretty broad range.
(8) Q. And would that description of the kind of
(9) services provided by your firm to MUDs and water
(10) districts generally apply specifically to the work your
(11) firm has done for Northwest Austin MUD Number One?
(12) A. Yes.
(13) MR. BLUSTEIN: Could I ask you to mark
(14) this, please?
(15) (Exhibit 16 marked)
(16) Q. (By Mr. Blustein) Mr. Reilly, I'm showing you
(17) what's been marked as Exhibit No. 16. Would you take a
(18) moment to familiarize yourself with that document,
(19) please?
(20) A. Yes, sir.
(21) Q. Could you identify it for the record, please?
(22) A. It appears to be a bill from our firm to the
(23) district for the period ended September 30th, 2004.
(24) Q. I'm trying to get an idea of the various kinds
(25) of work that your firm has performed for this district

26

(1) in the past. And the reason I have asked you to look
(2) this document over is to see if this document might be
(3) able to help us get a better picture of the kinds of
(4) services you provided.
(5) A. Okay.
(6) Q. Could I ask you, please, to walk us through
(7) each entry on this two-page document and briefly
(8) describe the nature of the work that was performed by
(9) your firm for the MUD?
(10) MR. COLEMAN: Before you answer that,
(11) beyond what's here I'll caution you against divulging
(12) specific conversations that you've had with your
(13) clients that might be governed by an attorney/client
(14) privilege.
(15) THE WITNESS: Sure.
(16) Q. (By Mr. Blustein) Understood. And I'm more
(17) interested in the areas of law that -- and the type of
(18) services that you provide to the MUD.
(19) A. The first entry is an entry from
(20) Ms. Qualtrough. She notes an office conference with me
(21) regarding conveyance of facilities to the City of
(22) Austin, and also she apparently performed some research
(23) on the notice of hearing on the tax rate that the
(24) district had adopted, so those are issues related to
(25) contract law and special district law and/or taxation

27

(1) law, if you will, for the district. Is that in the
(2) nature of what you're looking for?
(3) Q. Yes. Yes, it is.
(4) A. The next entry would be another conversation
(5) with her regarding the district's deposits and general
(6) compliance with the -- some of the laws with regard to
(7) district depository funds, likewise my time entry with
(8) regard to Bank One and conveyance of facilities and tax
(9) rate notice, which is similar to Ms. Qualtrough's.
(10) THE REPORTER: Could you speak up just a
(11) little bit?
(12) THE WITNESS: Sure. Note that we have
(13) two different days, and that occasionally happens when
(14) we write down over time a little late. Next one was
(15) more conversations Ms. Qualtrough had with regard to
(16) the banking depository. She drafted a notice on the
(17) agenda regarding collateral issue, which I presume
(18) would relate to the Bank One conversations. And she
(19) apparently researched something to do with the public
(20) notice posted at the courthouse. I assume that goes
(21) back to the tax rate but don't know. She had phone
(22) conferences with a couple of the district's bond
(23) counsel lawyers, Mr. Davenport and Mr. Braden. She
(24) spoke to the client regarding creation documents of the
(25) district. She had a conversation with Mr. Zimmerman

28

(1) regarding somebody's need for documents. I don't know
(2) what that was. It must have been an open records
(3) request, I guess. The time entry for me for preparing
(4) for and attending the monthly board meetings, which I
(5) typically do. An office conference with me regarding
(6) conveyance of Trailhead Park and a request from
(7) auditors with regard to that. That's a contractual
(8) agreement between the city and the district on the
(9) conveyance of Trailhead Park. Had another time entry
(10) with Kerrie for a conversation on working through the
(11) issues with the city. Qualtrough had correspondence to
(12) John Tresnicky regarding conveyance and acceptance of
(13) the facilities. That would have been contractual in
(14) nature between the district and the City of Austin.
(15) She had a phone conversation with somebody regarding
(16) accounting purposes. I don't know what that is. Legal
(17) research regarding whether the creation of contracts
(18) address changes to park facilities requiring city
(19) approval and contractual law. And that's pretty much
(20) it for that. I took a look at the appellants' brief
(21) and some litigation that the district was involved in
(22) and received a notice of filing of application for a
(23) hearing on rezoning some property that was probably
(24) adjacent to some district-owned property. We would
(25) have forwarded that on to the client no doubt. And

29

(1) received and reviewed second notice of public hearing
(2) regarding zoning change.
(3) Q. (By Mr. Blustein) Thank you.
(4) A. Pretty boring stuff.
(5) Q. Is this fairly representative of the kinds of
(6) legal issues that the firm handles for Northwest Austin
(7) MUD Number One?
(8) A. Yes.
(9) Q. Were there any matters relating to the
(10) district's voting responsibilities that the firm worked
(11) on during this billing period?
(12) A. Does not look to be the case.
(13) Q. And the total amount of the legal services for
(14) that particular billing period is, if I read this
(15) correctly, $2,510; is that correct?
(16) A. That's correct?
(17) Q. And is that within the range of the typical
(18) for services that the firm has provided for the MUD?
(19) A. Yes. It ranges, but typically it's around
(20) that number, 2,000, 2,500 or so a month. It might be
(21) less or a little more depending on what we're doing.
(22) Q. Some of the legal practice areas that you've
(23) touched on here today relate to state and federal
(24) regulations I imagine; is that correct?
(25) A. Yes. I would assume so.

30

(1) Q. I heard mention of the Open Records Act for
(2) one. If you would, take a moment and if you could
(3) identify for me the federal -- federal regulations that
(4) apply to the Northwest Austin MUD Number One that the
(5) MUD must comply with.
(6) A. Gosh, I don't know. Obviously the ones that
(7) we're here today on would be some of those. The
(8) district is a very unique district as you probably
(9) learned throughout this litigation in that we don't own
(10) the facilities or operate the facilities, so the -- or
(11) at least if we do it's a very brief period of time.
(12) And by facilities I mean water/wastewater facilities.
(13) Very brief time and then transferred to the City of
(14) Austin, who then takes over those responsibilities.
(15) Our practices are typically payment of the debt, the
(16) bond debt to pay for those facilities and through tax
(17) rates and operation of the district's park. So I'm
(18) trying to think of the context of those what other --
(19) I'm at a bit of a blank.
(20) Q. Clean Water Act apply?
(21) A. Only to the extent they relate to our
(22) facilities. Clean Water Act would apply to the City of
(23) Austin, Drinking Water Act, those sorts of things.
(24) But, again, we don't own or operate the facilities.
(25) Q. What about the Endangered Species Act?

(Pages 25 to 30)

**31**

(1)  A.  That certainly applies to us in our
(2)  conservation areas.
(3)  Q.  What kind of state regulations apply to the
(4)  district that it must comply with?
(5)  A.  A lot of those things we've already gone
(6)  through.  The requirements related to the financial
(7)  aspects of the district as far as everything from Pay
(8)  Act, where we have to pay things within a certain time
(9)  period, to the Public Information Act, also known as
(10)  the Open Records Act, to filing of our audits with the
(11)  district -- I mean with the Texas Commission on
(12)  Environmental Quality, to -- those sorts of things.
(13)  There is a myriad of them out there as you can see as
(14)  we walk through this.
(15)  Q.  Of the -- of the various legal work that the
(16)  firm performs for water districts and MUDs, what
(17)  percentage of that legal work involves elections?
(18)  A.  I would be hard-pressed to come up with a
(19)  number, but it is a part of it obviously because they
(20)  all or almost all of them have elections.  So every two
(21)  years in this case we have election-related matters,
(22)  and for the months in which we're working on the
(23)  elections it's a pretty high percentage of their bill
(24)  most likely.  The rest of the time it's not.  I really
(25)  couldn't come up with a number for you.

**32**

(1)  Q.  And what kinds of services relating to
(2)  elections does the firm provide for the Northwest
(3)  Austin MUD Number One?
(4)  A.  We prepare their orders, their notices, so
(5)  forth for the elections.  Prior to entering into any
(6)  contract with the county we would have probably done a
(7)  few other election-related items, but that's primarily
(8)  what we do.  And we also help them prepare the ballot,
(9)  get them translated to Spanish, as well is a
(10)  requirement here in Texas.  Just be sure that they
(11)  comply with the law and take all those steps they need
(12)  to take to hold the election.
(13)  Q.  Can you describe for us the firm's arrangement
(14)  with Northwest Austin MUD Number One with respect to
(15)  the fees for legal work that your firm does?
(16)  A.  We have agreed to cap our monthly retainer
(17)  of -- I guess retainer is the wrong word for it -- our
(18)  monthly legal fees at 2,500 unless we're doing
(19)  something unusual and outside the scope of the normal
(20)  monthly things.  We've been pretty flexible with that.
(21)  A lot of times we're doing things outside the normal
(22)  scope of what we do and we still cap it at 2,500.  It
(23)  just depends.  We just try to do that so that for
(24)  budget purposes they don't go over, typically.
(25)  Q.  If you could educate me a little bit, is it

**33**

(1)  $2,500 a month flat fee or is it $2,500 --
(2)  A.  No.
(3)  Q.  -- a cap?
(4)  A.  2,500 cap.
(5)  Q.  Okay.  And what kinds of legal services are
(6)  covered by this 25 -- or by this --
(7)  A.  Typically these sorts of things that you would
(8)  see in this Exhibit 16.  It would be attendance at the
(9)  board meetings, preparation of agendas, review and
(10)  preparation of minutes, maintaining the records,
(11)  handling small routine calls of -- from board members
(12)  or customers of the district, those sorts of things.
(13)  Things that would be outside of it would
(14)  be litigation, would be special research projects that
(15)  they might ask us to prepare an opinion on.  Again, as
(16)  I said, we've been pretty flexible on that.  Most of
(17)  the time those sorts of things can be worked into the
(18)  cap at will.  A lot of months we bill less than the
(19)  2,500, of course.
(20)  Q.  Has the firm had similar financial
(21)  arrangements with other MUDs and water districts?
(22)  A.  It varies with the districts as to our
(23)  individual billing practices.  I don't have
(24)  any quite like that, but it's not unusual, I don't
(25)  think.

**34**

(1)  MR. BLUSTEIN:  Would you mark this,
(2)  please?
(3)  (Exhibit 17 marked)
(4)  Q.  (By Mr. Blustein)  Mr. Reilly, I'm showing you
(5)  what's been marked as Exhibit No. 17, which for the
(6)  record was produced to us by the district in response
(7)  to our document requests.  It's Bates No. P 004815.
(8)  After you've had a chance to take a look at it, if you
(9)  could identify the document for the record, please.
(10)  A.  Appears to be an e-mail from Kerrie Qualtrough
(11)  to one of our legal assistants requesting her to look
(12)  through our files, our correspondence files, for e-mail
(13)  or correspondence from me to the board regarding
(14)  election costs.
(15)  Q.  Patti, the person referenced in the e-mail, is
(16)  affiliated with your firm?
(17)  A.  She's a legal assistant.
(18)  Q.  And do you know what document it's referred to
(19)  here in the e-mail as the, quote, e-mail or memo from
(20)  Frank to the board regarding election costs, end quote,
(21)  is?
(22)  A.  No, I don't, other than I would just -- I
(23)  really don't.  If I did and I explained it, I'd
(24)  probably be violating privilege anyway, but I really
(25)  don't recall exactly which one it is.

**35**

(1)  Q.  You can put it aside.
(2)  A.  Okay.
(3)  Q.  Let me show you another document which has
(4)  already been marked as Exhibit No. 3.
(5)  A.  Uh-huh.
(6)  Q.  Have you seen this document before?
(7)  A.  Yes, I have.
(8)  Q.  And this is the -- can you tell us what it is?
(9)  A.  It's the Section 5 preclearance submission
(10)  Ms. Qualtrough prepared to submit to the Justice
(11)  Department in 2004.
(12)  Q.  And am I correct that Exhibit No. 3 is the
(13)  submission your firm made to the Justice Department on
(14)  behalf of the Northwest Austin MUD Number One --
(15)  A.  Yes.
(16)  Q.  -- relating to the agreement between the
(17)  district and Travis County such that Travis County
(18)  would perform election-related work for the district?
(19)  A.  Uh-huh.  That's correct.
(20)  Q.  Am I correct that you've been general counsel
(21)  to the district for over 4-1/2 years now, is it?
(22)  A.  That would be about right.
(23)  Q.  All right.  And is this submission dated
(24)  February 26, 2004 the only Section 5 submission by your
(25)  firm on behalf of the MUD Number One since the time

**36**

(1)  you've been general counsel?
(2)  A.  Yes.
(3)  Q.  And the Department of Justice approved the
(4)  proposed voting changes?
(5)  A.  Yes, they did.
(6)  Q.  Who in your firm worked on the submission?
(7)  A.  To my recollection, Ms. Qualtrough, and I
(8)  would have had a little bit of time into it, as well.
(9)  Q.  Anyone else?
(10)  A.  Not that I know of.
(11)  Q.  Did -- your firm was also involved in working
(12)  with Travis County to enter into the underlying
(13)  agreement, correct?
(14)  A.  That's correct.
(15)  Q.  Putting aside the work that your firm did in
(16)  connection with negotiating that election agreement
(17)  with Travis County and just focusing on the Section 5
(18)  submission that your firm made to the Department of
(19)  Justice, can you tell us how many hours the firm put
(20)  into preparing this Section 5 letter to the Justice
(21)  Department?
(22)  A.  I'd have to go back and look at the billing
(23)  records in detail to sort that out, which probably
(24)  would be a little bit difficult.  I would guess that
(25)  there are mixtures of -- as you see how we bill, we

(Pages 31 to 36)

**37**

(1) don't bill like they do in bankruptcy court. We block
(2) our time together sometimes. So we have to sort
(3) through and make some sort of calculation or
(4) guesstimation as to what it was, but I am sure -- I
(5) don't know. I don't have an answer. I guess let's
(6) leave it that way.
(7) Q. Do you recall what the process was within the
(8) firm -- excuse me -- as far as the preparation for the
(9) document? In other words, who took the lead?
(10) A. Ms. Qualtrough took the lead. I asked her to
(11) take a stab at it, and then I reviewed the final
(12) submission. I'm sure we had conversations throughout
(13) and questions and so forth which are typical in putting
(14) it together.
(15) Q. Was this Section 5 submission within the kinds
(16) of legal services that the firm provided within the
(17) $2,500 cap?
(18) A. I don't recall how we handled that. Like I
(19) said, we were flexible in that, and I don't recall
(20) whether we capped that or we went over the cap.
(21) Q. Would the -- would the firm's billing rate be
(22) different for legal services performed within the
(23) $2,500 cap as opposed to legal services performed on
(24) special projects?
(25) A. They're the same.

**38**

(1) Q. Do you have Exhibit 3 in front of you?
(2) A. Yes, I do.
(3) Q. Could you please go to the page that's Bates
(4) numbered P 09614?
(5) A. Uh-huh.
(6) Q. And have you -- have you seen this document
(7) before?
(8) A. Yes.
(9) Q. Can you identify it, please?
(10) A. It appears to be the agreements between the
(11) district and Travis County to have the county perform
(12) election services to conduct a joint election for the
(13) district.
(14) Q. And what members of the firm worked on this
(15) agreement with Travis County?
(16) A. That still would have been Ms. Qualtrough and
(17) myself.
(18) Q. And can you walk us through the various steps
(19) that the -- that the firm took in order to hammer out
(20) this contract, this agreement with Travis County?
(21) MR. COLEMAN: Once again I'll instruct
(22) the witness that a basic description of the steps is
(23) okay, but don't disclose any specific communications
(24) related to the negotiation for or direction of that
(25) document.

**39**

(1) THE WITNESS: Ms. Qualtrough was
(2) primarily involved in discussions with the county and
(3) working through this agreement, and all I -- it's been
(4) a little while, but all I recall is that we went back
(5) and forth on various things that needed to be placed
(6) into the contract, such as proper names and so forth.
(7) But as far as actually what happened, I really don't
(8) recall. Kerrie was -- Kerrie was involved in that on a
(9) day-to-day basis, this part of the election agreement.
(10) Q. (By Mr. Blustein) Who was involved?
(11) A. Kerrie Qualtrough.
(12) Q. Kerrie. Was this -- this is the -- this
(13) particular agreement with Travis County relates only to
(14) the May 2004 election, correct?
(15) A. That's correct.
(16) Q. There's a subsequent agreement which we'll get
(17) to in a moment entered last year with Travis County
(18) that is a more global future-oriented contract,
(19) correct?
(20) A. Correct.
(21) Q. Was this idea of having Travis County conduct
(22) elections for the district something that was discussed
(23) during meetings of the board?
(24) MR. COLEMAN: I will instruct the witness
(25) that to the extent discussions took place in the open

**40**

(1) portions of the meeting they're certainly fair game.
(2) To the extent that discussions take place in your
(3) executive sessions, if any did, those would be
(4) privileged.
(5) THE WITNESS: I don't recall what was in
(6) open or executive. Obviously we discussed it and they
(7) voted on it, they approved it, but the nature of those
(8) I don't recall.
(9) Q. (By Mr. Blustein) Can you tell us whose idea
(10) it was initially to have Travis County conduct the May
(11) 2004 election for the district?
(12) A. I don't remember. Kerrie may recall, but it
(13) seems to me that it came from the board, but I -- as
(14) something and then we explored with them, but it could
(15) very well have come from the county. But it seemed
(16) like it was a board request, "Would you look into
(17) this?" But I don't recall for sure.
(18) Q. What's your understanding of the board's
(19) reasons for wanting Travis County to conduct that
(20) May 2004 election in the district?
(21) MR. BLUSTEIN: Same -- same instruction?
(22) MR. COLEMAN: Same instruction. To the
(23) extent that those reasons come directly from
(24) conversations that have attorney/client privilege,
(25) don't disclose them.

**41**

(1) THE WITNESS: I'm going to have to pass
(2) on that question because I can't recall what was in
(3) executive session and what was in open session, as far
(4) as -- you can ask the board members, I suppose, what
(5) their motivations were. But I do know that the
(6) district wanted to have an election outside of the
(7) garage and into the school where much more people could
(8) participate. I know that cost was an issue, but it
(9) really wasn't, as I recall -- and I'm certain we
(10) discussed this part in open session, the cost concept.
(11) Whether it was less expensive or more expensive wasn't
(12) as major of an issue for them. But they were hopeful
(13) that it would be less. And it appeared that it was
(14) somewhat of a wash for the district as to whether or
(15) not to hold the whole election by itself elsewhere
(16) versus going in with the county and having the county
(17) help them participate. As I recall it was not a
(18) substantial savings, but I don't recall what it was.
(19) It may have actually cost more. The main reason as I
(20) recall was just moving for greater access to voters.
(21) Q. (By Mr. Blustein) And pursuant to this 2004
(22) agreement Travis County, in fact, conducted the May
(23) 2004 election for the district, correct?
(24) A. That's correct.
(25) Q. And as I understand from looking at the

**42**

(1) document, the district appointed Marilyn Wahl, W-a-h-l,
(2) as the district's regular -- regular early voting
(3) clerk. Is that your understanding?
(4) A. That's what it says.
(5) Q. Do you know who she is?
(6) A. She would have been a resident of the district
(7) no doubt, but I don't recall who she was.
(8) Q. You can put that one aside for a moment. Let
(9) me show you what's been previously marked as Exhibit
(10) No. 4. Have you seen this document before?
(11) A. Yes.
(12) Q. And can you identify it, please?
(13) A. It is a 2006 joint election agreement between
(14) the district and the county.
(15) Q. And what is the nature of this agreement?
(16) A. It was a joint election agreement which
(17) outlines the responsibilities between the parties for
(18) holding a joint election. The county would, as it did
(19) in 2004, be primarily responsible for staffing the
(20) election, holding it, and providing machines.
(21) Q. Is the gist of the agreement that the county's
(22) election officer will conduct elections for Northwest
(23) Austin MUD Number One?
(24) A. Yes.
(25) Q. And that the -- under the terms of the

(Pages 37 to 42)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

43

(1) agreement the MUD will use the county's voting
(2) equipment to conduct elections?
(3)    A.  Yes.
(4)    Q.  And that the elections will -- the elections
(5) for the MUD will take place at the election locations
(6) that the county uses?
(7)    A.  Correct.
(8)    Q.  And was the -- was this proposal to enter into
(9) this agreement, the 2006 agreement with Travis County,
(10) something that was discussed in open meetings of the
(11) board?
(12)    A.  Yes.
(13)    Q.  And what, generally, was the reason for
(14) entering into this agreement with Travis County in
(15) 2006?
(16)    A.  I think that the district was pleased with the
(17) county's performance with the same duties in 2004,
(18) liked having it at the school at the same time that
(19) everybody else was holding their elections, so that was
(20) the primary reason for entering into this agreement.
(21)    Q.  Is it fair to say that the district was happy
(22) with the county's administration of the election in
(23) 2004?
(24)    A.  Uh-huh.
(25)        MR. COLEMAN:  Yes or no.  I'm sorry.

44

(1)        THE WITNESS:  I'm sorry.  Yes.  As far as
(2) I know.
(3)    Q.  (By Mr. Blustein)  And the district wanted to
(4) continue that relationship with the county?
(5)    A.  Yes.
(6)    Q.  Could you look, please, at page 11 of the
(7) document?
(8)        MR. HERREN:  Is there a Bates number?
(9)        MR. BLUSTEIN:  Yes.  It's the first --
(10) the page 11 Bates number is P 009719.
(11)        THE WITNESS:  Gotcha.
(12)    Q.  (By Mr. Blustein)  This is the -- just make
(13) sure we're on the same page.  This is the page that's
(14) signed by Mr. Zimmerman and others.
(15)    A.  Yes, sir.
(16)    Q.  Okay.  And if I could turn your attention,
(17) please, to the paragraph that's number -- letter N, if
(18) you could familiarize yourself with that --
(19)    A.  Uh-huh.
(20)    Q.  -- provision.
(21)    A.  Yes, sir.
(22)    Q.  Pursuant to this provision am I correct that
(23) the agreement with Travis County expires on July 1st,
(24) 2011 and renews automatically for two additional
(25) three-year terms unless one party notifies the other in

45

(1) writing that it wants to terminate?
(2)    A.  That's correct.
(3)    Q.  So unless one party terminates this agreement,
(4) the joint election agreement with Travis County will
(5) continue until the year 2017; is that correct?
(6)    A.  Unless one party terminates the agreement
(7) under Section Og following N, yes, it will continue
(8) until July 1, 2011.
(9)    Q.  And it will renew automatically until 2017?
(10)    A.  As long as no one terminates it or no one
(11) provides notice to the other party that they wish to
(12) terminate it.
(13)    Q.  Going back to the various duties under the
(14) contract -- or under the agreement, rather, under the
(15) terms of the agreement am I correct that the Travis
(16) County clerk, who is the county's election officer,
(17) will conduct the MUD's elections including runoff
(18) elections?
(19)    A.  That's my understanding.
(20)    Q.  As far as the preparation of this 2006
(21) agreement with the county, is this document based upon
(22) preexisting agreements between the county and other
(23) local jurisdictions?
(24)    A.  It is a similar -- you know, I don't know what
(25) everyone else signed, but it's my understanding it's a

46

(1) very similar agreement that they entered into with
(2) other local jurisdictions.
(3)    Q.  Okay.  So your firm and the county and the
(4) district weren't reinventing the wheel in preparing
(5) this particular agreement?
(6)    A.  The county is the one that provided the
(7) original form to us.
(8)    Q.  Okay.
(9)    A.  I don't think so.
(10)    Q.  So it was actually the county itself that
(11) provided the first draft to you of the -- of the
(12) agreement?
(13)    A.  That's correct.
(14)    Q.  Could I turn your attention, please, to page 2
(15) of the agreement, which is Bates number 009710?  And
(16) the final paragraph on that page addresses the election
(17) duties of the participating entity, which is the
(18) district itself, correct?
(19)    A.  Uh-huh.  Yes, it is.
(20)    Q.  And if you'll take a look at the following
(21) page, am I correct that there are eight enumerated
(22) categories of election duties that are the
(23) responsibility of the district?
(24)    A.  Yes.
(25)    Q.  And let me turn your attention to paragraph 2

47

(1) on that Page No. 3, which is Bates number 009711.
(2) Could you take a look at that for a moment, please?
(3)    A.  Uh-huh.
(4)    Q.  Am I correct that under this agreement the
(5) district is responsible for, quote, preparing federal
(6) voting rights election preclearance submissions to the
(7) Department of Justice other than changes in a joint
(8) election conducted under this agreement that directly
(9) affect the county, end quote?
(10)    A.  Correct.
(11)    Q.  Is it your understanding that pursuant to this
(12) agreement the MUD would not be responsible for
(13) preparing a preclearance submission for any voting
(14) changes that relate to a joint election where those
(15) changes directly affect Travis County?
(16)    A.  That appears to be what the provision says,
(17) yes.
(18)    Q.  And that's your understanding of the
(19) agreement?
(20)    A.  Yes.
(21)    Q.  And is it your understanding that pursuant to
(22) this agreement Travis County would be responsible for
(23) preparing a preclearance submission for any changes in
(24) connection with the joint election that directly affect
(25) Travis County?

48

(1)    A.  Yes.
(2)    Q.  Did the MUD make a Section 5 submission
(3) relating to the 2006 agreement with Travis County?
(4)    A.  No.
(5)    Q.  Do you know if Travis County made such a
(6) Section 5 submission?
(7)    A.  I believe they did.
(8)        MR. COLEMAN:  We're about an hour and
(9) 15 minutes.  Do you need a break?
(10)        MR. BLUSTEIN:  I've got maybe three more
(11) minutes on this line of questioning, and then that
(12) would be a good time for a break if that's all right.
(13)        MR. COLEMAN:  Sure.
(14)        MR. BLUSTEIN:  Thanks.  Would you mark
(15) this for me, please?  Thank you.
(16)        (Exhibit 18 marked)
(17)    Q.  (By Mr. Blustein)  Mr. Reilly, I'm showing you
(18) what's been marked as Exhibit No. 18.  Could you
(19) familiarize yourself with that document?  Have you seen
(20) it before?
(21)    A.  I'm not sure whether I have or not.  I might
(22) have.  It might be in our files or something, but I'm
(23) not sure.
(24)    Q.  For the record, the heading of the document is
(25) Agreement to Conduct Joint Elections for May 13, 2006

(Pages 43 to 48)

---



55

(1) board was involved with the Save Our Taxpayers group?
(2)     A.  Seems like he was, but I don't -- I don't have
(3) any direct knowledge of that.
(4)     Q.  Did you ever have any conversations with Don
(5) Zimmerman about his work with Save Our Taxpayers?
(6)     A.  It's possible, but I don't -- I don't know.
(7)     Q.  Did you ever have any discussions with
(8) Mr. Zimmerman about this annexation election?
(9)     A.  Again, possible, but I don't recall.
(10)     Q.  Do you have any personal views one way or the
(11) other as to the constitutionality of Section 5 of the
(12) Voting Rights Act?
(13)     A.  No.
(14)     Q.  Do you care one way or the other whether the
(15) present suit brought by the MUD succeeds?
(16)     A.  Well, I think -- yeah, I do.  I mean, I think
(17) it would be good for the district to not have to go
(18) through the preclearance provisions, that it wouldn't
(19) have to be burdened by the district.  So by that, as
(20) well as a stigma that might be attached to the fact
(21) that they remain under that provision of the Voting
(22) Rights Act.
(23)     Q.  Do you have any views as to the
(24) constitutionality of Section 5?
(25)     A.  No.

56

(1)     Q.  Do you know if the firm billed the Project For
(2) Fair Representation for doing the amicus brief in the
(3) LULAC versus Perry matter?
(4)     A.  I do not know.
(5)     Q.  Other than the Northwest Austin MUD Number
(6) One, are you aware of any MUDs or water districts that
(7) have conducted elections at private residences?
(8)     A.  I am sure it's happened, but I am not
(9) personally familiar with any others.
(10)     Q.  Bear with me one minute.
(11)     A.  Sure.
(12)     Q.  And can you tell us a little bit more about
(13) why you're sure that it's happened?
(14)     A.  Well, it's just that MUDs are relatively easy
(15) to set up and you can set them up on a single parcel of
(16) land, and if there just happens to be one parcel of
(17) land and one voter I am sure that elections have
(18) happened in someone's residence or trailer home or
(19) something.  I mean, I've heard stories of developers
(20) bringing in trailer houses and putting a college
(21) student in there and renting it out to them so they
(22) have someone there to vote.  So I'm sure it's happened
(23) before.  But just -- I don't know that for a fact, but
(24) it just seems to make sense.
(25)     Q.  I have no further questions.  I guess --

57

(1) pardon me.  I believe you indicated earlier in your
(2) testimony that you opened your firm's files to counsel
(3) for the district in order to --
(4)     A.  Yes.
(5)     Q.  -- make available responsive documents --
(6)     A.  Uh-huh.
(7)     Q.  -- in connection with our discovery requests.
(8) Do you know who -- who within the law firm actually did
(9) the inspection of the documents in your files?
(10)     A.  Who within our law firm or counsel's law firm?
(11)     Q.  Either.  Either and both.
(12)     A.  Well, in our law firm it would have been --
(13) I'm just saying myself and my legal assistant, Marti
(14) Asher.  I think Mr. Ward and Mr. Coleman reviewed
(15) files.  I don't know beyond that.
(16)     Q.  Did you yourself actually see a copy of the
(17) document request?
(18)     A.  Yes, I did.
(19)     Q.  Do you know when the review of the document
(20) inspection and review of your files occurred?
(21)     A.  No.  I don't recall specifically.
(22)     Q.  Did you make electronic files available also?
(23)     A.  Yes, I did.  I believe so.
(24)     MR. BLUSTEIN:  I don't have any further
(25) questions on behalf of the NAACP and the intervenors at

58

(1) this point, so I'm going to turn questioning over to my
(2) colleagues.
(3)     THE WITNESS:  Sure.  Thank you.
(4)     EXAMINATION
(5) QUESTIONS BY MS. GRAY:
(6)     Q.  I'm Danielle Gray, counsel for the Louis
(7) intervenors, and I just have a few questions.
(8)     A.  Yes, ma'am.
(9)     Q.  Are you aware of whether the MUD has ever
(10) conducted voter registration?
(11)     A.  No, I'm not aware of that.
(12)     Q.  You're not aware?
(13)     A.  No.
(14)     Q.  Do you have any reason to believe that they
(15) have?
(16)     A.  No.  No reason to believe they have or no
(17) reason to believe they haven't.  I'm just -- I'm not
(18) aware at all.
(19)     Q.  And are you aware of any steps taken by the
(20) MUD to publicize their efforts to obtain pre -- to
(21) obtain bailout in the preclearance requirement?
(22)     A.  Publication to -- for the bailout provision?
(23)     Q.  Right.  So are any efforts taken by the MUD to
(24) publicize its current efforts via this litigation to
(25) obtain bailout?

59

(1)     A.  No, I'm not aware of any.
(2)     Q.  You're not aware of any?
(3)     A.  No.
(4)     Q.  Okay.
(5)     EXAMINATION
(6) QUESTIONS BY MS. PERALES:
(7)     Q.  Good afternoon, Mr. Reilly.  My name is Nina
(8) Perales, and I represent the Diaz intervenors.  Where
(9) did you grow up, Mr. Reilly?
(10)     A.  I grew up in San Antonio and in Granite
(11) Shoals, Texas.
(12)     Q.  What's that second place?
(13)     A.  Granite Shoals, Granite Shoals.  It's a small
(14) town west of here.
(15)     Q.  Were you born in San Antonio?
(16)     A.  I was born in San Antonio.
(17)     Q.  Did you go to school in San Antonio?
(18)     A.  I attended elementary school in San Antonio
(19) and some middle school.
(20)     Q.  And which elementary school did you attend?
(21)     A.  Sunset Hills Elementary and Garner Middle
(22) School.
(23)     Q.  Garner Middle School.  And what part of town
(24) would you characterize your -- the neighborhood in
(25) which you lived?

60

(1)     A.  During the elementary years it was -- I would
(2) call it -- it's been a long time since I've been there.
(3)     Q.  You're such a young man.  I know you can't
(4) remember.
(5)     A.  Yeah.  But I would think it would probably be
(6) considered southwest, and for the middle school it
(7) would have been north side, northeast.
(8)     Q.  Did you -- did you go to elementary school
(9) around Kelly Air Force Base?
(10)     A.  I don't believe so.
(11)     Q.  And for middle school did your family move at
(12) that time?
(13)     A.  Yes.
(14)     Q.  And about what area did they move to?
(15)     A.  Just north of Loop 410 around Starcrest, in
(16) that area.
(17)     Q.  And how old were you when you left San
(18) Antonio?
(19)     A.  Well, I left when I was about seven or eight
(20) originally.  Then we moved to Granite Shoals, and then
(21) for a brief period of time we moved back to San Antonio
(22) for about half a year to Garner Elementary.  So eight,
(23) moved back when I was about ten or so.
(24)     Q.  So did you stay -- after about -- after the --
(25) what age did you stay in Granite Shoals?

(Pages 55 to 60)

ACUSCRIBE COURT REPORTERS
(800) 497-0277



**61**

(1)  A.  After probably about 11.
(2)  Q.  And so did you finish out middle school there
(3)  in Granite Shoals?
(4)  A.  I did.  Middle school and high school.
(5)  Q.  And what is the name of the high school that
(6)  you attended?
(7)  A.  Marble Falls High School.
(8)  Q.  And what school district is that in?
(9)  A.  That's in the Marble Falls ISD.
(10)  Q.  I know it better when you say Marble Falls.
(11)  A.  Yeah.
(12)  Q.  Were there tasks in your -- were there tasks,
(13)  legal tasks, that you performed for the MUD that were
(14)  sufficiently insignificant that they didn't show up on
(15)  your billing records?
(16)  A.  Possibly.  Occasionally.  Sometimes we don't
(17)  write everything down and if you-all do bills you know
(18)  that sometimes you forget to make entries, but possibly
(19)  there are some tasks that were insignificant that I'm
(20)  not aware of it.  It's entirely possible.
(21)  Q.  And when you bill did you -- you personally,
(22)  would you bill to review preclearance submissions?
(23)  A.  Yes.
(24)  Q.  Or the one that you-all did?
(25)  A.  Yes.  Normally so, yes.

**62**

(1)  Q.  Do you recall how long it took you to review
(2)  the preclearance submission in 2004?
(3)  A.  No, I don't.  I mean, I know that I was also
(4)  involved in the preparation of it somewhat because
(5)  Ms. Qualtrough would come to me with questions, so it
(6)  was not just a matter of taking her work product and
(7)  reading it over once or twice and tweaking it and
(8)  letting it go, but there was some involvement.  Not a
(9)  major amount.  She didn't -- she did the work on it.
(10)  Q.  Do you recall whether you billed
(11)  specifically -- you said already that you billed
(12)  specifically for time working on preclearance
(13)  submission.
(14)  A.  As far as I recall.
(15)  Q.  In all do you know about how much time you
(16)  spent working on that submission?
(17)  A.  Oh, I imagine a couple hours or so at least.
(18)  Q.  Do you remember communicating with anybody
(19)  besides Ms. Qualtrough about either the form or the
(20)  content of the submission?
(21)  A.  No, although we might have had a question or
(22)  two to the Justice Department as we were preparing it,
(23)  but I don't recall.
(24)  Q.  Do you recall when you worked on the 2004
(25)  submission the extent to which you relied on copies of

**63**

(1)  previous submissions that had been sent in by the
(2)  district?
(3)  A.  I don't, because Ms. Qualtrough did the
(4)  reliance on it, so I'm not sure how much she relied on
(5)  what was previously there.
(6)  Q.  Did you in the process of preparing the 2004
(7)  submission refer to the federal regulations guiding the
(8)  form and content of submissions?
(9)  A.  I would assume so.
(10)  Q.  Do you recall whether you made any changes to
(11)  either the form or the content of the submission
(12)  compared to the previous submission that had not been
(13)  done by your firm?
(14)  A.  I do not know.
(15)  Q.  Do you recall specifically doing any work
(16)  yourself on the 2004 submission related to the
(17)  demographics of the district, either total population
(18)  or minority population?
(19)  A.  I don't recall whether I did any.  I really
(20)  don't know whether I did any original work on that or
(21)  not.  Ms. Qualtrough handled that.
(22)  Q.  Do you recall either considering the issue in
(23)  the 2004 submissions of presence of language minority
(24)  voters in the district or not considering it?
(25)  A.  I don't --

**64**

(1)  MR. COLEMAN:  To the extent the
(2)  consideration would include attorney work product or
(3)  other privileged material, I will instruct you not to
(4)  respond, but I'm not sure she's getting there.
(5)  THE WITNESS:  Yeah.  No, I -- I don't
(6)  recall there was an issue one way or the other.
(7)  Q.  (By Ms. Perales)  Skipping around a little bit
(8)  in my outline to make sure that I don't reask any
(9)  questions that have already been asked.  Would it be
(10)  correct to say that since you became counsel for the
(11)  district the district has not administered any of its
(12)  own elections?
(13)  A.  To the extent that we contracted out to the
(14)  county to handle those activities, yes, as far as the
(15)  day-to-day elections, that's correct.  There are
(16)  certain duties, of course, the district would have to
(17)  do to hold the election.
(18)  Q.  I recall you mentioned earlier that one of the
(19)  duties would be to prepare the language of the ballot;
(20)  is that correct?
(21)  A.  That's one of the duties, yes.
(22)  Q.  And I believe you also mentioned that another
(23)  duty was to secure a Spanish language translation of
(24)  the ballot; is that right?
(25)  A.  That's correct.

**65**

(1)  Q.  Tell me how you did that for 2004.
(2)  A.  Ms. Qualtrough was involved in that, as well.
(3)  But I recall we contracted with a professor at the
(4)  University of Texas so we had it correct.
(5)  Q.  Do you remember his name?
(6)  A.  No, I sure don't.
(7)  Q.  Do you know if you -- if you contracted with
(8)  the same professor for 2006?
(9)  A.  I don't know that we did -- well, maybe we
(10)  did.  I don't recall whether we had the contract with
(11)  somebody in '06 or that we were able to just change the
(12)  names of the people involved in the election.  I really
(13)  don't recall what we -- no.
(14)  Q.  What is your understanding of the obligation
(15)  of the district to provide voting assistance to voters
(16)  with limited English proficiency?
(17)  A.  We are required to provide the materials in
(18)  bilingual format.  I'm not sure that we have -- beyond
(19)  that I'm not sure what else the district's obligations
(20)  would be.
(21)  Q.  And when you say materials, are you referring
(22)  to written materials?
(23)  A.  Written materials, yes.
(24)  Q.  Do you have an understanding of whether these
(25)  obligations spring from requirements in state law or

**66**

(1)  federal law or both?
(2)  A.  Perhaps both.
(3)  Q.  Do you have any specific knowledge of any
(4)  federal requirements?
(5)  A.  I am not 100 percent certain.  I just know
(6)  that it is required and -- but I'm pretty certain it's
(7)  required in the federal Voting Rights Act.
(8)  Q.  Are you familiar with any state requirements
(9)  to provide assistance to limited English proficient
(10)  voters?
(11)  A.  The bilingual translation requirements I
(12)  believe are also in the Texas Statute Code.
(13)  Q.  Do you -- I think I heard this earlier, but I
(14)  just wanted to be sure.  Did you say that it is your
(15)  practice to attend district board meetings?
(16)  A.  That's correct.
(17)  Q.  And have you attended them all since you
(18)  became counsel for the district?
(19)  A.  I've missed some, but typically one of our --
(20)  either myself or one of our attorneys will cover the
(21)  board meeting.
(22)  Q.  Do you know if the district has ever made
(23)  available voter registration applications at any of its
(24)  meetings?
(25)  A.  I do not know.

(Pages 61 to 66)

67

(1)    Q.   Have you ever seen a voter registration
(2)  application distributed at any meetings of the
(3)  district?
(4)    A.   Not that I recall.  Our meetings are pretty
(5)  sparsely attended.
(6)    Q.   Do you know if the district has a printed
(7)  newsletter?
(8)    A.   No, it does not.
(9)    Q.   Have you ever attended a meeting of the
(10) district in which a Spanish language interpreter was
(11) there to interpret the proceedings?
(12)   A.   No.
(13)   Q.   Have you ever seen an agenda for district
(14) board meetings that was translated into the Spanish
(15) language?
(16)   A.   No, I have not.
(17)   Q.   I believe you testified earlier that your firm
(18) represents a number of municipal utility districts or
(19) other special districts; is that right?
(20)   A.   That's correct.
(21)   Q.   And can you give me a sense of how many
(22) special districts including municipal utility districts
(23) are represented by your firm?
(24)   A.   Discussed that earlier, and my recollection is
(25) I can think of only two municipal utility districts we

68

(1)  currently represent and one other water district type
(2)  entity.  I could be mistaken.  There may be others.
(3)  But three right now is all I can think of.
(4)    Q.   Do you represent any other kinds of special
(5)  districts?
(6)    A.   Those are it, just those that we discussed.
(7)    Q.   Do you represent any cities?
(8)    A.   We have done some work for cities, yes.
(9)    Q.   And have they largely been in the area of
(10) Travis County?
(11)   A.   They've been across the state, East Texas and
(12) West Texas.
(13)   Q.   Have many of them been of a smaller type of
(14) city?
(15)   A.   Some are small.  Some have been larger cities.
(16)   Q.   Would it be fair to say that in your
(17) observation as an attorney that many smaller political
(18) jurisdictions contract out their election
(19) administration to the county?
(20)   A.   I'm not sure I can speak to that because a lot
(21) of those we don't always represent.  I would say there
(22) are a fair number that do.  More have done so as
(23) requirements of how they have come into place, so
(24) forth.
(25)   Q.   Do the other MUDs that you represent contract

69

(1)  out their election administration to their counties?
(2)    A.   I do not know.  I don't represent Emerald Day
(3)  MUD, although I've done some work on their behalf, and
(4)  so I don't know how their elections are held.  The
(5)  municipal water power district board is appointed
(6)  rather than elected.  So --
(7)    Q.   Do you have an understanding of why the
(8)  district at issue in this case did not enter into an
(9)  agreement with Travis County to administer its
(10) elections before 2004?
(11)   A.   No, I don't know.
(12)   Q.   When the issue came up of the possibility of
(13) this district contracting with Travis County to
(14) administer an election -- its elections, did you
(15) consider that a good idea?
(16)   A.   I considered it one worthy of studying and for
(17) the district to take a look at.  It was not a bad idea.
(18)   Q.   Can you tell me what the benefits are?
(19)   A.   As far as I'm concerned the benefits are it's
(20) easier for the district to hold the elections because
(21) they don't have to find people to staff it all day
(22) long.  In this particular case it allowed them to move
(23) into the school to where they have these joint
(24) elections with other entities which increases voter
(25) turnout and participation in the district's elections.

70

(1)  I would say the cost was I think somewhat of a wash.
(2)    Q.   And it would also mean that the district would
(3)  not have to identify poll workers or election judges;
(4)  is that right?
(5)    A.   That would be correct.
(6)    Q.   And the district also wouldn't have to train
(7)  the poll workers or the election judges?
(8)    A.   That's correct.
(9)    Q.   And the district wouldn't have to provide any
(10) paper ballots or electronic ballots; is that right?
(11)   A.   That's correct.
(12)   Q.   And the district wouldn't have to tabulate any
(13) ballots; is that right?
(14)   A.   That's correct.
(15)   Q.   You mentioned earlier that one of the election
(16) duties that the district retains under its agreement
(17) with Travis County is to prepare election notices.  Do
(18) you remember that testimony?
(19)   A.   Generally, yes.
(20)   Q.   And when you say election notices, do you --
(21) do you mean those things which are called order of
(22) election?
(23)   A.   Yes.
(24)   Q.   And are those generally posted in some public
(25) manner prior to the election?

71

(1)    A.   Yes.
(2)    Q.   And have you ever had a notice of election
(3)  translated?
(4)    A.   Yes, we have.
(5)    Q.   And did you have it translated in the same
(6)  manner that you translated your ballot?
(7)    A.   Yes.
(8)    Q.   Does the district present resident lists to
(9)  the county under its election agreement?
(10)   A.   I would have to look at the agreement, but I
(11) don't believe so.  We just use qualifying voters within
(12) the district and the county makes that determination.
(13)   Q.   And what is your understanding of how the
(14) county makes a determination about whether or not a
(15) qualified voter lives in the district?
(16)   A.   The county has possession of our district
(17) boundaries; metes and bounds, description of it, so I'm
(18) not sure how they make that determination from there,
(19) but they take that with their databases and merge them
(20) together.
(21)   Q.   I notice in the agreement with Travis County
(22) that you are named as the absentee ballot coordinator,
(23) essentially.  Do you -- do you understand that you have
(24) that function?
(25)   A.   I understand that it says that in there.  I

72

(1)  don't believe we received any absentee ballot requests
(2)  in this last election.
(3)    Q.   Do you remember if you received any absentee
(4)  ballot requests in 2004?
(5)    A.   Not to my recollection.
(6)    Q.   So since you became counsel for the district
(7)  and also assumed the responsibility of sending out
(8)  absentee ballots you can't recall receiving any
(9)  applications?
(10)   A.   I do not recall receiving any.
(11)   Q.   Can you tell me how a voter in the district
(12) would know to apply to you for an absentee ballot in a
(13) MUD election?
(14)   A.   Good question.  I don't really know what that
(15) procedure would be, other than if they had seen the
(16) order or whatever else, but --
(17)   Q.   Have you ever seen an application for an
(18) absentee ballot for a district election?
(19)   A.   No.
(20)   Q.   Tell me what your understanding is of what the
(21) district still would have to preclear in light of its
(22) agreement with Travis County that Travis County would
(23) administer district elections.
(24)   A.   There could be a number of things, I suppose.
(25) First of all, that presupposes the agreement remains in

(Pages 67 to 72)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

73

(1)  place which, of course, it's terminable at will. But
(2)  if the district were interested in changing the way in
(3)  which somehow the time and place of the election were
(4)  to be held for the district itself they would have to
(5)  preclear that. So if the district decided it no longer
(6)  desired the county's services, which it could do at any
(7)  given time, and hold the election elsewhere, that it
(8)  would need to do that. If the district decided it
(9)  wanted to change from the current form of election
(10)  where we vote according to the order for -- if you
(11)  have -- for example, you have one spot open -- or let's
(12)  say you have three spots open and you have three
(13)  candidates. Well, we'll cancel the election. But if
(14)  we have four people running, then the top three people
(15)  receive or are put into office. But if we went to a
(16)  place system or something similar to that, then we
(17)  would obviously have to preclear that with the
(18)  department.
(19)      Q.  Other than a change from at large to numbered
(20)  place or what we call a peer at large to numbered
(21)  place, if the agreement with Travis County remained in
(22)  effect, can you think of any other change that the
(23)  district would have to preclear?
(24)      A.  If the district had any desire in some point
(25)  in the future to change its boundaries to include or

74

(1)  exclude voters, by annexing or disannexing some portion
(2)  of the district, that would be something else that
(3)  would require preclearance from the department.
(4)      Q.  Is the district required to annex land that
(5)  is -- that would make it contiguous or may the district
(6)  annex land that is not connected to it?
(7)      A.  I don't know the answer to that to be
(8)  100 percent sure because I've never looked at that
(9)  particular question. I know there is a district in
(10)  Denton County that has annexed land all over the state,
(11)  small little pockets here and there. The developers
(12)  come and say, "Hey, we'd like you to be part of it."
(13)  So I don't know whether that's something specific to
(14)  them or whether that's something all districts can do.
(15)  I have not looked at that question specifically.
(16)      Q.  Do you know if there is any land contiguous to
(17)  the district in this case that could be annexed?
(18)      A.  I don't know whether there is or there isn't.
(19)  I've never really studied that particular question.
(20)      Q.  I'm not sure if you answered this question so
(21)  I thought I would ask it. From whom did you first hear
(22)  about the possibility of the district being involved in
(23)  a lawsuit to challenge the Voting Rights Act?
(24)      A.  I don't recall whether it was Mr. Coleman or
(25)  perhaps Mr. Zimmerman, who was president of the board

75

(1)  at the time. I don't recall which person it was.
(2)      Q.  Is it your opinion that Hispanics have never
(3)  been systemically denied the right to vote in Texas?
(4)      A.  In the State of Texas. No, it's not my
(5)  opinion that they've never been systemically denied the
(6)  right to vote. I'm sure that it has happened at some
(7)  point in the past history.
(8)      Q.  Is it your opinion that Texas Hispanics have
(9)  never been subjected to Jim Crow laws or segregation?
(10)      A.  I don't have opinions on that one way or the
(11)  other.
(12)      Q.  Do you have any information that would lead
(13)  you to believe that Hispanics have never been subjected
(14)  to Jim Crow policies?
(15)      A.  I don't know one way or the other.
(16)      Q.  And do you have any information that would
(17)  lead you to believe that Hispanics have never been
(18)  subjected to segregation?
(19)      A.  I don't -- I really don't know one way or the
(20)  other on it.
(21)      Q.  Are you aware that Texas maintained a poll tax
(22)  for its elections until it was struck down by the
(23)  Supreme Court?
(24)      A.  Yes, I recall the history.
(25)      Q.  And are you aware that Texas maintained

76

(1)  English-only elections until it became covered by the
(2)  Voting Rights Act?
(3)      A.  I don't know for sure, but that's not an
(4)  unlikely scenario.
(5)      Q.  Do you recall that Texas employed what we
(6)  call -- in many places in Texas the democratic party
(7)  employed what were known as white primaries?
(8)      A.  I'm not familiar with that history.
(9)      Q.  Are you familiar with the history of counties
(10)  in Texas denying Hispanic voters registration?
(11)      A.  I'm not aware of the history.
(12)      Q.  Are you aware of the history of lawsuits
(13)  brought by Hispanic voters to change certain kinds of
(14)  election systems such as changing election -- at large
(15)  election systems to single member districts?
(16)      A.  I know that there have been a number of
(17)  lawsuits over the years challenging the system in
(18)  Texas, yes.
(19)      Q.  Okay. When you were growing up -- just from a
(20)  personal perspective when you were growing up, were you
(21)  ever familiar with any public accommodations such as
(22)  restaurants or places of entertainment that either
(23)  segregated its guests on the basis of race or refused
(24)  to serve non-white patrons?
(25)      A.  Not in my lifetime is my answer.

77

(1)      Q.  Are you aware that there has been history of
(2)  discrimination against Hispanics in public
(3)  accommodations in Texas?
(4)      A.  I assume that it's happened but never
(5)  personally witnessed it.
(6)      Q.  If I could just have a moment to confer.
(7)  Thank you very much, Mr. Reilly.
(8)          MS. PERALES:  I pass the witness.
(9)          THE WITNESS:  Thank you, Ms. Perales.
(10)                        EXAMINATION
(11)  QUESTIONS BY MR. HERREN:
(12)      Q.  Hi, Mr. Reilly. I'm Chris Herren. I'm an
(13)  attorney with the U.S. Department of Justice in
(14)  Washington. Thank you very much for your time this
(15)  afternoon.
(16)      A.  You're welcome. Thank you.
(17)      Q.  I had a few questions for you about the MUD.
(18)  Right now is the MUD built out as far as it can be in
(19)  terms of the number of houses and the number of lots?
(20)  Is the development basically complete at this point?
(21)      A.  I would say that as far as the subdivision is
(22)  considered -- or subdivisions are considered I think
(23)  that they are fully platted in place. I believe there
(24)  are still some vacant lots that can still be built on,
(25)  but it is substantially built out.

78

(1)      Q.  Do you have any idea how many lots remain that
(2)  could be built on?
(3)      A.  No, sir, I do not.
(4)      Q.  Do you have any idea how we can figure that
(5)  out?
(6)      A.  I don't know. The developers in question who
(7)  are still developing those areas will probably be a
(8)  really good source for that.
(9)      Q.  When I drove up to the MUD the other day at
(10)  360 and Boulder Lane there was a sign that said there
(11)  were still model homes for Weekley and for Standard
(12)  Pacific. Are those --
(13)      A.  Right.
(14)      Q.  -- the builders that are still active?
(15)      A.  Those are the builders still active, yes, as
(16)  far as I know.
(17)      Q.  And are there model homes still in the MUD?
(18)      A.  You know, it's been a while since I've driven
(19)  around out there, but I think there are still.
(20)          MR. COLEMAN:  Are you in the market?
(21)          MR. HERREN:  They're beautiful houses.
(22)          MR. KORBEL:  Is that a settlement offer?
(23)      Q.  (By Mr. Herren)  Right now in the MUD are you
(24)  aware of whether there are just single-family houses or
(25)  are there apartments, as well?

(Pages 73 to 78)

**79**

```
(1)   A.  I am not certain, you know, personally
(2)  certain. There may be an apartment complex or two in
(3)  the district, but I -- I'm not familiar geographically
(4)  with what is out there.
(5)   Q.  Again, how would we be able to figure that
(6)  out?
(7)   A.  Take the district boundaries and go take a
(8)  look. I -- because the only apartments I believe that
(9)  would be in the district would be those roughly at the
(10) Boulder and 360, on the southern entrance of Boulder
(11) and 360. I'm sorry. 620, Highway 620.
(12)  Q.  Would the Travis County tax assessor have a
(13) definitive list of what properties would be in and
(14) outside the district?
(15)  A.  Should be a definitive list. We all know that
(16) taxing entities will make errors sometimes. It should
(17) be a pretty good idea.
(18)  Q.  Are you aware of any other lists that might be
(19) more definitive than that?
(20)  A.  No.
(21)  Q.  Does the district maintain a list of -- any
(22) separate list of the district properties that are in
(23) the district?
(24)  A.  No, not that I know of.
(25)  Q.  So do you rely on Travis County's assessor
```

**80**

```
(1)  list when you're making your determinations about tax
(2)  issues?
(3)   A.  Yes. They are our tax assessor. The district
(4)  contracts with Travis County for that.
(5)   Q.  Does the district maintain any list of the
(6)  residents of the MUD at all?
(7)   A.  Not to my knowledge.
(8)   Q.  Does -- has the district done any kind of
(9)  study of the population of the MUD in terms of the
(10) number of people?
(11)  A.  I don't believe so.
(12)  Q.  Would the district have available to it any
(13) data that postdated the 2000 census that would enable
(14) us to determine how many people live in the MUD?
(15)  A.  No, not that I can think of, other than maybe
(16) the City of Austin water taps or something similar to
(17) that. That's all I can think of. It's not something
(18) the district -- the City of Austin water taps or maybe
(19) electric. It's not something we maintain.
(20)  Q.  And is the City of Austin water taps, is that
(21) the number of water connections?
(22)  A.  Water connections.
(23)  Q.  At this point has the district issued all the
(24) bonds that it intends to issue?
(25)  A.  Yes.
```

**81**

```
(1)   Q.  And it's substantially under its bonding limit
(2)  that was established in 1988 elections; is that right?
(3)   A.  It's under it, yes. Yeah.
(4)   Q.  And so basically all of the bonds have been
(5)  issued that are needed to be issued in order to repay
(6)  the developer?
(7)   A.  That's correct.
(8)   Q.  In terms of the responsibilities of the
(9)  district, the district is responsible for the Trailhead
(10) Park?
(11)  A.  Yes.
(12)  Q.  Is that correct?
(13)  A.  That's correct.
(14)  Q.  And does the district actually own the land --
(15)  A.  The district --
(16)  Q.  -- Trailhead Park sits on?
(17)  A.  The district owns the land. They're
(18) contractually obligated at some point to turn it over
(19) to the city. They own the land.
(20)  Q.  Do you know when they will be turning that
(21) over to the city?
(22)  A.  About four years.
(23)  Q.  There is another park in the MUD, is there
(24) not, the Canyon Creek Park?
(25)  A.  The homeowners association has a park there.
```

**82**

```
(1)   Q.  And who owns the land for that park?
(2)   A.  Canyon Creek homeowners association does, to
(3)  my knowledge.
(4)   Q.  Are there any other parks the district is
(5)  responsible for?
(6)   A.  No.
(7)   Q.  Are there any other -- is there any other land
(8)  that the MUD owns?
(9)   A.  The MUD owns some conservation areas that
(10) have -- were set aside to protect some endangered
(11) species, golden-cheeked warbler and some of the karst
(12) invertebrates that are out there.
(13)  Q.  And I saw references in the minutes to these
(14) areas. They comprise about 460 acres; is that right?
(15)  A.  Sounds about right.
(16)  Q.  And is this the land that the MUD inherited
(17) essentially from Northwest Austin MUD Number Two when
(18) it dissolved in 1996?
(19)  A.  Some of it is. And some of it, I think, was
(20) always with Northwest Number One, but I -- that
(21) predates my involvement with the district.
(22)  Q.  Is this land subject to various restrictions
(23) about development?
(24)  A.  Yes, it is.
(25)  Q.  What sort of restrictions are they?
```

**83**

```
(1)   A.  It is -- it is currently set aside as, as I
(2)  said, an endangered species habitat so it is not land
(3)  that will be built upon or anything else. Conceivably
(4)  at some point in the future when the species if they
(5)  rehabilitate or are no longer endangered this land
(6)  might be opened back up, but it will take a process to
(7)  go through officially.
(8)   Q.  I assume there are restrictions from the
(9)  federal government and Fish and Wildlife service about
(10) not being able to develop the land.
(11)  A.  At this time that's correct.
(12)  Q.  Are there also restrictive covenants that say
(13) the land cannot be developed?
(14)  A.  Think. I believe they have some sort of a
(15) conservation easement on the property.
(16)  Q.  Are --
(17)  A.  But it's a bit unclear as to what that allows
(18) or doesn't allow.
(19)  Q.  Okay. Are there also City of Austin
(20) requirements about not being able to develop that land?
(21)  A.  I'm not aware of any, but you would have to
(22) obviously get a subdivision approval and those sorts of
(23) things from the city, change fees.
(24)  Q.  There have been various discussions in the
(25) minutes about negotiations with the City of Austin over
```

**84**

```
(1)  a possible fourth amendment to the consent agreement
(2)  with the City of Austin that governs the relationship
(3)  between the MUD and the city. Are you aware of those
(4)  discussions?
(5)   A.  Yes, I am.
(6)   Q.  Have they come to fruition at all?
(7)   A.  Almost, but not quite, but almost. But the --
(8)  the district and the city and the developer have agreed
(9)  in principle to the -- to the major terms. We have yet
(10) to have a closing of the whole sale yet, but that
(11) should perhaps occur within the next few weeks or so.
(12)  Q.  Can I ask you just based on open meeting
(13) discussion about this to -- there have been various
(14) drafts in the minutes that I have seen. Can you
(15) describe just basically what the public drafts
(16) describe?
(17)  A.  Well, I'll tell you what the -- what the
(18) current status is, if that's easier, rather than going
(19) back and -- there were many drafts. The agreement is
(20) for the district to transfer three of its tracts to the
(21) City of Austin. They will continue to hold those
(22) forever and ever as conservation easement land for the
(23) endangered species and is agreeing not to develop them.
(24) Those are not within the district boundaries. They are,
(25) outside of the district. And the city I presume will
```

(Pages 79 to 84)

85

```
(1)   use those for additional credits in the Balcones
(2)   conservation plan.  In return for that, the city will
(3)   provide residents of the district with a discount in
(4)   their water rates in order to help offset some of the
(5)   issues that they have had with the city in the past.
(6)   But that's the gist of it.  The district will continue
(7)   owning the largest chunk of the land, which is the land
(8)   that's adjacent to and actually I believe within the
(9)   district that remains undeveloped.  That -- on the
(10)  other side of it the city owns the land, but the
(11)  district will continue to own the large conservation
(12)  easement tract that has -- on one end Trailhead Park is
(13)  on, and then it goes on up past Boulder Lane.
(14)     Q.   At this point, in addition to this case, are
(15)  there two other lawsuits that the district has pending?
(16)     A.   Yes, in addition to this case two other
(17)  lawsuits.
(18)     Q.   But there's the case by the MUD against the
(19)  City of Austin, and that's pending in the Third Texas
(20)  Court of Appeals?
(21)     A.   Uh-huh.
(22)     Q.   And then there is a case by a developer
(23)  against the MUD?
(24)     A.   That's correct.
(25)     Q.   And that's still pending?
```

86

```
(1)      A.   That's still pending, which I believe we're on
(2)   the crux of getting that one also resolved, but is
(3)   still pending.
(4)      Q.   Is the fourth amendment to the consent
(5)   agreement, is that potentially resolved by these two
(6)   cases or is it still separate tracts?
(7)      A.   It is truly a separate tract.  A part of it
(8)   resolved, if you will, some of the differences between
(9)   the developer and the district.  There are still,
(10)  again, discussions with the developer with regard to
(11)  some reimbursable expenses or expenses they claim are
(12)  reimbursable which they didn't ask for originally but
(13)  came back later and said they wanted.  So the -- that
(14)  lawsuit between the district and the developer remains.
(15)  The fourth amendment settled some of the issues because
(16)  what they were trying to do was push the district to
(17)  issue the bonds.  The district was already in the
(18)  process of doing that, but regardless they filed their
(19)  suit.  They are keeping that online until we get the
(20)  second issue resolved with them.  As the other question
(21)  between the district and the city, no, that doesn't
(22)  impact that.  It remains on.
(23)     Q.   At the time you became the attorney for the
(24)  MUD in 2002, did you inherit, as far as you know, all
(25)  the files that Ms. Collins had as far as the public
```

87

```
(1)   records of the MUD?
(2)      A.   As far as I know, yes.
(3)      Q.   Do you have -- do you know whether you
(4)   inherited any documents that predate 1988 form
(5)   Ms. Collins about the creation or the operation of the
(6)   MUD?
(7)      A.   I do not know.
(8)      Q.   But Ms. Collins represented to you she had
(9)   given to you everything?
(10)     A.   That she had given us everything in her
(11)  possession, yes.
(12)     Q.   In terms of elections that the district holds,
(13)  what are the qualifications for someone to be a
(14)  director of the district?
(15)     A.   As I recall, they either need to be a
(16)  qualified voter within the district or own land within
(17)  the district.
(18)     Q.   When someone qualifies to be a candidate to be
(19)  a director of the MUD, do they qualify with you?
(20)     A.   They qualify with the -- I guess they file
(21)  with the secretary of the board.  If the secretary has
(22)  questions he or she will ask us at that time.  But I
(23)  think they're the ones who make that determination.
(24)     Q.   So the secretary of the board makes whatever
(25)  investigation that they deem necessary to determine
```

88

```
(1)   whether the person is qualified?
(2)      A.   Yes.
(3)      Q.   Is there a filing fee, to your knowledge?
(4)      A.   No, no filing fee.
(5)      Q.   And is the process essentially the same when
(6)   someone is appointed to fill a vacancy?
(7)      A.   Yes, although they don't file anything.  They
(8)   just make it known that they're interested, and the
(9)   board makes the determination filling the vacancy.
(10)     Q.   For appointments to fill vacancies on the
(11)  board there are no special elections; correct?
(12)     A.   That's correct.
(13)     Q.   It's all done by appointment?
(14)     A.   All done by appointment.  I seem to recall
(15)  there's some procedure if you have less than a majority
(16)  of the board, but I don't recall what it is.  That's if
(17)  you have a massive removal of people from the board for
(18)  whatever reason, resignation, death, or passing.  But I
(19)  don't recall what that is.
(20)     Q.   At the present time the district conducts its
(21)  elections at large, correct?
(22)     A.   Correct.
(23)     Q.   District-wide, correct?
(24)     A.   Yes.
(25)     Q.   The district has no subdistricts, no --
```

89

```
(1)      A.   No.
(2)      Q.   At the present time the district's elections
(3)   are conducted by plurality vote; is that correct?
(4)      A.   (Moving head up and down)
(5)      Q.   Yes?
(6)      A.   Yes.  Yes.  I'm sorry.
(7)      Q.   And at the present time the district has no
(8)   numbered posts or numbered places?
(9)      A.   That's correct.
(10)     Q.   At the present time the district's elections
(11)  are nonpartisan?
(12)     A.   That's correct.
(13)     Q.   At the present time the district holds no
(14)  primary elections?
(15)     A.   No primary election, that's correct.
(16)     Q.   There's only general election?
(17)     A.   Just a general election.
(18)     Q.   At the present time the district has staggered
(19)  terms?
(20)     A.   That's correct.
(21)     Q.   There's two directors elected, one in even
(22)  numbered year and three directors elected in the uneven
(23)  numbered year?
(24)     A.   That's correct.
(25)     Q.   The directors serve a four-year term of
```

90

```
(1)   office?
(2)      A.   Yes.
(3)      Q.   So essentially if there are three directors up
(4)   for election in a given year and five candidates run,
(5)   the candidates with the three highest vote totals are
(6)   declared elected?
(7)      A.   That's correct.
(8)      Q.   There is never a runoff election?
(9)      A.   That's correct, unless you happen to have a
(10)  tie, which is pretty unlikely.
(11)          MR. COLEMAN:  That's what Thomas
(12)  Jefferson had done.
(13)     Q.   (By Mr. Herren)  Ms. Perales had asked you a
(14)  couple of questions about annexations.  What is the
(15)  basic procedure under which the district could annex
(16)  land?
(17)     A.   As I said before, I don't recall for sure and
(18)  I've never really looked at the question of annexing
(19)  specifically one area or another, but as I generally
(20)  recall, there is a procedure for doing that.  We would
(21)  file a petition with the Texas Commission on
(22)  Environmental Quality.  The other opportunity we could
(23)  do so through special legislation through the
(24)  legislature, as well.
(25)     Q.   If the district were to try to annex in the
```

(Pages 85 to 90)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

91

(1) areas within the City of Austin city limits, would the
(2) district have to get the approval of the city council?
(3)    A. I would assume so, but I don't know for a
(4) fact. I would assume so.
(5)    Q. And at the present time the district is
(6) entirely located within not only Travis County, but the
(7) City of Austin; is that correct?
(8)    A. Yes, that's correct.
(9)    Q. Mr. Blustein had asked you some questions
(10) about 2006 election agreements in Travis County. Do
(11) you recall whether there was any discussion or
(12) consideration of possibly submitting one or both of
(13) those agreements to the Justice Department for
(14) clearance?
(15)    MR. COLEMAN: Again, same objection as
(16) before. To the extent any of that discussion was in
(17) open meetings --
(18)    THE WITNESS: I don't know whether we had
(19) any open meeting discussions on that.
(20)    (Exhibit 20 marked)
(21)    Q. (By Mr. Herren) Mr. Reilly, have you had a
(22) chance to review the document that's been marked as
(23) Exhibit 20? And it's Bates number P 009687.
(24)    A. Yes, sir.
(25)    Q. Marti Asher, is this someone who works for

92

(1) your firm?
(2)    A. She is my assistant, yes, sir.
(3)    Q. Okay. And this appears to be an e-mail
(4) exchange between Ms. Asher and Gail Fisher with Travis
(5) County; is that correct?
(6)    A. It appears to be.
(7)    Q. In the e-mail Marti Asher appears to say,
(8) "We're working on the preclearance letter but again
(9) will need the polling place locations for that, as
(10) well. Do you have a sample preclearance letter that
(11) you can send me?" Does this refresh your recollection
(12) at all about whether there may have been some
(13) discussion about or some consideration about submitting
(14) the 2006 agreement?
(15)    A. Again, as far as discussions or considerations
(16) by me it would be attorney work, client privilege types
(17) of information. Ms. Asher is not a lawyer, and I think
(18) she was just checking with the county as to what they
(19) were doing with regard to this, so I don't --
(20)    Q. Would it be your view that the 2006 agreements
(21) did not need to be submitted?
(22)    A. As far as between the district and that, no,
(23) because -- as far as the district having to submit
(24) something because it was really not a change in voting.
(25) We were -- anything the county was doing under that

93

(1) agreement the county was going to be submitting
(2) preclearance to us. We had nothing in our procedures
(3) or whatever else that we were doing that constituted a
(4) change in voting.
(5)    Q. So essentially it was the district's view that
(6) if the county changed early voting locations or split
(7) voting precincts or did something like that, that that
(8) was the county's responsibility to submit that?
(9)    A. That's correct.
(10)    Q. And that from the district's standpoint the
(11) MUD was not doing anything different --
(12)    A. That's correct.
(13)    Q. -- than they had done in 2004; is that
(14) correct?
(15)    A. That's correct.
(16)    Q. Is there anybody else aside from yourself as
(17) far as you know who might have maintained records of
(18) the MUD in terms of minutes, orders, that sort of
(19) thing?
(20)    A. Other than myself, Real Manage, as I mentioned
(21) before, that's it, as far as I know, other than what
(22) individual board members might keep from their
(23) meetings.
(24)    Q. And the documents that would have been
(25) maintained potentially by Real Manage would be what?

94

(1)    A. Typically financial statements or billing
(2) types of things, financial-related materials, work
(3) orders for the park, maintenance, and that sort of
(4) thing.
(5)    Q. But in terms of the minutes, you would be the
(6) basic custodian of that?
(7)    A. Minutes, yeah, that would be us.
(8)    Q. In terms of you or your firm, did you do any
(9) investigation to determine whether the MUD qualified to
(10) bail out under Section 4 of the Voting Rights Act?
(11)    A. No. I didn't do any individual looking into
(12) that.
(13)    Q. Are you aware of anybody connected at the
(14) district that took such investigation?
(15)    A. Other than our counsel, no.
(16)    Q. Did you yourself do any investigation of
(17) whether there were previous voting changes undertaken
(18) by the district that might not have been precluded
(19) under Section 5?
(20)    A. No.
(21)    Q. Same question, are you aware that anybody else
(22) connected with the district might have undertaken such
(23) investigation?
(24)    A. No.
(25)    Q. Other than your counsel?

95

(1)    A. Other than my counsel, right.
(2)    Q. If you give me just one moment. I don't
(3) believe I have anything else. Thank you very much for
(4) your time, Mr. Reilly.
(5)    THE WITNESS: Thank you, sir.
(6)    EXAMINATION
(7) QUESTIONS BY MR. HICKS:
(8)    Q. Mr. Reilly, I'm Renea Hicks representing
(9) Travis County. I stepped out for a few minutes as you
(10) might have noticed so I hope I don't ask you questions
(11) that's already been asked. I apologize if I do.
(12)    A. That's all right. Thank you.
(13)    Q. Would you look at Exhibit 4?
(14)    A. Yes, sir.
(15)    Q. And if you turn to -- it's P 009711, Bates
(16) stamped. It's the third page of the election
(17) agreement.
(18)    A. Uh-huh.
(19)    Q. And going back to that clause I'm going to ask
(20) about subparagraph 2, the thing about preparing voting
(21) rights preclearance submissions. Do you see that?
(22)    A. Yes, sir, I do.
(23)    Q. You had testified -- I had forgotten your
(24) response to whom about your interpretation of what that
(25) means with regard to Section 5 preclearance

96

(1) submissions. Do you have any opinion about whether
(2) that same provision deals with bailout requests?
(3)    A. No, I have no opinion on that.
(4)    Q. Have you thought about it either way?
(5)    A. Haven't thought about it.
(6)    Q. Has it been discussed other than in some
(7) privileged situation in any way?
(8)    A. No.
(9)    Q. And have -- are you aware of whether the MUD
(10) or any agent for the MUD has ever asked Travis County
(11) to keep bailout of the MUD or for the MUD or on the
(12) MUD's behalf?
(13)    A. No.
(14)    Q. You're not aware or --
(15)    A. I'm not aware. I'm not aware.
(16)    Q. I'm going to skip around like crazy. The -- I
(17) was a little unclear. Is there any land currently
(18) within MUD boundaries that's just not contiguous with
(19) each other?
(20)    A. No. The MUD is contiguous to itself, if you
(21) will.
(22)    Q. It closes?
(23)    A. It closes.
(24)    Q. So what is the land that -- in this amendment
(25) four? Is it now inside the MUD that the MUD is going

(Pages 91 to 96)

97

(1) to give up?
(2)      A.  There is land -- well, there's land in
(3) amendment four that's within the district.  That's the
(4) conservation land that's immediately adjacent to the
(5) district.  Then there is land outside of the district
(6) that is not part of it.  There are three separate
(7) tracts that are mostly landlocked.  One's not.  One is
(8) on 620, but -- that the district also owns.
(9)      Q.  Owns?
(10)      A.  Owns.  As of today until we complete the
(11) fourth amendment, and then we will transfer those three
(12) other tracts to the City of Austin.
(13)      Q.  But they are not inside the MUD boundaries?
(14)      A.  They are not inside the MUD boundaries.
(15)      Q.  All right.  Okay.
(16)      A.  At least that's my understanding.
(17)      Q.  What are -- they're just bare naked tracts?
(18)      A.  Just -- yeah.  Just tracts, yeah.
(19)      Q.  Okay.  And they are not contiguous with the
(20) MUD's political boundaries?
(21)      A.  That's correct.
(22)      Q.  Do you know whether there is any other land
(23) the MUD owns that's not contiguous other than those
(24) three pieces?
(25)      A.  That's either not contiguous or within, no, I

98

(1) don't.
(2)      Q.  And on annexation issues we -- I don't think
(3) we ever asked.  To your knowledge has the MUD ever
(4) disannexed land?
(5)      A.  Not to my knowledge.
(6)      Q.  And do you have an understanding about whether
(7) the MUD can disannex land if it still has obligations
(8) on its bonds?
(9)      A.  I've never looked at that issue, so I don't --
(10) I don't have a good answer for you on that.
(11)      Q.  How many subdivided tracts are there?  How
(12) many tracts inside the -- how many subdivisions are
(13) there in the MUD?
(14)      A.  You know, I don't know.  I'm trying to -- I
(15) don't know.  20-something I would guess.  Canyon Creek
(16) Section 1, Section 2, sections up through 26, 27, 28.
(17) I don't recall what the highest number is.
(18)      Q.  Would all of them be Canyon Creek something?
(19)      A.  I think so.
(20)      Q.  There's -- at least in my view there's been
(21) some confusion about who is eligible to actually vote,
(22) not just as -- not board members, who can actually vote
(23) in MUD elections.  What is your understanding of who is
(24) eligible to vote in MUD elections?
(25)      A.  My understanding is that there's a distinction

99

(1) between who can serve on the board and who can vote,
(2) that anyone who owns land or is a qualified voter of
(3) the district can vote -- can be a board member.  As far
(4) as voting in the elections, it appears to me from
(5) looking at the code that only qualified voters as that
(6) term is defined in the election code handbook.
(7)      Q.  And who would be qualified to vote in the MUD?
(8)      A.  People of 18 years of age who reside within
(9) the district and haven't been disqualified under law
(10) from voting for some reason.  I'd have to look at the
(11) code to give you exactly -- the code speaks for itself.
(12)      Q.  Okay.  And with regard to board member
(13) candidates for positions, when they come to the board's
(14) secretary to file for a position, you said they have a
(15) fee?
(16)      A.  No.  No fee.
(17)      Q.  No fee.  I'm sorry.  They have no fee.  Do
(18) they -- is there a form they fill out?
(19)      A.  There is a form.  It's the statutorily
(20) prescribed form that the Secretary of State has
(21) developed.
(22)      Q.  Does that -- I don't remember it well enough.
(23) Does that form have anything on it about ownership of
(24) property?
(25)      A.  No, it doesn't.  And so I suspect that if

100

(1) anyone who didn't reside within the boundaries of the
(2) district, I suspect that the secretary can inquire
(3) further as to do you own land, but I don't know that
(4) that's ever been done.
(5)      Q.  That was going to be my next question.  Do you
(6) know of any candidates for board membership who did not
(7) reside in the district -- or weren't qualified voters
(8) but did own property?
(9)      A.  No.
(10)      Q.  Can you look at -- you don't have to look at
(11) it.  In Exhibit 11 there's a list of who the temporary
(12) directors were when the -- if you want to, look at
(13) Exhibit 11.
(14)          MR. COLEMAN:  We don't have 11 in front
(15) of us.  But do we -- is it in the pile somewhere?
(16)          MR. HICKS:  Here, just take mine.
(17)          MR. COLEMAN:  This is the original
(18) preclearance from '86.
(19)      Q.  (By Mr. Hicks)  Do you see the list of -- I
(20) believe it's five individuals that were on this
(21) temporary directors?
(22)      A.  Yes, sir.
(23)      Q.  Do you know any of those people?
(24)      A.  I do not.  Actually, I -- I may know Homer
(25) Reed if he's still alive if that's the same one, but I

101

(1) don't know.  But I wouldn't --
(2)      Q.  You know him even if he's dead, I suppose.
(3)      A.  Yeah.  But I wouldn't know him from this --
(4) from this transaction.
(5)      Q.  Okay.  So you don't know any of the details
(6) about where those people might have lived or not lived?
(7)      A.  No, I do not.
(8)      Q.  Do you -- do you-all have -- maintain any
(9) records of people that own property in the MUD that
(10) don't live there?
(11)      A.  No, we do not.
(12)      Q.  Or entities?
(13)      A.  It's just public record from the county.
(14)      Q.  A question I didn't ask you that somebody
(15) nudged me to ask you.  Is the candidate application
(16) form in Spanish?
(17)      A.  Yes, it is.
(18)      Q.  Or there's an available one?
(19)      A.  Or there's an available one that's in Spanish,
(20) yes.
(21)      Q.  This may be --
(22)      A.  Actually, since -- the language is in both on
(23) the form.
(24)      Q.  How big is the district?
(25)      A.  I don't know.  You mean acres-wise or --

102

(1)      Q.  Some measure that makes sense to people.
(2)      A.  Gosh, I don't know.  I'm sure somewhere there
(3) is a description, perhaps even in the creation
(4) documents as to how many acres it is, but I --
(5)      Q.  Can you explain what it means to be an in-city
(6) MUD?  That is, what differences are there between -- in
(7) terms of your relationship with the city and your
(8) obligations inside the MUD for an in-city MUD as
(9) opposed to a MUD that's not in the city?  And I'm
(10) looking for something basic.
(11)      A.  Yeah.  And the law, of course, changes, but
(12) let's see if I can tell you in general.  If the MUD is
(13) outside of the city, then there's no relationship
(14) obviously between a city governing body and the MUD or
(15) city obligations between the city and the MUD.  The MUD
(16) is a special district that is designed to develop
(17) utilities for the specific area.  At least that's the
(18) concept behind it.  And if it's within the city, a lot
(19) of times the cities will have their own utilities, in
(20) which case they won't want a special district to be
(21) created within their boundaries.  And in that sort of
(22) an instance I believe the city's consent is required,
(23) but I have not looked at those provisions in a while.
(24) The city's consent would be required to be created in
(25) the first place.

(Pages 97 to 102)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

**103**

(1) Q. Right. But I guess what I'm looking at is,
(2) your -- this MUD is inside the city, right?
(3) A. Yes.
(4) Q. And what does it have taken off its plate of
(5) obligations of the MUD because it's an in-city MUD?
(6) A. Well, let me -- this specific MUD is a very
(7) unusual one as I said at the beginning. And it
(8) depends. If you're looking at all MUDs as to --
(9) Q. I'm just talking about this one right now.
(10) A. But this particular one --
(11) Q. Whichever way you're comfortable talking.
(12) A. Because it really depend -- I'll just say it
(13) depends on the MUD and the city and what the city wants
(14) and what it's providing and capable of providing and
(15) everything else. They typically sit down and they work
(16) out an agreement where they set forth which entity will
(17) provide which service, how it's to be paid, how the tax
(18) revenues are to be allocated, those sorts of things.
(19)        In this case we have a district that just
(20) pays for the building of the facilities and conveys
(21) them immediately to the city. And this district, all
(22) it does is collect bond money -- or tax revenues, I'm
(23) sorry, to pay the bonds and to pay the other
(24) obligations of the district, and, of course, it runs
(25) and manages the park there, the one park.

**104**

(1) Q. Also has board meetings?
(2) A. And it has board meetings in order to pay the
(3) bills and manage the park. If it were a fully fledged
(4) MUD it would typically have its facilities and be
(5) providing some way or another water/wastewater
(6) services, but it's not doing that.
(7) Q. You mentioned something earlier about there
(8) might -- there will always be potential in the future
(9) that the board might decide to change the date of an
(10) election. You gave that as an example something that
(11) might trigger preclearance requirement, preclearance
(12) activity?
(13) A. Yeah, maybe. I don't --
(14) Q. I'm not asking if you plan it or anything.
(15) But what dates could you change it to under current
(16) law?
(17) A. Under the current law we wouldn't be allowed
(18) to change the date I don't believe. The legislature
(19) requires us to be -- hold our elections in May, but
(20) legislature could change the statutes to a different
(21) time or give the boards different options.
(22) Q. Marti Asher that you were asked about in
(23) connection with Exhibit 20 --
(24) A. Right.
(25) Q. -- how long has she been your assistant?

**105**

(1) A. For about three or four years, I think.
(2) Q. And have you ever asked her in connection not
(3) with this district but with other government
(4) representation you do, have you ever asked her to
(5) independently undertake any tasks concerning Section 5
(6) preclearance?
(7) A. No.
(8) Q. Do you know if she's ever done any work on any
(9) of that?
(10) A. Not to my knowledge.
(11) Q. Why do you think, then, that she would have
(12) initiated something in this instance?
(13) A. She was in discussions with Ms. Fisher on the
(14) elections contract and getting it signed and that's my
(15) go-between, Ms. Fisher and myself, facilitating changed
(16) documents and the agreements and so forth.
(17) Q. So you think Ms. Fisher may have said
(18) something to her about Section 5?
(19) A. Possibly.
(20) Q. Can you think of anybody else that would?
(21) A. It would have been her or me.
(22) Q. And you said you didn't.
(23) A. I don't recall.
(24) Q. In your firm in connection with your
(25) representation of this MUD or any of them -- let's make

**106**

(1) it any of them, governmental entities you represent.
(2) Do you have a process that you have in place, detailed
(3) or general, for flagging and catching things that the
(4) governments do that may trigger Section 5 preclearance
(5) obligations?
(6) MR. COLEMAN: If you can answer without
(7) disclosing privileged information.
(8) THE WITNESS: I think to the extent we're
(9) aware of anything that doesn't -- it's really just up
(10) to the lawyers to make a determination if there's
(11) something that some entity is doing to bring it to
(12) their governing body or their manager's decision and
(13) say, well, before you do that, you would need to obtain
(14) preclearance.
(15) Q. (By Mr. Hicks) You just catch it in the
(16) course of representation? If you go to a board meeting
(17) and they annex something, for instance, you would know
(18) that that was -- whoever -- you or whoever went --
(19) A. Yes.
(20) Q. -- on behalf of your firm?
(21) A. Yeah.
(22) Q. So does that mean that all of the lawyers are
(23) trained to some degree in Section 5 rules and laws?
(24) A. Oh, I don't know whether that would be the
(25) case or not.

**107**

(1) Q. All the lawyers that do -- that represent the
(2) governmental entities.
(3) A. I would assume they would -- they would know
(4) well enough to realize. I would think that all of our
(5) lawyers realize that Section 5 exists and if you're
(6) taking some -- something that's changing voting you
(7) would need to at least investigate whether or not
(8) you're required to do some sort of a preclearance.
(9) Q. For this MUD in particular you -- is it my --
(10) is it correct that the MUD board and individuals of the
(11) board leave it to you to catch whether something is a
(12) Section 5 triggering event or not?
(13) A. I would assume so, yeah. At least they would
(14) rely upon me to know.
(15) MR. HICKS: I have no further questions.
(16) Thanks.
(17)         EXAMINATION
(18) QUESTIONS BY MR. KORBEL:
(19) Q. I'm George Korbel, and we've talked on the
(20) phone and shook hands outside.
(21) A. Yes, sir.
(22) Q. Mr. Reilly, I represent the Garcia
(23) defendant-intervenors. I've got a couple questions
(24) that I wanted to ask you about the formation of a
(25) Municipal Utility District. If -- by the way, are you

**108**

(1) still the mayor of Granite Shoals?
(2) A. I am.
(3) Q. You are. And how long have you been mayor
(4) of --
(5) A. Unfortunately I am. Since November of '05.
(6) Q. And would I be correct in assuming --
(7) MR. COLEMAN: He's up for reelection.
(8) We're taking contributions today.
(9) MR. KORBEL: Pass around the hat.
(10) Q. (By Mr. Korbel) Am I correct in assuming that
(11) Granite Shoals is sort of a -- sort of a suburb of
(12) Austin?
(13) A. I wouldn't call it that since it's 50 miles
(14) away, but a satellite system perhaps.
(15) Q. Satellite. All right. And, in fact, the
(16) Marble Falls Independent School District actually goes
(17) into Travis County, does it not?
(18) A. I don't know.
(19) Q. All right.
(20) A. I think there's some discussions about that
(21) right now.
(22) Q. I see.
(23) A. But at least on one side of the lake. I don't
(24) know about the other.
(25) Q. I see. When someone sets up -- someone is

(Pages 103 to 108)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

109

```
(1)    going to develop some property and sell lots in the
(2)    property, like the Municipal Utility District, when the
(3)    developer has the bare naked land and he or she drafts
(4)    out the -- where the streets are going to be and where
(5)    the lots are going to be and whatever, the developer
(6)    has a choice at that point, does he not or she not, can
(7)    either put in -- the developer can either put in
(8)    utilities and sell the lots and part of the price of
(9)    the lots would be the value of putting those utilities
(10)   in, could do that, couldn't he?
(11)       A. They could do that.
(12)       Q. All right. And in that particular case there
(13)   would be no necessity of having a Municipal Utility
(14)   District, would there?
(15)       A. Unless they wanted to perform some other
(16)   governmental function, yeah.
(17)       Q. Some other governmental function. But as far
(18)   as -- as far as this Municipal Utility District and
(19)   the -- and the water lines and the sewer lines and
(20)   whatever is involved with this Municipal Utility
(21)   District, the developer could have sold the lots and
(22)   charged a distributive share of the entire cost on the
(23)   value of the lots, could he not?
(24)       A. He could.
(25)       Q. So the developer had a choice, either do it
```

110

```
(1)    that way or to create a Municipal Utility District?
(2)       A. Or some other district.
(3)       Q. Or some other district.
(4)       A. Yeah.
(5)       Q. All right. And the reason they create a
(6)    Municipal Utility District or some other district is so
(7)    that they can really reduce the actual cost of the
(8)    lots, isn't it? That's what a developer does.
(9)       A. Well, sure. And also so they can finance it,
(10)   because most developers don't have the wherewithal to
(11)   put in a system like that and pass it back on through
(12)   individual lot sales.
(13)       Q. That's correct. But, for example, in this
(14)   particular case the bonds I think were initially
(15)   $23 million.. Is that --
(16)       A. That's what was originally authorized, yeah.
(17)       Q. All right. And I think that -- I think that
(18)   Mr. Zimmerman testified they're at 13 million or some
(19)   figure like that at this point, if you know or if you
(20)   don't.
(21)       A. I don't know specifically, but that sounds
(22)   about right.
(23)       Q. It's in range. All right. And there are
(24)   about 1300 lots in the -- that's what Mr. Zimmerman
(25)   testified to. Does that --
```

111

```
(1)       A. I'll take him at his word.
(2)       Q. All right. And if it cost $13 million to put
(3)    in the utilities for 1300 lots, that's about $100,000 a
(4)    lot?
(5)           MR. COLEMAN: No, I wouldn't say that.
(6)       Q. (By Mr. Korbel) Well, in any event, if the
(7)    distributive share was 10,000 or 100,000 or whatever,
(8)    the developer could have attached that cost of the lots
(9)    so instead of charging $70,000 let's say for the lots,
(10)   could have charged 170,000 for it, correct?
(11)       A. Uh-huh.
(12)       Q. You testified that you have clients in other
(13)   parts of the state. In East Texas you mentioned.
(14)       A. Yes.
(15)       Q. All right. And what counties are those in
(16)   where there was clearance --
(17)       A. You know, I don't -- I don't know where the
(18)   Emerald Bay MUD is, but we've got -- I couldn't tell
(19)   you.
(20)       Q. Have you ever been over to service those
(21)   clients or meet with those clients?
(22)       A. Some of them, yes.
(23)       Q. And you don't recall what county. Did you
(24)   drive there or did you fly there?
(25)       A. I drove. Well, it depends on which ones
```

112

```
(1)    you're talking about. If you're talking about the MUD,
(2)    I've never been to that one, I don't know.
(3)       Q. Your other clients, then?
(4)       A. Other clients.
(5)       Q. Yes. What counties are those in?
(6)       A. Let's just pick one. Cass County.
(7)       Q. And how did you get to it? Did you drive or
(8)    fly?
(9)       A. I drove.
(10)       Q. Drove from Austin over there?
(11)       A. Uh-huh.
(12)       Q. How long did that take?
(13)       A. About six hours.
(14)       Q. All right. And what were the closest airport
(15)   you could catch?
(16)       A. There's a very small one in Mt. Pleasant.
(17)       Q. And is there -- is there regular service to
(18)   Mt. Pleasant?
(19)       A. No.
(20)       Q. Let's say that -- do you have any clients in
(21)   the panhandle or in West Texas?
(22)       A. We have had some there, yes.
(23)       Q. In what counties or what cities were those?
(24)       A. There are some out of Hudspeth County, Randall
(25)   and Potter County.
```

113

```
(1)       Q. Randall and Potter are Amarillo?
(2)       A. Amarillo.
(3)       Q. And Hudspeth is close to El Paso?
(4)       A. It's next to El Paso.
(5)       Q. Okay. And how far would those be -- how far
(6)    would El Paso be from Washington, if you know?
(7)       A. Nine-hour drive at least.
(8)       Q. How far would Amarillo be from Austin?
(9)       A. I don't know. An ungodly amount.
(10)       Q. If anybody wanted to go there. Now, there was
(11)   reference to this amicus brief that you filed on behalf
(12)   of Mr. Blum?
(13)       A. Yes.
(14)       Q. And was there also Mr. Clegg that you filed
(15)   that amicus brief on behalf of?
(16)       A. I believe he was one of the people in there,
(17)   yes.
(18)       Q. Who is Mr. Clegg, if you know?
(19)       A. I don't know.
(20)       Q. All right. Have you ever met him?
(21)       A. Not to my knowledge.
(22)       Q. Okay. And how did you come to file this
(23)   amicus brief or write this amicus brief? Did somebody
(24)   ask you to do that?
(25)       A. Yes. The client would have asked us to do
```

114

```
(1)    that, and that was Mr. Levin's client. So the
(2)    specifics or most of that he would know, not me.
(3)       Q. Okay. And do you recall who paid for the
(4)    production of that brief?
(5)       A. No, I do not.
(6)       Q. Preparing that brief?
(7)       A. I do not.
(8)       Q. Would Mr. Levin have written the brief?
(9)       A. He was -- yes, he did write the brief.
(10)       Q. And you must have conferred with him because
(11)   you signed it, correct?
(12)       A. I did.
(13)       Q. Is that correct?
(14)       A. Yes.
(15)       Q. And you obviously agreed with what was in the
(16)   brief because you signed it.
(17)       A. Yes.
(18)       Q. All right. Now, you mentioned that you were
(19)   currently representing two MUDs, and then you said
(20)   there was a -- I think you called it a -- some kind of
(21)   another district.
(22)       A. Yeah. Municipal water power district.
(23)       Q. What is a municipal water power district?
(24)       A. It's an unusual district. It's got its own
(25)   chapter in the water code. And it is a -- this one is
```

(Pages 109 to 114)

**115**

(1) the Red Bluff Municipal Water Power District which
(2) operates out in Far West Texas off the Pecos River, and
(3) they provide water services for a lot of smaller
(4) utilities around, as well as the irrigation districts
(5) up there.
(6)    Q.   Is this the one by Hudspeth County?
(7)    A.   Yeah.  That's not one -- not the one I was
(8) referring to.  I think they're in Culberson County.
(9)    Q.   Culberson County?
(10)   A.   I believe.
(11)   Q.   All right.  And what is a water control
(12) improvement district?
(13)   A.   It's just a different form of entity,
(14) similar -- it's a water district, if you will.  It's
(15) similar to a MUD.
(16)   Q.   And they also elect; is that correct?
(17)   A.   I believe so.
(18)   Q.   If there were cause for that.  What about this
(19) municipal -- southern municipal district you talked
(20) about?
(21)   A.   Uh-huh.
(22)   Q.   Do they also elect directors?
(23)   A.   I believe their directors are appointed by the
(24) water districts that they serve.
(25)   Q.   I see.  So it's kind of an overall group?

**116**

(1)    A.   Right.
(2)    Q.   Okay.  And you're also familiar with
(3) groundwater conservation districts?
(4)    A.   Uh-huh.
(5)    Q.   Many of those elect also; is that correct?
(6)    A.   Yes, I believe they do.
(7)    Q.   All right.  And there is a whole plethora of
(8) different water districts and utility districts that we
(9) have in our statutes and our courts; isn't that
(10) correct?
(11)   A.   That's correct.
(12)   Q.   And many, though not probably all, but
(13) probably most of them elect some sort of a board of
(14) governors; isn't that correct?
(15)   A.   Yes.
(16)   Q.   Do you know how many water districts there are
(17) in Travis County?
(18)   A.   I do not know.
(19)   Q.   Okay.  Would you venture a guess on how many
(20) water districts?
(21)   A.   I'd hate to, but -- there are quite a few.
(22)   Q.   Quite a few.  Okay.  Now, what is the Texas
(23) Elections and Campaign Institute?
(24)   A.   It's a little nonprofit entity that provides
(25) training for candidates, elected officials, party

**117**

(1) activists from all types on campaign laws.
(2)    Q.   And that's out of your law office, right, your
(3) law firm?
(4)    A.   They were there, yes.
(5)    Q.   And you've spoken at several of their
(6) seminars, have you not?
(7)    A.   I have.
(8)    Q.   On election law?
(9)    A.   On election law, yes.
(10)   Q.   And has the Voting Rights Act been discussed
(11) at those seminars?
(12)   A.   It's possible that it has been.  I don't
(13) recall that it's ever been the subject of a
(14) presentation.
(15)   Q.   And you also have people from the Secretary of
(16) State's office from the election divisions appear at
(17) your seminars; is that correct?
(18)   A.   They have, yes.
(19)   Q.   In fact, the director of elections has been at
(20) your seminar if I'm not mistaken.
(21)   A.   Yes, she has.
(22)   Q.   Now, have you ever actually set up one of the
(23) municipal utility districts, been the lawyer involved
(24) in setting one of these up?
(25)   A.   Other than the one that went -- and I can't

**118**

(1) remember the name of it, but the one that went through
(2) the legislature, and I'm pretty sure it was a MUD, no.
(3)    Q.   Okay.  And you don't recall who that -- what
(4) district that was?
(5)    A.   (Moving head side to side)
(6)    Q.   No?
(7)    A.   I don't.  I don't.
(8)    Q.   And do you recall who the lawyer was that
(9) you -- I guess you said you did a favor for and helped
(10) them with that?
(11)   A.   It was Tim Brown.
(12)   Q.   Tim Brown.  And is he still alive?
(13)   A.   Yes.
(14)   Q.   So if I wanted to find out I could find out
(15) from him?
(16)   A.   Yes.
(17)   Q.   When you -- you graduated from college when?
(18)   A.   From law school or --
(19)   Q.   From college, college.
(20)   A.   College, 1981.
(21)   Q.   And you graduated from law school in --
(22)   A.   1990.
(23)   Q.   And between that time where did you work?
(24)   A.   I worked in the family real estate business a
(25) bit out of Marble Falls and also for the Texas

**119**

(1) Legislature.
(2)    Q.   Who did you work in the legislature for?
(3)    A.   It was a house member named Brad Wright.
(4)    Q.   Brad Wright.  Is he still in the house?
(5)    A.   He is not.  He is retired.
(6)    Q.   I see.  And what -- were you his -- what did
(7) you do for him?
(8)    A.   I was his administrative assistant, chief of
(9) staff, did a little of everything for him.
(10)   Q.   Did you stay here in the Austin office or
(11) where did you --
(12)   A.   Was here in the Austin office for most of it.
(13) My last three years I was working in his Houston office
(14) while I was going to law school.
(15)   Q.   Okay.  And when you worked at the legislature,
(16) what years did you work at the legislature?
(17)   A.   From the '83 -- '83 to '90, I guess.
(18)   Q.   So you were around for that whole -- that
(19) whole ten years of redistricting litigation that the
(20) legislature was involved in between the '80s and '90s?
(21)   A.   That's right.
(22)   Q.   Did you come to meet Mr. Blum then?
(23)   A.   Not that I recall.
(24)   Q.   And was your legislator, was he at all
(25) involved in that process?

**120**

(1)    A.   He was -- he was involved someway or another
(2) but, you know, as probably they all are, interested in
(3) what their districts are going to look like or
(4) districts that they might want to run for look like,
(5) but he wasn't an integral part of it.
(6)    Q.   Now, when you lived in San Antonio you said
(7) you lived on the south side.  Do you remember what
(8) school district that was?
(9)    A.   Seemed like it was the Southeast.
(10)   Q.   Southeast?
(11)   A.   But I was a little kid so I don't remember for
(12) sure.
(13)   Q.   And was your father a real estate agent?
(14)   A.   He was a real estate broker, yes.
(15)   Q.   At that time?
(16)   A.   Not at that time.  He was owner or part owner
(17) of a road construction business at that time.
(18)   Q.   Of a road construction?
(19)   A.   Uh-huh.
(20)   Q.   I'm sorry.
(21)   A.   Yeah.
(22)   Q.   I'm not hearing you very well.  I'm sorry.
(23) And did he become a real estate agent when -- or real
(24) estate broker, I should say, when he moved to Marble
(25) Falls?

(Pages 115 to 120)

## 121

(1)   A. Sometime after he moved to Marble Falls, yes.
(2)   Q. And when he went back to San Antonio, did he
(3) go back as a real estate broker or --
(4)   A. He was still in the construction business at
(5) that time.
(6)   Q. I see. And what happened to that construction
(7) company?
(8)   A. It's closed. It was a family operation, his
(9) brother and his mother and him. They just closed it
(10) down at some point.
(11)   Q. They're not involved in building toll roads or
(12) anything?
(13)   A. No, not at all. No Trans-Texas stuff.
(14)   Q. Now, in looking through the Internet I noticed
(15) that you were involved with Young Conservatives of
(16) Texas.
(17)   A. Many years ago, yes.
(18)   Q. Many years ago. And that was an offshoot of
(19) Young Americans for Freedom?
(20)   A. Not an off -- well, it was a -- the Texas
(21) organization of the Young Americans for Freedom
(22) succeeded, if you will, and it became the Young
(23) Conservatives of Texas.
(24)   Q. I see. And do you recall Doug Caddy who was
(25) one of the -- from Texas who was one of the founders of

## 122

(1) Young Americans for Freedom?
(2)   A. Doug Caddy?
(3)   Q. Doug Caddy, C-a-d-d-y.
(4)   A. Do not.
(5)   Q. He was the director of elections under
(6) Governor Clements. Do you recall him?
(7)   A. I don't recall him.
(8)   Q. Now, I notice that in your published works --
(9) one of your published works is Rat's Nest of
(10) Regulation: The Proliferation of Regulations and
(11) Administrative Appeals is Smothering the Courts and
(12) Spawning Injustice.
(13)   A. Yes. What a title, huh?
(14)   Q. Yeah. Tell us really what you think about
(15) this thing. I guess what I'm -- if you're looking at a
(16) Municipal Utility District like this Municipal Utility
(17) District, they face just an overwhelming number of
(18) administrative burdens and regulations and the sort of
(19) thing you were talking about in that article; isn't
(20) that correct?
(21)   A. Some of them. I mean, the article was very
(22) specific as to we were suggesting creating a court of
(23) appeals for administrative law decisions, but --
(24)   Q. But your Municipal Utility District, the
(25) Northwest Austin Municipal Utility District, just faces

## 123

(1) an enormous number of regulations and hoops that it has
(2) to jump through from the federal government and the
(3) state government; isn't that correct?
(4)   A. All businesses do in all districts, anyone who
(5) is out there.
(6)   Q. When someone runs as a candidate for the board
(7) of trustees or the board of directors of the MUD,
(8) Northwest Austin MUD, are they required to comply with
(9) our -- with our ethics laws with the campaign
(10) disclosures and all that sort of thing?
(11)   A. Yes, they are.
(12)   Q. All right. And have you ever assisted a
(13) candidate to filing all of those forms?
(14)   A. For the district?
(15)   Q. Any candidate.
(16)   A. Oh, any candidate. Yes, I have.
(17)   Q. And that's a -- that's just an enormous
(18) undertaking; is that correct?
(19)   A. It's a lot of fun.
(20)   Q. It's a lot of -- I suppose you're being
(21) facetious when you say fun.
(22)   A. I am being facetious.
(23)   Q. It's an enormous undertaking.
(24)   A. It's a task.
(25)   Q. And -- now, you were also assistant general

## 124

(1) counsel for the republican party in '94 to '97?
(2)   A. Yes, sir.
(3)   Q. Was that after you came to Austin?
(4)   A. That was after I came to Austin, yes, sir.
(5)   Q. And do you recall who the chairmen of the
(6) republican party were during that period?
(7)   A. Tom Pauken was chairman.
(8)   Q. Do you recall who the general counsel was?
(9)   A. My goodness. Ken Anderson, I think.
(10)   Q. Was that a paid position or was this --
(11)   A. No. It was a voluntary position.
(12)   Q. Voluntary position. And you also were acting
(13) staff attorney for the Trinity River Authority; is that
(14) correct?
(15)   A. That's correct.
(16)   Q. Now, did they elect the trustees?
(17)   A. No. The government appoints their board of
(18) directors.
(19)   Q. And some of our river authorities in Texas are
(20) appointed and some of them are elected; isn't that
(21) correct? The San Antonio River Authority, for example,
(22) is elected.
(23)   A. I'll take your -- I'll take your word for it,
(24) but I think some are and some aren't. Most are not.
(25) Most are appointed.

## 125

(1)   Q. All right. And the Edwards Underground
(2) Aquifer Authority is also elected, isn't it, or do you
(3) know?
(4)   A. That's my understanding.
(5)   Q. Now, is any part of Travis County in the
(6) Edwards Underground Aquifer Authority?
(7)   A. I do not know.
(8)   Q. If not, it comes right -- sits right on top of
(9) it; is that correct?
(10)   A. Most likely. I really don't know.
(11)   Q. Just let me go through this. Yesterday we listened to
(12) help me understand this. The day before that I listened to
(13) Susan Collins, and the day before that I listened to
(14) Mr. Zimmerman, and they both tried to describe the
(15) disagreement that the MUD's board appears to have had
(16) with Susan Collins.
(17)   MR. HICKS: Sharlene.
(18)   THE WITNESS: Sharlene?
(19)   Q. (By Mr. Korbel) Sharlene Collins. I'm sorry.
(20) Can you explain -- what she said yesterday was that she
(21) couldn't get the board -- I'm putting words in her
(22) mouth. It's my understanding she couldn't get the
(23) board to understand that they pay lower taxes because
(24) of the money that they pay to the Utility District.
(25) They pay less money for the water. Do you understand

## 126

(1) anything about that?
(2)   MR. COLEMAN: Same instruction as before
(3) as to privileged communications.
(4)   THE WITNESS: You know, I think they
(5) just -- you know, you had a -- let me --
(6)   Q. (By Mr. Korbel) Sure.
(7)   A. Let me say this. I think the reason they made
(8) the change, if this helps -- and I'm not sure I can
(9) quantify your specific question about the other thing.
(10) But I think they just had a disagreement. You had a
(11) new board coming in with different ideas, different
(12) administration, and I think that they just wanted to
(13) make a change. They had a difference of philosophy
(14) with Ms. Collins. They felt that -- like I said, this
(15) is a very unusual district because it's an in-city MUD.
(16) It doesn't allocate its taxes between the district and
(17) the city. And that's part of what's under litigation
(18) in this other lawsuit. And I think that was really
(19) kind of the gist of it. But as far as lower water
(20) rates or lower taxes or anything else, the people in
(21) the Northwest Austin MUD pay the same city taxes, the
(22) same water rates, same sewer rates, as anyone in the
(23) City of Austin who is not in the district, yet at the
(24) same time they also get to pay the MUD taxes to pay for
(25) utilities. Some areas the city will extend the

(Pages 121 to 126)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

127

(1) utilities and pay for those and not charge them against
(2) the residents. So that was a rambling answer. I'm
(3) sorry.
(4)     Q.  No, that's fine. That was my understanding of
(5) what Mr. Zimmerman had said. Now, Mr. Zimmerman said
(6) that the board considered that there was a conflict of
(7) interest between Ms. Collins and the MUD because she
(8) had signed an agreement with the City of Austin. Are
(9) you familiar with that?
(10)     A.  Well, she had represented either the
(11) developers or the district -- I'm not even sure which
(12) at this point in time -- in the original creation of
(13) the MUD. And because they had a difference of
(14) philosophies -- I wouldn't necessarily call it conflict
(15) of interest, but I think there was a difference in
(16) philosophies, how the board should proceed or not
(17) proceed on the tax issue and the city.
(18)     Q.  Well, he said that she had signed an agreement
(19) that said that the way they were proceeding complied
(20) with Texas Water Law.
(21)     A.  I didn't -- wasn't here, so --
(22)     Q.  Thank you.
(23)     A.  You're welcome. Thank you.
(24)     Q.  This Red Bluff Municipal Water Power District,
(25) does it make submissions to the Department of Justice,

128

(1) or do you know?
(2)     A.  I do not know. We do not serve as their
(3) general counsel, for clarification. I monitored those
(4) issues for them. So I don't know whether they do or
(5) not.
(6)     Q.  When you say monitored submissions, what --
(7)     A.  No, no. Monitor things for them, legislative
(8) activity and that sort of thing. I don't know whether
(9) they do or not. I don't believe they hold elections so
(10) they probably do not make submissions to the Justice
(11) Department.
(12)     Q.  Does your firm do lobbying? I guess every
(13) firm in Austin does lobbying.
(14)     A.  Lobbying, yes.
(15)     Q.  Are you a registered lobbyist?
(16)     A.  I am.
(17)     Q.  And who do you represent?
(18)     A.  I represent -- this session I'm representing
(19) Nueces County, representing a couple of gentlemen who
(20) are ad items for child support purposes out of Collin
(21) County. I'm not sure whether I'm registered for any
(22) other entity this session or not. I don't recall, but
(23) that's my -- those are my active things I'm working on
(24) right now.
(25)     Q.  I understand. And who do you represent -- do

129

(1) you represent the county in Nueces County?
(2)     A.  The county itself, yes, sir.
(3)     Q.  And is that on specific matters or is that
(4) general representation?
(5)     A.  Whatever it is they want me to do.
(6)     Q.  And what have they asked you to do so far in
(7) this session?
(8)     A.  We'll get into attorney/client privilege. I
(9) don't think I can tell you. But other than protect
(10) their interests and, you know, the big issues are
(11) spending and taxes this session. So you know that.
(12)     Q.  You're not involved in any of these
(13) inoculation cases, right?
(14)     A.  No, sir. No HPV cases.
(15)     Q.  I think that's it. Thank you very much. I
(16) appreciate it.
(17)     A.  You're welcome. Thank you.
(18)         MR. HERREN:  Just a very few quick
(19) follow-up questions.
(20)         FURTHER EXAMINATION
(21) QUESTIONS BY MR. HERREN:
(22)     Q.  Is there a map somewhere of the conservation
(23) lands or other lands that are owned by the MUD, whether
(24) it's in or out of the MUD?
(25)     A.  Yes.

130

(1)     Q.  Where might they be?
(2)     A.  Would be in our office, I would guess.
(3) It's -- I'm just trying to think of what form we have
(4) them or whatever, but we've got them.
(5)     Q.  If I could get a copy of that, that would
(6) be --
(7)     A.  We'll work it through. Yeah, that's not a
(8) problem.
(9)         MR. COLEMAN:  Mr. Herren, would you call
(10) me? I'm just wondering. I thought there was a map in
(11) the -- attached to the minutes where that agreement was
(12) being discussed.
(13)         MR. HERREN:  I will go back and look
(14) before I -- I will go back and look.
(15)         MR. COLEMAN:  If there's not, call me and
(16) we'll get it for you.
(17)         MR. HERREN:  That's great.
(18)     Q.  (By Mr. Herren)  The other question was, even
(19) if all houses aren't built in the MUD, even if there's
(20) some vacant lots, is all the utility work that the MUD
(21) is responsible for done?
(22)     A.  Yes.
(23)     Q.  And all of those utilities have been conveyed
(24) to the city and the city has accepted them?
(25)     A.  All but we have one last little bit that we

131

(1) have not quite conveyed yet and we're just working
(2) on -- it relates back to the reimbursement with the
(3) developer issue. The developer put some language in
(4) their deed to us that we're trying to get resolved so
(5) that we can give it to the city without feeling that
(6) there's some additional liability attached to that, but
(7) yes.
(8)     Q.  What piece is that?
(9)     A.  Couldn't tell you what the section numbers
(10) are, but it's the very last --
(11)     Q.  Section?
(12)     A.  Last section, yeah.
(13)     Q.  Thank you.
(14)     A.  But everything is built. Everything is
(15) finished in operation that the MUD has to do at this
(16) point in time.
(17)         MR. HICKS:  I'm going to ask one
(18) question.
(19)         FURTHER EXAMINATION
(20) QUESTIONS BY MR. HICKS:
(21)     Q.  How did the MUD come to own that property
(22) outside the MUD boundaries?
(23)     A.  Well, I suspect -- this will be a better
(24) question probably for Ms. Collins, but I suspect
(25) that -- and it's just a guess, that it was land that

132

(1) the developers had purchased and owned and that they
(2) just said, "Okay. If you let us build here in Canyon
(3) Creek we'll convey this, this, and this to you and --
(4) or not to you, but to -- we'll hold it for the MUD to
(5) be the manager of the conservation area." So I suspect
(6) that's probably what happened.
(7)     Q.  Thanks.
(8)     A.  Yeah.
(9)         MR. WALDMAN:  This is an administrative
(10) matter.
(11)         THE REPORTER:  Off the record?
(12)         MR. WALDMAN:  On the record. Off the
(13) record counsel had asked about the Bates numbers on
(14) some of the documents provided by NAACP defendants. We
(15) went and double-checked, and those were added during
(16) our production process and they should just be
(17) disregarded for the purposes of the case. The upper of
(18) the two Bates numbers are the official ones. The lower
(19) are the results of the error.
(20)         (DEPOSITION CONCLUDED)

(Pages 127 to 132)

133

(1)     CHANGES AND CORRECTIONS
(2)     WITNESS NAME: FRANK MICHAEL REILLY
(3)     DATE: FEBRUARY 23, 2007
(4)     Reason Codes: (1) to clarify the record; (2) to conform
        to the facts; (3) to correct a transcription error; (4)
(5)     other (please explain).
(6)     PAGE  LINE  CHANGE                    REASON CODE
(7)     _____
(8)     _____
(9)     _____
(10)    _____
(11)    _____
(12)    _____
(13)    _____
(14)    _____
(15)    _____
(16)    _____
(17)    _____
(18)    _____
(19)    _____
(20)    _____
(21)    _____
(22)    _____
(23)    _____
(24)    _____
(25)    _____

136

(1)     I further certify that I am neither counsel for,
        related to, nor employed by any of the parties or
(2)     attorneys in the action in which this proceeding was
        taken, and further that I am not financially or
(3)     otherwise interested in the outcome of the action.
(4)     Certified to by me on _____
(5)
(6)
        MARSHA EVANS, TEXAS CSR 5100
(7)     Expiration Date: 12/31/07
        Firm Registration No. 241
(8)     114 West 7th Street, Suite 750
        Austin, Texas  78701
(9)     512-499-0277
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

134

(1)                 SIGNATURE
(2)
(3)         I, FRANK MICHAEL REILLY, have read the foregoing
(4)     deposition and hereby affix my signature that same is
(5)     true and correct, except as noted on the previous page.
(6)
(7)     _____
(8)                 FRANK MICHAEL REILLY
(9)     STATE OF _____
(10)    COUNTY OF _____
(11)        Before me, _____, on this day
(12)    personally appears FRANK MICHAEL REILLY, known to me
(13)    (or proved to me under oath or through
(14)    _____) (description of identity card or
(15)    other document) to be the person whose name is
(16)    subscribed to the foregoing instrument and acknowledged
(17)    to me that they executed the same for the purposes and
(18)    consideration therein expressed.
(19)        Given under my hand and seal of office this
(20)    _____ day of _____, 2007.
(21)
(22)    _____
(23)        NOTARY PUBLIC IN AND FOR
(24)        THE STATE OF _____
(25)

135

(1)             IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
(2)
(3)     NORTHWEST AUSTIN MUNICIPAL    *
        UTILITY DISTRICT NUMBER ONE   *
(4)         Plaintiff                 *
                                      *
(5)     VS.                           *   Civil Action No.
                                      *   1:06-CV-01384
(6)     ALBERTO GONZALES, in his      *   (PLF, DST, EGS)
        official capacity as          *
(7)     Attorney General of the       *
        United States                 *
(8)         Defendant                 *
(9)
(10)
        ***************************************
(11)            REPORTER'S CERTIFICATION
            DEPOSITION OF FRANK MICHAEL REILLY
(12)                FEBRUARY 23, 2007
        ***************************************
(13)
(14)    I, MARSHA EVANS, Certified Shorthand Reporter in
        and for the State of Texas, hereby certify to the
(15)    following:
(16)    That the witness, FRANK MICHAEL REILLY, was duly
        sworn by the officer and that the transcript of the
(17)    oral deposition is a true record of the testimony given
        by the witness;
(18)
(19)    That the deposition transcript was submitted on
        _____ to the witness or to the
        attorney for the witness for examination, signature,
(20)    and return to ACUSCRIBE COURT REPORTERS by
(21)
        That the amount of time used by each party at the
(22)    deposition is as follows:
            Mr. Benjamin Blustein - 1 hour, 25 minutes
(23)        Mr. Max Renea Hicks - 17 minutes
            Mr. Chris Herren - 37 minutes
(24)        Mr. George Korbel - 23 minutes
            Ms. Danielle Gray - 1 minute
(25)        Ms. Nina Perales - 26 minutes.

(Pages 133 to 136)