```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN            )
MUNICIPAL UTILITY DISTRICT  )
NUMBER ONE,                 )
401 W. 15th Street          )    CIVIL ACTION NO.
Suite 850                   )
Austin, Texas 78701         )    1:06-CV-01384
          Plaintiff,        )    (DST,PLF,EGS)
                            )
v.                          )
                            )
ALBERTO GONZALES,           )
ATTORNEY GENERAL OF THE     )
UNITED STATES,              )
U.S. Department of Justice  )
950 Pennsylvania Avenue NW  )
Washington, D.C. 20530      )
```

```
         * * * * * * * * * * * * * * *
                ORAL DEPOSITION OF
                 JAMAL RICHARDSON
              Thursday, April 26, 2007
         * * * * * * * * * * * * * * *
```

ORAL DEPOSITION OF JAMAL RICHARDSON, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 26th day of April, 2007, from 7:02 p.m. to 7:28 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Yetter & Warden, LLP, 221 W. 6th Street, Suite 750, Austin, Texas 78701 pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1             APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
       Mr. Christian Ward
 4     YETTER & WARDEN, LLP
       221 West Sixth Street, Suite 750
 5     Austin, Texas 78701  (512) 743-2642
 6  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
 7
       Mr. Richard Dalheim (By telephone)
 8     Attorney at Law
       950 Pennsylvania Avenue, N.W., Room 7246
 9     Washington, D.C. 20530 (202) 305-0609
                 (202) 327-3961 Fax
10
    FOR LDF:
11
       Mr. Ryan Paul Haygood
12     Assistant Counsel
       99 Hudson Street, Suite 1600
13     New York, New York  10013  (212) 965-2235
                 (212) 226-7592 Fax
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX
 2  Appearances....................... 2
 3  Stipulations......................
 4
 5  JAMAL RICHARDSON
 6     Examination by Mr. Ward....... 4
 7
 8  Signature and Changes............. 18
 9  Reporter's Certificate............ 20
10
11              EXHIBIT INDEX
12  DEPOSITION EXHIBITS
13  (No exhibits were marked during this deposition)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1             JAMAL RICHARDSON,
 2  having been first duly sworn, testified as follows:
 3                   EXAMINATION
 4  BY MR. WARD:
 5     Q.  Mr. Richardson, I'm Chris Ward and I am here
 6  representing Northwest Austin Municipal Utility
 7  District No. 1.  If I during the deposition refer to
 8  the MUD or the district, you will understand that I am
 9  referring to that district?
10     A.  Yes.
11     Q.  Okay.  And that district is the plaintiff in
12  this lawsuit.  You have given the court reporter your
13  full name for the record.  Will you please state for
14  the record your address?
15     A.  My address is 11508 Tibee, T as in Tom, i-b as
16  in boy, e-e, Drive, Austin, Texas 78726.
17     Q.  And is that address inside the district?
18     A.  Yes, it is.
19     Q.  And how long have you lived there?
20     A.  I've lived there since last February 12th.  So
21  about a year so far now.  A little bit over a year.
22     Q.  And where did you live before that?
23     A.  I lived in Hayward, California.
24     Q.  And how long did you live there?
25     A.  I lived in California for pretty much most of
```

Page 5

```
 1  my life.  So 35 years.
 2     Q.  And have you done anything to prepare for this
 3  deposition?
 4     A.  No.
 5     Q.  Did you review any documents?
 6     A.  I already had information on Section 5.  I --
 7  my family comes from a long line of pollers.  My
 8  father -- my stepfather is an administrator in
 9  California, or at least he used to be.  So I have some
10  information but not pertaining to Texas itself.
11     Q.  Okay.  So you already had some familiarity --
12     A.  Yes.
13     Q.  -- with the general subject?
14     A.  Yes.
15     Q.  And did you bring any documents with you
16  today?
17     A.  No.  No, I did not.
18     Q.  Would you say that you are involved in your
19  community?
20     A.  Yes, I am.
21     Q.  All right.  Can you tell me about some of your
22  community involvement.
23     A.  Right now I -- I like the beautification of my
24  neighborhood.  Basically, I walk around cleaning up the
25  area, talk to my neighbors, make sure that everything
```

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 – HOUSTON (713) 572-8897 – SAN ANTONIO (210) 222-9161

6ff9ad10-90e2-4d9f-bb3a-4b2347f25d1e

Page 6

```
 1  is just fine.  And I'm planning on joining the HOA.
 2  Trying actually, hopefully this year, running for the
 3  board.
 4      Q.  Is -- to clarify, the HOA, is that the
 5  neighborhood homeowners association?
 6      A.  That is correct.
 7      Q.  And you are -- you're thinking about running
 8  for the board of that association, you say?
 9      A.  That is correct.
10      Q.  Do you vote?
11      A.  Yes.
12      Q.  And would you consider yourself to be an
13  active voter?
14      A.  Yes, I am.  The only time I had -- in the last
15  couple of years the only time I didn't vote was this
16  last year, because we just moved down here and I was
17  just getting used to actually who were all the people
18  politically down here.  And I -- I don't like to sit
19  there and just vote for somebody that I -- that --
20  unless I do my research first.
21      Q.  All right.  So you have not yet voted in the
22  district.  Is that correct?
23      A.  That's correct.  That's correct.  But I am
24  registered.
25      Q.  Okay.  In your past voting experience, do you
```

Page 7

```
 1  typically vote in local elections?
 2      A.  Yes.
 3      Q.  So things like city council or county
 4  elections?
 5      A.  School district.  Pretty much any voting for
 6  our district.
 7      Q.  Do you know what kinds of elections the MUD
 8  holds?
 9      A.  Not particularly definitely here, no.
10      Q.  Okay.  Are you aware that the MUD is run by a
11  board of directors?
12      A.  Yes.
13      Q.  And did you know that that board is an elected
14  board?
15      A.  No, I did not know.
16      Q.  If I were to tell you that the board -- the
17  board is elected and the elections the MUD holds are
18  elections for the board members, can you tell me if you
19  have had -- if you have any information about
20  particular elections held by the MUD?
21      A.  No, I don't have any information on particular
22  elections.
23      Q.  Have you attended board meetings of the MUD?
24      A.  No, I have not.
25      Q.  You've said that you're -- you're interested
```

Page 8

```
 1  in the homeowners association.  Have you attended
 2  meetings of the homeowners association?
 3      A.  So far, just one.
 4      Q.  And do you get the homeowners association
 5  newsletter?
 6      A.  Yes.
 7      Q.  And do you read that newsletter?
 8      A.  Absolutely.
 9      Q.  Okay.  Do you know any members of the MUD
10  board?
11      A.  No, I do not.
12      Q.  If I may, I would like to ask you if you're
13  familiar with certain individuals.  These are people
14  who are either on or have been on the board in the
15  past.  And I'm just going to ask you -- you -- you may
16  be familiar with them even if you don't know that they
17  are MUD board members.
18      A.  Okay.
19      Q.  Are you familiar with Bill Ferguson?
20      A.  No.
21      Q.  How about Don Zimmerman?
22      A.  I've seen the name.
23      Q.  You've seen his name, but you're saying you're
24  not familiar with him personally?
25      A.  That is correct.
```

Page 9

```
 1      Q.  How about George Frederickson?
 2      A.  No.
 3      Q.  How about Ed Swarthout?
 4      A.  No.
 5      Q.  How about Alan Weiss?
 6      A.  No.
 7      Q.  How about Karen Temborius?
 8      A.  I've seen the name.
 9      Q.  Okay.  But, again, you --
10      A.  But I'm not familiar --
11      Q.  But you're not familiar --
12      A.  No.
13      Q.  Can you tell me a little bit about how you
14  became -- how you came to be involved as an intervenor
15  in this lawsuit.
16      A.  Once I moved into the neighborhood I started
17  speaking with my neighbors.  There was a group -- one
18  neighbor in particular who was already involved in
19  the -- the case.  And they brought it to our attention,
20  what was happening.
21      Q.  In answering this next question, I don't want
22  you to go into the content of any discussions or any
23  kind of communication you might have had with your
24  attorneys, but without doing that, can you tell me,
25  what is your understanding of what this lawsuit is
```

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

6ff9ad10-90e2-4d9f-bb3a-4b2347f25d1e

Page 10

1  about?
2   A.  The lawsuit is about the federal decision for
3  polling booths, the right to notify the community about
4  deciding to move that polling booth from one section to
5  the -- to another section.  And that right now, as far
6  as I understand it, that has not been happening.
7  There's not been enough information back and forth.
8  And also the fact that the -- those polling booths
9  decide -- well, MUD is the one that wants to move --
10 not move the polling booths, but they want to go ahead
11 and change the federal ruling behind it about their
12 ability to move those polling booths.
13  Q.  Okay.  In the context of the Voting Rights
14 Act, are you familiar with Section 5?
15  A.  I know a little bit about it.
16  Q.  Okay.  Do you understand Section 5 as the part
17 of the Voting Rights Act that requires the MUD to seek
18 federal approval for changes made to voting?
19  A.  Yes.
20  Q.  Are you familiar with the term preclearance in
21 the context of the Voting Rights Act?
22  A.  I would -- just taking the word itself, means
23 prior clearance before actually doing anything.
24  Q.  So are -- were you -- are you aware that the
25 Section 5 process of going to the federal government is

Page 11

1  known as preclearance in this context?
2   A.  Well, now I do.  So --
3   Q.  Okay.  So just in case I use the word
4  preclearance from now on --
5   A.  I will understand what it means, yes.
6   Q.  -- that -- that's what I'll be talking about.
7  And are you familiar with the term bailout?
8   A.  If I understand the term correctly, it means
9  ability to go ahead and get out of whatever procedures
10 that you're go ahead -- are mandated to follow.
11  Q.  So do you understand that the MUD is seeking a
12 bailout in this lawsuit from the preclearance process?
13  A.  Yes.
14  Q.  And you've said that you don't have specific
15 information about particular elections in the MUD, so
16 is it fair to say that you're not complaining about
17 specific problems with elections that you know about in
18 the MUD?
19  A.  Since I've only been down here for a year, I
20 don't know -- I can't speak for anything that has
21 happened in the past.  I can only speak of anything
22 that's going from now into the future.  So in my
23 opinion it -- it should be the same way it has been
24 without any changes.
25  Q.  But with regard to what you know about since

Page 12

1  you've been here, is it fair to say that you don't have
2  a specific complaint about any specific election?
3   A.  No.  That's -- well, yes, that is correct.
4   Q.  Yes, that's correct.  Okay.  So, then, is it
5  also fair to say that your main interest in this
6  lawsuit is a philosophical objection to the MUD getting
7  a bailout from the preclearance process in the future?
8   A.  Yes.
9   Q.  Do you believe that any political entity, any
10 jurisdiction should ever be allowed to get a bailout
11 from the preclearance process?
12  A.  At the -- in our society today, no, they
13 shouldn't get a bailout.  When you bail out, you're
14 basically are -- are trying to circumvent something
15 that has been put there for a reason.  If that reason
16 has not changed, then you shouldn't bail out of it.
17 You should follow the reason -- the original mandate
18 that was set in stone, basically.
19  Q.  Would it make a difference to you if a
20 political -- a political unit could show that things
21 had changed?
22  A.  I would be interested in seeing that, but I
23 don't believe that that's even possible in today's
24 society, that it actually has changed.
25  Q.  And do you think that applies to the whole

Page 13

1  country or just parts of the country?  Let -- let me
2  clarify that.  What you have said about today's
3  society, do you feel that that applies to the entire
4  country or to certain areas of the country?
5   A.  It's -- it applies to the entire country, but
6  it's -- in certain areas it's even worse.  So it
7  pertains to those areas even more so.  Some areas are
8  not as progressive, not as -- as -- hasn't made social
9  changes in order to go ahead and go further.
10  Q.  Are you aware that the Section 5 preclearance
11 process applies only to certain areas of the country
12 and not to other parts of the country?
13  A.  Yes.
14  Q.  Do you think that the decision whether a
15 particular part of the country should be covered by
16 Section 5 preclearance should be based on certain
17 factors about that particular part of the country?
18  A.  They do weigh more heavily in certain
19 sections, yes.
20  Q.  So do you think that someone should maybe
21 examine areas of the country before they're covered to
22 decide if they should be covered?
23  A.  Yes.  They should examine all the time,
24 period.  But they also have to come with an open mind
25 that just because you're looking at that one section

Page 14

1 doesn't mean that -- you can't be close-minded, you
2 can't be looking at just the one section, because that
3 one section bleeds off into other sections. And if you
4 only look at one section you don't see the things that
5 are happening in the other sections that can cause
6 conflicts.
7    Q. Just to clarify that a little bit, when you
8 say sections, are you talking about sections of the
9 country or sections of the law, the Voting Rights Act?
10    A. I'm talking about sections of the country.
11 Say -- even if you break it down to districts, just
12 because you look at one district doesn't mean that it
13 doesn't apply to another district. You can't just look
14 at one district by itself. You have to look at all --
15 you have to look at one to start off with, you get your
16 information, you start examining the other sections or
17 other districts also, get your information and you
18 cross-reference them.
19    Q. So do you think it would make sense to compare
20 different districts and say, you know, these are the
21 worst ones that should be covered and these -- these
22 are not as bad so we're -- so we're --
23    A. Well, it depends on what you're trying --
24 trying to state with it. Okay, because even if you say
25 these sections here are bad doesn't mean that those

Page 15

1 other sections are any better. It just means that this
2 section here, because of economical reasons, whatever
3 reasons, or -- or just because of the area that it's
4 located at, it could have worse standings than some
5 other district. All that has to be looked at.
6    Q. But if -- if you're not going to cover the
7 entire country, do you think it makes sense to compare
8 districts to figure out which ones are worse and -- and
9 which ones --
10    A. Yes, you should do some comparison.
11    Q. Oh, okay.
12    A. You've got to do some comparisons between
13 them.
14    Q. And do you think that those comparisons should
15 be done recently or is it okay to rely on comparisons
16 that might have been done many years ago?
17    A. It actually has to be continual. Because life
18 is nothing but change. So because you looked at it
19 some years ago doesn't mean that it hasn't changed. It
20 could have gotten worse, it could have gotten better,
21 it could have just changed into a different way. So
22 comparisons need to be done all the time.
23    Q. So do you think if we were trying to decide
24 today which parts of the country need to be covered and
25 which parts don't, that it would make the most sense to

Page 16

1 compare, you know, recent past, what's -- what's going
2 on now in one district compared to what's going on now
3 in another?
4    A. You need to look -- you should look at what's
5 going on right now but you've also got to look at the
6 history from where it came from. That also affects the
7 area. If you look at just -- okay, I just want to look
8 at this year, well, you honest -- you can't understand
9 the full picture without looking at what happened the
10 previous years, because you want to understand the
11 state of where it's at right now. So you've got to --
12 you've got to look at the whole picture.
13    Q. All right.
14    A. You can't just look at one thing.
15    Q. But you wouldn't want to ignore the recent
16 years and look only like 20 years ago, 30 years ago.
17    A. No.
18    Q. Without --
19    A. No. I would rather look at the whole picture.
20    Q. Up -- up to the present time.
21    A. Correct. Well, you can't look in the future.
22    Q. Including -- right -- history, but up to now.
23    A. Correct.
24       MR. WARD: I think that's all I have.
25 I'll pass the witness.

Page 17

1       MR. HAYGOOD: I would like to go off the
2 record for a few minutes.
3       (Recess from 7:25 to 7:28 p.m.)
4       MR. HAYGOOD: I don't have any questions.
5       MR. DALHEIM: I have no questions on
6 behalf of the...
7       MR. WARD: Okay, then I think we're off
8 the record.
9       (Deposition concluded at 7:28 p.m.)

5 (Pages 14 to 17)

Page 18

```
 1        CHANGES AND CORRECTIONS
 2  WITNESS NAME: JAMAL RICHARDSON   DATE: _____
 3  Reason Codes:  (1) to clarify the record; (2) to
    conform to the facts; (3) to correct a transcription
 4  error; (4) other (please explain).
 5  PAGE  LINE  CHANGE                    REASON CODE
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 19

```
 1  PAGE  LINE  CHANGE                    REASON CODE
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8
 9         _____
            JAMAL RICHARDSON
10
11
12  THE STATE OF _____)
                         )
13  COUNTY OF _____)
14     Before me, _____, on this day personally
    appeared JAMAL RICHARDSON, known to me (or proved to me
15  under oath or through
    _____
16  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
18  expressed.
19     Given under my hand and seal of office this
    _____ day of May 2007.
20
21      _____
         NOTARY PUBLIC IN AND FOR
22       THE STATE OF _____
23
24
25
```

Page 20

```
 1       IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
 2
    NORTHWEST AUSTIN         )
 3  MUNICIPAL UTILITY DISTRICT )
    NUMBER ONE,              )
 4  401 W. 15th Street       )   CIVIL ACTION NO.
    Suite 850                )
 5  Austin, Texas 78701      )   1:06-CV-01384
            Plaintiff,       )   (DST,PLF,EGS)
 6  v.                       )
                             )
 7  ALBERTO GONZALES,        )
    ATTORNEY GENERAL OF THE  )
 8  UNITED STATES,           )
    U.S. Department of Justice )
 9  950 Pennsylvania Avenue NW )
    Washington, D.C. 20530   )
10
11         REPORTER'S CERTIFICATION
          DEPOSITION OF JAMAL RICHARDSON
12          Thursday, April 26, 2007
13      I, RANDALL N. FINCH, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16      That the witness, JAMAL RICHARDSON, was duly
17  sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given
19  by the witness;
20      That the deposition transcript was submitted
21  on May 3, 2007 to the witness or to the attorney for
22  the witness for examination, signature and return to me
23  by _____, 2007.
24      That the amount of time used by each party at
25  the deposition is as follows:
```

Page 21

```
 1      Mr. Christian Ward - 24 minutes
 2      Mr. Ryan Paul Haygood - 0 minutes
 3      That pursuant to information given to the
 4  deposition officer at the time said testimony was
 5  taken, the following includes counsel for all parties
 6  of record:
 7      Mr. Christian Ward, attorney for Plaintiff
 8      Mr. Carlos Becerra, attorney for MALDEF
 9      Mr. Chris Herren and Ms. Christy A. McCormick,
10  attorneys for U.S. Department of Justice
11      Mr. Benjamin Blustein, attorney for Lawyers'
12  Committee for Civil Rights Under Law
13      Mr. Daniel A. Zibel, attorney for NAACP
14      Mr. Max Renea Hicks, attorney for Travis Cty.
15      I further certify that I am neither counsel
16  for, related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20     Certified to by me this 3rd day of May, 2007.
21      _____
        RANDALL N. FINCH, Texas CSR #504
22      Expiration date: 12/31/2008
        Fredericks-Carroll Reporting
23      Firm Registration No. 82
        7800 Shoal Creek Blvd., Suite 200-W
24      Austin, Texas 78757 (512) 477-9911
25
```