Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN          )
MUNICIPAL UTILITY DISTRICT)
NUMBER ONE,               )
401 W. 15th Street        )   CIVIL ACTION NO.
Suite 850                 )
Austin, Texas 78701       )   1:06-CV-01384
        Plaintiff,        )   (DST,PLF,EGS)
                          )
v.                        )
                          )
ALBERTO GONZALES,         )
ATTORNEY GENERAL OF THE   )
UNITED STATES,            )
U.S. Department of Justice)
950 Pennsylvania Avenue NW)
Washington, D.C. 20530    )
```

* * * * * * * * * * * * * *
ORAL DEPOSITION OF
WENDY RICHARDSON
Thursday, April 26, 2007
* * * * * * * * * * * * * *

ORAL DEPOSITION OF WENDY RICHARDSON, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 26th day of April, 2007, from 9:00 a.m. to 9:35 a.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Yetter & Warden, LLP, 221 W. 6th Street, Suite 750, Austin, Texas 78701 pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1           APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
       Mr. Christian Ward
 4     YETTER & WARDEN, LLP
       221 West Sixth Street, Suite 750
 5     Austin, Texas 78701  (512) 743-2642
 6  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
 7
       Mr. Richard Dalheim (By telephone)
 8     Attorney at Law
       950 Pennsylvania Avenue, N.W., Room 7246
 9     Washington, D.C. 20530  (202) 305-0609
                    (202) 327-3961 Fax
10
    FOR LDF:
11
       Mr. Ryan Paul Haygood
12     Assistant Counsel
       99 Hudson Street, Suite 1600
13     New York, New York 10013  (212) 965-2235
                    (212) 226-7592 Fax
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2  Appearances........................  2
 3  Stipulations......................
 4
 5  WENDY RICHARDSON
 6     Examination by Mr. Ward.......................  4
 7     Further Examination by Mr. Haygood............ 23
 8     Further Examination by Mr. Ward............... 28
 9
10  Signature and Changes............................ 29
11  Reporter's Certificate........................... 31
12
13           EXHIBIT INDEX
14  DEPOSITION EXHIBITS
15  (No exhibits were marked during this deposition)
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              WENDY RICHARDSON,
 2  having been first duly sworn, testified as follows:
 3              EXAMINATION
 4  BY MR. WARD:
 5     Q.  And I'm representing Northwest Austin
 6  Municipal Utility District No. 1.
 7     A.  Mm-hmm.
 8     Q.  Which, if I refer to the district or the MUD
 9  during this deposition, you understand that that's the
10  district I'm referring to.
11     A.  Correct.
12     Q.  Okay.  I know you've told the reporter your
13  name.  Will you please state your address for the
14  record?
15     A.  11508 Tibee, that's T-i-b-e-e, Drive, Austin,
16  Texas.
17     Q.  And is that within the MUD?
18     A.  Mm-hmm.  Yes.
19     Q.  And how long have you lived there?
20     A.  One year and two months.
21     Q.  And where did you live before you lived at --
22     A.  California.
23     Q.  And how long did you live in California?
24     A.  Oh, all my life.
25     Q.  Well, welcome to Austin.
```

Page 5

```
 1     A.  Thank you.
 2     Q.  And have you done anything to prepare for this
 3  deposition?
 4     A.  Uh-huh.
 5     Q.  What did you do to prepare for the deposition?
 6     A.  I read over the material, and our lovely
 7  Mr. Ryan here has sat down and we've asked -- asked
 8  questions, answered questions and he's prepared us as
 9  well.
10     Q.  And did you review any documents in
11  preparation for this deposition?
12     A.  Just the documents that were sent to me via
13  e-mail.
14     Q.  Okay.  Did you bring any doc --
15     A.  Via mail -- I'm sorry.
16     Q.  I'm sorry.  Did you bring any documents --
17     A.  No.
18     Q.  -- with you today?
19     A.  No.
20     Q.  Okay.  Would you say that you are involved in
21  your community?
22     A.  I'm aware of my community.  I haven't been
23  there long enough to really get involved, but I'm
24  involved enough to know what's going on within the
25  community.
```

2 (Pages 2 to 5)

Page 6

1  Q. And do you vote?
2  A. Yes.
3  Q. Okay. Would you consider yourself to be an
4  active voter?
5  A. Here in Texas we just got registry of votery.
6  But in California I was an active voter. I voted every
7  year.
8  Q. Okay. So have you not yet voted --
9  A. No.
10 Q. -- in Texas?
11 A. This will be our first year.
12 Q. In your experience as a voter, do you
13 typically vote in local elections?
14 A. Yes.
15 Q. Within the MUD -- I know you haven't been
16 there very long yet and haven't had the opportunity to
17 participate in an election there, but are you aware of
18 what type of elections the MUD holds?
19 A. Mm-hmm.
20 Q. Just -- and I will ask you for the reporter's
21 sake if you could please answer with a yes or no.
22 A. Yes. Are you talking about elections where
23 you have to elect mayors and city officials? Is that
24 what you're asking?
25 Q. Well, do you understand that within your local

Page 7

1  area --
2  A. Mm-hmm.
3  Q. -- there -- there are different levels of
4  government and different --
5  A. Yes.
6  Q. -- jurisdictions?
7  A. There's different districts, mm-hmm.
8  Q. And that -- do you understand that elections
9  for the mayor and city council would be City of Austin
10 elections?
11 A. Yes.
12 Q. And do you understand that the MUD is a
13 separate --
14 A. Yes.
15 Q. -- district?
16 A. Totally separate district, yes.
17 Q. And what is your understanding of what the
18 MUD -- what the MUD's areas of responsibility are?
19 A. To be honest, I don't know what their areas of
20 responsibility is.
21 Q. Okay.
22 A. Because the MUD is fairly new to me in that
23 district. Even with dealing with this case, because
24 it's supposed to be a discrimination type of case, but
25 me personally, I'm really not for sure.

Page 8

1  Q. Okay. Are you aware that the MUD has an
2  elected board of directors?
3  A. I'm -- am -- I am aware of that. I was at a
4  meeting not too long ago.
5  Q. Okay. And are you aware that the elections
6  that the MUD is responsible for are -- are for election
7  of those directors?
8  A. I'm aware of that as well, too.
9  Q. Now, you say you have recently attended a
10 board meeting. Do you regularly attend board meetings
11 of the MUD?
12 A. No, that was the first one I've attended.
13 Q. And why did you come to attend that meeting?
14 A. I was interested in what they were going to
15 speak upon. The MUD, the -- this case here, I wanted
16 to know what was their involvement, how they were going
17 to handle the issues with residents being there asking
18 questions to them. I was interested in what else
19 they're going to do for the community, because I do pay
20 homeowners association dues, so they're over our money
21 within that development. So just interested in seeing
22 who was on the board. I know Mr. Zimmerman and a few
23 other were on the board and finding out where they fit
24 into all of this.
25 Q. And I want to come back to that a little bit

Page 9

1  in a minute, but just to clarify, are you aware that
2  there is a separate homeowners association within the
3  neighborhood?
4  A. What do you mean separate?
5  Q. That -- or is it your understanding that the
6  MUD, the municipal utility district, and the homeowners
7  association are the same --
8  A. No. Within the area --
9  Q. -- group?
10 A. -- they -- they have certain parts of our
11 development and homeowners have certain parts of
12 development. I did find that out when I was there.
13 Because there are some jurisdictions within there they
14 can't touch. Like, for instance, the pool area or so,
15 it has nothing to do with homeowners. Somebody else
16 has to deal with that. So is that what you're
17 referring to?
18 Q. I think somewhat, yeah. Have -- have you --
19 have you attended a meeting of the homeowners
20 association --
21 A. No.
22 Q. -- in the neighborhood?
23 A. I have not. Those are held at the church and
24 I have not had a chance to.
25 Q. And is it your understanding that your

3 (Pages 6 to 9)

Page 10

1  homeowners association dues go to the MUD?
2    A.  No.  Our homeowners association dues goes to
3  our homeowners.
4    Q.  Okay.
5    A.  It doesn't go to the MUD, not that I believe
6  so.  Does it?  I don't know.  I don't know where it
7  goes.  I just know we get an itinerary of the broken
8  down of the 500 something thousand dollars and it's
9  broken down into the landscape, the pools and
10 everything else.  So I have no clue where else that
11 money goes.
12   Q.  Okay.  So -- but is it -- is it your
13 understanding that the MUD board controls the spending
14 of homeowners association dues?
15   A.  No.  I mean, I don't know.  I have no clue.
16   Q.  Okay.
17   A.  Like I said, we get an itinerary of the
18 breakdown of where our money goes to homeowners.  They
19 send one out every year.  I know there's a total of 500
20 and something thousand dollars.  We pay $400 a year for
21 dues and it's broken down into landscaping, it's broken
22 down into the park, it's broken down into the pool
23 area.  So I have no clue.  I just know what's on that
24 piece of paper.  Whether if it's MUD related where MUD
25 gets part of it, I don't know.  It's relatively new to

Page 11

1  me, especially to this city.
2    Q.  Okay.  I understand.  Going back to the
3  meeting of the MUD board that you attended, did you ask
4  questions at the MUD board meeting?
5    A.  I asked one question and that question was how
6  come they felt like they weren't aware of what was
7  going on when the -- when that particular ballot came
8  up, the board members were like a deer with headlights.
9  They acted like they didn't know what was going on.  It
10 wasn't their responsibility to know what was going on.
11       We had residents there that asked
12 questions to them and they didn't want to deal with the
13 issue.  They spent 10 minutes on it and it was thrown
14 out.  They weren't going to vote on it.  They said
15 leave it for the end of the year.
16   Q.  Okay.  Let me back up a minute.  When was this
17 meeting that you attended?
18   A.  This was last week on Thursday.
19   Q.  Okay.
20   A.  Seven o'clock.  At Peace Lutheran Church.
21   Q.  And did you feel like you got an answer to
22 your question?
23   A.  No.  It was very uncomfortable.  Me
24 personally, I felt uncomfortable with even having a
25 board that didn't want to address the MUD issue, nor --

Page 12

1  I felt like they knew what was going on, they just
2  didn't want to display anything because they felt like
3  it wasn't important.  That was my issue.
4    Q.  Okay.  Do you have -- I know you have not had
5  the opportunity to vote in a MUD board election yet,
6  but do you know how those elections are run?
7    A.  No.  The only thing I can think of is my
8  grandparents where they were run in churches and
9  schools.  That was it.
10   Q.  Okay.  But you don't have -- is it correct to
11 say that you don't have any specific information about
12 elections run by this particular MUD?
13   A.  No.  Not this particular...
14   Q.  We talked a little bit about the homeowners
15 association in Canyon Creek.  Do you get the Canyon
16 Creek homeowners association newsletter?
17   A.  Mm-hmm.
18   Q.  And do you read that newsletter?
19   A.  I read it all the time.
20   Q.  And we talked about the MUD board, and am I
21 correct -- am I understanding you correctly that you
22 have some familiarity with Don Zimmerman?
23   A.  I know Zimmerman is posted everywhere.  I know
24 it's a family tradition here.  He's got a street named
25 after him.  Elections came up; I guess he got voted in

Page 13

1  again.  So I am aware of -- he has a history here, a
2  family history in Austin.  I mean, when you name a
3  street after you, so you have to be some -- of
4  importance.
5    Q.  Do you know any other members of the MUD
6  board?
7    A.  No.  Not by name.  Now, if there were faces
8  here I could tell you who was there.  But name-wise,
9  no.
10   Q.  Okay.
11   A.  They don't send a list of names around at the
12 meeting.
13   Q.  Let me -- related to that, though, let me ask
14 you if you're familiar with the names of some
15 individuals who are either on the MUD board now or have
16 been recently.  I'm just going to ask you -- these may
17 be people you're familiar with but maybe you didn't
18 realize they were on the MUD.  So can I just ask you --
19   A.  Mm-hmm.
20   Q.  -- are you familiar with Bill Ferguson?
21   A.  Uh-uh.
22   Q.  How about George Frederickson?
23   A.  Uh-uh.
24      MR. HAYGOOD:  You need to say yes or no.
25      THE WITNESS:  No.  Sorry.

4 (Pages 10 to 13)

Page 14

1  Q. (By Mr. Ward) How about Ed Swarthout?
2  A. No.
3  Q. How about Alan Wise?
4  A. No.
5  Q. How about Karen Temborius?
6  A. Yes. I remember her.
7  Q. And how are you familiar with Karen Temborius?
8  A. Because she was the only lady sitting there.
9  Q. So you're familiar with her from seeing her at
10 the MUD board meeting that you --
11 A. I believe one of the gentlemen had called her
12 name. They kept calling her name and I believe it was
13 Karen. That sounds right. She was the only lady on
14 the board.
15 Q. And with regard to this lawsuit, can you tell
16 me how you came to be an intervenor in this lawsuit?
17 A. My next-door neighbors. My next-door
18 neighbors were supposed to participate in this. They
19 could not participate because they put their house up
20 for sale and they're moving. And due to them moving,
21 they couldn't participate in this lawsuit or the
22 litigation there. So she asked me if I wanted to come
23 on board and deal with the MUD -- the MUD
24 investigations that was going on within our community.
25 So she gave me Christian's number, Christian Clark.

Page 15

1  Christian Clark called me; I called her back and forth,
2  and that's how I got involved with it.
3  Q. Without going into the content of any
4  conversations you might have had with your attorneys or
5  e-mail communication, any kind of discussions that
6  you've had with your attorneys, can you tell me what is
7  your understanding of what this lawsuit is about?
8  A. My understanding about this lawsuit is about
9  Texas is within -- I guess they have sections, and for
10 the voting rights of moving ballots or anything
11 within -- let me explain this correctly. My mind went
12 blank.
13      MR. HAYGOOD: He can ask you the question
14 again.
15      THE WITNESS: I am -- I understand that
16 anytime Texas decides to make a change on voting
17 ballots they have to go to the federal government in
18 order to have it approved for it to be changed.
19 Whether if it's going to be changed from a church to a
20 school or whether something is going to be changed on
21 the ballot, it has to be approved by the federal
22 government.
23 Q. (By Mr. Ward) Okay. Are you aware that what
24 you described falls within what's called Section 5 --
25 A. Section 5.

Page 16

1  Q. -- of the Voting Rights Act?
2  A. That's -- couldn't get it out. Section 5,
3  yes.
4  Q. And are you aware that those provisions of
5  Section 5 are the main issue in this lawsuit?
6  A. Correct.
7  Q. And are you aware that there are other
8  sections of the Voting Rights Act that are not -- that
9  are different from Section 5?
10 A. Okay, yes.
11 Q. Okay. All right. I guess that would make
12 sense, if there's at least five sections there.
13 A. There would have to be.
14 Q. But -- but are --
15 A. Okay.
16 Q. Are you aware that there -- that there are
17 other parts of the Voting Rights Act that are not
18 challenged or questioned in this lawsuit?
19 A. I would assume, yes. I mean, we have laws and
20 regulations for everything, but five is what we're here
21 for. We're not here for the other ones that's not on
22 here. We're here for five.
23 Q. And are you aware that the process that you
24 described involving Section 5 with approval by the
25 federal government is referred to as preclearance?

Page 17

1  A. Preclearance, yes, I am.
2  Q. And are you familiar with the term bailout in
3  this context?
4  A. No. Do you want to explain it?
5  Q. If -- if I -- well, are you aware that the --
6  what the MUD is asking for is an exemption from the
7  preclearance requirement?
8  A. I'm aware of that.
9  Q. And that's -- that's also called a bailout.
10 A. Okay. They're trying -- so they're trying not
11 to have to go through this. They want to be able to
12 move their voting rights when they want to without
13 having to get federal government approval.
14 Q. All right.
15 A. Yes?
16 Q. You said -- just to clarify, you said to move
17 voting rights. I think --
18 A. No, voting ballots.
19 Q. That's -- like for --
20 A. Voting polls.
21 Q. For example, do you think that the MUD should
22 be required to get this preclearance --
23 A. No.
24 Q. -- if it wants to move this --
25 A. No.

5 (Pages 14 to 17)

Page 18

1  Q.  -- polling place?
2  A.  Uh-uh.
3  Q.  Okay.  I just -- I just want -- I just want to
4  clarify to make sure --
5  A.  No.
6  Q.  -- you understood that question.  I --
7  A.  Okay.
8  Q.  -- I am -- do you feel that the MUD should
9  have to go through this preclearance --
10  A.  Yes, they should.
11  Q.  -- process?
12  A.  They should.
13  Q.  So you believe that the MUD should not be
14  permitted to get the bailout that would exempt it from
15  going through that process.
16  A.  Correct.  Yes.
17  Q.  And since you have -- you have mentioned that
18  you have no specific information about elections with
19  this particular MUD, would it be fair to say that your
20  primary interest in this lawsuit is a philosophical
21  objection to the MUD getting the bailout?
22  A.  Correct.  Yes.
23  Q.  And do you believe that no political entity --
24  A.  Mm-hmm.
25  Q.  -- should ever be able to get a bailout?

Page 19

1  A.  No.  I'm not saying that.  It just depends on
2  to me -- me personally, it depends on your state.  It
3  depends on what city.  Just depends.  We're talking
4  about this issue now.  I can't say for anyone else, I'm
5  just saying for our district right now.  That's what we
6  have to be concerned about.  I mean, fair is fair.
7  Q.  So are you aware that some parts of the
8  country are covered by the preclearance --
9  A.  Some are.
10  Q.  -- requirement --
11  A.  Some are not.  And if you noticed, the ones
12  that are are more south, because of history.  That's
13  why I don't feel like they -- they are going to have
14  to -- they need to go through preclearing.  It's due to
15  history.  I mean, history holds a lot when it comes
16  down to the south.
17  Q.  Are you aware that the bailout process
18  requires a jurisdiction to show a recent history of
19  complying with the Voting Rights Act?
20  A.  Don't know.  No.
21  Q.  If -- if I were to tell you that to get the
22  bailout, a jurisdiction has to go to a court and show
23  compliance, show a history of compliance, would that
24  affect your opinion of bailout?
25  A.  No.

Page 20

1  Q.  So do you think that once an area is covered,
2  that there should ever be a possibility for that area
3  to show --
4  A.  I can't answer that.  That's -- that's not for
5  me to judge.  I don't know.  I can't answer that.
6  Cities change, states can change, but the ones that are
7  here, some of them won't -- will never change.  So when
8  it comes down to the City of Austin and where I live,
9  that's the only one I'm concerned about.  I'm not
10  concerned about any other city or state.  I'm concerned
11  about the one I live in right now.
12  Q.  And if a -- if a city or a state, though, does
13  change and shows that it changed, would that affect
14  your idea about whether bailout should be available?
15  A.  No.  I don't live in that state.  Like I said,
16  the only thing I'm concerned about is this one right
17  now.  If I was in another state, then I would be
18  concerned about that, but for right now, we're not
19  talking about other states, we're talking about the
20  State of Texas, the City of Austin, and 11508 Tibee,
21  Canyon Creek area, which sits in that MUD district in
22  my area.  That's what I'm worried about right now.
23  Because I live there.  I have children and there are a
24  lot of other children there.  I want to make sure that
25  whatever happens or the outcome of this, it's done

Page 21

1  fair.
2       We're in the 21st, 22nd century and I
3  feel like that we have the right to make sure
4  everything is fair.  Discrimination can be against
5  anything.  But my thing is I want to make sure that the
6  MUD district is being fair to the residents that are
7  there in Canyon Creek.  That's what I'm concerned about
8  right now.
9  Q.  And you feel that the best way to do that is
10  for it to go through the federal government for
11  preclearance?
12  A.  And it needs to go through the federal
13  government.  Not only the federal government, it needs
14  to go higher.  Whatever resolution to resolve this, it
15  can go as high as the Supreme Court.
16  Q.  Other than elections, are there other areas
17  relating to local governments that you think should go
18  through the federal government?
19  A.  Not that I am aware of.  I'm from California.
20  I don't have to deal with this.  We don't go through
21  MUD problems, discrimination.  We go vote and we're
22  finished.  This is -- coming to the south, it's just --
23  it's got its own aura, it's just different.  There's
24  always going to be litigations within the south.
25  Coming from California, we vote.  We don't have a

Page 22

1  problem with MUD district and discrimination or, you
2  know, moving of ballots. Every year where I voted in
3  California it's been the same place every year.
4  Nothing changed.
5     Q. You -- you've mentioned moving ballot boxes.
6  Do you think -- would you think that a polling place in
7  some home -- homeowner's garage, would you feel that
8  that was a convenient place --
9     A. No.
10    Q. -- for you to vote?
11    A. That's very uncomfortable to me.
12    Q. Do you think that a public school nearby would
13 be a more convenient place for you to vote?
14    A. Just depends. It depends on who is running
15 the -- the poll. It just depends. Public schools are
16 normally the place where here in the south they've held
17 elections and voting. So I guess -- yeah, I guess it
18 would be okay. It would be.
19    Q. So were you aware that at one time the MUD
20 board elections were held separately in someone's
21 garage and that now they're held in the elementary
22 school?
23    A. No, I wasn't aware of that, it was held in
24 someone's garage.
25    Q. Do you think that it's better for it to be at

Page 23

1  the school or this homeowner's garage?
2     A. If I had a choice, it would -- it would be
3  best to have it at a public school.
4     Q. So that would -- would that be an example of a
5  change that you think is a good change for some
6  jurisdiction to make?
7     A. I can't answer that. I don't know. I don't
8  know if it's a good change or a bad change. I mean, if
9  it was good, I guess we wouldn't be sitting here
10 discussing this today, moving it from school -- from a
11 garage to a school, because there are still problems.
12    Q. You've mentioned California where you're from.
13 Are you aware that some parts of California are covered
14 by the preclearance requirement?
15    A. No, I wasn't aware of that. Never had a
16 problem.
17       MR. WARD: I think that's all I have.
18 And I'll pass the witness.
19       MR. HAYGOOD: Can we go off the record
20 for a few minutes?
21       (Recess from 9:47 to 9:52 a.m.)
22       MR. HAYGOOD: I only have a few
23 questions.
24           FURTHER EXAMINATION
25 BY MR. HAYGOOD:

Page 24

1     Q. Ms. Richardson, you mentioned that last week
2  you attended the MUD board meeting at Peace Lutheran
3  Church.
4     A. Mm-hmm.
5     Q. I think you said that was on Thursday. How
6  did you come to learn about that meeting?
7     A. Christian Clark, who represents the NAACP, she
8  got word from the Mexican association that Mr. Diaz is
9  on, I believe. She was the one who alerted me that
10 they were having a meeting that day that we were
11 unaware of.
12    Q. So you hadn't received notice --
13    A. No notice.
14    Q. -- of the meeting?
15    A. Uh-uh. No. Because normally for meetings
16 they have it posted up within Canyon Creek on like a
17 billboard. It's like a little small billboard they
18 will say homeowners meeting. They have it posted up
19 all throughout the neighborhood. But for that
20 particular meeting it was not posted.
21    Q. And do you remember what some of the items
22 were that were addressed there at the MUD meeting?
23    A. Yes. They only addressed two because after
24 the two I left. The first one was addressed on the
25 vandalism in the park. It's been an ongoing event and

Page 25

1  they specified that they had just put up a tent or
2  something within the park where somebody had poked
3  holes or had slit the tent. And somebody had
4  vandalized the bathroom and vandalized the children's
5  playground area. And they -- they spoke upon this
6  issue about security.
7        It took a good 40 minutes, they spoke on
8  it. And I guess they came to agreement that they were
9  going to hire security within the park in order to find
10 out who was doing this because they were going to have
11 to write a check for $10,000 to fix it.
12    Q. In addition to the vandalism, what other
13 issues did they address?
14    A. Then they brought up the MUD issue, but they
15 only brought it -- the only way it came up was one of
16 the board members said, "What's the next issue you want
17 to discuss?" and one of the members said the MUD issue.
18 I think it was No. 6 on the ballot or so, or -- I'm not
19 for sure. I wasn't familiar with what number it was.
20       The issue came up about the MUD district.
21 A lot of people on the board acted like they were not
22 familiar with what was going on. There was one
23 gentleman who had a little knowledge of it. I think he
24 had more knowledge of it, he just didn't want to speak
25 on it. Lasted for about 10 minutes. They basically

7 (Pages 22 to 25)

Page 26

1  said the issue for that had nothing to do with them.
2  They had no bearing on it. There was no need for them
3  to even really discuss it. If it needed to come up, it
4  could come up at the end of the year for the elections
5  for voting and that was basically --
6      Q. So it was your understanding --
7      A. -- the topic.
8      Q. -- the board members didn't want to deal with
9  the lawsuit at issue here?
10     A. No. Because one gentleman on the board, I
11 really don't know his name, I just know he was an
12 engineer, he made the statement, "Why is it always
13 about the rich white guys when it comes down to the
14 discrimination and -- and -- thus far?" And one
15 gentleman stated, "Why can't we just write a check for
16 a thousand dollars and call it a day for this? Why
17 does this have to continue to come up?" So he was
18 aware of what was going on. And the way he addressed
19 the issue it frustrated me; I was kind of infurious.
20 Because you can't write a check for a thousand dollars
21 to make something just go up under the rug.
22     Q. And was this the same board member that made
23 both comments?
24     A. No. One board member said one comment and
25 another board member said why can't we just write a

Page 27

1  thousand dollar check.
2      Q. So one board member said why is it -- in your
3  words -- why is it --
4      A. Mm-hmm.
5      Q. -- always the rich white guy --
6      A. Mm-hmm.
7      Q. -- who is punished for racial
8  discrimination.
9      A. And then -- yes. And then --
10     Q. And the other board member said why can't we
11 just write a check --
12     A. We write a thousand dollar check. And --
13     Q. -- to make this go away.
14     A. I'm sorry.
15     Q. Sorry. So Ms. Richardson, you're saying that
16 one board member said why is it the rich white guy is
17 punished for racial discrimination --
18     A. Mm-hmm.
19     Q. -- and another board member said why can't we
20 just write a $1,000 --
21     A. Mm-hmm.
22     Q. -- check to make this case go away.
23     A. And someone else, I don't know if it was from
24 the board or was it a resident, stated the facts that
25 this is not a middle-class, rich person's issue. This

Page 28

1  is basically due to the poor. This doesn't need to be
2  addressed here within Austin, it needs to be addressed
3  in the poor cities, because those are the people who
4  have the problems.
5      Q. And this was a third board member that said
6  this?
7      A. Yes. And one of Mr. -- Mr. Diaz, he stated
8  that it's not a -- it's not a racial issue, which it's
9  not a racial issue; it's a discrimination issue. Which
10 the discrimination could be whether it's poor or have
11 lack of knowledge or it could be a discrimination
12 within Canyon -- Canyon Creek. And I felt very
13 offensive behind that. And after that issue was
14 addressed they basically said, well, we're not going to
15 talk about this issue anymore. If you want to discuss
16 this, wait till voting. Everybody, a juror, say aye,
17 whatever. And they went on to the next issue and I
18 left.
19     Q. So Mr. Diaz, who is an intervenor --
20     A. Mm-hmm.
21     Q. -- also in this case, when he voiced his
22 concern, how was he received by the board members?
23     A. Like they didn't know what he was talking
24 about. Like they had no knowledge at all.
25     Q. And the total discussion of the board on

Page 29

1  this --
2      A. 10 minutes.
3      Q. -- issue was 10 minutes?
4      A. 10 minutes, if that. Nobody wanted to bring
5  up any issues, nobody really wanted to talk about it.
6          There was one particular guy on the
7  board, I don't know his name, he had salt and pepper
8  hair, it may have been Mr. Zimmerman, I'm not for sure,
9  but he was trying to pull more out of the board members
10 of what's going on, but they basically didn't want to
11 address anything. They were basically telling him,
12 "Don't worry about it. It's not our issue. It's
13 something that's going to be handled at the end of the
14 year."
15         MR. HAYGOOD: Thanks, Ms. Richardson.
16         THE WITNESS: Mm-hmm.
17         MR. HAYGOOD: That's all I have.
18         MR. WARD: Richard, did you have any
19 questions for the witness?
20         MR. DALHEIM: No. No, Chris, I have no
21 questions.
22         MR. WARD: Okay. Then I think that's all
23 we have. And we can go off the record.
24         (Deposition concluded at 9:58 a.m.)
25

8 (Pages 26 to 29)

## Page 30

```
 1        CHANGES AND CORRECTIONS
 2   WITNESS NAME: WENDY RICHARDSON   DATE: _____
 3   Reason Codes:  (1) to clarify the record; (2) to
     conform to the facts; (3) to correct a transcription
 4   error; (4) other (please explain).
 5   PAGE  LINE  CHANGE                    REASON CODE
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

## Page 31

```
 1   PAGE  LINE  CHANGE                    REASON CODE
 2   _____
 3   _____
 4   _____
 5   _____
 6   _____
 7
 8
 9       _____
         WENDY RICHARDSON
10
11
12   THE STATE OF _____)
                           )
13   COUNTY OF _____)
14      Before me, _____, on this day personally
     appeared WENDY RICHARDSON, known to me (or proved to me
15   under oath or through
     _____
16   (description of identity card or other document)) to be
     the person whose name is subscribed to the foregoing
17   instrument and acknowledged to me that they executed
     the same for the purposes and consideration therein
18   expressed.
19      Given under my hand and seal of office this
         _____ day of May 2007.
20
21      _____
         NOTARY PUBLIC IN AND FOR
22       THE STATE OF _____
23
24
25
```

## Page 32

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2
     NORTHWEST AUSTIN        )
 3   MUNICIPAL UTILITY DISTRICT )
     NUMBER ONE,              )
 4   401 W. 15th Street       )   CIVIL ACTION NO.
     Suite 850                )
 5   Austin, Texas 78701      )   1:06-CV-01384
              Plaintiff,  )       (DST,PLF,EGS)
 6   v.                       )
                              )
 7   ALBERTO GONZALES,        )
     ATTORNEY GENERAL OF THE  )
 8   UNITED STATES,           )
     U.S. Department of Justice )
 9   950 Pennsylvania Avenue NW )
     Washington, D.C. 20530   )
10
11        REPORTER'S CERTIFICATION
          DEPOSITION OF WENDY RICHARDSON
12        Thursday, April 26, 2007
13        I, RANDALL N. FINCH, Certified Shorthand
14   Reporter in and for the State of Texas, hereby certify
15   to the following:
16        That the witness, WENDY RICHARDSON, was duly
17   sworn by the officer and that the transcript of the
18   oral deposition is a true record of the testimony given
19   by the witness;
20        That the deposition transcript was submitted
21   on May 3, 2007 to the witness or to the attorney for
22   the witness for examination, signature and return to me
23   by _____, 2007.
24        That the amount of time used by each party at
25   the deposition is as follows:
```

## Page 33

```
 1        Mr. Christian Ward - 27 minutes
 2        Mr. Ryan Paul Haygood - 10 minutes
 3        That pursuant to information given to the
 4   deposition officer at the time said testimony was
 5   taken, the following includes counsel for all parties
 6   of record:
 7        Mr. Christian Ward, attorney for Plaintiff
 8        Mr. Carlos Becerra, attorney for MALDEF
 9        Mr. Chris Herren and Ms. Christy A. McCormick,
10   attorneys for U.S. Department of Justice
11        Mr. Benjamin Blustein, attorney for Lawyers'
12   Committee for Civil Rights Under Law
13        Mr. Daniel A. Zibel, attorney for NAACP
14        Mr. Max Renea Hicks, attorney for Travis Cty.
15        I further certify that I am neither counsel
16   for, related to, nor employed by any of the parties or
17   attorneys in the action in which this proceeding was
18   taken, and further that I am not financially or
19   otherwise interested in the outcome of the action.
20       Certified to by me this 3rd day of May, 2007.
21       _____
         RANDALL N. FINCH, Texas CSR #504
22       Expiration date: 12/31/2008
         Fredericks-Carroll Reporting
23       Firm Registration No. 82
         7800 Shoal Creek Blvd., Suite 200-W
24       Austin, Texas 78757 (512) 477-9911
25
```