IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, 401 W. 15th Street Suite 850 Austin, Texas 78701     Plaintiff, <br><br> v. <br><br> ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITED STATES, U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, D.C. 20530 | CIVIL ACTION NO. <br><br> 1:06-CV-01384 (DST,PLF,EGS) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION OF
RYAN F. ROBINSON
Wednesday, April 4, 2007
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF RYAN F. ROBINSON, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 4th day of April, 2007, from 1:10 p.m. to 2:10 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weil, Gotshal & Manges, LLP, 8911 Capital of Texas Highway, Suite 1350, Austin, Texas 78759 pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1           APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
        Mr. Gregory S. Coleman
 4      YETTER & WARDEN, LLP
        221 West Sixth Street, Suite 750
 5      Austin, Texas 78701  (512) 743-2642
              -and-
 6      Mr. Christian Ward
        WEIL, GOTSHAL & MANGES, LLP
 7      8911 Capital of Texas Highway
        Building One, Suite 1350
 8      Austin, Texas 78759  (512) 349-1937
              (512) 527-0698 Fax
 9
    FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
10  FUND (MALDEF):
11      Mr. Carlos Becerra (By telephone)
        Attorney at Law
12      110 Broadway, Suite 300
        San Antonio, Texas 78205  (210) 224-5476
13            (210) 224-5382 Fax
14  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
15
        Mr. Chris Herren (By telephone)
16      Attorney at Law
        950 Pennsylvania Avenue, N.W., Room 7246
17      Washington, D.C. 20530 (202) 305-0609
              (202) 327-3961 Fax
18
    FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:
19
        Mr. Benjamin Blustein (By telephone)
20      Staff Attorney, Voting Rights Project
        1401 New York Avenue, NW, Suite 1400
21      Washington, D.C. 20005  (202) 662-8320
              (202) 628-2858 Fax
22
23
24
25
```

Page 3

```
 1        APPEARANCES (Cont'd)
 2  FOR INTERVENOR DEFENDANTS TEXAS STATE CONFERENCE OF
    NAACP AND AUSTIN BRANCH OF THE NAACP:
 3
        Mr. Daniel A. Zibel (By telephone)
 4      WILMER, CUTLER, PICKERING, HALE & DORR, LLP
        1875 Pennsylvania Ave., N.W.
 5      Washington, D.C. 80006  (202) 603-6053
              (202) 663-6363 Fax
 6
    FOR INTERVENOR TRAVIS COUNTY:
 7
        Mr. Max Renea Hicks
 8      Attorney at Law
        101 W. 6th Street
 9      Austin, Texas  78701
10  Also present:  Gerald Hebert (By telephone)
                   Jennifer Garrett (By telephone)
```

Page 4

```
 1              INDEX
 2  Appearances.........................  2
 3  Stipulations.........................
 4
 5  RYAN F. ROBINSON
 6    Examination by Mr. Coleman...................  5
 7    Further Examination by Mr. Becerra...........  40
 8    Further Examination by Mr. Coleman...........  43
 9
10  Signature and Changes............................  46
11  Reporter's Certificate...........................  48
12
13           EXHIBIT INDEX
14  DEPOSITION EXHIBITS
15  1. Attachment B to the Report of Ryan Robinson....  9
16  2. Demographic data 2000 for Northwest Austin MUD
       No. 1..........................................  10
```

Page 5

```
 1            RYAN F. ROBINSON,
 2  having been first duly sworn, testified as follows:
 3            EXAMINATION
 4  BY MR. COLEMAN:
 5     Q.  Good afternoon, Mr. Robinson.  Thank you for
 6  coming today.  I'm Greg Coleman.  I represent the
 7  Plaintiff, Northwest Austin Municipal Utility District
 8  No. 1 in this lawsuit.  You understand that, right?
 9     A.  Yes, sir.
10     Q.  And you understand you're here today pursuant
11  to a notice of deposition for your testimony?
12     A.  Yes, sir.
13     Q.  Did you bring any documents today in response
14  to our notice?
15     A.  I brought the materials that I put together --
16     Q.  Okay.
17     A.  -- when I submitted my product that -- that
18  Renea Hicks asked me for.  But everything I have is --
19  is just -- it's -- I can provide copies because
20  everything I had was public information.  But the
21  materials I have in front of me are my backup materials
22  to try and help me answer the questions as they come.
23         (Off the record)
24     Q.  (By Mr. Coleman)  Mr. Robinson, I would like
25  during our deposition to make some reference to the
```

2 (Pages 2 to 5)

Page 6

1  materials that you have brought and perhaps even to
2  mark them as exhibits. I'm more than happy to make a
3  copy now or wait until afterwards and just make a copy.
4  We can do whatever informally as long as I can make
5  the -- part of the record later on. Is that agreeable
6  to you and your counsel?
7      A.  Absolutely. You can have -- you can either
8  have these actual copies --
9      Q.  Okay.
10     A.  -- or I can --
11     Q.  Okay.
12     A.  -- do what needs to be done to make these
13 available to you.
14         MR. HICKS: So you can just mark these as
15 exhibits if you want to as you go through.
16         MR. COLEMAN: If that's all right.
17         MR. HICKS: That's fine.
18         MR. COLEMAN: Okay. All right.
19         MR. BECERRA: Greg, if you do that, could
20 you send those around like you did the last time?
21         MR. COLEMAN: Sure. Of course. We'll --
22 we'll just get them scanned and sent around. It's
23 not -- it's not but about ten pieces of paper.
24         MR. BECERRA: Okay.
25         MR. COLEMAN: For the phone folks, if --

Page 7

1  if you'll just identify yourself when you kick in.
2      Q.  (By Mr. Coleman) Mr. Robinson, if you would,
3  tell me a little bit about how you came to be named as
4  an expert in this case.
5      A.  Yeah, I may not be the right person to ask.
6  The -- the -- the -- the reason I'm involved at all is
7  because I responded to a citizens request for
8  information, and that's one of the main things I do at
9  my job with the city and -- and -- people ask us for
10 population information, housing information, all sorts
11 of socioeconomic data. And so --
12     Q.  Who asked you for information?
13     A.  Renea Hicks.
14     Q.  And have you verified he's, in fact --
15         MR. HICKS: A citizen?
16     Q.  (By Mr. Coleman) -- qualified to ask you
17 questions?
18     A.  I know that he lives inside the city limit,
19 and -- and I don't necessarily -- I mean, I -- I -- I
20 do give partial treatment to citizens over the City of
21 Austin, but I also try and serve the data needs of
22 anyone regardless of -- of where they live.
23     Q.  In particular, someone who is such a fine
24 person and citizen as Renea Hicks?
25     A.  Well, Renea and I've -- have known each other

Page 8

1  a long time and have worked on a couple of other
2  different projects, so we know each other.
3         MR. HICKS: He didn't answer the
4  question.
5      Q.  (By Mr. Coleman) Did -- did Mr. Hicks
6  after -- or as part of that ultimately ask you to
7  become involved as an expert in this lawsuit?
8      A.  Yes.
9      Q.  Can you tell me the nature of the information
10 that he originally requested from you?
11     A.  Demographic information for a municipal
12 utility district that is, as we call it, an in-city
13 MUD. Asked for snapshot from decennial data 2000 to
14 decennial data 1990. He then expanded his data request
15 to include the ZIP code that the MUD resides within,
16 Travis County as a whole, probably to give comparable
17 datapoints or to put the datapoints in context.
18     Q.  Okay. Did -- did he ask for information that
19 is not at least summarized in the attachments to your
20 report?
21     A.  No, everything he asked for I gave him and
22 it's summarized.
23     Q.  Okay. In preparing that information, you went
24 through a particular process, and you've also described
25 a process in your report. Is that the same analysis or

Page 9

1  did you conduct one analysis for Mr. Hicks and then do
2  another analysis to prepare your report?
3      A.  No, there was only one piece of analysis.
4      Q.  Okay. And so these three paragraphs that are
5  Attachment B to your designation -- and that's --
6  that's your expert report in this case?
7      A.  I believe it is.
8      Q.  Would you like to look at it just to make
9  sure?
10     A.  I guess the part that I'm not 100 percent sure
11 is -- is what the -- I mean, but that is -- that is my
12 report.
13     Q.  I'll tell you what --
14     A.  Okay.
15     Q.  Let me just mark this. Do we want to just
16 start over at one or continue on?
17         MR. WARD: I don't --
18         MR. COLEMAN: We'll -- we'll call it one.
19         MR. WARD: -- remember where we were.
20         (Deposition Exhibit No. 1 marked)
21     Q.  (By Mr. Coleman) Mr. Robinson, I'm going to
22 ask -- hand you three pages that I have marked as
23 Exhibit No. 1. And again, I -- if you will just
24 confirm for us on the record that that's the report and
25 the attachments.

Page 10

1  A. This is my report and the attach -- and
2  attachments that belong with it, yes, sir.
3  Q. Okay. And that's a full report and all the
4  attachments that came with it or that you produced?
5  A. There's more material behind those. For
6  example, the stuff that's in front of me right now, the
7  aerial photograph that shows the relationship between
8  the census geography and the actual housing structures.
9  And so, I mean, I -- those three pages are, I guess,
10 the summary report piece of the work.
11 Q. Okay. Could I for purposes go ahead and just
12 put the preparation pages together? And let -- if you
13 don't mind, we'll mark those as Exhibit 2 and then
14 we'll just talk about them during the course of -- of
15 the deposition.
16       (Deposition Exhibit No. 2 marked)
17 Q. So, Mr. Robinson, I've handed you back the
18 pages that you brought to the deposition today, which I
19 have marked as -- as Deposition Exhibit 2. And those
20 are materials that you used as background or part of
21 the preparation for the materials that you produced as
22 your report?
23 A. That's correct.
24 Q. Could I direct your attention back to your
25 report? I would like you to walk through with me

Page 11

1  the -- the information that you collected and how it
2  did -- first -- first thing is you were asked to
3  collect information about the 1990 and 2000 census. Is
4  that correct?
5  A. Well, not to collect information about the
6  censuses themselves but rather to use them as an
7  indicator of the population that lives within the MUD.
8  Q. To use information from the 1990 and 2000
9  census?
10 A. (Nods head)
11 Q. Okay. If you would explain for me -- it says
12 the data was generated using a GIS system. Can you
13 explain that for me?
14 A. GIS is an acronym that stands for geographic
15 information systems. And so it's really sort of
16 redundant to -- to say GIS system. But it's -- it's
17 mapping -- it's computer mapping software with an
18 analytic capability. In other words, it's not just a
19 mapping software, but it's a -- some people refer to it
20 as a spatial spreadsheet.
21 Q. Is it proprietary software or is it like
22 Google Earth or -- what --
23 A. No, it's very expensive software that you have
24 to purchase.
25 Q. All right. Is that the name of the software?

Page 12

1  Are there different forms of the software or do you use
2  a particular kind?
3  A. There are different companies that produce GIS
4  software. We use ESRI, which is another acronym that
5  stands for environmental -- Chris probably knows what
6  the acronym means, but it's -- they're -- they're the
7  industry leader. There are other companies, it's not
8  just ESRI, but they're the -- they're the big ones.
9  Q. Just for the record, you said Chris knows, and
10 I'm not sure who that is.
11 A. Chris is the DOJ attorney that I think is also
12 a GIS user.
13 Q. Chris refers to Mr. Herren on the phone today?
14 A. Yes, sir. Yes, sir.
15 Q. Okay. Now, how do you know Mr. Herren uses
16 ESRI?
17 A. I don't know. I am guessing.
18 Q. But you've had conversations with him about
19 his system or your system?
20 A. I had a conversation with him concerning
21 the -- the compilation of the information and -- and --
22 and how -- how I got to it.
23 Q. Okay. How long of a conversation or how many
24 conversations?
25 A. They were brief. There were maybe a couple of

Page 13

1  them. And they dealt with what I -- I think -- and I'm
2  probably jumping ahead, but they dealt with kind of
3  what is one of the core issues where I am making an
4  estimation of a population using census data but the
5  spatial correspondence between the census blocks and
6  the MUD boundaries are not perfect. And so you have to
7  do a little bit of interpretation. And that's where he
8  and I had a conversation about he saw the same thing
9  that I saw, that there's not this -- this one-for-one
10 correspondence, and then -- and then he just simply
11 asked what were the procedures that you used to get at
12 your estimate.
13 Q. Okay.
14 A. And so I don't know if he uses ESRI or not,
15 but I wish I could tell you what that acronym stands
16 for.
17 Q. Who owns the ESRI software that you were
18 using?
19 A. City of Austin.
20 Q. What does the City of Austin use that software
21 for?
22 A. A wide variety of tasks. I think you could
23 simply put it that we use GIS to -- to operate the
24 city. I mean, we use it to route garbage trucks, we
25 use it to respond to EMS calls, we use it for planning

Page 14

1  purposes. GIS is becoming a more and more prevalent
2  tool. Almost every department in the city has some --
3  some sort of application that is GIS dependent.
4      Q. And is it -- it contains information from the
5  census, but it's not used as part of the census? Or is
6  it also used -- I noted from your -- your resume that
7  you were a liaison for the 2000 census. Is it -- you
8  helped them design the census or helped them accomplish
9  the census in this area?
10     A. That -- that latter is -- is -- is what it is.
11     Q. Okay.
12     A. I mean, every large city has got a census
13 liaison and we -- it's in every city's best interest to
14 get as good of a count as you can for a variety of
15 reasons. And so this -- I think that particular item
16 that you're looking at from my resume is where we did a
17 com -- we built a complete count committee in
18 preparation for 2000, which is basically advertising
19 the fact that the bureau's going to be in town counting
20 people and we want -- it's -- it's a community outreach
21 effort, because Austin has lots of difficult to
22 enumerate populations.
23     Q. Mm-hmm.
24     A. Our large Vietnamese community, for example,
25 is -- is a very difficult population to count because

Page 15

1  of linguistic isolation and social issues, that type of
2  thing. So I don't work for the Census Bureau, but I --
3  I try and coordinate census programs with the city.
4      Q. And in doing that, in helping them to -- to
5  sort of accomplish a more perfect census, is it -- is
6  it something that you would use GIS in, saying like
7  here are some intricacies about the City of Austin that
8  you need to plan for? Is it that kind of thing?
9      A. We -- we definitely used GIS in the -- in
10 the -- in the ramp-up to 2000. We -- we identified
11 areas that we felt would contain concentrations of
12 difficult to enumerate populations. We identified
13 group quarters housing, which -- which is different
14 than individuals who live within housing units.
15         I mean, so, again, it's -- it's --
16 it's -- GIS is a tool that you can use in thousands of
17 applications. And anytime you have a spatial component
18 to an issue, GIS is -- is -- is a beneficial tool.
19     Q. Let me talk about this ESRI. The City of
20 Austin owns it. Is it software that you buy once and
21 continue to use or do you have to buy periodic updates
22 for the data? How -- how does it work?
23     A. I'm not an expert on it, but the -- it's a
24 license, basically. Let me see if I can think of
25 something that's akin to it. But, I mean, you don't

Page 16

1  just own it once and forever. You're buying a license.
2  Updates are -- are always being produced and you're
3  having to purchase those updates. So I think if
4  license is a sufficient way to describe it, that's --
5  that's my understanding of -- of how -- of how we own
6  it as a city. And as we -- as we add employees who use
7  the GIS, we have to purchase additional seats, or
8  license seats.
9      Q. Mm-hmm.
10     A. So you can't just buy it and then have 20,000
11 people use it. You have to somehow make that
12 accountable.
13     Q. You mentioned that it was expensive software.
14 Can you give me some idea of how expensive?
15     A. Yeah. I -- I guess I use that term and, you
16 know, again, I don't know, but it -- it's -- it's a
17 whole lot more expensive than walking into a Fry's and
18 buying a copy of Excel. I mean, I think that the
19 full-blown version that we have, and this is -- this is
20 really a guess, but it's more than -- easily more than
21 $10,000 a year for our license. And so to me, that's
22 expensive, but from a corporate standpoint and -- and
23 what we're able to accomplish with it, I think it's a
24 real value.
25     Q. Okay. Let me direct your attention to the

Page 17

1  second paragraph of your report. And I believe this
2  makes reference to the conversations that you had with
3  Mr. Herren about overlaying aerial photographs and the
4  census block boundaries. My -- my sense in reading
5  that was that when the census block boundaries
6  overlapped MUD/nonMUD, the impression I got from your
7  report is that you could tell essentially 100 percent
8  whether population in that census block was entirely
9  inside the district or entirely outside. Is that -- is
10 that an accurate statement?
11     A. That is accurate.
12     Q. So there were -- there were no census blocks
13 that ran across the district boundary in which there
14 was any indication that there might be some people on
15 both sides of the district boundary?
16     A. Well, I mean, that's why we had to use an
17 aerial photograph. And so you're not -- if you were to
18 just look at a paper map, you couldn't be 100 percent
19 sure. But when you bring up an aerial photograph and
20 when you map census blocks against the aerial
21 photograph, there would have to be a housing unit
22 completely hidden underneath the scrub cedar for there
23 to be population outside the MUD.
24         You know, that situation, you know,
25 that -- that -- that could be possible. But -- but

Page 18

1  given my -- given my knowledge of the area, given my
2  knowledge of the subdivision and the way the
3  subdivision is built, it would be -- it would be really
4  weird if there was a -- a -- a housing unit that was
5  part of that development that was out into the plateau,
6  into the scrub cedar.
7      Q.  Do you know where Turtle Lane is in connection
8  with the district?
9      A.  I mean, I'm -- I don't have specific knowledge
10 of Turtle Lane.
11     Q.  You know where Foundation Road comes off of
12 620 and then runs back into the entrance to the
13 district?  Perhaps I could help you if you put that
14 down... (Brief pause)  This is 620?
15     A.  Mm-hmm.
16     Q.  Is the MUD the green on this --
17     A.  Correct.
18     Q.  -- particular photograph?
19     A.  Correct.  Census blocks are in purple.
20     Q.  The census blocks are in... Okay, here's an
21 example.  Let me just have you help me here.
22         MR. HICKS:  Can I break in?  Can you
23 identify that so it's clear on the record?
24         MR. COLEMAN:  I'm sorry.  The -- we are
25 looking at -- okay, we're looking at the fourth page of

Page 19

1  Exhibit 2, which is an aerial photograph entitled
2  Northwest Austin MUD No. 1 with census 2000 blocks in
3  tract 17.14 Travis County.  Did I read that correctly,
4  Mr. Robinson?
5          THE WITNESS:  Yes, sir.
6      Q.  (By Mr. Coleman) Okay.  So let me direct your
7  attention to this place here, the entrance where the
8  green comes forward all -- pretty much all the way to
9  620.  And there's an -- there's a road that goes into
10 Canyon Creek at that point.  There's another road,
11 which I think may essentially run along here, called
12 Foundation Road, and then there are some residential
13 streets coming back here, one of which is Turtle Lane.
14         Do these -- for instance, these blocks,
15 like 1012 and 1011, it appears to me that the lines run
16 across the green line.  And -- and I'm using these as
17 an example.  How were you able to determine that there
18 is no population on both sides of this green line?
19     A.  Well, the example that you've brought is the
20 other end of the continuum, to where that's an example
21 whereby looking at the aerial photograph I could tell
22 that the housing units within the census block, even
23 those -- there is a little bit of overlap, are not
24 within the MUD.  And so the populations of those census
25 blocks were completely excluded.

Page 20

1          The -- the other end of that situation is
2  where you're on the south end of the MUD where you have
3  a census block --
4      Q.  But, for instance, 10 --
5      A.  Okay, go ahead.
6      Q.  -- 1012 and 1011, it looks like the blocks
7  come in.
8      A.  They do.
9      Q.  And are you saying that there are no homes
10 along this stretch of the entrance road?
11     A.  Correct.
12     Q.  Okay.
13     A.  Because these structures here are all outside
14 of the MUD.
15     Q.  How were you able to verify that there are no
16 homes --
17     A.  I can --
18     Q.  -- along this stretch?  Just by looking with
19 this magnifying glass at the map itself?
20     A.  That's one technique.  And then also on my
21 computer screen I'm able to zoom in.  But I would -- I
22 would say that, yes, looking at -- at this aerial
23 photograph with the magnifying glass, to me it's
24 obvious that there are no housing units in those census
25 blocks that are within the MUD.

Page 21

1      Q.  Okay.  And you were going to -- you were also
2  going to say on the southern end of the district.
3      A.  On the southern end of the district you have
4  sort of the other end of the continuum to where you
5  have a census block -- like here's a census block
6  boundary.  Okay?  So that census block boundary is
7  clearly south of the MUD boundary, but, again, based on
8  a visual inspection, there are no housing units in that
9  census block that are outside of the MUD boundary, even
10 though the block boundary extends way out past the MUD
11 boundary.  Does that make sense?
12     Q.  This line runs all the way up here, so you're
13 just saying there's nothing in this area that's not in
14 the MUD?
15     A.  Correct.
16     Q.  Okay.  And we're talking about, now, just
17 census blocks 10 -- or block 10 --
18     A.  1005.
19     Q.  Okay, 1005.
20     A.  And another good example is 1062.  1062.
21     Q.  This one here?
22     A.  Yes.
23     Q.  Okay.
24         MR. COLEMAN:  Now I'm really going to
25 have to object to you not paying Mr. Robinson for the

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 22

1  time he took looking through the magnifying glass.
2        MR. HICKS: I paid him.
3        MR. COLEMAN: Okay.
4        THE WITNESS: No, I haven't been paid --
5  I haven't --
6        MR. HICKS: I pay taxes.
7        MR. COLEMAN: Okay.
8        THE WITNESS: I haven't been paid
9  anything.
10       MR. HICKS: I pay taxes.
11       MR. COLEMAN: Oh, indirectly, yes.
12       MR. WARD: Me, too.
13       MR. HICKS: Well, then you pay for it,
14 too.
15    Q. (By Mr. Coleman) All right. Mr. Robinson,
16 let me ask you, for the 1990 census data you concluded
17 that there were 12 people in the study area? And the
18 study area is defined as the boundaries of the
19 municipal utility district?
20    A. Yes, sir.
21    Q. And you used that same technique, the census
22 blocks, no overlap?
23    A. Yeah, but it's -- I mean, I would be very
24 quick to say that -- that it's a much shakier
25 proposition, that I can't be 100 percent sure about

Page 23

1  1990, simply because there really was practically no
2  development there to begin with.
3        The census geography was different in
4  1990. There were many, many fewer blocks, they were
5  larger, they were more spatially irregular. And so I
6  did -- I used the same technique because that's really
7  all I had. It's -- it's close, but it's not nearly
8  as -- as accurate as the 2000 snapshot.
9     Q. So would you say that you -- then for 1990,
10 you're not a hundred percent confident on the numbers,
11 but this is your best estimate?
12    A. I'm confident, but a hundred percent
13 absolutely sure, you know, that's -- that's a tough
14 thing to say.
15    Q. Okay. Turning to the next page, which is the
16 third page of your report, it's the demographic data
17 to -- for 2000 that we've been talking about?
18    A. Okay.
19    Q. You have -- you have listed a number for total
20 population. You see that at the top -- close to the
21 top?
22    A. Yes, sir.
23    Q. With various numbers for the study area, the
24 ZIP code, the City of Austin and all of Travis County.
25 And underneath that you have subcategories for white,

Page 24

1  African-American, Hispanic/Latino, Asian and other.
2     A. Yes, sir.
3     Q. Okay. Can you tell me how you arrived at
4  those numbers?
5     A. Information within each census block not only
6  contains total population but it contains ethnic --
7  ethnicity shares, and the census bureau uses those five
8  categories of Anglo, African-American, Hispanic, Asian
9  and other, and so I'm just pulling that straight from
10 the census data. Once -- I mean, the -- the -- kind of
11 the difficult part or the -- the -- the sort of
12 dicey part is -- is deciding which census blocks to use
13 and then how to deal with the split blocks.
14       The first item that you gain is total
15 population. But there's a host of other attributes
16 available from that block level data, and ethnicity --
17 ethnicity shares is -- is simply another piece of
18 information that comes across at that block level.
19    Q. So let me ask you, on the line that says
20 Hispanic/Latino, do you know what that means in terms
21 of the census data that you're able to obtain at a
22 block level?
23    A. I think I know what that means. It comes from
24 the combination of questions four and seven from the
25 short form. Question four asks you what your race is.

Page 25

1  And in the State of Texas and in many southern
2  examples, most Hispanic individuals will either answer
3  other or Anglo, because the census bureau does not
4  consider Hispanic/Latino to be a race, but rather an
5  ethnic designation. That's followed up by question
6  seven, which asks you "Are you of Hispanic origin?"
7        So to build discrete ethnic shares the
8  way everyone -- sort of the industrial standard way
9  that people do it, you have to use information from
10 both question four and question seven. And so it's a
11 self-designation. And so in -- in my mind, I think I
12 do understand the way you arrive at the data. Now,
13 whether or not I understand why people classify
14 themselves as Hispanic or not, that's a -- that's
15 another question altogether.
16    Q. Just to flesh this out, if I am answering the
17 questionnaire and my maternal grandmother immigrated
18 from Mexico and I am proud of that, I could -- I could
19 list myself on the -- in question seven as being of
20 Hispanic descent?
21    A. It's completely up to the respondent.
22    Q. Would the same be true if it were my maternal
23 great-grandmother?
24    A. It wouldn't matter. You could even make
25 something up. You could say that you were Chinese and

Page 26

not be Chinese. It -- there's -- the Census Bureau is not doing any type of determination based on information that you give on -- on people in your family. It's -- it's entirely dependent on how the person who is filling out that questionnaire form fills it out.

As -- maybe this is added information, for the first time ever in Census 2000, they allowed the designation of a multiple racial category. And it was interesting to see how different parts of the country responded to that. People -- places like Lawton, Oklahoma and Fort Bragg you had very, very high shares of total that responded as being multiracial. In parts of Mississippi and the other -- and the rest of the south, the multiracial share was not above one -- one percent.

There's also an age component to it. People underneath the age of 40 seem to be warming up to that multiracial category. People over the age of 40 are not -- not so much. But my point is, it's entirely a self-designation. There's -- there -- there's no sort of algorithm or analytic method that the bureau uses. They -- they take it -- they take your word for it.

Now, you could reach back into history

Page 27

and look at previous censuses where enumerators would come out into the field and change people's designation, but that has not been the case since 1990 or 2000.

Q. And I just want to capture what you're saying, that the answers to these questions could depend as much or more on your particular mindset as on the amount of his -- Hispanic or Latino blood in -- that you have, you know, based on sort of age-old genealogical type measurements.

MR. HICKS: Can I just --
MR. COLEMAN: Would that be --
MR. HICKS: You said -- you said "your," and I don't think you meant "your" like --
Q. (By Mr. Coleman) I'm sorry, a person. A person's.
A. It's an interesting line of argument. But I would say, you know, if we are going to build a -- a multiple regression model that is -- is designed to determine how a person responds on a racial answer, I would think mindset would not be one of the bigger explanatory variables. It certainly probably is in the mix, but is it as important as the fact that your last name is Lopez and, you know, you know that your grandfather immigrated from Mexico? You know, I -- I

Page 28

would argue that it's probably not as important as that people have known family identities and microcultures that are family-specific.

I -- I kind of see where you're talking about. There would certainly be some areas that are less than -- than -- than clear. But the vast majority of Latinos in Texas are from Mexico. There's an increasing component from Central America and South America, but I think that at least in places like Texas and California, the association with being Hispanic and Latino is -- is -- is not from a mindset but it's from family membership.

Q. But, for instance, if your name were Johnson, because you had a very strong maternal grandmother, you -- you may or may not have that same family pride as somebody whose last name is Guerrero because it was a -- it was a grandfather who was from Mexico. And so both -- both those families, Johnson and Guerrero, might share the same cultural pride and both list themselves, or perhaps they don't have the same cultural pride and both might not list themselves.

A. Yeah. I mean, I'm a demographer. I'm a data mechanic. That question to me would be one that you could kick around with a psychologist or maybe a sociologist. Again, the way --

Page 29

Q. That's --
A. -- I would respond is that I can see you have a Latino family with the last name Johnson, and a -- and a surname -- surname analysis is a technique that demographers have used to try and determine, you know, concentration of Latino families.
Q. But the answer to my question is that it's -- it's really beyond your expertise?
A. It -- to the best that I'm even understanding, you know, your question, I guess I just -- you know, I would emphasize that it's a self-designation and I think that -- you know, I will step out and say that I think in the vast majority of cases, it's -- it's a very clear identity, especially in the case of Texas and Florida. If this were -- if this were in the northeast coast, I think it would get a whole lot more -- more complicated.
Q. Does it have anything to do with language choice or language spoken at home or anything like that?
A. I think it has a lot to do with -- with -- with language spoken at home. I think that, for example, in a household where Spanish is spoken at home, they would use the self-designation as -- as Latino.

...

## Page 30

1  Q. They might be more likely to, but in a
2  household where Spanish is not spoken, you -- you could
3  have people listing themselves as Hispanic who are not
4  Hispanic, just depending or their sense of cultural
5  identity.
6  A. Certainly.
7  Q. Okay. And that cultural identity could be
8  based on very recent personal immigration, it could be
9  based on a parent, a grandparent. I mean, it's not
10  necessarily tied to one or more levels of -- of
11  parentage working back historically.
12  A. (Nods head)
13  Q. I mean, that's right, isn't it?
14  A. I guess I kind of lost the direct question in
15  that.
16  Q. It could be based on a parent, it could be
17  based on a grandparent, it's impossible to tell. So if
18  you had a really strong grandparent, a person could
19  say, you know, yes, absolutely, I'm -- I'm going to
20  list myself.
21  A. You know, why any one individual says, yes,
22  I'm of Hispanic origin or, no, I'm not of Hispanic
23  origin, you know, that's a question that I'm not really
24  qualified to answer.
25  Q. Okay. How many hours did you spend in

## Page 31

1  discussions with Mr. Hicks or discussions with
2  Mr. Herren or in, you know, looking at the data,
3  preparing your analysis, coming today? About how many
4  hours do you think you've spent?
5  A. Sort of in the sense of a billable hour where
6  you compress it all into, you know, one -- one
7  contiguous piece of --
8  Q. Sure.
9  A. -- temporal -- two hours.
10  Q. Let me ask this: If I were sitting at my
11  house without any of this information in front of me
12  that -- that you've presented today, would I be able to
13  easily duplicate your analysis?
14  A. You as an attorney or you just as a --
15  Q. Me as a person.
16  A. It would -- it would all depend on -- I mean,
17  I think that if you were a practicing demographer, it
18  would be pretty easy, but if you're not familiar with
19  where to get the information, if you don't have GIS
20  loaded on your computer, if you're not familiar with
21  Austin itself, it would be a whole lot more difficult
22  and would take you a whole lot more time than it took
23  me, if that's what your question is.
24  Q. I think it is. Let me ask you this: Let's --
25  let me ask you to assume that -- let's not use me;

## Page 32

1  let's just say a hypothetical person is not a
2  demographer, does not have access to GIS but is
3  generally familiar with, you know, Austin, would you
4  expect that person to be able to easily reproduce these
5  results?
6  A. No. And that's -- that's my big customer. I
7  mean, that -- those are the kinds of people that come
8  to me and -- and use my expertise to generate that kind
9  of information. It's not that I'm the only one in the
10  world that can do it, but I can do it a whole lot
11  faster just because that's -- that's what I do.
12  Q. Do you regularly produce this type of
13  information?
14  A. All the time. I mean, I -- I do hundreds of
15  these requests a year. I mean, certainly dozens and
16  dozens. It's -- it's a -- it's a very standard sort to
17  thing where all sorts of entities, from private sector
18  businesses who are looking to expand in Austin or
19  people who are writing grants -- we do information --
20  we do this kind of information per the request of the
21  city manager, city council.
22  Q. Mm-hmm.
23  A. I mean, this is one of my bread and butter
24  sort of things, is build up a profile of an area using
25  census data.

## Page 33

1  Q. You have used two particular dates, 1990 and
2  2000. And the reason is those are the dates that the
3  census data is available?
4  A. Those are the -- those are the two most recent
5  decennial census efforts.
6  Q. If I had come to you in 1992 and said put me
7  together one of these profiles, accurate in 1992,
8  how -- how difficult would that have been?
9  A. If you came to me in 1992, the best I could
10  have done is provided you a profile as of 1990.
11  Q. How about 1994?
12  A. Same thing.
13  Q. 1996?
14  A. Same thing.
15  Q. 1998?
16  A. Decennial means once -- once a decade. But
17  I'm sure you know that because you went to law school.
18  Q. Well, I didn't know that because I went to law
19  school, but I knew that in spite of the fact that I
20  went to law school.
21      MR. HICKS: That was the key question on
22  the LSAT.
23      THE WITNESS: There are -- to maybe jump
24  ahead, I mean, there are now sources of intercensal
25  information, but not for small areas. And so if you

Page 34

1  are doing this kind of particular small area analysis,
2  you have to use the decennial data.
3      Q. (By Mr. Coleman) And similarly, if I had come
4  to you in 2002 or 2004 or even 2006, the best you would
5  have been able to give me is the -- this third page,
6  the 2000 data.
7      A. Using census data. Now, I will also tell you
8  that there are people who say and in -- and say can you
9  give us a current estimate, and we do estimates all the
10 time. We use building permits, utility connections. I
11 write estimation algorithms, which is basically a --
12 just a fancy word for a guess.
13         You know, the city manager, when we do an
14 analysis for her, she always wants at least us to take
15 a stab at a "current as of," but that she fully
16 realizes that we're on much thinner ice than we are
17 when we're using decennial census data.
18     Q. It's an estimation. Any --
19     A. Purely.
20     Q. Unless it's an -- unless it's the census data
21 and you're close to the time of the census, it's an
22 estimation. Is that --
23     A. It's a -- it's a -- it's a pure estimation.
24     Q. Could I see Exhibit No. 2, please? I just
25 want to clarify a question that I asked about the

Page 35

1  accuracy of information between census times. That
2  sort of inability to do anything more of a guess would
3  apply both to total population numbers as well as to
4  the racial breakouts --
5      A. No, there's a difference. Estimating total
6  population is relatively straightforward, using, for
7  example, active utility accounts. Take that into
8  consideration with the housing type, apartment unit,
9  single-family structure, you can get really, really
10 close to estimating the total population.
11         Now, the underlying ethnic mix, because
12 you don't even have surrogate information for that -- I
13 mean, we have mentioned a surname analysis, that's sort
14 of what you can do, but it -- it's -- it's very much a
15 different second-tier, a more difficult thing to
16 estimate than total population, because it -- you just
17 have -- you have -- you have -- you have fewer
18 datapoints to use.
19     Q. Let me ask, on the census data, the
20 demographic data that you presented for 1990 and 2000,
21 that information comes from the census data directly
22 and there is built into the census data itself some
23 well-understood rates of error. You've not tried to
24 compensate for any of that as --
25     A. No, I've not done any adjustment. And I --

Page 36

1  error is not quite accurate. I mean, there -- there is
2  probably some random error in the -- in the mix, but
3  what is -- the issue is the ability to fully count
4  populations. And so some might call that error, but --
5  but that's sort of the phenomenon that's more well
6  understood. And -- and there's kind of one -- one
7  group of thought that says you should try a statistical
8  adjustment to --
9      Q. That's what I was speaking about.
10     A. Right.
11     Q. You're aware of the litigation --
12     A. Yes.
13     Q. -- throughout the '90s on --
14     A. Sure.
15     Q. -- whether you should do that.
16     A. Right.
17     Q. And it's based on the assumption that census
18 counting is incapable of coming up with an -- a truly
19 accurate count.
20     A. That's correct. I followed that with great
21 interest.
22     Q. So that there -- it is well understood within
23 the demographic -- or demographer community that the
24 data that would be presented in a study like this is
25 not, in fact, fully accurate but that it is the best

Page 37

1  that we can do under the circumstances.
2      A. Certainly. The one thing I would add to that,
3  though, is that because you're dealing with the notion
4  of difficult to enumerate populations in a -- in a part
5  of the region like this, that is overwhelmingly Anglo,
6  the undercount is probably very, very low.
7      Q. And that undercount -- and it's also an area
8  that is somewhere in the middle-class range and that
9  those areas, whatever their -- whatever their ethnic or
10 racial makeup, tend to also have much lower
11 undercounts. Wouldn't that be right?
12     A. Completely. But it is -- it's not a
13 middle-class area because middle class technically is
14 defined as the range from 200 percent to 400 percent of
15 poverty. So you're talking about a median family
16 income of like 35,000 to 70. The median family income
17 of this area is well above that. But -- but that
18 income is indicative of the high educational attainment
19 level, and that is a strong explanatory variable in
20 determining the magnitude of -- of undercount.
21     Q. And suggests that -- that it would be lower
22 than in some other areas?
23     A. The undercount would be much lower here than
24 it would be in Dove Springs, for example.
25     Q. And that would -- that would be the same

10 (Pages 34 to 37)

Page 38

1  across. I mean, because these people by and large
2  would tend to have a higher educational attainment and
3  be doing reasonably well, that undercount would be low
4  across all the racial and ethnic groups.
5      A.  That's -- that's an interesting question,
6  because there -- and -- and there are folks who study
7  this -- this very thing. And I think that you could --
8  you -- you could bring up an example of a
9  well-educated, affluent Latino family that have
10 longstanding issues of either mistrust or -- I mean,
11 the relationship between the Census Bureau and the
12 greater Hispanic community is -- is -- is -- is an
13 interesting read. I mean -- and it's gotten a whole
14 lot better. But in preparation for the 1980 census,
15 the INS posed as the Census Bureau out of El Paso and
16 held a fiesta and invited a bunch of folks to have a
17 barbeque, and once they were there, they gathered them
18 all up and deported them.
19      So I guess the point I'm trying to make
20 is that I still think there probably is some variance
21 at the household level, but in general terms, affluent,
22 well-educated families are not the difficult to
23 enumerate households.
24      Q.  Do you have an idea just to what the margin of
25 error or the margin of undercount or miscount might be

Page 39

1  in this area, for either the 1990 or 2000 numbers?
2      MR. HICKS:  Can you clarify, just because
3  you pointed, the -- by "this" area?
4      Q.  (By Mr. Coleman) I'm sorry. Whether the
5  district. The district.
6      A.  Other than to say it's very low, it would
7  be -- it would be hard to put a number on it. I do
8  know what that number is for the city as a whole. I
9  mean, and -- and it's -- and it's an estimation on our
10 part and an estimation by -- by -- by other people.
11     I mean, we think that the City of Austin
12 itself was undercounted by about seven percent in 2000,
13 which was better than it was undercounted in 1990. We
14 think it was undercounted in 1990 by almost 13 percent.
15 So I can't hang a number on it, but I will say that
16 this particular area, because it's affluent and -- and
17 largely Anglo, it's going to be a very, very slim
18 undercount. One or two -- one or two percent at the
19 most.
20     MR. COLEMAN:  I pass the witness. Thank
21 you, Mr. Robinson, for coming.
22     THE WITNESS:  Thank you.
23     MR. COLEMAN:  Telephone people, we done?
24     MR. HERREN:  This is Chris Herren. I
25 have no questions.

Page 40

1      MS. GARRETT:  This is Jennifer Garrett.
2  I have no questions.
3      MR. BLUSTEIN:  This is Ben Blustein. We
4  don't have any questions.
5      MR. BECERRA:  This is Carlos Becerra, and
6  I actually have a couple of questions. Can you hear
7  me?
8      THE WITNESS:  Yes.
9      FURTHER EXAMINATION
10 BY MR. BECERRA:
11     Q.  As I said, my name is Carlos Becerra and I
12 represent the Diaz intervenors in this matter. Does
13 the data presented in these charts allow someone to
14 determine median family income?
15     A.  Median family income is one of the figures
16 that's reported on the chart, yes, sir.
17     Q.  Okay. And can you desegregate that by race
18 and national origin?
19     A.  I could do it by ethnic -- by ethnic split.
20 In other words, I could generate a median family income
21 for a -- for -- for the Latino families, one for the
22 African-American families, one for the Anglo families.
23 I mean, that's an inherent variable within the census
24 data.
25     Q.  Okay. But you didn't do that for this report.

Page 41

1  Right?
2      A.  No, sir, I did not.
3      Q.  Okay. Is this your final report or will you
4  be creating another report?
5      A.  No, this is my -- this is my final report.
6  And there's a brief follow-up that you haven't asked
7  for. Even if we did dice up the median family incomes
8  by race, you would see a whole lot of homogeneity.
9  You're not going to get much variance by -- by race or
10 by household. And I say that just based on my
11 knowledge of the -- of the MUD and the -- of the
12 development.
13     Q.  Earlier you were asked a series of questions
14 about guessing the population or something to that
15 effect. You used the data from the census. Right?
16 There was no projections on your part for this data?
17     A.  Yeah, no projections, just straight up
18 reporting of census data. And it would -- the one
19 issue of there's a lack of 100 percent correspondence
20 between the census geography and the MUD boundary. But
21 other than that one sort of area where you have to get
22 in and do some -- some sort of a judgment call, we
23 didn't do any estimation or projection, no, sir.
24     Q.  And from the data set that you pulled this
25 information from, can -- can we get a sense of language

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 42

1  characteristics for the MUD?
2      A.  The -- language characteristics is a table
3  available from the census data set.  But I don't -- I
4  have -- I was not asked to report any -- any language
5  information.
6      Q.  Okay.  And -- and this process that you used,
7  is this the typical process you undertake when someone
8  asks you for this type of report?
9      A.  Yes, sir, it is.
10     Q.  And -- and is this the process that typically
11 is done by demographers throughout the country?
12     A.  To my knowledge, it is, yes, sir.
13     Q.  And is there a demographer -- how can I put
14 it?  Is this -- is there a demographer national group
15 or that sets standards?
16     A.  Not like -- not -- not one that would be
17 similar to the Bar Association.  I mean, the
18 demographic field is -- is a professional field but
19 it's not -- it's not -- I mean, I -- I can't think of
20 any sort of national organization that is setting rules
21 and regulations that absolutely have to be followed.
22 But to the best of my knowledge, this is the way that
23 most practitioners around the country would go about
24 it.
25     Q.  And -- and how many years experience do you

Page 43

1  have?
2      A.  17 with the city, and then five in
3  metropolitan Atlanta, so 22 years.
4      Q.  And so in the 22 years, this how -- this is
5  how this type of analysis is done, then?
6      A.  Absolutely.
7      Q.  And you have no -- other than the 1990 map,
8  you -- you had -- you're very confident in the data as
9  it's presented in the table.
10     A.  Yeah, I do.  I feel -- I feel very confident
11 about it.  You know, less so about the -- about the
12 1990 data, but that's a function of geographies.  But I
13 do feel very confident about this -- about the 2000
14 data slice.
15         MR. BECERRA:  Thank you, Mr. Robinson.
16         THE WITNESS:  Thank you.
17         MR. BECERRA:  Pass the witness.
18         (Off the record)
19             FURTHER EXAMINATION
20 BY MR. COLEMAN:
21     Q.  Mr. Robinson, I'm sorry, on this fourth page
22 of Exhibit 2, this aerial photograph, do we know what
23 year that photograph was taken?
24     A.  It's 2003.
25     Q.  Okay.  Do we know that a photograph taken in

Page 44

1  2003 would have this -- give us the same sense of
2  confidence regarding the census blocks for 2000 --
3  we're overlaying 2000 census blocks on a photograph
4  taken in 2003.
5      A.  It -- it's a good point, but I used the
6  photograph primarily to identify undeveloped areas.
7  And again, I call your attention to the two census
8  blocks that are on the southern end of the MUD in that
9  you could take an aerial photograph from 1999, 2002,
10 it's not going to -- it's not going to temporally match
11 the census day, but it's going to give you a definitive
12 feel -- or not feel, a definitive look at where the
13 edge of the development stops and the open cedar
14 starts.
15     Q.  Okay.
16     A.  But -- but -- but I think it's important, I
17 didn't use -- I didn't count households from the aerial
18 photograph to arrive at my -- at my figure.
19     Q.  Just boundaries were --
20     A.  Just boundaries were used.
21     Q.  I just wanted to clarify that.  Thank you.
22     A.  That's a good point.
23         MR. COLEMAN:  Pass the witness.
24         MR. HICKS:  Everybody on the phone
25 finished?  Should have asked it another way.

Page 45

1          MR. HERREN:  I think so.
2          MR. HICKS:  Okay.
3          MR. COLEMAN:  All right.  Thank you,
4  everyone.
5          MR. HICKS:  Thank you.
6          MR. HERREN:  Thank you.
7          (Deposition concluded at 2:10 p.m.)

Page 46

```
 1    CHANGES AND CORRECTIONS
 2    WITNESS NAME: RYAN F. ROBINSON      DATE: _____
 3    Reason Codes: (1) to clarify the record; (2) to
      conform to the facts; (3) to correct a transcription
 4    error; (4) other (please explain).
 5    PAGE  LINE   CHANGE                REASON CODE
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

Page 47

```
 1    PAGE  LINE   CHANGE                REASON CODE
 2    _____
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9              _____
                RYAN F. ROBINSON
10
11
12    THE STATE OF _____)
                             )
13    COUNTY OF _____)
14      Before me, _____, on this day personally
      appeared RYAN F. ROBINSON, known to me (or proved to me
15    under oath or through _____
      _____
16    (description of identity card or other document)) to be
      the person whose name is subscribed to the foregoing
17    instrument and acknowledged to me that they executed
      the same for the purposes and consideration therein
18    expressed.
19       Given under my hand and seal of office this
        _____ day of April 2007.
20
21      _____
        NOTARY PUBLIC IN AND FOR
22      THE STATE OF _____
23
24
25
```

Page 48

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2
      NORTHWEST AUSTIN          )
 3    MUNICIPAL UTILITY DISTRICT )
      NUMBER ONE,               )
 4    401 W. 15th Street        )   CIVIL ACTION NO.
      Suite 850                 )
 5    Austin, Texas 78701       )   1:06-CV-01384
             Plaintiff,         )   (DST,PLF,EGS)
 6    v.                        )
                                )
 7    ALBERTO GONZALES,         )
      ATTORNEY GENERAL OF THE   )
 8    UNITED STATES,            )
      U.S. Department of Justice)
 9    950 Pennsylvania Avenue NW )
      Washington, D.C. 20530    )
10
11           REPORTER'S CERTIFICATION
           DEPOSITION OF RYAN F. ROBINSON
12             Wednesday, April 4, 2007
13       I, RANDALL N. FINCH, Certified Shorthand
14    Reporter in and for the State of Texas, hereby certify
15    to the following:
16        That the witness, RYAN F. ROBINSON, was duly
17    sworn by the officer and that the transcript of the
18    oral deposition is a true record of the testimony given
19    by the witness;
20        That the deposition transcript was submitted
21    on April 20, 2007 to the witness or to the attorney for
22    the witness for examination, signature and return to me
23    by _____, 2007.
24        That the amount of time used by each party at
25    the deposition is as follows:
```

Page 49

```
 1        Mr. Gregory S. Coleman - 37 minutes
 2        Mr. Carlos Becerra - 2 minutes
 3        That pursuant to information given to the
 4    deposition officer at the time said testimony was
 5    taken, the following includes counsel for all parties
 6    of record:
 7        Mr. Gregory S. Coleman and Mr. Christian Ward,
 8    attorneys for Plaintiff
 9        Mr. Carlos Becerra, attorney for MALDEF
10        Mr. Chris Herren, attorney for U.S. Department
11    of Justice
12        Mr. Benjamin Blustein and Mr. Daniel A. Zibel,
13    attorneys for Lawyers' Cmte. for Civil Rights Under Law
14        Mr. Max Renea Hicks, attorney for Travis
15    County
16        I further certify that I am neither counsel
17    for, related to, nor employed by any of the parties or
18    attorneys in the action in which this proceeding was
19    taken, and further that I am not financially or
20    otherwise interested in the outcome of the action.
21        Certified to by me this 19th day of April, 2007.
22        _____
          RANDALL N. FINCH, Texas CSR #504
23        Expiration date: 12/31/2008
          Fredericks-Carroll Reporting
24        Firm Registration No. 82
          7800 Shoal Creek Blvd., Suite 200-W
25        Austin, Texas 78757 (512) 477-9911
```