IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN )
MUNICIPAL UTILITY DISTRICT )
NUMBER ONE, )
401 W. 15th Street ) CIVIL ACTION NO.
Suite 850 )
Austin, Texas 78701 ) 1:06-CV-01384
       Plaintiff, ) (DST,PLF,EGS)
)
v. )
)
ALBERTO GONZALES, )
ATTORNEY GENERAL OF THE )
UNITED STATES, )
U.S. Department of Justice )
950 Pennsylvania Avenue NW )
Washington, D.C. 20530 )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION OF
OFELIA MALDONADO ZAPATA
Wednesday, February 28, 2007
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF OFELIA MALDONADO ZAPATA, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 28th day of February, 2007, from 9:13 a.m. to 9:32 a.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weil, Gotshal & Manges, LLP, 8911 Capital of Texas Highway, Suite 1350, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1            APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
       Mr. Gregory S. Coleman
 4          -and-
       Mr. Christian J. Ward
 5     WEIL, GOTSHAL & MANGES, LLP
       8911 Capital of Texas Highway
 6     Building One, Suite 1350
       Austin, Texas 78759  (512) 349-1937
 7               (512) 527-0698 Fax
 8  FOR TEXAS RIO GRANDE LEGAL AID, INC.:
 9     Mr. Jose Garza
       Attorney at Law
10     1111 N. Main Avenue
       San Antonio, Texas 78212  (210) 212-3700
11               (210) 212-3772 Fax
12  FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
    DIVISION:
13
       Mr. Chris Herren
14          -and-
       Ms. Christy A. McCormick
15     950 Pennsylvania Avenue, N.W., Room 7246
       Washington, D.C. 20530  (202) 305-0609
16               (202) 327-3961 Fax
17
18             EXHIBIT INDEX
19  PLAINTIFF'S EXHIBITS
20  12.  Fax from the TRLA containing board minutes for
        the May 23rd, 2006 board meeting............ 12
21
22
23
24
25
```

Page 3

```
 1            OFELIA MALDONADO ZAPATA,
 2  having been first duly sworn, testified as follows:
 3             EXAMINATION
 4  BY MR. COLEMAN:
 5     Q.  Good morning, Ms. Zapata.
 6     A.  Good morning.
 7     Q.  Thank you for coming here today.  Can you tell
 8  me where you live?
 9     A.  I live in Austin.
10     Q.  Okay.
11     A.  Texas.
12     Q.  Can you tell me where in Austin you live?
13     A.  I live in southeast Austin.
14     Q.  Okay.  Can you give us an address?
15     A.  Yes, it's 5506 Mesquite Grove and the ZIP code
16  is 78744.
17     Q.  You have intervened in the lawsuit.  Do you
18  understand what intervene means?  You joined the
19  lawsuit?
20     A.  Yes.
21     Q.  Okay.  Yes.
22     A.  Yes.
23     Q.  Can you explain for me a little bit about how
24  you came to join this lawsuit.
25     A.  Well, I'm on the board -- I'm kind of the
```

Page 4

```
 1  representative for Texas Rio Grande Legal Aid and I had
 2  conversation with -- with Mr. Garza and I asked him if
 3  he could represent me.
 4     Q.  Okay.  How did you learn about this lawsuit?
 5     A.  Well, Mr. Garza and I met.
 6     Q.  Okay.  So -- again, Mr. Garza is your
 7  attorney, so --
 8     A.  Yes.
 9     Q.  I don't want to go into specific
10  conversations.  But is it -- would it be fair to say
11  you learned about the lawsuit from Mr. Garza?
12     A.  Yes.
13     Q.  You don't live in the district, do you?  When
14  I say district, I mean the district that has sued
15  the --
16     A.  No.
17     Q.  -- filed this lawsuit?  Do you know the name
18  of the district?
19     A.  Yes.  It's the Northwest Austin MUD.
20     Q.  Do you know where it is?
21     A.  In this part of town.
22     Q.  Okay.  I mean, more specifically, do you know?
23     A.  620 area.
24     Q.  Okay.  620 and --
25     A.  620 and -- well, this area.  I just know it's
```

Page 5

```
 1  just northwest up this way.
 2     Q.  Do you know -- have you ever been to the
 3  district?
 4     A.  I have been to the lake.  The lake is in that
 5  area.  I can -- is it --
 6     Q.  Which lake are you speaking about?
 7     A.  I don't know.  It's a lake we went to and I
 8  remembered -- just about driving up here, it was in
 9  this area.
10     Q.  Is it you your understanding --
11     A.  Like Travis, I believe.
12     Q.  Is it your understanding that Lake Travis is
13  in the district or in part of the district?
14     A.  I didn't know it was part of the district,
15  just in the route here.  Knowing that I was over there
16  from -- I'm assuming it's in the district.
17     Q.  Okay.  Other than having been to the lake, do
18  you know if you've ever been inside the district?
19     A.  No.
20     Q.  Okay.  You've never voted in an election in
21  the district --
22     A.  No.
23     Q.  -- have you?
24         Do you know anything about how the
25  district is organized?
```

Page 6

1   A. Only that it's -- has a board.
2   Q. Do you know how many members are on that
3 board?
4   A. I think there was five.
5   Q. Okay. Have you ever met any of the members of
6 the board?
7   A. No.
8   Q. Have you ever met any past members of the
9 board?
10  A. No.
11  Q. Do you know anything about how the board or
12 the district conducts elections?
13  A. No.
14  Q. Has anybody ever told you anything about how
15 the district conducts elections?
16  A. In this district -- this district? No.
17  Q. Do you know where the district hold its
18 elections?
19  A. No. I don't remember. I just read the
20 minutes of the last board where this came about, so,
21 no.
22  Q. Okay. Would it be safe to say that your
23 involvement in this lawsuit is not based on any
24 complaint about how the district conducts its
25 elections?

Page 7

1   A. Yes.
2   Q. Your involvement in the lawsuit is based
3 solely on the district's desire to exclude itself from
4 preclearance. Is that correct?
5   A. Preclearance being...
6   Q. Do you know what preclearance is?
7   A. No.
8   Q. Let me back up a little bit. Without telling
9 me any particular conversations you've had with your
10 lawyer, can you tell me why you have joined this
11 lawsuit?
12  A. Well, my involvement in the community is about
13 getting voter turnout in elections. And this lawsuit
14 interested me because of the intent to exclude Section
15 5 and that's why I'm -- I became interested in this
16 lawsuit.
17  Q. I think your involvement in the community to
18 increase voter participation is a wonderful thing and I
19 congratulate you on it. And I want to make sure, you
20 don't believe or understand that the district has any
21 different views about encouraging voter participation,
22 do you?
23  A. I don't know.
24  Q. Okay. What is your understanding of -- when
25 you say exclude Section 5, can you tell me your

Page 8

1 understanding of what that means?
2   A. The -- the Northwest MUD is -- is wanting to
3 eliminate Section 5 and -- and I'm against that.
4   Q. Can you tell me what Section 5 means to you?
5   A. Section 5 was -- was -- was created to protect
6 the rights of minorities around disproportionate --
7 disappropriation of voters, and so that's -- that's my
8 understanding. And I -- I feel and I believe that
9 eliminating Section 5 is -- is only going to hurt our
10 community, the community and the minority community
11 that I work with.
12  Q. Have you ever lived outside of Texas?
13  A. No.
14  Q. You've never lived in New Mexico?
15  A. No.
16  Q. Or Oklahoma?
17  A. No.
18  Q. Do you know whether Section 5 applies in
19 Oklahoma or New Mexico?
20  A. No. I don't know.
21  Q. Do you know how Section 5 works?
22  A. Yes. If the city or the county want to
23 create -- for example, if they want to eliminate voting
24 areas in East Austin, and they want to increase them in
25 West Austin, well, the Section 5 -- they can't do that

Page 9

1 because they need to get justification from the Justice
2 Department that that's legal or not. And without
3 Section 5, we wouldn't have that protection.
4   Q. Is it your understanding that Section 5 is the
5 protection that would prevent an illegal shift of
6 voting polling places?
7   A. Yes.
8   Q. Do you know what the term bailout means?
9   A. No. Other than when a convict bails out. But
10 I don't know.
11  Q. Do you know whether the Voting Rights Act
12 contains a provision that says if a government entity
13 has obeyed Section 5 for some period of time, it can
14 apply to be let out of Section 5 or to bailout of
15 Section 5. Do you -- do you know whether that type of
16 a provision exits or not?
17  A. No, I don't know about that.
18  Q. Do you know whether the district is asking for
19 that type of exclusion or not?
20  A. I understand they are, but my interest is more
21 on Section 5, not so much to bailout.
22  Q. Do you believe that if a -- if a governmental
23 entity does live up to its obligations under the Voting
24 Rights Act and can show that it has obeyed the law for
25 a period of time, and that the statute says if you've

Page 10

1  done these things we'll let you out of Section 5, do
2  you believe that that entity should get out of -- of
3  the preclearance requirements of Section 5?
4      A.  No. If it's going to impact more than beyond
5  that community, no.
6      Q.  Well, let me back up. Let's just say one
7  entity shows the federal government we have done
8  everything that's been asked of us for 10 years and you
9  have this statute that says after 10 years we can get
10 out, and so please let us out. Do you think that that
11 entity -- just that entity should get out?
12     A.  No, because Section 5 is to protect the
13 minorities. And we are becoming the majority. And so,
14 you know, that population is going to shift. So I
15 would say no.
16     Q.  Never?
17     A.  No.
18     Q.  Would it change your mind if I told you that,
19 for instance, in El Paso those entities have to do
20 preclearance, but in Las Cruces they don't, even though
21 they're only a couple of miles apart? Would that
22 change your mind at all?
23     A.  No.
24     Q.  Would it change your mind if I could show you
25 that a government entity in El Paso was living up to

Page 11

1  the Voting Rights Act just as much as a government
2  entity in Las Cruces, would that change your mind?
3      A.  No.
4      Q.  Would it change your mind if I could show you
5  that the government entity in Las Cruces actually had a
6  worse voting rights record than the government entity
7  in El Paso, but only the El Paso was subject to
8  preclearance, would that change your mind?
9      A.  No.
10     Q.  I'm sorry. Was that no?
11     A.  No.
12     Q.  Will you give me one minute? Could we go off
13 the record for just a minute?
14        (Discussion off the record)
15     Q.  (By Mr. Coleman) Back on the record.
16 Ms. Zapata, did you bring any documents with you today?
17     A.  Yes, I have these.
18     Q.  And can you --
19        MR. GARZA: And that would be documents
20 responsive to the subpoena?
21        MR. COLEMAN: Responsive to the --
22        MR. GARZA: Notice.
23        MR. COLEMAN: -- to the notice. And
24 that's what these are or --
25        MR. GARZA: Right. That's what she's

Page 12

1  reviewed in preparation for the deposition.
2        MR. COLEMAN: Would you mind if I just
3  attached one to the record?
4        MR. GARZA: Sure.
5        (Plaintiff's Exhibit No. 12 marked)
6      Q.  (By Mr. Coleman) Ms. Zapata, I'm going to
7  hand you what I've marked as Plaintiff's Exhibit 12.
8  You brought with you three documents today. One is
9  entitled Applicant's Motion to Intervene as Defendants,
10 which I am not entering into the record. One is
11 entitled Answer of Defendants/Garcia, et al. And then
12 the third one, which I've marked as Exhibit 12 appears
13 to be a fax from the TRLA that contains the board
14 minutes for the May 23rd, 2006 board meeting. Is that
15 correct?
16     A.  Yes.
17     Q.  Did you review these board minutes in
18 preparation for your testimony today?
19     A.  I did.
20     Q.  And is -- is that how you know that there are
21 five members on the board of directors?
22     A.  Well, I think that's common.
23     Q.  Okay.
24     A.  For the MUDs.
25     Q.  Okay.

Page 13

1      A.  But I noticed it was five here.
2      Q.  And these are the documents that you have
3  reviewed?
4      A.  Yes.
5         MR. COLEMAN: Okay. I'll pass the
6  witness.
7         MR. GARZA: We don't have any questions
8  at this time.
9         MR. HERREN: No.
10        MR. COLEMAN: Okay. Thank you for
11 coming. I appreciate your time today. I think we're
12 finished.
13        (Deposition concluded at 9:32 a.m.)

## Page 14

CHANGES AND CORRECTIONS

WITNESS NAME: OFELIA MALDONADO ZAPATA   DATE: _____

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

| PAGE | LINE | CHANGE | REASON CODE |
|---|---|---|---|
| | | | |

## Page 15

| PAGE | LINE | CHANGE | REASON CODE |
|---|---|---|---|
| | | | |

_____
OFELIA MALDONADO ZAPATA

THE STATE OF _____ )
                        )
COUNTY OF _____ )

Before me, _____, on this day personally appeared OFELIA MALDONADO ZAPATA, known to me (or proved to me under oath or through _____ (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of March 2007.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

## Page 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN             )
MUNICIPAL UTILITY DISTRICT   )
NUMBER ONE,                  )
401 W. 15th Street           )   CIVIL ACTION NO.
Suite 850                    )
Austin, Texas 78701          )   1:06-CV-01384
         Plaintiff,          )   (DST,PLF,EGS)
v.                           )
                             )
ALBERTO GONZALES,            )
ATTORNEY GENERAL OF THE      )
UNITED STATES,               )
U.S. Department of Justice   )
950 Pennsylvania Avenue NW   )
Washington, D.C. 20530       )

REPORTER'S CERTIFICATION
DEPOSITION OF OFELIA MALDONADO ZAPATA
Wednesday, February 28, 2007

I, RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, OFELIA MALDONADO ZAPATA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness.

That the deposition transcript was submitted on March 2, 2007 to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2007.

That the amount of time used by each party at the deposition is as follows:

## Page 17

Mr. Gregory S. Coleman - 19 minutes
Mr. Jose Garza - 0 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Gregory S. Coleman, attorney for Plaintiff
Mr. Jose Garza, attorney for Texas Rio Grande Legal Aid, Inc.
Mr. Chris Herren and Ms. Christy A. McCormick, attorneys for U.S. Department of Justice

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 1st day of March, 2007.

_____
RANDALL N. FINCH, Texas CSR #504
Expiration date: 12/31/2008
Fredericks-Carroll Reporting
Firm Registration No. 82
7800 Shoal Creek Blvd., Suite 200-W
Austin, Texas 78757 (512) 477-9911

```
         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN              )
MUNICIPAL UTILITY DISTRICT    )
NUMBER ONE,                   )
401 W. 15th Street            )   CIVIL ACTION NO.
Suite 850                     )
Austin, Texas 78701           )   1:06-CV-01384
          Plaintiff,          )   (DST,PLF,EGS)
                              )
v.                            )
                              )
ALBERTO GONZALES,             )
ATTORNEY GENERAL OF THE       )
UNITED STATES,                )
U.S. Department of Justice    )
950 Pennsylvania Avenue NW    )
Washington, D.C. 20530        )
```

          * * * * * * * * * * * * * * * *
                  ORAL DEPOSITION OF
                   NATHANIEL LESANE
                Monday, February 26, 2007
          * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF NATHANIEL LESANE, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 26th day of February, 2007, from 3:28 p.m. to 4:01 p.m., before RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weil, Gotshal & Manges, LLP, 8911 Capital of Texas Highway, Suite 1350, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1        APPEARANCES
 2  FOR THE PLAINTIFF NORTHWEST AUSTIN MUNICIPAL UTILITY
    DISTRICT NO. ONE:
 3
       Mr. Gregory S. Coleman
 4        -and-
       Mr. Christian J. Ward
 5     WEIL, GOTSHAL & MANGES, LLP
       8911 Capital of Texas Highway
 6     Building One, Suite 1350
       Austin, Texas 78759  (512) 349-1937
 7            (512) 527-0698 Fax
 8  FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION
    FUND (MALDEF):
 9
       Ms. Nina Perales
10        -and-
       Mr. Diego Bernal
11     Attorney at Law
       110 Broadway, Suite 300
12     San Antonio, Texas 78205  (210) 224-5476
              (210) 224-5382 Fax
13
    FOR THE U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS
14  DIVISION:
15     Mr. Chris Herren
          -and-
16     Ms. Christy A. McCormick
       950 Pennsylvania Avenue, N.W., Room 7246
17     Washington, D.C. 20530 (202) 305-0609
              (202) 327-3961 Fax
18
    FOR THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW:
19
       Mr. Benjamin Blustein
20     Staff Attorney, Voting Rights Project
       1401 New York Avenue, NW, Suite 1400
21     Washington, D.C. 20005  (202) 662-8320
              (202) 628-2858 Fax
22
23
24
25
```

Page 3

```
 1  FOR THE LEWIS INTERVENORS:
 2     Mr. Samuel Spital
       HOLLAND & KNIGHT, LLP
 3     195 Broadway, 24th Floor
       New York, New York 10007-3189  (212) 513-3454
 4            (212) 385-9010 Fax
 5  FOR THE WITNESS NATHANIEL LESANE:
 6     Mr. Jeremy Wright
       KATOR, PARKS & WEISER, P.L.L.C.
 7     812 San Antonio Street, Suite 100
 8     Austin, Texas 78701  (512) 312-0600
              (512) 477-2828 Fax
```

Page 4

```
 1           NATHANIEL LESANE,
 2  having been first duly sworn, testified as follows:
 3                EXAMINATION
 4  BY MR. COLEMAN:
 5     Q.  Mr. Lesane, thank you for coming here this
 6  afternoon.  Have you had a deposition taken before?
 7     A.  First time.
 8     Q.  All right.  It's like skydiving.  It's -- you
 9  know, it's always good to do something once.
10     A.  Sure.
11     Q.  Go through it.  You live in the district right
12  now?
13     A.  Yes.
14     Q.  Can you tell me where you live?
15     A.  My address is 9529 Corbe Drive, Austin, Texas,
16  in the Canyon Creek subdivision.
17     Q.  Okay.  How do you like living in Canyon Creek?
18     A.  It's quiet.  I like it.
19     Q.  How long have you been there?
20     A.  We actually moved into the home in July of
21  2000.  So almost seven years, six and a half years or
22  so.
23     Q.  Okay.  Where did you move from?
24     A.  Portland, Oregon.
25     Q.  Okay.  How long did you live in Portland,
```

Page 5

```
 1  Oregon?
 2     A.  About 13 and a half years.
 3     Q.  And before that?
 4     A.  Phoenix, Arizona.
 5     Q.  How long were you in Phoenix?
 6     A.  Three and a half years.
 7     Q.  What did you do in Phoenix?
 8     A.  I was an engineer with Intel Corporation.
 9     Q.  Does that also explain Portland, then?
10     A.  Yeah.
11     Q.  The whole time?
12     A.  Yeah.
13     Q.  Okay.  And before Phoenix?
14     A.  Austin.
15     Q.  All right.  Also Intel?
16     A.  Intel, Texas Instruments, and I went to
17  college at St. Edward's University.
18     Q.  Okay.  So your college and adult life has been
19  Austin, Phoenix, Portland and Austin?
20     A.  Correct.
21     Q.  Did -- did you grow up in the Austin area or
22  come here before --
23     A.  I grew up in south Florida.
24     Q.  Do you remember what county?
25     A.  St. Lucie County.
```

2 (Pages 2 to 5)

Page 6

1  Q. Okay. Do you consider yourself to be somebody
2  who is pretty involved in the community?
3  A. Not really. The only involvement I've had
4  since I've been here, since -- I voluntarily left Intel
5  and -- is with my kids' schools.
6  Q. Okay. So you're no longer with Intel now?
7  A. Correct.
8  Q. What are you doing now?
9  A. I'm basically retired.
10 Q. Basking in the glow of --
11 A. Basking in the glow of.
12 Q. All right. Now, are you active now in your
13 kids' schools?
14 A. Not at this particular moment.
15 Q. Okay. Say in the -- in the past 10 years have
16 you been active in any nonprofit organizations?
17 A. No.
18 Q. Elected politics?
19 A. No.
20 Q. Okay. Let's see. You moved in you say in
21 July of 2000?
22 A. Correct.
23 Q. Okay. That would have been after the 2000 MUD
24 elections. You don't recall?
25 A. I don't.

Page 7

1  Q. Okay. In the 2006 district elections, did you
2  participate in those elections?
3  A. Yes.
4  Q. Okay. And what was your participation?
5  A. I voted in the general elections for local
6  politicians as well as national.
7  Q. And you voted at that elementary school?
8  A. There are a number of places that you can
9  vote. And I voted early at one of the locations near
10 the HEB at 2222 and 620, near our home.
11 Q. How did that -- voting early, is that
12 convenient?
13 A. Yes.
14 Q. Okay. There weren't any problems with being
15 able to vote at the -- at the grocery store?
16 A. No.
17 Q. Okay. How about the 2004 election?
18 A. The presidential election?
19 Q. Well, that would have been in the fall of
20 2004, so I am asking -- I guess right now more the
21 May --
22 A. You mean the --
23 Q. Yes, the May election, which would have been
24 more local, including the MUD elections.
25 A. I don't recall voting in -- particularly for

Page 8

1  any MUD related items.
2  Q. Do you recall whether you did vote in that
3  particular election?
4  A. I don't recall.
5  Q. Did you vote in the presidential election?
6  A. Yes.
7  Q. Okay. And did you early vote then?
8  A. I don't recall.
9  Q. But again, no -- no issues or problems with --
10 A. No issues.
11 Q. -- the election? I'm cheating and doing this
12 in reverse order, sort of get -- going backwards, but
13 let me take you back to the 2002 election. Did you
14 vote in the district election?
15 A. Yes.
16 Q. Okay. And that would have been the one at
17 Mr. Stuber's house? Do you recall?
18 A. No.
19 Q. Let me -- let me get some clarification, then.
20 You voted that year in a -- in a local election?
21 A. I voted in a local election. I don't
22 recall -- when I voted I think it was at the elementary
23 school.
24 Q. Okay.
25 A. Canyon Creek Elementary.

Page 9

1  Q. Okay. So -- and then you did not separately
2  go to the Stubers' house for the district election?
3  A. I don't recall doing that.
4  Q. Do you recall knowing about it or --
5  A. No.
6  Q. Okay. Are you familiar with the tax issue
7  that the district has had with the City of Austin?
8      MR. WRIGHT: Objection. That's kind of
9  vague.
10 Q. (By Mr. Coleman) I'm sorry. Are you familiar
11 with the lawsuit, that the district sued against the
12 City of Austin over tax issues?
13 A. I'm familiar with a lawsuit.
14 Q. Okay. What -- what can you tell me or what is
15 your knowledge of that lawsuit?
16 A. It's -- it has to do with some MUD related
17 fees from a while ago, so I'm not really up on the
18 details of it all, but I know there is something going
19 on and what is going on.
20 Q. Okay. And you are obviously aware of this
21 lawsuit.
22 A. Mm-hmm.
23 Q. Having intervened into it. Tell me a little
24 bit about how you came to be associated with this
25 lawsuit.

3 (Pages 6 to 9)

Page 10

1  A. Can I mention Lisa's name?
2     MR. WRIGHT: I object to anything that's
3  covered by the attorney-client privilege.
4     MR. COLEMAN: Well, I'm entitled to know
5  who he has spoken to and when, without knowing the --
6  necessarily the content of that conversation. So if...
7     MR. WRIGHT: I -- I can direct the
8  deponent to answer with regard to which attorneys he
9  spoke to.
10    THE WITNESS: Okay. I spoke to Lisa
11 Graybill, and I think it was the end of October,
12 beginning of November of last year, 2006.
13 Q. (By Mr. Coleman) Okay. And did these
14 individuals call you on the telephone? Again, without
15 what any individual said, but did they call on the
16 telephone, come to the house?
17 A. They came to my home.
18 Q. All right. And again, without disclosing the
19 conversations themselves, after some discussion you
20 made a determination to come into this lawsuit as an
21 intervenor?
22 A. Correct.
23 Q. Okay. Okay. Again, in your own words, you --
24 tell me why you joined this lawsuit.
25 A. Basically, the right to vote has been

Page 11

1  long-fought, hard-fought. And after listening to Lisa
2  explaining the situation, I came to the conclusion that
3  any changes in the Voting Rights Bill, or that section
4  of the Voting Rights Bill that the MUD is looking to
5  have removed, just doesn't seem right under the --
6  under any circumstance.
7  Q. And can you tell me to the best of your
8  ability what -- what your understanding is of what the
9  district wants to do with -- with the lawsuit?
10 A. All that I understand is that there is a
11 section of the Voting Rights Bill that basically
12 requires a district to have -- as I recall, to have --
13 let's see, I guess Section 5 that -- that requires
14 review by the federal government if they want to have
15 that section removed.
16 Q. When you say to have -- to have that section
17 removed, I'm -- I'm not sure I understood that.
18 A. There's a -- I think it's Section 5 of the
19 Voting Rights Bill.
20 Q. Okay.
21 A. Well, my understanding is that that section
22 requires review by federal government if there are
23 changes to be made within the district.
24 Q. Okay. Do you happen to know whether that was
25 something that was in force when you lived in Portland,

Page 12

1  Oregon?
2  A. I don't remember any -- any specific things
3  going on in Portland related to voting rights.
4  Q. Okay. How about Phoenix?
5  A. That was a long time ago. I don't remember
6  anything.
7  Q. Okay. Let me go back to your understanding of
8  Section 5 just a little bit. Do you understand that
9  the Voting Rights Act may have, you know, a variety of
10 sections in it that do different things?
11 A. I'm sure.
12 Q. And do you understand that some of those
13 sections require governmental entities to -- to make
14 sure that the voting is available for everybody, that
15 there's no discrimination in voting, that is separate
16 from the -- what we call Section 5, the federal
17 government review?
18 A. As much as I can understand, yes.
19 Q. Okay. And I -- and I just want to make sure
20 and ask, do you understand that what the -- what the
21 district is seeking to do doesn't affect any of those
22 other sections that re -- that require, you know, that
23 all -- these governmental entities to -- to be fair in
24 their elections and to not discriminate against
25 anybody, to make sure that everybody can exercise their

Page 13

1  right to vote?
2  A. The only thing that I understand is what
3  appears to be related to Section 5 of the Voting
4  Rights -- Voting Rights Act.
5  Q. Okay. So you do, then, understand the
6  difference between some sections and the -- the Section
7  5 that's at issue here?
8  A. I am not an expert on that -- on the voting --
9  on the Voting Rights Bill, but, you know, just specific
10 to this particular section.
11 Q. Okay. Mr. Lesane, did you bring any documents
12 today with you?
13 A. No.
14    MR. COLEMAN: Do you know -- did we --
15 are there any?
16    MR. WRIGHT: He was provided with a --
17 the notice and there are no responsive documents.
18    MR. COLEMAN: Okay. I just wanted to
19 check. Thank you.
20 Q. (By Mr. Coleman) Mr. Lesane, I would like to
21 just follow up a little bit with my questioning. And
22 I -- you voted in several recent elections.
23 A. Mm-hmm.
24 Q. And I want to make sure that I understand the
25 basis of why you're in the lawsuit. And you've

Page 14

1  indicated that you have a feeling that Section 5 should
2  not be changed or there shouldn't be any changes
3  relating to Section 5. Setting that aside, I want to
4  talk a little bit, just to make sure, when you voted in
5  2006, you felt you were able to vote fine, there were
6  no problems with the -- with voting that year. Right?
7      A. Correct.
8      Q. And you've not -- you've not alleged any
9  discrimination or improper voting procedures with
10 regard to that election. Is that right?
11     A. Correct.
12     Q. Is the same true of 2004?
13     A. Correct.
14     Q. And 2002?
15     A. Correct.
16     Q. 2000, if -- I know -- if you voted in an
17 election in 2000?
18     A. I tend to vote in every general election. So,
19 yes.
20     Q. And if I may, I know you were in Portland in
21 1998, but is the same true there?
22     A. Correct.
23     Q. Okay. Do you know any of the members of the
24 board of the district, of the --
25     A. The MUD?

Page 15

1      Q. The -- the MUD district?
2      A. No, I do not.
3      Q. Have you been to any board meetings?
4      A. I have not been to any board meetings. I've
5  only been to homeowners' association meetings where
6  board issues -- I mean MUD issues have been discussed.
7      Q. What -- what homeowner meetings have you been
8  to? Back -- let me back up. About how many -- in the
9  nearly seven years you've been in the district, about
10 how many homeowner meetings have you been to?
11     A. Probably at most three or four.
12     Q. Okay. Have you been any -- to any in the last
13 year or two?
14     A. Within the last two years, but not -- I don't
15 think in the last year, no.
16     Q. So maybe in like 2005?
17     A. Yes.
18     Q. What -- do you have any recollection of that
19 meeting or what the issues might have been?
20     A. In particular it had to do with the -- the
21 lawsuit. One of the items on -- on the agenda was
22 discussion about what was happening with the lawsuit.
23     Q. Mm-hmm.
24     A. Against the MUD.
25     Q. Against them?

Page 16

1      A. Against the -- against Austin.
2      Q. Against the City of Austin?
3      A. Yes.
4      Q. Do you know why that would have been on the
5  homeowners' association agenda?
6      A. No, I don't.
7      Q. Is it -- would it have just been because
8  people in the district are interested in what's
9  happening to that?
10     A. I would believe so.
11     Q. Do most of the homeowners hope that the
12 district wins that lawsuit?
13     A. I -- I can't tell you.
14     Q. It would be a good thing to get a thousand
15 dollars off your taxes each year, though. Right?
16     A. Sure.
17     Q. Okay. Any of the prior homeowners meetings
18 that you went to, were -- were there other district --
19 MUD district issues in those or is that the one you're
20 talking about?
21     A. This is the one -- this is the only one that I
22 recall.
23     Q. Okay. I want to go back. You've not attended
24 any of the district meetings. I think you said that.
25 Is that right?

Page 17

1      A. Correct.
2      Q. And do you know the names of or know by sight
3  any of the members of the district board of directors?
4      A. No, I do not.
5      Q. Okay. And to your knowledge have not had any
6  interaction with any of those individuals?
7      A. Not to my knowledge, I have not.
8      Q. You -- do you know Don Zimmerman?
9      A. Yeah, I know Don.
10     Q. Okay. Don is on the board.
11     A. Okay.
12     Q. Do you know Bill Ferguson?
13     A. I don't know him.
14     Q. Do you know Ed Swarthout?
15     A. No, I do not. Can I clarify?
16     Q. Sure. Of course.
17     A. Don Zimmerman, I know of him. I think he ran
18 for an election, or was running for --
19     Q. The House --
20     A. Not related to MUD.
21     Q. The House District 50?
22     A. Yes.
23     Q. Okay.
24     A. And I met him. I think he was walking through
25 the neighborhood.

5 (Pages 14 to 17)

Page 18

1  Q. Okay. Is that the only time --
2  A. Yes.
3  Q. -- you would have met him?
4  A. That's the only time.
5  Q. Only time you would have talked to him or had
6  any communications with him?
7  A. Correct.
8  Q. Do you know George Frederickson?
9  A. No, I do not.
10 Q. Do you know Alan Weiss?
11 A. No.
12 Q. Karen Temborius?
13 A. No.
14 Q. If we can go off the record for a few
15 minutes...
16        (Recess from 3:53 to 3:55 p.m.)
17 Q. (By Mr. Coleman) Mr. Lesane, I'm -- in just
18 reviewing my notes, we talked a little bit about
19 elections and things like that.
20 A. Mm-hmm.
21 Q. And I just want to clarify the record on this.
22 Given your involvement in elections and absence of any
23 complaint about the way that they've been done and --
24 here or in other places where you've lived, would it be
25 safe to say that your involvement in this suit is not a

Page 19

1  disagreement with anything that's happened in elections
2  in the district, but is a -- a philosophical feeling
3  that Section 5 ought to be left alone?
4  A. Correct.
5  Q. Let me follow up. With respect to Section 5,
6  are you familiar with a part of the law that allows a
7  governmental entity to say, "We have been living up to
8  the Voting Rights Act, and so at some point we should
9  not have to submit to the federal government for review
10 anymore"? Are you familiar with that section
11 generally?
12 A. That is Section 5.
13 Q. Okay.
14 A. As I understand it.
15 Q. Okay. And so let -- let me clarify. Is -- is
16 your feeling that an entity like the district, if it
17 could show that it's acted responsibly for a period of
18 years, that it should not be exempted from further
19 federal review?
20 A. Could you re --
21        MR. WRIGHT: I'm going to object. Sort
22 of a vague question.
23        MR. COLEMAN: Well, I'm just asking --
24 okay.
25        MR. WRIGHT: I mean, he's not an

Page 20

1  attorney. I don't think he --
2        MR. COLEMAN: No, I --
3        MR. WRIGHT: -- could follow that
4  question.
5  Q. (By Mr. Coleman) You understand that there is
6  a section that lets government entities out from
7  federal review after a period of time. At all -- are
8  you -- are you or are you not --
9  A. I'm not.
10 Q. -- at all familiar with --
11 A. Not familiar.
12 Q. Okay.
13        MR. COLEMAN: Okay. Could we go back? I
14 just wanted to see his answer to the question before
15 that.
16        (Discussion off the record)
17 Q. (By Mr. Coleman) Okay. You don't know
18 whether a governmental entity can stop submitting
19 things for review by the federal government after a
20 period of time or after making some showing to the
21 federal government or not?
22 A. I do not know that.
23 Q. Okay. If I were to tell you that a procedure
24 like that exists, that an entity could go and say,
25 "Here's some paperwork. We've been doing things okay,"

Page 21

1  is -- would you object to entities being allowed to do
2  that or is your objection simply to trying to get out
3  from under the federal review at all?
4        MR. WRIGHT: Objection. It's vague and
5  calls for speculation.
6  Q. (By Mr. Coleman) You can answer that if you
7  can understand it.
8  A. I understand. And my answer would be the
9  latter.
10 Q. And the latter being...
11 A. Object to the ability to get out of that
12 review.
13 Q. At all?
14 A. At all.
15 Q. Under any circumstances?
16 A. Under any circumstance.
17        MR. COLEMAN: I pass the witness.
18        MR. WRIGHT: No questions.
19        MS. PERALES: I have no questions.
20        MR. HERREN: No questions.
21        MR. COLEMAN: Mr. Lesane, thanks for
22 coming today.
23        THE WITNESS: Sure.
24        (Deposition concluded at 4:01 p.m.)
25

## Page 22

(blank)

## Page 23

    CHANGES AND CORRECTIONS
WITNESS NAME: NATHANIEL LESANE    DATE: _____
Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE   LINE   CHANGE                      REASON CODE

## Page 24

PAGE   LINE   CHANGE            REASON CODE

_____

NATHANIEL LESANE

THE STATE OF _____ )
                       )
COUNTY OF _____ )

   Before me, _____, on this day personally appeared NATHANIEL LESANE, known to me (or proved to me under oath or through _____ (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

   Given under my hand and seal of office this _____ day of March 2007.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

## Page 25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN         )
MUNICIPAL UTILITY DISTRICT )
NUMBER ONE,              )
401 W. 15th Street       )   CIVIL ACTION NO.
Suite 850                )
Austin, Texas 78701      )   1:06-CV-01384
   Plaintiff,            )   (DST,PLF,EGS)
v.                       )
                         )
ALBERTO GONZALES,        )
ATTORNEY GENERAL OF THE  )
UNITED STATES,           )
U.S. Department of Justice )
950 Pennsylvania Avenue NW )
Washington, D.C. 20530   )

       REPORTER'S CERTIFICATION
       DEPOSITION OF NATHANIEL LESANE
            Monday, February 26, 2007

   I, RANDALL N. FINCH, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:
   That the witness, NATHANIEL LESANE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;
   That the deposition transcript was submitted on March 1, 2007 to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2007.
   That the amount of time used by each party at

Page 26

1  the deposition is as follows:
2      Mr. Gregory S. Coleman - 29 minutes
3      Ms. Nina Perales - 0 minutes
4      Mr. Samuel Spital - 0 minutes
5      Mr. George Korbel - 0 minutes
6      That pursuant to information given to the
7  deposition officer at the time said testimony was
8  taken, the following includes counsel for all parties
9  of record:
10     Mr. Gregory S. Coleman, attorney for Plaintiff
11     Ms. Nina Perales, attorney for MALDEF
12     Mr. George Korbel, attorney for Texas Rio
13 Grande Legal Aid, Inc.
14     Mr. Chris Herren, attorney for USDJ
15     Mr. Benjamin Blustein, attorney for Lawyers'
16 Committee for Civil Rights Under Law
17     I further certify that I am neither counsel
18 for, related to, nor employed by any of the parties or
19 attorneys in the action in which this proceeding was
20 taken, and further that I am not financially or
21 otherwise interested in the outcome of the action.
22     Certified to by me this 1st day of March, 2007.
23     _____
       RANDALL N. FINCH, Texas CSR #504
24     Expiration date: 12/31/2008
       Fredericks-Carroll Reporting
25     Firm Registration No. 82
       7800 Shoal Creek Blvd., Suite 200-W

Page 27

1      Austin, Texas 78757 (512) 477-9911

2