



**AcuScribe**

COURT REPORTERS

When accuracy means everything.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL )
UTILITY DISTRICT NUMBER ONE )
)
)
VS. )          CIVIL ACTION NO.:
)          1:06-CV-01384
)          (PLF, DST, EGS)
ALBERTO GONZALES, IN HIS )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**DONALD S. ZIMMERMAN**

FEBRUARY 21, 2007

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONDENSED TRANSCRIPT AND KEYWORD INDEX

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701

512-499-0277
800-497-0277
512-499-0298 (fax)
www.acuscribe.com



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL *
UTILITY DISTRICT NUMBER ONE *

    Plaintiff     *

VS.            * Civil Action No.
             * 1:06-CV-01384
ALBERTO GONZALES, in his   * (PLF, DST, EGS)
official capacity as        *
Attorney General of the    *
United States          *

    Defendant    *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
DONALD S. ZIMMERMAN
FEBRUARY 21, 2007
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Page 2**

(1)       ORAL DEPOSITION OF DONALD S. ZIMMERMAN,
(2) produced as a witness at the instance of the
(3) Defendant-Intervenors Texas State Conference of NAACP
(4) Branches and Austin Branch of the NAACP, and duly
(5) sworn, was taken in the above-styled and numbered cause
(6) on the 21st day of February, 2007, from 8:39 a.m. to
(7) 1:02 p.m., before MARSHA EVANS, Certified Shorthand
(8) Reporter in and for the State of Texas, reported by
(9) machine shorthand, at the Embassy Suites Hotel,
(10) 300 South Congress Avenue, Austin, Texas, pursuant to
(11) the Federal Rules of Civil Procedure and the provisions
(12) stated on the record or attached hereto.
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 3**

(1)
(2)             APPEARANCES
(3)
(4) FOR THE PLAINTIFF:
      MR. GREGORY S. COLEMAN
      WEIL, GOTSHAL & MANGES, LLP
(5)     8911 Capital of Texas Highway
      Building One, Suite 1350
(6)     Austin, Texas 78759
      512-349-1937
(7)
(8) FOR THE DEFENDANT ALBERTO GONZALES, IN HIS OFFICIAL
      CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
(9)
      MR. CHRIS HERREN
(10)    MS. CHRISTY A. MCCORMICK
       U.S. DEPARTMENT OF JUSTICE
(11)    CIVIL RIGHTS DIVISION
       950 Pennsylvania Avenue, NW
(12)    Room 7254 NWB
       Washington, DC 20530
(13)    202-514-1416
(14)
      FOR THE INTERVENOR TRAVIS COUNTY:
(15)
      MR. MAX RENEA HICKS
(16)    ATTORNEY AT LAW
       101 West 6th Street, Suite 504
(17)    Austin, Texas 78701
       512-480-8231
(18)
(19) FOR THE INTERVENORS LISA AND GABRIEL DIAZ:
(20)    MR. CARLOS BECERRA
       MALDEF
(21)    110 Broadway, Suite 300
       San Antonio, Texas 78205
(22)    210-224-5476
(23)
(24)
(25)

**Page 4**

(1)          APPEARANCES (CONT'D)
(2)
(3) FOR THE DEFENDANT-INTERVENORS RODNEY AND NICOLE LOUIS:
(4)    MR. DEBO P. ADEGBILE
       NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
(5)    99 Hudson Street, Suite 1600
       New York, New York 10013
(6)    212-965-2249
(7) FOR THE DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF
       NAACP BRANCHES AND AUSTIN BRANCH OF THE NAACP:
(8)
      MR. BENJAMIN BLUSTEIN
(9)    LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
       1401 New York Avenue, NW, Suite 400
(10)   Washington, DC 20005-2124
       202-662-8600
(11)
(12)   --and--
(13)   MR. PAUL R.W. WOLFSON
       WILMERHALE
(14)   1875 Pennsylvania Avenue, NW
       Washington, DC 20006
       202-663-6390
(15)
(16) FOR THE DEFENDANT-INTERVENOR ANGIE GARCIA:
(17)   MR. GEORGE J. KORBEL
       TEXAS RIOGRANDE LEGAL AID, INC.
(18)   1111 North Main Avenue
       San Antonio, Texas 78212
(19)   210-212-3700
(20)
(21) ALSO PRESENT:
(22)
      Markell Pool
(23)
(24)
(25)

**Page 5**

(1)
(2)
(3) REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
(4)
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 6**

(1)
(2)             INDEX
(3)                        PAGE
(4) Appearances........................ 3
(5) Stipulations........................ 5
(6)
(7) DONALD S. ZIMMERMAN
(8)    Examination by Mr. Wolfson............... 8
      Examination by Mr. Hicks................. 92
(9)    Examination by Mr. Becerra.............. 103
      Examination by Mr. Herren............... 107
(10)   Examination by Mr. Korbel.............. 123
       Examination by Mr. Adegbile............ 129
(11)   Further Examination by Mr. Korbel...... 178
(12)
(13) Changes and Corrections............... 180
(14) Signature.......................... 181
(15) Reporter's Certificate................ 182
(16)
(17)           EXHIBITS
(18)
(19) NO. DESCRIPTION       PAGE/LINE REFERENCED
(20)
(21) 6................................ 10/22
      Notice of Deposition
(22) 7................................ 168/8
      Article from LegalTimes.com
(23)
(24) 8................................ 37/25
      Minutes, Board of Directors, Northwest
      Austin Municipal Utility District No. 1,
(25)   May 23, 2006

7

```
(1)
(2)            EXHIBITS (cont'd)
(3)    NO. DESCRIPTION              PAGE/LINE REFERENCED
(4)   9........................................ 71/21
          First Amended Complaint
(5)
      10........................................ 161/2
(6)       Article from Save Our Taxpayers
(7)
(8)         REQUESTED DOCUMENTS/INFORMATION
(9)
(10)  NO. DESCRIPTION                        PAGE
      1........................................ 165
(11)      Letter to Department of Justice
(12)  2........................................ 167
          Copies of checks or payments relating to ACC
(13)      annexation
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

8

```
(1)            DONALD S. ZIMMERMAN,
(2)   having been first duly sworn, testified as follows:
(3)                EXAMINATION
(4)   QUESTIONS BY MR. WOLFSON:
(5)      Q.  Good morning, Mr. Zimmerman.
(6)      A.  Good morning.
(7)      Q.  Could you state your name and spell it for the
(8)   court reporter?
(9)      A.  Donald Shelly Zimmerman, D-o-n-a-l-d
(10)  S-h-e-l-l-y Z-i-m-m-e-r-m-a-n.
(11)     Q.  Thank you.  My name is Paul Wolfson, and I am
(12)  a lawyer for the Texas Conference of NAACP branches and
(13)  the Austin branch of the NAACP, and I'm here to take
(14)  your deposition.  Other counsel are present
(15)  representing other parties and may also have an
(16)  opportunity to ask questions.  Have you ever had your
(17)  deposition taken before?
(18)     A.  Not like this.
(19)     Q.  How do you mean not like this?
(20)     A.  I think I had a hearing here in Travis County
(21)  some years ago, but it was in a courtroom, so I don't
(22)  think I've done anything like this before.
(23)     Q.  Okay.
(24)        MR. COLEMAN:  It was in-court testimony
(25)  at a hearing.
```

9

```
(1)        MR. WOLFSON:  Okay
(2)        THE WITNESS:  Yeah, okay.  Sorry.  I
(3)   don't know the difference.
(4)      Q.  (By Mr. Wolfson) Okay.  Well, we are here to
(5)   ask you questions related to the -- to the case brought
(6)   by the Northwestern Austin Municipal Utility District
(7)   Number One against the attorney general and others.  By
(8)   the way, do you -- shall I refer to the district as the
(9)   district or the MUD?  How do you --
(10)     A.  Any way.
(11)     Q.  Okay.
(12)     A.  District or MUD.
(13)     Q.  Okay.  Before we begin I'd like to just go
(14)  through a few preliminaries.  First of all, please let
(15)  me know if you don't understand a question or you don't
(16)  hear a question.  I'm happy to -- to try to clarify it
(17)  for you.  Please let me finish my question before you
(18)  start your answer, and I'll try to do the same in
(19)  response.  Please tell me if you don't know or can't
(20)  remember the information.  Otherwise I'll assume that
(21)  you do.  Very importantly, please try to answer a
(22)  yes-or-no question with a yes or a no rather than a
(23)  uh-huh or shake of the head.  Let me know if you need a
(24)  break.  This is not an endurance test.
(25)        And is there any reason why you can't
```

10

```
(1)   give full and complete testimony today?
(2)      A.  Other than just some flu symptoms, no.
(3)      Q.  Okay.  I gather your voice might be a little
(4)   hoarse, so I need to ask you to try to speak clearly
(5)   for the record.  Now, this deposition is a little
(6)   unusual in that you've been -- you're here not just in
(7)   your personal capacity, but as a designated witness for
(8)   the MUD.  That's my understanding.  I'd like you to
(9)   look at what's previously been marked as Exhibit 1,
(10)  which is a notice of deposition of the -- of the
(11)  district.  Have you -- have you seen that document
(12)  before?
(13)     A.  I've -- very briefly.
(14)     Q.  Okay.  If you --
(15)     A.  Yeah, I kind of skimmed it over.
(16)     Q.  If you see at the end, there is sort of
(17)  a list of various topics.  Did you -- did you have a
(18)  chance --
(19)     A.  Right.  Yeah, I browsed through these.
(20)     Q.  Okay.  Did you -- I'd also ask the court
(21)  reporter to mark as an exhibit -- in fact, I think she
(22)  has marked as an exhibit Exhibit 6, which you are free
(23)  to look at, which is a notice of deposition of you
(24)  personally.  So I just -- just so you understand you're
(25)  here both as yourself and as a representative of the
```

11

```
(1)   district.
(2)         Can I ask you what -- what did you do to
(3)   prepare for this deposition?
(4)      A.  Got out of bed this morning, which was
(5)   extremely difficult.  I haven't done -- I haven't done
(6)   much.  I mean, you mean going over -- what do you mean
(7)   as in preparation?  What do you mean by --
(8)      Q.  Have you met -- have you met with the
(9)   lawyers -- your lawyers beforehand, before this?
(10)     A.  I -- I talked to Greg for a few minutes, just
(11)  in very general terms.
(12)     Q.  Did you -- did you review those list of topics
(13)  at the end of the document I showed you?
(14)     A.  Yeah.  We did talk a little bit about what
(15)  might be asked today.
(16)     Q.  Okay.  Did you -- how long would you say you
(17)  prepared for --
(18)     A.  Five minutes.
(19)     Q.  Okay.
(20)     A.  Maybe.
(21)     Q.  Did you review any documents from your files
(22)  or from the district's files to prepare for the
(23)  deposition?
(24)     A.  No.
(25)     Q.  Okay.  Did you speak to anybody else on the
```

12

```
(1)   district board about -- in advance of the deposition to
(2)   prepare for it?
(3)      A.  No.
(4)      Q.  Okay.  Have you -- former board members, did
(5)   you speak to any of those to prepare for the
(6)   deposition?
(7)      A.  No.
(8)      Q.  Okay.  Thank you.  Can you tell me where you
(9)   live?
(10)     A.  I live in the district, in the MUD.  10901 --
(11)  10901 Enchanted Rock.  It's two words, just like the
(12)  state park here.
(13)     Q.  And can you tell me a little bit about your --
(14)  your background, starting with where you graduated from
(15)  high school and going forward?
(16)     A.  I went to Highlands High School in San
(17)  Antonio.  I was born in raised in San Antonio.
(18)     Q.  Okay.  What year did you graduate?
(19)     A.  1977.
(20)     Q.  Okay.
(21)     A.  And I got an engineering degree from Texas A&M
(22)  in 1984 and a master's in engineering in 1986.
(23)     Q.  Also from Texas A&M?
(24)     A.  Yes.
(25)     Q.  And what did you do after you received your
```

(Pages 7 to 12)

---

**13**

(1) master's degree?
(2) A. I was recruited to work at Buick City in
(3) Flint, Michigan. So after living in Texas all my life
(4) I packed up and went to Michigan. I worked there for
(5) about a year on their manufacturing assembly lines.
(6) That was quite an experience, but I didn't like the
(7) weather, and I really left because of the -- I didn't
(8) like the climate in Michigan, so I came back to Texas.
(9) And I have worked engineering controls, computer
(10) controls, process control, and embedded computer
(11) systems, and some kernel device drivers, very low-level
(12) high-tech software, best way to describe 20 years of
(13) work.
(14) Q. And when you came back from Michigan what kind
(15) of company did you go work for or did you work for
(16) yourself or --
(17) A. It was a consulting company in Houston, and we
(18) did a lot of process control. I did a little bit of
(19) work offshore on oil rigs in the gulf, some chemical
(20) plants and what have you.
(21) Q. And how long did you stay in that line of
(22) business?
(23) A. About 20 years in what I would call high-tech
(24) software, low-level software and embedded systems.
(25) Q. And what -- what are you doing now?

**14**

(1) A. Right now I sell cars.
(2) Q. Okay.
(3) A. I started that back in June.
(4) Q. What --
(5) A. Looking for a career change.
(6) Q. What occasioned your shift out of engineering
(7) to selling cars?
(8) A. Well, I intend to get into technical sales,
(9) but none of the computer firms would let me do selling
(10) work without sales experience.
(11) Q. Okay. So you did this in order to develop
(12) sales experience?
(13) A. Oh, absolutely, yeah.
(14) Q. How did you -- what -- is it a new car
(15) dealership or what sort of business do you have?
(16) A. It's a -- it's a new car dealership.
(17) Q. Okay.
(18) A. I sell Toyotas. The engineering in the Toyota
(19) vehicle is outstanding. So I could work anywhere I
(20) wanted, but I decided to sell Toyotas. And I sell new
(21) and used vehicles, leases, whatever people want.
(22) Q. And you've been doing that since June; is that
(23) right?
(24) A. Since June.
(25) Q. Okay. And did you -- how did you get the

**15**

(1) capital to start up your new business?
(2) A. Well, I took a -- I took the job there.
(3) Q. Okay. So your --
(4) A. It's not my business.
(5) Q. Okay.
(6) A. I'm just working. It's not my business.
(7) Q. I understand. So you're working in the -- in
(8) the -- what's the name of the dealership?
(9) A. It's Champion Toyota.
(10) Q. Okay. Okay. Thank you. When did you move
(11) into the MUD?
(12) A. August of 2000.
(13) Q. Okay. And why did you move to that area in
(14) particular?
(15) A. Well, I moved to Austin because I was coming
(16) here with a start-up company and so -- high-tech, very,
(17) very promising high-tech company, and they paid me very
(18) well to move to Austin for this start-up opportunity.
(19) Canyon Creek -- I had a friend, a very good friend. He
(20) was the best man at my wedding, and he lived in Canyon
(21) Creek, so I knew all about this neighborhood. I knew
(22) more about Canyon Creek than anywhere else in Austin.
(23) My wife at the time really loved the neighborhood. It
(24) was her favorite place of all of Austin. So --
(25) Q. What -- what was appealing about the

**16**

(1) neighborhood to you?
(2) A. Its rolling -- it's hill country. It's got a
(3) nice park. It's quiet. It's kind of secluded. A lot
(4) of appealing things. We like the price range of the
(5) homes. That was just about right. And like I said, I
(6) had one good friend already that lived here, that lived
(7) in the area, and just I had always liked the place.
(8) Q. What's the price range of the homes in the
(9) MUD, generally speaking?
(10) A. They go from about 200,000 up to about 450.
(11) Q. That's for single-family homes, I assume.
(12) A. Yes.
(13) Q. Are there any apartment buildings in the MUD?
(14) A. No.
(15) Q. No. Are there any -- are there any units that
(16) are normally for rent in the MUD or is everybody
(17) pretty -- everybody pretty much a homeowner?
(18) A. It's mostly homeowners. There's a few homes
(19) that are rented, but very few.
(20) Q. So are there any what I would call sort of,
(21) you know, townhome developments or --
(22) A. No.
(23) Q. -- you know, duplexes or anything like that?
(24) So it's -- okay.
(25) A. Single-family.

**17**

(1) Q. Are you -- are you currently an officer of the
(2) MUD?
(3) A. Yes.
(4) Q. Okay. What office do you hold?
(5) A. There is five -- five board members, and right
(6) now I'm serving as vice president.
(7) Q. And what are the responsibilities of the vice
(8) presidency? You become president -- you become
(9) president if the president cannot serve? Is that --
(10) A. Yeah, yeah, something like that. And just
(11) basically participate on a daily basis. We don't have
(12) a formal division of labor.
(13) Q. Does the board have committees?
(14) A. We -- we have from time to time assigned
(15) committees, but, again, we don't have -- we don't have
(16) formal committees. We'll form a committee for someone
(17) to look at, say, the -- we had a wild hog problem, so I
(18) kind of led a small committee to look in the ways to
(19) control the wild hogs in the neighborhood. So we might
(20) do a committee as the need arises, but we don't really
(21) have formal committees.
(22) Q. Was there ever a committee configurated to
(23) deal with election issues of any kind?
(24) A. No, not that I'm aware of.
(25) Q. Or was there ever a committee that dealt with,

**18**

(1) you know, submissions to the Department of Justice?
(2) A. No, I don't think so. We had our attorney,
(3) Frank Reilly, do all that kind of work for us.
(4) Q. Do you receive compensation for being on the
(5) board of the MUD?
(6) A. Yes.
(7) Q. How much is that?
(8) A. I think it's -- it's a per diem of a hundred
(9) dollars, so if I go to a two-hour MUD meeting I get a
(10) hundred dollars.
(11) Q. Let me just see if I can understand something.
(12) When did you first run for election to the -- to the
(13) board?
(14) A. It was in May of 2002.
(15) Q. And -- and you were elected at that time; is
(16) that correct?
(17) A. Yes.
(18) Q. Okay. Did you run as part of a slate or a
(19) group of candidates together?
(20) A. Yes. There were three of us.
(21) Q. Okay. And how was that slate, you know,
(22) configured? Or let me -- let me change that. Who
(23) decided that the people would run together as a slate?
(24) A. As I remember, there were -- there were six
(25) people running for three positions that were open, and

(Pages 13 to 18)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

**19**

(1) I talked to all the candidates that were running in
(2) addition to myself, and there were two candidates that
(3) I thought were more closely aligned with my objectives,
(4) which was fiscal conservatism and challenging the
(5) property tax that we had in Canyon Creek, so two
(6) individuals, Alan Weiss and Bill Ferguson. So I told
(7) them I wanted to support them and I wanted us to run
(8) together as a team and that we would be fiscal
(9) conservatives and that we would look into remedies for
(10) the taxation issue in Canyon Creek.
(11)    Q.  And did you, you know, join together to do
(12) campaign literature or -- or something like that?
(13)    A.  I think it was limited to -- I don't think
(14) they did anything for me with any literature or -- I
(15) was the only guy that did signs. I had a yard sign for
(16) myself. I didn't mention the other people. But when I
(17) communicated with my voters and supporters, I would
(18) tell them to vote for these other two. And I sent
(19) e-mails asking people to vote for these other two
(20) candidates.
(21)    Q.  Tell me a little bit about your communications
(22) with your voters. I've heard that you have a broadcast
(23) list or something like that. How does -- how does that
(24) operate?
(25)    A.  It's a Yahoo group, and it has about 400

**20**

(1) people in it, and these e-mails came from me going door
(2) to door talking to voters, and I also collected names
(3) and e-mails at the polling place. Every election cycle
(4) for every election since 2002, May of 2002, I would sit
(5) out there for 12 hours, greet people as they came in
(6) and their name and e-mail and phone number and I would
(7) put them on my list. That's how I built a list.
(8)    Q.  So how many -- how many people would you say
(9) are on this list?
(10)    A.  About 400.
(11)    Q.  And these are all residents inside the
(12) district; is that right?
(13)    A.  Yes.
(14)    Q.  Okay.
(15)    A.  Registered voters, people that showed up to
(16) vote.
(17)    Q.  Are any of the people on the list
(18) African-American?
(19)    A.  I -- I really don't keep mental records of
(20) what race anybody is. There are probably a couple. I
(21) would ask everybody that would come in to vote and I
(22) ask them if they'd like to give me their name and
(23) e-mail and some did. I remember that Rodney Louis did.
(24)    Q.  Is he on your list?
(25)    A.  Yeah. He's still on my e-mail list, yeah.

**21**

(1)    Q.  How about Hispanic persons? Are any -- is
(2) anybody on your e-mail list Hispanic?
(3)    A.  Diaz was on my list, and I think he goes back
(4) maybe to 2002, a long time ago. There was a Diaz on my
(5) list. But I don't make any mental notes of race or
(6) ethnicity. We have a lot of Asians and Indians. And
(7) in my software field I've worked with a lot of Asians
(8) and Indians in my professional software field, so I can
(9) remember a lot of them signing up. I just don't make
(10) notes of it.
(11)    Q.  Would you say in the MUD is there any
(12) particular area -- well, let me go back. How many
(13) African-American residents would you say live in the
(14) MUD?
(15)    A.  I don't know if I would want to venture a
(16) guess. Don't know.
(17)    Q.  Well, would you say more than a hundred
(18) persons?
(19)    A.  Well, I don't know how I would -- how I would
(20) tell. I don't know.
(21)    Q.  Do any African-American residents show up at
(22) board meetings?
(23)    A.  You're asking me -- again, you're asking me to
(24) filter something I don't take note of, so I don't know.
(25) Not that I can remember.

**22**

(1)    Q.  What about Hispanic residents? Do they tend
(2) to show up at board meetings?
(3)    A.  Again, you're asking me to process racially.
(4) I'm just not acclimated to doing that.
(5)    Q.  Can I ask you this? Do you -- speaking either
(6) yourself personally or as a MUD, do you -- do you view
(7) it as a problem or a concern that African-Americans may
(8) not show up at board meetings?
(9)    A.  Well, no, because I don't look at people
(10) race-based. You know, if a person shows up at a MUD
(11) meeting, I don't look at them and say, oh, it's good
(12) that they're black or that they're white. I just
(13) don't. I mean, my experience falls that our
(14) neighborhood has some cohesiveness based on our tax
(15) situation with the City of Austin, and my support in
(16) the neighborhood as a MUD member comes from the legal
(17) action we've taken to try to remedy the illegal
(18) property taxes we have. And that is a common thing
(19) that everybody appreciates about me personally.
(20)    Q.  Have any African-American residents of the MUD
(21) affirmatively expressed their -- let's call it their
(22) solidarity with your position against the double
(23) taxation problem?
(24)    A.  Definitely. Back in 2002 when I was running,
(25) Rodney was one. I remember having some good talks with

**23**

(1) him about it, and he was thrilled that we had
(2) intentions to file suit if necessary to try to remedy
(3) the tax. He was very upset about his taxes, as
(4) everybody else is.
(5)    Q.  Anyone other than Mr. Louis?
(6)    A.  He's the only one I'm personally acquainted
(7) with.
(8)    Q.  Is he the only African-American resident of
(9) the district you're personally acquainted with?
(10)    A.  No. I think there's probably some others.
(11) There are some others.
(12)    Q.  How many would you say?
(13)    A.  I don't know. I have no idea. I mean, I
(14) don't know precisely how many white voters there are or
(15) how many Asian voters. I don't know.
(16)    Q.  Let's go back to the -- your office holding at
(17) the MUD. So if I recall correctly you were elected in
(18) 2002. And how long of a term was your term of office?
(19)    A.  It's four years.
(20)    Q.  Okay. And when you were elected you were
(21) elected as a board member. Did you -- were you then
(22) selected for some particular office?
(23)    A.  What happened was I garnered 87 percent of the
(24) votes, which was more than twice what the next person
(25) got, so I had a pretty good argument for becoming the

**24**

(1) president of the -- which I became the president of the
(2) MUD. The president is elected by the -- by the board
(3) members.
(4)    Q.  And how -- by what process do the board
(5) members decide who is going to hold what office?
(6)    A.  Well, there's a discussion among the board
(7) members in open meetings, and then they take a vote.
(8)    Q.  Does somebody put himself forward? Is that --
(9) is that how it works?
(10)    A.  There are nominations for positions after a
(11) discussion, typically.
(12)    Q.  And did anybody -- was anybody opposed to you
(13) in running for president?
(14)    A.  No.
(15)    Q.  And did you -- did you serve the full
(16) four-year term?
(17)    A.  Yes.
(18)    Q.  And then did you run for reelection?
(19)    A.  Well, I was barred from running for reelection
(20) because I was a candidate for state representative. I
(21) was in a republican primary for state representative
(22) when the filing deadline came, you know, to file for
(23) reelection. So I had a -- my attorney recommended that
(24) I not file for MUD reelection because maybe somebody
(25) would contend that I wasn't -- I shouldn't be allowed

(Pages 19 to 24)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

25

(1) to hold the MUD office plus be running for state
(2) representative. So that's why I didn't file to run
(3) again.
(4)   Q. So can you give me a time frame about -- about
(5) when this -- when this happened? Is this early 2006
(6) or --
(7)   A. March 2006.
(8)   Q. So you ran for state representative in the
(9) republican primary. And how did that turn out?
(10)   A. There was a -- there were three candidates, so
(11) I made it to the runoff. And then I lost the runoff
(12) election in April about 48 to 52.
(13)   Q. Okay. And then did you, in fact, serve a
(14) second term on the district -- the MUD board?
(15)   A. Well, what happened is back in the summer,
(16) last summer, I was appointed to get back on the MUD
(17) board because one of our members, Karen Temborius, MUD
(18) board member, had to leave the neighborhood. So she
(19) moved out of the neighborhood and resigned from the
(20) board, and they appointed me to take her position.
(21)   Q. So was she elected in the 2006 election?
(22)   A. Yes.
(23)   Q. All right. And what month of the year are the
(24) MUD elections?
(25)   A. Let me back up. Was she 2006 or was she -- or

26

(1) was she '04? She may have been elected in 2004.
(2)   Q. Okay. So you -- were you appointed
(3) essentially to fill an expired --
(4)   A. Yes.
(5)   Q. -- an unexpired term that had become vacant?
(6)   A. An unexpired term.
(7)   Q. And when are you up for reelection?
(8)   A. Should be in '08. If she was elected in '04,
(9) I should be up in '08.
(10)   Q. Can you -- let me see if I can understand.
(11) Which -- what time frame were you off the board to say
(12)   A. From end of May until about I want to say
(13) August.
(14)   Q. Of 2006?
(15)   A. Yes.
(16)   Q. So when did you resign from the MUD board?
(17)   A. Well, my term expired.
(18)   Q. Oh, I see.
(19)   A. And that would have been at the end of May.
(20)   Q. Okay.
(21)   A. I think my last meeting was the end of May.
(22)   Q. So you would have been a board member in the
(23) May 2006 board meeting; is that right?
(24)   A. Yes. I was -- I was still president at the
(25) May meeting.

27

(1)   Q. And what -- other than board member are you
(2) now an officer of the MUD?
(3)   A. Yeah, I can't remember if I'm the secretary or
(4) the vice president and it hardly matters.
(5)   Q. Can you tell me when -- when was the MUD
(6) established?
(7)   A. I believe it was established in 1988 in the
(8) election that our critics like to say it was one for
(9) and none opposed.
(10)   Q. Was that an election basically held by the
(11) developer?
(12)   A. Yes. The landowner/developer.
(13)   Q. And who -- who made the decisions as to how to
(14) draw the boundary lines of the MUD?
(15)   A. Well, it had to do, of course, with the
(16) property owner, and I know there was a lot of
(17) contention between -- it was Nash Phillips Copus at the
(18) time, and there was a lot of contention between him and
(19) the City of Austin. The City of Austin opposed the
(20) creation of the MUD, so there was all kinds of stuff
(21) that went on there. And the initial MUD formation was
(22) altered. You know, they drew some initial lines and
(23) they changed them. They wound up getting rid of some
(24) MUDs. And it was kind of a torturous history as to how
(25) the lines came to be what they are.

28

(1)   Q. And were the lines drawn to draw in any
(2) particular neighborhood or neighborhoods?
(3)   A. There were cows there.
(4)   Q. Okay.
(5)   A. Coyotes and wild hogs. And it was all --
(6) there was nothing out there. This was country land.
(7)   Q. Was it drawn to avoid bringing in any
(8) particular neighborhood?
(9)   A. There were no neighborhoods.
(10)   Q. Right. But was it -- was it assumed that it
(11) would -- that the area would eventually be developed?
(12)   A. Sure. Sure. That's what the MUD was for.
(13)   Q. Right.
(14)   A. A housing development.
(15)   Q. And what I'm wondering is whether when the
(16) lines were drawn the developer or somebody decided not
(17) to bring in a particular neighborhood because they
(18) didn't, you know, go along with the way that area would
(19) be developed or --
(20)   A. There because when you say neighborhood, I have the
(21) impression that you think of streets and houses.
(22)   Q. Area.
(23)   A. There's no streets, no houses. Areas. It's
(24) cactus and rocks and cedar trees. So I am having
(25) trouble understanding your question right because

29

(1) there's nothing there that constitutes a neighborhood.
(2)   Q. Are there any restrictive covenants on any of
(3) the property covered by the MUD?
(4)   A. There is -- there is definitely a Section 7
(5) permit for fish and wildlife on parts of the greenbelt
(6) that surround the backs of people's yards. The
(7) neighborhood has a lot of greenbelt lots, and part of
(8) the agreements that were made on this MUD was there
(9) would be preserve land, you know, greenbelt land that
(10) would never be developed. And behind those greenbelt
(11) lands there is the Balcones Canyonland Preserve, which
(12) is nature preserve owned by City of Austin probably.
(13) So that's a nature preserve in behind our greenbelt,
(14) which is behind our -- people's greenbelt yards. So
(15) there are -- there are protective covenants.
(16)   Q. What about older racially restricted
(17) covenants? Are there any that are still on the land?
(18)   A. Racially restrictive covenants?
(19)   Q. Right.
(20)   A. There were never any such -- that I'm aware of
(21) there was never any such covenants.
(22)   Q. Okay.
(23)   A. I'm not aware that there was any.
(24)   Q. I mean, they're not enforceable, of course,
(25) but I just wonder if you know in the land records there

30

(1) are any --
(2)   A. No, I don't know of any. I mean, if somebody
(3) put them in in 1950 or something before I was born, but
(4) I've never seen any evidence that there's anything like
(5) that in the neighborhood.
(6)   Q. Okay. Can you tell me who is eligible to vote
(7) in MUD elections?
(8)   A. You have to be a registered voter, and you
(9) have to own property in the MUD. I've read in the
(10) water code that you don't have to be a resident, per
(11) se. You don't have to live there. But you do have to
(12) own property.
(13)   Q. So if you -- if you live in the MUD but you
(14) rent a house, are you not eligible to vote?
(15)   A. That is an excellent question. That question
(16) has never come up. Wow. I don't know why I hadn't
(17) thought of that before. I guess our problem is getting
(18) people to show up to vote in the first place. Even the
(19) owners that live there, I mean, I still have -- it's
(20) hard to get them to come out and vote. That's a good question.
(21) That's a good question.
(22)   Q. Why is it hard to get people to come out to
(23) vote?
(24)   A. Voter apathy. It's everywhere. It's all over
(25) the country. It's not limited to our backyard.

(Pages 25 to 30)

ACUSCRIBE COURT REPORTERS
(800) 497-0277



31

(1) Q. Is it harder to get people to come out to vote
(2) for the MUD elections than for, you know, City of
(3) Austin elections or Travis County elections?
(4) A. Well, I -- I've studied some of the numbers
(5) from our past elections since 2002, and look at the
(6) votes for mayor, then look at the votes for MUD
(7) candidates. There's always more people voting for the
(8) city council or the mayor's office than they vote for
(9) MUD. So yeah, I think -- because the MUD just doesn't
(10) have the visibility that the city does. Everybody
(11) knows who City of Austin is, but there are still people
(12) that are not sure what the MUD is. A lot of them from
(13) California. They move in here from California. I
(14) knock on their door, "Hi, I'm your MUD president."
(15) "What? What's a MUD?" Never heard of that. So I
(16) educate them and say, "Hey, this is very important. It
(17) affects your property taxes. You know, you need to
(18) please get informed and please come to vote." That's a
(19) lot of what I do in the neighborhood.
(20) Q. Is information about the elections, the MUD
(21) elections, publicized?
(22) A. Yes.
(23) Q. How is that done?
(24) A. In a number of ways. We have a homeowners
(25) group that's very good about education. We have a

32

(1) newsletter that's hand-delivered to every door in the
(2) neighborhood. And in 2002 when I first ran they did
(3) a -- kind of a survey of all the candidates. So each
(4) candidate got several paragraphs, and that was
(5) published in the MUD newsletter. And that thing is
(6) delivered to every door, and I was amazed how many
(7) people read that.
(8) Q. So that's done by the homeowners association?
(9) A. Yes. They do it.
(10) Q. And who -- who was the -- what is the
(11) membership of the homeowners association?
(12) A. Everybody that lives there. Everybody in the
(13) neighborhood, you know, within the MUD boundaries.
(14) Q. Is that voluntary membership? You have to
(15) affirmatively sign up to join for the homeowners
(16) association?
(17) A. No. You pay dues, $400 a year. You're forced
(18) to pay.
(19) Q. Is that -- is that a line item on your
(20) property taxes or something like that? How -- how are
(21) you forced to pay?
(22) A. They send you a bill. It's not on the
(23) property tax list. But you're sent a bill. If you
(24) don't pay it, well, they -- they take you to court.
(25) Q. Does the homeowners association have regular

33

(1) meetings?
(2) A. Yes.
(3) Q. Do you attend those regularly?
(4) A. Yes.
(5) Q. How often do those occur?
(6) A. Four times a year. We just had one Monday
(7) night, but I was -- I was sick and didn't go. I
(8) normally go.
(9) Q. How many people tend to show up at these
(10) meetings?
(11) A. It varies anywhere from 50 to 60 to as many as
(12) 200.
(13) Q. Where are they usually held?
(14) A. Canyon Creek Church.
(15) Q. Okay. And how -- how is the public informed
(16) about the meetings?
(17) A. They're informed by e-mails, by an insurance
(18) sign, so when you drive into the neighborhood there's a
(19) very prominent sign there that announces the HOA
(20) meetings. There are signs -- front yard signs that are
(21) stuck around the neighborhood reminding people several
(22) days in advance. Of course, it's published in the
(23) newsletter, and a great number of e-mails go out
(24) notifying people.
(25) Q. And do African-American residents tend to turn

34

(1) up at the homeowners association meetings?
(2) A. There's always -- I think everybody shows up
(3) there. I see Asians, blacks, Hispanics, you know.
(4) Q. How often would you say a black resident shows
(5) up at a homeowners association meeting?
(6) A. There's probably several at every meeting.
(7) Q. Several meaning -- meaning what number?
(8) A. A handful. Five.
(9) Q. And what about Hispanic residents? Do they
(10) tend to show up at homeowners association meetings?
(11) A. Yeah, I think so. But, again, I don't --
(12) you're asking me to count numbers and I haven't counted
(13) numbers. Just trying to go on vague recollections. I
(14) don't look around and count how many blacks do we have
(15) today or how many Asians do we have. I mean, that's
(16) alien to my thinking.
(17) Q. Are there -- are there any community groups in
(18) the MUD that are sort of groups of African-American
(19) residents or Hispanic residents mostly?
(20) A. I don't think we have any race-based
(21) organizations in our neighborhood, you know, where
(22) there's membership based on your ethnicity. I'm not
(23) aware of any.
(24) Q. Does the MUD have any employees?
(25) A. I don't think so. Everybody works on

35

(1) contract. We have a MUD manager. Real Manage is the
(2) company. And we contract with a company. They keep
(3) books, pay bills, keep the yards mowed. You know, we
(4) hire -- hire everything out. We don't have any
(5) employees.
(6) Q. Do you have a regular management contract with
(7) Real Manage?
(8) A. Yes, uh-huh.
(9) Q. What's the -- how is the compensation of Real
(10) Manage determined? Is that an annual fee or a
(11) recurring charge?
(12) A. I think it's a monthly fee. Gosh, I don't
(13) know what it is now. Maybe 12- to 1500 dollars a
(14) month, somewhere in there. I think it's probably
(15) monthly, and then we might pay them for special
(16) projects.
(17) Q. And what services do they provide generally?
(18) A. They -- we have a park, so they manage the
(19) park, keep it cleaned up, picked up, do repairs. We've
(20) had vandalism problems, so they --
(21) Q. Vandalism in the MUD? I'm shocked. What's --
(22) what's been vandalized?
(23) A. We've had eyewitnesses -- eyewitnesses have
(24) told me they tear up our picnic benches. We have a
(25) little pavilion. They would sometimes spray graffiti,

36

(1) and they used to destroy the water fountain, you know,
(2) just tear it off the wall, tear up our park benches.
(3) We have a little playscape for kids, and they would
(4) break little pieces of wood off the playscape. We had
(5) a covering over the swing set. It was a -- like a tarp
(6) or something, sunshade. They destroyed one of the
(7) sunshades, stick a knife and ripped holes in it.
(8) Q. Who is they, by the way? Do you know?
(9) A. There's a police report that's been filed, but
(10) I just haven't got into it yet to -- of what we're
(11) going to do.
(12) Q. Has anyone ever been arrested or prosecuted?
(13) A. I don't -- not yet I don't think, but somebody
(14) needs to be. It is costing us thousands of dollars.
(15) So Real Manage tries to keep up with that, keep things
(16) repaired. We have --
(17) Q. What else do they do?
(18) A. -- a irrigation system so if something breaks
(19) they fix the irrigation. They also pay the bonds. You
(20) know, we're paying off MUD bonds, so Real Manage does
(21) the accounting, and they pay the bonds and interest
(22) when it's due. So they keep up with that.
(23) Q. So when the -- when the property taxes come
(24) in, where -- who is custodian of the money before it's
(25) distributed to obligations?

(Pages 31 to 36)

**37**

(1)    A. It's the Travis County Appraisal District. We
(2) contract through the Travis County Appraisal District.
(3) They collect the money, and they transfer it to the MUD
(4) bank accounts essentially.
(5)    Q. And then when -- and then when it comes time
(6) for Real Manage to pay an obligation, is that money
(7) then transferred to them by --
(8)    A. Correct.
(9)    Q. -- by check or --
(10)    A. Wire transfer usually.
(11)    Q. Is the MUD all within one voting precinct?
(12)    A. Yes. Precinct 333.
(13)    Q. Okay. I ask because I've read somewhere that
(14) some of the district is in 343 or at least it is now.
(15) Does that --
(16)    A. If it's been changed, no one has notified me.
(17) I don't think that's correct. Well, actually,
(18) Precinct 333 does pull in some areas that are outside
(19) the MUD, so yeah, they do. They pull in some of the
(20) apartments on 620. And the last map that I looked at
(21) had Precinct 333 ending at Zimmerman Lane.
(22)    Q. You would remember that. Yes.
(23)    A. Yeah. It ends at Zimmerman Lane.
(24)    Q. Could I ask you to look at what the court
(25) reporter has marked as Exhibit 8? I'll shuffle a

**38**

(1) little bit out of order here. This is --
(2)    A. I have 1 and 6 here.
(3)    Q. Yeah. This is -- I'll give it to you. This
(4) is the minutes of the May 23rd, 2006 meeting. And if
(5) you'll notice -- I'll point you to the right page, but
(6) if you'll notice there's a page that has a number at
(7) the bottom, 007620, which appears to be the certified
(8) final canvass report of the MUD elections.
(9)    A. I'm sorry. What are you looking at here?
(10)    Q. Oh, I'm sorry. It's on your left. That's --
(11)    MR. COLEMAN: This is attached. This is
(12) all attached. He wants you to look at the canvass
(13) report.
(14)    THE WITNESS: Oh, okay.
(15)    Q. (By Mr. Wolfson) And if you could look at the
(16) canvass report, it's about five pages, but three pages
(17) in on page 007623 you'll see something that says
(18) precinct report -- official results precinct report,
(19) Precinct 343, and there's a small number of voters.
(20)    A. Wow. Huh. Well, looking at the vote totals
(21) here of two votes, three votes, and one vote, so that's
(22) probably Mr. and Mrs. Smith that -- what that is. So they must
(23) have broken off that little piece. But see, those
(24) guys, they're not in the district. I can't -- I can't

**39**

(1) explain this.
(2)    Q. Did the MUD annex any territory recently?
(3)    A. No.
(4)    Q. Were the precinct boundaries redrawn?
(5)    A. Apparently so.
(6)    Q. Who -- who is responsible for -- for drawing
(7) precinct boundaries?
(8)    A. You know, I'm not sure. I would think it
(9) would be the, you know, Travis County voter registrar,
(10) right? I mean, Travis County maintains the voter
(11) records and the voter roles and they assign precincts,
(12) right, to every voter.
(13)    Q. Well, I guess Travis County will have to speak
(14) to that. But is there a polling place at a place
(15) called Vistas at Canyon Creek?
(16)    A. That is an apartment complex. There was an
(17) early voting location there. But I don't think there's
(18) an Election Day voting location there. I mean, unless
(19) they added one in May. See, this is -- this is strange
(20) because when I was running for state rep I had a
(21) precinct map, of course, of my 43 precincts for House
(22) District 50. And I don't -- I don't remember this 343.
(23)    Q. Did you review this canvass when it was
(24) submitted?
(25)    A. Well, I did, but I don't remember seeing this

**40**

(1) Precinct 343.
(2)    Q. Okay.
(3)    A. I mean, I -- of course, I would be looking for
(4) Precinct 333. This is the main point here. See,
(5) there's 870 votes here, and there's 14 votes over
(6) there. So I don't know what's going on here.
(7)    Q. Okay.
(8)    A. One -- one possible explanation is that there
(9) is a Leander school district boundary that cuts through
(10) Canyon Creek, so the school district separates a small
(11) part of our neighborhood to the southwest and breaks it
(12) off into a different school district. So maybe what
(13) they did is redraw lines based on the school district
(14) or something. I don't know what they're doing here.
(15)    Q. Let me -- let me ask you something else, then.
(16) What's the MUD's current annual budget?
(17)    A. I think it's -- well, when you say budget, do
(18) you mean -- what do you mean specifically? We have
(19) a -- we have a budget, you know, to pay off debts, of
(20) course, and those are mandated by what we owe. And we
(21) have an operations budget what I think is around a
(22) million dollars or so, 800,000 to a million dollars.
(23) And that's to keep up with legal fees. We have to pay
(24) an attorney, and we pay, you know, the MUD manager.
(25)    Q. Let me -- let me ask you this question. What

**41**

(1) are the -- what are the MUD's annual revenues?
(2)    A. I don't have the numbers in front of me. I'm
(3) not -- I'm thinking it's 1.2 to 1.5 million. Somewhere
(4) around there is what we take in in taxes.
(5)    Q. Okay.
(6)    A. That's for the debt and the maintenance and
(7) operations.
(8)    Q. I wonder -- in that same document I just gave
(9) you, I wonder if you could look at a document. And
(10) there's a document there. It's a one-page document
(11) that says Northwest Austin MUD Number One approved
(12) budget 2005-2006. And it looks like total revenues for
(13) something along the lines of 157,793.
(14)    A. This is a terrible copy here.
(15)    Q. Yes, I know.
(16)    A. So this is -- this is probably talking about
(17) the maintenance and operation budget.
(18)    Q. Okay.
(19)    A. The M&O, which has to do with keeping up with
(20) the park and paying the attorney and paying the
(21) managers. 145,000 obviously doesn't include the money
(22) paid on the MUD debt, which is the primary expense.
(23)    Q. There's actually another document. It's not a
(24) formal budget, but if you could look at document
(25) P 007558. It's actually a little earlier in the

**42**

(1) document. I think that's a two-page document.
(2)    A. Okay. And what is your question on this?
(3)    Q. Is this -- do these numbers -- where it says
(4) actual, I mean, do these numbers where revenues of
(5) about half a million dollars a year and expenses of
(6) about 575 for year to date 4/30/06, does that look like
(7) the right ballpark?
(8)    A. Well, is that January through April?
(9)    Q. Yeah, it says year to date actual.
(10)    A. Okay. The question you asked me before was --
(11) did you ask me a question about annual expenses?
(12)    Q. Yes. I mean --
(13)    A. Is there an annual sheet? I just --
(14)    Q. There isn't an annual sheet. That's what I'm
(15) trying to --
(16)    A. Okay. I'm sorry.
(17)    Q. I'm trying to figure out what -- what ballpark
(18) we're in.
(19)    A. And I've got some mental fatigue here, so --
(20)    Q. Take your time.
(21)    A. I'm just trying to figure out why I'm asked
(22) for an annual budget when given something through
(23) April.
(24)    Q. Well, I was confused because the annual budget
(25) that is in here is -- looks -- looks very low, and



**43**

(1) that's why I'm trying to figure out what -- what the
(2) right numbers would be.
(3)     A. Well, does that make sense to you what I -- it
(4) looked like my maintenance -- M&O, maintenance and
(5) operations.
(6)     Q. Okay. So this would not include -- the
(7) document that you looked at before, the approved
(8) budget, would not include essentially bond service
(9) expenses; is that -- is that right?
(10)     A. That's my impression. I mean, see, here's one
(11) that says bond payments due in April '06 -- or
(12) September '06, is $534,000.
(13)     Q. Okay. That -- that helps clarify.
(14)     A. Okay. And that doesn't show up on here, so
(15) you're already up to a million, right?
(16)     Q. Right.
(17)     A. The way I read this. But, again, I'm not my
(18) best today, so --
(19)     Q. So speaking generally, about what would be the
(20) annual expenses of the MUD, total annual expenses
(21) including --
(22)     A. Total expenses --
(23)     Q. -- including bond service?
(24)     A. -- probably a million to 1.2 million,
(25) somewhere around there.

**44**

(1)     Q. And how much of that is bond service?
(2)     A. Probably 90 percent.
(3)     Q. Okay.
(4)     A. You know.
(5)     Q. And could you give me a -- kind of a general
(6) breakdown of the other expenses that the MUD has? And
(7) if you want to look to the operations budget that --
(8) that might help. Is that --
(9)        MR. COLEMAN: What page was that?
(10)        MR. WOLFSON: Sorry. That was
(11) page 007565.
(12)        THE WITNESS: Is there something unclear
(13) to you?
(14)     Q. (By Mr. Wolfson) Does this look like an
(15) accurate description of the operating expenses --
(16)     A. Yeah.
(17)     Q. -- of the MUD?
(18)     A. I think it does, yeah.
(19)     Q. All right. Thanks.
(20)     A. Yeah. For the period that it shows and --
(21) yeah.
(22)     Q. Okay. Thank you.
(23)     A. These look reasonable.
(24)     Q. That's very helpful.
(25)        MR. WOLFSON: Shall we take a five-minute

**45**

(1) break?
(2)        MR. COLEMAN: Sure.
(3)        (Recess from 9:26 to 9:34)
(4)     Q. (By Mr. Wolfson) Mr. Zimmerman, I wonder if
(5) you could look back at the document called approved
(6) budget that we were looking at just a few minutes ago.
(7)        MR. COLEMAN: What was the reference
(8) number?
(9)     Q. (By Mr. Wolfson) The Bates -- sorry. This is
(10) in exhibit -- I think it was Exhibit 10, was it?
(11) Exhibit 8. And it's Page No. 007565. I apologize for
(12) the copy. Or maybe Mr. Coleman should apologize for
(13) the copy.
(14)        MR. COLEMAN: I think it just was done on
(15) some sort of nonwhite paper.
(16)        MR. WOLFSON: Thank you.
(17)     Q. (By Mr. Wolfson) I have a couple of
(18) questions. First of all, I see there's a line that
(19) says payroll taxes for -- budget for $544, and I think
(20) you said the MUD has no employees. Does that change
(21) it?
(22)     A. That's probably for the MUD board directors.
(23) See, when I started this they told me that the per
(24) diems -- well, they were per diems. Those are like
(25) expenses, not salaries. They're like just a general

**46**

(1) check that covers, you know, travel or whatever. So
(2) it's my understanding that I was not an employee of the
(3) MUD but, rather, a representative that was awarded a
(4) per diem. So the hundred dollars I get for showing up
(5) at each meeting is a per diem, and that didn't make me
(6) an employee. Whatever.
(7)     Q. So do you think the -- are those payroll taxes
(8) related to the directors' per diem?
(9)     A. I think they are, yes.
(10)     Q. And you see right underneath that it says
(11) legal fees general and there's a figure of $30,000?
(12)     A. Yes.
(13)     Q. Can you tell me what -- what is comprised
(14) within this legal fees general figure?
(15)     A. It's Potts & Reilly law firm.
(16)     Q. Okay.
(17)     A. So, of course, they're not employees of the
(18) district. He's his own firm, and we pay him a set fee
(19) to represent us. It's my understanding that's
(20) contract --
(21)     Q. Okay.
(22)     A. -- labor. It's not employees.
(23)     Q. And it looks like it's a regular payment of
(24) $2,500 a month.
(25)     A. Correct.

**47**

(1)     Q. What -- what tasks does this go towards? In
(2) other words, does this pay for certain regular
(3) recurring tasks that Potts & Reilly does for you?
(4)     A. Yes.
(5)     Q. What kind of tasks are those?
(6)     A. He shows up at all of our meetings and takes
(7) notes and gives the board general counsel at every
(8) meeting, and he answers e-mails if there's any
(9) questions in between on any issues that come up.
(10)     Q. Does this include election-related --
(11)     A. Yes.
(12)     Q. -- legal problems?
(13)     A. Uh-huh.
(14)     Q. Okay. So what kind of election-related legal
(15) problems would Potts & Reilly handle for you?
(16)     A. Well, of course, I went to -- I went to Frank
(17) Reilly when following up on my promise to move the
(18) election to the school. So Frank helped us do that,
(19) file paperwork, ask the appropriate questions.
(20)     Q. Let me ask you a question actually about
(21) moving the election to the school. When was -- when
(22) was that done? When was the election moved --
(23) elections moved to the elementary school?
(24)     A. That was one of the first things I started.
(25) Probably June or July was when we made a resolution,

**48**

(1) 2002. June of 2002 we passed a resolution directing
(2) the attorney to move the election to the school.
(3)     Q. And was that -- was that -- and when was that
(4) actually done? When were the elections actually moved
(5) to the school?
(6)     A. For the -- for the very next election.
(7)     Q. Okay.
(8)     A. They happen every two years, so it was 2004
(9) was our -- next MUD election was 2004, and it was at
(10) the school.
(11)     Q. Okay. Before the election was moved to the
(12) school, where -- where were elections for MUD board
(13) held?
(14)     A. Well, keep in mind that I came in 2000, so the
(15) only election I knew of was the 2002 election, and that
(16) was at Mr. Stueber's house.
(17)     Q. Okay. And why was -- why was the election
(18) being held at Mr. Stueber's house?
(19)     A. I think you might want to ask the former
(20) attorney why it was put there.
(21)     Q. Which former attorney is that?
(22)     A. Sharlene Collins was the former MUD attorney.
(23) You might want to ask her why it was there.
(24)     Q. Okay. Well, when you -- when you ran for
(25) election the first time that's where the election was

(Pages 43 to 48)



49

(1) held, right?
(2) A. Yes. And one of my campaign promises was to
(3) move the election to the school.
(4) Q. And when you say I should ask Ms. Collins why
(5) the election was held before, is that because you don't
(6) know or because you would prefer not to answer that
(7) question?
(8) A. Well, I -- I asked her, and I wasn't satisfied
(9) with the answer I got, so that's as far as I'll go with
(10) that.
(11) Q. Can you tell me what answer she gave you?
(12) A. I don't -- I don't want to go there. I mean,
(13) I will let her explain it.
(14) Q. Well, I'm asking you. I mean, this is not
(15) necessarily a reflection on you, sir. I'm simply
(16) asking you what Ms. Collins told you.
(17) A. I don't want to -- I don't want to speculate.
(18) I would just be speculating.
(19) Q. It's not speculation. I'm asking you what
(20) Ms. Collins told you as to why the elections were held
(21) at Mr. Stueber's house.
(22) A. Well, it would have been March --
(23) MR. COLEMAN: Is this while you were --
(24) THE WITNESS: It was March of 2002. So
(25) you're going to ask me to recall exact words she gave

50

(1) me in March of 2002.
(2) Q. (By Mr. Wolfson) I don't need the exact
(3) words, sir. I'm asking you to give me the substance of
(4) why Ms. Collins -- what Ms. Collins told you as to why
(5) the elections were held at Mr. Stueber's house.
(6) A. Well, she said it was -- something like it was
(7) a statutory requirement that the election be held in
(8) the district and Mr. Stueber's house is obviously in
(9) the district.
(10) Q. Did she offer any explanation as to why it was
(11) held at a private home?
(12) A. Only to say that it was a statutory
(13) requirement that elections be held in the district.
(14) Q. And did that satisfy you as an answer?
(15) A. Well, no, because the -- I thought they should
(16) be at the -- at the school, where everybody else votes.
(17) Q. Do you --
(18) A. And I said the school is in the district,
(19) so --
(20) Q. How long has the school been in existence in
(21) the --
(22) A. I think they built it in the mid-'90s. Early
(23) to mid-'90s is when I think they built the school.
(24) Q. Do you know at any time before you raised the
(25) issue had any -- anybody else, you know, active in the

51

(1) MUD raised the issue that the elections should not be
(2) held at a private home?
(3) A. Well, I don't think there had been another
(4) election if you check the record. I don't think there
(5) had ever been a MUD election until -- a contested
(6) election until May of 2002. That was the first
(7) contested election. You have five positions. So if
(8) you only have candidates to fill the positions
(9) available, then there's no election, right? Because
(10) there's no contest.
(11) Q. And before the contested elections, were --
(12) was the public informed about elections being held
(13) in -- in the MUD?
(14) A. I couldn't answer that. That was before I got
(15) there. I don't really know.
(16) Q. When you moved to the MUD in 2000, how did you
(17) go about finding out who your local MUD representatives
(18) were?
(19) A. I found out through the HOA newsletter.
(20) Q. And did you -- did you inquire as to sort of
(21) how they had become -- how they had been elected or --
(22) A. I went to some meetings and talked to them and
(23) found out that they were friends of the developer and
(24) they basically took the positions because he told them
(25) about it and they filed and no one else filed so they

52

(1) became the MUD board members.
(2) Q. When the board instructed Mr. Reilly to
(3) arrange for moving the election place, did -- was the
(4) board informed about the requirements of Section 5 of
(5) the Voting Rights Act regarding changes in elections?
(6) A. Yes.
(7) Q. What -- what did you -- what were you informed
(8) about Section 5 at that time?
(9) A. That there would have to be --
(10) MR. COLEMAN: Let me -- let me clarify
(11) when the --
(12) THE WITNESS: Yeah.
(13) MR. COLEMAN: In the MUD -- in the MUD
(14) meetings in executive session there are nonpublic
(15) things. That's going to be privileged. I don't know
(16) if you're asking about that, Paul. I just want to be
(17) careful. If you're going to ask generally like
(18) processes and things like that, obviously fair game. I
(19) think in executive session probably not. Certain
(20) communications won't be. So I just want to make sure
(21) that we're clear on that.
(22) MR. WOLFSON: All right. Well, I'm not
(23) sure we're clear on it, but it may depend on the kind
(24) of privilege and so forth.
(25) Q. (By Mr. Wolfson) But let me -- let me start

53

(1) this way. When -- when was the first time you ever
(2) learned about Section 5 of the Voting Rights Act?
(3) A. Well, actually, the former attorney told me
(4) that -- when I talked to her about the election at the
(5) house, one of the things she said was, well, the
(6) Department of Justice approved the voting location.
(7) She threw that out there for me. That's -- that's the
(8) first I heard of it.
(9) Q. Okay. And did you, you know, make any kind of
(10) inquiries or study as to what this -- the Voting Rights
(11) Act required about -- about elections?
(12) A. Not at that time, but I was kind of
(13) unimpressed that they would approve it at the house.
(14) Q. And when turning -- then going back to when
(15) the board, you know, instructed Mr. Reilly to change
(16) the voting location, did the board instruct Mr. Reilly
(17) to make a submission to the Justice Department asking
(18) for approval of the voting location?
(19) A. Well, we told him to do what needed to be
(20) done. We're not experts in the law, so we just told
(21) him to do what needed to be done to move it to the
(22) school. We had one interest, and that was increasing
(23) voter participation. And everybody was in an
(24) agreement. Everybody knew if we moved it to the school
(25) we'd get more voter turnout and, of course, we did.

54

(1) Q. Did Mr. Reilly give you any indication about
(2) what processes were involved in making that submission
(3) to the Justice Department?
(4) A. Yeah. He mentioned that he would have to get
(5) the DOJ preclearance, and everybody scratched their
(6) head and they're like, "Why should we have to do that?
(7) You know, any -- anybody could tell it's going to
(8) improve our voter turnout. Why do we have to get
(9) permission?" People were puzzled. I was puzzled.
(10) Q. And did you -- did you eventually -- did
(11) Mr. Reilly eventually prepare a petition or submission
(12) to the Justice Department asking for approval of the
(13) voting change?
(14) A. Yes. He told us he did. We didn't deliberate
(15) on that, per se. We just let him do it.
(16) Q. Did you -- did he submit it to the board for,
(17) you know, review beforehand?
(18) A. It was probably in the pile of papers, but I
(19) don't know if I even bothered to go through it. It was
(20) like paperwork to me.
(21) Q. Did he -- I mean, did he ask the board for its
(22) input on the -- on the submission? Let me step back.
(23) Did he -- did he give you a draft and say, you know,
(24) "I'd like your comments on it," or anything like that?
(25) A. I don't -- I don't remember.

(Pages 49 to 54)

**55**

(1) Q. Okay. Do you remember whether it came up at
(2) any board meetings, the proposed submission to the
(3) Justice Department or the planned submission to the
(4) Justice Department?
(5) A. No. We just kept asking him, "Are you done
(6) yet? Do we have it at the school?" You know, we just
(7) wanted to get it moved to the school.
(8) Q. Do you know how much he charged you for making
(9) that submission to the Justice Department?
(10) A. My memory tells me it was around a thousand
(11) dollars, but I could be wrong on that.
(12) Q. How -- what do you base that memory on? I
(13) mean, did you review a bill or something like that?
(14) A. Probably a -- probably a bill, but I just
(15) don't remember. It's been four years and something.
(16) Q. Would that have been covered in the legal fees
(17) general expenses?
(18) A. That would be special. That's the kind of
(19) stuff we put under special.
(20) Q. Okay. I do see that -- going back to that
(21) budget document I do see that there is a line item that
(22) says legal fees special, and I think that the annual
(23) budget is something like $19,000. Can you -- can you
(24) give me an indication of what special would include?
(25) A. Special includes things like moving the

**56**

(1) election. I think we started putting that in there
(2) after moving the 2002 -- after we moved the elections
(3) we incurred -- I'm thinking the total cost was
(4) somewhere around $5,000 for all the work that Frank had
(5) to do in addition to the DOJ filing. He had to work
(6) with Travis County officials. He had to do a lot of
(7) work to get the thing moved.
(8) Q. Okay. So there were -- were there state law
(9) requirements that had to be fulfilled to ensure that
(10) the election place could be moved?
(11) A. Probably, yeah. Again, that's his specialty.
(12) That's why we hire attorneys, so we don't get bogged
(13) down on these details.
(14) Q. Are there any attorneys on the board of the
(15) MUD currently?
(16) A. I don't think so. I don't think so.
(17) Q. Have there been while you've served on the
(18) board?
(19) A. I don't think so. No.
(20) Q. Going back to this $19,000 figure, I'm just
(21) interested in comparing this to the $5,000 figure you
(22) gave me for Mr. Reilly's election-related work, so I'm
(23) wondering if you could tell me what -- what else would
(24) be included in special legal work for the remaining
(25) $14,000, let's say.

**57**

(1) A. There could have been some work in document
(2) searches. I'm thinking at the time that we -- we were
(3) involved in getting the lawsuit against the City of
(4) Austin for illegal taxation. There could have been
(5) some fees incurred with that.
(6) Q. Is Mr. Reilly involved in handling that case?
(7) A. Well, I think he has like an adjunct role.
(8) Q. Is there any other ongoing litigation that the
(9) MUD is involved in that would be covered by this
(10) special legal fees category?
(11) A. We had a bond issue, the last bond issue for
(12) the MUD, and there were some -- there are some points
(13) of contention about that regarding what figures should
(14) be included in the bond package. So when stuff comes
(15) up like that that he has to spend extra time on we'll
(16) authorize that.
(17) Q. A little farther down if you could look on the
(18) budget line there's one that says election, and the
(19) figure associated with it is $3,000.
(20) A. Okay.
(21) Q. All right. Can you give me an indication of
(22) what that figure represents?
(23) A. There may be a cost to the MUD to have Travis
(24) County actually conduct the election, which means to
(25) put it on their eSlate ballot machine because we wanted

**58**

(1) to make it easier for voters. We wanted to make sure
(2) that the MUD items showed up with the City of Austin
(3) and everything else. You have one machine and
(4) everything is on there, and we had to pay to get on
(5) their machine from what I remember.
(6) Q. Let me ask you, before the vote was moved to
(7) the -- to the elementary school and it was held out of
(8) Mr. Stueber's house, how were ballot -- how was
(9) balloting actually done? That is, did people mark a
(10) paper ballot or so forth? How was that actually done?
(11) A. I voted in that election, and I believe we had
(12) paper ballots.
(13) Q. Okay.
(14) A. And Mr. Stueber had a book. You know, he
(15) would go through and check names off. That was
(16) probably, you know, the voter registration list from
(17) the county, because they're the one legally, you know,
(18) entitled to do that. But, again, you'd have to ask the
(19) former attorney. I'm not sure how they set all that
(20) up.
(21) Q. Can you tell me who -- who printed up these
(22) ballots?
(23) A. I don't know.
(24) Q. And you -- I mean, was this a fairly formal
(25) looking written ballot or was it -- you know, did it

**59**

(1) look like somebody had mimeographed out of their house
(2) or can you tell me what it looked like?
(3) A. It was perfectly adequate. You knew what it
(4) said and meant. There was no issue with that.
(5) Q. And when you marked the ballot, actually
(6) who -- you know, who did you give it to? Did you stuff
(7) it in the ballot box?
(8) A. There's a box there.
(9) Q. Okay. And was that a locked box?
(10) A. A lockbox.
(11) Q. And who actually counted the ballots?
(12) A. I don't know.
(13) Q. Was that done by Mr. Reilly's law firm?
(14) A. No. He was not the attorney at that time.
(15) Q. Was that done by Ms. Collins' law firm?
(16) A. Yes.
(17) Q. Okay. And do you know how they --
(18) MR. COLEMAN: Let me -- that's what law
(19) firm that you know whether they counted them or not?
(20) THE WITNESS: They were the law firm. I
(21) don't know who counted them. I think I already told
(22) you that. I don't know who counted the ballots.
(23) Q. (By Mr. Wolfson) All right. Did the law firm
(24) prepare the official canvass of the election?
(25) A. Probably, but -- I'm trying to remember what

**60**

(1) happened there. The board -- the outgoing board that
(2) was still in place canvassed the election under her
(3) kind of like a supervision. She gave them documents
(4) and they looked at it. I don't know. You're asking
(5) me -- this was all done by the former board and the
(6) former attorney. They did that whole election. I had
(7) nothing to do with it.
(8) Q. Were there -- in that election were there any
(9) election officials of the MUD?
(10) A. I don't know. You'd have to ask the attorney.
(11) I don't know how she -- how she set it up.
(12) Q. All right. Has there ever been a case where
(13) the MUD made a change in its election procedures but
(14) did not submit that to the Department of Justice?
(15) A. Not that I'm aware of, no.
(16) Q. Any change in polling hours?
(17) A. No.
(18) Q. Why does the MUD have a lawyer in particular
(19) handle its submissions to the Justice Department?
(20) A. Can you repeat the question?
(21) Q. Yeah. Or let me put it this way. Has anybody
(22) ever told you you have to have a lawyer to make your
(23) submissions to the Justice Department to approve voting
(24) changes?
(25) A. No. It just seems like a reasonable thing to

(Pages 55 to 60)

61

(1) do.
(2) Q. Could I ask you to look at exhibit -- it was
(3) yesterday. Exhibit 3.
(4)         MR. COLEMAN: Do you have a clip or
(5) something for 8 so we can keep it all together?
(6)         MR. HICKS: Here's a rubber band.
(7)         MR. WOLFSON: Can I get one back? Oh,
(8) actually, you know what? I think I have one. No, this
(9) is not it. I'm sorry. Sorry. I want the preclearance
(10) submission for 2004. I have it. Never mind.
(11)     Q. (By Mr. Wolfson) Have you -- have you seen
(12) this document before?
(13)     A. What am I looking at?
(14)     Q. Okay. This is a --
(15)     A. You said Exhibit 3?
(16)     Q. This is Exhibit 3, which should be -- well,
(17) the covering should be a letter dated February 26, 2004
(18) on the letterhead of Potts & Reilly. It's a submission
(19) to the Justice Department beginning at Bates number
(20) P 009609. If you look five pages in it's signed by
(21) Ms. Kerrie Jo Qualtrough, attorney for the district.
(22) And then there is an attachment to the document
(23) beginning at P 009614, which is a document called
(24) Agreement to Conduct Joint Elections between Travis
(25) County and Northwest Austin Municipal Utility District

62

(1) Number One, and that has a number of pages. And on the
(2) very last page there's a signature block in Spanish.
(3)         MR. COLEMAN: I think that's an
(4) attachment to the agreement.
(5)         MR. WOLFSON: Right. Yes. There's a
(6) sample ballot which is attached to the agreement.
(7) That's right.
(8)         THE WITNESS: Yeah, I remember
(9) flipping -- flipping through this. Uh-huh.
(10)     Q. (By Mr. Wolfson) Okay. When you -- when you
(11) say you flipped through it, can you tell me --
(12)     A. Kind of like I'm doing right now.
(13)         MR. COLEMAN: When you say "this," are
(14) you talking about the agreement or the latter?
(15)         MR. WOLFSON: I'm talking about --
(16)         THE WITNESS: Well, I remember this
(17) submission because I remember seeing some things in
(18) here about Dana DeBeauvoir, the county clerk, you know,
(19) and it looked to me like the county would run the
(20) election, which is what we wanted. We wanted the MUD
(21) to be on the same ballot as everybody else, just lump
(22) it all together.
(23)     Q. (By Mr. Wolfson) Okay. So before
(24) Ms. Qualtrough sent this document to the Justice
(25) Department, did you review a draft or -- beforehand?

63

(1)     A. Right. And it looked something like this. It
(2) was probably the same thing.
(3)     Q. Did you give Ms. Qualtrough any comments on
(4) the draft?
(5)     A. No, other than, you know, I -- as far as I
(6) could tell this was great, you know. I'm not -- I'm not an
(7) more professional expertise. I'm not -- I'm not an
(8) election lawyer. If I'm an election lawyer maybe I
(9) could say something, but it looked great to me.
(10)     Q. Could you give me an estimate of sort of how
(11) much time you spent flipping through it, as you said?
(12)     A. Probably ten minutes.
(13)     Q. Okay. What about other board members? Did
(14) they review this document?
(15)     A. Probably about the same.
(16)     Q. Okay.
(17)     A. We all went through it together.
(18)     Q. All right. Do you remember whether this was
(19) discussed at a board meeting, this document?
(20)     A. I don't have a clear recollection, but I know
(21) that we -- again, I keep going back to the fact that
(22) we -- we trusted our attorney to -- to get this done
(23) for us.
(24)     Q. Okay.
(25)     A. And we did a cursory check, just like I said,

64

(1) going through it quickly, and there was no reason for
(2) anybody to think that there was anything wrong with it.
(3) You know, we thought Frank had done a good job on it.
(4) Turns out he did.
(5)     Q. Now, this -- this document includes the 2004
(6) election agreement with Travis County, which begins at
(7) page 009614. If you want a chance to look at that,
(8) that's fine.
(9)     A. Okay.
(10)     Q. And on page 009624, which is page 11 of the
(11) agreement, there's what appears to be your signature.
(12) Is that -- is that, in fact, your signature?
(13)     A. Yes.
(14)     Q. Okay. Thanks.
(15)     A. Absolutely.
(16)     Q. So did you review this agreement with Travis
(17) County before you signed it?
(18)     A. Did I review it with Travis County?
(19)     Q. Did the review the agreement with Travis
(20) County before you signed it?
(21)     A. Yeah. Again, I did a cursory check of it. I
(22) remember some of the language here, some of the names.
(23)     Q. Can you tell me --
(24)     A. I remember phoning Marilyn Wahl. She was a
(25) precinct chair and election judge, and we assigned her

65

(1) as an early -- early voting clerk. There was some
(2) paperwork and stuff we had to do.
(3)     Q. Why was Ms. Wahl appointed as an early voting
(4) clerk?
(5)     A. She was the only one that had experience as an
(6) election judge at the time.
(7)     Q. Who is Ms. Wahl?
(8)     A. She's a longtime resident of the neighborhood.
(9)     Q. Is she white or black or do you know?
(10)     A. She has to have a race, huh? She's Anglo.
(11)     Q. Did you give any consideration at that time to
(12) asking an African-American or Hispanic person to be the
(13) elections clerk or --
(14)     A. Absolutely not. I would never do anything to
(15) someone based only on their skin color. I think it's a
(16) reprehensible notion that you're qualified because
(17) you're white or you're not qualified or -- because
(18) you're black or Indian. It's terrible.
(19)     Q. So --
(20)     A. The thought never entered my mind.
(21)     Q. Can you tell me what -- what occasioned this
(22) agreement with Travis County, what was the motivation
(23) for it?
(24)     A. This was all part of moving the election to
(25) the school and putting it on the eSlate ballot where

66

(1) the other elections were, you know, to boost our voter
(2) turnout, voter participation.
(3)     Q. So was this agreement sort of at the MUD's
(4) behest or was it the MUD's idea to enter into this
(5) agreement or was it something Travis County suggested
(6) in the first --
(7)     A. Oh, no. It was all the MUD. It was the MUD's
(8) idea to put the MUD election on the eSlate ballot
(9) together with Travis County's other elections.
(10)     Q. Let me go back to Ms. Wahl. You said that she
(11) had had experience in this area. Did you talk about --
(12) did the board have a discussion about who should be
(13) appointed the early voting clerk?
(14)     A. We were told it wasn't that important a
(15) spot. It was not that important a position. She
(16) wouldn't have to do that much work is the way we were
(17) told and that I think the -- our law firm actually
(18) assisted Marilyn, so I don't think she ended up having
(19) to spend much time on it, if any.
(20)     Q. Does she work at the law firm or --
(21)     A. No.
(22)     Q. Okay. If you can look in the election
(23) agreement itself on page P 009616 and the -- I'm
(24) looking in particular at the paragraph that starts
(25) No. 2 that says, Marilyn Wahl, the regular early voting

(Pages 61 to 66)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

67

(1)  clerk. Do you see that?
(2)     A.  Uh-huh.
(3)     Q.  And you see it says shall appoint Patti
(4)  Shannon, employee of the law firm of Potts & Reilly, et
(5)  cetera. Why was Ms. Shannon appointed to assist
(6)  Ms. Wahl?
(7)     A.  Why was what?
(8)     Q.  Ms. Shannon appointed to assist Ms. Wahl.
(9)     A.  When we talked to Marilyn she -- she said her
(10) time was very, very limited and she would appreciate,
(11) you know, some help, so I think that's why that -- why
(12) that happened.
(13)    Q.  Okay.  And do you know Ms. Shannon's race or
(14) ethnicity?
(15)    A.  Yes.  She is a -- she's Anglo.  She's
(16) Caucasian.
(17)    Q.  Could I ask you to look at another document
(18) now, ask you to look at what the court reporter has
(19) already marked as document -- as Exhibit No. 4.  And
(20) this document, the cover page is a letter dated
(21) February 27th, 2006 on the law firm letterhead of
(22) Potts & Reilly, signed by Mr. Reilly, and it encloses
(23) something referred to as an election agreement between
(24) Travis County and the MUD starting at page P 009709.
(25) Have you seen this document before?

68

(1)     A.  It looks vaguely familiar.
(2)     Q.  If you'd look at page 11 of the agreement,
(3)  which is Bates number 009719, it has what appears to be
(4)  your signature.
(5)     A.  Yes.  That's my signature.
(6)     Q.  Did you -- did you review this document?
(7)     A.  Briefly, yes.
(8)     Q.  Before -- before signing it on behalf of the
(9)  MUD?
(10)    A.  Yes.
(11)    Q.  Okay.  And can you tell me what -- what was
(12) the motivation for this particular agreement with
(13) Travis County?
(14)    A.  Well, this -- my impression was this was
(15) virtually identical to the '04 agreement we signed and
(16) it was just authorizing the county to run our election,
(17) same thing we had done before.  There was no difference
(18) and no change from the '04 election.
(19)    Q.  Does this -- does this agreement, this 2006
(20) agreement, does it carry forward into the future?
(21)    A.  It's my intention that it would, but they may
(22) ask us to sign it every two years.  I don't know.
(23)    Q.  Okay.  Well, do you know whether this
(24) agreement carries forward into the future --
(25)    A.  I don't know.

69

(1)     Q.  -- unless it's terminated by the parties?
(2)     A.  I don't know.  I remember asking why do I have
(3)  to sign this again.  I thought that the one we did in
(4)  '04 would carry on.  Apparently not.  I guess you have
(5)  to do it every election, I suppose.
(6)     Q.  So when are the next elections in the -- in
(7)  the MUD?
(8)     A.  They're going to be in '08.
(9)     Q.  Okay.  Is it -- what is your understanding as
(10) to whether Travis County will administer those
(11) elections?
(12)    A.  It's my expectation they will.
(13)    Q.  Okay.  Do you -- do you see on the horizon any
(14) changes in voting procedures or policies that the MUD
(15) would make?
(16)    A.  No.
(17)    Q.  Could you look at pages 2 to 3 of the election
(18) agreement?  That's starting at 009710 and carrying over
(19) to 9711.
(20)    A.  I must have the wrong -- oh, I was looking at
(21) the wrong number.
(22)    Q.  If you look at No. 2 on page 97111, as I
(23) understand it this sets forth duties that the MUD,
(24) which is referred to as the participating entity, will
(25) continue to perform.  And it says -- No. 2 says,

70

(1)  "Preparing federal Voting Rights Act election
(2)  preclearance submissions to the Department of Justice
(3)  other than changes in a joint election conducted under
(4)  this agreement that directly affect the county."
(5)     A.  Okay.  And your question is what?
(6)     Q.  Does -- is it your understanding that the
(7)  county does preclearance submissions for the MUD or any
(8)  elections that -- any joint -- so-called joint
(9)  elections?
(10)    A.  Joint elections meaning --
(11)    Q.  Elections where --
(12)    A.  -- MUD plus county or --
(13)    Q.  Yes.
(14)    A.  -- city or what have you?  It was my
(15) impression that we had to do our own preclearance
(16) probably in cooperation with Travis County.  But,
(17) again, I don't know the specifics on that.
(18)    Q.  Do you --
(19)    A.  I leave that up to our attorney, Frank Reilly,
(20) as to how that has to work.
(21)    Q.  Do you -- do you know the last time the MUD
(22) itself submitted a preclearance submission to the
(23) Justice Department?
(24)    A.  No.  I know we did one in '02, but I don't
(25) remember after that.

71

(1)     Q.  Was this '06 election agreement submitted to
(2)  the Justice Department by the MUD?
(3)     A.  I don't recall.  I know that the '02 one did.
(4)  I don't remember what happened in '04, because nothing
(5)  changed.  I mean, nothing changed.
(6)     Q.  Does Travis County -- have they ever charged
(7)  you any money for -- not you personally.  I mean the
(8)  MUD, have they ever charged the MUD any money for doing
(9)  a preclearance submission to the Justice Department?
(10)    A.  I don't know.  It may be covered in a lump
(11) sum.  We paid them some money.  I don't know how that's
(12) broken down.
(13)    Q.  How much money is that?
(14)    A.  I thought it was several thousand dollars.  I
(15) don't know how that's broken down.
(16)    Q.  Do they --
(17)    A.  I have no idea.
(18)    Q.  Do they provide the MUD with an itemization?
(19)    A.  No.  I never saw an itemization.
(20)    Q.  Okay.  Could I ask you to look at a document
(21) that the court reporter has marked as Exhibit 9?
(22) Mr. Zimmerman, this is a document called First Amended
(23) Complaint, which is a document that has been submitted
(24) to the U.S. District Court in the District of Columbia.
(25) Have you seen this document before?

72

(1)     A.  Yes.
(2)     Q.  Did you review it before it was filed?
(3)     A.  I don't -- I don't know if I did it before it
(4)  was filed.  You know, let's see.  The very -- there was
(5)  a document that we got from Mr. Coleman that I read in
(6)  some detail, which I think maybe was the first
(7)  complaint, but I have not read in detail anything after
(8)  that.
(9)     Q.  Okay.
(10)    A.  So I'm not sure which one this is.
(11)    Q.  Okay.  Might you have reviewed a document
(12) that's not the first amended complaint but is just a
(13) complaint?
(14)    A.  Possibly yes.  I don't know the exact names,
(15) but I have looked at something like that.
(16)    Q.  Okay.  Could I ask you to look carefully at
(17) paragraph 12, which is on page 3 of the first amended
(18) Complaint?  And please take your time to read that.
(19)    A.  The preclearance process is burdensome?
(20)    Q.  Yes.  You don't have to read it into the
(21) record.
(22)    A.  I would say yes, it is.  I agree.
(23)    Q.  Okay.  Tell me how it is burdensome.
(24)    A.  It causes delays, and it costs us money, and
(25) it puts a burden on us.  One of our concerns when we

(Pages 67 to 72)

73

(1) heard about preclearance, what would happen if we had a
(2) fire at the school or some catastrophe and the school
(3) became unsuitable for voting. I mean, a burden in that
(4) case is we would need to quickly move our voting
(5) location because the school is unusable for whatever
(6) reason. How do I know that we can get the paperwork
(7) back from, you know, the preclearance people to make
(8) sure that happens? I see a burden there logistically.
(9)    Q.    Let me -- let me stop you there. Did you --
(10) did you ever ask anybody what processes were available
(11) at the Justice Department in the event of such a
(12) scenario?
(13)    A.    Well, no, because I just see the whole thing
(14) as being wrong for the federal government to be, you
(15) know, meddling in our local elections like that.
(16)    Q.    So is this -- is this more of a -- what I
(17) would call a philosophical disagreement with the policy
(18) of Section 5?
(19)    A.    It's both. It's pragmatic and it's
(20) philosophical. My objection is on both grounds.
(21)    Q.    You said there are delays. I mean, has there
(22) ever been a situation where the MUD could not, you
(23) know, carry out a schedule of election because of the
(24) preclearance process?
(25)    A.    No, because we started in summer of 2002 to

74

(1) get ready for '04, so sure there's not -- there
(2) shouldn't be a delay in that kind of time frame.
(3)    Q.    When you say you started in 2002 to get ready
(4) for '04, were there other state law formalities that
(5) had to be observed to prepare for changing an election
(6) location?
(7)    A.    I don't know. I just thought it would be
(8) smart to start as soon as possible just in case.
(9) Again, our objective is to get voter turnout increased
(10) so, by God we're going to get that thing moved, and
(11) let's start now, start today.
(12)    Q.    So starting today wasn't necessarily because
(13) of Section 5, was it?
(14)    A.    Correct. I didn't know and I still don't know
(15) a lot of the intricacies about Section 5. I don't know
(16) how it works.
(17)    Q.    I think you said there was a financial burden.
(18) And what is that financial burden? Can you explain
(19) that to me?
(20)    A.    I -- our taxpayers shouldn't have to pay a
(21) single dollar for preclearance because it's unnecessary
(22) to us.
(23)    Q.    Why do you say it's unnecessary?
(24)    A.    Because our neighborhood has never had a
(25) problem or an issue racially with voting, never. The

75

(1) whole thing is completely unnecessary. And the people
(2) in our neighborhood are interested in voting, and when
(3) we moved the election to the school our voter turnout
(4) went up, of course, and there's never been an issue or
(5) a problem.
(6)    Q.    Did the -- when you moved the elections for
(7) school, do you know whether increasing numbers of
(8) African-Americans and Hispanics started voting for MUD
(9) elections?
(10)    A.    I -- I would never analyze the elections that
(11) way. I just look at the overall number of voters and
(12) it went up. I'm not interested in racial profiling
(13) that way, you know. It's never been an interest.
(14)    Q.    When you say you've never had a racial problem
(15) in voting, what exactly do you mean by that?
(16)    A.    No one's ever -- no one's ever complained to
(17) me about any of the voting processes or the election
(18) place. The only comments I've gotten on voting is,
(19) "Thank you for moving the election to the school," and
(20) I've heard that from many, many people.
(21)    Q.    So would you say that before the elections
(22) were moved to the school people were dissatisfied with
(23) where the elections were being held?
(24)    A.    I would say it's more convenient to vote at
(25) the school. Again, I think you need to ask the former

76

(1) attorney what that was about, having the election at
(2) the school. I don't know what she was thinking.
(3)    Q.    Could you look at -- continuing on that
(4) paragraph moving over to the next page, I'd like you to
(5) look at the last sentence of that paragraph, local
(6) governmental units must weigh, et cetera.
(7)    A.    Uh-huh.
(8)    Q.    Has the MUD ever weighed the benefit of a
(9) proposed voting change against the burden of seeking
(10) the attorney general's approval?
(11)    A.    We haven't in the past, but I think that
(12) certainly could be a problem in the future from the
(13) scenario I just told you about. If something happened
(14) to the regular polling place and we had to move it for
(15) purely pragmatic reasons and we have to go through the
(16) submission process, it could be a concern.
(17)    Q.    And continuing on where the sentence says,
(18) "Virtually assuring that many political subdivisions
(19) from time to time forgo beneficial changes because of
(20) the bureaucratic burden," has the MUD ever forgone a
(21) beneficial change in voting procedures because of the
(22) bureaucratic burden?
(23)    A.    Not in the past, no.
(24)    Q.    Could you look at paragraph 20 of the amended
(25) complaint? That's on page 5. If you could read

77

(1) just -- it begins "the burdens and infringement," et
(2) cetera.
(3)    A.    Okay. What's your question?
(4)    Q.    You see the sentence that says, "In fact,
(5) minority voters in covered jurisdictions like the
(6) district are frequently harmed, not aided, by Section 5
(7) coverage"?
(8)    A.    Okay.
(9)    Q.    All right. Have minority voters in the MUD
(10) been harmed by Section 5 coverage?
(11)    A.    Well, in the garage election minority voters
(12) as a part of all -- all voters were harmed, I think, by
(13) having it there, not just minority voters, but all
(14) voters. Minority voters, too, because some people
(15) probably would've prefer voting in a garage. They'd
(16) rather vote at the school.
(17)    Q.    And how were they -- how were minority voters
(18) harmed by the fact that Section 5 applied to the MUD?
(19)    A.    Maybe I could explain it to you a different
(20) way. In that same election, Paul, we had a school
(21) board election. No one was allowed to vote at the
(22) school for the school board election. So what sense
(23) does that make? So people were complaining that they
(24) didn't have enough time to drive to another location to
(25) go and vote for the school board election. They didn't

78

(1) have time or whatever. So on that particular day they
(2) had to go to another school to vote, to our school, and
(3) then to a garage. They had three voting locations.
(4) Well, I'm just talking outside the box here, but I
(5) don't see that Section 5 does anything to help those
(6) voters. And that to me is the point of this.
(7) Section 5 didn't help anybody.
(8)    Q.    But what I'm asking you is how did it harm
(9) those voters.
(10)    A.    By making it less convenient for them to vote.
(11)    Q.    Was -- was Section 5 the reason that the
(12) election was held at the private residence?
(13)    A.    I think you need to talk to the attorney about
(14) that again. I don't know what their rationale for that
(15) was.
(16)    Q.    Are you familiar with the term bailout as
(17) that's sometimes used with reference to the Voting
(18) Rights Act?
(19)    A.    My understanding of that was that there could
(20) be some voting locations exempted through, you know, a
(21) bailout provision, exempted from the preclearance.
(22)    Q.    Has anyone ever told you whether the MUD is
(23) eligible to get a bailout from the Voting Rights Act?
(24)    A.    It's been discussed, but, you know, no one can
(25) say definitively whether we're covered at all.

(Pages 73 to 78)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

79

(1) Q. Can you tell me when that was discussed?
(2) A. I'm thinking it came up -- I don't remember.
(3) I don't remember when that came up.
(4) Q. Did that come up at a board meeting, for
(5) example?
(6) A. I -- it came up at a board meeting. It could
(7) have been when Greg was talking to us about, you know,
(8) the preclearance requirements. I mean, we were
(9) unimpressed with the Section 5 preclearance, and we
(10) thought we should be exempted because there is no
(11) racial discrimination here. There's nothing even --
(12) nothing even close to it.
(13) Q. Did you ever review the legal requirements for
(14) obtaining a bailout?
(15) A. Not specifically, no.
(16) Q. Has the MUD ever made any affirmative efforts
(17) to ensure that black and Hispanic residents have equal
(18) access to the election processes of the MUD?
(19) A. Well, I've personally taken steps. I don't
(20) know about the MUD, per se, but I've personally taken
(21) steps to boost all voter turnout. You know, again, I
(22) never profile by race. I want all voters to come. And
(23) one of the things I did was to put a large banner on
(24) the highway outside our neighborhood and it says, "Hey
(25) Austin, Canyon Creek votes." Drivers would go by.

80

(1) Everybody saw that. And I got a lot of phone calls on
(2) people saying, "Hey, great idea. We're certain that's
(3) going to boost voter turnout," and it did. I spent
(4) three or four hundred dollars on that with the sole
(5) objective of getting people to vote, all people.
(6) Q. But the MUD hasn't made any efforts I would
(7) say focused on or targeted at or cognizant of in
(8) particular black or Hispanic voters to promote their
(9) access to the election processes?
(10) MR. COLEMAN: Objection, multipart.
(11) Targeted to and cognizant of --
(12) Q. (By Mr. Wolfson) All right. Let's start with
(13) targeted to minority voters. Has the MUD -- has the
(14) MUD ever made any efforts targeted to minority voters
(15) as such to ensure that they have equal access to the
(16) election processes?
(17) A. When you say equal access, I don't really
(18) understand the question. You know, everybody that
(19) wants to vote can come vote at the school. We promote
(20) the election just to say, hey, there's an election at
(21) the school. We don't -- we don't say there's an
(22) election at the school if you're black or Asian.
(23) There's an election at the school. That's where it is.
(24) Q. Has the MUD ever made any outreach to
(25) African-American or Hispanic voters in particular to

81

(1) encourage them to vote?
(2) A. No. We've done nothing based on race in the
(3) MUD, nothing at all.
(4) Q. Has the MUD ever made any efforts to encourage
(5) African-American or Hispanic residents to put
(6) themselves forward for election to the board?
(7) A. The MUD, no. Personally I supported a Chinese
(8) fellow, Oliver Ban. I endorsed him, and I worked to
(9) get him elected in the '04 election against one of the
(10) incumbents. He narrowly lost that election. But I
(11) didn't support Oliver because of his race or ethnicity.
(12) I supported him because he's a fiscal conservative and
(13) he supported our effort to fight the illegal taxation,
(14) had nothing to do with his race, ethnicity, nothing to
(15) do with it. And the person he opposed was Anglo, but I
(16) didn't oppose him because he was -- I keep telling you
(17) and -- you keep asking me and I keep telling you race
(18) has nothing to do with it.
(19) Q. Could I ask you to look at -- this may be some
(20) of the same thing, and I apologize for that, but if I
(21) could ask you to look at what the court reporter has
(22) marked as Exhibit No. 2, which is the MUD's answers to
(23) interrogatories. Have you -- have you seen this
(24) document before?
(25) A. This is -- I'm not familiar with this.

82

(1) Q. Can I ask you this? Are the MUD's ballots
(2) both in English and in Spanish?
(3) A. I'm sorry?
(4) Q. Are the MUD's ballots, election ballots, both
(5) in English and Spanish?
(6) A. I believe so. That's, again, the Travis
(7) County that puts it in both languages. So since we're
(8) on their ballot we have -- we have both.
(9) Q. Is that something that happens because, you
(10) know, state law requires Travis County to do that? Is
(11) that your understanding?
(12) A. You know, it could be, but I've always been
(13) confused with that because I thought only citizens
(14) could vote and a part of citizenship was, you know,
(15) having some command of English language. Is that
(16) correct?
(17) Q. Well, is it your understanding that you have
(18) to read and write English to be a United States
(19) citizen?
(20) A. I thought there was some requirement, but we
(21) did the Spanish translation as part of the package that
(22) was asked of us, so we just -- we did it.
(23) Q. Does the MUD board have an English only
(24) policy?
(25) A. No. No.

83

(1) Q. Has anyone ever come to a board meeting and,
(2) you know, exhibited -- I mean a member of the public
(3) exhibited, you know, less than, you know, conversant
(4) command of English but wanted to participate?
(5) A. We have some people with heavy Chinese accents
(6) sometimes. Of course, I can understand them because I
(7) did software with them. Some heavy accents from
(8) Indian -- Indian people. But, no, we've never had a
(9) problem communicating.
(10) Q. Has there ever been a situation where somebody
(11) has needed a translator at a board meeting?
(12) A. No. No.
(13) Q. What would the MUD board do if somebody, you
(14) know, say, came in and spoke, you know, limited English
(15) but was proficient in Spanish, let's say, and wanted to
(16) make themselves heard at the hearing?
(17) A. Just the same thing as if they knew Chinese or
(18) Russian or anything else. We do our best to
(19) accommodate them.
(20) Q. How would you do that?
(21) A. Try to find somebody that could talk to them
(22) in their native language. The Chinese is probably most
(23) of our minorities, as you keep calling them, probably
(24) Chinese, but they've never demanded that we put the --
(25) put the ballot in Chinese for them.

84

(1) Q. What's your understanding of why the MUD's --
(2) the ballot for MUD elections is printed in Spanish as
(3) well as English?
(4) A. Maybe there's a rule or statute on it.
(5) Q. Okay. Was that done, you know, out of concern
(6) to make sure that, you know, Spanish -- people who
(7) spoke better Spanish who lived in the MUD would be able
(8) to participate in the elections, do you know?
(9) A. I'm not aware of the background of that.
(10) Q. Okay.
(11) A. And, again, I'm thankful that some of our
(12) other minority residents don't demand that we put every
(13) language on the ballot. That would be very cumbersome.
(14) Q. Can I ask you, when did the MUD decide to
(15) authorize the institution of this lawsuit?
(16) A. I believe it was the summer of '06.
(17) Q. Okay. Was that at the May 2006 board meeting?
(18) A. It was discussed at the May meeting. I don't
(19) think we -- I don't think we moved forward until June
(20) or July.
(21) Q. Were you -- were you a board member when it
(22) was -- when the litigation was authorized?
(23) A. I don't think so. I think it was done when I
(24) was not on the board.
(25) Q. Do you know was it -- was it -- at the May

(Pages 79 to 84)

**85**

(1) 2006 meeting was it voted on whether to institute the
(2) litigation?
(3)     A. There was -- there was a vote and it was two
(4) for and two against, I believe.
(5)     Q. Okay. Who voted for and who against?
(6)     A. I voted for it, and I think Bill Ferguson
(7) voted against it -- or voted for it and the other
(8) two -- one of them was -- I think Karen Temborius was
(9) absent at that meeting.
(10)     Q. Could you look -- could you go back and look
(11) at the May 23, 2006 minutes? That is -- here it is,
(12) Exhibit 8. If you can look at the very first page, the
(13) second paragraph, the meeting was called to order by
(14) you, and the roll call was as follows. It says all
(15) board members were present except Karen Temborius. Is
(16) that --
(17)     A. Okay.
(18)     Q. Is that in accord with your recollection?
(19)     A. I think that's what I just told you, wasn't
(20) it? Yeah.
(21)     Q. And did Mr. Swarthout -- I hope I'm
(22) pronouncing that correctly -- and Mr. Frederickson vote
(23) against initiating litigation?
(24)         MR. COLEMAN: If you want to refresh your
(25) recollection.

**86**

(1)     Q. (By Mr. Wolfson) In particular if you want to
(2) refresh your recollection, a little bit on the next
(3) page there's a discussion of it in item 7 at the very
(4) bottom of the page and then a discussion at item 8 on
(5) the following page.
(6)     A. Okay. What's your question?
(7)     Q. Okay. So you -- you said that the vote was
(8) two to two.
(9)     A. Uh-huh.
(10)     Q. What were the -- can you tell me what the
(11) views expressed in were against instituting
(12) litigation?
(13)         MR. COLEMAN: Again I'll instruct the
(14) witness that executive session is privileged
(15) discussion. Anything in open meetings certainly you
(16) should reflect.
(17)         MR. WOLFSON: Can I just ask, is that a
(18) state law privilege for executive session putting aside
(19) attorney/client privilege?
(20)         MR. COLEMAN: Well, it's both a state law
(21) privilege and attorney/client.
(22)         MR. WOLFSON: If you could give me the
(23) information about what the non-attorney/client
(24) privilege is I would appreciate that.
(25)         MR. COLEMAN: Okay.

**87**

(1)     Q. (By Mr. Wolfson) Putting aside where your
(2) attorney has instructed you not to answer, can you tell
(3) me what views were expressed against instituting
(4) litigation?
(5)     A. They needed more information was the primary
(6) objection. They needed more information. That's what
(7) it came down to.
(8)     Q. What kind of more information did they need?
(9)     A. They wanted -- I'm trying to remember, but I
(10) don't think Mr. Coleman attended that meeting, so he
(11) was not able to explain what this was about. They had
(12) questions about possibly the cost to the district. I
(13) don't think they were clear on that either. They just
(14) had some general questions. So really it came down to
(15) they weren't ready because they needed more
(16) information, and I think they got that later. They
(17) voted unanimously to do it once they got all the facts
(18) they were looking for.
(19)     Q. Okay. And remind me again. Were you at the
(20) meeting where it eventually was decided to go forward
(21) with litigation?
(22)     A. I showed up late to that meeting as a -- you
(23) know, as a member of the public. I was not on the
(24) board.
(25)     Q. And was that -- was that decision made in

**88**

(1) executive session to go forward with the litigation?
(2)     A. No. It was voted on, you know, in the public,
(3) of course.
(4)     Q. Okay. All right. So you observed that vote?
(5)     A. Sure.
(6)     Q. All right.
(7)     A. And it was open to the public and we
(8) publicized it. We asked people to come.
(9)     Q. Were there -- did any member of the public --
(10) let's start with the original meeting in May. Did any
(11) member of the public express a position pro or con
(12) instituting litigation?
(13)     A. They had questions about the cost of it to the
(14) district. I don't remember if -- I had people call me.
(15) I don't know if they showed up at the meeting. And,
(16) again, I was late at that -- I was late, so I wasn't a
(17) witness to everything that went on. But -- and I
(18) didn't get many calls. Most of the inquiries I got
(19) were just questions about the cost to the district.
(20)     Q. Did any black or Hispanic persons speak up at
(21) the -- I'm talking about members of the public speak up
(22) about the litigation.
(23)     A. Not -- not that I saw. But I wasn't there for
(24) all the deliberations.
(25)     Q. Okay. Do you know was -- was any kind of

**89**

(1) public notice given that the MUD was considering going
(2) to court to seek a bailout of the Voting Rights Act?
(3)     A. Yes. It's on the agenda, public agenda that
(4) we post. It's posted online, and it's widely
(5) distributed in the neighborhood.
(6)     Q. Where was it posted online?
(7)     A. It's posted not only on my group but on the
(8) HOA internal Web site. The HOA has a Web site, and
(9) they post our stuff we give them.
(10)     Q. And if you could look at that -- those
(11) May 23rd, 2006 document, if you would look a few pages
(12) in there's something that is Bates number P 007531.
(13) It's a two-page document. After some formalities it
(14) says "notice is hereby given." And then actually
(15) there's a reference to this potential litigation in
(16) Item No. 7.
(17)     A. Right. The part No. 4.
(18)     Q. Right.
(19)     A. Uh-huh.
(20)     Q. Is this the public notice you, you know, were
(21) referring to?
(22)     A. This is the official public notice. It's
(23) filed at the courthouse, whatever they do.
(24)     Q. Okay. Filed at the courthouse. What do you
(25) mean?

**90**

(1)     A. Well, there's a requirement for filing public
(2) notices --
(3)     Q. Is this --
(4)     A. -- that we do for every meeting, every MUD
(5) meeting since the inception of the MUD.
(6)     Q. Is this the kind of public notice that would
(7) be put up on the drive-by board and so forth?
(8)     A. Well, the board announces meetings, and then I
(9) send out the agenda to the people who control the
(10) newsletter.
(11)     Q. Okay. Sorry. Is this what you're referring
(12) to as the agenda, this document?
(13)     A. Yes, this is the agenda, publicly posted
(14) agenda.
(15)     Q. Okay. Can you -- can you show me in Item
(16) No. 7 where it says that the board is considering
(17) seeking a bailout from the Voting Rights Act?
(18)     A. Well, that comes under the title of the -- the
(19) litigation or bailout I think was -- the bailout was
(20) part of avoiding litigation is my understanding. But I
(21) don't understand your question.
(22)     Q. Okay. I mean, what I'm trying to see is, I
(23) mean --
(24)     A. Nobody knows what bail -- if you just say
(25) bailout, who knows what that means. We're not lawyers.

(Pages 85 to 90)

ACUSCRIBE COURT REPORTERS
(800) 497-0277



**91**

(1) All right. The taxpayers are not lawyers. So --
(2) Q. What I'm trying to understand is -- that's a
(3) very good point. What I'm trying to understand is how
(4) a member of the public would know that the MUD was
(5) considering going to court to ask the court to declare
(6) that it is -- would no longer be required to comply
(7) with Section 5.
(8) A. You know, when I -- when I explain to my
(9) neighbors what this is about, I generally get
(10) glass-eyed looks. They're like, "What? Department of
(11) Justice, what?" And I explain, well, it comes from the
(12) 1964 civil rights law, you know. They're like, "What?
(13) We have to do that?" I mean, people are stunned that
(14) this is even an issue. So I have trouble getting these
(15) other complexities and bailouts and this and that
(16) because people are just dumbfounded that we're under
(17) this obligation in the first place.
(18) MR. WOLFSON: All right. Why don't we
(19) take a quick break, maybe five minutes, okay? Thank
(20) you.
(21) (Recess from 10:42 to 10:56)
(22) MR. WOLFSON: We are not sure if we're
(23) going to be able to finish, but I'm going to hand over
(24) the chair for a little bit to counsel for some other
(25) parties who would like the opportunity to ask you some

**92**

(1) questions. And hopefully we'll do what we can, all
(2) right?
(3) MR. HICKS: I think I can ask him my
(4) questions from here.
(5) MR. WOLFSON: All right. Can he be heard
(6) from there?
(7) MR. HICKS: Do you need me closer?
(8) THE REPORTER: If there's a problem I'll
(9) let you know.
(10) EXAMINATION
(11) QUESTIONS BY MR. HICKS:
(12) Q. I'm Renea Hicks, the attorney for Travis
(13) County, which is an intervenor here, and my questions
(14) are mainly going to be for clarification. Let me ask
(15) you to look first at Exhibit 8 -- that's the packet --
(16) and turn to the Bates numbered page that's 007528,
(17) about the third page in. And look up at the top at the
(18) first paragraph in the last sentence there. Just read
(19) that to yourself and then I have a question.
(20) A. Which -- sorry. Which paragraph?
(21) Q. The paragraph at the top that begins
(22) "regarding Item 8."
(23) A. Okay.
(24) Q. Look at the last sentence. Read that to
(25) yourself.

**93**

(1) A. Okay.
(2) Q. It's worded a little funny. It says it was
(3) reported that the resolution did such and such. Was it
(4) reported publicly that -- was the discussion public?
(5) A. This is an executive session, so my
(6) understanding is the executive sessions are not public.
(7) Q. But it says that the item about the lawsuit
(8) possibly authorizing institution of the litigation was
(9) not passed. Was the vote taken publicly?
(10) A. I believe it was. Uh-huh. All the discussion
(11) was private.
(12) Q. Okay.
(13) A. But I believe the vote was public.
(14) Q. That just wasn't -- so the vote that resulted
(15) in the two to two vote about whether to do the
(16) litigation was a public vote?
(17) A. Right. Uh-huh. Sure.
(18) Q. You had mentioned the Canyon Creek Church.
(19) What denomination is that church?
(20) A. Well, it had an affiliation with SBC, Southern
(21) Baptist Convention. I don't know if -- I don't think
(22) it's Baptist, but it's affiliated maybe with Baptist.
(23) It's a Protestant church.
(24) Q. Are there any other religious institution
(25) buildings inside the MUD's boundaries?

**94**

(1) A. There is one other potential place. There's
(2) St. Thomas More, I think it is, Catholic Church right
(3) off 620.
(4) Q. Is that inside the MUD?
(5) A. Neither one of these are in the MUD. There's
(6) no --
(7) Q. Okay.
(8) A. The school is the only public building inside
(9) the MUD.
(10) Q. And I'm going to go back to the school for a
(11) second. Can you -- Mister -- what's the gentleman's
(12) name whose house where the polling place was?
(13) A. Stueber, Jack Stueber.
(14) Q. Stueber. What was wrong -- you ran --
(15) basically part of your campaign, as I understand it,
(16) was it shouldn't be there, right, the polling place
(17) shouldn't be at --
(18) A. Should be at the school.
(19) Q. What was wrong with it being at his place?
(20) A. Well, it's inconvenient for somebody to have
(21) to locate this guy's house where they could just come
(22) to the school and vote for everything.
(23) Q. But why does that matter?
(24) A. Why does it matter?
(25) Q. Yes.

**95**

(1) A. Some of it is timing. I think I mentioned
(2) before I worked that polling place all day at the
(3) school and I told people, "Here is where you vote for
(4) the MUD." I gave them a map. I said, "Go down there,
(5) two blocks," gave them the address. And I had some
(6) people tell me, "I'm not going to somebody's house to
(7) vote."
(8) Q. Why did they -- what was your understanding of
(9) why that would be a problem?
(10) A. Well, for one thing, they came here to vote.
(11) They wanted to vote and be done with it. They had
(12) somewhere else they had to go. They didn't have time.
(13) Q. Was there anything about it being a private
(14) residence?
(15) A. Possibly. Maybe they didn't -- I don't know.
(16) Maybe they didn't feel comfortable going in somebody's
(17) garage. I don't know. You'd have to ask them.
(18) Q. But you had an understanding that it was -- it
(19) was a place that was both inconvenient and possibly
(20) uncomfortable for some people to go to, right, to vote?
(21) A. It's just inconvenient, probably inconvenient.
(22) Q. And so you wanted it -- the polling place
(23) moved to a more public building, right?
(24) A. Right.
(25) Q. And why did you want it moved? What was the

**96**

(1) underlying reason you wanted it moved from one place to
(2) another?
(3) A. To get more people to participate.
(4) Q. Because that's a good thing, right?
(5) A. It's a great thing.
(6) Q. And the polling place location matters?
(7) A. And it's not just the MUD. You know, I spent
(8) a lot of personal effort getting Round Rock ISD to add
(9) that same school as a voting location for the school
(10) board elections, because at that time in 2002 in May
(11) you couldn't vote for your school board elections at
(12) the school. You had to go to a different school. It
(13) was several miles away, and people said, "Forget it. I
(14) don't have time. I'm not going to vote."
(15) Q. So underlying this, as I understand it, is
(16) your feeling that as kind of the principle of democracy
(17) increasing voter turnout is a good thing?
(18) A. Great thing.
(19) Q. And the location of the polling place, as you
(20) understand it, can influence the level of voter
(21) turnout, correct?
(22) A. I think that makes sense, yeah.
(23) Q. Okay. Has the MUD ever annexed any territory?
(24) A. No.
(25) Q. Never?

(Pages 91 to 96)

97

(1)    A. No, never.
(2)      MR. COLEMAN: To your knowledge.
(3)      THE WITNESS: To my knowledge.
(4)    Q. (By Mr. Hicks) Okay. And do you know whether
(5) it has the authority to annex?
(6)    A. I think it does have authority to annex.
(7)    Q. Do you know whether there's ever been a board
(8) discussion or consideration of annexation?
(9)    A. Since I've participated in May 2002, there has
(10) never been a discussion to annex, never.
(11)    Q. And from what you know of the board's
(12) situation right now and the MUD's location right now,
(13) just -- I know you can only speak for yourself on this,
(14) but do you foresee or anticipate on the near horizon
(15) any need to annex?
(16)    A. No.
(17)    Q. Is the MUD entirely within a state
(18) representative district, a single state representative
(19) district?
(20)    A. Yes.
(21)    Q. What is the number?
(22)    A. House District 50.
(23)    Q. And who is the incumbent there now?
(24)    A. Mark Strama.
(25)    Q. I only have one more question. From your

98

(1) perspective, what is the reason for the MUD to continue
(2) to exist to this point? Why is it there?
(3)    A. It's there to pay off MUD bonds and to take
(4) care of a park, Trailhead Park. So we -- so we're
(5) there to administer the repayment of MUD debt and to
(6) take care of a park, manage the park, neighborhood
(7) park.
(8)    Q. The city of -- you're entirely within the City
(9) of Austin boundaries, right?
(10)    A. Yes.
(11)    Q. And the City of Austin could perform both
(12) those functions ultimately, couldn't they?
(13)    A. Well, there's certainly a duplication of
(14) service when it comes to parks because we pay property
(15) taxes to the city which should include park service,
(16) but we also have to pay MUD taxes and the MUD has to
(17) take care of the park.
(18)    Q. And what -- what's the situation with regard
(19) to the bond obligations in terms of the city? The city
(20) could take over that debt, correct?
(21)    A. Could take it over. We argue in a lawsuit
(22) they were required to take it over, but they refuse to
(23) take it over.
(24)    Q. That's the one that's pending in the Third
(25) Court of Appeals?

99

(1)    A. Yes, that's the one that's pending in the
(2) Third Court. Right.
(3)    Q. What is -- what is the size of that debt at
(4) this point?
(5)    A. I believe it's around 13 million.
(6)    Q. Total -- total debt?
(7)    A. Total debt.
(8)    Q. And what's the annual obligation as you
(9) understand it?
(10)    A. In the neighborhood of 800,000 a year.
(11)      MR. HICKS: I don't have any further
(12) questions.
(13)      THE WITNESS: Somewhere, you know, 800 to
(14) a million, somewhere around there. And, of course, it
(15) varies depending on when the bonds become due.
(16)    Q. (By Mr. Hicks) I do have one more question.
(17) Sorry. I just remembered it. If you had stopped you
(18) would have been okay. What I'm trying to find is the
(19) exhibit that has the agreement with the city to -- the
(20) election agreement. I've forgotten the exhibit number.
(21)      MR. COLEMAN: The '04 or the '06?
(22)      MR. HICKS: '06.
(23)      MR. COLEMAN: Exhibit 4.
(24)    Q. (By Mr. Hicks) It's Exhibit 4. And if you'll
(25) turn back to 009711, that's page 3 of the agreement.

100

(1) And it's item 2, the one that you had been questioned
(2) about earlier.
(3)    A. Uh-huh.
(4)    Q. And I wanted you to turn your attention to the
(5) concluding phrase, "Other than changes in joint
(6) election conducted under this agreement that directly
(7) affect the county," that part. I'm confused on what
(8) your understanding is of what that means the county's
(9) obligations are vis-a-vis the MUD's obligations of
(10) voting rights submissions as long as this agreement is
(11) in effect.
(12)    A. Well, I can't say it was ever clear to me who
(13) had what obligation.
(14)    Q. Right. I'm not asking if it's -- I'm asking
(15) your understanding as a board member now that this is-
(16) in effect what the county's obligations are vis-a-vis
(17) the MUD's obligations in terms of voting rights
(18) preclearance submissions at this point.
(19)    A. Let me just tell you simply what this means to
(20) me.
(21)    Q. Okay. That's what I want.
(22)    A. It's do what it takes to get the election
(23) moved from the house to the school.
(24)    Q. You mean you're telling --
(25)    A. And then -- and then to keep it at the school.

101

(1)    Q. You're telling the county that?
(2)    A. Yes.
(3)    Q. You're saying, "It's your job now, county"?
(4)    A. Yeah.
(5)    Q. So what obligations is your understanding
(6) under this does the MUD have? What areas would it have
(7) to obtain preclearance for it to have made election
(8) changes? Any?
(9)    A. We have -- we have an attorney that we hire to
(10) take care of those details, Frank Reilly.
(11)    Q. But do you have an understanding of what you
(12) have left to do under Section 5?
(13)    A. I don't have the specifics on that. I
(14) basically turn it over to my attorney and say, "Do what
(15) you need to do."
(16)    Q. Okay. What generally is your understanding?
(17) What do you have left to do? What does -- what
(18) obligations does the MUD have under Section 5 now, in
(19) your understanding, general, specific, whatever level?
(20)    A. Yeah. My understanding is I delegated it to
(21) the attorney to take care of it.
(22)    Q. No, I'm not asking who you delegated it to.
(23) I'm asking what your understanding is of what you have
(24) to do.
(25)      MR. COLEMAN: If any.

102

(1)    Q. (By Mr. Hicks) If any.
(2)    A. I personally don't do anything. I delegate it
(3) and I personally -- because I delegate it to the
(4) attorney, you take care of the details. I'm not going
(5) to get involved in the details.
(6)    Q. Let me ask it this way.
(7)    A. Okay.
(8)    Q. Since this agreement has gone into effect, has
(9) there been any board submission or board discussion of
(10) a submission of a Section 5 preclearance matter?
(11)    A. Well, it's gone through our attorney again.
(12)    Q. Okay. Well, has the attorney done anything
(13) for you with regard to submission since this agreement
(14) has gone into effect?
(15)    A. I'm not sure. I can't answer that. That
(16) would be Mr. Reilly that could answer that.
(17)    Q. But you don't recall any such thing?
(18)    A. No. I remember we had one in 2002 and I
(19) looked at that. It was a preclearance, but I don't
(20) remember. What was the date on this?
(21)      MR. COLEMAN: 2004.
(22)      THE WITNESS: Yeah. In '04? Gosh, I
(23) just don't have a recollection of it.
(24)    Q. (By Mr. Hicks) This agreement I think is
(25) 2006.

(Pages 97 to 102)

**103**

(1)         MR. COLEMAN: That's the 2006.
(2)         THE WITNESS: This is the '06, right?
(3) Yeah. I just don't remember. Again, it was whatever
(4) you got to do to make this work, go do it.
(5)    Q. Okay. Thank you.
(6)           EXAMINATION
(7) QUESTIONS BY MR. BECERRA:
(8)    Q. Good morning, Mr. Zimmerman. My name is
(9) Carlos Becerra, and I am one of the attorneys for
(10) MALDEF, and I just have a couple of questions just to
(11) kind of round out my notes, and so you'll have to
(12) excuse me if I jump around a little bit, but I need
(13) some clarification on a few things. I was a little
(14) confused as to the Potts & Reilly legal fees. You
(15) stated that the total to fill out -- or to seek a
(16) preclearance was a thousand dollars in legal fees; is
(17) that correct?
(18)    A. That was my recollection that that's --
(19)    Q. And why wasn't that lumped into the general
(20) legal fees?
(21)    A. It's just an accounting preference. I mean,
(22) general legal fees to me was the day-to-day stuff,
(23) day-to-day administration. The election comes around
(24) once every two years, so that's why we broke that out
(25) into special fees. We have a treasurer. I've never

**104**

(1) acted as the treasurer, and the treasurer makes those
(2) kind of determinations. I didn't make that direct
(3) determination.
(4)    Q. But you didn't negotiate your bill so that
(5) this submission would go under his day-to-day work?
(6)    A. No. I don't -- I guess you're asking a
(7) question I never -- I never thought of it that way. I
(8) think --
(9)    Q. I mean, you're a fiscal conservative.
(10) Wouldn't you want to save some money?
(11)    A. Sure. Sure. But I'm not a lawyer, so I don't
(12) know how lawyers work and how they bill. So I don't
(13) know what a, you know, general -- reasonable general
(14) fee is and what a special fee is. I'm not sure.
(15)    Q. Right. But wouldn't it make sense just to
(16) lump everything into the general fee as opposed to
(17) segregating it out and paying more or have the MUD pay
(18) more money for a submission like this?
(19)    A. Possibly. If I were a professional bean
(20) counter I could answer you better, but I'm not.
(21)    Q. You were asked also that certain people go to
(22) the homeowners association meetings, is that correct,
(23) that people attend the homeowners association? You've
(24) discussed that you attended the homeowners association
(25) meetings?

**105**

(1)    A. Sure, sure.
(2)    Q. I'm not sure, but you -- there was a line of
(3) questioning that African-Americans attend, Asians
(4) attend, Hispanics attend. I'm not sure you gave an
(5) estimate of the number of Hispanics who attend the
(6) homeowners association.
(7)    A. No, because like I said, I just don't
(8) categorize. I don't profile the visitors by race or
(9) ethnicity. I don't.
(10)    Q. Approximately how many total people attend the
(11) homeowners association meetings on a typical night?
(12)    A. They -- well, typical, but like I said, they
(13) have about four per year, and it can be anywhere from
(14) 50 to 150. It depends on what particular meeting it
(15) is. The biggest meeting is February of each year where
(16) they elect new board members. That's the biggest
(17) meeting of the year. The other meetings are typically
(18) smaller.
(19)    Q. Okay. So you're saying four meetings per
(20) year, 50 to 150 persons per meeting?
(21)    A. (Moving head up and down)
(22)    Q. Okay. And if you had to guess, if you -- if
(23) you were to estimate how many Hispanics attend those
(24) meetings, what would be that estimate?
(25)         MR. COLEMAN: If you can.

**106**

(1)         THE WITNESS: I just -- I just don't have
(2) a number. I think I've answered that already. I
(3) just -- I've never made mental notes of ethnicity of
(4) people that come.
(5)    Q. (By Mr. Becerra) You also mentioned that
(6) discrimination hasn't been a problem in the past in the
(7) MUD. Was that correct?
(8)    A. Yes.
(9)    Q. Yes or no. Okay.
(10)    A. Yeah, there's never been a problem.
(11)    Q. Could you foresee a situation where
(12) discrimination would be a problem in the future?
(13)    A. No.
(14)    Q. And why not?
(15)    A. It's never been an issue in the past and I can
(16) see no reason why it would ever be one.
(17)    Q. But wouldn't it be advantageous to have
(18) safeguards in place so that discrimination wouldn't be
(19) an issue?
(20)    A. No. If it's not needed, then it's not needed.
(21) It's not needed, so the answer is no, because it's not
(22) needed.
(23)    Q. Now, in your opinion are monolingual Spanish
(24) speakers not allowed to vote?
(25)    A. If you're a registered voter you're allowed to

**107**

(1) vote, and I think the state and counties regulate who
(2) is a registered voter. If you're registered to vote we
(3) want you to vote.
(4)    Q. Okay. But one of the qualifications to
(5) register to vote is that having the ability to speak
(6) English?
(7)    A. Well, it probably isn't.
(8)         MR. COLEMAN: Asks a legal conclusion.
(9)         THE WITNESS: Probably isn't a legal
(10) requirement because we do have the Spanish ballots. We
(11) do whatever the law complies.
(12)         MR. BECERRA: Thank you.
(13)           EXAMINATION
(14) QUESTIONS BY MR. HERREN:
(15)    Q. Hi, Mr. Zimmerman. My name is Chris Herren.
(16)    A. Hi, Chris.
(17)    Q. I'm an attorney with the Department of Justice
(18) in Washington. I had a few questions, and I'll
(19) probably skip around a little bit to try to answer a
(20) few things that I was confused about in your
(21) deposition. You ran for the MUD board in 2002,
(22) correct?
(23)    A. (Moving head up and down)
(24)    Q. And then you -- yes or no.
(25)    A. Yes. Yes.

**108**

(1)    Q. And then you ran for the state legislature in
(2) 2006?
(3)    A. Yes.
(4)    Q. Correct? Have you ever run for public office
(5) other than those two times?
(6)    A. I ran for precinct chair in republican party.
(7) I think that's all.
(8)    Q. What year was that?
(9)    A. 2002 and 2004.
(10)    Q. When you campaigned for the MUD board, when
(11) did you start your campaign?
(12)    A. Probably February of '02.
(13)    Q. And what sort of things did you do as part of
(14) your campaign for the board?
(15)    A. I printed about 50 yard signs, and I visited a
(16) lot of voters door to door, made a lot of acquaintances
(17) just going door to door talking about the MUD, and my
(18) primary issue was the double taxation. That was my
(19) primary interest.
(20)    Q. Did you go to any homeowners association
(21) meetings and discuss your platform? Did you do
(22) anything like that in the course of your campaign?
(23)    A. I don't think I made the February meeting of
(24) that year, so probably not, just because there was
(25) limited opportunity.

(Pages 103 to 108)

109

(1)    Q.  And so on Election Day in May you stood
(2)  outside the school you said and tried to make sure that
(3)  people knew that the MUD election was going on at the
(4)  same time?
(5)    A.  Yes.
(6)    Q.  And you tried to direct them to Mr. Stueber's
(7)  house?
(8)    A.  Yes.
(9)    Q.  What kind of success rate would you say you
(10)  had that you know of in getting people to go vote in
(11)  the MUD election and people to talk to?
(12)    A.  I think -- this is memory and I have the flu,
(13)  so I'm thinking the numbers were around 350 voters in
(14)  the city elections at the school, 350 to 400, somewhere
(15)  in that range, and I -- I got almost 300 votes.  So you
(16)  could see, you know, a definite drop-off, but still a
(17)  lot of people showed up.  And like I said before, my
(18)  next competitor was maybe less than half that many
(19)  votes.
(20)    Q.  Did you do any looking into the MUD, any kind
(21)  of investigation about what the MUD was about, what it
(22)  did, before you ran?
(23)    A.  Yes.  I attended several meetings, and I
(24)  reviewed the MUD consent agreement.
(25)    Q.  Where did you get a copy of that from, that

110

(1)  agreement?
(2)    A.  Where did I get that?  I don't remember.  I
(3)  don't remember where I got that.  Yeah, I don't
(4)  remember.
(5)    Q.  The MUD meetings that you attended, the board
(6)  meetings, where were they held?
(7)    A.  They were at a model home.  The neighborhood
(8)  was being developed and they had -- you know, builders
(9)  would have these model homes, so they had the meeting
(10)  in the model home at 7:30 in the morning or something.
(11)    Q.  One of the things I noticed in looking through
(12)  the minutes of the MUD board meeting was that you
(13)  changed the time to at night.
(14)    A.  Yes.
(15)    Q.  And what was the reason for that?
(16)    A.  Well, we found that we could get more people
(17)  to come if we had it in the evening.  People hated the
(18)  early morning meetings, and we would run out of time
(19)  frequently.  So by having it in the evenings we got
(20)  more people to come and then we could stay as long as
(21)  we needed to, you know, to get things done.
(22)    Q.  When I mention the name Perry Blanton, do you
(23)  know who that is?
(24)    A.  Never met him, but I'm acquainted with his
(25)  name.

111

(1)    Q.  Was he the developer of --
(2)    A.  He was one of the developers, yes.
(3)    Q.  And Captex, was that one of his companies?
(4)    A.  It could have been, but I don't have details
(5)  on that.
(6)    Q.  Did you ever go to any MUD board meetings that
(7)  were held at Captex?
(8)    A.  No.  Only at the model homes in the months
(9)  prior to the May election.
(10)    Q.  And Scott Storm, do you know who that is?
(11)    A.  Yes.
(12)    Q.  And was he the president of the MUD board
(13)  before you?
(14)    A.  Yes.
(15)    Q.  What was his relationship to the developer?
(16)    A.  He was -- I think he was a friend of Perry
(17)  Blanton's and they had worked professionally before.
(18)  He was also something of a builder/developer himself.
(19)    Q.  And what about the other members of the MUD
(20)  board at that time?  Did you have an impression about
(21)  what their relationship was to the developer?
(22)    A.  They were acquainted with the developer, you
(23)  know, loose relationship, but I didn't know that much
(24)  about them.
(25)    Q.  I notice that after you took over -- after you

112

(1)  your group took over the board and the MUD, one of the
(2)  first things you did was to change attorneys.
(3)    A.  Yeah.
(4)    Q.  That Ms. Collins was no longer retained.
(5)  Mr. Reilly was hired.
(6)    A.  Yes.
(7)    Q.  Why did you let Ms. Collins go?
(8)    A.  The main contention was -- the neighbors' and
(9)  my main issue in running was that we were being
(10)  illegally taxed.  It was our opinion that the city and
(11)  MUD tax were illegal combined, so we were considering
(12)  litigation because we had failed to get it resolved.
(13)  We got nowhere.  So I discovered when I studied the
(14)  documents that the attorney had signed a lawsuit
(15)  settlement saying she thought the consent agreement we
(16)  were under was legal under the Texas Water Code or that
(17)  it qualified as, you know, conforming to the Texas
(18)  Water Code.  And my opinion was that it violated the
(19)  Texas Water Code.  So I thought that if our attorney
(20)  would certify that it was good by the water code and we
(21)  felt that it was not, then we couldn't work together.
(22)    Q.  Did you have any impression about whether
(23)  there was some professional relationship or -- between
(24)  the developer and the attorney, Ms. Collins?
(25)    A.  Well, I think on that lawsuit settlement she

113

(1)  was the attorney for the developer at the time the
(2)  lawsuit was settled.
(3)    Q.  Was that the original lawsuit that the City of
(4)  Austin brought against --
(5)    A.  I believe it was, yeah.
(6)    Q.  -- the developer and relating to the creation
(7)  of the MUD?
(8)    A.  Correct.  And it was settled by the annexation
(9)  agreement and basically annexed the property in the
(10)  MUD, and then Austin dropped their lawsuit to allow the
(11)  MUD creation.
(12)    Q.  And so Ms. Collins was the attorney for the
(13)  developer you believe at the time?
(14)    A.  Yes.
(15)    Q.  One of the things that I noted in the minutes
(16)  of the meetings after you took over in 2004, in the
(17)  summer of 2004, it appeared there was a question
(18)  relating to an area called Shoal Creek that came up.
(19)  Do you recall it was in Mr. Eppright and Shoal Creek
(20)  development?
(21)    A.  Uh-huh.
(22)    Q.  And do you recall this at all?
(23)    A.  It may be that there was a development
(24)  proposed to adjoin the MUD and -- but it was not going
(25)  to be part of the MUD.  It was going to attach itself

114

(1)  to the MUD infrastructure for water and wastewater.
(2)  And there was some contention over that because we
(3)  wanted the MUD expanded to cover that area saying that
(4)  if he wanted to tie into the MUD infrastructure he
(5)  should help pay for the MUD infrastructure with that
(6)  area.
(7)    Q.  So essentially he was going to be using your
(8)  services but not paying any taxes?
(9)    A.  Not paying the taxes, exactly.  I think that's
(10)  what the case was about.
(11)    Q.  And I understand from reading the minutes that
(12)  there was a question about whether the City of Austin
(13)  was going to change the development status of this area
(14)  and that there was a hearing about that that you
(15)  attended, the City of Austin.
(16)    A.  Yes.
(17)    Q.  And did the city, in fact, allow this
(18)  development to occur?
(19)    A.  Yes.
(20)    Q.  And did the city act on your request?
(21)    A.  No.
(22)    Q.  At all?
(23)    A.  No.
(24)    Q.  So the MUD was not allowed to annex this area?
(25)    A.  We didn't do any annexation formal request,

(Pages 109 to 114)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

**115**

(1) per se. We were looking for cooperation from
(2) Mr. Eppright. We didn't want a -- a hostile
(3) annexation, and we never even attempted that. We were
(4) looking for fair cooperation and we didn't get it.
(5)     Q. But basically you went to the city and
(6) essentially asked, "We don't want to have him hook on
(7) to our system without paying"?
(8)     A. Without him paying like the people right down
(9) the street.
(10)     Q. Right. And nothing -- you didn't get anywhere
(11) with --
(12)     A. Nothing came of it.
(13)     Q. So that area was not annexed by the MUD?
(14)     A. No. It was annexed by the city, but not by
(15) the MUD.
(16)     Q. And would the city have to approve your effort
(17) to annex that area?
(18)     A. I believe so, yes.
(19)     Q. One of the things that I noted in the minutes
(20) of the meetings of the MUD board recently was a fair
(21) amount of discussion about a possible fourth amendment
(22) to the consent agreement with the City of Austin.
(23) There was various -- just about every meeting it
(24) seemed like there were various iterations of it. Do
(25) you remember that issue coming up?

**116**

(1)     A. Yes.
(2)     Q. Has that been executed? The fourth amendment
(3) to the consent agreement, has any version of that been
(4) executed?
(5)     A. It's -- it's been in for coming up
(6) on two years. And to summarize it, we were talking
(7) with Austin about giving up some of our MUD land in
(8) addition for a rebate on our water bills. That's just
(9) gone around and around and around, and I don't know
(10) where it is now. It was complicated because it
(11) involved the MUD, the city, and the developer, and it
(12) was just impossible to tell who's dragging their feet
(13) and holding it up. But we tried to get it done. I
(14) don't -- I still don't think it has been completely
(15) done.
(16)     Q. Would a possible consequence of any of these
(17) discussions that you had with the City of Austin be
(18) that the MUD might dissolve at some point?
(19)     A. Well, I think speaking as myself and most of
(20) the neighbors that I know, we -- we'd be okay with the
(21) MUD disappearing if the city would assume the debt.
(22) I'd be thrilled to see the MUD dissolve.
(23)     Q. This has often happened, hasn't it, when the
(24) city has annexed a MUD that the MUD will dissolve and
(25) the city will assume the debt? Has that not often

**117**

(1) happened?
(2)     A. Right. I mean, we feel they're obligated to
(3) do that under statute. If they're going to annex a MUD
(4) and take over the infrastructure, they need to take
(5) over the debt out of common sense, too.
(6)     Q. And this has been part of the discussions that
(7) have been ongoing at the city for quite some time?
(8)     A. It's part of the lawsuit, yeah, the one that's
(9) in the Third Court.
(10)     Q. At this point has the MUD issued all of the
(11) bonds that you expect that it's going to?
(12)     A. Yes.
(13)     Q. And so basically the structure is set up for
(14) the developer to be repaid --
(15)     A. Yes.
(16)     Q. -- for the work that he did in building out
(17) the utilities and everything?
(18)     A. Yes.
(19)     Q. There were some questions earlier about the
(20) election agreement with Travis County and the
(21) possibility that the precinct split had occurred that
(22) affected the MUD. If Travis County split the precinct,
(23) I mean, would you have any reason to be aware of that
(24) at all? Would you know that that had happened?
(25)     A. Like I said, I was very surprised to see that

**118**

(1) in the canvass, and -- I mean, nobody is going to look
(2) me up and tell me, you know. I'm not sure I understand
(3) your question, actually.
(4)     Q. Let me try again. Is that -- is the situation
(5) of dealing with voter precincts, voter assignments,
(6) something that you expect Travis County to deal with?
(7)     A. Sure. They deal with that.
(8)     Q. And that's not something the MUD board --
(9)     A. No. The MUD doesn't deal with that.
(10)     Q. And if there needed to be a Section 5
(11) submission sent to the Justice Department about that,
(12) is that something you would expect Travis County just
(13) to deal with that?
(14)     A. Well, I'd go on my attorneys' advice and they
(15) told us that it was something we had to do, so I don't
(16) know what the relationship is in terms of county and
(17) MUD or school district or anybody else that's covered
(18) by this. I don't know a lot of those details.
(19)     Q. But, I mean, if Travis County went out and
(20) made changes in its voter precincts all over the
(21) county, you would expect that's something that Travis
(22) County would deal with in terms of whatever legal
(23) requirements had to be satisfied?
(24)     A. Whatever they're obligated to do I would
(25) expect them to do it, yeah.

**119**

(1)     Q. And the Canyon Creek Elementary School where
(2) the MUD's elections are conducted, there are a bunch of
(3) other elections that are conducted there at the same
(4) time, correct?
(5)     A. Correct.
(6)     Q. And so there's the City of Austin elections.
(7) There's school board elections. There's --
(8)     A. Now there are, yeah.
(9)     Q. Yeah. If, for example, the situation that you
(10) described, the hypothetical situation you described,
(11) there was a fire at the school, it would affect all of
(12) those other elections as well, right?
(13)     A. Yes.
(14)     Q. And would you expect that Travis County or the
(15) City of Austin would deal with that since their
(16) elections are affected, as well?
(17)     A. I would think they would deal with it for
(18) their election, yes.
(19)     Q. But --
(20)     A. Not necessarily everybody else.
(21)     Q. But all of the elections are loaded into the
(22) same machine, right? They're loaded into a hard eSlate
(23) voting machine, right?
(24)     A. Yeah. We made requests for that, yes.
(25)     Q. And so they're all in the same ballot; is that

**120**

(1) correct?
(2)     A. Correct.
(3)     Q. All those different elections are in the same
(4) ballot. So that if -- if the elections had to be
(5) moved, for example, for some reason, like a fire --
(6)     A. Uh-huh.
(7)     Q. -- all of the elections would be moved you
(8) would assume to the same place?
(9)     A. Well, I don't know that that's a safe
(10) presumption because all that's needed is a letter from
(11) the county and it says, "Oh, gee, by the way, we
(12) weren't able to get your election moved. We tried. We
(13) didn't hear back from DOJ," blah, blah, blah, and then
(14) we're dropped off. Do they have a statutory
(15) requirement to make sure ours -- I wouldn't presume
(16) that, that they have a requirement to make sure we're
(17) moved with everybody else.
(18)     Q. Well, if I told you, for example, that Travis
(19) County prior to the election made a submission of
(20) hundreds of polling place changes, would you have any
(21) reason to disagree with that?
(22)     A. I don't have any information on that.
(23)     Q. You don't have any knowledge?
(24)     A. Yeah, I don't know how that works.
(25)     Q. And that's not something you ordinarily would

(Pages 115 to 120)

121

(1) keep up with?
(2)   A.  No. No.
(3)   Q.  But if all -- if all the elections that are
(4) conducted in May are loaded into one machine, the
(5) eSlate machine, and Travis County were to pick up those
(6) machines and move them somewhere else, your election
(7) would be in that machine, would it not?
(8)   A.  I'd like to make that presumption, but I've
(9) been wrong on presumptions before.
(10)   Q.  Give me just one moment. One of the things
(11) that I noted in looking through the minutes of the MUD
(12) board meetings was that there's a fair amount of
(13) regulatory issues that the MUD has to deal with; is
(14) that right?
(15)   A.  Yes.
(16)   Q.  There is an endangered spider, for example,
(17) that is in one of the conservation areas around the
(18) MUD; is that right?
(19)   A.  There is a cave spider, yes, and a
(20) golden-cheeked warbler, all three of them.
(21)   Q.  And do you have to deal with the Department of
(22) Fish and Wildlife on that issue?
(23)   A.  Yes.
(24)   Q.  And there's a permit that governs what can be
(25) done in that area?

122

(1)   A.  Yes.
(2)   Q.  And so any changes that you make to the green
(3) space areas you have to deal with some kind of
(4) regulatory issue?
(5)   A.  Yes.
(6)   Q.  And there are various requirements under state
(7) law that you have to do an audit every year of the MUD
(8) board's finances, for example?
(9)   A.  Yes.
(10)   Q.  And to get approval to do bond issues you have
(11) to go through the State of Texas?
(12)   A.  Yes. Through the attorney general and through
(13) Austin, of course, Austin city.
(14)   Q.  And there is a fair amount of expense to the
(15) MUD for doing that sort of thing, is there not?
(16)   A.  Yes.
(17)   Q.  You have to pay the lawyers --
(18)   A.  Yes.
(19)   Q.  -- bond consultants, investment bankers, that
(20) sort of thing?
(21)   A.  Yes.
(22)   Q.  You indicated that you grew up in Texas; is
(23) that correct?
(24)   A.  Yes.
(25)   Q.  In the time that you lived in Texas have you

123

(1) ever noted any issues about racial discrimination?
(2)   A.  Could you be a little more specific?
(3)   Q.  In the time that you have lived in Texas, have
(4) you observed or heard about any issues about racial
(5) discrimination in the State of Texas?
(6)   A.  You mean heard about reading newspaper stories
(7) or --
(8)   Q.  From any source.
(9)   A.  I'm going to say no. No, I haven't. I don't
(10) have any recollection.
(11)   Q.  If I could ask you what year were you born.
(12)   A.  1960.
(13)   Q.  In the time that you have been living in Texas
(14) on and off since 1960, I mean, do you have an opinion
(15) about whether there has been any racial discrimination
(16) in Texas?
(17)   A.  I'm not aware of any, no.
(18)   Q.  I don't think I have anything else. Thank
(19) you.
(20)       MR. KORBEL:  I've got a couple of
(21) questions.
(22)           EXAMINATION
(23) QUESTIONS BY MR. KORBEL:
(24)   Q.  George Korbel, representing the
(25) defendant-intervenors Garcia.

124

(1)   A.  Hi, George.
(2)   Q.  How are you?
(3)   A.  I've been better.
(4)   Q.  Well, you never want to deal with lawyers when
(5) you're sick. Couple of questions I've got. You said
(6) that the current bond indebtedness is $13 million,
(7) about?
(8)   A.  Rough number, uh-huh.
(9)   Q.  And who is that owed to?
(10)   A.  Municipal bondholders who buy the bonds.
(11)   Q.  Okay.
(12)   A.  Institutional or private investors.
(13)   Q.  And is there -- is there a single
(14) institutional investor or are there multiple ones?
(15)   A.  I don't know. I don't know what the ownership
(16) of the bonds is.
(17)   Q.  What would the date that the -- let's say the
(18) Austin -- you're not successful in your litigation and
(19) Austin doesn't do what it's supposed to do. When would
(20) you imagine that the bonds would be paid off?
(21)   A.  I believe the number is 2028.
(22)   Q.  2028. And when those bonds are paid off,
(23) would you anticipate that the MUD would be wound up and
(24) closed down?
(25)   A.  Yes, dissolved.

125

(1)   Q.  How many homes are there in the MUD now?
(2)   A.  There's around 12- to 1300. There's still a
(3) little build-out going on, but it's 98 percent
(4) complete.
(5)   Q.  98 percent. So how many, about, homes would
(6) you expect would eventually be in the MUD?
(7)   A.  I think the number I saw was 1,325, something
(8) like that.
(9)   Q.  And when you bought your house, were you aware
(10) of the bonds that were owed?
(11)   A.  Yes.
(12)   Q.  Okay. And did anyone ever tell you what your
(13) share of those bonds were when you bought the house?
(14)   A.  It wasn't explained in that detail to me. It
(15) was -- you know when you close on a house and you got a
(16) stack of 50 papers.
(17)   Q.  I know, I know.
(18)   A.  You know, that's Paper No. 38. Just sign it,
(19) sign it, sign it.
(20)   Q.  Do you know now what your share of the -- of
(21) the cost to paying off those bonds is?
(22)   A.  Not specifically, no.
(23)   Q.  Do you have an idea, a range that that would
(24) be in?
(25)   A.  No, I don't. I haven't run numbers like that.

126

(1)   Q.  Are the bonds assessed on the basis of lot
(2) size or front footage or value of the house or how are
(3) the --
(4)   A.  It's an ad valorem tax that's assessed.
(5)   Q.  Ad valorem?
(6)   A.  Yes.
(7)   Q.  So that's based on the value --
(8)   A.  Value of the home.
(9)       MR. COLEMAN:  Make sure you let him
(10) finish.
(11)       THE WITNESS:  I'm sorry.
(12)       MR. KORBEL:  I'm sorry?
(13)       MR. COLEMAN:  I just wanted to make sure
(14) that you were finishing the question.
(15)       THE WITNESS:  He's right. I'm just
(16) trying to get done faster. I'm sorry.
(17)   Q.  (By Mr. Korbel)  No, no. I understand. Now,
(18) when the board -- when the MUD was initially created
(19) there was an election to create the MUD? Yes?
(20)   A.  Yes.
(21)   Q.  Okay. And do you recall how many people voted
(22) in that election?
(23)   A.  Yes.
(24)   Q.  How many?
(25)   A.  One.

(Pages 121 to 126)

ACUSCRIBE COURT REPORTERS
(800) 497-0277



**127**

(1) Q. All right. Do you know who that one person
(2) was?
(3) A. No. I never got the name of the person. It
(4) could have been Clyde Copus. I don't know. It's
(5) probably one of those initial property owners that
(6) bought the land. I don't know who that was.
(7) Q. Would I be correct in assuming that the --
(8) that the person who voted was one of the owners of the
(9) property?
(10) A. The owner of the property.
(11) Q. Or the developer?
(12) A. Or the developer.
(13) Q. And when you had a -- when they had a one-vote
(14) election, that was 100 percent turnout, wasn't it?
(15) A. There you go. 100 percent. It's downhill
(16) from there.
(17) Q. And part of that election was the issuance of
(18) the bonds, wasn't it? Is that correct?
(19) A. Yes. Yes.
(20) Q. And also the election of the first board?
(21) A. I don't know how that came in -- yeah, I
(22) don't know the specifics on the first board. I think
(23) maybe the first board was appointed. I'm not -- I
(24) think it was appointed.
(25) Q. In any event, the first election created the

**128**

(1) MUD and issued the bonds, correct?
(2) A. They authorized.
(3) Q. The issuance of bonds?
(4) A. Issuance of bonds.
(5) Q. And those are the bonds that you're paying off
(6) right now?
(7) A. Yes.
(8) Q. As a result of that one vote?
(9) A. Yes.
(10) Q. The developer's one vote?
(11) A. Yes. Basically, yes.
(12) Q. Where did -- was it your idea to file this
(13) lawsuit?
(14) A. I think it's safe to say I spearheaded the
(15) effort. You're talking about the lawsuit against --
(16) Q. Sure.
(17) A. -- Austin or the lawsuit --
(18) Q. The MUD lawsuit that we're taking your
(19) deposition for right now.
(20) A. I probably spearheaded both efforts, the one
(21) against the City of Austin and the one here on the
(22) preclearance.
(23) Q. And who told you about the -- what could be
(24) done with this litigation, the litigation dealing
(25) with the Voting Rights Act? Who told you about that?

**129**

(1) A. Told me about?
(2) Q. Who advised you on the filing of this lawsuit?
(3) A. Well, I asked Mr. Coleman, of course, for some
(4) advice about it. I was very, very pleased with his
(5) work on the Austin illegal taxation suit. I was very
(6) impressed, so he was a logical source to go to for
(7) questions on this preclearance.
(8) Q. I think that's all I've got. Thank you.
(9) A. Thank you.
(10) (Discussion off the record)
(11) EXAMINATION
(12) QUESTIONS BY MR. ADEGBILE:
(13) Q. Good afternoon, Mr. Zimmerman. I'm Debo
(14) Adegbile, the NAACP Legal Defense and Educational Fund,
(15) and I represent the Louis intervenors in this action.
(16) I have a series of questions for you, some based on
(17) your testimony to this point and some on new topics.
(18) We'll do the best we can to make as much progress as we
(19) can. You've been very patient.
(20) Can you describe to me how many
(21) communications you -- well, first, how many
(22) communications have you had with the Louises?
(23) A. I think I met them first in May 2002 at the
(24) polling place, and he was very, very supportive of what
(25) I was doing at that time, and he gave me his e-mail

**130**

(1) address, so I put him on the mailing list, e-mail list
(2) for the neighborhood. And I probably called him or
(3) seen -- run into him four or five times in a period of
(4) four years, four to five years, maybe once a year.
(5) Q. Do you know Mrs. Louis?
(6) A. Just by acquaintance, just kind of run into
(7) her. I've never been to their house, talked to them
(8) in-depth.
(9) Q. Have you had any conversations with Mrs. Louis
(10) about your activities for the MUD or other issues?
(11) A. I think I talked to Rodney most of the time.
(12) I don't remember talking to her. I don't have any
(13) specific recollection.
(14) Q. With respect to the conversations that you've
(15) had with Mr. Louis, the first one was at the polling
(16) place when you met him and he volunteered his name for
(17) the Yahoo group list about which you've testified.
(18) A. Uh-huh.
(19) Q. And you said that he was very supportive of
(20) your work. Was that specifically with respect to the
(21) tax issue?
(22) A. Yes. Uh-huh. And the polling place.
(23) Q. And the polling place issue. You had
(24) conversations with Mr. Louis about moving the polling
(25) place?

**131**

(1) A. Well, it was on my little campaign brochure.
(2) It was one of my planks for running, is to move the
(3) election to the school.
(4) Q. And what views did he express with regard to
(5) the polling place?
(6) A. He says great idea. I showed him -- like I
(7) said, I had a map on it and showed him where to go and
(8) he goes, "I'm there." And I saw him drive down there.
(9) I'm sure he went down there and voted when I gave him
(10) the map and showed him where to go.
(11) Q. And when you say you showed him where to vote,
(12) you were showing him the garage?
(13) A. Uh-huh.
(14) Q. Directing him to the garage?
(15) A. Yes.
(16) Q. And so at that point is it fair to say that he
(17) didn't know where he was supposed to vote?
(18) A. That's probably fair to say.
(19) Q. And so you aided him in finding the polling
(20) place --
(21) A. Yes.
(22) Q. -- for that particular election?
(23) A. Yes. Him and hundreds of others.
(24) Q. The conversations that you had with Mr. Louis
(25) over the course of the four or five years after you met

**132**

(1) him, do you remember the specific topic that any of
(2) those addressed?
(3) A. I think the last time I talked to him was
(4) about my state rep campaign. I think I gave him a call
(5) on that, and I asked him to put out a campaign sign for
(6) me.
(7) Q. And what did Mr. Louis say?
(8) A. I think he agreed to do it, what I remember.
(9) Q. Did you ever take any steps to see if the
(10) campaign sign was on his property?
(11) A. There was one there for a short time and then
(12) it went down. I mean, sometimes vandals take them
(13) down. Sometimes -- I don't know. It was there for a
(14) while. I had -- I had a bunch of signs on his street,
(15) and I had problems with vandals removing them.
(16) Q. Is that a common problem, that the signs get
(17) taken down in the MUD political zones?
(18) A. It's common everywhere. I don't think it's
(19) any better or worse in our neighborhood than anywhere
(20) else.
(21) Q. Is it typical for people that are seeking
(22) office in the -- to represent the MUD to place campaign
(23) signs on lawns and the like?
(24) A. I might be the only person that has done it
(25) since I've been there, since I ran in 2002. I don't

(Pages 127 to 132)

---

133

(1) remember seeing other signs for MUD official.
(2)     Q. How about officials that represent the MUD but
(3) are part of a larger body, so, for example, state rep
(4) candidates, other state rep candidates?
(5)     A. Sure. State reps, yeah, sure, they post
(6) signs. Mark Strama had a bunch of signs.
(7)     Q. Aside from your conversations -- sorry. Were
(8) there any other conversations with Mr. Louis aside from
(9) the conversation at the polling place and the
(10) conversation in which you solicited his support in the
(11) context of placing a campaign sign on his lawn? Do you
(12) remember the specific content of any other conversation
(13) with Mr. Louis?
(14)     A. No. Probably have small talk things, what I
(15) can remember.
(16)     Q. Was there any other topic discussed in the
(17) conversation when you called him to see if he would
(18) place a sign out for you?
(19)     A. I don't think so. I don't remember. I'm
(20) trying to think when that was. That might have been
(21) about a year ago, February or March maybe. I don't
(22) remember.
(23)     Q. And is it your understanding that that was the
(24) last conversation that you had with --
(25)     A. I think so. Uh-huh.

134

(1)     Q. And would the last conversation that you had
(2) with Mrs. Louis be prior to or after that time?
(3)     A. Prior to, but I don't -- I don't remember -- I
(4) would never call her directly for anything. If I
(5) called her home phone and she answers maybe I'd talk to
(6) her.
(7)     Q. And why is that, that you never called her
(8) directly?
(9)     A. No particular reason. Just that I met Rodney
(10) when he came to the polling place. I think he was by
(11) himself that day. I don't think she was -- I don't
(12) think she was there the first time I met him.
(13)     Q. Do you recall offhand whether the e-mail that
(14) they have on your list is to both of them or one or the
(15) other?
(16)     A. Yeah, I don't remember. I don't remember.
(17)     Q. Have you seen Mr. Louis at any board meetings?
(18)     A. That's a good question. I don't -- I don't
(19) remember. He may have been to one, but I just don't
(20) remember. I know I've invited him. He's on my
(21) invitation list. I always invite him to come. I
(22) invite everybody to come.
(23)     Q. When you say you invite everybody to come, is
(24) that invitation limited to the people on your list or
(25) is there some broader step that you take to invite

135

(1) everybody to come to meetings?
(2)     A. I forward to my list and these are people that
(3) I know vote. I focus on voters mainly because they're
(4) the most likely to vote again. And then I ask them to
(5) forward, "Please, forward this to everybody you know,
(6) all your friends and neighbors. Tell everybody to
(7) vote."
(8)     Q. And that second piece, the asking the
(9) recipients to spread the -- spread the news is
(10) consistent with your efforts to increase voter
(11) participation within the MUD?
(12)     A. Yes.
(13)     Q. Do you recall any specific conversations that
(14) you've had with other intervenors in this lawsuit, the
(15) Diazes, for example?
(16)     A. They came -- I think he came to a meeting
(17) maybe in August or so and I believe -- I believe Greg
(18) was there, and he answered some of his questions. And
(19) before that I knocked on his door and asked for his
(20) vote for something, but I don't think the lawsuit had
(21) been filed at that point. So I don't -- and I think I
(22) left messages for him, as well, to talk to him about it
(23) before he was named as an intervenor, and he didn't
(24) return my call, so --
(25)     Q. When you say you attempted to leave -- or that

136

(1) you left a message for Mr. Diaz to talk to him about
(2) it, is the "it" this lawsuit?
(3)     A. Right. Right. This is when -- when he came
(4) to the meeting, public meeting, he asked some questions
(5) and we -- we had some discussions and I phoned him -- I
(6) think I phoned him a few days later to say, "Have you
(7) got any more -- do you have any more questions or
(8) anything else you need to know?" I don't think he was
(9) involved at that time. I had no knowledge that he was
(10) involved in anything at that time. And he -- and I
(11) didn't hear back from him.
(12)     Q. Did you make similar calls to anybody else to
(13) speak to them about the issues involved in this
(14) lawsuit?
(15)     A. I think people who showed up at the meeting --
(16) you know, we usually take names down of people that
(17) show up at the meeting, so if somebody had a lot of
(18) questions I may have called back one or two other
(19) people or just to call to say, "Have you got any more
(20) questions," if they expressed a lot of interest. Most
(21) people didn't express interest.
(22)     Q. Do you have any -- how did you know the people
(23) that you were to call back? Did you make any notation
(24) on the -- on the list of attendees or would there be
(25) any writing that reflects the people that you put in

137

(1) calls to?
(2)     A. I was already acquainted with them from prior
(3) voting. They were people that had showed up to vote,
(4) so I was already kind of loosely acquainted with them.
(5)     Q. So you knew them by name? At the time that
(6) they rose to raise an issue you recognized --
(7)     A. Yeah, I recognized them.
(8)     Q. Approximately how many people spoke at the
(9) meeting that you're describing?
(10)     A. Oh, man.
(11)     Q. Specifically on this issue of the litigation.
(12)     A. So are you talking which meeting, I guess?
(13) Because we had --
(14)     Q. Well, let me ask you that question just so we
(15) can clarify for the record. The meeting that you're
(16) describing at which Mr. Diaz addressed the board
(17) occurred when?
(18)     A. July or August. I would say it was late
(19) summer. The meeting in May where this first came up
(20) was in May of 2006, and there were very few people. I
(21) don't remember if anybody talked about it. And then I
(22) left the board, and I was not at all those meetings. I
(23) think I missed one of them and I was late to another
(24) one. And then when I got appointed back on, then, of
(25) course, I was present. So I think when Mr. Diaz came

138

(1) was probably after I had gotten back on the board, and
(2) I believe that's when Greg came. We put out a broad
(3) notice, asked everybody to come, and Greg explained to
(4) them what we were -- what we were doing.
(5)     Q. So based on your earlier testimony, the period
(6) during which you were not on the board was roughly May
(7) to August?
(8)     A. June, July -- June and July and possibly
(9) August. I wish that -- I just don't remember when I
(10) got back on if it was August or September.
(11)     Q. That's all right. I'm just asking for your
(12) best recollection. And the communication with Mr. Diaz
(13) was after you had been appointed to fill the vacancy of
(14) the board member who had left the MUD?
(15)     A. I believe so, yes.
(16)     Q. At the time that the board member left the MUD
(17) did she sell her home?
(18)     A. Yeah, I think so. Yes. I think she sold her
(19) home and that's why she had to resign, because once you
(20) sell your home you're not a resident in the district so
(21) you can't be a MUD board director.
(22)     Q. And --
(23)     A. Or property owner. Sorry. Property owner in
(24) the district.
(25)     Q. What information had you intended to convey to

(Pages 133 to 138)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

139

(1) Mr. Diaz when you called him?
(2) A. I wanted to ask him if he had any questions or
(3) issues.
(4) Q. What was your understanding of the questions
(5) or issues that he raised with the board at the meeting?
(6) A. I don't think he understood what the
(7) preclearance was about, and most of the people in the
(8) neighborhood have trouble understanding what this is.
(9) And when you talk about the background, you know, that
(10) this came out of a Civil Rights Act of 40-something
(11) years ago, they express a lot of surprise that this is
(12) in effect and in our neighborhood today. They are very
(13) surprised at that.
(14) Q. Were there steps taken at the meeting to
(15) clarify what you perceived to be Mr. Diaz's lack of
(16) information about Section 5?
(17) A. Oh, yeah, yeah. I thought it was very well
(18) explained.
(19) Q. Would that have been by --
(20) A. By Mr. Coleman.
(21) Q. By Mr. Coleman?
(22) A. Uh-huh.
(23) Q. Do you recall what Mr. Coleman said to
(24) Mr. Diaz?
(25) A. A lot of things we've talked about here, that

140

(1) we thought it was a burden, that we shouldn't have to
(2) pay legal fees to do this, you know, there's never been
(3) an issue in the neighborhood of discrimination, you
(4) know, and that we should be exempted from this because
(5) there's never been any hint of any discrimination in
(6) the neighborhood, so we shouldn't be required to do it.
(7) Q. Did you have an impression of whether or not
(8) Mr. Diaz appeared satisfied with the proffered
(9) explanation?
(10) A. I thought he may have still had some questions
(11) leaving, but -- that's why I wanted to talk to him.
(12) Q. Do you remember the specific names of the
(13) other people that you called?
(14) A. You know, if you had a list of attendees, I
(15) would help, you know, from that particular meeting; I
(16) could probably remember. But I can't remember off the
(17) top of my head.
(18) Q. Could you clarify for me when you said that
(19) you called Mr. Diaz? Are you speaking about Gabriel
(20) Diaz or David Diaz?
(21) A. David. David Diaz.
(22) Q. Was -- do you know Gabriel Diaz?
(23) A. I don't think so. I think he moved into the
(24) neighborhood sometime later, but David and Lisa Diaz
(25) were -- I think that's his wife's name, but I just

141

(1) remember meeting them at the polling place, and I took
(2) their e-mail down. They're one of the people I took an
(3) e-mail for.
(4) Q. So although you undertook to answer questions
(5) that MUD residents may have had that you observed at
(6) the meeting, you didn't have any further conversations
(7) with any MUD members about the litigation?
(8) A. No, not the ones that showed up there. Well,
(9) there was Rob Kempf, I think. He's my next-door
(10) neighbor. I think he came, and I think I talked to him
(11) about it. And there hasn't been -- there just hasn't
(12) been any angst -- much angst on this one way or
(13) another. I'm kind of surprised to be here. No one has
(14) had strong feelings on this either way. Most of my --
(15) the people I talk to are like, "Yeah, this is a waste
(16) of our money. We shouldn't have to do this. Let's get
(17) rid of it."
(18) Q. Prior to the initiation of this lawsuit did
(19) the Section 5 preclearance requirements cause angst to
(20) the board or the MUD?
(21) A. A lot of people didn't understand what it was
(22) about, so they were dispassionate about it because they
(23) didn't understand what it was about.
(24) Q. Did the board understand what it was about?
(25) A. Well, I was the one that dug into it, and when

142

(1) I looked at this and saw, "You know what? This doesn't
(2) make any sense," in my opinion this makes no sense for
(3) our neighborhood, and I contacted Mr. Coleman and then
(4) we started to -- I started the conversations on it with
(5) the board members, and they were a little surprised
(6) about this. Of course, they knew about it from the
(7) 2002 time frame. When we moved the election to the
(8) school there were some questions that came up on why we
(9) have to do this. But it wasn't until '04 that I said,
(10) "You know what? This looks like something we would
(11) object to. I don't want us to be under this burden."
(12) Q. And in your estimation you couldn't -- you
(13) can't conceive of any value added that the Section 5
(14) preclearance requirement might provide to a
(15) jurisdiction?
(16) A. I think it adds no value to our neighborhood.
(17) And, in fact, it could cause some harm.
(18) Q. And the harms would be the harms that you
(19) alluded to earlier?
(20) A. Yes.
(21) Q. Delay, cost. Were there -- were there others?
(22) A. Delay and cost mainly.
(23) Q. But also your philosophical difference with
(24) the notion that the federal government would purport to
(25) regulate the states in some way?

143

(1) A. That's a personal reason for me. You know,
(2) that's a personal thing, but yeah.
(3) Q. What percentage of the MUD board's business
(4) revolves around compliance with state law mandates,
(5) roughly? Obviously you can't come up with a perfect
(6) figure.
(7) A. Say that again. I'm not --
(8) Q. Sure. How much of the time that the board
(9) MUD -- MUD board -- I don't have the flu. I can't use
(10) that excuse. I apologize. How much of the time that
(11) the MUD board spends is involved in complying with
(12) state law mandates?
(13) A. Maybe a third of the time.
(14) Q. What would be your sense of how much is spent
(15) on compliance with federal law mandates?
(16) A. Probably 5, maybe 5 percent of the time.
(17) Q. And what percentage of that 5 percent would be
(18) involved in Section 5 compliance?
(19) A. Maybe 1 or 2 percent.
(20) Q. And what percentage would be other voting
(21) requirements?
(22) A. Probably about the same percentage.
(23) Q. Prior to the time at which you started raising
(24) the issues of preclearance, is it fair to say that
(25) Section 5 compliance was not a substantial aspect of

144

(1) MUD board business?
(2) A. That's -- that's fair to say. We had other
(3) fires to put out.
(4) Q. And --
(5) A. Most of our effort legally was on the illegal
(6) taxation lawsuit.
(7) Q. How does the -- how has the MUD in the past
(8) identified voting changes that required submission for
(9) preclearance? How do you know when something
(10) triggers --
(11) A. We consult our attorney, Frank Reilly, for
(12) instance. You know, we don't know.
(13) Q. And is it the case that Frank Reilly attends
(14) all MUD board meetings?
(15) A. Yes.
(16) Q. And the compliance regime then is that he's at
(17) the meetings, the official meetings of course, MUD,
(18) and if something rings that voting change bell you rely
(19) on Frank Reilly to say, "This presents an issue that we
(20) should consider"?
(21) A. Correct. And there really aren't any changes.
(22) I mean, the lines are -- the neighborhood is defined
(23) and the streets are kind of laid out, and everybody
(24) knows what's going to happen.
(25) Q. So --

(Pages 139 to 144)



145

(1)   A.  No changes.
(2)   Q.  So historically there have not been very many
(3)  voting changes in the MUD?
(4)   A.  I don't think there have been any -- any
(5)  voting changes, per se.  I mean, we had the one polling
(6)  place thing, but it's a boring neighborhood.
(7)   Q.  And looking into the future do you anticipate
(8)  many voting changes in the future?
(9)   A.  I don't anticipate any voting changes.
(10)   Q.  Does it raise a question for you about whether
(11)  it's worth investing time in litigation to be relieved
(12)  of a statutory requirement that is unlikely to impact
(13)  the MUD?
(14)   A.  I think if we can get rid of even one
(15)  unnecessary burdensome expense, I think it's a great
(16)  thing to do.
(17)   Q.  Are there other requirements that the federal
(18)  government imposes on state and local governments that
(19)  you think are unnecessary?
(20)   A.  Well, they've passed thousands of laws and I
(21)  haven't read them all, so I don't know yet.
(22)   Q.  Are there any that jump out at you?
(23)   A.  Not right now.
(24)   Q.  How about antidiscrimination laws generally?
(25)   A.  Can you be more specific?

146

(1)   Q.  Do you have a view about employment
(2)  discrimination laws?
(3)   A.  No.  I'm indifferent.  I mean, we comply with
(4)  all laws.  I don't have any feelings about it.
(5)   Q.  And the issue with respect to the spider and
(6)  the warbler that the MUD has faced, is that in the
(7)  province of a federal mandate?
(8)   A.  Yes.  And there has been some problems with
(9)  that.  We used the space for pedestrian hiking trails,
(10)  and the city forced the developer to erect some
(11)  barriers, stopping people from walking through the
(12)  land, that they had done since the neighborhood was
(13)  found.  So that's what involved us with Fish and
(14)  Wildlife and the city on that aspect.
(15)   MR. COLEMAN:  Renea knows I tried to help
(16)  Jim George on that.
(17)   MR. HICKS:  That's right.  My former law
(18)  partner.  I'd tell him I hope he loses.
(19)   THE WITNESS:  You know, the answer to
(20)  this is we stumble into these things.  I mean, I had no
(21)  idea what preclearance was.  You know, we stumble into
(22)  it.  And then we were trying to get -- we were walking
(23)  behind our greenbelt behind our houses, and suddenly
(24)  fences go up and we start hearing about Section 7(d)
(25)  permits from Fish and Wildlife, and your head just

147

(1)  wants to explode, all this bureaucracy and hassle.  We
(2)  just want to walk on our property and we're involved in
(3)  all this unbelievable, you know, bureaucracy and rules
(4)  and piles of paperwork.  I'll say that's frustrating.
(5)  I don't go looking for these problems.  They find me.
(6)   MR. COLEMAN:  Is there a question
(7)  pending?
(8)   Q.  (By Mr. Adegbile)  Do these laws, like the
(9)  environmental laws, wildlife laws, impose burdens on
(10)  the MUD?
(11)   A.  They have imposed burdens, yes.
(12)   Q.  Do they impose costs on the MUD?
(13)   A.  They have imposed some cost, yes.
(14)   Q.  Have you undertaken any effort to quantify the
(15)  costs that those environmental laws impose --
(16)   A.  No.
(17)   Q.  -- in comparison to Section 5 preclearance,
(18)  for example?
(19)   A.  No, we haven't.  By the way, these come under
(20)  those special -- somebody was asking about special
(21)  legal fees.  I think we've put some of that under
(22)  working with Fish and Wildlife and the city trying to
(23)  get pedestrian access to our -- to our property.
(24)   Q.  Any discussion about initiating lawsuit -- a
(25)  lawsuit to attack the environmental laws that protect

148

(1)  certain wildlife?
(2)   A.  No, not yet.
(3)   Q.  Why not?
(4)   A.  Probably just time and -- time and effort.  I
(5)  did talk to an attorney about it, and it looked like it
(6)  was possibly very expensive and we didn't have much --
(7)  we had less chance to win the case, so -- but it's
(8)  still a possibility, but it looked like it would be
(9)  expensive and very difficult.
(10)   Q.  Did this litigation look like it would be
(11)  expensive and difficult?
(12)   A.  Sorry?
(13)   Q.  Did this litigation, the litigation in which
(14)  you're offering testimony right now --
(15)   A.  For the preclearance?
(16)   Q.  Yes.
(17)   A.  Well, when we talked about it, Greg was
(18)  willing to do it, you know, pro bono to the MUD, really
(19)  causing us no expense, and I just thought that was
(20)  terrific.  So if we could get rid of some burdens and
(21)  get rid of a fee, get rid of some legal costs and it
(22)  wouldn't cost the MUD anything, I don't know how I
(23)  could pass that up.  And obviously the MUD board
(24)  agreed.  They voted unanimously to move ahead.
(25)   Q.  Of the legal services that the MUD receives,

149

(1)  what percentage of those are offered pro bono?
(2)   A.  I wouldn't begin to know how to compute that.
(3)   Q.  Do you have any understanding as to why
(4)  Mr. Coleman was willing to take this case pro bono?
(5)   A.  Because I think he's a good guy.  I've known
(6)  Mr. Coleman for many years, and I looked all over the
(7)  City of Austin for somebody that would take our case
(8)  against Austin, and he was the only one, so I just
(9)  think he's an extraordinary individual.
(10)   Q.  Have you had any discussions with Mr. Coleman
(11)  about assuming other legal duties of the MUD on a pro
(12)  bono basis?
(13)   A.  No.
(14)   Q.  Why not?
(15)   MR. COLEMAN:  I've got all I can take.
(16)   THE WITNESS:  Yeah.  Man, this guy has
(17)  done a lot for the residents of Canyon Creek.  I'm not
(18)  going to load him up with any more.
(19)   Q.  (By Mr. Adegbile)  Fair enough.  Having had
(20)  some success in receiving pro bono services that
(21)  presumably has a positive impact on the budget, have
(22)  you thought about seeking pro bono services from other
(23)  lawyers?
(24)   A.  Well, I think I talked to Paul Terrill, you
(25)  know, about the Fish and Wildlife case.  There was no

150

(1)  way they could do that pro bono.  That's the only other
(2)  instance I can think of that I asked somebody to look
(3)  at something.
(4)   Q.  And you have -- do you have any understanding
(5)  about how much Section 5 compliance cost the MUD?
(6)   A.  I think it's, like I said, around a thousand
(7)  dollars or so.  It falls under our special legal fees,
(8)  but I haven't carefully itemized it all.  Like I said,
(9)  $1 is too much.
(10)   Q.  Would you have any understanding on how much
(11)  Section 5 preclearance has cost the MUD since the MUD
(12)  was created?
(13)   A.  No, I don't know.
(14)   Q.  Were you aware that Congress -- are you aware
(15)  that Congress recently renewed this Section 5
(16)  preclearance provision?
(17)   A.  Yes.
(18)   Q.  How did you become aware of that?
(19)   A.  I read news on the Internet.
(20)   Q.  Were you aware that Congress had a series of
(21)  hearings over many months to evaluate whether or not to
(22)  renew Section 5 --
(23)   A.  Yes.
(24)   Q.  -- and other provisions of the Voting Rights
(25)  Act?

(Pages 145 to 150)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

---

151

(1) A. Yes.
(2) Q. You followed that renewal process to some
(3) degree in the media?
(4) A. I heard about it in the media. I read some
(5) media reports.
(6) Q. At the time that you were reading about it,
(7) did you have an awareness that Section 5 affected the
(8) MUD?
(9) A. Sure. I mean, our Section 5 goes back to
(10) 2002, is the first time I heard about Section 5.
(11) Q. Did you consider at any time whether or not
(12) you should make your views known as -- either as an
(13) individual or as a representative of the MUD to -- in
(14) the context of the congressional hearings that took
(15) place?
(16) A. I would have loved to have gone to the
(17) Congress and been in a hearing. I didn't go because of
(18) time and money and I wasn't invited.
(19) Q. Could you have considered writing a letter?
(20) A. I think I called Congressman McCaul's office
(21) and maybe Lamar Smith. I think I called them and
(22) mentioned that -- you know, that we were concerned
(23) about the burdens of preclearance. I -- I go to a lot
(24) of political meetings and I run into staffers and what
(25) have you, so I probably mentioned it to one of the

---

152

(1) congressional liaisons or something from those offices.
(2) I run into them at republican meetings. I don't know
(3) if I wrote -- I don't think I wrote a letter. I think
(4) I made phone calls.
(5) MR. COLEMAN: Are we getting close?
(6) MR. ADEGBILE: I could be done in
(7) 35 minutes.
(8) THE WITNESS: What time is it now?
(9) MR. COLEMAN: It's ten after.
(10) THE WITNESS: Can we take a five-minute
(11) break and try to finish?
(12) MR. ADEGBILE: Sure.
(13) (Recess from 12:12 to 12:23)
(14) Q. (By Mr. Adegbile) Mr. Zimmerman, I think your
(15) counsel has indicated that he's prepared to go forward.
(16) Are you ready to continue?
(17) A. Uh-huh. Yes.
(18) Q. Earlier you testified that there were some MUD
(19) residents you believed to be Chinese-American. Or I
(20) think what you said was they spoke with a Chinese
(21) accent. Do you --
(22) A. Yes.
(23) Q. Do you understand them to be Chinese-American?
(24) A. Oliver Ban, yes, one individual I am well
(25) acquainted with.

---

153

(1) Q. The person that you had helped solicit -- or
(2) the person who you supported in his effort to be
(3) elected to the MUD board?
(4) A. Yes.
(5) Q. And how do you know that he's
(6) Chinese-American?
(7) A. Because I know him. His first language is
(8) Chinese and he frequents China.
(9) Q. Were there other people that have addressed
(10) the MUD board in meetings that you understand to be
(11) Chinese-American?
(12) A. There have been a few. I'm not acquainted
(13) with them. I'm well acquainted with Oliver but not any
(14) others.
(15) Q. And I think you earlier testified that there
(16) were some people that speak with an Indian accent.
(17) A. Yes. Uh-huh.
(18) Q. And how do you know that those people are
(19) Indian-American?
(20) A. Again, I'm acquainted with them and I know
(21) they're from India.
(22) Q. So it's based on your personal --
(23) A. Personal -- personal information, yeah, just
(24) through acquaintance.
(25) Q. But your -- but your observations don't inform

---

154

(1) that judgment?
(2) A. No. I talk to the people, find out who they
(3) are, where they're from.
(4) Q. Do you know what race Mr. Rodney Louis is?
(5) A. He's mostly African-American, I presume, but I
(6) haven't talked to him about his family background.
(7) Q. How do you know his race?
(8) A. Well, he's dark. Just dark-colored.
(9) Q. Earlier I believe you testified that you grew
(10) up in San Antonio.
(11) A. Correct.
(12) Q. Do you recall what your street address was or
(13) street addresses during your time growing up in San
(14) Antonio? Where in San Antonio did you live?
(15) A. Southeast. It was on Skylark, 4018 Skylark.
(16) Q. Did you go to high school in San Antonio?
(17) A. Yes.
(18) Q. Have you -- did you tell us which high school
(19) you went to?
(20) A. Highlands High School.
(21) Q. And have you told us which college you went
(22) to?
(23) A. Texas A&M.
(24) Q. Do you have an understanding of what an
(25) annexation is?

---

155

(1) A. Yes.
(2) Q. Can you share that with me?
(3) A. Well, some political subdivision like a city
(4) or a MUD goes through some legal steps to put a
(5) jurisdiction on property and -- for taxation purposes
(6) and for regulation control and presumably to give some
(7) services, as well, and it's typically done against the
(8) owner's will. Most of the people I know that have been
(9) annexed were unhappy about it.
(10) Q. Why were they unhappy with it?
(11) A. Because they wanted -- they were not given a
(12) choice and their taxes went up, and they were unhappy
(13) with the service they got for their taxes, basically.
(14) Q. Why do jurisdictions undertake to annex?
(15) A. To grow their tax bases and their sphere of
(16) influence is my opinion on it.
(17) Q. Is there ever a benefit concurred to the
(18) annexed residents or landowners?
(19) A. Could be. I guess the benefit is in the eye
(20) of the beholder.
(21) Q. Have you looked at this issue carefully,
(22) annexation?
(23) A. I've studied it some in regards to the -- to
(24) the MUD, and I'm convinced that the property owner, the
(25) Nash Phillips Copus home builder did not want to be

---

156

(1) annexed and they were annexed against their will. They
(2) conceded to do it, but it wasn't their choice.
(3) Q. Can you tell me what Save Our Taxpayers is?
(4) A. It's a little private group that I started. I
(5) believe we kicked that off to oppose a property tax
(6) increase on the community college.
(7) MR. ADEGBILE: Can you read back his
(8) answer, please?
(9) (Requested portion was read)
(10) Q. (By Mr. Adegbile) When was that organization
(11) founded?
(12) A. Probably spring of '03, I think. I think it
(13) was spring of '03.
(14) Q. Is it incorporated or unincorporated?
(15) A. No, it's not -- there's no formal papers.
(16) There's nothing formal that was ever done. It's not a
(17) nonprofit. Just a group of people.
(18) Q. Who is in the membership of Save Our
(19) Taxpayers?
(20) A. Can you help me as to what -- I don't
(21) understand the question.
(22) Q. I understand your testimony to be that Save
(23) Our Taxpayers is an organization informal -- an
(24) unincorporated informal organization that you started
(25) in 2003 at the time of a community college tax issue,

---

(Pages 151 to 156)

157

(1) and you said that there are a group of people that
(2) participate in it. I'm trying to ascertain who those
(3) people are. So I'm actually asking you to help me --
(4)     A. Well, one of them was Ed Burke. He's a
(5) retired IBM engineer. He was one of our -- one guy
(6) that did a lot. And he did a lot on the hospital.
(7) There was an election for a hospital tax, property tax.
(8) He helped us on that. Another one was David Rogers.
(9) There's another guy, Larry Garrett, another retired --
(10) retired individual. I think David Rogers worked with
(11) me some. Another fellow, Frank Haskell. But these are
(12) just acquaintances of mine from around the county.
(13)     Q. Do they live in the -- do any of them live in
(14) the MUD?
(15)     A. No. None of them do.
(16)     Q. And what is the goal of Save Our Taxpayers?
(17)     A. It's to raise awareness of tax issues, really
(18) like a private education club and --
(19)     Q. So it doesn't have a budget, for example?
(20)     A. No, never had a budget.
(21)     Q. Ever do fund-raising?
(22)     A. There was some fund-raising, but the
(23) fund-raising was through a PAC, Republican Liberty
(24) Caucus of Texas PAC. And whatever expenses we had
(25) connected with campaigns, they were really part of a

158

(1) Republican Liberty Caucus PAC, and I filed with Texas
(2) Elections Commission, so all that's public so you can
(3) see who donated to us, what the money was used for.
(4) That's all public record.
(5)     Q. And what is that PAC that you just described?
(6)     A. It's -- it was dissolved a little over a year
(7) ago. Republican Liberty Caucus of Texas, RLC-TX PAC.
(8)     Q. And what was the RLC-TX prior to its
(9) dissolution?
(10)     A. It was a small PAC that dealt with tax issues
(11) mainly.
(12)     Q. Outside of your MUD directorship have you had
(13) occasion to be involved in Section 5 preclearance
(14) issues?
(15)     A. And by that you mean?
(16)     Q. Whether or not you had any --
(17)     MR. COLEMAN: Other than -- other than as
(18) a member of the board of MUD.
(19)     THE WITNESS: Oh, not outside the MUD.
(20) Only -- only within the MUD.
(21)     Q. (By Mr. Adegbile) Can you tell me what the
(22) Austin Community College is?
(23)     A. It's -- the title says what it is, kind of an
(24) introductory college for four-year universities. They
(25) mostly take people that are precollege. They do some

159

(1) remedial instruction, too, maybe like college prep.
(2) Then they have a nursing program. It's a big -- it's a
(3) big organization.
(4)     Q. Where is it based?
(5)     A. Travis County. But it actually is organized
(6) by school districts.
(7)     Q. Where is it in relation to the MUD?
(8)     A. It's in the MUD at this point.
(9)     Q. The --
(10)     A. The MUD was annexed by Austin Community
(11) College. There's a new property tax for the Austin
(12) Community College.
(13)     Q. Are you familiar that at the time of Section 5
(14) preclearance submissions the public is able to offer
(15) comments on the impact of a voting change?
(16)     A. No. I wasn't aware of that. Like I said, no
(17) one had even heard of Section 5 preclearance. I'll
(18) tell you, there's still some confusion and concern
(19) because no one knows -- like we've talked already in
(20) here about some land we were thinking about
(21) transferring to Austin, and nobody in my neighborhood,
(22) including me, is going to know if we have to go through
(23) preclearance again. You know, if we deed or title some
(24) land to Austin, what's that going to treat?
(25)     Q. Returning to the question of annexations, can

160

(1) annexations have an impact on minority communities?
(2)     A. I suppose they could.
(3)     Q. How so?
(4)     MR. COLEMAN: If you know.
(5)     THE WITNESS: Yeah. I -- I don't -- you
(6) know, I don't -- I should probably speak just from
(7) experience in the MUD, and I don't have any annexation
(8) experience with the MUD, so I know it won't affect us
(9) in our neighborhood.
(10)     Q. (By Mr. Adegbile) One more question. Do you
(11) control Save Our Taxpayers? Are you leader of Save Our
(12) Taxpayers?
(13)     A. I think it's fair to say that, yes.
(14)     MR. ADEGBILE: Pass that down. I'm
(15) passing down a highlighted copy of a March 25th article
(16) that I think purports to be from the Save Our
(17) Taxpayers.
(18)     MR. COLEMAN: Are we marking this?
(19)     MR. ADEGBILE: Yes, we need to mark that
(20) as the next exhibit.
(21)     Q. (By Mr. Adegbile) If you can take a moment to
(22) review the document I put before you.
(23)     MR. COLEMAN: What is that? That's 10?
(24)     THE REPORTER: 10.
(25)     THE WITNESS: Okay.

161

(1)     Q. (By Mr. Adegbile) Can you tell me what
(2) Exhibit 10 is?
(3)     A. Yes. I have a friend and colleague, Marc
(4) Levin, and during the election for this property tax
(5) annexation, Marc brought it to my attention that there
(6) could be some issues with how the -- how the
(7) annexations would affect voting patterns in minority --
(8) I think he wrote it out in here. I thought, well, that
(9) makes sense. So Marc did some research on this, and I
(10) think he filed with -- he filed something with DOJ.
(11) I'm not sure what he did. I was tangentially aware of
(12) that. What he told me made sense that somebody should
(13) look at that.
(14)     Q. Was it his view that the annexation in
(15) question 10 raised questions about minority
(16) vote dilution?
(17)     A. I think that's what it says here. I think he
(18) expressed it in his own words. The complaint notes the
(19) demographics of the proposed area to be annexed are
(20) dramatically different from the current taxing area.
(21)     Q. Does it also say in that highlighted
(22) paragraph, quote, "This election raises serious issues
(23) of dilution and retrogression in minority voting
(24) strength, implicating Sections 2 and 5 of the Voting
(25) Rights Act of 1965"?

162

(1)     A. Uh-huh. That's what his research uncovered.
(2)     Q. Now, you're saying that it was Mr. Levin's
(3) research, that he filed it.
(4)     A. Uh-huh.
(5)     Q. Is it fair to say that this comment was filed
(6) on behalf of Save Our Taxpayers?
(7)     A. I think so, yes.
(8)     Q. And that's the organization that you control?
(9)     A. Yes. Uh-huh.
(10)     Q. So indeed it was you who filed the comment
(11) letter with the Department of Justice raising issues of
(12) possible minority vote dilution arising out of the
(13) annexation?
(14)     A. Well, it was Marc that did it, not me. I
(15) didn't file it.
(16)     Q. Did he file it on your behalf or on the behalf
(17) of Save Our Taxpayers, the organization which you've
(18) testified you control?
(19)     A. Yes.
(20)     Q. Because, of course, Mr. Levin could have
(21) written a letter on his own and not talked to you about
(22) it at all.
(23)     A. I'm trying to remember the document itself.
(24) Been a couple years ago. And I think I did a cursory
(25) check of the document, but, you know, his concerns made

(Pages 157 to 162)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

163

(1) sense, so I thought we should address them under our
(2) organization. But he was the one that originated this,
(3) and I thought it was a good point to make, so I was
(4) happy for him to do that. But, again, he is the one
(5) that did that -- that research. I didn't have time to
(6) look all that up and research that.
(7)     Q. In much the same way that lawyers have handled
(8) the preclearance submissions for the MUD, though you
(9) are not physically the person that's doing the research
(10) or preparing the letter that's being submitted on
(11) behalf of the MUD?
(12)     A. Yes.
(13)     Q. In much the same way that a lawyer prepared
(14) this letter on behalf of the organization that you
(15) control, Save Our Taxpayers, to raise concerns about
(16) minority vote dilution arising out of the proposed
(17) annexation?
(18)     A. I think that's fair to say.
(19)     Q. Was it your understanding that Section 5
(20) provided a vehicle for protecting minority voters
(21) against the dilution that you fear could be occasioned
(22) by the annexation?
(23)     A. Well, my -- my greater concern was the way the
(24) election was organized that a relatively small number
(25) of voters in the annexed area that were -- I can't

164

(1) remember the numbers, but the minority of voters were
(2) being annexed into this ACC taxing district where all
(3) the voters in ACC were allowed to vote. So my primary
(4) objection and the point we made in all this is that
(5) there has to be something wrong with an election where
(6) the minority -- a minority of voters, regardless of
(7) color -- I'm just saying a minority of voters are
(8) allowed to be annexed by a majority of voters already
(9) paying the tax. That was my primary concern in the
(10) election. My concern personally was that it didn't
(11) have anything to do with race. But we -- our objective
(12) was to raise any issue to draw attention to what I felt
(13) was an unethical election because you got a small
(14) percentage of voters being forced into annexation by a
(15) larger percent of voters who are already annexed. It
(16) just didn't seem fair.
(17)     Q. Is it your understanding that Section 5 is a
(18) vehicle to be used to protect minority voters
(19) regardless of race --
(20)     A. Well, my --
(21)     Q. -- as to unfairness in tax matters?
(22)     A. My opinion right now is that it's worthless.
(23) It -- it served no purpose and it didn't illuminate.
(24) It didn't -- I don't know if they even answered Marc's
(25) complaint. They didn't respond. So we learned

165

(1) nothing. So I don't think they protected anybody.
(2)     Q. But in filing this letter on or about
(3) March 25th, 2005, as of that point you didn't think
(4) Section 5 was worthless?
(5)     A. We were hoping it would provide some debate at
(6) a minimum, that somebody would say something and offer
(7) an opinion where I can stir some debate on the issue.
(8) You know, I was looking for at least some debate, some
(9) more information. We got nothing.
(10)     Q. You felt that the -- that it was an avenue to
(11) provide some community input into the impact of a
(12) voting change, a proposed change?
(13)     A. Sure. Provide some more input from another
(14) source.
(15)     Q. And you thought that was valuable?
(16)     A. I had hoped we would get something that would
(17) be valuable and I was wrong.
(18)     Q. A moment ago when I asked you about what the
(19) intention was when you filed this letter, you answered
(20) the question by telling me about your greater concern.
(21) I want to return you to this highlighted paragraph
(22) because it appears that the letter says -- and I would
(23) request production of the letter that you provided on
(24) behalf of Save Our Taxpayers to the Department of
(25) Justice.

166

(1)     MR. ADEGBILE: Mr. Coleman, we can talk
(2) about that later.
(3)     Q. (By Mr. Adegbile) But I would like you to
(4) check your files and see if you still have a copy of
(5) that document so you can provide it to us. But I want
(6) to return to this language: "This election raises
(7) serious issues of dilution and retrogression." What's
(8) your understanding of what that means?
(9)     A. Well, I believe the Voting Rights Act in
(10) Section 5 back in the '60s was that people would
(11) electioneer precincts and gerrymander precinct lines so
(12) that minority neighborhoods would be split up such that
(13) they would be even a smaller minority in any precinct
(14) or district that they voted in. In fact, I think that
(15) the dilution or to minimize your -- the effect of your
(16) vote had a common effect in the election that I was
(17) objecting to here because, like I said before, minority
(18) of voters -- having nothing to do with race, the
(19) minority of voters were being lumped in with a majority
(20) of voters who were already paying a property tax. So I
(21) thought that there could be some parallel between this
(22) idea of minority voting rights of Section 5 which has
(23) to do with ethnicity and a minority of voters that were
(24) not paying a property tax. So I thought there was
(25) maybe a parallel point to be made there. That's what I

167

(1) was hoping would do.
(2)     Q. So your understanding, then, was that the
(3) letter that was filed on behalf of Save Our Taxpayers
(4) had nothing to do with race or ethnicity but just about
(5) an issue with respect to a numerical minority of
(6) voters?
(7)     A. It was to draw a parallel between the fact
(8) that we had a minority of voters having nothing to do
(9) with race and my vote was diluted because I was voting
(10) with other people who already paid a property tax when
(11) I didn't pay, so I thought that might be a dilution of
(12) my vote. I argued publicly that only the people facing
(13) the new property tax should be allowed to vote. Only
(14) those areas to be annexed should be allowed to vote.
(15) So that was my argument.
(16)     Q. How much did it cost Save Our Taxpayers to
(17) file this comment with the Department of Justice?
(18)     A. We may have paid them several hundred dollars.
(19) It may have been like $250, but I don't have the exact
(20) number. That's available from our PAC records. If you
(21) look it up you can see what it is. I don't remember.
(22)     Q. I would request that you provide us copies of
(23) any checks or payments associated with the letter that
(24) was provided to the Department of Justice relating to
(25) the ACC annexation matter. And your testimony was that

168

(1) Mr. Levin came to you about this issue?
(2)     A. Yes.
(3)     Q. Were you on the board of the MUD at the time?
(4)     A. Yes.
(5)     MR. ADEGBILE: I'd like to mark -- I
(6) guess we can backfill with this one so this can become
(7) Exhibit 7, a 1/15/2007 LegalTimes.com article. And I'd
(8) like to ask the witness to familiarize himself with the
(9) document.
(10)     THE WITNESS: Okay.
(11)     Q. (By Mr. Adegbile) On the second page of the
(12) document under the heading The District Line, the last
(13) sentence in the paragraph reads, "Residents accused the
(14) Utility District's attorney of suppressing voter
(15) turnout by holding utility board elections in a
(16) different location, a resident's home, than the
(17) citywide elections. We had an -- quote, 'We had an
(18) attorney who had some conflicts of interests,' close
(19) quote, says Donald Zimmerman, a board member."
(20)     A. Okay. And your question is?
(21)     Q. Can you explain your comment? First, did you
(22) make that comment?
(23)     MR. COLEMAN: First is whether the
(24) reporter is accurate.
(25)     Q. (By Mr. Adegbile) Did you make that comment,

(Pages 163 to 168)

169

(1)  Mr. Zimmerman?
(2)     A.  Something along those lines, and the
(3)  discussion on that was about the lawsuit with the City
(4)  of Austin.  And I've already explained that, that the
(5)  conflict was having to do with her, you know, signing a
(6)  lawsuit settlement that disagreed with our position on
(7)  the illegal taxation.
(8)     Q.  I'm not sure you've testified about this.
(9)  Could you explain --
(10)     A.  Yeah, in some detail.
(11)     Q.  Well, actually, my recollection of the
(12)  testimony is that you told us that we would have to
(13)  speak to -- first, who was the attorney in question
(14)  that you're referring to?
(15)     A.  It's Sharlene Collins.  Yeah, you probably
(16)  should -- you could talk to her.  That's what -- that's
(17)  what that comment is about.  It's a disagreement about
(18)  the lawsuit settlement.  It seemed to me a conflict
(19)  that if someone signed a document saying, "I certify
(20)  that this agreement complies with Texas Water Code,"
(21)  and then other residents like myself say, "We disagree.
(22)  We think that the consent agreement and the taxation is
(23)  illegal under the Texas Water Code," that's a conflict.
(24)  That's what I mean by the word conflict.
(25)     Q.  Is that why Ms. Collins was relieved of her

170

(1)  representation of the board?
(2)     A.  Yes.  That's why she was let go.
(3)     Q.  And it's your understanding that Mrs. Collins
(4)  orchestrated the situs of the polling place in
(5)  Mr. Stueber's home to suppress voter turnout?
(6)     A.  I wasn't there at the meetings when it
(7)  happened, but that's what people told me.
(8)     Q.  Did you make any independent assessment about
(9)  whether or not that was the case?
(10)     A.  I just listened to what prior MUD board
(11)  members told me, and I asked Mr. Stueber about it
(12)  and -- but I don't have any direct information.  You
(13)  know, just secondhand information.
(14)     Q.  Who conveyed the information to Mrs. Collins
(15)  that she was being replaced as counsel to the MUD?
(16)     A.  I did.
(17)     Q.  What did you tell her?
(18)     A.  It was in an open MUD board meeting, and I
(19)  think at the time that we -- we decided to just -- it
(20)  was time to make a change.  We didn't -- we didn't want
(21)  any, you know, controversy or accusation.  "Let's just
(22)  make a change."
(23)     Q.  Do you believe that she was trying to suppress
(24)  voters?
(25)     A.  No.  I think it had the effect of that, but

171

(1)  I'd be very surprised if she tried to deliberately cut
(2)  down turnout.  It had that effect.
(3)     MR. COLEMAN:  When you say it had the
(4)  effect, are you saying that more people could have
(5)  voted or that it affirmatively prevented people from
(6)  voting?
(7)     THE WITNESS:  Yeah.  The voter numbers,
(8)  if you look at the numbers from the garage election
(9)  compared to the numbers from the school election,
(10)  you'll see more voters are at the school.
(11)     Q.  (By Mr. Adegbile)  And that was in part
(12)  because people knew where the school was and may or may
(13)  not have known where Mr. Stueber's garage was?
(14)     A.  People show up to vote in city elections.
(15)  Sometimes they don't even know there's a MUD election
(16)  so I inform them.  "Hey, do you know there's a MUD
(17)  election going on at the same time?"  "Oh."  And then
(18)  we educate them and they vote.
(19)     Q.  So this issue of the siting of the polling
(20)  place in Mr. Stueber's garage, as well as the
(21)  annexation issue that we spoke about that was
(22)  identified in Exhibit 10, these are not things that
(23)  happened in 1965, are they?
(24)     A.  No.
(25)     Q.  And your comment letter submitted under the

172

(1)  Save Our Taxpayers Web site actually occurred in 2005;
(2)  is that right?
(3)     A.  Yes.
(4)     Q.  And yet it's your view that the Voting Rights
(5)  Act has no vitality in 2007?
(6)     A.  Correct.  Because in both those instances you
(7)  just mentioned --
(8)     MR. COLEMAN:  Let's be clear.  He's
(9)  talking about the Voting Rights Act that includes all
(10)  the substantive provisions.
(11)     THE WITNESS:  The Section 5 preclearance
(12)  is what we're talking about here, right?
(13)     Q.  (By Mr. Adegbile)  Sure.
(14)     MR. COLEMAN:  I don't know.  What are you
(15)  talking about?
(16)     Q.  (By Mr. Adegbile)  You can answer either
(17)  way --
(18)     A.  Aren't you talking about --
(19)     Q.  -- and then I'll ask you about the other way.
(20)     A.  -- the Section 5 preclearance?
(21)     Q.  Let's begin with Section 5 preclearance.
(22)     A.  Well, let's just begin and end with that
(23)  because that's all I'm really aware of.  That's what
(24)  we're talking about.
(25)     Q.  All right.  We can -- we can start there.

173

(1)     A.  So in both of those cases they didn't help us.
(2)  I don't see that their action increased voter turnout.
(3)  Looks to me like they were worthless.
(4)     Q.  Sir, does the speed limit stop every speeder
(5)  on the highway?
(6)     A.  No, of course not.
(7)     Q.  Is there value in having a speed limit?
(8)     A.  There's a value from an engineering viewpoint,
(9)  yeah.  It's a design limit for the road.  That's why we
(10)  put speed limits on.  It's an engineered number.  It's
(11)  not arbitrary.
(12)     Q.  And is it your understanding that that's the
(13)  only value, an engineering value?
(14)     A.  Well, the value is to try to help prevent
(15)  collisions and to make the roads safer to drive on.
(16)  You put speed limits on so you know what the road is
(17)  supposed to handle.
(18)     Q.  Is it fair to say that the purpose of
(19)  Section 5 is to help make sure that everybody can vote
(20)  without regard to race?
(21)     A.  Could you -- could you be a little more
(22)  specific?  I mean, in my explanation -- I think I've
(23)  already testified to this.  It has not been the case in
(24)  my neighborhood that Section 5 has done anything for
(25)  us.

174

(1)     Q.  But I'm asking you --
(2)     A.  I'm positive.
(3)     Q.  I'm asking you now, sir, about the purpose of
(4)  the Section 5 preclearance statute.
(5)     MR. COLEMAN:  If you know what it covers.
(6)     THE WITNESS:  Yeah, I -- from my
(7)  understanding it's worthless for our neighborhood.
(8)  That's the best answer I can give you.
(9)     Q.  (By Mr. Adegbile)  Do you understand whether
(10)  or not Section 5 has value for other neighborhoods?
(11)     A.  It doesn't have value for my neighborhood.
(12)     Q.  That's not the question I asked, though.
(13)     A.  Well, I don't know, then.
(14)     Q.  You have no opinion?
(15)     A.  No.  I should limit -- I'm going to limit my
(16)  opinion to my own neighborhood.
(17)     Q.  And when Congress acts to pass a federal civil
(18)  rights statute, is it realistic in your judgment for
(19)  them to make an assessment neighborhood by
(20)  neighborhood?
(21)     MR. COLEMAN:  Calls for a legal
(22)  conclusion, speculation.
(23)     THE WITNESS:  Yeah.
(24)     MR. ADEGBILE:  I don't think it calls for
(25)  a legal conclusion.  I'm asking for his opinion about

(Pages 169 to 174)

ACUSCRIBE COURT REPORTERS
(800) 497-0277

**175**

(1) whether or not it's realistic for the members of
(2) Congress to make determinations neighborhood by
(3) neighborhood before they enact federal legislation.
(4) That's the question.
(5)   Q.  (By Mr. Adegbile)  I'm not asking about the
(6) legal conclusion.  I'm asking about your opinion.
(7)        MR. COLEMAN:  I don't think he said that
(8) they had to.  I don't know if that's the foundation of
(9) your question.
(10)        THE WITNESS:  If you're asking for my
(11) opinion, I would say, well, if they can't -- if
(12) Congress can't know all these details, maybe they
(13) should not be voting, because they're voting blind,
(14) following your question.  Congress doesn't know what's
(15) happening in my neighborhood, so why are they forcing a
(16) mandate on it if they don't know what's going on?
(17) That's my opinion on your question.
(18)   Q.  (By Mr. Adegbile)  Is it fair to say that
(19) Congress has had hearings over the course of 40 years
(20) that resulted in the passage of the Voting Rights Act?
(21)   **A.  I don't know.  I'm not aware.  I haven't**
(22) **followed any of the hearings in 40 years.**
(23)   Q.  Did you testify earlier that you followed the
(24) renewal hearings by reading press accounts during the
(25) 2006-2007 renewal?

**176**

(1)   **A.  I'll read it, yeah, the message now and then.**
(2) **That doesn't make me an expert.  I just read.**
(3)   Q.  I'm not asking if you're an expert.  I'm not
(4) asking if you're an expert.  I'm just asking if it's
(5) your understanding that Congress has done fact-finding
(6) about the experience that minority voters face.
(7)   **A.  Well, I know that no one from Congress has**
(8) **contacted me to know what's going on in my**
(9) **neighborhood.  I know that for a fact.**
(10)   Q.  Would you consider that to be a prerequisite
(11) of renewing the Voting Rights Act, that Congress should
(12) contact you?
(13)   **A.  I would think that these neighborhoods should**
(14) **be contacted to see if this is still necessary.  Why**
(15) **wouldn't they do that for me or for any other political**
(16) **subdivision?  I think they owe it to us to find out**
(17) **what's happening in our neighborhood before they issue**
(18) **a mandate on it.**
(19)   Q.  And so then Congress should actually go
(20) neighborhood by neighborhood before imposing a federal
(21) mandate with respect to voting?
(22)        MR. COLEMAN:  Misstates the witness's
(23) testimony.
(24)        THE WITNESS:  I call that representative
(25) government, know what's going on in your area before

**177**

(1) you pass a law.
(2)   Q.  (By Mr. Adegbile)  Thanks for your time.
(3)   A.  Sure.
(4)   Q.  Actually, one more question.  And this really
(5) will be the last question.  Are you aware of a Supreme
(6) Court decision relating to the congressional districts
(7) that Texas drew after the last census?
(8)   **A.  I read a bunch about redistricting, but I**
(9) **don't have any specifics on it.**
(10)   Q.  Do you know whether or not there was a ruling
(11) about the Voting Rights Act that arose out of Texas's
(12) redrawing of the district lines?
(13)   **A.  Yeah, I think I remember they did make some**
(14) **changes to -- I think they made some changes to what**
(15) **the Texas House had passed or they moved some lines as**
(16) **I remember.**
(17)   Q.  They being the Supreme Court or they being --
(18)   **A.  The judiciary system somewhere, in one of the**
(19) **courts.**
(20)   Q.  Do you know whether or not there was a finding
(21) that Texas had violated the Voting Rights Act?
(22)   **A.  No.  I don't have that kind of specific**
(23) **information.**
(24)   Q.  Do you have any information about whether or
(25) not Latino voters were impacted by Texas's redrawing of

**178**

(1) district lines following the 2000 census?
(2)   **A.  No.  No.  I don't have any specific**
(3) **information.**
(4)   Q.  So in your review of news clippings and
(5) following politics, this was not an issue that you
(6) followed or became aware of?
(7)   **A.  I don't remember.**
(8)        MR. ADEGBILE:  No further questions.
(9) Thank you.
(10)        MR. COLEMAN:  Can we let this guy go?
(11)        MR. ADEGBILE:  Yes.  And thanks for your
(12) patience.
(13)        THE WITNESS:  Thank you.
(14)        MR. KORBEL:  Let me ask one more quick
(15) question.
(16)        MR. WOLFSON:  I've been superseded.  Go
(17) ahead, George.
(18)        FURTHER EXAMINATION
(19) QUESTIONS BY MR. KORBEL:
(20)   Q.  When did you graduate from Highlands?
(21)   A.  1977.
(22)   Q.  And did you come back to live in San Antonio
(23) then after you went to A&M?
(24)   A.  No.
(25)   Q.  Where did you go after you left A&M?

**179**

(1)   A.  I went to Michigan, and then I came back to
(2) Houston.  I lived in Houston pretty much until 2000
(3) when I moved to Austin.
(4)   Q.  And when did you come to Houston?
(5)   A.  I moved to Houston in -- I think it was
(6) November of '87.
(7)   Q.  Thank you.
(8)        MR. WOLFSON:  Thank you very much, and we
(9) appreciate your coming and sitting through this feeling
(10) not so well.  Thank you.
(11)        (DEPOSITION CONCLUDED)

**180**

(1)        CHANGES AND CORRECTIONS
(2)        WITNESS NAME:  DONALD S. ZIMMERMAN
(3)        DATE:  FEBRUARY 21, 2007
(4) Reason Codes:  (1) to clarify the record; (2) to conform
(5) to the facts; (3) to correct a transcription error; (4)
(6) other (please explain).
(6) PAGE  LINE  CHANGE                    REASON CODE
(7) _____
(8) _____
(9) _____
(10) _____
(11) _____
(12) _____
(13) _____
(14) _____
(15) _____
(16) _____
(17) _____
(18) _____
(19) _____
(20) _____
(21) _____
(22) _____
(23) _____
(24) _____
(25) _____

(Pages 175 to 180)

181

(1)
(2)                    SIGNATURE
(3)        I, DONALD S. ZIMMERMAN, have read the foregoing
(4)    deposition and hereby affix my signature that same is
(5)    true and correct, except as noted on the previous page.
(6)
(7)        _____
(8)            DONALD S. ZIMMERMAN
(9)    STATE OF _____
(10)   COUNTY OF _____
(11)       Before me, _____, on this day
(12)   personally appears DONALD S. ZIMMERMAN, known to me (or
(13)   proved to me under oath or through
(14)   _____) (description of identity card or
(15)   other document) to be the person whose name is
(16)   subscribed to the foregoing instrument and acknowledged
(17)   to me that they executed the same for the purposes and
(18)   consideration therein expressed.
(19)       Given under my hand and seal of office this
(20)   _____ day of _____, 2007.
(21)
(22)
(23)        NOTARY PUBLIC IN AND FOR
(24)        THE STATE OF _____
(25)

182

(1)              IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
(2)
(3)    NORTHWEST AUSTIN MUNICIPAL   *
       UTILITY DISTRICT NUMBER ONE *
(4)          Plaintiff            *
(5)    VS.                        *  Civil Action No.
                                  *  1:06-CV-01384
(6)    ALBERTO GONZALES, in his   *  (PLF, DST, EGS)
       official capacity as       *
(7)    Attorney General of the    *
       United States             *
(8)                               *
             Defendant            *
(9)
(10)   ***********************************************
(11)            REPORTER'S CERTIFICATION
            DEPOSITION OF DONALD S. ZIMMERMAN
(12)              FEBRUARY 21, 2007
       ***********************************************
(13)
(14)       I, MARSHA EVANS, Certified Shorthand Reporter in
       and for the State of Texas, hereby certify to the
(15)   following:
(16)       That the witness, DONALD S. ZIMMERMAN, was duly
       sworn by the officer and that the transcript of the
(17)   oral deposition is a true record of the testimony given
       by the witness;
(18)
           That the deposition transcript was submitted on
(19)       _____ to the witness or to the
       attorney for the witness for examination, signature,
(20)   and return to ACUSCRIBE COURT REPORTERS by
       _____.
(21)
           That the amount of time used by each party at the
(22)   deposition is as follows:
           Mr. Paul R.Q. Wolfson - 1 hour, 55 minutes
(23)       Mr. Max Renea Hicks - 12 minutes
           Mr. Carlos Becerra - 5 minutes
(24)       Mr. Chris Herren - 21 minutes
           Mr. George Zerbel - 7 minutes
(25)       Mr. Debo P. Adegbile - 1 hour, 10 minutes.

183

(1)        I further certify that I am neither counsel for,
       related to, nor employed by any of the parties or
(2)    attorneys in the action in which this proceeding was
       taken, and further that I am not financially or
(3)    otherwise interested in the outcome of the action.
(4)        Certified to by me on _____.
(5)
(6)        _____
(7)        MARSHA EVANS, TEXAS CSR 5100
           Expiration Date: 12/31/07
           Firm Registration No. 241
(8)        114 West 7th Street, Suite 750
           Austin, Texas  78701
(9)        512-499-0277
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

(Pages 181 to 183)

ACUSCRIBE COURT REPORTERS
(800) 497-0277