# Exhibit 1

US1DOCS 5739872v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN<br>MUNICIPAL UTILITY DISTRICT<br>NUMBER ONE,<br>401 W. 15th Street<br>Suite 850<br>Austin, Texas 78701<br>　　　　Plaintiff,<br><br>v.<br><br>ALBERTO GONZALES,<br>ATTORNEY GENERAL OF THE<br>UNITED STATES,<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br>　　　　Defendant. | Civil Action No. 1:06-CV-01384<br>(DST, PLF, EGS) |

**FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

1.   Plaintiff Northwest Austin Municipal Utility District Number One seeks to bail out from coverage under the preclearance requirements of §5 of the Voting Rights Act, 42 U.S.C. §1973c, or, in the alternative, seeks a declaratory judgment that continued application of §5 is unconstitutional.

**I.
THE PARTIES**

2.   The Plaintiff is a political subdivision of the State of Texas.

3.   The Defendant, acting in his official capacity, has his office in the District of Columbia.

AU1:\12553\02\9_P02!.DOC\99990.1228

## II.
## JURISDICTION AND VENUE

4. This court has jurisdiction pursuant to 42 U.S.C. §§1973b & 1973*l*.

## III.
## THREE-JUDGE PANEL

5. Pursuant to 42 U.S.C. §1973*b* and 28 U.S.C. §2284, the Court has appointed a three-judge panel to hear and resolve this complaint.

## IV.
## FACTUAL BACKGROUND

6. Northwest Austin Municipal Utility District Number 1 is a small municipal utility district in Travis County, Texas. Formed in the late 1980s to help provide infrastructure, provide water and wastewater service, operate a local park, and provide other localized services, the district exercises local governmental authority under Texas law and has long been considered a political subdivision under the Voting Rights Act. The district conducts periodic elections for the selection of its board members, and these elections are conducted in compliance with the provisions of the Voting Rights Act, including the preclearance provisions of §5, and the applicable election provisions of Texas law.

7. The district does now and has always supported full and open voting rights for all residents of the district and, consequently, does not believe that continued submission to the preclearance provisions is either necessary or constitutionally proper. Whether through the statutory bail-out procedures or by declaration of its rights under the Constitution, the district seeks to terminate its obligation to seek preclearance of voting changes in the future.

8. Texas became covered by §5 as of September 23, 1975, when the United States Attorney General determined that: (a) election materials in Texas had been offered only in

English; (b) more than 5% of Texas's voting age population was Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972 presidential election.

9.   In July 2006, Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions nor take into account that discriminatory conditions may now exist in jurisdictions that are not covered by §5.

10.   The conditions that caused Texas to be covered by §5 have long been remedied. Nonetheless, Texas and every political subdivision in Texas (including the district) continue to be covered by §5 because of conditions that have been remedied for over thirty years. The district did not even exist at the time that Texas was designated a "covered jurisdiction" under §5 and has never been found to violate voting rights.

11.   Section 5 of the Voting Rights Act requires covered jurisdictions to seek preclearance from the Attorney General for changes in voting practices and procedures. Although textually limited to states and political subdivisions involved in the process of registering voters, the Supreme Court has interpreted the provision beyond its text to expansively cover local political subdivisions, including local school districts and municipal utility districts.

12.   The §5 preclearance process is burdensome. To comply with §5, before any "change in practices or procedures affecting voting"—even the most minute of changes—the district must submit such changes to the Attorney General for approval. For example, in addition to large changes like statewide redistricting, every local political subdivision must ask the Attorney General of the United States to approve a plan to move a polling place across the street from a church to a school. In addition to the burden of preparing and submitting the request itself, most proposed changes are presumptively delayed by at least 60 days awaiting the

Attorney General's approval. Virtually all submissions are cursorily precleared on or close to the last day of the 60-day period allowed. Local governmental units must weigh the benefit of a proposed change against the burden of seeking the Attorney General's approval, virtually assuring that many political subdivisions from time to time forego beneficial changes because of the bureaucratic burden of asking the Attorney General's permission.

13. If the Attorney General were to file an objection, the burden is on the covered jurisdiction to devise another plan and again resubmit it and wait for another determination. Although the Attorney General almost never objects to proposed changes in local voting practices or procedures, the process itself imposes a substantial burden on state and local governmental units that extends far beyond the federal government's infringement on the sovereignty interests of state and local governments.

## V.
## CLAIM I: BAIL-OUT

14. The Voting Rights Act contains a provision that authorizes a political subdivision to bail-out from preclearance coverage under the Act. The district satisfies the statutory requirements and is entitled to a declaration from the Court that it is no longer a covered jurisdiction under the Act.

15. During the past ten years: (a) no test or device has been used within the district for the purpose or with the effect of denying or abridging the right to vote on account of race or color; (b) there have been no adverse final judgments against the district determining that denials or abridgements of the right to vote on account of race, color, or membership in a language minority group have occurred in the district, and no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds; (c) federal examiners have not been assigned to the district; (d) the district has fully complied

with §5 and all changes affecting voting within the district have been reviewed under §5 prior to their implementation; and (e) no change affecting voting in the district has been the subject of an objection by the Attorney General or the denial of a §5 declaratory judgment from the District of Columbia district court.

16. The district has made constructive efforts during the past ten years and throughout its existence to prevent any intimidation or harassment of persons seeking to vote and to expand opportunities for voter participation.

17. There are no lawsuits pending against the district that allege voting discrimination.

18. The district has satisfied all the requirements for a §4 bail-out.

## VI.
## CLAIM II: DECLARATORY JUDGMENT

19. In the alternative, if the district is not eligible to bail out of §5 coverage, then the preclearance requirements it imposes on the district should be stricken as unconstitutional under the Tenth, Fourteenth, and Fifteenth Amendments.

20. The burdens and infringement on sovereignty interests that the preclearance requirements impose are disproportionate to any claimed rationale supporting continued coverage by §5. In fact, minority voters in covered jurisdictions like the district are frequently harmed, not aided, by §5 coverage. For example, the district had to seek preclearance just to move the voting location for its directors out of a residential garage and into a public school, a move that was calculated to increase public access to the ballot box. But this change was made in spite of, and not because of, the preclearance requirements of §5.

21. The district and its voters are being punished for conditions that existed thirty or more years ago but have long since been remedied, and which never existed in the district, while

jurisdictions in which voting issues have arisen in recent years go uncovered simply because the conditions did not exist thirty years ago. If the district is not eligible for bail-out, then §5 is a trap in which conditions that existed three or four decades ago, but which have long since been remedied, are the sole basis for continuing a burdensome imposition on the sovereign rights of political subdivisions in covered jurisdictions.

22. In other words, §5 lacks any continuing justification and is nothing more than a badge of shame that Congress, without any cognizable justification, has chosen to continue in place. The district is being punished for conditions that existed more than three decades ago, yet in reauthorizing §5 Congress incongruously and irrationally opted to continue preclearance under a now ancient formula that leaves covered states that have long since remedied the conditions that originally justified preclearance while leaving uncovered numerous states that would be covered under any modern measure that Congress might reasonably have imposed.

23. The district recognizes that the Supreme Court upheld the original enactment of §5 against constitutional challenge. But when Congress originally enacted the preclearance requirements, and even when they were previously reauthorized in 1982, the conditions justifying preclearance were still very recent. But now, more than a generation later, it is both arbitrary and irrational for Congress to continue preclearance and, worse, under the same coverage formula established in a bygone era. Times have changed, and §5 cannot now be constitutionally applied to the district.

24. Congress cannot forever rely on findings of conditions that existed thirty years ago to continue to justify the use of its Fifteenth (or Fourteenth) Amendment enforcement power in a way that infringes on the rights of an entire generation of voters who were not even alive when those discriminatory practices were ended. Unlike other provisions of the Voting Rights

Act, §5 is no longer a "congruent and proportional" remedial exercise of Congress's enforcement power.

25. There has never been any finding that the district has engaged in discriminatory voting practices, because it has not. The sole basis for requiring the district to preclear is that it was created (in 1987) within a state that was deemed covered by the Voting Rights Act more than thirty years ago. Continued imposition of the preclearance requirement hinders the right of voters in the district to decide the manner in which their representation at the local level will be determined—that is, to alter the manner and procedures by which their representatives in the district are elected—because of the burden of the preclearance procedures.

26. Moreover, the Act as interpreted by the Attorney General (and Travis County) unconstitutionally alters the form of state government. The Attorney General claims that the Act does not permit the district to seek a bail-out at all and that, barring a statewide bail-out, the district must look to the county to bail out. Under state law, the district is a political subdivision of the state, a statutory creation that answers to the state and, on some issues, to certain state regulatory agencies, but not to the county. But under the Attorney General's interpretation of the Act, Congress has incongruously placed the district's bail-out rights in the hands of the county, a unit of government that under state law has no independent authority over the district's election policies or procedures.

27. State lines of governmental authority are not defined by geographic boundaries. It is not constitutionally permissible for Congress to place control over the district's affairs in the hands of county government—which may and does oppose the district's interests for partisan and possibly other illegitimate reasons—because to do so would fundamentally alter the lines of authority and responsibility established by the state.

28. If the district is not eligible to bail-out of the preclearance requirements, then the continued imposition of those requirements is an unconstitutional imposition on the district's sovereignty and is beyond Congress's authority.

## VII.
## PRAYER

Plaintiff requests the Court to declare that the district has met the bail-out requirements of §4 of the Voting Rights Act and that the preclearance requirements of §5 of the Act no longer apply to the district; or, in the alternative, that §5 of the Act as applied to the district is an unconstitutional overextension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment, and all other relief to which the district may show itself to be entitled.

Respectfully submitted,

/s/ Gregory S. Coleman
Gregory S. Coleman
(admitted *pro hac vice*)
Christian J. Ward
(admitted *pro hac vice*)
PROJECT ON FAIR REPRESENTATION
8911 Capital of Texas Hwy., Ste. 1350
Austin, Texas 78759
Tel.: (512) 349-1930
Fax: (512) 527-0798

/s/ *Erik S. Jaffe*
Erik S. Jaffe
D.C. Bar No. 440112
ERIK S. JAFFE, P.C.
5101 34th Street N.W.
Washington, D.C. 20008
Tel.: (202) 237-8165
Fax: (202) 237-8166

*Attorneys for Plaintiff*
*Northwest Austin Municipal*
*Utility District No. One*