# Exhibit 5

US1DOCS 5739872v1

Chapter 8

# Not Like the South? Regional Variation and Political Participation through the Lens of Section 2

Ellen D. Katz
University of Michigan Law School

## Introduction

On July 27, 2006, President Bush signed into law a twenty-five-year extension of the expiring provisions of the Voting Rights Act (VRA).[1] Among the provisions reauthorized is the preclearance process, a procedure that constitutes the VRA's most remarkable and notorious requirement. Included in Section 5 of the original 1965 statute, preclearance reverses the presumption of validity that typically attaches to state and local legislative and administrative action. It mandates that "covered" jurisdictions—defined as those that used a voting "test or device" and had extremely low levels of voter registration or turnout measured as of various dates beginning in 1964—obtain approval from federal officials before implementing any changes in their voting laws and procedures.[2]

---

    Ellen Katz is Professor of Law at the University of Michigan Law School. Thanks to Jenna Bednar, Chandler Davidson, Daniel Halberstam, Rick Hasen, Don Herzog, J. J. Prescott, and Scott Shapiro for helpful comments, Charles Doriean and Ryan Nunn for statistical work, and Anna Baldwin and Emma Cheuse for excellent research assistance and for their sustained contributions to the VRI. Thanks also to the Earl Warren Institute on Race, Ethnicity and Diversity at Boalt Hall School of Law and the University of Michigan Law School, which provided generous financial support for this project.

    [1] *See* Hamil R. Harris and Michael Abramowitz, *Bush Signs Voting Rights Act Extension*, WASH. POST, July 28, 2006.

    [2] As originally enacted, Section 5 mandates that "covered" jurisdictions demonstrate that a proposed change "does not have the purpose and will not have the effect" of denying or abridging the right to vote based on race. 42 U.S.C. § 1973c (2000). As reautho-

2                             *Ellen Katz*

Few would dispute that preclearance has been largely responsible for the VRA's remarkable efficacy in eliminating deep-rooted racial barriers to political participation in covered jurisdictions.[3] What is contested is whether this requirement remains justified.[4] Discrimination in voting persists, but is it sufficiently dire to warrant retention of Section 5's burden shifting regime? Is, moreover, the discrimination that persists in covered jurisdictions sufficiently different from the discriminatory practices voters confront in other parts of the country to justify keeping only the previously covered jurisdictions subject to the strictures of preclearance?[5]

It is widely assumed that the reauthorization of Section 5 will survive constitutional scrutiny only if the record Congress amassed to support the statute documents pervasive unconstitutional conduct in covered jurisdictions for which preclearance offers a remedy.[6] This chapter takes issue with this assumption. It argues

rized, Section 5 requires that the change "neither has the purpose nor will have the effect."

[3] *See, e.g.,* Samuel Issacharoff, *Is Section 5 of the Voting Rights Act a Victim of Its Own Success?*, 104 COLUM. L. REV. 1710, 1712–14 (2004) (arguing data shows that "[n]o longer are blacks political outsiders in the covered jurisdictions"); Chandler Davidson and Bernard Grofman, *The Voting Rights Act and the Second Reconstruction, in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965–1990, at 381 (C. Davidson and B. Grofman eds., 1994) [hereinafter QUIET REVOLUTION]; NAT'L COMM'N ON THE VOTING RIGHTS ACT, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, PROTECTING MINORITY VOTERS: THE VOTING RIGHTS ACT AT WORK 1982–2005, at 37, 40–49 (Chandler Davidson ed., Feb. 2006).

[4] For examples of those arguing it is not, *see, e.g.,* EDWARD BLUM AND LAUREN CAMPBELL, AMERICAN ENTERPRISE INSTITUTE FOR PUBLIC POLICY RESEARCH, ASSESSMENT OF VOTING RIGHTS PROGRESS IN JURISDICTIONS COVERED UNDER SECTION FIVE OF THE VOTING RIGHTS ACT 2-3 (May 17, 2006), *at* http://www.aei.org/publications/pubID. 24405,filter.all/pub_detail.asp (arguing that the AEI Bullock-Gaddie voting studies have found "no crisis in minority voting rights in 2006" and "no quantifiable difference" between covered and noncovered jurisdictions justifying the Act's renewal); *A Bill to Reauthorize and Amend the Voting Rights Act of 1965 (Part I): Hearing on H.R. 9 Before the H. Comm. on the Judiciary, Subcomm. on the Const. Regarding the Reauthorization of the Voting Rights Act,* 109th Cong. (May 4, 2006) [hereinafter *House Reauthorization Hearings*] (statement of Roger Clegg, President, Center for Equal Opportunity, at 6–7); *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary,* 109th Cong. (May 9, 2006) [hereinafter *Senate Reauthorization Hearings*] (statement of Samuel Issacharoff, Professor, NYU School of Law, at 1) (arguing that "it is far from clear that the injustices that justified Section 5 in 1965 can justify its unqualified reenactment today"); *id.* (May 17, 2006) (statement of Abigail Thernstrom, senior fellow, Manhattan Institute).

[5] *See, e.g., House Reauthorization Hearings, supra* note 4 (statement of Roger Clegg, president, Center for Equal Opportunity, at 6–7) (criticizing the record prepared by Congress partly for its failure to compare covered and noncovered jurisdictions).

[6] *See id.* (statement of J. Gerald Hebert, former U.S. Department of Justice, Civil Rights Division attorney, at 3) (affirming the record created as sufficient to satisfy *City of Boerne v. Flores,* 521 U.S. 507 (1997)); *id.* (statement of Debo Adegbile, Associate Director of Litigation, NAACP-LDEF, at 16) (calling the record compiled by Congress a

that recent Supreme Court precedent requiring such a record for new congressional legislation enforcing civil rights ought not apply when Congress renews an existing, operational statute such as Section 5. In this context, the record must make the case for the continuing need for preclearance, as opposed to the need for this legislation in the first instance. A record of pervasive unconstitutional conduct should not be expected since the legislation at issue was put in place to remedy precisely such conduct. Indeed, to require such a record would mean that only ineffective statutes are entitled to reauthorization.[7]

The continuing need for existing legislation like Section 5 requires not documentation of existing unconstitutional conduct but instead speculation about the scope of such conduct absent the preclearance requirement. To be sure, the quality of political participation in covered jurisdictions operating without the constraints imposed by Section 5 can hardly be predicted with certainty.[8] Nevertheless, an important source of information regarding the operation of the statute and the continued need for it is found in judicial decisions construing Section 2, the VRA's core permanent provision.

As amended in 1982, Section 2 of the VRA proscribes electoral practices that result in a denial or abridgment of the right to vote based on race, color, or membership in a particular language-minority group.[9] While Section 2 differs from Section 5 in significant ways,[10] Section 2 litigation illuminates the Section 5 de-

---

"strong" one); *see also Senate Reauthorization Hearings, supra* note 4 (statement of Richard Hasen, professor, Loyola Law School) (arguing that the record provided may not be enough to reauthorize under *City of Boerne* in the form of proposed bill H.R. 9); *id.* (statement of Laughlin McDonald, director, ACLU Voting Rights Project) (calling the record provided by Congress sufficient to meet the *Boerne* standard). *But see id.* (statement of Pamela S. Karlan, professor of public interest law, Stanford University School of Law, at 15).

[7] For development of this idea and an evaluation of alternate standards that might apply, see Ellen D. Katz, *Judicial Review and the Voting Rights Act* (working draft on file with author); *see also Senate Reauthorization Hearings, supra* note 4 (May 16, 2006) (statement of Pamela S. Karlan, professor of public interest law, Stanford University School of Law, at 15) ("The question whether Congress can continue coverage of the already covered jurisdictions . . . does not require that Congress conclude that if it were writing on a completely clean slate today, it would choose the original triggering formulas. Rather, it depends on whether continuing to subject the covered jurisdictions to the preclearance regime is congruent and proportional to preventing future constitutional injury.").

[8] *Cf.* Richard Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act after* Tennessee v. Lane, 66 OHIO ST. L. J. 177, 179 (2005) ("The question of how much racial discrimination in voting practices there would be today if we suddenly eliminated preclearance is almost too speculative to answer.").

[9] 42 U.S.C. § 1973(a) (2000).

[10] Unlike Section 5, Section 2 applies nationwide and importantly presumes state action to be valid absent proof establishing a statutory violation. Section 2 prohibits some conduct that might pass muster under Section 5 and permits various practices for which preclearance would be denied. *See Georgia v. Ashcroft*, 539 U.S. 461 (2003) (districting plan's apparent compliance with Section 2 does not establish preclearance is warranted

bate in important respects. Most notably, the very complexity of the Section 2 inquiry renders judicial opinions addressing these claims a rich source of valuable information detailing political participation in the defendant jurisdictions.

Under Section 2, an electoral practice results in a denial or abridgment of the right to vote if, based on the "totality of circumstances," minority voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[11] Addressing the "totality of circumstances," in turn, includes consideration of nine factors listed in the Senate Judiciary Committee Report that accompanied the 1982 amendments to Section 2. These so-called Senate Factors include: the existence of racial polarization in voting, a dearth of successful candidates from the minority group, racial appeals in campaigns, unresponsive elected officials, and a long history of official discrimination in virtually every realm of public life.[12]

For nearly a quarter century, federal judges nationwide have been evaluating these factors when adjudicating claims under Section 2. They have produced 763 published opinions involving 331 lawsuits in which they make thousands of factual findings.[13] A systematic analysis of these findings yields a complex portrait of political participation in the jurisdictions involved, one that reveals many similari-

---

under Section 5); *Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997) *(Bossier Parish I)* (apparent violation of Section 2 not grounds to deny preclearance under Section 5).

[11] 42 U.S.C. § 1973(b) (2000).

[12] S. REP. NO. 97–417, at 27–30 (1982) [hereinafter SENATE REPORT] (listing nine factors to measure the "totality of circumstances" under Section 2).

[13] *See* Ellen D. Katz with M. Aisenbrey, A. Baldwin, E. Cheuse, and A. Weisbrodt, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982, Final Report of the Voting Rights Initiative,* 39 U. MICH. J. L. REFORM 643, 654 (2006) [hereinafter "Katz et al., *Documenting Discrimination*"]; *see also* 2006 VRI Database Master List, available at http://www.votingreport.org (instructions on how to search and sort data are located within the Master List) [hereinafter "VRI Database Master List"].

Of all Section 2 litigation, 331 lawsuits produced at least one published or reported opinion considering a Section 2 claim between the passage of the 1982 amendment and December 31, 2005. *See* Katz et al., *Documenting Discrimination, supra,* at 650–54 (describing research objectives and project design). The 331 lawsuits include some lawsuits that have not yet resulted in a final, unappealable decision, but for which at least one opinion was published within the specified time period. *See, e.g., Hayden v. Pataki,* 2004 WL 1335921 (S.D.N.Y. 2004), *remanded by Hayden v. Pataki,* 2006 WL 1493837 (2d Cir. Jun 01, 2006). The findings noted in the Supreme Court's recent decision in *LULAC v. Perry* are included because this case produced published opinions before 2006. *See* 126 S. Ct. 2594 (2006). This study does not include lawsuits that did not produce a published opinion before 2006. Examples of such lawsuits include *Cottier v. City of Martin,* 445 F.3d 1113 (8th Cir. 2006); *Gonzalez v. City of Aurora,* 2006 WL 681048 (N.D. Ill. 2006); *Quinn v. Pauley,* 2006 WL 752965 (N.D. Ill. 2006).

ties between covered and noncovered jurisdictions, as well as a number of significant differences.[14]

This chapter proceeds in three parts. Part I offers an overview of the judicial findings in published Section 2 decisions, focusing in particular on how these findings differ between covered and noncovered jurisdictions. Briefly stated, more courts in covered jurisdictions reached outcomes favorable to plaintiffs, and did so in a greater proportion of the lawsuits they decided, than did courts in noncovered jurisdictions, a difference that is statistically significant at the 90% level. More plaintiffs successfully challenged local electoral practices and did so in a greater proportion of the successful lawsuits in covered jurisdictions than in noncovered ones, a difference that is also statistically significant at the 90% level. Successful plaintiff challenges to local practices in both covered and noncovered jurisdictions exceeded the number of such challenges to statewide ones.[15]

Courts in covered jurisdictions have both found and been more likely to find at levels that are statistically significant: acts of official discrimination that compromise voting rights, the use of devices that "enhance[ ]"[16] opportunities for discrimination against minority voters, and a lack of success by minority candidates. Courts in covered jurisdictions have also found and been more likely to find a lower level of minority voter registration and turnout, contemporary voting opportunities shaped by the continuing effects of discrimination in various socioeconomic realms, racial appeals in campaigns, and tenuous justifications underlying challenged practices, although these differences between covered and noncovered jurisdictions are not statistically significant.

In roughly equal numbers and proportions, courts in covered and noncovered jurisdictions have found racially exclusive slating processes and nonresponsive elected officials. Courts in both types of jurisdictions also found legally significant racial bloc voting in a roughly equal number of lawsuits, but courts in covered

---

[14] To be sure, this portrait is necessarily incomplete. The study underlying this paper tracks only Section 2 lawsuits that produced an opinion that was published on Westlaw or LexisNexis. It does not consider unpublished opinions, claims that settled without a published judicial opinion, or claims that plaintiffs otherwise failed to pursue after filing. As important, the survey does not (and indeed could not) consider jurisdictions in which Section 2 cases were not filed. Whether due to the prevalence of nondiscriminatory practices or a lack of resources to challenge discriminatory ones, the absence of such claims means that courts never examined opportunities for political participation in these jurisdictions and never produced the findings that a Section 2 inquiry would yield. As a consequence, the published Section 2 decisions do not offer an all-inclusive depiction of political participation and voting discrimination nationwide, but instead may be best understood as offering selective snapshots of political participation within the jurisdictions involved. These snapshots are themselves valuable for the rich detail they convey and for the more generalized, albeit necessarily qualified conclusions that may be extrapolated from them.

[15] *See infra* notes 18–22 and accompanying text; *see also* Appendix, Tables 8.1 and 8.3; *see also* VRI Database Master List, *supra* note 13.

[16] SENATE REPORT, *supra* note 12, at 27–30.

jurisdictions documented voting patterns that were more extremely polarized by race at a rate that is statistically significant.

Part II assesses the significance of these differences. It observes that the Section 2 findings do not establish the sort of record of recent unconstitutional conduct that the Supreme Court has required in cases involving new congressional legislation. It argues, however, that renewal of an operational statute such as Section 5 demands not a record of unconstitutional conduct, but instead a record that suggests the scope of such conduct in the absence of the statute. Part II then considers changes the Section 2 findings suggest might occur in covered jurisdictions absent Section 5. It argues that these findings both suggest that past discrimination in covered jurisdictions has yet to be fully remedied and portend future discrimination absent the deterrent effect of preclearance. Finally, Part III presents the chapter's conclusions.

## I.  Section 2 Claims in Covered and Noncovered Jurisdictions

Several courts adjudicating Section 2 claims in noncovered regions go out of their way to distinguish the jurisdictions involved from those subject to Section 5's preclearance requirement. A First Circuit panel, for example, stated that "Boston's history of discrimination in the area of voting rights was less egregious than in certain other parts of the country."[17] A district court in New York similarly stated that "[no]thing in the history of New York [state] even remotely approaches the systematic exclusion of blacks from the political process that existed in the South."[18]

Differences certainly abound, but so do similarities. Judicial findings in Section 2 cases reveal a complex and nuanced view of the relative opportunities for minority political participation in covered and noncovered jurisdictions—one that suggests that distinct problems persist in covered jurisdictions.

## A.  The Cases

Three hundred and thirty-one lawsuits addressed Section 2 claims between 1982 and December 2005. Although eleven more lawsuits originated in noncovered jurisdictions than in covered ones, more plaintiffs prevailed overall and in a

---

[17] Latino Political Action Comm., Inc. v. City of Boston, 784 F.2d 409, 412 (1st Cir. 1986).

[18] Reed v. Town of Babylon, 914 F. Supp. 843, 886 (E.D.N.Y. 1996) (quoting Abigail Thernstrom, Thernstrom Report, Def.Exh.R., at 11) (citing Nathan Glazer and Reed Ueda, *Policy Against Prejudice and Discrimination, in* HARVARD ENCYCLOPEDIA OF AMERICAN ETHNIC GROUPS 852–54 (Stephan Thernstrom ed., Harvard University Press 1980)); *see also* Rybicki v. State Bd. of Elections, 574 F. Supp. 1147, 1151 (N.D. Ill. 1983); *Rybicki*, 574 F. Supp. 1082, 1110–12 (N.D. Ill. 1982).

greater proportion of the cases decided in covered jurisdictions than in noncovered ones, a difference that is statistically significant at the 90% level.[19]

Plaintiffs in sixty-eight lawsuits met the three "preconditions" to a Section 2 claim that the Supreme Court articulated in its 1986 decision *Thornburg v. Gingles*.[20] More courts found the *Gingles* preconditions in noncovered jurisdictions, although courts in both types of jurisdiction found them in a roughly equal proportion of the lawsuits in which they considered them. More plaintiffs crossed the *Gingles* threshold in noncovered jurisdictions, but plaintiffs who did so prevailed in a greater proportion of the cases published in covered jurisdictions.[21]

*State vs. Local Practices*

In both covered and noncovered jurisdictions, many more Section 2 lawsuits challenged local electoral practices than statewide ones, and in both types of jurisdictions, plaintiffs were more likely to prevail in local suits than in statewide ones. Even so, in covered jurisdictions, the focus on local practices has been more pronounced. More plaintiffs challenged local procedures in covered jurisdictions than in noncovered ones, local challenges comprised a greater proportion of the lawsuits plaintiffs brought in covered jurisdictions than in noncovered, and plaintiffs prevailed in a greater proportion of the local challenges in covered jurisdictions than in noncovered, differences that are statistically significant at the 90% level. Plaintiffs achieved favorable outcomes in 46.7% of Section 2 lawsuits challenging local practices in covered jurisdictions, and 35.4% of such suits in noncovered jurisdictions.[22]

---

[19] *See* Appendix, Table 8.1; *see also* VRI Database Master List, *supra* note 13; Katz et al., *Documenting Discrimination*, *supra* note 13, at 655–56. Plaintiffs achieved successful outcomes in 123 (or 37.2%) of the total lawsuits. Of these successful suits, 92 documented a violation of Section 2— either on the merits or in the course of another favorable determination for the plaintiff. Another thirty-one lawsuits made a favorable determination for the plaintiff (such as issuing a preliminary injunction, granting a settlement, awarding fees, or crafting a remedy) without stating whether Section 2 was actually violated. Of the 160 published lawsuits decided in covered jurisdictions, sixty-eight (42.5%) resulted in plaintiff success, compared with fifty-five (32.2%) of 171 lawsuits published in noncovered jurisdictions. *Id.*

[20] Thornburg v. Gingles, 478 U.S. 30, 50–51 (1986) (the minority group must demonstrate, first, that it is "sufficiently large and geographically compact to constitute a majority in a single-member district;" second, that it is "politically cohesive;" and, third, that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate").

[21] Successful plaintiff outcomes comprise twenty-eight (93.3%) of the thirty such lawsuits that satisfied *Gingles* in covered jurisdictions, while amounting to twenty-nine (76.3%) of the thirty-eight such cases in noncovered ones. *See* VRI Database Master List, *supra* note 13. This difference is statistically significant at the 90% level (p = 0.058).

[22] *See* Appendix, Table 8.3; *see also* VRI Database Master List, *supra* note 13. Challenges to local practices, i.e., those of a county, city, town, or school board, comprise 235 (or 71%) of the total reported Section 2 lawsuits, with 122 of 160 such lawsuits (or

8                          *Ellen Katz*

Electoral practices implemented by counties in covered jurisdictions have been most vulnerable to challenge under Section 2, with plaintiffs obtaining favorable outcomes in 55.3% of the suits against county practices since 1982. Practices adopted by schools and by states as a whole, in covered and noncovered jurisdictions alike, have been more resilient, with plaintiffs succeeding in 28.6% of the lawsuits brought against these entities. Electoral practices adopted by cities and towns have been more vulnerable in covered than in noncovered jurisdictions, with more plaintiffs prevailing in covered jurisdictions and in a greater proportion of the cases decided in these regions than in noncovered jurisdictions, although this difference is not statistically significant.[23]

*Changes vs. Longstanding Practices*

Section 2 challenges to electoral changes in covered jurisdictions overwhelmingly address changes that have been precleared, given that Section 5 requires these jurisdictions to obtain preclearance for such changes. As a result, successful Section 2 challenges to these precleared practices constitute one area where Sections 2 and 5 do not overlap.[24] To obtain preclearance, covered jurisdictions must demonstrate that electoral changes are discriminatory neither in purpose nor in effect, a standard the Supreme Court has interpreted to require a showing that the changes do not worsen, or cause retrogression to, existing opportunities for political participation by minority voters.[25] An electoral change might not make things worse for minority voters when measured under Section 5's retrogression standard but might still be discriminatory in result within the meaning of Section 2.[26]

More plaintiffs challenged newly enacted or changed (as opposed to longstanding) electoral practices in noncovered jurisdictions than in covered ones.[27] In

---

76.3%) originating in covered jurisdictions, and 113 of 171 (or 66%) from noncovered ones. *Id.*

[23] *See* Table 8.3; *see also* VRI Database Master List, *supra* note 13. Plaintiffs in covered jurisdictions succeeded in 46.3% of county challenges (twenty-five of fifty-four of such challenges in this region) compared to 36.4%, or twenty of fifty-five such challenges in noncovered jurisdictions. *Id.*

[24] For examples, see, e.g., *United States v. Charleston County*, 365 F.3d 341 (4th Cir. 2004); *Williams v. City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990); *see also Major v. Treen*, 574 F. Supp. 325 (E.D. La. 1983) (citing case study of preclearance process and later Section 2 challenge outlined in SAMUEL ISSACHAROFF, PAMELA S. KARLAN AND RICHARD H. PILDES, LAW OF DEMOCRACY 642–71 (2d ed. 2002) [hereinafter LAW OF DEMOCRACY]).

[25] *See* Reno v. Bossier Parish School Board, 528 U.S. 320 (2000) (*Bossier Parish II*); Beer v. United States, 425 U.S. 130, 141 (1976).

[26] *See, e.g., Warren v. City of Tampa*, 693 F. Supp. 1051, 1053–54 (M.D. Fla. 1988), *aff'd Warren v. City of Tampa*, 893 F.2d 347 (11th Cir. 1989) (replacement of at-large system with mixed system of at-large and district seats precleared then revised in settlement following Section 2 challenge).

[27] Plaintiffs in noncovered jurisdictions challenged such changes in ninety-two (53.8%) lawsuits. In covered jurisdictions, seventy-four (46.3%) of the Section 2 lawsuits

both covered and noncovered jurisdictions, postcensus reapportionment plans[28] account for the majority of the electoral changes challenged under Section 2. In covered jurisdictions, however, more plaintiffs prevailed in these challenges and did so in a statistically significantly greater proportion of the challenges brought.[29]

Within covered jurisdictions, challenges to postcensus reapportionment plans were more successful than challenges to other types of electoral changes.[30] The opposite trend occurred in noncovered jurisdictions, with plaintiffs more frequently obtaining favorable outcomes in challenges to changes other than those involving postcensus reapportionment plans.[31] Plaintiffs in noncovered jurisdictions succeeded in 36.7% of lawsuits challenging these other electoral changes, while plaintiffs in covered jurisdictions succeeded in 28% of these suits.

*Challenged Practices*

Challenges to at-large elections comprise 146 of the 331 lawsuits examined, making at-large elections the electoral practice most often subject to challenge in published Section 2 lawsuits. More courts have struck down at-large elections and have done so in a greater proportion of the lawsuits decided in covered jurisdictions than in noncovered ones, although the difference between covered and noncovered jurisdictions on this point is not statistically significant.[32]

---

challenged electoral changes. *See* Appendix, Figure 8.6; *see also* VRI Database Master List, *supra* note 13.

[28] As used here, postcensus reapportionment plans refer to mandatory redistricting plans enacted every decade to comply with the one-person, one-vote mandate, *see Reynolds v. Sims*, 377 U.S. 533 (1964), and are distinct from voluntary decisions to alter the structure of a districting system by, for instance, moving from single-member districts to at-large elections, from at-large to single-member districts, or from either regime to a plan including some combination of single-member and at-large seats. These latter sort of districting changes are counted in the "other electoral changes" category.

[29] *See* Appendix, Table 8.4; *see also* VRI Database Master List, *supra* note 13. Plaintiffs in covered jurisdictions won twenty-seven (55.1%) of the forty-nine challenges they brought against reapportionment plans. Plaintiffs in noncovered jurisdictions won nineteen (30.6%) of the sixty-two such challenges they brought against these plans. *Id.*

[30] Plaintiffs in covered jurisdictions obtained favorable outcomes, as described, *id.*, in 55.1% of the challenges they brought to postcensus reapportionment plans, compared to the lower success rate of 28% (seven of twenty-five) of the challenges they brought to other types of electoral changes. *See* Appendix, Table 8.6; *see also* VRI Database Master List, *supra* note 13.

[31] These changes include challenges to the replacement of single-member with at-large districts, the adoption of new residency requirements, and the institution of majority vote requirements. Plaintiffs in noncovered jurisdictions obtained favorable outcomes in eleven of the thirty (36.7%) challenges they brought to such changes. This success rate is greater than the 30.6% success rate plaintiffs in noncovered jurisdictions achieved when they challenged such reapportionment plans. *See supra* note 29; *see also* Appendix, Figure 8.4; VRI Database Master List, *supra* note 13.

[32] *See* Appendix, Table 8.4 (showing that at-large challenges constitute 47.8% of covered suits and 40.6% of noncovered suits, with a success rate of 50.6% for plaintiffs

10                                          *Ellen Katz*

   In covered jurisdictions, challenges to at-large elections have declined in the
years since 1982, both in absolute numbers and as a proportion of the lawsuits
decided. In noncovered jurisdictions, at-large challenges have steadily declined as
a proportion of the lawsuits decided, although plaintiffs brought more of these
types of challenges in absolute numbers during the 1990s than they did during the
1980s.[33]

   A total of 111 Section 2 lawsuits challenged postcensus reapportionment
plans. Of these, forty-six ended with a favorable outcome for the plaintiffs. More
plaintiffs challenged reapportionment plans in noncovered jurisdictions than in
covered ones, but plaintiffs in covered jurisdictions prevailed in a statistically sig-
nificantly greater proportion of such suits. In both covered and noncovered juris-
dictions, Section 2 challenges to reapportionment plans have steadily increased as
a proportion of lawsuits brought, with a greater increase occurring in noncovered
jurisdictions.[34]

   Forty-one lawsuits challenged election administration procedures such as re-
quirements for registration, voting, or candidacy, or polling place rules or prac-
tices. Fourteen of these suits ended with a favorable outcome for the plaintiffs.
Plaintiffs in noncovered jurisdictions challenged roughly the same number of elec-
tion procedures as did plaintiffs in covered jurisdictions, but prevailed in a greater
proportion of these lawsuits, albeit one that is not statistically significant.[35]

   Thirteen lawsuits challenged majority-vote requirements such as a run-off re-
quirements, anti-single shot provisions, or numbered-place systems. Plaintiffs in
covered jurisdictions brought ten of these challenges and prevailed in five of them.
Plaintiffs prevailed in one of the three majority-vote challenges brought in non-
covered jurisdictions.[36]

   Thirty-nine Section 2 lawsuits addressed annexations, felon disfranchisement
provisions, and appointment practices, and none of these ended with a favorable
outcome for the plaintiffs. Seventeen of the lawsuits originated in covered jurisdic-
tions, while twenty-two originated in noncovered.[37]

---

in covered jurisdictions, compared to a success rate of 40.6% in noncovered); *see also*
Katz et al., *Documenting Discrimination, supra* note 13, at 655–56.

   [33] *See* Katz et al., *Documenting Discrimination, supra* note 13, at 656; *see also* VRI
Database Master List, *supra* note 13.

   [34] *See* Katz et al., *Documenting Discrimination, supra* note 13, at 656; *see also* Ap-
pendix, Table 8.4 (showing reapportionment challenge success rate of 55.1% in covered
jurisdictions and 30.6% in noncovered); VRI Database Master List, *supra* note 13 (show-
ing that in covered jurisdictions, reapportionment plan challenges have gone from 27% of
suits in the 1980s and 1990s, to 41.9% in the 2000s, and that in noncovered juisdictions,
these suits have increased from 14.6% in the 1980s, to 39.3% in the 1990s, and 51.5% in
the 2000s).

   [35] *See* Appendix, Table 8.4 (showing that twenty suits in covered jurisdictions chal-
lenged election administration procedures, with 25% of them succeeding, compared to
twenty-one such suits in noncovered jurisdictions, which had a 42.9% success rate); *see
also* VRI Database Master List, *supra* note 13.

   [36] *Id.*; *see also* VRI Database Master List, *supra* note 13.

   [37] *Id.*

## B.  The Senate Factors

More courts found Senate Factors 1 (history of official discrimination in voting), 3 (enhancing practices), and 7 (lack of minority candidate success) in covered jurisdictions than in noncovered ones. Courts in covered jurisdictions, moreover, found these factors in a statistically significantly greater proportion of the lawsuits in which they addressed the Senate Factors than did courts in noncovered jurisdictions. Courts in covered jurisdictions have found factors 5 (socio-economic discrimination hindering present opportunities for political participation), 6 (racial appeals), and 9 (tenuous justification for challenged policy) in a greater number and proportion of cases than have courts in noncovered jurisdictions, although the differences on these factors are not statistically significant. Courts in covered and noncovered jurisdictions have found Senate Factors 2 (racial bloc voting), 4 (inaccessible slating process), and 8 (lack of responsiveness) in roughly equal numbers and proportions. Courts in covered jurisdictions making Factor 2 findings, though, documented elections showing more extreme racially polarized voting patterns than did courts in noncovered jurisdictions, a difference that is statistically significant.[38]

Some Senate Factors have figured more prominently in Section 2 lawsuits than others. Racial bloc voting has consistently been the factor on which Section 2 liability most depends, with 105 judicial findings of racial bloc voting overall and 62.6% of all favorable plaintiff outcomes including such a finding. Courts have also consistently found a history of discrimination (111 findings, found in 56.1% of successful suits), a lack of minority electoral success (90 findings, found in 53.7% of successful suits), and socio-economic discrimination (88 findings, found in 47.2% of successful suits). Fewer courts adjudicating Section 2 lawsuits have found enhancing practices (52 findings, found in 29.3% of successful suits), racial appeals (33 findings, found in 16.3% of successful suits), a tenuous policy underlying the challenged policy (23 findings, found in 17.9% of successful suits), unresponsive elected officials (20 findings, found in 12.2% of successful suits), and a discriminatory slating process (10 findings, found in 7.3% of successful suits).

Some factors correlated more strongly with plaintiff success than others. Plaintiffs achieved a favorable result in 95.7% of the lawsuits that found a tenuous policy (Factor 9), 90% of those that identified a discriminatory slating process (Factor 4), 75% of the lawsuits that found nonresponsiveness (Factor 8), 73.3% of those that identified a lack of minority candidate success (Factor 7), 73.3% of those that found legally significant racial bloc voting (Factor 2), 69.2% of those

---

[38] This section compares Section 2 lawsuits that found a specific Senate factor to the total number of lawsuits that considered the Senate factors in each type of jurisdiction. Not every lawsuit identified included a published discussion of these factors, either because they did not need to reach the merits of the case or because the only published opinion documents a stage of the case, such as a settlement or remedy, when factor findings are rarely necessary. In covered jurisdictions, courts in 105 lawsuits published factor analysis, while 131 did so in noncovered jurisdictions. *See* Appendix, Table 8.2; *see also* VRI Database Master List, *supra* note 13.

12                          *Ellen Katz*

that identified use of an enhancing practice (Factor 3), 65.9% of those that found ongoing socio-economic discrimination (Factor 5), 62.2% of those that found a history of discrimination affecting the right to vote (Factor 1), and 60.6% of those finding racial campaign appeals (Factor 6).

*Extent of Official Discrimination in Voting*

The first factor listed in the Senate Report asks courts to assess "the extent of any history of official discrimination" in the jurisdiction that "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."[39] More courts found Factor 1 in covered jurisdictions, and did so in a statistically significantly greater proportion of the lawsuits in which they engaged in factor analysis, than did courts in noncovered jurisdictions.[40]

Thirty-three lawsuits—10% of the lawsuits suits decided—identified more than 100 instances of intentional, official discriminatory conduct in voting since 1982. More courts identified instances of such conduct and did so in a greater proportion of the lawsuits they decided in noncovered jurisdictions than in covered ones,[41] although this difference is not statistically significant.

These findings describe a wide range of conduct by public officials. In covered and noncovered jurisdictions alike, Factor 1 findings suggest that local officials more frequently engaged in intentional discriminatory conduct than did state officials and more frequently did so in the course of making new policies than when implementing existing ones.[42]

---

[39] SENATE REPORT, *supra* note 12, at 27–30.

[40] Covered jurisdiction lawsuits found this factor sixty-one times, or in 58.1% of the lawsuits to address the factors. Noncovered jurisdiction lawsuits found this factor fifty times, amounting to 38.2% of the relevant lawsuits. *See* Appendix, Table 8.2 (showing findings of the suits considering Senate factors); *see also* VRI Database Master List, *supra* note 13.

These findings are unsurprising given that the coverage formula for targeted jurisdictions is based on criteria Congress thought would capture regions that had just this history. *See* SENATE REPORT, *supra* note 12, at 115 (calling the trigger formula in section 4 of the VRA "designed to identify jurisdictions with a history of voting discrimination"); *see also id.* at 5 (citing 111 CONG. REC. 8295 (1965)) (quoting Senator Javits on the purpose of the act as aiming, "not only to correct an active history of discrimination, the denying to [minorities] of the right to register and vote, but also to deal with the accumulation of discrimination . . . the bill would attempt to do something about accumulated wrongs and the continuance of the wrongs"); *see also Senate Reauthorization Hearings, supra* note 4 (May 16, 2006) (statement by Karlan).

[41] *See* Katz et al., *Documenting Discrimination, supra* note 13, at 657 and n. 51 (listing judicial findings); *see also* VRI Database Master List, *supra* note 13 (showing that twelve (7.5%) of total covered suits found evidence of post-1982 intentional discrimination or a constitutional violation, compared with twenty-one such findings, amounting to 12%, of the noncovered lawsuits).

[42] *Id.* at 675–95.

Courts in an additional thirty lawsuits documented a history of official discrimination but either discounted the finding or concluded that such discrimination no longer affected contemporary voting rights. More courts made this finding in noncovered jurisdictions than covered jurisdictions.[43]

*Racial Bloc Voting*

Racial polarization in voting, also known as racial bloc voting, factors into the evaluation of Section 2 claims at two junctures. The second and third of the so-called *Gingles* preconditions instruct courts to determine whether minority voters are politically cohesive and whether white voters vote sufficiently as a bloc to defeat the minority-preferred candidate.[44] Courts who so find (and also find the first *Gingles* factor[45]) must then evaluate whether the plaintiffs can sustain their claim under "the totality of circumstances."[46] This inquiry includes analysis of Senate Factor 2, which calls for assessment of "the extent to which voting in the elections of the state or political subdivision is racially polarized."[47]

In practice, however, courts that consider racial bloc voting since 1986 generally engage in one inquiry, typically under the *Gingles* factors.[48] Of those that deem *Gingles* satisfied and proceed to the totality of circumstances review, some simply refer back to their previous analysis of racial bloc voting under *Gingles*. Other courts engage in additional analysis, typically examining within the totality of circumstances the question whether race is the cause of the polarized voting patterns identified under *Gingles*.[49]

Of the 236 lawsuits that considered the Senate Factors, 105 (44.5%) found legally significant racial bloc voting. Courts in covered and noncovered jurisdictions

---

[43] *See id.* at 676 and n.173, 695–97 (showing that twelve (16.4%) of the seventy-three courts documenting official discrimination in covered jurisdictions decided that such discrimination no longer affected the right to vote, compared with eighteen (26.5%) of the sixty-eight courts finding official discrimination in noncovered jurisdictions).

[44] *See* Thornburg v. Gingles, 478 U.S. 30, 50–51 (1986).

[45] *Id.* at 50 (plaintiffs must show that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district).

[46] *See, e.g.,* Johnson v. De Grandy, 512 U.S. 997, 1011–12 (1994).

[47] *See* SENATE REPORT, *supra* note 12, at 27–30; see also BERNARD GROFMAN, L. HANDLEY AND R. NIEMI, MINORITY REPRESENTATION AND THE QUEST FOR VOTING EQUALITY 82–103 (1992) (describing the various tests and approaches expert witnesses have used in Section 2 cases to define and measure racially polarized voting).

[48] Decisions announced between the 1982 Amendments and the Court's decision in *Gingles* obviously do not employ the *Gingles* test. Instead, these courts applied varied standards to evaluate racial bloc voting under Senate Factor 2. *See* Katz et al., *Documenting Discrimination, supra* note 13, at Part II.B.2.

[49] *See, e.g.,* United States v. Charleston County, 316 F. Supp. 2d 268, 277–78 (D.S.C. 2003); Westwego Citizens for Better Gov't v. Westwego, 946 F.2d 1109, 1116 (5th Cir. 1991); Gunn v. Chickasaw County, No. CIV.A. 1:92CV142-JAD, 1997 WL 33426761, at *3 (N.D. Miss. Oct. 28, 1997) (*Chickasaw County II*); United States v. Alamosa County, 306 F. Supp. 2d 1016, 1029–33 (D. Colo. 2004); Lewis v. Alamance County, 99 F.3d 600, 604 (4th Cir. 1996).

14                              *Ellen Katz*

alike found the existence of legally significant racial bloc voting in roughly the same number of lawsuits, with courts in covered jurisdictions making this finding in a greater, albeit not demonstrably statistically significant, proportion of the lawsuits in which they considered the Senate Factors.[50] More courts finding legally significant racially polarized voting produced an outcome favorable to the plaintiffs in covered jurisdictions than in noncovered ones. They also did so in a greater proportion of the lawsuits in which they considered the Senate Factors, although this difference is not statistically significant.[51]

When assessing racial bloc voting, courts have recorded election results from hundreds of state and local elections.[52] Of the cases in which courts found legally significant racial bloc voting, courts in covered jurisdictions have documented racial polarization in specific elections that was more extreme than have courts in noncovered ones, and have done so at rates that are statistically significant. Of the specific minority versus white elections documented in covered jurisdictions,[53]

---

[50] *See* Appendix, Table 8.2 (showing fifty-two findings in covered jurisdictions and fifty-three in noncovered, which represents 49.5% of covered suits and 40.5% of noncovered suits considering Senate factors); *see also* VRI Database Master List, *supra* note 13.

[51] *See* VRI Database Master List, *supra* note 13 (showing that, of the suits finding racially polarized voting in each type of jurisdiction, forty-one (78.8%) reached a favorable outcome in covered, compared to thrity-six (or 67.9%) in noncovered suits).

[52] Courts provided information regarding the size of the white voting bloc in 202 elections in covered jurisdictions and 257 elections in noncovered ones, sometimes including averages representing multiple elections. *See* Appendix, Table 8.5. The numbers included here were derived from the election data provided by courts in the 105 Section 2 lawsuits that found legally significant racial bloc voting. The analysis relies on the numbers courts most often provided, namely, details about either the number of white voters only voting for white candidates or the number or percentage of white voters who supported the minority candidate. Courts rarely provided a single level of overall polarization, opting instead to describe the levels in specific elections. *See, e.g.,* *Windy Boy v. County of Big Horn*, ish, 2002 WL 2022589, at *7 (E.D. La. Aug. 22, 2002) (noting that, in the 1999 election for St. Bernard Parish Council, a black candidate received 5% of the white vote). When courts cited an average level of polarization for a series of elections, that average was counted for the total number of elections it represents, if that number was provided, or once if the court gave the average without providing the total number of elections. This analysis excludes examples in covered and noncovered jurisdictions that were difficult to compare consistently with other lawsuits. *See, e.g.,* *Windy Boy v. County of Big Horn*, 647 F. Supp. 1002, 1010 (D. Mont. 1986) (discussing data for 241 election contests from 1978–1984 in a noncovered county of 12,671 people that showed average levels of white bloc voting of 86–96%). The analysis also could not include numbers where courts did not provide them. *See, e.g.,* *Gunn v. Chickasaw County II*, 1997 U.S. Dist. LEXIS 22087, at *4 (N.D. Miss. 1997) ("as a general rule, whites in Chickasaw County vote for white candidates and blacks vote for black candidates").

[53] *See* Appendix, Table 8.5; *see also* Katz et al., *Documenting Discrimination, supra* note 13, at Part II.C.2; *id.* app., tbl., *White Bloc Voting Levels Documented in Section 2 Litigation, 1982–2005: Elections and Citations*, at http://www.votingreport.org. Courts disagree about the probative value of elections involving only white candidates for purposes of the racial bloc voting inquiry, and many lawsuits provided no details about such

80.7% involved white bloc voting rising to at least 80%, meaning that 80% or more of white voters voted exclusively for white candidates in these elections. In noncovered jurisdictions, by contrast, 40.9% of the elections documented involved white vote polarization of 80% or higher.[54]

In both covered and noncovered jurisdictions, the total number of findings of racially polarized voting has declined from the 1980s to the 2000s. Findings of legally significant racially polarized voting have declined in covered jurisdictions from thirty lawsuits in the 1980s, to sixteen in the 1990s, and to six since 2000. In comparison, findings in noncovered jurisdictions ranged from fifteen in the 1980s, to twenty-eight in the 1990s, and to ten in the 2000s.[55]

*Use of Enhancing Practices: At-large Elections, Majority Vote Requirements*

Senate Factor 3 inquires about the "extent to which the state or political subdivision has used unusually large election districts, majority-vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."[56] Courts in fifty-two lawsuits documented the use of at least one of these practices, with courts in covered jurisdictions being more than twice as likely as courts in noncovered jurisdictions to make such a finding.[57] This difference is statistically significant. Courts in covered jurisdictions have nevertheless found Factor 3 less often over time.[58]

Thirty-four lawsuits found majority-vote requirements, with 79% (all but seven) of these originating in covered jurisdictions. Twenty-six found anti-single

---

elections. *See* Katz et al., *Documenting Discrimination, supra* note 13, at Part II.B.2. As a result, the analysis here includes data from only those elections involving a minority candidate where this was clear in the judicial opinion.

[54] *See* Appendix, Table 8.5.

[55] *See* VRI Database Master List, *supra* note 13.

[56] *See* SENATE REPORT, *supra* note 12, at 27–30. Single shot voting is a practice by which voters can direct their votes to a single candidate running in a multimember district and choose not to cast their remaining votes for other candidates running at the same time. Doing so increases the relative weight of their votes by reducing the number of votes other candidates receive. An anti-single shot provision may prevent voters from doing this, typically by disqualifying any ballot where a voter has not used all available votes. *See* QUIET REVOLUTION, *supra* note 3, at 46 (explaining the numbered place ballot system, a common type of anti-single shot provision: "[s]ingle shot voting is impossible if each candidate is required to qualify for a separate *place* or *post* (i.e., place no. 1, place no. 2, and so forth). Because every seat on the governing body is filled through a head-to-head contest in which only one vote can be cast, there is no way to increase the mathematical weight of one's ballot by denying votes to other candidates.").

[57] *See* Appendix, Table 8.2; *see also* VRI Database Master List and Katz et al., *Documenting Discrimination, supra* note 13, at 698.

[58] See VRI Database Master List, *supra* note 13 (findings of Factor 3 in covered jurisdictions have declined as follows: eighteen in the 1980s, eleven in the 1990s, and four in the 2000s; compared, in noncovered jurisdictions, to the following: eight in the 1980s, ten in the 1990s, and one in the 2000s).

16                                   *Ellen Katz*

shot provisions, such as staggered terms and/or numbered-place requirements, with thirteen (50%) originating in covered jurisdictions. In roughly equal proportions, courts in covered and noncovered jurisdictions found the use of an unusually large district, with five of the eleven findings coming from covered jurisdictions. Six courts, equally divided between covered and noncovered jurisdictions, found other enhancing practices, including the use of an automatic voter removal or "purge" law (based upon voting frequency), a short interval between an initial election and the runoff election, candidate registration fee, candidate residency requirement, or low financial compensation for elected officials.[59]

At-large elections were challenged in 146 lawsuits, but courts based a Factor 3 finding on their use in only thirteen lawsuits. Ten of these suits involved challenges to the at-large election itself, while the remaining three involved other practices.[60] This highlights the trend among courts to invoke and find Factor 3 only when identifying practices other than the one challenged in the lawsuit, namely ones that "enhanced" the discriminatory results of the practice challenged.

*Candidate Slating*

Factor 4 asks whether members of the minority group have been denied access to a candidate slating process if such a process exists in the jurisdiction.[61] While the Senate Report does not define the term discriminatory "slating," the Fifth Circuit has described it as "a process in which some influential nongovernmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected."[62] Courts adjudicating Section 2 claims have rarely found slating, identifying a total of thirteen instances of slating or slating-like conduct, four of which originated in covered jurisdictions.[63]

Eight instances of discriminatory slating involved political parties or their officers, seven of which originated in noncovered jurisdictions.[64] Courts cited the

---

[59] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 698.

[60] *Id.*; Harris v. Siegelman, 695 F. Supp. 517 (M.D. Ala. 1988) (election procedures); Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D. 2004) (redistricting); Jeffers v. Clinton, 730 F. Supp. 196 (E.D. Ark. 1989) (redistricting).

[61] *See* SENATE REPORT, supra note 12, at 27–30.

[62] Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991).

[63] *See* Appendix, Table 8.2. Courts in ten lawsuits expressly found the existence of a discriminatory slating process while courts in another three cases identified practices that sound in slating but discussed them in the context of another factor such as history of discrimination or racial appeals, *see* Katz et al., *Documenting Discrimination*, *supra* note 13, at 699; the four covered instances occur in: *Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997); *Citizens for a Better Gretna v. Gretna*, 834 F.2d 496, 499 (5th Cir. 1987); *Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1037 (D.S.D. 2004); *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1223–24 (S.D. Tex. 1997).

[64] Noncovered: Bridgeport v. Bridgeport Coalition For Fair Representation, 26 F.3d 271, 276 (2d Cir. 1994); McNeil v. City of Springfield, 658 F. Supp. 1015, 1030-31 (C.D. Ill. 1987); Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,

failure of political parties to slate or endorse minority candidates, the decision to support minority candidates only when they ran from majority-minority districts, the exclusion of "endorsed" minority candidates from party-prepared campaign materials, and the express opposition to minority candidates by party officials who actively campaigned against them.[65]

Three lawsuits, two of which originated in covered jurisdictions, document slating by private organizations, finding that electoral success hinged on the financial and endorsement support of certain private groups, which had rarely or never supported minority candidates.[66] In contrast, the noncovered *Marylanders* litigation identified slating by state-funded, all-white fire departments on the Eastern Shore of Maryland.[67] Finally, the 1997 *City of LaGrange* lawsuit from the covered state of Georgia inferred the existence of a discriminatory slating process because the absence of minority candidates "suggests a lack of opportunity, rather than a lack of inclination."[68]

*Ongoing Effects of Discrimination (Education, Employment, Health)*

The fifth Senate Factor calls for evaluation of "the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."[69] A roughly equal number of courts that engage in fac-

---

2003 WL 21524820, at *12 (July 7, N.D.N.Y. 2003); New Rochelle Voter Defense Fund v. City of New Rochelle, 308 F. Supp. 2d 152, 161 (S.D.N.Y. 2003); Goosby v. Town of Hempstead, 180 F.3d 476, 483-86, 494 (2d Cir. 1999); Ortiz v. City of Philadelphia Office of City Comm'rs Voter Registration Div., 824 F. Supp. 514, 537 & n.22 (1993); Armour v. Ohio, 775 F. Supp. 1044, 1056 (N.D. Ohio 1991). Covered: *Shirt*, 336 F. Supp. 2d at 1036.

[65] *See, e.g., County of Albany*, 2003 WL 21524820, at *12 ("minorities have generally been excluded from candidacy for County offices except in majority/minority districts"); *City of Bridgeport*, 26 F.3d at 276 (2d Cir. 1994) (noting that a black candidate won the mayoral primary, that an influential group called the Democratic Town Committee failed to endorse him, and that the candidate lost the general election in an overwhelmingly Democratic city); *Shirt*, 336 F. Supp. 2d at 1037 ("[T]he chairman of the Democratic central committee in Bennett County actively campaigned against his own party's nominees for county commissioner in the 2002 general elections after Indian candidates unseated the incumbent, non-Indian Democrats in the primary election."); *Armour*, 775 F. Supp at 1056 (noting that an officially endorsed African-American candidate received zero votes in several precincts despite the fact that party rules required party officials, two of whom resided in such precincts, to support the party's nominee); *City of Philadelphia*, 824 F. Supp. at 537 and n.22 (campaign materials distributed by the Democratic Party included all candidates running at-large for city council except one Latino and one African American).

[66] Covered: *Gretna*, 834 F.2d at 499; *Pasadena Indep. Sch. Dist.*, 958 F. Supp. at 1223-24. Noncovered: *City of Chicago Heights*, 1997 WL 102543, at *9.

[67] Marylanders for Fair Representation, Inc. v. Schaefer, 849 F. Supp. 1022, 1061 (D. Md. 1994).

[68] *City of LaGrange*, 969 F. Supp. at 777.

[69] See SENATE REPORT, *supra* note 12, at 27–30.

18                               *Ellen Katz*

tor analysis found this factor in covered and noncovered jurisdictions, but they did so in a greater proportion of the covered lawsuits than in noncovered ones. The difference in proportion suggests a relationship but does not rise to conventional levels of statistical significance.[70]

Many courts relied on voter registration rates as one way to gauge the minority group's "ability to participate effectively in the political process." Fourteen lawsuits in covered jurisdictions document minority voter registration rates that lag behind the white voter registration rate, compared with three such lawsuits in noncovered jurisdictions. Nine of the lawsuits from covered jurisdictions date from the 1980s, including one that found African-American voter registration in Mississippi in 1985 lagged twenty-five percentage points below that of whites.[71] The post-1990 findings report minority registration rates in covered jurisdictions that range from 9 to 32.1 points below that of whites.[72]

Courts also evaluated levels of minority-voter turnout as a measure of effective political participation. Thirteen lawsuits in noncovered jurisdictions identified lower rates of minority-voter turnout, notwithstanding equivalent voter registration rates.[73] Five lawsuits in covered jurisdictions found lower turnout alone,[74] while four additional lawsuits in covered jurisdictions expressly found both that the minority-voter registration rate and minority-voter turnout rate lagged behind that of whites.[75] Nearly equivalent levels of minority turnout or registration led courts in both covered and noncovered jurisdictions to conclude in roughly equal numbers that Factor 5 was not met.[76]

Some courts looked beyond quantitative comparisons to consider how various forms of racial segregation affected the ability of minority groups to participate in the political process. Five of the six lawsuits to consider the effects of ongoing

---

[70] *See* Appendix, Table 8.2; Katz et al., *Documenting Discrimination*, *supra* note 13, at 702; *see also* VRI Database Master List, *supra* note 13 (showing that courts found Factor 5 in 42.9% of covered suits considering Senate factors, compared to 32.8% of such noncovered suits).

[71] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 704–05; Mississippi State Chapter, Operation Push, Inc. v. Mabus, 932 F.2d 400, 403 (5th Cir. 1991).

[72] Askew v. City of Rome, 127 F.3d 1355, 1371 (11th Cir. 1997) (12.85-point black/white disparity in 1995); Teague v. Attala County, 92 F.3d 283, 294 (5th Cir. 1996) (19.8-point black/white registration gap as of 1996); Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1039–40 (D.S.D. 2004) (20-point Indian/white disparity in 2000); *City of La Grange*, 969 F. Supp. at 768 (32.1-point and 9-point black/white gaps in 1991 and 1995).

[73] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 704.

[74] U.S. v. Charleston County, 365 F.3d 341, 344 (4th Cir. 2004); Citizens for a Better Gretna v. City of Gretna, 636 F. Supp. 1113, 1119 (E.D. La. 1986); Jackson v. Edgefield County, 650 F. Supp. 1176, 1181 (D.S.C. 1986); Jordan v. City of Greenwood, 599 F. Supp. 397, 401 (N.D. Miss 1984); United States v. Dallas County Comm'n, 739 F.2d 1529, 1538 (11th Cir. 1984).

[75] *Shirt*, 336 F. Supp. 2d at 1039–40; Neal v. Coleburn, 689 F. Supp. 1426, 1428 (E.D. Va. 1988); McDaniels v. Mehfoud, 702 F. Supp. 588, 594 (E.D. Va. 1988); Terrazas v. Clements, 581 F. Supp. 1329, 1350 (N.D. Tex. 1984).

[76] *See* Katz et al., Documenting Discrimination, *supra* note 13, at 705 and n. 345.

segregation probative of the Factor 5 inquiry originated in covered jurisdictions.[77] The district court in the *Charleston County* litigation observed severe societal and housing segregation and found that racial separation "makes it especially difficult for African-American candidates seeking countywide office to reach out to and communicate with the predominantly white electorate from whom they must obtain substantial support to win an at-large election[.]"[78] The district court in the *Neal* litigation concluded that similar segregation means "that whites in the County have historically had little personal knowledge of or social contact with blacks. . . . Quite simply, whites do not know blacks and are, as a result highly unlikely to vote for black candidates."[79]

*Racial Appeals*

The sixth factor in the Senate Report instructs courts to assess whether political campaigns have been characterized by overt or subtle racial appeals.[80] In covered jurisdictions, 18 courts, comprising 17.1% of the lawsuits that considered the Senate Factors, found this factor, compared with fifteen findings (or 11.5%) in noncovered jurisdictions.[81] These differences are not statistically significant.

Some courts noted that campaigns generally have been marked by racial appeals,[82] but most decisions finding Factor 6 identified appeals in specific campaigns. Courts have identified racial appeals in seventy-three specific elections occurring between 1950 and 2002, with forty-three of these appeals occurring in covered jurisdictions. Courts finding Factor 6 identified forty-seven specific racial appeals or campaigns characterized by racial appeals since 1982, thirty (63.8%) of which occurred in covered jurisdictions.[83]

Section 2 lawsuits have construed a range of conduct to constitute a racial appeal. In covered and noncovered communities alike, racial appeals included advertisements with photographs that darkened the skin of minority candidates, efforts to link candidates with racially divisive figures, and the invocation of racially inflammatory issues and rhetoric in campaigns.[84]

---

[77] *Id.* at 706 (covered cases); Stabler v. County of Thurston, 129 F.3d 1015, 1023 (8th Cir. 1997) (noncovered).

[78] *Charleston County*, 316 F. Supp. 2d at 291.

[79] *Neal*, 689 F. Supp. at 1430.

[80] *See* SENATE REPORT, *supra* note 12, at 27–30.

[81] *See* Appendix, Table 8.2; VRI Database Master List, *supra* note 13; Katz et al., *Documenting Discrimination*, *supra* note 13, at 708; *id.* at 771–72, app., tbl. C, *Racial Appeals Documented in Section 2 Litigation: Timeline and Citations*, http://www.votingreport.org.

[82] *See, e.g.*, Ward v. Columbus County, 782 F. Supp. 1097, 1105 (E.D.N.C. 1991) (noting the long history and continuing practice of using racial appeals in campaigns in Columbus County and North Carolina generally).

[83] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 708.

[84] *Id.* at 708–17.

20                                    *Ellen Katz*

*Lack of Minority Electoral Success*

Under Senate Factor 7, courts are instructed to evaluate the "extent to which members of the minority group have been elected to public office in the jurisdiction."[85] Courts examining the Senate Factors were more likely to find a lack of minority electoral success in covered jurisdictions than in noncovered ones, and did so at a rate that is statistically significant. Nearly one in two courts in covered jurisdictions found a lack of candidate success, compared to less than one in three courts in noncovered jurisdictions.[86]

Courts evaluating Factor 7 looked primarily at election results, counting the number of minority candidates elected, typically over the course of several elections and even decades.[87] Several cases distinguished election results occurring before the lawsuit was initiated and those filed afterwards and often discounted evidence of postfiling minority success as strategic efforts to frustrate the lawsuit.[88]

Unsurprisingly, Factor 7 weighed heavily in the plaintiffs' favor in cases where electoral results revealed a total absence or dearth of minority candidates winning election. Courts have repeatedly found a lack of minority success in this situation. In covered jurisdictions, twenty-four lawsuits challenging thirty-two governing bodies specifically found that no minority candidate had ever been elected in the post-1964 era. Fourteen lawsuits in noncovered jurisdictions challenging seventeen governing bodies made the same finding.[89]

On the other hand, Factor 7 favored defendants where electoral results showed significant success of minority candidates. In twenty-two lawsuits, courts in noncovered areas found significant and sustained electoral success in the defendant jurisdictions. Eight courts in covered jurisdictions made the same finding.[90]

Electoral results do not constitute the entire inquiry under Factor 7. Numerous courts have considered the record of minority electoral success in conjunction with population statistics. While Section 2 is explicit that the statute provides no right to proportional representation,[91] several courts viewed the absence of proportional

---

[85] SENATE REPORT, *supra* note 12 at 27–30.

[86] *See* Appendix, Table 8.2 (showing that of covered suits considering Senate Factors, 48.6% found a lack of minority candidate success, compared to 29.8% of such noncovered suits; in absolute terms, fifty-one covered suits found a lack of success as compared to thirty-nine noncovered); VRI Database Master List, *supra* note 13; Katz et al., *Documenting Discrimination, supra* note 13, at 717–18.

[87] *See, e.g.*, Sanchez v. Colorado, 97 F.3d 1303, 1319 (10th Cir. 1996) (noting that no Hispanic candidate had won election to state legislature from the district since 1940).

[88] *See, e.g.*, Ruiz v. City of Santa Maria, 160 F.3d 543, 548 (9th Cir. 1998); Gunn v. Chickasaw County II, No. CIV.A. 1:92CV142-JAD, 1997 WL 33426761, at *4 (N.D. Miss. Oct. 28, 1997); Clark v. Edwards, 725 F. Supp. 285, 299 (M.D. La. 1988); McNeil v. City of Springfield, 658 F. Supp. 1015, 1031 (C.D. Ill. 1987).

[89] *See* Katz et al., *Documenting Discrimination, supra* note 13, at 718–19.

[90] *See id.*

[91] *See* 42 U.S.C. § 1973(b) (2005) (providing that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population").

representation as suggesting a lack of minority electoral success under Factor 7.[92] Others viewed evidence that minority officeholders approached or exceeded the proportion of minorities in the electorate as proof of minority electoral success.[93]

Where minority electoral success hinges on the advantages of incumbency secured through appointment, some courts have found that such "success" has little bearing on the ability of minority candidates to win elections generally.[94] Others have viewed such evidence as indicating minority electoral success is possible.[95]

Several lawsuits looked beyond electoral results to assess the number of minority candidates participating in given races. Some courts noted that the failure of minority citizens to "offer themselves" as candidates weighed against finding a lack of minority electoral success.[96] Other courts, however, considered the possibility that a dearth of minority candidates might itself stem from "the very barriers to political participation that Congress has sought to remove" and weighed the small number of minority candidates in favor of plaintiffs.[97]

*Lack of Responsiveness*

In addition to the seven "typical" factors listed above, the Senate Report adds two additional factors "that in some cases have had probative value" in establishing a Section 2 violation. The first, called here Factor 8, is whether there "is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."[98] Few courts have found a lack of responsiveness, with twenty findings in 331 lawsuits. Courts in covered and noncovered jurisdictions found this factor in equal numbers and similar proportions.[99]

Courts have more frequently found a lack of responsiveness when elected officials engaged in acts of official discrimination in covered jurisdictions.[100] Non-

---

[92] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 719 and n. 441.

[93] *See id.* at 720 and n. 442.

[94] *See id.* at 720 and nn. 450–51.

[95] *See* NAACP v. City of Niagara Falls, 65 F.3d 1002, 1021 (2d Cir. 1995); Askew v. City of Rome, 127 F.3d 1355, 1384 n.18 (11th Cir. 1997).

[96] *See, e.g.,* Jenkins v. Red Clay Sch. Dist., 780 F. Supp. 221, 226 (D. Del. 1991); McCarty v. Henson, 749 F.2d 1134, 1135 (5th Cir. 1984).

[97] *See, e.g.,* Clark v. Calhoun County, 88 F.3d 1393, 1397–98 (5th Cir. 1996) (quoting Westwego Citizens for Better Government v. City of Westwego, 872 F.2d 1201, 1208 n. 9 (5th Cir. 1989)); *see also* Cofield v. City of LaGrange, 969 F. Supp. 749, 776 (N.D. Ga. 1997); LULAC v. Midland Indep. Sch. Dist., 648 F. Supp. 596, 604 (W.D. Tex. 1986); Cousin v. Sundquist, 145 F.3d 818, 833 (6th Cir. 1998).

[98] Senate Report, *supra* note 12, at 29.

[99] *See* Appendix, Table 8.2; VRI Database Master List, *supra* note 13; *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 722.

[100] In eight cases where a court either made findings of post-1982 official discrimination or actually held that the jurisdiction had engaged in intentional discrimination in violation of the statute or Constitution, courts also found a lack of responsiveness—with six of these in covered jurisdictions. Dillard v. Baldwin County Bd. of Education, 686 F. Supp. 1459 (M.D. Ala. 1988); Brown v. Board of School Comm'rs, 706 F.2d 1103 (11th

discrimination sufficed to establish responsiveness in a number of lawsuits, but not all of them.[101] Many courts looked for additional efforts on behalf of minority constituents, ranging from the provision of services such as road paving, medical care, community policing, the creation of affirmative action hiring plans and staff training, or funding for community development.[102]

Several courts defined responsiveness in procedural terms, examining the extent to which elected officials met with minority constituents, knew their concerns, campaigned in their neighborhoods, and otherwise encouraged minority political participation.[103]

*Tenuousness*

The second additional factor the Senate Report lists for consideration, called here Factor 9, is "whether the justification for the policy behind the practice is tenuous."[104] Courts in both covered and noncovered jurisdictions held the identified justification to be tenuous infrequently, in roughly equal numbers but in a greater proportion of the covered lawsuits to engage in factor analysis than in noncovered ones. The difference in proportion suggests a relationship but does not rise to conventional levels of statistical significance.[105] Twelve lawsuits addressed tenuousness in cases where defendants offered no justification for the challenged policy, of which two-thirds are from covered jurisdictions.[106]

## II. The Need for a Record, But of What Type?

Congress approved reauthorization of Section 5 last summer, and President Bush promptly signed the legislation. The question that remains is whether the Supreme Court will let it stand. The Court has explicitly upheld Section 5's validity in the past[107] and specifically affirmed its continued constitutionality even

Cir. 1983); Holder v. Hall, 512 U.S. 874 (1994); Rybicki v. State Bd. of Elections of State of Ill., 574 F. Supp. 1147 (N.D. Ill. 1983); Armour v. Ohio, 775 F. Supp. 1044 (N.D. Ohio 1991); Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D 2004); Williams v. City of Dallas, 734 F. Supp. 1317 (N.D. Tex. 1990); Political Civil Voters Organization v. Terrell, 565 F. Supp. 338 (N.D. Tex. 1983).

[101] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 723 and n. 470; *id.* at 724.

[102] *Id.* at 724–25 and nn. 474–86.

[103] *Id.* at 725–27.

[104] SENATE REPORT, *supra* note 12, at 27–30.

[105] *See* Appendix, Figure 8.2 (showing that 12.4% of covered suits considering factors, compared to 7.6% of noncovered suits, found a tenuous justification); VRI Database Master List, *supra* note 13; Katz et al., *Documenting Discrimination*, *supra* note 13, at 727.

[106] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 727–28.

[107] *See, e.g.*, Lopez v. Monterey County, 525 U.S. 266, 284–85 (1999); City of Rome v. United States, 446 U.S. 156 (1980); South Carolina v. Katzenbach, 383 U.S. 301 (1966).

as the justices have articulated new, stringent limitations on congressional power to enforce civil rights in other contexts.[108] Nevertheless, the Court's willingness to uphold Section 5 as reauthorized remains far from certain.

The reason stems largely from a series of Supreme Court decisions beginning in 1997. *City of Boerne v. Flores* announced the now familiar requirement that congressional legislation enforcing the Reconstruction Amendments must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."[109] The Court invalidated six federal statutes under this standard, specifically judging the congressional findings underlying each statute insufficient to justify the statutory proscriptions involved.[110] The Court's two most recent *Boerne* decisions uphold congressional enactments based on thinner records than those deemed inadequate in the original decisions,[111] but they nevertheless continue to emphasize "the extent and specificity" of the unconstitutional state conduct needed as a predicate for congressional action.[112] Read

---

[108] *See, e.g.*, Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 373 (2001); United States v. Morrison, 529 U.S. 598, 626–27 (2000); Kimel v. Florida Bd. of Regents, 528 U.S. 62, 88–89 (2000); Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 639 and n.5 (1999); City of Boerne v. Flores, 521 U.S. 507, 518 (1997); *see also* Nevada Dep't of Human Resources v. Hibbs, 538 U.S. 721, 736–38 (2003); *id.* at 742–43 (Scalia, J., dissenting); Tennessee v. Lane, 541 U.S. 509, 547–48 (2004) (Rehnquist, C.J., dissenting). *See generally* Ellen D. Katz, *Reinforcing Representation: Congressional Power to Enforce the Fourteenth and Fifteenth Amendments in the Rehnquist and Waite Courts*, 101 MICH. L. REV. 2341, 2368 n. 157 (2003).

[109] City of Boerne v. Flores, 521 U.S. 507, 520 (1997).

[110] *See* Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001) (Title I of the Americans with Disabilities Act); Kimel v. Florida Bd. of Regents, 528 U.S. 62 (2000) (Age Discrimination in Employment Act); United States v. Morrison, 529 U.S. 598 (2000) (Violence Against Women Act); Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627 (1999) (*Florida Prepaid II*) (Patent and Plant Variety Protection Remedy Clarification Act); College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999) (*Florida Prepaid I*) (Trademark Remedy Clarification Act); Boerne v. Flores, 521 U.S. 507 (1997) (Religious Freedom Restoration Act).

[111] Nevada Dep't of Human Resources v. Hibbs, 538 U.S. 721 (2003), and Tennessee v. Lane, 541 U.S. 509, 520–22 (2004), upheld the Family Medical Leave Act and Title II of the Americans with Disabilities Act, respectively. These decisions may signal the Court's greater deference to Congress when challenged statutes implicate a suspect classification or fundamental right. *See* Erwin Chemerinsky, *New Federalism: Real Discrimination?*, 16 WASH. U. J. L. & POL'Y 97, 118 (2004) ("Together *Lane* and *Hibbs* establish that Congress has more authority to act under Section 5 . . . when it is dealing with claims of discrimination or violations of rights which receive heightened scrutiny."); *but see* Vikram David Amar, *The New "New Federalism": The Supreme Court in Hibbs (and Guillen)*, 6 GREEN BAG 2d 349, 351–54 (2003) (arguing that the heightened scrutiny for gender classifications notwithstanding, *Hibbs* is irreconcilable with *Boerne* and *Morrison*).

[112] *See Hibbs*, 538 U.S. at 733–34 and n.11 (2003); *Lane*, 541 U.S. at 528–29 ("sheer volume of evidence demonstrating the nature and extent of unconstitutional dis-

together,[113] the *Boerne* decisions suggest that Congress can rely on neither general assertions nor isolated examples of unconstitutional conduct,[114] but instead must document a widespread pattern of such conduct by entities of the sort being subject to suit.[115]

Many people read *Boerne* and its progeny to signal that the reauthorization of Section 5 will survive constitutional scrutiny only if the congressional record underlying the statute documents pervasive unconstitutional conduct in covered jurisdictions.[116] To the extent the Court will require such a record,[117] the Section 2 decisions offer one source for identifying recent instances of unconstitutional conduct related to voting. While Section 2's results-based test for discrimination in voting prohibits conduct that would not necessarily violate the Constitution,[118] eighteen Section 2 decisions, eight of which originated in covered jurisdictions, identified unconstitutional conduct.[119] As important, courts assessing the Senate

---

crimination" demonstrated through "judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services").

[113] *But cf.* supra note 111.

[114] *See, e.g., Garrett,* 531 U.S. at 370 (dismissing "unexamined, anecdotal accounts of 'adverse, disparate treatment by state officials,'" when found outside the formal legislative findings); *Kimel,* 528 U.S. at 90 (2000) (rejecting as insufficient "assorted sentences . . . cobble[d] together from a decade's worth of congressional reports and floor debates" as either general unsubstantiated assertions or isolated anecdotal examples). While the Court has not wholly rejected anecdotal evidence suggesting unconstitutional conduct, it has treated such examples with considerable skepticism and indicated its preference for examples of adjudicated constitutional violations. *See, e.g., Garrett,* 531 U.S. at 375–76 (Kennedy, J., concurring) (noting absence of "confirming judicial documentation" in the form of court decisions addressing unconstitutional discrimination by States against people with disabilities).

[115] *See, e.g., Kimel,* 528 U.S. at 91 (finding that Congress failed "to uncover any significant pattern of unconstitutional discrimination," and that it lacked "evidence of widespread and unconstitutional age discrimination by the States"); *Florida Prepaid I,* 527 U.S. 627, 640 (1999) (concluding that "Congress identified no pattern of such [patent] infringement [by the States], let alone a pattern of constitutional violations."); *City of Boerne,* 521 U.S. at 531 (noting absence of evidence documenting "some widespread pattern of religious discrimination in this country"); *id.* at 526 (noting absence of a "widespread and persisting deprivation of constitutional rights").

[116] *See, e.g., supra* note 6; *see also* Richard L. Hasen, *What Congress Should Consider Before Renewing the Voting Rights Act: A Chance to Preempt Supreme Court Invalidation, and Better Protect Minority Voting Rights,* FindLaw (May 30, 2006) ("[T]here is a very serious risk that the Roberts Court would strike down a renewed section 5 as unconstitutional."), at http://writ.news.findlaw.com/commentary/20060530_hasen.html.

[117] For the argument why it should not, see *infra* notes 124–152 and accompanying text.

[118] *See, e.g.,* City of Mobile v. Bolden, 446 U.S. 55 (1980).

[119] For lawsuits expressly finding both constitutional and Section 2 violations, see *Arakaki v. Hawaii,* 314 F.3d 1091 (9th Cir. 2002); *Garza v. County of Los Angeles,* 918 F.2d 763 (9th Cir. 1990); *Brown v. Board of School Comm'rs,* 706 F.2d 1103 (11th Cir.

factors in the course of adjudicating Section 2 cases have documented evidence
that reveals a wide range of unconstitutional conduct by state and local officials.
While these judicial findings are not formal adjudications of unconstitutional con-
duct, they represent the considered judgment of federal judges that the evidence
they reviewed in the course of litigation reveals conduct that runs afoul of the
Constitution.[120]

Standing alone, however, these findings do not appear to establish the sort of
record the Court has required in the *Boerne* decisions.[121] While courts evaluating
Section 2 claims in covered jurisdictions have documented pervasive, systematic
racial discrimination linked to voting in specific locations in recent years,[122] courts
in noncovered regions have identified official conduct of a similar character.[123] In
both regions, moreover, findings of unconstitutional conduct in specific Section 2
cases may in fact be relatively isolated examples of misconduct and not emblem-

---

1983); *NAACP v. Gadsden County*, 691 F.2d 978 (11th Cir. 1982); City of New Rochelle,
308 F. Supp. 2d 152, 158 (S.D.N.Y. 2003); *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D.
Ark. 1990); *Marks v. Stinson*, 1994 WL 146113, at * 33–4 (E.D. Pa. 1994); *Armour v.
Ohio*, 775 F. Supp. 1044 (N.D. Ohio 1991); *League of United Latin American Citizens v.
Midland Indep. Sch. Dist.*, 648 F. Supp. 596 (W.D. Tex. 1986); *Political Civil Voters
Org'n v. Terrell*, 565 F. Supp. 338 (N.D. Tex. 1983); *see also* Haywood County, 544 F.
Supp. 1122 (W.D. Tenn. 1982) (preliminary injunction based on proven Section 2 viola-
tion and likely success on constitutional claim); *Brown v. Dean*, 555 F. Supp. 502 (D.R.I.
1982) (declaratory and injunctive relief based on "constitutional error" and implied Sec-
tion 2 violation). For lawsuits finding discriminatory intent and effect under Section 2,
see *Dillard v. Town of North Johns*, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989); *Harris v.
Siegelman*, 695 F. Supp. 517, 525 (M.D. Ala. 1988); *Dillard v. Baldwin Bd. of Ed.*, 686
F. Supp. 1459, 1467 (M.D. Ala. 1988); *Buskey v. Oliver*, 565 F. Supp. 1473, 1485 (M.D.
Ala. 1983); *see also United States v. Town of Cicero*, 2000 WL 34342276, at *1 (N.D. Ill.
2000) (preliminary injunction based on likely success on showing purposeful discrimina-
tion under Section 2); *Dillard v. Crenshaw*, 640 F. Supp. 1347, 1361 (M.D. Ala. 1986)
(same).

[120] *See* Katz et al., *Documenting Discrimination*, *supra* note 13, at 675–97.

[121] To the extent that *Hibbs* and *Tennessee v. Lane* signal the Court's greater defer-
ence to Congress in cases implicating a suspect classification or fundamental right, the
reauthorization of Section 5 may be less vulnerable than commonly believed with the
Section 2 findings providing a good portion of the record that is required. *See supra* note
1111.

[122] *See, e.g.*, Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1024-28 (D.S.D. 2004); United
States v. Charleston County, 316 F. Supp. 2d 268, 286 n.23 (D.S.C. 2003); Hall v.
Holder, 955 F.2d 1563, 1570–71 (11th Cir. 1992); Williams v. City of Dallas, 734 F.
Supp. 1317, 1324 (N.D. Tex. 1990); Town of North Johns, 717 F. Supp. 1471, 1477
(M.D. Ala. 1989); Harris v. Siegelman, 695 F. Supp. 517, 527 and n.8 (M.D. Ala. 1988);
Harris v. Graddick, 593 F. Supp. 128, 133 (M.D. Ala. 1984); Dillard v. Crenshaw
County, 640 F. Supp. 1347, 1356, 1360–61 (M.D. Ala. 1986).

[123] *See, e.g.*, United States v. Berks County, 250 F. Supp. 2d 525, 527 (E.D. Pa.
2003); Cuthair v. Montezuma-Cortez Sch. Dist., 7 F. Supp. 2d 1152, 1162 (D. Colo.
1998); Stabler v. County of Thurston, 129 F. 3d 1015, 1022–23 (8th Cir. 1997); Jeffers v.
Clinton, 730 F. Supp. 196, 210 (E.D. Ark. 1989).

atic of a widespread pattern of such conduct in covered or noncovered regions as a whole.

To be sure, the Section 2 findings reflect the limitations that inhere in reliance on published Section 2 case law as a source for describing opportunities for political participation nationwide.[124] Judicial application of the Senate Factors in published Section 2 decisions offers selective snapshots of participation in the respective jurisdictions, not a comprehensive and systematic overview. And yet, the inability of these findings to satisfy the *Boerne* standard, at least in its strongest form, stems not simply from the inherent limits of the data set. In fact, no source will document the widespread pattern of unconstitutional conduct the *Boerne* decisions demand because official discrimination in covered jurisdictions is no longer as prevalent as it once was.

This assertion will alarm proponents of reauthorization who believe the continued validity of Section 5 depends on such a record. This belief, however, is mistaken. Section 5 is fundamentally different from the statutes at issue in the *Boerne* cases, and this difference renders the *Boerne* doctrine inapplicable to reauthorization, at least in the sense that the prevailing discussion seems to assume.

All the *Boerne* decisions involved the question whether a problem Congress sought to address was significant enough to warrant a new congressional statute. In that context, documentation of pervasive unconstitutional conduct signals a problem in need of a remedy. By contrast, reauthorization of an existing statute presents a distinct question. The issue is not whether a new statute is needed, but instead whether an existing one should continue. Here, the Court should not require evidence of widespread unconstitutional conduct because the statute at issue is already operational. Section 5, after all, was put in place more than forty years ago to address precisely the type of pervasive discrimination the *Boerne* cases demand for new legislation. As a consequence, the validity of reauthorization cannot depend on evidence that such discrimination persists largely unchanged. To require otherwise would limit reauthorization to statutes that are ineffectual.

Put differently, Section 5's very success in addressing racial discrimination in voting is itself neither proof that preclearance has become obsolete nor license for the statute to continue indefinitely. The question whether preclearance is still needed depends not on a raw assessment of the present scope of unconstitutional conduct in covered jurisdictions, but instead on a predictive judgment about the likely prevalence of such conduct absent the constraints imposed by Section 5. This question can only be answered through speculation about whether Section 5 has achieved its goals, broadly understood.

For four decades, the preclearance requirement has sought to suppress manifestations of racial discrimination in voting by "shift[ing] the advantages of time and inertia from the perpetrators of the evil to its victims."[125] The hope, however, was that Section 5 would do even more. Because Congress enacted Section 5 as a temporary measure and repeatedly extended it for only circumscribed periods,

---

[124] *See supra* note 14.
[125] *See* South Carolina v. Katzenbach, 383 U.S. 301, 328 (1966).

preclearance is necessarily premised on the belief that controlling the symptoms of racial discrimination can ultimately cure the underlying disease. In this sense, Section 5 might be understood as a behavior modification program, one designed not simply to check certain conduct during the pendency of the program but instead to bring about lasting changes in behavior and attitude.

Without doubt, Section 5 has been extraordinarily successful in controlling discrimination in voting. While blatantly unconstitutional conduct has hardly been eradicated, contemporary manifestations of racial discrimination in voting are jarring precisely because they are no longer the norm, as they were before Section 5 was implemented.[126] Less clear is whether Section 5 has successfully achieved its larger ambition not simply to suppress discrimination in voting but to change the attitudes that, if left unchecked, give rise to the behavior. The overall decline in unconstitutional conduct no doubt stems, at least in part, from changed attitudes.[127] And yet, the need to traverse the preclearance process, as well as simply the prospect of needing to do so, inevitably constrains discriminatory behavior to a significant degree.[128]

Here, the Section 2 decisions offer some basis to consider how covered jurisdictions might look absent Section 5. On the one hand, judicial findings in many Section 2 cases suggest fundamentally changed attitudes. Section 2 findings document successful minority candidacies for a range of public offices in covered jurisdictions, with minority electoral representation exceeding proportional representation in some areas.[129] These findings record instances in which minority candidates run successfully not just from majority-minority districts, but in at-large elections and districts in which minority voters do not comprise a majority of voters.[130]

---

[126] *See, e.g., Shirt*, 336 F. Supp. 2d at 1024–28; *Charleston County*, 316 F. Supp. 2d at 286 n.23.

[127] *See, e.g.,* Kevin Sack, *In the Rural White South, Seeds of a Biracial Politics*, N.Y. TIMES, Dec. 30, 1998, at A1.

[128] *See, e.g.,* Tex. H.J. (78th Sess., 11th day, Oct. 10, 2003) (statement by Representative Phil King) ("quite frankly, it's very, very difficult to draw a district in South Texas because of the Voting Rights Act and the only way you can do it, is to do it in the manner in which we did"); *Henderson v. Perry*, 399 F. Supp. 2d 756, 773 (E.D. Tex. 2005) ("By the time the plan now under attack was first proposed, the Voting Rights Act had effectively taken six Democratic Party seats off the table, rendering them untouchable . . . "); *see also* Pamela S. Karlan, Congressional Power to Extend Preclearance Under the Voting Rights Act, at 16 (June 14, 2006), American Constitution Society Issue Briefs, http://www.acslaw.org/node/2964 ("Jurisdictions that know that a change will not be precleared may decide not even to attempt making it.").

[129] *See supra* note 93 and accompanying text.

[130] Boddie v. City of Cleveland, 297 F. Supp. 2d 901, 908 (N.D. Miss. 2004) (minority success in city and countywide elections); NAACP v. Fordice, 252 F.3d 361, 371 (5th Cir. 2001) (minority success in at-large election where black voting age population was 26.88%); *City of Rome*, 127 F.3d at 1384 n.18 (finding that meaningful "biracial coalitions" exist and promote successful minority and minority-preferred candidates); see also Issacharoff, *supra* note 3, at 1714 (noting that "the major Supreme Court cases of the past

28                                    *Ellen Katz*

Section 2 findings, moreover, document that minority voters in some covered jurisdictions register and vote "without hindrance," and in some areas do so at a rate comparable to or greater than that of white residents.[131] Courts have documented numerous instances in which public services are distributed in a nondiscriminatory manner, as well as instances in which some minority neighborhoods receive greater services than nonminority ones. Courts have found that elected officials in various covered jurisdictions are generally responsive to the needs of the minority community.[132] Compared, moreover, to the first years after Section 2 was amended, fewer courts in recent years have found covered (and noncovered) jurisdictions using "enhancing devices" and fewer have found legally significant racial bloc voting in these jurisdictions.[133] Finally, since 1982 courts in covered jurisdictions have documented fewer, albeit not to a statistically significant degree, instances of official intentional discrimination as well as fewer Section 2 violations that simultaneously violated the Constitution than courts in noncovered jurisdictions.[134]

Taken together, these findings may well suggest a vital new way of thinking in covered jurisdictions. And yet, because these developments occurred in communities subject to the constraints imposed by Section 5, and, without doubt, were shaped by them,[135] the question arises whether they would persist in the absence of the preclearance process. That courts in covered jurisdictions have not documented extensive intentional racial discrimination of the sort Congress meant Section 5 to block may mean nothing more than that Section 5 is fulfilling its most basic mission, namely, blocking covered jurisdictions from "pour[ing] old poison into new bottles."[136]

Indeed, a broader comparison of the judicial findings in covered and noncovered jurisdictions suggests caution before concluding that preclearance has transformed the sentiments that long propelled discriminatory conduct in covered jurisdictions. This comparison shows that distinct vestiges of discrimination persist in

---

decade addressing minority representation, beginning with *Shaw v. Reno*, have all arisen from claims of southern politics being too solicitous of minority political claims.").

[131] McCarty v. Henson, 749 F.2d 1134, 1135 (5th Cir. 1984); *see supra* note 76 and accompanying text.

[132] *See* Katz et al., Documenting Discrimination, *supra* note 13, at 722.

[133] *See* text accompanying *supra* note 55; *see also supra* note 58 and accompanying text.

[134] *See supra* note 41 and accompanying text.

[135] *See* Peyton McCrary, C. Seaman and R. Valelly, *The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act*, 11 Mich. J. Race & L. 275, 297–299 (2006) (finding that the preclearance process has repeatedly blocked proposed electoral changes based on evidence of bad intent); *see also* Pamela S. Karlan, *Georgia v. Ashcroft and the Retrogression of Retrogression*, 3 Election L. J. 21, 36 (2004) (arguing that "the gains minority voters have achieved over the last four reapportionment cycles . . . have all occurred in the shadow of section 5, which has given minority voters and their representatives an invaluable bargaining chip").

[136] *Bossier Parish II*, 528 U.S. 320, 366 (2000) (Souter, J., concurring in part and dissenting in part).

covered jurisdictions such that the elimination of Section 5 would hardly be inconsequential.

Of particular note is that covered jurisdictions account for the majority of the Section 2 lawsuits in which plaintiffs achieved successful outcomes since 1982.[137] This greater success is noteworthy given that the opposite trend might have been anticipated. Less than one-quarter of the U.S. population resides in covered jurisdictions,[138] courts in the region arguably apply standards that make success on a Section 2 claim more difficult,[139] and the preclearance process blocks some portion of discriminatory electoral changes that might otherwise be challenged under Section 2.

To be sure, Section 2 and Section 5 are not coextensive, with each proscribing some conduct that would be permissible under the other.[140] Still, they are not wholly distinct, and a large number of electoral practices run afoul of both provisions. Where they do, preclearance should block such practices as retrogressive and thereby eliminate the need for plaintiffs to challenge them under Section 2. As a result, if governmental officials in each jurisdiction have equal propensity to engage in conduct prohibited by Section 2, one might have anticipated a greater number of successful Section 2 lawsuits in noncovered jurisdictions, where, by definition, preclearance does not operate. More Section 2 plaintiffs have nevertheless succeeded in covered jurisdictions even though a narrower range of practices is likely to be challenged under Section 2.

This phenomenon is most pronounced at the local level, where most objections interposed by the Department of Justice in the preclearance process have been made.[141] Even in this context, where preclearance operates most vigorously

---

[137] *See* Katz et al., *Documenting Discrimination, supra* note 13, at 655–56 (noting sixty-eight successful plaintiffs' outcomes in covered jurisdictions and fifty-five elsewhere).

[138] The raw numbers are 67,767,900 out of 281,421,906 (24% of the U.S. population). *See* U.S. Census Bureau, United States Census 2000, Demographic Profiles: 100% and Sample Data: Demographic Profile Data Search, http://censtats.census. gov/pub/Profiles.shtml (last visited September 14, 2006). In addition, these data show that 39.3% of African Americans, 31.8% of Hispanics or Latinos, and 24.8% of Native Americans in the United States live in Section 5-covered areas. *Id.* (Demographic Data Profiles, http://www.census.gov/Press-Release/www/2002/demoprofiles.html (last visited September 14, 2006)).

[139] *See, e.g., League of United Latin Am. Citizens (LULAC) v. Clements,* 999 F.2d 831, 850 (5th Cir. 1993) (en banc) (requiring plaintiffs prove race caused polarized voting trends in order to satisfy the third *Gingles* precondition); *see also* Elizabeth Ryan, Note, *Post-LULAC Section 2 Claims in the Fifth Circuit,* 105 MICH. L. REV.___ (2006) (forthcoming unpublished manuscript at 34, on file with author) (concluding that in the post-*LULAC* 5th Circuit, "[w]henever a defendant can introduce evidence of non-racial factors . . . plaintiffs lose").

[140] *See supra* note 10 and notes 32–37 and surrounding text.

[141] *See* Michael J. Pitts, *Let's Not Call the Whole Thing Off Just Yet: A Response to Samuel Issacharoff's Suggestion to Scuttle Section 5 of the Voting Rights Act,* 84 NEB. L.

30                          *Ellen Katz*

to block electoral changes, covered jurisdictions still are the subject of more suc-
cessful Section 2 challenges than are noncovered jurisdictions, where preclearance
is not screening out any of the challenges to local practices.[142]

A comparison of the underlying judicial findings in Section 2 litigation helps
explain the greater number of successful Section 2 claims in covered jurisdictions.
Compared with courts in noncovered jurisdictions, more courts in covered juris-
dictions have documented evidence of nonactionable bias, that is, racially dis-
criminatory conduct that violates no law, generally because private actors are en-
gaging in it. Examples include more extreme levels of racial bloc voting and more
election campaigns featuring racial appeals. Courts in covered jurisdictions have
also identified as salient various vestiges of discrimination at a higher rate,
namely, circumstances that are reasonably likely to follow from past active dis-
crimination, such as depressed levels of minority voter registration and turnout,
and the persistence of racial segregation found to hinder minority political partici-
pation.[143]

More courts have found a history of official discrimination in voting in cov-
ered jurisdictions than in noncovered ones, a finding that helps explain why more
courts find nonactionable bias and salient vestiges of discrimination in covered
jurisdictions than in noncovered ones. More courts in covered jurisdictions than in
noncovered ones have documented the use of various electoral "devices" that en-
hance opportunities for discrimination against minority groups, devices that give
expression to nonactionable bias and exacerbate the impact of various vestiges of
past discrimination. All these factors contribute to a lack of minority candidate
success, a finding consistently made by more courts in covered jurisdictions than
in noncovered ones.[144]

None of this, of course, establishes a contemporary constitutional violation.[145]
Section 2's totality of circumstance inquiry nevertheless calls for examination
based on the view that things like nonactionable bias, the vestiges of discrimina-
tion, historic official discrimination in voting, and the employment of practices
that enhance opportunities for discrimination all impede minority political partici-
pation and render electoral practices more likely to result in actionable discrimina-
tion against minority groups. While this actionable discrimination is not necessar-
ily unconstitutional discrimination, the reasons that render these problems proba-
tive of a Section 2 violation also make them indicia of an environment in which

---

REV. 605, 612 (2005) (arguing that the greatest impact of Section 5 and the VRA has
been to police voting discrimination at the local level).
    [142] *See supra* notes 22–23 and accompanying text.
    [143] *See supra* notes 50–54, 70–72, and 81–84 and accompanying text.
    [144] *See supra* note 92 and accompanying text.
    [145] As amended, Section 2's "results"-based test for discrimination in voting goes
beyond what the Constitution alone proscribes. *See* City of Mobile v. Bolden, 446 U.S.
55, 60–61 (1980).

past unconstitutional conduct has yet to be fully remedied and future constitutional injuries may arise.[146]

The Supreme Court has so recognized, or, more precisely, affirmed Congress's power to make this determination. *Katzenbach v. Morgan*[147] upheld the ban on literacy tests set forth in Section 4(e) of the Voting Rights Act of 1965, because such tests excluded members of New York City's Puerto Rican community from casting a ballot. The concern was both that the tests themselves were the product of prohibited discrimination and that the use of such tests fostered "discrimination in governmental services."[148] *Morgan* recognizes congressional power to ban this literacy test both as a remedy for past discrimination and also to protect the people the test excluded from future governmental discrimination. *Morgan* posits that people denied access to the franchise are more likely to confront such discrimination, and accordingly upholds congressional power to enact Section 4(e) because doing so "enhanced political power [that] will be helpful in gaining nondiscriminatory treatment in public services for the entire Puerto Rican community."[149]

*City of Boerne v. Flores* is known, in part, for its rejection of a distinct proposition long linked with *Morgan*, specifically, the suggestion that Congress may enact legislation that "expands" rights protected by the Fourteenth Amendment.[150] *Boerne*, however, assiduously affirmed the two rationales for *Morgan*'s holding, namely, congressional power to ban New York's English literacy test as a remedial measure for official discrimination in establishing voter qualification,[151] and congressional power to ban the test as a mechanism to address future discrimination in public services.[152]

*Boerne* and *Morgan* accordingly provide a framework under which the Supreme Court might uphold the reauthorization of Section 5 as both a remedial measure and a measure to block future discrimination. To be sure, Sections 4(e) and 5 are distinct, with one blocking an English literacy test as a prerequisite to voting and the other preventing covered jurisdictions from implementing any electoral change without first obtaining preclearance. *Boerne*, however, was careful to affirm the legitimacy not only of Section 4(e) but also of Section 5, which the decision presents as the paradigm of congruent and proportional congressional legislation.

---

[146] *Cf.* Hasen, *supra* note 8, at 190–94 (arguing that a potential for mischief is not the same as mischief itself and that nonstate action evidence is not a constitutionally acceptable substitute for evidence of intentional discrimination).

[147] 384 U.S. 641 (1966).

[148] *Id.* at 653.

[149] *Id.* at 652.

[150] *See City of Boerne v. Flores*, 521 U.S. 507, 527–28 (1997) (noting language in *Morgan* that "could be interpreted as acknowledging a power in Congress to enact legislation that expands the rights contained in Section 1 of the Fourteenth Amendment," and finding that "[a]ny suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our caselaw.").

[151] *See Boerne*, 521 U.S. at 528; *Morgan*, 384 U.S. at 654.

[152] 521 U.S. 507, 528 (1996). *See also* Katz, *supra* note 108, at 2395–96.

32                                   *Ellen Katz*

Whether Section 5 remains so after reauthorization is a complex and difficult question. Judicial findings in Section 2 lawsuits since 1982 attest to much of what Section 5 has accomplished. A comparison of these findings from covered and noncovered jurisdictions nevertheless suggests the many ways in which relevant differences persist.

## III. Conclusion

Federal judges adjudicating Section 2 claims are not social scientists. Their charge is not to produce a comprehensive portrait of political participation nationwide or even in the jurisdictions where electoral practices have been challenged. Section 2's totality of circumstances test functions instead much like a camera, distributed to courts in Section 2 litigation with instructions to photograph specific items. A quarter-century after the 1982 amendments to Section 2, federal judges have produced thousands of snapshots that offer selective but still probative images of political participation in covered and noncovered jurisdictions.

The quality of these images depends on various factors. These include the skill and diligence of, and resources available to, the attorneys involved in Section 2 litigation, as well as judicial predilections for interpreting the Voting Rights Act narrowly or expansively, for making detailed findings, and for publishing decisions that are reached. To the extent, however, that these factors vary in similar ways in covered and noncovered jurisdictions, the differences between the judicial findings in Section 2 lawsuits in these jurisdictions suggest real differences operating on the ground in these regions.

The significance of these differences is a matter of debate. But it is a debate about differences such as these that we should be having. The debate about the validity of reauthorization has instead focused for too long on the wrong question. The scope of unconstitutional conduct in covered jurisdictions cannot tell us whether preclearance is still needed. The debate should focus on evidence that might be more definitive given that the validity of reauthorization turns on it.

# Appendix

**Table 8.1. Total Lawsuits and Success in Voting Rights Act Section 2 Litigation, 1982–2005**

| Covered Jurisdictions | | | |
|---|---|---|---|
| Year Decided | Total Lawsuits | Success | % Success |
| 1980s | 59 | 35 | 59.3% |
| 1990s | 72 | 27 | 37.5% |
| 2000s | 29 | 6 | 20.7% |
| Grand Total | 160 | 68 | 42.5% |

| Noncovered Jurisdictions | | | |
|---|---|---|---|
| Year Decided | Total Lawsuits | Success | % Success |
| 1980s | 41 | 21 | 51.2% |
| 1990s | 84 | 23 | 27.4% |
| 2000s | 46 | 11 | 23.9% |
| Grand Total | 171 | 55 | 32.2% |

| Overall[a] | | | |
|---|---|---|---|
| Year Decided | Total Lawsuits | Success | % Success |
| 1980s | 100 | 56 | 56.0% |
| 1990s | 156 | 50 | 32.1% |
| 2000s | 75 | 17 | 22.7% |
| Grand Total | 331 | 123 | 37.2% |

[a] The chi-square value analyzing the contingency table with covered/noncovered jurisdictions versus successful/unsuccessful grand total is 3.782 (df = 1, p = 0.052).

*Source*: Ellen D. Katz & The Voting Rights Initiative, www.votingreport.org (2006).

33

34                          *Ellen Katz*

**Table 8.2. Senate Factor Findings in Post–1982 Section 2 Litigation, of All Suits Considering Factors**

|  | Covered Jurisdictions | | Noncovered Jurisdictions | | $p > \chi^2$ |
|---|---|---|---|---|---|
| Total Lawsuits | 160 | 100% | 171 | 100% | |
| Considered Factors | 105 | 65.6% | 131 | 76.6% | |
| Of Suits Considering Factors: | | | | | |
| Found Factor 1 | 61 | 58.1% | 50 | 38.2% | 0.002 |
| Found Factor 2 | 52 | 49.5% | 53 | 40.5% | 0.164 |
| Found Factor 3 | 33 | 31.4% | 19 | 14.5% | 0.002 |
| Found Factor 4 | 4 | 3.8% | 6 | 4.6% | 0.975 |
| Found Factor 5 | 45 | 42.9% | 43 | 32.8% | 0.113 |
| Found Factor 6 | 18 | 17.1% | 15 | 11.5% | 0.210 |
| Found Factor 7 | 51 | 48.6% | 39 | 29.8% | 0.003 |
| Found Factor 8 | 10 | 9.5% | 10 | 7.6% | 0.604 |
| Found Factor 9 | 13 | 12.4% | 10 | 7.6% | 0.222 |
| All *Gingles* Factors | 30 | 28.6% | 38 | 29.0% | 0.941 |

*Source*: Ellen D. Katz & The Voting Rights Initiative, www.votingreport.org (2006).

*Not Like the South?*                                    35

**Table 8.3. Local v. State Government Challenges under Section 2, 1982–2005[a]**

| Level of Gov't | Covered Jurisdictions | | | Noncovered Jurisdictions | | |
|---|---|---|---|---|---|---|
| | Total | Success | | Total | Success | |
| State | 38 | 11 | 28.9% | 58 | 15 | 25.9% |
| *County* | 47 | 26 | 55.3% | 44 | 16 | 36.4% |
| *City/Town* | 54 | 25 | 46.3% | 55 | 20 | 36.4% |
| *School*[c] | 21 | 6 | 28.6% | 14 | 4 | 28.6% |
| Local subtotal | 122 | 57 | 46.7% | 113 | 40 | 35.4% |
| Total | 160 | 68 | 42.5% | 171 | 55 | 32.2% |

| Level of Gov't | Test of Difference[b] $p > \chi^2$ |
|---|---|
| State | 0.739 |
| *County* | 0.070 |
| *City/Town* | 0.292 |
| *School*[c] | 0.703 |
| Local subtotal | 0.078 |
| Total | 0.052 |

[a] This figure displays the governing body challenged. Where suits challenged multiple governments, the highest level is counted.
[b] Chi-square values for each level of government analyze contingency tables for covered/noncovered jurisdictions versus successful/unsuccessful results.
[c] The chi-square value for this level of government is Yates continuity-corrected.
*Source*: Ellen D. Katz & The Voting Rights Initiative, www.votingreport.org (2006).

36                          *Ellen Katz*

**Table 8.4. Types of Electoral Practices Challenged under Section 2, 1982–2005[a]**

| At-Large Elections | | | | |
|---|---|---|---|---|
| Jurisdiction | Total | % of Suits | Success | % Success |
| Covered | 77 | 47.8% | 39 | 50.6% |
| Noncovered | 69 | 40.6% | 28 | 40.6% |
| | | | | |
| Total | 146 | 44.1% | 67 | 45.9% |

Chi-square = 1.486; p > $\chi 2$ = 0.223

| Reapportionment Plans | | | | |
|---|---|---|---|---|
| Jurisdiction | Total | % of Suits | Success | % Success |
| Covered | 49 | 30.4% | 27 | 55.1% |
| Noncovered | 62 | 36.5% | 19 | 30.6% |
| | | | | |
| Total | 111 | 33.5% | 46 | 41.4% |

Chi-square = 6.746; p > $\chi 2$ = 0.009

| Majority-Vote Requirements | | | | |
|---|---|---|---|---|
| Jurisdiction | Total | % of Suits | Success | % Success |
| Covered | 10 | 6.2% | 5 | 50.0% |
| Noncovered | 3 | 1.8% | 1 | 33.3% |
| | | | | |
| Total | 13 | 3.9% | 6 | 46.2% |

Chi-square = 0.023[b]; p > $\chi 2$ = 0.879

[a] Note that some lawsuits included a challenge to more than one practice simultaneously. Chi-square values for each electoral practice analyze contingency tables for covered/noncovered jurisdictions versus successful/unsuccessful results.
[b] The chi-square value reported for this electoral practice is Yates continuity-corrected.

*Not Like the South?*                                          37

**Table 8.4. cont.**

| Election Admin. Procedures | | | | |
|---|---|---|---|---|
| Jurisdiction | Total | % of Suits | Success | % Success |
| Covered | 20 | 12.4% | 5 | 25.0% |
| Non-Covered | 21 | 12.4% | 9 | 42.9% |
| | | | | |
| Total | 41 | 12.4% | 14 | 34.1% |

Chi-square = 1.453; $p > \chi 2 = 0.228$

| Other[c] | | | | |
|---|---|---|---|---|
| Jurisdiction | Total | % of Suits | Success | % Success |
| Covered | 17 | 10.6% | 0 | 0.0% |
| Noncovered | 22 | 12.9% | 0 | 0.0% |
| | | | | |
| Total | 39 | 11.8% | 0 | 0.0% |

Chi-square = N/A[d].

[c] Other practices include: felon disfranchisement statutes, annexations, appointment procedures.
[d] No chi-square value is reported for this factor.
*Source*: Ellen D. Katz & The Voting Rights Initiative, www.votingreport.org (2006).

38                              *Ellen Katz*

**Table 8.5. Level of White Bloc Voting in Elections Documented in Section 2 Litigation 1982–2005[a]**

| Whites Voting as a Bloc | Covered Jurisdictions | |
| --- | --- | --- |
| | Number of Elections | % of Elections |
| 90-100% | 106 | 52.5% |
| 80-89% | 57 | 28.2% |
| *80% WBV or higher:* | | *80.7%* |
| 70-79% | 22 | 10.9% |
| *70% WBV or higher:* | | *91.6%* |
| 60-69% | 13 | 6.4% |
| 50-59% | 4 | 2.0% |
| Total Elections | 202 | 100.0% |

| Whites Voting as a Bloc | Noncovered jurisdictions | |
| --- | --- | --- |
| | Number of Elections | % of Elections |
| 90-100% | 46 | 17.9% |
| 80-89% | 59 | 23.0% |
| *80% WBV or higher:* | | *40.9%* |
| 70-79% | 58 | 22.6% |
| *70% WBV or higher:* | | *63.4%* |
| 60-69% | 61 | 23.7% |
| 50-59% | 33 | 12.8% |
| Total Elections | 257 | 100.0% |

[a] Election data for this figure was collected from 105 lawsuits that found legally significant racially polarized voting. Some courts provided no election data with their finding. Elections showing 50% or less white bloc voting were rarely discussed by courts (six elections in covered, and five in noncovered), and so were not included here.

The chi-square value analyzing the contingency table with covered/noncovered jurisdictions versus 80% WBV or higher/79% WBV or lower categories is 73.876 (df = 1, p = 2.2*10^(-16)).

*Source*: Ellen D. Katz & The Voting Rights Initiative, www.votingreport.org (2006).

*Not Like the South?*                                                39

**Table 8.6. Changes v. Longstanding Electoral Practices Challenged Under Section 2, 1982–2005[a]**

| | Covered Jurisdictions | | | |
|---|---|---|---|---|
| Type of Challenge | Total | % Suits | Success | % Success |
| Longstanding/ Implementation | 86 | 53.8% | 35 | 40.7% |
| Reapportionment | 49 | 30.6% | 27 | 55.1% |
| Other Change | 25 | 15.6% | 7 | 28.0% |
| Total Changes | 74 | 46.3% | 34 | 45.9% |
| Total | 160 | 100.0% | 69 | 43.1% |

| | Noncovered Jurisdictions | | | |
|---|---|---|---|---|
| Type of Challenge | Total | % Suits | Success | % Success |
| Longstanding/ Implementation | 79 | 46.2% | 24 | 30.4% |
| Reapportionment | 62 | 36.3% | 19 | 30.6% |
| Other Change | 30 | 17.5% | 11 | 36.7% |
| Total Changes | 92 | 53.8% | 30 | 32.6% |
| Total | 171 | 100.0% | 54 | 31.6% |

| | Test of Difference |
|---|---|
| Type of Challenge | $p > \chi 2$ |
| Longstanding / Implementation | 0.167 |
| Reapportionment | 0.009 |
| Other Change | 0.495 |
| Total Changes | 0.079 |
| Total | 0.030 |

[a] This Figure compares the total number and success rate of suits challenging longstanding practices (including implementation), with the same for newly enacted practices. All challenges where the date of enactment is unclear are included in the old category.

*Source:* Ellen D. Katz & The Voting Rights Initiative, www.votingreport.org (2006).