# Exhibit 9

# THE UNDOING OF RECONSTRUCTION

In July of 1870, when the law declaring Georgia entitled to representation in Congress was finally enacted, the process of reconstruction was, from the technical point of view, complete. Ten of the states which had seceded from the Union had been "made over" by a series of operations which involved, first, the creation in each of a new political people, in which the freedmen constituted an important element, and, second, the organization in each of a new government, in the working of which the participation of the blacks on equal terms with the whites was put under substantial guarantees. The leading motive of the reconstruction had been, at the inception of the process, to insure to the freedmen an effective protection of their civil rights,—of life, liberty and property. In the course of the process, the chief stress came to be laid on the endowment of the blacks with full political rights,—with the electoral franchise and eligibility to office. And by the time the process was complete, a very important, if not the most important, part had been played by the desire and the purpose to secure to the Republican Party the permanent control of several Southern states in which hitherto such a political

353

organization had been unknown. This last motive had a plausible and widely accepted justification in the view that the rights of the negro and the "results of the war", in general would be secure only if the national government should remain indefinitely in Republican hands, and that therefore the strengthening of the party was a primary dictate of patriotism.

Through the operation of these various motives, successive and simultaneous, the completion of the reconstruction showed the following situation: (1) the negroes were in the enjoyment of equal political rights with the whites; (2) the Republican Party was in vigorous life in all the Southern states, and in firm control of many of them; and (3) the negroes exercised an influence in political affairs out of all relation to their intelligence or property, and, since so many of the whites were disfranchised, excessive even in proportion to their numbers. At the present day, in the same states, the negroes enjoy practically no political rights; the Republican Party is but the shadow of a name; and the influence of the negroes in political affairs is nil. This contrast suggests what has been involved in the undoing of reconstruction.

I

Before the last state was restored to the Union the process was well under way through which the

resumption of control by the whites was to be effected. The tendency in this direction was greatly promoted by conditions within the Republican Party itself. Two years of supremacy in those states which had been restored in 1868 had revealed unmistakable evidences of moral and political weakness in the governments. The personnel of the party was declining in character through the return to the North of the more substantial of the carpet-baggers, who found Southern conditions, both social and industrial, far from what they had anticipated, and through the very frequent instances in which the "scalawags" ran to open disgrace. Along with this deterioration in the white element of the party, the negroes who rose to prominence and leadership were very frequently of a type which acquired and practiced the tricks and knavery rather than the useful arts of politics, and the vicious courses of these negroes strongly confirmed the prejudices of the whites. But at the same time that the incapacity of the party in power to administer any government was becoming demonstrable, the problems with which it was required to cope were made by its adversaries such as would have taxed the capacity of the most efficient statesmen the world could produce. Between 1868 and 1870, when the cessation of the national military authority left the new state governments to stand by their own strength, there developed that widespread series of disorders with

which the name of the Ku Klux Klan is associated. While these were at their height the Republican Party was ousted from control in four of the old rebel states, namely, Tennessee, North Carolina, Georgia and Virginia. The inference was at once drawn that the whites of the South were pursuing a deliberate policy of overthrowing the negro party by violence. No attention was paid to the claim that the manifest inefficiency and viciousness of the Republican governments afforded a partial, if not a wholly adequate, explanation of their overthrow. Not even the relative quiet and order that followed the triumph of the whites in these states were recognized as justifying the new régime. The North was deeply moved by what it considered evidence of a new attack on its cherished ideals of liberty and equality, and when the Fifteenth Amendment had become part of the constitution, Congress passed the Enforcement Acts and the laws for the federal control of elections. To the forces making for the resumption of white government in the South was thus opposed that same apparently irresistible power which had originally overthrown it.

That the Ku Klux movement was to some extent the expression of a purpose not to submit to the political domination of the blacks, is doubtless true. But many other motives were at work in the disorders, and the purely political antithesis of the races was not so clear in the origin and development of the movement as in connection with the

efforts of the state governments to suppress it. Thousands of respectable whites, who viewed the Ku Klux outrages with horror, turned with equal horror from the projects of the governments to quell the disturbances by means of a negro militia. Here was the crux of the race issue. Respectable whites would not serve with the blacks in the militia; the Republican state governments would not—and indeed, from the very nature of the case, could not—exclude the blacks from the military service; the mere suggestion of employing the blacks alone in such service turned every white into practically a sympathizer with the Ku Klux: and thus the government was paralyzed at the foundation of its authority. It was demonstrated again and again that the appearance of a body of negroes under arms, whether authorized by law or not, had for its most certain result an affray, if not a pitched battle, with armed whites, in which the negroes almost invariably got the worst of it.

On the assumption, then, that the white state governments in the South were unwilling, and the black governments were unable, to protect the negro in his rights, Congress inaugurated the policy of the "Force Acts." The primary aim was to protect the right to vote, but ultimately the purely civil rights, and even the so-called "social rights," were included in the legislation. By the act of 1870,[1] a long series of minutely specified

---

[1] 16 Statutes at Large, 140.

offenses, involving violence, intimidation and fraud, with the effect or even the intention of denying equal rights to any citizens of the United States, were made crimes and misdemeanors, and were thus brought under the jurisdiction of the federal courts. Great activity was at once displayed by the United States district attorneys throughout the South, and hundreds of indictments were brought in; but convictions were few. The whites opposed to the process of the federal courts, supported by federal troops, no such undisguised resistance as had often been employed against state officers backed by a posse comitatus or a militia company of negroes. But every advantage was taken of legal technicalities; in the regions where the Ku Klux were strong, juries and witnesses were almost invariably influenced by sympathy or terror to favor the accused; and the huge disproportion between the number of arrests and the number of convictions was skillfully employed to sustain the claim that the federal officers were using the law as the cover for a systematic intimidation and oppression of the whites. As the effect of this first act seemed to be rather an increase than a decrease in the disorders of the South, Congress passed in the following year a more drastic law. This, known commonly as the Ku Klux Act,[1] healed many technical defects in the earlier law; reformulated in most precise and far-reaching

[1] 17 Statutes at Large, 13.

terms the conspiracy clause, which was especially designed to cover Ku Klux methods; and, finally, authorized the President, for a limited time, to suspend the writ of *habeas corpus* and employ military force in the suppression of violence and crime in any given district. In addition to the punitive system thus established, Congress at the same time instituted a rigorous preventive system through the Federal Elections Laws. By acts of 1871 and 1872,[1] every polling place, in any election for Congressmen, might be manned by officials appointed by the federal courts, with extensive powers for the detection of fraud, and with authority to employ the federal troops in the repression of violence.

Through the vigorous policy thus instituted by the national government the movement toward the resumption of control by the whites in the South met with a marked though temporary check. The number of convictions obtained under the Ku Klux Act was not large, and President Grant resorted in but a single instance — that of certain counties in South Carolina, in the autumn of 1871 — to the extraordinary powers conferred upon him. But the moral effect of what was done was very great, and the evidence that the whole power of the national government could and would be exerted on the side of the blacks produced a salutary change in method among the whites. The extreme and vio-

[1] U. S. Revised Statutes, § 2011 *et seq.*

lent element was reduced to quiescence, and haste was made more slowly. No additional state was redeemed by the whites until 1874. Meanwhile, the wholesale removal of political disabilities by Congress in 1872 brought many of the old and respected Southern politicians again into public life, with a corresponding improvement in the quality of Democratic leadership. More deference began to be paid to the Northern sentiment hostile to the Grant administration which had been revealed in the presidential campaign of 1872, and the policy of the Southern whites was directed especially so as to bring odium upon the use of the military forces in the states yet to be wrested from black control.

It was upon the support of the federal troops that the whole existence of the remaining black governments in the South came gradually to depend. Between 1872 and 1876 the Republican Party split in each of the states in which it still retained control, and the fusion of one faction with the Democrats gave rise to disputed elections, general disorder, and appeals by the radical Republicans to the President for aid in suppressing domestic violence. Alabama, Arkansas and Texas emerged from the turmoil in 1874 with the whites triumphant; and the federal troops, after performing useful service in keeping the factions from serious bloodshed, ceased to figure in politics. But in Louisiana and South Carolina the radical

factions retained power exclusively through the presence of the troops, who were employed in the former state to reconstitute both the legislature and the executive at the bidding of one of the claimants of the gubernatorial office. The very extraordinary proceedings in New Orleans greatly emphasized the unfavorable feeling at the North toward "governments resting on bayonets"; and when, upon the approach of the state election of 1875 in Mississippi, the radical governor applied for troops to preserve order, President Grant rather tartly refused to furnish them. The result was the overthrow of black government in that state. Though strenuously denied at the time, it was no deep secret that the great negro majority in the state was overcome in this campaign by a quiet but general exertion of every possible form of pressure to keep the blacks from the polls. The extravagance and corruption of the state administration had become so intolerable to the whites that questionable means of terminating it were admitted by even the most honorable without question. There was relatively little "Ku-Kluxing" or open violence, but in countless ways the negroes were impressed with the idea that there would be peril for them in voting. "Intimidation" was the word that had vogue at the time, in describing such methods, and intimidation was illegal. But if a party of white men, with ropes conspicuous on their saddlebows,

rode up to a polling place and announced that hanging would begin in fifteen minutes, though without any more definite reference to anybody, and a group of blacks who had assembled to vote heard the remark and promptly disappeared, votes were lost, but a conviction on a charge of intimidation was difficult. Or if an untraceable rumor that trouble was impending over the blacks was followed by the mysterious appearance of bodies of horsemen on the roads at midnight, firing guns and yelling at nobody in particular, votes again were lost, but no crime or misdemeanor could be brought home to any one. Devices like these were familiar in the South, but on this occasion they were accompanied by many other evidences of a purpose on the part of the whites to carry their point at all hazards. The negroes, though numerically much in excess of the whites, were very definitely demoralized by the aggressiveness and unanimity of the latter, and in the ultimate test of race strength the weaker gave way.

The "Mississippi plan" was enthusiastically applied in the remaining three states, Louisiana, South Carolina and Florida, in the elections of 1876. Here, however, the presence of the federal troops and of all the paraphernalia of the Federal Elections Laws materially stiffened the courage of the negroes, and the result of the state elections became closely involved in the controversy over the presidential count. The Southern Democratic

leaders fully appreciated the opportunity of their position in this controversy, and, through one of those bargains without words which are common in great crises, the inauguration of President Hayes was followed by the withdrawal of the troops from the support of the last radical governments, and the peaceful lapse of the whole South into the control of the whites.

II

With these events of 1877 the first period in the undoing of reconstruction came to an end. The second period, lasting till 1890, presented conditions so different from the first as entirely to transform the methods by which the process was continued. Two, indeed, of the three elements which have been mentioned as summing up reconstruction still characterized the situation: the negroes were precisely equal in rights with the other race, and the Republican Party was a powerful organization in the South. As to the third element, the disproportionate political influence of the blacks, a change had been effected, and their power had been so reduced as to correspond much more closely to their general social significance. In the movement against the still enduring features of reconstruction the control of the state governments by the whites was of course a new condition of the utmost importance; but not less

vital was the party complexion of the national government. From 1875 to 1889 neither of the great parties was at any one time in effective control of both the presidency and the two houses of Congress. As a consequence, no partisan legislation could be enacted. Though the state of affairs in the South was for years a party issue of the first magnitude, the legislative deadlock had for its general result a policy of non-interference by the national government, and the whites were left to work out in their own way the ends they had in view. Some time was necessary, however, to overcome the influence of the two bodies of legislation already on the national statute book,— the Force Acts and the Federal Elections Laws.

During the Hayes administration the latter laws were the subject of a prolonged and violent contest between the Democratic houses and the Republican President. The Democrats put great stress on the terror and intimidation of the whites and the violation of freemen's rights due to the presence of federal officials at the polls, and of federal troops near them. The Republicans insisted that these officials and troops were essential to enable the negroes to vote and to have their votes counted. As a matter of fact, neither of these contentions was of the highest significance so far as the South was concerned. The whites, once in control of the state electoral machinery, readily devised means of evading or neutralizing the

influence of the federal officers. But the patronage in the hands of the administration party under these laws was enormous. The power to appoint supervisors and deputy marshals at election time was a tower of strength, from the standpoint both of direct votes and of indirect influence. Accordingly, the attack of the Democrats upon the laws was actuated mainly by the purpose of breaking down the Republican party organization in the South. The attack was successful in Mr. Hayes's time only to the extent that no appropriation was made for the payment of the supervisors and deputy marshals for their services in the elections of 1880. The system of federal supervision remained, but gradually lost all significance save as a biennial sign that the Republican Party still survived; and when Mr. Cleveland became President even this relation to its original character disappeared.

The Force Acts experienced a similar decline during the period we are considering. In 1875, just before the Republicans lost control of Congress, they passed, as a sort of memorial to Charles Sumner, who had long urged its adoption, a Supplementary Civil Rights Bill,[1] which made criminal, and put under the jurisdiction of the federal courts, any denial of equality to negroes in respect to accommodations in theatres, railway cars, hotels, and other such places. This was not

---

[1] 18 Statutes at Large, 335.

regarded by the most thoughtful Republicans as a very judicious piece of legislation; but it was perceived that, with the Democrats about to control the House of Representatives, there was not likely to be a further opportunity for action in aid of the blacks, and so the act was permitted to go through and take its chances of good. Already, however, the courts had manifested a disposition to question the constitutionality of the most drastic provisions of the earlier Enforcement Acts. It has been said above that indictments under these acts had been many, but convictions few. Punishments were fewer still; for skillful counsel were ready to test the profound legal questions involved in the legislation, and numbers of cases crept slowly up on appeal to the Supreme Court. In 1875, this tribunal threw out an indictment under which a band of whites who had broken up a negro meeting in Louisiana had been convicted of conspiring to prevent negroes from assembling for lawful purposes and from carrying arms; for the right to assemble and the right to bear arms, the court declared, pertained to citizenship of a state, not of the United States, and therefore redress for interference with these rights must be sought in the courts of the state.[1] In the same year, in the case of United States *vs.* Reese,[2] two sections of the Enforcement Act of 1870 were declared unconstitutional, as involving the exercise by the United

---

[1] U. S. *vs.* Cruikshank, 92 U. S., 542.   [2] 92 U. S., 214.

States of powers in excess of those granted by the Fifteenth Amendment. It was not, however, till 1882 that the bottom was taken wholly out of the Ku Klux Act. In the case of United States *vs.* Harris[1] the conspiracy clause in its entirety was declared unconstitutional. This was a case from Tennessee, in which a band of whites had taken a negro away from the officers of the law and maltreated him. The court held that, under the last three amendments to the constitution, Congress was authorized to guarantee equality in civil rights against violation by a state through its officers or agents, but not against violation by private individuals. Where assault or murder or other crime was committed by a private individual, even if the purpose was to deprive citizens of rights on the ground of race, the jurisdiction, and the exclusive jurisdiction, was in the state courts. And because the conspiracy clause brought such offenses into the jurisdiction of the United States it was unconstitutional and void. This decision finally disposed of the theory that the failure of a state to protect the negroes in their equal rights could be regarded as a positive denial of such rights, and hence could justify the United States in interfering. It left the blacks practically at the mercy of white public sentiment in the South. A year later, in 1883, the court summarily disposed of the act of 1875 by declaring that the rights which it endeavored to

---

[1] 106 U. S., 629.

guarantee were not strictly civil rights at all, but rather social rights, and that in either case the federal government had nothing to do with them. The act was therefore held unconstitutional.[1]

Thus passed the most characteristic features of the great system through which the Republicans had sought to prevent by normal action of the courts, independently of changes in public opinion and political majorities, the undoing of reconstruction. Side by side with the removal of the preventives, the Southern whites had made enormous positive advances in the suppression of the other race. In a very general way the process in this period, as contrasted with the earlier, may be said to have rested, in last resort, on legislation and fraud rather than on intimidation and force. The statute books of the states, especially of those in which negro rule had lasted the longest, abounded in provisions for partisan — that is, race — advantage. These were at once devoted as remorselessly to the extinction of black preponderance as they had been before devoted to the repression of the whites. Moreover, by revision of the constitutions and by sweeping modifications of the laws, many strongholds of the old régime were destroyed. Yet, with all that could be done in this way, the fact remained that in many localities the negroes so greatly outnumbered the whites as to render the political ascendency of the latter impossible,

---

[1] Civil Rights Cases, 109 U. S. 1.

except through some radical changes in the laws touching the suffrage and the elections; and in respect to these two points the sensitiveness of Northern feeling rendered open and decided action highly inexpedient. Before 1880 the anticipation, and after that year the realization, of a "solid South" played a prominent part in national politics. The permanence of white dominion in the South seemed, in view of the past, to depend as much on the exclusion of the Republicans from power at Washington as on the maintenance of white power at the state capitals. Under all the circumstances, therefore, extra-legal devices had still to be used in the "black belt."

The state legislation which contributed to confirm white control included many ingenious and exaggerated applications of the gerrymander and the prescription of various electoral regulations that were designedly too intricate for the average negro intelligence. In Mississippi appeared the "shoestring district," three hundred miles long and about twenty wide, including within its boundaries nearly all the densest black communities of the state. In South Carolina, the requirement that, with eight or more ballot boxes before him, the voter must select the proper one for each ballot, in order to insure its being counted, furnished an effective means of neutralizing the ignorant black vote; for though the negroes, unable to read the lettering on the boxes, might acquire,

by proper coaching, the power to discriminate among them by their relative positions, a moment's work by the whites in transposing the boxes would render useless an hour's laborious instruction. For the efficient working of this method of suppression, it was indispensable, however, that the officers of election should be whites. This suggests at once the enormous advantage gained by securing control of the state government. In the hot days of negro supremacy the electoral machinery had been ruthlessly used for partisan purposes, and when conditions were reversed the practice was by no means abandoned. It was, indeed, through their exclusive and carefully maintained control of the voting and the count that the whites found the best opportunities for illegal methods.

Because of these opportunities the resort to bull-dozing and other violence steadily decreased. It penetrated gradually to the consciousness of the most brutal white politicians that the whipping or murder of a negro, no matter for what cause, was likely to become at once the occasion of a great outcry at the North, while by an unobtrusive manipulation of the balloting or the count very encouraging results could be obtained with little or no commotion. Hence that long series of practices, in the regions where the blacks were numerous, that give so grotesque a character to the testimony in the contested-election cases in Congress, and to the reminiscences of candid Southerners. Polling

places were established at points so remote from the densest black communities that a journey of from twenty to forty miles was necessary in order to vote; and where the roads were interrupted by ferries, the resolute negroes who attempted to make the journey were very likely to find the boats laid up for repairs. The number of polling places was kept so small as to make rapid voting indispensable to a full vote; and then the whites, by challenges and carefully premeditated quarrels among themselves, would amuse the blacks and consume time, till only enough remained for the casting of their own votes. The situation of the polls was changed without notice to the negroes, or, conversely, the report of a change was industriously circulated when none had been made. Open bribery on a large scale was too common to excite comment. One rather ingenious scheme is recorded which presents a variation on the old theme. In several of the states a poll-tax receipt was required as a qualification for voting. In an important local election, one faction had assured itself of the negro vote by a generous outlay in the payment of the tax for a large number of the blacks. The other faction, alarmed at the prospect of almost certain defeat, availed itself of the opportunity presented by the providential advent of a circus in the neighborhood, and the posters announced that poll-tax receipts would be accepted for admission. As a result, the audience at the

circus was notable in respect to numbers, but the negro vote at the election was insignificant.

But exploitation of the poverty, ignorance, credulity, and general childishness of the blacks was supplemented, on occasion, by deliberate and high-handed fraud. Stuffing of the boxes with illegal ballots, and manipulation of the figures in making the count, were developed into serious arts. At the acme of the development undoubtedly stood the tissue ballot. There was in those days no prescription of uniformity in size and general character of the ballots. Hence miniature ballots of tissue paper were secretly prepared and distributed to trusted voters, who, folding as many, sometimes, as fifteen of the small tickets within one of the ordinary large tickets, passed the whole, without detection, into the box. Not till the box was opened were the tissue tickets discovered. Then, because the number of ballots exceeded the number of voters as indicated by the polling list, it became necessary, under the law, for the excess to be drawn out by a blindfolded man before the count began. So some one's eyes were solemnly bandaged, and he was set to drawing out ballots, on the theory that he could not distinguish those of one party from those of the other. The result is not hard to guess. In one case given by the Senate committee[1] through whose investigation of

[1] The report of this committee is in Sen. Rep. 3d sess., 45th Cong., vol. iv.

---

the elections of 1878, in South Carolina, the theory and practice of the tissue ballot were revealed to an astonished world, the figures were as follows:—

| | |
|---|---:|
| Number of ballots in box | 1163 |
| Names on polling list | 620 |
| Excess drawn out | 543 |
| Tissue ballots left to be counted | 464 |

Not the least interesting feature of this episode was the explanation, given with entire gravity by the white committee, of the existence of the great mass of tissue ballots. They were prepared, it was said, in order to enable the blacks who wished to vote the Democratic ticket to do so secretly, and thus to escape the ostracism and other social penalties which would be meted out to them by the majority of their race.

Under the pressure applied by all these various methods upon the negroes, the black vote slowly disappeared. And with it the Republican Party faded into insignificance. In the presidential election of 1884 the total vote in South Carolina was, in round numbers, 91,000, as compared with 182,000 in 1876. In Mississippi the corresponding decrease was from 164,000 to 120,000; in Louisiana, from 160,000 to 108,000. The Republican party organization was maintained almost exclusively through the holders of federal offices in the postal and revenue service. When, in 1885, a Democratic administration assumed power, this basis for

continued existence was very seriously weakened, and the decline of the party was much accelerated. Save for a few judicial positions held over from early appointments, the national offices, like those of the states, were hopelessly removed from the reach of any Republican's ambition. A comparison of the Congressional delegation from the states of the defunct Confederacy in the Forty-first Congress (1869–71) with that in the Fifty-first (1889–91) is eloquent of the transformation that the two decades had wrought: in the former, twenty out of the twenty-two Senators were Republican, and forty-four out of fifty-eight Representatives; in the latter, there were no Republican Senators and but three Representatives.

Summarily, then, it may be said that the second period in the undoing of reconstruction ends with the political equality of the negroes still recognized in law, though not in fact, and with the Republican Party, for all practical purposes, extinct in the South. The third period has had for its task the termination of equal rights in law as well as in fact.

### III

The decline of negro suffrage and of the Republican Party in the South was the topic of much discussion in national politics and figured in the party platforms throughout the period from 1876 to 1888; but owing to the deadlock in the party

control of the national legislature the discussion remained academic in character, and the issue was supplanted in public interest by the questions of tariff, currency and monopoly. By the elections of 1888, however, the Republicans secured not only the presidency, but also a majority in each house of Congress. The deadlock of thirteen years was broken, and at once an effort was made to resume the policy of the Enforcement Acts. A bill was brought in that was designed to make real the federal control of elections. The old acts for this purpose were, indeed, still on the statute book, but their operation was farcical; the new project, while maintaining the general lines of the old, would have imposed serious restraints on the influences that repressed the negro vote, and would have infused some vitality into the moribund Republican Party in the South. It was quickly demonstrated, however, that the time for this procedure had gone by. The bill received perfunctory support in the House of Representatives, where it passed by the regular party majority, but in the Senate it was rather contemptuously set aside by Republican votes. Public sentiment in the North, outside of Congress, manifested considerable hostility to the project, and its adoption as a party measure probably played a rôle in the tremendous reaction which swept the Republicans out of power in the House in 1890, and gave to the Democrats in 1892 the

control of both houses of Congress and the presidency as well. The response of the Democrats to the futile project of their adversaries was prompt and decisive. In February, 1894, an act became law which repealed all existing statutes that provided for federal supervision of elections. Thus the last vestige disappeared of the system through which the political equality of the blacks had received direct support from the national government.

In the meantime, a process had been instituted in the Southern states that has given the most distinctive character to the last period in the undoing of reconstruction. The generation-long discussions of the political conditions in the South have evoked a variety of explanations by the whites of the disappearance of the black vote. These different explanations have of course all been current at all times since reconstruction was completed, and have embodied different degrees of plausibility and truth in different places. But it may fairly be said that in each of the three periods into which the undoing of reconstruction falls one particular view has been dominant and characteristic. In the first period, that of the Ku Klux and the Mississippi plan, it was generally maintained by the whites that the black vote was not suppressed, and that there was no political motive behind the disturbances that occurred. The victims of murder, bulldozing and other violence were represented as bad and socially dangerous men, and their treat-

ment as merely incident to their own illegal and violent acts, and expressive of the tendency to self-help instead of judicial procedure, which had always been manifest in Southern life, and had been aggravated by the demoralization of war time. After 1877, when the falling off in the Republican vote became so conspicuous, the phenomenon was explained by the assertion that the negroes had seen the light, and had become Democrats. Mr. Lamar gravely maintained, in a famous controversy with Mr. Blaine,[1] that the original Republican theory as to the educative influence of the ballot had been proved correct by the fact that the enfranchised race had come to recognize that their true interests lay with the Democratic Party; the Republicans were estopped, he contended, by their own doctrine from finding fault with the result. A corollary of this idea that the negroes were Democrats was generally adopted later in the period, to the effect that, since there was practically no opposition to the Democracy, the negroes had lost interest in politics. They had got on the road to economic prosperity, it was said, and were too busy with their farms and their growing bank accounts to care for other things.

Whatever of soundness there may have been in any of these explanations, all have been superseded, during the last decade, by another, which, starting with the candid avowal that the whites are

---

[1] *North American Review*, vol. 128 (1879), p. 225.

378  THE UNDOING OF RECONSTRUCTION

determined to rule, concedes that the elimination of the blacks from politics has been effected by intimidation, fraud, or any other means, legal or illegal, that would promote the desired end. This admission has been accompanied by expressions of sincere regret that illegal means were necessary, and by a general movement toward clothing with the forms of law the disfranchisement which has been made a fact without them. In 1890, just when the Republicans in Congress were pushing their project for renewing the federal control of elections, Mississippi made the first step in the new direction. Her constitution was so revised as to provide that, to be a qualified elector, a citizen must produce evidence of having paid his taxes (including a poll tax) for the past two years, and must, in addition, "be able to read any section in the constitution of this state, or . . . be able to understand the same when read to him, or give a reasonable interpretation thereof." Much might be said in favor of such an alternative intelligence qualification in the abstract: the mere ability to read is far from conclusive of intellectual capacity. But the peculiar form of this particular provision was confessedly adopted, not from any consideration of its abstract excellence, but in order to vest in the election officers the power to disfranchise illiterate blacks without disfranchising illiterate whites. In practice, the white must be stupid indeed who cannot satisfy the official demand for a

THE UNDOING OF RECONSTRUCTION  379

"reasonable interpretation," while the negro who can satisfy it must be a miracle of brilliancy.

Mississippi's bold and undisguised attack on negro suffrage excited much attention. In the South it met with practically unanimous approval among thoughtful and conscientious men, who had been distressed by the false position in which they had long been placed. And at the North, public opinion, accepting with a certain satirical complacency the confession of the Southerners that their earlier explanations of conditions had been false, acknowledged in turn that its views as to the political capacity of the blacks had been irrational, and manifested no disposition for a new crusade in favor of negro equality. The action of Mississippi raised certain questions of constitutional law which had to be tested before her solution of the race problem could be regarded as final. Like all the other seceded states, save Tennessee, she had been readmitted to representation in Congress, after reconstruction, on the express condition that her constitution should never be so amended as to disfranchise any who were entitled to vote under the existing provisions. The new amendment was a most explicit violation of this condition. Further, so far as the new clause could be shown to be directed against the negroes as a race, it was in contravention of the Fifteenth Amendment. These legal points had been elaborately discussed in the state conven-

tion, and the opinion had been adopted that, since neither race, color nor previous condition of servitude was made the basis of discrimination in the suffrage, the Fifteenth Amendment had no application, and that the prohibition to modify the constitution was entirely beyond the powers of Congress, and was therefore void. When the Supreme Court of the United States was required to consider the new clause of Mississippi's constitution, it sustained the validity of the enactment,[1] at least so long as injustice in its administration was shown to be possible only and not actual. There was still one contingency that the whites had to face in carrying out the new policy. By the Fourteenth Amendment it is provided that if a state restricts the franchise her representation in Congress shall be proportionately reduced. There was a strong sentiment in Mississippi, as there is throughout the South, that a reduction of representation would not be an intolerable price to pay for the legitimate extinction of negro suffrage. But loss of Congressmen was by no means longed for, and the possibility of such a thing was very carefully considered. The phrasing of the franchise clause may not have been actually determined with reference to this matter; but it is obvious that the application of the Fourteenth Amendment is, to say the least, not facilitated by the form used.

[1] Williams vs. Miss, 170 U. S., 213.

The action of Mississippi in 1890 throws a rather interesting light on the value of political prophecy, even when ventured upon by the most experienced and able politicians. Eleven years earlier, Mr. Blaine, writing of the possibility of disfranchisement by educational and property tests, declared: "But no Southern state will do this, and for two reasons: first, they will in no event consent to a reduction of representative strength; and, second, they could not make any disfranchisement of the negro that would not at the same time disfranchise an immense number of whites." How sadly Mr. Blaine misconceived the spirit and underrated the ingenuity of the Southerners Mississippi made clear to everybody. Five years later South Carolina dealt no less unkindly with Mr. Lamar, who at the same time with Mr. Blaine had dipped a little into prophecy on the other side. "Whenever," he said,—"and the time is not far distant,—political issues arise which divide the white men of the South, the negro will divide, too. . . . The white race, divided politically, will want him to divide." Incidentally to the conditions which produced the Populist Party, the whites of South Carolina, in the years succeeding 1890, became divided into two intensely hostile factions. The weaker manifested a purpose to draw on the negroes for support, and began to expose some of the devices by which the blacks had been prevented from voting.

The situation had arisen which Mr. Lamar had foreseen, but the result was as far as possible from fulfilling his prediction. Instead of competing with its rival for the black vote, the stronger faction, headed by Mr. Tillman, promptly took the ground that South Carolina must have a "white man's government," and put into effect the new Mississippi plan. A constitutional amendment was adopted in 1895 which applied the "understanding clause" for two years, and after that required of every elector either the ability to read and write or the ownership of property to the amount of $300. In the convention which framed this amendment, the sentiment of the whites revealed very clearly, not only through its content, but especially through the frank and emphatic form in which it was expressed, that the aspirations of the negro to equality in political rights would never again receive the faintest recognition.

Since the action of South Carolina, four other states, Louisiana in 1898, North Carolina in 1900, Alabama (1901) and Virginia (1902), have excluded the blacks from the suffrage by analogous constitutional amendments. By Louisiana, however, a new method was devised for exempting the whites from the effect of the property and intelligence tests. The hereditary principle was introduced into the franchise by the provision that the right to vote should belong, regardless of education or property, to every one whose father or grandfather possessed

the right on January 1, 1867. This "grandfather clause" was adopted by North Carolina, also, and, in a modified form, by Alabama and Virginia. The basis for the hereditary right in the latter states has been found, not in the possession of the franchise by the ancestor, but in the fact of his having served as a soldier of either the United States or the Confederacy. As compared with the Mississippi device for evading the Fifteenth Amendment, the "grandfather clause" has the merit of incorporating the discrimination in favor of the whites in the written law rather than referring it to the discretion of the election officers. Whether the Supreme Court of the United States will regard it as equally successful in screening its real purpose from judicial cognizance remains to be seen.

With the enactment of these constitutional amendments by the various states, the political equality of the negro is becoming as extinct in law as it has long been in fact, and the undoing of reconstruction is nearing completion. The many morals that may be drawn from the three decades of the process it is not my purpose to suggest. A single reflection seems pertinent, however, in view of the problems which have assumed such prominence in American politics since the war with Spain. During the two generations of debate and bloodshed over slavery in the United

States, certain of our statesmen consistently held that the mere chattel relationship of man to man was not the whole of the question at issue. Jefferson, Clay and Lincoln all saw more serious facts in the background. But in the frenzy of the war time public opinion fell into the train of the emotionalists, and accepted the teachings of Garrison and Sumner and Phillips and Chase, that abolition and negro suffrage would remove the last drag on our national progress. Slavery was abolished, and reconstruction gave the freedmen the franchise.

But with all the guarantees that the source of every evil was removed, it became obvious enough that the results were not what had been expected. Gradually there emerged again the idea of Jefferson and Clay and Lincoln, which had been hooted and hissed into obscurity during the prevalence of the abolitionist fever. This was that the ultimate root of the trouble in the South had been, not the institution of slavery, but the coexistence in one society of two races so distinct in characteristics as to render coalescence impossible; that slavery had been a *modus vivendi* through which social life was possible; and that, after its disappearance, its place must be taken by some set of conditions which, if more humane and beneficent in accidents, must in essence express the same fact of racial inequality. The progress in the acceptance of this idea in the North has measured the progress

in the South of the undoing of reconstruction. In view of the questions which have been raised by our lately established relations with other races, it seems most improbable that the historian will soon, or ever, have to record a reversal of the conditions which this process has established.