**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO GONZALES, Attorney General of the United States, <u>et al.</u>,<br><br>Defendants. | Civil Action No. 1:06-CV-01384<br>(DST, PLF, EGS) |

## DEFENDANT-INTERVENORS' JOINT STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULES 7(H) AND 56.1

In support of their respective accompanying Motions For Summary Judgment, and pursuant to Local Civil Rules 7(h) and 56.1, Defendant-Intervenors Texas State Conference of NAACP Branches, Austin Branch of the NAACP, Rodney Louis, Nicole Louis, Winthrop Graham, Yvonne Graham, Wendy Richardson, Jamal Richardson, Marisa Richardson, Nathaniel Lesane, People for the American Way, Jovita Casares, Angie Garcia, Ofelia Zapata, Lisa Diaz, David Diaz, Gabriel Diaz, and Travis County ("Defendant-Intervenors") hereby file Defendant-Intervenors' Joint Statement Of Material Facts As To Which There Is No Genuine Issue Pursuant To Local Civil Rules 7(h) and 56.1.

Dated: May 15, 2007

## PREFACE

The following Joint Statement Of Material Facts As To Which There Is No Genuine Issue ("SMF") is divided into two parts. Part I contains pertinent procedural and substantive aspects of the Voting Rights Act ("VRA"), and the Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006[1] ("VRARA") and the legislative history thereof. Part II focuses on facts relating to the plaintiff, the Northwest Austin Municipal Utility District Number One ("District").

Part I.D., which comprises the bulk of the SMF, represents the Defendant-Intervenors' effort to set forth material information presented to Congress as part of the enactment of the VRARA as well as the congressional determinations and findings of fact made based, at least in part, on that information. Defendant-Intervenors do not aver that this is, or should, constitute a complete summary of the legislative history of the VRARA. It is, however, an attempt to synthesize the nearly 18,000 pages of record evidence that was before Congress in the 2006 reauthorization supporting renewal of Section 5—record evidence from both Texas and other covered jurisdictions.

In Part I.C., Defendant-Intervenors have set forth information on the hearings, as well as a on the individuals and documents that are most frequently mentioned. Virtually all of these documents can be found in the legislative history that Defendant-Intervenors have lodged with the Court.

---

[1]     *See* Pub. L. No. 109-206, 120 Stat. 577, § 1 (codified at 42 U.S.C. §§ 1971, 1973).

# TABLE OF CONTENTS

Page

I.    THE VOTING RIGHTS ACT ................................................................. 1

   A.    Current VRA Structure .............................................................. 1

   B.    Chronology of the VRA Before 2006 ........................................ 5

       1.    Evidence from the Civil War Through 1965 .................... 5

       2.    The Voting Rights Act of 1965 ...................................... 10

       3.    Evidence Before Congress in 1970 ................................ 13

       4.    The 1970 Amendments to the Voting Rights Act ........... 16

       5.    Evidence Before Congress in 1975 ................................ 17

       6.    The 1975 Amendments to the Voting Rights Act ........... 37

       7.    Evidence Before Congress in 1982 ................................ 41

       8.    The 1982 Amendments to the Voting Rights Act ........... 58

   C.    Procedural History of the 2006 Voting Rights Act Reauthorization ................... 59

       1.    Procedural History .......................................................... 59

       2.    Information About Hearings and Selected Witnesses ...... 63

       3.    Selected Reports in the Congressional Record .............. 83

   D.    Evidence Before Congress During the Passage of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization Act of 2006 .................... 89

       1.    Evidence Before Congress:  the Enforcement of Section 5 ..... 89

           a)    Objections Interposed .......................................... 89

              (1)    Congressional Findings ............................. 89

              (2)    Summary Statistical Evidence .................... 94

              (3)    Objections in Covered Jurisdictions Other than Texas ................... 106

(4)  Objections in Texas ........................................................ 171

b)  Requests for More Information Submitted Followed by Withdrawals or Amendments ................................................ 188

(1)  Congressional Findings ................................................. 188

(2)  Summary Statistical Evidence ....................................... 188

(3)  MIRs in Covered Jurisdictions Other than Texas ........... 193

(4)  MIRs in Texas .............................................................. 197

c)  Section 5 Enforcement Actions ..................................... 198

(1)  Congressional Findings ................................................. 198

(2)  Enforcement Actions in Covered Jurisdictions Other than Texas ............................................................ 198

(3)  Enforcement Actions in Texas ...................................... 210

d)  Requests for Declaratory Judgments Withdrawn or Denied .......................................................................... 211

(1)  Summary Statistical Evidence ....................................... 211

(2)  Declaratory Judgments in Covered Jurisdictions Other than Texas ............................................................ 211

(3)  Declaratory Judgments in Texas .................................... 215

2.  Evidence Before Congress: the Effect of Section 5 ................................ 216

a)  Section 5 Encourages Collaboration ............................... 222

b)  Continued Need for Section 5 ........................................ 226

c)  Effect of Section 5 in Texas .......................................... 279

d)  Effect of Section 5 in Other Covered Jurisdictions ........ 284

3.  Evidence Before Congress: Racially Polarized Voting .......................... 293

a)  Congressional Findings Regarding Racially Polarized Voting ............................................................................ 293

b)  Racially Polarized Voting in States other than Texas ...... 294

|  |  | c) | Racially Polarized Voting in Texas | 322 |

| 4. | | | Evidence Before Congress:  Voting Discrimination in Section 2 Cases | 326 |

|  | a) | | Congressional Findings | 326 |

|  | b) | | Section 2 Litigation in Covered Jurisdictions Other than Texas | 326 |

|  | c) | | Section 2 Litigation in Texas | 352 |

|  | d) | | Section 2 Cases Filed Against Covered Jurisdictions Comapred to non-Covered Jurisdictions | 355 |

| 5. | | | Evidence Before Congress: Minority Language Discrimination in Section 4 Covered Jurisdictions | 356 |

|  | a) | | Congressional Findings | 356 |

|  | b) | | Minority-Language Discrimination | 359 |

| 6. | | | Evidence Before Congress:  Observer Coverage and the Intimidation of Minority Voters | 369 |

|  | a) | | Observer Coverage | 369 |

|  | | (1) | Congressional Findings | 369 |

|  | | (2) | Statistical Evidence | 371 |

|  | | (3) | Sending of Observers to Non-Texas Jurisdictions | 372 |

|  | | (4) | Sending of Federal Observers to Texas | 379 |

|  | b) | | Intimidation of Minority Voters | 380 |

|  | | (1) | Statistical Evidence | 380 |

|  | | (2) | Intimidation of Minority Voters in non-Texas Jurisdictions | 381 |

|  | | (3) | Intimidation of Minority Voters in Texas | 392 |

| 7. | | | Evidence Before Congress: Voter Registration, Voter Turnout, and the Number of Minority Elected Officials | 399 |

|  | a) | | Gains in Minority Participation and Representation Attributable to Section 5 and the VRA | 399 |

b)    Continuing Problems in Election of Minority Officials ............. 408

    (1)    Congressional Findings .................................................... 408

    (2)    Continuing Problems in Election of Minority Officials in Non-Texas Covered Jurisdictions ............... 409

    (3)    Evidence Regarding Continuing Problems in Election of Minority Officials in Texas .......................... 415

c)    Continuing Problems in Minority Voter Participation ............... 416

    (1)    Congressional Findings .................................................... 416

    (2)    Continuing Problems in Minority Voter Participation in Non-Texas Covered Jurisdictions .......... 417

    (3)    Continuing Problems in Minority Voter Participation in Texas ......................................................... 420

8.    Evidence Before Congress: the "Bailout" Provision ............................. 422

a)    Congressional Findings ............................................... 422

b)    The Operation of Bailout ............................................. 422

c)    Bailout and its Relationship to the Constitutionality of the VRA ............................................................... 425

d)    The Efficacy of the Bailout Provisions ....................... 427

9.    Evidence Before Congress: the Minimal Administrative Costs and Burdens Imposed by Section 5 ................................................. 436

a)    The Minimal Burden ................................................. 436

b)    Views of Covered Jurisdictions .................................. 438

10.    Evidence Before Congress: the Sufficiency of the 2006 Legislative Record ................................................................. 443

a)    The Acknowledgment of the *Boerne* Requirements ................... 443

b)    The Sufficiency of the Record Compared to 1982 ..................... 449

c)    The Comparison of of Covered to Non-Covered Jurisdictions ........................................................... 452

d)    Congressional Consideration of the Coverage Formula ............. 456

e)  The Length of the Renewal Period ............................................. 460

f)  The Difference Between an Enactment and a
Reauthorization ......................................................................... 464

g)  Congressional Findings Regarding the Constitutionality of
Renewed Section 5 ..................................................................... 465

11.  Evidence Before Congress: Amendments to Section 5 .......................... 467

a)  Congressional Findings ............................................................. 467

b)  The Amendments in Response to *Bossier Parish II.* .................. 468

(1)  Congressional Findings .................................................. 468

(2)  Testimony and Evidence Received ................................ 470

c)  *Georgia v. Ashcroft* ................................................................. 478

(1)  Congressional Findings .................................................. 478

(2)  Evidence and Testimony Received ................................ 481

d)  The Provision of Fees for Expert Witnesses ............................. 486

II.  THE NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NO. 1 ................. 488

A.  Creation and Purpose .......................................................................... 488

B.  Current Status ...................................................................................... 489

C.  District Governance.............................................................................. 489

D.  Election of Board Members ................................................................. 490

E.  The District's Failure to Make Affirmative Efforts to Expand
Opportunities for Minorities................................................................ 490

F.  Election Agreement with Travis County.............................................. 492

1.  Facts of 2004 Agreement ......................................................... 492

2.  Facts of 2006 Agreement ......................................................... 493

G.  Section 5 Compliance........................................................................... 494

1.  Previous Section 5 Submissions............................................... 494

      2.      Minimal Past Cost and Administrative Burden ........................................ 497

      3.      Facts Related to Future Compliance ....................................................... 500

   H.     The Initiation of this Lawsuit ............................................................................ 500

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
## IS NO GENUINE ISSUE

### I.    THE VOTING RIGHTS ACT

#### A.    Current VRA Structure

1.    Section 5 of the Voting Rights Act freezes any proposed change to a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," 42 U.S.C. § 1973c, in specified covered jurisdictions until the proposed voting change has been precleared by the United States Attorney General or after the filing of a successful declaratory judgment action before the United States District Court for the District of Columbia.  Proposed changes are precleared, or a declaratory judgment granted, if the submitting jurisdiction satisfies its burden of showing that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." *Id.*  If preclearance or a declaratory judgment is granted, the change may be implemented. *Id.*  However, if the jurisdiction is unable to persuade either the District Court for the District of Columbia or the Attorney General that the proposed change satisfies the preclearance standard, the change remains legally unenforceable. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

2.    Those jurisdictions subject to the requirements of Section 5 are covered as a result of a formula set forth in Section 4 of the Voting Rights Act.  The first element of the formula covered those states or political subdivisions within such states that, on November 1, 1964, maintained a "test or device" restricting the opportunity to register and vote.  42 U.S.C. § 1973b. "Test or device" means "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters of mem-

1

bers of any other class." 42 U.S.C. § 1973b(c).  The second element of the formula covered

those states or political subdivisions of such states for which the Director of the Census deter-

mined that less than 50% of persons of voting age were registered to vote on November 1, 1964,

*or* that less than 50% of persons of voting age voted in the presidential election of November

1964.  *Id.* § 1973b(b).  Jurisdictions had to satisfy both elements of the formula in order to be

covered under the Act.  Application of this formula resulted in the following states becoming

"covered jurisdictions" in their entirety, all of whom remain covered today:  Alabama, Georgia,

Louisiana, Mississippi, South Carolina, and Virginia.  In addition, counties in Arizona and North

Carolina, whose coverage is based on the 1965 formula, were also covered as a result of the 1965

Act.  28 C.F.R. pt. 51, app.; H.R. Rep. No. 109-478, at 10 n.28 (2006).

     3.     "All political subunits within a covered jurisdiction (e.g., counties, cities, school dis-

tricts) are subject to the requirement of Section 5."  28 C.F.R. § 51.6; *see also United States v.*

*Board of Comm'rs*, 435 U.S. 110 (1978).

     4.     In 1970 Congress recognized the continuing need for the special provisions of the

Voting Rights Act that were due to expire that year and renewed these provisions for another five

years.  Congress also adopted an additional coverage formula, contained in section 4(f)(4) and

section 203(c), for jurisdictions that maintained a test or device as of November 1, 1968 and had

under 50 percent voter registration or participation in the November 1968 presidential election.

42 U.S.C. § 1973b(b).  This additional formula resulted in the partial coverage of ten states.  28

C.F.R. pt. 51, app.

     5.     In 1975 the special provisions of the Voting Rights Act were extended for another

seven years and were broadened to address voting discrimination against members of "language

minorities."  *See* 42 U.S.C. § 1973b(f)(1).  An additional coverage formula was enacted, based

on the presence of a test or device as of November 1, 1972 and under 50 percent voter registration or participation in the November 1972 Presidential election. *See* 42 U.S.C. § 1973b(b). In addition, the definition of "test or device" was expanded, for the purpose of this additional coverage, to include the practice of providing election information, including ballots, only in English in states or political subdivisions where members of a single language minority constituted more than five percent of the citizens of voting age. 42 U.S.C. § 1973b(a)(3). Under the Voting Rights Act, "[t]he term 'language minorities' or 'language minority group' means persons who are American Indian, Asian American, Alaska Natives or of Spanish heritage. 42 U.S.C. § 1973*l*(c)(3). This third formula had the effect of covering Texas, Alaska, and Arizona in their entirety, and parts of California, Florida, Michigan, New York, North Carolina, and South Dakota. 28 C.F.R. pt. 51, app.

6.      Section 5 was again extended in 1982, this time for 25 years, but no new Section 5 coverage formula was adopted. *See* 42 U.S.C. § 1973b.

7.      On July 27, 2006, the Voting Rights Act was reauthorized by the passage of the Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 ("VRARA"). *See* Pub. L. No. 109-246, 120 Stat. 577 (2006), codified at 42 U.S.C. §§ 1971, 1973. As part of VRARA, Section 5 was extended for twenty-five years, through extension of the Section 4 coverage formula. 42 U.S.C. § 1973b(a)(8). The VRARA also provided that fifteen years after the effective date of the VRARA, Congress shall reconsider the provisions of Section 4. 42 U.S.C. § 1973b(a)(7).

8.      There are nine covered States that are subject to Section 5: Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia. Some political subdivisions in Virginia have bailed out. One or more political subdivisions in California, Florida,

Michigan, New Hampshire, New York, North Carolina, and South Dakota are covered.  There are no covered jurisdictions in the remaining 34 states.  28 C.F.R. pt. 51, app.

9.    The Voting Rights Act provides a method by which jurisdictions can "bail out" of coverage through the granting of a declaratory judgment by the United States District Court for the District of Columbia.  Congress amended the Act's bailout provisions in 1982.  Prior to the 1982 reauthorization, under the bailout standard as construed by the Supreme Court in *City of Rome v. United States*, 446 U.S. 156, 167 (1980), only a "State with respect to which the determinations have been made" under Section 4(b) or a "political subdivision with respect to which such determinations have been made as a separate unit" were eligible to seek bailout under the Act.  42 U.S.C. § 1973b(a)(1).  In the 1982 reauthorization legislation, bailout was expanded to permit a political subdivision of a covered State to seek termination.  *See id.* § 1973b(a).

10.    The Voting Rights Act defines "political subdivision" as "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."  42 U.S.C. § 1973*l*(c)(2).

11.    A declaratory judgment of bailout can be issued only if the court determines that during the ten year period preceding the filing of the declaratory action and during the pendency of the action, the state or political subdivision seeking bailout demonstrates that it has satisfied the factors set forth at 42 U.S.C. § 1973b(a)(1).

12.    Section 3(c) of the Voting Rights Act authorizes a federal district court to impose preclearance obligations on a jurisdiction if it finds that the jurisdiction has violated the voting guarantees of the Fourteenth and Fifteenth Amendments as part of its relief.  The jurisdiction has

the option to seek preclearance from the Attorney General or the court that imposed the require-ment.  42 U.S.C. § 1973a(c).  This procedure is also known as "bail in."

13.    Observers are appointed under Section 8 of the Voting Rights Act.  In jurisdictions covered under the Section 4 formula, the Attorney General can certify a jurisdiction for observer coverage based on meritorious complaints that efforts to deny or abridge the right to vote on the basis of race or membership in a minority language group are likely to occur or the Attorney General determines the "assignment of observers is otherwise necessary to enforce the guaran-tees of the 14th or 15th Amendment."  42 U.S.C. § 1973f(a)(2)(B).  A court may also authorize the appointment of observers where the court determines it is appropriate to enforce the voting guarantees of the Fourteenth and Fifteenth Amendment.  *Id.* §§ 1973a(a); 1973f(a)(1).

**B.    Chronology of the VRA Before 2006**

**1.    Evidence from the Civil War Through 1965**

14.    In 1865, following the end of the Civil War, the States ratified the Constitution's Thirteenth Amendment, which abolished legalized slavery in the United States.

15.    In 1867, Congress enacted the Military Reconstruction Act, which allowed former confederate States to be readmitted to the Union if they adopted new state constitutions that per-mitted universal male suffrage.

16.    In 1868, the States ratified the Constitution's Fourteenth Amendment.

17.    In 1870, the States ratified the Constitution's Fifteenth Amendment.

18.    The Fifteenth Amendment, Section 1, provides:  "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV, § 1.  Section 2 pro-

vides: "The Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XV, § 2.

19.     In 1870, Congress passed the Enforcement Act, which made it a crime for public officers and private individuals to interfere with exercise of the right to vote. *See* 16 Stat. 140.

20.     The statute was amended in 1871 to provide for federal supervision of the electoral process, from registration to the certification of returns. *See* 16 Stat. 433.

21.     In *South Carolina v. Katzenbach*, 383 U.S. 301, 310 (1966), the Supreme Court stated that "[a]s the years passed and the fervor for racial equality waned, enforcement of the laws became spotty and ineffective, and most of their provisions were repealed in 1894."

22.     Beginning in 1890, States of the former confederate South systematically enacted tests designed to prevent minorities from voting, "includ[ing] grandfather clauses, property qualifications, 'good character' tests, and so called literacy or interpretation requirements." *Id.* at 311.

23.     In *Nixon v. Herndon*, 273 U.S. 536 (1927), the Supreme Court struck down a Texas law that provided "in no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas." *Id.* at 540 (internal quotation marks omitted). The Court stated that while "States may do a good deal of classifying that it is difficult to believe rational, . . . there are limits, and it is too clear for extended argument that color cannot be made the basis of a statutory classification affecting the right set up in this case." *Id.* at 541.

24.     "Promptly after the announcement of [*Nixon v. Herndon*], the Legislature of Texas enacted a new statute repealing the article condemned by [the Supreme] Court . . . substituting for the article so repealed another bearing the same number." *Nixon v. Condon*, 286 U.S. 73, 81-82 (1932) (internal citation omitted). Under the terms of the new statute, "'every political party

in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party; provided that no person shall ever be denied the right to participate in a primary in this State because of former political views or affiliations or because of membership or non-membership in organizations other than the political party.'" *Id.* at 82. "Acting under the new statute, the state executive committee of the Democratic party adopted a resolution 'that all white democrats who are qualified under the constitution and laws of Texas and who subscribe to the statutory pledge provided in Article 3110, Revised Civil Statutes of Texas, and none other, be allowed to participate in the primary elections to be held July 28, 1928, and August 25, 1928.'" *Id.*

25.    On July 28, 1928, a black United States citizen was "[b]arred from voting at a primary . . . for the sole reason that his color [was] not white," and became the plaintiff in *Nixon v. Condon. Id.* at 82-83.

26.    In *Nixon v. Condon*, the Supreme Court found the Texas statute unconstitutional because "[d]elegates of the state's power have discharged their official functions in such a way as to discriminate invidiously between white citizens and black." *Id.* at 89. The Court further stated that "[t]he Fourteenth Amendment, adopted as it was with special solicitude for the equal protection of members of the Negro race, lays a duty upon the court to level by its judgment these barriers of color." *Id.*

27.    Three weeks after the Court's decision in *Nixon v. Condon*, the Texas State Democratic Party passed a resolution barring blacks from membership at its annual convention. When the resolution was challenged, however, the Court unanimously found there was no state action. *See Grovey v. Townsend*, 295 U.S. 45 (1935). The Court noted ways that Texas regulated party

7

primaries, by for example requiring primary elections be held, that voter qualifications for general elections be applicable in primaries, that absentee voting be permitted, and that election judges have certain powers—but found no state action where Texas neither paid the expenses of the primary nor furnished or counted the ballots. *Id.* at 49-51.

28.    Less than a decade after the unanimous decision in *Grovey*, however, the Court overruled it in *Smith v. Allwright*, 321 U.S. 649 (1944), by a vote of 8 to 1.

29.    In *Smith v. Allwright*, the plaintiff was denied the ability to vote in the Democratic primary because of his skin color.  Because the Democratic party was a private organization, party officials claimed they had no Constitutional obligation to allow Smith to participate in a primary election.  The Supreme Court disagreed, finding "the place of the primary in the electoral scheme makes clear that state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function that may make the party's action the action of the state." *Allwright*, 321 U.S. at 660.  It noted Texas's role in the primary, which included the State ultimately directing the selection of all party officers, and that primary elections were conducted by the party under state authority. *Id.* at 663.  Thus, the Court continued, "[w]hen primaries become a part of the machinery for choosing officials, state and national, as they have here, the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election." *Id.* at 664.  It therefore found state action in violation of the Fifteenth Amendment. *Id.* at 665.

30.    In 1953, the Court reached beyond the primary to address a pre-primary candidate nominating process in *Terry v. Adams*, 345 U.S. 461 (1953).  The association at issue was the Jaybird Association, which claimed it was a self-governing voluntary club unregulated by the State.  Each election year the association held the Jaybird primary, which selected by ballot the

candidates that the association would endorse for public county. Successful candidates would then, with few exceptions since 1889, run unopposed and win the Democratic primaries and the general elections that followed. *Id*. at 463. The problem was that the Association limited its membership to whites, who were automatically members if their names appeared on the official list of county voters. *Id*. The Court, finding Jaybird activities purposefully excluded blacks from voting while at the same time trying to escape the Fifteenth Amendment, held "[f]or a state to permit such a duplication of its election processes is to permit a flagrant abuse of those processes to defeat the purposes of the Fifteenth Amendment," and "[t]he use of the county-operated primary to ratify the result of the prohibited election merely compounds the offense." *Id*. at 469. Thus, "[t]he effect of the whole procedure, Jaybird primary plus Democratic primary plus general election, is to do precisely that which the Fifteenth Amendment forbids," and was therefore unconstitutional. *Id*. at 469-470.

31.    On September 9, 1957, President Eisenhower signed the Civil Rights Act of 1957, 71 Stat. 634, which authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds. Perfecting amendments in the Civil Rights Act of 1960, 74 Stat. 86, "permitted the joinder of States as parties defendant, gave the Attorney General access to local voting records, and authorized courts to register voters in areas of systematic discrimination." *South Carolina v. Katzenbach*, 383 U.S. at 313. In 1965, Congress specifically found that the "enforcement [of these laws] has encountered serious obstacles in various regions of the country." H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2441.

32.    On March 7, 1965, a day that came to be known as "Bloody Sunday," voting rights supporters planned a march from Selma, Alabama to the state capitol in Montgomery to present

then-Governor George Wallace with a list of grievances. They were stopped on the Edmund Pettus Bridge in Selma by state troopers and sheriff's deputies on horseback who, in front of television cameras, attacked the more than 500 demonstrators by firing toxic tear gas, charging the marchers, and beating people with clubs and whips. *See, e.g.*, S. Rep. No. 109-295, at 8 (2006); H.R. Rep. 109-478, at 146; 152 Cong. Rec. E1418.

33.     Eight days after "Bloody Sunday," President Lyndon B. Johnson called for a comprehensive and effective voting rights bill. *Continuing Need for Section 203's Provisions For Limited English Proficient Voters: Hearing Before the Senate Committee on the Judiciary*, 109th Cong. 240 (2006) ("*June 13, 2006 Hearing*") (excerpt from The Impact of the Voting Rights Act in Alabama Since 1982 (then forthcoming 2006)).

34.     In 1965, the House Judiciary Committee found "[p]rogress has been painfully slow, in part because of the intransigence of State and local officials and repeated delays in the judicial process. Judicial relief has had to be gaged [sic] not in terms of months - but in terms of years." H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2441.

35.     The House Judiciary Committee noted that "even after apparent defeat resisters seek new ways and means of discriminating. Barring one contrivance too often has caused no change in result, only in methods." *Id.*

### 2.     The Voting Rights Act of 1965

36.     "Before enacting [the VRA of 1965] Congress explored with great care the problem of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. at 308.

37.     In 1965, Congress enacted the Voting Rights Act "to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *Id.*

10

38.     During the 1965 legislative process, "[m]ore than three full days were consumed dis-cussing the bill on the floor of the House, while the debate in the Senate covered 26 days in all. At the close of these deliberations . . . [t]he House approved by bill by a vote of 328-74 , and the measure passed the Senate by a margin of 79-18." *Id.* at 309.

39.     In *South Carolina v. Katzenbach*, the Supreme Court found "Congress felt itself con-fronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.*

40.     The Supreme Court found "Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Id.*

41.     On August 3, 1965, the House of Representatives passed the Voting Rights Act; the Senate passed the Act on August 4; and on August 6 President Lyndon Johnson signed the Act into law.  Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437.

42.     "Section 4(a)-(d) [of the 1965 Act] lays down a formula defining the States and po-litical subdivisions to which [the] new remedies [of the Act] apply.  The first of these remedies, contained in § 4(a), is the suspension of literacy tests and similar voting qualifications for a pe-riod of five years from the last occurrence of substantial voting discrimination." *South Carolina v. Katzenbach*, 383 U.S. at 315.

43.     "Section 5 prescribe[d] a second remedy, the suspension of all new voting regulations pending review by federal authorities to determine whether their use would perpetuate voting discrimination." *Id.* at 315-316

44.     Provisions of the 1965 Voting Rights Act were challenged in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

45.     In *South Carolina v. Katzenbach*, the Supreme Court upheld the coverage formula outlined in Section 4 of the Act.  Specifically, the Court stated that "[i]t was therefore permissible to impose the new remedies on the . . . States and political subdivisions covered by the formula, at least in the absence of proof that they have been free of substantial voting discrimination in recent years.  Congress is clearly not bound by the rules relating to statutory presumptions in criminal cases when it prescribes civil remedies against other organs of government under § 2 of the Fifteenth Amendment."  *Id.* at 330.

46.     With regard to Section 5 of the Act, the Supreme Court found "Congress knew that some of the States covered by § 4(b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees.  Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself.  Under the compulsion of these unique circumstances, Congress responded in a permissively decisive manner."  *Id.* at 335.

47.     The Supreme Court further stated, regarding Section 5, "there was nothing inappropriate about limiting litigation under this provision to the District Court for the District of Columbia, and in putting the burden of proof on the areas seeking relief."  *Id.*

48.     Various portions of the 1965 Act have been reauthorized and amended on five separate occasions (1970, 1975, 1982, 1992, and 2006).  As Congress recognized in 2006, "[i]n reauthorizing the VRA on four [previous] separate occasions, Congress determined that the 'exceptional conditions' cited in *South Carolina v. Katzenbach* continued to exist in 1970, 1975, 1982, and 1992 such that Congress appropriately found that the temporary provisions were still needed.  On each occasion, Congress examined the extent to which minority citizens were able to fully

participate in the electoral process and weighed the record against the continued need for the temporary provisions. On each occasion, Congress found it necessary to continue the temporary provisions to ensure that minority voters continued to be protected in exercising their right to electoral franchise." H.R. Rep. No. 109-478, at 8-9.

### 3.    Evidence Before Congress in 1970

49.    "A 1968 report of the Civil Rights Commission . . . reported a sharp growth in vote dilution techniques as new methods of voting discrimination" in light of growth of Black registration post-1965. Similarly, testimony of voting rights attorney Armand Derfner noted that "the need for federal examiners under Sections 6 and 7 declined as registration barriers largely disappeared, but the need for federal election observers under Section 8 increased as the focus of efforts shifted from registration office difficulties to Election Day problems." *Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary*, 109th Cong. 81, 104  (2005) ("*October 20, 2005 Hearing*"); *see also Amendments to the Voting Rights Act of 1965: Hearing Before the Subcomm. on Constitutional Rights of the Sen. Comm. on the Judiciary*, 91st Cong. 9 (1969).

50.    "On January 15, 1969, former Attorney General Ramsey Clark submitted to the speaker of the House of Representatives proposed legislation to continue in full force and effect all the provisions of the Voting Rights Act of 1965 for an additional 5 years." H.R. Rep. No. 91-397, at 2 (1969), *reprinted in* 1970 U.S.C.C.A.N. 3277, 3278.

51.    In 1969, Congress noted that "Congressional enactments in 1957, 1960, and 1964, whose purpose was to facilitate case-by-case litigation to secure equal voting rights, encountered

13

State and local intransigence and delays in the judicial process [and] insignificant gains in non-white voter registration." *Id.*

52.    The 1969 House Judiciary Committee Report cited with approval the Supreme Court's statement in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), which "underscore the rationale of the legislation." The Court stated "Congress had learned that substantial voting discrimination presently occurs in certain sections of the country, and it knew no way of accurately forecasting whether the evil might spread elsewhere in the future. In acceptable legislative fashion, Congress chose to limit its attention to the geographic areas where immediate action seemed necessary." H.R. Rep. No. 91-397, at 2-3, 1970 U.S.C.C.A.N. at 3278-3279.

53.    The Report noted that "[a]lthough registration progress has been dramatic under the act, especially when compared to registration gains achieved under earlier voting rights legislation, significant disparities continue between white and nonwhite registration in areas covered by the act." *Id.* at 3, *reprinted in* 1970 U.S.C.C.A.N. at 3279.

54.    The Report also noted "although statewide totals do reflect increases, a substantial number of counties still disclose extremely low Negro registration. For example, in Alabama less than 50 percent of Negroes of voting age are registered in 27 of 67 counties." *Id.* at 4, *reprinted in* 1970 U.S.C.C.A.N. at 3280.

55.    The House Report further stated that "[s]ince August 1965, approximately 19 voting rights suits have been instituted by the Department of Justice in areas covered by the act. This litigation included suits to abolish the poll tax, to implement provisions of the act requiring placement of federally listed voters on State voter rolls and authorizing Federal observers to monitor elections and suits to protect substantive rights of Negro voters and candidates under the act." *Id.*

56.    The 1969 Report found, based on "the history of litigation over the past 4 years and reports of the U.S. Commission on Civil Rights, the committee concludes that it is essential to continue for an additional 5 years all the foregoing provisions of the act in full force and effect in order to safeguard the gains in Negro voter registration thus far achieved, and to prevent future infringements of voting rights based on race or color." *Id.* at 5, *reprinted in* 1970 U.S.C.C.A.N. at 3281.

57.    "The record before the [House Judiciary Committee in 1969] indicates that as Negro voter registration has increased under the Voting Rights Act, several jurisdictions have under-taken new, unlawful ways to diminish the Negroes' franchise and to defeat Negro and Negro-supported candidates." *Id.* at 7, *reprinted in* 1970 U.S.C.C.A.N. at 3283.

58.    The record included a report by the U.S. Commission on Civil Rights stating that efforts to diminish the voting rights of minorities "have taken the form of switching to at-large elections where Negro voting strength is concentrated in particular election districts and facilitating the consolidation for predominantly Negro and predominantly white counties. Other changes in rules or practices affecting voting having included increasing filing fees in elections where Negro candidates were running; abolishing or making appointive offices sought by Negro candidates; extending the term of office of incumbent white officials, and withholding information about qualifying for office from Negro candidates." *Id.*

59.    The 1969 House Judiciary Committee took "note of the recent decision of the Supreme Court in *Allen v. Board of Elections*, [393 U.S. 544 (1969),] in which the Court discussed the history of the enforcement of section 5 and clarified its scope. The decision underscores the advantage section 5 produces in placing the burden of proof on a covered jurisdiction to show that a new voting law or procedure does not have the purpose and will not have the effect of dis-

criminating on the basis of race or color." H.R. Rep. No. 91-397, at 8, *reprinted in* 1970 U.S.C.C.A.N. at 3284.

60.     Congress also took note of the portion of the Supreme Court's decision in *Allen* where the Court "makes clear that private persons have authority to challenge the enforcement of changed voting practices or procedures pursuant to section 5 on the grounds that such changes have not been submitted in accordance with the procedures of the act.  In perceiving the need for private policing, the Court, in *Allen*, said:  'The achievement of the act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation insti- tuted at the discretion of the Attorney General (393 U.S. 544, 556).'" *Id.*

61.     The 1969 House Committee Report "conclude[d] that this act has produced signifi- cant progress in making the equal right to vote a reality and not merely a promise.  The act has reconfirmed the faith of many that exercise of the franchise and political participation today rep- resent the best and most productive means of achieving social change.  The Nation has a vital stake in further securing the gains thus far achieved, and in encouraging all its citizens to exer- cise their right to the franchise." *Id.* at 9, *reprinted in* 1970 U.S.C.C.A.N. at 3285.

**4.     The 1970 Amendments to the Voting Rights Act**

62.     "In 1970, Congress reviewed the progress that had been made by minorities over the preceding 5 years and extended Section 4's covered jurisdiction status and Section 5's pre- clearance requirement for an additional 5 years.  In extending the temporary provisions, Con- gress determined that there had been a lack of enforcement by the Department of Justice. A '5 year cooling off period imposed by the bill . . . is both reasonable and necessary to permit the dissipation of the long established political atmosphere and tradition of discrimination in voting

because of color in those States and subdivisions in which literacy tests and low registration have gone hand in hand.'" H.R. Rep. No. 109-478, at 9.

63.    The 1970 amendments also extended the period of time for which a jurisdiction would have to prove that it had not used a discriminatory test or device in order to obtain "bail-out." Under section 4(a) of the 1965 Act, a covered jurisdiction could bail out only if it could prove to the U.S. District Court for the District of Columbia that no test or device had been used in the jurisdiction for a period of five years. The 1970 amendments expanded this period to a term of 10 years. H.R. Rep. No. 91-397, at 10-11.

### 5.    Evidence Before Congress in 1975

64.    In 2006, Congress explained that in 1975 "Congress was presented with substantial evidence demonstrating the necessity of broadening the protections afforded by the VRA to include minority citizens who did not speak English. By expanding the temporary provisions to include Sections 4(f) and 203 under its 14th amendment enforcement power, Congress sought to remedy the voting inequities resulting from the disparate treatment experienced by language minority citizens in educational opportunities. In doing so, Congress 'documented a systematic pattern of voting discrimination and exclusion against minority group citizens who are from environments in which the dominant language is other than English,' and '[b]ased on the extensive evidentiary record demonstrating the prevalence of voting discrimination and high illiteracy rates among language minorities, the [relevant] Subcommittee acted to broaden its special coverage to new geographic areas in order to ensure protection of the voting rights of language minority citizens.'" H.R. Rep. No. 109-478, at 9-10 (alterations in original).

65.    The 1975 House Subcommittee on Civil and Constitutional Rights heard from forty-eight witnesses. See Extension of the Voting Rights Act: Hearings Before the Subcomm. on

Civil and Constitutional Rights of the H. Comm. on the Judiciary, 94th Cong. (1975) [hereinafter February 25-May 25, 1975 Hearings].

66.    The record of the House Subcommittee was over 1625 pages. *See id.*

67.    The Senate Subcommittee on Constitutional Rights heard from twenty witnesses. *See Extension of the Voting Rights Act of 1965: Hearings Before the Subcomm. on Constitutional Rights of the Sen. Comm. on the Judiciary*, 94th Cong. (1975) (*April 8-May 1, 1975 Hearings*").

68.    The record of the Senate Subcommittee was over 1080 pages. *See id.*

69.    The 1975 Congress concluded that "[t]he State of Texas . . . has a substantial minority population, comprised primarily of Mexican Americans and blacks. Evidence before the Subcommittee documented that Texas also has a long history of discriminating against members of both minority groups in ways similar to the myriad forms of discrimination practiced against blacks in the South." H.R. Rep. No. 94-196, at 17 (1975); S. Rep. No. 94-295, at 25 (1975).

70.    Congress found "[t]urnout in recent presidential elections in Texas (1960-1972) has been consistently below 50 percent of the voting age population. Indeed, the only reason that Texas was not covered by the Voting Rights Act in 1965 or by the 1970 amendments was that it employed restrictive devices other than a formal literacy requirement. A generation ago numerous suits were required to eliminate the Texas white primary. *Nixon v. Herndon*, 273 U.S. 536 (1927); *Nixon v. Condon*, 286 U.S. 73 (1932); *Grovey v. Townsend*, 295 U.S. 45 (1935); *Smith v. Allwright*, 321 U.S. 649 (1944); *Terry v. Adams*, 345 U.S. 461 (1953)." *Id.*; S. Rep. No. 94-295, at 25

71.    The 1975 House and Senate reports cited a recent "Federal constitutional amendment and a suit brought by the Department of Justice pursuant to Congressional instructions, contained in Section 10 of the Voting Rights Act, were required to eliminate the Texas poll tax. *United*

*States v. Texas*, 252 F. Supp. 234 (W.D. Tex.), *aff'd*, 384 U.S. 155 (1966).  Subsequently the state enacted the 'most restrictive voter registration procedures in the nation' to replace the poll tax.  *Graves v. Barnes*, [343 F. Supp. 704, 731 (W.D. Tex. 1972),] *aff'd sub nom. White v. Regester*, 412 U.S. 755 (1973).  This new registration system was declared unconstitutional through private litigation in the Federal Court.  *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974) (per curium)."  *Id.*; S. Rep. No. 94-295, at 25.

72.     The Reports cited the District Court's opinion in *Graves v. Barnes*, 343 F. Supp. at 731, regarding the effect that Texas' history had on persons of Spanish origin: "This cultural and language impediment, conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican Americans access to the political process in Texas even longer than the blacks were formerly denied access by the white primary."  H.R. Rep. No. 94-146, at 17 (1975); S. Rep. No. 94-295, at 25.

73.     The Reports also noted that "[t]he exclusion of language minority citizens is further aggravated by acts of physical, economic, and political intimidation when these citizens do attempt to exercise the franchise.  Witnesses testified that local law enforcement officials in areas of Texas patrol only Mexican American voting precincts, and harass and intimidate Mexican American voters."  H.R. Rep. No. 94-146, at 18; S. Rep. No. 94-295, at 26

74.     The 1975 House and Senate Reports stated that "[m]uch more common, however, are economic reprisals against minority political activity.  Fear of job loss is a major deterrent to the political participation of language minorities.  A witness from Texas indicated that an Anglo candidate who was a loan officer at the bank went to each Mexican American who had loans with the bank and told them that he expected their votes."  H.R. Rep. No. 94-146, at 18; S. Rep.

No. 94-295, at 26; *Extension of the Voting Rights Act: Hearings Before the Subcomm. of the H. Comm. on the Judiciary*, 94th Cong. 521 (1975) ("*February 25-May 25, 1975 Hearings*"); *April 8-May 1, 1975 Hearings*, at 735-736.

75.    The Reports noted that "[t]he recent objections entered by the Attorney General of the United States to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism.  As registration and voting of minority citizens increases, other measures may be resorted to which would dilute increasing minority voting strength.  Such measures may include switching to at-large elections, annexations of predominantly white areas, or the adoption of discriminatory redistricting plans.  H.R. Rep. No. 94-196, at 10; S. Rep. No. 94-295, at 16-17.

76.    The 1975 Reports stated that "[t]he at-large structure, with accompanying variations of the majority run-off, numbered place system, is used extensively among the 40 largest cities in Texas.  And, under state statute, the countless school districts in Texas elect at-large with an option to adopt the majority run-off, numbered place system.  These structures effectively deny Mexican American and black voters in Texas political access in terms of recruitment, nomination, election and ultimately, representation."  H.R. Rep. No. 94-146, at 19-20; S. Rep. No. 94-295, at 27-28; *see also February 25-May 25, 1975 Hearings*, at 403; *April 8-May 1, 1975 Hearings*, at 491.

77.    According to the House and Senate Reports, "[i]n its analysis of problems of electoral participation by Spanish-speaking voters, the Commission on Civil Rights reported that some Mexican Americans in Uvalde, Texas are afraid their welfare checks will be reduced because of their political activity."  H.R. Rep. No. 94-196, at 18; S. Rep. No. 94-295, at 26.

78.    The Reports note, "[t]he proportion of elected officials who are Mexican American or Puerto Rican, for example, is substantially lower than their proportion of the population.  In

Texas, although Mexican Americans comprise 16.4 percent of the population, they hold only 2.5 percent of elective positions." H.R. Rep. No. 94-196, at 18; S. Rep. No. 94-295, at 26-27.

79.    According to the 1975 Reports, "[i]n Nacogdoches, Texas, the city charter provided for at-large elections with electoral victory for a plurality of the votes. In spring 1972, a black candidate almost won a plurality of votes in the election. In June 1972, the all-white city commission amended the city charter for the first time in 43 years to adopt a majority run-off, numbered place system for city elections. In the April 1973, election, another black candidate ran for city commissioner only to win a plurality of the votes but to lose in a majority run-off election. In 1975, a Federal district court ordered single-member districts for the City of Nacogdoches on the grounds that the at-large majority run-off, numbered place system abridged the voting rights of black citizens." H.R. Rep. No. 94-196, at 19 (citing *Weaver v. McUlroy*, Civil No. 5524 (E.D. Tex. 1975)); *see also* S. Rep. No. 94-295, at 27; *February 25-May 25, 1975 Hearings*, at 400-401; *April 8-May 1, 1975 Hearings*, at 489-490.

80.    The House and Senate reports concluded that "[e]lection law changes which dilute minority political power in Texas are widespread in the wake of recent emergence of minority attempts to exercise the right to vote. The following communities have adopted such changes in the face of growing minority strength: Corpus Christi, Lufkin, and Waco, in addition to a number of local school districts throughout the state. In January, 1972, a three-judge Federal Court ruled that the use of multi-member districts for the election of state legislators in Bexar and Dallas counties, Texas, unconstitutionally diluted and otherwise canceled the voting strength of Mexican Americans and black in those counties. This decision was affirmed by the United States Supreme Court in *White v. Regester*, 412 U.S. 755 (1973)." H.R. Rep. No. 94-196, at 19 (citing *Robinson v. Commissioners' Court, Anderson County*, 505 F.2d 674 (5th Cir. 1974); *Smith v.*

*Craddick*, 471 S.W. 2d 375 (Tex. Sup. Ct. 1971)); *see also* S. Rep. No. 94-295, at 27; *February 25-May 25, 1975 Hearings*, at 401; *April 8-May 1, 1975 Hearings*, at 490.

81.     The Reports noted that "[a]nother device which is used to affect adversely minority participation is the annexation of areas with large white voting populations.  In 1972, in Pearsall, Texas, for example, the City Council, while refusing to annex compact contiguous areas of high Mexican American concentration, chose to bring a 100 percent Anglo development within the city.  The City of San Antonio, in 1972, made massive annexations including irregular or finger annexations on the city's heavily Anglo north side.  The population breakdown in the areas annexed was overwhelmingly Anglo, although the city was previously almost evenly divided between Anglos and Mexican Americans." H.R. Rep. No. 94-196, at 20; S. Rep. No. 94-295, at 28; *see also February 25-May 25, 1975 Hearings*, at 369; *April 8-May 1, 1975 Hearings*, at 477.

82.     The Reports further noted that, "[i]n addition to the serious strictures on their access to political participation outlined previously, language minority citizens are also excluded from the electoral process through the use of English-only elections. . . .  In Texas, over 33 percent of the Mexican American population has not completed the fifth primary grade.  A series of reports by the U.S. Commission on Civil Rights on Mexican American education in the southwestern United States found that over 50 percent of all Mexican American children in Texas who enter the first grade never finish high school." H.R. Rep. No. 94-196, at 20; S. Rep. No. 94-295, at 28.

83.     In 1975, Congress had evidence before it that in 1973 "the Supreme Court upheld a lower court finding which noted that the Mexican American population in Texas had 'historically suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others.' *Graves v. Barnes*, 343 F. Supp. 704, 728 (W.D. Tex 1972), *aff'd in relevant part sub nom.*

22

*White v. Regester*, 412 U.S. 755 (1973). Later, the same three-judge district court iterated its

finding that Texas has 'a history pockmarked by a pattern of racial discrimination that has

stunted the electoral and economic participation of the black and brown communities in the life

of state.'" H.R. Rep. No. 94-196, at 22; S. Rep. No. 94-295, at 30.

84.     During the course of its deliberations on the 1975 amendments to the coverage for-

mula of the VRA, both the House and Senate stated: "[b]y covering these new geographic areas,

we simply apply the Act's special remedies to jurisdictions where language minorities reside in

greatest concentrations and where there is evidence of low voting participation. Currently avail-

able date indicate that Title II coverage would be triggered in . . . the entire state[] of . . . Texas."

H.R. Rep. No. 94-196, at 24; S. Rep. No. 94-295, at 32.

85.     In 1975, Congress heard evidence from the Hon. Arthur S. Flemming, Chairman of

the United States Commission on Civil Rights. Flemming testified that "[t]he State of Texas has

a substantial minority population, comprised primarily of Mexican Americans and Blacks.

Texas also has a long history of discriminating against members of both minority groups in ways

similar to the  myriad forms of discrimination practiced against blacks in the South." *February*

*25-May 25, 1975 Hearings*, at 28; *April 8-May 1, 1975 Hearings*, at 96-97.

86.     The Hon. Arthur S. Flemming testified before the 1975 Congress that "Commission

[on Civil Rights] staff visited two south Texas counties with substantial Mexican-American

populations. In those counties, they were told, Mexican-Americans encounter problems similar

to those facing newly enfranchised blacks in may Southern States. Precise data do not exist, but

registration of Mexican-Americans reportedly is very low. Chicano citizens report that registra-

tion hours and locations are inconvenient and that inadequate and ineffective use of bilingual

23

personnel and deputy registrars impedes registration." *February 25-May 25, 1975 Hearings*, at

28; *April 8-May 1, 1975 Hearings*, at 97.

87.     Arthur Flemming further testified that "Mexican Americans in south Texas, like

blacks throughout the South, must overcome the effects of past discrimination as well as present

efforts to minimize the impact of their political participation." *February 25-May 25, 1975 Hear-*

*ings*, at 28; *April 8-May 1, 1975 Hearings*, at 97.

88.     Arthur Flemming also gave evidence that "[t]he voting rights of Chicanos in some

parts of Texas have also been denied by dilution of their voting strength through the use of vot-

ing rules frequently found objectionable by the Attorney General when used in jurisdictions cov-

ered by the Voting Rights Act.  Texas makes widespread use of devices such as at-large election

with numbered posts and majority requirements which often have the effect of limiting the suc-

cess of minority voters at the polls.  In 1973, the United States Supreme Court upheld a lower

court finding that the use of multi-member districts for election of State legislators discriminato-

rily diluted the votes of Mexican Americans in Bexar County (San Antonio) and of blacks in

Dallas County. [*White v. Regester*, 412 U.S. 755 (1973)].  More recently, the lower court has

also held that multi-member legislative districts deny equal access to the political process for

Mexican Americans and blacks in El Paso, Corpus Christi, Lubbock, Fort Worth, and several

other Texas counties.  [*Graves v. Barnes*, 378 F. Supp. 640 (W.D. Tex 1974)].  In sum, the pre-

liminary information developed by the Commission with respect to Mexican American political

participation in Texas indicates that discrimination apparently still infects the electoral process in

some parts of the State." *February 25-May 25, 1975 Hearings*, at 28; *April 8-May 1, 1975 Hear-*

*ings*, at 97.

89.     The 1975 House of Representatives heard testimony from Representative Barbara Jordan that her "first attempts to become a member of the Texas House of Representatives were thwarted by the same type of discriminatory voting practices forbidden by the Voting Rights Act. In 1962, when I first ran for the Texas House, Harris County (Houston) was not divided into single member districts. I had to run at large—against all other candidates. I lost. I lost again in 1954. I could not get elected in an at-large election. In 1966 the Texas legislature was forced to reapportion itself. In *Reynolds v. Sims,* the United States Supreme Court had applied the "one man-one vote" rule of *Baker v. Carr* to state legislative districts. The reapportionment created a new, single-member State Senatorial District in which I lived. I ran and won. Absent the Supreme Court ruling, I would have lost again." *February 25-May 25, 1975 Hearings*, at 75.

90.     Representative Barbara Jordan also testified that, in 1965, "[the House Judiciary Committee] heard testimony that school teachers lose their jobs if they try to register. Mexican-Americans in Texas have lost their teaching jobs as the result of filing as a candidate." *Id.*

91.     Representative Barbara Jordan further stated that "[i]n at least three Texas towns that we know of the white majority have boycotted Mexican-American owned businesses supporting minority candidates. The boycotts effectively ruined their businesses because they could not support themselves on the economic of the minority population alone." *Id.* at 76.

92.     Representative Barbara Jordan gave evidence that "[r]egistration forms in Texas have been discarded if an individual made an error, crossed it out, and provided the correct information." *Id.*

93.     Representative Barbara Jordan testified that "[v]oting Procedures in Texas are used to discourage voting participation. In some communities where paper ballots are used voters are not provided voting booths in which to cast secret ballots. They are forced to vote on large ta-

bles where everybody can see. There have been instances where the clerk handling absentee ballots will fill out the ballot for anglos over the phone but will not provide assistance to minority voters. Under state law, officials can open ballot boxes after only ten voters have deposited their ballots. Votes of minorities who need to vote early in the day because of their job situation are easily correlated with individuals." *Id.*

94.     Representative Barbara Jordan testified that "[f]ar more subject to abuse is the numbered stub system for paper ballots. After voting, an individual must sign the stub which is numbered to correspond with the ballot. The ballot is deposited in one box and the stub in another. The stub box is delivered to the District Court Clerk at the end of the voting day. Although the box is sealed and may only be opened in the presence of the District Court judge, there have been instances where the boxes have been delivered with the seal broken. Even in larger metropolitan areas where voting machines are used, absentee voters must sign a numbered stub attached to their ballots." *Id.*

95.     In 1975, Congress received evidence from Representative Barbara Jordan, who submitted a table to the House Committee, that Texas had a 45.3 percent voting rate in 1972, with a 14.5 voting rate among "mother tongue" Spanish speakers. *Id.* at 79.

96.     In 1975, "Congress was presented with substantial evidence demonstrating the necessity of broadening the protections afforded by the VRA to include minority citizens who did not speak English. By expanding the temporary provisions to include Sections 4(f) and 203 under its 14th amendment enforcement power, Congress sought to remedy the voting inequities resulting from the disparate treatment experienced by language minority citizens in educational opportunities. In doing so, Congress 'documented a systematic pattern of voting discrimination and exclusion against minority group citizens who are from environments in which the dominant language

is other than English,' and '[b]ased on the extensive evidentiary record demonstrating the preva-
lence of voting discrimination and high illiteracy rates among language minorities, the [relevant]
Subcommittee acted to broaden its special coverage to new geographic areas in order to ensure
protection of the voting rights of language minority citizens.'" H.R. Rep. No. 109-478, at 10.

97.    In 1975, J. Stanley Pottinger, the Assistant Attorney General for Civil Rights, testified
before Congress that "[o]ur study of the State of Texas voting and census figures for 1972 reflect
that counties with high Mexican-American population had slightly lower voting participation
than counties with low Mexican-American populations; the disparity becomes somewhat greater
if the combined black and Mexican-American figures are compared with the white 'Anglo' fig-
ures." *Id.* at 178.

98.    In 1975, Congress heard evidence from J. Stanley Pottinger, the Assistant Attorney
General for Civil Rights who testified that "Texas allegedly conducted English-only elections in
1964 and 1968 and less than 50% of its voting age population voted in the 1964 and 1968 elec-
tions." *Id*. at 179.

99.    The 1975 Congress received testimony from Howard Glickstein, the Director of the
Notre Dame Center for Civil Rights, that "[t]he denial of access to the ballot has resulted in a
similar disproportionate absence of Mexican Americans from elected office. . . . In Texas, where
18 percent of the population is Mexican American, just 6.2 percent of the elected officials were
Mexican American." *Id.* at 335.

100.    George Korbel, the Assistant Regional Attorney for the EEOC, testified that "[t]here
are 11,196,780 persons who reside in the State [of Texas] of whom 1,419,677 are black and
2,059,671 are Mexican Americans.  Stated in other terms, 31.1% of the State is minority.  In-
deed, there are more blacks living in Texas than in any of the states which are currently thought

27

of as entirely covered by Section 5 of the Voting Rights Act and since, in Texas, Mexican Americans outnumber Blacks, there are more than twice as many minority residents in Texas than in any one of the states entirely covered by Section 5 . . . . These comparisons are even more striking when made in terms of those blacks and Mexican Americans who one would expect to be most deeply involved in the political structure—those over 25 years of age. Thus, Texas, with 1,467,873 minority residents of over 25; is almost three times larger than the largest of the states in the so called Covered jurisdictions." *Id.* at 360.

101.    George Korbel gave testimony stating that "for all their numbers, there is only 1 Black Mayor of a major city in Texas and there are no Mexican American Mayors among any of these cities. There are no black and only two Mexican American State Senators. There are no Black district judges. There is only one minority person—a Mexican American, among the state appellate judges. No Mexican American or Black has ever been elected to or served on either the Texas Supreme Court or the Texas Court of Criminal Appeals and as far as I can tell only one Mexican American has ever been a member of any of the Courts of Civil Appeals—the intermediate civil appellate court in Texas. Of the 2,770 elected and appointed posts in Texas, only 296 (6.7%) are Mexican American and many of these are from small south Texas counties where minority population exceeds 80%. Black elective success is even more sparse. There are only 49 black city councilmen, 17 of which are found in 4 small cities each overwhelmingly black." *Id.* at 360-361.

102.    George Korbel testified that "[o]f the 1,231 public school districts in Texas, blacks are found as board members on only 39. There are only two black judges in Texas—one of a Court of Domestic Relations and another of a County Criminal Court both in Harris County.

The only black chief of policy in the state is to be found in Ennis, Texas, a small, almost totally black town." *Id.* at 361.

103.    In 1975, George Korbel testified that, in the 1965 House Report No. 469, which recommended passage of the original Voting Rights Act, the House Judiciary Committee cited fourteen federal court decisions involving various methods and instances of denial of minority access to the political process.  Of these cases, 4 had their situs in Texas.  *Id.*

104.    In 1975, George Korbel testified that "Texas does not now and has never conducted its elections in any language but English.  This even though approximately one-third of the Mexican Americans in Texas, though literate in Spanish, are unable to speak, read, or write the English language.  In fact it was not until a federal court intervened in 1971, that non-English speakers could even have assistance casting their vote.  *Garza v. Smith*, 320 F. Supp. 131 (W.D. Tex. 1971)."  *February 25-May 25, 1975 Hearings*, at 361.

105.    George Korbel testified that "the highly criticized poll tax found one of its prime exponents in the State of Texas.  When Congressman Henry B. Gonzales was sworn in as a Texas State Senator in the mid 1950s, he had in his hand a bill to repeal the poll tax.  In spite of continued, dogged efforts on his part, the poll tax was not repealed until 1966 and then by a federal court not the Texas Legislature.  *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex. 1966) *aff'd* 384 U.S. 155.  In its opinion, the Court found that the poll tax had been enacted for the specific purpose of disenfranchising minority residents of the State of Texas.  *Id.* 252 F. Supp. 234, 245.  Shortly after the federal courts acted to open the process up, the Texas Legislature responded by passing what was later found by another federal judge to be 'The most restrictive voter registration procedures in the nation. . . .' *Graves v. Barnes*, 343 F. Supp. 704, 731 (W.D. Tex 1972)." *Id.* at 361-362.

106.    George Korbel also testified that "[n]ot to be denied, local officials are found, even today, placing unnecessary road blacks in the way of minority participation.  For example, a federal court found just last year in El Paso County: 'Intimidation of Mexican-Americans under law has been replaced with more subtle forms of demoralization.  For example, during voter registration drives in the late 1960's, the county tax assessor . . . attempted to place unreasonable limits on the number of deputy-voter registrars and often refused person access to the voter registration books.  He also declined to accept voter registration cards unless they were mailed by the registrant or submitted personally by the registrant.  Thus, he rejected any submission either by mail or by a deputy-voter registrar, or registration forms in bulk form.' *Graves v. Barnes*, 378 F. Supp. 640, 656 (W.D. Tex. 1974)." *Id.* at 362.

107.    George Korbel testified that "as blacks or Mexican Americans began to come close to political success, election rules have been changed.  In Waco, Texas, for example, the City Council played a cat and mouse game with the cities' minority community." *Id.* (statement of George Korbel, Assistant Regional Attorney for the EEOC).

108.    George Korbel cited *Graves v. Barnes*, 343 F. Supp. 704, 731 (W.D. Tex 1972), and testified that "[a]s a federal court said in considering a Texas reapportionment case in 1972: 'There is no aspect of human endeavor, in general and of American life in particular, in which the ability to read, write, and understand a language is more important than politics.  There can be no doubt that lack of political participation by Texas Chicanos is affected by a cultural incompatibility which has been fostered by a deficient educational system.  If this court ignores the reason for the minimal impact of Mexican Americans . . . 'it will prove that justice is blind and deaf.'" *Id.* at 364.

30

109.    George Korbel also cited *White v. Regester*, 412 U.S. 753, 769 (1972), and testified that the Supreme Court specifically recognized the struggles of Mexican Americans in Texas to achieve electoral opportunity, stating that "[c]ultural and language impediment, conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary." *Id.* at 365.

110.    George Korbel cited *Graves v. Barnes*, 378 F. Supp. 640, 649 (W.D. Tex. 1974), and noted that a federal court noted that in 1966 armed deputy sheriffs were brought to the polls in the black precincts in Jefferson County. *Id.* at 365 n.10.

111.    George Korbel testified that "[a] Texas political observer put it in a nut shell when he wrote 'The entire history of the expansion of sufferage [sic] in Texas is a story of federal court decisions and constitutional amendments.'" *Id.* at 365 (citing Charles Denton, The Year They Threw the Rascals Out (Shoal Creek Publishers, Inc. 1973)).

112.    George Korbel stated that "[t]he Austin Independent School District was found by the Fifth Circuit in 1972 to unconstitutionally segregate both Mexican American and Black school children. In 1972, its School Board chose to modify its Board election procedures under an option provided by Texas statute. This was a move from a plurality to a majority vote requirement in conjunction with at-large-place elections. It came after such a procedure in the state legislature context received strong, severe criticism by a U.S. District Court sitting in Austin, Texas. Such changes have typically been objected to under Section 5, and closely parallels the Corpus Christi situation referred to earlier." *Id.* at 378.

113.    Dr. Charles L. Cotrell, Associate Professor of Government at St. Mary's University in San Antonio Texas, testified before Congress in 1975 that "[a]lthough physical violence appears

no longer to be commonly used to prevent Blacks in the South from registering and voting, such episodes still occur. More common are economic reprisals against minority political activity. Fear of both violence and economic reprisals remains, especially in the rural South and among the old members of the Black population." *Id.* at 399.

114.    During the 1975 hearings on the Voting Rights Act, at least one member of Congress referenced the severity of race discrimination in Texas, and stated that "[t]he situation is very severe in Texas, and we have had lots of testimony to the fact of just how severe discrimination is in Texas." *Id.* at 633 (statement of RepresentativeEdwards).

115.    Congress received testimony in 1975 from Leonel Castillo, City Comptroller of Houston Texas, that "in Bexar County, Texas (accompanied by Al Perez, MALDEF), there were 48 precincts that had a population of 70 percent or more Mexican Americans in 1970. Of the 131,249 eligible voters in these precincts, only 61,857, or about 47 percent of all eligible to vote, were actually registered. In contrast, of the 92 precincts that had 70 percent or more Anglo population, 62 percent of the eligible voters were registered. Thus, it appears that Mexican Americans in Bexar County register at a rate of approximately 15 percent lower than the Anglo population." *Id.* at 800.

116.    Leonel Castillo also testified to a number of different irregularities in voting: "(1) Poll watchers were harassed and intimidated by election officials thus preventing them from exercising their responsibilities and rights under Federal and state election laws; (2) local election officials provided insufficient or wrong information on voting procedures. For example, registered voters who appeared at the polling places without voter registration certificates were not allowed to vote; (3) election officials denied assistance to non-English speaking, illiterate, and/or disable voters as required by Article 8.13 of the Texas Election Code; (4) there were in-

dications that there was a biased use of residential requirements to deny Mexican Americans, especially migrant laborers, the right to vote absentee; (5) law enforcement officials allegedly harassed and intimidated Mexican American voters by circulating and parking in front of selected polling places, by making excessive and unnecessary appearances at those polling places and by actually threatening Mexican American voters; (6) local officials, on occasion, selected voting places clearly designed to discourage participation by Mexican American voters; (7) voters were allegedly economically intimidated by threats of financial loss for failure to support certain candidates; (8) many voters were denied the right to vote due to the failure of local election officials to make registration equally convenient to all groups. For example, in some areas, Mexican Americans had difficulty in obtaining voter registration applications for registration drives." *Id.* at 809-810.

117.     Castillo further testified that "[d]espite the strong and repeated urging of the Texas Advisory Committee, the Department of Justice failed to respond to a request for on-site election monitoring." *Id.* at 810.

118.     Castillo also stated that "[o]n November 5, 1974, the day of the general election in Texas, several staff members of the Southwestern Regional Office of the U.S. Commission on Civil Rights were able to observe elections in three South Texas counties from which many of the voting complaints had originated. These were La Salle, Frio, and Uvalde counties, all located south and west of the San Antonio metropolitan area. Staff members visited the various polling places throughout the day and recorded several significant observations. These included: harassment and intimidation of Mexican American campaign workers, last-minute unannounced changes in voting times, insults to Mexican American poll watchers by a county clerk serving as an election judge, a highly visible presence of armed law enforcement officials near polling

33

places, and excessive demands for personal identification required of Mexican-American voters. The atmosphere surrounding these elections was tense and hostile. In at least one county, violence might have easily erupted (as indeed it had in other election years). In addition to witnessing these events, the Commission staff reported to our Advisory Committee that numerous additional problems were called to their attention by minority voters in these areas." *Id.*

119.    In 1975, Congress received evidence submitted by the U.S. Commission on Civil Rights that "[t]wo cases arising out of Texas do support, indirectly, a thesis that English-only elections are part of a pattern of discrimination against non-English speaking citizens. In *Garza v. Smith*, Mexican Americans successfully challenged a Texas statute which allowed aid in voting to physically handicapped citizens but did not provide such aid to 'Chicano' interests. The case, brought on an 'equal protection' theory, did not specifically reach the issue of monolingual elections as a *per se* denial of voting rights. In *Graves v. Barnes*, the U.S. District Court held a redistricting in Bexar County, Texas (San Antonio) which provided for multi-member districts to violate the 'one person, one vote' mandate of *Reynolds v. Sims* in relation to the Chicano population. The U.S. Supreme Court in sustaining the holding in relation to Bexar County, in *White v. Regester*, noted that the District Court had based its decision on its survey that the 'Chicano' population had differed from and continues to suffer from the effects of invidious discrimination in education, employment, economics, health and politics." *Id.* at 947 (Staff Memorandum by the U.S. Commission on Civil Rights).

120.    Congressman Edward Roybal, U.S. Representative from the State of California, gave evidence to Congress that, "[i]n a February 23, 1975 letter, the Department of Justice concludes that 'It is fully consistent with the spirit of the [Voting Rights] Act as amended to treat Mexican Americans and Puerto Ricans as racial groups.'" *April 8-May 1, 1975 Hearings*, at 267.

121.    Congressman Roybal testified that "the U.S. Commission on Civil Rights, in a recent staff memorandum (March 1975), expresses the view that 'population groups distinguished by, and discriminated against on the basis of, their language, their common cultural heritage, and their physical characteristics, meet the anthropological,/sociological definition of race." *Id.*

122.    During the 1975 hearings before the Senate Judiciary Committee, Senator Barry Goldwater stated for the record: "Now, I do not want to mention names, but Texas is notoriously the worst State in the country as it applies to voting rights of people of Spanish origin." *Id.* at 724.

123.    Modesto Rodriguez from Pearsall, Texas, testified before the 1975 Congress as to "intentional actions to deny or dilute [Mexican Americans'] vote by the Anglo politicians." Specifically, Rodriguez stated that "although Mexican Americans make up 75 percent of the Pearsall [Texas] population, and most of them live by the west side, the only polling place for city elections is in the east side where the Anglo lives. In a recent election, the Mexican Americans managed to get his [sic] polling place moved to a school in the west side, in other words, in the barrio. For that election, the number of Chicanos voting went up by 400 votes from the previous election. The white quickly moved the polling place to its original place for the next election, resulting in a dramatic decrease in the number of Chicanos voting." *Id.* at 736-737.

124.    Modesto Rodriguez also testified that "[b]y [Texas] State law counties with small populations can change the starting hours [of their polls] from 7 a.m. to 8 a.m. The 7 a.m. starting time used in Frio County was beneficial to Mexican Americans because many of them could vote before having to go to work. When the Anglos realized that Chicanos were taking advantage of this starting time to cast votes, the starting time for voting was changed to 8 a.m." *Id.* at 737.

35

125.    Modesto Rodriguez further stated that, "about three years ago the Pearsall [Texas] city council, dominated by Anglos, decided to insure their continued political domination by diluting the Mexican-American vote.  The council decided to annex 2 Anglo areas on the northern boundary of the city.  The annexed area—the Fairview and Galloway additions—have no symmetry with the city boundaries . . . The annexation of these two areas added more Anglo voters to the city population there by diluting the Chicano majority within the city limits." *Id.*

126.    In 1975, Congress received testimony from Leon Castillo, Controller of the City of Houston, Texas, who cited the U.S. District Court's 1972 decision in *Graves v. Barnes*, and testified that the Court's decision in *Graves* stated that: "[b]ecause of longstanding educational, social, legal, economic, political, and other widespread and prevalent restrictions, customs, traditions, biases and prejudices, some of a so-called de jure and some of a so-called de facto character, the Mexican-American population of Texas, which amounts to about 20 percent, has historically suffered from, and continues to suffer from, the results and defects of insidious discrimination and treatment in the fields of education, employment, economics, health, politics, and others." *April 8-May 1, 1975 Hearings*, at 740.

127.    In 1975, Congress received testimony from Leon Castillo stating that "[a] Bureau of the Census report entitled 'Voter Participation in November 1972' noted that there is a significant gap between Mexican Americans and Anglos regarding voting participation." *Id.* at 741.

128.    Leon Castillo summarized before Congress the "major allegations" that were brought to the Advisory Committee's attention regarding election-day irregularities: (1) "pollwatchers were harassed and intimidated by election officials, thus preventing them from exercising their responsibilities and rights under Federal and State election laws;" (2) "local election officials provided insufficient or wrong information on voting procedures;" (3) "election officials denied

36

assistance to non-English-speaking illiterate, and/or disabled voters as required by article 8.13 of the Texas Election Code;" (4) "there were indications that there was a biased use of residential requirements to deny Mexican Americans, especially migrant laborers, the right to vote absentee;" (5) "law enforcement officials allegedly harassed and intimidated Mexican American voters by circulating and parking in front of selected polling places, by making excessive and unnecessary appearances at those polling places, and by actually threatening Mexican American voters;" (6) "local officials on occasion selected voting places clearly designated to discourage participation by Mexican American voters;" (7) " voters were allegedly economically intimidated;" and (8) "many voters were denied the right to vote due to the failure of local election officials to make registration equally convenient to all groups." *Id.* at 741-742.

### 6.    The 1975 Amendments to the Voting Rights Act

129.    On January 14, 1975, H.R. 939 was introduced into the House of Representatives to extend the special provisions of the Voting Rights Act of 1965 for ten years, and to make permanent the temporary nationwide ban on literacy tests enacted in 1970. On February 19 and 20, 1975, H.R. 3247 and H.R. 3501 were introduced into the House to expand coverage of the Act to include certain minority groups. H.R. Rep. No. 94-196, at 3-4.

130.    In February and March, 1975, the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary conducted thirteen days of hearings. "During these sessions, the Subcommittee received testimony relating to all aspects of the proposed legislation. The witnesses included congressional sponsors of the legislation, other Members of Congress, the Assistant Attorney General of the United States, representatives of the U.S. Commission on Civil Rights, state and local officials, private citizens, as well as members of various civic or-

ganizations with special interest in the Voting Rights Act of 1965.  Those who did not appear

personally were given an opportunity to submit relevant material into the record." *Id.* at 4.

131.    On April 23, 1975, the Subcommittee adopted H.R. 219, a new proposal which had

been introduced to reflect the provisions of H.R. 939 with Subcommittee amendments, and rec-

ommended it for favorable action by the Committee.  On May 1, 1975, the Committee voted 27

to 7 to report H.R. 6219, as amended, for favorable action by the House.  *Id.*

132.    On January 27, 1975, S. 407 was introduced into the Senate to extend the Voting

Rights Act for five years and to continue the nationwide ban on "tests and devices."  Additional

bills were also introduced reflecting various proposals.  S. Rep. No. 94-295, at 10.

133.    In April and May, 1975, the Subcommittee on Constitutional Rights of the Senate Ju-

diciary Committee conducted seven days of hearings regarding the proposed amendments and

extensions of the Voting Rights Act.  The witnesses included congressional sponsors of the legis-

lation, other Members of Congress, the Assistant Attorney General of the United States, repre-

sentatives of the U.S. Commission on Civil Rights, state and local officials, private citizens, as

well as members of various civic organizations with special interest in the Voting Rights Act of

1965. . . .  In addition, the Subcommittee solicited the views of all state election officials affected

by the proposed legislation.  *Id.*

134.    After the conclusion of the hearings, the Senate Subcommittee "met in open Execu-

tive Session on June 6 and 11, 1975, to consider the various [proposed] measures.  Upon a proper

motion, the Subcommittee chose to amend S. 1279 with the language of H.R. 6219, the Voting

Rights bill passed by the House of Representatives."  The Subcommittee then voted, eight to

two, to report favorably S.1279 as amended.  *Id.* at 10.  After considering a variety of amend-

ments, the Senate Judiciary Committee subsequently voted (10-4) to report S. 1279.  *Id.* at 10-11.

135.    In enacting the 1975 Act, Congress extended sections 4 through 9, the temporary provisions of the Act, as they apply to covered jurisdictions for "another ten years." Pub. L. No. 94-73, 89 Stat. 402 (1975); H.R. Rep. No. 94-196, at 38.

136.    In extending the Section 5 provisions for an additional period of time, Congress cited the Supreme Court's decision in *Connor v. Waller*, 421 U.S. 656 (1975), in which the Court "reiterated its previous holdings which make Section 5 the front line defense against voting discrimination." S. Rep. No. 94-295, at 18. The Senate committee was "convinced that it is largely Section 5 which has contributed to the gains thus far achieved in minority political participation. Moreover, it is Section 5 which serves to insure that this progress shall not be destroyed through new procedures and techniques. Now is not the time to jeopardize this progress through the removal of these crucial preclearance protections." *Id.* at 19.

137.    The 1975 Amendments also "establish[ed] a permanent nationwide ban on literacy test and other similar devices as a voting qualification or prerequisite to voting." Pub. L. No. 94-73, 89 Stat. 402; H.R. Rep. No. 94-196, at 38. As the 1975 Congress recognized, "[u]nder the provisions of the original 1965 Act, literacy tests and other devices were suspended in the several states and counties covered at the time of the original enactment, primarily in the southern part of the United States. In 1970, when the Congress extended the temporary provisions of the original 1965 enactment, it also established a temporary nationwide ban on such tests and devices in areas not subject to the suspension of the 1965 Act." H.R. Rep. No. 94-196, at 39.

138.    The 1975 Amendments "expand[ed] coverage of the Voting Rights Act to new geographic areas which [met] certain criteria." *Id.* Under section 202 of the 1975 Amendments, jurisdictions were covered under the "expansion amendments" if (1) the Attorney General determines that a State or political subdivision of the State maintained a "test or device" on November

1, 1972 as a qualification for voting; and (2) the Director of the Census determines that less than 50 percent of the persons of voting age residing in any state or political subdivision of a state were registered to vote on November 1, 1972, or voted in the presidential election of 1972. Pub. L. No. 94-73, 89 Stat. 402; H.R. Rep. No. 94-196, at 39.

139.    The 1975 Amendments also extended the "special remedies of the Voting Rights Act" to "citizens of language minority groups based on their right to vote under the Fourteenth and Fifteenth Amendments." *Id.*; H.R. Rep. No. 94-196, at 40. In so doing, Congress specifically found that "these minority citizens are from environments in which the dominant language is other than English. These language minorities experience voting discrimination and exclusion caused by unequal educational opportunities and by acts of physical, economic, and political intimidation." H.R. Rep. No. 94-196, at 40.

140.    The 1975 Amendments also brought the newly covered jurisdictions under the existing provisions of Section 5 of the Act. Pub. L. No. 94-73, 89 Stat. 402; H.R. Rep. No. 94-196, at 41.

141.    In the 1975 VRA Amendments, Congress specifically added the Fourteenth Amendment as a constitutional basis for the VRA amendments. According to the section of the House Report summarizing the legislation: "The Fourteenth Amendment is added as a constitutional basis for these voting rights amendments. The Department of Justice and the United States Commission on Civil Rights have both expressed the position that all persons defined in this title as 'language minorities' are members of a 'race or color' group protected under the Fifteenth Amendment. However, the enactment of the expansion amendments under the authority of the Fourteenth as well as the Fifteenth Amendment, would doubly insure the constitutional basis for the Act." H.R. Rep. No. 94-196, at 41.

142.    On September 18, 1975, the Attorney General of the United States determined that the following jurisdictions met the requirements of Section 4(b) of the Voting Rights Act, as amended in 1975, due to their Spanish language minority populations:  Arizona (statewide); Kings County and Merced County (California); El Paso County (Colorado); Hardeo County, Hillsborough County, and Monroe County (Florida); Bronx County and Kings County (New York); and Texas (statewide).  This change became effective on September 23, 1975.  40 Fed. Reg. 43,746 (1975).

143.    On October 20, 1975, the Attorney General of the United States determined that the state of Alaska met the requirements of Section 4(b) of the Voting Rights Act, as amended in 1975, due to its Native Alaskan population.  40 Fed. Reg. 49,422 (1975).  On that same date, the Attorney General also determined that Apache County, Navajo County, and Pinal County (Arizona); and Jackson County (North Carolina) met the requirements of Section 4(b) of the Act due to their American Indian populations.  *Id.*

144.    In 1975, Congress broadened the reach of the temporary provisions of the Act to cover minority language citizens as a result of finding of a "'systemic pattern of voting discrimination and exclusion against minority group citizens who are from environments in which the dominant language is other than English.' . . . 'Based on the extensive record demonstrating the prevalence of voting discrimination and high illiteracy rates among language minorities, the [relevant] Subcommittee acted to broaden its special coverage to new geographic areas in order to ensure protection of the voting rights of language minority citizens.'"  H.R. Rep. No. 109-478, at 10.

7.    **Evidence Before Congress in 1982**

145.    On May 6, 1981, the House Judiciary Subcommittee on Civil and Constitutional Rights convened the first in its series of hearings on proposals of five bills to extend and amend the Voting Rights Act of 1962, certain provisions of which were set to expire on August 6, 1982. H.R. Rep. No. 97-227, at 2 (1981).

146.    The Subcommittee held eighteen days of hearings, including regional hearings in Montgomery, Alabama and Austin, Texas. H.R. No. 97-227, at 2. The hearings started in May 6, 1981, and lasted through July 13, 1981. Testimony was heard from 156 witnesses. *See Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 97th Cong. (1981) ("*May 6-July 13, 1981 Hearings*").

147.    Witnesses included current and former Members of Congress, two former Assistant Attorneys General of the U.S. Department of Justice, representatives of the U.S. Commission on Civil Rights, national, state, and local civil rights leaders, state and local government officials, representatives of various civic, union and religious organizations, private citizens, as well as social scientists and attorneys who specialized in voting discrimination issues. H.R. Rep. No. 97-227, at 2-3. Representatives from the U.S. Department of Justice were invited to testify but were unable to do so prior to the completion of the hearing process. *Id.* at 3.

148.    The record in the House was over 2,800 pages. *See Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil and Constitutional Rights of the Sen. Comm. on the Judiciary*, 97th Cong. (1982) ("*January 27-March 1, 1982 Hearings*").

149.    On July 21, 1982, the Subcommittee met and by unanimous voice vote ordered H.R. 3112 reported, without amendment, to the full committee. S. Rep. No. 97-417, at 3 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 179.

150.    On July 28, 30, and 31, the full Committee on the Judiciary met to consider H.R. 3112 and on July 31, the full Committee, by a vote of 23 to 1, ordered the bill reported to the House with a single amendment in the nature of a substitute. H.R. Rep. No. 97-227, at 3.

151.    House consideration culminated with a floor debate on October 5 after which the bill was passed by an overwhelming vote of 389 to 24. *See* 127 Cong. Rec. H7011 (daily ed. Oct. 5, 1981).

152.    H.R. 3112 was then placed on the Senate Calendar and an identical bill, S. 1992, was introduced. It was then referred to the Judiciary Committee and subsequently the Subcommittee on the Constitution. S. Rep. No. 97-417, at 3, 1982 U.S.C.C.A.N. at 180.

153.    The Subcommittee held nine days of hearings from January 27, 1982, to March 1, 1982. *Id.* Fifty-one witnesses were heard from. *See January 27-March 1, 1982 Hearings.*

154.    The record in the Senate was over 2900 pages. *See id.*

155.    On March 24, 1982, the Subcommittee amended S. 1992 and reported it out of Sub-committee by a vote of 5-0. S. Rep. No. 97-417, at 3, 1982 U.S.C.C.A.N. at 180.

156.    On March 29, 1982, S. 1992 was briefly considered by the Committee, and fully con-sidered on April 27, 28, 29, and May 4. On May 4, the Committee voted on amendment and or-dered the bill as amended to be favorably reported. *Id.*

157.    The Senate Judiciary Subcommittee ordered the bill to be favorably reported to the full Senate by a vote of 17-1. *Id.* at 4, 1982 U.S.C.C.A.N. at 181.

158.    Senate floor debate consumed seven full days from June 9 through June 18, and after overcoming a filibuster led by Senator Jesse Helms (R-N.C.), the amended bill passed the Senate by a vote of 85 to 8 on June 18, 1982. 128 Cong. Rec. S7139 (daily ed. June 18, 1982).

159.    The House then passed the Senate-amended bill on June 23, 1982.  128 Cong. Rec. H3839-H3846 (daily ed. June 23, 1982).

160.    President Reagan signed the bill into law on June 29, 1982.  96 Stat. 131.

161.    The 1981 House Report found that there were practices and procedures in the electoral process that resulted in inhibiting or diluting minority political participation and voting strength: since the passage of the Act in 1965, reports presented by the U.S. Commission on Civil Rights, studies conducted by social and political scientists, and congressional hearings all identified discriminatory elements of the elections process such as at-large elections, high fees and bonding requirements, shifts from elective to appointive office, majority vote run-off requirements, numbered posts, staggered terms, retrocession, incorporations, and malapportionment and racial gerrymandering.  H.R. Rep. No. 97-227, at 18.

162.    The House Report noted hearings on H.R. 3112 indicated there were numerous practices and procedures acting as continued barriers to registration and voting including inconvenient location and hours of registration, dual registration for county and city elections, refusal to appoint minority registration and election officials, intimidation and harassment, frequent and unnecessary purgings and burdensome reregistration requirements, and failure to provide or abusive manipulation of assistance to illiterates.  *Id.* at 14.

163.    As found by the 1981 House Report, it was not uncommon for jurisdictions to resubmit, without revision, changes to which objections had previously been interposed.  *Id.* at 19.

164.    The Committee's 1981 hearings on H.R. 3112 were noted by the House Report as reflecting the continuing existence of activity aimed at the intimidation of racial and language minority persons seeking to register and vote.  *Id.* at 21.

165.    The House Report found that, in the pre-1982 period, there were more Section 5 objections in Texas than in any other state.  H.R. Rep. No. 109-478 at 73.

166.    The Report found that since 1975, the Department of Justice issued approximately eighty-five letters of objection disapproving election changes in the State of Texas.  The proposed changes found to be discriminatory included: redistricting, majority vote requirements, numbered posts, and polling place changes and annexations.  For example, in the City of Victoria, Texas, Chicanos started to increase their voter turnout where the city had an at-large, numbered post, system with a majority rule requirement.  The city, realizing the Chicanos were gaining in strength, annexed numerous areas that were 85% Anglo, and the Attorney General issued a letter of objection.  The city then adopted a mixed plan and for the first time there was a Chicano on the city council.  Minorities there believed that without the Voting Rights Act, such representation would have been delayed indefinitely.  *Id.* at 19.

167.    The 1981 House Report found that Texas submitted a change in 1975 to the Attorney General requiring purging and re-registration.  The Attorney General, as reported by the 1981 Report of U.S. Commission on Civil Rights, objected to the change noting he was unable to conclude implementation of the purge would not have the effect of discriminating on account of race or color and language minority status.  *Id.* at 15-16

168.    The Report cited the 1981 Report of U.S. Commission on Civil Rights as stating that in October 1979, the Taylor, Texas Board of Commissioners submitted a polling place change in Taylor to move the polling place from the centrally located city hall approximately ten to twelve blocks north to a predominately white area and the Attorney General was unable to conclude that the polling place change would not have the effect of discriminating against minorities.  *Id.* at 17.

169.    Congress found "[n]owhere [was] it more clear" that Section 5 was an integral com-
plement to Federal court litigation than Tarrant County Texas, where after multi-member state
legislative districts had been declared unconstitutional in *White v. Regester*, 412 U.S. 755 (1973),
a three-judge federal panel declared the multi-member state legislative districts were constitu-
tionally permissible in Tarrant county and seven other populous Texas counties.  In 1975, under
court order to adopt single member districts, the state legislature passed House Bill 109, which
was objected to in Tarrant and Nueces-Corpus Christi Counties on the grounds the districts were
racially gerrymandered.  H.R. Rep. No. 97-227, at 20.

170.    On June 5, 1981, Congress received testimony from Douglas Caddy, the former Di-
rector of Elections for the Texas Secretary of State.  Caddy testified that, "[a]s a conservative
whose credentials include, among others, being the first executive director of Young Americans
for Freedom and the incorporating attorney for the National Conservative Political Action Com-
mittee, as well as the author of two books on the national election process, I was initially hostile
to the concept of Federal intrusion by means of the Voting Rights Act.  I now recognize that
without the Voting Rights Act and other Federal statutes protecting voting, Texas could revert
back to a Box 13 mentality, a condition symbolized by the rigging of an election in an obscure
south Texas county—and, by the way, I am reliably informed it was Jim Wells County and not
Duval County, Jim Wells having figured in the testimony this morning in this room—which
launched a politician on his career that carried him eventually to the White House, where his ac-
tions had global impact, whose consequences continue to be felt by those of us who survive to-
day. I am citing this past Texas election history to emphasize that the legislation being discussed
today has profound ramifications, some that might impact even outside Texas or the United
States." *May 6-July 13, 1981 Hearings*, at 1199.

171.    Douglas Caddy also testified that the issue of the burden on the state and localities was a "false issue." *Id.*

172.    Douglas Caddy gave testimony that the "Voting Rights Act has had two primary beneficial effects in the Lone Star State. One, it has helped to inhibit the ever-present discrimination that exists in some communities against minority groups which has resulted in these minority groups being frozen out of participation, and two, it has served as a great psychological tool in bringing honesty to Texas elections." *Id.* at 1198.

173.    In 1981, Congress received oral testimony and written statements about how a dead white candidate defeated a Latino candidate in a 1978 Aransas County (Texas) Democratic primary for Justice of the Peace. Congress was informed that the Latino candidate was attempting to become the first Latino to be elected Justice of the Peace in Aransas, and that the deceased candidate's wife had placed advertisements asking voters to vote for her husband because if he received a majority, then the local Democratic Party committee could certify a nominee for the general election. *Id.* at 929-930 (statement of Joaquin Avila, Associate Counsel Mexican-American Legal Defense and Educational Fund), 1009-1010 (political ad for Lawrence Miller), 1253 (statement of Ruben Bonilla, President of the League of United Latin American Citizens).

174.    In 1981, Congress received testimony from Attorney Joaquin Avila that the Department of Justice objected to a redistricting plan in Edwards County, Texas when the Latino community was split among several districts. *Id.* at 931-932.

175.    Joaquin Avila also testified that the City of Pecos, Texas attempted to implement a numbered place system even after the Department of Justice had objected. *Id.* at 933.

176.    In 1981, Congress received testimony from Ruben Bonilla, the President of the League of United Latin American Citizens ("LULAC") about how Crockett County, Texas had

47

absentee ballots marked in different colors for white (white) and Latino voters (red) in the 1970s. *Id.* at 1253.

177.    Ruben Bonilla testified about how racial appeals and voter intimidation (photograph-ing of voters) were features of the mayoral election in McAllen, Texas, in 1981. *Id.*

178.    Ruben Bonilla also described how the moving of polling places from election to elec-tion in South and West Texas negatively impacted Latino participation. *Id.*

179.    In 1981, Congress received testimony from a Latino member of the San Antonio, Texas, City Council who testified that a DOJ objection to city annexations resulted in a change in the method of election from at-large to single-member districts and a majority-minority coun-cil for the first time in city history. *Id.* at 1274-1275 (statement of the Hon. Bernardo Eureste).

180.    Paul Ragsdale, a Texas State Representative, provided Congress with testimony and documentation regarding the East Texas project. According to Representative Ragsdale, the Pro-ject filed a number of lawsuits intended to improve the ability of African-Americans to elect their candidates of choice. *Id.* at 1279-1282.

181.    In 1981, Congress received testimony and documentation about objections the De-partment of Justice issued regarding two redistricting plans in Jim Wells County, Texas. DOJ found that the plans discriminated against Latino voters. *Id.* at 1147-1173, 1187-1191.

182.    In 1981, Congress received a Section 5 objection letter to a proposed redistricting plan in Terrell County, Texas. According to the objection letter, the plan "unnecessarily divided the Mexican American community in Sanderson into three districts." Joaquin Avila testified be-fore Congress that Terrell County submitted the proposed plan only after a lawsuit had been filed. *Id.* at 933-934 (statement of Joaquin Avila, Associate Counsel Mexican-American Legal Defense and Educational Fund), 1125-1127 (letter from Drew Days III, Assistant Attorney Gen-

48

eral, Civil Rights Division to Lucius Bunton, Attorney, Shafer, Gilliland, Davis, Bunton, &

McCollum).

183.    Congress also received a June 11, 1979 Section 5 objection letter to annexations in

Houston, Texas.  According to the letter, the annexations that would have reduced the percentage

of the Latino and African-American population in Houston.  According to Joaquin Avila, this

objection resulted in Houston changing its method of election from at-large to a combination of

single-member districts and at-large seats, and a corresponding increase from one to four minor-

ity city council members.  *Id.* at 1116-1119 (letter from Drew Days III, Assistant Attorney Gen-

eral, Civil Rights Division to Robert Collie, Jr., City Attorney, of Houston (June 11, 1979)).

184.    Joaquin Avila's written statement to Congress in 1981 included information regarding

what he described as "the persistent evidence of governmental officials to discriminate against

Chicanos" in Medina County, Texas.  According to Avila, Medina County attempted to redistrict

its county commissioner's court in 1978-1979.  The county's first two plans were objected to by

the Department of Justice before the third was precleared.  *Id.* at 969-971, 1097-1112.

185.    Congress received testimony from A.C. Sutton, Texas President of the NAACP, re-

garding the disproportionately low number of African-American and Latino federal, state, and

local elected officials in Texas.  *Id.* at 891-892.

186.    The 1981 House Report noted existing and changed locations of polling places can

have a negative effect on minority voter turnout.  The 1981 Report of U.S. Commission on Civil

Rights as noted by the 1981 House Report gave the example of Hopewell, Virginia, where

there were no voting places in the black community, the location at the time was "like having the

polls at a country club, and "if one precinct was in the black community, then black people might

become more accustomed to voting."  H.R. Rep. No. 97-227, at 17.

187.    Congress received testimony from George Korbel, a former staff attorney and re-
gional director for MALDEF who had testified before Congress during the 1975 hearings.  In
1981, Korbel offered evidence that he had "spoken to the people who are on the inside, who ac-
tually have to make these voting rights submissions, and I have yet to run into anybody who ac-
tually complains about the volume of work that a Voting Rights Act submission entails. It just
doesn't happen." *May 6-July 13, 1981 Hearings*, at 482.

188.    Charles Cotrell, Professor of Political Science at St. Mary's University, testified be-
fore Congress on May 27, 1981, that his "impression" was that it was not "burdensome" to sub-
mit a change.  As he testified, the process "was set up to be a more convenient administrative
route for getting preclearance.  From the list of materials that the Justice Department has pub-
lished in terms of the requirements, its regulations for submission, it does not seem like it would
be terribly burdensome to collect that information and to include it along with the ordinance or
the statute or whatever." *Id.* at 461.

189.    In a hearing of the House of Representatives Subcommittee on Civil and Constitu-
tional Rights conducted on June 5, 1981, in Austin, Texas, Subcommittee Chairman, Representa-
tive Don Edwards noted that while much progress had been made in Texas since 1975, "signifi-
cant problems continue to exist, thereby requiring the continuance of the protections afforded
under the act, primarily under the Section 5 preclearance provisions." Id. at 885.

190.    The 1981 U.S. Commission on Civil Rights, as noted by the 1981 House Report,
found intimidation of voters was reported in Wrightsville, Georgia.  Blacks were accused by the
election official of blocking the entrance to the courthouse, the polling place. When the black
community leader assisting black voters explained he and the other blacks were standing an ac-
ceptable distance from the polling place, the election official called the state troopers to get them