to leave. Later, some white men in a truck with guns stopped in front of the polling place and began heckling black people until the blacks left, while whites were not heckled by the white men or the official. H.R. Rep. No. 97-227, at 15.

191.    Congress heard evidence from John Nettles in June, 1981, hearings that in Phoenix, Alabama, Arthur Sumbry was convicted and sentenced to four years for unauthorized voter registration when he assisted his pregnant wife, a deputy registrar. *Id.*

192.    Abigail Turner gave evidence in June, 1981, hearings that in Pickens County, where 67% of the eligible whites were registered, the county refused to appoint deputy registrars and voting registrars called the sheriff (who remained throughout the election) when groups of blacks came to register. *Id.*

193.    Abigail Turner also gave evidence that in Clio, Alabama, new elections were ordered in a suit brought pursuant to Section 5 in 1981 when a black candidate for city council who had a loan secured by a second mortgage from the only bank in town found the loan was ordered to be made current two weeks before the town council election—where the president of the bank who called her with the notice and came to her house after she filed an election contest was also the Mayor for the last twenty-five years. *Id.*

194.    Witnesses from Alabama reported five of the seven counties designated for reregistration in 1981 were "black belt" and the reregistration bills were passed by the legislature as local legislation under "Gentlemen's Agreements." Moreover, the sponsor of the Wilcox and Lowndes Counties' bill exempted the predominantly white counties in his district from compliance with the registration bill. *Id.* at 16.

195.    The House Report noted *United States v. Humboldt County, Nevada*, Civil Action No. R 70-0144 HEC (D. Nev. 1979), as stating that in Humboldt County, Nevada, registrars refused

to register Indians for failing to properly fill out registration cards while non-Indians were not subjected to the same scrutiny. *Id.*

196.    In hearings on May 28, 1981, and June 3, 1981, witnesses described dual registration requirements in Mississippi and Georgia and dual re-identification requirements for voters in some areas of Virginia. *Id.*

197.    The 1981 House Report noted that witnesses from Alabama and Georgia described the failure of elections officials to appoint additional registrars when, for example, most of the white population was registered but a small percentage of the black community was registered. *Id.* at 17.

198.    The 1981 Report also noted that in 1981 a bill was introduced in the Alabama Senate to appoint city clerks as voting registrars at the request of the municipal government, but an amendment was offered by a representative to exempt ten counties in the black belt from this expanded voting procedure. *Id.*

199.    Representative Henry Hyde indicated his desire to retain the Section 5 preclearance provision of the VRA but to amend the bailout provisions of the Act.  In particular, Congressman Hyde expressed an interest in "liberaliz[ing] the bailout sections where a jurisdiction can show that for 10 years there hasn't been a single significant objection sustained on any of their submissions, and show that they have made the submissions that are required."  Hyde also indicated a desire to "recognize good conduct, and permit a jurisdiction to bail out based on their record, an honest appraisal of their record, but to retain preclearance." *May 6, 1981-July 13, 1981 House Hearings*, at 920.

200.    Thomas M. Boyd, Associate Counsel of the Subcommittee on Civil and Constitutional Rights of the Judiciary Committee, expressed concern that "permanent coverage under the

preclearance provisions of the act" might serve as a "disincentive in some jurisdictions to im-
prove [and] to incorporate minorities into the electorate." Boyd indicated that the bail out provi-
sions encourage jurisdictions to "take appropriate action to incorporate those minority communi-
ties into the electorate." *May 6-July 13, 1981 Hearings* at 1197.

201.    Thomas M. Boyd, Associate Counsel of the Subcommitee on Civil and Constitutional
Rights of the Judiciary Committee, noted that even those jurisdictions that successfully bailout
would remain subject to a probationary period. In particular, Boyd noted that the "court would
retain jurisdiction for purposes of revoking bailout, and reinstituting administrative preclearance
in the event someone decides to return to business as usual. The purpose is simply to try to en-
courage people to improve their systems rather than maintain an inequitable status quo." *May 6-
July 13, 1981 Hearings* at 1197.

202.    In response to questions from Thomas M. Boyd, Associate Counsel of the Subcom-
mitee on Civil and Constitutional Rights of the Judiciary Committee, Douglas Caddy, former
Director of the Elections Division of the Texas Secretary of State's Office, expressed support for
the bailout provision. Caddy indicated that, in his view, the bailout provisions would provide an
incentive for eligible jurisdictions throughout the State of Texas to comply with the requirements
of the Act. Caddy stated that "those political entities that did a good job, who have built a good
record in this area, should be given a 'gold star' so to speak, publicly recognized that they have
built such a record and be bailed out from under coverage of the act." Caddy indicated that the
"peer pressure" resulting from this process would be "tremendous" and "most beneficial." *May
6-July 13, 1981 Hearings* at 1237.

203.    Vilma S. Martinez, former President and General Counsel of the Mexican American
Legal Defense and Educational Fund, stated that, in her view, many jurisdictions in Texas did

not satisfy the criteria for bailout. Martinez stated that "Texas, by contrast, is unable to meet the burden of proof for a very good reason: state and local election laws and practices continue to discriminate against Hispanics and other minorities. It is precisely in those areas where discriminatory tests and devices were used and where discriminatory election practices continue to this day that pre-clearance must be retained." *May 6-July 13, 1981 Hearings* at 1879.

204.    In a letter dated February 25, 1982 in response to questions from Senator Orrin G. Hatch, former Assistant Attorney General Wm. Bradford Reynolds observed, that proposed amendments "would substantially change the bailout process." Reynolds observed that "a bailout suit could be brought by an individual county in a fully covered state" and estimated that "[t]here are more than 800 such counties." *January 27-March 1, 1982 Hearings,* at 196.

205.    In a letter dated February 25, 1982 in response to questions from Senator Orrin G. Hatch, former Assistant Attorney General Wm. Bradford Reynolds observed that "the reasons for confining bailout suits to the District Court for the District of Columbia were (1) a desire for uniformity of decision at the trial-court level, (2) the belief that use of the District Of Columbia court would mean prompt and impartial adjudication of the cases, thus avoiding problems that had been experienced in some of the federal courts in covered states, and (3) the convenience to this Department." *January 27-March 1, 1982 Hearings,* at 197.

206.    In a written statement submitted to Congress, Senator Charles Mathias, Jr. observed that "[u]nder this new procedure, jurisdictions covered under the Act's special provisions, including Section 5 preclearance, can bailout more easily than if present law were extended." Mathias stated that the "change represents a major accommodation and I share the belief of the House Judiciary Committee that 'it will provide the necessary incentives to the covered jurisdictions to comply with laws protecting the voting rights of minorities,' and thus allow them to

achieve exemption from the Act's special requirements." *January 27-March 1, 1982 Hearings,* at 213.

207.   Prepared statement of Senator Edward Kennedy made note of several amendments that effectively "liberalized [the] bail out procedure[s]" but cautioned that "if the bail-out is amended further, there is a serious danger that the extension of Section 5 will prove a hollow victory.  A flimsey [sic] bail-out provision would become a sieve.  It would serve as a backdoor exit for many jurisdictions where the preclearance provision of Section 5 is still needed.  It would be an indirect repeal of Section 5." *January 27-March 1, 1982 Hearings,* at 220.

208.   Congress received written testimony from Benjamin L. Hooks, former Executive Director of the N.A.A.C.P. and former Chairman of the Leadership Conference on Civil Rights and the Black Leadership Forum, commenting that proposed changes offered during the 1982 reauthorization significantly "liberalized" the bailout process.  Hooks also observed that the "bail out standards are equitable and reasonable. Each of the provisions in S.1992 is necessary to insure that only those jurisdictions bail out that have (1) complied with the Act; (2) abandoned discriminatory voting procedures and practices; and, (3) taken positive steps to include minorities fully in the political process. These standards are achievable." *January 27-March 1, 1982 Hearings,* at 276.

209.   Vilma S. Martinez, former President and General Counsel of the Mexican American Legal Defense and Educational Fund, offered testimony expressing support for amendments of the bailout provision.  Martinez stated that "although we insist that section 5 must remain in effect in Texas and many other jurisdictions still eager to deny minorities voting rights, we recognize that some jurisdictions that have long abandoned discriminatory election practices should be allowed to exempt themselves from section 5 coverage upon a sufficient showing.  The new

bailout provisions propose a substantial relaxation of the bailout provisions in the current law

and would permit counties within a fully covered State to bail out independently of the State. I

urge the Senate to adopt the bailout contained in S. 1992 and to reject attempts to weaken it fur-

ther." *January 27-March 1, 1982 Hearings,* at 290.

210.    Congress received testimony from Vilma Martinez, former President and General

Counsel of the Mexican American Legal Defense and Educational Fund, expressing support for

limited amendments to the bailout provision. Martinez stated that "[t]he new bailout provisions

propose a substantial relaxation of the bailout provisions in the current law, and would permit

counties within a fully covered state to bailout independently of the state. Of the more than 800

counties now covered, approximately one fourth of them would meet the objective criteria for

bail out in 1984 and 1985. This measure fully answers the need for greater flexibility that some

Section 5 critics have called for. The record before the House strongly supported the need to

continue Section 5, not to weaken it. In light of this record, the generous provisions for bail out

contained in S. 1992, which may permit 200 counties to be released, cannot fairly be called 'im-

possible' or 'unreasonable.' Therefore, I urge the Senate to adopt the bail out contained in S.

1992 and to reject attempts to weaken it further." *January 27-March 1, 1982 Hearings,* at 302.

211.    Representative F. James Sensenbrenner noted that "[t]he bailout procedures contained

in the House-passed bill are tough. They ought to be tough. The House Judiciary Committee's

Subcommittee on Civil and Constitutional Rights heard over 100 witnesses in 17 days of hear-

ings. The testimony amply demonstrated that the ingenuity of the human mind is limitless when

it comes to devising ways to rig election systems to favor certain candidates or points of view.

Gerrymandering, moving polling places, re-registration and re-identification devices, limited

hours for registration, frequently at inconvenient sites, show that a need remains in many juris-

dictions for the Justice Department to continue preclearing election laws under section 5. Fortu-

nately, there appears to be little opposition to that part of the bill. However, in order for a juris-

diction to bail out from section 5 preclearance, there should be a tough but fair standard to show

that the officials there have purged themselves of all of the notions about returning to the bad old

days." *January 27-March 1, 1982 Hearings,* at 876.

212.    Robert M. Brinson, Attorney for the City of Rome, Georgia, offered testimony re-

garding the Act's bailout provision. Brinson stated that bailout "provides a mechanism for ex-

emption from the act's prohibitions" and observed that the bailout provision plays a role in the

"constitutional underpinnings of the act." *January 27-March 1, 1982 Hearings,* at 1093.

213.    Julius L. Chambers, former President of the NAACP Legal Defense and Educational

Fund, offered testimony expressing support for amendments to the Act's bailout provisions and

noted that the amendments represent "a workable and realistic standard under which those cov-

ered jurisdictions that have stopped discrimination can file for exemption from the responsibili-

ties of section 5." *January 27-March 1, 1982 Hearings,* at 1251.

214.    Congress received written testimony from Drew Days addressing questions concern-

ing the inability, under S. 1992, of political subdivisions below the county or independent city

level to be eligible for a bailout suit. Days observed that "there is a great danger in expanding

the level of jurisdiction eligible to file suit. The sheer number of suits resulting and the drain on

resources of the Justice Department and private intervenors would be enormous. Even the

change in S. 1992 to allow counties to bail-out presents some threat to uniform interpretation of

the Act. It is critical, consequently, for exclusive jurisdiction over such suits to remain in the

District of Columbia court." *January 27-March 1, 1982 Hearings,* at 1394.

215.    The Hon. Alfredo Gutierrez, member of the Arizona State Senate, offered testimony observing that "[t]he proposed bailout will both protect minority voters and permit jurisdictions with genuinely good records to be released. Detractors have referred to the bailout in S.1992 as 'impossible', while some on the other end of the spectrum consider it too loose. I believe the truth is somewhere in between. The bailout is stringent—and it should be. The purpose of Section 5 is to protect minority voting rights. Those who propose to weaken the bailout seem more interested in protecting local election officials from what they consider the "burden" and 'stigma' of pre-clearance. The Constitution, the Congress and the Courts have spoken on this issue many times and have concluded that it is the proper role of the federal government to protect citizens from denials or abridgments of their right to vote. Local election officials who consider this a 'burden' do not have my sympathy." Finally, Gutierrez urged Congress to "focus it[s] attention on the problems of minority voters rather than the cries from local election officials." *January 27-March 1, 1982 Hearings,* at 1638.

216.    Senator Howard Metzenbaum observed that the bill creates "a virtual bail-out sieve." Senator Metzenbaum described the amendments to the bailout provision as ones that "provide[] for a reasonable and achievable bail-out for political jurisdictions which have complied with the act in the past; have made no use of discriminatory election laws or devices; and have taken positive steps toward including more minority citizens in the electoral process." *January 27-March 1, 1982 Hearings,* at 227.

### 8.    The 1982 Amendments to the Voting Rights Act

217.    "In 1982, Congress extended the temporary provisions of the VRA for an additional 25 years. Congress found that 'despite the gains in increased minority registration and voting and in the number of minority elected officials . . . continued manipulation of registration procedures

and the electoral process, which effectively exclude minority participation from all stages of the political process' continued to occur.  Moreover, in extending the temporary provisions for an additional 25 years, Congress reiterated its intent 'that protection of the franchise extend[] beyond mere prohibition of official actions designed to keep voters away from the polls . . . [and] include[] prohibition of State actions which so manipulate the elections process as to render the vote meaningless,' including 'at large elections, high fees and bonding requirements, shifts from elective to appointive offices, majority vote run-off requirements, residency requirements, annexations, incorporations, malapportionment, and racial gerrymandering.'" H.R. Rep. No. 109-478, at 10.

218.    The House Report stated: "Congress acknowledged that the length of time under which certain States and political subdivisions would continue to remain covered was a source of concern.  To address these concerns, Congress liberalized the bailout process, enabling qualified jurisdictions to terminate coverage beginning in 1984.  In addition, the bailout process was amended to allow a political subdivision to terminate coverage independent of a covered State." *Id.*

219.    The House Judiciary Committee noted that "[i]n 1982, Congress amended the bailout provision to encourage jurisdictions to end their discriminatory practices and to integrate minority voters into the electoral process." *Id.* at 25; *see also id.* at 58

### C.    Procedural History of the 2006 Voting Rights Act Reauthorization

#### 1.    Procedural History

220.    The House Judiciary Committee found the authority for the VRARA "under amend. XIV, § 5 and amend. XV, § 2." H.R. Rep. No. 109-478, at 90.

221.    "The House Committee on the Judiciary's Subcommittee on the Constitution held 1 day of hearings on H.R. 9 on May 4, 2006." Testimony was received from seven witnesses, "with additional material submitted by individuals and organizations." *Id.* at 85.

222.    "On May 10, 2006, the House Judiciary Committee met in open session and ordered favorably reported the bill H.R. 9 with an amendment by a recorded vote of 33 to 1, a quorum being present." *Id.*

223.    "In compliance with clause 3(c)(1) of Rule XIII of the Rules of the House of Representatives, the House Judiciary Committee reported] that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of Rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report." *Id.* at 88.

224.    The House Judiciary Committee stated that H.R. 9 does the following: "(1) extend[s] for another 25 years Section 4(a)(8) and Section 203(b)(1), the temporary provisions of the Voting Rights Act of 1965 currently set to expire on August 6, 2007; and (2) amend[s] Section 3(a), Section (4), Section 5, Section 6, Section 7, Section 8, Section 9, Section 14, and Section 203 to update certain provisions of the Voting Rights Act of 1965 to reflect the current voting environment and to restore the original intent of Congress in enacting the temporary provisions of the Act." *Id.* at 90.

225.    The House Judiciary Committee stated that Section 1 of VRARA "provides that the Act may be cited as the 'Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006' (the 'VRARA').] *Id.* at 90.

226.    The House Judiciary Committee stated that Section 2 of VRARA "sets out the Congressional findings and purposes supporting the VRARA." *Id.* at 91.

227.    The House Judiciary Committee stated that Section 3(a) of H.R. 9 "authorizes the Attorney General or court under Section 3(a) of the VRA to directly assign Federal observers upon a finding that there is a reasonable belief that a violation of the 14th or 15th amendment has occurred or will occur, without having to first certify the use of Federal examiners." *Id.* at 91.

228.    The House Judiciary Committee stated that Section 3(b) of the VRARA modifies Section 13 of the VRA.  According to the Committee, the prior Section 13 enabled "covered jurisdictions certified for Federal examiners, and subject to the listing procedures set forth in Section 7 of the VRA, the opportunity to apply to the Attorney General or to the Federal court, if applicable, to terminate the certification of such examiners."   The Committee stated that "Section 3(b) of the VRARA [eliminated] these provisions as applied to examiners (which would be eliminated under Section 3(c) of the VRARA) and simply transfer those termination procedures to allow for the termination of observers." *Id.* at 91.

229.    The House Judiciary Committed stated that Section 3(c) of the VRARA repeals Sections 6, 7, and 9 of the Voting Rights Act, which concern the appointment and authority of Federal Examiners. *Id.* at 91.

230.    The House Judiciary Committee stated that Sec. 3(d) of the VRARA contains technical changes to several sections by substituting references to "observers" for references to "examiners" where necessary. *Id.* at 92.

231.    The House Judiciary Committee stated that Sec. 3(e) of the VRARA made "technical changes to section references in the VRA to reflect the changes made by the VRARA." *Id.* at 92.

232.    The House Judiciary Committee stated that Section 4 of the VRARA extends the preclearance and observer provisions of the Voting Rights Act for twenty-five years. *Id.* at 92.

233.    The House Judiciary Committee stated that Section 5 of the VRARA concerned changes to Section 5 of the Voting Rights Act. *Id.* at 92-94.

234.    The House Judiciary Committee stated that "[t]he expiring provisions of the Voting Rights Act allow any covered jurisdiction to remove itself from coverage if it can demonstrate a "clean record" on discrimination over the previous 10 years. In fact, 11 counties in Virginia have successfully removed themselves from coverage under the Voting Rights Act." *Id.* at 92-94.

235.    "Section 5 of the VRA (42 U.S.C. § 1973c) requires covered jurisdictions to preclear all voting changes with either the Department of Justice or the U.S. District Court for the District of Columbia." *Id.* at 92.

236.    The House Judiciary Committee stated that "[t]he need to renew Section 5 is evidenced in part by the fact that Section 5 was used more often between 1982 and 2005 than it was between 1965 and 1982, resulting in the retraction of more voting rules changes that would have adversely affected minorities." *Id.* at 92-93.

237.    The House Judiciary Committee stated that "[t]he expiring provisions of the Voting Rights Act only apply to jurisdictions that have the most extensive histories of discrimination and segregation." *Id.* at 93.

238.    The House Judiciary Committee stated that "[t]he Supreme Court has held that Congress has the clear authority to enact provisions that simply prevent certain states from "backsliding" in their protection of minority voting rights." *Id.* at 93.

239.    The House Judiciary Committee stated Section 5 of the VRARA makes clear "that Congress rejects the Supreme Court's holding in *Reno v. Bossier Parish*, by making clear that, contrary to that decision, 'retrogression' is not the only violation of voting rights the preclear-

ance procedures protect against, and that a voting rule change motivated by any discriminatory purpose also cannot be precleared. *Id.* at 93-94.

240.    The House Judiciary Committee stated Section 5 of the VRARA makes clear "that Congress partly rejects the Supreme Court's decision in *Georgia v. Ashcroft*" and "restores the standard articulated in *Beer v. United States*" through a new subsection (d), which stated that: "(d) The purpose of subsection (b) of [Section 5] is to protect the ability of such [minority] citizens to elect their preferred candidates of choice." *Id.* at 94.

241.    At the May 10, 2006 markup by the House Judiciary Committee, the Committee voted to report H.R. 9, as amended, favorably by a vote of 33 to 1. *Id.* at 171-173.

242.    On July 13, 2006, the House voted 390-33 to pass H.R. 9, the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006. 152 Cong. Rec. H5207

243.    On July 20, 2006, the Senate voted 98-0 to pass H.R. 9, the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006. 152 Cong. Rec. S8012.

244.    [Intentionally left blank]

### 2.    Information About Hearings and Selected Witnesses[2]

245.    On October 18, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, "*To Examine the Impact and Effectiveness of the Voting*

---

[2]    Paragraph Nos. ¶ 245 to ¶ 321 represent a selected list of witnesses who testified before Congress. This does not purport to be a complete list of all witnesses who testified before a House or Senate Committee, who submitted testimony into the record on their own behalf, or those individuals whose written works were submitted into the record on someone else's behalf.

*Rights Act.*" The Committee heard from 4 witnesses. The hearing record consists of 1,580 pages. Hereinafter the hearing is cited as *October 18, 2005 Hearing.*

246.    On October 20, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, "*Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act.*" The Committee heard from 4 witnesses. The hearing record consists of 255 pages. Hereinafter the hearing is cited as *October 20, 2005 Hearing.*

247.    On October 25, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, "*Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose Volumes I and II.*" The Committee heard from 4 witnesses. The hearing record consists of 3374 pages. Hereinafter, the hearing is cited as *October 25, 2005 Scope Hearing Vol. I* and *October 25, 2005 Scope Hearing Vol. II.*

248.    On October 25, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, "*Voting Rights Act: The Continuing Need for Section 5: Hearing.* The Committee heard from 4 witnesses. The hearing record consists of 220 pages. Hereinafter, the hearing is cited as *October 25, 2005 Need Hearing.*

249.    On November 1, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, "*Voting Rights Act: Section 5—Preclearance Standards: Hearing.* The Committee heard from 4 witnesses. The hearing record consists of pages 228 pages. Hereinafter, the hearing is cited as *November 1, 2005 Hearing.*

250.    On November 8, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, "*Voting Rights Act: Section 203—Bilingual Election Re-*

*quirements, Part I*. The Committee heard from 4 witnesses. The hearing record consists of 1446 pages. Hereinafter, the hearing is cited as *November 8, 2005 Hearing*.

251.    On November 9, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, *"Voting Rights Act: The Judicial Evolution of the Retrogression Standard"* The Committee heard from 4 witnesses. The hearing record consists of 220 pages. Hereinafter, the hearing is cited as *November 9, 2005 Hearing*.

252.    On November 9 & 10, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, *Voting Rights Act: Section 203—Bilingual Election Requirements, Part II*. The Committee heard from 4 witnesses. The hearing record consists of 268 pages. Hereinafter, the hearing is cited as *November 9 & 10, 2005 Hearing*.

253.    On November 15, 2005, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, *Voting Rights Act: Sections 6 and 8—The Federal Examiner and Observer Program*. The Committee heard from 3 witnesses. The hearing record consists of 302 pages. Hereinafter, the hearing is cited as *November 15, 2005 Hearing*.

254.    On March 8, 2006, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, *Voting Rights Act: Evidence of Continuing Need Volumes 1 - 4*. The Committee heard from 4 witnesses. The hearing record consists of 5,711 pages. Hereinafter, the hearing is cited as *March 8, 2006 Hearing Vol. I*, *March 8, 2006 Hearing Vol. II*, *March 8, 2006 Hearing Vol. III*, *March 8, 2006 Hearing Vol. IV*.

255.    On April 27, 2006, the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Judiciary Committee held a hearing entitled, *Renewing the Temporary Provisions of the Voting Rights Act: An Introduction to the Evidence*. The Committee heard from 2

witnesses.  The hearing consists of 31 pages.  Hereinafter, the hearing is cited as *April 27, 2006 Hearing*.

256.    On May 4, 2006, the Subcommittee on the Constitution of the House Judiciary Committee held a hearing entitled, *Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 Parts I and II*.  The Committee heard from 3 witnesses.  Part I and  Part II consists of 430 pages.  Hereinafter, the hearing is cited as *May 4, 2006 Hearing Part I* and *May 4, 2006 Hearing Part II*.

257.    On May 9, 2006, the Senate Judiciary Committee held a hearing entitled, *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization*.  The Committee heard from five witnesses.  The hearing record consists of 278 pages.  Hereinafter, the hearing is cited as *May 9, 2006 Hearing*.

258.    On May 10, 2006, the Senate Judiciary Committee held a hearing entitled, *Modern Enforcement of the Voting Rights Act Hearing*.  The Committee heard from 6 witnesses.  The hearing record consists of pages 159 pages.  Hereinafter, the hearing is cited as *May 10, 2006 Hearing*.

259.    On May 16, 2006, the Senate Judiciary Committee held a hearing entitled, *The Continuing Need for Section 5 Pre-Clearance Hearing*.  The Committee heard from five witnesses.  The hearing record consists of 207 pages. Hereinafter, the hearing is cited as *May 16, 2006 Hearing*.

260.    On May 17, 2006, the Senate Judiciary Committee held a hearing entitled, *Understanding the Benefits and Costs of Section 5 Pre-Clearance Hearing*.  The Committee heard from 5 witnesses.  The hearing record consists of 210 pages.  Hereinafter, the hearing is cited as *May 17, 2006 Hearing*.

261.    On June 13, 2006, the Senate Judiciary Committee held a hearing entitled, *Continuing Need for Section 203's Provisions For Limited English Proficient Voters Hearing*. The Committee heard from 6 witnesses. The hearing record consists of 501 pages. Hereinafter, the hearing is cited as *June 13, 2006 Hearing*.

262.    On June 21, 2006, the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Judiciary Committee, held a hearing entitled, *Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives and Views From the Field*. The Committee heard from 6 witnesses. The hearing consists of 315 pages. Hereinafter, the hearing is cited as *June 21, 2006 Hearing*.

263.    On July 10, 2006, the Senate Judiciary Committee held a paper hearing. The Questions and Answers for this hearing can be found in the *June 13, 2006 Hearing* record. The Committee heard from 5 witnesses. Hereinafter, the hearing is cited as *June 13, 2006 Hearing*.

264.    On July 13, 2006, the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Judiciary Committee held a hearing entitled, *Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options After LULAC v. Perry Hearing*. The Committee heard from 6 witnesses. The hearing consists of 511 pages. Hereinafter, the hearing is cited as *July 13, 2006 Hearing*.

265.    Over the course of 21 hearings on the Voting Rights Act, Congress heard or received information from over 90 witnesses and created a record consisting of over 16,000 pages.

266.    Congress heard testimony from Representatives James Sensenbrenner of Wisconsin and John Conyers of Michigan, chair and ranking member of the House Judiciary Committee on April 27, 2006. Representative Sensenbrenner and Representative Conyers presented the Senate

with the House Record on H.R. 9, the legislation reauthorizing the Voting Rights Act. *April 27, 2006 Hearing,* at 5-6.

267.    Congress heard testimony from Debo Adegbile on May 4 and June 21, 2006. He is the Associate Director of Litigation at the NAACP Legal Defense and Educational Fund Incorporated. Previously, Adegbile was an assistant counsel at LDF. Between 1994 and 2001, he was an associate at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison. Adegbile served as a coordinator of the National Nonpartisan Election Protection Program during the 2004 elections. *May 4, 2006 Hearing Part 1,* at 9; *June 21, 2006 Hearing,* at 5-8. On August 4, 2005, he testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005 this testimony was entered into the Congressional Record. *October 18, 2005 Hearing,* at 591-596. His Commission statement was entered into the Congressional Record on March 8, 2006. *March 8, 2006 Hearing Vol. IV,* at 4526-4548.

268.    Congress heard testimony from Theodore S. Arrington on May 16, 2006. Professor Arrington is the Chair of the Department of Political Science at the University of North Carolina-Charlotte, Charlotte, North Carolina. *May 16, 2006 Hearing,* at 2, 8-10.

269.    Congress heard testimony from Joaquin Avila on July 13, 2006. He is an Assistant Professor of Law at Seattle University School of Law in Seattle, Washington. On September 27, 2005, he testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005 this testimony was entered into the Congressional Record. *July 13, 2006 Hearing,* at 4, 11-13. His Commission statement was entered into the record on October 25, 2005. *October 25, 2005 Scope Hearing Vol. II,* at 3295-3322.

270.    James Blacksher is a civil rights lawyer in Birmingham, Alabama. He served as counsel of record in over 90 reported cases mainly in voting rights. He was a witness in hearings

before Congress on the extension of the Voting Rights Act in 1981 and 1993. On March 11, 2005, he testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005 this testimony was entered into the Congressional Record. *October 18, 2005 Hearing,* at 192-195; His Commission statement was entered into the record on October 25, 2006. *October 25, 2005 Scope Hearing Vol. II,* at 3198-3226.

271.    Congress heard testimony from Edward Blum on October 25, 2005. He is a visiting fellow at the American Enterprise Institute and a co-director of the Project on Fair Representation. *October 25, 2005 Scope Hearing Vol. I,* at 7, 14-15.

272.    Congress heard testimony from Tyrone Brooks on November 9, 2005. He is the Georgia State Representative representing the 47th District. He also serves as the President of the Georgia Association of Black Elected Officials. Brooks began his career at the Southern Christian Leadership Conference (SCLC), where he worked as a volunteer and was eventually hired by Dr. Martin Luther King, Jr. *November 9, 2005 Hearing,* at 11, 37-38.

273.    Vernon Burton is a Professor of History and Sociology at the University of Illinois. "He has written and testified extensively about the issue of racial discrimination in voting and is considered one of the most renowned scholars in the field[.]" On March 11, 2005, he testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005, this testimony was entered into the Congressional Record. *October 18, 2005 Hearing,* at 156, 163-167. Exhibits to his testimony were entered into the record on March 8, 2006. *Continued Need Hearing Vol. III,* at 2849 – 3114.

274.    Congress heard testimony from Juan Cartagena on November 9-10 and May 10, 2006. Since 1991, he has served as General Counsel for the Community Service Society. Prior to his work at CSS, Cartagena was the Legal Director in the New York Office of the Department

of Puerto Rican Affairs in the U.S. for the Commonwealth of Puerto Rico, and served as an attorney for the Puerto Rican Legal Defense and Education Fund. He also serves as co-chair of the New York Voting Rights Consortium, a collection of major legal defense funds that protects the voting rights of racial and language minorities. *November 9 & 10, 2005 Hearing,* at 2, 134-136; *May 10, 2006 Hearing,* at 14-16.

275.     Congress heard testimony from Roger Clegg on November 1, 2005 and July 13, 2006. He is Vice President and General Counsel for the Center for Equal Opportunity, where he specializes in civil rights, immigration and bilingual education issues. Prior to his work at the Center, Clegg held a number of positions at the U.S. Department of Justice between the years 1982 and 1993 including that of Assistant to the Solicitor General. *November 1, 2005 Hearing,* at 6; 21-31; *May 4, 2006 Hearing Part I,* at 8-9, 13-15; *July 13, 2006 Hearing,* at 4-6.

276.     Congress heard testimony from Rena Comisac on May 4, 2006. She is Principal Deputy Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice and before that Deputy Assistant Attorney General. Prior to joining the Civil Rights Division, Ms. Comisac served as Deputy Chief of Staff for the Criminal Division. From 1998 to 2000 she worked as Assistant U.S. Attorney for the middle district of Georgia. From 1997 to 1998 and 2000 to 2001, she served as a staffer on the U.S. Senate Permanent Subcommittee on Investigations. From 2001 to 2004 she served as staff on the Senate Judiciary Committee. *May 4, 2006 Hearing Part II,* at 6-9.

277.     Congress heard testimony from Chandler Davidson on May 9, 2006. He is a Professor at Rice University, and the Tsanoff Chair of Public Affairs Emeritus. "He and Professor Bernard Grofman of the University of California directed about 30 political science historians and sociologists and voting rights lawyers in an effort to assess the impact of the Voting Rights

Act in the South, and his resulting book, 'Quiet Revolution in the South' won the Richard Fenno

prize awarded by the American Political Science Association for the best book published on leg-

islative behavior of that year." He also served on the National Commission on the Voting Rights

Act. *May 9, 2006 Hearing*, at 5; *October 18, 2005 Hearing*, at 153-154.

278.    Congress heard testimony from Drew S. Days on May 17, 2006. He is the Alfred M.

Rankin Professor of Law at Yale Law School. "[Professor Drew Days] is one of the country's

top constitutional lawyers." He was the Solicitor General of the United States from 1993 to 1996

and has argued 23 cases before the Supreme Court of the United States. "He also formerly

served with distinction as the Assistant Attorney General for Civil Rights." *May 17, 2006 Hear-

ing,* at 2, 5-7.

279.    On June 12, 2006, Congress received written testimony from Alexander Keyssar.

Keyssar is the Matthew Stirling, Jr. Professor of History and Social Policy and the Chair of the

Democratic Institutions and Politics at the Kennedy School of Government at Harvard Univer-

sity. *July 13, 2006, Senate Hearing*, at 244-248.

280.    Congress heard testimony from Armand Derfner on October 20, 2005 and May 17,

2006. Derfner has appeared before the United States Supreme Court "in a number of pivotal vot-

ing rights cases." He has appeared before the Constitution Subcommittee during consideration

of all three extensions of the Voting Rights Act. He is the author of many voting publications

and is in private practice in Charleston, South Carolina. *October 20, 2005 Hearing*, at 8, 79-80;

*May 17, 2006 Hearing*, at 2, 9-11.

281.    Hazel Dukes is the President of the New York State Conference of NAACP

Branches. On June 14, 2005, she testified before the National Commission on the Voting Rights

Act and submitted a prepared statement.  On October 18, 2005, this testimony was entered into the Congressional Record.  *October 18, 2005 Hearing*, at 59-64.

282.     Congress heard testimony from Anita Earls on October 25, 2005 and May 16, 2006. She is the Director of Advocacy at the University of North Carolina Center for Civil Rights. Also, she is a former Deputy Assistant Attorney General for Civil Rights at the Department of Justice Civil Rights Division where she was responsible for voting rights, educational opportunities and disability rights issues.  In December 2000, she became the Director of the Voting Rights Project of the Lawyers Committee for Civil Rights Under Law.  Prior to her Government and public service work, Ms. Earls practiced civil rights law for 10 years.  *October 25, 2005 Scope Hearing Vol. I* at 7-8, 78-79; *May 16, 2006 Hearing*, at 2-4.  On March 11, 2005, she testified before the National Commission on the Voting Rights Act.  On October 18 2005 this testimony was entered into the Congressional Record.  *October 18, 2005 Hearing*, at 203-221.  Her prepared statement was entered into the record on October 25, 2005.  *October 25, 2005 Scope Hearing Vol. II,* at 3181-3192.

283.     Congress heard testimony from Richard Engstrom on October 25, 2005.  Professor Engstrom is a resource professor of political science and endowed professor of African Studies at the University of New Orleans.  He is a noted speaker in election systems and minority rights and has testified extensively in voting rights cases since the 1970's.  On March 11, 2005, Professor Engstrom also testified before the National Commission on the Voting Rights Act and submitted a prepared Statement.  On October 18, this testimony was entered into the Congressional Record.  *October 25, 2005 Need Hearing,* at 3, 49-50.  His Commission statement was entered into the record on March 8, 2006.

284.    Congress heard testimony from Margaret Fung on November 8, 2005.  She serves as the Executive Director of the Asian American Legal Defense and Education Fund (AALDEF).  In 1988, Ms. Fung organized AALDEF's first exit poll of Asian-American voters in New York City; and in 1992, testified before the full House Judiciary Committee on the need to continue Section 203.  *Nov, 8, 2006 Hearing Part I*, at 7-8, 12-14.  On June 14, 2005, Ms. Fung also testified before the National Commission on the Voting Rights Act and submitted a prepared Statement.  On October 18, 2005 this testimony was entered into the Congressional Record.  *October 18, 2005 Hearing,* at 12-21.

285.    Congress heard testimony from Ronald Gaddie on May 16, 2006 and received written testimony from him on October 25, 2005.  As a professor of political science at the University of Oklahoma, he teaches research methods, southern politics, and electoral politics.  Also, he serves as a litigation consultant in voting rights and redistricting cases, including those in Alabama, Georgia, Illinois, New Mexico, Oklahoma, South Dakota, Texas, Virginia, and Wisconsin.  *October 25, 2005 Scope Hearing Vol. II*, at 2994; *May 16, 2006 Hearing,* at 6-8.

286.    Congress heard testimony from Jose Garza on October 20, 2005.  He represents the League of United Latin American Citizens, as a voting rights attorney.  In addition to representing the league, Garza is a solo practitioner in San Antonio, Texas, and has served as the litigation director of Texas Rural Aid, Inc., since 1998.  *October 20, 2005 Hearing,* at 7, 12-14.

287.    Congress heard testimony from Fred D. Gray on May 17, 2006.  He is "one of the Nation's pioneering civil rights lawyers."  He defended Rosa Parks and Dr. Martin Luther King, Jr., in the Montgomery bus boycott.  "Starting in the late 1950's, "he brought landmark voting rights cases like *Gomillion v. Lightfoot* to the Supreme Court, paving the way for the expansion of vot-

ing rights that culminated in the Voting Rights Act of 1965." *May 17, 2006 Hearing,* at 2, 44-46.

288.    Congress received testimony from Jerome A. Gray on November 1, 2005. He serves as the State Field Director for the Alabama Democratic Conference, a position he has held for 25 years. For more than 20 years, Gray served as a member of the Alabama Advisory Committee to the U.S. Commission on Civil Rights, investigating civil rights injustices throughout the State. Gray is the coauthor of the Alabama chapter in the highly acclaimed publication edited by Chandler Davidson and Bernard Grofman, *Quiet Revolution in the South:* "The Impact of the 1965 Voting Rights Act, 1965-1990," and has served on numerous panels discussing race, politics and voting. *November 1, 2005 Hearing*, at 6, 44-46.

289.    Frank Jackson is the mayor of Prairie View, Texas. He was elected Mayor after serving on the city council for 12 years and as county commissioner of Waller County for eight years. On March 11, 2005, he testified before the National Commission on the Voting Rights Act. On October 18, 2005, this testimony was entered into the Congressional Record. *October 18, 2005 Hearing*, at 172-175.

290.    Congress heard testimony from Richard Hasen on May 9, 2006. Hasen in the "Hannon Distinguished Professor of Law at Loyola. He is the co-author of a leading case book on election law, and has authored more than three dozen articles on the subject." *May 9, 2006 Hearing*, at 8-10.

291.    Congress heard testimony from Gerald Hebert on October 20, 2005. He is a solo practitioner focusing on election law and redistricting. Hebert also has had an extensive career in voting litigation, representing a number of States in redistricting and election issues, including Texas, California, New York, South Carolina, and Virginia. Prior to his practitioner work,

Hebert worked at the Department of Justice from 1973 to 1994, where he served as Acting Chief, Deputy Chief, and Special Litigation Counsel in the Voting Section of the Civil Rights Division. *October 20, 2005 Hearing*, at 8, 87-89; *May 4, 2006 Hearing Part I*, at 8-11.

292.    Congress heard testimony from Wade Henderson on March 6, 2006.  He is the Executive Director of the Leadership Conference on Civil Rights and counsel to the Leadership Conference on Civil Rights Education Fund.  Prior to his role with the Leadership Conference, Henderson was the Washington Bureau Director of the National Association for the Advancement of Colored People, NAACP.  He was also the Associate Director of the Washington National Office of the American Civil Liberties Union.  Additionally, Henderson served as the Joseph L. Rauh, Jr., Professor of Public Interest Law at the David A. Clark School of Law at the University of the District of Columbia.  *March 8, 2006 Hearing Vol. I*, at 11, 45-46.

293.    Congress heard testimony from Robert Hunter on October 25, 2005.  He is a former chairman of the North Carolina Board of Elections and a partner in the law firm of Hunter, Higgins, Miles, Elam and Benjamin located in Greensboro, North Carolina.  Hunter has litigated a number of redistricting and voting rights cases, including serving as the original attorney for the intervenors in one of the landmark section 2 voting rights cases, *Gingles v. Thornburg*. *October 25, 2005 Need Hearing*, at 16-26.

294.    Congress heard testimony from Sherrilyn Ifill on July 13, 2006.  She is an Associate Professor of Law at the University of Maryland Law School in Baltimore.  She has previously served as Assistant Counsel at the NAACP Legal Defense and Education Fund, where she litigated various Voting Rights Act cases. *July 13, 2006 Hearing*, at 4, 6-8.

295.    Congress heard testimony from Jacqueline Johnson on November 9 & 10, 2005.  She is the Executive Director of the National Congress of American Indians (NCAI).  Prior to joining

NCAI, Ms. Johnson served as Deputy Assistant Secretary for Native American Programs at the U.S. Department of Housing and Urban Development; was Executive Director of the Tlingit Haida Regional Housing Authority, headquartered in Juneau, Alaska; served as Chairperson of the National American Indian Housing Counsel, and was appointed to the National Commission on American Indian, Alaskan Native, and Native Hawaiian Housing. Ms. Johnson is a member of the Raven-Sockeye Clan of the Tlingit. *November 9 & 10, 2005 Hearing*, at 1-5.

296.    Congress heard testimony from Pamela S. Karlan on May 16, 2006. She is the Kenneth and Harle Montgomery Professor of Public Interest Law, Co-Director of the Supreme Court Litigation Clinic, and Associate Dean for Research and Academics at Stanford University School of Law. *May 16, 2006 Hearing*, at 2, 174-195.

297.    Congress heard testimony from Jack Kemp on October 18, 2005. He is a former Member of Congress, former Secretary of Housing and Urban Development and Founder and Chairman of Kemp Partners. From 1993 to 2004, he was co-director of Empower America, a public policy institute. *October 18, 2005 Hearing*, at 4-8.

298.    Congress heard testimony from Wan J. Kim on May 10, 2006. Wan J. Kim is the Assistant Attorney General of the Civil Rights Division. Prior to serving as Assistant Attorney General, he served as Deputy Assistant; was in the Attorney General's Honors program; was Assistant United States Attorney for the District of Columbia and served on the staff of Senator Hatch. *May 10, 2006 Hearing*, at 4-7.

299.    Victor Landa served as the Central Region Director of the Southwest Voter Registration Education Project. On June 14, 2005, she testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005, this testimony was entered into the Congressional Record. *October 18, 2005 Hearing*, at 180-183.

300.    Congress heard testimony from Natalie Landreth on May 10, 2006.  Ms. Landreth has worked with the Native American Rights Fund since July 2003 and currently practices entirely in the area of Federal and State American Indian and Alaska Native Law.  Most recently, she authored a report entitled "Voting Rights in Alaska 1982-2006."  Prior to joining the Native American Rights Fund, she worked in the first Office of Tribal Justice in the United States Department of Justice. *May 10, 2006 Hearing*, at 14, 18-20.

301.    Congress heard testimony from Bill Lann Lee on March 8, 2006.  He served as Chair of the National Commission on the Voting Rights Act.  He is the Former Assistant Attorney General of the Civil Rights Division of the Department of Justice under President Bill Clinton. Lee's tenure in the Department of Justice followed 23 years as a civil rights attorney for the NAACP Legal Defense and Educational Fund, the Center for Law and the Public Interest, and the Asian-American Legal Defense and Education Fund.  *March 8, 2006 Hearing Vol. I*, at 10-14.

302.    Congress heard testimony from Anne Lewis on November 9, 2005.  She is a partner at the Georgia law firm Strickland Brockington Lewis LLP.  She represents clients in various public policy and legislative matters, including redistricting.  During the 2000 redistricting cycle, Ms. Lewis, represented four intervenors in the State of Georgia's section 5 preclearance case, *Georgia v. Ashcroft.*  Ms. Lewis also represented the plaintiffs in the Fulton County School Board redistricting case, *Markham v. Fulton County School Board;* and served as counsel to former Speaker Newt Gingrich and Congressman John Lewis, amicus curiae in the 1990 Georgia redistricting case, *Johnson v. Miller. November 9, 2005 Hearing,* at 11, 30-31.

303.    Congress heard testimony from K.C. McAlpin on November 9 & 10, 2005.  He is the Executive Director of ProEnglish, a national non-profit group dedicated to preserving English as

the common language, and to making it the official language of the United States. *November 9 & 10, 2005 Hearing,* at 2, 63-66.

304.    Congress heard testimony from Laughlin McDonald on October 25, 2005 and May 9, 2006. He is the Director of the ACLU's Voting Rights Project. McDonald also serves as the Executive Director of the Southern Regional Office of the ACLU, a position he has held since 1972. While at the Southern Regional Office, McDonald has won some of the most precedent-setting cases, including those that secured the principle of one person/one vote, ended the use of discriminatory at-large elections, and establishing the right of women to serve on juries. *History, Scope, and Purpose Hearing Vol II,* at 2-3, 3227-3234; *May 9, 2006 Hearing,* at 10-11. On March 11, 2005, he testified before the National Commission on the Voting Rights Act and sub-mitted a prepared statement. On October 18, this testimony was entered into the Congressional Record. *October 18, 2005 Hearing,* at 202-204. His prepared statement was entered into the record on October 25, 2005. *History, Scope, and Purpose Hearing Vol II,* at 2-3, 3227-3234

305.    Congress heard testimony from Robert McDuff on May 10, 2005. He is a civil rights and criminal defense attorney practicing in Jackson, Mississippi. He is currently Vice Chair of the Board of Directors of the Mississippi Center for Justice and serves on the Board of Lawyers' Committee for Civil Rights Under Law. Prior to opening his own practice, in 1992, he was a faculty member of the University of Mississippi Law School. On October 29, 2005, he testified before the National Commission on the Voting Rights Act. This testimony was entered into the Congressional Record on October 18, 2005. *May 10, 2006 Hearing,* at 14, 21-23.

306.    Congress heard testimony from Nina Perales on October 25, 2005 and July 13, 2006. She is the Regional Counsel for the Mexican American Legal Defense and Educational Fund. Ms. Perales specializes in voting rights litigation, including redistricting and vote dilution chal-

lenges. She served as the lead counsel for Latino plaintiffs in congressional redistricting in Texas in 2001 and in Texas and Arizona in 2003. On April 7, 2005, she testified before the National Commission on the Voting Rights Act and submitted a prepared statement. This testimony was entered into the Congressional Record on October 18, 2005. *October 25, 2005 Scope Hearing Vol. I,* at 8, 86-87; *July 13, 2006 Hearing,* at 4, 8-9.

307.    Congress heard testimony from Professor Nathaniel Persily on May 17, 2006. He is a Professor of Law at the University of Pennsylvania Law School. Professor Persily is a "nationally recognized expert on election law, frequent practitioner, [and] media commentator. . . . He was recently appointed by courts to help draw legislative districting plans for Georgia, Maryland, and New York and by the California State Senate as an expert in their redistricting litigation." *May 17, 2006 Hearing,* at 2, 11-13.

308.    Congress heard testimony from Penny Pew on November 15, 2005. She has served as Apache County Elections Director since 2001. She has been a certified Elections Officer with the Arizona Secretary of State's Office since 2001, as well as Arizona's League of Cities and Towns. On April 7, 2005, she testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005, the transcript of the hearing was entered into the Congressional Record. *Section 6 and 8 Hearing,* at 12-17.

309.    Congress heard testimony from Mark Posner on November 1, 2005. He is an Adjunct Professor of Law at the University of Maryland's School of Law and at American University's Washington College of Law, as well as an independent consultant in the area of civil rights. Prior to teaching and consulting, Posner served as an attorney in the U.S. Department of Justice Civil Rights Division from 1980 until 2003. Between the mid-1980's through 1995 he was one of two attorneys responsible for reviewing Section 5 preclearance submissions and served as

special Section 5 counsel from 1992 until 1995. On October 14, 2005, he testified before the National Commission on the Voting Rights Act and submitted a prepared statement. On October 18, 2005, the transcript of the hearing was entered into the Congressional Record. March 8, 2006 his prepared statement was entered into the Congressional Record. *November 1, 2005 Hearing*, at 5, 7-8; *March 8, 2006 Hearing Vol. IV*, at 5512.

310.    Joe Rich served as the Former Chief of the Voting Section of the Department of Justice. He has "several decades as a lawyer in the Civil Rights Division. On June 14, 2005, he testified before the National Commission on the Voting Rights Act. On October 18 and 25, 2005, his testimony and prepared statement were entered into the Congressional Record. *October 18, 2005 Hearing,* at 65-72, 332-333.

311.    Congress heard testimony from Joe Rogers on October 18, 2005 and March 8, 2006. He completed his term as the Lieutenant Governor of Colorado in 2003. He held the distinction of serving as America's youngest Lieutenant Governor and only the fourth African-American in U.S. history ever elected as the State's number two executive. Now a practicing attorney in Colorado, he served as a Commissioner on the National Commissioner on the Voting Rights Act. *October 18, 2005 Hearing*, at 21-24; *March 8, 2006 Hearing Vol. I,* at 87-94.

312.    Congress heard testimony from Bradley J. Schlozman on October 25, 2005 and November 8, 2005. At the time of the hearings, he was the Acting Assistant Attorney General for Civil Rights at the U.S. Department of Justice. *History, Scope, and Purpose Hearing*, at 7-10; *Noveraer 8, 2006 Hearing Part I*, at 7, 9-10.

313.    Congress received testimony from Theodore Shaw on November 9, 2005 and May 9, 2006. He is the Director-Counsel and President of the NAACP Legal Defense and Educational Fund. Shaw joined the NAACP in 1982. In 1987, he established LDF's Western Regional Of-

fice in Los Angeles, and served as the Western Regional Counsel. In 1990, Shaw left LDF to join the University of Michigan Law School faculty. Shaw rejoined LDF as Associate Director-Counsel in 1993. Shaw also serves as an adjunct professor of law at Columbia Law School. On June 14, 2005, he testified before and submitted a prepared statement to the National Commission on the Voting Rights Act. On October 18, 2005, the transcript of the hearing was entered into the Congressional Record. On October 25, 2005 his prepared statement was entered into the Congressional Record. *November 9, 2005 Hearing*, at 10-14; *May 9, 2006 Hearing*, at 7-8

314.    Bobby Singleton was elected to the Alabama Senate in January 2005. From 2002 to 2005, he served in the Alabama House of Representatives. On March 11, 2005, he testified before the National Commission on the Voting Rights Act. On October 18, 2005, the transcript of the hearing was entered into the Congressional Record. *October 18, 2005 Hearing* at 190-192.

315.    Congress received testimony from Constance Slaughter-Harvey on July 10, 2006. She is a lawyer and former Mississippi state election official. *June 13, 2006 Hearing*, at 389 (including Slaughter-Harvey's testimony from the Senate Judiciary Committee's July 10, 2006 Hearing)

316.    Congress heard testimony from Nadine Strossen on March 8, 2006. She is a professor of law at New York Law School, and since 1991 has served as President of the American Civil Liberties Union. She is the first woman to head this organization. *Continuing Need Hearing Vol. I*, at 11, 19-20.

317.    Congress heard testimony from John Trasviña on June 13, 2006. He is president and general counsel to the Mexican American Legal Defense and Education Fund. Trasviña once worked for the Senate Judiciary Committee as general counsel for the Senate Subcommittee on the Constitution. *June 13, 2006 Hearing*, at 6.

318.    Congress heard testimony from James Thomas Tucker on November 9 and 10, 2005, May 4, 2006, and July 10, 2006. He was a Voting Rights Consultant for the National Association for Latino Elected and Appointed Officials Education Fund with expertise in redistricting and voting rights law. He is also a former senior trial attorney with the voting section of the Department of Justice. *November 9 & 10, 2005 Hearing*, at 2, 76-78; *May 4, 2006 Hearing Vol. II*, at 57-82; *June 13, 2006 Hearing*, at 463-490 (including the record from the Senate's July 10, 2006 hearing).

319.    Congress heard testimony from Barry Weinberg on November 15, 2005. He is a former Deputy Chief and Acting Chief of the Voting Section at the U.S. Department of Justice. From 1965 until 2000, Weinberg served in many key roles at the Department, including supervising investigations and litigation under the Voting Rights Act. In December 1999, the Barry H. Weinberg Award was established by the Department of Justice, recognizing an individual who has made an outstanding contribution to the effectiveness of the Federal Observer Program for monitoring polling place procedures under the Voting Rights Act. *November 15, 2005 Hearing*, at 17-51.

320.    Congress heard testimony from Brenda Wright on November 1, 2005. She served as the Managing Attorney for the National Voting Rights Institute (NVRI). Prior to joining the NVRI, Ms. Wright served as the Director of the Voting Rights Project at the Lawyers' Committee for Civil Rights Under Law, where she successfully argued the first Supreme Court case, *Young v. Fordice*, involving NVRA. Ms. Wright also testified before the National Commission on the Voting Rights Act and her testimony was made part of the Congressional Record on October 18, 2005. *November 1, 2005 Hearing*, at 5-6, 19-20.

321.    Congress heard testimony from Donald Wright on June 21, 2006.  Since 2000, Wright has served as the General Counsel of the North Carolina State Board of Elections.  "He is active in the Election Center, the Nationwide Association of Election Administrators, and has served as an instructor for the center."  *June 21, 2006 Hearing, at 6.*

322.    [Intentionally left blank]

### 3.    Selected Reports in the Congressional Record[3]

323.    Congress incorporated into its record, the record of the National Commission on the Voting Rights Act.  The National Commission was created by the Lawyers' Committee for Civil Rights Under Law and was composed of a politically and ethnically diverse group of men and women, including former elected and appointed public officials, scholars, lawyers, and leaders. The National Commission was made up of Honorary Chair Charles Mathias, Chair Bill Lann Lee, John Buchanan, Chandler Davidson, Dolores Huerta, Elsie Meeks, Joe Rogers and Charles Ogletree.  The National Commission's charge was to evaluate discrimination in voting since Congress reauthorized the temporary provisions of the Voting Rights Act of 1982.  *March 8, 2006 Hearing Vol. I,* at 12.

324.    During his testimony, Bill Lann Lee, Chair of the National Commission on the Voting Rights Act, submitted the report supplement and entire record to the House Judiciary Committee: The report is entitled, "Protecting Minority Voters: The Voting Rights Act At Work, 1982-2005."  *March 8, 2006 Hearing Vol. I,* at 104-290.  The supplement is entitled, "Highlights of Hearings of the National Commission on the Voting Rights Act, 2005."  *March 8, 2006 Hear-*

---

[3]    Paragraph Nos. ¶ 323 to ¶ 331 represent a selected list of reports that were submitted into the record before Congress.  This does not purport to be a complete list of such reports submitted to the House or Senate Committees, or those written works that were otherwise provided to Congress.

*ing Vol. I*, at 291-377. Pursuant to the written request of Chairman Sensenbrenner, the National

Commission provided the Judiciary Committee "its entire record of several thousand pages."

*March 8, 2006 Hearing Vol. I*, at 12-14; 2840-5711.

325.    The National Commission on the Voting Rights Act held 10 hearings during 2005.

The transcript and record of each hearing were submitted into the congressional record:

- National Commission on the Voting Rights Act, Transcript of Southern Regional Hearing, March 11, 2005. *October 18, 2005 Hearing*, at 148-225.
- National Commission on the Voting Rights Act, Transcript of Southwest Regional Hearing, April 7, 2005. *October 18, 2005 Hearing*, at 226-312.
- National Commission on the Voting Rights Act, Transcript of NortheastRegional Hearing, June 14, 2005. *October 18, 2005 Hearing*, at 312-369.
- National Commission on the Voting Rights Act, Transcript of South Georgia Hearing, August 2, 2005. *October 18, 2005 Hearing*, at 370-461.
- National Commission on the Voting Rights Act, Transcript of Florida Hearing, August 4, 2005. *October 18, 2005 Hearing*, at 569-642.
- National Commission on the Voting Rights Act, Transcript of South Dakota Hearing, September 9, 2005. *October 18, 2005 Hearing*, at 643-733.
- National Commission on the Voting Rights Act, Transcript of Western Regional Hearing, September 27, 2005. *October 18, 2005 Hearing*, at 734-817.
- National Commission on the Voting Rights Act, Transcript of Mid-Atlantic Regional Hearing, October 14, 2005. *October 18, 2005 Hearing*, at 818-922.
- National Commission on the Voting Rights Act, Mississippi Hearing, October 29, 2005. *October 18, 2005 Hearing*, at 923-963.

326.    During her testimony before Congress, Nadine Strossen of the ACLU submitted into

its record, a report by the ACLU's Voting Rights Project, "The Case for Extending and Amend-

ing the Voting Rights Act, Voting Rights Litigation, 1982-2006." (hereinafter "ACLU Report").

The report was comprised of a summary of the in 293 legal cases in 31 States challenging dis-

crimination and failure to comply with Federal and State election laws that the ACLU's Voting

Rights Project litigated since 1982, the prior reauthorization of the Voting Rights Act. *March 8,*

*2006 Hearing Vol. I*, at 19-20; 378-1269.

327.    During his testimony before Congress, Wade Henderson of the Leadership Confer-

ence on Civil Rights submitted into its record reports on the states under the preclearance provi-

sions of the Voting Rights Act: "As part of the Leadership Conference's role in assessing the effectiveness of the Voting Rights Act and its continuing need, our sister organization, the LCCR Education Fund, commissioned an educational and research collaborative, *renewtheVRA.org,* to draft a series of reports that have been requested by Congress examining the impact of the Voting Rights Act over the past 25 years. Beginning today and over the next month, *renewtheVRA.org* will release reports on the following States: Alabama, Alaska, Arizona, California, Florida, Georgia, Louisiana, Mississippi, New York, North Carolina, South Carolina, South Dakota, Texas, and Virginia. These States were chosen as a representative sampling geographically and demographically of jurisdictions covered in whole or in part by the expiring temporary provisions of the Voting Rights Act. I would ask that each of the reports previously submitted to the Committee, those that will be submitted, and my testimony in full be admitted as part of the record of these proceedings." *March 8, 2006 Hearing Vol. I,* at 45.

328.    The reports submitted by renewtheVRA.org were:

- "Voting Rights in Texas, 1982-2006," a report of RenewTheVRA.org. (Appended to the Statement of Nina Perales, July 13, 2006). (Attached as Exhibit 8 to the Declaration of Paul R.Q. Wolfson ("Wolfson Decl.")) .
- "Voting Rights in Louisiana, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II,* at 1592-1708.
- "Voting Rights in South Carolina, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II,* at 1928-1985.
- "Voting Rights in Mississippi, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II,* at 1709-1727.
- "Voting Rights in South Dakota, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II,* at 1986-2029.
- "Voting Rights in Georgia, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II,* at 1499-1591.
- "Voting Rights in Alabama, 1982-2006," a report of RenewTheVRA.org. *July 13, 2006 Hearing* at 365-402.
- "Voting Rights in Alaska, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. I,* at 1308-1362.
- "Voting Rights in New York, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II,* at 1836-1927.

- "Voting Rights in Arizona, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. I*, at 1363-1453.
- "Voting Rights in Florida, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II*, at 1456-1498.
- "Voting Rights in California, 1982-2006," a report of RenewTheVRA.org. *July 13, 2006 Hearing* at 103-109.
- "Voting Rights in North Carolina, 1982-2006," a report of Renew-TheVRA.org. *March 8, 2006 Hearing Vol. II*, at 1728-1835.
- "Voting Rights in Virginia, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II*, at 2030-2092.

329. On October 18, 2005, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, by Ellen Katz *et al.*, was submitted into the congressional record by Representative Steve Chabot. This report is a study done by the Voting Rights Initiative of University of Michigan Law School, 39 U. Mich. J.L. Reform 643 (2006). It identified 323 lawsuits, encompassing 748 decisions that addressed Section 2 claims since 1982. *October 18, 2005 Hearing*, at 964-1124.

330. On March 8, 2006, *The Deterrent Effect of the Section 5 of the Voting Rights Act: The Role of More Information Requests*, by Luis Ricardo Fraga & Maria Lizet Ocampo, was submitted into the congressional record. This report studied the effect of More Information Requests in deterring discrimination in covered jurisdictions. *March 8, 2006 Hearing Vol. II*, at 2537.

331. On March 16, 2006, Congressman Chabot submitted into the record "Minority Language Assistance Practices in Public Elections," March 7, 2006. *March 8, 2006 Hearing Vol. I*, at 2093-2351.

332. On October 5, 2005, Acting Assistant Attorney General for Civil Rights at the U.S. Department of Justice, Bradley Schlozman submitted copies of Section 5 objection letters issued since 1982. *October 25, 2005 Scope Hearing Vol. I*, at 225-1684; *October 25, 2005 Scope Hearing Vol. I*, at 1686-2595.

333.    The House Judiciary Committee report details the extensive examination it did of the effectiveness of temporary provisions of the Voting Rights Act: "During these oversight hearings, the Subcommittee heard oral testimony from 39 witnesses, including State and local elected officials, scholars, attorneys and representatives from the voting and civil rights community. The Committee also received additional written testimony from the Department of Justice, other interested governmental and non-governmental organizations (NGOs), and private citizens. In all, the Committee assembled over 12,000 pages of testimony, documentary evidence and appendices from over 60 groups and individuals, including several Members of Congress." H.R. Rep. No. 109-478, at 5.

334.    The "Report" of the Senate Judiciary Committee on the "Fannie Lou Hamer, Rosa Parks, Coretta Scott King, and Cesar E. Chavez Voting Rights Act Reauthorization and Amendments Act of 2006" was not signed by a majority of the Senate Judiciary Committee. Nine of the eighteen members of the Senate Judiciary Committee signed the report. 152 Cong. Rec. S8372. Eight members of the Senate Judiciary Committee objected to the Committee report. S. Rep. No. 109-295, at 54.

335.    Congress received a statement supporting reauthorization from Senator Patrick Leahy (VT) that "Of course, at the time of floor debate and consideration of H.R. 9 in the Senate, no Senate Committee Report on S.2703 was available to Senators. Fortunately at the time of Senate floor debate and consideration of H.R. 9 in the Senate last week, Senators had available to them an extensive record to inform their votes. We had the voluminous Senate Judiciary Committee record, including thousands of pages of testimony. We had the full record before the House of Representatives, including thousands of pages of testimony. We had the House Committee Report; and the full debate on the floor of the House of Representatives, including debate surround-

87

ing four substantive amendments to H.R. 9 that were all rejected. Leading up to final passage of the Voting Rights Act reauthorization, I provided the Senate with some of the extensive evidence received in the Judiciary Committee about the persistence of discriminatory practices in covered jurisdictions that supports reauthorization of this crucial provision. . . . I included statements in the Congressional Record from Tuesday and Wednesday and available to all Senators during the course of the debate. I referred to that evidence early in the debate last Thursday. Most importantly, of course, at the time we voted, all Senators had before them the detailed findings in Section 2 of the legislation based on the record and all Senators endorsed those findings with their votes. For example, those findings explicitly include: 'Evidence of continued discrimination includ[ing] . . . the hundreds of objections interposed, requests for more information submitted followed by voting changes withdrawn from consideration by jurisdictions covered by the Voting Rights Act of 1965, and section 5 enforcement actions undertaken by the Department of Justice in covered jurisdictions since 1982 that prevented election practices, such as annexation, at-large voting, and the use of multi-member districts, from being enacted to dilute minority voting strength; . . . the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia; . . . the continued filing of section 2 cases that originated in covered jurisdictions; and . . . the litigation pursued by the Department of Justice since 1982 to enforce sections 4(e), 4(f)(4), and 203 of such Act to ensure that all language minority citizens have full access to the political process.' In addition, those findings include, '[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965.' These findings the Senate adopted in its unanimous vote for H.R. 9 and as a reauthorization

measure also incorporated the statutory findings within the following provisions of the Voting

Rights Act of 1965: Section 203(a); Section 4(f)(1); Section 10(a); and Section 202(a). By pass-

ing the legislation, Congress has adopted and reaffirmed the detailed findings in H.R. 9. The

Senate unanimously adopted these findings." 152 Cong. Rec. S8372-S8373.

### D. Evidence Before Congress During the Passage of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization Act of 2006

#### 1. Evidence Before Congress: the Enforcement of Section 5

##### a) Objections Interposed

###### (1) Congressional Findings

336.    The House Judiciary Committee Report contains a table listing the number of Section

5 submissions to the Department of Justice and Department of Justice Section 5 objections per

year from 1965 to July 11, 2005. The year-by-year numbers match statistics provided by the

Department of Justice. This table shows that there were more than 700 objections from 1982 to

July 11, 2005 and less than 700 objections from 1965 to 1981. *Compare* H.R. Rep. No. 109-478,

at 22 *with October 25, 2005 Scope Hearing Vol. I*, at 13.

337.    The House Judiciary Committee report states: "The Committee received testimony

that more Section 5 objections were lodged between 1982 and 2004 than were interposed be-

tween 1965 and 1982 and that such objections did not encompass minor inadvertent changes.

This increased activity shows that attempts to discriminate persist and evolve, such that Section 5

is still needed to protect minority voters in the future." H.R. Rep. No. 109-478, at 21

338.    The House Judiciary Committee stated: "[V]oting changes devised by covered juris-

dictions resemble those techniques and methods used in 1965, 1970, 1975, and 1982 including:

enacting discriminatory redistricting plans; switching offices from elected to appointed positions;

relocating polling places; enacting discriminatory annexations and deannexations; setting numbered posts; and changing elections from single member districts to at large voting and implementing majority vote requirements.  The Committee received testimony indicating that these changes were intentionally developed to keep minority voters and candidates from succeeding in the political process." *Id.* at 36.

339.    The House Judiciary Committee found that all but two of the sixteen states partially or totally covered under Section 5 had a large non-white population and that there was a close link between a large non-white population and objections.  *Id.* at 37.

340.    Citing the report of the National Commission on the Voting Rights Act, the House Judiciary Committee found that that "in nine of the sixteen Section 5-covered states, more objections were interposed after 1982 than before." *Id.* (internal quotation marks omitted).

341.    "The [House Judiciary] Committee received testimony highlighting the necessity of Section 5 objections to protect minority voters from actions undertaken by local governments." *Id.*

342.    The House Judiciary Committee report states: "Since 1982, the Department objected to more than 700 voting changes that have been determined to be discriminatory, preventing such changes from being enforced by covered jurisdictions." *Id.* at 21.

343.    The House Judiciary Report contains a chart showing that there were 1334 Section 5 submissions that were objected to from 1965 to July 11, 2005.  Five hundred five of the objected to submissions involved redistricting plans. *Id.* at 22.

344.    A map appended to the House Judiciary Committee Report shows that there have been more Section 5 objections in Texas than in any other state since the inception of the Act, and from August 5, 1982 to 2004, Texas ranks second to Mississippi. *Id.* at 73.

345.    A map appended to the House Judiciary Committee Report shows that from August 5, 1982 to 2004, there were forty-six counties in Texas where objections had been interposed against the county or a political unit located in the county. *Id.* at 80.

346.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were forty-six objections in Alabama and that there were seventeen counties in Alabama where objections had been interposed against the county or a political unit located in the county. *Id.* at 73-74.

347.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were eighty-three objections in Georgia and there were forty-seven counties in Georgia where objections had been interposed against the county or a political unit located in the county. *Id.* at 73, 76.

348.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were one hundred three objections in Louisiana and that there were thirty-seven parishes in Louisiana where objections had been interposed against the county or a political unit located in the county. *Id.* at 73, 77.

349.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were one hundred twenty objections in Mississippi and there were forty-four counties in Mississippi where objections had been interposed against the county or a political unit located in the county. *Id.* at 73, 78.

350.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were one hundred twenty-six objections in South Carolina and thirty-two counties in South Carolina where objections had been interposed against the county or a political unit located in the county. *Id.* at 73, 79.

351.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were nineteen objections in Arizona and there were seven counties in Arizona where objections had been interposed against the county or a political unit located in the county. *Id.* at 73, 75.

352.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were fifteen objections in Virginia and there were eight counties or independent cities in Virginia where objections had been interposed against the county (or independent city) or a political unit located in the county (or independent city). *Id.* at 73, 81.

353.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were 43 objections in North Carolina and there were twenty-three counties in North Carolina where objections had been interposed against the county or a political unit located in the county. *Id.* at 73, 82.

354.    The House Judiciary Committee Report contains the following example of a change that "was intentionally developed to keep minority voters and candidates from succeeding in the political process:" In 2001, the new Census data revealed that Kilmichael, Mississippi was majority African-American. A number of African-American candidates ran for city office later that year. Three weeks before the election the white mayor and the five-member, all-white Board of Aldermen cancelled the election. The Department of Justice objected to the cancellation and

compelled the city to reschedule the election. When the election was held, African-Americans were elected mayor and to three city council aldermanic positions. *Id.* at 36-37.

355.    The House Judiciary Committee received reports and testimony that "[i]n 2003, South Carolina, enacted legislation adopting the identical method of elections for the board of trustees of the Charleston County School District that had earlier, in a case involving the county council, been found to dilute minority voting strength in violation of Section 2." According to the House Judiciary Committee report, the Department of Justice objected to the change because it "would significantly impair the present ability of minority voters to elect candidates of choice to the school board and to participate fully in the political process." *Id.* at 39-40.

356.    The House Judiciary Committee Report cited to the repeated efforts of Northampton County, Virginia to implement a redistricting plan for its board of supervisors following the 2000 Census that eliminated multiple majority-minority districts. According to the report, the Department of Justice objected on retrogression grounds to two such plans. *Id.* at 40.

357.    The House Judiciary Committee Report states that "examples were reported [to the Committee] showing Section 5 was instrumental in preventing covered jurisdictions from intentionally reenacting and enforcing changes to which the Department of Justice had previously objected." The report states that the Department of Justice objected to three different acts of the South Carolina General Assembly to impose staggered terms for the Lancaster County School District. According to the report, the Department of Justice found that staggered terms, when combined with at-large elections and racial bloc voting, limited the potential of "black voters to participate effectively in the electoral process by reducing the ability of those voters to use single shot voting." *Id.* at 23.

358.    The House Judiciary Committee Report states that it was reported to the Committee that in 1990, the Department of Justice objected to an attempted annexation of white suburban areas to the City of Monroe, Louisiana, and in its objection letter, the Department of Justice noted that the City did not try to annex these areas until the first-ever African-American candidate ran for city court. *Id.* at 23.

359.    The House Judiciary Committee contains the following example of an objection: In 1991, the Department of Justice objected to the reduction in size in the Concordia Parish Police Jury from nine members to seven members when it had the consequence of eliminating a majority African-American district.  The Department of Justice noted that the parish sought to eliminate the district after an influx of African-American residents transformed the district from a majority white district to a majority African-American districts. *Id.*

### (2)    Summary Statistical Evidence

360.    Congress received testimony from Anita Earls that between 1965 and 1981 the Department of Justice objected to 815 of the total number of preclearance submissions, as compared to 2,282 objections between 1982 and 2005. *May 16, 2006 Hearing*, at 54.

361.    Congress heard testimony from Nadine Strossen that "[s]ince 1968, when DOJ first began to interpose objections to voting changes, more than 1,000 objections have been lodged. The majority of these objections, 56%, have been lodged since the last reauthorization in 1982." *March 8, 2006 Hearing Vol. I*, at 1290.

362.    Congress received testimony from Anita Earls that the gross number of objections interposed by the Department of Justice has "skyrocketed" since 1982.  Earls testified that Section 5 submissions increased to an average of 16,506 per year from 1982-2005, up from an average of 2,566 submissions from 1965-1981.  Earls thus stated that "while the percentage of submissions

that were not precleared may have lowered in the last twenty-five years, the number of objec-

tions has actually almost doubled from an average of fifty-one per year from 1965 to 1981 to an

average of ninety-nine per year from 1982-2005." *May 16, 2006 Hearing*, at 69.

363.    Congress received an article entitled "*The End of Preclearance as We Knew It: How

the Supreme Court Transformed Section 5 of the Voting Rights Act*," that was co-authored by

Peyton McCrary, the historian at the Voting Section of the Civil Rights Division of the Depart-

ment of Justice. *November 1, 2005 Hearing*, at 96.  The article analyzed the basis of Department

of Justice objections from 1980 to 2005.  According to the article, of the 722 separate objections

lodged by DOJ from 1980-2005, 436 of DOJ's objections—equal to greater than 60% of the total

during that period—included discriminatory intent as a basis for the objection.  During that same

frame, 8 objections were based solely on the ground that the proposed changes would violate

Section 2 and 47 objections had two grounds, of which a violation of Section 2 was one.  *Id.* at

180-181.  The following are the tables reflecting these statistics:

TABLE 2: LEGAL BASES FOR OBJECTION DECISIONS, BY DECADE

| Legal Bases | 1970s | % | 1980s | % | 1990s | % | Totals |
|---|---|---|---|---|---|---|---|
| *Exclusive Categories* | | | | | | | |
| Intent | 9 | 2% | 83 | 25% | 151 | 43% | 243 |
| Dilution | 34 | 9% | -- | | -- | | 34 |
| Retrogression | 297 | 77% | 146 | 44% | 73 | 21% | 516 |
| Technical | 17 | 4% | 15 | 5% | 1 | 0% | 33 |
| Section 2 | -- | | 2 | 1% | 6 | 2% | 8 |
| Minority Languages | 2 | 1% | 2 | 1% | 5 | 1% | 9 |
| *Combined Categories* | | | | | | | |
| Intent/Retrogression | 22 | 6% | 73 | 22% | 67 | 19% | 162 |
| Intent/Dilution | 5 | 1% | -- | | -- | | 5 |
| Intent/Section 2 | -- | | 6 | 2% | 41 | 12% | 47 |
| Other | -- | | 3 | 1% | 5 | 1% | 8 |
| *Totals* | 386 | 100% | 330 | 100% | 349 | 100% | 1065 |

TABLE 4: LEGAL BASES FOR OBJECTIONS SINCE BOSSIER II

| Change Type | Retrogressive Intent | % | Retrogressive Effect | % | Both | % | Totals |
|---|---|---|---|---|---|---|---|
| Annexations | 1 | 50% | 1 | 4% | 1 | 8% | 3 |
| At-large | 0 | | 2 | 7% | 1 | 8% | 3 |
| Enhancing Devices | 0 | | 6 | 21% | 0 | | 6 |
| Districting | 1 | 50% | 15 | 54% | 10 | 77% | 26 |
| Other | 0 | | 4 | 14% | 1 | 8% | 5 |
| | | | | | | | |
| Totals | 2 | 100% | 28 | 100% | 13 | 101% | 43 |

Note: Totals do not always equal 100 percent, due to rounding.

*Id.*

364.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights and authored by Debo Adegbile, Associate Director of Litigation for the NAACP Legal Defense and Educational Fund, indicating that "[f]rom the first Section 5 objection until the most recent renewal of Section 5 in 1982, the DOJ objected to 50 attempts by state and local authorities to implement voting changes that would have diluted African-American voting strength.  Since 1982, DOJ has objected to 96 proposed changes [more than in the period between 1965 and 1982].  Record evidence that the 'gains in political access' that have been realized by Blacks "have come only with steadfast enforcement of the VRA." *March 8, 2006 Hearing Vol. II*, at 1599.

365.    Congress received testimony through the National Commission on the Voting Rights Act that Objections alone are an inadequate measure of the effect of VRA enforcement.  The Commission submitted a table counting five variables (objections, submission withdrawals, declaratory judgments, DOJ section 5 and 203 enforcement actions) the sum of which totaled 550 from 1991-1995 compared to 291 objections alone during that time period.  From 2001 to 2004,

the sum of those variables was 192 compared with only 39 objections during that period. *March 8, 2006 Hearing Vol. I*, at 196.

366.    Congress received testimony from Gerald Hebert, former Acting Chief of the Civil Rights Division that a "number of objections interposed under Section 5 have been interposed to changes that have been illegally implemented (i.e., without Section 5 preclearance) for years, or even decades.  Some changes finally were submitted only as the result of litigation; in other cases it appears that the unprecleared changes were detected by DOJ during the Section 5 review of other changes (such as annexations) that were later submitted by the jurisdiction.  The utter failure to make a Section 5 submission to an objectionable change, when such changes have been known for years to increase the potential for racial discrimination in the political process, strongly suggests that deliberate racially discriminatory conduct is at work." *May 4, 2006 Hearing Part I*, at 13.

367.    Congress received testimony from Anita Earls in the form of a table showing the types of changes to which objections were interposed, by decade.  The types of changes included annexations, at-large elections, enhancing devices, districting and ballot access.  In the 1980's DOJ objected to 431 proposed changes.  In the 1990's DOJ objected to 402 proposed changes. Earls noted that "[t]he number of change types to which objections were interposed is greater than the total number of objections, because numerous objections affected two or more change types." *May 16, 2006 Hearing*, at 150.

368.    Congress heard testimony through the National Commission on the Voting Rights Act regarding objection letters issued by the Department of Justice.  According to this testimony, objection letters can be viewed as evidence of discrimination against minority voters.  An objection letter "implies that at least one proposed change in the jurisdiction's submission would vio-

late, on the basis of race or color or membership in a language-minority group, legally guaranteed voting rights of citizens. The targets of discrimination are virtually always racial minorities and language-minority citizens. An objection, in other words, is an instance of vote discrimination that would have been perpetrated by local government officials were it not foiled by Section 5." *March 8, 2006 Hearing Vol. I*, at 171.

369.    Congress received testimony from Anita Earls in the form of a table showing the legal bases for objection decisions by decade. The legal bases are categorized as Intent, Dilutive Effect, Retrogression, Technical, Section 2 and Minority Language or a combination of the categories. Those legal bases receiving the largest number of objections were Intent (25% in the 1980s; 43% in the 1990s); Retrogression (44% in the 1980s; 21% in the 1990s) or a combination of the two (22% in the 1980s; 19% in the 1990s). *May 16, 2006 Hearing*, at 151.

370.    Congress received testimony from Chandler Davidson that "in addition to 653 successful Section 2 cases there were 626 objection letters the Justice Department sent to Section 5-covered jurisdictions since 1982, prohibiting these jurisdictions from making one or more discriminatory changes in their election procedure. There were 25 declaratory judgments adverse to covered jurisdictions' submissions of proposed election-related changes to the D.C. Court. There were more than 200 proposed discriminatory submissions that jurisdictions withdrew from Department of Justice (DOJ) consideration in the same period, after the Department sent them queries implying that the changes would be objected to if they were not withdrawn or revised. Each of these roughly 1,500 events in Section 5-covered jurisdictions—Section 2 cases, objection letters (often objecting to more than one proposed change in a submission), adverse declaratory judgments, and withdrawal letters—can be considered as an instance either of actual discriminatory voting procedure changed as the result of a legal action or as a discriminatory proce-

dure proposed by officials and prohibited or discouraged by the DOJ or the D.C. Court since 1982." *May 9, 2006 Hearing*, at 50.

371.    Congress received testimony from Chandler Davidson that in addition to objections, there are four other indicia of "actual or potential vote discrimination-indicia contained in DOJ records. The first of these is an adverse declaratory judgment issued by the D.C. Court. . . . The second is a withdrawal of a proposed preclearance submission, whereby a jurisdiction, upon be- ing queried by the DOJ regarding the submission, decides to withdraw it, inferring in many in- stances that it would otherwise result in an objection. . . . The third is a successful Section 5 en- forcement action. . . . The fourth is an 'observer coverage.'" *Id.* at 64-66.

372.    Congress heard testimony from Chandler Davidson summarizing the findings of the National Commission on the Voting Rights Act: 1) "The Justice Department sent 626 letters ob- jecting to one or more proposed discriminatory election changes in Section 5 jurisdictions[.] There were at least 225 withdrawals of one or more proposed changes since 1982[.]"; 2) "[w]hile jurisdictions seldom submitted changes to the U.S. District Court for the District of Columbia, since 1982, the court refused to approve 25 proposed changes"; 3) "The Commission identified 105 successful enforcement suits in nine states."; 4) "The Department of Justice sent several thousand federal observers in 622 separate Election Day 'coverages' when it had reason to ex- pect racial discrimination."; 5) "There have been 19 such actions since 1982. While few in num- ber, these suits have played an important role in changing the way voting officials do business in the jurisdictions where they have been filed"; 6) "A nationwide study conducted by the Univer- sity of Michigan Law School by Professor Ellen Katz and her students identified 117 reported suits between 1982 and 2005. Most of them targeted one or more form of minority vote dilution.

In the same period, research by the National Commission's staff revealed 653 successful Section 2 suits, reported and unreported, in nine Section 5 states alone." *Id.* at 210-212

373.    Congress heard testimony from Nadine Strossen that "[b]etween January 1, 2000 and January 1, 2005, the Attorney General interposed 40 objections, 37 of which involved a change made by a local entity." *March 8, 2006 Hearing Vol. I*, at 1290.

374.    Congress received testimony from Wade Henderson that in Texas "[o]f the one hundred and ninety-six objections since 1975, fifty-nine have been related to the districting or redistricting plans proposed at various levels of government, including seven statewide redistricting plans.  There have also been 12 DOJ objections interposed with regard to changes in voting procedure at the local level." *March 8, 2006 Hearing Vol. I*, at 63.

375.    Congress received testimony from Wade Henderson that "[s]ince 1982, one hundred and seven Section 5 objections have been interposed. . . .  [R]acially discriminatory election changes have increased since 1982 and repeat offenses are common. For example, of the 72 counties experiencing challenges to election changes, 28 have demonstrated a pattern of repeat offenses." *Id.*

376.    Congress received testimony from Anita Earls that "Section 5 objections since 1982 demonstrate that purposeful discrimination continues to occur in matters affecting voting.  In the nine states that are substantially covered, there were a total of 682 objections from 1982 to 2004. Many of these objections included testimony that the change was motivated by a discriminatory purpose.  One study of these objections reports that in the 1990's, fully 151 objections were based on purpose alone; another 67 objections relied on a combination of purpose and retrogression; and 41 on both purpose and the need to comply with Section 2.  Thus, the intent prong was