involved in a remarkable 74 percent of all objections in that decade." *May 16, 2006 Hearing*, at 3.

377.    Congress received testimony through the National Commission on the Voting Rights Act that "[o]ne important measure of the extent of voting discrimination of both types is the number of Section 5 objections interposed by the Department of Justice. Of the 1,116 objections from 1968 through 2004, prohibiting 1,589 proposed election changes submitted for preclear-ance, 626, or 56 percent of the total, occurred after August 5, 1982." *March 8, 2006 Hearing Vol. I*, at 219-220.

378.    Congress received testimony from Anita Earls that more than one-half million voters have been aided by Section 5 enforcement:  "DOJ objections since 2000 have protected 8,764 voters in Virginia, 10,518 voters in Georgia, and 12,756 voters in North Carolina.  During the same time period, nine objections to South Carolina submissions protected 96,143 African-American voters, two objections to Arizona submissions protected 163,647 Hispanic and Ameri-can Indian voters, and six objections to Texas submissions protected 359,978 African American and Hispanic voters.  Approximately thirteen school board members, twenty-seven local legisla-tors, and six state legislators have been determined by this activity.  In total, 663,503 minority voters in the last six years have been aided by Section 5 objections." *May 16, 2006 Hearing*, at 58.

379.    The Department of Justice has objected to more than 700 submissions of voting changes since 1982.  H.R. Rep. No. 109-478, at 36.

380.    Nadine Strossen, president of the ACLU testified that between January 1, 2000 and January 1, 2005, the Attorney General interposed 40 objections to voting changes nationwide, 37 of which involved a change made by a local entity and that such objections have the potential to

protect thousands of voters from unlawful discrimination. *March 8, 2006 Hearing Vol. I*, at 1290.

381.    Congress received testimony from Nathaniel Persily, who testified that "[o]f the 40 objections interposed by the Attorney General between January l, 2000 and January l, 2005, 37 involved changes made by a local, rather than a state government. *May 17, 2006 Hearing*, at 129-130.

382.    Congress received testimony from Assistant Attorney General Wan Kim on the pro-portion of preclearance submissions that involve redistricting:  "[I]n Calendar Year 2004, we re-ceived 5,2ll submissions, 242 of which involved redistricting plans.  In Calendar Year 2005, we received a total of 4,734 submissions, 125 of which involved redistricting plans.  In Calendar Year 2006, we already have received 4,094 submissions (as of May 5), 19 of which have been redistricting plans.  Perhaps not surprisingly, the number of section 5 submissions sent to the Department of Justice tends to reach its apex two years after the decennial Census, the point at which jurisdictions have the demographic data necessary to redraw their political districts.  For example, in 2002, we received 5,910 submissions, of which 1,138 were redistricting plans.  Simi-larly, in 1992, we received 5,307 submissions, 974 of which involved redistricting plans." *May 10, 2006 Hearing*, at 116.

383.    Wan Kim, Assistant Attorney General, presented testimony regarding the recent de-cline in the number of objections.  Kim stated that the objection rate reflects the wide-spread compliance with the Voting Rights Act on the part of covered jurisdictions. *May 10, 2006 Hear-ing*, at 8.

384.    Congress received testimony from Robert McDuff that a "recent study revealed that discriminatory purpose served as the basis for 43 percent of all objections made in the administrative preclearance process prior to the *Bossier II* ruling." *Id.* at 95.

385.    Congress received information that after 1990, DOJ increased the number of objections interposed on the basis of discrimination against Hispanic voters.  "Objections were interposed on this basis to statewide plans in Arizona, New Mexico, New York, and Texas, and to local plans for three counties and a community college district in Arizona, two counties in California, the New York City Council, and, in Texas, 11 counties, two cities (Dallas and Houston), four school districts, a water district, and plans for justices of the peace and constables in five counties. In contrast, during the same time period in the 1980s, objections based on discrimination against Hispanic voters were interposed to statewide plans in New York and Texas, and to local plans only for the New York City Council and one county in Texas." *October 18, 2005 Hearing*, at 1408-1409.

386.    Congress received information that, "[f]ollowing the statewide objections, the affected states uniformly complied with Section 5.  No state sought to implement a plan to which the Attorney General objected, and after the objections were interposed the states generally adopted new plans, which were precleared and then implemented. In a few instances, the objected-to plan was replaced for the 1992 elections by a plan ordered into effect by a federal district court based on exigent circumstances, i.e., there was insufficient time for the state to develop a remedial plan and hold elections as scheduled.  This occurred with respect to the Alabama congressional plan, the Arizona legislative plans, and the Texas House plan. Arizona and Texas subsequently adopted an obtained preclearance for remedial plans, while Alabama is con-

tinuing to implement the court-drawn plan for congressional elections." *October 18, 2005 Hearing*, at 1409.

387.    Congress received testimony that, "[f]rom April 1991 through June 1995, the Attorney General interposed Section 5 objections to 153 redistricting plans (for 122 different elected bodies) for counties, cities, and school districts, as well as plans used to elect certain other local officials.  These included objections to the plans for the three largest cities covered in whole or in part by Section 5, New York City and Dallas and Houston, Texas. Preclearance was granted to 2,279 local plans." *October 18, 2005 Hearing*, at 1410.

388.    Congress received a report by Luis Ricardo Fraga and Maria Lizet Ocampo titled "The Deterrent Effect of Section 5 of the Voting Rights Act:  The Role of More Information Requests" explaining that "[f]rom 1990 through July 29, 2005, 261,388 changes were submitted.  A total of 792 objections to these changes were made by the DOJ." *March 8, 2006 Hearing Vol. II*, at 2540.

389.    Congress heard testimony from Chandler Davidson on "three separate possible explanations" for the decline in objections: 1) "Since 2001 the Department of Justice has not been enforcing Section 5 as aggressively as it should." 2) "The Supreme Court's interpretation of what Section 5 means has changed." 3) ". . . covered jurisdictions have finally accepted Section 5 as a principle they must comply with whenever they make a voting change, like it or not, and they have developed an efficient procedure for substantially increasing the likelihood of preclearance." *May 9, 2006 Hearing*, at 62-64.

390.    Congress heard testimony from Anita Earls that "[t]here are also some issues of under-enforcement of Section 5, in circumstances where the Department should have objected, but failed to.  Because affected communities do not have the right under the statute to appeal the

grant of preclearance, there are many examples of minority community groups opposing voting changes as retrogressive where the Department has granted preclearance. In the Georgia Voter ID case, the submission of a law later enjoined by a federal district court on the grounds that the plaintiffs were likely to prevail on their claims that the law was an unconstitutional poll tax and that it lacked a rational basis, was precleared against the advice of career attorneys in the Department." *May 16, 2006 Hearing*, at 54.

391.    Congress heard testimony from Assistant Attorney General for Civil Rights, former Solicitor General of the United States and Law Professor, Drew Days that the number of "vastly underestimate the true degree to which covered jurisdictions are making voting changes that disadvantage minority voters. Even with vigorous enforcement by the Justice Department, hundreds of changes that would not meet Section 5 preclearance requirements are never submitted for consideration. Given time and resource constraints, the Justice Department is unable to ensure that every electoral change influencing minority voters will be subject to preclearance." *May 17, 2006 Hearing*, at 38.

392.    Congress received a statement supporting reauthorization from Senator Patrick Leahy of Vermont that summarized the testimony of Debo P. Adegbile. Senator Leahy stated that Adegbile "testified about some examples of the types of evidence in the record: The Record before this Congress presents continued evidence of such violations, and highlights the necessity for continued review of voting changes to protect minority voters in covered jurisdictions. For example, since the VRA's 1982 renewal, violations of minority voting rights have taken the form of last minute election date or polling place changes, discrimination at the polls, and familiar dilutive tactics of 'cracking' and 'packing' minority voting districts. Objections to voting changes interposed by DOJ are one category of evidence relevant to the persistence of discrimination in

covered jurisdictions. . . . [T]here have been more objections in covered jurisdictions since the last reauthorization in 1982—608—than there were before that reauthorization, including 80 statewide section 5 objections. However, these objections only reveal a chapter of a much longer story. . . . Excluded from the category of objection statistics are other categories of deterred and rejected voting changes. These include matters that were denied preclearance by the Washington D.C. District Court; matters that were settled while pending before that court; voting changes that were withdrawn, altered or abandoned after the DOJ made formal More Information Requests, MIRs; as well as any recognition that the very existence of preclearance deters discriminatory voting changes in the first place. Taken together, these categories provide a more holistic view of the sizeable impact, deterrent effect, and continued need for section 5's provisions. Moreover, without the section 5 preclearance provisions many jurisdictions that have experienced a long history of exclusionary practices in voting would have lacked the incentive to tailor their electoral changes in a non-discriminatory fashion. Even with section 5 in place, many covered jurisdictions made voting changes that disadvantaged minority voters without preclearing them with the DOJ. This is the Testimony of Debo P. Adegbile, Associate Director of Litigation of the NAACP Legal Defense and Educational Fund, Inc., before the United States Senate Judiciary Subcommittee on the Constitution, June 21, 2006, citing generally Luis Ricardo Fraga & Maria Lizet Ocampo, *More Information Requests and the Deterrent Effect of Section 5 of the Voting Rights Act*, June 7, 2006 unpublished essay, submitted to Senate Judiciary Committee on June 9, 2006." 152 Cong. Rec. S7746.

### (3)    Objections in Covered Jurisdictions Other than Texas

393.    Congress received testimony from Anita Earls that the proper way to measure the true impact of Section 5 is to "take into account all of the ways that the preclearance requirement operates to deter and prevent the use of voting practices that disadvantage minority voters." In ad-

dition to objections, she mentioned declaratory judgments barring the implementation of discriminatory laws, and the effect of More Information Requests that can lead to withdrawal of voting changes." *May 16, 2006 Hearing*, at 52.

394.    Congress received testimony that objection letters issued by the Department of Justice can serve as evidence of discrimination against minority voters. Such a letter implies that, at least one proposed change in the jurisdiction's submission would violate, on the basis of race or color or membership in a language-minority group, legally guaranteed voting rights of citizens. The targets of discrimination are virtually always racial minorities and language-minority citizens. In other words, Congress received testimony that each objection from the Department of Justice is an instance of vote discrimination that would have been perpetrated by local government officials were it not foiled by Section 5. *March 8, 2006 Hearing Vol. I*, at 171.

395.    Congress received testimony from Attorney Armand Derfner that Section 5 has prevented implementation of voting changes that would have diluted minority voting strength. He stated that "of the 1300+ changes to which the Attorney General has objected to date, the vast majority have involved changes in representational systems, or, to put it in plainer terms, gerrymanders and related tactics: redistricting; changes to at-large or multimember districts; annexations superimposed upon at-large election systems; majority-runoff requirements; and anti-single-shot methods such as full-slate laws and numbered places." Derfner further noted that "[s]ince an objection is the equivalent of a court injunction, the large number of objections shows how central the role of preclearance is in guarding the right to vote." *October 20, 2005 Hearing*, at 81-82.

396.    Congress received testimony through the National Commission on the Voting Rights Act that the decline in objections could be attributable to a variety of reasons (*Bossier Parish II*,

politicization of the Voting Section, jurisdictions having learnt their lesson). Nevertheless, the Commission noted that despite a general decline in objections beginning in the early nineties, there continues to be an appreciable number of interventions of various kinds by the Department of Justice and by private plaintiffs to prevent vote discrimination. And in the period from 1982 through 2004, more of these interventions occurred than in the Act's earlier years. *March 8, 2006 Hearing Vol. I*, at 200.

397. Congress received testimony from Anita Earls that "[t]he lower number of objections from 2005 is consistent with past patterns of the ebb and flow associated with decennial redistricting. Section 5 submissions and resulting objections are greatest in years immediately prior to and after redistricting cycles. In a mid-decade year, such as 2005, you would expect to see a smaller number of submissions and objections because there are significantly fewer redistrictings." *May 16, 2006 Hearing*, at 54.

398. Congress heard testimony from Anita Earls that "[m]any of the objections in the last ten years have involved statewide objections impacting minorities throughout the state. Objections at the state level also have prevented sophisticated attempts to disenfranchise minority voters. This is not merely a 'numbers' game. No single measure is determinative of the continuing need for reauthorization." *Id.* at 55.

399. Congress received testimony from Anita Earls that "[e]ven in light of the severe limitations on Section 5 review that occurred as a result of *Bossier II* . . . the Department of Justice has objected to fifty-four submissions since 2000 for changes to voting procedures from Alabama, Arizona, California, Georgia, Louisiana, North Carolina, South Carolina, Texas, and Virginia. These objections have ranged in subject from state and local redistricting, annexations, voting methods, voting time, poll place location, and in at least one occasion the absolute cancel-

lation of an election. Section 5 objections have functioned to aid small as well as large scale elections, shielding as few as 208 and as many as 215,406 voters with a single objection." *Id.* at 58.

400.    Congress heard testimony from Armand Derfner that "many of the recent objections have involved statewide voting changes, thus having the broadest effect on the most voters. These statewide objections have prevented many sophisticated efforts to disenfranchise minority voters[.]" *May 17, 2006 Hearing*, at 75.

401.    Congress heard from attorney Armand Derfner that "well over half of the objections have come since the last reauthorization of the Act in 1982, which makes it plain that the problem has not disappeared, and the need for preclearance continues today." *May 17, 2006 Hearing*, at 176.

402.    Congress heard testimony from Pam Karlan discussing the decline in the number of objections: "Now, some people have pointed to the fact that the number of objections has gone down over time, and they say, well, this shows that there is no necessity for the Act. To the contrary. If the Act worked perfectly, there would be no objections, because if the Act worked perfectly, local- and State-level officials would be deterred from proposing changes that they cannot show have neither a discriminatory purpose nor a discriminatory effect." *May 16, 2006 Hearing*, at 5-6.

403.    Congress received testimony from the Mexican American Legal Defense and Educational Fund (MALDEF), the National Council of La Raza (NCLR), the National Association of Latino Elected Officials (NALEO) and the League of United Latin American Citizens (LULAC) that "[t]oday, Latinos comprise the minority in a substantial number of single-member election districts across the country but have great difficulty exercising political influence in such districts or affecting the outcome of elections in these districts. It is exactly at the point at which Latino

voters can exercise political power by electing their preferred candidate that many jurisdictions respond with discriminatory measures. For Latinos, the greatest number of election changes blocked by the Justice Department under Section 5 deal with jurisdictions in which Latino voters have become numerous enough to elect their preferred candidate in one or more districts." *November 9, 2005 Hearing*, at 133.

404.    Congress received testimony from Robert McDuff that "some of the decrease in the number of objections may also be attributable to several recent Supreme Court cases that restricted the scope and reach of Section 5 including the *Bossier II* and *Georgia v. Ashcroft* rulings." *May 10, 2006 Hearing*, at 88.

405.    Congress received information that after 1990, DOJ increased the number of objections to Section 5 preclearance it interposed on the basis of discrimination against Hispanic voters. "Objections were interposed on this basis to statewide plans in Arizona, New Mexico, New York, and Texas, and to local plans for three counties and a community college district in Arizona, two counties in California, the New York City Council, and, in Texas, 11 counties, two cities (Dallas and Houston), four school districts, a water district, and plans for justices of the peace and constables in five counties. In contrast, during the same time period in the 1980s, objections based on discrimination against Hispanic voters were interposed to statewide plans in New York and Texas, and to local plans only for the New York City Council and one county in Texas." *October 18, 2005 Hearing*, at 1408-1409.

406.    Congress received testimony that, "[f]rom April 1991 through June 1995, the Attorney General interposed Section 5 objections to 153 redistricting plans (for 122 different elected bodies) for counties, cities, and school districts, as well as plans used to elect certain other local officials. These included objections to the plans for the three largest cities covered in whole or in

part by Section 5, New York City and Dallas and Houston, Texas. Preclearance was granted to 2,279 local plans." *October 18, 2005 Hearing*, at 1410.

407.    Wade Henderson submitted a report to Congress ("Voting Rights in Georgia, 1982-2006") which stated that since 1982, the Department of Justice filed five objections to municipal annexations, one objection to a municipal de-annexation and two objections to consolidations of cities and counties.  Henderson provided evidence that several of these objections involved clear evidence of a racially discriminatory purpose.  *March 8, 2006 Hearing Vol. II*, at 1515.

408.    Professor Nathaniel Persily testified before Congress that there was a need to reauthorize Section 5 because of its effect at the local level.  According to Persily, "the greatest effect of section 5 can be felt at the local level, where elections are usually nonpartisan and the stakes as viewed by the national parties and interest groups are seen as relatively low.  The overwhelming majority of preclearance submissions concern changes at the local level." *May 17, 2006 Hearing*, at 129.

409.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were seventeen counties in Alabama where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 74.

410.    Congress received testimony from a report commissioned by the Renew the VRA campaign that, in 2003, in Chilton County Alabama, the Chilton County Commission, under pressure from an all white group Concerned Citizens of Chilton County, sought to reduce the size of the Commission, restore the probate judge to an ex official chair and repeal cumulative voting in an effort to end the opportunity for African-Americans to elect candidates of choice. The U.S. Attorney General refused to preclear this scheme.  *March 8, 2006 Hearing Vol. I*, at 53.

411.    Congress heard testimony from Wade Henderson that, in 1991, the Department of Justice refused to preclear two redistricting plans submitted by the city of Selma, Alabama. Henderson testified that, in so doing, the Department found that the plans purposefully prevented African-Americans from electing the candidates of their choice by fragmenting the African-American voting population.  He testified that amended plans were eventually precleared and resulted in the election of black candidates to the Selma City Council.  *July 13, 2006 Hearing*, at 54.

412.    Congress received testimony from Fred Gray, civil rights attorney, about objections issued by the Department of Justice to voting changes in Alabama: "the Department of Justice has objected to redistricting plans as purposefully preventing African Americans from electing candidates of choice to a majority of the seats on the city council and county board of education. The Department objected to the Alabama Legislature's 1992 congressional redistricting plan on the ground that fragmentation of black populations was evidence of a 'predisposition on the part of the state political leadership to limit black voting potential to a single district.'  In 1998, the Department objected to a redistricting plan for Tallapoosa County commissioners on the ground that it impaired the ability of black voters to elect a candidate of choice in order to protect a white incumbent.  In 2000, the Department objected to annexations by the City of Alabaster, which would have eliminated the only majority black district . . . ." *May 17, 2006 Hearing*, at 189-190

413.    Congress heard testimony from civil rights attorney, Fred Gray describing the impact of the Voting Rights Act in Alabama:  "Since the 1982 reauthorization, the Department of Justice has interposed objections to forty-six submissions under Section 5.  In addition, DOJ has deployed observers to monitor elections throughout Alabama sixty-seven times since the time of

the last renewal. Moreover, federal courts have found several times that the State of Alabama and/or its political subdivisions were engaged in intentional discrimination. Although improve-ments have been made that have provided minority voters with greater access to the political process, these gains are owed, in large part, to the protections provided under the Voting Rights Act. Given this testimony, in combination with persistent racially polarized voting, I believe that there is a sound basis for this Congress to renew the Section 5 preclearance requirement." *May 17, 2006 Hearing*, at 90.

414.    Attorney Fred Gray testified before Congress that racial discrimination still persists in Alabama and there is a continued need for Section 5 because of such discrimination including multiple DOJ objections to redistricting plans (both statewide congressional and county plans). One particular example, Gray testified, is DOJ's 2000 objection to annexations by the city of Alabaster "which would have eliminated the only majority black district, demonstrating that the boundary manipulations of Gomillion are not a relic of the past, but is still presently in existence in our State." *May 17, 2006 Hearing*, at 4.

415.    Through a report submitted to Congress by Nadine Strossen, Congress received in-formation that in 1992, the Attorney General objected to a voting change in Wrightsville, Ala-bama which proposed the relocation of a precinct from the county courthouse to the racially seg-regated American Legion Hall. *March 8, 2006 Hearing Vol. I*, at 732.

416.    Gerry Hebert presented Congress with testimony that racial discrimination was not merely anecdotal by relating a case in which he represented a group of black voters in Alabama. The voters wanted to be annexed into a neighboring city, Foley, because the water in their cur-rent location was contaminated. DOJ had blocked some annexations because Foley refused to annex the black voters but did annex some white voters. Herbert stated "make no mistake, the

decision to try and keep [those Black voters] out was intentionally based on racial discrimination. [The City] didn't want that group of people voting in their elections." *May 4, 2006 Hearing Part I*, at 8.

417.    Congress received a report analyzing the effect of the Voting Rights Act on Alabama stating that "[a]fter publication of the 1990 Census, the battle to preserve white control in the Black Belt focused on Selma and Dallas County, the city and county where the Voting Rights Act was born in 1965 after the assault of peaceful marchers on the Edmund Pettus Bridge. The black population of Selma had increased from 52.1 percent to 58.4 percent, and the black population of the entire county had increased from 54.5 percent to 57.8 percent.  The Department of Justice refused to grant Section 5 preclearance to three different redistricting plans submitted by the Dallas County Board of Education and two different redistricting plans submitted by the city of Selma on the ground that they exhibited a purpose to prevent African Americans from electing candidates of their choice to a majority of the seats on both bodies. All the plans packed as many black voters as possible into a minority of districts, then fragmented the remainder of the black population. The plans that eventually were precleared at last provided black citizens an equal opportunity in these racially polarized constituencies and resulted in the election of black majorities on the Dallas County School Board and Selma City Council." *July 13, 2007 Senate Hearing*, at 378-379 (internal footnote omitted).

418.    Wade Henderson submitted a report to Congress ("Voting Rights in Alabama, 1982-2006") which noted that since 1982, "the Department of Justice has objected to 46 Section 5 submissions from Alabama, 7 from the state and 39 from local jurisdictions." *July 13, 2006 Hearing*, at 371.

419.    Wade Henderson submitted a report to Congress ("Voting Rights in Alaska, 1982-2006") which indicated that, absent Section 5 preclearance, retrogressive and discriminatory voting practices against Alaska Native voters would have been implemented with the approval of the Alaska courts. *March 8, 2006 Hearing Vol. I*, at 1312.

420.    The Senate heard testimony from Anita Earls who testified that "[i]n 2002, the DOJ objected to an Arizona plan for statewide redistricting which would have diminished the districts where Hispanics could elect their candidate of choice from eight districts to five districts. The plan would have made it so the Hispanic population, which constituted over 25 percent of the state's population, would have only been able to elect 16 percent of the state's congressional delegation." Earls testified that "[a] conservative estimate of 162,067 minority voters were protected in the three districts which were retained in the Arizona objection." *May 16, 2006 Hearing*, at 61.

421.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 2002, the Department of Justice objected to Arizona's state legislative redistricting plan because it fractured Hispanic voters and reduced Hispanic voting age population in 5 districts below their 1994 benchmarks, despite the growth of the State's Hispanic population and the ability to draw three compact majority-Hispanic districts. The State court responded by accepting an interim plan recommended by a Special Master that restored one district to its benchmark level and created 2 new Hispanic-majority districts in metropolitan Phoenix to replace some of the other four majority Hispanic-majority districts that had been eliminated." 152 Cong. Rec. S7748.

422.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1985, the Apache County Board of Supervisors proposed to eliminate the

last remaining polling place on Arizona's Fort Apache Reservation, reduce the daily hours of operation for those voting stations that remained open, and implement a rotating polling place system that would make it even harder for Navajo voters to reach the polls. Yet, absentee voting opportunities were not provided to Indian voters. Pointing to the clear discriminatory purpose and effect of the proposed changes, the Department of Justice objected." 152 Cong. Rec. S7748.

423.    Congress received testimony from Wade Henderson that DOJ has imposed 19 objections to voting changes submitted by the state of Arizona since 1982. *March 8, 2006 Hearing Vol. I*, at 259.

424.    Anita Earls testified that DOJ objected to a voting change in Arizona which would have reduced the number of districts where Hispanics could elect their candidate of choice from eight districts to five districts. According to Earls, the plan would have made it so that the Hispanic population which constituted over 25 percent of the state's population, would have only been able to elect 16 percent of the state's congressional delegation. *May 16, 2006 Hearing*, at 61.

425.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were a total of 24 objections, submission withdrawals, and declaratory actions favorable to minorities in Arizona between 1982 and 2004. *March 8, 2006 Hearing Vol. I*, at 273.

426.    During reauthorization, Congress considered a report which found the following regarding the effect of the Voting Rights Act in Arizona: "The Justice Department has objected to four statewide redistricting plans because of their discriminatory impact on language minority voting-age citizens, including one in the 1980's, two in the 1990's, and one in 2002. Over 80 percent of all Section 5 objections in Arizona have occurred since 1982. The Justice Department has

116

interposed Section 5 objections to discriminatory voting changes in seven of Arizona's 15 counties since 1982. Several of the post-1982 Section 5 objections have been directed at discriminatory practices with the purpose or effect of denying language assistance and other basic election access to limited-English proficient (LEP) American Indian voting-age citizens, such as discriminatory practices remedied in 1989 and 1994 cases brought by the Department of Justice." *March 8, 2006 Hearing Vol. I*, at 1366-1367 (internal formatting omitted).

427.    Congress received a report analyzing the effect of the VRA on Arizona which determined that "Northern Arizona has a lengthy history of discrimination against Navajo, Apache, and Hopi voters. In 1989 and 1994, successful cases were brought against Coconino, Navajo, and Apache Counties for denying American Indian voters access to the political process. Those same three counties account for nearly half of all of the post-1982 Section 5 objections in Arizona. Prior to 1998, all of the federal observers and monitors deployed to Arizona were sent to observe elections in Apache and Navajo Counties. As recently as 2002, the Department of Justice identified significant deficiencies in the availability and quality of language assistance offered to American Indian voters in Apache County." *March 8, 2006 Hearing Vol. I*, at 1379.

428.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were seven counties in Arizona where objections had been interposed against the county or a political unit located in the county. H.R. Rep. No. 109-478, at 75.

429.    Congress received testimony from Joaquin Avila that "[c]urrently, there is one Latino serving as a county supervisor" in Merced County, California. Avila testified that "[t]he empowerment of the Latina/o community in Merced County to participate in the political process and elect candidates of its choice was greatly facilitated by the issuance of a letter of objection by the Attorney General pursuant to Section 5" as it "prevented the implementation of a county

117

supervisor redistricting plan that fragmented a politically cohesive Latina/o voting community." *July 13, 2006 Hearing,* at 123.

430.    Through the National Commission on the Voting Rights Act, Congress received a prepared statement from voting rights attorney, Joaquin Avila, Assistant Professor of Law at Seattle University School of Law, referencing a 1993 DOJ objection to a proposed redistricting plan in Monterey County, CA. He noted that DOJ concluded that the proposed redistricting plan "appears deliberately to sacrifice federal redistricting requirements, including a fair recognition of Hispanic voting strength, in order to advance the political interests of the non-minority residents of northern Monterey County." *October 25, 2005 Scope Hearing Vol. II,* at 3310.

431.    The Senate Committee on the Judiciary received testimony from Joaquin Avila, Assistant Professor of Law at Seattle University School of Law, analyzing the effect of the Voting Rights Act in California since 1982. This report discussed the positive impact of an objection letter against a 1990 redistricting plan in Merced County that sought to fragment the Latino Community. As a result of the objection "the county submitted for Section 5 approval a redistricting plan that avoided the fragmentation of the Latina/o community in the city of Merced and included significant Latina/o communities within a majority Latina/o supervisor district. The new plan was approved and resulted in the election of a Latina supervisor." *July 13, 2006 Hearing*, at 107-108.

432.    The Senate Committee on the Judiciary received testimony from Joaquin Avila, Assistant Professor of Law at Seattle University School of Law, analyzing the effect of the Voting Rights Act in California since 1982. This report provided information about an objection made against proposed annexations by the City of Hanford, followed by "an unsuccessful effort to seek a withdrawal of the letter of objection and an accompanying Section 5 lawsuit, the city agreed to

implement a district based method of election. This districting plan ultimately resulted in the election of one Latina and one Latino to the City Council in a city containing a significant Latina/o population." *July 13, 2006 Hearing*, at 110-111.

433.    Through the National Commission on the Voting Rights Act, Congress received a prepared statement from voting rights attorney, Joaquin Avila, Assistant Professor of Law at Seattle University School of Law, stating that DOJ has issued four objection letters to proposed voting changes in California covered jurisdictions since 1982. Avila noted that two of these letters involved redistricting of county supervised elections in Merced and Monterey Counties. In both instances, the DOJ objection led to the election of a Hispanic candidate. *October 25, 2005 Scope Hearing Vol. II*, at 3302.

434.    Congress was presented with information that "[t]he U.S. Attorney General issued a letter of objection to a county supervisor redistricting plan that served as the catalyst for the adoption of a new redistricting plan. The implementation of the new non-discriminatory redistricting plan resulted in a historic election that provided the Latino community in Monterey County with a Latino county supervisor for the first time in over a hundred years." *July 13, 2006 Hearing*, at 106.

435.    Through the National Commission on the Voting Rights Act, Congress received a prepared statement from voting rights attorney, Joaquin Avila, Assistant Professor of Law at Seattle University School of Law, referencing a 1992 DOJ objection to a proposed redistricting in Merced County, CA. Under the proposed redistricting, there was no majority Hispanic district even though the Hispanic population had grown significantly and the county demographer had proposed a more equitable redistricting. *October 25, 2005 Scope Hearing Vol. II, at 3306.*

435A.  Through the National Commission on the Voting Rights Act, Congress received the prepared statement of Robert Rubin, referencing DOJ's objection to Chualar Union Elementary School District's attempt to re-institute at-large elections.  Rubin states that DOJ "found evidence that the petition drive to make the change to at-large elections 'was motivated, at least in part, by a discriminatory animus.'  The cover letter for the petition drive 'attacked the credibility of the trustees from that district, citing the language skills of one trustee and making unfavorable references to the language preferences of another.'  The DOJ also found that 90% of the persons who signed the petition were non-Spanish surnamed people who lived outside the district."  *October 25, 2005 Scope Hearing Vol. II, at 3326.*

436.    Wade Henderson submitted a report to Congress ("Voting Rights in Florida, 1982-2006") which stated that "[a]s a result of the Section 5 objection to Florida's 1992 state reapportionment plan, the state created a majority-minority state senate district in the Tampa Bay/Hillsborough County area where previously none had existed even though black and Hispanic persons constituted more than 40.1 percent of the voting-age population in the area and the legislative record showed that the redistricting had been undertaken with the purpose of protecting white incumbents."  *March 8, 2006 Hearing Vol. II, at 1458.*

437.    In an appendix to the statement of Wade Henderson, Congress received information from a report commissioned by the Leadership Conference on Civil Rights analyzing Section 5 objections to Florida's administration of elections: "the Department of Justice [objections] to Florida election procedures was directed at three of thirty-seven changes proposed by Florida to the administration of absentee ballots in 1998. . . .  The three provisions to which DOJ objected placed heavy emphasis on literacy skills, ability to provide a Social Security number and a witness's signature."  *Id.* at 1467.

438.    Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that Congress received a report analyzing the effect of the Voting Rights Act on Florida which found that the Department of Justice's objection to Florida's 2002 state reapportionment plan resulted in the preservation of a Hispanic majority state house of representatives district in Collier County which the state had planned to eliminate. *Id.* at 1458.

439.    Congress received a report commissioned by the Leadership Conference on Civil Rights discussing Florida's history under Section 5 which noted that, "[s]ince 1982 the Department of Justice has objected to five voting changes in Florida. The Department directed only one of its five objections at a change enacted by one of the five counties, and it later withdrew that objection. The Department of Justice directed the remaining four objections at statewide reapportionment plans and legislation affecting the administration of elections. Significantly, the Department of Justice has been compelled to object to both of the statewide reapportionment plans submitted by Florida after the last two decennial censuses[.]" *Id.* at 1464-1465.

440.    Congress received testimony from Wade Henderson that as a result of the DOJ's Section 5 objection to the 2002 reapportionment plan for Collier County, Florida, the Hispanic minority-majority district was preserved and its existence is attributable solely to the Department of Justice's Section 5 review. *March 8, 2006 Hearing Vol. I,* at 61

441.    Congress received testimony from Wade Henderson that in 1998, DOJ objected to three provisions in a statewide Voter Fraud Act in Florida that placed heavy emphasis on literacy, ability to provide a social security number, and a witness' signature—provisions that disproportionately affected minority voters. *Id.* at 62.

442.    Congress received a report commissioned by the Leadership Conference on Civil Rights indicating that the "Department of Justice interposed an objection to the 2002 redistricting

plan for the Florida House of Representatives, stating that the plan reduced 'the ability of Collier County Hispanic voters to elect their candidate of choice [and] the drop in Hispanic population in the proposed district will make it impossible for these Hispanic voters to continue to do so." As a result of the DOJ's Section 5 objection to the 2002 reapportionment plan, the Hispanic minority-majority district was preserved in Collier County and its existence is attributable solely to the Department of Justice's Section 5 review. *March 8, 2006 Hearing Vol. II*, at 1466.

443.    Congress received testimony from a report commissioned by the Leadership Conference on Civil Rights that indicated that, "[i]n addition to objecting to both of Florida's reapportionment plans since 1982, the Department of Justice has also twice interposed objections to election legislation that adversely affects minority voters.  In the first instance, DOJ objected to a prospective change in Florida legislation that would prevent absentee voters from receiving assistance in marking their ballots from persons of their choice in violation of Section 208 of the Voting Rights Act." *Id.* at 1467.

444.    Congress received testimony from Theodore Shaw discussing the benefits of the VRA in the Latino Community.  For example, he discussed the 1998 Department of Justice objection to the burden on Latino voters of the additional state requirements for the absentee voting certificate, absentee balloting, and a corresponding criminal penalty in Collier, Hardee, Hendry, Hillsborough, and Monroe Counties in Florida. *November 9, 2005 Hearing*, at 17 & n.2

445.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were forty-seven counties in Georgia where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 75.

446.    Congress received a report analyzing the effect of the Voting Rights Act on Georgia. This report discussed vote discrimination in the city of Augusta, Georgia, where, in addition to

two Section 2 lawsuits settled in 1988, in 1987, the DOJ objected to "eight annexations [that were] enacted with a 'racial quota' policy[.]" The DOJ also lodged "a 1988 objection to [a] referendum election schedule and a 1989 objection to the city's consolidation with Richmond County. The series of racially-charged political battles as the city of Augusta developed a black population majority exemplify the tensions that can arise when jurisdictions approach majority-black status and how the Voting Rights Act checks the unfortunate impulse to frustrate black political empowerment that regularly has arisen in Georgia (as it has elsewhere)." *March 8, 2006 Hearing Vol. II*, at 1503.

447.    Through a report submitted to Congress by Nadine Strossen, Congress received information that "the three-judge court [in *Larios v. Cox*, 314 F. Supp. 2d 1357 (N.D. Ga. 2004)] agreed that court ordered plans should 'comply with the racial-fairness mandates of § 2 of the Act, as well as the purpose-or-effect standards of § 5,' and instructed the special master to draw another plan taking into account the unnecessary pairing of incumbents." *March 8, 2006 Hearing Vol. I*, at 530.

448.    Congress received a report on the effect of the Voting Rights Act in Georgia which found that since 1982, the Department of Justice has interposed ninety-one Section 5 objections in Georgia. Most of these objections were directed at methods of election changes including: at-large elections, numbered posta, staggered terms, majority vote requirements, and redistrictings. Other categories of voting changes receiving objections includes annexations, deannexations and consolidations, and judicial seats. *March 8, 2006 Hearing Vol. II*, at 1503-1506.

449.    Wade Henderson submitted a report to Congress ("Voting Rights in Georgia, 1982-2006") which indicated that the Department of Justice objected to a number of voting changes in Georgia between 1982 and 1995 including objections to proposed election schedules, candidate

educational requirements, voter registration procedures and polling place changes.  Henderson

presented testimony that DOJ found a number of these objections pointed directly or indirectly to

evidence that state and local election officials acted for racially discriminatory reasons.  *Id.* at

1515-1518.

450.    Congress received testimony from attorney Laughlin McDonald regarding the redis-

tricting plan at issue in *Georgia v. Ashcroft*.  McDonald stated that Georgia, a state covered by

Section 5, attempted "to manipulate the laws to diminish the protections afforded racial minori-

ties."  McDonald stated that in the brief filed by the state in the Supreme Court "[o]ne of the

state's arguments was that the retrogression standard of Section 5 should be abolished in favor of

an 'equal opportunity' to elect standard which it defined as a '50-50 chance of electing a candi-

date of choice.'"  McDonald noted that, since blacks are primarily elected from majority black

districts, if the state were allowed to adopt a 50-50 plan, the number of blacks elected to the leg-

islature would be essentially cut in half.  He also noted that, for this reason, "[t]he Supreme

Court rejected the state's invitation to rewrite Section 5."  *October 25, 2005 Scope Hearing Vol.

II*, at 3232-3234

451.    Nadine Strossen testified before Congress that following the 2000 Census, the City of

Albany, Georgia, adopted a new redistricting plan for its mayor and commission to replace an

existing mal-apportioned plan, but DOJ rejected it under Section 5.  Ms. Strossen presented tes-

timony that DOJ noted that while the black population had steadily increased in Ward 4 over the

past two decades, subsequent redistricting had decreased the black population "in order to fore-

stall creation of a black district."  *March 8, 2006 Hearing Vol. I*, at 1291; *see also March 8, 2006

Hearing Vol. I*, at 24 (testimony of Nadine Strossen).

452.    Congress received the Georgia State Report analyzing the effect of the Voting Rights Act in Georgia which noted: "It is critical to recognize circumstantial evidence of intentional discrimination by state and local officials, inasmuch as the days of overt public statements of racial antipathy (largely) have passed." For example, several methods of election objections involved efforts to add at-large seats to single-member district plans under circumstances that strongly suggested a discriminatory purpose. "The July 1992 objection for the Effingham County Commission blocked an attempt to change the county's then-existing five-member single-member district plan (which had been adopted in response to a vote dilution lawsuit) to a mixed plan with five single-member districts and an at-large chair to be elected with a majority vote requirement." *March 8, 2006 Hearing Vol. II*, at 1507.

453.    Through the National Commission on the Voting Rights Act, Congress received the written statement of voting rights attorney, Debo Adegbile stating that "[a]fter a 1991 Section 5 objection to its attempt to pack African-American voters in the city of Bastrop in Louisiana, the Morehouse Parish Police Jury made cosmetic changes and resubmitted the same plan. The DOJ objected again, and the police jury again resubmitted the same plan with only cosmetic changes. Only after the DOJ objected a third time in 1992 did the police jury address the substance of the first objection and draw district lines that did not over-concentrate African-American voters." *March 8, 2006 Hearing Vol. IV*, at 4540.

454.    Congress received information submitted by the National Commission on the Voting Rights Act, and authored by Debo Adegible, that "[b]etween 1982 and 2003, the DOJ was compelled to object to 33 parish school board redistricting and expansion plans proposed by 23 parishes and one city, 31 parish police jury redistricting and reduction plans proposed by 20 parishes, 7 parish council redistricting and reduction plans proposed by 6 parishes, 11 city and town

125

council redistricting plans proposed by 10 cities and towns, 2 board of alderman redistricting plans proposed by two cities, and 6 annexations proposed by the City of Shreveport[, Louisiana] alone." *March 8, 2006 Hearing Vol. IV*, at 4527.

455.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "in 1993, the Bossier Parish [Louisiana] School Board had cracked African-American population concentrations so effectively that the parish still had no African-American opportunity districts at all, despite an African-American population of 20 percent, a 12-member school board, and the availability of an alternative plan that would have drawn two compact majority African-American districts." *March 8, 2006 Hearing Vol. II*, at 1614.

456.    Through the National Commission on the Voting Rights Act, Congress received the written statement of voting rights attorney, Debo Adegbile, stating that "[i]n 1991 the DOJ objected that the [Louisiana] House redistricting plan prioritized compactness when that meant fragmenting an African-American population concentration among three districts in the north-central part of the state, but had no problem abandoning compactness to fragment African-American population southward in the Delta Parishes. Assistant Attorney General John R. Dunne wrote in his objection letter that 'the decision to apply or deviate from the criteria in each instance tended to result in the plan's not providing African-American voters with a district in which they can elect a candidate of their choice.'" *March 8, 2006 Hearing Vol. IV*, at 4542.

457.    Congress received a report, *Voting Rights in Louisiana: 1982-2006, Renew-TheVRA.org*, prepared by Debo Adegbile. This report discussed an objection against a voting change in St. Landry, Louisiana. Adegbile observed that "[i]n 1994, the St. Landry Parish Police Jury was advised by a white alderman in the town of Sunset that whites were uncomfortable walking into an African-American neighborhood to vote at the Sunset Community Center. With-

out holding a public hearing, seeking any further public input, or advertising the change in any way, the police jury moved the polling place to the Sunset Town Hall. African-American leaders in Sunset did not hear of the change until informed of it by DOJ officials performing a Section 5 preclearance review, at which time they 'expressed vehement opposition' to the change, because the proposed new Town Hall had been the site of historical racial discrimination and many African-American citizens did not feel welcome there. As the DOJ pointed out in its objection letter, 'the decision-making process considered the presumed desires of white voters, but made no effort to consider the desires of African-American voters.' If not for the light shone by the Section 5 preclearance process, African-American voters might not have known of the change until after they arrived at the wrong polling place on election day in 1994, at which point the retrogressive impact would have already been felt." Adegbile noted that in the absence of a strong Section 5, "under cover of darkness, jurisdictions such as St. Landry Louisiana would be free to make small changes that would have the pronounced impact of narrowing the opportunities for African Americans to participate in the political process." *Continued Need Hearing II*, at 1623.

458.    Gerry Hebert, former DOJ attorney in the Voting Rights Section, testified to Congress regarding DOJ's objection to a 1992 voting change in Effingham County, Georgia from five single-member districts (which were adopted in response to a vote dilution lawsuit) to four single member districts and a chairperson elected at-large. Hebert noted how the impetus for this change was to discriminate against minority voters and that this action was relatively recent in history. *May 4, 2006 Hearing Part I*, at 8.

459.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General objected to a de-annexation of 196 acres in Jones County from the city of Macon, Georgia because the Attorney General found that the city's alleged goal

of removing a state legislator from the delegation "could have been accomplished through alternate and much less drastic means," and "that race may well have been not only a factor, but a principal factor, in the de-annexation decision." *March 8, 2006 Hearing Vol. I*, at 604.

460.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, in 1983, the Attorney General objected to a voting change in Kingsland Georgia because of the presence of racial bloc voting. *March 8, 2006 Hearing Vol. I*, at 640.

461.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, in the 1970's, the DOJ objected to several voting changes submitted by East Dublin, Georgia including staggered terms and the postponement of city elections. Strossen further testified that for several years East Dublin once again tried to implement some of these changes and DOJ once again objected because the city could not present a non-racial reason for the change. *March 8, 2006 Hearing Vol. I*, at 736.

462.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1992, Effingham County, Georgia proposed an at-large election system despite anticipating that, due to racially polarized voting, after the change, African-Americans would no longer be able to elect the commissioner who would serve as chairperson. This decision came on the heels of the county's decision to eliminate the position of vice-chairperson, long held by an African-American commissioner. The county's justification for the change—that the proposed system would avoid tie votes in the selection of a chairperson—was tenuous at best because under the new system, an even number of commissioners would invite tie votes to a greater extent than the existing system. This is Robert Kengle, 'Voting Rights in Georgia: 1982-2006,' RenewTheVRA.org at 9-10." 152 Cong. Rec. S7749.

463.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In the post-1990 redistricting cycle, the Department of Justice objected to Georgia's Senate redistricting bill twice and to Georgia's House redistricting bill three times. The newly adopted plans were then challenged by litigation in which the state admitted to constitutional violations. After losing the lawsuit, the state claimed to remedy the problem. However, its newly adopted plans reduced the black populations of numerous districts, thereby drawing DOJ objections to both plans yet again in March 1996. This is from Robert Kengle, 'Voting Rights in Louisiana [sic]: 1982-2006,' RenewTheVRA.org at 14." 152 Cong. Rec. S7746-S7747.

464.    Congress received testimony from Wade Henderson that since 1982, Section 5 objections against voting changes in Georgia have included at-large elections, majority vote requirements, numbered posts, at-large elections in combination with residency districts, majority vote requirements in combination with numbered posts and staggered terms, and redistricting. *March 8, 2006 Hearing Vol. I*, at 62

465.    Congress received testimony from Wade Henderson that in 2002, DOJ objected to a redistricting plan that reduced the black population in one ward from 51% to 31% in the city of Albany, (Dougherty County) Georgia. Henderson observed that the proposed change sought to forestall the creation of an additional black district (blacks made up 60.2% of the voting age population in Albany in 2000 and 57.3% of the registered voters in the city at the time of the submission of the plan). *Id.* at 63.

466.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, in a 1982 letter from William Bradford Reynolds, Assistant Attorney General, to

Terry K. Floyd, Glynn County Attorney, the Department of Justice denied preclearance for a proposed change by Glynn County and Brunswick to consolidate their governments. *Id.* at 703.

467.    Congress received testimony from Wade Henderson that in 1992, DOJ objected to a polling place change for Johnson County, Georgia, in which the officials sought to move a polling place for the Wrightsville precinct from the county courthouse to an American Legion Hall, which had a well-known reputation in the county for racial hostility and exclusion. *Id.* at 63.

468.    Congress received testimony from Wade Henderson that objections have been made to statewide redistricting plans in Georgia in each of the redistricting cycles since 1982. *Id.*

469.    Congress received a report analyzing the effect of the Voting Rights Act in Georgia. This report found that: "Between 1982 and the present, there were 91 Section 5 objections in Georgia. It is most useful to discuss these objections according to the type of voting change, as is done below. But it is important to note first that the great majority of Section 5 objections have affected local governments. While twenty-three of these objections involved federal and state offices and procedures, another twenty-six involved county-level offices and procedures and forty-two involved changes at the municipal level. When discussing Section 5, there is a natural tendency to focus upon statewide changes, in particular Congressional and state legislative redistricting plans, but Section 5 is just as crucial—if not more so—at the local level as it is at the statewide level." *March 8, 2006 Hearing Vol. II*, at 1503-1505.

470.    Congress received a report analyzing the effect of the Voting Rights Act on Georgia. The report found that between 1982 and the time of the report: "[t]hirty-two method of election objections blocked a variety of discriminatory election features. Overall, twenty objections involved majority vote requirements (that is, alone or in combination), thirteen involved numbered

post requirements, three involved staggered term requirements and fourteen involved at-large election requirements." *Id.* at 1506.

471.     Congress received a report analyzing the effect of the Voting Rights Act in Georgia. This report discusses the number of objections that blocked two or more discriminatory changes: "in eleven cases, Section 5 objections blocked combinations of *two* discriminatory features: five objections were based upon the adoption of a majority vote requirement in combination with numbered posts, four cited the adoption of a majority vote requirement in combination with at-large elections and two were based upon the adoption of at-large elections in combination with residency districts (the functional equivalent of numbered posts). In four other cases, Section 5 objections blocked combinations of three discriminatory features: two objections cited the adoption of a majority vote requirement in combination with both numbered posts and staggered terms and two other objections blocked combinations of numbered posts, at-large seats, and majority vote requirements." *Id.* at 1506-1507.

472.     Wade Henderson submitted a report to Congress ("Voting Rights in Georgia, 1982-2006") which indicated that since 1982 there have been 14 objections to local redistricting plans in Georgia including objections to county, board of education and municipal redistricting plans. *Id.* at 1512-1513.

473.     Wade Henderson submitted a report to Congress ("Voting Rights in Georgia, 1982-2006") which indicated in the 1980's there were six redistricting objections in Georgia. Henderson provided additiona information that in Georgia during 1990's there were three redistricting objections and there have been five redistricting objections from 2000 onward. The report indicated that some of these objections involved compelling evidence of a racially discriminatory purpose. *Id.*

474.    Wade Henderson submitted a report to Congress ("Voting Rights in Georgia, 1982-2006") which indicated that the Department of Justice objected to a retrogressive voting change in January 2000 in Webster County, Georgia.  Henderson testified that local officials tried to re-draw the district plan because a third black member had recently been elected to the school board.  Henderson stated that the local officials said the plan had to be redrawn because it was malapportioned, however, the plan at a 5% deviation was well within constitutional limits while the newly proposed plan had a 13% deviation.  *Id.* at 1514.

475.    Through a report submitted to Congress by Nadine Strossen, Congress received in-formation that in a 1982 letter from William Bradford Reynolds, Assistant Attorney General, to Terry K. Floyd, Glynn County Attorney, the Department of Justice denied preclearance for a proposed change by Glynn County and Brunswick to consolidate their governments.  *Id.* at 703.

476.    Through a report submitted to Congress by Nadine Strossen, Congress received in-formation that that in a 1982 letter from William Bradford Reynolds, Assistant Attorney General, to Howard E. McClain, the Department of Justice denied preclearance to proposed changes by annexation to the city of Adel, Georgia because of their potential to dilute black voting strength[.]  *Id.* at 668.

477.    Through a report submitted to Congress by Nadine Strossen, Congress received in-formation that, in 1973, the Department of Justice had objected to majority vote and numbered post requirements adopted in Hogansville, Georgia, another Troup County town, after a black candidate was first elected to office[.]  *Id.* at 851.

478.    Through a report submitted to Congress by Nadine Strossen, Congress received in-formation that, in 1987, the City of Rome, Georgia sought to implement staggered terms for

school board members, but was stopped from doing so by an objection of the Attorney General. *Id.* at 698.

479.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, in a 1972 letter from David L. Norman, Assistant Attorney General, to Jerry Daniel, the Department of Justice denied preclearance to a proposed voting change by Waynesboro, Georgia, because the Attorney General could not conclude that it did "not have the purpose or effect of abridging rights on account of race." *Id.* at 615.

480.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General approved the districting plan for Millen, Georgia, but objected to the schedule of elections on the grounds that the new plan would not be fully implemented until 1995.  The Attorney General further noted that the city had not carried its burden of showing that the delay "has neither a discriminatory purpose nor a discriminatory effect." *Id.* at 728.

481.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Department of Justice approved the adoption of single member districts for the Hinesville, Georgia City Council, but objected to the majority vote requirement for mayor. *Id.* at 739.

482.    Through a report submitted to Congress by Nadine Strossen, Congress received information that Marion County, Georgia, argued that the reduction in black population in District 4 was unavoidable due to a decline in the overall black population of the county, but the Department of Justice disagreed and objected. *Id.* at 751.

483.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, after the 2000 Census, the Putnam County (Georgia) redistricting plan was sub-

mitted for preclearance. The Department of Justice objected, concluding that black voters had elected candidates of their choice in the majority black districts. The Department further stated that its "statistical analysis also shows that white voters do not provide significant support to candidates supported by the minority community." *Id.* at 787.

484.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General objected to Griffin, Georgia's proposed plan (four single-member districts and one at-large seat), finding that "[e]ven though the black population has increased to 42 percent of the city, only one district has been created with sufficient black population to constitute a voting age majority and, thus, allows blacks a realistic opportunity to elect a candidate of their choice to office." *Id.* at 808.

485.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General precleared the Butler, Georgia submission, except the majority vote requirement for mayor, concluding: "[t]he city has not demonstrated that the adoption of a majority vote requirement for mayoral elections will not 'lead to a retrogression in the position of . . . minorities with respect to their effective exercise of the electoral franchise." *Id.* at 830.

486.    Through a report submitted to Congress by Nadine Strossen, Congress received information that Lumber City, Georgia, submitted a number of voting changes to the Department of Justice for preclearance, including the majority vote and numbered post requirements, but the Attorney General objected to both in a July 1988 letter noting the presence of racially polarized voting in city elections. *Id.* at 834.

487.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Lyons, Georgia city council plan was submitted for preclearance, but the Attorney General predictably objected in November 1985, because of the "excessive concentration

of blacks in a single district and no potential for meaningful voter participation of blacks in any other." *Id.* at 846.

488.     Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General objected to the city of LaGrange, Georgia's plan to retain two at-large city council seats because "the City had not shown that the retention of two at-large seats for the council would not cause dilution of minority voting strength[.]" *Id.* at 851.

489.     Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General objected to the numbered post and majority vote requirements adopted in 1968 in Jesup, Georgia because "racial bloc voting . . . appears to exist in the city," and "the addition of numbered posts and a majority vote requirement eliminates the ability of black voters to single-shot vote for candidates of their choice and, therefore, is retrogressive, thereby having the prohibited racial effect." *Id.* at 869.

490.     Through a report submitted to Congress by Nadine Strossen, Congress received information that, while the Department of Justice approved most of the Louisiana Plan on November 21, 1994, it objected to a provision of the law which required first time voters who had registered by mail to present photo identification at the polls. *Id.* at 884.

491.     Through a report submitted to Congress by Nadine Strossen, Congress received information that the Department of Justice objected to the 1993 proposed redistricting plan for Randolph County on the grounds that it unnecessarily fragmented the black population in one of the previously majority black districts. *Id.* at 790.

492.     Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1987, the Department of Justice objected to Augusta, Georgia's "ambitious annexation program." This objection was later withdrawn as part of a court settlement. *Id.* at 793.

135

493.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the election plan for the city of Newnan, Georgia was submitted to the Attorney General for preclearance, who objected to it in August 1984. *Id.* at 672.

494.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1995, Jenkins Parish, LA, attempted to relocate a polling place from a predominately black community easily accessible to many voters by foot to a location outside the city limits in a predominately white neighborhood which had no sidewalks, curving roads, and a speed limit of 55 mph. The Attorney General rejected the change, concluding, 'the county's proffered reasons for the selection of this particular polling site appear to be pretextual, as the selection of this location appears to be designed, in part, to thwart recent black political participation.' This is Deval L. Patrick, Assistant Attorney General, to William E. Woodrum, Jenkins County Attorney, March 20, 1995." 152 Cong. Rec. S7748.

495.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "After finding Point Coupee Parish, Louisiana's redistricting plans retrogressive, the Department of Justice objected 3 decades in a row: in 1983, 1992, and 2002. After the first 2 census cycles, the parish attempted to pack minority voters into a single district while fragmenting the remaining African-Americans into majority-white districts. In 2002, without explanation, the parish eliminated one majority African-American district, despite an increase in the African-American population of the parish. Unfortunately, the experience in Point Coupee Parish is typical in Louisiana: '[b]etween 1982 and 2003, 10 other parishes were 'repeat offenders,' and 13 times the DOJ noted that local authorities were merely resubmitting objected-to proposals with cosmetic or no changes.' This is Debo P. Adegbile, 'Voting Rights in Louisiana: 1982-2006,' RenewTheVRA.org at 27." 152 Cong. Rec. S7747.

496.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1991 and 1992, the Morehouse Parish, Louisiana, Police Jury drew district lines in an attempt to pack African-American voters in the city of Bastrop multiple times in defiance of DOJ objections.  After a 1991 section 5 objection to its attempt to draw the same districting plan several times the Morehouse Parish Police Jury made cosmetic changes and resubmitted the same plan.  After DOJ lodged another objection, the police jury resubmitted the same plan with only cosmetic changes.  Only after DOJ objected a third time in 1992 did the police jury address the substance of the first objection and draw district lines that did not result in an over-concentration of African-American voters."  152 Cong. Rec. S7747.

497.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 2005, DOJ objected to the redistricting plan for the Town of Delhi, LA, which eliminated an African-American opportunity district, rejected an alternative plan which would have been better for minority voters, and was adopted with the intent to worsen the position of minority voters.  According to the 2000 Census, Delhi's population was majority African-American, yet local officials attempted to reduce minority voting strength in the town.  DOJ denied pre-clearance after determining that town officials sought to worsen the position of minority voters by looking first to the historical background of the city's decision, which revealed that the plan was adopted despite steadily increasing growth in the town's African-American population. In its April 25, 2005, objection letter, DOJ stated, '[w]ithout question, Black voters are worse off under the proposed plan,' which was adopted despite the counsel of the Town's demographer, who noted the retrogressive effect of the plan.  This is from a Letter from R. Alexander Acosta, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to David Creed,

Executive Director, North Delta Regional Planning and Development District, April 25, 2005."
152 Cong. Rec. S7747-S7748.

498.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in the case of *Wright v. City of Albany, Georgia,* 306 F. Supp. 2d 1228 (M.D. Ga. 2003), "in implementing a court ordered plan for the City of Albany in 2003, the court emphasized that '[i]n drawing or adopting redistricting plans, the Court must also comply with Sections 2 and 5 of the Voting Rights Act.' Under the court ordered plan, blacks were 50% of the population of Ward 4, and a substantial majority in four of the other wards." *March 8, 2006 Hearing Vol. I,* at 420.

499.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in the case of *Maher v. Avondale Estates, Georgia,* No. 1:98-CV-2584 (N.D. Ga.), *refiled and assigned* No. 1:00-CV-1847 (N.D. Ga. 2000), "one of the mechanisms employed to exclude black homeowners was a municipal ordinance . . . that prohibited the display of yard signs and thus limited information about real estate available for purchase." *Id.* at 679.

500.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1990, the city of Monroe, LA attempted to annex white suburban wards to its city court jurisdiction. In its objection, DOJ noted that the wards in question had been eligible for annexation since 1970, but that there had been no interest in annexing them until just after the first-ever African-American candidate ran for Monroe city court. This is Debo P. Adegbile, 'Voting Rights in Louisiana: 1982-2006,' RenewTheVRA.org at 24." 152 Cong. Rec. S7749.

501.    Congress received testimony from Debo Adegbile that "every statewide redistricting for the Louisiana House of Representatives since the VRA was passed has initially been met with an objection; this is but one illustration of the level of entrenchment of voting discrimina-

tion in that State, where more than half of the parishes have received objection letters." *May 4, 2006 Hearing Part I*, at 49.

502.    Congress received testimony from Wade Henderson that DOJ has imposed 103 objections against voting changes submitted by the state of Louisiana. *March 8, 2006 Hearing Vol. I*, at 259

503.    Congress received testimony that there were a total of 129 objections, submission withdrawals and declaratory judgment actions favorable to minorities in Louisiana between 1982 and 2004. *May 17, 2006 Hearing*, at 273.

504.    Wade Henderson presented testimony to Congress that there is a continuing need for Section 5 as evidenced by the fact that 60% of all the Section 5 objections filed in Louisiana occurred after the 1982 reauthorization of the Voting Rights Act. *March 8, 2006 Hearing Vol. I*, at 46.

505.    Debo Adegbile testified before Congress that since the enactment of the Voting Rights Act every statewide redistricting plan for the Louisiana House of Representatives has initially been met with an objection.  Moreover, Adegbile stated, more than ½ of Louisiana's parishes have received objections to some of their proposed voting changes.  *May 4, 2006 Hearing Part I*, at 49.

506.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there was a total of 129 objections, submission withdrawals and declaratory judgment actions favorable to minorities in Louisiana between 1982 and 2004. *March 8, 2006 Hearing Vol. I*, at 273.

507.    Congress was presented with testimony in the form of a report, *Voting Rights in Louisiana: 1982-2006, RenewTheVRA.org*, authored by Debo Adegbile that indicates that the Civil

Rights Division of the Department of Justice "has objected to discriminatory voting changes by Louisiana officials 146 times since Section 5 coverage of the state began, and . . . 96 times since Section 5 was last renewed in 1982. In other words, 65 percent of the objections interposed against Louisiana have occurred since Congress last acted to extend VRA protections to minority voters." *March 8, 2006 Hearing Vol. II*, at 1611.

508.    Congress received a report about the *Voting Rights in Louisiana: 1982-2006* which explains that, the pre-VRA tests and devices used to disfranchise Blacks were "not the last variations on the disfranchisement theme," since, "[i]n 1968, after the enactment of the VRA, Louisiana began a new phase of its campaign to minimize the African-American vote by passing state laws that enabled parish councils and school boards to switch to at-large elections that submerged newly-registered African-American voters in white majorities. If the laws had not been immediately nullified by two DOJ objections under Section 5, in Louisiana, the VRA might have represented little more than an occasion for another change in the strategy by which white officials perpetuated barriers to political equality." *March 8, 2006 Hearing Vol. II*, at 1599.

509.    Congress received written testimony from Theodore Shaw, who noted that "in 2001, the Louisiana State Legislature unsuccessfully sought judicial preclearance of its statewide redistricting plan for the Louisiana House of Representatives from a three-judge panel in the District Court for the District of Columbia. The proposed plan eliminated a majority Black district in Orleans Parish that provided African-American voters the opportunity to elect candidates of their choice. Ultimately, the litigation resulted in an eve of trial settlement that restored the opportunity district in Orleans Parish." *May 9, 2006 Hearing*, at 163. This settlement followed "a strong ruling" by the D.C. District Court "condemning the Louisiana House of Representatives for a mid-course revision in its litigation theory and tactics." *Id.* at 164.

510.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "attempts to dilute African-American voting strength in Louisiana have been widespread.  Thirty-three—more than half—of Louisiana's 64 parishes and 13 of its cities and towns have proposed discriminatory voting changes since 1982, many more than once.  Between 1982 and 2003, the DOJ was compelled to object to 33 parish school board redistricting and expansion plans proposed by 23 parishes and one city, 31 parish police jury redistricting and reduction plans proposed by 20 parishes, 7 parish council redistricting and reduction plans proposed by 6 parishes, 11 city and town council redistricting plans proposed by 10 cities and towns, 2 board of alderman redistricting plans proposed by two cities, and 6 annexations proposed by the city of Shreveport alone.  The DOJ was also compelled to object 17 times to attempts by the state itself to make changes that would have diminished minority voting rights in congressional, state legislative, state board of education, and state court elections.  And, in a stark illustration of the persistence of the hostility to equal African-American participation in Louisiana's political process with statewide consequences, in *every* decade since the VRA was passed in 1965, the proposed Louisiana State House of Representatives redistricting plan was met with a DOJ objection including three since 1982." *March 8, 2006 Hearing Vol. II*, at 1612.

511.    Congress was presented with a report entitled *Voting Rights in Louisiana: 1982-2006*, *RenewTheVRA.org*, prepared by Debo Adegbile indicating that "Section 5's anti-backsliding principle" thwarted the following attempted annexations in Louisiana:

- In 1990, the city of Monroe attempted to annex white suburban wards to its city court jurisdiction.  The DOJ noted in its objection that the wards in question had been eligible for annexation since 1970, but that there had been no interest in annexing them until just after the first-ever African-American candidate ran for Monroe city court.

- Annexation of white suburban wards to the Shreveport city court jurisdiction would have changed that at-large jurisdiction from 54 percent African-American to 45 percent African-American.  After the DOJ objected to the first

attempt at annexation in 1994, the city tried a total of five more times, twice in 1995, in 1996 and twice in 1997. Each time the DOJ informed the city that it would have no objection to the annexation if the city changed its method of electing judges from at-large to single-member districts, and each time the city refused to make that change.

- After the Washington Parish School Board finally added a second majority-African-American district in 1993 (bringing the total to two out of eight, representing an African-American population of 32 percent), it immediately created a new at-large seat to ensure that no white incumbent would lose his seat and to reduce the impact of the two African-American members (to 2 out of 9). The DOJ objected.

- In 1992, the year after Franklin Parish added a second majority-African-American district to its police jury, it attempted to cut the size of the jury in half, eliminating the new African-American seat over protests by the African-American community, and inviting a DOJ objection.

- In 1991 the Concordia Parish Police Jury announced that it would reduce its size from nine seats to seven, with the intended consequence of eliminating one African-American district. The parish made the pretextual claim that the reduction was a cost-saving measure, but the DOJ noted in its objection that the parish had seen no need to save money until an influx of African-American residents transformed the district in question—originally drawn as a majority-white district—into a majority African-American district.

*March 8, 2006 Hearing Vol. II*, at 1615-1616.

512.   Congress received a report, *Voting Rights in Louisiana: 1982-2006, Renew-TheVRA.org*, authored by Debo Adegbile indicating that, "[i]n 1988, Louisiana adopted anti-single-shot devices in circuit court elections (drawing a Section 5 objection) and added more at-large judges to the circuit courts (drawing another Section 5 objection). Despite DOJ objections (and requests for more information, which the state ignored), the state attempted to add at-large or multi-member judicial seats again in 1989, twice in 1990, 1991, 1992, and 1994, and again adopted anti-single-shot devices in 1990. In its 1991 objection letter, the DOJ noted blatant non-compliance with Section 5." *March 8, 2006 Hearing Vol. II*, at 1617.

513.   Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which indicated that many Louisiana officials resist Justice Department requests seeking additional information about voting changes. For example, Congress received testimony regard-

ing a 1993 effort by officials in Morehouse Parish to reduce the number of its elected justices of the peace, the DOJ noted that the parish's initial submission 'contained virtually none of the information required;' that the parish ignored a request for more information for over a year; and that the response, when finally received, still contained no population data by race, and included maps of such poor quality that 'we cannot determine the dividing lines between existing and proposed districts.' The DOJ noted similar efforts by Louisiana officials to withhold information in the city of Cottonport in 1987, Jackson Parish in 1991, Evangeline Parish in 1993, and Richland Parish in 2003. Objections followed in each instance." *March 8, 2006 Hearing Vol. II*, at 1624.

514.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were thirty-seven parishes in Louisiana where objections had been interposed against the county or a political unit located in the county. H.R. Rep. No. 109-478, at 76.

515.    Through the National Commission on the Voting Rights Act, Congress received the statement of Debo Adegbile noting that 66% of the objections interposed against Louisiana have occurred since Congress last acted to extend VRA protections to minority voters. *March 8, 2006 Hearing Vol. IV*, at 4527.

516.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "[b]etween 1982 and 2003, the DOJ was compelled to object to 33 parish school board redistricting and expansion plans proposed by 23 parishes and one city, 31 parish police jury redistricting and reduction plans proposed by 20 parishes, 7 parish council redistricting and reduction plans proposed by 6 parishes, 11 city and town council redistricting plans proposed by 10 cities and towns, 2 board of alderman redistricting plans proposed by two cities,

and 6 annexations proposed by the city of Shreveport[, Louisiana] alone." *March 8, 2006 Hearing Vol. II*, at 1612.

517.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that the Department of Justice objected 17 times to Louisiana's attempts "to make changes that would have diminished minority voting rights in congressional, state legislative, state board of education, and state court elections." *Id.*, at 1612.

518.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which indicated that "[s]ince 1982, Section 5 objections have helped prevent discriminatory changes in every aspect of Louisiana voting, including: redistricting, voter registration, election schedules, voting procedures, polling places, and the structure of elected bodies." The report further stated that "Section 5 has not only allowed the DOJ to nullify specific discriminatory changes [in Louisiana], but has also inhibited the practices that some officials use to promote such changes, including: secrecy, exclusion of minorities from decisionmaking processes, manipulation of standards, invention of new strategies . . . and frequent attempts to revive old dilutive strategies. *Id.* at 1614.

519.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "[m]ost of Louisiana's 96 Section 5 objections since 1982 have involved redistricting." The report further stated that "[o]fficials have consistently attempted to limit African-American voters' political influence by over-concentrating them into a few districts ("packing") or have "favored 'cracking'—dispersing African Americans among several majority-white districts to prevent them from achieving a majority that provides the opportunity for communities to elect candidates of their choice—even in the face of extreme racial bloc voting." *Id.* at 1614.

520.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "in the course of interposing objections, multiple assistant attorneys general have noted the persistence of racially polarized voting in [Louisiana], most recently in April, 2005." The report further stated that Louisiana "itself acknowledged the persistence of 'racial bloc voting' in 1996, the same year that the U.S. District Court for the Western District of Louisiana agreed that 'racial bloc voting is a fact of contemporary Louisiana politics.'" *Id.* at 1614.

521.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that in 1988 "Louisiana adopted anti-single-shot devices in circuit court elections (drawing a Section 5 objection) and added more at-large judges to the circuit courts (drawing another Section 5 objection)[;] [d]espite DOJ objections (and requests for more information, which the state ignored), the state attempted to add at-large or multi-member judicial seats again in 1989, twice in 1990, 1991, 1992, and 1994, and again adopted anti-single-shot devices in 1990." The report further stated that "[i]n its 1991 objection letter, the DOJ noted blatant noncompliance with Section 5." *Id.* at 1617.

522.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that between 1982 and 2003, 10 parishes in Louisiana proposed objectionable voting changes multiple times, and "13 times the DOJ noted that local authorities were merely resubmitting objected-to proposals with cosmetic or no changes." *Id.* at 1619.

523.    Theodore Shaw presented Congress with testimony that between 1982 and 2006, DOJ has "interposed 96 objections to proposed voting changes in Louisiana." Shaw testified that this was more objections than were interposed between 1965 and 1982. Shaw further testified that "[o]bjections have been interposed in more than half the State's parishes, and many for similar

violations that state or local officials have insisted in pursuing." Shaw stated that "[a]lthough the vast majority of these objections were to redistricting plans, they also include objections to proposed changes to voter registration requirements, election schedules, voting procedures, polling places, method of election, and structure of elected bodies." *May 9, 2006 Hearing*, at 151.

524.    Congress was presented with testimony from the Louisiana report that, "[s]ince 1982, Section 5 objections have helped prevent discriminatory changes in every aspect of Louisiana voting, including: redistricting, voter registration, election schedules, voting procedures, polling places, and the structure of elected bodies." Congress was presented with testimony that "Section 5 has not only allowed the DOJ to nullify specific discriminatory changes, but has also inhibited the practices that some officials use to promote such changes, including: secrecy, exclusion of minorities from decisionmaking processes, manipulation of standards, invention of new strategies . . . and frequent attempts to revive old dilutive strategies." *March 8, 2006 Hearing Vol. II*, at 1614.

525.    Congress was presented with testimony in the form of a report authored by Debo Adegbile that, "[i]n 1991, the DOJ objected that the [Louisiana] House redistricting plan prioritized compactness when that meant fragmenting an African-American population concentration among three districts in the north-central part of the State, but had no problem abandoning compactness to fragment African-American population southward in the Delta Parishes. Assistant Attorney General John R. Dunne wrote in his objection letter that 'the decision to apply or deviate from the criteria in each instance tended to result in the plan's not providing African-American voters with a district in which they can elect a candidate of their choice.'" *March 8, 2006 Hearing Vol. II*, at 1621 (internal footnotes omitted).

526.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were forty-four counties in Mississippi where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 78.

527.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1991, Mississippi legislators rejected proposed House and Senate redistricting plans that would have given African-American voters greater opportunity to elect representatives of their choice, referring to one such alternative on the House floor as the 'black plan' and privately as 'the n-plan.'  DOJ objected, concluding that a racially discriminatory purpose was at play.  In the 1992 elections, the cured redistricting plans boosted the percentage of African-American representatives in the legislature to an all time high: 27 percent of the House and 19 percent of the Senate—up from 13 percent and 4 percent respectively in a state where 33 percent of the voting age population is African-American.  This is Robert McDuff, 'Voting Rights in Mississippi: 1982-2006,' RenewTheVRA.org at 9-10."  152 Cong. Rec. S7747.

528.    Congress received testimony from Anita Earls of one of dozens of examples of objection activity from the DOJ website.  She stated that "[o]ne recent example of the VRA combating voter discrimination occurred in Kilmichael, Mississippi in 2001, where the African American voting population became over 50% of the voting age population according [sic] the 2000 Census.  Three weeks before the 2001 election, the all-white board of aldermen cancelled the election when four of the ten candidates running for Aldermen were black as well as one of the three mayoral candidates.  However, due to Section 5, the DOJ was able to object to the change."  *May 16, 2006 Hearing*, at 67.

529.    Mark Posner testified that in the 1990's about 1/5 of the redistricting objections based on discriminatory purpose were filed against plans enacted by Mississippi counties. *November 1, 2005 Hearing*, at 16.

530.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights that the Department of Justice denied preclearance of Mississippi's state legislature redistricting plans in 1991, finding significant indications of a racially discriminatory purpose. The Department also concluded that the legislature had rejected alternatives under which, "reasonably compact and contiguous districts could be drawn in a number of additional areas of the State in which black voters usually would be able to elect representatives of their choice." DOJ subsequently objected to the state's new Senate redistricting plans in 1992. As a result of DOJ's objections, the new plans resulted in significant increases in the numbers of blacks elected to the House and Senate in the 1992 special elections. *March 8, 2006 Hearing Vol. II*, at 1718-1719 (citing Section 5 objection letter, July 2, 1991, quoted in *Watkins v. Mabus*, 771 F. Supp. 789, 792 (S.D, Miss.) (three judge court), *aff'd in part and vacated in part*, 502 U.S. 954 (1991)).

531.    Congress received written testimony prepared by Rob McDuff, Mississippi civil rights lawyer and Voting rights expert, through the Leadership Conference on Civil Rights, discussing minority representation in Mississippi: "No black person served in the U.S. House of Representatives from Mississippi between 1883 and 1986. During much of this time, the majority-black area of the Mississippi Delta was contained within a single congressional district in the northwest part of the state. That district was almost 60 percent black as of 1962. But, in 1966, less than a year after passage of the Voting Rights Act, the Mississippi legislature carved the Delta up among three of the state's five congressional districts, resulting in no districts with a

black majority. This basic configuration was adopted again in 1971 and 1981. When the 1981

plan was submitted under Section 5, DOJ imposed an objection." *May 10, 2006 Hearing*, at 140.

532.     Nadine Strossen testified that Section 5 must continue in order to protect minority

voters from discriminatory practices. Strossen stated that in 2001 in Kilmichael, Mississippi, the

all white Board of Alderman and white mayor cancelled the municipal elections in which an un-

precedented number of African-Americans were running for office. Strossen further testified

that in objecting to this change under Section 5, the Justice Department found that the cancella-

tion occurred after Census data revealed that African-Americans had become a majority in the

town. The town did not reschedule the election, and DOJ forced it to hold one in 2003 where-

upon Kilmichael elected its first African-American mayor, along with three African-American

aldermen, Strossen stated. *March 8, 2006 Hearing Vol. I*, at 1282.

533.     Congress received information showing that there were a total of 155 objec-

tions/submission withdrawals/declaratory judgment actions favorable to minorities in Mississippi

between 1982 and 2004. *May 17, 2006 Hearing*, at 273.

534.     Congress received testimony through the National Commission on the Voting Rights

Act in the form of a map showing there were was a total of 155 objections, submission with-

drawals and declaratory judgment actions favorable to minorities in Mississippi between 1982

and 2004. *March 8, 2006 Hearing Vol. I*, at 273.

535.     In response to questions from Senator Leahy, Anita Earls, former Deputy Assistant

Attorney General for Civil Rights, provided the Senate with recent examples from Mississippi,

Texas, and Arizona where section 5 prevented voting discrimination. For example, her testi-

mony revealed that, absent section 5, voters in Kilmichael, Mississippi "would not have been

able to elect new town officials, and the existing officials would have been able to enact a single-

member districting plan that unfairly diluted the voting strength of black voters." *May 16, 2006 Hearing*, at 60.

536.    Congress received testimony that a report on DOJ has objected to voting changes in Mississippi a total of 169 times since 1969, and 112 of these objections have occurred since 1982. The objections cover a wide range of voting practices and more than one half of the objections relate to redistricting. *March 8, 2006 Hearing Vol. II*, at 1711.

537.    Congress received testimony that many of the 169 objections to voting changes in Mississippi involved acts passed by the state legislature which had a statewide impact. *March 8, 2006 Hearing Vol. II*, at 1711-1712.

538.    Congress received testimony that of the 169 objections in Mississippi since the Act was enforced, 99 objections related to changes involving the state's counties. Of these 99 objections, 79 occurred since 1982. The objections covered more than one-half of the state's 82 counties. Moreover, 25 of the counties were "repeat offenders." *March 8, 2006 Hearing Vol. II*, at 1712-1713.

539.    Congress received testimony indicating that Section 5 played a crucial role in increasing number of Black elected officials at county level in Mississippi: "The fruits of enforcement of the Voting Rights Act are reflected in the fact that Mississippi now has 127 black county supervisors, which is 31 percent of the total number of 410 supervisors. . . . Those 127 supervisors come from 67 different counties. Of those 67 counties, Section 5 objections were lodged one or more times against redistricting plans for supervisors in 43 of them. Two others were the subject of successful Section 2 lawsuits. (Some of the counties with Section 5 objections were also the subject of successful Section 2 litigation). Thus, most of the current plans under which black supervisors were elected in Mississippi are the legacy of direct enforcement of the Act, particu-