larly the preclearance provision of Section 5. Even for those counties that never encountered a

Section 5 objection or a Section 2 lawsuit, it is safe to say that most designed their plans lawfully

because of a recognition that discrimination likely would be met by a Section 5 objection." *May

10, 2006 Hearing*, at 142.

540.    Congress received a report on the effect on the Voting Rights Act in Mississippi

which discussed breadth and significance of objections in Mississippi, both pre and post 1982:

"Of the 169 objections [in Mississippi] since enforcement of the Act began, 104 relate to redis-

tricting. Of the 112 objections since the Act was reauthorized in 1982, 86 relate to redistricting.

Other objections were imposed because of changes involving at-large elections, annexations of

territory, numbered post requirements, majority vote requirements, candidate qualification re-

quirements, changes from election to appointment of certain public officials, drawing of precinct

lines, polling place relocations, open primary laws, repeal of assistance to illiterate and disabled

voters, and a variety of other measures. Most of these are classic weapons in the arsenal of racial

discrimination." *May 10, 2006 Hearing*, at 136.

541.    Congress received testimony documenting attempts in Mississippi to implement dis-

criminatory redistricting plans beginning in 1966 and continuing after 1982: "The Mississippi

legislature's 1966 backlash against the Voting Rights Act included a law giving counties the op-

tion of electing their governing boards (known as boards of supervisors) at-large rather than by

single-member districts as required under pre-existing state law. This would have allowed white

majority counties to ensure that all five members of the county board of supervisors would be

chosen by the majority-white electorate, thus preventing integration in county government. That

was one of the laws that the Supreme Court in *Allen* said could not be enforced absent preclear-

ance, and one in the first group to draw an objection from DOJ under Section 5. But the efforts

did not stop there. The 1971 legislature passed an act authorizing counties to convert to at-large elections with residency districts, a slight variation on the nullified 1966 law. Once again, DOJ objected. Two counties, Grenada and Attala, adopted at-large elections anyway, each drawing an objection in 1971. After those efforts failed, both Grenada and Attala Counties designed redistricting plans that caused DOJ to again object (in 1973 and 1974 respectively). Grenada County then concocted another plan that led to still another objection in 1976. Eleven years later, DOJ was once more compelled to object to yet another Grenada County redistricting plan." *May 10, 2006 Hearing*, at 138.

542.    Congress received testimony that in Mississippi: "Acts passed by the state legislature that had a statewide impact drew 21 objections—10 of them since the Act was reauthorized in 1982. In addition, the legislature passed five laws, each of which affected a specific group of localities, which also drew objections, all of them prior to the reauthorization. Ninety-nine objections were interposed to voting changes involving Mississippi's counties—79 of them since the Act was reauthorized in 1982. These objections covered 48 of Mississippi's 82 counties. Twenty-five of the 48 counties were repeat offenders, drawing two or more objections. Sunflower and Tate Counties had six each, Bolivar County had five, and Grenada, Leflore, Monroe, and Yazoo Counties had four each. Objections were imposed 36 times to actions affecting Mississippi municipalities—18 of those since reauthorization of the Act. The 36 objections involved 28 different municipalities." *May 10, 2006 Hearing*, at 137.

543.    Congress received testimony discussing objections to large number of county redistricting plans after1982 in Mississippi: "Since enforcement of the Act began, Section 5 objections were interposed against 87 different county redistricting plans in Mississippi—75 of those occurring after the 1982 reauthorization." *May 10, 2006 Hearing*, at 138.

544.    Congress received testimony about the effect of Section 5 at the local level in Mississippi: "Efforts of municipalities to convert to at large elections led to three objections, all of them before the 1982 reauthorization. New municipal redistricting plans led to 13 more objections, 10 of them since the reauthorization. And municipal annexations of property that changed the voting populations were met with another 13 objections, seven since reauthorization. There are no current statistics kept of the number of black city council members in Mississippi." *May 10, 2006 Hearing*, at 143.

545.    Robert McDuff testified before Congress that Mississippi did not comply with Section 5 following the 1982 amendments to the Voting Rights Act including failing to submit a number of voting changes regarding laws that added new state trial court judgeships elected under a numbered post system. McDuff further testified that in 1986 a federal district court required the state to seek preclearance of some of the changes and DOJ objected finding the changes had a retrogressive effect. *May 10, 2006 Hearing*, at 96-97.

546.    Wade Henderson presented Congress with testimony that Mississippi has a history of voting discrimination including a dual registration system that was implemented in 1892 and revised and re-implemented in 1984. Henderson stated that the system was not eliminated until 1987 when black voters filed a lawsuit against the system and the state subsequent adopted a unitary system where one registration allowed voters to vote in every election. *May 10, 2006 Hearing*, at 148.

547.    Wade Henderson submitted a report to Congress ("Voting Rights in Mississippi, 1982-2006") which indicated that, in 1991 DOJ denied pre-clearance of the Mississippi state legislature's redistricting plans because they found significant indications of a racially discriminatory purpose. *March 8, 2006 Hearing Vol. II*, at 1718.

548.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, after the state of Mississippi submitted its administrative rules for preclearance, the Attorney General objected to the State's dual registration system on September 22, 1997. *March 8, 2006 Hearing Vol. I*, at 907.

549.    Through a report submitted to Congress by Nadine Strossen, Congress received information that when the 1990 census showed that Perry County's (Mississippi) districts were malapportioned, and the county proceeded to adopt a new districting plan, it again drew all majority white districts.  The county submitted the plan to the Department of Justice for preclearance.  The Department subsequently denied preclearance. *Id.* at 909.

550.    Wade Henderson submitted a report to Congress ("Voting Rights in Mississippi, 1982-2006") indicating that in 1991 and 1992, the Department of Justice objected to redistricting plans proposed by the Mississippi state legislature.  Henderson stated that as a result of the Department of Justice's second objection in 1992 the new plan resulted in significant increase in the number of blacks elected to the House and Senate in 1992 special elections. *March 8, 2006 Hearing Vol. II*, at 1718-1719.

551.    Attorney Robert McDuff testified before Congress that in 1991 DOJ objected to a redistricting plan in Mississippi because they uncovered evidence of discriminatory intent including a reference to the plan as the "nigger plan." *May 10, 2006 Hearing*, at 91.

552.    Wade Henderson submitted a report to Congress ("Voting Rights in New York, 1982-2006") which noted that since 1982, the Department of Justice has interposed fourteen objections under Section 5 to voting changes submitted by New York's three covered counties (Bronx, Brooklyn and New York). *March 8, 2006 Hearing Vol. II*, at 1840.

553.    Congress received testimony through the National Commission on the Voting Rights Act from Theodore Shaw noting that since 1974 "New York municipal and state governments have attempted nineteen times to make electoral changes that [DOJ] found to have a retrogressive effect on minority voting rights." *October 25, 2005 Scope Hearing Vol. II*, at 3236.

554.    Congress received testimony through the National Commission on the Voting Rights Act from Theodore Shaw arguing that Section 5 has a deterrent effect on a covered jurisdictions tendency to make discriminatory voting changes and that it empowers voters to prevent jurisdictions from instituting discriminatory election systems. Shaw cites a 1981 enforcement suit brought by citizens to New York City's unprecleared redistricting and polling-place relocation plan because the City did not submit the changes to DOJ for preclearance. After the citizens obtained an injunction against the plan, DOJ found numerous instances of discrimination in the City's plan. *October 25, 2005 Scope Hearing Vol. II*, at 3245.

555.    Congress received testimony from Theodore Shaw about a 1982 DOJ objection to the State of New York's proposed redistricting that would have reduced the number of Assembly districts in New York City in which minority voters had a reasonable chance to elect candidates of their choice from 43% to 35% at a time when the racial minority population in New York City was growing rapidly. *October 25, 2005 Scope Hearing Vol. II*, at 3241.

556.    Theodore Shaw submitted testimony to Congress detailing the discriminatory voting practices employed by local and state officials other than racially discriminatory redistricting. For example, Shaw cited New York's 1994 attempt to avoid the electoral process by proposing to allow the Governor to appoint judges to the Court of Claims and then immediately transfer them to the State Supreme Court. Shaw testified that DOJ refused to preclear this change noting

that: "The state thus effectively has changed the method of selecting a class of Supreme Court judges from election to appointment." *October 25, 2005 Scope Hearing Vol. II*, at 3242.

557.    Theodore Shaw testified before Congress that vote dilution mechanisms are still employed to disenfranchise racial minorities. Shaw cited the federal government's objection to a proposed change in 1999 to limited voting in New York City school board elections. Shaw notes that limited voting is a classic "anti-single-shot" strategy used in the South to dilute minority-voting strength by preventing minorities from casting their votes in blocs. Shaw stated that this change would have made it three times as hard for minorities to elect candidates of their choice in New York City school board elections. *October 25, 2005 Scope Hearing Vol. II*, at 3244.

558.    Theodore Shaw testified before Congress regarding how Section 5 can be an effective means of enforcing the minority language provisions of the Voting Rights Act under Section 203. For example, Shaw noted that DOJ's objection to New York City's 1993 plan to address the needs of Chinese speaking voters was instrumental in making sure proper assistance was given. *October 25, 2005 Scope Hearing Vol. II*, at 3245.

559.    Congress received testimony from Wade Henderson that in 1992, DOJ objected to a New York State Assembly's redistricting plan concluding that it knowingly fractured the Latino community with the intent and effect of reducing the community's ability to elect candidates of choice. DOJ found that the Assembly was aware that the plan would minimize Hispanic voting strength. Following the issuance of the objection, Adriano Espaillat won a 1996 election and became the first Dominican ever elected to the NY Legislature. *March 8, 2006 Hearing Vol. I*, at 67.

560.    Congress received a report analyzing the effect of the Voting Rights Act on New York noting that "[i]n 1994, DOJ denied preclearance to Chinese-language election procedures

in Kings and New York counties [due to] the failure to translate candidates' names on machine

ballots . . . and the failure to translate operating instructions for voting machines." As Assistant

Attorney General Deval Patrick noted, the translation of candidates' names was critical because

"it would be extremely difficult, if not impossible, for these voters to understand names written

in English." *March 8, 2006 Hearing Vol. II*, at 1842-1843 (internal footnotes omitted)

561.    Wade Henderson submitted a report to Congress ("Voting Rights in New York, 1982-

2006") which noted that DOJ objected to the New York State Assembly redistricting plan in

1992, because it fractured the Latino community in Washington Heights in Northern Manhattan.

DOJ found that the existence of racially polarized voting in that area, and determined "that the

proposed district boundary lines appear[ed] to minimize Hispanic voting strength." *Id.* at 1841

(internal footnote omitted).

562.    Congress received a report analyzing the effect of the Voting Rights Act on New

York discussing the DOJ objection in 1994 to five changes in New York State's procedures for

electing Supreme Court judges on the grounds that the practices discriminated against African-

American and Latino voters.  DOJ specifically found evidence of "racially polarized voting in

the Section 5-covered counties of New York . . . and that the 'slating process used to nominate

judicial candidates . . . prevent[ed] minority voters from having an equal opportunity to elect

candidates of their choice.'" *Id.* at 1843-1844.

563.    Congress received a report analyzing the effect of the Voting Rights Act on New

York discussing the 1999 DOJ objection to New York State's plan to switch from choice voting

(or the Single Transferable Votes (STV) method) to Limited Voting, another form of propor-

tional representation, to elect members of community school boards.  DOJ found that the switch

would "diminish minority voting strength," and found that "voting in community school board elections was racially polarized." *Id.* at 1846.

564.    Wade Henderson submitted a report to Congress analyzing the effect of the Voting Rights Act on New York State.  The report discussed the Department of Justice objection to New York's City Council redistricting plan following the 1990 Census because it had a discriminatory effect on Latino voters in at least two separate areas of the city. *Id.* at 1840-1841.

565.    Congress received a table from Anita Earlsthat there were a total of 56 objections, submission withdrawals and enforcement actions favorable to minorities in North Carolina between 1982 and 2004. *May 16, 2006 Hearing*, at 149.

566.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights which indicated that, while only 40 of North Carolina's 100 counties, are covered by Section 5, the provision "has arguably had the greatest impact in the state because numerous objections have prevented the implementation of election changes that would have made it harder for black voters to participate in elections." The report indicated that, since 1982, DOJ has issued 45 objection letters relating to an even greater number of voting changes.  Ten of the objection letters involved multi-County or statewide changes, including redistricting plans. *March 8, 2006 Hearing Vol. II*, at 1729.

567.    Congress received testimony from Anita Earls that Section 5 was needed to protect gains made by Section 2 litigation successes.  Earls testified that even though Elizabeth City, North Carolina agreed to implement single member districts following a Section 2 lawsuit, the city actually adopted a plan with four single-member districts and four at-large residency districts.  Earls testified that DOJ's resulting objection prevented the city from doing so. *May 16, 2006 Hearing*, at 145.

568.    Through a report submitted to Congress by Nadine Strossen, Congress received information that Edgecombe County, North Carolina received an objection from the Department of Justice in 1984 when it sought to establish residency districts for the election of six of the seven school board members. *March 8, 2006 Hearing Vol. I,* at 929.

569.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1989 the Department of Justice objected to a submitted voting change of the annexation of several predominantly white neighborhoods in Ahoskie, North Carolina.  Strossen testified that the Attorney General stated: "even though the town is close to 50 percent black in total population, black candidates have had extremely limited success in winning seats on the five-member town council." *Id.* at 933.

570.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1994 the Department of Justice objected to a proposed annexation in Laurinburg, North Carolina because the annexation "would [have] further limit[ed] the opportunity of black voters to elect their candidates of choice to the city council." *Id.* at 952.

571.    Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that "Section 5 has . . . forced county and local officials to implement fair voting systems in response to Section 2 suits." For example, Congress had information that, in Pasquotank County, North Carolina, black voters and the NAACP filed suit, which resulted in a consent decree preventing Elizabeth City's use of an at-large district that diluted minority voting strength. *See NAACP v. Elizabeth City*, No. 83-39-CIV-2 (E.D.N.C. 1984).  When the city subsequently attempted to implement at-large districts, the attorney general objected and noted that the plan contained the "very features that characterized the plan abandoned by the consent

decree" and was enacted "with knowledge of the disparate impact it would have." There are currently four black members on the city council. *March 8, 2006 Hearing Vol. II*, at 1733-1734.

572.    Congress received testimony from Wade Henderson that Section 5 has been used in North Carolina to protect against proposed dilutive proposals including staggered terms, residency requirements, annexation of predominately white areas, majority vote and runoff requirements, unfair drawing of districts, and the maintenance of at-large voting. Between 1982 and 1987, Section 5 enabled the Attorney General to interpose objections to residency districts Beaufort, Bertie, Camden, Edgecombe, Guilford, Martin, Onslow, and Pitt counties. These requirements limit minority voters' ability to use single shot voting to elect candidate of choice. *March 8, 2006 Hearing Vol. I*, at 68.

573.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights which noted that Section 5 enforcement actions and DOJ objections in North Carolina have, on several occasions, prevented North Carolina jurisdictions from using the "whole county" provision ("which provides that no county can be divided in the formation of a Senate or Representative district") of the state constitution to weaken minority voting power. *March 8, 2006 Hearing Vol. II*, at 1735.

574.    Through a report submitted to Congress by Nadine Strossen, Congress received information that over a period of two decades, the Department of Justice found that the City of Rocky Mount, North Carolina repeatedly tried to dilute black voting strength through different election changes including annexations. In 1983, in conjunction with an ACLU lawsuit, the DOJ objected to a proposed annexation saying: "[E]ven though blacks constitute over 42 percent of the city's population, at no time has more than one black been elected to the city council, which appears to be the result of a general pattern of racially polarized voting occurring in the context

of Rocky Mount's at-large election system with its residency and majority vote requirements." *March 8, 2006 Hearing Vol. I*, at 927.

575.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1978, the Attorney General blocked the city of Laurinburg, North Carolina from attempting to implement a majority vote requirement and numbered post elections for the city council, concluding that "racial bloc voting appears to exist," and the proposed changes "could have the potential for abridging minority voting rights." *Id* at 952.

576.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Attorney General objected to the adoption of residency districts in Martin County, North Carolina because they deprived black voters of "the opportunity to single-shot, or 'bullet,' vote for the candidate(s) of their choice from among the entire field of candidates that appeared on the ballot at each election." *Id* at 938.

577.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the Mt. Olive, North Carolina plan was submitted for preclearance, and the Attorney General entered an objection, concluding: "given the presence of polarized voting and the limited success that black voters have enjoyed when five at-large seats are elected, there is considerable doubt as to whether black voters would have a significant opportunity to elect any at-large member under the proposed election method." *Id.* at 959.

578.    Congress received testimony from Anita Earls who observed that "[i]n Pasquotank County, [NC], after black voters and the NAACP filed suit opposing Elizabeth City's at-large method of election, the City agreed in a consent decree to implement single-member districts. Ultimately, however, the City adopted a plan with four single-member districts and four at-large residency districts. . . . When the City applied for preclearance, the Attorney General interposed

an objection, explaining that the City had chosen a plan that would elect half the governing body 'in a manner identical to that which the decree was designed to eliminate.' . . . The plan was, in fact, enacted 'with knowledge of the disparate impact' it would have. Elizabeth City has since adopted an election scheme with four wards that each elect two council members." *May 16, 2006 Hearing*, at 145.

579.    Congress received testimony from Wade Henderson that in North Carolina, Section 5 has been used to protect against proposed dilutive proposals including staggered terms, residency requirements, annexation of predominately white areas, majority vote and runoff requirements, unfair drawing of districts, and the maintenance of at-large voting. *March 8, 2006 Hearing Vol. I*, at 68.

580.    Congress received testimony from Anita Earls that North Carolina's state legislators "took special pains" in 1965-66 and 1981-82 to carefully draw districts in and around Durham County in order to diminish the voting strength of "the large and politically active black popula-tion of Durham County." The 1981 redistricting map drew a strangely shaped district dubbed "Fountain's Fishhook" that was curved around Durham. The Justice Department objected to that plan because it had "the purpose and effect of diluting minority voting strength." *March 8, 2006 Hearing Vol. II*, at 1759.

581.    Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that Section 5 covers 40 of North Carolina's 100 counties (mostly in the rural eastern parts of the state), and has had a positive impact on protecting minority voting rights in the state. Henderson stated that since 1982, DOJ has issued 45 objection letters relating to a number of voting changes and that ten of the objection letters involved multi-county or statewide changes, including redistricting plans. *Id.* at 1729.

582.    Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that 1987 DOJ interposed section 5 objections to voting plans adopted by Pitt and Bladen counties in North Carolina.  Henderson stated that DOJ found that the plans were calculated to minimize minority voting strength. *Id.* at 1752.

583.    Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that Section 5 enforcement actions and DOJ objections have, on several occasions, prevented North Carolina jurisdictions from using the "whole county" provision of the state constitution to weaken minority voting power.  Henderson stated this provision provides that no county can be divided in the formation of a Senate or Representative district, and can be used to dilute minority voting strength. *Id.* at 1759.

584.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were twenty-three counties in North Carolina where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 79.

585.    Congress received testimony from Wade Henderson that since 1982, DOJ has objected to Section 5 preclearance on seventy-three occasions in South Carolina.  The objections were made to redistrictings, annexations, voter assistance, changing county boundaries, eliminating offices, reducing number of seats on a public body, majority vote requirements, changing to at-large elections, using numbered posts or residency requirements, staggering terms, scheduling of elections, changing from nonpartisan to partisan elections, and limiting ability of African-Americans to run for office. *March 8, 2006 Hearing Vol. I*, at 65-66.

586.    Congress received testimony from Nadine Strossen that in 2004, Section 5 prevented South Carolina from implementing a new and retrogressive voting practice in Charleston

County, "one which everyone understood was adopted to dilute black voting strength and insure white control of the school board." *Id.* at 25.

587.    Congress received testimony from Armand Derfner, who citing ACLU and LCCR reports, states: "As these reports show, South Carolina has had several dozen voting rights suits during the life of the Voting Rights Act. But the number of Section 5 objections is 120, far exceeding the number of lawsuits. That means 120 voting violations by the State and its local governments. That is an astounding number. More to the point, 73 of the section 5 objections have come since renewal of the Act in 1982. That too is an astounding number. And nine of the objections have come in just the past five years." *May 17, 2006 Hearing*, at 177.

588.    Through a report submitted to Congress by Nadine Strossen, Congress received information regarding a recent denial of pre-clearance in Charleston County, South Carolina. Ms. Strossen testified that the county had tried to adopt a redistricting plan for the election of the County School Board of Trustees that was identical to a redistricting plan for the County Council that was declared unconstitutional under Section 2. *March 8, 2006 Hearing Vol. I*, at 1002.

589.    Congress received testimony from Laughlin McDonald, attorney with the ACLU Voting Rights Project, that the continued need for Section 5 was evidenced by the fact that in 2003 the South Carolina state legislature adopted a method of election for the Board of Trustees of the Charleston County School District that, in a different case involving the county council, had been found to dilute minority voting strength in violation of Section 2. *October 25, 2005 Need Hearing*, at 4-5.

590.    Congress received testimony from Attorney Armand Derfner that there have been 9 objections in the last 5 years to proposed voting changes in South Carolina. They include: four

discriminatory county redistricting plans and a majority vote requirement that would have prevented the election of the only successful black candidate. *May 17, 2006 Hearing*, at 75.

591.    Attorney Armand Derfner testified before Congress that South Carolina has had 120 Section 5 objections during the life of the Voting Rights Act. Derfner stated that seventy three of these objection have come since the Act's 1982 reauthorization. Nine of the objections have been since 2001. *May 17, 2006 Hearing*, at 177.

592.    Attorney Armand Derfner testified before Congress regarding the 2002 Supreme Court decision that overturned Charleston County's at-large election system on the ground that it was racially discriminatory. Derfner testified that while this case was being decided, the Charleston County School Board attempted to change its elections to reflect the most discriminatory features of the County's electoral system. Derfner stated that DOJ denied pre-clearance showing that in the absence of Section 5 the school board would have adopted a discriminatory practice. *October 20, 2005 Hearing*, at 85.

593.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in Batesburg, South Carolina, DOJ objected to a majority vote requirement stating that "[o]ur analysis of elections in Batesburg raises a clear inference that voting in elections involving black candidates is polarized along racial lines and that this voting pattern has hampered the ability of black voters to elect candidates of their choice." *March 8, 2006 Hearing Vol. I*, at 1030.

594.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1984, the Department of Justice objected to proposed voting change in Elloree, South Carolina. The proposed changes included staggered terms and majority vote requirements for the city council. Ms. Strossen testified that, in objecting to these changes, the Department of

Justice said that their "analysis . . . also indicates that, in the context of the racial bloc voting pat-

terns that seems to exist in Elloree, a change from concurrent elections by a simple plurality to

staggered terms and a majority vote requirement adversely affect the ability of minorities to elect

candidates of their choice to office, particularly where, as here, single-shot voting is permitted

under state law." *Id.* at 1036.

595.    Through a report submitted to Congress by Nadine Strossen, Congress received in-

formation that the Department of Justice objected to the city of Sumter, South Carolina's attempt

to annex portions of the Sumter County in 1985. *Id.* at 1056.

596.    Through a report submitted to Congress by Nadine Strossen, Congress received in-

formation that in a 2002 letter from Ralph F. Boyd, Assistant Attorney General, to Charles T.

Edens, the Department of Justice denied preclearance for proposed voting changes in Sumter

County, South Carolina.  The letter noted that "[u]nder 2000 census data, four of the seven dis-

tricts in the current, or benchmark plan have both total and voting-age populations that are ma-

jority black.  In three of these four, black voters will continue to have the ability to elect candi-

dates of their choice.  Our analysis, however, shows that this is not true for the fourth district,

District 7[.]" *Id.* at 1058.

597.    Through a report submitted to Congress by Nadine Strossen, Congress received in-

formation that, in a 2002 letter from Ralph F. Boyd, Assistant Attorney General, to C. Samuel

Bennett II, the Department of Justice objected to a proposed voting change by the City of Clin-

ton, South Carolina, because it "determined that a reduction in the voting strength of African

Americans was avoidable." *Id.* at 1028.

598.    Senator Patrick Leahy of Vermont provided the following example from the record

before Congress of jurisdictions changing their boundaries in order to diminish the voting power

of minorities by selectively changing the racial composition of a district: "In 2003, the Department of Justice interposed an objection to a proposed annexation in the Town of North, SC, because the town had 'been racially selective in its response to both formal and informal annexation requests.' DOJ found that 'white petitioners have no difficulty in annexing their property to the town' while 'town officials provide little, if any, information or assistance to black petitioners and often fail to respond to their requests, whether formal or informal, with the result that the annexation efforts of black persons fail.' Though the town argued that no formal attempts had been made by African-Americans to be annexed into the town, DOJ's investigation revealed that at least one petition had been signed by a significant number of African-American residents who sought annexation. The fact that the town ignored or was non-responsive to the requests of African-Americans, while accommodating the requests of whites, led DOJ to determine that race was 'an overriding factor in how the town responds to annexation requests.' This is a Letter from R. Alexander Acosta, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to H. Bruce Buckheister, Mayor, North, SC, September 16, 2003." 152 Cong. Rec. S7749.

599.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in a letter from James P. Turner, Acting Assistant Attorney General, to Jonathan R. Hendrix, the Department of Justice again objected to the proposed voting change by Clinton, South Carolina, of a majority vote requirement on June 1,1993. *March 8, 2006 Hearing Vol. I*, at 1031.

600.    Through a report submitted to Congress by Nadine Strossen, Congress received information that in a 1987 letter from William Bradford Reynolds, Assistant Attorney General, to James B. Richardson, Esq., the Attorney General denied preclearance to a proposed voting change by the Edgefield County School District in South Carolina. He concluded that the exis-

tence of racial bloc voting and other factors "strongly suggest that blacks will have a realistic op-
portunity for electing candidates of their choice in only two of the school board's proposed dis-
tricts—as opposed to the four claimed by the county." *Id.* at 1015.

601.    Through a report submitted to Congress by Nadine Strossen, Congress received in-
formation that, in 1976, the Department of Justice objected to the adoption of at-large elections
with residency requirements for the Sumter County South Carolina School Board to replace an
existing system of multi-member districts. The Department of Justice also objected in 1976, to
the adoption of at-large elections with residency requirements for the county school board to re-
place an existing system of multi-member districts. *Id.* at 1056.

602.    Through a report submitted to Congress by Nadine Strossen, Congress received in-
formation that the Attorney General objected to a submission made by Edgefield County, South
Carolina. Citing the findings of the district court, the Department of Justice concluded that the
proposed at-large elections had "the potential for impermissibly diluting minority voting
strength." *Id.* at 1012.

603.    ACLU attorney Laughlin McDonald testified that following the 1975 Amendments to
the Voting Rights Act, Shannon and Todd Counties in South Dakota became covered by Section
5. McDonald stated that following the coverage, South Dakota Attorney General William Jank-
low publicly avowed to comply with Section 5 preclearance requirements. McLaughlin further
testified, that the state only complied following a 2002 lawsuit by members of the Oglala and
Rosebud Sioux tribes. *October 25, 2005 Need Hearing*, at 131.

604.    Congress received testimony from Wade Henderson that although South Dakota has
three counties covered by Section 5, it has submitted only one letter to the DOJ requesting re-
view of proposed election procedures. DOJ objected to South Dakota's proposed changes re-

garding voter registration and driver's license applications; voter purging every four years; and changes in mail-in voter registration dates, citing a lack of evidence that they were not discriminatory in purpose against Native American voters. *March 8, 2006 Hearing Vol. I*, at 67.

605.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were eight counties or independent cities in Virginia where objections had been interposed against the county (or independent city) or a political unit located in the county (or independent city). H.R. Rep. No. 109-478, at 81.

606.    Congress received testimony from Wade Henderson that DOJ imposed 15 objections against voting changes submitted by the Commonwealth of Virginia since 1982. *March 8, 2006 Hearing Vol. I*, at 259.

607.    Former DOJ voting attorney Gerald Hebert testified to Congress that there were 7 objections in Virginia during 1985-1994 and 6 objections during 1995-2004. *October 20, 2005 Hearing*, at 167.

608.    Congress received testimony from Wade Henderson that there have been numerous Section 5 objections to voting changes that included redistricting, voting procedures, and election schedules or structure of elected bodies in every decade in Virginia since the last reauthorization of the VRA in 1982. *March 8, 2006 Hearing Vol. I*, at 64.

609.    Congress received testimony from Wade Henderson that in 2001 & 2003 in Northampton County, Virginia proposed collapsing six districts for the Board of Supervisors into three larger districts. Three of the six benchmark districts were majority-minority districts that regularly elected candidates of choice. DOJ objected to the 2001 plan based on diluted minority-majorities. DOJ then objected to a new six district plan that still had the same retrogressive effect. *Id.* at 64.

610.    Congress received testimony from Wade Henderson that in 1991, DOJ objected to the redistricting plan of the Virginia House of Delegates because the proposed configuration minimized black voting strength in Charles City County, James City County, and the Richmond/Henrico areas. The plan placed large concentrations of African-Americans in majority white districts.  DOJ concluded that protection of incumbents, which was the commonwealth's defense, could not be at the expense of minorities.  *Id.* at 64.

611.    Congress received testimony from Wade Henderson that in 1999, DOJ objected to a polling place relocation in Dinwiddie County, Virginia, "based on findings that the poll relocation was done for discriminatory reasons."  *Id.* at 65.

612.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1999, after the Davills Precinct polling center burned down and the County Board of Supervisors of Dinwiddie County, Virginia, moved the polling place to the Cut Bank Hunt Club, privately owned with a large African-American membership, one hundred and five citizens submitted their signatures to have the precinct moved to the Mansons United Methodist Church, located three miles southeast of the Hunt Club.  The petition's stated purpose for moving the precinct was for a 'more central location.'  Before the board's meeting to discuss moving the polling place, the Mansons United Methodist Church withdrew its name as a possible location.  The board then placed an advertisement for a public hearing on changing the polling place which stated that if any 'suitable centrally located location [could] be found prior to July 15, 1999,' they would consider moving it there.  On July 12, 1999, the Bott Memorial Presbyterian Church members offered their facilities for polling.  On August 4, 1999, the board approved changing the polling place to Bott Memorial Presbyterian Church.  The church is located at the extreme east end of the precinct, however, and 1990 Census data showed that a significant por-

tion of the black population resides in the western end of the precinct. DOJ objected to the change, finding that the polling place was moved for discriminatory reasons. This is a Letter from Bill Lann Lee, Acting Assistant Attorney General, Civil Rights Division, U.S. DOJ., to Benjamin W. Emerson of Sands, Anderson, Marks & Miller, October 27, 1999." 152 Cong. Rec. S7748.

### (4)    Objections in Texas

613.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1992, DOJ objected to a Justice of the Peace and Constable redistricting plan in Galveston County, Texas, that fractured geographically compact African-American and Hispanic voters and provided no opportunity districts among the 8 districts in the plan, even though African Americans and Hispanic comprised 31 percent of the county's population. This is from Nina Perales, Luis Figueroa and Criselda G. Rivas, 'Voting Rights in Texas, 1982-2006', RenewTheVRA.org, at 17-18." 152 Cong. Rec. S7747.

614.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1992, DOJ objected to the Terrell County Commissioners Court redistricting plan. Although the Hispanic population in the county had increased from 43 percent to 53 percent, the proposed redistricting plan cracked the Hispanic population by substantially decreasing the number of Hispanic voters in one of the two Hispanic majority districts and packing them into the other to create a district with an 83 percent Hispanic district. This is from Nina Perales, Luis Figueroa and Criselda G. Rivas, 'Voting Rights in Texas, 1982-2006,' RenewTheVRA.org, at 19." 152 Cong. Rec. S7747.

615.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were forty-six counties in Texas where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 80.

616.    The House Judiciary Committee received information that there have been more Section 5 objections in Texas than in any other state since the inception of the Act, and from August 5, 1982 to 2004, Texas ranks second to Mississippi. H.R. Rep. No. 109-478, at 73.

617.    Congress heard testimony from Wade Henderson that since 1982, 107 Section 5 objections to preclearance have been interposed in Texas.  Henderson also testified that racially discriminatory election changes have increased since 1982 and repeat offenses are common, and that of the 72 counties experiencing challenges to election changes, 28 have demonstrated a pattern of repeated offenses.  Further, of the 196 objections since 1975, 59 have been related to the districting or redistricting plans proposed at various levels of government, including seven state-wide plans.  There have been 12 DOJ objections interposed with regard to changes in voting procedure at the local level.  *March 8, 2006 Hearing Vol. I*, at 63.

618.    Congress received testimony from Nina Perales, that Texas had 196 section 5 objections to proposed election changes since 1975, more than any other State covered by section 5.  Of these objections, the majority were objections to changes in local election practices. *October 25, 2005 Scope Hearing Vol. I*, at 86.

619.    Congress received testimony from Jose Garza referencing a 2002 Department of Justice objection to a proposed redistricting plan in Waller County, Texas.  Garza noted that the county had consistently attempted to prevent students at Prairie View A & M, an historically African-American land grant college, from voting in County's elections.  Garza stated "Waller County is at once a white flight area from heavily minority Houston but also the location of Prai-

172

rie View A & M one of the traditionally African American land grant colleges. This is the latest of a more than 40 year history of limiting African Americans going to school there from interfering with local politics by voting. At first, the county attempted to just prohibit the Black students from voting at all. After several different federal and appellate courts found that such actions violated Section 2 and the 14th Amendment, the County now tries to accomplish the same thing through racial gerrymandering. The significance of this case is that if you look at the legislative history which led to extension of the special provisions of the Voting Rights Act to include Texas you find this Waller County discrimination to be one of the things Congress was concerned about. Things do not change in Texas racial politics." *October 20, 2005 Hearing*, at 67. *See also May 9, 2006 Hearing*, at 23.

620.    Congress heard testimony from Ronald Gaddie that "[t]he state with the most objections, Texas at 197, also has the largest numbers of covered subjurisdictions (254 counties, over 300 school boards, and over 1,200 incorporated cities[.]" *May 16, 2006 Hearing*, at 80.

621.    Congress received testimony from Anita Earls that "[e]arlier this year in Texas, the DOJ issued a Section 5 objection when the North Harris and Montgomery Community College District, comprised of an area of over 1000 square miles, reduced the number of polling places from 84 to 12. . . . The Department's objection letter noted specifically that under the proposed change, the site with the smallest proportion of minority voters served just 6,500 voters, while the site that served a population that was 79.2% black and Hispanic served over 67,000 voters." *Id.* 60-61.

622.    Congress heard testimony from Anita Earls which included a chart containing key Section 5 statistics in Section 5 covered states. The chart shows that since 1982, Texas has had 105 Section 5 objections, 10 of which were statewide; Texas withdrew 54 changes; there were 20

successful Section 5 enforcement cases in Texas; and there were 206 successful Section 2 cases in Texas. *Id.* at 149.

623.    Congress was presented with information from Chandler Davidson and Bernard Grofman's book, *Quiet Revolution in the South*, which notes that "[b]etween the time Texas was brought under section 5 coverage in 1975 and December 1990, the Justice Department interposed 131 objections to voting procedures in the state. Many of these objections were to multiple infractions of voting law within a single jurisdiction. The infractions embraced the spectrum of illegal procedures: racial gerrymandering, discriminatory purges of registered voters, imposition of numbered posts and the majority runoff requirement, annexations that diluted minority votes, a faulty bilingual oral assistance program, reduction in the number of elected officials, transfer of duties from one official to another, and unfair changes in election dates. One can only speculate about the number of discriminatory changes that would have occurred but for the deterrent effect of section 5." *October 18, 2005 Hearing,* at 1250.

624.    Congress received testimony through the National Commission on the Voting Rights Act that ". . . in Texas, where the most heavily non-white counties (60-100 percent) are predominantly majority-Latino, located along the Mexican border, there were few objections in the post-1982 period. Even so, the 40-60 percent non-white Texas counties are far more likely than the remaining ones with smaller minority populations to have experienced objections. Numerous East Texas counties whose minority population is largely black are locales where numerous objections were interposed." *March 8, 2006 Hearing Vol. I,* at 174.

625.    Congress received testimony through the National Commission on the Voting Rights Act that ". . . Section 5 has helped prevent discrimination against those voters when statewide changes are at issue. For example, the Department of Justice objection to the Texas State House

redistricting plan in 2001 was predicated on the state's attempt to eliminate effective districts for

Latino voters in heavily Latino South and West Texas." *March 8, 2006 Hearing Vol. I*, at 174.

In particular, DOJ found that the proposed plan would have resulted in a net loss of three districts

in which minority voters would have the opportunity to elect candidates of choice. The plan ac-

complished this by reducing Spanish surname registration levels in three districts; "fragment[ing]

the core of majority Hispanic districts; and packing Hispanic voters into neighboring districts."

DOJ concluded that the resulting fragmentation was both "unnecessary" and in contradiction

with the state's traditional redistricting principles. *October 25, 2005 Scope Hearing Vol. II*, at

2518-2523.

626.    Congress received testimony from Jose Garza regarding a 1997 DOJ objection to

proposed annexation by Baytown (Harris County, TX) that among other things "failed to annex

an area with a significant minority population, while it was simultaneously annexing an all-white

area that when added to the city's population will reduce the minority proportion" and contrary

to the concerns of representatives of the minority community "voted in favor of annexing only

the all-white area." *October 20, 2005 Hearing*, at 47-48.

627.    Congress heard testimony from Jose Garza citing a 1998 DOJ objection to "the

change in the procedures for filling certain vacancies in Texas judicial offices from election to

appointment." The DOJ noted that "[i]nstead of seeking input from Hispanic voters with regard

to potential judicial appointees, the governor selected an Anglo appointee who had been rejected

by the majority of the voters in that district in an earlier election in favor of a Hispanic candidate.

Had the vacancy been filled by election, rather than by gubernatorial appointment, Hispanic vot-

ers in the fourth court of appeals district would have had an opportunity to elect a candidate of

choice rather than having a judge for the past two years appointed to that seat who was not their choice." *Id.* at 50.

628.    Congress received testimony from Jose Garza citing a 1999 DOJ objection to a proposed deannexation plan presented by Lamesa (Dawson County, TX) which sought to remove a significant number of minority residents from the jurisdictions' boundaries. The DOJ found that the deannexation was primarily motivated by racial animus. *Id.* at 50-51.

629.    Congress received testimony from Jose Garza citing a 1998 DOJ objection to Galveston's (Galveston County, TX) proposed 4-2-1 method of election with numbered posts for the two at-large seats and a majority vote requirement. The DOJ found that Galveston's existing method of election was fair and that the proposed 4-2-1 method of election with numbered posts for the two at-large seats and a majority vote requirement would lead to a retrogression in minority voting strength prohibited by Section 5. *Id.* at 53.

630.    Congress received testimony from Jose Garza referencing the 2000 DOJ objection to Sealy ISD (Austin County, TX) proposal to prevent single shot voting and allow numbered post system. DOJ found racially polarized voting in the Sealy ISD and concluded that preventing single shot voting altogether while allowing numbered posts would negatively affect minority voting power in the ISD. *Id.* at 56-57.

631.    Congress received testimony from Jose Garza referencing a 2001 DOJ objection to Haskell Consolidated ISD's (Haskell, Knox, and Throckmorton Counties, Texas) proposed change from single-member districts to at-large elections. The single member districts were the result of a settlement of litigation claiming that the at-large system with staggered terms violated Section 2 of the VRA. DOJ determined that "[g]iven the demographics of the school district and apparent voting patterns within it, the jurisdiction has not carried its burden that the proposed

change will not significantly reduce the ability of minority voters to elect candidates of their choice to the school board." *Id.* at 60.

632.    Congress received testimony from Jose Garza referencing a 2002 DOJ objection to the city of Freeport's (Brazoria County, TX) proposed change from a single-member district system back to an at-large system. The DOJ noted that until 1992, the City elected its four-member council on an at-large basis, after which the City began to use the single-member district system which it had as part of a settlement of voting rights litigation challenging the at-large system. The DOJ further noted that, under the single-member district method of election, minority voters had demonstrated the ability to elect candidates of choice in at least two districts. The DOJ concluded that "a return to an electoral system where all council offices are elected on an at-large basis will result in a retrogression in their ability to exercise the electoral franchise that they enjoy currently." The DOJ determined that the change will have a retrogressive effect on the ability of minority voters to elect a candidate of their choice. *Id.* at 62.

633.    Congress received testimony from Jose Garza referencing a 2001 DOJ objection to the 2001 redistricting plan for the Texas House of Representatives. Garza notes that this redistricting, along with the ones in 1991, 1981, 1971, and 1961 had the effect of making it harder for minorities to elect candidates of their choice. Garza noted the growth in Texas from 1990 through 2000 was largely Hispanic. Yet the redistricting did not increase the number of majority Hispanic districts despite the significant growth in Texas' Hispanic population instead it reduced those districts by three  (3). *Id.* at 63.

634.    Congress received testimony from Jose Garza referring to a 2001 DOJ objection to the 2001 redistricting plan for the Texas House of Representatives. DOJ concluded that the redistricting plan unnecessarily reduced minority voting strength and had a retrogressive effect on

minority voting power in Bexar County, as well as various districts in South and West Texas. *Id.*
at 65.

635.   Congress received testimony from Jose Garza discussing a 2002 DOJ objection to
Waller County's (Texas) proposed redistricting plans for the commissioners court, justice of the
peace, and constable districts.  The DOJ objection letter notes that the proposed plan would re-
duce the black voting age population of one of the two majority Black districts from 52.5 percent
to 29.7 percent.  The DOJ noted that "[o]ur statistical analysis also shows that white voters do
not provide significant support to candidates sponsored by the minority community, and that in-
terracial elections are closely contested."  DOJ rejected the state's rationale that this was neces-
sary to reduce minority voting strength in one precinct in order to preserve minority voting
strength in another.  DOJ determined that the reduction would have worsened the position of mi-
nority voters, and objected to the submitted redistricting plan. *Id.* at 69-70.

636.   Congress received testimony from Mark Posner, who noted that Texas is among one
of the states with a large number of purpose redistricting objections.  He noted that "[t]he Texas
objections were particularly notable as the Section 5 concern often was that jurisdictions were
seeking to limit the growing political power of Hispanic voters." *Id.* at 16.

637.   Congress heard testimony through the National Commission on the Voting Rights
Act describing the testimony of Claude Foster of NAACP that "alluded to the events in 2004 at
predominantly black Prairie View A&M University, mentioned above, whereby efforts by white
officials to suppress black students' votes were thwarted by a Section 5 enforcement action - a
suit brought by the student NAACP chapter to prevent Waller County from implementing unpre-
cleared voting changes." *March 8, 2006 Hearing Vol. I,* at 307-308.

638.   Congress received testimony from Nina Perales, regarding a "large number" of un-precleared early polling place closures in Bexar County (San Antonio). Perales indicated that these polling places were in heavily populated Latino areas. Only after MALDEF filed an enforcement action under Section 5 were these changes enjoined. *Id.* at 309.

639.   Congress received testimony through the National Commission on the Voting Rights Act that "[t]here were a total of 165 objections, submission withdrawals and declaratory judgment actions favorable to minorities in Texas between 1982 and 2004. *Id.* at 273.

640.   Congress received testimony from Ronald Gaddie that "[t]he state with the most objections, Texas at 197, also has the largest number of covered subjurisdictions (254 counties, over 300 school boards, and over 1,200 incorporated cities)[.]" *May 16, 2006 Hearing*, at 80.

641.   Congress received evidence that on June 26, 1995, the U.S. Department of Justice interposed an objection to the proposed use of staggered terms and numbered posts for the City of Andrews in Andrews County, Texas. In its June 26, 1995 objection letter, DOJ found that the city's justifications for staggered terms and numbered post appear pretextual. In addition, DOJ observed that "[t]he electoral history of the city and within the county suggests that voting is polarized along racial and ethnic lines to such a degree that no person of Hispanic heritage has ever served as a councilmember." *October 25, 2005 Scope Hearing Vol. II*, at 2477-2481.

642.   Congress received evidence that on March 2, 1995, the U.S. Department of Justice interposed an objection to proposed changes concerning the Edwards Underground Water District in Bexar, Hays and Comal Counties, Texas. The objection letter references the fact that single-member districts were recently adopted by consent decree to settle a federal court challenge, *Williams v. Edwards Underground Water District*, C.A. No. SA92-CA0144, (W.D. Texas), to the existing water district election system that was based on one-person, one-vote grounds under the

Fourteenth Amendments and minority vote dilution grounds under Section 2. DOJ determined that the district's desire to hold a "timely general election did not necessarily require severing the Edwards election from the general ballot, and that once the decision to do so was made, that the failure to fully and clearly train poll officials and educate and assist voters further exacerbated the impact of holding the Edwards election on a separate ballot." *October 25, 2005 Scope Hearing Vol. II*, at 2473-2475.

643.    Congress received evidence that on February 17, 1995, DOJ interposed an objection to bilingual procedures to be used in the implementation of the National Voter Registration Act of 1993 for the State of Texas. In particular, DOJ found that "its examination of the proposed Spanish language materials reveals that some portions of the Spanish language translations are inconsistent with the English version, that there are numerous instances of misspelled Spanish words, and that there are instances of poor or incorrect Spanish word choice." DOJ concluded that "[a]s a result, persons relying on the proposed Spanish language translations have an increased likelihood of having their registration forms rejected." *Id.* at 2469-2472.

644.    Congress received evidence that on December 8, 1994, DOJ issued a letter to officials for the Judson Independent School District in Bexar County, Texas, in response to a request to reconsider DOJs November 18, 1994 objection. DOJ noted its continued objection to the district's failure to make materials available in English in connection with a bond election. DOJ rejected the district's contention that "there is only a very slight need for bilingual materials among the Hispanic electorate of the district" and found that this "provides no basis under the law for concluding that important election materials may be provided in English but not in Spanish." *Id.* at 2463-2465.

645.    Congress received evidence that on October 31, 1994, DOJ interposed an objection to a redistricting plan for the Gonzales County Underground Water Conservation District.  DOJ determined that the proposed redistricting plan was "grossly malapportioned."  In particular, DOJ observed that the City of Gonzales comprised a single district in the plan that was two and a half times the size of any other district.  DOJ also observed that this particular district contained nearly half of the minority population in the entire water district but still had an Anglo majority. Finally, DOJ also noted that "the minority community appears effectively to have been frozen out of the process which produced the redistricting plan" and observed that "none of the public hearing or meeting notices were posted in Spanish."  *Id.* at 2457-2459.

646.    Congress received evidence that on October 31, 1994, DOJ interposed an objection to the proposed increase in the number of officials on the municipal governing body for the City of Karnes in Karnes County, Texas.  DOJ found that the expanded at-large governing body would have the effect of limiting the effective use of single-shot voting in a context characterized by significant racially polarized voting.  In addition, DOJ also found that "little or no effort was made by the city to solicit the views of the Hispanic community."  *Id.* at 2454-2455.

647.    Congress received evidence that on October 21, 1994, DOJ interposed an objection to bilingual election procedures for the City of San Antonio in Bexar County, Texas.  DOJ observed that the city provided assistance and many materials bilinguals for the August 13, 1994, special referendum election, but provided the principal substantive document concerning the referendum election in English only.  DOJ noted that the city justified distribution of the document on the basis that it was "important for voters to know the components of the plan of which the project is a part."  DOJ observed that once the city provided this critical document to the public,

"it had an obligation to provide it so that all voters would benefit from its distribution, not only those who are proficient in English." *Id.* at 2451-2453.

648.    Congress received evidence that on September 12, 1994, DOJ interposed an objection to the method of election for the City of Morton in Cochran County, Texas. In its letter, DOJ noted that the hearing preceding adoption of the plan was "advertised only in English and it was not attended by any minority residents." In addition, DOJ noted that there was "no effort to so-licit specifically the view of the local minority community." Finally, DOJ also noted that the "city did not engage in any type of bi-lingual voter education program to ensure that minority voters would understand" the proposed change to the method of election. *Id.* at 2448-2449.

649.    Congress received evidence that on August 22, 1994, DOJ interposed an objection to a change in the method of election for the Edna Independent School District in Jackson County, Texas. In its letter, DOJ observed that the method of election was specifically designed to main-tain incumbents and provided at the expense of minority voters. In addition, DOJ observed that the district failed to provide sufficient election data to determine whether or not electoral contests are characterized by racially polarized voting. *Id.* at 2444-2447.

650.    Congress received evidence that on August 15, 1994, DOJ interposed an objection to the proposed expansion of the size of the at-large system for the Tarrant County Criminal Court located in Tarrant County, Texas. DOJ determined that the election of the additional judgeship seats by numbered place has the effect of eliminating the ability of the minority voters to use single-shot voting. *Id.* at 2441-2443.

651.    Congress received evidence that on June 13, 1994, DOJ interposed an objection to the method of election for trustees for the Mexia Independent School District in Limestone County, Texas. DOJ determined that the proposed plan provided protection to incumbents at the expense

of minority voters and noted an "apparent of racially polarized voting in school district elections." *Id.* at 2437-2439.

652.    Congress received evidence that on May 9, 1994, DOJ interposed an objection to the creation of a judgeship seat for the 385th Judicial District Court in Midland County, Texas. DOJ determined that the proposed election scheme would have a "racially discriminatory impact" on minority voters against a backdrop characterized by racially polarized voting patterns." *Id.* at 2430-2431.

653.    Congress received evidence that on April 18, 1994, DOJ interposed an objection to the polling place change for the Jefferson Volunteer Fire Department Building in Marion County, Texas. DOJ determined that the location of the polling place at issue "has divided the county along racial lines for some years." DOJ observed that the proposed polling place change was made after a racially polarized election in which a white challenger unseated a Black incumbent. DOJ concluded that the justification proffered for the change appeared "pretextual" and noted that the change appears to be "designed to thwart recent black political participation." *Id.* at 2427-2429.

654.    Congress received evidence that on November 19, 1993, DOJ interposed an objection to a proposed change concerning the Edwards Underground Water District in the State of Texas. Specifically, officials proposed to replace the elected board of directors with an appointed board. DOJ observed that none of the bodies responsible for making the appointments have a Hispanic majority among the selecting officials and found that Hispanic voters would have considerably less influence over the selection of members of the governing body than they do under the direct-election system for the water district. *Id.* at 2423-2426.

655.    Congress received evidence that on August 30, 1993, the DOJ interposed an objection to a proposed change concerning the commissioners court and justices of the peace/constables for Wharton County, Texas. The DOJ determined that the county's redistricting approach rested upon its assumption that Hispanic and black voters are not politically cohesive. However, the DOJ's independent analysis determined that Hispanic and black voters were politically cohesive in Wharton County. *Id.* at 2419-2421.

656.    Congress received evidence that on July 19, 1993, the DOJ interposed an objection to the proposed reduction in the number of justice of the peace and constable districts from four to one in Bailey County, Texas. The DOJ noted that the county proposed to reduce the size of the governing body while failing to recognize "existing electoral opportunities for minority voters." The DOJ also observed that "concerns have been raised about the timing of the decision" and the "nature and extent of minority participation in the county's decision-making process that led to the proposed change." *Id.* at 2416-2418.

657.    Congress received evidence that on June 4, 1993, the DOJ interposed an objection to proposed redistricting plan for the county commission in McCulloch County, Texas. The DOJ observed that the redistricting plan was adopted "[d]espite the significant increase in the percentage of Hispanic residents in the City of Brady" resulting in "unnecessary fragmentation" of the Hispanic population. Moreover, the plan was adopted in the face of "an apparent pattern of racially polarized voting." *Id.* at 2413-2415

658.    Congress received evidence that on May 10, 1993, the DOJ interposed an objection to the redistricting plan for the commissioner court districts in Castro County, Texas. The DOJ found unnecessary fragmentation of Hispanic voters and efforts to promote incumbency protec-

tion that were accomplished at the expense of minority voters. *October 25, 2005 Scope Hearing Vol. II*, at 2410-2412

659.    Congress received evidence that on May 4, 1993, the DOJ interposed an objection to procedures for conducting a January 5, 1993, special local option election in Bailey County, Texas. In its letter, the DOJ noted that the Attorney General had previously interposed objections to redistricting plans that were proposed to elect members of the commissioners court, and justices of the peace and constables. Despite these objections, officials permitted local residents to circulate their petitions in the objected-to district boundaries. The DOJ also noted that the county indicated the number of signatures obtained were sufficient to trigger an election in the district. Finally, the DOJ found that the county sought to use the unprecleared district boundaries despite having received notice of the objection on two separate occasions. *October 25, 2005 Scope Hearing Vol. II*, at 2408-2409

660.    Congress received evidence that on March 19, 1991, the DOJ interposed an objection to a proposed polling place change for Lubbock County Water Control and Improvement District No. 1 in Lubbock County, Texas. Officials sought to abandon the practice whereby voters could cast ballots at any District polling place and instead, designated voters to particular precincts each with its own polling place or places. The DOJ found that the vast majority of the Water District's population resides in Lubbock. The DOJ observed that the proposed plan sought to assign voters in the majority white precincts to polling sites inside the city but assigned those precincts serving minority voters to polling sites in "more remote and inaccessible rural communities." The DOJ also concluded that officials were eliminating use of a voting site that has historically been the "most convenient polling location for minority voters." *October 25, 2005 Scope Hearing Vol. II*, at 2300-2303.

661.    Congress had information before it that, in just five years, between 1975 and 1980, the Attorney General objected to eighty-six proposed changes in Texas, significantly more than the fifty-three changes objected to in Mississippi in the fifteen-year period between 1965 and 1980. *October 18, 2005 Hearing,* at 1255.

662.    Congress received testimony from former Justice Department Voting Section attorney, Mark Posner that "[t]he other states in which a large number of purpose redistricting objections were interposed were Louisiana and Texas. The Texas objections were particularly notable since the Section 5 concern often was that jurisdictions were seeking to limit the growing political power of Hispanic voters." *March 8, 2006 Hearing Vol. IV*, at 5515.

663.    In his testimony before Congress, Theodore Shaw discussed the 2002 objection to change in the method of electing city council members of the City of Freeport, Texas from single member to at large districts.  Shaw quoted the objection letter which noted "under [the single-member district method imposed by litigation settlement] minority voters have demonstrated the ability to elect candidates of choice in at least two districts." *November 9, 2005 Hearing*, at 19, n.5

664.    Congress received testimony of an October 4, 1991 DOJ objection to the redistricting plan for the City of Houston, Texas.  "As discussed in the objection letter, from 1980 to 1990 the city's Hispanic population grew by 60 percent, increasing from 18 to 28 percent of the total city population, while the black population percentage remained essentially unchanged and the white percentage decreased from 52 to 41 percent.  Although the city claimed that it sought to recognize the growing Hispanic population in drawing its new districts, the submitted plan—like the existing plan—provided only one district in which Hispanic voters would have the opportunity to elect a candidate of their choice and fragmented the remainder of the community into a number

186

of adjoining districts. Alternative plans developed during the redistricting process demonstrated that, by avoiding such fragmentation, the plan would contain two districts in which Hispanics would constitute a majority of the voting age population. The objection letter concluded that the goal of recognizing the Hispanic growth appeared to have been subordinated by the city to a concern for drawing districts that would protect the re-election chances of white incumbent councilmembers." *October 18, 2005 Hearing*, at 1418.

665.    Congress received evidence through a report entitled "Voting Rights in Texas, 1982-2006," which provided information that the Department of Justice interposed a Section 5 objection to an election change proposed by the state of Texas for the creation of fifteen additional Judicial Districts with numbered post requirements.  The Department of Justice stated in its objection that "[t]he history of the numbered post feature in Texas elections indicates that its adoption and continued maintenance over the years appears calculated to place an additional limitation on the ability of minority voters to participate equally in the political process and elect candidates of their choice." *Voting Rights in Texas, 1982-2006*, at 14 (Appended to the Statement of Nina Perales, July 13, 2006) (Wolfson Decl. Ex. 8).

666.    Congress received testimony through the renewthevra.org Texas State Report regarding a Section 5 objection interposed by the Department of Justice in 1997 to a near-totally white outlying area by Webster, Texas (Harris County) that would have reduced the voting strength of Hispanic and black residents.  In its review of the proposed annexation, the Department of Justice uncovered a largely Hispanic outlying area that was not considered for annexation by city officials.  It found that "the city's application of its annexation policy and the city's annexation choices appear to have been tainted, if in only in part, by an invidious racial purpose." *Id.* at 19-20.

    **b)**    **Requests for More Information Submitted Followed by With-drawals or Amendments**

    **(1)**    **Congressional Findings**

667.   The House Judiciary Committee stated that "Section 5's reach in preventing discrimination is broad. Its strength lies not only in the number of discriminatory voting changes it has thwarted, but can also be measured by the submissions that have been withdrawn from consideration, the submissions that have been altered by jurisdictions in order to comply with the VRA, or in the discriminatory voting changes that have never materialized." H.R. Rep. No. 109-478, at 36.

668.   The House Judiciary Committee found that "[t]he increased number of objections, revised submissions, and withdrawals over the last 25 years are strong indices of continued efforts to discriminate." H.R. Rep. No. 109-478, at 36.

669.   Congress found that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process. Pub. L. No. 109-246 § 2(b)(2), 120 Stat. 577.

    **(2)**    **Summary Statistical Evidence**

670.   Congress received a report by Luis Ricardo Fraga and Maria Lizet Ocampo titled "The Deterrent Effect of Section 5 of the Voting Rights Act: The Role of More Information Requests" arguing that "not every submitted change that ultimately results in an objection letter was preceded by the making of an MIR. A total of 792 objections were made to proposed changes during 1990-2005, however only 365 of these objections contained the issuance of a MIR at some point in the process of review. . . . The sum of the outcomes of withdrawals, superseded changes, and no responses, resulting from an MIR, is 855. This means that MIRs have resulted in directly affecting 855 additional changes, making their implementation illegal, in addition to

the 792 changes that resulted in objections." Thus, MIRs "increased the impact of the DOJ on submitted changes by 110%, i.e., doubling the number of changes that were not precleared by the DOJ." *March 8, 2006 Hearing Vol. II*, at 2553.

670A.  "*The Deterrent Role of Section 5 of the Voting Rights Act: The Role of More Information Requests*," was a study on More Information Requests (MIRs) authored by Luis Ricardo Fraga and Maria Lizet Ocampo.  The version received by the House of Representatives studied MIRs from 1990-2005 and found 855 MIRs that resulted in a withdrawn or superseded submission or no response. *March 8, Hearing Vol. II*, at 2537, 2565.  This figure was included in the House Judiciary Committee Report.  H.R. Rep. No. 107-478, at 40-41.  Subsequently, the authors expanded their study to MIRs from 1982 to 2005, and found 1162 MIRs that resulted in a withdrawn or superseded submission or no response.  This version was provided to the Senate.  S. Rep. No. 109-689, at 210, 225 (2006).  The table setting forth the MIR results by state is set forth here:

Table 3
Number of Changes, Objections, and MIR-Induced Outcomes by State, 1982-2005

| State | All Submissions | | MIRs Issued | | Outcomes for Changes Receiving a MIR | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Changes | Objections | # of MIR | More Info Req | No Objection | Objection | Withdraw | Superseded | No Response | Total MIR-Induced Outcome (WS, NR) | MIR-Induced Outcome and Objections | MIR-Induced Outcome/All Objections |
| ALABAMA | 24428 | 198 | 1159 | 301 | 743 | 58 | 64 | 24 | 93 | 181 | 379 | 0.91 |
| ALASKA | 5537 | 2 | 315 | 115 | 311 | 0 | 3 | 0 | 1 | 4 | 6 | 2.00 |
| ARIZONA | 26773 | 32 | 534 | 149 | 454 | 12 | 9 | 4 | 15 | 28 | 60 | 0.86 |
| ARKANSAS | 7 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| CALIFORNIA | 3374 | 60 | 186 | 9 | 114 | 2 | 4 | 1 | 0 | 5 | 65 | 0.08 |
| COLORADO | 132 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| FLORIDA | 3514 | 14 | 196 | 242 | 177 | 4 | 8 | 0 | 0 | 8 | 22 | 0.57 |
| GEORGIA | 53646 | 370 | 3274 | 539 | 2528 | 102 | 156 | 12 | 25 | 193 | 563 | 0.52 |
| HAWAII | 289 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| ILLINOIS | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| LOUISIANA | 23903 | 274 | 1512 | 400 | 1047 | 159 | 45 | 15 | 13 | 73 | 347 | 0.27 |
| MASSACHUSETTS | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| MICHIGAN | 365 | 0 | 24 | 1 | 19 | 0 | 5 | 0 | 0 | 5 | 5 | - |
| MISSISSIPPI | 11753 | 151 | 874 | 125 | 499 | 123 | 58 | 14 | 21 | 93 | 244 | 0.62 |
| NEW HAMPSHIRE | 227 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| NEW MEXICO | 201 | 1 | 59 | 57 | 55 | 0 | 1 | 3 | 1 | 4 | 5 | 4.00 |
| NEW YORK | 4217 | 14 | 121 | 75 | 34 | 4 | 51 | 0 | 2 | 53 | 67 | 3.79 |
| NORTH CAROLINA | 12305 | 142 | 832 | 96 | 582 | 75 | 22 | 4 | 3 | 29 | 171 | 0.20 |
| SOUTH CAROLINA | 23594 | 796 | 1186 | 234 | 856 | 77 | 36 | 3 | 64 | 103 | 899 | 0.13 |
| SOUTH DAKOTA | 2011 | 1 | 51 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 1 | 0.00 |
| TEXAS | 162397 | 194 | 3034 | 760 | 2036 | 129 | 185 | 120 | 61 | 366 | 560 | 1.89 |
| VIRGINIA | 28768 | 31 | 337 | 15 | 271 | 18 | 10 | 0 | 7 | 17 | 48 | 0.55 |
| WYOMING | 201 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| Totals | 367673 | 2280 | 13697 | 3120 | 9778 | 753 | 656 | 198 | 308 | 1162 | 3442 | 0.51 |

S. Rep. No. 109-689, at 210. Texas is the state with the most MIRs (366) that were withdrawn (185) or superseded (120) or where there was no response (61). *Id.*

671.    Chandler Davidson informed Congress that the Fraga and Ocampo study was an improvement on the study of submission withdrawals contained in the report of the National Commission on the Voting Rights Act. *May 9, 2006 Hearing*, at 69-70.

672.    Congress received testimony from Anita Earls that, while the percentage of objections may have decreased since 1982, "the number of More Information Requests (MIRs) issued by the DOJ to deter voter dilution actually increased (from an average of 47.3 withdrawn, superseded, and no response MIRs from 1982 to 1998, to an average of 51 such MIRs per year from 1999 to 2005)." *May 16, 2006 Hearing*, at 70.

673.    Congress received testimony from Anita Earls that "[a]n analysis of the DOJ's activity pre and post-*Bossier II* shows how [the decision] has functioned to hinder voting equality. Between 1982 and 1999, the DOJ objected to an average of 124 submissions a year. Following

190

*Bossier II*, that average dropped to 9 objections a year.  It is important to note that at the same time the number of objections fell to less than 10% of their previous average, the number of More Information Requests (MIRs) issued by the DOJ to deter voter dilution actually increased (from an average of 47.3 withdrawn, superseded, and no response MIRs from 1982-1998, to an average of 51 such MIRs per year from 1999 to 2005)." *Id.* at 70.

674.    Congress received testimony through the National Commission on the Voting Rights Act that "despite a general decline in objections beginning in the early nineties, there continues to be an appreciable number of interventions of various kinds by the Department of Justice and by private plaintiffs to prevent vote discrimination.  And in the period from 1982 through 2004, more of these interventions occurred than in the Act's earlier years." *March 8, 2006 Hearing Vol. I*, at at 196.

675.    Congress received testimony through the National Commission on the Voting Rights Act that "[w]hile no data on submission withdrawals prior to 1982 were available for the Commission's analysis, the post-1982 data revealed 205 withdrawals, compared with 626 objections and 25 declaratory judgment actions favorable to minorities in the same period." *March 8, 2006 Hearing Vol. I*, at 220.

676.    Congress received testimony from Anita Earls that More Information Requests "are a useful tool in deterring voter discrimination, often signaling to the local authorities that new policies may be questionable."  She noted that since policies that are likely to be objected to are preemptively withdrawn, the number of withdrawn or altered policies should be considered "in the same vein as an objection."  She further noted the study of MIRs by Fraga and O'Campo who concluded that "since 1982 the use of MIRs has increased the deterrent effect of Section 5 by 51 percent." *May 16, 2006*, at 53.

677.    Congress heard testimony from Anita Earls that stressed the importance of tallying jurisdictions' withdrawals of their submissions to the Department of Justice as a measure of their attempt to discriminate when measuring the DoJ's impact under Section 5. "Below the surface [of DoJ objections], what you don't see are all the times the Justice Department writes letters requesting more information on a submission, and as a result of that, the jurisdiction changes its plans and brings them into compliance. . . . It doesn't even have to rise to the level of a written letter for more information. [The Justice Department] gets a submission; they make phone calls; make inquiries; the jurisdiction says, 'Oh, you're right.'. . . They change what they're planning to do." *March 8, 2006 Hearing Vol. I*, at 300.

678.    Congress received a report by the Chief Justice Earl Warren Institute on the VRA stating that, "[a]nother study gauged Section 5's effectiveness by analyzing how the Department of Justice acted upon election changes submitted from Section 5 covered jurisdictions from 1990 to 2005, focusing on the issuance of more information requests ("MIRs")—a formal letter requesting the submitting jurisdiction provide additional information about the proposed change—rather than solely on objections to changes. Issuing an MIR can prevent implementation of a discriminatory voting change because upon receiving an MIR, a covered jurisdiction may choose whether or not to respond, but still cannot implement the proposed voting change without receiving preclearance. In this first-ever analysis of MIRs, the authors find that MIRs play a significant and more far-reaching role than objections in two ways. First, more MIRs are issued than objections. While the number of both objections and MIRs issued has declined dramatically since 1995, the number of MIRs issued (6,717) between 1990 and 2005 exceeds the number of objections by a factor of eight. Second, MIRs are issued regarding a larger variety of proposed election changes than objections. While method of election, redistricting, and annexations ac-

counted for nearly all (82.3%) objections issued, these topics only comprised 49.5% of MIRs issued. A substantial portion of MIRs was also issued for submissions regarding polling place changes, precincts, and voter registration." *May 4, 2006 Hearing Part I*, at 275-276.

679.    Congress received a report by the Chief Justice Earl Warren Institute on the VRA stating that, "[a]nalysis of the final outcome of changes receiving MIRs shows their preventative effect. Between 1990 and 2005, 365 submissions receiving MIRs were ultimately resolved with an objection to the proposed change (of 792 total objections). Moreover, an additional 855 submissions receiving MIRs ended with withdrawals, superseded changes, and no responses, effectively invalidating these proposed changes and increasing the impact of the DOJ on submitted changes by 110% more than objections alone." *May 4, 2006 Hearing Part I*, at 276.

680.    Congress received a report by Luis Ricardo Fraga and Maria Lizet Ocampo titled "The Deterrent Effect of Section 5 of the Voting Rights Act: The Role of More Information Requests" stating that Texas "surpasses all of the other states by far with a total of 112,261 submitted changes from 1990-2005." The number of submissions in Texas "is followed by Georgia with a total of 34,733 submissions, just under one-third the number from Texas. Louisiana, Arizona, Alabama, Virginia, and South Carolina comprise a third major group with 17,765, 17,612, 17,129, 16,697, and 15,358 submitted changes respectively. The number of submitted changes drops significantly to 8,229 from North Carolina and 7,411 from Mississippi." *March 8, 2006 Hearing Vol. II*, at 2550.

### (3)    MIRs in Covered Jurisdictions Other than Texas

681.    Congress received a report by Luis Ricardo Fraga and Maria Lizet Ocampo titled "The Deterrent Effect of Section 5 of the Voting Rights Act: The Role of More Information Requests" that MIRs (more information requests) are issued at a higher rate than letters of objec-

tions and "[a]s such, they have the potential to affect a wider range and larger number of changes, relative to objections, submitted to the DOJ for review. . . . Second, [the] measure of the impact of MIRs that were likely to serve as deterrents to the pursuit of procedures and practices that could have a discriminatory effect on African Americans and language minorities demonstrates that MIRs double the number of changes that did not have legal standing to be implemented under Section 5." *March 8, 2006 Hearing Vol. II*, at 2555-2556.

682.    Congress heard testimony from Armand Derfner that "[b]earing in mind that each objection is the equivalent of an injunction, these objections are part of the tapestry depicting a continuing major problem.  Moreover, Section 5, as a prophylactic, prevents many potentially discriminatory voting changes that never get reflected in an objection—for example, proposed changes that don't get enacted or that are withdrawn in the face of requests for more information." *May 17, 2006 Hearing*, at 75.

683.    Congress heard testimony from Chandler Davidson about the sources showing "the need for kind of extensive legislation" that Congress was considering for the Voting Rights Act including Department of Justice data such as objections and more information requests resulting in withdrawals.  Davidson concluded that "I think the inference that could be made is that they saw the handwriting on the wall that those would be changed that would be objected to if they did not withdraw them." *May 9, 2006 Hearing*, at 32.

684.    Congress was presented with a report, Voting Rights in Louisiana: 1982-2006, that indicated that "by sending more information letters to submitting jurisdictions, which point out deficiencies in a submission and require jurisdictions to provide supplementary information, the DOJ has deterred and/or effectively blocked additional discriminatory voting changes in Louisiana. Congress was presented with testimony that no fewer than 17 Louisiana parishes chose to

withdraw 22 submissions, most of them redistricting proposals, since the 1982 renewal after additional information was requested. Congress was presented with testimony that DOJ's request for more information puts jurisdictions on notice of the deficiencies of their submissions, and the jurisdictions withdrew the submissions rather than face a likely objection." *March 8, 2006 Hearing Vol. II*, at 1625.

685.    Congress received testimony from Wade Henderson about a 1990 redistricting plan in Alaska that was harshly criticized on the grounds that it diluted Native votes, disregarded differences between Native groups, and had allegedly been prepared in secret.  A coalition of Native groups appealed to DOJ not to preclear the plan and identified its retrogressive components.  DOJ requested more information about the plan and a trial court rejected the plan as unconstitutional. *March 8, 2006 Hearing Vol. I*, at 68.

686.    Attorney Robert McDuff testified before Congress that many jurisdictions who, following a pre-clearance submission, received a request for more information withdrew the proposed change, submitted a superseding change, or made no timely response which effectively terminates a pending submission. *May 10, 2006 Hearing*, at 87-88.

687.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "[b]y sending 'more information' letters to submitting jurisdictions, which point out deficiencies in a submission and require jurisdictions to provide supplementary information, the DOJ has deterred and/or effectively blocked additional discriminatory voting changes in Louisiana.  No fewer than 17 Louisiana parishes chose to withdraw 22 submissions, most of them redistricting proposals, since the 1982 renewal after additional information was requested.  It stands to reason that the DOJ's request for more information put the jurisdictions on notice of the deficiencies of their submissions.  Accordingly, in these situations, the jurisdictions

withdrew the submissions rather than face a likely objection." Congress was presented with evidence that this pattern "makes it clear that but for the prophylactic scrutiny of the Section 5 preclearance process, white officials would have successfully shut African-American citizens out of decisions with substantial impact on voters." Congress was presented with evidence that if Section 5 expired, "the burden of proof will once again be on the victims of discrimination, and secrecy will be on the side of the officials who practice it." *March 8, 2006 Hearing Vol. II*, at 1625.

688.    Wade Henderson submitted a report to Congress ("Voting Rights in Louisiana, 1982-2006") which stated that "[b]y sending 'more information' letters to submitting jurisdictions, which point out deficiencies in a submission and require jurisdictions to provide supplementary information, the DOJ has deterred and/or effectively blocked additional discriminatory voting changes in Louisiana." The report further stated that "no fewer than 17 Louisiana parishes chose to withdraw 22 submissions, most of them redistricting proposals, since the 1982 renewal after additional information was requested." Congress was presented with testimony that "[t]he DOJ's request for more information put the jurisdictions on notice of the deficiencies of their submissions," and "the jurisdictions withdrew the submissions rather than face a likely objection." *Id.* at 1625.

689.    Congress received a report analyzing the effect of the Voting Rights Act on Congress which discussed the deterrent effect of More Information Requests: "More Information Requests ["MIR or MIRs"] by DOJ provide another way to measure the impact of Section 5," by documenting instances in which "jurisdictions were prepared to implement" discriminatory changes but decided to forego them based on an MIR. A 2005 study by Fraga and Ocampo at Stanford

University sets forth "objective factors that document the full, deterrent effect of Section 5." *Id.* at 1846.

690.    Congress was presented the Louisiana report analyzing the Voting Rights Act noting that "[b]y sending 'more information' letters to submitting jurisdictions, which point out deficiencies in a submission and require jurisdictions to provide supplementary information, the DOJ has deterred and/or effectively blocked additional discriminatory voting changes in Louisiana." The report stated that "[n]o fewer than 17 Louisiana parishes chose to withdraw 22 submissions, most of them redistricting proposals, since the 1982 renewal after additional information was requested." *Id.* at 1625.

691.    Congress received a report analyzing the effect of the Voting Rights Act on New York noting that More Information Requests by the Department of Justice have played a significant role in New York in deterring discriminatory voting changes. Between 1990 and 2005, DOJ issued a total of 113 MIRs to New York, of which "53 resulted in outcomes" (such as withdrawals or superceding changes) that are the equivalent to interposing an objection. Thus, in effect, from 1990 to 2005, there were an additional 53 proposed voting changes that were prevented by the Section 5 preclearance process. *Id.* at 1848.

692.    Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that since 1982, there are 10 instances in North Carolina in which Section 5 submissions were withdrawn from consideration before DOJ made a determination; five of these instances occurred since 2000. Henderson testified that such withdrawals are a strong indication of Section 5's effectiveness in blocking unlawful voting changes. *Id.* at 1729.

(4)    **MIRs in Texas**

693.    The House Judiciary Committee received information that from August 5, 1982 to 2004, there were more withdrawals of Section 5 submissions after DOJ requested more information letters from Texas jurisdictions than in any other state. H.R. Rep. No. 109-478, at 83.

### c)     Section 5 Enforcement Actions

#### (1)     Congressional Findings

694.    The House Judiciary Committee report references testimony discussing Mississippi's effort to impose a dual registration system and Section 5's role in preventing it.  According to the report, in 1987, Mississippi's dual registration system was struck down, and the State attempted to revive a dual system in 1995—one system for federal elections and one for state and local elections.  The Report states that Mississippi did not submit the system for preclearance until a Section 5 enforcement action compelling it to do so was filed.  In addition, the Report notes that the Department of Justice denied preclearance to the dual system submission.  H.R. Rep. No. 109-478, at 39.

695.    It was reported to the House Judiciary Committee that in California "there is a significant problem relating to the enforcement of the Section 5 preclearance provisions."  The Committee noted that in *Lopez v. Monterey County*, the Supreme Count found that the California county had not submitted changes pursuant to Section 5, "[t]he County, although covered by Section 5 of the Act, failed to seek Federal preclearance for any of its six consolidation ordinances.  Nor did the State preclear its 1979 law[.]"  H.R. Rep. No. 109-478, at 42.

#### (2)     Enforcement Actions in Covered Jurisdictions Other than Texas

696.    Congress received testimony from Anita Earls stating that "[e]vidence that a law is being complied with is not a reason to do away with it."  She cited evidence that certain jurisdictions are not complying with the act, such as South Dakota enacting hundreds of statutes affect-

ing elections that were not submitted between 1976 and 2002 and a county in Alabama that

failed to submit voting changes for preclearance from 1995 to 2005. However, she stated, "the

most important question is whether Congress has reason to believe that racially discriminatory

laws and practices that disadvantage minority voters will be put in place in the covered jurisdic-

tions if Section 5 is not renewed." She concluded there is a strong basis for concluding that ret-

rogression will occur if Section 5 is not renewed. *May 17, 2006 Hearing*, at 62.

697.    The House Judiciary Committee found that "covered jurisdictions continue to resist

submitting voting changes for preclearance, as required by Section 5." The Committee found

that the ability of the federal government and private citizens to file Section 5 enforcement ac-

tions "played a critical role" in ensuring full compliance was achieved. H.R. Rep. No. 109-478,

at 41-42.

698.    Laughlin McDonald, attorney with the ACLU Voting Rights Project testified that

there was still a need for Section 5 in Alabama because as of 1984, Greensboro, Alabama had

never elected a black representative despite having a population that was 63% black. McDonald

testified that the city had at-large elections until a lawsuit by a black candidate under Section 5,

when the city switched to single member districts. *March 8, 2006 Hearing Vol. I*, at 302.

699.    Congress received testimony through the National Commission on the Voting Rights

Act that there have been 22 successful Section 5 enforcement actions in Alabama since 1982.

*March 8, 2006 Hearing Vol. I*, at 250.

700.    Through the National Commission on the Voting Rights Act, Congress received tes-

timony from James Blacksher, citing *Boxx v. Bennett* (1999) where voters in Jefferson County,

Alabama were forced to challenge the State's change in election law that, for the first time in the

State's history, authorized a single voter to demand a recount prior to filing a formal election

challenge and with no requirement of court supervision. The persons demanding recounts had focused solely on alleged irregularities in majority African-American precincts. *October 25, 2005 Scope Hearing Vol. II*, at 3203-3204.

701.    Through the National Commission on the Voting Rights Act, Congress received testimony from James Blacksher, noting that in the past 3 years, over 65 municipalities in Alabama have agreed to redraw their single-member districts with 2000 census data and submit them for Section 5 preclearance. This has resulted in the current operation of a number of fair election systems under Alabama law. *October 25, 2005 Scope Hearing Vol. II*, at 3204.

702.    Congress received testimony through the National Commission on the Voting Rights Act found that there have been 3 successful Section 5 enforcement actions in Arizona since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

703.    Joe Rogers, Member of the National Commission on the Voting Rights Act, testified before Congress regarding Monterey County, California refusal's to submit seven different voting changes that occurred between 1972 and 1983 until litigation in the 1990's (*Lopez v. Monterey County*) compelled them to do so. *March 8, 2006 Hearing Vol. I*, at 173.

704.    Congress received testimony through the National Commission on the Voting Rights Act that there have been 17 successful Section 5 enforcement actions in Georgia since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

705.    Congress received testimony from Laughlin McDonald about the role that a Section 5 enforcement action played in undermining the efforts of local officials to attempt to move Henry Cook, an African-American and Chairman of the Randolph County (Georgia) School Board, out of his district. In 2002, the DOJ precleared the school board's redistricting plan after receiving confirmation that Cook would remain in his prior district, District 5 (he lived on the border of