District 4 and District 5 in the precleared plan), and Cook received a registration card identifying him as a resident of District 5. His white opponent in District 5 in 2002 challenged him on residency grounds and lost. Before the 2006 election, Cook received a registration card identifying him as a resident of District 4 even though he had not changed residency since 2002. Local citizens represented by the ACLU filed a Section 5 enforcement action requesting that the court enjoin the Randolph County from reassigning Cook to District 4 unless the county submitted and received preclearance. *May 9, 2006 Hearing*, at 243-47. On September 12, 2006, less than two months after the VRARA was signed into law, the Department of Justice objected   to the proposed reassignment of Cook on discriminatory purpose grounds. Letter from Wan J. Kim, Assistant Attorney General, Civil Rights Division, to Tommy Coleman, Esq., Hodges, Erwin, Hedrick & Coleman (Sept. 12, 2006), *available at*

http://www.usdoj.gov/crt/voting/sec_5/ltr/l_091206.html (last visited May 13, 2007).

706.    Congress heard testimony through the National Commission on the Voting Rights Act that there have been 5 successful Section 5 enforcement actions in Louisiana since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

707.    Congress was presented with testimony that "Louisiana's record of complying with Section 5 for local elections is even worse than its record for state elections, which is precisely why Section 5 arguably plays such an important role in Louisiana in preventing voting discrimination for local office." Congress was presented with testimony that the Western District Court of Louisiana, which has enjoined multiple elections in jurisdictions that failed to preclear voting changes, enjoined in 1991 the city of Monroe "from holding elections in Wards 1, 2, and 4 until obtaining preclearance for elections to the City Court, in a jurisdiction of approximately 18,000 African Americans." *March 8, 2006 Hearing Vol. II*, at 1627 (internal footnotes omitted).

708.    Congress heard testimony from Wade Henderson that, in 1997, the Supreme Court, in *Young v. Fordice*, 520 U.S. 273 (1997), held that Mississippi violated Section 5 by refusing to submit for preclearance a number of changes to state law made in order to confirm with the National Voter Registration Act.  *March 8, 2006 Hearing Vol. I*, at 55.

709.    Congress heard testimony through the National Commission on the Voting Rights Act that there have been 15 successful section 5 enforcement actions in Mississippi since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

710.    A report submitted to Congress authored by the National Commission on the Voting Rights Act provided an example from Mississippi where section 5 reinforced the findings of a section 2 lawsuit.  In that case, "[f]ollowing Congress's amendment of Section 2 in its [1982] reauthorization . . . Mississippi's system [of dual voter registration] was finally challenged by a Section 2 suit, and in 1987, a federal court found that the system was adopted for a discriminatory purpose and had a discriminatory effect . . . .  However, . . . in 1993, the state once more adopted a dual registration system, becoming the only state in the union to require people who registered to vote in federal elections at drivers' license offices and other NVRA-sanctioned offices to register yet again for state and local elections. . . .  After at first refusing to submit the changed procedure to the Department of Justice for preclearance, Mississippi was forced to do so by a Section 5 enforcement action, with the U.S. Supreme Court unanimously ruling that the state was required to submit the change. When the state did so, the Department of Justice issued an objection, finding, just as the court had found in the 1987 Section 2 case, that the new dual system was racially discriminatory both in purpose and effect." *March 8, 2006 Hearing Vol. I*, at 176.

711.    Congress was presented with information through the National Commission on Voting Rights Act that "[a]s a result of the litigation filed under Section 2, and Section 5 and enforcement of Section 5 by the Justice Department . . . judicial districts [in Mississippi] were redrawn, and a significant number of African-American judges [were elected.]" *March 8, 2006 Hearing Vol. I*, at 365-366.

712.    Congress heard testimony from Wade Henderson indicating that, in November 2005, a three-judge federal court enjoined the city of McComb, Mississippi from enforcing a state court order it had obtained that removed a black member of McComb's Board of Selectmen from his seat by changing requirements for holding office.  The court noted that the city did not preclear this change. *March 8, 2006 Hearing Vol. I*, at 55 (*citing Myers v. City of McComb*, No. 3:05-cv-00481 (S.D. Miss. Nov. 23, 2005) (three-judge court)(unpublished order).

713.    Congress received testimony from Wade Henderson that in Mississippi in 1986, the federal district court in *Kirksey v. Allain*, enjoined elections until preclearance was obtained. When state officials submitted plans, the Department of Justice objected because of the numbered post requirement. *March 8, 2006 Hearing Vol. I*, at 55.

714.    Anita Earls testified before Congress that Section 5 and Section 2 often work together to protect minority voters.  For example, in Mississippi, dual registration requirements were implemented intentionally to disadvantage minority voters and were challenged under Section 2.  A Section 5 enforcement action and subsequent objection kept the Section 2 remedies in place. *May 16, 2006 Hearing*, at 146.

715.    Congress received testimony through the National Commission on the Voting Rights Act that there have been 15 successful Section 5 enforcement actions in Mississippi since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

716.    Congress received testimony from Joe Rogers, a member of the National Commission on the Voting Rights Act that after the Mississippi dual registration system was found to be discriminatory under Section 2, the state tried to reinstate it after the passage of NVRA and refused to submit the voting change for preclearance.  After the Supreme Court ruled the state must preclear the change, DOJ objected preventing the reinstitution of a discriminatory discrimination practice. *March 8, 2006 Hearing Vol. I, at 88.*

717.    Congress received testimony from Wade Henderson that in Mississippi in 1997, the state refused to submit changes in state law made to conform to NVRA for preclearance.  The court in *Young v. Fordice* concluded that state had violated Section 5 and could not go forward with changes until preclearance was obtained.  *March 8, 2006 Hearing Vol. I, at 55*

718.    Wade Henderson testified before Congress about the continued noncompliance with Section 5 by jurisdictions in the State of Mississippi.  He noted that immediately after the passage of the Act, the state "refused to comply with their obligations under Section 5." Two years later the Supreme Court, in *Perkins v. Matthews*, found that the City of Canton violated Section 5 by changing from ward to at-large elections, changing polling place locations and annexations. He added that "[a]t times over the years, black voters had to return to the courts to force state and local officials to fulfill the basic requirement of submitting voting changes for Section 5 review." He cited cases in 1986 and 1997 and noted that "[a]s recently as November 2005, a three-judge federal court enjoined the city of McComb from enforcing a state court order it had obtained that removed a black member of that city's Board of Selectmen from his seat by changing the requirements for holding that office." The change had not been precleared. *March 8, 2006 Hearing Vol. I,* at 54-55.

719.    Congress received testimony that following the passage of Section 5 of the Voting Rights Act, Mississippi repeatedly implemented a dual registration system that created obstacles for African-Americans registering to vote. Two separate lawsuits by private citizens ultimately led to the state abolishing the dual registration system. The first lawsuit, which reached the Supreme Court, held that the state must submit the change (the dual registration system) for pre-clearance. DOJ subsequently found the change had a racially discriminatory purpose and effect and refused to preclear the change. The Mississippi legislature's efforts to create a unitary registration system were vetoed by then Governor Kirk Fordice. Private citizens filed suit again and in 1998 the State's dual registration system was finally abolished. *March 8, 2006 Hearing Vol. I,* at 367-368.

720.    Congress received testimony that Mississippi officials delayed complying with Section 5 for several years after the VRA passed in 1965. In 1969, the state submitted three 1966 voting changes that were the subject of *Allen v. State Board of Elections*, 393 U.S. 544 (1969), and DOJ objected to each of the changes. *March 8, 2006 Hearing Vol. II,* at 1713.

721.    Congress received testimony that in Mississippi "[a]fter the Supreme Court's 1969 decision in *Allen*, the state finally submitted the three 1966 laws that were the subject of that case, leading to the first Section 5 objection in the state. It came on May 21, 1969, when DOJ objected to all three of those laws - one changing the method of selecting county superintendents of education in eleven counties from election to appointment; one giving counties the right to elect their boards of supervisors at-large rather than by districts; and one adding burdensome new qualification requirements for independent candidates in general election. *May 10, 2006 Hearing,* at 136.

722.    Congress received testimony documenting attempts in Mississippi to implement dis-

criminatory redistricting plans beginning in 1966 and continuing after 1982: "The Mississippi

legislature's 1966 backlash against the Voting Rights Act included a law giving counties the op-

tion of electing their governing boards (known as boards of supervisors) at-large rather than by

single-member districts as required under pre-existing state law.  This would have allowed white

majority counties to ensure that all five members of the county board of supervisors would be

chosen by the majority-white electorate, thus preventing integration in county government.  That

was one of the laws that the Supreme Court in *Allen* said could not be enforced absent preclear-

ance, and one in the first group to draw an objection from DOJ under Section 5.  But the efforts

did not stop there.  The 1971 legislature passed an act authorizing counties to convert to at-large

elections with residency districts, a slight variation on the nullified 1966 law.  Once again, DOJ

objected.  Two counties, Grenada and Attala, adopted at-large elections anyway, each drawing

an objection in 1971.  After those efforts failed, both Grenada and Attala Counties designed re-

districting plans that caused DOJ to again object (in 1973 and 1974 respectively).  Grenada

County then concocted another plan that led to still another objection in 1976.  Eleven years later,

DOJ was once more compelled to object to yet another Grenada County redistricting plan." *May*

*10, 2006 Hearing*, at 138.

723.    Wade Henderson presented Congress with testimony regarding the voting problems

that led to the U.S. Supreme Court decision in *Young v. Fordice*.  Henderson testified that when

the State began implementing procedures to conform to the National Voter Registration Act

(NVRA), some voters were registered for only federal elections while others who used the form

provided by the Department of Public safety were registered for both state and federal elections.

Henderson further testified that only after the Supreme Court order did Mississippi submit these changes for preclearance and DOJ subsequently objected. *May 10, 2006 Hearing*, at 148-149

724.     Wade Henderson presented testimony to Congress that the Supreme Court has twice intervened when Mississippi has failed to comply with Section 5.  Henderson stated that in 1969, the Court in *Allen v. Board of Education* held that the state must submit voting changes for pre-clearance.  Henderson further testified that in 1971, in *Perkins v. Matthews,* the Court held that the city of Canton, Mississippi violated Section 5 when it attempted to enforce a change from ward to at-large elections for the city council, a change in polling place locations and an altera-tion of the city's voting population through annexation. *May 10, 2006 Hearing*, at 139.

725.     Wade Henderson presented Congress with testimony that since the passage of the Voting Rights Act, Mississippians have had to file lawsuits in court to make state and local offi-cials comply with Section 5 preclearance requirements.  Henderson stated that one example was the 1986 decision in *Kirksey v. Allain* where a federal district court required the state to seek pre-clearance for laws passed that added new state trial court judgeships elected under a numbered post system.  Henderson testified that DOJ subsequently objected to many of the numbered post requirements. *May 10, 2006 Hearing*, at 139.

726.     Congress received testimony through the National Commission on the Voting Rights Act found that there have been 3 successful Section 5 enforcement actions in North Carolina since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

727.     Wade Henderson submitted a report to Congress ("Voting Rights in North Carolina, 1982-2006") which stated that Section 5 enforcement actions and DOJ objections have, on sev-eral occasions, prevented North Carolina jurisdictions from using the "whole county" provision of the state constitution to weaken minority voting power. Henderson stated this provision pro-

207

vides that no county can be divided in the formation of a Senate or Representative district, and can be used to dilute minority voting strength. *March 8, 2006 Hearing Vol. II*, at 1759.

728.    Congress received testimony through the National Commission on the Voting Rights Act found that there have been 10 successful Section 5 enforcement actions in South Carolina since 1982. *March 8, 2006 Hearing Vol. I*, at 250.

729.    The House Judiciary Committee received testimony involving Lee County, South Carolina where, in 1994, the county attempted to hold special elections under an unprecleared redistricting plan instead of using its precleared 1993 plan.  The Department of Justice and NAACP sued and the three-judge court vacated the results of the special primary election that had already been held and enjoined further use of the unprecleared plan.  H.R. Rep. No. 109-478, at 43.

730.    The House Judiciary Committee received testimony that "between 1976 and 2002, South Dakota enacted more than 600 statutes and voting changes, seeking preclearance in less than five cases."  This was after former South Dakota Attorney General William Janklow described the preclearance requirement as a "facial absurdity" and advised against compliance, stating "I see no need to proceed with undue speed to subject our State laws to a 'one-man veto' by the United States Attorney General."  In 2002, members of the Oglala and Rosebud Sioux Tribes in Shannon and Todd counties sued the State of South Dakota, with the assistance of the ACLU, to enforce Section 5's requirements.  These efforts resulted in a consent decree under which the State agreed to fulfill its preclearance obligations over a 3-year period.  H.R. Rep. No. 109-478, at 42.

731.    Congress received testimony from the National Commission on the Voting Rights Act about noncompliance with the Voting Rights Act in South Dakota:  "In one troubling case it

was discovered, in the words of a federal judge, 'from . . . 1976 [when two counties in South Dakota were first subject to Section 5] until 2002, South Dakota enacted over 600 statutes and regulations that affected elections or voting in Shannon and Todd Counties, but submitted fewer than 10 for preclearance.' Only after Indians in the counties brought suit against the state in 2002 to enforce compliance with Section 5 did the state begin to submit the statutes to the Department of Justice." *March 8, 2006 Hearing Vol. I,* at 172-173.

732.    Congress received testimony from Bryan Sells who submitted a prepared statement citing *Emery v. Hun,* "a successful challenge in 2000 to the [South Dakota] state legislature's decision in 1996 to abolish a single-member house district on the Cheyenne River Reservation that was specifically created in 1991 to avoid minority vote dilution." *October 25, 2005 Scope Hearing Vol. II,* at 3292.

733.    Through the National Commission on the Voting Rights Act Congress received testimony from Bryan Sells citing continued instances of non-compliance with the consent order entered into by the parties in *Elaine Quick Bear Quiver v. Secretary of State Hoyce Hazeltine.* Sells noted plaintiffs in the case later obtained a temporary restraining order enjoining the South Dakota Secretary of State from implementing House Bill 1265 absent DOJ preclearance. The district court subsequently turned the temporary restraining order into a preliminary injunction. The court noted South Dakota's intentional history of non-compliance with the VRA, including the Secretary of State's refusal to seek preclearance for the State's 2001 legislative redistricting plan. The court also found that House Bill 1265 was a "rushed attempt to circumvent the VRA." *October 25, 2005 Scope Hearing Vol. II,* at 3290.

734.    Congress received testimony through the National Commission on the Voting Rights

Act found that there has been 1 successful Section 5 enforcement actions in Virginia since 1982.

*March 8, 2006 Hearing Vol. I*, at 250.

### (3)    Enforcement Actions in Texas

735.    Congress received testimony through the National Commission on the Voting Rights

Act that there have been 29 successful Section 5 enforcement actions in Texas since 1982.

*March 8, 2006 Hearing Vol. I*, at 250.

736.    Congress received testimony through the National Commission on the Voting Rights

Act that journalist Victor Landa testified before the National Commission's Southern Regional

Hearing regarding an election in San Antonio, Texas where early polling places were going to be

moved away from predominantly Latino areas of town, allegedly because fewer people voted in

the Latino neighborhoods than in other areas.  Landa testified that, because the changes were not

submitted to the Department of Justice for preclearance, the changes were stopped before they

were implemented. *March 8, 2006 Hearing Vol. I*, at 299.

737.    Congress heard testimony through the National Commission on the Voting Rights

Act describing the testimony of Claude Foster of NAACP that "alluded to the events in 2004 at

predominantly black Prairie View A&M University, mentioned above, whereby efforts by white

officials to suppress black students' votes were thwarted by a Section 5 enforcement action - a

suit brought by the student NAACP chapter to prevent Waller County from implementing unpre-

cleared voting changes." *March 8, 2006 Hearing Vol. I*, at 307-08.

738.    Congress received testimony from Nina Perales, describing how in Bexar County

(San Antonio), "in the spring of 2003 a 'very large number' of early polling places were closed

in heavily populated Latino areas, without a timely submission of the changes for preclearance.

Only after MALDEF filed an enforcement action under Section 5 were these changes enjoined." *March 8, 2006 Hearing Vol. 1*, at 309.

739.    Congress received information in an essay authored by Mark Posner that, "[n]early all local jurisdictions complied with Section 5 by not implementing plans to which objections were interposed.  There were a few exceptions to this record of Section 5 compliance, notably involving jurisdictions in Arizona and Texas.  In response to these violations, lawsuits were filed by the United States and private plaintiffs to enforce Section 5, and the district courts generally enjoined the violations." *October 18, 2005 Hearing,* at 1410.

### d)    Requests for Declaratory Judgments Withdrawn or Denied

### (1)    Summary Statistical Evidence

740.    Congress heard testimony through the National Commission on the Voting Rights Act that the majority of declaratory judgments adverse to Section 5 jurisdictions handed down by the U.S. District Court for the District of Columbia occurred after August 5, 1982 (25 as opposed to 17 from 1965 to 1982).  *March 8, 2006 Hearing Vol. I*, at 177-178.

741.    Congress received testimony from Anita Earls stating that there have been 25 unsuccessful declaratory judgments where the court did not grant preclearance since 1982. *May 16, 2006 Hearing*, at 3.

742.    The testimony of continued discrimination found by Congress included "the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia." H.R. Rep. No. 109-478, at 2.

### (2)    Declaratory Judgments in Covered Jurisdictions Other than Texas

743.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the United States District Court for the District of Columbia found Georgia's 1980

redistricting plan to have been adopted for a discriminatory purpose in violation of Section 5. *March 8, 2006 Hearing Vol. I*, at 507.

744.     Through the National Commission on the Voting Rights Act Congress received testimony from Meredith Bell-Platts, citing *County Council of Sumter County v. U.S.* (D.D.C. 1984) where, the District Court of the District of Columbia denied preclearance to a 1984 proposal to adopt an at-large method of electing representatives to the County Council finding that Sumter County "failed to carry their burden of proving that the legislature did not pass Act 371 in 1967 for a racially discriminatory purpose at the insistence of the white majority in Sumter County, because the at-large method of voting may have diluted the value of the then increasing voting strength of the black minority, may have prevented formation of a black majority senate district, and probably prevented appointment by the Governor of blacks to the Sumter County Council, [and],.. failed to carry their burden of proving that the at-large system was not maintained after 1967 for racially discriminatory purposes and with racially discriminatory effect." *October 25, 2005 Scope Hearing Vol. II*, at 3282-3283.

745.     Congress received testimony from Wade Henderson that in 1984, Sumter County sought declaratory judgment from the District Court of the District of Columbia to preclear at-large elections in the Sumter County Council.  Court denied preclearance because only one African-American had been elected under the at-large plan and a fairly drawn single-member plan would likely allow black citizens to elect candidates of their choice in three of seven districts. *March 8, 2006 Hearing Vol. I*, at 66.

746.     Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were four declaratory judgment actions with rulings favorable to minorities in Louisiana since 1982. *March 8, 2006 Hearing Vol. I*, at 270.

Congress received the following information as part of "*Voting Rights in Alabama, 1982-2006*":

> In *City of Pleasant Grove v. U.S.*, 479 U.S. 462 (1987), the United States Supreme Court affirmed the district court's denial of Section 5 preclearance to two annexations to the city of Pleasant Grove on the ground that the city had engaged in a racially selective annexation policy. Pleasant Grove was [at that time] an all-white city with a long history of discrimination located in an otherwise racially mixed part of Alabama. The Supreme Court stated that "in housing, zoning, hiring, and school policies [the city's] officials have shown unambiguous opposition to racial integration, both before and after the passage of the civil rights laws. The city sought preclearance for two annexations, one for an area of white residents who wanted to attend the all-white Pleasant Grove school district instead of the desegregated Jefferson County school district, the other for a parcel of land that was uninhabited at the time but where the city planned to build upper income housing that would likely be inhabited by whites only. At the same time, the city refused to annex two predominantly black areas. The district court held "that the city failed to carry its burden of proving that the two annexations at issue did not have the purpose of abridging or denying the right to vote on account of race." In affirming the district court's decision, the Supreme Court stated:
>
>> It is quite plausible to see appellant's annexation [of the two parcels] as motivated, in part, by the impermissible purpose of minimizing future black voting strength[.]

*July 13, 2006 Hearing*, 381-82 (internal citations omitted).

747.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were there were 6 declaratory judgment actions with rulings favorable to minorities in Mississippi since 1982. *March 8, 2006 Hearing Vol. I*, at 270.

748.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there was one declaratory judgment action with a ruling favorable to minorities in Alabama since 1982. *Id.* at 270.

749.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were 2 declaratory judgment actions with rulings favorable to minorities in Georgia since 1982. *Id.* at 270.

750.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were 2 declaratory judgment actions in with rulings favorable to minorities in South Carolina since 1982. *Id.* at 270.

751.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were 3 declaratory judgment actions with rulings favorable to minorities in North Carolina since 1982. *Id.* at 270.

752.    Through a report submitted to Congress by Nadine Strossen, Congress received information that a three-judge court of the United States District Court for the District of Columbia in *Busbee v. Smith*, "denied preclearance to Georgia's infamous 1980 congressional redistricting plan finding that it was adopted with 'a discriminatory purpose in violation of section 5,' the decision was affirmed by the Supreme Court." *Id.* at 26.

753.    Theodore Shaw presented Congress with testimony that Louisiana recently "unsuccessfully sought judicial preclearance of its statewide redistricting plan for the State House of Representatives" that "would likely have gone into effect and placed minority voters in a worse position but for the deterrent effect of the Section 5 review process." *May 9, 2006 Hearing*, at 173.

754.    Congress received testimony from Theodore Arrington who noted that "[i]n redistricting after the 2000 US Census, the Louisiana Legislature had to deal with population loss in the New Orleans region. This loss dictated that the City area would have one less State House district. The legislature chose to reduce the number of black districts and maintain the same number of white districts. . . . The US Census for 2000 indicated that the loss of population in New Orleans was in the white population . . . . I drew several district plans for the region that had lower population deviations, had more compact districts, and treated incumbents equally as well

as the districts proposed by the State. . . . Louisiana could not justify their arrangement and the Attorney General did not pre-clear their original proposal. They finally adopted something similar to my district plans." *May 16, 2006 Hearing*, at 28.

755.    Through the National Commission on the Voting Rights Act, Congress received the written statement of voting rights attorney, Debo Adegbile, discussing a letter from Assistant Attorney General William Bradford Reynolds in which he "noted that the unexplained elimination [during the 1982 Louisiana redistricting] of a majority-African-American district in New Orleans left only one majority-African-American district and 4 majority-white districts in a ward that was 61% African American. Violating the state's purported traditional districting principles, white officials resorted to drawing a non-contiguous district in uptown New Orleans in order to dilute the African-American vote there. In the very same objection letter, Reynolds also objected to dilution in East Baton Rouge, East Feliciana, West Feliciana, and St. Helena Parishes, and noted that the legislature had adopted the dilutive plan despite the existence of non-dilutive alternative plans that would have adhered more closely to the State's other redistricting criteria, such as compactness and least change." *March 8, 2006 Hearing Vol. IV*, at 4532-4533.

### (3)    Declaratory Judgments in Texas

756.    Attorney Jose Garza testified before Congress concerning an attempt by the Texas Education Agency to take political control of school districts from minority elected officials (Texas v. United States (1998)). Garza stated that "[t]his case is significant because Texas is arguing for an interpretation of Section 5 which would have effectively cut it off at the knees," and that the case demonstrates that, "[a]s late as 1998, Texas was "fighting against the Voting Rights Act instead of trying to comply with it." *October 20, 2005 Hearing*, at 74.

757.    Congress received testimony through the National Commission on the Voting Rights

Act in the form of a map showing there were 6 declaratory judgment actions with rulings favor-

able to minorities in Texas since 1982. *March 8, 2006 Hearing Vol. I*, at 270.

### 2.    Evidence Before Congress: the Effect of Section 5

758.    According to the House Judiciary Committee, "[b]y requiring covered jurisdictions to

establish that neither a discriminatory purpose nor effect exists with respect to a proposed voting

change, Section 5 has prevented those voting changes that have a measurable negative impact on

minorities, as well as voting changes that are enacted with a racial animus, from being enforced."

H.R. Rep. No. 109-478, at 65.

759.    The House Committee on the Judiciary recognized the temporary provisions of the

Voting Rights Act "as necessary remedies to address the widespread injury caused by discrimi-

natory practices that had been employed by certain States and political subdivisions." H.R. Rep.

No. 109-478, at 8.

760.    The House Judiciary Committee received testimony that "Louisiana's record of com-

plying with Section 5 for local elections is even worse than its record for State elections, which is

why Section 5 plays an important role in Louisiana in preventing voting discrimination for local

offices." H.R. Rep. No. 109-478, at 43 (internal quotation marks omitted).

761.    The House Judiciary Committee received "[t]estimony from many outside groups

confirm[ing] the importance of Section 5's enforcement mechanisms, especially in protecting

smaller, more rural communities within covered States, where Federal oversight has been limited

and non-compliance extensive." H.R. Rep. No. 109-478, at 43.

762.    The House Judiciary Committee stated that "Congress designed Section 5 in such a

way as to allow the Federal Government and courts to stay one step ahead of jurisdictions with a

documented history of discrimination against its minority voters," and that "Section 5 has ac-complished this objective over the last 40 years by requiring covered jurisdictions to 'preclear' all voting changes with the United States District Court for the District of Columbia or the De-partment of Justice." H.R. Rep. No. 109-478, at 35-36.

763.    The House Judiciary Committee stated that "Section 5's reach in preventing discrimi-nation is broad.  Its strength lies not only in the number of discriminatory voting changes it has thwarted, but can also be measured by the submissions that have been withdrawn from consid-eration, the submissions that have been altered by jurisdictions in order to comply with the VRA, or in the discriminatory voting changes that have never materialized." H.R. Rep. No. 109-478, at 36.

764.    The House Judiciary Committee stated that the strength of Section 5 also "lies, in part, in its burden-shifting remedy that requires covered jurisdictions to prove to the Federal Government or United States District Court for the District of Columbia that a voting change 'does not have the purpose and will not have the effect of denying or abridging the right to vote' before such voting change can be enforced."  According to the Committee "[t]he two-pronged shield afforded by Section 5 has enabled the Federal Government and court to stay one step ahead of covered jurisdictions that have a documented history of denying minorities the protec-tions guaranteed by the Constitution." H.R. Rep. No. 109-478, at 65.

765.    Alexander Keyssar offered written testimony to Congress noting that "[i]n historical context "the pre-clearance provision of Section 5 of the VRA must be understood as a mecha-nism to prevent another round of rollbacks and reversals in the gains achieved by African Americans." *July 13, 2006 Hearing*, at 247.

217

766.    Congress received evidence from Nathaniel Persily, Professor of Law at the University of Pennsylvania Law School, who testified as to the importance of Section 5 for "the inglorious issues like annexations and the small things that happen—which are not notorious and where the partisan stakes are seen as relatively low." *May 17, 2006 Hearing*, at 11.

767.    Congress received information from Professor Nathaniel Persily, who submitted testimony that "the greatest effect of section 5 can be felt at the local level, where elections are usually nonpartisan and the stakes as viewed by the national parties and interest groups are seen as relatively low.  The overwhelming majority of preclearance submissions concern changes at the local level."  He cites an article by former Justice Department Voting Lawyer, Michael Pitts, noting that "[t]he experience of Justice Department attorneys in the Voting Section confirms the greater likelihood of a deterrent effect for potentially retrogressive voting changes at the local level.  Unlike state laws and redistricting plans, which operate under the threat of a likely section 2 lawsuit, for local voting changes the DOJ is often the only one 'in the room,' as it were, reviewing the laws and giving voice to the concerns of the minority community." *May 17, 2006 Hearing*, at 129-130 (internal citation omitted).

768.    Congress received testimony from Professor Nathaniel Persily who stated that "the record contains notable examples of DOJ denials of preclearance, requests for more information (MIRs) that are often followed by a change in voting laws, as well as numerous successful and settled section 2 lawsuits in the covered jurisdictions." *May 17, 2006 Hearing*, at 129.

769.    Congress heard testimony from Assistant Attorney General for Civil Rights Wan Kim that "the Voting Rights Act has widely been recognized as one of the most successful pieces of civil rights legislation ever passed by Congress, if not the most successful.  It has, during its course of history, significantly narrowed gaps in electoral participation by all Americans, and

that is certainly a proud history and one that we are proud to enforce." *May 10, 2006 Hearing*, at 8.

770.    Congress heard testimony from Assistant Attorney General for Civil Rights Wan Kim that "the very fact of submission is an important detail that prevents retrogression and prevents harming minority voting strength and prevents backsliding, the very types of evils that Congress sought to prevent in passing Section 5." *May 10, 2006 Hearing*, at 8.

771.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights regarding the "unmistakable" role of section 5 as both "remedy for, and as a deterrent to, voting discrimination." The report stated that "[t]he record of enhanced African-American voter registration, participation and minority office-holding, of Section 5 objections to retrogressive voting changes, deterrence of others, and of Section 2 litigation resulting in judgments or settlements, collectively paints a picture of a civil rights act that has been effective and whose protections remain vital." *March 8, 2006 Hearing Vol. II*, at 1596.

772.    Congress received information from a report authored by Anita Earls that "Section 5 has . . . guaranteed that, after minority voters have successfully brought Section 2 suits, cities and counties design systems that actually improve opportunities for minority residents to participate in the political process." *March 8, 2006 Hearing Vol. II*, at 1733.

773.    Congress received testimony from Drew Days that "Section 5 . . . clearly serves to prevent vote dilution practices through which district lines were widely used to 'fragment' cohesive minority communities or 'pack' them. . . . In this way, the VRA ensures greater political fairness for all citizens, and enhances rather than erodes our democracy. These are among the factors that have led the Voting Rights Act to be widely regarded as the single most successful piece of Civil Rights legislation ever passed." *May 17, 2006 Hearing*, at 66.

774.    Congress heard testimony from civil rights attorney Armand Derfner regarding the "genius of section 5." Specifically, Derfner testified that: "[A]fter literacy tests were banned and federal examiners put an end to outright denial of the right to register and vote, the tactics shifted to methods of abridgement, sometimes called dilution, which aimed at limiting the effectiveness of black voters. Much of this was what could be called 'rigging' elections, such as shifting to at-large elections so that black voters who were a majority in some areas of the city or county but a minority overall would be unable to win any seats on the city or county council. The Supreme Court took note of the shift in approach in the early Voting Rights Act cases, including *Allen v. State Board of Elections* (1969), and *Perkins v. Matthews* (1971). In those cases, the Supreme Court held that Section 5 was broad enough to cover these methods, which could be just as effective in limiting minority voters' rights as outright denial. That is the genius of Section 5. It did not aim at specific tactics, but was a broad prophylactic measure. In effect, Congress said 'we don't know exactly what you will try next, but whatever it is, we'll be ready.' That is why Section 5 has adapted to meet new methods of discrimination, and what we have learned under Section 5 has been of great value in other areas of the law. Earlier voting laws, such as the Civil Rights Acts of 1957 and 1960, were ineffective because they dealt only with specific problems, and it was easy for state and local officials to come up with new tactics to sidestep the laws." *May 17, 2006 Hearing*, at 79.

775.    Congress received testimony from Theodore Shaw who stated that "the existence of Section 5 itself functions as a deterrent to both retrogression and broader forms of voting discrimination in the covered jurisdictions. Although the analysis of Section 2 cases nationwide is not the central inquiry . . . data regarding Section 2 litigation inside covered jurisdictions suggests that the preclearance requirement of Section 5 and its accompanying role of federal over-

sight, have helped to chill some voting discrimination in the covered jurisdictions but also supports the need to continue Section 5's protections in the covered jurisdictions." *May 9, 2006 Hearing*, at 160.

776. Congress received testimony from Theodore Shaw that small and large voting changes, which are protected by Section 5, "can have a significant adverse impact on political participation, and the creation and protection of opportunities for minority communities to have the ability to elect candidates of their choice [which] have been at the core of the VRA." *November 9, 2005 Hearing*, at 19.

777. Congress heard testimony from Wade Henderson that "[t]he Voting Rights Act, including its temporary provisions, section 5, sections 6 through 9, and section 203, has been the pivotal force behind the Nation's progress toward protecting the right to vote." Henderson further testified that these provisions of the VRA "ha[ve] empowered large numbers of minority citizens to register and vote and to elect candidates of their choice to local, State, and Federal offices. The Act has been successful in removing direct and indirect barriers to voting for African-Americans, Asian-Americans, Hispanic-Americans, and Native Americans." *March 8, 2006 Hearing Vol. I*, at 45.

778. Congress received testimony from Theodore Shaw that "[t]he VRA and its expiring enforcement provisions have been the primary catalysts for dramatic increases in minority political participation, minority representation in elected bodies at the local, state and federal levels, and for the reductions in barriers to access to the political process for African Americans, Latinos, Asian Americans, and Native Americans." *November 9, 2005 Hearing*, at 16-17.

779. Congress received testimony from Wade Henderson, introducing a series of reports commissioned by the Leadership Conference on Civil Rights Education Fund examining the im-

pact of the VRA over the past 25 years. These reports note that the temporary provisions of the VRA have played "significant roles in protecting the voting rights of minority citizens." *March 8, 2006 Hearing Vol. I*, at 45.

780.    Congress received testimony from Anita Earls that "[e]vidence obtained from the Department of Justice's website and the Census Bureau shows that just since 2000 at least 1,195,899 minority voters have been directly aided by Section 5." *May 16, 2006 Hearing*, at 68.

781.    Civil rights attorney Armand Derfner testified to Congress that over one-half of all Section 5 objections issued by the Department of Justice occurred after the 1982 reauthorization. Derfner testified that this helps to show that successfully obtaining Section 5 preclearance has been a significant issue for covered jurisdictions since 1982. *October 20, 2005 Hearing*, at 82.

### a)    Section 5 Encourages Collaboration

782.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights, which indicated that election officials in jurisdictions covered by Section 5 make an effort to consult with the NAACP and other local African-American leaders before making voting changes, and are generally more conscious of the impact that such changes will have on black voter participation. *March 8, 2006 Hearing Vol. II*, at 1729.

783.    Congress received testimony from Anita Earls describing her experience as Deputy Assistant Attorney General in the Department of Justice's Civil Rights Division. Earls testified that "while some jurisdictions complained and refused to submit changes and, in a few instances, refused to cooperate with [DOJ] requests for information . . . . the majority of officials that I had direct contact with did not find Section 5 requirements to be burdensome, and in the majority of instances that I was aware of, there was an excellent working relationship between Department personnel and state and local officials." Earls further testified that "The Voting Section went to

great lengths to make that the technology and operating procedures in place would facilitate electronic submissions of much of the required information. [DOJ] conferred with state and local officials so we could take their concerns into account as we structured our processing of submissions." Finally, Earls testified that "Section 5 was a shield for local officials when they were negotiating settlements in Section 2 cases." *May 16, 2006 Hearing*, at 64-65.

784.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights which noted that, one of the benefits of Section 5 is that it presents "all interested parties—state legislative and administrative officials, Justice Department officials, and interested groups and individuals in the state—with a vital opportunity to take a 'second look' at electoral changes and how they will be implemented, which focuses exclusively on how those changes may affect minority voters. This process often provides the public with its only opportunity to review and comment on the new law's fairness to minorities. On some occasions, this 'second look' occasioned by the Section 5 review process has resulted in substantive changes that protect minority voting rights without the necessity of a Department of Justice objection." *March 8, 2006 Hearing Vol. II*, at 1471.

785.    Congress received information in the form of a report commissioned by the Leadership Conference on Civil Rights explaining that "Section 5 of the Voting Rights Act played a decisive role in the redrawing of congressional and state legislative districts in Alabama following publication of the 2000 Census. For the first time since 1901, without supervision of a federal court, the Alabama Legislature passed, and the Governor signed into law, redistricting statutes for congressional, House, Senate and state Board of Education seats. All four of these statutes received Section 5 preclearance and survived court challenges by white voters contending that they systematically discriminated against whites by overpopulating their districts and that

they violated the *Shaw v. Reno* racial gerrymandering standards.  Black legislators were able to leverage the no-retrogression command of Section 5 successfully 'to pull, haul, and trade to find common political ground' with their white Democratic and Republican colleagues.  Instead of attempting to maximize the number of seats black voter majorities control, African-American legislators were able to maintain the overall electoral power of blacks, while working with white legislators to consciously balance both racial and partisan interests with fair, neutral districting criteria.  Without the protection of Section 5, in Alabama's racially polarized environment, there would be little or no incentive for white legislators to bargain with the African-American minority in the Alabama Legislature." *July 13, 2006 Hearing*, at 385-386.

786.    Congress received testimony from Jerome Gray about situations in Lanette, Alabama and Evergreen, Alabama, in which the "threat of section 5 . . . has worked to get local governments to do the right thing." Specifically, Gray testified about an instance in Barbour County, Alabama, in which the need to preclear a redistricting plan specifically impacted the map that the County Commission drew.  "[T]he Commission's first instinct was to draw a plan that reduced the Black voting age population."  However, Gray contacted the commission and voiced his opposition to "any plan" that "retrogress[ed] or dilute[d] the Black vote in these majority Black districts"  The Barbour County Redistricting Commission "did better than expected" and Gray "wrote a strong letter of support to the Department of Justice " for the Barbour County redistricting plan." *November 1, 2005 Hearing*, at 45.

787.    Congress heard testimony from Jerome Gray who stated that "the Voting Rights Act, section 5, in particular, has made unlikely buddies of people who are ready, willing and able to communicate in a civil, democratic way as we engage in the process of representative government and full civic participation." *November 1, 2005 Hearing*, at 45.

788.    Congress heard testimony from civil rights attorney Robert McDuff who stated that

Section 5 "provide[s] a tremendous deterrent. I cannot tell you how many times I have talked to

legislators, city council members, lawyers in the State Attorney General's Office, or lawyers for

localities who have really now internalized sort of the goals of Section 5, and who, when voting

changes are being made, assess the impact on all groups, all racial groups, and reach out to all

groups, to try to determine if a solution can be developed that satisfies everyone's concerns in

light of the very deep racial fault line that still exists in the south and in other parts of the country

due to the history of discrimination." *May 10, 2006 Hearing*, at 26.

789.    The Senate Judiciary Committee received testimony from Anita Earls that, in a recent

public hearing held to gather information about the VRA at the local level, "Ms. Bobbie Taylor,

President of the Caswell County, North Carolina NAACP explained how the views of minority

voters on issues ranging from polling place location to the composition of election districts were

taken into account because of the requirements of Section 5." Earls stated that Ms. Taylor "testi-

fied that because she is 'considered one of the leaders in Caswell, I've been contacted on several

occasions when they have anticipated changes, *i.e.*, the voting precincts. In one instance we

were trying to get it [a precinct] moved because it was in a dangerous location. So when they

finally decided to look into that, . . . they contacted me.' When asked if local officials would still

involve minority community leaders without the Voting Rights Act coverage, Ms. Taylor re-

plied: 'No. I think we still need it and I think we've been able to accomplish what we have ac-

complished because it's there. Just like when the plans for the redistricting were being consid-

ered, it was because of the Voting Rights Act that the county commissioners contacted me, that

he made sure that I was at those meetings. Now, some people might say it was because he was a

nice guy, which he was . . . but I think it went deeper, in terms of the Voting Rights Act requiring

that this be done . . . if we had not known about it, they would have passed it, and we rejected all of them.'" Professor Earls testified that "[d]uring the preclearance process jurisdictions must indicate whether they have conferred with minority community representatives. That require- ment is one important way that changes having a harmful effect on minority voters are stopped before they ever reach the stage of an official objection or judicial determination." *May 16, 2006 Hearing*, at 141.

### b)    Continued Need for Section 5

790.    Congress concluded that the evidence before it "reveal[ed] that 40 years has not been sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution . . . [and that] [t]he record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years. Pub. L. No. 109-246, 120 Stat. 577, § 2(b)(7), (9).

791.    Congress received and placed into the record a report authored by the National Com- mission on the Voting Rights Act which indicates that "the deterrent effect of Section 5 is sub- stantial." According to the report, "[o]nce officials in covered jurisdictions become aware of the logic of preclearance, they tend to understand that submitting discriminatory changes is a waste of taxpayer time and money and interferes with their own timetables, because the chances are good that an objection will result. Conscientious officials, therefore, have a vested interest in submitting changes that will quickly be precleared. There was substantial hearing testimony about the deterrent effect of Section 5." *March 8, 2006 Hearing Vol. I*, at 177.

Congress found, the evidence supporting the continuing need for Section 5 included:

> the hundreds of objections interposed, requests for more informa-
> tion submitted followed by voting changes withdrawn from con-
> sideration . . . and Section 5 enforcement actions . . . in covered ju-
> risdictions since 1982 that prevented election practices, such as an-
> nexations, at-large voting, and the use of multi-member districts,
> from being enacted to dilute minority voting strength. . . the num-
> ber of requests for declaratory judgments denied by the United
> States District Court for the District of Columbia. . . the continued
> filing of section 2 cases that originated in covered jurisdictions. . . .
> the litigation pursued by the Department of Justice since 1982 to
> enforce sections 4(e), 4(f)(4), and 203 of such Act to ensure that all
> language minority citizens have full access to the political process.
> . . the counties certified by the Attorney General for Federal exam-
> iner and observer coverage and the tens of thousands of Federal
> observers that have been dispatched to observe elections in cov-
> ered jurisdictions.

Pub.L. No. 109-246 § 2(b)(4),(5), 120 Stat. 577.

792.    Congress received information from a report commissioned by the Leadership Con-

ference on Civil Rights that "Section 5 has not merely blocked a series of inadvertently retro-

gressive changes—as important as that would be—but rather has been a bulwark against re-

peated attempts to impose racially discriminatory election changes in a variety of forms." *March

8, 2006 Hearing Vol. II*, at 1503.

793.    Congress received information from a report authored by Anita Earls that

"[e]nforcement of Section 5 has continued to prevent the implementation of numerous election

systems that would have cut minority voters out of the political process.  Examples of dilutive

practices Section 5 has protected against include:  staggered terms, residency requirements, an-

nexation of predominately white areas, majority vote and runoff requirements, unfair drawing of

districts and maintenance of at-large voting.  Residency requirements - systems under which the

entire county or city votes for each seat but the candidate is required to reside in a particular

area—have been especially common proposals used in this state to weaken black voting strength." *March 8, 2006 Hearing Vol. II*, at 1733.

794.    Congress received information submitted by the National Commission on the Voting Rights Act, and authored by Debo Adegbile, Associate Director of Litigation, NAACP Legal Defense and Educational Fund, that changes to voting laws in Louisiana which were blocked under Section 5 would have also effected, "annexations and other alterations of elected bodies, and even the attempted suspension of a presidential primary election. Discriminatory changes were proposed at every level of government, including: the state legislature, the state court system, the state board of education, parish councils, school boards, police juries, city councils, and boards of aldermen." *March 8, 2006 Hearing Vol. IV*, at 4527.

795.    Congress received testimony from Anita Earls that jurisdictions frequently altered how they planned to implement a voting change based on preliminary discussions with the Justice Department, before they even made a preclearance submission. Specifically, Professor Earls testified that "[t]he Department [of Justice] also has a deterrent impact by routinely conferring with jurisdictions before they make a submission, explaining how the retrogression standard is applied and how changes affecting voting, including measures such as majority vote requirements, annexations, polling place changes, changes to appointed from elected office, and numerous other non-redistricting changes are reviewed by the Department." *May 16, 2006 Hearing*, at 53-54.

796.    Congress heard testimony from Theodore Shaw that "the Department of Justice entertains requests for information from jurisdictions that sometimes obviate the necessity of a Section 5 adverse finding. And that is still the Act working in a powerful way." Specifically, Section 5 has an effect "on jurisdictions that otherwise would engage in discriminatory activities and

with respect to the request for information, the Act works powerfully in ways that may appear under the radar screen that may not appear easily in statistics." As a result of Section 5, "some jurisdictions do not engage in actions they otherwise might take that would have a discriminatory, retrogressive, or dilutive effect because of the existence of Section 5 and the preclearance requirements." *May 9, 2006 Hearing*, at 17.

797.    Civil rights attorney Fred Gray testified before Congress that Section 5 has a deterrent effect that prevents officials in covered jurisdictions from engaging in discriminatory practices in which they would otherwise engage, absent Section 5. *May 17, 2006 Hearing*, at 4.

798.    Congress received testimony from civil rights attorney Fred Gray discussing the progress made under Section 5 and explaining why in the face of progress Section 5 is still needed: "I believe that Section 5 has had a significant deterrent effect and that Congress should renew this expiring provision to help provide necessary guideposts to covered jurisdictions, provide leverage for minority elected officials seeking to prevent the adoption of retrogressive voting changes, and to help ensure that there is a mechanism in place to ferret out retrogressive and discriminatory voting practices." *May 17, 2006 Hearing*, at 94.

799.    Congress received testimony from Nina Perales that "Section 5 mitigates discriminatory election practices not only in congressional redistricting but also at the State and local levels. By blocking discriminatory election practices before they go into effect, section 5 protects Latino voters from local jurisdictions that seek to limit their political participation by developing new exclusionary voting schemes." *October 25, 2005 Scope Hearing Vol. I.*, at 86.

800.    Congress received information submitted by the National Commission on the Voting Rights Act, and authored by Debo Adegible that "although the media and many academics train their focus on Section 5's impact on congressional elections, much of Section 5's important work

involves the protection that it extends to local communities. The political climate in these communities is often unknown outside of the locality, and their limited access to the expertise and resources of the handful of organizations and attorneys with VRA litigation expertise, coupled with the often prohibitive cost of Section 2 litigation, strongly suggest that most of these discriminatory voting changes would have succeeded but for the prophylactic review that Section 5 affords." *March 8, 2006 Hearing Vol. IV,* at 4541.

801.   Congress received testimony from Anita Earls that:  "Section 5 not only keeps there from being so much Section 2 litigation because it stops those changes from going into effect to begin with, but it also deters election officials from enacting and putting in place discriminatory measures to begin with." *May 16, 2006 Hearing,* at 14-15.

802.   Congress received testimony from Nadine Strossen regarding the deterrent effect of section 5.  Ms. Strossen testified that in the 2005 mid-decade redistricting in Georgia, the state legislature specifically adopted resolutions mandating compliance with the non-retrogresive standard of section 5 when redistricting.  Ms. Strossen stated that, "Section 5 encouraged the legislature to ensure that any voting changes would not have a discriminatory effect on minority voters." *March 8, 2006 Hearing Vol. I,* at 34-35.

803.   Congress received testimony from Marc Morial, President of the National Urban League, who testified that, "[i]n case after case, the efforts of the Civil Rights Division of the U.S. Department of Justice and minority voter advocates prompted Louisiana to withdraw its original plan and restore a district where African Americans had an opportunity to elect a candidate of choice." *October 18, 2005 Hearing,* at 18.

804.   Congress received testimony from Theodore Shaw evidencing the effect that Section 5 has had in Louisiana.  Shaw testified that "Section 5 has played a crucial role in Louisiana, and

elsewhere in covered jurisdictions. . . . Objections have been interposed in more than half the State's parishes, and many for similar violations that state or local officials have insisted in pursuing. Although the vast majority of these objections were to redistricting plans, they also include objections to proposed changes to voter registration requirements, election schedules, voting procedures, polling places, method of election, and structure of elected bodies. Despite this progress, and the role that Section 5 has played in barring retrogressive voting changes of all kinds, the record is replete with examples of persisting discrimination throughout the state." *May 9, 2006 Hearing*, at 155.

805.    Congress heard testimony from civil rights attorney Robert McDuff that "[o]bjection rates only tell part of the story of Section 5's success. These statistics do not account for enforcement actions that have been filed to force jurisdictions to submit their voting changes as required under the Act. Also, these statistics do not account for the strong deterrent effect of Section 5 in helping ensure that retrogressive voting changes are not put in place. As I testified, the existence of the Section 5 review process often discourages jurisdictions from adopting voting changes that may place minority voters in a worse position." *May 10, 2006 Hearing*, at 87.

806.    The House Judiciary Committee cited to the 2005 congressional redistricting in Georgia as an example of the deterrent effect of Section 5. Before performing the redistricting, the Georgia state legislature adopted resolutions that it would comply with Section 5. When it redistricted, it maintained the black voting age population in the two black majority districts as well as two other districts that had elected black members of Congress. H.R. Rep. No. 109-478, at 24.

807.    Congress received a prepared statement from Meredith Bell-Platts noting recent efforts in Georgia to discriminate against black voters. Ms. Bell-Platts observed that officials at-

tempted to locate a polling location within a police precinct in predominantly black College Park, GA and the City of Albany, GA. She also observed that officials in Dougherty County, Georgia attempted to dilute the voting strength of emerging majority-black districts by "packing" black voters into other districts. In particular, Ms. Bell-Platts noted "[w]hile each state is unique, I could say similar things about decisions in predominately black College Park, GA to locate a polling location within a police precinct or attempts in the City of Albany, GA or Dougherty County, GA to dilute naturally emerging majority black districts by packing black voters into other districts. It bears emphasis that these examples are not from history texts or from Jim Crow days. These events have occurred since the last reauthorization and during my short tenure at the Voting Rights Project. In each of these cases, compliance with Section 5 of the Voting Rights Act has served to protect black voters from devices and plans that would erode their political strength." *October 25, 2005 Scope Hearing Vol. II*, at 3285.

808.    The House Judiciary Committee found that "[t]he record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years." H.R. Rep. No. 109-478, at 2.

809.    The House Judiciary Committee stated that "the record reveals that without the remedies available from the VRA's temporary provisions, the injury to minority citizens and their right to the electoral franchise will be significant." H.R. Rep. No. 109-478, at 53.

810.    The House Judiciary Committee made the following determination: "The record before the Committee reveals that extending the VRA's temporary provisions is necessary to protect racial and language minority citizens located in covered jurisdictions from discrimination.

As a result, the gains achieved by minority voters over the last 40 years are vulnerable without the protections afforded by the temporary provisions. It is in light of this reality that the Committee concludes that the temporary provisions of the VRA must be reauthorized, including Section 4(a)(8) and the provisions it triggers . . . for an additional 25 years." H.R. Rep. No. 109-478, at 56.

811.    The House Judiciary Committee found that, "if not for the temporary provisions of the VRA the gains made by minorities would not have been made. But as Congress found in 1982, the gains are fragile. The Committee is not willing to jeopardize 40 years of progress made by minority citizens by allowing the temporary provisions to expire, especially in the face of the evidence of discrimination compiled in the record." H.R. Rep. No. 109-478, at 57 (internal footnote omitted).

812.    The House Judiciary Committee found that Section 5 has been "an effective shield against new efforts employed by covered jurisdictions" to discriminate. H.R. Rep. No. 109-478, at 21.

813.    Congress received testimony Professor Pamela Karlan agreeing that "Bossier II will also decrease the deterrence effects of section 5 because jurisdictions will no longer bear the burden of negating an inference of unconstitutional purpose. Especially at the local level, where practices like selective annexations and deannexations are commonplace, this may be especially important." *May 16, 2006 Hearing*, at 95.

814.    Congress received testimony from Joseph Rich which stated that "[t]he number of times that the Attorney General objects to voting change is very small—less than one percent of the Section 5 submissions are objected to. But that is not a good indicator of the importance of Section 5. Rather, the most important impact of Section 5 is its deterrent effect on discrimina-

tory voting changes. Jurisdictions, particularly local jurisdictions, that are required to get pre-clearance must always be aware of Justice Department review. Because the Department has built a tradition of excellence and meticulousness in its Section 5 review process, jurisdictions will think long and hard before passing laws with discriminatory impact or purpose." *October 18, 2005 Hearing*, at 66.

815.    Congress received testimony which was presented to the National Commission on the Voting Rights Act from Theodore Shaw arguing that Section 5 has a deterrent effect on a covered jurisdictions tendency to make discriminatory voting changes and that it empowers voters to prevent jurisdictions from instituting discriminatory election systems. Shaw cites a 1981 challenge under Section 5 by citizens to New York City's proposed redistricting and polling-place relocation plan because the City did not submit the changes to the Department of Justice for pre-clearance. After the citizens obtained an injunction against the plan, the Department of Justice found numerous instances of discrimination in the City's plan. *October 25, 2005 Scope Hearing Vol. II*, at 3245.

816.    Congress heard testimony from Drew Days who observed that the number of Department of Justice objections understates amount of discrimination in covered jurisdictions. Days stated that as he had noted in his testimony in 1982, objection statistics "vastly underestimate the true degree to which covered jurisdictions are making voting changes that disadvantage minority voters. Even with vigorous enforcement by the Justice Department, hundreds of changes that would not meet Section 5 preclearance requirements are never submitted for consideration. Given time and resource constraints, the Justice Department is unable to ensure that every electoral change influencing minority voters will be subject to preclearance." *May 17, 2006 Hearing*, at 38.

817.    In response to questions from Senator Cornyn (TX), Theodore Shaw stated that "Congress should not measure the utility and need for Section 5 through objection rates alone as these rates have decreased in recent years given the impact of two major Supreme Court rulings and the natural reduction in the number of submitted changes in the middle of a decade." Shaw further testified that "Section 5 has had a well-documented deterrent effect within covered jurisdictions that is not reflected" the number of objections, and objection statistics "do not account for those jurisdictions that unsuccessfully seek judicial preclearance in the D.C. District Court or those jurisdictions that alter a particular voting change as a result of a pre-litigation settlement or in response to a request for more information issued by the Justice Department." *May 9, 2006 Hearing*, at 166.

818.    Congress received the following statement supporting reauthorization from Senator Patrick Leahy of Vermont that "[t]he U.S. Constitution specifically provides that Congress has the power to remedy discrimination under both the fourteenth and the fifteenth amendments. Over the course of nine Judiciary Committee hearings we received testimony from a range of constitutional scholars, voting rights advocates, and Supreme Court practitioners. There was agreement among these witnesses that Congress is at the height of its powers when giving enforceable meaning to these amendments by enacting laws that address racial discrimination in connection with voting. The fourteenth and fifteenth amendments have not changed. As long as these amendments are in our Constitution, Congress has the authority to enforce them, especially on matters of racial discrimination in connection with the right to vote. These are matters of fundamental importance. The Senate Judiciary Committee held several hearings this year on the continuing need for the provision of the Voting Rights Act that requires covered jurisdictions to 'pre-clear' all voting changes before they go into effect. This provision has been a tremendous

source of protection for the voting rights of those long discriminated against and also a great de-terrent against discriminatory efforts cropping up anew." 152 Cong. Rec. S7745.

819.    Congress received a statement supporting reauthorization from Senator Patrick Leahy of Vermont that "based on the record established in hearings before the Senate Judiciary Com-mittee and the Subcommittee on the Constitution, Civil Rights, and Property Rights, which builds on the extensive record established in the House of Representatives, there remains a com-pelling need for section 5. The Judiciary Committee received three categories of evidence sup-porting the continuation of this remedy. First, there is evidence that even with section 5 in place, covered jurisdictions have continued to engage in discriminatory tactics. Often, this recurring discrimination takes on more subtle forms than in 1965 or 1982, such as vote dilution, which re-lies on racially polarized voting to deny the effectiveness of the votes cast by members of a par-ticular race. Second, there is evidence of the effectiveness of section 5 as a deterrent against bad practices in covered jurisdictions. Finally, there is evidence of the prophylactic effect of section 5, preserving the gains that have been achieved against the risk of backsliding." 152 Cong. Rec. S7745.

820.    Congress received the following statement supporting reauthorization from Senator Patrick Leahy: "Today, I would like to provide some of the evidence received in the Judiciary Committee about the persistence of discriminatory practices in covered jurisdictions that sup-ports reauthorization of this crucial provision. The robust record compiled in the Senate Judici-ary Committee includes voluminous evidence of recurring discrimination in section 5 covered jurisdictions. Often, this recurring discrimination takes on more subtle forms than in 1965 or 1982, such as vote dilution and redistricting to deny the effectiveness of the votes cast by mem-bers of a particular race. Notably, many jurisdictions are repeat offenders, continuing a pattern

of persistent resistance dating back to the enactment of the VRA." 152 Cong. Rec. S7745. The

examples Senator Leahy provided involved the following categories (with identified jurisdictions

in parentheses):

- o "VOTE SUPPRESSION" (Kilmichael, Mississippi; Prairie View, Texas; State of South Dakota; North Johns, Alabama) 152 Cong. Rec. S7746.

- o "DISCRIMINATORY REDISTRICTING" (Seguin, Texas; St. Bernard School Parish, Louisiana; State of Georgia; State of Louisiana; Point Coupee Parish, Louisiana; Morehouse Parish, Louisiana; Randolph County, Georgia; State of Mississippi; Northampton County, Virginia; Chickasaw County, Mississippi; Galveston County, Texas; Terrell County, Texas; Delhi, Louisiana; State of Florida; State of Arizona; Merced County, California) 152 Cong. Rec. S7746-S7748.

- o "DISCRIMINATORY POLLING PLACE CHANGES" (Wrightsville, Georgia; Jenkins Parish, Louisiana; Apache County, Arizona; St. Landry Parish, Louisiana; Dinwiddie County, Virginia) 152 Cong. Rec. S7748.

- o "METHODS OF ELECTIONS" (State of Mississippi; Effingham County, Georgia; Freeport, Texas; Washington Parish, Louisiana; Charleston County, South Carolina; McComb, Mississippi; Concordia Parish Police Jury, Louisiana) 152 Cong. Rec. S7748.

- o "ANNEXATIONS" (Monroe, Louisiana; Pleasant Grove, Alabama; North, South Carolina) 152 Cong. Rec. S7749.

821.    Congress received a statement supporting reauthorization from Senator Patrick Leahy

of Vermont stating that Section 5 should not be "a victim of its success." Leahy stated, "In my

view, abandoning a successful deterrent just because it works defies logic and common sense.

Why risk losing the gains we have made? When this Congress finds an effective and constitu-

tional way to prevent violations of the fundamental right to vote, we should preserve it. Now is

no time for backsliding." 152 Cong. Rec. S7745; *see also id.* at S8008 ("The passage of the Vot-

ing Rights Act in 1965 was a turning point. We have made progress toward a more inclusive

democracy since then but I fear that if we fail to reauthorize the expiring provisions of the Vot-

ing Rights Act, we are likely to backslide".); 152 Cong. Rec. S3987 ("[I]f we fail to reauthorize

the expiring provisions of the Voting Rights Act, our country is likely to backslide. We must make sure [Section 5-created] gains do not suffer the same fate as the gains in voting rights made during Reconstruction."); 152 Cong. Rec. S3987 ("[I]f we fail to reauthorize the expiring provisions of the Voting Rights Act, our country is likely to backslide. We must make sure [Section 5-created] gains do not suffer the same fate as the gains in voting rights made during Reconstruction.").

822.    During the floor debate in the House of Representatives, Representative F. James Sensenbrenner of Wisconsin, the Chairman of the Judiciary Committee, described some of the statistics on Voting Rights Act enforcement to support his view that of the need for reauthorization: "We need the Voting Rights Act, and we need the Voting Rights Act because in the last 25 years the covered jurisdictions have not come clean. Let's look at Georgia. Since 1982, there have been 91 objections, 91 objections submitted by the Department of Justice. And since 2002, there have been seven voting rule changes that were withdrawn by the State because of DOJ objections. Texas, 105 objections imposed by DOJ since 1982, and 14 voting rule proposals were withdrawn by the State because of voting rights concerns in the last 4 years. Mississippi, 112 objections since 1982, and Federal observers have been sent to this State 14 times to monitor elections since 2002, most recently last year. Louisiana, 96 objection[s] since 1982, eight Department of Justice objections to voting rules have been lodged since 2002, most recently in 2005, and 10 voting rule proposals withdrawn by the State in the last 4 years. South Carolina, 73 objections since 1982. North Carolina in the covered jurisdictions, 45 objections since 1982. And Alabama, 46 objections, and Federal observers have been assigned to the State 65 times since 2000 to monitor elections. Arizona, 17 objections since 2002, and Federal observers have been assigned to that State 380 times since 2000 to monitor elections, including 107 since 2004. 152

Cong. Rec. H5164-H5165; *see also*, *id.* at H5143-H5144 ("Based upon the committee's record

. . . it is one of the most extensive considerations of any piece of legislation that the United States

Congress has dealt with in the 27 1/2 years that I have been honored to serve as a Member of this

body. All of this is a part of the record that the Committee on the Constitution headed by Chabot

of Ohio has assembled to show the need for the reauthorization of the Voting Rights Act. . . . In

fact, the extensive record of continued abuse compiled by the committee over the last year,

which I have put on the table here today, echoes that which preceded congressional reauthoriza-

tion of the VRA in 1982[.]") .

823.    During the debate on the floor of the House of Representatives, Congressman Steve

Chabot, the chairman of the Subcommittee on the Constitution stated: "[W]e have given this is-

sue more time and more attention than any single issue since I became chairman of the Subcom-

mittee on the Constitution of the Judiciary Committee 6 years ago. Starting in October last year,

the Subcommittee on the Constitution held 12 hearings and heard testimony from 47 witnesses to

examine the reauthorization of the Voting Rights Act, and we generated more than 12,000 pages

of testimony. . . . Mr. Chairman, it is important to note that we examined in great deal each of

the temporary provisions of the Voting Rights Act currently set to expire. The extensive testi-

mony from a large number of diverse organizations demonstrated a clear need to reauthorize the

Voting Rights Act." 152 Cong. Rec. H5136; *see also id.* at H5183 ("Section 4 of the Voting

Rights Act sets forth a formula under which certain jurisdictions are subjected to voting rule pre-

clearance and Federal observer requirements. While the formula utilizes neutral registration and

turnout data from the 1964, 1968 and 1972 elections, coverage is really about the documented

history of discriminatory practices which is reflected in the first prong of the coverage formula

that brings jurisdictions that maintain prerequisites for voting or registration under the scrutiny of

the Federal Government. Examples of such discriminatory practices include that minorities, one, demonstrate the ability to read, write, understand or interpret any matter; two, demonstrate any education achievement or knowledge of any particular subject; three, possess good moral character; or, four, prove qualifications by the voucher of registered voters of members of any other class. I can tell you firsthand that the testimony gathered during the 12 hearings, which is reflected in more than 12,000 pages of record, demonstrates a continued need for the preclearance and Federal observer provisions."); 152 Cong. Rec. 5149 ("It is also important to take a minute to touch on the constitutional questions regarding the reauthorizations of the temporary provisions. The Supreme Court in *South Carolina v. Katzenbach* and later in the *City of Rome v. United States* upheld Congress's broad authority under section 2 of the 15th amendment to use the temporary provisions to address the problem of racial discrimination in voting in certain jurisdictions. With H.R. 9, Congress is simply using its authority under section 2 to ensure that every citizen in this country has the right to vote.").

824.    Representative John Conyers, Jr. (MI) made the following statement: "Chief among the expiring provisions of the VRA is Section 5, which requires that any change to voting rules in covered jurisdictions be submitted to either the U.S. Department of Justice or a federal court for 'preclearance' before it can take effect. Through Section 5, the VRA has prevented thousands of discriminatory voting changes from undermining minority voters' meaningful access to the ballot. Our inquiry in the Act has broken down into two fundamental questions: 1) Is there an adequate record of discrimination to justify reauthorization of the expiring provisions? and 2) Are the expiring provisions, as interpreted by the courts, still adequate to protect the rights of minority voters? These questions should continue to guide us as we examine H.R. 9 itself. There is no right more fundamental than the right to vote, but for nearly a century, many Ameri-

240

cans were denied this fundamental right of citizenship. While we applaud the substantial pro-

gress which has been made in the area of voting rights over the last 40 years, we must continue

our efforts to protect the rights of every American voter with the reauthorization and restoration

of the expiring provision of the Act." *May 4, 2006 Hearing Part I*, at 73.

825.     Senator George Allen of Virginia stated the following: "I think it is important that

the Act is reauthorized, not just for Virginia but throughout the United States. It applies every-

where from Florida to Alaska to New York. Some will argue that counties and cities and States

cannot be removed from or 'bail out' of preclearance if they so desire and have a good record.

The facts are that there are 11 counties and cities in Virginia that have been able to 'bail out' of

the Voting Rights Act by proving that 'no racial test or device has been used within such State or

political subdivision for the purpose or with the effect of denying or bridging the right to vote on

account of race or color.' The counties in Virginia that have been removed from this preclear-

ance review are Augusta, Frederick, Greene, Pulaski, Roanoke, Rockingham, Shenandoah, and

Warren and the cities of Fairfax, Harrisonburg, and Winchester." 152 Cong. Rec. S7971-S7972;

*see also id.* at H5147 ("Much has been said about the onerous nature of certain provisions of sec-

tion 5. My State, the Commonwealth of Virginia, in its entirety, is covered by section 5 in the

original Voting Rights Act. But we are also the only State to have jurisdictions that have exer-

cised their right to bail out under section 5. In order to bail out, a jurisdiction must have been in

full compliance with the preclearance requirements for 10 years. It can have no test or device to

discriminate on the basis of race, color, language, or minority status, and no lawsuit against the

jurisdiction alleging voter discrimination can be pending. Eleven jurisdictions, some of which

are in my district, have bailed out successfully. More jurisdictions should and will follow suit. I

have been assured by civil rights leaders they will support bailouts where appropriate, where jurisdictions can meet the basic requirement.") (statement of Representative Jo Ann Davis (VA)) .

826.    Before Congress, Representative John Lewis (GA) described pre-VRA discrimination (violence, poll tests), and stated that discrimination has taken on new forms through discrimination in redistricting, annexations, at-large elections, polling place changes, and the Georgia's voter ID law. *See* 152 Cong. Rec. H5103.

827.    Congress received a statement supporting reauthorization from Representative Melvin Watt (NC) that "[o]ur record consists of an abundance of evidence that supports the continuing need for the expiring provisions of the Voting Rights Act." He further stated that, "[w]e have deliberated long and hard over months and months of internal debate; we have assembled an extraordinary record with competing facts and policy perspectives; we have listened to every side of this issue from the left, from the right; and we have reached the considered judgment that H.R. 9, supported by factual evidence of ongoing discrimination, vindicates the Constitutional rights of racial and language minorities to participate fully in the electoral process." *May 4, 2006 Hearing Part I*, at 74.

828.    Congress received a statement supporting reauthorization from Representative William Jefferson (LA) that "the gains that have been made due to the Voting Rights Act must not overshadow the need to reauthorize the expiring provisions. Since Section 5 coverage of the state began, the Civil Rights Division has objected to discriminatory voting changes in Louisiana 146 times, 96 of which have occurred since the last extension in 1982. That is to say 65% of the objections placed against the state have occurred since Congress last extended protections to minority voters. Of the 96 objections since 1982 no fewer than half a dozen have directly concerned attempts to dilute minority influence in Orleans Parish. These include attempts by the state legis-

lature to eliminate minority opportunity districts in 1982, 1991, as recently as 2000. In 2000, the state's redistricting plan was opposed by the United States Department of Justice under Attorney General John Ashcroft as the state once again attempted to eliminate minority opportunity districts in Orleans Parish despite the fact that the African-American population of New Orleans had increased in real numbers and as a percentage of the Orleans Parish population." *May 4, 2006 Hearing Part I*, at 77.

829.    Congress received a statement supporting reauthorization from Senator Edward Kennedy of Massachusetts that: "[W]e have made progress that was almost unimaginable in 1965. But the goal of the Voting Rights Act was to have full and equal access for every American regardless of race. We have not achieved that goal. In considering this bill, the Senate Judiciary Committee has held nine hearings and heard from some 46 witnesses. In addition, we have received numerous written statements and have voluminous reports from a variety of groups that have examined the state of voting rights in our Nation. We have explored every aspect of the expiring provisions of the act, and have all come to one inescapable conclusion: continuing discrimination requires that we pass this bill and reauthorize the Voting Rights Act. . . . The number of objections under section 5 has remained large since we last reauthorized the act in 1982. Astonishingly, Professor Anita Earls of the University of North Carolina Law School testified that between 1982 and 2004, the Department of Justice lodged 682 section 5 objections in covered jurisdictions compared with only 481 objections prior to 1982. In Mississippi alone, the Department of Justice objected to 120 voting changes since 1982. This number is roughly double the number of objections made before 1982. Behind these statistics are stories of the voters who were able to participate in the political process because the Voting Rights Act protects their fundamental right to do so." Senator Kennedy provided examples of Section 5 objections in

Kilmichael, Mississippi and Dinwiddie County, Virginia; the Georgia voter identification provision that a federal court held was a poll tax and violated the constitution; and the 2003 Texas Congressional Restricting Plan that in 2006 the Supreme Court held violated the Voting Rights Act in 2006. 152 Cong. Rec. S7967-S7968; *see also*, *id.* at S7968 ("[I]t is crucial that we extend the guarantees of all of the temporary provisions of the act for 25 years. Twenty-five years is not a long time when compared to the centuries of oppression that the law is intended to overcome. While we have made enormous progress, it takes time to overcome the deep-seated patterns of behavior that have denied minorities full access to the ballot. Indeed, the worst thing we could do would be to allow that progress to slip away because we ended the cure too soon. We know that the act is having an impact. We know that it is deterring discrimination. And we know that despite the act, racial bloc voting and other forms of discrimination continue to tilt the playing field for minority voters and candidates. We need to ensure that jurisdictions know that the act will be in force for a sufficiently long period that they cannot simply wait for its expiration, but must eliminate discrimination root and branch.").

830. Congress received a statement supporting reauthorization from Senator Dianne Feinstein of California that "The section 5 so-called 'preclearance' provision is critically important. . . . It is important because it stops attempts to disenfranchise voters before they can start, not after they start. In the last decade, the Department of Justice has repeatedly struck down proposed changes to voting procedures under section 5 preclearance. This section has prevented the redrawing of municipal boundaries designed specifically to disenfranchise minority voters, blocked attempts to exclude minority candidates from the ballot, denied efforts to change methods of elections intended to dilute minority voting strength, kept polling places from being moved to locations that would have reduced minority voter turnout, and it has thrown out redis-

tricting proposals that would have marginalized minority voters. Clearly, this section has served us well. In California, the rejection of a discriminatory redistricting plan in Monterey County under section 5 led to the first election of a Latino to the Monterey County Boards of Supervisors in more than 100 years. The most significant impact of section 5, I believe, is not from its enforcement mechanism but from its deterrent effect. Just as the presence of police deters more crime than is stopped by actual police intervention, it is likely that the threat of Government action prevents far more attempts to disenfranchise voters than the Department of Justice's review actually does." 152 Cong. Rec. S7969-S7970.

831.   Congress received a statement supporting reauthorization from Senator Richard Durbin (IL), which, in part, stated that "[w]e had hearings before the Senate and House Judiciary Committees, more hearings than I have ever seen on any single piece of legislation: 21 hearings on the Voting Rights Act over the past 9 months, 12 in the House, 9 in the Senate. Over 100 witnesses appeared or submitted statements for the record, thousands of pages of reports and evidence, so there would be no question about the need for this bill. . . The evidence shows that attempts at voter discrimination are not simply a chapter from our history; they continue to threaten us and our democracy today. We have made progress as a nation over the past few decades, but discrimination endures, many times in more subtle forms." 152 Cong. Rec. S7974-7975.

832.   Congress received a statement supporting reauthorization from Senator Carl Levin (MI) that "[h]earings held in the Senate and in the House in 2005 and 2006 revealed a new generation of tactics, including at-large elections, annexations, last-minute poll place changes, and redistricting, which have had a discriminatory impact on voters, especially racial and ethnic minority American voters." 152 Cong. Rec. S8000.

833.     Congress received a statement supporting reauthorization from Senator Daniel Akaka (HI) that "[s]ection 5 of the VRA will help provide Asian Americans with equal access to the polls, ensuring that they are able to participate in the political process and empowering them to make a difference in their communities." Akaka also stated that, "[o]ver the years, our country has come a long way. But unfortunately, barriers to equal political participation remain. Some minority voters still face obstacles to making their political voice heard. There is evidence of attempts to mute the strength of minority voters via unfair redistricting." 152 Cong. Rec. S8001.

834.     Congress received a statement supporting reauthorization from Representative Jerrold Nadler of New York that "I represent parts of two counties covered by section 5's preclearance requirements, Manhattan and Brooklyn; that is, New York and Kings Counties. Our city is also home to main language minorities who also need the protections of the act. As the home to many new Americans, our board of elections must work with multiple language minorities who need assistance to be able to exercise their right to vote. My experience has shown that the act is still needed and that to the extent that the right to vote is safer now than it was 40 years ago, it is because the act is on the books and is working." *October 18, 2005 Hearing*, at 3.

835.     Congress received a statement supporting reauthorization from Representative Steve Chabot (OH) that "[i]n reauthorizing the temporary provisions, the Committee heard from several witnesses who testified about voter discrimination that currently exists in covered jurisdictions. It is on this evidence that the Committee considers it necessary to continue the temporary provisions for another 25 years. I believe it's important to note that in reauthorizing the temporary provisions the Supreme Court, in *South Carolina v. Katzenbach* and later in *City of Rome v. United States*, upheld Congress's broad authority under section 2 of the 15th amendment to use the temporary provisions to address the problem of racial discrimination in voting in certain ju-

risdictions. With H.R. 9, Congress again invokes its authority under section 2 in order to appropriately address the continued problem of discrimination in voting that is revealed in the record before it." *May 4, 2006 Hearing Part I*, at 1-2.

836.    Congress received a statement from Representative Al Green (TX), supporting the renewal of Section 5 due to the progress in electing Latino and African-American elected officials in Texas since the Act was passed. 152 Cong. Rec. H5053.

837.    During the floor debate in the House of Representatives, Congressman Sanford Bishop of Georgia stated, "Before I was elected to Congress in 1992, my area of Georgia had only been represented by an African American once in its history; it was for less than three months in 1870 and 1871. Jefferson Long was the first black Member of Congress from Georgia and only the second nationwide. It took 121 years and the passage of the Voting Rights Act before another African American was elected. This bill is vital to ensuring that minority voices are heard in our nation's capital and at every other level of government." 152 Cong. Rec. H5170.

838.    Congress received a statement from Representative G.K. Butterfield (NC). He noted great progress in black elected officials in his district, which includes jurisdictions covered under Section 5, in the last 32 years due to VRA. Representative Butterfield also provided an example where the Wilson, NC city council changed from single districts to at-large elections and passed an anti-single shot voting "vote for six rule" in order to prevent his election to city council in 1957—which he said later Section 5 would have prevented. 152 Cong. Rec. H4964.

839.    Congress received a statement from Representative Bennie Thompson of Mississippi supporting renewal and providing an example of when Section 5 deterred a discriminatory election cancellation from preventing the election of black candidates in Mississippi in 2001. 152 Cong. Rec. H5055.

840.    Congress received a statement from Senator Arlen Specter of Pennsylvania that included six cases where courts found discrimination in covered jurisdictions: *Hunter* v. *Underwood*, 730 F.2d 614 (11th Cir. 1984), affirmed 471 U.S. 222 (1985); *Dillard* v. *City of Foley*, 926 F. Supp. 1053 (M.D. Ala. 1995); *Brown* v. *Board of School Comm'rs.*, 706 F. 2d 1103 (11th Cir. 1983); *Common Cause* v. *Billups:* 4:05-CV-201 HLM (N.D. Ga.); *League of United Latin American Citizens* v. *Midland Indep. Sch. Dist.*, 648 F. Supp. 596 (W.D. Tex. 1986); and *Pegram* v. *City of Newport News*, 4:94cv79 (E.D.Va. 1994).  152 Cong. Rec. S7951-S7952.

841.    During the floor debate in the House of Representatives, Congresswoman Sheila Jackson-Lee of Texas stated "Mr. Chairman, I hail from the great State of Texas, the Lone Star State. A State that, sadly, had one of the most egregious records of voting discrimination against racial and language minorities. Texas is one of the Voting Rights Act's ``covered jurisdictions.'' In all of its history, I am only one of three African-American women from Texas to serve in the Congress of the United States, and one of only two to sit on this famed committee."  152 Cong. Rec. H5159; *see also May 4, 2006 Hearing Part I*, at 182 ("It has been reported that between 1974 and 1988 in Texas alone, MALDEF and Southwest Voter Registration Education Project filed 88 voting rights suits.")

842.    During the floor debate in the House of Representatives, Congressman David Ortiz of Texas stated "[i]t is ironic that today, the backdrop for this discussion is the Supreme Court decision on Texas redistricting recently that spoke to the unconstitutionality of how the State divided the Hispanic population in the 2003 map. While I wish we did not need the VRA and to protect minority voters, the bottom line is we still have discrimination in this country—a fact illustrated by the Supreme Court's Texas redistricting decision."  152 Cong. Rec. H5174.

843.    During the floor debate in the House of Representatives Congressman Bennie Thompson of Mississippi stated, "In 2001, one of the most shameful and shocking reminders of discrimination occurred in Kilmichael, Mississippi. An all-White city council canceled city election 3 weeks before they were to be held after several African Americans appeared to be in a strong position to win seats. Section 5 of the Voting Rights Act, which requires covered jurisdictions to obtain approval, or 'preclearance,' from the U.S. Department of Justice or the U.S. District Court in D.C. before they can change voting practices or procedures, protected the voting rights of the people of Kilmichael. When elections were held, three African Americans were elected to the Board of Aldermen and the town elected its first African-American mayor." 152 Cong. Rec. H5176-77.

844.    During the floor debate in the House of Representatives, Congressman Mel Watt of North Carolina noted "[t]he Voting Rights Act had been in effect just shy of 30 years in 1992 when I and former colleague Eva Clayton became the first African Americans elected to Congress from the State of North Carolina since George H. White delivered that speech in 1901. Put plainly, nearly three decades elapsed after the passage of the Voting Rights Act before the impact of the Voting Rights Act became real in North Carolina. We should be clear: although the successes of the Voting Rights Act have been substantial, they have not been fast and they have not been furious. Rather, the successes have been gradual and of very recent origin." 152 Cong. Rec. H5148.

845.    During the floor debate in the House of Representatives, Congressman Jose Serrano of New York noted: "I should note that I represent a district covered by section 5. Although the VRA was originally built upon the blood and activism of heroes who lived in a very different time, all of my constituents in my majority minority congressional district have a greater voice in

this country today because of their sacrifices. Therefore, my Latino constituents are keenly aware that section 5 is as important to their political empowerment as the section 203 requirement for certain jurisdictions to provide language assistance." 152 Cong. Rec. H5173.

846.    During the floor debate in the House of Representatives, Congresswoman Eddie Bernice Johnson of Texas discussed efforts to suppress votes in her home state: "There are still thousands of cases of voter intimidation and discrimination reported at every election. Minorities continue to face an uphill battle of misinformation over polling locations, the purging of voter rolls, scare tactics, and inaccessible voting locations. Prior to the 2004 elections, students at Prairie View A&M were told they could no longer register to vote in Waller County, TX. The fear was that the 8,000 students at this historically black college may elect someone the local district attorney didn't want. This change in voter registration was not precleared by the Department of Justice, and was ultimately overturned by the Texas attorney general and the Department of Justice. This is just one example of why we still need the Voting Rights Act." 152 Cong. Rec. H5161-62.

847.    Congress received a statement in support of reauthorization of Section 5 from Representative Robert Scott (VA) stating that: "The importance of this provision has been recognized by several civil rights organizations in previous hearings. A bipartisan congressional report in 1982 warned that without the section, discrimination . . . would reappear overnight. Frankly, Mr. Chairman, I don't think it would take that long." *November 1, 2005 Hearing*, at 4.

848.    Congress received a statement from Representative James Clyburn of South Carolina stating that, "if a thing has happened before, it can happen again. And I am afraid that the creative devices that were developed in the 1890s and early 1900s in this country under what we call the Black Codes, things like numbered posts, things like at-large voting, things like what we call