full-slate voting, would be allowed back into our electoral process if we politicize section 5 that grants review." 152 Cong. Rec. H4375.

849.    Through the National Commission on the Voting Rights Act, Congress received a statement from Representative G.K. Butterfield (NC), stating that there is a present need for Section 5 in North Carolina because of the resistance of many in the "power structure" to minority gains in voting rights.  He testified that, "if we eliminate Section 5, you will begin to see a mass movement to revert to at-large elections in the South.  And at-large elections would, I suppose, be fine if we did not have racially polarized voting.  But racially polarized voting continues to be a very, very serious problem in the rural South." *March 8, 2006 Hearing Vol. I*, at 332.

850.    Other members making statements supporting reauthorization of the Voting Rights Act include:

- Senator Harry Reid (NV), 152 Cong. Rec. S7262
- Senator George Allen (VA), 152 Cong. Rec. S6772
- Senator Mike Crapo (ID), 152 Cong. Rec. S8190
- Senator Ken Salazar (CO), 151 Cong. Rec. S9441
- Representative Linda Sánchez, *October 18, 2005 Hearing*, at 53
- Representative William Lacy Clay, *October 18, 2005 Hearing*, at 80
- Representative Gwen Moore (WI),  *October 18, 2005 Hearing*, at 127
- Senator Barack Obama (IL), 152 Cong. Rec. S7984
- Representative David Scott (GA), 152 Cong. Rec. H5056
- Representative Eddie Bernice Johnson (TX), 152 Cong. Rec. E1394
- Representative J.C. Watts, Jr. (OK), *May 4, 2006 Hearing Part I*, at 259-261.
- Representative Linda Sánchez (CA), *May 4, 2006 Hearing Part I*, at 111.
- Senator Mitch McConnell (KY), 152 Cong. Rec. S7976
- Senator Mark Pryor (AR), 152 Cong. Rec. S7976
- Senator Russell Feingold (WI), 152 Cong. Rec. S7976-S7977
- Senator Debbie Stabenow (MI), 152 Cong. Rec. S7977;
- Senator Hillary Clinton (NY), 152 Cong. Rec. S7982
- Senator Lindsey Graham (SC), 152 Cong. Rec. S7986
- Senator Chuck Grassley (IA), 152 Cong. Rec. S7988
- Senator Mike DeWine (OH), 152 Cong. Rec. S7989
- Senator John Kerry (MA), 152 Cong. Rec. S7992-S7993
- Senator Barbara Boxer (CA), 152 Cong. Rec. S7993
- Senator Charles Schumer (NY), 152 Cong. Rec. S7995

- Senator Bill Nelson (FL), 152 Cong. Rec. S7996
- Senator Blanche Lincoln (AR), 152 Cong. Rec. S7997
- Senator Christopher Dodd (CT), 152 Cong. Rec. S7998
- Senator Paul Sarbanes (MD), 152 Cong. Rec. S8000
- Representative Mike Honda (CA), *May 4, 2006 Hearing Part I*, at 5
- Senator Jack Reed (RI), 152 Cong. Rec. S8002
- Senator Mary Landrieu (LA), 152 Cong. Rec. S8003
- Senator Joseph Lieberman (CT), 152 Cong. Rec. S8003
- Senator Joseph Biden (DE), 152 Cong. Rec. S8004
- Representative Danny Davis (IL); 152 Cong. Rec. H5131
- Representative Betty McCollum (MN), 152 Cong. Rec. E1495
- Representative Nydia Velazquez (NY); 152 Cong. Rec. E1471
- Representative Maxine Waters (CA), 152 Cong. Rec. 5052
- Representative Albert Wynn (MD), 152 Cong. Rec. H5052-H5053
- Representative Lucille Roybal-Allard (CA), 152 Cong. Rec. H5167

851.    During the floor debate, a letter from the Council of State Governments, the National Conference of State Legislatures, the National Association of Secretaries of State, the National Association of Counties, the National League of Cities, and the U.S. Conference of Mayors to Speaker Dennis Hastert and Minority Leader Nancy Pelosi, dated June 6, 2006, was entered into the record.  The letter urged Congress to reauthorize the expiring provisions of the VRA:

> Three key provisions of the Voting Rights Act are set to expire on August 6, 2007. . . .  These sections have had the cumulative effect of reducing and prevent- ing racial and language discrimination against a significant number of citizens and have helped increase minority participation in elections for candidates at all levels of government.  While substantial progress has been made since passage of the Voting Rights Act in 1965, it has not yet resulted in the elimination of voting dis- crimination.  Congress must renew the enforcement provisions of the Voting Rights Act.

152 Cong. Rec. H5146.

852.    Congress received a statement from Marc Morial, President of the National Urban League and former Mayor of New Orleans, Louisiana, testifying that "attempts to undermine minority voting power in Louisiana continue to show its face from time to time in the present day.  Without preclearance, these and other discriminatory voting plans would, without a doubt,

252

be put into place not only in Louisiana, but throughout the country. And we as a Nation would take a giant step backward." *October 18, 2005 Hearing*, at 17.

853.    Congress received testimony from former Congressman Jack Kemp that, "if section 5 is not extended, . . . covered jurisdictions will not have to submit their voting changes to the Department of Justice, thereby the loss of Federal authority to control voting procedures could enable local governments to easily discriminate against minorities [sic] voters. For example, some areas have challenged minority black districts which changed elected positions to appointed and then transformed district elections to at-large elections. These measures are proven to weaken, in my opinion, the strength of minorities and are the main cause for our joint concern." *October 18, 2005 Hearing*, at 5.

854.    Congress received prepared testimony from Sherrilyn Ifill, Associate Professor of Law, University of Maryland School Law regarding the Supreme Court decision of *League of United Latin American Citizens (LULAC) v. Perry*, 126 S. Ct. 2594 (2006). Professor Ifill testified that, "Congress has compiled an extensive record that demonstrates that discrimination persists in the political process. This record illustrates the continuing need for Section 5 of the Voting Rights Act and provides a sufficient basis for Congress to reauthorize its expiring provisions. Although opponents have pointed to substantial progress made since the 1982 renewal, the evidence demonstrates that jurisdictions continue to find new ways to retrogress and dilute minority voting strength. Indeed, the *LULAC* Court recognized that the contested redistricting plan eliminated minority electoral opportunity in the face of growing numbers of politically cohesive Latino voters. This observation ties directly to well-established findings of Congress . . . showing that one of the periods of greatest danger for minority voting power occurs at the very time that minority communities are poised to exercise it." *July 13, 2006 Hearing*, at 233-234.

855.    Through the record of the National Commission on the Voting Rights Act, Congress received a prepared statement from James Blacksher, Alabama civil rights lawyer, that included the following statement: "There is no doubt in the minds of every fair-minded observer that if Section 5 is not reauthorized the State of Alabama will attempt rapidly to reverse or to undermine the gains African Americans have made under the Voting Rights Act in the last three decades." *October 25, 2005 Scope Hearing Vol. II*, at 3199.

856.    As part of his response to a written question from Senator Cornyn (TX) about the risks of permitting the expiring provisions of the Voting Rights Act to lapse, Chandler Davidson said, "I do not believe whites in covered jurisdictions have reached a point where, in the main, they can be counted to 'do to the right thing' regarding minority voting rights without continued oversight by the federal government." In his answer, Davidson cited the number of Section 2 cases since 1982, the number of Section 5 objection letters since 1982, the number of Section 5 submissions that had been withdrawn after Department of Justice more information letters since 1982, testimony before the National Commission on the Voting Rights Act of "ongoing ethnic racial discrimination affecting large numbers of minority voters," hate crimes in Texas, and analyses of racially polarized voting. *May 9, 2006 Hearing*, at 48-61.

857.    In his response to a question from Senator Leahy about the risks of allowing the expiring provisions of the Voting Rights Act to lapse, Professor Chandler Davidson cited a 2004 enforcement example from Waller County, Texas (Prairie View), where the white District Attorney proposed to prosecute black students who voted. The NAACP filed a successful Section 5 enforcement action to stop this from happening, showing the effect of Section 5 and the ongoing need for it. *May 9, 2006 Hearing*, at 23.

858.   As part of his response to a written question from Senator Cornyn, Chandler David-
son stated that "[t]he risks of letting the non-permanent features of the Act expire increase to the
extent that the gains in minority voting rights are not accepted and internalized by the white ma-
jority, such that this majority will be willing to 'do the right thing' on its own, without threat of
deterrent action by the Justice Department or the U.S. Court for the District of Columbia. . . .
Moreover, any comprehensive risk assessment must take into account the importance of what is
at risk. In this case, what is at risk is a fundamental right, the *sine qua non* of American democ-
racy: the right to vote." *May 9, 2006 Hearing*, at 48.

859.   Congress received testimony from former Drew Days, stating that, "I really think the
central issue before this Congress is at heart whether 40 years after the Act's passage, the time
has come to shift this advantage of time and inertia back to the jurisdictions covered by Section
5. My answer is that it has not. Instead, the Voting Rights Act and Section 5, in particular,
should be reauthorized in order to promote further progress in achieving truly equal participation
in the political process free of racial discrimination and exclusion or to prevent backsliding that
may result in undermining what success the Act has already achieved.  Now, I have not had a
chance to review all of the testimony and statements of witnesses or the studies that have been
submitted to the Committee and to the House Committee with respect to reauthorization, but
based upon my 4 years administering Section 5 and other provisions of the Act, I believe that this
record offers ample evidence of contemporaneous and continuing problems of electoral practices
discriminatory in both purpose and effect sufficient to support renewal.  I have in mind espe-
cially the reports prepared by the National Commission on the Voting Rights Act and by the Vot-
ing Rights Project of the American Civil Liberties Union." *May 17, 2006 Hearing*, at 5; *see also*
*id.* at 37 ("In the absence of the pre-clearance requirement, I expect that [covered] jurisdictions

would lack the incentive to avoid objections to proposed changes by actively tailoring changes in a non-discriminatory fashion, as is currently the case; *May 17, 2006 Hearing*, at 54. ( "As I view the portions of the record that I have had the opportunity to examine, while not identical to that of 1982, it shares many critical features: there is progress side-by-side with continuing discrimination; there are many egregious examples of violations of voting rights; last minute, drastic polling place changes, and familiar dilutive tactics through methods of 'cracking' and 'packing'; and racial campaign appeals but also a more carefully considered record on Section 5's deterrent effects . . . . Overall I believe that the record is consistent with that assembled in 1982. Both the quantity and quality of the evidence is strong.").

860.    Congress received testimony from civil rights attorney Armand Derfner that the Section 5 preclearance requirement is still necessary for its deterrent effect: "Another way to do [assess the need for Section 5] is to pay attention in our local communities . . . or our State legislatures . . . to the proposals that are floated, and that never even get off the ground because it's understood that they will not get precleared. And so, in fact, the deterrent effect of the preclearance provision, just for one, is a critical one. And half the time, we never see what might happen and what would happen if we didn't have section 5." *October 20, 2005 Hearing*, at 98.

861.    As part of his response to a written question from Senator Cornyn, Armand Derfner stated that Section 5 has served "as a prophylactic, preventing many potentially discriminatory voting changes that never get reflected in an objection—for example, proposed changes that don't get enacted or that are withdrawn in the face of requests for more information." He also stated that "the number of objections has been artificially reduced by the Supreme Court's interpretation of the Act in *Bossier Parish v. Reno*, which blocked objections even to changes that are [g]rossly discriminatory in purpose." *May 17, 2006 Hearing*, at 75.

862.    In response to a question from Senator Feingold about "what would happen in covered jurisdictions in the absence of Section 5," Anita Earls compared to the experiences of covered areas to non-covered areas in North Carolina.  She stated that (1) non-covered jurisdictions have reverted to at-large election systems while covered jurisdictions have not; (2) without Section 5, there would be less communication and involvement of the minority voters in how voting changes are made due to the loss of Section 5's deterrent effect; (3) non-covered jurisdictions do not annex adjoining black neighborhoods in the same they covered jurisdictions do, and 4) without Section 5, there would be a loss of 5 to 11 North Carolina legislative districts that elect candidates of choice of black voters.  *May 16, 2006 Hearing*, at 22-23; *see also, id.* at 62 ("There is a strong basis in evidence before Congress at this point for concluding that retrogression will occur if Section 5 is not renewed.") *id.* at 15 ("[I]n North Carolina, we have recently a pattern of local governing bodies going back to at-large systems."); *id.* at 141 (Earls relates statement of Bobbie Taylor, President of the Caswell County NAACP, about "how the views of minority voters on issues ranging from polling place location to the composition of election districts were taken into account because of the requirements of Section 5").

863.    Anita Earls testified before Congress that "[t]he original purpose of section 5 has not yet been fully served. The lingering effects of past intentional racial discrimination continue to disadvantage minority voters as they attempt to be heard at every step of the democratic process."  She stated that continued problems include "the continued prevalence of racially polarized voting; redistricting plans that crack and pack minority voters to dilute their voting strength; numerous efforts at the local levels to dismantle single-member districting plans; the manipulation of town boundaries through annexations that exclude Black voters; and the imposition of new

registration and voting practices that make it more difficult for minority voters to register and cast a ballot." *October 25, 2005 Scope Hearing Vol. I*, at 78.

864.    Congress received information from Jose Garza, voting rights attorney for the League of United Latin American Citizens (LULAC), regarding the continuing need for Section 5. *October 20, 2005 Hearing*, at 13 ("Today, the need for Section 5 continues. Racial bloc voting, which is a primary obstacle to an unencumbered participation by the minority community, is still alive and well in Texas); *id. at* 14 ("[W]ithout the Voting Rights Act and without litigation, minority representation in Texas would be abysmal."); *id.* at 45 ("Until states such as Texas can demonstrate some recovery from the illness of racial prejudice in the election process removal of Section 5 would just open up the process to the same old crowd which has so sadly dominated Texas."); *id.* at 78 ("[A]lthough there has been significant improvement in the ability of Latinos to participate in the political process since the passage of the Voting Rights Act, LULAC believes that Section 5 and the other remedial provisions of the VRA are still needed today to insure that gains made are not eroded by future enactments and practices. As the discussion above shows[,] Texas and its local jurisdictions continue to enact election provisions that aim to shove minorities back. Moreover, the Texas 2000 Redistricting Plan for the Texas House of Representatives failed to secure Section 5 approval because it reduced the number of districts that would allow Latinos to elect candidates by at least four districts.)"; and *id.* at 96 ("I think there has been a dramatic improvement in the level of representation in the Latino community in Texas and throughout the Southwest, and in large measure because of the Voting Rights Act—section 5 and section 2. I think there's still a lot of work that needs to be done. And we find examples every day of continuing applications of discriminatory features and of things that could be improved in this thing.").

865.    Congress received testimony and information from Fred Gray about the continuing need for Section 5 and about Section 5's deterrent effect. *May 17, 2006 Hearing*, at 192 ("Section 5 provides a powerful deterrent force in preventing discrimination. As a civil rights practitioner and one of Alabama's first African-American state legislators, I have worked with countless state office-holders and officials, city councils, county commissions, and their counsel. Based on these experiences, I strongly believe that continued Section 5 coverage in Alabama is not only necessary but imperative to prevent the backsliding that history has demonstrated will occur when it comes to full enfranchisement of African Americans. Simply put, Senators we have come too far to affirmatively invite retreat by changing and weakening the protections of the Voting Rights Act."); *id.* at 92 ("I have helped provide assistance to a number of jurisdictions that file submissions with the Justice Department pursuant to the preclearance requirements of Section 5. I know from my work with these jurisdictions that Section 5 has a strong deterrent effect and helps ensure that officials in these areas consider the impact of a particular change on the minority community before adopting it. In my experience, Section 5 has always served as a guidepost to help steer jurisdictions in the right direction to ensure that their legislative actions do not result in retrogressive and/or discriminatory voting practices that would worsen the position of minority voters. . . . [I]n those jurisdictions [in Alabama] where minority voters and/or elected officials were able to help ensure that jurisdictions adopted non-retrogressive plans, Section 5 played a decisive role.)"; *id.* at 95 ("Section 5 has had a significant deterrent effect and that Congress should renew this expiring provision to help provide necessary guideposts to covered jurisdictions, provide leverage for minority elected officials seeking to prevent the adoption of retrogressive voting changes, and to help ensure that there is a mechanism in place to ferret

out retrogressive and discriminatory voting practices); *id.* at 25 (If Congress failed to reauthorize Section 5, "there is a very serious chance of our losing some of what we have gained.").

866.    Congress received testimony from Fred Gray that in some covered jurisdictions, such as Alabama, African-American voters "still have some real problems about raising issues themselves" due to the possibility of "reprisals," such that federal oversight is still needed to protect their rights. *May 17, 2006 Hearing*, at 15.

867.    Congress received testimony and information from Fred Gray, an Alabama civil rights attorney, explaining that the Section 5's success is a reason to continue its operation, not to end it. *May 17, 2006 Hearing*, at 3-4 ("If it was necessary in order to obtain these rights, to have that law and to have proper interpretations of it, certainly it is equally important or more important that the law continues in effect so that these great successes which we have had will continue.").

868.    In response to a written question from Senator Leahy and Kennedy, Fred Gray provided Congress with reasons that, in his view, illustrate the continuing need for Section 5, including dozens of Department of Justice Section 5 objections (including Selma districting, 1992 Alabama congressional redistricting, 1998 Tallapaloosa County districting, 2000 annexation in Alabaster, Alabama); severe racially polarized voting; lack of statewide elected black officials (only 2 in state's history); successful Voting Rights Act enforcement actions including under Section 2, citing *Dillard v. Crenshaw County cases*; and Section 5's deterrent effect to prevent covered jurisdiction officials from engaging in discrimination. *May 17, 2006 Hearing*, at 93-94, 103-104.

869.    Congress received a prepared statement from Jon Greenbaum stating that from the "extensive research" done by the National Commission on the Voting Rights Act, "it is apparent that not only is the record of recent discrimination in voting massive, but that many of the places

260

that inspired the creation of the Voting Rights Act or that engaged in extensive voting discrimi-

nation during the early years of the Act continue to discriminate against those the Voting Rights

Act aims to protect." Greenbaum identified ten such places with the examples he cited from

each place in the parentheticals:

- Charleston County, South Carolina (Section 5 objections to annexations in the City of Charleston from the 1960s and 1970s; Section 5 objection to post-2000 redistricting in the City of Charleston; Section 5 objection in 2004 to proposed change in method of election for Charleston County School Board that had been held by federal district court in 2003 to violate Section 2 in case involving Charleston County Council);

- Cochise County, Arizona (Section 5 objections in 1970s and 1980s to Cochise County College Board; 2006 lawsuit alleging inadequate election assistance in Spanish that county did not contest);

- Dallas County, Alabama (pre-1965 litigation involving disenfranchising devices; "Bloody Sunday"; two Section 5 objections in the 1980s to proposed redistricting for Selma City Council; at-large elections for Dallas County Commission and Board of Education found to violate Section 2 in the 1980s; objections to redis-tricting plans for Selma City Council, Dallas County Board of Education, and Dallas County Commission in the 1990s);

- DeSoto Parish, Louisiana (1971 Section 5 objection to proposed change from ward to at-large elections for DeSoto Parish Police Jury; 1991 Section 5 objec-tion to police jury redistricting plan; 1992 Section 5 objection to school board re-districting plan; 2002 Section 5 objection to school board redistricting plan);

- Dougherty County, Georgia (1971 Section 5 objection to polling place changes; 1973 Section 5 objection to changes that included "substantial filing fees and de-posits as a prerequisite to qualification for candidacy"; 1982 Section 5 objection to redistricting for county board of commissioners; Section 5 objection to State House of Representatives 1981 redistricting plan to Dougherty County districts; Section 5 objection to 1992 House redistricting plan for Georgia based in part on district in Dougherty County; 2002 Section 5 objection to redistricting plan for City of Albany;

- Grenada County, Mississippi (1971 Section 5 objection to at-large elections, numbered posts, and multi-member districts in Grenada County; 1972 Section 5 objections to at-large elections, numbered posts, and a majority vote requirement; 1976 and 1987 Section 5 objections to redistrictings for Grenada County Super-visors; 1988 Section 5 objection to moving from elective to appointive positions for school district; 1997 Section 5 objection to City of Grenada municipal elec-tion where the city placed new limits on voter assistance; federal court finding in 1998 that city of Grenada violated Section 5; 1998 Section 5 objection to a pro-

posed annexation, cancellation of a general election, and redistricting plan for the City of Grenada; 171 observers sent to Grenada County since 1967);

- Hale County, Alabama (Poll tax, literacy test and harassment prior to the passage of the Voting Rights Act; four days after Voting Rights Act was enacted, legislation was passed changing the method of electing county commissioner from district to at-large that was not submitted to the Department until 1974—the change was objected to by the Department of Justice and the county's request for declaratory judgment was denied; Section 5 objection to attempted deannexation of property from the city of Greensboro where subsidized housing was going to be built on the property in question; Section 2 litigation challenging the at-large method of election from Greensboro city council in 1987—the Department of Justice objected to the first two remedial plans proposed by the city and the plan ultimately adopted was drawn as a court-appointed special master; observers sent to elections twenty-two times from 1966 to 2006);

- Lancaster County, South Carolina (Section 5 objections in the 1970s and 1980s to staggered terms for at-large county board of education and area boards of trustees; a 1982 Section 5 objection to a majority vote requirement for judicially contested elections in the city of Lancaster; Section 5 objection to a redistricting plan for the city of Lancaster drawn to settle a Section 2 action); and

- Waller County, Texas (attempts in the 1970's by the county registrar to prevent students at Prairie View A&M University, a historically black university, to register to vote that were struck down by the federal courts as constitutional violations; indictments of Prairie View students in 1990s for "illegal voting" that were later dropped; a 2001 Section 5 objection to redistricting plans, voting precinct changes, polling place switching and elimination, and early voting changes; threats made by the local criminal district attorney to prosecute Prairie View students for illegal voting before the 2004 primary election that were withdrawn after a lawsuit by the NAACP's student chapter; five days that lawsuit was filed, an attempt to reduce the hours of early voting at the precinct closest to campus— the primary election was during spring break—was rescinded after the NAACP student chapter filed a Section 5 enforcement action).

*June 13, 2006 Hearing*, at 235-252.

870.    Congress received testimony from Gerald Hebert, former Acting Chief, Deputy Chief, and Special Litigation Counsel in the Voting Section of the Civil Rights Division, responding to Representative Gary Franks of Arizona question regarding the effect of redistricting on minorities. Hebert noted that states and localities have access to very detailed information on demographics and voting patterns, and thus they can calibrate district election results "down to almost a tenth of a percent." He stated his belief that this data makes it possible for jurisdictions

to form districts that prevent minorities, particularly the growing Hispanic population, from voting or from electing the candidate of their choice. *October 20, 2005 Hearing*, at 103.

871.    Congress received testimony from Gerald Hebert responding to Representative Franks' inquiry as to what Hebert finds to be the most egregious discriminatory practice currently being employed by jurisdictions in elections.  Hebert stated, "I think today the biggest area that needs reform is redistricting, frankly.  I think you see gerrymandering taking place at all levels; and oftentimes, aimed at keeping certain potential candidates off the county commission or the city council or school board.  So I see intentional—a lot of times intentional fragmentation of the minority community, so that they cannot elect a candidate of choice.  I think that would probably be one of the principal things I see.  Problems that deal with method of election, I think, continue to be the largest ones; because they in fact ultimately preclude minority citizens from taking their rightful place, oftentimes, you know, in a governing situation." *October 20, 2005 Hearing*, at 102.

872.    Congress received testimony from Gerald Hebert that the temporary provisions of the Voting Rights Act are still "vitally" necessary today. *October 20, 2005 Hearing*, at 98.

873.    Congress received the written testimony from Pamela Karlan, Stanford Law School Professor of Public Interest Law, discussing why Section 5 is still needed.  She stated, "it is critical to remember that the gains minority voters have achieved over the last forty years by 'pull[ing], haul[ing], and trad[ing] to find common political ground,' *Johnson v. DeGrandy*, 512 U.S. 997, 1020 (1994), have all occurred in the shadow of Section 5, which has given minority voters and their representatives an invaluable bargaining chip." *May 16, 2006 Hearing*, at 191.

874.    As part of the record of the National Commission on the Voting Rights Act, Congress received a prepared statement from Laughlin McDonald, Director of the ACLU Voting Rights

Project, which said in part, "In the absence of Section 5, covered jurisdictions could enact new and discriminatory voting practices that could only be challenged in litigation in which the plaintiffs would have the heavy burden of proving intentional discrimination. As a practical matter, most federal judges have been extremely reluctant to label local officials or communities as racists. As important, a legislative body can <u>always</u> provide a non-racial reason for enacting a new voting practice, regardless of the discriminatory impact that it might have." *October 25, 2005 Scope Hearing Vol. II*, at 3230 (emphasis in original). Laughlin McDonald also testified before Congress: "Voting cases are among the most difficult cases tried in federal court. According to a study published by the Federal Judicial Center, voting rights cases impose almost four times the judicial workload of the average case. Indeed, voting cases are more work intensive than all but five of the sixty-three types of cases that come before the federal district courts." (footnotes omitted). *May 9, 2006 Hearing*, at 141.

875.     Congress received a statement from Marc Morial, former New Orleans mayor and head of the National Urban League, testifying that "We have come as far as we have precisely because of the existence and enforcement of Section 5. Section 5 gives full transparency to voting procedures that would otherwise be too complex, technical, or hidden for the public to discover. It also deters state officials from proposing some discriminatory voting changes in the first place." *October 18, 2005 Hearing*, at 18.

876.     As part of the supplement to report of the National Commission on the Voting Rights Act, Congress received the following information: Frank Jackson, the mayor of Prairie View, Texas, stated that the Voting Rights Act "provides us with some necessary safeguards, because if it was not for that looking-over-the-shoulder, somebody watching the process, then we would have been at the [states'] mercy." For an example, Jackson described the DOJ's ability to block

a local white District Attorney from disqualifying students at historically black Prairie View A&M University from voting during the 2004 presidential election year, on the grounds they were not legal residents of the county. They had tried this again, he noted, in spite of voting rights lawsuits in the late 1970s that settled that students were county residents. *March 8, 2006 Hearing Vol. I*, at 300.

877.    Congress received a report from the National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work 1982-2005*, stating its finding that: "Taken as a whole, the evidence presented at the hearings strongly suggests that the two major problems the Act has focused on solving—restricted ballot access and minority vote dilution—continue in twenty-first century America. Efforts to suppress the minority vote, while not as systematic and pervasive as those of the pre-Act South, are still encountered in every election cycle in many venues across the country. The location of polling places for minority voters is changed, often on short notice. Citizens with English-language difficulties are sometimes discouraged from voting. Requirements to register and vote are sometimes unduly burdensome on minority voters. Racially polarized voting continues in many venues across the country, with the result that qualified minority candidates often have difficulty winning election unless from majority-minority districts. Appeals to voters' racial prejudice are sometimes made by candidates, increasing the polarization. Several people who gave testimony stressed that problems encountered by minorities are the work of both white Democrats and Republicans. In short, both the evidence from the hearings and the additional data relied on in this Report indicate that while the Voting Rights Act has accomplished much during its first forty years, more remains to be done in order to protect the rights of racial and ethnic minorities to fully and equally participate in the electoral process." *March 8, 2006 Hearing Vol. I*, at 222-223; *see also*, *id.* at 209.

878.    As part of the supplement to the report of the National Commission on the Voting

Rights Act, Congress received a information from Richard Engstrom that Section 5 was still

needed because of his research showing the existence of polarized voting in several states cov-

ered by Section 5. *March 8, 2006 Hearing Vol. I*, at 301-302.

879.    Congress received a prepared statement from Chellie Pingree, President and CEO of

Common Cause, which stated that, the problems in the elections of 2000 and 2004, racially po-

larized voting, the return of at-large election systems, the discriminatory placement of polling

places, the manipulation of minority voting strength and other discriminatory tactics in the face

of greater minority participation in voting show a continued need for Section 5 of the VRA. *Oc-*

*tober 20, 2005 Hearing*, at 249.

880.    Congress received a prepared statement from Joe Rich, as part of the record of the

National Commission on the Voting Rights Act, in which he stated the following: "The number

of times that the Attorney General objects to voting change[s] is very small—less than one per-

cent of the Section 5 submissions are objected to.  But that is not a good indicator of the impor-

tance of Section 5.  Rather, the most important impact of Section 5 is its deterrent effect on dis-

criminatory voting changes." *October 18, 2005 Hearing,* at 66.

881.    Congress received a prepared statement from Joe Rich, as part of the record of the

National Commission on the Voting Rights Act, in which he stated the following:  "Today,

nearly forty years after passage of the Act, the landscape has changed. The blatant discrimination

in the south that gave rise to the Act has been substantially reduced. Yet, the more subtle forms

of discriminating against minority voters which replaced the invidious pre-act discrimination lin-

ger on . . . with continuing adverse effects on the right to vote free from discrimination. My ex-

perience has been that the non-permanent provisions of the Voting Rights Act which are sched-

uled to expire in 2007—Section 5; the authority of the attorney general to assign federal observers to elections in Section 5 covered jurisdictions pursuant to Sections 6 and 8; and the language assistance provisions in Section 203—remain crucial to address this continuing discrimination." *October 18, 2005 Hearing,* at 65.

882.    Congress received a prepared statement from Joe Rich, as part of the record of the National Commission on the Voting Rights Act, in which he noted the deterrent effect of DOJ's "more information" requests. He stated that, from 1982 through January 2004, there were several hundred changes withdrawn after receipt of "more information" letters. *October 18, 2005 Hearing,* at 66.

883.    Congress received statements from Theodore Shaw on the continued need for Section 5. *October 25, 2005 Scope Hearing Vol. II,* at 3245 ("The constant presence of Section 5 scrutiny deters discriminatory voting changes even before they are proposed, though this effect is of course less visible than instances of outright objection."); *May 9, 2006 Hearing,* at 171-72

884.    "The Section 5 review process has proven to be an effective deterrent on retrogressive and discriminatory voting practices in the covered jurisdictions.  Numerous witnesses have testified about this clear deterrent effect.  Eliminating Section 5 would lead to reemergence of more widespread retrogression within the covered jurisdictions."); *id.* at 17 ("The fact is, from what we understand, that also some jurisdictions do not engage in actions they otherwise might take that would have a discriminatory, retrogressive, or dilutive effect because of the existence of Section 5 and the preclearance requirements. . . .  But the main point here that I am trying to make is that both with respect to the effect of the existence of Section 5 on jurisdictions that otherwise would engage in discriminatory activities and with respect to the request for information, the Act works powerfully in ways that may appear under the radar screen that may not appear

easily in statistics.") *May 9, 2006 Hearing*, at 172 ( "If Section 5 were allowed to expire, there is little doubt that advances made in covered jurisdictions would be undermined. Some have offered the phrase, 'Bull Connor is dead,' to suggest that the political process has been rid of individuals determined to bar African Americans and other minorities from exercising the right to vote. I would take a different view. Indeed, the record is replete with examples of continued discrimination in the covered jurisdictions, and in some cases evidence that indicates that jurisdictions have tried to reimpose previously discredited practices."); *November 9, 2005 Hearing*, at 18 ("Section 5's use in changing circumstances, its success in promoting inclusion and preventing backsliding, as well as its deterrent effect over many decades illuminate the extent to which the VRA has been the Nation's most effective mechanism for protecting minority voting rights. There is thus no inconsistency in embracing the progress that the VRA has, in large part, made possible while recognizing that its deterrent effect and enforcement protections continue to be vital safeguards.")

885.    Congress received testimony from Nadine Strossen, ACLU President, that the report describing the ACLU's 293 voting cases since 1982 demonstrated the need for reauthorizing the temporary provisions of the Voting Rights Act: "These cases clearly demonstrate the need to extend the act's expiring provisions because they extensively document ongoing voting discrimination problems in the covered jurisdictions. In support of that conclusion, our litigation report prevents evidence substantiating five key findings. I am just going to list them now. . . . First, section 5 has blocked implementation of discriminatory voting changes. Two, there is a continuing pattern of blocked [sic] voting and racial polarization in the covered jurisdictions, as Lee alluded to. Third, there is continuing hostility to minority political participation. Four, there is a continued need for section 5, especially its deterrent effect. Five, the courts routinely apply

section 5 to protect minority voting rights." *March 8, 2006 Hearing Vol. I*, at 19; *see also id.* at 20 ("[T]here is a continued need for section 5 especially in terms of its deterrent effects. The redistricting that follows each decennial census as well as other evidence clearly demonstrates the deterrent effect of section 5. As the report makes clear, in the absence of section 5, minority voters would become increasingly marginalized during the redistricting process and elected officials would be more inclined to adopt voting changes that disadvantage minority voters.") and *id.* ("[T]he courts are routinely applying section 5 to protect minority voting rights to prevent retrogression and to protect equal rights.").

886.    Nadine Strossen testified before Congress that "each time the Voting Rights Act has been renewed, Congress has assessed the extent of current ongoing voting violations in the covered jurisdictions, and each time, Congress has concluded that these provisions must be extended. On every such past occasion, Congress has determined that its earlier attempts to remedy the evil of racial discrimination in voting had failed. Unfortunately, as the ACLU litigation report documents, those serious problems persist to the present day." *March 8, 2006 Hearing Vol. I*, at 20.

887.    Congress received a document authored by Ana Henderson and Christopher Edley, Jr. of Chief Justice Earl Warren Institute which stated: "Another study regarding the continuing need for 'the Act' in Texas highlighted live testimony from community leaders, advocates, and expert witnesses and found that discrimination against Latino and black voters in Texas persists. Based on this testimony, the authors conclude that minorities' voting rights would take a dramatic turn for the worse if Section 5 and other Voting Rights Act protections were abandoned. Indeed, they contend that the findings support the argument that 'the Act' plays an important role in protecting minority voting rights in Texas, both as a tool to remedy discriminatory practices

and as a deterrent to possible violations. For example, the authors note that Texas has been subject to more Department of Justice ("DOJ") objections to voting changes than any other state covered by Section 5. In particular, witnesses cited the objection to Texas's 2001 reapportionment of the Texas House of Representatives, which they characterized as a gerrymander against Hispanic voters that would have eliminated three Hispanic districts despite large growth in Hispanic population in the state between 1990 and 2000. In addition, witnesses complained that in the Fifth Circuit, racial impacts on districts are ignored if defendants offer a partisan rationale for redistricting decisions." *May 4, 2006 Hearing Part I*, at 274.

888.    Congress received information from the National Commission on the Voting Rights Act which suggests that the preclearance provisions of Section 5 can be quicker and more efficient than blocking certain changes under Section 2 of the VRA. Specifically, the Commission's report states that "[t]he Section 5 process thus prevented the implementation of a discriminatory voting change that could have taken several years and millions of dollars to invalidate in a Section 2 lawsuit." *March 8, 2006 Hearing Vol. I*, at 176.

889.    Congress heard testimony from Ann Marie Tallman, President and General Counsel of the Mexican American Legal Defense and Educational Fund, who testified that "[t]he impact of Section 5 in countering discriminatory election laws cannot be overemphasized. This provision of the VRA, which affects almost as many Latinos as it does African Americans, has been essential in stimulating the unprecedented Latino political participation that we see today at all levels of American government. Section 5 prevents covered jurisdictions from 'changing the rules of game' to disadvantage minority voters before these voters can seek redress for the deprivation of their voting rights. Section 5's effectiveness in protecting minority voting rights lies in its shifting the burden of proof from the minority voters who have historically been subject to

discriminatory practices to the covered jurisdictions seeking to change their election systems. By invalidating discriminatory election laws before they are put in place, Section 5 removes the need for minority voters to continually bring costly litigation to ensure that their voting rights are protected." *October 18, 2005 Hearing,* at 21.

890.    The Senate Committee on the Judiciary received testimony from Professor Joaquin Avila that "[i]n Monterey County, [California] election officials decided to reduce the number of polling places for the special gubernatorial recall election held on October 7, 2003. According to county officials, the number of polling places utilized in the November 2002 general election was reduced from 190 to 86 for the special recall election. The Department of Justice ultimately approved the voting precinct consolidations only after Monterey County withdrew from Section 5 consideration five precinct and polling place consolidations. Absent Section 5 coverage there would not have been a withdrawal of these particular polling place consolidations. The only alternative would have been to file a Section 2 case and seek a preliminary injunction enjoining the consolidation of these polling places. Given the shortened time periods involved between the setting of the special election and the actual date of the election, presenting a Section 2 case with all of the required expert-intensive evidence relating to a history of voting discrimination, racially polarized voting, and racial appeals, among other factors, would not have been possible. With respect to the Monterey County polling place consolidations, there was no realistic opportunity to even utilize Section 2. Based upon these case studies, Section 2 cannot be viewed as a substitute for Section 5 protections." *July 13, 2006 Hearing,* at 111.

891.    The House Judiciary Committee reached the following determination regarding the necessity of reauthorizing the temporary provisions: "[T]he Committee believes that a failure to reauthorize the temporary provisions, given the record established, would leave minority citizens

271

with the inadequate remedy of a Section 2 action. The Committee knows from history that case-by-case enforcement alone is not enough to combat the efforts of certain States and jurisdictions to discriminate against minority citizens in the electoral process." The Committee found that "Section 2 would be ineffective to protect the rights of minority voters, especially in light of the increased activity under Sections 5 and 8 over the last 25 years. It is against this backdrop that the Committee finds it necessary to extend the temporary provisions for an additional 25 years." H.R. Rep. No. 109-478, at 57.

892.   Congress received a statement supporting reauthorization from Representative Robert Scott of Virginia that "[i]n October of last year, we began the task of building a record to ascertain whether or not there was an ongoing need for these provisions. Through hearings in the Committee and field hearings conducted by many of the groups represented here on the panel, we have been able to build a clear and convincing record that there is a continuing need for the expiring provisions in the bill. The temptation to manipulate the law in ways that will disadvantage minority voters is great, as great and irresistible today as it was in 1982. There are many specific issues that need to be addressed, including the clear need for section 5 in light of the inadequate remedies provided under section 2. Section 5 must be reauthorized to continue blocking the implementation of discriminatory voting changes, whether by deterring jurisdictions from enacting the discriminatory law in the first place or by routinely blocking those changes in the courts." *May 4, 2006 Hearing Part I*, at 3; *see also* 152 Cong. Rec. H5053.

893.   Congress received a statement in support from Representative Robert Scott (VA) regarding why Section 2 is not an adequate substitute for Section 5. He stated, "[b]ringing a section 2 action is very expensive, more than what most voters or small groups may be willing to afford to vindicate their rights. And even if they were able to make a case and be successful, this

would be years down the road by the time you take into account the time frame for litigation, including appeals. By then, the winner of the illegal election is an incumbent, and we all know from our experiences as well as from observing other races in which there is an incumbent and from testimony before this Subcommittee, that incumbency is a huge and, more often than not, dispositive advantage in an election." *November 1, 2005 Hearing*, at 4.

894.    Congress received testimony from voting rights lawyer Joaquin Avila, stating that, "Section 2 cannot be viewed as a substitute for Section 5 protection.  The difficulties presented by a Section 2 case with its extensive use of expert testimony and with the burden on minority plaintiffs to demonstrate that a method of election or voting change results in a denial of an equal opportunity to elect a candidate of their choice is outweighed by a Section 5 administrative proceeding where the burden of proof is reversed.  Even if Section 2 cases were feasible, the shifting of the burden of proof to the covered jurisdiction in a Section 5 proceeding is far superior to having to expend substantial time and resources to meet the evidentiary burden imposed by Section 2." *July 17, 2006 Hearing*, at 111; *see also id.* ("In Monterey County, election officials decided to reduce the number of polling places for the special gubernatorial recall election held on October 7, 2003.  According to county officials, the number of polling places utilized in the November 2002 general election was reduced from 190 to 86 for the special recall election.  The Department of Justice ultimately approved the voting precinct consolidations only after Monterey County withdrew from Section 5 consideration five precinct and polling place consolidations.  Absent Section 5 coverage there would not have been a withdrawal of these particular polling place consolidations.  The only alternative would have been to file a Section 2 case and seek a preliminary injunction enjoining the consolidation of these polling places. Given the shortened time periods involved between the setting of the special election and the actual date of the elec-

tion, presenting a Section 2 case with all of the required expert-intensive evidence relating to a history of voting discrimination, racially polarized voting, and racial appeals, among other factors, would not have been possible. With respect to the Monterey County polling place consolidations, there was no realistic opportunity to even utilize Section 2." *July 13, 2006 Hearing*, at 111.

895.    Congress received a paper, *Saving Section 5: Reflections on* Georgia v. Ashcroft*, and Its Impact on Renewal of the Voting Rights Act*, by David J. Becker. Becker stated that "even with the *Ashcroft* standard, minority voters are better off with Section 5 than without it. Section 5 provides an additional, not an alternative, recourse and remedy for minority voters. Other causes of action, including constitutional claims and claims under Section 2 of the Voting Rights Act, are available after Section 5 review, but without Section 5, those claims would be the only means of addressing potential discrimination. . . . [S]uch an additional line of defense could be critical for minority voters, because only with Section 5 is the burden of proof not on those voters to prove discrimination, but on the jurisdiction to prove the absence of retrogression. As anyone who has ever litigated both Section 5 and Section 2 cases knows, such a distinction can be vital to obtaining necessary relief for minority voters." *March 8, 2006 Hearing Vol. II*, at 2511.

896.    As part of his response to written question from Senator Specter, Armand Derfner stated: "Section 2 is not an adequate substitute [for Section 5] because it puts the burden on the victim. Unlike Section 5, Section 2 allows the discriminatory voting change to go into effect. In addition, Section 2 cases are expensive and time-consuming to litigate and hard to win. The Federal Judicial Center studies the complexity of different types of cases, and has reported that voting cases rank near the top of all civil cases in complexity. . . . In my recent Charleston County case, the County spent over $2,000,000 defending the case, and we had to put in over 2000 hours

representing the plaintiffs, in addition to many more hours that the Justice Department put in. Lay persons may not be fully aware of the realities and burdens of litigation, but they are real. Those who would narrow or do away with Section 5 often claim, without support, that Section 5 is not needed because other litigation will do the job." *May 17, 2006 Hearing*, at 80; *see also id.* at 20.

897.    As part of her response to a written question from Senator Leahy, Anita Earls stated: "[I]n all Section 5 objections, the DOJ was able to stop the problematic voting alteration *before* it was put in place.  If section 5 were not renewed, then violations would have to be dealt with ret-roactively under section 2 of the VRA.  A Section 2 lawsuit is a more burdensome method of protection as it must retroactively stop voting legislation after it has already been implemented. It takes time to assemble plaintiffs with standing, file a case and engage in discovery, and even on an expedited schedule, trial will be months and possibly over a year after the new law is put in place.  Section 2 is also more difficult as it shifts the burden of proving the violation to the plain-tiffs, where Section 5 requires the submitting authority to preemptively show no such violation would occur." *May 16, 2006 Hearing*, at 61 (emphasis in original).

898.    Anita Earls stated to Congress that Section 5 is needed to protect the gains achieved through Section 2 litigation. *October 25, 2005 Scope Hearing Vol. I*, at 79; *May 16, 2006 Hear-ing*, at 145.

899.    Congress heard testimony from Gerald Hebert, in response to questions from Repre-sentative Robert Scott regarding what would happen to an illegal election scheme if Section 5 were not renewed. He said that without Section 5, a discriminatory scheme would immediately take effect, have a negative impact on minority voting rights, and "it might be too little too late to bring a suit even if you could muster the resources to file it."  He also explained that, "[b]ringing

vote dilution cases . . . is a very, very costly enterprise. You need expert witnesses, you need skilled lawyers. . . . I would estimate that the cost of a vote dilution case, to bring a vote dilution case through trial and appeal, runs close to half a million dollars." He also stated that even if a Section 2 suit is ultimately successful, candidates who won under an election scheme eventually found to be illegal were likely to have gained advantages from incumbency. *May 4, 2006 Hearing Part I*, at 65-66.

900.    Congress received statements from Pamela Karlan regarding the continued need for Section 5. *May 16, 2006 Hearing*, at 15 ("Section 2 is not an adequate substitute for Section 5 because it allows the changes to go into effect, and that means you can go through several election cycles while the litigation is going on where the discriminatory change is in effect. It requires the minority community to find a lawyer who will bring these cases. And let me tell you, from having litigated the cases and having litigated the attorneys' fees issues after the cases, this is not a way of getting rich. It is not even a way of making a living. And it requires that huge amounts of resources in the litigation process be used, both by the jurisdictions and by the individual citizens. So I don't think of it as an adequate substitute in any way."); *id.*, at 6 ("I know from my own experience doing compliance in California, dealing with covered jurisdictions there, that the Voting Rights Act has a huge deterrent effect, and it has a huge effect in telling jurisdictions that the concerns of racial minorities should not be at the bottom of the list.").

901.    Wade Henderson submitted a report to Congress ("Voting Rights in Mississippi, 1982-2006") which stated that, "if Section 5 is abolished, litigation under Section 2 will not be sufficient to prevent discriminatory voting changes that will occur in the absence of a preclearance requirement." The report asserted that, "litigation under Section 2 of the Act has played a role in the changes that occurred in Mississippi. But, it has only been a small part of the story.

Objections issued under Section 5 have made a far bigger difference." The report provided the example that, "127 black supervisors holding office today come from 67 different counties—43 of which incurred one or more Section 5 objections of redistricting plans for supervisors. There were only two counties whose redistricting plans were changed solely as a result of reported Section 2 lawsuits without any Section 5 objections." *March 8, 2006 Hearing Vol. II*, at 1726.

902.    Congress received written testimony from Robert McDuff, responding to a question from Senator Leahy regarding whether alternate remedies would be enough in the absence of Section 5. McDuff stated that, "In my experience, litigation under Section 2 will not be sufficient to prevent the discriminatory voting changes that would likely reemerge in the absence of the Section 5 preclearance requirement. Adequate legal, financial and human resources did not exist in Mississippi in the past 40 years to bring a lawsuit in lieu of every one of the 169 objections that have been issued. Those resources do not exist today, and given persistent socioeconomic disparities between Blacks and whites, I have little hope that this reality will change in the near future. Voting rights is intensely complex litigation that is both costly and time-consuming. To be appropriately presented, these cases require costly experts including historians, social scientists and statisticians, among others. Having litigated a great number of voting rights matters in the State of Mississippi, I know that there are not enough lawyers who specialize in this area to carry the load." *May 10, 2006 Hearing*, at 96; *see id. at* 92. (Without Section 5, I fear backsliding would result. In the 19th century, many of the gains of Reconstruction were eliminated when the federal government stopped enforcing civil rights. The protections of Section 5 should not be withdrawn now."

903.    Congress received the report of the National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work 1982-2005*, which found that the

value of Section 5 was demonstrated by the interplay of Section 2 and Section 5 remedies recently in Charleston County, South Carolina. "At the time of the county council trial, a majority of the school board, elected by a different method from that used by the county council, was black. In 2003, while the county council case was on appeal, the South Carolina General Assembly, led by legislators from Charleston County, enacted a law changing the method of electing the school board to that which had been successfully challenged in the county council case. The Department of Justice objected to the change on the ground that it would decrease minority voting strength. The Section 5 process thus prevented the implementation of a discriminatory voting change that could have taken several years and millions of dollars to invalidate in a Section 2 lawsuit." *March 8, 2006 Hearing Vol. I*, at 176.

904.    Alexander Keyssar offered written testimony to Congress stating that "[p]rogress in the expansion of the franchise has been piecemeal and fitful, not steady and gradual." Keyssar also observed that "[t]here have been prolonged periods when efforts to broaden the franchise were stymied, sometimes followed by breakthrough moments where a great deal was achieved." The most prominent landmarks in the history of suffrage were: the early nineteenth century (when most property and tax requirements were removed); the post-Civil War era of Reconstruction) when the Fourteenth and Fifteenth Amendments were passed); 1920 (when the Nineteenth Amendment was finally ratified, enfranchising women); and the 1960's when both Congress and the Supreme Court took pioneering steps to guarantee democratic rights to Americans. The Voting Rights Act, of course, was at the center of this last surge in democraticization." *July 13, 2006 Hearing*, at 244.

905.    Alexander Keyssar offered written testimony to Congress noting that "curing systematic discrimination or bans in voting rights has generally been a prolonged process, taking many

years to achieve. It took seventy- five years of organizing for women's suffrage to be achieved—and even longer for African Americans to secure their basic political rights." *July 13, 2006 Hearing*, at 245.

906.    Congress received written testimony from Alexander Keyssar who observed that "[i]n the course of [U.S.] history, the right to vote has sometimes been narrowed as well as expanded: there have been many episodes where gains were reversed, and men and women who possessed the right to vote were substantially disenfranchised." *July 13, 2006 Hearing*, at 245.

907.    In his written testimony to Congress, Alexander Keyssar observed that "[i]ndeed, dis-enfranchisements have been so frequent that during one prolonged period in our nation's history (roughly 1870 to 1920), the dominant trend was towards narrowing the franchise and reducing the proportion of citizens who possessed the right to vote. The progress of democracy in the United States has not been unilinear." Keyssar also observed that "[t]he[] rollbacks and reversals have been of immense significance in the history of racial restrictions on the right to vote." *July 13, 2006 Hearing*, at 246.

c)    **Effect of Section 5 in Texas**

908.    Congress was presented with information from Chandler Davidson and Bernard Grofman's book, *Quiet Revolution in the South*, which notes that "[t]he extension of section 5 to Texas was a major advance in securing minority voting rights. Justice Department intervention in Texas after 1975 either prevented many potentially dilutionary measures or required them to be counterbalanced with additional election changes that restored or enhanced minority voting strength. *October 18, 2005 Hearing,* at 1249-1250.

909.    Congress was presented with information from Chandler Davidson and Bernard Grofman's book, *Quiet Revolution in the South*, explaining that Section 5 coverage of Texas,

279

"nearly doubled the number of voting changes submitted for Section 5 review." Congress further received information that, "[s]ince Texas has become covered under Section 5, the state and its subjurisdictions have accounted for approximately 40 percent of the changes submitted for administrative Section 5 review, and about 30 percent of all submitted redistricting and districting plans." *October 18, 2005 Hearing,* at 1404.

910.   Congress was presented with information from Chandler Davidson and Bernard Grofman's book, *Quiet Revolution in the South*, which notes that, "after the extension section 5 to Texas in 1975 . . . attacks based on Fourteenth Amendment arguments developed in *White* [*v. Regester*] and section 5 objections by the Justice Department produced some form of single-member-district elections in most major Texas cities, including Houston, San Antonio, and Dallas. . . .These changes led to noteworthy increases in the number of elected minority officials." *October 18, 2005 Hearing,* at 1249.

911.   Congress received information from the National Commission on the Voting Rights Act regarding a statement made by Claude Foster, national field director for the NAACP National Voter Fund, to the chair of the National Commission's Southwest Regional hearing.  During the hearing, Foster stated that, "without the Voting Rights Act, what other tool would minority communities have for redress if a state, county, city, or town adopted a discriminatory new procedure or changed voting locations without adequately notifying the community?  This was done in the Houston mayoral election in 2001 when over 166 precincts were changed without the African American Community being notified...until the civil rights community challenged election officials under Section 5." *March 8, 2006 Hearing Vol. I,* at 307.

912.   Congress received testimony from civil rights attorney Jose Garza, that, "[a]fter two decades of litigation and redistricting, and advocacy before the United States Department of Jus-

tice, [following the coverage of Texas under the remedial provisions of the VRA] Mexican Americans increased by 79% to 129 of 1270 (10.15%) of the members of the county commissioners courts in Texas in 1994." Additionally, Garza testified that, since the coverage of Texas under Section 5, "the number of Mexican American legislators [in the state legislature] also dramatically increased. Between 1980 and 1994 the number of Mexican American members of the Texas House of Representatives increased from 15 to 27. Moreover, a study of cities that changed from at-large to some form of single member districts suggests that the advocacy and litigation done by LULAC, together with Mexican American Legal Defense and Educational Fund, TRLA, and SWVRP during the late 1970s through the 1990s was a substantial catalyst for a dramatic increase in the representation levels for Mexican Americans. In each of the instances where barriers to minority voting were challenged the special remedial provisions of the Voting Rights Act were crucial in achieving success." *October 20, 2005 Hearing*, at 16.

913. Congress received information from the National Commission on the Voting Rights Act describing the testimony of Frank Jackson, the mayor of Prairie View, Texas, the site of a historically black university, Prairie View A&M. Mr Jackson testified before the National Commission about the efforts of the white District Attorney to disqualify black students from voting during the 2004 presidential election year, on the grounds that they were not legal residents of the county. This was in spite of lawsuits in the late 1970s growing out of vote-suppression efforts in the surrounding county that settled the question of whether students were county residents. Mayor Jackson stated that the Voting Rights Act "provides us with some necessary safeguards[.]" *March 8, 2006 Hearing Vol. I*, at 300.

914. Congress received testimony from the National Commission on the Voting Rights Act describing the testimony of Victor Landa about the difference made by Section 5: During

one election in San Antonio, Texas "'where early voting places were [going to be] changed in the west side and south side . . . . that's predominantly Latino. . . . Early voting places were taken from there and put in the other part of town. The reasoning [given] for this was that more people vote in the other parts of town than they do on the south side and the west side.' But because the changes had not been submitted to the Department of Justice for Section 5 preclearance, 'it was easy to stop it before it even happened, while it was still in the planning stages[.]'" *March 8, 2006 Hearing Vol. I*, at 299.

915.    Congress received information from "Voting Rights in Texas, 1982-2006," a report of RenewTheVRA.org regarding the history of voting rights violation in Seguin, Texas. According to the Report, "[i]n 1978, Latino plaintiffs sued . . . Seguin for failing to redistrict following the 1970 Census. At the time, the city elected eight council members from four multi-member wards and the city was 40 percent Mexican American and 15 percent African American. There had never been more than two minority candidates elected at a time to the council. A federal court enjoined the 1978 election and the following year adopted a new redistricting plan for Seguin proposed by the city. The plaintiffs objected to this plan because it afforded insufficient Latino representation. Shortly afterwards, the plaintiffs filed a second lawsuit seeking to block implementation of the city's plan until it received the required preclearance from the DOJ. Ultimately, the plaintiffs won a ruling from the U.S. Court of Appeals . . . requiring the redistricting plan to be precleared. Following these victories . . .Seguin failed to redistrict after the 1980 and 1990 Census. By 1993, 60 percent of the City was minority, but only three of nine city Council members were Latino. Latino plaintiffs sued again and won a settlement in 1994 from the City that created eight single member districts." *Voting Rights in Texas, 1982-2006* at 29 (Appended to the Statement of Nina Perales, July 13, 2006) (Wolfson Decl. Ex. 8).

915A.   Congress received information that, "[f]ollowing the 2000 Census, [the City of] Seguin[, Texas,] redistricted but fractured the city's Latino population across the districts to preserve the incumbency of an Anglo councilmember and thus maintain a majority of Anglos on the City Council. When the DOJ refused to preclear the redistricting plan, Seguin corrected the violation but then closed its candidate filing period so that the Anglo incumbent would run for office unopposed. Latino plaintiffs sued once again, securing an injunction under Section 5 of the Voting Rights Act. The parties settled after negotiating a new election date, and today, a Latino majority serves on the Seguin City Council. *Id.*

916.   Congress received testimony from civil rights attorney Jose Garza discussing how a successful Section 5 enforcement action helped with the implementation of a remedy after the District Court determined that the at-large election system for the election of trustees of the Northeast Independent School District (NEISD) in Texas violated Section 2 of the Voting Rights Act.  Specifically, the school board was reluctant to adopt a single member district.  However, after "LULAC filed a Section 5 enforcement action and secured an injunction blocking the bond election and ordering the school district to submit the bond election for preclearance . . . the Defendant school district agreed to adopt single member districts and LULAC agreed to support the preclearance of the bond election.  In the first election after the adoption of single member districts a Latino candidate and an African American candidate secured election from majority minority districts." *October 20, 2005 Hearing*, at 34.

917.   Congress received testimony from Nina Perales that the "Mexican American Legal Defense and Educational Fund filed suit in 2002 against the City of Seguin, Texas, when it attempted to prevent Latinos from gaining a majority of seats on the city council.  The 2000 Census showed that the growing Latino population in Seguin comprised the majority of five of the

eight city council seats. The district had formerly been balanced four-four, Latino and Anglo. The City responded by dismantling the fifth Latino majority district in its new redistricting plan, but the Justice Department indicated it would not likely preclear a plan with such an obviously retrogressive effect." *October 25, 2005 Scope Hearing Vol. I.,* at 86.

918. Congress heard testimony from Ann Marie Tallman, President and General Counsel of the Mexican American Legal Defense and Educational Fund, who testified about a recent case brought by the Mexican American Legal Defense and Educational Fund in Texas. Ms. Tallman testified that, "[i]n 2001, when Latinos had reached one-third of the State's total population, Texas proposed a redistricting plan for its House of Representatives that minimized Latino voters' impact in three districts and completely eliminated a fourth Latino-majority district. Because the plan added only one new Latino-majority district and eliminated four such districts, the U.S. Justice Department concluded that it was retrogressive and blocked its implementation under Section 5. As a direct result of DOJ's Section 5 intervention, the current Texas House redistricting plan maintains the four Latino-majority districts that were dismantled and contains a total of thirty-five districts that afford Latino voters the opportunity to elect their candidate of choice. If Section 5 were not in effect, these districts would likely not exist." *October 18, 2005 Hearing*, at 21.

### d)    Effect of Section 5 in Other Covered Jurisdictions

919. The House Judiciary Report noted that in *Dillard v. City of Foley*, 926 F. Supp. 1053 (M.D. Ala. 1995), Section 5 was instrumental in preventing the City of Foley, Alabama, from annexing white areas and not African-American areas. Eventually the city adopted a non-discriminatory annexation policy and African-American areas were annexed into the city. H.R. Rep. No. 109-478, at 23.

920.     Through the National Commission on the Voting Rights Act, Congress received testimony from Alabama State Senator Bobby Singleton about the impact of the Voting Rights Act on Hale County, Alabama, and its county seat of Greensboro, deep in the state's Black Belt. Singleton ran for city council in 1984 in an at-large system. In spite of the fact that the city was 63 percent black, it had no black elected officials. In a previous election, Singleton lost by fifty votes. A suit he subsequently filed against the city's election system became part of a larger suit which eventually mandated single-member districts. The plan, in turn, had to be precleared under Section 5. The district system led in 1992 to the election of the city's first black council members in a century. In 1997, the city also elected its first African-American mayor, an event which Singleton attributed to the political mobilization of the city's black population as a result of the creation of single-member districts. *March 8, 2006 Hearing Vol. I,* at 302.

921.     Alabama State Senator Bobby Singleton, while speaking at the Southern Hearing of the National Commission of the Voting Rights Act, added that the Department of Justice was contacted many times to prevent efforts to change voting hours and to prevent "intimidation of black voters going to the poll." As a result of DOJ intervention and the presence of federal observers, blacks in Hale County are now a majority on many if not most of the elected governments in the county (including schools boards, the county government, and "most of the cities in the area") and, Singleton added, "we were able to elect a black circuit judge, black circuit clerk, [and] myself as a state representative[.]" *March 8, 2006 Hearing Vol. I,* at 302.

922.     Jerome Gray testified before Congress about the effect of the Section 5 process on the 2004 election in Evergreen, Alabama. After receiving a complaint from a voter about the clerk's failure to produce a complete voting list, he called the clerk and reminded him of the role the Department of Justice had played in 1980: "In that case, with section 5's help, we found out

that the Conecuh County Commission had changed its election system from single-member districts to at-large elections after 1965 and had not gotten them precleared. And we also learned that the county Democratic Executive Committee had changed its election procedure after the 1965 Voting Rights Act without submitting those changes for preclearance. At any rate, by reminding the clerk and the mayor about what had happened in 1980, they acquiesced and allowed for a fair voters list to be developed. The election went on without incident, and the city of Evergreen had the highest turnout in history, over 95 percent in 2004, and we elected our first Black mayor without a runoff. It was indeed 'peaceful astonishment.'" *November 1, 2005 Hearing*, at 46.

923.    Congress received a report commissioned by the Leadership Conference on Civil Rights analyzing the effect of the VRA on Alaska and the impact of preclearance in 2000 and 2004. According to the report, the "governing state administrations significantly overhauled election laws right before these important elections. In September 2004, the state submitted many significant changes, including changes to absentee and questioned ballots and acceptable forms of ID, which were implemented in the election just two months later. The state apparently did not obtain preclearance in time, as the DOJ STAPS report shows that these changes were 'precleared' on November 9, 2004 one week after the election. The state had made a similar overhaul of its election laws before the 2000 election, and submitted these changes for preclearance on August 7, 2000; final 'preclearance' was obtained on most of these changes on April 2, 2001 - five months after the election. About ten of these changes were withdrawn after the election; thus, with respect to these changes, Section 5 had an impact." *March 8, 2006 Hearing Vol. I*, at 1351.

924.    Congress received testimony from Joe Rogers that the "mere existence of [s]ection 5 had the deterrent effect of stopping jurisdictions from enacting discriminatory changes." Rogers testified that the post-1990 redistricting plans for the Alaska House and Alaska Senate were found to violate section 5 by reducing the voting strength of Alaska Natives. In comparison, Rogers testified that "in the post-2000 redistricting cycle, Alaska took specific measures to ensure that it did not reduce Alaska Native voting strength districts where Alaska Natives had a reasonable opportunity to elect candidates of their choice." *March 8, 2006 Hearing Vol. I*, at 92.

925.    Congress received a report commissioned by the Leadership Conference on Civil Rights analyzing the effect of the VRA in Alaska, which stated that Alaska still employs a test or device in the form of English-only elections, and only about 50 percent of the voting age population was registered to vote or did vote in more recent elections. *March 8, 2006 Hearing Vol. I*, at 1331.

926.    Through the National Commission on the Voting Rights Act, Congress received a prepared statement from Professor Joaquin Avila stating that Section 5 must be reauthorized to prevent jurisdictions from discriminating against minority voters. Avila cited the Chualar Union Elementary School District's attempt to re-institute an at-large election system, replacing a district election system, as evidence that many covered jurisdictions would revert to discriminatory election practices in the absence of Section 5. Avila noted that DOJ objected to Chualar Union Elementary School District's proposed change back to an at-large election system in 1995. *October 25, 2005 Scope Hearing Vol. II*, at 3303.

927.    Congress received information from the Florida State Report commissioned by the Leadership Conference on Civil Rights indicating that, in 1992, "Section 5 served as a crucial check on a Florida redistricting process that favored partisan and incumbent interests irrespective

of the impact on minority voting strength.  In addition, the 1992 Section 5 review of Florida's redistricting process has had the salutary effect of ensuring that both the courts and the legislators consider whether districting changes promote racial fairness, attention that is unlikely to be allocated to such considerations absent the requisite Section 5 review by the Department of Justice." *March 8, 2006 Hearing Vol. II*, at 1466.

928.    Congress received testimony from Laughlin McDonlad, Director of the Voting Rights Project of the American Civil Liberties Union regarding the deterrent effect of preclearance. McDonald testified that: "in 2005, the Georgia legislature redrew its congressional districts, but before doing so it adopted resolutions providing that it must comply with the non-retrogression standard of Section 5.  The plans that it drew maintained the black voting age population in the two majority black districts (represented by John Lewis and Cynthia McKinney) at almost exactly their pre-existing levels, and it did the same for the two other districts (represented by Sanford Bishop and David Scott) that had elected black members of congress.  There was no objection by the Department of Justice when the plan was submitted for preclearance.  That does not mean that Section 5 did not play a critical role in the redistricting process.  Rather, it means that Section 5 likely encouraged the legislature to ensure that any voting changes would not have a discriminatory effect on minority voters." *October 25, 2005 Need Hearing*, at 9.

929.    Through a report submitted to Congress by Nadine Strossen, Congress received information that, "[i]n Mississippi, which lost a congressional seat as a result of the 2000 census, both the state court and the federal court became involved in the redistricting process and drew plans relying upon the non-retrogression standard of Section 5 which maintained one of the districts as majority black." *March 8, 2006 Hearing Vol. I*, at 418.

930.    The Senate received testimony from Anita Earls, the Director of Advocacy at the University of North Carolina Law School's Center for Civil Rights, stating that, "Between 1965 and 2001, the town of Kilmichael, Mississippi did not elect a single African-American to the Board of Aldermen and only one African-American ever ran for mayor of the town. Statistics from the 2000 census indicated that the town had become majority African-American and would likely elect multiple black Aldermen and perhaps even a black Mayor in the 2001 election. With this knowledge, the all-white council cancelled their general election three weeks before its scheduled date with no notice to the community. The stated purpose for the town's action was to develop a single-member ward system for electing town officials; however, because the town was required to submit the proposal to the DOJ for preclearance, the elections were reinstated. Thus, without Section 5, voters in the town would not have been able to elect new town officials, and the existing officials would have been able to enact a single-member districting plan that unfairly diluted the voting strength of black voters." *May 16, 2006 Hearing*, at 60.

931.    Congress received information from the National Commission on the Voting Rights Act regarding the testimony of Theodore Shaw, President and Director-Counsel of the NAACP Legal Defense and Educational Fund before the Commission's Northeast Regional Hearing. The Commission's report stated: "Shaw pointed to the fact that since three New York City counties are covered and one, Queens, is not, this situation provides the opportunity for a natural experiment in which the impact of Section 5 can be measured. 'In Queens, where redistricting plans are not subject to the scrutiny of preclearance review, pressure to protect white incumbents from dramatic demographic changes has wrought a districting pattern that, according to former Assistant Attorney General John R. Dunne, 'consistently disfavored the Hispanic voters.' Additionally, though all State Senate districts in New York City are overpopulated (i.e., individual votes

289

are diluted), Queens County districts are twice as overpopulated as Kings, Bronx, and New York

Counties. If Section 5 is allowed to expire, we could expect that pattern to become the norm

across all of New York City.' Shaw claimed that even with Section 5 coverage, 'minorities still

hold a disproportionately low number of political seats in New York.'" *March 8, 2006 Hearing*

*Vol. I*, at 315.

932.    Congress received a copy of the testimony of Jose Garcia, of the Institute for Puerto

Rican Policy and the Latino Voting Rights Network, which had been submitted to the National

Commission on the Voting Rights Act.  Garcia testified that, "[i]n sections of New York City

and other large cities, the Voting Rights Act has demonstrated its effectiveness in protecting the

rights of Latinos to vote and elect candidates of their choice.  In New York City alone, there are

23 Latino elected officials at the local, state and federal levels, most elected in the three counties

of the city covered by Section 5 of the Voting Rights Act.  However, the newer and fastest-

growing Latino communities in the county of Queens, which is not covered by Section 5, have

been increasingly requesting Section 5 protections like their neighbors." *October 25, 2005*

*Scope Hearing Vol. II*, at 3256.

933.    Congress received information from the National Commission on the Voting Rights

Act regarding the testimony of Theodore Shaw, President and Director-Counsel of the NAACP

Legal Defense and Educational Fund, before the Commission's Northeast Regional Hearing.

During that hearing, Shaw stated that, in New York City since 1982, "Section 5 objections have

helped prevent minority vote dilution in three broad areas: redistricting, non-geographical elec-

tion procedures (voting rules, election control, suspension of elected bodies, etc.), and barriers to

political access for linguistic minorities.  The scope of these categories is significant: their

breadth touches virtually every aspect of the vote." *March 8, 2006 Hearing Vol. I*, at 314.

934.    Congress received information from the National Commission on the Voting Rights Act regarding the testimony of Theodore Shaw, President and Director-Counsel of the NAACP Legal Defense and Educational Fund before the Commission's Northeast Regional Hearing. During that hearing, Shaw stated that, since 1983, the Department of Justice has objected six times to submissions from New York jurisdictions, involving "dozens" of changes that would have diluted the minority vote in widespread areas of the city, said Shaw.  Thanks to Section 5 coverage, however, "many of these neighborhoods have become important bases for minority voting power." *March 8, 2006 Hearing Vol. I*, at 315.

935.    Anita Earls testified before Congress that: "Recently a number of counties and one city previously sued under Section 2 of the Voting Rights Act and [were] required by court order to abandon at-large systems have filed motions seeking to dissolve the consent decrees or court orders that currently bind them. . . . Of all these local jurisdictions, only Beaufort County[, North Carolina,] is covered by Section 5. . . . Any new method of election adopted in Beaufort County will need to afford minority voters the same opportunity they now have to elect their candidates of choice.  Thus, Section 5's non-retrogression principle is an important protection to safeguard the court orders and consent decrees that have been obtained to provide non-dilutive, fair and non-discriminatory methods of election under Section 2 of the Act." *May 16, 2006 Hearing*, at 146. (internal citation omitted).

936.    Congress received information from the National Commission on the Voting Rights Act that Anita Earls, former Deputy Assistant Attorney General for Civil Rights who oversaw the Voting Section of the Department of Justice, testified at the Commission's Southern Regional Hearing as to the situation in certain covered and uncovered counties in North Carolina.  Specifi-cally, Prof. Earls testified that, in North Carolina's covered counties, Section 5's non-

retrogression standard prevents efforts to "get rid of the court orders that were established to create opportunities for black voters." *March 8, 2006 Hearing Vol. I*, at 300.

937.    Congress received information from a report authored by Anita Earls explaining that "Section 5 has prevented the implementation of numerous voting systems [in North Carolina] that would have diminished minority voters' ability to elect candidates of their choice." *March 8, 2006 Hearing Vol. II*, at 1733.

938.    Congress was presented with information documenting anti-black discrimination, which has made it difficult for African-Americans to vote in South Carolina during the 1990s and 2002. For example, in a recent Charleston case, after the county was forced by a court to adopt single-member districts, the school board decided "after African Americans got elected...to change the method of elections and take away powers from them." *March 8, 2006 Hearing Vol. I*, at 298.

939.    Through a report submitted to Congress by Nadine Strossen, Congress received information that "the court [in *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002)] refused to adopt any of the plans proposed by the governor or the legislature, noting that 'it is inappropriate for the court to engage in political gerrymandering.' The court concluded that it was obligated to comply with Sections 2 and 5 of the Voting Rights Act, and proceeded to draw plans that maintained the state's existing majority black congressional district and actually increased the number of majority black house and senate districts. *March 8, 2006 Hearing Vol. I*, at 980; *see also October 25, 2005 Scope Hearing Vol. II*, at 3282 (statement of Meredith Bell-Platts).

940.    Congress received information from a report authored by the National Commission on the Voting Rights Act that Professor Dan McCool stated that "the Voting Rights Act . . ., in-

cluding Sections 5 and 203, has played a pivotal role in providing American Indians with an opportunity to vote and elect candidates of their choice [in South Dakota]. The impact has been enormous." *March 8, 2006 Hearing Vol. I*, at 339.

941.    Congress received testimony from Dan McCool, Director- American West Center, University of Utah—Salt Lake City speaking at the South Dakota Hearing of the National Commission on the Voting Rights Act, that Sections 5 and 203 of the Voting Rights Act have played a "pivotal role" in providing American Indians the opportunity to vote and elect candidates of choice in South Dakota. *March 8, 2006 Hearing Vol. I*, at 339.

942.    Congress heard testimony from Joe Rogers, a Commissioner on the National Commission on the Voting Rights Act and the former Lieutenant Governor of Colorado, that "in Fredericksburg, Virginia, the city council was preparing to dismantle its only majority African American district until the city attorney simply 'warned' the council that doing so would violate Section 5." *March 8, 2006 Hearing Vol. I*, at 92.

### 3.    Evidence Before Congress: Racially Polarized Voting

#### a)    Congressional Findings Regarding Racially Polarized Voting

943.    In the "Congressional Purpose and Findings" section of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Congress found that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965." H.R. Rep. No. 109-478, at 2.

944.    In its findings, the House Judiciary Committee found that: "The breadth of racially polarized voting and its impact on minority voters represent a serious concern to the Commit-

tee." The Committee noted that, "[t]estimony presented indicated that 'the degree of racially po-larized voting in the South is increasing, not decreasing . . . [and is] in certain ways re-creating the segregated system of the Old South, albeit a de facto system with minimal violence rather than the de jure system of late." The House Judiciary Committee's findings of racially polarized voting include the finding that, "in 2000, only 8 percent of African Americans were elected from majority white districts." The Committee's findings further note that, "[l]anguage minority citi-zens fared much worse. As of 2000, neither Hispanics nor Native Americans candidates have been elected to office from a majority white district." H.R. Rep. No. 109-478, at 34.

945.    The House Judiciary Committee stated that "[r]acially polarized voting occurs when voting blocs within the minority and white communities cast ballots along racial lines and is the clearest and strongest evidence the Committee has before it of the continued resistance within covered jurisdictions to fully accept minority citizens and their preferred candidates into the elec-toral process." H.R. Rep. No. 109-478, at 34.

946.    Citing to reports it received, the House Judiciary Committee found "that racially po-larized voting shapes electoral competition in the covered jurisdictions. For minority voters, there is effectively an election ceiling. In elections characterized by racially polarized voting, minority voters alone are powerless to elect their candidates." H.R. Rep. No. 109-478, at 34.

947.    The House Judiciary Committee found that because of the breadth of racially polar-ized voting "[t]he only chance minority candidates have to be successful are in districts in which minority voters control the elections." H.R. Rep. No. 109-478, at 34.

**b)      Racially Polarized Voting in States other than Texas**

948.    The House Judiciary Committee quoted a federal court's finding that "[i]n this case the parties have presented substantial evidence that this disturbing fact has seen little change in

the last decade. Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the State and in both primary elections and general elections. Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting. Indeed, this fact is not seriously in dispute." H.R. Rep. No. 109-478, at 35.

949.    The House Judiciary Committee cited to several examples in states fully or partially covered under Section 5 where federal courts have found racially polarized voting. H.R. Rep. No. 109-478, at 34-35 (n. 71-75)(*citing* to "Protecting Minority Voters: The Voting Rights Act at Work 1982-2005). The cases before Congress include *DeGrandy v. Wetherell,* 794 F. Supp 1076 (N.D. Fla. 1992) *aff'd in part and rev'd in part on other grounds sub nom. Johnson v. De-Grandy*, 512 U.S. 997, 1079 (1994); *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 641 (D.S.C. 2002); *Major v. Treen*, 574 F. Supp. 325, 351-52 (E.D. La. 1983); *Session v. Perry*, 298 F. Supp. 2d 451, 492 (E.D.Tex. 2004) *vacated and remanded on other grounds, Jackson v. Perry*, 125 S. Ct. 351 (2004); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d. 976, 1036 (D.S.D. 2004).

950.    The House Judiciary Committee quoted a federal court finding that "the parties agree that racially polarized voting exists throughout Florida to varying degrees. The results of Florida's legislative elections over the past 10 years established the presence of racially polarized voting." H.R. Rep. No. 109-478, at 35 *citing DeGrandy v. Wetherell,* 794 F. Supp 1076 (N.D. Fla. 1992) *aff'd in* part and rev'd in part on other grounds *sub nom. Johnson v. DeGrandy*, 512 U.S. 997, 1079 (1994).

951.    The House Judiciary Committee noted that a federal court stated the following regarding a Louisiana redistricting plan: "A consistently high degree of electoral polarization in Orleans Parish is proven through both statistical and anecdotal evidence. Particularly as en-

hanced by Louisiana's majority vote requirement, . . . racial bloc voting substantially impairs the ability of black voters in this parish to become fully involved in the democratic process." H.R. Rep. No. 109-478, at 35 *citing Major v. Treen*, 574 F. Supp. 325, 351-52 (E.D. La. 1983).

952.    The House Judiciary Committee recognized the following finding of a South Dakota court regarding racially polarized voting: "The court concludes that substantial evidence, both statistical and lay, demonstrates that voting in South Dakota is racially polarized among whites and Indians in Districts 26 and 27." H.R. Rep. No. 109-478, at 35 *citing Bone Shirt v. Hazeltine*, 336 F. Supp. 2d. 976, 1036 (D.S.D. 2004).

953.    The House Judiciary Committee found that the continued existence of racially polarized voting resulted in a great potential for discrimination, "as demonstrated by the increased use of Section 5, the increased need for Federal observers, and the increased need for Section 2 litigation." It further found that "[t]he continued need and increased use of the temporary provisions demonstrate that efforts to discriminate are as real today as they were in 1965 and 1982." H.R. Rep. No. 109-478, at 35.

954.    As part of the record of the National Commission on the Voting Rights Act, Congress received a letter from Carroll Rhodes addressed to John Tanner in which Rhodes stated that "[t]he courts have found that racial bloc voting in elections for circuit and chancery court judges is pervasive throughout the State of Mississippi. *See Martin v. Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987); *Martin v. Mabus*, 700 F. Supp. 327 (S.D. Miss. 1998)." *March 8, 2006 Hearing Vol. IV*, at 5571.

955.    Nadine Strossen provided testimony to Congress regarding a recent finding of racially polarized voting in Georgia. During her testimony, Strossen made reference to *Georgia v. Ashcroft*, 195 F. Supp. 2d. 25, 31 (D.D.C. 2002), a Section 5 preclearance action involving

Georgia's legislative redistricting plan in which the federal district court for the District of Columbia found that there were areas of the state where "white voters consistently vote against the preferred candidates of African Americans." *March 8, 2006 Hearing Vol. I*, at 28.

956.    Nadine Strossen provided testimony to Congress regarding racially polarized voting in Tennessee.   She made reference to *KWTAAAC v. McWherter*, 836 F. Supp. 453, 458, 462 (W.D. Tenn. 1993), in which a three judge court found that in West Tennessee there is "a high level of white bloc voting which usually enables the majority to defeat the black community's candidate of choice" and that "black candidates cannot expect to succeed in majority-white districts." Ms. Strossen further noted that in *Cousin v. McWherter*, 840 F. Supp. 1210, 1215 (E.D. Tenn. 1994), another district court in 1994 found that "the level of racial bloc voting is increasing in Hamilton County making it more difficult than ever for a black to win a countywide judicial office." *March 8, 2006 Hearing Vol. I*, at 28.

957.    The Report of the National Commission on the Voting Rights Act, which was received by Congress, notes that the court in *Jordan v. Winter*, 604 F. Supp. 807, 812-813 (N.D. Miss. 1984), *aff'd sub nom. Mississippi Republican Executive Committee v. Brooks*, 469 U.S. 1002 (1984), found racially polarized voting in a statewide redistricting case in Mississippi. *March 8, 2006 Hearing Vol. I*, at 215, 241-242.

958.    The Report of the National Commission on the Voting Rights Act, which was received by Congress, notes that the court in *Thornburg v. Gingles*, 478 U.S. 30, 80 (1982), found racially polarized voting in a statewide redistricting case in North Carolina.  *Id.* at 215, 241-242.

959.    Through a report submitted to Congress by Nadine Strossen, Congress received information that the "ACLU's second challenge to punch card voting, *NAACP v. Harris,* No. 01-120-CIV-GOLD/Simonton (S.D. Fla.), was filed on January 10, 2001, appropriately enough, in

Florida. There, a broad coalition of civil rights groups joined forces to represent the NAACP and 24 individual African American and Haitian American voter[s] to challenge the use of punch cards as well as various other practices that resulted in the denial of the right to vote." *Id.* at 1200.

960.    Congress received testimony from Wade Henderson regarding the Department of Justice's review of the redistricting undertaken in Louisiana following the 1990 Census. In a Section 5 letter provided to the state, the Department of Justice stated that it had "examined the 1991 House redistricting choices in light of a pattern of racially polarized voting that appears to characterize elections at all levels in the state." *Id.* at 60.

961.    Congress received testimony from Theodore Arrington about a Section 2 action brought by the U.S. government against the county council in Charleston County. Arrington explained that he "found there the most extreme polarized voting I think I have ever seen, and I have been doing this work since 1985. So there was no evidence of any reduction in polarized voting, at least in Charleston. The interesting thing to me was that the judge found, in accordance with my testimony, that there was legally and substantively polarized voting; that because of that and the at-large elections that they had there, African-Americans did not have a reasonable opportunity to elect candidates of their choice. But he also found that in the school board where the elections were non-partisan and, as I remember, were not in numbered posts, African-Americans did have a pretty good chance of winning. Right after the judge's decision, the State legislature changed the school board so it would look like the county commission elections that the judge had just said violated Section 2. In turn, of course, the Justice Department would not pre-clear that change because it was clear from the judge's decision that that change was in violation of Section 2 and Section 5." *May 16, 2006 Hearing*, at 20, 27-28.

962.    As part of the record of the National Commission on the Voting Rights Act, Congress received a prepared statement of Joaquin Avila that attached a 1993 Department of Justice objection to 73 annexations by the City of Hanford in Kings County, CA.  In the objection, the Department of Justice stated that "Hispanic voters have preferred Hispanic candidates in recent elections, but have been unable to elect those candidates due to an apparent pattern of polarized voting.  In these circumstances, the reduction in the Hispanic share of the city's population, as effected by the residential annexations, which have been implemented in past elections, appears to have diminished whatever opportunity would exist for Hispanic voters in the pre-annexation city to elect representatives of their choice to the city council." *October 25, 2005 House Hearing*, at 3313.

963.    As part of the record of the National Commission on the Voting Rights Act, Congress received a prepared statement of Joaquin Avila that attached a 2002 objection to a proposed plan to re-institute at-large elections in Chualar Union Elementary School District in Monterey County, CA.  The Department of Justice stated that "[t]here is . . . evidence that the change will, in fact, have a retrogressive effect.  Under the at-large system in the past, Hispanic voters have had only mixed success, and have faced consistent efforts - sometimes successful - to recall the candidates they have elected.  Since the implementation of district elections, Hispanic voters have been able to elect candidates of choice who have not been subject to recall by non-Hispanic voters.  It is also apparent that even though voter registration is majority Spanish surnamed, this majority is not large and other voters often have been able to defeat Hispanic candidates of choice in district-wide elections.  Indeed, during the referendum election which took place under highly charged and racially polarized circumstances the non-Hispanic proponents easily defeated the Hispanic opposition.  The school district has failed to establish that the reversion to an at-

large method of election will offer the same ability to Hispanic voters to exercise the electoral franchise that they enjoy currently." *October 25, 2005 Scope Hearing Vol. II*, at 3321.

964.    The record of the National Commission on the Voting Rights Act submitted to Congress included a 1997 Section 5 objection to proposed changes for the election of Board of Advisors for the Camp Butner Reservation in Granville County, North Carolina.  The Department of Justice noted that the county commission and board of education had stipulated to racially polarized voting and found that at-large elections for county offices since those stipulated indicated "that the pattern of racially polarized voting has not changed.  *March 8, 2006 Hearing Vol. III*, at 3222.

965.    As part of the record of the National Commission on the Voting Rights Act, Congress received a prepared statement of Robert Rubin.  A portion of the statement concerned  *Gomez v. Hanford Joint Union High School District*, a challenge to at-large high school district election system under the California Voting Rights Act (CVRA) that settled when the School District agreed to convert to district elections.  Rubin also stated that Hispanic voters filed suit under Section 5 of the VRA against the City of Hanford in the 1990s, challenging the City's at-large elections for County Council, and that the Department of Justice had found that elections in Hanford were racially polarized in 1993.  *October 25, 2005 Scope Hearing Vol. II*, at 3329.

966.    As part of the record of the National Commission on the Voting Rights Act, Congress received a written statement from Debo Adegbile, which included the following: "[S]ignificantly, in the course of interposing objections, multiple Assistant Attorneys General have noted the persistence of racially polarized voting in [Louisiana], most recently in April 2005.  In its extreme forms, racially polarized voting can block minority electoral success and operate to close off the political process.  The State itself acknowledged the persistence of 'racial