bloc voting' in 1996, the same year that the United States District Court for the Western District of Louisiana agreed that 'racial bloc voting is a fact of contemporary Louisiana politics.'" *March 8, 2006 Hearing Vol. IV*, at 4532.

967.     The report of the National Commission on the Voting Rights Act, which was received by Congress, noted that a non-comprehensive search for cases involving statewide redistricting plans since the 1982 reauthorization revealed twenty-three cases in sixteen states that found racial bloc voting.  Moreover, the report notes that more than one-third of the cases were decided in 2000 or later. *March 8, 2006 Hearing Vol. I*, at 215.

968.     Congress received the Report of the National Commission on the Voting Rights Act, which states that "[a]nother source suggestive of the extent of racially polarized voting is the analysis of reported Section 2 cases by the Voting Rights Initiative at the University of Michigan.  The 323 lawsuits in their data base . . . represent only a small percentage of all post-1982 Section 2 cases, reported and unreported.  Of the 186 cases that addressed racially polarized voting, in 91 (49 percent) there was a judicial finding, not overturned by a later court, that it existed. The governments whose elections were so characterized included school boards, city councils, state legislatures, judicial bodies, county commissioner boards, and state commissions of transportation and of public service." *March 8, 2006 Hearing Vol. I*, at 217.

969.     Congress received the Report of the National Commission on the Voting Rights Act which includes the following conclusions regarding racially polarized voting:  "In short, a broad range of evidence points to continuing racial polarization in many elections across the nation. The causes are more complex than white racism alone, although this factor obviously plays an important role.  But for whatever reasons minority voters are often prevented by a white bloc vote in combination with dilutive voting mechanisms, from electing their preferred candidates in

venues numerically dominated by whites.  It is this diamond-hard fact that the Department of Justice and minority voters have addressed, often effectively, using both the permanent and non-permanent features of the Voting Rights Act as their weapons." *March 8, 2006 Hearing Vol. I*, at 217.

970.    Congress received a 2006 study, "An Assessment of Racially Polarized Voting For and Against Latino Candidates" (Absoch, et al.), which analyzed "the extent to which voting in California is characterized by racial polarization between Whites and Latinos, its two largest ethnic groups."  The authors concluded that "[o]ur analysis of 15 candidates and issues between 1994 and 2003 reveals that polarized voting does exist."  The authors continued:  "*In every election examined here* . . . a consistent pattern emerges.  Indeed, under every different method we have employed here*, this pattern remains robust and consistent*.  These results demonstrate that not only are Latinos politically cohesive in their support of Latino candidates in Los Angeles County, but also that non-Latinos vote consistently against Latino candidates and issues." (original emphasis).  The authors found that, "in each of the elections we considered, which include local County elections, as well as elections for statewide office and statewide propositions, no Latino candidate was the most preferred candidate of non-Latinos."  The authors concluded that "racially polarized voting continues to disadvantage Latino candidates" and that Latino voters continue to need the protections of the Voting Rights Act.  *March 8, 2006 Hearing Vol. II*, at 2419-2446.

971.    The report entitled, *Voting Rights in Georgia 1982-2006*, which was appended to the testimony of Wade Henderson, stated that "[f]ederal courts have continued to find racially polarized voting and voting rights violations in the state under Section 2 of the Voting Rights Act and

other federal laws, and numerous cases continue to change voting practices via pre-trial settlements" in Georgia. *Id.* at 1503.

972.    Within the report entitled, *Voting Rights in Georgia 1982-2006*, which was appended to the testimony of Wade Henderson, was a statement that "the Supreme Court [in *Georgia v. Ashcroft*] did not reverse any of the district court's findings of racially polarized voting (in particular, the finding that voting was more polarized in local elections than in the statewide elections on which the state relied) or retrogression; indeed, the gist of the Supreme Court decision was that the state would have to produce evidence that it had compensated for the retrogression." *Id.* at 1521.

973.    Congress received information from a report authored by the National Commission on the Voting Rights Act that "[t]here is still a significant amount of racially polarized voting" in Georgia. *March 8, 2006 Hearing Vol. I*, at 326.

974.    Congress received a report entitled "Voting Rights in Louisiana, 1982-2006," which included information regarding racially polarized voting in Louisiana. The report states that in the face of persistent racially polarized voting electoral gains made by Blacks "have come about largely through the existence and protection of majority-minority districts." Congress received information from the Report that "every black representative currently holding office in Congress from Louisiana, or in the Louisiana State Legislature, has been elected from a majority black district." The report notes that "Representative William Jefferson, for example, won his seat through elections from the 2d Congressional District, which covers metropolitan New Orleans and has a voting age population that is 62 percent black. This district is the only majority-minority congressional district in Louisiana. Jefferson's election in 1990 represented the first time that the state sent an African American to Congress in the 113 years since Representative

303

Charles E. Nash (1875-1877) left Congress, the last African American to serve since the Civil War." Congress also received information from the Report that "[t]he racial disparities in voting that exist in Louisiana are also evident in the election patterns for virtually every office in the state" and that "numerous courts and the DOJ in several of its Section 5 objections have documented the phenomenon of Louisiana's racial bloc voting." *March 8, 2006 Hearing Vol. II*, at 1601.

975.    Congress received information of racially polarized voting through the Louisiana report's discussion of the 1995 gubernatorial race in which exit polls showed that Cleo Fields, an African American candidate, received 96 percent of the African American vote while his opponent received 84 percent of the white vote. Congress also received information that David Duke, a former grand wizard of the Ku Klux Klan, received 55%, a majority of the white vote, in the 1991 governor's race. *March 8, 2006 Hearing Vol. II*, at 1602.

976.    Congress received information from a report commissioned by the Renew the VRA campaign that the Department of Justice's review of post-1990 redistricting found a reduction of the number of Louisiana House districts with Black majorities. The review, which was done "in light of a pattern of racially polarized voting that appears to characterize elections at all levels in the state," found most of the post-1991 statewide plan comported with section 5 except in 7 areas where the boundary lines appeared to minimize black voting strength. *March 8, 2006 Hearing Vol. I*, at 60.

977.    Congress received the following information from a report entitled, *Voting Rights in Mississippi 1982-2006*, which was appended to the testimony of Wade Henderson and Robert McDuff: the federal district court in *Martin v. Allain*, 658 F. Supp. 1183, 1194  (S.D. Miss. 1987), noted that, with the exception of black circuit judge candidate Reuben Anderson (who ran

well among white voters), every other black candidate in a black-white judicial election in Mississippi as of 1987 had "received, on average, only two percent of the white vote." *March 8, 2006 Hearing Vol. II*, at 1722; *May 10, 2006 Hearing*, at 145.

978.    Congress received the following statement from a report entitled, *Voting Rights in Mississippi 1982-2006*, which was appended to the testimony of Wade Henderson and Robert McDuff: "Racial bloc voting has long been a fixture of Mississippi elections and unfortunately remains so to this day. The sad facts have been documented by a long litany of court decisions." The report cites several cases as examples where courts found racially polarized voting. *March 8, 2006 Hearing Vol. II*, at 1721; *May 10, 2006 Hearing*, at 144.

979.    Congress received the following statement from a report entitled, *Voting Rights in Mississippi 1982-2006*, which was appended to the testimony of Wade Henderson and Robert McDuff, regarding a recent example of racially polarized voting: "[T]his point was emphasized dramatically in the most recent elections for statewide offices in Mississippi, held in 2003.  The Director of the Mississippi Department of Finance and Administration, 46-year-old Gary Anderson, who is black, ran for the office of State Treasurer against a 29-year-old white candidate with no experience beyond the fact that he worked in a bank.  Despite his superior qualifications, Gary Anderson received only 47 percent of the vote and lost the election.  Of Mississippi's 25 majority-black counties, Anderson won 24.  Of the 57 majority-white counties, Anderson won only 18 and lost 39.  While he received some of the white vote, most whites voted against him. Anderson is a Democrat and his opponent a Republican, but that does not explain his defeat. Another Democratic candidate for a down-ticket statewide office, Jim Hood, won 62.7 percent of the vote in his race for attorney general against an opponent who not only, like Hood, had experience as a state prosecutor, but also had experience as an FBI agent.  Yet Hood won over-

whelmingly. Obviously, a number of factors come into play in any election contest but a major reason for the different electoral fates of Jim Hood, a Democrat running for attorney general, and Gary Anderson, a Democrat running for Treasurer, is that Hood is white and Anderson is black." *March 8, 2006 Hearing Vol. II*, at 1723; *May 10, 2006 Hearing*, at 146.

980.    Congress received the following statement from a report entitled, *Voting Rights in Mississippi 1982-2006*, which was appended to the testimony of Wade Henderson and Robert McDuff: "[T]he racial gulf in Mississippi was also driven home by the results of the racially charged 2001 referendum on the state flag, the upper left hand corner of which prominently displays the Confederate battle flag. A study of the election results showed that 93 percent of black voters supported a new flag. Only 11 percent of the white voters supported a new flag, despite the widespread recognition that the old one, containing the symbol of the Confederate civil war struggle to retain slavery in the South, is offensive to most black Mississippians." *March 8, 2006 Hearing Vol. II*, at 1723; *May 10, 2006 Hearing*, at 146.

981.    Congress received the following statement from a report entitled, *Voting Rights in Mississippi 1982-2006*, which was appended to the testimony of Wade Henderson and Robert McDuff: "[T]here have been instances of crossover voting that is sufficient to elect black candidates, but those are few and far between. When Mississippi's first black legislator in modern times, Robert Clark, attempted in 1982 to become Mississippi's first black congressman in the 20th century, he was defeated in the newly-drawn court-ordered 48 percent black VAP Second Congressional District when he received only 15 percent of the white vote. After the district was redrawn by the Court in 1984 with a 53 percent black VAP district, Clark again lost, receiving 95 percent of the black vote but only 7 percent of the white vote. Finally, in 1986, Mike Espy nar-

rowly won with 97 percent of the black vote and 12 percent of the white vote." *March 8, 2006 Hearing Vol. II*, at 1722; *May 10, 2006 Hearing*, at 145.

982.    Congress received information from the National Commission on the Voting Rights Act that racially polarized voting in Mississippi is "intense," and, without the creation of black majority districts, there would be few black lawmakers elected. *March 8, 2006 Hearing Vol. I*, at 365.

983.    Congress received a report prepared for the Project on Fair Representation by the American Enterprise Institute's Edward Blum, which notes that "[n]o African-American has won a statewide constitutional office in Mississippi." *May 4, 2006 Hearing Part I*, at 187.

984.    Congress received a report entitled, "Voting Rights in New York 1982-2006," which included a discussion of findings by the Department of Justice of racially polarized voting in New York.  The report notes that the Department of Justice "has justified, in part, a number of its objections to preclearance under Section 5 in New York City on the basis of the existence of RPV." Specifically, the report notes that the Department of Justice objected to the 1992 state assembly redistricting plan because it fractured the Latino community that was already suffering the effects of racially polarized voting.  The report further notes that proposed changes in judicial elections in 1994, 1982 and 1990 "were denied, in part, based on the existence of RPV." *March 8, 2006 Hearing Vol. II*, 1857-1858.

985.    Congress received the following information from a report entitled, *Voting Rights in North Carolina 1982-2006*, which was appended to the testimony of Wade Henderson: "Richard Engstrom's 1995 study of 50 recent elections in North Carolina in which voters have been presented with a choice between African-American and white candidates, including elections for the U.S. House of Representatives, statewide elections to high profile and low profile offices, and

state legislative elections in both single-member and multi-member districts, found that 49 of them were characterized by racially polarized voting." *Id.* at 1754.

986.    Congress received information  from a report authored by the National Commission on the Voting Rights Act that there is a "very high degree of racially polarized voting" in North Carolina.  As an example, the report provided the testimony of Congressman Mel Watt from North Carolina who stated that "[w]e had an African-American lawyer who had practiced law, distinguished record.  And a [white] fireman ran against him.  No legal background, no experience, nothing to commend him for [the elected appellate judgeship] except that he was white . . . [T]he fireman won the election.  And I mean, there is just no more dramatic example of the impact of racially polarized voting." *March 8, 2006 Hearing Vol. I*, at 355

987.    Congress received the report of the National Commission on the Voting Rights Act, which included a discussion of a 1993 article by political scientist Bernard Grofman.  Professor Grofman wrote that, "there is strong evidence for continuing patterns of racially polarized voting for both blacks and Hispanics. Such continuing polarization makes it likely that minorities will feel the need to sue to protect their voting rights[.]"  While noting that "most of the evidence on racial polarization is buried in court records," he pointed to the work of sociologist James Loewen, whose review of data from South Carolina elections provided, in Grofman's words, "stark testimony about the levels of polarization in that state which suggests little or no change in polarization over the course of a decade." Grofman stated that both in the Deep South and in many non-southern states, "black legislative success essentially occurs only in districts where blacks constitute a substantial portion of the electorate. While the pattern for Hispanics is not quite as stark, it is similar." *Id.* at 215.

988.    Congress received information  from a report authored by the National Commission on the Voting Rights Act that there are "high levels of racial polarization" in South Carolina, "with the result that 'black voters are rarely able to elect their candidates of choice in majority-white districts.'" *Id.* at 334.

989.    Joe Rogers, former Lieutenant Governor of Colorado, testified before Congress about the consequences of racially polarized voting.  Rogers testified that, "in many areas of the country, voting continues to be racially polarized. By that we simply mean, it is a circumstance where white voters will simply only vote for white candidates and, frankly, in circumstances where minority voters will only vote for minority candidates. One consequence of racially polarized voting is that minority voters cannot elect candidates of choice or preference perhaps if it is by race or ethnicity. That simply may not be an option unless there is a majority or near majority of the electorate." *October 18, 2005 Hearing,* at 23.

990.    Congress also was presented with testimony from attorney Sam Hirsch a voting rights attorney at the law firm of Jenner & Block who worked on redistricting litigation in approximately twenty states during the period 1995 through 2005.  Hirsch testified before a 2005 hearing of the National Commission on the Voting Rights Act that, "there are politically significant statistical levels of racial polarization between Anglos and Latinos, as between whites and blacks, in almost every locale which I have experienced." *March 8, 2006 Hearing Vol. I,* at 210.

991.    Professor Theodore Arrington testified before Congress that "minority vote dilution is still a problem.  It is still a problem because voting throughout the country is still strongly racially and ethnically polarized, as I have discovered in my expert testimony in voting rights cases throughout the country." *May 16, 2006 Hearing*, at 8.

992.    Congress was presented with testimony from Dr. Theodore Arrington that "we fre-
quently find that non-partisan elections are also racially polarized, and sometimes the RPV is
greater for non-partisan than for partisan offices. When it is possible to control statistically for
partisanship, there is a residual ethnic or racial effect in the voting." *May 16, 2006 Hearing*, at
38.

993.    Congress received testimony from Nadine Strossen regarding "a continuing pattern of
blocked voting and racial polarization in the covered jurisdictions." Ms. Strossen testified, that,
"[w]hile much progress has been made in minority registration and office holding the persis-
tence, the sad persistence, of racial block voting shows that race remains a dynamic and corro-
sive factor, particularly in the covered jurisdictions. Our litigation report is replete with findings
by courts and also by the Department of Justice of racial block voting in 12 States where the
ACLU has filed voting rights cases." *March 8, 2006 Hearing Vol. I*, at 20.

994.    Congress received testimony from Bill Lann Lee, former Assistant Attorney General
for Civil Rights, regarding findings of racially polarized voting. Lee noted that the National
Commission on the Voting Rights Act found 23 cases in 16 states where courts found racially
polarized voting in statewide redistricting cases. He noted further that, in a study of reported
Section 2 cases, the University of Michigan's Voting Rights Initiative concluded that 91 federal
courts found racially polarized voting in jurisdictions nationwide since 1982. *Id.* at 18.

995.    Voting rights attorney Fred Gray testified before Congress that, "[u]nfortunately,
Alabama still suffers from severe racially polarized voting." As Gray testified in May 2006,
"[o]nly two African-Americans have ever been elected to statewide office: the late Oscar Adams
and Ralph Cook to the Alabama Supreme Court. However, today, I am sad to tell this Committee
we have no statewide office holders of African-Americans." *May 17, 2006 Hearing*, at 4. Gray

further stated that, based on his experience as a civil rights litigator in Alabama, racially polar-ized voting, combined with other evidence, justified the renewal of Section 5. *May 17, 2006 Hearing*, at 92.

996.   Congress received testimony from Wade Henderson regarding racially polarized vot-ing in Alabama.  Henderson pointed to *Brown v. Board of School Comm'rs of Mobile County*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 464 U.S. 1005 (1983), in which the federal dis-trict court found that "[r]acial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choice of voters at the polls." Henderson also pointed to an expert analysis of the 2004 general election for the Chilton County (Alabama) Commission which, according to Henderson, provides "dramatic evidence of how white voters are unwilling to vote for African American candidates."  Although "the sole African American commissioner, Bobby Agee, has served continuously since 1988 he cannot garner support from the white electorate.  He is the first choice of African-American voters to represent them on the commission; in contrast, he finishes last in terms of votes cast by non-African Americans in each type of electoral analysis undertaken by voting experts." *March 8, 2006 Hearing Vol. I*, at 53-54.

997.   Congress received testimony from voting rights attorney Gerald Hebert, formerly with the U.S. Department of Justice, regarding "extreme racially polarized voting" in Selma, Alabama, located in Dallas County.  Hebert testified that, although blacks represented roughly fifty percent of the voting age population of Dallas County, black voters "were never able to elect a single county commissioner or school board member" until nearly 1990 when single-member districts were implemented following DOJ litigation. *October 20, 2005 Hearing*, at 97.

998.    Congress received testimony which voting rights attorney Joaquin Avila presented to the Western Regional hearing of the National Commission on the Voting Rights Act regarding racially polarized voting.  Avila attributed the underrepresentation of Latinos at the local level— on city councils, school boards, and governing bodies of special election districts in California— to "the pernicious effects of racially polarized voting in at-large methods of election and to the absence of effective enforcement of the bilingual election provisions." *March 8, 2006 Hearing Vol. I*, at 213-214.

999.    Dr. Richard Engstrom informed Congress that his analysis of racially polarized voting in Louisiana was based on his work "as an expert witness in the case called *Louisiana House of Representatives v. Ashcroft*, a section 5 case." According to Dr. Engstrom, "[t]his case did not go to trial [and] was settled when changes were made in the map that were favorable to minorities in Louisiana." *October 25, 2005 Need Hearing*, at 50.

1000.    Dr. Richard Engstrom informed Congress that he analyzed 90 black vs. white elections in Louisiana from 1991 to 2002.  He stated that out of these 90 elections, 78 elections (86.7 percent) showed racial divisions in candidate preferences and "extraordinarily strong preferences of one group favoring candidates different from the other." *October 25, 2005 Need Hearing*, at 50.

1001.    Regarding his study of Louisiana elections, Dr. Richard Engstrom provided the following testimony before Congress: "[T]ime frame made no difference under the extent to which there was racially polarized voting. The office made no difference.  It didn't matter if we are talking about State Rep, State Senator, Governor, Mayor, Register of Conveyances, Recorder of Mortgages, or Traffic Court Judge.  Racially polarized voting was there across basically all the

offices that were contested." *October 25, 2005 Need Hearing*, at 50; *see also March 8, 2006 Hearing Vol. I*, at 301 (testimony of Richard Engstrom).

1002.   Congress received testimony from Dr. Richard Engstrom regarding racially polarized voting in Louisiana elections since 2000.   Professor Engstrom found that in almost every election there was racially polarized voting.   Moreover, Professor Engstrom found that it did not matter what office was at issue, whether it was the office of governor or the office of the recorder of mortgages there was racially polarized voting in almost every instance. *March 8, 2006 Hearing Vol. I*, at 301.

1003.   Congress received testimony from Mississippi voting rights attorney Robert McDuff presented to the National Commission on the Voting Rights Act regarding continued racially polarized voting in Mississippi.   McDuff emphasized that there still are no statewide black elected officials in Mississippi, and elaborated on the 2003 election for state treasurer which highlighted the continued existence of polarized voting: "One of the candidates, African-American, had been the director of the State Department of Economic Development. He had a number of qualifications for the job that made him clearly the best choice, and he was defeated by a 29-year old white man who had no relevant experience in the area in an election that was characterized by severe racially polarized voting. Until elections in Mississippi are not characterized by the extreme levels of polarization that exist here, Section 5 must remain in place." *March 8, 2006 Hearing Vol. I*, at 213.

1004.   Constance Slaughter-Harvey, a former state election official and practicing attorney in Forest, Mississippi, presented her views to Congress regarding the connection between ongoing voting discrimination and current levels of racially polarized voting within covered jurisdictions.   Ms. Slaughter-Harvey noted that "[d]espite several state-wide campaigns by overly quali-

313

fied African-American candidates (such as Gary Anderson, Henry Kirskey, Barbara Blackmon, etc.), Mississippi has yet to elect any Black officials on a state-wide basis." In her view, "voting has been and remains significantly racially polarized in the State of Mississippi." Ms. Slaughter-Harvey cited several federal court decisions confirming the existence of racially polarized voting in Mississippi, including *Jordan v. Winter*, 604 F. Supp. 807, 812-813 (N.D. Miss. 1984) (three judge court), aff'd 469 U.S. 1002 (1984) in which the "three-judge district court concluded that 'blacks consistently lose elections in Mississippi because the majority of voters choose their preferred candidates on the basis of race,'" and *Martin v. Allain*, in which the district court noted that "racial polarization exists throughout the State of Mississippi." *June 13, 2006 Hearing*, at 446.

1005.   Congress received testimony from Mississippi attorney Carlton Reeves, Secretary of the Magnolia Bar Association in Mississippi regarding the use of the phrase, "He's one of us," by white candidates opposing blacks.  Reeves testified, "We know what those signals mean, 'being one of us'." *March 8, 2006 Hearing Vol. I*, at 213.

1006.   Congress received testimony from Anita Earls regarding public hearings conducted in North Carolina and Virginia to gather information about the impact of the Voting Rights Act at the local level in those states. Ms. Earls testified that, "in those hearings we heard what racially polarized voting really means.  John W. Boyd of Mecklenburg County, Virginia, an African-American, testified that recently he was a candidate for Congress in Virginia's Fifth Congressional District.  While campaigning, he attended a political function in the southwest part of the state.  He encountered a white woman at the function who told him: 'You would have done a lot better if you had not made an appearance here because you have a white last name . . . and we're all voting for those candidates.'" Ms. Earls noted that Boyd ultimately won 30.7% of the vote in

the 2000 general election, but "could not overcome the barrier of his race for many voters." *May 16, 2006 Hearing*, at 140-141.

1007.   In her congressional testimony, Anita Earls also provided the following example of the presence of racially polarized voting: "Ralph Campbell [is] the only African-American to win a non-judicial statewide election in North Carolina[.]  In his election campaigns for state auditor, he used a label from a Campbell's soup can rather than his photograph, in his election materials."  Ms. Earls testified, "[t]he continued prevalence of racially polarized voting in the covered jurisdictions is one of the most significant indicators of the continued need for the pre-clearance provision." *Id.* at 141.

1008.   The House Judiciary Committee received testimony that, as of 1989, no candidate of choice of black voters in North Carolina had been elected to statewide non-judicial office since 1990, and that every statewide biracial contest since 1988 had been characterized by racially po-larized voting."  H.R. Rep. No. 109-478, at 33.

1009.   Congress received testimony from South Carolina voting rights attorney Armand Derfner regarding "the presence of pervasive racial polarization among voters" in that state.  Derfner indicated that he was "not aware of any one of the dozens and dozens of voting lawsuits in our state in which any single expert has ever said we do not suffer from racially polarized vot-ing."  He further stated that, in the most recent statewide redistricting case, a three-judge court noted that, "'the history of racially polarized voting in South Carolina is long and well docu-mented' . . . and that there has been 'little change in the last decade.'" *October 20, 2005 Hear-ing*, at 84.

1010.   Congress received testimony from Armand Derfner referencing a 2002 Supreme Court decision overturning Charleston County's at-large elections on the ground that it discrimi-

nated against black voters on account of their race. Expert testimony revealed that racially polarized voting has been prevalent in South Carolina for the past 15 years. Derfner noted that only 3 of 41 people elected to the Charleston County Council since 1970 have been minorities, despite 1/3 of the population being comprised of African-Americans. Derfner also notes that in the last decade 9 candidates supported "cohesively" by black voters did not gain enough cross-over white votes to win. *October 20, 2005 Hearing*, at 84.

1011.   Armand Derfner testified before Congress that in the most recent statewide redistricting case in South Carolina, the "three-judge court took extensive note of the persistence of racially polarized voting." *October 20, 2005 Hearing*, at 84.

1012.   Congress received testimony from Theodore Arrington, professor of political science at the University of North Carolina-Charlotte, regarding a federal district court's findings of racially polarized voting in Charleston County, South Carolina, in a Section 2 action brought against the county council by the U.S. Department of Justice. Professor Arrington testified that, "I found there the most extreme polarized voting I think I have ever seen, and I have been doing this work since 1985. So there was no evidence of any reduction in polarized voting, at least in Charleston. The interesting thing to me was that the judge found, in accordance with my testimony, that there was legally and substantively polarized voting; that because of that and the at-large elections that they had there, African-Americans did not have a reasonable opportunity to elect candidates of their choice." *May 16, 2006 Hearing*, at 20.

1013.   Professor Theodore Arrington, in response to a question by Senator Kohl, disagreed with the proposition that the underrepresentation of African Americans and Latinos in elective office "has more to do with partisan politics than race." Professor Arrington pointed to the non-partisan County-wide School Board elections in Charleston County, South Carolina, where

316

black-preferred candidates "were still usually defeated by white bloc voting." Professor Arring-ton stated that "[t]his proved that the partisan aspect of the election system was not the problem." *May 15, 2006 Hearing*, at 37, 39.

1014.   Voting Rights attorney Armand Derfner provided testimony regarding racially polar-ized voting that, "[m]y most recent experience is in South Carolina, where the federal court in *Colleton County v. McConnell*, the most recent statewide reapportionment case, found continu-ing, pervasive and universal racial polarization in voting. The same was found again in the Charleston County Council case, where even the defendant's statistical expert agreed that there was polarized voting. Even in nonpartisan races, with no political party designations, the voting was completely racially polarized." *May 17, 2006 Hearing*, at 81.

1015.   Congress received testimony from Nadine Strossen regarding judicial findings of ra-cially polarized voting in South Carolina since the 1982 reauthorization. Ms. Strossen testified: "In 1992, the three-judge court in *Burton v. Sheheen* relied upon the stipulation of the parties 'that since 1984 there is evidence of racially polarized voting in South Carolina.' A subsequent three-judge court in *Smith v. Beasley*, decided in 1996, found that '[i]n South Carolina, voting has been, and still is, polarized by race. This voting pattern is general throughout the state.' In *Colleton County Council v. McConnell*, decided in 2002, the three-judge court made similar find-ings: '[v]oting in South Carolina continues to be racially polarized to a very high degree in all regions of the state and in both primary and general elections.' In 2004, the court of appeals af-firmed the finding of a district court in South Carolina 'that voting in Charleston County Council elections is severely and characteristically polarized along racial lines.'" *March 8, 2006 Hearing Vol. I*, at 27.

1016.   Attorney Anita Earls, in a written response to Senator Cornyn's request for empirical data demonstrating that minority voters have significantly less ability to participate fully in elections in covered jurisdictions than in non-covered jurisdictions, pointed to a recent article by Professor Ellen D. Katz, which was based upon her review of every reported opinion in a Section 2 case throughout the country since 1982.  These court opinions, Professor Katz determined, show that courts regularly found more extreme racially polarized voting in the covered jurisdictions than in non-covered jurisdictions:

> "Nearly ninety percent of the specific minority v. white elections documented in covered jurisdictions involved white bloc voting rising to at least 80 percent, meaning that 80 percent of white voters voted exclusively for white candidates in these elections.  Virtually all of the elections (96%) analyzed by courts in covered jurisdictions since 1982 exhibited white polarized voting at a level of seventy percent or more.  In non-covered jurisdictions, by contrast, only forty percent of the elections documented involved white polarization of 80 percent or higher, and about 60 percent involved white polarization rising to seventy percent."

*May 16, 2006 Hearing*, at 48.

1017.   Congress received a study of judicial findings prepared by Professor Ellen Katz in which she stated that of 186 Section 2 lawsuits with published opinions that considered the extent of racially polarized voting, "91 found the factor to exist, and 65 of these identified a violation of Section 2 (another 3 granted a preliminary injunction)."  Katz further noted that "[i]n covered jurisdictions, 44 lawsuits found racial bloc voting; 47 in non-covered.  Of the 27 lawsuits that found racial bloc voting but not a Section 2 violation, three deemed plaintiffs likely to succeed on the merits of the Section 2 claim." *October 18, 2005 Hearing,* at 981.

1018.   In a written statement provided to Congress in response to questions from Senator Cornyn, Professor Pamela Karlan noted that, following the most recent redistricting, federal courts in cases involving South Carolina, Georgia, and Texas all found the continued existence

of racial bloc voting. She further noted that both Professor Arrington and Professor Engstrom have testified before Congress on their work finding significant racial bloc voting in South Carolina and Louisiana. *May 16, 2006 Hearing*, at 102.

1019.   Professor Drew S. Days presented written testimony to Congress demonstrating that, "[u]nfortunately, racially polarized voting is alive and well in many jurisdictions, not just a 'scattered' few. Out of 6,667 House elections in white majority districts between 1966 and 1996— including special elections—only 35 (0.52%) were ever won by blacks. During the 1980s and early 1990s, according to one comprehensive study, not a single black candidate won in a majority-white district in the South." *May 17, 2006 Hearing*, at 69.

1020.   Congress received testimony regarding the Fourth Circuit Court of Appeals' decision in *United States v. Charleston County, South Carolina*, affirming the trial court's ruling for plaintiff in a challenge to the County's at-large method of electing its County Council. In the Fourth Circuit opinion, U.S. Court of Appeals Judge J. Harvey Wilkinson concluded that "voting in Charleston County elections is severely and characteristically polarized along racial lines." The Court noted: "[L]ooking at County Council elections since the early 1990s, white Democrats have at least occasionally won, while minority Democrats have invariably lost." *May 16, 2006 Hearing*, at 131.

1021.   Professor Theodore Arrington submitted written testimony to Congress regarding *DeGrandy v. Wetherell*, in which Professor Arrington provided an affidavit and testimony to the Special Master appointed to draw legislative and congressional plans for Florida following the 1990 Census. The three-judge court found that "the results of Florida's legislative elections over the past ten years established the presence of racially polarized voting." Professor Arrington stated that "[t]he Court highlighted the impact that racially polarized voting had on minority suc-

cess in Florida, including: the absence of African-Americans elected to Congress since the end of Reconstruction and only one Latino Congressman during that period; no African-American state senator until 1982; and no Latino state senator until 1988." *May 16, 2006 Hearing*, at 130.

1022. Congress received a prepared statement presented to the National Commission on the Voting Rights Act by attorney James Blacksher regarding racially polarized voting in Alabama. Blacksher stated that "[r]acially polarized voting remains as strong as ever" in the state, and pointed to: (1) an expert report attached to Blacksher's statement prepared by Dr. Richard Engstrom, which found racially polarized voting in the 2004 elections and was introduced into evidence in the matter of *Dillard v. Chilton County Comm*. (Ala.), CA No. 87-T-1179-N (M.D. Ala.); (2) judicial decisions in cases such as *Dillard v. Baldwin County Comm.*, 222 F. Supp. 2d 1283, 1290 (M.D. Ala. 2003) ("The plaintiffs have shown that black citizens of Baldwin County still suffer from the racially polarized voting and from historically depressed conditions, economically and socially."); and (3) the fact that not a single African-American currently holds statewide office in Alabama. *October 25, 2005 Scope Hearing Vol. II*, at 3199.

1023. The supplement to the report of the National Commission on the Voting Rights Act presented to Congress stated that racially polarized voting is "intense" in Mississippi and without the creation of black majority districts there would be few black lawmakers in office. *March 8, 2006 Hearing Vol. I*, at 365.

1024. In the supplement to the report of the National Commission on the Voting Rights Act presented to Congress, Georgia State Senator Robert Brown stated that there are still high levels of racially polarized voting in Georgia. Even though four African-Americans hold statewide elected positions, they were first appointed to these positions and then subsequently elected. *March 8, 2006 Hearing Vol. I*, at 326.

1025.   Congress received an expert report by Dr. Richard Engstrom that was introduced into evidence in the matter of *Dillard v. Chilton County Comm.* (Ala.), CA No. 87-T-1179-N (M.D. Ala.), regarding, *inter alia*, racially polarized voting in Alabama.  Engstrom's expert analysis revealed that Agee, a long-time incumbent on the County Commission, was the "overwhelming choice of African American voters" in Chilton County, Alabama, but received very little support from non-African-American voters.  Engstrom's report states, "[V]oting in the 2004 county commission election clearly polarized along racial lines.  While Agee finished second overall in this election, and therefore won one of the seven seats, he would have finished last if only the votes of the non-African American voters were counted."  *October 25, 2005 Scope Hearing Vol. II*, at 3199.

1026.   In his written testimony before Congress, Dr. Richard Engstrom stated that "[i]n both of the cases (after the 2000 Census) in which I testified at trial, my evidence about the presence of racially polarized voting has been credited and relied upon by the court to support findings that racially polarized voting was a feature of elections in those jurisdictions — Georgia v. Ashcroft, 195 F. Supp. 2d 25, (D.D.C. 2002) and 204 F. Supp. 2d 4 (D.D.C. 2002) and Sessions v. Perry, 258 F. Supp. 2d 451 (ED TX 200), referencing testimony concerning Latino and non-Latino voting in Balderas v. Texas, (ED TX No. 6:01-CV-158, 2002) (unpublished)."  *October 25, 2005 Need Hearing*, at 54.

1027.   Congress received testimony from Joaquin Avila that Latinos are underrepresented in local offices "due to the pernicious effects of racially polarized voting in at-large methods of election and in the absence of effective enforcement of the bilingual election provisions."  *October 25, 2005 Scope Hearing Vol. II*, at 3296.

1028.  Congress received testimony from Nathaniel Persily that voting is more racially po-larized in the South than in other areas of the country. *May 17, 2006 Hearing*, at 132.

### c)    Racially Polarized Voting in Texas

1029.  Congress received testimony from Sherilynn Ifill citing *LULAC v. Perry*, where the Supreme Court characterized the racially polarized voting in District 23 in Texas as "severe." *July 13, 2006 Hearing*, at 232.

1030.  Jose Garza's testimony to Congress noted that the federal court in *the LULAC v. North East Independent School District*, upon review of election data through 1994, found "un-deniable" that "there is a clear and persistent history of racially polarized voting in both NEISD school board elections as well in exogenous elections" and that "Anglos have consistently voted together for the Anglo candidate in such large percentages that the minority candidate, despite receiving a relatively significant percentage of minority votes, has rarely received enough Anglo crossover votes to win." *October 20, 2005 Hearing*, at 22.

1031.  Congress received a report presented by the National Commission on the Voting Rights Act regarding a federal district court's 2004 finding of racially polarized voting in Texas. In the cited case, the court "recognize[d] that Plaintiffs have established racially polarized voting and a political, social, and economic legacy of past discrimination." *March 8, 2006 Hearing Vol. I*, at 216 (citing *Session v. Perry*, 298 F. Supp. 2d 451, 492 (E.D. Tex. 2004), *vacated and re-manded on other grounds sub nom.*, *Jackson v. Perry*, 543 U.S. 941 (2004)).

1032.  Congress received testimony from Jose Garza citing the Department of Justice's con-clusion that candidates for the Haskell Consolidated ISD school board preferred by Hispanic voters historically have not received significant non-Hispanic cross-over votes, explaining the lack of Hispanic representatives on the school board.  The Department concluded that a change

from single member districts to an at-large system would reduce the ability of minority voters to elect a candidate of choice to the Haskell Consolidated ISD school board. *October 20, 2005 Hearing*, at 60.

1033.   Congress received testimony from Jose Garza referencing a 2002 Department of Justice objection to the city of Freeport's (Brazoria Co., TX) proposed change from a single-member district system back to an at-large system.  The Department noted that under the single-member district method of election, minority voters have demonstrated the ability to elect candidates of choice in at least two districts.  The Department further noted that "[e]lections in the city are marked by a pattern of racially-polarized voting."  The Department concluded that "a return to an electoral system where all council offices are elected on an at-large basis will result in retrogression in their ability to exercise the electoral franchise that they enjoy currently."  The Department determined that the change will have a retrogressive effect on the ability of minority voters to elect a candidate of their choice. *October 20, 2005 Hearing*, at 62.

1034.   Congress received testimony from Jose Garza discussing a 2002 Department of Justice objection to Waller County's (Texas) proposed redistricting.  According to Garza's testimony, the Department noted that **"[o]ur statistical analysis also shows that white voters do not provide significant support to candidates sponsored by the minority community, and that interracial elections are closely contested."**  The Department objected to the submitted redistricting plan, rejecting the state's rationale that it was necessary to reduce minority voting strength in one precinct in order to preserve minority voting strength in another.  DOJ objected to the submitted redistricting plan. *October 20, 2005 Hearing*, at 70 (emphasis in original).

1035.   Through the National Commission on the Voting Rights Act, Congress received a 2001 expert report from Jonathan Katz in which he stated: "U.S. Congressional Elections in

Texas are racially polarized.  I find that every district with higher than average Hispanic or black populations displays statistically significant racial bloc voting.  I further find that black and Hispanic voters overwhelmingly support Democratic and non-Anglo candidates, with typical support levels of greater than 70% and often as high as 90%, whereas majorities of Anglos in most districts vote for Republican and Anglo candidates."  *March 8, 2006 Hearing Vol. IV*, at 5359.

1036.   Through the National Commission on the Voting Rights Act, Congress received a 2001 expert report from Jonathan Katz in which he stated:  "[F]or every election for which we could calculate estimates, we can reject the hypothesis that Hispanics and Anglos vote alike.  That is, every contested election for the U.S. House in Texas in the ten districts with higher than average Hispanic populations is characterized by statistically significant racially polarized voting.  And in 76% of the cases we find a majority of Anglos voted for one candidate and a majority of Hispanics voted for the other candidate."  *March 8, 2006 Hearing Vol. IV*, at 5377.

1037.   Through the National Commission on the Voting Rights Act, Congress received a 2001 expert report from Jonathan Katz in which he stated:  "[E]lections in Texas for the U.S. House are racially polarized, both between black and Anglo voters and between Hispanic and Anglo voters."  *March 8, 2006 Hearing Vol. IV*, at 5371.

1038.   Congress was presented with information that racially polarized voting in Texas was not limited to partisan contests.  A study by Allan J. Lichtman, a historian at American University, found racial polarization to be common in numerous Democratic primary contests in which at least one black or Latino candidate faced at least one Anglo candidate.  *March 8, 2006 Hearing Vol. I*, at 211.

1039.   Congress was presented with a study of racially polarized voting in Louisiana conducted by political scientist Dr. Richard Engstrom.  Engstrom analyzed Louisiana elections since

the 2000 Census for at least ten types of offices, from governor to the recorder of mortgages. He concluded: "It doesn't matter what office is at issue; it doesn't matter whether it's high profile or low profile; it doesn't matter whether it's top of the ballot or down on the ballot. Time, place, and office do not matter. What we find consistently in almost every instance" is racially polarized voting. Engstrom found similar results in other states in which he had recently conducted polarization analysis, including South Carolina, Georgia, Florida, Alabama, and North Carolina (regarding African-Americans and whites), and Texas (regarding Latinos and whites). *March 8, 2006 Hearing Vol. I*, at 210.

1040. Congress received testimony from Jose Garza regarding *Sierra v. El Paso ISD*, 591 F. Supp. 802 (D. Tex. 1984), in which the federal district court found that expert testimony showed that voting in school district elections in the El Paso ISD (which was the fifth largest ISD in Texas at the time) "tends to be highly polarized along ethnic lines." The court further found "persuasive" the testimony of politicians familiar with voting behavior in El Paso County, who "testified unequivocally that bloc voting by Mexican-Americans for Mexican-American candidates and by Anglos for Anglo candidates is a political fact of life in El Paso[.]" *October 20, 2005 Hearing*, at 38.

1041. Congress received testimony from Joe Rogers that "[r]acially polarized voting remains a fact of life in many areas of the country. In states like Florida, Georgia, South Carolina, and Texas, federal courts have found racially polarized voting in statewide redistricting cases in this decade." *March 8, 2006 Hearing Vol. I*, at 94.

1042. In response to questioning by Senator John Cornyn (TX), Pamela Karlan noted that "[t]here is substantial evidence that the candidate preferences of minority and nonminority voters differ more significantly in many covered jurisdictions than in non-covered jurisdictions. In the

last round of redistricting, for example, federal courts in cases involving South Carolina, Georgia, and Texas all found the continued existence of racial bloc voting." *May 16, 2006 Hearing*, at 102.

### 4.    Evidence Before Congress:  Voting Discrimination in Section 2 Cases

#### a)    Congressional Findings

1043.   Congress found evidence of continued discrimination, including "the continued filing of Section 2 cases that originated in covered jurisdictions." H.R. Rep. No. 109-478, at 2.

1044.   Congress found that "[p]resent day discrimination experienced by racial and language minority voters is contained in evidence, including . . . section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters[.]" H.R. Rep. No. 109-478, at 2.

1045.   The House Judiciary Committee found that "[t]ogether with Section 5, Section 2 has been a driving force in achieving the gains made by minorities over the last several decades in the covered jurisdictions." H.R. Rep. No. 109-478, at 10-11.

1046.   Congress found that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965." Pub.L. No. 109-246 § 2(b)(3), 120 Stat. 577.

#### b)    Section 2 Litigation in Covered Jurisdictions Other than Texas

1047.   Congress received the Report of the National Commission on the Voting Rights Act, which found that 653 reported and unreported successful Section 2 cases in Section 5 covered and partially covered jurisdictions since 1982, and provided the following table:

**TABLE 5**
**SUCCESSFUL SECTION 2 CASES**
**AND THEIR EFFECTS ON COUNTIES,**
**NINE STATES, JUNE 29, 1982-DECEMBER 31, 2005**

| State | Reported Cases Only | All Cases, Reported & Unreported | County Voting Populations Affected |
|---|---|---|---|
| Alabama | 12 | 192 | 275 |
| Arizona | 0 | 2 | 3 |
| Georgia | 3 | 69 | 76 |
| Louisiana | 10 | 17 | 14 |
| Mississippi | 18 | 67 | 74 |
| North Carolina | 9 | 52 | 56 |
| South Carolina | 3 | 33 | 36 |
| Texas | 7 | 206 | 274 |
| Virginia | 4 | 15 | 17 |
| TOTAL | 66 | 653 | 825 |

*March 8, 2006 Hearing Vol. I*, at 251; *see also May 9, 2006 Hearing*, at 6 (Chandler Davidson, citing the Report of the National Comission on the Voting Rights); *May 17, 2006 Hearing*, at 132 (Nathaniel Persily); *March 8, 2006 Hearing Vol. I*, at 14 (testimony of Bill Lann Lee).

1048.    Congress received a report from the National Commission on the Voting Rights Act which described the judicial findings study by Professor Ellen Katz that, "[t]o summarize the research on Section 2's impact, the following can be said. First, the number of reported Section 2 cases leading to favorable results for minority voters, identified by the Voting Rights Initiative (VRI), was 117 nationwide in the 23-year period following the 1982 reauthorization. Second, the cases analyzed by the VRI revealed judicial findings of widespread and serious vote discrimination by whites against minorities. Third, the majority of the 117 cases were filed in Section 5-covered jurisdictions, in spite of the fact that only about a quarter of the nation's population lived in them. Fourth, cases with black plaintiffs were the most numerous, followed by those with Latino plaintiffs. Fifth, the Commission's investigation in nine states of reported and unreported

Section 2 cases resolved favorably to minorities, including those cases identified by the VRI in these states, came to approximately ten times the number of reported cases identified by the VRI in these states. Sixth, the number of times counties in the nine states were affected by favorably resolved Section 2 lawsuits is larger than the number of such lawsuits. Specifically, 653 such lawsuits were favorably resolved in those states, while counties were affected by them a total of 825 times. These figures are all the more remarkable when it is remembered that the list of cases in the nine state study is not comprehensive, and the definition of a Section 2 case is conservative, excluding the primarily one-person, one-vote suits even though a Section 2 claim was stated. Finally, the nine state data on reported and unreported Section 2 cases forcefully underscore Katz's conclusion that there is still much serious vote discrimination against minorities in America today." *March 8, 2006 Hearing Vol. I*, at 208.

1049.    Congress received the Report from the National Commission on the Voting Rights Act, which stated that the year-long study conducted by Professor Ellen Katz of the University of Michigan Law School for the Michigan Voting Rights Initiative Report found that "after June 1982 there were 322 reported cases in the United States in which a Section 2 claim was resolved in a manner that the researchers could determine. Of this total, 88 found a violation and another 29 resulted in a favorable determination for plaintiffs, typically a settlement, without finding a Section 2 violation. Thus 117 of the cases led to a reported outcome favorable to plaintiffs of various racial or ethnic groups asserting vote discrimination. The great majority of the 322 cases—including the 117 favorable to plaintiffs—challenged vote dilution. The vote dilution cases involved 145 challenges to at-large elections, 110 challenges to reapportionments; and 11 challenges to majority-vote requirements. (A few more cases challenging dilution were included

under other rubrics.) Of those cases challenging dilution, 108 had a favorable outcome for plaintiffs." *March 8, 2006 Hearing Vol. I*, at 202.

1050.   Congress received the Report of the National Commission on the Voting Right which cited to a study authored by Professor Ellen Katz.  The Commission's report stated that: "Four decades after the enactment of the Voting Rights Act, racial discrimination in voting is far from over.  Federal judges adjudicating Section 2 cases over the last twenty-three years have documented an extensive record of conduct by state and local officials that they have deemed racially discriminatory and intentionally so.  Judicial findings under the various factors set forth in the Senate Report reveal determined, systematic, and recent efforts to minimize minority voting strength." *March 8, 2006 Hearing Vol. I*, at 203.

1051.   Congress received a report by the Chief Justice Earl Warren Institute citing the report authored by Professor Ellen Katz, stating that "[o]ne study examined voting discrimination cases brought under Section 2 of the Act since 1982 to determine the extent to which the discrimination Section 5 seeks to remedy and prevent persists.  Section 2 cases are germane to reauthorization because they provide both direct evidence of constitutional violations of the right to vote as well as reasoned judicial determinations that discriminatory voting practices continue, including in Section 5 covered jurisdictions subject to such litigation. . . .  Such evidence supports and justifies reauthorization of Section 5, which was designed to prohibit the application of discriminatory voting changes as well as remove the onus on private individuals to challenge such practices after they were applied." The Warren Institute Report further stated that, "[t]he [Katz] study identified 322 Section 2 cases with published resolutions filed since 1982.  Plaintiffs prevailed in 117 (36.3%) of cases, with more successful cases in Section 5 covered jurisdictions than non-covered jurisdictions.  The most commonly challenged practice was at-large elections (138

cases), nearly half of which were held to violate Section 2. The second most common lawsuits were challenges to redistricting (106 lawsuits), of which 42 ended with a favorable outcome for the plaintiffs." *May 4, 2006 Hearing Part I*, at 272-73.

1052. Congress received the Report of the National Commission on the Voting Rights Act which described the scope of the report authored by Professor Ellen Katz:

- "[A] limitation to this excellent study by [Katz and the Michigan Voting Rights Initiative] is that it focuses exclusively on reported cases. The authors of the study readily acknowledge this fact and point to its implications. They were given information by the ACLU on the number of both reported and unreported Section 2 cases filed in the post-1982 period in South Carolina and Georgia, and by the law firm of Rolando Rios on such cases in Texas. These lists were so large in comparison to hers that Katz concludes: 'Insofar as these ratios of filings to reported decisions are at all representative, [our] study's compilation of 322 lawsuits suggests more than 600 Section 2 filings nationwide with filings in covered jurisdictions possibly exceeding 800 filings.'" *March 8, 2006 Hearing Vol. I*, at 204-05.

- The Commission Report stated that an additional point of information on measuring the extent of vote discrimination solely by counting the number of Section 2 suits resolved favorably to minority voters. The Report stated that sometimes a single lawsuit may affect numerous discriminatory mechanisms in many jurisdictions, citing the example of *Harris v. Graddick* (where a single Section 2 action ultimately forced 65 of Alabama's 67 counties to implement a non-discriminatory poll worker appointment process that allowed African Americans to participate equally, and where the state, after a trial, was compelled to create several new statewide procedures to ensure nondiscriminatory treatment of African American voters at the polls). *March 8, 2006 Hearing Vol. I*, at 206.

1053. Congress heard testimony from Anita Earls, former Deputy Assistant Attorney General of the United States and Director of Advocacy at the University of North Carolina Law School's Center for Civil Rights, that the report authored by Professor Ellen Katz cited instances of intentional discrimination in a number of covered jurisdiction lawsuits since 1982, including:

> *Charleston County*, 316 F. Supp. 2d 268, 286 n.23, 287-289 (D.S.C. 2003), *aff'd* 365 F.3d 341, 353 n.4 (4th Cir. 2004); *Bone Shirt Litig.*, 336 F. Supp. 2d 976, 1023-2108 (D.S.D. 2004) (Shannon, Todd Counties); *Holder v. Hall*, 955 F.2d 1563, 1566 n.3 (11th Cir. 1992), *rev'd on other grounds Holder v. Hall*, 512 U.S. 874 (1994) (Bleckley, Ga.); *City of Dallas*, 734 F. Supp. 1317, 1320 (N.D. Tex. 1990).
>
> *Town of N. Johns*, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989); *Harris*, 695 F. Supp. 517, 524-525, 527 & n.8 (M.D. Ala. 1988) (state of Alabama); *Dillard v. Crenshaw*, 640 F. Supp. 1347, 1356-1357, 1360-1361 (M.D. Ala. 1986) (granting pre-

liminary injunction due to likelihood of prevailing on Section 2 claim), *cited by Baldwin Bd. of Educ.*, 686 F. Supp. 1459, 1466-1467 (M.D. Ala. 1988) ("this court demonstrated in Crenshaw County that from the late 1880's to the present the State of Alabama and its political subdivisions have 'openly and unabashedly' discriminated against their black citizens by employing at different times such devices as the poll tax, racial gerrymandering, and at-large elections, and by enacting such laws as the anti-single-shot voting laws, numbered places laws, and the Sayre law"); *Harris*, 601 F. Supp. 70, 74 (M.D. Ala. 1984) (Jefferson County); *Buskey v. Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983) (Montgomery); *Terrell*, 565 F. Supp. 338, 341 (N.D. Tex. 1983).

*May 16, 2006 Hearing*, at 4.

1054.   Congress received a report authored by Professor Ellen Katz, which included a reference to a website accompanying that report. *October 18, 2005 Hearing*, at 973 ("Data Key located at www.votingreport.org").  Both the website, and the report received by Congress, include references to each of the following reported Section 2 decisions in covered jurisdictions - sorted chronologically—since 1982:[4]

> *Perry*, 548 U.S. Slip. Op. (2006); *Common Cause/Georgia*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005); *Williams v. McKeithen*, 2005 WL 2037545 (E.D. La. 2005); *Baldwin County Commission*, 376 F. 3d 1260 (11th Cir. 2004); *Kuhn v. Thompson*, 304 F. Supp. 2d 131 (M.D. Ala.2004); *Osburn*, 369 F.3d 1283 (11th Cir. 2004); *Sensley*, 385 F.3d 591 (5th Cir. 2004); *Tangipahoa*, 2004 WL 1638106 (E.D. La. 2004); *City of Cleveland*, 297 F. Supp.2d 901 (N.D. Miss. 2004); *Beaufort County*, 936 F.2d 159 (4th Cir. 2004); *Charleston County*, 365 F.3d 341 (4th Cir. 2004); *South Carolina Democratic Party*, 2004 U.S. Dist. LEXIS 27299 / 2004 WL 3262756 (D.S.C. 2004); *Bone Shirt*, 336 F. Supp. 2d 976 (D.S.D. 2004); *Bexar County*, 385 F.3d 853 (5th Cir. 2004); *Democratic Party of Virginia*, 323 F. Supp. 2d 696 (E.D. Va. 2004); *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004); *Jefferson Citizens - Parish II*, 2003 WL 1595167 (E.D. La. 2003); *Prejean*, 83 Fed. Appx. 5 (5th Cir. 2003); *Montiel v. Davis*, 215 F. Supp. 2d 1279 (S.D. Ala. 2002); *Hamrick*, 296 F.3d 1065 (11th Cir. 2002); *St. Bernard Parish School Board*, 2002 WL 2022589 (E.D. La. 2002); *Save Our Aquifer v. San Antonio*, 237 F. Supp. 2d 721 (W.D. Tex. 2002); *City of Roanoke*, 162 F. Supp. 2d 1335 (M.D. Ala. 2001); *Jones v. Alabama*, 2001 U.S. Dist. LEXIS 3909 (S.D. Ala. 2001); *NAACP v. Fordice*, 252 F.3d 361 (5th Cir. 2001); *Balderas*, 2001 U.S. Dist. LEXIS 2500 (E.D. Tex. 2001); *Dallas Independent school District*, 2001 U.S. Dist. LEXIS 5837 (N.D. Tex. 2001); *Dilworth v. Clark*, 129 F.

---

[4]    For a discussion of the Report's methodology and the guide to this database, *see October 18, 2005 Hearing,* at 973 (report of Professor Ellen Katz).

Supp. 2d 966 (S.D. Miss. 2000); *Howard v. Gilmore*, 2000 U.S. App. LEXIS 2680 (4th Cir. 2000).

*France*, 71 F. Supp. 2d 317 (S.D.N.Y. 1999); *Vander Linden v. Hodges*, 193 F.3d 268 (4th Cir. 1999); *Alamo Heights Indep. School District*, 168 F.3d 848 (5th Cir. 1999); *Pasadena Independent School District*, 165 F.3d 368 (5th Cir. 1999); *Brooks*, 158 F.3d 1230 (11th Cir. 1998); *St. Francisville*, 135 F.3d 996 (5th Cir. 1998); *City of Greenville*, 1998 WL 930709 (N.D. Miss. 1998); *City of Quitman*, 148 F.3d 472 (5th Cir. 1998); *Lafayette County*, 20 F. Supp. 2d 996 (N.D. Miss. 1998); *Cleveland County*, 142 F.3d 468 (D.C. Cir. 1998); African *American Legal Defense Fund*, 8 F. Supp. 2d 330 (S.D.N.Y. 1998); *Harris v. Houston*, 151 F.3d 186 (5th Cir. 1998); *Richmond County Board*, 1988 U.S. Dist. LEXIS 16729 (E.D. Va. 1998); *Salt River Project*, 109 F.3d 586 (9th Cir. 1997); *City of LaGrange*, 969 F. Supp. 749 (N.D. Ga. 1997); *City of Rome*, 127 F.3d 1355 (11th Cir. 1997); *Chickasaw County II*, 1997 WL 33426761 (N.D. Miss. 1997); *Lawrimore County*, 121 F.3d 698 (4th Cir. 1997); *Campos v. Houston*, 113 F.3d 544 (5th Cir. 1997); *Lulac v. Roscoe* I.S.D., 123 F.3d 843 (5th Cir. 1997); *Val Verde County*, 967 F. Supp. 917 (W.D. Tex. 1997); *White v. Alabama*, 74 F.3d 1058 (11th Cir. 1996); *Attala County*, 92 F.3d 283 (5th Cir. 1996); *Calhoun County*, 88 F.3d 139 (5th Cir. 1996); *Green*, 1996 WL 524395 (E.D.N.Y. 1996); *City of Pearland*, 945 F. Supp. 1069 (S.D. Tex. 1996); *City of San Antonio*, 937 F. Supp. 587 (W.D. Tex. 1996); *Fort Bend Independent School District*, 89 F.3d 1205 (5th Cir. 1996); *City of Hampton*, 919 F. Supp. 212 (E.D. Va. 1996); *Southern Christian Leadership*, 56 F.3d 1281 (11th Cir. 1995); *U.S. v. Jones*, 57 F.3d 1020 (11th Cir. 1995); *Al-Hakim*, 892 F. Supp. 1464 (M.D. Fla. 1995); *Chatman*, 44 F.3d 923 (11th Cir. 1995); *Concerned Citizens*, 63 F.3d 413 (5th Cir. 1995); *LULAC - North East I.S.D.*, 903 F. Supp. 1071 (W.D. Tex. 1995); *Autauga County Board of Education*, 858 F. Supp. 1118 (M.D. Ala. 1994); *Holder v. Hall*, 512 U.S. 874 (1994); *Carr*, 1994 WL 419856 (E. D. La. 1994); *Armstrong v. Allain*, 893 F. Supp. 1320 (S.D. Miss. 1994); *Walthall County*, 157 F.R.D. 388 (S.D. Miss. 1994); *Denis*, 1994 U.S. Dist. LEXIS 15819 (S.D.N.Y. 1994); *City of Columbia*, 33 F.3d 52 (4th Cir. 1994); *Varner v. Smitherman*, 1993 WL 663327 (S.D. Ala. 1993); *Forrest County*, 814 F. Supp. 1327 (S.D. Miss. 1993); *Lawrence County*, 814 F. Supp. 1346 (S.D. Miss. 1993); *Magnolia Bar Association*, 994 F.2d 1143 (5th Cir. 1993); *Prewitt v. Moore*, 840 F. Supp. 436 (N.D. Miss. 1993); *Ahoskie*, 998 F.2d 1266 (4th Cir. 1993); *Kershaw County*, 838 F. Supp. 237 (D.S.C. 1993); *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993); *Rangel*, 8 F.3d 24 (5th Cir. 1993); *Slagle*, 821 F. Supp. 1162 (W.D. Tex. 1993); *Brunswick County, Va.*, 984 F.2d 1393 (4th Cir. 1993); *Newman v. Hunt*, 787 F. Supp. 193 (M.D. Ala. 1992); *Wesch*, 785 F. Supp. 1491 (S.D. Ala. 1992); *Love*, 1992 WL 96307 (S.D. Ga. 1992); *Lucas*, 967 F.2d 549 (11th Cir. 1992); *Chisom*, 970 F.2d 1408 (5th Cir. 1992); *SW Texas Junior College Dist.*, 964 F.2d 1542 (5th Cir. 1992); *Jefferson Parish I*, 926 F.2d 487 (5th Cir. 1991); *Westwego*, 946 F.2d 1109 (5th Cir. 1991); *Operation Push*, 932 F.2d 400 (5th Cir. 1991); *Cumberland County*, 927 F.2d 595 (4th Cir. 1991); *Knight v. Alabama*, 1990 U.S. Dist. LEXIS 19604 (N.D. Ala. 1990); *Hardee County*, 906 F.2d 524 (11th Cir. 1990); *Ben Hill County*, 743 F. Supp. 864(M.D. Ga. 1990); *Clark*, 777 F. Supp. 445 (M.D. La.

1990); *Monroe County*, 740 F. Supp. 417 (N.D. Miss. 1990); *Anson County*, 1990 WL 123822 (W.D.N.C. 1990); *City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990); *Mexican American Bar Association*, 755 F. Supp. 735 (W.D. Tex. 1990); *White*, 909 F.2d 99 (4th Cir. 1990).

 *Chilton County Board of Education*, 868 F.2d 1274 (11th Cir. 1989); *Town of North Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989); *Holbrook Unified School District*, 703 F. Supp. 56 (D. Ariz. 1989); *Jefferson Parish School Board*, 1989 WL 3801 (E.D. La. 1989); *Chickasaw County I*, 705 F. Supp. 315 (N.D. Miss. 1989); *City of Woodville*, 881 F. Supp. 1327 (5th Cir. 1989); *Grenada County*, 1989 WL 251321 (N.D. Miss. 1989); *Houston v. Haley*, 869 F.2d 807 (5th Cir. 1989); *Bladen County*, 1989 WL 253428 (E.D.N.C. 1989); *Brewer*, 876 F.2d 448 (5th Cir. 1989); *City of Austin*, 871 F.2d 529 (5th Cir. 1989); *City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989); *Irby*, 889 F.2d 1352 (4th Cir. 1989); *Baldwin Board of Education*, 686 F. Supp. 1459 (M.D. Ala. 1988); *Harris*, 695 F. Supp. 517 (M.D. Ala. 1988); *City of Tampa*, 693 F. Supp. 1051 (M.D. Fla. 1988); *Granville County*, 860 F.2d 110 (4th Cir. 1988); *Ashe v. NYC*, 1988 WL 95427 (E.D.N.Y. 1988); *Baytown*, 840 F.2d 1240 (5th Cir. 1988); *Mehfoud*, 702 F. Supp. 588 (E.D. Va. 1988); *Neal*, 689 F. Supp. 1426 (E.D. Va. 1988); *Carrollton NAACP*, 829 F.2d 1547 (11th Cir. 1987); *Gretna*, 834 F.2d 496 (5th Cir. 1987); *Tensas Parish School Board*, 819 F.2d 609 (5th Cir. 1987); *Kirksey v. Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987); *Dallas County Board of Education*, 791 F.2d 831 (11th Cir.

 1986); *Dallas County Commission*, 636 F. Supp. 704 (S.D. Ala. 1986); *Dillard v. Crenshaw*, 640 F. Supp. 1347 (M.D. Ala. 1986); *City of Crystal Springs*, 626 F. Supp. 987 (S.D. Miss. 1986); *City of Houston*, 806 F.2d 634 (5th Cir. 1986); *Campaign for a Progressive Bronx*, 631 F. Supp. 975 (S.D.N.Y. 1986); *Edgefield County*, 650 F. Supp. 1176 (D.S.C. 1986); *Jefferson County*, 798 F.2d 134 (5th Cir. 1986); *LULAC—Midland*, 648 F. Supp. 596 (W.D. Tex. 1986); *Marengo County*, 623 F. Supp. 33 (S.D. Ala. 1985); *Sumter County*, 775 F.2d 1509 (11th Cir. 1985); *Seastrunk*, 772 F.2d 143 (5th Cir. 1985); *Madison County*, 610 F. Supp. 240 (S.D. Miss. 1985); *Welch v. McKenzie*, 765 F.2d 1311 (5th Cir. 1985); *Butts v. NYC*, 779 F.2d 141 (2d Cir. 1985); *Perez*, 629 F. Supp. 734 (S.D.N.Y. 1985); *Chapman v. Nicholson*, 579 F. Supp. 1504 (N.D. Ala. 1984); *Opelika*, 748 F.2d 1473 (11th Cir. 1984); *City of Greenwood*, 599 F. Supp. 397 (N.D. Miss. 1984); *Jordan*, 604 F. Supp. 807 (N.D. Miss. 1984); *Halifax County*, 594 F .Supp. 161 (E.D.N.C. 1984); *Abilene*, 725 F.2d 1017 (5th Cir. 1984); El *Paso Independent School District*, 591 F. Supp. 802 (W.D. Tex. 1984); *Lubbock*, 727 F.2d 364 (5th Cir. 1984); *McCarty*, 749 F.2d 1134 (5th Cir. 1984); *Terrazas*, 581 F. Supp. 1329 (N.D. Tex. 1984); *Buskey v. Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983); *Mobile School Board*, 706 F.2d 1103 (11th Cir. 1983); *Cross*, 704 F.2d 143 (5th Cir. 1983); *Major*, 574 F. Supp. 325 (E.D. La. 1983); *City of Jackson, MS*, 714 F.2d 42 (5th Cir. 1983); *Merced*, 574 F. Supp. 498 (S.D.N.Y. 1983); *Terrell*, 565 F. Supp. 338 (N.D. Tex. 1983); *Rocha*, 1982 U.S. Dist. LEXIS 15164 (S.D. Tex. 1982).

*October 18, 2005 Hearing,* at 973 (short citations provided on website accompanying report).

1055. Congress received the ACLU Report, *supra* at ¶ 36, stating that, "[t]his report describes the voting rights litigation brought, or participated in, by the Voting Rights Project of the American Civil Liberties Union after the amendment and extension of the Voting Rights Act on June 29, 1982. It documents continuing purposeful discrimination in voting against racial minorities in the South and against American Indians in the West."). The report described the number of voting rights enforcement suits in covered states, including cases under various provisions of the VRA and constitutional provisions as follows: Alabama (9); California (1); Florida (15); Georgia (145); Louisiana (4); Mississippi (3); New York (1); North Carolina (17); South Carolina (38); South Dakota (6); Texas (3); Virginia (15). *March 8, 2006 Hearing Vol. I*, at 399.

1056. The ACLU Report, *supra* at ¶ 36, stated that other examples of discrimination against minority voters discussed in this report include the following from its litigation since 1982:

- discriminatory annexations and deannexations [Adel, Ga., 1982; Augusta, Ga., 1987; Clinton, S.C., 2002; College Park, Ga., 1979; Emporia, Va. 1987; Foley, Ala., 1989 & 1993; Hemingway, S.C., 1994; Laurinburg, N.C., 1994; Macon, Ga., 1987; Sumter County, S.C., 1985 & 1986];

- challenges by white voters or elected officials to majority minority districts [Ga., congressional, house, and senate redistricting, 1990; Georgetown County, S.C., 1983; La., congressional redistricting, 1994; N.C., congressional redistricting, 1991-2001; Perry County, Miss. , 1993; Putnam County, Ga., 1997; S.C., house and senate redistricting, 1996; S.C. congressional redistricting, 1996 & 1998; St. Francisville, La., 1995; Telfair County, Ga., 1986; Union County, S.C., 2002; Va., congressional redistricting, 1995; S.D. redistricting, 1996)];

- refusing to draw majority minority districts [Bossier Parish, La., 1992; Ga., congressional redistricting, 1982];

- refusing to appoint blacks to public office [Ben Hill County, Ga., 1988; Johnson County, Ga., 1983];

- maintaining a racially exclusive sole commissioner form of county government [Bleckley County, Ga., 1985; Wheeler County, Ga., 1993];

- refusing to designate satellite voter registration sites in the minority community [Columbus/Muscogee County, Ga., 1984];

- refusing to accept "bundled" mailing voter registration forms [Ga., 2004];

- refusing to allow registration at county offices [Fulton County, Ga., 1986];

- refusing to comply with Section 5 or Section 5 objections [Ga., judicial elections, 1989; Charlton County, Ga., 1985; Ga., soil and water conservation elections, 2004; Douglasville, Ga., 1996; Greene County, Ga., 1985; Rochelle, Ga., 1984; La., 1995; S.D. , 1976-2002];

- transferring duties to an appointed administrator following the election of blacks to office [Kingston, Ga., 1987];

- white opposition to restoring elections to a majority black town [Keysville, Ga., 1990];

- requiring candidates for office to have a high school diploma or its equivalent [Clay County, Ga., 1993; Augusta, Ga., 1987];

- prohibiting "for sale" and other yard signs in a predominantly white municipality [Avondale Estates, Ga., 2000];

- disqualifying black elected officials from holding office or participating in decision making [Sumter County, Ga., 1998; Thomaston, Ga., 1986; Beaufort County, S.C., 1983)];

- relocating polling places distant from the black community [Millen, Ga., 1995; Wrightsville, Ga., 1992];

- refusing to hold elections following a Section 5 objection [Butler, Ga. 1995];

- maintaining an all white self-perpetuating board of education [Thomaston, Ga., 1981]

- governance by state legislative delegation [S.C., 1999];

- packing minority voters to dilute their influence [S.D., legislative redistricting, 2002]; and

- using discriminatory punch card voting systems [Ga., 2001].

*March 8, 2006 Hearing Vol. I*, at 413-15.

1057.  Congress received the ACLU Report, *supra* at ¶ 36, which included a list of Section 2 and other affirmative litigation from the following covered states: Alabama (pp. 38-61), Hendry County, Fla. (pp. 96-97); Georgia (pp. 108-478; p. 796; pp. 818-22); Louisiana (pp. 481-92); Allegan and Saginaw, Mich. (p. 500); Mississippi (pp. 502-09); Wilson, Nash & Edgecombe Co., N.C. (*Thornburg v. Gingles*, p. 512; *Green v. City of Rocky Mount*, p. 523); Martin Co., N.C. (p.

535); Person Co., N.C. (p. 544); Scotland Co., N.C. (p. 549); Washington, Wayne Co., N.C. (pp. 552-58); South Carolina (pp. 562-663); Texas (pp. 687-89; pp. 841-43); Virginia (pp. 690-719; 827-28); South Dakota (p. 751). *March 8, 2006 Hearing Vol. I*, at 381-95.

1058.   Through a report submitted to Congress by Nadine Strossen, Congress received information that in *Bone Shirt v. Hazeltine*, 200 F. Supp. 2d 1150 (D.S.D. 2002), "[t]he district court heard plaintiffs' Section 2 claim and in a detailed 144 page opinion invalidated the state's 2001 legislative plan as diluting Indian voting strength.  The court found the plaintiffs had established the three *Gingles* factors.  Turning to the totality of circumstances analysis, the court found there was 'substantial evidence that South Dakota officially excluded Indians from voting and holding office.'" *March 8, 2006 Hearing Vol. I*, at 1163; *see also October 25, 2005 Need Hearing*, at 13 (Laughlin McDonald).

1059.   Congress received the a report authored by Professor Ellen Katz which indicates that in the *Bone Shirt* litigation, 336 F. Supp. 2d 976, 1041 (D.S.D. 2004):

- "[T]he court found that informal activities by the party organizations stymied Native American candidacies.  The court highlighted as evidence the conduct of the chairman of the Democratic Central Committee, who campaigned against his own party's nominees for county commissioner in the 2002 general election after Indian candidates unseated non-Indian incumbents in the primary." *October 18, 2005 Hearing,* at 999-1000.

- "The district court identified racial appeals occurring during the 2002 primary elections for county commission, in which three Native American candidates confronted accusations that Indians were seeking to 'take over the county politically . . . [and] trying to take land back and put it in trust.'" *October 18, 2005 Hearing,* at 999-1000.

- The court found a "limitation imposed by county officials on the number of voter registration forms given to people intending to register Native Americans voters despite the absence of a legal limit on the provision of such forms." The report cited "[t]he refusal of county officials to accept Internet voter registration forms from Native American voters," and "[t]he 'erroneous rejections of registration cards' by county officials whom, later (after apparent protest) accepted them without explaining why they had first been rejected." *October 18, 2005 Hearing*, at 988.

- "[t]he 1984 refusal of the Fall River County Auditor 'to register Indians who had attempted to register as part of a last-minute voter registration drive on the Pine Ridge Reservation,' a refusal that led to a court order the day before the election requiring that voters be allowed to register and cast their ballots." *October 18, 2005 Hearing*, at 989.

1060.    Congress received testimony from Laughlin McDonald that "the district court, sitting as a single-judge court, heard plaintiffs' Section 2 claim [*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004)] and in a detailed 144 page opinion invalidated the state's 2001 legislative plan as diluting Indian voting strength. . . .  The court found there was 'substantial evidence that South Dakota officially excluded Indians from voting and holding office.'" *May 9, 2006 Hearing*, at 120.

1061.    Congress received a report prepared by Robert McDuff entitled *Voting Rights in Mississippi 1982-2006*, providing an example Section 2 case where Black plaintiffs in Mississippi prevailed: *Jordan v. Winter*, 604 F. Supp. 807 (N.D. Miss. 1984), resulting in the drawing of a black-majority district in the Mississippi Delta which allowed the election to the U.S. House of Representatives in 1986 of the first black member of Congress from Mississippi in over 100 years. *March 8, 2006 Hearing Vol. II*, at 1718.

1062.    Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1989, in section 2 suit, a Federal district court knocked down Chickasaw County, Mississippi, illegal plan to have all majority-white supervisors' districts.  Sent back to the drawing board, the county then passed 3 different plans over the next 6 years.  Not one passed section 5 pre-clearance.  Finally, the Federal court drew its own plan for the 1995 elections, providing for 2 majority-black districts to reflect a population that was nearly 40 percent black.  Only then did the county adopt a plan that met no objection by the Department of Justice. This is Robert McDuff, 'Voting Rights in Mississippi: 1982-2006,' RenewTheVRA.org at 6." 152 Cong. Rec. S7747.

1063.   Congress received a report prepared by Robert McDuff entitled *Voting Rights in Mississippi 1982-2006*, stating that a federal district court in 1987 ruled in favor of black voters in Mississippi in a Section 2 action challenging the state's dual registration provision requiring voters to register separately for state and municipal elections.  The court in *Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), had originally held that the law was originally adopted in 1890 for a racially discriminatory purpose and a revised version enacted in 1984 had a discriminatory result.  *March 8, 2006 Hearing Vol. II*, at 1725.

1064.   Congress received a report authored by Professor Ellen Katz which states that "[t]he court in the *Operation Push* litigation, [674 F. Supp. 1245, 1266 (N.D. Miss. 1987),] deemed administrative ease tenuous as a justification for a dual registration system, concluding that '[m]ere inconvenience to the state is no justification for burdening citizens in the exercise of their protected right to register to vote.'"  *October 18, 2005 Hearing,* at 1014.

1065.   Congress received a report authored by Professor Ellen Katz which states that "[i]n the *Kirksey v. Allain* litigation, [658 F. Supp. 1183 (S.D. Miss. 1987),] . . . the court deemed historic practice a tenuous justification for using a numbered post system because other judicial bodies in the state no longer used it."  *October 18, 2005 Hearing*, at 1014.

1066.   Congress received a statement from Senator Arlen Specter of Pennsylvania regarding three Alabama examples of discrimination found by courts:

- *Hunter* v. *Underwood*, 730 F.2d 614 (11th Cir. 1984), affirmed 471 U.S. 222 (1985) (ACLU Rep., p. 51).  The ACLU represented two voters who were disenfranchised under a nearly 80 year-old law that prohibited those who had committed a 'crime of moral turpitude' from voting.  Id. at p. 52.  The court struck down the law because there was evidence that when it was adopted in the early 1900s, the legislators intended to disenfranchise black voters.  The Supreme Court unanimously affirmed that, in view of the proof of racial motivation and continuing racially discriminatory effect, the state law violated the Fourteenth Amendment. . . .

- *Dillard* v. *City of Foley*, 926 F. Supp. 1053 (M.D. Ala. 1995) (ACLU Rep., p. 57).  African American plaintiffs in the City of Foley, Alabama, filed a motion to require the City to adopt

and implement a nondiscriminatory annexation policy and to annex Mills Quarters and Beulah Heights. Plaintiffs also claimed that the City had violated section 5 and section 2. As a result of negotiations, the parties entered into a consent decree. The decree found plaintiffs had established 'a prima facie violation of section 2 of the Voting Rights Act and the United States Constitution.' *Id.* at p. 59.

- *Brown* v. *Board of School Comm'rs.*, 706 F. 2d 1103 (11th Cir. 1983) (U Mich. L. Rep., http://www.votingreport.org.). A class of African American voters challenged Mobile County's at-large system for electing School Board members. In 1852, Mobile County created at-large school board elections of 12 commissioners. In 1870, the election procedures changed; instead of selecting all 12 commissioners, voters would select 9 of the 12 and the other 3 would be appointed. This system had the effect of ensuring minority representation on the school board. In 1876, the Alabama state legislature eliminated the Mobile County school board system and returned the County to the 1852 at-large election scheme which remained in effect until this suit was brought. The district court found that by re-instating the at-large election system, the Alabama state legislature intended to discriminate against African Americans in Mobile County in violation of the Fourteenth and Fifteenth Amendment. The Eleventh Circuit affirmed. 152 Cong. Rec. S7951.

1067.  Congress received a report from James Blacksher, Edward Still, Nick Quinton, Cullen Brown, and Royal Dumas, entitled *Voting Rights in Alabama, 1982-2006* ("AL Report"), that "[s]hortly after the 1982 reauthorization, black citizens in Alabama challenged the method of appointing poll officials under Section 2 of the Voting Rights Act. By means of a preliminary injunction, the federal court ordered 65 of Alabama's 67 counties to institute programs aimed at appointing more African Americans as poll officials." The claims against the state of Alabama went to trial." *July 13, 2006 Hearing*, at 372.

1068.  Wade Henderson submitted a report to Congress ("Voting Rights in Alabama, 1982-2006") which stated that "[t]he city of Valley, a new municipality that carved white residential areas out of Chambers County, was challenged . . . to justify its refusal to annex several adjacent black neighborhoods. The district court stayed the city's 1988 elections pending resolution of the dispute, and on December 12, 1988, it approved a consent decree in which Valley agreed to facilitate annexation of the black neighborhoods. The terms of the consent decree provided that Valley would not change to single-member districts until the 1992 elections. Before the districts

were drawn, Valley tried to annex another 243 persons, only two of whom were black, but the Department of Justice denied preclearance pending completion of the transition to district elections. Finally, after all the black annexations were completed, the Valley City Council adopted a seven single-member district plan that included two majority-black districts, and the case was dismissed." *July 13, 2006 Hearing*, at 376-77.

1069. Wade Henderson submitted a report to Congress ("Voting Rights in Alabama, 1982-2006") which described the successful *Dillard v. Crenshaw County* litigation in detail. The Report stated that "[b]y far the biggest advance in equal access for African Americans came after May 28, 1986, when a federal district court made findings that, in the century following Reconstruction, the Alabama Legislature had purposefully switched from single-member districts to at-large election of local governments as needed to prevent black citizens from electing their candidates of choice, and that the general laws of Alabama governing all at-large election systems throughout the state had been manipulated intentionally during the 1950s and 1960s to strengthen their ability to dilute black voting strength. The court concluded: 'From the late 1800's through the present, the state has consistently erected barriers to keep black persons from full and equal participation in the social, economic, and political life of the state.' Based on these findings, the district court expanded the *Dillard v. Crenshaw County* litigation to include a defendant class of 17 commissions, 28 county school boards, and 144 municipalities who were then employing at-large election systems tainted by the racially motivated general laws." *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Report stated, "provided the political cover Alabama's elected officials might have needed to justify to their majority-white constituencies their decisions not to continue defending racially discriminatory election system when they were challenged in court. Most of the local jurisdictions in the defendant class entered into consent de-

crees negotiated by state and local black political leaders, although a few proceeded to trial and judgment. Twelve of the 17 county commissions changed to single-member districts, one agreed to use cumulative voting roles with its at-large elections, and four are still pending judgment. Twenty-three of the 28 county boards of education changed to single member districts, one agreed to use cumulative voting roles with its at-large elections, and four are still pending judgment. One hundred two of the 144 municipalities changed to single member districts, 13 agreed to change to multimember districts, 20 agreed to use limited voting rules with their at-large elections, five agreed to use cumulative voting roles with their at-large elections, two agreed to use plurality-win rules with their at-large elections, and two are still pending judgment. Some of the *Dillard* jurisdictions would not agree to consent decrees providing a complete remedy for the dilution of black citizens' votes, and the district court had to adjudicate the remedy issues based on the jurisdictions' admissions of liability." *July 13, 2006 Hearing*, at 372-74; *see also May 17, 2006 Hearing*, at 4 (Fred D. Gray).

1070.   Congress received a report authored by Professor Ellen Katz which states that the *Dillard v. Crenshaw County* court's finding that there were barriers "consistently erected" by the state "[f]rom the late 1800's through the present [1986] to keep black persons from full and equal participation in the social, economic, and political life of the state," that were "still having their intended racist impact." *October 18, 2005 Hearing,* at 1000.

1071.   Congress heard testimony that in *Dillard v. Baldwin County Bd. of Education*, 686 F. Supp. 1459 (M.D. Ala. 1988) the court stated: "The plaintiffs have relied on this court's earlier findings in *Crenshaw County*, unchallenged here, that the Alabama legislature adopted numbered place laws in 1961 in order to make local at-large elections systems 'more secure mechanisms for discriminations' against the state's black citizens. 640 F. Supp. at 1357. In other words, the

state adopted numbered place laws and continued to maintain at-large systems across the state

for the specific purpose of racial discrimination. The evidence is undisputed that the Baldwin

County Board of Education's at-large system, including the numbered-place feature, is a product

of these racially discriminatory efforts of the Alabama legislature. Moreover, as demonstrated in

Part III of this opinion, the evidence is overwhelming that the enactments continue today to have

their intended racist effect. The plaintiffs have therefore established a prima facie case of inten-

tional racial discrimination." *July 13, 2006 Hearing*, at 375.

1072.    Wade Henderson submitted a report to Congress ("Voting Rights in Alabama, 1982-

2006") which stated that: "In other Alabama jurisdictions, extended trial proceedings and court

rulings were necessary before and after all-white local governing bodies finally agreed to consent

decrees. In North Johns, a tiny municipality near Birmingham, after the mayor agreed to a con-

sent decree that changed the method of electing council members from at-large voting to single-

member districts, the district court found that he intentionally withheld state mandated ethics

forms from the African-American candidates: The mayor was aware that Jones and Richardson,

as black candidates, were seeking to take advantage of the new court-ordered single-member dis-

tricting plan and that their election would result in the town council being majority black. The

court is convinced that Mayor Price acted as he did in order to prevent this result, or at least not

to aid in achieving it." *July 13, 2006 Hearing*, at 376.

1073.    Congress received a report authored by Professor Ellen Katz which states that, in the

*Town of North Johns* litigation, 717 F. Supp. 1471, 1477 (M.D. Ala. 1989), the court found that

"[t]he town mayor's 1988 selective refusal to provide registration forms required by state law to

two African-American city council candidates, the first African-Americans to run for town office

after the entry of a consent decree that replaced an at-large regime with a districted one, where

'[t]he mayor was aware that Jones and Richardson, as black candidates, were seeking to take advantage of the new court-ordered single-member districting plan and that their election would result in the town council being majority black.'" The Report stated that, the court found that "[t]he town's prosecution of two successful black candidates for failing to file the forms required by state law that the mayor refused to give them, a failing a federal court later found occurred only because of the mayor's intentionally discriminatory actions." The Report also noted that the town refused "to seat the candidates after they were elected in 1988 until a federal court ordered the town to do so."    *October 18, 2005 Hearing,* at 990.

1074.  Congress received a report authored by Professor Ellen Katz which states that, in the *Harris* litigation in Alabama, 593 F. Supp. 128, 133 (M.D. Ala. 1983), the court found:

- "The intentional failure of the Governor and Attorney General of Alabama to remedy past discrimination or ongoing racial harassment at the polls."  The Report cited the court's finding that "[t]he conduct of white poll officials who 'continue to harass and intimidate black voters' including 'detailed numerous instances of where white poll officials refused to help illiterate black voters or refused to allow them to vote, where they refused to allow black voters to cast challenged ballots, and where they were simply rude and even intimidating toward black voters.'" *October 18, 2005 Hearing,* at 991.

- "The express refusal of Jefferson County officials to appoint black workers in white precincts in 1984 on the ground that white voters will not listen to black poll officials, a refusal found to amount to 'open and intentional discrimination' that 'is lawless and inexcusable.' The court stated that 'try[ing] to excuse the practice under cover of the purported intolerance of their own constituents is indefensible and repugnant.'" *October 18, 2005 Hearing,* at 991.

1075.  Congress received a report authored by Professor Ellen Katz which states that, in the *Buskey v. Oliver* litigation in Montgomery, Alabama, 565 F. Supp. 1473, 1483 (M.D. Ala. 1983) the court found the "[c]ity ordinance proposed by mayor (sic) in 1981, following a series of annexations, to lower the African-American population in majority-black district 3 to 'the lowest level he understood to be legally possible in order to reduce the possibility that district 3's council member could be reelected.'  The ordinance was still in place as of 1983 and was found to be

'in substantial measure the product of a scheme purposefully designed and executed to decrease

the voting strength of the black electorate in district 3.'" *October 18, 2005 Hearing*, at 991.

1076.   Congress received a statement from Senator Arlen Specter of Pennsylvania regarding

a Georgia example of discrimination found by courts as:

> *Common Cause* v. *Billups*: 4:05-CV-201 HLM (N.D. Ga.) (ACLU
> Rep., 185-191).  The Department of Justice precleared the photo
> ID bill on August 26, 2005.  The ACLU filed suit in federal district
> court, charging the law violated the state and federal constitutions,
> the 1965 Voting Rights Act, and the 1964 Civil Rights Act.  The
> district court issued a preliminary injunction holding plaintiffs had
> a substantial likelihood of succeeding on several grounds, includ-
> ing claims that the photo ID law was a poll tax and violated the
> equal protection clause of the Constitution.  The state appealed to
> the Eleventh Circuit, which refused to stay the injunction. In an at-
> tempt to address the poll tax burden cited by the district court in its
> injunction, the Georgia legislature passed a new photo ID bill pro-
> viding for free photo identification cards . . . . 152 Cong. Rec.
> S7951; *see also March 8, 2006 Hearing Vol. I*, at 84 (testimony of
> Wade Henderson).

1077.   Congress received information presented by Laughlin McDonald that "[f]rom 1974 to

1993, more than 100 lawsuits were brought against no fewer than 40 cities (in 41 lawsuits) and

62 counties (in 67 law suits) in Georgia alone, challenging at-large election plans as discrimina-

tory violations of either the constitution, the Voting Rights Act, or both. Of the 188 lawsuits dur-

ing this 19 year period in Georgia, more than three-quarters (72) were not resolved until 1983 or

later. Of these 72 cases, all but approximately five were resolved by the creation of single mem-

ber districts, which allowed blacks the opportunity to elect candidates of their choice.

1078.   Congress received a written statement from Laughlin McDonald which stated that

"[t]he persistence of at-large voting schemes as a mechanism to dilute minority votes well into

the 1980s and 1990s is a testament to the continued need for Section 5, as well as the wisdom of

Congress in reauthorizing the special provisions in 1982." *October 25, 2005 Need Hearing*, at 11.

1079.   Through a report submitted to Congress by Nadine Strossen, Congress received information that in the Georgia case of *Vereen v. Ben Hill County*, 743 F. Supp. 864 (M.D. Ga. 1988), "Black residents of the county, represented by the ACLU, filed suit in federal court in 1988 alleging that the grand jury had systematically excluded them from service on the board of education, and that the 1872 grand jury law had been enacted with a racially discriminatory purpose in violation of Section 2 and the Constitution." *March 8, 2006 Hearing Vol. I*, at 536.

1080.   Through a report submitted to Congress by Nadine Strossen, Congress received information that in the Georgia case of *Wilson v. Powell*, Civ. No. 383-14 (S.D. Ga.), "black residents of Johnson County, represented by the ACLU, filed suit in February 1983, challenging at-large voting for the county board of commissioners and the Wrightsville City Council.  The county had a black population of 31%, and its county seat, Wrightsville, had a black population of 38%.  No black person, however, had ever been elected to either of the governing bodies." *March 8, 2006 Hearing Vol. I*, at 730.

1081.   Through a report submitted to Congress by Nadine Strossen, Congress received information that in the case of *Howard v. Commissioner of Wheeler County*, Civ. No. 390-057 (S.D. Ga. Jan. 13, 1993), "Wheeler County adopted its sole commissioner form of government in 1924 to replace a three-member board of commissioners elected from single member districts. As of 1990, no African American had ever been elected to the office of sole commissioner or any other county office elected at-large." *March 8, 2006 Hearing Vol. I*, at 549.

1082.   Congress received a report authored by Professor Ellen Katz which cited an intentional discrimination finding in Bleckley County, Georgia where the county, in 1984, made a

"decision to replace numerous polling places that "provid[ed] ready access to voters in the outly-ing areas" with a single precinct for the 219 square mile county and to locate this single precinct in an "all-white civic club" (the Jaycee Barn in Cochran). The Report also cited the county's de-cision to use the precinct as the sole polling place for county commissioner and county school board elections throughout the 1980s and up to the court's 1992 decision. *October 18, 2005 Hearing,* at 991.

1083.  Through a report submitted to Congress by Nadine Strossen, Congress received in-formation that in *Vander Linden v. Hodges,* 193 F.3d 268 (4th Cir. 1999) (finding that South Carolina's county legislative delegation system violated one person/one vote), after a district court held that the VRA and Constitution did not apply, but "the court of appeals reversed, mak-ing extensive findings of the discriminatory origins of the legislative delegation system and its present day unconstitutionality." *March 8, 2006 Hearing Vol. I,* at 964.

1084.  Congress received evidence taken from a pleading drafted by Laughlin McDonald that in the case of *Stanley v. Darlington County School District,* 879 F. Supp. 1341, 1390 (D.S.C. 1995), the court found that before and after *Brown,* South Carolina "took actions to perpetuate racially dual school systems; that the effects of the State's actions persist to the present; and that, although most active resistance had ceased by the mid-1970s, the State of South Carolina has done little or nothing since then to eliminate the vestiges of the dual school system by them, de-spite an affirmative duty to do so." *March 8, 2006 Hearing Vol. III,* at 3470.

1085.  Armand Derfner presented Congress with testimony about lawsuits he and others brought that he said effectively blocked discriminatory and irregularly shaped annexations in Orangeburg, South Carolina and Hemingway, South Carolina. *Scope and Criteria Hearning,* at 83.

1086.   Congress received a report authored by Professor Ellen Katz which describes the

*Charleston County* litigation, 316 F. Supp. 2d 268, 286) (D.S.C. 2003). In that case, the court

found a consistent and recent pattern of whites attempting to intimidate and harass African-

American voters at the polls from the 1980s up to the 2000 general election, including "signifi-

cant evidence of intimidation and harassment" that was "undeniably racial" and that "never oc-

curred at predominantly white polling places, including those that tended to support Democratic

candidates." *October 18, 2005 Hearing,* at 985. The Report also stated that the court found:

- "[H]arassment by county officials, including at least one member of the Charleston County Election Commission and at least one county-employed poll manager, as participants in the Ballot Security Group which, in the 1990 election, 'sought to prevent African-American voters from seeking assistance in casting their ballots.'" *October 18, 2005 Hearing,* at 987.

- "The county's assignment of white poll managers, described by some as 'bulldogs,' in un-specified recent elections since 1982, to majority African-American precincts, where they 'caused confusion, intimidated African-American voters, . . . had the tendency to be conde-scending to those voters;' and engaged in 'inappropriate behavior.'" *October 18, 2005 Hearing,* at 987.

- "'[R]ecurring' official harassment of elderly African-American voters during the 1980s and 1990s, so severe that that the Charleston County Circuit Court 'issue[d] a restraining order against the Election Commission requiring its agents to cease interfering with the voting process.'" *October 18, 2005 Hearing,* at 987.

- "The state legislative delegation's proposal to replace single member districts with an at-large system following African-American success in School Board elections in 2000, without communicating at all with members of the School Board at the time." *October 18, 2005 Hearing,* at 988.

1087.   Congress received additional information regarding the *Charleston County* litigation

from:

- Laughlin McDonald, who cited facts ascertained by the court of appeals, 365 F.3d at 351-53, and the district court, 316 F. Supp.2d. at 286 n.23, 294-95, in *Charleston County* regarding vote dilution, including that "[o]ther factors contributing to minority vote dilution found by the courts included: "fewer financial resources" available to minority candidates to finance campaigns; 'past discrimination that has hindered the present ability of minorities to vote or to participate equally in the political process;' '[t]he on-going racial separation that exists in Charleston County-socially, economically, religiously, in housing and business patterns-

[which] makes it especially difficult for African-American candidates seeking county-wide office to reach out to and communicate with the predominantly white electorate;' 'significant evidence of intimidation and harassment' of blacks 'at the polls during the 1980s and 1990s and even as late as the 2000 general election." *October 25, 2006 Hearing*, at 9.

- Armand Derfner, noting that: "Perhaps the most telling sign of voting discrimination in Charleston County elections was the Court's finding that racial appeals of a subtle or not-so-subtle (i.e., overt) nature were used in election campaigns. The most telling of these examples were white candidates running ads or circulating fliers with photos of their black opponents—sometimes even darkened to leave no mistake—to call attention to the black candidates' race in case any white voter happened to be unaware of it." *October 20, 2005 Hearing*, at 84. Derfner also cited the evidence in the case of severe racially polarized voting, with evidence that white voters rarely voted for candidates favored by black voters, especially when the candidates were themselves black, the result being that only 3 of 41 individuals elected to County Council since 1970 were minority even though blacks constituted one third of the population. *May 17, 2006 Hearing*, at 180-81; *see also March 8, 2006 Hearing Vol. I*, at 85 (Wade Henderson).

1088.   Congress received testimony from Armand Derfner, that after the *Charleston County* plaintiffs won, and the case was upheld on appeal, removing the at-large system, the South Carolina legislature, led by legislators from Charleston County, tried to implement an identical system for the County's School Board (which had previously used a different system). The Department of Justice denied preclearance. *October 20, 2005 Hearing*, at 85-86.

1089.   Congress received a prepared statement by Meredith Bell-Platts, Staff Counsel for American Civil Liberties Union Voting Rights Project, included in the National Commission on the Voting Rights Act Report, that in the ACLU's successful malapportionment case of *Colleton County v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), "Our expert found that no black candidate of choice of black voters was elected in contested general elections to the General Assembly from a district that was less than 43% nonwhite. Indeed South Carolina Republican Governor Mark Sanford was asked in May about the prospects of blacks winning statewide office in South Carolina; he responded, 'I think there never will be.' The State, May 10, 2005. This was said with the recognition that South Carolina has one of the highest percentages of black population

in the nation at just less than one-third of all residents." Bell-Platts also described that, "legislative Democrats, led by then-governor Jim Hodges, argued that black percentages in majority-black senatorial districts could be reduced in order to ward off further electoral failures for the Democratic Party in senatorial elections—a position specifically rejected by the three-judge court. Furthermore, during the trial, it was reported that a collection of citizens in Lexington County, S.C. informed one of their Republican representatives that they didn't want any n-----s on the Lexington County delegation—referring specifically to a plan that had drawn a black representative into portions of Lexington County." *October 25, 2005 Scope Hearing Vol. II*, at 3282.

1090.   Congress received a statement from Senator Arlen Specter of Pennsylvania regarding a Virginia example of discrimination found by courts as:

> *Pegram* v. *City of Newport News*, 4:94cv79 (E.D.Va. 1994) (ACLU Rep., p. 714). In July 1994, the ACLU filed suit on behalf of African American voters challenging the at-large method of city elections in the City of Newport News. On October 26, 1994, a consent decree was entered in which the City admitted that its at-large system violated section 2 as well as the Fourteenth and Fifteenth Amendments. The consent decree required the City to implement a racially fair election plan." 152 Cong. Rec. S7951.

1091.   The House Judiciary Committee cited to Citizens for a *Better Gretna v. City of Gretna*, as an example of Section 2 litigation. In that case, African-American voters brought a Section 2 action under the VRA challenging the city's at-large aldermanic elections. The court found that African-Americans had been excluded from the slating process, no African-American had ever been elected alderman though they comprised 28% of the population, the city had a majority vote requirement, and there was "persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process." H.R. Rep. No. 109-478, at 53.

1092.   Congress received testimony from Wade Henderson that in *Major v. Treen*, "[t]he court granted the plaintiffs' declaratory judgment that Act 20 violated Section 2 of VRA by diluting black voting strength; enjoined the state of Louisiana from conducting elections with Act 20 districts; and gave the legislature the opportunity to redraw the districts.  The resulting district led to the election of Louisiana's first African-American Congressman since reconstruction." *March 8, 2006 Hearing Vol. I*, at 82; *see also March 8, 2006 Hearing Vol. II*, at 1608-09.

1093.   Senator Patrick Leahy of Vermont provided the following example from the record before Congress: "In 1983, African-American legislators were excluded from legislative sessions held to develop Louisiana's post-census redistricting plan after negotiations stalled.  The governor had threatened to veto a proposed plan that would create one African-American majority district and the Senate rejected the governor's plan to create all white majority districts. In the absence of minority legislators, a compromise—Act 20—was reached that sacrificed the majority-minority district despite the fact that—after a marked increase in the previous decade—the highly-concentrated African-American population now made up 48.9 percent of the voting age population in Orleans Parish.  Act 20 was struck down by a 1982 section 2 case.  The remedied district led to the election of Louisiana's first African-American congressman since reconstruction.  This is also from Debo P. Adegbile, 'Voting Rights in Louisiana: 1982-2006,' RenewTheVRA.org at 16."  152 Cong. Rec. S7747.

1094.   Congress heard testimony from Nadine Strossen, President of the American Civil Liberties Union, that "[i]n Louisiana, no state house of representatives redistricting plan has ever been precleared since the VRA was passed forty years ago.  But in 2003, the state wanted to move forward with redistricting plans anyway, and deleted those provisions in the state redistricting guidelines that set out Louisiana's obligations under the VRA.  The state also chose to