spend taxpayer money to protect a redistricting plan that was designed to diminish the political opportunities of African-American voters. After litigation challenged these practices, a federal court decision forced the state to withdraw its original plan and restore a district where African Americans had an opportunity to elect a candidate of choice." *March 8, 2006 Hearing Vol. I*, at 1292.

1095.    Congress received information from Laughlin McDonald that the San Carlos Apache Tribe and several of its members, among others, challenged legislative and congressional redistricting in Arizona following the 1980 census as violating the constitution and the Voting Rights Act in the case of *Goddard v. Babbitt*, 536 F. Supp. 538, 541 (D. Ariz. 1982). The Department of Justice objected to the state's legislative plan and district court concluded that fragmentation of tribe under proposed plan has the effect of diluting the San Carlos Apache Tribal voting strength and dividing the Apache community of interest. *October 25, 2005 Need Hearing*, at 111.

1096.    Congress received information from Walter Fields, Director of Political Development at the Community Service Society (CSS), "The Community Service Society has used legal advocacy to ensure full and fair representation of the City's poorest neighborhoods, especially Black and Latino voters. In 1989 CSS successfully used the Voting Rights Act to stop the discriminatory purge of over 320,000 voters in *United Parents Associations v. New York City Board of Elections*. Subject to the State's non-voting purge, CSS proved that the law's application had an unlawful, discriminatory effect as black and Latino voters were 32 percent  more likely to be purged for non-voting. The federal National Voter Registration Act of 1993 eventually superseded and eliminated New York's non-voting purge." *October 25, 2005 Scope Hearing Vol. II*, at 3264.

### c)    Section 2 Litigation in Texas

1097.    Congress received the Report of the National Commission on the Voting Rights Act which stated that, compared to other states, Texas has largest number of Section 2 suits resolved on behalf of minority plaintiffs since 1982. In Texas, 206 such suits, both reported and unreported, were identified. As a result of these 206 cases, 197 jurisdictions changed their discriminatory voting procedures. The map shows that 110 of Texas' 254 counties were affected at least once by the suits, for a total of 274 times. *March 8, 2006 Hearing Vol. I*, at 207. *See also* H.R. Rep. No. 109-478, at 35 (noting that Federal courts reached the merits of a Section 2 claim in 26 reported cases from Texas and identified Section 2 violations in seven cases.).

1098.    Congress received a statement from Senator Arlen Specter of Pennsylvania regarding a Texas example of discrimination found by courts as:

> *League of United Latin American Citizens* v. *Midland Indep. Sch. Dist.*, 648 F. Supp. 596 (W.D. Tex. 1986) (U Mich. L.Rep., *http://www.votingreport.org*). Latino plaintiffs argued that the at-large election system diluted their votes. The parties agreed to a court order that eliminated the election scheme and defendants submitted a proposal in which four trustees would be elected from single-member districts and three would be elected at large. Plaintiffs objected and filed a plan in which all seven trustees would be elected from single-member districts. The court, applying *Gingles* and the totality-of-circumstances tests, held that defendants' plans violated section 2 and the Fourteenth and Fifteenth Amendment. The court ordered that a seven-member district plan for electing trustees be immediately implemented according to district boundaries drawn by the court. 152 Cong. Rec. S7951.

1099.    Congress received the a report authored by Professor Ellen Katz, which states that, in the *City of Dallas, Tex.* litigation, 734 F. Supp. 1317, 1324, 1368 (N.D. Tex. 1990) the court found that "the city's attempts to keep a partially at-large election system after minority voters petitioned for its change and city officials recognized the existing system 'denied both blacks and Hispanics access to any of the 3 at-large seats.'" The Report states that "a 1989 newspaper col-

umn warning that a vote for the African-American candidate running against the incumbent white mayor 'could lead to racial violence and white flight' was classified as a racial appeal." The Report notes the court's finding that "an organization known as the Citizen's Charter Association had denied black and Latino candidates access to slating through 1977." *October 18, 2005 Hearing,* at 990, 1000.

1100.   Congress received a report authored by Professor Ellen Katz which states that, in the *Terrell, Tex.* litigation, the court found the "City's reliance on at-large elections with staggered terms for five member city council, adjudicated on the merits to constitute intentional racial discrimination; [t]he city's settlement of a lawsuit 'alleging that poll workers improperly refused to let certain black citizens vote; [and] [t]he city's refusal in 1983 to establish a polling place repeatedly sought by black residents." *October 18, 2005 Hearing,* at 991.

1101.   Congress received information from Jose Garza, that the court in *Lulac v. Northeast Ind. School Dist.* found "the at large election system for the election of trustees to the Northeast Independent School District to violate Section 2 of the Voting Rights Act.  However, the Defendant school board was reluctant to adopt single member districts and instead determined to appeal." *October 20, 2005 Hearing*, at 38.

1102.   Congress heard further testimony from Jose Garza that in the Northeast Independent School District in Texas, a study concluded that around 98% of all winning candidates in the district from 1973-1994 were white, and one Hispanic candidate had won 1 of 48 elections, and no black candidates had ever won. *October 20, 2005 Hearing*, at 13.

1103.   Congress received testimony from Jose Garza, Attorney for the League of United Latin American Citizens, that in the case of *Sierra v. El Paso ISD* (1984), the court found that the El Paso ISD school board elections violated the VRA because the present at-large, by-place,

majority runoff; nonpartisan election of school board trustees does tend to deprive Mexican-Americans of an equal opportunity to elect candidates of their choice. This finding is based primarily upon the consideration of the first three factors, to wit: (1) historical discrimination of an official nature that affected the exercise by Mexican-Americans of their rights to register and vote; (2) the high degree of voter polarization along ethnic lines in elections conducted by the El Paso Independent School District; and (3) the extent to which the at-large, by-place, majority runoff, nonpartisan election procedure enhances the difficulties faced by a Mexican-American candidate seeking election to the position of school board trustee, it is not without significance that, at the present time, and for the last four years, a school district, of which 70 percent of the students are Mexican-American, of which over 50 percent of the residents are Mexican-American, and of which 43 percent of the registered voters are Mexican-American, has had only one trustee out of seven who is of Mexican-American descent. Although the other factors listed by Congress must be considered, and although each has been considered in this opinion, the Court's findings with respect to the first three factors in combination inescapably point to a result which violates the Voting Rights Act as amended in 1982. Therefore, judgment must be entered in favor of the Plaintiffs, and the Defendants must be ordered to implement single-member districts in place of the present at-large scheme." *October 20, 2005 Hearing*, at 47.

1104. Congress received further evidence from Jose Garza that in the case of *LULAC v. Haskell Conosol. Indep. School Dist.,* 193-CV-0178(C) (N.D. Tex. Oct. 21, 1994), his "analysis of the district's electoral history indicates that under the current method of election, which utilizes seven single-member districts, Hispanic voters have been able to elect candidates of their choice to office in at least one district. We note that this election method resulted from the settlement of federal litigation claiming that the previous method, an at-large system with staggered

terms, violated Section 2 of the Voting Rights Act.  The school district implemented the single-member district system, which contained one district with a Hispanic population majority, in 1995." *October 20, 2005 Hearing*, at 63.

1105.   Congress heard evidence that a Section 2 violation was found in *LULAC v. Mattox*, 1989*,* No. MO-88-CA-154 (W.D. Tex, Midland-Odessa Div.)  *October 18, 2005 Hearing,* at 1250.

### d)      Section 2 Cases Filed Against Covered Jurisdictions Comapred to non-Covered Jurisdictions

1106.   In a report presented to the House Judiciary Committee, "it was shown that of all the successful litigation undertaken in the last 25 years pursuant to Section 2, more than half of the cases were filed in covered jurisdictions, which contain less than 39 percent of the country's total population."  H.R. Rep. No. 109-478, at 53.  *See also*, *May 9, 2006 Hearing*, at 43-44.

1107.   Congress received a report authored by Professor Ellen Katz which states that 57 percent of successful Section 2 cases were filed in jurisdictions covered by Section 5, which in 2000 contained less than one-quarter of the nation's population — 39 percent of the U.S. African-Americans, 31.8 percent of Latinos, and 25 percent of Native Americans.  *March 8, 2006 Hearing Vol. I*, at 202-03; *see also May 9, 2006 Hearing*, at 47 (Chandler Davidson); *March 8, 2006 Hearing Vol. I*, at 203 (Commission Report); *see also May 9, 2006 Hearing*, at 160 (Theodore Shaw).

1108.   Congress received a report authored by Professor Ellen Katz which states that, "[p]laintiffs won more Section 2 lawsuits in Section 5-covered jurisdictions than they did in non-covered jurisdictions.  Of the 114 successful plaintiff outcomes documented, 64 originated in covered jurisdictions and 50 elsewhere, even though less than one-quarter of the U.S. population resides in a jurisdiction covered by Section 5.  Plaintiffs in covered jurisdictions also won a

higher percentage of the cases decided than did those in non-covered ones. Thirty percent of the 164 lawsuits published in non-covered jurisdictions ended favorably for plaintiffs, while 40.5% of the 158 lawsuits from covered jurisdictions produced a result favorable to the plaintiffs." *October 18, 2005 Hearing,* at 974. *See also May 9, 2006 Hearing*, at 44-45 (testimony of Chandler Davidson); *May 16, 2006 Hearing*, at 42 (testimony of Anita Earls); *May 9, 2006 Hearing*, at 159 (written responses by Theodore Shaw).

### 5. Evidence Before Congress: Minority Language Discrimination in Section 4 Covered Jurisdictions

#### a) Congressional Findings

1109. The House Judiciary Committee found that "[i]n authorizing Sections 4(f) and 203 [in 1975], Congress did not want language to be a barrier to exercising the most fundamental right in our system of government, a right which had been historically compromised by the deliberate barriers erected by the administration of English-only elections, barriers that were exacerbated by the unequal educational opportunities that existed and continue to exist." H.R. Rep. No. 109-478, at 60.

1110. The House Judiciary Committee "received testimony revealing that 63 percent of Asian Americans in New York reside in limited English proficient homes. Hispanics are similarly situated, with more than 75 percent of Latinos nationwide reportedly speaking a language other than English in the home, and 23 percent of registered Latinos identifying Spanish as their primary language." *Id.* at 46.

1111. The House Judiciary Committee found that although "our Nation's educational system has improved" since 1975, "disparities in education continue to exist, resulting in the disparate treatment of language minority citizens and students. The evidence reveals that English lan-

guage learner students must rely almost exclusively on the judicial system to protect their rights to equal educational opportunities." *Id.* at 60.

1112.   The House Judiciary Committee stated that "Section 4(f) and 203 level the playing field for language minority citizens, ensuring that the most fundamental right of all citizens is preserved regardless of one's ability to speak English well." *Id.* at 61.

1113.   The House Judiciary Committee found that "[f]or non-Native English speakers, learning English takes several years to even obtain a fundamental understanding of the English language—certainly not enough to understand complex ballots that native English speaking citizens often do not understand." *Id.* at 61-62.

1114.   The House Judiciary Committee found that "The continued need for bilingual support is reflected by: (1) the increased number of linguistically isolated households, particularly among Hispanic and Asian American communities; (2) the increased number of language minority students who are considered to be English language learners, such that students do not speak English well enough to understand the required curriculum and require supplemental classes; (3) the continued disparity in educational opportunities as demonstrated by the disparate impact that budget shortfalls have on language minority citizens, and the continued need for litigation to protect English language learners; and (4) the lack of available literacy centers and English as a Second Language programs." *Id.* at 59.

1115.   Congress found that "there is a positive correlation between the bilingual assistance provisions and increased voter registration levels in jurisdictions fully complying with Section 203." *Id.* at 58.

1116.   Congress found that "[p]resent day discrimination experienced by racial and language minority voters is contained in evidence, including the objections interposed by the Department

of Justice in covered jurisdictions; the section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters; the enforcement actions filed to protect language minorities; and the tens of thousands of Federal observers dispatched to monitor polls in jurisdictions covered by the Voting Rights Act of 1965." *Id.* at 2.

1117.   The House Judiciary Committee found significant disparities in registration and turnout between white and language-minority citizens. *Id.* at 29.

1118.   The House Judiciary Committee found "that the number of language minority officials elected to office has failed to keep pace with population growth among the minority communities." *Id.* at 33.

1119.   The House Judiciary Committee found that "Federal observers have become increasingly necessary to ensure that language assistance within jurisdictions covered by Section 203 are fulfilled." *Id.* at 44.

1120.   The House Judiciary Committee found that "observers were able to identify and report back to the Department of Justice instances in which language minority voters fell victim to the harassment and intimidation of polling officials.  For example, observers were recently assigned to covered jurisdictions, such as in Georgia, Alabama, and Texas, to protect Latino and Asian American voters." *Id.* at 45.

1121.   The House Judiciary Committee found that "Latinos, Asian Americans, Alaskan Natives and Native Americans continue to suffer from discrimination in voting." *Id.* at 45.

1122.   The House Judiciary Committee cited the following language from the Supreme Court's 1923 decision in *Meyers v. Nebraska*:  "Certain fundamental rights [are guaranteed] to all those who speak other languages as well as to those born with English on the tongue. Perhaps it would be advantageous if all had ready understanding of our ordinary speech, but this cannot

be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited means." *Id.* at 60.

1123.   The House Judiciary Committee cited the following language from the Supreme Court's decision in *Katzenbach v. Morgan*: "In 1966, the Supreme Court upheld Section 4(e) of the VRA, finding that Congress was within its authority to 'question whether denial of a right so precious and fundamental in our society [the right to vote] was a necessary and or appropriate means of encouraging persons to learn English or of furthering the goal of an intelligent exercise of the franchise.'" *Id.* at 60.

1124.   The House Judiciary received testimony and cited court findings showing the disparate educational opportunities Native Alaskan citizens experience:  "[T]estimony revealed that during 'the 2003-2004 school year, the statewide graduation rate for all students was 62.9 percent compared to the 47.5 percent of Alaska Native students who graduated.'" In *Kasayulie v. State of Alaska*, the court "found the discrepancy in funding for school construction in urban and rural Alaska unconstitutionally discriminated against Alaska Natives." *Id.* at 50-51.

1125.   Regarding the continuation of the minority language provisions, the House Judiciary Committee stated that "[c]itizens in the process of learning to read should not be denied assistance in voting, and such citizens should not be denied aid for lack of educational opportunities." *Id.* at 95.

1126.   The House Judiciary Committee noted that "[s]ince 1992, at least 10 successful cases have been filed, with litigation and consent decrees pending in the three States that are covered statewide under Section 4(f)(4) of the Act, Texas, Alaska, Arizona, and Florida and in other States with large language minority populations, including California and New York." *Id.* at 60.

**b)    Minority-Language Discrimination**

1127.   Testimony was received by the House Judiciary Committee "from language minority citizens in New York, Alaska, Arizona, California, Florida, and South Dakota, all of whom identified . . . tactics used to keep Native Alaskans, Native Americans, Asian Americans and Latinos from registering and casting effective ballots. These tactics include providing ineffective language assistance and fragmenting and packing Hispanic and Asian Americans." *Id.* at 45

1128.   The House Judiciary Committee received evidence revealing "that English language learner students must rely almost exclusively on the judicial system to protect their rights to equal educational opportunities." The Committee noted that "[s]ince 1992, at least 10 successful cases have been filed, with litigation and consent decrees pending in the three States that are covered statewide under Section 4(f)4 of the Act . . . and in other States with large language minority populations, including California and New York." *Id.* at 60.

1129.   "In testimony presented [to the House Judiciary Committee] by the National Congress of American Indians, it was reported that many Native people speak English only as a second language, with many Native Alaskans and Native Americans continuing to speak in their native tongue, particularly among the elders—'many who speak English poorly'—and many tribal businesses that continue to conduct business exclusively or primarily in Native languages." *Id.* at 46.

1130.   The House Judiciary Committee found "that Sections 4(f) and 203 have been instrumental in fostering progress among language minority citizens." *Id.* at 18.

1131.   The report, "Minority Language Assistance Practices in Public Elections" cites the congressional record describing the type of discrimination that triggers Section 4(f)(4) coverage of a jurisdiction: "The Section 4(f)(4) trigger targets 'those jurisdictions with the more serious problems' of voting discrimination against language minorities. Specifically, 'the more severe

remedies . . . are premised not only on educational disparities' (like the less stringent provisions under Section 203(c)), 'but also on evidence that language minorities have been subjected to 'physical, economic, and political intimidation' when they seek to participate in the political process.'" *March 8, 2006 Hearing Vol. II*, at 2136 (internal citations omitted).

1132.    The report, "Minority Language Assistance Practices in Public Elections" explains what it means to be subject to Section 4(f)(4) of the Voting Rights Act:  "The Section 4(f)(4) trigger is 'essentially identical to the traditional trigger' found in Section 4(b) of the Act, which already had proven effective in covering jurisdictions with a history of discrimination against African-Americans.  S. Rep No., 94-295 at 32, *reprinted in* 1975 U.S.C.C.A.N. 798.  States or political subdivisions covered under Section 4(f)(4) have to comply with Section 203 by providing all election materials, including assistance and ballots, in the language of the applicable language minority group.  See 28 C.F.R. § 55.8(a).  In addition, 4(f)(4) covered jurisdictions are subject to all the Act's special provisions, including administrative preclearance of voting changes under Section 5, . . . eligible voters, and election coverage by federal Observers." *March 8, 2006 Hearing Vol. II*, at 2137.

1133.    Congress heard testimony from John Trasvina, that "[i]n the State of Texas alone, the U.S. Census found in 2002 that there were 818,185 Latino voting-age citizens" and that "nearly one out of every four Latino voting-age citizens in the state [is] not yet fully proficient in English." *June 13, 2006 Hearing*, at 348.

1134.    Congress received written testimony from Alexander Keyssar noting that "[t]he denial of political rights to language minorities also has a long and complex history, dating back at least to the passage of the first literacy tests in the middle of the nineteenth century.  As late as the 1940s, eighteen states denied the franchise to men and women who could not establish that

they were literate in English. Although such restrictions were often justified as methods of insuring that the electorate was well-informed, in practice they commonly served to suppress the political participation of particular ethnic populations. The same was true of the more informal barriers that existed when non-English speaking citizens encountered ballots printed only in English." *July 13, 2006 Hearing*, at 248.

1135.   Wade Henderson presented Congress with a summary report from the RenewtheVRA.org's Texas State Report stating that "[t]he Census Bureau estimates that of the Spanish-speaking Latino population [in Texas] over the age of 5, approximately 29.3 percent speaks English 'not well,' 'not at all' or speaks an alternative language[.] Statistics on the Spanish-speaking Latino population indicate that because of their deficiency in English language skills they are less likely to participate in the American electoral process." *March 8, 2006 Hearing Vol. I*, at 69-70. *See also generally,* Wolfson Decl. Ex. 8,

1136.   Wade Henderson presented Congress with a report entitled, "Voting Rights in Alaska, 1982-2006" that indicated that bilingual election-related assistance in Alaska, mandated pursuant to Section 203, is inadequate. The report stated that the 1) "[t]he Native groups identified by the Census Bureau for purposes of Alaska's compliance with Section 203 do not correspond to Alaska's twenty language groups"; 2) "[i]nterviews with Native voters and surveys reveal that even oral assistance is not always available"; 3) "[a]vailability of oral assistance is not advertised; phone hotline is in English only"; 4) "Alaska provides no written voting materials in any native languages." *March 8, 2006 Hearing Vol. I*, at 1341.

1137.   Congress received evidence through a report entitled, "Voting Rights in Arizona 1982-2006" (Arizona State Report), the Attorney General in 1989 entered a Consent Decree with Apache County, Arizona, in an action alleging that the State of Arizona and Apache and Navajo

Counties employed discriminatory voter registration, absentee ballot, and voter registration can-cellation procedures, as well as failed to implement effective bilingual election procedures as re-quired by Section 4(f)(4). *Id.* at 1408

1138.   Wade Henderson submitted a report to Congress ("Voting Rights in Alaska, 1982-2006") which stated that, "[s]ince its inclusion in the VRA in 1975, Alaska appears to have not complied with its obligation to provide voting assistance in Alaska Native languages.  While it provides intermittent oral assistance, it does not provide any written materials for the thousands of Alaska Natives."  The report notes that, "[s]urveys distributed to tribes throughout Alaska also showed that there is only intermittent language assistance readily available." *Id.* at 1337, 1340.

1139.   Wade Henderson submitted a report to Congress ("Voting Rights in Alaska, 1982-2006") which indicated that both oral language and written language assistance are "intermit-tently" available at the polls.  Henderson presented information that while Alaska does provide sample ballots and other written materials in Tagalog for the Filipino population in Kodiak, "it does not provide written materials for *any* of the 20 Native languages in Alaska." *Id.* at 1341-1342 (emphasis in original).

1140.   Wade Henderson presented Congress with a report from the RenewtheVRA.org's Alaska State Report regarding voting discrimination in Alaska that stated "[i]n interviews con-ducted with Alaska Natives in October 2005, several residents located within one of the fourteen 203 covered jurisdictions in Alaska indicated that assistance was not available in their Native language." *March 8, 2006 Hearing Vol. I,* at 76.

1141.   Congress received evidence of a report on voting rights in Arizona that stated that during the 2004 elections in Maricopa and Pima Counties, officials only provided English ballots

and did not have any Spanish speaking poll workers. These failures both constitute violations of Section 203. *March 8, 2006 Hearing Vol. III*, at 3978.

1142. Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-2006") which stated that "[s]ince 1982 there have been more than 1200 federal observers deployed to Apache, Navajo, and Yuma Counties [in Arizona], identifying substantial non-compliance in the availability and quality of language assistance to American Indian and Latino voting-age citizens. *March 8, 2006 Hearing Vol. I*, at 1367.

1143. Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-2006") which stated that as recently as 2002, Department of Justice observers identified significant non-compliance with Section 203 for Native American voters in Apache and Navajo counties in Arizona. *Id.* at 1379.

1144. Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-2006") which stated that in 2002 the Department of Justice identified substantial noncompliance with Section 203 by Apache County, Arizona denying thousands of American Indian voting-age citizens equal access to the election process. *Id* at 1367.

1145. Wade Henderson submitted a report to Congress ("Voting Rights in Alaska, 1982-2006") which indicated that a survey "distributed to tribes throughout Alaska also showed that there is only intermittent language assistance readily available." Henderson presented information showing that "[a]s a result of the inconsistent language assistance, many Alaska Natives resort to self-help." *Id.* at 1340.

1146. The National Commission of the Voting Rights Act presented Congress with a report in which Penny Pew, Elections Director of Apache County, Arizona since 2001, gave detailed testimony of her efforts in providing language assistance to the 35,000 Native American regis-

tered voters in a county of 11,000 square miles. Despite challenges, Pew "was enthusiastic about the language assistance her office provided to Navajos" and assured the Commission that "reauthorization [of Section 203] will help us continue with our program." *Id* at 306 (brackets in original).

1147.   Wan Kim testified before Congress that Section 203 enforcement efforts have made a tremendous impact in enhancing minority representation in Harris County, Texas. Assistant Attorney General Kim stated that an agreement order in Harris County "helped double Vietnamese voter turnout, and the first Vietnamese candidate in history was elected to the Texas legislature - defeating the incumbent chair of the appropriations committee by 16 votes out of over 40,000 cast." *May 10, 2006 Hearing*, at 119; *see also November 8, 2006 Hearing Part I*, at 1383-1384 (prepared statement of the Asian American Justice Center); *March 8, 2006 Hearing Vol. I*, at 193 (summary of Rogene Calvert testimony).

1148.   In testimony before the National Commission on the Voting Rights Act which was later submitted into the congressional record Rogene Calvert testified that in Harris County, Texas, minority language assistance was absolutely necessary to increasing access to the polls for minority language speakers. She testified that upon inquiring about Harris county voluntarily providing assistance in Chinese, she was told by the County Clerk that "unless it was mandatory, she wouldn't be as 'enthusiastic.'" *Bilingual Education Requirements Hearing Part I*, at 1412-1413.

1149.   Wade Henderson presented Congress with an excerpt from the report from the *RenewtheVRA.org*'s Texas State Report (Wolfson Decl. Ex. 8) detailing the 2005 Department of Justice claim against Ector County "on grounds that the county had failed to provide a sufficient number of bilingual poll workers . . . and had failed to effectively publicize the availability of

bilingual voting materials and services. The county admitted to wrongdoing and agreed to a con-
sent decree and 'required the immediate implementation of a Spanish language program for mi-
nority constituents, as well as and the use of federal observers during election periods to monitor
and ensure their compliance.'" *March 8, 2006 Hearing Vol. I*, at 70.

1150.  Nina Perales presented Congress with information regarding a 2005 study by the
Mexican American Legal Defense Fund (MALDEF) evaluating the availability of translated ma-
terials and language assistance in Texas. The MALDEF study showed that "of the 101 counties
investigated, 80 percent were unable to produce voter registration forms, official ballots, provi-
sional ballots and their written voting instructions; only one county was able to produce evidence
of full compliance with the language minority provisions of the Voting Rights Act." *Voting
Rights in Texas, 1982-2006* at 4 (Appended to the Statement of Nina Perales, July 13, 2006)
(Wolfson Decl. Ex. 8).

1151.  Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-
2006") which stated that "[i]n 2004, Arizona voters adopted Proposition 200, which has made it
increasingly difficult for voting-age citizens, particularly elderly American Indian voters, to reg-
ister or vote because of lack of requisite documentation including birth certificates and other fed-
eral or state forms of identification." The report stated that "[a]lthough Arizona's English liter-
acy test was repealed in 1972 after being suspended by the 1970 amendments to the Voting
Rights Act, these and other similar measures reinstitute de facto English literacy tests that effec-
tively deny political access to tens of thousands of Arizonans." *March 8, 2006 Hearing Vol. I*, at
1366.

1152.  Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-
2006") which stated that "[a]ccording to the 2000 Census, 20.6 percent (104,967) of Arizona's

510,488 Latino voting-age citizens speak English 'less than very well' and need language assistance to vote." *Id.* at 1375.

1153.   Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-2006") which stated that "[a]ccording to the 2000 Census, 21.7 percent (38,457) of Arizona's American Indian voting-age citizens are LEP and need voting assistance." The report stated that "46.5 percent of all American Indian citizens over the age of 65 are LEP" and "[t]he percentage is even higher among American Indians over 75 years of age, with 49.4 percent (2,994) of the 6,059 persons needing language assistance in the voting process." *Id* at 1375.

1154.   Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-2006") which stated that the Voting Rights Act has had a substantial effect in Arizona on the number of Latinos elected to political office in Arizona. The report stated that "[b]etween 1973 and 1984, Latino representation in Arizona increased by 154 percent, growing from 95 to 184 elected officials." Additionally, Henderson stated that "[b]etween 1985 and 2005, the number of Latino elected officials in Arizona increased by 62 percent, from 230 to 373. Latinos are elected at every level of office in Arizona, except the statewide office where elections are at-large among all voters in the State." *March 8, 2006 Hearing Vol. I*, at 1442-1443.

1155.   John Lewis testified before Congress that Section 203 is "essential" for many tribal communities in Arizona. Lewis stated that because the common language of choice is not English among such communities the minority language provisions are "essential to overcoming voting barriers in language minority communities." *October 18, 2005 Hearing*, at 85.

1156.   Wade Henderson presented Congress with a summary of the report from the RenewtheVRA.org's Texas State Report which discussed a detailed MALDEF survey of "254 counties in Texas, requesting 31 pieces of voting related materials or election data relevant to the admini-

stration of Spanish language voting material and assistance." The report stated "73.6 percent failed to respond," 47 of the 67 counties that responded "were found to be 'fundamentally non-compliant' with Section 203." Only one county was able to provide the vast amount of election material requested. *March 8, 2006 Hearing Vol. I*, at 70. *See also generally* Wolfson Decl. Ex. 8.

1157.   Congress was presented testimony from Ann Marie Tallman that in 2002, Cooke County, Texas purchased a voting system that did not adequately inform Spanish speaking voters. Tallman stated that MALDEF challenged the system, obtained a consent decree for more Spanish speaking poll workers, new training and monitoring and that "this would not have been possible without section 203." *October 18, 2005 Hearing*, at 21.

1158.   Through the Report of the National Commission on the Voting Rights Act, Congress received evidence of the testimony of Nina Perales that, in Texas, there "is widespread noncompliance with both Section 203 and Section 5." As an example of the former, she pointed to Tarrant County (Fort Worth) where the Spanish translation of the ballot was "utterly incoherent, because it had been done by a non-Spanish-speaking staff in the county elections administrator's office." *March 8, 2006 Hearing Vol. I*, at 309.

1159.   Congress received a report from the National Commission on the Voting Rights Act in which, "*Adam Andrews*, executive assistant to the Chair of the Tohono O'odham Nation, stated that the elderly members of his tribe [in Pima County] needed language assistance." Andrews stated that "because of the Section 203 requirements [Pima County] has made affirmative efforts to work with the tribe, including hiring tribal members to serve as poll workers. He said that these efforts have resulted in unprecedented turnout of tribal members in the 2002 and 2004 elections." *March 8, 2006 Hearing Vol. I*, at 311.

1160.   Congress received a report from the National Commission on the Voting Rights Act in which Victor Landa of the Southwest Voter Registration Education Project, stressed the importance to Latino citizens of having election materials, especially registration cards, in Spanish. Landa stated that "[w]ithout materials in Spanish, those citizens whose eagerness . . . to participate . . . would compel them to register even using a form with registration instructions they did not understand, would run the risk of making errors on the registration card that would prevent them from voting if those errors made them wrongly appear ineligible.  Without materials in Spanish, many citizens not fluent in English would find the process too difficult to navigate and would not vote or would not necessarily vote in the way that they had intended." *March 8, 2006 Hearing Vol. I*, at 299.

### 6.    Evidence Before Congress:  Observer Coverage and the Intimidation of Minority Voters

#### a)    Observer Coverage

##### (1)    Congressional Findings

1161.   The House Judiciary Committee found that "Section 8, the Federal observer provision, has played a critical role in preventing and deterring discrimination inside polling locations over the last 25 years."  H.R. Rep. No. 109-478, at 24.

1162.   The House Judiciary Committee found that federal observers "have served a critical oversight function, monitoring and reporting on the actions of voters and poll workers inside the polling locations." *Id. at* 44.

1163.   The House Judiciary Committee found "that observers have played a critical role in law enforcement efforts to protect minority citizens. These observations often become the foundation of Department of Justice enforcement efforts." *Id.*

1164.   Congress found that "[t]he evidence clearly shows the continued need for Federal oversight in jurisdictions covered by the Voting Rights Act of 1965 since 1982, as demonstrated in the counties certified by the Attorney General for Federal examiner and observer coverage and the tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions." *Id. at* 2.

1165.   The House Judiciary Committee stated that "[u]nder Section 8, observers are assigned to a polling location only when there is a reasonable belief that minority citizens are at risk of being disenfranchised." *Id. at* 44.

1166.   The House Judiciary Committee found that "indicia of discrimination are reflected in the continued need for Federal observers to monitor polling places located in covered jurisdictions.  The assignment of Federal officials to these jurisdictions demonstrates that the discriminatory conduct experienced by minority voters is not solely limited to tactics to dilute the voting strength of minorities but continues to include tactics to disenfranchise, such as harassment and intimidation inside polling locations." *Id.*

1167.   The House Judiciary Committee found that "observers were able to identify and report back to the Department of Justice instances in which language minority voters fell victim to the harassment and intimidation of polling officials.  For example, observers were recently assigned to covered jurisdictions, such as in Georgia, Alabama, and Texas, to protect Latino and Asian American voters." *Id. at* 45.

1168.   The House Judiciary Committee report states that "[s]ince 1965, more than 22,000 Federal observers have been assigned to protect minority voters in polling places." *Id. at* 44

1169.   The House Judiciary Committee report states that "[i]n the last 25 years, between 300 and 600 observers have been assigned annually to covered jurisdictions to protect minority voters." *Id. at* 44; *see also November 15, 2005 Hearing*, at 23 (testimony of Barry Weinburg).

1170.   The House Judiciary Committee report states that in 2004, "more than 1,400 observers were sent to 105 jurisdictions in 29 States to protect the rights of minority citizens." H.R. Rep. No. 109-478, at 44. *Cf. March 8, 2006 Hearing Vol. I*, at 184 (report of the National Commission on the Voting Rights Act) ("[I]n 2004 alone, the Department of Justice had dispatched a total of 898 federal observers and monitors to 85 jurisdictions.").

### (2)    Statistical Evidence

1171.   "The Office of Personnel Management reported to the [House Judiciary] Committee that it has worked with the Department of Justice to assign more than 26,000 observers to 22 States, over the last 40 years, with the greatest number of Federal observers having been assigned to Mississippi." H.R. Rep. No. 109-478, at 24; *see also October 20, 2005 Hearing*, at 251 (statement of Chellie Pingree); *March 8, 2006 Hearing Vol. I*, at 152 (report of the National Commission on the Voting Rights Act) ("[s]ince 1966, a total of 25,000 . . . roughly 25,000"); *March 8, 2006 Hearing Vol. I*, at 43 (testimony of Nadine Strossen) (since 1966, 25,000 observers); *November 15, 2005 Hearing*, at 29, 47-48 (statement of Barry Weinberg) (over 23,000 federal observers from 1966 through 2000, 4,393 since 1990).

1172.   The report of the National Commission on the Voting Rights Act, which was presented to Congress, included information showing the great majority of observer coverage in the covered jurisdictions occurred in counties that were significantly nonwhite. *March 8, 2006 Hearing Vol. I*, at 181.

1173.   The following statement was made to Congress and was appended to Nadine Strossen's testimony:  "Post-1982 data reveals that several thousand observers were sent to 622 covered locations.  Prior to 1982, observers were sent to 520 covered jurisdictions.  In Mississippi alone after 1982 there were 250 sites involving 3,000 observers.  Five of six southern states accounted for 66% of all post-1982 locations needing observers.  During the 2004 election alone, observers were sent to locations in 25 states.  DOJ dispatched 898 federal observers and monitors to 85 jurisdictions."  *Id.* at 1298 (footnote omitted); *see also May 9, 2006 Hearing*, at 6 (testimony of Chandler Davidson).

1174.   In a statement provided to Congress, Joe Rich, former chief of the Department of Justice Civil Rights Division's Voting Section stated that "in the 2004 general election, the Department of Justice dispatched 840 federal observers to 27 jurisdictions and sen[t] monitors to 58 other jurisdictions."  *October 18, 2005 Hearing,* at 67.

1175.   Wan Kim testified before Congress that for the 2004 election, "the Civil Rights Division worked with the Office of Personnel Management to send nearly 1,500 observers to cover 55 elections in 30 jurisdictions in 14 different States."  *May 10, 2006 Hearing*, at 5.

### (3)    Sending of Observers to Non-Texas Jurisdictions

1176.   The National Commission on the Voting Rights Act, in a report presented to Congress, included the following statement about the continued need for observers: "[O]bservers have played a major role for decades in deterring race-based discrimination on Election Day, and evidence in numerous cities across the nation indicates the observers have served a useful role in the current century. . . . The presence of these observers on Election Day has 'consistently . . . had a calming effect curing highly charged elections in which there have been allegations of pos-

sible Voting Rights Act violations and has helped deter discriminatory acts[.]'" *March 8, 2006 Hearing Vol. I*, at 184 (footnote omitted).

1177.  In his testimony before Congress, Wan Kim made the following statement: "[W]e think that sending observers and monitors to help assist local election officials conduct the elections is enormously important because they help to prevent problems before there is a real problem, and they help to make sure that no one at the polls is denied access to the polls consistent with Federal law and constitutional law.  The decision on when to appoint observers and monitors is one based upon the facts and circumstances on the ground with respect to any particular election." *May 10, 2006 Hearing*, at 8.

1178.  Congress received testimony from Barry Weinberg that the existence of federal observers is "crucial" and "irreplaceable in the Voting Rights Act."  According to Weinberg, this is because "there's no other way for the law enforcement function of the Justice Department to be able to be performed with regard to harassment and intimidation and disenfranchisement of racial and language minority group members in the polling place on Election Day." *November 15, 2005 Hearing*, at 18.

1179.  Congress received the following testimony from Barry Weinberg regarding the continued need for federal observers:  "I think that the use of Federal observers in law enforcement is important and ought to be continued." *Id.*

1180.  Wade Henderson testified before Congress that the observer provision of the Voting Rights Act "ha[s] played a significant role in protecting the rights of minority citizens." *March 8, 2006 Hearing Vol. I*, at 45.

1181.  As part of the supplement to the report by the National Commission on the Voting Rights Act, Congress received a statement from Anita Earls "stressed the important role federal

observers play, as provided for under the Voting Rights Act, in preventing discrimination because of their ability to get inside polling places." *Id.* at 300-301.

1182.   Armand Derfner testified before Congress that "the need for federal examiners under Sections 6 and 7 declined as registration barriers largely disappeared, but the need for federal election observers under Section 8 increased as the focus of efforts shifted from registration office difficulties to Election Day problems." *October 20, 2005 Hearing*, at 81.

1183.   As part of a transcript to a hearing of the National Commission on the Voting Rights Act, Congress received the following statement from Mark Posner, a former Department of Justice lawyer: "Of course observers are not sent out willy-nilly but are sent out after the Department identifies potential problems on Election Day and they're a way to try to prevent those problems from occurring, to try to have people on the ground should problems occur." Posner stated that "there has been a close connection between observer activity . . . and subsequent lawsuits and enforcement actions and work under [Section] 203[.] [I]f you take it [the sending of federal observers] as a whole, I think it is a clear indication of the presence of problems." *March 8, 2006 Hearing Vol. I*, at 236 n. 203.

1184.   The report by the National Commission on the Voting Rights Act received by Congress included the following finding: "[Observer] coverage is related to potential vote discrimination: observers are sent because there are reasonable grounds in the opinion of the Department of Justice to expect discrimination on Election Day. However, it is obvious that an observer coverage does not represent the same type of phenomenon as does an objection, a withdrawal, or a declaratory judgment. . . . Nonetheless, as an indicator of at least potential (and sometimes actual) vote discrimination, the list of observer coverages is an important data set." *Id.* at 180-181.

1185.   The House Judiciary Committee received documentation indicating that "five of the six States originally covered by the VRA (Louisiana, Georgia, Alabama, South Carolina, and Mississippi) accounted for approximately 66 percent of all the observer coverages since 1982." H.R. Rep. No. 109-478, at 24-25; *see id.* at 44.

1186.   The report Congress received from the National Commission on the Voting Rights Act included statements from Alabama State Senator Bobby Singleton about the importance of federal observers in preventing discrimination at the polls in Hale County, Alabama.  Singleton stated that the presence of observers helped enable black candidates to get elected. *March 8, 2006 Hearing Vol. I*, at 182-183.

1187.   Wade Henderson presented Congress with the following information regarding federal observers in Alabama: "Federal observers were assigned to 174 elections between 1966 and 2004; 67 of those elections occurred after 1982."  *Id.* at 79; *see also May 17, 2006 Hearing*, at 90 (testimony of Fred Gray).

1188.   Joe Rogers, a member of the National Commission on the Voting Rights Act presented the following testimony before Congress regarding the importance of the observer provisions: "Moreover, we heard about the impact of the Voting Rights Act's observer coverage provisions.  Alabama [State] Senator Bobby Singleton is from Hale County, Alabama, where the Department of Justice has sent observers on some 20 separate occasions.  Senator Singleton stated that when the Department of Justice was not present at an election, Whites closed predominantly Black polling places early.  As a result [of] Department of Justice intervention on multiple occasions . . . and Voting Rights Act enforcement measures, Blacks are now a majority of the elected officials within Hale County." *March 8, 2006 Hearing Vol. I*, at 88.

1189.   Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received information that in a 2004 Alabama election, the Department of Justice had sent observers after some local county leaders feared racial unrest at the polls on election day and a black commissioner had received harassing phone calls and personal threats because of his role in a new redistricting plan. *March 8, 2006 Hearing Vol. III*, at 3505.

1190.   Jerome Gray testified before Congress regarding an alleged incident in his hometown that resulted in the Department of Justice sending observers: "I received a . . . call from a voter who complained about a clerk's failure to produce a complete and fair voters list. At first, many names were omitted including my 94-year-old mother, a retired educator. I called the clerk, and I got the former mayor on the phone, and I reminded him of the election fiasco we had in 1980 when the clerk at the time had prepared a sloppy voters list that omitted scores of Black voters from the official list. A Black candidate that we supported that year lost by four votes, and our organization, Democratic organization, NAACP, complained to the Department of Justice, and the Justice Department reviewed those complaints, found them to be legitimate, and for the next election sent down some Federal observers to monitor the election." *November 1, 2005 Hearing*, at 46.

1191.   Wade Henderson presented Congress with the following information regarding federal observers in Arizona: "Federal observers were assigned to 40 elections between 1966 and 2004; all 40 of those elections occurred after 1982." *March 8, 2006 Hearing Vol. I*, at 79-80; *see also id.* at 275.

1192.   Congress received the following evidence from a report entitled, *Voting Rights in Arizona 1982-2006*, which was appended to the testimony of Wade Henderson: "Since 1982, there have been more than 1200 federal observers deployed to Apache, Navajo, and Yuma Counties,

identifying substantial non-compliance in the availability and quality of language assistance to American Indian and Latino voting-age citizens." *Id.* at 1367.

1193.  Congress received the following evidence from a report entitled, *Voting Rights in Arizona 1982-2006*, which was appended to the testimony of Wade Henderson:  "Northern Arizona has a lengthy history of discrimination against Navajo, Apache, and Hopi voters.  In 1989 and 1994, successful cases were brought against Coconino, Navajo, and Apache Counties for denying American Indian voters access to the political process.  Those same three counties account for nearly half of all of the post-1982 Section 5 objections in Arizona.  Prior to 1998, all of the federal observers and monitors deployed to Arizona were sent to observe elections in Apache and Navajo Counties.  As recently as 2002, the Department of Justice identified significant deficiencies in the availability and quality of language assistance offered to American Indian voters in Apache County." *Id.* at 1379.

1194.  Wade Henderson presented Congress with the following information regarding federal observers in California:  "Federal observers were assigned to 9 elections between 1966 and 2004; seven of those elections occurred after 1982." *Id.* at 80.

1195.  Congress received the following evidence from a report entitled, *Voting Rights in Georgia 1982-2006*, which was appended to the testimony of Wade Henderson:  "Federal observers were present for a total of 87 elections in twenty-eight different Georgia counties since 1965, among which 65.5 percent occurred from 1982 onward.  Eleven of the twenty-eight counties that had elections covered by federal observers post-1982 had not previously been covered, nine had elections covered both before and after 1982 and eight had elections covered only before 1982." *March 8, 2006 Hearing Vol. II,* at 1529; *see also March 8, 2006 Hearing Vol. I,* at 79 (statement of Wade Henderson).

1196.   According to the House Judiciary Committee Report, "[i]n Georgia, observers were present in 28 counties monitoring 57 elections within the State since 1982." H.R. Rep. No. 109-478, at 44. *See also March 8, 2006 Hearing Vol. I*, at 275 (testimony of Wade Henderson) (noting 55 observer coverages in Georgia between August 5, 1982 and 2004).

1197.   Wade Henderson presented Congress with the following information regarding federal observers in Louisiana: "Federal observers were assigned to 67 elections between 1966 and 2004; 15 of those elections occurred after 1982." *March 8, 2006 Hearing Vol. I*, at 80.

1198.   Robert McDuff provided the following information to Congress about federal observers in Mississippi. "In Mississippi, federal observers have been sent to various locations in the state to monitor elections on 540 separate occasions since 1966 - 250 times since the 1982 reauthorization. Both figures are more than in any other state. In fact, Mississippi accounts for 40 percent of the overall elections to which federal observers have been sent since the 1982 reauthorization. Since 1982, observers were sent to 48 of the state's 82 counties. Many of these counties were the subject of repeat visits during that time period. For example, observers monitored 19 elections in Sunflower County, 17 in Noxubee County and 16 in Bolivar County since 1982." *May 10, 2006 Hearing*, at 147-148; *see also March 8, 2006 Hearing Vol. I*, at 80 (statement of Wade Henderson) ("548 elections between 1966 and 2004; 250 of those elections occurred after 1982"); *March 8, 2006 Hearing Vol. I*, at 283 (Report of the National Commission on the Voting Rights Act).

1199.   Wade Henderson presented Congress with the following information regarding federal observers in North Carolina: "Federal observers were assigned to 6 elections between 1966 and 2004; all six of those elections occurred after 1982." *March 8, 2006 Hearing Vol. I*, at 80.

1200.   The House Judiciary Committee "received testimony revealing that more than 800 Federal observers were assigned to covered counties in New York City from 1985 through 2004 to protect Asian American and Latino voters' full participation in the electoral process." H.R. Rep. No. 109-478, at 44-45.

1201.   Congress heard testimony from Theodore Shaw that federal observers have been deployed in a number of elections in New York City since 1992 "because of concerns regarding treatment of Latino voters." *November 9, 2005 Hearing*, at 17.

1202.   Wade Henderson testified before Congress about "the inability to fully comply with Section 203 requirements for Latino voters resulted in the assignment of federal observers in a number of elections" since 1992 in New York, including September 2001 (Kings and New York Counties); October 2001 (Bronx County); and September 2004 (Queens County). *March 8, 2006 Hearing Vol. I*, at 74.

1203.   Wade Henderson testified that "[f]ederal observers have been assigned to 37 elections in South Carolina since 1966," and "[o]f those 37 elections, 23 occurred after 1982." *Id. at* 78, 275; *see also* H.R. Rep. No. 109-478, at 44.

1204.   Wade Henderson testified to the following before Congress regarding observer coverage in South Carolina:  "Most of the communities to which observers have been sent have repeatedly requested assistance under the Act to protect the ability of African-American voters fully to participate in the electoral process.  Those include Bamberg County (1984, 1985); Calhoun County (1984, 1988); Chester (twice in 1990, twice in 1991, 1993 and 1996); Dorchester (1990, 1996 and 2001); Marion (1984 and 1996); and Williamsburg (1984, 1988 and twice in 1996)." *March 8, 2006 Hearing Vol. I*, at 78-79.

**(4)     Sending of Federal Observers to Texas**

1205.   Wade Henderson presented testimony to Congress that in Texas "[f]ederal observers were assigned to 22 elections between 1966 and 2004; 10 of those elections occurred after 1982." *March 8, 2006 Hearing Vol. I*, at 80.

1206.   The House Judiciary Committee Report noted that the Committee received evidence that, from August 5, 1982 to 2004, there were ten observer coverages in Texas.  H.R. Rep. No. 109-478, at 84 (map of Observer Coverage: All States); *see also March 8, 2006 Hearing Vol. I*, at 13 (testimony of Bill Lann Lee).

1207.   The House Judiciary Committee "received testimony demonstrating the importance of the observer report in *United States v. Conecuh County, Alabama* (Civil Action No. 83-1201 (S.D. Ala. June 12, 1984)).  The personal accounts of observers were instrumental in enabling Federal prosecutors to proceed against County officials for discriminatory conduct against African Americans in polling locations."  H.R. Rep. No. 109-478, at 44.

1208.   Congress received evidence in a statement from Barry H. Weinberg, former Deputy Chief of the Voting Rights Division of the Department of Justice, that since 1982, the Department of Justice has sent 101 monitors to elections in Texas.  *Voting Rights Act: Sections 6 and 8*, at 47-48.

1209.   The Department of Justice has certified six Texas counties and one political subdivision other than a county for election monitoring since 1982.  *Voting Rights Act: Sections 6 and 8*, at 264.

### b)      Intimidation of Minority Voters

#### (1)      Statistical Evidence

1210.   Congress was presented with the following information from the supplement to the report of the National Commission on the Voting Rights Act:  "AALDEF [the Asian American

Legal Defense and Education Fund] . . . reported a number of . . . problems reported by Asian Americans in the exit polls.  (The total sample consisted of 10,789 voters in twenty-three cities in eight states.)

- The names of 371 voters were not on the lists of registered voters.
- 126 voters complained that poll workers were discourteous or hostile.
- 239 voters said that poll workers were poorly trained.
- 185 voters were directed to the wrong poll site or election district.
- 385 voters encountered other voting problems."

*March 8, 2006 Hearing Vol. I*, at 315-16.

1211.  Congress was presented with the following information from the supplement to the report of the National Commission on the Voting Rights Act:  "Asian Americans, too, have faced barriers to voting in recent years.  The Asian American Legal Defense and Education Fund (AALDEF) conducted exit polls during the 2004 presidential election in various locales.  Their report, submitted to the Commission, noted that while in most jurisdictions identification was not a voting requirement (aside from the HAVA requirement that first-time voters who registered by mail must provide identification), 'two-thirds (66%) of New York and New Jersey [Asian-American] voters who had registered prior to January 1, 2003 were required to show identification, even though it was not legally required by HAVA.'"  *March 8, 2006 Hearing Vol. I*, at 315.

### (2)    Intimidation of Minority Voters in non-Texas Jurisdictions

1212.  As part of the supplement to the report of the National Commission on the Voting Rights Act, Congress received the following information:  "Apparent discrimination against Latinos, a growing segment of Georgia's population, was described by *Tisha Tallman*, regional counsel for MALDEF.  This discrimination is part of a larger negative response to the rapid influx of Latino immigrants in the South.  She spoke of individuals who, prior to the 2004 primary elections, challenged the citizenship of Latino registered voters at the Registrar's office in Long

County, Georgia, on the basis of nothing more than their Spanish surname, so far as MALDEF could determine. The office required that the voters attend a hearing for the purpose of establishing their citizenship. Tallman believed this had a 'chilling effect' on Latino turnout in the primary. 'We believe that this process was in violation of Georgia law and potentially in violation of Section 2 of the Voting Rights Act,' Tallman said. She had protested this behavior to the State Election Board a week before her testimony to the Commission, but, she said, 'nothing has been done to date in regard to action by the State of Georgia.' The Department of Justice was still investigating." *March 8, 2006 Hearing*, at 327-28 (emphasis in original).

1213.   Congress received a prepared statement from Ihsan Ali Alkhati which referenced a Department of Justice suit brought against the City of Hamtramck, Michigan for alleged discrimination against Arab voters by "challengers" during the 1999 general elections. *October 18, 2005 Hearing*, at 140.

1214.   In response to a written question from Congress, Anita Earls submitted the following testimony: "[I]n Bayou La Batre, Alabama during the 2004 election Asian Americans constituted a third of the electorate and fielded a candidate for city council. Supporters of the Caucasian candidate engaged in systematic voter intimidation through legal challenges to Asian American voters. Allowed by state law, the challenges required voters to fill out a paper ballot and have a registered voter vouch for them. The Department of Justice was able to use the VRA to prevent purely racially targeted challenges from occurring during the general election." *June 13, 2006 Hearing*, at 66-67.

1215.   Congress was presented with the following testimony from Barry Weinberg about the discrimination witnessed by federal observers: "The discriminatory treatment of racial and minority language voters witnessed by the federal observers . . . runs the gamut from actions that

make those voters feel uncomfortable by talking rudely to them, or ridiculing their need for assistance in casting their ballot, to actions that bar them from voting, such as failing to find their names on the lists of registered voters and refusing to allow them to vote on provisional ballots, or misdirecting them to other polling places." *November 15, 2005 Hearing*, at 24.

1216.   Barry Weinberg provided the following testimony to Congress: "White poll workers treated African American voters very differently from the respectful, helpful way in which they treated white voters[.] If the [white] voter's name was not found, often he or she either was allowed to vote anyway, with his or her name added to the poll book, or the person was allowed to vote a provisional or challenged ballot . . . . If, however, the voter was black, the voter was addressed by his or her first name and either was sent away from the polls without voting, or told to stand aside until the white people in line had voted." *Id.* at 30.

1217.   Barry Weinberg testified before Congress that "[i]n some instances, white poll workers would loudly announce the African American voter's inability to read or write, embarrassing the voter in front of his or her neighbors." *Id.* at 30-31.

1218.   Congress was presented with the following testimony from Barry Weinberg: "Minority language voters suffer additional discriminatory treatment when people who speak only English are assigned as polling place workers in areas populated by minority language voters. The polling place workers fail to communicate the voting rules and procedures to the voters, or fail to respond to the voters' questions." *Id.* at 24.

1219.   The record of the National Commission on the Voting Rights Act submitted to Congress included a prepared statement from Jose Garcia of the Institute for Puerto Rican Policy and the Latino Voting Rights Network. In the statement, Garcia said that Latinos have encountered discrimination in voting as a result of policies and practices that include the following:  discrimi-

natory redistricting plans and other issues relating to redistricting; the lack of notices in Spanish at polling places and Spanish-language poll workers; the training of poll workers to discriminate against "foreign-looking and sounding voters"; the use of off-duty police officers and other law enforcement personnel as poll watchers in Latino communities; the use of the media to threaten Latino voters by spreading rumors that illegal aliens caught trying to vote will be deported; the direct harassment of Latino voters by government officials and election administrators; and the moving, without notice, of polling places to inconvenient locations for Latino voters. *October 25, 2005 Scope Hearing Vol. II*, at 3257.

1220.   As an appendix to his written testimony before Congress, Barry Weinberg attached "Excerpts from Plaintiff's Response to Interrogatories and Request for Production of Documents" in *United States v. Conecuh Alabama*, Civil Action No. 83-1201-H (S.D. Ala., June 12, 1984). The interrogatory response contained several examples taken from observer reports in Conecuh County, Alabama where black voters had allegedly been mistreated. *November 15, 2005 Hearing*, at 49-50.

1221.   As part of the report of the National Commission on the Voting Rights Act, Congress was presented with statements from Gwen Patton. Ms. Patton recounted instances of "polling places being relocated in Black Belt counties [in Alabama] without voters knowing where the new sites were, as well as charges filed against people who 'were simply assisting elderly people with the right to vote'" at the polls. *March 8, 2006 Hearing Vol. I*, at 298-299.

1222.   Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from a 1986 article: "After repeated allegations of intimidation of voters in Alabama's 'black belt counties', an agency of the United

Church of Christ organized 'freedom rides' to protest such incidents. The freedom rides were meant to mirror those of the 1960's civil rights era." *March 8, 2006 Hearing Vol. III*, at 3502.

1223.  Through the supplement to the report of the National Commission on the Voting Rights Act, Congress received the following testimony from Alabama State Senator Bobby Singleton about the 1992 election in Hale County, Alabama: "We had at that time, still, white minorities . . . in that community who were still in control of the electoral process, holding the doors, closing the doors on African-American voters before the . . . voting hours were over. I . . . had to go to jail because I was able to snatch the door open and allow people who was coming from the local fish plant . . . whom they did not want to come in, that would have made a difference in the . . . votes on that particular day. We've experienced that in the city of Greensboro . . . over and over again, and even in the county of Hale." *March 8, 2006 Hearing Vol. I*, at 302.

1224.  Barry Weinberg presented to Congress a portion of the United States' responses to interrogatories in *United States v. Conecuh County, Alabama*, Civil Action No. 83-1201-H (S.D. Ala., June 12, 1984). That response contained the following information purportedly noted by observers:

> While providing assistance to a black voter, white poll official Albrest asked, "'Do you want to vote for white or niggers?" The voter stated that he wanted to give everyone a fair chance. Albrest proceeded to point out the black candidates and, with respect to one white candidate, stated, "This is who the blacks are voting for." Poll official Albrest made further reference to black citizens as "niggers" in the presence of federal observers, including a statement that "niggers don't have principle enough to vote and they shouldn't be allowed. The government lets them do anything."

*November 15, 2005 Hearing*, at 30.

1225.  Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from various reports about the 2004

election cycle in Arizona: "[I]n Pima county, men wearing black t-shirts that said 'U.S. Constitu-tional Enforcement' and military or tool belts and carrying a variety of equipment harassed Lati-nos waiting in line to vote. These men would approach potential voters with video and photo cameras and harass them for proof of citizenship. Others would stand outside of polling places and videotape or photograph voters as they would enter and leave." *March 8, 2006 Hearing Vol. III*, at 3976.

1226. Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from the Election Incident Reporting System for the November 2004 election in Arizona:

- "At certain precincts, trucks with megaphones were parked outside. The drivers warned Latinos that they would be deported if they had wrongfully registered to vote."
- Additionally, pollworkers only asked minorities for identification.
- "At a precinct, a man dressed in black was seen to have an automatic weapon and magazines in his pockets."
- "At one location, a Border Patrol Officer appeared in uniform to vote."
- "At many locations, the booths were very close to each other and voters felt in-timidated because other could see for whom they were voting."
- "Police cars were seen driving around polling places and parked within view of polling places."

*Id.* at 3979-3980.

1227. Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from an October 2000 article: "On the official website for the Georgia Republican Party, poll watchers were encouraged to take a still or video camera with them on Election Day to the polls in an attempt to discourage African-Americans from voting. The state's Republican Chairman argued that those web instructions were four years old and were ordered removed from the site, where they were left inadvertently. Discovery of the instructions on the website was made on the same day that the Republican Na-

tional Committee launched ads in Spanish in order to draw the attention of Latino voters in Georgia and in six other states." *March 8, 2006 Hearing Vol. III*, at 3528.

1228.   Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from an article concerning a 1991 election in Mississippi: "In the state's primary election for state governor, numerous complaints of voter intimidation were reported to the voter-fraud unit of the U.S. Justice Department.   Counties throughout the state reported instances of candidate representative, 'hawking' nursing home halls and other polling locations on the day of the election." *Id.* at 3562.

1229.   Robert McDuff, an attorney from Jackson, Mississippi testified before Congress on May 10, 2006.   McDuff authored a report entitled "Voting Rights in Mississippi, 1982-2006" that was submitted to the Congressional Record as an appendix to his testimony. *May 10, 2006 Hearing*, at 132.

1230.   Congress received testimony from William Clay, a witness who submitted a statement to the National Commission  on the Voting Rights Act on July 20, 2005, noting that St. Louis, Missouri election officials prevented inactive voters from voting in the 2000 presidential election. *October 18, 2005 Hearing,* at 79.

1231.   Congress received the following evidence from a report entitled, *Voting Rights in North Carolina 1982-2006*, which was appended to the testimony of Wade Henderson: "[I]n 1990, just days before the general election in which Harvey Gantt, an African-American, was running against Jessie Helms for U.S. Senate, post cards headed 'Voter Registration Bulletin' were mailed to 125,000 African-American voters throughout the state.   The bulletin suggested, incorrectly, that they could not vote if they had moved within 30 days of the election, and threatened criminal prosecution.   The postcards were sent to black people who had lived at the same

address for years.  As a result of the postcard campaign, black voters were confused about whether or not they could vote and some went to their local board of election office to try to vote there.  Considerable resources were devoted to trying to clear up the confusion." *March 8, 2006 Hearing Vol. II*, at 1755 (internal citation omitted); *see also May 16, 2006 Hearing*, at 18 (testimony of Anita Earls) (testifying the postcards caused great confusion and discouraged people from voting).

1232.  Congress received the following evidence from a report entitled, *Voting Rights in North Carolina 1982-2006*, which was appended to the testimony of Wade Henderson:  "Ms. Bobbie Taylor, president of the Caswell County Branch NAACP, reported incidents 'where on election day, the candidates - workers for the whites have been permitted to put up their tables, their tents, and whatever closer to the entrance of a polling place than we were allowed to.'  In fact, as Ms. Taylor recounted, blacks were asked to move further away from the polling place. Black voters were also spoken to rudely and their questions were routinely dismissed." *March 8, 2006 Hearing Vol. II*, at 1739.

1233.  In a report entitled, *Voting Rights in North Carolina 1982-2006*, which was appended to the testimony of Wade Henderson, it was reported to Congress that black voters were the targets of deceptive election practices in North Carolina during the November 2004 election, including signs posted in predominately black districts stating that the voting would occur on Wednesday, November 5 (the day after Election Day). *Id.* at 1753.

1234.  Congress received evidence from the National Commission on the Voting Rights Act which reported the testimony of Nina Perales, regional counsel of the Mexican American Legal Defense and Educational Fund, during the Commission's Southwest Regional hearing.  According to the report submitted to Congress, Ms. Perales testified that "Anglos standing outside poll-

ing places in Dona Ana County (Las Cruces), New Mexico videotaped the license plates of Mexican Americans as they went to vote." *March 8, 2006 Hearing Vol. I*, at 308-309.

1235. As part of the record submitted by the National Commission on the Voting Rights Act, Congress received a written statement from Hazel Dukes in which Ms. Dukes stated that armed, white off-duty police officers "blanketed" polling places in black communities during the 1993 mayoral election in New York City. *October 18, 2005 Hearing,* at 62.

1236. Armand Derfner testified before Congress about "campaigns by private citizens to intimidate Black voters" in South Carolina. *October 20, 2005 Hearing,* at 80.

1237. In written testimony to Congress, Armand Derfner stated the following: "A second type of problem frequently encountered, the harassment of poor or black voters at the polls, bears the hallmarks of the intentional discrimination that some people mistakenly think lives only in the history books. In a 1990 election for Probate Judge of Charleston County, a black candidate faced a white candidate. There was widespread intimidation of black voters at rural polling places, especially black voters who needed assistance because they were old, infirm or not fully literate." *May 17, 2006 Hearing*, at 179.

1238. Congress received evidence from Armand Derfner who submitted a prepared statement referencing a 2002 Supreme Court decision overturning Charleston County's at-large elections on the ground that it discriminated against black voters on account of their race. Derfner noted "powerful evidence of intimidation and harassment of blacks at the polls" in the 1980s and 1990s, and during the 2000 general election. In particular, Derfner observed that "[i]n addition to demographic factors that are relevant in judging voting discrimination, there was powerful evidence of intimidation and harassment of blacks at the polls during the 1980s and 1990s and

even as late as the 2000 general election. There was also evidence of race baiting tactics used by political strategists." *October 20, 2005 Hearing*, at 84-85.

1239.  Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from a 2004 article in South Carolina: "Phony letters from the 'NAACP' were sent to residents of Charleston County, cautioning would-be voters that they might be arrested if they had outstanding parking tickets or overdue child support payments and attempted to vote. The letter also falsely stated that voters were required to provide two forms of photo identification, a social security card, a voter registration card, and a handwriting sample, and were required to submit to a credit check in order to be voter eligible." *March 8, 2006 Hearing Vol. III*, at 3619.

1240.  Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from November 2004 news reports in South Carolina: "Voters, many of whom were college students, were turned away for a brief period from a precinct located on Benedict College's campus. Poll watchers affiliated with the Republican Party contested the legality of many voters at the site. One college student who had a student ID but did not have state identification was challenged by a poll watcher and forced to get out of line until the dispute was settled. Other students, frustrated by the repeated challenges to their vote left crying, without casting a vote. Others were forced to leave before voting because the high volume of voting-related challenges created tremendously long delays at the polls." *Id.* at 3620.

1241.  Meredith Bell-Platts submitted a prepared statement to Congress making reference to discriminatory tactics used in the November 2004 runoff election for Greenville County Council. Ms. Bell-Platts observed that the NAACP had mobilized black voters to replace Steve Selby,

who opposed recognizing Martin Luther King Day as a holiday, with a more moderate Republican, Tony Trout, who did support recognition of the holiday. Selby threatened to use aggressive poll observers during the election and he and his legal team threatened to prosecute voters who voted in both the Republican and Democratic primaries. This latter tactic gave the false impression that Democratic voters could not vote in the runoff, even though this law only applied to democrats who had actually voted in the democratic primary. In particular, Bell-Platts observed that "Greenville County, SC remained one of a few jurisdictions that did not celebrate the Martin Luther King Jr. holiday. County council had refused for years to vote in favor of it. Newspaper articles debated the cost of an additional holiday to taxpayers. Black voters, the NAACP, and others recognized that one way to sway the council vote would be to exercise their right under state law to vote in the Republican primary to replace a staunch opponent to the MLK holiday - one who incidentally claimed that MLK was not an appropriate role model - with a more moderate Republican who was in favor of the holiday. The battle to replace incumbent Councilman Steve Selby took much longer than many expected. A highly contested race from the start, the campaign resulted in two runoff elections. We became involved with the election when Selby said that he planned to place poll observers during the final runoff on September 7, 2004 and threatened to call for sheriff's deputies to enforce voting laws and encouraged prosecution of anyone trying to vote in the new runoff who already voted in the Democratic primary. Selby's attorney complicated matters when he said, 'If Democrats attempt to vote in the election, we're going to call upon the solicitor to start charging and indicting Democrats.' The newspaper ran such quotes from Selby and his legal team. To be clear, it was not a crime for democrats to vote in the Republican primary runoffs. The only people who were prohibited from voting in the

primary were those voters who voted in the Democratic primary. All other voters, whether democrat or republican, were eligible to vote." *October 25, 2005 Scope Hearing Vol. II*, at 3284.

1242.   Anita Earls testified before the Senate Judiciary Committee: "John W. Boyd of Mecklenburg County, Virginia, an African-American, testified that recently he was a candidate for Congress in Virginia's Fifth Congressional District. While campaigning, he attended a political function in the southwest part of the state. He encountered a white woman at the function who told him 'It's a pleasure to meet you. You speak very well. You would have done a lot better if you had not made an appearance here because you have a white last name, which is Boyd, and we're all voting for those candidates.'" *May 16, 2006 Hearing*, at 140.

1243.   Congress received evidence from Gwen Carr, a witness who submitted a statement to the National Commission on the Voting Rights Act on July 22, 2005, noting instances of discrimination by Wisconsin officials against Native American voters, including denial of access to the polls. *October 18, 2005 Hearing,* at 85.

### (3)     Intimidation of Minority Voters in Texas

1244.   Congress was presented with the following testimony from Barry Weinberg: "In Texas and Southern Arizona polling places Hispanic voters were admonished not to use Spanish when talking in the polling places and when giving assistance to voters who needed help when voting. Moreover, the citizenship of Hispanic voters was questioned at the polls, with voters being required to somehow provide on-the-spot evidence of their citizenship before being given a ballot; such evidence was not required of Anglo voters." *November 15, 2005 Hearing*, at 34.

1245.   Through an appendix to the record of the National Commission on the Voting Rights Act, Congress was presented with a document which alleged that citizens who were intimidated by persons who claimed to be investigating petitions filed by judicial candidates to place their

names on a primary ballot in Harris County, Texas. The alleged actions include: "appearing un-announced at the residents' homes after dark on a Saturday, failing to identify themselves, claim-ing to be affiliated with the campaign of a candidate whose petition the voter had signed, show-ing what appeared to be a badge, asserting that they were investigating fraud, [and] asking the voter to sign a form verifying their signature on the petition." *March 8, 2006 Hearing Vol. III*, at 3821.

1246.  Congress received evidence from the National Commission on the Voting Rights Act that Vernon Burton, a historian at the University of Illinois who specializes in southern history and voting rights issues, testified before the National Commission's Southern Regional Hearing regarding overt racial appeals in Texas. Professor Burton testified that, in the 2000 and 2002 elections, intimidation and misinformation were directed at African-American Texans, as well as reports of "late change of polling places; dropping individuals from poll lists without cause; [and] not allowing individuals to file challenge ballots." The campaign staff treasurer for a black candidate for treasurer was also the victim of a hate crime when her home was set on fire and she received threatening phone calls. *March 8, 2006 Hearing Vol. I*, at 298.

1247.  Congress was presented with sworn testimony by C.G. Walwyn before a panel inves-tigating voter irregularities conducted by the Texas State Conference of the NAACP in Decem-ber 2000. Walwyn testified that he was the first African-American in 102 years to be on the bal-lot for the November election in Wharton County, Texas. He also said that Linda Nichols told him that she "was getting phone calls from someone saying to get off [his] campaign or we're going to burn a cross in [her] yard, string up [her] dogs and gut them," and that her house was later burned. *March 8, 2006 Hearing Vol. III*, at 2998-2999.

1248.   Congress was presented with a statement from Gary Bledsoe, president of the Texas State Conference of NAACP Branches, that included the following allegation from the November 2000 election: "We were made aware early on of a number of irregularities, intimidation efforts in [Fort] Worth through calls to individuals trying to suggest that they needed to be sure that they were registered to vote, trying to raise issues that would suppress the African American vote." *Id.* at 2977.

1249.   Through a report submitted by the National Commission on the Voting Rights Act, Congress was presented with evidence of newspaper articles in Fort Worth, Texas that threatened to have people arrested if they illegally voted. *October 18, 2005 Hearing*, at 169.

1250.   Congress was presented with evidence of the dropping of individuals from voter lists with cause and the denial of the right to file challenge ballots in Texas jurisdictions. S. Rep. No. 109-295, at 342-343, 345.

1251.   Congress was presented with evidence of the selective stationing of police officers outside predominantly minority polling sites in Texas. Congress was presented with evidence of police officers demanding that minority voters show identification in order to vote. S. Rep. No. 109-295, at 342-245.

1252.   Congress was presented testimony of a racial slur directed at a minority voter by an election judge and an election judge who demanded that Latino voters present identification contrary to Texas law.  In addition, Congress was presented with testimony of poll workers in Texas questioning minorities more intensely. S. Rep. No. 109-295, at 342-345.

1253.   Congress was presented with sworn testimony by Nata Kerber before a panel investigating voter irregularities conducted by the Texas State Conference of the NAACP in December 2000 in which she stated she "had reports of people who were turned away to vote even though

those individuals were in line at 7:00" in the November 2000 election. *March 8, 2006 Hearing*, at 2988.

1254.   Congress was presented with sworn testimony by Elizabeth Lentz before a panel investigating voter irregularities conducted by the Texas State Conference of the NAACP in December 2000.  Ms. Lentz, a volunteer election-day monitor for the Harris County Democratic Party, testified to receiving "[a] lot of calls about people being sent back for multiple ID's, even if they had the[ir] voter registration cards."  Ms. Lentz testified that these calls were "predominantly [from] minorities."  *Id.* at 3044-3045.

1255.   Through an appendix to the record of the National Commission on the Voting Rights Act, Congress was presented with the following excerpt from a *Legal Times* article discussing the 2000 election:  "[I]n Fort Worth, a vocal supporter of a Republican candidate for Congress tried to scare elderly black voters from voting.  She distributed leaflets (falsely) accusing several longtime African-American community activists of violating the law by assisting elderly voters apply for absentee ballots.  Similarly, in Wharton County (50 miles southwest of Houston), a campaign worker for the first African-American candidate for sheriff awoke to find, in her backyard, an apparent cross being burned along with a photograph of the candidate."  *Id.* at 3638.

1256.   Congress was presented with the following summary of the testimony of Howard Jefferson taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas:  "Mr. Howard Jefferson, President of the Houston Branch NAACP testified that on the Thursday before the Saturday election of November 6, 2000 he was made aware that 100 polling places were changed.  On Election Day there were 171 polling places that had been changed without notifying the voters.  He also said that people were put in jail because they were trying to vote.  Others had their license and were still not allowed to vote."  *Id.* at 3060.

1257.   Congress received evidence from the National Commission on the Voting Rights Act regarding a statement submitted by Claude Foster, national field director for the NAACP National Voter Fund, regarding complaints voiced at a Voter Irregularity Hearing held by the Houston Coalition for Black Civic Participation in Harris County, Texas on December 12, 2001.  According to Foster, the following complaints were voiced at this hearing, held shortly after a non-partisan mayoral run-off election:

- "[Officials] said they could not vote because they were not [registered] in that county.  They [officials] claimed they ran out of ballots."
- "Tried to vote and the precinct judge told him he was not on rolls.  Told he could not vote in elections."
- "Was told by precinct judge that she could not vote because she was not in city limits.  She voted at that same place for 12 years."
- "[She was] showed a list of signed names of the only people who could vote.  White people of same zip code were allowed to vote."
- "The woman would not let her vote, did not try to help her find out what precinct to vote in, and ultimately was discouraging."
- "Drove 30 miles to vote from original precinct and was again told she couldn't vote.  Never allowed to vote."
- "They asked her name without asking for ID, and told her she was not eligible to vote.  She received a challenged ballot and when she tried to submit the ballot, they rejected it saying she could not vote."
- "Told she could not vote because she wasn't [registered] in the county.  White people were allowed to vote though."
- "Saw a list of handwritten names and was told that those people's votes wouldn't count.  Also her husband was on the list, and she was told she was not allowed to vote.  The precinct or school called the police.  Black people were not being allowed to vote."

*March 8, 2006 Hearing Vol. I*, at 306-307.

1258.   Congress was presented with the following summary of the testimony of Felicia Dykes taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas:  "Felicia Dykes testified that at the time of the election she was 43 years old, and she had been voting at the same location since the age of 18.  During this election she

was told that she needed to go to another location to vote. She went to vote at the Precinct Judge twice. The first time she was turned away and on the second occasion she was told that her vote wouldn't count after she filled out the necessary paperwork for a challenged affidavit and submitted her ballot." *March 8, 2006 Hearing Vol. III*, at 3060.

1259. Congress was presented with the following summary of the testimony of Terrence Scott taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas: "Terrence Scott testified that he was arrested because he insisted that he be able to vote. He went to cast a vote at the local church where his mom votes but he was told that he was registered to vote on another side of town and refused the right to vote. The police officer charged him with trespassing." *Id.*

1260. Congress was presented with the following summary of the testimony of Linda D. Mitchell taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas: "Linda D. Mitchell testified that she was given the run-around as to where she needed to vote. She went to several different locations and the instructions as to where she needed to vote were scratched away without any clear alternative information. She left frustrated and returned with her husband demanding why she could not vote. At that time, she and her husband were given a challenge ballot." *Id.*

1261. Congress was presented with the following summary of the testimony of Denise Jordan taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas: "Denise Jordan testified that she voted and called to see if her elderly mother had voted yet. She was made aware that her mother attempted to vote but was told that she needed to go to another location and when she did, she was told that that location was closed. At that time, Ms. Jordan contacted her local Representative, Sheila Jackson-Lee and some repre-

sentatives were sent to the problem area, Precinct 506. She had a picture of the sign that said that no one in the 506 precinct could vote in the mayor's election. The sign did not say where those individuals were to go to vote. The judge at the poll called the police and a policewoman was present when the witness and her mother returned." *Id.*

1262. Congress was presented with the following summary of the testimony of Melody Rames taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas: "Melody Rames testified that she witnessed people being turned away from the polls and voters being disenfranchised. She went to the polls that day to take a friend to vote. While she was waiting she was rushed by a white who came from the other side of the room and assaulted her. She was later informed that he was the Precinct 6 Judge. He pushed her forcibly on her arm backed her up to the door. He yelled at her and she didn't know why, he waved a piece of paper in her face and told her that she could not loiter within 100 feet of the polling place. An hour later she gave a police report." *Id.* at 3060-3061; *see also id.* at 3823.

1263. Congress was presented with the following summary of the testimony of Bernadine Thorn taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in Harris County, Texas: "Bernadine Thorn testified that when she went to vote she presented her driver's license and she was told that she could not vote in the mayor's election because she was out of city limits. She has been at the same address for 12 years and voted at the same location for the duration of that time." *Id.* at 3061.

1264. The Senate heard testimony from Nina Perales, who presented evidence that in Bexar County, TX (San Antonio) in the spring of 2003 a "very large number" of early polling places were closed in heavily populated Latino areas, without a timely submission of the changes for preclearance. *March 8, 2006 Hearing Vol. I,* at 309.

1265.  Congress received evidence from the National Commission on the Voting Rights Act that Frank Jackson, the mayor of Prairie View, Texas, testified at the Commission's Southern Regional Hearing about the efforts of the white District Attorney to disqualify black students from voting during the 2004 presidential election year, on the grounds they were not legal residents of the county.  This was in spite of lawsuits in the late 1970s growing out of vote-suppression efforts in the surrounding county that settled the question of whether students were county residents.  Prairie View, Texas is the site of Prairie View A& M - a historically black university.  The Commission's report indicated that Mayor Jackson asserted that the Voting Rights Act "provides us with some necessary safeguards, because if it was not for that looking-over-the-shoulder, somebody watching the process, then we would have been at the mercy of the powers that still advocate states rights." *Id.* at 300.

### 7.  Evidence Before Congress: Voter Registration, Voter Turnout, and the Number of Minority Elected Officials

#### a)  Gains in Minority Participation and Representation Attributable to Section 5 and the VRA

1266.  According to the House Report, since 1982 electoral participation among African-American citizens in Texas has increased due to the Voting Rights Act.  The House Report provided the following statistics:

Chart B1: Reported Registration by Race in Texas and Outside the South
1980–2004

| | 1980 | 1982 | 1984 | 1986 | 1988 | 1990 | 1992 | 1994 | 1996 | 1998 | 2000 | 2002 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS** | | | | | | | | | | | | | |
| Black | 56.4 | 56.6 | 65.3 | 66.6 | 64.2 | 60.0 | 63.5 | 58.5 | 63.2 | 62.1 | 69.5 | 65.1 | 68.4 |
| White | 61.4 | 59.4 | 66.0 | 58.2 | 66.5 | 61.1 | 66.1 | 59.7 | 62.7 | 59.7 | 61.8 | 57.7 | 61.5 |
| Latino | 39.3 | 43.2 | 45.2 | 43.1 | 45.5 | 40.0 | 42.9 | 39.2 | 42.7 | 39.7 | 43.2 | 39.1 | 41.5 |
| **NON-SOUTH** | | | | | | | | | | | | | |
| Black | 60.6 | 61.7 | 67.2 | 63.1 | 65.9 | 58.4 | 63.0 | 58.3 | 62.0 | 58.5 | 61.7 | 57.0 | NA |
| White | 69.3 | 66.7 | 70.5 | 66.2 | 68.5 | 64.4 | 70.9 | 65.5 | 68.1 | 63.9 | 65.9 | 63.0 | NA |
| Latino | 35.5 | 33.9 | 39.0 | 33.2 | 32.4 | 30.4 | 32.9 | 29.1 | 33.8 | 31.9 | 32.7 | 30.6 | NA |

Source: Various post-election reports by the U.S. Bureau of the Census

Chart B2: Reported Turnout by Race in Texas and Outside the South
1980–2004

| | 1980 | 1982 | 1984 | 1986 | 1988 | 1990 | 1992 | 1994 | 1996 | 1998 | 2000 | 2002 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS** | | | | | | | | | | | | | |
| Black | 40.7 | 37.8 | 51.2 | 39.8 | 47.0 | 38.7 | 50.1 | 33.1 | 47.1 | 35.5 | 57.5 | 44.3 | 55.8 |
| White | 52.7 | 40.6 | 55.5 | 37.5 | 55.2 | 42.5 | 57.2 | 39.4 | 46.7 | 33.5 | 48.1 | 35.0 | 50.6 |
| Latino | 29.7 | 26.8 | 32.7 | 23.6 | 33.2 | 22.5 | 33.1 | 18.9 | 27.9 | 15.3 | 29.5 | 19.1 | 29.3 |
| **NON-SOUTH** | | | | | | | | | | | | | |
| Black | 52.8 | 48.5 | 58.9 | 44.2 | 55.6 | 38.4 | 53.8 | 40.2 | 51.4 | 40.4 | 53.1 | 39.3 | NA |
| White | 62.4 | 53.1 | 63.0 | 48.7 | 60.4 | 48.2 | 64.9 | 49.3 | 57.4 | 44.7 | 57.5 | 44.7 | NA |
| Latino | 29.8 | 25.8 | 32.8 | 23.8 | 26.8 | 20.5 | 27.4 | 20.8 | 26.3 | 21.4 | 26.8 | 18.2 | NA |

Source: Various post-election reports by the U.S. Bureau of the Census

H.R. Rep. No. 109-478, at 12, 14.

1267.   Congress heard testimony from Assistant Attorney General Wan Kim citing dramatic gains in Black registration and turnout in Alabama and Mississippi, and in Black elected officials, including in covered states such as Alabama and Georgia, as "fruits of" DOJ's "vigorous enforcement of voting rights." *May 10, 2006 Hearing*, at 123.

1268.   Congress heard evidence from Arturo Vargas, Executive Director of the National Association of Latino Elected and Appointed Officials Educational Fund, that since the last major VRA reauthorization Latinos have made significant political advances.  According to Census data 7.6 million Latinos voted in the 2004 Presidential Election, an increase of 145% since 1984.  In January 2005, there were 5,014 Latino elected officials nationwide, an increase of 60% since 1984.  In 1984, no Latinos served in the U.S. Senate.  There were only nine Latino members of the U.S. House of Representatives, five statewide elected officials, and 105 state legislators.  In 2005, two Latinos now served in the U.S. Senate, and 23 served as Representatives in the House.