There were also nine Latinos serving in statewide office, and 232 in state legislatures. *Novemer 9 & 10, 2006 Hearing Part II*, at 202.

1269.  Citing to reports received, Congress found that although Native American participation has traditionally been the lowest of any community, Native American participation has increased in recent years and the number of Native American candidates has increased.  H.R. Rep. No. 109-478, at 20.

1270.  The House Judiciary Committee found that the increased number of African-American citizens who are registered to vote and who have cast ballots, together with the protections afforded by the temporary provisions of the Voting Rights Act against dilutive techniques, have resulted in significant increases in the number of African-Americans serving in elected offices.  H.R. Rep. No. 109-478, at 18.

1271.  Congress heard testimony from Professor Chandler Davidson that "[t]he [Voting Rights] Act has had a major impact in incorporating racial and language minorities into the polity.  Perhaps the most striking evidence is the extraordinary increase in black elected officials in the South.  In 1970 there were 565.  In 2000, there were 5,579. *May 9, 2006 Hearing*, at 6.

1272.  The House Committee on the Judiciary found that "the number of African-Americans who are registered and who turn out to cast ballots has increased significantly over the last 40 years, particularly since 1982."  H.R. Rep. No. 109-478, at 12.

1273.  The House Committee on the Judiciary found that the progress made by African-Americans in participation and in getting elected to office in covered jurisdictions "demonstrates the effectiveness of the temporary provisions in fostering and protecting minority participation in the electoral process."  H.R. Rep. No. 109-478, at 18.

1274.   The House Committee on the Judiciary found that as a "direct result of the Voting Rights Act of 1965," "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices." H.R. Rep. No. 109-478, at 2.

1275.   Congress received a report commissioned by the Leadership Conference on Civil Rights which, after analyzing the effect of the VRA in Arizona, determined that the Act — including Section 5—has "had a substantial impact on the number of Hispanic and American Indian candidates elected to public office in Arizona." For example, the report noted that "[b]etween 1973 and 1984, Latino representation in Arizona increased by 154 percent, growing from 95 to 184 elected officials." Specifically, the report credits Section 5 with having "eliminated barriers [to voter participation] and prevented their implementation." *March 8, 2006 Hearing Vol. I*, at 1442.

1276.   Congress received the following statistics regarding "African-American Representatives and African-American citizen voting age population in Section 5 covered and non-covered States:

AFRICAN-AMERICAN REPRESENTATIVES AND AFRICAN-AMERICAN
CITIZEN VOTING AGE POPULATION, ORIGINAL SECTION 5 STATES AND
OTHER STATES

| State | Citizen VAP | Black CVAP | African-American Proportion: CitizenVAP | Representatives | |
|---|---|---|---|---|---|
| United States | 193,376,975 | 22,614,559 | .12 | .092 | (ratio = .76) |
| | | | | | |
| Alabama | 3,276,570 | 791,752 | .24 | .143 | (ratio = .60) |
| Georgia | 5,675,210 | 1,564,032 | .28 | .308 | (ratio = 1.10) |
| Louisiana | 3,198,079 | 957,771 | .30 | .143 | (ratio = .48) |
| Mississippi | 2,049,386 | 684,233 | .33 | .250 | (ratio = .77) |
| North Carolina | 5,820,423 | 1,199,611 | .21 | .154 | (ratio = .73) |
| South Carolina | 2,939,606 | 811,761 | .28 | .167 | (ratio = .60) |
| Virginia | 5,051,517 | 955,503 | .19 | .091 | (ratio = .48) |
| | | | | | |
| Seven Original Covered Southern States | | | | | |
| | 28,010,791 | 6,964,663 | .25 | .18 | (ratio = .72) |
| | | | | | |
| Florida | 11,081,542 | 1,365,175 | .12 | .12 | (ratio = 1.00) |
| Texas | 13,299,845 | 1,606,131 | .12 | .094 | (ratio = .78) |
| | | | | | |
| US, Outside Seven Original Covered Southern States | | | | | |
| | 165,366,184 | 15,649,896 | .095 | .078 | (ratio = .82) |
| | | | | | |
| US, Outside Nine Covered Southern States | | | | | |
| | 140,984,797 | 12,678,590 | .089 | .073 | (ratio = .82) |

Source: Data compiled by author from the U.S. Census and Michael Barone and Richard E. Cohen (2005).
*The Almanac of American Politics 2006.* Washington, DC: National Journal.

*May 16, 2006 Hearing*, at 173.

1277.   During a hearing on the Special Provisions of the Act, Representative Bobby Scott of Virginia stated for the record:  "[I]n the 40 years since its passage, the Voting Rights Act has guaranteed millions of minority voters a chance to have their voices heard and their votes counted.  The number of Black elected officials has increased from just 300 nationwide in 1964, to more than 9,100 today.  Poll taxes, literacy tests, and other discriminatory barriers that once closed the ballot box to Blacks and other minorities have been dismantled.  The process also opened the political process for nearly 6,000 Latinos who now hold public office, including more than 250 who serve at the State or Federal level." *October 20, 2005 Hearing*, at 4.

1278.   Congress received a report authored by the National Commission on the Voting Rights Act in which North Carolina Congressman Melvin Watt indicated that he and other African-American members of Congress "would not be members of the Congressional Black Caucus, [and] would not be serving in the Congress of the United States  but for the provisions of the Voting Rights Act." *March 8, 2006 Hearing Vol. I*, at 355.

1279.  In a statement submitted into the Congressional Record, Representative Sanford Bishop of Georgia referred to the expiring provisions of the Voting Rights Act as "one of the most important civil rights initiatives ever enacted, protecting minority voters from discrimination[.]"  Representative Bishop further noted that the renewed provisions "stop[] practices such as those that allowed every African American to be expelled from the Georgia legislature  between 1866 and 1900.  It stops poll taxes, racial gerrymanders that dilute minority voting power.  It stops moving polling places without notice.  It stops hanging chads.  It is the reason, after 100 years, that I was finally able to follow Jefferson Long as the first African American to represent my area of Georgia in Congress.  It has empowered descendants of slaves like me to participate fully in America's political process."  *Remarks of Represetnative Sanford Bishop of Georgia regarding H.R. 9, Voting Rights Act Reauthorization* (July 12, 2006).

1280.  In his testimony before the Senate Judiciary Committee, Drew Days explained that "[f]rom the end of the Nineteenth Century until the mid-1980s or in some states the early 1990s, well past the time of the most recent renewal of the Voting Rights Act, not a single black was elected to Congress from Louisiana, Mississippi, Alabama, South Carolina, North Carolina, or Virginia."  Additionally, Days testified that, "[i]n many of the rest of the Southern states covered in their entirety by Section 5, it was not until after the most recent VRA reauthorization [in 1982] that a single black representative was elected.  For most of a century, and in some states for over a century, racially discriminatory practices thwarted the ability of black voters to elect even a single black representative."  *May 17, 2006 Hearing*, at 66.

1281.  Congress received testimony from Wade Henderson that vigorous enforcement of the Voting Rights Act starting in 1990 is responsible for the election of many African-American members of the U.S. House of Representatives.  *March 8, 2006 Hearing Vol. I*, at 355.

1282.   Congress received testimony from Laughlin McDonald about the impact of majority-minority districts on equal political participation by minority voters.  He noted that "[a]s late as 1988, no black had been elected from a majority white district in Alabama, Arkansas, Louisiana, Mississippi, or South Carolina.  The number of blacks elected to state legislatures increased after the 1990 redistricting, but again, the gain resulted from an increase in the number of majority black districts.  *May 9, 2006 Hearing*, at 92.

1283.   Congress received testimony from Fred Gray that, as "a civil rights lawyer practicing both before and after enactment of the Voting Rights Act, I can and I do attest to its profound impact on the full participation of African-Americans in our society.  On a more personal note, it was enforcement of the Voting Rights Act in redistricting cases that allowed me in 1970 to become one of the first two African-Americans to serve in the Alabama Legislature since Reconstruction."  *May 17, 2006 Hearing*, at 3.

1284.   Congress heard testimony from Margaret Fung that between 1990 and 2005, the number of Asian American elected officials in California increased from zero to nine as a result of portions of the state being covered under the minority language provisions of the Voting Rights Act.  In California, the State with the largest Asian-American population, there were no Asian-Americans serving on the State legislature in 1990; now there are nine.  *November 8, 2006 Hearing Part I*, at 13.

1285.   Congress received a report commissioned by the National Commission on Civil Rights indicating that, since the passage of the Voting Rights Act, there has been an increase in the number of black elected officials in Mississippi.  The report shows that, in 2005, there was 1 U.S. Representative, 11 state senators and 120 state representatives—all of whom are African-American—in Mississippi.  *March 8, 2006 Hearing Vol. I*, at 365.

1286.   Congress received testimony from civil rights lawyer Robert McDuff discussing integration of the Mississippi legislature: "Significant integration came to Mississippi's legislature even later than in other states.  No black citizen was elected to the state's legislature in the twentieth century until 1967.  In that year, Robert Clark of Holmes County won election to the state House of Representatives.  He remained the only black member of the 122-seat House until 1975, when DOJ objected to the legislature's redistricting plan of that year and a court-ordered plan creating single-member districts in some of the urban areas in the state led to the election of three more black House members." *May 10, 2006 Hearing*, at 141.

1287.   Congress received information from the National Commission on the Voting Rights Act that the "only reason for" the election of the first African-American member of Congress from Mississippi in 1986 was the "enforcement of Section 5 of the Voting Rights Act by the Justice Department and litigation under . . . Section 2." *March 8, 2006 Hearing Vol. I*, at 365.

1288.   Congress received information from the National Commission on the Voting Rights Act, which provided an excerpt of testimony given by civil rights lawyer Robert McDuff. McDuff testified that, after the first black member of the Mississippi legislature was elected in 1967, no additional black members were elected until 1975, when enforcement of Section 5 by the Department of Justice and civil litigation finally cleared the way. *March 8, 2006 Hearing Vol. I*, at 365.

1289.   Congress received testimony from Wade Henderson that "[t]hirty-six percent of Mississippi's population is black, the highest percentage of the fifty states.  33 percent of the voting age population is black.  But no black person has been elected to a statewide office since Reconstruction." Henderson further testified that, "[i]n 2001, the last year covered by its study of black elected officials, the Joint Center for Political and Economic Studies reported that Mississippi

had 892 black elected officials. While this is the highest number of any of the fifty states, the Center's report states that this represents less than 19 percent of the state's elected officials. Nearly all of the black officials were elected from black majority districts, and most of those districts were created as a result of the Voting Rights Act." *March 8, 2006 Hearing Vol. I*, at 56.

1290. Congress received testimony from Marc Morial, President of the National Urban League and former Mayor of New Orleans, that "Louisiana went almost 100 years despite having almost a one third (sic) African American population with zero elected officials until the passage of the Voting Rights Act in 1965." *October 18, 2005 Hearing,* at 15.

1291. Marc Morial also testified before Congress that it was unlikely that he, "nor many of the Members who serve in this Congress or the many African Americans who serve in State legislatures, particularly in the south, but across the Nation, would have been able to serve their cities, their States and this Nation without the passage of the Voting Rights Act." Morial testified that Section 5 "greatly improv[ed] the quality of representation for all Americans and all voters." *October 18, 2005 Hearing,* at 16.

1292. Through the National Commission on the Voting Rights Act, Congress was presented with information from Kent Willis, executive director of the ACLU in Virginia, that, "'[b]y 1991, after a series of voting rights cases filed under Section 2 and after dramatic changes with redistricting' thanks to Section 5, 'Virginia moved from 75 to 150 African-American elected officials by the mid-'90s. By the late '90s, that had moved to about 300.'" *March 8, 2006 Hearing Vol. I*, at 362.

1293. Through the National Commission on the Voting Rights Act, Congress received testimony from Jose Garcia noting the increase in Latino representation at the local, state and federal levels, particularly in the covered jurisdictions in New York City. Garcia compared this to

the non-covered county of Queens, which has requested section 5 coverage to address discrimi-
nation against minority voters. *October 25, 2005 Scope Hearing Vol. II*, at 3256.

### b) Continuing Problems in Election of Minority Officials

### (1) Congressional Findings

1294.  The House Judiciary Committee found that, as of 2000, neither Latinos nor Native
Americans have been elected to office in the U.S. House of Representatives from majority-white
districts, and only 8% of African-Americans elected to the U.S. House represent majority-white
districts. The Committee found that because of the breadth of racially polarized voting "[t]he
only chance minority candidates have to be successful are in districts in which minority voters
control the elections." H.R. Rep. No. 109-478, at 34.

1295.  The House Judiciary Committee found that "few African Americans have been
elected to positions in State legislatures relative to the total African American population in cer-
tain areas." The Committee also found that, "[a]s in 1982, the number of African Americans
elected to State legislatures failed to reflect the number of African Americans in the general
population." The Committee also found that "in States such as Alabama, Georgia, Louisiana,
Mississippi, South Carolina, and North Carolina, where African Americans make up 35 percent
of the population, African Americans made up only 20.7 percent of the total number of State leg-
islators." H.R. Rep. No. 109-478, at 32-33.

1296.  The House Judiciary Committee found that "[a]s of 2000, only 35 African Americans
held a statewide elected office." The Committee also found that some of these officials origi-
nally were not elected to their position but were appointed. The Committee cited to the report of
the National Commission on the Voting Rights Act, which stated that "often it is only after
blacks have been first appointed to a vacancy that they are able to win statewide office as incum-

bents.  Moreover, in order for a black to win statewide election, a prior appointment to fill a va-

cancy is not always sufficient." The Committee also found that "[i]n certain covered States, such

as Mississippi, Louisiana, and South Carolina, African Americans have yet to be elected to any

Statewide office."  H.R. Rep. No. 109-478, at 33.

1297.   The House Judiciary Committee found that "[t]The number of language minority of-

ficials elected to office has failed to keep pace with population growth among the minority

communities." The Committee also found that "Latinos occupied a mere 0.9 percent of the total

number of elected offices in the country, despite being the largest minority group in the country."

H.R. Rep. No. 109-478, at 33-34.

1298.   The House Judiciary Committee found that "[t]he number of Asian American elected

officials also has not kept pace with the population growth experienced by the Asian American

community.  For example, the number of Asian American elected officials has increased from

120 in 1978 to 346 in 2004.  However, as of 2004, there were twelve million Asian Americans

residing in the United States compared to the 1.2 million Asian Americans who resided in 1970."

H.R. Rep. No. 109-478, at 34.

1299.   Citing to *City of Rome v. United States*, 446 U.S. 156, 180-81 (1980), the House Judi-

ciary Committee stated that "[t]he Supreme Court has found the extension of the VRA warranted

when there were disproportionately small numbers of African American State legislators and

disproportionately small numbers of African Americans elected statewide in covered jurisdic-

tions, especially when the disparities exist in combination with continuing enforcement efforts

and evidence of new methods of discrimination."  H.R. Rep. No. 109-478, at 32.

      **(2)**    **Continuing Problems in Election of Minority Officials
in Non-Texas Covered Jurisdictions**

1300.   Congress received a report authored by University of Michigan Law School Professor Ellen Katz which indicates that, with regard to Senate Factor 7 (lack of minority candidate success) "[o]f the lawsuits analyzed, 137 specifically addressed this factor, and 85 found a lack of minority candidate success. Of these, 60 (71%) also found a violation of Section 2.  Two additional lawsuits ended in outcomes favorable to plaintiffs, albeit not with an adjudicated Section 2 violation. . . . Forty-nine (57.6%) of the Factor 7 findings were in covered jurisdictions, while 36 (42.4%) were in non-covered jurisdictions." *October 18, 2005 Hearing,* at 1008.

1301.   The House Judiciary Committee found "that the number of language minority officials elected to office has failed to keep pace with population growth among the minority communities" H.R. Rep. No. 109-478, at 33.

1302.   The House Judiciary Committee found that "[a]s of 2000, only 35 African Americans held a statewide elected office.  It also found that some of these officials originally were not elected to their position but were appointed.  The Committee cited to the report of the National Commission on the Voting Rights Act, which stated that "often it is only after blacks have been first appointed to a vacancy that they are able to win statewide office as incumbents. Moreover, in order for a black to win statewide election, a prior appointment to fill a vacancy is not always sufficient." H.R. Rep. No. 109-478, at 33.

1303.   The House Judiciary Committee found that "Latinos occupied a mere 0.9 percent of the total number of elected offices in the country, despite being the largest minority group in the country." H.R. Rep. No. 109-478, at 33-34.

1304.   The House Judiciary committee found that "[t]he number of Asian American elected officials also has not kept pace with the population growth experienced by the Asian American community.  For example, the number of Asian American elected officials has increased from

120 in 1978 to 346 in 2004. However, as of 2004, there were twelve million Asian Americans

residing in the United States compared to the 1.2 million Asian Americans who resided in 1970."

H.R. Rep. No. 109-478, at 34.

1305. Congress received a statement of James Blacksher, at a hearing conducted by the National Commission on the Voting Rights Act, March 11, 2005, stating that not a single African-American currently holds statewide office in Alabama. *October 25, 2005 Scope Hearing Vol. II,* at 3198-3199.

1306. Congress received the following statements from a report entitled, *Voting Rights in Mississippi 1982-2006*:

- "Thirty-six percent of Mississippi's population is black, the highest percentage of the fifty states. Thirty-three percent of the voting age population is black. Despite that, no black person has been elected to a statewide office in Mississippi since Reconstruction." *March 8, 2006 Hearing Vol. II,* at 1717.
- "No black candidate has won election to Congress or the state legislature from a majority-white district in Mississippi." *May 10, 2006 Hearing,* at 145.
- "No black person served in the U.S. House of Representatives from Mississippi between 1883 and 1986," despite the existence of a "majority-black area in the Mississippi Delta" which was "almost 60% black as of 1962." However, until the 1980s this area was "carved" up among three different districts, thus depriving the black majority of political power, according to the report. *March 8, 2006 Hearing Vol. II,* at 1717-18 (internal footnotes omitted).

1307. Congress received testimony from Robert McDuff stating an example that: "[D]espite the fact that [Mississippi] has the highest percentage of black population among the 50 States, no black citizen has been elected to office in a statewide election in Mississippi in the 20th century, and at every level of government, viewed from a statewide perspective, the percentage of black officeholders is lower than the black voting-age population percentage in the State, and the percentage of white officeholders is higher than the percentage of white voting-age population, and we continue to see disturbing signs of the destructive role that race plays in public life." *May 10, 2006 Hearing,* at 22.

1308.   Congress received testimony from Robert McDuff stating that: "In 2003, in the most recent statewide election in Mississippi, a 46-year-old black candidate for State treasurer, who had served as the State's Director of Finance Administration, who had a wealth of public finance and private sector experience, was defeated in an election marked by racially polarized voting by a 29-year-old white candidate, whose only experience was that he had worked as a mid-level bank employee, demonstrating that it is still difficult for a black person, no matter how qualified, to be elected to statewide office in Mississippi." *May 10, 2006 Hearing*, at 22.

1309.   Marc Morial, President of the National Urban League and former Mayor of New Orleans, Louisiana, testified before Congress that until the enactment of the Voting Rights Act Louisiana went almost 100 years without electing African-American officials despite the fact that one-third of the African-American population in Louisiana was African-American. *October 18, 2005 Hearing,* at 15.

1310.   Congress received information from Debo P. Adegbile that Louisiana "has never elected a black governor, although Cleo Fields and William Jefferson ran for that office in 1995 and 1999, respectively.  In the Fields/Foster race, exit polls indicated that Fields received 96 percent of the African-American vote while Foster received 84 percent of the white vote. Moreover, the political climate in Louisiana, not only in 1965 but just last decade, was such that the nation's most infamous modem day Klansman, David Duke [] ran for the state's highest elected offices. In the 1991 governor's race, Duke — a former grand wizard of the Ku Klux Klan . . . garnered 39 percent of the state's vote, winning 55 percent, a majority, of the white vote, though he eventually lost to Edwin Edwards.  Nor was Duke's strong gubernatorial showing a fluke.  In the Senate race of 1990, Duke won 44 percent of the vote against a long-time incumbent, and again won the support of the majority of whites." *March 8, 2006 Hearing Vol. II*, at 1602.

1311. Congress received information from Debo P. Adegbile that although Blacks in Lousiana "have made measurable progress toward political equality since the enactment of the VRA, forty years after the enactment of the VRA, the contemporary political reality is that African Americans in Louisiana have an opportunity to elect their preferred candidates only when those candidates are white or if an African-American candidate runs in a district with a majority of African-American voters. In this context, the gains that African Americans in Louisiana have made in the ability to elect candidates of their choice are largely attributable to the protections afforded by the VRA." *March 8, 2006 Hearing Vol. II*, at 1605.

1312. Congress received testimony from Meredith Bell-Platts, citing *Colleton County v. MConnell* (D.S.C. 2002) where plaintiff's expert testified that no black candidate of choice of black voters was elected in contested General Assembly elections from a district that was less than 43% non-white. Bell-Platts also notes that, when asked about the prospects of blacks winning statewide office in South Carolina, the state's Republican Governor, Mark Sanford, remarked, "I think there never will be," (The State, May 10, 2005) despite the fact that South Carolina has one of the highest percentages of African-American population in the country (slightly under 1/3 of all residents). "Our expert found that no black candidate of choice of black voters was elected in contested general elections to the General Assembly from a district that was less than 43% nonwhite." *Scope, and Purpose Hearing Vol. II*, at 3282.

1313. In the supplement to the report of the National Commission on the Voting Rights Act, which was presented to Congress, Georgia State Senator Robert Brown stated that even though four African-Americans are in statewide elected positions, they were first appointed to these positions and then subsequently elected. *March 8, 2006 Hearing Vol. I*, at 326.

1314.  The House Judiciary Committee found that "in States such as Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina, where African Americans make up 35 percent of the population, African Americans made up only 20.7 percent of the total number of State legislators." H.R. Rep. No. 109-478, at 33.

1315.  The House Judiciary Committee found that "[i]n certain covered States, such as Mississippi, Louisiana, and South Carolina, African Americans have yet to be elected to any State-wide office." H.R. Rep. No. 109-478, at 33.

1316.  The House Judiciary Committee received testimony that, as of 1989, "no candidate of choice of black voters in North Carolina had been elected to statewide non-judicial office since 1990, and that every statewide biracial contest since 1988 had been characterized by racially polarized voting." H.R. Rep. No. 109-478, at 33.

1317.  The House Judiciary Committee cited to *Citizens for a Better Gretna v. City of Gretna*, as an illustration of the important role Section 2 plays.  In that case, African-American voters brought a Section 2 action under the VRA challenging the city's at-large aldermanic elections.  The court found that (1) African-Americans had been excluded from the slating process, (2) no African-American had ever been elected alderman though they comprised 28 percent of the population, and (3) the city had a majority vote requirement.  The court also recognized "the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process." H.R. Rep. No. 109-478, at 53.

1318.  Citing to reports it received, the House Judiciary Committee found "that racially polarized voting shapes electoral competition in the covered jurisdictions.  For minority voters, there is effectively an election ceiling.  In elections characterized by racially polarized voting, minority voters alone are powerless to elect their candidates." H.R. Rep. No. 109-478, at 34.

1319. The House Judiciary Committee found that as of 2000, only 8 percent of African Americans elected to office in the United States House of Representatives were from majority white districts. H.R. Rep. No. 109-478, at 34.

1320. The House Judiciary Committee found that as of 2000, that Latinos or Native Americans elected to office in the United States House of Representatives were from majority white districts. H.R. Rep. No. 109-478, at 34.

1321. The House Judiciary Committee found that because of the breadth of racially polarized voting "[t]he only chance minority candidates have to be successful are in districts in which minority voters control the elections." H.R. Rep. No. 109-478, at 34.

(3)    **Evidence Regarding Continuing Problems in Election of Minority Officials in Texas**

1322. Congress received a report by the Chief Justice Earl Warren Institute stating that, "Latinos and African Americans are underrepresented in elected bodies in Texas on the statewide, county, and local level." *May 4, 2006 Hearing Part I*, at 275.

1323. Congress was presented with the judicial findings in *LULAC v. Clements*, 999 F.2d. 831 (5th Cir 1993) (finding Section 2 was violated) regarding in countywide elections of trial judges in 1993 in Travis County, where the voting age population was "312,392" and "14.4% of eligible voters had Spanish surnames; 9.3% were African-American." The court found that: "None of 13 district judges were Latino or African-American. Latino lawyers made up 2.7% of the eligible lawyers in the county." *March 8, 2006 Hearing Vol. III*, at 3646-47.

1324. Congress received a report from Orville Vernon Burton stating that minorities in Texas have been severely underrepresented in the U.S. Congress. With very few exceptions, minorities were better represented only after the courts required effective majority-minority districts in accordance with the 1965 Voting Rights Act. *March 8, 2006 Hearing Vol. III*, at 3084.

1325.   Congress received testimony from Jose Garza referencing a study included in the court's decision in *League of United Latin Am. Citizens v. NEISD* (1995).  He cited the findings that:

- About 98% of all winning candidates in Texas's Northeast Independent School District school board elections from 1973-1994 were white (one Hispanic candidate had 1 of 48 elections, no black candidates had ever won).  *October 20, 2005 Hearing*, at 17.
- In 1986 and 1992-94 Northeast Independent School District school board elections, the minimum percent of Hispanic votes for minority candidates ranged from 42% to 69% whereas the maximum percent of white votes for minority candidates was 30% or lower (except for Ojeda in 1992: 75% maximum). *October 20, 2005 Hearing*, at 19.
- In Northeast Independent School District elections in 1986, 1987, and 1993, Hispanic and black voters preferred the same candidate.  At the same time, however, this study shows the significant lack of minority representation in the Northeast Independent School District, even where minority voters favored the same candidate.  *October 20, 2005 Hearing*, at 19.
- On average, the minority candidate in exogenous elections received a maximum of 26% of the white vote in NEISD and a minimum of 74% of the Hispanic vote.  *October 20, 2005 Hearing*, at 21.

### c)      Continuing Problems in Minority Voter Participation

#### (1)      Congressional Findings

1326.   The House Judiciary Committee found significant disparities in registration and turn-out between white and language minority citizens.  H.R. Rep. No. 109-478, at 29.

1327.   The House Judiciary Committee found that "[i]n the State of Texas, 41.5 percent of Hispanic citizens were registered to vote in 2004 compared to 61.5 percent of white citizens." H.R. Rep. No. 109-478, at 29.

1328.   The House Judiciary Committee "received testimony demonstrating continued registration and turnout disparities between African-American and white citizens in Virginia and South Carolina." H.R. Rep. No. 109-478, at 25-28.

1329.   The House Judiciary Committee found significant disparities in registration and turn-out between white and language minority citizens.  H.R. Rep. No. 109-478, at 29.

1330.   [Intentionally left blank]

1331.   The House Judiciary Committee found that "[i]n Florida, 36.7 percent of Hispanic citizens were registered to vote in 1996 compared to 67.8 percent of white citizens. Turnout among Hispanics was also substantially lower in 1996 with 29 percent of Hispanic voters turning out to cast ballots compared to 52.7 percent of white voters." H.R. Rep. No. 109-478, at 29.

### (2)    Continuing Problems in Minority Voter Participation in Non-Texas Covered Jurisdictions

1332.   The Senate received testimony from Professor Ronald Gaddie comparing legislative representation of African Americans to the African American voting age population in nine southern covered states and in the United States at-large.  Each of the compared covered states— except Georgia and Florida—are under-represented by African American representatives and the Every covered state other than Georgia and Florida is below proportionality and below the U.S. average. *May 16, 2006 Hearing,* at 173.

1333.   Congress received written testimony from Nathaniel Persily regarding census voter data, stating that:  "Moreover, as the supplement to Professor Ronald Gaddie's report makes clear and as the House Report erroneously suggests otherwise, in most of the covered Southern states, like the rest of the country, black turnout continues to lag turnout of non-Hispanic whites. The House Report, like Professor Gaddie's original report, states differences in voter turnout and registration between blacks, whites, and Hispanics; however, the white category also includes Hispanics, thereby lowering the turnout of whites (due to the very low turnout of Hispanics) and reducing the black-white differences in turnout.  When comparing the estimates of turnout of blacks and non-Hispanic whites in the 2004 election, the only two covered Southern states where black turnout appears to exceed non-Hispanic white turnout are Alabama (where the difference is within the confidence interval) and Mississippi (where the estimates differ by 6.8 percentage

points).  So while it would be wrong to suggest that racially differential rates of turnout have not shrunk over time or to suggest that the South is qualitatively different in this regard than the rest of the country, blacks tend to lag non-Hispanic whites in the covered jurisdictions in their registration and turnout rates and sometimes do so to a significant degree." *May 17, 2006 Hearing*, at 131.

1334.   Congress heard testimony from Anita Earls, Director of Advocacy, University of North Carolina Law School Center for Civil Rights, citing Spencer Overton's study that shows covered states predominate on 6 of 8 factors measuring political exclusion of minority voters. *May 16, 2006 Hearing*, at 47.

1335.   Congress received a report by the Chief Justice Earl Warren Institute stating that, "[o]ne study assessed the relationship between electoral structures, the political participation of blacks, Latinos, and Asian Americans, and the ensuing representation, or lack thereof, of these groups in the context of city council elections.  It notes that despite gains in minority representation since 'the Act' passage, minority political representation still lags behind that of non-minority.  Indeed, although blacks, Latinos, and Asian Americans combined constitute more than 25% of the US population, they constitute only 5% of elected officials nation wide.  Latino citizens are the most under-represented." *May 4, 2006 Hearing Part I*, at 275; *see also id. at* 278-79 (report of Chief Justice Earl Warren Institute).

1336.   Congress received a report authored by Professor Ellen Katz which describes current voter participation problems related to ongoing socioeconomic vestiges of official discrimination as found by courts assessing Section 2 lawsuits in covered jurisdictions. *October 18, 2005 Hearing,* at 45.

1337.   Congress received a report authored by Professor Ellen Katz which describes the *Charleston County* litigation.  In that case, the district court in the court noted severe societal and housing segregation and found that this ongoing racial separation "'makes it especially difficult for African-American candidates seeking county-wide office to reach out to and communicate with the predominately white electorate from whom they must obtain substantial support to win an at-large elections [sic].'"  *October 18, 2005 Hearing,* at 1002.

1338.   Congress received information regarding the Supreme Court's 1980 ruling in *City of Rome v. United States*, 446 U.S. 156 (1980) in which the Court upheld the constitutionality of Section 5.  Among other things, the Court noted the significant disparity between white and African-American turnout in certain covered jurisdictions, the "minor" positions held by African Americans, and the proportionally low number of African Americans serving in state legislatures.  The Court also stated that "'Congress gave careful consideration to the propriety of re-adopting Section 5's pre-clearance requirement.'  *Id.* at 181."  H.R. Rep. No. 109-478, at 9 n.20.

1339.   Congress received testimony from Debo P. Adegbile, Associate Director of Litigation—NAACP Legal Defense and Education Fund that there are stark socioeconomic disparities along racial lines in Louisiana in the areas of education, employment, income and housing.  *Id.* at 1600.

1340.   Congress received an appendix to the testimony of Wade Henderson, "Voting Rights in Alaska," analyzing the effect of the VRA in Alaska and reporting disparities between Alaska Native and non-Native high school education and graduation rates, and stating that "[t]hey are at a significant disadvantage voting in English-only elections."  *Id.*, at 1335-36.

1341.   Wade Henderson submitted a report to Congress ("Voting Rights in Arizona, 1982-2006") which stated that "other barriers to voting persist for American Indians. Polling places

and registration sites can be few and far between. Geographical isolation and long travel distances make it difficult for many Indian people living on reservation to register and to vote. Disparate education opportunities for American Indians enrolled in BIA schools have also led to high illiteracy rates. Socio-economic barriers have heightened the crippling effect of illiteracy, resulting in voter registration and turnout rates that continue to lag far behind non-Hispanic white voters." *Id.* at 1379.

### (3)    Continuing Problems in Minority Voter Participation in Texas

1342.   Citing to reports received, the House Judiciary Committee found that "[i]n the State of Texas, 41.5 percent of Hispanic citizens were registered to vote in 2004 compared to 61.5 percent of white citizens." H.R. Rep. No. 109-478, at 29.

1343.   Congress heard testimony from Nina Perales: "According to the Census Bureau, in the November 2004 presidential election, 58.5 percent of Latino voting age citizens reported that they were registered to vote, compared to 74.7 percent of all non-Hispanic white voting age citizens. Latino turnout also lagged 15.5 percent behind non-Hispanic white turnout in that election." *March 8, 2006 Hearing Vol. I*, at 70, *Voting Rights in Texas, 1982-2006* at 5 (Appended to the Statement of Nina Perales, July 13, 2006) (Wolfson Decl. Ex. 8).

1344.   Congress received evidence from Nathaniel Persily who testified that "blacks tend to lag non-Hispanic white in the covered jurisdictions in their registration and turnout rates and sometimes so to a significant degree." The table cited by Professor Persily in his testimony indicates that while 73.4 percent of non-white Hispanic eligible voters are registered to vote, only 68.4 percent of eligible black voters are registered. *May 17, 2006 Hearing*, at 131 (citing to a Census Bureau table)

1345.   Congress heard testimony from Jose Garza, citing the Court's holding in *League of United Latin American Citizens v. NEISD* that minorities in the North East Independent School Distric—located in San Antonio, Texas—bear the effects of past discrimination in almost all areas of life, including education, employment and health, which make it more difficult to effectively participate in the political process.  The Court finds that plaintiffs have shown that Blacks and Hispanics still bear the effects of past discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.  *October 20, 2005 Hearing*, at 29.

1346.   Congress received a report by the Chief Justice Earl Warren Institute stating that, "[u]pdating some evidence Congress considered when passing and renewing the temporary provisions of the Act, witnesses noted that socio-economic disparities between Latinos and African Americans and the Anglo population in Texas persist, including significantly lower levels of educational attainment and income for Latino and black Texans." *May 4, 2006 Hearing Part I*, at 275.

1347.   A report presented to Congress from Orville Vernon Burton states: "White Texans show significantly higher levels of important socioeconomic indicators (such as education and economic prosperity) than their African American and Latino counterparts.  These socioeconomic disadvantages experienced by African Americans and Latinos constitute a clear hindrance to the effective participation of those groups in the political process." *March 8, 2006 Hearing Vol. III*, at 3077

1348.   A report presented to Congress from Orville Vernon Burton lists the following socio-economic disparities affecting minority participation: disparity in elementary education, *March 8, 2006 Hearing Vol. III*, at 3078; high school education, *March 8, 2006 Hearing Vol. III*, at

3079; public university education, *March 8, 2006 Hearing Vol. III*, at 3079; income, poverty, housing, *March 8, 2006 Hearing Vol. III*, at 3077-3078, 3080; unemployment rate, *March 8, 2006 Hearing Vol. III*, at 3078; health insurance, *March 8, 2006 Hearing Vol. III*, at 3080.

### 8.    Evidence Before Congress: the "Bailout" Provision

#### a)    Congressional Findings

1349.    The House Judiciary Committee found that use of the bailout provisions demonstrated that "covered status has been and continues to be within the control of the jurisdiction such that those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so." H.R. Rep. No. 109-478, at 25.

1350.    The House Judiciary Committee found "that the success and effectiveness of the VRA's temporary provisions were also reflected by those jurisdictions that successfully terminated their covered status. Since 1982, 11 counties from the covered State of Virginia have successfully bailed out from coverage under Section 4." H.R. Rep. No. 109-478, at 93. *See also id.* at 93 ("In fact, 11 counties in Virginia have successfully removed themselves from coverage under the Voting Rights Act."). *Cf. October 20, 2005 Hearing*, at 93 (attachment 1 to the written statement of Gerald Hebert) (indicating that 9 Virginia counties have achieved bailout and 2 counties have pending applications); *March 8, 2006 Hearing Vol. I*, at 65 (testimony of Wade Henderson) (indicating same).

1351.    The House Judiciary Committee found that "[b]ailout, available through Section 4(a), while for the most part has gone unused until recently, has proven to be achievable to those jurisdictions that can demonstrate an end to their discriminatory histories." H.R. Rep. No. 109-478, at 61.

#### b)    The Operation of Bailout

1352.   Congress received testimony from Gerald Hebert, who has "represented all nine of the jurisdictions that have bailed out since the '82 amendments" that "[t]he bailout provisions are really an incentive for the covered jurisdictions, which have a presumption that they discriminate, to show that, in fact, they have a clean record.  That's what you intended when you enacted the bailout provisions; and thus far, they've worked very well."  *October 20, 2005 Hearing*, at 88-89.

1353.   Congress received testimony from Gerald Hebert, who stated that, in his opinion, around 90% of covered jurisdictions meet some of the bailout requirements.  He stated that "[y]ou have to show that within the last 10 years you have used no test or device; that there have been no final judgments or settlements that you've entered into as a jurisdiction because it's been alleged that you discriminated on the basis of race, color, or membership in a language minority group in your voting and election practices; that there haven't been any Federal examiners assigned to your jurisdiction; that you've timely submitted all the voting changes to the Justice Department for preclearance; that the Justice Department has not objected to any of your changes, or the D.C. court denied any of your changes."  *October 20, 2005 Hearing*, at 88.

1354.   Congress received testimony from John J. Park Jr., Assistant Attorney General of the State of Alabama, who suggested to the Senate Judiciary Committee that Congress should amend the bailout eligibility provision of the Act to allow "political parties and other covered entities that are not political subdivisions of a covered State" to bail out from coverage.  *June 21, 2006 Hearing*, at 237; *see also October 20, 2005 Hearing*, at 91 (written statement of Gerald Hebert) (noting to the House Judiciary Committee that one "solution may be to allow towns, cities, and other local governmental units within a covered county to bailout independently").  Congress

declined to make such a change. H.R. Rep. No. 109-478, at 63 (indicating that the Committee did not make this change).

1355.  Congress received testimony from Gerald Hebert regarding the use of the bailout provision since Congress amended it in 1982 to allow covered jurisdictions to bail out. He explained that "not a single jurisdiction has attempted to bail out since the '82 amendments and been turned down by the Justice Department or a Federal court. When you think about the bailout provisions, they are just the right stuff. They go exactly to the issues that Congress was concerned about when it enacted the Voting Rights Act in the first place. When you think about the criteria that you have to establish in order to bail out, you have to show that you haven't lost a court case in which you've been found guilty of discriminating on the basis of race or color or membership in a language minority group. You have to show that you've actually taken constructive measures to increase minority voter participation. You have to show that you've complied with section 5's preclearance requirements. You have to show that not only have you made your submissions, but you haven't proposed anything that discriminates against minority voters or makes them worse off. All of the kinds of things that jurisdictions should have to show in order to escape. And quite frankly, I think they're perfectly tailored to meet the nature and extent of the violation[.]" *October 20, 2005 Hearing*, at 104; *see also Id.* at 88 (testimony of Gerald Hebert).

1356.  Congress received a paper from Gerald Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act*, regarding the way bailout works. Hebert cited the 1982 Senate Report, S. Rep. No. 97-417, at 53, stating that "[t]he legislative history anticipated that '[t]his safeguard will permit evidence to be presented of voting rights infringements which have not previously been the subject of a judicial determination . . . . However, such violations would not

bar bailout if 'the plaintiff establishes that any such violation were trivial, were promptly corrected, and were not repeated.'" Hebert further stated that, "[w]hat this means in practice is that a jurisdiction that inadvertently failed to submit a voting change for preclearance but implemented the change anyway will not be barred from obtaining a bailout even though such failures are technical violations of the preclearance provisions. Such 'violations,' if inadvertent, would fall into the 'trivial' category." *March 8, 2006 Hearing Vol. II*, at 2676.

1357. Congress received testimony from Assistant Attorney General Wan Kim that "[u]nder the Act, a county within a covered State can file a successful bailout action separate from the State. Current law, however, does not permit a city and other political subdivisions within a covered county to separately bailout of coverage." *May 10, 2006 Hearing*, at 61.

<blockquote>

c)      **Bailout and its Relationship to the Constitutionality of the VRA**

</blockquote>

1358. Congress received a paper from Gerald Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act*, stating that "[t]he current bailout formula was an important step toward achieving the goals of the Voting Rights Act. It gave covered jurisdictions an incentive to move beyond the *status quo*, and to improve accessibility to the entire electoral process for racial and ethnic minorities. As the 1982 Senate Judiciary Committee report stated, 'the goal of the bailout . . . is to give covered jurisdictions an incentive to eliminate practices denying or abridging opportunities for minorities to participate in the political process.' There is evidence that the bailout provisions have done precisely that. The bailout provisions actually 'provide[d] additional incentives to the covered jurisdictions to comply with laws protecting the voting rights of minorities, and . . . improve[d] existing election practices.'" *March 8, 2006 Hearing Vol. II*, at 2676-2677.

1359.   Congress received a paper from Gerald Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act*, stating that, "[i]n sum, the current standards for bailout are practical and are drafted in such a way as to require covered jurisdictions to prove the absence of those conditions which led to coverage in the first place. . . .  For the most part, jurisdictions subjected to the Act's special remedial provisions, such as the preclearance provisions, have an effective and reasonable opportunity to bailout today.  Moreover, the bailout provisions are tailored in such a way as to require a covered jurisdiction to prove nondiscrimination in voting and elections on the very issues that Congress intended to target when it enacted the special remedial provisions in the first place.  The Voting Rights Act has made our democracy stronger, and the extension of the special remedial provisions will help bring about a day when there will be no discrimination that affects the ability of any person to register to vote or to cast a ballot." *March 8, 2006 Hearing Vol. II*, at 2689.

1360.   Congress received a paper from Gerald Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act*, stating that "[t]he Supreme Court has held the VRA to be constitutional because its remedial provisions are proportional to the injury Congress sought to remedy.  The bailout provisions help insure the Act's constitutionality because they provide a reasonable means by which covered jurisdictions can exempt themselves from the Act's special (and more intrusive) provisions, and because the bailout provisions, like other parts of the Act, relate so closely to the Act's original purpose and the discrimination in voting it sought to eliminate.  And finally, the bailout provisions serve the important function of insuring that state and local governments with a history of discrimination have eliminated such practices and have let minority voters take their rightful place as full participants in all aspects of the political process." *March 8, 2006 Hearing Vol. II*, at 2689-2690.

1361.   Congress received testimony from Anita Earls stating that, "[t]he current standard for bailout is the best measure for when Section 5 is no longer needed.  If all covered jurisdictions eventually meet this standard, then Section 5 would lapse of its own accord." *May 16, 2006 Hearing*, at 55.

### d)      The Efficacy of the Bailout Provisions

1362.   Congress heard a statement from Representative John Conyers of Michigan that "the bailout circumstances . . . I think have been expedited by now.  You don't even—you can do it through just filing." *October 20, 2005 Hearing*, at 103.

1363.   Congress received a statement from Representative Mel Watt of North Carolina who explained that "[i]f a jurisdiction under section 4(b) wants to get out from under the preclearance requirements of the Voting Rights Act, there is a process for doing that[.]  Under section 4—the bailout mechanism permits a covered jurisdiction to demonstrate that it now facilitates equal opportunity at the ballot box.  By doing so, the jurisdiction may relieve itself of the obligations imposed under the act.  And in fact, nine jurisdictions in the Sate [sic] of Virginia alone have availed themselves of this provision and have successfully bailed out of the preclearance coverage of the Voting Rights Act." *October 20, 2005 Hearing*, at 6.

1364.   Congress received testimony from Drew Days who explained that "the current bailout provisions balance concerns that jurisdictions that continue to abridge or deny the voting rights of minorities remain covered by the Act while encouraging compliance.  Congress should not relax the bailout requirements in view of the fact that no jurisdiction has demonstrated that the current provisions present unreasonable obstacles.  For Congress to do so in light of hearing evidence of serious VRA violations in the twenty-first century would send an unfortunate message." *May 17, 2006 Hearing*, at 46.

1365.   Congress received written testimony from Assistant Attorney General Wan Kim that "[i]t appears that the Department of Justice has, consistent with congressional intent, taken a commonsense approach to satisfying the bailout criteria by agreeing to allow cities and counties to bail out although there had been some oversights in compliance, provided those oversights were cured before bailout was granted. *See* S. Rep. No. 97-417, at 48 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 226 ('Courts and the Department of Justice have used, and would continue to use, common sense on changes that are really *de minimis*.'). Will the Department continue to take this approach if section 4(a) is reauthorized?" Assistant Attorney General Kim answered "[t]he Department of Justice has approached the bailout provisions in a manner consistent with its text and congressional intent. The Department will continue to do so with respect to all provisions of the Act, including Section 4(a)." *May 10, 2006 Hearing*, at 61.

1366.   Congress received written testimony from Assistant Attorney General Wan Kim regarding the Department of Justice's approach to bailout, stating that, "[t]he Department of Justice has not conducted any coordinated outreach program targeted to inform local authorities of their option to seek a bailout. The Department of Justice has worked closely with each individual jurisdiction that has expressed an interest in obtaining a bailout. Our assistance has focused on helping the jurisdiction to fully develop a factual record on which a bailout could be based." *May 10, 2006 Hearing*, at 71.

1367.   Congress received testimony from Gerald Hebert, speaking "in my capacity as legal counsel to a number of the jurisdictions that have already bailed out, or are in the process of bailing out; including, among others, Augusta County, Virginia, and Kings County, California." He testified that, "I do support an extension of the act, and I believe the bailout provisions, as they presently exist, are largely working." *October 20, 2005 Hearing*, at 87.

1368.   Congress received testimony from Gerald Hebert stating that, "I'm pleased to see that the bill, H.R. 9, makes no substantive changes in the bailout provisions.  I think they're a good fit.  I think they're easy to prove for jurisdictions that are not engaged in voting discrimination. I'm pleased to see that was left intact." *May 4, 2006 Hearing Part I*, at 9.

1369.   Congress received testimony from Gerald Hebert that voting rights complaints in districts that have bailed out are decreasing because "in the bailout jurisdictions, the opportunities were actually increasing, as the Justice Department found when they consented to them," showing the provision appropriately removes those jurisdictions that no longer commit substantial voting rights abuses. *October 20, 2005 Hearing*, at 102.

1370.   Congress received testimony from Anita Earls stating that "[t]he record at this time does not justify instituting a broad-based bailout.  As Congress concluded in 1982, 'if we turn the bailout into a sieve, it would make the extension of Section 5 an exercise in futility and a cruel hoax on millions of black and brown Americans.'" *May 16, 2006 Hearing*, at 45.

1371.   Congress received testimony from Anita Earls that the bailout provision is "more than ample."  She noted that, "[a]ccording to voting rights attorney J. Gerald Hebert, these provisions are 'easily proven' for jurisdictions that do not have discriminatory voting practices."  She stated that, "[t]he fact that a majority of jurisdictions have failed to bailout on an individual basis illustrates that Section 5 is still necessary in those jurisdictions." *Id.* at 42.

1372.   Congress received testimony from Pamela Karlan stating, "[t]hat the jurisdictions that have pursued bailout have been successful in obtaining it suggests that the actual process strikes an appropriate balance."  She noted the "rarity of bailout" is due "first . . . [to the fact] that jurisdictions have not sought bailout because they have not satisfied all the conditions — including the important 'constructive efforts' detailed in section 4(a)(1)(F) — and see no point in a futile

effort to bail out, an effort that might lead to scrutiny over whether the jurisdiction has even fully complied with section 5." She further testified that "jurisdictions appreciate either the 'seal of approval' that preclearance accords or the political cover it provides." She also testified that "local jurisdictions are unaware of the bailout process." *Id.* at 93.

1373. Congress received testimony from Armand Derfner that, "I do not see any need for a 'broad-based' bailout when the current bailout has not proved to be an obstacle." *May 17, 2006 Hearing*, at 78.

1374. Congress received a statement from Representative John Conyers of Michigan regarding the bailout record since 1982. He testified that, "[s]ignificantly, section 4, in adding to defining the scope coverage, contains a bailout provision that allows jurisdictions to terminate or bail out from coverage under the act's special provisions; originally enacted as a means to remedy any possible over-inclusiveness resulting from application of the trigger formula. So we amended the procedure in 1982 so jurisdictions that meet the statutory standards can obtain relief. Bailout, though stringent in its terms, has been realistically available as an option to covered jurisdictions. For example, when the act was reauthorized in 1970, enhancements in the coverage formula resulted in the partial coverage of 10 States. After 1982 modifications to the bailout provision, the City of Fairfax, Virginia, filed the first bailout action, and the United States consented to the declaratory judgment entered in October 1997. And since that time, several other jurisdictions have obtained similar judgments. It is a quick way to get out from under it. Thus, the act's bailout provision serves as a self-adjusting mechanism that enables jurisdictions in which the right to vote is no longer threatened to remove themselves from preclearance requirements from section 5." *October 20, 2005 Hearing*, at 3.

1375.   Congress received a statement from Representative Tom Feeney of Florida to Gerald Hebert that, "your average fee of about $5,000 seems to be one of the most affordable waivers of any Federal program that I know of.  I don't know of any lawyer in the country that can brag about that success rate for such an affordable proposition." *October 20, 2005 Hearing*, at 106; *see also Id.* at 90 (testimony of Gerald Hebert) ("[W]hile bailouts come with some costs (on average about $5,000 for legal expenses), it is still less costly than making § 5 preclearance submissions indefinitely.").

1376.   Congress received a report by the Chief Justice Earl Warren Institute summarizing various research studies.  The report cited Gerald Hebert, *The Voting Rights Act: Is It Time to Bailout?*, stating that "[this] study reviewed the function of the bailout provisions of Section 5 since last amended and how the provisions might be improved during reauthorization.  This study posits that bailout is not overly burdensome, in terms of expense or time, despite the low number of jurisdictions that have taken advantage of the option.  The author, who has represented jurisdictions that have applied for bailout, estimates that the process costs approximately $5,000 in legal fees.  He opines that the standards for bailout are not too onerous, as they closely mirror Section 5 requirements, and points out that all jurisdictions that have applied for bailout since the 1982 reauthorization have been successful.  Moreover, he contends that the option of bailing out of Section 5 coverage and the fact that the bailout procedure is not overly burdensome demonstrate that Section 5 is narrowly tailored because jurisdictions that should not be covered can be exempted from coverage." *May 4, 2006 Hearing Part I*, at 276-277.

1377.   Congress received the Report of the National Commission on the Voting Rights Act which summarized testimony from Gerald Hebert.  According to the Report, Hebert believes that "[t]he current standards . . . are neither as costly nor as onerous for many jurisdictions as is gen-

erally believed, and they reward good behavior in complying with Section 5." *March 8, 2006 Hearing Vol. I*, at 357.

1378.    Congress received testimony from Gerald Hebert describing the pre-1982 bailout record. He stated that, "[b]etween 1965 and '70, Alaska, three counties in Arizona, Elmore County, Idaho, and Wake County, North Carolina, all bailed out. Nash and Gaston County . . . were not allowed to bail out. The Justice Department opposed that in those early years. In 1970 to '75, when Congress extended the act again, you had a couple of jurisdictions. The State of Alaska bailed out, as did the State of New York. And New York ended up getting recovered under the Voting Rights Act, when it was found that they had in fact used a test or device in a discriminatory manner. And my home State of Virginia in 1974 sought a bailout. And they were denied a bailout because there was evidence that the setting up of inferior schools for minority voters in fact disabled minority voters from passing the literacy test. And so therefore, the literacy test in Virginia had a discriminatory impact, and they did not meet the bailout provisions. Now, Congress in 1982 dramatically changed the bailout provisions. And . . . essentially, as a result of the '82 amendments, in the last 25 years you've now had a bailout standard that is totally different, and not focused on a time limit of 5 years showing a non-discriminatory test or device or so on." *October 20, 2005 Hearing*, at 87-88.

1379.    Congress received testimony from Anita Earls discussing her experience at the Justice Department working with local officials. She testified that "[o]ne of the best indicators of the fact that many state and local officials do not find Section 5 to be burdensome is that so few have sought to bailout from coverage." *May 16, 2006 Hearing*, at 64.

1380.    Congress received testimony from Armand Derfner, South Carolina civil rights lawyer, regarding the use of the bailout provision since Congress amended it in 1982 to allow cov-

ered jurisdictions to bail out. He explained, "[t]he debate in 1982 took place because at that time the bailout had been very infrequently used. And in effect, the only bailout at that time available was for jurisdictions that could sort of show that it was a mistake to include them from the beginning. So there was no way that a jurisdiction, once covered, in those days could bail out simply by improving and doing better. The 1982 bailout — and I think Mr. Hebert's cases have shown this — has shown that a jurisdiction can bail out effectively, and it can do it as much by showing that it has a good record today, it has worked to have a good record, and it has worked to do those things that are the goals of the act[.] I think the bailout as it is is just fine, and fully supports the constitutionality of the Voting Rights Act by giving a safety valve, or almost a reverse trigger, to correspond to the trigger of section 4." *October 20, 2005 Hearing*, at. 104.

1381. Congress received testimony from Theodore Shaw that, "Section 4(a) establishes a bailout process that is both reasonable and achievable for those jurisdictions that enjoy full minority participation in the electoral process. The evidence demonstrates that all jurisdictions that have attempted to bail-out from coverage under § 5 have been able to do so." *May 9, 2006 Hearing,* at 161.

1382. Congress received testimony from Theodore Shaw that, "evidence in the record demonstrates that the bailout process is reasonable and that the 1982 Amendments sufficiently readjusted the requirements of the bailout mechanism. Moreover, the evidence shows that the Justice Department has generally provided assistance to those jurisdictions that have sought bail out and routinely offered joint consent to an entry of judgment granting bailout as permitted under the Act. Given these facts, the bailout provisions adequately prevent Section 5 from applying too broadly by providing eligible jurisdictions an effective and accessible tool to terminate their covered status." *May 9, 2006 Hearing*, at 177.

1383.   Congress received a paper from Gerald Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act*, citing *South Carolina v. Katzenbach*, 383 U.S. 301, (1966). Hebert stated that, "[w]ith respect to the bailout provisions, the Court found the burden on a covered jurisdiction seeking bailout 'quite bearable, particularly since the relevant facts relating to the conduct of voting officials are peculiarly within the knowledge of the States and political subdivisions themselves.'" *March 8, 2006 Hearing Vol. II*, at 2667.

1384.   Congress received written presentations on behalf of Merced County in which the County advocated that Congress considering a revised bailout and coverage formula in the 2006 reauthorization. *See October 20, 2005 Hearing*, at 171-248.  Congress received a report, *Voting Rights in California, 1982-2006*, prepared by Joaquin G. Avila, Eugene M. Lee, and Terry Ao. The California report stated, regarding Monterey, Merced, and Kings Counties in California, that "none of the three counties could qualify for a bailout under the statute's current criteria. Merced County would have difficulty demonstrating that there are no discriminatory methods of elections within the county that deny minorities with equal access to the political process.  For example, the city of Los Banos has a total population of 25,869, based upon the 2000 Census, of which 13,048 or 50.4 percent are Latina/o.  The at-large method of election is implemented to select members to the City Council.  Despite this large concentration of Latina/os within the city there is not a single Latina/o serving on the City Council.  Such an absence clearly suggests that the at-large method of election utilized by the city of Los Banos may have a dilutive effect on Latina/o voting strength and thus would impede efforts of Merced County to seek a Section 5 bailout.  In addition, based upon an on-site study of annexations for special election districts . . . there appeared to be many annexations that had not been submitted for Section 5 approval.  This factor, if true, would also prevent Merced County from successfully securing a Section 5 bailout.

The remaining two counties also would not be successful in securing a Section 5 bailout. In Kings County, the recent settlement involving the Hanford Joint Union High School District which resulted in the abandonment of the at-large method of election and the implementation of district elections would also prevent Kings County from bailing out from Section 5 coverage. In Monterey County, the recent letter of objection issued against the Chualar Union Elementary School District on March 29, 2002, would result in the same outcome. This effort by Monterey, Kings, and Merced counties to secure legislative amendments to facilitate a Section 5 bailout further reinforces the need to have Section 5 coverage in California. These efforts demonstrate that these counties and their political subunits would have no hesitation in reverting back to redistricting plans or methods of elections that had a discriminatory effect on minority voting strength." *July 13, 2006 Hearing,* at 113.

1385.   Congress received a paper from Gerald Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act,* regarding the time and cost of using the bailout provision. Hebert stated from his experience as counsel for provisions that had bailed out or were in the process of doing so, that recent bailout requests have been "processed more efficiently and led to a reduction in the amount of time (and cost) for the bailout process." *March 8, 2006 Hearing Vol. II,* at 2680.

1386.   Congress received testimony from Robert McDuff that, "Section 4(a) establishes a bailout process that is extremely liberal and achievable for those jurisdictions that enjoy full minority participation in the electoral process. It is my understanding that all jurisdictions that have sought to opt out from coverage under Section 5 have been able to do so." *May 10, 2006 Hearing,* at 99.

### 9.     Evidence Before Congress: the Minimal Administrative Costs and Burdens Imposed by Section 5

#### a)     The Minimal Burden

1387.   Congress received testimony from Anita Earls that Section 5 preclearance is not a particularly burdensome process.  Ms. Earls testified that, "[o]ne of the best indicators of the fact that many state and local officials do not find Section 5 to be burdensome is that so few have sought to bailout from coverage."  Ms. Earls further testified that, during her tenure with the Department of Justice, the government "went to great lengths to make sure that the technology and internal operating procedures in place would facilitate electronic submission of much of the required information.  [The Department] conferred with state and local officials so we could take their concerns into account as we structured our processing of submissions.  [The Department] also modified the Section 5 regulations to make the process technically easier for jurisdictions." *May 16, 2006 Hearing*, at 64.

1388.   Congress heard testimony from Armand Derfner that, based on his experience preparing Section 5 preclearance submissions, "[t]he administrative burden is not great."  Derfner testified that preparing Section 5 preclearance submissions is "a task that is typically a tiny reflection of the work, thought, planning, and effort that had to go into making the [election] change to begin with.  For example, even a polling place change, it is a small change, but the submission is also small, and typically the work involved in submitting a polling place change is less than the work it took to find a new polling place to begin with. . . . [I]f there is a sudden need for a new polling place, that can be pre-cleared very swiftly if there is an election coming up." *May 17, 2006 Hearing*, at 10-11.

1389.   Congress received evidence from Fred Gray who noted that the deterrent effect of Section 5 is very important, and outweighs the "small administrative act" which covered jurisdic-

tions submit themselves to and are now used to doing. Gray offered a cost-benefit analysis in support of reauthorization finding that Section 5 had a very low burden but relatively high value—cost-benefit analysis favors reauthorization. *May 17, 2006 Hearing*, at 25.

1390.  Congress received testimony from Fred Gray that the Department of Justice's Guidelines regarding Section 5 compliance facilitate the preclearance process, thus making it less burdensome. Gray stated that the Department's Guidelines, "identify specific information that jurisdictions must provide in order for their submission to be deemed complete and reviewable. Further, the Guidelines are written in easy to understand language that generally avoids 'legalese.'" *May 17, 2006 Hearing*, at 100.

1391.  Congress received evidence from Debo Adegbile that the Department of Justice "applies the preclearance standard with a degree of flexibility that takes into account the nature of the electoral change being reviewed, and the time before the proposed change would take effect." As Adegible testified, "[f]or example, last minute polling place changes will be reviewed quickly before elections, whereas for more complex changes, the DOJ will be more likely to use its statutorily given 60-day review period. The DOJ's actions following Hurricanes Katrina and Rita further illustrate the flexible nature of preclearance review. After the hurricanes, the DOJ immediately sent a letter to the Secretaries of State in Mississippi and Louisiana acknowledging that they would be ready to expedite voting changes." *June 21, 2006 Hearing*, at 141-142.

1392.  Congress received evidence from Debo Adegbile that "[t]o date, every jurisdiction that has tried to bail out has been successful, and those jurisdictions have expressed satisfaction with both the existing bailout formulation as well as the results they have achieved." *June 21, 2006 Hearing*, at 143-44.

1393.   Congress received testimony from Anita Earls that, "the majority of officials that I had direct contact with did not find Section 5 requirements to be burdensome[.]" *May 16, 2006 Hearing*, at 64.

### b)    Views of Covered Jurisdictions

1394.   During the floor debate, a letter from the Council of State Governments, the National Conference of State Legislatures, the National Association of Secretaries of State, the National Association of Counties, the National League of Cities, and the U.S. Conference of Mayors to Speaker Dennis Hastert and Minority Leader Nancy Pelosi, dated June 6, 2006, was entered into the record.  The letter urged Congress to reauthorize the expiring provisions of the Voting Rights Act:

> Three key provisions of the Voting Rights Act are set to expire on August 6, 2007. . . These sections have had the cumulative effect of reducing and preventing racial and language discrimination against a significant number of citizens and have helped increase minority participation in elections for candidates at all levels of government. While substantial progress has been made since passage of the Voting Rights Act in 1965, it has not yet resulted in the elimination of voting discrimination. Congress must renew the enforcement provisions of the Voting Rights Act.

152 Cong. Rec. H5146.

1395.   During the reauthorization process, Senator Patrick Leahy stated "[i]n fact, Section 5 is supported by many local officials in covered jurisdictions, like those on the Monterey County Board of Supervisors, who sent a letter to House Judiciary Chairman Sensenbrenner urging that it be reauthorized." *May 17, 2006 Hearing*, at 195.

1396.   Congress received evidence from Gerald Hebert who observed that "[a] lot of jurisdictions like section 5 preclearance and like to get a stamp of approval from the Justice Department that their voting system is non-retrogressive.  And I've heard a number of officials say

that." *May 4, 2006 Hearing Part I*, at 66.  See also May 10, 2006 Hearing, at 26 (testimony of

Robert McDuff) (noting that one of the benefits of Section 5 is that it can provide cover for poli-

cymakers who "want to do what is right").

1397.   Congress received evidence from Anita Earls who stated that "[t]he main benefit of

Section 5 for state and local jurisdictions that I heard expressed by local officials was that after a

voting change was precleared, they could deflect criticism by minority voters by pointing out

that the redistricting plan, or polling place change, for example, had been precleared by the De-

partment of Justice." *May 16, 2006 Hearing*, at 64.

1398.   Congress received evidence from Anita Earls who observed that "[a]s a practicing at-

torney litigating Section 2 voting rights cases, I saw a different benefit to Section 5 coverage.  In

negotiating with local officials to change from an at-large system to single-member districts, lo-

cal officials could use Section 5 preclearance as a justification for doing the right thing when

some constituents did not want them to create avenues for minority voter participation.  Thus,

Section 5 was a shield for local officials when they were negotiating settlements in Section 2

cases." *Id.* at 64-65.

1399.   Congress received testimony from Donald Wright, General Counsel of the North

Carolina State Board of Elections, who testified that "[f]rom [his] first contact with USDOJ to

the present, all my dealings as to Voting Rights Act issues have been prompt, efficient, and han-

dled in a friendly, yet professional matter by their attorneys and staff." *June 21, 2006 Hearing*,

at 310.

1400.   Congress received testimony from Donald Wright, General Counsel of the North

Carolina State Board of Elections, who testified that  "USDOJ Attorney Chris Herren was in

charge of overseeing Section 5 preclearances for North Carolina for many years until April of

this year. Mr. Herren, without abandoning his watchdog role for possible violations of the Voting Rights Act, was as open as any government employee, on any level of government, who I have ever dealt with. Mr. Herren and other Department staff promptly reviewed and responded to all of my phone calls, faxes, and e-mails to make Section 5 compliance easier." *June 21, 2006 Hearing*, at 310.

1401. Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[t]he responsibility for overseeing North Carolina Section 5 submissions has now been assumed by Attorney Yvette Rivera. Attorney Rivera was kind enough to call me in April to introduce herself and informed me of the change. I have no reason to believe that she will not continue the same excellent level of service than Mr. Herren did. In addition, I have had pleasant dealings with all USDOJ employees and staff since 2000, and I have not had any complaint from any North Carolina jurisdiction that deals with the USDOJ to the contrary. The cooperative and efficient performance by the USDOJ has facilitated the cost effective and efficient submission of voting changes under Section 5 by me and election officials from North Carolina jurisdictions." *June 21, 2006 Hearing*, at 310.

1402. Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[i]n my experience, Section 5 works effectively and efficiently. Generally, any delays in preclearance fall into four areas attributable to actions by the submitting jurisdiction: local governmental units not submitting voting changes or submitting them on a tardy basis; submissions that fail to provide the information required by state law or USDOJ regulations/guidelines to facilitate the Section 5 review process; failure to identify relevant circumstances or evidence that may delay consideration of the submission; and

failure to promptly communicate with USDOJ in response to a request for additional informa-tion." *June 21, 2006 Hearing*, at 310.

1403.   Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that the State Board of Elections has "never had a situation where the USDOJ has failed to cooperate with our agency or local government to en-sure that a preclearance issue did not delay an election." *June 21, 2006 Hearing*, at 312.

1404.   Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "sometimes local jurisdictions delay re-sponding to requests for additional information from the USDOJ.  The USDOJ is to be compli-mented because it facilitates submissions by following up with the jurisdictions in a regular and professional manner, often without results.  If the Board of Elections learns of such a situation, we will let the non-responding jurisdiction know that they need to respond and work with them to provide all required information." *June 21, 2006 Hearing*, at 313.

1405.   Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[t]he 'average' submission using the form guidelines in Subpart B of Part 51 of the CFR usually takes less than an hour to prepare and mail. The ease and cost of such submissions also improves with the use of previous submissions in an electronic format to prepare new submissions.  In my experience, most submissions are routine matters that take only a few minutes to prepare using electronic submission formats readily available to me." *June 21, 2006 Hearing*, at 313 (written testimony of Donald Wright).  In other words: "So is the current set-up a burden upon the average State or jurisdiction in regards to submission?  I would contend that it is not . . . [as shown by an informal survey in which com-

ments were received such as:] 'preclearance requirements are routine and do not occupy an exorbitant amount of time, energy or resources'[.]" *Id.* at 12-13 (oral testimony of Donald Wright).

1406.   Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[t]he costs of preclearance submissions are insignificant, except for redistricting submissions, which entail a large amount of detailed demographic information and election data.  These redistrictings generally occur on a state, county, or municipal level once every ten years since they follow the release of the new census data.  So even if they are large submissions, they are very infrequent." *June 21, 2006 Hearing*, at 313.

1407.   Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[m]any jurisdictions in North Carolina have staff counsel that prepare submissions as part of their ongoing duties, so additional costs are not incurred in those situations.  The costs of submissions are significantly reduced by ensuring that they are promptly and correctly submitted the first time." *June 21, 2006 Hearing*, at 313.

1408.   Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[p]rior to a 2005 conference on the Voting Rights Act, I communicated with election officials in a dozen North Carolina counties about their opinions of the benefits and any burdens of Section 5 preclearance. Out of the dozen, only one county elections director stated that he desired that Section 5 not be renewed.  The remainder of the directors viewed Section 5 as a manageable burden providing benefits in excess of costs and time needed for submissions." *June 21, 2006 Hearing*, at 313.

1409.   Representative David Price of North Carolina submitted a statement into the Congressional Record disputing the idea that Section 5 is "burdensome" and that "pre-clearance is no longer needed." Specifically, Representative Price stated: "But listen to the testimony of North

Carolina election officials. 'I would hate to operate without it,' says one. 'Pre-clearance requirements are routine, and do not occupy exorbitant amounts of time, energy or resources,' adds another. 'The history of X County causes our operations to be scrutinized and rightfully so,' says a third official. And a fourth adds, '[t]he Voting Rights Act allows us opportunity to assure the public that minority rights are being protected and that someone is independently validating those decisions.'" 152 Cong. Rec. H5054.

1410.    Congress heard evidence from Tyrone Brooks, an election official from Georgia, who described the problems surrounding Black candidates' efforts to seek support from white voters. Brooks stated that Robert Benham, elected to the court of appeals in 1984, was one candidate who the governor felt they could "sell" in the white community with the support of the bar and the Democratic leadership, because nobody knew he was black. The plan was to "get out the vote" in the black community in the traditional way, but to ignore race in the white community. Benham's photograph appeared only on brochures distributed in the black community and there were no public endorsements of Benham by Maynard Jackson, Julian Bond, Jesse Jackson, or anybody in the civil rights community. *November 9, 2005 Hearing*, at 39.

### 10.    Evidence Before Congress: the Sufficiency of the 2006 Legislative Record

#### a)    The Acknowledgment of the *Boerne* Requirements

1411.    After a discussion of the *City of Boerne* standard, the House Judiciary Committee stated that "[t]he record before the Committee reveals that extending the VRA's temporary provisions is necessary to protect racial and language minority citizens located in covered jurisdictions from discrimination. As a result, the gains achieved by minority voters over the last 40 years are vulnerable without the protections afforded by the temporary provisions. It is in light of this reality that the Committee concludes that the temporary provisions of the VRA must be

reauthorized, including Section 4(a)(8) and the provisions it triggers, as well as Section 203, for an additional 25 years." H.R. Rep. No. 109-478, at 56 (referencing the Supreme Court's decisions in *City of Rome*, *City of Boerne*, and *Lopez v. Monterey County*).

1412.   The House Judiciary Committee stated that, "[i]n *Tennessee v. Lane,* the Court noted that 'The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination.' Similar circumstances are true of the VRA: despite previous reauthorizations, the problem of voting discrimination justified reauthorization.  In light of the considerable record before it, the Committee has a duty to maintain the protections afforded by the temporary provisions by reauthorizing these vital provisions." H.R. Rep. No. 109-478, at 56 (internal footnotes omitted).

1413.   Representative Jerrold Nadler of New York stated that "[a]ny remedies in the reauthorizing act must be based on the actual documented need and be appropriately tailored to that need.  The Supreme Court has made clear how we must go about reviewing the act." *March 8, 2006 Hearing Vol. I*, at 13.

1414.   Representative Bobby Scott of Virginia stated that "the Supreme Court has cited the Congressional Record of the Voting Rights Act as a model in recent cases where it actually struck down other civil rights laws after finding that Congress had not established a record of discrimination to support its remedial action.  These decisions have made clear that reauthorization of expiring provisions of the Voting Rights Act must be supported by a record showing discrimination in voting since its last reauthorization in order to survive a constitutional challenge." *March 8, 2006 Hearing Vol. I*, at 5.

1415.   Senator Edward Kennedy of Massachusetts stated, "[w]e are mindful that the Supreme Court will carefully review the legislation we are considering under the standards it has applied in reviewing other civil rights laws in the past[.]  Congress has a special role in enforcing the Fifteenth Amendment, which prohibits racial and ethnic discrimination in voting[.]  Despite having greater latitude in this area than in others, there's no question that we must make a clear record on any legislation to extend the expiring provisions of the Act." *May 16, 2006 Hearing*, at 195.

1416.   Senator Patrick Leahy of Vermont stated that "in the *City of Boerne* decision, the Supreme Court went out of its way to recognize that the Voting Rights Act is an example of a law where Congress acted with authority and got it right."  Senator Leahy noted Justice Kennedy's opinion in that case, which "declared that anti-discrimination laws such as the Voting Rights Act do not require termination dates or geographic tailoring in order to survive judicial review.  Nonetheless our bill includes those limitations and shows, in Justice Kennedy's own words, aspects that 'tend to ensure that Congress's means are proportionate.'"  *Id.* at 197.

1417.   Congress received testimony from Nadine Strossen that Section 5 of the Voting Rights Act satisfies both the congruence and proportionality prong of the Supreme Court's standard set forth in the *City of Boerne* case.  Ms. Strossen stated that the preclearance requirement of Section 5 is congruent to preventing ongoing voting rights abuses, particularly in light of the availability of bailout, the "extensive record of continued voting rights discrimination developed in the congressional record to-date," and the provision's limited duration.  Ms. Strossen further testified that the preclearance requirement of Section 5 is proportional to the injury because it "does not apply nationally, but only to limited jurisdictions with histories of voting discrimination; the bailout provisions allow jurisdictions to avoid preclearance by demonstrating they have

been free of discriminatory voting practices; and Section 5 contains a sunset provision under which it lapses without reauthorization from Congress." *March 8, 2006 Hearing Vol. I*, at 1286; *see also id.* at 1285 (testimony of Nadine Strossen) (noting that the Supreme Court in *Boerne* "explicitly pointed to the Voting Rights Act as an example of appropriate congruent and proportional remedial action by Congress.").

1418.   In response to questioning by Senator John Cornyn (TX), Fred Gray testified that "the *Boerne* Court recognized that the VRA was enacted to protect the right to vote against racial discrimination and found that Congress' power was at its 'zenith' when enacting remedial legislation that reaches problems of racial discrimination.'" *May 17, 2006 Hearing*, at 91.

1419.   Congress received testimony from Armand Derfner that Congress' task under the standard set forth in the *City of Boerne* case "is to determine whether the record shows a continuing need for the section 5 remedy in the jurisdictions where it has been held to be appropriate thus far[.]"  Derfner testified that there are several forms of empirical data that show that Congress has more than met its burden under *Boerne*—these data include: the number of successful Section 2 cases; court findings of high levels of racially polarized voting that interact with certain election methods and procedures to deny minorities equal opportunities to elect their candidates of choice; successful Section 5 enforcement actions; and the Justice Department's Section 5 objections, More Information Requests, and resulting withdrawals of discriminatory voting changes.  Derfner stated that the Senate has received thousands of pages of empirical evidence supporting reauthorization. *May 17, 2006 Hearing*, at 72.

1420.   Congress received testimony from Armand Derfner explaining the Supreme Court's standard set forth in the *City of Boerne* case.  Derfner testified that the question before Congress is "not whether passing the Act in the first instance today would be justified, but whether the

covered jurisdictions . . . have changed enough to allow Congress to remove its protections." Derfner further testified that "the evidence on which Congress has acted in previous reauthorizations, and which it must judge now, is the evidence of continuing voting discrimination in the present and the very recent past (namely, since the last reauthorization in 1982). There is abundant evidence since 1982 of a need to continue protecting minority citizens in the covered jurisdictions from their own governments. Therefore, the evidence here is not 40 years old." *May 17, 2006 Hearing*, at 74.

1421. Congress received testimony from Chandler Davidson, that "<u>roughly 1,500</u> events in Section 5 covered jurisdictions," including "Section 2 cases, objection letters (often objecting to more than one proposed change in a submission), adverse declaratory judgments, and withdrawal letters" can each be characterized as "an instance either of actual discriminatory voting procedure changed as a result of a legal action or as a discriminatory procedure proposed by officials and prohibited or discouraged by the [Department of Justice] or the [District Court for the District of Columbia] since 1982." *May 9, 2006 Hearing*, at 50. (emphasis in original).

1422. Congress received testimony from Anita Earls that "[s]ome scholars suggest that the Constitutional standard under *City of Boerne* is somewhat different when Congress is enacting a new law rather than simply continuing an existing remedial program." *May 16, 2006 Hearing*, at 49.

1423. Congress heard testimony from Professor Pamela Karlan who testified that the Constitutionality of the VRA reuauthorization is "unlike all of the previous *Boerne* line of cases that have come before the Court, [because the VRA reauthorization] deals with a renewal of an act that is already in place." Professor Karlan further testified that "[t]he analogy is if you have a really bad infection and you go to the doctor, they give you a bunch of pills, and they tell you,

'Do not stop taking these pills the minute you feel better. Go through the entire course of treatment because, otherwise, the disease will come back in a more resistant form.' And the Voting Rights Act is strong medicine, but it needs to finish its course of treatment, and that has not yet happened for reasons that you have heard from other witnesses." *May 16, 2006 Hearing*, at 5.

1424. Congress heard testimony from Professor Pamela Karlan who testified that, in reauthorizing the Voting Rights Act, "Congress's power here is, if anything, at its absolute peak. . . . [T]he post-*Boerne* cases all cite the Voting Rights Act of 1965 as the example of a statute that meets the *Boerne* test of being congruent and proportional." *May 16, 2006 Hearing*, at 21.

1425. Congress heard testimony from Professor Karlan, who explained that "the Supreme Court's decisions after *Lopez* [*v. Monterey County*]—most particularly *Tennessee v. Lane*, 541 U.S. 509 (2004), and *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721 (2003)—as well as its election clause cases, reaffirm that the Voting Rights Act satisfies the *City of Boerne* congruence and proportionality test." *May 16, 2006 Hearing*, at 90.

1426. Congress received written testimony from Theodore Shaw, who noted that "(1) *Boerne* and its progeny consistently point to the VRA as the exemplar of appropriate use of congressional Civil War Amendment enforcement powers; (2) recent *Boerne*-line decisions make it clear that Congress is at the height of its power when it acts to protect a fundamental right such as the right to vote from continuing threats of invidious discrimination; and (3) the only post-*Boerne* constitutional challenge to Section 5 of the VRA to reach the Supreme Court cited *Boerne*, and then swiftly reaffirmed the reasoning of *Katzenbach* and *City of Rome*, and upheld preclearance for 'jurisdictions properly designated for coverage.'" *May 9, 2006 Hearing*, at 158.

1427. Congress received testimony from Fred Gray that "the *Boerne* Court recognized that the VRA was enacted to protect the right to vote against racial discrimination and found that

Congress' power was at its 'zenith' when enacting remedial legislation that reaches problems of racial discrimination." *May 17, 2006 Hearing*, at 91.

### b) The Sufficiency of the Record Compared to 1982

1428.   The House Judiciary Committee noted that "more Section 5 objections were lodged between 1982 and 2004 than were interposed between 1965 and 1982 and that such objections did not encompass minor inadvertent changes." The House Judiciary Committee concluded that "[t]his increased activity shows that attempts to discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future." H.R. Rep. No. 109-478, at 21.

1429.   The House Judiciary Committee cited the report of the National Commission on the Voting Rights Act, finding that "in nine of the sixteen Section 5-covered states, more objections were interposed after 1982 than before." *Id.* at 37; *id.* at 92-93.

1430.   Congress received testimony from former U.S. Solicitor General Drew Days, that, "while not identical to that of 1982, [the current legislative record] shares many critical features: there is progress side-by-side with continuing discrimination; there are many egregious examples of violations of voting rights; last minute, drastic polling place changes, and familiar dilutive tactics through methods of 'cracking' and 'packing'; and racial campaign appeals but also a more carefully considered record on Section 5's deterrent effects, and the operation of Section 203. Overall I believe that the record is consistent with that assembled in 1982. Both the quantity and quality of the evidence is strong." *May 17, 2006 Hearing*, at 12.

1431.   Congress heard evidence from former U.S. Solicitor General Drew Days who testified that "I have not been able to review all of the testimony and studies presented to the House of Representatives and now, to the Senate, with respect to the reauthorization. Based upon my four years administering Section 5 and other provisions of the Act, however, I believe that they

offer ample evidence of contemporaneous and continuing problems of electoral practices discriminatory in purpose and effect to support renewal. I have in mind especially the reports prepared by the National Commission on the Voting Rights Act and by the Voting Rights Project of the American Civil Liberties Union." *Id.* at 165.

1432. Congress received testimony from Armand Derfner that "[t]here are several forms of empirical data that show that Congress has more than met its burden under *Boerne*[.] These data include items such as: the number of successful Section 2 cases; court findings of high levels of racially polarized voting that interact with certain election methods and procedures to deny minorities equal opportunities to elect their candidates of choice; successful Section 5 enforcement actions; and the Justice Department's Section 5 objections, More Information Requests, and resulting withdrawals of discriminatory voting changes. The Senate has received thousands of pages of empirical evidence supporting reauthorization." *May 17, 2006 Hearing*, at 72.

1433. Congress received testimony from Professor Sherrilyn Ifill that "the evidence demonstrates that jurisdictions continue to find new ways to retrogress and dilute minority voting strength." Professor Ifill specifically noted that the "*LULAC* [*vs. Perry*] Court recognized that the contested redistricting plan eliminated minority electoral opportunity in the face of growing numbers of politically cohesive Latino voters. This observation ties directly to well-established findings of Congress, in the context of previous renewal debates, showing that one of the periods of greatest danger for minority voting power occurs at the very time that minority communities are poised to exercise it." *July 13, 2006 Hearing*, at 233.

1434. Representative John Conyers of Michigan testified before the Senate Judiciary Committee that the inquiry conducted by the House Judiciary Committee "broke down into two fundamental questions: Is there an adequate record of discrimination to justify reauthorization of the