expiring provisions, and are the expiring provisions, as interpreted by the courts, still adequate to protect the rights of minority voters. While there is so much to celebrate over the last 40 years, our record indicates that we have not yet reached the point where the special provisions of the Act should be allowed to lapse. As some might have you believe, efforts to suppress or dilute minority votes, I report to you sadly, are still all too common." *April 27, 2006 Hearing*, at 8.

1435. Representative John Conyers of Michigan testified before the Senate Judiciary Committee that "[w]ith respect to Section 5, covered jurisdictions, [the House Judiciary Committee] found continuing patterns of discrimination in voting, as evidenced by adverse Section 2 findings, Section 5 objections, and withdrawals of Section 5 submissions after requests for more information from the Department of Justice itself. Similarly, with respect to Section 203, we received substantial testimony from the advocacy community and the Department of Justice, supported by its litigation record, that language minorities remain the victims of discrimination in voting. Most importantly, our record indicates that substantial native-born populations and other citizens still need language assistance to cast an effective ballot. In addition to examining whether there was continuing discrimination in voting, we also examined the impact that several Supreme Court decisions have had on Section 5's ability to protect the minority community in covered jurisdictions from discriminatory voting changes. This inquiry was important to ensure the continuing vitality of the Voting Rights Act." *Id.* at 8.

1436. Representative John Conyers of Michigan testified before the Senate Judiciary Committee that "the record we present to you today is one of the most complete that I have seen for any piece of legislation, with testimony from almost 40 witness, national reports, state specific reports and investigations as to the effectiveness of specific statutory provision by government and academic experts. Should it choose to review this legislative history, as it has done in the

past, the Supreme Court should find this record evidence of a careful inquiry that supports the guarantees of equal voting rights which are enshrined in the Constitution." *Id.* at 14.

1437.   Congress received a statement from former Senate Majority Leader Tom Daschle of South Dakota who noted that, "as the Supreme Court has made clear, a detailed record showing discrimination in voting since its last reauthorization is necessary for future reauthorization to withstand a constitutional challenge." Senator Daschle further stated that Section 5 is "needed every bit as much today as it was 40 years [ago], on August 6, 1965, when it was signed by President Johnson." *March 8, 2006 Hearing Vol. IV*, at 4596-4602.

### c)    The Comparison of of Covered to Non-Covered Jurisdictions

1438.   Congress received testimony from Ronald Gaddie, that "[t]he top six States in terms of overall progress [concerning African-American voter registration and participation] are the ones that were caught by the initial trigger mechanism of the Voting Rights Act.  The two States brought in later, Florida and Texas, place seventh and ninth in an 11-State South, respectively, in terms of voting rights progress.  The States never required to comply with Section 5, Arkansas and Tennessee, rank last and eighth, respectively." *May 16, 2006 Hearing*, at 7.

1439.   Congress heard testimony from Anita Earls that in North Carolina, there is a recent "pattern of local governing bodies going back to at-large election systems, something that is not occurring in non-covered jurisdictions.  So this pattern of continuing to try to either go back to discriminatory patterns or enact new discriminatory measures, is something that is unique to the covered jurisdictions." *Id.* at 15.

1440.   Congress heard testimony from Anita Earls concerning the differences in discriminatory activity in covered and non-covered jurisdictions.  Responding to questioning by Senator Russ Feingold of Wisconsin, Ms. Earls testified that "several counties non-covered under Section

5 sued under Section 2, required by court order to put in place single and redistrict systems, are now passing laws to go back to at-large election systems. Under Section 5, that would be retrogression and it is prohibited. It is not happening in the covered counties." *Id.* at 22.

1441. Congress heard testimony from Anita Earls concerning the deterrent effect that Section 5 has in covered jurisdictions as compared to non-covered jurisdictions. Responding to questioning by Senator Russ Feingold of Wisconsin Ms. Earls testified that "[i]n preparation for the report that we prepared on North Carolina and Virginia, we had hearings and local residents came and talked about how in the covered counties local officials will consult with them if they want to move a polling place or when they are enacting new districting plans. That doesn't happen in the non-covered counties." *Id.* at 22.

1442. Congress heard testimony from Anita Earls concerning the differences in discriminatory activity in covered and non-covered jurisdictions. Responding to questioning by Senator Russ Feingold of Wisconsin Ms. Earls testified that, "[i]n Rocky Mount, a covered [North Carolina] city, in the late 1990's, that city annexed Battleboro, a predominately black neighborhood, because under Section 5 they couldn't continue to annex white areas and not annex that black neighborhood. In Pinehurst, not a covered jurisdiction, there are four or five African-American communities that are outside the town boundaries that still don't have water and sewer and still can't vote for local officials. So there is really a difference in the experiences of covered versus non-covered counties." *Id.* at 22.

1443. Congress received testimony from Anita Earls that "while limited to only reported cases of published opinions, [Professor Ellen] Katz's study concluded that 24 lawsuits since 1982 identified more than 100 instances of intentionally discriminatory conduct in voting. Eight

of these 24 lawsuits were in jurisdictions covered by Section 5; 14 were in non-covered jurisdictions." *Id.* at 4.

1444.   Congress received testimony from Anita Earls about an article by Ellen Katz on Section 2 litigation since 1982. Ms. Earls testified concerning Katz' article, "[r]eviewing election results from hundreds of state and local elections, the courts regularly found more extreme racially polarized voting in the covered jurisdictions than in non-covered jurisdictions." Earls further testified that "[t]his wide divergence in racially polarized voting between covered and non-covered jurisdictions is an important empirical finding demonstrating that minorities have less ability to participate equally in the political process in covered jurisdictions." *Id.* at 48.

1445.   Congress received testimony from Anita Earls citing a study by Spencer Overton assessing "indicators of political exclusion" in covered and non-covered jurisdictions. Earls testified concerning "cumulative evidence contained in individual state reports on covered jurisdictions since 1982 that have been introduced into the record during the Voting Rights Act reauthorization hearings in the House and Senate. A careful review of those reports yields overwhelming evidence of polarized voting in covered jurisdictions, attempts to circumvent court orders regarding redistricting plans and other election practices, widespread use of racial appeals in election campaigns, violations of Section 2 of the Voting Rights Act, and overt attempts to intimidate minority voters. While there are isolated incidents of such practices in non-covered states, and some Section 2 cases are brought and won in non-covered jurisdictions, there is no evidence of significant and continuing violations of minority voting rights at the state and local level in non-covered jurisdictions." *Id.* at 47-48.

1446.   Congress received testimony from Anita Earls that, "[s]ince I believe the evidence indicates there is a clear differentiation between covered and non-covered jurisdictions, and be-

cause in my experience of litigating voting rights cases around the country over the past 18 years, including cases in covered jurisdictions and non-covered jurisdictions I have found important differences between those jurisdictions, I believe that reauthorization needs to be for a period of 25 years. Covered jurisdictions show a continuing pattern of enacting laws and procedures designed to suppress and dilute the voting strength of minority voters." *Id.* at 55.

1447.   Congress heard testimony from Professor Pamela Karlan that "[t]here is substantial evidence that the candidate preferences of minority and non-minority voters differ more significantly in many covered jurisdictions than in non-covered jurisdictions. In the last round of redistricting, for example, federal courts in cases involving South Carolina, Georgia, and Texas all found the continued existence of racial bloc voting." *Id.* at 74-75.

1448.   Congress heard testimony from Professor Pamela Karlan that "[a]s a factual matter, if . . . half of the examples of racial discrimination since 1982 occurred in covered jurisdictions and half occurred in non-covered jurisdictions, it is worth remembering the denominator there, which is, there are 9 fully covered States that are covered jurisdictions and there are 41 States that are not covered. So half of the discrimination is occurring in those 9 States. It suggests that there is actually more of a problem in the covered jurisdictions than in the non-covered ones." *May 16, 2006 Hearing*, at 13. *Cf. May 9, 2006 Hearing*, at 43-44 (written response of Chandler Davison) (noting that "a disproportionate number of the reported Section 2 cases resolved favorably to minorities nationwide were filed in Section 5-covered jurisdictions.").

1449.   Congress received testimony from Chandler Davidson, citing the report of the National Commission on the Voting Rights Act, which found that "when compared to courts in non-covered jurisdictions, courts in covered jurisdictions have more frequently found racial appeals, acts of official discrimination that impact voting rights, and the use of devices that 'en-

hance' opportunities for discrimination against minority voters more likely to be employed. These courts more often identify a lack of success by minority candidates and a lower level of minority voter registration and turnout. Courts in covered jurisdictions have documented voting patterns that are more extensively racially polarized than have courts in non-covered jurisdictions. They have more often found that the effects of discrimination in various socio-economic arenas remain salient and continue to shape contemporary opportunities for minority political participation." *May 9, 2006 Hearing*, at 44-45.

### d)    Congressional Consideration of the Coverage Formula

1450.    Congress received testimony from Anita Earls that the Section 4 trigger is neither under-inclusive nor over-inclusive. Ms. Earls testified that the trigger is not under-inclusive because the Voting Rights Act "also gives a court the power to initiate Section 5 coverage by court order in any proceeding instituted by the Attorney General or an aggrieved person where the court finds that violations of the fourteenth or fifteenth amendment justify equitable relief[.] Thus, coverage can be expanded to include jurisdictions where there are serious constitutional violations and the risk is great of continued barriers to minority political participation." Ms. Earls further testified that the trigger is not over-inclusive because of "the more than ample 'bailout' provisions[.]" *May 16, 2006*, at 42.

1451.    Congress received testimony from Drew Days, that "[a]s in 1982 . . . I believe Congress should preserve the use of the presidential elections of 1964, 1968, and 1972 in the reauthorized formula, given the past reliability of the formula in appropriately targeting jurisdictions for pre-clearance with a historical pattern of voting discrimination that Congress must consider. The original coverage formula considered whether a jurisdiction had employed a test or device and the level of voter turnout and registration. Accordingly, it bears emphasis that the depressed

turnout and registration levels were an indicator of the larger problem of entrenched discrimination in voting that Congress intended to address and not the end itself." *May 17, 2006 Hearing*, at 32-33.

1452.   Congress received testimony from Drew Days that "the current trigger formula still works in most instances to correctly identify those jurisdictions where preclearance is necessary given past and current patterns of discrimination[.]" *May 17, 2006 Hearing*, at 34.

1453.   Congress received testimony from Armand Derfner that he would not support updating the coverage formula to refer to the Presidential elections of 2000 and 2004.  Derfner testified that "[b]ased on the records before Congress at those times, the litmus test was remarkably accurate in pinpointing those places where the malignancy existed and in generally leaving alone those places where it did not.  Thus, the purpose of the original triggers has no logical connection with mere showings of low voter participation in a particular recent election in a given jurisdiction." *May 17, 2006 Hearing*, at 73.

1454.   Congress heard testimony from Professor Pamela Karlan that the current coverage formula is neither unconstitutionally over- nor under-inclusive.  With regard to the issue of over-inclusiveness, Professor Karlan cited the bailout provision, whereby "jurisdictions that ought not be covered, but that are brought within the trigger, can get out."  With regard to the issue of under-inclusiveness, Professor Karlan cited the "pocket trigger" (or bail-in), which allows a court to order that a jurisdiction exhibiting pervasive intentional discrimination against minority voters be brought within Section 5 coverage.  Professor Karlan testified that the pocket trigger was used in an Arkansas jurisdiction, "which . . . is one of the worst States in the south because it wasn't brought within the Voting Rights Act in 1965." *May 16, 2006 Hearing*, at 13.

1455.   Congress received testimony from Representative Jessie Jackson, Jr. of Illinois that "reauthorization of Section 5 of the Act . . . is vital.  Section 5 must not be removed or weakened.  However, Section 5 must not be applied nationally where it is not needed.  These provisions were specifically designed to target areas where there was a history or pattern of voter exclusion and discrimination.  Any modification of Section 5 must be similarly targeted to current problems so that it can pass constitutional muster in a potential court challenge." *October 25, 2005 Scope Hearing Vol. II*, at 3279.

1456.   Congress received testimony from Theodore Shaw, who stated that "the *Boerne* ruling does not call for outright exclusion of historical data, such as the 1964 presidential election turn-out figures that help develop the coverage formula, so long as this data is sufficiently complimented by recent and contemporary evidence of continued voting discrimination." *May 9, 2006 Hearing*, at 163.

1457.   Congress received testimony from Professor Nathaniel Persily that "abandoning a seemingly neutral [coverage] formula for ad hoc judgments about the relative threat certain jurisdictions pose necessarily opens one up to charges of political cherry-picking and threatens both the passage and survival of section 5 at the Court." *May 17, 2006 Hearing*, at 135.

1458.   Congress heard testimony from Robert McDuff who stated that he would not support changing the existing coverage formula requiring preclearance of changes because "it has worked very successfully, and I think there is still a need for it." *May 10, 2006 Hearing*, at 26.

1459.   Congress heard testimony from Robert McDuff, who testified that he agreed with Senator Leahy's statement that the preclearance provisions act as "a protection for those people who want to do what is right." *May 10, 2006 Hearing*, at 26.

1460.   Congress received the testimony of Robert McDuff that "Section 4(a) establishes a bailout process that is extremely liberal and achievable for those jurisdictions that enjoy full minority participation in the electoral process.  It is my understanding that all jurisdictions that have sought to opt out from coverage under Section 5 have been able to do so."  *May 10, 2006 Hearing*, at 99.

1461.   Congress received the testimony of Robert McDuff that "Section 3(c) of the Act, the 'bail-in' mechanism, allows a court to order a non-covered jurisdiction to submit its voting changes in accordance with the requirements of Section 5."  *May 10, 2006 Hearing*, at 99, [footnote omitted]

1462.   Robert McDuff testified to Congress that because the bailout and bail-in features of the Voting Rights Act "provide a mechanism for jurisdictions and courts to expand or reduce the scope and reach of Section 5, I believe that there is no need to revise the coverage formula. Moreover, in 1982, Congress did not alter the coverage formula given the record that was developed about historical and persisting discrimination that persisted in the covered jurisdictions."  *May 10, 2006 Hearing*, at 99

1463.   Congress received testimony from Drew Days who explained his belief that "extending Section 5 beyond the covered jurisdictions at this point [cannot] be justified."  *May 17, 2006 Hearing*, at 15.

1464.   Congress received evidence from the testimony of Theodore Shaw who stated that the "trigger served the purpose of identifying the jurisdictions where the problems originally existed. I believe that the record that we have now in some ways eclipses the old trigger to the extent that what we have done is looked at jurisdictions that have been covered and asked the question of

whether there are continuing problems in those jurisdictions. And that is the basis on which the jurisdictions that are covered should continue to be covered." *May 9, 2006 Hearing*, at 25.

### e)      The Length of the Renewal Period

1465.   The House Judiciary Committee stated that "[t]he record before the Committee reveals that extending the VRA's temporary provisions is necessary to protect racial and language minority citizens located in covered jurisdictions from discrimination. As a result, the gains achieved by minority voters over the last 40 years are vulnerable without the protections afforded by the temporary provisions. It is in light of this reality that the Committee concludes that the temporary provisions of the VRA must be reauthorized, including Section 4(a)(8) and the provisions it triggers, as well as Section 203, for an additional 25 years." H.R. Rep. No. 109-478, at 56.

1466.   Citing *City of Rome v. Untied States*, 446 U.S. 156, 182 (1990), the House Judiciary Committee stated that, "[i]n upholding the 1975 VRA extension, the Supreme Court noted that a 7-year extension was 'plainly constitutional' in light of the 95-year period of pervasive discrimination it was attempting to remedy." The Committee concluded that extending the temporary provisions until 2032 is appropriate "given the near century of discrimination the Act is designed to combat." H.R. Rep. No. 109-478, at 57-58.

1467.   The House Judiciary Committee stated that "[i]n reauthorizing the temporary provisions [of the Voting Rights Act] for an additional 25 years, the Committee looks to related Supreme Court decisions, such as *Tennessee v. Lane*, to address constitutional concerns about continued reauthorizations of the VRA. In *Tennessee v. Lane*, the Court noted that 'The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination.'

Similar circumstances are true of the VRA: despite previous reauthorizations, the problem of voting discrimination justified reauthorization. In light of the considerable record before it, the Committee has a duty to maintain the protections afforded by the temporary provisions by reauthorizing these vital provisions." H.R. Rep. No. 109-478, at 56.

1468. Congress received testimony from Anita Earls that, "[S]ince . . . the evidence indicates there is a clear differentiation between covered and non-covered jurisdictions, and because in my experience of litigating voting rights cases around the country over the past 18 years, including cases in covered jurisdictions and non-covered jurisdictions I have found important differences between those jurisdictions, I believe that reauthorization needs to be for a period of 25 years." *May 16, 2006*, at 55.

1469. Congress received testimony from Anita Earls that "[a]nother fact that supports reauthorizing the Voting Rights Act for 25 years instead of a shorter period is that not only do there continue to be wide disparities between minority and white voters' participation in the political process, as measured by factors such as the rate of minority office holding, but the gains that have been made are very recent. At the Congressional level, for example, many covered jurisdictions in the south only elected an African American to Congress for the first time since reconstruction following the 1990 round of redistricting. Such recent gains will be easily reversed if the non-retrogression standard is removed." *Id.* at 56.

1470. Congress received testimony from Anita Earls that "[i]t is appropriate to extend coverage for 25 years because the current evidence of continuing voting rights violations in covered jurisdictions supports the judgment that it will take at least that long to afford minority voters a level playing field for political participation. Moreover, extending coverage for 25 years is ap-

propriate because the bailout provisions allow jurisdictions that have complied with the law for ten years to no longer be covered." *Id.* at 43.

1471.  Congress received testimony from Ronald Gaddie that "[t]he purpose of the Voting Rights Act is to ensure minority voter participation where historic disfranchisement has prevented such participation. Our own analysis shows that the longer one applies the oversight mechanism, the more successful minority voters are in achieving full participation in the process." *Id.* at 76.

1472.  Congress received testimony from Fred Gray that, "[a]s a practical matter, some of Alabama's recent voting crises have taken many years to resolve. *Dillard v. Crenshaw County* led to changes from at-large to single-member districts for dozens of county commissions, school boards and municipalities. Filed in the 1980s, the litigation took over two decades in order to fully implement the protections of the Voting Rights Act around the state. I believe that these long struggles to resolve voting discrimination provide a sound basis for a 25 year renewal of the Act's expiring provisions." *May 17, 2006 Hearing*, at 93.

1473.  Congress received testimony from Armand Derfner that, "[i]n a Nation where slavery lasted for a quarter of a millennium, where another century went by with racial segregation in full force before the Voting Rights Act, where, in other words, the Voting Rights Act sought to change nearly 20 generations of human behavior, the problem could certainly not be solved in 5 or 10 or 17 years." *May 17, 2006 Hearing*, at 176.

1474.  Congress received testimony from Fred Gray that based on his experience litigating Voting Rights Act cases in Alabama, "I believe that Congress should extend the Act for an additional 25 years. This time period will help ensure that the Act is in place to provide leverage for minority elected officials seeking to ensure that their jurisdictions properly figure Section 5 re-

quirements into their analysis when considering the adoption of voting changes. Most importantly, I believe that experience shows that 25 years provides a reasonable period for jurisdictions to properly comply with this mandate of the Act." *May 17, 2006 Hearing*, at 92.

1475.  Congress received written testimony from Theodore Shaw, who stated that "[a] 25 year extension of Section 5 ensures that we will have no less than two decennial redistricting cycles to help make an informed assessment about the need to renew Section 5 when this provision come before Congress again. As described above, jurisdictions tend not to adopt a significant number of voting changes during the middle of a decade. For that reason, the decennial redistricting cycles have historically been tremendously active periods for jurisdictions." *May 9, 2006 Hearing*, at 167.

1476.  Congress received written testimony from Theodore Shaw, who stated that "the 25-year time period also allows for no less than four senatorial election cycles. These unique moments in the political calendar tend to be marked by heightened levels of racially polarized voting. Further, experience dictates that jurisdictions will sometimes adopt eleventh-hour voting changes during these highly contentious moments in the electoral process, whether they be for political advantage or racial disadvantage." *May 9, 2006 Hearing*, at 167.

1477.  Congress received testimony from Fred Gray stating that "Congress should extend the Act for an additional 25 years. This time period will help ensure that the Act is in place to provide leverage for minority elected officials seeking to ensure that their jurisdictions properly incorporate the requirements of Section 5 into their analysis when enacting voting changes. Moreover, I believe that experience shows that 25 years provides a reasonable period for jurisdictions to properly comply with this mandate of the Act." *May 17, 2006 Hearing*, at 104.

1478.   Congress received testimony from Drew Days stating that "[t]he period of time be-tween congressional review of the Voting Rights Act's temporary provisions is a policy choice soundly committed to Congress to be determined in light of the evidence presented in this re-newal process, as well as previous ones.  When it enacted the Voting Rights Act in 1965, Con-gress hoped that issues of racial discrimination in elections would be resolved quickly.  The four occasions on which Section 5 of the VRA previously was considered arguably make it the most carefully reviewed civil rights measure in our nation's history.  Each time the duration of the law was weighed in light of Congress's assessment of the persistence of discrimination that it sought not to lessen, but to eradicate.  Today, as in 1982, we have learned that voting discrimination is more entrenched than we had hoped.  In fact, though some historical means of discrimination are less pervasive, new and creative methods of discrimination in the political process continue to emerge.  Consequently, a Congressional policy decision to apply a renewed Section 5 provision for another 25 years should be based on the full record of Congressional experience under the Act." *May 17, 2006 Hearing*, at 42.

### f)    The Difference Between an Enactment and a Reauthorization

1479.   Congress received testimony from Professor Pamela Karlan who explained the "im-portant consequences" of the fact that the VRARA is "a renewal of an act that is already in place."  Specifically, Professor Karlan testified that:  "The analogy is if you have a really bad infection and you go to the doctor, they give you a bunch of pills, and they tell you, 'Do not stop taking these pills the minute you feel better. Go through the entire course of treatment because, otherwise, the disease will come back in a more resistant form.'  And the Voting Rights Act is strong medicine, but it needs to finish its course of treatment, and that has not yet happened for reasons that you have heard from other witnesses." *May 16, 2006 Hearing*, at 92.

464

1480.   In her responses to questions submitted by Senator Patrick Leahy of Vermont, Professor Pamela Karlan noted that, in reauthorizing Section 5, "Congress can rely on the evidence in the legislative history underlying the Act's original passage as well as its amendment and extension in 1970, 1975, and 1982, as well as evidence of discrimination during the past 24 years. That is, the justification for the Act rests not only on examples of discrimination that have occurred since the last renewal, but also on Congress's understanding that the discrimination occurred against a backdrop of prior pervasive discrimination and efforts to eradicate it." *Id.*

1481.   Congress heard testimony from Professor Pamela Karlan, that "this case, unlike all of the previous *Boerne* line of cases that have come before the Court, deals with a renewal of an act that is already in place[.]"  Karlan testified that, because the Voting Rights Act is being renewed rather than enacted, evidence that discrimination in voting may be decreasing—for example, the reduction in Section 5 objections—shows not that the Act is no longer needed but that the Act must be reauthorized so that it can "finish its course of treatment." *Id.* at 5.

> **g)     Congressional Findings Regarding the Constitutionality of Renewed Section 5**

1482.   The House Judiciary stated that "[i]n reauthorizing the temporary provisions for an additional 25 years, the Committee is aware that it is again acting under its broadest power—to remedy continued discrimination." H.R. Rep. No. 109-478, at 53.

1483.   Citing to the Supreme Court's decision in *South Carolina v. Katzenbach*, the House Judiciary Committee stated that Congress has broad powers to remedy discrimination in voting. H.R. Rep. No. 109-478, at 54-55.

1484.   Quoting from *South Carolina v. Katzenbach*, the House Judiciary Committee stated that "[l]egislation need not deal with all phases of a problem in the same way, so long as the distinctions drawn have some basis in practical experience."  H.R. Rep. No. 109-478, at 55.

1485.   The House Judiciary Committee cited the Supreme Court decision in *City of Rome v. United States* which stated "that the Act's ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting. Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." H.R. Rep. No. 109-478, at 55-56 (internal quotations omitted).

1486.   The House Judiciary Committee stated that "in reauthorizing the temporary provisions for an additional 25 years, the Committee looks to related Supreme Court decisions, such as *Tennessee v. Lane*, to address constitutional concerns about continued reauthorizations of the VRA. In *Tennessee v. Lane*, the Court noted that 'The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination.' Similar circumstances are true of the VRA: despite previous reauthorizations, the problem of voting discrimination justified reauthorization. In light of the considerable record before it, the Committee has a duty to maintain the protections afforded by the temporary provisions by reauthorizing these vital provisions." H.R. Rep. No. 109-478, at 56.

1487.   The House Judiciary Committee found that evidence supporting renewal of the temporary provisions of the Voting Rights Act "far exceeds the quantum of evidence found adequate in other contexts (in which Congress's power is less broad) to justify Congressional action to remedy discrimination." The Committee cited to the evidence supporting a provision in the

Family and Medical Leave Act that the Supreme Court found constitutional in *Nevada Department of Resources v. Hibbs*. H.R. Rep. No. 109-478, at 57.

### 11.     Evidence Before Congress: Amendments to Section 5

#### a)     Congressional Findings

1488.   Congress found that "[t]he effectiveness of the Voting Rights Act of 1965 has been significantly weakened by the United States Supreme Court decisions in *Reno v. Bossier Parish II* and *Georgia v. Ashcroft*, which have misconstrued Congress' original intent in enacting the Voting Rights Act of 1965 and narrowed the protections afforded by section 5 of such Act." H.R. Rep. No. 109-478, at 2.

1489.   The House Judiciary Committee in its Report found that in these cases "the Supreme Court has interpreted Section 5 to allow preclearance of voting changes that would have previously drawn objections." The Committee also found "that Congress did not intend for the burden of proof to be placed on covered jurisdictions to be weakened in the way that the Supreme Court rulings in these cases permit." H.R. Rep. No. 109-478, at 65.

1490.   The House Judiciary Committee Report stated that the strength of Section 5 "lies, in part, in its burden-shifting remedy that requires covered jurisdictions to prove to the Federal Government or United States District Court for the District of Columbia that a voting change 'does not have the purpose and will not have the effect of denying or abridging the right to vote' before such voting change can be enforced." According to the Committee, "[t]he two-pronged shield afforded by Section 5 has enabled the Federal Government and court to stay one step ahead of covered jurisdictions that have a documented history of denying minorities the protections guaranteed by the Constitution." The Committee noted, "By requiring covered jurisdictions to establish that neither a discriminatory purpose nor effect exists with respect to a pro-

posed voting change, Section 5 has prevented those voting changes that have a measurable negative impact on minorities, as well as voting changes that are enacted with a racial animus, from being enforced." H.R. Rep. No. 109-478, at 65.

### b) The Amendments in Response to *Bossier Parish II.*

#### (1) Congressional Findings

1491. The House Judiciary Committee Report stated that the Supreme Court in *Bossier II* "severely limited the reach of Section 5's 'purpose' requirement, announcing that 'Section 5 prevents nothing but backsliding,' such that a jurisdiction must prove only that its purpose in enacting a voting change is not retrogressive." H.R. Rep. No. 109-478, at 66 *citing Reno v. Bossier Parish*, 528 U.S. at 336.

1492. The House Judiciary Committee Report stated that "[t]hrough the 'purpose' requirement, Congress sought to prevent covered jurisdictions from enacting and enforcing voting changes made with a clear racial animus, regardless of the measurable impact of such discriminatory changes." H.R. Rep. No. 109-478, at 66.

1493. The House Judiciary Committee Report stated that "[t]he Committee heard testimony revealing that for more than 30 years [prior to *Bossier II*], the purpose standard has been unbroken, barring those plans that were motivated by a discriminatory intent." H.R. Rep. No. 109-478, at 66-67.

1494. The House Judiciary Committee received testimony that the discriminatory purpose requirement in place prior to *Bossier II* was the basis for 83 objections that were interposed during the 1980's and 151 objections interposed in the 1990's. These "objections accounted for 25 percent and 43 percent of all objections interposed, respectively." H.R. Rep. No. 109-478, at 67.

1495.   A report issued by the House Judiciary Committee stated that "[v]oting changes that 'purposefully' keep minority groups 'in their place' have no role in our electoral process and are precisely the types of changes Section 5 is intended to bar. To allow otherwise would be contrary to the protections afforded by the 14th and 15th amendment and the VRA." H.R. Rep. No. 109-478, at 68.

1496.   The House Judiciary Committee stated the "[h]ad the *Bossier II* standard been in effect in 1982, the District of Columbia court would have been required to preclear Georgia's congressional redistricting plan, which was found by the court to be the product of purposeful discrimination" in *Busbee v. Smith*, 549 F. Supp. 495, 501 (D.D.C. 1982).   The House Judiciary Committee found that "[s]uch a result is inconsistent with the clear purposes of the Voting Rights Act." H.R. Rep. No. 109-478, at 67.

1497.   The House Judiciary Committee found that, "[s]ince *Bossier II* . . . less than 1 percent of the objections that have been interposed have been on the basis of the purpose prong alone, supporting the perception that only an 'incompetent retrogressor' can be caught and denied preclearance under Section 5." H.R. Rep. No. 109-478, at 67.

1498.   According to the House Judiciary Committee Report, "the Committee heard testimony that if the *Bossier II* standard is left unaddressed 'all of the places where [we] did not have Black representation where the number of seats, members on the commission or county school board or city council were increased, we would stand to lose representation, all of those governing bodies, if the *Bossier II* standard is applied.'" H.R. Rep. No. 109-478, at 67.

1499.   The House Judiciary Committee stated Section 5 of the VRARA "make[s] clear that Congress rejects the Supreme Court's holding in *Reno v. Bossier Parish*, by making clear that, contrary to that decision, 'retrogression' is not the only violation of voting rights the preclear-

ance procedures protect against, and that a voting rule change motivated by any discriminatory purpose also cannot be precleared." H.R. Rep. No. 109-478, at 93.

1500.  The House Judiciary Committee stated that "Congress intended Section 5 to impinge on traditional State functions in certain States and jurisdictions, for a reason. Some of the States and jurisdictions covered by the temporary provisions of the VRA have a long and documented history of discriminating against certain citizens and preventing their exercise of the most fundamental right in our system of government . . . . Congress sought to make Section 5's hurdles significant, requiring of covered jurisdictions that any and all voting changes discriminated neither in purpose nor effect if they are to be precleared." H.R. Rep. No. 109-478, at 66.

1501.  The House Judiciary Committee acknowledged concerns by some that by amending the purpose prong of Section 5 to bar "any discriminatory purpose," would make Section 5 "standardless" and "unadministerable." The Committee found the concerns to be unfounded because the amendment was "intended to restore the 'discriminatory purpose' standard that was in place and administered until 2000" and that "the factors set out in *Village of Arlington Heights et al. v. Metropolitan Housing Development Corporation et. al.* provide an adequate framework for determining whether voting changes submitted for preclearance were motivated by a discriminatory purpose." H.R. Rep. No. 109-478, at 68.

### (2)    Testimony and Evidence Received

1502.  Several Members of Congress explained that it was their intent to restore the Act to its original, pre-*Bossier II* meaning. *November 1, 2005 Hearing*, at 2 (statement of Rep. Steve Chabot); *November 1, 2005 Hearing*, at 3 (statement of Representative Conyers) (noting that the Supreme Court in *Bossier II* reversed over three decades of practice concerning the implementa-

tion of Section 5); *April 27, 2006 Hearing*, at 16 (statement of Representative Conyers) ("[W]e must support restoring the Act to its original strength.").

1503.  Congress received a statement supporting Section 5 reauthorization from Representative Melvin Watt of North Carolina, who stated that "[w]ithout the fix contained in H.R. 9, covered jurisdictions—those with a history **and** ongoing record of discrimination precluding the ability to bail-out from coverage—could enact and enforce, with impunity, voting changes that purposefully discriminate or undermine minority voters ability to elect candidates who share their values and represent their interests." *Reauthorization and Amendments Hearing Pt. I*, at 74 (emphasis in original).

1504.  Congress received a statement supporting reauthorization from former Representative J.C. Watts, Jr. of Oklahoma, who stated that, "[i]n addition to renewing Section 5, importantly, H.R. 9 also addresses the recent Supreme Court cases that have significantly narrowed Section 5's effectiveness.  First, the bill makes clear that Congress rejects the Supreme Court's holding in *Reno v. Bossier Parish School Board (Bossier II)*.  In that case, because the Bossier Parish school board in Louisiana had no majority African American districts before 1990, the Court held that despite changes in racial demographics, the enactment of a new plan preserving the all-white school board could not violate Section 5 because African American voters were not worse off with the new plan.  The Court held so, regardless of the fact that there was blatant evidence that the plan was motivated by racial discrimination.  Critically, H.R. 9 corrects this problematic decision by establishing that a voting rule change motivated by any discriminatory purpose cannot be precleared.  The bill's language restores the original intent of Congress by guaranteeing that jurisdictions can no longer intentionally discriminate against voters." *Reauthorization and Amendments Hearing Pt. I*, at 261.

1505.   Congress received testimony from several voting rights attorneys that *Bossier II* reversed decades of legal interpretation and practice, under which any voting change that involved intentional racial discrimination, whether or not it was retrogressive, violated Section 5.  *November 1, 2005 Hearing*, at 7, 10 (statement of former Department of Justice voting rights attorney Mark Posner that, "[f]or over 34 years prior to . . . [*Bossier II*], section 5 prohibited the implementation of voting changes adopted with a racially discriminatory purpose.");  *May 4, 2006 Hearing Part I*, at 44 (statement of Debo Adegbile referencing several Supreme Court cases which stand for the proposition that any purposeful discrimination should not be precleared, and noting that "nothing in the text of Section 5 or the Constitution was understood to require the rule of *Bossier II*."); *November 1, 2005 Hearing*, at 19 (statement of Brenda Wright, pointing to the 1975 case *City of Richmond v. U.S.*, 422 U.S. 358 (1975), in which the Court held that a voting change which had no unlawfully discriminatory effect was still barred by Section 5 because the voting change was made with the intent to discriminate against black voters and this violated both the Voting Rights Act and the Constitution).

1506.   Congress received evidence that *Bossier II* is inconsistent with the Department of Justice's prior interpretation—and enforcement of—Section 5.  Specifically, Congress received written testimony by Theodore Shaw that, "[p]rior to *Bossier II*, in over 30 years of enforcement of the Voting Rights Act . . . [DOJ] had consistently interpreted § 5 to require covered jurisdictions to show that their voting changes were enacted without an unconstitutionally discriminatory purpose.  During the pre-*Bossier II* era, DOJ conducted its purpose analysis in accordance with its guidelines which state that 'the Attorney General [] consider[s] whether the change is free of discriminatory purpose and retrogressive effect in light of, and with particular attention being

given to, the requirements of the 14th, 15th, and 24th amendments to the Constitution.'" *May 9, 2006 Hearing*, at 182 (internal footnotes omitted).

1507. Congress received evidence from Mark Posner who stated that the Department of Justice had long used the *Arlington Heights* factors to determine whether a change was based on unconstitutional purpose. Posner—who served as an attorney in DOJ's Civil Rights Division from 1980 to 2003 and, between the mid-1980s and 1995, was one of two attorneys responsible for reviewing Section 5 preclearance submissions—provided evidence regarding the origins of DOJ's purpose-based objections in the 1980s and 1990s. Posner stated that, "[t]he 1980s increase in the number of purpose objections to non-retrogressive changes began in the Reagan Administration under the leadership of then Assistant Attorney General William Bradford Reynolds. These objections first took full flower in the Department's reviews of post-1980 redistrictings by Mississippi counties. During Reynolds' tenure, the Department interposed about twenty-five objections to nonretrogressive Mississippi plans based on discriminatory purpose." Posner further noted that, in the 1990s, "[t]he modes of analysis forged under Mr. Reynolds then were applied by the Justice Department to the post-1990 redistrictings and to the continuing submission of election method changes. For example, about a fifth of the total number of 1990s purpose redistricting objections were again to plans enacted by Mississippi counties. The other states in which a large number of purpose redistricting objections were interposed were Louisiana and Texas. The Texas objections were particularly notable as the Section 5 concern often was that jurisdictions were seeking to limit the growing political power of Hispanic voters." *November 1, 2005 Hearing*, at 8, 15-16.

1508.   Congress received evidence from Mississippi voting rights attorney Robert McDuff

that, "discriminatory purpose served as the basis for 43 percent of all objections made in the ad-

ministrative preclearance process prior to the *Bossier II* ruling." *May 10, 2006 Hearing*, at 95.

1509.   Congress received evidence from several voting rights attorneys to the effect that the

*Bossier II* decision has "significantly narrowed the ability to object to and deter discriminatory

[behavior] when compared to the pre-*Bossier Parish* standard." *March 8, 2006 Hearing Vol. I*, at

316 (observations of Joseph Rich, former Chief of the Voting Section in the Department of Jus-

tice, provided to the National Commission on the Voting Rights Act).   Attorney Brenda Wright

stated that, under the *Bossier II* decision, "the intent prong of Section 5 covers only so-called

'retrogressive intent,' that is, an intent to make things worse for minority citizens as compared to

the status quo" and therefore, "a jurisdiction that never had minority representation on its elected

body could continue to adopt new redistricting plans, intentionally designed to freeze out minor-

ity voting strength; and section 5 would provide no protection." *November 1, 2005 Hearing*, at

19.   Attorney Debo Adegbile stated that, "without section 5's protections and without this resto-

ration [of pre-Bossier II law], there will be more [purposeful discrimination] that go[es] com-

pletely undetected because there are not the resources or wherewithal to [combat it]." *May 4,

2006 Hearing Part I*, at 58.

1510.   Congress received evidence from Mark Posner who offered an explanation as to why

*Bossier II* constitutes an unreasonable interpretation of Section 5.   Posner stated that "the plain

meaning of the word 'purpose' in Section 5 encompasses any and all discriminatory purposes,

not merely a purpose to cause retrogression.   Second, it is implausible, if not unbelievable, that

Congress in 1965 meant to adopt such a small bore definition of purpose when, as the Supreme

Court noted in 1966, Congress had adopted Section 5 to respond to 'exceptional conditions' by

acting in a 'decisive manner' through an 'uncommon exercise of congressional power.'" *November 1, 2005 Hearing*, at 16.

1511.   Congress received written testimony from Theodore Shaw that, to the extent *Bossier II* "eliminated the ability to detect, ferret out, and block discriminatory purpose during the Section 5 review process, the ruling is inconsistent both with Congress' original intent and with common sense." *May 9, 2006 Hearing*, at 178.

1512.   Congress received, through the report of the National Commission on the Voting Rights Act, the statement of Joseph Rich that, "It is truly anomalous to me that a voting change which intentionally discriminates against minority voters in a manner that violates the constitution is not objectionable unless it has 'retrogressive purpose.'" *March 8, 2006 Hearing Vol. I*, at 316.

1513.   Congress received evidence regarding the impact that the *Bossier II* standard would have had on the outcomes of voting changes had it been in place at the time those changes were submitted for preclearance.  Congress heard testimony from Professor Pamela Karlan who observed that, "Had the Supreme Court's view in *Bossier Parish II* been the prevailing view in 1965, the Voting Rights Act would have been a dead letter in any covered jurisdiction where black voters were entirely excluded—for example, the counties in Mississippi or Alabama where no black voters (or only a token handful) were registered.  Those jurisdictions would have been permitted to substitute other disenfranchisement mechanisms for their literacy tests with impunity:  no black voters could vote prior to the suspension of the literacy test, so no black voters would have been rendered worse off by new disenfranchising tactics." *May 16, 2006 Hearing*, at 94; *March 8, 2006 Hearing Vol. II*, at 1511 ("[t]he *Bossier II* decision would have a mixed effect on the outcomes of these post-1982 method of election objections [in Georgia] if it were applied

to them today.  Some of these objections were not retrogressive in nature and, under *Bossier II*, would have to be precleared today no matter how egregious the evidence of racially discriminatory purpose in their adoption."); *May 10, 2006 Hearing*, at 90 ("Mississippi's 1991 House and Senate plans are examples of redistricting plans that were adopted despite evidence of discriminatory purpose underlying the change. Today, these plans would fall beyond the scope of Section 5 because of the *Bossier II* decision.").

1514.  Congress received evidence regarding the Justice Department's reliance, prior to the *Bossier II* decision, on findings of purposeful discrimination as a basis for objecting to voting changes.  Congress heard testimony from Mark Posner that "[a] substantial majority (about four-fifths) of the Department's objections to post-1990 redistricting plans were based on discriminatory purpose with no finding of retrogression, and about a third of the objections to the post-1980 plans were interposed on this basis." *November 1, 2005 Hearing*, at 13.

1515.  Congress received evidence regarding the impact of the *Bossier II* decision on the Justice Department's enforcement of Section 5.  Through the National Commission on the Voting Rights Act, Congress received testimony of Richard Valelly, that a study of Section 5 objections from the 1970s to 2004 found a sharp drop in objections from 2000-2004.  The study's authors (a Swarthmore political scientist, a voting rights attorney and a DOJ historian) attribute the drop in objections to the Supreme Court's decision in *Bossier II* which interpreted the intent prong of Section 5 to mean retrogressive intent. *March 8, 2006 Hearing Vol. I*, at 198-99.

1516.  Congress received evidence from Anita Earls who observed that "[a]n analysis of the DOJ's activity pre and post-*Bossier II* shows how [the decision] has functioned to hinder voting equality.  Between 1982 and 1999, the DOJ objected to an average of 124 submissions a year.  Following *Bossier II*, that average dropped to 9 objections a year.  It is important to note that at

the same time the number of objections fell to less than 10% of their previous average, the number of More Information Requests (MIRs) issued by the DOJ to deter voter dilution actually increased (from an average of 47.3 withdrawn, superseded, and no response MIRs from 1982-1998 to an average of 51 such MIRs per year from 1999 to 2005)." *May 16, 2006 Hearing*, at 70.

1517.    Congress received evidence from Mark Posner that, "[w]hereas the Department objected to about seven percent of the redistricting plans adopted following the 1980 Census and about eight percent of the post-1990 plans, the Department has objected to just one percent of the post-2000 redistricting plans." Posner further stated that, "Interestingly, the number of redistricting plans submitted to the Department for preclearance was almost exactly the same after both the 1990 and 2000 Censuses, and the number of retrogression objections to post-1990 and post-2000 plans also remained the same. Accordingly, the sharp drop in the post-2000 objection percentage, and the corresponding sharp shop in the actual number of redistricting objections, occurred entirely because the purpose-based objections disappeared." *November 1, 2005 Hearing*, at 14.

1518.    Congress received evidence from Pamela Karlan who stated that as a result of *Bossier II*, the number of Department of Justice objections issued since that ruling will underestimate the number of unconstitutional attempts to limit minority voting power by covered jurisdictions and also points out that the decision decreases the deterrent effect of Section 5. *May 16, 2006 Hearing*, at 95; *see also, May 17, 2006 Hearing*, at 75 (Armand Derfner: "the number of objections has been artificially reduced by the Supreme Court's misreading of the Act in *Bossier Parish v. Reno*, which blocked objections even to changes that are grossly discriminatory in purpose."); *May 4, 2006 Hearing Part I*, at 44-45 (Debo Adegbile: "the *Bossier II* rule has significantly narrowed Section 5's implementation by the DOJ.").

c)     *Georgia v. Ashcroft*

(1)     **Congressional Findings**

1519.   The House Judiciary Committee in its Report stated that the Supreme Court's 2003

ruling in *Georgia v. Ashcroft* "construed Section 5 to narrow its reach, significantly restricting

the scope of the 'effect' prong and weakening Section 5's protection of minority groups from

voting changes that diminish their ability to elect their preferred candidates of choice." H.R. Rep.

No. 109-478, at 68.

1520.   The House Judiciary Committee's Report found the Supreme Court's holding in

*Georgia v. Ashcroft* regarding to be "inconsistent with the original and current purpose of Sec-

tion 5." The Report stated, "[t]he preclearance provisions in Section 5 were and are intended to

put the burden of proof on covered jurisdictions to demonstrate they are not enacting voting

changes that diminish the ability of minorities to elect their preferred candidates of choice.  Di-

rectly contrary to that proposition, *Georgia v. Ashcroft* appears to hold that courts should defer to

the political decisions of States rather than the genuine choice of minority voters regarding who

is or is not their candidate of choice." The Report interpreted *Georgia v. Achcroft* to mean that

"the Supreme Court would allow the minority community's own choice of preferred candidates

to be trumped by political deals struck by State legislators purporting to give 'influence' to the

minority community while removing that community's ability to elect candidates." H.R. Rep.

No. 109-478, at 69.

1521.   The House Judiciary Committee stated that "[o]ver the last 30 years, Section 5's 'ef-

fect' prong has served to protect the minority communities' ability to elect candidates of choice

in covered jurisdictions. In particular, the Committee heard testimony describing the 'judicial

development of the retrogression standard' and the importance of the standard in protecting mi-

nority voters and their ability to elect candidates of their choice. Since the Supreme Court's decision in *Beer v. United States*, it was accepted that if 'the ability of minority group's ability to elect candidates of choice to office is diminished, Section 5 requires the denial of preclearance.'" H.R. Rep. No. 109-478, at 69.

1522. "The [House Judiciary] Committee heard testimony describing the positive impact that minority-preferred representatives have had on minority communities by fully 'representing their interests.' In particular, the Committee heard testimony confirming that minority-preferred elected officials fight for issues that are of importance to minority communities, and received evidence that '[o]fficials elected because of the equal voting opportunities afforded minority citizens were more attuned to the needs of the minority communities.'" The Committee found that "[t]hese 'tangible benefits were the direct result of the success of the Voting Rights Act.'" H.R. Rep. No. 109-478, at 69-70.

1523. The House Judiciary Committee Report stated that "[t]he Committee believes that the gains made by minority communities in districts represented by elected officials of the minority communities' choice would be jeopardized if the retrogression standard, as altered by the Supreme Court in *Georgia*, remains uncorrected." Specifically, the Committee noted that it "is concerned by testimony indicated that '[m]inority influence is nothing more than a guise for diluting minority voting strength.'" The Committee further noted that it heard evidence "that Section 5, if left uncorrected, would now allow 'States to turn black and other minority voters into second class voters who can influence elections of white candidates, but who cannot elect their preferred candidates, including candidates of their own race.'" H.R. Rep. No. 109-478, at 70.

1524. The House Judiciary Committee "was persuaded by testimony revealing that the current interpretation 'permits a jurisdiction to choose among different theories of representation,

introduces a substantial uncertainty for minority communities into a statute that was specifically intended to block persistent and shifting efforts to limit the effectiveness of minority political participation.'" H.R. Rep. No. 109-478, at 70.

1525.   The House Judiciary Committee stated that "Section 5 was intended to prevent covered jurisdictions from making decisions that shut minority voters out of the political process. The Committee [was] convinced that Congress should not allow covered jurisdictions the discretion to make decisions on behalf of minority voters on the record it has before it.  To leave the present retrogression standard enunciated in *Georgia* uncorrected would effectively diminish the significance of Section 5's remedy and would make Federal scrutiny a wasteful formality." H.R. Rep. No. 109-478, at 70.

1526.   In amending Section 5 to add a new subsection (b), the House Judiciary Committee Report clarified "that in making preclearance determinations under Section 5, the comparative 'ability [of the minority community] to elect preferred candidates of choice' is the relevant factor to be evaluated when determining whether a voting change has a retrogressive effect."  The intent of the Committee was to restore the "standard of analysis articulated by the Supreme Court in *Beer v. United States*, the retrogression standard of analysis on which the Court, the Department of Justice, and minority voters relied for 30 years." H.R. Rep. No. 109-478, at 70-71.

1527.   The House Judiciary Committee Report stated that "[v]oting changes that leave a minority group less able to elect a preferred candidate of choice, either directly or when coalesced with other voters, cannot be precleared under Section 5."  The Committee Report further stated that, "by adding the adjective 'preferred' before 'candidate,' the Committee makes clear that the purpose of Section 5 is to protect the electoral power of minority groups to elect candidates that the minority community desires to be their elected representative." H.R. Rep. No. 109-478, at 71.

1528.   The House Judiciary Committee Report stated that "[t]he comparative [retrogression] analysis under Section 5 is intended to be specifically focused on whether the electoral power of the minority community is more, less, or just as able to elect a preferred candidate of choice after a voting change as before." H.R. Rep. No. 109-478, at 71.

1529.   The House Judiciary Committee Report explicitly rejected "all that logically follows from Justice O'Connor's statement [in *Georgia v. Ashcroft*] that '[i]n assessing the totality of the circumstances, a court should not focus solely on the comparative ability of a minority group to elect a candidate of its choice. While this factor is an important one in the Section 5 retrogression inquiry, it cannot be dispositive.'" The Committee Report further noted that, "it is the intent of Congress that the relevant analysis in determining whether a voting change violates subsection (b) is a comparison between the minority community's ability to elect their genuinely preferred candidate of choice before and after a voting change, consistent with the standard established by the *Beer* Court and the precedent that followed." H.R. Rep. No. 109-478, at 71.

1530.   The House Judiciary Committee Report stated Section 5 of the VRARA makes clear "that Congress partly rejects the Supreme Court's decision in *Georgia v. Ashcroft*" and "restores the standard articulated in *Beer v. United States*" through a new subsection (d), which stated that: "(d) The purpose of subsection (b) of [Section 5] is to protect the ability of such [minority] citizens to elect their preferred candidates of choice." H.R. Rep. No. 109-478, at 94.

(2)     **Evidence and Testimony Received**

1531.   Representative John Lewis stated during a November 9, 2005 hearing that, "[t]he 'opportunity to elect' standard prior to *Georgia v. Ashcroft* was well understood and relatively easily applied. The new, subjective standard appears to allow ill defined 'influence districts' to be a non-retrogressive substitute for majority-minority districts, even without an analysis of ra-

481

cially polarized voting. This is . . . very dangerous, and may turn back the clocks for minority voters, so that they cannot elect candidates of their own choice or their own race, but may only 'influence' the election of white candidates. Influence is not a substitute for opportunity to elect. We need to ensure that this standard is clarified and meaningful." Representative Lewis also observed that "[i]n Georgia and in other places there has been collusion in drawing districts. . . . When incumbents are drawing district lines, they are attempting to make themselves less vulnerable or to make their party more successful. This may or may not be in the best interests of minority voters and it is dangerous to give great weight to this factor in the retrogression analysis." *November 9, 2005 Hearing*, at 80-81.

1532.  Congress received a statement from former Representative J.C. Watts, Jr. of Oklahoma, who stated that, "the bill rejects a troubling holding in the Supreme Court's decision in *Georgia v. Ashcroft*.  This case reversed the long-standing intent of the VRA to protect the minority community's ability to elect their preferred candidates of choice.  Essentially, the Court in *Ashcroft* allowed states to make minorities into second-class voters, who can 'influence' the election of white candidates, but who cannot amass the political power necessary to elect a candidate of their choice.  Under this standard, even if the effect of a voting change is an overall reduction in the election of candidates of choice by minority constituencies, the Court will likely find it permissible as long as there is an increase in the 'number of representatives [assumed] sympathetic to the interests of minority voters.'  This is a particularly problematic standard because it allows states with a history of discrimination to trade in majority-minority districts for those where minority voters wield less influence.  Therefore, I applaud this bill's clarification of Section 5 by providing that any voting change that would leave minority voters with less opportunity to elect preferred candidates than they had before the change would violate Section 5.  This clari-

fication shows Congress' commitment to protecting all citizens' voting power." *Reauthorization and Amendments Hearing Pt. I*, at 261-62.

1533. Congress received evidence that the standard enunciated by the Supreme Court in *Georgia v. Ashcroft* is vague and difficult to apply. Voting rights attorney Laughlin McDonald observed that, "[t]he opinion of the majority introduced new, vague and difficult to apply, and contradictory standards. According to the Court, the ability to elect is 'important' and 'integral,' but a court must now also consider the ability to 'influence' and elect 'sympathetic' representatives. The Court took a standard that focused on the ability to elect candidates of choice, that was understood and applied, and turned it into something subjective, abstract, and impressionistic." *November 9, 2005 Hearing*, at 53 (internal citations omitted); *see also*, *May 17, 2006 Hearing*, at 39 (Drew Days: "the *Georgia v. Ashcroft* 'influence' standard is poorly defined and virtually impossible to meaningfully administer" and "the amorphous, easily manipulable *Georgia* standard is an open invitation to mischief."); *May 16, 2006 Hearing*, at 9 (Theodore Arrington: "[t]here are no clear guidelines for measuring influence districts or substantive representation."); *May 4, 2006 Hearing Part I*, at 50 (Debo Adegbile: "[t]he influence theory eradicates any meaningful benchmark analysis because it invites wholly incongruous comparisons"); *November 9, 2005 Hearing*, at 136 (Robert Kengle: "the *Ashcroft* decision does not provide a judicially manageable standard for making the comparisons that it requires"); *May 16, 2006 Hearing*, at 193 (Pamela Karlan: "nebulous and speculative standard").

1534. Congress received information from Drew Days who explained that Section 5 is not a mandate for "racial gerrymandering." Days stated that "[m]easuring the opportunity to elect has always been a case specific analysis that takes into account a number of factors but focuses primarily on the level of racially polarized voting. This assessment requires a careful examination

of election returns to determine the extent to which a white voting bloc consistently negates minority-preferred candidates. Where bloc voting is intense it may be necessary to preserve an existing majority-minority district or a district with a minority voting population that is very close to preserve the ability-to-elect. Maintaining existing minority ability-to-elect districts against deliberate efforts or efforts which result in dilution is not a mandate for 'racial gerrymanders.'" *May 17, 2006 Hearing*, at 62.

1535.   Congress received testimony from Laughlin McDonald that, "[t]he inability of blacks to exercise the franchise effectively in so-called influence districts is apparent from the lack of electoral success of black candidates in majority white districts. As of 2002, of the ten blacks elected to the state senate in Georgia, all were elected from majority black districts (54% to 66% black population). Of the 37 blacks elected to the state house, 34 were elected from majority black districts. Of the three who were elected from majority white districts, two were incumbents. The third was elected from a three-seat district." *November 9, 2005 Hearing*, at 53 (internal citations omitted).

1536.   Congress received evidence from Drew Days who, drawing on his experience administering Section 5, stated that the *Georgia v. Ashcroft* ruling will be un-administrable, and may make it easier for jurisdictions to hide discriminatory conduct. Days stated that "[t]he problem with the *Georgia v. Ashcroft* 'influence' test is not that there could never be a situation where minority influence is discernible and important, but as a former DOJ official responsible for administering the Voting Rights Act it seems clear to me that ferreting out such instances consistently is simply unrealistic. Furthermore, I believe that such a standard in many ways constitutes an open invitation to mischief. For instance, the pursuit of an influence trade-off theory could be used to cloak purposefully retrogressive or discriminatory actions from effective Section 5 re-

view." Days stated that, "left unchecked, the Georgia decision may allow jurisdictions to return to intentional discrimination when redistricting, with no viable check on their ability to do so." *May 17, 2006 Hearing*, at 40, 58-59; *see also*, *May 4, 2006 Hearing Part I*, at 50 (Debo Adegbile: "[t]he pursuit of an influence theory will likely be used to cloak and protect intentionally discriminatory or retrogressive acts from meaningful Section 5 review."); *May 17, 2006 Hearing*, at 93 (testimony of Fred Gray that the influence district standard may invite elimination of majority black districts, particularly where there is severe racially polarized voting as in Alabama).

1537.   Congress received testimony from Professor Nathaniel Persily, explaining that districts that can elect "the 'preferred candidate of choice' of the minority community does not mean [that a] minority candidate [will be elected].  Minorities can prefer particular white candidates, just as white communities can prefer particular minority candidates . . . [Thus,] districts that happen to be majority-minority, even substantially so, can still elect white candidates . . ..  [Persily went on to explain that] it [was] important to make this point in case the ability to elect standard be seen as affirmative action for minority candidates.  It is not.  Its focus is on minority voters and ensuring that their ability to elect their preferred candidates, whatever their race, is not diminished by changes in voting laws." *May 17, 2006 Hearing*, at 119.

1538.   Congress received testimony from Professor Persily that the "ability to elect" standard "does not require packing of the minority community, *nor does it even allow it* when doing so will diminish the minorities' ability to elect their preferred candidates across districts. For example, [the standard] . . . would deny preclearance to a proposed combination of two districts each with a 70 percent probability of electing the minorities' candidates of choice, into one dis-

trict with a 100 percent probability and another with a 10 percent probability of electing the minority's preferred candidates." *May 17, 2006 Hearing*, at 118-19 (emphasis in original).

### d) The Provision of Fees for Expert Witnesses

1539.   The House Judiciary Committee stated in its Report that, in amending Section 14 to provide for the recovery by the prevailing party of expert costs as part of attorneys fees, "the Committee seeks to update the Voting Rights Act of 1965 to comport with other Federal civil rights laws." H.R. Rep. No. 109-478, at 64.

1540.   The House Judiciary Committee Report recognized that evidence from one or more expert witnesses is critical to trying voting discrimination cases pursued under the VRA. The Committee received "testimony indicating that much of the burden associated with either proving or defending a Section 2 vote dilution claim is established by information that only an expert can prepare." H.R. Rep. No. 109-478, at 64.

1541.   The House Judiciary Committee Report noted that, "[i]n harmonizing the Voting Rights Act of 1965 with other Federal civil rights laws, the Committee also seeks to ensure that those minority voters who have been victimized by continued acts of discrimination are made whole." H.R. Rep. No. 109-478, at 64-65.

1542.   During the May 4, 2006 hearing, Congressman Steven Chabot stated that amendments to the fee provisions of the Voting Rights Act were necessary because prior law "create[d] a chilling effect on voting rights litigation because it prevents lawyers and nonprofit organizations from recovering tens of thousands of dollars, sometimes hundreds of thousands of dollars, in expert witness fees." *May 4, 2006 Hearing Part I*, at 3; *see also, October 20, 2005 Hearing*, at 78 (Jose Garza: "vote dilution challenges under Section Two are dependent on expert analysis. Yet, successful plaintiffs cannot recover the costs of expert witnesses under the current fee shift-

ing provisions of the Act."); *May 17, 2006 Hearing*, at 181 (Armand Derfner: the large sum spent on expert witnesses by Charleston County in *Colleton County v. McConnell* (D.S.C. 2002) "shows what private citizens have to be prepared to match in order to vindicate *bona fide* claims.").

1543.  Congress amended Section 3(a) of the VRA by replacing the authority of the courts to assign Federal examiners with the authority to assign federal observers only.  H.R. Rep. No. 109-478, at 92.

1544.  "In weighing whether to reauthorize the Federal examiner program, the [House Judiciary] Committee looked to voting rights experts, and representatives from the Department of Justice and the Office of Personnel Management who have worked with and supported the Federal examiner program over the last several decades.  Testimony received by the Committee revealed that the Federal examiner provisions were 'cumbersome' and 'archaic,' and their functions were considered to be 'outdated.' . . . H.R. 9 reflects the lack of necessity and contains language to address this shift."  H.R. Rep. No. 109-478, at 61-62.

1545.  The House Judiciary Committee noted that "the record reveals that Section 6, the Federal examiner program, has not been used in twenty years, suggesting to the Committee that examiners have successfully served their purpose" and the "Committee amended and eliminated certain provisions" to eliminate the examiner provisions while retaining the appointment of federal observers under the Act.  *Id.* at 61.

1546.  The House Judiciary Committee amended Section 13 of the Act "to make the same termination process available to those jurisdictions currently certified for the assignment of Federal examiners to those that will be certified for Federal observers in the future under Section 8."  *Id.* at 63.

II.    **THE NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NO. 1**

    A.    **Creation and Purpose**

    1547.    The Northwest Austin Municipal Utility District No. 1 ("District" or "MUD") is a lo-cal governmental entity wholly located within both the City of Austin and Travis County, Texas. Zimmerman Dep. 98:8-10; Am. Compl. ¶ 6 (Wolfson Decl. Ex. 1, Def. Dep. Ex. 9).

    1548.    The District was formed "to help provide infrastructure, provide water and wastewa-ter service, operate a local park, and provide other localized services" to District residents. Am. Compl. ¶ 6 (Wolfson Decl. Ex. 1, Def. Dep. Ex. 9); *see* Feb. 26, 2004 Submission at 1 (Wolfson Decl. Ex. 2-N, Def. Dep. Ex. 3).

    1549.    Municipal utility districts ("MUDs") are typically created to issue bonds, as well as to levy and collect taxes to retire the bond debt, in order to facilitate the financing and construction of water, wastewater and drainage utilities on previously undeveloped land. Tex. Water Code §§ 54.501, 54.601; Collins Dep. Vol. I at 17:19-19:5.

    1550.    In Texas, after their creation, MUDs remain "subject to the continuing right of super-vision of the state," Texas Code § 54.024, and can be dissolved once their debt is paid. Collins Dep. Vol. I at 19:6-24; Zimmerman Dep. 116:16-117:5, 124:22-25.

    1551.    After a creation process that began in 1986 or earlier, the District was created on March 16, 1988, by order of the Texas Water Commission (a predecessor agency to the present-day Texas Commission on Environmental Quality). Nov. 25, 1986 Submission at 1 (Wolfson Decl. Ex. 2-A, Def. Dep. Ex. 11); Mar. 21, 1988 Submission at Ex. B (Wolfson Decl. Ex. 2-B).

    1552.    The TWC previously had approved the District's creation by order dated April 18, 1986, and a Confirmation and Director Election, Bond Election and Maintenance Tax Election was called for December 1986. However, the original property developer declared bankruptcy in 1987, and the initial slate of directors thereafter resigned. The property subsequently was pur-

chased by a new partnership and a new petition for creation of the District was filed with the TWC. Following a hearing in March 1988, the TWC issued a new order withdrawing its earlier April 1986 order, and approving the District's creation. Collins Dep. Vol. II at 166:19-168:13; Nov. 25, 1986 Submission at 1 (Wolfson Decl. 2-A, Def. Dep. Ex. 11); Mar. 21, 1988 Submission at Ex. B (Wolfson Decl. Ex. 2-B).

**B.     Current Status**

1553.   There currently are over 1000 residential homes within the District's boundaries. Zimmerman Dep. 125:1-8.

1554.   The total number of District residents at the time of the 2000 Census, according to an analysis conducted by the City Demographer for the City of Austin, TX, was 3,586, of whom 2,872 (80.1%) were white, 54 (1.5%) were African-American, 197 (5.5%) were Hispanic or Latino, 416 (11.6%) were of Asian heritage, and 47 (1.3%) were "Other." Wolfson Decl. Ex. 3, Attachment 2 at 3 (Expert Report of Ryan F. Robinson).

1555.   The District is governed by a Board of five directors, each of whom is elected to a four-year term by qualified voters residing in the District. Tex. Water Code §§ 49.103, 54.101, 11.001.

1556.   The Board meets on a monthly basis and is responsible for administering annual tax revenues that currently exceed one million dollars, the bulk of which is dedicated to retiring the debt incurred when the District issued bonds in the late 1980's in order to complete the necessary water, wastewater and storm drainage construction to develop the residential neighborhood. Collins Dep. Vol. I at 17:19-19:5, 52:6-24; Zimmerman at 41:8-44:2; Ferguson at 24:12-26:12.

**C.     District Governance**

1557.   The District has no full-time employees.  Collins Dep. Vol. I at 61:11-13; *see* Ferguson Dep. Vol. I at 31:3-5.

1558.   The District contracts with various agents who, among other things, service the existing bond debt, maintain the parks and common areas, and provide financial, accounting and legal services.  Collins Dep. Vol. I at 61:11-62:13; Ferguson Dep. Vol. I at 29:3-31:2.

### D.      Election of Board Members

1559.   The terms of the District's board members are staggered, with elections held every two years.  Collins Dep. Vol. I at 22:3-4; Nov. 25, 1986 Submission at 1 (Wolfson Decl. Ex. 2-A, Def. Dep. Ex. 11).

1560.   From 1988 through 2002, the District administered its own elections.  Collins Dep. Vol. I at 22:18-25; Collins Dep. Vol. II at 163:15-19.

### E.      The District's Failure to Make Affirmative Efforts to Expand Opportunities for Minorities

1561.   According to Sharlene Collins, an Austin attorney who served as the District's general counsel from 1986 to 2002, at no time during her tenure did the District take affirmative steps to increase voter turnout in District elections.  Collins Dep. Vol. I at 22:18-25, 36:24-37:12.

1562.   Before 2004, the District held its elections at residents' private homes (and, immediately prior to the 2004 election, in a resident's garage), separately from all other jurisdictions' elections (such as county, state, and federal elections).  If District elections were held on the same day as other elections, voters would have to travel to two polling places to vote in both sets of elections—a situation that several MUD Board members viewed as an impediment to voter participation.  Feb. 26, 2004 Submission at 1 (Wolfson Decl. Ex. 2-N, Def. Dep. Ex. 3); Ferguson Dep. Vol. I at 27:4-28:5, 49:14-50:13; 52:5-53:1; Collins Dep. Vol. I at 32:18-36:11; Collins Dep. Vol. II at 163:15-19; Zimmerman Dep. 94:10-96:22.

1563.   The District has made no efforts targeted to minority voters to ensure that they have equal access to the election process. Zimmerman Dep. 80:12-81:3.

1564.   The District has made no outreach to African-American or Hispanic voters to encourage them to vote.  Zimmerman Dep. 80:24 - 81:3.

1565.   The District has made no efforts to encourage African-American or Hispanic residents to run for election to the District Board.  Zimmerman Dep. 81:4-18; Collins Dep. Vol. I at 51:4-13.

1566.   The newly-created District's first two residents in 1986 were African-Americans, and Hispanics and African-Americans have continued to reside in the District.  Collins Dep. Vol. I at 44:19-46:1, 49:14-50:8, 102:12-103:23; Nov. 25 1986 Submission at 2 (Wolfson Decl. Ex. 2-A, Dep. Ex. 11); Wolfson Decl. Ex. 3, Attachment 2 at 3.

1567.   No African-American or Hispanic person has ever been elected to the District's board.  Plaintiff's Response to Defendant-Intervenor's Joint Interrogatory No. 17 at 11(Def. Dep. Ex. 2); Ferguson Dep. Vol. I at 36:14-37:13; Collins Dep. Vol. I at 49:14-50:12.

1568.   No African-American or Hispanic person has ever run for election to the Board. Plaintiff's Response to Defendant-Intervenor's Joint Interrogatory No. 17 at 11-12 (Def. Dep. Ex. 2); Ferguson Dep. Vol. I at 40:18-42:11; Collins Dep. Vol. I at 50:22-51:3.

1569.   The District's general counsel from 1986 to 2002, Sharlene Collins, was unaware of any affirmative efforts by the District to encourage African-American or Hispanic residents of the District to run for Board office.  Collins Dep. Vol. I at 51:4-13.

1570.   Donald Zimmerman, who served as District Board President from 2002-2006 and currently serves as Board Vice President, testified as the District's representative at deposition

that he would "absolutely not" make special efforts to recruit an African-American or Hispanic person to serve as an elections clerk. Zimmerman Dep. 17:4-6, 23:16-24:3, 65:11-15.

1571.   In response to deposition questioning by a Department of Justice attorney, Zimmerman testified that, despite having lived in Texas for all but one year since his birth in 1960, he has never personally observed, heard about, or read any newspaper stories about racial discrimination in Texas. Zimmerman Dep. 12:8-13:8, 122:22-123:17, 178:20-179:6.

1572.   Regarding the state law requirement that election materials be printed in both English and Spanish, Zimmerman testified at deposition that, "I'm thankful that some of our other minority residents don't demand that we put every language on the ballot." Zimmerman Dep. 84:11-13.

1573.   Zimmerman expressed his frustration with the Voting Rights Act and gave the following testimony regarding whether he thought that Congress should make a neighborhood by neighborhood assessment of Section 5's value as a prerequisite to renewing the Act: "[I]f they can't know all the details, maybe they should not be voting, because they're voting blind . . . . Congress doesn't know what's happening in my neighborhood, so why are they forcing a mandate on it if they don't know what's going on?" Zimmerman Dep. 175:11-16. He went on to state that "I would think that these neighborhoods should be contacted to see if this is still necessary. Why wouldn't they do that for me or for any other political subdivision? I think they owe it to us to find out what's happening in our neighborhood before they issue a mandate on it." *Id.* at 176:13-18.

### F.    Election Agreement with Travis County

#### 1.    Facts of 2004 Agreement

1574.  Beginning with the 2004 election, the District's elections have been administered by the Travis County Clerk at a shared polling place pursuant to election agreements between the District and Travis County.  Feb. 26, 2004 Submission at 3 (Wolfson Decl. Ex. 2-N, Def. Dep. Ex. 3); Joint Election Agreement at 1-4 (Feb. 27, 2006 Letter from Reilly to Fisher) (Def. Dep. Ex. 4); Ferguson Dep. Vol. I at 42:19-45:1; Zimmerman Dep. 67:17-69:12.

1575.  There are over 100 governmental entities within Travis County, including cities, school districts, municipal utility districts and fire districts.  The Travis County Clerk has entered into an election services agreement with virtually all of these governmental entities to conduct their elections.  DeBeauvoir Dep. 6:16-8:10.

1576.  The District has never conducted voter registration.  Collins Dep. Vol. I 66:12-14.

1577.  Voter registration of individuals who reside in the District has, since the District's inception, been conducted by Travis County.  Collins Dep. Vol. I at 66:4-14; DeBeauvoir Dep. 79:10-13; Zimmerman Dep. 39:6-12.

1578.  In 2004, the District moved its elections to an elementary school, where its elections could be held at the same time and using the same machines as Travis County elections.  Ferguson Dep. Vol. I at 27:4-28:5, 49:14-50:13, 52:5-53:1; Feb. 26, 2004 Submission at 3 (Wolfson Decl. Ex. 2-N, Def. Dep. Ex. 3).

**2.    Facts of 2006 Agreement**

1579.  Under a 2006 election services agreement between the Travis County and the District,[5] the Travis County Clerk will administer the District's elections through July 2011, and the agreement is automatically renewable for two additional three-year terms unless one party termi-

---

[5]    The District did not file a preclearance submission with the Department of Justice regarding the 2006 Agreement with Travis County.  Ferguson Dep. Vol. I at 69:10-17.

nates the agreement. Joint Election Agreement at 1-4, 11 (Feb. 27, 2006 Letter from Reilly to Fisher) (Def. Dep. Ex. 4).

1580. The District entered the 2004 and 2006 election agreements with Travis County in order to promote voter convenience for District residents and as a cost-savings measure for the District. Ferguson Dep. Vol. I at 49:14-50:13; Qualtrough Dep. 58:5-60:12.

1581. The District is "very pleased" with Travis County's performance in conducting elections for the District. Ferguson Dep. Vol. I at 44:24-45:1, 50:12-13, 69:23-70:2.

### G.    Section 5 Compliance

#### 1.    Previous Section 5 Submissions

1582. During its entire period of creation and existence (1986-present), the District has made eight submissions to the U.S. Department of Justice pursuant to Section 5. Feb. 26, 2004 Submission at 2 (Wolfson Decl. Ex. 2-N, Def. Dep. Ex. 3).

1583. On November 25, 1986, the District made a submission to the Department of Justice under Section 5 of the Voting Rights Act. The submission was made seeking preclearance of voting changes regarding the "Creation of the District", the "Polling Place", and the "Bilingual Election Procedures" as such changes related to: "(a) the existence of the District; (b) the Confirmation and Director Election, Bond Election, and Maintenance Tax Election, . . . on December 13, 1986; and (c) subsequent elections to be held by the District." Nov. 25, 1986 Submission at 2-8 (Wolfson Decl. Ex. 2-A, Def. Dep. Ex. 11). The November 25, 1986 submission was "the first submission by the District under Section 5 of the Voting Rights Act." *Id.* at 8. On January 26, 1987, the Department of Justice responded that it did not interpose any objections to the changes in question at that point. Jan. 26, 1987 Letter from Reynolds to Collins (Nov. 25, 1986 Submission) (Wolfson Decl. Ex. 2-A).

1584.  On March 21, 1988, the District made a submission to the Department of Justice un-der Section 5 of the Voting Rights Act seeking preclearance of voting changes regarding the Creation of the District, the Polling Place, and the Bilingual Election Procedures as such changes related to: (a) the existence of the District; (b) the Confirmation and Director Election, Bond Election, and Maintenance Tax Election, on May 7, 1988; and (c) subsequent elections to be held by the District.  Mar. 21, 1988 Submission at 2-8 (Wolfson Decl. Ex. 2-B).  The submission stated it was "the first submission by the District under Section 5 of the Voting Rights Act as Amended."  *Id.*  On June 10, 1988, the Department of Justice stated that it did not interpose any objections to the submitted changes.  June 10, 1988 Letter from Reynolds to Collins (Mar. 21, 1988 Submission) (Wolfson Decl. Ex. 2-B).

1585.  On March 6, 1990, the District made a submission to the Department of Justice under Section 5 of the Voting Rights Act seeking preclearance of voting changes regarding the Polling Place as such change related to: (a) the Directors election on May 5, 1990, and (b) subsequent elections to be held by the District.  Mar. 21, 1988 Submission at 2 (Wolfson Decl. Ex. 2-B).  On June 11, 1990, the Department of Justice responded that it did not interpose any objections to the change in question at that point.  June 11, 1990 Letter from Dunne to Collins (Mar. 6, 1990 Submission) (Wolfson Decl. Ex. 2-C).

1586.  On April 4, 1996, the District made a submission to the Department of Justice under Section 5 of the Voting Rights Act seeking preclearance of voting rights changes regarding the Polling Place as such change related to: (a) the Director election on May 4, 1996; and (b) subse-quent elections to be held by the District.  Apr. 4, 1996 Submission at 2-3 (Wolfson Decl. Ex. 2-D, Def. Dep. Ex. 14).  On June 3, 1996, the Department of Justice responded that it did not inter-

pose any objection to the specified change at that point. June 3, 1996 Letter from Patrick to Collins (Wolfson Decl. Ex. 2-G, Def. Dep. Ex. 27).

1587.   On June 6, 1996, the District made a submission to the Department of Justice under Section 5 of the Voting Rights Act suggesting that it erroneously failed to seek preclearance for certain voting rights changes that it was now submitting regarding Notice Requirements for Election and Cancellation of Election as such changes related to: (a) the cancellation of the May 4, 1996 director's election as required by state law; and (b) subsequent elections to be held by the District. June 6, 1996 Submission at 1-3 (Wolfson Decl. Ex. 2-G).  On August 1, 1996, the Department of Justice responded that it did not interpose any objection to the specified changes at that point and additionally noted the district need not submit future implementation of the cancellation of a general election except in certain circumstances. Aug. 1, 1996 Letter from Patrick to Collins (Wolfson Decl. Ex. 2-I).

1588.   On March 26, 1998, the District made a submission to the Department of Justice under Section 5 of the Voting Rights Act seeking preclearance of voting rights changes regarding the polling place and annexation as such changes related to: (a) the change of polling place; (b) the annexation of land; and (c) subsequent elections to be held by the District. Mar. 26, 1998 Submission at 2-3 (Wolfson Decl. Ex. 2-J, Def. Dep. Ex. 15).  On May 19, 1998, the Department of Justice responded that it did not iternpose any objection.  May 19, 1998 letter from Johnson to Collins (Wolfson Decl. Ex. 2-K).

1589.   On March 27, 2002, the District made a further submission to the Department of Justice under Section 5 of the Voting Rights Act seeking preclearance of voting rights changes regarding the polling place as such changes related to: (a) the change of polling place; (b) subsequent elections to be held by the District.  March 27, 2002 Submission at 2-3 (Wolfson Decl. Ex.

2-L, Def. Dep. Ex. 12). On May 24, 2002, the Department of Justice responded that it did not interpose any objection to the specified change of polling place at that point. May 24, 2002 Letter from Rich to Collins (Wolfson Decl. Ex. 2-M, Def. Dep. Ex. 13).

1590. On February 26, 2004, the District made a submission to the Department of Justice under Section 5 of the Voting Rights Act seeking preclearance of voting rights changes regarding the joint election agreement with Travis County, election day polling place, early voting, and electronic ballot as such changes related to: (a) the joint election agreement with Travis County; (b) the May 15, 2004 polling place; (c) the early voting location; and (d) the electronic ballot. Feb. 26, 2004 Submission at 3-5 (Wolfson Decl. Ex. 2-N, Def. Dep. Ex. 3). On April 8, 2004, the Department of Justice responded that it did not interpose any objection to the specified change at that point. Apr. 28, 2004 Letter from Rich to Qualtrough (Wolfson Decl. Ex. 2-P).

### 2.    Minimal Past Cost and Administrative Burden

1591. During the pre-2004 period when the District prepared its own preclearance submissions, the District's preparation of preclearance submissions under Section 5 required only minimal expenditures of time, cost, or administrative burden. Musika Report ¶¶ 12-26 (citing Musika Rep. Exs. D-F) (Wolfson Decl. Ex. 4).

1592. Complying with Section 5 has not imposed a financial burden on the District. Musika Report ¶¶ 12-18 (citing Musika Rep. Ex. F) (Wolfson Decl. Ex. 4).

1593. Complying with Section 5's preclearance requirement has cost the District, on average, only $233 per year. Musika Report ¶ 12 (citing Musika Rep. Exs. C, D, F) (Wolfson Decl. Ex. 4).

1594.   The District's average annual cost of compliance amounts to less than one-tenth of one-percent (0.04%) of the District's average annual expenditures.  Musika Report ¶ 22 (citing Musika Rep. Ex. F) (Wolfson Decl. Ex. 4).

1595.   From 1989 through 2005, the District's auditors never deemed preclearance-related expenses a material expenditure.  Musika Report ¶ 19 (Wolfson Decl. Ex. 4).

1596.   Compliance with Section 5 has imposed little administrative burden on the District or its board members.  Musika Report ¶¶ 14-17 (Wolfson Decl. Ex. 4).

1597.   Former District general counsel Sharlene Collins, who prepared seven Section 5 submissions for the District from 1986 to 2002, testified that, "I don't think I ever had one of the board members take a look at [a] submission."  Collins Dep. Vol. I at 22:18-23:14, 69:20-70:5.

1598.   Current board member Donald Zimmerman, who was serving as Board president when the District made its February 2004 preclearance submission, testified that he "flipp[ed] through" a draft of that submission but provided no comments on the draft. Zimmerman Dep. 61:16-63:12.

1599.   Board member Donald Zimmerman, testifying as Fed R. Civ. P. 30(b)(6) witness for the District, estimated that the MUD board spends approximately 1/1000th of its time on Section 5 related business.  Zimmerman Dep. 143:8-19.

1600.   There is no requirement that a Section 5 submission to the Department of Justice be prepared or filed by an attorney.  *See* 28 C.F.R. § 51.23(a).

1601.   Sharlene Collins, the District's outside counsel from 1986 through 2002, prepared the District's first seven submissions.  The submissions took Collins little time to prepare.  Collins typically required two hours to prepare a submission when it related to a simple matter such as moving a polling place—as did four of the District's submissions—and an estimated three to six

hours to prepare a submission involving an annexation (as did only one of the District's submissions). Collins Dep. Vol. I at 22:18-23:14, 25:1-14, 26:4-14; Collins Dep. Vol. II at 128:11-25.

1602.   All of the District's Section 5 submissions to the Department of Justice have been pre-cleared by the Department of Justice.   Am. Compl. ¶ 15(e) (Wolfson Decl. Ex. 1, Def. Dep. Ex. 9); Collins Dep. Vol. I at 68:6-11, 69:8-12; Reilly Dep at 35:20-36:5.

1603.   The Section 5 compliance requirement has never prevented the District from timely implementing a voting change, and the District has never decided to forego a proposed voting change because the contemplated change would have required a Section 5 submission.   Collins. Dep. 90:12-91:1; Zimmerman Dep. 73:21-25, 76:8-11; Ferguson Dep. Vol. I at 70:11-23.

1604.   In his expert witness report assessing the financial implications of Section 5 for the District, Terry Musika explained that, like many utility districts, the District raises capital by selling bonds and benefits in terms of its credit rating from coverage under Section 5 because the auditor's certification of compliance sends a message to the financial markets that the District complies with voting rights laws.   Musika stated that "[t]he amount of interest expense paid on the District's bonded indebtedness is based on the bond's interest rate.   The bond's interest rate is largely determined by the credit rating assigned to the District's bonds.   Based on the size of the District's indebtedness and the length of the time such bonds remain outstanding, a slight change in the District's bond rating and interest rate could have a significant impact on the District's interest expense and overall financial health."   Musika went on to state that "[t]he periodic cost of a Section 5 pre-clearance submission . . . is a fraction of the annual average interest cost of $328,914[.]   One way of viewing the Section 5 pre-clearance submission cost is as an insurance policy to ensure a favorable debt rating.   Removing the nominal cost and allowing the District to establish an internal control over its compliance on a voluntary basis could subject the

District to an imprudent risk." Musika Rep. at 13-14 (citing Musika Rep. Ex. F, G) (Wolfson Decl. Ex. 4).

### 3. Facts Related to Future Compliance

1605. The District has not filed any Section 5 submissions since entering the joint election agreements with Travis County in 2004. Reilly Dep. 35:20-36:2

1606. The District does not anticipate making any future changes in voting procedures or policies that would require the District to prepare a preclearance submission under Section 5 of the Voting Rights Act. Zimmerman Dep. 69:13-16, 145:2-9.

### H. The Initiation of this Lawsuit

1607. On May 19, 2006, as Congress debated the VRARA, the District's counsel wrote to the District's Board of Directors to inquire whether the District would be interested in challenging the constitutionality of Section 5. May 19, 2006 Memorandum at P05914-P05915 (Wolfson Decl. Ex. 7).

1608. Counsel stated his opinion that the "time-consuming and expensive" Section 5 preclearance process "is no longer justifiable," and that, "if the district were interested in pursuing legal relief from the preclearance process," he "would be very interested in helping . . . do that." May 19, 2006 Memorandum at P05914 (Wolfson Decl. Ex. 7).

1609. Counsel expressed his desire to file a complaint on behalf of the District seeking "a declaration that the district is no longer subject to the preclearance provisions, either because it is entitled to 'bail out' of the coverage . . . or because the continued application of the preclearance provisions is an unconstitutional infringement on the sovereignty of the district." May 19, 2006 Memorandum at P05914-P05915 (Wolfson Decl. Ex. 7).

Respectfully Submitted,


*/s/ Seth P. Waxman*
Seth P. Waxman (D.C. Bar No. 257337)
John A. Payton (D.C. Bar No. 282699)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Ariel B. Waldman (D.C. Bar No. 474429)
Daniel A. Zibel (D.C. Bar No. 491377)
WILMER CUTLER PICKERING HALE and
     DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363


Jon M. Greenbaum (D.C. Bar No. 489887)
Benjamin J. Blustein (D.C. Bar No. 418930)
Jonah H Goldman (D.C. Bar No. 497507)
LAWYERS' COMMITTEE FOR CIVIL
     RIGHTS UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 628-2858


Dennis C. Hayes (admitted *pro hac vice*)
General Counsel
NATIONAL ASSOCIATION FOR THE ADVANCEMENT
     OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
Facsimile: (410) 358-9350


*Counsel for Defendant-Intervenors*
*Texas State Conference of NAACP Branches and Austin Branch of the NAACP*

*/s/ Debo P. Adegbile*
Debo P. Adegbile

*/s/ Norman J. Chachkin*
Norman J. Chachkin (D.C. Bar No.235283)
Theodore Shaw
President and Director-Counsel
Jacqueline A. Berrien
Ryan P. Haygood
Jenigh J. Garrett
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York 10013
Telephone: (212) 965-2200

Kristen M. Clarke
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005
Telephone: (202) 682-1300

Samuel Spital
HOLLAND & KNIGHT
195 Broadway, 24th Floor
New York, NY 10007
Telephone: (212) 513-3454

*Counsel for Defendant-Intervenors*
*Rodney and Nicole Louis; Winthrop and Yvonne Graham;*
*Wendy Richardson, Jamal Richardson, and Marisa Richardson*

*/s/ Laughlin McDonald*
Moffatt Laughlin McDonald
Neil Bradley
AMERICAN CIVIL LIBERTIES UNION
      FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, GA 30303-1227
Telephone: (404) 523-2721

Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION
1400 20th Street, NW, Suite 119
Washington, DC 20036
Telephone: (202) 457-0800
Facsimile: (202) 452-1868

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, NW, #350
Washington, DC 20036-6101
Telephone: (202) 898-4800
Facsimile: (202) 289-1389

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

Lisa Graybill
Legal Director
ACLU FOUNDATION OF TEXAS
1210 Rosewood Avenue
Austin, Texas 78702

*Counsel for Defendant-Intervenor Nathaniel Lesane*

*/s/ David J. Becker*
David J. Becker (D.C. Bar No. 496318)
PEOPLE FOR THE AMERICAN WAY FOUNDATION
2000 M Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 467-4999

*Counsel for Defendant-Intervenor People for the American Way*

*/s/ Jose Garza*
Jose Garza
Judith A. Sanders-Castro
George Korbel
TEXAS RIOGRANDE LEGAL AID, INC.
1111 N. Main Street
San Antonio, Texas 78212
Telephone: (210) 212-3700
Facsimile: (210) 212-3772


*/s/ Michael T. Kirkpatrick*
Michael T. Kirkpatrick (DC Bar No. 486293)
Brian Wolfman (DC Bar No. 427491)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
Telephone: 202-588-7728
Facsimile: 202-588-7795
mkirkpatrick@citizen.org

*Counsel for Defendant-Intervenors Angie Garcia, Jovita Casarez, Ofelia Zapata*

*/s/ Nina Perales*
Nina Perales
MEXICAN AMERICAN LEGAL DEFENSE &
AND EDUCATIONAL FUND
Texas State Bar No. 240054046
110 Broadway, Suite 300
San Antonio, Texas 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382
nperales@maldef.org

*/s/ Joseph E. Sandler*
Joseph E. Sandler
D.C Bar # 255919
Sandler Reiff & Young PC
50 E St SE # 300
Washington, D.C. 20003
Telephone: (202) 479-1111
Facsimile: (202) 479-1115
sandler@sandlerreiff.com

*Counsel for Defendant-Intervenors Lisa Diaz, David Diaz and Gabriel Diaz*

_/s/ J. Gerald Hebert_
J. Gerald Hebert
5019 Waple Lane
Alexandria, VA 22304
Telephone: (703) 628-4673
Facsimile: (202) 736-2222

Max Renea Hicks
1250 Norwood Tower
114 West 7th Street
Austin, TX 78801
Telephone: (512) 480-8231
Facsimile: (512) 480-9105

_Counsel for Defendant-Intervenors Travis County, Texas_

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2007, I caused to be served a copy of the foregoing DEFENDANT-INTERVENORS' JOINT STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULES 7(H) AND 56.1 to all counsel of record via the Court's CM/ECF filing system.


*/s/ Ariel B. Waldman*
Ariel B. Waldman