**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO GONZALES, Attorney General of the United States, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:06-CV-01384
(DST, PLF, EGS)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF DEFENDANT-INTERVENORS TEXAS
STATE CONFERENCE OF NAACP BRANCHES, AUSTIN BRANCH OF THE NAACP,
RODNEY LOUIS, NICOLE LOUIS, WINTHROP GRAHAM, YVONNE GRAHAM,
WENDY RICHARDSON, JAMAL RICHARDSON, MARISA RICHARDSON,
NATHANIEL LESANE, PEOPLE FOR THE AMERICAN WAY,
JOVITA CASARES, ANGIE GARCIA, AND OFELIA ZAPATA**

Dated  May 15, 2007

# TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................1

BACKGROUND ...............................................................................................2

    A.    The Voting Rights Act...............................................................................2

        1.    The Genesis of the Voting Rights Act of 1965.............................2

        2.    Section 5 ...........................................................................6

            a)    Preclearance Rules................................................................6

            b)    Scope Of Coverage .............................................................7

            c)    Bailout....................................................................9

            d)    Expiration ..............................................................9

        3.    Congressional Reauthorizations Of Section 5 .............................9

            a)    1970 Reauthorization...................................................10

            b)    1975 Reauthorization...................................................10

            c)    1982 Reauthorization...................................................12

            d)    2006 Reauthorization:  The VRARA ............................13

    B.    The Northwest Austin Municipal Utility District Number One ............15

        1.    The District's Creation, Operation And Governance .................15

        2.    Participation In The District's Political Process.........................16

        3.    The District's Preclearance Submissions....................................17

        4.    The District's Action In This Case .............................................19

STANDARD OF REVIEW....................................................................20

ARGUMENT....................................................................21

I.    THE DISTRICT IS NOT ELIGIBLE TO BAIL OUT FROM SECTION 5....................21

II.    SECTION 5 OF THE VOTING RIGHTS ACT IS CONSTITUTIONAL........................25

A. Section 5 Has Been Repeatedly Upheld As A Proper Exercise Of Congress's Enforcement Authority Under The Fourteenth And Fifteenth Amendments ................................................................................................28

  1. The Supreme Court And This Court Collectively Have Rejected Four Separate Challenges To Section 5 As Exceeding Congress's Enforcement Authority ..........................................................................28

  2. *City Of Boerne v. Flores* And Its Progeny Have Reaffirmed The Constitutionality Of Section 5 ...................................................31

B. Section 5 Is A Congruent And Proportional Response To A Pattern Of Constitutional Violations In Covered Jurisdictions ...............................35

  1. In Attacking Racial Discrimination In Voting, Congress Acted At The Zenith Of Its Enforcement Authority ...................................37

  2. The Evidence Before Congress Of The Unconstitutional Discrimination To Be Remedied And Deterred Was Extensive ...............41

   a) The Record Demonstrates Continuing Voting-Related Discrimination Against Minorities In Covered Jurisdictions And Establishes Reason For Concern That Such Discrimination Would Increase Were Section 5 Not Renewed ....................................................................41

    i) Section 5 objections ........................................45

    ii) Requests for Section 5 declaratory judgments withdrawn or denied .........................................49

    iii) More information requests ................................51

    iv) Noncompliance ................................................54

    v) Racially polarized voting .................................55

    vi) Section 2 litigation ..........................................58

    vii) Minority registration, turnout, and officials ......59

    viii) Observer coverage and intimidation of minority voters ..............................................................61

    ix) Discrimination against minority language voters ..............62

    x) Evidence of the harm of not renewing Section 5 ...............63

    xi) Incorporation of previous reauthorization records ...........67

           b)     The Record Evidence Of The Gravity Of Harm In This Case Is Stronger Than The Records In *Hibbs* And *Lane* .............. 68

    C.     Section 5 Is A Congruent And Proportional Response By Congress To The Continuing Problem And Lingering Effects Of Discrimination In Voting ................................................................................................... 70

III.     THE DISTRICT'S CONSTITUTIONAL CHALLENGE TO SECTION 5 "AS APPLIED" FAILS AS A MATTER OF LAW ................................................ 74

    A.     Because Section 5 Is A Constitutional Exercise Of Congress's Enforcement Authority Under The Fourteenth and Fifteenth Amendments, No Further Showing Is Required To Sustain Section 5's Constitutionality As Applied To The District ................................................................... 75

        1.     An "As-Applied" Challenge To Section 5 Cannot Be Sustained Merely Because An Entity Contends That It Has Not Previously Discriminated In Voting ........................................................... 75

        2.     Allowing As-Applied Constitutional Challenges By Political Subunits Would Seriously Undermine The Effectiveness Of Section 5 .................................................................................... 80

    B.     The District's Claim Based On The Burdens Of Compliance With Section 5 Fails................................................................................................... 81

CONCLUSION............................................................................................................. 83

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alden v. Maine*, 527 U.S. 706 (1999) ...................................................................................72

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................................20

*Arrington v. United States*, 473 F.3d 329 (D.C. Cir. 2006)...........................................20

*Association of Community Organizations for Reform Now v. Edgar*, 56 F.3d 791 (7th Cir. 1995).......................................................................................................................74

*Association of Community Organizations for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997).......................................................................................................................74

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) ...................................27, 32, 34, 35, 39, 72, 81

*Briscoe v. Bell*, 432 U.S. 404 (1977) ..............................................................................13

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988).........................................60

*City of Boerne v. Flores*, 521 U.S. 507 (1997).............1, 26, 27, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 43, 65, 67, 71, 73, 74, 80, 81

*City of Pleasant Grove v. United States*, 479 U.S. 462 (1987)......................................51

*City of Rome v. United States*, 446 U.S. 156 (1980) .................9, 21, 22, 23, 28, 29, 33, 69, 78, 79

*City of Rome v. United States*, 472 F. Supp. 221 (D.D.C. 1979), *aff'd*, 446 U.S. 156 (1980)......................................................................................................1, 25, 29, 78

*Clark v. Roemer*, 500 U.S. 646 (1991) .............................................................................6

*County Council of Sumter County v. United States*, 555 F. Supp. 694 (D.D.C. 1983) ...........25, 30

*Dillard v. Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986)..............................60

*Dougherty County Board of Education v. White*, 439 U.S. 32 (1978) ..........................23

*Dunn v. Blumstein*, 405 U.S. 330 (1972).......................................................................40

*Ex Parte Virginia*, 100 U.S. 339 (1879)..............................................................26, 29, 40

*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976).............................................................26, 27

*Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999)...........................................................................................32, 34, 72, 81

i

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) ...................................................................69

*Gaston County v. United States*, 395 U.S. 285 (1969) ...................................................79

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ................................................................41

*Graves v. Barnes*, 343 F. Supp. 704 (W.D. Tex. 1972) ................................................11

*Harris v. Siegelman*, 695 F. Supp. 517 (M.D. Ala. 1988) .............................................

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000) ...........22

*Hunter v. Underwood*, 471 U.S. 222 (1985) ..............................................................4, 41

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ......................................................43

*Jones v. Lubbock*, 727 F.2d 364 (5th Cir. 1984) ...........................................................60

*Katzenbach v. Morgan*, 384 U.S. 641 (1966) ...........................................................26, 65

*Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) ..........................32, 39, 72, 81

*Lamie v. United States Trustee*, 540 U.S. 526 (2004) ....................................................22

*League of United Latin American Citizens v. North East Independent School District*, 903 F. Supp. 1071 (W.D. Tex. 1995) ...........................................................................60

*League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594 (2006) .........8, 31, 49, 58, 60

*Lopez v. Monterey County*, 525 U.S. 266 (1999) .....................23, 25, 26, 27, 30, 31, 33, 34, 79

*Loving v. Virginia*, 388 U.S. 1 (1967) ........................................................................40

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ....................................................31

*Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003)......32, 34, 35, 37,38, 39, 40, 69, 70, 71, 72, 81

*Nixon v. Condon*, 286 U.S. 73 (1932) .....................................................................4, 40

*Nixon v. Herndon*, 273 U.S. 536 (1927) ..................................................................4, 41

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) .................................................77

*Oregon v. Mitchell*, 400 U.S. 118 (1970) ...................................................................80

*Padilla v. Lever*, 463 F.3d 1046 (9th Cir. 2006) ..........................................................23

*Purcell v. Gonzalez*, 127 S. Ct. 5 (2006) ...................................................................40

*Ramos v. Koebig*, 638 F.2d 838 (5th Cir. 1981) ...........................................................48

*Reynolds v. Sims*, 377 U.S. 533 (1964)...........................................................................40

*Rogers v. Lodge*, 458 U.S. 613 (1982) ....................................................................41, 60

*Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873) ............................................26, 40

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ..............1, 2, 3, 4, 5, 6, 27, 28, 29, 32, 33, 35, 36, 40, 67, 80

*Strauder v. West Virginia*, 100 U.S. 303 (1880)............................................................40

*Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986) .............................40

*Tennessee v. Lane*, 541 U.S. 509 (2004) ...................27, 32, 35, 36, 37, 38, 39, 43, 69,, 70, 71, 81

*Terry v. Adams*, 345 U.S. 461 (1953) .............................................................................11

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..............................................................57, 60

*Trinidad v. Koebig*, 638 F.2d 846 (5th Cir. 1981) .........................................................48

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004)................................12, 80

*United States v. Board of Commissioners*, 435 U.S. 110 (1978)......................................8

*United States v. Charleston County*, 365 F.3d 341 (4th Cir. 2004).....................57, 58, 60

*United States v. Classic*, 313 U.S. 299 (1941)...............................................................41

*United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993)......................................77

*United States v. Louisiana*, 380 U.S. 145 (1965) ....................................................4, 41

*United States v. Mississippi*, 380 U.S. 128 (1965) .........................................................4

*United States v. Morrison*, 529 U.S. 598 (2000) ..........................................................34

*United States v. Raines*, 362 U.S. 17 (1960) .................................................................43

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)....................................................................................................................40

*Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) .................................74

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)......................................................78

*White v. Regester*, 412 U.S. 755 (1973) .......................................................................41

*Williams v. City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990) ................................................ 60

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................ 40

## CONSTITUTIONAL PROVISIONS, STATUTES, REGULATIONS, AND RULES

U.S. Const. art. I, § 4 ................................................ 41

U.S. Const. art. I, § 8 ................................................ 41

U.S. Const. amend. XIII ................................................ 3

U.S. Const. amend. XIV ................................................ 1, 3, 26

U.S. Const. amend. XV ................................................ 1, 3

29 U.S.C. § 626(c)(1) ................................................

29 U.S.C. § 2612(a)(1) ................................................ 38

42 U.S.C. § 1971 ................................................ 14

42 U.S.C. § 1973 ................................................ 6, 14

42 U.S.C. § 1973a(a) ................................................ 62

42 U.S.C.A. § 1973a(a)(8) (West 2007) ................................................ 9

42 U.S.C. § 1973a(c) ................................................ 7

42 U.S.C. § 1973aa-1a(a) ................................................ 11

42 U.S.C. § 1973b(a) ................................................ 9, 21, 22

42 U.S.C. § 1973b(a)(1) ................................................ 9, 21, 22

42 U.S.C. § 1973b(a)(3)-(4) ................................................ 21

42 U.S.C.A § 1973b(a)(7) (2007) ................................................ 9

42 U.S.C. § 1973b(b) ................................................ 6, 7

42 U.S.C. § 1973b(c) ................................................ 7

42 U.S.C. § 1973b(f)(3) ................................................ 7

42 U.S.C. § 1973c ................................................ 6

42 U.S.C.A. § 1973c (West 2007) ................................................ 6, 73

42 U.S.C. § 1973f(a)(2) ................................................................................. 62

42 U.S.C. § 1973*l*(b) ..................................................................................... 82

42 U.S.C. § 1973*l*(c)(2) .................................................................................. 21

42 U.S.C. § 1973*l*(c)(3) ................................................................................... 8

42 U.S.C. § 2000e(k) ..................................................................................... 38

42 U.S.C. § 2000e-2 ...................................................................................... 38

42 U.S.C. § 13981 .......................................................................................... 34

Act of May 31, 1870, ch. 114, 16 Stat. 140 .................................................... 3

Act of Feb. 28, 1871, ch. 99, 16 Stat. 433 ...................................................... 3

The Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (codified as amended at
     42 U.S.C. §§ (codified as amended in 42 U.S.C. §§ 1971, 1971 note, 1973, 1973
     note, 1973a-1973*l*, 1973n-1973p, 1973aa, 1973aa-1, 1973aa-1a, 1973aa-2 to
     1973aa-6, 1973bb, 1973bb-1)) ........................................................................... 2

1975 Amendments, Pub. L. No. 94-73, 89 Stat. 400 (codified as amended at 42 U.S.C.
     §§ 1973a, 1973d) .............................................................................................. 9

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 (codified as amended at 42
     U.S.C. § 1975) .................................................................................................. 5

Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 (codified as amended at 42
     U.S.C. § 1974) .................................................................................................. 5

Civil Rights Act of 1968, Pub. L. No. 88-352, 78 Stat. 241 (codified as amended at 42
     U.S.C. §§ 2000a-2000h) ................................................................................... 5

Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 (codified as
     amended at 42 U.S.C. § 1973) ........................................................................ 13

Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act
     Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat.
     577 (codified as amended at 42 U.S.C. §§ 1971 note, 1973 to 1973aa-1a) ........ 14, 15, 27,
     40, 42, 56

Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (codified at 42
     U.S.C. §§ 15301-15545) ............................................................................ 41, 74

National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (codified at 42
     U.S.C. §§ 1973gg to 1973gg-10) ................................................................. 41, 74

28 C.F.R. pt 51 app...........................................................................................8, 9

28 C.F.R. § 51.1..................................................................................................6

28 C.F.R. § 51.2................................................................................................23

28 C.F.R. § 51.6............................................................................................8, 23

28 C.F.R. § 51.23..............................................................................................18

28 C.F.R. § 51.37..............................................................................................52

28 C.F.R. § 51.40..............................................................................................52

28 C.F.R. §§ 51.41-51.44 ....................................................................................6

40 Fed. Reg. 43,746 (Sept. 23, 1975).............................................................8, 12

40 Fed. Reg. 49,422 (Oct. 22, 1975) ................................................................12

41 Fed. Reg. 784 (Jan. 5, 1976) (corrected at 41 Fed. Reg. 1503 (Jan. 8, 1976)) .......................12

41 Fed. Reg. 34329 (Aug. 13, 1976) .................................................................12

Fed. R. Civ. P. 56(c) .........................................................................................20

Local Civ. R. 56.1 .............................................................................................20

Ala. Const. of 1902 art. VIII, § 182 .....................................................................4

Tex. Water Code § 49.103 .................................................................................15

Tex. Water Code § 54.024 .................................................................................15

Tex. Water Code § 54.101 .................................................................................15

Tex. Water Code § 54.501 .................................................................................15

Tex. Water Code § 54.601 .................................................................................15

## LEGISLATIVE HISTORY MATERIALS

H.R. Rep. No. 94-196 (1975) .............................................................................10

H.R. Rep. No. 97-227 (1981) .......................................................................12, 13

H.R. Rep. No. 107-329 (2001) ...........................................................................41

H.R. Rep. No. 109-478 (2006) ...................................13, 40, 45, 49, 52, 53, 55, 56, 61, 62, 63, 68

S. Rep. No. 94-295 (1975)................................................................................10

S. Rep. No. 97-417 (1982)................................................................10, 23, 25

S. Rep. No. 109-295 (2006)....................................................................12, 13, 14

152 Cong. Rec. H5143-H5207 (daily ed. July 13, 2006) ...........................14

## OTHER AUTHORITIES

*Botetourt County v. Gonzales*, No. 1:06cv1052 (Consent Judgment and Decree).......................74

*City of Salem v. Gonzales*, No. 1:06cv977 (Consent Judgment and Decree)................................74

DOJ Civil Rights Division Voting Section Home Page, Section 5 Covered Jurisdictions, *available at* http://www.usdoj.gov/crt/voting/sec_5/covered.htm (last visited May 14, 2007) ........................................................................................8

Dunning, William A., *The Undoing of Reconstruction*, in *Essays on the Civil War and Reconstruction* (1897, 1965 reprint)..............................................................4

Karlan, Pamela S., *Section 5 Squared:  Congressional Power to Extend and Amend the Voting Rights Act*, 44 Hou. L. Rev. 1 (2007)...................................................39

Katz, Ellen D., *Not Like the South?  Regional Variation and Political Participation through the Lens of Section 2*, in *Democracy, Participation and Power: Perspectives on Reauthorization of the Voting Rights Act* (forthcoming 2007)..........59, 65

*Large v. Fremont County*, No. 05-CV-270J (D. Wyo. Jan. 26, 2007) .........................................80

*League of United Latin American Citizens Council #682 v. City of Seguin*, No. 93-0333 (W.D. Tex. 1994).............................................................................49, 58, 60

Metzger, Gillian E., *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873 (2005) ..........82

O'Rourke, Timothy G., *Voting Rights Act Amendments Of 1982:  The New Bailout Provision And Virginia*, 69 Va. L. Rev. 765 (1983)........................................................23

Texas Comm'n on Envtl. Quality, List of Texas Water Districts, *available at* http://www3.tceq.state.tx.us/iwud/dist/index.cfm (last visited May 13, 2007)................24

*United States v. Conecuh County*, Civil Action No. 83-1201-H (S.D. Ala., June 12, 1984) ........63

U.S. Commission on Civil Rights, *The Voting Rights Act:  Ten Years After, at 69, reprinted in Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, Part II, 94th Cong., App. 2, at 969-1466...........................................................................10

## INTRODUCTION

This is not a case of first impression.

To dispose of Plaintiff's claims, the Court need only give effect to clear statutory language defining eligibility under the Voting Rights Act's bailout provisions and then decline the "high adventure"[1] of overruling three Supreme Court precedents that unequivocally sustain Section 5's constitutionality. These precedents, decided over three decades, are foundational to the Voting Rights Act and inextricably bound to the expressly granted congressional enforcement powers that define both the roots and reach of the transformative Reconstruction Amendments. The Supreme Court embraced this point in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), and has restated it more recently, and with no less certainty, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and its progeny.

As a result of the 2006 renewal debates, and guided by both recent and longstanding precedents and its institutional expertise, Congress extended the temporary provisions of the Voting Rights Act—including Section 5. In pursuit of the goal of political equality that was envisioned by the Reconstruction Amendments, Congress appropriately balanced the minimal burdens of which Plaintiff complains, but cannot substantiate here, against the real and substantial burdens that continuing racial discrimination in voting imposes on citizens individually—and on the nation as a whole.

Like the unsuccessful plaintiffs in the earlier Section 5 challenges, Plaintiff complains that it is unconstitutionally burdened by the Act's preclearance requirements. This claim fails for three principal reasons. First, the broad enforcement powers of the Fourteenth and Fifteenth

---

[1]  *City of Rome v. United States*, 472 F. Supp. 221, 235 (D.D.C. 1979) (three-judge court), *aff'd*, 446 U.S. 156 (1980).

Amendments were designed to allow incursions on traditional state authority to eradicate the vestiges of slavery and racial discrimination. Second, for over forty years, the evidence before Congress has demonstrated the entrenched nature of discrimination against minority voters in certain parts of the country. In response, Congress has employed a carefully drawn statute to remedy and prevent some of the corrosive manifestations of that discrimination. Third, Congress has the discretion to weigh the evidence and fashion the scope of the Section 5 remedy to guard the uniquely important right to vote against the continuing threat of discrimination against racial and ethnic minorities. Governing precedent and the record in this case—including ongoing discrimination in spite of Section 5's significant deterrent effects—make clear that Section 5 is an appropriate exercise of Congress's expressly granted authority to pursue the racial equality in voting that is among the Constitution's highest objectives.

## BACKGROUND

### A.    The Voting Rights Act

#### 1.    The Genesis of the Voting Rights Act of 1965

The Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 ("VRA" or "Act"), is one of the most important civil rights measures in the history of the United States. The VRA was "designed by Congress to banish the blight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), and includes powerful remedies intended to eliminate voting discrimination in States where such discrimination has been most flagrant. One critical such remedy is Section 5 of the Act—described by the Supreme Court as the "heart of the [VRA]," *id.* at 315—which in covered jurisdictions requires "the suspension of all new voting regulations pending review by federal authorities to determine whether their use would perpetuate voting discrimination." *Id.* at 316. As detailed below, Section 5 prevents

2

jurisdictions with a history of discrimination from implementing discriminatory voting practices or procedures.

Congress's judgment in 2006 that there was a need to renew Section 5 must be understood by reference to the historical experience that animates the Act. Following the end of the Civil War, the States ratified three constitutional amendments in 1865, 1868, and 1870, respectively. The Thirteenth Amendment outlaws slavery and involuntary servitude. U.S. Const. amend. XIII, § 1. The Fourteenth Amendment provides, among other things, that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifteenth Amendment mandates that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Each Amendment conferred on Congress the power to enforce the given Amendment through "appropriate legislation." U.S. Const. amends. XIII, § 2; XIV, § 5; XV, § 2.

Almost immediately after ratifying the Fifteenth Amendment, Congress passed the Enforcement Act of 1870, which made it a crime for public officers and private individuals to obstruct the exercise of the right to vote. *See* Act of May 31, 1870, ch. 114, 16 Stat. 140. The statute was amended in 1871 to provide for federal supervision of the electoral process, from registration to the certification of returns. *See* Act of Feb. 28, 1871, ch. 99, 16 Stat. 433.

In the years following, the extension of the franchise to minority citizens was strongly resisted in the South with violent and other means. As the Supreme Court later observed, "fervor for racial equality waned, enforcement of the laws became spotty and ineffective," and in 1894, "most of [the Enforcement Act's] provisions were repealed." *South Carolina v. Katzenbach*, 383 U.S. at 310.

Beginning in 1890, States of the former Confederate South systematically instituted laws designed to prevent minorities from voting. "These included grandfather clauses, property qualifications, 'good character' tests," and so called literacy or interpretation requirements, 383 U.S. at 311, and disqualification for "crimes of moral turpitude" (expansively defined and applied), *see, e.g.*, Ala. Const. of 1902 art. VIII, § 182 (held unconstitutional by *Hunter v. Underwood*, 471 U.S. 222 (1985)).[2] These laws were facially race-neutral, but were designed to exclude Black citizens by allowing white election officials to apply the procedures selectively. Other laws and practices, such as the "white primary" used by the State of Texas and other Southern States, attempted to evade the Fifteenth Amendment, first by excluding nonwhites from primary elections of the dominant party, and then (after the Supreme Court invalidated that device) delegating to political parties the power to exclude nonwhites from primary elections. *See generally Nixon v. Condon*, 286 U.S. 73 (1932); *Nixon v. Herndon*, 273 U.S. 536 (1927). As a result of these devices, Black voting rates in the former Confederate States dropped precipitously. *See, e.g.*, *United States v. Mississippi*, 380 U.S. 128, 144 (1965) ("The success of the expedients adopted in 1890 and in later years to accomplish this purpose [of disfranchising Black voters] appears from statistics in the complaint … [A]t the time the suit was filed[,]County, Mississippi, the registrar of which was one of the defendants here, had a white voting age population of 4,449 with white registration of 3,295, while it had 2,560 colored persons of voting age, of whom only one was a registered voter."); *United States v. Louisiana*,

---

[2]    *See generally* William A. Dunning, *The Undoing of Reconstruction*, in *Essays on the Civil War and Reconstruction* 353-385 (1897, 1965 reprint), attached as Ex. 9 of the accompanying Declaration of Paul R.Q. Wolfson in Support of Motion for Summary Judgment of Defendant-Intervenors (Wolfson Decl.); *id.* at 377-378 (noting the "candid avowal that the whites are determined to rule [and] that the elimination of the blacks from politics has been effected by intimidation, fraud, or any other means, legal or illegal, that would promote the desired end").

380 U.S. 145, 147-148 (1965) (noting that beginning with the adoption of the Louisiana Constitution of 1898, the State implemented a policy of denying Black citizens the right to vote such that from 1898 to 1944, the percentage of Black registered voters declined from 44% to 0.2%).

Beginning in 1957, Congress enacted three statutes seeking "to cope with the problem" of racial discrimination in voting "by facilitating case-by-case litigation against voting discrimination." *South Carolina v. Katzenbach*, 383 U.S. at 313. The Civil Rights Act of 1957 authorized the Attorney General to seek injunctions against public and private interference with the right to vote. *See* Pub. L. No. 85-315, § 131(c), 71 Stat. 634, 637. The Civil Rights Act of 1960 permitted the joinder of States as defendants, authorized the Attorney General to obtain access to local voting records and empowered courts in certain areas with systematic discrimination to register voters. *See* Pub. L. No. 86-449, §§ 303, 601(a), 601(b), 74 Stat. 86, 88, 90-92. The Civil Rights Act of 1964, among other things, expedited the hearing of voting cases before three-judge courts. *See* Pub. L. No. 88-352, § 101(d), 78 Stat. 241, 242.

The case-by-case approach underlying these laws proved ineffective. As the Supreme Court later observed:

> Voting suits are unusually onerous to prepare, sometimes requiring as many as 6,000 man-hours spent combing through registration records in preparation for trial. Litigation has been exceedingly slow, in part because of the ample opportunities for delay afforded voting officials and others involved in the proceedings. Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity between white and Negro registration. Alternatively, certain local officials have defied and evaded court orders or have simply closed their registration offices to freeze the voting rolls.

*South Carolina v. Katzenbach*, 383 U.S. at 314 (footnote omitted).

5

Congress concluded that "the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures," 383 U.S. at 309, and, accordingly, enacted the Voting Rights Act of 1965, codified as amended, at 42 U.S.C. § 1973 to eradicate racial discrimination in voting.

## 2.     Section 5

Section 5 retains today the basic structure established in the 1965 legislation.

### a)     Preclearance Rules

Jurisdictions covered by Section 5 may not change any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," 42 U.S.C. § 1973c, without first obtaining federal "preclearance." Absent preclearance, a voting change by a covered jurisdiction is legally unenforceable. Covered jurisdictions have two paths available to obtain preclearance of proposed voting changes. First, the jurisdiction may submit the proposed change to the Department of Justice (DOJ), which may affirmatively approve the change within 60 days, notify the jurisdiction of its objection, or fail to respond, which has the effect of preclearing the proposed change. *See* 28 C.F.R. §§ 51.41-51.44. Alternatively, a jurisdiction may seek preclearance by filing a declaratory judgment action in this Court. The proposed change must be precleared if the applicant entity satisfies its burden of showing that a proposed change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color," or language minority status under 42 U.S.C. § 1973b(f). 42 U.S.C. § 1973c (U.S.C.A. 2007). If preclearance is granted, the change may be implemented. *See* 28 C.F.R. § 51.1. If the jurisdiction is unable to persuade either this Court or the Attorney General that the proposed change satisfies the preclearance standard, the change remains legally unenforceable. *See Clark v. Roemer*, 500 U.S. 646, 652 (1991); 28 C.F.R. § 51.1.

### b)    Scope Of Coverage

The formula for determining which States or political jurisdictions are subject to Section 5's preclearance requirements is set forth at 42 U.S.C. § 1973b(b).  A jurisdiction is "covered"— and therefore required to comply with Section 5's preclearance requirements—if, during the 1964, 1968, or 1972 presidential elections:  (a) the jurisdiction maintained a "test or device" and (b) the jurisdiction had less than a 50% voter registration rate, or fewer than 50% of the registered voters actually voted in the presidential election.  42 U.S.C. § 1973b(b).  The VRA defines "test or device" as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters of members of any other class." 42 U.S.C. § 1973b(c).[3]

Later amendments to the VRA extended the same protections to language minority citizens.  Under the Act's minority language provisions, a jurisdiction is deemed to have employed a "test or device" if in the year 1972, it "provided any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, only in the English language, where the Director of the Census determines that more than five percent[] of the citizens of voting age residing in such State or political subdivision are members of a single language minority." 42 U.S.C. § 1973b(f)(3).  Language

---

[3]    In addition, Section 3(c) of the VRA provides a "bail-in" mechanism whereby jurisdictions not subject to Section 5 preclearance obligations may be subjected to the preclearance requirements by judicial order "[i]f in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision." 42 U.S.C. § 1973a(c).

minorities are defined in the VRA as "persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage." 42 U.S.C. § 1973*l*(c)(3).

Texas has since 1975 been a covered jurisdiction subject to Section 5 preclearance by virtue of the VRA's minority language provisions. *See* 40 Fed. Reg. 43,746 (Sept. 23, 1975). As the Supreme Court very recently observed in *League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594 (2006) (*LULAC*):

> Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act.

*Id.* at 2622 (quoting with approval the district court opinion). As the District acknowledges, First Amended Complaint, Dkt. No. 83, ¶ 10 (Am. Compl.), in light of Texas's statewide coverage since 1975, all political subunits in Texas have been subject to Section 5's preclearance requirements. *See* 28 C.F.R. § 51.6; *United States v. Board of Comm'rs*, 435 U.S. 110, 117 (1978).

Jurisdictions in sixteen States are currently covered by Section 5. 28 C.F.R. pt. 51, app. There are nine covered States: Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia. *See id.*[4] One or more political subdivisions in seven States—California, Florida, Michigan, New Hampshire, New York, North Carolina, and South

---

[4] Though the Commonwealth of Virginia is covered as an entity, fourteen political subdivisions in Virginia—ten counties and four cities—have "bailed out" of Section 5 coverage. The United States consented to a declaratory judgment in each of those cases. *See* DOJ Civil Rights Division Voting Section Home Page, Section 5 Covered Jurisdictions, *available at* http://www.usdoj.gov/crt/voting/sec_5/covered.htm (last visited May 14, 2007).

Dakota—are also covered. *See id.* There are no covered jurisdictions in the remaining 34 States. *Id.*

### c)     Bailout

The Voting Rights Act has a "procedure for exemption from" Section 5's preclearance obligations: the "so-called 'bailout' provision."[5]  Congress amended the bailout provision in 1975 and 1982, and the current provisions are set forth at 42 U.S.C. § 1973b(a).  A jurisdiction may bail out only if this Court issues a declaratory judgment stating that the jurisdiction is no longer covered.  To receive a declaratory judgment, an applicant State or political subdivision must show that its conduct over the ten years preceding its application satisfies the statutory criteria set forth at 42 U.S.C. § 1973b(a)(1).

### d)     Expiration

Since the enactment of the Voting Rights Act of 1965, Section 5 has been subject to an expiration date.  Section 5 as reauthorized in 2006 is set to expire in 2031.  *See* 42 U.S.C.A. § 1973a(a)(8) (2007).[6]

### 3.     Congressional Reauthorizations Of Section 5

Relying in each instance on its enforcement powers under the Fourteenth and Fifteenth Amendments, Congress reauthorized Section 5 in 1970, 1975, 1982 and 2006.[7]  Each

---

[5]     *City of Rome v. United States*, 446 U.S. 156, 167 (1980).

[6]     By statute, Congress is scheduled to "reconsider" the coverage formula beginning fifteen years after the Act's enactment—in July 2021.  *See* 42 U.S.C.A § 1973b(a)(7) (2007).

[7]     In the VRA as initially enacted, Congress relied on Section 5 of the Fourteenth Amendment only in suspending literacy tests that determined the voting eligibility of citizens educated in United States schools where the language instruction was not English.  For the remainder of the VRA, Congress relied on its enforcement powers under the Fifteenth Amendment.  In the later statutes reauthorizing and amending the VRA, Congress has expressly relied on its enforcement powers under both the Fourteenth and Fifteenth Amendments with respect to the entire Act, including Section 5.  *See* 1975 Amendments, Pub. L. No. 94-73, § 205,

9

reauthorization was based on extensive hearings and the assessment of evidence before Congress regarding the continued need for Section 5 in covered jurisdictions.

### a)   1970 Reauthorization

Over the course of 1969 and 1970, Congress held fourteen days of hearings in the House and Senate concerning the reauthorization of the Act. The Act had "resulted in an immediate increase in minority registration."[8] Nonetheless, that success had actually set off a new wave of purposeful discrimination against racial minorities and, "[f]ollowing the dramatic rise in registration" after the 1965 passage of the Act, "a broad array of dilution schemes were employed to cancel the impact of the new black vote." S. Rep. No. 97-417, at 6 (1982). "Elective posts were made appointive; election boundaries were gerrymandered; majority runoffs were instituted to prevent victories under a prior plurality system; at-large elections were substituted for election by single-member districts, or combined with other sophisticated rules to prevent an effective minority vote. The ingenuity of such schemes seems endless. Their common purpose and effect had been to offset the gains made at the ballot box under the Act." *Id.*

### b)   1975 Reauthorization

In 1975, Congress again assessed the continued need for Section 5. Congress conducted 20 days of hearings in the House and Senate. The record before Congress in 1975 was "filled

---

89 Stat. 400, 402 (codified as amended at 42 U.S.C. §§ 1973a, 1973d) (subsection 1973d repealed 2006) (replacing "fifteenth amendment" each time it appears in Sections 3 and 6 of the VRA with "fourteenth and fifteenth amendments").

[8]     U.S. Commission on Civil Rights, The Voting Rights Act: Ten Years After, at 69, reprinted in Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary, Part II, 94th Cong., App. 2, at 969-1466; see also H.R. Rep. No. 94-196, at 6 (1975) (discussing the period immediately following passage of the 1965 legislation).

with examples of the barriers to registration and voting that language minority citizens encounter in the electoral process." S. Rep. No. 94-295, at 25 (1975). Citing voting discrimination in Texas as an example of the problem to be remedied, the Senate report concluded that Mexican-Americans and African-Americans had been discriminated against by the State "in ways similar to the myriad forms of discrimination practiced[] against blacks in the South." *Id.* Congress noted the extensive litigation, culminating in *Terry v. Adams*, 345 U.S. 461 (1953), that was required to eliminate the Texas White Primary; the litigation that was necessary to eliminate the State of Texas's discriminatory poll tax; and the litigation that was necessary to eliminate the "'most restrictive voter registration procedures in the nation'" enacted by Texas to replace the poll tax. S. Rep. No. 94-295, at 25 (quoting *Graves v. Barnes*, 343 F. Supp. 704, 731 (W.D. Tex. 1972)). Congress also cited numerous other practices that had been used to deny Mexican-Americans access to voting. *See* S. Rep. No. 94-295, at 26-27. In addition to disparate treatment in voting, Congress found that language minority citizens had been the targets of discrimination in education, housing, the administration of justice, and employment, all of which had contributed to a depressed level of political participation. *Id.* at 28-30.

As a result, Congress expanded the coverage of the Act, including Section 5, to protect language minority citizens, defined as Asian-Americans, American Indians, Alaskan Natives, and those of Spanish heritage. Congress found that "citizens of language minorities have been effectively excluded from participation in the electoral process," and that to enforce the guarantees of the Fourteenth and Fifteenth Amendments "it is necessary to eliminate such discrimination by prohibiting these practices, and by prescribing other remedial devices." 42 U.S.C. § 1973aa-1a(a). This coverage brought—by orders of the Attorney General later in

11

1975—the States of Texas, Arizona, and Alaska under Section 5 coverage, as well as political subdivisions in other States.[9]

In addition to extending Section 5 coverage to Texas and other States and political subdivisions in 1975, Congress also retained Section 5 coverage of previously covered jurisdictions. The Senate Report concluded that the "recent objections entered by the Attorney General of the United States to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism." S. Rep. No. 94-295, at 16-17. Accordingly, Congress extended Section 5 for an additional seven years—through 1982.

### c)    1982 Reauthorization

In 1981 and 1982, Congress again debated whether to reauthorize Section 5 and the corresponding coverage and bailout provisions. Congress heard evidence from "over 100 witnesses and at least 27 days of testimony in the Senate alone." *United States v. Blaine County*, 363 F.3d 897, 908 (9th Cir. 2004). The Senate Report concluded that:

> The extent of objections under Section 5 has remained substantial[.] All too often, the background of rejected submissions—the failure to choose unobjectionable alternatives, the absence of an innocent explanation for the proposed change, the departure from past practices as minority voting strength reaches new levels, and, in some instances, direct indications of racial considerations—serves to underline the continuing need for Section 5.

S. Rep. No. 97-417, at 10. Congress also heard evidence that several hundred objections to proposed voting changes had been interposed since 1975. The changes found to be discriminatory included redistricting, majority vote requirements, numbered posts, polling place changes, and annexations. H.R. Rep. No. 97-227, at 19 (1981). Congress also found a pattern of

---

[9]    *See* 40 Fed. Reg. 43,746 (Sept. 23, 1975); 40 Fed. Reg. 49,422 (Oct. 22, 1975); 41 Fed. Reg. 784 (Jan. 5, 1976) (corrected at 41 Fed. Reg. 1503 (Jan. 8, 1976)), and 41 Fed. Reg. 34,329 (Aug. 13, 1976).

noncompliance with Section 5, including the failure or refusal of jurisdictions to submit voting changes for preclearance and continuing to implement changes after the change had been the subject of an objection. *See* S. Rep. No. 97-417, at 12-14. And Congress documented examples of efforts to exclude minorities from political participation, including "physical violence and intimidation of voters and candidates, discriminatory manipulation of voters, reregistration requirements and purging of voters, changing the location of polling places and insistence on retaining inconvenient voting and registration hours." S. Rep. No. 97-417, at 10 n.22; H.R. Rep. No. 97-227, at 11-21.

In addition, the House Report noted the pattern of ongoing discrimination and widespread opposition to equal voting rights that followed passage of the 1965 Act, and the 1970 and 1965 reauthorizations. *See* H.R. Rep. No. 97-227, at 18. And indeed, the initial response by the State of Texas to becoming subject to Section 5 was to resist coverage. In *Briscoe v. Bell*, 432 U.S. 404 (1977), the Supreme Court unanimously rejected the State's request for an order enjoining the Director of the Census from publishing a determination that Texas was covered. The experience of Texas from 1975 to 1982 amply showed the importance of coverage of that State; during that period, the DOJ interposed more Section 5 objections for Texas jurisdictions than for any other State before the 1982 renewal. *See* SMF ¶¶ 165, 616.

Following its comprehensive reexamination of the VRA in 1982, Congress reauthorized Section 5 for twenty-five years, through 2007. *See* Pub. L. No. 97-205, § 2, 96 Stat. 131, 131 (1982).

### d) 2006 Reauthorization: The VRARA

From October 2005 through July 2006, Congress held a total of twenty-one hearings concerning the reauthorization of the expiring provisions of the VRA in general and Section 5 in particular. *See* SMF ¶¶ 245-264. The Senate and House Judiciary Committees each heard

13

testimony from over 40 witnesses. *See id.* On May 10, 2006, the House Judiciary Committee voted a bill to reauthorize the VRA out of committee by a vote of 33-1. *See* H.R. Rep. No. 109-478, at 85 (2006). On July 13, 2006, the full House of Representatives, by a vote of 390-33, passed the Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 (VRARA). 152 Cong. Rec. H5143-H5207 (daily ed. July 13, 2006). On July 20, 2006, the Senate passed the VRARA by a 98-0 margin following the Senate Judiciary Committee's vote of 18-0 on July 19, 2006. *See* S. Rep. No. 109-295, at 4 (2006). On July 27, 2006, President George W. Bush signed the VRARA into law, renewing Section 5's applicability once again for twenty-five years, through 2031. *See* Pub. L. No. 109-246, § 1, 120 Stat. 577, 577 (2006) (codified at 42 U.S.C. §§ 1971, 1973).

Defendant-Intervenors in their accompanying Joint Statement Of Material Facts As To Which There Is No Genuine Issue (SMF) have set forth a detailed summary of the massive legislative record—the more than 16,000 pages of record evidence presented to Congress in the reauthorization proceedings that culminated in the 2006 reauthorization of the VRA and Section 5. That evidence is discussed in Section II of the argument below. It suffices here to note that Congress in the VRARA codified a statutory finding that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process." Pub. L. No. 109-246, § 2(b)(2), 120 Stat. 577. Congress further found that the record evidence revealed "that 40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution," *id.* § 2(b)(7), 120 Stat. 578; *see also id.* § 2(b)(9), 120 Stat. 578, and that "without the continuation of the Voting Rights Act of 1965 protections,

14

racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years," *id.* § 2(b)(9), 120 Stat. 578.

**B.      The Northwest Austin Municipal Utility District Number One**

**1.      The District's Creation, Operation And Governance**

The Northwest Austin Municipal Utility District Number 1 ("the District") is a local governmental entity wholly located within the City of Austin and Travis County, Texas. SMF ¶ 1547. The District was formed "to help provide infrastructure, provide waste and wastewater service, operate a local park, and provide other localized services" to District residents. *Id.* ¶ 1548 (quoting Am. Compl. ¶ 6). Municipal utility districts ("MUDs") are typically created to issue bonds, as well as to levy and collect taxes to retire the bond debt, in order to facilitate the financing and construction of water, wastewater and drainage utilities on previously undeveloped land. *See id.* ¶ 1549; *see also* Tex. Water Code §§ 54.501, 54.601. In Texas, after their creation, MUDs remain "subject to the continuing right of supervision of the state," Tex. Water Code § 54.024, and may be dissolved once their debt is paid. SMF ¶ 1550. The number of District residents as reported in the 2000 Census—according to an analysis conducted by the City Demographer for the City of Austin—was 3,586, of whom 2,872 (80.1%) were white, 54 (1.5%) were African-American, 197 (5.5%) were Hispanic or Latino, 416 (11.6%) were of Asian heritage, and 47 (1.3%) were "other." *Id.* ¶ 1554 (citing and quoting Expert Report of Ryan F. Robinson, attached as Ex. 3 of the accompanying Declaration of Paul R.Q. Wolfson in Support of Motion for Summary Judgment of Defendant-Intervenors (Wolfson Decl.), at 3).

The District is governed by a Board of five directors, each of whom is elected to a four-year term by qualified voters residing in the District. *See* Tex. Water Code, §§ 49.103, 54.101. The Board meets monthly, *see* SMF ¶ 1556, to administer annual tax revenues that exceed one

15

million dollars, the bulk of which is dedicated to retiring the debt incurred when the District issued bonds in the late 1980s in order to complete the water, wastewater and storm drainage construction necessary to develop the residential neighborhood. SMF ¶ 1556. The District has no full-time employees. *Id.* ¶ 1557. Rather, the District contracts with various agents who, among other things, service the existing bond debt, maintain parks and common areas, and provide financial, accounting and legal services. *Id.* ¶ 1558.

The terms of the District's board members are staggered, with elections held every two years. *Id.* ¶ 1559. From 1988 through 2002, the District administered its own elections. *Id.* ¶ 1560. Beginning with the 2004 election, however, the District's elections have been administered by the Travis County Clerk at a shared polling place pursuant to agreements between the District and Travis County. *Id.* ¶ 1574. The County Clerk now conducts elections for virtually all of the 100-plus subjurisdictions located in Travis County, which include, in addition to municipal utility districts, cities, fire districts, water districts and school districts. *Id.* ¶ 1575.

The District has never conducted voter registration. SMF ¶ 1576. Voter registration of individuals who reside in the District has, since the District's inception, been conducted by Travis County. *Id.* ¶ 1577.

### 2.     Participation In The District's Political Process

For most of its existence, the District made little effort to expand opportunities for District residents to participate in the District's electoral process or affairs. According to Sharlene Collins, an Austin attorney who served as the District's general counsel from 1986 through 2002, at no time during her tenure did the District take affirmative steps to increase voter turnout in District elections. *Id.* ¶ 1561. Before 2004, the District held its elections at residents' private homes (and, prior to the District's 2004 election, in a resident's garage), separately from

16

all other jurisdictions' elections (such as county, state, and federal elections). *Id.* ¶ 1562. In 2004, the District moved its elections to an elementary school, where its elections could be held at the same time and using the same machines as Travis County elections. *Id.* ¶ 1578.

Although the transfer of elections to the elementary school may have increased *general* voter participation in the District, the District has made no specific efforts directed at expanding opportunities for minority residents to participate in the District's political life. Donald Zimmerman—who served as District Board President from 2002-2006 and currently serves as Board Vice President—testified as the District's representative at deposition that he would "absolutely not" make specific efforts to recruit an African-American or Hispanic person to serve as an elections clerk. SMF ¶ 1570. In response to questioning by a DOJ attorney, Mr. Zimmerman testified that, despite having lived in Texas for all but one year since his birth in 1960, he has never personally observed, heard about, or read any newspaper stories about racial discrimination in Texas. *Id.* ¶ 1571.

### 3.    The District's Preclearance Submissions

The District has not filed any Section 5 preclearance submissions since entering into the agreement with Travis County in 2004. SMF ¶ 1605. At present, the District does not anticipate making any future changes in voting procedures or policies that would require it to prepare a Section 5 submission. *Id.* ¶ 1606.

The District's preparation of preclearance submissions under Section 5 has required only minimal expenditures of time, cost, or administrative burden. SMF ¶ 1591. During its entire period of creation and existence (1986-present), the District has made eight submissions to the DOJ pursuant to Section 5, as follows:

| **Date** | **Changes Affecting Voting** |
|---|---|
| November 25, 1986 | Creation, Confirmation and Director Election, Bond and Maintenance Tax Election, Polling Place |
| March 21, 1988 | Creation, Confirmation and Director Election, Bond and Maintenance Tax Election, and Polling Place |
| March 6, 1990 | Polling Place Change |
| April 4, 1996 | Polling Place Change |
| June 6, 1996 | Notice of Election and Cancellation of Election |
| March 26, 1998 | Annexation and Polling Place Change |
| March 27, 2002 | Polling Place Change |
| February 26, 2004 | Joint Election Agreement with Travis County |

*See Id.* ¶¶ 1582-1590.   Although jurisdictions may file Section 5 preclearance submissions without counsel preparing or filing the submission, *see* 28 C.F.R. § 51.23, the District has employed outside counsel to prepare all of its Section 5 submissions, the first seven of which were prepared by Ms. Collins.  SMF ¶¶ 1600-1601.  Collins typically required two hours to prepare a submission when it related to a simple matter such as moving a polling place (as did three of the District's submissions) and approximately three to six hours to prepare a submission involving an annexation (as did only one of the District's submissions). *Id.* ¶ 1601.

Complying with Section 5 has imposed only a nominal financial burden on the District. Terry L. Musika, a certified public accountant and auditing expert retained by the NAACP Defendant-Intervenors, concluded, based on his review of the District's billing and other financial records and the deposition testimony of the District's former and current general counsels, that complying with Section 5's preclearance requirement has cost the District, on average, only $233 per year. *See* Report of Terry Musika, attached as Ex. 4 to Wolfson Decl., at

18

7-9. This amounts to less than one-tenth of one percent (0.04%) of the District's average annual expenditures. *Id.* Moreover, in the District's annual financial statements from 1989 through 2005, the District's auditors never deemed preclearance-related expenses a material expenditure. *See id.* at 9-10.

Compliance with Section 5 has imposed little administrative burden on the District or its board members. Collins testified that "I don't think I ever had one of the board members take a look at [a] submission." SMF ¶ 1597 (quoting Collins Dep. Tr.). Current board member Donald Zimmerman, who was serving as Board president when the District made its February 2004 preclearance submission, testified that he "flipp[ed] through" a draft of that submission, but provided no comments on the draft. *Id.* ¶ 1598 (quoting Zimmerman Dep. Tr.).

Nor has compliance with Section 5 caused the District any delay in implementing voting changes. All of the District's Section 5 submissions have been precleared by the DOJ. *See* SMF ¶ 1602. It is undisputed that the requirement of Section 5 compliance has never prevented the District from timely implementing a voting change, and that the District has never decided to forego a proposed voting change because the contemplated change would have required a Section 5 submission. *See id.* ¶ 1603.

### 4.    The District's Action In This Case

On May 19, 2006, as Congress debated the VRARA, the District's counsel wrote to the District's Board and outside general counsel to inquire whether the District would be interested in challenging the constitutionality of Section 5. *See* Memorandum from Gregory S. Coleman to Members of the Board & Frank Reilly, Subject "Possible Challenge to Preclearance Procedures" (May 19, 2006), attached as Ex. 7 to Wolfson Decl. Counsel stated that the "time-consuming and expensive" Section 5 preclearance process "is no longer justifiable," and that, "if the district were interested in pursuing legal relief from the preclearance process," he "would be very

19

interested in helping … do that." *Id.* Counsel expressed his desire to file a complaint on behalf of the district seeking "a declaration that the district is no longer subject to the preclearance provisions, either because it is entitled to 'bail out' of the coverage … or because the continued application of the preclearance provisions is an unconstitutional infringement on the sovereignty of the district." *Id.*; SMF ¶¶ 1608-1609.

On August 4, 2006—eight days after President Bush signed the VRARA into law—the District filed suit in this case. In its Amended Complaint, the District makes two claims. First, the District claims that it satisfies the criteria under the VRA to bail out from Section 5 preclearance requirements and is thus "entitled to a declaration from the Court that it is no longer a covered jurisdiction under the Act." *See* Am. Compl. ¶ 14; *see also id.* ¶ 15. Second, and in the alternative, the District seeks a declaration that "§5 of the Act as applied to the [D]istrict is an unconstitutional overextension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment." *Id.* at 8, Prayer for Relief.

## STANDARD OF REVIEW

A moving party is entitled to summary judgment where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Local Civ. R. 56.1; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986); *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006). In this case, there is no genuine issue as to any material fact, and movants Defendant-Intervenors Texas State Conference of NAACP Branches, Austin Branch of the NAACP, Rodney Louis, Nicole Louis, Winthrop Graham, Yvonne Graham, Wendy Richardson, Jamal Richardson, Marisa Richardson, Nathaniel Lesane, People For The American Way, Jovita Casares, Angie Garcia, and Ofelia Zapata (Defendant-Intervenors) are

20

entitled to a judgment as a matter of law on both the District's statutory and constitutional claims.

## ARGUMENT

## I.    THE DISTRICT IS NOT ELIGIBLE TO BAIL OUT FROM SECTION 5

Summary judgment for the Defendant-Intervenors is warranted on the District's bailout claim because the District is ineligible to bail out from Section 5 coverage.[10]  This conclusion is compelled by the clear statutory text and legislative history and is further reinforced by pragmatic considerations.

The VRA's bailout provisions allow a covered "State or political subdivision" to seek a declaratory judgment in this Court that would terminate the jurisdiction's covered status under Section 5 of the Act.  *See* 42 U.S.C. § 1973b(a)(1)(A)-(D) & (F), & 1973b(a)(3)-(4) (each subsection specifying showings by the "State or political subdivision" required for this Court to be able to issue a declaratory judgment "under this section").  Because the District is not a State, whether the District is eligible to seek a bailout turns on whether the District qualifies as a "political subdivision" under the statute.

The statute makes clear that the District is not a "political subdivision."  Section 14 of the VRA provides that "[t]he term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."  42 U.S.C. § 1973*l*(c)(2).  This definition of "political subdivision" governs the use of that term

---

[10]    Because it is clear that the District is ineligible to seek bailout, Defendant-Intervenors do not address in this brief the statutory criteria that eligible jurisdictions must satisfy in order to bail out.  Even if the District were eligible to *seek* bailout, however, the District would not have met its burden to satisfy the statutory criteria for bailout specified by 42 U.S.C. § 1973b(a).

for bailout analysis. *See City of Rome v. United States*, 446 U.S. 156, 168 & n.5 (1980). Under that straightforward definition, a political subunit that is not a county or parish and that does not itself conduct voting registration is not a "political subdivision" eligible for bailout.

The District is indisputedly not a county or a parish. Moreover, Travis County conducts voting registration for every special purpose jurisdiction within the county, such as the District. *See* SMF ¶¶ 1575-1577. Thus, under the statute's plain language, the District does not satisfy the definition of "political subdivision." This ends the inquiry necessary to resolve the bailout claim. *See City of Rome*, 446 U.S. at 168 & n.5 (denying bailout to a municipality located in a covered state because the municipality did not meet the then-existing definition "[o]n the face of the statute" of a jurisdiction eligible to seek bailout); *see also Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000))).

Beyond the statute's clear definition of "political subdivision," there are several additional indications that Congress did not intend for subunits within a county that conducts voter registration to be eligible for bailout. First, the statute's bailout provision states that the required showing is to be made by the applying "political subdivision and all governmental units within its territory." 42 U.S.C. § 1973b(a)(1)(D), (F). This provision indicates that Congress anticipated that those jurisdictions seeking bailout would typically have other governmental units, not themselves eligible for bailout, within their boundaries.

Second, the bailout provision's legislative history shows that Congress purposefully made ineligible for bailout political subunits of States *other* than counties and parishes that do not conduct voter registration—such as the District. Before the 1982 reauthorization, under the

22

bailout standard as construed by the Supreme Court in *City of Rome*, only "State[s] with respect to which the determinations have been made" under Section 4(b) or a "political subdivision with respect to which such determinations have been made as a separate unit" were eligible to seek bailout under the Act. *See* 446 U.S. at 167. In the 1982 reauthorization legislation, Congress partially "reverse[d] *City of Rome*['s]" statutory holding by broadening the class of eligible jurisdictions to permit certain political subdivisions in covered States "to bail out independently of the state government."[11] In doing so, Congress expanded the class of eligible jurisdictions to include counties, S. Rep. No. 97-417, at 57, but specifically declined to permit *all* political subunits within a covered jurisdiction to file separate bailout applications. Congress described this decision as "a logistical limit." *Id.* at 57 n.192. As the 1982 Senate Report explained, "[t]owns and cities within counties may not bailout separately[.] As a practical matter, if every political subdivision were eligible to seek separate bailout, we could not expect that the Justice Department or private groups could remotely hope to monitor and defend the bailout suits[.] Few questioned the reasonableness and fairness of this cutoff in the House." *Id.*[12] Congress has

---

[11]    Timothy G. O'Rourke, *Voting Rights Act Amendments Of 1982: The New Bailout Provision And Virginia*, 69 Va. L. Rev. 765, 792 (1983).

[12]    The construction of the bailout statute reflected in the DOJ's regulations implementing Section 5 further supports construing the statute to reflect this limitation. The regulations—tracking the statutory definition—define a "[p]olitical subdivision" as "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." *See* 28 C.F.R. § 51.2 (internal quotation marks omitted). The regulations use the distinct term "political subunits" to make clear that "[a]ll political subunits within a covered jurisdiction (e.g., counties, cities, school districts) are subject to the requirement of Section 5." *Id.* § 51.6. The Supreme Court has "traditionally afford[ed] substantial deference to the Attorney General's interpretation of § 5 in light of h[is] 'central role … in formulating and implementing' that section.'" *Lopez v. Monterey County*, 525 U.S. 266, 281 (1999) (quoting *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 39 (1978)). This Court should afford deference to the subunit/subdivision distinction reflected in the DOJ's regulations implementing the bailout provisions. *Accord Padilla v. Lever*, 463 F.3d 1046, 1058 (9th Cir. 2006).

not since 1982 altered the bailout eligibility provisions and, indeed, declined to do so in the VRARA. *See* SMF ¶ 1354 (testimony of Jack Park to the Senate and Gerald Hebert to the House asking Congress to consider expansion of the class of jurisdictions eligible to apply for bailout).

Congress thus made a considered decision to limit bailout to States, counties, and parishes and—in limited instances where voting registration is *not* conducted under the supervision of a county (or parish)—any other State subdivision that conducts voting registration. Several practical considerations make clear that Congress's choice was eminently reasonable.

First, allowing every political subunit to avail itself of the VRA's bailout procedures could substantially burden the limited resources of this Court while placing enormous costs on those parties charged with defending these suits, including the Attorney General and aggrieved citizens. More than 900 jurisdictions in sixteen States are independently covered, in full or in part, by Section 5. Were every political *sub*unit of every covered political subjurisdiction able to initiate a separate bailout proceeding, the number of eligible filings could be crushing, perhaps in excess of 1,800 eligible subunits in Texas alone.[13]

Second, the current statutory framework provides the uniformity and clarity essential to the smooth operation of the Section 5 preclearance regime. If preclearance requirements remained for a covered larger jurisdiction, but were removed for a subunit within, voting officials could be subject to unnecessarily confusing or conflicting obligations.

---

[13]   According to data provided on websites of Texas government agencies, Texas has 691 active MUDS, *see* Texas Comm'n on Envtl. Quality, List of Texas Water Districts, *available at* http://www3.tceq.state.tx.us/iwud/dist/index.cfm (last visited May 13, 2007), 176 active water control and improvement districts, *see id.*, and more than 1000 independent school districts, *see* http://askted.tea.state.tx.us/org-bin/school/SCHOOL_RPT?Y::All::Directory (last visited May 15, 2007).

Finally, the current system in Travis County appears to be functioning in a manner that demonstrates Congress's wisdom in making eligible for bailout counties that conduct voting registration and making *in*eligible political subunits within those counties. Travis County is the entity responsible for the election administration activities of the county and nearly all of the political subunits within the county. If Travis County successfully sought bailout, the District, as a political subunit within the County, would also be excused from Section 5 obligations. *See* S. Rep. No. 97-417, at 56.[14] Meanwhile, from the County's perspective, "administrative costs associated with Section 5 compliance … are outweighed by the valuable benefits to the County and its voters that come with the continued existence and application of Section 5." Travis County Intervention Mot., Dkt. No. 23, at 3. Travis County has not sought bailout. The District, for its part, has acknowledged that it saves time and money and promotes voter convenience under its agreements with Travis County, and, as the District Board President and Rule 30(b)(6) designee William Ferguson stated, is "very pleased" with Travis County's administration of elections. *See* SMF ¶ 1581 (quoting Ferguson Dep. Tr.).

## II.    SECTION 5 OF THE VOTING RIGHTS ACT IS CONSTITUTIONAL

Plaintiff's central claim is that, in reauthorizing Section 5, Congress exceeded the authority it was granted to enforce the guarantees of the Fourteenth and Fifteenth Amendments through "appropriate legislation." Plaintiff's "rather bold demand"[15] that this Court invalidate

---

[14]    The Supreme Court in *Lopez v. Monterey County* reaffirmed that "there is no question that [a] County may avail itself of § 4(a)'s bailout provision." 525 U.S. 266, 284 (1999) (internal quotation marks omitted).

[15]    *County Council of Sumter County v. United States*, 555 F. Supp. 694, 707 (D.D.C. 1983); *see also City of Rome v. United States*, 472 F. Supp. 221, 235 (D.D.C. 1979) ("We are bound to note, at the outset, that in asking this Court to declare [S]ection 5 unconstitutional, the plaintiffs summon us to a life of high adventure. For we could not do as the plaintiffs ask without

Section 5 does not require the Court to plow new ground. Both the Supreme Court and this Court have upheld Section 5 as a proper exercise of Congress's enforcement authority, a remedial measure well-designed to uproot entrenched official racial discrimination in voting and to prevent such discrimination from taking hold again. Although the Supreme Court's jurisprudence has evolved since Section 5's constitutionality was first sustained in 1965, the Court's recent decisions only reinforce Section 5's validity. *City of Boerne v. Flores*, 521 U.S. 507 (1997), and the Court's subsequent decisions have consistently pointed to Section 5 as the exemplar of remedial legislation that is an appropriate exercise of Congress's enforcement authority.

The common "pervading purpose" of the Reconstruction Amendments was "freedom of [former slaves], the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 71 (1873). Those Amendments created a "shift in the federal-state balance," *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976), and "by their nature [they] contemplate some intrusion into areas traditionally reserved to the States," *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999).

The Reconstruction Amendments do not stop at declaring certain practices unconstitutional, however. They also give Congress a broad authority to remedy constitutional violations and to ensure that such violations do not occur in the future:

> All must acknowledge that § 5 [of the Fourteenth Amendment] is a "positive grant of legislative power" to Congress, *Katzenbach* v. *Morgan*, 384 U.S. 641, 651 (1966). In *Ex Parte Virginia*, 100 U.S. 339, 345-346 (1879), we explained the scope of Congress' § 5 power in the following broad terms:

overruling or ignoring unequivocal and repeated holdings by the Supreme Court of the United States.").

26

"Whatever legislation is appropriate, that is, adapted to carry out the objects the [Reconstruction] amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power."

Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into "legislative spheres of autonomy previously reserved to the States." *Fitzpatrick*[, 427 U.S. at 455].

*Boerne*, 521 U.S. at 517-518; *see also Tennessee v. Lane*, 541 U.S. 509, 518-519 & n.3 (2004) (quoting *Boerne*, and noting that Congress's enforcement power under § 5 of the Fourteenth Amendment "as we have often acknowledged, is a broad power indeed" (internal quotation marks omitted)).[16]

Moreover, where it is clear that the conduct—here, official discrimination in voting—to which Congress has responded is unconstitutional, and where the only question is whether Congress's response was appropriate, courts accord great deference to Congress's judgments that a legislative response is necessary and proper. "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), even when

---

[16] *Boerne* and its progeny discussed in this brief have involved statutes enacted under Congress's enforcement power under Section 5 of the Fourteenth Amendment. Section 5 of the VRA rests on Congress's enforcement power under both the Fourteenth and Fifteenth Amendments. *See supra* p. 9 n.7; *see also* VRARA, Pub. L. No. 109-246, § 3, 120 Stat. 578-580. *Boerne* characterized Congress's power to enforce the Fifteenth Amendment as "parallel" to its power to enforce the Fourteenth Amendment, *see* 521 U.S. at 518, and the Court has elsewhere indicated that its precedents interpreting Congress's enforcement power under the Fourteenth Amendment are relevant in the context of the Fifteenth Amendment and vice versa. *See Board of Trs. v. Garrett*, 531 U.S. 356, 373 & n.8 (2001); *Lopez*, 525 U.S at 282-283. As explained below, *see infra* Part II.B, Section 5 satisfies the *Boerne* test. Accordingly, this case presents no occasion for this Court to decide whether Congress's enforcement power under Section 2 of the Fifteenth Amendment is broader than its power under Section 5 of the Fourteenth Amendment.

such legislation forbids conduct that is not itself unconstitutional and displaces state laws on matters previously reserved to the domain of the States, *see id.* at 315-327; *City of Rome*, 446 U.S. at 174-178.

The District, though, claims that, however necessary Section 5 might have once been to uproot racial discrimination, the case for the statute has been undermined by significant improvements in minority voting rights since 1965. *See* Am. Compl. ¶¶ 10, 22-24. Thus, according to the District's logic, Section 5 has been so successful that it must be struck down. This would be a strange constitutional rule under any circumstance, but it is particularly ill-founded with respect to the evil addressed by Section 5. Section 5 was enacted, and has now been reauthorized four times, after a century of experience demonstrating that racial discrimination in voting is exceedingly difficult to remedy and deter, and that those who would carry out such discrimination have been persistent and ingenious in finding new ways in which to do so. There was no shortage of evidence before Congress in 2006 showing that Section 5 remains necessary both to remedy past and ongoing discrimination and to prevent discriminatory voting practices in the future. Section 5 as renewed in the VRARA—including its cabined remedial scheme, geographic and time limitations, and bailout protection—should therefore be, once again, upheld as constitutional.

A.   **Section 5 Has Been Repeatedly Upheld As A Proper Exercise Of Congress's Enforcement Authority Under The Fourteenth And Fifteenth Amendments**

1.   **The Supreme Court And This Court Collectively Have Rejected Four Separate Challenges To Section 5 As Exceeding Congress's Enforcement Authority**

As soon as Section 5 was enacted, South Carolina challenged the statute on the ground that it exceeded Congress's constitutional enforcement authority. The Supreme Court rejected that challenge in *South Carolina v. Katzenbach.* Explaining that "[t]he constitutional propriety

of the Voting Rights Act … must be judged with reference to the historical experience which it reflects," 383 U.S. at 308, the Court looked to the "voluminous legislative history of the Act," *id.* at 309, which demonstrated the "unremitting and ingenious defiance of the Constitution" in certain sections of the country, *id.*, the failure of the case-by-case method to end discrimination, and the repeated attempts of local jurisdictions to evade anti-discrimination requirements by enacting new and different discriminatory voting procedures, *see id.* at 309-314. The Court acknowledged that Section 5 was an "uncommon exercise of congressional power," but found that Congress's enactment was justified by the exceptional history of voting discrimination in the covered jurisdictions. *Id.* at 334. In doing so, the Court applied a broad test for congressional power to enforce the Reconstruction Amendments: "Whatever legislation is appropriate … to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." *Id.* at 327 (quoting *Ex parte Virginia*, 100 U.S. 339, 345-346 (1880)).

After Congress extended Section 5 in 1970 and 1975, the statute's constitutionality was challenged once again. Rome, Georgia, argued that Section 5 violated principles of federalism, and that even if the preclearance requirements were constitutional when enacted in 1965, "they had outlived their usefulness by 1975." *City of Rome*, 446 U.S. at 180. Affirming this Court's decision, *see* 472 F. Supp. 221, 236-239 (D.D.C. 1979), the Supreme Court rejected the federalism claim, noting that the Fourteenth and Fifteenth Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." 446 U.S. at 179. As for the claim that Section 5 had outlived its usefulness, the Court concluded that "Congress' considered determination that at least another 7 years of statutory remedies were

necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable." *Id.* at 182.

After the extension of Section 5 in 1982, Sumter County, South Carolina, filed yet another challenge to the constitutionality of the statute. The county contended that the 1982 extension was unconstitutional because the formula for Section 5 coverage was outdated: more than half of the age-eligible population in South Carolina and Sumter County was registered to vote by 1982, which supposedly "distinguish[ed] the 1982 extension as applied to them from the circumstances relied upon in *South Carolina v. Katzenbach* ... to uphold the 1965 Act." *County Council of Sumter County v. United States*, 555 F. Supp. 694, 707 (D.D.C. 1983). A three-judge panel of this Court rejected that argument, stressing that "Congress held hearings, produced extensive reports, and held lengthy debates before deciding to extend the Act in 1982." *Id.* at 707 n.13.

Most recently, in *Lopez v. Monterey County,* the Supreme Court held—for the third time—that Section 5 is appropriate enforcement legislation. In that case, California made an "as-applied" argument, similar to that made by the District here, that Section 5 "could not withstand constitutional scrutiny if it were interpreted to apply to voting measures enacted by States that have not been designated as historical wrongdoers in the voting rights sphere." 525 U.S. at 282. The Supreme Court rejected that federalism contention, sustaining the constitutionality of Section 5 as applied to "nondiscretionary" actions of counties to implement "acts initiated by non-covered States." *Id.* at 282-283. Quoting its then-recent decision in *Boerne*—which had reaffirmed that "'[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself constitutional and intrudes into legislative spheres of autonomy previously reserved to

30

the States'"—the Court reiterated that Section 5 is a proper exercise of Congress's enforcement power. *Id.* (quoting *Boerne*, 521 U.S. at 518 (alteration in *Lopez*)).

Additionally, in *League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594 (2006) (*LULAC*), the validity of Section 5 was underscored when all eight Justices who reached the issue agreed that compliance with Section 5 is a compelling state interest for the purpose of applying strict scrutiny.[17] Justice Scalia and three other Justices pointed out that "[w]e long ago upheld the constitutionality of § 5 as a proper exercise of Congress's authority under § 2 of the Fifteenth Amendment," and noted that Section 5 was enacted for the purpose of remedying past discrimination. *See id.* at 2666 (Scalia, J., concurring in the judgment in part and dissenting in part).

### 2.     *City Of Boerne v. Flores* And Its Progeny Have Reaffirmed The Constitutionality Of Section 5

Notwithstanding this consistent line of cases upholding Section 5 (including one decision post-dating and relying on *Boerne*), Plaintiff invokes *Boerne* to argue that Section 5 is unconstitutional because it is not a "congruent and proportional" exercise of Congress's enforcement powers. *See* Am. Compl. ¶ 24. But *Boerne* is of no help to Plaintiff, because the separation of powers concern to which *Boerne* was addressed—the possibility that Congress might try to redefine the substance of the Constitution and thereby undermine the courts' leading role "to say what the law is," 521 U.S. at 536 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))—is far removed from Section 5. Official racial discrimination in voting indisputably violates the Fourteenth and Fifteenth Amendments. Thus, the only question is

---

[17]     *See LULAC*, 126 S. Ct. at 2642 n.12 (Stevens, J., joined by Breyer, J., concurring in part and dissenting in part); *id.* at 2648 n.2 (Souter, J., joined by Ginsburg, J., concurring in part and dissenting in part); *id.* at 2667 (Scalia, J., joined by Roberts, C.J., Thomas and Alito, JJ., concurring in the judgment in part and dissenting in part).

whether the *response* to such unconstitutional conduct that Congress designed in Section 5 is "appropriate legislation." And on that point the Supreme Court has been consistent and clear in the *Boerne* line of cases: Section 5 is valid.

In *Boerne*, the Court explained that, under its decisions, there is a sharp distinction between remedial and preventive legislation—which lies within Congress's enforcement powers under the Reconstruction Amendments (and as to which Congress deserves great deference in its choice of remedies)—and legislation designed to redefine the substantive scope of the Constitution, which lies outside Congress's powers. *See* 521 U.S. at 524-526. The Court recognized that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies." *Id.* at 519-520. Nonetheless, because "the distinction exists and must be observed," *id.* at 520, the Court has, in *Boerne* and subsequent cases, applied a test designed to evaluate the constitutionality of laws enacted pursuant to the Fourteenth Amendment's enforcement provision: "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* The congruence-and-proportionality test guides courts in determining whether congressional legislation is remedial or preventive, and thus "appropriate," or whether it substantively redefines constitutional rights, thus exceeding Congress's power. *See Lane*, 541 U.S. at 520; *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003); *Board of Trs. v. Garrett*, 531 U.S. 356, 365 (2001); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 639 (1999). This now-familiar test reflects the distinction between remedial and substantive legislation recognized in *South Carolina v. Katzenbach*, where the Court spoke in broad terms

32

about Congress's authority to enact remedial legislation pursuant to the Fifteenth Amendment, *see* 383 U.S. at 324-327, but also noted that it had invalidated statutes in which "Congress had attacked evils not comprehended by the Fifteenth Amendment," *id.* at 326.

Plaintiff's claim that Section 5 fails the congruence-and-proportionality test is refuted by *Boerne* and its progeny, which have consistently reaffirmed the constitutionality of Section 5 as a remedial measure within the proper scope of Congress's enforcement powers. First, in *Boerne* itself, the Court cited the Voting Rights Act, including Section 5, as the prime example of appropriate remedial legislation. 521 U.S. at 525-527 (calling the VRA's provisions "remedies aimed at areas where voting discrimination has been most flagrant ... necessary to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century," and stating that "the Court continued to acknowledge the necessity of using strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination") (internal quotation marks omitted). In reaching this conclusion, the Court explained that *South Carolina v. Katzenbach* and *City of Rome* upheld Section 5 of the VRA because the statute is remedial. *See Boerne,* 521 U.S. at 525-526. Thus, the Court used Section 5 as a point of distinction from the statute before the Court in *Boerne*—the Religious Freedom Restoration Act (RFRA)—which was "so out of proportion" to any possible objective of enforcing a constitutional provision that it could only be understood as an attempt to work a "substantive change in constitutional protections." *Id.* at 532.

Second, as noted above, just two years after *Boerne*, the Court in *Lopez* rejected an as-applied challenge to Section 5, and in so doing both reaffirmed the vitality of *South Carolina v. Katzenbach* and *City of Rome* and cited *Boerne*'s reaffirmation of the breadth of congressional

authority to enact legislation that deters or remedies constitutional violations. *See* 525 U.S. at 282-283. The Court in *Lopez* was unequivocal on the issue of whether Section 5 falls comfortably within its post-*Boerne* conception of congressional power:

> Recognizing that Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions, we find no merit in the claim that Congress lacks Fifteenth Amendment authority to require federal approval before the implementation of a state law that may have just such an effect in a covered county. Section 5, as we interpret it today, burdens state law only to the extent that that law affects voting in jurisdictions properly designated for coverage.

*Id.* at 283-284.

Third, in *Florida Prepaid*, the Court invalidated the Patent Remedy Act as beyond the scope of Congress's Fourteenth Amendment enforcement power, but in so doing, it explicitly distinguished Section 5 and again noted the constitutionality "of Congress' various voting rights measures," which are properly understood as measures "'responsive to, or designed to prevent, unconstitutional behavior.'" 527 U.S. at 639 (quoting *Boerne*, 521 U.S. at 532).

Fourth, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court distinguished Section 5 from 42 U.S.C. § 13981, which provided penalties against private individuals who had committed criminal acts motivated by gender bias, and the Court again cited Section 5 as an example of the proper exercise of congressional power. *See id.* at 626.

Fifth, in *Garrett*, the Court once again reaffirmed the constitutionality of Section 5, distinguishing Section 5 from Title I of the Americans with Disabilities Act (ADA), which the Court determined to be beyond the scope of Congress's Fourteenth Amendment enforcement authority. *See* 531 U.S. at 373-374. The Court specifically indicated its approval of the VRA, including Section 5, as "a detailed but limited remedial scheme." *Id.* at 373. And sixth, in *Hibbs*, the Court again cited with approval its precedent rejecting challenges to provisions of the

Voting Rights Act as exceeding the scope of Congress's enforcement power. *See* 538 U.S. at 737-738.

This unbroken line of authority refutes any possible contention that cases such as *South Carolina v. Katzenbach* that upheld Section 5 have lost their force either because *Boerne* requires a different analysis or because Section 5 has been reauthorized by Congress. It would be both unprecedented and illogical to conclude that Section 5 "cannot be understood as responsive to, or designed to prevent, unconstitutional legislation," *Boerne*, 521 U.S. at 532, when the Supreme Court has *held* in three cases and has *stated* in at least six others that Section 5 lies within the proper scope of Congress's enforcement authority under the Fourteenth and Fifteenth Amendments. The congruence-and-proportionality test distinguishes between remedial and preventive legislation on the one hand, and substantive legislation on the other, and the Supreme Court's precedents are clear that Section 5 is remedial and preventive, and thus constitutional.

**B.    Section 5 Is A Congruent And Proportional Response To A Pattern Of Constitutional Violations In Covered Jurisdictions**

Even absent binding precedent sustaining Section 5's constitutionality, it would be clear that Section 5 is constitutional. Under the analytic framework that the Court has set forth in *Boerne* and its progeny, Section 5—Congress's response to a pattern of constitutional violations dating back well over a century and continuing to this day—easily passes muster.

The *Boerne* framework requires a reviewing court to engage in three inquiries. First, the Court must identify the constitutional right or rights that Congress sought to enforce by enacting the legislation in question. *See Lane*, 541 U.S. at 522; *Garrett*, 531 U.S. at 365. As discussed below, if state action affecting the right in question is subject to heightened judicial scrutiny,

Congress has more latitude to enact remedial legislation than it does if the state action in question affecting the right is not subject to heightened scrutiny.

Second, the Court must examine the "gravity of the harm [the legislation] seeks to prevent." *Lane*, 541 U.S. at 523. The gravity of harm "'must be judged with reference to … historical experience.'" *Id.* (quoting *South Carolina v. Katzenbach*, 383 U.S. at 308). "Difficult and intractable problems often require powerful remedies." *Id.* at 524 (internal quotation marks omitted).

Third, the Court must determine whether the statute in question is "an appropriate response" to the harms identified in the first two steps. *Lane*, 541 U.S. at 530. Though not required, limitations on the breadth of an enforcement statute support a conclusion that the statute at issue is an appropriate response to the relevant harms. For example, geographic restrictions on coverage, termination dates, and limiting the statute's impact to a discrete class of state laws are features that "tend to ensure Congress' means are proportionate to ends legitimate" under the Fourteenth Amendment. *Boerne*, 521 U.S. at 533.

Section 5 readily satisfies the three-step congruence-and-proportionality test articulated in *Boerne*. *First*, because Section 5 targets restrictions on the right to vote free from racial discrimination—restrictions that are subject to the most demanding judicial scrutiny—Congress acted at the zenith of its remedial authority when it reauthorized Section 5 in the VRARA. *Second*, before reauthorizing Section 5, Congress held ten months of hearings in which it compiled extensive evidence documenting the need to renew Section 5 to remedy and deter voting discrimination in covered jurisdictions. *Finally*, Congress's targeted response in renewing Section 5 was proportional to the grave harms to be remedied and deterred. This

analysis establishes that Section 5 is a valid exercise of Congress's enforcement powers under the Fourteenth and Fifteenth Amendments.

### 1.    In Attacking Racial Discrimination In Voting, Congress Acted At The Zenith Of Its Enforcement Authority

Because the purpose of Section 5 is to remedy and deter acts of official racial discrimination against racial and ethnic minorities' exercise of the right to vote—acts that warrant the most searching scrutiny known to the Constitution—Congress's judgment about the need for reauthorization of Section 5 is entitled to the greatest measure of deference.[18]

The Supreme Court has twice applied the congruence-and-proportionality test to congressional legislation protecting certain classes or constitutional rights that receive heightened judicial scrutiny, and in both cases, the Court upheld the law. In *Hibbs*, the Court concluded that the Family Medical Leave Act (FMLA) is valid remedial legislation designed to combat gender discrimination in employment. In reaching that conclusion, the Court emphasized that official disparate treatment based on gender (unlike that based on age or disability) is subject to heightened judicial scrutiny. *See* 538 U.S. at 728-729, 735-736. Because the FMLA could "'be understood as responsive to, or designed to prevent, unconstitutional behavior,'" *id.* at 740 (quoting *Boerne*, 521 U.S. at 532), it was upheld as a valid exercise of Congress's power to enforce the Equal Protection Clause's prohibition against gender-based

---

[18]    In *Lane*, Justice Scalia stated that he would no longer apply *Boerne*'s congruence-and-proportionality standard to congressional "measures designed to remedy racial discrimination by the States." 541 U.S. at 564 (dissenting opinion). He explained that "[g]iving § 5 [of the Fourteenth Amendment] more expansive scope with regard to measures directed against racial discrimination by the States accords to practices that are distinctively violative of the principal purpose of the Fourteenth Amendment a priority of attention that this Court envisioned from the beginning, and that has repeatedly been reflected in our opinions." *Id.* at 561. While this Court, of course, must follow as the analytical approach set forth by the majority of the Supreme Court in *Boerne* and its progeny, it should do so with the recognition that Congress has renewed Section 5 at the height of its constitutional enforcement power.

discrimination, even though the FMLA goes well beyond doing what would be necessary simply to mirror Title VII—itself prophylactic legislation that forbids a greater swath of conduct than that prohibited by the Equal Protection Clause—"simply mandat[ing] gender equality in the administration of leave benefits," *id.* at 738.[19]

Similarly, in *Lane*, the Court held that, as to ensuring the basic right of access to the courts for persons with disabilities, Title II of the ADA is a "reasonable prophylactic measure" designed to remedy unconstitutional treatment of disabled people in the administration of justice. 541 U.S. at 533. In reaching this conclusion, the Court emphasized that, as with the gender discrimination targeted by the FMLA, official conduct limiting court access for persons with disabilities is subject to heightened judicial scrutiny. *See id.* at 522-523, 528; *see also id.* at 529 ("Title II is aimed at the enforcement of a variety of basic rights, including the right of access to the courts at issue in this case, that call for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications."). The Court held that, although the ADA "subjects a State to liability for failing to make a vast array of special accommodations [for the disabled], without regard for whether the failure to accommodate results in a constitutional wrong," it "cannot be said to be 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Id.* at 533 (quoting *Boerne*, 521 U.S. at 532).

---

[19]    The FMLA imposes an affirmative obligation on state employers to provide twelve weeks of unpaid leave to their employees for any of several medical or family-related reasons, on pain of money damages. 29 U.S.C. § 2612(a)(1). The FMLA thus goes well beyond any prohibitions that the Equal Protection Clause has been held to impose on state employers in the name of ensuring gender equality and also goes beyond both Title VII of the Civil Rights Act of 1964, which prohibits sex-based discrimination in employment (including disparate-impact discrimination), *see* 42 U.S.C. § 2000e-2, and the Pregnancy Discrimination Act, *see* 42 U.S.C. § 2000e(k).

*Hibbs* and *Lane* stand in sharp contrast to *Kimel* and *Garrett*—which each invalidated statutes targeting classifications that implicate only rational-basis constitutionality review. *See Kimel*, 528 U.S. at 83-84 (stating that age classifications, unlike race or sex classifications, are presumptively rational and subject only to rational basis review); *Garrett*, 531 U.S. at 366-367 (same with regard to disability classifications). The contrast between *Garrett*, holding that Title I of the ADA was not valid remedial legislation, and *Lane*, holding that Title II of the ADA was valid remedial legislation as applied to court access, provides a particularly stark illustration of these principles. The Court drew opposite conclusions with regard to different provisions of the same law, largely because Title I targeted rights that are not subject to heightened scrutiny under the Court's jurisprudence, whereas Title II (as applied to court access) sought to protect rights that are subject to heightened scrutiny. Indeed, the Court's as-applied analysis in *Lane* further reinforces this point: the Court only upheld Title II as applied to court access, which implicates constitutional rights that warrant heightened judicial scrutiny, and did not resolve whether Title II is valid remedial legislation as applied in other circumstances. The rule that emerges from these cases applying *Boerne* is that "when Congress acts to protect a fundamental right or when it acts to protect a suspect or quasi-suspect class, its powers are generally broader than when it acts to promote equality more generally." Pamela S. Karlan, *Section 5 Squared: Congressional Power to Extend and Amend the Voting Rights Act*, 44 Hous. L. Rev. 1, 13 (2007).

Applying this precedent demonstrates that Congress acted at the zenith of its enforcement authority in reauthorizing Section 5. Section 5 seeks to remedy and deter conduct that is subject to strict judicial scrutiny in two regards. First, racial discrimination receives the very strictest judicial scrutiny—scrutiny that is unquestionably closer than the scrutiny accorded sex-based classifications (at issue in *Hibbs*) and at least as strict as the scrutiny accorded restrictions on

court access (at issue in *Lane*).  *See, e.g., Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Loving v. Virginia*, 388 U.S. 1, 10 (1967) (citing, *inter alia, Slaughter-House Cases*, 83 U.S. at 71; *Strauder v. West Virginia*, 100 U.S. 303, 307-308 (1880); *Ex parte Virginia*, 100 U.S. 339, 344-345 (1880)); *see also Nixon v. Condon*, 286 U.S. 73, 89 (1932) (invalidating one of several iterations of the white primary in Texas, and stating that "[t]he Fourteenth Amendment, adopted as it was with special solicitude for the equal protection of members of the Negro race, lays a duty upon the court to level by its judgment these barriers of color").  Second, Section 5 is intended specifically to remedy and deter racial discrimination *in voting*.  *See* Pub. L. No. 109-246, § 2(a), (b), 120 Stat. 577; H.R. Rep. No. 109-478, at 53 & n.136.  The Supreme Court has consistently held that the right to vote is "a fundamental political right, because [it is] preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see, e.g., Purcell v. Gonzalez*, 127 S. Ct. 5, 7 (2006) (per curiam); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), and has made clear that the right to vote is so central a constitutional right that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

The level of scrutiny applied to official actions that purposefully disadvantage voters because of their race—and thus implicate *both* of these concerns—is extraordinarily strict. Indeed, the Court has consistently considered such laws to be virtually *per se* invalid, not even stopping to consider whether the law in question could satisfy strict scrutiny as narrowly tailored to a compelling governmental interest. *See, e.g., South Carolina v. Katzenbach*, 383 U.S. at 325 ("[Section 1 of the Fifteenth Amendment] has repeatedly been construed, without further legislative specification, to invalidate state voting qualifications or procedures which are

40

discriminatory on their face or in practice.") (citing numerous cases); *Hunter v. Underwood*, 471 U.S. 222, 231-233 (1985); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *White v. Regester*, 412 U.S. 755, 765-770 (1973); *Louisiana v. United States*, 380 U.S. 145, 153 (1965); *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960); *Nixon v. Herndon*, 273 U.S. 536, 541 (1927). Accordingly, because the Supreme Court has subjected racially discriminatory voting restrictions to virtual *per se* invalidation, because the principal purpose of the Reconstruction Amendments was to eliminate the vestiges of slavery and guarantee political equality to Blacks, and because the Fifteenth Amendment's purpose was to eliminate racial discrimination in voting, Congress's enforcement authority could not have been any greater than it was when Congress reauthorized Section 5 in the VRARA.[20]

> **2.    The Evidence Before Congress Of The Unconstitutional Discrimination To Be Remedied And Deterred Was Extensive**
>
> > **a)    The Record Demonstrates Continuing Voting-Related Discrimination Against Minorities In Covered Jurisdictions And Establishes Reason For Concern That Such Discrimination Would Increase Were Section 5 Not Renewed**

In deciding whether to reauthorize Section 5, Congress, as it had for the three previous reauthorizations, undertook an extensive investigation. Based on the evidence it compiled,

---

[20]    Congress may derive even further (though not necessary) authority to reauthorize the Voting Rights Act from Article 1, Section 4 of the Constitution, which provides that "[t]he times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators." Together with the Necessary and Proper Clause, U.S. Const. art. I, § 8, the Elections Clause "leaves to the Congress the choice of means by which its constitutional powers are to be carried into execution." *See United States v. Classic*, 313 U.S. 299, 320 (1941). Congress has relied on the Elections Clause to enact several recent statutes regulating elections that are in some respects considerably more intrusive on state election practices than is Section 5. *See* Help America Vote Act of 2002, 42 U.S.C. §§ 15301-15545 (HAVA); H.R. Rep. No. 107-329, at 57 (2001) (indicating Congress's reliance on the Elections Clause to enact HAVA; *see also* the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg to 1973gg-10 (NVRA).

41

Congress found that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process." Pub. L. No. 109-246, § 2(b)(2), 120 Stat. 577. Congress further found that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965." *Id.* § 2(b)(3), 120 Stat. 577. Congress concluded that the evidence before it "reveal[ed] that 40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution ... [and that] [t]he record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years." *Id.* § 2(b)(7), (9), 120 Stat. 578.

Congress's findings are amply supported by the legislative record. As Congress found, the evidence supporting the continuing need for Section 5 included

> the hundreds of objections interposed, requests for more information submitted followed by voting changes withdrawn from consideration ... and Section 5 enforcement actions ... in covered jurisdictions since 1982 that prevented election practices, such as annexation, at-large voting, and the use of multi-member districts, from being enacted to dilute minority voting strength ... the number of requests for declaratory judgments denied by [this Court] ... the continued filing of [S]ection 2 cases that originated in covered jurisdictions ... the litigation pursued by the [DOJ] since 1982 to enforce [S]ections 4(e), 4(f)(4), and 203 of such Act to ensure that all language minority citizens have full access to the political process ... the counties certified by the Attorney General for Federal examiner and observer coverage and the tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions.

*Id.* § 2(b)(4), (5), 120 Stat. 577-578.

42

Defendant-Intervenors' SMF summarizes significant parts of the evidence captured in the VRARA's massive legislative record that supports Congress's findings and its decision to reauthorize Section 5. *See* SMF ¶¶ 220-1546; *see also id.* I.C.3 (summarizing the evidence from, among others, the National Commission Report: "Protecting Minority Voters:  The Voting Rights Act at Work, 1982-2005," the ACLU Report: "VOTE:  The Case for Extending an[d] Amending the Voting Rights Act, Voting Rights Litigation, 1982-2006," as well as state reports submitted to Congress for the covered jurisdictions).

Illustrations of the evidence before Congress are set forth in that statement summary by category.  In addition to the record evidence across covered jurisdictions, the statement details evidence of voting-related discrimination in Texas, which is relevant to the District's claim in this case.[21]

Sadly, as detailed below, the record reveals, in Texas and the other covered jurisdictions, a "spectacle" of voting-related discrimination "unwilling to die." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 445 (1968) (Douglas, J., concurring).  *See, e.g.*, SMF ¶ 665 (detailing proposed plan by State of Texas to adopt numbered posts for judicial elections objected to by the DOJ under Section 5 as discriminatory); *id.* ¶¶ 613-614 (1992 Section 5 objections to redistricting plans in Galveston County and Terrell County, Texas); *id.* ¶¶ 631-632, 633, 1032-1033 (Section 5 objections to proposed adoption of at-large elections in Haskell Consolidated Independent School District (2001) and Freeport, Texas (2002)); *id.* ¶ 666 (1997 Section 5 objection to

---

[21]    Under the *Boerne* framework, Section 5 is constitutional based on the record evidence from all covered jurisdictions of discrimination in voting before Congress in the original 1965 enactment of the VRA and in subsequent reauthorizations.  Demonstrating the record evidence for Texas is sufficient, but not necessary, to establish that Section 5 satisfies the congruence-and-proportionality test.  *See Lane*, 541 U.S. at 531; *United States v. Raines*, 362 U.S. 17, 21, 25 (1960).

43

proposed annexation in Webster, Texas that would have reduced the voting strength of Hispanic and Black residents, and which the DOJ found was "tainted ... in part by invidious racial purpose"); *id.* ¶ 637 (successful 2004 Section 5 enforcement action blocking effort to limit student voting at Prairie View A&M University, a historically Black university in Waller County, Texas).[22]

---

[22]    *See also, e.g.,* SMF ¶ 1067 (in Section 2 action challenging state method of appointing poll officials, court orders 65 of Alabama's 67 counties to institute programs to appoint more African-American poll-workers); *id.* ¶ 1069 (*Dillard v. Crenshaw* litigation challenging Alabama legislature's intentionally discriminatory policies led to changes from at-large to single-member districts for dozens of Alabama county commissions, school boards and municipalities); *id.* ¶ 746 (denial of Section 5 preclearance to two annexations of all-white city of Pleasant Grove, Alabama that refused to annex areas with Black population); *id.* ¶¶ 416, 919, 1066 (DOJ blocked city of Foley, Alabama from annexing white areas and not African-American areas); *id.* ¶¶ 411, 417 (1992 Section 5 objection to redistricting by Selma, Alabama); *id.* ¶¶ 1072-1073 (1989 finding that mayor of North Johns, Alabama acted with racial animus in refusing to provide required candidate registration forms to Black candidates); *id.* ¶ 410 (2003 Section 5 objection to measures by Chilton County, Alabama to prevent Blacks from electing candidates of choice); *id.* ¶ 1074 (court finds "repugnant" the refusal by Jefferson County, Alabama officials to place Black poll workers in white election precincts on the ground that white voters would not listen to them); *id.* ¶¶ 451, 465, 807 (Section 5 objection to post-2000 redistricting plan in Albany, Georgia that reduced Black population in one ward from 51% to 31%); *id.* ¶¶ 509, 828 (Louisiana unsuccessfully sought preclearance of post-2000 statewide redistricting plan for state House of Representatives that eliminated a majority Black district in Orleans Parish); *id.* ¶ 495 (Point Coupee Parish, Louisiana's School Board and Police Jury redistricting plans found to violate Section 5 three decades in a row, in 1983, 1992, and 2002); *id.* ¶ 527 (Section 5 objection to 1991 statewide redistricting in Mississippi); *id.* ¶ 540 (Mississippi redistricting plans have drawn 86 Section 5 objections since 1982); *id.* ¶¶ 567, 582 (Section 5 objections to voting plans in Elizabeth City, and Pitt and Bladen Counties, North Carolina); *id.* ¶ 552 (DOJ has interposed fourteen objections to voting changes in New York's three covered counties since 1982); *id.* ¶¶ 355, 592, 869 (Section 5 objection to 2003 change in method of election for Charleston County, South Carolina School District that had been found in prior Charleston County Section 2 case to dilute minority voting strength); *id.* ¶ 598 (2003 Section 5 objection to proposed annexation by Town of North, South Carolina because town had been racially selective in response to annexation requests); *id.* ¶ 610 (1991 Section 5 objection to statewide redistricting in Virginia); *id.* ¶¶ 611-612 (1999 Section 5 objection to polling place relocation in Dinwiddie County, Virginia based on findings of discriminatory purpose); *id.* ¶¶ 1058, 1060 (court finds South Dakota's 2001 legislative plan dilutes Indian voting strength in violation of Section 2); *id.* ¶¶ 436, 438-440, 442, 927 (Section 5 objections to both of Florida's statewide reapportionment plans since 1982); *id.* ¶¶ 435A, 963 (2002 Section 5 objection to at-large election plan by

i)      **Section 5 objections**

Congress received evidence of the DOJ objections to more than 700 Section 5 submissions by covered jurisdictions from 1982 through 2005—more than from 1965 to 1982. H.R. Rep. No. 109-478, at 21, 37; *see generally* SMF ¶¶ 336-666 (summarizing the VRARA congressional record concerning Section 5 objections). Each Section 5 objection prevented one or more voting changes that the DOJ deemed discriminatory from going into effect.

A substantial portion of the objections were lodged on the basis of the DOJ's determination that the proposed voting change was due to discriminatory purpose or intent. Congress received an article authored by the historian at the Voting Section of the DOJ. *See* SMF ¶ 363 (discussing Peyton McCrary, et al., *The End of Preclearance as We Knew It:  How The Supreme Court Transformed Section 5 of the Voting Rights Act*).  According to the article, of the 722 separate objections lodged by the DOJ from 1980-2005, 436 of DOJ's objections—at least 60% of the total during that period—included discriminatory intent as a basis for the objection.  During that same time frame, 47 objections had two grounds, of which a violation of Section 2 was one ground, and 8 objections were based solely on the ground that the proposed changes would violate Section 2.  *See id.* (discussing McCrary, Appendix, Table 2).

The evidence of Section 5 objections for Texas was also substantial.  Congress received evidence that the DOJ has registered objections to more proposed voting changes in Texas (201)

---

Chualar Union Elementary School District Board in Monterey County, California, based in part on racial animus); *id.* ¶¶ 429-431, 433-435 (Section 5 objections to redistricting plans in Merced and Monterey Counties, California, in 1990 and 1993, respectively, that diminished Latino voting strength); *id.* ¶ 1138 (failure to provide election materials in Native Alaskan languages as required by VRA); *id.* ¶¶ 420-421 (2002 Section 5 objection to Arizona statewide redistricting that diminished Hispanic voting strength); *id.* ¶ 1137 (Apache County, Arizona enters consent decree in DOJ action alleging discriminatory voter registration and failure to provide effective bilingual election procedures).

than any other State—even though Texas has been covered by the Act only since 1975. *See* Texas Report, Wolfson Decl., Ex. 8. Since the 1982 reauthorization, jurisdictions in Texas have triggered 105 objections, more than any State other than Mississippi. *See id.* ¶¶ 344, 622, 822.

These objections show how the actions of covered jurisdictions in Texas and elsewhere threaten to abridge the rights of minority voters in covered jurisdictions in familiar and persistent ways, and might well successfully do so in the absence of Section 5. Most recently, in 2006, the DOJ interposed an objection to a proposed reduction in polling sites for the North Harris Montgomery Community College District in Harris and Montgomery Counties, Texas. *See* SMF ¶ 621. The jurisdiction proposed to reduce the number of polling sites from 84 to twelve. The DOJ determined that the assignment of voters to these twelve sites was remarkably uneven, noting that "the site with the smallest proportion of minority voters will serve 6,500 voters, while the most heavily minority site (79.2% Black and Hispanic) will serve over 67,000 voters." *Id.* (quoting DOJ objection letter). As the underlying facts suggest, without Section 5, this proposed change would have had a pronounced effect on minority voters.

Notably, water districts in Texas have been subject to a number of DOJ objections since the post-1982 renewal. *See* SMF ¶ 645 (1994 objection to a Gonzales County Underground Water Conservation District redistricting plan with "grossly malapportioned" districts and the freezing of the minority community out of the process that produced the plan, and for failing to make public hearing notices available in Spanish); *id.* ¶ 654 (1993 objection to Edwards Underground Water District where officials proposed to replace the elected board of directors with an appointed board); *id.* ¶ 660 (1991 objection to Lubbock County Water Control and Improvement District No. 1 where officials sought to reassign majority minority precinct to polling sites in "more remote and inaccessible rural communities.").

46

Recent statewide examples of Section 5's effectiveness in Texas can be traced to the post-2000 Census redistricting. For example, the DOJ objection to the Texas State House redistricting plan in 2001 was predicated on the State's attempt to eliminate effective districts for Latino voters in heavily Latino South and West Texas. *Id.* ¶ 625. In particular, the DOJ found that the proposed plan would have resulted in a net loss of three districts in which minority voters would have the opportunity to elect candidates of choice. *See id.* The plan accomplished this by reducing the numbers of Hispanic voters in three districts, thus "fragment[ing] the core of majority Hispanic districts; and packing Hispanic voters into neighboring districts." *Id.* The DOJ concluded that the resulting fragmentation was both "unnecessary" and in contradiction with the State's traditional redistricting principles. *Id.*

In 2002, the DOJ objected to a change in the method of election proposed by the City of Freeport, Texas, which involved abandoning single-member districts in favor of an at-large election system. *See* SMF ¶¶ 632, 663. The DOJ noted that until 1992, the City elected its four-member council on an at-large basis, after which the City began to use the single-member district system, which it had adopted as part of a settlement of voting rights litigation challenging the at-large system. *See id.* Under the adopted single-member district method of election, minority voters had, according to the DOJ objection, "demonstrated the ability to elect candidates of choice in at least two districts." *Id.* The city then proposed "to reinstitute the at-large method of election." *Id.* The DOJ recognized that, due to the existence of extremely racially polarized voting, at-large elections would impair the ability of minority voters to elect a candidate of their choice and concluded that "the change will have a retrogressive effect on the ability of minority voters to elect a candidate of their choice." *Id.*

In June 2002, the DOJ interposed an objection to the proposed redistricting plans for the commissioners court, justice of the peace, and constable districts in Waller County, Texas. *See* SMF ¶¶ 635, 1034. Here, officials proposed to reduce the Black voting age population of one of two majority Black districts from 52.5% to 29.7%. *Id.* The DOJ determined that the reduction would worsen the position of minority voters. *See id.*; *see also, e.g., id.* ¶ 625 (2001 Section 5 objection to proposed redistricting plan for Texas State House of Representatives); *id.* ¶ 631 (2001 objection to proposed change in method of election to Haskell Consolidated Independent School District); *id.* ¶¶ 915, 915A (following DOJ objection to city's failure to redistrict after 2000 census, and subsequent attempt to close its candidate filing period, Latino plaintiffs secured injunctive relief under Section 5, ultimately resulting in a city council that as of 2002 was majority Latino); *see also Ramos v. Koebig*, 638 F.2d 838 (5th Cir. 1981) and *Trinidad v. Koebig*, 638 F.2d 846 (5th Cir. 1981).

The record evidence from Section 5 objections was, of course, not limited to Texas. For example, evidence before Congress concerning Kilmichael, Mississippi, illustrates the kind of conduct by jurisdictions that has triggered Section 5 objections. In 2000, census data revealed that the town of Kilmichael had become majority African-American. In an unfortunately familiar scenario, *see, e.g., LULAC*, 126 S. Ct. at 2622, once the minority community was on the verge of decisively exercising its political will, the entrenched powers attempted to change the electoral rules. As reflected in the *LULAC* decision and other evidence weighed by Congress, the most intense threats to minority communities' voting power often occur as those minority communities are "about to exercise it." *Id.* In 2001, several African-American candidates ran for city office in Kilmichael. Three weeks before the election, the white mayor and the five-member, all-white Board of Aldermen cancelled the election. The DOJ lodged an objection to

the cancellation of the city election and compelled the city to reschedule it.  When the election was held, an African-American citizen was elected mayor and several were elected to alderman positions.  *See* SMF ¶¶ 532, 843, 930; H.R. Rep. No. 109-478, at 36-37.

Similarly, Congress received evidence that, in 2002, the DOJ objected to a Section 5 submission from the Chualar Union Elementary School District in Monterey County, California, where the district sought preclearance to change its method of election from single-member districts after a referendum.  The DOJ found that "the language and tone" of the cover letter accompanying the petition to change the method of election raised "the implication that the petition drive and resulting change was motivated, at least in part, by a discriminatory animus," and that the referendum on the method of election change took place under highly charged and racially polarized circumstances.  SMF ¶¶ 435, 963 (citing objection letter); *see also*, *e.g.*, *id.* ¶¶ 420-421 (2002 Section 5 objection to Arizona legislative redistricting plan that reduced the Latino population in several districts); *id.* ¶¶ 611-612 (1999 Section 5 objection to proposed polling place change in Dinwiddie County, Virginia to location away from Black voters in the precinct); *id.* ¶ 598 (2003 Section 5 objection to racially selective annexations in North, South Carolina); *id.* ¶ 465 (2002 Section 5 objection to proposed redistricting plan for city of Albany, Georgia where Black population was "cracked" from 51 percent to thirty percent in one district and "packed" up to 90 percent Black in another district).

### ii)    Requests for Section 5 declaratory judgments withdrawn or denied

Congress received evidence that there were more denied or withdrawn requests for *judicial* preclearance since the 1982 reauthorization (twenty-five) than from 1965 to 1982 (seventeen).  *See* SMF ¶¶ 740-741; *see generally id.* ¶¶ 740-757 (summarizing the VRARA congressional record concerning such requests withdrawn or denied).  This evidence is

significant because every time an application for preclearance is denied by the courts or withdrawn by the applying jurisdiction, Section 5 has prevented a voting change that is discriminatory or carries substantial indicia of being discriminatory from being implemented.

As discussed in the report on Alabama provided to Congress, *see* SMF ¶ 746 (discussing *Voting Rights in Alabama, 1982-2006*, *a report of RenewTheVRA.org*), in *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987), the Supreme Court held that the district court properly denied the city's application for Section 5 preclearance of two annexations to the city on the ground that the city had engaged in a racially selective annexation policy. Pleasant Grove was at the time of the litigation an all-white city with a long history of discrimination located in an otherwise racially mixed part of Alabama. *See id.* at 465. The Supreme Court stated that "in housing, zoning, hiring, and school policies [the city's] officials have shown unambiguous opposition to racial integration, both before and after the passage of the federal civil rights laws." *Id.* The city sought preclearance for two annexations—one for an area of white residents who wanted to attend the all-white Pleasant Grove school district instead of the desegregated Jefferson County school district, the other for a parcel of land that was uninhabited at the time but where the city planned to build upper-income housing that would likely be inhabited by whites only. *Id.* at 465-466. Meanwhile, the city refused to annex two predominantly Black areas. *See id.* at 466 & n.4. The district court held "that the city had failed to carry its burden of proving that the two annexations at issue did not have the purpose of abridging or denying the right to vote on account of race." *Id.* at 467. Affirming that decision, the Supreme Court stated that "[c]ommon sense teaches that appellant cannot indefinitely stave off the influx of Black residents and voters—indeed, the process of integration, long overdue, has already begun. One

means of thwarting this process is to provide for the growth of a monolithic white voting block, thereby effectively diluting the black vote in advance." *Id.* at 472 (internal citation omitted).

More recently, Congress received testimony that in redistricting after the 2000 Census, the Louisiana legislature chose to reduce the number of Black districts in New Orleans and maintain the same number of white districts despite the fact that the 2000 census data indicated that the net loss of population in New Orleans was within the white population. *See id.* ¶¶ 674, 828 (citing *Voting Rights in Louisiana, 1982-2006, a report of RenewTheVRA.org,* and testimony of Debo Adegbile). The State initially argued that white voters were entitled to "proportional representation," and eliminated a majority-minority district without offsetting the loss elsewhere in the state. *See id.* ¶ 509; *see also id.* ¶ 754 (discussing testimony of Professor Theodore Arrington concerning the significance of polarized voting patterns). The State initially sought a declaratory judgment in federal district court approving the State's plan, but settled the case on the eve of trial, withdrew the offending plan, and restored the majority-Black district.[23] *See id.* ¶ 509.

The record with respect to requests for Section 5 declaratory judgments withdrawn or denied was strong for Texas jurisdictions. Since 1982, more such requests have been denied or withdrawn for Texas than for any other fully or partially covered State. *See* Texas Report, Wolfson Decl., Ex. 8, at Introduction.

### iii)    More information requests

The House Report concluded that "[e]fforts to discriminate over the past 25 years were … also reflected by an administrative mechanism, known as a 'more information request

---

[23]    Notably, the three-judge panel criticized Louisiana's litigation tactics during the case in a written order. *See* SMF ¶ 509.

(MIR).'" H.R. Rep. No. 109-478, at 40; *see also* SMF ¶¶ 667-693 (detailing the VRARA's congressional record of MIRs). The Justice Department sends an MIR when it determines that more information is required to assess whether a proposed voting change complies with Section 5. *See* 28 C.F.R. §§ 51.37 & 51.40. A covered State or political subunit that receives an MIR has the option to "(1) submit additional information to prove a change is non-discriminatory; (2) withdraw a proposed change from consideration because it is discriminatory; (3) submit a new or amended non-discriminatory voting plan; or (4) make no change." H.R. Rep. No. 109-478, at 40 & n.91 (citing 28 C.F.R. §§ 51.37 & 51.40).

The House Report noted that "[t]he actions taken by a jurisdiction are often illustrative of a jurisdiction's motives … MIRs affected more than 800 additional voting changes that were submitted for preclearance, compelling covered jurisdictions to either alter the proposal or withdraw it altogether." H.R. Rep. No. 109-478, at 40-41 & n.92; *see also* SMF ¶¶ 667-672, 676. The record included evidence that voting changes that were withdrawn following MIRs came "primarily" from jurisdictions in southern States with a substantial concentration of African-American voters. *See* H.R. Rep. No. 109-478 at 41.

The following table from a report submitted to Congress by Professors Fraga and Ocampo[24] shows the distribution of MIRs:

---

[24]  *See* SMF ¶¶ 670, .670A, 680 (setting forth the comprehensive study done on MIRs by Professors Luis Fraga and Lizet Ocampo, *More Information Requests and the Deterrent Effect of Section 5 of the Voting Rights Act*); *id.* ¶ 671 (testimony of Chandler Davidson favorably discussing Fraga and Ocampo study).

Table 3
Number of Changes, Objections, and MIR-Induced Outcomes by State, 1982-2005

| State | All Submissions | | MIRs Issued | | Outcomes for Changes Receiving a MIR | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Changes | Objections | # of MIR | More Info Foll | No Objection | Objection | Withdraw | Superseded | No Response | Total MIR-induced Outcome (W/S, NR) | MIR-induced Outcome and Objections | MIR-induced Outcome/All Objections |
| ALABAMA | 24426 | 198 | 1159 | 301 | 743 | 58 | 64 | 24 | 93 | 181 | 379 | 0.91 |
| ALASKA | 5537 | 2 | 315 | 115 | 311 | 0 | 3 | 0 | 1 | 4 | 6 | 2.00 |
| ARIZONA | 26773 | 32 | 534 | 149 | 454 | 12 | 9 | 4 | 15 | 28 | 60 | 0.88 |
| ARKANSAS | 7 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| CALIFORNIA | 3374 | 60 | 186 | 9 | 114 | 2 | 4 | 1 | 0 | 5 | 65 | 0.08 |
| COLORADO | 132 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| FLORIDA | 3514 | 14 | 196 | 242 | 177 | 4 | 8 | 0 | 0 | 8 | 22 | 0.57 |
| GEORGIA | 53646 | 370 | 3274 | 539 | 2528 | 102 | 156 | 12 | 25 | 193 | 563 | 0.52 |
| HAWAII | 289 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| ILLINOIS | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| LOUISIANA | 23903 | 274 | 1512 | 400 | 1047 | 159 | 45 | 15 | 13 | 73 | 347 | 0.27 |
| MASSACHUSETTS | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| MICHIGAN | 365 | 0 | 24 | 1 | 19 | 0 | 5 | 0 | 0 | 5 | 5 | - |
| MISSISSIPPI | 11753 | 151 | 874 | 126 | 499 | 123 | 58 | 14 | 21 | 93 | 244 | 0.62 |
| NEW HAMPSHIRE | 227 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| NEW MEXICO | 201 | 1 | 59 | 57 | 55 | 0 | 0 | 1 | 3 | 4 | 5 | 4.00 |
| NEW YORK | 4217 | 14 | 121 | 75 | 34 | 4 | 51 | 0 | 2 | 53 | 67 | 3.79 |
| NORTH CAROLINA | 12305 | 142 | 832 | 96 | 582 | 75 | 22 | 4 | 3 | 29 | 171 | 0.20 |
| SOUTH CAROLINA | 23594 | 796 | 1188 | 234 | 656 | 77 | 36 | 3 | 64 | 103 | 899 | 0.13 |
| SOUTH DAKOTA | 2011 | 1 | 51 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 1 | 0.00 |
| TEXAS | 162397 | 194 | 3034 | 760 | 2038 | 129 | 185 | 120 | 61 | 366 | 560 | 1.89 |
| VIRGINIA | 28758 | 31 | 337 | 15 | 271 | 18 | 10 | 0 | 7 | 17 | 48 | 0.55 |
| WYOMING | 201 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| Totals | 387673 | 2280 | 13697 | 3120 | 9778 | 763 | 656 | 198 | 308 | 1162 | 3442 | 0.51 |

Congress thus received evidence that from 1982-2005, the DOJ issued 1,162 MIRs that led to a withdrawal, superseding change, or non-response by the covered jurisdiction in question seeking to enact a voting change. *See* SMF ¶ 670A.[25]  The data included 366 such MIR outcomes for jurisdictions in Texas (185 withdrawn changes, 120 superseded changes, and 61 MIRs with no response), the most of any State.  *See id.*

Congress received an example from California of evidence of the practical difference an MIR can make:

In Monterey County, election officials decided to reduce the number of polling places for the special gubernatorial recall election held on October 7, 2003.

---

[25]     This column includes data from seven States with jurisdictions that were at some point since 1982 subject to Section 5 preclearance obligations but, through either bailout or the expiration of their judicially ordered bail-in requirements, were by 2006 no longer subject to Section 5 preclearance obligations.  The figure of 1162 withdrawn proposed changes, superseding changes, or non-responses from MIRs includes four from New Mexico, which is no longer subject to preclearance obligations.

According to county officials, the number of polling places utilized in the November 2002 general election was reduced from 190 to 86 for the special recall election. The Department of Justice ultimately approved the voting precinct only after Monterey County withdrew from Section 5 consideration five precinct and polling place consolidations. Absent Section 5 coverage there would not have been a withdrawal of these particular polling place consolidations. The only alternative would have been to file a Section 2 case and seek a preliminary injunction enjoining the consolidation of these polling places.

SMF ¶ 890 (quoting testimony of Joaquin Avila).

### iv) Noncompliance

The House Committee Report concluded after careful study that "many … covered jurisdictions … continue to enact and enforce changes to voting procedures without the Federal Government's knowledge." H.R. Rep. 109-478, at 41. One indication of the lack of compliance by covered jurisdictions is enforcement actions brought to compel jurisdictions to submit voting changes for preclearance review. Congress received evidence that since 1982, 105 successful Section 5 enforcement actions had been brought in nine of the covered States. *See generally* SMF ¶¶ 694-739 (setting forth the evidence before Congress as to enforcement actions). For example, an enforcement action was brought against South Dakota after that State for decades defiantly refused to submit thousands of voting changes that affected two covered counties for preclearance review. *See id.* ¶¶ 603, 696, 730-732 (summarizing relevant litigation and the testimony of Laughlin McDonald).

Congress received testimony about the role that a Section 5 enforcement action played in undermining the efforts of local officials to attempt to move Henry Cook, an African-American and Chairman of the Randolph County (Georgia) School Board, out of his district. *See* SMF ¶ 705 (testimony of Laughlin McDonald). In 2002, the DOJ precleared the school board's redistricting plan after receiving confirmation that Mr. Cook would remain in his prior district (he lived on the border of two districts included in the precleared plan), and Mr. Cook received a

registration card identifying him as a resident of his prior and actual district. Cook's white opponent in his district in 2002 challenged Cook's eligibility on residency grounds—and that challenge was unsuccessful. Subsequently, prior to the 2006 election, Cook received a registration card identifying him as a resident of a different district though he had not changed residency since 2002. Local citizens then filed a Section 5 enforcement action requesting that the court enjoin Randolph County from reassigning Mr. Cook to the different district unless the county submitted the change and received preclearance. *Id.*[26]

The record of noncompliance by jurisdictions in Texas was also substantial. *See* SMF ¶¶ 735-739. Of the nine States with the most post-1982 objections surveyed, more successful Section 5 enforcement actions were brought in Texas—twenty-nine—than in any other State. *See id.* ¶ 735; *cf., e.g., id.* ¶¶ 699, 702, 704, 706, 709. Congress was presented with examples where Section 5 enforcement actions prevented last-minute polling place changes for the Houston mayoral election in 2001 and for an election in Bexar County in 2003. *See id.* ¶¶ 738, 911.

### v)    Racially polarized voting

Congress found that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965." VRARA, Pub. L. No. 109-246, § 2(b)(3), 120 Stat. 577. The House Report identified racially polarized voting as "the clearest and strongest evidence ... of the continued resistance within covered jurisdictions to fully accept minority

---

[26]    Notably, on September 12, 2006, less than two months after the VRARA's passage, the DOJ objected to the proposed reassignment of Mr. Cook on discriminatory purpose grounds. *See* SMF ¶ 705.

citizens and their preferred candidates into the electoral process." H.R. Rep. No. 109-478, at 34; *see generally* SMF ¶¶ 943-1042 (detailing the VRARA's legislative record concerning racially polarized voting). Racially polarized voting is a key metric of minority voting opportunity because, where it is prevalent, local voting rules can be tailored to effectively shut off minority communities' ability to elect a representative of their choice. *See Thornburg v. Gingles*, 478 U.S. 30, 68 (1986) ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice"); SMF ¶¶ 985, 999-1002, 1022, 1025-1026 (Engstrom House testimony and Arrington Senate testimony and Written Responses).

Congress was presented with court findings of racially polarized voting in post-1982 cases involving covered states, including Alabama,[27] Florida,[28] Georgia,[29] Louisiana,[30] Mississippi,[31] North Carolina,[32] South Carolina,[33] South Dakota,[34] and Texas,[35] as well as numerous court findings of racial bloc voting in local elections in partially covered jurisdictions. *See* SMF ¶¶ 962-963, 984. In addition, several witnesses, including experts who conduct analyses of racial bloc voting and attorneys who litigate Voting Rights Act cases, testified about the prevalence of racially polarized voting. *See id.* ¶¶ 961, 968-972, 987, 989-1006, 1016-1019, 1022-1025, 1027-1028. Further, Congress heard evidence that racially polarized voting remains

---

[27]    SMF ¶¶ 995-997, 1022, 1025

[28]    *Id.* ¶¶ 949, 950, 1021.

[29]    *Id.* ¶¶ 955, 973, 1024.

[30]    *Id.* ¶¶ 949, 951, 960, 966, 974, 976, 999.

[31]    *Id.* ¶¶ 954, 957, 977-978, 1003-1005.

[32]    *Id.* ¶¶ 958, 964-965, 985-986, 1007-1008.

[33]    *Id.* ¶¶ 948, 949, 961, 988, 1009-1015, 1020.

[34]    *Id.* ¶¶ 949, 952.

[35]    *Id.* ¶¶ 949, 1029-1042.

more severe in covered jurisdictions, *see id.* ¶ 1016, and has persisted in partisan as well as non-partisan elections, *see id.* ¶ 1992 (detailing testimony of Dr. Arrington).

Congress received evidence from South Carolina that provided a striking example of the persisting problem of racially polarized voting. In *United States v. Charleston County*, 365 F.3d 341 (4th Cir. 2004), the Fourth Circuit affirmed the trial court's ruling for plaintiff in a challenge to the County's at-large method of electing its County Council. The court found that "voting in Charleston County Council elections is severely and characteristically polarized along racial lines," 363 F.3d at 350, and that "since the early 1990s, white Democrats have at least occasionally won, while minority Democrats have invariably lost," *id.* at 353; *see also* SMF ¶ 1089 (noting that in May 2005, the Governor of South Carolina was quoted as saying that in South Carolina, Blacks "never will be" elected to statewide office "[i]n the foreseeable future").

The evidence of racially polarized voting in Texas was particularly recent and powerful. The Supreme Court issued its decision in *LULAC*, 126 S. Ct. 2594, in the month immediately before the congressional floor votes on the VRARA, and the decision was the subject of the final Senate hearing in connection with the VRARA. *See* SMF ¶¶ 264, 854, 1433 (detailing Senate Hearing concerning *LULAC*). In *LULAC*, the Court held in relevant part that Texas's 2003 redistricting plan for the State's federal congressional delegation violated the anti-vote dilution provision of Section 2 of the VRA. 126 S. Ct. at 2623. The Court stated, in assessing the new District 23 at issue, that:

> the second and third *Gingles* preconditions—cohesion among the minority group and bloc voting among the majority population—are present in District 23. The District Court found "racially polarized voting" in south and west Texas, and indeed "throughout the State[.]" The polarization in District 23 was especially severe: 92% of Latinos voted against [Representative Henry] Bonilla in 2002, while 88% of non-Latinos voted for him[.] Furthermore, the projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district.

*Id.* at 2615.

### vi)    Section 2 litigation

The evidence before Congress contains numerous examples of findings of discrimination established in Section 2 cases. *See* SMF ¶¶ 1043-1108 (detailing evidence of Section 2 cases in the VRARA's congressional record). Congress received evidence that, in published Section 2 decisions since 1982, plaintiffs prevailed at a higher rate in covered than in non-covered jurisdictions, even though covered jurisdictions comprise less than one-quarter of the total population of the nation and less than forty percent of the nation's minority population. *See id.* ¶¶ 1047-1048, 1051, 1106-1108. As noted in a study performed of the judicial findings that were before Congress in considering the VRARA, this difference is most pronounced in suits challenging local government actions. *See* Ellen D. Katz, *Not Like the South?  Regional Variation and Political Participation through the Lens of Section 2*, in *Democracy, Participation and Power:  Perspectives on Reauthorization of the Voting Rights Act*, ch. 8, at 5, 7 (forthcoming 2007) (attached hereto as Ex. 5 to Wolfson Decl.). These disparities support Congress's decision to maintain the preclearance requirement for covered jurisdictions but not extend the requirement nationwide.

The nine States with the most Section 5 objections since 1982 yielded more than 600 successful Section 2 cases (including settled cases and cases decided in unpublished decisions). SMF ¶¶ 372, 1048. Of those States, Texas jurisdictions had the most successful Section 2 cases: 206. *Id.* ¶ 622, 1097. Much of the evidence offered in successful Section 2 cases—a history of official discrimination regarding the right to vote; racially restrictive candidate slating systems; a lack of official responsiveness to minority needs; tenuous government policies underlying challenged practices; socioeconomic racial disparities corresponding to disparities in electoral participation; racial appeals; a lack of minority elected officials; and electoral devices including

anti-single-shot voting, numbered posts, majority-vote requirements, and unusually large election districts, *see Gingles*, 478 U.S. at 36-37—can be indicative of intentional racial discrimination in voting and its continuing effects. *See Rogers*, 458 U.S. at 616-628; S. Rep. No. 97-417, at 21-30 (incorporating the *White v. Regester*, 412 U.S. 755, factors as articulated in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), into the Section 2 analysis).

Congress was presented with several Section 2 cases where courts found that a jurisdiction covered by Section 5 acted with discriminatory intent. *See* SMF ¶ 1053 (citing *Harris v. Siegelman*, 695 F. Supp. 517, 526 (M.D. Ala. 1988), and *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1356-1360 (M.D. Ala. 1986)). Again, *LULAC* is instructive. There, the Supreme Court suggested intentional discrimination is a continuing threat in the political process. The Court observed that the Texas redistricting plan "bears the mark of intentional discrimination that could give rise to an equal protection violation." 126 S. Ct. at 2622. The Court found that "[i]n essence the State took away the Latinos' opportunity because Latinos were about to exercise it[.] The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active." *Id.* (internal quotation marks omitted); *see also, e.g.*, *Campos v. City of Baytown*, 840 F.2d 1240, 1241 (5th Cir. 1988) (upholding Section 2 violation in Baytown, Texas); *Jones v. Lubbock*, 727 F.2d 364, 386 (5th Cir. 1984) (upholding finding of Section 2 violation); *LULAC v. North E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) (finding Section 2 violation); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1318 (N.D. Tex. 1990) (same).

### vii)    Minority registration, turnout, and officials

Although Congress received some evidence indicating that minorities had made significant gains in obtaining access to the political process, the evidence before Congress also revealed significant continuing problems, especially in covered jurisdictions. *See* SMF ¶¶ 1266-

1348 (setting forth the record before Congress in the VRARA with respect to minority registration, turnout, and officials). In particular, the evidence pointed to a paucity of African-American elected statewide officials. *None* had ever been elected to statewide office in Mississippi, Louisiana, or South Carolina, H.R. Rep. No. 109-478, at 33; SMF ¶ 1296, and as of 2000, only "35 African Americans held statewide elected office" in the entire country. H.R. Rep. No. 109-478, at 33; SMF ¶ 1296. The statistics also revealed a disproportionately low number of Latino and Asian-American elected officials. H.R. Rep. No. 109-478, at 33-34; SMF ¶¶ 1297-1298. Moreover, Congress received evidence that in the covered jurisdictions, most minority officials represented majority-minority districts, which in many instances were created as a result of the Voting Rights Act. *See* SMF ¶¶ 450, 877, 947, 974, 982, 1289, 1294, 1320, 1324, 1535. The number of African-American elected officials was disproportionately low in the Section 5 covered Southern States with large Black populations. "[I]n States such as Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina, where African-Americans make up 35 percent of the population, African-Americans made up only 20.7 percent of the total number of State legislators." H.R. Rep. No. 109-478, at 33.

With respect to voter *participation*, the evidence reflected some progress in eliminating disparities between whites and African-Americans, and a substantial remaining disparity between whites and Hispanic citizens. The House Committee Report stated that disparities in participation between African-Americans and white citizens "narrowed considerably" in Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia, H.R. Rep. No. 109-478, at 12, as well as in Texas (though additional evidence—provided to the Senate—indicated that the disparities are greater when the data for white voters exclusive of the data for Hispanic eligible voters is compared to that of African-American voters, *see* SMF ¶¶ 1333-1334 (detailing

testimony of Professor Nathaniel Persily)). The House Report concluded that the decreases in disparity of participation are evidence of Section 5's effectiveness: the progress "reflects the effectiveness of the VRA's temporary provisions." H.R. Rep. No. 109-478, at 25.

Moreover, the evidence showed lingering disparities in participation in covered States. In Texas, for example, as of 2004, 61.5% of white citizens were registered, compared to only 41.5% of Hispanic citizens. *See* H.R. Rep. No. 109-478, at 29; *see also* SMF ¶ 1327.

### viii)     Observer coverage and intimidation of minority voters

Congress further supported the VRARA's reauthorization of Section 5 by compiling evidence of observer coverage and of intimidation of minority voters. *See* SMF ¶¶ 1161, 1265 (setting forth the evidence on these issues before Congress in the VRARA). The same coverage formula used for determining Section 5 coverage is also used for determining when the Attorney General has discretion to send federal observers to monitor elections. Federal observers are assigned to a polling location "only when there is a reasonable belief that minority citizens are at risk of being disenfranchised." H.R. Rep. No. 109-478, at 44; *see also* 42 U.S.C. § 1973f(a)(2); 42 U.S.C. §§ 1973a(a); 1973f(a)(1). Observer coverage thus reflects a judgment that there is a basis for concern about continuing problems related to racial and ethnic minority voting in a jurisdiction.

Statistics provided to Congress showed that more than 22,000 observers have been assigned since 1965 and that observers have been sent to covered jurisdictions more than 600 times since the 1982 reauthorization, a greater number than in the pre-1982 period. H.R. Rep. No. 109-478, at 44; SMF ¶¶ 1171, 1173-1174. In addition, Congress was presented with many examples of intimidation and harassment encountered by minority voters. *See* SMF ¶¶ 1210-1265. One powerful example came from the United States' responses to interrogatories in *United States v. Conecuh County*, Civil Action No. 83-1201-H (S.D. Ala., June 12, 1984). *See*

61

*id.* ¶¶ 1207, 1220, 1224.  In that case, federal observers noted the following acts of a poll worker

in Conecuh County, Alabama:

> While providing assistance to a black voter, white poll official [Name] asked,
> "'Do you want to vote for white or ni*ers?"  The voter stated that he wanted to
> give everyone a fair chance.  [Name] proceeded to point out the black candidates
> and, with respect to one white candidate, stated, "This is who the blacks are
> voting for."  Poll official [Name] made further reference to black citizens as
> "ni*ers" in the presence of federal observers, including a statement that "ni*ers
> don't have principle enough to vote and they shouldn't be allowed.  The
> government lets them do anything."

*Id.* ¶ 1224.

The evidence presented to Congress of voter intimidation in Texas was substantial and is

set forth at Paragraphs 1244-1265 of the Statement of Material Facts.  Congress, for example,

heard evidence from Texas that:

- In Harris County, a man "was arrested because he insisted that he be able to vote.  He
  went to cast a vote at the local church where his mom votes but he was told that he
  was registered to vote on another side of town and refused the right to vote.  The
  police officer charged him with trespassing."  SMF ¶ 1259.

- In Wharton County, where an African-American ran in the November 2000 election
  for treasurer and was the first African-American in the jurisdiction to appear on the
  ballot in 102 years, the treasurer to the campaign received threatening phone calls
  from "someone saying to get off [his] campaign or we're going to burn a cross in [the
  treasurer's] yard, string up [her] dogs and gut them," and her house was later burned
  down.  *Id.* ¶ 1247.

### ix)    Discrimination against minority language voters

Congress was presented with substantial evidence regarding discrimination against

minority language voters in Section 5 covered jurisdictions.  *See* SMF ¶¶ 1109-1160 (setting

forth the evidence of discrimination against minority language voters before Congress in the

VRARA). This evidence included documentation of the failure of certain jurisdictions to comply

with their minority language obligations under the Voting Rights Act.  *See id.* ¶ 1149 (detailing

consent decree entered against Ector County, Texas after a claim filed alleging that the county

failed to provide a sufficient number of bilingual poll workers and failed to effectively publicize the availability of bilingual voting materials); *see also id.* ¶¶ 1126, 1150, 1156, 1158 (setting forth additional examples from Texas of jurisdictions' violations of Section 4(f)(4) and Section 203 of the Act).    Similarly, Congress heard evidence that "[i]n Texas and Southern Arizona polling places Hispanic voters were admonished not to use Spanish when talking in the polling places and when giving assistance to voters who needed help when voting.    Moreover, the citizenship of Hispanic voters was questioned at the polls, with voters being required to somehow provide on-the-spot evidence of their citizenship before being given a ballot; such evidence was not required of Anglo voters." *Id.* ¶ 1244 (quoting Weinberg testimony).    Further, Congress received evidence that in Bexar County, Texas, in the spring of 2003, a "very large number" of early polling places were closed in heavily populated Latino areas without a timely submission of the changes for preclearance.    *See id.* ¶¶ 738-1264.    There was also evidence of discriminatory treatment of minority language voters through means such as *en masse* challenges to minority voters.    *See, e.g., id.* ¶¶ 1212, 1214 (describing en masse challenges in Long County, Georgia and Bayou La Batre, Alabama).

x)    <b>Evidence of the harm of not renewing Section 5</b>

The Supreme Court has recognized that, in enacting enforcement legislation, Congress may properly consider the risk that state actors will engage in purposeful discrimination absent a prophylactic federal statute. *See Boerne*, 521 U.S. at 532-533 (citing *City of Rome*, 446 U.S. at 177); *see also Katzenbach v. Morgan*, 384 U.S. 641, 653 (1966).    The judgment that Congress made about what would happen if Section 5 were not reauthorized warrants particular deference because—unlike the case with any other statute that the Supreme Court has evaluated in the *Boerne* line of decisions—Congress was able to assess the need for the statute in the future based on experience with its *actual* operation. *See* Katz, *supra*, Wolfson Decl. at Ex. 5 at 26 (noting

63

that "the validity of reauthorization cannot depend on evidence that [past] discrimination persists largely unchanged[;] [t]o require otherwise would limit reauthorization to statutes that are ineffectual" and that the "question whether preclearance is still needed depends ... on a predictive judgment about the likely prevalence of [unconstitutional] conduct absent the constraints imposed by Section 5").

Congress received extensive evidence that a failure to reauthorize Section 5 would create a substantial risk of widespread unconstitutional discrimination against minority voters in covered jurisdictions. *See* SMF ¶¶ 790-907 (setting forth in detail evidence and related testimony in the VRARA hearings). Congress received testimony, for example, concerning "jurisdictions in Alabama who indicate that Section 5 serves as a guidepost that helps to ensure that they consider the impact that a voting change might have on minority voters." *Id.* ¶¶ 798, 865 (Fred Gray testimony). As Representative Robert Scott explained, "Section 5 helps to ensure that jurisdictions reach out to and solicit the input of minority elected officials in the process leading up to the adoption of a change. Indeed, we cannot underestimate this deterrent effect when talking about the role that Section 5 plays." *Id.* ¶¶ 847, 892-893; *cf. id.* ¶¶ 450, 589 (testimony of Laughlin McDonald that the States of Georgia and South Carolina have each argued in the VRA cases that they should be permitted to abolish their respective majority Black districts).

Numerous witnesses emphasized before Congress that, absent the preclearance requirements and the opportunity for objections before a discriminatory voting change takes place, the risk of an increase of discrimination in voting against racial or language minority citizens would be substantial. *See, e.g.*, SMF ¶ 865 (testimony of Fred Gray that "there is a very serious chance of our losing some of what we have gained," and citing as examples a number of

specific objections made by DOJ that prevented discrimination); *id.* ¶ 696 (testimony of Anita

Earls, former Deputy Assistant Attorney General for DOJ's Civil Rights Division who oversaw

the Voting Section, that "[t]here is a strong basis in evidence before Congress at this point for

concluding that retrogression will occur if Section 5 is not renewed" and stating, for example,

that "in North Carolina, we have, under cases decided in the past few years in the State courts, a

whole-county provision that requires legislative districts to be drawn from whole counties. If

Section 5 is removed, we are at risk of losing from 5 to 11 of our current legislative districts that

elect candidates of choice of black voters."); *id.* ¶ 864 (testimony of Jose Garza on the likely

"abysmal" state of minority representation in Texas absent Section 5's protections for Latino

voters); *id.* ¶ 330 (Fraga Report); *id.* ¶ 858 (Davidson testimony that the "risks of letting the non-

permanent features of the Act expire increase to the extent that the gains in minority voting rights

are not accepted and internalized by the white majority, such that this majority will be willing to

'do the right thing' on its own, without threat of deterrent action by the [DOJ] or [this Court] …

Moreover, any comprehensive risk assessment must take into account the importance of what is

at risk. In this case, what is at risk is a fundamental right, the sine qua non of American

democracy:  the right to vote."); *id.* ¶ 904 (testimony of historian Alexander Keyssar noting that

minority voting rights progress has been marked by ebbs and flows).

The central rationale of Section 5's preclearance requirement is that a "case-by-case

approach" requiring minority citizens to affirmatively challenge voting practices as

discriminatory is insufficient to protect voting rights from abridgment. *See Boerne*, 521 U.S. at

526 (stressing that Section 5 was necessary because of "the ineffectiveness of the existing voting

rights laws and the slow, costly character of case-by-case litigation" (internal citation omitted)).

Congress received extensive testimony from numerous witnesses with voting rights litigation

experience to the effect that remedies other than preclearance are not sufficient at present to remedy and deter discriminatory voting changes.[36]  Having reviewed the record evidence of both ongoing intentional discrimination against ethnic and racial minorities in voting and Section 5's deterrence value, the House Committee Report reached the judgment that "a 'failure to reauthorize the temporary provisions, given the record established, would leave minority citizens with the inadequate remedy of a Section 2 action.  The Committee knows from history that case-by-case enforcement alone is not enough to combat the efforts of certain States and jurisdictions to discriminate against minority citizens in the electoral process." H.R. Rep. No. 109-478, at 57. This concern is particularly trenchant in the VRARA record for the numerous covered jurisdictions—such as Waller County, Texas—that have been found to have implemented discriminatory voting changes on multiple occasions.  *See* SMF ¶¶ 869 (testimony of Jon Greenbaum regarding repeat-offender covered jurisdictions).

In light of this testimony regarding what would happen in the absence of Section 5, members of Congress recognized a substantial risk if Section 5 was permitted to expire.  Senator Leahy summed up well the decision Congress faced: "[I]f we fail to reauthorize the expiring

---

[36]     *See, e.g.*, SMF ¶ 896 (testimony of Derfner that "Section 2 is not an adequate substitute because it puts the burden on the victim.  Unlike Section 5, Section 2 allows the discriminatory voting change to go into effect.  In addition, Section 2 cases are expensive and time-consuming to litigate and hard to win.  The Federal Judicial Center studies the complexity of different types of cases, and has reported that voting cases rank near the top of all civil cases in complexity[.]  In my recent Charleston County case, the County spent over $2,000,000 defending the case, and we had to put in over 2000 hours representing the plaintiffs, in addition to many more hours that the Justice Department put in."); *see also id.* ¶ 895 (testimony of David Becker that "[o]nly with Section 5 is the burden of proof not on those voters to prove discrimination, but on the jurisdiction to prove the absence of retrogression.  As anyone who has ever litigated both Section 5 and Section 2 cases knows, such a distinction can be vital to obtaining necessary relief for minority voters."); *see also id.* ¶¶ 457, 511 (*Voting Rights in Louisiana: 1982-2006, RenewTheVRA.org*, prepared by Debo Adegbile); *id.* ¶¶ 890, 894 (testimony of Avila); *id.* ¶ 874 (testimony of McDonald that "voting cases are more work intensive than all but five of the sixty-three types of cases that come before the federal district courts").

provisions of the Voting Rights Act, our country is likely to backslide. We must make sure [Section 5 created] gains do not suffer the same fate as the gains in voting rights made during Reconstruction." SMF ¶ 821.

### xi)     Incorporation of previous reauthorization records

The extensive record of discrimination and deterrence amassed in connection with the 2006 reauthorization of Section 5 demonstrates the necessity of continuing the Section 5 protections. That conclusion is further reinforced when the 2006 record is considered in combination with the records that compelled Congress to enact Section 5 in 1965 and reauthorize the law in 1970, 1975, and 1982. It is appropriate for this Court—as it was for Congress—to consider this long record of discrimination in voting because, as the Supreme Court has emphasized, the gravity of the harm to be combated "'must be judged with reference to historical experience.'" *Lane*, 541 U.S. at 523 (quoting *South Carolina v. Katzenbach*, 383 U.S. at 308); *see also City of Rome*, 446 U.S. at 180-182 (relying in part on the legislative record of the 1965 Act in sustaining the constitutionality of Section 5 as reauthorized in 1975); *Fullilove v. Klutznick*, 448 U.S. 448, 503 (1980) (Powell, J., concurring) (Congress may properly consider "information and expertise that Congress acquires in the consideration and enactment of earlier legislation").

In sum, the VRARA's legislative record establishes three fundamental points. First, Congress compiled extensive evidence of continuing racial discrimination in voting in covered jurisdictions due to their long history of official discrimination, including Texas. Second, in some covered jurisdictions there has been some progress in remedying racial inequalities in voting since the adoption of Section 5—suggesting the statute is having a remedial and deterrent effect—but it would be quite premature to conclude that racial inequalities and disparities in participation in voting have been eliminated. Third, there was a substantial basis for Congress's

conclusion that retaining Section 5's protections in covered jurisdictions was necessary to remedy—and continue to deter—discrimination in voting against racial and language minorities.

> **b)** **The Record Evidence Of The Gravity Of Harm In This Case Is Stronger Than The Records In *Hibbs* And *Lane***

The extraordinary record compiled by Congress in the VRARA is indisputably more extensive than the records that were held sufficient to justify the FMLA in *Hibbs* and Title II of the ADA, as applied to court access, in *Lane*. In *Hibbs*, the Supreme Court "approved the family-leave care provision of the FMLA as valid § 5 legislation based primarily on evidence of disparate provision of parenting leave, little of which concerned unconstitutional state conduct." *Lane*, 541 U.S. at 528. Specifically, the *Hibbs* Court relied on (1) a Senate Report citation to a survey revealing gender disparities in private sector leave provisions; (2) submissions from two sources at a hearing on predecessor legislation stating that public sector leave provisions differed little from private sector policies; (3) evidence that fifteen States provided women up to one year of extended maternity leave, while only four provided extended paternity leave; and (4) a House Report's quotation of a study that found that failing to implement a uniform leave policy would subject federal employees to discretionary and possibly unequal treatment. *Lane*, 541 U.S. at 529 n.17 (discussing *Hibbs*, 538 U.S. at 728-733).

In *Lane*, the Court upheld Title II of the ADA as applied to court access, relying on (1) a history of unequal treatment against disabled people in the administration of state services and programs, including deprivations of fundamental rights such as the right to vote; (2) the shortcomings of existing laws that protected disabled people, including hundreds of examples of unequal treatment of persons with disabilities by States and their political subdivisions; (3) a report before Congress showing that 76% of public services and programs housed in state-owned buildings were inaccessible to persons with disabilities; and (4) numerous examples of the

exclusion of persons with disabilities from state judicial services and programs. *See* 541 U.S. at 524-527.

The record compiled by Congress in enacting the VRARA dwarfs either of these showings. For example, in *Hibbs* and *Lane*, the records at issue did not include many examples that carried strong indicia of unconstitutional conduct by state officials, though they did include numerous examples that Congress could justifiably rely upon in reaching the conclusion that unconstitutional conduct likely was occurring and thus that a prophylactic measure was appropriate. The VRARA certainly contains ample evidence of the latter kind, which permitted Congress to draw the reasonable inference that retaining Section 5's prophylactic protections was necessary to deter future unconstitutional discrimination. But the VRARA also includes the kind of evidence that the dissenters in *Hibbs* and *Lane* argued was *missing* from the records Congress assembled in enacting the FMLA and Title II of the ADA, *see Lane*, 541 U.S. at 541-548 (Rehnquist, C.J., dissenting); *Hibbs*, 538 U.S. at 742-743 (Scalia, J., dissenting): evidence of actual constitutional violations, *i.e.*, continuing unconstitutional discrimination against minority voters in covered jurisdictions. Thus, as established above, the VRARA record includes evidence of numerous proposed voting changes by jurisdictions to which the DOJ objected noting evidence of discriminatory purpose, including discriminatory redistricting plans proposed by Texas in 2001, discriminatory annexations and deannexations, and discriminatory cancellation of elections, successful Section 2 suits probative of jurisdictions' discriminatory intent, many thousands of observers sent by the DOJ based on a belief that minority citizens were at risk of being disenfranchised, and evidence of racist statements by poll workers.

C.     **Section 5 Is A Congruent And Proportional Response By Congress To The Continuing Problem And Lingering Effects Of Discrimination In Voting**

Congress voted to renew Section 5 only after taking account of the Supreme Court's guidance in the *Boerne* line of decisions. *See* SMF ¶¶ 1411-1412, 1482-1487. And indeed, under the *Boerne* analysis, Section 5 is clearly a congruent and proportional response to the evils it is designed to combat. First, as established above in Part II.B.1, Congress, by acting to combat racial discrimination in voting, proceeded at the zenith of its enforcement authority under the Fourteenth and Fifteenth Amendments. Second, as established in Part II.B.2, the evidence before Congress in 2006 of the gravity of the harms Section 5 seeks to prevent was extensive—and stronger than that of the Supreme Court's recent decisions sustaining legislation as a valid exercise of Congress's enforcement authority. Against this backdrop of extraordinary enforcement authority and a substantial record, Congress might well have enacted a broad and pervasive remedy and still retained the required congruence-and-proportionality. Nonetheless, Section 5's congruence-and-proportionality—and hence appropriateness as remedial enforcement legislation—is further reinforced by features that importantly limit the federalism concerns posed by the statute.

First, Congress continued to omit from Section 5 any provision authorizing private citizens (or the United States) to recover money damages from state or local treasuries. Congress in some circumstances has the power to authorize private suits for money damages as part of its enforcement authority under the Reconstruction Amendments. *See, e.g., Hibbs*, 538 U.S. 721 (sustaining as constitutional a State employee's statutory right to recover money damages against the State for failure to comply with certain provisions of the FMLA). However, when Congress authorizes private suits for money damages against state treasuries, there is a risk that the federal law in question is "not a remedy but a benefit program." *Id.* at 745 (Kennedy, J., dissenting).

70

Specifically, Congress's "authorization to sue the State for monetary damages" raises constitutional concerns because that authorization "blurs the line of accountability the State has to its own citizens." *Id.* at 744-745; *see generally Alden v. Maine*, 527 U.S. 706, 750 (1999). Thus, in *Florida Prepaid*, the Court, in holding that the Patent Remedy Act did not satisfy the congruence-and-proportionality standard, emphasized the "expansive liability" to which the Patent Remedy Act subjected States. 527 U.S. at 646; *see also Garrett*, 531 U.S. at 376 (Kennedy, J., concurring); *Kimel*, 528 U.S. at 67 (noting that the Age Discrimination in Employment Act (ADEA) permitted any person aggrieved by an employer's violation to file a civil action for "legal … relief" (citing 29 U.S.C. § 626(c)(1)). The complete absence in Section 5 of any of these concerns militates in favor of the statute's congruence and proportionality.

Second, Section 5's geographic reach is confined to all or parts of only sixteen—fewer than one-third—of the States, based on a coverage formula designed to target those regions of the country where voting discrimination has historically been most flagrant. The Court in *Boerne* identified geographic limitations as one type of statutory limitation "tend[ing] to ensure Congress' means are proportionate to ends legitimate" under the Fourteenth Amendment's enforcement provision. 521 U.S. at 532-533 (in holding that RFRA was not congruent and proportional, emphasizing that the statute's "restrictions apply to every agency and official of the Federal, State and local Governments"). Moreover, in reauthorizing Section 5, Congress did not expand the statute's geographic scope, but rather maintained its limited geographic scope, previously upheld by the Supreme Court.

Third, Section 5 does not regulate all political, or even all election-related, activities of covered jurisdictions. *Cf. Boerne*, 521 U.S. at 515, 532 (invalidating RFRA's ban on "government from substantially burdening a person's exercise of religion," noting that in

contrast to the Voting Rights Act, RFRA's "sweeping coverage ensures its ... prohibiting official actions of almost every description and regardless of subject matter" (alterations and internal quotation marks omitted)). Rather, Section 5 is substantively limited, requiring preclearance only of covered jurisdictions' *changes* in their voting-related qualifications and procedures. *See* 42 U.S.C. § 1973c. Further, for any non-discriminatory voting changes submitted by a covered jurisdiction, preclearance will at most cause a delay in the jurisdiction's enactment of the proposed change.[37]

Fourth, Section 5 has an escape hatch from its coverage. *Compare Boerne*, 521 U.S. at 532 (in invalidating RFRA, noting that the statute lacked any "termination mechanism"). As reauthorized in the VRARA, the statute provides for bailout by any of those approximately 900 separately covered States or political subdivisions if they satisfy the bailout criteria. And, indeed, on the day that the VRARA was signed into law, this Court issued an Order granting bailout to the City of Salem, Virginia, *City of Salem v. Gonzales*, No. 1:06cv977 (Consent Judgment and Decree) (D.D.C. July 27, 2006) (Kavanaugh, Kennedy, and Leon, JJ.), and less than a month after the VRARA's passage, this Court issued an Order granting bailout from Section 5 to another political subdivision (also in Virginia), *see Botetourt County v. Gonzales*,

---

[37]    Any federalism concerns arising from Section 5 are at most marginal relative to those imposed separately by existing federal voting or election-related legislation. *See, e.g.*, the NVRA, 42 U.S.C. §§ 1973gg to 1973gg-10 (sustained against Tenth Amendment challenge in *Association of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836-837 (6th Cir. 1997); *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1416 (9th Cir. 1995); *Association of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995)); Help America Vote Act of 2002, 42 U.S.C. §§ 15301-15545 (HAVA) (requiring that States meet a variety of election standards when administering federal elections).

No. 1:06cv1052 (Consent Judgment and Decree) (D.D.C. Aug. 28, 2006) (Henderson, Collyer, and Robertson, JJ.).[38]

Finally, Section 5 has a termination date, an additional feature that "tend[s] to ensure Congress' means are proportionate to ends legitimate." *Cf. Boerne*, 521 U.S. at 533 ("RFRA has no termination date."). Prior to Section 5's termination date, Congress will once again assess whether the evidence of past and ongoing harms from discrimination in voting continues to justify retaining Section 5's remedial scheme.

Given these limiting features to Section 5, it bears note that not a single witness testified before Congress on behalf of a governmental entity against Section 5's reauthorization.[39] To the contrary, the Council of State Governments, National Conference of State Legislatures, National Association of Secretaries of State, National Association of Counties, National League of Cities, and United States Conference of Mayors filed a joint letter to the Speaker and Minority Leaders of the House advocating for renewal of Section 5 and other temporary provisions of the VRA. *See* SMF ¶ 851 (citing June 6, 2006 Letter, H5146). Representing thousands of state and local officials and governmental entities across the nation, these organizations urged that "[w]hile substantial progress has been made since passage of the Voting Rights Act in 1965, it has not yet resulted in the elimination of voting discrimination. Congress must renew the enforcement provisions of the Voting Rights Act." *Id.* Congress, under its authority to enforce the Reconstruction Amendments, was entitled to make this judgment of experience.

---

[38]    This Court's Orders granting bailout for the City of Salem and Botetourt County are attached as Exhibits 6A and 6B respectively to the Wolfson Declaration.

[39]    The Section 5 covered jurisdictions of which Private Defendant-Intervenors are aware that submitted some critical testimony on Section 5 advocated only for alterations to the bailout rules and coverage formulas. *See* SMF ¶ 1384 (discussing congressional testimony of Merced County, California); *id.* ¶ 1354 (discussing testimony of John J. Park, Jr., Alabama Assistant Attorney General).

## III.    THE DISTRICT'S CONSTITUTIONAL CHALLENGE TO SECTION 5 "AS APPLIED" FAILS AS A MATTER OF LAW

The District cannot show that Congress lacked authority under the Fourteenth and Fifteenth Amendments to reauthorize Section 5 and is therefore reduced to arguing that Section 5 "cannot be constitutionally applied to the [D]istrict." Am. Compl. ¶ 23.  The District bases this meritless claim on its assertions that the reauthorization rests only on "generalized findings," that there "has never been any finding that the [D]istrict has engaged in discriminatory voting practices," *id.* ¶¶ 9, 25, and that Section 5's "burdens" are therefore "disproportionate to any claimed rationale supporting continued coverage by § 5," *id.* ¶ 20.  This claim fails as a matter of law.  Contrary to the District's apparent belief, the Constitution does not require Congress to establish that each and every entity covered by Section 5 had previously engaged in voting discrimination,[40] and any such requirement would be unworkable and undermine Section 5's ability to prevent official voting discrimination before it occurs.  And even if the particular burdens on the District were somehow relevant to the Court's constitutional analysis, the District could not credibly sustain any claim on this basis, since the burdens on the District of compliance with Section 5 are trivial.

---

[40]    The District's Rule 30(b)(6) designee Donald Zimmerman stated that "I would think that these neighborhoods should be contacted to see if this is still necessary.  Why wouldn't [Congress] do that for me or for any other political subdivision?  I think they owe it to us to find out what's happening in our neighborhood before they issue a mandate on it."  SMF ¶ 1573 (quoting Zimmerman Dep. Tr.).

A.    **Because Section 5 Is A Constitutional Exercise Of Congress's Enforcement Authority Under The Fourteenth and Fifteenth Amendments, No Further Showing Is Required To Sustain Section 5's Constitutionality As Applied To The District**

1.    **An "As-Applied" Challenge To Section 5 Cannot Be Sustained Merely Because An Entity Contends That It Has Not Previously Discriminated In Voting**

The District's as-applied challenge rests on a fundamental misapprehension of the circumstances in which the courts have, and have not, entertained "as-applied" challenges to laws that are (as demonstrated above here) valid on their face.    The Supreme Court has consistently held that such a law will not be held constitutionally invalid "as applied" to a particular litigant based on the contention that the governmental interests supporting the law are not advanced by applying the law to the circumstances of that particular litigant (as opposed to, for example, a class of activities that lie outside the legitimate sweep of the law).    That is particularly true where, as here, Congress reasonably concluded that renewed application of Section 5 to all covered States and political subdivisions as well as to all political subunits within those covered jurisdictions was necessary to eradicate and prevent the recurrence of discrimination in voting.

In *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978), for example, the Court rejected an attorney's challenge to a rule against solicitation "not facially, but as applied to his acts of solicitation."    The Court rejected the attorney's view that his "as-applied" challenge required the State to show that *his particular conduct* harmed the interests that the regulation sought to protect.    The Court held, as it described in a later case that because the State had "a strong interest in adopting and enforcing rules of conduct designed to protect the public," *id.* at 464, it was "*entitled to protect its interest by applying a prophylactic rule to those circumstances generally,*" *United States v. Edge Broad. Co.*, 509 U.S. 418, 431 (1993) (emphasis added).    The

75

*Edge* Court "declined to require the State to go further and to prove that the state interests supporting the rule actually were advanced by applying the rule in [the] particular case." *Id.*

Similarly, in *Edge Broadcasting*, 509 U.S. at 427, the Court, in analyzing a constitutional challenge to a federal statute prohibiting broadcast advertisements of lotteries in States that did not have legalized lotteries, held that the "question cannot be answered by limiting the inquiry to whether the governmental interest is directly advanced as applied to a single person or entity." Rather, the Court explained that it would "judge the validity of the restriction in this case by the relation it bears to the general problem ... [and] not by the extent to which it furthers the Government's interest in an individual case."[41] *Id.* at 430-431.

This reasoning is readily applicable to the VRA context, and indeed, the Supreme Court has already rejected several claims that Section 5 sweeps too broadly in relation to the governmental interest in eradicating entrenched voting discrimination—which is in essence the District's "as-applied" claim here. In *City of Rome*, the city, like the District in this case, claimed both that it was eligible to seek bailout independently of the State, and that, if it were not so eligible, then Section 5 exceeded Congress's legitimate authority to enforce the Fourteenth and Fifteenth Amendments. Like the District in this case, the City of Rome contended that it had not engaged in voting discrimination for seventeen years before the Court's decision. *See* 472 F. Supp. 221, 224 (D.D.C. 1979).

In affirming this Court's rejection of the City's claims, the Supreme Court relied on the legislative record evidence concerning all covered jurisdictions—*i.e.*, those "'certain parts of our

---

[41]    *See also Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (in rejecting a Speech Clause challenge to municipal bandshell regulation, noting that "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case").

country'" where racial discrimination had been "'an insidious and pervasive evil.'" 446 U.S. at 182 (quoting *South Carolina v. Katzenbach*, 383 U.S. at 309). The Court gave no weight to, and indeed saw no occasion to discuss, the existing record with respect to the City itself. And, as Justice Stevens' concurring opinion explained: "If racially discriminatory voting practices elsewhere in the State of Georgia were sufficiently pervasive to justify the statewide remedy Congress prescribed, that remedy may be applied to each and every political unit within the State, including the city [of Rome]," even if "we may assume that there has never been any racial discrimination practiced in the city[.]" *Id.* at 190.

Likewise, in *Lopez*, although there had "been no legislative finding that the State of California has ever intentionally discriminated on the basis of race, color, or ethnicity with respect to voting," 525 U.S. at 295-296 (Thomas, J., dissenting), the Court, in its six-Justice majority decision sustaining Section 5's constitutionality under the Fifteenth Amendment, declined to assess the strength of the record of discrimination by California or indeed that of the covered county. The Court explained that "Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions." *Id.* at 283.[42]

Essentially, the District's challenge here is a disagreement with Congress's determinations that (a) if a jurisdiction is covered by Section 5, then all subunits within that jurisdiction must also be covered, and (b) only States and specially-defined "political subdivisions" may bail out of the Act. But that is not in substance an as-applied challenge to the

---

[42]    Notably, the Court in *Lopez* sustained as constitutional the application of Section 5's preclearance requirement to a covered *county*'s change in voting dictated by the law of a state not covered by Section 5. *A fortiori*, it is surely constitutionally permissible for the United States to require the District as political *sub*unit of a *covered* state to comply with those same preclearance requirements.

law; it is, rather, a challenge to certain fundamental congressional decisions about how the statute should operate in order to ensure its effectiveness. As an as-applied challenge, the District's contention has no more merit than the challenges in *City of Rome* and *Lopez,* or than unsuccessful as-applied challenges to other aspects of the Voting Rights Act by individual jurisdictions claiming the law was not justified based on their particular circumstances. *See Gaston County v. United States*, 395 U.S. 285, 287, 296-297 (1969) (rejecting County's contention that the VRA's suspension of literacy tests should not be applied there because the County had not used any such test during the preceding five years to discriminate against anyone on account of race or color); *Oregon v. Mitchell*, 400 U.S. 118, 284 (1970) (opinion of Stewart, J., concurring in part and dissenting in part) (upholding nationwide suspension of literacy tests despite lack of jurisdiction-specific findings that such a suspension was necessary to prevent voting-related discrimination); *see also id.* at 216 (opinion of Harlan, J., concurring in part and dissenting in part); *South Carolina v. Katzenbach*, 383 U.S. at 329-330 (upholding the fundamental operation of Section 5 based on its conclusion that the coverage formula was "rational," even while recognizing that, for certain covered jurisdictions, evidence of prior voting discrimination was only "fragmentary").[43]

---

[43]    Similarly, lower courts have consistently rejected as-applied challenges to Section 2, relying heavily on the *Boerne* line of cases. A recent challenge to the constitutionality of Section 2 of the VRA was made by Blaine County, Montana, in a suit alleging that at-large elections for the county commission diluted Indian voting strength. The county argued that Section 2 as applied in Indian Country was now unconstitutional under *Boerne*. In rejecting Blaine County's argument, the court of appeals held that the *Boerne* "line of authority strengthens the case for [S]section 2's constitutionality." *United States v. Blaine County,* 363 F.3d 897, 904 (9th Cir. 2004). The court noted that "in the Supreme Court's congruence-and-proportionality opinions, the VRA stands out as the prime example of a congruent and proportionate response to well documented violations of the Fourteenth and Fifteenth Amendments." *Id.* Another recent "as applied" challenge to the constitutionality of Section 2 was dismissed by the district court in Wyoming. The court rejected Fremont County's argument that Section 2 "is unconstitutional as

The Supreme Court's decisions in *Boerne* and its progeny reinforce the conclusion that the constitutionality of the application of Section 5 to a jurisdiction need not be justified by a record of constitutional violations in that *particular* jurisdiction—although it *could* be so justified. In *Boerne* itself, the Court's analysis of the evidence of the problem Congress sought to remedy—laws that burden the exercise of religion—did not limit the inquiry to those laws passed by the City of Boerne or, indeed, to those passed by the State of Texas. *See* 521 U.S. at 530-532. Similarly, the Court's subsequent decisions upholding laws under *Boerne*'s analytical framework have evaluated the *general* record evidence that supported the law, regardless of the location in which the prior constitutional violations had occurred. *See Hibbs*, 538 U.S. at 730-734 (in sustaining under a *Boerne* analysis the constitutional validity of the FMLA as applied to a Nevada state entity—notwithstanding the existence of Nevada's family leave policies—relying on evidence from a broad range of States); *Lane*, 541 U.S. at 526-529 (in sustaining under *Boerne* the validity of Title II of the ADA as applied to a Tennessee entity, relying on evidence from "many States across the country"). And even in cases where the Supreme Court has invalidated a law under *Boerne*, it has done so only after canvassing the full range of evidence that might support the law, regardless of the jurisdiction. *See Garrett*, 531 U.S. at 368-370; *Florida Prepaid*, 527 U.S. at 643 n.8 & 645-648; *Kimel*, 528 U.S. at 87-91.

This approach also comports with common sense. Congress is a national legislative body. Its assessments of problems to be remedied and the measures necessary to remedy the

---

applied to counties that are not covered by Section 5 of the Voting Rights Act and that are located in States that are not covered by Section 5." Order Denying Summary Judgment at 1, *Large v. Fremont County*, No. 05-CV-270 (D. Wyo. Jan. 26, 2007) (attached as Ex. 6C to Wolfson Decl.). The court held the County's argument was foreclosed by the numerous decisions of the courts finding Section 2 to be constitutional and an appropriate exercise of congressional power in implementing the Fourteenth and Fifteenth Amendments. *See id.* at 2-3.

problems are typically multi-jurisdictional, if not nationwide.   If the District's claim were

accepted, it would require Congress to determine the appropriateness of Section 5's coverage of

every single state, county, city, village, utility district, special purpose district, or any other entity

that holds elections.   Such a requirement would render the legislative process enormously

cumbersome and costly, and, not surprisingly, finds no support in precedent.   Rather, in

assessing a claim by a particular governmental entity against the validity of Congress's exercise

of its enforcement authority under the Fourteenth and Fifteenth Amendments, the "law

applicable to a congressional power challenge requires a court to go beyond the facts before it

and assess the targeted legislation on a more general basis."   Gillian E. Metzger, *Facial

Challenges and Federalism*, 105 Colum. L. Rev. 873, 875 (2005).   As demonstrated in Part II,

that assessment shows that Section 5 is constitutional.

### 2.   Allowing As-Applied Constitutional Challenges By Political Subunits Would Seriously Undermine The Effectiveness Of Section 5

The District is one of dozens of political subunits within Travis County, which is just one

of the 254 counties of Texas, itself just one of nine fully covered States under Section 5 and one

of sixteen States with at least one covered jurisdiction.   Sustaining an as-applied challenge based

on whether there was evidence of discrimination in an individual subunit of a covered

jurisdiction could spawn the filing of separate as-applied constitutional challenges by numerous

similarly situated subunits, with each case each turning on a distinct factual inquiry, and each

action filed in this Court.   *See* 42 U.S.C. § 1973*l*(b).   That outcome could lead to (and indeed, the

District's challenge appears intended to lead to) the complete unraveling of the law and could

render nugatory Section 5's prophylactic protections if the government, affected citizens, and

private groups could not effectively monitor the many separate suits.   *Cf.* S. Rep. No. 97-417, at

57 n.192 (declining to allowing separate bailout claims by every political subunit based on such a

concern). This Court should reject any invitation to curtail the enforcement powers granted expressly to Congress by the Reconstruction Amendments.

**B.      The District's Claim Based On The Burdens Of Compliance With Section 5 Fails**

Even if the burden of compliance with the challenged statute for a particular litigant were a relevant line of inquiry under the Fourteenth and Fifteenth Amendments, the District is particularly ill-situated to make such a claim. Indeed, the distance between the District's allegations and reality is stark. The burden on the District of complying with Section 5 is minimal, whether measured in terms of financial impact, administrative process, or time associated with the implementation of proposed voting changes.

The District makes few voting changes and has made only eight (including the one submitted prior to its formal creation) submissions in 20 years—less than one submission per year. *See* SMF ¶ 1582. Further, the District does not anticipate making any future changes in voting procedures or policies that would require it to prepare a separate Section 5 submission. *Id.* ¶ 1606.

Complying with Section 5 has not imposed a financial burden on the District. Section 5's preclearance requirement has cost the District an average of only $233 per year, amounting to *less than one-tenth of one percent* (0.04%) of the District's average annual expenditures. *See* SMF ¶¶ 1593-1594; Musika Report (attached as Ex. 4 to Wolfson Decl.) at 8, 9, 11-12, 18, 22; *cf.* SMF ¶ 14 (testimony of Don Wright, General Counsel, North Carolina State Board of Elections) (stating, following an informal survey: "So is the current set-up a burden upon the average State or jurisdiction in regards to submission? I would contend that it is not ... 'preclearance requirements are routine and do not occupy an exorbitant amount of time, energy or resources[.]'").

81

Moreover, the District's annual financial statements from 1989 through 2005 show that the District's auditors never deemed preclearance-related expenses to be appropriate for reporting as a material expenditure. *See* Musika Report, Wolfson Decl., Ex. 4, at 6. In fact, the District, which like many utility districts raises capital by selling bonds, benefits in terms of its credit rating from coverage under Section 5 because the auditor's certification of compliance sends a message to the financial markets that the District complies with voting rights laws. *See* SMF ¶ 1604.

Nor has Section 5 compliance imposed any administrative burden on the District or its board members. Ms. Collins, the District's former outside general counsel, who has prepared all but one of the District's Section 5 submissions, testified that, "I don't think I ever had one of the board members take a look at [a] submission." SMF ¶ 1597. Current board member Donald Zimmerman who was Board President when the District made its most recent (February 2004) preclearance submission, testified that he "flipp[ed] through" a draft of that submission, but noted no comments. *Id.* ¶ 1598. Mr. Zimmerman also estimated that the District Board spends only 1/1000th of its time on Section 5 compliance. *Id.* ¶ 1599.

Finally, notwithstanding the District's naked assertion, *see* Am. Compl. ¶¶ 12-13, complying with Section 5's preclearance obligations has not delayed implementation of a single one of the District's proposed voting changes. Each of the District's Section 5 submissions to the DOJ has received preclearance. Section 5 compliance has never prevented the District from timely implementing a voting change, nor has the District ever decided to forego a contemplated proposed voting change because the potential change required a Section 5 submission as Plaintiff has alleged, *see* SMF ¶ 1603.

In short, the record demonstrates that even if the issue were somehow relevant to the Court's constitutional analysis, the District could not credibly sustain any claim based on its particular burden of compliance with Section 5.

## **CONCLUSION**

Summary judgment should be granted to the Defendant-Intervenors in this case.

Respectfully submitted,

*/s/ Seth P. Waxman*
Seth P. Waxman (D.C. Bar No. 257337)
John A. Payton (D.C. Bar No. 282699)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Ariel B. Waldman (D.C. Bar No. 474429)
Daniel A. Zibel (D.C. Bar No. 491377)
WILMER CUTLER PICKERING HALE and
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363


Jon M. Greenbaum (D.C. Bar No. 489887)
Benjamin J. Blustein (D.C. Bar No. 418930)
Jonah H Goldman (D.C. Bar No. 497507)
LAWYERS' COMMITTEE FOR CIVIL
    RIGHTS UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Telephone: 202-662-8600
Facsimile: 202-628-2858


Dennis C. Hayes (admitted *pro hac vice*)
General Counsel
NATIONAL ASSOCIATION FOR THE ADVANCEMENT
    OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
Facsimile: (410) 358-9350


*Counsel for Defendant-Intervenors*
*Texas State Conference of NAACP Branches and Austin Branch of the NAACP*

*/s/ Debo P. Adegbile*     .
Debo P. Adegbile

*/s/ Norman J. Chachkin*     .
Norman J. Chachkin (D.C. Bar No.235283)
Theodore Shaw
President and Director-Counsel
Jacqueline A. Berrien
Ryan P. Haygood
Jenigh J. Garrett
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

Kristen M. Clarke
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005
(202) 682-1300

Samuel Spital
HOLLAND & KNIGHT
195 Broadway, 24th Floor
New York, NY 10007
(212) 513-3454

*Counsel for Defendant-Intervenors*
*Rodney and Nicole Louis; Winthrop and Yvonne Graham;*
*Wendy Richardson, Jamal Richardson, and Marisa Richardson*

2

*/s/ Laughlin McDonald* .
Moffatt Laughlin McDonald
Neil Bradley
AMERICAN CIVIL LIBERTIES UNION
      FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, GA 30303-1227
Telephone: (404) 523-2721

Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION
1400 20th Street, NW, Suite 119
Washington, DC 20036
Telephone: (202) 457-0800
Facsimile: (202) 452-1868

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, NW, #350
Washington, DC 20036-6101
Telephone: (202) 898-4800
Facsimile: (202) 289-1389

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

Lisa Graybill
Legal Director
ACLU FOUNDATION OF TEXAS
1210 Rosewood Avenue
Austin, Texas 78702

*Counsel for Defendant-IntervenorNathaniel Lesane*

_/s/ David J. Becker_         .
David J. Becker (D.C. Bar No. 496318)
PEOPLE FOR THE AMERICAN WAY FOUNDATION
2000 M Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 467-4999

_Counsel for Defendant-Intervenor People for the American Way_

_/s/ Jose Garza_              .
Jose Garza
Judith A. Sanders-Castro
George Korbel
TEXAS RIOGRANDE LEGAL AID, INC.
1111 N. Main Street
San Antonio, Texas 78212
210-212-3700
210-212-3772 (fax)

_/s/ Michael T. Kirkpatrick_        .
Michael T. Kirkpatrick (DC Bar No. 486293)
Brian Wolfman (DC Bar No. 427491)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-7728
202-588-7795 (fax)
mkirkpatrick@citizen.org

_Counsel for Defendant-Intervenors Angie Garcia, Jovita Casarez, Ofelia Zapata_

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2007, I caused to be served a copy of the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF NAACP BRANCHES, AUSTIN BRANCH OF THE NAACP, RODNEY LOUIS, NICOLE LOUIS, WINTHROP GRAHAM, YVONNE GRAHAM, WENDY RICHARDSON, JAMAL RICHARDSON, MARISA RICHARDSON, NATHANIEL LESANE, PEOPLE FOR THE AMERICAN WAY FOUNDATION, JOVITA CASARES, ANGIE GARCIA, AND OFELIA ZAPATA to all counsel of record via the Court's CM/ECF filing system.

*/s/ Ariel B. Waldman*
Ariel Waldman

US1DOCS 6188114v4