## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | § § § | |
| *Plaintiff,* | § § § | |
| vs. | § § | Civil Action No. 1:06-1384 (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States | § § | |
| *Defendant.* | § § | |

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT-INTERVENORS LISA DIAZ, DAVID DIAZ, AND GABRIEL DIAZ

## TABLE OF CONTENTS

                                                                                         PAGE

TABLE OF AUTHORITIES ....................................................................... i

INTRODUCTION .................................................................................1

BACKGROUND ..................................................................................1

APPLICABLE LEGAL STANDARD............................................................4

ARGUMENT ......................................................................................4

I.  SECTION 5 IS A CONSTITUTIONAL EXERCISE OF CONGRESSIONAL
    AUTHORITY UNDER THE 14TH AND 15TH AMENDMENTS....................4

    A.  Congress is Authorized to Enforce the 14th and 15th Amendments..........5

    B.  Section 5 is a "Congruent and Proportional" Response to
        Continued Widespread Discrimination in Voting .............................8

        1.  The Bailout Provisions, Geographic Limitations and the
            Expiration Date Confine the Reach of Section 5.......................10

        2.  Congress Based its Reauthorization of Section 5 on a Well-
            Documented Record of Continued Widespread Racial
            Discrimination in Voting....................................................12

            a.  Section 5 Objections ................................................13
            b.  Violations of Section 2 of the Voting Rights Act...............16
            c.  Additional Evidence of Discrimination in Voting.............19

    C.  Section 5's Success as a Deterrent Should Not Work Against a Showing
        of its Constitutionality.....................................................21

    D.  The MUD Cannot Show That Section 5 as Applied Burdens the MUD......22

II. THE MUD CANNOT BAIL OUT FROM COVERAGE UNDER
    SECTION 5 ...................................................................................26

CONCLUSION ..................................................................................30

## TABLE OF AUTHORITIES

**Cases:**                                                                    **Page:**

*Am. Fed'n of Gov't Employees,*
*   AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . 4

*Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Beare v. Smith*, 321 F.Supp. 1100 (S.D. Tex. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Beer v. U.S.*, 425 U.S. 130 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Rome v. United States*, 446 U.S. 156 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Flores v. City of Boerne*, 521 U.S. 507 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Forman v. Dallas County* , 512 U.S. 979 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Katzenbach v. Morgan*, 384 U.S. 641 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45 (1959) . . . . . . . . . . . . . . . . . . . . . 9

*Lopez v. Monterey County*, 526 U.S. 266 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*LULAC v. North East Indep. Sch. Dist.*, 903 F. Supp. 1071 (W.D. Tex. 1995) . . . . . . . . . . . . 17

*LULAC v. Perry*, 126 S.Ct. 2594 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*LULAC Council #682 v. City of Seguin,* Civ. No 93-0333 (W.D. Tex. 1994) . . . . . . . . . . . . . 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . 4

*Nixon v. Condon*, 286 U.S. 73 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ramos v. Koebig*, 638 F.2d 838 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

*Scott v. Harris*, 127 S.Ct. 1769 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Smith v. Allwright,* 321 U.S. 649 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Sumter County v. U.S.*, 555 F.Supp. 694 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Tennessee v. Lane,* 541 U.S. 509 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Terry v. Adams*, 345 U.S. 461 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Trinidad v. Koebig,* 638 F.2d 846 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*U.S. v. Texas Education Agency,* 467 F.2d 848 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . 25

*Williams v. City of Dallas,* 734 F. Supp. 1317 (N.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . 17

*White v. Register*, 412 U.S. 755 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statutes and Constitutional Provisions**:

42 U.S.C § 1973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 1973b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 1973b(1)(A-E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

42 U.S.C. § 1973b(1)(A)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 U.S.C. § 1973b(1)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42 U.S.C. § 1973c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1973l (c) (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. CONST. amend. XV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## INTRODUCTION

The Northwest Austin Municipal Utility District No. 1 ("the MUD") seeks to bail out

from the preclearance requirements of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, or,

in the alternative, asks this Court to declare that Section 5 is unconstitutional.

The MUD's challenge to the constitutionality of Section 5 rests largely on unsupported

statements that the reauthorization of the preclearance provisions by Congress in 2006 was

unnecessary to combat discrimination in voting. The MUD claims that discrimination in voting

no longer necessitates the requirement of Section 5 preclearance and that Congress based its

reauthorization on an insufficient record.

The facts of the case demonstrate that Congress based its reauthorization of Section 5's

preclearance provisions on an extensive record of continuing discrimination against minority

voters, including in the State of Texas. Located in the City of Austin and Travis County, Texas,

the MUD cannot divorce itself from both the history of discrimination and modern-day attempts

to thwart minority voting across the State.

Section 5 has been upheld time and time again as an appropriate and limited response to

the problem of discrimination. Texas and Travis County, the only entities who can bail out under

Section 5, have not sought to do so. The MUD itself, waging this attack alone, cannot meet the

criteria for bail out, both because it does not satisfy the definition of a political subdivision that is

entitled to seek bail out and because the MUD cannot demonstrate that it has complied with the

prerequisites for bailout.

## BACKGROUND

The MUD is a conservation and reclamation district which operates under Chapters 54

and 49 of the Texas Water Code. Created in 1988 by an order of the Texas Water Commission

(now the Texas Commission on Environmental Quality), the MUD is essentially a vehicle to re-pay the debt incurred by the developers of the Canyon Creek Subdivision when they constructed its wastewater and drainage infrastructure. SMF ¶¶ 1552, 1556.  Today, the Canyon Creek Subdivision is 98% complete and the wastewater and drainage infrastructure has been conveyed to the City of Austin. *Deposition Transcript of D. Zimmerman 125:1-4.*[1] The remaining function of the MUD is to operate a park within the subdivision and ensure that payments on the bonds are made in a timely fashion. SMF ¶¶ 1552, 1548.  The MUD's Board of Directors is comprised of five residents of the Canyon Creek Subdivision who are elected and meet on a monthly basis. SMF ¶¶ 1552, 1549, 1556.

The Canyon Creek Subdivision is an upper income neighborhood of approximately 1,000 single family homes. SMF ¶ 1553; Perales Decl. Ex. 20, 21.  (For the Court's convenience, Diaz Intervenors have filed true and correct copies of documents specific to their brief in the Declaration of Nina Perales in Support of Motion for Summary Judgment of Defendant Intervenors Lisa Diaz, David Diaz, and Gabriel Diaz.  Hereinafter, Perales Decl. Ex.) According to 2000 Census data, the total population of the approximately MUD is 3,586.  SMF ¶ 1554.    Eighty percent of the population of the MUD is White, Non-Hispanic ("Anglo"); the MUD is also Asian American (11%), Latino (5.5%) and African American (1.5%). SMF ¶ 1554.

---

1 For the Court's convenience, Defendant-Intervenors have lodged a DVD containing the deposition transcripts relied upon in this brief.

2

As is typical for a small jurisdiction, the MUD has made only eight Section 5 preclearance requests in the last 19 years. SMF ¶ 1582. After its first preclearance submission, regarding the creation of the MUD and its election procedures, the MUD's submissions have been simple, straightforward letters involving uncomplicated voting changes, such as relocation its polling place, and typically only required two hours of an attorney's time. SMF ¶ 1601. According to expert testimony, compliance with Section 5 averaged $233 per annum. SMF ¶ 1593.[2] For each submission, the MUD sought administrative preclearance with the U.S. Department of Justice ("DOJ") and DOJ precleared every submission made by the MUD. SMF ¶ 1602. The MUD has never been deterred from making changes in voting because of the preclearance requirements of Section 5. SMF ¶ 1603.

In 2004, the MUD entered into an agreement with Travis County in which the county will conduct all MUD elections and also relocated its polling place, which had previously been in a private home, to the County's precinct polling place at the local elementary school. SMF ¶ 1574; *Deposition Transcript of W. Ferguson Vol. 1 27:14-22.*

In 2006, before Congress held hearings on the expiring provisions of the Voting Rights Act of 1965 (including Section 5), MUD board members met with attorneys to plan their participation in a challenge to Section 5 as a "bureaucracy . . . without any real role in the true purpose of the Voting Rights Act." Wolfson Decl. Ex. 7. Eight days after President George W.

---

[2] This average, while relatively low, may be inflated because the last Section 5 submission (notice of the election agreement between the MUD and Travis County) was prepared by a lawyer with no prior experience in preparing Section 5 submissions. *Deposition Transcript of K. Qualtrough 26:15-18.*

Bush signed the reauthorized Voting Rights Act, the MUD filed this lawsuit.

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if there is no genuine issue as to any material fact and if either [party] is entitled to a judgment as a matter of law." *American Federation of Government Employees, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 351 (D.C. Cir. 2007). In this case, there is no material fact in dispute that would show Plaintiff NW Austin MUD can prevail on its claims. Where, as here, "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial[]'" and summary judgement is warranted. *Scott v. Harris*, 127 S.Ct. 1769 (2007) quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (footnote omitted).

## ARGUMENT

I.    **SECTION 5 IS A CONSTITUTIONAL EXERCISE OF CONGRESSIONAL AUTHORITY UNDER THE 14TH AND 15TH AMENDMENTS**

If denied bailout under Section 5, the MUD seeks "a declaratory judgment that continued application of §5 is unconstitutional" and argues that Section 5 "should be stricken as unconstitutional under the Tenth, Fourteenth, and Fifteenth Amendments." Dkt. No. 83. The MUD's argument fails for at least two reasons. First, the authority of Congress to enact the preclearance provisions to enforce the 14th and 15th Amendments has been upheld repeatedly by the U.S. Supreme Court. Second, the MUD is unable to produce any facts in support of its claim that "Congress [relied] on findings of conditions that existed thirty years ago," and "Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions." Amd. Compl. ¶ 24 and ¶ 9.

4

A.    **Congress is Authorized to Enforce the 14th and 15th Amendments**

Courts must give Congress "wide latitude" in deciding the constitutionally-appropriate

measures that remedy or prevent unconstitutional actions. *Flores v. City of Boerne*, 519-521

U.S. 507 (1997). *See also Tennessee v. Lane*, 541 U.S. 509, 520 (2004) ("Congress must have a

wide berth in devising appropriate remedial and preventive measures for unconstitutional

actions[.]").

Abandoning the deference required for congressional enactments, the MUD urges this

court to adopt an overly-narrow view of Congressional authority to enforce the 14th and 15th

Amendments. The MUD's claim that Congress unconstitutionally reauthorized Section 5 rests

on the assertion that Congressional authority in this area is limited to curing only two problems:

low voter registration and English-only elections.

Observing in its Amended Complaint that "Texas became covered by §5 as of September

23, 1975, when the United States Attorney General determined that: (a) election materials in

Texas had been offered only in English; (b) more than 5% of Texas's voting age population was

Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972

presidential election," the MUD asserts that Congress improperly reauthorized Section 5 because

"[t]he conditions that caused Texas to be covered by §5 have long been remedied" Amd. Compl.

¶¶ 8, 10.

However, the scope of congressional authority to combat voting discrimination under the

14th and 15th Amendments has never been limited to addressing elements of the Section 5

coverage formula for Texas. To define a constitutional mandate in terms of a federal statute is

nonsensical and incorrectly restricts congressional authority to only small pockets of problems in

voting.[3]

Congress is empowered by Section 5 of the 14th Amendment "to enforce, by appropriate legislation, the provisions of this article" and by Section 2 of the Fifteenth Amendment to "to enforce this article by appropriate legislation." U.S. CONST. amend. XIV, § 2,  U.S. CONST. amend. XV, § 2. This "positive grant of legislative power" is broad enough to authorize laws that prevent or deter unconstitutional action as well as state action that has a negative impact on the basis of race.  *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966); *Boerne*, 521 U.S. at 517-518.

Congressional power to combat voting discrimination is not limited to enacting laws that generally ban discrimination or re-state the prohibitions of the 14th and 15th Amendments. *See South Carolina v. Katzenbach*, 383 U.S. at 314 (rejecting the argument "that the task of fashioning specific remedies or of applying them to particular localities must necessarily be left entirely to the courts" because "Congress is not circumscribed by any such artificial rules under 2 of the Fifteenth Amendment.").

Congress enacted Section 5 specifically to combat "unremitting and ingenious defiance of the Constitution," by jurisdictions that imposed new discriminatory voting schemes each time the previous scheme was struck down. *South Carolina v. Katzenbach, Id*. at 309 (1966).  Section 5 addressed persistent and creative attempts by states and localities to thwart minority voting, including the use of literacy tests, grandfather clauses, white primaries, racially exclusionary gerrymandering, discriminatory procedural hurdles including good-morals requirements, and

---

[3]As demonstrated below in section B2, Congress relied on a substantial record of continued and persistent discrimination in reauthorizing Section 5, including evidence that many jurisdictions in Texas still conduct English-only elections in violation of the Voting Rights Act. Wolfson Decl. Ex. 8 at 37-38.

6

more. *Id.* at 311, 314.[4]

Congressional authority to enforce the 14th and 15th Amendments is necessarily broad

because "the ingenuity of the human mind is limitless when it comes to devising ways to rig

election systems to favor certain candidates or points of view. Gerrymandering, moving polling

places, re-registration and re-identification devices, limited hours for registration, frequently at

inconvenient sites, show that a need remains in many jurisdictions for the Justice Department to

continue preclearing election laws under section 5." SMF ¶ 211.

The scope of voting problems that Congress may address through its enforcement powers

is not limited, as urged by the MUD, to only one or two aspects of voting such as low turnout or

English-only elections. On the contrary, in Section 5 Congress understood that voting

discrimination shifts and changes over time and chose to exercise its broad enforcement powers

to deter and block new forms of discrimination. *See Sumter County v. U.S.*, 555 F.Supp. 694,

707 (D.C.D.C. 1983) (rejecting county's claim that Section 5 was unconstitutional because the

county's voter registration exceeded fifty percent, explaining that "[o]bviously, the preclearance

requirements of the original act and its 1982 amendment had a much larger purpose than to

increase voter registration in a county like Sumter to more than 50 percent.").

---

[4]Texas itself is a perfect example of the appropriate response by Congress to enact Section 5 to combat serial discrimination. In 1923 Texas enacted a state law instituting the White Primary which was applied to African Americans and, in relevant areas of Texas, to Mexican Americans. Wolfson Decl. Ex. 8 at 9. In 1927, the year after the Supreme Court struck down Texas' white primary law, the Texas Legislature passed a law authorizing political parties to set their own voter qualifications, and the Democratic Party simultaneously enacted a rule that only whites could vote in the primary. This law was struck down in 1932. *Nixon v. Condon*, 286 U.S. 73 (1932). That same year, the Texas Democratic party passed a new resolution limiting party membership to white citizens; that rule remained in effect until struck down by the Supreme Court in 1944. *Smith v. Allwright*, 321 U.S. 649 (1944). The Court later struck down the "Jaybird primary" for good in 1953. *Terry v. Adams*, 345 U.S. 461 (1953). It was not until 1966, however, that the poll tax was eliminated in its entirety as a prerequisite for voter participation. *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966). In response, the first Senate bill of the first 1966 Texas legislative session required voters to register annually. The annual registration requirement was not removed until 1971. *Beare v. Smith*, 321 F.Supp. 1100 (S.D.T.X. 1971), *aff'd, Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

7

**B. Section 5 is a "Congruent and Proportional" Response to Continued Widespread Discrimination in Voting**

In the face of a line of cases upholding Section 5, the MUD appears to concede that Section 5 can be an appropriate exercise of congressional authority. *See South Carolina v. Katzenbach*, 383 U.S. 301 (1966); *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966); *City of Rome v. U.S.*, 446 U.S. 156 (1980); *Lopez v. Monterey County*, 526 U.S. 266 (1999). The MUD claims however that "§5 is no longer a 'congruent and proportional' remedial exercise of Congress's enforcement power." Amd. Compl. at ¶ 24. As to this claim, and the related assertion that Section 5 is unconstitutional because voting discrimination has "been remedied for over thirty years," the MUD can marshal no supportive facts. Amd. Compl. at ¶ 10.

In reauthorizing Section 5, Congress did not expand upon the rights guaranteed by the 14 and 15th Amendments. The rights enforced by Congress through Section 5 are well established – the right to equal treatment under the law and the fundamental right to vote. The voters protected by Section 5 are racial minorities who have been subjected to a long history of discrimination in the area of voting. Section 5's enforcement of rights squarely within the ambit of the 14th and 15th Amendments, as well as Section 5's protection of racial minorities, support the conclusion that Section 5 is a proper exercise of congressional authority.

Comparing the Religious Freedom Restoration Act of 1993, which the Court struck down, with Section 5 and other federal statutes enforcing the right to vote, the *Boerne* Court explained:

> [T]he Court upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment, *see* U. S. Const., Amdt. 15, §2, as a measure to combat racial discrimination in voting, *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), despite the facial constitutionality of

8

the tests under *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45 (1959). We
have also concluded that other measures protecting voting rights are within Congress'
power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those
measures placed on the States. *South Carolina v. Katzenbach, supra* (upholding several
provisions of the Voting Rights Act of 1965); *Katzenbach v. Morgan, supra* (upholding
ban on literacy tests that prohibited certain people schooled in Puerto Rico from voting);
*Oregon v. Mitchell*, 400 U.S. 112 (1970) (upholding 5 year nationwide ban on literacy
tests and similar voting requirements for registering to vote); *City of Rome v. United
States*, 446 U.S. 156, 161 (1980) (upholding 7 year extension of the Voting Rights Act's
requirement that certain jurisdictions preclear any change to a " `standard, practice, or
procedure with respect to voting' ")[.]

*City of Boerne*, 521 U.S. at 517.

The Supreme Court again reiterated its prior rulings on the validity of Section 5 in *Lopez
v. Monterey County*, 526 U.S. 266, 282-85 (1999) ("Recognizing that Congress has the
constitutional authority to designate covered jurisdictions and to guard against changes that give
rise to a discriminatory effect in those jurisdictions, we find no merit in the claim that Congress
lacks Fifteenth Amendment authority to require federal approval before the implementation of a
state law that may have just such an effect in a covered county.").

The scope of the enforcement powers of Congress includes adopting prophylactic
measures to prevent discrimination in violation of the Constitution and laws that ban voting
practices that have a discriminatory effect on minority voters. *See City of Boerne*, 521 U.S. 517,
quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976) ( "Legislation which deters or remedies
constitutional violations can fall within the sweep of Congress' enforcement power even if in the
process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative
spheres of autonomy previously reserved to the States.'"). *See also City of Rome v. U.S.*, 446
U.S. 156, 178 (1980) ("We find no reason, then, to disturb Congress' considered judgment that

9

banning electoral changes that have a discriminatory impact is an effective method of preventing states from 'undo[ing] or defeat[ing] the rights recently won by Negroes.'") (quoting *Beer v. U.S.*, 425 U.S. 130, 140 (1969).

## 1. The Bailout Provisions, Geographic Limitations and the Expiration Date Confine the Reach of Section 5

The limitations placed by Congress on Section 5 represent a "congruence between the means used and the ends to be achieved." *Boerne* at 530. Section 5 applies only to geographic areas with a history of discrimination against minority voters. Furthermore, Section 5 is not a permanent provision of the Voting Rights Act. The reauthorized Section 5 amends section 4 of the Voting Rights Act of 1965 to provide for a 25-year renewal of the coverage formula. It also requires Congress to reconsider these provisions in 15 years. Section 5's reconsideration and termination dates ensure that Congress will evaluate, when Section 5 approaches expiration, whether or not it is necessary to continue the preclearance provision.

Finally, Congress chose to allow certain political jurisdictions to bail out from coverage when they can demonstrate, among other things, that they have complied with Section 5 for ten years, have eliminated dilutive election practices, have engaged in other constructive efforts, such as expanding registration and made affirmative efforts to include minority voters. *See* 42 U.S.C. 1973b.

Although the test of congruence and proportionality does not turn on whether a statute contains "termination dates, geographic restrictions, or egregious predicates[,] limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under §5 [of the 14[th] Amendment]." *Boerne* at 533.

10

In one example of the limited and reasonable approach of Congress to Section 5, Congress has over time liberalized the bailout provision that permits political jurisdictions to be released from the preclearance requirement. In 1982, Congress amended the bail out provision to allow counties (or cities if they are responsible for voter registration) to bailout even if the state in which they are located cannot meet the bailout requirements. Congress also created the current bailout criteria after considering extensive testimony regarding how to strike the appropriate balance between preventing discrimination and permitting jurisdictions to bail out from coverage.

For example, U.S. Representative Henry Hyde indicated his desire to retain the Section 5 preclearance provision of the VRA but to amend the bailout provisions of the Act to "liberaliz[e] the bailout sections." Hyde also indicated a desire to "recognize good conduct, and permit a jurisdiction to bail out based on their record, an honest appraisal of their record, but to retain preclearance." SMF ¶ 199.

Many other witnesses wrote and testified in favor of the change that would allow more than 800 covered counties to work towards meeting the bailout criteria and would also protect minority voters living in jurisdictions that continued to discriminate, calling the new bailout criteria "equitable and reasonable." SMF ¶ 208. *See also* SMF ¶ 204; SMF ¶ 206; SMF ¶ 210; SMF ¶ 213;

Congress also relied on evidence and testimony in favor of ensuring that the bailout provision remained strong enough to protect minority voters from discrimination. SMF ¶ 203; SMF ¶ 215; SMF ¶ 210)

In support of amending the bailout provision, Senator Edward Kennedy wrote that the

11

amendment to Section 5 effectively "liberalized [the] bail out procedures" but cautioned that "if

the bail out is amended further, there is a serious danger that the extension of Section 5 will

prove a hollow victory. A flimsy bail out provision would become a sieve. It would serve as a

backdoor exit for many jurisdictions where the preclearance provision of Section 5 is still

needed. It would be an indirect repeal of Section 5." SMF ¶ 207.

Representative James Sensenbrenner, who in 2006 chaired the House committee that

heard and approved the Section 5 reauthorization legislation, noted in 1982 that "[t]he bail out

procedures contained in the House-passed bill are tough. They ought to be tough. . . [I]n order for

a jurisdiction to bail out from section 5 preclearance, there should be a tough but fair standard to

show that the officials there have purged themselves of all of the notions about returning to the

bad old days." SMF ¶ 211

The bailout provisions serve an important narrowing function for Section 5 and reflect the

decision of Congress in 1982 and in 2006 to strike the balance between expanding the bailout

provision and ensuring that Section 5 still protects minority voters from discrimination.

## 2. Congress Based its Reauthorization of Section 5 on a Well-Documented Record of Continued Widespread Racial Discrimination in Voting

As demonstrated below, there are no facts to support the MUD's assertion that Section 5

is unconstitutional because it is "a trap in which conditions that existed three or four decades ago,

but which have long since been remedied, are the sole basis for continuing a burdensome

imposition on the sovereign rights of political subdivisions in covered jurisdictions." Dkt. No. 83

at ¶ 21. This claim, as well as the MUD's related assertion that "Congress reauthorized §5,

relying on generalized findings that do not specifically identify evidence of continuing

12

discrimination in covered jurisdictions," (Amd. Compl. at ¶ 9) is belied by the congressional record for Section 5.

Congress received and considered thousands of pages of evidence, as well as testimony of 46 witnesses, before concluding in 2006 that race discrimination in voting is persistent and Section 5 remains necessary to enforce the constitutional guarantee of non-discrimination in voting.

The entire congressional record supporting the reauthorized Section 5 is too voluminous to summarize here and Diaz Defendant Intervenors refer the Court to Defendant-Intervenors' Joint Statement of Material Facts as to Which There is No Genuine Issue Pursuant to Local Civil Rules 7(H) and 56.1. However, to convey a sense of the strength of the congressional record, albeit an incomplete sense, Diaz Defendant Intervenors present below some of the evidence relied upon by Congress that is specifically from Texas. Although only a portion of the congressional record supporting reauthorization, the Texas story serves as an important example of the varied, persistent and widespread nature of race discrimination in voting.

### a. Section 5 Objections

In its 2006 reauthorization of Section 5, Congress reviewed the crucial role played by Section 5 in preventing, after 1982, discriminatory election changes affecting more than 70 percent of the State's minority voting age population.[5] These Section 5 objections interposed in Texas by the U.S. Department of Justice demonstrated to Congress both the efficacy of Section 5 in preventing discrimination as well as the modern-day, continuing need for Section 5.

---

[5]From 1982 to 2006, Section 5 objections in Texas affected voting in nearly 30 percent of Texas's counties. Most importantly, 71.8 percent of the state's non-white voting age population resided in those counties and were assisted in a direct way through this enforcement of Section 5. Wolfson Decl. Ex. 8 at 16.

Texas alone was responsible for 107 objections interposed by the Department of Justice under Section 5 from 1982 through June 2006. Wolfson Decl. Ex. 8 at 15.  Ten of these objections were aimed at blocking statewide voting changes that would discriminate against minority voters. Wolfson Decl. Ex. 8 at 16).

One recent example of such a change was the 2001 redistricting plan for the Texas House of Representatives.  This plan "fractured" Latino populations across South and West Texas and resulted in the loss of Latino electoral control in four districts.  SMF ¶ 634.  When Texas submitted the plan for Section 5 preclearance, the DOJ objected to the Texas House plan, noting that the State had reduced by four the number of districts in which Latino voters would be able to elect their candidate of choice. SMF ¶ 918.

The Department of Justice noted that one Latino majority district in Bexar County which contained close to 70 percent Latino voting age population was simply eliminated in the state's new redistricting plan and its Latino voters scattered across other districts.[6]

In West Texas District 74, the State reduced the Latino voting age population by more than 15 percent; the Department of Justice noted that this decrease rendered the district ineffective for Latino voters and was unnecessary because the district fell within the acceptable population deviation at the time of the 2000 Census. Wolfson Decl. Ex. 8 at 17. In South Texas, the state reduced the Latino-majority District 44 to a bare 50.2 percent Latino voter registration, prompting the Department of Justice to note that the district no longer allowed Latino voters to

---

[6]Bexar County's long history of discrimination against Latinos, and its impact on political participation, was noted by the U.S. Supreme Court in *White v. Regester*, 412 U.S. 755, 768 (1973) ("The bulk of the Mexican-American community in Bexar County occupied the Barrio . . . an area of poor housing; its residents have low income and a high rate of unemployment. The typical Mexican-American suffers a cultural and language barrier that makes his participation in community processes extremely difficult, particularly, the [district] court thought, with

elect their preferred candidate. Finally, in the Rio Grande Valley, the state reduced the Latino population in District 38 and rendered it ineffective for Latino voters. Wolfson Decl. Ex. 8 at 16.

The Department of Justice concluded in its Objection Letter that although the State had created one new Latino-majority District 80 in South Texas, there was a net loss of three districts in which Latinos could elect their candidate of choice and thus the Texas plan was retrogressive. SMF ¶ 915. Following the Department of Justice's objection, and because a vote dilution lawsuit challenging this redistricting plan was already pending, a federal court ordered a new map in which these districts were restored. Wolfson Decl. Ex. 8 at 20-21.

From 1982 to 2006, Section 5 blocked a total of ten statewide proposals that would have discriminated against minority voters, including: statewide redistricting plans for the Texas Senate and House in the 1990 redistricting cycle; incorrectly translated statewide voter registration forms; and laws creating exclusionary procedures for filling judicial vacancies and nominating candidates for general elections. Wolfson Decl. Ex. 8 at 40-49.

The overwhelming majority of discriminatory election changes prevented in Texas by Section 5 were proposed by local governments. These include: discriminatory use of numbered posts and staggered terms that ensure that Anglos continue to be overrepresented in elected offices; discriminatory implementation of majority vote and/or runoff requirements; polling place or election date changes that deny minorities equal voting opportunities; discriminatory absentee voting practices; discriminatory annexations or deannexations; dissolution of single member districts, reductions in the number of offices, or revocation of voting rules when minority candidates of choice are about to be elected to office; election procedures that violate Section 203

---

respect to the political life of Bexar County.")

15

of the Voting Rights Act; and discriminatory redistricting practices to deny minorities an equal opportunity to elect their chosen candidates. Wolfson Decl. Ex. 8 at 40-49).

The evidence before Congress demonstrated that more than half of all the Section 5 objections made in Texas since its coverage in 1975 occurred between 1982 and 2006. Wolfson Decl. Ex. 8 at 15-16. The record of Section 5 objections in Texas since the previous reauthorization reflect a pattern of discrimination that is undeniably widespread and persistent. In light of the fact that, since 1982, Section 5's preclearance scheme blocked discriminatory voting changes at the local level for more than 70% of the State's minority voting age population, it is difficult to conceive of a more substantial record upon which Congress could answer the question whether Section 5's preclearance mechanism is a congruent and proportional response to ongoing official discrimination in voting.[7]

### b. Violations of Section 2 of the Voting Rights Act

Congress also based its consideration of Section 5 on evidence of attempts to enforce privately, through lawsuits brought under Section 2 of the Voting Rights Act, the guarantees of the 14th and 15th Amendments. *See* 42 U.S.C. 1973. Congress heard that private enforcement and litigation, while successful in a number of cases, was expensive and time-consuming and could not serve to combat the widespread and continuing voting discrimination. SMF ¶ 894.

---

[7]In addition to cases in which DOJ objected to discriminatory changes submitted for preclearance, there have been at least 29 successful Section 5 enforcement actions filed in court to block unprecleared changes. For example, in 1997, the Supreme Court held that Dallas County wrongly failed to submit a rule limiting poll worker selection that had a discriminatory impact on Latino citizens. *Foreman v. Dallas County*, 521 U.S. 979 (1997). Furthermore, the Department of Justice has requested that jurisdictions in Texas provide more information (More Information Requests (MIRs)) regarding submitted changes in 1512 cases between 1990 and 2005, more than in any other state. SMF ¶ 670a. In many of these instances, jurisdictions withdrew their preclearance submissions and altered their proposals to impose less harm on minority voters. SMF ¶ 670a.

These cases include: *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) (striking down city's use of at-large election system that diluted the voting strength of Latinos and African Americans); *Williams v. City of Dallas* 734 F.Supp. 1317 (N.D. Tex. 1990) (ruling that the use of at-large seats for the Dallas City Council diluted the voting strength of both blacks and Mexican-Americans); and *LULAC v. North East Indep. Sch. Dist.*, 903 F. Supp. 1071 (W.D. Tex. 1995) (ruling that the at-large election system used by the Northeast Independent School District in San Antonio violated Section 2 of the Voting Rights Act).

In 2006 in *LULAC v. Perry*, the U.S. Supreme Court struck down the Texas congressional redistricting plan because it diluted Latino voting strength in Congressional District 23 in violation of Section 2 of the Voting Rights Act. *LULAC v. Perry*, 126 S. Ct. 2594 (2006). The Court found:

> District 23's Latino voters were poised to elect their candidate of choice. They were becoming more politically active, with a marked and continuous rise in Spanish-surnamed voter registration. . . In response to the growing participation that threatened [the incumbent], the State divided the cohesive Latino community in Webb County, moving about 100,000 Latinos to District 28, which was already a Latino opportunity district, and leaving the rest in a district where they now have little hope of electing their candidate of choice. The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive.

*Id.* at 2621.

After reviewing a line of cases that document the history of official discrimination against Latinos in Texas, the legacy of which continues to hinder Latino political participation in the state, the Court concluded:

> In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation. . . The State not only made fruitless the Latinos' mobilization

efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.

*Id.* at 2622.

In addition to demonstrating ongoing discrimination by the State of Texas against minority voters, the *LULAC* litigation is also a perfect example of the high cost, in terms of expense and delay, and the general inefficiency of relying on private litigation to enforce the Voting Rights Act. In order to achieve a court ruling that the 2006 Texas congressional redistricting plan violated the Section 2 rights of Latinos, as well as enforce the court-ordered remedy against a later attempt by the State to truncate early voting in the ensuing special congressional runoff election, private parties were forced to litigate the case for more than three years. During this time, Latino voters lacked the opportunity to participate in the political system on equal terms with Anglo voters, private litigants spent more than 6,500 attorneys hours and more than $200,000 in associated costs to prosecute the case, and federal courts expended precious judicial resources on litigation that went twice to the U.S. Supreme Court before reaching its conclusion.[8] In the end, the State of Texas was forced to implement a court-drawn remedial redistricting plan, hold special elections in five congressional districts and pay over $750,000 in attorneys fees and costs.[9]

By contrast, the administrative preclearance process is an efficient and low-cost method to identify and halt implementation of election changes that will thwart the minority vote. SMF ¶

---

[8] Perales Decl. Ex. Nos. 12, 13, 14.

[9] Perales Decl. Ex. No.15.

18

894.    Today, jurisdictions may even complete their preclearance submissions online, using the

Internet. *See* http://wd.usdoj.gov/crt/voting/sec_5/evs/.

The preclearance process works as intended to block discriminatory election changes

without the necessity of court involvement and without forcing minority voters to file a lawsuit to

enforce their voting rights.  In light of the evidence before Congress demonstrating the delay and

expense associated with relying on private litigation to enforce the guarantees of the 14th and 15th

Amendments, as well as the evidence that private litigants lack the resources to combat the many

proposed retrogressive changes that persist today, Congress could reasonably conclude that the

Section 5 preclearance mechanism is an efficient and effective approach to vindicate those rights.

It is also reasonable for Congress to conclude that, if left to enforcement through private

litigation, Section 5 would go largely unenforced.  It remains true today that case-by-case

adjudication of election changes has "proved too ponderous a method to remedy voting

discrimination." *City of Rome*, 446 U.S. 156, 174. *See also South Carolina v. Katzenbach*, 383

U.S. at 328 (explaining that the preclearance mechanism is "clearly a legitimate response to the

problem [of voting discrimination] . . . Congress found that case-by-case litigation was

inadequate to combat widespread and persistent discrimination in voting, because of the

inordinate amount of time and energy required to overcome the obstructionist tactics invariably

encountered in these lawsuits.")

## c. Additional Evidence of Discrimination in Voting

In the 2006 reauthorization of Section 5, Congress heard that since 1982, the Department

of Justice has sent 101 monitors to elections in Texas. SMF ¶ 1208.  In addition, the Department

of Justice has certified six Texas counties and one political subdivision other than a county for

19

election monitoring since 1982. SMF ¶ 1209.  Finally, Congress heard evidence of continued

intimidation of minority voters in Texas.  In Waller County, an Anglo district attorney threatened

felony prosecution of the predominantly African American student body at Prairie View A&M

University if they voted in the March 2004 primary. SMF ¶ 1265.

Congress also heard evidence of:  threatened arrests of voters in newspaper articles in

Fort Worth, TX (SMF ¶ 1249); the selective stationing of police officers outside predominantly

minority polling sites in Texas; police officers demanding that minority voters show

identification in order to vote; and disparate questioning by officials of minority voters who

entered the polls to vote. SMF ¶ 1251.

The record before Congress during its 2006 reauthorization of Section 5, even the small

portion related to Texas among all the covered jurisdictions, provides recent, compelling and

ample evidence of ongoing, widespread discrimination against Latinos and African American

voters.  Based on this evidence, which has been incorporated into the record of this case, there is

no material fact in dispute showing that "Congress reauthorized §5, relying on generalized

findings that do not specifically identify evidence of continuing discrimination in covered

jurisdictions . . ." Dkt. No. 83 at ¶ 2.  Similarly, the MUD is unable to produce any fact to

suggest that, as claimed in its Amended Complaint, that "[t]he conditions that caused Texas to be

covered by §5 have long been remedied." Dkt No. at ¶¶ 2-3.

### C.    Section 5's Success as a Deterrent Should not Work Against a Showing of its Constitutionality

Section 5 has an undisputed deterrent effect on jurisdictions that would otherwise adopt

discriminatory voting changes. *See* SMF ¶¶ 330, 671.

20

In one example presented to Congress in 2006, the City of Seguin, Texas attempted in its 2002 redistricting plan to prevent Latinos from gaining a majority of seats on its city council. The 2000 Census showed that the growing Latino population in the Seguin comprised the majority of five of the eight city council districts. At the time, the Council was split with four Latino members and four Anglo members; the Anglo Mayor would cast the tie-breaking vote. The City responded to the threat of a majority of Latino members of the Council by dismantling the fifth Latino majority district in its new redistricting plan. Upon receiving the submission, the Department of Justice indicated that it would not likely preclear a plan with such an obviously retrogressive effect. SMR ¶¶ 915, 915A.

Seguin changed its redistricting plan to restore the fifth Latino-majority district upon learning that its submission was unlikely to receive preclearance. No objection letter issued and Section 5 worked as intended. *Id.* However, Congress can legitimately consider this evidence as supportive of a finding of effectiveness of Section 5, as opposed to considering it an instance of non-discrimination.

Congress was also entitled to view, as proof of persistent, continued discrimination, what occurred in the wake of Seguin's withdrawn submission. After proposing a new redistricting plan to restore the fifth Latino-majority district, Seguin immediately closed the candidate filing period so that no Latino could run in the election for that district. Only after private litigants filed a Section 5 enforcement action against the City and secured an injunction postponing Seguin's election timetable did the Department of Justice preclear Seguin's redistricting plan.

21

*See LULAC Council #682 v. City of Seguin*, No. 93-0333 (W.D. Tex. 1994). As a result, Latinos have now elected their candidate of choice to a majority of seats on the Seguin City Council.[10]

Thus, Congress heard evidence that Section 5 not only deters discriminatory election changes but also works to ensure that jurisdictions who are "repeat offenders" do not foreclose minority political participation by constantly devising and applying new methods of discrimination. SMF ¶ 495.

Quite simply, the MUD cannot establish, based on the current record, that widespread acts of race discrimination in voting are "conditions . . . which have long since been remedied" or that Congress lacked a sufficient record upon which to reauthorize Section 5 in 2006. On the contrary, the undisputed facts of the case show that Congress based its reauthorization of Section 5 on a substantial record of continuing and widespread discrimination, not just in Texas but throughout the jurisdictions covered by Section 5.

### D. The MUD Cannot Show That Section 5 as Applied Burdens the MUD

With respect to the claim by the MUD that it is burdened by Section 5 without cause, Defendant Intervenors maintain that it is not necessary for Congress to make specific findings for each and every covered jurisdiction in the U.S. in order to legislate within the scope of its authority to enforce the Constitution. To the extent that the MUD's as-applied challenge requires Congress to make specific findings of discrimination as to the MUD, it must fail.

In addition, the MUD is unable to make out any claim of harm or burden as a result of Section 5's preclearance requirements. The financial cost of preparing a preclearance submission

---

10 Latino voters filed suit in 1978 and 1979 to force Seguin to redistrict and preclear its redistricting plan. Latino voters were forced to sue Seguin again in 1993 when the city failed to redistrict and comply with Section 5. See *Ramos v. Koebig*, 638 F.2d 838 (5th Cir. 1981) and *Trinidad v. Koebig*, 638 F.2d 846 (5th Cir. 1981).

22

is minimal. SMF ¶ 1592. The MUD has made only eight 8 submissions in 19 years, most of them requests involving simple polling place changes. SMF ¶ 1601. The MUD has never shown that the preclearance requirement has forced it to abandon plans for a voting change or that DOJ has prevented the MUD from implementing a voting change. SMF ¶ 1603. The MUD produced no Board meeting minutes in which Board members or voters express concern over preclearance. The "harm" asserted in this case is purely manufactured to provide an avenue of attack upon a legitimate statute.

Although it was created almost twenty years ago, for much of this time MUD elections were characterized by lack of competition for seats, hand-picked candidates, use of private homes as polling places and little to no public outreach to voters. In close to twenty years of existence the MUD has only had three contested elections. SMF ¶ 1562. In fact, until the late 1990's the MUD Board consisted of acquaintances of the developers who were conveyed land in the MUD in order to comply with statutory requirements after agreeing to run in non-competitive elections.[11] Collins Depo. Transcript Vol. 2 p. 138:2-10. Prior to 2004, MUD elections were held at residents' homes. SMF ¶ 1562. Not unexpectedly, voter turnout in the MUD was, until 2002, abysmal. In three elections, the voter turnout consisted entirely of the two Election Judges, voting at their house. *See, e.g.,* 1992 Election Order Perales Decl. Ex. 25.

Quite simply, the MUD cannot show harm to it as a result of the preclearance requirement. The MUD is similarly unable to assert facts supporting its additional claims that voters and other political entities are harmed by Section 5, including any facts to support its

---

[11] The 1988, 1990, 1992, 1994, 1996, 1998, and 2000 elections were uncontested elections. After a change in Texas law the MUD was not required to hold elections from 1996-2000.

claim that: Section 5 "infringes on the rights of an entire generation of voters . . ." (Amd. Compl. at ¶ 24); "minority voters in covered jurisdictions like the district are frequently harmed, not aided, by §5 coverage" (Amd. Compl. at ¶ 20); and "many political subdivisions from time to time forego beneficial changes because of the bureaucratic burden of asking the Attorney General's permission" (Amd. Compl. at ¶ 12).

The MUD's legal claims rest in part on the implication that it is uninvolved or somehow separate from past or present racial discrimination.   This is not the case for a number of reasons. First, as a neighborhood of the City of Austin, Texas, the MUD is deeply imbedded in a context of exclusion of both Latinos and African Americans from civic and political life.  Second, many of the residents of the MUD grew up in Texas and themselves lived through discriminatory practices aimed at racial minorities.  Simply because it is a small, predominantly Anglo neighborhood of the City of Austin, the MUD cannot divorce itself from its surroundings or its residents in order to claim that past and present day discrimination have no bearing upon it. Perales Decl. Ex. No. 22.

The MUD sits inside the City of Austin which is 30% Latino and is characterized by deep racial disparities in income, education and housing.  Perales Decl. Ex. No. 24.  In Austin, 44 percent of Latinos have no high school diploma; by contrast only 4.9 percent of Anglos lack a high school diploma.  *Id.*  Latinos in Austin are more than twice as likely as Anglos to live in poverty.  *Id.*  Latinos in Austin are linguistically isolated; although the overwhelming majority of Austin Latinos are native born, more than 75 percent of Latinos over the age of 5 in Austin speak Spanish at home.  *Id.*  .

24

Many Austin Latinos remember the poll tax and its exclusionary effect on Latino voters.[12]
The Austin school district segregated both Latino and African American students into their own
schools. *See United States v. Texas Education Agency*, 467 F. 2nd 848 (1972) (requiring the
elimination of school segregation of African Americans and Latinos).[13]  The City of Austin also
discriminated on the basis of race in housing.  The 1928 City Plan for Austin brazenly proposes
moving Mexican Americans and African Americans out of "desirable" areas to enable the
construction of the proposed Waller Creek Driveway and Congress Avenue.[14]  Perales Decl. Ex.

---

12 *See* Perales Decl. Ex. 16, 19.  *See also* Perales Decl. Ex. 1 a case study published in 1933 by Roscoe
Martin entitled "The Municipal Electorate: A Case Study" (concluding that through the poll tax "whites augment
their strength . . . solely at the expense of the Mexican element."); Perales Decl. Ex. 4 T.N Porter's report Dr. J.W.
Edgar entitled "Tabulation – Tax Election, July 19, 1948" (showing that the "Latino Ward" had the lowest voter
turnout with only 68 voters); Perales Decl. Ex. 2 article in Austin American Statesman  (reporting that after the
repeal of the poll tax eligible voters in Austin increased from 42,300 to 71,300).

13 *See also* Perales Decl. Ex. 7 "Historical Factors Affecting Mexican American Parental Involvement and
Educational Outcomes: The Texas Environment from 1910-1996" (describing the segregated Mexican School at
Metz Elementary) ;  Perales Decl. Ex. 3 "The History of Mexican-American Schools in Austin: From Reconstruction
Through World War II" by Carol R. Adams (documenting school board vote to segregate Mexican Americans at the
West Avenue School and Zavala Elementary); Perales Decl. Ex. 5 Austin Public School District in 1954 "Austin
Schools, 1881-1954: Origin, Growth, Future" Volume 2 (referring to the "Latin American" schools of Allan Jr. High,
University Jr. High, and Zavala Elementary -- all located in East Austin).  Austin Latinos today bear the effects of
racial segregation and substandard education.  *See* Perales Decl. Ex. 16, 17, 18, 19.

14 The plan describes the property as "occupied by very unsightly and unsanitary shacks inhabited by
negroes.  With these buildings removed for the trafficway, most of the remaining property will be of substantial and
more desireable type."  Perales Decl. Ex. 8.  The Plan recommends creating a "negro district" despite the fact that at
this time African Americans were found throughout Austin:

> It is our recommendation that the nearest approach to the solution of the
> race segregation problem will be the recommendation of this as a negro
> district; and that all the facilities and conveniences be provided the negroes
> in this district, as an incentive to draw the negro population to this area.  This
> will eliminate the necessity of duplication of white and black schools, white
> and black parks, and other duplicate facilities for this area. Perales decl.

*See also* Perales Decl. Ex. 6 "Slavery and Vigilantism in Austin, Texas, 1840-1860" by Paul D. Lack (chronicling a
vigilante committee organized by the mayor, judges, and other prominent Anglo citizens with sole purpose of
identifying Mexican-Americans for expulsion from Austin by force);  Ex. 9 "A Social Survey of Austin" William B.
Hamilton; Ex. 10 The Duplex Nation Historic District, an Austin neighborhood on Manor Road and present I-35 that
was developed by Texas Land Commissioner Bascom Giles in 1948 for returning WWII veterans and Bergstrom
A.F.B. personnel, included a "restrictive covenant which prohibited non-whites from owning or residing in the
neighborhood."  Perales decl. Ex. 11.  The Wilshire Historic District was not only developed and sold with
restrictive covenants, but covenants were advertised as a means to induce Anglos to purchase the properties.  Perales

8. Like many other Texas cities, Austin's legacy of housing segregation remains in the form of racially-identifiable neighborhoods.[15]  Finally, Austin Latinos also bear the effects of discrimination in public accommodations, including theaters, restaurants and department stores. *See* Perales Decl. Ex. 16, 17, 18, 19.

The people living in Austin today, including those who live in and around the Canyon Creek Subdivision and those who are Anglo or minority, bear the effects of discrimination by Texas and the City of Austin.

Within this context lies the Plaintiff MUD.

## II.  THE MUD CANNOT BAIL OUT FROM COVERAGE UNDER 5

The MUD is ineligible for bailout under Section 5 because the Voting Rights Act only allows states or "political subdivisions" to bail out from coverage under Section 5.  The Act defines the term "political subdivision" as "any county or parish, except that, where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." 42 U.S.C. 1973*l* (c) (2).

Although the MUD is a governmental entity and is responsible for holding elections for members of its Board of Directors, the MUD does not conduct voter registration.  SMF ¶ 1576. The DOJ implementing regulations for Section 5 define an entity like the MUD as a "political subunit." *See* 28 C.F.R. Sec. 51.6 ("All political subunits within a covered jurisdiction (e.g. counties, cities, school districts) are subject to the requirement of section 5.").

---

Decl. Ex. 11. In recent years, Austin Latinos living on the East Side struggled to receive City infrastructure improvements. Perales Decl. Ex. 18, 19.

15 Austin's East Side contains a number of heavily Latino neighborhoods, including Holly (90% Latino), Govalle (86% Latino), and East Cesar Chavez (78% Latino). Perales Decl Ex. 22. When compared to Anglos,

Importantly, the U.S. Supreme Court has already upheld Congress's power to limit eligibility for bailout to discrete governmental entities. *See City of Rome v. U.S.*, 446 U.S. 156 (1980). In *Rome,* the Supreme Court found that Congress could limit eligibility for bailout to a "State with respect to which the determinations have been made" or "a political subdivision with respect to which such determinations have been made as a separate unit." *Id.* at 162.

Furthermore, the MUD could not meet the bailout criteria even if the MUD were considered eligible for bailout under Section 5. In order for a state or political subdivision to be eligible for bailout it would have to demonstrate that in the past ten years:

> (1) No test or device has been used to determine voter eligibility
> with the purpose or effect of discrimination;
>
> (2) No final judgments, consent decrees, or settlements have been
> entered against the jurisdiction for racially discriminatory voting practices;
>
> (3) No federal examiners have been assigned to monitor elections;
>
> (4) There has been timely preclearance submission of all voting changes
> and full compliance with Section 5; and
>
> (5) There have been no objections by the Department of Justice or the
> District Court for the District of Columbia to any submitted voting changes.

42 U.S.C. § 1973b(1)(A-E) (2005).

In addition, jurisdictions seeking to bail out must also bear the burden of proving nondiscrimination in all aspects of their voting and electoral processes including a showing that at the time bailout is sought:

---

Latinos in Austin are more likely to live in housing that is overcrowded or substandard, including housing without

(1) Any dilutive voting or election procedures have been

eliminated;

(2) Constructive efforts have been made to eliminate any known

harassment or intimidation of voters;

(3) It has engaged in other constructive efforts at increasing

minority voter participation such as, expanding opportunities

for convenient registration and voting, and appointing minority

election officials throughout all stages of the registration/election

process.

42 U.S.C. § 1973b(1)(F) (2005).

In the past ten years the MUD has implemented, without the required preclearance, two

changes in the address at which a voter could obtain a mail-in ballot. In 1994 the MUD failed to

preclear a change in the early voting location, a change in the election day polling place, a change

in the address to obtain a mail-in ballot, and most importantly, the adoption of numbered place

voting for election of Board members. *See* Perales Decl. Ex. 25.

In addition to failing to preclear certain voting changes, the MUD has failed to make

constructive efforts to expand minority voter participation. SMF ¶ 1570. The MUD cannot point

to a single instance in the past ten years in which it undertook efforts to increase the participation

of minority voters in its elections. In fact former MUD Board President Don Zimmerman

testified in deposition that would "absolutely not" make special efforts to recruit African-

Americans or Latinos to serve as elections clerks. *Id.* He further stated that he did not

---

adequate plumbing or kitchen facilities. Perales Decl Ex. 24.

understand the requirement to translate election materials into Spanish to comply with Section 203 of the Voting Rights Act "because I thought only citizens could vote and a part of citizenship was, you know, having some command of English language." Zimmerman Depo. Trans 82:9-16.

The MUD elected officials failed to make even minimal efforts to publicize their intent to seek bailout. The Diaz Intervenors, residents of the MUD, were unaware of the lawsuit until months after it was filed. Perales Decl. Ex. 20, 21, 26. The MUD could not produce a single newspaper notice, other publication or even a posting on the Canyon Creek bulletin board informing the public of its intent to file for bailout. Other than placing the item on its agenda under the Texas Opening Meetings Act, the MUD made no effort to inform residents of Canyon Creek of its plans to file this case. Perales Decl. Ex. 20, 21, 26.

The MUD demonstrated a cavalier attitude toward its minority voters in the manner in which it became involved in this lawsuit, attempted to bail out when bail out is not available and ignored the requirements of bailout. When Dr. David Diaz and Gabriel Diaz attended a MUD Board meeting to question why the MUD Board sought to declare Section 5 unconstitutional, the Board members explained that their decision was based on the cost of submissions to the Department of Justice and a commitment they made to an attorney who had represented the MUD *pro bono* in a separate suit against the City of Austin. Perales Decl. Ex. No. 20.

Although compliance with Section 203 is not a prerequisite for bailout, the MUD's uneven record of compliance with Section 203 is further evidence that its leadership is unconcerned with expanding access to racial minorities. In 1990, 1994, and 2002 the MUD failed to translate its Order of Election informing voters of the upcoming election. The MUD has

29

not translated its Election Canvass, which informs the public of its election results, into Spanish in any election. Similarly, the MUD has made no attempt to conduct outreach regarding the availability of Spanish language assistance in voting.

Finally, in its bailout lawsuit, the MUD has made no attempt to comply with the requirement that it present to the Court "evidence of minority participation, including evidence of the levels of minority group registration and voting . . ." 42 U.S.C. 1973b1(a)(2). On the contrary, the MUD has shown complete disregard for documenting information about its minority residents and has not updated the racial and linguistic information in its preclearance submissions to the Department of Justice since 1996. In its April 4, 1996 submission, the MUD represented that: it had a population of 5,400 people; less than 2.5% of its residents were African American; less than 5% of its residents were Spanish surnamed; and no residents could be considered language minorities. Illogically, the MUD did not update this information after the 2000 Census, despite an obvious increase in the number of houses located in the MUD.[16] Moreover, Kerrie Jo Qualtrough, the attorney who prepared the MUD's 2004 submission, admitted that she made no effort to update the information presented in the MUD's last preclearance submission. K. Qualtrough Depo Trans. 74:7-11.

Thus, the record in the case demonstrates that the MUD cannot show facts supporting its claim that it would be able to bail out of Section 5 coverage, even if statutorily eligible.

## CONCLUSION

For the reasons set out above, Diaz Defendant Intervenors respectfully request that the Court grant summary judgment in their favor on all claims in the case.

---

[16]The 2004 submission uses the demographic data from the March 27, 2002 submission.

30

RESPECTFULLY SUBMITTED this 15th day of May, 2007.

MEXICAN AMERICAN LEGAL DEFENSE &
EDUCATIONAL FUND, INC. (MALDEF)

_/s/ Nina Perales_____
NINA PERALES
No. TX0040
110 Broadway, Suite 300
San Antonio, Texas 78205
Tel: (210) 224-5476
Fax: (210) 224-5382
nperales@maldef.org


JOSEPH E. SANDLER
D.C Bar #255919
Sandler Reiff & Young PC
50 E St SE # 300
Washington, D.C. 20003
Tel: (202) 479 1111
Fax: (202) 479-1115
sandler@sandlerreiff.com

31