IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, *Plaintiff,* vs. ALBERTO GONZALES, Attorney General of the United States *Defendant.* | § § § § § § § § § § § § | Civil Action No. 1:06-1384 (DST, PLF, EGS) |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT-INTERVENORS LISA DIAZ, DAVID DIAZ, AND GABRIEL DIAZ

# **TABLE OF CONTENTS**

                                                           **PAGE**

**TABLE OF AUTHORITIES** ............................................................................... i

**INTRODUCTION** ............................................................................................. 1

**BACKGROUND** ............................................................................................... 1

**APPLICABLE LEGAL STANDARD** ............................................................. 4

**ARGUMENT** ..................................................................................................... 4

I.   **SECTION 5 IS A CONSTITUTIONAL EXERCISE OF CONGRESSIONAL AUTHORITY UNDER THE 14TH AND 15TH AMENDMENTS** ..................... 4

    A.   Congress is Authorized to Enforce the 14th and 15th Amendments .......... 5

    B.   Section 5 is a "Congruent and Proportional" Response to Continued Widespread Discrimination in Voting ............................. 8

        1.   The Bailout Provisions, Geographic Limitations and the Expiration Date Confine the Reach of Section 5 ...................... 10

        2.   Congress Based its Reauthorization of Section 5 on a Well-Documented Record of Continued Widespread Racial Discrimination in Voting ............................................................ 12

            a.   Section 5 Objections ................................................. 13
            b.   Violations of Section 2 of the Voting Rights Act .............. 16
            c.   Additional Evidence of Discrimination in Voting ............. 19

    C.   Section 5's Success as a Deterrent Should Not Work Against a Showing of its Constitutionality ........................................................................ 21

    D.   The MUD Cannot Show That Section 5 as Applied Burdens the MUD ...... 22

II.   **THE MUD CANNOT BAIL OUT FROM COVERAGE UNDER SECTION 5** ......................................................................................... 26

**CONCLUSION** .............................................................................................. 30

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page:**

*Am. Fed'n of Gov't Employees,*
    *AFL-CIO, Local 446 v. Nicholson,* 475 F.3d 341 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . 4

*Beare v. Briscoe,* 498 F.2d 244 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Beare v. Smith,* 321 F.Supp. 1100 (S.D. Tex. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Beer v. U.S.,* 425 U.S. 130 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Rome v. United States,* 446 U.S. 156 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Campos v. City of Baytown,* 840 F.2d 1240 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fitzpatrick v. Bitzer,* 427 U.S. 445 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Flores v. City of Boerne,* 521 U.S. 507 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Forman v. Dallas County,* 512 U.S. 979 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harper v. Virginia Bd. of Elections,* 383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Katzenbach v. Morgan,* 384 U.S. 641 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45 (1959) . . . . . . . . . . . . . . . . . . 9

*Lopez v. Monterey County,* 526 U.S. 266 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*LULAC v. North East Indep. Sch. Dist.,* 903 F. Supp. 1071 (W.D. Tex. 1995) . . . . . . . . . . . . 17

*LULAC v. Perry,* 126 S.Ct. 2594 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*LULAC Council #682 v. City of Seguin,* Civ. No 93-0333 (W.D. Tex. 1994) . . . . . . . . . . . . 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . 4

*Nixon v. Condon,* 286 U.S. 73 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ramos v. Koebig,* 638 F.2d 838 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Scott v. Harris*, 127 S.Ct. 1769 (2007) .................................................. 4

*Smith v. Allwright,* 321 U.S. 649 (1944) ................................................. 7

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ........................... passim

*Sumter County v. U.S.*, 555 F.Supp. 694 (D.D.C. 1983) ........................... 7

*Tennessee v. Lane,* 541 U.S. 509 (2004) ................................................. 5

*Terry v. Adams*, 345 U.S. 461 (1953) ..................................................... 7

*Trinidad v. Koebig,* 638 F.2d 846 (5th Cir. 1981) .................................... 22

*U.S. v. Texas Education Agency,* 467 F.2d 848 (5th Cir. 1972) ............... 25

*Williams v. City of Dallas,* 734 F. Supp. 1317 (N.D. Tex. 1990) ............. 17

*White v. Register*, 412 U.S. 755 (1973) ................................................. 14

**Statutes and Constitutional Provisions:**

42 U.S.C § 1973 ........................................................................................ 16

42 U.S.C. § 1973b ..................................................................................... 10

42 U.S.C. § 1973b(1)(A-E) ................................................................. 27, 30

42 U.S.C. § 1973b(1)(A)(2) ...................................................................... 30

42 U.S.C. § 1973b(1)(F) ........................................................................... 28

42 U.S.C. § 1973c ....................................................................................... 1

42 U.S.C. § 1973l (c) (2) .......................................................................... 26

U.S. CONST. amend. XIV ........................................................................... 6

U.S. CONST. amend. XV ............................................................................ 6

## INTRODUCTION

The Northwest Austin Municipal Utility District No. 1 ("the MUD") seeks to bail out from the preclearance requirements of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, or, in the alternative, asks this Court to declare that Section 5 is unconstitutional.

The MUD's challenge to the constitutionality of Section 5 rests largely on unsupported statements that the reauthorization of the preclearance provisions by Congress in 2006 was unnecessary to combat discrimination in voting. The MUD claims that discrimination in voting no longer necessitates the requirement of Section 5 preclearance and that Congress based its reauthorization on an insufficient record.

The facts of the case demonstrate that Congress based its reauthorization of Section 5's preclearance provisions on an extensive record of continuing discrimination against minority voters, including in the State of Texas. Located in the City of Austin and Travis County, Texas, the MUD cannot divorce itself from both the history of discrimination and modern-day attempts to thwart minority voting across the State.

Section 5 has been upheld time and time again as an appropriate and limited response to the problem of discrimination. Texas and Travis County, the only entities who can bail out under Section 5, have not sought to do so. The MUD itself, waging this attack alone, cannot meet the criteria for bail out, both because it does not satisfy the definition of a political subdivision that is entitled to seek bail out and because the MUD cannot demonstrate that it has complied with the prerequisites for bailout.

## BACKGROUND

The MUD is a conservation and reclamation district which operates under Chapters 54 and 49 of the Texas Water Code. Created in 1988 by an order of the Texas Water Commission

(now the Texas Commission on Environmental Quality), the MUD is essentially a vehicle to repay the debt incurred by the developers of the Canyon Creek Subdivision when they constructed its wastewater and drainage infrastructure. SMF ¶¶ 1552, 1556. Today, the Canyon Creek Subdivision is 98% complete and the wastewater and drainage infrastructure has been conveyed to the City of Austin. *Deposition Transcript of D. Zimmerman 125:1-4*.[1] The remaining function of the MUD is to operate a park within the subdivision and ensure that payments on the bonds are made in a timely fashion. SMF ¶¶ 1552, 1548. The MUD's Board of Directors is comprised of five residents of the Canyon Creek Subdivision who are elected and meet on a monthly basis. SMF ¶¶ 1552, 1549, 1556.

The Canyon Creek Subdivision is an upper income neighborhood of approximately 1,000 single family homes. SMF ¶ 1553; Perales Decl. Ex. 20, 21. (For the Court's convenience, Diaz Intervenors have filed true and correct copies of documents specific to their brief in the Declaration of Nina Perales in Support of Motion for Summary Judgment of Defendant Intervenors Lisa Diaz, David Diaz, and Gabriel Diaz. Hereinafter, Perales Decl. Ex.) According to 2000 Census data, the total population of the approximately MUD is 3,586. SMF ¶ 1554. Eighty percent of the population of the MUD is White, Non-Hispanic ("Anglo"); the MUD is also Asian American (11%), Latino (5.5%) and African American (1.5%). SMF ¶ 1554.

---

[1] For the Court's convenience, Defendant-Intervenors have lodged a DVD containing the deposition transcripts relied upon in this brief.

As is typical for a small jurisdiction, the MUD has made only eight Section 5 preclearance requests in the last 19 years. SMF ¶ 1582. After its first preclearance submission, regarding the creation of the MUD and its election procedures, the MUD's submissions have been simple, straightforward letters involving uncomplicated voting changes, such as relocation its polling place, and typically only required two hours of an attorney's time. SMF ¶ 1601. According to expert testimony, compliance with Section 5 averaged $233 per annum. SMF ¶ 1593.[2] For each submission, the MUD sought administrative preclearance with the U.S. Department of Justice ("DOJ") and DOJ precleared every submission made by the MUD. SMF ¶ 1602. The MUD has never been deterred from making changes in voting because of the preclearance requirements of Section 5. SMF ¶ 1603.

In 2004, the MUD entered into an agreement with Travis County in which the county will conduct all MUD elections and also relocated its polling place, which had previously been in a private home, to the County's precinct polling place at the local elementary school. SMF ¶ 1574; *Deposition Transcript of W. Ferguson Vol. 1 27:14-22.*

In 2006, before Congress held hearings on the expiring provisions of the Voting Rights Act of 1965 (including Section 5), MUD board members met with attorneys to plan their participation in a challenge to Section 5 as a "bureaucracy . . . without any real role in the true purpose of the Voting Rights Act." Wolfson Decl. Ex. 7. Eight days after President George W.

---

[2] This average, while relatively low, may be inflated because the last Section 5 submission (notice of the election agreement between the MUD and Travis County) was prepared by a lawyer with no prior experience in preparing Section 5 submissions. *Deposition Transcript of K. Qualtrough 26:15-18.*

Bush signed the reauthorized Voting Rights Act, the MUD filed this lawsuit.

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if there is no genuine issue as to any material fact and if either [party] is entitled to a judgment as a matter of law." *American Federation of Government Employees, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 351 (D.C. Cir. 2007). In this case, there is no material fact in dispute that would show Plaintiff NW Austin MUD can prevail on its claims. Where, as here, "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial[]'" and summary judgement is warranted. *Scott v. Harris*, 127 S.Ct. 1769 (2007) quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (footnote omitted).

## ARGUMENT

I. **SECTION 5 IS A CONSTITUTIONAL EXERCISE OF CONGRESSIONAL AUTHORITY UNDER THE 14TH AND 15TH AMENDMENTS**

If denied bailout under Section 5, the MUD seeks "a declaratory judgment that continued application of §5 is unconstitutional" and argues that Section 5 "should be stricken as unconstitutional under the Tenth, Fourteenth, and Fifteenth Amendments." Dkt. No. 83. The MUD's argument fails for at least two reasons. First, the authority of Congress to enact the preclearance provisions to enforce the 14th and 15th Amendments has been upheld repeatedly by the U.S. Supreme Court. Second, the MUD is unable to produce any facts in support of its claim that "Congress [relied] on findings of conditions that existed thirty years ago," and "Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions." Amd. Compl. ¶ 24 and ¶ 9.

A.  **Congress is Authorized to Enforce the 14th and 15th Amendments**

Courts must give Congress "wide latitude" in deciding the constitutionally-appropriate measures that remedy or prevent unconstitutional actions. *Flores v. City of Boerne*, 519-521 U.S. 507 (1997). *See also Tennessee v. Lane*, 541 U.S. 509, 520 (2004) ("Congress must have a wide berth in devising appropriate remedial and preventive measures for unconstitutional actions[.]").

Abandoning the deference required for congressional enactments, the MUD urges this court to adopt an overly-narrow view of Congressional authority to enforce the 14th and 15th Amendments. The MUD's claim that Congress unconstitutionally reauthorized Section 5 rests on the assertion that Congressional authority in this area is limited to curing only two problems: low voter registration and English-only elections.

Observing in its Amended Complaint that "Texas became covered by §5 as of September 23, 1975, when the United States Attorney General determined that: (a) election materials in Texas had been offered only in English; (b) more than 5% of Texas's voting age population was Spanish speaking; and (c) less than 50% of Texas's voting age population voted in the 1972 presidential election," the MUD asserts that Congress improperly reauthorized Section 5 because "[t]he conditions that caused Texas to be covered by §5 have long been remedied" Amd. Compl. ¶¶ 8, 10.

However, the scope of congressional authority to combat voting discrimination under the 14th and 15th Amendments has never been limited to addressing elements of the Section 5 coverage formula for Texas. To define a constitutional mandate in terms of a federal statute is nonsensical and incorrectly restricts congressional authority to only small pockets of problems in

5

voting.[3]

Congress is empowered by Section 5 of the 14th Amendment "to enforce, by appropriate legislation, the provisions of this article" and by Section 2 of the Fifteenth Amendment to "to enforce this article by appropriate legislation." U.S. CONST. amend. XIV, § 2, U.S. CONST. amend. XV, § 2. This "positive grant of legislative power" is broad enough to authorize laws that prevent or deter unconstitutional action as well as state action that has a negative impact on the basis of race. *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966); *Boerne*, 521 U.S. at 517-518.

Congressional power to combat voting discrimination is not limited to enacting laws that generally ban discrimination or re-state the prohibitions of the 14th and 15th Amendments. *See South Carolina v. Katzenbach*, 383 U.S. at 314 (rejecting the argument "that the task of fashioning specific remedies or of applying them to particular localities must necessarily be left entirely to the courts" because "Congress is not circumscribed by any such artificial rules under 2 of the Fifteenth Amendment.").

Congress enacted Section 5 specifically to combat "unremitting and ingenious defiance of the Constitution," by jurisdictions that imposed new discriminatory voting schemes each time the previous scheme was struck down. *South Carolina v. Katzenbach, Id.* at 309 (1966). Section 5 addressed persistent and creative attempts by states and localities to thwart minority voting, including the use of literacy tests, grandfather clauses, white primaries, racially exclusionary gerrymandering, discriminatory procedural hurdles including good-morals requirements, and

---

[3]As demonstrated below in section B2, Congress relied on a substantial record of continued and persistent discrimination in reauthorizing Section 5, including evidence that many jurisdictions in Texas still conduct English-only elections in violation of the Voting Rights Act. Wolfson Decl. Ex. 8 at 37-38.

more. *Id.* at 311, 314.[4]

Congressional authority to enforce the 14th and 15th Amendments is necessarily broad because "the ingenuity of the human mind is limitless when it comes to devising ways to rig election systems to favor certain candidates or points of view. Gerrymandering, moving polling places, re-registration and re-identification devices, limited hours for registration, frequently at inconvenient sites, show that a need remains in many jurisdictions for the Justice Department to continue preclearing election laws under section 5." SMF ¶ 211.

The scope of voting problems that Congress may address through its enforcement powers is not limited, as urged by the MUD, to only one or two aspects of voting such as low turnout or English-only elections. On the contrary, in Section 5 Congress understood that voting discrimination shifts and changes over time and chose to exercise its broad enforcement powers to deter and block new forms of discrimination. *See Sumter County v. U.S.*, 555 F.Supp. 694, 707 (D.C.D.C. 1983) (rejecting county's claim that Section 5 was unconstitutional because the county's voter registration exceeded fifty percent, explaining that "[o]bviously, the preclearance requirements of the original act and its 1982 amendment had a much larger purpose than to increase voter registration in a county like Sumter to more than 50 percent.").

---

[4] Texas itself is a perfect example of the appropriate response by Congress to enact Section 5 to combat serial discrimination. In 1923 Texas enacted a state law instituting the White Primary which was applied to African Americans and, in relevant areas of Texas, to Mexican Americans. Wolfson Decl. Ex. 8 at 9. In 1927, the year after the Supreme Court struck down Texas' white primary law, the Texas Legislature passed a law authorizing political parties to set their own voter qualifications, and the Democratic Party simultaneously enacted a rule that only whites could vote in the primary. This law was struck down in 1932. *Nixon v. Condon*, 286 U.S. 73 (1932). That same year, the Texas Democratic party passed a new resolution limiting party membership to white citizens; that rule remained in effect until struck down by the Supreme Court in 1944. *Smith v. Allwright*, 321 U.S. 649 (1944). The Court later struck down the "Jaybird primary" for good in 1953. *Terry v. Adams*, 345 U.S. 461 (1953). It was not until 1966, however, that the poll tax was eliminated in its entirety as a prerequisite for voter participation. *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966). In response, the first Senate bill of the first 1966 Texas legislative session required voters to register annually. The annual registration requirement was not removed until 1971. *Beare v. Smith*, 321 F.Supp. 1100 (S.D.T.X. 1971), *aff'd*, *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

### B. Section 5 is a "Congruent and Proportional" Response to Continued Widespread Discrimination in Voting

In the face of a line of cases upholding Section 5, the MUD appears to concede that Section 5 can be an appropriate exercise of congressional authority. *See South Carolina v. Katzenbach*, 383 U.S. 301 (1966); *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966); *City of Rome v. U.S.*, 446 U.S. 156 (1980); *Lopez v. Monterey County*, 526 U.S. 266 (1999). The MUD claims however that "§5 is no longer a 'congruent and proportional' remedial exercise of Congress's enforcement power." Amd. Compl. at ¶ 24. As to this claim, and the related assertion that Section 5 is unconstitutional because voting discrimination has "been remedied for over thirty years," the MUD can marshal no supportive facts. Amd. Compl. at ¶ 10.

In reauthorizing Section 5, Congress did not expand upon the rights guaranteed by the 14 and 15th Amendments. The rights enforced by Congress through Section 5 are well established – the right to equal treatment under the law and the fundamental right to vote. The voters protected by Section 5 are racial minorities who have been subjected to a long history of discrimination in the area of voting. Section 5's enforcement of rights squarely within the ambit of the 14th and 15th Amendments, as well as Section 5's protection of racial minorities, support the conclusion that Section 5 is a proper exercise of congressional authority.

Comparing the Religious Freedom Restoration Act of 1993, which the Court struck down, with Section 5 and other federal statutes enforcing the right to vote, the *Boerne* Court explained:

> [T]he Court upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment, *see* U. S. Const., Amdt. 15, §2, as a measure to combat racial discrimination in voting, *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), despite the facial constitutionality of

8

the tests under *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45 (1959). We have also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States. *South Carolina v. Katzenbach, supra* (upholding several provisions of the Voting Rights Act of 1965); *Katzenbach v. Morgan*, supra (upholding ban on literacy tests that prohibited certain people schooled in Puerto Rico from voting); *Oregon v. Mitchell*, 400 U.S. 112 (1970) (upholding 5 year nationwide ban on literacy tests and similar voting requirements for registering to vote); *City of Rome v. United States*, 446 U.S. 156, 161 (1980) (upholding 7 year extension of the Voting Rights Act's requirement that certain jurisdictions preclear any change to a " `standard, practice, or procedure with respect to voting' ")[.]

*City of Boerne*, 521 U.S. at 517.

The Supreme Court again reiterated its prior rulings on the validity of Section 5 in *Lopez v. Monterey County*, 526 U.S. 266, 282-85 (1999) ("Recognizing that Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions, we find no merit in the claim that Congress lacks Fifteenth Amendment authority to require federal approval before the implementation of a state law that may have just such an effect in a covered county.").

The scope of the enforcement powers of Congress includes adopting prophylactic measures to prevent discrimination in violation of the Constitution and laws that ban voting practices that have a discriminatory effect on minority voters. *See City of Boerne*, 521 U.S. 517, quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976) ( "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'"). *See also City of Rome v. U.S.*, 446 U.S. 156, 178 (1980) ("We find no reason, then, to disturb Congress' considered judgment that

banning electoral changes that have a discriminatory impact is an effective method of preventing states from 'undo[ing] or defeat[ing] the rights recently won by Negroes.'") (quoting *Beer v. U.S.*, 425 U.S. 130, 140 (1969).

### 1. The Bailout Provisions, Geographic Limitations and the Expiration Date Confine the Reach of Section 5

The limitations placed by Congress on Section 5 represent a "congruence between the means used and the ends to be achieved." *Boerne* at 530. Section 5 applies only to geographic areas with a history of discrimination against minority voters. Furthermore, Section 5 is not a permanent provision of the Voting Rights Act. The reauthorized Section 5 amends section 4 of the Voting Rights Act of 1965 to provide for a 25-year renewal of the coverage formula. It also requires Congress to reconsider these provisions in 15 years. Section 5's reconsideration and termination dates ensure that Congress will evaluate, when Section 5 approaches expiration, whether or not it is necessary to continue the preclearance provision.

Finally, Congress chose to allow certain political jurisdictions to bail out from coverage when they can demonstrate, among other things, that they have complied with Section 5 for ten years, have eliminated dilutive election practices, have engaged in other constructive efforts, such as expanding registration and made affirmative efforts to include minority voters. *See* 42 U.S.C. 1973b.

Although the test of congruence and proportionality does not turn on whether a statute contains "termination dates, geographic restrictions, or egregious predicates[,] limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under §5 [of the 14th Amendment]." *Boerne* at 533.

In one example of the limited and reasonable approach of Congress to Section 5, Congress has over time liberalized the bailout provision that permits political jurisdictions to be released from the preclearance requirement. In 1982, Congress amended the bail out provision to allow counties (or cities if they are responsible for voter registration) to bailout even if the state in which they are located cannot meet the bailout requirements. Congress also created the current bailout criteria after considering extensive testimony regarding how to strike the appropriate balance between preventing discrimination and permitting jurisdictions to bail out from coverage.

For example, U.S. Representative Henry Hyde indicated his desire to retain the Section 5 preclearance provision of the VRA but to amend the bailout provisions of the Act to "liberaliz[e] the bailout sections." Hyde also indicated a desire to "recognize good conduct, and permit a jurisdiction to bail out based on their record, an honest appraisal of their record, but to retain preclearance." SMF ¶ 199.

Many other witnesses wrote and testified in favor of the change that would allow more than 800 covered counties to work towards meeting the bailout criteria and would also protect minority voters living in jurisdictions that continued to discriminate, calling the new bailout criteria "equitable and reasonable." SMF ¶ 208. *See also* SMF ¶ 204; SMF ¶ 206; SMF ¶ 210; SMF ¶ 213;

Congress also relied on evidence and testimony in favor of ensuring that the bailout provision remained strong enough to protect minority voters from discrimination. SMF ¶ 203; SMF ¶ 215; SMF ¶ 210)

In support of amending the bailout provision, Senator Edward Kennedy wrote that the

11

amendment to Section 5 effectively "liberalized [the] bail out procedures" but cautioned that "if the bail out is amended further, there is a serious danger that the extension of Section 5 will prove a hollow victory. A flimsy bail out provision would become a sieve. It would serve as a backdoor exit for many jurisdictions where the preclearance provision of Section 5 is still needed. It would be an indirect repeal of Section 5." SMF ¶ 207.

Representative James Sensenbrenner, who in 2006 chaired the House committee that heard and approved the Section 5 reauthorization legislation, noted in 1982 that "[t]he bail out procedures contained in the House-passed bill are tough. They ought to be tough. . . [I]n order for a jurisdiction to bail out from section 5 preclearance, there should be a tough but fair standard to show that the officials there have purged themselves of all of the notions about returning to the bad old days." SMF ¶ 211

The bailout provisions serve an important narrowing function for Section 5 and reflect the decision of Congress in 1982 and in 2006 to strike the balance between expanding the bailout provision and ensuring that Section 5 still protects minority voters from discrimination.

**2. Congress Based its Reauthorization of Section 5 on a Well-Documented Record of Continued Widespread Racial Discrimination in Voting**

As demonstrated below, there are no facts to support the MUD's assertion that Section 5 is unconstitutional because it is "a trap in which conditions that existed three or four decades ago, but which have long since been remedied, are the sole basis for continuing a burdensome imposition on the sovereign rights of political subdivisions in covered jurisdictions." Dkt. No. 83 at ¶ 21. This claim, as well as the MUD's related assertion that "Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing

12

discrimination in covered jurisdictions," (Amd. Compl. at ¶ 9) is belied by the congressional record for Section 5.

Congress received and considered thousands of pages of evidence, as well as testimony of 46 witnesses, before concluding in 2006 that race discrimination in voting is persistent and Section 5 remains necessary to enforce the constitutional guarantee of non-discrimination in voting.

The entire congressional record supporting the reauthorized Section 5 is too voluminous to summarize here and Diaz Defendant Intervenors refer the Court to Defendant-Intervenors' Joint Statement of Material Facts as to Which There is No Genuine Issue Pursuant to Local Civil Rules 7(H) and 56.1. However, to convey a sense of the strength of the congressional record, albeit an incomplete sense, Diaz Defendant Intervenors present below some of the evidence relied upon by Congress that is specifically from Texas. Although only a portion of the congressional record supporting reauthorization, the Texas story serves as an important example of the varied, persistent and widespread nature of race discrimination in voting.

**a. Section 5 Objections**

In its 2006 reauthorization of Section 5, Congress reviewed the crucial role played by Section 5 in preventing, after 1982, discriminatory election changes affecting more than 70 percent of the State's minority voting age population.[5] These Section 5 objections interposed in Texas by the U.S. Department of Justice demonstrated to Congress both the efficacy of Section 5 in preventing discrimination as well as the modern-day, continuing need for Section 5.

---

[5]From 1982 to 2006, Section 5 objections in Texas affected voting in nearly 30 percent of Texas's counties. Most importantly, 71.8 percent of the state's non-white voting age population resided in those counties and were assisted in a direct way through this enforcement of Section 5. Wolfson Decl. Ex. 8 at 16.