Texas alone was responsible for 107 objections interposed by the Department of Justice under Section 5 from 1982 through June 2006. Wolfson Decl. Ex. 8 at 15. Ten of these objections were aimed at blocking statewide voting changes that would discriminate against minority voters. Wolfson Decl. Ex. 8 at 16).

One recent example of such a change was the 2001 redistricting plan for the Texas House of Representatives. This plan "fractured" Latino populations across South and West Texas and resulted in the loss of Latino electoral control in four districts. SMF ¶ 634. When Texas submitted the plan for Section 5 preclearance, the DOJ objected to the Texas House plan, noting that the State had reduced by four the number of districts in which Latino voters would be able to elect their candidate of choice. SMF ¶ 918.

The Department of Justice noted that one Latino majority district in Bexar County which contained close to 70 percent Latino voting age population was simply eliminated in the state's new redistricting plan and its Latino voters scattered across other districts.[6]

In West Texas District 74, the State reduced the Latino voting age population by more than 15 percent; the Department of Justice noted that this decrease rendered the district ineffective for Latino voters and was unnecessary because the district fell within the acceptable population deviation at the time of the 2000 Census. Wolfson Decl. Ex. 8 at 17. In South Texas, the state reduced the Latino-majority District 44 to a bare 50.2 percent Latino voter registration, prompting the Department of Justice to note that the district no longer allowed Latino voters to

---

[6]Bexar County's long history of discrimination against Latinos, and its impact on political participation, was noted by the U.S. Supreme Court in *White v. Regester*, 412 U.S. 755, 768 (1973) ("The bulk of the Mexican-American community in Bexar County occupied the Barrio . . . an area of poor housing; its residents have low income and a high rate of unemployment. The typical Mexican-American suffers a cultural and language barrier that makes his participation in community processes extremely difficult, particularly, the [district] court thought, with

elect their preferred candidate. Finally, in the Rio Grande Valley, the state reduced the Latino population in District 38 and rendered it ineffective for Latino voters. Wolfson Decl. Ex. 8 at 16.

The Department of Justice concluded in its Objection Letter that although the State had created one new Latino-majority District 80 in South Texas, there was a net loss of three districts in which Latinos could elect their candidate of choice and thus the Texas plan was retrogressive. SMF ¶ 915. Following the Department of Justice's objection, and because a vote dilution lawsuit challenging this redistricting plan was already pending, a federal court ordered a new map in which these districts were restored. Wolfson Decl. Ex. 8 at 20-21.

From 1982 to 2006, Section 5 blocked a total of ten statewide proposals that would have discriminated against minority voters, including: statewide redistricting plans for the Texas Senate and House in the 1990 redistricting cycle; incorrectly translated statewide voter registration forms; and laws creating exclusionary procedures for filling judicial vacancies and nominating candidates for general elections. Wolfson Decl. Ex. 8 at 40-49.

The overwhelming majority of discriminatory election changes prevented in Texas by Section 5 were proposed by local governments. These include: discriminatory use of numbered posts and staggered terms that ensure that Anglos continue to be overrepresented in elected offices; discriminatory implementation of majority vote and/or runoff requirements; polling place or election date changes that deny minorities equal voting opportunities; discriminatory absentee voting practices; discriminatory annexations or deannexations; dissolution of single member districts, reductions in the number of offices, or revocation of voting rules when minority candidates of choice are about to be elected to office; election procedures that violate Section 203

---

respect to the political life of Bexar County.")

15

of the Voting Rights Act; and discriminatory redistricting practices to deny minorities an equal opportunity to elect their chosen candidates. Wolfson Decl. Ex. 8 at 40-49).

The evidence before Congress demonstrated that more than half of all the Section 5 objections made in Texas since its coverage in 1975 occurred between 1982 and 2006. Wolfson Decl. Ex. 8 at 15-16. The record of Section 5 objections in Texas since the previous reauthorization reflect a pattern of discrimination that is undeniably widespread and persistent. In light of the fact that, since 1982, Section 5's preclearance scheme blocked discriminatory voting changes at the local level for more than 70% of the State's minority voting age population, it is difficult to conceive of a more substantial record upon which Congress could answer the question whether Section 5's preclearance mechanism is a congruent and proportional response to ongoing official discrimination in voting.[7]

### b. Violations of Section 2 of the Voting Rights Act

Congress also based its consideration of Section 5 on evidence of attempts to enforce privately, through lawsuits brought under Section 2 of the Voting Rights Act, the guarantees of the 14th and 15th Amendments. *See* 42 U.S.C. 1973. Congress heard that private enforcement and litigation, while successful in a number of cases, was expensive and time-consuming and could not serve to combat the widespread and continuing voting discrimination. SMF ¶ 894.

---

[7] In addition to cases in which DOJ objected to discriminatory changes submitted for preclearance, there have been at least 29 successful Section 5 enforcement actions filed in court to block unprecleared changes. For example, in 1997, the Supreme Court held that Dallas County wrongly failed to submit a rule limiting poll worker selection that had a discriminatory impact on Latino citizens. *Foreman v. Dallas County*, 521 U.S. 979 (1997). Furthermore, the Department of Justice has requested that jurisdictions in Texas provide more information (More Information Requests (MIRs)) regarding submitted changes in 1512 cases between 1990 and 2005, more than in any other state. SMF ¶ 670a. In many of these instances, jurisdictions withdrew their preclearance submissions and altered their proposals to impose less harm on minority voters. SMF ¶ 670a.

These cases include: *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) (striking down city's use of at-large election system that diluted the voting strength of Latinos and African Americans); *Williams v. City of Dallas* 734 F.Supp. 1317 (N.D. Tex. 1990) (ruling that the use of at-large seats for the Dallas City Council diluted the voting strength of both blacks and Mexican-Americans); and *LULAC v. North East Indep. Sch. Dist.*, 903 F. Supp. 1071 (W.D. Tex. 1995) (ruling that the at-large election system used by the Northeast Independent School District in San Antonio violated Section 2 of the Voting Rights Act).

In 2006 in *LULAC v. Perry*, the U.S. Supreme Court struck down the Texas congressional redistricting plan because it diluted Latino voting strength in Congressional District 23 in violation of Section 2 of the Voting Rights Act. *LULAC v. Perry*, 126 S. Ct. 2594 (2006). The Court found:

> District 23's Latino voters were poised to elect their candidate of choice. They were becoming more politically active, with a marked and continuous rise in Spanish-surnamed voter registration. . . In response to the growing participation that threatened [the incumbent], the State divided the cohesive Latino community in Webb County, moving about 100,000 Latinos to District 28, which was already a Latino opportunity district, and leaving the rest in a district where they now have little hope of electing their candidate of choice. The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive.

*Id.* at 2621.

After reviewing a line of cases that document the history of official discrimination against Latinos in Texas, the legacy of which continues to hinder Latino political participation in the state, the Court concluded:

> In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation. . . The State not only made fruitless the Latinos' mobilization

17

> efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.

*Id.* at 2622.

In addition to demonstrating ongoing discrimination by the State of Texas against minority voters, the *LULAC* litigation is also a perfect example of the high cost, in terms of expense and delay, and the general inefficiency of relying on private litigation to enforce the Voting Rights Act. In order to achieve a court ruling that the 2006 Texas congressional redistricting plan violated the Section 2 rights of Latinos, as well as enforce the court-ordered remedy against a later attempt by the State to truncate early voting in the ensuing special congressional runoff election, private parties were forced to litigate the case for more than three years. During this time, Latino voters lacked the opportunity to participate in the political system on equal terms with Anglo voters, private litigants spent more than 6,500 attorneys hours and more than $200,000 in associated costs to prosecute the case, and federal courts expended precious judicial resources on litigation that went twice to the U.S. Supreme Court before reaching its conclusion.[8] In the end, the State of Texas was forced to implement a court-drawn remedial redistricting plan, hold special elections in five congressional districts and pay over $750,000 in attorneys fees and costs.[9]

By contrast, the administrative preclearance process is an efficient and low-cost method to identify and halt implementation of election changes that will thwart the minority vote. SMF ¶

---

[8] Perales Decl. Ex. Nos. 12, 13, 14.

[9] Perales Decl. Ex. No.15.

18

894.  Today, jurisdictions may even complete their preclearance submissions online, using the Internet. *See* http://wd.usdoj.gov/crt/voting/sec_5/evs/.

The preclearance process works as intended to block discriminatory election changes without the necessity of court involvement and without forcing minority voters to file a lawsuit to enforce their voting rights. In light of the evidence before Congress demonstrating the delay and expense associated with relying on private litigation to enforce the guarantees of the 14th and 15th Amendments, as well as the evidence that private litigants lack the resources to combat the many proposed retrogressive changes that persist today, Congress could reasonably conclude that the Section 5 preclearance mechanism is an efficient and effective approach to vindicate those rights. It is also reasonable for Congress to conclude that, if left to enforcement through private litigation, Section 5 would go largely unenforced. It remains true today that case-by-case adjudication of election changes has "proved too ponderous a method to remedy voting discrimination." *City of Rome*, 446 U.S. 156, 174. *See also South Carolina v. Katzenbach*, 383 U.S. at 328 (explaining that the preclearance mechanism is "clearly a legitimate response to the problem [of voting discrimination] . . . Congress found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits.")

c. **Additional Evidence of Discrimination in Voting**

In the 2006 reauthorization of Section 5, Congress heard that since 1982, the Department of Justice has sent 101 monitors to elections in Texas. SMF ¶ 1208. In addition, the Department of Justice has certified six Texas counties and one political subdivision other than a county for

19

election monitoring since 1982. SMF ¶ 1209. Finally, Congress heard evidence of continued intimidation of minority voters in Texas. In Waller County, an Anglo district attorney threatened felony prosecution of the predominantly African American student body at Prairie View A&M University if they voted in the March 2004 primary. SMF ¶ 1265.

Congress also heard evidence of: threatened arrests of voters in newspaper articles in Fort Worth, TX (SMF ¶ 1249); the selective stationing of police officers outside predominantly minority polling sites in Texas; police officers demanding that minority voters show identification in order to vote; and disparate questioning by officials of minority voters who entered the polls to vote. SMF ¶ 1251.

The record before Congress during its 2006 reauthorization of Section 5, even the small portion related to Texas among all the covered jurisdictions, provides recent, compelling and ample evidence of ongoing, widespread discrimination against Latinos and African American voters. Based on this evidence, which has been incorporated into the record of this case, there is no material fact in dispute showing that "Congress reauthorized §5, relying on generalized findings that do not specifically identify evidence of continuing discrimination in covered jurisdictions . . ." Dkt. No. 83 at ¶ 2. Similarly, the MUD is unable to produce any fact to suggest that, as claimed in its Amended Complaint, that "[t]he conditions that caused Texas to be covered by §5 have long been remedied." Dkt No. at ¶¶ 2-3.

C.  **Section 5's Success as a Deterrent Should not Work Against a Showing of its Constitutionality**

Section 5 has an undisputed deterrent effect on jurisdictions that would otherwise adopt discriminatory voting changes. *See* SMF ¶¶ 330, 671.

20

In one example presented to Congress in 2006, the City of Seguin, Texas attempted in its 2002 redistricting plan to prevent Latinos from gaining a majority of seats on its city council. The 2000 Census showed that the growing Latino population in the Seguin comprised the majority of five of the eight city council districts. At the time, the Council was split with four Latino members and four Anglo members; the Anglo Mayor would cast the tie-breaking vote. The City responded to the threat of a majority of Latino members of the Council by dismantling the fifth Latino majority district in its new redistricting plan. Upon receiving the submission, the Department of Justice indicated that it would not likely preclear a plan with such an obviously retrogressive effect. SMR ¶¶ 915, 915A.

Seguin changed its redistricting plan to restore the fifth Latino-majority district upon learning that its submission was unlikely to receive preclearance. No objection letter issued and Section 5 worked as intended. *Id.* However, Congress can legitimately consider this evidence as supportive of a finding of effectiveness of Section 5, as opposed to considering it an instance of non-discrimination.

Congress was also entitled to view, as proof of persistent, continued discrimination, what occurred in the wake of Seguin's withdrawn submission. After proposing a new redistricting plan to restore the fifth Latino-majority district, Seguin immediately closed the candidate filing period so that no Latino could run in the election for that district. Only after private litigants filed a Section 5 enforcement action against the City and secured an injunction postponing Seguin's election timetable did the Department of Justice preclear Seguin's redistricting plan.

21

*See LULAC Council #682 v. City of Seguin*, No. 93-0333 (W.D. Tex. 1994). As a result, Latinos have now elected their candidate of choice to a majority of seats on the Seguin City Council.10

Thus, Congress heard evidence that Section 5 not only deters discriminatory election changes but also works to ensure that jurisdictions who are "repeat offenders" do not foreclose minority political participation by constantly devising and applying new methods of discrimination. SMF ¶ 495.

Quite simply, the MUD cannot establish, based on the current record, that widespread acts of race discrimination in voting are "conditions . . . which have long since been remedied" or that Congress lacked a sufficient record upon which to reauthorize Section 5 in 2006. On the contrary, the undisputed facts of the case show that Congress based its reauthorization of Section 5 on a substantial record of continuing and widespread discrimination, not just in Texas but throughout the jurisdictions covered by Section 5.

### D. The MUD Cannot Show That Section 5 as Applied Burdens the MUD

With respect to the claim by the MUD that it is burdened by Section 5 without cause, Defendant Intervenors maintain that it is not necessary for Congress to make specific findings for each and every covered jurisdiction in the U.S. in order to legislate within the scope of its authority to enforce the Constitution. To the extent that the MUD's as-applied challenge requires Congress to make specific findings of discrimination as to the MUD, it must fail.

In addition, the MUD is unable to make out any claim of harm or burden as a result of Section 5's preclearance requirements. The financial cost of preparing a preclearance submission

---

10 Latino voters filed suit in 1978 and 1979 to force Seguin to redistrict and preclear its redistricting plan. Latino voters were forced to sue Seguin again in 1993 when the city failed to redistrict and comply with Section 5. See *Ramos v. Koebig*, 638 F.2d 838 (5th Cir. 1981) and *Trinidad v. Koebig*, 638 F.2d 846 (5th Cir. 1981).

is minimal. SMF ¶ 1592. The MUD has made only eight 8 submissions in 19 years, most of them requests involving simple polling place changes. SMF ¶ 1601. The MUD has never shown that the preclearance requirement has forced it to abandon plans for a voting change or that DOJ has prevented the MUD from implementing a voting change. SMF ¶ 1603. The MUD produced no Board meeting minutes in which Board members or voters express concern over preclearance. The "harm" asserted in this case is purely manufactured to provide an avenue of attack upon a legitimate statute.

Although it was created almost twenty years ago, for much of this time MUD elections were characterized by lack of competition for seats, hand-picked candidates, use of private homes as polling places and little to no public outreach to voters. In close to twenty years of existence the MUD has only had three contested elections. SMF ¶ 1562. In fact, until the late 1990's the MUD Board consisted of acquaintances of the developers who were conveyed land in the MUD in order to comply with statutory requirements after agreeing to run in non-competitive elections.[11] Collins Depo. Transcript Vol. 2 p. 138:2-10. Prior to 2004, MUD elections were held at residents' homes. SMF ¶ 1562. Not unexpectedly, voter turnout in the MUD was, until 2002, abysmal. In three elections, the voter turnout consisted entirely of the two Election Judges, voting at their house. *See, e.g.*, 1992 Election Order Perales Decl. Ex. 25.

Quite simply, the MUD cannot show harm to it as a result of the preclearance requirement. The MUD is similarly unable to assert facts supporting its additional claims that voters and other political entities are harmed by Section 5, including any facts to support its

---

[11] The 1988, 1990, 1992, 1994, 1996, 1998, and 2000 elections were uncontested elections. After a change in Texas law the MUD was not required to hold elections from 1996-2000.

23

claim that: Section 5 "infringes on the rights of an entire generation of voters . . ." (Amd. Compl. at ¶ 24); "minority voters in covered jurisdictions like the district are frequently harmed, not aided, by §5 coverage" (Amd. Compl. at ¶ 20); and "many political subdivisions from time to time forego beneficial changes because of the bureaucratic burden of asking the Attorney General's permission" (Amd. Compl. at ¶ 12).

The MUD's legal claims rest in part on the implication that it is uninvolved or somehow separate from past or present racial discrimination. This is not the case for a number of reasons. First, as a neighborhood of the City of Austin, Texas, the MUD is deeply imbedded in a context of exclusion of both Latinos and African Americans from civic and political life. Second, many of the residents of the MUD grew up in Texas and themselves lived through discriminatory practices aimed at racial minorities. Simply because it is a small, predominantly Anglo neighborhood of the City of Austin, the MUD cannot divorce itself from its surroundings or its residents in order to claim that past and present day discrimination have no bearing upon it. Perales Decl. Ex. No. 22.

The MUD sits inside the City of Austin which is 30% Latino and is characterized by deep racial disparities in income, education and housing. Perales Decl. Ex. No. 24. In Austin, 44 percent of Latinos have no high school diploma; by contrast only 4.9 percent of Anglos lack a high school diploma. *Id.* Latinos in Austin are more than twice as likely as Anglos to live in poverty. *Id.* Latinos in Austin are linguistically isolated; although the overwhelming majority of Austin Latinos are native born, more than 75 percent of Latinos over the age of 5 in Austin speak Spanish at home. *Id.* .

Many Austin Latinos remember the poll tax and its exclusionary effect on Latino voters.[12] The Austin school district segregated both Latino and African American students into their own schools. *See United States v. Texas Education Agency*, 467 F. 2nd 848 (1972) (requiring the elimination of school segregation of African Americans and Latinos).[13] The City of Austin also discriminated on the basis of race in housing. The 1928 City Plan for Austin brazenly proposes moving Mexican Americans and African Americans out of "desirable" areas to enable the construction of the proposed Waller Creek Driveway and Congress Avenue.[14] Perales Decl. Ex.

---

12 *See* Perales Decl. Ex. 16, 19. *See also* Perales Decl. Ex. 1 a case study published in 1933 by Roscoe Martin entitled "The Municipal Electorate: A Case Study" (concluding that through the poll tax "whites augment their strength . . . solely at the expense of the Mexican element."); Perales Decl. Ex. 4 T.N Porter's report Dr. J.W. Edgar entitled "Tabulation – Tax Election, July 19, 1948" (showing that the "Latino Ward" had the lowest voter turnout with only 68 voters); Perales Decl. Ex. 2 article in Austin American Statesman (reporting that after the repeal of the poll tax eligible voters in Austin increased from 42,300 to 71,300).

13 *See also* Perales Decl. Ex. 7 "Historical Factors Affecting Mexican American Parental Involvement and Educational Outcomes: The Texas Environment from 1910-1996" (describing the segregated Mexican School at Metz Elementary) ; Perales Decl. Ex. 3 "The History of Mexican-American Schools in Austin: From Reconstruction Through World War II" by Carol R. Adams (documenting school board vote to segregate Mexican Americans at the West Avenue School and Zavala Elementary); Perales Decl. Ex. 5Austin Public School District in 1954 "Austin Schools, 1881-1954: Origin, Growth, Future" Volume 2 (referring to the "Latin American" schools of Allan Jr. High, University Jr. High, and Zavala Elementary -- all located in East Austin). Austin Latinos today bear the effects of racial segregation and substandard education. *See* Perales Decl. Ex. 16, 17, 18, 19.

14 The plan describes the property as "occupied by very unsightly and unsanitary shacks inhabited by negroes. With these buildings removed for the trafficway, most of the remaining property will be of substantial and more desireable type." Perales Decl. Ex. 8. The Plan recommends creating a "negro district" despite the fact that at this time African Americans were found throughout Austin:
> It is our recommendation that the nearest approach to the solution of the race segregation problem will be the recommendation of this as a negro district; and that all the facilities and conveniences be provided the negroes in this district, as an incentive to draw the negro population to this area. This will eliminate the necessity of duplication of white and black schools, white and black parks, and other duplicate facilities for this area. Perales decl.

*See also* Perales Decl. Ex. 6 "Slavery and Vigilantism in Austin, Texas, 1840-1860" by Paul D. Lack (chronicling a vigilante committee organized by the mayor, judges, and other prominent Anglo citizens with sole purpose of identifying Mexican-Americans for expulsion from Austin by force); Ex. 9 "A Social Survey of Austin" William B. Hamilton; Ex. 10 The Duplex Nation Historic District, an Austin neighborhood on Manor Road and present I-35 that was developed by Texas Land Commissioner Bascom Giles in 1948 for returning WWII veterans and Bergstrom A.F.B. personnel, included a "restrictive covenant which prohibited non-whites from owning or residing in the neighborhood." Perales decl. Ex. 11. The Wilshire Historic District was not only developed and sold with restrictive covenants, but covenants were advertised as a means to induce Anglos to purchase the properties. Perales

8. Like many other Texas cities, Austin's legacy of housing segregation remains in the form of racially-identifiable neighborhoods.[15] Finally, Austin Latinos also bear the effects of discrimination in public accommodations, including theaters, restaurants and department stores. *See* Perales Decl. Ex. 16, 17, 18, 19.

The people living in Austin today, including those who live in and around the Canyon Creek Subdivision and those who are Anglo or minority, bear the effects of discrimination by Texas and the City of Austin.

Within this context lies the Plaintiff MUD.

## II. THE MUD CANNOT BAIL OUT FROM COVERAGE UNDER 5

The MUD is ineligible for bailout under Section 5 because the Voting Rights Act only allows states or "political subdivisions" to bail out from coverage under Section 5. The Act defines the term "political subdivision" as "any county or parish, except that, where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." 42 U.S.C. 1973*l* (c) (2).

Although the MUD is a governmental entity and is responsible for holding elections for members of its Board of Directors, the MUD does not conduct voter registration. SMF ¶ 1576. The DOJ implementing regulations for Section 5 define an entity like the MUD as a "political subunit." *See* 28 C.F.R. Sec. 51.6 ("All political subunits within a covered jurisdiction (e.g. counties, cities, school districts) are subject to the requirement of section 5.").

---

Decl. Ex. 11. In recent years, Austin Latinos living on the East Side struggled to receive City infrastructure improvements. Perales Decl. Ex. 18, 19.

15 Austin's East Side contains a number of heavily Latino neighborhoods, including Holly (90% Latino), Govalle (86% Latino), and East Cesar Chavez (78% Latino). Perales Decl Ex. 22. When compared to Anglos,

Importantly, the U.S. Supreme Court has already upheld Congress's power to limit eligibility for bailout to discrete governmental entities. *See City of Rome v. U.S.*, 446 U.S. 156 (1980). In *Rome,* the Supreme Court found that Congress could limit eligibility for bailout to a "State with respect to which the determinations have been made" or "a political subdivision with respect to which such determinations have been made as a separate unit." *Id.* at 162.

Furthermore, the MUD could not meet the bailout criteria even if the MUD were considered eligible for bailout under Section 5. In order for a state or political subdivision to be eligible for bailout it would have to demonstrate that in the past ten years:

> (1) No test or device has been used to determine voter eligibility with the purpose or effect of discrimination;
>
> (2) No final judgments, consent decrees, or settlements have been entered against the jurisdiction for racially discriminatory voting practices;
>
> (3) No federal examiners have been assigned to monitor elections;
>
> (4) There has been timely preclearance submission of all voting changes and full compliance with Section 5; and
>
> (5) There have been no objections by the Department of Justice or the District Court for the District of Columbia to any submitted voting changes.

42 U.S.C. § 1973b(1)(A-E) (2005).

In addition, jurisdictions seeking to bail out must also bear the burden of proving nondiscrimination in all aspects of their voting and electoral processes including a showing that at the time bailout is sought:

---

Latinos in Austin are more likely to live in housing that is overcrowded or substandard, including housing without

(1) Any dilutive voting or election procedures have been eliminated;

(2) Constructive efforts have been made to eliminate any known harassment or intimidation of voters;

(3) It has engaged in other constructive efforts at increasing minority voter participation such as, expanding opportunities for convenient registration and voting, and appointing minority election officials throughout all stages of the registration/election process.

42 U.S.C. § 1973b(1)(F) (2005).

In the past ten years the MUD has implemented, without the required preclearance, two changes in the address at which a voter could obtain a mail-in ballot. In 1994 the MUD failed to preclear a change in the early voting location, a change in the election day polling place, a change in the address to obtain a mail-in ballot, and most importantly, the adoption of numbered place voting for election of Board members. *See* Perales Decl. Ex. 25.

In addition to failing to preclear certain voting changes, the MUD has failed to make constructive efforts to expand minority voter participation. SMF ¶ 1570. The MUD cannot point to a single instance in the past ten years in which it undertook efforts to increase the participation of minority voters in its elections. In fact former MUD Board President Don Zimmerman testified in deposition that would "absolutely not" make special efforts to recruit African-Americans or Latinos to serve as elections clerks. *Id.* He further stated that he did not

---

adequate plumbing or kitchen facilities. Perales Decl Ex. 24.

understand the requirement to translate election materials into Spanish to comply with Section 203 of the Voting Rights Act "because I thought only citizens could vote and a part of citizenship was, you know, having some command of English language." Zimmerman Depo. Trans 82:9-16.

The MUD elected officials failed to make even minimal efforts to publicize their intent to seek bailout. The Diaz Intervenors, residents of the MUD, were unaware of the lawsuit until months after it was filed. Perales Decl. Ex. 20, 21, 26. The MUD could not produce a single newspaper notice, other publication or even a posting on the Canyon Creek bulletin board informing the public of its intent to file for bailout. Other than placing the item on its agenda under the Texas Opening Meetings Act, the MUD made no effort to inform residents of Canyon Creek of its plans to file this case. Perales Decl. Ex. 20, 21, 26.

The MUD demonstrated a cavalier attitude toward its minority voters in the manner in which it became involved in this lawsuit, attempted to bail out when bail out is not available and ignored the requirements of bailout. When Dr. David Diaz and Gabriel Diaz attended a MUD Board meeting to question why the MUD Board sought to declare Section 5 unconstitutional, the Board members explained that their decision was based on the cost of submissions to the Department of Justice and a commitment they made to an attorney who had represented the MUD *pro bono* in a separate suit against the City of Austin. Perales Decl. Ex. No. 20.

Although compliance with Section 203 is not a prerequisite for bailout, the MUD's uneven record of compliance with Section 203 is further evidence that its leadership is unconcerned with expanding access to racial minorities. In 1990, 1994, and 2002 the MUD failed to translate its Order of Election informing voters of the upcoming election. The MUD has

29

not translated its Election Canvass, which informs the public of its election results, into Spanish in any election. Similarly, the MUD has made no attempt to conduct outreach regarding the availability of Spanish language assistance in voting.

Finally, in its bailout lawsuit, the MUD has made no attempt to comply with the requirement that it present to the Court "evidence of minority participation, including evidence of the levels of minority group registration and voting . . ." 42 U.S.C. 1973b1(a)(2). On the contrary, the MUD has shown complete disregard for documenting information about its minority residents and has not updated the racial and linguistic information in its preclearance submissions to the Department of Justice since 1996. In its April 4, 1996 submission, the MUD represented that: it had a population of 5,400 people; less than 2.5% of its residents were African American; less than 5% of its residents were Spanish surnamed; and no residents could be considered language minorities. Illogically, the MUD did not update this information after the 2000 Census, despite an obvious increase in the number of houses located in the MUD.[16] Moreover, Kerrie Jo Qualtrough, the attorney who prepared the MUD's 2004 submission, admitted that she made no effort to update the information presented in the MUD's last preclearance submission. K. Qualtrough Depo Trans. 74:7-11.

Thus, the record in the case demonstrates that the MUD cannot show facts supporting its claim that it would be able to bail out of Section 5 coverage, even if statutorily eligible.

## CONCLUSION

For the reasons set out above, Diaz Defendant Intervenors respectfully request that the Court grant summary judgment in their favor on all claims in the case.

---

[16] The 2004 submission uses the demographic data from the March 27, 2002 submission.

RESPECTFULLY SUBMITTED this 15th day of May, 2007.

        MEXICAN AMERICAN LEGAL DEFENSE &
        EDUCATIONAL FUND, INC. (MALDEF)

        /s/ Nina Perales
        NINA PERALES
        No. TX0040
        110 Broadway, Suite 300
        San Antonio, Texas 78205
        Tel: (210) 224-5476
        Fax: (210) 224-5382
        nperales@maldef.org

        JOSEPH E. SANDLER
        D.C Bar #255919
        Sandler Reiff & Young PC
        50 E St SE # 300
        Washington, D.C. 20003
        Tel: (202) 479 1111
        Fax: (202) 479-1115
        sandler@sandlerreiff.com