POLITICS & GOVERNMENT
Martin, Roscoe C.
The municipal electorate: a case study by Roscoe C. Martin. 1933.
22 pp

Austin History Center ⚜ Austin Public Library

# THE SOUTHWESTERN SOCIAL SCIENCE QUARTERLY

The editors disclaim responsibility for views expressed by contributors to THE QUARTERLY

Vol. XIV            DECEMBER, 1933            No. 3

## THE MUNICIPAL ELECTORATE: A CASE STUDY

BY ROSCOE C. MARTIN
*The University of Texas*

### I. PURPOSE AND PROCEDURE

The present study constitutes an investigation, by statistical techniques, of the composition and voting habits of a section of the electorate. The universe of data selected for analysis coincides with the electorate of the City of Austin, Texas, as of April, 1933, and the selection is justified on two grounds. First, Austin experienced a city council election in the month named, so that the time selected provides an opportunity to observe the electorate in action. Secondly, the indicated circumscription of the problem in time and area makes possible a complete and wholly objective investigation, whereas study of a more extensive electorate almost of necessity would result in the injection of subjective and nonmensurable factors. By this it is not meant to imply that the author by so limiting his problem defined for himself a task of an inconsequential character. There were, after all, 14,400 persons registered to vote in Austin in April, 1933, and those experienced in handling mass data will agree that the analysis of such a number of subjects is a very onerous task. It is true that the method of sampling might have been employed to reduce the data to a more manageable bulk, but except in one particular sampling was rejected in favor of complete enumeration.[1] The study therefore constitutes a detailed and objective analysis of a municipal electorate at a given time; this much is claimed for it, and for the present nothing more.

The materials from which the required facts were assembled were varied and diverse. The basic data were taken from the

---

[1] See *infra*, Section V.

Austin History Center ★ Austin Public Library

A PION[.] [S]TUDY OF CONTEMPORARY S[...] 893

mean to ignore others that have appeared in the pages of that journal. As far as empirical studies of theoretical significance are concerned the more recent volumes have contained several; it would be pointless to list them here. But, any reader who cares to look will find, even among much earlier volumes, pieces by O. Douglas Weeks, Cortez Ewing, Pendleton Herring, Leonard White, and others touching upon such questions as cumulative voting, direct primaries, the Republican party in the south, roll call voting, etc. The task of selection is not easy, but the reader will find that Martin's article stands up well today as it did in 1933.

"Poll Tax List," a compilation of the names of those eligible to vote, made by the county tax collector and furnished to the city.[2] This list includes not only the names of electors by wards, but also the address of each, his occupation, his place of birth, his color, his age, and the number of years he has resided in state, county, and city. Further, while there is no specific reference to the sex and marital status of the elector, these were determined in a very large majority of the cases by study of the names entered. Examination of the city tax records provided information on the basis of which the elector was classified as property-owner and non-property-owner, and the city divided into categories resting on the per capita value of real property and improvements.[3] Again, in order to identify the elector as voter or non-voter in this particular election, the poll tax list, containing the names of all those eligible to vote, was compared with the "poll list," which bears the names of those who actually voted, and a notation was made on the former to distinguish voters from non-voters. The city clerk's records provided the data needed concerning absentee voters. Yet again, a supplementary list, compiled immediately before the election, gave the names and new addresses of those electors who changed their residences within the city after the compilation of the original list, thus making it possible to single out the transfer for special attention. Finally, check of the poll tax list by the city payroll enabled the author to identify city employees, regarding whom some interesting conclusions were reached. The fragments of information thus pieced together from many sources then were recorded on Hollerith "punch cards," one card for each elector, and tabulated under the

---

[2] The election laws of Texas provide that a person qualified to vote in state elections shall be deemed eligible also to vote in city elections, provided he shall have resided for the six months immediately preceding the election in the city in which he offers to vote. *Revised Civil Statutes of the State of Texas*, 1925, Art. 2957.

The fifteen election "wards" of the City of Austin coincide with fifteen of the election "precincts" of Travis County. The county tax collector therefore discharges his duty by providing the city clerk with a poll tax list for each of the city's fifteen wards.

[3] The usefulness of the data of an economic character depended largely upon population statistics of the city by enumeration districts. Since Austin's population was not reported by wards in the census of 1930, it was necessary to go directly to the Bureau of the Census in Washington for data for the minor divisions of the city. See *infra*, Section V.

Perales Decl.
00002

desired headings by use of sorting and counting machines. Ulti- mately, therefore, every pertinent fact concerning each of the 14,400 electors was entered upon a single master sheet, which presented for interpretation literally thousands of data.

Enough has been said to indicate roughly the procedure fol- lowed. Moreover, the reader may have arrived at the conclusion that the possibilities as to method of treatment of the facts re- corded are limitless, as indeed they appear to the author to be. The data, it is clear, might have been sorted and counted, each category against all the rest, almost endlessly, and in truth the materials seem to warrant a more exhaustive examination than limitations of the moment permit. For present purposes, the author has been content to select for summary consideration a number of the more significant problems. The problems chosen include voting and non-voting, the factor of sex, the influence of marital status, economic standing and its bearing on the vote, occupational groups as blocs of electors, the significance of age, poll tax payment and exemption as methods of qualifying for the vote, the nativity and the race of electors (voters and non-voters), and certain special groups, namely, absentee voters, transfers, and city employees. No effort has been made in the pages which follow to deal with any particular problem in detail, but only to indicate some of the more significant conclusions which are ap- parent from contemplation of each.

## II. THE POTENTIAL AND THE EFFECTIVE VOTE

According to the last federal census, the City of Austin had 53,120 inhabitants in 1930. That figure, however, will not suffice for our purposes, since reckoned as of April, 1933, it is almost three years out of date. Unfortunately there is no way to deter- mine precisely what is the 1933 population of the city, though several methods exist by which an approximation of the figure desired may be had. None probably is more satisfactory than the simple projection forward for three years of the city's rate of increase for the decade 1920-1930 and the calculation of its popu- lation on this basis. During that decade Austin's inhabitants in- creased in number by 52.3 per cent, or 15.7 per cent every three years. The figure, therefore, which is 115.7 per cent of 53,120, is the measure of the city's 1933 population, and this figure is

---

similarly the number of p—found by calculation— *tial electorate of Austin, who may be said to constitute the poten- sons over 21 years of age,* may be calculated. Application of the formula to the census figure reveals that there are at present 39,119 such persons in the city. It is obvious that neither the population nor the "over 21" figure may be taken as being exactly correct. It is apparent further, however, that the procedure fol- lowed will produce a result substantially in accord with the facts. Attention may be called also to the use made of the figures. They are not of great intrinsic importance in the development of the study, but are employed chiefly to indicate certain ratios and rela- tionships, so that conclusions based upon their use would not be vitiated by slight errors in either direction.

### CHART I
Percentage Distribution of Total Population, Potential Electorate, and Electorate, as Voters and Non-Voters*



*From the figures of Table I.

All facts recorded in this chart and in subsequent charts and tables relate to the City of Austin, Texas, as of April, 1933.

### TABLE I
Percentage Distribution of Total Population, Potential Electorate, and Electorate, as Voters and Non-Voters

|  | Per cent voted | Per cent qualified but did not vote | Per cent not qualify to vote |
|---|---|---|---|
| Total population | 12.2 | 11.2 | 76.6 |
| Potential electorate | 19.2 | 17.6 | 63.2 |
| Electorate | 52.1 | 47.9 | — |

Chart I, with its accompanying table, offers certain facts con- cerning voting and non-voting which will give pause to the thoughtful student of democracy.[4] Far from participation by the

---
[4] See also *infra*, Chart XVII.

majority, it may be seen readily that 76.6 per cent of the population did not even qualify to vote; the electors of the city, that is, comprised but 23.3 per cent of its populace. And lest this statement appear too harsh, let us apply the gauge of interest in public affairs to the potential electorate, a very large majority of whom assuredly could have qualified had they so desired. Here the figures are somewhat less astounding, but remain nevertheless arresting. Of the potential electorate, 63.2 per cent did not even bother to become eligible to vote; or, to shift the emphasis, only 36.8 per cent of those who presumably could have qualified to vote actually were electors.

Within the electorate, the relationship between voting and non-voting elements presents some interesting features. Somewhat more than 50 per cent of those who qualified actually voted (52.1 per cent voted, 47.9 per cent did not vote), which is to say that almost half of the electors deemed it disadvantageous, or mayhap simply neglected, or forgot, to vote. Of the total population, 12.2 per cent voted, while 11.2 per cent qualified to vote but abstained; of the potential electorate, 19.2 voted, while 17.6 qualified but shunned the polls. The significance of these figures is brought out more sharply when it is observed that the five winning candidates for the city council polled an average vote equal to 56.6 per cent of the vote cast, 29.5 per cent of the electorate, 10.9 per cent of the potential electorate, and 6.9 per cent of the population. The present councilmen thus were placed in office by less than 7 per cent of the city's population, and in any except the broadest understanding of the term "representative government" they represent only a small minority of the people of the city—not, let us hasten to add, through any fault of their own, but simply by reason of the apathy of the citizenry. This may be democracy, or as close an approximation as the typical community is able presently to achieve, but it patently is not the traditional American democracy whose dogmas so long have been familiar to the man on the street.

Chart II reveals in summary form the distribution by voting wards of the electorate as voters and non-voters. The major fluctuations from what appears to be the normal vote may be explained readily. In Ward 2B is located the Texas Confederate (Veterans') Home, which is filled with octo- and nonagenarians most of whom did not vote (see *infra*, Section VII). Ward 3C includes the best residential district of the city, and as will be demonstrated (*infra*, Section V) the wealthier districts furnished



CHART II

Percentage Distribution of Electorate as Voters and Non-Voters, by Wards*

*From the figures of Table II.

TABLE II

Percentage Distribution of Electorate as Voters and Non-Voters, by Wards

| Total electorate by wards | Per cent voted | Per cent did not vote |
|---|---|---|
| East First | 57.3 | 42.7 |
| West First | 60 | 40 |
| 2A | 50.1 | 49.9 |
| 2B | 41.7 | 58.3 |
| 3A | 53.8 | 46.2 |
| 3B | 55.5 | 44.5 |
| 3C | 67.1 | 32.9 |
| 4A | 56.7 | 43.3 |
| 4B | 53.4 | 46.6 |
| 4C | 52 | 48 |
| 5A | 49.1 | 50.9 |
| 5B | 45.4 | 54.6 |
| 6 | 41.4 | 58.6 |
| 7A | 49.7 | 50.3 |
| 7B | 54.2 | 45.8 |
| Total Electorate | 52.1 | 47.9 |

Austin History Center ⋆ Austin Public Library

Case 1:06-cv-01384-PLF-EGS-DST   Document 101-5   Filed 05/16/2007   Page 4 of 10

Perales Decl. 00004

*Austin History Center ☆ Austin Public Library*

901

strength of the vote of each group as well. In only three wards, 3B, 4A, and 4B, do the female electorates compare favorably in size with the male. In two of these are found more women electors than men; but in only one were there more female voters than male. In that ward, 4A, there are 741 female electors and 609 male, yet the female voters outnumbered the male by only 383 to 382, or .01 per cent of the total electorate! In only one male, and in that ward, as above noted, is located the Confederate Veterans' Home. Nothing appears, therefore, from an analysis of the wards to controvert or modify our conclusion reached with reference to the electorate as a whole.

CHART IV

Percentage Distribution by Wards of Electorate, as Male Voters, Male Non-Voters, Female Voters, and Female Non-Voters*

[Bar chart showing percentages for wards: West First, East First, 2A, 2B, 3A, 3B, 3C, 4A, 4B, 4C, 5A, 5B, 6, 7A, 7B — with bars for MEN and WOMEN — scale 0 to 6 Per cent]

Legend:
- ■ Men Voted
- ▨ Women Voted
- ▨ Men did not vote
- ☐ Women did not vote

*From the figures of Table V.

TABLE V

Percentage Distribution by Wards of Electorate, as Male Voters, Male Non-Voters, Female Voters, and Female Non-Voters

| Ward | Male voters Per cent of Electorate | Male non-voters Per cent of Electorate | Female voters Per cent of Electorate | Female non-voters Per cent of Electorate |
|---|---|---|---|---|
| East First | 1.95 | 1.03 | 1.22 | 1.33 |
| West First | 2.04 | .96 | .81 | .94 |
| 2A | 1.00 | .79 | .40 | .60 |
| 2B | 1.53 | 2.16 | .80 | 1.10 |
| 3A | 3.15 | 2.05 | 2.05 | 2.43 |
| 3B | 1.65 | 1.03 | 1.56 | 1.53 |
| 3C | 1.22 | .43 | .89 | .60 |
| 4A | 2.65 | 1.58 | 2.66 | 2.49 |
| 4B | 3.13 | 2.04 | 2.39 | 2.78 |
| 4C | 3.16 | 2.17 | 2.13 | 2.70 |
| 5A | 2.12 | 1.54 | 1.18 | 1.88 |
| 5B | 1.20 | .99 | .64 | 1.22 |
| 6 | 2.52 | 3.01 | 1.18 | 2.16 |
| 7A | 1.72 | 1.55 | .73 | .93 |
| 7B | 3.31 | 2.02 | 1.21 | 1.80 |

The facts regarding sex and the vote, then, are these: although Austin's population is 52.4 per cent female and her potential electorate 53.2 per cent, her electorate is male to the extent of 55.7 per cent. Further, the men maintain their electoral predominance in the matter of votes cast, voting to the extent of 58 per cent whereas only 44.7 per cent of the female electors vote. If proof be needed that politics is still preponderantly a man's game, it is found here in indisputable terms.

IV. MARITAL STATUS

Closely related to the problem of sex and the vote is that of marital status. In the days when woman suffrage was pending, one of the chief arguments of those who sought to stem the tide in its favor rested on the husband-wife relation. Give the wife a vote, argued the anti-suffragettes, and you merely give the husband two votes, for who can doubt that the wife will vote as her spouse directs? If any effort has been made to measure objectively the electoral importance of the husband-wife relation, the author is not acquainted with it; yet it appears that such a task is not impossible of accomplishment.

Perales Decl. 00005

Austin History Center ❖ Austin Public Library

902

The data chosen for investigation here comprise every pair of electors in the city readily identifiable as husband and wife. The method by which these persons were identified and selected is simple: (1) every man and woman bearing the same name (as John Doe and Mrs. John Doe) and residing at the same place were chosen; and (2) every man and woman bearing the same surname, listed so as to indicate marriage (as John Doe and Mrs. Mary Doe), of approximately the same age, and residing at the same place were chosen. The author concedes at once that the procedure employed will not yield absolute accuracy, and that in all probability a few husbands and wives have been included which should have been left out. The error, however, is believed to be very small, for the safeguards used undoubtedly eliminated substantially all electors except those sought. The process of selection produced the names of 7,212 persons, 3,606 husbands and 3,606 wives, who constitute slightly more than 50 per cent of the electorate.

It is not possible to ascertain how the electors in question voted, since the contents of the ballot box are not open for inspection. It is not a difficult matter, however, to determine whether or not any particular person voted, nor, therefore, to observe the husbands and wives listed as voters and non-voters. Chart V presents the fruits of such observation, revealing, within the limits of time and space set for the study, the electoral performance of the groups



CHART V
Marital Status and the Vote*

Husbands
Wives

☐ Husbands voted, wives voted
▨ Husbands voted, Wives did not vote
■ Wives voted, Husbands did not vote
▧ Wives voted, Husbands did not vote

*From the figures of Table VI.

Perales Decl. 00006

903

TABLE VI
Marital Status and the Vote

|  | Per cent of total number of husbands | Per cent of total number of wives |
|---|---|---|
| Husband voted with wife | 45.3 | |
| Husband voted without wife | 21.8 | |
| Husband did not vote | 32.9 | |
| Wife voted with husband | | 45.3 |
| Wife voted without husband | | 2.5 |
| Wife did not vote | | 52.2 |

at hand. An equal number of husbands and wives, perforce, voted together, and the number constituted 45.3 per cent of the husband votes, although the husband frequently votes without the wife. Aside from the paired voters, however, significant divergences may be observed, for whereas 21.8 per cent of the husbands voted without their wives, only 2.5 per cent of the wives voted without their husbands. Further, whereas only 32.9 per cent of the husbands failed to vote, 52.2 per cent of the wives are listed as non-voters.

The conclusion to be drawn from the figures given is clear. Stated bluntly, it is this: the wife ordinarily does not vote unless the husband votes, although the husband frequently votes without the wife. The contention of those who opposed woman suffrage therefore appears to have been justified, for it is evident that, in so far as the electorate is composed of husbands and wives, and in so far as the wives participate in politics by voting, the enfranchisement of women merely doubled the vote of those husbands sufficiently interested (or sufficiently influential) to persuade their wives to exercise the privilege of the franchise. There doubtless will be those who will insist that the emphasis should be exactly reversed, but a sufficient answer to that suggestion would seem to be found in the relatively large "independent" vote among the husbands as compared with the very small "independent" vote among the wives. Apparently it is the husband who takes the lead in politics, and not the wife.

While the most intriguing questions arise from consideration of the comparative electoral performances of husbands and wives, a further significant problem is presented by comparison of the

5

husbands and the wives with the total bodies of male and female electors respectively. Reference to the data reveals that 67.1 per cent of the husbands voted while no more than 58.1 per cent of the male electors voted, and that 47.8 per cent of the wives voted as against 44.7 per cent of the female electors. The most apparent explanation of these phenomena is that the husbands-wives fall into the age groups which are most active as voters (see *infra*, Section VII). And so far as the wives are concerned, this explanation seems plausible, inasmuch as the percentage of voters among the females of every age group from 36 to 60 years is greater than the figure set for the wives. Married females, that is, do not vote with any greater enthusiasm than other females of comparable age range. To explain the vote of the husbands, however, a less obvious line of reasoning is required, for in only one male age group, and that one of the smaller, is so large a percentage of voters found as among the husbands. Further, only one of the twelve occupational groups studied boasts so large a percentage of voters among its male members as the husband group (see *infra*, Section VI). An examination of several groups defined in sundry terms thus fails to reveal a chance relationship which would provide a logical explanation of the abnormally high percentage of voters among the husbands. We are justified, therefore, in setting the husband group apart and calling attention to the enthusiasm as electors which characterizes its members. Tentatively, we may advance as a possible explanation of this phenomenon that interest in civic affairs which is supposed to be greater in "family" than in single men, though no data are at hand, other than those noted, by which such an explanation may be tested objectively.

The relation between marital status and the vote appears, from our casual investigation, to offer interesting possibilities for research. The data here presented warrant the conclusions (1) that the wife votes when, and almost always only when, the husband votes, and (2) that the husband group affords an intriguing field for hypotheses by reason of the high percentage of voters among its members. It would be exceedingly interesting to know how each member of every pair of husbands-wives voted, for such information would provide a basis for conclusions of the greatest significance. The data desired, however, are not to be had at present, hence any statement regarding the nature of the vote cast by the groups under consideration must be based upon nothing more than speculation.

## V. ECONOMIC STANDING

As significant a problem as may be raised concerning the electorate and the vote has to do with considerations of an economic character. There was a time when property holding was prerequisite to participation in politics, and even now certain vestiges of the property ownership requirement for voting and holding office remain with us. To what extent were the practices of earlier days based upon sound principles? To what extent is the elector's economic status responsible for his attitude toward voting? To what extent is the electorate dominated and the government controlled by voters whose motives may be supposed to be affected by their economic interests? These and countless other questions, only a few of which may be considered here, clamor for answer when one turns to the problem suggested.

Prerequisite to any reasoned discussion of the economic factor and the vote is the definition of a yardstick by means of which the economic standing of the elector may be measured. The author has devised two such yardsticks, one of which indicates in a general way the position in society of the group measured; the other pertains more specifically to the matter of property ownership. The first rests upon the per capita valuation of real estate and improvements, and was derived from the tax assessor and collector of the City of Austin with population data furnished by the Federal Bureau of the Census. Austin's population was not analyzed by wards in the last (Fifteenth) census reports, nor, inquiry disclosed, did the census enumeration districts coincide, except in three instances, with the city's wards. Investigation revealed, however, that some half of the enumeration districts might be combined so as to be coterminous with half of the wards. Moreover, the division so suggested placed what the author hypothesized to be the "poorer" sections of the city in one category and the "wealthier" sections in the other, with the city's chief business street, which divides the more valuable business property into two approximately equal parts, serving as the line of demarcation between them. Thus was it possible to divide the population into two groups, not widely separated in size, and to obtain the per capita real property and improvements valuation for each. The fruits of this operation are set down in Table VII, which reveals that the wealthier wards

Perales Decl.
00007

enjoy a marked superiority over the poorer in the matter of property values.[6]

### TABLE VII

Per Capita Valuation of Real Property and Improvements for Wealthier and Poorer Wards*

|  | Lots | Improvements | Lots and Improvements |
|---|---|---|---|
| Wealthier Wards | $560.11 | $736.99 | $1297.10 |
| Poorer Wards | 342.68 | 485.86 | 828.54 |

*The valuations employed are the *actual* valuation figures listed on the city's property assessment rolls. Non-taxable property is not taken into account.

Now, this whole operation rests upon the assumptions first that the residents of the wealthier wards occupy a better economic position than those of the poorer, and second that this difference in status will be reflected in the vote of the two groups. The validity of the first hypothesis is substantiated by the figures of Table VII, if we accept the customary definition of the term "better economic position." The second may be tested by reference to Chart VI, which reveals that, although the wealthier wards

### CHART VI

Percentage Distribution of Population and of Electorate, as Between Wealthier and Poorer Wards*



■ Wealthier wards  □ Poorer wards

*From the figures of Table VIII.

### TABLE VIII

Percentage Distribution of Population and of Electorate, as Between Wealthier and Poorer Wards

|  | Per cent residing in wealthier wards | Per cent residing in poorer wards |
|---|---|---|
| Population | 48.2 | 51.8 |
| Electorate | 56.9 | 43.1 |

[a] The author has not attempted here to set up an absolute scale for the measurement of real property and improvement valuations, but only to indicate that one group of wards has a higher per capita valuation, and therefore is "wealthier," than another.

---

contain only 48.2 per cent of the city's population as against 51.8 per cent for the poorer wards,[7] the former boast 56.9 per cent of the electorate as compared with 43.1 per cent for the latter. The evidence, then, is incontrovertible. Some will suggest, however, that the figures adduced do not indicate a greater interest in politics among the electors of the wealthier wards, but merely a more general ability to qualify for the vote through payment of the poll tax. That there is logic in this position would seem to be beyond question. That it does not offer a sufficient explanation of the phenomenon under observation, however, is demonstrable by reference to Chart VII, which bears proof of a more active

### CHART VII

Percentage Distribution of Electorate by Wealthier and Poorer Wards as Voters and Non-Voters*



■ Wealthier Wards  □ Poorer Wards

■ Voted  □ Did not vote

*From the figures of Table IX.

### TABLE IX

Percentage Distribution of Electorate by Wealthier and Poorer Wards as Voters and Non-Voters

|  | Per cent voted | Per cent did not vote |
|---|---|---|
| Wealthier wards | 53.4 | 46.6 |
| Poorer wards | 50.5 | 49.5 |

interest, as measured by the vote, among the electors of the wealthier wards than among those of the poorer. Chart VI, then, justifies the statement that the wealthier wards, though smaller in population, furnished a considerable majority of the electors; Chart VII evidences clearly the fact that the wealthier electors voted in greater numbers than the poorer, the wealthier wards providing, indeed a majority of 58.2 per cent of the vote cast.

[7] The actual figures are 29,628 inhabitants for the wealthier wards and 31,831 for the poorer.

It is apparent, therefore, from the application of our first criterion, that the elector's economic status has a marked influence on his attitude toward voting, though general conclusions concerning the economic factor must be held in abeyance temporarily, pending the examination and evaluation of additional data.

The second criterion on which the study rests its conclusions regarding economic status concerns the electorate as property owners, that is, as taxpayers. In this respect and in this only did the author take advantage of the short-cut offered by sampling. An investigation of each of the 14,400 electors would have required a tremendous amount of time; hence a 10 per cent sample was taken, every tenth elector being chosen for study.[8] The city tax rolls then were searched for each of the names selected.[9] The results of this procedure, so far as the composition of the electorate is concerned, are recorded graphically in Chart VIII, which rate advantage of the franchise privilege? The query may be answered by reference to two series of data. First, let us note that while those who pay real or real-and-personal property taxes constitute 46.6 per cent of the electorate, they comprise 51.4 per cent of the voters. Again, while those who pay only personal property taxes total 18.4 per cent of the electorate, they participated in the election in such numbers as to cast 19.2 per cent of the vote. On the other hand, the non-taxpayers comprise 34.9 per cent of the electorate, but only 29.4 per cent of the voters. In short, the property-owners dwindle in numbers from 34.9 per cent to 29.4 per cent of the respective categories. The property-owner therefore asserts himself and casts a larger vote than would be expected; the property-less elector evinces less interest in politics

## CHART VIII
Percentage Distribution of Electorate as City Taxpayers and Non-Taxpayers*

[bar chart with scale 0 to 100 per cent, with legend:]
▨ Pay Real or Real-and-personal Property Tax
■ Pay Only Personal Property Tax
☐ Pay No Property Tax

*From the figures of Table X.

reveals that almost half of the electors pay taxes to the city on real or real-and-personal property, while more than 65 per cent pay some form of property tax.[10]

It is not enough, however, to know that the electorate is dominated by property owners. A further question which demands consideration is this: to what extent do the groups at hand take

## TABLE X
Percentage Distribution of Electorate as City Taxpayers and Non-Taxpayers

| | Per cent of electorate |
|---|---|
| Pay real or real-and-personal property tax | 46.7 |
| Pay only personal property tax | 18.4 |
| Pay no property tax | 34.9 |

---

[8] The number actually studied was 1426; it should have been 1440. The difference arises from the fact that instead of making the selection by count the author took the distance between the first and the tenth names on the poll tax list of East First Ward as a unit and "measured" for the names desired by application of this unit. The result is not precisely accurate, but the error is negligible.

[9] Originally it was intended to take into account also the elector as a taxpayer or non-taxpayer of Travis County, and the data for this phase of the study were collected and computations completed. From the facts available, however, no significant features appeared to differentiate the elector as a city taxpayer or non-taxpayer from the elector as a county taxpayer or non-taxpayer. Differences there were, to be sure, but none notation of which would have furthered the purpose of this study. Hence it was decided to omit mention of the county entirely.

[10] If the percentage of taxpayers seems high, a ready explanation therefor is at hand. The person who pays a property tax to the city ordinarily pays a tax also to the county (though the county tax assessor overlooks considerable personal property found by the city assessor). Now, while the city tax officers say nothing about the poll tax, the county officers collect that tax from all property taxpayers. And the law provides that any person who has paid the (county) poll tax shall be eligible to vote in elections in the city in which he resides.

On the other hand, while all persons are liable for payment of the poll tax, the county tax officers have devised no means for collecting that tax from those who own no property. The poll tax thus becomes a levy which is compulsory on property taxpayers and optional on those who escape the property tax. Under these circumstances the large percentage of property owners among the electors need occasion no surprise.

Perales Decl. 00009

and loses ground in proportion as the taxpayer gains.¹¹ A second and independent series of data, portrayed graphically in Chart IX, provides further evidence of the same tendency. There it may be observed that the real or real-and-personal property taxpayer gives voice to the greatest (relative) interest in politics; that the payer of a personal property tax alone follows a considerable distance behind; and that the non-taxpayer brings up the rear, seemingly content to leave control of the city in the hands of property interests. It is interesting to note that no substantial differences appear between men and women as taxpayers and non-taxpayers.¹²

CHART IX

Percentage Distribution by City Taxpayers and Non-Taxpayers of Males and Females, as Voters and Non-Voters*



*From the figures of Table XI.

TABLE XI

Percentage Distribution by City Taxpayers and Non-Taxpayers of Males and Females, as Voters and Non-Voters

| Electorate | Per cent males voted | Per cent males did not vote | Per cent females voted | Per cent females did not vote |
|---|---|---|---|---|
| Pay real or real-and-personal property tax | 58.1 | 41.9 | 44.7 | 55.3 |
| Pay only personal property tax | 66.7 | 33.3 | 51.6 | 48.4 |
| Pay no property tax | 61.5 | 38.5 | 44.4 | 55.6 |
| | 51 | 49 | 37.5 | 62.5 |

---

¹¹ This shift is the less to be anticipated in light of the fact that the property-owner must pay the poll tax, if his property is assessed and his tax paid, whether he will or no, whereas the non-property-owner pays only if he desires (see *supra*, note 10). One would suppose that many involuntary electors would be included among the property-owners, and that non-voting would be high among them. On the other hand, it would appear that a large percentage of the non-taxpaying electors, all of whom presumably paid the poll tax of their own volition, would vote. Apparently the economic stake in the community held by the taxpayers, together with an indifference born of the absence of such a stake on the part of the non-taxpayers, reversed the natural process and led to the development described above.

bring us to the same end. It is clear first that citizens residing in the "wealthier" wards more frequently qualify to vote than those of the poorer, and having qualified take part more frequently in elections. It is evident secondly that the city's government is controlled, or at any rate that the representatives are elected, by property-owners, for non-taxpayers do not qualify so universally nor, having qualified, do they vote so enthusiastically as taxpayers. The data on which our conclusions are based are, of course, limited in character, and do not warrant broad generalizations on so large a question as the property-holding qualification on the right to hold office and the privilege of voting. They do, however, justify the statement that the possession of property might be reestablished as a prerequisite to voting in Austin without great hardship on or grave injustice to the populace, for the city council even now represents a body of voters who are property-owners to the extent of more than 70 per cent.

VI. OCCUPATION

Logically following the problem of economic status is that of occupation. The two, indeed, are fundamentally but related phases of the same problem, though by reason of the necessity of classifying scores of divers trades into a dozen occupational categories, questions concerning the economic standing of the various vocational groups must be passed over to a large extent in this section. Notwithstanding this limitation, an examination of the available facts pertaining to occupation will yield significant results, for it will enable us to reach certain interesting conclusions regarding the electoral performance of the groups at hand.

---

¹² Sex provided one of the primary bases for classifying the electorate, and the distinction between men and women electors will be maintained except where the interests of clarity demand that it be ignored.

Perales Decl.
00010