Perales Decl. 00017

It is to be presumed that the legislative body had in mind certain purposes when it exempted the three groups here examined from payment of the poll tax. Among them, we may surmise, was that of fostering the interest in politics of the groups in question by removing the greatest legal obstacle to membership in the electorate. No effort has been made here to determine what proportion of the population legally eligible to claim exemption actually did so; but an examination of those who qualified to vote under the various statutory exemptions warrants the statement that, if such was the purpose of the legislature, that body is justified in entertaining a feeling of keen disappointment. Apparently electors place a value on the privilege of voting which corresponds roughly with what it costs them. If they acquire it free of charge, they hold it lightly and scorn elections; if they are forced to pay for the privilege, they vote as a usual thing—not improbably (in some part, at least) with the idea in mind of collecting on their investment! Quite patently the author here ignores significant factors, namely the ages and physical condition of those who are exempt. In age, one of the three groups is 21 years and under, another 60 and over, and electors do not vote as heavily at the extreme ages as in the medium ranges (*supra*, Section VII). Moreover, electors of the third group are not wholly free to decide whether they will or will not participate in elections, since they include some who are not physically able to vote. These words may be spoken in behalf of the tax-exempt elector, but, while they explain the condition described, they do not invalidate our conclusions. It is inescapable that the poll tax payer dominates the electorate, that his voice sounds with greater authority than mere numbers would lead one to expect, and that the tax-exempt elector is content in general to leave politics to those who pay for the privilege of voting.

### IX. NATIVITY

Somewhat removed from the subjects discussed heretofore but of such intrinsic importance as to merit more than passing attention is the problem of nativity. Where were the 14,400 electors of Austin born? What relation may be traced between place of birth and the vote? Here again the considerations on which the analysis rests are not qualitative in character, for it is not possible to ascertain how the electors of any particular place of birth voted. It is, however, quite feasible to determine whether or not

an elector voted, and thus to make a quantitative analysis of the voting and non-voting tendencies of the larger groups by nativity. A casual perusal of the poll tax list will reveal that every American state and many foreign countries have been entered as places of birth by the electors of the city. To reduce this number to a convenient size the author devised a simple scheme of classification which established three place-of-birth categories. First, since it was apparent that the bulk of the electorate was born in Texas, this State was placed in a class to itself. Secondly, all other states of the American union were combined and given separate standing; and thirdly, all foreign countries were thrown together to form a distinct group. The electorate then was classified according to the criteria established, with results which may be seen from Chart XIV. Texas, it is seen, claims as native sons

### CHART XIV

Percentage Distribution of Electorate by Place of Birth*



- ■ Born in Texas
- ▨ Born in American State other than Texas
- ☐ Born in Foreign Country

*From the figures of Table XVIII.

### TABLE XVIII

Percentage Distribution of Electorate by Place of Birth

| | Per cent of electorate |
|---|---|
| Born in Texas | 73.6 |
| Born in American state other than Texas | 19.5 |
| Born in foreign country | 6.9 |

and daughters 73.6 per cent of those qualified to vote; others of the United States claim 19.5 per cent; foreign countries must be content with no more than 6.9 per cent.

Table XIX gives data on the basis of which conclusions may be reached regarding the electors of these various categories as voters and non-voters. It will be observed at once that native Texans voted to the extent of 53.9 per cent of their number, while

926

### TABLE XIX
Percentage Distribution by Place of Birth of Electorate, as Voters and Non-Voters

| Electorate | Per cent voted | Per cent did not vote |
|---|---|---|
| Born in Texas | 52.1 | 47.9 |
| Born in American state other than Texas | 53.9 | 46.1 |
| Born in foreign country | 50.4 | 49.6 |
| | 38.3 | 61.7 |

50.4 per cent of those American-born in other states than Texas voted, as compared with 38.3 per cent voters among foreign-born electors.[21] These facts are recorded graphically in Chart XV, which also affords opportunity for comparison by place of birth of males and females as voters and non-voters.

It is not the duty of the author to offer explanations for the phenomena he describes, except in those few instances where cause-and-effect may be related unmistakably from the data.

### CHART XV
Percentage Distribution by Place of Birth of Males and Females, as Voters and Non-Voters*

Electorate
- Born in Texas — MEN / WOMEN
- Born in American state other than Texas — MEN / WOMEN
- Born in Foreign Country — MEN / WOMEN

Per cent: 0  20  40  60  80  100

■ Men voted    ▨ Men did not vote
▨ Women voted  □ Women did not vote

*From the figures of Table XX.

---

[21] These findings may occasion some surprise. Lest it be surmised that they rest upon inadequate data, let it be noted that they flow from a sufficient number of cases in each instance to equalize any momentary tendency which might have thrown a smaller body of data out of balance. The cases total 2,803 in the instance of electors born in American states other than Texas, and 1,001 in the instance of those foreign-born. The data, therefore, are unassailable.

---

X. A CASE STUDY

### TABLE XX
Percentage Distribution by Place of Birth of Males and Females, as Voters and Non-Voters

| Electorate | Per cent males voted | Per cent males did not vote | Per cent females voted | Per cent females did not vote |
|---|---|---|---|---|
| Born in Texas | 58.1 | 41.9 | 44.7 | 55.3 |
| Born in American state other than Texas | 60 | 40 | 46.6 | 53.4 |
| Born in foreign country | 55.4 | 44.6 | 43.8 | 56.2 |
| | 46.8 | 53.2 | 24.6 | 75.4 |

Nevertheless it is not out of order in connection with the problem of nativity to comment briefly on a conjectural explanation which may suggest itself to the reader concerning the low vote among foreign-born electors. The State of Texas adjoins Mexico, and as a consequence the City of Austin has a considerable Mexican population, a goodly percentage of which was born in Mexico. Now, the Mexican elector is notoriously delinquent in the matter of voting (see *infra*, Section X). What more natural, therefore, than the assumption that these circumstances are sufficient to determine the character of the foreign-born group as voters and non-voters? Notwithstanding the seeming logic of this line of reasoning, an examination of the facts available reveals that the postulate is valid only in part; for if every person born in Mexico be taken from the list of foreign-born electors, the percentage of that group voting increases only to 44, that for non-voters dropping to 56. Thus, while the absolute percentage figures change by considerable sums, the relative positions of the three categories of electors are not affected by the operation. The plain truth, therefore, is that native Texans voted more heavily by an appreciable margin than the electors of either of the other groups; that those born in one of the United States other than Texas came second in the matter of electoral performance; and that those born in a foreign country ranked third, far behind the other groups. Since no explanation of these facts appears from the data, none is offered here.

X. RACE

Of all the problems which arise from consideration of the electorate, none commands more instant attention than that of race, nor are many more deserving of study. Since democracy is

Perales Decl.
00018

927

Austin History Center ⋅ Austin Public Library

A SE STUDY 929

9.

looked upon by most as an institution indigenous to American soil, it is assumed that native white Americans the country over will react in about the same way, quantitatively at least, to the stimuli of our democratic way of existence. It is assumed further that other racial groups will react to the same stimuli in ways which will distinguish them from native whites and from each other. While the validity of these assumptions, and more particularly of the first, may of course be questioned, for present purposes let us suppose them to be valid. It becomes at once an interesting question, what do the data before us reveal with regard to the comparative electoral behavior of the various racial groups?

## CHART XVI

Percentage Distribution of Total Population, Potential Electorate, and Electorate by Race*



*From the figures of Table XXI.

## TABLE XXI

Percentage Distribution of Total Population, Potential Electorate, and Electorate by Race

|  | Per cent White | Per cent Negro | Per cent Mexican |
|---|---|---|---|
| Total population | 71.9 | 18.6 | 9.5 |
| Potential electorate | 74.8 | 18.6 | 6.6 |
| Electorate | 91.9 | 5.5 | 2.6 |

Chart XVI provides us with some significant facts concerning the racial composition of population, potential electorate, and electorate. Each of the three categories is divided according to race into white, negro, and Mexican groups.[22] The population of the city, it will be noted, contains considerable numbers of negroes and Mexicans, though the whites predominate with a strength of 71.9 per cent of the total, as compared with 18.6 per cent for the

---

[22] A negligible number of Chinese are ignored in this section.

negroes and 9.5 for the Mexicans. Analysis of the potential electorate reveals no change in relative position, albeit the whites augment their strength by almost 3 per cent of the population, apparently solely at the expense of the Mexican element. Our investigation thus far, therefore, leads us to anticipate a considerable negro and Mexican influence in local politics, for each group possesses sufficient strength to make its presence felt.

Mere existence of a strong racial group is of little political consequence, however, unless its members qualify to vote, and it is here that the negroes and the Mexicans first fail to take advantage of the opportunity extended them. Chart XVI reveals that large majorities of these elements do not become electors, with the result that the whites increase in relative strength from 74.8 per cent of the potential electorate to 91.9 per cent of the actual electorate, while the negroes drop from 18.61 per cent to 5.5 and the Mexicans from 6.6 to 2.6. Neither negroes nor Mexicans, therefore, achieve the position of importance as electoral groups to which their numbers entitle them.

There is another and mayhap more significant criterion by which the electoral behavior of the racial groups may be compared; for if it is important that persons qualify to vote, it is yet more important that those qualified actually vote. If the racial elements under investigation be analyzed as electors and non-electors, and the former as voters and non-voters, the results recorded in Chart XVII are reached. Let it be noted here that this chart presents an analysis of the potential electorate, which was chosen for study because it was desired to compare the potential with the actual as well as the actual with the effective electorate in light of the factor of race. The chart presents two kinds of data: vertically, one may discover at a glance the component elements of the potential electorate by race and sex; horizontally, each group so defined is analyzed for its electoral performance. The facts presented vertically are self-explanatory. The analysis of each group, however, is worthy of some time and thought. The white portion of the chart represents those who were eligible to vote in respect of age, but who for various reasons did not qualify; the colored portion represents the electorate, which is divided in turn into voters and non-voters. The significance of this data, whose general meaning can be grasped in a moment, becomes greater when the chart is studied in light of the figures of

Perales Decl.
00010

## CHART XVII

Percentage Distribution of Potential Electorate by Race and by Sex;*
Percentage Distribution of Male and Female Racial
Groups as Voters and Non-Voters†



Potential Electorate

White — MEN 35.53, WOMEN 39.29
Negro — MEN 7.92, WOMEN 10.69
Mexican — MEN 18.61, WOMEN (illegible)

Legend: ■ Voted  ▨ Qualified, but did not vote  □ Did not qualify to vote

*Fifteen Chinese, comprising .04 per cent of the potential electorate, are ignored here.
†From the figures of Table XXIII.

### TABLE XXII

Percentage Distribution of Potential Electorate's Male and Female Racial Groups as Voters and Non-Voters

|  | Per cent voted | Per cent qualified but did not vote | Per cent did not qualify to vote |
|---|---|---|---|
| Potential electorate | 19.2 | 17.6 | 63.2 |
| White men | 31.2 | 21 | 47.8 |
| White women | 17.9 | 21 | 61.1 |
| Negro men | 8.6 | 6.8 | 84.6 |
| Negro women | 2.3 | 5.3 | 92.4 |
| Mexican men | 3.9 | 18.7 | 77.4 |
| Mexican women | .8 | 5.9 | 93.3 |

---

the accompanying table. The facts here recorded constitute an accurate graphic comment not only on race and its significance for the student of the electorate but on the factor of sex as well.

The importance of race, therefore, is clear. The whites dominate the electorate, and by a larger majority than one would expect from a study of the population and the potential electorate. Further, within the electorate, the same group continues to evince a greater enthusiasm for politics than either of the others. Table XXIII provides data for a summary statement. It reveals that

### TABLE XXIII

Percentage Distribution of Electorate by Race, as Voters and Non-Voters, as Male Voters and Male Non-Voters, and as Female Voters and Female Non-Voters

|  | Per cent electors voted | Per cent electors did not vote | Per cent males voted | Per cent males did not vote | Per cent females voted | Per cent females did not vote |
|---|---|---|---|---|---|---|
| Electorate | 52.1 | 47.9 | 58.1 | 41.9 | 44.7 | 55.3 |
| White | 53.6 | 46.4 | 59.9 | 40.1 | 46 | 54 |
| Negro | 45.4 | 54.6 | 55.6 | 44.4 | 30.3 | 69.7 |
| Mexican | 16 | 84 | 17.3 | 82.7 | 11.8 | 88.2 |

59.9 per cent of the white males voted, as compared with 55.6 per cent of the negro males and 17.3 per cent of the Mexican, and that 46 per cent of the white females voted, as compared with 30.3 per cent of the negro females and 11.8 per cent of the Mexican. Both male and female electors, therefore, voted with ever less enthusiasm from white to negro to Mexican group, the last-named enjoying as voters only a small fraction of its potential electoral strength. The facts may be epitomized in these figures: among the white electors (disregarding sex), 53.6 per cent voted, among the negroes, 45.4 per cent, among the Mexicans, 16 per cent. It is to be doubted whether more extended consideration would produce a more pointed comment on race and the vote.

### XI. SPECIAL GROUPS

Let us turn now from an examination of the whole electorate to consider briefly certain special groups. The possibilities here are endless, since literally hundreds of such groups might have been singled out for discussion. Three only have been selected for present purposes, however, and among these the first comprises those voters who cast absentee ballots. Only forty-seven such

E STUDY 933

ballots were dispensed by the city clerk;[23] that is to say, only .6 per cent of the voters petitioned to vote absentee. Of these ballots, 66 per cent were delivered to male electors, and 34 to female. Every absentee ballot claimed of the clerk was returned marked except one;[24] 97.9 per cent of those who requested absentee ballots, therefore, actually voted. From these figures we may conclude (1) that absentee voting is not practiced by any considerable percentage of the electorate, (2) that male electors use the absentee ballot almost twice as much as female, and (3) that an overwhelming percentage of those who claim absentee ballots return them to be counted. Our conclusions are, of course, subject to the usual limitations imposed by the nature of the study.

A second special group selected for examination comprises the "transfers," that is, those electors who changed their residences between the time when their poll tax receipts were issued and the day of election. There were 348 such persons, equalling in number 2.4 per cent of the electorate, eligible to vote in the election of April 3. Now, the author approached this group with a definite hypothesis in mind, namely, that an elector sufficiently concerned to record a change in residence with the county tax collector probably would reveal his interest by casting a ballot in the election. Chart XVIII provides data for a comparison of the electorate and the transfer group on the score of electoral performance, thus setting up a rough gauge by which the hypothesis may be tested. As may be seen, 58.1 per cent of the male electors voted, as compared with 59.9 per cent of the male transfers, and 44.7 per cent of the female electors voted as against 45.2 per cent of the female transfers. In the case of both male and female electors, therefore, the transfers enjoyed a distinct though not a marked advantage over the whole electorate in the matter of voting. The validity of the hypothesis thus seems to have been confirmed by the data at hand. It will prove of interest to note further that 6 per cent of the transfers voted in the wrong wards, as compared with 1 per cent of the total number of voters who committed the same offense. The transfer therefore may be said to be somewhat more enthusiastic as a voter than the non-transfer, though much more likely to cast an illegal ballot through offering to vote in a ward other than that in which he is qualified to vote.

A third group deserving of special mention includes the city employees. According to her April (1933) payroll, Austin has 646 employees, which we shall designate the potential electorate of the city hall. Of this number, 78.3 per cent (506) qualified to vote, as compared with the 36.8 per cent of the city's potential electorate which qualified. The relative voting performances of electorate and city employee electorate may be seen from Chart XIX, which indicates that 87.6 per cent of the male employee electors voted as compared with 58.1 per cent of the male electors. The figure for female employee electors is 71 per cent voters, as against a female electors' percentage of 44.7. The city employees, then, reveal a very great interest in politics; in the first place, they become members of the electorate in large numbers; in the second, having qualified, they vote by an overwhelming majority.



CHART XVIII

Percentage Distribution of Electorate and of Transfers, Males and Females, as Voters and Non-Voters*

Electorate ▬▬▬  
Transfers ▬▬▬

Men voted / Men did not vote  
Women voted / Women did not vote

*From the figures of Table XXIV.

TABLE XXIV

Percentage Distribution of Electorate and of Transfers, Males and Females, as Voters and Non-Voters

| | Per cent males voted | Per cent males did not vote | Per cent females voted | Per cent females did not vote |
|---|---|---|---|---|
| Electorate | 58.1 | 41.9 | 44.7 | 55.3 |
| Transfers | 59.9 | 40.1 | 45.2 | 54.8 |

---

[23] An absentee ballot may be voted in the office of the city clerk by an elector who anticipates leaving the city before election day, or it may be mailed out by the clerk to an elector who is out of the city temporarily.

[24] One ballot, mailed to a wife on vacation by her anxious spouse, was not returned!

Perales Decl. 00021

Austin History Center ← Austin Public Library

934    E STUDY    935

refrained from conjectural comment which, while it perhaps would have added to the interest of the argument, would have introduced an element of doubt as to the accuracy of the data and of uncertainty concerning the validity of the conclusions. The care exercised has eliminated any question regarding either the author's preconceptions or possible errors in judgment. Errors there doubtless have been, but they have resulted from shortcomings in execution and not in judgment; and they are inconsequential in view of the 14,400 cases investigated.[25] But to note these facts is merely to reiterate the advantages of the statistical method, which it is no part of the author's present purpose to champion.

The significance of the study here brought to a close appears reasonably evident. A great deal of information of the greatest value may be had from a source which in the past has received too little attention, namely, election statistics. True, it is often difficult and in some instances it may be downright impossible to use this source,[26] but the possibilities which it offers for productive research nevertheless are boundless. Among the problems suggested by contemplation of those possibilities is the character and functioning of the electorate, whose key position in the democratic process entitles it to the most serious consideration by students of politics. But if the problem of the electorate is of the utmost importance, it is likewise limitless in scope. It is, therefore, or appears to the author to be, a fruitless task to attempt to treat the problem without assigning to it definite limitations of

---

[25] One who takes the pains to investigate will perceive at once that the study reports 7,510 voters, while the official returns of the election of April 3 reported 7,874. On the face of the figures, then, the study rests on a body of voters too few by 364. This is an error of 4.6 per cent, reckoned from the official figures, and is larger than the study can assume comfortably.

Fortunately it does not have to carry the whole of the error. This is not the place to discuss election administration in Austin, but the truth is this: the author, after long and diligent search, failed to find (or to identify) on the poll tax list 325 names entered as those of voters on the poll lists. The reported vote, then, was 7,874, the vote recorded by the author 7,549, and that on which the study rests 7,510. The second figure represents the vote actually cast by duly qualified electors, as near as the author can determine it. The error chargeable to the study therefore is thirty-nine votes, or .5 per cent of the actual vote, and this the author cheerfully assumes. Any error over this figure must be charged to election administration.

[26] See Idella G. Swisher's article, "Election Statistics in the United States," in *The American Political Science Review*, XXVII, 422 ff.



CHART XIX

Percentage Distribution of Electorate and of City Employees, Males and Females, as Voters and Non-Voters*

Electorate — MEN / WOMEN
City Employees — MEN / WOMEN

▓ Men voted    ☐ Men did not vote
▓ Women voted  ☐ Women did not vote

*From the figures of Table XXV.

TABLE XXV

Percentage Distribution of Electorate and of City Employees, Males and Females, as Voters and Non-Voters

|  | Per cent males voted | Per cent males did not vote | Per cent females voted | Per cent females did not vote |
|---|---|---|---|---|
| Electorate | 58.1 | 41.9 | 44.7 | 55.3 |
| City employees | 87.6 | 12.4 | 71 | 29 |

If all elements comprising Austin's population were as election-minded as the municipal employees, this city would have no serious problem of non-voting.

XII. SOME OBSERVATIONS ON CONTENT AND ON METHOD

The data above presented constitute in their sum an analysis of the electorate of the City of Austin as of April, 1933. In content, the study suggests a number of conclusions concerning the electorate, with special reference to the potential and the effective vote, sex, marital status, economic standing, occupation, age, method of qualifying for the vote, nativity, race, and special groups. Its net results eventuate in an accurate if not a detailed picture of the politically significant portion of the city's population.

In method, the author has attempted to make the study objective from beginning to end. To this purpose he has deliberately

Perales Decl.
00022

time and space. The present study rests upon the theory that comprehension of the whole depends upon understanding of the component parts. It follows that, since the whole problem is the matter of primary concern, the analysis of a small portion is not of superlative intrinsic importance. The author is content to have this article regarded as a small contribution which, together with similar studies which it is hoped will be made in the future, will pave the way for an understanding of the electorate and an appreciation of the problems which it presents.



Austin History Center ✦ Austin Public Library

Perales Decl. 00023