Austin History Center ★ Austin Public Library

*Historical Quarterly*

# Slavery and Vigilantism in Austin, Texas, 1840–1860

PAUL D. LACK*

IN JANUARY, 1840, ONLY ABOUT A MONTH AFTER AUSTIN ACHIEVED corporate status, the first issue of a local newspaper referred to it as "the infant City, just throwing off the last vestages [sic] of savage barbarianism." For years many wondered whether the paper had been overly optimistic, since the city still suffered from the crudity and isolation of its frontier setting. It survived, but had only 854 people on its tenth anniversary. Early residents neither demanded nor received many municipal services, so formal law enforcement procedures remained primitive. Although city ordinances allowed for deputies, Austin relied on a single professional—the city marshal—which befitted both its size and its southern heritage of individualism. The 1850s brought apparent success in the quest for urban growth, with the population expanding to over 3,500 in 1860—an increase that overwhelmed existing police methods.[1]

One challenge to the weak system of law enforcement came from a growing contingent of urban slaves. In Austin, as in other southern cities, these bondsmen assumed liberties and displayed an independence that violated the prevailing concept of race relations: white supremacy and black servitude. The threat to social order seemed especially grave in 1854, when the presence of a group of Mexican Texans further loosened the controls of masters over slaves, and again in 1856 and 1860, when statewide rumors of slave rebellion conjured up the specter of black insurrection. The question that confronted Austin in each instance was, given its tradition of limited government, could the city meet the emergency? Further, if the community went outside the legal system to quell the turmoil that threatened from below, could law be restored once the crisis passed? Or would the efforts to stir up "vigilance" create instead hysteria, overturning both law and order?[2]

Despite its rudimentary state of development, the city government from the outset recognized the special nature of urban bondage and created a set of laws to restrict slave social life. In 1840 the mayor and aldermen passed the first of these ordinances, establishing a ten o'clock curfew for slaves, outlawing the sale of liquor to bondsmen, and forbidding "any white man or Mexican" from "making associates" of Negroes. In 1848 the city made it illegal for an owner to allow a slave to hire his own time or to "act or deal as a free person." The major problem that faced the city officials was not deciding what activities to prohibit but arriving at a means of enforcing their edicts. Recognizing the weakness of relying on the city marshal alone, the council in 1850 created a city watch, to be appointed monthly, with responsibility for suppressing all "assemblages of negroes after nine o'clock at night," and slaves "found drunk . . . or guilty of abuse or other improper conduct," and for keeping down "seditious or insurrectionary feelings among the negro population." Members of the guard had the authority to inflict punishments without resorting to trials. This attempt to adapt and invigorate the county patrol system, a timeworn, ineffective institution that did little more than soothe white fears during emergencies, failed to meet the needs of the growing town. A chronicler who had lived in Austin in the early 1850s recalled that during this period, "somehow, the enforcement of the penal statutes . . . had not been attended with that energy, promptness, and decision that was desirable."[3]

---

* Paul D. Lack is professor of history at McMurry College.

[1] *Austin Texas Sentinel*, Jan. 15, 1840; Kenneth W. Wheeler, *To Wear a City's Crown: The Beginnings of Urban Growth in Texas* (Cambridge, Mass., 1968), 25–35. The size of Austin's early population cannot be determined accurately without examination of the manuscript census returns. United States Seventh Census (1850) and United States Eighth Census (1860): Schedule 1: Free Inhabitants, Schedule 2: Slave Inhabitants, Travis County, Texas (microfilm; Archives, University of Texas Library, Austin). For 1850 the figure published by the census bureau, and repeated by scholars since then, placed Austin's population at 629. See J. D. B. DeBow, *The Seventh Census of the United States: 1850* (Washington, D.C., 1853), 504. This figure in fact represents the free population only. The census taker failed to differentiate between the slaves of Austin and the rest of Travis County, but a reliable estimate of the number of town slaves can be made by cross-checking the names of all slaveholders in the county (taken from the slave schedules) against the persons enumerated as living in Austin (in the free population schedules). This method reveals a count of 225 slaves living in Austin in 1850, making the total population 854. This cross-referencing technique, when applied to the 1860 census data, indicates 1,019 slave inhabitants in Austin, making the total population 3,546.

[2] Richard C. Wade, *Slavery in the Cities: The South, 1820–1860* (New York, 1964), 143–179.

[3] *Austin City Gazette*, Feb. 12, 1840; *Austin Texas State Gazette*, Oct. 5 (first quotation), Nov. 2 (second quotation), 1850. A state law to prevent slaves from hiring their own time had already been passed in 1846. H. P. N. Gammell (ed.), *The Laws of Texas, 1822–1897* (10 vols.; Austin, 1898), II, 1,501–1,503; Frank Brown, "Annals of Travis County and the City of Austin from the Earliest Times to Close of 1875" (typescript; Austin–Travis County Collection, Austin Public Library), XVIII, 67.

Accounts of slave life in early Austin read like a catalogue of activities forbidden by the slave code. According to the *State Gazette* in 1850, some local residents (placing personal profit and convenience above social order) completely disregarded the restrictions on the hire of slaves, which resulted in a class of "quasi free people of color scattered about in every nook and corner." The paper believed that this situation had dire consequences not only for these indulgent owners but for society as a whole: "a large portion of slaves now industrious and honest will inevitably be converted into thieves and idlers by the vagabonds who are permitted to hire their own time." The next year the *Gazette* reiterated this theme that a slave "permitted to have his own way and be his own master" almost always became "addicted to vice and dissipation, and the worst possible example to others." With alarm it asserted that one-half of the local slaves both hired their own time and also kept their own houses, "where no surveillance is over them," and where the "worst disposed" slaves "assemble at night and discuss, if they do not organize, plans of mischief." The newspaper also concluded that the large number of "absconding negroes . . . may, in many instances, be traced to the unusual liberties which slaves in Texas seem to exercise in our towns when out of the control of their masters." The runaway problem began soon after the founding of Austin and persisted despite reports of fugitives who suffered from disease, privation, or recapture during their treks to Mexico.[4]

The breakdown in the enforcement of regulations stimulated appeals for stricter control and threats of vigilante action. In an 1853 letter to the editor, "A Tax Paying Citizen," complaining that Negroes gathered without restraint at "doggeries" and other places, asked, "what has become of the City Council . . . [and] our city Watch? . . . it is a *moral shame*, it is superlatively degrading, that at the seat of government of a large and prosperous State we have such a *farce of a city government*." In conclusion he warned, "unless the corporation will act soon and act promptly, the citizens will be *compelled to act in self-defense* in the control of our negroes."[5]

Elections in 1854 produced a new mayor, John S. ("Rip") Ford, who criticized the failures of city officials and promised energetic leadership. Yet, Ford advocated a pure form of laissez-faire and personal [...]tions to the problems of law enforcement, so his administration [...] not invigorate local government. Later the same year the *Gazette* [...] in editorialized on the "unlicensed conduct of our slave popula[...]," charging that blacks broke curfew, carried deadly weapons, and assembled at "unlicensed balls . . . of a most outrageous character." Furthermore, barriers between the races seemed to be breaking down. According to the paper, Austin contained a number of "low, unprincipled white men, who associate almost entirely with negroes." Such scandalous scenes occurred "that the observer almost imagines himself in the land of amalgamation, *abolition meetings, and woman's rights conventions*." The social environment seemed capable of producing insurrectionary movements or "a general negro stampede for Mexico." Deficiencies in the law rendered the city watch ineffective, and the *Gazette* recognized that the marshal, though capable and duty-minded, could not enforce the city statutes because he "is not possessed of ubiquity." Thus the editor confined himself to the traditional remedy: all community-minded citizens ought to do "everything which the law allows" to correct these evils. Soon the leaders of Austin would act, but outside the law rather than within it.[6]

This volatile social situation erupted in the fall of 1854 following the arrival of a group of Mexican laborers. Nativism was especially strong in the 1850s, but anti-Mexican prejudices had become common among Anglo Texans long before the rise of the Know Nothing movement of this decade. The two most recent and complete works of scholarship differ on the origins of anti-Mexican sentiment. Arnoldo De León concludes that the attitude was primarily a racial or color prejudice that Anglo emigrants held from their first Texas settlements, while James E. Crisp suggests that the antipathy developed from contradictory and fluctuating views in Texas during the 1820s and 1830s. The two scholars agree that most Anglo Texans eventually viewed Mexicanos as racially inferior, culturally defective, and morally corrupt, and that these beliefs had triumphed by the time of statehood, at least in part because of the animosities of the Texas Revolution and Republic period.[7]

---

[4] *Austin Texas State Gazette*, Feb. 16, Sept. 21, Oct. 12 (first quotation), 1850, July 12, 19 (second quotation), Aug. 2, 1851, Feb. 21, July 1, Sept. 23 (third quotation), 1854; Austin *Texas Sentinel*, Feb. 26, 1840; Austin *City Gazette*, Mar. 11, May 27, 1840; Austin *South[w]estern American*, July 28, 1852; Brown, "Annals," VII, 47, XV, 14.

[5] Austin [...] *State Gazette*, June 25, 1853; see also ibid., Sept. 13, 1851.

[6] Austin *Texas State Times*, Jan. 21, 1854; William J. Hughes, *Rebellious Ranger: Rip Ford of the Old Southwest* (Norman, 1964), 108–109, 115; Austin *Texas State Gazette*, July 22, 1854 (quotations).

[7] Arnoldo De León, "White Racial Attitudes Toward Mexicanos in Texas, 1821–1900" (Ph.D. diss., Texas Christian University, 1974), 2–7, 28–32, 35, 42, 200; James Ernest Crisp, "Anglo-Texan Attitudes Toward the Mexican, 1821–1845" (Ph.D. diss., Yale University, [...]), 7–194.

*Slavery and Vi[gilantism]*    Austin History Center ★ Austin Public Library    [Southwestern Hist]orical Quarterly

In Austin, anti-Mexican propaganda employed both racial and moral arguments. The *Gazette* once described all Mexicans as "half-negro, half Indian greasers," but in other columns insisted that it intended its denunciations only for the "peons," described as "a lazy, thievish horde of lazaroni, who in many instances are fugitives from justice in Mexico, highway robbers, horse and cattle thieves, and idle vagabonds." In using terms like "peons" and "transients" to describe the local Mexican residents, the paper implied that the recent arrivals were alien immigrants rather than hard-working permanent citizens, whom it claimed to respect.[8]

Anti-Mexican attitudes also grew because of the anti-slavery temperament that the Tejanos traditionally displayed. For years slave owners had charged that Mexicans throughout central and western Texas aided runaways in their flights to the border. Then in 1854 the newspapers carried reports that increased Anglo hostility towards the group of Mexicans living on the outskirts of Austin. Their alleged violations included trading arms to fugitives and stirring up insubordination "by placing themselves on an equality with the slave." In early October a "respectable" citizen who had observed the Mexican camp told of slaves and "peons" smoking, drinking, gambling, and making love. The normal machinery of justice could not cope with this injurious situation, according to the *State Gazette*, because "a peon Mexican can claim the political and civil privileges of a white man." The *State Times* spoke for a majority of the slave owners in concluding, "something must be done to prevent the negroes and Mexicans from associating." That "something" had already been proposed by the other paper when it called for "a little timely exertion in clearing our country of rascally peons."[9]

Jews that the nearby communities of Seguin and San Antonio had organized public meetings in early September also seemed to spur action by slave owners in Travis County and provided two model solutions. Seguin resorted to vigilantism and ran the "straggling Mexicans" out of the county; slave owners in Bexar County, where Hispanics formed a large part of the population, confined themselves to recommending tighter enforcement of the law and a reward system to aid prosecution of those who enticed slaves into running away.[10] Citizens' meetings held in Austin on September 27 and October 7 and 14 turned to vigilantism to resolve the slave-Mexican problem. In adopting this time-honored frontier method of enforcing "justice," local residents were bypassing a legal system they considered clumsy and ineffective. At the same time the vigilantes sought a kind of legitimacy by involving men of solid reputation and by exercising caution in implementing the group's edicts. The makeup of the vigilance committee, reassured the *State Gazette*, "comprises many of our excellent citizens." An analysis of the roster of the vigilantes suggests these thirty-three individuals formed a cross section of the men of wealth, social status, political position, and intellectual leadership in antebellum Austin and Travis County.[11]

Every social and economic characteristic of the vigilantes suggests

---

8. *Austin Texas State Gazette*, Sept. 9, 1854 (second quotation), Apr. 21, 1855 (first quotation). This racial identification of Mexicans with blacks suggests that Texans thought of this group as "Free Persons of Color." One scholar in fact suggests that the "free persons of color" of the Spanish period did merge ethnically with Mexicans during the Republic. Harold Schoen, "The Free Negro in the Republic of Texas," *Southwestern Historical Quarterly*, XXXIX (Apr., 1936), 292–293. Just as Austin evicted the Mexican population, so it also more quietly (by legislation) prevented the development of a free black population—there lived in the city only one of this class in 1850 and twelve in 1860. U.S. Seventh Census (1850) and U.S. Eighth Census (1860), Schedule 1: Free Inhabitants, Travis County.

The extant sources do not provide clear data to determine whether the individuals in the group that came to Austin were long-time Texans or recent immigrants from Mexico. The newspapers' use of "peons" and "transients" may have been merely a ploy to increase Anglo animosities.

9. Ibid., Sept. 9, 30 (first and third quotations), Oct. 14 (second quotation), 1854; De León, "White Racial Attitudes," 38; *Austin Texas State Times*, Oct. 7, 1854 (fourth quotation). Local court records do not validate the charges against Mexican Texans. Only four in-

10. *Austin Texas State Gazette*, Sept. 2, 16, 1854; *San Antonio Alamo Star*, Aug. 26, Sept. 2, 16, 1854.

11. *Austin Texas State Gazette*, Oct. 21, 1854. Those known to have been involved in the public meetings and vigilance committee are as follows. Officers of the Sept. 27 public meeting: John S. Ford, chairman, William M. Walton, secretary. Appointed as delegates to the Gonzales meeting: George L. Robards, Newton Burdett, A. G. Weir, George W. Davis, A. B. Burleson. Members of the committee to raise funds for the expenses of the delegates: Ed Finnin, A. N. Hopkins, Allen Burdett. Named to a resolutions committee: W. C. Phillips, J. T. (or T. J.) Cleveland, John Marshall, J. R. Jackson, Josiah Fisk. Officers of the Oct. 7 meeting: John S. Ford, chairman, William Leigh Chalmers, secretary. Appointed to the vigilance committee to enforce resolutions adopted at the Oct. 14 meeting: John Marshall, S. G. Sneed, W. C. Phillips, J. A. Burdett, J. W. Jones, S. G. Norvell, John S. Ford, Aaron Burleson, James G. Swisher, Alfred Smith, James H. Matthews, Gideon Pace, Abner P. Blocker, Enoch Johnson, Sven M. Swensson, Austin Texas State Gazette, Sept. 30, Oct. 14, 21, 1854; *Austin Texas State Times*, Oct. 14, 21, 1854.

stances, involving three persons with Hispanic surnames, appear on the criminal docket from 1850 to 1865, and none of these cases involved slaves. It is possible, of course, that the newspaper accounts were correct in asserting that the authorities were failing to prosecute those who violated the slave code. Civil [and Criminal] Minutes, Travis County District Court, Book C, 389, D, 117, E, 97–98 (Office of the District Clerk, Travis County Courthouse, Austin).

this solid-citizen image. The vigilantes were not fired by youthful intemperance—they were an older, settled group, the median age being thirty-nine in 1854. Reflecting the fact that the citizens' meetings decided on a county-based strategy rather than just a city strategy, nineteen of the vigilantes were farmers, as opposed to eleven professional men. Only three came from the ranks of the wage earners. As in other frontier vigilante groups, what one scholar calls the "legal illuminati" were well represented. The census listed only three as professional lawyers, but a total of eight had at one time practiced law or received legal training. Nor did the local politicians shun this extralegal movement. Headed by Mayor Ford, the ranks of the vigilantes included four who had or would serve in such positions within the next five years, who had been elected to offices in state government. The involvement of four veterans of the Texas Revolution further enhanced the public status of the vigilantes. The majority (twenty-four) of the group also participated in the party organizations that emerged in the state during this time. Seventeen of the vigilantes eventually became active Democrats. Men from this group, including most notably party vice president William S. Oldham and secretary Joseph W. Hampton, made up the entire county delegation to the 1854 state convention. *State Gazette* editor John Marshall soon became the acknowledged head of the Texas Democracy. The Know Nothings at least temporarily gained the allegiance of twelve members of the vigilance committee. Candidates of this nativist party, who were to sweep local elections in 1855, had all been vigilantes.[12]

As suited their social station and interest in the problem of slave discipline, most of the vigilantes owned slaves. Eighty-one percent

were slave owners, a figure that unmistakably points to their elite status, since the incidence of slave-ownership was only 48 percent of Austin's heads of family in 1850 and 35 percent in 1860. Exceptional wealth also characterized the group. The following economic portrait indicates a high degree of material success.

1854 Austin Vigilantes
Property Owned, 1860 Census

| Amount | Owners of Realty | Owners of Personalty |
|---|---|---|
| None | 2 | 2 |
| 0–$1,000 | 0 | 2 |
| $1,000–$5,000 | 5 | 5 |
| $5,000–$20,000 | 10 | 11 |
| $20,000–$100,000 | 8 | 4 |
| over $100,000 | 0 | 1 |
| median | $10,000 | $6,000 |

The Austin vigilantes owned over three times more property than the average Travis County head of household, almost six times as much as the average head of family for the state as a whole, and 44 percent more than the typical Texas political leader.[13]

The high socio-economic status and political activism of the vigilantes should not obscure one other common attribute—as individuals they frequently displayed aggressive and discordant personalities. This trait resulted from habits of mind and behavior common to the southern frontier. All but three of the vigilantes were born in the South, in a culture that encouraged militant behavior by implanting individualism, the habit of command, and chivalric concepts of honor.

---

[12] The data on age, occupation, wealth, and slaveholding status were compiled from U.S. Seventh Census (1850) and U.S. Eighth Census (1860), Schedule 1: Free Inhabitants, and Schedule 2: Slave Inhabitants, Travis County; Richard Maxwell Brown, *Strain of Violence: Historical Studies of American Violence and Vigilantism* (New York, 1975), 144–179; *Austin State Gazette*, Jan. 17, Aug. 26, 1854, Dec. 22, 1855; Brown, "Annals," XIV, 31–XVII, 5, 13–15, 26–29; Walter Prescott Webb, H. Bailey Carroll, and Eldon Stephens Branda (eds.), *The Handbook of Texas* (3 vols.; Austin, 1952, 1976), I, 298, 570, II, 198, 311, 639, III, 572; *Members of the Texas Legislature, 1846–1962* (Austin, n.d.), 3, 11, 13, 30, 85, 91; *The Veterans of the Texas Revolution* were Thomas F. McKinney, Anton Burleson, George W. Davis, and James G. Swisher; Ernest William Winkler (ed.), *Platforms of Political Parties in Texas* (Austin, 1916), 37, 40, 55, 56, 63, 65, 68, 71, 75; Larry Jay Gage, "The Texas Road to Secession and War: John Marshall and the *Texas State Gazette*, 1860–1861," *Southwestern Historical Quarterly*, LXII (Oct., 1958), 191–226; John S. Ford, *Rip Ford's Texas*, ed. Stephen B. Oates (Austin, 1963), 234; Hughes, *Rebellious Ranger*, 111; Three of the Know Nothings had previously been prominent Democrats.

[13] The 1854 vigilantes held a mean value of $36,635 in real and personal property combined, while the figure for the average head of household in the county was $12,126. According to Randolph Campbell and Richard Lowe, the total wealth of the average Texas family head was $6,393, and the total holdings of the average political leader was $25,499. See *Wealth and Power in Antebellum Texas* (College Station, Tex., 1977), 119–116. The figures compiled by Ralph A. Wooster suggest that the Austin vigilantes occupied virtually the same economic position as the average statewide leader; members of the 1860 legislature and the 1861 secession convention owned a median value of $6,000 in real estate and $10,000 in personal property. Ralph A. Wooster, "An Analysis of the Membership of the Texas Secession Convention," *Southwestern Historical Quarterly*, LXII (Jan., 1959), 325; Ralph A. Wooster, "Membership in Early Texas Legislatures," *ibid.*, LXIX (Oct., 1965), 171.

Slavery and [...]                                                                                                Austin History Center ✯ Austin Public Library                                                                  n Historical Quarterly

Indian warfare and other features of the frontier environment rein- forced these tendencies and encouraged what one early resident praised as "the wonderful self-reliance of the pioneer settlers of Austin." Racism, ethnic prejudice, and government lethargy also contributed to the process of making Central Texas the region most "irrepressibly prone to violence" in all the United States, according to Richard N. Brown, a leading historian of the subject. The elitist orientation of the Austin vigilantes seemed to temper the propensity toward un- seemly violence, but they had clearly resolved that, as editorial spokes- man Marshall later wrote, "we need some purging out to make us healthy."[14]

Chaired by Mayor Ford, the first public meeting gathered on Sep- tember 27 to consider how to provide "security of slave property in Western Texas." This group established a committee that ten days later reported its methods of assuring "more salutary [sic] regulations" over local slaves. The committee condemned the "dangerous privi- leges" allowed to Austin blacks, and a subsequent meeting approved with little debate the resolutions to tighten up on these liberties and to create a vigilance committee "to enforce a strict compliance." Hav- ing once again deplored the quasi-freedoms allowed by urban slavery, the vigilantes considered what action should be taken against the "peons." The Mexican population, according to the resolutions, asso- ciated with slaves, instilled "false notions of freedom," and made them "discontented and insubordinate." The citizens' meeting of October 7 adopted a report that warned all "transient Mexicans" to leave within ten days or face forcible expulsion. The gathering also resolved to forgo employing Mexican laborers, to "discourage their presence among us," and to empower the vigilance committee to implement the policy. No one defended the "peons," but some debate ensued because, as Judge (Joseph) Lee argued, the eviction resolution "struck

at the Mexican population as a class." In an apparent effort to achieve moderation, the meeting agreed that Mexicans could remain in Travis County if their "good character and good behavior, be vouched for by some responsible American citizen." As a further precaution the vigilance committee called for another general meeting on October 14 to secure a fuller expression of public opinion.[15]

Both newspapers supported the amended form of the resolutions. Ford's State Times, though careful not "to be the advocates of un- worthy Mexicans," concurred with the revised version, which pro- vided an extralegal hearing for the suspects before their expulsion. As always, Marshall's State Gazette advocated "stringent measures," but declared that it did not "wish to be understood as favouring the idea of proscribing the entire Mexican population now among us. . . ." Magnanimously it admitted "there are a few" worthy Mexicans in every county. The public gathering of October 14 adopted the resolutions in their existing form but again reflected some tension between one faction, which sought to eliminate all Mexicans from the Austin community, and another, which wanted to confine action to the "transients" and "urged the most pacific means." The weight of opin- ion considered expelling the Mexicans a necessity, to be accomplished "peaceably if we can, but forcibly if we must."[16]

The meeting seemed to generate support for vigorous, almost in- discriminate use of force. Upon its adjournment the vigilante repre- sentatives formed a cavalcade, marched to the camp of the "transient Mexican population," and gave them notice to leave. The following week the State Times, which had previously advocated fair-minded caution, lashed out at the "pernicious and growing influence of the Mexican peon population now in our midst." Because of the difficulty of convicting those who had "unquestionably committed" criminal of- fenses, the journal argued, all suspects should be summarily ejected. Two weeks after the vigilantes confronted the Mexicans, the State Gazette announced triumphantly, "no Peon remains in the city, who is not vouched for by respectable citizens. It should be the duty of every citizen to aid in preserving the present state of things." The vigilantes directed their purge at some who had given no offense. They drove out the Mexicans at work on the house of merchant Swen M.

---

[14] Brown, "Annals," XVII, 1; Oates (ed), Rip Ford's Texas, xxix–xxxv, 213; William S. Red, "Allen's Reminiscences of Texas, 1838–1842," Southwestern Historical Quarterly, XVIII (Jan., 1915), 287–304; Ronnie C. Tyler, Joseph Wade Hampton, Editor and Indi- vidualist (El Paso, 1969), 5–10, 27, 29; W. S. Oldham, "Colonel John Marshall," Southwest- ern Historical Quarterly, XX (Oct., 1916), 132–138; Alex W. Terrell, "The City of Austin from 1839 to 1865," Quarterly of the Texas State Historical Association, XIV (Oct., 1910), 126. The most complete study of the violent tendencies of the antebellum South is John Hope Franklin, The Militant South, 1800–1861 (Cambridge, Mass., 1956). See especially pages 33–36. In a fine interpretive study Charles S. Sydnor suggested that apparent south- ern lawlessness, of which vigilantism was one expression, resulted largely from the per- sistence of frontier patterns in this rural, plantation-dominated society. "The Southerner and the Laws," Journal of Southern History, VI (Feb., 1940), 3–23; Brown, Strain of Vio- lence, 237–238; Austin Texas State Gazette, Oct. 21, 1854.

[15] Austin Texas State Gazette, Sept. 30 (first quotation), Oct. 14 (second and third quo- tations), 1854; Austin Texas State Times, Oct. 14, 1854 (fourth quotation).

[16] Austin Texas State Times, Oct. 14, 1854, Austin Texas State Gazette, Oct. 1, 1854.

*Slavery ...* ... *tern Historical Quarterly*

Swenson, a member of the vigilance committee. Altogether about twenty families were expelled. In December some unnamed parties cut down and burned the tents of a company of Mexican showmen. The vigilante frame of mind persisted in the following years. According to a northern traveler, in 1855 "a few families, who had returned to Austin, were again driven out." Although some citizens denounced these actions as unwarranted, the *State Gazette* as late as 1859 defended the rough handling of the Mexicans five years earlier. In 1860 only twenty persons with Spanish surnames resided in Travis County, and their position clearly rested on the uncertain toleration of Anglo residents. In fact, a few months after the climax of the expulsion movement the *State Gazette* described Mexicans as "a bad element of society . . . [that] sooner or later will be extinguished."[17]

Besides the anti-Mexican activities of the vigilantes, the 1854 public meetings in Austin produced a spurt of government activity but no real solution to the problems of local slave owners. In the fall of 1854 the legally constituted authorities for the first time began prosecuting a significant number of slave owners for violations of the slave code, especially on the charge of allowing slaves to hire their own time. Other proposals achieved inconsequential results. The vigilance committee, ignoring the October 7 mandate to enforce strict regulations over Austin slaves, faded from the scene after threatening the Hispanic element. Along with representatives from eight other counties, several of the Austin vigilantes attended a slave owners' convention in the fall at Gonzales. This meeting suggested traditional remedies to tighten controls over slaves, asked for the assistance of the United States government in forcing Mexico to alter its policy of harboring runaways, and devised plans for incorporating mutual-assistance associations for slave owners. The failure of these ideas led to the development of more direct methods. Representatives from Travis and other Central Texas counties met in Bastrop in 1855, where they formulated a scheme to aid General Santiago Vidaurri in northern Mexico in exchange for the extradition of runaway slaves. Following the breakdown of these negotiations, western Texas slave owners fostered an abortive military expedition in October, 1855, led by James H. Cal-

lahan, that attempted to bring fugitives back from across the border.[18] The militancy displayed by slave owners in the Austin area in the mid-1850s produced few of the expected changes. In the years after 1854 none of the problems that Austin slaveholders had attributed to the presence of Mexicans with Mexico remaining the most common destination. Slaves continued to escape from their owners, with Mexico remaining the most common destination. The dangers posed by these fugitives increased in 1856 and 1857, when armed groups of runaways passed through the area or hid in the hills around Austin and conducted periodic raids in search of supplies. Newspapers advocated various measures to combat the problem, none of which yielded practical results. With the "peons" evicted from Austin, blame for the runaway problem shifted largely to slave stealers and abolitionists, but Austin authorities arrested only one "scoundrel" for enticing a slave. From the dominant white point of view the slaves who lived in Austin remained dangerously out of control. Through illicit trading and by forging their own passes, they managed to acquire guns and liquor and even to make use of the mails for what some whites feared were communications with abolitionists. Recreational life included gambling, frolics, and secret meetings at night, which the *State Times* considered "prejudicial to the quietude and good morals of the blacks." Even the slaves' religious activities aroused suspicion. According to the *State Gazette*, prayer meetings were actually "the great rendezvous for bad negroes," where slaves met outside the scrutiny of whites, "and every kind of thievish plot, incendiary work, and conspiracy were concocted[,] circulated, discussed, and attempts made to mature them." At the heart of these complaints lay the feeling that the life-style displayed by Austin's blacks threatened the very existence of slavery. As one journalist wrote, "Either the slave should be kept to his condition, or the institution abolished." But the slave steadfastly refused to be confined to "his condition" and chose instead conduct that whites saw as disorderly and disrespectful. One such "impudent" slave responded to a rebuke by swearing, "let any white man tell him to stop his mouth, and see if he would not give him h[ell]."[19]

---

[17] *Austin Texas State Gazette*, Oct. 21, 28, 1854, Feb. 24, 1855, Sept. 24, 1859; *Austin Texas State Times*, Oct. 21, Dec. 9, 1854; Frederick Law Olmsted, *Travels through Texas; or, A Saddle-Trip on the Southwestern Frontier* (New York, 1860), 164; Austin *Southern Intelligencer*, Dec. 9, 1857; U.S. Eighth Census (1860), Schedule 1: Free Inhabitants, Travis County.

[18] Civil [and Criminal] Minutes, Travis County District Court, E, 19, 20, 21, 190; Austin *Texas State Gazette*, Nov. 4, 1854; Hughes, *Rebellious Ranger*, 117; Ronnie C. Tyler, "The Callahan Expedition of 1855: Indians or Negroes?" *Southwestern Historical Quarterly*, LXX (Apr., 1967), 574–585.

[19] *Austin Texas State Gazette*, June 2, 16, 1855, Mar. 8, 1856 (third quotation), Mar. 14 (second quotation), Apr. 4, Aug. 22, Oct. 24, 31, 1857, June 30, 1860 (fourth quotation); *Austin Texas State Times*, Feb. 17, June 2, July 21, 28, Aug. 18, 1855,** 1, 15, May 31,

The unintimidated attitude and irrepressible freedoms of the slave community made slave owners ever-fearful of insurrection. In 1856 and 1860, while national debate raged over slavery and reports of slave revolts circulated from other parts of the state, the specter of rebellion became frighteningly immediate in the Texas capital. As the Christmas holidays approached in 1856, the *State Gazette* reported that uprisings had been put down south of Austin in nearby Colorado and Lavaca counties, but expressed regret that the plotters, including the whites who instigated the revolts, had been merely whipped rather than lynched. It insisted that Austin should fear for its "citizens—fathers, wives, children—who may be burnt in their houses or murdered in their beds without a moment's warning." The paper concluded, "We are advocates of law and order, but we believe that there are times like these, when the popular vengeance may be meted out to the criminal with as much necessity as we would strike down an enemy in self-defense, or shoot a mad dog in our path." The following week the *State Gazette* claimed to have "reliable information" showing the necessity for precautionary measures in Austin. The "emissaries of free soil" would likely choose the holiday season, when masters normally kept a looser rein over the slaves, as the time for fulfilling the "blood-thirsty schemes." Of slave owners, the newspaper demanded a crackdown on the "idle, loitering negroes." To the authorities it insisted on the creation of an armed, mounted, paid patrol. But editor John Marshall refused to place trust in the invigoration of city or county government. As if by second nature, he and other concerned Austinites created a vigilance committee to deal with the suspected emergency.[20]

Though this vigilante movement once again circumvented the normal legal process, it was but an extension of existing law enforcement in that every important local officeholder served on the committee.[21] Led by Mayor Thomas E. Sneed and Chief Justice John B. Costa, two aldermen, the city marshal, and the county sheriff also joined the ranks of the vigilantes. Ten other former or future city, county, or state officials participated in the 1856 vigilante investigation.[22] Just as their 1854 counterparts, these vigilantes were leaders in party organizations, with ten of them representing Travis County at state Democratic conventions and four serving on the Democratic central committee.[23]

Being predominantly southern-born and middle-aged, the members of the 1856 vigilance committee also had social origins similar to those of the previous group. Here the similarities end. The 1856 vigilantes had much more geographic mobility—only nineteen of the thirty-one still resided in Travis County at the time of the 1860 census. Since the insurrection scare centered in Austin, almost all of those who formed the vigilance committee had urban occupations. A majority were professional men; the group included only three laborers and four businessmen. Most conspicuously, seven members of the committee were lawyers. Overall, this group occupied a modest social and economic position. Only twelve held slaves, most of them owning but one or two

---

[20]Austin *Texas State Gazette*, Nov. 15, 22, 1856. Rumors of slave revolt circulated throughout the South beginning in September, 1856, with the conspiracies supposedly designed to mature during the Christmas holidays. One scholar describes the insurrection fears as a contagious panic, but also sees "a fair amount of reality behind the accounts." Harvey Wish, "The Slave Insurrection Panic of 1856," *Journal of Southern History*, V (May, 1939), 222.

June 14, 1856, Mar. 14 (first quotation), May 30, 1857; Austin *Southern Intelligencer*, Aug. 26, 1857, Mar. 3, 1858. As West Texas filled with Anglo settlers in the 1850s, the prospects of successful slave escape to Mexico appear to have lessened. Austin *Texas State Gazette*, Feb. 14, 1857. In vehement language journalists renewed the theme of the need for tightened restrictions by slave owners and local authorities, called for the state legislature to create a reward system to encourage abduction of fugitives from across the border, and even urged support for the liberal party in Mexico in the hope of gaining a treaty to extradite runaways.

[21]The vigilante committee on resolutions was as follows: G. M. Flourney, chairman, J. C. Wilson, W. H. D. Carrington, George W. Glasscock, William M. Fowler, John Marshall, Nat G. Raymond, John Bremond, Ed Finnin, John B. Costa, John S. Ford, P. Humphries. All of this group, with the exception of Costa and Humphries, also served on the vigilante patrol, along with J. F. Purvis, A. Schwartz, William Byrd, Thomas E. Sneed, Joseph Darter, Pet Cook, A. B. Fanton, G. W. McAnnally, J. T. Graves, W. J. Montgomery, W. Von Rosenberg, Alex Evans, John M. Swisher, John T. Price, A. N. Hopkins, J. L. Blinn, George M. Walton, and A. W. Raglan, A. C. Weir chaired the public meeting which received the report of the vigilance committee. Austin *Texas State Gazette*, Nov. 22, 1856.

[22]On the city level, those holding office at the time were aldermen John Bremond and William M. Fowler, and Marshal G. W. McAnnally. Other city officials included Ed Finnin, city treasurer in 1854, John S. Ford, mayor in 1854, and John M. Swisher, an 1851 alderman, and G. L. Walton, an alderman in 1855. The county sheriff was John T. Price. A. C. Weir became sheriff of Travis County in 1859. Two of the 1856 vigilantes assumed leading state positions for a short time following Texas's secession from the Union. William Byrd became adjutant general, and G. M. Flourney was attorney general in 1861. George M. Glasscock was elected to the Texas House of Representatives in 1863. A. N. Hopkins, J. F. Purvis, and H. W. Raglan held assistant clerk posts before and during the 1856 vigilante movement. Brown, "Annals," XV, 5; XVII, 26–29, 58–59, 61, 62, XVIII, 10; Gage, "Road to Secession," 196–197; Austin *Texas State Times*, Apr. 8, 1854; Austin *Texas State Gazette*, Aug. 26, 1854; Ernest William Winkler (ed.), *Journal of the Secession Convention of Texas, 1861* (Austin, 1912), 25; Webb, Carroll, and Branda (eds.), *Handbook*, I, 617–618; *Members of the Texas Legislature*, 48.

[23]In contrast to the earlier group of vigilantes, Democrats dominated the 1856 committee, in part no doubt because the Know Nothings had declined rapidly during the preceding two years. Only John S. Ford, Ed Finnin, and G. L. Walton had been Know Nothings. Winkler (ed.), *Platforms*, 55, 56, 61, 68, 72, 84; Brown, "Annals," XVII, 26–29; XVIII, 35–36; Austin *Texas State Gazette*, Jan. 14, Sept. 15, 1860.

*Slavery and [Vigilantism]*  ◆ Austin History Center ☆ Austin Public Library  *[...] Historical Quarterly*

bondsmen. In terms of wealth, the 1856 vigilantes were average Travis County residents; they had not achieved the same amount of affluence as the 1854 vigilantes or other political leaders across the state.[24] Their middle-class economic status is shown by the table below:

### 1856 Austin Vigilantes
### Property Owned, 1860 Census

| Amount | Owners of Realty | Owners of Personalty |
|---|---|---|
| None | 3 | 5 |
| $0–$1,000 | 3 | 4 |
| $1,000–$5,000 | 5 | 6 |
| $5,000–$20,000 | 3 | 3 |
| $20,000–$100,000 | 4 | 1 |
| over $100,000 | 1 | 0 |
| median | $3,500 | $1,500 |

While the 1854 vigilance committee represented a county-wide movement by the social and economic elite to deal with a divisive social problem, the 1856 committee formed in response to an immediate, potentially catastrophic, crisis. In 1856 the regular leaders of county and city formed a vigilante group in order to bypass the legal process that they apparently believed hampered energetic investigation and repression. That the average citizen in Austin participated more fully in 1856 reflected the fact that the 1854 episode was not an insurrection and threatened only property.

On November 22 the vigilance committee reported its findings and recommendations to a public meeting in Austin. Although it condemned the unsupervised nighttime religious gatherings of slaves, the committee concluded that "there had been no actual insurrection contemplated by an organized body of negroes, nor was there any to be apprehended if the necessary vigilance be now exercised by the public authorities." At the same time the report made it clear that the potential for danger had not passed, and the meeting attempted to provide the "necessary vigilance" by preparing resolutions for "the better regulation of the servile population" and by securing volunteers for a patrol, under the direction of the city marshal. On motion of *State Gazette* editor Marshall, the gathering also resolved "that the county Court and Corporation of Austin be requested to spare no expense in employing such means as may be found necessary to secure an effective police during the Christmas holidays." The vigilance committee disappeared following this attempt to infuse some energy into local government.[25]

The vigilance effort prompted quick action by the authorities. Within two weeks Chief Justice Costa reported regularly organized patrols at work in every precinct. The ever-alert *State Gazette* was satisfied that the county court had "done its share in the execution of the law . . . to show our servile population that a strict police is to be maintained." Even after the crisis, county officials remained active. In 1857 the court considered methods of establishing "a more efficient black police law." A military company formed during the insurrection investigation served as an auxiliary to the public provisions for order and security. County commissioners continued appointing slave patrols, though perhaps a bit irregularly, throughout the antebellum period. According to Frank Brown, clerk during these years, the Travis County court became generally more active and effective beginning in 1857.[26]

The city joined in this campaign for order by adjusting its black code. Municipal statutes reaffirmed the curfew system, attempted to prevent unlawful assemblages, and outlawed liquor sales to slaves. More importantly, in 1855 local law for the first time declared the overall "conduct, carriage, demeanor and deportment of slaves" to be a public responsibility. Another revision the next year specifically delineated the duties and powers of the mayor, city council, and marshal. An intricate licensing law designed to curtail the practice whereby

---

[24] The median age of the twenty vigilantes whose birthdates could be identified was thirty-seven; only three were born outside the South. Meaningful comparison on the basis of average wealth is difficult because two of the 1856 vigilantes owned as much property as the rest combined, thus drastically inflating the mean figure for the group. When the holdings of these two wealthiest are excluded, the mean amount of property owned by the 1856 vigilantes was almost the same as the average Travis County head of household ($2,826 for the vigilantes and $2,126 for the average family head) and just over twice that of the average family head in Texas. For comparison with the 1854 vigilantes and county-wide political leaders, see p. 8 above. The wealth profile of the 1856 vigilantes was compiled out of the manuscript census returns, U.S. Eighth Census (1860), Schedule 1: Free Inhabitants, and Schedule 2: Slave Inhabitants, Travis County.

[25] *Austin Texas State Gazette*, Nov. 29, 1856, Mar. 14, 1857.

[26] Ibid., Dec. 6, 16, 1856, Nov. 21, 1857; Minutes, Travis County Commissioners Court, Vol. B, Book 3, pp. 347–348, 385–386 (Austin-Travis County Collection, Austin Public Library); Brown, "Annals," XVIII, 64, 68.

slaves hired their own time apparently had little effect, but a city ordinance of 1859 preventing slaves from living separately from their owners was respected at least to some degree in subsequent years.[27]

Proof of the growth of local government came in 1860, when slave-revolt hysteria again swept through the state. The major panic occurred in northern Texas, but the reporting of the *State Gazette* contributed to fears in the capital. Though it disavowed intending to create "any false impression" or to trifle "with the feelings of the people," the paper emphasized that "powerful enemies to the institution live here among us," seeking to "deluge with blood" all those who supported slavery. In early August the paper called for stern counter-revolutionary measures: "Let the citizens of Texas everywhere be on their guard, and we hope that should a well attested case of incendiarism be discovered, that the severest penalty will be quickly inflicted." The fear of slave revolt in Austin was fanned by more than newspaper rhetoric. Beginning in mid-July, a series of fires destroyed two manufacturing establishments and damaged three other buildings. In all but one instance the owners believed that arsonists were responsible for the blazes. Some citizens claimed to have seen an unidentified man apply a torch to one of the houses that burned.[28]

In this emotionally wrought atmosphere city officials responded quickly and decisively to uncover evidence of a slave uprising. The mayor ordered an examination of all slave quarters; this investigation disclosed that blacks had firearms, knives, and a substantial quantity of powder. Their possession of weapons must not have seemed unduly disturbing, for even the *State Gazette* concluded, "the powder is the only ominous sign; it may yet be explained." Apparently it was explained, for the paper made no further mention of the results of the search, and an Austin resident wrote to a business associate that the city inquiry found "nothing of any importance."[29]

Besides sponsoring this investigation, the city government took the precautionary measures of increasing patrols and providing additional fire-fighting equipment. The county court also invigorated the patrol. The results of these activities were not always soothing. The alerted city patrol hailed and fired at one armed black man who eluded it. Other individual acts of slave rebellion also occurred, but Austin did not experience a major panic. Some, like local Unionists, concluded that spontaneous explosions of matches and other unknown causes, rather than arsonists, had caused the fires, and that secessionists exaggerated the incidents for partisan purposes.[30] Although residents still had misgivings about the rebelliousness of local slaves and the activities of "black republicans," most of the alarm dissipated quickly. Even the vigilante-minded *State Gazette* dropped its calls for further investigation, praised the conduct of the mayor, and discontinued speculation that a conspiracy existed in Austin. When, two months after the first fires, slaves in and around the city turned to arson, no panic ensued. The prompt action of the authorities averted any real hysteria or vigilante excesses, whereas hardly greater provocations in North Texas resulted in illegal beatings and executions. Clearly local government had matured considerably during the late 1850s in its ability to provide order and to maintain law.[31]

To the victims of illegal activities—the Mexican Texans and the slaves—vigilantism was a formidable force of oppression. Folk stories told by descendants of Austin slaves reveal a spirit of jubilation in confounding attempts to regulate dances or other forms of black social life, and a dislike of the "Paterollers" [sic], without distinguishing between vigilante and legally constituted authority. The 1854 vigilante movement launched a period of increased Anglo-Hispanic conflict. The example of Seguin and Austin seemed to stimulate attacks on Mexicans throughout Southwest Texas. A wave of eviction movements

---

[27] *Austin Texas State Gazette*, Feb. 24, 1855; *Charter and City Ordinances of the City of Austin* (Austin, 1859), 42–45; *Austin Southern Intelligencer*, Jan. 14, 1857; Records of the Mayor's Office and Board of Aldermen, Apr. 5, 1864 (Office of the City Clerk, City Hall, Austin).

[28] *Austin Texas State Gazette*, July 28, Aug. 4, 1860; *Austin Southern Intelligencer*, July 28, 1860.

[29] *Austin Texas State Gazette*, Aug. 4, 1860; John T. Allan to D. C. Osborn, Aug. 2, 1860, John T. [Allan] Letter Book (Archives, University of Texas Library, Austin).

[30] *Austin Texas State Gazette*, July 28, Aug. 4, 25, Sept. 1, Oct. 6, 1860. Minutes, Travis County Commissioners Court, B, 347–348, 385–386.
According to the Austin correspondent of the Galveston *News*, local citizens discovered an eleven-year-old black girl setting fire to a residence. Under interrogation by the mayor, she confessed to burning one of the buildings that had been destroyed earlier. She reportedly was seeking revenge for the lynching of her father in Missouri and refused to implicate an accomplice. Galveston *Weekly News*, Aug. 14, 1860. According to the Unionist view, secessionists had exploited fears of slave insurrection for political effect, in the words of John T. Allan, to make "the people ripe for treason, and rebellion, and murder." John T. Allan to D. C. Osborn, Oct. 17, 1860, Allan Letter Book.

[31] Lucadia Pease to "Dear Sister," Dec. 4, 1860, Pease-Graham-Niles Family Papers (Austin Public Library); E. Barret to "My Dear Uncle," Dec. 29, 1860, in Texas Writers' Project, Austin File Chronological, 1860, Item 4, p. 1 (Austin Public Library); Austin *Southern Intelligencer*, Oct. 10, 1860; Brown, *Strain of Violence*, 239–241; William W. White, "The Texas Slave Insurrection of 1860," *Southwestern Historical Quarterly*, LII (January 1949), 259–285.

swept through the area; the entire Mexican populations were expelled from Colorado and Matagorda counties in 1856, and a portion of the Mexican-born residents of San Antonio were dispossessed and driven across the border sometime later. A citizens group in Uvalde in September, 1857, passed resolutions aimed at preventing Mexicans from even traveling through the county unless they obtained "passports" from local officials. Large-scale instances of group violence also erupted. Eleven Mexicans were reportedly lynched near the Nueces River in 1855, and in that same year vigilante attacks against Mexican teamsters began in Guadalupe County. This latter activity developed in 1857 into an organized gang war known as the Cart War, which by October had resulted in the deaths of seventy-five cartmen, according to the Mexican Legation in Washington, D.C. These attacks produced a response from the State Department and from Governor Elisha M. Pease, but subsided only after the appearance of counter-vigilante groups. The Mexican Texans responded to the breakdown of law and order in several ways. Some Bexar County families chose to relocate on the southern side of the Rio Grande. Others remained in Texas to fight back. The astute northern traveler Frederick Law Olmsted concluded that the vigilantism in Austin contributed to rising ethnic tensions, and he speculated that, "deprived of their means of livelihood, and rendered furious by such wholesale injustice, it is no wonder if they [the evicted Mexicans] should take to the very crimes with which they are charged." This prediction came true in 1859 when Texas Mexicans rallied to the cause of Juan Cortina, who had led a war of retribution against Anglos in the Rio Grande valley. Such attitudes had their origin in the vigilantism that began in the Texas capital in 1854. As a Mexican border commission noted some twenty years later, "the Texan Mexicans . . . were wronged and outraged with impunity, because as far as they were concerned, justice and oppression were synonymous."[32]

In contrast to the victims of vigilantism, those in Austin who valued property, order, and white supremacy viewed the vigilante movements as constructive and necessary supplements to the regular course of justice. In turning to vigilantism in the mid-1850s the leaders of Austin drew on a long-standing American tradition. Here, as elsewhere, the frontier setting presented serious problems of law enforcement. Rapid settlement, primitive police systems, and disorderly behavior by minority groups combined to threaten what conservatives saw as the fundamental virtues of civilization. Without a highly developed sense of due process, frontier elites—including leaders of the legal profession, wealthy citizens, government officials, and others with high status formed these "conservative mobs" to assert their control over society.[33]

From the point of view of this elite group, vigilantism in Austin must have seemed quite successful. Although this form of policing failed to force slaves into the desired mold of obsequiousness, it purged a supposedly disruptive force in eliminating the Hispanic group and quelled a suspected insurrection. Slaves in Austin assumed and, for the most part, maintained greater liberties than existed in rural environments, but vigilantism helped preserve the institution of slavery from a more complete disintegration, if only by attacking scapegoats and exorcising deep-seated fears. Moreover, when the vigilance committees accomplished their most pressing tasks, they returned power to the legally established authorities. In the last few years of the antebellum period, municipal and county government in Austin safeguarded order, security, and property without the aid of its vigilante arm. With the waning of the frontier, vigilantism also passed, or at least lay dormant, awaiting some other vital impulse to bring it to life again.

---

[32] The Story of Mrs. Sallie Johnson, Federal Writers' Project, "Slave Narratives," in vertical file on slavery, folder 2 (Austin Public Library); J. Mason Brewer (ed.), *An Historical Outline of the Negro in Travis County* (Austin, 1940), 14; De León, "White Racial Attitudes," 7, 137–146; Wish, "Panic of 1856," 207, 208; *Report of the Mexican Commission on the Northern Frontier Question* (New York, 1875), reprinted in Carlos E. Cortés (ed.), *The Mexican Experience in Texas* (New York, 1976), 129–134; John J. Linn, *Reminiscences of Fifty Years in Texas* (Austin, 1935), 352–354; Roger Allen Griffin, "Connecticut Yankee in Texas: A Biography of Elisha Marshall Pease" (Ph.D. diss., University of Texas, Austin, 1973), 99–102; Olmsted, *Texas*, 164.

[33] Brown, *Strain of Violence*, 95–133, 145–179.