IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL. | § § § | |
| vs. | § § | CIVIL ACTION NO. 2:03-CV-354 |
| RICK PERRY, GOVERNOR OF TEXAS ET.AL. | § § | Consolidated |

**LULAC's MOTION AND BRIEF IN SUPPORT OF REASONABLE FEES AND COSTS**

Plaintiffs League of United Latin American Citizens (LULAC), et. al. move this Court for an award of attorneys' fees and costs of litigation pursuant to 42 U.S.C. §§ 19731(e) and 1988. In support of their motion, Plaintiffs would show the following:

1. The Plaintiffs brought this action on November 3, 2003, pursuant to the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, seeking declaratory relief under 28 U.S.C. §§ 2201 and 2202 and injunctive relief. Plaintiffs challenged the Texas Congressional Redistricting Plan, 1374C, used by the State of Texas for the 2003 elections as dilutive of the voting strength of the Latino community in south and west Texas.

2. In June 2006, the United State Supreme Court found that Plan 1374C violated Section 2 of the Voting Rights Act, 42 U.S.C. 1973c because it diluted the voting strength of the Latino Community in south and west Texas by taking away their ability to elect candidates of their choice, *LULAC v. Perry*, 126 S. Ct. 2594.

3. Plaintiffs are the prevailing party in this litigation. This case involved two trips to the Supreme Court and resulted in a Supreme Court holding in favor of the LULAC. Plaintiffs achieved their objectives in the litigation by securing a Congressional Plan ordered by this court, in which the violation declared by the Supreme Court was remedied and the congressional district in south and west Texas had to be redistricted.

4. LULAC retained counsel to prosecute this case. In order to obtain the results in the litigation, Plaintiffs' counsel had to commit reasonable time and expenses, which are reflected in the filed affidavits.

5. As reflected in the affidavits of attorneys Rios, Garza, Korbel, Vera, M. Castro and J. Castro the following is a summary of fees and costs sought for compensation in this action at the prevailing market rates indicated:

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| Rolando L. Rios | 953.6 | $375.00 $ | 357,600.00 |
| Melissa Castro | 228 | $195.00 $ | 44,460.00 |
| Jose Garza | 610.8 | $375.00 $ | 229,050.00 |
| George Korbel | 600.9 | $375.00 $ | 225,337.50 |
| Luis Vera | 345 | $215.00 $ | 74,175.00 |
| Judith Castro | 26 | $300.00 $ | 7,800.00 |
| Paralegal | 89.9 | $85.00 $ | 7,641.50 |
| total hours & fees | 2854.2 | | $946,064.00 |

6.      **TAB A** to this motion is an affidavit of Mr. Rick Gray documenting the prevailing rate for this type of litigation. **TAB B** to this document is a stipulation entered by the State of Texas, through their counsel of record during the state redistricting case heard by this court, *Balderas v. State of Texas*, No. 6:01-cv-158, in which the State stipulated that a fee of $325.00 was a reasonable fee for attorneys Rios and Garza. Since this stipulation was entered five (5) years ago, our request of $375.00 in today's market is reasonable. Finally, **TAB C** is documentation that for the 1990 congressional redistricting legal battle, *Bush v. Vera*, the plaintiffs attorneys documented over 2,500 hours *just for the appeal* portion of that case ten years ago and were compensated by the court; the decision indicates that the fees for the trial on the merits was settled, (see pages 2 and 4). Nevertheless, this information gives the court some

LULAC MOTION and BRIEF FOR ATTORNEY FEES-Page 2

perspective on the number of hours required to properly prosecute a case of this magnitude.

      7.    Finally, Plaintiffs seek compensation for the following costs and expenses as detailed in the filed affidavits:

**Expenses**

| | |
|---|---|
| Rios Firm | $10,263.09 |
| Garza Firm | $2,470.52 |
| LULAC National | $19,095.28 |
| Korbel Firm | $2,911.00 |
| **Total Expenses** | **$34,739.89** |

      8.    Accordingly, Plaintiffs request attorneys' fees, expenses and costs for the services provided totaling **$980,803.89**

      9.    MULTIPLIER ON FEES: LULAC also seeks a multiplier of the fee request. In extraordinary circumstances, such as the ones presented in this case, the courts have allowed for a multiplier of the final fees awarded. The Supreme Court has at least twice stated that "in some cases of exceptional success an enhanced award may be justified." *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983); and *Blum v. Stenson,* 465 U.S. 886, 897 (1984). Given the exceptional success reached in this case and as further elaborated in our brief, we seek a multiplier of 1.5. Therefore, with the multiplier of 1.5 the total request for fees is **$1,419,096** plus expenses of **$34,739.89** which totals **$1,453,835.89**

      10.    <u>Interest on fees</u>: The law allows interest to occur from the time of entitlement to

3

fees. This case was decided by the Supreme Court on June 28, 2006; therefore, LULAC request that interest be awarded as of the Supreme Court decision when LULAC became prevailing party in this case. The interest rate should be based on the rate established for Treasury Bills set by the United States Treasure Department.

### Legal Principles and Factual Support for Attorney Fees

1.      An award of Reasonable Attorneys' Fees and Costs is proper under 42 U.S.C. §§1973-l(e) and 1988.

2.      This Motion is appropriate since final judgment was entered in this cause with regard to the United States Congressional Districts on August 4, 2006.

### Prevailing Party

3.      Prevailing parties are entitled to recover "a reasonable attorney's fees as part of the costs." 42 U,S.C. §§ 19731(e) and 1988.

4.      Supreme Court has determined that civil rights plaintiffs are prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Texas State Teachers Association v. Garland Independent School District, 489 782, 789,* 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), In other words, "the plaintiff must be able to point to. a resolution of the dispute which changes the legal relationship between [it] and the defendant," *Texas State Teachers, 489* U.S. *at 792.* In this case, the Supreme Court decision declared that the rights of Latino voters in south and west Texas were violated and mandated the redrawing of the south and west Texas congressional districts.

5.      LULAC claimed that the Defendant State of Texas, in adopting Congressional Redistricting Plan 1374C, violated Section 2 of the Voting Rights Act because it diluted the voting

**Perales Decl.**
**00301**

strength of the Latino community in south and west Texas. Specifically, that Plan 1374C "fragmented cohesive Latino voters in Webb County" (docket entry # 33 para 15 of LULAC First Amended Complaint) and eliminated an effective cohesive Latino district (CD 23) by reducing the Spanish surnamed voter registration rate below 50% (docket entry #33 para 18). Further, LULAC alleged that CD 25 created in Plan 1374C unnecessarily fragmented Latino voters in Hidalgo, Cameron and Travis Counties (docket entry #33 para 18).

6.     LULAC presented witnesses from Webb County and from Travis County to testify on the vote dilution that was created by Plan 1374C in those areas of Texas.

7.     The Supreme Court found that Plan 1374C violated Section 2 of the Voting Rights Act: "We hold that the redrawing of the lines in District 23 violates § 2 of the Voting Rights Act." *LULAC v Perry*, 126 S. Ct. 2594, at 2623. In fact, the Supreme Court specifically cited the pages 4 and 5 of LULAC Complaint as the basis for the vote dilution claim that it upheld, *Id* at 2620.

8.     Moreover, the Supreme Court held that "the redrawing of lines in District 23 caused the Latino share of the citizen voting-age population to drop from 57.5% to 46%" *Id* at 2615, and that the old CD 23 "did possess electoral opportunity protected by § 2", *Id* at 2615.

9.     Further, the Supreme Court found that CD 25 was an invalid replacement district for CD 23 and that it unnecessarily fragmented the Latino community through its non-compactness and by uniting the geographically distinct Latino community of Austin with the Latino community in Hidalgo County.

10.     Finally, the Supreme Court found that "The districts in south and west Texas will have to be redrawn to remedy the violation in District 23…" *Id* at 2623

5

**Perales Decl.
00302**

11.     In addition to the obvious substantial victory of securing a finding of violation of Section 2 of the Voting Rights Act, LULAC secured the remedy it sought for the 23rd Congressional district. As stated by Mr. Rick Gray in his affidavit supporting our fees request:

> "I entered this case during the remedy phase of this case as counsel for Intervenor Cuellar. In that capacity I reviewed all the plans submitted by the parties as proposed remedies. LULAC's plan A was the only plan submitted that suggested placing all of Webb County in the 28[th] Congressional District and to raise the HCVAP of the 23[rd] Congressional District above 57% by moving Latino population from South Bexar County into the District. This is the precise remedy adopted by this Court in its remedial plan. Moreover, during the remedial hearing it was suggested that there was no history of Latinos from South Bexar County being combined with Latinos from West Texas to form an effective Latino District. At Mr. Garza's suggestion, I presented to the this Court argument that showed that: Texas Senate District 19 in fact had been drawn in such a fashion; was approximately the same size as a Texas Congressional District; had been accepted by this Court in the *Balderas* litigation; and had consistently, over more than 10 years, worked as an effective Latino district."

"[T]he degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all." *Texas State Teachers Association v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 790, 109 S.Ct, 1486, 1492, 103 L.Ed.2d 866 (1989). In this case, the LULAC not only succeeded in reversing the district court decision on the Voting Rights Act claim but also obtained the remedy they were seeking.

### Johnson Factors[1] --The Lodestar Analysis

12.     The Fifth Circuit has provided the following guidance for district courts to determine an appropriate award of attorney's fees:

---

[1] The *Johnson* factors are as follows: (1) the time a labor required, (2) the novelty and difficulty of the question, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by *the* client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relations with the clients, (12) awards in similar cases, Johnson, 488 F.2d. at 717. These factors are discussed in the affidavits filed in support of this motion for fees and costs.

6

In *Johnson v. Georgia Highway Express, Inc., 488* F.2d 714 (5th Cir. 1974), we established twelve factors which district courts must consider in deciding the amount of attorney's fees to award to a prevailing plaintiff. The twelve factors are considered within the framework outlined in *Copper Liquor, Inc. v. Adolph Coors, 684* F.2d 1087 (5th Cir. 1982) *[Copper Liquor III].* Under *Copper Liquor* the district court should: (1) ascertain the nature and extent of the services supplied by the attorney; (2) value the services according to the customary fee and quality of the legal work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance, 684 F.2d at 1092. The product of factors (1) and (2) is called the "lodestar." *See Nisby v. Commissioners Court,* 798 F.2d 134, 136-37 (5th Cir. 1986).

13. Subsequent to the opinion in *Johnson,* the Supreme Court held that an award of attorney's fees under section 1988 should normally be based on multiplying a reasonable number of hours worked by a reasonable rate of compensation. *Blum v. Stenson, 465* U.S. 886, *888, 104* S.Ct.1541,1548, 79 L.Ed.2d 891, 895 (1984); *Hensley v. Eckerhart,* 461 U.S. *424, 434,* 1.03 S.Ct. 1933, 1939-40, 76 L.Ed.2d 40, 50 (1983). The Court noted, however, that the calculation of the lodestar does not end the inquiry and that other considerations may persuade the district court to increase or decrease a fee award. *Hensley, 461* U.S. at *434,* 103 S.Ct. at 1940, 76 L.Ed.2d at 51. In *Brantley v. Surles,* 804 F.2d 321(5th Cir. 1986), another panel of the court upheld a fee award where the district court did not evaluate each *Johnson* factor because the overall award "me[t] the Supreme Courts guidelines in *Blum and Hensley. Id.* at 326. Further, in a case decided before *Blum* and *Hensley,* the court stated that if there is "some assurance that the court has arrived at a just compensation based upon appropriate standards ..., it will not always be necessary for a district court to address each of the twelve *[Johnson]* factors in explaining the considerations affecting its decision." *Davis v. Fletcher,* 598 F.2d 469, 471 (5th Cir. 1979). Thus, the district court must utilize the *Johnson* factors in its analysis on the issue of attorney's fees, it will not be reversed summarily if a district court finding omits discussion of one of *the Johnson* factors so

7

long as the record clearly indicates that the district court has utilized the *Johnson* framework as

the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount

that can be said to be just compensation. *Cobb v. Miller,* 818 F.2d 1227,1231-32 (5th *Cir.*

1987)." *See also Sims v. Jefferson Downs Racing*

*Assn, 778* F.2d 1068, *1084* (5th Cir, 1985) (referring to "discussion of methodology" in

*Copper Liquor III* and *Riddell v, National Democratic Party,* 712 F.2d 165 (5th Cir. 1983)).

### Determination of Amount of Fees

14.) In determining the amount of fees, a court should "(1) ascertain the nature and

extent of the services supplied by the attorney, (2) value the services according to the customary

fee and quality of the legal work, and (3) adjust the compensation on the basis of the other

*Johnson* factors that may be of significance in the particular case." *Alberti v. Klevenhagen,* 927

F.2d 927, 930 (5th Cir. 19990); quoting *Leroy v. City of Houston,* 831 F.2d 576, 583 n.11 (5th Cir.

1987), cert. denied, 486 U.S. 1008 (1988).

15.) First, the Court determines the reasonable number of hours that the attorneys

spent on the case by reviewing the attorneys' time records. *Alberti,* 927 F.2d at 930. Attached to

the Motion for Attorney's fees are documents directed at demonstrating the reasonableness of the

hours documented in this case.

16.) After determining the number of compensable hours, the court "selects an

appropriate hourly rate based on prevailing community standards for attorneys of similar

experience in similar cases." *Id* at 938, quoting *Sims v. Jefferson Downs Racing Ass'n.,* 778 F.2d

1068, 1084 (5th Cir. 1985). Attached to the Motion for Attorney's fees is an affidavit from a

respected voting rights litigator stating that our request is reasonable along with a stipulation in

which the State of Texas stipulated to a $325 per hour rate back in 2001.

8

17.) A court may, in appropriate cases, adjust the lodestar up or down in accordance with relevant *Johnson* factors not already included in the lodestar. *Id* Several of the *Johnson* factors are nor considered independently, because the lodestar determination subsumes them . *Id.*

18.) The Supreme Court has at least twice stated that "in some cases of exceptional success an enhanced award may be justified." *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983); and *Blum v. Stenson,* 465 U.S. 886, 897 (1984). A number of circuit courts have approved upward adjustments where exceptional results were obtained. *See e.g.: Hyatt v. Apfel,* 195 F. 3d 188 (4th Cir. 1999)(enhancement for 1.33 for exceptional success); *Wing v. Asarco Inc.* 114 F.3d 986 (9th Cir. 1997)(enhancement of 2.0 in part for exceptional results); *White v. City of Richmond,* 713 F.2d 458 (9th Cir. 1983)(enhancement of 1.5 for exceptional success in the face of great odds). The 5th Circuit has also recognized the appropriateness of an upward adjustment to the loadstar in a voting rights case involving a novel issue, *Flowers v Riley,* 675 R. 2d 704, 707 (1982)( approved a multiplier of 33%) Given the extra ordinary results obtained in reversing the district court decision on a novel issue and winning in the Supreme Court on a 5-4 decision, and in securing a remedy to the violation found in District 23, as suggested by Plaintiff, LULAC, this Court should adjust the lodestar upward by a factor of 1.5.

### Costs

19.) It is also appropriate to require Defendants to reimburse Plaintiff-Intervenor's attorneys for reasonable costs. An award of reasonable attorneys fees pursuant to 42 U.S.C. §1988, for example, includes an award of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client." *Neufeld v. Searle Laboratories*, 884 F.2d 335, 342 (8th Cir. 1989). Citing *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4,30 (D.C. Cir.

9

1984), cert. Denied, 472 U.S. 1021 (1985); see also *Rendon v. AT&T Technologies*, 883 F.2d

388, 399-90 (5th Cir. 1989) (timely request for fees and expenses is appropriate).

## Hours and Market Rate

20.) In this case, LULAC attorneys devoted the following number of hours to the

successful prosecution of this cause and request the following loadstar:

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| Rolando L. Rios | 953.6 | $375.00 $ | 357,600.00 |
| Melissa Castro | 228 | $195.00 $ | 44,460.00 |
| Jose Garza[2] | 610.8 | $375.00 $ | 229,050.00 |
| George Korbel | 600.9 | $375.00 $ | 225,337.50 |
| Luis Vera | 345 | $215.00 $ | 74,175.00 |
| Judith Castro | 26 | $300.00 $ | 7,800.00 |
| Paralegal | 89.9 | $85.00 $ | 7,641.50 |
| **total hours & fees** | 2854.2 | | **$946,064.00** |

The state has stipulated that the prevailing market rate for Jose Garza and Rolando L. Rios is

$325.00 per hour, (TAB B in Motion for Fees). Moreover, Mr. Rick Gray has testified that the

prevailing market rate for Mr. Garza, Mr. Rios and Mr. Korbel is now $375 per hour and that the

prevailing market rate for Ms Castro is $195.00 per hour. (TAB A in Motion for Fees)

Therefore, Plaintiff's requested rate of compensation and lodestar are reasonable.[3]

21.) Plaintiff's counsel also expended the following out-of-pocket expenses in this

cause and request an award of costs, as part of attorneys fees in the following amounts:

---

[2] As noted in Mr. Garza's and Mr. Korbel's affidavits and summary tables attached thereto, hours have been
discounted to account for efforts challenging the plan as a political gerrymander. Plaintiff would therefore,
respectfully request that no further discount of hours be undertaken.
[3] Attached as TAB D to this brief is an newspaper article in which they report that the State of Texas spent over $3
Million on their attorneys on redistricting. The outside counsel billed at $375 per hour back in 2001.

**Perales Decl.
00307**

**Expenses**

| | |
|---|---|
| Rios Firm | $10,263.09 |
| Garza Firm | $2,470.52 |
| LULAC National | $19,095.28 |
| Korbel Firm | $2,911.00 |
| **Total Expenses** | **$34,739.89** |

22.) Accordingly, Plaintiffs request attorneys' fees, expenses and costs for the services provided totaling **$980,803.89**

22.) MULTIPLIER ON FEES: As mentioned in paragraph 18 above, LULAC also seeks a multiplier of the fee request. In extraordinary circumstances, such as the ones presented in this case, the courts have allowed for a multiplier of the final fees awarded. Given the exceptional success reached in this case and as further elaborated in our brief, we seek a multiplier of 1.5. Therefore, with the multiplier of 1.5 the total request for fees is **$1,419,096** plus expenses of **$34,739.89** which totals **$1,453,835.89**

23.) Interest on fees: The law allows interest to occur from the date of entitlement, *Jenkins v Missouri*, 931 F. 2d 1273, (8th Cir.) *cert denied*, 502 U.S. 925 (1991). This case was decided by the Supreme Court on June 28, 2006; therefore, LULAC request that interest be awarded as of the Supreme Court decision. The interest rate should be based on the rate established for Treasury Bills set by the United States Treasure Department.

DATED: August 17, 2006                    Respectfully Submitted,

11

By: _____
Rolando L. Rios –Attorney in charge
SBN. 169359000 / FBN: 14370

Rolando L. Rios
George Korbel
The Law Office of Rolando L. Rios
115 E. Travis, Suite 1645
San Antonio, Texas 78205
Ph    (210) 222-2102
Fax   (210) 222-2898

Jose Garza
SBN: 07731950 / FBN: 1959
Judith A. Sanders-Castro
SBN:17595255
The Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
Ph (210) 392-2856

Luis Roberto Vera, Jr.
SBN: 20546740 / FBN: 16294
LULAC General Counsel
105 S. St. Mary's Street
San Antonio, Texas 78205
Ph    (210) 225-3300
Fax   (210) 225-2060

Attorneys for Plaintiff, LULAC-Statewide

## CERTIFICATE OF SERVICE

I, Rolando L. Rios, hereby certify that I am a member of the Bar of this court, and that I have this 18th day of August, 2006, caused one copy of the LULAC's Motion and Brief For Reasonable Attorney Fees along with the accompanying Order and affidavits of attorneys Rios, Garza, Korbel, Castro and Vera to be served electronically to:

John Ament johnament@hotmail.com

**Perales Decl.**
**00309**

Steve Bickerstaff sbickerstaff@bickerstaff.com

Gary L. Bledsoe garybledsoe@sbcglobal.net

Don Cruse don.cruse@oag.state.tx.us

R. Ted Cruz ted.cruz@oag.state.tx.us

Jose Garza garzpalm@aol.com

Richard Scott Gladden richscot1@hotmail.com

Anthony P. Griffin agriffinlawyers@sbcglobal.net

Javier P. Guajardo jpguajardo@sbcglobal.net

Max Renea Hicks rhicks@renea-hicks.com

Robert M. Long Micklong@earthlink.net

David C. Mattax david.mattax@oag.state.tx.us

Robert Stephen Notzon notzonlaw@sbcglobal.net

Morris L. Overstreet moverstreet@tsulaw.edu

Nina Perales nperales@maldef.org

Lucas A. Powe, Jr. spowe@ulaw.utexas.edu

Rolando L. Rios rrios@rolandorioslaw.com

Thomas A. Saenz tsaenz@maldef.org

David Weiser dweiser@katorparks.com

Don R. Willett don.willett@oag.state.tx.us

Jeremy D. Wright jwright@katorparks.com

Rolando L. Rios

13

Perales Decl.
00310

## N THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL. | § § § | |
| vs. | § § | CIVIL ACTION NO. 2:03-CV-354 |
| RICK PERRY, GOVERNOR OF TEXAS ET.AL. | § § | Consolidated |

## AFFIDAVIT OF RICHARD E. GRAY, III IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES AND COSTS

**BEFORE ME,** the undersigned authority, on this day personally appeared Richard E. Gray, III who swore on oath that the following facts are true:

"My name is Richard E. Gray, III. I am over 18 years of age, of sound mind, and fully competent to make this affidavit. I have personal knowledge of the facts stated herein and they are all true and correct.

I have been an attorney for 30 years and am currently in private practice in the firm of Gray and Becker. *See* attached vitae. I have litigated cases involving questions of statutory and constitutional law regarding statewide redistricting and have represented the State of Texas in such cases for the last three decades. I have represented the State as the Executive Assistant Attorney General under Mark White, and as out-side counsel in private practice. I have overseen such litigation and I have been attorney in charge for the State in such litigation.

Through these experiences, I have become very familiar with the demands such litigation makes upon the attorneys and equally familiar with the skills it takes to take such a case from inception through discovery, pre-trial motions, trial and appeal - to a successful

Perales Decl.
00311

## Tab A

completion in the United States Supreme Court. I have also defended the State at the conclusion of such cases through the attorney's fees stage. In fact, I represented the State during the fees stage of the *Vera v. Bush* litigation.

I have known Jose Garza, Rolando L. Rios and George Korbel for over twenty years. I have had the opportunity to litigate with Mr. Garza in redistricting, as my co-counsel, and against Jose Garza, Rolando Rios and George Korbel as opposing counsel, in statewide redistricting cases. I am familiar with the high quality of work they all produce. I am also familiar with their reputation in the legal community and know that they are both skilled and respected members of the bar.

I have reviewed the time records of the law office of Jose Garza, and the time records of the law office of Rolando Rios and George Korbel and I find that they represent the reasonable and necessary attorneys' fees and costs based upon the following factors:

1. The novelty and difficulty of the issues involved, the skill required to provide the legal services properly, and the experience, reputation, and expertise of the lawyer or lawyers performing the services;

2. The time and labor involved to perform the legal services properly; and,

3. The fee customarily charged in the community for similar services.

4. The results obtained.

Having litigated for over twenty-five years throughout Texas and in Travis County I am familiar with the prevailing market rate for attorneys of the experience and skill of George Korbel, Rolando Rios, and Jose Garza. They were the principle lawyers for LULAC in this case. Based on my knowledge and experience of prevailing market rates in the Eastern District of Texas and in Travis County, Texas, and based on my knowledge of the skills and expertise and work product of these lawyers, a rate of $375.00/hour is a

reasonable hourly rate for Jose Garza, George Korbel and Rolando L. Rios. In addition,

upon review of the resume submitted by Melissa Castro Killen, I believe a rate of $195.00

per hour, would be reasonable. Finally, it is usual to use paralegals in the preparation of

cases such as this and I believe the prevailing market rate for paralegal work is between

$75.00 and $100.00 per hour.

Further affiant sayeth not.

SIGNED on *August 16* 2006.

_____
Richard E. Gray, III.


**THE STATE OF TEXAS**          §
                                §
**COUNTY OF TRAVIS**            §
                                §


SUBSCRIBED AND SWORN TO before me on this 16th day of August, 2006.

_____
Richard E. Gray, III.

Notary Public, State of Texas

P:\2600\2614-01\REG_Attys'Fees_Affidvit-1.doc

**Richard E. Gray, III** -- Preparatory education: Washington and Lee University, B.A. with honors (1973); legal education: University of Texas School of Law, J.D. with honors (1976). Private practice of law with Butler, Binion, Rice, Cook & Knapp, Houston, Texas, specializing in litigation (1976-80); Executive Assistant to Attorney General Mark White (1980-82); has served as Special Counsel to Attorney General Jim Mattox (1983-86) and Special Counsel to Attorney General Daniel Morales (January 1991-92). Admitted to practice before the United States Supreme Court, Texas Supreme Court, United States Court of Appeals for the Fifth Circuit, and the United States District Courts for the Northern, Southern, Eastern, and Western Districts of Texas. Member: Omicrom Delta Kappa; Who's Who Among Students in American Universities and Colleges; Who's Who in American Law; Who's Who Among Rising Young Americans; listed in "The Best Lawyers in America"; Order of the Coif; American Bar Association; State Bar of Texas and Travis County Bar Association. Selected as "Best Lawyers in America" and "Texas Super Lawyers."

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SIMON BALDERAS, ET AL. | § | |
| | § | |
| Plaintiffs, | § | |
| | | |
| Mexican American Legislative Caucus | | |
| Texas House of Representatives | | |
| Plaintiff Intervenor | § | |
| vs. | § | NO. 6:01-CV-158 |
| | § | |
| STATE OF TEXAS, ET AL. | § | |
| | § | |
| Defendant | § | |

## STIPULATION REGARDING ATTORNEY FEES OF JOSE GARZA AND ROLANDO L. RIOS

The parties stipulate to the following:

1. That the prevailing market rate for attorneys fees for Rolando L. Rios and Jose Garza is $325.00 per hour; also, the prevailing rate of $125 per hour for junior attorneys (law graduates taking the bar) and $65 per hour for paralegals in the law offices of Rolando L. Rios and Jose Garza.

AGREED TO BY:

Rolando L. Rios

Jose Garza

Attorneys for the Mexican American Legislative Caucus

Andy Taylor
Attorney for Defendant State of Texas

Perales Decl.
00315

**Tab B**

United States Court
in District of Texas
FILED

1 8 1996

Michael N. Milby, Clerk

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| AL VERA, EDWARD CHEN, PAULINE ORCUTT, EDWARD BLUM, KENNETH POWERS and BARBARA L. THOMAS | § § § § § § § | |
| Plaintiffs | § § | |
| vs. | § § § | CIVIL ACTION NO. H-94-0277 |
| GEORGE W. BUSH, in his official capacity as Governor of the State of Texas, BOB BULLOCK, in his official capacity as Lt. Governor and President of the Texas Senate, DAN MORALES, in his official capacity as Attorney General for the State of Texas, PETE LANEY, in his official capacity as Speaker of the House of Representatives, and ANTONIO GARZA, in his official capacity as Secretary of State of the State of Texas | § § § § § § § § § § § § § § § § | |
| Defendants | § § | |

## ORDER

Before JONES, Circuit Judge, HITTNER and HARMON, District Judges:

Before the Court is the issue of attorneys' fees awardable as the result of the successful defense in the United States Supreme Court of this Court's decision holding that the Texas legislature had unconstitutionally redrawn three congressional districts. This Court held a hearing on the plaintiffs' application for attorneys' fees on October 11, 1996 and has considered the carefully documented fee application of appellate counsel and the submissions of the state of Texas and the United States. We award attorneys' fees as follows.

Perales Decl.
00316

Tab C

# I.
## FACTUAL BACKGROUND

The instant application for attorneys' fees arose from a suit by six Texas voters (the "Plaintiffs") who challenged a state redistricting plan that followed the 1990 census. The 1990 census indicated a population increase in Texas, giving the state the right to three more congressional seats. In response, the State of Texas (the "State") drew up a plan for redistricting that created three new majority-minority districts. This plan was precleared by the Department of Justice in 1991, pursuant to § 5 of the Voting Rights Act, 42 U.S.C. § 1973 *et seq.*. The Plaintiffs challenged the plan and alleged that the State had racially gerrymandered 24 out of 30 total congressional districts. This Court held that three of the districts were unconstitutional in *Vera v. Richards*, 861 F. Supp. 1304 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, — U.S. —, 116 S.Ct. 1941 (1996).

Following the affirmance of this decision by the United States Supreme Court, the Plaintiffs sought an award of attorneys' fees under 42 U.S.C. § 1988 for both trial and appellate counsel. Shortly before a hearing in this Court on October 11, 1996 regarding the Plaintiffs' application for attorneys' fees, the Plaintiffs settled their claims for trial counsel fees with the State. Now before this Court is the remaining application for attorneys' fees for the Plaintiffs' appellate counsel, Wiley, Rein, & Fielding ("Wiley").[1] The State of Texas seeks to reduce the award sought by the Plaintiffs and seeks contribution from the United States Government.

---

[1] Wiley represented the Plaintiffs only at the appellate stage.

2

Perales Decl.
00317

## II.
## ANALYSIS

The Fifth Circuit set forth twelve guidelines for determining court-ordered reasonable attorneys' fees in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The twelve factors announced in *Johnson* are: (1) "The time and labor required"; (2) "The novelty and difficulty of the questions"; (3) "The skill requisite to perform the legal service properly"; (4) "The preclusion of other employment by the attorney due to acceptance of the case"; (5) "The customary fee"; (6) "Whether the fee is fixed or contingent"; (7) "Time limitations imposed by the client or the circumstances"; (8) "The amount involved and the results obtained"; (9) "The experience, reputation, and ability of the attorneys"; (10) "The 'undesirability' of the case"; (11) "The nature and length of the professional relationship with the client"; and (12) "Awards in similar cases." *Id.*, at 717-19.

This Circuit calculates the award of attorneys' fees according to the lodestar method. First, the court must ascertain the reasonable hours and hourly rates for the attorneys in question. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995), *cert. denied*, — U.S. —, 116 S.Ct. 173 (1995). In determining the reasonable hours and hourly rate, the court should consider the twelve *Johnson* factors. *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). Next, the reasonable number of hours expended are multiplied by the reasonable hourly rate to calculate the lodestar. *Louisiana*, 50 F.3d at 324. Finally, the court may lower or raise the lodestar as an adjustment based any of the *Johnson* factors not considered in the determination of reasonable fees. *Watkins*, 7 F.3d at 457. These standards are applicable in constitutional cases such as this and in those involving the Voting Rights Act. *See, e.g., id.* (applying the *Johnson* factors and the lodestar method to determine an award of attorneys' fees in a Voting Rights Act case).

3

Perales Decl.
00318

A.    Reasonable Attorney's Fees

1.    The reasonable number of hours expended

Wiley billed a total of 2,640.50 hours for attorneys' work, and 746.75 hours for legal support. The State contests the number of hours sought by the Plaintiffs for Wiley's work, alleging that Wiley engaged in duplicative overbilling in the preparation for: (1) the Plaintiffs' Motion to Affirm, (2) the Joint Appendix for the briefs on the merits, (3) the Appellees' Brief, and (4) the oral argument. The State also contests the amount sought by the Plaintiffs for Wiley's efforts to prepare its fee application.

At the hearing on attorneys' fees, however, one of Wiley's attorneys, Mr. Daniel Troy, testified that each of the attorneys who billed for these tasks performed different work, by working on different sections of the same document, and by editing and critiquing the work of the others. As for the effort expended on the fee application, the Plaintiffs point out that Mr. Troy, the partner who reviewed the hours personally, deducted 250 hours as an exercise of billing judgment.[1] Thus, the Plaintiffs assert that the billing judgment and efforts of Mr. Troy were necessary and even beneficial to the State.

This case involved voluminous records and complicated facts that Wiley, which only represented the Plaintiffs at the appellate stage, was required to digest and use on appeal. The law governing racial gerrymandering was new and unsettled when this case was appealed—the claim of racial gerrymandering was first recognized in 1993,[2] and another major Supreme Court racial

---

[2]    *See Shaw v. Reno,* 509 U.S. 630 (1993).

4

**Perales Decl.
00319**

gerrymandering decision came out after the plaintiffs' first appellate brief had been drafted.[3] Substantial briefing was required twice on appeal: to support the Motion to Affirm and, later, to address the merits in detail. Like plaintiffs' trial counsel, Wiley confronted and was required to respond to a large array of adversaries, including the State of Texas, several intervening defendants (including the United States), and numerous *amici*. Thus, the instant case by its nature required extraordinary time and effort on appeal.

We find that the number of hours requested by Wiley is reasonable. Wiley has produced evidence that the attorneys who worked on the same motions on the same day were working on different portions or aspects of the same motion. It is reasonable for attorneys, both associates and partners, to review the work of other attorneys for criticism and feedback, especially in a case this complex. The State has not produced evidence that Wiley engaged in duplicative billing, and our independent review reveals no obvious excess, therefore this Court finds no reason to reduce the number of hours submitted by the Plaintiffs.

2.     The reasonable hourly rates

The State contests the hourly rates sought by the Plaintiffs for Wiley's attorneys. Citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984), the State points out that reasonable attorneys' fees under § 1988 are calculated according to the prevailing market rate in the relevant legal community. The State cites *Davis v. Mason County*, 927 F.2d 1473, 1488 (9th Cir. 1991), *cert. denied*, 502 U.S. 899 (1991) for the proposition that the rates of attorneys practicing in the forum district court should be used to establish the market rate. In the absence of special circumstances, such as the unavailability of local counsel, or the requirement of special expertise, the State asserts

---

[3]     *See Miller v. Johnson*, — U.S. —, 115 S.Ct. 2475 (1995).

5

Perales Decl.
00320

that other non-local market rates may not be used. In the instant case, the State contends that the Plaintiffs have failed to produce evidence showing unavailability of local counsel, or special expertise, and therefore, that they are confined to an award of local rates within the forum of the Southern District of Texas rather than rates appropriate for Washington, D.C.

The Plaintiffs have requested the following rates for Wiley's attorneys:

| Name | Experience | 1994 rate | 1995 rate | 1996 rate |
|------|-----------|-----------|-----------|-----------|
| Toner | (1992 grad) | $140/hr. | $140/hr. | $180/hr. |
| Martin | (1993 grad) | $124/hr. | $124/hr. | $160/hr. |
| Troy | (1983 grad) | $220/hr. | $230/hr. | $250/hr. |
| Rein | (1965 grad) | $375/hr. | $390/hr. | $400/hr. |
| Baran | (20 + yrs. Exp.) | | | $300/hr. |
| Potter | (1982 grad) | | | $280/hr. |

Additionally, the Plaintiffs have requested between $64/hr. and $92/hr. for paralegals, law clerks and the librarian.

The State asserted, however, that the following rates are more appropriate for attorneys' fees for a firm located within the forum of the Southern District of Texas:

| Name | Rate for three years |
|------|---------------------|
| Toner | $100/hr. |
| Martin | $ 90/hr. |
| Troy | $160/hr. |
| Rein | $200/hr. |
| Baran | $200/hr. |

6

Perales Decl.
00321

Potter        $160/hr.

The State also contends that $50/hr. is a more appropriate rate for paralegals and law clerks.

The Plaintiffs, on the other hand, contend that no authority compels the use of local rates. The Plaintiffs argue that this was a national case, requiring experienced federal appellate specialists; thus, the relevant market was nationwide. Alternatively, the Plaintiffs argue that the relevant market for Supreme Court representation is Washington, D.C., the district where the Supreme Court proceeding occurred. Finally, the Plaintiffs argue that even if local rates are used, Wiley's rates are comparable with those of large firms in Houston.

Successful Supreme Court advocacy requires great skill, particularly where the law is unsettled and the facts are complex. Wiley, Rein and Fielding is a Washington, D.C. law firm with nationally recognized appellate litigation and election law practices. The partners who worked on this case were experienced in this type of litigation, and the associates were capable. Wiley's attorneys have testified that they were precluded from working for other paying clients because of the demands of the instant case, which was entered into on a contingency basis. Wiley seeks the same hourly rates for this case as it does for its paying clients.

The State correctly points out that reasonable attorney's fees should be calculated in accordance with the prevailing market rate in the relevant legal community. While the State and the Plaintiffs dispute which is the relevant legal community, we conclude that Wiley's hourly rates are in accordance with rates for firms of Wiley's size in both Houston and Washington, D.C. The State's figures for hourly rates for Texas attorneys show that Wiley's rates are within the upper range of Texas rates. This upper range of rates presumably consists of many attorneys employed at large firms with sophisticated federal practices; under questioning at the attorneys' fees hearing

7

Perales Decl.
00322

the State did not contest that its suggested rates for Wiley's work fall below customary rates for some of the larger firms in Houston. We find the hourly rates sought by the Plaintiffs for Wiley's services are appropriate in this case.

3.    The lodestar figure

The cumulative fees for Wiley's attorneys and legal support staff are as follows:

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| D.E. Troy (1994) | 129.00 | 220.00 | $ 28,380.00 |
| D.E. Troy (1995) | 331.00 | 230.00 | $ 76,130.00 |
| D.E. Troy (1996) | 97.50 | 250.00 | $ 24,375.00 |
| K.J. Martin (rate through 1995) | 806.75 | 124.00 | $100,037.00 |
| K.J. Martin (1996) | 189.25 | 160.00 | $ 30,280.00 |
| M.E. Toner (rate through 1995) | 859.50 | 140.00 | $120,330.00 |
| M.E. Toner (1996) | 5.25 | 180.00 | $    945.00 |
| J.W. Baran | 2.50 | 300.00 | $    750.00 |
| J.E. Barry | 7.75 | 230.00 | $  1,782.50 |
| T.W. Brunner | 4.25 | 320.00 | $  1,360.00 |
| A.R. Hayward | 70.75 | 140.00 | $  9,905.00 |
| T. Potter | 0.75 | 280.00 | $    210.00 |
| B.W. Rein (1994) | 12.75 | 375.00 | $  4,781.25 |
| B.W. Rein (1995) | 36.00 | 390.00 | $ 14,040.00 |

8

Perales Decl.
00323

| | | | | |
|---|---|---|---|---|
| B.W. Rein (1996) | 5.00 | 400.00 | $ | 2,000.00 |
| J.M. Shaw | 42.50 | 180.00 | $ | 7,650.00 |
| D.E. Troy/T.W. Kirby (Estimate since 9/10/96) | 40.00 | 250.00 | $ | 10,000.00 |
| **SUBTOTAL** | 2,640.50 | | $ | 432,955.75 |
| Legal Support | 746.75 | | $ | 56,074.00 |
| Total Fees | 3,387.25 | | $ | 489,029.75 |

After multiplying the number of hours times the various hourly rates for Wiley's attorneys and legal staff, the lodestar figure is $489,029.75. We conclude that no *Johnson* factors or special circumstances warrant adjusting the lodestar upward or downward.

**B.    Reasonable Expenses**

Finally, while Wiley seeks $60,622.51 for out of pocket expenses, the State argues this amount is excessive for a case involving only appellate work. Furthermore, the State asserts that the billing records inadequately document which expenses were related to the bulk of Wiley's claim. Therefore, the State suggests halving this amount.

We note that some of the expenses claimed by Wiley are not appropriate. Wiley sought compensation for overtime meals, local transportation, and overtime transportation[5]—the State should not have to bear these overhead costs, some of which are peculiar to a commuter city such as Washington, D.C. The rest of the expenses appear appropriate; albeit high. According to

---

[4]    In a post-October 11 affidavit, purportedly responding to the State's supplemental objections to the Plaintiffs' claim, Wiley's attorney stated in the last line or two that the firm had decided to seek compensation for the past two years' time at current rates, effectively increasing their bill by over $75,000. The request is untimely and unseemly. This Court instructed all counsel to file fee applications in August. While expenses incurred after that time have been awarded, there is no basis for our approving a last-minute inflation adjustment.

[5]    In their fee application, the Plaintiffs requested $1323.96 for overtime meals, $398.85 for local transportation, and $864.72 for overtime transportation.

9

Perales Decl.
00324

Wiley, the printing of sophisticated overlay maps for the briefs proved challenging and expensive.
Thus, the Plaintiffs are entitled to $58,034.98 in expenses.

C.    The Liability of the United States

The State asserted that the United States should be held jointly and severally liable
for attorneys' fees in this case for the first time at the October 11, 1996 hearing. The State contends
that the United States is liable for a portion of the Plaintiffs' attorneys' fees award under the Equal
Access to Justice Act. 28 U.S.C. § 2412(b) states:

> a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be
> awarded . . . to the prevailing party in any civil action brought by or against the United States . . . .
> The United States shall be liable for such fees and expenses to the same extent that any other party
> would be liable under the common law or under the terms of any statute which specifically provides
> for such an award.

By its own terms, the EAJA requires common law liability or the triggering of a fee shifting statute
before the United States can be found liable for attorneys' fees. The Plaintiffs prevailed on their
claim under 42 U.S.C. § 1983, and 42 U.S.C. § 1988 provides an express basis for the awarding of
attorneys' fees based on § 1983. Section 1988 in turn applies to the federal government through §
2412. *Knights of the Ku Klux Klan v. East Baton Rouge School Board*, 735 F.2d 895, 899 (5th Cir.
1984). Thus, the United States should be liable for a portion of the award of attorneys' fees if it is
also liable under § 1983.

Section 1983 requires a showing that the liable party acted under color of state law.
This does not mean, however, that the federal government is never subject to § 1983, for as the Fifth
Circuit has observed, "Ordinarily, when federal officials conspire or act jointly with state officials
to deny constitutional rights, 'the state officials provide the requisite state action to make the entire
conspiracy actionable under section 1983.'" *Knights*, 735 F.2d at 900 (quoting from *Hampton v.
Hanrahan*, 600 F.2d 600, 623 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980)).

10

Perales Decl.
00325

In *Knights*, the HEW (now the United States Department of Health and Human Services) notified the East Baton Rouge Parish School Board that it would be in violation of the Emergency School Aid Act, 20 U.S.C. § 1601 *et seq.* (repealed 1978) and Title VI, 42 U.S.C. § 2000d *et seq.*, and would lose all federal monetary assistance to the school district if it allowed the Ku Klux Klan to use Board facilities. *Id.* at 897. The day after receiving this notification, the Board withdrew permission to rent its facilities to the Klan, and following an unsuccessful attempt to get injunctive relief against the school district, the Klan joined the United States, HEW, and two HEW officials as defendants. *Id.* Based on this implicit agreement between HEW and the Board, the Fifth Circuit found that the United States government was liable for its participation in a § 1983 violation of the Klan's first amendment rights. *Id.* at 900.

In the instant case, the State argues that Texas officials adopted the 1991 congressional redistricting plan against a "backdrop of pressure" by the Department of Justice (the "DOJ"), which had veto power under § 5 of the Voting Rights Act. The State asserts that the DOJ had a consistent position that it would not preclear a state plan if the DOJ thought the plan would violate § 2 of the Voting Rights Act, and the DOJ took the now-discredited position that § 2 requires states to maximize the number of majority-minority districts. *See, e.g., Miller v. Johnson*, --- U.S. ---, ---, 115 S. Ct. 2483-84 (1995) (discussing the DOJ's refusal to preclear Georgia's congressional redistricting plan on two successive occasions until the Georgia legislature created three majority-minority districts). The State contends the DOJ's position was presented to the Texas Legislature through the Texas Legislative Council, and through the testimony of non-DOJ witnesses.

What the State does not allege, and what easily distinguishes this case from *Knights of the Ku Klux Klan*, is that any federal official or agency actually told the State that it had to draw

11

up minority districts or face federal repercussions. This was not a situation where the DOJ had rejected a proposed legislative redistricting plan because of a majority-minority district maximization policy, as it did in *Miller*. The DOJ did not issue any sort of mandate to the State in this case, and a nebulous "backdrop of pressure" does not rise to the level of joint participation by the federal government in a § 1983 violation. Moreover, the preclearance letter from the Attorney General regarding the 1991 Congressional redistricting plan stated:

> While we are preclearing this plan under Section 5, the extraordinarily convoluted nature of some districts compels me to disclaim any implication that our preclearance establishes that the proposed plan is otherwise lawful or constitutional.

The evidence, if anything, establishes that the State eagerly exceeded any DOJ requirements.

We find that the United States is not liable for contributing to the attorneys' fees to the Plaintiffs.

## CONCLUSION

For the following reasons, IT IS HEREBY ORDERED that the State of Texas pay the Plaintiffs $489,029.75 in fees, and $58,034.98 in expenses.

SIGNED on this the 13ᵗʰ day of *November*, 1996.

_____
Honorable Edith Jones
United States Circuit Judge

_____
Honorable David Hittner
United States District Judge

_____
Honorable Melinda Harmon
United States Circuit Judge

12

Perales Decl.
00327

*Holiday*
GIFT GUIDE

**my sa** .com

FROM KENS 5 AND THE SAN ANTONIO EXPRESS-NEWS

NE

- News
- Sports
- Spurs
- Weather
- Business
- Lifestyle
- Classifieds
- Opinion
- Entertainment
- Lotto
- Shopping
- Video
- Community
- Obituaries

Metro and State

# State taxpayers handed $3 million redistrict bill

## By Bob Richter
Express-News Austin Bureau

**Web Posted : 12/05/2001 12:00 AM**

AUSTIN — Texas taxpayers are facing a $3 million-plus bill from private-sector lawyers involved in litigating the state's recently concluded redistricting battle.

The legal tab includes more than $1.4 million, plus about $75,000 in collateral expenses, billed to the attorney general's office; $904,747 charged to the lieutenant governor; and $687,878 to the speaker of the House, according to invoices obtained by the San Antonio Express-News.

All fees will be paid by Texas taxpayers.

The largest single expense, $750,053.14, came from the Houston firm of Locke Liddell & Sapp. Its lead redistricting lawyer, Andy Taylor, was until last spring Attorney General John Cornyn's first assistant.

He billed the state at $375 per hour.

Two Taylor associates, Jan Soifer and Brent Benoit, also formerly on the attorney general's staff, billed the state at $300 and $230 per hour, respectively.

Bob Heath and Steve Bickerstaff, two Austin lawyers hired by Cornyn, each billed the state at $250 an hour.

Rick Gray, House Speaker Pete Laney's lead attorney, and Leon Carter, acting Lt. Gov. Bill Ratliff's, billed the state at $225 an hour.

The tab was defended as the price of doing the decennial business of redistricting by the state officials who hired the outside legal help.

"You don't have any alternative but to respond," Ratliff said, adding that he was named as a defendant in 18 redistricting lawsuits.

**Related**
**Contact t**
**Express-**
Send press n
story ideas to
City Desk or
210-250-310

**Contact K**
Send press n
story ideas to
KENS 5 or fa
366-2716.

**Commen**
Send comme
section using
feedback for

**Perales Decl.
00328**

http://news.mysanantonio.com/story.cfm?xla=saen&xlb=180&xlc=541132&xld=180

12/5/2001

**Tab D**

However, Jeff Wentworth, R-San Antonio, chairman of the Senate Redistricting Committee, and Dan Morales, the attorney general during the last round of redistricting, in 1991, were highly critical of the expense.

Wentworth, who favors an independent commission to redraw political maps after each census, said redistricting dominates one of five legislative sessions.

"We can't afford that," he said. "There is a better way, one that does not squander the time of legislators and their staffs and the attorney general and his staff."

For Morales, who could face Cornyn next fall in the U.S. Senate race, the opportunity to criticize Cornyn's outside legal assistance was just desserts.

Cornyn has been critical of Morales' handling of the state's $17 billion tobacco settlement, which paid contingency fees of $3 billion to five private attorneys.

"We would not have allowed that," Morales said of the state's arrangement with Taylor. "It appears unseemly for a lawyer to leave state employment and immediately start to profit from a relationship with a state official."

Jeff Boyd, chief of Cornyn's civil litigation section, said the "standard criteria" Texas uses in hiring outside legal help is if the state lacks either the expertise or the resources to try the case itself.

In this case, Boyd said, Heath had the experience from past rounds of redistricting, and Taylor had handled all the AG's redistricting work before leaving the agency.

While he winced at the fees, Boyd said: "I think taxpayers clearly got their money's worth to guarantee the voting rights of 20 million Texans."

And, Boyd added: "The process begins with the Legislature, and they didn't get it done."

The Legislature failed to pass redistricting plans this year, and the House

Questions or comments about the site? 



About Us | Advertising Info | Help | Privacy Policy | Terms of Use
Express-News Editors | KENS 5 Editors | Circulation Department
Letters to the Editor | Archives
Portions © 2001 KENS 5 and the San Antonio Express-News. © 2001 MyWay. All rights reserved.

Perales Decl.
00329