IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL. | § § § | |
| Vs. | § § | CIVIL NO. 2:03-CV-354 CONSOLIDATED |
| RICK PERRY, GOVERNOR OF TEXAS, ET AL. | § § § | |

## GI FORUM PLAINTIFFS' MOTION AND BRIEF IN SUPPORT OF REASONABLE ATTORNEYS FEES AND COSTS

Plaintiffs GI Forum of Texas, *et al.* ("GI Forum Plaintiffs") hereby move this Court for

an award of reasonable attorneys fees and costs as prevailing parties under 42 U.S.C. §1973*l* (e),

42 U.S.C. § 1988, 28 U.S.C. § 1920, and Fed. R. Civ. P. 54(d). In support of the motion, GI

Forum Plaintiffs would show the following:

## I.
## INTRODUCTION AND BACKGROUND

GI Forum Plaintiffs, the prevailing parties in this case, sought and won a judgment

striking down the Texas Congressional Redistricting Plan, 1374C (the "2003 Plan" or "Plan

1374C"), because it illegally diluted the voting strength of Latino voters in south and west Texas.

As a result, this Court ordered into place a remedial redistricting plan that restored the Latino

registered voter majority in Congressional District 23. Consequently, GI Forum Plaintiffs seek

reasonable fees for the time spent on this case and costs in the amount of $1,110,483.27.

The Plaintiffs brought this action on October 14, 2003, pursuant to the Voting Act of

1965, as amended, 42 U.S.C. § 1973, challenging the 2003 Plan and seeking declaratory relief

Perales Decl.
00384

under 28 U.S.C. §§ 2201 and 2202 and injunctive relief. GI Forum Plaintiffs filed their First Amended Complaint on November 7, 2003 pursuant to the Voting Rights Act of 1965, and the Fourteenth and Fifteenth Amendments. They sought declaratory and injunctive relief, alleging, among other things, that the 2003 Plan unlawfully diluted the voting strength of Latino voters. *See* Dkt. No. 39, First Amended Complaint of GI Forum Plaintiffs ("Am. Compl.") at ¶ 2. In their Complaint, GI Forum Plaintiffs emphasized that the 2003 Plan violated Sec. 2 of the Voting Rights Act by seeking to "reduce the Latino population and voting strength in Congressional District 23 in order to prevent Latino voters from being able to elect the candidate of their choice." *Id.* at ¶ 26.[1]

In June 2006, the United States Supreme Court found that the 2003 Plan violated Section 2 of the Voting Rights Act, 42 U.S.C. 1973c, because it diluted the voting strength of Latinos in south and west Texas by taking away the ability to elect candidates of their choice in Congressional District 23. *LULAC v. Perry*, 126 S.Ct. 2594 (2006).

On August 4, 2006, this Court entered an Opinion and a Remedial Order adopting a new Congressional redistricting plan for Texas that corrected the "flaws the Supreme Court found in Plan 1374C." *See* Dkt. Entry No. 335 at 1 (recognizing that the "fracturing of communities of interest found by the Supreme Court was a hand-in-glove companion to the effort to enhance Congressman Bonilla's support in District 23"); Dkt. No. 336. On August 22, 2006, this Court entered its Final Judgment, stating that "the court imposed Plan 1438C as its remedial plan for the violation of Section 2 of the Voting Rights Act found by the Supreme Court. All other relief not specifically granted is denied." Dkt. No. 344 at 1.

---

[1] GI Forum Plaintiffs also asserted that when the 2003 Plan created seven congressional districts in the southern and western parts of Texas, Section 2 required that all seven districts offer Latino voters the opportunity to elect their candidate of choice. *See* Am. Compl. at ¶¶ 21-23. All of the claims presented by GI Forum Plaintiffs related to Latino vote dilution; GI Forum Plaintiffs presented no arguments related to partisan gerrymandering, mid-decade redistricting, or vote dilution for African American voters.

Perales Decl.
00385

In this application, GI Forum Plaintiffs have included the fees and costs associated with bringing the claim on which they prevailed.

## II.
## ARGUMENT

### A. Standards Awarding Attorneys Fees and Costs

Pursuant to 42 U.S.C. §§ 1973*l*(e) and 1988, a court, "in its discretion, may allow the prevailing party a reasonable attorney's fee" in voting rights cases. These sections contain "nearly identical language and are driven by similar congressional purposes." *King v. State Board of Elections*, 2002 WL 221606 at *2 (N.D. Ill. Mar. 2002). Consequently, courts apply the same standards when evaluating fee applications under both statutes. *See Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't. of Health and Human Res.*, 532 U.S. 598, 603 (2001) ("We have interpreted these fee-shifting provisions consistently."); *cf. Hensley v. Eckerhart*, 461 U.S. 424, 433, n.7 (1983).

The fee-shifting provisions of the Civil Rights Act and the Voting Rights Act were meant to apply in cases such as this, where GI Forum Plaintiffs were forced to bring suit in order to remedy Latino vote dilution in a statewide redistricting plan. "[T]he legislative history of sections 1973*l*(e) and 1988 emphasizes over and over again the critical goal of enabling private citizens to serve as 'private attorneys general' in bringing suits to vindicate the civil rights laws." *Donnell v. U.S.*, 682 F.2d 240, 245 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1204 (1983); *see also* S. Rep. No. 295, 94th Cong., 1st Sess. 40, *reprinted in* 1975 U.S. Code Cong. & Admin. News, 774, 807.

Consistent with the goals of 42 U.S.C. §§ 1973*l*(e) and 1988, GI Forum Plaintiffs secured counsel and acted as private attorneys general in this litigation, ultimately ensuring that the

3

**Perales Decl.**
**00386**

Voting Rights Act remains a vital tool for achieving justice for minorities in the political realm.

## B. Plaintiffs are Prevailing Parties in this Action

GI Forum Plaintiffs are "prevailing parties" for the purposes of recovering attorneys' fees under § 1988. "A plaintiff prevails if the relief obtained through judgment or settlement, materially alters the defendants' behavior in a way directly benefiting the plaintiff." *Watkins v. Fordice*, 7 F.3d 453, 456 (5th Cir. 1993) (citing *Farrar v. Hobby*, 113 S.Ct. 566 (1992)). The essential test requires the plaintiff to achieve a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon*, 532 U.S. at 605. An enforceable judgment on the merits creates the material alteration of the legal relationship between the parties necessary to permit an award of fees. *Id.* at 604.

A party that secures an order granting their requested relief undoubtedly "prevails" within the meaning of the fee-shifting statutes at issue in this case. *See, e.g., Walker v. City of Mesquite*, No. 01-11380 (5th Cir. 2002). A prevailing party need not achieve all its goals in the litigation. *See Tyler v. Union Oil Company of California*, 304 F.3d 379, 404 (5th Cir. 2002) ("plaintiffs [who] have obtained 'at least some relief on the merits' . . . qualify as prevailing parties."). This is particularly true in voting rights cases where a plaintiff may raise several different claims. *See Emery v. Hunt*, 272 F.3d 1042 (8th Cir. 2001).

The Supreme Court overturned the 2003 Texas redistricting plan. On August 4, 2006, GI Forum Plaintiffs achieved the relief they sought by securing a congressional redistricting plan ordered by this Court which remedied the Latino vote dilution found by the Supreme Court. *See Associated Builders & Contractors of La., Inc. v. Orleans Parish School Board*, 9191 F.2d 274,

4

**Perales Decl.
00387**

378 (5th Cir. 1990).[2] GI Forum Plaintiffs clearly won the relief they sought – a redistricting plan that did not dilute Latino voting strength.[3]

GI Forum Plaintiffs did not join other plaintiffs and appellants in challenging 1374C as being an unconstitutional partisan gerrymander or an unlawful dilution of the voting strength of minorities outside South and West Texas. GI Forum Plaintiffs also never asserted claims related to the constitutionality of mid-decade redistricting.

Instead, throughout this litigation, GI Forum Plaintiffs concentrated on a Latino vote dilution claim related to the districts in south and west Texas. GI Forum Plaintiffs sought to establish a violation of the Voting Rights Act under *Thornburg v. Gingles*, 478 US 30 (1986), by showing: that Latino voters were fractured across districts in South and West Texas; the existence of cohesive Latino voting and Anglo bloc voting against Latino candidates of choice; and the existence of factors leading to the conclusion that, under the totality of circumstances, Plan 1374C diluted Latino voting strength. *See* Ex. 1 (Decl. of Nina Perales); *see also* Trial Brief of Plaintiffs GI Forum ("Tr. Brief") at 2-11; Post-Trial Brief of Plaintiffs GI Forum ("Post-Trial Brief") at 9-24; Jurisdictional Statement of GI Forum Appellants, filed on April 4, 2004 ("J.S. 2004") at 22-30; Jurisdictional Statement of GI Forum Appellants, filed on September 30, 2005 ("J.S. 2005") at 22-30; Supreme Court Appellate Brief for GI Forum Appellants ("Merits

---

[2] The fact that GI Forum Plaintiffs were not successful in their alternative argument on fracturing (that if the State created seven districts in South and West Texas, Section 2 required all seven districts to be Latino opportunity districts) does not alter their status as prevailing parties in this case. "[T]he degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not the eligibility for a fee award at all." *Texas State Teachers Association v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 790 (1989).

[3] *See* GI Forum Original Complaint at 1 ("GI Forum seeks a declaratory judgment that the congressional redistricting plan signed by the Texas Governor on October 13, 2003 violates its members' civil rights because the plan unlawfully dilutes the voting strength of Latinos. GI Forum seeks a permanent injunction prohibiting the calling, holding, supervising or certifying of any future congressional elections under the newly-enacted redistricting plan. GI Forum seeks the creation of a congressional redistricting plan that will not cancel out, minimize or dilute the voting strength of Latino voters in Texas.")

**Perales Decl.**
**00388**

Brief") at 36-49. With respect to demonstrating fracturing, GI Forum Plaintiffs argued that by reducing the Latino population in District 23 to ensure the re-election of a candidate who was not preferred by Latino voters, Plan 1374C discriminated against Latino voters.[4] *See* Tr. Brief at 12-13; Post-Trial Brief at 2-9; J.S. 2004 at 14-21; J.S. 2005 at 14-21; Merits Brief at 27-35. GI Forum also argued an alternative theory of fracturing – that when the State created seven congressional districts in the Latino-majority South and West Texas region, all seven districts should have been Latino opportunity districts. Either theory of fracturing was sufficient to satisfy the first *Gingles* precondition, and ultimately the Supreme Court accepted GI Forum Plaintiffs' argument that Latinos were fractured in District 23.

Before the Supreme Court, the only claims that prevailed on appeal were those brought, briefed and argued primarily by the GI Forum Plaintiffs. Specifically, the Court reversed and remanded the case on the Voting Rights Act claim with respect to District 23, while affirming the District Court's dispositions on the statewide political gerrymandering claims, the mid-decade redistricting claims, the *Shaw* claim as to District 25 and the Voting Rights Act claim as to District 24. *See Perry*, 126 S.Ct. at 2605. As detailed further below, in making its determination with respect to District 23, the Court relied on the facts and arguments presented by GI Forum Plaintiffs throughout the litigation.

### 1. The Supreme Court Found Facts Argued by GI Forum Plaintiffs

Many of the facts found by the Court to be instrumental to its decision were those argued by GI Forum Plaintiffs. For instance, the Court noted that of particular importance to its analysis was the fact that, prior to the 2003 redistricting, the Latino share of the citizen voting-age

---

[4] Concluding that the changes to District 23 violated Section 2 of the Voting Rights Act, the Court did not reach GI Forum's claim under the Fourteenth Amendment to the Constitution. However, the Court indicated that GI Forum Plaintiffs' intentional race discrimination claim was supported by the record and contributed to a finding that, under the totality of circumstances, the State had violated Section 2. *Perry*, 126 S.Ct. at 2622.

6

population in District 23 was 57.5% and the support of incumbent congressman Henry Bonilla

had dropped with each successive election since 1996. *See id.* at 2613; Merits Brief at 30;

Supreme Court Reply Brief for GI Forum Appellants ("Reply Brief") at 2, 9; J.S. 2005 at 128,

145; J.S. 2004 at 6; Brief on Remand of Plaintiffs GI Forum ("Brief on Remand") at 5. Facing

the loss of support for Bonilla, found the Court, the Legislature acted to protect his incumbency

by splitting Webb County - which is 94% Latino and which had previously rested entirely within

District 23 - shifting over100,000 people into neighboring districts. *Id.*; Merits Brief at 9-10;

Reply Brief at 1-2; J.S. 2005 at 4. As a result of the redistricting, the "Latino share of the citizen

voting-age population dropped to 46%, though the Latino share of the total voting-age

population remained just over 50%." *Id.*

The most critical fact findings by the Court were presented only by GI Forum Plaintiffs,

including the fact that District 23 was an opportunity district in 2002, prior to its dismantling by

the Legislature, and the fact that the Legislature sought to ensure a bare Latino voting age

majority in District 23 to create the appearance of Latino support for the incumbent.

The Court based much of its vote dilution conclusion on the factual argument made by GI

Forum Plaintiffs that:

> The change to Congressional district 23 served the dual
> goal of increasing Republican seats in general and
> protecting Bonilla's incumbency in particular, with the
> additional political nuance that Bonilla would be reelected
> in a district that had a majority of Latino voting age
> population – although clearly not a majority of citizen
> voting age population and certainly not an effective voting
> majority.

*Id.*, citing *Session v. Perry*, 298 F.Supp.2d 451, 497 (E.D. Tex. 2004); Merits Brief at 10;

Reply Brief at 14; J.S. 2005 at 8, 10; Post-Trial Brief at 6-8.

**Perales Decl.**
**00390**

2.    **The Court Reversed and Remanded the Case Solely on the Claims Brought by the GI Forum Plaintiffs.**

The Court recognized GI Forum Plaintiffs' vote dilution argument to be that the "changes to District 23 diluted the voting rights of Latinos who remain in the district." *Id*. at 2614-15. With the above facts at hand, the Court then turned to analyze and ultimately conclude that the dismantling of District 23 violated §2 of the Voting Rights Act – the argument on which GI Forum had focused its evidentiary presentation at trial and briefing on appeal. *See* Am. Compl. at 6; Tr. Brief at 3-12; Post-Trial Brief at 10-24; J.S. 2004 at 22-23; J.S. 2005 at 22-30; Merits Brief at 36-47.

a.    The Court agreed with GI Forum Plaintiffs that all the *Gingles* preconditions were met with respect to District 23.

The Court began its analysis by agreeing with GI Forum Plaintiffs that the second and third preconditions under *Gingles* were present in District 23. *See id.* at 2615.   Specifically, the Court noted that "racially polarized voting" existed throughout Texas, with polarization in District 23 being "especially severe." *Id*.; Brief on remand at 8; Post-Trial Brief at 16-19. Furthermore, as had been asserted by the GI Forum Plaintiffs, the Court noted that the "projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district." *Id*.; Am. Compl. at 5; Post-Trial Brief at 4-5.  Therefore, held the Court, the GI Forum Plaintiffs had "demonstrated sufficient minority cohesion and majority bloc voting to meet the second and third *Gingles* requirements." *Id*.

As to the first *Gingles* factor, that a group be "sufficiently large and geographically compact to constitute a majority in a single-member district," the Court agreed with the argument *made only by the GI Forum Plaintiffs* that, under Plan 1151C, "the Latino majority in old District

8

23 did possess electoral opportunity protected by §2" of the Voting Rights Act. *Id.*; Post-Trial Brief at 4; J.S. 2004 at 6; Brief on Remand at 3, 6 ("Defendants pursued their partisan goals by disassembling a Latino majority district that had been created by a federal court only two years earlier to offer Latino voters the opportunity to elect their candidate of choice"); J.S. 2005 at 4-8; Merits Brief at 7 ("In 2002, District 23 was a Latino opportunity district"); Reply Brief at 2 ("The State dismantled District 23 because it offered Latino voters the opportunity to elect their candidate of choice and threatened to unseat Congressman Henry Bonilla.").

The Court found the assertion by GI Forum Plaintiffs true, noting that, by 2002, the Latino candidate of choice in District 23 won the majority of the district's votes in 13 out of 15 elections for statewide officeholders – a fact that became the impetus for changing District 23 because state legislators "worried that Latinos would vote Bonilla out of office." *Id.*; J.S. 2004 at 6 ("[T]he State eliminated Congressional District 23 as an opportunity district for Latinos because it wanted to preserve the incumbency of Henry Bonilla, who was not the candidate of choice of Latino voters"); Brief on Remand at 8; J.S. 2005 at 4 ("The Legislature radically reconfigured District 23 because it wanted to preserve the incumbency of Henry Bonilla, a Republican congressman whose declining support among Latino voters had placed his continued reelection in doubt."); Merits Brief at 9-10 ("In 2003, in order to preserve Congressman Bonilla's incumbency, the State dismantled District 23 as a Latino opportunity district."); Reply Brief at 2-5.

The Court explicitly rejected the District Court's suggestion "that District 23 was not a Latino opportunity district in 2002 simply because Bonilla prevailed," a conclusion that GI Forum Plaintiffs had consistently and adamantly rejected. *Id.*; Merits Brief at 7-8; Reply Brief at 2 ("The District Court clearly erred in characterizing District 23 as not being an 'effective

9

Perales Decl.
00392

opportunity district' because Congressman Bonilla held his seat in 2002."); J.S. 2005 at 4-8. The Court thus concluded that the *Gingles* preconditions had been met in District 23.

      b. <u>As had been asserted by GI Forum Plaintiffs, the Court held that the State could not cure the deficiencies of Plan 1374C by creating an "offset" district.</u>

After determining that all three of the *Gingles* requirements had been met, the Court then considered and rejected the State's argument that it had met its §2 obligations by creating a new offsetting opportunity district in District 25. *Id.* at 2616. The Court accepted GI Forum Plaintiffs' arguments that the decisions in *Shaw v. Hunt*, 517 U.S. 899 (1996) (*Shaw II*), and *Johnson v. De Grandy*, 512 U.S. 997 (1994), rejected the premise that a State could "make up for the less-than-equal opportunity of some individuals by providing greater opportunity to others." *Perry*, 126 S.Ct. at 2616; Tr. Brief at 9-11; J.S. 2004 at 22-23 ("This Court's rulings in *Shaw II* and *De Grandy* make clear that States may not trade-off the voting rights of people in one region for those in another region."); J.S. 2005 at 23-24; Merits Brief at 36-38.

The creation of the offset district in this case could not legitimize the State's dismantling of District 23, noted the Court, as the "majority of Latinos who were in the old District 23 are still in the new District 23, but no longer have the opportunity to elect their candidate of choice." *Id.* Tr. Brief at 9-11; J.S. 2004 at 22-23 ; J.S. 2005 at 23-24; Merits Brief at 36-38. The Court thus concluded that the *Gingles* preconditions had been met in District 23 and, as had always been asserted by GI Forum Plaintiffs, "the creation of new District 25 [did] not remedy the problem." *Id.* at 2619.

      c. <u>The Court also agreed with GI Forum Plaintiffs that the "totality of the circumstances" compelled a finding that the legislatures' dismantling of District 23 violated §2.</u>

10

**Perales Decl.**
**00393**

Because a finding that the *Gingles* preconditions are met does not, in itself, necessitate a finding of a violation of §2, the Court then turned to GI Forum Plaintiffs' argument that the totality of the circumstances in this case also evinced unlawful vote dilution under the Voting Rights Act. *See id.* at 2619-20.

### i. Regional v. Statewide Proportionality

The Court first addressed the proportionality inquiry, recognizing that proportionality was a relevant fact in the totality of circumstances. *See id.* at 2620 (citing *De Grandy*, 512 U.S. at 1000). The Court recognized the dispute between the State and GI Forum Plaintiffs regarding how proportionality should be calculated. *See id.* The State argued that proportionality should be argued on a regional basis, while GI Forum Plaintiffs had always asserted that proportionality required the Court to conduct a statewide analysis. *See id.*; Tr. Brief at 10; Post-Trial Brief at 21-23; J.S. 2004 at 28-30; J.S. 2005 at 29-30; Merits Brief at 46-49; Reply Brief at 18-20 ("To confine the proportionality inquiry to a "regional analysis," as the State here requests this Court do, is not only nonsensical, but would certainly defeat the purpose of Section 2 of the Voting Rights Act.").

The Court rejected the State's contention that *De Grandy* required a regional analysis of proportionality, noting that, unlike the Plaintiffs in *De Grandy*, the GI Forum Plaintiffs had argued from the inception of this lawsuit that the proportionality inquiry had to be determined on a statewide basis. *See id.* (citing GI Forum Plaintiffs' First Amended Complaint in Civ. Action No. 2:03-354 (E.D. Tex.), pp. 1, 5, 7). Ultimately the Court agreed with GI Forum Plaintiffs that "the answer in these cases is to look at proportionality statewide." *Id.* at 2620. Considering the number of congressional districts in Texas and the fact that Latinos comprise between 22% and 24.5% of the Texas' citizen voting-age population, the Court concurred with GI Forum Plaintiffs

11

**Perales Decl.**
**00394**

that Latinos fell "shy of proportional representation." *Id.* at 2621; Post-Trial Brief at 21-23; J.S. 2004 at 28-30; J.S. 2005 at 29-30; Merits Brief at 46-49.

*ii. Other factors in the totality of the circumstances inquiry*

In addition to proportionality, the Court also considered and ultimately agreed with GI Forum Plaintiffs' assertion that other factors present in the legislative dismantling of District 23 also indicated a violation of §2. *See id.* The Court first took note that, just as GI Forum Plaintiffs had argued, the record was clear that the legislature acted to protect an incumbent who was not the Latino-preferred candidate in a district where Spanish-surnamed voter registration was on the rise, when it removed over 100,000 Latinos from District 23. Post-Trial Brief at 2-9; J.S. 2004 at 6-7; Brief on Remand at 4-9; J.S. 2005 at 4-8; Merits Brief at 6-12 ("The State accomplished this reduction in Latino voting strength by slicing through Webb county and the city of Laredo, both of which have greater than 90% Latino population."). As noted by the Court, "by divid[ing] the cohesive Latino community in Webb County" just as "District 23's Latino voters were poised to elect their candidate of choice," the Legislature acted to dilute Latino voting strength. *Id.*

The Court also agreed with the argument presented by GI Forum Plaintiffs that the Legislature's action in breaking apart a Latino opportunity district, when viewed in the context of the long history of voting-related discrimination in Texas, weighed in favor of finding a violation of §2. Am. Compl. at 5; Post-Trial Brief at 20 (quoting *Clark v. Calhoun Co.*, 88 F.3d 1393, 1397 (5th Cir. 1996)); Merits Brief at 25-27 and fn. 22 (citing cases describing the history of voting-related discrimination against Latinos in Texas). As explained by the Court, "[t]he changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active

12

**Perales Decl.
00395**

and cohesive." *Id.* The Court referenced the evidence of the history of discrimination against

Latinos in Texas as discussed by the District Court, which in turn had made its findings on the

basis of the evidence provided only by Plaintiffs' experts at trial. *See id.* at 2622; *see also*

*Session* 298 F.Supp.2d at 473; Post-Trial Brief at 20-21.

> d. Although finding it unnecessary to reach a decision on the issue,
> the Court indicated that GI Forum Plaintiffs' Equal Protection
> claims had merit.

Reversing and remanding the District Court's decision with respect to District 23, the

Court did not reach "appellants' claim that the use of race and politics in drawing that district

violates . . . equal protection." Id. at 2623. Nonetheless, the Court noted that, prior to the

Legislature's redistricting, diminishing Latino electoral support for Bonilla in District 23

suggested that he was "unresponsive to the particularized needs of the members of the minority

group." *Id.* at 2622 (quoting *Gingles*, 478 U.S. at 45). According to the Court, and as GI Forum

Plaintiffs had insisted throughout this case, the State's action in taking away Latino opportunity

"because Latinos were about to exercise it," bore "the mark of intentional discrimination that

could give rise to an equal protection violation." *Id.*; Am. Compl. at 5,6; Tr. Brief at 12-13;

Post-Trial Brief at 2-9; Brief on remand at 4-9; J.S. 2004 at 14-21; J.S. 2005 at 14-22; Merits

Brief at 29-31; Reply Brief at 1-3. As argued by Plaintiffs:

> [T]he District Court had sufficient evidence of the State's
> intent to minimize the voting power of the Latino
> population in District 23. In 2002, with 57.5% Hispanic
> citizen voting age population and 55.3% Spanish-surnamed
> registered voters, District 23 was a Latino opportunity
> district. In the face of increasing racial polarization in his
> elections, and the lowest level of Latino voter support he
> had ever received, Congressman Henry Bonilla barely held
> his seat in the 2002 election. In response, the State
> intentionally carved out of District 23 a large portion of the
> Latino population in order to ensure that Latinos could not
> remove Bonilla from office in the next election.

13

Merits Brief at 30 (internal citations omitted).

## B. GI Forum Plaintiffs' Fee and Expense Request is Reasonable and Merits an Upward Departure under the *Johnson* Factors

In the Fifth Circuit, trial courts use the lodestar method of awarding attorneys fees. The lodestar involves multiplying "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984). The lodestar "is presumed to be the reasonable fee," *id.*, and "includes most, if not all, of the relevant factors constituting a reasonable attorneys' fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986).

After the lodestar has been calculated, the district court must then address its reasonableness as a whole. *Hensley*, 461 U.S. at 434; *Longden v. Sunderman*, 979 F.2d 1095, 1099 (5th Cir.1992). The trial court makes this assessment by applying the factors articulated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).[5]

---

[2] The *Johnson* factors are:

(1) the time and labor required;
(2) the novelty and difficulty of the questions involved;
(3) the skill required to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to the acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) the time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client; and
(12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19; *Singer v. City of Waco, Texas*, 324 F.3d 813, 829 (5th Cir.2003).

14

1.  **The Time and Labor Claimed by GI Forum Plaintiffs Is Reasonable in Light of Their Pivotal Role in Securing the Ruling That Plan 1374C Diluted Latino Voting Strength in District 23.**

The time and labor expended by Plaintiffs' counsel was reasonable to prepare the lawsuit, try the case and draft necessary pleadings. The case was developed and prepared on an expedited basis in order to seek relief prior to the 2004 election cycle; counsel for GI Forum Plaintiffs filed their complaint on October 14, 2003, the day after Plan 1374C was signed into law by the Governor. Discovery, too, was expedited, in order to prepare for the start of trial on December 11, 2003. Following the adverse ruling from the District Court in January 2004, counsel for GI Forum Plaintiffs appealed the case to the United States Supreme Court and prepared and filed a Jurisdictional Statement and Response in Opposition to the State's Motion to Affirm. Following the Supreme Court's remand to the District Court for reconsideration, counsel for GI Forum Plaintiffs prepared a brief on remand and advocated once again before the District Court for a finding of Latino vote dilution. After the second ruling from the District Court upholding the 2003 redistricting plan, counsel for GI Forum Plaintiffs appealed the case again to the United States Supreme Court, filed a Jurisdictional Statement, Merits Brief and Reply Brief, and prepared and presented oral argument before the U.S. Supreme Court. In the remedial phase of the case, counsel for GI Forum prepared a proposed remedial plan and accompanying brief, responded to proposed remedial plans of other parties and advocated again before the District Court for a redistricting plan that would provide Latino voters with the opportunity to elect their candidate of choice in District 23. *See* Ex. 1 (Decl. of Nina Perales).

This case involved substantial discovery, numerous fact and expert witnesses, voluminous documentary evidence and complex legal issues at the forefront of litigation under the Voting Rights Act of 1965. *See Johnson*, 488 F.2d at 717-19 (*Johnson* factors 1-3 showing

Perales Decl.
00398

reasonableness of a fees request). Counsel for GI Forum were competent to litigate this case and expended only the time that was reasonably necessary to prosecute the case to its conclusion. *See* Ex. 4 (Decl. of Anita Earls).

As reflected in the declarations of Nina Perales and Joaquin Avila, the following is the time sought for compensation in this action at the prevailing market rates indicated:

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| Nina Perales | 1096.1 | $400 | $438,440 |
| Thomas Saenz | 113 | $400 | $45,200 |
| Joaquin Avila | 119.6 | $600 | $71,760 |
| David Urias | 175.6 | $275 | $48,290 |
| Diego Bernal (2004-6) | 274.5 | $210 | $57,645 |

Plaintiffs also seek compensation for paralegal time[6] as follows:

| Paralegal | Hours | Rate | Amount |
|---|---|---|---|
| Diego Bernal (2003) | 159 | $90 | $14,310 |

Finally, GI Forum Plaintiffs also seek compensation of $134,872.02 for costs detailed in the Declaration of Nina Perales. *See* Ex. 1.

The hours claimed by the Plaintiffs' counsel are well-documented, relate to necessary litigation tasks and are neither excessive nor duplicative. The judgment they sought and won required the vast majority of the effort they reasonably expended on the case. Excluding time spent solely on the claim that Section 2 required the creation of seven Latino opportunity

---

[6] Reasonable fees may be granted for hours worked by paralegals. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284-85 (1989).

16

districts in South and West Texas, GI Forum Plaintiffs seek to recover 85% of their fees and expenses at the trial stage of the case and 100% of their fees at the appellate stage. *See* Ex. 1 (Decl. Nina Perales).

### 2. GI Forum Plaintiffs are Requesting Reasonably Hourly Rates

The hourly fee GI Forum Plaintiffs request is also reasonable. Hourly rates for attorney fees must be reasonable within the relevant market. Because this case was tried before a three-judge panel in Austin, Texas, and most hearings in the case were also heard in that city, the relevant market is Austin. *Blum*, 465 U.S. at 895-96. The attorneys fees awarded to a prevailing party must also be appropriate based on "community standards for attorneys of similar experience in similar cases." *Sims v. Jefferson Downs Racing Ass'n*, 778 F.2d 1068, 1084 (5th Cir. 1985).

In the relevant market of Austin, Texas, the usual and customary fees for highly experienced litigators such as Nina Perales and Thomas Saenz is $400 an hour. The customary fee for experienced litigators such as David Urias is $275 per hour and the customary fee for an entry-level associate such as Diego Bernal is $210 hour. The customary fee for a paralegal is $90; because Diego Bernal was in his third year of law school while he worked on the case in 2003, he is billed at the paralegal rate during that period. *See* Ex. 5 (Decl. of Tullos Wells)

As stated in the supporting Declaration of Sanford J. Rosen, the usual and customary fee for an experienced Supreme Court advocate such as Mr. Avila for work related to the Supreme Court argument of this case is $600. *See* Ex. 3 (Decl. of Sanford J. Rosen).

### 3. An Enhancement of the Lodestar is Appropriate

As demonstrated above, this case is one of "exceptional success" for GI Forum Plaintiffs. *See Blum v. Stenson*, 465 U.S. 886, 898-900 (1984). GI Forum Plaintiffs secured an order

17

striking down the State's congressional redistricting plan, winning for Latino plaintiffs the first favorable ruling by the U.S. Supreme Court on the merits of a Section 2 claim. The ruling in this case not only protects Texas Latino voters in the remaining election cycles of the decade but will, in the next round of redistricting, operate to protect minority voters across the nation from vote dilution that is cloaked in the guise of incumbency protection or partisan politics. *See Perry*, 126 S.Ct. at 2622-23 ("If, on the other hand, incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. By purposely redrawing lines around those who opposed Bonilla, the state legislature took the latter course. This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters.").

Counsel for GI Forum Plaintiffs staffed this case minimally. For extensive periods the case was handled by only one attorney. Almost the entire case was handled by either one or two attorneys working at a time. *See* Ex. 1 (Decl. of Nina Perales) at Tab B. For that reason, the success achieved transcends the fee request in this case and the lodestar should be enhanced by .5. Accordingly, GI Forum Plaintiffs seek attorneys fees and costs in the amount of $1,110,483.27.

### 4. GI Forum Plaintiffs' Request for Costs is Appropriate

In addition to an award of attorneys' fees, GI Forum Plaintiffs are entitled to an award of costs. The Federal Rules of Civil Procedure provides for an award of costs "to the prevailing party unless the court otherwise directs." FED. R. CIV. P. 54(d)(1). The Fifth Circuit strongly presumes that courts will award costs to the prevailing party. *See Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1017 (5th Cir.1992) (citing *Sheets v. Yamaha Motors Corp. U.S.A.*, 891 F.2d 533, 539 (5th Cir.1990)).

18

**Perales Decl.
00401**

An attorney's "reasonable out-of-pocket expenses" which are ordinarily charged to fee paying clients may be recovered under 42 U.S.C. § 1988. *See West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83, 87 n.3(1991).

The Plaintiffs seek an award of costs in the amount of $134,872.02. *See* Ex. 1 (Decl. of Nina Perales at Tab C; Ex. 2 (Decl. of Joaquin Avila) at Tab C. These costs include charges incurred for photocopying, facsimile transmissions, transcripts, computerized legal research, travel, and telephone usage. *Associated Builders,* 919 F.2d at 380. As these submitted costs are routinely charged to fee paying clients, they are recoverable. *See Simi,* 236 F.3d at 255. The costs are also adjusted to reflect the fact that Mr. Avila's expenses are reflected in both the Declaration of Nina Perales and of Mr. Avila.

### III.  CONCLUSION

In summary, the amount of legal fees being requested by GI Forum Plaintiffs is $975,611.25, and the amount of legal costs is $134,872.02. Therefore, in total, GI Forum Plaintiffs seek $1,110,483.27 in fees and costs.

GI Forum Plaintiffs respectfully pray that this Court will grant this motion and award the requested fees and costs.

DATED: September 22, 2006             Respectfully submitted,

                                      MEXICAN AMERICAN LEGAL DEFENSE &
                                      AND EDUCATIONAL FUND


                                      BY: _____/s/ Nina Perales
                                      NINA PERALES
                                      State Bar No. 240054046
                                      Attorney-in-Charge
                                      110 Broadway, Suite 300
                                      San Antonio, Texas 78205
                                      (210) 224-5476 (telephone)
                                      (210) 224-5382 (facsimile)
                                      19

CERTIFICATE OF SERVICE

I hereby certify that an electronic form of this Motion and Brief in Support of Reasonable Attorneys Fees and costs was provided to counsel in this case through the Court's electronic filing system on this 22nd day of September, 2006.


_____/s/ Nina Perales

Perales Decl.
00403

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

FILED—CLERK
U.S. DISTRICT COURT

2007 MAR 28 PM 3: 32

TX EASTERN-MARSHALL

BY_____

LEAGUE OF UNITED LATIN AMERICAN §
CITIZENS, ET AL.

Vs.                                    §    CIVIL NO. 2:03-CV-354
                                            CONSOLIDATED
RICK PERRY, GOVERNOR OF TEXAS,
ET AL.                                 §

## MEMORANDUM OPINION AND ORDER

**1.    Introduction.**

The plaintiffs in these consolidated cases challenged the adoption of a new congressional redistricting plan by the State of Texas. The claims challenging the entirety of the statewide plan failed. The Supreme Court, however, concluded that the state violated Section 2 of the Voting Rights Act when it created new CD 23. We drew a remedial map in response to the Court's mandate. Various parties now request attorneys' fees. We agree that some plaintiffs prevailed, and we therefore grant their applications. Others lack prevailing party status, and we deny their petition.

**2.    Factual Background and Procedural Posture.**

These cases arose in 2003 when the Texas state legislature replaced a court-drawn congressional map with a legislative plan. Various voters, office holders, interest groups and municipalities challenged the state's authority to replace a map mid-decade, when the basis for doing so was partisan gain. Some of the plaintiffs directed additional challenges at specific districts. After a trial on the merits, this court, in a partially divided opinion, rendered judgment against the plaintiffs

Perales Decl.
00404

**EX. 15**

rejecting all of their claims.

The Supreme Court vacated this court's judgment and remanded the case for further consideration in light of *Vieth v. Jubilirer*, 541 U.S. 267 (2004). In response to the Court's mandate, we asked for supplemental briefs and held argument in January 2005. We reinstated our prior judgment.

Certain plaintiffs appealed, and the Supreme Court noted probable jurisdiction. On June 28, 2006, the Supreme Court rendered its decision. *League of United Latin American Citizens v. Perry*, 126 S.Ct. 2594 (2006). The Court rejected the argument advanced by the appellants that Plan 1374C was an unconstitutional political gerrymander. *Id.* at 2609-11. The absence of an administrable test for partisan fairness factored centrally in the Court's holding. Id. at 2610. Likewise, the Court rejected the argument brought by the City of Austin and Travis County that mid-decade redistricting for exclusively partisan purposes violates the one-person, one-vote requirement due to the state's use of old census data. *Id.* at 2611-12. The Court also rejected the argument that the plaintiffs had proven a Section 2 claim in connection with the lines drawn in the Dallas/Fort Worth area. *Id.* at 2625-2626.

With respect to CD 23, however, the Supreme Court held that the evidence revealed a violation of Section 2. *Id.* at 2623. The Court found it unnecessary to consider the Equal Protection challenge to CD 25 because the Court had directed us to re-draw CD 23, and the Court assumed that CD 25 would not survive that exercise. *Id.* The prior judgment of this court was affirmed in part, reversed in part, and vacated in part. The Court remanded the case for the entry of a remedial plan. In response to the mandate, we issued an opinion dated August 4, 2006, and an accompanying order regarding special elections. We imposed Plan 1438C as its remedial plan for the violation of Section

2

**Perales Decl.**
**00405**

2 of the Voting Rights Act found by the Supreme Court. The remedial order prompted these fee applications.

## 3. Discussion.

Section 1988 provides that a court "in its discretion, may allow the prevailing party . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.[1] A plaintiff "prevails" by receiving some relief on the merits of his claim. *Hewitt v. Helms*, 482 U.S. 755, 760 (1987). "[T]he plaintiff must be able to point to a resolution of the dispute which changes the legal relationship of the parties." *Texas State Teachers Assn. v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 792 (1999). According to *Garland*, "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." In *Garland*, the plaintiffs "prevailed" because they obtained a judgment which vindicated their First Amendment rights and materially altered the defendant's policy limiting the rights of its employees to communicate concerning union activites." *Id.* at 793. The threshold is not high for civil rights plaintiffs. The Supreme Court has held that a plaintiff who wins nominal damages in a civil rights suit is a prevailing party under 42 U.S.C. § 1988. *Farrar v. Hobby*, 506 U.S. 103 (1992).

Once a civil rights plaintiff crosses the prevailing party threshold, that party is generally entitled to some award of fees, absent special circumstances. *See Newman v Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968). Partial success on the merits is relevant to the *amount* of fees to which a plaintiff is entitled, not the plaintiff's entitlement to any fee at all. *Garland*, 489 U.S. at 790 ("[T]he degree of the plaintiff's success in relation to the other goals of the lawsuit is a

---

[1]     The Voting Rights Act contains a fee-shifting provision that is nearly identical to section 1988. 42 U.S.C. § 1973l(e). Courts construe these provisions consistently. *Leroy v. City of Houston*, 831 F 2d 576, 579 n.4 (5th Cir. 1987), *cert. denied*, 486 U.S. 1008 (1988).

3

Perales Decl.
00406

factor critical to the determination of the size of a reasonable fee, not the eligibility for a fee award at all.").

For reasons we shall explain, we conclude that the Jackson plaintiffs, LULAC, and the GI Forum are prevailing parties for purposes of the fee-shifting statute. Each of these parties challenged the legality of Plan 1374C, albeit for a multitude of constitutional and statutory reasons. Moreover, each of these plaintiffs eventually obtained an enforceable judgment that altered the legal relationship between them and the state. This type of judgment is the touchstone for prevailing party status. At the same time, we conclude that none of these parties is entitled to all of their fees, or even most of them. Finally, we deny the Valdez-Cox plaintiffs' fee application. This court rendered a judgment against them, and they failed to perfect an appeal of the judgment, effectively abandoning their claims. They are not prevailing parties entitled to fees.

First, we address the Jackson plaintiffs' fee application. The Jackson plaintiffs point to their amended complaint, pre-and post-trial briefs, and the evidence they offered during the 2003 trial to support their application. They also contend that the Supreme Court's decision is attributable to their efforts. The Jackson plaintiffs concede they are not entitled to all of their fees, because they did not prevail on all of their claims. They have reduced their fees and costs by 2/3rds. The Jackson plaintiffs seek attorneys' fees in the amount of $352,946 and costs in the amount of $30,427 11.

The state challenges the Jackson plaintiffs' entitlement to fees. The state argues that any victory was a technical one, as the Supreme Court only found a violation in one of the thirty-two Congressional Districts. Moreover, the state argues that the Jackson plaintiffs did not prevail on the claims they pursued, which included (1) a challenge to mid-decade redistricting, (2) a challenge to the dilution of influence districts, and (3) a racial gerrymander challenge to CD 25. The state argues

4

that the Jackson plaintiffs focused primarily on a challenge to the plan as a whole and on an Equal Protection theory directed toward CD 25. As the Supreme Court found only a Voting Rights Act violation, the state urges that this holding defeats the Jackson plaintiffs' prevailing party status.

We heed the statements made by the *Balderas* court that "[r]edistricting litigation is not ordinary civil rights litigation." *Balderas v. State of Texas*, 6:01-CV-158 Dkt. #499 (E.D. Tex. February 20, 2002). Nevertheless, due in large part to the Supreme Court's generous formulation of the prevailing party test, we determine that the Jackson plaintiffs prevailed. In their first amended complaint, the Jackson plaintiffs brought claims on behalf of Richard Raymond, an Hispanic citizen from Laredo, Texas who resided in CD 23 under Plan 1151C and in CD 23 under Plan 1374C. The Jackson plaintiffs also brought claims on behalf of Maria Torres, an Hispanic citizen from McAllen, Texas, who resided in CD 15 under Plan 1151C but in CD 25 under Plan 1374C. The Jackson plaintiffs challenged the state's conduct with respect to District 23 and alleged that "[m]ore than three hundred thousand Hispanics are left in proposed District 23 where they will have no chance to elect their preferred candidates." (Dkt. # 46 at 16). The Jackson plaintiffs also alleged that "the other Hispanic opportunity districts were drawn very irregularly, with extreme awareness of where Hispanics live, and with the use of land bridges and relatively unpopulated connectors to 'rope together' concentrations of Hispanic population." (Dkt. #46, at 16). The Jackson plaintiffs brought claims under Section 2 and the Equal Protection Clause. (Dkt. #46 at 16-17).

In their pre-trial brief, the Jackson plaintiffs built on the allegations in their amended complaint and urged that the state, by removing Hispanic Democrats from Webb County, undermined the opportunity for Hispanic citizens in this region of Texas to elect their preferred candidates to Congress. These plaintiffs urged: "That intentional cracking of the Hispanic

5

population violates Section 2 of the Voting Rights Act and the Equal Protection Clause." (Dkt. #115 at 18). The Jackson plaintiffs also elaborated on their equal protection challenge to CD25 Their brief argues that "the award for the oddest district would have to go to the new District 25, which starts in McAllen, in Hidalgo County, slides over to Starr County, and then snakes up through six barely contiguous and very sparsely populated counties before reaching into Travis County and pulling out Austin's most Hispanic neighborhoods." (Dkt. # 115 at 32). They maintained that the "bacon strip" districts triggered strict scrutiny because, "in each case, ethnicity predominated over traditional principles of compactness, respect for counties and municipalities, and respect for communities defined by actual shared interests (as opposed to 'communities' defined by nothing but ethnicity)." (Dkt. #115 at 33). The Jackson plaintiffs also offered evidence during the trial on these issues and reiterated the substance of their challenges in the post-trial briefing.

To be sure, the Jackson plaintiffs alleged several other claims in this litigation. They brought challenges to the authority of the state to redistrict mid-decade and brought challenges directed toward other districts in the state. The record, however, will not allow us to ignore the Jackson plaintiffs' pleadings, briefing, and evidence which challenged the treatment of Hispanic voters in South and West Texas. Consistent with what the Jackson plaintiffs had alleged, the Supreme Court found a Section 2 violation arising out of the removal of Hispanic voters from CD 23 and concluded that the state could not remedy that violation through the creation of CD 25. It is true, as the state argues, that the Supreme Court did not reach the Equal Protection claim asserted against District 25. But the short of the matter is that the Jackson plaintiffs challenged the legality of the districts in South and West Texas. At least in part as a result of their efforts, CD 23 and CD 25 of Plan 1374C no longer exist. The final judgment rendered in the case materially altered the legal relationship

6

between the state and the voters in both CD 23 and CD 25 under Plan 1374C. The Jackson plaintiffs are prevailing parties.

Next, we consider whether LULAC is a prevailing party in this litigation. In its first amended complaint, LULAC complained that Plan 1374C "fragmented cohesive Latino voters in Webb County" and eliminated an effective cohesive Latino district (CD 23) by reducing the Spanish surnamed voter registration rate below 50%. (Dkt. # 33 ¶¶ 15, 18). LULAC also alleged that Plan 1374C "purports to replace" the elimination of CD 23 with CD 25. According to LULAC, however, the creation of CD 25 was accomplished by "unnecessarily fragmenting Latino voter communities in Hidalgo County, Cameron County, and Travis County." (Dkt. #33 ¶ 18).

LULAC elaborated on its CD 23 allegations in its pre-trial briefs. In its pre-trial papers, LULAC challenged the cracking of "a cohesive Latino community–Laredo, Webb County, Texas." (Dkt. # 98 at 8). LULAC also argued that no legitimate state policy supported the creation of some of the districts. In connection with this argument, LULAC maintained that the link between the Austin and the Rio Grande Valley segments in Districts 15 and 25 was based only on racial considerations. In support of this position, LULAC pointed to the testimony of Dr. Gaddie, the state's expert: "Indeed, Dr. Gaddie, who has written extensively on the subjects of regionalism in Texas, could not point to a single example of a context in which Austin and the Rio Grande Valley have ever previously been considered a community of interest . . . ." (Dkt. # 98, at 19). These allegations supported LULAC's claim that the state violated Section 2 of the Voting Rights Act. Although LULAC's post-trial brief urges the court to strike Plan 1374C as a whole and order elections under Plan 1151C, the basis for LULAC's position was unlawful vote dilution directed toward Hispanics and African-Americans. As we have noted, the judgment rendered in this case

7

found that the state violated Section 2 when it re-drew CD 23. The creation of CD 25 did not compensate for the loss of CD 23 for essentially the reasons urged by LULAC. LULAC is a prevailing party.

Third, the court addresses GI Forum's fee petition. The GI Forum challenged Plan 1374C because it created no Latino majority congressional districts in the Dallas area and drew only 6 (as opposed to 7) effective districts in South and West Texas. (Dkt. # 39, ¶¶ 18, 20-25). In addition, however, the GI Forum specifically challenged the state's conduct in CD 23, by alleging that "[t]he new Texas congressional redistricting plan intentionally discriminates against Latino voters by reducing the Latino population and voting strength in Congressional District 23 in order to prevent Latino voters from being able to elect their candidate of choice." (Dkt. #39, ¶ 26). For its causes of action, the GI Forum alleged that the state violated Section 2 of the Voting Rights Act in connection with its statewide plan, and also "because it intentionally reduces the Latino population and voting strength of Congressional District 23 in violation of 42 U.S.C. Sections 1971(a) and 1973 and the Fourteenth and Fifteenth Amendments of the U.S. Constitution." (Dkt # 39, ¶¶ 28-29).

In the portion of its pre-trial brief devoted to intentional discrimination, the GI Forum contended that the state had intentionally reduced the Latino population in CD 23 to ensure the re-election of a candidate who is not preferred by the majority of Latino voters in the district. (Dkt # 108 at 12). In the context of the Section 2 claim, the GI Forum argued that "[i]n South and West Texas, Plan 1374C completely eliminates Congressional District 23 as a district that offers Latino voters the opportunity to elect their candidate of choice." (Dkt. #108 at 2). The GI Forum criticized Plan 1374C because it divided Webb County, and the City of Laredo, in half. (Dkt. #108 at 2). The GI Forum urged that "[t]his new boundary effectively cripples Webb County and ensures that its

Perales Decl.
00411

Latino voters can no longer cast their block of votes for the Latino candidate of choice . . . " (Dkt. # 108 at 2). The GI Forum also maintained that the State could not offset the loss of CD 23 with CD 25. (Dkt #108 at 9-10). GI Forum devoted a substantial portion of its trial presentation and its post-trial brief to its argument that the state had improperly reduced the number of Latinos in CD 23 to ensure the re-election of Representative Henry Bonilla.

For essentially the same reasons identified in connection with the Jackson plaintiffs and LULAC, the final judgment in this case altered the legal relationship between the state and the GI Forum. It bears mention that Justice Kennedy's opinion finding a Section 2 violation emphasized that the state's conduct in connection with CD 23 bore the mark of intentional discrimination. The GI Forum is a prevailing party.

Finally, the court turns to the application submitted by the Valdez-Cox plaintiffs. Unlike the other applicants, the Valdez-Cox plaintiffs did not participate in this case after the trial on the merits. As the state observes, the Valdez-Cox plaintiffs abandoned pursuit of their claims, did not file any briefing with the Supreme Court, and did not participate in the remedial phase of this litigation. It is fair to state that the Valdez-Cox plaintiffs abandoned their claims. The court rejects the argument that the Valdez-Cox plaintiffs aided the construction of an evidentiary record on which the Supreme Court could base its decision. Rather, we find that any contribution to the record was cumulative of the efforts of other parties  The Valdez-Cox plaintiffs are not prevailing parties.

We have concluded that the Jackson plaintiffs, LULAC, and the GI Forum plaintiffs are prevailing parties. We now address an appropriate amount to award as attorneys' fees. We have considered all of the applications in light of our collective experience with the parties and the case.

9

A reasonable fee for each prevailing party is 25% of the party's total fees.[2]

We begin with the Jackson plaintiffs. This group seeks only 1/3 of the total fees billed in this case. Experience tells us, however, that the primary relief sought by the Jackson plaintiffs was the invalidation of the state's plan as a whole. These plaintiffs sought a rule of law banning mid-decade redistricting for purely partisan purposes. Moreover, these plaintiffs devoted a considerable amount of trial time challenging the state's conduct in the Dallas/Fort Worth area and in other "influence" districts across the state. These claims, viewed collectively, vastly overshadowed the Jackson plaintiffs' efforts in South and West Texas. Their attempt to recover a full third of their fees and costs is too aggressive in the context of this case. We find that 25% of the hours billed are reasonable in light of the result obtained. We further find that the rates are reasonable and customary for this type of work. We award them $264,709.75 in attorneys' fees and $22,820.33 in costs.

LULAC seeks all of its fees in the amount of $946,064, costs in the amount of $34,739.89,

_____

[2]     We first "calculate[d] a lodestar fee by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir.1999). We also considered whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case, and the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

The *Johnson* factors are: (1) the time and labor required to litigate the matter; (2) the novelty and complicatedness of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case imposed time constraints; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) whether the case was "undesirable"; (11) the type of attorney-client relationship and whether the relationship was long-standing; and (12) awards made in similar cases. *Id.* at 717-19.

To the extent that any *Johnson* factors were subsumed in the lodestar, we did not reconsider them when we determined whether any adjustment to the lodestar was required. *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir.1998).

Perales Decl.
00413

and also a multiplier for "exceptional success." LULAC aided in the efforts to challenge the districts in South and West Texas. At the same time, however, LULAC was preoccupied with its statewide challenge and its desire to create additional Latino opportunity districts. We treat LULAC like we treat the Jackson plaintiffs and award 25% of its fees. No multiplier is appropriate under the *Johnson* factors. LULAC is awarded $236,516 in attorneys' fees and $8684.97 in costs.

Finally, the GI Forum seeks fees in the total amount of $650,407.50 and costs in the total amount of $134,872.02. The GI Forum also seeks a fee multiplier. Although the GI Forum is correct that it focused exclusively on the Latino vote dilution in South and West Texas, this court rejected the GI Forum's primary goal to create a seventh Latino opportunity district in South or West Texas. The GI Forum plaintiffs devoted much of their attention, however, to the state's conduct in CD 23, and we recognize those efforts. Nevertheless, we reduce their fees because they achieved only partial success on the merits of their claims. We intend no criticism of the GI Forum's effort. We must recognize, however, that many parties contributed to a Supreme Court decision that awarded complete relief to none. We allow the GI Forum 25% of its fees and costs. We determine that no multiplier is appropriate. The GI Forum plaintiffs are entitled to recover $196,319.88 in fees and $33,718 in costs.

### 4. Conclusion.

We grant in part and deny in part the Jackson plaintiffs' application for attorneys' fees (##354, 355), LULAC's application for attorneys' fees (#340), and the GI Forum's application for attorneys' fees (#356). We deny the Valdez-Cox plaintiffs' application for attorneys' fees (#350).

11

So **ORDERED** and **SIGNED** this 28th day of March, 2007.

Patrick E. Higginbotham
PATRICK E. HIGGINBOTHAM
UNITED STATES CIRCUIT JUDGE

Lee H. Rosenthal
LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

T. John Ward
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

12

**Perales Decl.**
**00415**