**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | Civil Action No. 1:06-1384 (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States *Defendant.* | § § § § | |

## DECLARATION OF MARCELO TAFOYA IN SUPPORT OF DIAZ INTERVENORS' MOTION FOR SUMMARY JUDGEMENT

1.    My name is Marcelo Tafoya. I am over the age of 18 and am of sound mind and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.    I was born in 1939 in Lorain, OH. In 1945 I moved to Georgetown, TX, and then relocated to Austin, TX in 1969. My current address is 2908 Overdale Rd., Austin, TX, 78723. I am a Mexican American registered voter of Travis County and the City of Austin.

3.    I have first-hand knowledge of racial discrimination against Latinos in the City of Austin.

4.    In my experience Austin and Travis County have historically failed to provide adequate access to the polls to Latino voters. For example, up until the 1970's there was no polling place in the heavily-Latino residential areas.

5.    In Georgetown, I clearly recall on several occasions my father was required to pay a poll tax before he was allowed to vote. After he paid the tax, he would receive a receipt,

which he was required to produce at the polling place in order to cast his ballot. My father believed this practice was unfair, and frequently complained to me about the poll tax requirement, often asking aloud why he "had to pay money to vote." He was infuriated by the tax, as his wages as a city groundskeeper did not allow him to pay the poll tax and support us at the same time. Ultimately, my father stopped voting altogether. Once he stopped, I do not recall my father ever returning to the polls.

6.     Furthermore, I recall a more recent incident during the 2004 election at the Northeast Austin Health Clinic polling place. My wife and I arrived at the clinic to vote, and while we were there I asked one of the poll workers if there were any Latino poll workers on duty. They said there were not. I then asked whether any of the present workers spoke Spanish. There were not any Spanish-speaking poll workers at the site. When I inquired about the availability of bilingual poll workers, especially at a polling place serving a predominately Latino neighborhood, the poll worker explained their plan was to call the central office if the need arose, and the office would dispatch a bilingual worker to the site.

7.     Similarly, during a previous election at the A.B. Cantu Pan Am Recreation Center polling place, which also services a predominately Latino area, I witnessed an elderly, wheelchair-bound, Spanish-speaking woman unsuccessfully attempt to vote on her own, as she was unable to communicate with the English-speaking poll workers. There were not Spanish-speaking or bilingual poll workers on duty, and the workers there did not offer to call a translator to assist the woman. As a result, she was forced to get out of line and wait for someone to translate or help her. Only after the woman's bilingual daughter arrived at the site was she allowed to vote.

8.  Georgetown, located 28 miles north of Austin, had three public primary schools, all racially segregated: white, Black, or Latino. Most students in the Latino school, which I attended, were migrant workers, and many did not continue past the 3rd grade. I recall we used the same first grade reader for every grade in every year I attended that elementary school. The school itself was comprised of one room with a large furnace in the center; the bathroom was located outside and had no running water.

9.  When our school's lone teacher, Mrs. Richardson, passed away, we were transferred to the Anglo grammar school, which was much larger, more modern and cleaner than our last school.

10. Those of us who continued past primary school attended Georgetown Junior High/High School, where a special class was created just for the Latino students. Our classes were taught by the same instructor, the school's physical education coach. I recall out of 42 Latino students, only 12 graduated from Georgetown.

11. After graduation and working in various fields, from assembly line work to radio broadcasting, I came to Austin.

12. When I first arrived in Austin the East Side of the city was predominately Latino, and it remains that way today.

13. Interestingly, in 1980, after paying off the mortgage on my home I came to discover a racially restrictive covenant in the deed. It stated the house could not be sold to Blacks or Hispanics. It was then that I realized the only reason I was able to purchase a home in this area of Austin was that a friend had transferred this house to me after I paid him a small amount of money and took over the mortgage payments. It then made sense to me

why the neighborhood was almost completely Anglo, and the few Latino neighbors I did have were recent arrivals to the area.

14. Most of the residential growth accompanying these shifts has occurred in the northwest. The large majority of those living in Northwest Austin are Anglos. Predominantly Anglo-populated, gated communities appear to be popular in the northeast and southwest Austin.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in the City of Austin, TX on May 8, 2007.

Marcelo Tafoya

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL §
UTILITY DISTRICT NUMBER ONE, §
§
    *Plaintiff,* §
§
vs. §   Civil Action No. 1:06-1384
§      (DST, PLF, EGS)
ALBERTO GONZALES, §
Attorney General of the United States §
§
    *Defendant.* §

## DECLARATION OF FIDEL ACEVEDO IN SUPPORT OF DIAZ INTERVENORS' MOTION FOR SUMMARY JUDGEMENT

1.    My name is Fidel Acevedo. I am over the age of 18 and am of sound mind and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.    I was born in 1940 in Levelland, TX. I moved to Austin, TX, in 1969 and have lived there ever since. My current address is 3807 Prairie Lane, Austin, TX, 78729, which is located in an area of Austin known as Westover Hills. I am a Mexican American registered voter in Travis County and the City of Austin.

3.    I have first-hand knowledge of racial discrimination against Latinos in the City of Austin.

4.    My parents were both migrant workers, picking produce to earn a living for our family. Although we frequently traveled for work, I grew up primarily in New Braunfels, TX.

5.  I attended public schools in New Braunfels. The elementary schools were racially segregated, and I did not attend an integrated school until the 9th grade at New Braunfels Senior High. There were other high schools in the district, however, that were almost entirely Latino or African American.

6.  I have lived in the same area since coming to Austin in 1969.

7.  When I arrived in Austin it was a racially segregated city, with racially identifiable sides of town. As a result, I was able immediately to locate the Latino community on Austin's East Side. There, I met many residents and community leaders who voiced concerns about Austin's racially segregated schools. From speaking with them and my own observations I came to understand that Palm Elementary and Johnston High School were the Latino schools, and Lyndon B. Johnson and Reagan High School were predominately Black campuses.

8.   Since education was such a focus of the community, I took it upon myself to learn more about educational issues as well. As a result, I have spent a great deal of time at the State Capitol trying to persuade legislators to pay more attention to these, and other, issues, particularly the high-drop out rate among minorities in Texas.

9.  An increase in population is not the only reason Austin has expanded, as many Anglos moved North to Round Rock, and west towards Westlake Hills and Lakeway. This phenomenon, "white flight," has threatened to return Austin to the segregation I experienced when I first moved here 30 years ago.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in the City of Austin, TX on May 8, 2007.

Fidel Acevedo

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, §§§ | |
| *Plaintiff,* §§ | |
| vs. § | Civil Action No. 1:06-1384 |
| § | (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States §§§ | |
| *Defendant.* §§ | |

## DECLARATION OF GLORIA MORENO IN SUPPORT OF DIAZ INTERVENORS' MOTION FOR SUMMARY JUDGEMENT

1. My name is Gloria Moreno. I am over the age of 18 and am of sound mind and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. I was born in 1943 in Austin, TX, where I have lived my entire life except for nine years spent in Dallas, TX.

3. My current address is 2504 Hidalgo St, Austin, TX, 78702. I am a Mexican American registered voter of Travis County and the City of Austin.

4. I have first hand knowledge of racial discrimination against Latinos in the City of Austin.

5. For example, I remember my aunts, uncles and grandparents paying the poll tax when I was a child.

6. Also, when I first arrived at Metz Elementary my English was accented since my family and I were bilingual and often spoke Spanish at home. Because of my accent I was told I had a speech impediment and was placed in a special education class with disabled children.

7. Aside from the public schools, I believe the city ignored my neighborhood, East Austin. When I was growing up the streets did not have sidewalks. There were also no public library branches in East Austin. Even more bothersome was the fact that the neighborhood lacked medical clinics and doctors; in order to visit my doctor my family and I had to venture downtown.

8. I believe because the Latino population is concentrated in East Austin the city has not spent money on infrastructure in the neighborhood. After decades of feeling that there were not enough street lights in the neighborhood, in 1998 a small group of residents and myself started documenting- by house address and utility pole number- the street blocks that lacked street lights or those blocks where the light bulbs had burned out. We would write the information down and mail it to the City. It was not until 2001 that the City added street lights and replaced the burne-out bulbs.

9. I also recall segregation in public accommodations in Austin. As a child I remember African Americans were forced to sit in the back of public buses. There were movie theatres that required Latinos to sit in the balcony to watch movies. There were also restaurants that would not serve me and my family because we were Latino.

10. This discrimination hit especially close to home in 1977 when I attempted to rent a home closer to the O'Henry School on Lake Shore and Exposition where my children were being bused. At that time that neighborhood was predominantly Anglo. I inquired about

a house situated two blocks from the school, only to be rebuffed by the landlord who told me, "that we don't rent to people like you." He went on to tell me that he had "had problems with people like you." I interpreted these statements to mean that they did not rent to Latinos.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in the City of Austin, TX on May 8, 2007.

Gloria Moreno

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | Civil Action No. 1:06-1384 (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States | § § § | |
| *Defendant.* | § § | |

## DECLARATION OF DIANA CASTANEDA IN SUPPORT OF DIAZ INTERVENORS' MOTION FOR SUMMARY JUDGEMENT

1.  My name is Diana Castaneda. I am over the age of 18 and am of sound mind and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.  I was born in 1951 in Austin, TX, where I have lived my entire life. My current address is 1805 E. 3rd Street, Austin, TX, 78702. I am a Mexican American registered voter of Travis County and the City of Austin.

3.  I have first-hand knowledge of racial discrimination against Latinos in the city of Austin.

4.  Although the poll tax was abolished when I was young, I recall as a child accompanying my aunt and uncle to collect poll taxes from local residents. They carried a tablet and receipt book with them as they traveled through the neighborhood collecting poll taxes from voters. I vividly recall many of the people they visited, all of whom were Latino, explain that they did not have the money to pay the tax. My aunt and uncle would suggest to the voters that they save their money, and would promise to return at a later date to retrieve the fee.

5.    Many people in my family attended racially segregated "Mexican schools" in the 1920's and 1930's, and I also attended racially segregated public schools in the city of Austin. I attended Metz Elementary, a racially segregated primary school comprised almost entirely of Latino students, with approximately 300 Latino and 10 white students. After completing the 6th grade my classmates and I attended the racially segregated Allen Junior High for the 7th and 8th grades. Nearly every student attending Allen was Latino or African American.

6.    At Metz, the 6th graders who were advanced readers were assigned to a special reading group taught by a teacher named Nancy Giles. As a group we read as many books as we could get our hands on, and completed them at such a rate Mrs. Giles had to look outside the school for additional reading material. I remember she approached the school and district administrations and asked them to provide more books for us to read. They refused her requests.

7.    At Travis High School I told my guidance counselor that I wanted to go to college. I made a point to visit her as often as I could, although she never sought me out. I did not know what it meant at the time, but the counselor placed me, without my knowledge, in the "Plan 2" program- a vocational academic track that would allow a student to meet the minimum requirements to graduate. As a result I was not allowed to enroll in Senior English or Algebra. Nevertheless, I performed well academically and continued to set my sights on college.

8.    I was driven to do well having witnessed my family's struggles. For example, I recall my father was not allowed to work as a baker because he was Latino. I knew I had to excel in order to have the life I wanted for myself. Unfortunately, the guidance counselor did

not share my aspirations, and advised me to forgo going to college. In fact, during one particular conversation, she said to me, "Honey, you aren't going to college, you're pretty, stay home, have babies." I graduated from Travis in 1970 and attended what was then Southwest Texas University. I did not complete my studies at Southwest Texas because I felt academically unprepared and unable to navigate the new, intimidating collegiate setting.

9.    Segregation in Austin was not limited to the public schools, as I recall discrimination by local businesses as well. For example, Youngblood's restaurant denied service and seats to non-white customers. Latinos and African Americans were not permitted inside the restaurant; my family and I were only allowed to pick up our meals from a window located on the side of the building. It was not until mid-1960's that Youngblood's finally integrated.

10.    Although a few theaters in Austin openly invited Latino audiences, I recall others relegated us to the balcony seats. In these segregated theaters, we were not allowed to sit with the Anglo patrons on the main floor.

11.    Many retail establishments in Austin similarly did not serve Latino customers. I specifically recall Good Friends, Marie Antoinette and Scarborough's department stores regularly refused service to Latino patrons. I can remember numerous occasions where my family and I were never approached by a salesperson. Also, many of these establishments had segregated facilities, such as bathrooms, water fountains and elevators.

12.    In 1974 and 1975 my husband and I were repeatedly refused rentals in South Austin, with no explanation. We were unable to find a realtor who was willing to meet us at the

properties outside of East Austin we wanted to see. These properties were in safe, majority Anglo areas, yet the realtors nonetheless refused to meet with us.

13.  I currently live in East Austin, which is a predominately Latino area. I believe it has been last, or at the tail end, among neighborhoods to receive city improvements. There was a time when it was one of the only areas without sidewalks. It was also the last area in Austin to get paved roads; until these improvements the streets were made of gravel. The area was also last to get street signs.

14.  East Austin has been politically ignored as well. Most political campaigns fail to reach out to the people in my community. There are rarely political signs placed in the area, if at all. Literature about candidates and initiatives are rarely distributed, dispersed, or sent out to the community at large. The same is true for phone banking. Political candidates rarely, if ever, block-walk in my area.

15.  I believe this behavior has had a negative impact on Latino voter registration and overall civic engagement.

16.  Despite the array of issues facing East Austin, the city has nonetheless continued to expand tremendously. I attribute much of this growth to "white flight," especially towards the northwest. I fear this rapid growth may shift the city's attention further away from East Austin and the Latino community there.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in the City of Austin, TX on May 8, 2007.

Diana Castaneda

**IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | Civil Action No. 1:06-1384 (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States | § § § | |
| *Defendant.* | § § | |

## DECLARATION OF DAVID A. DIAZ IN SUPPORT OF DIAZ INTERVENORS' MOTION FOR SUMMARY JUDGEMENT

1.  My name is David A. Diaz. I am over the age of 18 and am of sound mind and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.  I was born in Topeka, Kansas. I grew up in Albuquerque, NM. I earned my Doctorate in Medicine from the University of Texas Southwestern Medical School in Dallas, TX. After completing my residency in Pueblo, CO, I moved to Austin, TX, to practice medicine as a family physician in 1993.

3.  My current address is 10424 Ember Glen Drive, Austin, TX, 78726, where I have lived with my wife and children for 13 years. My home is located within the Canyon Creek subdivision, a predominantly Anglo, upper income neighborhood of single family homes. Canyon Creek is located within the Northwest Austin Municipal Utility District #1 ("MUD"). I am a registered voter of the MUD.

4. I am opposed to the bailout lawsuit filed by the MUD and would have expressed my opposition if I had known their plans to file the lawsuit.

5. I believe racial discrimination still exists in Texas. While my parents worked diligently to shield me from prejudice, I have traveled throughout the country and the state of Texas and encountered numerous people who have told me their stories of discrimination. I believe that, as a Latino voter, I benefit from the MUD's coverage under Section 5 because I and other Latino voters are protected from discriminatory election changes.

6. The MUD Board did not tell local residents about their plans to pursue this lawsuit, and did not ask community members if we supported it.

7. I regularly read the Austin American-Statesman newspaper, Canyon Creek newsletter, and read the neighborhood bulletin boards. I never read anything about the MUD Board's lawsuit challenging the preclearance section of the Voting Rights Act.

8. In fact, I did not find out about the lawsuit until after it was filed.

9. After learning about the MUD Board's lawsuit, I attended one of their meetings in the Fall of 2006. Although the lawsuit was not on the agenda, I raised the issue during the question and answer session at the end.

10. When I asked the Board why they decided to pursue the lawsuit, they immediately became defensive, and seemed surprised I was aware of it. They explained that whenever they wanted to change polling sites an attorney had to draft a letter to the United States Department of Justice at a cost of about $1100. They claimed it was "a hassle."

11. Earlier in the meeting the Board discussed spending thousands of dollars on upkeep to a soccer field and playgrounds, as well as over $4000 on hog snares for feral hogs who had

eaten neighbors' yards. I recall the Board also reported their coffers were in the six figures.

12. When I asked how the issue came up in the first place, the Board explained that attorney Greg Coleman, who they said had worked for the Board in the past, offered to represent the MUD in a taxation lawsuit against Austin on a pro bono basis, but in return for his services asked the MUD to act as a plaintiff in this lawsuit.

13. I asked what this lawsuit had to do with our neighborhood and its overall functioning, but I did not feel I received a real answer from the Board.

14. After that meeting, I discussed the case and my involvement in it with several of my neighbors and found that a vast majority of them oppose the MUD's participation in this lawsuit. Similarly, they expressed support of the position my wife and I have taken. These supporters are a multi-cultural, multi-ethnic group, all of whom do not understand what interest the MUD has in eliminating protections granted minorities by the Voting Rights Act.

15. On April 18, 2007, I attended another MUD Board meeting. I learned about the meeting through a notice I received via email, which also contained an agenda. The agenda stated the Board was going to vote on a "numbered place" voting scheme for the district. I felt compelled to share my opinion with the Board and decided to attend the meeting.

16. At the meeting I voiced my opposition to the "numbered place" voting agenda item, stating my belief that it was being proposed to somehow help the Board's lawsuit, and that it was not something our community wanted or needed.

17. Other members of the community, some of whom I did not know, voiced similar concerns.

18.   I reiterated my position regarding the Voting Rights Act lawsuit, noted that it was unpopular in our community, and did not comport with the wishes of many of the people who live in the MUD. I told them that a lawsuit against Voting Rights Act is a travesty and that we should not be attacking it.

19.   The Board seemed surprised after my impromptu speech, and no one said a word. Then Mr. Swarthout, a member of the Board, stated it was clear that the community had voiced its opinion on the "numbered place" issue, and moved that it be removed from the agenda.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in the City of Austin, TX on May 14, 2007.

David A. Diaz

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL    §
UTILITY DISTRICT NUMBER ONE,    §
                           §

    *Plaintiff,*               §
                           §

vs.                           §     Civil Action No. 1:06-1384
                           §           (DST, PLF, EGS)

ALBERTO GONZALES,           §
Attorney General of the United States    §
                           §

    *Defendant.*            §

## DECLARATION OF LISA DIAZ IN SUPPORT OF DIAZ INTERVENORS' MOTION
## FOR SUMMARY JUDGEMENT

1.       My name is Lisa Diaz. I am over the age of 18 and am of sound mind and capable of

making this declaration. The facts stated in this declaration are within my personal

knowledge and are true and correct.

2.       I was born in 1964 in McAllen, TX. I am a second generation Mexican American. I

grew up and went to school in McAllen.   I have lived in Texas all my life except for

three years when I lived in Colorado. My husband and I moved to Austin in 1993. I hold

a Bachelors of Science in Pharmacy from the University of Texas.

4.       My current address is 10424 Ember Glen Drive, Austin, TX, 78726. I have lived at this

address for 13 years with my husband and children. My home is located within the

Canyon Creek subdivision, a predominantly Anglo, upper income neighborhood of single

family homes. Canyon Creek is located within the Northwest Austin Municipal Utility

District #1 ("MUD").   I am a registered voter of the MUD.

5.       I am opposed to the bailout lawsuit filed by the MUD and would have expressed my

**Perales Decl.**
**00438**

opposition if I had known of the plans by its leadership to file the lawsuit.

6.  I believe Texas and its local governments must be monitored to ensure they do not continue to discriminate or revert back to prior discriminatory practices. I have been affected by discrimination against Mexican Americans in my lifetime. For example, when I was a child my mother was a school teacher, and my family lived across the street from the school I attended, Davy Crockett Elementary. Nonetheless, Crockett would not hire my mother, or any Mexican Americans or Latinos, for a teaching position. Thus, she was forced to travel for work across town, to Navarro Elementary, even though she did not drive. I believe that, as a Latina voter, I benefit from the MUD's coverage under Section 5 because I and other Latino voters are protected from discriminatory election changes.

7.  The MUD Board did not tell local residents about their plans to pursue this lawsuit, much less inquire whether or not we were in favor or opposed to it.

8.  I regularly read the Austin American-Statesman newspaper, Canyon Creek newsletter, and read the neighborhood bulletin boards where MUD Board announcements are made. I never read anything regarding the MUD Board's lawsuit challenging the preclearance section of the Voting Rights Act. I did not learn of the lawsuit until after it was filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in the City of Austin, TX on May 14, 2007.

_Lisa A. Diaz_
Lisa Diaz