## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------- X

NORTHWEST AUSTIN MUNICIPAL
UTILITY DISTRICT NUMBER ONE

              *Plaintiff,*

     - v -

ALBERTO GONZALES, Attorney General
of the United States, *et al.*,

             *Defendants.*

-------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:06-CV-01384
(DST, PLF, EGS)


## MEMORANDUM OF LAW OF
## THE BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW,
## *AMICUS CURIAE*,
## IN SUPPORT OF DEFENDANT'S AND DEFENDANT-INTERVENORS'
## MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICUS CURIAE ..................................................................................... 1

INTRODUCTION .............................................................................................................. 2

ARGUMENT ..................................................................................................................... 3

I.  Judicial Review of the Exercise of Congress's Enforcement Powers Is Highly
    Deferential in the Fifteenth Amendment Context.................................................... 4

  A.  The Court's Scrutiny of Congress's Exercise of its Enforcement Powers Is Relaxed
      When Congress Prevents Discrimination Against Suspect Classes or Protects
      Fundamental Rights. ........................................................................................... 4

  B.  Fifteenth Amendment Legislation Does Not Raise the Same Federalism and
      Separation-of-Powers Concerns that Animated the Court in *City of Boerne v. Flores*. . 7

II.  The History of the Fifteenth Amendment Reflects Congress's Broad Enforcement
     Powers........................................................................................................................ 9

III.  NAMUDNO's Constitutional Challenge to the Voting Rights Act's Preclearance
      Requirements Should Be Rejected....................................................................... 15

CONCLUSION.................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### CASES

*Ball v. James*, 451 U.S. 355 (1981) ............................................................... 11

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................... passim

*City of Rome v. United States*, 446 U.S. 156 (1980)........................... 4, 16, 17

*Civil Rights Cases*, 109 U.S. 3 (1883) ....................................................... 9, 10

*Crandon v. United States*, 494 U.S. 152 (1990) ............................................. 17

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)......................................................... 7

*Employment Division v. Smith*, 494 U.S. 872 (1990) ...................................... 8

*Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428 (1983)............ 17

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993)............................ 17

*Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966) ...................................... 7

*Hayden v. Pataki*, 449 F.3d 305 (2d Cir. 2006)............................................... 7

*James v. Bowman*, 190 U.S. 127 (1903)......................................................... 14

*Johnson v. California*, 543 U.S. 499 (2005) .................................................... 7

*Johnson v. Governor of State of Florida*, 405 F.3d 1214 (11th Cir. 2005) ...... 7

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)................................ 17, 18

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)........................................... 9

*League of United Latin American Citizens  v. Perry*,
    ____ U.S. _____, 126 S. Ct. 2594 (2006)................................................ 1

*Lopez v. Monterey County*, 525 U.S. 266 (U.S. 1999) .............................. 4, 17

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)...................................... 8

*Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874)..................................... 14

*Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) ..................... 4, 5

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ........................................... 6, 15, 19

*Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000)................................. 18

*Rice v. Cayetano*, 528 U.S. 495 (2000)........................................ 2, 10, 11, 19

*Romeu v. Cohen*, 265 F.3d 118 (2d Cir. 2001) ............................................... 7

*Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973) ...... 11

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966).......................... 4, 16, 17

*Tennessee v. Lane*, 541 U.S. 509 (2004)................................................. 4, 5, 6, 9

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................... 14

*United States v. Reese*, 92 U.S. 214 (1875) .................................................. 13

## TABLE OF AUTHORITIES

**Page**

### STATUTES

Act of March 2, 1867, 14 Stat. 428...................................................... 11

Acts of June 22 and 25, 1868, 15 Stat. 72 ........................................... 12

An Act to Regulate the Elective Franchise in the District of Columbia, 14 Stat. 375................. 11

### LEGISLATIVE HISTORY

Cong. Globe, 39th Cong., 2d Sess., 481-82, 485, 487, 1096, 1121 (1867) .................................. 11

Cong. Globe, 40th Cong., 3d Sess., App. 151 (1869) (statement of Rep. Doolittle)................... 13

Cong. Globe, 40th Cong., 3d Sess., App.163 (1869) (statement of Sen. Saulsbury) .................. 13

Cong. Globe, 41st Cong., 2d Sess., 3655 (1870) (statement of Sen. Howard)........................... 12

Cong. Globe, 41st Cong., 2d Sess., 3670 (1870) (statement of Sen. Morton)........................... 12

H.R. Rep. No. 109-478 (2006)......................................................................... 16

### OTHER AUTHORITIES

Gillette, William, *The Right to Vote:  Politics and the Passage of the Fifteenth Amendment* (1965) ...................................................................... 11

Karlan, Pamela S., *Section 5 Squared:  Congressional Power to Amend and Extend the Voting Rights Act*, 44 Hous. L. Rev. 1 (2007) ................................... 7

Katz, Ellen D, *Congressional Power to Extend Preclearance:  A Response to Professor Karlan*, 44 Hous. L. Rev. 33 (2007)......................................... 18

Katz, Ellen D, *Reinforcing Representation:  Congressional Power to Enforce the Fourteenth and Fifteenth Amendments in the Rehnquist and Waite Courts*, 101 Mich. L. Rev. 2341 (2003) ......................................... 7

Kousser, J. Morgan, *The Voting Rights Act and the Two Reconstructions*, *in* Controversies in Minority Voting:  The Voting Rights Act in Perspective (Bernard Grofman & Chandler Davidson eds., 1992).......................... 14

Matthews, John Mabry, *Legislative and Judicial History of the Fifteenth Amendment* (1909)......................................................................... 12

McDonald, Laughlin, *A Voting Rights Odyssey:  Black Enfranchisement in Georgia* (2003) .............................................................. 12

Swinney, Everett, *Suppressing the Ku Klux Klan:  The Enforcement of the Reconstruction Amendments 1870-1877* (1987) ................................. 12

## <u>INTEREST OF AMICUS CURIAE</u>

The Brennan Center for Justice at NYU School of Law ("Brennan Center") respectfully submits this brief as *amicus curiae* in support of Defendant and Defendant-Intervenors and urges the Court to grant their motion for summary judgment.

Named for late Associate Justice William J. Brennan, Jr., the Brennan Center is a not-for-profit, nonpartisan public-policy and law institute that focuses on issues of democracy and justice. Through the activities of its Democracy Program, the Brennan Center seeks to bring the ideal of representative self-government closer to reality by working to eliminate barriers to full and equal political participation and to ensure that public policy and institutions reflect the diverse voices and interests that make for a rich and energetic democracy. The Brennan Center has focused extensively on the protection of minority voting rights, including by authoring a report on minority representation and reports on other issues relating to voting rights; launching a major, multi-year initiative on redistricting; and participating as counsel or *amicus* in a number of federal and state cases involving voting and election issues, including *League of United Latin American Citizens v. Perry*, ____ U.S. _____, 126 S. Ct. 2594 (2006).

The Brennan Center has an interest in preserving Congress's broad power under the Fifteenth Amendment to protect against racial discrimination in voting. Plaintiff's challenge to the Voting Rights Act (sometimes referred to herein as the "VRA") will have an effect on minority voters' ability to have a meaningful voice in their government in light of increasingly sophisticated techniques to suppress the electoral participation of people of color. The Brennan Center seeks to ensure that Congress retains its full powers to enforce the guarantees of the Fifteenth Amendment.

## INTRODUCTION

The Fifteenth Amendment is designed "to reaffirm the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). Congress has sweeping powers to enforce this bedrock guarantee. Congress determined that the VRA's preclearance requirements prevent discriminatory voting measures from going into effect and deter state and local governments from attempting to adopt discriminatory measures in the first place. Section 5 of the Voting Rights Act thus provides a crucial tool in Congress's effort to eradicate race discrimination in elections.

Northwest Austin Municipal Utility District Number One ("NAMUDNO") asks this Court to ignore settled doctrine and hold that Section 5 of the VRA is not a "congruent and proportional" use of Congress's powers. NAMUDNO's position ignores the specific purpose of the Fifteenth Amendment as well as the strong federal interest Congress has in protecting the voting rights of racial minorities.[1] Even assuming that the Court would scrutinize congressional enactments pursuant to the Fifteenth Amendment under the same standard it uses to review Fourteenth Amendment legislation, Section 5 is unquestionably a constitutional means of enforcing the Fifteenth Amendment's core protections.

This Court should afford Congress great deference when determining what constitutes "appropriate" enforcement legislation under the Fifteenth Amendment. While the Supreme Court has found that some statutes were not an appropriate means of enforcing the ***Fourteenth Amendment***, the Court has been far more deferential when Congress's ***Fifteenth Amendment*** powers are at stake. Fourteenth Amendment legislation has the potential to raise greater federalism and separation-of-powers concerns than Fifteenth Amendment legislation because the

---

[1] Although NAMUDNO's position is also contrary to the Fourteenth Amendment, this *amicus* brief addresses only Congress's Fifteenth Amendment enforcement powers.

Fourteenth Amendment is the vehicle through which other constitutional provisions have been incorporated against the States. In contrast, because the Fifteenth Amendment is more narrowly focused, targeting the interactions between the suspect classification of race and the fundamental right to vote, judicial review is more relaxed in that context. The greater breadth of Congress's Fifteenth Amendment enforcement power is supported by the legislative and judicial history of the amendment. From the very beginning of the Supreme Court's Reconstruction jurisprudence, doctrines that constrained Congress's power to enforce the Fourteenth Amendment were less restrictive in the Fifteenth Amendment context.

When viewed in light of the Fifteenth Amendment's text and history, and the precedents interpreting it, Congress's decision to extend the VRA's preclearance requirements unquestionably fall within Congress's enforcement powers. This Court should reaffirm long-settled doctrine and dismiss NAMUDNO's novel constitutional challenge.

## ARGUMENT

The courts' review of Fifteenth Amendment enforcement legislation is highly deferential. When legislation targets the nexus between racial discrimination and voting, the Supreme Court has made it clear that Congress's authority is at its zenith. In this context, the Supreme Court has never required Congress to make detailed factual findings in order to eradicate voting practices that have a racially discriminatory purpose or effect. Nor has the Court confined Congress's power to enact remedial legislation to laws prohibiting unconstitutional conduct. NAMUDNO's challenge should be rejected.

I.    **Judicial Review of the Exercise of Congress's Enforcement Powers Is Highly
      Deferential in the Fifteenth Amendment Context.**

There is no unitary standard to evaluate all "enforcement" legislation without regard to
the underlying substantive provisions and federal interests that the legislation is designed to
enforce.  When evaluating legislation passed pursuant to Congress's Fourteenth Amendment
enforcement power, the Supreme Court has applied a sliding scale of review, closely scrutinizing
laws that seek to redefine or expand the scope of a constitutional right, *see City of Boerne v.
Flores*, 521 U.S. 507 (1997), and deferring to Congress's determinations with respect to
safeguarding a fundamental right, *see Tennessee v. Lane*, 541 U.S. 509 (2004), or preventing
discrimination against a "suspect class," *see Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721
(2003).  Congress's enforcement powers are at their pinnacle with respect to Fifteenth
Amendment legislation, which involves ***both*** the fundamental right to vote and the suspect
category of race.  Indeed, the Court has "compared Congress' Fifteenth Amendment enforcement
power to its broad authority under the Necessary and Proper Clause."  *Lopez v. Monterey
County*, 525 U.S. 266, 294 (U.S. 1999) (citing *City of Rome v. United States*, 446 U.S. 156, 175
(1980); *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966)).  Given the importance of the
underlying right and the federal interest at stake in Fifteenth Amendment cases, the Court should
afford Congress greater leeway and respect its broad powers to regulate in this area.

A.    **The Court's Scrutiny of Congress's Exercise of its Enforcement Powers Is
      Relaxed When Congress Prevents Discrimination Against Suspect Classes or
      Protects Fundamental Rights.**

The Supreme Court first employed a "congruent and proportional" test in *City of Boerne
v. Flores* when considering the scope of congressional power to enforce the Fourteenth
Amendment.  *Boerne*, 521 U.S. at 530.  Rather than serving as a rigid doctrinal test, the Court's
analysis has functioned as a sliding scale that provides more deferential review of legislation

4

prohibiting invidious classifications or protecting fundamental rights. Applying this sliding scale, the Supreme Court has struck down federal legislation only in areas that the Court has deemed peripheral to the Fourteenth Amendment's central concerns. In *Nevada Department of Human Resources v. Hibbs*, the Court indicated that when Congress legislates to protect against classifications (such as those based on age or disability) that are normally reviewed under rational-basis scrutiny, "Congress must identify, not just the existence of age- or disability-based state decisions, but a 'widespread pattern' of irrational reliance on such criteria." *Hibbs*, 538 U.S. at 735. In contrast, when Congress protects against discrimination on the basis of a suspect class (such as sex), Congress does not bear the burden of proving a widespread pattern of unconstitutional state action. *See id.* at 734 (assuming from a *post hoc* examination of state statutes what Congress "could reasonably conclude"); *id.* at 736 (holding that when Congress attacks discrimination on account of sex, it is "easier for Congress to show a pattern of . . . constitutional violations").

The Court similarly relaxes its review when federal legislation is designed to protect a fundamental right under the Fourteenth Amendment's Due Process Clause. In upholding the Americans with Disabilities Act's ("ADA") abrogation of sovereign immunity in *Tennessee v. Lane*, the Court explained that, as applied to access to courts, the ADA is "aimed at the enforcement of a variety of basic rights, including the right of access to the courts at issue in this case, that call for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications." *Lane*, 541 U.S. at 529. Just as is it easier for Congress to pass prophylactic legislation affecting a suspect class, so too can Congress more easily pass powerful enforcement legislation to protect fundamental constitutional rights. *See also id.* at 548 n.9 (Rehnquist, C.J., dissenting) ("The Court correctly

explains that it is easier for Congress to show a pattern of state constitutional violations when it targets state action that triggers a higher level of constitutional scrutiny." (internal quotation marks and citations omitted; alterations incorporated)).

Long before *Boerne*, Justice Black explained in his controlling opinion in *Oregon v. Mitchell*, 400 U.S. 112 (1970), that the Court's review of legislation passed pursuant to the Fourteenth Amendment should be relaxed when Congress protects against racial discrimination as opposed to when Congress passes legislation designed to combat other forms of classifications:

> The Fourteenth Amendment was surely not intended to make every discrimination between groups of people a constitutional denial of equal protection. Nor was the Enforcement Clause of the Fourteenth Amendment intended to permit Congress to prohibit every discrimination between groups of people. On the other hand, the Civil War Amendments were unquestionably designed to condemn and forbid every distinction, however trifling, on account of race.

*Id.* at 127 (opinion of Black, J.). Justice Scalia has similarly observed:

> [G]iving § 5 more expansive scope with regard to measures directed against racial discrimination by the States accords to practices that are distinctively violative of the principal purpose of the Fourteenth Amendment a priority of attention that this Court envisioned from the beginning, and that has repeatedly been reflected in our opinions . . . . Broad interpretation was particularly appropriate with regard to racial discrimination, since that was the principal evil against which the Equal Protection Clause was directed, and the principal constitutional prohibition that some of the States stubbornly ignored.

*Lane*, 541 U.S. at 561-63 (Scalia, J., dissenting).[2]   The Court has thus adopted a "two-tiered vision of Congress's enforcement powers under the Reconstruction-era Amendments" under which "Congress possesses broad discretion to free state political processes of racial

---

[2] Because of these distinctions, Justice Scalia has even suggested abandoning the congruence and proportionality analysis for Fourteenth Amendment legislation altogether. In his dissent in *Lane* he declared: "I shall henceforth apply the permissive *McCulloch* standard to congressional measures designed to remedy racial discrimination by the States." *Lane*, 541 U.S. at 564.

discrimination, but enjoys far more limited authority to combat other forms of discrimination at the state and local level."  Ellen D. Katz, *Reinforcing Representation:  Congressional Power to Enforce the Fourteenth and Fifteenth Amendments in the Rehnquist and Waite Courts*, 101 Mich. L. Rev. 2341, 2343 (2003) (footnotes omitted).  Because the Voting Rights Act focuses on racial equality in voting, a subject of great federal interest, it is thus entitled to an extremely deferential review under *Boerne* and its progeny.

In short, "Congress's enforcement authority is at its zenith when protecting against discrimination based on suspect classifications (such as race), or when protecting fundamental rights (such as voting)."  *Hayden v. Pataki*, 449 F.3d 305, 359 (2d Cir. 2006) (en banc) (opinion of Parker, J.).  Legislation enforcing the Fifteenth Amendment is afforded deferential review because it necessarily protects against racial discrimination and deprivations of the fundamental right to vote, both of which are, of course, subject to strict scrutiny.  *See Johnson v. California*, 543 U.S. 499, 505 (2005); *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966).[3]

**B.    Fifteenth Amendment Legislation Does Not Raise the Same Federalism and Separation-of-Powers Concerns that Animated the Court in *City of Boerne v. Flores*.**

Judicial review is further relaxed for Fifteenth Amendment legislation because the concerns animating *Boerne* do not exist in the Fifteenth Amendment context.  When the

---

[3] While some lower courts have assumed that Fifteenth Amendment legislation would be analyzed under the same standards as Fourteenth Amendment legislation, the Supreme Court has never ruled on the matter.  *See Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1242 n.3 (11th Cir. 2005) (Wilson, J., concurring in part and dissenting in part) ("It bears noting that the Supreme Court has yet to determine whether the congruence and proportionality test applies to the Fifteenth Amendment."); *see also Romeu v. Cohen*, 265 F.3d 118, 133 n.3 (2d Cir. 2001) (Walker, C.J., concurring).  To date, the Court has applied "congruent and proportional" review to evaluate only legislation passed pursuant to Section 5 of the Fourteenth Amendment.  *See Eldred v. Ashcroft*, 537 U.S. 186, 218 (2003) (stating that "we have never applied that standard outside the § 5 context"); *cf.* Pamela S. Karlan, *Section 5 Squared:  Congressional Power to Amend and Extend the Voting Rights Act*, 44 Hous. L. Rev. 1, 20 (2007) (questioning whether the "congruent and proportional" test should affect courts' analysis of the Voting Rights Act).

Supreme Court first articulated the "congruent and proportional" test in *Boerne*, it expressed

concern that because the Fourteenth Amendment is the vehicle through which other

constitutional provisions are incorporated against the States,[4] Fourteenth Amendment

enforcement legislation could undermine the Court's authority to "say what the law is." *Boerne*,

521 U.S. at 537 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

      The history of *Boerne* reveals much of what animated the Court's ruling. The Supreme

Court had ruled in *Employment Division v. Smith*, 494 U.S. 872 (1990), that the Free Exercise

Clause does not excuse persons from complying with generally applicable laws that do not target

religious activities. Congress then passed the Religious Freedom Restoration Act ("RFRA") to

overrule *Smith* and to invalidate generally applicable state laws that burdened religion unless the

law could be justified by a compelling governmental interest. The Court in *Boerne* thus

confronted a situation in which Congress had, in effect, usurped the Court's role in defining the

rights incorporated against the States. The Court responded by declaring that "Congress does not

enforce a constitutional right by changing what the right is." *Boerne*, 521 U.S. at 519. In the

Court's view, Congress had no more power to force States to comply with an enhanced Free

Exercise Clause than it would to force States to obey the Second Amendment, the Seventh

Amendment, or the Grand Jury Clause of the Fifth Amendment, none of which has been

incorporated against the States.

      The Court's review in *Boerne* was intended to cabin the breadth of subjects Congress

could regulate in the guise of "enforcing" the Fourteenth Amendment. Because the Fourteenth

---

[4] As the *Boerne* Court explained, "Congress' power to enforce the Free Exercise Clause follows from our holding in *Cantwell v. Connecticut*, that the fundamental concept of liberty embodied in the Fourteenth Amendment's Due Process Clause embraces the liberties guaranteed by the First Amendment." *Boerne*, 521 U.S. at 519 (internal quotation marks and citations omitted; alterations incorporated).

Amendment has the potential for such a broad application, the Court in *Boerne* expressed concern that, absent congruence and proportionality, "it is difficult to conceive of a principle that would limit congressional power." *Id.* at 529. The Court noted that plenary power to enforce the Fourteenth Amendment would entail "broad congressional power to prescribe uniform national laws with respect to life, liberty, and property." *Id.* at 523. When reviewing subsequent cases, the Court has reiterated its concern that legislation enforcing the Fourteenth Amendment must not be "an attempt to substantively redefine the States' legal obligations." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88 (2000).

By contrast, the same concerns about the potential breadth of congressional powers do not apply to Fifteenth Amendment legislation. "[T]he Fourteenth Amendment, unlike the Fifteenth, is not limited to denial of the franchise and not limited to the denial of other rights on the basis of race." *Lane*, 541 U.S. at 555 (Scalia, J., dissenting). There is, therefore, no concern that Congress could use the Fifteenth Amendment to legislate all aspects of "life, liberty, and property." Legislation that targets racial discrimination in voting is, of necessity, "congruent and proportional" to the Fifteenth Amendment's underlying guarantees.

## II.    The History of the Fifteenth Amendment Reflects Congress's Broad Enforcement Powers.

The three Reconstruction Amendments are not "coextensive" in every respect. Although the amendments each contain similarly worded enforcement provisions, they enforce different substantive guarantees.[5] As early as the *Civil Rights Cases*, the Supreme Court indicated that,

---

[5] It is worth noting, in this regard, that, while all three Reconstruction Amendments have textually similar enforcement sections, the Fourteenth Amendment's provision is worded slightly differently than the enforcement provision in the Thirteenth and Fifteenth Amendments. *Compare* U.S. Const. amend. XIII, § 2 ("Congress shall have power to enforce this article by appropriate legislation.") *and* U.S. Const. amend. XV, § 2 (same) *with* U.S. Const. amend. XIV,

despite their similar texts, the Enforcement Clauses of the Thirteenth and Fourteenth

Amendments give Congress vastly different powers:

> The amendments are different, and the powers of congress under them are different. What congress has power to do under one, it may not have power to do under the other . . . . Under the thirteenth amendment the legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by state legislation or not; under the fourteenth, as we have already shown, it must necessarily be, and can only be, corrective in its character, addressed to counteract and afford relief against state regulations or proceedings.

*Civil Rights Cases*, 109 U.S. 3, 23 (1883).  The Court thus drew a distinction between Thirteenth

Amendment legislation, which may be "direct and primary," and Fourteenth Amendment

legislation, which must be "corrective in character."  *Id.*  The Court drew a similar distinction in

its early opinions interpreting the Fifteenth Amendment, recognizing Congress's power to enact

"direct and primary" enforcement legislation to root out the vestiges of racial discrimination in

voting.  *See, e.g.*, *Ex parte Yarbrough* ("*The Ku Klux Cases*"), 110 U.S. 651 (1884); *United

States v. Cruikshank*, 92 U.S. 542 (1875).  Whether or not Congress's Fifteenth Amendment

enforcement power is constrained to state action under current Supreme Court doctrine, these

cases show that the early Court understood the Fifteenth and Thirteenth Amendment

enforcement powers to be even more robust than the Fourteenth.

Indeed, as recently as in *Rice v. Cayetano*, 528 U.S. 495 (2000), the Court observed that

the Fifteenth Amendment is not coextensive with the Fourteenth Amendment in all respects.  In

*Rice*, Hawaii argued that the commands of the Fifteenth Amendment should not apply to

elections for trustees of Hawaii's Office of Hawaiian Affairs.  In support of that argument,

Hawaii cited Supreme Court precedent holding that "the rule of one person, one vote does not

---

§ 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.").

pertain to certain special purpose districts, such as water or irrigation districts." *Id.* at 522 (citing *Ball v. James*, 451 U.S. 355 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973)).  The Supreme Court rejected Hawaii's argument and explained that "[o]ur special purpose district cases have not suggested that compliance with the one-person one-vote rule of the Fourteenth Amendment somehow excuses compliance with the Fifteenth Amendment." *Id.* at 523.  Although *Rice* did not involve a challenge to congressional enforcement legislation, the Court's emphatic declaration that "[t]he Fifteenth Amendment has independent meaning and force," *id.* at 522, suggests that cases analyzing enforcement of the Fourteenth Amendment should not be unthinkingly imported into the Fifteenth Amendment context.  The legislative and judicial history of the Fifteenth Amendment demonstrates that when Congress seeks to protect "the equality of the races at the most basic level of the democratic process," it enjoys greater deference in pursuing that paramount federal interest.  *Id.* at 512.

The Congress that adopted the Fifteenth Amendment was well-acquainted with the need for vigorous enforcement legislation to protect the right to vote.  In a series of enactments enfranchising blacks, the Thirty-Ninth Congress demonstrated that its power "was not to be trifled with."  William Gillette, *The Right to Vote:  Politics and the Passage of the Fifteenth Amendment* 30 (1965).  In January 1867, Congress passed legislation to enfranchise blacks in the District of Columbia and the federal territories.  *See* An Act to Regulate the Elective Franchise in the District of Columbia, 14 Stat. 375.  That same month, Congress overrode President Johnson's veto to make Nebraska's admission to the Union conditional on its agreement to enfranchise blacks.  Cong. Globe, 39th Cong., 2d Sess., 481-82, 485, 487, 1096, 1121 (1867).  In the Act of March 2, 1867, 14 Stat. 428, Congress required that the southern state constitutions guarantee black suffrage.  Then Congress made this guarantee permanent by conditioning the States'

11

readmission on the requirement that their "constitutions . . . shall never be so amended or changed as to deprive any citizen or class of citizens . . . of the right to vote."  Acts of June 22 and 25, 1868, 15 Stat. 72-74.

When it drafted the Fifteenth Amendment, Congress included Section 2's Enforcement Clause as a mechanism for future enforcement legislation.  "There was never any difference in opinion among friends of the measure, either as to the desirability of including [an enforcement clause] in the Amendment or as to the form which it should assume."  John Mabry Mathews, *Legislative and Judicial History of the Fifteenth Amendment* 36 n.55 (1909).  Indeed, the drafters of the Fifteenth Amendment had just witnessed "the violence and intimidation that had accompanied the election of 1868 in parts of the South."  Everette Swinney, *Suppressing the Ku Klux Klan:  The Enforcement of the Reconstruction Amendments 1870-1877* at 22-23 (1987); *see also* Laughlin McDonald, *A Voting Rights Odyssey:  Black Enfranchisement in Georgia* 24 (2003).  Congress was therefore under no illusions that the Amendment would by itself guarantee the right to vote without supporting legislation.  As explained by Senator Morton: "[T]he second section was put there for the purpose of enabling Congress itself to carry out the provision."  Cong. Globe, 41st Cong., 2d Sess., 3670 (1870) (statement of Sen. Morton).  Senator Howard warned against a "strict construction" that would strip the Enforcement Clause "of that remedial and protective justice which was in the minds of its authors when it was under discussion in these Chambers."  *Id.* at 3655 (statement of Sen. Howard).[6]

---

[6] The Amendment's critics left no doubt that they understood the Enforcement Clause to provide Congress with the authority to determine for itself what measures would be "appropriate" to enforce the rights guaranteed by the Fifteenth Amendment:

> Under the exercise of the power to carry this amendment into execution by appropriate legislation what cannot you do?  You can send your soldiery into my State to see who shall vote; surround the polls in time of peace in that State, as

From the very beginning, the Supreme Court acknowledged the centrality of Congress's role in enforcing the Fifteenth Amendment — even more so than in enforcing the Fourteenth Amendment.  In *United States v. Reese*, 92 U.S. 214 (1875), the Court explained that the Fifteenth Amendment "has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress.  That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude.  This, under the express provisions of the second section of the amendment, Congress may enforce by 'appropriate legislation.'"  *Id.* at 218.[7]  Then in *United States v. Cruikshank*,  the Court held that Congress could not punish private conduct under the Fourteenth Amendment, but nevertheless concluded that it could reach the same conduct under the Fifteenth.  The Court ultimately overturned the conviction of the *Cruikshank* defendants, but only because the indictment did not specifically allege that the defendants sought to deprive their victims of voting rights on account of race.  *Cruikshank*, 92 U.S. at 556 ("We may suspect that race was the cause of the hostility; but it is not so averred."); *see also* J. Morgan Kousser, *The Voting Rights Act and the Two Reconstructions*, *in* Controversies in Minority Voting:  The

---

you did in time of war, by armed soldiery, and make me walk under crossed bayonets to deposit my ballot, to say whom I should like to be Government of my State, and who to make laws for my government and the protection of my life, liberty, and property . . . .  By 'appropriate' legislation — a word not defined in the instrument, but leaving its legitimate and proper meaning to be determined by each particular head in this Senate Chamber and in the House of Representatives  — you send your soldier there, arrest the State authorities, and subject them to punishment at the will of irresponsible power.

Cong. Globe, 40th Cong., 3d Sess., App.163 (1869) (statement of Sen. Saulsbury); *see also id.* at 151 (statement of Rep. Doolittle).

[7] Applying the rule of lenity to the statute's criminal prohibitions, *Reese* ultimately invalidated a portion of the Enforcement Act on vagueness grounds because the statute could be read to criminalize interference with the right to vote in general, not merely interference on account of race.  *Reese*, 92 U.S. at 218-220.

Voting Rights Act in Perspective 161 (Bernard Grofman & Chandler Davidson eds., 1992)
(explaining that *Cruikshank* dismissed the case "not on grounds that the law was unconstitutional
but on grounds that the indictment did not aver that the blacks were murdered or denied the right
to vote *because* they were black").[8]

      Nine years later, the Court unanimously held in *Ex parte Yarbrough* that the Fourteenth
Amendment's state-action limitations do not apply when Congress enacts legislation to protect
Fifteenth Amendment rights in federal elections.  In *Yarbrough*, the petitioner filed for a writ of
habeas corpus challenging his conviction under the Ku Klux Klan Acts for conspiring to attack a
black man in order to deprive him of his right to vote for Congress.  *Yarbrough*, 110 U.S. at 652-
53.  The petitioner relied on Fourteenth Amendment cases in which the Court had restricted
Congress's enforcement powers to remedying official state action.  *Id.* at 664-65 (discussing
*Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874)).  The Court rejected the analogy, stating
that "[t]he reference to cases in this court in which the power of Congress under the first section
of the Fourteenth Amendment has been held to relate alone to acts done under state authority can
afford petitioners no aid in the present case."  *Id.* at 665-66.  The Court explained that the
Fourteenth Amendment cases were not controlling in the Fifteenth Amendment context because
"it is quite a different matter when congress undertakes to protect the citizen in the exercise of
rights conferred by the constitution of the United States, essential to the healthy organization of
the government itself."  *Id.* at 666.

---

[8] *Cruikshank*'s holding regarding whether the Fifteenth Amendment's Enforcement Clause is
limited by the state action doctrine may arguably have been undermined by *James v. Bowman*,
190 U.S. 127 (1903), but *Cruikshank* remains powerful historical evidence of the contemporary
understanding that Congress possessed especially broad powers to enforce the Fifteenth
Amendment.  *See United States v. Morrison*, 529 U.S. 598, 622 (2000) (citing portions of
*Cruikshank* and other Reconstruction-era cases and stating that "the doctrine of *stare decisis*
behind these decisions stems not only from the length of time they have been on the books, but
also from the insight attributable to the Members of the Court at that time").

Congress's wide discretion in selecting appropriate Fifteenth Amendment enforcement mechanisms is most clearly demonstrated in *Oregon v. Mitchell*, in which the Supreme Court upheld Congress's decision to enact a nation wide ban on literacy tests at the polls, even in jurisdictions that had no history of using literacy tests in a discriminatory fashion. Although the Court sharply splintered in other respects, the Justices were unanimous in their interpretation of the Fifteenth Amendment. Justice Harlan stated that "***[d]espite the lack of evidence of specific instances of discriminatory application or effect***, Congress ***could have*** determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious." *Oregon*, 400 U.S. at 216 (opinion of Harlan, J.) (emphasis added). He explained that "[w]hether to engage in a more particularized inquiry into the extent and effects of discrimination, either as a condition precedent or as a condition subsequent to suspension of literacy tests, was a choice for Congress to make," and that "[w]hile a less sweeping approach in this delicate area might well have been appropriate, the choice which Congress made was within the range of the reasonable." *Id.* at 216-17 (footnote omitted). Similarly, Justice Stewart concluded: "This approach to the problem is a rational one; consequently it is within the constitutional power of Congress under § 2 of the Fifteenth Amendment." *Id.* at 284 (opinion of Stewart, J., joined by Burger, C.J., & Blackmun, J.).

## III.    NAMUDNO's Constitutional Challenge to the Voting Rights Act's Preclearance Requirements Should Be Rejected.

In light of the principles animating judicial review of Congress's enforcement powers and the history of Fifteenth Amendment enforcement legislation, NAMUDNO's challenge to the Voting Rights Act's preclearance requirements should be rejected. Those requirements have been upheld by the Supreme Court on three separate occasions. *See South Carolina v.*

*Katzenbach*, 383 U.S. at 329-33; *City of Rome*, 446 U.S. at 178; *Lopez*, 525 U.S. at 282-85.  As

explained in the House Report accompanying the most recent reauthorization:

> Section 5 has been and continues to be one of the VRA's most effective tools.  Its strength lies, in part, in its burden-shifting remedy that requires covered jurisdictions to prove to the Federal Government or United States District Court for the District of Columbia that a voting change "does not have the purpose and will not have the effect of denying or abridging the right to vote" before such voting change can be enforced.  The two-pronged shield afforded by Section 5 has enabled the Federal Government and court to stay one step ahead of covered jurisdictions that have a documented history of denying minorities the protections guaranteed by the Constitution.

H.R. Rep. No. 109-478, at 65 (2006) (footnotes omitted).  This congressional judgment was

bolstered by testimony that "[s]ince 1982, the Department [of Justice] objected to more than 700

voting changes that have been determined to be discriminatory" and that those proposed changes

"were calculated decisions to keep minority voters from fully participating in the political

process."  *Id.* at 21 (footnote omitted).  Indeed, Congress concluded that "the existence of

Section 5 deterred covered jurisdictions from even attempting to enact discriminatory voting

changes" in the first place.  *Id.* at 24.  In hearing extensive testimony and examining a

comprehensive documentary record, Congress went far beyond its burden in building a

legislative record to support extending the Voting Rights Act.[9]

---

[9] It is useful to contrast Congress's detailed record with the standard that applies to most other federal legislation.  Outside of circumstances warranting restrictive review, Congress can make legislative choices based solely on rational speculation without compiling an evidentiary record of any kind:

> [B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.  Thus, the absence of  "legislative facts" explaining the distinction on the record has no significance in rational-basis analysis.  In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

NAMUDNO argues that it cannot be required to submit to preclearance because it never engaged in intentional voting discrimination in the past, but the Supreme Court definitively rejected that argument in *Lopez v. Monterey County*.  Just two years after *Boerne v. Flores*, the Supreme Court in *Lopez* required preclearance before Monterey County could implement a voting change required by California law even though California itself had not engaged in intentional discrimination in the past.  In doing so, the Court rejected Monterey County's constitutional challenge and reiterated its earlier conclusions in *South Carolina v. Katzenbach* and *City of Rome v. United States* that "once a jurisdiction has been designated, the Act may guard against both discriminatory animus and the potentially harmful effect of neutral laws in that jurisdiction." *Lopez*, 525 U.S. at 283 (emphasis omitted).[10]

Because the Voting Rights Act targets racial discrimination, it make no difference that the most recent authorization of the VRA came 40 years after the Act was originally passed.  In *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court affirmed that, over 100 years after the abolition of slavery, Congress still retained the power under the Thirteenth Amendment to combat all vestiges of slavery no matter how temporally removed they may have

*FCC v. Beach Communications*, *Inc.*, 508 U.S. 307, 315 (1993) (internal quotation marks and citations omitted; alterations incorporated).  Moreover, the Supreme Court has often recognized that Congress may rationally decide to accomplish its objectives by adopting prophylactic safeguards like Section 5.  *See, e.g.*, *Crandon v. United States*, 494 U.S. 152, 164 (1990) (stating, in the context of prohibitions on government employees accepting a supplemental salary, that "Congress appropriately enacts prophylactic rules that are intended to prevent even the appearance of wrongdoing and that may apply to conduct that has caused no actual injury to the United States"); *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 435 (1983) (stating, in the antitrust context, that "[i]n keeping with the Robinson-Patman Act's prophylactic purpose, [the statute] does not require that the discriminations must in fact have harmed competition").

[10] *Lopez* cited *Boerne v. Flores*, but only for the proposition that "'[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy reserved to the states.'" *Lopez*, 525 U.S. at 282-83 (quoting *Boerne*, 521 U.S. at 518).

been from actual enslavement.  The *Jones* Court upheld the constitutionality of the Fair Housing

Act because Congress determined that contemporary housing discrimination was a vestige of

slavery:  "Just as the Black Codes enacted after the Civil War . . . were substitutes for the slave

system, so the exclusion of Negroes from white communities became a substitute for the Black

Codes.  And when racial discrimination herds men into ghettos and makes their ability to buy

property turn on the color of their skin, then it too is a relic of slavery."  *Id.* at 442-43.  Similarly,

reauthorization of the Voting Rights Act "should be understood to target political processes that

continue to be compromised by race, compromised in ways that reflect past misconduct and that

portend future misconduct absent the statute's renewal."  Ellen D. Katz, *Congressional Power to*

*Extend Preclearance:  A Response to Professor Karlan*, 44 Hous. L. Rev. 33, 53 (2007).

      Finally, it should be noted that Congress can use its Fifteenth Amendment powers to

protect against vote dilution as well as vote denial.  The Supreme Court has never resolved

whether Section 1 of the Fifteenth Amendment, by itself, prohibits claims of vote dilution.

*Compare Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000), *with id.* at 359-60

(Souter, J., dissenting).  But regardless of whether the Fifteenth Amendment provides a self-

executing protection against vote dilution that the Supreme Court could enforce, it is clear that

Congress can act on its own to protect against vote dilution through Fifteenth Amendment

enforcement legislation.  *Cf. Jones*, 392 U.S. at 439 (explaining that regardless of whether the

first section of the Thirteenth Amendment by itself does any more than simply abolish slavery,

"the Enabling Clause of that Amendment empowered Congress to do much more").

      The framers of the Fifteenth Amendment were acutely concerned, not only with the right

to vote, but also with the right to elect a representative of one's choice.   Indeed, the

Reconstruction Congress demonstrated its understanding of broad powers to protect both those

rights.  In the summer of 1868, Georgia's governor declared — despite the State's ratification of the Fourteenth Amendment — that the state constitution did not permit blacks to hold legislative office and expelled 32 black representatives from the state assembly.  In response, Congress placed Georgia under military rule and ordered Georgia to ratify the Fifteenth Amendment.  *See* McDonald, *supra*, at 23.  The Reconstruction Congress intended to protect minority rights to hold office and was prepared to enact measures as drastic as the imposition of military rule to protect those guarantees.  Given this history, at the same time that Justice Harlan dissented from decisions upholding Congress's power to protect voting rights under the Fourteenth Amendment, he pointed to the Fifteenth Amendment as an appropriate source of authority for Congress to protect against vote dilution and racial barriers to holding office:

> I would find it surprising if a State could undercut the right to vote by taking steps to ensure that all candidates are unpalatable to voters of a certain race.  Although an explicit provision on officeholding was deleted from the proposed Fifteenth Amendment at the eleventh hour, the idea that the right to vote without more implies the right to be voted for was specifically referred to by supporters of the Fifteenth Amendment in both houses.

*Oregon*, 400 U.S. at 167 n.19 (opinion of Harlan, J.) (citing sources).

In protecting against both racial discrimination and vote dilution, the Voting Rights Act's preclearance requirements protect rights that were in the forefront of the minds of the Fifteenth Amendment's framers.  Those requirements remain necessary today to ensure "the equality of the races at the most basic level of the democratic process."  *Rice*, 528 U.S. at 512.  Like the three previous challenges to the Voting Rights Act's preclearance provisions, NAMUDNO's claims should be rejected.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant the Defendant's and Defendant-Intervenors' motion for summary judgment.

Date:  May 15, 2007                                    Respectfully submitted,

                                                       /s/ Paul M. Smith

Deborah Goldberg*                    Paul M. Smith (D.C. Bar No. 436482)
Wendy R. Weiser*                     Joshua A. Block*
Myrna Perez*                         JENNER & BLOCK, LLP
BRENNAN CENTER FOR JUSTICE           919 Third Avenue, Floor 37
AT NYU SCHOOL OF LAW                 New York, NY 10022
161 Avenue of the Americas, 12th Fl. (212) 891-1600
New York, NY 10013
(212) 998-6730                       Sam Hirsch (D.C. Bar No. 455688)
                                     JENNER & BLOCK, LLP
                                     601 Thirteenth Street, N.W.
*not admitted in this district       Suite 1200 South
                                     Washington, DC 20005
*Attorneys for Amicus Curiae*        (202) 639-6000