# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NUMBER ONE,
401 W. 15th Street
Suite 850
Austin, Texas 78701,
　　　　　　　　　　*Plaintiff*,

v.

ALBERTO GONZALES,
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530,
　　　　　　　　　*Defendant*.

Civil Action No. 1:06-CV-01384
(DST, PLF, EGS)

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. v

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 3

Summary Judgment Standard .............................................................................................. 9

Argument ............................................................................................................................ 9

I.     The District Is Entitled to Bail Out of §5 Preclearance ........................................... 9

    A.     The District Is a Political Subdivision Eligible to Pursue Bailout Under §4(a) ............................................................................................................ 9

        1.     Defendants' Attempt to Get Around the Statute Ignores Its Plain Language and Supreme Court Interpretations ......................................... 11

        2.     Defendants' Reliance on Legislative History Is Misplaced ..................... 14

        3.     In Any Event, the Only Potentially Relevant Legislative History Discloses Congress's Overriding and Unmistakable Intent That Bailout Be a Broadly Available and Usable Mechanism ........................................... 16

        4.     Defendants' Interpretation Raises Grave Constitutional Concerns That Must Be Avoided ...................................................................................... 19

            a.     Under Defendants' Interpretation of §4(a), §5 Has No Hope of Being Rendered a Congruent and Proportional Remedy ............. 20

            b.     Under Defendants' Interpretation, the Bailout Statute Impermissibly Discriminates Among States ................................. 22

            c.     Under Defendants' Interpretation, the Preclearance and Bailout Regime Impermissibly Reorders State Government .................... 25

    B.     Defendants Cannot Show That the District Fails to Meet the Statutory Requirements for a Declaration That It Is Entitled to Bail Out .......................... 27

        1.     The Diaz Intervenors Cannot Demonstrate That the District Has Failed to Comply with §5 in the Ten Years Preceding This Action ........................ 29

        2.     The Diaz Intervenors Cannot Demonstrate That the District Failed to Make Constructive Efforts to Preserve and Expand Access to Voting .... 30

II.    Section 5 Cannot Be Constitutionally Applied to the District. ........................ 36

    A.    The 2006 Enactment of §5 Cannot Be Constitutionally Applied to the
        District If It Fails to Independently Satisfy the Congruence and
        Proportionality Standard ...................................................................... 39

        1.    Section 5 Cannot Be Justified as Merely an Adjunct to Constitutional
            Provisions of the VRA as a Whole .......................................... 41

        2.    The Constitutionality of the 2006 Enactment of §5 Is Not Settled by Cases
            Upholding Earlier Enactments in Light of Formerly Existing Conditions
            and Evidence ............................................................................... 43

    B.    The 2006 Enactment of §5 Does Not Satisfy the Congruence and
        Proportionality Standard ...................................................................... 49

        1.    Section 5 Cannot Be an Appropriate Prophylactic If It Is Not Congruent
            and Proportional to the Right to Be Free of Purposeful Discrimination in
            Voting ...................................................................................... 51

            a.    The Relevant Right Is the Right to Be Free of Purposeful
                Discrimination in Voting ............................................... 51

            b.    The Importance of the Right to Vote Does Not Excuse Compliance
                with the Congruence and Proportionality Standard ..................... 53

        2.    Defendants Fail to Identify a Pattern of Relevant Constitutional Violations
            in the Congressional Record Sufficient to Support the Constitutionality of
            §5 .......................................................................................... 56

            a.    Congress Failed to Find a Pattern of Preclearance-Related
                Constitutional Violations ............................................... 56

            b.    Increasingly Rare DOJ Objections and MIRs Do Not Show
                Congruence or Proportionality ...................................... 63

         3.    Preclearance Is Not a Congruent or Proportional Response ................... 65

            a.    The Most Intrusive Remedy, Even if Perceived to Be Effective, Is
                Neither Congruent Nor Proportional ............................. 65

            b.    After Decades of Increasingly Successful Compliance, Congress
                May No Longer Employ a Presumption That States and Local
                Governments Will Act in Bad Faith ............................. 68

            c.    The Perceived Inadequacies of §2 Do Not Make §5 Either
                Congruent or Proportional ............................................. 69

C.    The 2006 Enactment of §5 Cannot Be Supported By the Elections Clause ......... 74

Conclusion ................................................................................................................ 75

Certificate of Service ............................................................................................... 76

# TABLE OF AUTHORITIES

## CASES

*Allen v. State Bd. of Elections*,
  393 U.S. 544, 89 S.Ct. 817 (1969)................................................................................54

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S.Ct. 2505 (1986).............................................................................9

*Bd. of Trs. of the Univ. of Ala. v. Garrett*,
  531 U.S. 356, 121 S.Ct. 955 (2001).................................................................... *passim*

*Beer v. United States*,
  425 U.S. 130, 96 S.Ct. 1357 (1976)..................................................................... *passim*

*Bennett v. Brown County Water Improvement Dist. No. 1*,
  272 S.W.2d 498 (Tex. 1954).........................................................................................10

*Bragdon v. Abbott*,
  524 U.S. 624, 118 S.Ct. 2196 (1998)...........................................................................15

*Branson Sch. Dist. RE-82 v. Romer*,
  161 F.3d 619 (10th Cir. 1998) .....................................................................................11

*City of Boerne v. Flores*,
  521 U.S. 507, 117 S.Ct. 2157 (1997).................................................................... *passim*

*City of Mobile, Ala. v. Bolden*,
  446 U.S. 55, 100 S.Ct. 1490 (1980).................................................................49, 51, 52

*City of Rome v. United States*,
  446 U.S. 156, 100 S.Ct. 1548 (1980).................................................................... *passim*

*City of Rome, Ga. v. United States*,
  472 F.Supp. 221 (D.D.C. 1979) ...................................................................................13

*Connor v. Waller*,
  421 U.S. 656, 95 S.Ct. 2003 (1975) *(per curiam)* ..........................................................52

*Czekalski v. Peters*,
  475 F.3d 360 (D.C. Cir. 2007) .......................................................................................9

*Dillard v. Crenshaw*,
  640 F.Supp. 1347 (M.D. Ala. 1986) .............................................................................72

*Dougherty County, Ga. Bd. of Educ. v. White*,
    439 U.S. 32, 99 S.Ct. 368 (1978)....................................................................11, 12

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568, 108 S.Ct. 1392 (1988)....................................................................20

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
    527 U.S. 627, 119 S.Ct. 2199 (1999)...................................................39, 45, 50, 55

*Georgia v. United States*,
    411 U.S. 526, 93 S.Ct. 1702 (1973)......................................................................15

*Guinn v. United States*,
    238 U.S. 347, 35 S.Ct. 926 (1915)........................................................................51

*Harris v. Siegelman*,
    695 F.Supp. 517 (M.D. Ala. 1988) .......................................................................72

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ...............................................................................9

*Holder v. Hall*,
    512 U.S. 874, 114 S.Ct. 2581 (1994)...............................................................51, 62

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398, 54 S.Ct. 231 (1934).......................................................................48

*Hooper v. Cal.*,
    155 U.S. 648, 15 S.Ct. 207 (1895)..................................................................19, 20

*Kimel v. Fla. Bd. of Regents*,
    528 U.S. 62, 120 S.Ct. 631 (2000)................................................................. *passim*

*Lamie v. United States Tr.*,
    540 U.S. 526, 124 S.Ct. 1023 (2004)....................................................................14

*Landgraf v. USI Film Prods.*,
    511 U.S. 244, 114 S.Ct. 1483 (1994)....................................................................14

*League of United Latin Am. Citizens v. Perry*,
    __U.S.__, 126 S.Ct. 2594, 2612-23 (2006) .........................................................62

*Lopez v. Monterey County*,
    525 U.S. 266, 119 S.Ct. 693 (1999)..........................................................11, 20, 39, 44

*Lorillard v. Pons*,
    434 U.S. 575, 98 S.Ct. 866 (1978)...................................................................15

*McMillan v. Nw. Harris County Mun. Util. Dist. No. 24*,
    988 S.W.2d 337 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).............10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71, 126 S.Ct. 1503 (2006).............................................................15

*Miller v. Johnson*,
    515 U.S. 900, 115 S.Ct. 2475 (1995).................................................. *passim*

*Monsanto Co. v. Cornerstones Mun. Util. Dist.*,
    865 S.W.2d 937 (Tex. 1993)...............................................................10, 26

*Myers v. Anderson*,
    238 U.S. 368, 35 S.Ct. 932 (1915)...............................................................51

*N.L.R.B. v. Amax Coal Co.*,
    453 U.S. 322, 101 S.Ct. 2789 (1981).............................................................15

*Nev. Dep't of Human Res. v. Hibbs*,
    538 U.S. 721, 123 S.Ct. 1972 (2003).................................................. *passim*

*Oregon v. Mitchell*,
    400 U.S. 112, 91 S.Ct. 260 (1970)...........................................................49, 74

*Pierce v. Underwood*,
    487 U.S. 552, 108 S.Ct. 2541 (1988).............................................................15

*Reno v. Bossier Parish Sch. Bd.*, *(Bossier Parish I)*,
    520 U.S. 471, 117 S.Ct. 1491 (1997).........................................................16, 64

*Reno v. Bossier Parish Sch. Bd. (Bossier Parish II)*,
    528 U.S. 320, 120 S.Ct. 866 (2000)...........................................................49, 52

*Rogers v. Lodge*,
    458 U.S. 613, 102 S.Ct. 3272 (1982).............................................................52

*Shaw v. Reno*,
    509 U.S. 630, 113 S.Ct. 2816 (1993)...........................................................49, 52

*South Carolina v. Katzenbach*,
    383 U.S. 301, 86 S.Ct. 803 (1966)................................................... *passim*

*State of Ariz. v. Reno,*
    887 F.Supp. 318 (D.D.C. 1995) ........................................................................16

*Tennessee v. Lane,*
    541 U.S. 509, 124 S.Ct. 1978 (2004) ....................................................39, 54, 60

*United States ex rel. Atty. Gen. v. Del. & Hudson Co.,*
    213 U.S. 366, 29 S.Ct. 527 (1909) ...................................................................19

*United States v. Bd. of Comm'rs of Sheffield, Ala.,*
    435 U.S. 110, 98 S.Ct. 965 (1978) .......................................................... *passim*

*United States v. Georgia,*
    546 U.S. 151, 126 S.Ct. 877 (2006) .............................................................39, 58

*United States v. Morrison,*
    529 U.S. 598, 120 S.Ct. 1740 (2000) ..........................................39, 45, 46, 47

*United States v. Uvalde Consol. Indep. Sch. Dist.,*
    625 F.2d 547 (5th Cir. 1980) .......................................................................12, 13

*W. Va. Univ. Hosp., Inc. v. Casey,*
    499 U.S. 83, 111 S.Ct. 1138 (1991) ..................................................................14

*Whitcomb v. Chavis,*
    403 U.S. 124, 91 S.Ct. 1858 (1971) ..................................................................52

*White v. Regester,*
    412 U.S. 755, 93 S.Ct. 2332 (1973) ..................................................................52

*Williams v. Bd. of Comm'rs of McIntosh County,*
    938 F.Supp. 852 (S.D.Ga. 1996) ......................................................................72

*Williams v. Taylor,*
    529 U.S. 420, 120 S.Ct. 1479 (2000) ..........................................................11, 15

*Wilson v. New,*
    243 U.S. 332, 37 S.Ct. 298 (1917) ....................................................................48

*Yick Wo v. Hopkins,*
    118 U.S. 356, 6 S.Ct. 1064 (1886) ....................................................................53

## STATUTES AND REGULATIONS

2 U.S.C. §7.................................................................................................74

28 C.F.R.§51.14............................................................................................8

42 U.S.C. §1973*a*...........................................................................................71, 72

42 U.S.C. §1973*a*(a)-(c)...................................................................................12

42 U.S.C. §1973*b*(a)........................................................................................9

42 U.S.C. §1973*b*(a)(1)....................................................................................10, 15, 27, 28

42 U.S.C. §1973*b*(a)(1)(F)................................................................................32, 33, 34

42 U.S.C. §1973*b*(b)........................................................................................46

42 U.S.C. §1973*l*(c)(2).....................................................................................12

42 U.S.C. §1973*l*(e)........................................................................................72

FED. R. CIV. P. 56(c).......................................................................................9

TEX. CONST. art. XVI, §59(a)............................................................................10, 25

TEX. CONST. art. XVI, §59(b)............................................................................10, 25

TEX. ELEC. CODE §41.001(a)(1)..........................................................................75

TEX. ELEC. CODE §41.005..................................................................................10

TEX. WATER CODE §54.011.................................................................................10

TEX. WATER CODE §54.012.................................................................................26

TEX. WATER CODE §54.013(a).............................................................................26

TEX. WATER CODE §54.016(f)..............................................................................6

TEX. WATER CODE §54.016*l*................................................................................26

TEX. WATER CODE §54.024.................................................................................4

TEX. WATER CODE §54.239.................................................................................4

TEX. WATER CODE §54.5161 .................................................................26

U.S. CONST. art. I, §4 ........................................................................74

VA. CODE §15.2-1500(A) ....................................................................22

**MISCELLANEOUS**

H.R. REP. NO. 94-196 .........................................................................48

H.R. REP. NO. 97-227 .........................................................................19

H.R. REP. NO. 109-478 ................................................................. *passim*

S. REP. NO. 97-417...................................................................... *passim*

S. REP. NO. 109-295 .....................................................................37, 73

BLACK'S LAW DICTIONARY (2d Pocket ed. 2001) ................................11

BLACK'S LAW DICTIONARY (6th ed. 2001) ...........................................11

Commission on Local Government, Commonwealth of Virginia,
    http://www.dhcd.virginia.gov/CommissiononLocalGovernment/
    PDFs/oe2005.pdf ........................................................................22

THE EAGLES, HOTEL CALIFORNIA,
    (Asylum Records 1976) ..............................................................24

Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the*
    *Voting Rights Act After* Tennessee v. Lane, 66 OHIO ST. L.J. 177 (2005) .......37, 55, 63, 64

Samuel Issacharoff, *Is Section 5 of the Voting Rights Act a Victim of Its Own Success?,*
    104 COLUM. L. REV. 1710 (2004) .................................................37

Pamela S. Karlan, *Section 5 Squared: Congressional Power to Extend and Amend the*
    *Voting Rights Act,* 44 HOUS. L. REV. 1 (2007)................................40

Ellen D. Katz, *Congressional Power to Extend  Preclearance: A Response to Professor*
    *Karlan,* 44 HOUS. L. REV. 33 (2007) ..........................................74

Richard H. Pildes, *Pildes:  More on Bailout,*
    http://electionlawblog.org/archives/005968.html (June 20, 2006)  ...................................37

Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?,*

81 Denv. U. L. Rev. 225 (2003) ........................................................................37, 46, 47

*Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options After*
LULAC v. Perry: *Hearing Before the Subcommittee on the Constitution, Civil
Rights and Property Rights of the S. Comm. on the Judiciary*, 109th Cong. 109-
823 (2006) (statement of Roger Clegg, President and General Council, Center for
Equal Opportunity) ...........................................................................................................37

Shlomo Slonim, *Federalist No. 78 and Brutus' Neglected Thesis on Judicial Supremacy*,
23 Const. Comment. 7 (2006) .........................................................................................55

*Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing Before the
Senate Judiciary Committee*, 109th Cong. 109-545 (2006) (Edward Blum &
Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered
Under Section Five of the Voting Rights Act*) ...........................................................56, 73

*Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose: Hearing Before
the Subcommittee on the Constitution of the H. Comm. on the Judiciary*, 109th
Cong. 109-79 (2005) (statement of Edward Blum, Visiting Fellow, American
Enterprise Institute) .........................................................................................................42

Richard A. Williamson, *The 1982 Amendments to the Voting Rights Act: A Statutory
Analysis of the Revised Bailout Provisions,* 62 Wash. U. L.Q. 1, 30 (1984) ..............18, 23

.

Plaintiff Northwest Austin Municipal Utility District No. 1 files this consolidated memorandum in opposition to the four motions for summary judgment by (1) defendant Attorney General Alberto Gonzales; (2) defendant-intervenors Texas State Conference of NAACP Branches, Austin Branch of the NAACP, Rodney Louis, Nicole Louis, Winthrop Graham, Yvonne Graham, Wendy Richardson, Jamal Richardson, Marisa Richardson, Nathaniel Lesane, People for the American Way, Jovita Casares, Angie Garcia, and Ofelia Zapata; (3) defendant-intervenor Travis County; and (4) defendant-intervenors Lisa Diaz, David Diaz, and Gabriel Diaz.

## INTRODUCTION

Defendants' motions for summary judgment are grounded in certain fundamental, and fundamentally false, assumptions regarding the availability of bailout and the constitutionality of preclearance:

- That the term "political subdivision" used in §4(a) of the VRA is governed by §14(c)(2) and selected statements made in the legislative history from the 1982 amendments, rather than by the plain language of §4(a) itself and the Supreme Court opinions expressly limiting the reach of §14(c)(2);

- That Congress, despite announcing that bailout would be a widely available remedy for all jurisdictions that could show compliance with the statutory requirements, instead intended to enact a bailout remedy that would be available only to certain counties and independent cities in Virginia;

- That anecdotal findings relating generally to the need to retain the substantive prohibitions of the VRA as a whole constitute sufficient justification for the reenactment of preclearance, without any particularized showing relating to the uniquely intrusive nature of preclearance itself;

- That Congress may on that basis decline to narrowly tailor the VRA's remedial scope and may reassert a federal veto authority over all state and local enactments relating to voting and elections, without even a nod to historically significant boundaries between state and federal government; and

- That Congress could properly retain a coverage formula last adjusted more than 30 years ago and then—on the basis of data no more recent than the 1972 presidential election— justify the reenactment of preclearance by maintaining a long-outdated and noxious

presumption that covered states and local governments are, as a whole, in bad faith unwilling to follow the dictates of the Constitution and the VRA.

All of these assumptions are demonstrably erroneous, as the district established in its memorandum in support of its motion for summary judgment and as explained in additional detail in this response.

The district is a political subdivision as that term is used in §4(a) of the bailout statute. The limitation contained in §14(c)(2), as the Supreme Court has already determined, applies only to whether a political subunit may be separately covered under §4(b), and thus does not apply for determining whether a political subdivision is entitled to pursue bailout from preclearance. The fragments of legislative history to which the Attorney General point the Court's attention are not consistent with the plain statutory text or the structure of the bailout provision and, consequently, are not useful in interpreting the language actually used in the statute. Individual legislators may not modify the language Congress actually used in enacting the bailout provision simply by making assertions of limitation into the legislative history.

When Congress originally enacted the VRA, it made specific findings that preclearance was necessary to prevent jurisdictions from avoiding enforcement of the VRA by adopting new discriminatory practices and thereby staying one step ahead of the courts. In 2006, Congress made no attempt to justify reenacting §5 using that same rationale because there is simply no evidence anywhere in the legislative record that could justify such a conclusion. Not a single legislator or civil rights group attempted to demonstrate or even claim that any evidence of that kind of behavior by political subdivisions in covered jurisdictions now exists, or that it would abound if preclearance was not reenacted.

Of all the hundreds of pages of memoranda and statements filed in connection with the defense-side motions for summary judgment, only the Diaz intervenors have even attempted to

claim that the district does not satisfy the bailout provision's requirement that the district demonstrate compliance with §5 for the past ten years.  As was demonstrated in connection with the district's motion for summary judgment and in additional detail in this response, there is no possible justification for denying the district a bailout under the statute if it can show itself entitled to use the bailout mechanism, which it has done.

At the end of the day, notwithstanding the substantial volume of arguments made in opposition to the district's request for relief, there is no justifiable basis for denying the district relief from the continuing requirements of preclearance.  The district asks the court to deny the Attorney General's and the defendant-intervenors' motions for summary judgment and to grant the motion for summary judgment filed by the district.

### BACKGROUND

Northwest Austin Municipal Utility District No. 1 is located in northwest Austin, Texas. Municipal utility districts are created under state law, pursuant to chapter 54 of the Texas Water Code, in part for the purpose of assisting in the development of an area through the creation of a governmental entity with bonding and taxing authority to fund infrastructure construction and other core improvements.  Created in the late 1980s in connection with the development of a residential subdivision now known as Canyon Creek, the district sits wholly within the geographical boundaries of both the City of Austin and Travis County.  The creation of the district and the establishment of the original polling location were submitted to and precleared by the Attorney General.  Nov. 25, 1986 Preclearance Submission & Response, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 2.

The district is a political subdivision of the State of Texas and performs certain governmental functions including the maintenance of a local park and the assessment of ad valorem taxes to service bond indebtedness.  The district is subject to direct supervision by the

state through the Texas Commission on Environmental Quality (TCEQ) (formerly known as the Texas Natural Resources and Conservation Commission), TEX. WATER CODE §54.024, and certain decisions of the district can be appealed directly to the commission. TEX. WATER CODE §54.239. Although the district is geographically located within Austin and Travis County, it is independent of both. Neither the city nor the county exercises any supervisory authority over the district. *See* Deposition of Dana DeBeauvoir, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 14 at 17:13-18:1.

The district is governed by a board consisting of five individuals who serve staggered four-year terms. District elections are held every two years, with two director positions on the ballot in one election and three the following election. District elections are nonpartisan. In each election, candidates for director positions do not run head-to-head for a particular place, but voters are instructed to vote for two or three candidates, depending on the number of director positions up for election. The candidates with the highest number of votes are elected to the board. *See, e.g.*, Orders Calling for Election, attachments to Pl.'s Mem. in Supp. of Mot. for Summ. J. Exs. 6,7, 9; Official Canvass Reports, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 37.

Early in Canyon Creek's development, the only locations available to be used as polling places for the district's elections were private residences. During the 1990s, Sharlene Collins, the district's then counsel, sought approval to hold the district's elections at one of the builder's model homes, but this request was denied. Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 13 at 144:6-19. Ms. Collins also testified that after Canyon Creek Elementary School opened in the neighborhood, she sought permission to hold the district's

elections at the elementary school, and this request was also denied. Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 33:2-11.

For nearly 20 years, the district has complied with the preclearance requirements of §5, seeking and obtaining preclearance approval from the Attorney General when, from time to time, the district changed its election practices and procedures. Mar. 21, 1988 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 3; Mar. 6, 1990 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 4; Apr. 4, 1996 Preclearance Submission, Ex. 2; Mar. 28, 1998 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 6; Mar. 27, 2002 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 7; June 6, 1996 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 5; Mar. 26, 1998 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 6.

2002 brought a significant change to the district. Until then, the directors had largely been individuals generally affiliated with the developers, and the district performed its statutory duties without significant fanfare or notice. Prior to 2002, the district's elections were largely uncontested and without any significant campaign issue. The 2002 election was different. In 2002, a handful of residents decided to run for the district's board because they had become convinced that the district's contract entered into at its creation with the city of Austin contained a provision that violated state law and resulted in district homeowners paying too much in ad valorem taxes. *See* Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 26-30. The contract authorized both the city of Austin and the district to charge their full ad valorem tax rates to homeowners in the district. That double taxation was contrary to a state law that required the city to allocate ad valorem taxes so that the total amount collected by the city and the district combined was no more than the city's full tax rate (*i.e.*, so that district

5

homeowners paid no more in total ad valorem taxes than other city residents). TEX. WATER CODE §54.016(f). These district residents, including current board president Bill Ferguson, board member and former board president Don Zimmerman, and former board member Alan Weiss, made the so-called double taxation issue a campaign issue and ran against the board incumbents in 2002. The challengers won with overwhelming popular support, including the support of many, if not most, of the individual intervenors who voted. *See* 2002 Official Canvass Report, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 37; Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 26-30.

Like previous district elections, the 2002 election was held at a private residence, that of Mr. and Mrs. Stueber, approximately a quarter mile from the elementary school where some of the other local elections were held. Before the election, then candidate Don Zimmerman inquired whether it would be possible to hold the election at the elementary school with most of the other local elections to make voting more convenient for local residents and thereby improve voter turnout.[1] He was told no. *See* Deposition of Don Zimmerman, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 35 at 50:6-19. On the day of the election, Zimmerman spent much of the day at the elementary school encouraging residents to vote in the district's election and directing them to the district's polling place. *Id.* at 95:1-5. Indeed, at least one of the individual intervenors had personal recollections of Zimmerman encouraging his participation in the district's election and directing him to the polling location. Deposition of Rodney Louis, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 26 at 36.

Sometime after the election, Zimmerman again inquired whether it would be possible to hold the district election at a public location, like the elementary school, to make voting in the

---

[1] Round Rock Independent School District, which by state law also held its election that day, had its polling location elsewhere, so that a resident of Canyon Creek had to go to three different locations in order to vote in all of the local elections that day.

district's elections more convenient and to encourage greater participation in the district's elections. During the course of counsel's inquiries into that possibility, the district learned not only that it was now possible to hold the district's elections at the elementary school, but that the district could contract with the county to put the district's election on the larger county ballot and to delegate to the county the task of conducting the district's election. Deposition of Kerrie Jo Qualtrough, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 28 at 57:17-59:9, 65:9-66:8. The district concluded that this arrangement would benefit voters because it would allow district voters to go to a single, public, convenient location to cast their ballots in all local elections at the same time.

The contractual arrangement also permitted the district to tie into the county's substantial election apparatus, including minority and language-minority election officials and workers for the various individual precincts. Prior to the 2004 election, a bilingual member of the district's counsel's office would be on call throughout election day, and the local residents serving as the election officials could call (or allow voters to call) to receive any language assistance that might be needed. Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 13 at 157:11-158:7. The contract delegating the conduct of the district's election to the county permitted the district to use the county's more sophisticated minority outreach and language-minority assistance programs, including the county's systematized practice of ensuring at least one minority or language-minority election official in each of the county's many precincts plus a hotline for further Spanish-language assistance. Deposition of Dana DeBeauvior, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 14 at 58:15-18, 67:6-17.

The district contracted with the county to conduct its 2004 election. *See* February 26, 2004 Preclearance Letter & Exhibit, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 9. Because

the polling place relocation and the new method of conducting the election were changes to the district's election practices, the changes were submitted to the Department of Justice for preclearance and were approved by the Attorney General. The contract was renewed in 2006, and the county also conducted the district's 2006 election. The renewal of the contract with the county in 2006 was not precleared because the renewal did not constitute a change by the district. *See* 28 C.F.R. §51.14 (2006) (confirming that recurrent voting practices do not have to be repeatedly precleared). Any general changes that affected the broader election were submitted for preclearance by the county on behalf of itself, the district, and the other political subdivisions with which it contracts. *See* Deposition of Dana DeBeauvoir, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 14 at 33:16-34:3; Travis County April 4, 2003 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 8.

Throughout the past 20 years, the Attorney General has never interposed an objection to any of the district's several preclearance submissions. Affidavit of Frank Reilly, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1. No election-related lawsuit has ever been filed against the district, so it should go without saying that no court has ever entered a judgment against the district on any election-related matter. *Id.* Indeed, in its entire history, not a single individual has ever complained about or questioned any voting or election procedure used by the district. And notwithstanding the several individual intervenors that various advocacy groups have personally recruited and convinced to oppose the district's lawsuit, not one of the intervenors during their depositions identified a single complaint about the district's elections or the way they are conducted.[2]

---

[2] Deposition of Jose Gabriel Diaz, Ex. 16 at 27:4-6; 27:22-28; 24:22-25:14; Deposition of Nathaniel Lesane, Ex. 24 at 13:24-14:22; 18:21-19:4; Deposition of David Diaz, Ex. 15 at 12:12-15; 14:2-18; 15:1-8; Deposition of Lisa Diaz, Ex. 17 at 16:17-17:6; Deposition of Rodney Louis, Ex. 26 at 25:16-27:7; Deposition of Nicole Louis, Ex. 25 at 16:1-17; Deposition of Winthrop Graham, Ex. 21 at 9:1-11; Deposition of Yvonne Graham, Ex. 22 at 17:18-18:2;

SUMMARY JUDGMENT STANDARD

Summary judgment is not appropriate unless the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Only those facts "that might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); *accord Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). When the Court considers a motion for summary judgment, it must "eschew making credibility determinations or weighing the evidence" and draw all reasonable inferences in favor of the nonmovant. *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

ARGUMENT

**I.    THE DISTRICT IS ENTITLED TO BAIL OUT OF §5 PRECLEARANCE.**

The district's primary claim in this action is a straightforward request for a declaration permitting it to bail out of §5 coverage under the §4(a) bailout provision. 42 U.S.C. §1973*b*(a). Defendants, however, devote most of their energy to the district's alternative argument that if the district is not eligible to pursue or receive bailout then it is unconstitutional to apply §5 to the district. But the Court need not reach the constitutional question if, as it should, it grants the district's motion for summary judgment that it is entitled to bail out and denies defendants' motions for summary judgment.

**A.  The District Is a Political Subdivision Eligible to Pursue Bailout Under §4(a).**

As demonstrated in the district's motion for summary judgment and discussed further below, the district is a political subdivision that is eligible to pursue bailout under the plain text

---

Deposition of Jamal Richardson, Ex. 30 at 11:14-12:8; Deposition of Wendy Richardson, Ex. 31 at 12:4-13; 18:13-22; Deposition of Marisa Williams, Ex. 33 at 8:22-9:19; Deposition of Gary Bledsoe, Ex. 10 at 18:15-19:7; 21:15-22; Deposition of Angela Garcia, Ex. 20 at 8:6-11; Deposition of Ofelia Zapata, Ex. 34 at 6:22-7:1; Deposition of Tanya House, Ex. 23 at 20:11-20; Deposition of Jovita Casares, Ex. 11 at 7:10-13.

9

of §4(a) as enacted by Congress. Section 4(a) says clearly that "any political subdivision of" any covered state can seek a bailout declaration.[3]

A Texas municipal utility district (MUD) is a "political subdivision" of Texas under Texas state law. MUDs are created under the authority of the Texas Constitution. *See* TEX. CONST. art. XVI, §59(a), (b) (authorizing creation of conservation and reclamation districts as necessary to conserve and develop State natural resources); *see also* TEX. WATER CODE §54.011 (authorizing creation of MUDs). And Texas law expressly recognizes those districts as political subdivisions of the state. *Bennett v. Brown County Water Improvement Dist. No. 1*, 272 S.W.2d 498, 500 (Tex. 1954) (holding that entities created under Article XVI, §59 of the Texas Constitution are political subdivisions of the State with governmental authority and their own areas of autonomy); *McMillan v. Nw. Harris County Mun. Util. Dist. No. 24*, 988 S.W.2d 337, 340 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("MUD 24 is a political subdivision of the State of Texas . . ."); *see Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 n.2 (Tex. 1993) (assuming that a MUD is a political subdivision of the State of Texas).

Indeed, the Texas Election Code expressly denotes governmental units that hold elections as "political subdivisions" of the state. *E.g.*, TEX. ELEC. CODE §41.005 (pertaining to general elections "of *political subdivisions* other than counties" (emphasis added)). Accordingly, the 1988 preclearance submission relating to the district's creation identified "[t]he change affecting voting" as "a result of the creation of the District as a political subdivision of the State of Texas."

---

[3] More fully, §4(a) provides, "no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device *in any State with respect to which the determinations have been made under the first two sentences of subsection (b) of this section or in any political subdivision of such State (as such subdivision existed on the date such determinations were made with respect to such State), though such determinations were not made with respect to such subdivision as a separate unit*, or *in any political subdivision with respect to which such determinations have been made as a separate unit*, unless the United States District Court for the District of Columbia issues a declaratory judgment under this section." 42 U.S.C. §1973*b*(a)(1) (2006) (emphasis added).

Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 3.   Texas's use of "political subdivision" to encompass an entity like a MUD is determinative.   *See Dougherty County, Ga. Bd. of Educ. v. White*, 439 U.S. 32, 43 & n.13, 99 S.Ct. 368, 375 & n.13 (1978) (noting that the appellant school board was "a political subdivision under state law" and citing Georgia law sources).   And that usage squarely comports with the ordinary meaning of "political subdivision" to refer to "[a] division of a state that exists primarily to discharge some function of local government." BLACK'S LAW DICTIONARY 535 (2d Pocket ed. 2001); *accord, e.g.*, *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998) (recognizing that a school district was a "political subdivision" of a state); BLACK'S LAW DICTIONARY 1159 (6th ed. 1991) (defining "political subdivision" as "[a] division of the state made by proper authorities thereof, acting within their constitutional powers, for purposes of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public"). Because there is no indication that Congress intended to give the term "political subdivision" a specialized meaning for purposes of §4(a), that term carries its ordinary, contemporary, or common meaning.   *See Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 1488 (2000) ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.") (internal quotation marks omitted); *Lopez v. Monterey County*, 525 U.S. 266, 278-79, 119 S.Ct. 693, 701 (1999) (turning to dictionary definitions to interpret "administer" as used in §5).

### 1.    Defendants' Attempt to Get Around the Statute Ignores Its Plain Language and Supreme Court Interpretations.

Defendants' only argument for avoiding the obvious conclusion that the district is a political subdivision, although purporting to rely on plain language, actually ignores the text of the statute as interpreted by the Supreme Court and relies instead on nonauthoritative scraps of

legislative history.  Their one bow to the text relies on §14(c)(2) of the Act, which states that "[t]he term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."  42 U.S.C. §1973*l*(c)(2). But the Supreme Court has made clear in at least two holdings—neither of which has been overruled—that §14(c)(2)'s definition of "political subdivision" has the narrow, exclusive purpose of limiting the types of substate entity that can be separately designated for coverage. *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 131 n.18, 98 S.Ct. 965, 979 n.18 (1978) ("Congress' *exclusive* objective in §14(c)(2) was to limit the jurisdictions which may be separately designated for coverage under §4(b)." (emphasis added)); *accord Dougherty County*, 439 U.S. at 43-44, 99 S.Ct. at 375 (holding that the appellant school board's contention that it was not a political subdivision because §14(c)(2) applied and because the board did not register voters was "squarely foreclosed by" *Sheffield*).

Simply put, defendants cannot use §14(c)(2)'s definition to define "political subdivision" in the context of §4(a) when the Supreme Court has said the definition has no application to that context.  *See United States v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 554-55 (5th Cir. 1980) ("[T]he Supreme Court has held that [§14(c)(2)'s] definition limits the meaning of the phrase 'State or political subdivision' only when it appears in certain parts of the Act, and that it does not confine the phrase as used elsewhere in the Act.").  "The usage 'in a political subdivision,' which occurs in §4(a) and in many other sections of the Act, *see, e.g.*, 42 U.S.C. §§1973*a*(a)-(c) (1970 ed., Supp. V), would be nonsensical if 'political subdivision' denoted only specific functional units of state government."  *Sheffield*, 435 U.S. at 129 n.15, 98 S.Ct. at 978 n.15.  Accordingly, as used outside the context of limiting the types of substate geographical

areas that may be separately designated for coverage, "political subdivision" must include state political subunits that—like the City of Sheffield and the district—do not register voters. *Cf. id.* at 129 n.16, 98 S.Ct. at 978 n.16 (noting that "[u]nder §14(c)(2)'s terms, counties are 'political subdivisions' whether or not they register voters").

None of the defense side's four motions even cites *Sheffield* or *Dougherty County*, let alone explains how defendants can overcome the Supreme Court's clear holdings confining the reach of §14(c)(2). *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548 (1980), does not help defendants' argument. *City of Rome* held that Rome, Georgia was ineligible to initiate bailout. *Id.* at 167, 100 S.Ct. at 1556. But Rome was not ineligible because it did not register voters; rather, it was ineligible because, under the 1975 version of §4(a), the only political subdivisions eligible to bail out independently were those covered under §4(b) as separate units. *Id.*[4] *City of Rome* did not overrule *Sheffield*'s cabining of the §14(c)(2) definition to the coverage context. *See Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d at 556 (holding, in light of *Sheffield*, *Dougherty County*, and *City of Rome* "that a school board is a political subdivision for section 2 purposes" although it did not fall within §14(c)(2)'s definition because it did not register voters); *accord City of Rome*, 446 U.S. at 190-93, 100 S.Ct. at 1568-70 (Stevens, J., concurring) (noting that from "the Court's decision in *Sheffield* that all political units in a covered State are to be treated for §5 purposes as though they were 'political subdivisions' of that State, it follows that they should also be treated as such for purposes of §4(a)'s bailout provisions").

---

[4] Indeed, Rome previously had conducted voter registration—as permitted by Georgia law at the time, *see Sheffield*, 435 U.S. at 143, 98 S.Ct. at 985 (Stevens, J., dissenting)—and had voluntarily transferred voter registration to the county. *City of Rome, Ga. v. United States*, 472 F.Supp. 221, 224 (D.D.C. 1979). Neither the Supreme Court nor this Court, in answering Rome's assertion that it was eligible to pursue bailout, remotely suggested that Rome could bail out only if it resumed the function of voter registration. *See generally City of Rome*, 446 U.S. at 156, 100 S.Ct. at 1548; *City of Rome*, 472 F.Supp. at 221.

### 2.    Defendants' Reliance on Legislative History Is Misplaced.

This Court is not bound by the Attorney General's interpretation of the VRA.  *Miller v. Johnson*, 515 U.S. 900, 923, 115 S.Ct. 2475, 2491 (1995) ("[W]e think it inappropriate for a court engaged in constitutional scrutiny to accord deference to the Justice Department's interpretation of the Act."); *see also* Part I.A.4 *infra* (discussing the serious constitutional implications of the Attorney General's interpretation of §4(a) of the VRA).  Nor can this Court be bound by fragments of internally inconsistent legislative history that contradict both the plain language Congress enacted and prior judicial interpretations of that language.  The best evidence of congressional purpose is the statutory text adopted by both Houses of Congress and signed by the President.  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 1146-47 (1991)*, superseded by statute on other grounds as recognized in Landgraf v. USI Film Prods*., 511 U.S. 244, 251, 114 S.Ct. 1483, 1490 (1994).  Where statutory text is unambiguous, it cannot be expanded or contracted by the statements of individual legislators or committees made during the course of the enactment process.  *W. Va. Univ. Hosps., Inc.*, 499 U.S. at 98-99, 111 S.Ct. at 1146-47.  "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Lamie v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030 (2004).

In particular, the language of the current bailout statute has now been enacted twice, both times following the Supreme Court's interpretations in *Sheffield* and *Dougherty County* constraining the reach of §14(c)(2).  In 1982 Congress legislatively abrogated the relevant holding of *City of Rome* by amending §4(a) to add political subdivisions in covered states to the category of entities that can independently pursue bailout, even if the subdivision was not

covered as a separate unit.  The 2006 VRA retains that addition.[5]  But neither the 1982 nor the

2006 reauthorizations made any change affecting *Sheffield*'s and *Dougherty County*'s

conclusions that the §14(c)(2) definition of "political subdivision" does not "impose any

limitations on the reach of the [VRA] outside the designation process," *Sheffield*, 435 U.S. at 129

n.16, 98 S.Ct. at 978, n.16, and thus that "political subdivision" as used in §4(a) must encompass

any subunits of a state that would ordinarily be encompassed by the term.  "Quite obviously,

reenacting precisely the same language would be a strange way to make a change." *Pierce v.*

*Underwood*, 487 U.S. 552, 567, 108 S.Ct. 2541, 2551 (1988).

"Congress is presumed to be aware of a[] . . . judicial interpretation of a statute and to

adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S.

575, 580, 98 S.Ct. 866, 870 (1978).[6]  Indeed, the Supreme Court has specifically found that

Congress's failure to change particulars of the VRA indicates congressional acquiescence in

Supreme Court interpretations of the Act.  *E.g.*, *Georgia v. United States*, 411 U.S. 526, 533, 93

S.Ct. 1702, 1707 (1973) (concluding that Congress's failure to make substantive changes to §5

despite ample opportunity to do so indicated Congress's agreement with the Court's broad

interpretation of that section).

Thus, given the Supreme Court's clearly dispositive interpretation that §14(c)(2)'s

definition is limited to the context of designating entities for separate coverage, Congress's

---

[5] Section 4(a) now provides, "no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device *in any State with respect to which the determinations have been made under the first two sentences of subsection (b)* of this section *or in any political subdivision of such State (as such subdivision existed on the date such determinations were made with respect to such State), though such determinations were not made with respect to such subdivision as a separate unit, or in any political subdivision with respect to which such determinations have been made as a separate unit*, unless the United States District Court for the District of Columbia issues a declaratory judgment under this section." 42 U.S.C. §1973*b*(a)(1)(emphasis added).

[6] *See also, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 2208, 126 S.Ct. 1503, 1513 (2006); *Williams*, 529 U.S. at 434, 120 S.Ct. at 1489; *Bragdon v. Abbott*, 524 U.S. 624, 645, 118 S.Ct. 2196, 2208 (1998); *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794 (1981).

enactment of the bailout amendments in 1982 and reenactment of those provisions in 2006 without making any relevant change to the statutory text interpreted by the Court could not incorporate the §14(c)(2) definition into §4(a)'s reference to political subdivisions of covered states. And contradictory statements inserted into the unenacted legislative history cannot change the enacted legislation or judicial interpretations of the relevant enacted text. *See, e.g.*, *Reno v. Bossier Parish Sch. Bd.* (*Bossier Parish I*), 520 U.S. 471, 483-84, 117 S.Ct. 1491, 1500 (1997) ("Given our longstanding interpretation of §5, . . . we believe Congress has made it sufficiently clear that a violation of §2 is not grounds in and of itself for denying preclearance under §5. That there may be some suggestion to the contrary in the Senate Report to the 1982 Voting Rights Act amendments . . . does not change our view.").

As the Supreme Court explained: "We doubt that Congress would depart from the settled interpretation of §5 and impose a demonstrably greater burden on the jurisdictions covered by §5 . . . by dropping a footnote in a Senate Report instead of amending the statute itself." *Id.* at 484, 117 S.Ct. at 1500. This Court agrees. *State of Ariz. v. Reno*, 887 F.Supp. 318, 321-22 (D.D.C. 1995) (noting that a "single footnote in the Senate Report is not sufficient to demonstrate that Congress intended to require a covered jurisdiction to prove that its proposed change does not violate section 2 in order to receive section 5 preclearance").

### 3. In Any Event, the Only Potentially Relevant Legislative History Discloses Congress's Overriding and Unmistakable Intent That Bailout Be a Broadly Available and Usable Mechanism.

Because the language of the bailout provision and the Supreme Court's interpretation of the statutory scheme are clear, no legislative history need be considered and any that is inconsistent with the enacted text and Supreme Court precedent must certainly be disregarded. But if any legislative history may be considered, the 2006 legislative history has the most force with respect to applying the current version of the Act. *See Sheffield*, 435 U.S. at 135 n.25, 98

S.Ct. at 981 n.25 (rejecting the dissent's contention that the legislative histories of the 1970 and 1975 VRA's were unreliable guides as to what Congress intended when it drafted §5 in 1965 and noting that "[i]t cannot be gainsaid that we are construing, not the 1965 enactment of §5, but a 1975 reenactment"); *see also City of Rome*, 446 U.S. at 173, 180-82, 100 S.Ct. at 1559, 1563-64 (looking to the legislative history of 1975 reauthorization of the VRA).

The legislative history accompanying the 2006 enactment uniformly supports Congress's intent that bailout be a broadly available and usable remedy.  For example, the House Report states, "covered status has been and continues to be within the control of the jurisdiction such that those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so."  H.R. REP. NO. 109-478, at 25 (2006).  Similarly, the Committee "reiterate[d] that termination of covered status has been and continues to be within the reach of compliant covered jurisdictions," and expressed "hope[] that more covered States and political subdivisions will take advantage of the [bailout] process."  *Id.* at 58.  The committee stressed again: "Bailout, available through Section 4(a), while for the most part has gone unused until recently, has proven to be achievable to those jurisdictions that can demonstrate an end to their discriminatory histories."  *Id.* at 61.  These statements reflect Congress's intent to grant all jurisdictions that are subject to the preclearance requirements the ability to bail out of those requirements by complying with the statutory conditions for bailout.  The House Report puts it as plainly as it can be said: "The expiring provisions of the Voting Rights Act allow *any covered jurisdiction* to *remove itself from coverage* if it can demonstrate a 'clean record' on discrimination over the previous 10 years."  H.R. REP. NO. 109-478, at 93 (first emphasis added).

The 1982 legislative history, however, also clearly evinces Congress's intent that the bailout mechanism be frequently and successfully used by a broad array of covered jurisdictions.

For example, the Senate Report notes that "Congress' concern that bailouts not be overly complicated is particularly reasonable because the proposed bailout would significantly increase the number of jurisdictions that can file bailout suits." S. REP. NO. 97-417, at 53 n.182. In response to the concern that very small subdivisions might have difficulty meeting the bailout requirement of adequate compliance with §5, the report notes: "Even if a *small community*, without a large legal staff, was unsure of its obligations, it could have asked the State Attorney General's office for guidance—and many jurisdictions did." *Id.* at 48 (emphasis added).

As one close observer of the 1982 amendment process explained, part of the impetus for the new bailout statute was that "the original bailout mechanism made no provision for local political subdivisions within a state covered in its entirety to seek termination of coverage independently of the state," which "may have had the effect of providing little incentive for compliance at the local level." Richard A. Williamson*, The 1982 Amendments to the Voting Rights Act: A Statutory Analysis of the Revised Bailout Provisions*, 62 WASH. U.L.Q. 1, 30 (1984). That lack of incentive for local jurisdictions to improve, which contributed to freezing potentially discriminatory systems in place, was regarded by civil rights proponents as a significant weakness of the VRA. *See id.* at 31. Providing such an incentive for covered regions to improve from the local level up was a key objective of the new statute's proponents. *See id.* at 32. Plainly expecting a large number of eligible subdivisions to seek bailout, Congress delayed the effective date of the new bailout mechanism until 1984 so the Department of Justice could brace itself for the expected flood of litigation. *Id.* at 33; *see* S. REP. NO. 97-417, at 59 (Senate Judiciary Committee's statement that the delay was "essential for the Department of Justice to prepare for the heavy load of litigation under the new standards" and to "permit the Department,

the covered jurisdictions, and local civil rights groups to review the law and to prepare for proceedings"); *see also* H.R. R‍EP. N‍O. 97-227, at 39.

In short, the thrust of the legislative history declares that Congress intended and expected bailout both to be within the reach of numerous covered jurisdictions and to be used by large numbers of them. At the very least, statements to the effect that "any covered jurisdiction," H.R. R‍EP. N‍O. 109-478, at 93, can pursue bailout, which facially contradict defendants' fragments suggesting that bailout is limited only to certain covered jurisdictions, demonstrate that legislative history is an unreliable guide for applying statutes as compared to the actual statutory text as elucidated by Supreme Court interpretation. Beyond that, such statements show definitively that at least some members of Congress understood that by enacting the current bailout mechanism without statutorily abrogating *Sheffield* and *Dougherty County* they were opening bailout to all political subdivisions within covered jurisdictions. Further, statements that any covered jurisdiction may pursue bailout should carry more weight than any contradictory statements because they are in keeping with the overall spirit of congressional intent to enact a functioning bailout provision.

### 4. Defendants' Interpretation Raises Grave Constitutional Concerns That Must Be Avoided.

Aside from conflicting with the statutory text, judicial interpretations, and Congress's intent to make bailout widely available, the Attorney General and defendant-intervenors' cramped construction of the bailout provision raises serious constitutional concerns that must be avoided by giving the statute its more natural reading. "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Atty. Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 536 (1909); *accord Hooper v. Cal.*,

155 U.S. 648, 657, 15 S.Ct. 207, 211 (1895) ("The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality."); *see Miller*, 515 U.S. at 926-27, 115 S.Ct. at 2493-94 (finding it unnecessary to reach serious constitutional questions posed by an Attorney General interpretation of §5 when the VRA should not be interpreted in the manner urged by the Attorney General); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397 (1988).

Specifically, interpreting §4(a) as defendants urge, to restrict the district from access to bailout, maximizes the lack of congruence and proportionality that makes §5 an inappropriate exercise of Congress's power to enforce the Civil War Amendments. Further, that interpretation would exacerbate the already severe federalism costs of §5 by impermissibly reordering state government by bestowing on counties through federal dictate political powers withheld from them by state law.

### a.    Under Defendants' Interpretation of §4(a), §5 Has No Hope of Being Rendered a Congruent and Proportional Remedy.

Congress has the power to enforce the Fifteenth Amendment by creating appropriate prophylactic remedies. *See South Carolina v. Katzenbach*, 383 U.S. 301, 327, 86 S.Ct. 803, 818 (1966); *see also City of Boerne v. Flores*, 521 U.S. 507, 518, 117 S.Ct. 2157, 2163 (1997). But "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520, 117 S.Ct. at 2164.[7]   If jurisdictions with genuinely clean records are subject to the preclearance requirements

---

[7] Even though *City of Boerne* dealt with the Fourteenth Amendment, the congruence and proportionality standard applies to the Fifteenth Amendment.   *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 n.8, 121 S.Ct. 955, 967 n.8 (2001); *City of Boerne*, 521 U.S. at 518, 117 S.Ct. at 2163 (referring to the Fourteenth and Fifteenth Amendments as "parallel power[s]"); *see also Lopez*, 525 U.S. at 294 n.6, 119 S.Ct. at 709 n.6 (Thomas, J., dissenting) ("Although *City of Boerne* involved the Fourteenth Amendment enforcement power, we have always treated the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive.").

yet are ineligible to bailout, Congress exceeded its enforcement powers under the Fifteenth Amendment when it reenacted the preclearance requirements.

In a classic bait and switch, the Attorney General and defendant-intervenors tout bailout as the safety valve that renders §5 congruent and proportional but then try to sell the Court on an impossibly restrictive version of bailout that cannot be expected to solve §5's overbreadth problem.   As discussed further below, the 2006 reauthorization of a largely unmodified preclearance prophylactic was not a congruent and proportional exercise of Congress's Fifteenth Amendment enforcement power.   But even if the 2006 reauthorization of §5 could be considered legitimate as a general matter, the concern relating to the remedy's incongruence is magnified exponentially if §4(a) is distorted beyond its plain meaning to preclude jurisdictions like the district from even attempting to demonstrate that preclearance coverage should not extend to them.   In other words, if bailout were restricted to only counties, parishes, and other governmental units that register voters—providing no recourse for the remaining thousands of municipalities and special-purpose districts otherwise qualified to escape the preclearance requirement—reauthorized §5 would be an irretrievably overbroad and unconstitutional remedy.

As long as the bailout option is available to all covered jurisdictions, the concern that preclearance is not congruent and proportional is somewhat diminished if jurisdictions with genuinely clean records that fall under the overbroad coverage formula can bail out of preclearance.  *See City of Boerne*, 521 U.S. at 533, 117 S.Ct. at 2170; *Katzenbach*, 383 U.S. at 331, 86 S.Ct. at 820.   But if the many covered jurisdictions that lie within a county's geographical boundaries cannot bail out, then the overinclusive coverage formula indefinitely traps many jurisdictions, like the district, that have absolutely no record of discrimination under the preclearance obligations.   Therefore, interpreting §4(a) to prevent these political subdivisions

from bailing out intensifies the already significant problem of congressional authority to enact preclearance legislation.  To avoid this grave constitutional question, the Court should reject defendants' erroneous construction of §4(a).

>           **b.**    **Under Defendants' Interpretation, the Bailout Statute Impermissibly Discriminates Among States.**

Nothing in the text or legislative history of the 1982 or 2006 enactments remotely suggests that Congress intended the bizarre result of effectively limiting the availability of bailout to counties and independent cities in Virginia.  Yet that is the practical effect of the statutory interpretation urged by the Attorney General and defendant-intervenors.  If the statute were to be so interpreted, it would impermissibly discriminate against states, favoring Virginia solely because of its particular form of state government, and it would improperly place the states on an unequal footing in relation to one another.  Unlike most states, Virginia uniquely structures its local government so that counties and independent cities do not contain large numbers of smaller governmental units.   *See* VA. CODE §15.2-1500(A) ("Every locality shall provide for all the governmental functions of the locality, including, without limitation, the organization of all departments, offices, boards, commissions and agencies of government, and the organizational structure thereof, which are necessary and the employment of the officers and other employees needed to carry out the functions of government."); *see also, e.g.*, Commission on Local Government, Commonwealth of Virginia, *Operating Expenditures of Virginia's Counties and Cities FY 2005*, *available at* http://www.dhcd.virginia.gov/CommissiononLocalGovernment/PDFs/oe2005.pdf  (delineating the numerous public services for which Virginia counties and independent cities are directly responsible).  The fact that *only* Virginia counties have successfully achieved bailout illustrates

the practical impossibility of bailing out for the majority of covered counties under the interpretation of §4(a) advanced by the Attorney General.

The Attorney General acknowledges that fourteen jurisdictions in Virginia, and no other political subdivision anywhere in the United States, have bailed out under §4(a). But the Attorney General does not even attempt to acknowledge the fact that his interpretation of the bailout statute is essentially a Virginia-only bailout provision. Under that interpretation, no political subdivision smaller than a county is eligible to use the bailout procedure, even if the local government fully complies with the statutory prerequisites for bailout. And, at the same time, no county in states other than Virginia could rationally expect to be able to bail out because it, like Travis County, would be responsible for establishing the §4(a) compliance of dozens upon dozens of local governments over which it has no authority or control. *See* Williamson, *supra*, at 42 (noting that "[w]hile the state properly may be held accountable for the activities of its local governmental units, it is quite another matter for the Act to require a county government seeking bailout to assume the responsibility for the activities of, for example, an independent school board within its geographic (but not political) territory" and that bailout conditions requiring counties to assume such responsibility may be "so restrictive that bailout will continue to be impossible for most jurisdictions").[8] Notwithstanding this obvious implication of the Attorney General's interpretation of the bailout provision, the Attorney General makes no effort to account for or otherwise explain this utterly irrational ramification of his atextual interpretation of §4(a).

Defendant-intervenors, like the Attorney General, make no effort whatsoever to explain how a county outside the Commonwealth of Virginia could attempt to collect the information

---

[8] Although Professor Williamson appears to have fallen into the trap of reading the §14(c)(2) definition into §4(a), his analysis of the problems such an interpretation generates remains sound.

necessary to prepare and process a bailout request to the Department of Justice, when it is clear that the county would lack the authority to obtain the information necessary to prepare an application of that size and complexity. Nor do defendant-intervenors even attempt to explain why a county would voluntarily assume an undertaking of that magnitude in the face of so many practical hurdles. Indeed, history has demonstrated that counties outside the state of Virginia will not and cannot undertake the impossible. In stark contrast to the "heavy load of litigation" anticipated by Congress in 1982, S. REP. NO. 97-417, at 59, since 1982, only fourteen counties and independent cities in Virginia have successfully bailed out, but no county outside the state of Virginia has even made the attempt. Section 4(a) should be interpreted to comport with Congress's clear intent to make bailout not a Virginia-only remedy, but a procedure that is "within the reach" of *all* compliant covered jurisdictions. *See* H.R. REP. No. 109-478, at 58.

Finally, defendant-intervenors suggest that permitting noncounty political subdivisions to seek bailout would create a crushing number of eligible filings. The Department of Justice is already processing thousands of preclearance submissions by these political subdivisions every year. H.R. REP. NO. 109-478, at 21 (noting that the Department receives 4,000-6,000 submissions annually). And the Congress that first enacted the current bailout mechanism expected the Department to process a similar number of bailout applications. S. REP. NO. 97-417, at 59. If those political subdivisions can satisfy the requirements of the bailout provision, then there can be no justifiable basis for requiring them to continue to preclear every voting change they make. Defendant-intervenors' argument proves far too much. If thousands of political subdivisions in covered jurisdictions can satisfy the bailout requirements, then justice demands that they be entitled to bailout rather than being stuck in preclearance simply because

Congress has enacted a nonsensical bailout mechanism that works in Virginia, but acts like a Hotel California everywhere else.[9]

> ### c.    Under Defendants' Interpretation, the Preclearance and Bailout Regime Impermissibly Reorders State Government.

Moreover, under the Attorney General's interpretation, §4(a) would interfere with and reorder state government by granting a Texas county political control over jurisdictions that are not under its authority according to state law.  Under the interpretation of §4(a) advanced by the Attorney General and defendant-intervenors, the VRA would substantially interfere with and reorder state government by politically interposing Travis County between the district and the State of Texas, which is the district's only supervisory authority under state law.  That flawed view of §4(a) would grant Travis County the discretion to determine when the district may terminate its preclearance obligations; that is, the district's ability to bail out would be contingent on the county's decision about whether to initiate a bailout action on behalf of the county as a whole.  And Travis County would retain this discretion even if all the entities located within its geographical bounds had satisfied the conditions for bailout.  Travis County, accordingly, could deny for any reason whatever—or no reason at all—the district the opportunity to terminate its preclearance obligations, simply by refusing to initiate the bailout proceeding.

Travis County's very participation in this lawsuit illustrates the degree and nature of the interference with state governmental structure that inheres in defendants' interpretation of the bailout provision.  Travis County's only asserted interest in this case is its desire to exercise a measure of political control over the district that state law does not provide it.  The federal government cannot give Travis County statutory political authority over other state subdivisions.

---

[9] The song by the Eagles describes a hotel where "you can check out anytime you like, but you can never leave." THE EAGLES, HOTEL CALIFORNIA (Asylum Records 1976).

Travis County acknowledges, as it must, that the only source of direct political authority over the district resides in the state. Travis County Memorandum 3. The district was created under the authority of the Texas Constitution. *See* TEX. CONST. art. XVI, §59(a), (b) (authorizing creation of conservation and reclamation districts as necessary to conserve and develop State natural resources). And the district operates exclusively under the supervision of the State of Texas. TEX. WATER CODE §54.012 (providing that a MUD is subject to the continuing right of supervision of the state, exercised through a state commission). Although the district is geographically located within Travis County, it is emphatically *not* a subunit of the county. *See id.* at §54.013(a) (noting that a single MUD can be located in multiple counties). Under Texas law, Texas counties never have binding authority over the creation or the operation of MUDs. *See id.* at §54.0161 (allowing counties to make only *nonbinding* recommendations to the commission regarding the creation of MUDs and then only for MUDs that are not located entirely within a city); *see id.* at §54.5161 (permitting counties to make only nonbinding recommendations to the state commission regarding the approval of MUD bond projects). Indeed, because the MUD at issue in this case is located entirely within the City of Austin, Travis County never had even a nonbinding say in the district's creation. *Id.* at §54.0161. Travis County further acknowledges that a MUD is a "political subdivision" of Texas. Travis County Memorandum 3 n.4 (citing *Monsanto Co.*, 865 S.W.2d at 940-41).

Contrary to defendant-intervenors' suggestion, Travis County is not "the entity *responsible* for the election administration activities of . . . nearly all of the political subunits within the county," NAACP Memorandum 25 (emphasis added), but merely the entity to which most political subdivisions in Travis County's geographic territory have chosen to contractually delegate administration of their elections. *See* Deposition of Dana DeBeauvoir, Pl.'s Mem. in

Supp. of Mot. for Summ. J. Ex. 14 at 7:14-17. Travis County acknowledges that its responsibilities for administering the district's elections arise purely from delegation by contract. *Id.* at 2. The legal responsibility and authority for the district's elections reside entirely with the district. Travis County's suggestion that it is happy to abdicate its own constitutional responsibility to protect voting rights to "the watchful presence of the Department of Justice in the background," *id.* at 6, gives it no warrant to cede that responsibility on behalf of independent political entities like the district. And Travis County's general ruminations about its broader experience with election-related matters, to the extent they make any sense,[10] are legally irrelevant to construing the statute. The district, quite obviously, is not asserting a right to bail out on behalf of the entire county in which it geographically sits; nor is it assenting a right to exempt non-MUD elections occurring within the district's geographical boundaries from §5 requirements. The district's claim in this case is simple: the district can and desires to vigilantly preserve the constitutional rights of its own electors. Texas law gives the district that responsibility. And no showing has been or can be made that the district has done otherwise.

### B. Defendants Cannot Show That the District Fails to Meet the Statutory Requirements for a Declaration That It Is Entitled to Bail Out.

Resting on his erroneous assertion that the district cannot pursue bailout despite the contrary statutory text and Supreme Court interpretations, the Attorney General makes no attempt even to argue that the district does not satisfy the substantive requirements for a bailout declaration.[11] Nor do any of the defendant-intervenors other than the Diaz intervenors make any

---

[10] Travis County's motion contains several puzzling, and immaterial, theories about how its election-related activities relate to its alleged federal authority to exercise political control over the district. For example, Travis County posits that it was entrusted with voter registration duties because it is "mature enough," Travis County Memorandum 8 n.5, rather than simply because it is a county and counties are the units that register voters in Texas.
[11] The substantive requirements for a covered jurisdiction to establish its entitlement to bailout are set forth in 42 U.S.C. §1973*b*(a)(1):

> A declaratory judgment under this section shall issue only if such court determines that during the ten years preceding the filing of the action, and during the pendency of such action—

such argument. The district's memorandum in support of its motion for summary judgment details the district's satisfaction of the substantive requirements—including compliance with §5 and constructive efforts to preserve and expand electoral participation—over the statutory ten-year period preceding this suit. Those details will not be repeated in full here. This section addresses how the Diaz intervenors' attempts to poke pinholes in the district's record of compliance fail.

---

(A) no such test or device has been used within such State or political subdivision for the purpose or with the effect of denying or abridging the right to vote on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2) of this section;

(B) no final judgment of any court of the United States, other than the denial of declaratory judgment under this section, has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) that denials or abridgements of the right to vote in contravention of the guarantees of subsection (f)(2) of this section have occurred anywhere in the territory of such State or subdivision and no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds; and no declaratory judgment under this section shall be entered during the pendency of an action commenced before the filing of an action under this section and alleging such denials or abridgments of the right to vote;

(C) no Federal examiners or observers under [this Act] have been assigned to such State or political subdivision;

(D) such State or political subdivision and all governmental units within its territory have complied with [section 5 of this Act] section 1973c of this title, including compliance with the requirement that no change covered by section 1973c of this title has been enforced without preclearance under section 1973c of this title, and have repealed all changes covered by section 1973c of this title to which the Attorney General has successfully objected or as to which the United States District Court for the District of Columbia has denied a declaratory judgment;

(E) the Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under section 1973c of this title, with respect to any submission by or on behalf of the plaintiff or any governmental unit within its territory under section 1973c of this title, and no such submissions or declaratory judgment actions are pending; and

(F) such State or political subdivision and all governmental units within its territory—(i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process; (ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under [this Act]; and (iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process.

1.    **The Diaz Intervenors Cannot Demonstrate That the District Has Failed to Comply with §5 in the Ten Years Preceding This Action.**

Alone among the numerous litigants on the defense side, the Diaz intervenors allege that the district has implemented two voting changes in the past ten years without the required §5 preclearance.  Diaz Memorandum 28.[12]  The Diazes identify the allegedly unprecleared changes as "changes in the address at which a voter could obtain a mail-in ballot," but do not specify the years in which such changes occurred.  *Id.*

A change in a mailing address—which, after all, still requires a voter to travel no farther than the nearest mailbox—is not even arguably a change affecting voting.  But in any event, the Diazes' assertion that any such changes by the district were implemented without preclearance in the last ten years is simply wrong.  Each of the district's preclearance submissions in the last ten years—occurring in 1998, 2002, and 2004—included that year's order calling for election, providing the Department of Justice the details about that year's electoral process, including changes to the mailing address for obtaining mail-in ballots.  Pl.'s Mem. in Supp. of Mot. for Summ. J. Exs. 6, 7, 9.[13]  The Diazes' attempt to show the district's failure to comply with §5 is without merit.

---

[12] Attempting to bolster their nonexistent showing of noncompliance, the Diazes also make allegations reaching back to 1994, Diaz Memorandum 28, which is not even arguably within the ten-year period considered under the bailout criteria.  *See* 42 U.S.C. §1973b(a)(1).  The relevant historical period for this suit, which was filed on August 4, 2006, began on August 4, 1996.  The Diazes' most serious allegation—that the district in 1994 adopted "numbered place voting for election of Board members," Diaz Memorandum 28—is also their most absurd.  The district has never adopted "numbered place voting," and the order calling for the director election in 1994 made clear that "[e]ach voter may vote for none, one, two or three persons for director" to fill the three terms on the five-member board expiring that year.  Perales Decl. Ex. D.  Although they do not cite it, the Diazes perhaps rely on the 1994 canvass report for their misconception that voting was by "numbered place."  Ex. 1.  That canvass report did purport to assign place numbers to the three candidates who had run for the three board seats open that year, *id.*, but it is apparent that such numbering was either a mistake or administrative shorthand for identifying which three of the five staggered terms expired that year.  The purported designations on the canvass report did not and could not have affected how balloting actually occurs in the district, as illustrated by canvass reports from later, contested elections in which the number of candidates exceeded the number of available seats on the board.  *E.g.*, Plaintff's Memorandum in Support of Motion for Summary Judgment Ex. 37.

[13] The district's 1996 election would have occurred in May 1996, before the statutorily relevant period began on August 4, 1996, and the district's 1996 submission for preclearance of an address change was submitted on April 4, 1996.  Ex. 2.  In any event, that submission also included the information about the 1996 change in the mailing

## 2. The Diaz Intervenors Cannot Demonstrate That the District Failed to Make Constructive Efforts to Preserve and Expand Access to Voting.

It cannot be seriously disputed that the district's relocation of its polling place from a residential garage to the neighborhood's public elementary school and the district's concomitant contract to have Travis County run its elections in conjunction with the county's elections, *see* Feb. 26, 2004 Preclearance Submission, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 9, greatly expanded access and convenience for voters in the district's elections. That change took effect, after preclearance, for the 2004 elections, and the polling place for the district's biennial elections remains at the Canyon Creek Elementary School. *See id.* Don Zimmerman, then a candidate for the board, proposed that move before the 2002 election and, almost immediately after being elected to the board, spearheaded a resolution to make those changes in time for the very next election. Deposition of Don Zimmerman, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 35 at 47-49. And at least as early as the 1998-2002 timeframe, the district's counsel had pursued the possibility of moving the district's elections to the local school. Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 34. Yet the Diaz intervenors allege that the district "has failed to make constructive efforts to expand minority voter participation." Diaz Memorandum 28.[14] That assertion is without merit.

The district's elections have always been conducted in full compliance with state and federal law, and there has never been an accusation—let alone a lawsuit or judgment—claiming that the district has ever conducted elections in a discriminatory fashion. *See, e.g.*, Preclearance

---

address for obtaining mail-in ballots, information that was also included in an exhibit filed with the district's June 6, 1996 submission requesting preclearance of the cancellation of that year's election. *Id.*; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 5.

[14] The remaining defendant-intervenors, although offering no argument that the district failed to meet the substantive statutory requirements for bailout, in their background section also attempt to cast aspersions on the district's constructive efforts. But they are forced to concede that the move to hold elections at the school and to delegate administration of the elections to Travis County was an improvement over the previous practice of holding elections at private residences (which were, nevertheless, precleared) and should be expected to "increase[] general voter participation in the District." NAACP Memorandum 17 (emphasis omitted).

Submissions & Responses, Pl.'s Mem. in Supp. of Mot. for Summ. J. Exs. 2, 3, 4, 5, 6, 7, 8, 9; Ex. 1; Affidavit of Frank Reilly, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1; Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 99-100. Accordingly, every single one of the 11 minority-group residents of the district who have intervened as defendants in this action testified that they have no knowledge of any problems relating to the electoral process in the district, or any complaint other than a philosophical objection to this bailout action.[15] Nor do any of the nonresident defendant-intervenors have knowledge of problems ever occurring in connection with the district's elections.[16]

The changes begun by the district at least five years ago took its commitment to open and expansive electoral access from good to better. In addition to obvious advantages like the school's greater visibility in comparison to a private residence and a public nature more befitting a public function like voting, the school is where the district's residents cast their ballots for the other elections—state, county, and city—held on the same day as the district's elections. By contracting to participate in the joint election conducted by Travis County, the district thus provided its voters a time-saving "one-stop shopping" solution to voting in the district's elections. Previously, a voter who wanted to vote in the other state and local elections on Election Day would have to make a second trip to a separate location to participate in the

---

[15] Deposition of Jose Gabriel Diaz, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 16 at 27:4-6; 27:22-28; 24:22-25:14; Deposition of Nathaniel Lesane, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 24 at 13:24-14:22; 18:21-19:4; Deposition of David Diaz, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 15 at 12:12-15; 14:2-18; 15:1-8; Deposition of Lisa Diaz, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 17 at 16:17-17:6; Deposition of Rodney Louis, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 26 at 25:16-27:7; Deposition of Nicole Louis, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 25 at 16:1-17; Deposition of Winthrop Graham, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 21 at 9:1-11; Deposition of Yvonne Graham, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 22 at 17:18-18:2; Deposition of Jamal Richardson, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 30 at 11:14-12:8; Deposition of Wendy Richardson, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 31 at 12:4-13; 18:13-22; Deposition of Marisa Williams, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 33 at 8:22-9:19.

[16] Deposition of Gary Bledsoe, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 10 at 18:15-19:7; 21:15-22; Deposition of Angela Garcia, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 20 at 8:6-11; Deposition of Ofelia Zapata, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 34 at 6:22-7:1; Deposition of Tanya House, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 23 at 20:11-20; Deposition of Jovita Casares, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 11 at 7:10-13.

district's elections. (Indeed, to vote in school district elections, a voter would have to make three trips. *See* Deposition of Don Zimmerman, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 35 at 77:20-78:3.) Additionally, through its contract with Travis County, the district provides voters additional services and convenience that the district—which has no employees or offices—acting alone could not provide. Those benefits include improved access to Spanish-language assistance and locations for early voting. Deposition of Dana DeBeauvior, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 14 at 58:15-18, 67:6-17, 74: 14-19; Feb. 26, 2004 Preclearance Letter, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 9 at 4, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. B to letter.

The requirement in 42 U.S.C. §1973*b*(a)(1)(F) that a jurisdiction seeking bailout demonstrate constructive efforts "is a flexible one depending upon the particular needs and conditions in the applicant jurisdiction." S. REP. NO. 97-417, at 55.[17] The district is not required to prove a negative. *See id.* ("These requirements are not meant to imply that the described conduct [*i.e.*, intimidation and harassment] has occurred in all covered jurisdictions."). As illustrated by defendant-intervenors' testimony that they can identify no problems with the district's elections, the district has no history of election-related intimidation or harassment.

The district's move to holding its elections at the local public school and the concomitant contract for Travis County to provide election services preserved and expanded access, and, as was expected, that effort did increase participation in the district's elections. *See* Official Canvass Reports, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 37 (reflecting the rising trend of voter participation since the last election held at a private residence). The increased interest and participation in the district's elections has coincided with a general uptick in MUD-related issues

---

[17] Although, as discussed above, legislative history is an unreliable guide to the correct application of "political subdivision" in §4(a), it may help this Court to correctly apply the 42 U.S.C. §1973*b*(a)(1)(F), both because the text is less precise than §4(a) and because it has not been the subject of Supreme Court interpretation.

affecting the lives of district residents.  In the first dozen or so years of the district's existence and development, sparse population and citizen disinterest toward the governance of their utility district combined to make the district's elections poorly attended, uncontested affairs.  *See* Ex. 1; Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 41.  It is still not easy to get residents excited about the operations of their MUD, but, beginning in 2002, issues came to the fore that prompted the first contested election in the district's history and the beginning of a surge in voter participation.  *See* Official Canvass Reports, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 37.  Primarily, the new concerns were (1) the realization that district residents were being subjected to double-taxation by the City of Austin and (2) a growing sense that this maturing community was ready to exert influence over its MUD board that was previously aligned more with the subdivision's original developers than its residents.  *See* Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 12 at 26-30.  The election changes the district's board implemented in 2004 nurtured that growing interest in the district's operations and governance by making electoral participation more convenient and attractive.

In their attempt to discredit the obviously constructive changes made in 2004, the Diazes and other defendant-intervenors proceed on the flawed premise that the only measures that count to satisfy 42 U.S.C. §1973*b*(a)(1)(F) are those undertaken with a cynically race-conscious focus. Gary Bledsoe, testifying as the representative of the NAACP intervenors, went so far as to assert that the district's omission to curry his personal favor was the only evidence he needed of the district's alleged indifference to minority voting rights.  *See* Deposition of Gary Bledsoe, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 10 at 32, 37.[18]  But the district cannot be penalized for

---

[18] Bledsoe also opined at length on the perceived failure of individual voters residing in the district to abide by a purported "gentleman's agreement" by which, in Bledsoe's view, citizens of Austin are obliged to cast votes in favor

an emphatic commitment to expanding electoral access and participation for *all* its residents, regardless of their race or ethnicity.

42 U.S.C. §1973*b*(a)(1)(F) encourages constructive efforts in expressly race-neutral terms, offering as one example "expanded opportunity for convenient registration and voting for *every person* of voting age." (Emphasis added). There can be no doubt that the changes implemented by the district in 2004 expanded opportunities for convenient voting by all its residents of voting age. "[T]here is no requirement of a specific level of minority participation," S. REP. No. 97-417, at 56, but there can also be no doubt that the district's commitment to expanding access for all voters has the salutary effect of providing the same expanded opportunities for minority residents in particular.

Indeed, some of the changes implemented in 2004 especially redound to the benefit of minority voters, as explained by representatives of Travis County and the NAACP in their deposition testimony. For example, the district previously provided language assistance to Spanish-speaking voters by ensuring that a Spanish speaking legal assistant or law librarian was available by telephone at all times on Election Day. Deposition of Sharlene Collins, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 13 at 157:11-158:7 (testimony by the district's former attorney that she ensured that a Spanish-speaking staff member was available by telephone to provide voter assistance). The district's decision to have Travis County administer its elections improved access to Spanish-language voter assistance by ensuring there would be at least one Spanish-speaking poll worker onsite at the polling place as well as a hotline to a call center that could

---

of reserving "one black seat and one brown seat" on the Austin City Council. Deposition of Gary Bledsoe, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 10 at 13-14, 26. Aside from the dubiousness of the proposition that individual voters ever can or should be bound by a "gentleman's agreement" to vote for particular candidates based solely on their race, *cf.* S. REP. NO. 97-417, at 54 ("Communities are not held absolutely liable for all acts by their private citizens."), the district has no involvement with elections for the Austin City Council.

provide additional Spanish-language assistance.  Deposition of Dana DeBeauvior, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 14 at 58:15-18, 67:6-17.

Moreover, in what Travis County Clerk Dana DeBeauvoir characterized as "the perfect example" of "affirmative efforts to reach out to Latino and African-American voters," the district's participation in the joint election ballot gives district residents the option of casting their ballots at any of numerous early-voting sites maintained at locations throughout Travis County that are "equitably distributed . . . and put . . . in commercial areas" during the weeks preceding Election Day.  *Id.* at 75:11-12, 14-19; *see also* Feb. 26, 2004 Preclearance Letter, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 9 at 4, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. B to letter.  For example, in the 2004 election, early voting was held every day, including Sundays, from April 28 through May 11, at 26 locations, with the polls open 11 or 12 hours each day (except Sundays, when voting was from noon to 6:00 p.m.).  Feb. 26, 2004 Preclearance Letter, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 9 at Ex. B to letter.  Previously, early voting for the district's elections was held at only a single location—the same private residence used as an Election Day polling place—on weekdays only and only between the hours of 11:00 a.m. and 7:00 p.m. on those days.  Feb. 26, 2004 Preclearance Letter, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 9 at 4.  The NAACP's Bledsoe agreed that the county's network of numerous, equitably distributed early voting locations expands access for African American and Latino voters.  Deposition of Gary Bledsoe, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 10 at 33.

Finally, related to their flawed view that expanded electoral participation for minority voters is somehow incompatible with expanded electoral access for all voters, the Diazes and other defendant-intervenors attempt to suggest that the district has not acted in good faith in carrying out its obligations under the VRA by citing out of context a statement made by Don

Zimmerman regarding whether it is appropriate to make a person an election official solely because of his or her race.  The fact that Mr. Zimmerman believes that all individuals should be treated equally, regardless of their race, does not in the least suggest any lack of commitment to full enforcement of the VRA or any discriminatory intent whatsoever by him personally or the district as an entity.  In fact, the evidence shows clearly that Mr. Zimmerman has consistently, throughout his involvement in the district's board, reached out to many individuals, regardless of their race or ethnicity, to encourage their participation in the district's activities and to encourage participation on the board and in voting by residents of the district, regardless of their race.  For example, individual defendant-intervenors expressly testified that they were assisted personally by Mr. Zimmerman in locating the district's polling place or otherwise encouraged by Mr. Zimmerman to participate in electoral politics and government in the district.  Deposition of Rodney Louis, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 26 at 36 (explaining that he was only able to vote in the district's 2002 election "because Mr. Zimmerman was running for MUD president and he instructed me on where to go and vote"); *see also id.* at 14-15, 21-24; Deposition of David Diaz, Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 15 at 8-9.

In short, the district's successful efforts to expand voter access and participation within the ten years preceding this action cannot be denied.  And defendant-intervenors' attempt to transform the district's commitment to electoral participation into discriminatory intent should not be countenanced.

## II.    SECTION 5 CANNOT BE CONSTITUTIONALLY APPLIED TO THE DISTRICT.

Because defendants' motions for summary judgment fail to establish that the district is ineligible for bailout and because the district's motion for summary judgment that it is entitled to bailout should be granted, the Court need not reach the issue whether §5 may be constitutionally applied to the district.  If, however, the Court does reach that issue, defendants' motions for

summary judgment that §5 may constitutionally be applied to the district should be denied because defendants have not shown and cannot show that §5 is a congruent and proportional exercise of Congress's enforcement power, particularly if it provides no escape hatch for jurisdictions like the district for which no predicate of invidious conduct has been laid.

The Attorney General begins his discussion of constitutionality with the assertion that the court should defer to a congressional finding about the constitutionality of §5. Although the Court is required to defer to Congress on many things, the court should not defer to Congress on the question of constitutionality, particularly when so many legislators and commentators alike have questioned the continued constitutionality of preclearance.[19]

The core theme to defendants' attempt to justify the reenactment of preclearance is simply that preclearance is a part of the larger VRA and that the congressional record contains sufficient anecdotal evidence to support the continued existence of the VRA itself and that, therefore, preclearance must be constitutionally upheld as an adjunct to the larger VRA. Not so. Section 5 must stand or fall on its own. Congress cannot justify a reenactment of §5 simply by

---

[19] *See, e.g.*, Additional Views of Senators John Cornyn and Tom Coburn, S. REP. NO. 109-295, at 33-34 (2006) (stating that "[w]e believe it would have been beneficial for the…constitutionality . . . of the Voting Rights Act had for the Senate Judiciary Committee to engage in a serious, reasoned debate," and "it would have been beneficial for us to have had a full discussion of ways to improve the Act to ensure its important provisions were narrowly tailored and applied in a congruent and proportional way, something the Supreme Court will take into consideration when it considers the renewed Act."); *Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options After LULAC v. Perry: Hearing Before the Subcommittee on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary*, 109th Cong. 109-823, at 16 (2006) (statement of Roger Clegg, President and General Council, Center for Equal Opportunity) ("I think that Section 5, if it is reauthorized, would be constitutionally vulnerable. I think it would be unconstitutional. I think the Court is likely to strike it down, and I think the Court should strike it down."); Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?*, 81 DENV. U. L. REV. 225, 249 (2003) ("If extended in its entirety and without revision, Section 5 seems likely to fail."); Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After Tennessee v. Lane*, 66 OHIO ST. L.J. 177, 177 (2005) ("This Article considers a single question: Does Congress have the power to renew the Voting Rights Act's preclearance provisions, set to expire in 2007?"); Samuel Issacharoff, *Is Section 5 of the Voting Rights Act a Victim of Its Own Success?*, 104 COLUM. L. REV. 1710, 1714 (2004) ("In light of the major federalism decisions of late, *City of Boerne v. Flores* and *Nevada Department of Human Resources v. Hibbs*, it is certainly possible to revisit the Court's acceptance of the constitutionality of section 5 dating back to the seminal cases of the 1960s and 1970s."); Richard H. Pildes, *Pildes: More on Bailout*, http://electionlawblog.org/archives/005968.html (June 20, 2006) (noting that "improving the bailout process . . . can only enhance the constitutionality of section 5 as a whole, particularly if Congress does not adjust the coverage formula in any way at all.").

pointing to the beneficial purposes of the VRA as a whole or by joining preclearance with other specific beneficial statutory provisions contained within the VRA itself.  The Attorney General cannot successfully justify the reenactment of §5 by pointing to evidence: "(1) that §5 has been effective at preventing and remedying some voting discrimination, and (2) that covered jurisdictions continue to discriminate in voting against minority citizens."  *See* Attorney General Memorandum 8.  The Attorney General draws these conclusions by pointing to statements in the 2006 amendments finding that "first generation barriers" have been largely eliminated, but that "vestiges of discrimination" continue to exist in elections in which minorities participate.  These conclusions, even if true, cannot justify the reenactment of preclearance.  Congressional findings of vestiges of discrimination or second generation barriers to voting may justify the continuation of §2 or §203 of the VRA, but that kind of finding cannot justify §5.

Like the Attorney General, defendant-intervenors attempt to justify §5 simply as an appendage to the VRA as a whole, intended to help root out continuing vestiges of voting discrimination generally and to prophylactically deter violations of the VRA through the preclearance mechanism.  There is no attempt by defendant-intervenors to even argue that §5, as reenacted in 2006, is supported by evidence of states or local jurisdictions repeatedly attempting to evade the requirements of the VRA by enacting new and different discriminatory voting procedures, thus frustrating enforcement of the act through traditional litigation.

In short, defendants fail to establish—because they cannot do so—that the record before Congress when it enacted the 2006 authorization of §5 supports a finding that the uniquely intrusive preclearance requirement remains a congruent and proportional remedy to any problem of constitutional magnitude.  The correct analysis, as first applied by the Supreme Court to §5 in *Katzenbach* and as further articulated in *City of Boerne* and its progeny, demonstrates that the

severe federalism costs exacted by §5 cannot be justified absent "extraordinary circumstances," *Miller,* 515 U.S. at 927, 115 S.Ct. at 2493, and Congress did not show and could not have shown continue to exist in 2007.

> ### A.   The 2006 Enactment of §5 Cannot Be Constitutionally Applied to the District If It Fails to Independently Satisfy the Congruence and Proportionality Standard.

The Attorney General and defendant-intervenors concede, as they must, that §5 cannot be constitutionally applied to the district if it fails the congruence and proportionality standard articulated in *City of Boerne* and its progeny.  *See* Attorney General Memorandum 9; NAACP Memorandum 27 n.16.  *City of Boerne* explains that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" in order for Congress to use its remedial enforcement powers under the Civil War Amendments.  521 U.S. at 520, 117 S.Ct. at 2164.[20]  In a line of cases following *City of Boerne,* the Court has further articulated that standard: *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 119 S.Ct. 2199 (1999); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631 (2000); *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740 (2000); *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955 (2001); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972 (2003); *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978 (2004); *United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877 (2006).

---

[20] Although *City of Boerne* concerned the Fourteenth Amendment, the congruence and proportionality standard applies to the Fifteenth Amendment.  *See Garrett*, 531 U.S. at 373 n.8, 121 S.Ct. at 967 n.8; *City of Boerne*, 521 U.S. at 518, 117 S.Ct. at 2163 (referring to the Fourteenth and Fifteenth Amendments as "parallel power[s]"); *see also Lopez,* 525 U.S. at 294 n.6, 119 S.Ct. at 709 n.6  ("Although *City of Boerne* involved the Fourteenth Amendment enforcement power, we have always treated the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive.").  Indeed, *City of Boerne* explicitly drew on *Katzenbach*'s analysis of Congress's "remedial" powers under §5 of the Fifteenth Amendment.  *City of Boerne*, 521 U.S. at 519, 117 S.Ct. at 2164 ("Congress' power under § 5, however, extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment.  The Court has described this power as 'remedial,' *South Carolina v. Katzenbach, supra*, at 326, 86 S.Ct., at 817-818." (alteration in original)).

As the Attorney General acknowledges, Attorney General Memorandum 11 n.11, the standard articulated in the *City of Boerne* line of cases is an elaboration of the test applied in *Katzenbach* to determine that the 1965 enactment of §5 was an appropriate congressional response to the "exceptional conditions," *Katzenbach*, 383 U.S. at 334, 86 S.Ct. at 822, found, on a sufficient evidentiary record, to exist at that time. *See City of Boerne*, 521 U.S. at 518-20, 117 S.Ct. at 2163-64 (relying in part on *Katzenbach* in setting forth the congruence and proportionality standard). More specifically, the congruence and proportionality analysis must be applied to the 2006 enactment of §5 in light of 2006 conditions as discerned in the 2006 legislative record. *See Garrett*, 531 U.S. at 369 n.6, 121 S.Ct. at 965 n.6 (invalidating parts of the ADA when the congressional record, although including evidence of historical measures like compulsory sterilization of the disabled, contained "no indication that any State had persisted in requiring such harsh measures as of 1990 when the ADA was adopted"); *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169 (requiring that the congressional record demonstrate "modern instances" of unconstitutional state action).

The constitutionality of the 2006 enactment of §5, extending the preclearance regime for another quarter century is not, as defendant-intervenors assert, a settled question. It is certainly not answered by *Katzenbach*'s determination more than 40 years ago that a five-year response to an emergency was appropriate. *Cf.* Pamela S. Karlan, *Section 5 Squared: Congressional Power to Extend and Amend the Voting Rights Act*, 44 HOUS. L. REV. 1, 11-12 (2007) (acknowledging that "*City of Boerne*'s citation of only pre-1982 Voting Rights Act cases . . . might be taken to deliberately avoid passing on the question whether the 1982 extension of the preclearance regime satisfied the 'congruence and proportionality' requirements articulated in *City of Boerne*").

1.    **Section 5 Cannot Be Justified as Merely an Adjunct to Constitutional Provisions of the VRA as a Whole.**

At the heart of the parties' disagreement regarding whether Congress had sufficient evidence to authorize the reenactment of §5 for another quarter century is a fundamental conceptual disagreement over the kinds of evidence that the Supreme Court found originally justified the enactment of §5 in 1965 and the kinds of evidence needed to sustain §5 today. Defendants believe that a substantial body of anecdotal evidence of acts of discrimination in voting or of vote dilution or widespread racial bloc voting in political subdivisions can, by itself, justify the reimposition of this uniquely intrusive remedy. In other words, defendants assert that the same evidence that supports the federal imposition of prohibitions on vote suppression, vote dilution, or districting that improperly gives effect to racial bloc voting will also simultaneously justify the additional and more extensive remedy embodied by preclearance. The district, on the other hand, reads the Supreme Court's decisions in *Katzenbach* and *City of Rome* to more narrowly ground the preclearance remedy in the churning or iterative process of imposing new discriminatory voting practices and procedures in order to foil the federal courts' ability to remedy discriminatory conduct and thereby make the enforcement of the substantive provisions of the VRA nearly impossible.

Although the Attorney General agrees that the Supreme Court's congruence and proportionality test is the proper way to evaluate the constitutionality of §5, Attorney General Memorandum 10-11, the Attorney General seriously misapplies the test by attempting to justify the preclearance provisions of §5 merely as an adjunct to the VRA as a whole. In other words, the Attorney General seeks to have the court uphold preclearance on the basis that the VRA as a whole is a constitutional exercise of congressional power. That analysis does not work. *Katzenbach* made clear that the "uncommon exercise of congressional power" embodied in the

41

1965 enactment of §5 was justified by the extraordinary conditions found to persist up to the moment of the provision's enactment. 383 U.S. at 334, 86 S.Ct. at 822 (noting that "exceptional conditions can justify legislative measures not otherwise appropriate"). *City of Rome* likewise held that the 1975 extension of §5 was warranted based on specific evidence supporting the unsurprising finding that five or ten years had not yet been enough to eradicate a century of Jim Crow tactics. 446 U.S. at 180-81, 100 S.Ct. at 1563-64. Before reenacting the same 40-year-old remedy—and applying it based on 35-year-old coverage proxies—Congress was constitutionally required to undertake a serious investigation of whether the specific type of evil addressed by §5 still persists to a significant degree in today's radically changed landscape. *See Garrett*, 531 U.S. at 369 n.6, 121 S.Ct. at 965 n.6; *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169.

Time and time again throughout the Attorney General's memorandum in support of its motion for summary judgment, the Attorney General attempts to justify the reenactment of §5 merely by reference to congressional findings that covered jurisdictions "continue to discriminate against minorities in voting." *E.g.*, Attorney General Memorandum 11. Those kinds of findings likely would sustain the continuation of §2 of the VRA, but they cannot sustain §5 because that is not what §5 was enacted to do. Moreover, the congressional record clearly demonstrated that noncovered jurisdictions also sometimes discriminate against minorities and others.[21] Indeed, one could easily conclude from the record that the incidence of actionable conduct occurs with as great or greater frequency outside the jurisdictions covered by

---

[21] *Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose: Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 109-79, at 15-16 (2005) (statement of Edward Blum, Visiting Fellow, American Enterprise Institute) ("The data we have analyzed are indisputable. The incidence of statutory and congressional violations of voting rights in the covered jurisdictions are few and far between and no different from the noncovered jurisdictions . . . It is noteworthy that since 1998, the Department of Justice has brought nearly four times as many Section 2 lawsuits against non-covered jurisdictions as against covered ones."); Defendant-Intervenors' Joint Statement of Material Facts 453-454, ¶1443 ("24 lawsuits since 1982 identified more than 100 instances of intentionally discriminatory conduct in voting. Eight of these 24 lawsuits were in jurisdictions covered by Section 5; 14 were in non-covered jurisdictions.").

preclearance, leaving serious questions about not only Congress's decision to reenact preclearance, but also its decision to leave the coverage criteria unchanged, even after more than three decades.

It is true that the constitutionality of preclearance "must be judged with reference to the historical experience which it reflects." Attorney General Memorandum 12 (quoting *Katzenbach*, 383 U.S. at 308, 86 S.Ct. at 808). But that historical experience is not discrimination in general, as the Attorney General suggests; rather, it is the more specific conduct that made judicial enforcement of the law ineffective at the time the VRA was enacted and that led to the creation of preclearance in the first place. The district does not assert that there was not a sufficient record to permit Congress to enact preclearance in 1965, or in 1975, the two preclearance enactments the Supreme Court evaluated in *Katzenbach* and *City of Rome*. The district does, however, assert that, more than a generation later, the state of voting rights in the United States and the record placed before Congress cannot justify the preclearance mechanism that Congress reenacted without change.

**2.    The Constitutionality of the 2006 Enactment of §5 Is Not Settled by Cases Upholding Earlier Enactments in Light of Formerly Existing Conditions and Evidence.**

Defendant-intervenors assert that §5 should be upheld solely because the Supreme Court has upheld previous enactments of preclearance in 1965 and 1975. *See* NAACP Memorandum 28-31. Their assumption is that if §5 preclearance is constitutional at one point in time, then it must follow that it will always be constitutional. That assumption is false. The Supreme Court in *Katzenbach* and *City of Rome* upheld the enactments of preclearance in 1965 and 1975, but that does not necessarily mean that preclearance remains a congruent and proportional remedy in 2007, more than 25 years after the Supreme Court last upheld the preclearance remedy. The fact that Congress had before it in 1965 and 1975 substantial evidence that states and local

governments were switching to new discriminatory devices to prevent the effective enforcement

of the VRA does not mean that Congress had similar evidence before it in 2006, and in fact the

record, though large in magnitude, demonstrates that Congress undeniably did not have evidence

of continuing practice-switching or "staying one step ahead of the federal courts" that existed

and was part of the congressional record in prior generations. *Beer v. United States,* 425 U.S.

130, 140, 96 S.Ct. 1357, 1364 (1976). What *Katzenbach* and *City of Rome* provide is a process

for determining whether Congress had before it sufficient evidence of that kind of conduct to

justify not merely the imposition of the substantive prohibitions of the VRA, but also the more

intrusive preclearance remedy that serves the additional and different purpose of injecting the

federal government into state and local legislative processes by creating a presumptive federal

veto to all election-related enactments at the state and local level.

     The defendant-intervenors attempt to bolster their support for §5 by suggesting that the

Supreme Court in *Lopez v. Monterey County* separately upheld the constitutionality of §5.

NAACP Memorandum 30. That is a misreading of the case. In *Lopez*, the state did not make a

general challenge to preclearance itself, but merely to its application to enactments of a

noncovered state that affected covered counties. 525 U.S. at 282, 119 S.Ct. at 703. The

Supreme Court determined that the county would have to preclear state enactments that affected

voting practices within the covered county, but the Court did not address the general

constitutionality of preclearance itself because California did not make that argument.

     Likewise, the fact that the Court has made reference to §5 in a number of its recent

federalism decisions addressing whether various congressional enactments are a congruent and

proportional exercise of Congress's enforcement powers under §5 of the Fourteenth Amendment

does not in the least suggest that the Supreme Court has in those decisions reaffirmed that

preclearance is and always will be a congruent and proportional remedy.  Rather, those decisions all provide an analytic framework for determining whether Congress has acted constitutionally in impinging on federalism principles by upsetting the relationship between the federal government and state and local governments.

City of Boerne and subsequent cases have noted that Congress acted constitutionally in 1965 and 1975 in light of the circumstances then before it.  *Fla. Prepaid*, 527 U.S. at 638-39, 119 S.Ct. at 2206-07; *Kimel*, 528 U.S. at 81-82, 120 S.Ct. at 643; *Morrison*, 529 U.S. at 626-27, 120 S.Ct. at 1759; *Garrett*, 531 U.S. at 373, 121 S.Ct. at 967; *City of Boerne*, 521 U.S. at 533, 117 S.Ct. at 2170-71.  But none of those cases contained an independent approval of §5 as enacted in 2006 and presently constituted.  To the contrary, each case stands for the obvious proposition that a congressional enactment must be evaluated based on the evidence before Congress at the time of the enactment, not based on events of a prior generation.  *City of Boerne* itself makes clear that the Supreme Court's imprimatur on earlier enactments of §5 was not an endorsement for perpetual reauthorization of that extraordinary remedy for all times and under all circumstances.  *City of Boerne* explains that limitations like "termination dates, geographic restrictions, or egregious predicates . . . tend to ensure Congress' means are proportionate to ends legitimate under §5."  521 U.S. at 533, 117 S.Ct. at 2170-71.  All three factors were evident in the 1965 enactment of §5.  *Id.* at 532-33, 117 S.Ct. at 2170.  Such factors could have no meaning if *Katzenbach's* upholding of a 5-year version of an emergency remedial provision passed in 1965 sufficed to validate extending that provision in perpetuity.

Each of the two previous enactments of §5 upheld by the Supreme Court had precise termination dates, which have long since passed.  *See City of Rome*, 446 U.S. at 181, 100 S.Ct. at 1564 (noting the 7-year termination date of the 1975 enactment).  *City of Boerne* recognized that

those time limits were part of what made those earlier enactments of §5 constitutionally appropriate legislation when they occurred. 521 U.S. at 533, 117 S.Ct. at 2170-71 (noting that the incarnation of §5 last upheld in *City of Rome* "lapsed in seven years"). It simply makes no sense to suggest, as defendant-intervenors do, that the cases sustaining prior, now-expired enactments of §5 "unequivocally sustain," NAACP Memorandum 1, the new enactment of §5 with its new, 25-year lifespan. Because the termination dates included in the 1965 and 1975 enactments of §5 were limitations important to finding those enactments constitutional, it cannot be that the Supreme Court's holdings that those enactments were appropriate simultaneously sanctioned the extension of §5 to 2031 and, presumably, beyond that date ad infinitum. The true effect of the Supreme Court's precedent regarding exercises of Congress's remedial enforcement powers under the Civil War Amendments is that this Court must seriously consider the constitutional appropriateness of this new enactment of preclearance—with its new commencement and termination dates—on its own terms and in its own context.

In addition to termination dates, the 1965 and 1975 enactments had the geographic restrictions that the Supreme Court also found contributed to their constitutionality. *Id.* at 533, 117 S.Ct. at 2170; *cf. Morrison*, 529 U.S. at 626, 120 S.Ct. at 1759 (invalidating the Violence Against Women Act's civil-remedy provision in part because it "applie[d] uniformly throughout the [n]ation," including to states with no history of discriminating against victims of gender-motivated violence). Importantly, each of those enactments employed a coverage formula using data from the most recent presidential elections. *See* 42 U.S.C. §1973*b*(b). The then timeliness of relevant proxy statistics could rationally be expected to impose meaningful geographic restrictions, appropriately confining §5 "to those regions of the country where voting discrimination had been most flagrant." *City of Boerne*, 521 U.S. at 532-33, 117 S.Ct. at 2170.

Analyzing the constitutionality of the 2006 enactment, by contrast, requires considering the appropriateness of geographic restrictions based on data that is now 35 or more years old.[22]  The relevance of statistics from the 1972 presidential election to the prevalence of invidious electoral gamesmanship in 2006 is, to say the least, far less obvious than its relevance to conditions persisting in 1975.  And Congress made no attempt to explain how 35- or 40-year old proxies could be relevant to conditions today.

Further, the Supreme Court has indicated that the bailout provision was important to tailoring the geographic and temporal scope of §5 preclearance.  *Id.* at 533, 117 S.Ct. at 2170 (noting that the bailout provision was intended "to ensure that the reach of the Voting Rights Act was limited to those cases in which constitutional violations were most likely (in order to reduce the possibility of overbreadth)" and noting also the provision for bailout in the 1975 version upheld in *City of Rome* (emphasis added)).  Defendants' reliance on bailout to support their assertion that §5 remains a congruent and proportional remedy while, at the same time, doggedly insisting that entities like the district cannot even pursue bailout borders on the disingenuous.  If the Court has reached the constitutional issue in this case, it can only mean that the bailout provision is of limited utility for appropriately restraining §5's reach.  Accordingly, the 2006 enactment of §5 could only be upheld if it were possible to show that proxies based on data up to 1972 draw geographic boundaries sufficiently congruous to contemporary problems in the first instance, without the need for tailoring those boundaries through the bailout mechanism.  *See Morrison*, 529 U.S. at 626, 120 S.Ct. at 1759.

---

[22] The Diaz intervenors appear to misconceive the district's argument regarding the outdated coverage formula as an attempt "[t]o define a constitutional mandate in terms of a federal statute."  Diaz Memorandum 5.  The point is that the terms of the coverage formula are proxies, nominally intended to geographically limit §5 to those areas of the country where constitutional mandates were being systematically violated on a pervasive basis.  *See, e.g.*, Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?*, 81 DENV. U. L. REV. 225, 231-232 (2003).  Because those proxies have not been updated in more than 30 years, there is no reason to believe that they draw the lines of the present-day geographic restrictions to coincide with any contemporary problem.

Relatedly, the preclearance "requirement was placed only on jurisdictions with a history of intentional racial discrimination in voting." *City of Boerne*, 521 U.S. at 533, 117 S.Ct. at 2170. Specifically, those jurisdictions had a demonstrated history "of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer*, 425 U.S. at 140, 96 S.Ct. at 1363 (quoting H.R. Rep. No. 94-196, at 57-58 (1975)). At the time of both earlier enactments, that "egregious predicate[]," *City of Boerne*, 521 U.S. at 533, 117 S.Ct. at 2170, was recent. *City of Rome*, 446 U.S. at 180-81, 100 S.Ct. at 1563-64; *Katzenbach*, 383 U.S. at 334, 86 S.Ct. at 822. The 2006 enactment of §5 can only be upheld, if at all, by a sufficient showing of a similarly egregious predicate close in time to 2006—an impossible standard that defendants do not even attempt to satisfy.

*Katzenbach* justified the original enactment of §5 as a provision with a five-year lifespan by characterizing it as a response to an acute emergency. 383 U.S. at 334-35, 86 S.Ct. at 821-822 (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231 (1934) (upholding Minnesota's mortgage relief laws as a response to the emergency of the Great Depression), and *Wilson v. New*, 243 U.S. 332, 37 S.Ct. 298 (1917) (upholding the reponse to a labor dispute threatening to stop all movement in interstate commerce)). Emergencies do not typically persist for 40 years and beyond. Indeed, if §5 had failed to resolve the emergency in 40 years, its efficacy and desirability as an emergency response must be called into serious question. Simply put, the Supreme Court's precedents addressing the preclearance requirement uniformly confirm that the 2006 enactment of §5 can only be upheld if Congress demonstrated that present-day circumstances in jurisdictions covered under 35-year-old criteria are still sufficiently exceptional to warrant the unique federal intrusion posed by the preclearance requirement.

Section 5, as enacted and approved by the Supreme Court in *Katzenbach* and *City of Rome*, was remedial of circumstances that existed in 1965 and 1975. But Congress emphatically did not find the same circumstances in 2006. Section 5 cannot be upheld simply to give effect to a policy of preventing voting discrimination, nor can it be upheld as a big-stick deterrent to root out second-generation vestiges of voting discrimination. To the contrary, §5 can only be upheld based on a substantial congressional record of states and local governments attempting to evade the substantive provisions of the VRA by enacting new and different discriminatory voting procedures, thus frustrating the traditional enforcement mechanisms for the VRA. Congress made no such findings in 2006, and preclearance can no longer be justified as a congruent and proportional response to circumstances that no longer exist a quarter century after the last reenactment of preclearance.

**B.    The 2006 Enactment of §5 Does Not Satisfy the Congruence and Proportionality Standard.**

Congress did not and could not demonstrate that the 2006 enactment of §5 was appropriate legislation. "As broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell*, 400 U.S. 112, 128, 91 S.Ct. 260, 266 (1970) (opinion by Black, J.). When purporting to enforce the Civil War Amendments, Congress cannot rewrite their substantive scope.[23] *See City of Boerne*, 521 U.S. at 519, 117 S.Ct. at 2164 ("Congress does not enforce a constitutional right by changing what the right is."). The distinction between

---

[23] In fact, however, Congress appears to have attempted to redefine part of the substantive rights at issue. Prior to the 2006 reauthorization, the Supreme Court held preclearance could only be denied for vote dilution when it was retrogressive, even if the Department of Justice believed it to be motivated by a discriminatory intent. *Reno v. Bossier Parish Sch. Bd.* (*Bossier Parish II*), 528 U.S. 320, 335-36, 120 S.Ct. 866, 875-76 (2000). In the 2006 reauthorization, Congress attempts to override *Bossier Parish II* "by clarifying that any voting change motivated by any discriminatory purpose is prohibited under Section 5." H.R. REP. NO. 109-478, at 68 (2006). But the Supreme Court has expressly noted that extending §5 preclearance to cover non-retrogressive discrimination would "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts . . . perhaps to the extent of raising concerns about § 5's constitutionality." *Bossier Parish II*, 528 U.S. at 336, 120 S.Ct. at 876. That is because a change must have both the purpose and *effect* of discriminating to be unconstitutional. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 641, 113 S.Ct. 2816, 2823 (1993); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 65, 100 S.Ct. 1490, 1498 (1980) (plurality opinion) (emphasis added).

49

"purportedly prophylactic legislation" and "substantive redefinition of the . . . right at issue," *Kimel*, 528 U.S. at 81, 120 S.Ct. at 644, "exists and it must be observed." *City of Boerne*, 521 U.S. at 520, 117 S.Ct. at 2164.

For prophylactic legislation to be a valid exercise of Congress's enforcement power, Congress must "identify conduct transgressing the . . . substantive provisions" of the relevant amendments and "tailor its legislative scheme to remedying or preventing such conduct." *Fla. Prepaid*, 527 U.S. at 639, 119 S.Ct. at 2207. To satisfy that standard, Congress must develop a "legislative record" that demonstrates a "history and pattern" of unconstitutional state conduct. *Garrett*, 531 U.S. at 368, 121 S.Ct. at 965; *accord Hibbs*, 538 U.S. at 729, 123 S.Ct. at 1978; *Fla. Prepaid*, 527 U.S. at 640, 119 S.Ct. at 2207. And, considered in light of that record, the purported prophylactic must not be "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532, 117 S.Ct. at 2170; *accord Garrett*, 531 U.S. at 372-73, 121 S.Ct. at 966-67. For a prophylactic remedy to be a valid use of Congress's enforcement powers under the Civil War Amendments, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520, 117 S.Ct. at 2165.

The Supreme Court has articulated a three-step process for determining whether a particular congressional enactment is a congruent and proportional exercise of Congress's remedial power under the Civil War Amendments. First, a court must identify the "metes and bounds of the constitutional right in question," *Garrett*, 531 U.S. at 368, 121 S.Ct. at 964, with "some precision." *Id.* at 365, 121 S.Ct. at 963. Second, it must ask "whether Congress identified a history and pattern" of unconstitutional deprivations of the relevant right. *Id.* at 368,

121 S.Ct. at 964.  Such a pattern must represent a "widespread and persisting deprivation of constitutional rights."  *City of Boerne*, 521 U.S. at 526, 117 S.Ct. at 2167.  Third, a court must determine whether the statutory remedy is congruent and proportional to the constitutional rights that are being enforced.  *Garrett*, 531 U.S. at 372, 121 S.Ct. at 966.

> **1.    Section 5 Cannot Be an Appropriate Prophylactic If It Is Not Congruent and Proportional to the Right to Be Free of Purposeful Discrimination in Voting.**
>
> > **a.    The Relevant Right Is the Right to Be Free of Purposeful Discrimination in Voting.**

For §5 to be an appropriate exercise of Congress's remedial enforcement powers it must be congruent and proportional to protecting the substantive constitutional right to vote as expounded by the Supreme Court.  *See Garrett*, 531 U.S. at 365, 121 S.Ct. at 963 ("[I]t is the responsibility of this Court, not Congress, to define the substance of constitutional guarantees."); *City of Boerne*, 521 U.S. at 519, 117 S.Ct. at 2164 (noting that Congress's enforcement power is not the power to decree substantive restrictions on the states).  The basic constitutional guarantee of the right to vote free of discrimination is stated in §1 of the Fifteenth Amendment: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

More precisely, the Supreme Court has explained that the Fifteenth Amendment guarantee is a guarantee against "*purposefully* discriminatory denial or abridgment by government of the freedom to vote."  *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 65, 100 S.Ct. 1490, 1498 (1980) (plurality opinion) (emphasis added); *accord Myers v. Anderson*, 238 U.S. 368, 379, 35 S.Ct. 932, 935 (1915); *Guinn v. United States*, 238 U.S. 347, 363-65, 35 S.Ct. 926, 930-31 (1915).  Thus, the Fifteenth Amendment prohibits measures implemented with the intent and effect of denying racial minorities access to the ballot.  *Holder v. Hall*, 512 U.S. 874,

922, 114 S.Ct. 2581, 2607 (1994) (Thomas, J., concurring) (listing examples of voting measures designed to deny ballot access).

To the extent §5 is also directed at enforcing the Fourteenth Amendment's Equal Protection Clause, that constitutional guarantee is also one against purposeful discrimination.  A plaintiff challenging an election scheme under the Fourteenth Amendment "must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination,'" *Mobile*, 446 U.S. at 66, 100 S.Ct. at 1499 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872 (1971) (alterations in original)).    That is, apportionment schemes that have the effect of diluting minority voting strength "violate the Fourteenth Amendment when they are adopted with a discriminatory purpose."  *Shaw v. Reno*, 509 U.S. 630, 641, 113 S.Ct. 2816, 2823 (1993); *see also, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 616-17, 102 S.Ct. 3272, 3274-75 (1982); *White v. Regester*, 412 U.S. 755, 765-66, 93 S.Ct. 2332, 2339-40 (1973).

According to defendants, §5 is best understood as an attempt to enforce the substantive prohibition on voting discrimination enshrined the Civil War Amendments.  But §5 does not directly target actual violations of those constitutional rights.    Instead, §5 presumptively invalidates every legislative enactment or administrative decision by covered jurisdictions that remotely affects the exercise of the right to vote regardless of whether such changes have any constitutionally impermissible effect or purpose.  *See, e.g.*, *Connor v. Waller*, 421 U.S. 656, 656, 95 S.Ct. 2003, 2003 (1975) (*per curiam*) (noting that local enactments subject to §5 "are not now and will not be effective as laws until and unless cleared pursuant to §5").  "[T]he extraordinary burden-shifting procedures of §5," *Reno v. Bossier Parish Sch. Bd. (Bossier Parish II)*, 528 U.S. 320, 355, 120 S.Ct. 866, 875 (2000), are thus not directed at actual discrimination already

committed but at a specific evil that, as of 1965, was making case-by-case adjudication an impracticable means of foreclosing constitutional offenses—the "one step ahead" problem. *Beer*, 425 U.S. at 140, 96 S.Ct. at 1363.

> **b.    The Importance of the Right to Vote Does Not Excuse Compliance with the Congruence and Proportionality Standard.**

The right to vote has been "regarded as a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071 (1886). No one—certainly not the district, which has in recent years focused on increasing electoral participation among its constituents—denies the importance of that right. But the importance of that right does not, as defendants suggest, alter the nature or stringency of the test for congruence and proportionality. Discussing *Katzenbach's* analysis of the constitutionality of provisions of the VRA, including specifically §5, as paradigmatic, *City of Boerne* makes clear that, however fundamental the right Congress seeks to enforce, a purported remedy that sweeps too broadly cannot be valid. *City of Boerne*, 521 U.S. at 525-26, 530, 117 S.Ct. at 2166-67, 2169.

The Supreme Court's observation in *Hibbs* that it "was easier for Congress to show a pattern of state constitutional violations" in the context of sex-based classifications, which received heightened scrutiny, than in areas invoking only rational basis scrutiny, *Hibbs*, 538 U.S. at 721-22, 123 S.Ct. at 1975, does not diminish the need to show that any prophylactic is congruent and proportional to remedying such violations or relax the standard for showing congruence and proportionality. *See id.* (upholding the Family Medical Leave Act only upon finding that it was "narrowly targeted at the faultline between work and family—precisely where sex-based overgeneralization has been and remains strongest—and affects only one aspect of the employment relationship" and had "many other" significant limitations and distinguishing it from the broader statutes invalidated in *City of Boerne*, *Kimel*, and *Garrett*). *Hibbs* merely

recognizes the unremarkable fact that more state activity of a certain type is likely to cross the constitutional line when it implicates rights accorded more constitutional protection. *Cf. Lane*, 541 U.S. at 530-31, 124 S.Ct. at 1992-93 (recognizing that Congress's power to enforce the fundamental right of access to judicial services does not imply a power to enforce a substantive right of access to, for example, hockey rinks). By the same token, a broad remedy is less likely to bring constitutionally benign activity within its scope when the constitutional right at issue is itself broad.

Conceived as a Venn diagram, the overlap between set A, the set of constitutional violations, and set B, the set of activities implicated by a remedial statute, is likely to be greater the larger set A is. But if the elements in the portion of set B that does *not* intersect with set A still outnumber those within the intersection, the remedy defining set B cannot be congruent and proportional to the problem defining set A.

Even in the context of the broad constitutional protection afforded the right to vote, that right is implicated—at best—in only a minute portion of the activity touched by §5. That disconnect between the protected right and what §5 actually does makes §5 incongruent and disproportional even to remedying the important right to vote, especially given the severe tension between §5 and the federal structure enshrined in the Constitution.

Section 5 covers a vast amount of clearly constitutional government activity in two distinct senses. First, the essence of §5 is that it compels state and local governmental units to invite an arm of the national government—in all but the rarest cases, the Executive Branch—into their legislative processes. It is certainly not unconstitutional for a state legislature to pass a bill into law or a local authority like the district's board to pass resolutions in a process that bypasses the federal government. *Cf. Allen v. State Bd. of Elections*, 393 U.S. 544, 596, 89 S.Ct. 817, 847

(1969) (Black, J., dissenting) (noting that "[p]roposals to give judges a part in enacting or vetoing legislation before it passed were made and rejected in the Constitutional Convention"); Shlomo Slonim, *Federalist No. 78 and Brutus' Neglected Thesis on Judicial Supremacy*, 23 CONST. COMMENT. 7, 28-29 (2006) (noting that the Constitutional Convention considered before ultimately rejecting a proposal by James Madison to give Congress the power to veto unconstitutional state legislation).  Second, out of the tens of thousands of changes submitted for preclearance over the past several years, the percentage actually found to present even arguable constitutional problems, and thus draw objection from the Department of Justice, is minute. Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After* Tennessee v. Lane, 66 OHIO ST. L.J. 177, 191-92 (2005) (noting that objections were "down to 0.05% from 0.23% in the last three five-year periods" up to 2005).  And even most of those objections do not signify any concern regarding the *purposeful* discrimination that is required for a constitutional violation.

Section 5 cannot satisfy the congruence and proportionality standard when it touches so much activity that is not related to the constitutional guarantee against purposeful voter discrimination.  *See Kimel*, 528 U.S. at 86, 120 S.Ct. at 647 (noting that the Age Discrimination in Employment Act failed to satisfy the standard because it "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable" constitutional standard); *Fla. Prepaid*, 527 U.S. at 646, 119 S.Ct. at 2210 (noting that, in the Patent Act, Congress "did nothing to limit the coverage . . . to cases involving arguable constitutional violations").  Like the Religious Freedom Restoration Act found to be invalid in *City of Boerne*, §5, as reenacted in 2006, is not "designed to identify and counteract state laws likely to be unconstitutional."  521 U.S. at 534, 117 S.Ct. at 2171.

2.    **Defendants Fail to Identify a Pattern of Relevant Constitutional Violations in the Congressional Record Sufficient to Support the Constitutionality of §5.**

The uniqueness of the §5 prophylactic demands a unique showing of specific, extraordinary evil before it can be justified as a legitimate use of Congress's enforcement powers. *See Miller*, 515 U.S. at 925, 115 S.Ct. at 2493. Alone among federal remedial provisions, §5 reaches into the heart of state government—injecting the federal government directly into the legislative and administrative processes of state governments and their political subdivisions.

Also uniquely among federal remedies, §5 is prospective and preemptive. It effectively imposes a guilty-until-proven-innocent standard that local governments must (and, particularly in recent years, virtually always do) satisfy before any constitutional infringement could possibly occur. By comparison, the legislative provisions addressed in *City of Boerne* and cases involving related federalism issues limited themselves to proscribing standards of conduct or purporting to abrogate state sovereign immunity for certain conduct. None of those enactments—even those held to be invalid—went so far as to preempt state and local legislative acts. Section 5 is certainly unlike any other federal provision the courts have ever upheld under the congruence and proportionality test.

a.    **Congress Failed to Find a Pattern of Preclearance-Related Constitutional Violations.**

In recent years there have been as many findings of constitutional violations against nonminority voters as there have of constitutional violations against minority voters. *See, e.g.*, *Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing Before the Senate Judiciary Committee*, 109th Cong. 109-545, at 161 (2006) (Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting*

*Rights Act*).  As race has become increasingly bound up in partisan politics, and race-based redistricting has been used by both major political parties in pursuit of partisan advantages, it can no longer be said that voting-related misconduct is directed only at minorities.  The defendant-intervenors' attempt to invoke the specter of widespread constitutional violations is unsupported and misplaced.

Nor can it properly be said that *Hibbs* and *Lane* clearly support the reenactment of preclearance.  *Hibbs*, *Lane*, *Garrett*, and *Kimel* all involved prohibitory enactments, *i.e.*, like §2.  *Hibbs*, 538 U.S. at 724-37, 123 S.Ct. at 1973-83, *Lane*, 541 U.S. at 516-17, 124 S.Ct. at 1984-85, *Garrett*, 531 U.S. at 360-61, 121 S.Ct. at 960-61, and *Kimel*, 528 U.S. at 66-69, 120 S.Ct. at 636-38.  None involved anything approaching the kind of interference with state and local government created by preclearance.  While defendant-intervenors attempt to suggest that preclearance is really no different than the enactments upheld in *Hibbs* and *Lane*, nothing could be further from the truth.  This lawsuit does not challenge the constitutionality of any direct prohibitory enactment contained in the VRA, but rather assumes that Congress has acted constitutionally in prohibiting state and local governments from undertaking conduct that would discriminate against minority voters or give effect to racial bloc voting in a way that disadvantages minority voters.  But that assumption cannot simultaneously justify the constitutionality of preclearance itself because preclearance interferes with the functioning of state and local government in a far more significant and intrusive way than do the substantive provisions of the VRA or, for that matter, than did the prohibitory enactments at issue in *Hibbs* or *Lane*.

If, as the Attorney General seems to assert, that preclearance may be imposed as long as Congress enacts certain prohibitory laws within its authority under §5 of the Fourteenth

Amendment or §2 of the Fifteenth Amendment, then Congress may impose preclearance requirements on state and local governments over a broad range of federal enactments that have been upheld against constitutional challenge. For example, given that the Family Medical Leave Act has been sustained against constitutional challenge, under the Attorney General's analysis, Congress could simply require every state government and political subdivision to obtain approval from the Department of Justice before putting into effect any human resources leave policy. The simplicity with which Congress could create federal oversight of the inner workings of state and local governments is contrary to the long-running understanding of the courts and constitutional experts. It is also contrary to a proper understanding of the Supreme Court's decisions in *Katzenbach* and *City of Rome*.

Despite the unique characteristics of preclearance, neither Congress nor defendants have made any attempt to show a pattern of constitutional violations that are intrinsically linked to the peculiar nature of preclearance. Instead, the Attorney General relies heavily on congressional authority to remedy past violations of constitutional rights by "prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter unconstitutional conduct." Attorney General Memorandum 9 (quoting *Hibbs*, 538 U.S. at 721-22, 727-28, 123 S.Ct. at 1974, 1977). Nobody disputes Congress' power to remedy past violations of constitutional rights or even its authority to prohibit some conduct that may itself not be unconstitutional. *See Georgia*, 546 U.S. at __, 126 S.Ct. at 881. That is precisely what Congress has done in the primary substantive provisions of the VRA, like §2 and §203, which prohibit much conduct that is not itself a violation of the Constitution. But contrary to the Attorney General's assertion, §5 is not that kind of legislation. Preclearance does not in and of itself directly prohibit discriminatory conduct by states and localities. Rather, it prophylactically changes the structure

of state government by interposing the threat of a federal veto that is costly and difficult to override.  Rather than merely telling states and local governments that certain kinds of voting changes are outlawed under federal law, preclearance reconstitutes the relationship between federal and state governments, and it does so only in limited geographic areas based on criteria established more than 30 years ago.

For such an intrusion to be justified, there must be a showing—as in *Katzenbach*—of a systematic pattern of covered jurisdictions recently engaging in concerted efforts to game the system to the disadvantage of minorities by acting preemptively to impose new barriers to voting once old barriers are judicially deemed unenforceable.  *See Miller*, 515 U.S. at 925, 115 S.Ct. at 2493.  Circumstances in which case-by-case adjudication cannot keep up with a vicious circle of unconstitutional conduct present the only conceivably justifiable basis for inverting the traditional concept that constitutional violations are not ripe for prosecution until they have already occurred or are at least imminent.  *See Beer*, 425 U.S. at 140, 96 S.Ct. at 1363.  The Supreme Court has made clear that the federalism costs exacted by §5 must be taken seriously and can only be justified by a real, specific problem.  *See Miller*, 515 U.S. at 926-27, 115 S.Ct. at 2493 (noting that the Court's belief that "the federalism costs exacted by §5 preclearance could be justified by those extraordinary circumstances" identified in *Katzenbach*, 383 U.S. at 327, 337 86 S.Ct. at 818, 823 (*i.e.*, "some States' 'extraordinary stratagem[s] of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees'") did not mean §5 could be justified by all circumstances (alteration in original)).

The Supreme Court's recent decisions in *Hibbs* and *Lane* continue to apply the rule that prophylactic legislation must be supported with a legislative record reflecting a history and

pattern of relevant unconstitutional state conduct.  In *Hibbs*, considering the validity of the FMLA, the Court "inquire[d] whether Congress had evidence of a pattern" of sex discrimination in the workplace by states.  538 U.S. at 729, 123 S.Ct. at 1978.  A thorough review of that legislative record demonstrated that it was "weighty enough to justify the enactment of prophylactic [Enforcement Clause] legislation."  *Id.* at 735, 123 S.Ct. at 1981.  Similarly, *Lane* upheld a portion of the Americans with Disabilities Act as a valid prophylactic protecting the right of access to courts when the record regarding discrimination in the provision of public services "far exceed[ed] the record in *Hibbs*."  541 U.S. at 529, 124 S.Ct. at 1992.  *Hibbs* noted "the extent and specificity of the [] record of unconstitutional state conduct."  538 U.S. at 735 n.11, 123 S.Ct. at 1981 n.11.  In *Lane*, too, the Court considered the extent of the legislative record with respect to the specific conduct found to implicate the relevant constitutional right— in that case, the right of access to public services.  541 U.S. at 529, 124 S.Ct. at 1992.

The Court in *Katzenbach* and *City of Rome* made clear that it was affirming the constitutionality of preclearance against a unique and egregious set of circumstances that existed under which certain jurisdictions had made enforcement of federal law ineffective by simply enacting new discriminatory voting practices when the old ones were struck down.  Congress did not even attempt to find or declare that similar circumstances exist today or that other substantive provisions of the VRA, including §2 and §203, are ineffective because of state and local governments' bad-faith gaming of the system.  Despite their best efforts, defendants are unable to demonstrate that the record adduced by Congress in the 2006 enactment of §5, massive though it may be, contains any meaningful evidence of a pattern of the specific conduct addressed by §5 to warrant that provision's severe incursion into the federal structure.

Defendants incorrectly assert that the Supreme Court in *Katzenbach* upheld §5 simply because of the history of voting discrimination in the South. Although the Court made reference of the various methods and devices that had been designed to prevent minorities from voting, *Katzenbach*, 383 U.S. at 310-12, 86 S.Ct. at 809-10, the Court did not justify preclearance by reference to those methods and devices themselves,[24] but rather because "Congress knew that some of the States covered by §4(b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *Id.* at 335, 86 S.Ct. at 822. So, in addition to the fact that the methods and devices to which the Court pointed in *Katzenbach* no longer exist, the underlying justification for §5—that state and local governments frequently changed those devices to stay ahead of the courts—also no longer exists. And Congress in 2006 found neither that those circumstances exist nor that there was any likelihood that those practices would reemerge if preclearance was not reenacted.

The Attorney General's recounting of what he believes were the core findings that Congress made in authorizing and reauthorizing §5 in 1965, 1970, 1975, and 1982 demonstrates how different the legislative record was in 2006. Although Congress last year clearly found that the country has not achieved all of the goals of the VRA, the kinds of discriminatory and intimidating conduct recited in the congressional record of earlier enactments clearly demonstrates that today's America does not even remotely resemble the troubled times of the 1960s and 1970s.

Beyond that, the Attorney General suggests that §5 can be justified so long as Congress makes any finding of continued failure to achieve full participatory parity by minority voters.

---

[24] Most of the Court's discussion of various provisions had more to do with the fact that much of the entire act was being challenged, not because those facts were particularly relevant to the §5 analysis.

Although §5 was never seriously challenged after the 1982 amendments to the VRA, including the reenactment of §5, still congressional approval of the continuation of preclearance 25 years ago was necessarily based on the same kinds of circumstances that existed in 1965 and 1975. Today, although Congress may have authority to regulate or forbid practices that have the effect of diluting the voting strength of minority voters, a point on which the Supreme Court is not united, *compare League of United Latin Am. Citizens v. Perry*, __U.S.__, 126 S.Ct. 2594, 2612-23 (2006) (finding a §2 violation due to vote dilution) *with id.* at 2662 (Scalia, J., concurring in the judgment in part and dissenting in part and citing *Holder*, 512 U.S. at 891-946, 114 S.Ct. at 2591-2619 (Thomas, J., concurring in judgment)) (urging dismissal of vote-dilution claim for failure to state a claim), stopping dilutive redistricting or at-large elections is not a proper constitutional foundation for continuing preclearance well into the 21st century.

The district does not challenge Congress's reauthorization of §5 in 1975 and 1982, and it is possible that, even in 1982, Congress could legitimately have extended §5 for another short period to ensure that early gains in minority political participation would not be destroyed "through new (discriminatory procedures and techniques)." *Beer*, 425 U.S. at 140-41, 96 S.Ct. at 1364. But those original reenactments, only a half a generation or less after the original enactment in 1965, cannot justify the continuation of preclearance in 2006, a quarter century after the last reenactment and more than 40 years after the original temporary enactment.

The Attorney General attempts to support the 2006 reenactment of preclearance by asserting that Congress relied on the same types and sources of evidence that it had relied on in previous reauthorizations. Attorney General Memorandum 18. That is untrue. Although Congress found that certain second-generation barriers to full participation still exist and that there remain certain vestiges of the discrimination that Congress previously found, Congress did

not find that the same level of first-generation barriers still exist and, more importantly, Congress made no findings at all that any covered or noncovered state or local political subdivisions have recently engaged in or are likely to engage in the kind of discriminatory gamesmanship on which Congress grounded its original passage of preclearance and to which the Supreme Court looked in upholding the constitutionality of §5 in its earliest enactments.

**b.**  **Increasingly Rare DOJ Objections and MIRs Do Not Show Congruence or Proportionality.**

In his false assertion that Congress relied on the same types of evidence that it used in its original enactment of preclearance in 1965, the Attorney General also asserts that the number and rate of justice department objections was slightly higher from 1982 to the present than from 1965 to 1982. Attorney General Memorandum 20. In so contextualizing the evaluation, the Attorney General attempts to evade the undisputable evidence that the rate of objections to preclearance submissions has been negligible in recent years. The Attorney General's attempt to use aggregated numbers of §5 objections and lawsuits over the past quarter century presents no meaningful data justifying the reenactment of §5 using the same coverage formula and applicability put in place more than three decades ago.

"[T]he Department of Justice reported that roughly between 4,000 and 6,000 submissions have been received annually from jurisdictions covered by the VRA," and "more Section 5 objections were lodged between 1982 and 2004 than were interposed between 1965 and 1982." H.R. REP. NO. 109-478, at 21, 36. But reliance on these statistics is a "poor prox[y] for intentionally discriminatory state action in voting, for a number of reasons." Hasen, *supra* at 190. The number of submissions only proves that "states and local jurisdictions covered by Section Five have been endeavoring to make a large number of changes in voting practices and procedures and submitting those changes to DOJ for approval." *Id.* The raw number of

63

objections—taken, as they are by the Attorney General, out of context—fails to account for the significant increase in the number of submissions over time. Objections as a percentage of submissions have drastically decreased in the past forty-two years: "Objection rates exceeded 4% of total submissions in the first five years of the Voting Rights Act. They fell precipitously to 1.31% in the next five-year period and have been falling steadily ever since, down to 0.05% from 0.23% in the last three five-year periods." *Id.* Thus there is "very little in the DOJ evidence that Congress could use to support a case for a renewed Section Five." *Id.* In short, the raw number of objections in recent years is no evidence of a "widespread and persisting deprivation," *City of Boerne*, 521 U.S. at 526, 117 S.Ct. at 2167, when the *proportion* of those objections to *all* submissions is a minute fraction of a percent. Moreover, in the 1980s and 1990s many objections were made on improper grounds under an interpretation of the preclearance statute that the Supreme Court later rejected. *See Bossier Parish I*, 520 U.S. at 477, 117 S.Ct. at 1497.

The very evidence on which the Attorney General relies in fact establishes conclusively that, if any gamesmanship occurs in covered jurisdictions today of the type that justified the 1965 §5 remedy it is the farthest thing from prevalent. In the past 10 years, the overall number of objections and the corresponding rate of objection have been so vanishingly small as to lay bare any serious claim that §5 acts as anything other than a symbolic assertion of federal supremacy intended to perpetuate the fiction that states and localities cannot be trusted to enact fair and nondiscriminatory voting practices and procedures. The Attorney General's attempt to sweep into the evaluation events that occurred 20 or 30 years ago cannot serve as a shield against the undisputable truth that §5 has been only rarely exercised to prevent arguably discriminatory conduct in recent years.

Moreover, the government's assertion that more information requests (MIRs) deterred more changes than did formal objections in recent years, *see* Attorney General Memorandum 32, is misleading in that the number of formal objections has been so infinitesimal in recent years that any number of MIRs will necessarily have a larger impact than objections that essentially are never made.

### 3. Preclearance Is Not a Congruent or Proportional Response.

The congruence and proportionality standard is similar to a narrow tailoring standard, because it examines the fit between the asserted constitutional right, the evidence of a pattern of violations, and the remedial choice made by Congress. Neither Congress nor the Attorney General nor the defendant-intervenors perceive any difference in the nature of the showing needed to justify the VRA generally and the reenactment of a provision so intrusive and so inherently counter to our historical understanding of the relationship of the federal and state governments. Because neither Congress nor defendants could demonstrate a direct connection between preclearance and the perceived continuing need to alleviate second-generation barriers, defendants offer an array of alternative arguments to justify preclearance. These alternatives— the big-stick theory of enforcement, a continuing presumption of bad faith by all covered jurisdictions, and the claimed inadequacy of traditional enforcement mechanisms—are all insufficient to declare preclearance congruent and proportional.

### a. The Most Intrusive Remedy, Even if Perceived to Be Effective, Is Neither Congruent Nor Proportional.

Defendants generally assert that preclearance may be properly extended in view of evidence that it has been effective not only in stopping the legislative end-runs that were the focus of Congress when it originally enacted §5, but also because the preauthorization requirement of §5 continues to stop other perceived forms of discriminatory enactments. But it

is not enough to conclude that §5 has been effective over the more than 40 years that it has been in effect. If that were true, then no effective temporary measure would ever need to end. The fact that there may be more work to do to stamp out all discrimination in voting is simply not a constitutional basis to continue §5. That is why Congress has constitutional authority to prohibit state and local governments from discriminating in voting practices, but that power does not mean that Congress may indefinitely interfere with the functioning of state and local government by inserting the federal executive into the state and local legislative process. Section 5 cannot be justified simply because it is the biggest gun in the federal arsenal. That kind of constitutional analysis stands federalism principles on their head, favoring the most intrusive and blunt remedy over equally effective but more narrowly tailored tools.

Defendants improperly view §5 as a general license to improve voting rights through the discretionary use of the preclearance power, even though it is rarely used to permanently stop any changes. By seeking to justify preclearance simply because it is an effective big stick against state and local governments, the Attorney General ignores the intrusive nature of preclearance and the substantial political risks created by the continuation of §5. The Attorney General no longer recognizes the historic values of federalism on which preclearance intrudes but sees only a means to keep in place a federal veto over state and local voting-related enactments that the Department of Justice may believe to be discriminatory, even though that power is but rarely used. Just like Congress, the Attorney General makes no attempt to justify the reenactment of §5 on anything other than general grounds relating to the overall goals of the VRA, so that the so-called evidence used to justify §5 is indistinguishable from the evidence that might be used to justify §2.

Similarly, throughout the longest portion of the defendant-intervenors' brief, they recount the evidence before Congress that they believe justifies its reenactment in 2006. NAACP Memorandum 35-69.   This lengthy recitation summarizing the evidentiary record before Congress amply demonstrates that defendant-intervenors, like the Attorney General, believe that preclearance may be constitutionally justified as a big-stick deterrent to the substantive prohibitions of the VRA.   In their view, contrary to the analysis set out by the Supreme Court in *Katzenbach* and *City of Rome*, there is no need to demonstrate that states and local governments have continued to play a legislative shell game with the federal courts to eviscerate the substantive provisions of the VRA.   That assumption by Congress, and furthered by the Attorney General and the defendant-intervenors, would, if adopted, permit Congress to enact a preclearance-like procedure intruding into the states' sovereignty anytime Congress may enact a substantive prohibition pursuant to §5 of the Fourteenth Amendment.   The Supreme Court has never so much as suggested that that would be permissible.

That §5 has been an effective remedy, Attorney General Memorandum 47, does not necessarily lead to the conclusion that Congress should or may continue to keep it in place indefinitely.   Again, under the Attorney General's big-stick theory, once Congress perceives a continuing need for a federal remedy to perceived ongoing voting discrimination and vote dilution, it does not follow that Congress can or should enact the most extreme remedy available without serious consideration of the damage being done to the traditional balance between the federal government and the states.   The district does not dispute that preclearance can deter conduct in violation of the Constitution and the VRA.   But the fact that it does so by interjecting a federal veto authority over inherently nonfederal decisions by state and local governments should caution Congress against using the most blunt instrument available to it, particularly in

light of the extreme disruption to the federal-state relationships and balance that have always been zealously guarded by the courts and the intrusion into which has been permitted only in the voting rights area and under the extreme circumstances that existed more than a generation ago.

> **b.    After Decades of Increasingly Successful Compliance, Congress May No Longer Employ a Presumption That States and Local Governments Will Act in Bad Faith.**

At their core, defendants' arguments in favor of preclearance are grounded entirely in a presumption that state and local governments in covered areas are incapable of acting in good faith for the benefit of all citizens who reside in those political subdivisions with regard to voting-related enactments.  In the 1960s and 1970s, there may have been sufficient evidentiary basis to constitutionally justify that kind of interference with the functioning of state and local government in those jurisdictions, but whatever may have existed three or four decades ago, the evidentiary record does not support that kind of conclusion in today's America.

Only if one is willing to accept the presumption that state and local governments in covered areas are incapable of acting in good faith toward minority voters can one even begin to justify the intrusive nature of preclearance.  But if, as the evidentiary record strongly suggests, local government by and large actively and effectively seeks to follow and give effect to both the letter and the spirit of the VRA, then one can no longer justify a regime in which every state and local enactment or change regarding voting must be submitted to the Department of Justice for its approval before it can become effective. Particularly given the miniscule proportion of submissions to which any objection is made today, there is no basis to employ a presumption of bad faith against local jurisdictions, and it is clear that the preclearance process makes it more difficult for political subdivisions to make beneficial changes in voting practices because it interposes an additional layer of federal bureaucracy and uncertainty that impedes the legislative process for state and local governments considering possible changes to voting practices.

The Attorney General's suggestion that the use of federal observers can justify §5 puts the cart before the horse. Indeed, the Attorney General's assertion that §5 must be kept in place to permit the Attorney General to continue to use federal election observers demonstrates that these preclearance remedies are based in a presumption of bad faith by all covered states and political subdivisions within them, *i.e.*, that states and local governments are unable or unwilling to follow the requirements and spirit of the VRA. But there was no evidence before Congress to justify that kind of a conclusion regarding covered jurisdictions, whether considered by themselves or in comparison with noncovered jurisdictions.

>        **c.**        **The Perceived Inadequacies of §2 Do Not Make §5 Either Congruent or Proportional.**

In addition to the fact that the Attorney General relies mostly on ancient history, Congress in 2006 did not find and could not have found that the anecdotal reports that it recites in the legislative history could not have been remedied by ordinary litigation under the substantive provisions of the VRA. An alleged incident of discriminatory action in the voting rights arena cannot justify the reenactment of §5 if provisions of state or federal law could have been used to correct the condition through ordinary litigation or if Congress could enact an effective prohibition that could be used to prevent discriminatory actions.

Defendants recite at great length a number of anecdotal accounts of various state or local enactments to which the Attorney General objected over the past two decades. Nowhere in defendants' memoranda, or in the congressional record, is there any hint that these alleged problems in voting practices could not have been remedied through §2 litigation or other litigation under either the VRA or state law. But neither Congress in 1965 nor the Supreme Court in upholding §5 missed that distinction. In the very different society and circumstances in which the VRA was originally passed, both Congress and the Supreme Court went out of their

way to justify preclearance as necessary not simply because voting problems existed, but because VRA legislation at that time could not have been effective without the stand-still provisions of preclearance, *see Katzenbach*, 383 at 335, 86 S.Ct. at 822, for which there is no support in the 2006 legislative record.

Defendants' recitation of various anecdotes relating to specific instances in which the Department of Justice has interposed an objection to a preclearance submission says nothing about the continuing need for preclearance. The anecdotes are situations that could have been as effectively addressed by a §2 lawsuit. The fact that using §5 is more convenient than proving up a §2 case is not grounds to support the constitutionality of §5, because, once again, that argument is grounded in the assumption that state and local governments cannot be trusted and that Congress may utilize the biggest stick available to it, regardless of the impact on state sovereignty and traditional notions of federalism.

The same is true of the government's argument attempting to support preclearance based on the numbers and asserted effectiveness of the Department of Justice's requests for more information. Again, the fact that the Department has been able to force states and local governments to withdraw or modify various changes based on administrative expressions of concern regarding a proposed change does not help justify §5. Rather, the government's satisfaction in its ability to require state and local governments to rethink submitted changes without having to formally object to a submission heightens the concern regarding the political risks created by preclearance. The fact that the preclearance regime permits federal administrative browbeating of state and local governments simply highlights the extent to which preclearance improperly injects the federal government into the heart of the local legislative process.

As has already been seen, the anecdotes and alleged examples of discriminatory conduct by states or political subdivisions in covered jurisdictions all could have been remedied by use of the prohibitory provisions of the VRA.  The Attorney General makes no effort to claim otherwise.  Instead, the Attorney General simply asserts that reported §2 violations that lasted into the 1980s and 1990s are, by themselves, sufficient justification for the reenactment of §5.  But, as the Attorney General's own evidence notes, those kinds of §2 cases tailed off significantly in the latter half of the 1990s and early years of the 2000s.  Moreover, because §2 has been widely acknowledged to be an effective remedy against alleged acts of discrimination in voting practices, the Attorney General cannot rationally rely on information regarding alleged §2 violations to support a supplemental remedy that is completely different in nature, and particularly one that so completely destroys the autonomy of states and local governments in covered jurisdictions over voting practices and procedures.

Like the Attorney General's other asserted justifications for preclearance, his assertion that §2 is an inadequate remedy to address discrimination in voting is self-defining and would authorize a preclearance-type remedy in every area in which Congress may constitutionally regulate the activities of state and local governments.  For example, the Attorney General's assertion that §2 is inadequate simply because it imposes "an after-the-fact remedy," Attorney General Memorandum 49, is always true when Congress authorizes the judiciary to enforce a federal enactment.  Moreover, the government's assertion that litigation is ineffective because it may take a period of years to reach a final judgment is simply false because it discounts the availability of temporary injunctive relief under which a federal court can temporarily stop or modify a voting practice or procedure that it believes may be in violation of §2 as well as the court's power to interlocutorily authorize appointment of federal observers.  *See* 42 U.S.C.

§1973*a*.  Rather than taking years to achieve a federal remedy, §2 lawsuits frequently result in an effective temporary remedy almost immediately upon the filing of the lawsuit, which remains in place during the pendency of the lawsuit and is either lifted or replaced with permanent injunctive relief at the time of a final judgment.  *See id.*; *see also, e.g.*, *Dillard v. Crenshaw*, 640 F.Supp. 1347, 1356-57, 1360-61 (M.D. Ala. 1986) (granting preliminary injunction due to likelihood of prevailing on Section 2 claim); *Harris v. Siegelman*, 695 F.Supp. 517, 521 (M.D. Ala. 1988) ("the court issued a preliminary injunction").

Likewise, the assertion that §2 litigation is inadequate because of the financial burden of litigating a claimed improper election practice is undercut by the availability of fee-shifting under the VRA.  *See* 42 U.S.C. §1973*l*(e).  Indeed, many of the groups involved in this case as defendant-intervenors or counsel for defendant-intervenors obtain a significant degree of funding through fee awards as a result of litigation brought under the VRA.  *See, e.g.*, *Williams v. Bd. of Comm'rs of McIntosh County*, 938 F.Supp. 852 (S.D.Ga. 1996).  This fee-shifting remedy is well known and so frequently utilized that numerous advocacy groups throughout the United States obtain sustaining funding through the initiation and the litigation of lawsuits under the VRA.  To suggest that either individual voters or groups of voters are unable to enforce their voting rights through litigation is plainly contrary to the statutory language, its frequent usage, and common sense.

Finally, most legislative enactments authorizing their enforcement through civil litigation place the burden on the suing plaintiff to demonstrate that the statutory provision has been violated.  Section 2 of the VRA is not ineffective simply because it follows this time-honored tradition, nor is it ineffective simply because §5, as it is presently constituted, gives effect to a presumption that states and local governments do not act in compliance with the VRA by

imposing the burden on the state or local government defendant in §5 litigation. If Congress believes that §2 cannot be effectively enforced by retaining the burden on the plaintiff, it may act to shift that burden, but the fact that Congress has not done so does not make §2 inadequate.

Although Texas is a covered jurisdiction solely based on proxies intended to align with discrimination against language minorities in the 1960s and early 1970s, the Attorney General makes no argument whatsoever linking the asserted necessity for reenacting §5 to the asserted discrimination against language minorities. Of course the Attorney General does not contest that the original rationale for including Texas as a covered jurisdiction in 1975—*i.e.*, failure to provide Spanish-language voting materials despite a sizable Spanish-speaking population—was long ago remedied. The Attorney General's discussion of registration rates and turnout rates of Latino voters in Texas and Florida makes no attempt to link the statistics offered to either §5 or acts of alleged discrimination more generally. To the contrary, the Attorney General simply reports a disparity in registration and participation rates and makes no effort to demonstrate how §5 could remedy those disparities or how the absence of §5 would, in the least, aggravate them. The evidence of disparities in noncovered jurisdictions is similar or worse[25] and the Attorney General makes no attempt to explain how §5 has had or in the future will have any material impact on how those disparities will eventually be dissolved.

---

[25] *See, e.g.*, Additional Views of Senators John Cornyn and Tom Coburn, S. Rep. No. 109-295, at 26 (2006) ("Today, the voter registration rate among blacks, for example, in covered jurisdictions is over 68.1 percent of the population—higher than the 62.2 percent found in non-covered jurisdictions…covered jurisdictions have demonstrated equal or higher voter registration rates among black voters as non-covered jurisdictions since the mid 1970's. Voter turnout data is equally encouraging, with 60 percent of black citizens casting votes in both covered jurisdictions and non-covered jurisdictions."); *Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing Before the Senate Judiciary Committee*, 109th Cong. 109-545, at 155 (2006) (Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act*) (noting that Texas's percentage of Latino voter registration is more than 10 points higher than the national average and several points higher than in California and Colorado, noncovered states with substantial Latino populations).

**C.    The 2006 Enactment of §5 Cannot Be Supported By the Elections Clause.**

Finally, borrowing from the efforts of commentators concerned about the constitutionality of preclearance, the Attorney General halfheartedly, and defendant-intervenors more expressly, suggest that §5 may also be regarded as an attempted exercise of Congress's power under the Elections Clause. *See* U.S. CONST. art. I, §4 ("The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators.") That suggestion has no merit as a general matter and, in particular, has no relevance to whether Congress can constitutionally apply §5 to a purely local political subdivision like the district, which has nothing to do with federal elections.

Any power that Congress may have to regulate the conduct of congressional elections cannot conceivably extend to the district's promulgation of practices for electing its board of directors, especially given that the district's elections are not even held at the same time as federal elections under Texas law. *See Oregon*, 400 U.S. at 130, 91 S.Ct. at 268 (opinion by Black, J.) (announcing the Court's judgment that Congress's statutory imposition of an 18-year-old minimum voting age was invalid as applied to state and local elections although valid as applied to federal elections); *see also* Ellen D. Katz, *Congressional Power to Extend Preclearance: A Response to Professor Karlan*, 44 HOUS. L. REV. 33, 46 (2007) (attempting to defend the constitutionality of §5 but acknowledging that, even if the Elections Clause lends any support, that clause "does not reach purely local elections"). The Elections Clause, which has never been used to support section 5, could not in any event be used to support the application of preclearance to the district, because it is undisputed that district elections are entirely separate from the elections for federal senators and representatives, and the spring elections at which the districts directors are selected have no federal officials on the ballot. *See* 2 U.S.C. §7 (setting

federal elections for November); TEX. ELEC. CODE §41.001(a)(1) (providing for a uniform election date in May).

**CONCLUSION**

For these reasons, the Court should deny the motions for summary judgment by defendant and defendant-intervenors and grant the district's motion for summary judgment.

DATED:  June 15, 2007                    Respectfully submitted:

                                         /s/ Gregory S. Coleman
                                         Gregory S. Coleman
                                         (admitted *pro hac vice*)
                                         Christian J. Ward
                                         (admitted *pro hac vice*)
                                         PROJECT ON FAIR REPRESENTATION
                                         YETTER & WARDEN, L.L.P.
                                         221 West 6th Street, Suite 750
                                         Austin, Texas  78701
                                         [Tel.] (512) 533-0150
                                         [Fax]  (512) 533-0120

                                         /s/ Erik S. Jaffe
                                         Erik S. Jaffe
                                         D.C. Bar No. 440112
                                         ERIK S. JAFFE, P.C.
                                         5101 34th Street N.W.
                                         Washington, D.C .20008
                                         [Tel.] (202) 237-8165
                                         [Fax]  (202) 237-8166

                                         *Attorneys for Plaintiff*
                                         *Northwest Austin Municipal*
                                         *Utility District No. One*

## CERTIFICATE OF SERVICE

I hereby certify that I served Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' and Defendant-Intervenors' Motions for Summary Judgment upon counsel for the parties indicated below through the Court's electronic case filing system on June 15, 2007.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

*Counsel for Defendant*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland  21215

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
    EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas  78205

*Counsel for Intervenors-Defendants Lisa
Diaz, Gabriel Diaz, and David Diaz*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C.  20003

*Counsel for Intervenors-Defendants Lisa Diaz,
Gabriel Diaz, and David Diaz*

Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York  10013

*Counsel for Intervenors-Defendants Rodney
and Nicole Louis for Applicants by Winthrop
Graham, Yvonne Graham, Wendy
Richardson, Jamal Richardson, and Marisa
Richardson*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
    FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.  20005

*Counsel for Intervenors-Defendants Rodney and
Nicole Louis and for Applicants by Winthrop
Graham, Yvonne Graham, Wendy Richardson,
Jamal Richardson, and Marisa Richardson*

David J. Becker
dbecker@pfaw.org
People for the American Way Foundation
2000 M Street NW, Suite 400
Washington, D.C.  20036

*Counsel for Intervenor-Defendant People
for the American Way*

Max Renea Hicks
rhicks@renea-hicks.com
1250 Norwood Tower
114 West 7th Street
Austin, Texas  78701

*Counsel for Intervenor-Defendant Travis County*

J. Gerald Hebert
jghebert@comcast.net
5019 Waple *Lane*
Alexandria, Virginia  22304

*Counsel for Intervenor-Defendant Travis
County*

Laughlin McDonald
Neil Bradley
courtfilings@aclu-nca.org
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, Georgia  30303

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Lisa Graybill
Legal Director
courtfilings@aclu-nca.org
ACLU FOUNDATION OF TEXAS
1210 Rosewood Ave.
Austin, Texas 78702

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Art Spitzer
artspitzer@aol.com
courtfilings@aclu-nca.org
Legal Director
ACLU OF THE NATIONAL CAPITAL AREA
1400 20th Street N.W., Suite 119
Washington, D.C. 20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jose Garza
jgarza@trla.org
Judith A. Sanders-Castro
George Korbel
Texas RioGrande Legal Aid, Inc.
1111 N. Main Street
San Antonio, Texas 78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Alpha Hernandez
ahernandez@trla.org
Eloy Padilla
epadilla@trla.org
Texas RioGrande Legal Aid, Inc.
309 Cantu Street
Del Rio, Texas 78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael T. Kilpatrick
mkirkpatrick@citizen.org
Brian Wolfman
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, N.W., Suite 350
Washington, D.C. 20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

*Counsel for Intervenor-Defendant Nathaniel Lesane*

/s/ Christian J. Ward
Christian J. Ward

NW MUD – Exhibits to Response to Motions for Summary Judgment

| Exhibit No. | | Description |
|---|---|---|
| 1 | | 1994 Official Canvass Report |
| 2 | 4/4/96 | Preclearance letter and response |