IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NORTHWEST AUSTIN MUNICIPAL                )
UTILITY DISTRICT NUMBER ONE,              )
                                          )
            Plaintiff,                    )
                                          )
        v.                         )    Civil Action No. 1:06-cv-1384
                                          )
ALBERTO R. GONZALES,                      )    Three-judge court
Attorney General of the United States,    )    (PLF, DST, EGS)
*et al.*,                                 )
                                          )
           Defendants.                   )
_____)

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    PLAINTIFF IS NOT ELIGIBLE TO SEEK BAILOUT
      UNDER SECTION 4(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    There Is No Dispute That Plaintiff Does Not Fall Within The First Or
            Third Categories Of Jurisdictions Eligible To Seek A Bailout . . . . . . . . 3

      B.    Nor Does Plaintiff Qualify For The Second Category Of Jurisdictions
            Eligible To Seek A Bailout Because Plaintiff Is Not A "Political
            Subdivision" As That Term Is Defined In The Voting Rights Act . . . . . . . 5

      C.    Sheffield And Dougherty County Do Not Support Plaintiff's Claims . . . . 9

      D.    The Attorney General's Procedures Accurately Reflect The Act . . . . . . 10

      E.    This Court Need Not Address Whether Plaintiff Satisfies Other
            Bailout Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.   SECTION 5 REMAINS A VALID MEANS OF ENFORCING THE
      PROTECTIONS OF THE FOURTEENTH AND FIFTEENTH
      AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    There Is No Dispute That Section 5 Enforces Fundamental Rights . . . . 13

      B.    Plaintiff's Arguments That The Record Supporting The 2006
            Reauthorization Of Section 5 Is Insufficient Are Mistaken And
            Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.    The Record Of Discrimination Justifying The 2006
                  Reauthorization Of Section 5 Is Significantly Greater Than
                  The Type Of Record The Supreme Court Has Required
                  In Recent Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Congress's Finding Of Racially Polarized Voting Is Relevant
                  To Determining Whether Covered Jurisdictions Continue To
                  Discriminate Against Minority Voters . . . . . . . . . . . . . . . . . . . . 16

            3.    Covered Jurisdictions Continue To Discriminate Against
                  Minority Voters More Than Non-Covered Jurisdictions Do . . . . 17

**TABLE OF CONTENTS (continued):**                                    **PAGE**

4.    *Congress Reliably Concluded That Section 2 Of The Voting Rights Act Is Insufficient On Its Own To Prevent And Remedy Discrimination Against Minority Voters In Covered Jurisdictions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    *Section 5 Remains A Congruent And Proportional Means Of Enforcing Minority Citizens' Right To Vote Free Of Discrimination* . . . 20

1.    *The Supreme Court Has Repeatedly Held That Section 5's Preclearance Mechanism Is A Valid Prophylactic Means Of Enforcing The Fourteenth And Fifteenth Amendments* . . . . . . . . 20

a.    *Legislation To Enforce The Fourteenth And Fifteenth Amendments Is Designed To Intrude Into Spheres Of Authority Formerly Reserved To The States* . . . . . . . . . . 21

b.    *Congress Is Justified In Employing A Prophylactic Remedy To Prevent And Remedy Discrimination In Voting Against Minority Citizens* . . . . . . . . . . . . . . . . . . . 22

c.    *The Bailout System In Section 4(a) Is A Constitutional Aspect Of The Section 5 System* . . . . . . . . . . . . . . . . . . . . . 25

i.    *Plaintiff's Inability To Seek Bailout Does Not Imperil The Constitutionality Of Section 5* . . . . . 25

ii.   *The Current Bailout System Remains Congruent And Proportional* . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.    *Section 5 Remains A Valid Prophylactic Means Of Enforcing The Protections Of The Fourteenth And Fifteenth Amendments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

a.    *In 2006, As With Every Prior Reauthorization, Congress Found That Minority Voters Had Made Some Progress That Is Directly Attributable To Section 5* . . . . . . . . . . . 31

b.    *In 2006, As With Every Prior Reauthorization, Congress Found That Section 5 Is Required To Preserve And Extend The Progress Made To Date* . . . . . . . . . . . . . . . 34

**TABLE OF CONTENTS (continued):**                                        **PAGE**

i.      *Congress Determined That The Progress Made To Date Is Fragile* . . . . . . . . . . . . . . . . . . . . . . . . 34

ii.     *Congress Found That Second Generation Barriers Continue To Limit Minority Voters' Full Participation* . . . . . . . . . . . . . . . . . . . . . . . . 35

iii.    *Section 5 Helps Prevent Gamesmanship By Covered Jurisdictions* . . . . . . . . . . . . . . . . . . . . . 37

iv.     *Recent Objection Rates Support Congress's Decision To Reauthorize Section 5* . . . . . . . . . . 39

3.   *Plaintiff's Texas- And MUD-Specific Claims Are Misplaced* . . . 41

a.      *Texas Is A Covered Jurisdiction Because Of Its Extensive History Of Discriminating Against Minority Voters, Not Merely Because Of The Two Criteria In The Coverage Formula* . . . . . . . . . . . . . . . . . . . . . . . . 42

b.      *Congress Need Not Have Found That This Specific Plaintiff Engaged In A Pattern Of Discriminatory Behavior Before It May Subject Plaintiff To Section 5's Preclearance Requirement* . . . . . . . . . . . . . . . . . . . . . . . 47

**III.   PLAINTIFF'S ALLEGED AS-APPLIED CHALLENGE MUST FAIL BECAUSE PLAINTIFF HAS NOT IDENTIFIED ANY INDIVIDUAL RIGHT TRANSGRESSED BY SECTION 5 COVERAGE** . . . . . . . . . . . . 49

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGE**

*Board of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Boddie* v. *Connecticut*, 401 U.S. 371 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Boerne* v. *Flores*, 521 U.S. 507 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Briscoe* v. *Bell*, 432 U.S. 404 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 43, 49

*Bush* v. *Vera*, 517 U.S. 952 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*City of Lockhart* v. *United States*, 460 U.S. 125 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*City of Rome* v. *United States*, 472 F. Supp. 221 (D.D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . 26-27

*City of Rome* v. *United States*, 446 U.S. 156 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Clark* v. *Jeter*, 486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dougherty County Bd. of Educ.* v. *White*, 439 U.S. 32 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*Dunn* v. *Blumstein*, 405 U.S. 330 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

*FDIC* v. *Meyer*, 510 U.S. 471 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Fitzpatrick* v. *Bitzer*, 427 U.S. 445 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gaston County* v. *United States*, 288 F. Supp. 678 (D.D.C. 1968),
    aff'd, 395 U.S. 285,(1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Geduldig* v. *Aiello*, 417 U.S. 484 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harper* v. *Virginia State Bd. of Elections*, 383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . 13, 23

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kramer* v. *Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969) . . . . . . . . . . . . . . . . . . . . . . . . 24

**CASES** (continued):                                                                          **PAGE**

*LULAC* v. *Perry*, 126 S. Ct. 2594 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-47

*Lopez* v. *Monterey County*, 525 U.S. 266 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 49

*N.A.A.C.P.* v. *Hampton County Election Comm'n*, 470 U.S. 166 (1985) . . . . . . . . . . . . . . . . 10

*Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721 (2003) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Perkins* v. *Matthews*, 400 U.S. 379 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Regents of Univ. of Calif.* v. *Bakke*, 438 U.S. 265 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Reno* v. *Bossier Parish*, 528 U.S. 320 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Session* v. *Perry*, 298 F. Supp. 2d 451 (E.D. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22-24

*United States* v. *Albertini*, 472 U.S. 675 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States* v. *Beer*, 425 U.S. 130 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States* v. *Board of Commissioners of Sheffield*, 435 U.S. 110 (1978) . . . . . . . 9-10, 32, 48

*United States* v. *Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States* v. *Morrison*, 529 U.S. 598 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 50

*United States* v. *Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) . . . . . . . . . . . . . . . . . 9

*United States* v. *Uvalde Consolidated Indep. School District*, 625 F.2d 547 (5th Cir. 1980) . . 10

*Vera* v. *Richards*, 861 F. Supp. 1304 (S.D. Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Ex parte Virginia*, 100 U.S. 339 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES:**                                                      **PAGE**

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act
      Reauthorization and Amendments Act of 2006,
      Pub. L. No. 109-246, 120 Stat. 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Family and Medical Leave Act, 29 U.S.C. 2601 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq.*
      42 U.S.C. 1973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      42 U.S.C. 1973b(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      42 U.S.C. 1973b(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      42 U.S.C. 1973b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      42 U.S.C. 1973c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      42 U.S.C. 1973*l*(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pub. L. No. 89-110 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. No. 97-205 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**REGULATIONS:**

28 C.F.R. 51.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 C.F.R. 51.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 C.F.R. 51.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**LEGISLATIVE HISTORY:**

115 Cong. Rec. S5520, *Joint View of 10 Members of the Judiciary Committee
      Relating to Extension of the Voting Rights Act of 1965* (Mar. 2, 1970) . . . . . . 32, 34, 47

152 Cong. Rec. 7976 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

H.R. Rep. No. 397, 91st Cong., 1st Sess. (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34-35

H.R. Rep. No. 196, 94th Cong., 1st Sess. (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-35

H.R. Rep. No. 227, 97th Cong., 1st Sess. (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

S. Rep. No. 162, 89th Cong., 1st Sess. (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**LEGISLATIVE HISTORY (continued):**                                    **PAGE**

S. Rep. No. 295, 94th Cong., 1st Sess. (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues
    Relating to Reauthorization:  Hearing Before the Senate Comm. on the Judiciary*,
    109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Appendix to Voting Rights Act:  Evidence of Continued Need:  Hearing Before the
    House Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . *passim*

*Continuing Need for Section 203's Provisions for Limited English Proficient Voters:
    Hearing Before the Senate Comm. on the Judiciary*,
    109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-40

*Modern Enforcement of the Voting Rights Act:  Hearing Before the Senate Comm. on the
    Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33

*Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives
    and Views From the Field, Hearing before the Subcommittee on the
    Constitution, Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . 8, 30

*The Continuing Need for Section 5 Pre-clearance:  Hearing Before the Senate
    Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . . . . . . . *passim*

*To Examine the Impact and Effectiveness of the Voting Rights Act:  Hearing Before
    the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) . . . . . . . . . 19, 38, 41

*Understanding the Benefits and Costs of Section 5 Pre-clearance:  Hearing Before
    the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . 40

*Voting Rights Act:  Evidence of Continued Need:  Hearing Before the House
    Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . . . . . . . . . *passim*

*Voting Rights Act:  The Continuing Need for Section 5 Pre-clearance:  Hearing Before
    the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) . . . . . . . . . . . . . 18, 39

*Voting Rights Act: Section 5 of the Act – History, Scope, & Purpose: Hearing Before
    the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) . . . . . . . . . . . . . *passim*

**MISCELLANEOUS:**                                                                      **PAGE**

45 Fed. Reg. 18,890 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

46 Fed. Reg. 870 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

46 Fed. Reg. 19,122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

52 Fed. Reg. 486 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTRODUCTION

Plaintiff Northwest Austin Municipal Utility District Number One (Plaintiff) has failed to establish that it is entitled to terminate its coverage under Section 5 of the Voting Rights Act. According to the unambiguous statutory language of the Act, Plaintiff is not eligible to seek a bailout under Section 4 of the Act. This conclusion is bolstered by the history of Section 4, the legislative history of the 1982 and 2006 amendments to the Act, Supreme Court case law, and the Attorney General's procedures for implementing the Act.

Plaintiff has also failed to establish that Congress exceeded its constitutional authority when it extended the life of Section 5 in 2006. Plaintiff is simply incorrect that Congress failed to amass evidence that there is an ongoing problem of discrimination against minority voters in covered jurisdictions. In fact, as detailed in the United States' opening memorandum, Congress amassed a record of discrimination that echoes the records amassed by previous Congresses prior to previous reauthorizations of Section 5 – records approved of by the Supreme Court. Moreover, Congress specifically found that such discrimination continues to abound in Plaintiff's home State of Texas.

Plaintiff's primary constitutional argument is that Section 5 is not a congruent and proportional remedy. In support of its claim, Plaintiff largely recycles arguments that have been considered and rejected by the Supreme Court. The Court has repeatedly held that, although Section 5 intrudes on the sovereignty of covered jurisdictions, it is a valid means of enforcing the rights guaranteed in the Reconstruction Amendments.

Moreover, Plaintiff fails to demonstrate that Congress overstepped its constitutional authority by reauthorizing Section 5. Although Plaintiff is correct that minority voters have increased their participation, the same was true at the time of every previous reauthorization of

- 2 -

Section 5.  And, just as Congress found in 1970, 1975, and 1982 that the progress made to date had not stamped out all discrimination, so Congress determined in 2006 that more work remains. Significantly, Congress found that the gains achieved by minority voters to date are fragile and that continued enforcement of Section 5 is necessary to prevent backsliding.

Finally, Plaintiff is simply mistaken in characterizing its challenge to Section 5 as an as-applied challenge.  Plaintiff argues that, in extending the life of Section 5, Congress acted outside of its enumerated powers.  Such an argument is a facial challenge to the statute.  In order to state an as-applied constitutional challenge, Plaintiff must establish that enforcement of Section 5 against Plaintiff unconstitutionally infringes a protected individual right of Plaintiff. Not only did Plaintiff fail to do that, but Plaintiff also failed to establish that complying with Section 5 is burdensome in any way.

**ARGUMENT**

## I.    PLAINTIFF IS NOT ELIGIBLE TO SEEK BAILOUT UNDER SECTION 4(A)

The plain language of the Voting Rights Act and its legislative history demonstrates that Plaintiff does not qualify under Section 4(a) of the Act, 42 U.S.C. 1973b(a), as a jurisdiction eligible to file an action to bail out of the preclearance requirements of Section 5 of the Act, 42 U.S.C. 1973c.

Under the current bailout provisions in Section 4(a)(1) of the Act, only three types of jurisdictions may seek to bail out:  (1) "any State with respect to which the determinations have been made";  (2) "any political subdivision of such State * * * though such determinations were not made with respect to such subdivision as a separate unit"; and (3) "any political subdivision with respect to which such determinations have been made as a separate unit."  42 U.S.C.

- 3 -

1973b(a)(1).  The "determinations" referenced in Section 4(a) are the those made by the Attorney General and the Director of the Census of whether a State or political subdivision falls within the coverage formulas set forth in Section 4(b), 42 U.S.C. 1973b(b).   The Act itself, in Section 14(c)(2), 42 U.S.C. 1973*l*(c)(2), defines a "political subdivision" as "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."  Plaintiff does not fall within any of the three categories of jurisdictions eligible to seek bailout.

    A.    *There Is No Dispute That Plaintiff Does Not Fall Within The First Or Third Categories Of Jurisdictions Eligible To Seek A Bailout*

The first and third categories of jurisdictions eligible to seek a bailout, as set forth in the current Section 4(a)(1), were adopted as part of the original Voting Rights Act.  From the time of the statute's enactment in 1965 through August 5, 1984, Section 4(a)(1) extended the bailout option to only two types of jurisdictions:  (1) "any State with respect to which the determinations have been made"; and (2) "any political subdivision with respect to which such determinations have been made as a separate unit."  See Section 4(a), Pub. L. No. 89-110 (1965).  The definition of these two categories of Section 4(a) has not been amended since 1965.

In interpreting the Act, the Supreme Court has expressly used the Act's definition of "political subdivision," rather than a dictionary or state law definition.  In 1979, when the City of Rome – a municipality in the fully covered State of Georgia – filed an action seeking to bail out under the then-existing Section 4(a), the Supreme Court rejected Rome's argument that it was a jurisdiction eligible to seek bailout.  *City of Rome* v. *United States*, 446 U.S. 156, 167 (1980), aff'g, 472 F. Supp. 221 (D.D.C. 1979) (three-judge court).  The Court concluded that, "under the

- 4 -

express statutory language, the city is not a 'political subdivision' for purposes of § 4(a) 'bailout.'" *Id.* at 168.  Nor could Rome, as "a municipality in a covered State," be considered "itself a 'State' for purposes of the § 4(a) exemption procedure." *Ibid.*  Moreover, "the city fails to meet the definition for either term, since the coverage formula of § 4(b) has never been applied to it." *Id.* at 167.  "Rather, the city comes within the Act because it is part of a covered State." *Ibid.*  Thus, "any bailout action to exempt the city must be filed by, and seek to exempt all of, the State of Georgia." *Ibid.*.  The Supreme Court's interpretation of the bailout provisions in the *City of Rome* explicitly relied on the definition of "political subdivision" set forth in Section 14(c)(2) of the Act, and on the House and Senate Reports accompanying the 1965 Act, in concluding that Rome was not eligible to bail out.  *Id.* at 168 & n.5, 169.

Thus, under the original 1965 standard, bailout was available only to jurisdictions for which the Attorney General and the Director of the Census had published the requisite coverage determinations in the Federal Register, whether they were (1) fully covered states or (2) political subdivisions that had separate coverage determinations.  Clearly, Plaintiff falls in neither category; because "the coverage formula of § 4(b) has never been applied to it," *City of Rome*, 446 U.S. at 166, it has no published coverage determination.  See Procedures for the Administration of Section 5, 28 C.F.R. pt. 51, App. (listing current jurisdictions with published coverage determinations).  Indeed, Plaintiff admits that "the district * * * has never been separately designated for coverage."  Pl. Mem. at 2.

Congress has not amended the definition of "political subdivision" in Section 14(c)(2) or the language of Section 4(a) regarding these two original categories of jurisdictions eligible to seek bailout.  Thus, the *City of Rome* decision remains the definitive interpretation of these two

- 5 -

categories under Section 4(a)(1).  Plaintiff clearly, therefore, does not fall within either the first

or third categories of jurisdictions eligible to seek bailout under Section 4(a)(1).

> **B.     Nor Does Plaintiff Qualify For The Second Category Of Jurisdictions Eligible To Seek A Bailout Because Plaintiff Is Not A "Political Subdivision" As That Term Is Defined In The Voting Rights Act**

Subsequent to *City of Rome*, as part of the 1982 amendments to the Act, Congress

amended Section 4(a)(1) to add an additional category of jurisdictions eligible to bail out –

namely, "any political subdivision of such State * * * though such determinations were not made

with respect to such subdivision as a separate unit."  See Pub. L. No. 97-205, § 2(b)(2), 96 Stat.

131 (1982).

The statutory language itself precludes Plaintiff's claim that this new category enables it

to seek a bailout.  The 1982 amendment allows "any political subdivision" of a fully covered

State to seek bailout, even though it lacks a separate coverage determination under the Act.  See

§ 2(b)(2), 96 Stat. 131.  Section 14(c)(2) of the Act defines "political subdivision" as  "any

county or parish, except that where registration for voting is not conducted under the supervision

of a county or parish, the term shall include any other subdivision of a State which conducts

registration for voting."  42 U.S.C. 1973*l*(c)(2).   From the face of the Act, it is thus clear that the

1982 amendment means that counties or parishes of fully covered States were newly enabled to

seek bailout under Section 4(a)(1), and that smaller subdivisions could seek bailout only if

counties did not conduct voter registration, but the smaller subdivisions did.

Like the text of the Act, the legislative history of the 1982 amendments is unambiguous.

Congress repeatedly described the unit of government newly eligible to seek bailout as

"counties" – "[f]or the first time individual counties within a fully covered state will be

- 6 -

permitted to file for bail-out even though other counties and the state government, itself, are not

yet eligible to do so."[1]  In both the House and Senate, Congress explicitly incorporated the

definition of "political subdivision" set forth in Section 14(c)(2) in describing the new bailout

amendment.  The House Report stated that only rarely, where the county did not supervise voter

registration, might a subunit smaller than a county be able to seek to bailout:

> This amendment provides that political subdivisions within fully covered states
> may initiate a declaratory judgment action seeking to bail out independently of
> the state.  This expands current law.  When referring to a political subdivision this
> amendment refers only to counties and parishes except in those rare instances in
> which the county does not conduct voter registration; only in such rare instances,
> such as independent cities in Virginia, can a jurisdiction smaller than a county or
> parish file for bailout.

H.R. Rep. No. 227, 97th Cong., 1st Sess. 39 (1981) (*1981 House Report*).[2]  Congress deliberately

decided not to permit subjurisdictions smaller than counties to bail out because of the

---

[1]  S. Rep. No. 417, 97th Cong., 2d Sess. 45 (1982) (*1982 Senate Report*); see also H.R. Rep. No. 227, 97th Cong., 1st Sess. 32-33 (1981) (*1981 House Report*) ("A major change in current law is that counties within fully covered states will be allowed to file for bailout independently from the State."); *id.* at 44 ("The new bailout already constitutes a very substantial liberalization of the avenues available to covered jurisdictions to end their preclearance obligation.  For example, individual counties in covered states for the first time will be able to bail out separately even though the state as a whole is not yet eligible to do so."); *id.* at 57 ("counties will now have the opportunity to obtain exemption on an individual basis"); *ibid.* ("Counties within a covered state are now eligible to bail out if they can demonstrate their record of non-discrimination.").

[2]  See also *1982 Senate Report* 69 ("[C]ertain political subdivisions within full covered states may initiate a declaratory judgment action seeking to bail out independently * * *.  When referring to a political subdivision this amendment refers only to counties and parishes except in those rare instances in which registration is not conducted under the supervision of a county or parish.  In such instances, such as independent cities in Virginia, a jurisdiction other than a county or parish may file for bailout.  A city with such registration may not bailout separately."); *1982 Senate Report* 57, n.192 ("A coun[]ty seeking to bail out must show that all of the subdivisions within its territory are eligible for bailout, as well.  Towns and cities within counties may not bailout separately.  This is a logistical limit.").

- 7 -

overwhelming burden it would place on the Attorney General and this Court to handle potentially thousands of such cases.[3]

Plaintiff misconstrues both the Act's text and its legislative history. In arguing that it is a "political subdivision" for purposes of the Act's bailout provisions, Plaintiff relies on a dictionary definition of the phrase, citing the rule that courts should "construe a statutory term in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U.S. 471, 476 (1991). Unlike the situation here, that rule comes into play *only* when a term is "not defined in the Act" itself. *Ibid*. Similarly, Plaintiff wrongly dismisses the legislative history of the 1982 amendments as "scanty evidence" or a "footnote." Pl. Mem. at 20. To the contrary, the 1982 House and Senate Reports repeatedly and clearly describe what jurisdictions can bail out under the amendments to the bailout standard. These reports are precisely the type of legislative history relied on by the Supreme Court in *City of Rome*. 446 U.S. at 169. Moreover, there is no indication in the 1982 legislative history that Congress intended to repudiate the Supreme Court's reliance in *City of Rome* on the statutory definition of "political subdivision" in Section 14(c)(2) for bailout purposes. Indeed, Congress repeatedly invoked that very same statutory

---

[3] *1981 House Report* 41 (the 1982 amendment "represents a significant expansion of jurisdictions eligible to bail out without creating the prospect of unmanageable litigation in the court."); *1982 Senate Report* 57, n.192 ("As a practical matter, if every political subdivision were eligible to seek separate bailout, we could not expect that the Justice Department or private groups could remotely hope to monitor and to defend the bailout suits. It would be one thing for the Department and outside civil rights litigators to appear in hundreds of bailout suits. It would be quite another for them to have to face many thousands of such actions because each of the smallest political subunits could separately bail out. Few questioned the reasonableness and fairness of this cutoff in the House."); *id.* at 69 ("This limitation is a logistical one. If the smallest of political subdivisions could bail out, the Department of Justice and private groups would have to defend thousands of bailout suits.").

- 8 -

definition in describing the scope of the 1982 bailout amendments.[4]

In Texas, only its 254 counties conduct registration for voting in elections.  See Pl. Mem. at 22; Def's Statement of Material Facts at ¶¶ 120-121 (Def. SMF).  Hence, only the fully covered State of Texas, on behalf of all of its subjurisdictions, or each of its 254 counties individually, on behalf of the subjurisdictions within each county, may seek to bail out of Section 5 coverage.  While the 1982 amendments to Section 4(a) did newly enable Texas' 254 counties to seek bailout on their own, the 1982 amendments did not enable the smaller jurisdictions in the State, like the Plaintiff, to seek bailout on their own.

Because the statutory language is so clear, Plaintiff's argument that Section 4 must be interpreted to permit jurisdictions such as Plaintiff to seek bailout on their own in order to avoid "grave constitutional concerns," Pl. Mem. 24, is misplaced.  The Supreme Court has made clear

---

[4]  Contrary to Plaintiff's claims, the 2006 reauthorization of the Act, and its legislative history, does not support its bailout claim.  During the 2006 reauthorization process, some witnesses explicitly urged Congress to amend the bailout standard to allow jurisdictions smaller than counties to seek to bail out.  See, *e.g.*, *Voting Rights Act:  An Examination of the Scope & Criteria for Coverage under the Special Provisions of the Act:  Hearing Before House Comm. on the Judiciary*, 109th Cong., 2d Sess. 91-97 (2006) (Testimony of Hebert urging revision of Section 4(a) to allow jurisdictions smaller than counties to seek bailout); *Reauthorizing the Voting Rights Act's Temporary Provisions:  Policy Perspectives and Views From the Field: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 15, 236-238 (2006) (Testimony of Park urging change to allow smaller jurisdictions to seek bailout).  If Section 4(a) already allowed bailout by the smallest jurisdictions, as Plaintiff contends is the case, then witnesses before Congress in 2006 would not be urging amendments to this effect.  Congress declined the invitation to further amend the bailout standard (aside from a single technical amendment), and indicated that it was satisfied with the standard that went into effect in 1984. See, *e.g.*, H.R. Rep. No. 478, 109th Cong., 2d Sess. 10, 25, 58, 61 (2006) (*2006 House Report*). In the 2006 amendments, Congress made only a technical "conforming" change to Section 4(a)(1)(C) of the bailout standard by adding a reference to federal observers not having been assigned to a jurisdiction in the previous ten years.  See Section 3(d)(2), Pub. L. No. 109-246, § 3(d)(2), 120 Stat. 580 (2006); *2006 House Report* 63.  This conformed to other changes in the 2006 amendments regarding the end of the federal examiner program.

- 9 -

repeatedly that the canon of constitutional avoidance "has no application in the absence of statutory ambiguity." *United States* v. *Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001). "Any other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." *United States* v. *Albertini*, 472 U.S. 675, 680 (1985). Because it is perfectly clear that jurisdictions such as Plaintiff – political subunits that are covered by virtue of their location within wholly-covered States, but that are not counties – are not eligible to seek bailout under Section 4(a), the avoidance canon has no place in this action. Moreover, as discussed on pages 25-31, *infra*, the current bailout system is a constitutional part of the Section 5 scheme.

      C.      *Sheffield* And *Dougherty County* Do Not Support Plaintiff's Claims

Plaintiff's invocation of *United States* v. *Board of Commissioners of Sheffield,* 435 U.S. 110 (1978), and *Dougherty County Board of Education* v. *White*, 439 U.S. 32 (1978), including various quotes and dicta cited out of context, does not assist its bailout argument. In each of those cases, the Supreme Court considered solely the scope of Section 5's coverage, not the bailout provisions of Section 4(a). The Court held that a city in Alabama and a school board in Georgia, respectively, were subject to the preclearance requirements, even though they were not themselves "political subdivisions" under the definition in Section 14(c)(2) of the Act. Rather, these jurisdictions were covered by Section 5 because they enacted or administered voting changes within fully covered States. The Plaintiff here, like the cities in *Rome* and *Sheffield* and the school board in *Dougherty County*, is covered by Section 5 because it is part of a fully covered State, *not* because it meets the definition of a "political subdivision" under the Act.

Neither *Sheffield* nor *Dougherty County* interpreted the bailout provisions of Section 4(a).

- 10 -

*City of Rome*, which was decided after both *Sheffield* and *Dougherty County*, did concern the

interpretation of the bailout requirements of Section 4(a).  As the Supreme Court noted in *City of*

*Rome*, *Sheffield*  "did not even discuss the bailout process" and "did not hold that cities such as

Rome are 'political subdivisions.'"  446 U.S. at 168.  *City of Rome* used the definition of

"political subdivision" in Section 14(c)(2) of the Act in the course of interpreting the bailout

provisions of Section 4(a) of the Act.[5]  Contrary to Plaintiff's assertion, far from repudiating the

Act's definition of "political subdivision" utilized by the Supreme Court in the *City of Rome* for

purposes of bailout under Section 4(a), Congress expressly endorsed this definition in the 1982

legislative history of the bailout amendments.

    D.    *The Attorney General's Procedures Accurately Reflect The Act*

Finally, the Attorney General's Procedures for the Administration of Section 5 of the

Voting Rights Act, 28 C.F.R. pt. 51, accurately reflect Congress's determination that, while all

subunits of a covered jurisdiction must comply with Section 5, jurisdictions smaller than

counties may not seek a bailout under Section 4(a), unless counties do not supervise voter

registration and the smaller units do.[6]  Since 1981, the Attorney General's Procedures have

reflected that all entities within a covered jurisdiction are subject to Section 5's preclearance

---

[5] The Plaintiff's citation to *United States* v. *Uvalde Consolidated Independent School District*, 625 F.2d 547 (5th Cir. 1980), similarly does not assist its bailout argument.  That case concerned solely the interpretation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973.

[6] Subject to "certain limitations," the Supreme Court has "traditionally afford[ed] substantial deference to the Attorney General's interpretation of § 5 in light of [the Attorney General's] 'central role * * * in formulating and implementing' that section."  *Lopez* v. *Monterey County*, 525 U.S. 266, 281-282 (1999), (quoting *Dougherty County Bd. of Ed.*, 439 U.S. at 39). See also *United States* v. *Sheffield Bd. of Comm'rs*, 435 U.S. 110, 131 (1978); *N.A.A.C.P.* v. *Hampton County Election Comm'n*, 470 U.S. 166, 178-179 (1985); *Perkins* v. *Matthews*, 400 U.S. 379, 390-391 (1971).

- 11 -

requirements.  See 28 C.F.R. 51.6 ("All political subunits in a covered jurisdiction (*e.g.*,

counties, cities, school districts) are subject to the requirement of Section 5.").[7]  Likewise, since

1987, the Procedures have reflected that only "covered jurisdictions" with separate coverage

determinations and "political subdivision[s] of a covered state" may seek to bail out under

Section 4(a).  See 28 C.F.R. 51.5 (describing what jurisdictions can seek bailout), and 28 C.F.R.

51.2 (defining "covered jurisdiction" as those which have a separate coverage determination and

defining "political subdivision" as it appears in Section 14(c)(2) of the Act).[8]  The Procedures

thus support the conclusion that Plaintiff is not eligible to seek bailout under Section 4(a).

Hence, under the clear language of the Act and its legislative history, Plaintiff may be

relieved of its obligations under Section 5 only if either the State of Texas or Travis County

successfully seeks to bail out.  This Plaintiff may not bail out on its own.

E.     *This Court Need Not Address Whether Plaintiff Satisfies Other Bailout Criteria*

Because the Plaintiff fails to meet the threshold of being a "State" or "political

subdivision" that is eligible to seek bailout under Section 4(a)(1), the Court need not address

whether the Plaintiff meets the remaining bailout criteria set forth in Section 4(a) of the Act.

---

[7] The Attorney General added 28 C.F.R. 51.6 in 1981, citing to *Sheffield* and *Dougherty County*.  See 45 Fed. Reg. 18,890 (1980) (proposed procedures); 46 Fed. Reg. 870 (1981) (final procedures).

[8] The Attorney General revised 28 C.F.R. 51.5 in 1987 to take into account the changes in the bailout standard embodied in the 1982 amendments.  The Attorney General noted that "effective in August 1984, the Amendments authorize bailout actions by individual political subdivisions (which are usually counties) of covered States.  In the past, if statewide coverage existed, only the State could bail out.  Section 51.5 has been revised to reflect this change." 50 Fed. Reg. 19,122 (1985) (proposed procedures); see also 52 Fed. Reg. 486 (1987) (final procedures).

- 12 -

That said, Plaintiff bears the burden of proof on "each element" of the bailout standard.[9]  The Attorney General questions whether the Plaintiff has in fact presented sufficient evidence that it meets all of the bailout criteria.  See, *e.g.*, Resp. to Pl's Statement of Material Facts.

## II.    SECTION 5 REMAINS A VALID MEANS OF ENFORCING THE PROTECTIONS OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS

As discussed in the United States' opening memorandum, Plaintiff bears a heavy burden in attempting to demonstrate that Congress exceeded its constitutional authority when it reauthorized Section 5 of the Voting Rights Act in 2006.  Because Plaintiff failed to meet that burden in moving for summary judgment, this Court should deny Plaintiff's motion for a declaration that Section 5 is unconstitutional.

In assessing whether Congress has enacted valid prophylactic legislation pursuant to its authority under Section 5 of the Fourteenth Amendment or, by extension, Section 2 of the Fifteenth Amendment, courts must determine the following:  (1) what constitutional rights Congress intends to protect through the legislation in question; (2) whether the history of violations of those constitutional rights is sufficient to justify prophylactic legislation in the area; and (3) whether, in light of the importance of the rights and the history of violations, Congress's chosen legislative remedy is a congruent and proportional means of enforcing those rights.  *E.g.*, *Tennessee* v. *Lane*, 541 U.S. 509 522, 529-530 (2004).

-------

[9]  *1982 Senate Report* 56; see also *South Carolina* v. *Katzenbach*, 383 U.S. 301, 331 (1966); *Gaston County* v. *United States*, 288 F. Supp. 678, 683, 688 n.20 (D.D.C. 1968) (three-judge court) ("[T]he burden in a § 4(a) Voting Rights Act case could not be more emphatic – it lies squarely on the certified subdivision."), aff'd, 395 U.S. 285, 293 (1969) ("In an action for declaratory relief under § 4(a) * * * the plaintiff carries the burden of proof"); *1981 House Report* 33, 39.

- 13 -

A.    *There Is No Dispute That Section 5 Enforces Fundamental Rights*

Plaintiff concedes that Section 5 enforces the Constitution's guarantee of minority

citizens' right to vote free of discrimination.  Pl. Mem. 44-45.  As noted in the United States'

opening memorandum, U.S. Mem. 11-12, the Supreme Court has repeatedly held that the right to

vote is "fundamental" and is "preservative of all rights."  *Harper* v. *Virginia State Bd. of*

*Elections*, 383 U.S. 663, 667 (1966).  Where a State denies some citizens the right to vote, while

granting the right to others, a court must subject such a denial to strict scrutiny to "determine

whether the exclusions are necessary to promote a compelling state interest."  *Dunn* v.

*Blumstein*, 405 U.S. 330, 337 (1972) (internal quotation marks omitted).  Such restrictions are all

the more suspect, moreover, when they divide citizens along lines of race or national origin

because such classifications are also subject to strict scrutiny, regardless of whether they are

employed in the voting context.  See, *e.g.*, *Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-

482 (1997) (race); *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (national origin).

Thus, there is no question that Section 5 of the Voting Rights Act seeks to protect a

citizen's fundamental right to vote against infringement by the most suspect type of

governmental discrimination.

B.    *Plaintiff's Arguments That The Record Supporting The 2006 Reauthorization Of*
      *Section 5 Is Insufficient Are Mistaken And Misplaced*

Plaintiff asserts that, "when Congress reenacted §5 in 2006, it made no attempt

whatsoever to justify its reauthorization on the same grounds and with the same kinds of findings

on which it had originally supported §5."  Pl. Mem. 4.  This statement is demonstrably false.

Congress did, in fact, amass a significant record of ongoing discrimination against

minority voters in covered jurisdictions similar to the one compiled in support of previous

- 14 -

reauthorizations.  That record is discussed in detail in the United States' opening memorandum in support of summary judgment, as well as in Defendants-Intervenors' memoranda and statement of material facts.  Even a cursory review of the record reveals that Congress found more than enough evidence of continued discrimination in voting to justify reauthorizing Section 5.  The record includes examples of discrimination throughout covered jurisdictions perpetrated at every level of government.  The types of discrimination include harassment and intimidation of voters, U.S. Mem. 38-40, discriminatory purges of voter registration rolls and challenges to the registration of minority voters, U.S. Mem. 39-40, adoption of intentionally discriminatory districting plans, U.S. Mem. 40-42, and employment of the full range of dilutive techniques, U.S. Mem. 42-44.

In keeping with the Supreme Court's approach in *City of Rome*, this Court must determine whether the ongoing record of voting discrimination Congress amassed in 2006 was sufficient to justify Congress's decision to extend the life of Section 5.  See 446 U.S. at 180-182 (reviewing "Congress' judgment that the 1975 extension was warranted").  Because the Voting Rights Act has been in operation for several decades, one should not expect the extent and types of voting discrimination that exist today to mirror exactly the extent and types of voting discrimination that led to the enactment of the Act in 1965.  Indeed, if covered jurisdictions had failed to make any progress in combating voting discrimination over the last several decades, Congress would have faced serious questions about the effectiveness of its chosen remedy.

- 15 -

1.    *The Record Of Discrimination Justifying The 2006 Reauthorization Of Section 5 Is Significantly Greater Than The Type Of Record The Supreme Court Has Required In Recent Years*

Plaintiff levels a number of specific attacks at the adequacy of the evidentiary record Congress compiled.  Plaintiff claims, Pl. Mem. 42, for example, that the record of discrimination Congress compiled in 2006 cannot compete with the record of discrimination the Supreme Court found in 2003 to justify Congress's enactment of the family leave provisions of the Family and Medical Leave Act (FMLA), 29 U.S.C. 2601 *et seq.*  See *Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721, 729-735 (2003).  In fact, however, the record supporting the 2006 reauthorization of the Voting Rights Act eclipses the record found sufficient in *Hibbs*.  In enacting the family leave provisions of the FMLA, Congress invoked its authority under the Fourteenth Amendment to protect the right of state and local government employees "to be free from gender-based discrimination in the workplace."  *Id.* at 728.  In support of its view that unconstitutional gender-based discrimination in the provision of family leave was a sufficiently large problem to justify prophylactic legislation, however, Congress relied almost entirely on evidence of such discrimination by private employers – although discrimination perpetrated by private employers does not run afoul of the Constitution and is not appropriately addressed through exercise of Congress's authority under Section 5 of the Fourteenth Amendment.  See *United States* v. *Morrison*, 529 U.S. 598, 621 (2000).

The Supreme Court identified only three evidentiary items even suggesting discriminatory behavior by state actors:  (1) historic evidence of state laws that had limited the employment opportunities of women in general (although such laws had been upheld as constitutional by the Supreme Court); (2) statistics demonstrating that a few States provided

- 16 -

greater child-birth-related leave for women than for men (although the Supreme Court has held

that differential treatment based on pregnancy is not gender-based discrimination under the

Equal Protection Clause, see *Geduldig* v. *Aiello*, 417 U.S. 484, 496-497 & n.20 (1974)); and (3)

two isolated statements indicating that discrimination in the provision of parental leave in the

public sector mirrored that in the private sector.  538 U.S. at 729-732.  As noted, the Supreme

Court had previously found that the first and second items did not constitute unconstitutional

discrimination on the basis of gender.  Thus, the only direct evidence of unconstitutional

behavior by state actors that Congress and the Court relied on was a pair of conclusory

statements claiming that discrimination in the pubic sector mirrored that in the private sector.

The amount of evidence of unconstitutional voting discrimination greatly exceeds the

amount of evidence of unconstitutional gender discrimination found sufficient in *Hibbs*.  To

begin with, virtually all of the evidence of discrimination against minority voters implicates state

actors rather than private individuals or companies.  Moreover, a large swath of that evidence

indicated unconstitutional behavior by those state actors.  And, even where it was unclear that

the discriminatory behavior rose to the level of a constitutional violation, the Supreme Court

already has held that the history of discrimination in voting by covered jurisdictions is sufficient

to give rise to an inference of unconstitutional discrimination where a jurisdiction implements a

voting practice with a discriminatory effect.  See *City of Rome*, 446 U.S. at 177-178.

> 2.    *Congress's Finding Of Racially Polarized Voting Is Relevant To
>        Determining Whether Covered Jurisdictions Continue To Discriminate
>        Against Minority Voters*

Plaintiff also takes aim at Congress's finding of racially polarized voting in covered

jurisdictions.  Plaintiff complains that the existence of racially polarized voting cannot justify

- 17 -

Section 5's preclearance mechanism on the ground that racial polarization is not state action, and therefore not properly the target of Congress's authority to enforce the Fourteenth and Fifteenth Amendments.  Pl. Mem. 49-50.  If Section 5 outlawed racially polarized voting, Plaintiff might have a point.  Section 5, however, prohibits covered governmental entities from implementing voting changes that discriminate against minority voters.  Those prohibited practices include dilutive voting schemes that inhibit minority voters' opportunity to elect their candidates of choice.  As explained in the United States' opening memorandum, racially polarized voting is a necessary precondition for vote dilution techniques to have their intended discriminatory effect.  Congress found as much in the statute:  "The continued evidence of racially polarized voting in each of the jurisdictions covered by [Section 5] demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of" Section 5.  Pub. L. No. 109-246, § 2(b)(3), 120 Stat. 577.  Thus, Congress's finding that racial bloc voting continues throughout covered jurisdictions bolsters Congress's determination that covered jurisdictions continue to discriminate against minority voters.  See U.S. Mem. at 40-46 (discussing covered jurisdictions' use of dilutive techniques and the role of racially polarized voting in vote dilution).

      3.      *Covered Jurisdictions Continue To Discriminate Against Minority Voters More Than Non-Covered Jurisdictions Do*

Plaintiff also complains that there is insufficient evidence that covered jurisdictions discriminate against minority voters more than non-covered jurisdictions do.  Such a claim cannot stand given that, even after 30 or 40 years of supervision by the Attorney General through the preclearance mechanism, covered jurisdictions continue to discriminate against minority voters.  Indeed, as detailed in the United States' opening memorandum, Congress found extensive reliable evidence that such discrimination abounds in covered jurisdictions.  Even

- 18 -

excluding evidence of discrimination stemming from the Section 5 process itself, nationwide

indicators demonstrate that covered jurisdictions engage in more discrimination than non-

covered jurisdictions.  For example, as noted in the United States' opening memorandum, U.S.

Mem. 61, Congress learned that the behavior of covered jurisdictions gave rise to more than

twice their proportional share of plaintiffs' successful Section 2 suits notwithstanding close

monitoring of those jurisdictions' behavior through Section 5.  *Appendix to Voting Rights Act:*

*Evidence of Continued Need:  Hearing Before the House Comm. on the Judiciary*, 109th Cong.,

2d Sess. 125-126 (2006) (*H. Appx.*); *id.* at 203; H.R. Rep. No. 478, 109th Cong., 2d Sess. 53

(2006) (*2006 House Report*).  Testimony also revealed that racial bloc voting is more prevalent

and severe in covered jurisdictions than in non-covered jurisdictions.  *The Continuing Need for*

*Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d

Sess. 48 (2006) (Statement of Earls).

Congress also found that Section 5 has prevented the implementation of countless voting

changes that would have discriminated against minority voters in covered jurisdictions.  These

findings, taken together, indicate that covered jurisdictions remain the worst offenders in the

realm of voting discrimination – and would be even worse absent Section 5.  Congress was,

therefore, justified in continuing to apply Section 5's preclearance mechanism to those

jurisdictions found by the Supreme Court to have the worst historical records of "pervasive

voting discrimination."  *City of Rome*, 446 U.S. at 182.  Congress also understood that, if

covered jurisdictions ceased to be covered by Section 5, the result would be backsliding in the

voting rights of minority citizens in covered jurisdictions, resulting in the loss of much of the

progress that has been made.  See *Modern Enforcement of the Voting Rights Act:  Hearing*

- 19 -

*Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 8 (2006) (*Modern Enforcement of the Voting Rights Act*) (Testimony of Assistant Attorney General Wan J. Kim); Pub. L. 109-246, § 2(b)(7), 120 Stat. 578.

> 4.    *Congress Reliably Concluded That Section 2 Of The Voting Rights Act Is Insufficient On Its Own To Prevent And Remedy Discrimination Against Minority Voters In Covered Jurisdictions*

Finally, Plaintiff erroneously claims both that the remaining evidence of discrimination is merely evidence that Section 2, rather than Section 5, is still needed, Pl. Mem. 4, and that Congress failed in 2006 to determine that case-by-case litigation is inadequate to address the problem of voting discrimination, Pl. Mem. 51.  In fact, however, Congress specifically found that Section 2 of the Act was an insufficient remedy to prevent and deter voting discrimination against minority citizens.  U.S. Mem. 49-51.  Congress identified three significant shortcomings of Section 2 litigation that are not present in the Section 5 preclearance system.  First, unlike Section 5, Section 2 cannot prevent the implementation of illegal voting practices and procedures, allowing any candidate elected under such an illegal scheme to enjoy the significant advantage of incumbency.  *To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 13-14 (2005) (Testimony of Kemp); *Voting Rights Act:  Evidence of Continued Need:  Hearing Before the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 97 (2006) (*Evidence of Continued Need*) (Testimony of Rogers); cf. *South Carolina*, 383 U.S. at 314 (case-by-case litigation ineffective); *City of Rome*, 446 U.S. at 174 (same).  Second, Section 2 places a heavy financial burden on minority voters challenging illegal election practices and schemes, whereas Section 5 places a comparatively minor financial and administrative burden on covered jurisdictions.  See *Voting*

- 20 -

*Rights Act:  Section 5 of the Act – History, Scope, & Purpose:  Hearing Before the House*

*Comm. on the Judiciary*, 109th Cong., 1st Sess. 92, 97 (2005) (*History, Scope, & Purpose*)

(Testimony of Perales); *id.* at 79 (Testimony of Earls).  And third, Section 2 requires minority

plaintiffs to prove that a challenged practice has a discriminatory effect, while Section 5 places

the burden on jurisdictions to demonstrate that a proposed change will not have a discriminatory

effect and was not animated by a discriminatory purpose.  *History, Scope, & Purpose* 83

(Statement of Earls); *Evidence of Continued Need* 97 (Testimony of Rogers).

> C.    *Section 5 Remains A Congruent And Proportional Means Of Enforcing Minority*
> *Citizens' Right To Vote Free Of Discrimination*

The main focus of Plaintiff's argument is that Section 5 is not a congruent and

proportional means of enforcing minority citizens' right to vote free of discrimination.  In so

arguing, Plaintiff attacks the statute on two distinct fronts.  First, Plaintiff argues that the nature

of Section 5's preclearance remedy generally is beyond the scope of Congress's authority under

the Fourteenth and Fifteenth Amendments.  Second, Plaintiff argues that, even if Section 5 was

an appropriate exercise of Congress's authority in 1965, it is no longer an appropriate means of

enforcing minority citizens' rights.  Plaintiff is wrong on both counts.

> 1.    *The Supreme Court Has Repeatedly Held That Section 5's Preclearance*
> *Mechanism Is A Valid Prophylactic Means Of Enforcing The Fourteenth*
> *And Fifteenth Amendments*

In objecting to the nature of Section 5's preclearance remedy, Plaintiff merely recycles

arguments that have already been considered and rejected by binding Supreme Court precedent.

Specifically, Plaintiff argues that Section 5 is unconstitutional because it (1) intrudes on the

sovereignty of the States, (2) prohibits some conduct not directly prohibited by the Constitution,

and (3) applies to some jurisdictions that are ineligible to seek bailout under Section 4.

- 21 -

>    a.    *Legislation To Enforce The Fourteenth And Fifteenth Amendments Is Designed To Intrude Into Spheres Of Authority Formerly Reserved To The States*

Plaintiff complains that Section 5 "is perhaps the most federally invasive law in existence" because it "reaches into the heart of state and local government in covered jurisdictions and changes the very nature of lawmaking by injecting into the process a federal shadow executive with veto power over any change involving voting and elections."  Pl. Mem. 2.  Plaintiff  also asserts that "[t]he concept of a federal veto over state enactments was expressly rejected in the Constitutional Convention of 1787 as contrary to the scheme of federalism that the founders established."  Pl. Mem. 2.

While such statements may have rhetorical value, they ignore the fact that, when the States ratified the Reconstruction Amendments, they themselves approved clear "limitations on their authority."  *Fitzpatrick* v. *Bitzer*, 427 U.S. 445, 453 (1976).  Indeed, it is by now a fundamental tenet that "the Constitution * * * expressly gives authority for congressional interference and compulsion in the" areas protected by the Reconstruction Amendments, and that congressional enforcement of the rights secured in the Amendments is, in fact, "no invasion of State sovereignty" at all.  *Ex parte Virginia*, 100 U.S. 339, 346-348 (1879); accord, *Boerne* v. *Flores*, 521 U.S. 507, 517-518 (1997).

To be sure, Congress's enforcement authority under Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment extends only to the enforcement of rights secured by the Amendments.  *Boerne*, 521 U.S. at 518; *Ex parte Virginia*, 100 U.S. at 348.  Indeed, recent Supreme Court decisions concerning the reach of congressional authority under the Reconstruction Amendments have defined the outer limits of Congress's authority to enforce

- 22 -

the protections of the Fourteenth Amendment's Equal Protection Clause. But Section 5 of the

Voting Rights Act enforces the very core of the Fourteenth and Fifteenth Amendments, and

recent Supreme Court cases have repeatedly affirmed its validity. See, *e.g.*, *Lane*, 541 U.S. at

519 n.4; *Hibbs*, 538 U.S. at 737-738; *Board of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 373

(2001); *Boerne*, 521 U.S. at 526.

b.      *Congress Is Justified In Employing A Prophylactic Remedy To Prevent And Remedy Discrimination In Voting Against Minority Citizens*

Plaintiff also contends that Section 5 exceeds Congress's authority because Section 5

prohibits some voting practices that were not necessarily adopted with a discriminatory purpose,

and therefore would not violate the Fourteenth or Fifteenth Amendments. Pl. Mem. 45. This,

too, is well-covered territory. The Supreme Court has repeatedly affirmed Congress's general

authority to "enact prophylactic legislation proscribing practices that are discriminatory in effect,

if not in intent," *Tennessee* v. *Lane*, 541 U.S. 509, 520 (2004), as well as Section 5's prohibition

of "voting practices that have only a discriminatory effect," *City of Rome*, 446 U.S. at 175.

Enforcing a constitutional right by "prohibiting a somewhat broader swath of conduct" than is

prohibited by the Constitution, *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 81 (2000), is a far

cry from attempting to redefine a constitutional right. The former is a legitimate means of

preventing and remedying constitutional violations, see, *e.g.*, *South Carolina*, 383 U.S. at 327,

while the latter is an unconstitutional overstepping of congressional authority, see *Boerne*, 521

U.S. at 532. As the Supreme Court has repeatedly held, Section 5 of the Voting Rights Act falls

squarely on the legitimate side of that line.

To take a more recent example of permissible prophylactic legislation, in 2003, the

- 23 -

Supreme Court upheld the family leave provisions of the FMLA in *Hibbs*. That statutory

remedy was intended to "protect the right to be free from gender-based discrimination in the

workplace." *Id.* at 728. And yet, not only was there "no suggestion that the State's leave policy

was adopted or applied with a discriminatory purpose that would render it unconstitutional" in

that case, *Lane*, 541 U.S. at 519, the statute did not actually prohibit gender-based discrimination

– or any discrimination – at all. Rather, the statute required employers to provide employees

with up to 12 weeks of unpaid leave annually in certain family leave situations. Noting that

Congress is not confined to merely prohibiting conduct that is unconstitutional, the Court held

that this remedy – a remedy that makes no reference either to gender or to discrimination – was

an appropriate means of enforcing the Equal Protection Clause's prohibition on gender-based

discrimination. *Hibbs*, 538 U.S. at 740.

Unlike the FMLA, Section 5's remedy is addressed explicitly to discrimination against

minority voters. While Section 5 operates both prophylactically and remedially, there is no

doubt that protecting against discrimination in voting is one of the most appropriate areas for

prophylactic legislation under the Reconstruction Amendments. As noted in the United States'

opening memorandum, the right to vote is "fundamental," is "preservative of all rights," *Harper*

v. *Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966), and cannot be granted to some

citizens and denied to others unless "the exclusions are necessary to promote a compelling state

interest," *Dunn* v. *Blumstein*, 405 U.S. 330, 337 (1972) (internal quotation marks omitted). The

Supreme Court has explained that this heightened level of protection

> is necessary because statutes distributing the franchise constitute the foundation
> of our representative society. Any unjustified discrimination in determining who
> may participate in political affairs or in the selection of public officials
> undermines the legitimacy of representative government.

- 24 -

*Kramer* v. *Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969).

Moreover, given Congress's finding that voting discrimination in covered jurisdictions was "an insidious and pervasive evil" that had been perpetrated in and by those jurisdictions "through unremitting and ingenious defiance of the Constitution," *South Carolina*, 383 U.S. at 309, Congress was justified in employing a strong remedy. The Supreme Court concluded that this history of discrimination was sufficient to justify Congress's decision to prohibit voting changes with a discriminatory effect because "electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination." *City of Rome*, 446 U.S. at 177. Section 5's preventive preclearance mechanism is appropriate because "there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *Boerne*, 521 U.S. at 532 (citing Section 5 favorably). Moreover, where Congress has tried and failed to provide legislative remedies for a constitutional problem, Congress is justified in enacting "prophylactic measures in response." *Hibbs*, 538 U.S. at 737; see also *Lane*, 541 U.S. at 531. In upholding Section 5, the Supreme Court chronicled Congress's previous unsuccessful legislative attempts to address the problem of discrimination in voting. *South Carolina*, 383 U.S. at 309-315.

In recent years, the Supreme Court has also acknowledged that, where a history of purposeful discrimination exists, there arises a risk that stereotypes and prejudice born of that history will result in difficult to detect discrimination in the exercise of discretionary functions by governmental actors. See *Hibbs*, 538 U.S. at 736-737. The continuing risk that the very prejudice targeted by the Reconstruction Amendments will infect the adoption and

- 25 -

implementation of voting systems in covered jurisdictions justifies Section 5's ban on

implementation of discriminatory voting changes.

> c.     The Bailout System In Section 4(a) Is A Constitutional Aspect Of
> The Section 5 System

Plaintiff also argues that it cannot constitutionally be subject to Section 5 if it is not

eligible to seek to bail out of Section 5 coverage under Section 4(a) of the Act.  Essentially

identical challenges to the Act's bailout system have been considered and rejected by the

Supreme Court.

> i.     Plaintiff's Inability To Seek Bailout Does Not Imperil The
> Constitutionality Of Section 5

From the beginning, the Supreme Court has highlighted the Act's bailout mechanism[10] as

an important aspect of Section 5's constitutionality.  But the legitimacy and importance of the

statute's bailout mechanism does not now – and has not ever – hinged on the ability of every

covered jurisdiction to seek to bail out of coverage under Section 5.  As discussed at pages 3-5,

*supra*, between 1965 and 1984, only jurisdictions that had themselves been designated by the

Attorney General and the Director of the Census as falling under the coverage formula of Section

4(b), were eligible to seek bailout – a considerably stricter standard than that faced by Plaintiff

today.  And yet, the Supreme Court twice upheld the statute during those years, even against

challenge from a plaintiff that was not eligible to seek a bailout.

In *South Carolina*, 383 U.S. at 332, the plaintiff State contended that the bailout standard

would "impose an impossible burden of proof upon States and political subdivisions entitled to

---

[10] Background on the history of the bailout standard under Section 4(a) can be found in
Hancock and Tredway, *The Bailout Standard of the Voting Rights Act: An Incentive to End
Discrimination*, The Urban Lawyer (1985).

- 26 -

relief." The Supreme Court disagreed, holding that the "burden of proof" is "quite bearable, particularly since the relevant facts relating to the conduct of voting officials are peculiarly within the knowledge of the States and political subdivisions themselves." *Id.* at 331-332. Indeed, the Court found that the possibility of bailout was an important guard against any overbreadth in the statute's coverage. *Id.* at 331-332. More recently, too, the Court has reaffirmed the importance of the Act's bailout mechanism in ensuring the statute's congruence and proportionality. *Boerne*, 521 U.S. at 532.

Against this holding approving of the bailout system as written in 1965, the Supreme Court faced a constitutional challenge to Section 5 from a covered jurisdiction that was not eligible to seek a bailout in 1980 in *City of Rome*. In that case, the plaintiff city was covered by virtue of its location within the wholly-covered State of Georgia, and argued that: "if municipalities are now to be subject to section 5, it would be anomalous and unfair if they are not permitted to bail-out from the Act's coverage under Section 4(a)." *City of Rome*, 472 F. Supp. at 230. This Court and the Supreme Court disagreed. The Supreme Court held that the City of Rome, although required to comply with the requirements of Section 5, was not eligible to seek to bail out of those requirements on its own, but must rely on the State of Georgia to seek a bailout on behalf of the entire State and all of the political subunits within the State. *City of Rome*, 446 U.S. at 167-169. The Court nevertheless upheld the constitutionality of Section 5's application to Rome. *Id.* at 183. If the Supreme Court was not troubled by the fact that a covered city had to rely on the State within which it was located to seek a bailout, there is no reason for this Court to be troubled by the fact that Plaintiff must rely on the county in which it is located to seek a bailout.

- 27 -

ii.    *The Current Bailout System Remains Congruent And Proportional*

After the Supreme Court's decision in *City of Rome*, Congress liberalized the bailout provisions as part of the 1982 amendments to the Act both by expanding the number of jurisdictions that could seek to bail out, and by easing the substantive standard under which eligible jurisdictions may bail out.  The 1982 amendment to Section 4(a) expanded by a factor of ten the number of jurisdictions that were eligible to seek a bailout – from approximately 91 to at least 896 jurisdictions overall.  See Def. SMF at  ¶¶ 113-114.

Although Plaintiff complains that the current bailout limits are overly restrictive to the point of imperiling the constitutionality of Section 5, the Supreme Court twice upheld Section 5 under the old, more restrictive, bailout system.  Under that system, Plaintiff also would not have been eligible to seek bailout, and would have had to rely on Texas to bail out on behalf of the entire State and every subjurisdiction within the State.  The current bailout system is significantly less burdensome.

Congress's decision to limit the bailout option to counties, rather than the smallest covered subjurisdictions, was a deliberate and rational decision.  The limits prevent a potentially substantial burden on this Court and the Attorney General.  See n.3, *supra*.[11]  Indeed, extending the bailout option to the smallest jurisdictions in every covered state and political subdivision, such as Plaintiff, would allow well over 10,000 jurisdictions to file bailout cases in this Court. See Def. SMF at  ¶ 116.  Moreover, counties are typically a nexus for election functions.  In

---

[11] Cf. *City of Rome*, 472 F. Supp. at 232 (noting the "potentially severe administrative burden on the Attorney General by forcing him to defend numerous bail-out suits brought by political subunits.")

- 28 -

Texas, for example, counties conduct voter registration for elections for all of the subunits in the county, and are authorized to conduct joint elections for all the subunits.  Texas Election Code 271.001 to 271.014.  Indeed, Travis County has contracted with all of the 107 political subunits within the county – including Plaintiff – to conduct elections on their behalf.  Def. SMF at ¶¶ 28, 29, 32-33.  Thus, contrary to Plaintiff's assertions, it seems likely that Travis County would already have at hand much of the information necessary to analyze whether it and its subjurisdictions could successfully bailout if it chose to do so, because the county conducts voter registration and elections for all of its subjurisdictions.

Congress's 1982 amendments create "an incentive" for covered jurisdictions to "eliminate practices denying or abridging opportunities for minorities to participate in the political process."  S. Rep. No. 417, 97th Cong., 2d Sess. 59 (1982) (*1982 Senate Report*).  In amending the substantive standard, Congress sought to create a "behavior oriented standard" that gave covered jurisdictions "the incentive to do more than simply maintain a status quo that grandfathered in pre-1965 elections laws and practices that were discriminatory."  *Id.* at 46.  At the time, Congress estimated that at least 25% of approximately 800 covered jurisdictions studied would be immediately eligible to seek bailout when the new standard took effect in 1984, because they appeared to face no obvious barrier to obtaining a declaratory judgment.[12]  See *1982 Senate Report* 60, 69.  And, with respect to those jurisdictions that had failed to comply with "every single one" of the bailout criteria prior to the 1982 amendments, Congress determined that a jurisdiction that actually "desires to bail out and fully complies with the laws

---

[12] See also *Voting Rights Act, Hearing before the Subcommittee on the Constitution, Senate Comm. on the Judiciary*, 97th Cong., 2d Sess. 826-828 (1982) (Statement of Derfner).

- 29 -

protecting voting rights from that point on, []would be able to demonstrate a ten-year track record no later than 1992." *Id.* at 47. Congress expected that "most jurisdictions" covered by the temporary provisions and hopefully "all of them" would have bailed out under the new standard by 2007. *Id.* at 60.

Contrary to Plaintiff's assertions, the fact that most jurisdictions covered by Section 5 have not sought to bail out does not undermine the Supreme Court's conclusion that the bailout standard is constitutional. Aside from this case, 14 jurisdictions have filed actions seeking to bail out under Section 4(a) since the 1984 standard went into effect.[13] In each of those 14 cases, the Attorney General carefully investigated the claims and consented to the bailout requests without trial or formal discovery, as allowed by Section 4(a)(9) of the Act. No intervenors opposed bailout by those jurisdictions, and this Court granted bailout in each case.

While all of these 14 post-1984 bailouts have been by Virginia jurisdictions, bailout is not limited to jurisdictions in that State. Certainly, prior to 1984, jurisdictions from a number of different states successfully bailed out under Section 4(a). See nn.10, 15 *supra* (describing 14 successful bailout actions brought under the pre-1984 bailout standard by jurisdictions from 12 different states, none of them in Virginia). Moreover, Congress found that many covered jurisdictions likely already met the criteria to bail out starting in 1984, and all covered jurisdictions should be able to meet the objective bailout criteria, if they desired to do so.

Given that the Attorney General has consented to entry of bailout by each of the 14

---

[13] At the time of the 2006 House Report on the reauthorization, 11 jurisdictions had bailed out under Section 4(a) from 1997 to 2006. *2006 House Report* 25. Since the 2006 House Report was published, three additional jurisdictions have bailed out. Def. SMF at ¶ 115. There was one bailout case pending when the 1984 standard came into effect, from the State of Alaska, and the State voluntarily dismissed that case. See n.10, *supra*.

- 30 -

jurisdictions that have sought bailout since 1984, there is no basis for concluding that the bailout standard is too stringent.  Like Congress, the Attorney General believes many covered jurisdictions may be eligible to seek bailout.  Some jurisdictions, like Travis County, have not sought a bailout because they perceive advantages to being covered by Section 5.  See Travis County's Mot. for Summ. J. at 6.  Representatives of other jurisdictions, such as the State of North Carolina, similarly testified before Congress in 2006 in support of the preclearance requirements.[14]  The Attorney General has taken steps to inform covered jurisdictions and the public about the bailout procedures under Section 4(a), and to invite eligible jurisdictions to discuss the possibility of seeking bailout if they believe that they might be eligible.[15]

During the 2006 reauthorization process, Congress found that "the success and effectiveness of the VRA's temporary provisions" was reflected in part "by those jurisdictions that successfully terminated their covered status" through use of the Section 4(a) bailout process. *2006 House Report* 25.  Congress found that the "success of those jurisdictions illustrates that: (1) covered status is neither permanent nor over-broad; and (2) covered status has been and continues to be within the control of the jurisdiction such that those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so."  *Ibid.*  That determination remains valid.

---

[14] *Reauthorizing the Voting Rights Act's Temporary Provisions:  Policy Perspectives and Views From the Field:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 309-315 (2006) (Statement of Wright).

[15] See, *e.g.*, http://www.usdoj.gov/crt/voting/misc/sec_4.htm#bailout.

- 31 -

> 2.      *Section 5 Remains A Valid Prophylactic Means Of Enforcing The Protections Of The Fourteenth And Fifteenth Amendments*

Plaintiff also argues that Congress exceeded the bounds of its constitutional authority in extending the life of Section 5 in 2006 because, since 1965, the problem of discrimination against minority voters in covered jurisdictions has been alleviated. Again, Plaintiff is incorrect. Although discrimination has decreased against minority voters in covered jurisdictions, that fact does not distinguish the 2006 reauthorization of Section 5 from the reauthorizations in 1970, 1975, and 1982. Indeed, every time Congress has had to decide whether to extend Section 5, it has found two things: (1) minority voters in covered jurisdictions have made progress in participating and in having their votes count as a direct result of the enforcement of Section 5; and (2) continued enforcement of Section 5 is necessary to achieve further progress and protect that progress against backsliding. The 2006 reauthorization was no different.

> a.      *In 2006, As With Every Prior Reauthorization, Congress Found That Minority Voters Had Made Some Progress That Is Directly Attributable To Section 5*

In support of its argument that Section 5 has outlived its constitutionality, Plaintiff relies on Congress's statutory finding that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters." Pub. L. No. 109-246, § 2(b)(1), 120 Stat. 577. But Plaintiff's selective reliance on a fragment of one statutory finding highlights the flaws in its argument. The second half of the finding Plaintiff cites states: "This progress is the direct result of the Voting Rights Act of 1965." *Ibid.* And the very next statutory finding states:

> However, vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process.

*Id.* at § 2(b)(2), 120 Stat. 578. Thus, Congress found both that the progress minority voters have

- 32 -

enjoyed in their ability to participate in our democracy is directly attributable to the Voting

Rights Act, and that discriminatory barriers to minority voters' full participation remain.

Taken together, these findings refute the kernel of Plaintiff's argument – namely, that

some progress is enough progress.  Congress enacted Section 5 "to rid the country of racial

discrimination in voting."  *South Carolina*, 383 U.S. at 315.  Congress did not enact Section 5

"simply to reduce racial discrimination in voting to what some view as a tolerable level." 152

Cong. Rec. at S7976 (daily ed. July 20, 2006) (Statement of Sen. Feingold).  Thus, like previous

Congresses, Congress in 2006 was justified in concluding that the progress made to date is

insufficient progress.

In prior reauthorizations, Congress found that minority voters had made significant

progress toward attaining an equal opportunity to vote.  Before the 1970 reauthorization, for

example, Congress concluded that the Voting Rights Act had been "the most effective civil

rights legislation ever enacted by the Congress" and had "proven effective in implementing the

15th Amendment and making real the rights to register to vote which that Amendment secures."

*Joint View of 10 Members of the Judiciary Committee Relating to Extension of the Voting Rights

Act of 1965*, 115 Cong. Rec. 5520 (Mar. 2, 1970) (*1970 Joint View*).[16]  Congress also specifically

noted that registration rates of black voters had increased because of the Act, as had the number

of minority citizens elected to public office, as a result of enforcement of Section 5 and the rest

of the Act.  H.R. Rep. No. 397, 91st Cong., 1st Sess. 3-4 (1969) (*1969 House Report*).  The same

---

[16] The view of these members has been cited by both the Supreme Court and later Congresses as the committee report on the bill which was enacted.  See *City of Lockhart* v. *United States*, 460 U.S. 125, 140 n.4 (1983) (Marshall, J., concurring & dissenting in part); *United States* v. *Board of Comm'rs of Sheffield*, 435 U.S. 110, 133 (1978); *1982 Senate Report* 7.

- 33 -

was true prior to the reauthorizations in 1975, S. Rep. No. 295, 94th Cong., 1st Sess. 13-15

(1975) (*1975 Senate Report*); H.R. Rep. No. 196, 94th Cong., 1st Sess. 6 (1975) (*1975 House

Report*), and 1982, *1981 House Report* 7-11; *1982 Senate Report* 6.  Indeed, in 1982, the Senate

Report found that:

> As a result of the Voting Rights Act of 1965, hundreds of thousands of Americans
> can now vote and, equally important, have their vote count as fully as do the votes
> of their fellow citizens.  Men and women from racial and ethnic minorities now
> hold public office in places where that was once impossible.

*1982 Senate Report* 4-5.  Moreover, in upholding the reauthorization of Section 5 in *City of

Rome*, the Supreme Court, too, noted the effectiveness of the remedy and the resulting progress

in participation by minority voters.  446 U.S. at 180-181.

In 2006, Congress again concluded that the progress has been precisely *because of*

enforcement of the Voting Rights Act.  See *2006 House Report* 21.  Congress heard testimony

that Section 5, "in fact, ha[s] prevented and remedied much discrimination" and "continue[s] to

do so to this day."  *Evidence of Continued Need* at 13 (Testimony of Lee); see also *H. Appx.* 310;

*id.* at 365.  Mirroring the conclusions of earlier Congresses, Assistant Attorney General of the

Civil Rights Division Wan J. Kim testified that "the Voting Rights Act has widely been

recognized as one of the most successful pieces of civil rights legislation ever passed by

Congress, if not the most successful."  *Modern Enforcement of the Voting Rights Act* 8.  See also

*Voting Rights Act:  The Judicial Evolution of the Retrogression Standard:  Hearing Before the

House Comm. on the Judiciary*, 109th Cong., 1st Sess. 16-17 (2005).

- 34 -

b.    *In 2006, As With Every Prior Reauthorization, Congress Found That Section 5 Is Required To Preserve And Extend The Progress Made To Date*

In addition to finding that Section 5 was an effective remedy, every Congress to consider reauthorizing Section 5 – including the Congress in 2006 – also concluded that (1) discrimination in voting persisted despite the progress made, and (2) the continued operation of Section 5 was necessary to protect the gains made thus far by minority voters.

i.    *Congress Determined That The Progress Made To Date Is Fragile*

Prior to the 1970 reauthorization, Congress determined that the progress made by minority voters was insufficient and fragile. *1969 House Report* 4-5 (concluding that it was "essential" to reauthorize Section 5 "in order to safeguard the gains in Negro voter registration thus far achieved, and to prevent future infringements of voting rights based on race or color"). The Senate emphasized that, "[w]hile progress has been significant, it should not obscure the pressing needs which remain," and concluded that "more time is needed to accomplish what finally must be done to implement the 15th Amendment, by preserving the only voting rights law that has really worked." *1970 Joint View* 5520. The same was true in 1975, when Congress concluded that the progress made thus far was "limited." *1975 Senate Report* 14-15.

In upholding the 1975 reauthorization, the Supreme Court reached the same conclusion, finding that continued enforcement of Section 5 was "necessary to preserve the 'limited and fragile' achievements of the Act and to promote further amelioration of voting discrimination." *City of Rome*, 446 U.S. at 182. The Court credited Congress's determination in 1975 that "it is largely Section 5 [that] has contributed to the gains thus far achieved in minority political participation, and it is likewise Sect[i]on 5 [that] serves to insure that progress not be destroyed

- 35 -

through new procedures and techniques." *Id.* at 181 (citing *1975 Senate Report* 15-19; see also

*United States* v. *Beer*, 425 U.S. 130, 140-141 (1976)).

In 1982, Congress acknowledged this dynamic, recognizing that, with every

reauthorization determination, "Congress has had to balance a record of some progress against

strong evidence of continuing discrimination." *1982 Senate Report* 7. In striking that balance,

Congress concluded that:

> Although we have come a long way since 1965, the nation's task in securing
> voting rights is not finished. Continued progress toward equal opportunity in the
> electoral process will be halted if we abandon the Act's crucial safeguards now.
> The Committee is equally concerned about the risk of losing what progress has
> already been won. The gains are fragile. Without the preclearance of new laws,
> many of the advances of the past decade could be wiped out overnight with new
> schemes and devices.

*1982 Senate Report* 10.

> ii. *Congress Found That Second Generation Barriers*
> *Continue To Limit Minority Voters' Full Participation*

Significantly, Congress has found over the life of Section 5 that, as first generation

barriers to registration and participation began to fall away, second generation barriers arose. As

early as 1969, as more minorities began to vote, Congress found that jurisdictions resorted to

other means of limiting those voters from fully participating in the democratic process. *1969*

*House Report* 7. That trend continued in 1975, when Congress found that the "central problem

documented is that of dilution of the vote – arrangements by which the votes of minority electors

are made to count less than the votes of the majority." *1975 Senate Report* 27; accord *1975*

*House Report* 19; *Briscoe* v. *Bell*, 432 U.S. 404, 405-406 (1977). Congress recognized in 1981

that vote dilution mechanisms "can nullify minorities' ability to elect the candidate of their

choice just as would prohibiting some of them from voting." *1981 House Report* 17-18. And, in

- 36 -

1982, Congress explicitly linked the rise in minority registration resulting from enforcement of Section 5 with the rise in covered jurisdictions' use of dilutive techniques, finding that, "[f]ollowing the dramatic rise in registration, a broad array of dilution schemes were employed to cancel the impact of the new black vote." *1982 Senate Report* 6.

The 1982 Congress detailed some of the second-generation barriers employed by covered jurisdictions, including converting elective posts to appointive, manipulating election boundaries, and instituting majority vote requirements and at-large election schemes. *1982 Senate Report* 6. Such devices, Congress found, were used "to offset the gains made at the ballot box under the Act." *Ibid.*; see also *id.* at 10 ("[S]ince the adoption of the Voting Rights Act, covered jurisdictions have substantially move[d] from direct, over[t] impediments to the right to vote to more sophisticated devices that dilute minority voting strength."). But, as the 1982 Senate Report notes: "Congress anticipated this response. The preclearance provisions of Section 5 were designed to halt such efforts." *1982 Senate Report* 6. Congress's and the Supreme Court's findings regarding covered jurisdictions' use of second generation barriers make clear, moreover, that the use of such devices constitutes *intentional* discrimination.

As discussed in the United States' opening memorandum, U.S. Mem. 40-44, in 2006 Congress found that covered jurisdictions continue to engage in widespread vote dilution to diminish the effect of votes cast by minority citizens. The types of dilutive techniques mirror the techniques found objectionable in 1982. See *Evidence of Continued Need* 20 (Testimony of Strossen). To signify the magnitude of the ongoing problem, Congress codified its conclusion regarding the prevalence of second generation barriers to voting in its statutory findings. Pub. L. No. 109-246, § 2(b)(2), 120 Stat. 577 ("vestiges of discrimination in voting continue to exist as

- 37 -

demonstrated by second generation barriers constructed to prevent minority voters from fully

participating in the electoral process").

Thus, in 2006, Congress concluded – as it had in conjunction with every prior

reauthorization of Section 5 – that, in spite of the progress made to date, minority voters in

covered jurisdictions continue to face an unacceptable level of discrimination:

> Despite the progress made by minorities under the Voting Rights Act of 1965, the
> evidence before Congress reveals that 40 years has not been a sufficient amount
> of time to eliminate the vestiges of discrimination following nearly 100 years of
> disregard for the dictates of the 15th amendment and to ensure that the right of all
> citizens to vote is protected as guaranteed by the Constitution.

Pub. L. No. 109-246, § 2(b)(7), 120 Stat. 578.  Congress also noted that, "without the

continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens

will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted,

undermining the significant gains made by minorities in the last 40 years."  *Id.* at § 2(b)(9), 120

Stat. 578.  As detailed in the United States' and Defendants-Intervenors' opening memoranda,

these conclusions were amply supported by the evidence before Congress detailing not only

numerous examples of discrimination, but also the robust deterrent effect of Section 5.

### iii.     *Section 5 Helps Prevent Gamesmanship By Covered Jurisdictions*

Plaintiff notes, Pl. Mem. 4, 47, 58, that Congress relied in 1965 on the record of covered

jurisdictions' "gamesmanship" in evading both the effect of Congress's numerous legislative

attempts to enforce the Fifteenth Amendment and the force of judicial judgments entered against

the jurisdictions.  See *South Carolina*, 383 U.S. at 309-315.  Plaintiff claims that Congress erred

in reauthorizing Section 5 in 2006 because it "had no evidence that the type of gamesmanship

described in *Katzenbach* was still rampant in" covered jurisdictions.  Pl. Mem. 47.  But

- 38 -

Plaintiff's argument ignores the fact that Congress chose Section 5's preclearance mechanism precisely because preclearance would preclude such gamesmanship. As the Supreme Court recognized in *South Carolina*, Congress adopted the preclearance mechanism because it "had reason to suppose" that covered jurisdictions would continue to resort "to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees" if Congress adopted a more traditional after-the-fact remedy. 383 U.S. at 334-335. But by preventing covered jurisdictions from implementing voting changes without obtaining a determination that such changes are not discriminatory, Congress simply removed the opportunity for such gamesmanship by covered jurisdictions. Indeed, if such behavior had continued in the same scope and form through 2006, that behavior would suggest that Section 5 is an ineffective remedy.

In any case, Congress did have evidence that some covered jurisdictions continue to resist the nondiscrimination mandate of the Voting Rights Act. For example, Congress heard that, in Texas alone, 28 of the 72 counties in which objections have been interposed have "demonstrated a pattern of repeat offenses." *Evidence of Continued Need* 63 (Statement of Henderson). Congress heard testimony that in Louisiana, "since 1965, not one single Louisiana State House of Representatives redistricting plan as initially submitted to the Justice Department for review, has been precleared." *To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 16 (2005) (*To Examine the Impact and Effectiveness of the Voting Rights Act*) (Testimony of Morial). Congress also received evidence of numerous other repeat offenders among covered jurisdictions. See, *e.g.*, *Continuing Need for Section 203's Provisions for Limited English*

- 39 -

*Proficient Voters:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 235-252 (2006) (Statement of Greenbaum); cf. U.S. Mem. 32-33.

> iv.    *Recent Objection Rates Support Congress's Decision To Reauthorize Section 5*

Plaintiff also points to the annual rate of objections interposed by the Attorney General, as a percentage of the number of submissions by covered jurisdictions, as evidence that discrimination against minority voters is no longer a problem in covered jurisdictions.  When viewed in context, however, the rate of objections since 1982 supports reauthorization of Section 5 to the same degree that previous rates of objections supported previous reauthorizations. Historically, excluding the first few years of Section 5's implementation, the Attorney General has objected to approximately 1% of the changes submitted by covered jurisdictions.  See United States' Br. on Reargument, *Reno* v. *Bossier Parish*, Nos. 98-405, 98-406, 1999 WL 33609319, at *13 n.9, *22-*23 (July 26, 1999).  Although the rate of objections has decreased in the last 25 years, the number of changes submitted during that time has gone up precipitously, from an average of 2,466 per year before 1982 to an average of 16,506 per year since 1982.  *The Continuing Need for Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 69 (2006) (*The Continuing Need for Section 5 Pre-clearance*) (Statement of Earls); http://www.usdoj.gov/ crt/voting/sec_5/changes.htm.  During that time, Congress heard that the average number of objections interposed per year has, in fact, almost doubled – from an average of 51 per year to an average of 99 per year.  *The Continuing Need for Section 5 Pre-clearance* 69.[17]  Moreover, the Attorney General has objected to approximately

---

[17] The rate of objections since 2000 is understated due in part to the Supreme Court's

(continued...)

- 40 -

4% of the redistricting plans submitted between 1982 and 2004.  See *History, Scope, &*
*Purpose* 2596.  Objections to redistricting plans are a significant measure of discrimination
because they tend to affect the greatest number of voters.[18]

In addition, as detailed in the United States' opening memorandum, U.S. Mem. 31-32,
47-49, the objection statistics alone vastly underestimate the effect of Section 5.  Congress
learned that requests by the Department of Justice for more information sometimes cause the
jurisdiction to alter its proposed change. *H. Appx.* 124; *History, Scope, & Purpose* 93-94
(Testimony of Perales).  Congress found that requests for more information "affected more than
800 additional voting changes that were submitted for preclearance, compelling covered
jurisdictions to either alter the proposal or withdraw it from consideration altogether." *2006*
*House Report* 40-41.  One study concluded that "more information requests" (MIR's) prevented
the implementation of over a thousand voting changes; combined with the 2,282 objections
interposed during that time period, MIR's thus "increased the impact of the DOJ's efforts to

---

[17](...continued)
decision in *Reno* v. *Bossier Parish*, 528 U.S. 320, 336 (2000), which held that the Attorney
General could no longer interpose an objection to a voting change based on a finding of
discriminatory but nonretrogressive purpose.  That interpretation was contrary to the settled
understanding of the Attorney General and Congress as to the meaning of Section 5.  Pub. L. No.
109-246, § 2(b)(6), 120 Stat. 578 (2006); *2006 House Report* 66-68.  As the Attorney General
noted in a brief filed with the Supreme Court in *Bossier*, approximately 60% of objections
interposed in the 1990s were based on a finding of discriminatory but nonretrogressive purpose.
United States' Brief on Reargument, *Reno* v. *Bossier Parish*, Nos. 98-405, 98-406, 1999 WL
33609319, at *13 n.9, *22-*23 (July 26, 1999).

[18] Since 1982, the Attorney General has interposed an objection to at least one statewide
redistricting plan in every fully covered State and in most partially covered States.  As Congress
heard, objections to statewide election changes protect the most voters.  *Understanding the*
*Benefits and Costs of Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the*
*Judiciary*, 109th Cong., 2d Sess. 75 (2006) (Statement of Derfner).

- 41 -

promote compliance with Section 5 by 51% between 1982 and July 2005." *Continuing Need for Section 203's Provisions for Limited English Proficient Voters:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 219 (2006) (Submission of Frago & Ocampo).

Congress also noted Section 5's significant deterrent effect.  As discussed in the United States' opening memorandum, U.S. Mem. 47-49, numerous witnesses testified that Section 5 plays a vital, but unquantifiable deterrent role in the protection of minority voters.  One witness remarked that, "in the absence of section 5, minority voters would become increasingly marginalized during the redistricting process and elected officials would be more inclined to adopt voting changes that disadvantage minority voters." *Evidence of Continued Need* 20 (Testimony of Strossen).  Former mayor of New Orleans Marc Morial explained that Section 5 makes the voting process transparent, which in turn discourages election and legislative officials from taking discriminatory or otherwise retrogressive actions. *To Examine the Impact and Effectiveness of the Voting Rights Act* 17.[19]

3.    *Plaintiff's Texas- And MUD-Specific Claims Are Misplaced*

In addition to attacking the continued validity of Section 5 as applied to covered jurisdictions generally, Plaintiff also challenges its own coverage and that of the State of Texas.  Again, Plaintiff's arguments are unavailing.

---

[19] See also *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 17 (2006) ("[S]ome jurisdictions do not engage in actions they otherwise might take that would have a discriminatory, retrogressive, or dilutive effect because of the existence of Section 5 and the preclearance requirements.") (Testimony of Shaw).

- 42 -

    a.    *Texas Is A Covered Jurisdiction Because Of Its Extensive History Of Discriminating Against Minority Voters, Not Merely Because Of The Two Criteria In The Coverage Formula*

Plaintiff claims that Texas "is a covered jurisidiction [sic] solely because of the lack of Spanish-language election materials and less than 50% voter turnout in the 1972 presidential election," Pl. Mem. 5, and argues that reliance on such indicators from more than 30 years ago is inappropriate. But Plaintiff is simply incorrect that Texas became a covered jurisdiction based "solely" on its lack of Spanish-language voting materials and its low voter turn-out. Congress opted to cover Texas because of its extensive and inventive record of discriminating against minority voters, using methods well beyond English-only materials and barriers to registration.

The coverage formula codified in Section 4(b) of the Act must be viewed through the lens of history. In crafting the original coverage formula in 1965, Congress first examined the problem of voting discrimination in the country and found the worst records of such discrimination in a number of southern states. S. Rep. No. 162, Pt. 3, 89th Cong., 1st Sess. at 13-14 (1965). Congress determined that those jurisdictions "share[d] two characteristics * * *: the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average." *South Carolina*, 383 U.S. at 330. Congress extracted these two objective indicia of discrimination, and those two criteria became the coverage formula. When Congress extended the reach of Section 5 in 1975 to protect language minority voters, it employed the same method, first identifying the worst offenders and then adjusting the coverage formula to describe elements of the offenders' behavior.

In extending Section 5 to protect language minority voters, Congress took particular note of the State of Texas's history of discriminating against such citizens. Congress found that

- 43 -

Texas had "a long history of discriminating" against both black citizens and Mexican American citizens "in ways similar to the myriad forms of discrimination practiced, against blacks in the South." *1975 Senate Report* 25. Congress chronicled various aspects of Texas's discriminatory history, including its use of restrictive registration devices, white primaries, a poll tax, intimidation schemes, and various dilution techniques. *1975 Senate Report* 25-26. Such behavior included instances of "acts of physical, economic, and political intimidation when [minority] citizens [did] attempt to exercise the franchise." *1975 Senate Report* 26. The Supreme Court confirmed Congress's conclusions, noting Congress's particular concern "over the plight of Mexican-American citizens in Texas." *Briscoe*, 432 U.S. at 406.

A review of recent objections reveals a continuation of the types of behavior that led to Congress's decision to cover Texas in the first place. For example, in 1975, Congress noted Texas's history of discriminating against language minority voters by locating "polls at places where minority voters feel unwelcome or uncomfortable, or which are inconvenient to them, [or] inadequa[te]." *1975 Senate Report* 26. In 2006, the Attorney General objected to a Texas jurisdiction's change in the location and distribution of polling places because the proposed change would provide areas with large minority populations with "remarkably" fewer polling places per person than areas with small minority populations. Letter from Wan J. Kim to Renee Smith Byas (May 5, 2006) (Re: North Harris Montgomery Community College District). In 1975, Congress noted that the at-large election structure, accompanied at times by majority run-off and numbered post requirements, was used "extensively" throughout Texas to dilute the voting strength of racial and language minority voters. *1975 Senate Report* 27-28. Since 1982, the Attorney General has interposed objections to at least 20 separate submissions proposing the

- 44 -

adoption of at-large election schemes, numbered posts, and/or majority vote requirements.[20]  In

1975, Congress also found that Texas jurisdictions frequently adopted other vote dilution

techniques "in the wake of the recent emergence of minority attempts to exercise their right to

vote." *Id.* at 27.  Since 1982, the Attorney General has interposed objections approximately 30

---

[20] Letter from Bill Lann Lee to David Mendez (June 5, 2000) (Re:  Sealy Indep. Sch. Dist.), in *History, Scope, & Purpose* 2508-2512 (numbered posts); Letter from James P. Turner to Robert Gorsline (Apr. 26, 1993) (Re:  City of Lamesa), in *History, Scope, & Purpose* 2405-2407 (majority vote); Letter from James P. Turner to Earl Scarborough (Mar. 22, 1993) (Re: Corsicana Indep. Sch. Dist.), in *History, Scope, & Purpose* 2400-2402 (majority vote); Letter from John R. Dunne to Gary W. Smith (Dec. 14, 1992) (Re:  City of Galveston), in *History, Scope, & Purpose* 2390-2392 (numbered posts); Letter from James P. Turner to Frances Vesley (Aug. 17, 1992) (Re:  City of Ganado), in *History, Scope, & Purpose* 2384-2385 (numbered posts); Letter from John R. Dunne to John T. Fleming  (July 31, 1992) (Re:  Del Valle Indep. Sch. Dist.), in *History, Scope, & Purpose* 2381-2383 (majority vote); Letter from John R. Dunne to Hon. Preston Parks (July 20, 1992) (Re:  City of Wilmer), in *History, Scope, & Purpose* 2378-2379 (numbered posts); Letter from John R. Dunne to Robert C. Story (Nov. 13, 1990) (Re:  City of Freeport), in *History, Scope, & Purpose* 2291-2292 (majority vote); Letter from James P. Turner to Jerry W. Corbin (Feb. 5, 1990) (Re:  Denver City), in *History, Scope, & Purpose* 2278-2279 (numbered posts, majority vote); Letter from James P. Turner to Richard Collins (Feb. 3, 1989) (Re:  City of El Campo), in *History, Scope, & Purpose* 2262-2263 (numbered posts, majority vote); Letter from Wm. Bradford Reynolds to John R. Saul (Jan. 4, 1988) (Re: Columbus Indep. Sch. Dist.), in *History, Scope, & Purpose* 2247-2248 (numbered posts, majority vote); Letter from Wm. Bradford Reynolds to Hon. Jack M. Rains (Oct. 2, 1987) (Re: Crockett County), in *History, Scope, & Purpose* 2245-2246 (at large, numbered posts); Letter from Wm. Bradford Reynolds to Kelly Frels (Dec. 29, 1986) (Re:  Wharton Indep. Sch. Dist.), in *History, Scope, & Purpose* 2240-2241 (majority vote); Letter from James P. Turner to Brenda Adams (Nov. 8, 1985) (Re:  City of El Campo), in *History, Scope, & Purpose* 2221-2223 (numbered posts, majority vote, at large); Letter from Wm. Bradford Reynolds to E. Max Harris (Feb. 26, 1985) (Re:  Liberty-Eylau Indep. Sch. Dist.), in *History, Scope, & Purpose* 2216-2218 (majority vote); Letter from Wm. Bradford Reynolds to Tony E Murray (Jan. 18, 1985) (Re: Rusk Indep. Sch. Dist.), in *History, Scope, & Purpose* 2214-2215 (numbered posts); Letter from Wm. Bradford Reynolds to Jack R. Trammell (Dec. 27, 1983) (Re:  Pewitt Consol. Indep. Sch. Dist.), in *History, Scope, & Purpose* 2207-2208 (numbered posts); Letter from Wm. Bradford Reynolds to Bennie Wolff (Aug. 19, 1983) (Re:  Stockdale Indep. Sch. Dist.), in *History, Scope, & Purpose* 2201-2203 (numbered posts); Letter from James P. Turner to Don Savage (Oct. 14, 1982) (Re:  City of Pleasanton), in *History, Scope, & Purpose* 2192-2198 (numbered posts); Letter from Wm. Bradford Reynolds to Leroy Bieri (Mar. 15, 1982) (Re:  Angleton Indep. Sch. Dist.), in *History, Scope, & Purpose* 2190-2192 (numbered posts, majority vote).

- 45 -

times to dilutive redistricting plans alone adopted by Texas jurisdictions, including some

statewide plans.[21]

---

[21] Letter from Ralph F. Boyd, Jr. to Hon. Geoffrey Connor (Nov. 16, 2001) (Re:  State of Texas), in *History, Scope, & Purpose* 2518-2523; Letter from Deval L. Patrick to Mary Anne Wyatt (Oct. 31, 1994) (Re:  Gonzales County Underground Water Conservation District), in *History, Scope, & Purpose* 2457-2459; Letter from James P. Turner to Irene E. Foxhall (Aug. 30, 1993) (Re:  Wharton County), in *History, Scope, & Purpose* 2419-2421; Letter from James P. Turner to Virginia Daugherty (June 4, 1993) (Re:  McCulloch County), in *History, Scope, & Purpose* 2413-2415; Letter from James P. Turner to Virginia Daugherty (May 10, 1993) (Re:  Castro County), in *History, Scope, & Purpose* 2410-2412; Letter from John R. Dunne to Robert Bass (Oct. 6, 1992) (Re:  Castro County), in *History, Scope, & Purpose* 2386-2389; Letter from John R. Dunne to Robert T. Bass (July 14, 1992) (Re:  Gaines County), in *History, Scope, & Purpose* 2376-2377; Letter from John R. Dunne to Robert T. Bass (Apr. 10, 1992) (Re:  Deaf Smith County), in *History, Scope, & Purpose* 2370-2372; Letter from John R. Dunne to Robert T. Bass (Apr. 10, 1992) (Re:  Hale County), in *History, Scope, & Purpose* 2367-2369; Letter from John R. Dunne to Robert T. Bass (Apr. 6, 1992) (Re:  Cochran County), in *History, Scope, & Purpose* 2364-2366; Letter from John R. Dunne to Marilyn Cox (April 6, 1992) (Re:  Bailey County), in *History, Scope, & Purpose* 2362-2363; Letter from John R. Dunne to Robert T. Bass (Apr. 6, 1992) (Re:  Terrell County), in *History, Scope, & Purpose* 2359-2361; Letter from John R. Dunne to Brian P. Quinn (Mar. 30, 1992) (Re:  Lubbock Indep. Sch. Dist.), in *History, Scope, & Purpose* 2357-2358; Letter from John R. Dunne to Michael Morrison (Mar. 30, 1992) (Re:  Ellis County), in *History, Scope, & Purpose* 2355-2356; Letter from John R. Dunne to James E. Nelson (Mar. 30, 1992) (Re:  Monahans-Wickett-Pyote Indep. Sch. Dist.), in *History, Scope, & Purpose* 2352-2354; Letter from John R. Dunne to Bob Bass (Mar. 30, 1992) (Re:  Castro County), in *History, Scope, & Purpose* 2349-2351; Letter from John R. Dunne Hon. Ray Holbrook (Mar. 17, 1992) (Re:  Galveston County), in *History, Scope, & Purpose* 2344-2345; Letter from John R. Dunne to Michael D. Morrison (Mar. 17, 1992) (Re:  Galveston County), in *History, Scope, & Purpose* 2341-2343; Letter from John R. Dunne to J. Elliott Beck (Mar. 17, 1992) (Re:  Gregg County), in *History, Scope, & Purpose* 2338-2340; Letter from John R. Dunne to Hon. John Hannah (Nov. 12, 1992) (Re:  State of Texas), in *History, Scope, & Purpose* 2319-2323; Letter from John R. Dunne to Hon. John Hannah (Oct. 4, 1991) (Re:  City of Houston), in *History, Scope, & Purpose* 2315-2318; Letter from John R. Dunne to Analeslie Muncy (May 6, 1991) (Re:  City of Dallas), in *History, Scope, & Purpose* 2307-2311; Letter from James P. Turner to Pam Rhodes (Feb. 12, 1990) (Re:  Nolan County Hosp. Dist.), in *History, Scope, & Purpose* 2280-2283; Letter from James P. Turner to Richard D. Cullen (Oct. 27, 1989) (Re:  City of Cuero), in *History, Scope, & Purpose* 2275-2277; Letter from James P. Turner to Ben Colwell (May 8, 1989) (Re:  Refugio Indep. Sch. Dist.), in *History, Scope, & Purpose* 2272-2274; Letter from James P. Turner to Randall Strong (Mar. 20, 1989) (Re:  City of Baytown), in *History, Scope, & Purpose* 2269-2271; Letter from Wm. Bradford Reynolds to William T. Armstrong, III (Jan. 22, 1988) (Re:  Hondo Indep. Sch. Dist.), in *History, Scope, &*

(continued...)

- 46 -

Moreover, Congress had evidence of continued voting discrimination in Texas well beyond recent objection letters. Congress amassed evidence that: (1) registration and turnout rates of Latino voters in Texas continue to lag far behind those of Anglo voters, *2006 House Report* 29; (2) Texas has sustained more objections in the aggregate than any other covered State since 1965, in spite of the fact that Texas has been covered only since 1975, *History, Scope, & Purpose* 86; (3) Texas jurisdictions were the losing defendant in more Section 5 enforcement actions between 1982 and 2004 than any other State, *H. Appx.* 250; (4) Texas led every covered State in combined objections, submission withdrawals, and judgments favorable to minority voters between 1982 and 2004, *H. Appx.* 273; (5) Texas was on the losing side of more Section 2 cases than any other covered jurisdiction since 1982, *H. Appx.* 206-207; and (6) anecdotally, discrimination against minority and language minority voters continues to abound in Texas, see, *e.g.*, *H. Appx.* 138, 185, 309.

Furthermore, the Supreme Court itself has chronicled Texas's history of voting discrimination. Just last year, the Court held that Texas's 2003 congressional redistricting violated Section 2 of the Voting Rights Act because it diluted the voting strength of Latino voters within the State. *LULAC* v. *Perry*, 126 S. Ct. 2594, 2613-2623 (2006). In so holding, the Court upheld the district court's finding of "'racially polarized voting' in south and west Texas, and indeed 'throughout the State.'" *Id.* at 2615 (quoting *Session* v. *Perry*, 298 F. Supp. 2d 451, 492-493 (E.D. Tex. 2004) (3-judge court)). The Court recognized that:

---

[21](...continued)
*Purpose* 2249-2250; Letter from Wm. Bradford Reynolds to William J. Campion (Oct. 14, 1986) (Re: Trinity Valley Community College Dist.), in *History, Scope, & Purpose* 2236-2237; Letter from Wm. Bradford Reynolds to Richard B. Collin (July 18, 1986) (Re: City of El Campo), in *History, Scope, & Purpose* 2233-2235.

- 47 -

Texas has a long, well-documented history of discrimination that has touched
upon the rights of African-Americans and Hispanics to register, to vote, or to
participate otherwise in the electoral process.  * * *  The history of official
discrimination in the Texas election process – stretching back to Reconstruction –
led to the inclusion of the State as a covered jurisdiction under Section 5 in the
1975 amendments to the Voting Rights Act.

126 S. Ct. at 2622 (quoting *Vera* v. *Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex.1994)); accord

*Bush* v. *Vera*, 517 U.S. 952, 981-982 (1996) (noting "Texas' long history of discrimination

against minorities in electoral processes, stretching from the Reconstruction to modern times,

including violations of the Constitution and of the VRA").

Thus, even if Texas has addressed and remedied the two indicia of discrimination

incorporated into the coverage formula of Section 4(b) in 1975, it has fallen far short of

demonstrating that its minority citizens are no longer subject to discrimination in voting.  As

Congress explained in 1970, the original coverage formula was "not intended as a measure of an

adequate level of political enfranchisement" of minority voters.  *1970 Joint View* 5521.  Nor did

Congress intend that the formula itself would "adequately serve as a criterion for determining

when the discriminatory efforts had been sufficiently eradicated to warrant removing the

safeguards which made the improvement possible."  *Ibid.*  Rather, Section 5 was intended to

"banish the blight" of discrimination in the entire voting system, *South Carolina*, 383 U.S. at

308, a goal yet to be attained in Texas or throughout covered jurisdictions.

> b.  *Congress Need Not Have Found That This Specific Plaintiff*
> *Engaged In A Pattern Of Discriminatory Behavior Before It May*
> *Subject Plaintiff To Section 5's Preclearance Requirement*

Plaintiff correctly notes that it is covered by Section 5 by virtue of its location within the

State of Texas.  But Plaintiff is incorrect in suggesting that Congress cannot constitutionally

- 48 -

subject a district such as Plaintiff to Section 5 without first finding that the district itself has

engaged in a pattern of discriminating against minority voters.  The Supreme Court long ago

clarified that governmental units located within a State covered by Section 5 must be covered if

Section 5 is to have any effect at all, regardless of whether Congress determined that those

smaller units had themselves engaged in voting discrimination.  In *United States* v. *Board of

Commissioners of Sheffield*, 435 U.S. 110, 124-125 (1978), the Court found that any contrary

reading of the statute "would permit the precise evil that § 5 was designed to eliminate" by

"invit[ing] States to circumvent the Act" by allowing districts such as Plaintiff "that do not

conduct voter registration to control critical aspects of the electoral process."  Indeed, as Plaintiff

points out, Plaintiff is a creation of the State of Texas; the fact that it is covered by Section 5 as a

result of Texas's unconstitutional behavior does not make Section 5 any more intrusive an

exercise of Congress's authority under the Fourteenth and Fifteenth Amendments.

The Supreme Court's holdings in *City of Rome* and *Lopez* confirm this reading of the

statute.  In *City of Rome*, the Court upheld the constitutionality of Section 5 in a case applying

the statute to a jurisdiction in the same situation as Plaintiff:  the City of Rome was located

within a fully-covered State and was unable to seek bailout on its own behalf.  446 U.S. at 167-

169.  Although there was no evidence that Congress had made findings that the City itself had

engaged in a pattern of voting discrimination, the Court upheld the statute against the City's

constitutional challenge.  *Id.* at 172-183.  An analogous situation arose in *Lopez*, in which the

Supreme Court upheld Section 5's application to a law enacted by the State of California, as that

law was applied to a covered county within California, even though California itself was not

subject to Section 5.  525 U.S. at 283-285.  The Court specifically rejected California's argument

- 49 -

"that § 5 could not withstand constitutional scrutiny if it were interpreted to apply to voting

measures enacted by States that have not been designated as historical wrongdoers in the voting

rights sphere." *Id.* at 282. The Court instead reaffirmed its previous holdings that, "once a

jurisdiction has been designated, the Act may guard against both discriminatory animus and the

potentially harmful *effect* of neutral laws in that jurisdiction." *Id.* at 283. The same logic

dictates that all changes in voting practices within the entire State of Texas should be covered by

Section 5, regardless of which governmental subunit created by the State proposes the change.

Indeed, the rights guaranteed under the Reconstruction Amendments are "personal

rights" that are "guaranteed to the individual." *Regents of Univ. of Calif.* v. *Bakke*, 438 U.S. 265,

289 (1978); see also *City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469, 493 (1989). In 1975,

Congress determined that the minority citizens of Texas had been subject to a pattern of

purposeful discrimination in voting and were entitled to the prophylactic protection of Section

5's preclearance mechanism. The Supreme Court approved that determination. *Briscoe*, 432

U.S. at 414-415. The minority citizens who reside within Plaintiff are minority citizens of the

State of Texas and remain entitled to have their fundamental right to vote safeguarded by Section

5 against invasion by any arm of the State.

### III. PLAINTIFF'S ALLEGED AS-APPLIED CHALLENGE MUST FAIL BECAUSE PLAINTIFF HAS NOT IDENTIFIED ANY INDIVIDUAL RIGHT TRANSGRESSED BY SECTION 5 COVERAGE

As explained in the United States' opening memorandum, U.S. Mem. 9 n.9, Plaintiff's

attack on Congress's authority under the Fourteenth and Fifteenth Amendments to enact Section

5 is a facial challenge to the statute, not an as-applied challenge. Where the subject of a federal

statute asserts that Congress acted outside of its enumerated powers in enacting the statute, a

- 50 -

court must determine whether the statute is valid on its face.  See, *e.g.*, *Hibbs*, 538 U.S. 721;

*Morrison*, 529 U.S. 598; *Boerne*, 521 U.S. 507; *United States* v. *Lopez*, 514 U.S. 549 (1995).  A

"statute or a rule may be held constitutionally invalid as applied when it operates to deprive an

individual of a protected right although its general validity as a measure enacted in the legitimate

exercise of state power is beyond question."  *Boddie* v. *Connecticut*, 401 U.S. 371, 379 (1971).

In order to assert an as-applied challenge to Section 5, Plaintiff must demonstrate that

application of Section 5 to it unconstitutionally deprives it of some protected personal right.

Plaintiff has failed to do so.

Sprinkled throughout Plaintiff's memorandum are vague assertions that complying with

Section 5 imposes an unacceptable "burden" on Plaintiff.  Pl. Mem. 46, 52, 54.  But Plaintiff

does not even attempt to articulate exactly what that burden is, or how it affects any personal

right secured to Plaintiff by the Constitution, to say nothing of demonstrating that Section 5

unconstitutionally burdens such a right.  Nor could it.  The evidence adduced through discovery

demonstrates that Section 5 imposes almost no burden at all on Plaintiff, let alone an

unconstitutional burden.

Plaintiff cannot establish that Section 5 has ever prevented it from implementing a voting

change.  None of Plaintiff's submitted changes has ever been objected to by the Attorney

General or this Court.  Def. SMF at ¶¶ 71-78.  Plaintiff has never been sued under Section 5 by

the Attorney General or a private plaintiff seeking to enjoin implementation of an unprecleared

change.  Def. SMF at  ¶ 89; Plaintiff's Affidavit of Frank Reilly.  Plaintiff has made only eight

Section 5 submissions total in its 20 year history, and the cost of Plaintiff's Section 5

submissions is quite modest, particularly by comparison to its overall budget.  Def. SMF at  ¶¶

- 51 -

71-78, 98-99 (Plaintiff expends an average of $233 on preclearance submissions annually, out of an average annual expenditures of $548,338).  Moreover, Plaintiff admits that it is unaware of any instance in which it has considered and then refrained from making a voting change because of Section 5.  Def. SMF at ¶ 88.  Plaintiff has not submitted any voting changes since 2004 and cannot identify any voting change that it plans to adopt in the future.  Def. SMF at  ¶¶ 84-87, 94, 96.

Moreover, the range of voting changes that Plaintiff has discretion to adopt is quite limited.  Nearly all features of its existing electoral system are fixed by state law, and Plaintiff does not have discretion under state law to change the vast majority of these features on its own, absent a change in state law.  Def. SMF at  ¶¶ 53-70.  For example, Plaintiff has no discretion under state law to change the qualifications for candidates for director positions, the number of directors, the term of office for its directors, the non-partisan nature of its director elections, the plurality-win feature of its director elections, the fact that it only conducts general elections and not primaries, its method of filling vacancies for director positions, the date of its elections, or its polling place hours.  Def. SMF at  ¶¶ 53-70.  Likewise, Plaintiff has no discretion to alter the qualifications of voters in its elections because such qualifications are fixed by state law, and cannot alter the procedures for registering to vote in its elections because registration duties are delegated by state law to the county registrar.  Def. SMF at  ¶¶ 70, 120-124.

Plaintiff's own particular situation likewise vastly limits the range of voting changes that it might adopt on its own.  Plaintiff has signed joint election agreements with Travis County that cover 2004 through 2011, and automatically renew for two additional three-year periods through 2017.  Def. SMF at  ¶¶ 28-29, 32-33.  Plaintiff maintains that it need not submit for preclearance

- 52 -

the county's future conduct of its elections under such agreements having already received

preclearance for its initial 2004 joint election agreement.  See Pl. Mot. for Summ. J. at 10.

Likewise, under these joint election agreements, Plaintiff maintains that Travis County will

submit the voting changes for joint elections with Plaintiff that relate to the county's conduct of

the election.  See Pl. Mot. for Summ. J. at 10.  Hence, Plaintiff believes, and facts seem to bear

out, that Travis County or the City of Austin will submit for preclearance any foreseeable future

changes in election precincts, polling places, and early voting locations in its jointly conducted

elections, thus relieving Plaintiff of the burden of making such submissions.  See Pl. Mot. for

Summ. J. at 10; Def. SMF at  ¶¶ 79-83.

Finally, the number of elections that Plaintiff holds, and thus the opportunities for it to

adopt voting changes, is likewise quite limited.  By state law, Plaintiff only conducts one

election every two years.  Def. SMF at  ¶¶ 58-60.  Since its creation in 1986, Plaintiff has

conducted only eight elections, having cancelled three because of lack of opposition.  Def. SMF

at  ¶¶ 12, 17, 19-21, 23-26, 31, 36.  Since 1988, Plaintiff has conducted no type of election other

than director elections.  Def. SMF at  ¶¶ 12, 17, 19-21, 23-26, 31, 36.  Plaintiff does not conduct

special elections to fill vacancies because state law requires that such vacancies are filled by

appointment.  Def. SMF at  ¶ 68.  Plaintiff has received preclearance to cancel its director

elections under state law whenever its director candidates are unopposed, and Plaintiff has

cancelled its elections under these circumstances on three occasions since 1986.  Def. SMF at  ¶¶

23-25, 67, 75.   Plaintiff need not ever conduct any type of election other than director elections

(such as a tax or bond election) because all of the utility work for the district has been

completed, the district has issued all of the bonds it intends to issue to pay for that utility work,

- 53 -

and the district is well below its bonding limit.  Def. SMF at  ¶¶ 47-49, 92.  Plaintiff itself will

eventually be dissolved entirely, and thus cease holding any elections, once its bonds are paid

off.   Def. SMF at  ¶ 100.[22]

Because Plaintiff has not demonstrated – and cannot do so – that Section 5

unconstitutionally burdens any protected right secured to Plaintiff, it cannot assert an as-applied

challenge to Section 5.

_____

[22] In particular, Plaintiff cannot claim to be burdened by changes made by the 2006 amendments to the Act to the substantive standards by which the Attorney General determines whether voting changes are discriminatory in purpose or effect under Section 5.  See Pub. L. No. 109-246, § 5, 120 Stat. 580-581.  Plaintiff has not submitted any voting changes for review under Section 5 since the 2006 amendments went into effect, has not identified any voting changes that it plans to adopt or to submit in the future, and has not had any voting changes objected to under Section 5.  See Pl. Mot. for Summ. J. at 45 n.10; Def. SMF at  ¶¶ 84-87, 94, 96.  In any case, the substantive amendment Plaintiff complains of – Congress's "clarifying that any voting change motivated by any discriminatory purpose is prohibited under Section 5," Pl. Mem. 45 n.10 – merely reflects the Constitution's prohibition on intentional discrimination.

- 54 -

## CONCLUSION

This Court should deny Plaintiff's motion for summary judgment because it is not

eligible to seek a bailout under Section 4 of the Voting Rights Act, and because, in extending the

life of Section 5 of the Voting Rights Act in 2006, Congress acted within its constitutional

authority.

Respectfully submitted,

JEFFREY A. TAYLOR                WAN J. KIM
United States Attorney          Assistant Attorney General
                                Civil Rights Division

                                ASHEESH AGARWAL
                                Deputy Assistant Attorney General
                                Civil Rights Division

                                JOHN K. TANNER (D.C. Bar No. 318873)
                                Chief, Voting Section

                                  */s/ T. Christian Herren, Jr.*
                                H. CHRISTOPHER COATES
                                Principal Deputy Chief
                                T. CHRISTIAN HERREN, JR.
                                chris.herren@usdoj.gov
                                RICHARD DELLHEIM
                                richard.dellheim@usdoj.gov
                                SARAH E. HARRINGTON
                                sarah.harrington@usdoj.gov
                                CHRISTY A. McCORMICK
                                christy.mccormick@usdoj.gov
                                Attorneys
                                Civil Rights Division
                                United States Department of Justice
                                Room 7254 - NWB
                                950 Pennsylvania Ave., N.W.
                                Washington, DC 20530
                                Phone: (800) 253-3931
                                Fax:    (202) 307-3961

Date:  June 15, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2007, I caused to be served a copy of the foregoing

through the Court's ECF filing system to counsel of record.


    */s/ T. Christian Herren, Jr.*
T. CHRISTIAN HERREN, JR.