# Exhibit 1

2769

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHENANDOAH COUNTY, VIRGINIA,           )
                                       )
                Plaintiff,             )
                                       )
        v.                             ) C.A. No. 1:99CV00992
                                       )
JANET RENO, Attorney General           ) (KLH, PLF, NHJ)
of the United States of America        ) (three-judge court)
BILL LANN LEE, Acting Assistant        )
Attorney General, Civil Rights         ) FILED
Division,                              )
                                       ) OCT 1 5 1999
                Defendants.            ) Clerk, U.S. District Court
                                       )   District of Columbia

CONSENT JUDGMENT AND DECREE

This action was initiated by Shenandoah County, a political subdivision of the Commonwealth of Virginia (hereafter "the County"). The County is subject to the provisions of Section 5 of the Voting Rights Act of 1965 as amended. 42 U.S.C. §1973c. The County seeks a declaratory judgment under Section 4 of the Voting Rights Act of 1965, as amended, 42 U.S.C. §1973b. A three-judge court has been convened as provided in 42 U.S.C. §1973b(a)(5) and 28 U.S.C. §2284.

Section 4(A) of the Voting Rights Act provides that a State or political subdivision subject to the special provisions of the Act may be exempted from those provisions if it can demonstrate in an action for a declaratory judgment before the United States District Court for the District of Columbia that it has both 1) complied with the Voting Rights Act during the ten-year period prior to filing the action; and 2) taken positive steps both to encourage minority political participation and to remove



2770

structural barriers to minority electoral influence.

In order to demonstrate compliance with the Voting Rights Act during the ten-year period prior to commencement of a declaratory judgment action under Section 4(a), a political subdivision in Virginia must satisfy five conditions: 1) no test or device may have been used within the political subdivision during that ten-year period for the purpose or with the effect of denying or abridging the right to vote on account of race or color; 2) no court of the United States may have issued a final judgment during that ten-year period that the right to vote has been denied or abridged on account of race or color within the territory of the political subdivision; no consent decree, settlement or agreement may have been entered into during that ten-year period that resulted in the abandonment of a voting practice challenged on such grounds; and no such claims may be pending at the time the declaratory judgment action is commenced; 3) no Federal examiners may have been assigned to the political subdivision during the ten-year period preceding commencement of the declaratory judgment action; 4) the political subdivision and all governments units within its territory must have complied with Section 5 of the Voting Rights Act, 42 U.S.C. §1973c, during that ten-year period, including the requirement that voting changes covered under Section 5 were not enforced without Section 5 preclearance, and that all voting changes denied Section 5 preclearance by the Attorney General or the District Court for the District of Columbia have been repealed; and 5) neither the

- 2 -

2771

Attorney General nor the District Court for the District of Columbia may have denied Section 5 preclearance to a submission by the political subdivision or any governmental unit within its territory during that ten-year period, nor may any Section 5 submissions or declaratory judgment actions be pending. 42 U.S.C. §1973b(a)(1)(A-E).

Also, to obtain the declaratory judgment, a political subdivision and all governmental units within its territory must have eliminated voting procedures and methods of election that inhibit or dilute equal access to the electoral process. 42 U.S.C. §1973b(a)(1)(F)(i). In addition, the political subdivision must have engaged in constructive efforts to eliminate intimidation or harassment of persons exercising voting rights, and to expand the opportunity for convenient registration and voting for every person of voting age, and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process. 42 U.S.C. §1973b(a)(1)(F)(ii-iii).

The political subdivision is required to present evidence of minority participation, including the levels of minority group registration and voting, changes in such levels over time, and disparities between minority group and non-minority group participation. 42 U.S.C. §1973b(a)(2). The political subdivision may not in the preceding ten years have engaged in violations of any provision of the Constitution or laws of the United States or any State or political subdivision with respect

- 3 -

2772

to discrimination in voting on account of race or color. 42 U.S.C. §1973b(a)(3). Finally, the political subdivision must provide public notice of its intent to seek a Section 4(a) declaratory judgment. 42 U.S.C. §1973b(a)(4).

The defendant United States has conferred with Plaintiff Shenandoah County and, upon investigation, has agreed that the Plaintiff is entitled to the requested declaratory judgment, subject to annual reporting requirements for a period of five years to which the parties have agreed as a basis for resolving this action. 42 U.S.C. §1973b(a)(9). The parties have filed a joint motion, accompanied by a Stipulation of Facts, for entry of this Consent Judgment and Decree.

### FINDINGS

Pursuant to the parties Stipulations and joint motion, this Court finds as follows:

1. Shenandoah County is a political subdivision of the Commonwealth of Virginia, and a political subdivision of a state within the meaning of Section 4(a) of the Voting Rights Act, 42 U.S.C. §1973b(a)(1). See Stipulation of Facts, ¶ 1.

2. There are nine separate governmental units within Shenandoah County, including: the towns of Edinburg, Mount Jackson, New Market, Strasburg, Toms Brook, and Woodstock; two special districts including: the Stoney Creek Sanitary District, and the Toms Brook-Maurertown Sanitary District; and the Shenandoah County School Board. See Stipulation of Facts, ¶ 2.

3. No discriminatory test or device has been used by the

- 4 -

2773

County during the ten years prior to the commencement of this action for the purpose or with the effect of denying or abridging the right to vote on account of race or color. See Stipulation of Facts, ¶ 33.

4. No court of the United States has issued a final judgment during the last ten years prior to the commencement of this action that the right to vote has been denied or abridged on account of race or color in Shenandoah County, and no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds during that time. No such claims presently are pending or were pending at the time this action was filed. See Stipulation of Facts, ¶¶ 34, 35.

5. No Federal Examiners have been to Shenandoah County. See Stipulation of Facts, ¶ 38.

6. Shenandoah County and the governmental units within the County have obtained Section 5 preclearance for all voting changes enforced within Shenandoah County during the ten-year period preceding this action. However, preclearance was not obtained in a timely manner, i.e. before the changes were enforced, with respect to a special election conducted by the county and various annexations by four of the towns. See Stipulation of Facts, ¶¶ 23, 41.

7. All voting changes submitted by the County under Section 5 have been precleared by the Attorney General. No Section 5 submissions by Shenandoah County presently are pending before the

- 5 -

2774

Attorney General. Shenandoah County has never sought Section 5 judicial preclearance from this court. See Stipulation of Facts, ¶ 24.

8. The County is not employing voting procedures or methods of election which inhibit or dilute equal access to the electoral process by its minority citizens. See Stipulation of Facts, ¶ 37.

9. There is no indication that any persons in the County have been subject to intimidation or harassment in the course of exercising their right to participate in the political process. See Stipulation of Facts, ¶ 39.

10. The County has engaged in constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age, and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process. See Stipulation of Facts, ¶¶ 25-27, 30-31.

11. Because Shenandoah County does not record the race of its registered voters, it is unable to present evidence directly measuring minority voter participation, but the County has provided evidence of voter participation to the extent possible. See Stipulation of Facts, ¶ 13.

12. The County has not within the ten years prior to the commencement of this action engaged in violations of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on

- 6 -

2775

account of race or color. See Stipulation of Facts, ¶ 36.

13. Shenandoah County has publicized the intended commencement and proposed settlement of this action in the media and in appropriate United States post offices as required under 42 U.S.C. §1973b(a)(4). See Stipulation of Facts, ¶ 40. No aggrieved party has sought to intervene in this action pursuant to 42 U.S.C. §1973b(a)(4).

14. As a basis for resolving this action, the parties have agreed that Shenandoah County will be subject to annual reporting requirements for a period of five years. The County will submit to the United States, an annual Report documenting all voting changes adopted by the County as well as the nine governmental units within the County during each calendar year. The first Report will be due December 15, 2000, and subsequent Reports will be due each December 15, thereafter.

- 7 -

2776

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED:

A.  The plaintiff Shenandoah County, Virginia, is entitled to a declaratory judgment in accordance with Section 4(a)(1) of the Voting Rights Act, 42 U.S.C. §1973b(a)(1);

B.  The parties' Joint Motion for Entry of Consent Judgment and Decree is GRANTED, and Shenandoah County, including the towns of Edinburg, Mount Jackson, New Market, Strasburg, Toms Brook, and Woodstock; the two special districts including the Stoney Creek Sanitary District and Toms Brook-Maurertown Sanitary District, and the Shenandoah County School Board shall be exempt from coverage pursuant to Section 4(b) of the Voting Rights Act, 42 U.S.C. §1973b(b), provided that Shenadoah County be subject to annual reporting requirements as provided in paragraph 14, and provided that this Court shall retain jurisdiction over this matter for a period of ten years. This action shall be closed and placed on this Court's inactive docket, subject to being reactivated upon application by either the Attorney General or any aggrieved person in accordance with the procedures set forth in 42 U.S.C. §1973b(a)(5).

C.  The parties shall bear their own costs.

2777

Entered this _15th_ day of _October_, 1999.

                                          _[signature]_
                                   UNITED STATES CIRCUIT JUDGE

                                      _Norma Holloway Johnson_
                                   UNITED STATES DISTRICT JUDGE

                                      _[signature]_
                                   UNITED STATES DISTRICT JUDGE

Approved as to form and content:

For the Plaintiff Shenandoah County, Virginia

_[signature]_
J. GERALD HEBERT
J. Gerald Hebert, P.C.
5019 Waple Lane
Alexandria, VA 22304
(703) 567-5873
DC Bar No. 447676

For the Defendant Janet Reno
 and Bill Lann Lee:

_[signature]_
JOSEPH D. RICH                          WILMA A. LEWIS
ROBERT A. KENGLE                 United States Attorney
CYNTHIA A. VALENZUELA
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
P.O. Box 66128
Washington, D.C. 20035-6128
(202) 514-6346

# Exhibit 2

Jul 12 06 11:02a    Citw180478602145         918047860245          p.2



CITY OF SALEM, VIRGINIA
OFFICE OF THE GENERAL REGISTRAR
P.O. BOX 2027       101 CLAY STREET
ZIP CODE 24153

June 23, 2006

The Honorable Arlen Specter
United States Senate
Chairman, Senate Judiciary Committee
711 Hart Building
Washington, DC 20510

The Honorable Patrick J. Leahy
United States Senate
Ranking Democratic Member,
  Senate Judiciary Committee
433 Russell Senate Office Building
Washington, DC 20510

RE: Voting Rights Act of 1965, as amended

Dear Senators Specter and Leahy:

    I am the General Registrar in Salem, Virginia. I have worked in the Office of the General Registrar in Salem for eighteen years, including the last two years in my current capacity. My understanding is that the Judiciary Committee of the United States Senate is currently reviewing whether to reauthorize the expiring provisions of the Voting Rights Act, including the preclearance and bailout sections. I am writing to share Salem, Virginia's experience with the bailout process.

    On May 25, 2006, the City of Salem, Virginia filed a complaint in the United States District Court for the District of Columbia, seeking to "bailout" from coverage under the special provisions of the Voting Rights Act. A copy of the complaint is

354

Jul 12 06 11:02a   Citw180478602145            918047860245              p.3

enclosed. Under Section 5 of the Voting Rights Act, the city is currently required to obtain preclearance from either the District Court for the District of Columbia or the Attorney General for any change in voting standards, practices, or procedures. If the District Court grants the city a declaratory judgment that the city qualifies for a "bailout," the city will no longer need federal approval for changes affecting voting.

During my time in the Registrar's Office, I have not been responsible for making the city's Section 5 submissions, but I am familiar with the submissions and the process because they affected my work. Generally, the process of making submissions is routine and not a huge burden on the office's resources. On occasion, however, we have made changes requiring preclearance with elections approaching and needed a prompt decision by the DOJ. We believe DOJ has been cooperative and responsive to our requests for expedited review. For example, we moved a polling place just prior to the recent May 2nd election. The DOJ gave us an answer (i.e., preclearance) in plenty of time to prepare for the election. My experience has been that the DOJ will not use the 60 days it has by statute to make a decision when minor changes are involved, or if the circumstances require an expedited response.

Similarly, the DOJ has been cooperative, rather than adversarial, in our pursuit of the bailout. In fact, the DOJ has worked with our legal counsel to facilitate our pursuit of the bailout. We understand, for example, that the DOJ interviewed people in the Salem community and to review our records to make sure that we have met our obligations under the Voting Rights Act. The DOJ is making sure that we meet the requirements for a bailout and has provided us feedback to ensure that we provide all of the information necessary for the DOJ to make an informed decision. All of the indications are that the City will meet the requirements for a bailout and we expect the bailout to be forthcoming.

The process of seeking a bailout has been neither time-consuming nor expensive. It took me about a week, working off-and-on, to put the materials together to support our complaint. The Voting Rights Act requires jurisdictions seeking to bailout to present evidence of minority voter registration and turnout, changes in minority voting

355

participation over time, and disparities (if any) between minority and non-minority participation levels. We do not keep voting statistics by race, but we were able to show that as of 2005, 78.7 percent of our voting age population was registered to vote. Employees of the DOJ also did some of the leg work, and they reviewed our files and theirs to check whether we had submitted all of our voting changes for preclearance. The overall costs of a bailout for the City will be less than $5000, which includes all legal fees and costs. This is not an insignificant sum for a city our size, but it was not unduly burdensome either. Moreover, we believe a bailout will be cost-effective for the City in the long run, and will enable us to make routine voting changes without delay.

I am aware that several other jurisdictions located in Salem's vicinity plan to seek a bailout after the June statewide primary election. I am currently working with three registrars in our area and have heard there are an additional eight jurisdictions interested in pursuing bailout. Based on our experience in Salem, I believe that more jurisdictions would seek to bailout if they were aware of the opportunity and understood the requirements. It does not require the time and money that many jurisdictions assume it does, and it is not a burdensome process either. In my opinion, bailout provides a real option for those jurisdictions that have complied with their Section 5 obligations and no long warrant federal oversight.

Sincerely,

Dana M. Oliver
General Registrar,
Salem, Virginia

# Exhibit 3

265



**OFFICE OF THE COUNTY ATTORNEY**
County of Augusta, Virginia
18 Government Center Lane, P. O. Box 590
Verona, Virginia 24482-0590
(540) 245-5017 (Voice)
(540) 245-5096 (Fax)

Steven L. Rosenberg
County Attorney
srosenberg@co.augusta.va.us

June 19, 2006

The Honorable Arlen Specter
United States Senate
Chairman, Senate Judiciary Committee
711 Hart Building
Washington, DC 20510

The Honorable Patrick J. Leahy
United States Senate
Ranking Democratic Member,
   Senate Judiciary Committee
433 Russell Senate Office Building
Washington, D.C. 20510

Re:   Voting Rights Act of 1965

Dear Senators Specter and Leahy:

I understand that the Senate Judiciary Committee is presently considering the extension of the provisions of Section 5 of the Voting Rights Act of 1965 (the "Act"), which will otherwise expire in 2007. I further understand that the committee's consideration of Section 5 also includes a review of those provisions of Section 4 of the Act which allow covered jurisdictions to obtain a termination of coverage or "bailout" from the requirements of Section 5. To assist the committee in its deliberations, I would like to share with you Augusta County, Virginia's recent experience with the bailout process.

The Board of Supervisors of Augusta County, Virginia first determined to seek a bailout in March 2004. For this purpose, the board authorized this office to engage outside counsel knowledgeable in election law to assist with the county's efforts. Those efforts commenced in earnest in March 2005. The county obtained its bailout in November 2005, when a Consent Judgment and Decree was entered by the United States District Court for the District of Columbia.

266

The Honorable Arlen Specter
The Honorable Patrick J. Leahy
June 19, 2006
Page 2

In seeking a bailout, the county desired to eliminate the costs of repeated preclearance submissions to the Attorney General and to obtain more flexibility for the registrar's office in its voter outreach efforts. As importantly, the members of the Board of Supervisors welcomed the opportunity to demonstrate the county's past compliance with the Act—a condition of the bailout.

On the whole, the process was a positive one for the county. Initially, the county furnished county records to the Department of Justice for review. Thereafter, on several occasions during the Spring of 2005, a team of attorneys from the Voting Section visited the county to conduct interviews with county residents and officials, and to further review county records. The team conducted its activities efficiently and productively, working with county staff and the county's outside counsel to complete a thorough examination of the county's record of compliance with the Act. While the team identified two minor changes the county had not submitted for preclearance, the county was permitted to make preclearance submissions for those changes in conjunction with the bailout process, and the submissions were approved.

As required by Section 4, the county also posted notices of its intention to seek a bailout at multiple locations in the county and conducted a public hearing on March 9, 2005.

In conclusion, Augusta County was able to achieve a bailout at a reasonable cost, with a benefit that will continue indefinitely. Based on the county's experience, the bailout provisions of Section 4 establish a workable mechanism for covered jurisdictions to terminate coverage under Section 5.

I would be pleased to furnish any additional information you, other members of the committee or the committee's staff may desire.

Very truly yours,

Steven L. Rosenberg

cc:   The Honorable Chairman and Members
      of the Board of Supervisors of Augusta
      County, Virginia

      Patrick J. Coffield
      County Administrator

      Susan Miller
      Registrar of Voters

G:\SLRFILES\REGISTRAR\SENATE JUDICIARY COMMITTEE LETTER V3.DOC