IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:06-CV-01384 (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States, et al., | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF NAACP BRANCHES, AUSTIN BRANCH OF THE NAACP, RODNEY LOUIS, NICOLE LOUIS, WINTHROP GRAHAM, YVONNE GRAHAM, WENDY RICHARDSON, JAMAL RICHARDSON, MARISA RICHARDSON, LISA DIAZ, DAVID DIAZ AND GABRIEL DIAZ, PEOPLE FOR THE AMERICAN WAY, TRAVIS COUNTY, NATHANIEL LESANE, JOVITA CASAREZ, ANGIE GARCIA, AND OFELIA ZAPATA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ................................................................................................................. 1

I.    THE DISTRICT'S BAILOUT CLAIM FAILS ............................................................. 2

    A.    Because The District Is Not A "Political Subdivision" For Purposes Of
      The Statute's Bailout Provision, The District Is Ineligible To Petition For
      Bailout.................................................................................................................... 2

        1.    Under The Statutory Text and Structure, The District Is Not A
            "Political Subdivision" For Purposes Of The Bailout Provision................. 2

        2.    The Supreme Court Foreclosed Any Alternative Interpretation Of
            The Statute In *City Of Rome v. United States* .............................................. 4

        3.    The Legislative History Unambiguously Confirms That The
            District Does Not Fall Within The Scope Of Entities Eligible To
            Seek Bailout................................................................................................ 11

            a)    Bailout Following The 1965 Enactment Of The VRA................. 12

            b)    Bailout Following The 1970 Amendments.................................... 12

            c)    Amendments to the Bailout Statute in 1982 ................................ 13

            d)    Bailout Statute Following The 2006 Renewal .............................. 16

            e)    Bailout Is Achievable ................................................................. 18

        4.    The Attorney General's Interpretation Confirms That The
            Statutory Definition Of "Political Subdivision" Applies To The
            Bailout Provision ....................................................................................... 20

        5.    The Canon Of Constitutional Avoidance Is Inapplicable Here ................. 22

    B.    Even If The District Were Eligible To Apply For Bailout Independently
      Of Travis County, It Would Not Be Entitled To Bailout Because It Fails
      To Satisfy The Required Statutory Criteria ............................................................ 22

II.   THE DISTRICT'S CONSTITUTIONAL CLAIM FAILS ............................................. 25

    A.    The District Has Abandoned Any Facial Challenge To Section 5 And Fails
      To Explain How Its Challenge Is "As-Applied" .................................................... 25

B.  The District Ignores The Long-Recognized Fundamental Alteration In The Balance Of Power Between The Federal Government And The States Embodied In The Reconstruction Amendments ......................................................28

C.  Section 5 And The Bailout Rules Do Not Unconstitutionally Alter The Form Of State Government ...............................................................................29

D.  The District Misstates And Misapplies The *Boerne* Framework .........................31

1.  The District Fails To Acknowledge That Congress Possesses Broad Authority To Remedy Official Racial Discrimination In Voting ...............................................................................................................31

2.  The District's Analysis Of The Gravity Of The Harm Is Erroneous.........32

    a)  The District Misstates The Standard For A Constitutional Harm That Congress May Properly Deter And Remedy...............32

    b)  The District Mischaracterizes The Relevance And Sufficiency Of The Record Before Congress in 2006 ...................36

        i)  The record includes substantial indicia of gamesmanship by covered jurisdictions ............................36

        ii)  The District's attack on the DOJ objection statistics fails ...............................................................................42

        iii)  Evidence of racially polarized voting in the covered jurisdictions supports Congress's finding of a continuing need for Section 5 ...........................................44

        iv)  The District fails to respond to numerous categories of evidence of discrimination relied on by Congress ........48

        v)  The District fails to acknowledge the relevance of the deterrence evidence in renewing the VRARA.............49

        vi)  The evidence of discrimination by small government units, if relevant, supports Congress's judgment that reauthorization was appropriate.................50

        vii)  The District's Attack on "Anecdotal" Evidence is Misplaced.......................................................................54

3.  The District's Congruence and Proportionality Analysis is Seriously Flawed ...................................................................................55

ii

a)      The District Fails to Acknowledge the Numerous Features
        of Section 5 that Help Ensure Congruence and
        Proportionality ...............................................................................55

b)      The District's Attack On The Coverage Formula Is
        Unavailing.......................................................................................56

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alden v. Maine*, 527 U.S. 706 (1999) ...................................................................................28

*Beer v. United States*, 425 U.S. 130 (1976)..........................................................................57

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) ..............................................................33

*Brown v. Board of School Commissioners*, 542 F. Supp. 1078 (S.D. Ala. 1982), *aff'd*,
    464 U.S. 1005 (1983).......................................................................................................46

*Brown v. Gardner*, 513 U.S. 115 (1994) ................................................................................4

*Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983) ..........46

*City of Boerne v. Flores*, 521 U.S. 507 (1997).................................................33, 35, 49, 56, 63

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ...............................26

*City of Port Arthur v. United States*, 459 U.S. 159 (1982)...........................................45

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .........................................54

*City of Rome v. United States*, 446 U.S. 156 (1980) ........2, 3, 4, 7, 8, 9, 13, 14, 28, 29, 34, 37, 45,
    46, 49, 59, 60, 62

*Clark v. Martinez*, 543 US. 371 (2005) ................................................................................22

*Coalition to Preserve Houston v. Interim Board of Trustees of the Westheimer*
    *Independent School District*, 494 F. Supp. 738 (S.D. Tex. 1980) ......................................6

*Commodity Futures Trading Commission v. Schor*, 478 U.S. 833 (1986)...................22

*Conroy v. Aniskoff*, 507 U.S. 511 (1993)..............................................................................14

*County Council of Sumter County v. United States*, 555 F. Supp. 694 (D.D.C. 1983)........60, 61, 62

*Dillard v. Baldwin County Board of Education*, 686 F. Supp. 1459 (M.D. Ala. 1988)...............47

*Dougherty County Board of Education v. White*, 439 U.S. 32 (1978) ...........................5, 7, 21, 29

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ...............................................................................14

*Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527
    U.S. 627 (1999)................................................................................................................33

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) .................................................................34

*Garcia v. United States*, 469 U.S. 70 (1984) ..............................................................14

*Giles v. Ashcroft*, 193 F. Supp. 2d 258 (D.D.C. 2002)..............................................62

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)................................32

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) .........54

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968).....................................................42

*Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) .............................................33

*Koog v. United States*, 79 F.3d 452 (5th Cir. 1996) ....................................................30

*Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985)..........30, 31

*League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594 (2006) ........................47, 48

*Lopez v. Monterey County*, 525 U.S. 266 (1999) ..................................21, 28, 34, 37, 62

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) ................8

*McCarthy v. Bronson*, 500 U.S. 136 (1991) ................................................................3

*McDaniel v. Sanchez*, 452 U.S. 130 (1981)...............................................................11

*Miller v. Johnson*, 515 U.S. 900 (1995) ....................................................................21

*Mitchum v. Foster*, 407 U.S. 225 (1972) ...................................................................28

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)...................................54

*National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005).........................................................................................21

*Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) .. 31, 33, 36, 45, 49, 56, 63

*New York v. United States*, 505 U.S. 144 (1992)........................................................30

*Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) ............................40

*Oregon v. Mitchell*, 400 U.S. 118 (1970) ..................................................................55

*Printz v. United States*, 521 U.S. 898 (1997).............................................................51

*Reaves v. DOJ*, 355 F. Supp. 2d 510 (D.D.C. 2005) ..................................................62

*Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000).................................56, 57

*Rogers v. Lodge*, 458 U.S. 613 (1982) ................................................................46, 47

*Rowland v. California Men's Colony*, 506 U.S. 194 (1993) ..............................................3

*Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989) ....................26

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ................................................................26

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ..........................................28

*Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873) ................................................33

*Smith v. Salt River Project Agricultural Improvement & Power District*, 109 F.3d 586 (9th Cir. 1997) ............................................................................................................10

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ..................12, 28, 31, 33, 34, 45, 62

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ....................................................8

*Symm v. United States*, 439 U.S. 1105 (1979) ..............................................................38

*Tennessee v. Lane*, 541 U.S. 509 (2004) ........................31, 33, 34, 35, 36, 49, 55, 56, 63

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..............................................................45, 46

*United States v. Board of Commissioners of Sheffield*, 435 U.S. 110 (1978) .............5, 6, 7, 11, 15

*United States v. Salerno*, 481 U.S. 739 (1987) ..............................................................26

*United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547 (5th Cir. 1980) ................................................................................................................9, 10

*Vachon v. New Hampshire*, 414 U.S. 478 (1974) ............................................................8

*Wilson v. New*, 243 U.S. 332 (1917) ..............................................................................32

*Young v. Fordice*, 520 U.S. 273 (1997) ..........................................................................40

## STATUTES, REGULATIONS, AND LEGISLATIVE MATERIALS

42 U.S.C. § 1973(a) ..........................................................................................................57

42 U.S.C. § 1973a(c) ........................................................................................................56

42 U.S.C. § 1973b(a) ..........................................................................................................2

42 U.S.C. § 1973b(a)(1) ..........................................................................................3, 4, 23

42 U.S.C. § 1973b(a)(4) ....................................................................................................24

42 U.S.C. § 1973*l*(c)(2) .................................................................................................3, 18

28 C.F.R. § 51 *et. seq*............................................................................................................20

28 C.F.R. § 51.2.............................................................................................................18, 20

28 C.F.R. § 51.6....................................................................................................................20

H.R. Rep. No. 89-162 (1965) ...............................................................................................58

H.R. Rep. No. 89-439 (1965) ..........................................................................................12, 33

H.R. Rep. No. 89-711 (1965) ...............................................................................................58

H.R. Rep. No. 91-397 (1970) ..........................................................................................58, 59

H.R. Rep. No. 94-196 (1975) ..........................................................................................12, 59

H.R. Rep. No. 97-227 (1981) ..........................................................................................59, 60

H.R. Rep. No. 109-478 (2006) .........................................................37, 41, 42, 48, 53, 63

S. Rep. No. 89-162 (1965)....................................................................................................33

S. Rep. No. 94-295 (1975) ...................................................................................................13

S. Rep. No. 97-417 (1982).............................................................................2, 3, 14, 19, 23, 34

*Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the
    Special Provisions of the Act: Hearing before the Subcomm. on the Constitution
    of the H. Comm. on the Judiciary*, 109th Cong. (2005)....................................................16

*Voting Rights Act: History, Scope, and Purpose: Hearing before the Subcomm. on the
    Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005)...............................21

*Reauthorizing the Voting Rights Act's Temporary Provisions: Policy, Perspectives, and
    Views from the Field: Hearing before the Subcomm. on the Constitution, Civil
    Rights, and Property Rights of the S. Comm. on the Judiciary*, 109th Cong.
    (2006)........................................................................................................................................16

Pub. L. No. 109-246 (2006)...................................................................34, 48, 57, 59, 61

Pub. L. No. 89-110 (1965)...............................................................................................1, 58

Pub. L. No. 91-285 (1970)...................................................................................................58

Pub. L. No. 97-205 (1982)...................................................................................................66

**OTHER AUTHORITIES**

Bolick, Clint, *Grassroots Tyranny:  The Limits of Federalism* (1993) .........................................54

Katz, Ellen, *Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39
U. Mich. J.L. Reform 643 (2006) ...................................................................................61

Sara Galvan, *Wrestling with MUDs to Pin Down the Truth About Special Districts*, 75
Fordham L. Rev. 3041 (forthcoming 2007).....................................................................54

*Protecting Minority Voters:  The Voting Rights Act at Work 1982-2005* (Feb. 2006).................43

# INTRODUCTION

The bailout provision of the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 ("VRA" or "Act"), provides a workable mechanism by which certain covered jurisdictions may terminate their obligations under the Section 5 preclearance provision. Although Congress expanded the scope of bailout-eligible jurisdictions during the 1982 renewal, the statute's structure, text and legislative history make clear that political subunits such as the District that do not register voters have never been eligible to seek bailout. The case law and Attorney General's regulations also underscore this point. Despite the text, and the weight of the interpretive evidence standing against the District, it now urges a construction of the bailout eligibility provisions contrary to the legislative choice of Congress.

Anticipating that its bailout argument will fail, the District asks this Court to declare that Section 5 is an unconstitutional exercise of Congressional authority. In so doing, the District is not faithful to its "as-applied" First Amended Complaint, but launches a facial attack on Section 5 that ignores an unequivocal line of Supreme Court decisions that foreclose such a claim.

Further, the District's efforts to minimize the weight of the evidence amassed by Congress during the reauthorization are to no avail. As Representative F. James Sensenbrenner, then-chairperson of the House Judiciary Committee, stated: the 2006 reauthorization of Section 5 and the other temporary provisions of the Voting Rights Act was "one of the most extensive considerations of any piece of legislation that the United States Congress has dealt with in the 27 ½ years" of his congressional tenure. 152 Cong. Rec. H5143. The record before Congress leaves no doubt that Section 5 is responsive to, and designed to deter, unconstitutional conduct. This Court should not set aside the Congressional decision to renew Section 5 as valid enforcement legislation under the Reconstruction Amendments, properly applied to the District and the other covered jurisdictions.

1

## I.    THE DISTRICT'S BAILOUT CLAIM FAILS

The District is not entitled to summary judgment on the bailout claim, for two reasons. *First* and foremost, the District is not eligible to petition for bailout under the statute. The statute's text and structure, its judicial construction in *City of Rome v. United States*, 446 U.S. 156, 168 (1980), and the legislative history, consistent with the Attorney General's interpretation of the Act, all make clear that political subunits such as the District that do not conduct voter registration are ineligible to seek bailout. As the 1982 Senate Judiciary Committee Report explained, other than States, bailout is limited "only to counties and parishes except in those rare instances in which registration is not conducted under the supervision of a county or parish." S. Rep. No. 97-417, at 69 (1982). And because the statute's bailout eligibility provision is clear (and constitutional, *see* Part II) the District's reliance on the canon of constitutional avoidance is meritless. *Second*, even if the District were eligible to seek bailout, it has failed to show that it satisfies the statute's bailout criteria.

### A.    Because The District Is Not A "Political Subdivision" For Purposes Of The Statute's Bailout Provision, The District Is Ineligible To Petition For Bailout

#### 1.    Under The Statutory Text and Structure, The District Is Not A "Political Subdivision" For Purposes Of The Bailout Provision

The Act sets forth the coverage formula for Section 5 preclearance obligations in Section 4(b). *See* 42 U.S.C. § 1973(b). Section 4(a) sets forth the bailout rules. *Id.* § 1973b(a). It is undisputed that under the bailout provisions in Section 4(a), only States or "political subdivisions" are eligible to petition for bailout. *See* 42 U.S.C. § 1973b(a); *see* D-I Mem. 21; Pl. Mem. 11-12. The District is not eligible to petition for bailout because it is not a State and, contrary to its assertions, *see* Pl. Mem. 12-23, the District is not a "political subdivision."

Section 14(c)(2) of the Act provides that "[t]he term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of

2

a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." 42 U.S.C. § 1973*l*(c)(2). When a term is defined in the text of the statute, any contrary definition in the dictionary or under state law is irrelevant. *See, e.g., Rowland v. California Men's Colony*, 506 U.S. 194, 200 (1993). Because the District indisputably does not satisfy the Section 14(c)(2) definition of "political subdivision," *see* SMF ¶¶ 1575-1577, its citations to the dictionary and Texas state law, Pl. Mem. 13-14, are inapposite. The Court need not look any further than the definition of "political subdivision" in Section 14(c)(2) to end the inquiry necessary to resolve the bailout claim. *See City of Rome*, 446 U.S. at 168.

The definition of "political subdivision" for bailout purposes is confirmed by statutory context. *See generally McCarthy v. Bronson*, 500 U.S. 136, 139 (1991). Section 4(a), unlike any other provision of the VRA, explicitly and repeatedly distinguishes between "political subdivision[s]" and the "governmental units within [the subdivision's] territory." *See* 42 U.S.C. § 1973b(a)(1)(D), (F), (a)(3), (a)(5). If "political subdivision" simply meant any political subunit, as the District claims, the vast majority of "political subdivision[s]" would not have *any* governmental units within their territory, and certain bailout requirements in Section 4(a) would be nonsensical. *See, e.g.*, 42 U.S.C. § 1973b(a)(1)(F) (listing positive steps that must be satisfied by the "state or political subdivision and *all governmental units within* its territory") (emphasis added).[1]

The District's interpretation of Section 4(a) is further undermined by the fact that the District would require the Court to ascribe different meanings to the term "political subdivision" within the same sentence. Section 4(a) limits bailout to three potential entities: (i) any State that

---

[1] The legislative history confirms that the term "all governmental units" as used in § 4(a) "refers to all jurisdictions within a State or political subdivision." S. Rep. No. 97-417, at 71 (1982).

has been covered under Section 4(b) or (ii) any *political subdivision* of such State that has not been separately covered under Section 4(b), or (iii) any *political subdivision* that has been separately covered under Section 4(b). *See* 42 U.S.C. § 1973b(a)(1). It is undisputed that the Section 14(c)(2) definition applies to the term "political subdivision" in delineating the third category of government entities that are eligible to initiate bailout, because only "political subdivisions" that meet Section 14(c)(2)'s definition can be covered separately under Section 4(b). *See* Pl. Mem. 15. The District's interpretation of the statute requires defining "political subdivision" in the second above category to mean any political subunit, thus giving a different meaning to the same term in the *same sentence*. Lacking any affirmative evidence to support it, that interpretation must be rejected. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994).

**2.    The Supreme Court Foreclosed Any Alternative Interpretation Of The Statute In *City Of Rome v. United States***

The District maintains that "[t]he Supreme Court has determined that political subunits in covered states are 'political subdivisions' under § 4(a) even when they do not meet the definition in § 14(c)(2)." Pl. Mem. 14 (capitalization omitted). The Supreme Court has made no such determination, and, in *City of Rome v. United States*, 446 U.S. 156 (1980) the Court squarely rejected the position the District urges here.

In 1979, the City of Rome, Georgia—a political subunit of the State of Georgia—filed an action in this Court seeking to bail out from coverage under the Act. This Court, and on appeal the Supreme Court, rejected the argument that the City could seek bailout independently of the State of Georgia. Instead, because the City was not a "political subdivision" under the Act, the City had to rely on a larger entity in order to petition for exemption from coverage. *See City of Rome v. United States*, 472 F. Supp. 221, 229-332 (D.D.C. 1979) (three-judge court), *aff'd*, 446

4

U.S. 156 (1980). The Supreme Court stated that "under the express statutory language, the city is not a 'political subdivision' for purposes of § 4(a) 'bailout.'" 446 U.S. at 168.

The District's misinterpretation of Section 4(a) and *City of Rome* is based on a misreading of two cases that predate *Rome*: *United States v. Board of Commissioners of Sheffield*, 435 U.S. 110 (1978) and *Dougherty County Board of Education v. White*, 439 U.S. 32 (1978). *See* Pl. Mem. 14-20. These cases do not "even discuss the bailout process," *Rome*, 446 U.S. at 168, and they do not support the District's claim that the Section 14(c)(2) definition of "political subdivision" is inapplicable to Section 4(a). As discussed below, any doubt on this point is resolved by *Rome*, in which the Court unequivocally rejected Plaintiff's interpretation of *Sheffield* (and by necessary extension rejected Plaintiff's interpretation of *Dougherty County*).

In *Sheffield,* the Court held that the City of Sheffield, Alabama was subject to Section 5's preclearance requirements. In reaching this conclusion, the Court considered factors including the importance of giving Section 5 "the broadest possible scope" to fulfill the VRA's remedial objectives, 435 U.S. at 122-123 (citation and quotation marks omitted), the statutory structure, the legislative history, and the Attorney General's interpretation of the statute, *see id.* at 126-135. Based on this analysis, the Court held that Section 5 "applies territorially and includes political units like Sheffield whether or not they conduct voter registration." *Id.* at 130. Specifically, the Court interpreted the word "State" in Section 5 to "include[] all state actors within it." *Id.* at 129 n.17. The Court further noted that a similar analysis would likely apply to the term "political subdivision" in Section 5. *See id.* at 129.

The *Sheffield* Court's conclusion that Section 5 "applies territorially" was based in part on the Court's view that Congress intended the substantive obligations of Section 5 to have the same scope as the substantive obligations of Section 4(a) regarding the suspension of literacy

5

tests in covered jurisdictions. *See* 435 U.S. at 126-128. As the District recognizes, in *Sheffield*, the Court explained "'§4(a) imposes a duty on *every entity* in the covered jurisdictions having power over the electoral process, *whether or not the entity registers voters*.'" Pl. Mem. 15 (quoting *Sheffield*, 435 U.S. at 120) (emphasis in Pl. Mem.). The District reads this statement from *Sheffield* as establishing that Section 14(c)(2) does not define "political subdivision" as "the term is used ... in § 4(a)." *Id.* However, the District's claim that *Sheffield* defines the term "political subdivision" in Section 4(a) as coextensive with those political entities covered by Section 4(a)'s coverage scope is belied by *Sheffield* itself. As the Court explained:

> [Section] 4(a) imposes a duty on every entity in the covered jurisdictions having power over the electoral process, whether or not the entity registers voters. That § 4(a) has this geographic reach is clear both from the fact that a 'test or device' may be employed by any official with control over any aspect of an election and from § 4(a)'s provision that its suspension [of literacy tests and similar devices] operates "*in* any [designated] State ... or *in* any [designated] political subdivision."

435 U.S. at 120 (quoting § 4(a)) (alterations to statute and emphases in *Sheffield*). As the majority noted, even Justice Stevens' dissent did not "dispute that § 4(a)'s duties apply to all political units within designated jurisdictions." *Id.* at 125 n.13; *see also id.* at 144 n.6 (Stevens, J., dissenting). The City of Sheffield was covered by Section 4(a) not because it *was* a "political subdivision," but because it was *in* a covered jurisdiction. *Sheffield*, thus does *not* stand for the proposition that political subunits constitute "political subdivisions" under Section 4(a) regardless of whether they satisfy Section 14(c)(2)'s definition of the term. *Accord Coalition to Preserve Houston v. Interim Bd. of Trs. of the Westheimer Ind. School Dist.*, 494 F. Supp. 738, 740 n.1 (S.D. Tex. 1980) ("[S]chool districts in Texas are covered by § 5 of the Act, not because school districts come within the definition of 'political subdivision' ... but for the reason that Texas school districts are political units within a designated state.") (citing *Sheffield*).

*Dougherty County* is also inapposite to resolving the question of whether Section 14(c)(2)'s definition of "political subdivision" applies to Section 4(a). As in *Sheffield*, at issue in *Dougherty County* was whether a political subunit in a covered State was subject to Section 5's preclearance regime, and nothing more. *See* 439 U.S. at 44 ("[The County Board of Education's] contention [that it is not subject to Section 5] is squarely foreclosed by our decision last Term in [*Sheffield*]. There, ... we held that once a State has been designated for coverage, § 14(c)(2)'s definition of political subdivision has no 'operative significance in determining the reach of § 5.'" (quoting *Sheffield*, 435 U.S. at 126)).

Once the District's misinterpretation of *Sheffield* and *Dougherty County* is corrected, the District is left to rely on two quotations taken out of context from footnotes in *Sheffield*. The District cites the following statements from *Sheffield*: "Congress' exclusive objective in § 14(c)(2) was to limit the jurisdictions which may be separately designated for coverage under § 4(b)," 435 U.S. at 130 n.18, and "the only limitation § 14(c)(2) imposes on the Act pertains to the areas that may be designated for coverage," *id.* at 129 n.16; *see* Pl. Mem. 15, 18. The District reads these statements to mean that the Section 14(c)(2) definition of "political subdivision" does not apply to Section 4(a). Pl. Mem. 15, 18. The District's interpretation of *Sheffield* is unavailing—because it misreads *Sheffield* itself and is squarely foreclosed by the Supreme Court's later interpretation in *City of Rome*.

The District misconstrues *Sheffield* by failing to acknowledge that when *Sheffield* was decided, the only entities eligible to petition for bailout were a "'State with respect to which the determinations have been made under the third sentence of subsection (b) of this section'" or a "'*political subdivision with respect to which such determinations have been made as a separate unit.*'" *Rome*, 446 U.S. at 167 (quoting pre-1982 version of § 4(a)) (emphasis added). At that

time, the "'determinations' in each instance" were "the Attorney General's decision whether the jurisdiction falls within the coverage formula of § 4(b)." *Id.* (quoting pre-1982 version of § 4(a)). Thus, the *Sheffield* Court's statements that the Section 14(c)(2) definition of "political subdivision" applied to Section 4(b) also necessarily meant that the same Section 14(c)(2) definition applied to Section 4(a). When *Sheffield* was decided, political subunits of counties or parishes that did not conduct registration were not even eligible to have had the Section 4(b) "determinations … made [to them] as a separate unit," and therefore could not have possibly constituted "political subdivisions" under Section 4(a).[2]

In any event, *City of Rome*, 446 U.S. 156, definitively rejected the interpretation of *Sheffield* offered here by the District. This Court need not parse the language of *Sheffield* (or *Dougherty County*, which, as noted above, simply applied *Sheffield*) to determine whose reading of those opinions is more persuasive, because in *Rome* the Supreme Court considered and resolved that question. In *Rome*, the city argued that, under *Sheffield*, it was entitled to initiate a bailout action. The Supreme Court disagreed, explaining that the City had misinterpreted *Sheffield*. The *Rome* Court determined that *Sheffield* is irrelevant to the proper construction of

---

[2]     The District also fails to acknowledge that the statements in *Sheffield* concerning the application of Section 14(c)(2)'s definition of "political subdivision" to Section 4(b) were made in the context of addressing the limited question of whether Section 14(c)(2) applies to Section 5, and a fair reading of the entire opinion undermines the District's contention that these isolated statements were intended to resolve the applicability of Section 14(c)(2) to provisions of the VRA that were not before the Court. "[I]t [is] generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), and the District's reliance on isolated statements taken out of context from *Sheffield* is unpersuasive on its own terms, *see, e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 457 (1988); *Vachon v. New Hampshire*, 414 U.S. 478, 484-485 (1974) (Rehnquist, J., dissenting) (noting that "those reading and relying upon our opinions would be ill-advised to seize one phrase out of context").

8

Section 4(a)'s bailout provision and that Section 14(c)(2)'s definition of "political subdivision" applies generally to the provisions of the VRA:

> [*Sheffield*] did not even discuss the bailout process. In *Sheffield*, the Court held that when the Attorney General determines that a State falls within the coverage formula of § 4(b), any political unit of the State must preclear new voting procedures under § 5 regardless of whether the unit registers voters and therefore would otherwise come within the Act as a "political subdivision." [n5: Section 14(c)(2) of the Act, as set forth in 42 U.S.C. § 1973 *l*(c)(2), provides: "The term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."] In so holding, the Court necessarily determined that the scope of §§ 4(a) and 5 is "geographic" or "territorial," 435 U.S. at 120, 126 … and thus that, when an entire State is covered, it is irrelevant whether political units of it might otherwise come under § 5 as "political subdivisions." 435 U.S., at 126-129[.]
>
> *Sheffield*, then, did not hold that cities such as Rome are "political subdivisions" under §§ 4 and 5.

*Rome*, 446 U.S. at 168. *City of Rome* thus forecloses the District's contention that *Sheffield* (or *Dougherty County*) establishes the District's eligibility to bail out.

The District's effort to evade *City of Rome* is unpersuasive. The District points out, correctly, that at the time *Rome* was decided, the only political subdivisions eligible to bail out under Section 4(a) were those independently covered under Section 4(b). Pl. Mem. 17. Thus, the *Rome* Court could have limited its decision to holding that the city was a "political subdivision" that could not bail out because it had not been independently covered under Section 4(b). But, as the quoted passage makes clear, that is not what the *Rome* Court did. Instead, the Court conclusively rejected the construction of "political subdivision" in Section 4(a) that the District advances here.

Moreover, contrary to the District's contention, *see* Pl. Mem. 17, the Fifth Circuit's decision in *United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547 (5th Cir. 1980) recognized that, under *Rome*, political subunits that do not conduct voter registration

9

do not constitute "political subdivisions" under Section 4(a).    In *Uvalde*, the Fifth Circuit analyzed statutory purpose and legislative history to conclude that Section 14(c)(2)'s definition of "political subdivision" does not apply to Section 2 of the Act.    *See id.* at 555-556.    The Fifth Circuit's interpretation of "political subdivision" in Section 2 is correct in light of, among other things, the importance of interpreting the VRA "'in a manner that provides the broadest possible scope in combating racial discrimination." *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 593 (9th Cir. 1997) (internal quotation marks omitted); *see id.* (embracing *Uvalde*'s construction of "political subdivision" under Section 2).    However, the Fifth Circuit reached this conclusion concerning Section 2 only after recognizing that, in *Rome*, the Supreme Court had determined that political subunits did not constitute "political subdivisions" for purposes of Section 4(a).    *See Uvalde*, 625 F.2d at 555 (analyzing *Rome*, *Sheffield*, and *Dougherty County* and explaining:  "Here we must determine whether the term 'State or political subdivision' in section 2 is to be read, as it is in section 5, to include a school board (to which Sheffield and Dougherty County would lead us) *or whether it excludes such a governmental unit (to which Rome, interpreting section 4(a), leads)*." (emphasis added)).

Because it misinterprets *Sheffield*, *Dougherty County*, *Rome*, and *Uvalde*, the District mischaracterizes the judicial interpretations of Section 4(a) that Congress ratified when it amended that provision.    In 1982, Congress modified Section 4(a) to permit "political subdivisions" that had not been independently covered to initiate bailout actions, but Congress did not in any way signal its intent to alter the definition of "political subdivision" in Section 4(a).    As the District correctly points out, Congress is presumed to have acquiesced in the Supreme Court's prior construction of the term "political subdivision" in Section 4(a).    *See* Pl. Mem. 18-20.    The District fails to acknowledge, however, that by 1982 the Court had

10

definitively rejected the District's view that "political subunits in covered states are 'political subdivisions' under § 4(a) even when they do not meet the definition in § 14(c)(2)." *Id.* at 14. In other words, Congress had no need to "make any change affecting *Sheffield*'s and *Dougherty County*'s conclusions that the Section 14(c)(2) definition of 'political subdivision' does not 'impose any limitations on the reach of the [VRA] outside the designation process,' *Sheffield*, 435 U.S. at 129 n.16, and thus that 'political subdivision' as used in Section 4(a) must encompass any subunits of a state that would ordinarily be encompassed by the term," Pl. Mem. 18. The Court in *City of Rome* decided that *Sheffield* and, by necessary extension *Dougherty County*, do not stand for those propositions, and that *Sheffield* is irrelevant for purposes of construing the bailout provision. Rather, under *City of Rome*'s analysis, political subunits that do not conduct voter registration are not "political subdivisions" under Section 4(a).

### 3. The Legislative History Unambiguously Confirms That The District Does Not Fall Within The Scope Of Entities Eligible To Seek Bailout

Beyond the plain text, statutory structure, and the Supreme Court's definitive statement in *City of Rome*, the bailout provision's legislative history further confirms that Congress purposefully declined to extend the class of non-state jurisdictions eligible to initiate bailout actions beyond counties and entities that register voters where the county does not do so. *See, e.g., McDaniel v. Sanchez*, 435 U.S. 130, 147 (1981) (examining legislative history in construing Section 5 of the VRA); *Sheffield*, 435 U.S. at 129-31 (same). The bailout provision has undergone a number of modifications since the Act's original passage in 1965. Most importantly, in 1982, Congress ratified *City of Rome*'s explanation that political subunits that do not conduct voter registration do not constitute "political subdivisions" under Section 4(a). At no point before or since has Congress indicated an intent to modify the bailout statute in a manner that conforms with the District's proposed interpretation.

11

### a)    Bailout Following The 1965 Enactment Of The VRA

In 1965, Congress created a link between Section 4(a)'s bailout provision and the coverage formula of Section 4(b):  only those jurisdictions that had been independently designated for coverage could bail out. *See South Carolina v. Katzenbach*, 383 U.S. 301, 339-342, 353 (1966) (Appendix) (Sections 4 and 14(c)(2) of the Voting Rights Act of 1965).  By definition, only those States or political subdivisions that satisfied the Section 14(c)(2) definition were eligible to bail out.  *See* H.R. Rep. No. 89-439, at 14 (1965) ("This opportunity to obtain exemption is afforded only to those States or to those subdivisions as to which the formula has been determined to apply as a separate unit; subdivisions within a State which is covered by the formula are not afforded the opportunity for separate exemption.").  At the time, the House Judiciary Committee reasoned that allowing each subdivision to seek bailout "would severely limit the effectiveness of the bill and would impose a continuation of the burdensome county-by-county litigation approach which has been shown to be inadequate." *Id.* at 13-16.

### b)    Bailout Following The 1970 Amendments

During the 1970 and 1975 reauthorization process, Congress did not make any changes regarding the type of jurisdictions eligible to seek bailout.  In 1970, Congress extended the time, from five to ten years, during which eligible jurisdictions seeking to bail out had to demonstrate that they had not used a prohibited test or device for the purpose or with the effect of denying or abridging the right to vote on account of race or color.  SMF ¶¶ 135-136; H.R. Rep. No. 94-196, at 12 (1975).  In 1975, Congress determined that there was a need to "insure the applicability of Section 5 protections during the [1980s] reapportionment and redistricting" cycles, and again

extended the statutory time period from ten to seventeen years but did not modify the class of jurisdictions eligible to seek bailout.  S. Rep. No. 94-295, at 17.[3]

### c)    Amendments to the Bailout Statute in 1982

In 1982, Congress amended the bailout provision to permit political subdivisions that had not been separately covered by Section 4(b) to initiate bailout suits.  The legislative history of the 1982 Amendments described below unambiguously supports the understanding that only counties, parishes, or other entities that register voters may initiate bailout actions.

In broadening the scope of jurisdictions eligible to seek bailout, Congress abrogated that aspect of the Supreme Court's decision in *City of Rome* that any bailout action in a covered state must be filed by, and seek to exempt, the covered state in its entirety.  *See Rome*, 446 U.S. at 167.  Congress did *not*, however, change the definition or applicability of the term "political subdivision" in Section 4. The 1982 Amendments expanded the scope of bailout-eligible jurisdictions to permit counties or other entities that conduct voter registration (in counties that do not do so) to initiate bailout actions, regardless of whether they had been separately covered. The amendments do not permit smaller subunits, which could not have been separately designated for coverage, to bail out.  *See* SMF ¶ 9.

Congress's intent on this point was clear.  The Senate Judiciary Committee Report accompanying the 1982 Amendments explained that, for purposes of bailout, "[w]hen referring to a political subdivision this amendment refers only to counties and parishes except in those rare instances in which registration is not conducted under the supervision of a county or parish.  In such instances, such as independent cities in Virginia, a jurisdiction other than a county or parish

---

[3]    In 1982, Congress reduced the statutory time period for which a jurisdiction would have to make a factual showing from seventeen back to ten years.

may file for bailout." S. Rep. No. 97-417, at 69.[4]  Moreover, the Senate Report made clear that

its amendments represented a "significant easing of the bailout provisions in current law" and

noted that "[f]or the first time individual counties in a fully covered state will be permitted to file

for bail-out even though other counties and the state government, itself, are not yet eligible to do

so." *Id.* at 45.

The District's construction of the bailout statute directly contravenes Congress's intent in

1982.    Congress reasoned that the limitation on which entities could initiate bailout is a

"logistical one."  If political subunits could bail out, the DOJ and private groups "would have to

defend thousands of bailout suits."  S. Rep. No. 97-417, at 69.  The Report notes that "[f]ew

questioned the reasonableness and fairness of this cutoff in the House."  *Id.* at 57 n.192.  These

unambiguous statements from a legislative committee report provide authoritative evidence of

Congress's intent.[5]

Congress's understanding of the statute was shared by William Bradford Reynolds, who

at that time was Assistant Attorney General of the DOJ's Civil Rights Division.   Reynolds

observed that, under the amendments, "a bail out suit could be brought by an individual county

in a fully covered state" and estimated that "[t]here are more than 800 such counties."  SMF

¶¶ 135-136.  Reynolds's interpretation of Congress's changes to the bailout statute is significant

---

[4]    To the degree that the District implies that the legislative histories from 1982, 1975, 1970, and 1965 are irrelevant merely because the bailout provision was reenacted in 2006, *see* Pl. Mem. 21, the District is plainly incorrect.  *See, e.g.*, *City of Rome*, 446 U.S. at 168-169; *Conroy v. Aniskoff*, 507 U.S. 511, 516-517 (1993).

[5]    *See, e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 207 n.15 (2003) ("'In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those members of Congress involved in drafting and studying proposed legislation.'") (quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984) (alterations and internal quotation marks omitted)).

in that it was not contested by any member of Congress and would inform the DOJ's long-standing regulations regarding the types of jurisdictions eligible to seek bailout (discussed in Part I(A)(4) *infra*). *See Sheffield*, 435 U.S. at 131 (noting, in interpreting Section 5 of the Voting Rights Act, that the "contemporaneous administrative construction of the Act is persuasive evidence of the original understanding, especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress").

Indeed, statements by members of Congress and witnesses during the 1982 renewal explain why Congress rejected further liberalization of the bailout statute in the manner that Plaintiff now proposes: Congress made the judgment that such an amendment would have significantly weakened the Section 5 preclearance provision and over-burdened those charged with defending bailout suits. *See, e.g.*, SMF ¶ 207 (statement in 1982 hearings of Senator Edward M. Kennedy) ("[I]f the bail-out is amended further, there is a serious danger that the extension of Section 5 will prove a hollow victory. A flimsy bail-out provision would become a seive [sic]. It would serve as a backdoor exit for many jurisdictions where the preclearance provision of Section 5 is still needed. It would be an indirect repeal of Section 5."); *id.* ¶ 214 (testimony of Drew S. Days III, former Assistant Attorney General of the Civil Rights Division) (observing that "there is a great danger in expanding the level of jurisdiction eligible to file suit. The sheer number of suits resulting and the drain on resources of the Justice Department and private intervenors would be enormous."); *id.* ¶ 209 (testimony emphasizing that the "new bail out provisions propose a substantial relaxation of the bail out provisions in the current law and would permit counties within a fully covered State to bail out independently of the State" and calling on the Senate to "reject attempts to weaken it further").

### d)    Bailout Statute Following The 2006 Renewal

More recently, in 2006, Congress was presented with evidence regarding the status of the Section 4(a) bailout provision but declined to make any further revisions.  J. Gerald Hebert, a former senior official of the Voting Section of the Civil Rights Division of the DOJ, suggested that States might bail out more easily if "towns, cities and other local governmental units within a covered county [could] bailout independently."[6]  In addition, John J. Park, Jr., Assistant Attorney General of Alabama, proposed that "with respect to bailout, the Congress should make certain that all covered entities, not just jurisdictions, be entitled to bail out."[7]  Again, Congress declined to modify the statute in order to adopt the change that the District now seeks.  Rather, Congress was persuaded by evidence in the record demonstrating the success and workability of the bailout statute.

Although a relatively small number of political subdivisions had sought bailout under the 1982 Amendments, there was no evidence presented to Congress indicating that this is the result of "unworkable" or "unachievable" standards.  *See* June 19, 2006 Letter from County of Augusta, Virginia, to Senators Arlen Specter and Patrick J. Leahy, Declaration of Kristin M. Clarke in Supp. of Resp. to Pls.' Mot. for Summ. J. of Def.-Intervenors, Ex. 3, at 2 (noting that Section 4 provides a "workable mechanism for covered jurisdictions to terminate coverage").  Rather, the evidence made clear that every political subdivision that has applied for bailout since

---

[6]    *Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act: Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 91 (2005) (*October 20, 2005 Hearing*).

[7]    *Reauthorizing the Voting Rights Act's Temporary Provisions: Policy, Perspectives, and Views from the Field: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Property Rights of the S. Comm. on the Judiciary*, 109th Cong. 15 (2006) (*June 21, 2006 Hearing*).

16

1982 has done so successfully.[8]  Moreover, the evidence made clear that the Attorney General

has defended these suits in a manner that does not seek to impose unreasonable barriers to

jurisdictions that have made efforts to take the statutory prerequisites seriously.  *May 9, 2006*

*Hearing*, at 176 (Shaw); June 23, 2006, Letter from City of Salem, Virginia to Senators Patrick

Leahy and Arlen Specter, Clarke Decl., Ex. 2.

　　Finally, Theodore Shaw, Director-Counsel of the NAACP Legal Defense and

Educational Fund, testified that "there are some administrative steps that the Justice Department

might take to educate jurisdictions about [bailout] eligibility and requirements."  *May 9, 2006*

*Hearing*, at 177.   Shaw observed that the DOJ has, in stark contrast, invested tremendous

resources to help inform jurisdictions about other provisions of the Act including the Section 5

preclearance provision and the Section 203 minority language requirements.   *Id.*   Shaw

concluded that additional administrative efforts on the part of the Attorney General to educate

---

[8]　　Theodore Shaw testified that "[unlike] the time period leading up to the 1982 reauthorization that resulted in liberalization of the bailout process, there is no evidence in the record that demonstrates that jurisdictions have encountered difficulty with the bailout process or that indicates that jurisdictions have tried, without success, to bail out from coverage under the Act."  *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization: Hearing before the S. Comm. on the Judiciary*, 109th Cong. 10, 14 (2006) (*May 9, 2006 Hearing*).   Likewise, Drew Days observed that "the bailout provisions—particularly if the Department makes increased efforts to share information about the process—will continue to provide an important incentive for covered jurisdictions to comply with Section 5 as intended in 1982."  *Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing before the S. Comm. on the Judiciary*, 109th Cong. 55 (2006) (*May 17, 2006 Hearing*).  Professor Pamela Karlan testified that "it would be possible to amend section 4(a) to make it easier for jurisdictions to bail out.  I have yet to see any convincing arguments as to why that should be done."  *The Continuing Need for Section 5 Pre-Clearance: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 104 (2006).  Karlan observed that some jurisdictions have not chosen to bail out because "they have not satisfied all the conditions … and see no point in a futile effort to bail out," "jurisdictions appreciate … the 'seal of approval' that preclearance accords," and "local jurisdictions are unaware of the bailout process."  *Id.* at 93.  Anita Earls, former Deputy Assistant Attorney General for DOJ's Civil Rights Division who oversaw the Voting Section, testified that "the bailout provisions already in place provide suitable means for the termination of Section 5 coverage."  *Id.* at 42, 43.

17

bailout-eligible jurisdictions would likely result in "an increase in the number of jurisdictions that seek bailout over the course of the next 25 years as compliance improves." *Id.* However, these kinds of administrative efforts did not warrant legislative modification of the statute. That Congress chose not to further liberalize the bailout statute makes clear that Congress was persuaded by evidence of the workability and viability of the statute.

### e)    Bailout Is Achievable

The District seeks to avoid this overwhelming evidence of Congress's intent in 1982 by relying on more general legislative history from 2006, which does not discuss bailout eligibility at all, but which demonstrates that Congress believed that bailout was achievable for eligible jurisdictions. In the District's view, this history means that all subunits must be able to seek bailout, or bailout will be a Virginia-only remedy. Pl. Mem. 22-23 & n.5. Even assuming this general legislative history could trump the specific legislative history (not to mention the statutory text), which establishes the District's ineligibility to seek bailout, the District is plainly incorrect. The DOJ's interpretation of the statute, consistent with its plain text, judicial construction and history, as not permitting subunits that do not conduct voter registration to initiate bailout actions does not render bailout a Virginia-only remedy.

As the District notes, fourteen political subdivisions in the Commonwealth of Virginia (Essex, Botetourt, Salem, Augusta, Frederick, Greene, Pulaski, Roanoke, Rockingham, Shenandoah, and Warren Counties and the Cities of Fairfax, Winchester, and Harrisonburg) have bailed out from Section 5 coverage since the 1982 renewal.[9] The District argues that the fact that

---

[9]    The cities of Fairfax, Harrisonburg and Winchester, Virginia were eligible to bail out independent of their respective counties because they satisfy the statute's and Guidelines' definition of a "political subdivision" in that these are jurisdictions "where registration for voting is not conducted under the supervision of a county or parish." *See* 28 C.F.R. § 51.2. Each of these three jurisdictions "conducts [its own] registration for voting." *Id.*; *see also* 42 U.S.C.

only Virginia jurisdictions have bailed out "illustrates the practical impossibility of bailing out for the majority of covered counties." Pl. Mem. 23 n.5. The District's argument is unavailing. In 1982, Congress made note of the exceptional efforts of Virginia officials in helping to bring about compliance with the mandate of Section 5, which means it is unsurprising that many of the Commonwealth's political subdivisions have successfully bailed out. Indeed, the 1982 Senate Report notes that "[w]here state attorneys general have been active in advising and educating local officials about their obligations, e.g., Virginia, there has been much less non-compliance with the law than in other covered states." S. Rep. 97-417, at 57.

Moreover, the District's contention that bailout is only possible in Virginia because many of the state's counties have "independent cities" that conduct their own voter registration and have a uniquely small number of subunits, *see* Pl. Mem. 23 n.5, ignores the fact that several of the Virginia counties that have successfully bailed out since the 1982 renewal are structured very similarly to many counties throughout the United States. Specifically, several of these counties have no "independent cities" and have numerous political subunits lying within their territory. Indeed, the bailouts of Shenandoah, Warren, Greene, and Pulaski Counties involved political subdivisions with no independent cities. *See October 25, 2005 Hearing Vol. 2*, at 2769-2777, 2789-2800, 2653-2659, 2693-2703. These political subdivisions had to demonstrate compliance among their respective political subunits in order to satisfy their burden under the statute. 42 U.S.C. § 1973b(a). Gerald Hebert, who served as counsel to Virginia jurisdictions that bailed out, testified that this process was "workable and practical." *October 20, 2005 Hearing Vol. 1*, at 163. Indeed, Shenandoah County, which successfully bailed out in October 1999, is a political

---

§ 1973*l*(c)(2). In Virginia, some cities are considered "independent" of the counties that surround them, and counties have no governmental authority within such cities' boundaries.

subdivision with a total of nine political subunits lying within its territory.  *See Shenandoah County v. Reno*, No. 1:99-cv-00992-PLF (D.D.C. Oct. 15, 1999), Clarke Decl., Ex. 1. Notwithstanding the state's exceptional size, data provided by the Texas Secretary of State's Office indicates that Texas has a total of 254 counties and an average of fourteen political subunits governed by elected bodies lying within each county.  Clarke Decl., Ex. 4.  Although some counties, such as Travis County, are large, many of the state's counties are comparable in size to counties that have successfully bailed out in Virginia.  That some political subdivisions may seek to bail out under more fact-intensive circumstances than others hardly suggests that bailout is "practically impossible" to achieve.  Indeed, the best evidence of the statute's achievable standard lies in the fact that every political subdivision that has applied for bailout has successfully done so under the liberalized eligibility standards adopted in 1982.

> **4.    The Attorney General's Interpretation Confirms That The Statutory Definition Of "Political Subdivision" Applies To The Bailout Provision**

The DOJ's interpretation of the statute is in accord with the statute's text, binding precedent interpreting the statute, and the legislative history.  The Justice Department relies, in part, on its Guidelines, as reflected in the Code of Federal Regulations, to handle all bailout requests.  *See* 28 C.F.R. § 51 *et. seq.* (2007).  These Guidelines, which were revised in 1985 to reflect the 1982 amendments, critically distinguish between "political subdivisions," defined in Section 51.2, and "political subunits," defined in Section 51.6.  Under the Guidelines, a "political subdivision" is "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." 28 C.F.R. § 51.2.  Meanwhile, they also state that "[a]ll *political subunits within a covered jurisdiction* (e.g. counties, cities, school districts) are subject to the requirement of section 5." *Id.* § 51.6 (emphasis added).  Thus, not only do the

20

Guidelines contemplate a distinction between political subdivisions and political subunits, but they also note that political subunits are specifically housed *within* other covered jurisdictions. This agency construction is yet further support for Defendants' position. *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.") (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-844 (1984)); *see also Lopez v. Monterey County*, 525 U.S. 266, 281 (1999) (noting deference owed Attorney General's interpretation of Section 5 of the VRA in light of his "'central role … in formulating and implementing' that section" (quoting *Dougherty County*, 439 U.S. at 39) (alteration in *Lopez*)).[10]

Moreover, Congress was aware of the DOJ Guidelines during the most recent renewal yet did not override or otherwise express disagreement with the prevailing interpretation of the agency charged with defending the interests of the United States in bailout suits. Indeed, these Guidelines were submitted into the record by Representative Steve Chabot, Chairman of the House Subcommittee on the Constitution. *Voting Rights Act:  Section 5 of the Act—History, Scope, and Purpose:  Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 1688-1698 (2005).  Under these circumstances, Congress is presumed to

---

[10] The District cites *Miller v. Johnson*, 515 U.S. 900, 923 (1995), for the proposition that the Attorney General's interpretation of the VRA should not receive deference if his interpretation raises grave constitutional questions. *See* Pl. Mem. at 11-12. However, as discussed in the text, the canon only applies at most in case of actual ambiguity. And even were there ambiguity, the avoidance canon would not be relevant here because as explained in Part II, the Attorney General's interpretation of the statute does not raise any grave constitutional questions. *Accord Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (granting deference to an agency construction and refusing to avoid the constitutional issue presented since it was not "grave").

have acquiesced in the Attorney General's interpretation of the statute.  *See, e.g., Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).

### 5.    The Canon Of Constitutional Avoidance Is Inapplicable Here

The District seeks refuge in the canon of constitutional avoidance.  *See* Pl. Mem. 24-28; *see also id.* at 11-12.  For two reasons, however, the canon of constitutional avoidance does not apply here.  First, that canon is irrelevant unless the statute is genuinely susceptible to two different constructions.  *See, e.g., Clark v. Martinez*, 543 U.S. 371, 385 (2005); *Schor*, 478 U.S. at 841 (reversing the lower court's decision, noting that the court had erred in applying the avoidance canon since "examination of the [statute] and its legislative history and purpose reveals that Congress plainly intended" the result avoided).  As explained above, it is clear that the Section 14(c)(2) definition of "political subdivision" applies to Section 4(a), which means that the canon is inapplicable here.  Second, in any event, there are no grave constitutional questions implicated by applying the § 14(c)(2) definition of political subdivision" to Section 4(a)'s bailout provision.  *See* Part II, *infra*.

### B.    Even If The District Were Eligible To Apply For Bailout Independently Of Travis County, It Would Not Be Entitled To Bailout Because It Fails To Satisfy The Required Statutory Criteria

Even if the District were eligible to seek bailout, the record is clear that the District has not met its burden to satisfy the statutory criteria for bailout specified by 42 U.S.C. § 1973b(a).  *See* Mem. in Supp. of Mot. for Summ. J. of Diaz Def.-Intervenors , Dkt. No. 101, at 26-30.

The VRA's bailout provision provides that "[a] declaratory judgment under this section shall issue only if such court determines that during the ten years preceding the filing of the action," the applying entity has met the criteria specified at 42 U.S.C. § 1973b(a).  Congress has indicated that "it is important that a jurisdiction seeking bailout be required to present compelling evidence that it has earned the right to remove itself from Section 5 coverage," and thus, the

District, if deemed eligible to seek bailout, now bears "the burden of proof as to each element of the bailout criteria." S. Rep. No. 97-417, at 56 (1982). "This burden must be met by objective evidence and cannot be satisfied on the basis of assertions and conclusory declarations." *Id.; see also Gaston County v. United States*, 288 F. Supp. 678, 688 n.20 (D.D.C. 1968) (three-judge court) ("The placing of the burden in a § 4(a) Voting Rights Act case could not be more emphatic—it lies squarely on the certified subdivision."). Thus, were the District deemed eligible to bail out, it would now have the burden to show that there is no genuine issue of fact as to whether it has satisfied the statutory criteria for bailout to obtain a declaratory judgment from this Court. The District has not met this burden, in at least two respects.

First, it has not shown that over the previous ten years that it "has engaged in [any] … constructive efforts, such as expanded opportunity for … the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process." 42 U.S.C. § 1973b(a)(1)(F). The District's General Counsel (1986 through 2002) stated she was unaware of any affirmative efforts to encourage African-American or Hispanic residents of the District to run for Board office. SMF ¶ 1569.[11] Indeed, former MUD Board

---

[11]    Moreover, the District's opening memorandum also mischaracterizes some of the efforts it has made to increase general voter participation. For example, in 2004 and as part of the District's decision to enter into an election agreement with Travis County, the District moved its polling place out of Mr. and Mrs. Stueber's private home and into the local Elementary School. Pl. Mem. 9. The decision to move the polling places was not, however, made purely out of a desire to increase voter convenience; the District had substantial financial incentives to enter into the agreement. *See* Qualtrough Dep. 59:6-9.

   Additionally, the District's opening brief also mischaracterizes the difficulties it has faced in making efforts to increase voter participation. By use of the passive voice, the District's brief leaves a misimpression about the District's difficulties in 2002 in finally moving polling places from a resident's home to a public location were somehow associated with Section 5 or the federal government. The District states that it "sought approval to hold [its] elections at one of the builder's model homes" and that "this request was denied," Pl. Mem. 6, and that when it then sought to hold elections in the Canyon Creek Elementary School after the school opened in the

President Donald Zimmerman testified that he would "absolutely not" make any special efforts to recruit African Americans or Latinos to serve as election clerks. *See id.* ¶ 1570.

Second, the District failed to publicize this action seeking bailout "in the media serving such State or political subdivision and in appropriate United States post offices." 42 U.S.C. § 1973b(a)(4). Other than placing an action item on its May 23, 2006 regular meeting agenda pursuant to the Texas Open Meetings Act "regarding continued enforcement of Section 5," the District made no effort to inform its residents that it had decided to seek bailout from Section 5 or that it had filed this case. The District failed to publish any notice in a local newspaper or newsletter, write to its voters or even post a notice on the residential subdivision's bulletin board informing the public that it had decided to file a bailout action. The District's sole public notice concerning this action was a meeting agenda that said nothing about seeking bailout. *See* June 15, 2007 Wolfson Decl., Ex. 6; Zimmerman Dep. 88:25-91:178. Nor is there any record evidence whatsoever that the District posted any notice of this action in any United States post office.[12]

---

neighborhood, "this request was also denied." *Id.* Yet the District fails to clarify that it was *local officials* who denied the request (the developer and the school, respectively)—not the federal government pursuant to Section 5. Collins Dep. 33:2-11; 144:6-19.

[12]    Plaintiff also mischaracterizes, as merely a "philosophical" difference, the deep concern expressed by the District's minority voters who have intervened in this case. However, although they never received the required notice by the District of its plan to file this case, after learning about the case, minority voters of the District attended a District Board meeting to voice their opposition, intervened in this litigation and presented testimony. When the District recently attempted to adopt a change to numbered place elections, a system notorious in Texas for increasing the effect of minority vote dilution, minority voters once again attended the District Board meeting to voice their concern and opposition. *See, e.g.*, J.G. Diaz Dep. Tr. 14:23-15:9; Richardson Dep. 11:2-12:4, 25:14-29:14. Individual Intervenors have also described their painful experiences with racial discrimination in the District, and one intervenor has discussed the ways in which that discrimination has affected his participation in the political process. Mr. Winthrop Graham, an African-American resident of the District, has been subject to repeated police harassment because of his race, and has found the prejudice of his neighbors so severe that

## II.    THE DISTRICT'S CONSTITUTIONAL CLAIM FAILS

### A.    The District Has Abandoned Any Facial Challenge To Section 5 And Fails To Explain How Its Challenge Is "As-Applied"

The District has abandoned its claim that Section 5, as reauthorized in 2006, is *facially* invalid, and has limited its claim to what it calls an "as-applied" challenge to the law.  In its Motion for Leave to File an Amended Complaint, the District informed the Court and the Defendants that it was "clarify[ing] the nature of its constitutional claim" by "remov[ing] any wording that might have given opposing litigants the impression that the district was alleging a facial challenge to the constitutionality of §5 of the Voting Rights Act," and that its challenge to the Act was exclusively "as applied to the district."  Dkt. No. 65, at 2.

Notwithstanding the clarification of its claim, in its summary judgment brief, the District fails to adhere to this self-imposed standard, and spends virtually all of its discussion of constitutional issues attacking Section 5's fundamental underpinnings.  For example, the District argues that the reauthorization "is not congruent to voting problems in today's America," Pl. Mem. 37 (capitalization altered), that the "[e]xceptional circumstances" that existed when Section 5 was first enacted in 1965 no longer exist, *see id.* at 38, that "the great bulk of activity forbidden by §5 is constitutionally benign," *id.* at 43, that Congress did not make sufficient findings to justify Section 5's reauthorization, *see id.* at 47-48, that Section 5 is excessive in duration and scope, *see id.* at 57, and that even if the District were permitted to bailout, Section 5 would still be unconstitutional, *see id.* at 4, 36.  These arguments are not consistent with an as-

---

he and his wife must pretend they do not own their health food store so that white customers are not discouraged from shopping there.  *See* W. Graham Dep. 17:15-24:23, 26:19-28:9, Apr. 25, 2007.  Mr. Graham explained that these experiences have reduced his interest in voting and other forms of political participation because, among other things, "I haven't seen a candidate who I think would look out for my view or … my interests."  *Id.* at 24:24-26:10; *see also* Y. Graham Dep. 18:11-20:10, Apr. 25, 2007.

applied challenge but rather a frontal attack on Section 5, which the District has expressly withdrawn.[13]

Whereas a facial challenge must establish that "no set of circumstances exists under which the [challenged law] would be valid," see *United States v. Salerno*, 481 U.S. 739, 745 (1987), an as-applied challenge typically asserts that a statute is unconstitutional only as applied to a particular category of circumstances. *See, e.g., Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 124, 131 (1989) (holding the statute's prohibition of obscene and indecent interstate telephonic communications invalid as applied to indecent communications, even though it could be validly applied to obscene calls); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (holding zoning ordinance "invalid as applied in this case"); *see also Sanjour v. EPA*, 56 F.3d 85, 92 n.10 (D.C. Cir. 1995) (comparing "as-applied" and "facial" challenges and noting that as-applied challenges "ask only that the reviewing court declare the challenged statute or regulation unconstitutional on the facts of the particular case"). The District, however, fails to identify the particular *category* of circumstances to which it believes that Section 5 could not be constitutionally applied. Given the facial nature of the District's arguments, this Court and the

---

[13]    Apparently recognizing the contradictions in its argument, the District has salted its brief with propositions such as: "To Be Applied to the District as Appropriate Legislation, §5 Must Be Congruent and Proportional to the Right to be Free of Purposeful Discrimination in Voting." Pl. Mem. at 44. These passing references to the law's "application" to the District do not obscure what is evident from the text of the brief: namely, that the District has made a facial argument even after abandoning such a claim. Thus, notwithstanding the District's repeated use of the phrase "as-applied to the district," *see id.* at 37, 43, 44, 46, 59, the District's particular circumstances, to the extent they are mentioned at all in the constitutional argument, appear as an afterthought following a broadside attack on Section 5. *See id.* at 46-52 (mentioning the District only after a lengthy discussion flatly claiming that Congress lacked sufficient evidence to reauthorize Section 5).

Defendants are entitled to a meaningful explanation of how, if at all, the District's claim is "as-applied," which so far the District has entirely failed to provide.[14]

Although it has withdrawn its facial claim, the District's constitutional challenge to Section 5 does not relate to any particular characteristics of the District itself, nor even to a particular class of circumstances in which the District believes the provision might not be validly applied, but rather to core, fundamental aspects of Section 5: the formula for coverage, the standard for bailout eligibility, and the legislative record on which the 2006 reauthorization was based. But even if the District argued that it could not be brought within the reach of Section 5, there would be no basis for such a challenge. The Constitution does not require Congress to establish that each and every subunit within jurisdictions covered by Section 5 had previously engaged in voting discrimination, and any such requirement would be unworkable and undermine Section 5's ability to prevent official voting discrimination before it occurs. Even if the particular burdens on the District were somehow relevant to the Court's constitutional analysis, the District could not credibly sustain any claim on this basis, since the compliance burdens are trivial, *see* D-I Mem. § III, a conclusion nowhere addressed, let alone undermined, by the District's opening brief.

In sum, the District's effort to fashion a constitutional claim in the face of unequivocal precedents and a record that forecloses it does not change the result—the claim fails whether styled as either an as-applied or facial challenge.

---

[14]    *See, e.g.*, District's Resps. to Travis County's First Set of Interrogs. (replying, in response to Interrogatory No. 6 ("Do you contend that, if the NW Austin MUD is not allowed to bail-out from coverage by Section 5, then Section 5 is unconstitutional on its face?") and Interrogatory No. 7 ("Do you contend that, if the NW Austin MUD is not allowed to bail-out from coverage by Section 5, then Section 5 is unconstitutional as applied to the NW Austin MUD?"), that: "The District objects to this contention interrogatory because it requests information beyond the scope of discovery [and] demands legal contentions, not properly discoverable[.]").

**B.**    **The District Ignores The Long-Recognized Fundamental Alteration In The Balance Of Power Between The Federal Government And The States Embodied In The Reconstruction Amendments**

The District ignores important developments in the evolution of this nation's constitutional law: the ratification of the Thirteenth, Fourteenth, and Fifteenth Amendments, and perhaps more importantly, the significance that those developments have with regard to its claim. Thus, while the District is quick to advert to the "federal veto over state enactments [being] expressly rejected in the Constitutional Convention of 1787," Pl. Mem. 2, it fails to acknowledge that a "new structure of law ... emerged in the post-Civil War era," under which "the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established." *Mitchum v. Foster*, 407 U.S. 225, 239 (1972); *see also Fitzpatrick v. Bitzer,* 427 U.S. 445, 455 (1976). The Supreme Court's decisions affirming and reaffirming Section 5's constitutional vitality have emphasized that the Reconstruction Amendments "supersede[] contrary exertions of state power." *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966); *see also Lopez*, 525 U.S. at 282 ("[T]he Reconstruction Amendments by their nature contemplate some intrusion into areas traditionally reserved to the States."); *City of Rome*, 446 U.S. at 179. Even while limiting congressional authority to act under certain Article I powers, the Court has reaffirmed that the Reconstruction Amendments "fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996). Thus, when Congress enacts appropriate legislation to enforce the Reconstruction Amendments, "federal interests are paramount, and Congress may assert an authority over the States which would be otherwise unauthorized by the Constitution." *Alden v. Maine*, 527 U.S. 706, 756 (1999).

**C.    Section 5 And The Bailout Rules Do Not Unconstitutionally Alter The Form Of State Government**

The District contends that, by precluding the District from bailing out independently of Travis County, Section 5 and the bailout rules "substantially interfere with and reorder state government by politically interposing Travis County between the district and the State of Texas." Pl. Mem. 27.  There is no substance to this argument.  The District fails to acknowledge that its opportunity to be removed from coverage through a Travis County bailout is *in addition to* its opportunity to be removed from coverage through the State of Texas.  Ever since the VRA was enacted, subunits of covered States have been able to bail out if the State bails out.  Thus, there is no merit to the District's argument that it is somehow trapped by Travis County's coverage. Travis County is not an independently covered jurisdiction and falls within the coverage of Section 5 because the State of Texas is covered.  *See Dougherty County*, 439 U.S. at 45.

There could be no serious argument that Section 5 unconstitutionally alters the form of state government in this case by predicating a subunit's ability to bail out on the State's ability and willingness to bail out.  The District is, by its own admission, a subordinate political entity within the State of Texas and is accountable to the State for the operation of its governmental functions.  *See* Pl. Mem. 27.[15]  Thus, the District's claim has even less merit than the locality's in *City of Rome*, where the Supreme Court held that Congress may constitutionally preclude a political subunit in a covered state from bailing out independently of the covered State—in that case, the State of Georgia.  446 U.S. at 168-169.  The Court rejected the contention that Section 5 unconstitutionally "displac[ed] the States' freedom to structure integral operations in areas of traditional governmental functions."  *Id.* at 178 (internal quotation marks omitted).  And in

---

[15]    In any event, as the District makes clear in its memorandum, *see* Pl. Mem. 33-35, it has by contract transferred its core election related functions to Travis County.

*Lopez*, the Court rejected a constitutional challenge to Section 5 similar to that raised by the District here; the Court held there that it was permissible for Congress to require preclearance for a covered county's implementation of a non-covered state's laws, even on the assumption that Section 5 made no provision for the state to bail the county out from coverage. 525 U.S. at 283-284. If state laws, including those of a non-covered state, can be subject to preclearance unless the *county*—a subordinate political entity—obtains bailout, surely a locality's voting practices, in a fully covered state, can be subject to preclearance unless the county or state in which the locality is located obtains bailout.

Nor do the bailout rules unconstitutionally "commandeer[]," Pl. Mem. 2, state or local jurisdictions in any way. Section 5 and the bailout rules do not "compel[]" the District "to enact and enforce a federal regulatory program" by foisting "new federally-prescribed, non-discretionary tasks" that represent core policy decisions "on local officials whose offices and duties are defined by state statutes." *Koog v. United States*, 79 F.3d 452, 461 (5th Cir. 1996). Section 5 also does not compel the District to regulate according to Congress's direction on pain of monetary liability. *See New York v. United States*, 505 U.S. 144, 167-168, 174-175 (1992). Rather, Section 5 is a federal regulatory scheme designed to protect a fundamental right, in which Congress has determined the entities that shall be covered, and the bailout rules are a federal provision that allow some of those covered entities, if they so choose, to petition for removal from that federal regulatory structure. "Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions[.]" *Lopez*, 525 U.S. at 283. So long as Congress is operating within that congressional authority, it may decide which state or local entities fall within the scope of the law. *Cf. Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269 (1985)

(rejecting argument that Congress had violated "concerns of federalism" by directing federal funds to be used by school district in a manner consistent with federal law rather than state law, and turning aside suggestion that "the Federal Government may not intrude lightly into the State's efforts to provide fiscal guidance to its subdivisions").

This sensible constitutional rule is supported by obvious practical considerations. Individual states' structures vary widely. If Congress had to account for each State and political subunit's unique structures, it would be unable to design effective legislation with a national scope. *Cf., e.g., Lawrence County*, 469 U.S. at 268 n.21 (stressing "reasons of administrative efficiency"). Such a rule would be particularly inappropriate in the present context, given that Section 5 was designed to ensure an effective remedy against states' "ingenious" ways of continuing discriminatory practices. *See South Carolina v. Katzenbach*, 383 U.S. at 309.

**D.     The District Misstates And Misapplies The *Boerne* Framework**

The *Boerne* framework requires a reviewing court to engage in three inquiries. First, the Court must identify the constitutional right or rights that Congress sought to enforce by enacting the legislation in question.  Second, the Court must examine the gravity of the harm the legislation seeks to prevent.  Third, the Court must determine whether the statute in question is congruent and proportional and therefore can "be understood as responsive to, or designed to prevent" the harms identified in the first two steps. *See* D-I Mem. 35. The District's *Boerne* analysis is infected by error at all three steps.

**1.     The District Fails To Acknowledge That Congress Possesses Broad Authority To Remedy Official Racial Discrimination In Voting**

Congress has especially broad latitude to enact remedial legislation where state action affecting a constitutional right is subject to heightened judicial scrutiny. *See Tennessee v. Lane*, 541 U.S. 509, 528-529 (2004); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003).

Official discrimination against racial and ethnic minorities' voting rights implicates both the strict scrutiny accorded racial discrimination and the heightened scrutiny accorded the fundamental right to vote. *See* D-I Mem. 37-41. Accordingly, Congress acted at the zenith of its remedial authority when it reauthorized Section 5. *See id.* The District fails to acknowledge this broad congressional authority.

### 2. The District's Analysis Of The Gravity Of The Harm Is Erroneous

#### a) The District Misstates The Standard For A Constitutional Harm That Congress May Properly Deter And Remedy

Concerning the gravity of the harm that Congress seeks to address, the District misapprehends the *Boerne* framework in several respects. First, contrary to the District's portrayal, the Reconstruction Amendments do not require that the scope of unconstitutional conduct in the years immediately preceding the renewal of the VRA be precisely what it was in the years immediately preceding the initial enactment in 1965. The District contends that the Court's holding in *South Carolina v. Katzenbach* was premised on an "emergency," and therefore there *must* be an "emergency" state of affairs concerning discrimination in voting for Congress to reauthorize Section 5. *See* Pl. Mem. 38-39; *see also id.* at 58 ("Congress was unable to adduce an adequate record of an endless emergency persisting to the present day[.]"); *id.* at 39, 40, 43, & 52.

The District's argument is wrong. As the Court recognized in *South Carolina v. Katzenbach*, the VRA was enacted to address substantial and persistent interference with the right to vote; however, the Court did not employ the word "emergency" a single time.[16] Further,

---

[16]    The Court did cite *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) and *Wilson v. New*, 243 U.S. 332 (1917), but the extent of the Court's reliance on those cases was the following sentence: "[Section 5] may have been an uncommon exercise of congressional power, as South Carolina contends, but the Court has recognized that exceptional conditions can justify

the "unique circumstances" of discrimination in voting were entrenched for "nearly a century" since the adoption of the Fifteenth Amendment. *South Carolina v. Katzenbach*, 383 U.S. at 334-337; *see also id.* at 309-315 (citing H.R. Rep. No. 89-439, at 8-16 (1965); S. Rep. No. 89-162, pt. 3, at 3-16 (1965)); D-I Mem. 3-6, 9-15; SMF ¶¶ 14-35, 49-128, & 336-1546. It is thus not surprising that in neither *City of Rome* nor *Lopez*, nor in *Boerne* or any of its progeny—each of which built on *South Carolina v. Katzenbach*—did the Court use the term "emergency" in the manner that the District suggests.[17] Nor have even any of the concurrences or dissents in those decisions used the term to describe the conditions justifying the passage of the VRA.[18]

The Court in *South Carolina v. Katzenbach* did recognize the "extraordinary stratagem" that some covered jurisdictions had used to perpetuate voting discrimination and concluded that, in enacting Section 5, Congress had responded appropriately to "unique circumstances." 383 U.S. at 334-335. However, the Court has never stated that "only" circumstances resembling those at issue in *South Carolina v. Katzenbach* justify the promulgation of remedial measures (tellingly, the word "only" in the District's Memorandum is not part of the quote from any case, *see* Pl. Mem. 38-39). The Court has certainly never suggested the *reauthorization* of such a

---

legislative measures not otherwise appropriate." *South Carolina v. Katzenbach*, 383 U.S. at 334-335 (citing *Blaisdell* and *Wilson*).

[17] *See City of Boerne v. Flores*, 521 U.S. 507 (1997); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627 (1999); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000); *Board of Trs. v. Garrett*, 531 U.S. 356 (2001); *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003); *Tennessee v. Lane*, 541 U.S. 509 (2004). The term "emergency" was used several times only in ways not relevant here. *See Hibbs*, 538 U.S. at 734 n.8; *Garrett*, 531 U.S. at 379, 405 (App. C), 419 (App. C) & 422 (App. C) (Breyer, J., dissenting).

[18] *See* cases collected in *supra* n.17; *see also Lane*, 541 U.S. at 561-562 (Scalia, J., dissenting) ("The Equal Protection Clause … 'is so clearly a provision for that race and that emergency[.']") (quoting *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 81 (1873) and referring only to the "emergency" state of affairs that led to the adoption of the Reconstruction Amendments, *not* suggesting that an emergency is required for Congress to enforce those amendments).

33

remedial measure depends on a congressional finding that the circumstances underlying the initial reauthorization have not in any way improved, which would permit Congress to reauthorize only ineffective remedial statutes. Rather, since *Katzenbach*, the Court has held that the 1975 and 1982 renewals of Section 5 constituted valid enforcement legislation, *see City of Rome*, 446 U.S. at 173-182; *Lopez*, 525 U.S. at 282-285 (citing, *inter alia*, *Boerne*),[19] even though at the time of those renewals, as in 2006, the evidence before Congress demonstrated that: (1) as a result of the VRA, there had been gains in advancing minority voting rights; (2) those gains were "fragile;" and (3) in response to the increase in minority registration effectuated by the VRA, many covered jurisdictions implemented other measures designed to dilute minority voting strength. *Compare City of Rome*, 446 U.S. at 180-182 (discussing evidence before Congress in 1975) and S. Rep. No. 97-417, at 9-14 (discussing evidence before Congress in 1982) *with* Pub. L. No. 109-246 § 2(b), 120 Stat. 577-578, and H.R. Rep. No. 109-478, at 35-46, 53, 57 (discussing evidence before Congress in 2006). *See also* Part II.D(3)(b), *infra*.

Second, and relatedly, contrary to the District's approach, *see* Pl. Mem. 46-59, evidence from before 1982 is plainly relevant to the constitutionality of the 2006 renewal. The Supreme Court has consistently approved Congress's consideration of its own "historical experience" when exercising its enforcement powers. *Lane*, 541 U.S. at 523 (quoting *South Carolina* v. *Katzenbach*, 383 U.S. at 308); *Fullilove v. Klutznick*, 448 U.S. 448, 503 (1980) (Powell, J., concurring); *see also City of Rome*, 446 U.S. at 181-182 (considering history underlying 1965 promulgation as well as 1975 renewal of the Voting Rights Act). Because Section 5 has been in operation since 1965,

---

[19]    Contrary to the District's suggestion, *see* Pl. Mem. 40, *Lopez* unequivocally held that Section 5 is a constitutional exercise of Congress's Fifteenth Amendment enforcement authority, 525 U.S. at 284-285, and thus necessarily sustained the constitutionality of the 1982 reauthorization—the then-most-recent Section 5 reauthorization prior to the Court's decision in *Lopez*.

evidence underlying the 1965 enactment and the 1975 and 1982 reauthorizations, as well as record evidence from 1982 through the 2006 reauthorization, is highly probative of the conclusion that unconstitutional voting discrimination remains a problem that warrants Section 5's continuing operation in covered jurisdictions. *See* SMF ¶¶ 1479-1481. In short, the task for this Court is not to determine whether the scope of voting discrimination underlying the 2006 renewal was identical to the scope of discrimination underlying the 1965 passage of the VRA. Rather, the Court's role is to determine whether, in light of the record of continuing discrimination in covered jurisdictions before Congress in 2006, as well as the records of discrimination in covered jurisdictions dating back to the 1965 enactment of the VRA, Congress's decision to reauthorize Section 5 can now "be said to be 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Lane*, 541 U.S. at 533 (quoting *Boerne*, 521 U.S. at 532).

Third, the District misconceives the nature of the evidence that Congress may consider in crafting a congruent and proportional remedy to voting discrimination against minority groups. Although the principal evidence in this case involves State action—namely the extensive record of voting discrimination by states and localities compiled by Congress during the 2006 renewal—contrary to the District's repeated suggestions, *see* Pl. Mem. 44, 47, 49, 50, 53, Congress may consider more than just evidence of State action. In particular, Congress may consider evidence of improper actions by private actors where such evidence is relevant to determining the risks or likelihood of unconstitutional state action. In both *Hibbs* and *Lane*, the records did not include many examples carrying strong indicia of conduct by state officials—but *did* include evidence Congress could justifiably rely on in reaching the conclusion that unconstitutional conduct was occurring that warranted a prophylactic or remedial measure. In

*Hibbs,* the Court "approved the family-leave care provision of the FMLA as valid § 5 legislation based primarily on evidence of disparate provision of parenting leave, little of which concerned unconstitutional state conduct," including a Senate Report citation to a survey revealing gender disparities in private sector leave provisions and submissions at a hearing on predecessor legislation stating public sector leave provisions differed little from private sector leave provisions. *Lane,* 541 U.S. at 528, 529 n.17 (citing *Hibbs,* 538 U.S. at 728-733). *Lane,* in upholding Title II of the ADA, relied on hundreds of examples of unequal treatment of persons with disabilities by States, local governments and "nonstate governmental actors." 541 U.S. at 526-527 & n.16; *see also* D-I Mem. 68-69.

### b)    The District Mischaracterizes The Relevance And Sufficiency Of The Record Before Congress in 2006

As demonstrated in the Defendant-Intervenors' opening brief, and *infra,* Section 5 as renewed in 2006 is an appropriately remedial and prophylactic measure that fully satisfies the *Boerne* standard. D-I Mem. 41-68. The District ignores much of the evidence before Congress and acknowledges only that "in reauthorizing §5 in 2006, Congress pointed to (1) racially polarized voting, (2) DOJ preclearance statistics, and (3) anecdotal evidence." Pl. Mem. 48. These categories of evidence would, on their face, justify renewal, but in any event, as set forth below, the congressional record was far more robust than the District acknowledges.

### i)    The record includes substantial indicia of gamesmanship by covered jurisdictions

The District claims that, in 2006 Congress had "no evidence that the type of gamesmanship described in *Katzenbach* was still rampant." Pl. Mem. 47. This attack is unavailing for two reasons. First, because "gamesmanship" has never been the core of the problem that Congress sought to address in Section 5, but rather a manifestation of persistent voting discrimination, gamesmanship is not a prerequisite for congressional use of its

36

enforcement powers under the Reconstruction Amendments. *See City of Rome*, 446 U.S. 156 (upholding Section 5 as reauthorized in 1975 without addressing evidence of gamesmanship); *Lopez*, 525 U.S. 266 (same with regard to Section 5 as reauthorized in 1982); *County Council of Sumter County v. United States*, 555 F. Supp. 694, 707-08 (D.D.C. 1983) (same).

Second, the District's claim that gamesmanship evidence was absent in 2006, Pl. Mem. 47; *see also id.* at 49, 58, is belied by the record. As the House Committee Report concluded regarding the 1982-2006 period, "voting changes devised by covered jurisdictions resemble those techniques and methods used in 1965, 1970, 1975, and 1982 including:  enacting discriminatory redistricting plans; switching offices from elected to appointed positions; relocating polling places; enacting discriminatory annexations and deannexations; setting numbered posts; and changing elections from single member districts to at large voting and implementing majority vote requirements." H.R. Rep. No. 109-478, at 36; *see also* SMF ¶ 338. Congress received evidence that numerous covered jurisdictions had been forced to abandon one discriminatory practice only to adopt a new one (or even to readopt the same practice) and continue to draw objections based on discrimination in voting.

The experience of Waller County, Texas, is illustrative.[20]  The county has repeatedly attempted to deny the right of its minority voters to participate in the political process.  Congress received evidence that starting in the 1970s and continuing through 2004, the County acted to prevent African-American students at Prairie View A&M University, a historically Black college, from voting.  *See* SMF ¶ 869.  Waller County tried to maintain white control of elected offices during the 1970s after, according to the Census, Blacks had a slim majority of 52.5 percent.  The County tried to prevent Prairie View students from voting, claiming that they were not legally residents of the County.  The Supreme Court disagreed, holding unconstitutional the denial of the presumption of residency to the students that extended to other Waller County residents.  *See Symm v. United States*, 439 U.S. 1105 (1979), *aff'g United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978).

In the 1990s, several Prairie View students were indicted for "illegal voting" through a misreading of the residency requirements.  *See June 13, 2006 Hearing*, at 251-252; *see also March 8, 2006 Hearing Vol. I*, at 185-186, 1243-1245; SMF ¶ 869.  The charges were later

---

[20]    Waller County is only one of many Texas jurisdictions that have repeatedly run afoul of the VRA well after its initial enactment and into the present day.  In Texas, of the 72 Texas counties to experience objections to election changes since 1982, "28 have demonstrated a pattern of repeated offenses."  SMF ¶¶ 375, 617, 820.  For example, in 1975, Congress had noted the long history of discrimination against Blacks and Mexican-Americans in determining that Texas's minority populations needed the protection of Section 5.  *Id.* ¶ 69.  This evidence included the exclusion of language minorities from the political process.  *Id.* ¶ 73.  Part of the evidence informing Congress's 1975 decision was the discrimination against minority voters in Bexar County.  In 2006, Congress once again heard repeated testimony of continued and repeated discrimination against minority voters in Bexar County.  *See id.* ¶ 634 (2001 objection to voting change in Bexar County concluding that redistricting plan unnecessarily reduced minority voting strength); *id.* ¶ 638 (unprecleared early polling place closures in Bexar County); *id.* ¶ 642 (1995 objection to proposed changes to Edwards Underground Water District in Bexar County (and other counties) that ran afoul of a consent decree in a federal court challenge); *id.* ¶ 644 (December 1994 objection citing failure to make materials available in Spanish in Bexar County); *id.* ¶ 647 (October 1994 objection to bilingual election procedures in Bexar County).

dropped. But, as recently as 2004, after a student from the University sought to run for the Waller County Commissioner's Court, the district attorney threatened that student voting in the primary election would constitute a felony. *June 13, 2006 Hearing*, at 252. After the NAACP chapter sued, the district attorney withdrew the threats. *Id.* Yet, less than a week after the lawsuit was filed, and a month before the election, the Waller County Commissioners' Court voted to reduce the availability of early voting at the polling place closest to campus from seventeen hours over two days to six hours in one day. *March 8, 2006 Hearing Vol. I*, at 185. This reduction in hours was particularly significant because the students would be on spring break during the day of the primary and would have to vote early if they planned on leaving town for the break. *Id.* at 185-186. Following yet another lawsuit—to prevent Waller County from implementing this change without the requisite Section 5 preclearance—county officials abandoned the change and restored the additional eleven hours. *Id.* Even after the 2006 reauthorization, both the Texas Attorney General and the DOJ have been investigating allegations that the names of approximately 1,000 Prairie View students who had registered to vote were not reflected at the polls.[21] *See also* Diaz Def.-Intervenors' Opening Mem., Dkt. No. 101-2, at 20-22 (describing repeated attempts by Seguin, Texas, to prevent the election of a Latino majority on the City Council by changing its election practices).

Congress also received ample gamesmanship evidence from covered jurisdictions outside Texas. A particularly striking example presented to Congress concerns Mississippi's recalcitrance with respect to elimination of its dual registration requirements. As part of its 1890 disfranchising constitution, the State adopted a dual registration system, which required voters to

---

[21]    *See* Helen Eriksen, *Waller County gets monitors for May vote*, Houston Chron., Apr. 28, 2007, 2007 WLNR 8073018, at B5 (noting Waller County's long history of "election irregularities," including the 2003 questioning of student residency requirements).

register separately for municipal and non-municipal elections. In 1987, a court—finding, *inter alia*, that the law was adopted for a discriminatory purpose and had a significant ongoing discriminatory effect—invalidated the law. *Mississippi State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1251-1252 (N.D. Miss. 1987); SMF ¶ 1063. However, in the 1990s, Mississippi enacted a new dual registration system after Congress's passage of the National Voter Registration Act; the State refused to submit this voting change to the DOJ even after the Department informed Mississippi that its re-adoption of dual registration had to be precleared. Private citizens were then forced to file a Section 5 enforcement action, which was decided in their favor by a unanimous Supreme Court. *See Young v. Fordice*, 520 U.S. 273 (1997); SMF ¶ 708. But this was not enough; then-Governor Kirk Fordice vetoed a law that would have created a unitary registration system, and private citizens were forced to bring yet another lawsuit. SMF ¶ 719. Indeed, "[o]nly in late 1998—thirty-three years after passage of the [Voting Rights] Act, eighteen years after Section 5 was last reauthorized, and more than a decade after the federal court struck down the original dual registration system—was the state's dual registration system abolished." *May 9, 2006 Hearing*, at 54-55 (testimony of Chandler Davidson).

Another dramatic example of gamesmanship from Mississippi involves Grenada County, which was subject to a Section 5 objection in 1971 for proposed changes to at-large elections, numbered posts, and multi-member districts; in 1972 to a proposal to move to at-large elections, numbered posts, and a majority vote requirement; in 1976 and 1987 to attempted redistrictings for the county supervisors; in 1988 for moving from elective to appointive positions for school districts; in 1997 for proposing in a municipal election to place new limits on voter assistance, leading to a federal court finding in 1998 that the City of Grenada had violated Section 5; and in

1998 to yet another Section 5 objection to a proposed annexation, cancellation of a general election, and redistricting plan for the City of Grenada. SMF ¶¶ 541, 722, 869.

In Louisiana, the DOJ objected three decades in a row—1983, 1992, and 2002—to retrogressive redistricting plans proposed by Point Coupee Parish. SMF ¶ 495. Similarly, De Soto Parish received a Section 5 objection for, in 1971, a proposed change from ward to at-large elections for police jury; in 1991 for a police jury redistricting plan; in 1992 for a school board redistricting plan; and in 2002 for another school board redistricting plan. *Id.* ¶ 869. Between 1982 and 2003, ten other parishes in Louisiana were "repeat offenders," and thirteen times the DOJ noted that local authorities were merely resubmitting objected-to proposals with "cosmetic or no changes." *Id.* ¶ 495. In 2001, the Louisiana State Legislature unsuccessfully sought judicial preclearance of its statewide redistricting plan for the Louisiana House of Representatives from a three-judge panel in this Court. *Louisiana H.R.  v. Ashcroft,* Civ. No. 02-62 (D.D.C. June 6, 2002) (Garland, Walton, Robertson, JJ.). The plan reflected no effort to comply with Section 5 because it eliminated a minority opportunity district in Orleans Parish without any cognizable justification. SMF ¶¶ 495, 509. As was the case when the VRA was initially passed, the state's substantive actions and litigation tactics reflected a disregard for the settled principles of the VRA. The court found that the state "blatantly violate[d] important procedural rules" in the course of the litigation; "subverted what had been an orderly process of narrowing the issues in th[e] case"; criticized the state for its "radical mid-course revision in the [legal] theory of the case"; and noted that the court would entertain a discovery sanctions motion as a result of the state's conduct. *See* Clarke Decl. Ex. 6. There are numerous examples from

41

other covered jurisdictions as well.[22] The record amassed by Congress yields further evidence of gamesmanship: a "spectacle" of voting-related discrimination "unwilling to die." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 445 (1968) (Douglas, J., concurring); *see* D-I Mem. 41-63.

### ii)    The District's attack on the DOJ objection statistics fails

Contrary to the District's argument, *see* Pl. Mem. 50, the record concerning objections supports Congress's decision to renew Section 5. The evidence of objections was substantial. *See* D-I Mem. 45-49. Congress received testimony that there have been more objections in the post-1982 period than in the prior period. *See* SMF ¶¶ 377, 361; *see also id.* ¶¶ 336, 337, 340, 362. The House Report noted that "such objections did not encompass minor inadvertent changes." *Id.* ¶ 337; H.R. Rep. No. 109-478, at 21. These objections were "instance[s] of vote

---

[22]    *See, e.g.*, SMF ¶ 357 (noting that the DOJ objected to three separate acts of the South Carolina General Assembly to impose staggered terms for the Lancaster County School District); H.R. Rep. No. 109-478, at 39-40; SMF ¶ 356 (citing repeated efforts of Northampton County, Virginia, to implement a redistricting plan for its board of supervisors following the 2000 Census that eliminated multiple majority-minority districts, to which the DOJ interposed two objections); *id.* ¶ 820 (citing the statement of Senator Patrick Leahy that "many jurisdictions are repeat offenders, continuing a pattern of persistent resistance dating back to the enactment of the VRA," including (1) discriminatory vote suppression in Kilmichael, Mississippi; the State of South Dakota; North Johns, Alabama; and Prairie View, Texas; (2) discriminatory redistricting in the State of Georgia; the State of Louisiana; Point Coupee Parish, Louisiana; Morehouse Parish, Louisiana; Randolph County, Georgia; the State of Mississippi; Northampton County, Virginia; Chickasaw County, Mississippi; Delhi, Louisiana; the State of Florida; the State of Arizona; Merced County, California; Seguin, Texas; St. Bernard School Parish, Louisiana; Terrell County, Texas; and Galveston County, Texas; (3) discriminatory polling place changes in Wrightsville, Georgia; Jenkins Parish, Louisiana; Apache County, Arizona; St. Landry Parish, Louisiana; and Dinwiddie County, Virginia; (4) discriminatory methods of elections in the State of Mississippi; Effingham County, Georgia; Washington Parish, Louisiana; Charleston County, South Carolina; McComb, Mississippi; Freeport, Texas; and Concordia Parish Police Jury, Louisiana; and (5) discriminatory annexations in Monroe, Louisiana; Pleasant Grove, Alabama; and North, South Carolina); *id.* ¶¶ 355, 592 (Section 5 objection to 2003 change in method of election for Charleston County, South Carolina School District that had been found in prior Charleston County Section 2 case to dilute minority voting strength); *June 13, 2006 Hearing*, at 252-253 (same).

discrimination that would have been perpetuated by local government officials were [they] not foiled by Section 5." SMF ¶ 368. Of the 722 separate objections lodged by the DOJ from 1980 through 2005, over 60 percent included discriminatory intent as a basis for the objection. *See* D-I Mem. 45; SMF ¶ 363.

Beyond the substantial absolute numbers, these data carry weight for several additional reasons. First, a single objection may address multiple discriminatory acts. *See, e.g.*, SMF ¶ 367 (testimony that "[t]he number of change types to which objections were interposed is greater than the total number of objections, because numerous objections affected two or more change types"); *see also id.* ¶ 623.

Second, the magnitude and scope of the protections to voters from Section 5 objections is forceful when viewed in terms of the number of voters who have benefited from the protections of Section 5. Objections against Texas submissions affected thirty percent, *i.e.*, 72 of 254, of Texas counties where 71.8 percent of the State's non-white voting age population lives. *See July 13, 2006 Hearing*, at 36; *see also* SMF ¶ 617. Of the objections between the 1982 renewal and the year 2004, ten were statewide. *Protecting Minority Voters: The Voting Rights Act at Work 1982-2005*, Map 5B. The Texas-wide objection issued on February 17, 1995 against Texas bilingual procedures illustrates the benefits that statewide objections can have for minority voters across a state. *See* SMF ¶ 643 (objection concluding that the State had not met its burden in showing that the submitted change did not have a discriminatory purpose and effect because the Spanish language procedures contained incorrect translations and increased the likelihood of having registration forms rejected); *see also id.* ¶ 378 (testimony that over one-half million voters were protected by Section 5 enforcement including 359,978 minority voters in Texas). The evidence of statewide objections during the renewal period and their significant impact on

43

large numbers of minority voters in the fully covered states, apart from Texas, is substantial for these jurisdictions as well. The evidence of statewide objections during the renewal period and the minority citizen registered voters in the fully covered states, apart from Texas, is substantial for these jurisdictions as well. *See* March 8, 2006 Hearing Vol. I, at 104-290 (The National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act At Work*, 1982-2005 (Feb. 2006)), Map 5B (documenting during the 1982-2004 period, sixteen statewide objections in Georgia, thirteen in Louisiana, eleven in Mississippi, and seven in Alabama, and six in South Carolina).

Thus, even though the rate of objections has declined, the extent of discrimination documented by objections between 1982 and 2006 is more than sufficient to justify reauthorization in light of the Supreme Court's precedents. *See* D-I Mem. 41-49, 68-69.

Third, the objection data demonstrate Section 5's important deterrent effects, which the District fails to address. Although the District focuses on the declining rate of preclearance objections, Congress concluded that this still-substantial—rate, though decreasing, supported reauthorization because it provides evidence of Section 5's deterrent effect. Indeed, the District's argument shows that Section 5 often has had its intended goal of preventing unconstitutional voting discrimination before it could be carried out—hardly a reason to declare Section 5 unconstitutional. Moreover, Congress received evidence that, following preclearance applications, the DOJ issued 1,162 More Information Requests (MIRs) that led to a withdrawal, superseding change, or non-response by the covered jurisdiction in question seeking to enact a voting change. *See* D-I Mem. 53; SMF ¶ 670A. This evidence that Section 5 has effectively prevented unconstitutional discrimination in voting supports Congress's decision to reauthorize

44

the statute.  *See* SMF ¶ 383 (testimony of Assistant Attorney General for Civil Rights noting VRA compliance); *see also infra* Part II.D(2)(b)(v) (discussing deterrence evidence).

iii)    **Evidence of racially polarized voting in the covered jurisdictions supports Congress's finding of a continuing need for Section 5**

Contrary to the District's argument, *see* Pl. Mem. 48-49, racially polarized voting, though not itself State action, is highly pertinent in assessing the continued need for Section 5.  Congress was entitled to take into account relevant social conditions in enacting the VRARA.  *See South Carolina v. Katzenbach*, 383 U.S. at 330 ("In identifying past evils, Congress obviously may avail itself of information from any probative source."); *see also Hibbs*, 538 U.S. at 730-731. Racially polarized voting is such a relevant condition because it can form the basis of minority vote dilution and consequent unequal access to the political process.  *See Thornburg v. Gingles*, 478 U.S. 30, 48-50 (1986).

Local officials seeking to thwart minority electoral strength capitalize on racially polarized voting to convert what might otherwise be innocuous changes in voting systems into dramatic limitations on the ability of racial minorities to participate in the electoral process.  In the context of Section 5, the courts and Congress have repeatedly recognized that racially polarized voting frequently interacts with changes in election practices to create a pernicious effect.  In *City of Rome*, the Court affirmed the denial of preclearance to various voting changes after concluding that the lower court correctly held "that the electoral changes … when combined with the presence of racial bloc voting and Rome's majority white population and at-large electoral system, would dilute Negro voting strength."  446 U.S. at 183.  Other decisions are to the same effect.  *See City of Port Arthur v. United States*, 459 U.S. 159, 163-169 (1982) (affirming district court's decision to deny preclearance of city's method of elections plans "not only because each was adopted with a discriminatory purpose, but also because in the context of

45

the severe racial bloc voting characteristic of the recent past in the City neither plan adequately reflected the minority's potential political strength in the enlarged community as required [by the Supreme Court]").[23]

When a jurisdiction characterized by racially polarized voting changes from single-member districts to multi-member or at-large elections, implements a numbered-place or majority-runoff requirement, or draws new district lines, the change can dilute minority voting strength. *See Gingles*, 478 U.S. at 47. Similarly, a change to a runoff system may harm the ability of minority voters to elect preferred candidates because, while those candidates could prevail in a multi-candidate field, they would be unlikely to win a two-person race. *See, e.g., March 8, 2006 Hearing Vol. I*, at 68 (testimony that Section 5 has been used in North Carolina to protect against proposed dilutive proposals including majority vote and runoff requirements); *see also Rome*, 446 U.S. at 183 (affirming district court conclusion that African-American voting strength would be diluted by the combination of racially polarized voting with changes from plurality-win to majority-win elections, numbered posts, and staggered terms). In addition, as the Supreme Court explained in *Gingles*, "[n]ot only does '[v]oting along racial lines' deprive minority voters of their preferred representatives in these circumstances, it also 'allows those elected to ignore [minority] interests without fear of political consequences,' leaving the minority effectively unrepresented." 478 U.S. at 48 n.14 (quoting *Rogers v. Lodge*, 458 U.S. 613, 623 (1982)) (second and third alterations in *Gingles*).

---

[23]     *See also, e.g., Busbee v. Smith*, 549 F. Supp. 494, 499 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983) (denying preclearance to Georgia's 1980 congressional redistricting after finding, among other things, racially polarized voting); SMF ¶ 969 (*March 8, 2006 Hearing Vol. I*, at 217, noting the National Commission Report's statement that "white racism ... obviously plays an important role" in causing continued "racial polarization"); *id.* ¶ 996 (same, citing *Brown v. Board of Sch. Comm'rs*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 464 U.S. 1005 (1983)).

Even more significantly, because the effects of voting changes against a backdrop of racially polarized voting are well-known, officials in jurisdictions that implement such changes are highly likely to be aware of, and are sometimes motivated by, the expected discriminatory impact. *See Rogers*, 458 U.S. at 623-624 (explaining that the existence of racially polarized voting, combined with a lack of candidate success, "bear[s] heavily on the issue of purposeful discrimination [and v]oting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race"). Indeed, the conclusion that a jurisdiction has purposefully (and unconstitutionally) discriminated against minority voters by erecting barriers such as redistricting, selective annexations, and numbered posts is always premised on officials' awareness of racially polarized voting. As the record before Congress in 2006 made abundantly clear, such purposeful discrimination remains all too common in covered jurisdictions. *See, e.g., Dillard v. Baldwin County Bd. of Educ.*, 686 F. Supp. 1459, 1468-1469 (M.D. Ala. 1988); SMF ¶ 435 (Merced County, California); *id.* ¶ 551 (Mississippi); *id.* ¶¶ 571, 578 (Elizabeth City, North Carolina); *id.* ¶ 574 (Rocky Mount, North Carolina); *id.* ¶ 582 (Pitt and Bladen counties, North Carolina); *id.* ¶ 586 (Charleston County, South Carolina); *id.* ¶ 666 (Webster, Texas); *id.* ¶ 746 (Pleasant Grove, Alabama); *id.* ¶ 598 (North, South Carolina).

The 2003 congressional redistricting in Texas provides a stark example of this principle. Finding that Texas legislators in 2003 had removed Latino voter population from congressional District 23 to thwart growing Latino voting strength, the Supreme Court noted racially polarized voting in District 23 and found that "[t]he changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive." *League of United Latin Am. Citizens v.*

47

*Perry*, 126 S. Ct. 2594, 2621 (2006) (also connecting racially polarized voting with "the possible submergence of minority votes—throughout Texas").  The Court concluded that against the "background" of Texas's "long, well-documented history of discrimination," the State's redistricting plan violated the anti-vote dilution provision of Section 2 of the VRA and "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 2622 (internal quotation marks omitted).  The concern that officials will rely on the expected results of combining certain voting changes with racially polarized voting is especially significant in jurisdictions (such as those covered by Section 5) with a history of discrimination in voting.

Congress appropriately considered the existence of racially polarized voting because it is an important indicator of the state of minority voting rights in covered jurisdictions today, and thus reviewed extensive evidence of racially polarized voting, *see* D-I Mem. 55-58 (summarizing the evidence of racially polarized voting before Congress in 2006); SMF ¶¶ 943-1042 (further details of same); H.R. Rep. No. 109-478, at 34-35 (concluding that "[t]he potential for discrimination in environments characterized by racially polarized voting is great").  Given this record, and the recognition of the pernicious role that racially polarized voting can play in jurisdictions' efforts to implement retrogressive voting changes, this Court should defer to Congress's reasonable finding that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the [VRA] demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the [VRA]." VRARA, Pub. L. No. 109-246, § 2(b)(3).

       **iv)**     **The District fails to respond to numerous categories of evidence of discrimination relied on by Congress**

Beyond those categories addressed in this opposition brief, the District fails to address in any serious way a number of additional categories of record evidence supporting reauthorization—the substantial evidence of Section 5 enforcement actions, Section 5 declaratory judgment actions withdrawn or denied, MIRs, noncompliance, Section 2 litigation, depressed levels of minority office holding, observer coverage, and discrimination against minority language voters. *See* D-I Mem. 49-55.

       **v)**     **The District fails to acknowledge the relevance of the deterrence evidence in renewing the VRARA**

The District's argument that evidence providing examples of progress since 1965 "negate[s] the existence of extraordinary circumstances like those existing in 1965," Pl. Mem. 47-48, amounts to a claim that measurable success, however incomplete, makes Section 5 unconstitutional. That argument should be rejected. By documenting Section 5's actual remedial and preventive effect, the record demonstrates the risk of not reauthorizing Section 5: much official discrimination in voting would have been carried out in the absence of Section 5. D-I Mem. 45-53; *see also* SMF ¶¶ 1053, 1056. The Supreme Court has previously upheld statutes under *Boerne* based upon a prediction that they would have a remedial or deterrent effect—and without even suggesting that once that desired effect was achieved, the statute's constitutionality would be questionable, even though those statutes, unlike the VRA, lacked a termination date. *See, e.g.*, *Hibbs*, 538 U.S. at 733-734 & 734 n.10 ("Congress could reasonably conclude" that the FMLA would appropriately remedy the harm of state gender-based leave laws); *Lane,* 514 U.S. at 531 (citing *Hibbs*, 538 U.S. at 737); *see also Boerne*, 521 U.S. at 532 (citing *City of Rome*, 446 U.S. at 177). This is entirely sensible: the need for a prophylactic statute does not disappear once the statute has its initial deterrent impact—particularly when

Congress and the courts have over decades amassed a record showing that voting rights discrimination is an especially entrenched form of discrimination that is both persistent and adaptive.

Section 5 now comes before the Court with a proven history of deterrent impact, so this Court need not speculate. It is difficult to imagine what could establish the ongoing need for legislation *better* than a record showing how a provision has worked in practice to block or deter new laws and practices that would have discriminated against minority voters. Congress received substantial evidence that much of the measured progress in covered jurisdictions is recent and *attributable* to Section 5 operating in tandem with other provisions of the VRA. Once gains in election districts or methods are achieved through Section 2 or other enforcement mechanisms, Section 5's preclearance rules play the crucial role of preventing backsliding. *See* D-I Mem. 72; *see also* SMF ¶¶ 758-942, 1266-1269, 1438, 1469 (testimony noting that many gains due to the VRA have occurred since 1990), 1472 (testimony noting VRA litigation that has taken many years to resolve). Those gains would be placed in peril were Section 5 struck down.[24]

---

[24]     Minority voters have made measurable progress in recent years. However, the District relies on mistaken data for its claims concerning voter registration and turnout. *See* Pl. Mem. 47-48. The House and Senate Reports listed data that counted Hispanics as white, instead of comparing non-Hispanic white and Black voter rates, thus depressing the voter turnout numbers for whites and making it appear that these numbers were on par with Black voters in some jurisdictions. *See* SMF ¶ 1333.

> vi)    **The evidence of discrimination by small government units, if relevant, supports Congress's judgment that reauthorization was appropriate**

The District's contention that "Congress failed to adduce evidence that small, local governmental units like the district are a significant source of any problems," Pl. Mem. 52, is both irrelevant and inaccurate.

The claim is irrelevant because evidence regarding local political subunits is unnecessary to justify Congress's broad latitude pursuant to its enforcement authority under the Fourteenth and Fifteenth Amendments. Local governments occupy an important place in the federal system, *see, e.g.*, *Printz v. United States*, 521 U.S. 898, 920-921 (1997), but any rights that local governments may have against unwarranted intrusion by the federal government flow solely from, and not beyond, their status as political subunits of a State. Neither the Supreme Court nor any Justice (in concurrence or dissent) has ever suggested that Congress must have evidence of discrimination by small government units to enact valid enforcement legislation that would be applicable to States and to all their political subunits. Under the District's logic, Congress under the Reconstruction Amendments would have a duty to conduct a distinct examination regarding local governments *beyond* those required for federal laws' application to States. That reasoning is exactly backwards. *See, e.g.*, *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978) (unlike States, local government bodies are not protected by Eleventh Amendment immunity and "[t]here is certainly no constitutional impediment to municipal liability").

Moreover, the District's claim is inaccurate because the record includes extensive evidence of discrimination at the local level in covered jurisdictions. Of the 101 DOJ objections to voting changes proposed by jurisdictions in Texas since 1982, 79 were lodged against local governmental units. *See* Texas Report, Wolfson Decl., Ex. 8 at 40-49. During the VRARA hearings, Congress received evidence that since the 1982 reauthorization, there were at least

twenty-five objections for voting changes proposed by Texas cities, twenty-eight for Texas school districts, two for community college districts, one objection in a Texas water control and improvement district, two objections in a Texas underground water conservation district, an objection in a Texas underground water conversation district, an objection in a Texas hospital district, and two objections concerning the creation of additional judgeships in Texas county courts of law.  Wolfson Decl., Ex 8 at 40-49; *see also* SMF ¶¶ 645, 654, 660 (discussing DOJ objections in Gonzales County Underground Water Conservation District, Edwards Underground Water District, and Lubbock County Water Control and Improvement District No. 1).[25]

Indeed, the evidence presented to Congress makes clear that there is significant evidence of discrimination at the political subunit-level throughout the State of Texas.  For example, the DOJ objected to attempts by the city of El Campo to eliminate single-shot voting in 1985, 1986, 1989, and 1992, *see id.* at 24; the DOJ objected to the City of Webster's 1997 proposed annexation of a white outlying area that would have reduced the Hispanic and Black voting strength where "the city's application of its annexation policy and the city's annexation choices appear to have been tainted, if only in part, by an invidious racial purpose" when a Hispanic outlying area was not considered for annexation, SMF ¶ 666; and a successful Section 5 action helped implement a remedy after a federal court determined that the at-large election system for electing trustees in the Northeast Independent School District violated Section 2 of the VRA, *see* SMF ¶ 916.  Moreover, the record in the VRARA was similarly replete with examples of

---

[25]    In addition, the District's former president, Donald Zimmerman, authorized a recent March 24, 2005, letter to the DOJ alleging that local officials for the Austin Community College District had failed to obtain preclearance for an election that raised "serious issues of dilution and retrogression in minority voting strength" under the Act.  *See* March 24, 2005, Letter from Marc Levin on behalf of Donald Zimmerman to DOJ, Clarke Decl., Ex. 5; Donald Zimmerman Dep. 161:21-163:18.

evidence of ongoing voting discrimination in local covered political subunits outside of Texas as well.[26]

Thus, to the extent the record before Congress in 2006 of discrimination by local jurisdictions in voting *is* relevant, the record serves only to provide an additional basis for Congress's judgment that the problem to be remedied remains substantial. Each objection from the DOJ represents one or more instances of vote discrimination that the DOJ has determined would have been perpetrated by local government officials were it not foiled by Section 5. *See* SMF ¶ 394. Further, Congress received evidence that preventing discrimination at the local level is arguably "the greatest effect of Section 5" because local elections are "usually nonpartisan and the stakes as viewed by the national parties and interest groups are seen as relatively low" and because "'[t]he overwhelming majority of preclearance submissions concern changes at the local level." *Id.* ¶ 408 (quoting testimony of Professor Nathaniel Persily); *see also* D-I Mem. 58; Wolfson Decl., Ex. 5 at 5, 7, table 8.3. In the local context, where fewer people are observing voting changes and those affected may be more isolated, the need for the DOJ to play a voting rights watchdog role is heightened. *See* SMF ¶ 469 ("Section 5 is just as crucial—if not more so—at the local level as it is at the statewide level."). As Justice Scalia has observed, "racial discrimination against any group finds a more ready expression at the state and local [level] than

---

[26]     Congress received evidence of fifty-two DOJ objections against non-state, non-political subdivision entities in Georgia since August 5, 1982. Congress received evidence of fifty such objections in South Carolina, forty in Louisiana, twenty-six in Alabama, twenty-two in Mississippi, twenty-one in North Carolina, five in both Arizona and New York, and two such objections in both California and Virginia. *See October 25, 2005 Scope Hearing Vol. I*, at 104-224. To take one significant example, in 2001, an all-white city council in Kilmichael, Mississippi, canceled city elections only three weeks before they were to be held after several African-Americans appeared to be in a strong position to win seats. The DOJ objected and the elections were reinstated. When elections were held, three African-Americans were elected to the Board of Aldermen and the town elected its first African-American mayor. *See* H.R. Rep No. 109-478 at 36-37; SMF ¶¶ 354, 528, 532, 535, 930.

at the federal level." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 523 (1989) (Scalia, J., concurring).  Indeed, "acute awareness of the heightened danger of oppression from political factions in small, rather than large, political units dates back to the very beginning of our national history." *Id.*[27]

### vii)    The District's Attack on "Anecdotal" Evidence is Misplaced

Unable to mount an effective response to the cumulative record evidence before Congress, *see* D-I Mem. 41-70—the District is left to attack Congress's reliance on what it pejoratively terms "anecdotal" evidence.  Pl. Mem. 51.  But this unrebutted evidence from individuals who had personally observed and, in many instances, encountered discriminatory voting practices is powerful:  there was evidence of grossly outrageous purposeful discrimination, *id.*, throughout the State of Texas—despite the State being under VRA coverage for more than thirty years.  Further, this testimony buttresses the exhaustive quantitative and qualitative data  that Congress considered in the VRARA hearings and shows that, for all the improvements that the District cites, official racial discrimination in voting remains an entrenched problem warranting an effective remedy.  *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) (Court observed that "'statistics alone'" could not support the finding of discrimination, but that first-person accounts "brought the cold numbers convincingly to life").  Moreover, first-person accounts of discrimination bolster the breadth of

---

[27]    *See also* Clint Bolick, *Grassroots Tyranny: The Limits of Federalism* 167 (1993) (noting that "departures from the principle of equality under law now occur most often at the state and local levels of government" and that "[u]nlike the national government, local governments can multiply, and they do so in rabbit-like fashion"); Sara Galvan, *Wrestling with MUDs to Pin Down the Truth About Special Districts*, 75 Fordham L. Rev. 3041 (forthcoming 2007) (discussing the "long-term democracy deficit" in Texas municipal utility districts and noting that "[w]eak public oversight has facilitated numerous cases of fraud or unlawful behavior on the part of MUD boards and individual directors").

54

other evidence presented to Congress, including, but not limited to, expert reports, studies, scholarly findings, DOJ objection letters, and judicial rulings that, together, revealed a continuing pattern of pervasive discrimination in the covered jurisdictions. *See Lane*, 541 U.S. at 527 (upholding Title II of ADA as applied to court access based on, among other evidence, first-hand accounts of discrimination); *see id.* at 545 (Rehnquist, C.J., dissenting) (discussing this evidence).

Indeed, one example of the important contribution that first-person accounts lend to the analysis of contemporary voting discrimination is offered by Chandler Davidson, a social scientist and expert witness who has participated in over thirty voting rights cases, and is widely recognized as one of the foremost researchers regarding the impact of the VRA. Professor Davidson explained the importance of this evidence in detail and indicated that "the testimony of long-time voting rights attorneys, minority activists and various local officials" provides compelling indicia of ongoing vote discrimination. *See May 9, 2006 Hearing*, at 48-71.

### 3. The District's Congruence and Proportionality Analysis is Seriously Flawed

#### a) The District Fails to Acknowledge the Numerous Features of Section 5 that Help Ensure Congruence and Proportionality

Although the District notes the VRARA's twenty-five-year termination date, the availability of bailout, and Section 5's geographical limitations, the District dismisses all three as failing to contribute to the statute's congruence and proportionality. *See* Pl. Mem. 54-58.[28]

---

[28]    In addition, the District neglects the relevance of four features that ensure the statute's congruence and proportionality. First, Congress in the VRARA continued to omit from Section 5 any provision authorizing either private citizens or the United States to recover money damages from state or local treasuries. *See* D-I Mem. 70-71.    Second, Section 5 does not regulate all political, or even all election-related, activities of covered jurisdictions and where it is in place, Section 5 is a less intrusive form of federal regulation than other remedies upheld as non-objectionable, such as an outright ban, *see Oregon v. Mitchell*, 400 U.S. 112, 118 (1970),

Though none is necessary for this Court to meet the *Boerne* standard, each of these features provides a meaningful limitation to Section 5 that contributes to the statute's constitutionality. *See Lane*, 541 U.S. 509 (upholding a statute with no time or geographic limitations whatsoever and no provision analogous to bailout); *Hibbs*, 538 U.S. 721 (same); *see also Boerne*, 521 U.S. at 533 ("This is not to say, of course, that § 5 legislation requires termination dates, geographic restrictions, or egregious predicates."). Regardless, each feature helps ensure congruence and proportionality. First, Section 5 is not "unlimited in time" and thus is not "perpetual," Pl. Mem. 58; the statute's expiration date is set at 2031. *See* D-I Mem. 73; 42 U.S.C.A § 1973(a)(8) (West 2007). Second, the District, prior to that date, may be able to achieve bailout, through either Travis County or the State of Texas. *See supra* at § II.C.; D-I Mem. 25. And third, Section 5's geographic reach is finite—confined to all or parts of sixteen (less than one-third) of the States, based on a coverage formula designed—not generally to target "areas with problems," as the District states, Pl. Mem. 54 (capitalization omitted)—but, rather, to target those parts of the country where voting discrimination has historically been most flagrant and entrenched.[29]

---

since Section 5 at most creates a short delay or temporary suspension in the enforcement of constitutional laws passed by the jurisdiction. *See* D-I Mem. 70-73. Third, the District, though it has pled this case based on the supposed "burden" of compliance, Am. Compl., Dkt. no. 83, ¶ 12, has failed to address the evidence showing that compliance with Section 5 is neither unduly burdensome for covered jurisdictions generally, Def. United States Mem. 64-66 (citing, *e.g.*, *Understanding the Benefits and Costs of Section 5 Preclearance: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2006)), nor for the District specifically, D-I Mem. 17-19 (citing Report of Terry Musika, attached as Wolfson Decl., Ex. 4, at 7-9). Finally, the District fails to acknowledge the VRA's bail-in provision, which permits courts to subject non-covered jurisdictions to preclearance requirements, *see* 42 U.S.C. § 1973a(c), thus minimizing the extent to which discriminatory jurisdictions not within the coverage formula are subject to different obligations than covered jurisdictions. *See, e.g., Jeffers v. Clinton,* 740 F. Supp. 585, 586 (E.D. Ark. 1990), related proceeding *aff'd,* 498 U.S. 1019 (1991).

[29]    And contrary to the District's suggestion, *see* Pl. Mem. 45 n.10, Congress's overriding in the VRARA of *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000) ("*Bossier Parish II*"), was not an attempt to "redefine" the substantive constitutional rights at issue, but rather was a

**b)**    **The District's Attack On The Coverage Formula Is Unavailing**

Finally, the District argues that the "failure" of Congress "to enact an updated coverage formula with any hope of tailoring the geographic scope of current § 5 to the contours of any present day problem compels a conclusion that the 2006 extension of Section 5 is unconstitutional." Pl. Mem. 54-55. In support of this argument, the District contends: (1) "if coverage were based on voter registration and turnout level under 50 percent at the county during the [2000 and 2004] presidential elections, at least 351 currently covered counties would no longer be covered (including nearly half of all Texas covered counties—118 out of 254)," *id.*, and (2) "Congress made no meaningful comparison between previously covered jurisdictions and noncovered ones," *id.* at 55.

This argument misunderstands the purpose of Section 5 and is foreclosed by the precedents of the Supreme Court and this Court. Section 5 is not intended to address all problems in voting or even all problems of racial discrimination in voting. A different VRA provision, Section 2, makes it unlawful, nationwide and without regard to the degree of entrenchment of the jurisdiction's history of discrimination in voting, to engage in a voting practice "in a manner which results in a denial of the infringement or abridgement of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a) (placing the burden on plaintiffs to prove a violation). The purpose of Section 5 is narrower: preventing

---

clarification that Section 5 reaches the full extent of conduct prohibited by the Fifteenth Amendment. In *Bossier Parish II*, the Court's decision rested on "the language of [Section] 5" and on the Court's "prior holding in *Beer*," which was similarly based on the language of Section 5. 528 U.S. at 341, 333-34 (citing *Beer v. United States*, 425 U.S. 130 (1976)); *see also id.* at 334 (comparing the text of Section 5 with both Section 2 of the VRA and the Fifteenth Amendment to note "[o]ur reading … is faithful to the differing contexts in which the term ['abridge'] is used"). Congress's amendment simply restored what Congress understood to be the "original intent in enacting the Voting Rights Act of 1965." VRARA, Pub. L. No. 109-246 § 2(b)(6).

certain jurisdictions with a persistent history of discrimination from resuming their discriminatory practices.  It is thus entirely appropriate that Congress in the VRARA relied upon the same coverage formula for Section 5 that had been in place previously *taken together with evidence of continuing voting discrimination in covered jurisdictions*.  It badly mischaracterizes the history of congressional reenactment of the Section 5 to suggest that it rests upon a formula in isolation.  As in prior reauthorizations upheld by the courts as constitutional, Section 5 as reauthorized in the VRARA continues to target coverage to jurisdictions in parts of the country where the problem of voting discrimination has been most entrenched *and* recent evidence indicates a basis for ongoing concern.

When it enacted the VRA in 1965 and initially reauthorized Section 5 in 1970, Congress determined that discriminatory tests and devices, like the literacy test, had been primary methods used by jurisdictions to prevent minority voters from registering and voting.  Congress created a formula for Section 5 coverage and federal examiners and observers that would focus on jurisdictions whose use of discriminatory tests or devices had resulted in low (below 50 percent) voter registration or turnout, while at the same time, banning the tests and devices.  Pub. L. No. 89-110, § 4 (1965); H.R. Rep. No. 89-162 at 6, 11-16, 25 (1965); H.R. Rep. No. 89-711 (Conference Report) at 12 (1965); Pub. L. No. 91-285 (1970); H.R. Rep. No. 91-397, at 3 (1970).  In 1975, as a response to significant evidence of discrimination against language minorities, Congress included the use of English-only elections in jurisdictions with more than five percent voting age citizens from a language minority group as a test or device and brought within the coverage of Section 5 those jurisdictions where use of English-only elections had resulted in depressed levels of registration or turnout.

As had been intended, the combination of Section 5 coverage, federal examiners and observers, and the elimination of tests and devices restricting the right to vote, yielded increased minority voter participation and turnout in most covered jurisdictions. *See* SMF ¶¶ 53-54, 57, 61, 136, 217 (noting references to this trend in the 1970, 1975, and 1982 reauthorization hearings). However, beginning with the 1970 reauthorization of Section 5, Congress in each reauthorization received extensive evidence that with the elimination of first-generation voting discrimination—use of tests and devices to prevent minority voter participation—covered jurisdictions had moved on to more subtle but no less insidious, second-generation voting discrimination—such as changes to methods of election, changing elective offices to appointed offices, and racially selective annexations designed to minimize the impact of increased minority voter participation. *See, e.g.*, H.R. Rep. No. 91-397, at 7 (1970) ("[A]s Negro voter registration has increased under the Voting Rights Act, several jurisdictions have undertaken new, unlawful ways to diminish the Negroes' franchise and to defeat Negro and Negro-supported candidates[.] [T]hese measures have taken the form of switching to at-large elections where Negro voting strength is concentrated in particular election districts and facilitating the consolidation of predominantly Negro and predominantly white counties."); H.R. Rep. No. 94-196, at 10 (1975); H.R. Rep. No. 97-227, at 17-20 (1981); Pub. L. No. 109-246 § 2(b)(2), (4), 120 Stat. 577-578 (2006) (congressional findings).

After the 1970 and 1975 reauthorizations and amendments, the City of Rome's legal challenge advanced an argument similar to one made by the District here—that Section 5, even if constitutional in 1965, "had outlived [its] usefulness by 1975." *City of Rome*, 446 U.S. at 180. In rejecting that argument, the Supreme Court concluded that Congress, in extending Section 5 in 1975, had properly relied on evidence of Section 5 objections, the continued need for

preclearance, disparities in minority office holding, the danger that jurisdictions would resort to measures that would dilute minority voting strength, and the limited and fragile nature of political gains by minorities in the covered jurisdictions. *Id.* at 180-181. The Court thus upheld the Act's constitutionality notwithstanding the fact that "[i]n considering the 1975 extension, Congress acknowledged that largely as a result of the Act, Negro voter registration had improved dramatically since 1965." *Id.* at 180.

In the 1982 reauthorization, Congress again examined the extent of second-generation discrimination in covered jurisdictions. After concluding that the evidence indicated that such discrimination was ongoing, *see* H.R. Rep. No. 97-227, at 17-20, Congress, appropriately, reauthorized Section 5 by retaining the existing coverage formula that had been sustained as constitutional in *City of Rome* in light of the record that it had assembled. *See* SMF ¶ 217; Pub. L. No. 97-205 (1982).

After the 1982 reauthorization, Sumter County, South Carolina again made essentially the same arguments to this Court that the District is now making. *See County Council of Sumter County v. United States*, 555 F. Supp. 694 (D.D.C. 1983). Count VII of Sumter County's complaint was strikingly similar to the District's argument here, challenging "the constitutionality of the 1982 amendments to Section 5 ... on the ground that Congress failed to make current factual findings about the extent of voting registration in 1975 and 1982 comparable to the congressional findings made on this subject to justify the ... legislation enacted in 1965." *Id.* at 707. Rejecting that argument, this Court concluded that it would not re-examine the "firm conclusions made by Congress in extending the Act, and the Supreme Court in *City of Rome* and *South Carolina v. Katzenbach*, ... in holding that the categories chosen by Congress were and are appropriate." *Id.* at 707-708 (footnote omitted). The Court noted that

"[o]bviously, the preclearance requirements of the original act and its 1982 amendment had a much larger purpose than to increase voter registration in a county like Sumter to more than 50 percent." *Id.* at 707.

In the 2006 renewal, Congress maintained the same coverage it had employed in 1975 and 1982 and, again, specifically recognized the importance of Section 5 in eliminating some first-generation voting discrimination, as reflected in increases in minority voter participation. *See* VRARA, Pub. L. No. 109-246, § 2(b)(1). But Congress also again determined that Section 5 was still needed because of the significant evidence of second-generation voting discrimination in covered jurisdictions. *Id.* § 2(b)(2). And as it had in previous reauthorizations, Congress relied on substantial evidence in reaching the conclusion that reauthorizing Section 5 was necessary. Congress heard or received evidence from more than 90 witnesses and considered studies examining data available since the prior renewal in 1982.[30] Congress also received

---

[30]    These reports included, but were not limited to, the following major empirical sources, described at the listed pages and cited throughout the congressional record and the Defendant-Intervenors' Statement of Material Facts: (1) The National Commission on the Voting Rights Act, *The Voting Rights Act At Work, 1982-2005*, a supplement to the report entitled *Highlights of Hearings of the National Commission on the Voting Rights Act, 2005*, and transcripts from hearings held across the country in 2005, SMF ¶¶ 323-325; (2) the ACLU Report, *Voting Rights Litigation, 1982-2006*, SMF ¶ 326; (3) the Leadership Conference on Civil Rights RenewtheVRA.Org reports on fourteen fully or partially covered states, including *Voting Rights in Texas, 1982-2006*, SMF ¶¶ 327-328; (4) the Section 2 litigation study by Professor Ellen Katz, *Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39 U. Mich. J.L. Reform 643 (2006), SMF ¶¶ 329, 1047-1055; (5) the DOJ's Section 5 objection letters issued since 1982, SMF ¶ 331; (6) An article co-authored by Peyton McCrary, the historian at the Voting Section of the Civil Rights Division of the Department of Justice, titled "The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act," SMF ¶ 363 (showing that of the 722 separate section 5 objections made by the DOJ from 1980-2005, at least 60% involved discriminatory intent as a basis for the objection); and (7) A report by Luis Ricardo Fraga and Maria Lizet Ocampo, titled "The Deterrent Effect of Section 5 of the Voting Rights Act: The Role of More Information Requests," SMF ¶¶ 670, 670A, 680 (noting that More Information Requests (MIRs) "increased the impact of the DOJ on submitted changes by 110%, i.e., doubling the number of changes that were not precleared by the DOJ.").

substantial new evidence that the coverage formula continues to describe covered jurisdictions with both a history and continued problems of discrimination in voting. *See* SMF ¶¶ 1451-1454. After conducting that examination, Congress elected to maintain Section 5's focus on areas where there has been both historical and recent evidence of discrimination in voting.

The extensive record of voting discrimination in Texas and other covered jurisdictions reviewed by Congress in 2006 bears out Congress's judgment that Section 5 remains necessary to deter and remedy such discrimination. *See* D-I Mem. 41-68. No more was required to justify the continued application to these areas of Congress's powers under the Reconstruction Amendments. *See City of Rome*, 446 U.S. at 173-183; *Lopez*, 525 U.S. at 282-285; *Sumter County*, 555 F. Supp. at 707-708.[31] Nor is there merit to the District's claim that Congress was required to justify its *non*-coverage of jurisdictions outside the scope of preclearance coverage. Not a single time that the Supreme Court has considered the constitutionality of Section 5 has it required an assessment of jurisdictions not selected by Congress for coverage, and indeed the Court has rejected the very argument the District makes here. *See South Carolina v. Katzenbach*, 383 U.S. at 330-331 ("It is irrelevant that the coverage formula excludes certain localities … for which there is evidence of voting discrimination[.]"); *see also Sumter County*, 555 F. Supp. at 707.[32] This makes good sense: if, notwithstanding federalism principles, Congress may enact

---

[31]   *See also Giles v. Ashcroft*, 193 F. Supp. 2d 258, 263 (D.D.C. 2002) ("[t]he Supreme Court's previous decisions upholding the Voting Rights Act have in effect foreclosed such challenges to Section 5"); *Reaves v. DOJ*, 355 F. Supp. 2d 510, 515 (D.D.C. 2005).

[32]   In any event, there was substantial evidence before Congress suggesting a basis for particular ongoing concern in covered jurisdictions. *See, e.g.*, D-I Mem. 58; *see also* SMF ¶¶ 1016, 1444 (since 1982, racially polarized voting has been more extreme in covered jurisdictions than non-covered jurisdictions); *id.* ¶¶ 1300, 1438-1449, 1468 (empirical studies demonstrate a range of greater voting rights problems in covered jurisdictions than non-covered jurisdictions since 1982); *id.* ¶¶ 1047-1048, 1051, 1106-1108 (greater Section 2 litigation success in covered jurisdictions). Indeed, given Texas's consistent ranking in the bottom five of the fifty States for

national legislation in response to evidence of unconstitutional conduct in only certain jurisdictions, *see, e.g.*, *Hibbs*, 538 U.S. at 729-735, surely Congress may seek to confine remedial legislation to those jurisdictions where such legislation is especially needed.

The question before this Court is whether, by determining in 2006 that Section 5 was still needed to protect minority voting rights in covered jurisdictions, Congress enacted legislation that can "be said to be 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Lane*, 541 U.S. at 533 (quoting *Boerne*, 521 U.S. at 532). Section 5 withstands scrutiny under this test and this Court thus should affirm the congressional decision to renew its protections. Congress determined that, however much progress had been made, the gains in protection for minority voting rights "are fragile." H.R. Rep. No. 109-478, at 57. And Congress was not willing to jeopardize those "fragile" gains—which took forty years to achieve—by allowing Section 5 to expire, "especially in the face of the evidence of discrimination compiled in the record." *Id.* Congress recognized that the substantial evidence of ongoing discrimination in covered jurisdictions demonstrated the need to reauthorize Section 5, and that gains achieved might never have occurred had Section 5 not been enacted and reauthorized. To now invalidate Section 5 would not just be unfaithful to the court's obligation to give substantial deference to Congress's authority and judgments; it would be a tragic mistake.

Respectfully submitted,

---

voter turnout rates, *see Reported Voting and Registration for Total and Citizen Voting-age Population by State: Presidential Elections 1972 to 2004*, Table A-5, at http://www.census.gov/population/www/socdemo/voting.html, the District's complaint about Texas remaining subject to Section 5 under the coverage formula is particularly misplaced.

63

*/s/ Seth P. Waxman*

Seth P. Waxman (D.C. Bar No. 257337)
John A. Payton (D.C. Bar No. 282699)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Ariel B. Waldman (D.C. Bar No. 474429)
Daniel A. Zibel (D.C. Bar No. 491377)
WILMER CUTLER PICKERING HALE and
     DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Jon M. Greenbaum (D.C. Bar No. 489887)
Jonah H Goldman (D.C. Bar No. 497507)
LAWYERS' COMMITTEE FOR CIVIL
     RIGHTS UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Telephone: 202-662-8600
Facsimile: 202-628-2858

Dennis C. Hayes (admitted *pro hac vice*)
General Counsel
NATIONAL ASSOCIATION FOR THE ADVANCEMENT
     OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
Facsimile: (410) 358-9350

*Counsel for Defendant-Intervenors*
*Texas State Conference of NAACP Branches and Austin Branch of the NAACP*

_/s/ Debo P. Adegbile_
Debo P. Adegbile

_/s/ Norman J. Chachkin_
Norman J. Chachkin (D.C. Bar No. 235283)
Theodore Shaw
President and Director-Counsel
Jacqueline A. Berrien
Ryan P. Haygood
Jenigh J. Garrett
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

Kristen M. Clarke (D.C. Bar No. 973885)
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005
(202) 682-1300

Samuel Spital
HOLLAND & KNIGHT
195 Broadway, 24th Floor
New York, NY 10007
(212) 513-3454

_Counsel for Defendant-Intervenors_
_Rodney and Nicole Louis; Winthrop and Yvonne Graham;_
_Wendy Richardson, Jamal Richardson, and Marisa Richardson_

*/s/ Nina Perales*
Nina Perales
MEXICAN AMERICAN LEGAL DEFENSE &
AND EDUCATIONAL FUND
Texas State Bar No. 240054046
110 Broadway, Suite 300
San Antonio, Texas 78205
(210) 224-5476 (telephone)
(210) 224-5382 (facsimile)
nperales@maldef.org

*/s/ Joseph E. Sandler*
Joseph E. Sandler
D.C Bar # 255919
Sandler Reiff & Young PC
50 E St SE # 300
Washington, D.C. 20003
Tel: (202) 479 1111
Fax (202) 479-1115
sandler@sandlerreiff.com

*Counsel for Defendant-Intervenors Lisa Diaz, David Diaz and Gabriel Diaz*

*/s/ David J. Becker*
David J. Becker (D.C. Bar No. 496318)
PEOPLE FOR THE AMERICAN WAY FOUNDATION
2000 M Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 467-4999

*Counsel for Defendant-Intervenor People for the American Way*

*/s/ J. Gerald Hebert*
J. Gerald Hebert
5019 Waple Lane
Alexandria, VA 22304
Telephone: (703) 628-4673
Facsimile: (202) 736-2222

Max Renea Hicks
101 West 6th Street
Suite 504
Austin, TX 78801
Telephone: (512) 480-8231
Facsimile: (512) 480-9105

*Counsel for Defendant-Intervenor Travis County, Texas*

*/s/ Laughlin McDonald*
Moffatt Laughlin McDonald
Neil Bradley
AMERICAN CIVIL LIBERTIES UNION
      FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, GA 30303-1227
Telephone: (404) 523-2721

Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION
1400 20th Street, NW, Suite 119
Washington, DC 20036
Telephone: (202) 457-0800
Facsimile: (202) 452-1868

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, NW, #350
Washington, DC 20036-6101
Telephone: (202) 898-4800
Facsimile: (202) 289-1389

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

Lisa Graybill
Legal Director
ACLU FOUNDATION OF TEXAS
1210 Rosewood Avenue
Austin, Texas 78702

*Counsel for Defendant-Intervenor Nathaniel Lesane*

*/s/ Jose Garza*
Jose Garza
Judith A. Sanders-Castro
George Korbel
TEXAS RIOGRANDE LEGAL AID, INC.
1111 N. Main Street
San Antonio, Texas 78212
210-212-3700
210-212-3772 (fax)

*/s/ Michael T. Kirkpatrick*
Michael T. Kirkpatrick (DC Bar No. 486293)
Brian Wolfman (DC Bar No. 427491)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-7728
202-588-7795 (fax)
mkirkpatrick@citizen.org

*Counsel for Defendant-Intervenors Angie Garcia, Jovita Casarez, Ofelia Zapata*

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 15, 2007, I caused to be served a copy of the foregoing DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF NAACP BRANCHES, AUSTIN BRANCH OF THE NAACP, RODNEY LOUIS, NICOLE LOUIS, WINTHROP GRAHAM, YVONNE GRAHAM, WENDY RICHARDSON, JAMAL RICHARDSON, MARISA RICHARDSON, LISA DIAZ, DAVID DIAZ AND GABRIEL DIAZ, PEOPLE FOR THE AMERICAN WAY, TRAVIS COUNTY, NATHANIEL LESANE, JOVITA CASAREZ, ANGIE GARCIA, AND OFELIA ZAPATA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT to all counsel of record via the Court's CM/ECF filing system.


                      */s/ Ariel B. Waldman*
                      Ariel B. Waldman