**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, 401 W. 15th Street Suite 850 Austin, Texas 78701,<br><br>*Plaintiff*,<br><br>v.<br><br>ALBERTO GONZALES, Attorney General of the United States, U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, D.C. 20530,<br>*Defendant*. | Civil Action No. 1:06-CV-01384 (DST, PLF, EGS) |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iv

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 4

I.  The District Should Be Granted Bailout ............................................................ 4

    A.  The District Is Eligible to Pursue Bailout Under the Statute .................. 4

        1.  The Supreme Court Has Confined §14(c)(2) to the Issue of Separate Coverage ............................................................................ 5

        2.  Accepting Defendants' Argument Would Have Numerous Unintended Consequences Throughout the Act ........................... 9

        3.  Defendants' Interpretation Raises Grave Constitutional Concerns That Must Be Avoided ........................................................ 13

            a.  Rendering Bailout Practically Unworkable Would Negate the Only Possible Chance for §5 to Be Rendered Congruent and Proportional .................................................................... 13

        4.  Limiting Bailout As Defendants Urge Exacerbates the Federalism Costs of the Preclearance and Bailout Regime by Reordering State Government ............................................................................... 17

        5.  Defendants' Continued Reliance on Fragments of Legislative History Is Still Misplaced ....................................................... 18

    B.  The District Meets the Substantive Requirements for Bailout ............... 19

II.  Section 5 Cannot Be Constitutionally Applied to the District ........................... 22

    A.  Section 5 Cannot Be Constitutionally Applied to the District If It Is Not Supported by a Legislative Record of Gamesmanship, Which Defendants Have Not Shown and Cannot Show to Exist ......................................... 24

    B.  Comparison of the *Relevant* Legislative Record to Those at Issue in *Hibbs* and *Lane* Demonstrates That the Record Is Insufficient to Support the 2006 Enactment of §5 ............................................................................ 26

        1.  There Was No Congressional Finding of Gamesmanship, and There Is No Sufficient Record to Support One ................................... 27

        2.  Evidence of Racially Polarized Voting Is No Evidence of Gamesmanship ............................................................................... 31

C.    Defendants' Attempts to Demonstrate That §5 Is Appropriately Limited in Time, Scope, and Geography Fail.......................................................................... 32

    1.    Under Defendants' Theories, Termination Dates Are Meaningless......... 32

    2.    Defendants' Ineffective Version of Bailout Could Never Save §5, Which Is Not Appropriately Limited in Geographic Scope .................... 33

    3.    Section 5 Touches Too Much Constitutionally Benign Activity to Remain Congruent and Proportional ....................................................... 35

Conclusion ................................................................................................................... 37

Certificate of Service ................................................................................................... 38

### TABLE OF AUTHORITIES

#### CASES

*Beer v. United States*,
    425 U.S. 130, 96 S.Ct. 1357 (1976).................................................................24, 25, 31

*Bennett v. Brown County Water Improvement Dist. No. 1*,
    272 S.W.2d 498 (Tex. 1954).......................................................................................7

*Bd. of Trs. of the Univ. of Ala. v. Garrett*,
    531 U.S. 356, 121 S.Ct. 955 (2001) ..................................................................... *passim*

*Bragdon v. Abbott*,
    524 U.S. 624, 118 S.Ct. 2196 (1998)........................................................................6

*Branson Sch. District RE-82 v. Romer*,
    161 F.3d 619 (10th Cir. 1998) ...................................................................................5

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837, 104 S.Ct. 2778 (1984) .....................................................................12

*City of Boerne v. Flores*,
    521 U.S. 507, 117 S.Ct. 2157 (1997)................................................................. *passim*

*City of Dallas v. United States*,
    482 F.Supp. 183 (D.D.C. 1979) ...............................................................................9

*City of Lockhart v. United States*,
    460 U.S. 125, 103 S.Ct. 998 (1983)..........................................................................9

*City of Rome v. United States*,
    446 U.S. 156, 100 S.Ct. 1548 (1980)................................................................7, 8, 9

*Dougherty County, Ga. Bd. of Educ. v. White*,
    439 U.S. 32, 99 S.Ct. 368 (1978)....................................................................5, 6, 15

*Freeman v. Pitts*,
    503 U.S. 467, 112 S.Ct. 1430 (1992)......................................................................31

*Georgia v. United States*,
    411 U.S. 526, 93 S.Ct. 1702 (1973)..........................................................................6

*Grutter v. Bollinger*,
    539 U.S. 306, 123 S.Ct. 2325 (2003) ......................................................................33

iv

*James v. Humphreys County Bd. of Election Comm'rs*,
    384 F.Supp. 114 (N.D. Miss. 1974)......................................................................11

*Kimel v. Florida Board of Regents*,
    528 U.S. 62, 120 S.Ct. 631 (2000) ...............................................................36

*Landgraf v. USI Film Prods.*,
    511 U.S. 244, 114 S.Ct. 1483 (1994)............................................................18

*League of United Latin American Citizens v. Perry*,
    __U.S. __, 126 S.Ct. 2594 (2006).................................................................22

*Lopez v. Monterey County*,
    525 U.S. 266, 119 S.Ct. 693 (1999)..............................................................25

*Lorillard v. Pons*,
    434 U.S. 575, 98 S.Ct. 866 (1978)..................................................................6

*McMillan v. Nw. Harris County Mun. Util. Dist. No. 24*,
    988 S.W.2d 337 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).................7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71, 126 S.Ct. 1503 (2006)................................................................6

*Midatlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*,
    474 U.S. 494, 106 S.Ct. 755 (1986)...........................................................5, 13

*Miller v. Johnson*,
    515 U.S. 900, 115 S.Ct. 2475 (1995) ..............................................24, 25, 33

*Miss. State Ch., Operation Push v. Allain*,
    674 F.Supp. 1245 (N.D. Miss. 1987) ............................................................29

*Monsanto Co. v. Cornerstones Mun. Util. Dist.*,
    865 S.W.2d 937 (Tex. 1993).............................................................................7

*N.L.R.B. v. Amax Coal Co.*,
    453 U.S. 322, 101 S.Ct. 2789 (1981)..............................................................6

*Nev. Dep't of Human Res. v. Hibbs*,
    538 U.S. 721, 123 S.Ct. 1972 (2003).................................................23, 26, 27

*Norfolk S. Ry. Co. v. Shanklin*,
    529 U.S. 344, 120 S.Ct. 1476 (2000).............................................................12

v

*Oregon v. Mitchell*,
   400 U.S. 112, 91 S.Ct. 260 (1970) ...................................................................23

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, Nos. 05-908, 05-915,
   __S.Ct. __, 2007 WL 1836531 (June 28, 2007) ..........................................22, 33

*Reno v. Bossier Parish Sch. Board* (*Bossier Parish I*),
   520 U.S. 471, 117 S.Ct. 1491 (1997)...............................................................5

*Rogers v. Lodge*,
   458 U.S. 613, 102 S.Ct. 3272 (1982).............................................................31

*Shapiro v. United States*,
   335 U.S. 1, 68 S.Ct. 1375 (1948) ..................................................................13

*Shaw v. Hunt*,
   517 U.S. 899, 116 S.Ct. 1894 (1996).............................................................31

*Shaw v. Reno*,
   509 U.S. 630, 113 S.Ct. 2816 (1993)......................................................... 22, 31

*South Carolina v. Katzenbach*,
   383 U.S. 301, 86 S.Ct. 803 (1966) ......................................................... *passim*

*State of Ariz. v. Reno*,
   887 F.Supp. 318 (D.D.C. 1995)......................................................................6

*Tennessee v. Lane*,
   541 U.S. 509, 124 S.Ct. 1978 (2004)................................................23, 26, 27

*United States v. Bd. of Comm'rs of Sheffield, Ala.*,
   435 U.S. 110, 98 S.Ct. 965 (1978)............................................................. 4, 6

*United States v. Morrison*,
   529 U.S. 598, 120 S.Ct. 1740 (2000) ...........................................................33

*United States v. Shabani*,
   513 U.S. 10, 115 S.Ct. 382 (1994)..................................................................8

*United States v. Uvalde Consol. Indep. Sch. Dist.*,
   625 F.2d 547 (5th Cir. 1980) ...................................................................5, 10

*W. Va. Univ. Hosp., Inc. v. Casey*,
   499 U.S. 83, 111 S.Ct. 1138 (1991)...............................................................18

*Williams v. Taylor*,
    529 U.S. 420, 120 S.Ct. 1479 (2000) ................................................................6

## STATUTES

42 U.S.C. §1973 ........................................................................................................9

42 U.S.C. §1973(a) .................................................................................................10

42 U.S.C. §1973*a* ..................................................................................................11

42 U.S.C. §1973*a*(a)-(c) .........................................................................................6

42 U.S.C. §1973*b*(4) ..............................................................................................20

42 U.S.C. §1973*b*(a) ................................................................................................8

42 U.S.C. §1973*b*(a)(1) ...............................................................................4, 10, 19

42 U.S.C. §1973*b*(a)(1)(A)-(F) .............................................................................20

42 U.S.C. §1973*b*(a)(1)(F) ...............................................................................20, 21

42 U.S.C. §1973*b*(a)(1)(F)(iii) ...........................................................................21, 22

42 U.S.C. §1973*b*(f)(2) ...........................................................................................10

42 U.S.C. §1973*b*(f)(4) ...........................................................................................10

42 U.S.C. §1973*c*(a) ............................................................................................7, 9

42 U.S.C. §1973*f*(a)(1)-(2) .....................................................................................11

42 U.S.C.  §1973*k*(c) ..............................................................................................11

42 U.S.C. §1973*l*(c)(2) .............................................................................................4

Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act
    Reauthorization and Amendments Act of 2006,
    Pub. L. No. 109-246 ..........................................................................................34

TEX. CONST. ART. XVI, §59(a) .................................................................................17

TEX. CONST. ART. XVI, §59(b) .................................................................................17

TEX. ELEC. CODE §41.005 ........................................................................................5

TEX. WATER CODE §54.012 ....................................................................................17

TEX. WATER CODE §54.013(a)..........................................................................12, 17

TEX. WATER CODE §54.0161 ..................................................................................17

TEX. WATER CODE §54.5161 ..................................................................................17

**MISCELLANEOUS**

BLACK'S LAW DICTIONARY 535 (2d Pocket ed. 2001) ...................................................5

BLACK'S LAW DICTIONARY 1159 (6th ed. 1991) ........................................................5

*Continuing Need for Section 203's Provisions for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006)............................... 30

H.R. REP. NO. 94-196.............................................................................................24

H.R. REP. NO. 97-227.............................................................................................19

H.R. REP. NO. 109-478 ....................................................................................19, 29

Pamela S. Karlan, *Section 5 Squared: Congressional Power to Extend and Amend the Voting Rights Act,* 44 HOUS. L. REV. 1 (2007)...................................................25

*Modern Enforcement of the Voting Rights Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) ..........................................................................30

Nathaniel Persily, *Options and Strategies for Renewal of Section 5 of the Voting Rights Act*, 49 HOWARD L.J. 717 (2006) ...................................................................4

Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?,* 81 DENV. U. L. REV. 225 (2003)...................................................................31

S. REP. NO. 94-295.................................................................................................24

S. REP. NO. 97-417...........................................................................................19, 25

S. REP. NO. 109-295...............................................................................................35

*Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing Before the Senate Judiciary Committee*, 109th Cong. 109-545 (2006) (Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act*) ...................................................................35

*Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) ....................................................30

*Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2006)...............................30

*Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005)...................................................................................................................30

Richard A. Williamson, *The 1982 Amendments to the Voting Rights Act: A Statutory Analysis of the Revised Bailout Provisions*, 62 WASH. U. L.Q. 1 (1984) ...................15, 16

Paul Winke, *Why the Preclearance and Bailout Provisions of the Voting Rights Act Are Still a Constitutionally Proportionate Remedy*, 28 N.Y.U. REV. L. & SOC. CHANGE (2003) ...............................................................................13, 15, 16, 33

### INTRODUCTION

For nearly a year, the U.S. Department of Justice and dozens upon dozens of lawyers working with numerous major national advocacy groups have scoured the records of Northwest Austin Municipal Utility District No. 1 for any sign of impropriety in the conduct of its elections during the past decade, all without the faintest hint of success. Those same advocacy groups sent teams of lawyers into the neighborhood, personally recruiting and persuading various minority residents to intervene to oppose the district's attempt to bail out of the VRA's preclearance requirements, and yet not a single intervenor in this lawsuit has uttered a single word in complaint against the district's conduct of its elections over these many years. It is undisputed that the district has acted to encourage participation by all residents, minority and nonminority alike, and has taken concrete steps to make its elections more convenient and user-friendly. Yet, despite the district's exemplary fairness in the conduct of its elections, the Attorney General and these advocacy groups insist on preserving a presumption that states and local governments (including the district, in particular) will act illegally and in bad faith in the conduct of their elections.

The district is entitled to bail out of the preclearance requirements of the VRA because the plain language of the bailout provision authorizes the district's use of the statute for that purpose and the Supreme Court has interpreted the language of the Act so as to require that result. Defendants weakly (and unsuccessfully) attempt to distinguish the applicability of *Sheffield* and *Dougherty County*, and their attempt to substitute *City of Rome* as the controlling pronouncement fails because, unlike *Sheffield* and *Dougherty County*, the Court in *City of Rome* did not remotely purport to evaluate the reach of §14(c)(2). Defendants' miserly interpretation of the bailout provision effectively limits its application to Virginia. By purporting to give control over bailout to state subdivisions (counties) that have no state-law authority over other

1

local political subdivisions of the state, including the authority to collect basic information for a bailout submission, defendants' interpretation both impermissibly modifies the structure of state government and creates insurmountable practical obstacles to bailout.

In their mad rush to prevent the district from being able to even attempt to bail out, defendants have blindly espoused an interpretation of the reach of §14(c)(2) that is essentially the equivalent of the position rejected by the Supreme Court in *Sheffield—i.e.*, that §14(c)(2) limits the term "political subdivision" everywhere in the VRA—and that would, if adopted, nullify much of the Act. Defendants cannot have it both ways. The Supreme Court expressly limited §14(c)(2) in order to extend the reach of many of the substantive provisions of the VRA to small political subdivisions, like the district, that would not otherwise apply if §14(c)(2) were read broadly to limit the term "political subdivision" everywhere it appears in the VRA. Having spent the past two decades following the dictates of the VRA as a political subdivision in a covered state, the district is entitled now to bail out as a political subdivision in a covered state.

Once the Court recognizes that the district is entitled to rely on the bailout statute, the Court may quickly conclude that the district has satisfied the statutory requirements for bailout. The Attorney General has interposed no objection to the district's claim that it satisfies the bailout requirements. While the intervenors have asserted that the district has not done sufficient minority-targeted outreach, they do so only by misrepresenting the nature of the district's obligations under the statute. The district has complied with its preclearance obligations, no person has ever made a single complaint about the district's elections, and the district has made substantial steps to improve voter participation and convenience, and particularly for language-minority voters in the district. The district is entitled to bail out.

Alternatively, the district is entitled to be released from the obligations of preclearance because §5 cannot be constitutionally enforced against the district. When Congress originally enacted preclearance, it did so not as a backstop to the general provisions of the VRA, but as a specific remedy for a specific problem—the calculated gamesmanship by certain states and local governments to frustrate enforcement of federal voting-rights protections through the improper use of iterative changes in election practices and procedures. In the 1960s and 1970s, there was a sufficient fit between the problem and the solution to constitutionally justify preclearance because the §5 remedy, as intrusive as it is, was directly responsive to governmental attempts to evade judicial enforcement of federal law.

But that is no longer even remotely true, and the Court should view as a red warning flag the fact that defendants expressly reject the need even to attempt to provide a justification similar to the original fit between the uniquely intrusive nature of preclearance and the unique circumstances that were the impetus for the passage of §5 when the VRA was originally enacted. Preclearance cannot be constitutionally justified as simply an effective means of enforcing the VRA's general prohibitions on voting discrimination, and the Supreme Court has never suggested that it could. That dangerous line of thinking could lead to federal executive preclearance over any subject matter area within which Congress may constitutionally legislate.

Defendants halfheartedly assert that there was evidence of governmental gamesmanship before Congress when it reenacted §5, but that very assertion is grounded in a misleading conflation of periodic violations of the VRA, which cannot constitutionally support §5, and pervasive evidence of systematic avoidance of VRA enforcement altogether, which could. No one could fairly read the legislative record as even remotely supporting the need to reenact preclearance as being essential to enforcement of the VRA.

Perfect compliance with our voting-rights laws has not yet been achieved, but it also cannot be disputed that we do not live in our grandparents' tumultuous times.  It is time to acknowledge the progress that has been made and to fairly recognize that preclearance, the most egregious intrusion into state and local sovereignty on the books,[1] can no longer be justified.

Either way, the district should no longer be subject to preclearance.

ARGUMENT

## I.   THE DISTRICT SHOULD BE GRANTED BAILOUT.

### A.   The District Is Eligible to Pursue Bailout Under the Statute.

The district is eligible to file this declaratory action for bailout because it is a "political subdivision of" a "State with respect to which the determinations have been made under" §4(b). 42 U.S.C. §1973*b*(a)(1).  Defendants' only argument from the statutory text of the VRA that the district is ineligible to pursue bailout is from the limiting definition of "political subdivision" in §14(c)(2) of the Act.  *See* 42 U.S.C. §1973*l*(c)(2) ("The term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting.").  Their argument fails because the Supreme Court, as necessary to give effect to the intended expansive effect of the VRA's substantive and procedural provisions, has cabined the §14(c)(2) definition to the specific context of determining which political subunits are potentially eligible for separate coverage under the Act's special provisions.  *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 131 n.18, 98 S.Ct. 965, 979 n.18 (1978) ("Congress' *exclusive* objective in §14(c)(2) was to limit the jurisdictions which may be separately designated for coverage under §4(b)." (emphasis added));  *accord*

---

[1] Nathaniel Persily, *Options and Strategies for Renewal of Section 5 of the Voting Rights Act*, 49 HOWARD L.J. 717, 718 (2006) ("The measure remains alone in American history in its intrusiveness on values of federalism ….").

*Dougherty County, Ga. Bd. of Educ. v. White*, 439 U.S. 32, 43 & n.13, 99 S.Ct. 368, 375 & n.13 (1978) (holding that the appellant school board's contention that it was not a political subdivision because §14(c)(2) applied and because the board did not register voters was "squarely foreclosed by" *Sheffield*); *United States v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 554-55 (5th Cir. 1980) ("[T]he Supreme Court has held that [§14(c)(2)'s] definition limits the meaning of the phrase 'State or political subdivision' only when it appears in certain parts of the Act, and that it does not confine the phrase as used elsewhere in the Act.").

> **1.    The Supreme Court Has Confined §14(c)(2) to the Issue of Separate Coverage.**

The very fact that Congress needed to include a limiting definition in order to restrict the scope of "political subdivision" in a particular context illustrates that the ordinary meaning of the term encompasses any political subunit of a state, regardless whether it registers voters. *See, e.g.*, Tex. Elec. Code §41.005; *Dougherty County*, 439 U.S. at 43-44, 99 S.Ct. at 375; *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998); Black's Law Dictionary 535 (2d Pocket ed. 2001); Black's Law Dictionary 1159 (6th ed. 1991). Try as they might, defendants cannot escape the necessary consequence of the Supreme Court's holdings in *Sheffield* and *Dougherty County* that limited §14(c)(2) to the context of defining the type of entities that could be eligible for separate coverage. "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midatlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 501, 106 S.Ct. 755, 760 (1986). Had Congress wanted to expand the application of §14(c)(2), it could do so only by a statutory response to the Supreme Court's limiting interpretation. *See Reno v. Bossier Parish Sch. Bd.* (*Bossier Parish I*), 520 U.S. 471, 483-84, 117 S.Ct. 1491, 1500 (1997) ("Given our longstanding interpretation of §5, . . . we

believe Congress has made it sufficiently clear that a violation of §2 is not grounds in and of itself for denying preclearance under §5.  That there may be some suggestion to the contrary in the Senate Report to the 1982 Voting Rights Act amendments . . . does not change our view."); *Georgia v. United States*, 411 U.S. 526, 533, 93 S.Ct. 1702, 1707 (1973) (concluding that Congress's failure to make substantive changes to §5 despite ample opportunity to do so indicated Congress's agreement with the Court's broad interpretation of that section); *State of Ariz. v. Reno*,  887 F.Supp. 318, 321-22 (D.D.C. 1995).[2]

The effect of *Sheffield* is that, outside the context of separate coverage, "political subdivision" is no longer a defined term but plain language.  The fact that *Sheffield* did not address bailout does not affect that conclusion.  Nor does the district's argument depend, as defendant-intervenors suggest, on a direct holding in *Sheffield* that entities like the district are "political subdivisions" as used in §4(a).  *Sheffield* explained that "[t]he usage 'in a political subdivision,' which occurs in §4(a) and in many other sections of the Act, *see*, *e.g.*, 42 U.S.C. §§1973*a*(a)-(c) (1970 ed., Supp. V), would be nonsensical if 'political subdivision' denoted only specific functional units of state government."  435 U.S. at 129 n.15, 98 S.Ct. at 978 n.15.   If the "exclusive" purpose of §14(c)(2) was to limit the reach of "political subdivision" in §4(b), *id.*, the §14(c)(2) definition has no other purpose in the statute.  Because "political subdivision" is not a defined term throughout the Act, it must be given its ordinary meaning in uses outside the coverage context.  *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 1488 (2000).  That meaning obviously encompasses entities like the district.  *See Dougherty County*, 439 U.S. at 43 & n.13, 99 S.Ct. at 375 & n.13 (school board was a political subdivision).

---

[2] *See also, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, __, 126 S.Ct. 1503, 1513 (2006); *Williams*, 529 U.S. at 434, 120 S.Ct. at 1489; *Bragdon v. Abbott*, 524 U.S. 624, 645, 118 S.Ct. 2196, 2208 (1998); *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794 (1981);  *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870 (1978).

*Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 n.2 (Tex. 1993); *Bennett v. Brown County Water Improvement Dist. No. 1*, 272 S.W.2d 498, 500 (Tex. 1954); *McMillan v. Nw. Harris County Mun. Util. Dist. No. 24*, 988 S.W.2d 337, 340 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

Defendants' attempts to dismiss *Sheffield*'s statements are unavailing.  Far from being dicta, the Supreme Court's limiting interpretation is the key to its holdings in *Sheffield* and *Dougherty County*.  Without that limitation, no warrant exists in the text of §5 to require subunits of covered states—other than counties, parishes, or other entities that register voters—to submit to preclearance.  Section 5 requires preclearance only by "a State or political subdivision with respect to which the prohibitions" of §4(a) are in effect.  42 U.S.C. §1973*c*(a).  Those prohibitions were in effect with respect to Sheffield and the Dougherty County school board because they were, territorially, within covered states.  *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548 (1980), makes clear that such entities are subject to §5 not because they are themselves "States . . . with respect to which the prohibitions" were in effect, 42 U.S.C. §1973*c*(a), but rather because they are political units within covered states.  *City of Rome*, 446 U.S. at 168, 100 S.Ct. at 1557.

*City of Rome* did not lift *Sheffield*'s restriction of §14(c)(2) to the coverage context. Attempting to circumvent the necessary implications of *Sheffield* and *Dougherty County*, it is defendants who misapply *City of Rome* and attempt to read that case as answering questions it did not reach.  Contrary to defendant-intervenors' assertion, *City of Rome* did not "conclusively reject[]" the district's construction of §4(a) to encompass entities like the district, Defendant-Intervenors Resp. 9,  and could not have done so.  The provision of current §4(a) on which the district relies—the provision expanding the availability of bailout to "political subdivisions" not

separately covered, 42 U.S.C. §1973*b*(a)—did not even exist when *City of Rome* was decided. And the very absence of that provision was essential to *City of Rome*'s rationale. 446 U.S. at 167-168, 100 S.Ct. at 1556 (explaining that "the issue turns on whether the city is, for bailout purposes, . . . a 'political subdivision *with respect to which . . . determinations have been made as a separate unit*'" (emphasis added) and that "[o]n the face of the statute, the city fails to meet" that definition "since the coverage formula of §4(b) has never been applied to it"). The construction of "political subdivision"—in isolation—was not before the Court in *City of Rome* and was not reached by it. *Cf. United States v. Shabani*, 513 U.S. 10, 16, 115 S.Ct. 382, 386 (1994) (noting that "[q]uestions which 'merely lurk in the record' are not resolved, and no resolution of them may be inferred" (alteration in original)). Because pre-1982 §4(a) permitted only those political subdivisions that were separately covered to pursue bailout, it was irrelevant whether Rome could be a "political subdivision" in any context because Rome was not, and could not be, separately covered.[3] The Supreme Court simply applied the plain language of the pre-1982 statute and nothing more, rejecting (appropriately) Rome's arguments that *Sheffield* either made Rome "itself a 'State' for purposes of the §4(a) exemption procedure" or somehow erased the express limitation of bailout to only those political subdivisions that were separately covered. *City of Rome* at 168, 100 S.Ct. at 1557.

The Attorney General simply misrepresents *City of Rome*'s reasoning by asserting that the Court relied on §14(c)(2)'s definition of "political subdivision" and (unnecessarily) importing it into §4(a). *See* Attorney General Resp. 4. *City of Rome* did no such thing. *City of Rome* quoted §14(c)(2) in the course of explaining *Sheffield*'s holding regarding §5, *City of Rome*, 446 U.S. at 168 & n.5, 100 S.Ct. at 1557, and cited legislative history regarding the issue

---

[3] Relatedly, defendant-intervenors' contention that the district's interpretation of current §4(a) requires "giving a different meaning to the same term in the *same sentence*," Defendant-Intervenors Resp. 4, is absurd. Quite obviously, a political subdivision can be separately covered or not while remaining a political subdivision.

of what entities would be subject to separate coverage, not with regard to limiting the meaning of "political subdivision" as used elsewhere in the Act. *Id.* at 168-69, 100 S.Ct. at 1557.

> ### 2.    Accepting Defendants' Argument Would Have Numerous Unintended Consequences Throughout the Act.

At bottom, defendants' argument would require this Court to find—contrary to the holdings in *Sheffield* and *Dougherty County* and the rationale underlying *City of Rome*—that §14(c)(2)'s definition of "political subdivision" applies throughout the Act, limiting the term wherever it is used to counties, parishes, or other entities that register voters. Because Congress used the term "political subdivision" in many different provisions and contexts, limiting that term as defendants urge would eviscerate much of the VRA's substantive protection of voting rights and even distort the preclearance regime in ways that neither Congress nor defendants could possibly intend. Nor has the Department of Justice or any court interpreted the Act as limited in the way the Attorney General and defendant-intervenors demand.

For example, under defendants' limitation of "political subdivisions," governmental subunits other than counties (or their equivalent) could not institute a suit for judicial preclearance of voting changes under §5. *See* 42 U.S.C. §1973*c*(a) (providing that only "a State or *political subdivision* . . . may institute an action in the United States District Court for the District of Columbia for a [preclearance] declaratory judgment" (emphasis added)); *cf., e.g.*, *City of Lockhart v. United States*, 460 U.S. 125, 129, 103 S.Ct. 998, 1001-1002 (1983) (City of Lockhart, Texas, filed for a preclearance declaratory judgment in this Court); *City of Dallas v. United States*, 482 F.Supp. 183, 184 (D.D.C. 1979) (*per curiam*) (City of Dallas, Texas, filed for a preclearance declaratory judgment in this Court). Defendants' definition would, in fact, exempt noncounty political subunits from compliance with §2's substantive prohibition of discrimination. *See* 42 U.S.C. §1973 (prohibiting discriminatory practices "*by* any State or

*political subdivision*" (emphasis added)); *cf. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d at 556 (holding, in light of *Sheffield*, *Dougherty County*, and *City of Rome* "that a school board is a political subdivision for section 2 purposes" although it did not fall within §14(c)(2)'s definition because it did not register voters). The definition would also remove all other subunits from §2's prohibition on voting requirements or prerequisites that result in the denial or abridgement of voting rights on the basis of race or color. *See* 42 U.S.C. §1973(a) ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied *by* any State or *political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." (emphasis added)).

Defendants' definition would similarly remove all subunits smaller than a county (or its equivalent) from the §2 prohibition on the use of tests or devices to deny the right to vote. *See* 42 U.S.C. §1973*b*(a)(1) ("no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State . . . or in any *political subdivision* of such State" (emphasis added)). Units smaller than counties would no longer be prohibited from using voting qualifications or prerequisites to deny language minorities the right to vote or be required to provide election information in languages other than English. *See* 42 U.S.C. §1973*b*(f)(2) (requiring that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied *by* any State or *political subdivision* to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group." (emphasis added)); 42 U.S.C. §1973*b*(f)(4) (providing that "any State or *political subdivision* . . . shall provide [voting and election information] in the language of the applicable language minority group as well as in the English language" (emphasis added)).

Further, under a definition limiting "political subdivisions" to counties (or their equivalent), neither the courts nor the Attorney General would be able to assign observers to monitor elections in any subunit smaller than a county (or its equivalent). *See* 42 U.S.C. §1973*a* (providing that a court may "authorize the appointment of Federal observers . . . to serve for such period of time and for such *political subdivisions* as the court shall determine is appropriate" (emphasis added)); 42 U.S.C. §1973*f*(a)(1)-(2) (providing for the assignment of observers whenever "a court has authorized the appointment of observers . . . for a *political subdivision*" or "the Attorney General certifies with respect to any *political subdivision* . . . determinations made under section 1973b(b)" (emphasis added)); *cf., e.g.*, *James v. Humphreys County Bd. of Election Comm'rs*, 384 F.Supp. 114, 119 (N.D. Miss. 1974) (six federal observers assigned to single Silver City precinct). And if such observers were assigned to units smaller than counties, under the Attorney General's definition those units would not be allowed to petition for the observer's removal. *See* 42 U.S.C. §1973*k*(c) ("[a] *political subdivision* may petition the Attorney General for a termination" of observer coverage (emphasis added)).

Those consequences were certainly not intended by Congress, and likely are not intended by defendants. But they are the necessary result of defendants' disingenuous tactic of reading §14(c)(2) to make "political subdivision" a defined term throughout the Act. Defendant-intervenors appear to anticipate the necessary implications of reading "political subdivision" as a defined term throughout the Act and attempt to avoid this result by suggesting that the term's usage in §4(a) is "unlike" in "any other provision of the VRA." Defendant-Intervenors Resp. 3. But they offer no principled reason derived from the text to treat §4(a) differently, and there is none.

Defendant-intervenors' observation that §4(a) refers to political subdivisions having governmental units within their territory, *see id.*, does not help them. Nothing in the text indicates that *all* "political subdivisions" *must* have other governmental units within their territory or the converse that only a political subunit with other subunits within its territory can be a "political subdivision." It has never been suggested, for example, that an independent city in Virginia could not pursue bailout for lack of subunits within its territory. Indeed, cities and other entities, including MUDs, can and often do cross county lines. *See* TEX. WATER CODE §54.013(a). It simply makes no sense to read the reference to units within a political subdivision's territory to do anything more than address the situation, neither unusual nor universal, that a political subdivision happens to have other governmental units within its territory. Similarly, that Department of Justice guidelines refer to political subunits "housed *within* other covered jurisdictions," Defendant-Intervenors Resp. 21, adds nothing to defendants' argument. Unquestionably, all political subdivisions in covered states are "housed *within*" those states, even if they are counties. A governmental entity can be—and in ordinary usage is—both a political subdivision and a political subunit. Moreover, deference to an agency's interpretation of a statute under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778 (1984), is inappropriate when the Supreme Court has already interpreted §14(c)(2) as limited to the coverage context. *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 356, 120 S.Ct. 1467, 1476 (2000) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning.").

The only way the text of the current Act avoids an emasculating construction that precludes enforcement against noncounty political subunits is to recognize congressional

acquiescence in the *Sheffield-Dougherty County* cabining of §14(c)(2)'s definition.  *See Midatlantic Nat'l Bank*, 474 U.S. at 501, 106 S.Ct. at 759; *Shapiro v. United States*, 335 U.S. 1, 16, 68 S.Ct. 1375, 1383 (1948).

> **3.     Defendants' Interpretation Raises Grave Constitutional Concerns That Must Be Avoided.**
>
> > **a.     Rendering Bailout Practically Unworkable Would Negate the Only Possible Chance for §5 to Be Rendered Congruent and Proportional.**

The Attorney General misses the point regarding the relevance of bailout to the congruence and proportionality analysis at issue in this case.  It makes little difference—and little sense to talk about—whether bailout is itself congruent and proportional.  The point is that an effective bailout mechanism, by permitting compliant jurisdictions to terminate preclearance obligations before 2031, would be more likely to render the 2006 reauthorization of §5 a congruent and proportional remedy.  An effective bailout mechanism could potentially trim the contours of §5's geographic and temporal reach sufficiently to counteract the preclearance regime's overbroad and outdated coverage mechanism.  *See, e.g.*, Paul Winke, *Why the Preclearance and Bailout Provisions of the Voting Rights Act Are Still a Constitutionally Proportionate Remedy*, 28 N.Y.U. REV. L. & SOC. CHANGE 69, 111 (2003).  But an ineffective bailout mechanism never could do so.

As detailed further in the district's opening memorandum and its response to defendants' motions for summary judgment, if §4(a) is construed—in conflict with Supreme Court precedent regarding the purpose of §14(c)(2)—to mean that, for the most part, counties are the only political subdivisions that can pursue bailout, then there is no realistic opportunity for the vast majority of covered jurisdictions to bail out.  And if a jurisdiction like the district, which has no history of noncompliance with §5 or the VRA as a whole and which can demonstrate its

satisfaction of the substantive bailout requirements, has no realistic chance of achieving bailout, then the bailout mechanism is not effective.

The Attorney General's suggestion, Attorney General Resp. 28, that, as a practical matter, a county is optimally situated to have access to the details of compliance with the substantive bailout requirements of all the numerous political subunits within its territory is belied by the testimony of the one county official who has been deposed in this case. Dana DeBeauvoir, who has been Travis County's chief election official for 20 years, testified that, unsurprisingly, she "didn't know anything specific about this MUD until this [lawsuit]" and had no specific knowledge of its electoral practices. Deposition of Dana DeBeauvoir, Ex. 14 at 13-14, 21. To suggest that a jurisdiction like Travis County could easily and cost-effectively gather the data relating to compliance with the substantive bailout criteria over a ten-year period for each of the approximately 107 politically independent subunits within its territory flies in the face of reason and experience. The best defendants can muster is to point to the successful bailout of one Virginia county with a grand total of nine jurisdictions within its geographical territory. Defendant-Intervenors Resp. 19-20.

Further, as a practical matter, it is inconceivable that bailout could ever be achieved on a statewide level. If the logistical problems of showing compliance with the bailout requirements are, as a practical matter, virtually insurmountable for most covered counties, they are not even conceivably surmountable for any covered state. Defendants' own figures illustrate the problem. Defendant-intervenors assert that Texas's 254 counties have, on average, "fourteen political subunits governed by elected bodies" within them. Defendant-Intervenors Resp. 20. Defendant-intervenors' statistics, by limiting themselves to "subunits governed by elected bodies" and, perhaps, to subunits located entirely within the boundaries of single counties, *id.*, may well

14

underestimate the number of relevant political subdivisions subject to §5 in Texas.  *See Dougherty County,* 439 U.S. at 43-44, 99 S.Ct. at 375 (holding that a school board, which was a political subdivision, was subject to §5 although it held no elections).  But even by defendant-intervenors' own count, Texas would have to investigate and prove compliance over a ten-year period for at least 3,810 political subunits in order to bail out.  The Attorney General estimates that, throughout the covered jurisdictions, there are "well over 10,000" political subunits, or more than 1,000 per covered state.  Attorney General Resp. 27.  In defendants' view, §4(a) would not allow most of those subunits to bail out independently, although it clearly permits states to pursue bailout for hundreds or thousands of subunits at a time.  But it is beyond argument that no state—even if, in fact, all its political subdivisions satisfied the bailout criteria—could or likely would undertake such an effort.[4]

Moreover, defendants' reliance on the Supreme Court's approval of earlier versions of the bailout statute are misplaced.  The previous enactments of §5 and its accompanying bailout statute were justified by a sufficient record of prevalent legislative gamesmanship permeating covered states, which—as detailed in the district's two previous memoranda and further below—was not the case for the 2006 enactment.  In those circumstances, a bailout mechanism limited to state-by-state exemption was appropriate.  More importantly, the pre-1982 provisions were effectively tied to the mere passage of time.  Winke, *supra,* at 107-08; Richard A. Williamson*, The 1982 Amendments to the Voting Rights Act: A Statutory Analysis of the Revised Bailout Provisions*, 62 WASH. U.L.Q. 1, 29 (1984).  Essentially, when the statutory time period was up, §5 coverage automatically terminated because all tests and devices were outlawed since 1965.

---

[4] In any event, if covered states actually ever did pursue bailout on behalf of themselves and thousands of subunits at a time, the logistical burden on the Department of Justice and this Court would far exceed that imposed by bailing out one political subdivision at a time.  Because even defendants' interpretation of §4(a) would (theoretically) permit such a scenario, that fact negates defendants' assertion that Congress could never have intended to impose the lesser logistical burden of subunits bailing out one at one time.

Winke, *supra,* at 107-08; Williamson, *supra,* at 29.  Such a mechanism could be considered adequate when §5 coverage was itself limited to a five- or seven-year period and based on sufficient findings of extraordinary circumstances.

But the 1982 amendments were intended to provide local jurisdictions a real opportunity—and incentive—to escape a 25-, now extended to 50-, year term of coverage.  *See* Winke, *supra,* at 108; Williamson, *supra,* at 31.  With the 1982 amendments, bailout became tied to more than simply the date on a calendar and requires demonstration of numerous substantive factors, like ten years' worth of compliance with §5 coupled with constructive efforts to improve electoral access within the same time period, that no state could hope to demonstrate on a locality-by-locality basis.

"[T]he congruence and proportionality requirement *City of Boerne* now strongly suggests that . . . some means of escape for jurisdictions that never discriminated—or have not for an extended period—must be made available."  Winke, *supra,* at 111.  Simply put, if bailout is not available to every local covered jurisdiction, it will not work for the vast majority of those jurisdictions.  And if bailout does not work, §5 can never be made congruent and proportional. *See Katzenbach*, 383 U.S. at 331-32, 86 S.Ct. 803, 820-21 (1966) (recognizing that, even in the context of the sufficient legislative record justifying the 1965 enactment of §5 that coverage without the possibility of bailout would have raised overbreadth concerns); Winke, *supra,* at 111 (acknowledging that "[t]he bailout provisions are thus required to cut the potentially overbroad preclearance remedy down to a size congruent with the problem of persistent racial discrimination in voting.").

###### 4. Limiting Bailout As Defendants Urge Exacerbates the Federalism Costs of the Preclearance and Bailout Regime by Reordering State Government.

The Attorney General again misses the point by asserting that, if it is constitutionally permissible for Congress to put the district's chances for bailout in the hands of the State of Texas, it is necessarily permissible for Congress to put the district at the mercy of Travis County. Aside from the changes that make state control of bailout in the current regime a very different proposition from that under the pre-1982 bailout provision, the fact is that, while Texas always has political authority over the district, Texas law gives Travis County no political control over the district. *See* TEX. CONST. art. XVI, §59(a), (b); TEX. WATER CODE §54.012, §54.013(a), §54.0161, §54.5161. Defendants can cite no authority for the idea that Congress has constitutional authority to interpose one political subdivision between the federal government and another political subdivision in a way not contemplated by the law of the state having the only political authority to which both subdivisions directly answer.

And that objection is not answered by defendant-intervenors' theory that the district's opportunity to be bailed out by Travis County is "in addition to" its opportunity to be bailed out by the state, Defendant-Intervenors Resp. 29, especially given that the practical workability of bailout on behalf of the entire state of Texas at one time is, if it is possible to be, even more of a fantasy than bailout of Travis County as a whole. The improper reordering of state government would arise from §4(a)'s giving any measure of political control over the district to Travis County, notwithstanding that the district could also (purely in theory) be bailed out by the state to which it is politically subject.

17

### 5.    Defendants' Continued Reliance on Fragments of Legislative History Is Still Misplaced.

Faced with statutory text that makes bailout available to all political subdivisions in covered states and Supreme Court precedent that confines the Act's specialized definition of "political subdivision" to a different context, defendants are forced to attempt to glean their interpretation of the statutory text from unenacted legislative history. Indeed, defendants reach beyond legislative history to cite testimony by individuals, including counsel for defendant-intervenor Travis County. The fact that private individuals may, by ignoring the Supreme Court's treatment of §14(c)(2), have committed the same errors as unnamed, unelected drafters of committee reports gives their misinterpretations no authoritative weight.

Given the statutory text, the Supreme Court's interpretation, the unintended consequences that would flow from applying defendants' interpretation throughout the Act, and the grave constitutional concerns raised by applying that interpretation in §4(a), defendants' reliance on the scraps of legislative history that even arguably support their argument must be rejected. *See, e.g.*, *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99, 111 S.Ct. 1138, 1146-47 (1991)*, superseded by statute on other grounds as recognized in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251, 114 S.Ct. 1483, 1490 (1994). And most of the legislative history defendants cite does not even arguably support their assertion that Congress intended to abrogate *Sheffield* to the extent that case limited §14(c)(2) to the coverage context. For example, quotations referring to counties making use of the bailout procedure demonstrate that Congress had counties in mind and maybe even that Congress contemplated that bailout would most frequently occur on a county-by-county basis. But the vast bulk of the snippets quoted by defendants say nothing to the effect that counties would be the *only* political subdivisions eligible to pursue bailout. And the fragments that do suggest as much are inconsistent with numerous clear statements to the

effect that bailout was intended to be a workable, frequently used procedure available to "any covered jurisdiction." H.R. REP. NO. 109-478, at 93; *see also, e.g., id.* at 25, 58, 61, S. REP. NO. 97-417, at 48, 53 n.182, 59; H.R. REP. NO. 97-227, at 39. In short, legislative history is, at best, an unreliable guide compared with statutory text and judicial precedent. Defendants' attempt to use legislative history to make the statute say something it does not say should be rejected.

### B.      The District Meets the Substantive Requirements for Bailout.

"The burden of proof" for a jurisdiction seeking bailout to show that it meets the substantive requirements is intended to be "quite bearable." *Katzenbach*, 383 U.S. at 332, 86 S.Ct. at 820-21. "[A]n area need do no more than submit affidavits" asserting compliance with the bailout requirements "and then refute whatever evidence to the contrary may be adduced by the Federal Government." *Id.* The district has done far more than submit affidavits, supporting its ten-year history of compliance with documentary exhibits from the district's records and deposition testimony, including the uniform testimony of every single intervenor that they cannot identify any problems with the district's elections.[5]

Resting on his erroneous construction of the bailout statute, the Attorney General presents no argument to counter the district's showing that it satisfies the substantive requirements for receiving bailout that are set forth in 42 U.S.C. §1973*b*(a)(1). Defendant-

---

[5] Defendants' response to the district's statement of material facts attempts to take issue with portions of the affidavit of Frank Reilly, general counsel for the district. As the district's counsel for the past five years and custodian of all the district's records going back to its inception, Mr. Reilly clearly has sufficient knowledge to affirm the district's compliance with the bailout requirements addressed in his affidavit. As detailed in the district's memorandum in support of summary judgment and its response to defendants' motions for summary judgment, the facts supporting the district's entitlement to bailout are also fully supported by additional documentary evidence and deposition testimony. Negative bailout factors—*e.g.*, the nonexistence of tests or devices, §5 objections, lawsuits against the district, or consent decrees—are supported by the absence of anything suggesting their existence in the voluminous document production and deposition testimony in this case. Defendants have come forward with no evidence to rebut the district's showing of the nonexistence of such negative factors despite, for example, having every opportunity to explore such factors during depositions of the three attorneys who have handled election-related matters for the district since its inception. *See generally* Depositions of Sharlene Collins, Kerri Jo Qualtrough, and Frank Reilly, Exs. 12, 13, 28, 29.

intervenors attempt to counter the district's proof of compliance with the substantive requirements, but their efforts fail.

Most of the allegations leveled by defendant-intervenors are not even material to the statutory bailout factors, which are contained in 42 U.S.C. §1973*b*(a)(1)(A)-(F).  Defendant-intervenors' allegations that the district's publicity of this suit was insufficient—despite the obvious fact that it was sufficiently publicized to permit intervention by eighteen individuals and organizations purporting to be aggrieved by it—relate to 42 U.S.C. §1973*b*(4) and are immaterial to the substantive factors listed in 42 U.S.C. §1973*b*(a)(1)(A)-(F).  And defendant-intervenors' allegation that the district's "decision to move the polling places [*sic*] [to the local elementary school] was not . . . made purely out of desire to increase voter convenience" because "the District had substantial financial incentives to enter into the agreement" with Travis County—in addition to being patently false—is similarly immaterial to the substantive bailout factors. Defendant-Intervenors Resp. 23 n.11.  Nothing in 42 U.S.C. §1973*b*(a)(1)(F) requires that a jurisdiction's constructive efforts to improve electoral participation be motivated by any particular purpose.  In any event, the evidence is clear that (1) the district desired to move the polling place and took steps toward doing so before it was even aware that it could contractually delegate its election administration to Travis County, Deposition of Kerri Jo Qualtrough, Ex. 28 at 58-59 (attorney who arranged to move the polling place to the school testifying that the district wanted to move the election to the school "to make it more accessible" and that it was only through her research into making that move that she and the district discovered that they could enter into a joint election agreement with Travis County, providing additional benefits for voter convenience like greater access to early voting); (2) the primary—if not only—motivation for that decision was to increase voter convenience and thus electoral participation, *id.*; Deposition

of William Ferguson, Ex. 18 at 49-50; Deposition of Don Zimmerman, Ex. 35 at 47-48, 53; and (3) the fact that the district could save taxpayer money—while tapping into a broad network of additional services for voters—by contracting with Travis County was serendipitous.  Deposition of Kerri Jo Qualtrough, Ex. 28 at 58-59; Deposition of William Ferguson, Ex. 18 at 49-50.[6]

Aside from reading a nonexistent *mens rea* requirement into 42 U.S.C. §1973*b*(a)(1)(F), defendant-intervenors do not even attempt dispute that the district's moving the polling place and concomitant participation in joint elections with Travis County "expanded opportunity for convenient . . . voting for every person of voting age."  42 U.S.C. §1973*b*(a)(1)(F)(iii).  Nor could they, as detailed in the district's opening memorandum and response to defendants' motions for summary judgment.  Pl. Mem. in Supp. of Mot. for Summ. J. 33-35; Pl. Mem. in Opp. to Mots. for Summ. J. 30-36.  Instead, defendant-intervenors misleadingly suggest that 42 U.S.C. §1973*b*(a)(1)(F)(iii) specifically requires "the appointment of minority persons as election officials."  Defendant-Intervenor Resp. 23 (selectively quoting 42 U.S.C. §1973*b*(a)(1)(F)(iii)).  42 U.S.C. §1973*b*(a)(1)(F)(iii) does no such thing.  Rather, it identifies expanded opportunity for such appointments as one nonexclusive example of a constructive effort that would satisfy the bailout provision.

As they have done in previous briefing, defendant-intervenors quote out of context Don Zimmerman's testimony that he treats all people equally regardless of race.  Defendant-intervenors' suggestion that 42 U.S.C. §1973*b*(a)(1)(F)(iii) requires local officials to make decisions based solely on the highly suspect classification of race should not be countenanced.

---

[6] Defendant-intervenors also accuse the district of using "the passive voice" to "leave[] a misimpression about the District's difficulties in 2002 in finally moving polling places [*sic*] . . . were somehow associated with Section 5 or the federal government."  Defendant-Intervenors Resp. 23 n.11.  The sentences to which defendant-intervenors refer cannot be fairly or reasonably read to leave any such impression.  It is clear from the context—and the fact that the district has never gotten an objection to any preclearance submission from the Department of Justice—that the district has never suggested that any federal official denied its requests to hold elections in a model home or the public school.  Indeed, for the district to erroneously suggest that it had received a §5 objection in the last ten years would be at cross purposes with the district's claim for bailout.

*Cf. League of United Latin Am. Citizens v. Perry*, __U.S. __, 126 S.Ct. 2594, 2663 (2006) (Roberts, C.J., concurring in part and dissenting in part) ("It is a sordid business, this divvying us up by race.").  Indeed, the Supreme Court has very recently affirmed that when a government actor makes decisions in which race "is *the* factor" such decisions are, to say the least, highly suspect constitutionally.  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, Nos. 05-908, 05-915, __S.Ct. __, 2007 WL 1836531, at *2 (June 28, 2007).  Thus, it would almost certainly be unconstitutional for the district to, as defendant-intervenors suggest 42 U.S.C. §1973*b*(a)(1)(F)(iii) requires it to do, select or reject persons willing to serve as election officials based solely on their race.  *Cf. Shaw v. Reno*, 509 U.S. 630, 654, 113 S.Ct. 2816, 2830 (1993) (noting that "in the context of a Fourteenth Amendment challenge, courts must bear in mind the difference between what the law permits and what it requires").

There is no evidence or indication that opportunities have ever been restricted for minority persons who wish to do so to serve as election officials in the district.  In any event, the district's participation in joint elections with Travis County since 2004 has increased the likelihood that the district's elections will be staffed by diverse personnel by, for example, ensuring that at least one Spanish-speaking pollworker will be onsite and by locating polling places for early voting in diverse areas throughout the county.  *See* Deposition of Dana DeBeauvoir, Ex. 14 at 58:15-18, 67:6-17; 75:11-12, 14-19.

## II.     SECTION 5 CANNOT BE CONSTITUTIONALLY APPLIED TO THE DISTRICT.

If the Court finds, for any reason, that the district is not eligible for bailout, it should further find that §5 cannot be constitutionally applied to the district because §5 is not a congruent and proportional exercise of Congress's remedial power under the Civil War Amendments. Defendants' arguments that the 2006 enactment of §5 is a congruent and proportional remedy

22

justified by a sufficient legislative record misconceive and distort the nature of both §5 and the congruence and proportionality analysis.

Section 5 is not, like §2 of the VRA or the statutes upheld in *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972 (2003), and *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978 (2004), a simple prohibition on discriminatory acts. Unlike any simple prohibitory measure, a requirement that the national government preclear policy choices of local governmental entities injects the federal government bodily into local law- and policymaking processes. That extraordinary remedy cannot be justified simply, as defendants tautologically suggest, by the recognition that the Civil War Amendments altered the federal structure by permitting federal intrusions into certain traditional state functions where that intrusion was not permitted before. *See Katzenbach*, 383 U.S. at 334, 86 S.Ct. at 822 (acknowledging that §5 is an "uncommon exercise of congressional power" and that "*exceptional* conditions can justify legislative measures not otherwise appropriate" (emphasis added)). "As broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell*, 400 U.S. 112, 128, 91 S.Ct. 260, 266 (1970) (opinion by Black, J.). The essence of the congruence and proportionality analysis is that it determines whether a particular federal intrusion into state functions has a sufficiently tight fit to a substantive constitutional right guaranteed by the Civil War Amendments to be an appropriate exercise of Congress's remedial powers to enforce those amendments. *See City of Boerne v. Flores*, 521 U.S. 507, 518, 520, 117 S.Ct. 2157, 2163-64 (1997). Simply put, the 2006 enactment of §5 cannot be constitutionally applied to the district if it is not (1) justified by a sufficient legislative record of pervasive, contemporary gamesmanship by local districts attempting to subvert constitutional guarantees by staying one step ahead of judicial correction and (2) appropriately limited in time, scope, and geographical reach.

23

**A.    Section 5 Cannot Be Constitutionally Applied to the District If It Is Not Supported by a Legislative Record of Gamesmanship, Which Defendants Have Not Shown and Cannot Show to Exist.**

As they did in their motions for summary judgment, defendants attempt to justify §5 preclearance largely by general evidence of voting discrimination that might justify the VRA as a whole, and in particular the substantive prohibitions against discriminatory state action contained in §2.   Defendants conflate and elide the concerns animating §§2 and 5, with the Attorney General going so far as to misrepresent *Katzenbach*'s statements about the purpose of the VRA as a whole as statements specific to the §5 prophylactic remedy.  *Compare Katzenbach*, 383 U.S. at 315, 86 S.Ct. at 812 (noting that Congress enacted the VRA *as a whole*, including its substantive prohibitions on voting discrimination, "to rid the country of racial discrimination in voting") *with* Attorney General Resp. 32 (asserting that *Katzenbach*'s statement referred specifically to §5).

But preclearance cannot be justified simply by showing that discrimination in voting continues to occur.  The federal veto power, and the concurrent preemptive invalidation of state and local legislation and rulemaking, is only conceivably justifiable by a showing that covered jurisdictions persist in attempting to purposefully discriminate by staying one step ahead of the courts.  *See Miller v. Johnson*, 515 U.S. 900, 926-27, 115 S.Ct. 2475, 2493 (1995); *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 1363 (1976); *Katzenbach*, 383 U.S. at 327, 337 86 S.Ct. at 818, 823.  For example, the legislative history of the 1975 enactment of §5 recognized that the preclearance requirement was based on realization of the "great lengths" to which jurisdictions had recently gone to violate the Fifteenth Amendment guarantee.  H.R. REP. No. 94-196 at 8; S. REP. 94-295 at 15.  And, contrary to defendants' assertions, the Supreme Court has expressly recognized that gamesmanship is the core problem targeted by the preemptive prophylactic of §5.  *Miller*, 515 U.S. at 926-27, 115 S.Ct. at 2493; *Beer,* 425 U.S. at 140, 96

S.Ct. at 1363; *Katzenbach*, 383 U.S. at 327, 337 86 S.Ct. at 818, 823.  As *Miller* explains, it was that problem that justified the serious federalism costs exacted by §5 in its original enactment. 515 U.S. at 926-27, 115 S.Ct. at 2493.

Further, to justify the 2006 enactment of §5, the legislative record must demonstrate that such gamesmanship persists to the present day and is prevalent in the covered jurisdictions or, at the very least, concrete evidence, not conclusory speculation, that such gamesmanship would arise and *abound* throughout jurisdictions currently covered if that coverage ceased.  The 1965 and 1975 enactments of §5 were upheld on their own terms as supported by sufficient findings of close-in-time electoral gamesmanship and appropriately limited by five- or seven-year termination dates.  *See City of Boerne*, 521 U.S. at 532-33, 117 S.Ct. at 2170-71.[7]  Congress itself has recognized that §5 has never been upheld as a perpetual remedy that can be repeatedly reauthorized without regard to changing circumstances.  For example, in 1982, the Senate Report identified that year's enactment of §5 as a "special remedy," intended to expire after 25 years absent a showing that it was still needed.  S. REP. No. 97-417 at 60.  That report further acknowledged that *Katzenbach* and *City of Rome* expressed the Supreme Court's concern about imposing the stringent preclearance remedy as a permanent fixture.  *Id.* at 61.

The Attorney General simply misstates the district's argument on §5's constitutionality.  The district does not assert that §5 was never a congruent and proportional remedy.  The district's argument is that, although a five-year enactment of §5 in 1965 and a further seven-year

---

[7] Contrary to defendant-intervenors' assertion, *Lopez v. Monterey County*, 525 U.S. 266, 119 S.Ct. 693 (1999), did not reach the constitutionality of the 1982 enactment of §5 and uphold that enactment as a general matter.  The constitutional question before the Court in *Lopez* was the one raised by California in its brief—whether §5 could be constitutionally applied to require preclearance of legislation enacted by a noncovered state when a covered locality sought to administer that change—not the constitutionality of §5 generally.  *Id.* at 282-84, 119 S.Ct. at 703; Brief for State Appellee State of California at 1, *Lopez*, 525 U.S. 266, 119 S.Ct. 693 (1999) (No. 97-1396); *cf.* Pamela S. Karlan, *Section 5 Squared: Congressional Power to Extend and Amend the Voting Rights Act*, 44 HOUS. L. REV. 1, 11-12 (2007) (acknowledging that "*City of Boerne*'s citation of only pre-1982 Voting Rights Act cases . . . might be taken to deliberately avoid passing on the question whether the 1982 extension of the preclearance regime satisfied the 'congruence and proportionality' requirements articulated in *City of Boerne*").

extension of preclearance in 1975 may have been appropriate legislation in the circumstances then existing, the 2006 enactment must be considered anew in the context of current conditions and as adduced in the current legislative record.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 n.6, 121 S.Ct. 955, 965 n.6 (2001) (invalidating parts of the ADA when the congressional record, although including evidence of historical measures like compulsory sterilization of the disabled, contained "no indication that any State had persisted in requiring such harsh measures as of 1990 when the ADA was adopted"); *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169 (requiring that the congressional record demonstrate "modern instances" of unconstitutional state action); *id.* at 533, 117 S.Ct. at 2170-71 (noting that the incarnation of §5 last upheld in *City of Rome* "lapsed in seven years").  Defendants effectively concede, as they must, that the extraordinary circumstances that once justified a time-limited preclearance remedy no longer exist.  *See, e.g.*, Defendant-Intervenors Resp. 32-33.  As the Attorney General acknowledges, if §5 failed to stem the emergency after 40 years, it was never an effective remedy.  Attorney General Resp. 14.  Defendants fail to show that there is a sufficient record of relevant conduct to support the 2006 enactment of preclearance as a congruent and proportional remedy.

      **B.**      **Comparison of the *Relevant* Legislative Record to Those at Issue in *Hibbs* and *Lane* Demonstrates That the Record Is Insufficient to Support the 2006 Enactment of §5.**

The statutes at issue in *Hibbs* (Family Medical Leave Act) and *Lane* (Title II of the Americans with Disabilities Act) directly prohibited the discriminatory conduct identified. *Hibbs*, 538 U.S. at 724-25, 123 S.Ct. at 1976; *Lane*, 541 U.S. at 516-17, 124 S.Ct. at 1984-85.  In the voting rights realm, those prohibitory statutes are analogous to §2, not §5.  The Supreme Court has never upheld a preemptive, preclearance-type remedy under the *City of Boerne* framework.

In *Hibbs*, the import of evidence that sex-specific leave policies by private employers had a discriminatory effect was that the same types of policies would necessarily have the same discriminatory effect when used by state employers, which, in the employment arena, are performing functions equivalent to those performed by private actors. *See* 538 U.S. at 728, 123 S.Ct. at 1978 ("The FMLA aims to protect the right to be free from gender-based discrimination *in the workplace*." (emphasis added)).  Thus, to uphold the FMLA, it was not necessary to demonstrate "that discrimination in the pub[l]ic sector mirrored that in the private sector." Attorney General Resp. 16.  It was merely necessary to show that the same prohibited conduct would have the same discriminatory effect whether practiced by a public or private employer.

In the context of §5, Congress seeks to regulate a quintessentially government function— not specifically discriminatory conduct, but rather local legislating and policymaking.  Thus, evidence of state action, specifically action involving the gamesmanship in the conduct of legislating and policymaking that makes case-by-case adjudication infeasible, was required.  The provision of the ADA upheld in *Lane*, although dissimilar from §5 in being a substantive prohibition rather than a preemptive federal veto, similarly involved public entities performing a quintessentially public function, in that case providing access to public services.  *See Lane*, 541 U.S. at 531, 124 S.Ct. at 1993 (noting the Court's finding "that Title II unquestionably is valid §5 legislation as it applies to the class of cases implicating the accessibility of judicial services").

### 1.    There Was No Congressional Finding of Gamesmanship, and There Is No Sufficient Record to Support One.

The relevant evidence in the 2006 legislative record, *i.e.*, the evidence of the one-step-ahead gamesmanship problem, is far from sufficient to justify reauthorizing preclearance. Congruence and proportionality may not require that 2006 conditions exactly mirror those in 1965, but there must be some evidence that they are at least remotely similar.  *See Garrett*, 531

U.S. at 369 n.6, 121 S.Ct. at 965 n.6; *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169.  Even if the entire handful of examples cited by defendants were true examples of electoral gamesmanship, they are far too few to show that such tactics are *pervasive* in covered jurisdictions.  Because isolated examples could be effectively dealt with by case-by-case adjudication, they provide no warrant for subjecting some 10,000, *see* Attorney General Resp. 27, jurisdictions to continuing §5 burdens.

Unable to point to any actual congressional findings of present-day "unremitting and ingenious defiance of the Constitution," *Katzenbach*, 383 U.S. at 309, 86 S.Ct. at 808, or that numerous jurisdictions are still "resort[ing] to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees," *id.* at 335, 86 S.Ct. at 822, defendants scour the record for the shards they assert could support such a finding.  But most of the purported examples offered by defendants are not even arguably indicative of problems similar to those existing in 1965.  For one thing, defendants attempt to equate the mere fact of repeat offenses with bad-faith gamesmanship.  *See, e.g.*, Defendant-Intervenors Resp. 39-42 & n.22.  The two are not the same. Gamesmanship involves a conscious and continuing effort to avoid the requirements of the VRA—"unremitting and ingenious defiance"—not merely a showing that some jurisdictions have problems getting it right.  And some of the repeat offenders cited as examples have not had an objection filed anytime in the recent past; the last objection was often a decade or two ago. *E.g.*, *id.* at 40 (last of three objections involving Grenada County, Mississippi occurred in 1987).

Further, in many of the examples proffered by defendants, there are large gaps of time, often a decade or more, between violations in a single jurisdiction.  *E.g.*, *id.* at 40 (citing

attempted changes in Mississippi voting registration over a period of more than a decade);[8] *id.* (citing redistricting changes in Grenada County, Mississippi separated by 11 years); *id.* at 41 (citing examples from Louisiana separated by several years). The essence of electoral gamesmanship is the race to stay one step ahead of the courts by changing to a new practice as soon as the old one is struck down, not temporally divergent changes that lag far behind the judicial process. Similarly, the same violation repeated multiple times, *see, e.g.*, *id.* at 42 n.22; H.R. REP. NO. 109-478, at 39-40, is not gamesmanship. Gamesmanship refers to efforts to use *different* discriminatory tactics to evade judicial correction, "ingenious defiance," not repeatedly butting headfirst into the same brick wall. Defendant-intervenors' response brief expressly recognizes that many jurisdictions simply resubmit an already prohibited or objected to proposal with little or no change. Defendant-Intervenors Resp. 41 (noting that "authorities were merely resubmitting objected-to proposals with 'cosmetic or no changes.'").

Moreover, several examples that defendants misleadingly suggest as evidence of repeat offenders simply are not. For instance, attempting to suggest that Bexar County, Texas is guilty of repeat offenses (which, in turn, defendants try to characterize as gamesmanship), defendant-intervenors lump together objections involving numerous individual political subunits, none of which they can show is individually guilty of iterative attempts to stay one step ahead of federal enforcement. *See* Defendant-Intervenors Resp. 38 n.20 (citing solitary violations or objections involving the State of Texas (statewide redistricting affecting Bexar County), the Edwards Underground Water District, Judson Independent School District, and the City of San Antonio); *see also* Defendant-Intervenors' Statement of Material Facts ¶¶634, 638, 642, 644, 647; *Voting*

---

[8] Moreover, Chandler Davison's quoted testimony suggesting undue delay in altering Mississippi's registration system is misleading in that it ignores that the system was not challenged until the mid-1980s and that soon after the challenge was brought "the challenged statutes were amended in the 1984 session of the Legislature and were submitted to the United States Attorney General for pre-clearance." *Miss. State Ch., Operation Push v. Allain*, 674 F.Supp. 1245, 1247 (N.D. Miss. 1987).

*Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 109-68, at 65 (2005); *Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 109-103, at 309 (2006); *Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 109-79, at 2473-75, 2463-65, 2451-53 (2005).  Similarly, examples defendant-intervenors attempt to attribute to Grenada County, Mississippi, Defendant-Intervenors Resp. 40-41, actually involved a school district and the City of Grenada.  Defendant-Intervenors' Statement of Material Facts ¶¶722, 869; *see also Modern Enforcement of the Voting Rights Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. J-109-75, at 138 (2006); *Continuing Need for Section 203's Provisions for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. J-109-84, at 235-52 (2006) (*June 13, 2006 Hearing*).  And defendant-intervenors' discussion of De Soto Parish, Louisiana, in addition to involving gaps of ten and 20 years between objections, also misleadingly ignores that they involve multiple jurisdictions, the parish (*i.e.*, police jury) and at least one school board, Defendant-Intervenors Resp. 41; Defendant-Intervenors' Statement of Material Facts ¶869, not a single persistent repeat offendor, let alone one engaging in one-step-ahead gamesmanship.  *See also June 13, 2006 Hearing*, *supra*, at 235-252.

Any of defendants' isolated examples that even arguably stand up to scrutiny as instances of gamesmanship could readily have been dealt with by §2, particularly if the Department of Justice's resources were not stretched thin by having annually to preclear thousands of unobjectionable preclearance submissions from compliant jurisdictions.  Congress cannot justify

using the big stick of §5, which hits a multitude of demonstrably compliant jurisdictions, to knock out isolated pockets of discriminatory conduct.

### 2.    Evidence of Racially Polarized Voting Is No Evidence of Gamesmanship.

Defendants' arguments about evidence of racially polarized voting also do not help them demonstrate a sufficient legislative record of relevant gamesmanship.  At most, evidence of racially polarized voting indicates the existence of the minimal conditions necessary for a particular type of voter discrimination to occur.  *See Shaw*, 509 U.S. at 641, 113 S.Ct. at 2823. That is not the same as evidence that such discrimination does occur, much less that it occurs by jurisdictions attempting to stay one step ahead of the courts.

At bottom, racially polarized voting amounts to discriminatory behavior by voters, private citizens making electoral choices based solely on race.  *See Rogers v. Lodge*, 458 U.S. 613, 647 n.30, 102 S.Ct. at 3272, 3291 n.30 (1982) (Stevens, J., dissenting);  Michael J. Pitts, *Section 5 of the Voting Rights Act: A Once and Future Remedy?*, 81 DENV. U. L. REV. 225, 261 (2003).  "Bloc racial voting is an unfortunate phenomenon," *Beer*, 425 U.S. at 144, 96 S.Ct. 1357 at 1365 (White, J., dissenting), but, in and of itself, that conduct by private actors has no constitutional implications.  *Cf. Shaw v. Hunt*, 517 U.S. 909-10, 116 S.Ct. 1894, 1903 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling [state] interest.");  *Freeman v. Pitts*, 503 U.S. 467, 495, 112 S.Ct. 1430, 1448 (1992) ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications.").  More importantly to this case, racially polarized voting is not remedied by §5.  Section 5 could only be justified by a showing that jurisdictions are pervasively and persistently making changes deliberately calculated to stay ahead of judicial correction, whether such changes relate to racial bloc voting or not.

**C.    Defendants' Attempts to Demonstrate That §5 Is Appropriately Limited in Time, Scope, and Geography Fail.**

Limitations like "termination dates, geographic restrictions, or egregious predicates . . . tend to ensure Congress' means are proportionate to ends legitimate under §5." *City of Boerne*, 521 U.S. at 533, 117 S.Ct. at 2170-71.  But defendants' attempt to defend §5's congruence and proportionality by relying on purportedly limiting factors like its termination date, geographical reach, and the provision for bailout fails because defendants' arguments based on those factors are fundamentally inconsistent with their own theories about §5's continued constitutionality and the district's eligibility for bailout.    Further, defendants fail to demonstrate that §5 is appropriately limited in scope.  *See id.* at 532, 117 S.Ct. at 2170 (noting that the Religious Freedom Restoration Act, which was held not to be congruent and proportional, had "[s]weeping coverage" that "ensure[d] its intrusion at every level of government").

**1.    Under Defendants' Theories, Termination Dates Are Meaningless.**

If the 2006 enactment of §5 could be upheld, then termination dates are meaningless. The 25-year-term of the 2006 enactment of §5 is already much longer than the five- and seven-year termination periods for the only two enactments of §5 that were previously upheld by the Supreme Court.  And the 2031 expiration date of the current provision means that §5 would not end, if ever, until nearly seven decades after its original enactment.   More fundamentally, defendants have argued both that the Supreme Court's precedents upholding the 1965 and 1975 enactments of §5 settle the constitutionality of the preclearance remedy for all time and that, in any event, Congress could justify the 2006 enactment on the basis of the historical evidence justifying the 1965 enactment.  If either of those propositions were true, then §5 has no effective termination date because it could be renewed in perpetuity based solely on the 1965 record.

Of course, defendants' assertions are not correct; the 2006 enactment of §5 must be assessed on its own terms in light of current conditions.  *See Garrett*, 531 U.S. at 369 n.6, 121 S.Ct. at 965 n.6; *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169; *Miller,* 515 U.S. at 927, 115 S.Ct. at 2493; *cf. Parents Involved*, 2007 WL 1836531, at *15 n.12 (noting that once a county had, as constitutionally required, eliminated "the vestiges of prior segregation," those previously existing circumstances could not continue to justify use of racial classifications); *Grutter v. Bollinger*, 539 U.S. 306, 343, 123 S.Ct. 2325, 2347 (2003) (noting, in approving state law school's race-conscious admission program, that "[w]e expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today").   But defendants cannot rely on a termination date while pressing their arguments that, if accepted, would make that date, which is already far in the future, illusory.

### 2.     Defendants' Ineffective Version of Bailout Could Never Save §5, Which Is Not Appropriately Limited in Geographic Scope.

Just as they cannot rely on time limits while arguing that perpetual renewal of §5 has already been judicially sanctioned, defendants cannot rely on bailout to trim the contours of §5's geographic scope while urging an interpretation of §4(a) that would make bailout impossible for the vast majority of covered jurisdictions.  *See Katzenbach*, 383 U.S. at 331-32, 86 S.Ct. at 820-21; Winke, *supra,* at 111.   At a bare minimum, to be congruent and proportional, such an intrusive remedy as §5 must be appropriately limited in geographic scope.  *See United States v. Morrison*, 529 U.S. 598, 626, 120 S.Ct. 1740, 1759 (2000) (invalidating the Violence Against Women Act's civil-remedy provision in part because it "applie[d] uniformly throughout the [n]ation," including to states with no history of discriminating against victims of gender-motivated violence).

Further, regardless of the theoretical availability of bailout, the geographic scope of the 2006 enactment of §5 is not tailored to fit any contemporary problem that may exist because coverage is based on 35-year-old data. The Attorney General does not even attempt to defend the 35-year-old coverage formula, and defendant-intervenors' effort to do so consists of unsupportable conclusory assertions. Merely reciting that the original or amended coverage formulas drew appropriate geographical lines in 1965 and 1975, *see* Defendant-Intervenors Resp. 58, does not answer the relevant question. The question is whether the formula as amended in 1975, relying on data from no later than 1972, draws appropriate lines in 2007. *See Garrett*, 531 U.S. at 369 n.6, 121 S.Ct. at 965 n.6; *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169. That question could not be answered without, at least, a serious evidentiary comparison of covered jurisdictions to noncovered ones.

Congress made no such comparison or findings, resting instead on generalized assertions that covered jurisdictions, considered in isolation, should remain covered. *Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006*, Pub. L. No. 109-246, §2(b)(3)-(5), (8), 120 Stat. 577 (referring to findings and evidence relating only to covered jurisdictions with no comparison to noncovered ones). The Attorney General can point to no congressional findings comparing covered jurisdictions to those left uncovered by the outdated formula and no significant evidence that such a comparison was undertaken. Instead, he points only to a couple of alleged indicators of discrimination (not electoral gamesmanship) buried in the record. *See* Attorney General Resp. 18 (citing evidence regarding the occurrence of §2 suits and racial bloc voting). When Congress attempts to single out states or their subdivisions for unequal treatment, such minimalist evidence is hardly

34

sufficient to substitute for a meaningful comparison between covered jurisdictions and their neighbors or other jurisdictions across the country.

Moreover, the examples the Attorney General cites are countered by evidence in the record of indicators that covered jurisdictions have been more successful than their neighbors at eliminating vestiges of discrimination. *See, e.g.*, Additional Views of Senators John Cornyn and Tom Coburn, S. REP. NO. 109-295, at 26 (2006) ("Today, the voter registration rate among blacks, for example, in covered jurisdictions is over 68.1 percent of the population—higher than the 62.2 percent found in non-covered jurisdictions . . . covered jurisdictions have demonstrated equal or higher voter registration rates among black voters as non-covered jurisdictions since the mid 1970's. Voter turnout data is equally encouraging, with 60 percent of black citizens casting votes in both covered jurisdictions and non-covered jurisdictions."); *Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing Before the Senate Judiciary Committee*, 109th Cong. 109-545, at 155 (2006) (Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act*) (noting that Texas's percentage of Latino voter registration is more than 10 points higher than the national average and several points higher than in California and Colorado, noncovered states with substantial Latino populations).

### 3. Section 5 Touches Too Much Constitutionally Benign Activity to Remain Congruent and Proportional.

Finally, defendants' observations that a prophylactic remedy can reach a broader swath of activity than actually reached by the substantive guarantees of the Constitution does not demonstrate that §5 is appropriately limited in scope. As the Supreme Court has repeatedly made clear, Congress's power to enforce the Civil War Amendments "includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a *somewhat*

broader swath of conduct" than that forbidden by the Constitution, *Kimel v. Florida Board of Regents*, 528 U.S. 62, 81, 120 S.Ct. 631, 644 (2000) (emphasis added), but not a hugely broader swath of activity.   Section 5 does not simply prohibit some voting changes that are constitutionally benign, it requires all changes affecting voting, as broadly conceived, to be vetted through the federal government.   The vast majority of activity reached by §5 is not unconstitutional, and the minimal amount of unconstitutional activity that §5 touches is already prohibited by §2.

Defendants arguments for the insufficiency of §2 also fail.   The argument that incumbent officeholders elected under a system later declared invalid in a §2 suit would enjoy a benefit in later elections is speculative, attenuated, and proves too much.   A similar rationale would permit other types of federal preclearance to avoid advantaging beneficiaries of discrimination.

The argument that the burden of a §2 suit on private plaintiffs is great compared to that imposed on covered jurisdictions by compliance with preclearance ignores that the primary burden of §5 transcends money.   The primary burden of §5 is the strain it puts on the federalist structure.   And §2's cost-shifting provision negates the alleged financial burden of a §2 suit. Moreover, the alleged difficulties of proving up a §2 case could be alleviated, if Congress so chose, by shifting the burden of proof in such cases.   In short, nothing warrants continuing to use the preemptive big stick of §5, a type of remedy that has never been attempted or recognized in any other context, in place of traditional enforcement of substantive prohibitions.

## CONCLUSION

For these reasons, and those more fully discussed in the district's opening memorandum and its memorandum in opposition to defendants' motions for summary judgment, the Court should grant the district's motion for summary judgment.

DATED:  July 6, 2007                          Respectfully submitted:

                                              /s/ Gregory S. Coleman
                                              Gregory S. Coleman
                                              (admitted *pro hac vice*)
                                              Christian J. Ward
                                              (admitted *pro hac vice*)
                                              PROJECT ON FAIR REPRESENTATION
                                              YETTER & WARDEN, L.L.P.
                                              221 West 6th Street, Suite 750
                                              Austin, Texas  78701
                                              [Tel.] (512) 533-0150
                                              [Fax]  (512) 533-0120

                                              /s/ Erik S. Jaffe
                                              Erik S. Jaffe
                                              D.C. Bar No. 440112
                                              ERIK S. JAFFE, P.C.
                                              5101 34th Street N.W.
                                              Washington, D.C .20008
                                              [Tel.] (202) 237-8165
                                              [Fax]  (202) 237-8166

                                              *Attorneys for Plaintiff*
                                              *Northwest Austin Municipal*
                                              *Utility District No. One*

## CERTIFICATE OF SERVICE

I hereby certify that I served Plaintiff's Reply in Support of Motion for Summary Judgment upon counsel for the parties indicated below through the Court's electronic case filing system on July 6, 2007.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

*Counsel for Defendant*


Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*


Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland  21215

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
    EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas  78205

*Counsel for Intervenors-Defendants Lisa
Diaz, Gabriel Diaz, and David Diaz*

Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York  10013

*Counsel for Intervenors-Defendants Rodney
and Nicole Louis for Applicants by Winthrop
Graham, Yvonne Graham, Wendy
Richardson, Jamal Richardson, and Marisa
Richardson*

David J. Becker
dbecker@pfaw.org
People for the American Way Foundation
2000 M Street NW, Suite 400
Washington, D.C.  20036

*Counsel for Intervenor-Defendant People
for the American Way*

J. Gerald Hebert
jghebert@comcast.net
5019 Waple *Lane*
Alexandria, Virginia  22304

*Counsel for Intervenor-Defendant Travis
County*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C.  20003

*Counsel for Intervenors-Defendants Lisa Diaz,
Gabriel Diaz, and David Diaz*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
    FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.  20005

*Counsel for Intervenors-Defendants Rodney and
Nicole Louis and for Applicants by Winthrop
Graham, Yvonne Graham, Wendy Richardson,
Jamal Richardson, and Marisa Richardson*

Max Renea Hicks
rhicks@renea-hicks.com
1250 Norwood Tower
114 West 7th Street
Austin, Texas  78701

*Counsel for Intervenor-Defendant Travis County*

Laughlin McDonald
Neil Bradley
courtfilings@aclu-nca.org
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, Georgia  30303

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Lisa Graybill
Legal Director
courtfilings@aclu-nca.org
ACLU FOUNDATION OF TEXAS
1210 Rosewood Ave.
Austin, Texas  78702

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Art Spitzer
artspitzer@aol.com
courtfilings@aclu-nca.org
Legal Director
ACLU OF THE NATIONAL CAPITAL AREA
1400 20th Street N.W., Suite 119
Washington, D.C.  20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jose Garza
jgarza@trla.org
Judith A. Sanders-Castro
George Korbel
Texas RioGrande Legal Aid, Inc.
1111 N. Main Street
San Antonio, Texas  78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Alpha Hernandez
ahernandez@trla.org
Eloy Padilla
epadilla@trla.org
Texas RioGrande Legal Aid, Inc.
309 Cantu Street
Del Rio, Texas  78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael T. Kilpatrick
mkirkpatrick@citizen.org
Brian Wolfman
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C.  20009

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, N.W., Suite 350
Washington, D.C.  20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas  78701

*Counsel for Intervenor-Defendant Nathaniel Lesane*

/s/ Christian J. Ward
Christian J. Ward