**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:06-CV-01384 (DST, PLF, EGS) |
| ALBERTO GONZALES, Attorney General of the United States, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF NAACP BRANCHES, AUSTIN BRANCH OF THE NAACP, RODNEY LOUIS, NICOLE LOUIS, WINTHROP GRAHAM, YVONNE GRAHAM, WENDY RICHARDSON, JAMAL RICHARDSON, MARISA RICHARDSON, LISA DIAZ, DAVID DIAZ AND GABRIEL DIAZ, PEOPLE FOR THE AMERICAN WAY, TRAVIS COUNTY, NATHANIEL LESANE, JOVITA CASAREZ, ANGIE GARCIA, AND OFELIA ZAPATA'S REPLY MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENORS' <u>MOTIONS FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.   THE DISTRICT IS INELIGIBLE FOR BAILOUT ............................................................2

  A.   The District's Bailout Arguments Misconstrue Section 4 .......................................2

  B.   The Definition of "Political Subdivision" Provided In The VRA Controls ............5

  C.   The District's Reliance On Legislative History Is Unavailing ...............................5

  D.   The District Does Not Meet The Statute's Bailout Criteria....................................6

II.  SECTION 5 IS CONSTITUTIONAL ................................................................................8

  A.   Once the District's Misstatements Concerning The Justification For
       Section 5 Are Rebutted, Its Claims About The Sufficiency Of The Record
       Collapse....................................................................................................................8

    1.   Section 5 Remedies And Deters Voting Discrimination ...........................8

    2.   Congress Properly Relied On The Full Range Of Record Evidence
         When Reauthorizing Section 5 .............................................................11

    3.   The District Continues To Mischaracterize The Congressional
         Record ....................................................................................................14

  B.   The "Narrow Tailoring" Doctrine Is Not Relevant Here........................................20

  C.   The District's Arguments Regarding The Coverage Formula Fail.......................22

  D.   Congress Properly Rejected The "Bull Connor Is Dead" Argument....................24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990) ................................................................5

*Allen v. State Board of Elections*, 393 U.S. 544 (1969) ....................................................13

*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) .................................20

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) .........................................................21

*Briscoe v. Bell*, 432 U.S. 404 (1977) ...............................................................................24

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .............................................1, 11, 21, 22

*City of Rome v. United States*, 446 U.S. 156 (1980) .............................3, 4, 6, 10, 11, 13

*Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987) ...............................................19

*Colautti v. Franklin*, 439 U.S. 379 (1979) ........................................................................5

*Conroy v. Aniskoff*, 507 U.S. 511 (1993) ...........................................................................6

*County Council of Sumter County v. United States*, 555 F. Supp. 694 (D.D.C. 1983) ..........................................................................................................10, 24

*Dougherty County Board of Education v. White*, 439 U.S. 32 (1978) ..............................5

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................................20, 21

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) .................................................................19

*Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) .................................................22

*League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594 (2006) ................14

*Lopez v. Monterey County*, 525 U.S. 266 (1999) .............................................................10

*Meese v. Keene*, 481 U.S. 465 (1987) .................................................................................5

*Miller v. Johnson*, 515 U.S. 900 (1995) ...........................................................................18

*Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) .......................21

*Parents Involved in Community Schools v. Seattle School District No. 1*, 2007 WL 1836531 (June 28, 2007) ...........................................................................1, 11

*Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000) ...........................................3

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997) .........................................15

*Reno v. Flores*, 507 U.S. 292 (1993) .........................................................................20

*Shaw v. Reno*, 509 U. S. 630 (1993) ..........................................................................18

\* *South Carolina v. Katzenbach*, 383 U.S. 301 (1966)........................................ *passim*

*Tennessee v. Lane*, 541 U.S. 509 (2004)................................................................18, 21

*United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994) ............................................20

## STATUTES AND REGULATIONS

42 U.S.C.
  § 1973b....................................................................................................2, 7, 8
  § 1973*l* ..........................................................................................................2

Pub. L. No. 109-246 (2006), 120 Stat. 577.................................................................13

28 C.F.R. Part 51 App. ...............................................................................................3

## LEGISLATIVE MATERIALS

H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437 ...........................3

H.R. Rep. No. 94-196 (1975)......................................................................................23

H.R. Rep. No. 109-478 (2006)................................................................................3, 16

S. Rep. No. 94-295 (1975)..........................................................................................23

S. Rep. No. 97-417 (1982)............................................................................................6

Conf. Rep. No. 89-711 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2578 ...........................3

*The Continuing Need for Section 5 Pre-Clearance:  Hearing Before the S. Comm.*
  *on the Judiciary*, 109th Cong. (2006) ("*May 16, 2006 Hearing*") ...................23

*Continuing Need for Section 203's Provisions for Limited English Proficient*
  *Voters:  Hearing Before the S. Comm. on the Judiciary*, 109th Cong.
  (2006) ("*June 13, 2006 Hearing*").......................................................................23

*To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) ("*October 18, 2005 Hearing*") ..................................16, 17

*Understanding the Benefits and Costs of Section 5 Pre-Clearance: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. (2006) ("*May 17, 2006 Hearing*") ...............................................16

*Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the H. Comm on the Judiciary*, 109th Cong. (2006) ("*March 8, 2006 Hearing*") ...............................................................................................18

## OTHER AUTHORITIES

Katz, Ellen D., *Not Like the South? Regional Variation and Political Participation Through the Lens of Section 2, in Democracy, Participation and Power: Perspectives on Reauthorization of the Voting Rights Act* (2007)......................................................................................................................12, 16, 17

Williamson, Richard A., *The 1982 Amendments to the Voting Rights Act: A Statutory Analysis of the Revised Bailout Provisions*, 62 Wash. U. L.Q. 1 (1986)..........................................................................................................................4

Lacking support for either its bailout or constitutional claims, the District substitutes its own political theories for the controlling legal rules established by Congress and the Supreme Court. In so doing, the District: disregards the bailout provision's statutory text, structure, and purpose, which make clear that the District is not a "political subdivision" eligible to seek bailout; repeats constitutional arguments rejected by the Supreme Court in *South Carolina v. Katzenbach*, *City of Rome v. United States*, and *Lopez v. Monterey County*; distorts the congruence-and-proportionality test so as to strip Congress of its expressly granted authority to remedy and deter unconstitutional conduct; argues that Congress may not reauthorize remedial legislation if it is effective (or ineffective); and ignores the compelling evidence from Texas and other covered jurisdictions of ongoing racial discrimination in voting.

The District's central arguments flow from its unfounded claim that some evidence of recent progress in voting discrimination renders Section 5 unconstitutional. However, the Supreme Court has foreclosed the District's approach by recognizing that the Voting Rights Act properly seeks to "'banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century.'" *City of Boerne v. Flores*, 521 U.S. 507, 525 (1997) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). Justice Kennedy's recent observations in a different context are apt here:

> Our Nation from the inception has sought to preserve and expand the promise of liberty and equality on which it was founded…. [O]ur tradition is to go beyond present achievements, however significant, and to recognize and confront the flaws and injustices that remain. This is especially true when we seek assurance that opportunity is not denied on account of race. The enduring hope is that race should not matter; the reality is that too often it does.[1]

---

[1]    *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 2007 WL 1836531, at *46 (June 28, 2007) (Kennedy, J., concurring in part and concurring in the judgment).

Section 5—the "heart of the VRA"—seeks to turn that enduring hope into a reality for voters in the covered jurisdictions. *South Carolina v. Katzenbach*, 383 U.S. at 315. Thus, as the Supreme Court has recognized time and again, Section 5 is valid enforcement legislation.

## I.    THE DISTRICT IS INELIGIBLE FOR BAILOUT

The Act's bailout provisions allow a "State or political subdivision" to seek a declaratory judgment in this Court to terminate the applicability of the requirements of Section 5. *See* 42 U.S.C. § 1973b(a)(1)(A)-(D) & (F), & 1973b(a)(3)-(4). The District is not a State. Nor is the District a "political subdivision" as the VRA defines that term because the District is not a county, does not conduct voter registration, and lies within a county that *does* conduct voter registration. *See id.* § 1973*l*(c)(2). Because it does not meet these required statutory criteria, the District is ineligible to seek bailout. This conclusion is supported by the bailout provision's text and structure, binding precedent, legislative history, and the longstanding interpretation by the Attorney General, the official charged with enforcing the statute. *See* D-I Opening Mem. [Dkt. No. 100] 21-25; D-I Opp. [Dkt. No. 111] 2-4. In its efforts to show otherwise, the District makes three basic errors: it misconstrues the Section 4 coverage provision; it inappropriately replaces Congress's definition of "political subdivision" in the Voting Rights Act with a state law definition; and it misreads the bailout provision's legislative history.

### A.    The District's Bailout Arguments Misconstrue Section 4

In its argument that it is eligible to bail out, the District reasons as follows: (1) the District is a jurisdiction covered by Section 5; (2) the VRA allows covered jurisdictions to bail out independently; and thus, (3) the District is eligible to bail out. This argument, however, is based on a misapprehension of the Act's coverage and bailout provisions.

Although one might refer to the District as a "covered jurisdiction" in light of the fact that the District must obtain preclearance of its voting changes, *see, e.g.*, *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 323 (2000), the District's obligations under Section 5 do not stem from the fact that the District itself falls within the Act's coverage formula, set forth in Section 4. Rather, the District is subject to Section 5 not because of any independent coverage determination concerning the District, but because—and only because—the District is a political subunit of (and subordinate to) the State of Texas. *See City of Rome v. United States*, 446 U.S. 156, 166 (1980) ("As we have noted, the city of Rome comes within the preclearance requirement because it is a political unit in a covered jurisdiction, the State of Georgia.").[2]

Since 1965, any jurisdiction that is *independently* covered under the Act may bail out; in 1982, Congress extended eligibility for bailout to "political subdivisions" as defined in Section 14(c)(2) that were not independently covered, but were within covered States. Smaller units of government that are, like the District, within a county that conducts voter registration become subject to the preclearance requirement—and may be released from that requirement—as a result

---

[2]     *See also* 28 C.F.R. pt. 51 app. (listing Texas, but not the District or any other of Texas's political subunits, as a jurisdiction to which Section 5 preclearance requirements directly apply); H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2464 ("The term 'political subdivision' is not intended to encompass precincts, election districts, or similar units where they are within a county or parish which supervises registration for voting."); Conf. Rep. No. 89-711 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2578, 2582 (adopting the House version of the statutory definition of "political subdivision"). The District's out-of-context statement from the legislative history that "[t]he expiring provisions of the Voting Rights Act allow any covered jurisdiction to remove itself from coverage[,]" Pl. Opp. [Dkt. No. 107] 17 (quoting H.R. Rep. No. 109-478, at 93 (emphasis from Pl. Opp. omitted)) is not inconsistent with Defendant-Intervenors' position. As noted above, the District is not *independently* covered by Section 5, but rather is subject to the preclearance obligations of that law because it is within the State of Texas, which is covered as a State; the District's ability to bail out is thus dependent on the bailout of Texas or, since 1982, Travis County.

- 3 -

of the coverage and bailout status of the State or "political subdivision" in which the subunit is located. *See* D-I Opp. 10-11, 13-15.[3]

*City of Rome* also disposes of any argument that there is a constitutional flaw in the fact that the District is required as a political subunit of the State of Texas to comply with the pre-clearance requirement—but cannot *independently* bail out. The rule the District advocates here—that Section 5 is unconstitutional unless every political subunit of a covered State that is required to preclear its voting changes may also independently bail out—was advanced by Justice Powell in *dissent* and rejected by the Court. Joined only by then-Justice Rehnquist, Justice Powell argued that "the Court's interpretation of § 4(a) renders the Voting Rights Act unconstitutional as applied to the city of Rome" and that "the Fifteenth Amendment provides no authority for continuing [preclearance obligations] until the entire State of Georgia satisfies the bailout standards." *City of Rome*, 446 U.S. at 200-201 (Powell, J., dissenting). The Court, however, stressed that the City of Rome was required to obtain preclearance of its voting changes because it was a political subunit of an independently covered jurisdiction—the State of Georgia—and sustained Section 5 as consistent with federalism principles and as valid enforcement legislation under the Fifteenth Amendment. *See id.* at 180-183. Similarly, here the District is subject to Section 5 pre-clearance obligations because of its subordinate relationship to the State of Texas, and may bail out through the State of Texas (or, in *addition*, through Travis County). *City of Rome* makes clear that this arrangement is constitutionally sound.

---

[3]    Professor Richard Williamson, whom the District describes as a "close observer" of the Act's 1982 amendments, Pl. Opp. 18, shares the Defendants' views. As the District acknowledges, Professor Williamson interprets Congress's 1982 Amendments to have liberalized the bailout eligibility provisions *only* to include States and "political subdivisions" as that term is defined in the Act. Pl. Opp. 23 n.8; Richard A. Williamson, *The 1982 Amendments to the Voting Rights Act: A Statutory Analysis of the Revised Bailout Provisions*, 62 Wash. U. L.Q. 1, 41 (1984) ("Congress specifically has authorized bailout by a 'political subdivision' (as defined for coverage purposes)[.]").

**B.    The Definition of "Political Subdivision" Provided In The VRA Controls**

Recognizing that it is not a "political subdivision" under Section 14(c)(2) of the Act, the District claims that Texas law is "determinative" of its ability to bail out. Pl. Opp. [Dkt. No. 107] 11. This argument is baseless because Congress, in Section 14(c)(2), expressly provided a definition for the term. When Congress defines a term in a statute's text, that definition controls and excludes meanings not included within the statutory definition. *See Meese v. Keene*, 481 U.S. 465, 484 (1987); *Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979). Further, to prevent federal law from turning on the vagaries of state law, courts presume, in the absence of a clear statement to the contrary, that when Congress enacts a statute it is not making the application of the federal act dependent on state law. *E.g., Adams Fruit Co. v. Barrett*, 494 U.S. 638, 643, 646-647 (1990).

The District cannot point to any legislative history indicating Congress's intent to defer to state law (and indeed, one can imagine the confusion that could ensue if the Attorney General had to examine disparate state laws to decide which jurisdictions could bail out). Instead, to support its theory that Texas law controls the definition of "political subdivision," the District only cites a reference to "state law" in *Dougherty County Board of Education v. White*, 439 U.S. 32, 43 & n.13 (1978). *See* Pl. Opp. 11. That citation is unpersuasive. Although *Dougherty* included a reference to Georgia law, the Court did not rely in any way on that fact in its analysis of the scope of coverage under Section 5. *See Dougherty*, 439 U.S. at 43-47 & n.13. In sum, the definition of "political subdivision" adopted by Congress in the VRA controls the construction of the term for bailout purposes.

**C.    The District's Reliance On Legislative History Is Unavailing**

The District's selective reliance on the legislative history is unavailing, for two principal reasons. First, the District improperly minimizes the weight of the history accompanying the 1982 amendments to the bailout provision, which demonstrates that Congress did *not* intend for

- 5 -

every political subunit in covered jurisdictions to be eligible for bailout, but rather drew the line at counties, parishes, and other jurisdictions that conduct voter registration (which the District does not). *See, e.g.*, S. Rep. No. 97-417, at 69 (1982). When Congress reenacts a statute, the legislative history surrounding an earlier enactment of the same Act is highly relevant.[4] Further, that Congress chose to defer the effective date for the 1982 amendments until 1984 does not, *contra* Pl. Opp. 18, indicate that Congress expected political subunits that do not register voters to seek bailout. Rather, Congress's 1982 amendments significantly expanded the class of jurisdictions eligible to seek bailout, and Congress indicated its intent to provide DOJ "sufficient time to prepare" for its new responsibilities in implementing the as-amended bailout eligibility provision. S. Rep. No. 97-417, at 69.

The District's approach to the 2006 legislative history raises a second problem. Although the District cites a number of highly generalized statements regarding the bailout provision in both 1982 and 2006, Pl. Opp. 17, Congress was well aware of the Supreme Court's holding in *City of Rome* and of the history surrounding its previous enactment. *See* D-I Opp. 10; Pl. Opening Mem. [Dkt. No. 99] 18-20. And as the District concedes, "[q]uite obviously, reenacting precisely the same language would be a strange way to make a change." Pl. Opening Mem. 18 (quoting *Pierce v. Underwood*, 487 U.S. 552, 567 (1988)).

### D.    The District Does Not Meet The Statute's Bailout Criteria

Further, even if the District were eligible to apply for bailout, the District has failed to carry its burden to show that it meets the statutory criteria. *See* Diaz Mem. [Dkt. No. 101] 26-30;

---

[4]    *See, e.g.*, *City of Rome*, 446 U.S. at 169 (in interpreting the bailout statute as reenacted in 1975, concluding that the 1965 legislative history of the bailout provision demonstrated "unambiguous congressional intent"); *Conroy v. Aniskoff*, 507 U.S. 511, 516-517 & n.11 (1993) (examining the legislative history of a 1918 federal statute in interpreting the Soldiers' and Sailors' Civil Relief Act of 1940 when the latter was "[i]n many respects ... a reenactment" of the former).

D-I Opp. 22-24. First, the District failed to comply with 42 U.S.C. § 1973b(a)(4), which requires that political subdivisions publicize locally their intent to seek bailout before filing suit before this Court. *See* Diaz Mem. 29; D-I Opp. 24.

Second, the District has failed to show that over the previous ten years it has "engaged in [any] constructive efforts, such as expanded opportunity for … the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process." 42 U.S.C. § 1973b(a)(1)(F)(iii); *see* Diaz Mem. 28; D-I Opp. 23.

Third, the District has made no attempt to comply with the requirement that it present to the Court "evidence of minority participation, including evidence of the levels of minority group registration and voting[.]" 42 U.S.C. § 1973b(a)(2). Rather, the District has given no regard to recent Census data about its minority voters and has not updated the racial and linguistic information in its preclearance submissions to the DOJ in more than ten years. *Compare* Pl. Mot. Summ. J. Ex. 5, at 2 (1996 submission) *with* Pl. Mot. Summ. J. Ex. 7, at 2 (2002 submission) and Pl. Mot. Summ. J. Ex. 9, at 2 (2004 submission); *see also* Qualtrough Dep. 72:21-74:11.[5] More-

---

[5] The District also fails to rebut Defendants' showing that the District failed in the past to comply with its Section 5 obligations. The District changed, and never pre-cleared, its method of election from pure at-large to numbered place for the 1992 and 1994 Board elections. *See* May 2, 1992 Ballot (Statement of Material Facts of Defendant Attorney General [Dkt. No. 98], Ex. 13); Order Canvassing the Returns and Declaring the Results of the May 7, 1994 Director Election (6/15/2007 Wolfson Decl. Ex. 2). The ballot for the 1992 Director election listed candidates running by numbered place and forced any write-in candidate to run head to head, in a numbered place, against a candidate already listed on the ballot. The ballot for the 1994 Director election also listed candidates by numbered place and instructed the voter to "Vote for the candidate of your choice for each director place[.] Vote for none or one for each director place." *See* May 7, 1994 Ballot (Statement of Material Facts of Defendant Attorney General [Dkt. No. 98], Ex. 15). Thus, in 1992 and 1994, the District employed un-precleared numbered place elections, departing from its previous practice of pure at-large voting and thereby eliminating the possibility of any minority single shot voting. Further, the District recently attempted to adopt numbered place voting again in the face of vocal minority voter opposition. *See* J.G. Diaz Decl. [Dkt. No. 101] (Perales Decl., Ex. 26) ¶ 13.

over, the District has not verified whether any minority resident has served on its Board. *See* Pl. Resp. to Defs.' SMF [Dkt. No. 107] 226 ¶ 1567.

Congress enumerated certain statutory factors that covered jurisdictions must demonstrate before achieving bailout. *See* 42 U.S.C. § 1973b(a). The District has the burden to show that it has satisfied those factors, and it has failed to do so.

## II. SECTION 5 IS CONSTITUTIONAL

The District's opposition brief does not attempt to meet the weight of Defendant-Intervenors' constitutional arguments, but instead repeats three fundamental errors from its initial memorandum. First, and most importantly, the District misstates Congress's justifications for Section 5—which have been repeatedly upheld by the Supreme Court. Second, the District attempts to salvage its claim by severing the preclearance trigger from the congressional record of voting discrimination in the State of Texas, an argument inconsistent both with binding Supreme Court authority and with the legislative record underlying Section 5's reauthorizations. Third, the District would import the Supreme Court's narrow-tailoring jurisprudence into the congruence-and-proportionality doctrine, an approach that finds no support in *Boerne* or any other precedent. When these misstatements are corrected, resolution of the constitutional claims is clear: Section 5 is valid enforcement legislation under the Fourteenth and Fifteenth Amendments and is consistent with principles of federalism.

### A. Once the District's Misstatements Concerning The Justification For Section 5 Are Rebutted, Its Claims About The Sufficiency Of The Record Collapse

#### 1. Section 5 Remedies And Deters Voting Discrimination

The District's constitutional arguments rest on fundamental misunderstandings of the justifications for Section 5 provided by Congress and repeatedly endorsed as constitutional by the Supreme Court. According to the District, Section 5 was not intended to remedy or deter—and could

not be justified as a means to remedy or deter—official racial discrimination affecting voting. *See* Pl. Opp. 51-73. The District further argues that Section 5's purpose is limited to preventing repetitive efforts to avoid the effect of federal court rulings striking down discriminatory voting practices—and can only be justified on that basis. *Id.* at 48. The District asserts that this "iterative" discrimination has largely disappeared. *Id.* at 41; *but see* D-I Opp. 36-42 (detailing the substantial evidence of gamesmanship by covered jurisdictions in the 2006 legislative record). Thus, goes the District's argument, to the extent that racial discrimination in voting remains a problem, those affected by it must resort to the laborious, expensive, case-by-case method that Congress has found to be inadequate: bringing suit under Section 2 of the VRA and the Fifteenth Amendment.

Under the District's cramped view, Section 5's reauthorization could be upheld *only* if the record before Congress demonstrated that covered jurisdictions were continuing to do in 2006 exactly what they were doing in 1965—evading legal proscriptions against racial discrimination in voting through "gamesmanship." In other words, according to the District, Section 5 may be upheld only if, after forty years, it had been a complete failure and jurisdictions were behaving exactly as they had in the Bull Connor era.

That submission cannot be accepted as a serious proposition of constitutional law, and, not surprisingly, the District fails to muster a single case in support of its theory. To the contrary, the District's explanation is at odds with the justifications underlying Congress's original enactment and subsequent reauthorizations of Section 5.

Although "ingenious" defiance of court orders in covered jurisdictions initially led Congress to conclude in 1965 that case-by-case litigation was no longer sufficient, *South Carolina v. Katzenbach*, 383 U.S. at 309, the goal of Section 5 has always been the elimination of "the blight of racial discrimination in voting" in particular jurisdictions with a history of persistent and per-

vasive voting-related discrimination, *id.* at 308.  Thus, in upholding Section 5 the first time, the Supreme Court emphasized that "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting," *id.* at 324, without suggesting that Section 5 could be justified *only* based on evidence that jurisdictions were manipulating their laws to avoid federal court rulings in persistent defiance of the Constitution.  Further, the Supreme Court has since made clear that Section 5, as reauthorized by Congress after extensive congressional review of the effect of and continuing need for the preclearance mechanism, also has the goal of "preserv[ing] the 'limited and fragile' achievements of the Act and … promot[ing] further amelioration of voting discrimination." *City of Rome*, 446 U.S. at 182.

Thus, although "gamesmanship" is certainly a *manifestation* of voting discrimination, it is the persistent nature of voting discrimination, its long-term consequences, and the heightened risk of the return of such discrimination in certain jurisdictions that underlie Congress's decision—and constitutional authority—to use its enforcement powers under the Reconstruction Amendments to reauthorize Section 5.  *See Lopez v. Monterey County*, 525 U.S. 266 (1999) (sustaining Section 5 as reauthorized in 1982 *without* considering evidence of gamesmanship); *City of Rome*, 446 U.S. 156 (same as to Section 5 as reauthorized in 1975); *see also County Council of Sumter County v. United States*, 555 F. Supp. 694 (D.D.C. 1983) (same as to 1982).

Further, the District's claim that *Lopez* did not address the "general constitutionality" of Section 5, *see* Pl. Opp. 44, is a particularly weak attempt to avoid the import of a decision that fundamentally undermines its theory.  *See Lopez*, 525 U.S. at 282, 284-285 (rejecting the State's argument that "§ 5 could not withstand constitutional scrutiny" under the Court's interpretation of the statute and concluding that Section 5 "intrudes on state sovereignty. *The Fifteenth Amendment permits this intrusion, however*[.]" (emphasis added)).

The District's assertion that Section 5 was justified only because of an "emergency" in voting discrimination as of 1965 is similarly flawed and has been fully refuted. *See* D-I Opp. 32-34. As the Court explained in *City of Rome*, both the original enactment of Section 5 and its reauthorizations in 1970 and 1975 were deemed necessary by Congress "to counter the perpetuation of 95 years of pervasive voting discrimination," 446 U.S. at 182—which followed, of course, more than two centuries of slavery of persons of African descent.[6]

### 2. Congress Properly Relied On The Full Range Of Record Evidence When Reauthorizing Section 5

Congress's reliance on the full range of record evidence, including the history of the enactment and prior reauthorizations, which tended to show the continuing need for Section 5, *see* D-I Opening Mem. 67-68, was entirely appropriate. Congress has justified its reauthorizations of Section 5 with a far broader set of evidence than the District suggests, both as to *timeframe* and to the *type* of evidence, and these justifications are constitutionally sound.

As to *timeframe*, the District would limit evidence Congress could appropriately consider to "today's America," Pl. Opp. 61, and "recent years," *see, e.g., id.* at 56, 63; *see also id.* at 64 (referring to the number of DOJ objections "[i]n the past 10 years").[7] But as Defendant-

---

[6]    *See also South Carolina v. Katzenbach*, 383 U.S. at 328 (noting that Section 5 was enacted "[a]fter enduring nearly a century of systematic resistance to the Fifteenth Amendment"); *cf. Parents Involved*, 2007 WL 1836531, at *46 (Kennedy, J., concurring in part and concurring in the judgment) ("Fifty years of experience since *Brown v. Board of Education* ... should teach us that the problem before us defies so easy a solution.").

[7]    What the District implies in its opposition brief concerning its position that evidence not extremely recent in 2006 is irrelevant, it makes explicit in its response to Defendants' Statement of Material Facts: "The district disputes that any facts preceding August 4, 1996[, 'the commencement of the statutorily material [bailout] 10-year period,'] are material to this *action*[.]" *See* Pl. Resp. to Defs.' SMF 2 (emphasis added). Of course, the constitutionality of Section 5 cannot turn upon a selective window that bears no relationship to the historical lens that the precedents require. *See, e.g., Boerne*, 521 U.S. at 525 ("'[t]he constitutional propriety of [legislation adopted under the Enforcement Clause] must be judged with reference to the historical ex-

Intervenors have established, the evidence of ongoing discrimination in covered jurisdictions since the 1982 renewal was similar to the evidence underlying the 1970, 1975, and 1982 renewals, and was independently sufficient to justify Section 5's 2006 reauthorization. *See* D-I Opening Mem. 41-69; D-I Opp. 59-63.  Moreover, the District's argument fails to accord sufficient deference to Congress's power to remedy and deter violations of the Fifteenth Amendment. Evidence underlying the 1965 enactment and the 1970, 1975, and 1982 reauthorizations, as well as record evidence from 1982 through the 2006 reauthorization, is highly probative of whether preclearance is still needed.  Given that Section 5 is predicated on Congress's perception that certain forms of discrimination in certain jurisdictions are particularly difficult to uproot, evidence of the long history and persistence of that discrimination is relevant.  With this history in mind, Congress properly exercised predictive judgment about the likely prevalence of unconstitutional conduct absent Section 5—an issue Congress was able (and institutionally best qualified) to address based on experience with the statute's actual operation.  *See* Ellen Katz, *Not Like the South?* at 26 (5/15/2007 Wolfson Decl. Ex. 5); D-I Opp. 34-35; D-I Opening Mem. 63-65; *id.* at 2-15 (discussing relevant historical evidence).

As to the *types* of evidence relied on, the District argues that the only evidence that could have justified reauthorization of Section 5 in 2006 was evidence that was both (a) of the kind of gamesmanship that was occurring in 1965, *see, e.g.*, Pl. Opp. 48 and (b) "preclearance-related," *id.* at 56 (capitalization altered).  This approach is unwarranted.

First, as established above, it is the persistent nature of voting discrimination and risk of the return of any such discrimination that underlies Congress's ability to use its enforcement powers under the Reconstruction Amendments.  Therefore, it was entirely appropriate for Con-

---

perience ... it reflects.'") (quoting *South Carolina v. Katzenbach*, 383 U.S. at 308) (alterations in *Boerne*); D-I Opening Mem. 67.

gress to rely in its 2006 reauthorization of Section 5 on evidence—in addition to gamesman-

ship—of second-generation barriers, many of which result from intentional discrimination.  In-

deed, as the Court has long made clear in the Section 5 context, "[t]he Voting Rights Act was

aimed at the subtle, as well as the obvious, state regulations which have the effect of denying

citizens their right to vote because of their race [and,] compatible with the decisions of this

Court, the Act gives a broad interpretation to the right to vote, recognizing that voting includes

all action necessary to make a vote effective."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 565-

566 (1969) (footnote and internal quotation marks omitted).[8]

Any doubt as to the constitutional propriety of Congress's reliance on second-generation

evidence is resolved by *City of Rome*.  There, the Court explicitly relied on second-generation

evidence to sustain Section 5's constitutionality, including evidence of "modest" gains in "mi-

nority political progress," and evidence that "[a]s registration and voting of minority citizens in-

creases[,] other measures may be resorted to which could dilute increasing minority voting

strength."  446 U.S. 180-181 (internal quotation marks omitted).  The evidence relied on by the

*City of Rome* Court bore no relationship to gamesmanship and reached well beyond the limited

scope of evidence the District would deem permissible.  Like the 1975 reauthorization, the 2006

reauthorization included substantial evidence of second-generation discrimination—culminating

in the statutory finding that "vestiges of discrimination in voting continue to exist as demon-

strated by second generation barriers constructed to prevent minority voters from fully participat-

ing in the electoral process."  Pub. L. No. 109-246, § 2(b)(2), 120 Stat. 577 (2006).  The fact that

conditions for minority voters have, in some respects, improved is evidence of Section 5's im-

---

[8]    In any event, the congressional record includes substantial evidence of ongoing "games-
manship" in many covered jurisdictions.  *See* D-I Opening Mem. 41-68; D-I Opp. 36-42.

portance, and does nothing to undo the Supreme Court's repeated pronouncements of its constitutional validity.

Second, the class of constitutionally relevant evidence is *not* limited solely to Section 5-specific data. Section 5 is one of a package of legal tools Congress has adopted in the VRA, as enacted originally and as reauthorized, to work together in combating official discrimination in voting in covered jurisdictions—some permanent, and some renewable. Under the District's approach, the Court should deem irrelevant the Supreme Court's finding in *League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594, 2622 (2006) (*LULAC*), that against the "background" of Texas's "long, well-documented history of discrimination," the State adopted a redistricting plan that violated the anti-vote dilution provision of Section 2 of the VRA and "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* (internal quotation marks omitted); *see also* D-I Opening Mem. 59; D-I Opp. 47-48 (discussing the 2006 reauthorization hearings on *LULAC*). But the different parts of the VRA—in particular Sections 2 and 5—are designed to complement each other, not to operate in a vacuum. *See, e.g.,* D-I Opp. 50, 57-58. Congress was entitled to consider evidence from non-Section 5 contexts like that in *LULAC* in deciding to reauthorize Section 5 because such evidence was probative of the ongoing need to remedy and deter discrimination in jurisdictions such as Texas that have a history of persistent voting discrimination.

### 3. The District Continues To Mischaracterize The Congressional Record

The District almost categorically dismisses the record before Congress in 2006 as not "material to summary judgment."[9] However, this record, which contains ample evidence of ongoing voting discrimination in Texas and other Section 5 covered jurisdictions, is relevant be-

---

[9]     Pl. Resp. to Defs.' SMF 11-225 ¶¶ 48-1546.

cause it documents the basis for Congress's determination that reauthorization of Section 5 was necessary to ensure that discrimination is stopped and would not reappear, thus imperiling the fragile gains that minority voters had made in covered jurisdictions. The District dismisses much of the evidence considered by Congress by claiming that the record does not "contain[] any meaningful evidence of a pattern of the specific conduct addressed by [Section] 5," Pl. Opp. 60, and that there are "no findings of discrimination on the part of state and local governments," *id.*, but concedes that it has not bothered to "independently verif[y] the accuracy of defendant-intervenors' representations of the legislative record." Pl. Resp. to Defs.' SMF 11-225 ¶¶ 48-1546. Despite its failure to independently review the record, the District urges this Court to overturn Congress's considered judgment regarding the continuing need for Section 5.

Defendant-Intervenors have elsewhere refuted the District's mischaracterizations of the legislative record, including the record of gamesmanship, D-I Opp. 36-42, objection statistics, *id.* at 42-45, racially polarized voting, *id.* at 44-48, deterrence evidence, *id.* at 49-50, and evidence of discrimination in voting by small governmental units, *id.* at 50-54, and will not repeat those explanations here. The District's opposition, however, introduces at least six additional errors concerning the congressional record.

First, the District suggests that the "Attorney General's … assertion that §2 is an inadequate remedy to address discrimination in voting is self-defining" and lacks a basis. Pl. Opp. 71. Yet both the Supreme Court and this Court have "consistently understood" Sections 2 and 5 to "combat different evils and, accordingly, to impose very different duties upon the States." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 476 (1997). Moreover, the District has nowhere even attempted to refute Defendant-Intervenors' showing of the extensive testimony by litigators and expert statisticians with voting rights litigation experience that remedies other than preclear-

ance—in particular Section 2—are "not sufficient at present to remedy and deter discriminatory voting practices." D-I Opening Mem. 66 & n.36 (summarizing testimony, including that the recent Charleston County Section 2 case required 2000 hours of work by private plaintiffs' lawyers, in addition to the many DOJ resources required to litigate the case).[10] The District nowhere attempts to undercut the conclusion in the House Report that removing Section 5's protections would "leave minority citizens with the inadequate remedy of a Section 2 action." H.R. Rep. No. 109-478, at 57 (2006); D-I Opening Mem. 66.

Second, the District suggests that the "incidence of actionable conduct occurs with as great or greater frequency outside the jurisdictions covered by preclearance." Pl. Opp. 42-43. The District provides no citation for this statement, which is apparently based on a comparison within a small subset of Section 2 cases brought in covered and non-covered jurisdictions. *See id.* at 42 & n.21.[11] In any event, the District's suggestion of underinclusiveness is of no conse-

---

[10]    The District's assertion that the heavy financial burden of litigating a Section 2 case is "undercut by the availability of fee-shifting under the VRA" is also misplaced. The record before Congress made clear that Section 2 cases can cost *millions* of dollars to bring or defend. *See, e.g., May 17, 2006 Hearing*, at 181; D-I SMF [Dkt. No. 100] ¶ 888. While successful plaintiffs are able to pursue recovery for attorney's fees (and, since 2006, the costs of expert witnesses), these fees are by no means guaranteed and in any event are at best contingent and future payments. The possible availability of attorney's fees in Section 2 cases thus does not convert Section 2 from a costly, after-the-fact remedy into an adequate substitute for the strong preclearance regime of Section 5.

[11]    For a number of reasons, the District's effort to compare covered and non-covered jurisdictions is misleading. The number of States with no covered jurisdictions is more than double the number of States with covered jurisdictions, rendering skewed any direct numerical comparison. Nonetheless, "plaintiffs won more Section 2 lawsuits in Section 5-covered jurisdictions than they did in non-covered jurisdictions … even though less than one-quarter of the U.S. population resides in a jurisdiction covered by Section 5." *See October 18, 2005 Hearing*, at 974 (report of Ellen Katz, *Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39 U. Mich. J.L. Reform 643 (2006) (citing 2000 U.S. Census)). Moreover, the documented rate of litigation success in reported cases was higher in covered jurisdictions than in non-covered jurisdictions since 1982, *see* Ellen Katz, *Not Like the South?* at 6-7 (5/15/2007 Wolfson Decl. Ex. 5) (also describing in covered jurisdictions a greater rate of judicial findings of electoral structures "that may enhance the opportunity for discrimination," *id.* 15-16, a lower rate of mi-

quence. *See South Carolina v. Katzenbach*, 383 U.S. at 330-331. The only issue of constitutional relevance for the Section 2 data is whether it tends to support Congress's decision to renew the preclearance regime, and the evidence makes clear that it does. *See* D-I Opening Mem. 58-59 (documenting more than 600 successful Section 2 cases in covered jurisdictions since 1982).

Third, in an apparent effort to minimize the scope of ongoing, unconstitutional discrimination against minority voters in covered jurisdictions, the District claims that in recent years there have been as many findings of constitutional violations against non-minority as against minority voters. To support this proposition, the District cites a statement in a report presented to Congress in which the authors characterized a report submitted by the ACLU of voting rights litigation it had been involved in since 1982 as demonstrating that as many courts found discrimination against white voters as have found discrimination against minority voters.[12] This characterization is simply not correct, and it also fails to account for the voluminous record of DOJ objection letters concerning purposeful discrimination against minority voters in covered jurisdictions since 1982.[13]

---

nority candidate success, *id.* at 20-21, and more extreme rates of racially polarized voting, *id.* at 14-15). Further, any comparison of the number of cases that is based on only reported decisions severely undercounts the number of successful Section 2 cases because it omits the many settled, and therefore unreported, Section 2 cases. *See, e.g., October 18, 2005 Hearing*, at 974 (collecting data, including testimony by a voting rights practitioner that less than four percent of his 211 Texas Section 2 cases have yielded a reported judicial decision).

[12]     *See* Pl. Opp. 56 (citing Edward Blum & Lauren Campbell, Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act, *May 17, 2006 Senate Hearing*, at 161 (2006)).

[13]     The Blum & Campbell report refers only to a subset of judicial findings and says nothing of the voluminous record of objection letters issued by the DOJ concerning purposeful discrimination against minority voters in covered jurisdictions since 1982, nor the findings by courts and DOJ of pervasive racial bloc voting. *See* D-I Opening Mem. 45. Indeed, analysis of Texas-based objections issued since 1982 reveals that approximately two thirds relied in whole or in part on findings of discriminatory purpose. The Blum & Campbell report also fails to note that the ACLU report documents that, in cases in covered jurisdictions in which the ACLU has been

Fourth, the District's claim that the 2006 legislative record consists primarily of "anecdotes," *see* Pl. Opp. 1-2, 52, and 70, is unsupportable.  A page-by-page survey of the over 16,000-page record indicates that approximately 4,000 pages come from federal sources (including objection letters issued by the Attorney General, more information requests (MIRs), complaints, and consent decrees, among other things) and over 2,900 pages come from studies and testimony submitted by social scientists.  These two sources represent roughly half of the legislative record and do not include the reports submitted into the record by public interest groups and civil rights organizations, *see* D-I Opp. 61 n.30.  Moreover, first-person anecdotal evidence bolsters the breadth of other constitutionally significant evidence of discrimination.  *See Tennessee v. Lane*, 541 U.S. 509, 527 (2004) (relying on first-hand accounts of discrimination); D-I Opp. 54-55 (rebutting the District's attack on anecdotal evidence).

Fifth, the District argues that Section 5 inflicts an unconstitutional burden on covered jurisdictions, *see, e.g.*, Pl. Opp. 59, but ironically, the District cites as its principal basis for suggesting that the evidence of discrimination has disappeared the fact that the DOJ objections rate

---

involved since 1982: there have been ten judicial findings of unconstitutional discrimination against minority voters (as opposed to the six findings acknowledged by the Blum & Campbell report); in 20 additional cases, courts have found Section 2 violations against minority voters or plaintiffs established a prima facie case of a Section 2 violation; and 101 additional cases raising Section 2 claims on behalf of minority voters have been settled. *See The Case for Extending and Amending the Voting Rights Act, Voting Rights Litigation, 1982-2006*, in *March 8, 2006 Hearing Vol. I*, at 378-1269; D-I SMF ¶ 326; *see also* D-I Opening Mem. 58-59.  The claim that non-minorities in covered jurisdictions have been the victims of discrimination in voting as frequently as minorities has no basis whatever in fact.

Further, the Blum & Campbell report seriously mischaracterizes even the small subset of cases it analyzes by asserting that cases in which courts upheld claims under *Shaw v. Reno*, 509 U.S. 630 (1993), constitute findings of unconstitutional discrimination against white voters.  A *Shaw* claim is "analytically distinct" from a claim that a voting restriction purposefully discriminates against a particular racial group.  As *Miller v. Johnson*, 515 U.S. 900, 911-913 (1995), explained, a *Shaw* claim is based on the Court's conclusion that *all* voters, of any race, may be harmed when race is unnecessarily the predominant factor in districting. *See id.*

has decreased, *id.* at 63-64. In any event, under Section 5, the only imposition for the vast majority of proposed changes is a short "suspension" period for the change before it goes into effect while the DOJ undertakes an administrative review that generally must be completed within 60 days, *see South Carolina v. Katzenbach*, 383 U.S. at 315-316. Indeed, the District concedes that it has never been unable to implement a single voting change due to the preclearance requirement. Pl. Resp. to Defs.' SMF at 229 ¶ 1603. Further, the unrefuted expert testimony is that the cost to the District of Section 5 compliance is nominal—less than $225 per year. *See* Report of Terry Musika (5/15/2007 Wolfson Decl. Ex. 4), ¶ 9 and Ex. F.

Finally, the District contends that there was a lack of unanimity in Congress regarding the need for and constitutionality of Section 5, and so the justification for the reauthorized law must somehow be considered less compelling. *See* Pl. Opp. 37 n.19. Of course, for very practical reasons, unanimity has never been required for any congressional enactment. The District's novel argument is based largely on the "Additional Views" of Senators Cornyn (who represents Texas) and Coburn in the Senate Report. This Senate Report, however, was not issued until after the Senate voted 98-0 to reauthorize Section 5. Thus, these "Additional Views" can hardly represent any genuine reflection of congressional uncertainty about the desirability or propriety of reauthorizing Section 5.[14] And, if the margin of the victory were relevant to Section 5's constitutional status, the fact remains that the Senate voted 98-0 and the House voted 390-33 to reauthorize. Indeed, the District's reliance on two Senators' post-enactment views is particularly ironic given that they both voted *for* reauthorization—a fact that underscores the irrelevance of the views they expressed after they cast their votes.

---

[14]    *See, e.g.*, *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2766 n.10 (2006) (giving no weight to statements inserted by lawmakers into the Congressional Record after floor debate on pending legislation); *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 407 (1987) (similar).

Once the District's fundamental misunderstandings about the justifications for Section 5 and the evidence in the 2006 legislative record are corrected, it is clear that Congress had an overwhelming basis on which to conclude that renewal of Section 5 was necessary to prevent the recurrence of racial discrimination in voting in the covered jurisdictions—discrimination that historically has proven extraordinarily difficult to eradicate. Nothing more is required under the Supreme Court's precedents to sustain Section 5.

### B.    The "Narrow Tailoring" Doctrine Is Not Relevant Here

Evidently grasping that the legislative record amply satisfies the requirements of congruence and proportionality set forth in *Boerne*, the District attempts to rewrite the *Boerne* standard by conflating the unrelated concepts of "narrow tailoring" and "congruence and proportionality" and arguing that narrow tailoring should be applied as part of the *Boerne* standard. *See* Pl. Opp. 65. That is a misstatement of the governing standard.

"Narrow tailoring" is associated with strict scrutiny. When legislation impinges on certain fundamental rights, it is presumed invalid and may only be sustained in those cases in which it is narrowly tailored to a compelling government interest.[15] This strict scrutiny standard is not fatal, and it must be applied with due consideration for context. *Grutter v. Bollinger*, 539 U.S. 306, 326-327 (2003). However, because strict scrutiny requires a particularly close fit between the law and the compelling government interest, laws may fail the narrow-tailoring test if they are deemed underinclusive or overinclusive. *See, e.g., Arkansas Writers' Project, Inc. v.*

---

[15]    *See, e.g., Reno v. Flores*, 507 U.S. 292, 302 (1993) (noting that the Fifth and Fourteenth Amendments "forbid[] the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest" (emphasis in original)); *United States v. Johnson*, 40 F.3d 436, 439 n.1 (D.C. Cir. 1994).

*Ragland*, 481 U.S. 221, 232 (1987). Narrow tailoring also requires that the legislature have considered less-restrictive alternatives. *Grutter*, 539 U.S. at 339-340.

The congruence-and-proportionality test of *Boerne* and its progeny is distinct from the narrow-tailoring requirement, and, not surprisingly, the District fails to cite a single authority to the contrary. Indeed, the Supreme Court has never suggested that the *Boerne* standard involves strict scrutiny in any way. Rather, the Court has consistently recognized that the purpose of the congruence-and-proportionality test is simply to determine whether legislation is remedial, and thus valid enforcement legislation. *See, e.g., City of Boerne*, 521 U.S. at 519-520; *Board of Trs. v. Garrett*, 531 U.S. 356, 365 (2001). The congruence-and-proportionality test does not examine whether the fit between a law and a compelling state interest is close enough to withstand strict scrutiny. Instead, in analyzing whether legislation is remedial, Congress has "wide latitude" and its conclusions are entitled to "much deference." *Boerne*, 521 U.S. at 520, 536. As a result, legislation is invalidated under the congruence-and-proportionality standard only when it is "'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Lane*, 541 U.S. at 533 (quoting *Boerne*, 521 U.S. at 532). Congruence and proportionality requires that prophylactic legislation reflect *reasonable* judgments on the part of Congress, not that the legislation be narrowly tailored to a compelling state interest.[16]

Similarly, the District's Venn diagram discussion incorrectly suggests (again without citation) that the *Boerne* test turns on a quantitative comparison between the number of constitu-

---

[16]    *See, e.g., Lane*, 541 U.S. at 533 (Title II of the ADA, in the context of court access, satisfies *Boerne* because the statute is "a reasonable prophylactic measure, reasonably targeted to a legitimate end"); *Nevada Dep't of Human Res. v. Hibbs* (2003), 538 U.S. 721, 734 (finding FMLA to be effective "remedial legislation" because Congress could "reasonably conclude" that existing state policies would be less effective).

tional violations and the set of activities implicated by a remedial statute. Pl. Opp. 54. So long as a statute enforcing the Fourteenth or Fifteenth Amendments can be understood as responsive to, or designed to prevent, unconstitutional conduct, it satisfies *Boerne* regardless of any hypothetical diagram representing an unmanageable and unnecessary numerical comparison.

The Venn diagram analysis reflects another of the District's fundamental mischaracterizations of *Boerne* and its progeny—the claim that *Boerne* requires Congress to amass a record that meets particular thresholds. *See, e.g.*, Pl. Opp. 50-51, 54. In fact, *Boerne* stated unequivocally that "[j]udicial deference, in most cases, is based not on the state of the legislative record Congress compiles but 'on due regard for the decision of the body constitutionally appointed to decide.' As a general matter, it is for Congress to determine the method by which it will reach a decision." *Boerne*, 521 U.S. at 531-532 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 207 (1970) (Harlan, J., concurring in part and dissenting in part)). Courts look to the legislative record not because Congress must compile one, but because courts can determine, based on that record, whether Congress had "reason to believe" that a prophylactic statute was necessary. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000). The legislative record in this case provided ample reason to believe that there was a need for Congress, once more, to exercise its broad Fourteenth and Fifteenth Amendment enforcement powers—here at their zenith—to protect the fundamental rights of minority citizens. *See* D-I Opening Mem. 37-69; D-I Opp. 31-32, 36-54. At the same time, Congress retained the numerous aspects of Section 5 that mitigate federalism concerns and that continue to ensure the law's congruence and proportionality. D-I Opening Mem. 70-73; D-I Opp. 55-56.

**C.    The District's Arguments Regarding The Coverage Formula Fail**

The District's arguments concerning the coverage formula are equally unavailing. The District claims that "the *original rationale* for including Texas as a covered jurisdiction in

1975—*i.e.*, failure to provide Spanish-language voting materials despite a sizeable Spanish-speaking population—was long ago remedied," Pl. Opp. 73 (emphasis added), and that "Texas is a covered jurisdiction *solely* based on proxies intended to align with discrimination against language minorities in the 1960s and early 1970s," *id.* (emphasis added). These contentions are erroneous, and they reflect the District's continuing misunderstanding of why jurisdictions such as Texas were initially covered and why Congress in 2006 decided, after careful study, to retain Section 5's applicability to covered jurisdictions, subject to the bailout and bail-in provisions.

The coverage formula was constructed as a tool for identifying discrimination and does not in any way alter Section 5's fundamental goal of eradicating all racial discrimination in voting in those jurisdictions with particularly long and egregious histories of such discrimination.[17] When Congress amended the coverage formula in 1975, its purpose was to remedy unconstitutional conduct in voting that had not been addressed by the original trigger. Congress determined, based on a U.S. Commission on Civil Rights report, twenty days of hearings between the two chambers, testimony from over sixty witnesses, and "overwhelming evidence" of discrimination, that language minorities faced significant levels of discrimination in states that were not covered through the 1965 coverage formula. In response to this extensive body of evidence, Congress adopted a revised coverage formula based on an alternate election-year marker (1972) aimed at reaching formerly non-covered jurisdictions, including Texas. *See* S. Rep. No. 94-295, at 24, 30, 32 (1975); H.R. Rep. No. 94-196, at 16, 22, 24 (1975); *see also* D-I Opening Mem. 10-12. The amended trigger remained a tool for identifying discrimination; Congress's goal remains

---

[17]    *See June 13, 2006 Hearing*, at 62-63 (testimony of Abigail Thernstrom that the coverage formula in 1965 "perfectly targeted the states and counties with egregious histories of Fifteenth Amendment violations"); *May 16, 2006 Hearing*, at 99 (testimony of Pamela Karlan observing that coverage formula "has always been both slightly over- and under-inclusive[, b]ut the trigger formula fit the problem closely enough").

now, as it was in 1975, to eliminate discrimination against Black and language-minority voters. Despite the District's suggestions to the contrary, *see* Pl. Opp. 73, Congress's goal was never simply to provide election materials in Spanish or increase turnout, even though those factors were used to create the trigger. *See Sumter County*, 555 F. Supp. at 707 ("Obviously, the pre-clearance requirements of the original act and its 1982 amendment had a much larger purpose than to increase voter registration in a county like Sumter to more than 50 percent.").

The District's claim that Texas continues to be covered based "solely" on an out-of-date proxy is simply not supported by the evidence of how Congress conducted its reauthorization analysis. Pl. Opp. 73. Defendant-Intervenors have already demonstrated the extensive record evidence before Congress of unconstitutional discrimination against minority voters that persists in Texas and other covered jurisdictions. *See* D-I Opening Mem. 13-15, 41-69. It was only after analyzing that evidence in the course of ten months and twenty one hearings—as reflected in the over-16,000 page record—that Congress decided that Section 5 should continue to apply to Texas and other covered jurisdictions to remedy and deter unconstitutional conduct.[18]

### D.    Congress Properly Rejected The "Bull Connor Is Dead" Argument

The District would have this Court strike down Section 5 because the District believes there is little evidence "of Jim Crow tactics" today. Pl. Opp. 42. With Bull Connor's death, goes the District's theory, so went the need for federal supervision of voting changes in jurisdictions that had historically denied the right to vote to racial minorities despite repeated federal attempts

---

[18]    *See also Briscoe v. Bell*, 432 U.S. 404, 414-415 (1977) (holding that other than through a bailout action, the Attorney General's Section 4(b) coverage determinations are final and unre-viewable, and sustaining this prohibition on judicial review as constitutional because "there can be no question that in attacking the pervasive evils and tenacious defenders of voting discrimina-tion [by promulgating Section 5], Congress acted within its 'power to enforce' the Fourteenth and Fifteenth Amendments 'by appropriate legislation'" (quoting *South Carolina v. Katzenbach*, 383 U.S. at 334)).

to combat the problem on a case-by-case basis. But by an overwhelming majority, Congress in 2006 rejected the "Bull Connor Is Dead" argument and reauthorized Section 5.

As William Faulkner observed in *Requiem For A Nun* (1951): "The past is never dead. It's not even past." The continuing presence of widespread unconstitutional conduct, racially polarized voting, and numerous other pieces of evidence that Defendants have detailed demonstrate that race remains divisive in the political process in covered jurisdictions. Accordingly, there remains a substantial basis for the ongoing concern that officials in jurisdictions with a legacy of persistent racial discrimination in voting will continue to manipulate the law to disadvantage minority voters. Bull Connor is gone, but the legacy of hundreds of years of racial discrimination remains.

Congress's considered judgment in 2006 of the continuing need for Section 5 to preserve the fragile gains secured by the VRA since 1965 was based on the extensive and powerful evidence before it, and should not be second-guessed by the judiciary. Section 5 remains a vital tool for protecting minority voters in covered jurisdictions, and because of the record evidence supporting reauthorization in 2006, continues to stand today, as in 1966, on strong constitutional footing.

## CONCLUSION

For the reasons set forth above and in the prior memoranda, summary judgment should be granted to the Defendant-Intervenors.


Respectfully submitted,

*/s/ Seth P. Waxman*

Seth P. Waxman (D.C. Bar No. 257337)
John A. Payton (D.C. Bar No. 282699)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Ariel B. Waldman (D.C. Bar No. 474429)
Daniel A. Zibel (D.C. Bar No. 491377)
WILMER CUTLER PICKERING HALE and
     DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Jon M. Greenbaum (D.C. Bar No. 489887)
Jonah H Goldman (D.C. Bar No. 497507)
LAWYERS' COMMITTEE FOR CIVIL
     RIGHTS UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 628-2858

Dennis C. Hayes (admitted *pro hac vice*)
General Counsel
NATIONAL ASSOCIATION FOR THE ADVANCEMENT
     OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
Facsimile: (410) 358-9350

*Counsel for Defendant-Intervenors*
*Texas State Conference of NAACP Branches and Austin Branch of the NAACP*

*/s/ Debo P. Adegbile*
Debo P. Adegbile

*/s/ Norman J. Chachkin*
Norman J. Chachkin (D.C. Bar No. 235283)
Theodore Shaw
President and Director-Counsel
Jacqueline A. Berrien
Ryan P. Haygood
Jenigh J. Garrett
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

Kristen M. Clarke (D.C. Bar No. 973885)
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005
(202) 682-1300

Samuel Spital
HOLLAND & KNIGHT
195 Broadway, 24th Floor
New York, NY 10007
(212) 513-3454

*Counsel for Defendant-Intervenors*
*Rodney and Nicole Louis; Winthrop and Yvonne Graham;*
*Wendy Richardson, Jamal Richardson, and Marisa Richardson*

*/s/ Nina Perales*
Nina Perales
MEXICAN AMERICAN LEGAL DEFENSE &
AND EDUCATIONAL FUND
Texas State Bar No. 240054046
110 Broadway, Suite 300
San Antonio, Texas 78205
(210) 224-5476 (telephone)
(210) 224-5382 (facsimile)
nperales@maldef.org

*/s/ Joseph E. Sandler*
Joseph E. Sandler
D.C Bar # 255919
Sandler Reiff & Young PC
50 E St SE # 300
Washington, D.C. 20003
Tel: (202) 479 1111
Fax (202) 479-1115
sandler@sandlerreiff.com

*Counsel for Defendant-Intervenors Lisa Diaz, David Diaz and Gabriel Diaz*

_/s/ David J. Becker_
David J. Becker (D.C. Bar No. 496318)
PEOPLE FOR THE AMERICAN WAY FOUNDATION
2000 M Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 467-4999

_Counsel for Defendant-Intervenor People for the American Way_

*/s/ J. Gerald Hebert*
J. Gerald Hebert
5019 Waple Lane
Alexandria, VA 22304
Telephone: (703) 628-4673
Facsimile: (202) 736-2222

Max Renea Hicks
101 West 6th Street
Suite 504
Austin, TX 78801
Telephone: (512) 480-8231
Facsimile: (512) 480-9105

*Counsel for Defendant-Intervenor Travis County, Texas*

*/s/ Laughlin McDonald*
Moffatt Laughlin McDonald
Neil Bradley
AMERICAN CIVIL LIBERTIES UNION
      FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, GA 30303-1227
Telephone: (404) 523-2721

Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION
1400 20th Street, NW, Suite 119
Washington, DC 20036
Telephone: (202) 457-0800
Facsimile: (202) 452-1868

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, NW, #350
Washington, DC 20036-6101
Telephone: (202) 898-4800
Facsimile: (202) 289-1389

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

Lisa Graybill
Legal Director
ACLU FOUNDATION OF TEXAS
1210 Rosewood Avenue
Austin, Texas 78702

*Counsel for Defendant-Intervenor Nathaniel Lesane*

*/s/ Jose Garza*
Jose Garza
Judith A. Sanders-Castro
George Korbel
TEXAS RIOGRANDE LEGAL AID, INC.
1111 N. Main Street
San Antonio, Texas 78212
210-212-3700
210-212-3772 (fax)

*/s/ Michael T. Kirkpatrick*
Michael T. Kirkpatrick (DC Bar No. 486293)
Brian Wolfman (DC Bar No. 427491)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-7728
202-588-7795 (fax)
mkirkpatrick@citizen.org

*Counsel for Defendant-Intervenors Angie Garcia, Jovita Casarez, Ofelia Zapata*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2007, I caused to be served a copy of the foregoing DEFENDANT-INTERVENORS TEXAS STATE CONFERENCE OF NAACP BRANCHES, AUSTIN BRANCH OF THE NAACP, RODNEY LOUIS, NICOLE LOUIS, WINTHROP GRAHAM, YVONNE GRAHAM, WENDY RICHARDSON, JAMAL RICHARDSON, MARISA RICHARDSON, LISA DIAZ, DAVID DIAZ AND GABRIEL DIAZ, PEOPLE FOR THE AMERICAN WAY, TRAVIS COUNTY, NATHANIEL LESANE, JOVITA CASAREZ, ANGIE GARCIA, AND OFELIA ZAPATA'S REPLY MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT to all counsel of record via the Court's CM/ECF filing system.

/s/ Daniel A. Zibel
Daniel A. Zibel