IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
NORTHWEST AUSTIN MUNICIPAL     )
UTILITY DISTRICT NUMBER ONE,    )
                                  )
        Plaintiff,         )
                                  )
      v.               )    Civil Action No. 1:06-cv-1384
                                  )
ALBERTO R. GONZALES,        )    Three-judge court
Attorney General of the United States,  )    (PLF, DST, EGS)
*et al.*,                        )
                                  )
        Defendants.     )
_____)

### DEFENDANT'S REPLY MEMORANDUM

# TABLE OF CONTENTS

**PAGE**

I.   Plaintiff Is Ineligible To Seek Bailout Under Section 4(a) ................................................. 1

   A.   The Text of The Act Precludes Plaintiff's Bailout Claim ...................................... 1

   B.   The Legislative History Refutes Plaintiff's Bailout Claim .................................... 3

   C.   Plaintiff's Other Arguments Regarding Bailout Are Unavailing ......................... 7

II.   Plaintiff Mischaracterizes The *Boerne* Test And The United States' Position ................. 8

   A.   This Court Should Review The Evidence Congress Amassed Of Violations
        Of Minority Citizens' Fundamental Right To Vote Free Of Discrimination ......... 9

      1.   Evidence Of Discrimination In Voting Against Minority Citizens Is
           Relevant To Section 5's Congruence And Proportionality ...................... 9

      2.   Plaintiff Cannot Demonstrate That The Evidentiary Record Before
           Congress In 2006 Was Insufficient In Comparison To The
           Evidentiary Records Before Congress Prior To Previous
           Reauthorizations ................................................................................. 15

   B.   Section 5 Is A Congruent And Proportional Means Of Enforcing Minority
        Citizens' Right To Be Free Of Discrimination ................................................... 18

CONCLUSION ........................................................................................................................ 21

# TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGE**

*Board of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001) .................................................... 10

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) .................................................... *passim*

*City of Rome* v. *United States*, 446 U.S. 156 (1980) .......................................... *passim*

*Dougherty County Bd. of Educ.* v. *White*, 439 U.S. 32 (1978) .................................................... 2

*Eldred* v. *Ashcroft*, 537 U.S. 186 (2003) .................................................... 6

*FDIC* v. *Meyer*, 510 U.S. 471 (1994) .................................................... 3

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000) .................................................... 10

*Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721 (2003) ............................ 10, 11, 12, 19, 20

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) .......................................... 9, 10, 12, 19, 21

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) .................................................... *passim*

*United States* v. *Board of Comm'rs of Sheffield*, 435 U.S. 110 (1978) .................................................... 2, 3

*United States* v. *Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) .................................................... 8

*United States* v. *Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547 (5th Cir. 1980) .................................................... 3

**CONSTITUTION & STATUTES:**

United States Constitution
    Fourteenth Amendment .................................................... 8, 9, 21
    Fifteenth Amendment .................................................... 8, 9, 21

29 U.S.C. 2612 .................................................... 20

Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*
    42 U.S.C. 12131 .................................................... 20
    42 U.S.C. 12132 .................................................... 20

Civil Rights Act of 1964 (Title VII), 42 U.S.C. 2000e *et seq.* .................................................... 19

**STATUTES (continued):**                                                        **PAGE**

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization
    and Amendments Act of 2006, Pub. L. No. 109-246, § 5, 120 Stat. 580-581 ................. 18

Pregnancy Discrimination Act, 42 U.S.C. 2000e(k) .................................................... 19

Voting Rights Act, 42 U.S.C. 1973 *et seq.*
    42 U.S.C. 1973 ............................................................................................... 3
    42 U.S.C. 1973b(a) ........................................................................................ 1
    42 U.S.C. 1973b(a)(1) ................................................................................... 1
    42 U.S.C. 1973b(b) ........................................................................................ 1
    42 U.S.C. 1973*l*(c)(2) ................................................................................... 2

Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, § 2(b)(2), 96 Stat. 131 ............... 4


**REGULATIONS:**

28 C.F.R. 35.130(b)(7) .............................................................................................. 20

28 C.F.R. Pt. 51 ........................................................................................................ 7


**LEGISLATIVE HISTORY:**

127 Cong. Rec. 22,903 (1981) ................................................................................... 6

127 Cong. Rec. 23,142 (1981) ................................................................................... 6

127 Cong. Rec. 23,146 (1981) ................................................................................... 7

127 Cong. Rec. 23,147 (1981) ................................................................................... 6

127 Cong. Rec. 33,180 (1981) ................................................................................... 6

128 Cong. Rec. 14,114 (1982) ................................................................................... 6

128 Cong. Rec. 14,151 (1982) ................................................................................... 6

128 Cong. Rec. 14,319 (1982) ................................................................................... 6

128 Cong. Rec. 14,336 (1982) ................................................................................... 6

**LEGISLATIVE HISTORY (continued):**                                    **PAGE**

H.R. Rep. No. 227, 97th Cong., 1st Sess. (1981) ....................................................... 4-6

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ......................................................... 4-6

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) ............................................... 13, 16

*To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) ...................................... 14

*Voting Rights Act:  Evidence of Continued Need: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) ............................................................ 14

*Voting Rights Act:  Hearing Before the Senate Comm. on the Judiciary*, 97th Cong., 2d Sess. (1982) ......................................................................................................... 7

*Voting Rights Act: Section 5 of the Act – History, Scope, & Purpose: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (2005) .................................. 14

Defendant Attorney General respectfully submits this reply memorandum in support of his Motion for Summary Judgment, and in opposition to Plaintiff's Motion for Summary Judgment. The United States emphasizes a few major points in response to Plaintiff's latest brief, without waiving any arguments or reiterating every aspect of every issue.

## I.    Plaintiff Is Ineligible To Seek Bailout Under Section 4(a)

Plaintiff is not a jurisdiction eligible to seek to bail out of the special provisions of the Voting Rights Act under Section 4(a), 42 U.S.C. 1973b(a). This is clear from the Act's explicit definition of the term "political subdivision," the Act's unambiguous legislative history, the *only* Supreme Court case to consider what type of jurisdictions may seek to bail out, and the Attorney General's Procedures for the Administration of Section 5.

### A.    *The Text Of The Act Precludes Plaintiff's Bailout Claim*

Under the current bailout provisions in Section 4(a)(1) of the Act, only three types of jurisdictions may seek to bail out: (1) "any State with respect to which the determinations have been made"; (2) "any political subdivision of such State * * * though such determinations were not made with respect to such subdivision as a separate unit"; and (3) "any political subdivision with respect to which such determinations have been made as a separate unit." 42 U.S.C. 1973b(a)(1). There is no dispute that Plaintiff cannot bailout under Section 4(a)'s first and third categories. Plaintiff is not a "State" or "political subdivision" for which a separate coverage "determination" has been made by the Attorney General and the Director of the Census as set forth in Section 4(b), 42 U.S.C. 1973b(b). Plaintiff does not contest this. Pl. Mem. 2.

There is a dispute regarding whether Plaintiff falls within the second category as a "political subdivision" within a fully covered State. Section 14(c)(2) defines a "political subdivision" as "any county or parish, except that where registration for voting is not conducted

- 2 -

under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."  42 U.S.C. 1973*l*(c)(2).  Plaintiff contends that this Court should ignore the statutory definition of "political subdivision" and instead rely on a state law or dictionary definition.  In support, Plaintiff cites two cases, *United States* v. *Board of Commissioners of Sheffield*, 435 U.S. 110 (1978), and *Dougherty County Board of Education* v. *White*, 439 U.S. 32 (1978), in which the Supreme Court held that Section 5's preclearance requirements extended to a city in Alabama and a school board in Georgia, respectively, even though the city and school board were not themselves "political subdivisions" under the definition in Section 14(c)(2) of the Act.  Pl. Opp at 12-13.  Plaintiff suggests that the term "political subdivision" therefore is not limited to the statutory definition.

The Supreme Court's decision in *City of Rome* v. *United States*, 446 U.S. 156 (1980), which is the only case to consider the question of what jurisdictions can bailout under Section 4(a), refutes Plaintiff's analysis.  In *City of Rome*, the Supreme Court concluded that "political subdivisions" in fully covered States could not seek to bail out under the then-existing version of Section 4(a).  446 U.S. at 168 & n.5.  The Court relied on the statutory definition of "political subdivision" in Section 14(c)(2) and the Act's 1965 legislative history in interpreting the scope of Section 4(a).  *Id.*  The Court in *Rome* expressly rejected the argument that its earlier decision in *Sheffield* meant that every covered political unit qualified as a "political subdivision" that could seek to bail out.  The cities in *Sheffield* and *Rome* were covered by Section 5 because they were part of a fully covered State, *not* because they met the Act's definition of a "political subdivision."  As the Court explained, "any political unit of the [covered] State must preclear new voting procedures under Section 5 regardless of whether the unit registers voters and

- 3 -

therefore would otherwise come within the Act as a 'political subdivision.'" *Id*. at 169.

Moreover, *Sheffield* "did not even discuss the bailout process" and "did not hold that cities such as Rome are 'political subdivisions.'" *Id*. at 168.[1]

While Congress amended the bailout provisions after *City of Rome* to add the second category to Section 4(a) allowing political subdivisions in fully covered States to seek bailout, Congress added this amendment knowing that *City of Rome* had relied on Section 14(c)(2)'s definition of "political subdivision" in interpreting the bailout provisions of Section 4(a). Hence, Plaintiff cannot substitute a dictionary or state law definition of the phrase "political subdivision" for the one that Congress explicitly included in the Act itself. The canon that courts should "construe a statutory term in accordance with its ordinary or natural meaning," comes into play *only* when a term is "not defined in the Act" itself. *FDIC* v. *Meyer*, 510 U.S. 471, 476 (1994). Thus, from the text of the Act, Plaintiff is not eligible to seek bailout under Section 4(a) because it is not a county, and in Texas, counties are the only entities that conduct voter registration.

B.     *The Legislative History Refutes Plaintiff's Bailout Claim*

In 1982, after *City of Rome* was decided, Congress amended the bailout provisions to allow "political subdivisions" in fully covered States to seek to bail out, even if those

---

[1] Plaintiff's citation to *United States* v. *Uvalde Consolidated Independent School District*, 625 F.2d 547, 555 (5th Cir. 1980), similarly does not assist its bailout argument. That case concerned solely the interpretation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973. In *Uvalde*, the Fifth Circuit noted that the Supreme Court has interpreted the terms "State" and "political subdivision" differently in different parts of the Act, and that in *Rome*, the Supreme Court had relied on the legislative history of the Act in discerning Congress's intent that cities did not fall within the statutory definition of "political subdivision" for bailout purposes. Here, Congress clearly expressed its intent in the 1982 legislative history that jurisdictions such as the Plaintiff fell outside the category of a "political subdivision" for bailout purposes.

- 4 -

subdivisions had not been separately designated for coverage. Pub. L. No. 97-205, § 2(b)(2), 96 Stat. 131 (1982). Although Plaintiff maintains that "there is no indication that Congress intended to give the term 'political subdivision' a specialized meaning for purposes of § 4(a)," Pl. Opp. 11, the committee reports and other legislative history reveal that Congress intended to give the term "political subdivision" in the bailout provisions of Section 4(a) precisely the meaning set forth in Section 14(c)(2) that the Court had utilized in *City of Rome*.

The amendment's relevant language was identical in the bills reported out by both the House and Senate Judiciary Committees. See H.R. Rep. No. 227, 97th Cong., 1st Sess. 49-50 (1981) (*1981 House Report*); S. Rep. No. 417, 97th Cong., 2d Sess. 83 (1982) (*1982 Senate Report*). The House and Senate reports clearly stated that Congress intended to define "political subdivision" by reference to the existing definition of that term in Section 14(c)(2):

> The standard for bail-out is broadened to permit political subdivisions, *as defined in Section 14(c)(2)*, in covered states to seek bail out although the state itself may remain covered.

*1981 House Report* 2 (emphasis added).

> The standard for bailout is also broadened by permitting political subdivisions in covered states, *as defined in Section 14(c)(2)*, to bail out although the state itself remains covered.

*1982 Senate Report* 2 (emphasis added).

These reports repeatedly define the scope of the new bailout amendments by reliance on the Act's definition of "political subdivision," and explicitly state that jurisdictions smaller than counties can seek bailout only when counties do not conduct voter registration.[2]  These reports

---

[2]  See *1981 House Report* 39 ("This amendment provides that political subdivisions within fully covered states may initiate a declaratory judgment action seeking to bail out

(continued...)

- 5 -

consistently describe the unit of government newly eligible to seek bailout as "counties."[3]  The

reports describe Congress's very deliberate decision not to permit governmental units smaller

than counties to bail out because of the overwhelming burden it would place on the Attorney

General and this Court to handle thousands of such cases.[4]  Committee reports are the best

---

[2](...continued)
independently of the state. * * *  When referring to a political subdivision this amendment refers
only to counties and parishes except in those rare instances in which the county does not conduct
vote[r] registration; only in such rare instances, such as independent cities in Virginia, can a
jurisdiction smaller than a county or parish file for bailout."); *1982 Senate Report* 69 ("certain
political subdivisions within full covered states may initiate a declaratory judgment action
seeking to bail out independently of the state. * * *  When referring to a political subdivision this
amendment refers only to counties and parishes except in those rare instances in which
registration is not conducted under the supervision of a county or parish.  In such instances, such
as independent cities in Virginia, a jurisdiction other than a county or parish may file for bailout.
A city with such registration may not bailout separately.").

[3] See *1981 House Report* 32 ("A major change in current law is that counties within fully
covered states will be allowed to file for bailout independently from the State."); *1982 Senate
Report* 44 ("The new bailout already constitutes a very substantial liberalization of the avenues
available to covered jurisdictions to end their preclearance obligation.  For example, individual
counties in covered states for the first time will be able to bail out separately even though the
state as a whole is not yet eligible to do so."); *id.* at 45 ("For the first time individual counties
within a fully covered state will be permitted to file for bail-out even though other counties and
the state government, itself, are not yet eligible to do so."); *id.* at 57 ("counties will now have the
opportunity to obtain exemption on an individual basis"); *ibid.* ("Counties within a covered state
are now eligible to bail out if they can demonstrate their record of non-discrimination."); *id.* at
60 ("A substantial number of counties may be eligible to bail out when the new procedure goes
into effect.").

[4] *1981 House Report* 41 (The 1982 amendment "represents a significant expansion of the
jurisdictions eligible to bail out without creating the prospect of unmanageable litigation in the
court."); *1982 Senate Report* 57, n.192 ("A coun[]ty seeking to bail out must show that all of the
subdivisions within its territory are eligible for bailout, as well.  Towns and cities within counties
may not bailout separately.  This is a logistical limit.  As a practical matter, if every political
subdivision were eligible to seek separate bailout, we could not expect that the Justice
Department or private groups could remotely hope to monitor and to defend the bailout suits.  It
would be one thing for the Department and outside civil rights litigators to appear in hundreds of
bailout suits.  It would be quite another for them to have to face many thousands of such actions
because each of the smallest political subunits could separately bail out.  Few questioned the
(continued...)

- 6 -

source for discerning congressional intent.  *Eldred* v. *Ashcroft*, 537 U.S. 186, 209 n.16 (2003)

("In surveying legislative history we have repeatedly stated that the authoritative source for

finding the Legislature's intent lies in the Committee Reports") (internal quotations and citations

omitted).  Cf. *City of Rome*, 446 U.S. at 169 (Supreme Court was "[b]ound by this unambiguous

congressional intent" reflected in 1965 House and Senate reports in interpreting Section 4(a) of

the Act).[5]

Plaintiff has offered no contrary specific legislative history.  At best, Plaintiff has offered

generalized statements that Congress intended to expand the number of jurisdictions that could

---

[4](...continued)
reasonableness and fairness of this cutoff in the House."); *1982 Senate Report* 69 ("This
limitation is a logistical one.  If the smallest of political subdivisions could bail out, the
Department of Justice and private groups would have to defend thousands of bailout suits.").

[5] Similarly, the floor debates in the House and Senate echo the Committee Reports in
noting that "counties" in fully covered States are the relevant governmental units newly enabled
to seek bailout by the 1982 amendments.  See 127 Cong. Rec. 22,903 (1981) (statement of Rep.
Sensenbrenner) ("The bailout provisions in H.R. 3112 will have a dual effect; an incentive is
created for the State to clean up its act * * * If not, then the counties and parishes will still be
permitted to bail out"); 127 Cong. Rec. 23,147 (1981) (statement of Rep. Conyers) ("we have
added an additional bailout procedure * * * which will allow for the first time counties to bail
out separate from States"); 127 Cong. Rec. 23,142 (1981) (statement of Rep. Railsback) ("in the
provision for bailout, counties will be permitted to bail out, and not just States."); 127 Cong.
Rec. 33,180 (1981) (statement of Sen. Moynihan) ("The provision allows bailout suits to be
brought * * * by either States or counties; but to bail out a State or county must meet certain tests
both for itself and for governmental units within it."); 128 Cong. Rec. 14,336 (1982) (statement
of Sen. Byrd) ("permitting individual counties to qualify for the bailout, even though their State
does not qualify at that time, is a commendable change"); 128 Cong. Rec. 14,114 (1982)
(statement of Sen. Mathias) ("For the first time individual counties in covered States would be
able to bail out separately even though the State as a whole is not eligible to do so."); 128 Cong.
Rec. 14,151 (1982) (statement of Sen. Dole) ("for the first time individual counties will be able
to bailout independently.  Under current law, they must wait until the State as a whole is able to
bailout."); 128 Cong. Rec. 14,319 (1982) (statement of Sen. Riegle) (S.1992 would "[p]ermit
jurisdictions, down to the county level, to be released from the preclearance requirement if they
can demonstrate a genuine record of non-discrimination in voting.").

- 7 -

seek to bail out in the 1982 amendments, and that Congress believed that these amendments

would allow many jurisdictions to bail out.  Pl. Opp. 16-19.  Although both statements are true,

they are completely consistent with Congress's very specific intent to expand the bailout option,

but only to the county level.[6]  See also U.S. Opp. 8 n.4 (explaining that the legislative history

behind the 2006 amendments includes statements from witnesses asking Congress to extend

bailout to the smallest jurisdictions, which Congress declined to do); Attorney General's

Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. Pt. 51

(reflecting the Attorney General's understanding of the Act – see U.S. Opp. 10-11).

      C.    *Plaintiff's Other Arguments Regarding Bailout Are Unavailing*

      This Court need not address Plaintiff's other arguments regarding bailouts.  Because

Plaintiff is ineligible to seek to bail out, there is no need to reach Plaintiff's argument, Pl. Opp.

27-36, that it meets the remaining bailout criteria in Section 4(a).  Similarly, Plaintiff argues that

Section 4 must be interpreted to permit jurisdictions such as Plaintiff to seek bailout on their own

in order to avoid "serious constitutional concerns."  Pl. Opp. 19-20.  The canon of constitutional

avoidance, however, "has no application in the absence of statutory ambiguity," *United States* v.

---

     [6] In 1982, Congress clearly understood that extending the bailout option to the county level involved roughly 900 jurisdictions – a number equal to including counties in fully covered states.  See also 127 Cong. Rec. 23,146 (1981) (Statement of Rep. Edwards) (answering question regarding whether thousands of bailout cases could be filed under the 1982 amendment, by stating "No. There are close to 900 counties involved"); *Voting Rights Act:  Hearing Before the Senate Comm. on the Judiciary*, 97th Cong., 2d Sess. 825 (1982) (Statement of Derfner) ("going to county level already increases the number of potential bailout suits from several dozen to 900"); *id.* at 196 (Letter dated Feb. 25, 1982, from William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, to Sen. Orrin Hatch) (The 1982 amendment would mean "a bailout suit could be brought by an individual county in a fully covered state.  There are more than 800 such counties.").

- 8 -

*Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001), and here the statute clearly precludes Plaintiff's bailout.  U.S. Opp. 8-9.

Next, Plaintiff argues that Section 5 is unconstitutional because Plaintiff cannot bailout on its own.  Pl. Opp. 25-27.  However, as discussed previously, the Supreme Court has twice upheld Section 5 as constitutional when only states and separately covered counties in non-covered states could bailout.  U.S. Opp. 25-30.  Plaintiff also argues that allowing bailouts only for counties in fully covered States would "reorder" state government.  Pl. Opp. 25-27.  Counties are logical units to seek bailout, however, because of their central role in registering voters and conducting elections.  Travis County in particular is a logical unit to seek bailout because it conducts voter registration and elections for all subjurisdictions in the county that hold elections.  U.S. Opp. 27-28.  Finally, Plaintiff's argument that bailout is restricted solely to Virginia jurisdictions, Pl. Opp. 22-25, is inaccurate, particularly given that every jurisdiction (besides Plaintiff) that has pursued a bailout claim since 1984 has been granted bailout with the Attorney General's consent.  U.S. Opp. 29-30.

For all these reasons, Plaintiff's bailout claim must fail.

## II.     Plaintiff Mischaracterizes The *Boerne* Test And The United States' Position

In arguing that the 2006 reauthorization of Section 5 was an unconstitutional exercise of Congress's authority under the Fourteenth and Fifteenth Amendments,[7] Plaintiff misunderstands the congruence and proportionality analysis articulated in *City of Boerne* v. *Flores*, 521 U.S. 507 (1997), and its progeny.  As explained in the United States' previous memoranda, the Supreme

---

[7] Plaintiff appears to have abandoned its "as-applied" challenge to the constitutionality of Section 5.  As explained in the United States' opening and opposition memoranda, U.S. Mem. 9 n.9; U.S. Opp. 49-53, Plaintiff cannot mount an as-applied challenge to the statute.

- 9 -

Court has instructed that, to assess whether a statute validly enforces rights guaranteed under the Fourteenth and Fifteenth Amendments, a court must (1) "identify the constitutional right or rights that Congress sought to enforce when it enacted" the statute in question; (2) inquire whether the history of violation of those rights is sufficient to warrant congressional action; and (3) determine whether the statute in question is a congruent and proportional means of protecting the rights at stake. *Tennessee* v. *Lane*, 541 U.S. 509, 522-530 (2004). In its opposition memorandum, Plaintiff conflates and misstates these distinct steps.

    A.    *This Court Should Review The Evidence Congress Amassed Of Violations Of Minority Citizens' Fundamental Right To Vote Free Of Discrimination*

As Plaintiff concedes, Pl. Opp. 51-52, Congress enacted Section 5 to protect the right of minority citizens to vote free of discrimination. See *South Carolina* v. *Katzenbach*, 383 U.S. 301, 315 (1966). The right to vote is fundamental, and the intentional infringement of that right on the basis of race or national origin is subject to strict scrutiny. See U.S. Mem. 11-12. On that much – the first step of the *Boerne* analysis – all parties agree. In its opposition memorandum, however, Plaintiff errs on the second step of the *Boerne* analysis by arguing that Congress exceeded its authority in 2006 when it reauthorized Section 5.

    1.    *Evidence Of Discrimination In Voting Against Minority Citizens Is Relevant To Section 5's Congruence And Proportionality*

As laid out in detail in the United States' opening memorandum, Congress collected a massive amount of evidence that minority voters in covered jurisdictions continue to face discrimination in voting. Rather than countering or even addressing that evidence, Plaintiff asserts that evidence of such discrimination is irrelevant to whether Section 5 remains a congruent and proportional means of preventing and deterring such discrimination. *E.g.*, Pl.

- 10 -

Opp. 42-43.  Plaintiff is mistaken.  In the second step of the *Boerne* analysis, courts must

examine the history of violations of the constitutional right that Congress seeks to protect and

enforce through the legislative remedy under review.  *See, e.g.*, *South Carolina*, 383 U.S. at 308-

315; *City of Rome*, 446 U.S. at 180-182; *Boerne*, 521 U.S. at 530-532; *Kimel* v. *Florida Bd. of

Regents*, 528 U.S. 62, 88-91 (2000); *Board of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 368-

374 (2001); *id.* at 377-382, 389-424 (Breyer, J., dissenting); *Nevada Dep't of Human Res.* v.

*Hibbs*, 538 U.S. 721, 729-738 (2003); *id.* at 745-754 (Kennedy, J., dissenting); *Lane*, 541 U.S. at

523-529; *id.* at 541-548 (Rehnquist, C.J., dissenting).

 Although Plaintiff agrees that Section 5 is intended to protect the right of minority

citizens to vote free of discrimination, Plaintiff insists that the United States and Congress err in

relying on evidence of infringement of that right in covered jurisdictions.  Rather, Plaintiff

asserts that the *only* evidence relevant to the continuing validity of Section 5 is evidence of  "a

systematic pattern of covered jurisdictions recently engaging in concerted efforts to game the

system to the disadvantage of minorities by acting preemptively to impose new barriers to voting

once old barriers are judicially deemed unenforceable."  Pl. Opp. 58-59.  In other words, Plaintiff

argues that, in exercising its authority under the Reconstruction Amendments, Congress must

work backwards by identifying a pattern of hypothetical violations of the statutory remedy it

intends to enact.  Not surprisingly, Plaintiff's strained interpretation of the *Boerne* analysis finds

no support in any Supreme Court case.

 Instead, the Supreme Court's recent decisions indicate that Plaintiff's view of the *Boerne*

test is incorrect.  In *Nevada Department of Human Resources* v. *Hibbs*, 538 U.S. 721, 728

(2003), upholding the family leave provisions of the Family and Medical Leave Act (FMLA),

- 11 -

the Supreme Court determined that the FMLA was intended to protect the right of state and local government employees "to be free from gender-based discrimination in the workplace."  As noted in the United States' memorandum in opposition, however, the FMLA does not prohibit gender-based discrimination – or, indeed, any discrimination at all – but instead grants to all employees the right to take up to twelve weeks of unpaid leave annually in certain family leave situations.  In fact, the Supreme Court subsequently noted that there was "no suggestion" in *Hibbs* "that the State's leave policy was adopted or applied with a discriminatory purpose that would render it unconstitutional."  *Lane*, 541 U.S. at 519.  Yet Plaintiff concedes that, in applying the *Boerne* analysis to the FMLA, the Supreme Court examined the record before Congress of violations of the constitutional right at stake, not merely the record of state employers' failure to provide equal amounts of family leave to male and female employees.  As Plaintiff states, "the Court 'inquire[d] whether Congress had evidence of a pattern' of sex discrimination in the workplace by states."  Pl. Opp. 60 (quoting *Hibbs*, 538 U.S. at 729).

Similarly, in *Tennessee* v. *Lane*, 541 U.S. 509 (2004), the Court upheld Title II of the Americans with Disabilities Act (ADA) as applied to the court access context.  Title II of the ADA requires state and local government entities to provide reasonable accommodations in the provision of government services to qualified individuals with disabilities.  In reviewing the record supporting the enactment of Title II, however, the Court did not limit itself to instances in which government entities engaged in the specific behavior ultimately prohibited through Title II – namely, failing to provide reasonable accommodations to persons with disabilities.  Rather, after finding that Congress enacted Title II of the ADA to enforce the Equal Protection Clause's "prohibition on irrational disability discrimination" as well as "a variety of other basic

- 12 -

constitutional guarantees," 541 U.S. at 522-523, the Court reviewed the record Congress had

amassed of government entities' violating the rights Congress sought to protect through Title II,

541 U.S. at 523-529 (cataloguing "the sheer volume of evidence demonstrating the nature and

extent of unconstitutional discrimination against persons with disabilities in the provision of

public services").

Just as Congress and the Supreme Court looked at evidence of violations of the

underlying constitutional rights at stake in *Hibbs* and in *Lane*, so Congress looked at violations

of the underlying constitutional right protected by Section 5 prior to reauthorizing the statute in

2006. Moreover, as explained in more detail in the United States' memorandum in opposition,

the amount and quality of evidence the Supreme Court found sufficient in recent cases is

eclipsed by the amount and quality of evidence Congress amassed in support of its 2006

reauthorization of Section 5. U.S. Opp. 15-16; see also Def.-Int. Mem. 68-69.

In 2006, Congress examined all types of violations of minority citizens' constitutional

right to vote free of discrimination. The Supreme Court has previously upheld Section 5's

constitutionality based on such a comprehensive review. Contrary to Plaintiff's assertion, the

Supreme Court in *South Carolina* did not rely solely on evidence of "gamesmanship" by covered

jurisdictions in upholding Section 5. Rather, the Court evaluated Section 5 by examining

evidence of "actual voting discrimination" in covered jurisdictions. 383 U.S. at 329; *id.* at 310-

315. In *City of Rome*, too, the Court examined evidence of discrimination against minority

voters in covered jurisdictions, concluding that Congress was justified in determining that more

time was needed "to counter the perpetuation of 95 years of pervasive voting discrimination."

446 U.S. at 182; *id.* at 180-181. The Court did not rely on, or even suggest that it needed to rely

- 13 -

on, evidence of ongoing efforts by covered jurisdictions to avoid judicial efforts to remedy

voting discrimination.

Moreover, as noted in the United States' memorandum in opposition, Congress had

before it in 2006 evidence that covered jurisdictions continue to evade enforcement of Section 5

and the rest of the Voting Rights Act.  See U.S. Opp. 38-39; Def.-Int. Opp. 36-42.  Indeed,

Congress concluded in 2006 that in recent years,

> voting changes devised by covered jurisdictions resemble those techniques and
> methods used in 1965, 1970, 1975, and 1982, including:  enacting discriminatory
> redistricting plans; switching offices from elected to appointed positions;
> relocating polling places; enacting discriminatory annexations and deannexations;
> setting numbered posts; and changing elections from single member districts to
> at-large voting and implementing majority vote requirements.

H.R. Rep. No. 478, 109th Cong., 2d Sess. 36 (2006) (*2006 House Report*).  One recent example

of a covered jurisdiction's efforts to evade the requirements of the Act involves Kilmichael,

Mississippi.  In 2001, an unprecedented number of African-American candidates ran for local

office, and new Census data revealed that African Americans had become a majority of the

town's population.  *Id.* at 36-37.  Three weeks prior to the election, the town's mayor and the all-

white five-member Board of Aldermen canceled the election.  *Ibid.*  Even after the Attorney

General interposed an objection, finding that the cancellation was calculated to retrogress the

voting strength of African-American voters, the town refused to reschedule the election until the

Department of Justice forced it to hold one in 2003.  *Ibid.*; Letter from Ralph F. Boyd, Jr. to J.

Lane Greenlee (Dec. 11, 2001) (re: Kilmichael, MS), in *Voting Rights Act: Section 5 of the Act –*

*History, Scope, & Purpose: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st

Sess. 1616-1619 (2005).  When the citizens of Kilmichael finally voted, they elected the town's

first African-American mayor and three African-American aldermen.  *2006 House Report* 37.

- 14 -

The sequence of events in Kilmichael, Mississippi, is merely one example of both (1) a type of strategic behavior that Section 5 targets, and (2) the effectiveness of Section 5 as a remedy for such behavior.  Other examples abound, including the following: the State of Louisiana's inability to submit a single non-retrogressive State House of Representatives redistricting plan since 1965, *To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 16 (2005) (Testimony of Morial); the extensive efforts of election officials in Waller County, Texas, to prevent African-American students at Prairie View A&M University from voting, U.S. Mem. 38, Def.-Int. Opp. 38-39; and numerous jurisdictions' pattern of repeatedly enacting retrogressive voting changes, *e.g.*, *Voting Rights Act:  Evidence of Continued Need: Hearing Before the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 63 (2006) (*Evidence of Continued Need*) (Statement of Henderson) (noting that, in Texas alone, 28 of the 72 counties in which objections have been interposed have "demonstrated a pattern of repeat offenses").

Thus, there is no basis for Plaintiff's claims either that recent evidence of such evasive behavior is the only type of evidence relevant to the question whether Section 5 remains congruent and proportional legislation, or that Congress failed to find any such evidence. Indeed, as explained in the United States' memorandum in opposition, U.S. Opp. 37-39, Congress adopted the preclearance remedy to remove the opportunity for covered jurisdictions to engage in such gamesmanship.  The fact that Congress's chosen remedy has been and continues to be successful supports, rather than undermines, the appropriateness of the remedy.  Under Plaintiff's view of congruence and proportionality, Congress could not reauthorize a statutory remedy unless it finds that the targeted constitutional problem continues unabated – in other

- 15 -

words, only ineffective remedies would be congruent and proportional.  That simply cannot be the state of the law.  Just as Congress is entitled to take into account when previous legislative attempts have failed to remedy a problem, so is Congress entitled to take into account when a chosen remedy succeeds.

> 2.    *Plaintiff Cannot Demonstrate That The Evidentiary Record Before Congress In 2006 Was Insufficient In Comparison To The Evidentiary Records Before Congress Prior To Previous Reauthorizations*

As explained in detail in the United States' opening and opposition memoranda, the record Congress amassed in 2006 of discrimination against minority voters in covered jurisdictions mirrors the records previous Congresses amassed prior to previous reauthorizations. U.S. Mem. 12-53; U.S. Opp. 13-19.  Beyond merely asserting that it "is untrue" that "Congress [in 2006] relied on the same types and sources of evidence that it had relied on in previous reauthorizations," Pl. Opp. 62, Plaintiff does not even attempt to refute the United States' argument.  Nor could it.

Plaintiff asserts that "Congress did not find that the same level of first-generation barriers still exist" today.  Pl. Opp. 62-63.  This assertion demonstrates a lack of familiarity with the record of discrimination in 2006 as well as the records of discrimination amassed by previous Congresses.  Congress has found over the life of Section 5 that, as first generation barriers to registration and participation began to fall away, second generation barriers arose.  Congress made that finding in 1969, 1975, 1981, 1982, and again in 2006.  See U.S. Opp. 35-37; U.S. Mem. 40-44.  Plaintiff simply ignores this evidence.

Moreover, the earlier legislative records leave no doubt that Congresses throughout the last forty years have relied on the same types of evidentiary sources in finding a consistent

- 16 -

pattern of voting discrimination in covered jurisdictions. Indeed, Congress concluded in 2006 that the evidence before it "resembles the evidence before Congress in 1965 and the evidence that was present again [when Congress reauthorized Section 5] in 1970, 1975, [and] 1982." *2006 House Report* 6. Specifically, in 2006 Congress relied on evidence from enforcement of all aspects of the Voting Rights Act, as well as anecdotal and statistical evidence, just as it had in 1970, 1975, and 1982. U.S. Mem. 18-37. In such sources, Congress in 2006 found ample evidence that minority voters were subject to intimidation and harassment, and that covered jurisdictions continue to employ dilutive techniques to prevent minority citizens from having a fair opportunity to elect their candidates of choice.[8] U.S. Mem. 38-46. Moreover, Congress found in 2006 – as it had prior to every previous reauthorization – that enforcement of Section 5 had allowed minority voters to move towards an equal opportunity to participate in the electoral process. U.S. Mem. 8, 18-19; U.S. Opp. 31-33. However, every Congress considering reauthorization, including Congress in 2006, also found that the progress was fragile, insufficient, and needed protection by further enforcement of Section 5. U.S. Mem. 8-9, 18-19, 28-31; U.S. Opp. 34-41. Plaintiff offers neither evidence nor argument to refute the extensive evidence of covered jurisdictions' discriminating against minority voters amassed by multiple Congresses over the years.

---

[8] Indeed, on June 25, 2007, the Attorney General interposed an objection to the City of Fayetteville, North Carolina's change in the method of electing members of its City Council. The city proposed changing from nine single-member districts to six single-member districts and three at-large seats. The Attorney General objected after finding that the proposed change, combined with the existence of racially polarized voting, would impair African-American voters' opportunity to elect representatives of their choice to the council. Letter from Wan J. Kim to Michael Crowell (June 25, 2007).

- 17 -

In addition, the few specific attacks Plaintiff levels at the evidentiary record Congress amassed in 2006 are unavailing.  The only evidence of discrimination Plaintiff challenges directly is the rate of Section 5 objections interposed by the Attorney General, as well as the efficacy of the Attorney General's requests for more information from jurisdictions submitting changes for preclearance.  Pl. Opp. 63-65.  In addition to relying on the fact that the rate of objections has fallen over time – a claim addressed in the United States' memorandum in opposition, U.S. Opp. 39-41 – Plaintiff simply reasserts its claim that the only relevant evidence is evidence of gamesmanship by covered jurisdictions.  Again, the purpose of Section 5's preclearance mechanism is to remove the opportunity for such behavior.

Plaintiff also asserts, without support, that discrimination against minority voters "occurs with as great or greater frequency outside the jurisdictions covered by preclearance."  Pl. Opp. 42-43.  As noted in the United States' previous memoranda, that assertion is demonstrably false. Even after forty years of Section 5's prophylactic coverage, the rate of plaintiffs' successful Section 2 cases establishes that covered jurisdictions are responsible for more than twice their proportional share of Section 2 violations.  U.S. Mem. 60-61; U.S. Opp. 17-19.

Finally, Plaintiff is simply incorrect that Section 2 alone is an adequate remedy for discrimination against minority voters.  As discussed in the United States' prior memoranda, Congress concluded, based on reliable evidence, that Section 2 is insufficient to prevent and deter violations of the voting rights of minority citizens because Section 2 (1) cannot prevent the implementation of discriminatory voting practices, (2) places a heavy financial burden on the

- 18 -

victims of unlawful discrimination, and (3) places a difficult burden of proof on those victims. U.S. Mem. 49-51; U.S. Opp. 19-20.[9]

> B.      *Section 5 Is A Congruent And Proportional Means Of Enforcing Minority Citizens' Right To Be Free Of Discrimination*

In arguing that Section 5 is not a congruent and proportional means of enforcing minority citizens' right to be free of discrimination in voting, Plaintiff mischaracterizes the United States' argument in two respects. First, Plaintiff erroneously states that "the Attorney General seeks to have the court uphold preclearance on the basis that the VRA as a whole is a constitutional exercise of congressional power." Pl. Opp. 41. Second, Plaintiff incorrectly asserts that the Attorney General argues that Congress may "enact a preclearance-like procedure intruding into the states' sovereignty anytime Congress may enact a substantive prohibition pursuant to §5 of the Fourteenth Amendment." Pl. Opp. 67.

a. Plaintiff's first mischaracterization rests on its erroneous contention that the only evidence relevant to the validity of Section 5 is evidence of "gamesmanship" by covered jurisdictions. As discussed *supra*, that contention is wrong and is contrary to the Supreme Court's consistent application of the *Boerne* analysis. In relying on evidence of discrimination

---

[9] Plaintiff also reasserts its claim that Congress in 2006 "attempted to redefine part of the substantive rights at issue." Pl. Opp. 49 n.23. As noted in the United States' memorandum in opposition, however, Plaintiff cannot claim to be burdened by changes made by the 2006 amendments to the Act to the substantive standards by which the Attorney General determines whether voting changes are discriminatory in purpose or effect under Section 5. See Pub. L. No. 109-246, § 5, 120 Stat. 580-581. Plaintiff has not submitted any voting changes for review under Section 5 since the 2006 amendments went into effect, has not identified any voting changes that it plans to adopt or to submit in the future, and has not had any voting changes objected to under Section 5. See U.S. SMF at ¶¶ 84-87, 94, 96. In any case, the substantive amendment Plaintiff complains of – Congress's "clarifying that any voting change motivated by any discriminatory purpose is prohibited under Section 5," Pl. Opp. 45 n.23 – merely reflects the Constitution's prohibition on intentional discrimination.

- 19 -

by covered jurisdictions, the United States follows exactly the Supreme Court's example in

*South Carolina*, *City of Rome*, and more recent cases applying the *Boerne* analysis. In support of

its view, Plaintiff asserts that evidence of discrimination can only support a remedy like Section

2 of the Act, which provides a means of remedying discriminatory voting practices once they are

already in place. Plaintiff again ignores the weight of Supreme Court's authority, as well as the

evidence before Congress.

In *Hibbs*, the Supreme Court noted that the type of discrimination Congress was

concerned about – discrimination against women in the workplace – had already been made

illegal under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, and under the

amendment to Title VII by the Pregnancy Discrimination Act, 42 U.S.C. 2000e(k). In spite of

such legislation directly targeting the discrimination Congress sought to root out, Congress

found that women in the workplace continued to suffer discrimination. Noting the similarity

between the situation before the Congress in enacting the FMLA and the situation before

Congress in enacting Section 5, the Court stated: "Here, as in [*South Carolina*], Congress again

confronted a 'difficult and intractable proble[m],' * * * where previous legislative attempts had

failed." *Hibbs*, 538 U.S. at 737. The Court approved of Congress's decision to impose "an

across-the-board, routine employment benefit" rather than merely recodifying its prohibition on

discrimination. *Ibid.* Indeed, the Court explicitly rejected the position of the dissent – which

mirrors the position of Plaintiff in the instant case – that, "in the face of evidence of gender-

based discrimination by the States, * * * Congress could do no more in exercising its [Fourteenth

Amendment] power than simply proscribe such discrimination." *Ibid.* As the Court recognized

- 20 -

in *Hibbs*, *id.* at 738, the same reasoning supports the imposition of Section 5's preclearance remedy to prevent discrimination against minority voters.

b.  Plaintiff further mischaracterizes the United States' position in contending that the United States argues that Congress is justified in enacting a preclearance remedy anytime it finds a pattern of violations of a constitutional right.  Plaintiff misunderstands both the United States' argument and the nature of the right to vote.

Initially, it is unclear what form Plaintiff's hypothetical "preclearance-like procedure" would take outside the context of voting.  It is clear, however, that Congress has enacted prophylactic remedies in other contexts that grant across-the-board benefits, see 29 U.S.C. 2612 (FMLA requires employers to provide 12 weeks of family leave to all employees), or impose broad standards of conduct beyond simply prohibiting discrimination, see 42 U.S.C. 12131-12132; 28 C.F.R. 35.130(b)(7) (Title II of ADA requires government entities to provide reasonable accommodations to qualified individuals with disabilities).  Such remedies have been upheld by the Supreme Court.  *Hibbs*, 538 U.S. at 737-740; *Lane*, 541 U.S. at 531-534.  Yet, in the forty-two years since Congress first enacted Section 5, it has not attempted to impose preclearance in any other context, reflecting the fact that voting is different from other rights guaranteed by the Reconstruction Amendments.

Nowhere does the United States suggest that a preclearance remedy would be an appropriate means of enforcing citizens' constitutional rights "anytime Congress may enact a substantive prohibition pursuant to §5 of the Fourteenth Amendment."  Pl. Opp. 67.  On the contrary, Section 5 is an appropriately targeted response to the identified problem of discrimination against minority voters in covered jurisdictions.  The Supreme Court, too, has

- 21 -

repeatedly explained that Section 5's strong remedy is justified by the extensive history of

unconstitutional infringement of minority citizens' right to vote in covered jurisdictions.  *South*

*Carolina*, 383 U.S. at 337 ("After enduring nearly a century of widespread resistance to the

Fifteenth Amendment, Congress has marshalled an array of potent weapons against the evil.");

*City of Rome*, 446 U.S. at 181-182 (same); *Boerne*, 521 U.S. at 525-526.[10]

## CONCLUSION

This Court should grant the United States' motion for summary judgment, holding that

Plaintiff is not eligible to seek a bailout under Section 4(a) of the Voting Rights Act, and that the

2006 reauthorization of Section 5 of the Act was a valid exercise of Congress's authority under

the Fourteenth and Fifteenth Amendments.

---

[10] The remainder of Plaintiff's complaints about the congruence and proportionality of Section 5 have been addressed in the United States opening and opposition memoranda.  See, *e.g.*, U.S. Mem. 59-61 (defending the validity of Section 5's coverage formula); U.S. Opp. 42-47 (explaining that Texas is a covered jurisdiction because of its extensive history of discriminating against minority voters, not merely because of the two indicia of discrimination included in the coverage formula); U.S. Opp. 22-25 (explaining that the Supreme Court has repeatedly held that legislation to enforce rights guaranteed by the Reconstruction Amendments may prohibit conduct not prohibited by the Constitution); U.S. Opp. 21-22 (explaining that legislation passed pursuant to Congress's authority under the Reconstruction Amendments is intended to intrude on States' sovereignty).

Respectfully submitted,

JEFFREY A. TAYLOR                    WAN J. KIM
United States Attorney               Assistant Attorney General
                                     Civil Rights Division

                                     ASHEESH AGARWAL
                                     Deputy Assistant Attorney General
                                     Civil Rights Division

                                     JOHN K. TANNER (D.C. Bar No. 318873)
                                     Chief, Voting Section
                                     Civil Rights Division

                                     ___/s/ T. Christian Herren, Jr._____
                                     H. CHRISTOPHER COATES
                                     Principal Deputy Chief
                                     T. CHRISTIAN HERREN, JR.
                                     chris.herren@usdoj.gov
                                     SARAH E. HARRINGTON
                                     sarah.harrington@usdoj.gov
                                     RICHARD DELLHEIM
                                     richard.dellheim@usdoj.gov
                                     CHRISTY A. McCORMICK
                                     chirsty.mccormick@usdoj.gov
                                     Attorneys
                                     Civil Rights Division
                                     United States Department of Justice
                                     Room 7254 - NWB
                                     950 Pennsylvania Ave. N.W.
                                     Washington, DC 20530
                                     Phone: (800) 232-3931
                                     Fax: (202) 307-3961

Date: July 6, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2007, I caused to be served a copy of the foregoing through the Court's ECF filing system to counsel of record.


_/s/ T. Christian Herren, Jr._
T. CHRISTIAN HERREN, JR.