IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORTHWEST AUSTIN MUNICIPAL UTILITY
DISTRICT NUMBER ONE,
401 W. 15th Street
Suite 850
Austin, Texas 78701,
      *Plaintiff*,

v.

ALBERTO GONZALES,
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530,
      *Defendant*.

Civil Action No. 1:06-CV-01384
(DST, PLF, EGS)

**PLAINTIFF'S COMMENTS ON NATHANIEL PERSILY'S**
*THE PROMISE AND PITFALLS OF THE NEW VOTING RIGHTS ACT*

Pursuant to the Court's request, plaintiff Northwest Austin Municipal Utility District Number One files these comments on the forthcoming article by Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*.[1]

As relevant to this case, Professor Persily correctly identifies several of the serious constitutional questions attending the 2006 reauthorization of §5, which he aptly characterizes as an intrusive measure "unlike anything else in the U.S. Code." Persily, *supra*, at 33. Persily also points up several of the specific aspects of the reauthorized provision—including its backward-looking rationale, Congress's failure to revise the outdated coverage formula or underused bailout mechanism, and the paucity of relevant data in the congressional record—that cast grave doubt on whether the 2006 enactment of §5 meets constitutional standards. Yet, although purporting to defend §5's constitutionality, Persily offers no persuasive case for overcoming the constitutional infirmities he identifies. Persily's analysis thus confirms that §5 cannot be constitutionally applied to the district.

I.   SECTION 5 PLACES UNPARALLELED STRAINS ON FEDERALISM.

Persily correctly acknowledges, repeatedly, that §5 has no parallel as an intrusion by the federal government into the sovereignty reserved to the states in the constitutional structure. "[A]ll recognize section 5 of the VRA is the most invasive encroachment on states' rights in the U.S. Code." *Id.* at 5. The district agrees with Persily's observation that §5 "remains alone in American history in its intrusiveness on values of federalism and the unique and complicated procedures it requires of states and localities that want to change their laws." *Id.* at 2. No other statute imposes a federal veto power over state and local enactments, "requir[ing] covered states and localities to get permission from the federal government before implementing a certain type

---

[1] Quotations and page citations in this response relate to a version of Professor Persily's article that was dated May 29, 2007 and made publicly available online.

1

of law." *Id.* "The preclearance procedures of section 5 are completely unlike anything else in the U.S. Code, given their inversion of the normal federal-state relationship." *Id.* at 33.

As Persily also correctly recognizes, that "inversion" renders §5 constitutionally "tough medicine," *id.*, requiring the most stringent of justifications if §5 is to be held a congruent and proportional exercise of Congress's enforcement powers. Specifically, as the district has argued in greater detail in its previous briefing, §5 could only be justified as a response to invidious gamesmanship making case-by-case adjudication of constitutional violations impossible. *Compare id.* at 2 ("Such a remedy was necessary because case-by-case adjudication of voting rights lawsuits proved incapable of reining in crafty Dixiecrat legislatures hell-bent on depriving African Americans of their right to vote, regardless of what a federal court might order.") *with Miller v. Johnson*, 515 U.S. 900, 926-27, 115 S.Ct. at 2475, 2493 (1995); *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 1363 (1976); *South Carolina v. Katzenbach*, 383 U.S. 301, 327, 337, 86 S. Ct. 803, 818, 823 (1966). Persily does not quite grasp, however, that the federally intrusive, prospective nature of preclearance—particularly its unique requirement that states and localities vet local governmental actions through the federal government—is the most important difference between §5 and the simple prohibitory statutes that the Supreme Court has considered under the *City of Boerne* framework. *See* Persily, *supra*, at 15 (identifying only two "important ways" in which the 2006 §5 differed from other statutes considered under *City of Boerne*, (1) that it was a renewal, and (2) that it was not nationwide in scope).

II. **THE OUTDATED COVERAGE FORMULA CANNOT RENDER §5 GEOGRAPHICALLY CONGRUENT AND PROPORTIONAL.**

Persily appears to recognize the importance to the congruence and proportionality analysis of the geographic scope of a prophylactic remedy purporting to enforce the guarantees of the Civil War Amendments. *Compare id.* (noting §5's limited geographic reach as important)

2

*with City of Boerne v. Flores*, 521 U.S. 507, 533, 117 S.Ct. 2157, 2170-71 (1997) (identifying geographic scope as a factor in the constitutional analysis). Yet Persily admits that—and describes why—the coverage formula, as enacted in the 2006 VRA, is essentially arbitrary. Arbitrarily drawn geographical limitations are, by definition, not calculated to ensure a congruent and proportional response to identified constitutional violations.

Persily acknowledges both that §5 coverage is triggered "based on voting practices and data that are at least 30 years old," Persily, *supra*, at 4, and that, despite a "recognized need to alter coverage to the newest generation of voting rights violators," *id.* at 16, Congress failed to update the formula in the slightest. *Id.* (asserting that "judicial and political constraints prevented any alteration of the statute's geographic reach"). "The new Act was therefore not viewed as an attempt to capture the worst voting rights violators." *Id.* It "represented a glance backward rather than a step forward." *Id.* at 2-3. Faced with the impossibility of developing a new coverage formula that would "pass[] constitutional muster and not giv[e] rise to concerted political opposition," *id.* at 26, Congress deliberately enacted a coverage formula that was intended *not* to be congruent and proportional to a current problem, but is instead a symbolic memorial to changes made in an earlier generation.

Persily himself recognizes that "no one can defend" the current coverage formula. *Id.* It is certainly no constitutional defense that keeping the outdated formula was merely "the best of politically feasible alternatives." *Id.* And Persily's observation that a jurisdiction newly covered under an updated formula would regard its coverage as a "national condemnation of its recent voting rights record," *id.* at 27, applies equally to previously covered jurisdictions that remain covered under a formula that ignores their substantial progress over the last three decades. Congressional reluctance to "heap a new and costly administrative scheme onto jurisdictions

3

unaccustomed to getting federal permission for their voting laws," *id.*, is no justification to continue those burdens on previously covered jurisdictions just because those burdens were first heaped on them decades ago.

Persily questions the extent to which a reenactment must be constitutionally justified, though he concludes that it must. *Id.* at 15. That is the very purpose of sunsetting, forcing Congress to affirmatively reenact a provision designed to expire. And in this respect, there is a significant difference between §5 and §2. It is much easier to justify the continuation of a uniform standard of conduct than to justify anew a geographically targeted expression of congressional distrust in state and local governments' ability to make changes in a fair way. Continuation and extension of §5 burdens could be constitutionally justified, if at all, only by a sufficiently developed evidentiary record of recent relevant conduct. "A slapdash choice of jurisdictions arising from a political compromise to balance out the partisan effects of a new coverage regime, almost by definition, would be incongruent to the geography of voting rights violators." *Id.* at 28. And so is a slapdash retention of a coverage regime based on decades-old data.

### III. THE UNREVISED BAILOUT MECHANISM FAILS TO RENDER §5 CONGRUENT AND PROPORTIONAL, ESPECIALLY IF IT IS IMPOSSIBLE TO USE.

Effectively conceding that the outdated coverage formula by itself presents insurmountable constitutional problems, Persily acknowledges that an altered bailout process might be the only way to constitutionally redeem the 2006 enactment of §5. *See id.* ("Anything that increased the likelihood that 'good' jurisdictions could escape from coverage would make the constitutionality of the coverage formula easier to defend."). Yet, as Persily explains, like the coverage formula, "[t]he requirements for bailout remained unchanged in the reauthorized VRA." *Id.* at 29.

4

Recognizing that bailout has occurred for only a handful of jurisdictions (all of them in Virginia), Persily aptly notes that bailout may be a practical impossibility for most jurisdictions," in which case it "exists more as a fictitious way out of coverage than an authentic way of shoring up the constitutionality of the coverage formula." *Id.* at 30. As relevant to this case, Persily's observations illustrate the importance of interpreting the bailout provision—in accordance with its plain language and Supreme Court interpretations—to permit the district to pursue and achieve bailout. If an entity like the district, which has no history of voting discrimination and a demonstrated history of compliance with §5, can bail out, it may be that grave constitutional questions that would otherwise have to be confronted can be avoided.

## IV. THE CONGRESSIONAL RECORD IS INSUFFICIENT TO SUPPORT THE 2006 ENACTMENT OF §5.

Persily's survey of the materials on which Congress relied in enacting the 2006 authorization of §5 lays bare the insufficiency of that record to support §5 as a congruent and proportional response to identified constitutional violations. As further detailed in the district's previous briefing, the vast bulk of activity touched by §5 is constitutionally benign. Section 5 does not directly catch and penalize constitutional violations; it injects the federal government into state and local decisionmaking, almost always resulting in the conclusion that no constitutional violation is about to occur. That uniquely intrusive measure requires uniquely strong justification, specifically evidence of invidious gamesmanship that would make case-by-case adjudication of actual constitutional violations impossible. Persily falls into the same trap as Congress (and defendants), focusing on purported indicators of continuing voting rights violations to the exclusion of evidence of the specific gamesmanship to which §5 is directed. This looseness of thought presupposes that the same evidence that might justify §2—"examples of voting rights violations," *id.* at 10—will also justify §5 without any further attempt to link the

5

evidence with the nature and rationale behind the preclearance remedy. Even if generalized evidence of voting discrimination were relevant to supporting the specific, extraordinary remedy of §5, Persily fails to make the case that the record amassed could justify continuing to imposed that remedy on the covered jurisdictions.

Persily identifies four categories of evidence in the legislative record that he regards as relevant to reauthorization: "(1) voter turnout and registration statistics by race; (2) statistics concerning DOJ and jurisdiction behavior with respect to the preclearance process; (3) examples of voting rights violations in the covered jurisdictions; and (4) a comprehensive analysis of all VRA section 2 litigation nationwide." *Id.* at 14. None of those categories goes to the real problem to which §5 is addressed—the one-step-ahead problem that prevented effective enforcement of voting rights laws in the 1960s. But even on Persily's own terms, the evidence he describes does not satisfy the constitutional standard.

Because §5 imposes unique federalism burdens on a subset of American jurisdictions (delimited, of course, by the outdated coverage formula) there can be no justification for continuing those burdens without, at a minimum, some evidentiary showing that those jurisdictions are uniquely deserving of that differential treatment. Yet, Congress paid practically no attention to developing comparative evidence of conditions in covered jurisdictions to those in noncovered ones. *See id.* at 11, 16, 21. There is not "much in the way of systematic empirical data to justify differences between the covered and uncovered jurisdictions." *Id.* at 21. And, to the extent that there is any evidence comparing covered and noncovered jurisdictions, none of it speaks to rejustifying either the fundamental rationale behind §5 or the geographic boundaries to which it applies.

Ultimately, Persily must concede that none of the evidence in the four categories he identifies are of much help in supporting the constitutionality of reauthorized §5. "Turnout rates in the covered and uncovered jurisdictions do not differ consistently. Both the House and the Senate Reports also noted the remarkable decrease in differential registration and turnout rates among racial groups." *Id.* at 17. Even correcting for data that aggregated Hispanics and non-Hispanic whites, "the conclusions reached with accurate data would not be all that different," *id.*, and controlling for socioeconomic status and citizenship eligibility to vote largely accounts for any remaining differences. *Id.* at 18. "[T]urnout statistics simply do not capture, as they previously did, the level of unconstitutional discrimination that may exist in the covered or noncovered jurisdictions." *Id.*

Given that the rate of §5 objections has diminished in recent years to almost nothing, *see id.* at 19, "[t]he threat to reauthorization posed by the success of the VRA becomes most clear when considering the paucity of evidence concerning violations of section 5, itself." *Id.* "If evidence of widespread violation of section 5 were necessary to prove its continued utility and constitutionality, then the newly reauthorized bill would be in big trouble," Persily admits. *Id.* Persily posits that "the number of DOJ 'Requests for More Information' (MIRs) and the rate of withdrawal of voting changes pursuant to such requests" may better indicate §5's deterrent effect. *Id.* at 20. But he is forced to concede that even those numbers are miniscule compared to the total volume of preclearance submissions. *Id.* And Persily does not, for example, identify instances of jurisdictions responding to MIRs by making bad faith alterations attempting to trick the Department of Justice into preclearing invidious changes. If anything, instances of alteration or withdrawal of voting changes following MIRs, without more, are indicators of a *lack* of the type of gamesmanship that motivated the original §5. A jurisdiction that alters or withdraws

7

after a problem is flagged is demonstrating a good faith effort to comply with constitutional guarantees, not to circumvent them. Similarly, a jurisdiction negotiating with DOJ before attempting to make a change, *see id.*, represents the very opposite of gamesmanship; and the availability of these kinds of informal advisory channels helps demonstrate the absence of any continuing need for §5.

Persily posits that the largely anecdotal evidence of voting rights violations is the best support for §5 against constitutional challenge although, again, without distinguishing between §5 and §2 or any of the other provisions of the VRA. Persily virtually concedes that there is little evidence of constitutional violations in covered jurisdictions and even less evidence that violations occur more frequently in covered jurisdictions, warranting their differential treatment. "[T]he Reports can identify only six published cases since 1982 arising in covered jurisdictions where a court has found unconstitutional discrimination against minorities with respect to the right to vote." *Id.* at 21. And there were "an equal number in the uncovered jurisdictions, as well as an equal number of successful claims made by white voters." *Id.* (footnotes omitted). Persily theorizes that the (in his view) surprisingly small number of findings of constitutional violations might be explained by the prevalence of §2 suits in comparison to suits brought under the Fourteenth and Fifteenth Amendments. *Id.* But one prophylactic remedy cannot be justified by evidence of violation of another prophylactic. A *relevant* pattern of *constitutional* violations must be shown. *See, e.g.*, *City of Boerne*, 521 U.S. at 530, 117 S.Ct. at 2169 (requiring instances of recent unconstitutional state action). Persily's theory effectively concedes that, absent demonstrated gamesmanship, §2 can be used to address those constitutional violations that exist. The small number of actual constitutional violations that have been found—18 in reported cases in the last 25 years and "less than one successful case per year in the covered jurisdictions" even

8

allowing that the actual number may be 3 to 4 times higher than indicated in the cases, Persily, *supra*, at 21—confirms that case-by-case adjudication is entirely feasible. Persily acknowledges a "data vacuum" in "the low number of court-identified cases of constitutional violations in the covered jurisdictions." *Id.* Even if §2 cases were a relevant measure, "in the last decade the gap between covered and noncovered jurisdictions has either vanished or reversed—with the total number of successful section 2 cases declining and the share of successful lawsuits in uncovered jurisdictions outpacing the share in covered jurisdictions." *Id.* at 24.

Nor does any other evidence satisfy the burden of showing either a particularized continuing need for §5 or any relevant difference between covered and noncovered jurisdictions. The anecdotal evidence that comprises much of the congressional record, apart from such evidence's inherent unreliability for identifying systemic patterns, is an undifferentiated listing of alleged problems of many different kinds, none of which invoke the rationale behind §5 or speak with any particularity to the §5 issue. Likewise, the anecdotal evidence was culled almost entirely from covered jurisdictions, providing no comparisons to noncovered jurisdictions. *Id.* at 21-22.

Finally, although this case involves an attempted bailout and not a redistricting, Persily's discussion of Congress's imposition of a stricter retrogression standard by overruling *Bossier Parrish II* and *Georgia v. Ashcroft* only heightens the constitutional concern with the reenacted §5, particularly to the extent that the new §5 may substantively change the applicable voting-rights standards in a small subset of states and local jurisdictions. Congress's determination to do so for political reasons in the face of warnings from members of the Supreme Court that such an application of §5 might create insurmountable constitutional hurdles is further evidence of the lack of constitutional care that went into the reenactment of §5.

DATED: September 10, 2007                    Respectfully submitted:

/s/ Gregory S. Coleman
Gregory S. Coleman
(admitted *pro hac vice*)
Christian J. Ward
(admitted *pro hac vice*)
PROJECT ON FAIR REPRESENTATION
YETTER & WARDEN, L.L.P.
221 West 6th Street, Suite 750
Austin, Texas  78701
[Tel.] (512) 533-0150
[Fax]  (512) 533-0120

/s/ Erik S. Jaffe
Erik S. Jaffe
D.C. Bar No. 440112
ERIK S. JAFFE, P.C.
5101 34th Street N.W.
Washington, D.C .20008
[Tel.] (202) 237-8165
[Fax]  (202) 237-8166

*Attorneys for Plaintiff*
*Northwest Austin Municipal*
*Utility District No. One*

**CERTIFICATE OF SERVICE**

I hereby certify that I served Plaintiff's Comments on Nathaniel Persily's *The Promise and Pitfalls of the New Voting Rights Act* upon counsel for the parties indicated below through the Court's electronic case filing system on September 10, 2007.

Wan J. Kim
Jeffrey A. Taylor
John K. Tanner
H. Christopher Coates
T. Christian Herren Jr
chris.herren@usdoj.gov
Sarah E. Harrington
Christy A. McCormick
Christy.mccormick@usdoj.gov
Civil Rights Division
UNITED STATES DEPARTMENT OF JUSTICE
Room 7254 – NWB
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

*Counsel for Defendant*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Benjamin J. Blustein
bblustein@lawyerscommittee.org
Jonah H. Goldman
jgoldman@lawyerscommittee.org
LAWYERS COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Seth P. Waxman
seth.waxman@wilmerhale.com
John A. Payton
john.payton@wilmerhale.com
Paul R.Q. Wolfson
paul.wolfson@wilmerhale.com
Ariel B. Waldman
ariel.waldman@wilmerhale.com
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Dennis C. Hayes
General Counsel
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.
NAACP National Office
4805 Mt. Hope Drive
Baltimore, Maryland  21215

*Counsel for Intervenors-Defendants Texas State Conference of NAACP and Austin Branch of the NAACP*

Nina Perales
nperales@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE &
   EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas  78205

*Counsel for Intervenors-Defendants Lisa Diaz, Gabriel Diaz, and David Diaz*

Theodore Shaw
Jacqueline A. Berrien
Norman J. Chachkin
nchachkin@naacpldf.org
Debo P. Adegbile
NAACP LEGAL DEFENSE AND
   EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York  10013

*Counsel for Intervenors-Defendants Rodney and Nicole Louis for Applicants by Winthrop Graham, Yvonne Graham, Wendy Richardson, Jamal Richardson, and Marisa Richardson*

David J. Becker
dbecker@pfaw.org
People for the American Way Foundation
2000 M Street NW, Suite 400
Washington, D.C.  20036

*Counsel for Intervenor-Defendant People for the American Way*

J. Gerald Hebert
jghebert@comcast.net
5019 Waple *Lane*
Alexandria, Virginia  22304

*Counsel for Intervenor-Defendant Travis County*

Joseph E. Sandler
sandler@sandlerreiff.com
SANDLER REIFF & YOUNG PC
50 E St. SE #300
Washington, D.C.  20003

*Counsel for Intervenors-Defendants Lisa Diaz, Gabriel Diaz, and David Diaz*

Kristen M. Clarke
NAACP LEGAL DEFENSE AND EDUCATIONAL
   FUND, INC.
1444 Eye Street, N.W., 10th Floor
Washington, D.C.  20005

*Counsel for Intervenors-Defendants Rodney and Nicole Louis and for Applicants by Winthrop Graham, Yvonne Graham, Wendy Richardson, Jamal Richardson, and Marisa Richardson*

Max Renea Hicks
rhicks@renea-hicks.com
1250 Norwood Tower
114 West 7th Street
Austin, Texas  78701

*Counsel for Intervenor-Defendant Travis County*

Laughlin McDonald
Neil Bradley
courtfilings@aclu-nca.org
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION, INC.
2600 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, Georgia  30303

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Lisa Graybill
Legal Director
courtfilings@aclu-nca.org
ACLU FOUNDATION OF TEXAS
1210 Rosewood Ave.
Austin, Texas 78702

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Jose Garza
jgarza@trla.org
Judith A. Sanders-Castro
George Korbel
Texas RioGrande Legal Aid, Inc.
1111 N. Main Street
San Antonio, Texas 78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael T. Kilpatrick
mkirkpatrick@citizen.org
Brian Wolfman
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Jeremy Wright
KATOR, PARKS & WEISER, PLLC
812 San Antonio Street, Suite 100
Austin, Texas 78701

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Art Spitzer
artspitzer@aol.com
courtfilings@aclu-nca.org
Legal Director
ACLU OF THE NATIONAL CAPITAL AREA
1400 20th Street N.W., Suite 119
Washington, D.C. 20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

Alpha Hernandez
ahernandez@trla.org
Eloy Padilla
epadilla@trla.org
Texas RioGrande Legal Aid, Inc.
309 Cantu Street
Del Rio, Texas 78212

*Counsel for Intervenors-Defendants Angie Garcia, Jovita Casarez and Ofelia Zapata*

Michael J. Kator
KATOR, PARKS & WEISER, PLLC
1020 19th Street, N.W., Suite 350
Washington, D.C. 20036

*Counsel for Intervenor-Defendant Nathaniel Lesane*

 

/s/ Christian J. Ward
Christian J. Ward