# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHWEST AUSTIN MUNICIPAL UTILITY DISTRICT NUMBER ONE, *Plaintiff,* vs. ALBERTO GONZALES, Attorney General of the United States *Defendant.* | Civil Action No. 1:06-1384 (DST, PLF, EGS) |

## POST-ARGUMENT SUBMISSION BY DIAZ AND GARCIA DEFENDANT INTERVENORS

The Diaz and Garcia Defendant-Intervenors, whose counsel did not present argument in the summary judgment hearing held on September 17, 2007, have carefully studied the transcript of the oral argument and believe that it is important that they clarify one matter: Congress has the authority under the Fifteenth Amendment to protect Latino voters from racial discrimination in voting. We do not intend to alter the position articulated in the private Defendant-Intervenors' summary judgment briefs that Congress holds the authority to reauthorize Section 5 under both the Fourteenth and Fifteenth Amendments. *See* Diaz SJ Br. (Doc. 101-2) at 4-7; Texas NAACP et al. SJ Br. (Doc. 100-24) at 25-41.

In the September 17 hearing, the Court asked whether "certain kinds of protections, in this case [of] minority language citizens as opposed to African American citizens" are unavailable under the Fifteenth Amendment. Tr. 86 2-8. Without question, the Fifteenth Amendment prohibits race discrimination in voting, including race discrimination against

Latinos, Asian Americans and Native Americans.

<u>Latinos are Protected by the Fifteenth Amendment from Racial Discrimination in Voting</u>

The Fifteenth Amendment protects all voters, including Latinos, from discrimination on the basis of race. The Fifteenth Amendment's prohibition on voting discrimination "grants protection to all persons, not just members of a particular race." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). The Supreme Court's decision in *Cayetano* affirmed the principle that "'racial discrimination' is that which singles out 'identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics.'" *Id.* at 515 (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). Noting the "hostility all too often directed against persons whose particular ancestry is disclosed by their ethnic characteristics and cultural traditions," the Court rejected the argument that the State's restriction, in certain elections, of the franchise to Native Hawaiians was not a racial classification and concluded that the State used ancestry as a "proxy" for race. *Id.* at 514.

Latino, Native American and Asian American plaintiffs have asserted claims under the Fifteenth Amendment in litigation challenging racial discrimination in voting. *See Olagues v. Russoniello*, 797 F.2d 1511 (9th Cir. 1986), *vacated on other grounds*, 484 U.S. 806 (1987) (concluding that organization of Chinese Americans had standing to assert Fifteenth Amendment claim); *United States v. South Dakota*, 636 F.2d 241, 243 n.1 (8th Cir. 1980) (noting that Native Americans are protected by the Fifteenth Amendment); *Bonilla v. City Council*, 809 F. Supp. 590, 600 (N.D. Ill. 1992) (concluding that Latino plaintiffs' allegation of intentional discrimination in violation of the 15th Amendment was sufficient to withstand a motion to dismiss); *Coal. for Educ. v. Bd. of Elections*, 370 F. Supp. 42, 57 (S.D.N.Y. 1974) (finding that

school board conducted election in violation of Puerto Rican plaintiffs' Fourteenth and Fifteenth Amendment rights).

The 1975 expansion of Section 5 coverage to Texas followed some twenty years after the Supreme Court's landmark ruling that Mexican Americans are a class subject to racial discrimination. *See Hernandez v. Texas*, 347 U.S. 475, 477 (1954). In *Hernandez*, the Supreme Court overruled a series of decisions in Texas jury cases that held that Mexican Americans could not suffer discrimination on the basis of their race because they were "white." *Id.* at 478 n.5 (citing, *inter alia*, *Sanchez v. State*, 243 S.W.2d 700 (Tex. Crim. App. 1951)). The Court based its conclusion on a finding that "residents of the community distinguished between 'white' and 'Mexican,'" and had segregated Mexican American children in public schools, denied service to Mexican Americans in restaurants and maintained racially segregated bathrooms for Mexican Americans at the local courthouse. *Id.* at 479-80.

Of course, the lengthy history of racial discrimination against Latinos in Texas extends beyond Jackson County, where *Hernandez* arose. *See, e.g.*, *White v. Regester*, 412 U.S. 755, 768 (1973) (affirming district court conclusion that "the Mexican-American population of Texas . . . has historically suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others"); *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994), *aff'd*, 517 U.S. 952 (1996) ("Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process."); *Clifton v. Puente*, 218 S.W.2d 272 (Tex. Civ. App. 1948) (ruling that racially restrictive covenants prohibiting the sale of land to persons of Mexican descent were

unenforceable).

It is also important to note that provisions of the Voting Rights Act enacted prior to 1975 benefitted many Latino voters, just as the expansion of Section 5 coverage in 1975 to states like Texas benefits many African American voters. For example, a provision of the 1965 Voting Rights Act specifically prohibited the application of English literacy tests to Puerto Rican voters educated in American-flag schools. *See* 42 U.S.C. 1973b (e). In addition, Congress in 1970 suspended the use of all literacy tests for voting, including in Arizona where Congress specifically found discrimination against the "Spanish-American population." *See Oregon v. Mitchell*, 400 U.S. 112, 133 (1970). Moreover, many African Americans have been protected against the implementation of discriminatory voting changes in Texas. *See, e.g.* Letter from J. Michael Wiggins, Acting Assistant Attorney General, to Denise Nance Pierce, Esq. (June 21, 2002), http://www.usdoj.gov/crt/voting/sec_5/obj_activ.htm (objecting to retrogressive proposed redistricting plan).

When it expanded the Voting Rights Act in 1975, Congress was very conscious of the difference between measures within the bill intended to protect Latino, Native American and Asian American voters from race discrimination and measures intended to increase access to the political process for limited English proficient voters, such as the 'bilingual provisions' of the Voting Rights Act. *Compare* 42 U.S.C. 1973c *to* 42 U.S.C. 1973aa-1a(b)(2)(A). The decision by Congress in 1975 to amend the Section 5 coverage formula to include areas with a history of race discrimination against Latino, Native American and Asian American voters, while also employing a separate coverage formula for the Act's bilingual provisions, demonstrates that Congress intended for the Act's special remedies, including Section 5, to aid Latino, Native

4

American and Asian American voters in their struggle against racially-discriminatory voting practices:

> [a]lthough English-only elections are an impediment to the participation of language minorities, other tactics of discrimination have also been used and would still be readily available to state or local elections officials. Thus, the Committee believes that the appointment of examiners and observers in those areas . . . is the effective answer to such tactics . . . Further, in light of the ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise affect the voting rights of language minorities, the Committee acted to extend the preclearance mechanisms of the Section 5 of the Voting Rights Act to the newly-covered jurisdictions.

H.R. Rep. No. 94-196 at 26-27 (1975). *See also id.* at 17-19, 22-23, 28; S. Rep. 94-295 at 24-26, 31-32 (1975)(reviewing findings of intentional racial discrimination against Latinos).

In sum, the Diaz and Garcia Defendant-Intervenors wish to clarify that the Fifteenth Amendment's protection against racial discrimination in voting extends to all racial groups, including Latinos.

RESPECTFULLY SUBMITTED this 3rd day of December, 2007.

        MEXICAN AMERICAN LEGAL DEFENSE &
        EDUCATIONAL FUND, INC. (MALDEF)

        /s Nina Perales
        NINA PERALES
        No. TX0040
        110 Broadway, Suite 300
        San Antonio, Texas 78205
        Tel: (210) 224-5476
        Fax: (210) 224-5382
        nperales@maldef.org

JOSEPH E. SANDLER
D.C Bar #255919
Sandler Reiff & Young PC
50 E St SE # 300
Washington, D.C. 20003
Tel: (202) 479 1111
Fax: (202) 479-1115
sandler@sandlerreiff.com

Counsel for Defendant-Intervenors Diaz, *et al.*

TEXAS RIO GRANDE LEGAL AID, INC.

　　/s Jose Garza　　
Jose Garza
George Korbel
1111 N. Main Street
San Antonio, TX 78212
(210) 212-3700
212-3772 - fax
Jgarza@trla.org

Michael T. Kirkpatrick
Brian Wolfman
Public Citizen Litigation Group
1600 30th Street NW
Washington, DC 20009
(202) 588-7728
(202) 588-7795 - fax
mkirkpatrick@citizen.org

Counsel for Defendant-Intervenors Garcia, *et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2007, I caused to be served a copy of the foregoing through the Court's CM/ECF filing system to counsel of record.

　　/s Nina Perales
Nina Perales

6