UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
NORTHWEST AUSTIN MUNICIPAL              )
UTILITY DISTRICT NUMBER ONE,            )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )          Civil Action No. 06-1384
                                        )          Three-judge court
MICHAEL B. MUKASEY,                     )          (PLF, EGS, DST)
Attorney General of the United States, *et al.*,   )
                                        )
            Defendants.                 )
_____)


Before:  FRIEDMAN and SULLIVAN, *District Judges*, and TATEL, *Circuit Judge*.


Opinion for the Court filed by *Circuit Judge* TATEL.


## OPINION

TATEL, *Circuit Judge*: Section 5 of the Voting Rights Act of 1965 prohibits

"covered jurisdictions"—those states and political subdivisions with histories of racial

discrimination in voting—from making any change in their voting procedures without

first demonstrating to either the Attorney General or a three-judge panel of this court that

the change "neither has the purpose nor will have the effect of denying or abridging the

right to vote on account of race or color."  42 U.S.C. § 1973c.  Plaintiff, a municipal

utility district in Texas, a covered jurisdiction, seeks a declaratory judgment exempting it

from section 5's "preclearance" obligation.  In the alternative, plaintiff challenges section

5's constitutionality, arguing that when Congress extended the provision in 2006 it lacked

sufficient evidence of racial discrimination in voting to justify the provision's intrusion

upon state sovereignty.  We reject both claims.  First, plaintiff is ineligible to seek a declaratory judgment exempting it from section 5 because it does not qualify as a "political subdivision" as defined in the Voting Rights Act.  Second, applying the standard set forth by the Supreme Court in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), we conclude that given the extensive legislative record documenting contemporary racial discrimination in voting in covered jurisdictions, Congress's decision to extend section 5 for another twenty-five years was rational and therefore constitutional.  Alternatively, we conclude that section 5's extension was constitutional even if, as plaintiff argues, its challenge is controlled by the stricter standard set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997).  Given section 5's tailored remedial scheme, the extension qualifies as a congruent and proportional response to the continuing problem of racial discrimination in voting.

This opinion is organized as follows.  Part I describes the background of this case, including the Voting Rights Act's passage and key provisions; the two decisions in which the Supreme Court sustained section 5's constitutionality, *Katzenbach* and *City of Rome v. United States*, 446 U.S. 156 (1980); the 2006 extension of section 5, which plaintiff challenges here; and the convening of this three-judge panel.  *See infra* pp. 3-16.  In Part II we explain why plaintiff is ineligible to seek a declaratory judgment exempting it from section 5.  *See infra* pp. 16-23.  In Part III we explain why we believe plaintiff's constitutional challenge is facial and why that challenge is governed by the standard set forth in *Katzenbach*.  *See infra* pp. 24-44.  Applying the *Katzenbach* standard in Part IV, we explain why Congress's decision to extend section 5 for another twenty-five years was constitutional.  *See infra* pp. 45-93.  In Part V we explain why section 5's extension

2

survives even *City of Boerne*'s more demanding test. *See infra* pp. 93-113. And finally, in Part VI we consider and reject two arguments plaintiff makes that could be construed as an as-applied challenge to section 5. *See infra* pp. 113-20.

## I.

Ratified in 1870 after the Civil War, the Fifteenth Amendment guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. amend. XV, § 1. Yet following Reconstruction, "[t]he blight of racial discrimination in voting . . . infected the electoral process in parts of our country for nearly a century." *Katzenbach*, 383 U.S. at 308. "Beginning in 1890," southern states "enacted tests . . . specifically designed to prevent Negroes from voting," making "the ability to read and write a registration qualification." *Id.* at 310-11. Black citizens faced many other obstacles, including property qualifications, good character tests, and "[d]iscriminatory administration of voting qualifications." *Id.* at 311-12. Congress eventually responded with the Civil Rights Acts of 1957, 1960, and 1964, each of which "tried to cope with the problem by facilitating case-by-case litigation against voting discrimination." *Id.* at 313. This case-by-case approach, however, did "little to cure the problem." *Id.* Convinced that it confronted "an insidious and pervasive evil . . . perpetrated . . . through unremitting and ingenious defiance of the Constitution," Congress decided to adopt "sterner and more elaborate measures," *id.* at 309, by enacting a "complex scheme of stringent remedies aimed at areas where voting discrimination ha[d] been most flagrant," *id.* at 315. As a result, after building a "voluminous legislative history" during eighteen days of committee hearings and twenty-nine days of floor

debate, Congress, acting pursuant to section 2 of the Fifteenth Amendment—"Congress shall have power to enforce this article by appropriate legislation," U.S. CONST. amend. XV, § 2—approved the Voting Rights Act of 1965 by wide margins in both chambers. *Katzenbach*, 383 U.S. at 308-09; Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (codified as amended at 42 U.S.C. §§ 1971, 1973 to 1973bb-1) ("1965 Act").

Section 2 of the Voting Rights Act contains the statute's basic prohibition: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973. Other provisions of the statute strengthen the equitable powers of federal courts, authorize civil and criminal penalties, and outlaw poll taxes. *See* 42 U.S.C. §§ 1973a(c), 1973h, 1973i(d), 1973j.

Unlike those provisions, which apply nationwide and are permanent, certain sections of the Act are temporary and apply only to states and political subdivisions with particularly egregious histories of racial discrimination in voting. In such "covered" jurisdictions, section 4(a) bans the use of any test or device to deny the right to vote. As originally enacted, the statute defined "test or device" as any requirement that a prospective voter "(1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 1965 Act § 4(c), 79 Stat. at 438-39 (codified at 42 U.S.C. § 1973b(c)).

In addition to section 4(a), covered jurisdictions are subject to section 5—the provision challenged in this case.  Section 5 prohibits any and all changes in voting regulations pending review and approval by the federal government in a process known as preclearance.  42 U.S.C. §§ 1973b, 1973c.  To obtain preclearance of a proposed change under section 5, covered jurisdictions may either submit the proposed change to the United States Attorney General or seek a declaratory judgment from a three-judge panel of this court.  42 U.S.C. § 1973c.  Under section 5, the Attorney General or the district court may preclear the change only if it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  *Id.*  If the Attorney General interposes no objection after sixty days or if the district court grants a declaratory judgment, the jurisdiction may implement the change.  Absent preclearance, covered jurisdictions may not modify any existing voting qualifications, standards, practices, or procedures.  Another provision applicable only in covered jurisdictions authorizes the Attorney General to appoint federal election observers.  42 U.S.C. § 1973f.

To determine which jurisdictions would be covered, Congress adopted a formula that utilized two proxies for discrimination.  Specifically, section 4(b) originally provided that the requirements of sections 4(a) and 5 would apply to any state or political subdivision that both: (1) according to the Attorney General maintained a test or device on November 1, 1964; and (2) according to the Director of the Census had registration or turnout rates below fifty percent of the voting age population in November 1964.  1965 Act § 4(b), 79 Stat. at 438 (codified as amended at 42 U.S.C. § 1973b(b)).  This two-part coverage formula resulted in most southern states becoming covered jurisdictions.  Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia were covered

statewide.  *See* 28 C.F.R. pt. 51 app.  Thirty-nine of North Carolina's one hundred

counties and one Arizona county also qualified for coverage as separately designated

political subdivisions.  *See id.*

Recognizing that section 4(b)'s formula could prove either over- or under-

inclusive, Congress incorporated two procedures for adjusting coverage over time.  First,

as originally enacted, section 4(a) allowed jurisdictions to earn exemption from coverage

by obtaining from a three-judge panel of this court a declaratory judgment that in the

previous five years they had not used a test or device "for the purpose or with the effect

of denying or abridging the right to vote on account of race or color."  1965 Act § 4(a),

79 Stat. at 438 (codified as amended at 42 U.S.C. § 1973b(a)).  This "bailout" provision,

as subsequently amended, addresses potential statutory over-inclusiveness, allowing

jurisdictions with clean records to terminate their section 5 preclearance obligation.

Second, section 3(c) authorizes courts to require preclearance by any noncovered state or

political subdivision found to have violated the Fourteenth or Fifteenth Amendment.  42

U.S.C. § 1973a(c).  Specifically, courts presiding over voting discrimination suits may

"retain jurisdiction for such period as [they] may deem appropriate" and order that during

that time no voting change take effect unless either approved by the court or unopposed

by the Attorney General.  *Id.*  This judicial "bail-in" provision, known as a pocket trigger,

addresses the formula's potential under-inclusiveness.

Less than two months after Congress passed the Voting Rights Act, South

Carolina, invoking the Supreme Court's original jurisdiction, challenged the statute's

constitutionality.  The Court granted South Carolina leave to file a complaint, expedited

the case, and invited other states to participate as *amici curiae*.  South Carolina argued

that certain provisions of the Voting Rights Act, including the coverage formula, the test

or device ban, and section 5's preclearance requirement, "exceed[ed] the powers of

Congress and encroach[ed] on an area reserved to the States by the Constitution."

*Katzenbach*, 383 U.S. at 323.  Rejecting these arguments, the Court held that Congress

had properly exercised its enforcement power under section 2 of the Fifteenth

Amendment.  *See id.* at 327.  The "fundamental principle" guiding the Court was this:

"As against the reserved powers of the States, Congress may use any rational means to

effectuate the constitutional prohibition of racial discrimination in voting."  *Id.* at 324.

Four years after *Katzenbach*, and just before sections 4 and 5 were set to expire,

Congress reauthorized and extended them for five years.  Pub. L. No. 91-285, § 3, 84

Stat. 314, 315 ("1970 Amendments").  It extended them again in 1975, this time for

seven years, Pub. L. No. 94-73, § 101, 89 Stat. 400, 400 ("1975 Amendments"), and then

again in 1982, this time for twenty-five years, Pub. L. No. 97-205, §2(b)(8), 96 Stat. 131,

133 ("1982 Amendments").  Prior to each extension, Congress held numerous hearings

and heard extensive testimony documenting the continued existence of racial

discrimination in voting.

These reauthorizations amended the Voting Rights Act in several important ways.

Most relevant to this case, the 1975 Amendments added section 4(f), which bars voting

discrimination against certain language minorities—specifically, persons of American

Indian, Asian American, Native Alaskan, and Spanish heritage.  1975 Amendments §§

203, 207, 89 Stat. at 401-02 (codified as amended at 42 U.S.C. §§ 1973b(f), 1973*l*(c)(3)).

Acting pursuant to the Fourteenth Amendment, as well as the Fifteenth, Congress

expanded the definition of "test or device" to include the provision of English-only

voting materials in jurisdictions where more than five percent of voting-age citizens belonged to a single language minority.  *Id.* § 203, 89 Stat at 401-02 (codified at 42 U.S.C. § 1973b(f)(3)).  As in the case of the 1970 Amendments, which added references to the 1968 election, 1970 Amendments § 4, 84 Stat. at 315 (codified as amended at 42 U.S.C. § 1973b(b)), the 1975 Amendments expanded coverage to jurisdictions that met section 4(b)'s two-part test in 1972, at that time the most recent presidential election, 1975 Amendments § 202, 89 Stat. at 401 (codified at 42 U.S.C. § 1973b(b)).  The statute thus covered any jurisdiction that in 1972 used a test or device (including the provision of English-only voting materials to specified language minorities) and had registration or turnout rates below fifty percent.  *See id.* §§ 203-204, 89 Stat. at 401-02 (codified at 42 U.S.C. § 1973b(b), (f)).

As a result of the 1975 language minority amendments, Texas, Alaska, and Arizona became covered, as did several counties in California, Colorado, Florida, New York, North Carolina, and South Dakota, plus two townships in Michigan.  *See* 28 C.F.R. pt. 51 app.  Section 4(f) requires these jurisdictions to provide all materials and information relating to the electoral process in the language of the applicable minority group as well as in English.  1975 Amendments § 203, 89 Stat. at 402 (codified as amended at 42 U.S.C. § 1973b(f)(4)).  The Act's other requirements, including section 5, also apply to these most recently covered jurisdictions.  *Id.* § 206, 89 Stat. at 402 (codified as amended at 42 U.S.C. §§ 1973-1973d, 1973k).

The 1975 Amendments, including their language minority provisions, were in effect in 1980 when the Supreme Court again upheld the constitutionality of section 5's preclearance requirement in *City of Rome v. United States*, 446 U.S. at 177-82.  Rome, a

municipality within the covered state of Georgia, argued that it was eligible for bailout and that section 5 was unconstitutional.  The Court denied both claims, finding Rome ineligible to apply for bailout and "declin[ing] th[e] invitation to overrule Congress' judgment that the 1975 extension was warranted."  *Id.* at 180.  Emphasizing Congress's finding that "minority political progress under the Act, though undeniable, had been modest and spotty," *id.* at 181 (internal quotation marks omitted), the Court concluded that Congress's "considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable," *id.* at 182.

The 1982 reauthorization amended the bailout mechanism in two respects.  First, it sharply increased the number of jurisdictions eligible to pursue bailout.  Previously, only states or separately designated political subdivisions (such as covered counties in noncovered states) could seek bailout.  In the 1982 Amendments, however, Congress allowed political subdivisions *within* covered states to apply for bailout, even if such subdivisions had never been separately designated for coverage.  1982 Amendments § 2(b)(2), 96 Stat. at 131 (codified as amended at 42 U.S.C. § 1973b(a)(1)).  Second, the 1982 Amendments altered the substantive requirements for bailout.  To qualify for bailout under earlier versions of the Act, covered jurisdictions had to show that during some period of time—the previous five, ten, or seventeen years, depending upon the version of the Act then in effect—they had maintained no test or device and no court had found they had denied or abridged the right to vote.  *See* 1965 Act § 4(a), 79 Stat. at 438; 1970 Amendments § 3, 84 Stat. at 315; 1975 Amendments §§ 101, 201, 206, 89 Stat. at 400-02.  Because this approach "offered no bailout opportunity for jurisdictions that

eliminated discriminatory voting tests and practices that [had been] used at the time of initial coverage," Congress liberalized the standard to give even those jurisdictions with post-1965 histories of discrimination an incentive to improve their voting rights records. Paul F. Hancock & Lora L. Tredway, *The Bailout Standard of the Voting Rights Act: An Incentive to End Discrimination*, 17 URB. LAW. 379, 381 (1985).  To accomplish this, the 1982 Amendments require covered jurisdictions seeking bailout to demonstrate (among other things) that during the past ten years they used no test or device, were the subject of no judicial findings of racial discrimination in voting, successfully precleared all voting changes, and engaged in constructive efforts to eliminate intimidation and harassment of voters.  *See* 1982 Amendments § 2(b)(4), 96 Stat. at 131-32 (codified at 42 U.S.C. § 1973b(a)(1)(A)-(F)); *see also id.*, 96 Stat. at 132-33 (codified at 42 U.S.C. § 1973b(a)(2)-(4)) (listing additional requirements).  By early 2006, eleven counties and cities, all in Virginia, had successfully obtained exemptions under the new standards.  Moreover, according to the Attorney General, no bailout applications have been denied since 1984, Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 29 ("Def.'s Opp'n"), the year in which the current procedures became effective, 1982 Amendments § 2(b), 96 Stat. at 131.

In October 2005, well before section 5 and the Act's other temporary provisions were set to expire, Congress began considering whether to extend them once again. During several months of hearings, the House and Senate Judiciary Committees compiled a legislative record "no less extensive . . . than in prior years."  H.R. REP. NO. 109-478, at 11 (2006).  Because the constitutional question we face in this case turns in no small part on the care with which Congress approached its task, we quote in full the House Judiciary Committee's description of its work:

H.R. 9 results from the development of one of the most extensive legislative records in the Committee on the Judiciary's history.

## LEGISLATIVE HISTORY OF H.R. 9

*Oversight Hearings*

Prior to introducing H.R. 9, the House Committee on the Judiciary held ten oversight hearings before the Subcommittee on the Constitution examining the effectiveness of the temporary provisions of the [Voting Rights Act ("VRA")] over the last 25 years. During these oversight hearings, the Subcommittee heard oral testimony from 39 witnesses, including State and local elected officials, scholars, attorneys, and other representatives from the voting and civil rights community. The Committee also received additional written testimony from the Department of Justice, other interested governmental and non-governmental organizations (NGOs), and private citizens. In all, the Committee assembled over 12,000 pages of testimony, documentary evidence and appendices from over 60 groups and individuals, including several Members of Congress.

In addition to the oral and written testimony, the Committee requested, received, and incorporated into its hearing record two comprehensive reports that have been compiled by NGOs that have expertise in voting rights litigation and extensively documented: (1) the extent to which discrimination against minorities in voting has and continues to occur; and (2) the continued need for the expiring provisions of the VRA. The Committee also requested, received, and incorporated into its record 11 separate reports that document the extent to which discrimination occurred in 11 of the 16 States covered in whole or in part under Section 4(b) over the last 25 years. Those reports also describe the impact that the VRA has had on protecting racial and language minority citizens from discriminatory voting techniques in those jurisdictions.

*Legislative Hearings*

In addition to ten oversight hearings, the Subcommittee on the Constitution held two legislative hearings on May 4, 2006, to examine H.R. 9. During these hearings, the Committee received oral and written testimony from seven additional witnesses concerning: (1) the impact that H.R. 9 will have on continuing the progress that minority groups have made in the last forty years and on protecting racial and language minority voters over the next 25 years; and (2) the need for H.R. 9 to update the VRA's temporary provisions, and to restore the VRA to its original intent so that it can continue to be an effective remedy in addressing the history and continuing vestiges of racial discrimination.

*Id.* at 5.  The Senate Judiciary Committee undertook its own extensive hearings, resulting

in a combined record "of over 15,000 pages."  S. REP. NO. 109-295, at 10 (2006).  One of

the comprehensive reports Congress requested and relied heavily upon came from the

National Commission on the Voting Rights Act, an entity "composed of a politically and

ethnically diverse group of men and women, including former elected and appointed

public officials, scholars, lawyers, and leaders."  1 *Voting Rights Act: Evidence of*

*Continued Need*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on*

*the Judiciary*, 109th Cong. 104, 121 (Mar. 8, 2006) ("1 *Evidence of Continued Need*")

(appendix to statements of Bill Lann Lee and Joe Rogers), *available at*

http://judiciary.house.gov/media/pdfs/printers/109th/26411v1.pdf.  The Commission held

ten hearings around the country, heard testimony from more than one hundred witnesses,

and compiled a record of several thousand pages.  *Id.* at 12, 110.  The Commission's

report, entitled *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005*,

contains a number of maps, *id.* at 252-87, several of which we have included in this

opinion.  Map 1, on the next page, identifies all currently covered jurisdictions (though it

includes the Virginia counties and cities that have bailed out).  *Id.* at 252.

     Based on the extensive legislative record described above, Congress concluded

that "vestiges of discrimination in voting continue to exist."  Pub. L. No. 109-246, §

2(b)(2), 120 Stat. 577, 577 (2006) ("2006 Amendments").  According to the House

Judiciary Committee, its "findings of continued efforts to discriminate against minority

citizens in voting demonstrate that despite substantial improvements, there is a

demonstrated and continuing need to reauthorize the temporary provisions."  H.R. REP.

NO. 109-478, at 53 (2006).  As a result, in July 2006 Congress extended section 5 for an

MAP 1

Section 4(b) Covered Jurisdictions



Key:   Covered Jurisdictions

States Covered as a Whole

Covered Counties in States Not Covered as a Whole

Covered Townships in States Not Covered as a Whole

The entire state of Alaska is also covered.  No jurisdiction in Hawaii is covered
Map created by the United States Department of Justice based on coverage determination made by 28 CFR Part 51, Appendix

additional twenty-five years.  Entitled the Fannie Lou Hamer, Rosa Parks, and Coretta

Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, the statute,

which passed overwhelmingly in both chambers (unanimously in the Senate and by 390-

33 in the House), overruled several Supreme Court decisions interpreting section 5's

substantive test, but otherwise left the law virtually unchanged.  2006 Amendments, 120

Stat. at 577.  President George W. Bush signed the bill into law on July 27, 2006.

Just days after the 2006 Amendments became effective, plaintiff Northwest

Austin Municipal Utility District Number One filed this action.  Created in the late 1980s

to facilitate the development of a residential subdivision, the District is a local

government entity in Texas that sits within the boundaries of Austin and Travis County

but remains independent of both.  Am. Compl. ¶ 6.  The District provides infrastructure,

waste and wastewater service, and other local services to its approximately 3,500

residents.  *Id.*; Def.'s Statement of Uncontested Material Facts ¶¶ 45, 52.  The five

members of the District's board of directors serve staggered four-year terms, with

elections held every two years.  Def.'s Statement of Uncontested Material Facts ¶¶ 55,

58-59.  Although counties control voter registration under Texas law, the District

conducted its own board of directors elections until 2002.  *Id.* ¶¶ 17-27, 120.  Since then,

Travis County, pursuant to a written agreement with the District, has administered the

District's elections at a shared polling place.  *Id.* ¶¶ 28-34.

The District makes two claims in its amended complaint.  Claim I seeks a

declaratory judgment pursuant to section 4(a) exempting the District from section 5's

preclearance requirement.  Alternatively, Claim II alleges that section 5 "is an

unconstitutional overextension of Congress's enforcement power to remedy past

violations of the Fifteenth Amendment." Am. Compl. at p. 8. In his answer, the

Attorney General argues that because the District is not a political subdivision as defined

in the Act, it may not bail out under section 4(a). Def.'s Answer at 5. The Attorney

General also defends the Act's constitutionality, arguing that renewal of section 5

represented a valid exercise of Congress's express authority to enforce the Fourteenth and

Fifteenth Amendments. Mem. in Supp. of Def.'s Mot. for Summ. J. at 7 ("Def.'s

Mem.").

       As required by section 4(a), a district court of three judges was convened to hear

the District's challenge. *See* 42 U.S.C. § 1973b(a)(5) ("An action pursuant to this

subsection shall be heard and determined by a court of three judges in accordance with

the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme

Court."); 28 U.S.C. § 2284(b)(1) ("Upon the filing of a request for three judges, the judge

to whom the request is presented shall . . . immediately notify the chief judge of the

circuit, who shall designate two other judges, at least one of whom shall be a circuit

judge."). Several parties sought and received permission to intervene as defendants:

Travis County, the Texas State Conference of NAACP Branches, the Austin Branch of

the NAACP, People for the American Way, eleven District residents (David, Lisa, and

Gabriel Diaz; Nicole and Rodney Louis; Wendy, Jamal, and Marisa Richardson; Yvonne

and Winthrop Graham; and Nathaniel Lesane), and three residents from elsewhere in

Texas (Jovita Casares, Angie Garcia, and Ofelia Zapata). The Brennan Center for Justice

submitted an *amicus curiae* brief. Following extensive discovery, the parties filed cross-

motions for summary judgment, and we heard oral argument on September 17, 2007. We

express our gratitude to the parties and counsel for the cooperative and skilled manner in

which they have conducted themselves throughout these important and complex
proceedings, from discovery through briefing and oral argument.

## II.

We begin with bailout. As noted above, section 5 requires covered jurisdictions
to obtain federal approval for any change in voting procedures unless a three-judge panel
of this court has issued a declaratory judgment terminating the jurisdiction's section 5
preclearance obligation. 42 U.S.C. § 1973c. Until 1982 section 4(a) limited bailout to
two types of entities: (1) covered states, and (2) political subdivisions covered "as a
separate unit." *See* 1965 Act § 4(a), 79 Stat. at 438; 1982 Amendments § 2(b)(2), 96 Stat.
at 131 (codified at 42 U.S.C. § 1973b). According to section 14(c)(2), "[t]he term
'political subdivision' shall mean any county or parish, except that where registration for
voting is not conducted under the supervision of a county or parish, the term shall include
any other subdivision of a State which conducts registration for voting." 1965 Act §
14(c)(2), 79 Stat. at 445 (codified at 42 U.S.C. § 1973*l*(c)(2)). As a result, apart from
covered states, only political subdivisions separately designated for coverage could seek
bailout. So, for example, Texas could seek bailout as a covered state, as could certain
counties in California, North Carolina, and other noncovered states (*see* Map 1, *supra* p.
13). But political subdivisions within covered states—such as Travis County, in which
the District is located—could not apply for bailout despite meeting the section 14(c)(2)
definition because they had never been separately designated for coverage. *See City of
Rome*, 446 U.S. at 167 (finding city ineligible to seek bailout because "the coverage
formula of § 4(b) ha[d] never been applied to it").

In 1982, however, Congress expanded bailout eligibility to include section

14(c)(2) political subdivisions within covered states.  1982 Amendments § 2(b)(2), 96

Stat. at 131 (codified at 42 U.S.C. § 1973b(a)(1)).  It accomplished this by inserting the

italicized language into section 4(a), which bans the use of tests or devices and identifies

entities eligible to seek bailout:

> To assure that the right of citizens of the United States to vote is not
> denied or abridged on account of race or color, no citizen shall be denied
> the right to vote in any Federal, State, or local election because of his
> failure to comply with any test or device in any State with respect to which
> the determinations have been made under the first two sentences of
> subsection (b) of this section *or in any political subdivision of such State
> (as such subdivision existed on the date such determinations were made
> with respect to such State), though such determinations were not made
> with respect to such subdivision as a separate unit,* or in any political
> subdivision with respect to which such determinations have been made as
> a separate unit, unless the United States District Court for the District of
> Columbia issues a declaratory judgment under this section.

*Id.*  By including political subdivisions within covered states even though they had not

been designated for coverage "as a separate unit," Congress made jurisdictions like

Travis County eligible to seek bailout.

The District claims that although it does not qualify as a political subdivision

under section 14(c)(2)—having never "conduct[ed] registration for voting," 42 U.S.C. §

1973*l*(c)(2)—it is nonetheless eligible to apply for bailout because Congress intended the

term "political subdivision" as used in amended section 4(a) to carry its common

meaning: "[a] division of a state that exists primarily to discharge some function of local

government."  BLACK'S LAW DICTIONARY 1197 (8th ed. 2004).  As an undisputed subunit

of Texas, the District claims, it easily satisfies the common definition of political

subdivision and thus qualifies to seek section 4(a) bailout even though it does not register

voters.  In support of this argument, the District relies on dictum from *United States v.*

*Board of Commissioners of Sheffield, Alabama*, 435 U.S. 110 (1978), a voting rights case decided several years prior to the 1982 Amendments.  There, emphasizing that section 4(a)'s ban on the use of tests or devices "operates '*in* any [designated] State . . . or *in* any [designated] political subdivision,'" *id.* at 120 (quoting 42 U.S.C. § 1973b(a)), the Court held that once a state has been designated for coverage, section 5's preclearance requirement applies to all political units within it regardless of whether the units qualify as section 14(c)(2) political subdivisions, *id.* at 122.  As an aside, the Court noted—in a sentence crucial to the District's claim—that a similar result would follow where a separately designated political subdivision (rather than a state) was the covered entity because section 14(c)(2)'s definition "was intended to operate *only for purposes* of determining which political units in nondesignated States may be separately designated for coverage under § 4(b)."  *Id.* at 128-29 (emphasis added).  Reiterating this point in a nearby footnote, the Court said that "the *only limitation* § 14(c)(2) imposes on the Act pertains to the areas that may be designated for coverage."  *Id.* at 129 n.16 (emphasis added).

Arguing that "[w]hen Congress amends a statute, it is presumed to be mindful of prior judicial interpretations of that statute," the District claims that when Congress amended section 4(a) it did so in light of *Sheffield*'s dictum that the only purpose of section 14(c)(2)'s definition is to identify which political subunits qualify for coverage in section 4(b).  Pl.'s Mot. for Summ. J. with Mem. of P. & A. in Supp. of Mot. for Summ. J. at 19 ("Pl.'s Mem.").  Although the District acknowledges that Congress can overrule the Supreme Court's interpretation of a statute simply by changing the law, *see, e.g.*, *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) ("[I]n the area of statutory construction . . .

Congress is free to change this Court's interpretation of its legislation."), it points out that section 14(c)(2) underwent no change at all, meaning that Congress left *Sheffield*'s limiting construction intact. *See* Pl.'s Mem. at 18. We disagree.

That Congress left section 14(c)(2) undisturbed does not resolve the question before us. Eligibility for bailout is governed by section 4(a), which, as noted above, Congress expanded in 1982 to include "any political subdivision of [a covered] State . . . , though [the coverage] determinations were not made with respect to such subdivision as a separate unit." 42 U.S.C. § 1973b(a)(1). Had Congress stopped at the comma, there might be some question as to whether it intended to use the term "political subdivision" in its broadest sense. But Congress did not stop at the comma. Instead, it added the phrase "though [the coverage] determinations were not made with respect to such subdivision as a separate unit." *Id.* This language demonstrates that Congress intended "political subdivision" to refer only to section 14(c)(2) political subdivisions—that is, counties, parishes, and voter-registering subunits—since only "such subdivision[s]" can be separately designated for coverage. Under the District's interpretation, this language would be surplusage. *See, e.g.*, *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (quoting *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). On its face, then, amended section 4(a) excludes political subunits—like the District—that do not register voters and thus could not have been separately designated for coverage.

The House and Senate Reports accompanying the 1982 Amendments further clarify that Congress intended the expanded bailout mechanism to encompass only section 14(c)(2) political subdivisions. The 1981 House Report states that the "standard

for bail-out is broadened to permit political subdivisions, *as defined in Section 14(c)(2)*, in covered states to seek to bail out although the state itself may remain covered." H.R. REP. NO. 97-227, at 2 (1981) (emphasis added).  Leaving no doubt about the issue, the same report observes that "[w]hen referring to a political subdivision this amendment refers only to counties and parishes except in those rare instances in which the county does not conduct vote[r] registration; only in such rare instances . . . can a jurisdiction smaller than a county or parish file for bailout." *Id.* at 39.  The 1982 Senate Report not only includes almost identical language, *see* S. REP. NO. 97-417, at 2, 69 (1982), but also explains why Congress expressly rejected the broad definition of political subdivision advanced by the District here:

> Towns and cities within counties may not bailout separately.  This is a logistical limit.  As a practical matter, if every political subdivision were eligible to seek separate bailout, we could not expect that the Justice Department or private groups could remotely hope to monitor and to defend the bailout suits.  It would be one thing for the Department and outside civil rights litigators to appear in hundreds of bailout suits.  It would be quite another for them to have to face many thousands of such actions because each of the smallest political subunits could separately bail out.  Few questioned the reasonableness and fairness of this cutoff in the House.

*Id.* at 57 n.192.  In support of its position, the District points to passages in the 1982 and 2006 committee reports encouraging covered jurisdictions to use the broadened bailout mechanism.  *See, e.g.*, H.R. REP. NO. 109-478, at 58 (2006) (expressing "hope[] that more covered States and political subdivisions will take advantage of the [bailout] process").  None of these statements, however, even hints that political subdivisions outside section 14(c)(2)'s definition would qualify for bailout.  Section 4(a)'s legislative history thus confirms what its plain language reveals: political subunits like the District are not qualified to seek bailout.

This conclusion is reinforced by post-1982 developments.  In 1987 the Attorney General issued a regulation providing that only political subdivisions as defined in section 14(c)(2) may seek bailout.  One provision of the regulation states that "a covered jurisdiction or a political subdivision of a covered State" may seek to terminate coverage, 28 C.F.R. § 51.5, while another clarifies that the regulation uses the term political subdivision "as defined in the Act" and quotes section 14(c)(2) in full, *id.* § 51.2.  This matters for two reasons.  First, the Supreme Court "traditionally afford[s] substantial deference to the Attorney General's interpretation of § 5 in light of [his] 'central role . . . in formulating and implementing'" the preclearance system.  *Lopez v. Monterey County*, 525 U.S. 266, 281 (1999) (quoting *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 39 (1978)) (citing cases).  Second, when Congress reauthorized section 5 in 2006, it had every opportunity to override the Attorney General's 1987 interpretation, yet declined to do so.  Not only was Congress aware of the regulation—it was contained in the legislative record—but it knew that eleven Virginia political subdivisions had relied on the regulation and successfully bailed out.  *See* 2 *Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 3364-74 (Oct. 25, 2005) ("2 *Section 5 History*"), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/ 24120_vol.2.pdf; H.R. REP. NO. 109-478, at 93 (2006).  Had Congress disagreed with the Attorney General's interpretation, "it presumably would have clarified its intent when re-enacting the statute in [2006]."  *Dougherty*, 439 U.S. at 38.  Congress's silence on this matter is especially salient given that at least two witnesses urged Congress— unsuccessfully as it turned out—to expand bailout eligibility to encompass governmental

subunits smaller than counties and parishes.  *See Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives and Views from the Field*, *Hearing Before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary*, 109th Cong. 237 (June 21, 2006) ("*Reauthorizing the Voting Rights Act*") (statement of John J. Park, Jr.), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_senate_hearings&docid=f:31269.pdf; *Voting Rights Act: An Examination of the Scope and Criteria for Coverage under the Special Provisions of the Act*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 91 (Oct. 20, 2005) ("*Examination of Scope and Criteria for Coverage*") (statement of J. Gerald Hebert (counsel here for Travis County)), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/24034.pdf.

Given this extensive evidence of clear legislative intent—both textual and historical—we need say little about *Sheffield*.  As we explained above, *Sheffield* relates to section 5 preclearance, not section 4(a) bailout.  *See City of Rome*, 446 U.S. at 168 (observing that *Sheffield* does "not even discuss the bailout process").  Moreover, the *Sheffield* language on which the District relies pertains to an issue that the Court itself said it "need not consider," namely how section 5 would apply to a subunit of a separately designated political subdivision.  *Sheffield,* 435 U.S. at 128.  In any event, even if, as *Sheffield*'s dictum suggests, section 14(c)(2)'s definition originally operated only to identify entities eligible for coverage, the amended section 4(a)'s text and legislative history make clear that Congress used that definition in 1982 for an additional purpose: to identify those entities eligible to seek bailout.

The District's remaining arguments are equally unpersuasive.  First, it argues that Texas law, which the District says recognizes municipal utility districts as political subdivisions, qualifies it as a political subdivision for purposes of the Voting Rights Act.  But because section 14(c)(2) of the Voting Rights Act expressly defines the term "political subdivision," we need not resort to state law.  In any event, the case the District cites in support of this argument, *Dougherty County*, makes only a passing reference to state law and in no way relies upon it.  *See* 439 U.S. at 43 & n.13.  Second, the District insists that limiting bailout to section 14(c)(2) political subdivisions would eviscerate or distort other provisions of the Act, such as by denying cities the right to seek judicial preclearance under section 5 or by exempting cities from section 2's nationwide obligations.  This is incorrect.  Like section 5, those provisions all refer to "State[s] or political subdivision[s]," and *Sheffield* holds that the Act applies to all political subunits *in* a covered state or political subdivision—meaning that cities may file for judicial preclearance and must comply with section 2.  Finally, the District asserts that bailout is impractical for most counties given their size and the number of political subunits they contain.  But nothing in the record supports this claim.  In fact, since 1984 every single applicant for bailout has succeeded.

In the end, deciding which entities may seek bailout is a question for Congress, not the courts.  In 1982 Congress increased ten-fold the number of entities eligible to apply for bailout—from approximately 91 to almost 900.  Def.'s Statement of Uncontested Material Facts ¶¶ 113-14.  If the District believes this expansion was too modest, it should address its concerns to Congress.

## III.

Having determined that the District is ineligible to seek bailout, we turn to its

primary argument: that section 5 "should be stricken as unconstitutional under the Tenth,

Fourteenth, and Fifteenth Amendments" because Congress "irrationally and

incongruously" chose to continue imposing "disproportionate" burdens and a "badge of

shame" on covered jurisdictions on the basis of an "ancient formula" and "conditions that

existed thirty or more years ago but have long since been remedied." Am. Compl. ¶¶ 19-

22. Defending the statute, the Attorney General argues that Congress, given its findings

of continued discrimination and its judgment that failure to renew the Act's temporary

provisions would undermine significant gains in minority participation, properly

extended section 5 in "a valid exercise of its authority under the Fourteenth and Fifteenth

Amendments." Def.'s Mem. at 9. The intervenors likewise contend that "[s]ection 5 is

valid enforcement legislation under the Fourteenth and Fifteenth Amendments and is

consistent with principles of federalism." Reply Mem. in Supp. of Def.-Intervenors'

Mots. for Summ. J. at 8.

Before addressing the District's constitutional claim, we must determine whether

its challenge is facial, as applied, or both. In its original complaint, the District argued

that section 5 should "be struck down as unconstitutional, either on its face, or as

applied." Compl. ¶ 23. In its amended complaint, however, the District reframed its case

exclusively as an "as applied" challenge, leaving the parties and this court puzzled about

the District's intentions. Am. Compl. ¶ 23. Nowhere has the District explained—not in

its amended complaint, not in its briefs, and not at oral argument—the nature of its as-

applied challenge or how that claim differs from the facial challenge pleaded in its

original complaint.  In any event, as the Attorney General and intervenors point out, the

nature of the District's challenge, however labeled, is facial.  Like the plaintiffs in

*Katzenbach* and *City of Rome*, the District alleges that section 5 exceeds Congress's

enumerated powers.  Although the District uses the as-applied label in its amended

complaint, the arguments offered in its briefs—which focus almost exclusively on the

legislative record and the statutory design—indicate that it still regards its challenge as

facial.  Accordingly, we shall treat the District's challenge as facial.  *See infra* Parts IV

and V.  Out of an abundance of caution, however, we shall also consider the two

arguments the District makes that could be construed as reflecting an as-applied

challenge.  *See infra* Part VI.

In order to resolve the District's facial challenge to section 5, we must first

determine the appropriate standard of review.  In two lines of cases, the Supreme Court

has articulated two distinct standards for evaluating the constitutionality of laws

enforcing the Civil War Amendments.  One line, relied on by the District, begins with

*City of Boerne v. Flores*, 521 U.S. 507, in which the Court established a congruence and

proportionality test for certain legislation enacted pursuant to section 5 of the Fourteenth

Amendment.  According to the District, in extending section 5 of the Act, Congress failed

to clear the "high evidentiary hurdle" of showing that "a 1965 remedy was congruent and

proportional to the facts on the ground in 2006."  Pl.'s Mem. at 43.  Disagreeing, the

Attorney General, supported by the Diaz intervenors, argues that given Congress's amply

supported findings that section 5 "has been effective at preventing and remedying some

voting discrimination" and that "covered jurisdictions continue to discriminate in voting

against minority citizens," the provision "remains a congruent and proportional means of

enforcing the Constitution's prohibition on race and national origin discrimination in voting." Def.'s Mem. at 8-9; *see also* Mem. in Supp. of Mot. for Summ. J. of Def.-Intervenors Lisa Diaz et al. at 8-10 ("Diaz Mem."). Although NAACP intervenors agree with the Attorney General that Congress has satisfied the congruence and proportionality standard, they also invoke an earlier and less demanding test, namely the one articulated in *South Carolina v. Katzenbach*, 383 U.S. 301. Mem. of P. & A. in Supp. of Mot. for Summ. J. of Def.-Intervenors Texas NAACP et al. at 27, 29 ("NAACP Mem."). There, the Supreme Court held that when acting pursuant to Section 2 of the Fifteenth Amendment, "Congress may use *any rational means* to effectuate the constitutional prohibition of racial discrimination in voting." *Katzenbach*, 383 U.S. at 324 (emphasis added). Applying that standard, the Court sustained the constitutionality of the Voting Rights Act both as originally enacted, *id.* at 337, and as extended in 1975 under both the Fourteenth and Fifteenth Amendments, *City of Rome*, 446 U.S. at 183. According to NAACP intervenors, an "unbroken line of authority refutes any possible contention" that the holdings in *Katzenbach* and *City of Rome* have "lost their force . . . because *Boerne* requires a different analysis." NAACP Mem. at 35. Further developing this theory, the Brennan Center for Justice argues that "while the Supreme Court has found some statutes were not an appropriate means of enforcing the *Fourteenth Amendment*, the Court has been far more deferential when Congress's *Fifteenth Amendment* powers are at stake." Mem. of Law of the Brennan Center for Justice at NYU School of Law, Amicus Curiae, in Supp. of Def.'s and Def.-Intervenors' Mot. for Summ. J. at 2.

In the following pages we summarize these two lines of cases in some detail: the *Katzenbach* rationality standard in Part IIIA and the more rigorous *City of Boerne* test in

Part IIIB.  Informed by this review, we conclude in Part IIIC that notwithstanding the *City of Boerne* cases, *Katzenbach*'s rationality standard remains fully applicable to constitutional challenges to legislation aimed at preventing racial discrimination in voting.

## A.

In *South Carolina v. Katzenbach*, the Supreme Court began by explaining the Fifteenth Amendment's impact on the relationship between Congress and the states: by adding section 2's enforcement clause, "the Framers indicated that Congress was to be chiefly responsible for implementing the rights created in § 1. . . . Accordingly, in addition to the courts, Congress has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting." *Katzenbach*, 383 U.S. at 326.  As framed by the Court, the "basic question" was whether Congress had "exercised its powers under the Fifteenth Amendment in an appropriate manner with relation to the States." *Id.* at 324.  To answer this question, the Court employed the test set forth in *McCulloch v. Maryland*, 17 U.S. 316 (1819), for statutes enacted pursuant to the Necessary and Proper Clause: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Katzenbach*, 383 U.S. at 326 (quoting *McCulloch*, 17 U.S. at 421).  Put simply, "[a]s against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Id.* at 324.

Applying this deferential standard, the Court declared the Act a "legitimate response" to "nearly a century of systematic resistance to the Fifteenth Amendment." *Id.* at 328. Emphasizing the "great care" with which Congress examined racial discrimination in voting, the Court explained that two points "emerge[d] vividly from the voluminous legislative history":

> First: Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution. Second: Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment.

*Id.* at 308-09. Restricting section 5 and the other temporary provisions to certain states was "permissible," the Court concluded, because having compiled "reliable evidence of actual voting discrimination" in covered jurisdictions, Congress had only to show that its coverage formula was "relevant to the problem." *Id.* at 329-30. The Court found the formula "rational in both practice and theory." *Id.* at 330. The Court also concluded that section 5 preclearance represented a "permissibly decisive" response to the risk that covered jurisdictions "might try" to devise new voting rules to evade the Act's remedies, as certain states had previously done "in the face of adverse court decrees." *Id.* at 335. "Exceptional conditions," the Court declared, "can justify legislative measures not otherwise appropriate." *Id.* at 334.

Just three months later, in *Katzenbach v. Morgan*, 384 U.S. 641 (1966), the Court extended *Katzenbach*'s rationality test to provisions of the Voting Rights Act passed pursuant to section 5 of the Fourteenth Amendment. Like section 2 of the Fifteenth Amendment, section 5 of the Fourteenth Amendment gives Congress "power to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5.

At issue in *Morgan* was section 4(e), which provides (in effect) that no person who successfully completes sixth grade in an accredited Spanish-language school in Puerto Rico "shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret . . . English." 42 U.S.C. § 1973b(e). New York voters challenged section 4(e), arguing that it exceeded Congress's Fourteenth Amendment authority. Holding that *McCulloch*'s rationality standard provides "the measure of what constitutes 'appropriate legislation' under § 5 of the Fourteenth Amendment," *Morgan*, 384 U.S. at 651 (quoting U.S. CONST. amend. XIV, § 5), the Court concluded that Congress had reasonably determined that section 4(e) would promote the nondiscriminatory provision of public services by enhancing the Puerto Rican community's "political power," *id.* at 652-53. The Court also found that Congress could reasonably have enacted section 4(e) to eliminate "an invidious discrimination in establishing voter qualifications." *Id.* at 653-54.

In subsequent years, the Supreme Court repeatedly applied the rationality standard in cases challenging the constitutionality of Voting Rights Act reauthorizations. For example, as part of the 1970 reauthorization, Congress renewed section 4(a)'s ban on literacy tests and extended it to the entire nation. 1970 Amendments § 201, 84 Stat. at 315 (codified as amended at 42 U.S.C. § 1973aa). In *Oregon v. Mitchell*, 400 U.S. 112 (1970), the Court, though splintering on other issues, applied *Katzenbach* and *Morgan* and unanimously sustained the nationwide ban. *Id.* at 118 (opinion of Black, J.) (announcing judgment of the Court); *id.* at 217 (opinion of Harlan, J.) ("[T]he choice which Congress made was within the range of the reasonable."); *id.* at 231 (opinion of Brennan, J.) ("[C]ongressional power to enact the challenged Amendments is found in

the enforcement clauses of the Fourteenth and Fifteenth Amendments, and . . . we may easily perceive a rational basis for the congressional judgments underlying each of them.").  Eight justices believed the Fifteenth Amendment gave Congress ample authority to extend the ban; one believed the Fourteenth Amendment did so.  *See City of Rome*, 446 U.S. at 176-77 & n.13 (discussing *Mitchell*).  None required Congress to make a terribly strong evidentiary showing.  Indeed, Justice Harlan wrote that "[d]espite the lack of evidence of specific instances of discriminatory application or effect, Congress could have determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious."  *Mitchell*, 400 U.S. at 216 (opinion of Harlan, J.).  In another case involving the 1970 Amendments, *Georgia v. United States*, 411 U.S. 526 (1973), Georgia challenged the constitutionality of section 5's extension, but the Court summarily rejected the claim, reiterating that "for the reasons stated at length in [*Katzenbach*] . . . the Act is a permissible exercise of congressional power under § 2 of the Fifteenth Amendment."  *Id.* at 535.

In 1975, this time acting pursuant to both the Fourteenth and Fifteenth Amendments, Congress again extended section 5, adding provisions to protect the voting rights of language minorities—defined as "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage."  1975 Amendments § 207, 89 Stat. at 402 (codified at 42 U.S.C. § 1973*l*(c)(3)); *see also* 28 C.F.R. § 55.1 (adopting same definition); *supra* pp. 7-8.  Challenging the constitutionality of the 1975 extension and foreshadowing the issue we face here, Rome, Georgia, argued that section 5's preclearance provisions "had outlived their usefulness" and no longer represented

appropriate enforcement legislation. *City of Rome*, 446 U.S. at 180.  Rejecting this argument, the Supreme Court reaffirmed *Katzenbach*'s holding that Congress's authority under section 2 of the Fifteenth Amendment is "no less broad than its authority under the Necessary and Proper Clause." *Id.* at 175.  According to the Court, then, the question before it was whether "Congress could rationally have concluded" that extending section 5 was necessary. *Id.* at 177.

Applying this permissive standard, the Court reviewed three types of evidence compiled by Congress: (1) racial disparities in registration and turnout rates; (2) the number of black elected officials; and (3) the number and types of voting changes submitted for preclearance, along with the number and nature of objections interposed by the Attorney General. *Id.* at 180-81.  The Court found that Congress had given "careful consideration" to this evidence—which showed that progress since 1965, "though 'undeniable,' had been 'modest and spotty'"—and "decline[d] this invitation to overrule Congress' judgment that the 1975 extension was warranted." *Id.* (quoting H.R. REP. NO. 94-196, at 7-11 (1975); S. REP. NO. 94-295, at 11-19 (1975)).  As the Court explained, Congress thought reauthorization "necessary to preserve the 'limited and fragile' achievements of the Act" and to "counter the perpetuation of 95 years of pervasive voting discrimination." *Id.* at 182 (quoting H.R. REP. NO. 94-196, at 10-11 (1975)).  According to the Court, this "considered determination" was "both unsurprising and unassailable," making section 5's extension "plainly a constitutional method of enforcing the Fifteenth Amendment." *Id.*

The final case in this series, *Lopez v. Monterey County*, 525 U.S. 266, came just nine years ago.  There, the Court held that Monterey County, a separately designated

political subdivision in California, had to preclear voting changes required by state law "notwithstanding the fact that the State is not itself a covered jurisdiction." *Id.* at 282. Citing both *Katzenbach* and *City of Rome*, the Court observed that it had "specifically upheld the constitutionality of § 5 of the Act against a challenge that this provision usurps powers reserved to the States." *Id.* at 283. Even the dissent recognized that both *Katzenbach* and *City of Rome* had "compared Congress' Fifteenth Amendment enforcement power to its broad authority under the Necessary and Proper Clause." *Id.* at 294 (Thomas, J., dissenting). Critically, neither the majority nor the dissent questioned that standard even though *Lopez* came two years after *City of Boerne*, the case that announced the congruence and proportionality test, to which we now turn.

## B.

The Fourteenth Amendment cases upon which the District relies begin with *City of Boerne*, which involved a constitutional challenge to the Religious Freedom Restoration Act (RFRA). *City of Boerne*, 521 U.S. at 515-16. Purporting to enforce the Constitution's free exercise guarantee, Congress relied on section 5 of the Fourteenth Amendment to apply RFRA to the states. Though acknowledging that section 5 represents a broad grant of legislative power to remedy and deter constitutional violations, even if the prohibited conduct itself is constitutional or the prohibition intrudes on state sovereignty, the Court stressed that this power is "'not unlimited.'" *Id.* at 518 (quoting *Mitchell*, 400 U.S. at 128 (opinion of Black, J.)). In particular, the Court held that Congress's remedial power authorizes it neither to "decree the substance of the Fourteenth Amendment's restrictions" nor to "make a substantive change in the governing law." *Id.* at 519. While observing that Congress deserves "wide latitude" in

32

drawing the line between remedial and substantive legislation, the Court demanded "a *congruence and proportionality* between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520 (emphasis added).

The Court held that RFRA failed this test for several reasons. To begin with, the legislative history documented not a single state law involving deliberate religious persecution in the previous forty years; the congressional hearings instead focused on laws imposing incidental burdens on the free exercise of religion. *Id.* at 530. The Court contrasted this record, which "lack[ed] examples of modern instances of generally applicable laws passed because of religious bigotry," with the "record which confronted Congress and the Judiciary in the voting rights cases." *Id.* Moreover, RFRA's "[s]weeping coverage" and lack of either a termination date or termination mechanism led the Court to view it as far "out of proportion to a supposed remedial or preventive object." *Id.* at 532. Finally, by imposing litigation burdens and regulatory constraints on states, RFRA exacted "substantial costs" that "far exceed[ed] any pattern or practice of unconstitutional conduct." *Id.* at 534.

For all of these reasons, the Court held that Congress had exceeded its Fourteenth Amendment authority by applying RFRA to the states. In doing so—and central to the issue before us—the Court contrasted RFRA with section 5 of the Voting Rights Act, observing that the latter included an expiration date, affected a discrete class of state laws, applied only to regions where discrimination was severe, and allowed covered jurisdictions to bail out. *Id.* at 532-33.

In a series of later cases, the Court refined *City of Boerne*'s congruence and proportionality test, holding that those parts of three statutes abrogating state sovereign

immunity exceeded Congress's Fourteenth Amendment authority.  In each case the Court

left intact statutory provisions, enacted pursuant to the Commerce Clause, that regulated

private conduct.  In the first case, *Florida Prepaid Postsecondary Education Expense*

*Board v. College Savings Bank*, 527 U.S. 627 (1998), the Court invalidated provisions of

the Patent and Plant Variety Protection Remedy Clarification Act that made states liable

in federal courts for patent infringement.  *Id.* at 647.  In *Kimel v. Florida Board of*

*Regents*, 528 U.S. 62 (2000), the Court struck down provisions of the Age Discrimination

in Employment Act that authorized suits for money damages against state employers.  *Id.*

at 91.  And in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356

(2001), the Court invalidated provisions of Title I of the Americans with Disabilities Act

(ADA) that subjected state employers to money damages for violating the Act.  *Id.* at

374.  As in *City of Boerne*, the Court contrasted the thin legislative records of

unconstitutional state action in *Florida Prepaid* and *Garrett* with the "undisputed record

of racial discrimination confronting Congress in the voting rights cases."  *Fla. Prepaid*,

527 U.S. at 640; *see also Garrett*, 531 U.S. at 373 ("In t[he Voting Rights] Act, Congress

documented a marked pattern of unconstitutional action by the States.").  Also, as in *City*

*of Boerne*, the Court contrasted the broad accommodation duty at issue in *Garrett* with

the Voting Rights Act's "detailed but limited remedial scheme designed to guarantee

meaningful enforcement of the Fifteenth Amendment in those areas of the Nation where

abundant evidence of States' systematic denial of those rights was identified."  *Garrett*,

531 U.S. at 373.

    Following these cases, two statutes abrogating state sovereign immunity pursuant

to the Fourteenth Amendment survived constitutional challenges under the *City of Boerne*

test.  In *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003), the
Court rejected a challenge to Family and Medical Leave Act (FMLA) provisions
allowing recovery of money damages from states.  *Id.* at 740.  One year later, in
*Tennessee v. Lane*, 541 U.S. 509 (2004), the Court rejected a constitutional challenge to
ADA Title II, which generally prohibits states from excluding disabled individuals from
public services, programs, and entities, including state courthouses—the focus of
plaintiffs' claims in that case.  *Id.* at 533-34.  In *Hibbs* the Court emphasized that as with
the Voting Rights Act, Congress enacted the FMLA only after being "confronted [with] a
'difficult and intractable proble[m]' where previous legislative attempts had failed."
*Hibbs*, 538 U.S. at 737 (citations omitted) (second alteration in original); *see also Lane*,
541 U.S. at 531 ("[Congress] faced . . . considerable evidence of the shortcomings of
previous legislative responses.").  Distinguishing *Garrett* and *Kimel*, the Court explained
in both *Hibbs* and *Lane* that Congress sought to enforce a right or to protect a class that
receives heightened judicial scrutiny: suspect gender classifications (the FMLA) and the
fundamental right of access to courts (ADA Title II).  *Hibbs*, 538 U.S. at 735; *Lane*, 541
U.S. 529.  By contrast, as the Court had previously observed, disparate state treatment on
the basis of age (*Kimel*) and disability (*Garrett*) receive only rational basis review.
*Kimel*, 528 U.S. at 83; *Garrett*, 531 U.S. at 366-68.

   Taken together, these four cases—*Kimel*, *Garrett*, *Hibbs*, and *Lane*—add a
preliminary but critical step to the *City of Boerne* test: identification of the right or
protected class at issue.  That is, before assessing the adequacy of the record of
unconstitutional state conduct and determining whether Congress's remedial scheme is
congruent and proportional to the constitutional harm, courts must decide whether a

challenged statute implicates a fundamental right or protected class.  As the Court

explained in *Hibbs*, if the right or class at issue receives heightened scrutiny, "it [will be]

easier for Congress to show a pattern of state constitutional violations."  *Hibbs*, 538 U.S.

at 736.  For example, "[b]ecause racial classifications are presumptively invalid, most of

the States' acts of race discrimination" that Congress documented in passing the Voting

Rights Act of 1965 "violated the Fourteenth Amendment."  *Id*.

**C.**

Now that we have summarized *Katzenbach*'s rationality standard and *City of*

*Boerne*'s congruence and proportionality test, the time has come to choose between them.

For two independent reasons, we believe that *Katzenbach*'s rationality standard governs

this case.

The first reason is *City of Rome*.  There, the Supreme Court addressed a facial

challenge to the 1975 extension of section 5, which Congress had enacted pursuant to

both the Fourteenth and Fifteenth Amendments.  To resolve that challenge, the Court

applied *Katzenbach*'s rationality test, finding the extension a reasonable response to the

problem of continued racial discrimination in voting.  Here we confront precisely the

same issue: a facial challenge to an extension of section 5 based on both the Fourteenth

and Fifteenth Amendments.

To be sure, at the time of *City of Rome* there was no indication that the Fourteenth

and Fifteenth Amendment standards might differ.  *See Morgan*, 384 U.S. at 650-51

(applying same rationality standard to both Fourteenth and Fifteenth Amendments); *see*

*also City of Rome*, 446 U.S. at 180-82 (upholding section 5 with reference only to the

Fifteenth Amendment); *id.* at 208 n.1 (Rehnquist, J., dissenting) ("[Because] the nature of

the enforcement powers conferred by the Fourteenth and Fifteenth Amendments has always been treated as coextensive . . . , it is not necessary to differentiate between the Fourteenth and Fifteenth Amendment powers for the purposes of this opinion.") (citations omitted).  Not until *City of Boerne* did the Supreme Court establish the more restrictive congruence and proportionality test for certain statutes enacted pursuant to the Fourteenth Amendment.  In our view, however, the *City of Boerne* standard does not apply to the issue before us.  To begin with, although the *City of Boerne* cases repeatedly describe the Voting Rights Act as congruent and proportional, they never state that *Katzenbach*'s and *City of Rome*'s more deferential standard no longer governs constitutional challenges to statutes aimed at racial discrimination in voting.  In fact, none of those cases even involved a statute dealing with race or voting rights.  What's more, in *Lopez*, decided two years after *City of Boerne*, the Court cited both *Katzenbach* and *City of Rome* with approval while rebuffing a constitutional challenge to section 5's "federalism costs." *Lopez*, 525 U.S. at 282-83 (internal quotation marks omitted).  True, the same passage quotes *City of Boerne*, but only for the general proposition that Congress possesses broad enforcement powers.  *Id.*

Nor does anything in *City of Boerne* cast doubt on *Morgan*, in which the Court applied *Katzenbach*'s rationality test to a provision of the Voting Rights Act that Congress enacted pursuant to the Fourteenth Amendment and crafted to protect the voting rights of a specific language minority.  *See supra* pp. 28-29.  The *City of Boerne* Court discussed *Morgan* at some length, explaining that it had upheld section 4(e) as a "*reasonable* attempt to combat" unconstitutional discrimination by the state of New York.  *City of Boerne*, 521 U.S. at 527-28 (emphasis added).  Indeed, citing *Morgan* and

viewing section 4(e) as a measure aimed at "racial discrimination," Justice Scalia

announced in *Lane*, the most recent of the *City of Boerne* cases, that "I shall leave it to

Congress, under constraints no tighter than those of the Necessary and Proper Clause, to

decide what measures are appropriate under § 5 [of the Fourteenth Amendment] to

prevent or remedy racial discrimination by the States."  *Lane*, 541 U.S. at 561, 564

(Scalia, J., dissenting).

 Moreover, the basic concerns animating the *City of Boerne* cases do not apply to

legislation designed to prevent racial discrimination in voting.  In *City of Boerne* itself,

the Court worried that Congress, by relying on its authority to enforce the Fourteenth

Amendment's broad guarantees, could "decree the substance" of that amendment's

restrictions on the states, thereby transforming the Constitution from a "superior

paramount law" into something "on a level with ordinary legislative acts."  *City of*

*Boerne*, 521 U.S. at 519, 529 (citations and internal quotation marks omitted).  The risk

that Congress might redefine substantive rights carries special force in the Fourteenth

Amendment context because that amendment functions as the vehicle through which

various rights, including the Constitution's broadly drafted equal protection and due

process guarantees, apply to the states.  *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 628-29

(1996) (observing that "heightened equal protection scrutiny" applies to classifications

involving sex, illegitimacy, race, and ancestry); *Washington v. Glucksburg*, 521 U.S. 702,

720 (1997) (observing that "in addition to the specific freedoms protected by the Bill of

Rights," the Due Process Clause protects "the rights to marry, to have children, to direct

the education and upbringing of one's children, to marital privacy, to use contraception,

to bodily integrity, and to abortion" (citations omitted)); *see also* 1 Laurence H. Tribe,

AMERICAN CONSTITUTIONAL LAW 936 (3d ed. 2000) ("Because the [Fourteenth A]mendment's phrases are so open to a range of interpretations, they invite not only remedial congressional legislation, but congressional definition of the very rights themselves."). No such risk exists here because the Voting Rights Act focuses exclusively on racial discrimination—the precise evil addressed by the Civil War Amendments—in the narrow context of voting, as the Fifteenth Amendment expressly authorizes. *See, e.g.*, *Mitchell*, 400 U.S. at 127 (opinion of Black, J.) (noting, in upholding ban on use of literacy tests or other devices to discriminate against voters on account of race, that "the Civil War Amendments were unquestionably designed to condemn and forbid every distinction, however trifling, on account of race").

In the cases following *City of Boerne*, the Court also worried that Congress had impermissibly included states within the ambit of statutes targeting non-state actors. Those cases all involve broadly applicable statutes enacted under both the Fourteenth Amendment and the Commerce Clause. In that context, the Court refused to "infer from Congress' general conclusions regarding societal discrimination . . . that the States had likewise participated in such action." *Garrett*, 531 U.S. at 371. Through the congruence and proportionality test, the post-*Boerne* cases thus require Congress, when relying on the Fourteenth Amendment to abrogate state sovereign immunity through statutes enacted primarily under the Commerce Clause, to establish an adequate record of constitutional violations by states rather than compiling evidence of discrimination by private actors. Congress satisfied this requirement in 2006 when it extended section 5 on the basis of a legislative record that focused almost exclusively on state actors. Equally significant, the prohibitions contained in the Voting Rights Act apply only to states and their political

subunits. *Cf. United States v. Morrison*, 529 U.S. 598, 625-27 (2000) (holding that Congress exceeded its authority to enforce the Fourteenth Amendment by enabling victims of gender-motivated violence to file suits against private perpetrators, not "any State or state actor").

There is a second, independent reason we feel bound to apply *Katzenbach*'s and *City of Rome*'s rationality standard. Even if the *City of Boerne* cases changed the test for *all* statutes enacted pursuant to the Fourteenth Amendment, including provisions aimed at preventing racial discrimination in voting, those cases leave the Fifteenth Amendment standard untouched. The *City of Boerne* cases all arose under the Fourteenth Amendment, not the Fifteenth, and although the Court described Congress's powers to enforce the two amendments as "parallel," *City of Boerne*, 521 U.S. at 518, and observed in a footnote that their enforcement clauses are "virtually identical," *Garrett*, 531 U.S. at 373 n.8, such dicta hardly suffice to overrule *Katzenbach* and *City of Rome*. Indeed, the Supreme Court has never applied the congruence and proportionality test to legislation enforcing the Fifteenth Amendment. *See Eldred v. Ashcroft*, 537 U.S. 186, 218 (2003) ("[P]etitioners ask us to apply the 'congruence and proportionality' standard described in cases evaluating exercises of Congress' power under § 5 of the Fourteenth Amendment. But we have never applied that standard outside the § 5 context." (citation omitted)).

This matters a great deal because, at its core, this is a Fifteenth Amendment case: while Congress cited the Fourteenth Amendment when it adopted the Act's protections for language minorities in 1975 and extended them in 2006, it could have relied solely on its Fifteenth Amendment authority. Although the Supreme Court has yet to speak precisely to whether the Fifteenth Amendment protects language minorities, its decisions

strongly suggest that such minorities, at least as defined in the Act, qualify as racial groups. For example, in a recent case involving native Hawaiian voters, the Supreme Court held that "[a]ncestry can be a proxy for race" and that the Fifteenth Amendment protects "all persons, not just members of a particular race." *Rice v. Cayetano*, 528 U.S. 495, 512, 514 (2000). Further, in a case involving an Arab-American plaintiff, the Court held that a statutory ban on racial discrimination protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Finally, in *Mitchell*, where the Supreme Court sustained the constitutionality of the nationwide literacy test ban, two of the opinions that relied on the Fifteenth Amendment treated both Native Americans and individuals with "Spanish surname[s]" as racial minorities. *Mitchell*, 400 U.S. at 132 (opinion of Black, J.); *id.* at 235 (opinion of Brennan, J.). Given that section 5 protects specific language minorities, all identified by ancestry or heritage, Congress could have based the provision's expansion solely upon the Fifteenth Amendment.

This conclusion finds support in Supreme Court cases treating Latinos as a racial group protected by the Fourteenth Amendment's Equal Protection Clause. As early as 1954, in a case challenging the exclusion of Mexican-Americans from jury service, the Court rejected Texas's argument that "there are only two classes—white and Negro— within the contemplation of the Fourteenth Amendment." *Hernandez v. Texas*, 347 U.S. 475, 477 (1954). The Court instead found that persons of Mexican descent represented an identifiable class protected against discrimination because "residents of [Jackson County] distinguished between 'white' and 'Mexican'" in segregating their local schools, courthouse bathrooms, and "at least one restaurant." *Id.* at 479. Similarly, in a case

41

involving a Texas legislative redistricting, the Court affirmed a district court order

finding that a multi-member district was "invidiously discriminatory" against Mexican-

Americans, which the Court regarded as a "cognizable racial or ethnic group[]."  *White v.*

*Regester*, 412 U.S. 755, 756, 767-70 (1973); *see also Keyes v. Sch. Dist. No. 1*, 413 U.S.

189, 195, 198 (1973) (finding that in Denver—a "tri-ethnic" community—blacks and

Hispanics "suffer identical discrimination in treatment when compared with the treatment

afforded Anglo students").  Finally, in a more recent Texas redistricting case, the Court

treated the state's Latino population as a distinct minority group characterized by

"*racially* polarized voting."  *League of United Latin Am. Citizens v. Perry*, 126 S. Ct.

2594, 2615 (2006) ("*LULAC*") (emphasis added); *see also id.* at 2663 (Roberts, C.J.,

dissenting) ("It is a sordid business, this divvying us up by race."); *id.* at 2667 (Scalia, J.,

dissenting) ("[W]hen a legislature intentionally creates a majority-minority district, race

is necessarily its predominant motivation.").  Because the Fifteenth Amendment, like the

Fourteenth, prohibits discrimination on the basis of race, these cases, which treat persons

of Spanish heritage as a distinct racial group, support the conclusion that the Fifteenth

Amendment gave Congress all the authority it needed to extend section 5 to protect

language minorities.

Indeed, the Justice Department advised Congress that it had no need to invoke the

Fourteenth Amendment in order to expand section 5 protection to language minorities.

"[I]t is clear," the Justice Department explained in a 1975 memorandum to the Senate

Judiciary Committee, "that [the Fifteenth Amendment's] protection is not limited to

blacks."  *Extension of the Voting Rights Act of 1965*, *Hearing Before the Subcomm. on*

*Constitutional Rights of the S. Comm. on the Judiciary*, 94th Cong. 698 (Apr. 29, 1975)

(exhibit to testimony of J. Stanley Pottinger). The Department pointed out that when

drafting the Fifteenth Amendment, the Senate "twice rejected . . . a provision which

stated that: 'Citizens . . . of African descent shall have the same right to vote and hold

office . . . as other citizens,'" and that some opposition to this proposal "was based on the

belief that the amendment's protection should not be limited to one race." *Id.* (second

and third omissions in original). Moreover, California and Oregon refused to ratify the

amendment in part because of "fear that it would lead to enfranchisement of Chinese

persons." *Id.* Given that "there was general agreement in Congress in 1869 that the 15th

Amendment would protect the voting rights of Indians," *id.* at 699, and given that the

"vast majority of the population of Mexico is at least in part of Indian ancestry," the

Justice Department concluded by "stat[ing] firmly . . . that Congress has the power under

[section] 2 of the 15th Amendment to enact legislation protecting the voting rights of

[Mexican-Americans] or Puerto Ricans," *id.* at 700. The Department explained that this

view was consistent with its implementation of the Voting Rights Act: in reviewing

section 5 submissions, the Attorney General had consistently "treat[ed] Indians, Puerto

Ricans and Mexican-Americans as racial groups." *Id.* at 698.

Having heard the Justice Department's advice, Congress cited the Fourteenth

Amendment only out of an abundance of caution. The Senate Report explains:

> The Department of Justice and the United States Commission on Civil
> Rights have both expressed the position that all persons defined in this title
> as "language minorities" are members of a "race or color" group protected
> under the Fifteenth Amendment. However, the enactment of the expansion
> amendments under the authority of the Fourteenth as well as the Fifteenth
> Amendment, would *doubly insure* the constitutional basis for the Act.

S. REP. NO. 94-295, at 47-48 (1975) (emphasis added).  Thus, although Congress cited the Fourteenth Amendment when it extended section 5 in 1975, 1982, and 2006, it had no need to do so, as it could have relied solely on the Fifteenth Amendment.

To sum up, given relevant Supreme Court precedent, we must treat this case either as a sequel to *City of Rome* or as a straightforward Fifteenth Amendment case. Either way we must apply *Katzenbach*'s and *City of Rome*'s rationality test.  With its greater degree of deference to Congress, this test is proper here because, put simply, this case implicates Congress's express constitutional authority to remedy *racial* discrimination in *voting*.  None of the *City of Boerne* cases involved two such essential rights, much less any rights so close to the core objectives of the Civil War Amendments. We thus have no basis for reading those cases as overturning the Court's longstanding rule, set forth in *Katzenbach* and followed in *Morgan*, *Mitchell*, *Georgia*, and *City of Rome*, that "against the reserved powers of the states, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Katzenbach*, 383 U.S. at 324.

Indeed, as a district court bound by Supreme Court precedent, we would follow *Katzenbach* and *City of Rome* even if we thought the *City of Boerne* cases cast some doubt on those cases.  As the Supreme Court has warned, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [district courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  Here, the decisions that "directly

control[]" are *Katzenbach* and *City of Rome*, for only they resolve constitutional

challenges to section 5 of the Voting Rights Act.

# IV.

Before applying *Katzenbach*'s rationality standard to the record before us, we can

easily dispose of three of the District's broader attacks on the Act's constitutionality, for

each was squarely considered and rejected in *City of Rome*.  First, the District challenges

section 5 as an extraordinarily intrusive federal mandate that "interfere[s] with and

reorder[s] state government," violating rights reserved to the states under the Tenth

Amendment.  Pl.'s Mem. at 26.  In *City of Rome*, however, the Court made clear that the

Fifteenth Amendment was "specifically designed as an expansion of federal power and

an intrusion on state sovereignty."  446 U.S. at 179.  Second, the District argues that

because the Fifteenth Amendment prohibits only "measures implemented with the intent

and effect of denying racial minorities access to the ballot," section 5 "cuts too broad a

swath" given that it covers a "vast amount of clearly constitutional government activity."

Pl.'s Mem. at 45, 56.  Rejecting the identical argument in *City of Rome*, the Court held

that "the Act's ban on electoral changes that are discriminatory in effect is an appropriate

method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that

§ 1 of the Amendment prohibits only intentional discrimination in voting."  *City of Rome*,

446 U.S. at 177; *cf. Lopez*, 525 U.S. at 282 ("[Section] 5's preclearance requirement

applies to a covered county's nondiscretionary efforts to implement a voting change

required by state law, notwithstanding the fact that the State is not itself a covered

jurisdiction.").  Finally, pointing to congressional findings of "significant progress" under

the Act, the District insists that "Congress could not permissibly [extend section 5] with

no showing that [the] extraordinary conditions [of 1965] persist in modern times."  Pl.'s

Mem. at 46-47.  Yet in *City of Rome*, while acknowledging minority political progress

since 1965, the Court still accepted Congress's judgment that extension of section 5's preclearance requirement was "necessary . . . to promote *further amelioration* of voting discrimination." *City of Rome*, 446 U.S. at 182 (emphasis added).

With the District's resurrected arguments out of the way, we turn to the primary task before us. Under *Katzenbach* and *City of Rome*, we ask whether Congress could rationally have concluded that unless it extended section 5, "racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years." 2006 Amendments § 2(b)(9), 120 Stat. at 578. Given that the Court in *City of Rome* found the 1975 legislative record sufficient to demonstrate that Congress had rationally extended section 5, the more precise questions before us are these: how do the nature and magnitude of the racial discrimination in voting revealed in the 2006 legislative record compare to the conditions documented by Congress in 1975, and is the 2006 record sufficiently comparable to the 1975 record for us to conclude that Congress again acted rationally when it extended section 5 for another twenty-five years?

## A.

Keeping *Katzenbach*'s deferential standard firmly in mind and using the 1975 legislative record as a guidepost, we begin our review of the 2006 legislative record with Congress's consideration of the three categories of evidence the Court examined in *City of Rome*: racial disparities in registration (as well as turnout), the number of minority elected officials, and objections by the Attorney General. We then examine additional evidence Congress relied upon in 2006: "more information request" letters from the Attorney General, judicial preclearance suits, section 5 enforcement actions, section 2

47

litigation, appointment of federal election observers, and racially polarized voting.  This summary concludes with evidence of section 5's deterrent effect.  All citations are to evidence contained in the legislative record.  A few studies presented to Congress in draft form later underwent minor revisions before being published, but given that our review is limited to the actual evidence Congress considered, we refer only to the original versions.

*Registration and Turnout*

Massive disparities between black and white registration rates in many southern states, together with other evidence of discrimination, prompted the original enactment of the Voting Rights Act in 1965.  For example, black registration was 32% in Louisiana, 19% in Alabama, and only 6% in Mississippi—more than 50 percentage points below the rate for white citizens in each of those states.  S. REP. NO. 109-295, at 11 (2006); *Katzenbach*, 383 U.S. at 313.  In its challenge to the 1975 reauthorization, Rome pointed out that by 1976 black registration rates in four southern states exceeded the national average for blacks and argued that the "emergency with respect to which Congress acted in 1964 ha[d] passed."  Brief for the Appellants at 106-07, *City of Rome*, 446 U.S. 156 (No. 78-1840).  Although the Supreme Court acknowledged this dramatic progress, it upheld the constitutionality of the 1975 extension because Congress had found that "[s]ignificant disparity persisted between the percentages of whites and Negroes registered in at least several of the covered jurisdictions."  *City of Rome*, 446 U.S. at 180.  In particular, 16- to 24-point gaps in registration rates persisted in Alabama, Louisiana, and North Carolina.  H.R. REP. NO. 94-196, at 7 (1975); S. REP. NO. 94-295, at 13 (1975).

Echoing Rome's arguments, the District claims that increasing black registration and turnout rates, as documented by Congress in 2006, "*negate* the existence of

extraordinary circumstances like those existing in 1965." Pl.'s Mem. at 47-48

(discussing findings in S. REP. NO. 109-295, at 8 (2006), and H.R. REP. NO. 109-478, at

12 (2006)). But this is the wrong comparison. As noted above, the *City of Rome* Court

acknowledged the dramatic progress the South had made since 1965, yet found the

evidence of continued discrimination sufficient to justify the 1975 extension. The correct

comparison, then, is between the evidence the Court found sufficient in *City of Rome* and

the evidence Congress compiled in 2006. Viewed from that perspective, the racial

disparities revealed in the 2006 legislative record differ little from what Congress found

in 1975. Alabama, Louisiana, and North Carolina had racial disparities in registration of

16 to 24 points at the time of *City of Rome*; the 2006 House Report identifies comparable

gaps in three other states: Virginia, Texas, and Florida. In Virginia the racial disparity

between whites and blacks in registration was 11 points; the disparity in turnout was 14

points. H.R. REP. NO. 109-478, at 25 (2006). In Texas the registration gap between

whites and Hispanics was 20 points. *Id.* at 29. And in Florida the House committee

found even larger gaps between whites and Hispanics: 31 points in registration and 24

points in turnout. *Id.* In other words, despite significant progress—attributable in large

part to the Voting Rights Act itself—Congress, having surveyed evidence from covered

jurisdictions, determined that more remained to be done.

   In fact, as NAACP intervenors point out, racial disparities in electoral

participation were actually greater than even Congress believed. Both the House and

Senate Reports rely on a 2004 census table, but each focuses on the wrong row of

numbers, i.e., on a row entitled "White alone" rather than the row immediately below

entitled "White non-Hispanic alone." This mistake effectively reduced the registration

and turnout rates of non-Hispanic whites.  NAACP Mem. at 60-61 (citing Senate testimony of Nathaniel Persily).  Data in the correct row reveal that black registration and turnout rates were higher than those of non-Hispanic whites not in five covered states, as Congress thought, but in only one—Mississippi.  *Compare* U.S. Census Bureau, Current Population Survey tbl. 4a (Nov. 2004) ("Census Bureau Survey"), *available at* http://www.census.gov/population/socdemo/voting/cps2004/tab04a.xls, *with* S. REP. NO. 109-295, at 11 (2006).  The impact of this error in Texas was dramatic: although both the House and Senate committees reported that black registration and turnout rates *exceeded* those for whites by 7 and 5 points respectively, those rates were actually 5 and 8 points *lower* than for non-Hispanic whites alone.  *Compare* H.R. REP. NO. 109-478, at 12 (2006), *and* S. REP. NO. 109-295, at 11 (2006), *with* Census Bureau Survey tbl. 4a.

At oral argument counsel for the District pointed to a second error, namely that "with respect to Hispanic registration rates in Texas, if you equalize for citizenship, that gap [of 20 points between whites and Hispanics] largely disappears."  Mots. Hr'g Tr. at 43 (Sept. 17, 2007).  True, Congress failed to acknowledge that only 71% of Hispanic adults in Texas were U.S. citizens eligible to register, *see* Census Bureau Survey tbl. 4a. But taking citizenship into account hardly makes the registration gap "largely disappear[]."  In fact, a substantial 16-point gap remains, *id.*—a gap comparable to the disparity the *City of Rome* Court called "significant."  *City of Rome*, 446 U.S. at 180.

### Minority Elected Officials

In 1965, when Congress originally enacted the Voting Rights Act, only seventy-two blacks were serving as elected officials in eleven southern states.  S. REP. NO. 94-295, at 14 (1975).  Ten years later, when Congress extended section 5 for a second time,

995 black elected officials, including sixty-eight state legislators and one member of Congress, were serving in seven covered states. *Id.* Acknowledging this progress in *City of Rome*, the Court took note of Congress's finding that "'a bleaker side of the picture yet exists,'" observing that black elected officials "held only relatively minor positions, none held statewide office, and their number in the state legislatures fell far short" of proportional representation. *City of Rome*, 446 U.S. at 180-81 (quoting H.R. REP. NO. 94-196, at 7 (1975)). In Mississippi, then 37% black, African Americans held less than 1% of state legislative seats. S. REP. NO. 94-295, at 14 (1975). And in South Carolina, then 31% black, they held less than 8% of legislative seats. *Id.*

Highlighting the South's progress, the District cites Congress's finding that the number of African American elected officials in the six southern states originally covered by the Act "increased by approximately 1000 percent *since 1965*." H.R. REP. NO. 109-478, at 18 (2006) (emphasis added). Again, this is the wrong comparison. Although the House committee found that minorities have made significant gains in winning elected office in covered jurisdictions, *id.*, progress on this front, as the Court recognized in *City of Rome*, was well underway by 1975, 446 U.S. at 180. And like the "bleaker side" Congress emphasized in 1975, the 2006 legislative record reveals that gains by minority candidates remain uneven, both geographically and by level of office. In three of the six originally covered states—Mississippi, Louisiana, and South Carolina—the House committee found that not one African American had ever been elected to statewide office. H.R. REP. NO. 109-478, at 33 (2006). The committee also reported that African Americans accounted for only 21% of state legislators in six southern states where the black population averaged 35%—Alabama, Georgia, Louisiana, Mississippi, South

Carolina, and North Carolina. *Id.* Finally, the committee found that the number of

Latinos and Asian Americans elected to office nationwide "has failed to keep pace with

[the] population growth" of those two communities. *Id.*

*Attorney General Objections*

Recall that section 5 requires covered jurisdictions to submit all proposed voting

changes for review to either the Attorney General or a three-judge panel of this court.

*See supra* p. 5. During the Act's first five years, from 1965 to 1970, the Attorney

General reviewed 578 proposed changes, objecting to only 4%. H.R. REP. NO. 94-196, at

9-10 (1975). Around the time of the 1970 Amendments, the Justice Department adopted

regulations for screening submissions, and two Supreme Court rulings "gave broad

interpretations to the scope of Section 5." *Id.* at 9 (discussing *Allen v. State Bd. of

Elections*, 393 U.S. 544 (1969), and *Perkins v. Matthews*, 400 U.S. 379 (1971)). These

two events produced a spike in section 5 submissions, from 255 in 1970 to an annual

average of 975 from 1971 to 1974, during which time the rate of Attorney General

objections remained steady at 3 to 4%. *Id.*

In its challenge to the 1975 reauthorization, Rome informed the Court that by

1978 the objection rate had fallen sharply to 0.8%. Jurisdictional Statement of

Appellants at 42 n.16, *City of Rome*, 446 U.S. 156 (No. 78-1840). Given this, Rome

argued that section 5 had become obsolete and that administrative preclearance, "having

become a mere 'inventory of voting procedures,' ha[d] paradoxically become a 'dead

letter.'" *Id.* (quoting *Georgia*, 411 U.S. at 531, 538). The Supreme Court rejected this

argument, emphasizing Congress's "ringing endorsement" of section 5 and quoting at

length from the 1975 House Report:

> The recent objections entered by the Attorney General . . . clearly bespeak the continuing need for this preclearance mechanism. As registration and voting of minority citizens increases [sic], other measures may be resorted to which would dilute increasing minority voting strength. . . .
>
> The Committee is convinced that it is largely Section 5 which has contributed to the gains thus far achieved in minority political participation, and it is likewise Sect[i]on 5 which serves to insure that that progress not be destroyed through new procedures and techniques.

*City of Rome*, 446 U.S. at 181 (quoting H.R. REP. NO. 94-196, at 10-11 (1975)).

Again echoing *Rome*'s challenge, the District argues that the objection rate has been "negligible in recent years." Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mots. for Summ. J. at 63 ("Pl.'s Opp'n"). According to the District, the rate has become "so vanishingly small" as to refute all claims that section 5 "acts as anything other than a symbolic assertion of federal supremacy intended to perpetuate the fiction that states and localities cannot be trusted to enact fair and nondiscriminatory voting practices and procedures." *Id.* at 64. For support the District cites statistics revealing a steady drop in objection rates over 5-year intervals beginning in 1968: from 4.06% (1968-72) to 1.31% (1973-77) to .44% (1978-82) to .21% (1983-87) and ultimately to .05% (1998-2002). *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 219 (May 9, 2006) ("*Introduction to Expiring Provisions*") (statement of Richard L. Hasen), *available at* http://www.access.gpo.gov/congress/senate/pdf/109hrg/28213.pdf.

Objection rates have indeed declined, but that hardly means section 5 has outlived its usefulness. For one thing, Congress heard testimony that the Attorney General interposed more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490). 1 *Evidence of Continued Need* 172 (report of Nat'l

Comm'n on the Voting Rights Act). Map 5A, on the next page, displays the number of objections in each covered jurisdiction, revealing that nine states received more objections after 1982 than before. *Id.* at 259 (showing that in nine of fourteen covered states receiving objections, the post-1982 total (the lower, bolded number) is greater than half the cumulative 1966-2004 total (the upper, italicized number)). Congress found that "[t]his increased activity shows that attempts to discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future." H.R. REP. NO. 109-478, at 21 (2006); *see also id.* at 21-24, 36-40 (discussing section 5 objections). Moreover, as the legislative record reveals, the objection rate has always been low, and the sharpest declines occurred before *City of Rome*. *Introduction to Expiring Provisions* 219 (statement of Richard L. Hasen). Finally, as the intervenors point out, the number and rate of objections reveal little about the true impact of a proposed change. For example, an objection to a minor procedural change by a small utility district affects far fewer voters than an objection to a statewide redistricting, yet each counts as one objection. And the frequency of objections depends on a variety of factors unrelated to actual levels of discrimination, such as shifting Supreme Court and statutory standards as well as how aggressively different Attorneys General interpret and enforce the law. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 923-27 (1995) (rejecting Attorney General's view that section 5 requires covered jurisdictions to maximize the number of majority-minority districts in ameliorative redistricting plans); *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 477 (1997) ("*Bossier Parish I*") (rejecting Attorney General's view that violations of section 2 provide an independent basis for section 5 objections); *Reno v. Bossier Parish Sch. Bd.*,



528 U.S. 320, 335-36 (2000) ("*Bossier Parish II*") (rejecting Attorney General's view that section 5 authorizes objections based on a finding of discriminatory but nonretrogressive purpose); 2006 Amendments § 5, 120 Stat. at 580-81 (overruling *Bossier Parish II* by defining "purpose" to include "any discriminatory purpose").

Significantly for our purposes, Congress's evaluation of the evidence extended beyond bare numbers of submission counts and objection rates. Like the Congress that extended the Act in 1975, the 2006 Congress delved into the "*types* of submissions made by covered jurisdictions and the . . . *nature* of objections interposed by the Attorney General." *City of Rome*, 446 U.S. at 181 (emphasis added). As in 1975, the legislative record reveals that the Attorney General interposed objections to a wide variety of electoral changes proposed by governments at all levels. *See* 1 *Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 225-1684 (Oct. 25, 2005) ("1 *Section 5 History*") (displaying by state all objection letters since 1982), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/24120_vol.1.pdf; 2 *Section 5 History* 1686-2595 (same). Since 1982, the Attorney General has objected to at least one statewide election change in every fully covered state and in most partially covered states; indeed, Map 5B, on the next page, reveals that six covered states received more such objections after 1982 than before. 1 *Evidence of Continued Need* 260 (report of Nat'l Comm'n on the Voting Rights Act). In one particularly stark example, Congress heard testimony that not one redistricting plan for the Louisiana House of Representatives had ever been precleared as originally submitted. *To Examine the Impact and*



MAP 5B
Statewide Objections Only
(1966 - 2004 and August 5, 1982 - 2004)*

Percent Nonwhite Voting-Age Population (2000)
By Quintile

Section 5 Fully Covered States
Partially Covered States

0.0 - 8.5
8.6 - 16.0
16.1 - 24.7
24.8 - 35.8
35.9 - 66.2

*Italicized numbers = Objections 1966 - 2004
Boldface numbers = Objections August 5, 1982 - 2004

Two objections were interposed in Alaska after 1982,
and none in Hawaii at any time.

Created for the National Commission on the Voting Rights Act

*Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 16 (Oct. 18, 2005) ("*Impact and Effectiveness*") (testimony of Marc Morial), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/24033.pdf.  Within states, at the local government level, objections were more numerous in areas with higher percentages of minority residents, as Maps 5F and 5G (on the next pages) show for Louisiana and Mississippi.  1 *Evidence of Continued Need* 264-65 (report of Nat'l Comm'n on the Voting Rights Act).  Even the smallest political subunits, including several water districts in Texas, received objections. For example, in a 1994 letter concerning the Gonzales County Underground Water Conservation District, the Attorney General objected to a redistricting plan with "grossly malapportioned" districts that were developed through a process in which "the minority community appear[ed] effectively to have been frozen out."  2 *Section 5 History* 2458 (Letter from Deval L. Patrick, Assistant Attorney Gen., DOJ Civil Rights Div., to Mary Anne Wyatt (Oct. 31, 1994)).  In 1993 the Edwards Underground Water District drew an objection when, having recently elected its first Hispanic directors, it sought to replace its system of single-member districts with an appointed board.  *Id.* at 2424 (Letter from James P. Turner, Acting Assistant Attorney Gen., DOJ Civil Rights Div., to John Hannah, Jr., Tex. Sec'y of State (Nov. 19, 1993)).  And in 1991 the Attorney General blocked Lubbock County Water Control and Improvement District No. 1 from reassigning polling places serving minority voters to "more remote and inaccessible rural communities."  *Id.* at 2301 (Letter from John R. Dunne, Assistant Attorney Gen., DOJ Civil Rights Div., to Don Graf, Esq. (Mar. 19, 1991)).



**MAP 5F**
**Objections by Parish: Louisiana**
**(August 5, 1982 - 2004)**

Percent Nonwhite Voting-Age Population (2000)

- 0.0 - 10.0
- 10.1 - 20.0
- 20.1 - 40.0
- 40.1 - 60.0
- 60.1 - 100.0

Created for the National Commission on the Voting Rights Act

# MAP 5G
## Objections by County: Mississippi
## (August 5, 1982 - 2004)





Created for the National Commission on the Voting Rights Act

Equally significant, Congress heard testimony regarding many objection letters in which the Attorney General summarized evidence of possible intentional discrimination and concluded that the jurisdiction had failed to satisfy its burden of demonstrating that the proposed change was not motivated by a discriminatory or retrogressive purpose. *See, e.g.*, *Voting Rights Act: Section 5—Preclearance Standards, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 7-8, 13-18 (Nov. 1, 2005) ("*Section 5—Preclearance Standards*") (testimony of Mark A. Posner) (discussing objections based on discriminatory intent in the 1990s), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/24283.pdf; *id.* at 20 (testimony of Brenda Wright) (observing that during the 1980s and 1990s, "over 200 section 5 objections were based solely on racially discriminatory intent").  Objection letters based on intent provide particularly salient evidence of potentially unconstitutional state action. *See Bossier Parish I*, 520 U.S. at 481 ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose.").  Using the analytic framework set forth in *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265-66 (1977), which the Attorney General employs to evaluate possible intentional discrimination, *see Bossier Parish I*, 520 U.S. at 488-89 (finding the *Arlington Heights* framework relevant to section 5 purpose analysis), one study in the legislative record found that during the two decades from 1980 to 2000, the Attorney General interposed 421 objections based entirely or partly upon discriminatory intent.  *Section 5—Preclearance Standards* 129-30, 180 tbl. 2.  Even as recently as the 1990s, 43% of all objections were based on intent alone, while another

31% were based on a combination of intent and effect. *Id.* at 180 tbl. 2. Relying on this large number of intent-based objections, the House committee found that covered jurisdictions continued to "intentionally develop[]" voting changes "to keep minority voters and candidates from succeeding in the political process," including so-called second-generation techniques such as: "enacting discriminatory redistricting plans; switching offices from elected to appointed positions; relocating polling places; enacting discriminatory annexations and deannexations; setting numbered posts; and changing . . . single member districts to at-large voting and implementing majority vote requirements." H.R. Rep. No. 109-478, at 36 (2006); *see also id.* at 12; 2006 Amendments §§ 2(b)(1) and (2), 120 Stat. at 577 (discussing first and second generation barriers). This finding mirrors the 1982 legislative record where Congress observed that "the right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot," H.R. Rep. No. 97-227, at 17 (1981) (quoting *Allen*, 393 U.S. at 569), and that "covered jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices to dilute minority voting strength," S. Rep. No. 97-417, at 10 (1982).

Three Mississippi objection letters are particularly revealing. The first involves the town of Kilmichael, where the white mayor and the all-white Board of Aldermen cancelled local elections in 2001 when an "unprecedented number" of African Americans sought office. H.R. Rep. No. 109-478, at 36-37 (2006). After objecting to the cancellation, the Justice Department discovered that, according to the most recent census, African Americans had become a majority in Kilmichael. The town refused to

reschedule the election, but after the Attorney General forced it to do so, Kilmichael elected three African American aldermen and its first African American mayor. *Id.*

The second letter involves Mississippi's recent efforts to revive its dual registration system, "which was initially enacted in 1892 to disenfranchise Black voters." H.R. REP. NO. 109-478, at 39 (2006). Requiring separate registration for state and federal elections, the system was struck down in 1987 by a federal court. *Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd sub nom. Operation PUSH v. Mabus*, 932 F. 2d 400 (5th Cir. 1991). In 1995, without seeking preclearance, Mississippi again established separate registration systems, ostensibly to comply with the National Voter Registration Act, which required states to provide voter registration through public assistance agencies. Mississippi, however, allowed registration at its Department of Human Services only for federal elections and administered the new system "in such a way that discriminatory effects on black voters were not just foreseeable but almost certain to follow." *Section 5—Preclearance Standards* 83 (Letter from Isabelle Katz Pinzler, Assistant Attorney Gen., DOJ Civil Rights Div., to Sandra M. Shelson, Miss. Special Attorney Gen. (Sept. 22, 1997)). According to the Justice Department, the reasons state officials gave for rejecting alternative proposals were "insubstantial, and in some cases . . . couched in racially charged terms indicating antipathy towards 'welfare voters.'" *Id.* After the Supreme Court directed Mississippi to submit the changes for review, *Young v. Fordice*, 520 U.S. 273 (1997), the Attorney General denied preclearance, finding that the state had failed to show its registration procedures were "not tainted by improper racial considerations." *Section 5—Preclearance Standards* 83; *see also id.* at 70-78 (statement of Brenda Wright); 2 *Voting Rights Act: Evidence of*

*Continued Need*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 1725-26 (Mar. 8, 2006) ("2 *Evidence of Continued Need*") (report of Robert McDuff), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/26411v2.pdf.

In the third Mississippi letter, the Attorney General concluded that the 1991 statewide redistricting plan was "calculated not to provide black voters in the Delta with the equal opportunity for representation required by the Voting Rights Act." 1 *Section 5 History* 1411 (Letter from John R. Dunne, Assistant Attorney Gen., DOJ Civil Rights Div., to Hainan A. Miller, Miss. Senate Elections Committee Chair (July 2, 1991)). According to the Attorney General, the legislative debate was "characterized by overt racial appeals." *Id.* at 1412. Congress heard testimony that when speaking on the floor of the state legislature, members referred to an alternative plan that would have increased the number of black majority districts as the "black plan"; privately, they called it the "nigger plan." *Modern Enforcement of the Voting Rights Act, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 22 (May 10, 2006) (testimony of Robert B. McDuff), *available at* http://www.access.gpo.gov/congress/senate/pdf/109hrg/28342.pdf.

Scouring the legislative record ourselves, we have discovered many more section 5 objections based on discriminatory intent. In the Appendix to this opinion, we summarize a representative sample from Alabama, California, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia. *See infra* pp. 122-36. The District dismisses such objection letters as mere "anecdotes" that "come nowhere close to showing extraordinary circumstances or a 'systematic resistance to the Fifteenth Amendment.'" Pl.'s Mem. at 51 (quoting *Katzenbach*, 383 U.S. at 328). But Congress

found to the contrary.  Based on all the evidence, the House committee concluded that "voting changes devised by covered jurisdictions resemble those techniques and methods used in 1965, 1970, 1975, and 1982."  H.R. REP. NO. 109-478, at 36 (2006); *cf.* H.R. REP. NO. 94-196, at 10 (1975) (renewing section 5 to prevent use of "at-large elections, annexations of predominantly white areas, or the adoption of discriminatory redistricting plans").

*More Information Requests*

Congress discovered additional evidence of intentional discrimination in letters from the Attorney General asking jurisdictions seeking section 5 preclearance to provide additional information about their proposed changes.  Known as "more information requests" ("MIRs"), these letters typically explain that the submitted information is "insufficient to enable [the Department] to determine that the proposed change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group."  2 *Evidence of Continued Need* 2570 (Letter from Joseph D. Rich, Acting Chief, Voting Section, DOJ Civil Rights Div., to Wilbur T. Gamble III, Esq. (Apr. 17, 2000)).  As the House Report explains, a jurisdiction seeking preclearance may respond by submitting the requested information "to prove a change is non-discriminatory" or by taking one of three actions: (1) withdrawing the requested change "because it is discriminatory"; (2) filing a "new or amended non-discriminatory voting plan"; or (3) offering no response.  H.R. REP. NO. 109-478, at 40 (2006).  In all three circumstances, the "MIR-induced outcome" has the same effect as an objection in that the submitting jurisdiction may not implement the

proposed change.  2 *Evidence of Continued Need* 2545 (report of Luis Ricardo Fraga and Maria Lizet Ocampo).

The District insists that MIRs represent nothing more than "federal administrative browbeating," Pl.'s Opp'n at 70, but Congress thought otherwise.  As the Attorney General emphasizes, the House committee found that MIR-induced outcomes "are often illustrative of a jurisdiction's motives."  H.R. REP. NO. 109-478, at 40 (2006).  Indeed, the committee found that together with objection letters, the increased number of revised submissions and withdrawals during the last 25 years represents "strong [evidence] of continued efforts to discriminate."  *Id.* at 36.  Recognizing that "[s]ection 5's reach in preventing discrimination is broad," Congress found that "[i]ts strength lies not only in the number of discriminatory voting changes it has thwarted, but . . . also [in] the submissions that have been withdrawn from consideration [and in] the submissions that have been altered by jurisdictions in order to comply with the [Act]."  *Id.*  In fact, in terms of enforcing section 5, MIRs have become nearly as important as formal objection letters.  One study finds:

> A total of 792 objections were made to proposed changes during 1990-2005. . . . However, the sum of the outcomes of withdrawals, superseded changes, and no responses, resulting from an MIR, is 855. This means that MIRs have . . . directly affect[ed] 855 additional changes, making their implementation illegal.

2 *Evidence of Continued Need* 2552-53 (report of Luis Ricardo Fraga and Maria Lizet Ocampo).  According to the same study, MIRs have actually become more important than objection letters, recently deterring six times as many changes.  *Id.* at 2567 tbl. 10 (reporting ratio of MIR outcomes to objections from 1999 to 2005).

Texas stands as the covered jurisdiction most affected by MIRs, both overall and in proportion to the number of objection letters received since 1990. *Id.* at 2566 tbl. 9 (showing Texas with 290 MIR-induced outcomes, followed by Alabama with 148). In Louisiana, "no fewer than 17 . . . parishes [after receiving MIRs] chose to withdraw 22 submissions, most of them redistricting proposals, since the 1982 renewal." *Id.* at 1626 (appendix to statement of Wade Henderson). In Georgia, the city of Griffin asked the Attorney General to preclear a redistricting plan under which only two of the six single-member districts would be majority black even though the city's black population had recently increased from 42% to 49%. 1 *Evidence of Continued Need* 809-10 (appendix to statement of Nadine Strossen). The Attorney General requested more information, "but the city was not responsive." *Id.* at 809. Instead, the city abandoned the proposed change and announced it would hold elections using its existing "malapportioned" districts. *Id.* When the local NAACP sued, the city agreed to a plan with three majority-minority districts. In the next election, three African American candidates won. *Id.* at 810.

*Judicial Preclearance Suits*

Instead of requesting administrative preclearance from the Attorney General or after receiving an objection, a covered jurisdiction may seek a declaratory judgment from a three-judge panel of this court preclearing its proposed change. Like the Attorney General, the court can grant preclearance only if it finds the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the [language minority provisions]." 42 U.S.C. § 1973c(a). Although covered jurisdictions seek Attorney General preclearance far more frequently than they file declaratory judgment actions, Congress found that the latter shed

light on section 5's impact: "Evidence of continued discrimination includes . . . the number of requests for declaratory judgments denied." 2006 Amendments § 2(b)(4)(B), 120 Stat. at 577. Specifically, evidence reveals that plaintiffs either withdrew their proposed changes or lost on the merits in twenty-five declaratory judgment actions filed since 1982. 1 *Evidence of Continued Need* 270 map 6 (report of Nat'l Comm'n on the Voting Rights Act). Texas and Mississippi tied for the lead, each accounting for six unsuccessful suits during that time. *Id.*

The legislative record contains several examples of judicial decisions denying preclearance that reveal evidence of intentional discrimination. For example, in a declaratory action filed by Pleasant Grove, Alabama—then an "all-white enclave in an otherwise racially mixed area" with a "long history of racial discrimination"—the Supreme Court affirmed the district court's denial of preclearance for two annexations. *City of Pleasant Grove v. United States*, 479 U.S. 462, 464-65 (1987). While rejecting annexation petitions from two adjacent black neighborhoods, the town had sought to annex two other parcels: one vacant but "likely to be developed for use by white persons only," and the other inhabited by whites eager to send their children to the city's all-white schools rather than desegregated county schools. *Id.* at 465-66. Pleasant Grove insisted that its refusal to annex the black areas reflected economic considerations, not racial animus, but the Court affirmed the district court's finding that the economic argument was a "mere pretext" the city "developed after the fact." *Id.* at 470, 472. Finding it "quite plausible to see appellant's annexation[s] . . . as motivated, in part, by the impermissible purpose of minimizing future black voting strength," *id.* at 471-72, the Court affirmed the district court's determination that Pleasant Grove had failed to carry

"its burden of showing that the annexations were untainted by a racially discriminatory purpose," *id.* at 469.

In another declaratory action, Louisiana admitted, according to the Attorney General, that it aimed "to diminish black electoral opportunity in order to increase the electoral opportunity of white voters." Def.'s Mem. at 30. Having failed to secure Attorney General preclearance for every single previous state legislative redistricting plan, Louisiana sought a declaratory judgment preclearing its 2001 plan. *Reauthorizing the Voting Rights Act* 42-43 (statement of Debo P. Adegbile (counsel here for Louis intervenors)). According to testimony before Congress, that plan "eliminated a majority-black district in Orleans Parish but failed to create a comparable new opportunity for black voters anywhere else in the state." *Id.* at 43. Louisiana explained to the court that it aimed to ensure proportional representation for white voters within Orleans Parish. *Id.* at 43-44. At no point, however, did the state ever consider how to ensure proportional representation for voters of all races statewide. *Id.* at 43. Moreover, its plan "simply ignored" the increased number of black residents in Orleans Parish. *Id.* After evidence emerged that Louisiana had violated its own redistricting guidelines, the state abandoned the litigation on the eve of trial and restored the majority-black district. *Id.* at 44.

Congress heard testimony demonstrating the cumulative impact of failed judicial preclearance suits, objection letters, and MIRs. Map 9, on the next page, shows for each covered state the combined number of objections, submission withdrawals, and declaratory judgment actions favorable to minorities since August 1982. 1 *Evidence of Continued Need* 273 (report of Nat'l Comm'n on the Voting Rights Act). Two aspects of



MAP 9
Sum of Objections, Submission Withdrawals,
and Declaratory Judgment Actions Favorable to Minorities
(August 5, 1982 - 2004)*

Percent Nonwhite Voting-Age Population (2000)
By Quintile

Section 5 Fully Covered States
Partially Covered States

2.9 - 8.5
8.6 - 16.0
16.1 - 24.7
24.8 - 35.8
35.9 - 68.2

*The sum in Alaska is three,
and zero in Hawaii.

Created for the National Commission on the Voting Rights Act

the map warrant emphasis.  First, it shows that section 5 has successfully blocked racial discrimination in voting throughout the covered states.  Second, when compared to the number of post-1982 objections in Map 5A, *supra* p. 54, the combined totals in Map 9 reveal that section 5 has been far more effective in most states—especially Georgia, Mississippi, and Texas—than a mere count of objections would suggest.

*Section 5 Enforcement Suits*

When covered jurisdictions fail to submit voting changes for approval, either the Attorney General or private citizens may file suit under section 5 to compel preclearance. Failure to submit proposed changes strikes at the heart of the Voting Rights Act.  As late as 1984, the Supreme Court acknowledged that "widespread noncompliance with the preclearance requirement . . . combined with the absence of an independent mechanism in the Justice Department to monitor changes, has permitted circumvention of the requirement which itself was designed to eliminate circumvention of the goals of the Act."  *McCain v. Lybrand*, 465 U.S. 236, 249 (1984).

According to the House Report, "many defiant covered jurisdictions and State and local officials continue to enact and enforce changes to voting procedures without the Federal Government's knowledge," in part because the Attorney General lacks any "systematic way" to ensure that changes are submitted.  H.R. REP. NO. 109-478, at 41 (2006).  The report observes that in *Lopez* the Supreme Court found that Monterey County "failed to seek Federal preclearance for any of its six consolidation ordinances." *Id.* at 42 (quoting *Lopez*, 525 U.S. at 273).  The House committee expressed particular concern about "smaller, more rural communities within covered States," where section 5 enforcement suits play an important role because noncompliance is "extensive."  *Id.* at

43.  One study in the legislative record reports at least 105 successful section 5

enforcement actions between 1982 and 2004.  1 *Evidence of Continued Need* 250 tbl. 4

(report of Nat'l Comm'n on the Voting Rights Act).  Map 11, on the next page, reveals

that since 1982 the Attorney General has joined enforcement suits in almost every

covered state.  *Id.* at 281.

The House committee singled out South Dakota as "perhaps the most egregious"

offender.  H.R. REP. NO. 109-478, at 42 (2006).  When two counties in South Dakota first

became covered in 1975, the state attorney general derided "the preclearance requirement

as a 'facial absurdity' and advised against compliance, stating 'I see no need to proceed

with undue speed to subject our State laws to a 'one-man veto' by the United States

Attorney General.'"  *Id.*  South Dakota then implemented more than six hundred voting

changes, many of which "negatively impacted" the voting rights of Native American

citizens in its covered counties, yet the state sought preclearance fewer than five times.

*Id.*  This defiance eventually prompted Native American plaintiffs to file a section 5

enforcement suit that ended with a consent decree in which the state—after twenty-six

years of noncompliance—finally promised to fulfill its preclearance obligations.  *Id.*

Texas lost more enforcement suits than any other covered state, accounting for 29

of the 105 cases in which plaintiffs prevailed.  1 *Evidence of Continued Need* 250 tbl. 4

(report of Nat'l Comm'n on the Voting Rights Act).  One such case arose in Waller

County, a majority-white jurisdiction that contains the majority-black city of Prairie

View, home to historically black Prairie View A&M University.  *Id.* at 185-86.  For

years, county officials discouraged Prairie View students from voting: among other



MAP 11
Section 5 Enforcement Actions in Which
Department of Justice Participated
(1966-2004 and August 5, 1982-2004)*

actions, the county registrar tried to prevent them from registering, and local prosecutors indicted them for "illegal voting" before dropping all charges. *Id.* at 185; *see Symm v. United States*, 439 U.S. 1105 (1979), *aff'g United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978). When two Prairie View students ran for local office in 2004, the white district attorney (a former state judge) threatened to prosecute students for illegal voting. After being sued, the district attorney relented, but less than a month before the election, white county commissioners, aware that the primary would occur when students were away on spring break, reduced the time period for early voting. The NAACP filed suit under section 5, prompting the county to restore the full schedule for early voting. Five times as many students voted early as on the day of the primary, and the student running for a seat on the county's governing body narrowly prevailed. 1 *Evidence of Continued Need* 185-86 (report of Nat'l Comm'n on the Voting Rights Act).

Another Texas case arose in Seguin. After the 2000 census revealed that Latinos had become a majority in five of the city's eight districts, Seguin proposed a redistricting plan that would have eliminated one of the majority-Latino districts. When the Attorney General signaled that preclearance was unlikely, Seguin withdrew its proposal and then "promptly closed the candidate filing period so no Latino could run in the election for that district." 1 *Section 5 History* 86 (testimony of Nina Perales (counsel here for Diaz intervenors)). When the Mexican American Legal Defense and Educational Fund filed a section 5 suit and successfully enjoined the election timetable, Latinos "elected their candidate[s] of choice to a majority of seats." *Id.*

*Section 2 and Constitutional Litigation*

Enforceable through suits filed by either the Attorney General or private parties, section 2 contains the Act's basic prohibition against racial discrimination in voting. 42 U.S.C. § 1973. Although section 2 requires no proof of discriminatory intent, several section 2 cases, together with decisions resting on the Constitution alone, include express findings of intentional racial discrimination—judicial determinations that represent "reliable evidence of actual voting discrimination." *Katzenbach*, 383 U.S. at 329. According to the Senate Report, "[s]ince 1982, six published cases have ended in a court ruling or a consent decree finding that [a] covered jurisdiction[] had committed unconstitutional discrimination against minority voters." S. REP. NO. 109-295, at 13 (2006). Those six cases arose in Alabama, Georgia, Texas, and Virginia. *Id.* at 65-70 app. I. Another study in the record listed eight additional decisions finding intentional discrimination or constitutional violations in covered jurisdictions between 1982 and 2005. *See Impact and Effectiveness* 986-91, 1062-64 (report of Ellen Katz). Congress thus knew of a combined total of fourteen judicial findings of intentionally discriminatory or unconstitutional state action across six covered states.

To be sure, this is not a great number of cases, especially compared to the large number of intent-based objection letters, but the relative scarcity of published judicial findings of intentional discrimination by covered jurisdictions is understandable. To begin with, section 5 preclearance has blocked hundreds of intentionally discriminatory changes in recent years, *see supra* pp. 60-61, reducing the need for section 2 litigation. Moreover, section 5 deters covered jurisdictions from even attempting to implement intentionally discriminatory changes. *See infra* pp. 85-87. As one witness explained,

"the statistics [in studies of section 2 litigation] do not account for the fact that the existence of Section 5 itself functions as a deterrent to both retrogression and broader forms of voting discrimination in the covered jurisdictions." *Introduction to Expiring Provisions* 160 (written response of Theodore Shaw). Finally, compilations of *reported* cases necessarily exclude lawsuits that jurisdictions settled to avoid adverse rulings. Congress heard testimony that surveys of published opinions fail to "account for the vast number of Section 2 lawsuits that are resolved through pre-trial settlement or those suits that are dismissed because the jurisdiction adopted a remedial plan." *Id.* at 159. Acknowledging that "some plaintiffs failed to pursue their claims, many settled, and others saw their cases go to judgment" with no published opinion, one survey of reported cases observes that the total number of section 2 actions remains unknown. *Impact and Effectiveness* 974 (report of Ellen Katz). Congress, however, received testimony that although this survey discovered only three successful section 2 cases in Georgia since 1982, "[a] closer examination reveals that there have been a total of 69 successful Section 2 suits in Georgia, with most victories resulting from settlements or other pre-trial resolution of the claims." *Introduction to Expiring Provisions* 159 (written response of Theodore Shaw). In the nine fully covered states, Congress also heard that since 1982 "there have been 653 successful claims overall that provided relief to plaintiffs in various forms," many times the number of successful published cases identified in surveys of reported decisions. *Id.*

Though few in number, the section 2 decisions contained in the legislative record offer powerful evidence of continuing intentional discrimination. A particularly egregious example, *Dillard v. Town of North Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989),

followed a wave of litigation challenging racially discriminatory at-large electoral systems in cities and counties throughout Alabama. *See, e.g.*, *Dillard v. Baldwin County Bd. of Educ.*, 686 F. Supp. 1459 (M.D. Ala. 1988). After conceding that its at-large system violated section 2, North Johns signed a consent decree requiring the creation of five single-member town council districts. *North Johns*, 717 F. Supp. at 1473. Prior to the first election under the new system, however, Alabama enacted a law requiring candidates for municipal office to file financial disclosure forms, and the town's white mayor helped every candidate other than the two black candidates comply with the new requirement. *Id.* at 1473-75. Asking the town clerk for assistance, one black candidate was referred to an office that had no forms and whose staff suggested he need not file. *Id.* at 1475. The candidate then sought help directly from the mayor, who "refused to assist him." *Id.* Nonetheless remaining on the ballot, the two black candidates won, but the mayor refused to swear them in and the town clerk sued to prevent them from taking office because they had failed to file the appropriate forms. *Id.* The district court ruled that "North Johns, through its mayor, intentionally discriminated against [the black candidates] because of their race." *Id.* at 1476.

Other examples of judicial findings of intentional discrimination include:

- *Harris v. Siegelman*, 695 F. Supp. 517 (M.D. Ala. 1988).

  Black residents of Alabama challenged the treatment of black voters at polling places and the manner in which the state appointed poll officials. The district court found that the state had an official policy of appointing only white poll officials and of "keeping the electoral process closed to black citizens, a policy enforced both by law as well as through the use of fraud, force and intimidation, often by poll officials." *Id.* at 525. The court also found that two features of a racially inspired 1893 law—requiring voters seeking assistance to swear an oath

of illiteracy and limiting voters to five minutes in the voting booth—remained in effect and continued to have a racially discriminatory impact. Witnesses testified that polling officials used the five-minute rule to harass black voters and refused to assist black voters either "because they did not meet the state's rigorous assistance standard or because the white poll officials arbitrarily decided that assistance was not needed." *Id.* at 526. The court found that the challenged policies and 1893 statute "are products of intentional discrimination and . . . continue today to have their intended discriminatory effects." *Id.*; *see also Impact and Effectiveness* 991 (report of Ellen Katz).

- *United States v. Charleston County*, 316 F. Supp. 2d 268 (D.S.C. 2003).
  The United States and African American residents challenged the county's at-large system for council elections. While finding that the at-large system violated section 2, the district court rejected plaintiffs' claim that the system was adopted with discriminatory intent, observing: "Certainly the timing of the General Assembly's adoption of the at-large system raises suspicions, but the Court will not disparage its authors without more compelling evidence" of intentional discrimination. *Id.* at 306. The court nonetheless "agree[d] that there is significant evidence of intimidation and harassment and by a preponderance of the evidence" made several findings of intentional discrimination. *Id.* at 287 n.23. First, "poll managers were assigned to the majority-African American precincts who caused confusion, intimidated African-American voters, and had the tendency to be condescending to those voters." *Id.* Moreover, one election commissioner had "received complaints from African-American voters concerning rude or inappropriate behavior by white poll officials in every election between 1992 and 2002," while an attorney who worked as an election observer testified that from 1980 through 2000 "[e]very time, every election we would have controversies in African-American precincts about voter assistance, or just the way voters are treated when they vote." *Id.* at 287-88 n.23 (alteration in original). Indeed, "[s]everal white poll managers—including a future chairperson of the Election Commission—were routinely appointed as poll managers by the

Election Commission and assigned to predominantly African-American polling places in Charleston County, where they intimidated and harassed African-American voters." *Id.* at 288 n.23. One "particularly problematic" white poll manager had such a severe record of harassing black voters that the county's circuit court "issue[d] a restraining order against the Election Commission requiring its agents to cease interfering with the voting process." *Id.* Yet even after being made aware of this misconduct, "the Election Commission . . . had some difficulty removing him from his position as election manager." *Id.* In 1990 "a member of the . . . Election Commission and others participated in a Ballot Security Group that sought to prevent African-American voters from seeking assistance in casting their ballots." *Id.* at 289 n.23. Although white poll managers often complained that blacks sought to vote improperly, a former Election Commission chair "never once found merit to any such allegations." *Id.* Finally, the court expressed "particular concern over two recent episodes of racial discrimination against African-American citizens." *Id.* In the first, the county council "reduced the salary for the Charleston County Probate Judge in 1991, following the election of the first and only African-American person elected to that position"—a judge "whose election was upheld by the South Carolina Supreme Court and who was still forced to seek the Justice Department's intervention to be sworn into office." *Id.* at 289-90 n.23. In the second episode, after African Americans for the first time won a majority of seats on the county school board, "the Charleston County Legislative Delegation to the South Carolina General Assembly sponsored several pieces of legislation to alter the method of election for the school board" without contacting board members to seek their views on the proposed changes. *Id.* at 290 n.23. On appeal, while affirming the section 2 violation, the Fourth Circuit explained that "we do not need to reach the private plaintiffs' claim that the at-large system violated § 2 by intentionally discriminating against minority voters." *United States v. Charleston County*, 365 F.3d 341, 347 n.2 (4th Cir. 2004); *see also* H.R. REP. NO. 109-478, at 39-40 & n.87 (2006); *Impact and Effectiveness* 987-88 (report of Ellen Katz).

- *Williams v. City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990).

  African American and Hispanic residents of Dallas, Texas, challenged the city council's eight single-member districts and three at-large seats. Ruling that the system violated section 2, the district court found that "[t]he present configuration of single-member districts intentionally packs and cracks the African-American population with the effect of diluting their vote for the purpose of maintaining the political power of whites." *Id.* at 1409; *see also Impact and Effectiveness* 990 (report of Ellen Katz).

- *League of United Latin Am. Citizens v. Midland Indep. Sch. Dist.*, 648 F. Supp. 596 (W.D. Tex. 1986).

  Hispanic and black residents of Midland, Texas, challenged the at-large system for electing school district trustees, alleging that it violated the Fourteenth and Fifteenth Amendments. The district court, citing a legacy of intentional discrimination, found unconstitutional not only the original at-large system, but also two alternative plans the school district proposed to implement. *Id.* at 607-10; *see also* S. REP. NO. 109-295, at 67-68 (2006); *Impact and Effectiveness* 1097-98 n.497, 1260.

- *Political Civil Voters Org. v. City of Terrell*, 565 F. Supp. 338 (N.D. Tex. 1983).

  Under the Charter of Terrell, Texas, which provided for five at-large city council seats, council members ran for numbered positions with staggered terms subject to a majority-vote requirement. Pursuant to a settlement of an earlier voting rights case, the city agreed to hold a referendum on converting to single-member districts. Although the referendum passed, the city council determined that the election was merely a "straw vote" and scheduled a second referendum to amend the Charter. That referendum, with "much smaller turnout," failed. *Id.* at 341. Plaintiffs then sued, and the district court found not only that this two-tiered amendment procedure departed from local and state law, but also that the city had failed to submit it for section 5 preclearance. *Id.* In light of the city's tenuous explanations for maintaining the at-large system, its refusal to establish a second polling place, and its requirement that all candidates for public office own real

80

property, the court found "discriminatory intent in the maintenance of the current election system." *Id.* at 349; *see also Impact and Effectiveness* 991 (report of Ellen Katz).

- *Pegram v. City of Newport News*, No. 4:94cv79 (E.D. Va. Nov. 4, 1994) (consent decree).
  The American Civil Liberties Union, representing African American voters, filed suit challenging the city council's at-large electoral system. The United States filed a parallel action, and the district court consolidated the cases. Within months, the city admitted that the at-large system violated section 2 as well as the Fourteenth and Fifteenth Amendments and signed a consent decree requiring it to create racially nondiscriminatory districts. *See also* S. REP. NO. 109-295, at 68 (2006).

For still another example of a section 2 suit revealing evidence of intentional discrimination, the Attorney General calls our attention to the Supreme Court's recent decision in *LULAC*, 126 S. Ct. 2594. The Court issued this high-profile decision only a few weeks before the House and Senate voted on the 2006 Amendments. Although the Attorney General had precleared Texas's 2003 redistricting plan, the Court found the plan "damaging to . . . Latinos" and bearing "the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 2622. Finding that Texas drew the district in question precisely to divide "those Latinos who were becoming most politically active," the Court ruled that the state had "undermined the progress of a racial group that has been subject to significant voting-related discrimination." *Id.* at 2621-22. "In essence," the Court concluded, "the State took away the Latinos' opportunity because Latinos were about to exercise it." *Id.* at 2622.

*Federal Election Observers*

Section 8 of the Voting Rights Act authorizes the Attorney General to ask the Office of Personnel Management to assign federal observers to monitor polling places in covered jurisdictions.  42 U.S.C. § 1973f.  Election observers monitor whether persons entitled to vote are in fact permitted to do so and whether votes cast are properly counted. According to the House Report, the Attorney General has assigned between 300 and 600 observers each year since 1982.  H.R. REP. NO. 109-478, at 44 (2006).

Contrary to the District's assertion that the appointment of observers rests on a "presumption of bad faith," Pl.'s Opp'n at 69, Congress found that the Attorney General certifies observers "only when there is a reasonable belief that minority citizens are at risk of being disenfranchised," often through "harassment and intimidation inside polling locations," H.R. REP. NO. 109-478, at 44 (2006).  According to the Attorney General, Congress properly concluded that observer appointments provide "another indicator of actual or potential vote discrimination."  Def.'s Mem. at 34.  Appointments signal actual discrimination because "observers are often sent to covered jurisdictions precisely because minority voters have faced discrimination in such jurisdictions in recent elections."  *Id.* at 35.  Appointments also flow from the Attorney General's predictive judgment—typically informed by "communication among Voting Section lawyers and local officials, minority leaders, and U.S. Attorneys"—regarding the potential for discrimination in upcoming elections.  1 *Evidence of Continued Need* 179 (report of Nat'l Comm'n on the Voting Rights Act).

Witnesses described many examples of the very type of voter intimidation that usually leads to the appointment of observers.  For instance, in Harris County, Texas, one

man testified that during a 2000 election he was "arrested because he insisted that he be able to vote.  He went to cast a vote at the local church where his mom votes but he was told that he was registered to vote on another side of town . . . . The police officer charged him with trespassing."  3 *Voting Rights Act: Evidence of Continued Need*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 3060 (Mar. 8, 2006) (report of Orville Vernon Burton), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/26411v3.pdf.  Other witnesses testified that Hispanic voters in Texas and southern Arizona were "admonished not to use Spanish when talking in the polling places and when giving assistance to voters who needed help when voting."  *Voting Rights Act: Sections 6 and 8—The Federal Examiner and Observer Program, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 34 (Nov. 15, 2005) ("*Federal Examiner and Observer Program*") (statement of Barry H. Weinberg), *available at* http://judiciary.house.gov/media/pdfs/printers/109th/24606.pdf.  Testimony also revealed that poll workers demanded that Latino voters produce evidence of citizenship before receiving a ballot, a requirement never imposed on non-Hispanic white voters.  *Id.*  The House Report highlights *United States v. Conecuh County, Alabama*, Civil Action No. 83-1201-H (S.D. Ala. June 12, 1984), where observer testimony was "instrumental in enabling Federal prosecutors to proceed."  H.R. REP. NO. 109-478, at 44 (2006). Responding to interrogatories in that case, one observer testified that a white poll worker, when providing assistance to a black voter, asked "Do you want to vote for white[s] or niggers?"  *Federal Examiner and Observer Program* 30 (statement of Barry H. Weinberg).  This poll worker identified the black candidates, stated "with respect to one

white candidate . . . 'This is who the blacks are voting for,'" and "made further reference to black citizens as 'niggers' . . . , including a statement that 'niggers don't have principle enough to vote and they shouldn't be allowed.'" *Id.*

*Racially Polarized Voting*

The House committee found that racially polarized voting, which occurs "when voting blocs within the minority and white communities cast ballots along racial lines," represents a "serious concern" in two respects. H.R. REP. NO. 109-478, at 34 (2006). First, aside from "districts in which minority voters control the elections," racially polarized voting effectively places an "election ceiling" on minority voters, leaving them "powerless to elect their candidates." *Id.* Second, the committee found that "[t]he potential for discrimination in environments characterized by racially polarized voting is great." *Id.* at 35. In fact, as the Attorney General explains, racial bloc voting is "a necessary precondition for vote dilution to occur." Def.'s Mem. at 44 (quoting 1 *Evidence of Continued Need* 126). Bloc voting by whites, for example, enables the use of devices such as multi-member districts and at-large elections that dilute the voting strength of minority communities.

Congress heard testimony that the "degree of racially polarized voting in the South is increasing, not decreasing." H.R. REP. NO. 109-478, at 34 (2006) (citation omitted). The House Report cites federal court findings of racially polarized voting by whites, blacks, Latinos, and Native Americans in Florida, Louisiana, South Carolina, South Dakota, and Texas. *Id.* at 34-35. The committee also reported that in the 2000 election few African Americans and no Hispanic or Native American candidates won office in majority-white districts. *Id.* at 34. Based on this evidence, the committee

84

concluded that racially polarized voting revealed "continued resistance within covered jurisdictions to fully accept minority citizens and their preferred candidates into the electoral process."  *Id.*  As a consequence, Congress found, "continued evidence of racially polarized voting in each of the [covered] jurisdictions . . . demonstrates that racial and language minorities remain politically vulnerable, warranting the [Act's] continued protection."  2006 Amendments § 2(b)(3), 120 Stat. at 577.

The District insists that these legislative findings are irrelevant because "racially polarized voting is not state action" and state action is the "only appropriate target for Congress's enforcement powers."  Pl.'s Mem. at 49.  One dissenter in *City of Rome* made just this argument, but the Court explained that "racial bloc voting" was one factor the Attorney General and the district court properly relied on in refusing to preclear certain electoral changes proposed by Rome.  *City of Rome*, 446 U.S. at 161-62, 183; *id.* at 216-17 (Rehnquist, J., dissenting) (arguing that because "[a]ny disparate impact" from the proposed changes "results from . . . private rather than governmental discrimination," the refusals to preclear "do not implicate congressional power to devise an effective remedy for prior constitutional violations by local governments").  The Court reiterated the relevance of racial bloc voting in its recent decision in *LULAC*, 126 S. Ct. 2594.  In concluding that a Texas redistricting plan violated section 2's vote dilution provision, the Court highlighted the district court's finding that racially polarized voting, which was common "throughout the State," had reached such "especially severe" levels in one district that "the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice."  *Id.* at 2615.

*Section 5's Deterrent Effect*

In addition to all the foregoing evidence, Congress heard extensive testimony demonstrating that section 5 prevents discriminatory voting changes in a less visible but undeniably powerful manner, operating "under the radar screen [in ways] that may not appear easily in statistics." *Introduction to Expiring Provisions* 17 (testimony of Theodore Shaw). For example, a former head of the Justice Department's Voting Section with more than three decades of experience in the Civil Rights Division stated:

> The number of times that the Attorney General objects to voting changes is very small—less than one percent of the Section 5 submissions are objected to. But that is not a good indicator of the importance of Section 5. Rather, the most important impact of Section 5 is its deterrent effect on discriminatory voting changes. Jurisdictions, particularly local jurisdictions, that are required to get preclearance must always be aware of Justice Department review. Because the Department has built a tradition of excellence and meticulousness in its Section 5 review process, jurisdictions will think long and hard before passing laws with discriminatory impact or purpose.

*Impact and Effectiveness* 66 (statement of Joseph D. Rich). This official explained that he had "often heard examples of this deterrent effect, e.g. careful consideration of [the] discriminatory impact of a voting change during the legislative process, and minority elected officials reminding white officials of the need for [J]ustice [D]epartment review of laws under consideration." *Id.* Making this same point, one experienced voting rights litigator urged Congress to "pay attention . . . to the proposals that are floated, and that never even get off the ground because it's understood that they will not get precleared. . . . [H]alf the time, we never see what might happen and what would happen if we didn't have section 5." *Examination of Scope and Criteria for Coverage* 98 (testimony of Armand Derfner). Many other witnesses likewise emphasized section 5's deterrent effects. *See, e.g.*, *Understanding the Benefits and Costs of Section 5 Pre-*

*clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 94-95 (May 17, 2006) (responses of Fred Gray), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_senate_hearings&docid=f:29625.pdf; *The Continuing Need for Section 5 Pre-clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 14-15 (May 16, 2006) ("*Continuing Need for Pre-clearance*") (testimony of Anita S. Earls), *available at* http://www.access.gpo.gov/congress/senate/pdf/109hrg/28753.pdf; 1 *Evidence of Continued Need* 34-35 (statement of Nadine Strossen).

  Beyond expert testimony, the record contains several concrete examples of section 5 quietly but effectively deterring discriminatory changes. In some cases, jurisdictions reacted to previous objections by altering their behavior. For example, after the Attorney General objected to Alaska's post-1990 state legislative redistricting plans, the state "took specific measures [in the 2000 redistricting cycle] to ensure that it did not reduce Alaska Native voting strength in districts where Alaska Natives had a reasonable opportunity to elect candidates of their choice." 1 *Evidence of Continued Need* 92 (statement of Joe Rogers). Elsewhere section 5's deterrent effect proved so potent that formal objections were unnecessary to thwart discriminatory voting changes; all the Attorney General had to do was indicate informally that preclearance was unlikely. Consider again Seguin, Texas, where the 2000 census showed that Latinos had become a majority in five of eight city council districts. *See supra* p. 73. With the council split between four Latinos and four Anglos, the city proposed a redistricting plan that would have dismantled one of the majority-Latino districts. When the Justice Department warned it would probably object, the city withdrew its submission. 1 *Section 5 History* 86 (testimony of Nina Perales). In still other cases, covered jurisdictions decided against

proposing certain changes once they realized the proposals would prompt objections.  In 2002, for example, officials in Fredericksburg, Virginia, which has long had one majority-black district, considered eliminating that district, believing that recent Supreme Court cases permitted it to do so.  Only after the city attorney explained, "listen, you can't do it . . . under any interpretation of [section 5]," did the city council agree to retain the majority-black district.  1 *Evidence of Continued Need* 362 (statement of Kent Willis); *see also id.* at 92 (testimony of Joe Rogers).

Crediting such testimony, the House committee described preclearance as a "vital prophylactic tool[]," concluding that discrimination and racial disparities would have been far greater but for section 5's deterrent effect.  H.R. REP. NO. 109-478, at 21 (2006); *see also id.* at 57.  The committee found that "[a]s important as the number of objections that have been interposed to protect minority voters against discriminatory changes is the number of voting changes that have never gone forward as a result of Section 5."  *Id.* at 24.  For support, the committee quoted testimony that "[o]nce officials in covered jurisdictions become aware of the logic of preclearance, they tend to understand that submitting discriminatory changes is a waste of taxpayer time and money and interferes with their own timetables, because the chances are good that an objection will result."  *Id.* (quoting 1 *Evidence of Continued Need* 177 (report of Nat'l Comm'n on the Voting Rights Act)).  The committee thus concluded that "the existence of Section 5 deterred covered jurisdictions from even attempting to enact discriminatory voting changes."  *Id.*

**B.**

Comparing the foregoing summary to the record Congress amassed in 1975, we return to the question posed at the outset: does the 2006 legislative record contain

sufficient evidence of contemporary discrimination in voting to justify Congress's

decision to subject covered jurisdictions to section 5 preclearance for another twenty-five

years?  In answering this question, we emphasize that under *Katzenbach* our duty as

judges is not to decide whether we would have voted to extend section 5, but rather to

determine whether Congress's decision to do so was rational.  To repeat: "As against the

reserved powers of the States, Congress may use any rational means to effectuate the

constitutional prohibition of racial discrimination in voting."  *Katzenbach*, 383 U.S. at

324.  In our view, Congress satisfied that standard.

 To begin with, as in 1975, Congress approached its task seriously and with great

care.  It held extensive hearings and compiled a massive legislative record documenting

contemporary racial discrimination in covered states.  In particular, with respect to

registration rates, minority elected officials, and Attorney General objections—the three

indicators considered significant in *City of Rome*—the 2006 legislative record looks

much like the evidence Congress compiled in 1975.  As then, "[s]ignificant disparit[ies]"

remain in registration rates "in at least several of the covered jurisdictions."  *City of

Rome*, 446 U.S. at 180.  In 1975 Congress reported registration disparities between

whites and blacks of 16 to 24 points in Alabama, Louisiana, and North Carolina; in 2006

it found similar 11 to 31 point gaps between whites and either African Americans or

Latinos in three other states—Florida, Texas, and Virginia.  As for minority elected

officials, African American candidates have continued to make significant gains, but as in

1975, Congress found that progress remained uneven.  In 1975 Congress reported that no

blacks held statewide office in seven covered states and that the number of black state

legislators in covered states fell far short of proportional representation.  Likewise, in

2006 Congress found that African American candidates had yet to win statewide office in Louisiana, Mississippi, and South Carolina, and that in six covered states where African Americans constituted 35% of the population, they accounted for only 21% of state legislators. As to the third *City of Rome* factor, although section 5 objection rates have fallen since 1975, the rate has always been low and the Attorney General continues to interpose large numbers of objections—in fact, more since 1982 than before.

The 2006 legislative record contains far more than the statistical evidence considered sufficient in *City of Rome*. Most important, it includes extensive contemporary evidence of intentional discrimination. During the two decades from 1980 to 2000, the Attorney General issued objection letters that blocked 421 intentionally discriminatory voting changes. Twenty-five requests for declaratory judgments were either denied or withdrawn, some due to evidence of discriminatory intent. Through more information requests, the Attorney General deterred hundreds of other voting changes, many of which Congress believed were intentionally discriminatory. Since 1982 plaintiffs have filed at least 105 successful section 5 enforcement suits against nine covered states whose officials refused to submit voting changes for preclearance. In addition, federal courts have found intentional discrimination or unconstitutional state action by covered jurisdictions in fourteen section 2 cases. During the same time, the Attorney General, responding to reports of actual or likely intimidation of minority voters, appointed tens of thousands of election observers to monitor polling places in covered jurisdictions. Furthermore, testimony indicated that racially polarized voting in the South is increasing, not decreasing, thus perpetuating minority vulnerability to continued discrimination in voting. Though powerful in and of itself, all this evidence

becomes even more compelling given Congress's finding that section 5's preclearance requirement has deterred covered jurisdictions from even attempting to implement an unknown and unknowable number of such changes.

In view of this extensive legislative record and the deference we owe Congress under *Katzenbach*'s rationality standard, we see no constitutional basis for rejecting Congress's considered judgment that "[d]espite the substantial progress that has been made, the evidence before the Committee resembles the evidence before Congress in 1965 and the evidence that was present again in 1970, 1975, [and] 1982"—evidence the Supreme Court twice found sufficient to justify section 5. H.R. REP. NO. 109-478, at 6 (2006). To be sure, "it may well be true that today the statute is maintaining strict federal controls that are not as necessary or appropriate as they once were," *Riley v. Kennedy*, No. 07-77, slip op. at 1 (U.S. May 27, 2008) (Stevens, J., dissenting), but that hardly means Congress's decision to extend section 5 was irrational. Although no one can know for sure what would happen if section 5 were allowed to expire, Congress considered the evidence before it and determined that "failure to reauthorize the temporary provisions, given the record established, would leave minority citizens with the inadequate remedy of a Section 2 action," which history demonstrates is "not enough to combat the efforts of certain States and jurisdictions to discriminate against minority citizens in the electoral process." H.R. REP. NO. 109-478, at 57 (2006). That predictive judgment deserves particular respect because, as in the case of the 1975 reauthorization upheld in *City of Rome*, Congress was evaluating not the need for new legislation, but rather the deterrent effect of a statute that had been in place for decades. Its judgment thus rested on experience, requiring less in the way of conjecture than when Congress enacts legislation

for the first time.  We must "'accord substantial deference to the predictive judgments of Congress,' particularly when . . . those predictions are so firmly rooted in relevant history and common sense."  *McConnell v. FEC*, 540 U.S. 93, 165 (2003) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)) (sustaining constitutionality of Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81, in view of experience under Federal Election Campaign Act of 1971, 2 U.S.C. §§ 431-455).

A final issue requires our consideration: the length of the 2006 extension.  The provisions upheld in *Katzenbach* and *City of Rome* expired in five and seven years respectively, whereas when Congress reauthorized section 5 in 2006, it followed its 1982 precedent and extended the provision for another twenty-five years.  We see nothing irrational in that decision.  To begin with, neither *Katzenbach* nor *City of Rome* even hints that the relatively short expiration dates were critical to the constitutionality of the statutes at issue in those two cases.  Moreover, in 2006 Congress considered an amendment that would have extended the law for only nine years, but following extensive floor debate, the House overwhelmingly rejected it.  *See* 152 Cong. Rec. H5143-204 (daily ed. July 13, 2006).  As opponents of the amendment argued, given that most section 5 activity "occurs during redistricting, which only happens every 10 years following each census," a shorter extension would "capture only one redistricting cycle, and that will not provide enough evidence . . . to allow Congress to make the same reasoned determination regarding renewal 10 years from now that this Congress is allowed to make on the previous record of 25 years."  *Id.* at H5187 (statement of Rep. Sensenbrenner).  The amendment's opponents also pointed out that because jurisdictions seeking bailout must demonstrate compliance with the Act's requirements for the

previous ten years, a nine-year renewal "would completely nullify the current incentive [for] covered jurisdictions to maintain clean voting rights records." *Id.* The 1982 Congress made exactly the same point in deciding to extend section 5 for twenty-five years rather than a shorter period. *See* S. REP. NO. 97-417, at 60 (1982) ("If the duration of Section 5 were too short, then there would be no incentive for any jurisdiction to make the good record that will allow them to bail out."). Furthermore, even as Congress followed the 1982 precedent and extended section 5 for another twenty-five years, it obligated itself to "reconsider" the provision after fifteen years. 2006 Amendments § 4, 120 Stat. at 580 (codified at 42 U.S.C. § 1973b(a)(7), (8)). Congress thus determined that a twenty-five-year extension was "appropriate given the near century of discrimination the Act is designed to combat." H.R. REP. NO. 109-478, at 57-58 (2006). We see no basis for questioning this quintessentially legislative judgment. As the Supreme Court has instructed, courts evaluating whether a statutory time period is rational "are not at liberty to second-guess congressional determinations and policy judgments of this order." *Eldred*, 537 U.S. at 208 (finding Congress's decision to extend the terms of existing copyrights to be "a rational" exercise of "Congress' power under the Copyright Clause").

     In sum, reviewing the massive amount of evidence Congress collected—only some of which we have summarized above—leaves us with no doubt that despite the "undeniable" political progress made by minorities, "Congress could rationally have concluded" that it was necessary to extend section 5 for another twenty-five years. *City of Rome*, 446 U.S. at 177, 181. As in *Katzenbach*, "Congress had reason to suppose" that covered states "might try" to evade the Act's remedies. *Katzenbach*, 383 U.S. at 335. As in *City of Rome*, Congress aimed "to counter the perpetuation of [decades] of pervasive

93

voting discrimination." *City of Rome*, 446 U.S. at 182. And as in 1975, Congress gave "careful consideration" not just to the extensive record it developed, but to whether section 5 remains an appropriate response to the problem of continued racial discrimination in voting. *City of Rome*, 446 U.S. at 181. Like the Supreme Court in *City of Rome*, we thus "decline [the District's] invitation to overrule Congress' judgment that the [2006] extension was warranted." *Id.* at 180.

## V.

As we have just demonstrated, the 2006 reauthorization satisfies *Katzenbach*'s rationality standard. In our view, this should end the matter. But because the District insists that *City of Boerne*'s congruence and proportionality test applies to voting rights legislation enacted under the Fifteenth *or* Fourteenth Amendments—a result we believe would require overruling *Katzenbach*, *Morgan*, and *City of Rome*—we nonetheless proceed in this section to address the District's argument that section 5, although congruent and proportional when upheld in *Katzenbach* and *City of Rome*, no longer satisfies that standard given "the facts on the ground in 2006." Pl.'s Mem. at 43. Congress's task, the District believes, was to "demonstrate a sufficient nexus between a regime that burdens thousands of local entities with a requirement that they seek federal permission for every minute change affecting voting" and the prevention of contemporary racial discrimination in voting. *Id.* at 46. According to the District, Congress failed to clear that "high evidentiary hurdle" in enacting the 2006 Amendments. *Id.* at 43.

Defending the statute, the Attorney General, supported by the Diaz intervenors, argues that Congress's twin findings that section 5 has prevented voting discrimination

and that covered jurisdictions continue discriminating "establish that Section 5 remains a congruent and proportional means of enforcing the Constitution's prohibition on race and national origin discrimination in voting." Def.'s Mem. at 8-9; *see also* Diaz Mem. at 8-10. NAACP intervenors agree, arguing that "[e]ven absent binding precedent" from *Katzenbach* and *City of Rome*, "[u]nder the analytic framework that the Court has set forth in *Boerne* and its progeny, Section 5—Congress's response to a pattern of constitutional violations dating back well over a century and continuing to this day—easily passes muster." NAACP Mem. at 35.

As we explained in Part IIIB, *see supra* pp. 32-36, the test established in the *City of Boerne* line of cases involves three steps. First, we must "identify with some precision the scope of the constitutional right at issue," i.e., the appropriate level of judicial scrutiny for the right that Congress aims to enforce. *Garrett*, 531 U.S. at 365. Second, we examine "the Fourteenth Amendment 'evil' or 'wrong' that Congress intended to remedy, guided by the principle that the propriety of any § 5 legislation 'must be judged with reference to the historical experience . . . it reflects.'" *Fla. Prepaid*, 527 U.S. at 639-40 (omission in original) (quoting *City of Boerne*, 521 U.S. at 525). If the right Congress seeks to protect receives heightened scrutiny, Congress can more easily establish the necessary record of unconstitutional state conduct. Using voting rights as an example, the Court explained in *Hibbs*:

> Because the standard for demonstrating the constitutionality of a gender-based classification is more difficult to meet than our rational basis test . . . it was easier for Congress to show a pattern of state constitutional violations [in *Hibbs* than in *Garrett* or *Kimel*]. Congress was similarly successful in *South Carolina v. Katzenbach*, where we upheld the Voting Rights Act of 1965: Because racial classifications are presumptively invalid, most of the States' acts of race discrimination violated the Fourteenth Amendment.

*Hibbs*, 538 U.S. at 736 (citations omitted).  At the third and final step, we evaluate

whether the statutory scheme to remedy and prevent violations of the protected right is

congruent and proportional to the record Congress developed and to the risk of future

constitutional harm.  The "appropriateness of remedial measures must be considered in

light of the evil presented," because "[s]trong measures appropriate to address one harm

may be an unwarranted response to another, lesser one."  *City of Boerne*, 521 U.S. at 530.

Hence, the greater the level of scrutiny and the stronger the record of violations, the more

deference Congress deserves in crafting enforcement schemes that may "prohibit[]

conduct which is not itself unconstitutional and intrude[] into 'legislative spheres of

autonomy previously reserved to the States.'"  *Id.* at 518 (quoting *Fitzpatrick v. Bitzer*,

427 U.S. 445, 455 (1976)).

## A.

We begin with the first step: the nature of the constitutional right Congress sought

to protect.  Recall that the statutory provisions struck down in *Kimel* and *Garrett*

enforced rights receiving only rational basis review.  *See Kimel*, 528 U.S. at 83 (age

discrimination); *Garrett*, 531 U.S. at 366-68 (disability discrimination).  The statutes

challenged in *Hibbs* and *Lane* fared better because both protect rights subject to

heightened scrutiny.  ADA Title II, upheld in *Lane*, implicates strict scrutiny insofar as

the statute protects the fundamental right of access to courts.  *Lane*, 541 U.S. at 530-31

("[T]he question presented in this case is . . . whether Congress had the power under § 5

to enforce the constitutional right of access to the courts.").  The FMLA, upheld in *Hibbs*,

is designed to combat gender classifications subject to heightened scrutiny.  *Hibbs*, 538

U.S. at 736.  By contrast, the 2006 extension of section 5 simultaneously enforces two

rights, each of which receives the highest level of judicial scrutiny.  Specifically,

Congress aimed to prevent discrimination based on race, a suspect classification, in the

context of the fundamental right to vote, a liberty "preservative of all rights."  *Yick Wo v.*

*Hopkins*, 118 U.S. 356, 370 (1886).  As a consequence, our deference here is at its zenith.

The District argues that "the importance of [the] right does not . . . alter the nature

or stringency of the test for congruence and proportionality."  Pl.'s Opp'n at 53.  But the

District cites no authority to support this assertion, and for good reason: *Kimel*, *Garrett*,

*Hibbs*, and *Lane* are to the contrary.  Essentially conceding the point, the District

contends that even if Congress can more easily show a pattern of constitutional violations

in the context of rights or classes that receive heightened scrutiny, section 5 goes too far

because "only a minute portion of the activity" it touches is unconstitutional.  *Id.* at 54.

In *City of Boerne*, however, the Court reiterated what it has said again and again since

*Katzenbach*, namely that legislation enforcing the Civil War Amendments can "prohibit[]

conduct which is not itself unconstitutional."  *City of Boerne*, 521 U.S. at 518; *see also*

*Fla. Prepaid*, 527 U.S. at 638; *Kimel*, 528 U.S. at 81; *Garrett*, 531 U.S. at 365.

Moreover, as *Hibbs* and *Lane* demonstrate and as we show in Part VC below, the Court

gives Congress significant leeway to craft broad remedial prohibitions when fundamental

rights or protected classes are at stake.  *See infra* pp. 104-07.

At oral argument, NAACP counsel suggested that where, as here, two rights

receiving strict scrutiny are at stake, *Katzenbach*'s rationality standard and *City of*

*Boerne*'s congruence and proportionality test may well converge.  Because there is less

risk that Congress will "actually try to change the substance of the constitutional

provision" when it focuses on the "specific overlap of race and voting," counsel

observed, "I think that does help to explain . . . why in *City of Boerne* the Supreme Court expressly said what we are doing here is really very consistent with *South Carolina v. Katzenbach*."  Mots. Hr'g Tr. at 86-87 (Sept. 17, 2007).  The Supreme Court, however, has yet to address this issue, and we need not do so here.  As we explain in this section, the 2006 extension passes muster as congruent and proportional, especially when compared to the statutes the Court upheld in *Hibbs* and *Lane*, each of which protects only one right receiving heightened scrutiny.

<strong>B.</strong>

That section 5 protects against racial discrimination in voting has critical implications for our consideration of *City of Boerne*'s second step—the record of constitutional violations.  As in *Hibbs*, "it was easier for Congress to show a pattern of state constitutional violations" in enacting the 2006 Amendments than it is when Congress seeks to protect rights subject to rational basis review because racial classifications and restrictions on the right to vote—like gender discrimination (*Hibbs*) and restrictions on access to courts (*Lane*)—are "presumptively invalid."  *Hibbs*, 538 U.S. at 736.  In Part IVA we catalogued some of the enormous quantity of evidence of racial discrimination in voting by covered jurisdictions that Congress collected when considering the 2006 extension of section 5.  Rather than repeating those findings here, we simply highlight two comparisons that give us confidence that this record suffices to justify remedial legislation.

First, as we have already noted, the 2006 record is quite comparable to the record Congress compiled in its 1975 reauthorization of section 5.  Indeed, by Congress's own reckoning, the 2006 evidence "resembles" not only the legislative record it developed in

98

1975, but also the 1965 record considered adequate in *Katzenbach*. H.R. REP. NO. 109-478, at 6 (2006). This resemblance is crucial because the Supreme Court has repeatedly described the records at issue in *Katzenbach* and *City of Rome* as more than sufficient. For example, the *City of Boerne* Court found RFRA's legislative record inadequate when compared "to the record which confronted Congress and the Judiciary in the voting rights cases," namely *Katzenbach* and *City of Rome*. *City of Boerne*, 521 U.S. at 530. Likewise, in *Florida Prepaid* the Court found that in contrast to the "*undisputed record of racial discrimination confronting Congress in the voting rights cases*, Congress came up with little evidence of infringing conduct on the part of the States." *Fla. Prepaid*, 527 U.S. at 640 (emphasis added) (citation omitted). And in *Garrett*, the Court explained that the "ADA's constitutional shortcomings are apparent" when compared to the Voting Rights Act, for which "Congress documented a marked pattern of unconstitutional action." *Garrett*, 531 U.S. at 373. The contrast between that evidence and the "half a dozen examples" of state discrimination that Congress considered when enacting the ADA was "stark." *Id.* at 369, 374. Given the *City of Boerne* cases' favorable references to the legislative records at issue in *Katzenbach* and *City of Rome*, and the similarity between those records and the record here, the 2006 legislative record is plainly adequate to justify section 5's "strong remedial and preventive measures." *City of Boerne*, 521 U.S. at 526.

Second, the 2006 legislative record is far more powerful than those supporting the only two statutes sustained in the *City of Boerne* cases: the FMLA (*Hibbs*) and ADA Title II (*Lane*). In *Hibbs* the Supreme Court upheld the FMLA's family-care leave provision "based primarily on evidence of disparate provision of parenting leave, little of

which concerned unconstitutional state conduct." *Lane*, 541 U.S. at 528. Indeed, the

legislative record at issue in *Hibbs* included only the following:

> (1) a Senate Report citation to a Bureau of Labor Statistics survey
> revealing disparities in private-sector provision of parenting leave to men
> and women; (2) submissions from two sources at a hearing on the Parental
> and Medical Leave Act of 1986, a predecessor bill to the FMLA, that
> public-sector parental leave polices "diffe[r] little" from private-sector
> policies; (3) evidence that 15 States provided women up to one year of
> extended maternity leave, while only 4 States provided for similarly
> extended paternity leave; and (4) a House Report's quotation of a study
> that found that failure to implement uniform standards for parenting leave
> would "leav[e] Federal employees open to discretionary and possibly
> unequal treatment."

*Id.* at 528-29 n.17 (citation omitted) (summarizing *Hibbs*, 538 U.S. at 728-33). In *Lane*

the Court reviewed a slightly stronger legislative record that included "judicial findings

of unconstitutional state action" as well as "statistical, legislative, and anecdotal evidence

of the widespread exclusion" of the disabled from public services. *Id.* at 529. But in

terms of access to courthouses—the central issue in *Lane*—Congress compiled limited

evidence, consisting primarily of "testimony from persons with disabilities who described

the physical inaccessibility of local courthouses." *Id.* at 527. Thus, in both *Hibbs* and

*Lane*, the relevant parts of the legislative records, as summarized by the Court, consisted

of little more than a few reports and limited testimony from a handful of witnesses.

　　This evidence pales in comparison to the extensive record Congress compiled

when extending section 5. During more than twenty hearings, Congress assembled a

15,000-page record that includes numerous studies by voting rights experts, testimony

from dozens of witnesses describing racial discrimination in voting by covered

jurisdictions, and hundreds of judicial and Attorney General findings of unconstitutional

discrimination against minority voters. Indeed, Congress collected evidence of the very

kind of intentional discrimination the dissenters in *Hibbs* and *Lane* thought missing in those cases but present in *Katzenbach* and *City of Rome*.  Quoting *City of Rome*, one *Hibbs* dissenter noted that whereas the Voting Rights Act's "most sweeping provisions" applied only to states "'with a demonstrable history of intentional racial discrimination in voting,'" Congress failed to show that Nevada itself had been "acting in violation of the Fourteenth Amendment."  *Hibbs*, 538 U.S. at 742-43 (Scalia, J., dissenting) (quoting *City of Rome*, 446 U.S. at 177).  Similarly, one *Lane* dissenter compared ADA Title II's "nonexistent" record of unconstitutional state action to the "extensive" record of racial discrimination in voting reviewed in *Katzenbach*.  *Lane*, 541 U.S. at 547-48 (Rehnquist, C.J., dissenting).  That Congress, in considering the 2006 Amendments, developed a record of discrimination more extensive than the records found adequate in *Hibbs* and *Lane* is all the more significant given that section 5 was actively deterring constitutional violations throughout the period under review.  *See supra* pp. 85-87.  Had section 5 not existed, Congress presumably would have developed a record dwarfing by even greater margins those supporting the FMLA and ADA Title II.

     The District nonetheless argues that the 2006 legislative record, though adequate to support section 2 and other permanent provisions of the Voting Rights Act, is insufficient to justify section 5's "uniquely intrusive" scheme.  Pl.'s Mem. at 37.  According to the District, *Katzenbach* upheld the preclearance requirement only because certain covered states had devised "extraordinary stratagem[s]" to evade adverse court orders, a finding that justified Congress's decision to "shift the advantage of time and inertia from the perpetrators of the evil to its victims."  *Katzenbach*, 383 U.S. at 328, 335.  The District argues that the 2006 extension of section 5 is unconstitutional because the

legislative record contains no evidence of such stratagems or "gamesmanship," which the District defines as calculated attempts "to frustrate enforcement of federal voting-rights protections through the improper use of iterative changes in election practices and procedures." Pl.'s Reply in Supp. of Summ. J. at 3 ("Pl.'s Reply"). For three reasons, we disagree.

First, the District misreads *Katzenbach*. Although the Court did emphasize that Congress knew that "some" covered states had "contriv[ed] new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees," it upheld section 5 even though the record contained no evidence that *all* covered jurisdictions had engaged in such behavior. *Katzenbach*, 383 U.S. at 335. Equally important, the Court never stated that evidence of "extraordinary stratagem[s]" was critical to section 5's constitutionality. The critical factor, the Court repeatedly stressed, was that "Congress had found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits." *Id.* at 328; *see also id.* at 313-15 (explaining why laws facilitating case-by-case litigation had "proved ineffective"). Confirming this interpretation of *Katzenbach*, the Supreme Court in *City of Boerne* explained that "[t]he [Voting Rights Act's] new, unprecedented remedies were deemed necessary given the ineffectiveness of the existing voting rights laws, and the slow, costly character of case-by-case litigation." *City of Boerne*, 521 U.S. at 526 (citations omitted); *see also Garrett*, 531 U.S. at 373 ("In [the Voting Rights] Act . . . Congress also determined that litigation had proved ineffective."). Congress again made this crucial finding when extending

section 5, declaring that "failure to reauthorize the temporary provisions, given the record established, would leave minority citizens with the inadequate remedy of a Section 2 action." H.R. REP. NO. 109-478, at 57 (2006). This conclusion flowed from testimony that section 2 litigation (1) cannot prevent enactment of discriminatory voting measures, which remain in effect for years until litigation ends; (2) imposes a heavy financial burden on minority plaintiffs; and (3) places the burden of proof upon plaintiffs rather than upon covered jurisdictions. *See, e.g.*, 1 *Section 5 History* 92, 97, 101 (testimony of Nina Perales); *id.* at 79, 83-84 (testimony of Anita Earls); 1 *Evidence of Continued Need* 97 (testimony of Joe Rogers). The Court relied on similar findings in *Hibbs* and *Lane* to sustain the constitutionality of the statutes at issue in those two cases. *See Lane*, 541 U.S. at 531 ("Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this 'difficult and intractable proble[m]' warranted 'added prophylactic measures in response.'" (alteration in original) (quoting *Hibbs*, 538 U.S. at 737)).

Second, in *City of Rome* the Court found Congress's reauthorization of section 5 constitutional without ever mentioning stratagems, gamesmanship, or anything of the sort. Instead, the Court relied on evidence of racial disparities in registration rates and the number of elected officials, as well as on the number and nature of Attorney General objections. *See supra* pp. 30-31. Moreover, the Court upheld section 5 against a facial challenge without examining any specific evidence—of gamesmanship or anything else—from Texas or other jurisdictions newly covered by the 1975 Amendments.

Finally, even if evidence of contemporary stratagems to evade court orders were necessary, the 2006 legislative record documents just such behavior. For example, as

described earlier, Mississippi sought to revive its discriminatory dual registration system after a federal court struck it down; Waller County, Texas, while losing or settling a series of lawsuits, repeatedly sought to block students attending an historically black university from voting; and North Johns, Alabama, first signed a consent decree in which it agreed to abandon its discriminatory at-large system, but later intentionally discriminated against two African American candidates for town council. *See supra* pp. 62-63, 71-73, 75-76. These are hardly examples of "jurisdictions hav[ing] problems getting it right." Pl.'s Reply at 28. Quite to the contrary, these and many similar examples in the legislative record amount to just the kind of "conscious and continuing effort to avoid the [Act's] requirements" that the District insists are necessary to justify section 5's extension. *Id.* At oral argument District counsel contended that gamesmanship involves a series of legislative enactments, not isolated actions by individual officials. Mots. Hr'g Tr. at 33 (Sept. 17, 2007) ("The [North Johns] Mayor's actions at that time were separate, but they were not an independent enactment."). Again, the District misreads *Katzenbach*. There, the Court emphasized that "*certain local officials* have defied and evaded court orders or have simply closed their registration offices to freeze the voting rolls." *Katzenbach*, 383 U.S. at 314 (emphasis added).

We have no doubt that 1960s-style gamesmanship is less common today, but that is unsurprising. Section 5 has been deterring voting discrimination since 1965, *see supra* pp. 85-87, and "[d]iscrimination today is more subtle than the visible methods used in 1965," H.R. Rep. No. 109-478, at 57 (2006). Emphasizing the critical role played by section 5, the Attorney General explains:

> Congress adopted the preclearance remedy to remove the opportunity for covered jurisdictions to engage in such gamesmanship. The fact that

> Congress's chosen remedy has been and continues to be successful
> supports, rather than undermines, the appropriateness of the remedy.
> Under [the District]'s view of congruence and proportionality, Congress
> could not reauthorize a statutory remedy unless it finds that the targeted
> constitutional problem continues unabated—in other words, only
> ineffective remedies would be congruent and proportional.  That simply
> cannot be the state of the law.

Def.'s Reply Mem. at 14-15.  We agree.  The District's gamesmanship argument reduces

Congress's Fourteenth and Fifteenth Amendment enforcement authority to a Catch-22.

JOSEPH HELLER, CATCH-22, at 55 (Simon & Schuster 2004) (1955) ("If he flew [combat

missions] he was crazy and didn't have to; but if he didn't want to he was sane and had

to.").

## C.

Moving to the third and final step—the congruence and proportionality of the

statutory scheme—we start again with what the *City of Boerne* cases say about the Voting

Rights Act, this time focusing on its tailored remedial scheme.  In *City of Boerne* the

Court pointed out that the provisions challenged in *Katzenbach* and *City of Rome*

"affected a discrete class of state laws" and were "confined to those regions of the

country where voting discrimination had been most flagrant."  *City of Boerne*, 521 U.S. at

532-33.  It also stressed that the Act was temporary and that covered jurisdictions could

seek bailout.  *Id.* at 533.  These limiting provisions, the Court explained, "tend to ensure

Congress' means are proportionate to ends legitimate under § 5."  *Id.*  By contrast,

"RFRA [wa]s not designed to identify and counteract state [actions] likely to be

unconstitutional."  *Id.*  In *Garrett* the Court drew a similar contrast between the ADA's

general accommodation duty and the Voting Rights Act's "detailed but limited remedial

scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment in

those areas of the Nation where abundant evidence of States' systematic denial of those rights was identified." *Garrett*, 531 U.S. at 373.

Significantly for our purposes, the limiting features of section 5 the Court believed so compelling in the *City of Boerne* cases all remain in place today. Section 5 still applies for only a limited time, i.e., twenty-five years. Section 5 still targets only those states with the most severe histories of discrimination; in fact, it covers fewer than one-third of the fifty states. And the statute still includes both bailout and "bail-in" provisions for expanding or contracting coverage over time. Indeed, the Act, as extended in 2006, provides broader eligibility for bailout than the versions upheld in *Katzenbach* and *City of Rome* and commended throughout the *City of Boerne* cases. Under the original 1965 Act, only ninety-one covered states and separately covered political subdivisions could seek bailout; thanks to the 1982 Amendments, today nearly nine hundred entities—including political subdivisions within covered jurisdictions—may do so. Def.'s Statement of Uncontested Material Facts ¶¶ 113-14.

Furthermore, section 3(c)'s bail-in provision continues to serve its intended purpose of ensuring coverage where it is needed. As Congress knew when it passed the 2006 Amendments, two states and several counties have been designated for coverage by court order since *City of Rome*. 1 *Evidence of Continued Need* 154 (report of Nat'l Comm'n on the Voting Rights Act); *see also Continuing Need for Pre-clearance* 188 (testimony of Pamela S. Karlan). In one of the two statewide cases, a federal district court found that from 1973 to 1989 Arkansas intentionally discriminated against minority voters by enacting "a series of four majority-vote statutes passed to convert to a run-off system those plurality elections in which blacks were succeeding." *Jeffers v. Clinton*,

740 F. Supp. 585, 594, 600 (E.D. Ark. 1990). Finding the "inference of racial motivation

. . . inescapable," the district court directed Arkansas to preclear any majority-vote

requirements in general elections "until further order of this Court." *Id.* at 595, 601, 627.

After withdrawing its appeal, *Clinton v. Jeffers*, 498 U.S. 1129 (1991), Arkansas

complied with the order, seeking preclearance as recently as 2002. *See* U.S. Dep't of

Justice, Notice of Preclearance Activity Under the Voting Rights Act of 1965, as

Amended (Jan. 18, 2002), *available at* http://www.usdoj.gov/crt/voting/notices/

vnote011802.html. In the other statewide case, a three-judge district court found that

New Mexico's post-1980 legislative reapportionment violated section 2 and ordered the

state to obtain preclearance for any statewide legislative redistricting "for a period of ten

years." *Sanchez v. Anaya*, No. 82-0067M ¶ 8 (D.N.M. Dec. 17, 1984) (judgment).

Because of that court order, the Attorney General was able to review and then object to

New Mexico's 1991 state senate redistricting plan, which the state failed to demonstrate

was not motivated by discriminatory intent. 1 *Section 5 History* 1620-21 (Letter from

John R. Dunne, Assistant Attorney Gen., DOJ Civil Rights Div., to Manny M. Aragon,

N.M. Senate President Pro Tempore, and Raymond G. Sanchez, N.M. House of

Representatives Speaker (Dec. 10, 1991)).

Moreover, the 2006 extension is far more tailored than the statutes the Court

found congruent and proportional in *Hibbs* and *Lane*. Although the Court praised the

"narrowly targeted" and "limited" remedies provided by the FMLA and ADA Title II,

*Hibbs*, 538 U.S. at 738; *Lane*, 541 U.S. at 531, those laws are broader than section 5 in

several key respects: both the FMLA and ADA Title II impose obligations nationwide,

apply to all public employers or programs, and are permanent. By contrast, section 5 is

geographically targeted, temporary, and applies only to *changes* in voting procedures, not to all political or election-related activities in covered jurisdictions. One *Lane* dissenter, pointing out that Title II "applies to any service, program, or activity provided by any entity," observed that "Title II's all-encompassing approach to regulating public services contrasts starkly with the more closely tailored" Voting Rights Act, whose "'limited remedial scheme[s]' . . . were narrowly tailored to address massive evidence of discrimination in voting." *Lane*, 541 U.S. at 550 & n.10 (Rehnquist, C.J., dissenting) (alteration in original) (quoting *Garrett*, 531 U.S. at 373).

The District nonetheless insists that the 2006 extension is insufficiently tailored to survive a *City of Boerne* challenge. First, it argues that the coverage formula is no longer congruent because "[b]oth proxies"—(1) use of a test or device and (2) registration or turnout rates below 50%—are "out of date and cannot indicate which jurisdictions have recently engaged in unconstitutional transgressions." Pl.'s Mem. at 55. The statute's current constitutionality, however, does not turn on the fit between the coverage formula's proxies and conditions existing in covered jurisdictions today. Congress designed the coverage formula to identify jurisdictions with histories of voting discrimination severe enough to justify being subjected to section 5's preclearance requirement. Once covered, jurisdictions remain so unless they bail out. As *City of Boerne* explains with respect to the Act's original, less generous bailout provision, "to ensure that the reach of the Voting Rights Act was limited to those cases in which constitutional violations were most likely (in order to reduce the possibility of overbreadth), the coverage under the Act would terminate 'at the behest of States and political subdivisions in which the danger of substantial voting discrimination has not

materialized during the preceding five years.'" *City of Boerne*, 521 U.S. at 533 (quoting

*Katzenbach*, 383 U.S. at 331).  Moreover, in *City of Rome* the Court sustained the

constitutionality of the section 5 extension even though most covered jurisdictions had by

then achieved registration rates well in excess of 50%.  *See City of Rome*, 446 U.S. at 180

(discussing racial disparities in registration rates, not overall average rates); S. REP. NO.

94-295, at 14 (1975) (revealing that in 1971-72, seven southern states had average

registration rates of 68% for whites and 57% for blacks).  Under *City of Boerne*, the

constitutional question before us turns on whether Congress documented sufficient

evidence of contemporary discrimination in covered jurisdictions and designed an

appropriately tailored remedy.  Congress has easily passed both tests.  To be sure, some

covered jurisdictions—perhaps even many—no longer discriminate in voting.  The way

out for such jurisdictions, however, is not a blanket order from this court declaring

section 5 unconstitutional, but rather declaratory judgments allowing bailout.

Continuing its assault on the coverage formula, the District next argues that

Congress "made no meaningful comparison between previously covered jurisdictions and

noncovered ones."  Pl.'s Mem. at 54, 56.  This is incorrect.  The legislative record reveals

significant differences between covered and noncovered jurisdictions.  In particular, one

study found that of the 114 section 2 suits in which plaintiffs prevailed, more than half

(64) originated in covered jurisdictions, even though less than one-quarter of the nation's

population resided in such jurisdictions.  *See Impact and Effectiveness* 974 (report of

Ellen Katz).  According to the same study, from 1982 to 2005 the success rate of section

2 suits in covered jurisdictions exceeded the success rate of such litigation elsewhere.  *Id.*

(showing success rates of 41% in covered jurisdictions and 30% in noncovered

jurisdictions).  Finally, the study reported that courts hearing section 2 suits in covered

jurisdictions, compared with their counterparts in noncovered jurisdictions, more often

found (1) the use of devices that enhance the opportunity for racial discrimination in

voting, (2) racial appeals in campaigns, (3) the failure of minority candidates to win

elections, and (4) tenuous justifications given for practices challenged as discriminatory.

*Id.* at 998, 1003, 1008, 1013-15.  These differences are particularly striking given that but

for section 5's prophylactic effects, covered jurisdictions would likely have been targeted

by far more section 2 litigation.

Next, the District argues that if jurisdictions like it may not apply for bailout, as

we have held in Part II, "then bailout is an empty promise."  Pl.'s Mem. at 58.  If only

political subdivisions that register voters are able to seek bailout, the District insists, the

"concern relating to the remedy's incongruence is magnified exponentially," rendering

the "reauthorized § 5 . . . unconstitutionally overbroad."  *Id.* at 26.  In *City of Rome*,

however, the Supreme Court upheld section 5's constitutionality even though the city was

ineligible to seek bailout.  *See* 446 U.S. at 169, 180.  Indeed, one *City of Rome* dissenter

took precisely the same position the District does here: "[I]f governments like the city of

Rome may not bail out, the statute oversteps [the] limits [of Fifteenth Amendment

authority]."  *Id.* at 205 (Powell, J., dissenting).  To be sure, in *City of Rome* the Supreme

Court was applying *Katzenbach*'s rationality standard, but we see no basis for reaching a

different result under *City of Boerne*'s more demanding congruence and proportionality

test.  After all, in *City of Boerne* the Court emphasized that the Act's bailout mechanism

"tend[s] to ensure Congress' means are proportionate to ends legitimate under § 5," *City

of Boerne*, 521 U.S. at 533, and as the Attorney General points out, "[t]he current bailout

system is significantly less burdensome" than the system sustained in *City of Rome*.

Def.'s Opp'n at 27. Specifically, in addition to Texas, Travis County may now seek

bailout on the District's behalf.

The District next claims that the amended bailout procedure is "practically

unworkable and in effect unachievable" because covered jurisdictions that register voters

"must establish that every city, town, school district, or other entity within [their]

boundaries has met the statutory conditions." Pl.'s Mem. at 22. According to the

District, for example, Travis County bears the burden of "research[ing] the activities of

each and every one of [107] entities [within its boundaries] for the prior ten years." *Id.* at

22-23; *see* Def.'s Statement of Uncontested Material Facts ¶ 29. As the Attorney General

points out, however, "Travis County has contracted with all of the 107 political subunits

within the county—including [the District]—to conduct elections on their behalf,"

making it "likely that Travis County would already have at hand much of the information

necessary" for bailout. Def.'s Opp'n at 28; Def.'s Statement of Uncontested Material

Facts ¶¶ 28-29, 32-33. Moreover, demonstrating the feasibility of bailout, every one of

the fourteen jurisdictions to have applied since 1984 has, with the Attorney General's

support, succeeded in terminating coverage. Def.'s Opp'n at 29; Def.'s Statement of

Uncontested Material Facts ¶ 115. Unimpressed, the District considers it "telling" that all

fourteen jurisdictions are from Virginia and that "Virginia uniquely structures its local

government so that counties and independent cities do not contain large numbers of

smaller governmental units." Pl.'s Mem. at 23 n.5. Yet one of the Virginia jurisdictions

that successfully bailed out, Shenandoah County, has nine political subunits, a number

almost identical to Texas's median of ten subunits per county. *See* 2 *Section 5 History*

2772; Decl. of Kristen M. Clarke in Supp. of Resp. to Pl.'s Mot. for Summ. J. of Def.-

Intervenors Texas NAACP et al. Ex. 4 (data from Texas Secretary of State showing by

county all subunits that conduct elections).  More significantly, Congress heard testimony

that many jurisdictions believe preclearance to be advantageous and have no desire to

seek bailout.  *See, e.g.*, *Reauthorizing the Voting Rights Act* 313-14 (statement of Donald

M. Wright) (noting that officials in many covered North Carolina counties supported

renewal and "viewed Section 5 as a manageable burden providing benefits in excess of

costs and time needed for submissions").  This includes intervenor Travis County, which

explains in its brief:

> [T]he County sees the Section 5 preclearance process through a very different lens than the District—one polished by experience, not theory. While there is some administrative burden associated with Section 5 compliance, it is minor and not disruptive to the County's business.  On the other side of the scale, the County actually receives benefits from the Section 5 preclearance process.  The continued existence of the Act's preclearance requirements carries with it valuable educational and deterrent effects that aid Travis County and its lead election officials—the County Clerk and the County Tax Assessor-Collector—in administering their many election-related duties, not just for themselves, but also for the more than one hundred jurisdictions whose elections the County handles and for the voters themselves.

> To take only one example, the interface between poll workers and voters, particularly minority voters, is probably the most personal interaction between local government officials and the electorate in the democratic process.  Yet, as the Travis County Clerk has explained, the process of selecting those poll workers who fan out across the County on election day is highly idiosyncratic, varying from precinct to precinct and electoral unit to electoral unit.  Training is an essential component in making the system work in a way that results in an atmosphere of sensitivity and concern for voters rather than an environment of hostility and indifference.  The existence of the anti-discrimination principles underlying Section 5 and of the watchful presence of the Department of Justice in the background are beneficial tools, aiding the County in its efforts to train poll workers and others involved in the election process in a way that furthers the principles of openness and fairness to minority voters.

> Thus, for the County, the modest administrative costs that come with being subject to Section 5's preclearance requirements are far outweighed by the benefits that come from such coverage.

Travis County's Mot. for Summ. J., with Accompanying Mem. of P. & A. at 6-7.  The county concludes: "The day may come when the balance shifts, and Section 5's burdens on conducting local elections outweigh the benefits, but it isn't here yet."  *Id.* at 7.

Finally, the District argues that the twenty-five-year extension goes so far beyond the "modest seven-year extension" upheld in *City of Rome* as to have "no end in sight." Pl.'s Mem. at 40, 58.  But as we explained earlier, Congress considered and reasonably rejected a shorter extension.  *See supra* pp. 91-92.  As in 1982, when it also extended section 5 for twenty-five years, Congress believed that the longer extension was necessary to incorporate two decennial redistrictings and to encourage bailout.  Given the special deference we owe Congress under the circumstances of this case, we have no basis for questioning this judgment.

### D.

For the foregoing reasons, the 2006 extension represents "a reasonable prophylactic measure, reasonably targeted to a legitimate end."  *Lane*, 541 U.S. at 533. The evidence of unconstitutional state conduct amassed by Congress resembles the 1975 legislative record extolled in the *City of Boerne* cases and dwarfs those considered adequate in *Hibbs* and *Lane*.  Racial disparities remain in voter participation rates and the number of elected officials, and racial discrimination in voting continues throughout covered jurisdictions—on some measures, at a higher rate than in noncovered jurisdictions despite section 5's deterrent effects.  To be sure, the record also reveals that minorities in covered jurisdictions have made significant progress since 1982.  But given

that this progress is due in no small part to the Voting Rights Act itself, and given the deference owed Congress when it acts at the zenith of its Fourteenth and Fifteenth Amendment enforcement authority to prevent states from discriminating in voting on the basis of race, we have no basis for overturning Congress's judgment that preclearance— "a vital prophylactic tool[]," H.R. REP. NO. 109-478, at 21 (2006)—remains necessary. Moreover, section 5, as extended, is more tailored than the versions sustained in *Katzenbach* and *City of Rome*, and far more tailored than the statutes considered congruent and proportional in *Hibbs* and *Lane*. Of course, Congress could perhaps have made section 5 even more tailored, such as by modifying the coverage formula or further liberalizing bailout. But again, given Congress's broad authority to fashion remedial measures to combat racial discrimination in voting, we decline to second-guess its decision to renew coverage and bailout provisions upheld in *Katzenbach* and *City of Rome* and discussed with approval in the *City of Boerne* cases.

## VI.

Having rejected the District's facial challenge to section 5 under both *Katzenbach* and *City of Boerne*, we turn finally to two arguments in the District's amended complaint that could reflect an as-applied challenge.

First, the District asserts that "[t]here has never been any finding that [it] has engaged in discriminatory voting practices." Am. Compl. ¶ 25. The "sole basis" for its preclearance obligation, according to the District, "is that it was created (in 1987) within a state that was deemed covered by the Voting Rights Act more than thirty years ago." *Id.* The District's brief explains:

> Throughout its two decades of existence, the [D]istrict has held elections
> in compliance with the Voting Rights Act.  When it needed to, the
> [D]istrict has sought and received preclearance from the Attorney
> General—who has never interposed an objection to any election change
> made by the [D]istrict.  The [D]istrict has never been subjected to federal
> election examiners, has never had a judgment entered against it in any
> election matter, and has never had any voting or election lawsuit filed
> against it.  In its entire history, not a single individual has ever complained
> about or questioned any voting or election procedure used by the [D]istrict
> on federal voting rights grounds.  In their depositions, not one of the
> intervenors identified a single complaint about the [D]istrict's elections or
> the way they are conducted.

Pl.'s Mem. at 1.  Given its exemplary record, the District argues, "there is no conceivable rationale to force [it] to continue to wear the badge of shame that is preclearance."  *Id.*

The fundamental flaw in this argument is that in *City of Rome* the Supreme Court upheld section 5's application to a jurisdiction that, like the District, had no record of unconstitutional discrimination in voting.  There, as an alternative to its bailout request, Rome advanced an as-applied challenge to section 5 along with its facial claim.  *See* Jurisdictional Statement of Appellants at 36, *City of Rome*, 446 U.S. 156 (No. 78-1840) ("This is the first case since 1966 in which the constitutionality of Section 5, both facially and as applied, has been placed squarely before this Court, based upon a record which includes samples of actual experience under this controversial provision.").  Emphasizing that the district court had found no evidence of intentional discrimination on its part, *see City of Rome v. United States*, 472 F. Supp. 221, 224-25 (1979), Rome urged the Supreme Court to address section 5's "impact . . . upon a political subdivision which is found to be innocent of any discriminatory purpose," Brief for the Appellants at 19, *City of Rome*, 446 U.S. 156 (No. 78-1840).  In sustaining section 5's constitutionality, however, the Court paid no heed to Rome's record of constitutional compliance, instead focusing entirely on the legislative record documenting racial discrimination in voting

throughout the covered states.  *See City of Rome*, 446 U.S. at 173-83.  Indeed, one

dissenter took precisely the same position the District does here, accusing the majority of

"ignor[ing] the most relevant facts" and "avert[ing] its eyes from the central paradox of

this case: Even though Rome has met every criterion established by the Voting Rights

Act for protecting the political rights of minorities, the Court holds that the city must

remain subject to preclearance."  *Id.* at 196 n.4 (Powell, J., dissenting).  According to that

dissent, the Court's rejection of Rome's bailout request rendered the Act

"unconstitutional as applied to the city of Rome."  *Id.* at 200.

Given the dissenter's position and the majority's silence as to Rome's record, we

think it fair to read *City of Rome* as holding that where, as here, Congress has compiled a

sufficient legislative record to defeat a facial constitutional challenge, *see supra* Part IV,

an as-applied challenge based on a political subunit's record of nondiscrimination must

also fail.  *See also Lopez*, 525 U.S. at 282-87 (upholding application of section 5 to

covered county's efforts to implement voting change required by noncovered state while

conducting no examination of county's or state's records of discrimination); *Mitchell*,

400 U.S. at 216 (Harlan, J., concurring in part and dissenting in part) (upholding

application of nationwide literacy test ban because "[d]espite the lack of evidence of

specific instances of discriminatory application or effect, Congress could have

determined that racial prejudice is prevalent throughout the Nation, and that literacy tests

unduly lend themselves to discriminatory application"); *id.* at 284 (Stewart, J., concurring

in part and dissenting in part) ("Because the justification for extending the ban on literacy

tests to the entire Nation need not turn on whether literacy tests unfairly discriminate

against Negroes in every State in the Union, Congress was not required to make state-by-

state findings . . . .").  This principle is consistent with cases rejecting as-applied

challenges in other contexts.  *See, e.g.*, *United States v. Edge Broad. Co.*, 509 U.S. 418,

430-32 (1993) (discussing as-applied First Amendment cases in which the Court

"judge[d] the validity of the restriction . . . by the relation it bears to the general problem

. . . , not by the extent to which it furthers the Government's interest in an individual

case"); *United States v. Blaine County*, 363 F.3d 897, 904-09 (9th Cir. 2004) (rejecting

county's as-applied challenge to section 2 of the Voting Rights Act, *see* Appellants'

Opening Brief at 12, *Blaine County*, 363 F.3d 897 (No. 02-35691), by upholding the

provision as facially valid under *City of Boerne*).  And we believe this principle applies

here even if *City of Boerne* provides the proper test for evaluating the statute's facial

validity.  Given that the Voting Rights Act's coverage is congruent and proportional, *see*

*supra* Part V, the unique circumstances of a particular political subunit, like the District,

cannot provide grounds for an as-applied constitutional challenge.

This conclusion finds support not only in precedent, but also in logic.  As NAACP

intervenors explain: "Congress is a national legislative body.  Its assessments of problems

to be remedied and the measures necessary to remedy the problems are typically multi-

jurisdictional, if not nationwide."  NAACP Mem. at 79-80.  "If the District's claim were

accepted," their brief continues, "it would require Congress to determine the

appropriateness of Section 5's coverage of every single state, county, city, village, utility

district, special purpose district, or any other entity that holds elections."  *Id.* at 80.  The

District's position would also open the door to as-applied challenges by thousands of

entities that conduct elections within covered jurisdictions, upsetting the balance

Congress struck when it expanded bailout eligibility in 1982.  Unsurprisingly, such an

approach finds no support in cases addressing claims that Congress exceeded its enumerated powers. *See supra* Parts IIIA and IIIB.

As an aside, we think it worth noting that the District's as-applied challenge would also fail under a different approach proposed by two justices—an approach that would entertain as-applied challenges by evaluating the records of covered jurisdictions, not their political subunits. Responding to the dissenters in *City of Rome*, Justice Stevens explained in a concurrence that "[i]f racially discriminatory voting practices elsewhere *in the State of Georgia* were sufficiently pervasive to justify the *statewide remedy* Congress prescribed, that remedy may be applied to each and every political unit within the State." *City of Rome,* 446 U.S. at 190 (Stevens, J., concurring) (emphasis added). Similarly, dissenting in *Hibbs*, Justice Scalia argued that courts evaluating as-applied challenges to enforcement legislation should "examin[e] whether *the State has itself* engaged in discrimination sufficient to support the exercise of Congress's prophylactic power." *Hibbs*, 538 U.S. at 743 (Scalia, J., dissenting) (emphasis added). Under this state-by-state approach, the District's as-applied challenge would fail because as we explained throughout Part IV, the 2006 legislative record is replete with evidence of contemporary racial discrimination in voting by Texas and its political subunits. For example, the record reveals not only a substantial gap in registration rates between whites and Hispanics, but also that since 1982 Texas led all covered jurisdictions in the number of MIR-induced outcomes, judicial preclearance suits resolved favorably to minorities, and successful section 5 enforcement suits. *See supra* pp. 48-49, 66-67, 71. In fact, despite having been covered only since 1975, Texas received more objections during the entire 1966-2004 period than did any other covered state. *See supra* p. 54. The record also

contains telling examples of intentional discrimination by the Texas cities of Prairie View, Seguin, Dallas, Midland, and Terrell, as well as by Texas itself through the statewide redistricting plan partially invalidated in *LULAC*. *See supra* pp. 71-73, 79-80.

The District's second argument in support of an as-applied challenge focuses on the burden that section 5 allegedly imposes upon it. Specifically, the District asserts that section 5 "hinders the right of voters in the [D]istrict to decide the manner in which their representation at the local level will be determined—that is, to alter the manner and procedures by which their representatives in the [D]istrict are elected—because of the burden of the preclearance procedures." Am. Compl. ¶ 25. According to the District, "even the most minute . . . changes"—such as "a plan to move a polling place across the street from a church to a school"—require preclearance, imposing "the burden of preparing and submitting the request" and "presumptively delay[ing most changes] by at least 60 days [pending] the Attorney General's approval." *Id.* ¶ 12. Even though "the Attorney General almost never objects to proposed changes in local voting practices or procedures," the District argues, "the process itself imposes a substantial burden." *Id.* ¶ 13.

This argument fails essentially for the same reason as the District's first argument. In extending section 5, Congress determined, pursuant to its authority under section 2 of the Fifteenth Amendment, that eradicating racial discrimination in voting justifies any burden preclearance might impose on covered jurisdictions and their political subunits. Because section 5's extension was facially constitutional, *see supra* Part IV, that same burden, whatever its magnitude, cannot now provide the basis for an as-applied challenge. Again, this is the teaching of *City of Rome*. Like the District here, Rome

contended that "[t]he practical operation of section 5 supports the conclusion that it is now unconstitutional" because "the procedures prescribed by Congress for obtaining preclearance of the electoral changes in a covered jurisdiction have proven intrusive and burdensome." Brief for the Appellants at 79, *City of Rome*, 446 U.S. 156 (No. 78-1840). Detailing the costs of its declaratory judgment action, Rome argued that "[a]lthough this burden would be substantial to any unit of government forced to shoulder it, it is even more serious to a city the size of Rome." *Id.* at 80 n.71. Yet the Court rejected the city's constitutional challenge without even mentioning the burden section 5 imposed on Rome, *see City of Rome*, 446 U.S. at 173-83, doing so over a vigorous dissent that emphasized "the burden of preclearance on Rome" and condemned the majority's "decree[] that the citizens of Rome will not have direct control over their city's voting practices until the entire State of Georgia can free itself from the Act's restrictions," *id.* at 200, 203 (Powell, J., dissenting). Obviously, the Court rebuffed Rome's burden argument for the same reason it rejected its innocence claim: because Congress had compiled a sufficient legislative record to defeat a facial constitutional challenge to section 5, an as-applied challenge based on Rome's particular circumstances necessarily failed. We again see no reason to reach a different result if *City of Boerne* provides the proper test for evaluating section 5's constitutionality. Once section 5 has been found facially constitutional under whatever standard—*Katzenbach* or *City of Boerne*—we fail to see how a constitutionally covered jurisdiction's particular circumstances could possibly support an as-applied challenge.

In any event, even assuming the burden section 5 imposes on covered jurisdictions is relevant under *City of Boerne*'s congruence and proportionality standard,

the District's burden is trivial.  Throughout its two decades of existence, the District has filed only eight preclearance requests, Def.'s Statement of Uncontested Material Facts ¶¶ 71-78, 93, and the cost of these submissions—$223 per year—is modest, especially when compared to the District's average annual budget of $548,338, *id.* ¶¶ 98-99.  As the Attorney General points out, moreover, the District has never received an objection letter or been targeted by a section 5 enforcement suit.  *Id.* ¶¶ 71-78, 89.  Nor has the District identified a single voting change that it considered but chose not to pursue because of section 5.  *Id.* ¶ 88.  Finally, given that state law controls most features of the District's electoral system, it has limited autonomy to adopt voting changes in the first place.  *Id.* ¶¶ 53-70, 90. 120-24.  In light of this evidence—all uncontested by the District—we find it impossible to conclude that section 5 imposes any meaningful burden on the District, much less an unconstitutional one.

## VII.

Because the District does not qualify as a "political subdivision" as defined in section 14(c)(2) of the Voting Rights Act, it is ineligible to request a declaratory judgment exempting it from section 5's preclearance requirement.  The District's constitutional challenge fails because Congress, acting pursuant to section 2 of the Fifteenth Amendment, rationally concluded that extending section 5 was necessary to protect minorities from continued racial discrimination in voting.  Alternatively, under the *City of Boerne* standard, the 2006 Amendment qualifies as a congruent and proportional response to the continuing problem of racial discrimination in voting that Congress sought to remedy.

121

Consistent with this opinion, an order denying the District's motion for summary judgment and granting the Attorney General's and intervenors' motions for summary judgment is issued this same day.

_____
PAUL L. FRIEDMAN
United States District Judge

_____
EMMET G. SULLIVAN
United States District Judge

_____
DAVID S. TATEL
United States Circuit Judge

DATE:  May 30, 2008

122

## APPENDIX

### *Examples of Objection Letters Based on Discriminatory or Retrogressive Intent, 1982-2005*

### ALABAMA

- Tallapoosa County (Feb. 6, 1998), 1 *Section 5 History* 429-34.

  Noting a "history of noncompliance [with voting rights laws] on the part of the county," the Justice Department objected to a plan revising district lines and reducing the number of county commissioners from six to five. According to 1990 census data, African Americans constituted 26 percent of the county's total population and 23 percent of the voting-age population. To settle a section 2 suit, the county agreed in a consent decree to adopt by 1998 "a fairly apportioned five-member plan with one district with a majority black voting age population." After a white commissioner announced that he no longer planned to step down in 1998, the commission voted along racial lines to approve a plan that violated the consent decree by creating one district with a black voting-age population of only 49 percent. At first, the county refused to submit the plan for preclearance, but then did so after amending it "apparently in order to achieve a marginal majority in black voting age population" in the relevant district. Compared to the existing plan, "the proposed plan reduce[d] the black voting age population in the majority black district by at least 10.7 percentage points" and was "very similar . . . to the 'minority' district . . . in effect in 1990 in which the candidate of choice of minority voters lost the election by a significant margin." The Justice Department concluded: "Taken together, the history of the instant redistricting process and its results raise serious concerns that the county . . . purposefully impaired the ability of black voters to elect a candidate of choice in order to protect the reelection opportunities of a white incumbent."

- City of Greensboro (Jan. 3, 1994), 1 *Section 5 History* 412-14.

  According to the 1990 Census, black residents constituted 62 percent of the total population and 56 percent of the voting-age population in Greensboro. After objecting to a 1992 districting plan that "appeared unnecessarily to limit black voters to an opportunity to elect only two of the five councilmembers," the Justice Department again objected to a 1993 plan that made only "minimal changes to the objected-to plan." The letter explains: "With regard to District 2, which had been the focus of our concern, the 1993 plan adds one block to the district and removes another block from the district. While the plan provides for slight increases in the black population percentages in District 2, the opportunity for black voters to elect a representative of their choice in that district appears to have been

constrained deliberately, taking into account the continued fragmentation of black population concentrations, the pattern of racially polarized voting and the reduced electoral participation by black persons, which is traceable to a history of discrimination." Although "aware of several alternative plans" to create a third district with a larger proportion of black voters than the proposed District 2, the city "provided no satisfactory explanation" for rejecting the alternative plans and was "not free to adopt a districting plan which, as would appear here, is calculated to limit black voting strength."

## CALIFORNIA

- Monterey County (Mar. 29, 2002), 2 *Section 5 History* 3319-22; *see also* 1 *Evidence of Continued Need* 351.

   The county's Chualar Union Elementary School District proposed changing from districts to an at-large system for electing trustees. According to the 2000 Census, the school district's population was 78 percent Hispanic, while the voting-age population was 74 percent Hispanic. Under the existing system, Hispanic voters in a single district— Area 3, where the Hispanic population exceeded 90 percent—elected three of the school district's five trustees. The proposed change to at-large elections resulted from a petition drive and referendum. The letter explains:

   > [T]he actions of the trustees elected from Area 3 . . . regarding the tenure of the district's superintendent of schools provided the impetus for the petition drive. The cover letter . . . attacked the credibility of the trustees from [Area 3], citing the language skills of one trustee and making unfavorable references to the language preferences of another. The language and tone of the letter raises the implication that the petition drive and resulting change was motivated, at least in part, by a discriminatory animus. This conclusion is further supported by statements made by proponents of the petition during our investigation.

   > Moreover, the petition focused on the actions of the persons elected by the Hispanic community in Area 3. However, over 90 percent of the persons signing the petition did not reside in that district. Rather, they were residents of Area 1, virtually all of whom were not Spanish-surnamed persons.

   > There is also evidence that the change will, in fact, have a retrogressive effect. Under the at-large system [in

> effect before 1995], Hispanic voters have had only mixed success, and have faced consistent efforts—sometimes successful—to recall the candidates they have elected. Since the implementation of district elections, Hispanic voters have been able to elect candidates of choice.

## GEORGIA

- City of Albany (Sept. 23, 2002), 1 *Section 5 History* 845-48; *see also* H.R. Rep. No. 109-478, at 37-38 (2006); *Continuing Need for Pre-clearance* 80.

    > According to census data, the city's black population increased from 48 percent in 1980 to 65 percent in 2000, when blacks also represented 60 percent of the voting-age population. The city's 2001 redistricting plan proposed to reduce the black population in one district, Ward 4, from nearly 51 percent to 31 percent. This proposal resembled the city's 1991 redistricting, which reduced Ward 4's black population from 40 percent to 30 percent. Noting that "one of the city's explicit redistricting criteria was to 'maintain ethnic ratios (four majority black districts),'" the Justice Department found that "implicit in that criterion is an intent to limit black political strength in the city to no more than four districts, even though Ward 4 had become majority black and demographic trends indicate that its [black majority] will continue to increase." The letter concludes:

    > > Our review of the benchmark and proposed plans, as well as alternative plans considered by the city, indicates that the reduction in the black population percentage in Ward 4 was neither inevitable nor required by any constitutional or legal imperative. Alternative redistricting approaches available to the city avoided reducing black voting strength in Ward 4 below the benchmark plan levels, while adhering substantially to the city's redistricting criteria as described in your submission. These facts indicate that the city has fallen short of demonstrating that the change in Ward 4 was not motivated by an intent to retrogress.

- Webster County (Jan. 11, 2000), 1 *Section 5 History* 830-33.

    > A redistricting plan for the county board of education proposed to reduce the black population in three of the board's five single-member districts. In one district, the total black population would fall from 66 to 57 percent (and to 46 percent of the voting-age population). In another, the total black population would decrease from 56 to 52 percent (and to 42 percent of voting-age adults). Such reductions, according to the objection letter, "raise serious doubt whether minorities would continue to have an equal

opportunity to elect candidates of choice in either district."   Regarding intent, the letter finds:

> The process of developing a new redistricting plan was initiated after the school district elected a majority black school board for the first time in 1996.   We have been advised that black school board members were told that the districts had to be reapportioned and that keeping the existing districts was not an option.   However, we have examined each of the reasons asserted by the school district for adopting a new redistricting plan and they appear to be merely pretexts for intentionally decreasing the opportunity of minority voters to participate in the electoral process.

## LOUISIANA

- Town of Delhi (Apr. 25, 2005), *available at* http://www.usdoj.gov/crt/voting/ sec_5/ltr/l_042505.htm; *see also* 2 *Evidence of Continued Need* 1612, 1654; 1 *Section 5 History* 158; *Voting Rights Act: The Judicial Evolution of the Retrogression Standard*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 16-17 n.1 (Nov. 9, 2005).

> The town's 2003 redistricting plan would reduce the black voting-age population in Ward B—one of five wards—"by 10.5 percentage points to only 37.9%."   The Justice Department found that the proposed plan "eliminates one of the four wards in which minorities . . . have the ability to exercise the franchise effectively."   Moreover, "[t]he loss of this district was not necessary" because "[t]he town rejected a less-retrogressive alternative . . . presented to it during its initial redistricting considerations."   As to intent, the Justice Department concluded that "the totality of the circumstantial evidence suggests the town intentionally sought the result we anticipate from the proposed plan."   The letter explains:

> > The city's black population has consistently and significantly increased over the past three decades, and the increase is expected to continue.   There are now four wards under the benchmark plan in which black persons are a majority of the registered voters, yet the town persists in its efforts to maintain a plan with only three such districts.
> >
> > The drop in black voting strength in Ward B was not driven by any constitutional or statistical necessity.   The town has made no claim that the reduction of the black population in this ward[] was necessary, nor has the town offered any justification for its actions, other than to say that

the plan is legal because it is within the constitutional standard for population deviation, and was adopted by a majority of the board. . . .

Moreover, the demographer hired by the town to prepare and submit its redistricting plan has told the board that the proposed plan does not best satisfy the redistricting criteria and retrogresses minority voting strength. Nevertheless, the town has twice adopted plans that are contrary to that guidance. The town has offered no legitimate reasons for adopting such plans . . . .

- City of Ville Platte (June 4, 2004), *available at* http://www.usdoj.gov/crt/voting/ sec_5/ltr/l_060404.html; *see also* 2 *Evidence of Continued Need* 1612, 1654; 1 *Section 5 History* 158; *Impact and Effectiveness* 1421.

According to census data, the city's black population "increased both consistently and considerably" over recent decades: in 1980 blacks constituted less than a third of the population, but by 2000 blacks represented 57% of the population and 48% of voting-age adults. In one of the city council's six districts, District F, a similar increase occurred, as the black population grew from 29% in 1997 to 55% in 2000. Voter registration data indicated that "black persons currently appear to constitute a majority of the voting age population" in District F, but the city's "proposed 2003 redistricting plan eliminates [District F's] black population majority by reducing it to 38.1%," a drop of "17 points." According to the Justice Department, "[u]nder such a reduction and within the context of the racially polarized elections that occur in the city, black voters will have lost the electoral ability they currently possess." The objection letter finds that "the evidence precludes a determination that the proposed plan was not adopted, at least in part, to effectuate this proscribed [retrogressive] effect." The letter "turn[s] first to the city's past redistricting efforts, particularly those in 1993 and 1995," during which "the Attorney General determined that the city failed to establish that, under an analogous set of facts, those efforts were not motivated, at least in part, by a discriminatory purpose." The letter continues:

Second, despite the existence under the benchmark plan of four districts in which black persons were a majority, the city sought a redistricting plan, "which would consist of three majority-minority districts, and three majority districts." Letter of April 2, 2004, at 1. The city has provided no evidence to rebut the conclusion that use of such a criterion under these circumstances was designed, at least in part, to retrogress minority voting strength . . . .

Third, the precipitous drop in black voting strength in District F was not driven by any constitutional or statistical necessity. The district required, at the most, only minimal adjustments. However, the city undertook wholesale changes, swapping white neighborhoods for black neighborhoods, and moving black population from District F into District B, a district which was already 78.8 percent black.

The city claims that the reduction in District F was necessary to retain the electoral ability of black voters in District B. Contrary to the city's assertion, however, a plan that retains benchmark levels of minority voting strength while following most of the city's criteria, was possible. . . . Thus, the retrogression that results from the plan was avoidable.

## MISSISSIPPI

- City of Grenada (Aug. 17, 1998), 1 *Section 5 History* 1606-12.

Reviewing three voting changes—a 1993 annexation, the cancellation of a 1996 election, and a 1997 redistricting plan—the Justice Department found "substantial direct and circumstantial evidence of discriminatory purpose." Census data indicated that the city's population had declined during the 1980s and 1990s, "with the white population decreasing significantly faster than the black population." A "special census commissioned by the City" in May 1997 revealed that blacks had become a majority, constituting 54% of the population. As for the annexation, when a consultant hired by the city in the 1980s recommended annexation of a parcel whose population was 70% black, the city "took no action and let the . . . issue lie dormant for several years"—reportedly "because [the consultant] proposed to annex this majority-black area first." In 1992 the city council again considered annexation "after a black candidate made a strong showing in a race for the Ward 4 council seat." And "this time the City's new consultant" proposed a "large, one-time annexation" that would "almost quintuple[]" Grenada's geographic area and "change[] the City from majority black . . . to majority white . . . , while leaving black voters outside the City." Black city council members voted for the annexation, but withdrew their support upon being provided with racial demographic data *after* the vote. Meanwhile, the proposed redistricting "would reduce the number of wards in which black persons constitute a majority [from four] to three," while also reducing the black proportion in one district from 77% to 63% and in Ward 4 from 56% to 35%. The Justice Department found that these reductions "appear to be significant" given the degree of racially polarized voting and the fact that in "several

128

recent elections . . . the candidate or position strongly favored by black voters lost in Ward 4 by narrow margins." Moreover, the Department concluded that these reductions "were not necessary" given the existence of an alternative plan that "was precluded . . . from even [being] plac[ed] . . . on the agenda by a vote of the four white city council members." Finally, it found that the impact of the canceled election appeared to fall "more heavily on black voters than on white voters" because "a black candidate had qualified to run against the white incumbent in Ward 4, and . . . was generally thought to have a reasonable chance of winning." As was the case in the annexation process, the Justice Department found that "the sequence of events leading to the cancellation of the 1996 election and the adoption of the redistricting plan, and the numerous procedural and substantive departures from a normal, neutral legislative process . . . establish a pattern of alternating action and inaction, indicative of a purpose to maintain and strengthen white control of a City on the verge of becoming majority black."

- City of Greenville (Nov. 17, 1995), 1 *Section 5 History* 1516-21.

  Under a preexisting plan, the city utilized a "4-2-1" system for council elections: four members represented single-member districts; two represented superdistricts "created by pairing two of the four single-member districts"; and the mayor, who votes only to break ties, was elected at large. In 1991 the city proposed a "least change" redistricting plan that made only minor alterations even though (1) the 1990 Census revealed that the black population had increased from 54% to 59% and (2) under the existing plan "black candidates of choice [had been] defeated in all contests" but two. Reviewing the submission, the Justice Department took "into account the [city's] long history of discrimination in voting," its "six years of resistance to any resolution of [a] vote dilution case," and "its subsequent refusal to consider any . . . plans for settlement" other than one "essentially identical" to the one proposed. As to intent, the Department also considered the sequence of events leading to the 1991 plan, including:

    a) the results of the 1990 elections indicated that Superdistrict 6 indeed did not provide black voters with an equal opportunity to elect a . . . candidate of choice; b) the apparent decision by white city councilmembers from the outset . . . to limit the scope of the changes that would be undertaken in redistricting; c) the refusal by the [council] to consider alternative redistricting plans advocated by members of the black community that would have alleviated the packing and fragmentation of the black population among the council districts; and d) the apparent disregard for the serious concerns expressed by members of the black community concerning the city's "least change" approach to redistricting

129

(including the fact that several white councilmembers walked out of a public meeting where such concerns were being expressed).

The Justice Department concluded that the proposed plan "served to minimize minority electoral opportunity" and that "city officials had ignored the concerns of the minority community regarding the plan's impact largely because of, not merely in spite of, the dilutive effect the plan would have." In sum, the plan "appeared to have been motivated by a desire on the part of white city councilmembers to retain white control of the city's governing body."

## NORTH CAROLINA

- Bladen County (Nov. 2, 1987), 2 *Section 5 History* 1760-63.

  The county proposed that the electoral system for the board of commissioners change from at-large elections to three double-member districts and one at-large position. Because under the previous at-large system "only one black ha[d] been elected in modern times, despite numerous black candidacies," the Justice Department concluded that the change "will not have a retrogressive effect." It was nonetheless "unable to conclude . . . that the county . . . satisfied its burden that the proposed election system [wa]s free from discriminatory intent." Following "a substantial effort by the black community," the county appointed "leading white and black citizens" to a study committee that "recommended a compromise system of five single-member districts (two of which would be majority black) and one at-large." Although it preferred to have five single-member districts, the "black community indicated that it would support such a plan." The letter continues:

  > While it became clear that some change in the election method would be mandated, it appears that the responsible public officials desired to adopt a plan which would maintain white political control to the maximum extent possible and thereby minimize the opportunity for effective political participation by black citizens. Thus, the board rejected the recommendation of its redistricting committee and representatives of the black community, and instead adopted a plan under which blacks would appear to be limited to an opportunity to elect two of the seven members of the board. The board's membership would be increased by two though we have been advised of no reason for expanding the size of the board independent of the change in method of election. In addition, after the black community opposed the local bill which would have adopted the proposed election system and

the bill was dropped from consideration, the change was then adopted pursuant to a transfer of authority which constitutes a significant deviation from the normal procedure . . . . [N]either the increase in the size of a governing body nor the empowering of a local board to adopt a new election plan is *per se* unlawful but, in the circumstances present here, it appears that the board undertook extraordinary measures to adopt an election plan which minimizes minority voting strength.

- Wilson County (Mar. 10, 1986), 2 *Section 5 History* 1730-32.

  Following a district court ruling that the county's "existing at-large election structure denies black citizens an opportunity equal to that afforded white citizens to participate in the political process," the county proposed a plan creating two multimember districts. Although the Justice Department found that the proposal "will enhance the opportunity for effective black political participation," it could not "conclude . . . that the proposed method of election was adopted without a discriminatory purpose." Under the plan, "[o]ne district would elect five members and is about 76 percent white . . . ; the other district would elect two members and is about 67 percent black." Moreover, according to the letter, "[t]he proposed five-member district is geographically large and essentially retains features of the at-large election system" previously found to violate section 2:

  > In particular, in light of the . . . court finding that there is "a substantial degree of racial polarization in Wilson County elections," black voters likely will have little, if any, chance of electing a representative of their choice in the five-member district. This is significant because nearly half of the county's black population has been placed in this district, while a relatively insignificant portion of the county's white population has been placed in the majority black district. . . . [T]he material submitted concerning the county commissioners' deliberations shows that they were well aware of these limiting aspects of the submitted plan and supports an inference that the plan was designed and intended to limit the number of commissioners black voters would be able to elect.

**SOUTH CAROLINA**

- Charleston County (Feb. 26, 2004), *available at* http://www.usdoj.gov/crt/voting/sec_5/ltr/l_022604.html; *see also* H.R. Rep. No. 109-478, at 39-40 (2006); 1 *Evidence of Continued Need* 25.

> The county enacted legislation changing the method of election for school board trustees from nonpartisan to partisan elections even though a federal court had ruled that an identical system for county council elections violated section 2. The Justice Department viewed the change as retrogressive because it "would significantly impair the present ability of minority voters to elect candidates of choice." Moreover, "it was enacted despite the existence of a nonretrogressive alternative." According to the Department, "[t]he proposed change would likely eliminate the possibility of plurality victories by requiring head-to-head contests with the winner needing a majority of votes." The letter explains:

>> [B]ecause Charleston school board elections are non-partisan, they can result in numerous candidates running, thus creating the opportunity for single-shot voting and a plurality win by minority-preferred candidates despite the at-large method of election and the prevalence of racially polarized voting. The proposed change will impose a de facto majority-vote requirement that will make it extremely difficult for minority-preferred candidates to win.

>> Another significant factor in our determination is the lack of support for the proposed change from minority-preferred elected officials. Our investigation reveals that every black member of the Charleston County delegation voted against the proposed change, some specifically citing the retrogressive nature of the change. . . . [T]he retrogressive nature of this change is not only recognized by black members of the delegation, but is recognized by other citizens in Charleston County, both elected and unelected.

>> . . . The governmental interest in implementing partisan elections can be achieved by non-retrogressive means. A switch to partisan elections would not represent a retrogression of minority voting strength if accompanied by a concomitant shift from at-large elections to a fairly drawn single-member districting plan. Indeed, such a non-retrogressive alternative was considered and adopted by the State Senate, but was not taken up by the State House.

- Town of North (Sept. 16, 2003), *available at* http://www.usdoj.gov/crt/voting/sec_5/ltr/l_091603.html; *see also* 152 CONG. REC. S7749 (daily ed. July 18, 2006) (statement of Sen. Leahy).

> The town proposed two annexations that would add white persons of voting age to its population. Following a MIR, the town "fail[ed] to respond completely" by refusing to provide information "routinely provided in submissions." Moreover, "some current and former town officials . . . declined to speak" with Justice Department officials. In the end, the Department objected because "information . . . indicate[d] that the Town of North ha[d] been racially selective in its response to both formal and informal annexation requests." The letter explains:

>> [W]hite petitioners have no difficulty in annexing their property to the town. In fact, they received help and assistance from town officials. In contrast, there is evidence suggesting that town officials provide little, if any, information or assistance to black petitioners and often fail to respond to their requests, whether formal or informal, with the result that the annexation efforts of black persons fail.

>> The town has made no effort to rebut this evidence nor has it articulated any explanation for failing to provide the same treatment to black and white persons who make formal and informal annexation requests. The town contends it has no formal record of annexation requests made by black persons. However, . . . credible evidence . . . revealed the existence of at least one petition for annexation by black persons in the past. The petition was submitted to the town in the early 1990s and included a large number of black persons seeking annexation who reside to the southeast of the town's current boundary. Further, it appears that the granting of this one petition would have resulted in black persons becoming a majority of the town's population. The town has offered no reason why this annexation petition and possibly other requests brought by minorities would be denied or ignored.

>> Nor has the town provided equal access to the annexation process for white and black persons. The evidence we have gathered suggests that the town has not disseminated information on the annexation process to black persons and has not established a procedure[] by which black applicants can learn the status of their annexation request. As it appears that annexation petitions brought by minorities have been denied while those brought by white persons have been accepted, in the absence of clearly defined procedures, race

appears to be an overriding factor in how the town responds to annexation requests.

## TEXAS

- City of Webster (Mar. 17, 1997), 2 *Section 5 History* 2489-93.

  According to the 1990 Census, the city's population was 19% Hispanic and 5% black, while the voting-age population was 17% Hispanic and 4% black. The city proposed an annexation that would add more than one thousand citizens to the population, "all of whom appear to be white," and thereby decrease the proportion of minority citizens. Regarding intent, the following facts "weigh[ed] heavily" in the Justice Department's assessment of whether the city had met its burden:

  > (1) the city failed to annex an area with a significant minority population, while it was simultaneously annexing an all-white area . . . ; (2) the city deviated from what appears to be its primary annexation consideration in deciding not to annex [the black area] (*i.e.*, that the cost of providing municipal services not be outweighed by the revenues anticipated from the annexation); (3) the city failed to achieve its purported objective of establishing an easily distinguishable boundary in the north [with annexation of the white area, whereas t]his objective would have been more fully realized . . . had [the black area] been annexed; and (4) the city in the decision-making process appears to have been apprised by representatives of the minority community of their concerns about excluding from the city the population that resides in [the black area], but . . . voted in favor of annexing only the all-white area.

  Moreover, evidence suggested "that the city's agent in determining which areas were eligible for annexation . . . refused to consider [the black area] for annexation because of the racial/ethnic background of the persons who reside [there]." As a consequence, the Justice Department concluded that "significant questions persist regarding a lack of even-handedness in the city's application of its annexation policy and the city's annexation choices appear to have been tainted, if only in part, by an invidious racial purpose."

- Marion County (Apr. 18, 1994), 2 *Section 5 History* 2427-29.

  The county proposed moving a polling place from a community center to a fire department building. According to the 1990 Census, the county's population was 31% black, while the voting-age population was 28%

black.  Four of the five county commissioners were elected from single-member districts.  Only one of these—District 3—was majority-minority, with a black population of 62%.  The polling place in question served "one of two black-majority precincts located in District 3," and its location "ha[d] divided the county along racial lines for some years."  Black voters generally supported placing the polling place in the western part of the district, and District 3's first black commissioner, elected in 1988, successfully moved the polling place from a temporary building to the community center in 1991.  But "[a]fter his defeat by a white candidate [the next year], in an election that appears to have been characterized by racially polarized voting, the proposed polling place change was initiated."  The county commission made this decision "without any meaningful input from the black community regarding the possible effects of the proposed change."  According to the letter, the community center "is located in a heavily black portion of the precinct"; the fire department building, by contrast, "is one to two miles away in a heavily white portion of the precinct."  And "[i]n a county with limited public transportation," the Justice Department found, "this proposed location would appear to make it more difficult for black voters to exercise their right to vote."  Although the county claimed that the move "was motivated by concerns of voter safety at the community center," the Department found that "there have been no incidents identified warranting this concern."  Moreover, "citizens in the county, both black and white, regularly use the community center for activities not related to voting apparently without similar safety concerns."  Finally, "other options to ensure voter safety would appear to be available."  The Department thus found that "the county's proffered explanation for the polling place change appears to be pretextual, as the change appears to be designed, in part, to thwart recent black political participation."

## VIRGINIA

- Pittsylvania County (Apr. 29, 2002), 2 *Section 5 History* 2588-91.

  After the 2000 Census, which showed that the county's population was 24% black, officials proposed a redistricting plan for the board of supervisors and the school board.  Under the existing plan, the county had one majority-minority district in which blacks constituted 51% of the population and 50% of voting-age residents.  According to the Justice Department, "[s]ince 1991 black voters have had the ability to elect their candidate of choice in this district."  The county's proposed plan, however, would reduce the district's black population below a majority.  Although the proposed reduction is "relatively small," the Justice Department determined that "a variety of factors preclude the county from establishing . . . that the adoption of this plan is free from either discriminatory effect or purpose."  The Department found the change to be

135

retrogressive because "analysis of county elections shows that the level of racial polarization is extreme, such that any reduction whatsoever would call into question the continued ability of black voters to elect their candidate of choice."   Moreover, the Department emphasized "the availability of easily constructed alternative plans that not only are non-retrogressive and meet other traditionally recognized redistricting principles, but are ameliorative, in that they increase the voting strength of minority voters" in the district.   Regarding intent, "[s]everal factors establish that the county falls short of demonstrating the lack of retrogressive purpose."   And "[c]hief among these," the letter explains, are the following:

> (1) it appears that the Board procedurally blocked formal consideration of alternative, ameliorative plans supported by at least one council member and members of the black community; (2) the county was aware of easily drafted, non-retrogressive and ameliorative alternatives, most of which were in fact similar to the county's own preferred plan; and (3) the apparently pretextual nature of the reasons given by the county for its decision to adopt the plan rather than a non-retrogressive alternative.

- Dinwiddie County (Oct. 27, 1999), 2 *Section 5 History* 2579-83; *see also* 1 *Evidence of Continued Need* 65.

> The county proposed moving a polling place in its Darvills Precinct, a "heavily rural [area], containing no incorporated towns or public schools." Until 1998 the polling place was a community center "located on the western edge of the precinct" and "not commonly utilized by black persons."   After fire destroyed the center, the county electoral board moved the polling place to "a privately owned hunting club with a predominantly black membership."   Seven months after the 1998 election, however, the county board received a petition with 105 signatures requesting that the polling place be moved to a church three miles southeast of the hunting club.   The "overwhelming number of signatures" came from white residents of two communities on the eastern side of the district.   Moreover, the Justice Department found that 23 signatures came from residents not registered to vote in the precinct, and only 18 signatures were of persons who had voted at the hunting club.   Just before a hearing on the petition, the church withdrew its offer to serve as a polling place. The county board then "authorized the placement of an advertisement for a public hearing on changing the Darvills polling place 'if a suitable centrally located location can be found prior to July 15, 1999.'"   Three days before the deadline, a different church—located "at the extreme eastern end" of the precinct with "an overwhelmingly white congregation"—offered its building.   The county board approved the

change and submitted it for preclearance. The Justice Department determined that because "the black population is heavily concentrated in the western part of the precinct, it appears that the proposed polling place change will impose a significantly greater hardship on minority voters than white voters." As to intent, the letter finds that the county failed to carry its burden, explaining:

> The sequence of events leading up to the decision to change the polling place to [the church] tends to show a discriminatory purpose. The decision was made after the Darvills polling place was changed to a location operated by black persons, and after submission of a petition seeking a change that was signed almost exclusively by white citizens. Moreover, the [church's] congregation is almost exclusively white. Procedural and substantive departures from the normal practice also tend to show a discriminatory purpose. The board of supervisors discounted the recommendation of the electoral board to retain the [hunting club] and, substantively, the desire for a central location, articulated by both the county and the petitioners as the preeminent criterion, was immediately abandoned when the [church] site became available.